**EXHIBIT D**

## Affidavit of Joel P. Wiesen, Ph.D

I, Joel P. Wiesen, do hereby affirm and state as follows:

1. The Topic of This Affidavit
   I was asked by counsel for the Plaintiffs to explain the need for certain data as described in the Proposed Order on Document Discovery.

2. Documents Reviewed
   Prior to preparing this affidavit I reviewed the following documents provided to me by counsel:
   a. Plaintiffs' Motion to Amend Complaint, Rule 26 Discovery, and Proposed Orders on Document Discovery and Depositions (dated 1/15/2008)
   b. Third Amended Complaint: Injunctive and Declaratory Relief Requested (dated 1/15/2008)
   c. Rule 26 Disclosure (dated 1/15/2008)
   d. Proposed Order on Document Discovery (undated)
   e. The State Defendants' Opposition to Plaintiffs' Proposed Discovery Orders (dated 1/29/2008)
   f. Affidavit of Sally McNeely (dated 1/29/2008)

3. My Education and Experience
   I was awarded a Ph.D. in Psychology from Lehigh University in 1975. My major field of doctoral study was psychology and my minor field of study was psychometrics. Since 1975, I have worked in that area of psychology known as industrial psychology, particularly in the development of fair, valid personnel assessment methods and instruments for the assessment, selection and promotion of employees. I have taught college courses in industrial psychology, experimental methods, and statistics at the undergraduate and graduate levels. For over 15 years I worked for the Department of Personnel Administration, later called the Human Resources Division, of the Commonwealth of Massachusetts. I was hired to lead the effort to validate all civil service examinations and, for some of my tenure, I was in charge of all test development and validation for civil service jobs in the Commonwealth. Also, while employed there, I was charged with developing two job performance evaluation systems: one for all state managers (covering about 3,000 employees) and the other for all non-managerial state employees (covering perhaps 50,000 employees). Since I left the employ of the Commonwealth of Massachusetts, my professional work has consisted mainly of consulting to large organizations on personnel assessment and selection matters, and developing new written tests for government, business/industry and education. In the course of my professional career I have conducted several thousand adverse impact analyses in employment settings: hiring, promotion, and layoff. I have served as President of the International Personnel Management Association Assessment Council (IPMAAC), an organization of over 500 testing professionals, and as President of the New England Society for Applied Psychology (NESAP), a Boston-area association of applied psychologists. From 1989 to 2007 I served on the Program Committee for at least nine annual conferences of the Society for Industrial and Organizational Psychology, a national, professional group of several thousand members. I have served as an expert for both plaintiffs and defense in employment discrimination cases, including race, age, and sex discrimination cases, a few of which have gone to trial. I have served as an expert consultant on testing matters for the

Page 1

Massachusetts Attorney General's Office, the Connecticut Department of Administrative Services, the Connecticut Attorney General's Office, and the US Department of Justice, as well as several large private sector organizations. I have lectured and published in the areas of personnel assessment, employment discrimination, and civil service examining. I have made presentations before professional groups, including several invited addresses. I am licensed as a psychologist in Massachusetts and Pennsylvania. A copy of my resume is attached to this report. (See Attachment.)

4. The Need to Conduct an Adverse Impact Analysis
Whenever many people compete for relatively few jobs, some will be hired and others not. Adverse impact (also known as disparate impact) of a selection procedure is typically evaluated or considered early in impact discrimination legal challenges. Evaluating adverse impact is typically done based on statistical analyses designed to answer this question: Is there statistically reliable indication that black (or similarly protected) applicants were adversely affected by the screening and selection criteria related to the selection process in question.

Adverse impact is defined in the federal *Uniform Guidelines on Employee Selection Procedures* (*UGESP*, 1978), in Section 3.4, paragraph D, which begins as follows:
> Adverse impact and the "four-fifths rule." A selection rate for any race, sex, or ethnic group which is less than four-fifths (4/5) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact. Smaller differences in selection rate may nevertheless constitute adverse impact, where they are significant in both statistical and practical terms or where a user's actions have discouraged applicants disproportionately on grounds of race, sex, or ethnic group.

The requirements of the *UGESP* were clarified in *Questions and Answers on the UGESP* printed in the Federal Register March 2, 1999. Question 13 clarifies the difference between the adverse impact of the overall selection procedure and its components, as follows:
> 13. Q. Is adverse impact determined on the basis of the overall selection process or for the components in that process?
> A. Adverse impact is determined first for the overall selection process for each job. If the overall selection process has an adverse impact, the adverse impact of the individual selection procedures should be analyzed. For any selection procedures in the process having an adverse impact which the user continues to use in the same manner, the user is expected to have evidence of validity satisfying the Guidelines.

5. Data Needed to Conduct an Adverse Impact Analysis
To evaluate the adverse impact of the Massachusetts civil service examination for Police Sergeant, I would need at least the following two types data.
   a. The number of applicants and the number appointed as Sergeant, with racial/ethnic identification
      To determine these numbers would involve reviewing relevant listings of persons who applied and of persons who were appointed as Sergeant. These data would be used to evaluate the overall adverse impact of the examination.

Page 2

    b. The scores of all applicants, including those appointed and not appointed as Sergeant, on each component of the civil service examination for Sergeant
These data would be used to evaluate the adverse impact of each component of the examination for Sergeant.

6. Why Data is Needed From Many Years
There are two reasons why it is imperative to have data from many administrations of the examination for Sergeant: (a) large numbers of applicants and appointees are needed for meaningful and powerful statistical adverse impact analyses, and (b) large numbers of minority takers are needed for meaningful and powerful statistical adverse impact analyses. Further, for meaningful adverse impact analyses, larger numbers of applicants are needed when the proportion of appointments is low. Since there are several factors that jointly determine the power of a statistical analysis, without seeing the data it is hard to say definitively what number of applicants would allow for statistically meaningful adverse impact analyses, however, it is highly desirable to have data for at least several hundred minority applicants.

Although many police departments typically take part in the Massachusetts Police Sergeant examination each time it is offered, the number of people appointed based on one administration of the examination is likely to be too small to conduct meaningful statistical adverse impact analyses. The typical way to address this problem is to combine data across examination administrations. Thist type of combination of data seems to make sense in this case since the examinations for Sergeant were basically similar from year to year.

Further support for combining data across years may be found in another of the questions in *Questions and Answers on the UGESP*:

    85. Q. What are the record keeping obligations of a user who cannot determine whether a selection process for a job has adverse impact because it makes an insufficient number of selections for that job in a year?
        A. In such circumstances the user should collect, maintain, and have available information on the impact of the selection process and the component procedures until it can determine that adverse impact does not exist for the overall process or until the job has changed substantially.

7. Conclusion
In order to be able to conduct meaningful statistical adverse impact analyses, it is necessary to have large numbers of applicants and appointees and large numbers of minority applicants, especially when the proportion of appointments to Sergeant is low. Due to the way statistical analyses work, without such large numbers the adverse impact analyses will not show statistical significance even if there is underlying inequity in the test. Only by combining data across years can a powerful and meaningful adverse impact analysis be done.

Signed under the pains and penalties of perjury.

Signature: _____  Date: February 12, 2008
Joel P. Wiesen, Ph.D.

## Attachment: Resume of Joel P. Wiesen, Ph.D.

27 Judith Road  (617) 244-8859 (work)
Newton, Massachusetts 02459-1715  (617) 332-6984 (home)

| | |
|---|---|
| Education | Ph.D. in Psychology, Lehigh University, 1975<br>M.A. in Psychology, C. W. Post College, 1969<br>B.A. in Psychology, Stony Brook State University, 1967 |
| Employment History | Consultant in Industrial Psychology, 1977 - present<br>Consult to public and private organizations, primarily in the areas of personnel assessment, selection, and layoff; develop tests of knowledge, ability, aptitude, and work-style; conduct applied research concerning employment in organizational settings. (Full-time since 1/94.)<br><br>Director of Test Development and Validation, 1977 - 1993<br>Massachusetts Department of Personnel Administration<br>Develop, implement and evaluate employee selection, promotion, and performance evaluation tools and programs; conduct applied research concerning civil service employment. (Part-time position 1987 to 1993.) |
| Professional Accomplishments | Plan, develop and implement programs in support of excellence and fairness in human resource management: develop culturally fair personnel assessment, selection and promotion tests and systems; conduct validation research and statistical analyses; develop diagnostic math tests for use in school settings; conduct program evaluation and redesign; expert witness in employment discrimination and sobriety testing cases; develop employee performance evaluation programs; and publish/deliver reports, papers. |
| Teaching Experience | Northeastern University, School of Engineering,<br>Engineering Management Program<br>Lecturer, 1978 - 1994<br><br>Lesley College, School of Management<br>Adjunct Faculty, 1989 - 1994<br><br>Kings College, Psychology Department<br>Asst. Prof. and Acting Department Chair, 1969 - 1975 |
| Professional Associations | International Public Management Association for Human Resources Assessment Council, American Psychological Association, Association for Psychological Science, New England Society for Applied Psychology, Society of Industrial and Organizational Psychology, American Statistical Association. |
| Professional Honors | Past-President of IPMA-Assessment Council, Past-President of the New England Society of Applied Psychologists. |
| Licensure | Licensed as psychologist in two states (Massachusetts and Pennsylvania). |