# EXHIBIT D

**Expert Report on Adverse Impact, Validity and Fairness of Four Promotional Examinations for Police Sergeant Administered Pursuant to MGL Chapter 31**

Joel P. Wiesen, Ph.D.
October 3, 2008

### Table of Contents

Section One: Overview .................................................. Page 1

1. The Topics of This Report ............................................ Page 1

2. Summary of My Opinions ............................................. Page 1
   A. The Sergeant Exams Show Adverse Impact on Minority Applicants ........ Page 1
   B. The Sergeant Exams Do Not Meet Professional Standards for Validation .... Page 1
   C. Alternative, Valid Examining Methods with Less Adverse Impact Not Used .. Page 2

3. Documents and Computer Files Reviewed ............................... Page 2
   A. Written Materials ................................................. Page 2
   B. Computer Files ................................................... Page 2

4. My Professional Background and Some Related Information ................... Page 3
   A. Education, Professional Experience and Qualifications .................. Page 3
   B. Publications and Papers ........................................... Page 4
   C. Compensation .................................................... Page 4
   D. Court Appearances and Depositions ................................. Page 4

Section Two: Evaluation of Adverse Impact ................................. Page 5

1. Definition of Adverse Impact .......................................... Page 5

2. Understanding the Statistics of Adverse Impact Analyses ...................... Page 5
   A. Using Statistics to Understand Variability in Data ...................... Page 6
   B. The Law of Large Numbers ......................................... Page 6
   C. A Coin Tossing Example: In Theory ................................. Page 6
   D. A Coin Tossing Example: In Practice ................................ Page 6
   E. Why Not Just Look at the Percent or Number of Heads? .................. Page 6
   F. The Components of a Report of a Chi Square Test ...................... Page 7
   G. Other Statistical Tests .............................................. Page 7
   H. What is Statistical Significance? ..................................... Page 8
   I. What is the Difference Between a One and Two Tailed Test? ............. Page 8

3. An Overview of the Hiring Process for Sergeants ............................ Page 8

i

4.  Overview of the Adverse Impact Analyses Reported Below ................... Page 9

5.  Overall Adverse Impact in Hiring For All Sergeant Exams, 2003-2007 .......... Page 10
    A.  Number of Promotions: All Exams 2003-2007 ....................... Page 10
    B.  Adverse Impact Ratio for Promotions by Ethnic Group: 2003-2007 ....... Page 11
    C.  Probability and Statistical Significance of Promotions: Exams 2003-2007 ... Page 12
    D.  Practical Import of Promotions: Exams 2003-2007 ................... Page 13
    E.  Opinion on Promotions: Exams 2003-2007 ......................... Page 13

6.  Overall Adverse Impact in Hiring For All Statewide Sergeant Exams, 2003-2007 ... Page 13
    A.  Number of Promotions: Statewide Exams 2003-2007 .................. Page 13
    B.  Adverse Impact Ratio for Promotions by Ethnic Group: 2003-2007 ....... Page 14
    C.  Probability and Statistical Significance of Promotions: Exams 2003-2007 ... Page 14
    D.  Practical Import of Promotions: Statewide Exams 2003-2007 .......... Page 14
    E.  Opinion on Promotions: Statewide Exams 2003-2007 ................. Page 15

7.  Adverse Impact in Hiring For Statewide Sergeant Exams, 2003-2006 .......... Page 15
    A.  Number of Promotions: Statewide Exams 2003-2006 .................. Page 15
    B.  Adverse Impact Ratio for Promotions by Ethnic Group: 2003-2006 ....... Page 15
    C.  Probability and Statistical Significance of Promotions: Exams 2003-2006 ... Page 16
    D.  Practical Import of Promotions: Statewide Exams 2003-2006 .......... Page 16
    E.  Opinion on Promotions: Statewide Exams 2003-2006 ................. Page 16

8.  Adverse Impact in Hiring For Statewide Sergeant Exams, 2005-2007 .......... Page 16
    A.  Number of Promotions: Statewide Exams 2005-2007 .................. Page 16
    B.  Adverse Impact Ratio for Promotions by Ethnic Group: 2005-2007 ....... Page 17
    C.  Probability and Statistical Significance of Promotions: Exams 2005-2007 ... Page 17
    D.  Practical Import of Promotions: Statewide Exams 2005-2007 .......... Page 17
    E.  Opinion on Promotions: Statewide Exams 2005-2007 ................. Page 17

9.  Adverse Impact in Hiring For Statewide Sergeant Exams, 2005-2006 .......... Page 18
    A.  Number of Promotions: Statewide Exams 2005 and 2006 ............... Page 18
    B.  Adverse Impact Ratio for Promotions by Ethnic Group: 2005-2006 ....... Page 18
    C.  Probability and Statistical Significance of Promotions: Exams 2005-2006 ... Page 19
    D.  Practical Import of Promotions: Statewide Exams 2005-2006 .......... Page 19
    E.  Opinion on Promotions: Statewide Exams 2005-2006 ................. Page 19

10. Adverse Impact in Hiring For BPD, 2005 .............................. Page 19
    A.  Number of Promotions: BPD, 2005 ............................... Page 19
    B.  Adverse Impact Ratio for Promotions by Ethnic Group: BPD, 2005 ....... Page 20
    C.  Probability and Statistical Significance of Promotions: BPD, 2005 ......... Page 20
    D.  Practical Import of Promotions: BPD, 2005 ........................ Page 20
    E.  Opinion on Promotions: BPD, 2005 ............................... Page 20

11. Adverse Impact in Hiring For 2003 Statewide Exam . . . . . . . . . . . . . . . . . . . . . . . . . Page 21
    A. Number of Promotions: 2003 Statewide Exam . . . . . . . . . . . . . . . . . . . . . . . . Page 21
    B. Adverse Impact Ratio for Promotions by Ethnic Group: 2003 Statewide Exam Page 21
    C. Probability and Statistical Significance of Promotions: 2003 Statewide Exam  Page 22
    D. Practical Import of Promotions: 2003 Statewide Exam . . . . . . . . . . . . . . . . . Page 22
    E. Opinion on Promotions: 2003 Statewide Exam . . . . . . . . . . . . . . . . . . . . . . . . Page 22

12. Adverse Impact in Hiring For 2004 Statewide Exam . . . . . . . . . . . . . . . . . . . . . . . . . Page 22
    A. Number of Promotions: 2004 Statewide Exam . . . . . . . . . . . . . . . . . . . . . . . . Page 22
    B. Adverse Impact Ratio for Promotions by Ethnic Group: 2004 Statewide Exam Page 23
    C. Probability and Statistical Significance of Promotions: 2004 Statewide Exam  Page 23
    D. Practical Import of Promotions: 2004 Statewide Exam . . . . . . . . . . . . . . . . . Page 24
    E. Opinion on Promotions: 2004 Statewide Exam . . . . . . . . . . . . . . . . . . . . . . . . Page 24

13. Adverse Impact in Hiring For 2005 Statewide Exam . . . . . . . . . . . . . . . . . . . . . . . . . Page 24
    A. Number of Promotions: 2005 Statewide Exam . . . . . . . . . . . . . . . . . . . . . . . . Page 24
    B. Adverse Impact Ratio for Promotions by Ethnic Group: 2005 Statewide Exam Page 25
    C. Probability and Statistical Significance of Promotions: 2005 Statewide Exam  Page 25
    D. Practical Import of Promotions: 2005 Statewide Exam . . . . . . . . . . . . . . . . . Page 25
    E. Opinion on Promotions: 2005 Statewide Exam . . . . . . . . . . . . . . . . . . . . . . . . Page 25

14. Adverse Impact in Hiring For 2006 Statewide Exam . . . . . . . . . . . . . . . . . . . . . . . . . Page 26
    A. Number of Promotions: 2006 Statewide Exam . . . . . . . . . . . . . . . . . . . . . . . . Page 26
    B. Adverse Impact Ratio for Promotions by Ethnic Group: 2006 Statewide Exam Page 26
    C. Probability and Statistical Significance of Promotions: 2006 Statewide Exam  Page 27
    D. Practical Import of Promotions: 2006 Statewide Exam . . . . . . . . . . . . . . . . . Page 27
    E. Opinion on Promotions: 2006 Statewide Exam . . . . . . . . . . . . . . . . . . . . . . . . Page 27

15. Summary of Adverse Impact Analysis In Hiring . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 27

16. Overall P/F Impact of the Written Test For All Sergeant Exams, 2003-2007 . . . . . . . Page 27
    A. Passing and Failing: All Exams 2003-2007 . . . . . . . . . . . . . . . . . . . . . . . . . . Page 28
    B. Adverse Impact Ratio for Passing by Ethnic Group: 2003-2007 . . . . . . . . . . Page 28
    C. Probability and Statistical Significance For passing: Exams 2003-2007 . . . . . Page 28
    D. Practical Import For passing: Exams 2003-2007 . . . . . . . . . . . . . . . . . . . . . . Page 29
    E. Opinion on Passing: Exams 2003-2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 29

17. Overall P/F Impact of the Written Test For All Statewide Sergeant Exams, 2003-2007
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 29
    A. Passing and Failing: Statewide Exams 2003-2007 . . . . . . . . . . . . . . . . . . . . . Page 29
    B. Adverse Impact Ratio for P/F by Ethnic Group: 2003-2007 . . . . . . . . . . . . . Page 30
    C. Probability and Statistical Significance For passing: Exams 2003-2007 . . . . . Page 30
    D. Practical Import For passing: Statewide Exams 2003-2007 . . . . . . . . . . . . . . Page 30

iii

        E.  Opinion on Passing: Statewide Exams 2003-2007 ...................... Page 31

18. P/F Impact of the Written Test For Statewide Sergeant Exams, 2003-2006 ....... Page 31
        A.  Passing and Failing: Statewide Exams 2003-2006 ...................... Page 31
        B.  Adverse Impact Ratio for P/F by Ethnic Group: 2003-2006 .............. Page 31
        C.  Probability and Statistical Significance For passing: Exams 2003-2006 ..... Page 32
        D.  Practical Import For passing: Statewide Exams 2003-2006 .............. Page 32
        E.  Opinion on Passing: Statewide Exams 2003-2006 ...................... Page 32

19. P/F Impact of the Written Test  For Statewide Sergeant Exams, 2005-2007 ....... Page 32
        A.  Passing and Failing: Statewide Exams 2005-2007 ...................... Page 32
        B.  Adverse Impact Ratio for P/F by Ethnic Group: 2005-2007 .............. Page 33
        C.  Probability and Statistical Significance For passing: Exams 2005-2007 ..... Page 33
        D.  Practical Import For passing: Statewide Exams 2005-2007 .............. Page 33
        E.  Opinion on Passing: Statewide Exams 2005-2007 ...................... Page 33

20. P/F Impact of the Written Test For Statewide Sergeant Exams, 2005-2006 ........ Page 34
        A.  Passing and Failing: Statewide Exams 2005 and 2006 ................... Page 34
        B.  Adverse Impact Ratio for P/F by Ethnic Group: 2005-2006 .............. Page 34
        C.  Probability and Statistical Significance For passing: Exams 2005-2006 ..... Page 35
        D.  Practical Import For passing: Statewide Exams 2005-2006 .............. Page 35
        E.  Opinion on Passing: Statewide Exams 2005-2006 ...................... Page 35

21. P/F Impact of the Written Test For BPD, 2005 ............................... Page 35
        A.  Passing and Failing: BPD, 2005 ................................... Page 35
        B.  Adverse Impact Ratio for P/F by Ethnic Group: BPD, 2005 ............. Page 36
        C.  Probability and Statistical Significance For passing: BPD, 2005 ........... Page 36
        D.  Practical Import For passing: BPD, 2005 ............................ Page 36
        E.  Opinion on Passing: BPD, 2005 ................................... Page 37

22. P/F Impact of the Written Test For 2003 Statewide Exam ..................... Page 37
        A.  Passing and Failing: 2003 Statewide Exam .......................... Page 37
        B.  Adverse Impact Ratio for P/F by Ethnic Group: 2003 Statewide Exam ..... Page 37
        C.  Probability and Statistical Significance For passing: 2003 Statewide Exam .. Page 38
        D.  Practical Import For passing: 2003 Statewide Exam .................... Page 38
        E.  Opinion on Passing: 2003 Statewide Exam .......................... Page 38

23. P/F Impact of the Written Test For 2004 Statewide Exam ..................... Page 38
        A.  Passing and Failing: 2004 Statewide Exam .......................... Page 38
        B.  Adverse Impact Ratio for P/F by Ethnic Group: 2004 Statewide Exam ..... Page 39
        C.  Probability and Statistical Significance For passing: 2004 Statewide Exam .. Page 39
        D.  Practical Import For passing: 2004 Statewide Exam .................... Page 39
        E.  Opinion on Passing: 2004 Statewide Exam .......................... Page 39

24. P/F Impact of the Written Test For 2005 Statewide Exam ..................... Page 40
    A. Passing and Failing: 2005 Statewide Exam .......................... Page 40
    B. Adverse Impact Ratio for P/F by Ethnic Group: 2005 Statewide Exam ..... Page 40
    C. Probability and Statistical Significance For passing: 2005 Statewide Exam .. Page 41
    D. Practical Import For passing: 2005 Statewide Exam ..................... Page 41
    E. Opinion on Passing: 2005 Statewide Exam .......................... Page 41

25. P/F Impact of the Written Test For 2006 Statewide Exam ..................... Page 41
    A. Passing and Failing: 2006 Statewide Exam .......................... Page 41
    B. Adverse Impact Ratio for P/F by Ethnic Group: 2006 Statewide Exam ..... Page 42
    C. Probability and Statistical Significance For passing: 2006 Statewide Exam .. Page 42
    D. Practical Import For passing: 2006 Statewide Exam ..................... Page 42
    E. Opinion on Passing: 2006 Statewide Exam .......................... Page 42

26. Summary of Adverse Impact Analysis In Passing the Written Test .............. Page 43

27. Other Adverse Impact Statistical Analyses ................................ Page 43

Section Three: Evaluation of Test Validity .................................... Page 43

1. Standards for Evaluating the Validity and Fairness of a Test ................... Page 43
    A. Government and Professional Testing Guidelines, Standards, and Principles
    ...................................................... Page 44
    B. Accepted Approaches to Validating a Test .......................... Page 45
    C. Content Validation ............................................. Page 46

2. HRD Did Not Provide A Professionally Acceptable Content Validation Study ..... Page 46
    A. 1991 Validation Report is a Brief Summary, Devoid of Substantive Details .. Page 46
    B. Job Analysis on Which the 1991 Report Apparently Relies is Undocumented
    ...................................................... Page 47
    C. Other Documents Produced are Similarly Inadequate .................. Page 47

3. HRD Set Passing Points Arbitrarily ...................................... Page 48
    A. Passing Score for Boston Sergeant Exam Set Arbitrarily ................ Page 48
    B. Assistant Director Said 70% is Traditional
    ...................................................... Page 48
    C. HRD Did Not Follow Its Own Procedure for Setting Passing Points
    ...................................................... Page 48
    D. SMEs Asked to Rate Item Difficulty, Ignoring Competence .............. Page 49
    E. Passing Rates Vary from Exam to Exam ............................. Page 49
    F. HRD Says Disparate Scores Reflect Equal Ability ..................... Page 49

4. HRD Exams Omit Many Important Abilities ............................... Page 49
    A. HRD Testimony: No Attempt to Measure Reasoning ................... Page 50

     B.  1991 Validation Report Acknowledges Important KSAPs Unmeasured  . . . . .  Page 50
     C.  2006 Boston Exam: HRD Ignored Half the Important KSAPs  . . . . . . . . . . . .  Page 50

5.  Minimal HRD Guidance Given to Examiner Who Wrote Test Questions . . . . . . . . .  Page 50
     A.  No Definitions of Test Areas  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Page 50
     B.  No HRD Internal Guidelines on Writing Test Questions  . . . . . . . . . . . . . . . .  Page 51
     C.  No Formal Training In Writing Test Questions  . . . . . . . . . . . . . . . . . . . . . . . .  Page 51
     D.  No Assistance From Experts in Cultural Bias or Readability  . . . . . . . . . . . .  Page 51
     E.  Immediate Supervisor Lacked Relevant Training  . . . . . . . . . . . . . . . . . . . . . .  Page 51
     F.  No Consultation with Industrial/Organizational Psychologists  . . . . . . . . . . . .  Page 51

6.  Exam Questions Test Recognition of Textbook Phraseology  . . . . . . . . . . . . . . . . . .  Page 51

7.  Other Indications of Poor Quality Test Development  . . . . . . . . . . . . . . . . . . . . . . . .  Page 52
     A.  Large Number of Changes to the 2007 Answer Key  . . . . . . . . . . . . . . . . . . . .  Page 52
     B.  Unnecessarily Difficult/Academic Words in the Test Questions . . . . . . . . . . .  Page 52
     C.  Closed Book Questions On Material That Could Be Looked-Up  . . . . . . . . . .  Page 53
     D.  Poorly Worded Questions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Page 53
     E.  Grammatical Errors in Exam Questions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Page 53
     F.  Questions Not Appropriate for Sergeant  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Page 54

8.  Improvements In 2007 Exam Point to Deficiencies in 2005-2006 Exams  . . . . . . . .  Page 54
     A.  There are No "Exception" Questions on 2007 Exam  . . . . . . . . . . . . . . . . . . . .  Page 54
     B.  2007 Questions are Shorter  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Page 54

Section Four: Fairness and Alternative Selection Procedures and Approaches . . . . . . . .  Page 54

1.  Examples of Alternative Selection Procedures  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Page 54
     A.  Alternatives are Practical . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Page 55

2.  Examples of Alternative Use of Test Scores  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Page 55

3.  Alternative Selection Procedure Envisioned by the State Legislature . . . . . . . . . . . .  Page 55

4.  No Efforts to Reduce Adverse Impact Prior to 2007 Exam  . . . . . . . . . . . . . . . . . . .  Page 55
     A.  HRD Did Not Follow Its Own Cultural Bias Review Process  . . . . . . . . . . . . .  Page 55

Section Five: Summary of My Opinions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Page 55

Attachment A: Resume of Joel P. Wiesen, Ph.D.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Page 57

Attachment B: List of Papers and Publications  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Page 58

Attachment C: Confidential Test Material . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Page 61

**Expert Report on Adverse Impact, Validity and Fairness of Four Promotional
Examinations for Police Sergeant Administered Pursuant to MGL Chapter 31**

Joel P. Wiesen, Ph.D.
October 3, 2008

My name is Joel Wiesen. I have been retained as an expert by plaintiffs in *Lopez, et al. v
City of Lawrence, et al.* This report was prepared at the request of counsel.

**Section One: Overview**
**1. The Topics of This Report**
This report concerns evaluations I conducted of promotional examinations (hereafter exams)
for Police Sergeant administered by the Massachusetts Human Resources Division (HRD),
and the subsequent promotions of Sergeants based on these exams. This report addresses
several discrete topics: (1) the adverse impact seen with these exams, (2) the validity and
fairness of these exams, and (3) possible alternative examination approaches that would
have been expected to have equal or greater validity and less adverse impact.

**2. Summary of My Opinions**
A brief summary of my opinions is provided here concerning my review of written material
and related data I received from counsel. I reserve the right to amend this report when I
receive additional information that I have requested based on the review below.[1] I note that
my ability to review the actual tests has been hampered by my being precluded from putting
them into electronic form.

**A. The Sergeant Exams Show Adverse Impact on Minority Applicants**
The Sergeant examinations themselves and the subsequent hiring based on these exams
show a clear pattern of adverse impact on minority (black and Hispanic) applicants in
hiring, passing, average test score, and ranking, as compared with non-minority applicants
(all other applicants). (Here and below I use the terms hiring and promotion
synonymously as the exams being challenged are promotional exams.) The generally
lower exam scores of minority applicants causes minority applicants who do pass to be
delayed in certification and thus in hiring.

**B. The Sergeant Exams Do Not Meet Professional Standards for Validation**
The HRD's test development process for the Sergeant exams being challenged is seriously

---

[1] I have requested raw test data from test-takers who were Sergeants at the time of the
testing and who, in-effect, took the written tests for Sergeant. They did this as applicants for the
position of Lieutenant because the statewide written tests for Lieutenant included all the
questions that appeared on statewide written tests for Sergeant. These data would allow me to do
a further evaluation of the validity or reasonableness of the passing point used for the written
statewide tests for Sergeant, in a fashion similar to that described in the 1991 HRD Test
Validation Report (Bates 00381).

Page 1

flawed in crucial ways, resulting in exams of unknown validity that contain questions that are unfair to all test takers and to minority test takers in particular. In short, the HRD and its employees have presented no sound, professionally acceptable documentation or data in support of the validity of the four exams being challenged: the job analysis efforts are undocumented in crucial respects and are seriously flawed, the exams do not cover some of the most important job-related abilities and do tap some abilities unimportant to job performance, the areas that are untested include some that typically have relatively less adverse impact and the areas tested are those that typically have greater adverse impact, the exams include test questions not fair to the applicants and especially to minority applicants, and there was no attempt to set a passing score that reflects competence to do the job. I conclude that these exams have not been shown to be valid for the purposes for which HRD has used them.

## C. Alternative, Valid Examining Methods with Less Adverse Impact Not Used

The examination approach used by HRD is dated. Across the nation, large and small jurisdictions are holding examinations for promotion to Police Sergeant that include practical exercises, structured oral boards, and the like, which tend to have less adverse impact on minority applicants and add to the validity of the examinations. The Civil Service law (MGL Ch 31) provides legislative authority for HRD to use examination components such as oral boards and past job performance (Ch 31, Sec 6A, B and C), but these were not used in the exams being challenged. HRD has been using the examination model that maximizes adverse impact on minority applicants.

## 3. Documents and Computer Files Reviewed

In preparing this report I reviewed all the documents produced by the Defendant, over 2,000 pages of documents, in addition to computerized data files provided to me by counsel. Some of these materials were specifically requested by me, as I saw a need for them to allow me to evaluate more fully the impact and validity of the exams in question. In addition, I reviewed some material on the HRD and the Massachusetts state government website (e.g., examination announcements, MGL Chapter 31).

### A. Written Materials

I cite specific documents in this report, by Bates stamp number, as I rely on them.

### B. Computer Files

One Excel file created 8/27/2008 contains data for the 2005, 2006, and 2007 Sergeant exams being challenged, including written test scores, overall exam grades, and dates of promotion for each person who took the exams. The name of that file is "2005 2006 2007 Sergeant Exam Data Aug 27 2008.xls." I used this file in doing the adverse impact analyses reported below.

One Excel file contains similar data for the 2003 statewide exam for Sergeant and that file is named "Sgt03^examdata^20080604.xls." Another Excel file contains similar data for the 2004 statewide exam for Sergeant and that file is named

Page 2

"Sgt04^examdata^20080604.xls." I used these files in doing the adverse impact analyses reported below.

## 4. My Professional Background and Some Related Information

This section summarizes my professional background in general and as it relates to this legal proceeding specifically.

### A. Education, Professional Experience and Qualifications

I was awarded a Ph.D. in Psychology from Lehigh University in 1975. My major field of doctoral study was psychology, and my minor field of study was psychometrics. Since 1975, I have worked in that area of psychology known as industrial psychology, particularly in the development of fair, valid personnel assessment methods and instruments for the assessment, selection and promotion of employees. I have taught college courses in industrial psychology, experimental methods, and statistics at the undergraduate and graduate levels. For over 15 years I worked for the Department of Personnel Administration, later called the Human Resources Division, of the Commonwealth of Massachusetts. I was hired to lead the effort to validate all civil service examinations, and, for some of my tenure, I was in charge of all test development and validation for civil service jobs in the Commonwealth. Also, while employed there, I was charged with developing two job performance evaluation systems: one for all state managers (covering about 3,000 employees) and the other for all non-managerial state employees (covering perhaps 50,000 employees). Since I left the employ of the Commonwealth of Massachusetts, my professional work has consisted mainly of consulting to large organizations on personnel assessment and selection matters, and developing new written tests for government, business/industry and education. In the course of my professional career I have conducted several thousand adverse impact analyses in employment settings: hiring, promotion, and layoff. I have served as President of the International Personnel Management Association Assessment Council (IPMAAC), an organization of over 500 testing professionals, and as President of the New England Society for Applied Psychology (NESAP), a Boston-area association of applied psychologists. From 1989 to 2006 I served on the Program Committee for at least eight annual conferences of the Society for Industrial and Organizational Psychology, a national, professional group of several thousand members. An organization I founded, own and operate, APR Testing Services, has been approved by the American Psychological Association (APA) to sponsor continuing education for psychologists and grant continuing education credits to psychologists who have successfully completed study of specific topics. Continuing education credits earned from APA approved sponsors are recognized by most state psychology licensing boards that require such continuing education for renewal of licensure as a psychologist. I have served as a volunteer reviewer for the annual conference of the Society for Industrial and Organizational Psychology for 10+ years. I am a published test author. One of my tests (a test of mechanical aptitude) is marketed worldwide by a respected test publisher (Psychological Assessment Resources). My expert witness work has included testimony and related work for both defendants and plaintiffs in employment discrimination cases. I

have served as an expert for both defendants and plaintiffs in employment discrimination cases, including race, age, and sex discrimination cases, a few of which have gone to trial. I have served as an expert consultant on testing matters for the Massachusetts Attorney General's Office, the Connecticut Department of Administrative Services, the Connecticut Attorney General's Office, and the US Department of Justice, as well as several large private sector organizations. I have lectured and published in the areas of personnel assessment, employment discrimination, and civil service examining. I have made presentations before professional groups, including several invited addresses. I am licensed as a psychologist in Massachusetts and Pennsylvania. A copy of my resume is attached to this report. (See Attachment A.)

## B. Publications and Papers

In the past 10 years I have authored publications and presented papers at professional meetings, sometimes co-authored with others. A list of these 32 publications and papers is presented in Attachment B.

## C. Compensation

I am being compensated at my usual rate of $250 per hour for all work on this matter in calendar year 2008 (schedule to increase to $260 per hour for work performed in calendar year 2009).

## D. Court Appearances and Depositions

Within the past four years I have appeared as an expert at trial or by deposition in connection with the following matters:

*Terry Urban v. Haliburton Energy Services, Inc.*, February, 2004
Charleston, WV
Testified for the claimant at a binding arbitration hearing.

*Jacob Bradley, et al. v. City of Lynn, et al.*, May, 2006
Federal District Court, Boston, MA
Testified for plaintiff at trial.

*Bridges v The Alcohol Beverage Control Commission*
Massachusetts Division of Administrative Law Appeals, November, 2006
Testified for defense at a hearing.

*Boston Police Superior Officers Federation v. Boston Police Department and the Massachusetts Human Resource Division*, June, 2007
Boston, MA
Testified for the appellant before the Massachusetts Civil Service Commission in January, 2007 and June, 2007 and was deposed in February, 2006.

*USA and Vulcans Society et al. v. City of New York*

Page 4

Deposed in November, 2007 and September, 2008

**Section Two: Evaluation of Adverse Impact**
First I clarify here the definition of adverse impact and the use of statistical tests to evaluate
adverse impact, and then report the results of analyses of the adverse impact of the HRD exams
for Sergeant.

1. **Definition of Adverse Impact**
   Whenever many people compete for relatively few jobs, some will be hired and others not. I
   conducted adverse impact analyses to answer this question: Is there statistically reliable
   indication that minority applicants were adversely affected by the civil service examination
   and appointment process?

   Adverse impact is defined in the federal *Uniform Guidelines on Employee Selection
   Procedures* (*UGESP*, 1978), in Section 3.4, paragraph D, which begins as follows:
   "Adverse impact and the 'four-fifths rule.' A selection rate for any race, sex, or
   ethnic group which is less than four-fifths (4/5) (or eighty percent) of the rate for the
   group with the highest rate will generally be regarded by the Federal enforcement
   agencies as evidence of adverse impact, while a greater than four-fifths rate will
   generally not be regarded by Federal enforcement agencies as evidence of adverse
   impact. Smaller differences in selection rate may nevertheless constitute adverse
   impact, where they are significant in both statistical and practical terms or where a
   user's actions have discouraged applicants disproportionately on grounds of race, sex,
   or ethnic group."

   The prototype adverse impact or disparate impact analysis compares the "bottom line,"
   tallies and rates of hire for minority and non-minority applicants. (The terms adverse
   impact and disparate impact are used synonymously here and in general.) To conduct an
   adverse impact analysis, one must identify the relevant group of candidates. This
   identification should be based on the nature of the challenge. In the current matter, the
   challenge is to the civil service hiring process for Police Sergeant. Below I report
   analyses for the specific exams being challenged as well as for two similar statewide
   promotional exams. I have looked at the bottom line hiring for minorities and non-
   minorities, but have also gone beyond that global view and separately evaluated the
   impact of other aspects of these two examinations and the subsequent screening process,
   including the pass-fail decisions and placement on the lists of eligible candidates.

2. **Understanding the Statistics of Adverse Impact Analyses**
   Adverse impact analyses use statistics in two very different ways: to describe data and to
   make inferences based on data. We all have encountered and have some familiarity using
   statistics to describe numbers (as with averages, percents, or just tallies). Using statistics to
   make inferences in a formal way is not a tool the general public is familiar with. This short
   introduction will explain the essence of inferential statistics.

Page 5

**A. Using Statistics to Understand Variability in Data**

The actions or events we observe in the real world have causes that we know or posit, but often the causes are not clear and it appears that chance looms large, for example: will a fish take your bait, will you catch a cold, will a flipped coin come up heads, will you get a job, will a certain candidate get elected? We can count the number of times we catch a fish, catch a cold, get heads, get a job, or poll more people about the candidate. But when should we be sure that we have identified a good fishing spot, an unhealthy lifestyle, a fair coin, or a winning candidate? How many observations do we need to provide a specified level of certainty? By quantifying the level of uncertainty, inferential statistical methods help us make decisions based on limited data.

**B. The Law of Large Numbers**

We all have an intuitive understanding that more data lets us make more certain judgements: we fish on more days or we flip the coin more often or we poll more people. We understand intuitively that the variability in the data will "average out" if we have more data. But sometimes we must deal with the data we have and not collect more. Inferential statistics is based in large part on quantifying the variability in a limited number of observations, and making numeric probability statements related to the trends we may see in our data.

**C. A Coin Tossing Example: In Theory**

Let's say we will observe exactly 100 tosses of a coin and will have to decide if we think the coin is fair based on the observations. How many heads will it take before we think the coin is biased? If we knew how much variability there is in a fair coin, we would be better able to evaluate our observed 100 tosses. If it is common to get more than 60 heads on tossing a coin 100 times, then if we get 60 heads or fewer we might most reasonably conclude that we have no reason to say the coin is biased in favor of heads. Inferential statistics provides a mathematical basis for describing the expected amount of variability in observations.

**D. A Coin Tossing Example: In Practice**

Say you tossed a coin 1,000 times and got 550 heads and 450 tails. Without inferential statistics you may be unsure what to think about the fairness of the coin. Inferential statistics can help by informing you that a fair coin would give you an outcome as extreme as 550 heads only about 1 time out of 500. With that information most people would conclude that the data offer strong evidence that the coin is biased. This example lends itself to use of a statistical test known as the Chi Square test (which I describe below), and I used a Chi Square test to arrive at the probability of 1 in 500.

**E. Why Not Just Look at the Percent or Number of Heads?**

If you toss a coin twice and get two heads, you have gotten heads 100% of the time. Although that is as far from 50% as you can get, the probability is 1 in 4 of getting two heads on tossing a fair coin twice; something that is not unusual. In our 1,000 toss example, 550 heads is 55% out of 1,000, a difference of only 5%; yet the probability of

Page 6

getting 550 heads in 1,000 tosses is quite low. Clearly the percent of heads by itself is not a good metric for probability. Similarly, initially we were not sure what to decide about the coin that gave us 550 heads out of 1,000, or 50 heads more than expected. But if we tossed a coin 20 times and got 20 heads we would be sure the coin is biased, even though 20 heads is only 10 more heads than we would expect by chance. So number of heads by itself is not a good metric for probability. Statistical tests calculate numeric values based on our data that are designed to allow us to answer the question, based on chance alone of how unusual it is to get a result as extreme as we observed.

## F. The Components of a Report of a Chi Square Test

The report of a Chi Square statistical test has at least three main components.

### i. The Chi Square Value

The Chi Square test statistic is calculated based on the observed data. The Chi Square statistic can vary from zero to infinity. Other things being equal, a larger Chi Square value indicates that the outcome is less likely to have occurred solely by chance.

### ii. The Associated Probability

For every Chi Square value it is possible to find the probability. I used the Chi Square value and the degrees of freedom (see below) to find the value of 1 in 500 in the coin toss example above.

### iii. The Degrees of Freedom

Finding the probability for the value of Chi Square that is calculated from the observed data is computationally tedious, and depends on the number of groups being compared and the number of categories involved. (In choosing between four presidential candidates, there would be four categories. In the coin toss, there are two.) Fortunately, the hard work has been done for us. A technical term, "degrees of freedom," as used with Chi Square test, reflects the number of groups and categories, and is used by statisticians to calculate the probability from the Chi Square value. The reader can safely focus on the probability value and ignore the degrees of freedom.

## G. Other Statistical Tests

The Chi Square test is widely used with categorical data. Other statistical tests are needed for other situations, such as comparing average scores of two groups. To compare the numeric averages of two groups, either the F test or the t-test is appropriate. I indicate in the tables below when I use either of these tests, as is professionally appropriate in the reporting of such analyses. Both of these tests involve interpreting a test statistic calculated from the data. Both tests use degrees of freedom to help find the probability associated with the calculated value of the test statistic. This probability is the probability that an outcome as extreme as the observed outcome would occur by chance alone.

### H. What is Statistical Significance?

In the coin toss example we said that a probability of 1 in 500 (or .002) is too rare to accept as happening purely by chance, and so we decided that the coin was biased. The most usual standard of statistical proof uses .05 as the critical value. If the probability of an outcome as extreme as the observed outcome (or result) is .05 or less, we say the result is statistically significant and we say that is improbable that the outcome occurred due to chance alone. In many commonly used statistical tests, a probability of .05 corresponds to 1.96 standard deviation units. Perhaps the next most commonly used criterion is .01, which corresponds to 2.56 standard deviation units. This is the basis for the US Supreme Court's reference to "two or three standard deviations" as a general rule for evaluating statistical significance (*Castaneda v. Partida*, 430 U.S. 482, 496-497, n. 17).

### I. What is the Difference Between a One and Two Tailed Test?

A statistical test asks this question, what is the probability of an outcome as unusual as we have observed? Often when we have two possible outcomes we are concerned about differences in both directions (e.g., bias in favor of heads and bias in favor of tails). Sometimes when we have two possible outcomes we are interested in identifying an unusual outcome in one direction. For example, if we have an established medical procedure, we may be interested in deciding if a new procedure is better than the existing method, and we may have no interest in deciding if it is worse. When we are interested in identifying unusual events in either direction, we use a two-tailed test. When we are interested in identifying events in one direction, we use a one-tailed test. Usually experts for plaintiffs like to use one-tailed tests, since it is easier to achieve statistical significance with one tailed tests, and because the usual employment discrimination case involves adverse impact against minorities, and ignores the possibility of bias in favor of minorities. Experts for the defense usually prefer two tailed tests, for the same reason. In the analyses I conducted for this report, I use the conservative, two-tailed approach unless otherwise noted.

## 3. An Overview of the Hiring Process for Sergeants

For the sake of understanding the adverse impact analyses which follow, the process for promotion to Sergeant may be summarized as follows. HRD's practice is to hold a statewide examination for Sergeant every year. The exam is described in an official Examination Announcement that states the job title, job duties, test components (generally, and for all the examinations being challenged, there are just two components, a written multiple-choice test and an evaluation of education and experience, referred to below as E&E) and the like. Individual municipalities that wish to be included in the statewide examination file a request with HRD. On the exam day, HRD administers the exam in various locations across the Commonwealth. HRD grades the exams[2] and reviews protests of specific questions, modifies

---

[2]The grading process is described in more detail in the section on validity below.

the planned answer key as needed,[3] and establishes passing points. Each passing applicant receives a grade on the examination overall as well as on each of the exam components. Qualified veterans receive an additional 2 points, added to their exam grade. (Failing applicants do not receive a score on the E&E nor an overall grade; they receive only a score on the written test.) The E&E component is nominally weighted 20% but everyone who takes the written test receives a score of at least 70% on the E&E component, so this component contributes relatively little to the overall exam grade. After HRD completes the grading process, "eligible lists" for the various municipalities that participated in the exam are established in accordance with MGL Chapter 31 and the Personnel Administration Rules (PAR).[4] When such a municipality has an opening, promotions may be made to vacant Sergeant positions, under which 3 names are certified for one opening, 5 names for two openings, etc. (following the formula 2N+1, where N is the number of openings).[5] Under usual circumstances the appointing authority is restricted to making promotions from the names certified, and many police departments make promotions in order of grade on the civil service exam. The statewide exams for 2003-2007 were quite similar, relying on the same test outline, written by the same HRD employees, consisting of 80 multiple choice questions, and based on the same reading list (with minor updates). The Sergeant exam for Boston was similar too, but had some questions taken from reading material unique to the Boston Police Department (BPD) and a few questions that measured basic math and grammar.

**4. Overview of the Adverse Impact Analyses Reported Below**
To conduct adverse impact analysis, I had to identify the logically relevant group or groups of candidates. For each exam, I aggregated exam data across all municipalities.[6] My first adverse impact analysis considers promotion decisions from all 6 HRD exams for which I have data: 5 yearly statewide exams from 2003-2007 and the 2005 Sergeant exam for the BPD. Additional adverse impact analyses for promotions are presented for other groupings of examinations and years to address three contingencies or goals: (1) in case data from the 2003 and 2004 statewide promotional exams are not considered relevant to this matter, or (2) to consider separately the adverse impact of the 2005 promotional examination for the BPD, or (3) to omit the 2007 exam because the eligible lists resulting from this exam were only

---

[3]Some questions may be "double-keyed" or "credited." If two answer choices are both considered correct, the item is double-keyed (e.g., both answers B and C receive full credit). If the question is more seriously flawed, all answers may receive full credit (in effect reducing the number of questions on the test and reducing the difficulty level of the test).

[4]"Eligible list, a list established by the administrator in accordance with M.G.L. c. 31 from which certifications are made to appointing authorities upon requisition." PAR Definitions

[5]As stated in PAR 9.

[6]Without such aggregation, statistical analyses would be to no avail due to the small numbers. (Only from 2 to 10 minority applicants were promoted based on any of HRDs annual exams, in all municipalities combined.)

established 3/30/08 (at the earliest) and few[7] promotions have been made from these lists.

Following a demonstration that there is adverse impact in hiring, I evaluate adverse impact in written test score, first evaluating adverse impact in pass-fail (P/F) decisions and then evaluating adverse impact in ranking.

For all the analyses described in this report, each applicant is categorized either as minority, that is, either black or Hispanic, or non-minority, that is, all other applicants. Only applicants from police departments with both minority and non-minority applicants and promotions are included in the analyses below.[8]

## 5. Overall Adverse Impact in Hiring For All Sergeant Exams, 2003-2007

The most basic evaluation of adverse impact involves an evaluation of the number and percent of minority and non-minority applicants promoted. The first adverse impact analysis was done to determine whether there is statistical indication of adverse impact in all the hiring of Sergeants pursuant to the 2003, 2004, 2005, 2006, and 2007 HRD civil service promotional exams for Police Sergeant[9]

### A. Number of Promotions: All Exams 2003-2007

For this analysis, as for the other adverse impact analyses summarized in this report, I tallied the number of applicants appointed based on data in the Excel files provided to me as described above in the section titled "Documents and Computer Files Reviewed."

These tallies are presented in Table 1a below, with the associated percents. This table shows 5.9% of the black applicants were appointed, as compared with 15.9% of the non-minority applicants.

---

[7]Only 11 promotions were made from the 2007 exam as of 8/27/08, the date of the HRD Excel file given to me to analyze.

[8]The eligible lists that resulted from the 2007 exam was established about the beginning of April of 2008, and hiring from that exam will continue for some years; so there will be more hiring from this exam. Also, the eligible lists that resulted from the 2006 exam have not expired, so there may well be additional hiring from those lists. I reserve the right to update the adverse impact analyses presented in this report when additional hiring becomes sizeable.

[9]Understandably HRD did not provide data for three municipalities that conducted their own assessment center examination as an additional component to the standard statewide exam: Leominster, Salem, and Salisbury (Bates page 00017, McNeely deposition, page 60). I analyzed all the data provided by HRD, as described below. (In the remainder or this report, citations to a deposition page will be made in this format: name, page.)

| Table 1a.  Promotions from All Exams 2003-2007, by Ethnic Group | | | |
|---|---|---|---|
| Group | Number Promoted (percent) | Number Not Promoted (percent) | Total (percent) |
| Minority | 26 (5.9%) | 414 (94.1%) | 440 (100%) |
| Non-minority | 247 (15.9%) | 1,310 (84.1%) | 1,557 (100%) |
| Total | 273 | 1,724 | 1,997 |

**B. Adverse Impact Ratio for Promotions by Ethnic Group: 2003-2007**

As shown in Table 1b, the adverse impact ratio for promotions is .37, which I got by dividing the percentage of minorities promoted (5.9%) by the percentage of non-minorities promoted (15.9%).  This result tells us that minority applicants were promoted at a rate only 37% of the rate that non-minority applicants were promoted, or that minority applicants had a little over 1/3 the chance of being promoted as non-minority applicants.  A statistical analysis of this adverse impact ratio is reported in Table 1b.

Page 11

| Table 1b.  Adverse Impact: Promotions from Exams 2003-2007 | | | | | |
|---|---|---|---|---|---|
| Minority: Percent Promoted | Non-minority: Percent Promoted | Adverse Impact Ratio | Probability[10] | Chi Square[11] | Standard Deviation Units[12] |
| 5.9% | 15.9% | .37 | < .0001[13] | 28.0 | 5.3 |

**C. Probability and Statistical Significance of Promotions: Exams 2003-2007**
The adverse impact ratio of .37 is highly statistically significant.  A ratio this small would occur by chance much less than 1 time in ten thousand (see Table 1b, the column titled "Probability").  This probability corresponds to 5.3 standard deviation units.[14]

---

[10]The usual way social science researchers interpret a Chi Square value is based on the probability that the result would have occurred due to chance or random causes alone.  The most usual standard is: if the probability associated with the observed data is less than or equal to 0.05, the result is called statistically significant.

[11]Chi Square is the statistic that was calculated based on the data in order to determine the probability value associated with the result.  Larger Chi Square values are seen when the results are less likely to have occurred by chance.  The Chi Square value is reported here, as is customary in reporting statistical analyses.  Here, and for all similar statistical analyses reported below, the Chi Square value reported is corrected for continuity, as is recommended practice.  Here, and for all similar analyses below, the "degrees of freedom" (d.f.), a technical statistical term, is equal to 1.  The d.f. is reported because that is standard practice in reporting statistical analyses, and it may be useful to statisticians reading the report.  The column labeled "Probability" simply states the probability, as determined based on the Chi Square value and the d.f.

[12]Here, and for all similar statistical analyses reported below, I give the number of "standard deviation units" that correspond to the Chi Square value, as the US Supreme Court has referred to "two or three standard deviations" as a general rule for evaluating statistical significance (*Castaneda v. Partida, 430 U.S. 482, 496-497, n. 17*).  The higher the number of standard deviation units, the less probable the outcome is due to chance.  The term "standard deviation" is used in other ways in some other contexts, but here it reflects the probability of the results occurring based on chance.

[13]The actual probability is much smaller than .0001, it is .00000012.  The usual convention is not to write out such small values, but just to indicate that the value is less than some small number, such as I have done here.  The standard I will use for all the statistical tests is p=.05, but I report more exact p values for the reader who may be interested.

[14]I also used a second approach to determining the probability of obtaining results as extreme as these by chance, namely the Stouffer or sum of z's method.  This method involves

**D. Practical Import of Promotions: Exams 2003-2007**
The practical importance of hiring 5.9% of minority applicants versus 15.9% of non-minority applicants is obvious: there is a disproportionately low hiring rate for minority applicants. The adverse impact ratio (.37) also fails the .80 rule of thumb of the *UGESP*. (Here and elsewhere I interpret an adverse impact ratio of less than .80 to indicate obvious practically significant adverse impact.) Non-minority applicants were promoted at more than 2½ times the rate of minority applicants.

**E. Opinion on Promotions: Exams 2003-2007**
Considering HRD's promotional exams to Sergeant from 2003-2007, there is practically important and highly statistically significant adverse impact against minority applicants in promotions.

6. **Overall Adverse Impact in Hiring For All Statewide Sergeant Exams, 2003-2007**
This adverse analysis considers only HRD's Statewide examinations for Sergeant from 2003-2007, omitting the 2005 promotional exam for the BPD. I did this analysis in case the Defendant claims that the exam for the BPD was dissimilar to the statewide exams. I consider the BPD exam separately in subsequent analysis.

**A. Number of Promotions: Statewide Exams 2003-2007**
I tallied the number of applicants appointed based on data in the Excel files provided to me as described above in the section titled "Documents and Computer Files Reviewed."

These tallies are presented in Table 2a below, with the associated percents. This table shows 8.4% of the black applicants were appointed, as compared with 16.3% of the non-minority applicants.

---

calculating a Chi-Square value separately for each exam, determining the corresponding z values, summing the z values, and interpreting the sum according to a statistical formula. This method yields very similar results and so it not presented or discussed further.

| Table 2a.  Promotions from Statewide Exams 2003-2007, by Ethnic Group | | | |
|---|---|---|---|
| Group | Number Promoted (percent) | Number Not Promoted (percent) | Total (percent) |
| Minority | 18 (8.4%) | 196 (91.6%) | 214 (100%) |
| Non-minority | 192 (16.3%) | 985 (83.7%) | 1,177 (100%) |
| Total | 210 | 1,181 | 1,391 |

**B. Adverse Impact Ratio for Promotions by Ethnic Group: 2003-2007**
As shown in Table 2b, the adverse impact ratio for promotions is .52, which I got by dividing the percentage of minorities promoted (8.4%) by the percentage of non-minorities promoted (16.3%). This result tells us that minority applicants were promoted at a rate only 52% of the rate that non-minority applicants were promoted, or that minority applicants had roughly 1/2 the chance of being promoted as non-minority applicants. A statistical analysis of this adverse impact ratio is reported in Table 2b.

| Table 2b.  Adverse Impact: Promotions from Statewide Exams 2003-2007 | | | | | |
|---|---|---|---|---|---|
| Minority: Percent Promoted | Non-minority: Percent Promoted | Adverse Impact Ratio | Probability | Chi Square | Standard Deviation Units |
| 8.4% | 16.3% | .52 | .004 | 8.2 | 2.9 |

**C. Probability and Statistical Significance of Promotions: Exams 2003-2007**
The adverse impact ratio of .52 is highly statistically significant. A ratio this small would occur by chance much less than 4 times in a thousand. This probability corresponds to 2.9 standard deviation units.[15]

**D. Practical Import of Promotions: Statewide Exams 2003-2007**
The practical importance of hiring 8.4% of minority applicants versus 16.3% of non-minority applicants is obvious: there is a disproportionately low hiring rate for minority applicants. The adverse impact ratio (.52) also fails the .80 rule of thumb of the *UGESP*. Non-minority applicants were promoted at close to twice the rate of minority applicants.

---

[15]The Stouffer method yields very similar results.

### E. Opinion on Promotions: Statewide Exams 2003-2007
Considering HRD's statewide promotional exams to Sergeant from 2003-2007, there is practically important and highly statistically significant adverse impact against minority applicants in promotions.

## 7. Adverse Impact in Hiring For Statewide Sergeant Exams, 2003-2006
This adverse analysis considers only HRD's Statewide examinations for Sergeant from 2003-2006, omitting the 2005 promotional exam for the BPD and also omitting the 2007 exam. The 2007 exam is omitted because the eligible lists that resulted from this exam are relatively young[16] and only 11 appointments were made from these lists as of 8/27/08, the date the HRD last provided hiring data. I did this analysis in case the Defendant claims that the exam for the BPD was dissimilar to the statewide exams and also claims the 2007 exam should not be aggregated with the earlier exams. I consider the BPD exam and the 2007 exam separately in subsequent analysis.

### A. Number of Promotions: Statewide Exams 2003-2006
I tallied the number of applicants appointed based on data in the Excel files provided to me as described above in the section titled "Documents and Computer Files Reviewed."

These tallies are presented in Table 3a below, with the associated percents. This table shows 8.5% of the black applicants were appointed, as compared with 17.0% of the non-minority applicants.

| Table 3a. Promotions from Statewide Exams 2003-2006, by Ethnic Group | | | |
|---|---|---|---|
| Group | Number Promoted (percent) | Number Not Promoted (percent) | Total (percent) |
| Minority | 17 (8.5%) | 183 (91.5%) | 200 (100%) |
| Non-minority | 182 (17.0%) | 891 (83.0%) | 1,073 (100%) |
| Total | 199 | 1,074 | 1,273 |

### B. Adverse Impact Ratio for Promotions by Ethnic Group: 2003-2006
As shown in Table 3b, the adverse impact ratio for promotions is .50, which I got by dividing the percentage of minorities promoted (8.5%) by the percentage of non-minorities promoted (17.0%). This result tells us that minority applicants were promoted

---

[16]Most of the eligible lists based on this exam were established on 3/30/08 and the remainder on 4/3/08.

at a rate only 50% of the rate that non-minority applicants were promoted, or that minority applicants had roughly 1/2 the chance of being promoted as non-minority applicants. A statistical analysis of this adverse impact ratio is reported in Table 3b.

| Table 3b. Adverse Impact: Promotions from Statewide Exams 2003-2006 | | | | | |
|---|---|---|---|---|---|
| Minority: Percent Promoted | Non-minority: Percent Promoted | Adverse Impact Ratio | Probability | Chi Square | Standard Deviation Units |
| 8.5% | 17.0% | .50 | .004 | 8.5 | 2.9 |

### C. Probability and Statistical Significance of Promotions: Exams 2003-2006
The adverse impact ratio of .50 is highly statistically significant. A ratio this small would occur by chance much less than 4 times in a thousand. This probability corresponds to 2.9 standard deviation units.[17]

### D. Practical Import of Promotions: Statewide Exams 2003-2006
The practical importance of hiring 8.5% of minority applicants versus 17.0% of non-minority applicants is obvious: there is a disproportionately low hiring rate for minority applicants. The adverse impact ratio (.50) also fails the .80 rule of thumb of the *UGESP*. Non-minority applicants were promoted at twice the rate of minority applicants.

### E. Opinion on Promotions: Statewide Exams 2003-2006
Considering HRD's statewide promotional exams to Sergeant from 2003-2006 (i.e., omitting the 2005 BPD exam for Sergeant), there is practically important and highly statistically significant adverse impact against minority applicants in promotions.

## 8. Adverse Impact in Hiring For Statewide Sergeant Exams, 2005-2007
This adverse analysis considers only HRD's Statewide examinations for Sergeant from 2005-2007, omitting the 2005 promotional exam for the BPD. I did this analysis in case the Defendant claims that the exam for the BPD was dissimilar to the statewide exams. I consider the BPD exam and the 2007 exam separately in subsequent analysis.

### A. Number of Promotions: Statewide Exams 2005-2007
I tallied the number of applicants appointed based on data in the Excel files provided to me as described above in the section titled "Documents and Computer Files Reviewed."

These tallies are presented in Table 4a below, with the associated percents. This table shows 4.5% of the black applicants were appointed, as compared with 11.5% of the non-minority applicants.

---

[17]The Stouffer method yields very similar results.

| Table 4a.  Promotions from Statewide Exams 2005-2007, by Ethnic Group | | | |
|---|---|---|---|
| Group | Number Promoted (percent) | Number Not Promoted (percent) | Total (percent) |
| Minority | 5 (4.5%) | 106 (95.5%) | 111 (100%) |
| Non-minority | 67 (11.5%) | 517 (88.5%) | 584 (100%) |
| Total | 72 | 623 | 695 |

**B. Adverse Impact Ratio for Promotions by Ethnic Group: 2005-2007**
As shown in Table 4b, the adverse impact ratio for promotions is .39, which I got by dividing the percentage of minorities promoted (4.5%) by the percentage of non-minorities promoted (11.5%). This result tells us that minority applicants were promoted at a rate of less than 40% of the rate that non-minority applicants were promoted, or that non-minority applicants had about 39% chance of being promoted as non-minority applicants. A statistical analysis of this adverse impact ratio is reported in Table 4b.

| Table 4b.  Adverse Impact: Promotions from Statewide Exams 2005-2007 | | | | | |
|---|---|---|---|---|---|
| Minority: Percent Promoted | Non-minority: Percent Promoted | Adverse Impact Ratio | Probability | Chi Square | Standard Deviation Units |
| 4.5% | 11.5% | .39 | < .042 | 4.2 | 2.0 |

**C. Probability and Statistical Significance of Promotions: Exams 2005-2007**
The adverse impact ratio of .39 is statistically significant. A ratio this small would occur by chance less than 3 times in a hundred. This probability corresponds to 2.0 standard deviation units.

**D. Practical Import of Promotions: Statewide Exams 2005-2007**
The practical importance of hiring 4.5% of minority applicants versus 11.5% of non-minority applicants is obvious: there is a disproportionately low hiring rate for minority applicants. The adverse impact ratio (.39) also fails the .80 rule of thumb of the *UGESP*. Non-minority applicants were promoted at about 2 1/2 times the rate of minority applicants.

**E. Opinion on Promotions: Statewide Exams 2005-2007**
Considering HRD's statewide promotional exams to Sergeant from 2003-2007 (omitting

the 2005 BPD exam for Sergeant), there is practically important and statistically significant adverse impact against minority applicants in promotions.

9. **Adverse Impact in Hiring For Statewide Sergeant Exams, 2005-2006**
   This adverse analysis considers only HRD's 2005 and 2006 Statewide examinations for Sergeant. The 2007 exam is omitted because the eligible lists that resulted from this exam are relatively young and only 11 appointments were made from these lists as of 8/27/08, the date the HRD last provided hiring data. I did this analysis in case the Defendant claims that the exam for the BPD was dissimilar to the statewide exams and also claims the 2007 exam should not be aggregated with the earlier exams. I consider the other exams in subsequent analysis.

   A. **Number of Promotions: Statewide Exams 2005 and 2006**
      I tallied the number of applicants appointed based on data in the Excel files provided to me as described above in the section titled "Documents and Computer Files Reviewed."

      These tallies are presented in Table 5a below, with the associated percents. This table shows 4.1% of the black applicants were appointed, as compared with 11.9% of the non-minority applicants.

| Table 5a. Promotions from Statewide Exams 2005-2006, by Ethnic Group | | | |
|---|---|---|---|
| Group | Number Promoted (percent) | Number Not Promoted (percent) | Total (percent) |
| Minority | 4 (4.1%) | 93 (95.9%) | 97 (100%) |
| Non-minority | 57 (11.9%) | 423 (88.1%) | 480 (100%) |
| Total | 61 | 516 | 577 |

   B. **Adverse Impact Ratio for Promotions by Ethnic Group: 2005-2006**
      As shown in Table 5b, the adverse impact ratio for promotions is .34, which I got by dividing the percentage of minorities promoted (4.1%) by the percentage of non-minorities promoted (11.9%). This result tells us that minority applicants were promoted at a rate only 34% of the rate that non-minority applicants were promoted, or that minority applicants had roughly 1/3 the chance of being promoted as non-minority applicants. A statistical analysis of this adverse impact ratio is reported in Table 5b.

Page 18

| Table 5b. Adverse Impact: Promotions from Statewide Exams 2005-2006 | | | | | |
|---|---|---|---|---|---|
| Minority: Percent Promoted | Non-minority: Percent Promoted | Adverse Impact Ratio | Probability | Chi Square | Standard Deviation Units |
| 4.1% | 11.9% | .34 | .037 | 4.3 | 2.1 |

**C. Probability and Statistical Significance of Promotions: Exams 2005-2006**
The adverse impact ratio of .34 is statistically significant. A ratio this small would occur by chance less than 4 times in a hundred. This probability corresponds to 2.1 standard deviation units.[18]

**D. Practical Import of Promotions: Statewide Exams 2005-2006**
The practical importance of hiring 4.1% of minority applicants versus 11.9% of non-minority applicants is obvious: there is a disproportionately low hiring rate for minority applicants. The adverse impact ratio (.34) also fails the .80 rule of thumb of the *UGESP*. Non-minority applicants were promoted at close to 3 times the rate of minority applicants.

**E. Opinion on Promotions: Statewide Exams 2005-2006**
Considering HRD's statewide promotional exams to Sergeant for 2005 and 2006, there is practically important and statistically significant adverse impact against minority applicants in promotions.

**10. Adverse Impact in Hiring For BPD, 2005**
This adverse analysis considers HRD's promotional examination for Sergeant, BPD. This exam is considered separately in case the Defendant claims that the exam for the BPD was dissimilar to the statewide exams.

**A. Number of Promotions: BPD, 2005**
I tallied the number of applicants appointed based on data in the Excel files provided to me as described above in the section titled "Documents and Computer Files Reviewed."

These tallies are presented in Table 6a below, with the associated percents. This table shows 3.5% of the black applicants were appointed, as compared with 13.8% of the non-minority applicants.

---

[18]The Stouffer method yields very similar results.

Page 19

| Table 6a.  Promotions from BPD Sergeant Exam, 2005, by Ethinc Group | | | |
|---|---|---|---|
| Group | Number Promoted (percent) | Number Not Promoted (percent) | Total (percent) |
| Minority | 8 (3.5%) | 218 (96.5%) | 226 (100%) |
| Non-minority | 55 (13.8%) | 345 (86.3%) | 400 (100%) |
| Total | 63 | 563 | 626 |

**B. Adverse Impact Ratio for Promotions by Ethnic Group: BPD, 2005**
As shown in Table 6b, the adverse impact ratio for promotions is .25, which I got by dividing the percentage of minorities promoted (3.5%) by the percentage of non-minorities promoted (13.8%). This result tells us that minority applicants were promoted at a rate only 25% of the rate that non-minority applicants were promoted, or that minority applicants had 1/4 chance of being promoted as non-minority applicants. A statistical analysis of this adverse impact ratio is reported in Table 6b.

| Table 6b.  Adverse Impact: Promotions from BPD Sergeant Exam, 2005 | | | | | |
|---|---|---|---|---|---|
| Minority: Percent Promoted | Non-minority: Percent Promoted | Adverse Impact Ratio | Probability | Chi Square | Standard Deviation Units |
| 3.5% | 13.8% | .25 | < .0001 | 15.5 | 3.9 |

**C. Probability and Statistical Significance of Promotions: BPD, 2005**
The adverse impact ratio of .25 is highly statistically significant. A ratio this small would occur by chance less than 4 times in a hundred. This probability corresponds to 3.9 standard deviation units.

**D. Practical Import of Promotions: BPD, 2005**
The practical importance of hiring 3.5% of minority applicants versus 13.8% of non-minority applicants is obvious: there is a disproportionately low hiring rate for minority applicants. The adverse impact ratio (.25) also fails the .80 rule of thumb of the *UGESP*. Non-minority applicants were promoted at about 4 times the rate of minority applicants.

**E. Opinion on Promotions: BPD, 2005**
Considering HRD's 2005 promotional exam to Sergeant, BPD, there is practically important and highly statistically significant adverse impact against minority applicants in

Page 20

promotions.

**11. Adverse Impact in Hiring For 2003 Statewide Exam**
   This adverse analysis considers HRD's 2003 statewide promotional examination. This exam
   is considered separately in case the Defendant claims that the overall pattern seen in the
   aggregate adverse impact analysis reported first does not hold for the individual exams that
   were aggregated.

   **A. Number of Promotions: 2003 Statewide Exam**
      I tallied the number of applicants appointed based on data in the Excel files provided to
      me as described above in the section titled "Documents and Computer Files Reviewed."

      These tallies are presented in Table 7a below, with the associated percents. This table
      shows 18.2% of the black applicants were appointed, as compared with 25.6% of the
      non-minority applicants.

| Table 7a. Promotions from 2003 Statewide Exam, by Ethnic Group | | | |
|---|---|---|---|
| Group | Number Promoted (percent) | Number Not Promoted (percent) | Total (percent) |
| Minority | 10 (18.2%) | 45 (81.8%) | 55 (100%) |
| Non-minority | 67 (25.6%) | 195 (74.4%) | 262 (100%) |
| Total | 77 | 240 | 317 |

   **B. Adverse Impact Ratio for Promotions by Ethnic Group: 2003 Statewide Exam**
      As shown in Table 7b, the adverse impact ratio for promotions is .71, which I got by
      dividing the percentage of minorities promoted (18.2%) by the percentage of non-
      minorities promoted (25.6%). This result tells us that minority applicants were promoted
      at a rate only 71% of the rate that non-minority applicants were promoted, or that
      minority applicants had less than 3/4 the chance of being promoted as non-minority
      applicants. A statistical analysis of this adverse impact ratio is reported in Table 7b.

| Table 7b.  Adverse Impact: Promotions from 2003 Statewide Exam | | | | | |
|---|---|---|---|---|---|
| Minority: Percent Promoted | Non-minority: Percent Promoted | Adverse Impact Ratio | Probability | Chi Square | Standard Deviation Units |
| 18.2% | 25.6% | .71 | .32 | 1.0 | .99 |

**C.  Probability and Statistical Significance of Promotions: 2003 Statewide Exam**
The adverse impact ratio of .71 is not statistically significant.  A ratio this small would occur by chance less than 3 times in ten.  This probability corresponds to .99 standard deviation units.

**D.  Practical Import of Promotions: 2003 Statewide Exam**
The practical importance of hiring 18.2% of minority applicants versus 25.6% of non-minority applicants is obvious: there is a disproportionately low hiring rate for minority applicants.  The adverse impact ratio (.71) also fails the .80 rule of thumb of the *UGESP*. Non-minority applicants were promoted at about 1 2/5 times the rate of minority applicants.

**E.  Opinion on Promotions: 2003 Statewide Exam**
Considering HRD's 2003 statewide promotional exam to Sergeant, there is practically important adverse impact against minority applicants in promotions.  The multi-year adverse impact analyses reported above show that the lack of statistical significance for 2003 was due to the relatively small number of test takers and promotions involved in the 2003 analysis.[19]

**12.  Adverse Impact in Hiring For 2004 Statewide Exam**
This adverse analysis considers HRD's 2004 statewide promotional examination.  This exam is considered separately in case the Defendant claims that the overall pattern seen in the aggregate adverse impact analysis reported first does not hold for the individual exams that were aggregated.

**A.  Number of Promotions: 2004 Statewide Exam**
I tallied the number of applicants appointed based on data in the Excel files provided to me as described above in the section titled "Documents and Computer Files Reviewed."

These tallies are presented in Table 8a below, with the associated percents.  This table shows 6.2% of the black applicants were appointed, as compared with 17.5% of the non-

---

[19]In each of the adverse impact analyses for the individual exam years, it is the number of minority promotions that is the smallest number that enters into the analysis; the number ranged from 1 to 10 for each of the exams.  That is, the largest number of minorities promoted to Sergeant statewide, including Boston, in any year was 10.

minority applicants.

| Table 8a.  Promotions from 2004 Statewide Exam, by Ethnic Group | | | |
|---|---|---|---|
| Group | Number Promoted (percent) | Number Not Promoted (percent) | Total (percent) |
| Minority | 3 (6.2%) | 45 (93.8%) | 48 (100%) |
| Non-minority | 58 (17.5%) | 273 (82.5%) | 331 (100%) |
| Total | 61 | 318 | 379 |

**B.  Adverse Impact Ratio for Promotions by Ethnic Group: 2004 Statewide Exam**
As shown in Table 8b, the adverse impact ratio for promotions is .71, which I got by dividing the percentage of minorities promoted (6.2%) by the percentage of non-minorities promoted (17.5%).  This result tells us that minority applicants were promoted at a rate only 36% of the rate that non-minority applicants were promoted, or that minority applicants had a little more than 1/3 the chance of being promoted as non-minority applicants.  A statistical analysis of this adverse impact ratio is reported in Table 8b.

| Table 8b.  Adverse Impact: Promotions from 2004 Statewide Exam | | | | | |
|---|---|---|---|---|---|
| Minority: Percent Promoted | Non-minority: Percent Promoted | Adverse Impact Ratio | Probability | Chi Square | Standard Deviation Units |
| 6.2% | 17.5% | .36[20] | .08[21] | 3.154 | 1.77 |

**C.  Probability and Statistical Significance of Promotions: 2004 Statewide Exam**
The adverse impact ratio of .36 is not statistically significant using the Chi Square test.  However, a more precise test (the Fisher Exact Test) yields a probability of .030, one-

---

[20]An apparent mathematical error is due to rounding.  Specifically, 6.2 divided by 17.5 is .35, but the actual promotion rate for minority applicants is 6.25%, and .625 divided by 17.5 is .36, as reported in this table.

[21]A more accurate test, namely the Fisher Exact Test, yields a probability of .057 two-tailed and .030 one tailed.  In this situation, it is my opinion that the .030 value is most appropriate.

tailed. It is my opinion that the .030 value is the proper probability value to use in interpreting this analysis. A ratio this small would occur by chance less than 3 times in a hundred. This probability of .030 corresponds to 1.88 standard deviation units.

### D. Practical Import of Promotions: 2004 Statewide Exam
The practical importance of hiring 6.2% of minority applicants versus 17.5% of non-minority applicants is obvious: there is a disproportionately low hiring rate for minority applicants. The adverse impact ratio (.36) also fails the .80 rule of thumb of the *UGESP*. Non-minority applicants were promoted at about 3 times the rate of minority applicants.

### E. Opinion on Promotions: 2004 Statewide Exam
Considering HRD's 2004 statewide promotional exam to Sergeant, there is practically important adverse impact against minority applicants in promotions. The multi-year adverse impact analyses reported above show that the lack of statistical significance for 2004 was due to the relatively small number of test takers and promotions involved in the 2004 analysis.

## 13. Adverse Impact in Hiring For 2005 Statewide Exam
This adverse analysis considers HRD's 2005 statewide promotional examination. This exam is considered separately in case the Defendant claims that the overall pattern seen in the aggregate adverse impact analysis reported first does not hold for the individual exams that were aggregated.

### A. Number of Promotions: 2005 Statewide Exam
I tallied the number of applicants appointed based on data in the Excel files provided to me as described above in the section titled "Documents and Computer Files Reviewed."

These tallies are presented in Table 9a below, with the associated percents. This table shows 5.7% of the black applicants were appointed, as compared with 16.3% of the non-minority applicants.

Page 24

| Table 9a.  Promotions from 2005 Statewide Exam, by Ethnic Group | | | |
|---|---|---|---|
| Group | Number Promoted (percent) | Number Not Promoted (percent) | Total (percent) |
| Minority | 2 (5.7%) | 33 (94.3%) | 35 (100%) |
| Non-minority | 28 (16.3%) | 144 (83.7%) | 172 (100%) |
| Total | 30 | 177 | 207 |

**B.  Adverse Impact Ratio for Promotions by Ethnic Group: 2005 Statewide Exam**
As shown in Table 9b, the adverse impact ratio for promotions is .35, which I got by dividing the percentage of minorities promoted (5.7%) by the percentage of non-minorities promoted (16.3%). This result tells us that minority applicants were promoted at a rate only 35% of the rate that non-minority applicants were promoted, or that minority applicants had about 1/3 the chance of being promoted as non-minority applicants. A statistical analysis of this adverse impact ratio is reported in Table 9b.

| Table 9b.  Adverse Impact: Promotions from 2005 Statewide Exam | | | | | |
|---|---|---|---|---|---|
| Minority: Percent Promoted | Non-minority: Percent Promoted | Adverse Impact Ratio | Probability | Chi Square | Standard Deviation Units |
| 5.7% | 16.3% | .35 | .175 | 1.84 | 1.36 |

**C.  Probability and Statistical Significance of Promotions: 2005 Statewide Exam**
The adverse impact ratio of .35 is not statistically significant. A ratio this small would occur by chance less than 2 times in ten. This probability corresponds to 1.36 standard deviation units.

**D.  Practical Import of Promotions: 2005 Statewide Exam**
The practical importance of hiring 5.7% of minority applicants versus 16.3% of non-minority applicants is obvious: there is a disproportionately low hiring rate for minority applicants. The adverse impact ratio (.35) also fails the .80 rule of thumb of the *UGESP*. Non-minority applicants were promoted at about 3 times the rate of minority applicants.

**E.  Opinion on Promotions: 2005 Statewide Exam**
Considering HRD's 2005 statewide promotional exam to Sergeant, there is practically important adverse impact against minority applicants in promotions. The multi-year

adverse impact analyses reported above show that the lack of statistical significance for 2005 was due to the relatively small number of test takers and promotions involved in the 2005 analysis.[22]

### 14. Adverse Impact in Hiring For 2006 Statewide Exam

This adverse analysis considers HRD's 2006 statewide promotional examination. This exam is considered separately in case the Defendant claims that the overall pattern seen in the aggregate adverse impact analysis reported first does not hold for the individual exams that were aggregated.

#### A. Number of Promotions: 2006 Statewide Exam

I tallied the number of applicants appointed based on data in the Excel files provided to me as described above in the section titled "Documents and Computer Files Reviewed."

These tallies are presented in Table 10a below, with the associated percents. This table shows 3.2% of the black applicants were appointed, as compared with 9.4% of the non-minority applicants.

| Table 10a. Promotions from 2006 Statewide Exam, by Ethnic Group | | | |
|---|---|---|---|
| Group | Number Promoted (percent) | Number Not Promoted (percent) | Total (percent) |
| Minority | 2 (3.2%) | 60 (96.8%) | 62 (100%) |
| Non-minority | 29 (9.4%) | 279 (90.6%) | 308 (100%) |
| Total | 31 | 339 | 370 |

#### B. Adverse Impact Ratio for Promotions by Ethnic Group: 2006 Statewide Exam

As shown in Table 10b, the adverse impact ratio for promotions is .34, which I got by dividing the percentage of minorities promoted (3.2%) by the percentage of non-minorities promoted (9.4%). This result tells us that minority applicants were promoted at a rate only 34% of the rate that non-minority applicants were promoted, or that minority applicants had about 1/3 the chance of being promoted as non-minority applicants. A statistical analysis of this adverse impact ratio is reported in Table 10b.

---

[22]Only 2 minority applicants were promoted.

Page 26

| Table 10b.  Adverse Impact: Promotions from 2006 Statewide Exam | | | | | |
|---|---|---|---|---|---|
| Minority: Percent Promoted | Non-minority: Percent Promoted | Adverse Impact Ratio | Probability | Chi Square | Standard Deviation Units |
| 3.2% | 9.4% | .34 | .176 | 1.83 | 1.35 |

**C. Probability and Statistical Significance of Promotions: 2006 Statewide Exam**
The adverse impact ratio of .34 is not statistically significant.  A ratio this small would occur by chance less than 2 times in ten.  This probability corresponds to 1.35 standard deviation units.

**D. Practical Import of Promotions: 2006 Statewide Exam**
The practical importance of hiring 3.2% of minority applicants versus 9.4% of non-minority applicants is obvious: there is a disproportionately low hiring rate for minority applicants.  The adverse impact ratio (.34) also fails the .80 rule of thumb of the *UGESP*.  Non-minority applicants were promoted at about 3 times the rate of minority applicants.

**E. Opinion on Promotions: 2006 Statewide Exam**
Considering HRD's 2006 statewide promotional exam to Sergeant, there is practically important adverse impact against minority applicants in promotions.  The multi-year adverse impact analyses reported above show that the lack of statistical significance for 2006 was due to the relatively small number of test takers and promotions involved in the 2006 analysis.[23]

**15. Summary of Adverse Impact Analysis In Hiring**
The analyses above reveal that there is adverse impact in hiring based on the HRD exams.  Overall, the adverse impact against minority applicants is statistically significant, and sizeable and of practical import. The overall finding is also seen in the statistical analyses for individual exams and for several groupings of those exams.  (Although not detailed above, a similar statistical analysis reveals that the 2007 exam also has adverse impact of less than .80 for the hiring of minorities.)[24]

**16. Overall P/F Impact of the Written Test For All Sergeant Exams, 2003-2007**
After finding statistical indications of adverse impact in hiring, I undertook analyses of the most important component of the exam: the written test.  With respect to the written test, the first analysis was done to determine whether there is statistical indication of adverse impact

---

[23]Only 2 minority applicants were promoted.

[24]Again I point out that few people have been hired based on this exam, but that more hiring is anticipated.  I reserve the right to conduct additional statistical analyses when additional hiring data becomes available from the 2007 and the 2006 exams.

in passing the 2003, 2004, 2005, 2006, and 2007 HRD civil service promotional exams for Police Sergeant.

## A. Passing and Failing: All Exams 2003-2007

For this analysis, as for the other adverse impact analyses summarized in this report, I tallied the number of applicants passing and failing the written test based on data in the Excel files provided to me as described above in the section titled "Documents and Computer Files Reviewed."

These tallies are presented in Table 11a below, with the associated percents. This table shows 47.5% of the black applicants passed the written test, as compared with 72.1% of the non-minority applicants.

| Table 11a. P/F All Exams 2003-2007, by Ethnic Group | | | |
|---|---|---|---|
| Group | Number Passing (percent) | Number Failing (percent) | Total (percent) |
| Minority | 209 (47.5%) | 231 (52.5%) | 440 (100%) |
| Non-minority | 1,122 (72.1%) | 435 (27.9%) | 1,557 (100%) |
| Total | 1,331 | 666 | 1,997 |

## B. Adverse Impact Ratio for Passing by Ethnic Group: 2003-2007

As shown in Table 11b, the adverse impact ratio for P/F is .66, which I got by dividing the percentage of minorities passing (47.5%) by the percentage of non-minorities passing (72.1%). This result tells us that minority applicants passed the written test at a rate only 66% of the rate that non-minority applicants passed the written test, or that minority applicants had a little under 3/4 the chance of passing as non-minority applicants. A statistical analysis of this adverse impact ratio is reported in Table 11b.

| Table 11b. Adverse Impact: P/F Exams 2003-2007 | | | | | |
|---|---|---|---|---|---|
| Minority: Percent Passing | Non-minority: Percent Passing | Adverse Impact Ratio | Probability | Chi Square | Standard Deviation Units |
| 47.5% | 72.1% | .66 | < .0001 | 92.0 | 9.6 |

## C. Probability and Statistical Significance For passing: Exams 2003-2007

The adverse impact ratio of .66 is highly statistically significant. A ratio this small would occur by chance much less than 1 time in ten thousand (see Table 11b, the column titled

Page 28

"Probability"). This probability corresponds to 9.6 standard deviation units.[25]

**D. Practical Import For passing: Exams 2003-2007**

The practical importance of passing 47.5% of minority applicants versus 72.1% of non-minority applicants is obvious: there is a disproportionately low passing rate for minority applicants. The adverse impact ratio (.66) also fails the .80 rule of thumb of the *UGESP*. Non-minority applicants passed the written test at about 1½ times the rate of minority applicants.

**E. Opinion on Passing: Exams 2003-2007**

Considering HRD's promotional exams to Sergeant from 2003-2007, there is practically important and highly statistically significant adverse impact against minority applicants in passing the written test.

**17. Overall P/F Impact of the Written Test For All Statewide Sergeant Exams, 2003-2007**

This adverse analysis considers only HRD's Statewide examinations for Sergeant from 2003-2007, omitting the 2005 promotional exam for the BPD. I did this analysis in case the Defendant claims that the exam for the BPD was dissimilar to the statewide exams. I consider the BPD exam separately in subsequent analysis.

**A. Passing and Failing: Statewide Exams 2003-2007**

I tallied the number of applicants passing and failing the written test based on data in the Excel files provided to me as described above in the section titled "Documents and Computer Files Reviewed."

These tallies are presented in Table 12a below, with the associated percents. This table shows 51.9% of the black applicants passed the written test, as compared with 71.4% of the non-minority applicants.

---

[25]The Stouffer method yields very similar results.

| Table 12a.  P/F Statewide Exams 2003-2007, by Ethnic Group | | | |
|---|---|---|---|
| Group | Number Passing (percent) | Number Failing (percent) | Total (percent) |
| Minority | 111 (51.9%) | 103 (48.1%) | 214 (100%) |
| Non-minority | 840 (71.4%) | 337 (28.6%) | 1,177 (100%) |
| Total | 951 | 440 | 1,391 |

**B.  Adverse Impact Ratio for P/F by Ethnic Group: 2003-2007**
As shown in Table 12b, the adverse impact ratio for P/F is .73, which I got by dividing the percentage of minorities passing (51.9%) by the percentage of of non-minorities passing (71.4%).  This result tells us that minority applicants passed the written test at a rate only 73% of the rate that non-minority applicants passed the written test, or that minority applicants had roughly 1 1/3 the chance of passing as non-minority applicants.  A statistical analysis of this adverse impact ratio is reported in Table 12b.

| Table 12b.  Adverse Impact: P/F Statewide Exams 2003-2007 | | | | | |
|---|---|---|---|---|---|
| Minority: Percent Passing | Non-minority: Percent Passing | Adverse Impact Ratio | Probability | Chi Square | Standard Deviation Units |
| 51.9% | 71.4% | .73 | < .0001 | 30.9 | 5.6 |

**C.  Probability and Statistical Significance For passing: Exams 2003-2007**
The adverse impact ratio of .52 is highly statistically significant.  A ratio this small would occur by chance much less than 1 time in ten thousand.  This probability corresponds to 5.6 standard deviation units.[26]

**D.  Practical Import For passing: Statewide Exams 2003-2007**
The practical importance of passing 51.9% of minority applicants versus 71.4% of non-minority applicants is obvious: there is a disproportionately low passing rate for minority applicants.  The adverse impact ratio (.73) also fails the .80 rule of thumb of the *UGESP*.  Non-minority applicants passed the written test at about 1 1/3 the rate of minority applicants.

---

[26]The Stouffer method yields very similar results.

### E. Opinion on Passing: Statewide Exams 2003-2007

Considering HRD's statewide promotional exams to Sergeant from 2003-2007, there is practically important and highly statistically significant adverse impact against minority applicants in passing.

## 18. P/F Impact of the Written Test  For Statewide Sergeant Exams, 2003-2006

This adverse analysis considers only HRD's Statewide examinations for Sergeant from 2003-2006, omitting the 2005 promotional exam for the BPD and also omitting the 2007 exam. The 2007 exam is omitted because the eligible lists that resulted from this exam are relatively young[27] and only 11 appointments were made from these lists as of 8/27/08, the date the HRD last provided hiring data.  I did this analysis in case the Defendant claims that the exam for the BPD was dissimilar to the statewide exams and also claims the 2007 exam should not be aggregated with the earlier exams.  I consider the BPD exam and the 2007 exam separately in subsequent analysis.

### A. Passing and Failing: Statewide Exams 2003-2006

I tallied the number of applicants passing and failing the written test based on data in the Excel files provided to me as described above in the section titled "Documents and Computer Files Reviewed."

These tallies are presented in Table 13a below, with the associated percents.  This table shows 50.0% of the black applicants passed the written test, as compared with 70.7% of the non-minority applicants.

| Table 13a.  P/F Statewide Exams 2003-2006, by Ethnic Group | | | |
|---|---|---|---|
| Group | Number Passing (percent) | Number Failing (percent) | Total (percent) |
| Minority | 100 (50.0%) | 100 (50.0%) | 200 (100%) |
| Non-minority | 759 (70.7%) | 314 ( 29.3%) | 1,073 (100%) |
| Total | 859 | 414 | 1,273 |

### B. Adverse Impact Ratio for P/F by Ethnic Group: 2003-2006

As shown in Table 13b, the adverse impact ratio for P/F is .71, which I got by dividing the percentage of minorities passing (50.0%) by the percentage of of non-minorities passing (70.7%).  This result tells us that minority applicants passed the written test at a rate only

---

[27]Most of the eligible lists based on this exam were established on 3/30/08 and the remainder on 4/3/08.

71% of the rate that non-minority applicants passed the written test, or that minority applicants had a little less than 3/4 the chance of passing as non-minority applicants. A statistical analysis of this adverse impact ratio is reported in Table 13b.

| Table 13b.  Adverse Impact: P/F Statewide Exams 2003-2006 | | | | | |
|---|---|---|---|---|---|
| Minority: Percent Passing | Non-minority: Percent Passing | Adverse Impact Ratio | Probability | Chi Square | Standard Deviation Units |
| 50.0% | 70.7% | .71 | < .0001 | 32.1 | 5.7 |

**C. Probability and Statistical Significance For passing: Exams 2003-2006**
The adverse impact ratio of .71 is highly statistically significant. A ratio this small would occur by chance much less than 1 time in a thousand. This probability corresponds to 5.7 standard deviation units.[28]

**D. Practical Import For passing: Statewide Exams 2003-2006**
The practical importance of passing 50.0% of minority applicants versus 70.7% of non-minority applicants is obvious: there is a disproportionately low passing rate for minority applicants. The adverse impact ratio (.71) also fails the .80 rule of thumb of the *UGESP*. Non-minority applicants passed the written test at about 1 2/5 the rate of minority applicants.

**E. Opinion on Passing: Statewide Exams 2003-2006**
Considering HRD's statewide promotional exams to Sergeant from 2003-2006 (i.e., omitting the 2005 BPD exam for Sergeant), there is practically important and highly statistically significant adverse impact against minority applicants in passing the written test.

**19. P/F Impact of the Written Test For Statewide Sergeant Exams, 2005-2007**
This adverse analysis considers only HRD's Statewide examinations for Sergeant from 2005-2007, omitting the 2005 promotional exam for the BPD. I did this analysis in case the Defendant claims that the exam for the BPD was dissimilar to the statewide exams. I consider the BPD exam and the 2007 exam separately in subsequent analysis.

**A. Passing and Failing: Statewide Exams 2005-2007**
I tallied the number of applicants passing and failing the written test based on data in the Excel files provided to me as described above in the section titled "Documents and Computer Files Reviewed."

These tallies are presented in Table 14a below, with the associated percents. This table

---

[28]The Stouffer method yields very similar results.

Page 32

shows 50.5% of the black applicants passed the written test, as compared with 68.0% of the non-minority applicants.

| Table 14a.  P/F Statewide Exams 2005-2007, by Ethnic Group | | | |
|---|---|---|---|
| Group | Number Passing (percent) | Number Failing (percent) | Total (percent) |
| Minority | 56 (50.5%) | 55 (49.5%) | 111 (100%) |
| Non-minority | 397 (68.0%) | 187 (32.0%) | 584 (100%) |
| Total | 453 | 242 | 695 |

**B.  Adverse Impact Ratio for P/F by Ethnic Group: 2005-2007**

As shown in Table 14b, the adverse impact ratio for P/F is .74, which I got by dividing the percentage of minorities passing (50.5%) by the percentage of non-minorities passing (68.0%).  This result tells us that minority applicants passed the written test at a rate of 74% of the rate that non-minority applicants passed the written test, or that non-minority applicants had roughly 3/4 the chance of passing as non-minority applicants.  A statistical analysis of this adverse impact ratio is reported in Table 14b.

| Table 14b.  Adverse Impact: P/F Statewide Exams 2005-2007 | | | | | |
|---|---|---|---|---|---|
| Minority: Percent Passing | Non-minority: Percent Passing | Adverse Impact Ratio | Probability | Chi Square | Standard Deviation Units |
| 50.5% | 68.0% | .74 | .001 | 11.9 | 3.4 |

**C.  Probability and Statistical Significance For passing: Exams 2005-2007**

The adverse impact ratio of .74 is statistically significant.  A ratio this small would occur by chance less than 1 time in a thousand.  This probability corresponds to 3.4 standard deviation units.

**D.  Practical Import For passing: Statewide Exams 2005-2007**

The practical importance of passing 50.5% of minority applicants versus 68.0% of non-minority applicants is obvious: there is a disproportionately low passing rate for minority applicants.  The adverse impact ratio (.74) also fails the .80 rule of thumb of the *UGESP*.  Non-minority applicants passed the written test at about 1 1/3 times the rate of minority applicants.

**E.  Opinion on Passing: Statewide Exams 2005-2007**

Considering HRD's statewide promotional exams to Sergeant from 2003-2007 (omitting the 2005 BPD exam for Sergeant), there is practically important and statistically significant adverse impact against minority applicants in passing.

**20. P/F Impact of the Written Test For Statewide Sergeant Exams, 2005-2006**
This adverse analysis considers only HRD's 2005 and 2006 Statewide examinations for Sergeant, omitting the 2005 promotional exam for the BPD and also omitting the 2007 exam. The 2007 exam is omitted because the eligible lists that resulted from this exam are relatively young and only 11 appointments were made from these lists as of 8/27/08, the date the HRD last provided hiring data. I did this analysis in case the Defendant claims that the exam for the BPD was dissimilar to the statewide exams and also claims the 2007 exam should not be aggregated with the earlier exams. I consider the other exams in subsequent analysis.

**A. Passing and Failing: Statewide Exams 2005 and 2006**
I tallied the number of applicants passing and failing the written test based on data in the Excel files provided to me as described above in the section titled "Documents and Computer Files Reviewed."

These tallies are presented in Table 15a below, with the associated percents. This table shows 46.4% of the black applicants passed the written test, as compared with 65.8% of the non-minority applicants.

| Table 15a.  P/F Statewide Exams 2005-2006, by Ethnic Group | | | |
|---|---|---|---|
| Group | Number Passing (percent) | Number Failing (percent) | Total (percent) |
| Minority | 45 (46.4%) | 52 (53.6%) | 97 (100%) |
| Non-minority | 316 (65.8%) | 164 (34.2%) | 480 (100%) |
| Total | 361 | 216 | 577 |

**B. Adverse Impact Ratio for P/F by Ethnic Group: 2005-2006**
As shown in Table 15b, the adverse impact ratio for P/F is .71, which I got by dividing the percentage of minorities passing (46.4%) by the percentage of of non-minorities passing (65.8%). This result tells us that minority applicants passed the written test at a rate only 71% of the rate that non-minority applicants passed the written test, or that minority applicants had less than 3/4 the chance of passing as non-minority applicants. A statistical analysis of this adverse impact ratio is reported in Table 15b.

Page 34

| Table 15b.  Adverse Impact: P/F Statewide Exams 2005-2006 | | | | | |
|---|---|---|---|---|---|
| Minority: Percent Passing | Non-minority: Percent Passing | Adverse Impact Ratio | Probability | Chi Square | Standard Deviation Units |
| 46.4% | 65.8% | .71 | <.001 | 12.2 | 3.5 |

### C. Probability and Statistical Significance For passing: Exams 2005-2006

The adverse impact ratio of .71 is statistically significant.  A ratio this small would occur by chance less than 1 time in a thousand.  This probability corresponds to 3.5 standard deviation units.[29]

### D. Practical Import For passing: Statewide Exams 2005-2006

The practical importance of passing 46.4% of minority applicants versus 65.8% of non-minority applicants is obvious: there is a disproportionately low passing rate for minority applicants.  The adverse impact ratio (.71) also fails the .80 rule of thumb of the *UGESP*.  Non-minority applicants passed the written test at close to 1 2/5 times the rate of minority applicants.

### E. Opinion on Passing: Statewide Exams 2005-2006

Considering HRD's statewide promotional exams to Sergeant for 2005 and 2006, there is practically important and highly statistically significant adverse impact against minority applicants in passing the written test.

## 21. P/F Impact of the Written Test For BPD, 2005

This adverse analysis considers HRD's promotional examination for Sergeant, BPD.  This exam is considered separately in case the Defendant claims that the exam for the BPD was dissimilar to the statewide exams.

### A. Passing and Failing: BPD, 2005

I tallied the number of applicants passing and failing the written test based on data in the Excel files provided to me as described above in the section titled "Documents and Computer Files Reviewed."

These tallies are presented in Table 16a below, with the associated percents.  This table shows 43.4% of the black applicants passed the written test, as compared with 70.5% of the non-minority applicants.

---

[29]The Stouffer method yields very similar results.

| Table 16a.  P/F BPD Sergeant Exam, 2005, by Ethnic Group | | | |
|---|---|---|---|
| Group | Number Passing (percent) | Number Failing (percent) | Total (percent) |
| Minority | 98 (43.4%) | 128 (56.6%) | 226 (100%) |
| Non-minority | 282 (70.5%) | 118 (29.5%) | 400 (100%) |
| Total | 380 | 246 | 626 |

**B.  Adverse Impact Ratio for P/F by Ethnic Group: BPD, 2005**

As shown in Table 16b, the adverse impact ratio for P/F is .62, which I got by dividing the percentage of minorities passing (43.4%) by the percentage of of non-minorities passing (70.5%).  This result tells us that minority applicants passed the written test at a rate only 62% of the rate that non-minority applicants passed the written test, or that minority applicants had less than 2/3 the chance of passing as non-minority applicants.  A statistical analysis of this adverse impact ratio is reported in Table 16b.

| Table 16b.  Adverse Impact: P/F BPD Sergeant Exam, 2005 | | | | | |
|---|---|---|---|---|---|
| Minority: Percent Passing | Non-minority: Percent Passing | Adverse Impact Ratio | Probability | Chi Square | Standard Deviation Units |
| 43.4% | 70.5% | .62 | < .0001 | 43.5 | 6.6 |

**C.  Probability and Statistical Significance For passing: BPD, 2005**

The adverse impact ratio of .62 is highly statistically significant.  A ratio this small would occur by chance less than 1 times in ten thousand.  This probability corresponds to 6.6 standard deviation units.

**D.  Practical Import For passing: BPD, 2005**

The practical importance of passing 43.4% of minority applicants versus 70.5% of non-minority applicants is obvious: there is a disproportionately low passing rate for minority applicants.  The adverse impact ratio (.62) also fails the .80 rule of thumb of the *UGESP*.  Non-minority applicants passed the written test at over 1 1/2 times the rate of minority applicants.

**E. Opinion on Passing: BPD, 2005**
Considering HRD's 2005 promotional exam to Sergeant, BPD, there is practically important and highly statistically significant adverse impact against minority applicants in passing the written test.[30]

## 22. P/F Impact of the Written Test For 2003 Statewide Exam
This adverse analysis considers HRD's 2003 statewide promotional examination. This exam is considered separately in case the Defendant claims that the overall pattern seen in the aggregate adverse impact analysis reported first does not hold for the individual exams that were aggregated.

**A. Passing and Failing: 2003 Statewide Exam**
I tallied the number of applicants passing and failing the written test based on data in the Excel files provided to me as described above in the section titled "Documents and Computer Files Reviewed."

These tallies are presented in Table 17a below, with the associated percents. This table shows 65.5% of the black applicants passed the written test, as compared with 84.0% of the non-minority applicants.

| Table 17a. P/F 2003 Statewide Exam, by Ethnic Group | | | |
|---|---|---|---|
| Group | Number Passing (percent) | Number Failing (percent) | Total (percent) |
| Minority | 36 (65.5%) | 19 (34.5%) | 55 (100%) |
| Non-minority | 220 (84.0%) | 42 (16.0%) | 262 (100%) |
| Total | 256 | 61 | 317 |

**B. Adverse Impact Ratio for P/F by Ethnic Group: 2003 Statewide Exam**
As shown in Table 17b, the adverse impact ratio for P/F is .78, which I got by dividing the percentage of minorities passing (65.5%) by the percentage of of non-minorities passing (84.0%). This result tells us that minority applicants passed the written test at a rate only 78% of the rate that non-minority applicants passed the written test, or that minority applicants had less than 4/5 the chance of passing as non-minority applicants. A statistical analysis of this adverse impact ratio is reported in Table 17b.

---

[30]An internal HRD report came to the same conclusion (Bates 1964).

| Table 17b.  Adverse Impact: P/F 2003 Statewide Exam | | | | | |
|---|---|---|---|---|---|
| Minority: Percent Passing | Non-minority: Percent Passing | Adverse Impact Ratio | Probability | Chi Square | Standard Deviation Units |
| 65.5% | 84.0% | .78 | .003 | 8.9 | 3.0 |

**C.  Probability and Statistical Significance For passing: 2003 Statewide Exam**
The adverse impact ratio of .78 is statistically significant.  A ratio this small would occur by chance less than 3 times in a thousand.  This probability corresponds to 3.0 standard deviation units.

**D.  Practical Import For passing: 2003 Statewide Exam**
The practical importance of passing 65.5% of minority applicants versus 84.0% of non-minority applicants is obvious: there is a disproportionately low passing rate for minority applicants.  The adverse impact ratio (.78) also fails the .80 rule of thumb of the *UGESP*.  Non-minority applicants passed the written test at about 1 1/4 times the rate of minority applicants.

**E.  Opinion on Passing: 2003 Statewide Exam**
Considering HRD's 2003 statewide promotional exam to Sergeant, there is practically important and statistically significant adverse impact against minority applicants in passing the written test.

**23. P/F Impact of the Written Test For 2004 Statewide Exam**
This adverse analysis considers HRD's 2004 statewide promotional examination.  This exam is considered separately in case the Defendant claims that the overall pattern seen in the aggregate adverse impact analysis reported first does not hold for the individual exams that were aggregated.

**A.  Passing and Failing: 2004 Statewide Exam**
I tallied the number of applicants passing and failing the written test based on data in the Excel files provided to me as described above in the section titled "Documents and Computer Files Reviewed."

These tallies are presented in Table 18a below, with the associated percents.  This table shows 39.6% of the black applicants passed the written test, as compared with 67.4% of the non-minority applicants.

| Table 18a. P/F 2004 Statewide Exam, by Ethnic Group | | | |
|---|---|---|---|
| Group | Number Passing (percent) | Number Failing (percent) | Total (percent) |
| Minority | 19 (39.6%) | 29 (60.4%) | 48 (100%) |
| Non-minority | 223 (67.4%) | 108 (32.6%) | 331 (100%) |
| Total | 242 | 137 | 379 |

**B. Adverse Impact Ratio for P/F by Ethnic Group: 2004 Statewide Exam**
As shown in Table 18b, the adverse impact ratio for P/F is .59, which I got by dividing the percentage of minorities passing (39.6%) by the percentage of of non-minorities passing (67.4%). This result tells us that minority applicants passed the written test at a rate only 59% of the rate that non-minority applicants passed the written test, or that minority applicants had less than 2/3 the chance of passing as non-minority applicants. A statistical analysis of this adverse impact ratio is reported in Table 18b.

| Table 18b. Adverse Impact: P/F 2004 Statewide Exam | | | | | |
|---|---|---|---|---|---|
| Minority: Percent Passing | Non-minority: Percent Passing | Adverse Impact Ratio | Probability | Chi Square | Standard Deviation Units |
| 39.6% | 67.4% | .59 | < .001 | 12.8 | 3.6 |

**C. Probability and Statistical Significance For passing: 2004 Statewide Exam**
The adverse impact ratio of .59 is statistically significant. A ratio this small would occur by chance less than 1 time in a thousand. This probability corresponds to 3.6 standard deviation units.

**D. Practical Import For passing: 2004 Statewide Exam**
The practical importance of passing 39.6% of minority applicants versus 67.4% of non-minority applicants is obvious: there is a disproportionately low passing rate for minority applicants. The adverse impact ratio (.59) also fails the .80 rule of thumb of the *UGESP*. Non-minority applicants passed the written test at more than 1 1/2 times the rate of minority applicants.

**E. Opinion on Passing: 2004 Statewide Exam**
Considering HRD's 2004 statewide promotional exam to Sergeant, there is practically important and statistically significant adverse impact against minority applicants in

passing the written test.

## 24. P/F Impact of the Written Test For 2005 Statewide Exam

This adverse analysis considers HRD's 2005 statewide promotional examination. This exam is considered separately in case the Defendant claims that the overall pattern seen in the aggregate adverse impact analysis reported first does not hold for the individual exams that were aggregated.

### A. Passing and Failing: 2005 Statewide Exam

I tallied the number of applicants passing and failing the written test based on data in the Excel files provided to me as described above in the section titled "Documents and Computer Files Reviewed."

These tallies are presented in Table 19a below, with the associated percents. This table shows 25.7% of the black applicants passed the written test, as compared with 47.7% of the non-minority applicants.

| Table 19a.  P/F 2005 Statewide Exam, by Ethnic Group | | | |
|---|---|---|---|
| Group | Number Passing (percent) | Number Failing (percent) | Total (percent) |
| Minority | 9 (25.7%) | 26 (74.3%) | 35 (100%) |
| Non-minority | 82 (47.7%) | 90 (52.3%) | 172 (100%) |
| Total | 91 | 116 | 207 |

### B. Adverse Impact Ratio for P/F by Ethnic Group: 2005 Statewide Exam

As shown in Table 19b, the adverse impact ratio for P/F is .54, which I got by dividing the percentage of minorities passing (25.7%) by the percentage of of non-minorities passing (47.7%). This result tells us that minority applicants passed the written test at a rate only 54% of the rate that non-minority applicants passed the written test, or that minority applicants had about 1/2 the chance of passing as non-minority applicants. A statistical analysis of this adverse impact ratio is reported in Table 19b.

Page 40

| Table 19b.  Adverse Impact: P/F 2005 Statewide Exam | | | | | |
|---|---|---|---|---|---|
| Minority: Percent Passing | Non-minority: Percent Passing | Adverse Impact Ratio | Probability | Chi Square | Standard Deviation Units |
| 25.7% | 47.7% | .54 | .028 | 4.84 | 2.2 |

**C.  Probability and Statistical Significance For passing: 2005 Statewide Exam**
The adverse impact ratio of .54 is statistically significant.  A ratio this small would occur by chance less than 3 times in a hundred.  This probability corresponds to 2.2 standard deviation units.

**D.  Practical Import For passing: 2005 Statewide Exam**
The practical importance of passing 25.7% of minority applicants versus 47.7% of non-minority applicants is obvious: there is a disproportionately low passing rate for minority applicants.  The adverse impact ratio (.54) also fails the .80 rule of thumb of the *UGESP*. Non-minority applicants passed the written test at about twice the rate of minority applicants.

**E.  Opinion on Passing: 2005 Statewide Exam**
Considering HRD's 2005 statewide promotional exam to Sergeant, there is practically important and statistically significant adverse impact against minority applicants in passing the written test.

**25. P/F Impact of the Written Test For 2006 Statewide Exam**
This adverse analysis considers HRD's 2006 statewide promotional examination.  This exam is considered separately in case the Defendant claims that the overall pattern seen in the aggregate adverse impact analysis reported first does not hold for the individual exams that were aggregated.

**A.  Passing and Failing: 2006 Statewide Exam**
I tallied the number of applicants passing and failing the written test based on data in the Excel files provided to me as described above in the section titled "Documents and Computer Files Reviewed."

These tallies are presented in Table 20a below, with the associated percents.  This table shows 58.1% of the black applicants passed the written test, as compared with 76.0% of the non-minority applicants.

| Table 20a.  P/F 2006 Statewide Exam, by Ethnic Group | | | |
|---|---|---|---|
| Group | Number Passing (percent) | Number Failing (percent) | Total (percent) |
| Minority | 36 (58.1%) | 26 (41.9%) | 62 (100%) |
| Non-minority | 234 (76.0%) | 74 (24.0%) | 308 (100%) |
| Total | 270 | 100 | 370 |

**B. Adverse Impact Ratio for P/F by Ethnic Group: 2006 Statewide Exam**

As shown in Table 20b, the adverse impact ratio for P/F is .76, which I got by dividing the percentage of minorities passing (58.1%) by the percentage of of non-minorities passing (76.0%). This result tells us that minority applicants passed the written test at a rate only 76% of the rate that non-minority applicants passed the written test, or that minority applicants had about 3/4 the chance of passing as non-minority applicants. A statistical analysis of this adverse impact ratio is reported in Table 20b.

| Table 20b.  Adverse Impact: P/F 2006 Statewide Exam | | | | | |
|---|---|---|---|---|---|
| Minority: Percent Passing | Non-minority: Percent Passing | Adverse Impact Ratio | Probability | Chi Square | Standard Deviation Units |
| 58.1% | 76.0% | .76 | .006 | 7.51 | 2.74 |

**C. Probability and Statistical Significance For passing: 2006 Statewide Exam**

The adverse impact ratio of .76 is statistically significant. A ratio this small would occur by chance 6 times in a thousand. This probability corresponds to 2.74 standard deviation units.

**D. Practical Import For passing: 2006 Statewide Exam**

The practical importance of passing 58.1% of minority applicants versus 76.0% of non-minority applicants is obvious: there is a disproportionately low passing rate for minority applicants. The adverse impact ratio (.76) also fails the .80 rule of thumb of the *UGESP*. Non-minority applicants passed the written test at about 1 1/4 times the rate of minority applicants.

**E. Opinion on Passing: 2006 Statewide Exam**

Considering HRD's 2006 statewide promotional exam to Sergeant, there is practically important and statistically significant adverse impact against minority applicants in

passing the written test.

## 26. Summary of Adverse Impact Analysis In Passing the Written Test

The analyses above reveal that there is adverse impact in passing HRD's written test for Sergeant. Overall, the adverse impact against minority applicants is statistically significant, and sizeable and of practical import. The overall finding is also seen in the statistical analyses for individual exams and for several groupings of those exams. (Although not detailed above, a similar statistical analysis reveals that the 2007 exam does not have adverse impact of less than .80 for passing.)[31]

## 27. Other Adverse Impact Statistical Analyses

I undertook other statistical analyses of the impact of the HRD exams on minority applicants. Although not reported here in any detail, there are statistically significant differences between the mean scores of minority and non-minority applicants,[32] with minority applicants scoring lower on average; and minority applicants tend to be ranked lower on eligible lists, and so tend to be delayed in certification relative to non-minority applicants.

## Section Three: Evaluation of Test Validity

HRD has not provided professionally acceptable demonstration that the Sergeant exams are valid. The documentation that has been provided is seriously flawed. The HRD exams cannot be trusted to provide reasonable assurance that the applicants who pass the exams can perform the job successfully and the applicants who fail cannot. In addition, there are indications that test questions are poorly crafted or not job-related. Such flaws in the questions make the tests unfair to all applicants, but particularly to minority applicants. Following a short summary of the professional and governmental standards for test validation, some major flaws are briefly described.

## 1. Standards for Evaluating the Validity and Fairness of a Test

For about 100 years psychologists have studied tests[33] as they are used for selecting

---

[31]Again I point out that few people have been hired based on this exam, but that more hiring is anticipated. I reserve the right to conduct additional statistical analyses when additional hiring data becomes available from the 2007 and the 2006 exams. Since the analyses above consider only departments which have both appointment and minority applicants, the data considered in the analyses will change as more departments make appointments from these exams.

[32]An internal HRD report evaluated grades from the 2005 exam for Sergeant, BPD and concluded that there were statistically significant racial group differences (Bates 1963).

[33]The word "test" may be broadly defined as a sample of an examinee's behavior that is obtained and scored using a standardized process. This includes multiple-choice tests, evaluations of education and experience, structured interviews, minimum requirements for a job, and the like.

employees, as well as tests of human abilities in general. Government and professional standards for testing have been issued and published over the years, and several approaches to developing tests and evaluating the validity of tests have been identified and described.

A. **Government and Professional Testing Guidelines, Standards, and Principles**

About 30 years ago four federal enforcement agencies jointly issued guidelines on employee selection procedures (after seeking input from professional and other interested groups). In addition, two professional organizations of psychologists have published standards and guidelines for testing. Thus, there are three documents that are generally and widely used when developing and evaluating employee selection tests such as the promotional exams for Sergeant: The *Uniform Guidelines on Employee Selection Procedures*[34] (hereafter referred to as the *Uniform Guidelines*), the *Standards for Educational and Psychological Tests* (hereafter referred as the *APA Standards2*[35]) and the *Principles for the Validation and Use of Personnel Selection Procedures* (hereafter referred to as the *SIOP Principles*).

In 1978, the federal enforcement agencies for Title VII of the 1964 Civil Rights Act, as amended, issued the *Uniform Guidelines* that contains specific requirements for personnel selection procedures and tests that have adverse impact on protected groups. Since the *Uniform Guidelines* were issued, public and private sector employers and the industrial psychologists and psychometricians doing work for them have generally attempted to comply with the validation and documentation requirements therein. The *Uniform Guidelines* states their purpose as follows:

> "These guidelines incorporate a single set of principles which are designed to assist employers, labor organizations, employment agencies, and licensing and certification boards to comply with requirements of Federal law prohibiting employment practices which discriminate on grounds of race, color, religion, sex, and national origin. They are designed to provide a framework for determining the proper use of tests and other selection procedures. These guidelines do not require a user to conduct validity studies of selection procedures where no adverse impact results. However, all users are encouraged to use selection procedures which are valid, especially users operating under merit principles."[36]

The American Psychological Association, together with two other nationwide professional organizations, in 1999 published the *APA Standards*, an authoritative work

---

[34] 43 FR 38295, 38314, August 25, 1978.

[35] Although now co-authored by three professional associations, the first editions were authored only by the American Psychological Association, and they are still commonly referred to as the *APA Standards*.

[36] *Uniform Guidelines*, Section 3.1. Statement of Purpose.

written "to promote the sound and ethical use of tests and to provide a basis for evaluating the quality of testing practices."[37] This comprehensive, 200-page document covers educational and psychological testing. Of particular relevance to this case are its chapters on test validity, test reliability, test development and revision, supporting documentation for tests, fairness in testing and test use, and testing in employment and credentialing. This document is a revision of an earlier, similar document published in 1985.

The Society for Industrial and Organizational Psychology in 2003 published the *SIOP Principles*, intended "to specify established scientific findings and generally accepted professional practice in the field of personnel selection psychology in the choice, development, evaluation, and use of personnel selection procedures..."[38] This document is a revision of an earlier, similar document published in 1987 and is intended to be consistent with the *APA Standards*.

## B. Accepted Approaches to Validating a Test

The *Uniform Guidelines*, the *APA Standards* and the *SIOP Principles* recognize several types of evidence that can support the validity of a test for a specific use. According to the *APA Standards* a test itself is not considered valid or invalid; rather the validity of the specific use to which the test is put, the use and interpretation of the test scores, is evaluated. All three documents describe several sources of evidence that might be used to evaluate the validity of a test in a specific application. The most widely used approaches to validation of tests used for personnel selection purposes are commonly referred to as: content validation, criterion-related validation, and construct validation. These approaches to validity are specific to a given test in a given application (e.g., an exam for promotion to Police Sergeant in Boston). Another approach to validation that involves use of data from other situations includes what is referred to as "validity generalization" or "transportability" depending on the number of such studies being relied upon. Since the Director of Civil Service, Human Resources Division (HRD) of the Commonwealth of Massachusetts, Sally McNeely, has testified at deposition that HRD relied solely on content validity,[39] I describe just that approach to validation below.[40]

---

[37]*APA Standards*, page 1, column 1.

[38]*SIOP Principles*, page 1.

[39]McNeely, 99.

[40]Other approaches to evaluating test validity typically entail research into the empirical relationship of test scores to some measure or measures of job performance (typically referred to as the criterion).

Page 45

### C. Content Validation

Evidence of the content validity of a test[41] relies on an analysis of the relationship of what the test measures (the content of the test[42]) and the content of the job.[43] This analysis is fundamentally a judgmental process, but it can be supported or facilitated by a job analysis (i.e., a systematic study of the job duties, and the abilities and worker characteristics required to perform successfully the job duties). For example, postal clerks or bank tellers might spend much of their work days making change for customers, and so a content valid personnel selection test for these jobs might reasonably include questions that involve making change. Any attempt to prove that a test is content valid involves a judgement of the degree to which the content of the test agrees with the content of the job. As the *Uniform Guidelines* state,

> "...a content validity study should consist of data showing that the content of the selection procedure is representative of important aspects of performance on the job for which the candidates are to be evaluated."[44]

## 2. HRD Did Not Provide A Professionally Acceptable Content Validation Study

The documents disclosed by HRD in response to Interrogatories asking for all validation studies are, at best, an incomplete and disjointed hodgepodge of partial copies of questionable content validation efforts. Taken singly or together they provide no professionally acceptable support for or demonstration of the content validity of the HRD exams for Sergeant. I provide a few examples here of the incomplete and inadequate nature of the HRD documents.

### A. 1991 Validation Report is a Brief Summary, Devoid of Substantive Details

Perhaps the most complete and germane (but dated) document produced by HRD is a 1991 report titled, "Validation Report for the 1991 Police Promotional Selection Procedures."[45] However, this report is incomplete. All 28 appendices to the job analysis study are missing.[46] These Appendices purport to contain the essence of the content validity study: the job analysis and data analysis methodology, and summaries of the data collected. A report stating only conclusions and lacking methodology and data summaries is simply and grossly inadequate and is not professionally acceptable support

---

[41]*Uniform Guidelines*, Sections 14B and 15B.

[42]Sometimes called the "content domain" of the test.

[43]Sometimes called the "job domain" or "work domain."

[44]*Uniform Guidelines*, 3.5 B

[45]Bates stamp 00246-00382.

[46]Appendix BB is mentioned on page 14 of the Report (Bates 00262).

Page 46

for test validity. However, the test outline presented in the 1991 report[47] is virtually identical to the test outline used for HRD's statewide exams for Sergeant in 2005, 2006, and 2007, and for all Sergeant exams since 2000.[48] Thus this report appears to be the foundation for HRD's current test outlines.

**B. Job Analysis on Which the 1991 Report Apparently Relies is Undocumented**

The tasks listed in the 1991 Validation Report were taken from a 1990 job analysis project,[49] which is itself undocumented as to methodology and data collected. What appears to be the cover memo to the 1990 task list has only this one paragraph describing the job analysis methodology:

> "Though we simplified the rating scale used (as compared to the one we used in the state-wide classification study), we got mixed results. In an effort to provide you [the Director of Selection] with more usable information, we have produced two additional documents. In the first of these, using the listing of KSAP's that the SME's rated as important we identified KSAP's required at hire based on our knowledge of the jobs and our conventions developed and used during the state-wide classification study (and now in use by the Classification and Compensation analysts). In the second of these we produced a listing of KSAP's required at hire and acquired on the job to a great extent based on our discretion and classification knowledge."

This is the sum total of the documentation of the job analysis efforts. This inadequate paragraph provides: no indication of the jurisdictions, number, rank, or qualifications of the persons surveyed; no task or KSAPs survey document; no description or summary of the job analysis data collected or the data analysis methodology; no discussion of the criteria used to determine which tasks and KSAPs are deemed important; and no description of the nature of the "mixed results" mentioned in the first sentence. A memo so short and lacking in basic, crucial information about methodology and data summaries is simply and grossly inadequate and is not professionally acceptable support for test validity.

**C. Other Documents Produced are Similarly Inadequate**

The various other documents produced by the Defendant in support of the test content

---

[47]Bates 00322-0033.

[48]"Same outline has been in place since the beginning of the 1990's when I started writing items." (Bates 00005).

[49]Identical task wording is found in the 1991 Validation Report and in what appears to be a 1990 listing of tasks. For example, the task numbered 1 in the 1991 Validation Report (Bates 00269) appears as number 1 in the 1990 document (Bates 00515); the task numbered 7 in the 1991 Validation Report (Bates 00269) appears as number 7 in the 1990 document (Bates page 00515). The cover memo on the preceding page is dated 1990 (Bates 00493).

and validity are similarly inadequate and/or flawed in various ways and do not provide professionally acceptable support for test validity.

### 3. HRD Set Passing Points Arbitrarily

There was simply no logical or empirical basis presented for the passing point for this examination. No testimony or document produced by the Defense provides such a rationale for setting the passing score at 70.

#### A. Passing Score for Boston Sergeant Exam Set Arbitrarily

An HRD memo states without explanation or comment, "Used 70 as that is what BPD requested."[50] In addition to the lack of empirical support for the passing point, it should be noted that it is possible for an applicant to pass the exams despite missing every question on law.[51] There is no professionally acceptable reason to think that people who pass the exam can do the job or that people who fail the exam cannot do the job.

#### B. Assistant Director Said 70% is Traditional

When asked why the passing score was set at 70%, the Assistant Director of Civil Service, the person who supervises exam development,[52] said "It's always been that way."[53]

#### C. HRD Did Not Follow Its Own Procedure for Setting Passing Points

The HRD 1991 Validation Report[54] describes a methodology for setting passing points based on the test data from test-takers who were Sergeants at the time of the testing and who, in-effect, took the written tests for Sergeant.[55] HRD did not provide any indication of following that procedure in setting the passing points for the exams being challenged. I have requested, but not yet received, the examination data from the 2005-2007

---

[50]Memo of 11/23/05 from M. Asano to V. Lee (Bates # 1946).

[51]Law comprised 20% of the exam, with 16 test questions. It is mathematically possible for an applicant to get all 16 law questions wrong and still earn a grade of 80%.

[52]Lee, 11, lines 19-22.

[53]Lee, 17, lines 15-16.

[54]Bates 00381.

[55]HRD's statewide written test for Lieutenant consists of 100 questions, the first 80 of which comprise the written test for Sergeant. So every Sergeant taking the HRD test for Lieutenant, in effect, takes the HRD written test for Sergeant.

Lieutenants exams to help me evaluate the reasonableness of the passing points.[56]

### D. SMEs Asked to Rate Item Difficulty, Ignoring Competence

In an apparent attempt to target the difficulty level of the written tests, HRD had a small number of police chiefs rate the difficulty level of the test questions prior to use. This process was flawed in several respects: the use of only 1 (sometimes 2) raters is inadequate to provide reliable ratings, the rating of difficulty is not the same as making a rating related to competence or knowledge required to do the job, and the ratings were systematically inaccurate (i.e., the difficulties ascribed to test questions do not agree with the actual difficulty levels of the items, since a much higher proportion of applicants correctly answered the questions than predicted by the ratings).

### E. Passing Rates Vary from Exam to Exam

Although there is no reason to think the applicants in one year are more or less qualified than those in another year, the passing rates for HRD's Sergeant exams varied dramatically, from 48% in 2005 to 78% in 2007 for non-minorities, and from 26% to 79% for minorities (in departments that had both minority applicants and appointments).

### F. HRD Says Disparate Scores Reflect Equal Ability

An HRD document reports statistical computations concerning two (hypothetical) applicants whose scores differ by 6 points and concludes, "...we can be fairly confident that both are functioning at approximately the same level."[57] This finding may support alternative approaches to using the test scores, but the HRD report did not explicitly explore that possibility.

## 4. HRD Exams Omit Many Important Abilities

The HRD exams do not measure such abilities as the following, all of which were determined to be important for success on the job by the job analysis study[58] relied on by HRD in developing the test outline for the Boston Sergeant exam, and shown by studies done in other jurisdictions to be important for Sergeant:

    analytical skill
    skill in supervision and leadership
    interpersonal skills
    presentation skills
    reasoning and judgement

---

[56] I reserve the right to supplement this report after the Lieutenant data are made available to me.

[57] Bates 1965.

[58] Table S-1 shows HRD was not able to link these (and other) KSAs to the test outline used for the promotional exams. (KSAPs numbered 51, 67, 77, 78, 79, 80, 85, 127, 145, 156, and 157 are not linked to the HRD exam outline; Bates 1620-1628.)

oral communication
ability to persuade others
ability to make sound decisions quickly based on the facts presented
ability to manage time effectively
ability to give written and oral instructions in a precise and understandable manner
ability to follow oral and written instructions

### A. HRD Testimony: No Attempt to Measure Reasoning

The HRD employee who had the main responsibility for constructing the 2005, 2006, and 2007 exams for Sergeant testified at deposition that he did not try to devise questions that would test one's ability to reason.[59]

### B. 1991 Validation Report Acknowledges Important KSAPs Unmeasured

The 1991 Test Validation Report explicitly says that important KSAPs were not measured. These include knowledges that are not covered by the material on the reading list and

"...still other KSAPs could not be measured by means of a written test; e.g., ...ability to establish rapport with persons from different ethnic, cultural, and/or economic backgrounds."[60]

### C. 2006 Boston Exam: HRD Ignored Half the Important KSAPs

HRD attempted to use the Morris & McDaniel, Inc. Job Analysis Report[61] as a basis for the outline for the 2005 Boston Sergeant's exam.[62] HRD's own linking exercise reveals that over half the KSAPs identified as important by the MMI study were ignored by HRD in the exam for Sergeant, BPD.

## 5. Minimal HRD Guidance Given to Examiner Who Wrote Test Questions

One HRD employee has had the primary responsibility for compiling the written tests for Sergeant from 2005 through 2007, and he wrote some, but not all, of the questions for each of these exams. This employee was not provided with the structure and training needed to do his job correctly.

### A. No Definitions of Test Areas

The HRD employee with primary responsibility for compiling the written test for Sergeant

---

[59]Paris, 29, lines 12-17.

[60]Bates 00265.

[61]Bates 1542 - 1704.

[62]HRD attempted to link the KSAPs MMI identified as important to the list of competencies that form the test outline for HRD's Sergeant's exam. This process is described at Bates #1950, and the resulting Table S-1 is at Bates #2167-2170.

from 2005 through 2007 testified at deposition that HRD has no written definition of the Competency areas listed on the test outlines for the statewide exams. He made judgements concerning which category a question falls based on his own, undocumented understanding of the competencies. He was unable to say if the definitions of these competency areas used for the 2005 Boston exam were the same as the definitions he used in categorizing competencies.

**B. No HRD Internal Guidelines on Writing Test Questions**
The HRD employee with primary responsibility for compiling the written test for Sergeant from 2005 through 2007 testified that HRD has no written guidelines for writing test questions.

**C. No Formal Training In Writing Test Questions**
The HRD employee with primary responsibility for choosing the multiple-choice (m-c) test questions for Sergeant from 2005 through 2007 testified that he has had no formal training in writing test questions.

**D. No Assistance From Experts in Cultural Bias or Readability**
The HRD employee with primary responsibility for choosing the multiple-choice (m-c) test questions for Sergeant from 2005 through 2007 testified that he has not consulted with people who specialize in the area of cultural bias or the area of readability.

**E. Immediate Supervisor Lacked Relevant Training**
The supervisor of the HRD employee with primary responsibility for creating the written tests had no training in the relevant professional reference materials (e.g., the *SIOP Principles* and *APA Standards*) nor in the federal *Uniform Guidelines on Employee Selection Procedures*.[63]

**F. No Consultation with Industrial/Organizational Psychologists**
The HRD employee with primary responsibility for choosing the multiple-choice (m-c) test questions for Sergeant from 2005 through 2007 testified that he has not had the opportunity to consult with industrial/organizational psychologists on how to write test questions.

**6. Exam Questions Test Recognition of Textbook Phraseology**
The HRD employee with primary responsibility for writing or choosing the multiple-choice (m-c) test questions for Sergeant from 2005 through 2007 testified that the HRD test questions are partial or total verbatim quotes of material on the reading list.[64] This is

---

[63]Lee, 34, line 9 - 35, line 6.

[64]Paris, 23, lines 6-20.

Page 51

consistent with historic criticisms that HRD exams emphasize memorization.[65]  Relying on memory questions alone is a less than ideal way to test understanding of the material on the reading list.

## 7. Other Indications of Poor Quality Test Development

The HRD documents reveal a number of indications of poor quality test development.  A few examples follow.

### A. Large Number of Changes to the 2007 Answer Key

For the 2007 exam, HRD double keyed or credited 18 items.  This involves 22.5% of the items comprising the 80 item test (18/80 = 22.5%).  That many changes to the planned answer key is disquieting for several reasons.  It indicates an effective lack of quality control in the writing and review of test questions, it upsets the intended weighting of the various test areas, and it makes the test easier.

### B. Unnecessarily Difficult/Academic Words in the Test Questions

Ideally test questions are written clearly, so that the test taker can understand the question.  According to professionally accepted practice, the vocabulary used in a multiple-choice test question should be simple enough so that reading comprehension does not mask or otherwise interfere with measuring the intended ability.  For example, one respected set of guidelines on item-writing states, "Simplify vocabulary so that reading comprehension does not interfere with testing the content intended."[66]  Another classic reference on developing tests states, "Item writers should be alert to irrelevant sources of difficulty in items.  Unnecessary difficulty of vocabulary is a case in point."[67]  In addition, the questions should be brief.  For example, the first set of guidelines just quoted states, "Make the stem as brief as possible" (the "stem" refers to the question).  The second authority cited above on writing test questions states, "Economy in use of language, in order to reduce reading time and complexity, is an important feature of good test construction" (page 84).  The HRD written tests contain a number of unnecessarily difficult words, such as: unequivocal, intrusiveness, inherent, adhere, homogeneous, and

---

[65]The 1991 Test Validation Report quoted SME comments on the written test such as, "Knowledge of none of the tasks are necessary to answer these questions.  Good study habits and reading of the books is all that is needed." and "It does not appear to me that I have to know any of the questions to do the tasks.  What I needed to know, was to have read the books." (Bates 00358)

[66]Haladyna, T.M. (2004)  *Developing and Validating Multiple-Choice Test Items (3rd ed).* Mahwah, NJ: Lawrence Erlbaum Publishing (page 99).

[67]Adkins, D.C. (1974) *Test Construction (2nd ed.)*  Columbus, OH: Merrill Publishing (page 85).

apportioned.[68]

**C. Closed Book Questions On Material That Could Be Looked-Up**

The HRD exams asked a number of questions on topics that could reasonably be looked up. Here are 8 examples from the 2005 exam for Sergeant, BPD of questions asked on material that need not be memorized:

    (1) Q1 asks what forms are needed to judge a civilian employee fit to return to work (presumably after an illness, but the question does not say).

    (2) Q 17 asks which senior officer is responsible for determining fixed locations for traffic enforcement.

    (3) Q18 asks what factors the District Commander uses to determine fixed locations for traffic enforcement.

    (4) Q31 asks with whom past copies of Inventory Form #2012 are filed?

    (5) Q68 asks whose written approval is needed for a PO to work off duty?

    (6) Q77 asks where vehicle crash reports are filed (only 19.2% got this question right).

    (7) Q70 asks who is responsible for preparing a list of on-call clerks. (See Attachment C for the full wording of this question.)

    (8) Q80 asks which form must an employee submit to report a change of address. (See Attachment C for the full wording of this question.)

**D. Poorly Worded Questions**

All the choices in a question should be logical completions or answers to the stem of the question. That was not the case with all the questions in the HRD exams. For example, the first question in Exam 2006 asks about "the suspect's conduct" but the key (the correct answer) refers to actions of the police. So the key does not answer the question. This is particularly troublesome since it comes at the start of the test. (See Attachment C for the full wording of this question.)

As another example, question 5 on this exam asks, "Which of the following is an accurate statement concerning police responsibilities?" However, two of the choices do not make any statements about police responsibilities. (See Attachment C for the full wording of this question.)

Such poorly worded questions can (and should) make candidates concerned about the quality of the test. Such question may increase test anxiety as test takers struggle to understand illogical questions.

**E. Grammatical Errors in Exam Questions**

---

[68]All these words appeared in the first 35 questions of the 2007 exam (Bates C-979 to C-985). Additional examples may be found in other HRD exams being challenged.

Grammatical errors in exam questions can raise the anxiety level of test takers who may think, "If the test has grammatical errors, what other errors does it have?" Too many of the HRD questions contain obvious grammatical errors. For example, in question 72 of Exam 2005, "sight" is used improperly instead of "site."

### F. Questions Not Appropriate for Sergeant

The 2005 stateside exam contains several questions that ask about subject matter that may not be appropriate for a Sergeant. For example, question 49 asks about the administrative and bureaucratic theories of organization. Question 52 asks about police departments that have recently undergone decentralization. Question 63 asks about the name of a step in a certain problem solving process. (Only 23% of applicants answered that question correctly.)

## 8. Improvements In 2007 Exam Point to Deficiencies in 2005-2006 Exams

The 2007 exam had some innovations and improvements[69] that could have been implemented in earlier exams. Two are mentioned here.

### A. There are No "Exception" Questions on 2007 Exam

Exception questions[70] can be confusing. The 2006 Exam contains 8 exception questions (comprising 10% of the 80 questions). The 2007 exam does not contain a single exception question.

### B. 2007 Questions are Shorter

Longer questions are often harder to understand than shorter questions. The questions on the HRD exams have been getting shorter recently. In the 2007 exam the average question was 47 words; in the 2005 Boston exam the average question was 71 words, almost 50% longer than in the 2007 exam.

## Section Four: Fairness and Alternative Selection Procedures and Approaches

There are alternative selection procedures with less adverse impact and equal or greater validity than ranking applicants based solely or mainly on a multiple choice technical knowledge test.

## 1. Examples of Alternative Selection Procedures[71]

Approaches used by other jurisdictions include so called "high fidelity" test components such as:

▾ Structured oral examinations (also known as structured oral boards)
▾ In-basket exams (both traditional and multiple-choice)

---

[69]McNeely, 76 line 20 to 77 line 2.

[70]These are questions that read, All but one of the following is ..., the exception is.

[71]Examination announcements and candidate briefing materials are available on the web for almost all the jurisdictions mentioned in this section.

Page 54

- ▾ Video based tests of judgment
- ▾ Role playing (sometimes with live role players or with videos of others)
- ▾ Assessment Center

### A. Alternatives are Practical

That these alternative approaches are practical is clear from their widespread use across the nation in examinations for promotion to Police Sergeant. For example, alternatives such as listed above are used in:
- ▾ Philadelphia, Pennsylvania
- ▾ Dallas, Texas
- ▾ Denver, Colorado
- ▾ Miami, Florida
- ▾ Jefferson County, Alabama
- ▾ The State of Tennessee

## 2. Examples of Alternative Use of Test Scores

Rather than use scores from a multiple choice job knowledge test to rank applicants, some jurisdictions use these scores on a pass-fail basis and rank applicants using other measures.

## 3. Alternative Selection Procedure Envisioned by the State Legislature

The Massachusetts Legislature envisioned promotional exams that included measures of past job performance, and enacted legislation to enable this (MGL Chapter 31, Section 6A, B and C). Despite this legislation being in place for almost 20 years, it was not been used by HRD in these exams.

## 4. No Efforts to Reduce Adverse Impact Prior to 2007 Exam

The Director of Civil Service testified at deposition that HRD made no efforts to minimize adverse impact prior to the 2007 exam.[72] During this same time period (pre 2007) most, if not all, major civil service jurisdictions nationwide were striving to reduce adverse impact.

### A. HRD Did Not Follow Its Own Cultural Bias Review Process

The 1991 Test Development Report describes a process for reviewing items for cultural bias. The Director of Civil Service testified at deposition that cultural bias review was a change made by an outside consultant assisting with the development of the 2007 exam.[73]

## Section Five: Summary of My Opinions

The HRD exams resulted in severe and statistically significant adverse impact in hiring, and the written tests had adverse impact at the passing score and in mean score and in ranking. Lower ranks for minority applicants means their names are certified after non-minority applicants, on average.

---

[72]McNeely, 102, lines 2-13.

[73]McNeely, 76 line 20 to 77 line 2; 80 line 3 -12.

As an experienced test developer who realizes that there is no such thing as a perfect test, I opine that the HRD Sergeant exams are without even barely adequate validation support. The documentation of the HRD validation efforts is grossly incomplete.

There are major, serious flaws in the design and implementation of major aspects of the challenged exams, including but not limited to the following:

A. The HRD exams are too narrow in focus, leaving out important abilities.
B. Test questions were poorly constructed, heightening test anxiety and over-emphasizing reading ability.
C. The passing score bears no relationship to job performance.
D. Absent professionally acceptable validation support for the written tests or the E&E, there is no professionally sound reason to conclude that people higher on an Eligible List will do the job better than people lower on the list.

Based on a detailed review of materials provided by HRD, it is my professional opinion that the Defendant has not provided any professionally acceptable support for the validity of the exams for promotion to Sergeant.

Alternative selection procedures are available that could increase validity and decrease adverse impact of the exam for Sergeants. Many jurisdictions nationwide use such procedures in their exams for Police Sergeant.

Signed: _____     Date: __10_/_3_/_2008__

**Attachment A: Resume of Joel P. Wiesen, Ph.D.**

27 Judith Road                                                      (617) 244-8859 (work)
Newton, Massachusetts 02459-1715                      (617) 332-6984 (home)

| | |
|---|---|
| Education | Ph.D. in Psychology, Lehigh University, 1975<br>M.A. in Psychology, C. W. Post College, 1969<br>B.A. in Psychology, Stony Brook State University, 1967 |
| Employment History | Consultant in Industrial Psychology, 1977 - present<br>Consult to public and private organizations, primarily in the areas of personnel assessment, selection, and layoff; develop tests of knowledge, ability, aptitude, and work-style; conduct applied research concerning employment in organizational settings. (Full-time since 1/94.)<br><br>Director of Test Development and Validation, 1977 - 1993<br>Massachusetts Department of Personnel Administration<br>Develop, implement and evaluate employee selection, promotion, and performance evaluation tools and programs; conduct applied research concerning civil service employment. (Part-time position 1987 to 1993.) |
| Professional Accomplishments | Plan, develop and implement programs in support of excellence and fairness in human resource management: develop culturally fair personnel assessment, selection and promotion tests and systems; conduct validation research and statistical analyses; develop diagnostic math tests for use in school settings; conduct program evaluation and redesign; expert witness in employment discrimination and sobriety testing cases; develop employee performance evaluation programs; and publish/deliver reports, papers. |
| Teaching Experience | Northeastern University, School of Engineering,<br>Engineering Management Program<br>Lecturer, 1978 - 1994<br><br>Lesley College, School of Management<br>Adjunct Faculty, 1989 - 1994<br><br>Kings College, Psychology Department<br>Asst. Prof. and Acting Department Chair, 1969 - 1975 |
| Professional Associations | International Public Management Association for Human Resources Assessment Council, American Psychological Association, Association for Psychological Science, New England Society for Applied Psychology, Society of Industrial and Organizational Psychology, American Statistical Association. |
| Professional Honors | Past-President of IPMA-Assessment Council, Past-President of the New England Society of Applied Psychologists. |
| Licensure | Licensed as psychologist in two states (Massachusetts and Pennsylvania). |

## Attachment B: List of Papers and Publications

(1998, May) *Development of a New Test of Mechanical Aptitude.* Invited presentation to the New England Society of Applied Psychologists (NESAP), Newton, MA.

(1999, June) *A Review and Critique of Published Aptitude Tests for Computer Programmer.* Paper presented at the annual meeting of the International Personnel Management Association's Assessment Council, Trade Winds Resort, FL.

(1999, June) *The WTMA: a Measure of Mechanical Aptitude With Reduced Adverse Impact.* Paper presented at the annual meeting of the International Personnel Management Association's Assessment Council, Trade Winds Resort, FL.

(2000, June) *Content-Oriented Cultural Bias Review of Test Questions.* Paper presented at the annual meeting of the International Personnel Management Association's Assessment Council, Arlington, VA.

(2001) *Technical Manual for the Diagnostic Test of Pre-Algebra Math (DT-PAM).* Applied Personnel Research, Newton, MA.

(2001, April) *Reducing Adverse Impact While Maintaining Validity; The Public Sector Experience: Some Possible Reasons for Adverse Impact.* Paper presented at the Annual Conference of the Society for Industrial and Organizational Psychology, San Diego, CA.

(2001, May) *Using Tests to Minimize Adverse Impact While Maintaining Validity.* Invited presentation to the Recruitment and Hiring Seminar of the Massachusetts Chiefs of Police Association Westborough, MA.

(2001, June) *Development of a New Test for Computer Programmer/Analyst Aptitude.* Paper presented at the annual meeting of the International Personnel Management Association's Assessment Council, Newport Beach, CA.

(2001, June) *Tutorial: Review of Multiple-Choice Test Items, With Emphasis on Cultural Bias.* Presented at the annual meeting of the International Personnel Management Association's Assessment Council, Newport Beach, CA.

(2002, April) *Review of Written, Multiple-Choice Test Items, With Some Emphasis on Cultural Bias.* Paper presented at the Annual Conference of the Society for Industrial and Organizational Psychology, Toronto, Canada.

(2002, July) *Developing Defensible Written Test Questions: Art, Science, and Some Guidelines* (with I. Gast, Ph.D. and D. Hamill). Paper presented at the annual meeting of the International Personnel Management Association's Assessment Council, New Orleans, LA.

(2002, July) *The PCBS: A Quantified, Public Safety Candidate Background Self-Report Instrument.* Paper presented at the annual meeting of the International Personnel Management Association's Assessment Council, New Orleans, LA.

(2002, October) *Some Possible Reasons for the Black-White Mean Score Differences Seen With Many Cognitive Ability Tests.* Paper presented at the annual meeting of the Institute for the Study and Promotion of Race and Cultures, Boston, MA.

(2003) *How to Prepare for the Mechanical Aptitude and Spatial Relations Tests.* Barrons Educational Series, Hauppauge, NY.

(2003) *Technical Manual For The Diagnostic Test for High School Math (DT-HSM),* Applied Personnel Research, Newton, MA.

(2003) *Technical Manual For The Language-Free Computer Programmer/Analyst Aptitude Test (LPAT),* Applied Personnel Research, Newton, MA.

(2003) *Technical Manual For The Police Candidate Background Self-Report (PCBS),* Applied Personnel Research, Newton, MA.

(2003) *Guidelines and Suggestions for Avoiding Cultural Bias in Multiple-Choice Test Questions.* Reprinted by the ERIC Clearinghouse on Counseling & Student Services (ERIC/CASS), in the 2003 ERIC/CASS publication, Measuring Up: Assessment Issues for Teachers, Counselors, and Administrators, edited by Janet Wall and Garry Walz.

(2003, June) *An In Depth, Content Review of Spatial Ability Tests.* Paper presented at the annual meeting of the International Personnel Management Association's Assessment Council, Baltimore, MD.

(2003, June) *The Potential of Diagnostic Math Tests.* Paper presented at the annual meeting of the International Personnel Management Association's Assessment Council, Baltimore, MD.

(2004, October) *Adverse Impact: Theory & Practical Approaches.* Invited Address to the MAPAC Training Workshop, New York, NY.

(2005, June) *Innovative, Psychometrically Sound Approaches to Hiring Firefighters,* Member Showcase Presentation to the New England Society for Applied Psychology, Weston, MA.

(2005, June) *Statistical Support of Test Fairness Reconsidered.* Paper presented at the annual meeting of the International Personnel Management Association's Assessment Council, Orlando, FL.

(2005, June) *Minimizing Adverse Impact: Learning from some Serious Flaws in the Wonderlic Personnel Test.* Paper presented at the annual meeting of the International Personnel Management Association's Assessment Council, Orlando, FL.

(June, 2006) *Thinking Outside the Box in Merit Selection.* Paper presented at the 30th Annual IPMAAC Conference on Personnel Selection, Las Vegas, NV.

(June, 2006) *Benefits, Drawbacks, and Pitfalls of z-Score Weighting.* Paper presented at the 30th Annual IPMAAC Conference on Personnel Selection, Las Vegas, NV.

(October, 2006) *Limitations and Flaws in the Research Supporting Field Sobriety Tests.* Invited address presented at the National Association of Criminal Defense Lawyers/National College for DUI Defense Seminar, Las Vegas, NV.

(November, 2006) *Thinking Outside the Box in Personnel Selection.* Invited address presented at the MAPAC Fall Conference, Princeton, NJ.

(June, 2007) *Possible New Approaches to Reduce Adverse Impact.* Paper presented at the 31st Annual IPMAAC Conference on Personnel Assessment, St. Louis, MO.

(June, 2007) *Tips on Writing an Expert Witness Report.* Paper presented at the 31st Annual IPMAAC Conference on Personnel Assessment, St. Louis, MO.

(June, 2007) *Introduction to Using SPSS Command Files.* Paper presented at the 31st Annual IPMAAC Conference on Personnel Assessment, St. Louis, MO.

(August, 2008) *Six Alternative Methods of Use of Employee Selection Test Data.* Poster session at the 116th Annual Convention of the American Psychological Association.