## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

PEDRO LOPEZ, et al.,

                 Plaintiffs,

      v.

CITY OF LAWRENCE, et al.,

                 Defendants.

CIVIL ACTION
NO. 07-11693-JLT

## STATE DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO DISMISS
## OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

The State defendants, the Commonwealth of Massachusetts and Paul Dietl, in his capacity as Chief Human Resources Officer of its Human Resources Division (together, "HRD"), submit this memorandum of law in support of their motion to dismiss or, in the alternative, for summary judgment. As explained below, judgment should enter for HRD on Count I of the complaint—alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e—because (i) plaintiffs and HRD are not in an employment relationship, as is required to state a claim under that statute, and (ii) no provision of Title VII explicitly governs HRD's conduct here as a non-employer, rendering plaintiffs' claims subject to dismissal under the Eleventh Amendment of the United States Constitution. Should the Eleventh Amendment shield fail, all claims challenging examinations administered in 2005 should still be dismissed on account of being barred by the statute of limitations. Finally, Count II, alleging violations of Mass. Gen. Laws ch. 151B, § 4, should be dismissed because the Eleventh Amendment bars federal courts from instructing states on how to conform their conduct to state law. For these reasons the Court should enter judgment for HRD on all counts of the complaint.

<u>**BACKGROUND**</u>

I. **THE PROMOTIONAL PROCESS UNDER THE MASSACHUSETTS CIVIL-SERVICE SYSTEM**

   A.    <u>**HRD's Role is Mainly One of Oversight and Regulation.**</u>

HRD is charged by statute with certain responsibilities in implementing the civil-service system, including the preparation and administration of civil-service examinations.  <u>See</u> Mass. Gen. Laws ch. 31, § 5.  In addition, HRD is empowered to "make and amend rules which shall <u>regulate</u> recruitment, selection, training and employment of persons for civil service positions."  <u>Id.</u> § 3 (emphasis added).

The Civil Service Commission ("Commission"), not named as a defendant in this action, is a distinct state agency from HRD that has different responsibilities within the civil-service system, primarily involving adjudicating disputes between employees and their employers.  <u>See</u> <u>id.</u> § 2.  Indeed, the Commission has previously adjudicated disputes regarding the content or administration of police promotional examinations.  <u>See</u>, <u>e.g.</u>, <u>Boston Police Superior Officers Fed'n v. Boston Police Dep't & HRD</u>, Civil Serv. Comm'n case nos. G-02-143 (2002) and I-02-606 (2008) (copies attached).  The Commission also has the right to disapprove rules proposed, or other actions taken, by HRD.  <u>See</u> Mass. Gen. Laws ch. 31, § 3.

The "fundamental purposes" of the civil-service system are "to guard against political considerations, favoritism, and bias in governmental employment decisions."  <u>Town of Falmouth v. Civil Service Comm'n</u>, 814 N.E.2d 735, 739 (Mass. App. Ct. 2004).  By focusing on "basic merit principles" as defined in Mass. Gen. Laws ch. 31, § 1,[1] the system encourages employers—

---

[1]    Section 1 defines "basic merit principles" to include "assuring fair treatment of all applicants and employees in all aspects of personnel administration without regard to political affiliation, race, color, age, national origin, sex, marital status, handicap, or religion and with proper regard for privacy, basic rights outlined in this chapter and constitutional rights as citizens."

referred to as "appointing authorities," id.—to make personnel decisions free of "overtones of political control or objectives unrelated to merit standards or neutrally applied public policy." Town of Falmouth, 814 N.E.2d at 739.  It is not within the authority of HRD or the Commission to "substitute [their] judgment about a valid exercise of discretion based on merit or policy considerations by an appointing authority."  Id.  Thus, both agencies' role in the system is one of oversight and regulation, not of personnel decision-making in the first instance.  See id.

**B.    Although HRD Administers a Police Sergeant's Promotional Examination, Municipal Appointing Authorities May Use Other Testing Components in Addition to, or in Lieu of, that Examination.**

Municipal police officers, such as plaintiffs in this case, are hired and paid wages not by HRD, but by the various municipal appointing authorities across the Commonwealth.  Affidavit of Sally McNeely ("McNeely Aff."), ¶ 18.[2]  These officers hold "civil service position[s]" if their municipal employer has accepted the applicability of the civil-service law and rules.  Mass. Gen. Laws ch. 31, § 1; see id. §§ 53-55.  Promotional appointments of police officers "shall be made only after competitive examination," with some exceptions not applicable here.  Id. § 59.

HRD prepares, administers, and scores a written promotional examination for police sergeants every year and then releases rank-ordered eligible lists of all passing candidates. McNeely Aff. ¶ 2.  Municipalities may elect to use HRD's exam or, as plaintiffs concede, may "conduct [their] own alternative police sergeant promotional examination."  6th Am. Compl. (Paper No. 110-2) ¶ 82; see Mass. Gen. Laws ch. 31, §§ 9-11; McNeely Aff. ¶ 3.  In fact, several municipalities (including defendant Springfield) have entered into delegation agreements with

---

[2]   This motion is being filed principally under Fed. R. Civ. P. 12(b)(1) because the Eleventh Amendment is a jurisdictional bar depriving federal courts of subject matter jurisdiction. Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98-100 (1984).  Affidavits and public documents may be considered in connection with a motion to dismiss grounded in the Eleventh Amendment.  Savage v. Glendale Union High Sch., 343 F.3d 1036, 1039 & n.2 (9th Cir. 2003).

HRD, allowing them to use other testing components in addition to, or in lieu of, HRD's written exam, and/or their own promotional processes.  McNeely Aff. ¶ 5.  For example, in 2007, Leominster and Salem supplemented the written exam with "assessment centers," in which candidates are evaluated based on their performance in job simulations.  Id. ¶ 6.  Further, in 2002 Boston hired a testing consultant and prepared and administered its own promotional exam.  Id. ¶ 8.  And in 2005, Boston, in conjunction with HRD, prepared and administered an exam that differed from the one given to all other participating municipalities in that year.  Id. ¶ 9.  HRD has long encouraged the municipalities to use these types of supplementary or alternative testing components in the promotional process.  Id. ¶ 6.

### C.    HRD Does Not Make Promotional Decisions or Otherwise Control Any Aspect of Municipal Police Officers' Employment.

When a municipality wishes to make a promotional appointment, it will submit a requisition to HRD, which will in turn issue a certification list ranking the persons eligible for promotion.  Mass. Gen. Laws ch. 31, § 7; McNeely Aff. ¶ 10.[3]  For municipalities that have entered into full delegation agreements, technical assistance and oversight might be HRD's only role with regard to the promotional process.  McNeely Aff. ¶ 11.  Typically, HRD does not receive any information from delegated communities with respect to promotions that those communities ultimately choose to make.  Id.

Even absent a delegation agreement, it is the municipality's responsibility, not HRD's, to make the actual promotion decisions.  Id. ¶ 13.  In making such decisions, the municipality may consider not only an individual's standing on a certification list but also his/her job performance, interview performance, education, specialized skills, criminal history, and disciplinary history.

---

[3]    HRD does not ever take the race, color, or national origin of candidates into account when scoring exams and, with respect to the exams being challenged here, race, color, and national origin played no role in the establishment or certification of eligible lists.  McNeely Aff. ¶ 10.

Id.  Further, under Mass. Gen. Laws ch. 31, § 27, an appointing authority may bypass a person on the list and select someone with a lower score, so long as it submits a written statement of reasons for the bypass to HRD.  Id. ¶ 14.  HRD will review the statement but will not "substitute its judgment about a valid exercise of discretion based on merit or policy considerations by an appointing authority."  Town of Falmouth, 814 N.E.2d at 739; see McNeely Aff. ¶ 15.  Thus, for example, HRD generally will approve as sound and sufficient any request by a municipality to bypass a candidate based on a legitimate arrest or pending criminal charges.  McNeely Aff. ¶ 16.

In addition to promotion decisions, municipalities control all other relevant aspects of their police officers' employment.  Id. ¶ 19.  As mentioned, the municipality, not HRD, hires and pays its officers.  Id. ¶ 18.  HRD also does not train, transfer, assign work to, set work schedules for, supervise, discipline, or fire municipal police officers, and does not pay them fringe benefits, worker's compensation insurance, or ERISA benefits.  Id. ¶ 21.  Moreover, disputes between officers and their municipal employers relating to application of the civil-service laws are adjudicated by the Commission, not by HRD.  See Mass. Gen. Laws ch. 31, §§ 2, 6C, 24, 35, 41-43; McNeely Aff. ¶ 23.

## II.  THE PLAINTIFFS

### A.    As Confirmed by the Allegations in the Complaint, Plaintiffs Are Employed by the Municipal Defendants, Not HRD.

Plaintiffs are Hispanic or African-American police officers for the cities of Boston, Lawrence, Lowell, Methuen, Springfield, or Worcester, or for the Massachusetts Bay Transportation Authority ("MBTA").[4]  According to the complaint, each of the plaintiffs took HRD's police-sergeant examination in 2005, 2006 or 2007, but has not, of date, been selected for

---

[4] For simplicity, this memorandum will refer to the other defendants, including the MBTA, collectively as the "municipalities" or the "municipal" defendants.

promotion.  6th Am. Compl. ¶¶ 1, 3-25.  The complaint concedes that plaintiffs work for the respective municipal defendants, not HRD.  Id. ¶¶ 3-48.  The complaint further concedes that the municipalities, not HRD, are responsible for promotional appointments of their police officers.  Id. ¶¶ 51, 53, 55, and 71.

HRD does not exercise any day-to-day control over plaintiffs' work activities.  McNeely Aff. ¶ 20.  HRD does not pay plaintiffs wages or benefits and has no involvement in their training, supervision, work assignments, or schedules.  Id. ¶¶ 20-21.  HRD also has no authority to discipline plaintiffs or to terminate their employment.  Id. ¶ 22.

### B.     <u>Plaintiffs Did Not File Charges Challenging the 2005 Exams Until 2008.</u>

Of the municipal defendants, only Springfield and the MBTA participated in the 2005 statewide sergeant's exam, which was administered in October 2005.  Id. ¶ 24.  HRD mailed candidates their scores on December 27, 2005, and made public the rank-ordered eligible lists on March 24, 2006.  Id. ¶ 25.  The eligible lists expired on March 29, 2008, after which they were no longer used to make promotions.  Id. ¶ 26.  The Springfield and MBTA plaintiffs did not file charges with the Equal Employment Opportunity Commission ("EEOC") or the Massachusetts Commission Against Discrimination ("MCAD") until September 24, 2008.  See Pls.' Reply Mem. to Defs.' Opp. to Sixth Mot. to Amend Compl. (Paper No. 116), Exh. A.

The examination unique to Boston was also administered in October 2005.  McNeely Aff. ¶ 27.  HRD mailed candidates their scores on December 16, 2005, and released the rank-ordered eligible list on February 13, 2006.  Id. ¶ 28.  The first four Boston plaintiffs who joined this case, see 4th Am. Compl. (Paper No. 62) ¶¶ 12-15, filed charges with the EEOC and MCAD on March 5, 2008.  Affidavit of Iraida Álvarez ("Álvarez Aff."), ¶¶ 4, 6-8 and Exhibits B – E.  The remaining Boston plaintiffs did not file charges until September 24, 2008.  See Paper No. 116, Exh. A.  The current Boston eligible list will expire in the near future.  McNeely Aff. ¶ 29.

## ARGUMENT

**I.    COUNT I SHOULD BE DISMISSED AS TO HRD BECAUSE HRD IS NOT THE PLAINTIFFS' EMPLOYER.**

Title VII makes it unlawful for an "employer"—defined as "a person engaged in an industry affecting commerce who has fifteen or more employees," 42 U.S.C. § 2000e(b)—to discriminate against his employees[5] on the basis of race or color.  Id. § 2000e-2(a).  The threshold requirement for liability to attach is that there must be an "employment relationship" between the plaintiff and the entity that is allegedly discriminating against him.  Camacho v. Puerto Rico Ports Auth., 369 F.3d 570, 573 (1st Cir. 2004);[6] see Alberty-Velez v. Corporación de Puerto Rico Para la Difusión Pública, 361 F.3d 1, 6 (1st Cir. 2004).  Plaintiffs here have no such relationship with HRD, and so their Title VII claims against HRD must be dismissed.

**A.    HRD is not the Plaintiffs' Direct Employer.**

Ordinarily, liability under Title VII "depends upon the existence of a direct employer-employee relationship."  Camacho, 369 F.3d at 574.  Here, it is obvious that there is no direct employment relationship between plaintiffs and HRD.  Although HRD is a Title VII employer of its own employees (none of whom are charged with the supervision of police officers, McNeely Aff. ¶ 30), it is not the direct employer of police officers who are hired, compensated, supervised, promoted, and fired by the various municipal appointing authorities.  See Camacho, 369 F.3d at 574.  HRD cannot therefore be held liable under Title VII simply by virtue of the fact that it administered an exam that was used by some appointing authorities during the

---

[5]    Title VII defines "employee" as "an individual employed by an employer."  42 U.S.C. § 2000e(f).

[6]    Camacho involved a claim under the Age Discrimination in Employment Act (ADEA), not Title VII.  369 F.3d at 571-72.  It is settled, however, and Camacho reaffirmed, that the ADEA and Title VII are analogous statutes and so "judicial precedents interpreting one such statute [are] instructive in decisions involving [the other]."  Id. at 578 n.5 (quotation marks omitted).

promotional process.  See EEOC v. Illinois, 69 F.3d 167, 169 (7th Cir. 1995) (finding it "implausible" that Congress intended to "create a blanket liability to employees of other employers for interference with their employment relationships").

**B.    HRD is not the Plaintiffs' De Facto Employer.**

**1.    None of the Common-Law Agency Factors Support a Finding of an Employment Relationship.**

Because they have no direct employment relationship with HRD, plaintiffs can only maintain a Title VII claim[7] if HRD "so extensively controls [their] employment relationship [with the municipalities] so as to become [their] de facto employer." Camacho, 369 F.3d at 574 (emphasis added).  In Nationwide Mutual Ins. Co. v. Darden, 503 U.S. 318 (1992), the Supreme Court expressly rejected the idea that "employee" should be liberally construed to advance the remedial purposes of a statute (there, the Employee Retirement Income Security Act). Id. at 324-25.  Rather, the Court held that, in the absence of a statutory definition of "employee," it must be assumed that "Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine." Id. at 322-23.

The First Circuit has applied Darden in the Title VII context, holding that the common-law agency test controls whether an individual meets Title VII's definition of "employee." Alberty-Velez, 361 F.3d at 6-7; see Camacho, 369 F.3d at 574 & n.3 (applying same test in ADEA context); see also Gulino v. N.Y. State Educ. Dep't, 460 F.3d 361, 374 (2d Cir. 2006) ("An expansive definition of 'employer' [in Title VII context] contravenes Supreme Court precedent and fundamental canons of statutory interpretation."), cert. denied 128 S.Ct. 2986

---

[7]    Setting aside for the moment the plaintiffs' Eleventh Amendment hurdle, which will be discussed in Point II, infra.

(2008).  Under that test the court must consider the following, so-called <u>Reid</u> factors[8]:

> the hiring party's right to control the manner and means by which the product is accomplished[;] . . . the skills required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

<u>Alberty-Velez</u>, 361 F.3d at 7.  Although no one factor is decisive, in most cases, the first factor—the common-law element of "control"—"will be the most important . . . in the analysis."  <u>Id.</u>; accord <u>Gulino</u>, 460 F.3d at 371.

Here, none of the traditional hallmarks of an employer-employee relationship are present, and so HRD cannot reasonably be deemed plaintiffs' de facto employer under the common-law test.  Most fundamentally, HRD does not hire or pay wages to plaintiffs.  Thus, because "no financial benefit is obtained by" plaintiffs from HRD, "no plausible employment relationship of any sort can be said to exist."  <u>Gulino</u>, 460 F.3d at 372 (quotation marks omitted).  Moreover, HRD does not train, transfer, assign work to, set work schedules for, supervise, discipline, pay benefits to, or fire municipal police officers.  In short, HRD exercises no "control" whatsoever over plaintiffs' day-to-day work activities, as is required to establish an employment relationship. <u>Alberty-Velez</u>, 361 F.3d at 7; <u>Camacho</u>, 369 F.3d at 574.  The <u>Reid</u> factors set forth above require a level of control that is "direct, obvious, and concrete, not merely indirect or abstract." <u>Gulino</u>, 460 F.3d at 379.  Because HRD exercises no such control over plaintiffs, it simply cannot be characterized as their "employer" under Title VII.

---

[8]   <u>Community for Creative Non-Violence v. Reid</u>, 490 U.S. 730, 751-52 (1989).

2.     **No Employment Relationship Exists Where, as Here, the State Agency is Acting in a Regulatory Capacity and Does Not Otherwise Exercise Workaday Supervision Over the Plaintiffs.**

HRD's position is supported by "a long line of cases" holding that Title VII liability cannot lie against a state agency acting in a regulatory capacity. Camacho, 369 F.3d at 578. When a state agency, as opposed to a private entity, is the defendant in a Title VII action, considerations of state sovereignty and federalism come into play. Gulino, 460 F.3d at 375. For it is well-settled that, to "safeguard[] the sovereignty retained by the states in our federal system," Congress must be "unmistakably clear" when and to what extent "it intends to pre-empt the historic powers of the States." Gregory v. Ashcroft, 501 U.S. 452, 460-61 (1991); see Gulino, 460 F.3d at 375.[9]

Applying this principle, courts have consistently recognized that Congress did not intend to hold state regulatory or licensing agencies liable under Title VII absent a traditional common-law employment relationship. In enacting Title VII and similar employment statutes, Congress was "obviously aware" of state regulatory and licensing activities that affect individuals' employment prospects to varying degrees. NOW, 468 F. Supp. at 321. Yet while Congress explicitly extended Title VII's reach to certain parties apart from traditional common-law employers—i.e., labor unions and employment agencies, 42 U.S.C. § 2000e-2(a)-(c)—the legislative history "is barren of any reference" to state regulatory and licensing agencies or to the people affected by their activities. NOW, 468 F. Supp. at 321; accord Haddock v. Bd. of Dental

---

[9]  See also United States v. N.Y. State Dep't of Motor Vehicles, 82 F.Supp.2d 42, 51 (E.D.N.Y. 2000) (state cannot be held liable under Americans with Disabilities Act "[w]ithout Congressional manifestation of an intent to sanction states for actions taken in their sovereign capacity"); Nat'l Org. for Women v. Waterfront Comm'n of N.Y. Harbor, 468 F.Supp. 317, 321 (S.D.N.Y. 1979) ("NOW") (courts must "assume that Congress [in enacting Title VII] was cognizant of the Supreme Court's repeated reminder that it disfavors inroads by implication on state authority") (quotation marks omitted).

Examiners of Cal., 777 F.2d 462, 464 (9th Cir. 1985).  Congress therefore "obviously" intended

that "only [those] two additional groups would be included within the reach of" private actions

under Title VII.  Gulino, 460 F.3d at 375; see Sunshine Dev., Inc. v. FDIC, 33 F.3d 106, 116 (1st

Cir. 1994) ("legislature's affirmative description of certain powers or exemptions implies denial

of nondescribed powers or exemptions").  Further support for this reading can be found in 42

U.S.C. § 2000e-6(a), which gives the Attorney General the authority to seek an injunction

against "any person," not just "employers," engaged in a pattern or practice of discrimination.

See United States v. Bd. of Educ. for the Sch. Dist. of Phila., 911 F.2d 882, 892 (3d Cir. 1990).

Consistent with this rationale, the First Circuit held in Camacho that, while "a state

licensing and regulatory agency" such as HRD "may qualify as an employer of those individuals

it hires and supervises," it "does not become an employer of those individuals whom it neither

hires, compensates, nor supervises day-to-day even though it licenses and regulates them."  369

F.3d at 578.[10]  This holding is dispositive here.  Camacho had brought an ADEA claim after the

Puerto Rico Ports Authority revoked his harbor pilot's license when he turned 70, the maximum

age allowed by the licensing statute.  The First Circuit acknowledged that pilotage was a

"heavily regulated profession" in that the Authority had the power to issue, renew, suspend, and

revoke licenses; to limit licenses to certain ports; to fine or otherwise discipline pilots for

improper conduct; to fix rates for pilotage services; and to establish standard procedures to guide

pilots in boarding and taking command of ships.  Id. at 576.  The court further acknowledged that

---

[10]  See also Sch. Dist. of Phila., 911 F.2d at 891 (no employment relationship under Title VII where state's "control over the terms of employment" is being "exercised exclusively in its regulatory capacity rather than in the course of a customary employer-employee relationship"); George v. N.J. Bd. of Veterinary Med. Examiners, 635 F. Supp. 953, 955 (D.N.J. 1985) ("where a governmental organization is exercising its police power, the control it exerts over a person's access to the job market does not render the governmental organization an 'employer' . . . within the meaning of Title VII"), aff'd 794 F.2d 113 (3d Cir. 1986).

the Authority had set up a retirement plan for the benefit of harbor pilots and that such plan was

funded entirely by contributions at rates determined by the Authority.  Id.  Nevertheless, and

despite plaintiff's claim that the Authority's regulations evidenced "an unusually high level of

control over the pilots' day-to-day activities," the court held that these "regulations [fell] far

short of evincing the degree of control and supervision traditionally considered sufficient to

create an employer-employee relationship."  Id.  Importantly, the court found it dispositive that

all the traditional hallmarks of an employment relationship were missing:

> In practice, [the Authority] simply does not act like an employer vis-à-vis the
> harbor pilots.  After all, it does not hire or fire harbor pilots, withholds no taxes
> from their earnings (which come wholly from the shipowners), pays no F.I.C.A.
> premiums, carries no workers' compensation insurance referable to them, affords
> them no paid vacations or other fringe benefits, . . . furnishes them no gear, . . .
> [and] is not engaged either in selling pilotage services or in contracting with others
> to make such services available.  These attributes militate strongly against a finding
> that the Authority functions as the de facto employer of the harbor pilots.

Id. at 577.

Similarly, in the recent Gulino decision, the Second Circuit held that city school teachers

could not sue the state under Title VII for creating and administering an allegedly discriminatory

teacher's certification examination.  460 F.3d at 370-79.  Applying the "traditional indicators of

employment under the common law of agency," the court found it dispositive that the state

(1) did not hire or compensate the teachers; (2) did not promote, demote, or fire them; (3) did not

decide issues of tenure, pay, and benefits; and (4) while "control[ling] basic curriculum and

credentialing requirements," did "not exercise the workaday supervision necessary to an

employment relationship."  Id. at 379.  Thus, based on these factors, the court found that the state

was "plainly not [the teachers'] employer for the purposes of Title VII liability."  Id.

Numerous other courts have likewise held that state agencies acting in a regulatory

capacity are not liable as "employers" under Title VII absent evidence that they hired,

compensated, and exercised day-to-day control over the worker's activities.[11]  This Court should now follow this great weight of authority and hold that HRD is not a de facto employer of the plaintiffs.  Similar to the facts in Camacho, Gulino, and the other cited cases, HRD does not hire or pay plaintiffs and exercises no control over their daily activities.  The "absence of that degree of control defeats" plaintiffs' claim.  Camacho, 369 F.3d at 577.  To hold otherwise would require the Court to rewrite Title VII "despite the utter absence of any intent that Congress intended to extend liability to state agencies that merely exercise licensing and regulatory authority pursuant to a state's police power."  Id. at 578.  As in Camacho, this Court should "refuse to start down so slippery a slope."  Id.

### 3. HRD is not a De Facto Employer with Regard to Promotions Only.

Plaintiffs will likely argue that, even though none of the traditional indicators of employment are met, HRD exercises enough control over the promotional process to be a de facto employer with regard to that aspect of their employment only.  Any such argument would

---

[11] E.g., EEOC v. Illinois, 69 F.3d at 171 (state was not "employer" of local school teachers where powers of "hiring and firing" were in hands of school district); Fields v. Hallsville Indep. Sch. Dist., 906 F.2d 1017, 1020 (5th Cir. 1990) (state's administration of teachers' certification exam did not create employment relationship where state "played [no] role in the general hiring or firing of teachers" and was not "involved in the daily supervision of [t]eachers"); Haddock, 777 F.2d at 464 (state dentistry board's administration of dental exam did not create employment relationship where board "neither pa[id] the wages nor engage[d] the services of the examinees"); Conroy v. City of Phila., 421 F.Supp.2d 879, 888-90 (E.D. Pa. 2006) (state was not "employer" of city police officers despite its control over hiring and certification process, where it did not tell city when to hire or fire officers or how much to pay them and where city could add own eligibility requirements with respect to hiring); N.Y. State Dep't of Motor Vehicles, 82 F.Supp.2d at 54 (state agencies had no employment relationship with school bus drivers where they had "no authority to hire or fire drivers, to supervise drivers' work or the conditions of their employment, to determine their rate or method of pay, or to maintain records of their employment"); George, 635 F. Supp. at 955-56 (state veterinary board was not "employer" of license applicant where board did not pay wages or "control the day-to-day operations of veterinarians"), aff'd 794 F.2d 113 (3d Cir. 1986); NOW, 468 F. Supp. at 320 (state waterfront commission was not an "employer" where it "neither pa[id] the wages nor engage[d] the services of persons it register[ed]").

be foreclosed by the First Circuit's pronouncement in <u>Camacho</u> that, in determining whether an employment relationship exists, "one swallow does not a summer make." 369 F.3d at 577. That is, even if HRD has some role in the promotional process, <u>Camacho</u>, and numerous other cases analyzing the <u>Reid</u> factors, make clear that no one factor is dispositive. Thus, in <u>Camacho</u>, even though the Authority was in charge of administering a retirement plan for the harbor pilots and determined the rates for contributions, the court held that those acts were not enough, standing alone, to justify treating the Authority as the pilots' de facto employer for ADEA purposes. <u>Id.</u>

Similarly, here, all of the <u>Reid</u> factors—including the critical element of "control" over work activities—must be analyzed in determining whether HRD is plaintiffs' de facto employer under Title VII. In this regard, HRD respectfully submits that the court erred in <u>Bradley v. City of Lynn</u>, 403 F.Supp.2d 161 (D. Mass. 2005), in holding that HRD was a de facto employer of municipal firefighters and police officers "with respect to . . . entry-level hiring" only. <u>Id.</u> at 169. By analyzing only one aspect of the relationship between the plaintiffs and HRD, the Bradley court ran afoul of the settled principle that no one factor is decisive.[12] <u>Camacho</u>, 369 F.3d at 577; <u>Alberty-Velez</u>, 361 F.3d at 7; <u>Gulino</u>, 460 F.3d at 371. The First Circuit's decisions, not <u>Bradley</u>, should of course control this case.

Moreover, <u>Bradley</u> is factually distinguishable in a critical way. There, the court found that HRD "extensively control[led]" the entry-level hiring of municipal firefighters and police

---

[12]   Although the court noted in passing that "HRD plays an extensive role in the promotion process," <u>Bradley</u>, 403 F.Supp.2d at 169, that was not a factual determination. Rather, in support of its statement, the court relied solely on Mass. Gen. Laws ch. 31, § 59, which is the general provision outlining the process for original and promotional appointments of municipal police officers and firefighters. HRD is barely mentioned in that provision, and only in relation to administrative acts that it must perform when a municipal appointing authority wishes to offer its promotional examination to someone other than a full-time member of the regular force. Mass. Gen. Laws ch. 31, § 59, ¶ 3. Moreover, elsewhere in the decision, the court makes the contrary observation that HRD "exercise[d] extensive control over hiring but little control over other aspects of the employment relationship." <u>Bradley</u>, 403 F.Supp.2d at 168.

officers in that "Massachusetts civil service law reduces the role that municipalities have in the [entry-level] hiring process to deciding yes or no to the candidates that the HRD provides." 403 F.Supp.2d at 169. In other words, at the entry-level stage, municipalities have no choice but to use HRD's examination. Id.; McNeely Aff. ¶ 4. Here, in contrast, plaintiffs concede that the municipalities may conduct their own promotional examinations, 6th Am. Compl. ¶ 82, and some have in fact done so. McNeely Aff. ¶¶ 5-8. And with respect to some communities, HRD does not even receive notification regarding the promotions that are ultimately made. Id. ¶ 11.

Thus, even were it proper to disregard all the other Reid factors, HRD's alleged influence over the promotional process is not enough, given the municipalities' ultimate control over the process, to create an employment relationship. See Conroy, 421 F.Supp.2d at 890 ("City's ability to place its own requirements upon the hiring process, its control over the rate of hiring, and its authority vis à vis firings, all militate against finding that the Commonwealth has an indirect or de facto employment relationship with [police officer applicant]"). Again, "control" is the critical question, Alberty-Velez, 361 F.3d at 7, and HRD simply does not exercise the direct level of control necessary to give rise to liability under Title VII. For all these reasons, this Court should dismiss Count I of the complaint as against HRD.

## II.    PLAINTIFFS' TITLE VII CLAIMS AGAINST HRD ARE BARRED BY THE ELEVENTH AMENDMENT.

The Eleventh Amendment's "ultimate guarantee" is "that nonconsenting States may not be sued by private individuals in federal court." Bd. of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356, 363 (2001). Congress may abrogate Eleventh Amendment immunity only if it "unequivocally expresse[s] its intent to abrogate" by "a clear legislative statement," and it acts "pursuant to a valid exercise of power." Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 55 (1996) (quotation marks omitted). "To determine whether a federal statute properly subjects

States to suits by individuals," the Supreme Court applies a "simple but stringent test: 'Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute.'" Dellmuth v. Muth, 491 U.S. 223, 228 (1989) (quoting Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 242 (1985)).

In Fitzpatrick v. Bitzer, 427 U.S. 445 (1976), the Court held that, in enacting the 1972 amendments to Title VII, Congress intended a limited override of the States' Eleventh Amendment immunity, noting that the statute made unequivocal reference to the availability of private actions against state and local governments. 427 U.S. at 452.[13]  Congress, however, only authorized former, current, or prospective employees to "sue the State as employer."[14]  Id.

---

[13]  Unlike here, all of the plaintiffs in Fitzpatrick were present or former state employees.  427 U.S. at 448.  They had sued state authorities under Title VII challenging the validity of the Connecticut State Employees' Retirement Act, on its face and as applied, insofar as it discriminated against male state employees with respect to retirement age and the computation of benefits.  Id.; 390 F. Supp. 278, 279 (D. Conn. 1974).  The respondent state officials did not appeal from the District Court's finding of a Title VII violation; rather, the employees appealed from the denial, on Eleventh Amendment grounds, of any pecuniary recovery.  427 U.S. at 450 & n.7.  The Court held that the Eleventh Amendment did not bar an award of retroactive retirement benefits to these state employees because Congress had specifically provided in the 1972 amendments for just such a remedy to safeguard the substantive provisions of the Fourteenth Amendment (which forbid States from, inter alia, enforcing statutes that deny citizens "the equal protection of the laws").  Id. at 456.

[14]  As previously noted, Title VII's definition of "employer" is "a person engaged in an industry affecting commerce who has fifteen or more employees[.]"  42 U.S.C. § 2000e(b).  The 1972 amendments amended the definition of "person" to include "governments" and "governmental agencies."  86 Stat. 103, 42 U.S.C. § 2000e(a).  But the key operative provision of Title VII, on which plaintiffs base their claim here, clarifies that the aggrieved individual and the "employer" (whether private or public) must be in a direct (actual or contemplated) employment relationship:

> It shall be an unlawful employment practice for an employer--
>   . . .
>   . . . to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(2) (emphasis added).  See also 42 U.S.C. § 2000e(f) (defining

. . . footnote continues on the next page . . .

(emphasis added); see also id. at 449 n.2 (Congress achieved abrogation in the 1972 amendments chiefly by striking from Title VII's former definition of "employer" an express exclusion for "State[s]"). Accordingly, Fitzpatrick concluded only that "congressional authorization to sue the State as employer" (and to that limited extent "abrogat[ing] the immunity conferred by the Eleventh Amendment") was "clearly present" in the 1972 amendments. Id. at 452 (citation and internal quotation marks omitted, emphasis added).

Here, plaintiffs "challenge the sergeant's promotional examination on grounds that it has a disparate impact on minority test takers and cannot be shown to be job-related under applicable federal [regulatory and state statutory] standards." 6th Am. Compl. ¶ 1. The abrogation of Eleventh Amendment immunity upheld in Fitzpatrick does not extend to this case where (i) HRD, in devising and administering the challenged exams, is not acting as an "employer," as required for Title VII liability to attach;[15] and (ii) plaintiffs are not alleging the type of unlawful employment practice explicitly forbidden to States in the text of Title VII. See Dellmuth, 491 U.S. at 230 ("[E]vidence of congressional intent [to abrogate immunity] must be both unequivocal and textual."). Accordingly, plaintiffs' Title VII claim is barred by the Eleventh Amendment because Congress did not manifest a clear intent, in the text of the statute itself, to authorize the particular claim plaintiffs are pressing against HRD.

As recognized in Fitzpatrick, States and state agencies are only included among the class

---

"employee" as "an individual employed by an employer") (emphasis added).

[15] Eleventh Amendment immunity applies equally to any department or agency of the state that has no existence separate from the state (such as HRD). Pennhurst, 465 U.S. at 100; Laskaris v. Thornburgh, 661 F.2d 23, 25 (3d Cir. 1981). Eleventh Amendment immunity also extends to state officials sued in their official capacities (Paul Dietl's status here, see 6th Am. Compl. ¶ 50) because such suits are just another way of pleading a claim against the state itself. Pennhurst, 465 U.S. at 101-102; Bettencourt v. Board of Reg. in Medicine, 904 F.2d 772, 781 (1st Cir. 1990).

of potential defendants when sued under Title VII for their actions as "employers."  Here, there is no indication in the text of Title VII that Congress intended to subject sovereign states to potential liability when the state defendant is not the actual employer of the plaintiffs.  Gulino, 460 F.3d at 375.  The absence of a clear statement by Congress that the definition of public "employer" is to be construed expansively means that the Eleventh Amendment bars Title VII claims brought against a State that is acting in a non-employer, non-proprietary capacity.  "In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision."  United States v. Bass, 404 U.S. 336, 349 (1971).

Any attempt to read into the statute by implication authorization for suit against a non-employer state defendant must fail.  The holdings of Atascadero and Dellmuth severely limit judicial inquiry; in order for plaintiffs' case to proceed against HRD, this Court must find congressional intent to abrogate sovereign immunity solely from "the unmistakable language of the statute itself."  Atascadero, 473 U.S. at 242.  Moreover, traditional constraints against courts acting as a "super legislature" preclude any effort to read language into Title VII that Congress did not enact, and likely did not intend.  See City of New Orleans v. Dukes, 427 U.S. 297, 303 (1976); Griswold v. Connecticut, 381 U.S. 479, 482 (1965).  In the absence of a clear statutory statement, this Court should not conclude that Congress intended for Title VII suits to be brought against state entities that merely act as test developers and administrators and oversee the civil-service process.[16]  The only provisions of Title VII that bear any relevance to the present

---

[16]    If Congress had intended to reach the activities of state entities not acting in a direct employer capacity, in order effectively to abrogate sovereign immunity, Congress would have had to, at a minimum, define "employer" in the way it is defined in the Fair Labor Standards Act: "any person acting directly or indirectly in the interest of an employer in relation to an employee

. . . footnote continues on the next page . . .

controversy plainly do not apply on their face to plaintiffs' claims against the state defendants.[17]

In the absence of a clear textual statement by Congress that the claims set forth in the plaintiffs'

Sixth Amended Complaint may be asserted against a non-employer state defendant, all such

claims must be dismissed under the Eleventh Amendment.

### III.    ALL CLAIMS CHALLENGING THE 2005 EXAMS SHOULD BE DISMISSED BECAUSE THEY ARE BARRED BY THE STATUTE OF LIMITATIONS.

####    A.    None of the Plaintiffs Filed a Charge Within 300 Days of the 2005 Exams or Within 300 Days of the Date That Eligible Lists Were Established From Those Exams.

Title VII contains a charge-filing provision, 42 U.S.C. § 2000e-5(e)(1), that "specifies

with precision the prerequisites that a plaintiff must satisfy before filing suit." Nat'l R.R.

Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002) (quotation marks omitted). Specifically, if

an employee has "initially instituted proceedings with a State or local agency with authority to

grant or seek relief from [the allegedly unlawful employment] practice," he or she must file a

---

and includes a public agency." 29 U.S.C. § 203(d).

[17]    Each of the provisions of Title VII that Congress made applicable to state entities via the 1972 amendments govern only "employers." In addition to the key "unlawful employment practices" quoted in footnote 14, supra, subsection (h) of 42 U.S.C. § 2000e-2 provides:

> Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to . . . give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin.

Whether or not the above provision applies to the plaintiffs' actual employers (i.e., the municipalities), it contains no text clearly stating that it is applicable to the state defendants, neither of which is an "employer" in the context of this case. In 1991 Congress further amended Title VII to add two provisions—sections (*l*), entitled "Prohibition of discriminatory use of test scores," and "(k) Burden of proof in disparate impact cases." Similarly, nowhere in these provisions does Congress use the terms "States," "governmental agencies," or the like. Instead, the target of the prohibitions contained therein is simply "the respondent," which is defined in 42 U.S.C. § 2000e(n) to mean "an employer" or certain other entities (such as a "labor organization"), but not a sovereign State acting in a non-employer capacity.

charge with the EEOC, and serve notice upon the employer, within 300 days of the employment practice. 42 U.S.C. § 2000e-5(e)(1). In all other cases, the charge must be filed with the EEOC, and notice must be served, within 180 days. Id. By "choosing what are obviously quite short deadlines," Congress made clear its "inten[t] to encourage the prompt processing of all charges of employment discrimination." Morgan, 536 U.S. at 109 (quotation marks omitted). Filing a charge within the prescribed period is "mandatory" in order to maintain a Title VII suit. Id.

Here, as set forth above, the 2005 Boston exam and the 2005 statewide exam utilized by Springfield and the MBTA were both administered in October 2005. McNeely Aff. ¶¶ 24, 27. HRD mailed the Boston candidates their scores and released the rank-ordered eligible list for Boston by February 2006, and did the same for Springfield and the MBTA by March 2006. Id., ¶¶ 25, 28. Plaintiffs who took the 2005 exams did not, however, file charges with the EEOC and MCAD until March and September 2008 (Álvarez Aff., Exhs. B-E & Paper No. 116, Exh. A), well beyond the 300-day maximum time limit for acting upon any potential cause of action. See 42 U.S.C. § 2000e-5(e)(1). All claims challenging the 2005 exams should therefore be dismissed as time-barred.[18]

---

[18] Even if the claims were tolled pending a decision on plaintiffs' motion for class certification, they are still untimely. The original plaintiffs in this case did not amend their complaint to add class allegations until January 4, 2008, see 2d Am. Compl. (Paper No. 21), and they did not add claims based on the 2005 exam until March 17, 2008, see 4th Am. Compl. (Paper No. 62). This Court denied the class-certification motion on June 9, 2008, and denied plaintiffs' motion for reconsideration on June 26, 2008. See Docket. On September 12, 2008, the First Circuit declined to grant an interlocutory appeal. See id. Plaintiffs' claims could therefore have been tolled for at most three months (from March 17 to June 26, 2008).

    **B.**      **Even if the Municipalities Made Promotions from the Certification Lists Within the Limitations Period, the Continuing-Violation Doctrine Does Not Rescue Plaintiffs' Claims.**

          **1.**      **The Supreme Court Has Consistently Rejected Attempts to Revive Time-Barred Claims by Relying on Current Effects of Past Uncharged Acts of Discrimination.**

Plaintiffs will likely argue that, so long as the municipalities made promotions from the certification lists within the limitations period, the continuing-violation doctrine allows them to challenge the exams themselves, even though no charges were filed within 300 days of the exams or the date the eligible lists were made public. Any such argument should be rejected, as it is squarely foreclosed by a long line of Supreme Court precedent.

Beginning with United Air Lines, Inc. v. Evans, 431 U.S. 553 (1977), the Court has made clear that Title VII's limitations period begins to run when a discrete discriminatory act occurs and is not restarted by later acts that are merely continuing effects of the alleged past discrimination. United Air Lines had forced Evans to resign pursuant to its policy forbidding female flight attendants to be married, and Evans did not file a timely EEOC charge challenging her termination. Id. at 554-55. After the airline did away with the "no marriage rule," it rehired Evans but treated her as a new employee for seniority purposes. Id. Evans then filed an EEOC charge, claiming that the airline was guilty of a continuing violation because its refusal to give her credit for prior service gave "present effect to [its] past illegal act [termination]." Id. at 557. The Court rejected this argument, explaining that, in a limitations analysis, "the emphasis should not be placed on mere continuity" but on "whether any present violation exists." Id. at 558. In Evans's case, because she did not file a timely charge challenging her termination, the airline "was entitled to treat that past act as lawful." Id. In other words, the past act had "no present legal consequences" and could not therefore be the predicate for Evans's later challenge to the

seniority system, which was "neutral in its operation." Id.

The Court reached the same conclusion in Delaware State College v. Ricks, 449 U.S. 250 (1980). Ricks, a college librarian, was denied tenure in March 1974 but was given a final, nonrenewable contract that expired in June 1975. Id. at 252-53. In April 1975 he filed an EEOC charge alleging race discrimination. Id. at 254. Applying the rationale of Evans, the Court found Ricks's charge to be untimely because "the only alleged discrimination occurred—and the filing limitations periods therefore commenced—at the time the tenure decision was made and communicated . . . even though one of the effects of the denial of tenure [termination] . . . did not occur until later." Id. at 258.

The same approach controlled in Lorance v. AT & T Technologies, Inc., 490 U.S. 900 (1989), which involved a challenge to a new seniority rule contained in a collective-bargaining agreement. Three years after the agreement was adopted, the plaintiffs, all women, were demoted because of their low seniority as calculated under the new rule. Id. at 902. They then filed EEOC charges alleging that the rule had been motivated by discriminatory intent. Id. at 905. The Court held that the charges were untimely "[b]ecause the claimed invalidity of the facially nondiscriminatory and neutrally applied . . . seniority system [was] wholly dependent on the alleged illegality of signing the underlying agreement." Id. at 911. Thus, the Court concluded, "it [was] the date of that signing which govern[ed] the limitations period." Id.

More recently in Morgan, the Court confirmed that the EEOC charging period begins to run when a discrete unlawful practice occurs and is not retriggered by later effects of that past practice. The Court observed that Title VII "explains in great detail the sorts of actions that qualify as '[u]nlawful employment practices' and includes among such practices numerous

discrete acts." Morgan, 536 U.S. at 111.[19]    According to the Court, there is "simply no indication" that Congress intended that such acts be "convert[ed] . . . into a single unlawful practice for the purposes of timely filing"; thus, "discrete discriminatory acts are not actionable if time-barred, even when they are related to acts alleged in timely filed charges." Id. at 113; see also Marrero-Gutierrez v. Molina, 491 F.3d 1, 6 (1st Cir. 2007) (statute of limitations accrues "at the first discrete act of discrimination"); Rivera v. Puerto Rico Aqueduct & Sewers Auth., 331 F.3d 183, 188 (1st Cir. 2003) ("a discrete discriminatory act transpires only at the time it takes place, even if it was related to acts that were timely filed").

The Court's latest foray into this arena was Ledbetter v. Goodyear Tire & Rubber Co., 127 S.Ct. 2162 (2007). Ledbetter had sought to bring a pay discrimination claim on grounds that her supervisors had in the past given her poor evaluations because of her sex; that as a result her pay was not increased as much as it should have been; and that these past pay decisions continued to affect the amount of her pay throughout her employment. Id. at 2165-66. The Court held that Ledbetter's claim was untimely because she did not file an EEOC charge within "180 days after each allegedly discriminatory pay decision was made and communicated to her." Id. at 2169. In so holding, the Court rejected Ledbetter's argument that "the paychecks that she received during the charging period each violated Title VII and triggered a new EEOC charging period." Id. That argument, in the Court's view, could not be reconciled with Evans, Ricks, Lorance, and Morgan, all of which stand for the principle that "current effects alone cannot breathe life into prior, uncharged discrimination." Id.

---

[19]    For example, as mentioned above, the statute makes it unlawful "for an employer . . . to limit, segregate, or classify . . . his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities" because of the individual's race or national origin. 42 U.S.C. § 2000e-2(a)(2); see footnote 14, supra.

### 2. In this Case the EEOC Charging Period Commenced, at the Latest, When the Eligible Lists Were Released and Was Not Retriggered by Any Subsequent Promotions.

The instruction provided by the Supreme Court is "clear":  the EEOC charging period begins to run "when a discrete unlawful practice takes place," and "[a] new violation does not occur and a new charging period does not commence upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from the past discrimination." Ledbetter at 2169.  Here, the "discrete" act that plaintiffs are challenging is the exam itself, which they allege was discriminatory against minority officers.  6th Am. Compl. ¶ 1, 80-88. Thus, with respect to their 2005 claims, the EEOC charging period began accruing no later than February and March 2006, when HRD completed the examination process by issuing the eligible lists for Boston and for Springfield and the MBTA, respectively.  See Ledbetter, 127 S.Ct. at 2169; Morgan, 536 U.S. at 111; Marrero-Gutierrez, 491 F.3d at 6; Rivera, 331 F.3d at 188.

Because plaintiffs failed to bring timely charges after administration of the exams and establishment of the eligible lists, HRD and the municipalities were "entitled to treat [the exams and the lists] as lawful." Evans, 431 U.S. at 558.  Plaintiffs cannot therefore argue that a new charging period was triggered each time Boston, Springfield, or the MBTA made promotions from the lists.  The promotions themselves are made neutrally—i.e., in rank order unless a municipality chooses to make a bypass.  Further, HRD's role in the promotional process is more or less ministerial; it issues the lists to the municipalities and, in non-delegated communities, records the fact of the promotions.  McNeely Aff. ¶ 12.  Thus, to the extent plaintiffs claim that the promotions are invalid, that claim, as to HRD, is "wholly dependent on the alleged illegality of" the underlying exams and eligible lists.  Lorance, 490 U.S. at 911.  The date that the lists were established therefore "governs the limitations period." Id.; see Evans, 431 U.S. at 560 (past uncharged act had "no present legal significance" and could not be predicate for challenge to

"neutral" seniority system).

This result is consistent with other cases applying a limitations analysis in the testing context. For example, in <u>Lewis v. City of Chicago</u>, 528 F.3d 488 (7th Cir. 2008), the court was confronted with facts much like those here. The City of Chicago had administered a firefighter exam in 1995 and placed applicants in three categories based on their scores: "well qualified," "qualified," and "not qualified." <u>Id.</u> at 490. Applicants were notified of their scores in January 1996 and were informed that anyone who did not score in the "well qualified" category was unlikely to be hired. <u>Id.</u> Applicants rated "qualified" would, however, remain on the eligibility list for as long as the list was used. <u>Id.</u> The plaintiffs, black applicants who placed in the "qualified" category, filed EEOC charges in March 1997—420 days after receiving notification of the test results but within 300 days of the City's hiring of "well qualified" applicants. <u>Id.</u> The court held that these charges were untimely because the alleged discrimination was complete, and the claims accrued, "when [plaintiffs] were placed in the 'qualified' category of the hiring list on the basis of their score[s] in the firefighters' test; for that categorization delayed indefinitely their being hired." <u>Id.</u> at 493. The court also rejected plaintiffs' assertion of a continuing violation, reasoning that the City's subsequent hiring of "well qualified" applicants did not restart the limitations period because the hiring "was the automatic consequence of the test scores rather than the product of a fresh act of discrimination." <u>Id.</u> at 491.

The Sixth Circuit reached the same result in <u>Cox v. City of Memphis</u>, 230 F.3d 199 (6th Cir. 2000). In November 1995 the City of Memphis began a testing process, involving exams and various assessments, for promotion of lieutenants to the rank of major. <u>Id.</u> at 201. The City published a rank-ordered list of the candidates in May 1996, stating that the list would be effective for two years. <u>Id.</u> Plaintiffs filed EEOC charges in November 1998—over two years after the list was published but within five months of the City's latest round of promotions—

claiming discrimination against white females.  Id.  The court held that the charges were untimely because the limitations period began running "at the point of promulgation of the roster," for it is at that point that "a potential plaintiff is aware that alleged discrimination is likely to play a pivotal role in her future advancement."  Id. at 204.  The court further held that the fact that "the promotions were made neutrally, i.e., in rank order, from the eligibility list" brought the case "under the rules articulated in Evans and Lorance."  Id.  That is, the facial neutrality of the list foreclosed any claim that promotions from the list constituted fresh acts of discrimination; at most, they were "current effect[s]" of past discriminatory acts.  Id. at 205.

The same reasoning applies in this case.  The eligible lists that were established from the 2005 exams are facially neutral, and promotions from those lists were "made neutrally, i.e. in rank order."  Id. at 204.  Thus, as in Lewis and Cox, the alleged discrimination occurred, and plaintiffs' claims accrued, no later than the date they were notified of their placement on the lists.  A contrary result would directly contravene the Supreme Court's instruction that "current effects alone cannot breathe life into prior, uncharged discrimination."  Ledbetter, 127 S.Ct. at 2169.  Moreover, "[t]o allow employees to challenge an eligibility roster during the entire time it is used would . . . create substantial uncertainty for employers who have to make important staffing decisions based upon the list."  Cox, 230 F.3d at 205.  This "important policy consideration[]" additionally "counsel[s] against treating promotions from a questionable list as a continuing act" for purposes of liability under Title VII.  Id.; accord Lewis, 528 F.3d at 493 (extending charging period for duration of eligibility roster would have "ludicrous consequences" in that it would subject employer to open-ended period of liability).

### C.  The "Discovery Rule" Does Not Postpone Accrual of Plaintiffs' Claims.

Plaintiffs may also argue that they could not have brought their claims sooner because, until the eligibility lists expired, they could not have known whether or not they would be

promoted.  Any such argument would fail because a "claimant is deemed to 'know' or 'learn' of a discriminatory act at the time of the act itself and not at the point that the harmful consequences are felt."  Marrero-Gutierrez, 491 F.3d at 5-6; see Ricks, 449 U.S. at 258 ("proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful") (quotation marks omitted).  Here, the complaint alleges that written exams such as the 2005 exams "have, over the last 20 years, been shown to have a significant adverse impact upon minority . . . test takers."  6th Am. Compl. ¶ 81.  But if that were true, plaintiffs knew about the alleged discrimination when the 2005 exams were administered or, at the latest, when the eligible lists were released.  For it was at that point that plaintiffs were made "aware that alleged discrimination [was] likely to play a pivotal role in [their] future advancement."  Cox, 230 F.3d at 204; see Lewis, 528 F.3d at 491 ("discrimination was complete when the tests were scored and . . . was discovered when the applicants learned the results").

Cox is instructive on this issue.  There, the court held that "the assignment of an allegedly discriminatory ranking is the relevant discriminatory act" for limitations purposes, "even where the low ranking is not a 'certain prelude' to an adverse employment action."  230 F.3d at 205.  Otherwise, the court reasoned, employees could "'sit on their rights' in the hopes that promotion would occur despite alleged discrimination in an eligibility roster."  Id.  Such a rule would contradict "important policy considerations"—namely, it would create uncertainty for employers "during the entire period in which a roster was utilized, and for a substantial period thereafter if litigation ensues."  Id.  This would be "an unreasonable demand to make upon employers when potential plaintiffs know of alleged discrimination in ranking many months or years before a failure to promote."  Id.

Similarly, in Lorance, the Court held that plaintiffs suffered concrete harm when the challenged seniority rule was adopted, even though plaintiffs had no reason to believe at the time

that they would ever be demoted because of the rule.  According to the Court, "it makes no sense to say that no 'concrete harm' occurs when an employer provides a patently less desirable seniority guarantee than what the law requires."  490 U.S. at 907 n.3.  While acknowledging that "the injury to the employee becomes substantially <u>more</u> concrete when the less desirable seniority system causes his demotion," the Court found that "irrelevant" to the analysis.  <u>Id.</u>  The pertinent question, rather, was "whether there was any concrete injury at the outset."  <u>Id.</u>

<u>Lorance</u> and <u>Cox</u> preclude any argument here that the expiration of the eligible lists is the relevant event for limitations purposes.  It is of no matter that plaintiffs' injury may "become[] substantially more concrete" once they know for certain that they will not be promoted.  <u>Id.</u>  The relevant inquiry is whether "there was <u>any</u> concrete injury at the outset," <u>id.</u>, and, as in <u>Cox</u>, the release of allegedly tainted eligible lists is "an event that should . . . alert[] the average lay person to protect his rights."  230 F.3d at 204 (quotation marks omitted).  This is particularly true in view of the fact that the lists remained in effect for two years—or, in the case of Boston, for three years—after their promulgation.  This "degree of permanence . . . should trigger an employee's awareness of a duty to assert his or her rights."  <u>Id.</u> (quotation marks omitted).

Factually, this is confirmed by the deposition testimony of plaintiff Angela Williams-Mitchell, a Boston police officer and president of the Massachusetts Association of Minority Law Enforcement Officers ("MAMLEO").  <u>See</u> Álvarez Aff., Exh. A at 8.  Williams-Mitchell testified that even <u>before</u> the release of the individual scores in late 2005, and shortly afterwards, MAMLEO consulted with an attorney from the Lawyers' Committee for Civil Rights Under Law regarding the potentially discriminatory nature of Boston's 2005 exam.  <u>Id.</u> at 56-59.  She further testified that MAMLEO raised concerns about the exam with Boston's Police Commissioner both before and after the results were released.  <u>Id.</u> at 48.  This testimony forecloses any argument that plaintiffs could not have known of potential discrimination until expiration of the

lists.

Such an argument would also be undercut by the fact that plaintiffs are challenging the 2007 exam even though the eligible lists created from that exam likely will not expire any sooner than October 2009.  McNeely Aff. ¶ 31.  Indeed, when plaintiffs amended their complaint on January 15, 2008, to include the 2007 claims, see Paper No. 30, the lists had not even been released to the public.  McNeely Aff. ¶ 32.  Yet the complaint still asserts that the 2007 exam is discriminatory because, "[a]lthough a majority of the . . . plaintiffs passed the . . . examination, they have not received scores high enough that they will likely be reached for promotion."  6th Am. Compl. ¶ 86; see id. ¶¶ 1, 80-81, 83-85, 87-88.  Plaintiffs cannot claim on the one hand that they know that the 2007 exam is discriminatory even though the eligible lists had not yet been established (and, to date, are still being used), and then claim on the other that they could not have known that the 2005 exam was discriminatory until the lists were exhausted.

In sum, even if the municipalities made promotions within the charging period, the relevant event for limitations purposes regarding the 2005 exams is when the eligible lists were promulgated and released in early 2006.  Plaintiffs' claims began accruing, at the latest, on that date.  Accordingly, because plaintiffs did not file their EEOC charges until March and September 2008, well beyond the 300-day maximum time limit, 42 U.S.C. § 2000e-5(e)(1), all claims challenging the 2005 exams must be dismissed.

## IV.    COUNT II SHOULD BE DISMISSED AS TO HRD BECAUSE IT IS BARRED BY THE ELEVENTH AMENDMENT.

In Count II of the complaint, plaintiffs allege that HRD violated state anti-discrimination laws, in particular, Mass. Gen. Laws ch. 151B, § 4.  It is settled, however, that the Eleventh Amendment bars federal courts from instructing state officials on how to conform their conduct to state law.  See Pennhurst, 465 U.S. at 106; O'Brien v. MBTA, 162 F.3d 40, 44 (1st Cir. 1998);

<u>Adams v. Mass. Dep't of Revenue, Child Support Enforcement Div.</u>, 510 F.Supp.2d 157, 159-61

(D. Mass. 2007).  Plaintiffs' chapter 151B claim may only be asserted in state court, <u>Adams</u>, 510

F. Supp.2d at 160-61, and so Count II of the complaint should be dismissed.

### **CONCLUSION**

For the reasons stated, HRD respectfully requests that the Court enter judgment in its

favor on all counts of the plaintiffs' complaint.

> Respectfully submitted,
> COMMONWEALTH OF MASSACHUSETTS and
> PAUL DIETL, in his capacity as Chief Human
> Resources Officer of the Human Resources
> Division,
>
> By their attorney,
>
> MARTHA COAKLEY
> ATTORNEY GENERAL
>
>   /s/ Sookyoung Shin
> Robert L. Quinan, Jr. BBO #553010
> Sookyoung Shin, BBO # 643713
> Assistant Attorneys General
> One Ashburton Place, Room 2019
> Boston, MA 02108-1698
> (617) 963-2554 (Quinan)
> (617) 963-2052 (Shin)

Dated:  January 26, 2009

### **CERTIFICATION UNDER L.R. 7.1(A)(2)**

I hereby certify that I have conferred with counsel for plaintiffs and attempted in good
faith to resolve or narrow the issues set forth in the above pleading.

>   /s/ Sookyoung Shin
> Sookyoung Shin, BBO # 643713
> Assistant Attorney General

## <u>CERTIFICATE OF SERVICE</u>

  I hereby certify that the above document and the accompanying affidavits and exhibits referenced herein will be served on January 26, 2009, by electronic notice for registered counsel and copies will be served by first-class mail, postage pre-paid, for non-registered counsel.


      /s/ Sookyoung Shin
      Sookyoung Shin, BBO # 643713
      Assistant Attorney General