**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

_____
                                                    )
PEDRO LOPEZ, et al.,                                )
                    Plaintiffs,                     )
                                                    )
v.                                                  )
                                                    )    Case No.  07-11693
CITY OF LAWRENCE, et al.,                           )
                                                    )
                    Defendants.                     )
_____)

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY**
**JUDGMENT**

I.    <u>**INTRODUCTION**</u>.

        Despite a history spanning nearly 40 years in which the Commonwealth

has been found liable or settled cases under Title VII involving police and fire civil

service examinations, including most recently in a comprehensive decision by

Judge Saris, <u>see</u> <u>Bradley v. City of Lynn, et al.</u>, 403 F.Supp. 2d 161 (2005), the

Commonwealth now attempts to shift responsibility for its discriminatory

promotional examinations to the respective municipalities in which such

examinations were administered by arguing that it is not a Title VII employer.

        The Commonwealth's motion must be denied given the overwhelming

evidence relied upon by Judge Saris in <u>Bradley</u> and present here that

demonstrates the Commonwealth's pervasive control over the employment of

police officers and fire fighters in civil service towns in Massachusetts. The

Commonwealth could have appealed the decision of Judge Saris finding HRD to

be an employer of municipal police and fire for Title VII purposes, but chose

instead to litigate the matter through trial, lose, and then not appeal.  Having not appealed this comprehensive decision, having accepted responsibility for such testing under Title VII, and having identified no "new" evidence that would support a different outcome, the Commonwealth cannot attempt to circumvent Judge Saris' decision by bringing it to another Judge here.

In addition, the Commonwealth erroneously argues that Plaintiffs' challenge to the 2005 examination is time barred.  However, this issue has already been litigated in this action, as it was the basis for the Commonwealth's Opposition to Plaintiffs' Motion to Amend Complaint (Docket No.113), and, after thorough briefing, the Court implicitly decided the issue in Plaintiffs' favor.  Thus, the Commonwealth cannot raise the issue again.  Even if it could, the argument is clearly wrong.  Because the fall 2005 examination, which was not certified until 2006, continued to result in discriminatory promotions through 2008, all of the Plaintiffs' claims are timely.

Moreover, the vast majority of circuits and court decisions explicitly make clear that in a disparate impact challenge to an entry-level or promotional exam where the plaintiffs pass such examination and are on a list for hiring or promotion, the time for challenging such list continues until the expiration of such list, not its commencement.  This is because it would make no sense for someone who has passed a promotional exam, and thus has a real chance of being promoted from that list, to institute litigation before it becomes apparent that the test results will preclude their promotion.  Even the cases upon which Defendants' rely make this critical distinction.  Because the overwhelming weight

of judicial authority supports the Plaintiffs on this issue, Defendants' motion must be denied.  Further, granting the motion would not in any way end this litigation with respect to the challenges here to the 2006 and 2007 exam.

Finally, the Plaintiffs do not object to the Court dismissing the state law claims without prejudice, and Plaintiffs have re-filed them in state court.

## II.     STATEMENT OF FACTS RELEVANT TO THESE MOTIONS.

Plaintiffs have filed herewith a detailed statement of material facts, including their response to the Commonwealth's statement of material facts. However, for the convenience of the Court, the key facts are summarized here.

### A.     Facts Relating To The 2005 Examination And The Plaintiffs' Knowledge Of The Likelihood Of Their Being Promoted.

In October of 2005, the Commonwealth of Massachusetts administered a statewide police sergeants' promotional exam. Pl.'s SOF ¶1.  A number of cities and towns throughout the Commonwealth, including the City of Springfield, the City of Boston, and the Massachusetts Bay Transportation Authority ("MBTA") utilized the exam for the purposes of making promotions.[1] Id. at ¶2.  Generally speaking, the police officers in those cities received notice of their examination score in late December of 2005, but the eligibility list – listing the rankings for

---

[1] The Springfield police officer plaintiffs taking the exam were James Jackson, Juan Rosario, Louis Rosario, Julio Toledo, Devon Williams, and Obed Almeyda. Pl.'s SOF ¶3.  The MBTA police officer plaintiffs taking the exam were Lynn Davis and Royline Lamb. Id. at ¶4.   The City of Boston police officer plaintiffs taking the exam were Shumeane Benfold, Angela-Williams Mitchell, Gwendolyn Brown, Lynette Praileau, Tyrone Smith, Eddy Chrispin, David E. Melvin, Steven Morgan, William E. Iraolo, Jose Lozano, Courtney A. Powell, James L. Brown, George Cardoza, Larry Ellison, David Singletary, Charisse Brittle-Powell, Cathenia D. Cooper-Paterson, Molwyn A. Shaw, Lamont Anderson, Gloria Kinkead, Kenneth Gaines, Murphy Gregory, Julian Turner, Neva Grice, Delores E. Facey, Lisa Venus, Rodney O. Best, Karen VanDyke, and Robert C. Young. Id. at ¶5.

each town and city - were not made public until February or March 2006.  Id. at ¶¶6-8.  While it may be true that the so-called eligibility list for each city or town was released in February/March of 2006 that eligibility list was not sent to any of the Plaintiffs, nor is there any evidence as to when or whether any of the Plaintiffs in these cities or towns even saw the list.  Id. at ¶¶9-10.

While a few of the Plaintiffs in these cities or towns received failing scores on these examinations, the vast majority of the named Plaintiffs from these cities and towns received passing scores and therefore had no way of knowing at that time whether or not they would be reached for promotion during the duration of such eligibility list.  Pl.'s SOF ¶¶13-16, and 23.  Indeed, on the eligibility lists that were publicly available through the Commonwealth's Human Resources Division ("HRD") website, scores are not provided, and the race and ethnicity of the test taker is also not provided.  Id. at ¶ 11. Further, no information was provided by the Commonwealth as to how the examination was scored, what the overall statistics demonstrated with respect to the disparate impact, or relative scores received by minority and non-minority test takers. Id. at ¶¶11-12.  Finally, HRD provided absolutely no information to any of the Plaintiffs as to any job-relatedness studies demonstrating the validity of the examination under EEOC standards. Id.

Promotions from these lists for Boston, Springfield and the MBTA did not begin until, at the earliest, March 24, 2006, and continued to be made in Springfield and the MBTA until the lists expired in the beginning of 2008 and are continuing to be made in Boston where the list has not yet expired. Id. at ¶23.

During this time the Plaintiffs who took that examination believed that they might be reached for promotion, they hoped that they would be reached for promotion, and they had no way of knowing that they would not be reached. Id. at ¶¶13-16, and 23.

According to Dr. Joel Wiesen, who has conducted *thousands* of adverse impact analyses of employment decisions, it was impossible for an adversely affected minority applicant for promotion to sergeant in the City of Boston, Springfield and MBTA to notice and evaluate the overall level of possible adverse impact of the Commonwealth's 2005 sergeant examination as to appointments *prior to* the completion of all hiring and/or expiration of the eligibility lists created by that examination. Pl.'s SOF ¶24. For BPD, the plaintiffs could not have had this data until *at least* 10/24/2008, the date of the last appointments so far off the 2005 eligible list (which has not yet expired). For Springfield and the MBTA, the plaintiffs could not have had this data until *at least* 3/24/2008, when the eligible Lists based on the 2005 exam were replaced by eligible Lists based on the 2007 sergeant exam. Id. Moreover, as detailed above, the data needed to conduct an adverse impact analyses relative to the number of applicants passing and failing the exams and in the case of the grades on the written exams was not made available to applicants by HRD and absent such necessary data it was and remains impossible for applicants to evaluate the level of possible adverse impact of the written tests. Id.

There was, in short, absolutely no way for any named Plaintiff who passed the 2005 exam to know prior to March of 2008: (1) whether or not they would be

promoted; (2) what the other scores were of minority and non-minority

candidates; (3) what the scores were of minority and non-minority candidates in

other communities that had taken the exam; or (4) whether there had been

disparate impact with respect to the score results.

### B. Facts Relating To The Commonwealth's Pervasive Control Over The Employment Of Police Officers And Fire Fighters In The Commonwealth Of Massachusetts.

In Massachusetts, municipalities have the option of accepting the civil

service law, M.G.L. Chapter 31. Id. at ¶27.   If a municipality accepts Chapter 31,

the Commonwealth assumes much of the responsibility for not only hiring, but

also determining qualifications, addressing layoffs, recalls, promotions, discipline,

and other matters typically handled by an "employer." Id.   Unlike most other

states in the country, Massachusetts has elected, through its civil service

statutes, to retain extensive control over the careers of municipal police officers

and fire fighters starting from their hiring, continuing through their employment,

and ending with their retirement.   Pl.'s SOF ¶28.

This control is exhaustively described by Judge Saris in Bradley, et al. v.

City of Lynn, 403 F.Supp.2d 161 (D. Mass. 2005), and Bradley et al v. City of

Lynn, 443 F.Supp.2d 145 (D. Mass. August 8, 2006).   As Judge Saris found in

her two published opinions in Bradley, et al. v. City of Lynn, 403 F.Supp.2d 161

(D. Mass. 2005), and 443 F.Supp.2d 145 (D. Mass. August 8, 2006), HRD

effectively controls the entry level hiring process for all civil service police officers

and firefighters in the Commonwealth.[2]

---

[2] Recently, in response to the Bradley, et al. v. City of Lynn case, the Commonwealth has taken
to "banding" candidates such that people within a range of certain test scores are banded and

6

First, in order to become a police officer in a civil service town or city, including all of the towns and cities in this case, an individual interested in such position must apply for and take an examination devised, administered, scored, and promulgated by the HRD.  See M.G.L. Chapter 31, §§ 5, 16, 21, 48, and 59. After those exam scores are issued, applicants may appeal their scores to HRD, and not to the municipality.  See Chapter 31, §§ 22 -24.   It is HRD, and not the municipality, that decides all such appeals of the scoring and of the test questions given.  Id.

It is then HRD that determines how to rank the candidates in order of their exam scores while giving certain absolute preferences to certain individuals such as veterans or the sons and daughters of deceased police officers who died in the line of duty.  See Chapter 31, §§ 6 and 26.  See also Quinn, et al. v. City of Boston, 325 F.3d 18 (1st Cir. 2003) (describing such statutory preferences); see also Affidavit of Sally McNeeley in Support of State Defendants' Motion to Dismiss/Summary Judgment, ¶¶2, 12, 25 and 28.

Recently, HRD made sudden and significant changes to both the scoring and the establishment of eligibility lists for sergeant promotional examinations. Pl.'s SOF ¶¶ 34-35. HRD established a new passing point for the written component of the 2008 Boston sergeant examination and similar to candidates for initial hire is issuing the exam results in score "bands" such that people within a range of certain test scores are banded and treated as though they had the same score.  The cities or towns have no role in the determination of the bands.

---

treated as though they had the same score.  The cities or towns have no role in the determination of the bands.  This is further evidence that it is HRD that determines how initial hirings are made. Pl.'s SOF ¶34.

Id. This is further evidence that HRD determines how hirings are made in municipalities.

The Commonwealth does not just establish the eligibility list, but it is the Commonwealth alone that determines how people are reached for hire. It is the Commonwealth alone that sets the initial medical standards that each candidate for police officer must meet in order to be hired. See Carlton v. Commonwealth of Massachusetts, 447 Mass. 791 (2006). And it is the Commonwealth alone that is responsible for setting ongoing fitness and medical standards to which police officers must adhere during the course of their employment. See M.G.L. Chapter 31, § 61

Moreover, even after a candidate has been approved for hire, he or she is subject to all of the training and academy requirements set by the Commonwealth of Massachusetts and not the city or town. Thus, the Commonwealth's Criminal Justice Training Council (see M.G.L. Chapter 6, §116, et. seq.) sets all of the requirements and training which a police officer candidate must go through in order to become a police officer. Further, the Mass Criminal Justice Training Council, a state agency, decides the medical standards for persons entering such local police academies. See also, Chapter 41, § 96B. Before an individual can even be hired as a police officer, or attend a Criminal Justice Training Council approved police academy, they must pass a physical agility test that is designed and administered by the Commonwealth of Massachusetts. See Chapter 31, §61A; see also Pl.'s SOF ¶40.

In addition it is the Commonwealth and HRD that set the procedures for how layoffs and recalls occur, should that become necessary. See M.G.L. Chapter 31, §§ 42 - 44. See also Boston Chapter NAACP v. Beecher et al., 679 F.2d 965 (1982). Even such matters as leaves of absence and discipline are regulated by the state civil service system and not the municipality. See M.G.L. Chapter 31, §§7-15, 39, and 41-43.

Moreover, of particular relevance to this case, the Commonwealth and HRD exercise pervasive control over the promotional process in cities and towns subject to civil service. While a municipality may, in theory, apply to HRD for the right to administer its own promotional examination, if it does so, it must have that alternative examination reviewed and approved by HRD. See M.G.L. c. 31, §§9-11. In practice, it is rare that any community ever opts out of the Commonwealth's promotional exam system. For example, according to HRD, for the years 2005, 2006, and 2007, every civil service promotional exam for police officers has been devised, created, and administered by HRD with two small exceptions, one year in the City of Leominster and one year in the City of Salem. See Affidavit of Sally McNeeley in Support of State Defendants' Motion to Dismiss/Summary Judgment, ¶¶ 5-6. Every other municipality has simply utilized HRD's promotional examination system and, in this case, all the municipalities involved, and all the named Plaintiffs, are from cities or towns that relied upon the HRD promotional examination system and nothing else. Id. Further, HRD has done literally nothing to require such municipalities to utilize an alternative examination processes for promotion. In addition, while it is true

that the City of Boston has on two prior occasions created its own alternative examination, the last time it did so was in 2002 (and that was in response to a consent decree in which HRD was involved). Pl.'s SOF ¶¶43-44.  In all the years since then, Boston has utilized HRD's promotional exam.  (See discussion below.)

Significantly, when HRD administers a police promotional exam, it devises the exam entirely on its own utilizing its in-house staff.  Id. at ¶45.  It creates the format for the exam, and it alone determines how grading will be accomplished. Id.  Further, it determines all issues on appeal as to whether a question should be thrown out or credit given for more than one answer, et cetera.  Id. at ¶46. Moreover, it is HRD that tracks whether the exam has disparate impact on minority officers.  Id. at ¶47. It is then HRD that notifies the candidates of their score and ranks the candidates on their respective municipality eligibility list. HRD then provides those eligibility lists to the municipalities and to the candidates.  Id. at ¶48.

Further, pursuant to state law and practice, it is the Commonwealth that requires that if one vacancy exists for a police promotional opportunity, the person hired must be among the top three on the list.  Id. at ¶49.  This is known as the "2N plus one" rule.  Id.  Thus, if three vacancies exist for police sergeant, those three must be picked from the top seven candidates.  Id.  As a consequence, even if a municipality wanted to hire more minority police officers, it normally could not do so because it must hire from the top of the HRD-determined eligibility list.  Pl.'s SOF ¶¶43-44.  Equally important, if the

municipality attempts to bypass the highest ranked candidate without good and sufficient reason, HRD will not approve such bypass, and the individual is entitled to a hearing before the state Civil Service Commission. See M.G.L. Chapter 31, § 27; see also Cotter v. City of Boston, 323 F.Supp.3d 160 (D. Mass. 2003).

Contrary to what it argues in its brief, HRD has the right to, and has exercised the right to have significant involvement in the police promotional process, and this has been particularly true when minority candidates are involved (see discussion below).

**C.    Facts Relating To The Commonwealth's Involvement In Police Hiring And Promotional Exam Litigation.**

The Commonwealth's argument that it is not an employer for Title VII purposes must be judged in light of history spanning almost 40 years in which the Commonwealth has been found to be liable under Title VII, and/or was intimately involved with litigation involving promotional exams which it created, administered, and scored. As far back as 1974, see United States of America v. City of Boston and Boston Chapter NAACP v. Beecher, 371 F.Supp. 507 (D. Mass. 1974), the Commonwealth of Massachusetts was held liable under Title VII for creating and administering an entry-level fire fighter examination. The Commonwealth was also held liable for such police examinations in Castro v. Beecher, 459 F.2d 725 (1st Cir. 1972). In both cases, the Commonwealth's then-called "Civil Service Division" was found to be liable for the creation of an entry-level police and fire exam that had significant disparate impact upon minority candidates. The Commonwealth, as here, defended its entry-level examinations under Title VII, but the court disagreed and found the exams to be discriminatory.

See Boston Chapter NAACP, 370 F. Supp. at 515-518.  Thus, the court issued a decree ordering "the Massachusetts Division of Civil Service and their official agents and employees and all persons in act of concert … from engaging in any act or practice which has the purpose or effect of discriminating…."  Id. at 521. Specifically, the Massachusetts Division of Civil Service was ordered to cease using its written examination.  Id. at 521-522.  See also United States of America v. City of Boston, et al., 1973 WL 301 (D. Mass. 1973) Significantly, at no time in that litigation is there any reported decision in which the Commonwealth ever sought to escape liability under Title VII on the grounds that it was not an "employer" under the statute.

Later, in the mid-1980's, there was additional litigation involving the Commonwealth of Massachusetts and police promotional exams.  See Massachusetts Association of Afro-American Police, Inc. v. The Boston Police Department, at al., 106 F.R.D. 80 (D. Mass. 1985).  According to the history reported in Judge McNaught's opinion in that case, in 1978, Black police officers filed a complaint against the Boston Police Department and various state defendants challenging the Commonwealth's police sergeant's promotional examination.  After several years of negotiation the parties entered into a consent decree requiring the Boston Police Department to utilize a non-discriminatory promotional sergeant's examination.  Specifically, the decision specifies that an Assistant Attorney General defended the "state defendants" in that case.  The First Circuit reviewed the consent decree resulting from that litigation in Massachusetts Association of Afro-American Police, Inc. v. Boston Police

Department, et al., 780 F.2d 5 (1st Cir. 1985).  The defendant in that case was

the "appellee Department of Personnel Administration of the Commonwealth of

Massachusetts," which is now the Human Resources Division (HRD).  Once

again, there is no indication that the Commonwealth sought to exempt itself from

this litigation based on an argument that it was not an employer.

During the 1990's and reaching into this decade, HRD continued to have

significant involvement in police promotional litigation involving minority officers,

or claims of reverse discrimination.  In the late 1990's, a group of white Boston

police officers who had earned a score of 84 on the civil service sergeant's

examination "administered by the Commonwealth of Massachusetts Human

Resources Division" brought an action alleging reverse discrimination in how the

promotional list was administered.  HRD was named a defendant in that case,

and moved to dismiss claiming that it was not responsible for the allegedly

discriminatory actions.  See Cotter, et al. v. City of Boston and James Hartnett,

Director of Department of Personnel Administration, 73 F.Supp.2d 62 (D. Mass.

1999).[3]  Judge Young flatly rejected the Commonwealth's motion to dismiss the

case.  Noting that the Defendant was "James J. Hartnett, in his official capacity

as the Personnel Administrator of the [Human Resource Division]" the court

commented "Hartnett says in effect '**Who? Me?**'  And moves to dismiss the

---

[3] In that case, HRD administered a police sergeant's examination and "after scoring the exams
the [Commonwealth] provided the police department with a list of the 69 highest scorers arranged
in alphabetical order by each score (ranging from 92 down to 82).  The group with the score of 84
included both White officers and Black officers … the police department eventually promoted a
total of 36 individuals, including the Black officers.  The White officers, despite the fact that they
had the same score as the Black officers, did not receive promotions."  See 73 F.Supp.2d at 64-
65.

White officers' claims against him for failure to state a claim." (Emphasis

supplied.)

Judge Young then exhaustively listed the obligations of HRD under the

civil service law – the same obligations that HRD continues to have today. See

id. at 65. He noted that:

> As the Personnel Administrator of the Human Resources Division,
> Hartnett is charged with providing eligible lists based on test scores
> … when, however, the police department awards a promotional
> appointment to an individual other than the qualified person whose
> name appears highest on the list … the police department must
> immediately file with Hartnett a written statement of reasons for
> appointing the person whose name was not highest … Hartnett has
> the power to accept or reject the reasons given by the police
> department for the bypass…. Hartnett relied on this power of
> rejection when it prevented the police department's attempt to
> promote the Black police officers to the exclusion of White
> candidates with test scores.

Id. at 65-66.

The Court went on to hold:

> Since the allegations illustrate that Hartnett was aware of and
> disapproved of the police department's attempt to promote the
> Black officers on basis of race, his failure to require the police
> department to justify the eventually promotion of the Black officers
> to the exclusion of the equally scoring White officers does not
> comport with basic merit principles. Hartnett failed to assure 'fair
> treatment … without regard to race' and protect the White officers
> from arbitrary and capricious action.
>
> Second, Hartnett has the authority to approve or disapprove
> specifications and qualifications submitted by an appointing
> authority…. Hartnett was required to disapprove and establish
> satisfactory qualifications and specifications.
> Third, Hartnett has the authority to evaluate the qualifications of
> applicants for civil service positions. This broad grant of discretion
> … is triggered when, as is the case here, Hartnett knows that the
> race is the primary qualification of a selected applicant. In light of
> the three general statutory obligations, Hartnett's attempt to shrug
> off his authority to prevent what is alleged to be a known and

> admittedly race-based appointment policy, one that is clearly
> violative of basic merit principles – is unacceptable.

Id. at 66-67.  Not surprisingly, the Court denied the Commonwealth's motion.

Finally, in more recent years, HRD has continued to exert pervasive responsibility for determining promotions in civil service police departments.  In William Brackett, et al. v. Civil Service Commission, et al., 447 Mass. 233 (Mass. 2006), white police officers challenged, among other things HRD's creation of regulations and policies providing for so-called "special certifications" permitting the promotion of minority and female candidates to police positions, and authorizing same, even where higher scoring non-minority candidates were ranked higher on such eligibility lists.  Significantly, HRD was a party to that case and argued vigorously that it could authorize municipalities to engage in such race-based promotional decisions where there was evidence of a significant under-representation by minorities in supervisory law enforcement positions.  Ironically, in its brief to the Supreme Judicial Court, HRD extolled the extensive authority it had to determine such promotional issues in civil service communities.  See "Brief of the Appellee Human Resources Division of the Commonwealth of Massachusetts in Bracket v. Civil Service Commission, see 2005 WL 3954113 (Mass.).  In that brief, the same counsel for HRD as in this case wrote:

> As both the Commission and the Superior Court determined, HRD
> acted within its statutory authority in adopting Rule 10 … civil
> service law **gives HRD broad power to make rules governing
> the appointment and promotion of candidates for civil service
> positions. G.L. Chapter 31, Sections 3 and 4.  Section 3
> provides that HRD's administrator shall make and amend rules
> which shall regulate the recruitment, selection, training, and**

**employment of persons for civil service positions.  Rule 10 is within this grant of authority.**

Id. at 38-39. (Emphasis added.)

HRD went on to argue in its brief;

In addition to this general grant of rule making authority, the legislature specifically instructed HRD to promulgate rules regarding:  promotional appointments, on the basis of merit as determined by examination, performance evaluation, seniority of service or any combination of factors which fairly test the applicant's ability to perform the duties of the position as determined by the administrator.  Chapter 31, Section 3(e).  By setting up a procedure to remedy discrimination based on race or gender, Rule 10 accomplishes this goal of fairly testing the applicant's ability.  There is no statutory requirement that HRD restricts consideration for promotion to examination scores alone.

Id. at 41-42.

Viewed against this background, it is truly ironic that HRD would now

claim, as Judge Young so eloquently put it **"who me."**

III.    **THE FINDING OF JUDGE SARIS IN BRADLEY, ET AL. V. CITY OF LYNN, ALONG WITH THE CASES CITED THEREIN, CONCLUSIVELY ESTABLISH THAT HRD IS AN EMPLOYER IN THIS CASE FOR TITLE VII PURPOSES.**

A.    **The Decision Of Judge Saris In Bradley, et al. v. City of Lynn Is Dispositive Of The Commonwealth's Motion, And Requires That It Be Denied.**

In arguing that the Commonwealth cannot be held liable under Title VII as

an employer in this case, the Commonwealth states:

One swallow does not a summer make … that is, even if HRD has some role in the promotional process, Camacho and numerous other cases … make clear that no one factor is dispositive.

(Commonwealth Br. at 14.)

16

Ironically, this is one point on which both the Commonwealth and the Plaintiffs agree. If HRD simply had "some limited role" in police promotions, but had no other involvement in the employment relationship of civil service police officers, then the Commonwealth might not have Title VII liability. But if "one swallow does not a summer make," certainly flocks of swallows coupled with thousands of blooming flowers does a summer make. That is the case here as described above at pp. 6 to 12. The Commonwealth of Massachusetts, unlike most other states,[4] retains pervasive control over the initial hiring, the employment of, the training, the discipline, and promotion of all civil service police officers and fire fighters in the Commonwealth. These facts led Judge Saris to find that the Commonwealth of Massachusetts is a Title VII employer with respect to municipal civil service fire fighters and police officers in the Commonwealth of Massachusetts. In reaching this conclusion, Judge Saris first recited the extensive "statutory and administrative framework" that gives overwhelming responsibility to HRD for establishing entry-level fire and police examinations for Massachusetts municipalities. Bradley v. City of Lynn, 403 F.Supp. at 163. The court noted the vast authority given to HRD with respect to Massachusetts civil service police officers and fire fighters for conducting and

---

[4] The only other state to have similarly pervasive control over municipal police and fire hiring and promotion is the State of New Jersey. In a series of cases challenging the New Jersey civil service examinations for police and firefighters, courts have not hesitated to hold New Jersey liable under Title VII for discriminatory examinations. See, e.g., United States v. State of New Jersey, New Jersey State Department of Personnel, 1995 WL 1943013 (D. N.J. 1995) (approving consent decree in longstanding employment discrimination case involving entry-level law enforcement positions in municipalities throughout New Jersey). See also Vulcan Pioneers v. New Jersey Department of Civil Service, 832 F.2d 811 (3rd Cir. 1987) (affirming that New Jersey's promotion, selection, examination procedures for municipal fire fighters violated Title VII). See also United States of America v. State of New Jersey, et al., 1980 WL 90 (D. N.J. 1980) (granting preliminary injunctive relief); United States of America v. State of New Jersey, 473 F.Supp. 1199 (D. N.J. 1979) (holding specifically that both state and municipality were liable for discriminatory hiring and promotion procedures in fire department of various municipalities).

determining the form, method, and subject matter of examinations, its authority to
establish, maintain, or devise eligible lists that must be used in the hiring and
promoting of police and fire forces, and its authority for determining whether or
not the top person on such list could lawfully be bypassed by a lower ranking
individual. Id. at 163. Further, the court recognized that HRD was empowered to
establish mandatory standards, specifications, and qualifications for all police
and fire, including standards that would be used to evaluate the qualifications of
applicants. Citing M.G.L. Chapter 31, §5(c)(f), the court noted that such
examples include health and fitness standards, height minimums, educational
requirements, et cetera. In addition to this extensive control, the court also noted
the history of the Commonwealth in federal court litigation involving police and
fire examinations. It noted that the Commonwealth of Massachusetts was
directly involved as a defendant in Boston Chapter NAACP v. Beecher, 371 F.
Supp. 507 (D. Mass. 1974), and in Castro v. Beecher, 365 F. Supp. 655 (D.
Mass. 1973).

As in this case, the Commonwealth strenuously argued that because its
only role with respect to municipal police officers and fire fighters was in
constructing, devising, and scoring entry-level examinations, its function was
more akin to those cases where the state was found not to be a Title VII
employer by reason of the fact that it created and administered certification or
licensing examinations with respect to other occupations. In support, the
Commonwealth cited Camacho v. Puerto Rico Ports Authority, 369 F.3d 570,
573-74 (1st Cir. 2004) (Puerto Rico Port Authority revoked plaintiff's harbor pilot's

license because he had reached his 70th birthday, even though harbor pilots function as independent contractors taking on work for various shipping companies), and similar cases from other jurisdictions, such as <u>Haddock v. Board of Dental Examiners</u>, 777 F.2d 462 (9th Cir. 1985) (dental board giving examination which plaintiff failed did not make dental board an employer). <u>Woodard v. Virginia Board of Bar Examiners</u>, 598 F.2d 1345, 1346 (4th Cir. 1979) (bar examiners not employers).

The <u>Bradley</u> court specifically found that such cases notwithstanding, the fact that a state entity administered an examination did not foreclose it from being considered an employer for Title VII purposes where such entity also "exercises other control over the relationship between the employee and her customary employer."  403 F. Supp. 168 (<u>citing</u> <u>Association of Mexican-American Educators v. California</u>, 231 F.3d 572, 581-583 (9th Cir. 2000) (holding that state liable as an employer for administering a teacher certification examination where the state exerted a high degree of control over the operation of the local school activities)). In this regard, Judge Saris specifically rejected the Commonwealth's contention that <u>Camacho</u>, overruled <u>Car Parts Distribution Center, Inc. v. Auto Wholesalers Association of New England, Inc.</u>, 37 F.3d 12, 16 (1st Cir. 1994).  In that case, the First Circuit explicitly held that a defendant would be treated as an employer if it "exercised control over an important aspect of the employee's employment," even if it did not control other aspects.  <u>Bradley</u>, 403 F. Supp. at 167.  The First Circuit held that defendant Car Parts was an "employer" with respect to employee health care coverage if it existed for the purpose of enabling the

employer to delegate its health insurance responsibility to another.  Car Parts, 37 F.3d at 17.

In this case, as in Bradley, the Commonwealth is implicitly arguing that Camacho overruled Car Parts.  Judge Saris correctly rejected this argument, holding that Camacho was best understood as part of that line of cases finding that when states administer examinations as part of their "licensing authority," they are not employers.

Thus, Judge Saris held in Bradley that where an entity, such as the Commonwealth of Massachusetts, has by statute taken on such broad authority to regulate hiring and employment of police officers and fire fighters in Massachusetts, well beyond merely providing examinations, it must be considered an employer for Title VII purposes:

> Accordingly, while there is no question that Massachusetts law established HRD, pursuant to a governmental exercise of police power, the HRD does more than merely license and regulate.  The HRD acts as a hiring party that extensively controls the manner and means by which fire fighters and police officers are selected.  Therefore, Camacho does not control the outcome of this case.

Id. at 169.

As described above, not only does Bradley control the outcome of this case, but the First Circuit's decision in Car Parts requires the same result.  Car Parts relies on a long line of cases from this Circuit holding that an entity that has the means and authority to control a significant portion of one's employment is a statutory employer under Title VII.  See Baranek v. Kelly, 630 F. Supp. 1107, 1113 (D. Mass. 1986) (holding that agency with "the means and authority to control discriminatory employment practices" of regional employers was an

"employer" under Title VII); <u>Barone v. Hackett</u>, 602 F. Supp. 481, 483 (D. R.I. 1984) (director of state agency that administered disability benefits for state employees was liable under Title VII even though agency did not employ plaintiffs); <u>Mas Marques v. Digital Equipment Corp.</u>, 637 F.2d 24, 27 (1st Cir. 1980) (district court properly considered whether the defendant parent corporation exercised sufficient control over its subsidiary to be liable under Title VII for discriminatory hiring practices); <u>Curran v. Portland Superintending School Committee</u>, 435 F. Supp. 1063, 1072-73 (D. Me. 1977) (although city was not permitted by its charter to engage in actual management of school system, it was liable as an employer under Title VII because it limited the school committee's hiring authority through its role in appropriating funds and setting salaries).

Given that HRD and the Commonwealth perform so many functions related to the hiring, promotion and employment conditions of police officers in civil service communities, the Commonwealth must be viewed as an "employer" in this case for Title VII purposes under all the criteria set forth in <u>Car Parts</u>. HRD clearly exercises control over important aspects of municipal police officers' employment for, by example, administering entry-level exams for hiring, administering all exams for promotions, mandating the requirements for initial hire, setting the medical standards, setting the physical agility test standards, requiring ongoing fitness programs, and setting forth rules for leaves of absences, discipline, bypassing people for promotion, et cetera.  In addition, HRD clearly acts as a civil service municipalities' "agent" in administering so many aspects of the hiring, employment, and promotion of police officers.  As

stated above, Car Parts makes clear that an employer cannot "insulate a discriminatory condition of employment from attack under Title VII" by having another entity perform that duty.  Car Parts, 37 F.3d at 17-18 (quoting Spirit v. Teachers Insurance and Annuity Association, 691 F.2d 1054, 1063 (2nd Cir. 1982), vacated on other grounds, 436 U.S. 1223 (interpreting the term employer under Title VII and noting that the term employer … "is sufficiently broad to encompass any party who significantly affects access of any individual to employment opportunities")).

Thus, since HRD's extensive involvement in civil service communities' hiring, employment, and promotional practices so plainly fits under each and all of the theories of liability set forth in Car Parts, and since the Commonwealth could be considered an "employer" subject to Title VII liability in this case under any one of these theories, the Plaintiffs submit that HRD must be subject to liability under Title VII.[5]

**B.    Camacho, Upon Which Defendant Primarily Relies, Is Clearly Not On Point.**

As described above, in Bradley, Judge Saris specifically held that the case primarily relied upon by the Commonwealth here, Camacho v. Puerto Rico Ports Authority, was clearly distinguishable from the present case, and did not purport to and did not overrule the First Circuit's decision in Car Parts.  Her reasoning, described above, is persuasive.

---

[5] While it is difficult to imagine how, on these facts, this Court could conclude otherwise,  Plaintiffs submit that HRD's extensive involvement in municipalities' hiring and employment of police officers must at least present an issue of fact regarding HRD's status as an employer and that this issue would have to be resolved at trial rather than on this motion.

Moreover, an examination of the facts and decision in Camacho make clear that it is not on point.  First, the court in Camacho held that a state agency's performance of a mere licensing function is not subjected to Title VII liability.  369 F.3d at 577-78.  However, here, Plaintiffs allege that HRD exercised significant control over many aspects of hiring, conditions of employment, and promotion, far beyond any act of licensing.  Second, in Camacho, the court concluded only that the Port Authority did not "so extensively control the plaintiff's employment relationship as to become his de facto employer."  Id. at 574.  Camacho and similar cases cited by the Commonwealth involve state entities performing licensing functions (i.e. dental board examinations, bar examinations, etc.) and not employment arrangements.  See Camacho, 369 F.3d at 576-77.  Thus, in Camacho, the court emphasized that the Port Authority had no involvement in the hiring, firing, or terms and conditions of employment of the harbor pilots, except that it had the authority to license such harbor pilots and had general regulatory authority over the harbor.  This is in sharp contrast to the Commonwealth of Massachusetts, which controls multiple critical aspects of a police officers employment beginning with hiring, extending through promotions, layoffs and recalls, discipline, health and medical standards, etc.  Finally, there is a critical distinction between the facts in Camacho and those here.  In Camacho, the plaintiff was not an employee of anyone, but rather was self employed as a harbor pilot.  He was not an employee of the ship owners; indeed, he was specifically deemed an "independent contractor."  Thus, the plaintiff was not an

employee for Title VII purposes and there was no employer.   That is obviously not the case here.

**C.    This Court Should Follow The Long Line Of Cases Holding State And Governmental Entities Liable As Title VII Employers Where They Directly Affect The Employment Relationship.**

A long series of Title VII cases have held that a governmental entity can be held liable as an employer if it discriminates in the employment relationship, even if it is not the employer of the particular individual bringing suit. [6] See Barone, 602 F. Supp. at 483; United States v. City of Yonkers, 592 F. Supp. 570, 590 (S.D. N.Y. 1994); United States Equal Employment Opportunities Commission v. City of Evanston, 854 F. Supp. 534, 538 (N.D. Ill. 1994); Association of Mexican-American Educators v. California, 231 F.3d. 572, 580 (9th Cir. 2000); Guardians Association v. Civil Service Commission, 630 F.2d 79, 104-105 (2nd Cir. 1980) (holding that state was properly held to be an employer pursuant to a Title VII challenge to a municipal police department); Owens v. Rush, 636 F.2d 283, 287 (10th Cir. 1980); Williams v. Montgomery, 550 F. Supp. 662, 668-69 (N.D. Ala. 1982) (holding personnel board liable as employer under Title VII as an agent of the city employing the plaintiff); Puntolillo v. New Hampshire Racing Commission, 375 F. Supp. 1089, 1091-92 (D. N.H. 1974).

The City of Yonkers case is directly on point.  There the court held that the State of New York would remain a defendant in that Title VII case, even though it

---

[6] In Robert St. Peter v. Commonwealth of Massachusetts Public Employee Retirement Administration Commission (PERAC), Superior Court Case No. 02-5569-H (Hines, 2007), attached hereto as Exhibit 1, the court, borrowing from federal cases interpreting Title VII, held that PERAC was St. Peter's employer under Massachusetts Anti-Discrimination Laws, G.L. c. 151B for purposes of disability retirement because it had control over all decisions regarding St. Peter's disability benefits.

was not actually the employer of the plaintiffs, because the state Civil Service

Commission played a pervasive role in the hiring relationship – a role nearly

identical to HRD in the present case.  Id. at 589.  The court relied upon the fact

that the New York Civil Service Commission designed the exams in question,

listed the candidates, decided disciplinary appeals, et cetera.  Therefore, it

denied the Commission's motion for summary judgment, stating that the record

"strongly supports the view that the State acted as an employer in connection

with police hiring in Yonkers during the years covered by the complaint."  Id. at

590.  Further, as described herein in footnote 4, in a series of cases decided by

the federal district court in New Jersey, and affirmed by the Third Circuit, the

State of New Jersey was held liable for its creation of entry-level hiring and

promotional exams for municipal police and fire departments.  See, United States

v. State of New Jersey, New Jersey State Department of Personnel; Vulcan

Pioneers v. New Jersey Department of Civil Service, 832 F.2d 811 (3rd Cir.

1987).

       Moreover, in Massachusetts, the entire history of police and fire entry-level

and promotional exams have involved the Commonwealth of Massachusetts, as

the entity that created such exams, and never before has the Commonwealth

been dismissed from any of these cases.  See Castro v. Beecher, supra; NAACP

v. Beecher, supra; African-American Association of Police, supra; and Cotter v.

City of Boston, supra.

       The Plaintiffs intend to prove at trial that HRD consciously knew that the

pen and pencil police sergeant's written exam that they were responsible for

developing and administering would have an unlawful discriminatory impact upon

minority candidates, having been on notice of this issue for 20 years, and having

been the only entity keeping the statistical records on the passing rates of

minorities and non-minorities.  Despite this knowledge that the exam would

discriminate, and not withstanding that in <u>Brackett v. Civil Service Commission</u>,

<u>supra</u>, the Commonwealth admitted that its exams were discriminatory, the

Commonwealth has done nothing to rectify the situation.[7]  For the

Commonwealth to try to pass the blame for its promotional examination

procedure to the civil service municipalities, which had little or no involvement,

and to claim that those cities or towns should have used other examinations and

opted out of the Commonwealth's promotional examination process, is clearly

disingenuous.  The Commonwealth should not be permitted to escape its own

responsibility by placing it on the backs of the municipalities that it is supposed to

serve.

**IV.    THE COMMONWEALTH'S STATUTE OF LIMITATIONS ARGUMENT  IS
WRONG BOTH AS A MATTER OF LAW AND FACT.**

---

[7] Surprisingly, HRD made sudden and significant changes to the scoring and establishment of eligibility lists for the 2008 sergeant promotional examinations claiming that such changes are being made "after a careful analysis and much guidance by [their] expert testing consult EB Jacobs," the Commonwealth's expert in this litigation.  Specifically, HRD established a new passing point for the written component of the 2008 Boston sergeant examination and similar to candidates for initial hire is issuing the exam results in score "bands" such that people within a range of certain test scores are banded and treated as though they had the same score.  HRD states that its changes were recommended by HRD's experts because they believe that the sergeants' examination does meet the reliability standards that are to be expected for a knowledge test to serve as a basis for strict rank-ordered appointment.  Pl.'s SOF ¶¶35.

### A.    This Issue Has Already Been Litigated And Decided Against The Commonwealth.

After the Court denied class certification in this case in the summer of 2008, Plaintiffs timely moved under applicable Supreme Court precedent to add, as named plaintiffs, individuals who had formerly been putative class plaintiffs. These included individuals from Boston, Springfield, and MBTA, who had taken the sergeant's examination in late 2005. The Commonwealth asserts that the 300-day clock for purposes of filing claims relating to the 2005 examination began to run when the resulting eligibility lists for those cities were established in February and March of 2006. Significantly, the Commonwealth does not assert that the lists were provided to any of the Plaintiffs on those dates, just that they were "made public." Moreover, the Commonwealth completely overlooks that those lists did not list scores, or failures, or the ethnic or racial composition of the test takers, and it did not provide test results for any community other than the one in which the individual was employed. Pl.'s SOF ¶¶11-12. Moreover, it is uncontested that the vast majority of the named plaintiffs received a passing score on the promotional exam and, therefore, had no way of knowing at the time they first saw the eligibility list whether or not they would be actually reached for promotion or not. They certainly had no way of assessing whether there was disparate impact with respect to the entire 2005 exam, and whether or not the examination met Title VII validation standards.[8]

---

[8] The Commonwealth's math is clearly faulty. As detailed in plaintiffs' reply memorandum in support of motion to amend complaint (Docket # 116), this action was originally filed both before the EEOC and in court as a putative class action on behalf of all test takers of the 2005, 2006, and 2007 exam. As such, the law is undisputed that when a case is filed as a class action, the filing of such class action, including the filing of the EEOC complaints, are tolled during the period

In the summer of 2008, when Plaintiffs moved, after denial of class certification, to add named plaintiffs from Boston, Springfield, and the MBTA, the Commonwealth vigorously opposed this request, asserting, inter alia, that such amendment would be "futile" because the claims of the Boston, Springfield and MBTA plaintiffs, who took the exam in 2005, were untimely. See Commonwealth's Opposition to Motion to Amend Complaint (Docket No. 113.)[9] The Commonwealth extensively briefed why such amendment was futile, citing many of the same cases it now cites in support of its motion to dismiss. The Plaintiffs responded with extensive briefing demonstrating that under applicable precedent, the 300-day filing deadline for individuals who had taken the promotional examination and passed did not run until such time as the list expired or it became clear that they would not be promoted off such list, and therefore the claims were timely. After briefing, the court granted Plaintiffs' Motion to Amend, and therefore implicitly decided this issue in Plaintiffs' favor. This issue having been decided in Plaintiffs' favor already, the Commonwealth should not be permitted to re-litigate it here. See US v. Benenhaley, 2007 WL 2012673 (4th Cir. 2007) (by omitting claim from its opinion the court implicitly rejected it); see also In re Swanson, 2002 WL 31342410, 1 (Bkrtcy D.N.D.,

---

that the court considers and either grants or denies class certification. See Crown Cork and Seal Company v. Parker, 462 US 345, 353-54 (1993); see also Plaintiffs' Sixth Motion to Amend Complaint (Docket No. 110.) In this case, the original MCAD and EEOC complaints challenging these exams were filed in spring of 2007, months before the lawsuit was filed in September of 2007. Pl.'s SOF ¶17. Therefore, the 300 days reached back to the spring of 2006. See discussion in Plaintiffs' Reply Memorandum to Motion for Sixth Amended Complaint (Docket # 116). Promotions from the 2005 test had hardly begun by that date. Id. at ¶23.
[9] It should be pointed out that the MBTA and Springfield Plaintiffs also took the 2007 examination, the results of which were certified in early 2008. Thus, the Court's decision will only affect part of their claims.

2002); see also Peurto Ricans for Puerto Rico Party v. Dalmau, 544 F.3d 58, 69

(Peurto Rico, 2008).

>    **B.    Because the Eligibility List for the October 2005 Exam Was Not
>    Established Until February and March 2006 and Because
>    Promotions From That Exam Continued Through 2008 to
>    Present, the Plaintiffs Taking That Exam Have Asserted
>    Timely Claims.**

Overlooking the numerous cases and circuits taking a contrary position,

the Commonwealth claims that the Boston and Springfield plaintiffs who took the

October 2005 exam were required to file their EEOC claims within 300 days of

the establishment of the eligibility list in February and March of 2006.  This is

clearly not the law.  See Bouman v. Block, 940 F.2d. 1211 (9th Cir. 1991) (holding

that the time for filing a disparate impact challenge to a promotional examination,

for those persons who passed such exams, is at expiration of, not the

commencement of the eligibility list).  Moreover, in 2006, as explained in the

statement of facts, the plaintiffs would have no way of knowing if the exam was

discriminatory under a disparate impact theory since the data on selection rates

that would show disparity impact was unavailable to the candidates/plaintiffs.

Pl.'s SOF ¶¶11-12, and 24-26,

In support of its argument that the 300-day period had already run, the

Commonwealth cites several Supreme Court decisions involving acts of

intentional discrimination, United Airlines v. Evans, 431 U.S. 553 (1977);

Delaware State College v. Ricks, 449 U.S. 250 (1980); Ledbetter v. Goodyear

Tyre and Rubber Co., 127 S.Ct. 2162 (2007).  The Commonwealth argues that

the act of discrimination here occurred when the eligibility list was established in

February and March 2006.  However, the Commonwealth fails to makes the
critical distinction between discrete acts of intentional discrimination, and so
called "pattern and practice" – disparate impact claims.

The U.S. Supreme Court specifically held in <u>Lorance v. AT&T,</u> 490 U.S.
900, 907-908 (1989), that while the 300-day filing period for disparate
treatment/intentional discrimination cases begin to run from the time of the
"discriminatory act," where the claim is "one of discriminatory impact," the statute
of limitations begins "to run from the time that that impact is felt" <u>Id.</u> at 908.
Similarly, in <u>National Railroad Passenger Corp. v. Morgan,</u> 536 U.S. 101 (2002),
the Supreme Court squarely held that each time an employer takes an action
(such as making a discriminatory promotion) that violates Title VII, such action
starts anew the charge period even if the employee failed to file a charge over an
earlier "related" violation.  536 U.S. at 113. Thus, <u>Morgan</u> along with <u>Lorance</u>
stand for the proposition that in disparate impact cases, each time a
discriminatory promotion is made, a new charge period begins, even if the
employee failed to file a charge over an earlier "related" violation.  <u>Morgan,</u> 536
U.S. at 113.  Thus, each time HRD approved new Boston and Springfield
promotions in 2006, 2007, and 2008, an adverse employment action caused by a
"particular employment practice" that produced a "disparate impact" and was not
otherwise justified, occurred, and was actionable. <u>Allen v. City of Chicago,</u> 351
F.3d 306, 311-312 (7th Cir. 2003).

Based on the above, the great majority of circuits that have addressed the
issue have held that, in disparate impact cases such as this, the time for filing a

claim starts each time a promotion, hire, or adverse employment action occurs as a result of the employment policy resulting in such disparate impact.  Bouman v. Block, 940 F.2d 1211 (9th Cir. 1991); Anderson v. Zubieta, 180 F.3d 329, 336 (D.C.Cir. 1999); Beavers v. American Cast Iron and Pipe, 975 F.2d 972, 977 (11th Cir. 1992); Guardians Association v. Civil Service, 633 F. 2d 232, 249 (2d Cir. 1980); Gonzalez v. Firestone Tire and Rubber, 610 F.2d 231, 249 (5th Cir. 1980).  Additionally, the Third Circuit has indicated that it would follow the rule that specific instances of discrimination that result from "application" of the policy having a discriminatory impact starts the charge period.  EEOC v. Westinghouse, 725 F.2d 211, 219 (3d Cir. 1983).  Further, the Ninth Circuit has recently affirmed its position in Tatreau v. City of Los Angeles, 138 Fed. App. 959, 2005 WL 1607221, at *1 (9th Cir. 2005) (cause of action for denial of police promotion accrued when eligibility list for promotion expired).

Thus, in the context of police and fire examinations, courts have distinguished between plaintiffs who receive failing scores on the examination, or are otherwise informed that their score will not result in their being reached for hire and promotion, in which case such plaintiff is then on notice of a discrete adverse action, and those cases in which an individual passes the exam but is not ultimately reached for hire or promotion during the duration of such eligibility lists.  Bouman, 940 F.2d at 1221; Tatreau, 2005 WL 1607221, at *1; Lynch, 1993 WL 512597, at *2-3; Alverez v. City of Philadelphia, 98 F.R.D. 286, 290 (1983) ("plaintiffs filed their charges on December 24, 1976….this was timely, the discriminatory practice of which they complained, the use of an examination

which [resulted in a] low ranking on a eligibility roster, cannot not be said to have ceased when they received notice of their ranking…so long as that roster was used"); Hood v. New Jersey Department of Civil Service, 680 F.2d 955, 959 (3d Cir. 1982) (noting that since Hood had been placed on the eligibility list for timeliness purposes, his case stood on different grounds than those plaintiffs who had not made it to such list).

In order to counter this long line of authority, the Commonwealth relies almost exclusively on two cases, Lewis v. City of Chicago, 528 F.3d 488 (7th Cir. 2008)(petition for certiorari filed, 77 USLW 3449 (January 21, 2009)(No. 08-974)), and Cox v. City of Memphis, 230 F.3d 199 (6th Cir. 2000).  However, both of these cases are not only readily distinguishable, but also fully support the plaintiffs' position here.  In Lewis v. City of Chicago, a panel of the Seventh Circuit held that where firefighter applicants for initial hire were informed by the City upon the announcement of their test scores that none of the applicants in their banded group would be permitted to proceed in the hiring process (because their scores were too low to proceed), as to that group of plaintiffs their claims began to run when they were informed, 1) of their score, 2) that they could not proceed further based on such score, and 3) it was announced publicly by the mayor that minorities had fared poorly on the exam.  Id. at 494.[10]  That decision has no application to a case such as this, where the applicants passed the examination such that their hiring or promotion from the established list was still

---

[10] The lower court had agreed with plaintiffs both on the timeliness question and the merits and had struck down the entry level exam used by the Chicago Fire Department.  The Seventh Circuit reversed only as to the timeliness question, and the case is currently being appealed to the U.S. Supreme Court. Cert. petition was filed by the plaintiffs on January 29, 2009.

quite possible.  The Seventh Circuit specifically noted those cases such as Bouman v. Block, where that distinction was made.  Accordingly, the Lewis decision is not relevant to the facts presented here, where most of the named plaintiffs passed the promotional exam, and had a real opportunity and chance to be promoted from the list, and the plaintiffs were not informed of the racial and ethnic composition of the test scores and rankings.

The Commonwealth's reliance on Cox v. City of Memphis is even less compelling.  First and foremost, Cox was not a disparate impact case at all – rather it was a conventional claim of intentional reverse discrimination. According to the Sixth Circuit, the plaintiffs alleged that most of the top officials for the Memphis Police Department were black males, and that after the City administered a written promotional exam and oral assessment center for the rank for "major," of the top 18 candidates in rank order, five of six black female applicants were among the top 18 and were promoted on May 30, 1996, while none of the white female plaintiffs was ranked as high.  230 F.3d at 201-202. However, the plaintiffs did not file their EEOC charges until November of 1998, almost two and a half years after the five black females were promoted, and more than 180 days after that promotional list had expired.  The Sixth Circuit, applying cases related to intentional discrimination, held simply that the discrete discriminatory act/adverse action occurred when the Memphis Police Department was alleged to have "gerrymandered" the promotional rankings by intentionally placing the black females at the top of the list, not when the list expired years later.  Id. at 204-205.  This is in sharp contrast to those cases involving a

disparate impact challenge where the list is promulgated based upon a pen and paper examination, the plaintiffs pass such examination, and have a real chance of being promoted prior to the expiration of the list.

Recent cases from the various circuits confirm that Cox and Lewis do not control the present facts. Only several weeks ago, this very argument was directly addressed in United States, et al. v. City of New York, 2009 WL 212154 (E.D. N.Y. January 28, 2009.). In that case, the City administered a written examination for firefighter in 1999 that it used to generate a rank order list of eligible entry level firefighters. This list was utilized from 2001 until the end of 2004, with the City hiring firefighters from the list in descending order of ranking. See id. at *1. In August 2002, the plaintiff class filed EEOC charges on behalf on black applicants for the position of firefighter, charging that the examination had a disparate impact upon minority takers. Id. at *1. The City of New York moved to dismiss arguing that the plaintiff interveners did not file timely charges because it was more than 300 days after the establishment of the rank order list. In response, the plaintiffs argued that the filing period "begins on the last date that the City used the eligibility list to hire new firefighters." Id. at *2.

Recognizing the longstanding Second Circuit precedent holding that in disparate impact cases the time for filing EEOC claims continue through the duration of the eligibility list, Guardians Association v. Civil Service Commission, 633 F.2d 232 (2d Cir. 1980); Association Against Discrimination in Employment, Inc. v. the City of Bridgeport, 647 F.2d 256, 274-75 (2d Cir. 1981), the court denied the motion. As in the present case, the City argued that the recent

Supreme Court decisions in <u>Ledbetter</u>, and <u>Morgan</u> "largely curtailed the continuing violations theory when applied to discrete discriminatory acts." However, the court disagreed with this argument stating:

> The Court declines to reach this conclusion.  Although <u>Ledbetter</u> and <u>Morgan</u> take a narrow view of when the Title VII charge…..those cases address claims distinct from those presented here.  <u>Ledbetter</u> involved one….."disparate treatment" claim based on discrete compensation decisions, while <u>Morgan</u> involved an individuals' disparate treatment claims for various discrete discriminatory acts.  Neither involved a pattern or practice or disparate impact claim.

<u>Id</u>. at *5.[11]

The district court went on to hold that disparate treatment cases, unlike disparate impact cases, require two elements "an adverse employment practice and discriminatory intent."  <u>Id</u>. at *5, and that the plaintiff is normally aware of the discriminatory intent at the time it is carried out.  The court held however that "that concern is not implicated by interveners complaint, which does not allege disparate treatment based on discrete acts."  <u>Id</u>. at *5.  For that reason, the court refused to apply <u>Ledbetter</u> and <u>Morgan</u> to the disparate impact claims involved in the fire department lawsuit.  Many other courts have agreed that neither <u>Ledbetter</u> nor <u>Morgan</u> control the timely filing question in pattern and practice cases.  <u>See</u>, <u>e</u>.<u>g</u>., <u>Carpinteria Valley Farms Ltd., v. County of Santa Barbara,</u> 344 F.3d 822, 829 (9th Cir. 2003); <u>Milani v. IBM Corp.,</u> 322 F.Supp. 2nd 434, 452-453 (S.D.N.Y. 2004); <u>Employees Committed for Justice v. Eastman Kodak Co.,</u> 407 F.Supp 2nd 423, 442 (W.D.N.Y. 2005); <u>EEOC v. Kovacevich Farms,</u> 2007 WL 174444, at *19 (E.D.Cal. 2007); <u>Anderson v. Boeing Co.,</u> 222 F.R.D. 521, 547

---

[11] The district court also noted that in <u>Morgan</u>, 536 U.S. at 115 n. 9, the Supreme Court specifically held "we have no occasion here to consider the time ly filing question with respect to pattern or practice claims brought by private litigants as none are issued here."

(N.D. Okla. 2004); <u>see</u> <u>also</u> <u>Moore v. Chertoff,</u> 437 F.Supp 2nd 156 (D.D.C.

2006) (challenge to promotional system at the Secret Service not governed by

<u>Morgan</u>, where plaintiffs alleged pattern and practice of discrimination).

**C.** **The Significant Differences Between Disparate Impact and Disparate Treatment Cases Require the Conclusion That Morgan and Ledbetter Are Not Controlling.**

42 U.S.C. § 2000e-2(k) provides that the burden of proof in a disparate

impact case is the following:

> "a complaining party demonstrates the respondent's use of a particular employment practice that causes a disparate impact on the basis of race…and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with this necessity…"

Any person subject to such a practice must file a charge of discrimination with

the EEOC "within 300 days after the alleged unlawful employment practice

occurred." 42 U.S.C. § 2000e-5(e)(1). Under the rule argued here by the

Commonwealth, a discriminatory employment practice that is not challenged

within the short charge filing period after its initial adoption would be immunized

from subsequent challenge by applicants or employees, even if that practice (in

this case the promotional exam taken by hundreds or thousands of police

officers) continues to result in continued promotion of non-minority employees

over subsequent years. Thus, the Commonwealth's view would undermine

Congress' intent to authorize civil actions by private litigants as an important

means of eradicating employment discrimination. <u>Alexander v. Gardner-Denver</u>

<u>Co.</u>, 415 U.S. 36, 45 (1997) ("Congress gave private individuals a significant role

in the enforcement process of Title VII…to vindicate the important congressional policy against discriminatory employment practices").

At bottom, the Supreme Court has continued to make it clear that where there are recurring present violations of the statute, even if those violations may be related to an earlier act of discrimination, the new charge filing period commences each time a subsequent act occurs that satisfies all elements of a Title VII violation.  As explained in National Railroad Passenger Corp., v. Morgan:

> Each discrete discriminatory act starts a new clock for filing charges…..
> The charge, therefore, must be filed within…..the 300 day time period
> after the discrete discriminatory act occurred.  The existence of past acts
> and the employee's prior knowledge of their occurrence, however, does
> not bar employees from filing charges about related discriminatory acts so
> long as the acts are independently discriminatory…..

536 U.S. at 113.

Applying these principles to claims of disparate impact discrimination, a charge should be considered timely if filed within the charge filing period after any use of or application of a selection process that adversely affects protected groups.  Lorance v. AT&T, Inc., 490 U.S. at 908.  Thus, a disparate impact violation is established when the employer "uses a particular employment practice that causes a disparate impact on the basis of race."  See 42 U.S.C. § 2000e-2(k)(1)(A).  Id.

At the very least, in cases where police officers have passed the sergeants exam and are on the promotional list, the discrete discriminatory act cannot have occurred at the time the officers received their scores because 1) they would have no idea or way of knowing that they would not be reached for

promotion and 2) the promotions have yet to made from the list, and therefore
there has been no "discrete discriminatory act."

For all these reasons, the motion to dismiss plaintiffs' claims regarding the
2005 examination should be denied.

Respectfully submitted,

PEDRO LOPEZ, et al.,

By their attorneys,

Dated:  February 26, 2009          s/Harold L. Lichten___
                                   Harold L. Lichten, BBO #549689
                                   Shannon Liss-Riordan, BBO #640716
                                   Leah M. Barrault, BBO # 661626
                                   Pyle, Rome, Lichten, Ehrenberg
                                       & Liss-Riordan, P.C.
                                   18 Tremont St., Ste. 500
                                   Boston, MA 02108
                                   (617) 367-7200


## CERTIFICATE OF SERVICE

I hereby certify that a copy of plaintiffs' Memorandum of Law in Opposition
to Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment
was served upon the Court and counsel of record via the Court's ECF filing
system on February 26, 2009.

                                   s/Harold L. Lichten_____
                                     Harold L. Lichten