# EXHIBIT L

Lynette Praileau

1

```
 1                              Volume:  I
 2                              Pages:  1-73
 3                              Exhibits:  1-4
 4           UNITED STATES DISTRICT COURT
 5             DISTRICT OF MASSACHUSETTS
 6   Civil Action No. 07-11693-JLT
 7   - - - - - - - - - - - - - - - - - - - -x
 8   PEDRO LOPEZ, et al.,
 9                   Plaintiff,
10        v.
11   CITY OF LAWRENCE, MASSACHUSETTS, et al.,
12                   Defendants.
13   - - - - - - - - - - - - - - - - - - - -x
14
15        Deposition of Lynette Praileau
16             December 2, 2008
17          11:37 a.m. - 1:36 p.m.
18         Morgan, Brown & Joy, LLP
19             200 State Street
20          Boston, Massachusetts
21
22      Reporter:  Daria L. Romano, RPR/CRR
23
24
```

JONES REPORTING COMPANY
617-451-8900

Lynette Praileau

2
1   A P P E A R A N C E S:

2

3       WILMER CUTLER PICKERING HALE AND DORR, LLP

4       (by Jeffrey Gleason, Esq.)

5       60 State Street

6       Boston, Massachusetts 02109

7       (617) 526-6000

8       jeffrey.gleason@wilmerhale.com

9       for Plaintiff Lynette Praileau.

10

11      MORGAN, BROWN & JOY, LLP

12      (by Robert P. Morris, Esq.)

13      200 State Street

14      Boston, Massachusetts 02109

15      (617) 523-6666

16      rmorris@morganbrown.com

17      for Defendant City of Boston.

18

19   (Continued.)

20

21

22

23

24

Lynette Praileau

3

1    A P P E A R A N C E S, Continued:

2

3        THE COMMONWEALTH OF MASSACHUSETTS

4        OFFICE OF THE ATTORNEY GENERAL

5        (by Robert L. Quinan, Jr., Esq. and

6        Iraida J. Alvarez, Esq.)

7        One Ashburton Place

8        Boston, Massachusetts 02108

9        (617) 727-2200

10       robert.quinan@ago.state.ma.us

11       iraida.alvarez@ago.state.ma.us

12       for Defendant Paul Dietl, in his

13       capacity as personnel administrator

14       for the Commonwealth of Massachusetts,

15       Human Resources Division.

16

17

18

19

20

21

22

23

24

Lynette Praileau

4

<table>
<tr><td></td><td colspan="2" style="text-align:center">I N D E X</td></tr>
</table>

1

2  Deposition of:                              Page

3  LYNETTE PRAILEAU

4  By Mr. Morris                                 5

5  By Mr. Quinan                                43

6

7

8                  E X H I B I T S

9  No.                                         Page

10   1   Documents                              16

11   2   Police Commissioner's memo dated

12       April 21, 2005 regarding study

13       seminars regarding promotional

14       examinations for sergeant,

15       lieutenant and captain                 21

16   3   Charge of discrimination               30

17   4   Fifth amended complaint; injunctive

18       and declaratory relief requested       39

19

20

21

22  *Original exhibits retained by Mr. Morris

23

24

Lynette Praileau

5

```
1                P R O C E E D I N G S

2

3              MR. MORRIS:  Before we begin, I'll

4     just recite for the record, and this will

5     probably be the only plaintiff deposition we'll

6     do it in, but that the parties have agreed to

7     the same stipulations that had been in effect in

8     the depositions already taken in this case;

9     namely, that motions to strike and objections as

10    to the form of the questions will be reserved

11    until time of trial, that the notary requirement

12    for the signing of the deposition will be

13    waived, and the witness will read and sign the

14    deposition within 30 days of receipt.

15              Is that accurate?

16              MR. GLEASON:  That's acceptable,

17    yes.

18              MR. MORRIS:  Very good.  Thank you.

19

20              LYNETTE PRAILEAU

21

22    a witness called for examination by counsel for

23    the Defendant, being first duly sworn, was

24    examined and testified as follows:
```

Lynette Praileau

6

1

2              DIRECT EXAMINATION

3    BY MR. MORRIS:

4         Q.   Would you please state your full and

5    complete name for the record?

6         A.   My name is Lynette Praileau.

7         Q.   And what is your residential address?

8         A.   116 Itasca Street.

9         Q.   And where is that?

10        A.   Mattapan, Massachusetts.

11        Q.   Okay.  Have you ever been deposed

12   before?

13        A.   No, I have not.

14        Q.   Okay.  Have you ever testified in

15   court or at a hearing?

16        A.   No.

17        Q.   Okay.  I just want to give you a few

18   ground rules that I'm sure your attorney has

19   discussed with you.

20             I think the most important is we don't

21   talk over each other.  In conversation people

22   talk over each other and don't think twice about

23   it.  But where we have a reporter trying to take

24   everything down, I will try and let you complete

Lynette Praileau

7

1    your answer before asking a further question;

2    and if you could let me complete my question

3    before answering, even if you know exactly where

4    I'm headed, I think that will just make the

5    transcript much easier to read for everyone.

6            And if you want to take a break,

7    that's fine.  I would just ask that you not do

8    so while a question is pending.

9            Now, do you have any medical condition

10   that you're aware of that might affect your

11   ability to understand questions and answer them

12   truthfully?

13       A.    No.

14       Q.    Okay.  Have you taken any medication

15   that might affect your ability to answer --

16   understand questions and answer them truthfully?

17       A.    No.

18       Q.    Okay.  Besides the present action, the

19   present lawsuit, have you filed any other

20   lawsuits?

21       A.    In regards to myself?

22       Q.    Yes.  Have you ever filed another

23   lawsuit?

24       A.    As a plaintiff?

Lynette Praileau

8

1    Q.    As a plaintiff, yes.

2    A.    No.

3    Q.    Okay.  Have you been sued before?

4    A.    No.

5    Q.    Okay.  Could you describe for me your

6    educational background?

7    A.    Sure.  I have a bachelor's in computer

8    science with a minor in communications, and I

9    have a master's degree in criminal justice.

10   Q.    And are both of those degrees from

11   Northeastern University?

12   A.    Yes.

13   Q.    And did you get your bachelor's degree

14   in 1993?

15   A.    Yes.

16   Q.    And your master's in 2000?

17   A.    Yes.

18   Q.    And have you taken any courses since

19   getting your master's degree in 2000?

20   A.    I have taken a class for culinary

21   arts.

22   Q.    Okay.  But you're not working towards

23   any further degrees?

24   A.    Not at this time.

Lynette Praileau

9

1          Q.    Okay.   Now, you're a Boston police

2    officer; is that correct?

3          A.    Yes.

4          Q.    And when did you join the -- become a

5    member of the Boston police force?

6          A.    1996.

7          Q.    Okay.   And had you attended the police

8    academy?

9          A.    Yes.

10          Q.    Okay.   And what position were you

11    hired into?

12          A.    Police officer.

13          Q.    Okay.   And have you held the same

14    position until the present day?

15          A.    Yes.

16          Q.    And could you describe for me the

17    positions that you've held as a Boston police

18    officer since 1996?

19          A.    I worked in the rapid unit, wagon,

20    service unit.

21              I've also been assigned to the

22    information systems group.

23              And I'm currently assigned to the

24    Boston Police Academy as an instructor.

Lynette Praileau

10

1   Q.   And is that your full-time work as an

2   instructor at the academy?

3   A.   Yes.

4   Q.   And how long have you been holding

5   that position?

6   A.   Since the -- towards the end of last

7   year.

8   Q.   Okay.  And you mentioned work, I

9   believe, in information systems?

10  A.   Yes.

11  Q.   And for how long did you work in that

12  area?

13  A.   From 1997 to the time that I was

14  transferred to the academy as an instructor.

15  Q.   Okay.

16  A.   And that would be the end of 1997,

17  December.

18  Q.   Okay.  And as an instructor, what type

19  of courses or other areas do you instruct in?

20  A.   I teach substance abuse, cultural

21  diversity and computer applications that the

22  officers will be using once they go out to

23  various districts.

24  Q.   And when you were in the information

Lynette Praileau

11

1    systems group or area, what were the nature of

2    your responsibilities?

3        A.    In information systems, I created

4    applications for various units to track their

5    cases.

6            We also did training on the new

7    applications that were introduced to the

8    department.

9            I also did statistical reports.

10       Q.    Okay.  What kind of statistical

11   reports did you do?

12       A.    Just based on the information that was

13   entered into the databases that I created.  So

14   if it was something like a community disorders

15   tracking their cases or another unit and they

16   wanted to know how many cases they had for a

17   certain year, I could run a query on it and get

18   them that information.

19       Q.    Okay.  During the course of your

20   employment with the Boston Police, have you held

21   any outside employment outside the Boston

22   Police?

23       A.    Have I held any outside employment?  I

24   would say no, but I do put in the off-duty

Lynette Praileau

12
1  employment forms.

2      Q.    Okay.  But you haven't actually held

3  any work outside the Boston Police?

4      A.    No.

5      Q.    Okay.  Thank you.

6            Now, we're here on this date because

7  you applied to be a police sergeant in 2005, is

8  that correct, you did complete an application to

9  be promoted to a police sergeant position in

10 2005?

11     A.    Yes.

12     Q.    Prior to 2005, had you on other

13 occasions sought to be promoted to the sergeant

14 position?

15     A.    Prior to 2005?

16     Q.    Prior to 2005.

17     A.    Yes, I had.

18     Q.    And can you tell me in what years you

19 sought to be promoted?

20     A.    I believe the -- I took the 2002 exam.

21 And I don't remember if I took any before that.

22 I believe I just remember right now the 2002.

23     Q.    Okay.  And did you take the most

24 recent promotional exam, which would have been

Lynette Praileau

13

1    October 2008?

2        A.    Yes.

3        Q.    Okay.  Now, the 2002 exam, as I

4    understand it, and you can correct me if I'm

5    wrong, consisted of two parts, that there was a

6    written exam and an oral component.  Is that

7    accurate?

8        A.    Yes.

9        Q.    Can you tell me what the oral part of

10   the exam, what that entailed?

11       A.    They gave you different scenarios that

12   a supervisor would have to respond to.

13       Q.    Okay.  You said they gave you.  Who

14   are --

15       A.    I would say HRD, when they prepared

16   the scenario portion or the company that they

17   had prepare it.

18           What you did was you watch a video,

19   they would tell you what the scenario was, and

20   you had to respond.

21       Q.    And were there various examiners there

22   watching you as you responded?

23       A.    It was video recorded.

24       Q.    Okay.  Do you recall how many

Lynette Praileau

14

1    scenarios you had to respond to?

2        A.    Not off the top of my head I don't.

3        Q.    Do you recall hearing at any time from

4    your fellow officers any complaints about the

5    nature of the 2002 promotional exam?

6        A.    Can you say that one more time?

7        Q.    Sure.  It's kind of a general

8    question, whether you recall ever discussing or

9    overhearing other police officers who had taken

10   part in the 2002 promotional exam, had you ever

11   heard them make any complaints about any part of

12   the exam, whether the oral exam or any other

13   aspect of that exam?

14       A.    I would say yes.

15       Q.    Could you describe the nature of the

16   complaints you heard?

17       A.    I don't remember exactly, but I know

18   that some people did not like the oral portion

19   of the exam.

20       Q.    Okay.  And can you recall why, what

21   their reasons were for not liking the oral

22   portion?

23            MR. GLEASON:  Objection.

24            To the extent you know, you can

Lynette Praileau

15

1   answer.

2             MR. MORRIS:   Right.   Obviously.

3       A.    I don't remember all of it at this

4   time.   I can't think of any specific one right

5   at this time.

6       Q.    You can't recall anything specific

7   about the oral part of the exam that other

8   officers didn't like or said they didn't like?

9       A.    I don't know how accurate, but I do

10  remember --

11            MR. GLEASON:   Let me caution you,

12  you don't guess.   If you remember something, you

13  can answer.

14      A.    Then I'm going to say no, I don't

15  remember specifically off the top of my head.

16      Q.    That's fine.   I'm not asking you to

17  vouch for any complaints that anyone said.   I'm

18  not trying to buy into anything that anyone else

19  said.   I'm just asking whether you recall

20  anything specific that anyone said in regard to

21  the oral part of the 2002 exam.

22            And I take it you don't recall; is

23  that correct?

24      A.    I don't recall anything specific, no.

Lynette Praileau

16

1    Q.   Okay.  Do you recall how many officers

2  commented on the --

3    A.   No, I don't.

4         MR. GLEASON:  Let me just caution

5  you to wait for him to finish his question

6  before you answer.

7         THE WITNESS:  Okay.

8         MR. MORRIS:  That's the first time

9  you've done that.  That's pretty good.

10  BY MR. MORRIS:

11    Q.   I'd like to show you a collection of

12  documents which we'll mark as Exhibit 1 to this

13  deposition.

14         (Exhibit 1 marked

15          for identification)

16         (Pause)

17    Q.   Have you had a chance to review the

18  documents which have been marked as Exhibit 1 to

19  your deposition?

20    A.   Yes.

21    Q.   Okay.  And are these -- I understand

22  these are documents which were produced to us by

23  your attorneys as part of the document

24  production process in this case.

Lynette Praileau

17

1          Do you recognize these documents?

2     A.    Yes.

3     Q.    Okay.  Let me just ask you more

4 generically before we go into the specifics of

5 the documents.

6          The 2005 exam, as I understand it,

7 contained a written exam; is that correct?

8     A.    Yes.

9     Q.    And it was -- and did you prepare for

10 that exam?

11     A.    Yes.

12     Q.    Can you tell me when you started --

13 the exam was administered in October 2005.  Does

14 that seem accurate to you?

15     A.    Yes.

16     Q.    Can you tell me when you started

17 preparing for the exam?

18     A.    The exact date I don't recall.

19     Q.    Sure.  Do you recall approximately

20 when?

21     A.    I would say as soon as the material

22 was released or the list of material that we had

23 to study from was released.

24     Q.    And that would be the so-called

Lynette Praileau

18

1   reading list.  Is that fair to say?

2       A.    Correct.

3       Q.    Okay.  And did you purchase the books

4   that were on that reading list?

5       A.    Yes.

6       Q.    And you were working full time in

7   2005, I assume; is that correct?

8       A.    Yes.

9       Q.    How did you go about -- how many hours

10  per week would you devote to preparing for the

11  exam?

12      A.    Off the top of my head, I can't say

13  exactly how many hours per week.

14      Q.    Okay.  Can you tell me how many hours

15  per month you would have spent preparing for the

16  exam?

17      A.    That would be difficult.  When I had

18  time to study, I would read my books and stuff.

19  It's hard for me to tell you an exact amount of

20  time.

21      Q.    Sure.  I understand.

22            Did you study every day in preparation

23  for the exam once the reading list was published

24  and you had the materials?

Lynette Praileau

19

1     A.    I would study when I came home from

2  work in the evening.  I can't say every single

3  day because if something came up on one of the

4  days and I had to take care of it, so I don't

5  want to tell you something that's --

6     Q.    Okay.  That's fair.

7           Do you have children?

8     A.    No, I don't.

9     Q.    Are you married?

10    A.    No.

11    Q.    Okay.  Did you take part in any study

12  groups with other police officers who were also

13  taking the promotional exam?

14    A.    Yes.

15    Q.    Can you tell me who was in your study

16  group, if you recall?

17    A.    There was Marlin.

18    Q.    I'm sorry?

19    A.    Marlin.

20    Q.    Is that the first name, last name?

21    A.    First name.

22          There was probably about three other

23  people, three or four other people besides

24  myself.  I remember Marlin, I believe Wayne and

Lynette Praileau

20

1   Rita.   I don't remember if there was anyone

2   else.   Those are the three that I remember right

3   now off the top of my head.

4        Q.   Okay.   And just if you recall, do you

5   recall the last names of Marlin, Wayne or Rita?

6        A.   Wayne's last name is Williams.

7        Q.   Okay.

8        A.   I don't remember Rita's last name off

9   the top of my head.

10       Q.   Okay.

11       A.   And Marlin -- I just refer to them

12   basically by their first names.

13       Q.   That's fine.   That's fine.

14            Was there a schedule that you tried to

15   follow where this group would get together?

16       A.   Yes.   We tried to meet at least once a

17   week to go over material that we had read prior.

18       Q.   Okay.   And for how long would you get

19   together, typically?

20       A.   I don't remember the exact time.   I

21   guess it could be anywhere from two to three

22   hours.

23       Q.   Where would you typically meet?

24       A.   We would meet at my house.

Lynette Praileau

21

1      Q.    Okay.  Now, did the Boston Police

2  Department offer a tutorial or study seminar?

3          A.    Yes.

4      Q.    Let me show you a much shorter group

5  of documents which we'll mark as Exhibit 2 to

6  your deposition.

7                      (Exhibit 2 marked

8                      for identification)

9                      (Pause)

10 BY MR. MORRIS:

11     Q.    Now, you've had a chance to look at

12 this Exhibit 2 to your deposition, or are you

13 still looking?

14     A.    I'm still looking.

15     Q.    Sorry.

16                  (Pause)

17     Q.    Do you recognize the documents which

18 are part of Exhibit 2 to your deposition?

19     A.    Yes.

20     Q.    And can you tell me, did you -- you

21 did attend the seminar offered by the Boston

22 Police; is that correct?

23     A.    Yes.

24     Q.    Why don't you tell me, how many

Lynette Praileau

22

1  sessions were there that made up this tutorial,

2  or whatever you want to call it, offered by the

3  Boston Police?

4       A.    How many sessions?

5       Q.    Yes.  My interpretation is there may

6  be four sessions; is that correct?  I'm trying

7  to read the schedule.  Do you recall how many

8  classes or sessions there were?

9       A.    There were four series based on your

10  work schedule and when you could get in.

11            If you worked days, there were two

12  different ones you could choose from.  And if

13  you worked nights, there were an additional two

14  you could choose from.

15            And based on the schedule here, there

16  were four different classes for each series for

17  the sergeant portion.

18       Q.    Okay.  And you attended all those

19  classes?

20       A.    Yes.

21       Q.    And was there any charge to you for

22  taking these classes?

23       A.    No.

24       Q.    And looking at part of this deposition

Lynette Praileau

23

1    Exhibit 1, you attended a so-called crash course

2    prior to the exam?  If you look at about page 23

3    of the -- LP and it has the numbers 23, 24.

4         A.    Yes.

5         Q.    You're looking at LP 23?

6         A.    Yes.

7         Q.    Okay.  And these were all day

8    sessions; is that correct?

9         A.    Yes.  They began at eight o'clock, and

10   it ended at 3:30.

11        Q.    And this was offered by a group known

12   as Commonwealth Police Service, Inc.; is that

13   correct?

14        A.    Yes.

15        Q.    Okay.  Tell me, in regards to this

16   so-called crash course, do you know if there

17   were police officers from outside the City of

18   Boston who were attending this course?

19        A.    Off the top of my head, I do not

20   recall.

21        Q.    You don't recall?

22        A.    No.

23        Q.    Do you have any reason to believe the

24   course was intended solely for Boston police

Lynette Praileau

24

1   officers who were taking the promotional exam?

2        MR. GLEASON:  Objection.

3        You can answer.

4     A.   No.

5     Q.   Do you recall whether this so-called

6   crash course focused on or had any section that

7   dealt with Boston Police rules and regulations?

8     A.   Could you say that question one more

9   time?

10    Q.   Sure.

11        MR. MORRIS:  Could you read it back

12   for me, please.

13        (Record read)

14    A.   This specific course here on LP 23?

15    Q.   Yes.

16    A.   I believe it did not.  I believe I

17   took a second class on rules and procedures with

18   this same company which will be LP 24.

19    Q.   Okay.  Fair enough.

20        So you mentioned the Boston Police

21   tutorial session, these courses referenced in LP

22   23 and 24, the study groups, the time you spent

23   when you got home from work and studying for the

24   exam.

Lynette Praileau

25

1          Are there any other steps that you
2    took to prepare for the 2005 promotional exam?
3                    (Pause)
4    BY MR. MORRIS:
5        Q.    And feel free to use those documents
6    if they help refresh your recollection.
7        A.    I recorded seminars that I attended,
8    and I would listen to them.
9                    (Pause)
10       A.    I also took a class with Law
11   Enforcement Dimensions.
12       Q.    Is that all you can recall at this
13   time?
14       A.    Yes.
15       Q.    Thank you.
16             You mentioned that you recorded
17   seminars.  What seminars did you record?
18       A.    When I attended -- the seminar
19   recordings here from Commonwealth Police
20   Services, and I had the dates on which I
21   attended those classes, July 11th -- not July --
22   yeah, July 11th, August 1st, August 8th,
23   August 2nd, August 9th.
24             And then I attended a criminal

Lynette Praileau

26

1    procedures seminar from October 3rd through

2    October 7th, and the last one is -- October 3rd

3    to the 7th is the five-day crash course.

4           So the seminars I attended with

5    Commonwealth Police Services, I recorded them.

6        Q.    Okay.  And is that recordings that you

7    made or recordings that you purchased through

8    the --

9        A.    Recordings that I made.

10       Q.    Okay.  And can you tell me about this

11   seminar offered by Law Enforcement Dimensions?

12   It looks to be -- LP 26 seems to make reference

13   to that, 26, 28 and so on.

14           MR. GLEASON:  I'm not seeing in the

15   copy I have an LP 27.  I'm wondering if that's a

16   labeling issue on our end.

17           MR. MORRIS:  I just noticed that

18   now, so I am not 100 percent sure.  I'm not sure

19   whether our copy machine just left the pages

20   out.

21           MR. GLEASON:  I can certainly

22   double check after the deposition.

23           MR. MORRIS:  Okay.

24           MS. ALVAREZ:  Actually, I do have

Lynette Praileau

27

1    here -- there is an LP 27 that was not -- I

2    guess it was a copying error.  Oh, I'm sorry.

3    I'm sorry.  That's not right.  I was too quick

4    to answer.

5    BY MR. MORRIS:

6        Q.    Hopefully that won't be a big issue,

7    but based on what we have in front of us --

8        A.    I can't tell exactly what this class

9    was for, and I don't recall based on this letter

10   here.

11       Q.    And this letter here is --

12       A.    I'm referring to LP 26.

13       Q.    Okay.  Do you know -- in LP 26 there

14   is a name at the top John Sofis Scheft.

15             Do you know if Mr. Scheft was part of

16   the tutorial sessions offered by the Boston

17   Police Department, was one of the presenters or

18   instructors?

19       A.    Yes.

20       Q.    But you don't remember anything

21   further about the Law Enforcement Dimensions?

22       A.    Off the top of my head, I don't

23   remember what this specific class was that the

24   letter is for.

Lynette Praileau

28

1      Q.    Okay.  I want to ask a few questions
2  about your family background.
3            Can you tell me where you were born?
4      A.    Boston, Massachusetts.
5      Q.    Did you grow up in Boston?
6      A.    Yes.
7      Q.    What neighborhood did you grow up in?
8      A.    I lived in Roxbury, Dorchester and
9  Mattapan.
10      Q.    Okay.  Did you live with both your
11  mother and father?
12      A.    No.
13      Q.    Can you tell me who you primarily
14  lived with?
15      A.    My mother.  And when she got married,
16  my mother and her husband.
17      Q.    Okay.  And how old were you when she
18  got married?
19      A.    I don't recall.
20      Q.    Okay.  Did your mother work?
21      A.    Yes.
22      Q.    What was the nature of the work she
23  held?
24      A.    She worked at Sears & Roebuck.

Lynette Praileau

29

1     Q.    Okay.  Do you recall what positions or
2  position she held there?
3     A.    No, I don't.
4     Q.    Okay.  And this would be your
5  stepfather that your mother married?
6     A.    Yes.
7     Q.    Do you recall the nature of the work
8  he performed?
9     A.    He worked for Merchant Tire Company.
10    Q.    And do you know what kind of work he
11 did for Merchant Tire Company?
12    A.    Something to do with tires.
13    Q.    Okay.  Fair enough.
14          Did your mother graduate from college?
15    A.    Not that I know of.
16    Q.    Did she graduate from high school?
17    A.    I believe so, yes.
18    Q.    And your stepfather, do you know if he
19 graduated from college?
20    A.    Not that I know of.
21    Q.    Did he graduate from high school?
22    A.    I believe he did.
23    Q.    Okay.  I want to show you a document
24 which will be marked as Exhibit 3.

Lynette Praileau

30

1          (Exhibit 3 marked

2          for identification)

3          (Pause)

4  BY MR. MORRIS:

5      Q.   Do you recognize Exhibit 3 to your

6  deposition?

7      A.   Yes.

8      Q.   And is this a charge of discrimination

9  that you filed with the Massachusetts Commission

10  Against Discrimination?

11      A.   Yes.

12      Q.   I'd like to focus your attention kind

13  of in the middle of the page, on the right-hand

14  side.  There's a box which says -- it has the

15  heading date discrimination took place, and

16  what's typed in there is January 2008.

17          Do you see that section of the

18  document?

19      A.   Yes, I do.

20      Q.   Can you describe for me what

21  discrimination or the nature of the

22  discrimination that you believe took place in

23  January 2008?

24          MR. GLEASON:  Objection to form.

Lynette Praileau

31

1          You can answer to the extent you
2    understand the question.
3          A.    Can you be a little bit more clear?
4          Q.    Well, I'll do my best, but there's the
5    allegations you see in the body of the
6    complaint.
7          A.    Right.
8          Q.    And the section here in the charge
9    which says date discrimination took place, and
10   it says January 2008.
11         And what I'm trying to understand is
12   what discriminatory acts or events that you
13   believe took place or you believe that the City
14   of Boston or the Commonwealth of Massachusetts
15   took against you in January 2008?
16              MR. GLEASON:  Objection.
17              You can answer the question.  I'm just
18   preserving the record.
19         A.    The fact that the written exam was
20   discriminatory.
21         Q.    Okay.  Anything else?
22         A.    I don't understand what you mean.
23         Q.    You said "the fact that the written
24   exam was discriminatory."

Lynette Praileau

32

1    You, as I understand it, took that

2  exam some time in October 2005; is that correct?

3    A.    Correct.

4    Q.    Okay.  So what happened in

5  January 2008, which is roughly over two years

6  later, in relationship to the written exam that

7  you believe was discriminatory?

8            MR. GLEASON:  I object.

9        You can answer.

10    A.    Experts took a look at the exam and

11  found that it had a disparate impact.

12    Q.    And who are these experts?

13            MR. GLEASON:  I'm going to object

14  to the extent that this may call for revelation

15  of attorney-client privileged communications.

16            MR. MORRIS:  I'm not interested in

17  any conversations with counsel, but she used the

18  word expert.

19  BY MR. MORRIS:

20    Q.    If there's somebody other than an

21  attorney that you're referring to -- is there

22  somebody other than an attorney you're referring

23  to when you say experts took a look at the exam

24  and found a disparate impact?

Lynette Praileau

33

1      A.    I would have to refer to the attorney.

2      Q.    You used the phrase, if I'm not

3  mistaken, experts, is that correct, that experts

4  took a look at the exam?

5      A.    I did use the phrase experts, but what

6  I was referring to is that the exam was looked

7  at, and based on what was found is that it had a

8  disparate impact.

9      Q.    Right.  And are you referring to

10  anyone other than an attorney when you talk

11  about the fact that the exam was looked at and

12  found to have a disparate impact?

13      A.    Can I have a minute with him?

14      Q.    The question's pending.

15          MR. GLEASON:  But she has a right

16  to confer if it's an issue of privilege.  She

17  would have a right to confer with me to

18  determine whether or not her answer would call

19  for --

20          MR. MORRIS:  I'm not trying to get

21  at any conversations she had with counsel.

22  There is no interest whatsoever in that.  I'm

23  just trying to understand -- if she said experts

24  took a look at this or an expert and found that

Lynette Praileau

34

1    the exam had a disparate impact, fine.

2    BY MR. MORRIS:

3        Q.   If you're simply referring to counsel

4    or legal counsel, I don't want to know about

5    anything that legal counsel said to you or you

6    said to them.  I'm not interested in that.  But

7    if you're referring to somebody who isn't an

8    attorney whom you consider to be an expert, then

9    I would like to know about that.

10            MR. GLEASON:  Are you done with

11   your question?

12            MR. MORRIS:  I'm just trying to

13   explain this.  I'm not trying to intrude, and I

14   don't know that --

15            MR. GLEASON:  I think your reading

16   of the scope of privilege is too narrow.

17            This privilege doesn't relate just to

18   communications with attorneys themselves but

19   agents who act on behalf of the attorney in the

20   capacity of facilitating the rendering of legal

21   advice.

22            So to the extent her communications

23   are through an attorney or set up through an

24   attorney with an expert or she's hearing through

Lynette Praileau

35

1   an attorney what an expert may or may not have
2   said, I think this is all unfair to ask her
3   that.

4           Now, if you want to give her a moment
5   to talk to me about it, we can figure out --
6           MR. MORRIS:  All right.  Why don't
7   I give you a moment.  I don't know if I
8   necessarily agree with you on the scope of
9   privilege issue, but fine, you can have a moment
10  to talk about this and see where we go from
11  here.

12          MR. GLEASON:  And just before we
13  go, I don't know that I understand where this
14  line of questioning is going.  If you're asking
15  for an expert opinion or a legal opinion as to
16  what defines disparate impact or some sort of
17  discriminatory action, I think those questions
18  are wholly inappropriate for this witness.

19          If you're asking her just for her
20  understanding as a layperson as to what
21  constitutes discrimination, I think that's fair.

22          But as we start to delve into more
23  detail analysis of when did injury take place
24  and what constitutes the injury, I just don't

Lynette Praileau

36

1    think this is the person who you should be

2    asking those questions to.

3                    MR. MORRIS:  I'm not really

4    interested in that.  I am interested in the fact

5    that a date was put down here as the date the

6    discrimination took place, and I'm trying to

7    explore what that may mean, and I think I'm

8    entitled to do that.

9                    MR. GLEASON:  Can we take a moment?

10                   MR. MORRIS:  Sure.  I think that's

11   fine.

12                   (Witness and counsel confer)

13   BY MR. MORRIS:

14      Q.   I had made reference to the box on

15   Exhibit 3, the MCAD charge which says

16   January 2008 under the box date discrimination

17   took place.

18              I asked you some follow-up questions,

19   and I believe you testified, and forgive me if

20   I'm not paraphrasing it accurately, that an

21   expert or experts concluded that the written

22   exam was discriminatory, and we had a discussion

23   about legal privilege and so on with your

24   attorney.

Lynette Praileau

37

1           And what I'd like to ask you now, if

2    you're prepared to answer, is can you tell me,

3    were the experts that you're referring to

4    someone other than an attorney?

5       A.   I'm going to say that that was

6    established -- this was established by the

7    attorney.

8       Q.   When you say "this," you say --

9       A.   The January 2008 date.

10      Q.   It was determined by legal counsel; is

11   that correct?

12      A.   Yes.

13      Q.   Is it fair to say that legal counsel

14   completed this -- did the bulk of the work on

15   this MCAD charge?  Is that fair to say?

16           MR. GLEASON:  Objection.

17           I caution you not to reveal any

18   substance of any communication with counsel.

19   BY MR. MORRIS:

20      Q.   Let me strike that.

21           Did you write any portion of this MCAD

22   charge or prepare any portion of this MCAD

23   charge?

24           MR. GLEASON:  Objection.

Lynette Praileau

38

1    A.    Did I write it?

2    Q.    Yes.

3    A.    I would say the bottom portion where I

4    signed my name.

5    Q.    Okay.  Any other portion?

6    A.    No.

7    Q.    That's no?

8    A.    No.

9    Q.    Okay.  If I understand your testimony,

10    I believe you testified that the information

11    under the box date discrimination took place was

12    completed by an attorney; is that correct?

13    A.    Correct.

14    Q.    And sitting here, do you understand

15    the basis for the attorneys using the date

16    January 2008?

17           MR. GLEASON:  Objection.

18           You can answer that question yes or no

19    but nothing further.

20    A.    State that question one more time,

21    please?

22           MR. MORRIS:  Could you repeat it,

23    please, read it back?

24           (Record read)

Lynette Praileau

39

1    A.   Off the top of my head, I don't recall
2  at this time.
3    Q.   Is there anything that would help you
4  recall?  You said you don't recall at this time.
5  Is there anything that would help you recall?
6         MR. GLEASON:  Again, you can answer
7  yes or no.
8    A.   Anything that's currently --
9    Q.   I'm sorry?
10   A.   Is there anything that will help me
11 recall at this moment?
12   Q.   Yes, right now, is there anything that
13 would help you?  You said you couldn't recall --
14 I believe -- I can read it back, but I believe
15 you said at this time you couldn't recall, and
16 I'm asking whether you're aware of anything that
17 would help you recall.
18   A.   Not at this time.
19   Q.   Okay.  I want to direct your attention
20 to a document called Fifth Amended Complaint
21 which we'll mark as Exhibit 4 to your
22 deposition.
23         (Exhibit 4 marked
24         for identification)

Lynette Praileau

40

1                      (Pause)

2    BY MR. MORRIS:

3        Q.    Have you reviewed Exhibit 4?

4        A.    Yes.

5        Q.    Have you seen this document before?

6        A.    Yes.

7        Q.    Okay.  I wanted to direct your

8    attention to page eight of the document and to

9    paragraph 37.

10                     (Pause)

11       Q.    Do you see that paragraph?

12       A.    Yes.

13       Q.    Okay.  Just so you know where I'm

14   headed here, I'm going to ask you to focus on

15   the language in that paragraph, and I'm going to

16   leave out some words, I'm not trying to

17   misconstrue it, but just so we can focus a

18   little better, where the paragraph alleges that

19   minority police officers have been -- have taken

20   the examination, have been ranked significantly

21   lower than their nonminority counterparts

22   despite their being otherwise equally as

23   qualified for sergeant's promotional position.

24                 Do you see that?

Lynette Praileau

41

1      A.    Yes.

2      Q.    I'm going to represent to you that as

3   a result of the 2005 promotional exam as

4   administered for the Boston Police, 56 white

5   police officers had been promoted.

6           And what I'd like to ask you is why

7   you believe that you are equally as qualified

8   for a sergeant's promotional position as those

9   56 white police officers?

10          MR. GLEASON:  I'm going to object

11   to that.

12          To the extent you can answer the

13   question about 56 unnamed white police officers,

14   you can answer.

15      A.    Why do I feel I am --

16      Q.    Equally as qualified as white police

17   officers who were promoted.

18      A.    I believe I possess the skills of a

19   supervisor, management, organizational, decision

20   making.  I utilize those skills -- do you have

21   something else to say?

22      Q.    No, I'm not trying to interrupt you.

23      A.    -- while instructing my classes.

24          Also, I am the vice president of an

Lynette Praileau

42

1    organization, and we do have staff there that we

2    manage as well or that I manage as well.

3         Q.    Have you finished your answer?

4         A.    Yes.

5         Q.    What organization are you the vice

6    president of?

7         A.    The Massachusetts Association of

8    Minority Law Enforcement Officers.

9         Q.    How long have you held that position?

10        A.    I believe I'm in my eighth year.

11        Q.    Do you know anything as you sit here

12    today about the qualifications of the white

13    police officers who were promoted as a result of

14    the 2005 exam?

15        A.    No, I don't.

16        Q.    Okay.  You mentioned that you held an

17    outside job, or your counsel did.  Can you tell

18    me about that?

19        A.    There was one day I assisted in some

20    training at a college facility for police

21    officers for that college.  I don't remember the

22    name of the college off the top of my head, but

23    that was the only one I could remember.

24        Q.    And that was just for one day?

Lynette Praileau

43

1      A.   Yes.

2           MR. MORRIS:  I don't have any

3    further questions, but Mr. Quinan will have

4    questions.

5

6                CROSS-EXAMINATION

7    BY MR. QUINAN:

8      Q.   Good afternoon.  I'm Robert Quinan,

9    and I represent of the Commonwealth of

10   Massachusetts and HRD in this lawsuit.  I just

11   have a few follow-up questions.

12           Could you tell me what year you

13   graduated from high school?

14     A.   1988.

15     Q.   What high school or high schools did

16   you attend?

17     A.   I attended Boston Latin School.

18     Q.   And you were there from grades seven

19   to 12?

20     A.   Yes.

21     Q.   And then you went on to Northeastern

22   University; is that correct?

23     A.   Yes.

24     Q.   Did you receive a scholarship to

Lynette Praileau

44

1   attend college?

2       A.    No.  I just applied regularly.

3       Q.    Okay.  What made you decide to go into

4   policing as a career?

5       A.    When I graduated from Northeastern

6   with my computer science degree, I applied for a

7   job there and was hired as a computer

8   programmer.

9             While there, I was able to see what

10  law enforcement was about, and I decided to take

11  the examination and was called for the class.

12      Q.    For how many years did you work as a

13  computer programmer in a civilian capacity for

14  the BPD?

15      A.    I started working there in 1993, and I

16  would say up until I went into the academy in

17  June of '96.

18      Q.    So I take it that you took an

19  examination to be appointed a police officer in

20  1995.  Is that about right?

21      A.    I don't recall the exact date off the

22  top of my head.

23      Q.    Was it more than a year prior to your

24  starting the police academy in June of 1996?

Lynette Praileau

45

1      A.    I don't recall.

2      Q.    Do you recall how you did on the
3  entry-level examination?

4      A.    I don't remember the grade, no, I
5  don't.

6      Q.    Okay.  In preparation for becoming a
7  police officer, what training did you receive?

8      A.    To become?  Can you rephrase that
9  question?  What exam are you referring to?

10      Q.    Let me ask if you received any kind of
11  training to become a police officer before
12  enrolling in the Boston Police Academy?

13      A.    I'm going to say no.

14      Q.    Did you do anything in preparation for
15  entering the police academy?

16      A.    Yes.  A lot of running.

17      Q.    Anything else?

18      A.    I would say just a physical fitness
19  part of it, just getting prepared for that,
20  because they give you a little booklet that
21  outlines situps and pushups and stuff like that.

22      Q.    And how long were you enrolled in the
23  Boston Police Academy?

24      A.    I graduated in January of '97.

Lynette Praileau

46

1       Q.   Is performance in the academy graded

2   in any way?

3       A.   We had weekly examinations on material

4   that was covered, and we also had level exams.

5       Q.   And those exams were scored?

6       A.   Yes.

7       Q.   How did you do overall?

8       A.   I did well.

9       Q.   Were you ever disciplined while

10  enrolled in the academy?

11      A.   Not that I recall. They yell at you

12  regardless.

13      Q.   But you don't remember there having

14  been any written discipline placed in your file

15  or anything of that nature, do you?

16      A.   No.

17      Q.   Okay. We talked earlier about some of

18  your assignments after you were sworn in as a

19  police officer.

20      A.   Yes.

21      Q.   I don't think we covered all of your

22  assignments.

23           I heard you testify briefly that you

24  had worked with the rapid unit, wagon service

Lynette Praileau

47

1    unit.  What is that?

2        A.    That's when I worked out in the

3    district.  I was assigned to District C-11 at

4    the time in Dorchester.

5        Q.    And what is this rapid unit, wagon?

6        A.    A rapid unit is a two-man car, where

7    you would go to the Priority 1 calls.  And then

8    you have your service unit, and then you have

9    the wagon, and then you'll have a walking beat.

10   So it's different kinds of deployment of

11   officers based on a situation.

12       Q.    And how long were you doing this work?

13       A.    Up until the time I was transferred to

14   ISG, and I believe that was in December of '97.

15       Q.    ISG stands for?

16       A.    Information Systems Group.

17       Q.    So you were with the rapid unit, wagon

18   unit for less than a year, because you graduated

19   from the police academy in January of 1997, and

20   then you transferred to ISG in December of 1997?

21       A.    That's correct.

22       Q.    In the ISG position, did you have any

23   supervisory responsibilities?

24       A.    No, I did not.

Lynette Praileau

48

1    Q.    What sorts of supervisory

2    responsibilities, if any, have you discharged as

3    an instructor in the police academy?

4    A.    I would say maintaining and handling a

5    class while doing instruction.

6    Q.    How many students are typically

7    enrolled in your classes?

8    A.    It varies because they come in with

9    one number and they dwindle down.  So it depends

10   on when my class is scheduled and how many

11   people we've lost from the academy.

12   Q.    At the beginning of your course,

13   what's the highest number of students you've had

14   in one class?

15   A.    I don't want to guess, but I know that

16   when we started out, it was around 60 something,

17   but I believe when they graduated, it was much

18   less.

19   Q.    So you've had 60 students in your

20   classroom at one time?

21   A.    (Witness nods).

22   Q.    Teaching what matter?

23   A.    I would say when I taught substance

24   abuse.

Lynette Praileau

49

1        Q.    And am I recalling correctly that you

2   had been an instructor for about a year?

3        A.    I would say yes because I -- this was

4   my first full class, so I would say yes.

5        Q.    Have you participated in any special

6   assignments in your career as a police officer?

7        A.    What do you mean by special

8   assignments?

9        Q.    Anything that we haven't talked about

10  yet.

11       A.    I was undercover in a live lineup.

12            I did Operation Squeeze, which is

13  where they send you undercover as like a

14  prostitute to catch the johns, things like that.

15            I did work during the Democratic

16  National Convention in assigning security posts.

17       Q.    Tell me about that.

18       A.    I worked on a committee that was

19  charged with getting everything ready for the

20  Democratic National Convention.

21            And I worked in a group where I was

22  responsible for organizing and typing up all the

23  posts with the assistance of another supervisor.

24  And we were provided a list of all the people

Lynette Praileau

50

1   from each district that were going to go into

2   the positions.

3       Q.   And what sort of committee was this

4   that you were working with?

5       A.   I don't remember the exact name of the

6   committee.

7       Q.   Was it all Boston police officers?

8       A.   Yes.

9            And I've done a similar committee to

10  that one when they also had the International

11  Association of Chiefs of Police coming into town

12  as well.

13      Q.   How many officers would be on this

14  committee?

15      A.   I don't remember the exact number

16  because a lot of little committees were working

17  on different things.  I don't remember everyone

18  that was on the committee.  That's been a little

19  while.

20      Q.   What was your role on that committee?

21      A.   Just to make sure there was -- how do

22  you say it -- the bat gets out to the person who

23  is doing the roll call, making sure people were

24  getting into their right positions, giving a

Lynette Praileau

51

1    count to the person who was delivering the

2    lunches and the water and stuff to the officers.

3        Q.    Have you received any commendations

4    for your work?

5        A.    Yes.

6        Q.    Can you tell me what those

7    commendations were?

8        A.    I know I received a commendation for

9    working on that committee with the DNC.

10        Q.    Did the commendation specify anything

11    in particular that you were being commended for?

12        A.    I don't remember off the top of my

13    head.

14        Q.    Have you ever been disciplined as a

15    police officer?

16        A.    Not that I can recall.

17        Q.    Have you ever attended any continuing

18    education or certification course to advance

19    your career as a police officer?  Setting aside

20    the exam prep courses we've talked about

21    earlier.

22        A.    I was lobbying at the academy as an

23    instructor.  We had a course there from the FBI

24    for instructor training.

Lynette Praileau

52

1        I have had some other training in
2    regards to applications that the departments
3    have utilized in order to train officers on it.
4        Q.    Would these be computer applications?
5        A.    Correct.
6        Q.    And you've had trainings to further
7    your knowledge how those computer applications
8    are utilized?
9        A.    Yes.
10       Q.    How long are those trainings?
11       A.    I don't remember.
12       Q.    Are they one-day trainings?
13       A.    I think it depends on the training
14    whether or not it was one day or not.
15             I don't recall that the trainings were
16    one day.  I believe they were longer than one
17    day.
18       Q.    Were any of them longer than three
19    days?
20       A.    I don't remember exactly.
21       Q.    Do you recall attending any off-site
22    trainings; in other words, trainings that were
23    not delivered at a Boston Police building?
24       A.    Yes.

Lynette Praileau

53

1    Q.    Any outside of Boston?

2    A.    I believe so.

3    Q.    Can you recall anything about the

4  trainings you attended outside of Boston?

5    A.    I believe one training that I attended

6  had to do with computer forensics.  I believe it

7  was still in Massachusetts, but I don't believe

8  it was in the Boston area.

9    Q.    About how many years ago would that

10 training have taken place?

11   A.    I don't recall.  I don't recall the

12 date.

13   Q.    Apart from the Massachusetts

14 Association of Minority Law Enforcement

15 Officers, are you involved in any other

16 professional or community organizations?

17   A.    Yes.

18   Q.    And what would those organizations be?

19   A.    I'm a member of the Urban League of

20 Eastern Massachusetts.  I'm also a member of the

21 NAACP.

22   Q.    Any other organizations?

23   A.    Bethlehem Baptist Church and Citizens

24 Against Crime.  And that's all I can think of

Lynette Praileau

54

1   right now.

2       Q.   Do you hold any leadership position in

3   any of those organizations?

4       A.   I am the secretary in Citizens Against

5   Crime, but as far as leadership of vice

6   president and president, no.  The only one is

7   MAMLEO, Massachusetts Association of Minority

8   Law Enforcement Officers.

9       Q.   And did I hear correctly that you said

10  you were vice president of MAMLEO for eight

11  years?

12      A.   Correct.

13      Q.   How many members does MAMLEO have?

14      A.   I'm going to say maybe around about

15  400.

16      Q.   How often does MAMLEO meet as an

17  organization?

18      A.   MAMLEO --

19      Q.   Well, let me ask first about the

20  organization as a whole.  How often are there

21  large scale events sponsored by MAMLEO?

22      A.   When you say "events," events like --

23      Q.   Social or professional or community

24  oriented.

Lynette Praileau

55

1      A.   We just did like a senior -- a

2  Thanksgiving turkey give-away for the senior

3  citizens.  We normally do a Halloween party for

4  the kids in the community.  We have monthly

5  meetings.

6      Q.   What are those monthly meetings about?

7  Do you have guest speakers?  Are they socials?

8      A.   No, it's mostly talking -- having

9  membership come in, just updating them on

10  different things that we are working on.

11      Q.   And how many officers are typically in

12  attendance at a monthly meeting?

13      A.   It varies.  You need at least 10 for a

14  quorum, so it could be 10 or more.

15      Q.   And what are your chief

16  responsibilities as vice president?

17      A.   To assist the president in running the

18  day-to-day functions of the organization.

19      Q.   And what specifically do you do to

20  assist the president?

21      A.   What do I do?  Well, just to give you

22  an idea of some of the stuff that I do, if we

23  have classes that we're preparing, I'll handle

24  the classes.

Lynette Praileau

56

1    Q.    These would be classes just for MAMLEO

2    members?

3    A.    It could be outside members as well.

4    Q.    What types of classes?

5    A.    We just recently had a preparation

6    class for the past or the examination that just

7    passed, the October 2008 exam, and it was open

8    to anyone.

9         I also make sure that paperworks are

10   filed, like the annual reports.  If there's

11   anything I could do to assist her or assist the

12   president in making sure that everything gets

13   done.

14        Communicate with the office of staff,

15   make sure that mailings are going out.  Things

16   like that.

17   Q.    How many staff members do you work

18   with?

19   A.    We have a secretary, and we also have

20   a mature worker.  And they just come in and do

21   various things around the office.

22        We have a secretary that's there daily

23   to answer the phone and take messages.

24   Q.    The other person is basically a

Lynette Praileau

57

1    volunteer?

2        A.    Yeah, like a mature worker's program.

3        Q.    A senior citizen?

4        A.    Yes.

5        Q.    To your knowledge, has MAMLEO

6    sponsored an exam preparation class like the one

7    you just mentioned prior to 2008?

8        A.    Yes.

9        Q.    Did MAMLEO sponsor any such classes in

10   connection with the 2005 promotional exams?

11       A.    I don't believe so.

12       Q.    Do you recall whether MAMLEO sponsored

13   any classes prior to the 2002 promotional exams?

14       A.    I don't know.

15       Q.    Okay.  In 2008, how many hours or days

16   of classes did MAMLEO sponsor in connection with

17   the promotional exams?

18       A.    I know it was every Saturday.  I think

19   the classes ran from 12 to three.  But I don't

20   have the number of weeks that it ran off the top

21   of my head.

22            And we had -- we also had some other

23   classes in regards to rules and procedures prior

24   to that.

Lynette Praileau

58

1    Q.    Do you believe that those classes took

2 place over the course of more than two months?

3    A.    Yes.

4    Q.    Were they well attended?

5    A.    Yes.

6    Q.    Did you utilize any of the instructors

7 in the classes that you took in 2005, or is it a

8 different group of instructors that have done

9 the MAMLEO classes?

10    A.    Different.

11    Q.    Different group?

12    A.    Mm-hmm.

13    Q.    Are MAMLEO's efforts being supported

14 by the Boston Police Department?

15        MR. GLEASON:   Objection.

16    A.    I don't understand what you mean by

17 supported.

18    Q.    Is the Boston Police Department in any

19 way providing any support for MAMLEO's efforts

20 to hold these classes, or is it your effort

21 completely independent of the Boston Police

22 Department?

23    A.    I would say it's independent.

24    Q.    Okay.   Is there any other co-sponsor

Lynette Praileau

59

1   of the classes, or is MAMLEO the only sponsor of

2   these classes?

3      A.   I don't understand what you mean by

4   co-sponsors.  If there's a topic that -- I don't

5   understand what you mean by co-sponsor.

6      Q.   That there might be a different

7   organization out there, not that this is likely,

8   but the Massachusetts Association of Chiefs of

9   Police is co-sponsoring this with you where

10   they're helping you on the program?

11      A.   Not like that.

12      If we were looking for any assistance,

13   we'd probably go to -- we have done -- when we

14   did prep classes for the detective's exam, we

15   had utilized community organizations to assist

16   us with some of the training, but nothing

17   like --

18      Q.   Have any community organizations

19   assisted you with running the prep class for the

20   promotional exam, the sergeant promotional exam?

21      A.   No.

22      Q.   Do you use instructors who are not

23   MAMLEO members for these classes?

24      A.   Yes.

Lynette Praileau

60

1    Q.    Do you pay those instructors?

2    A.    No.

3    Q.    So they volunteer?

4    A.    Yes.

5    Q.    What's been marked as Deposition

6    Exhibit 2, the first page, I don't know if you

7    still have a copy of that.

8    A.    Okay.

9    Q.    Toward the end of the third paragraph,

10   this document indicates that textbooks on the

11   reading list for the 2005 exam were being

12   distributed at the police academy in late

13   April of 2005.

14         Do you recall whether you obtained

15   your copies of the reading list of materials in

16   or about late April of 2005? Do you remember

17   going to the police academy and getting them

18   there, or did you order them separately?

19   A.    I don't know if I actually got them

20   from the academy or if I ordered it from the

21   company or not.  I don't know off the top of my

22   head.

23   Q.    Do you believe you had your copies of

24   the textbooks prior to the seminars that you

Lynette Praileau

61

1    participated in in June of 2005, the seminars on

2    page LP 0050?

3         A.    Did I have my books prior to June?

4         Q.    Yes.

5         A.    I believe I did.

6         Q.    You testified that you participated in

7    a study group.  Do you recall whether your study

8    group had formed by the time of the seminars

9    that are listed on page LP 50?

10        A.    I don't recall.

11        Q.    Do you recall whether you were meeting

12   regularly with your fellow study group members

13   in the summer of 2005?

14        A.    I don't remember the actual dates.

15        Q.    Here's a real memory test.  Can you

16   tell me whether the preparation you did for the

17   2002 sergeant promotional exam was the same or

18   different from the preparation you undertook in

19   2005?

20             MR. GLEASON:  Objection to form.

21             If you understand the question, you

22   can answer it.

23        A.    Would you please repeat that?

24        Q.    Sure.  I was simply asking whether the

Lynette Praileau

62

1   preparation that you can recall undertaking for

2   the 2002 sergeant promotional exam was of the

3   same nature as the preparations you did for the

4   2005 exam.  In other words, did you enroll in

5   special classes?  Did you join a study group?

6   Did you tape presentations and listen to the

7   tapes afterward?

8       A.   Yes, they were similar.  I did take

9   study -- promotional classes that I enrolled in.

10  I don't recall off the top of my head if I had a

11  study group at that time or whether I taped the

12  seminars that I attended.

13      Q.   Would you say that you prepared more

14  intensively for the 2005 exam as opposed to the

15  2002 exam?

16           MR. GLEASON:  Objection.

17           You can answer.

18      A.   Any time I prepare for an exam, I

19  prepare intensively.

20      Q.   So it's your recollection that you

21  prepared intensively for the 2002 sergeant

22  promotional exam as well?

23      A.   Yes.

24      Q.   And is it your recollection that you

Lynette Praileau

63

1  would have prepared over a similar length of

2  time for both exams?

3      A.    I'm going to say -- a similar length

4  of time?  I'm going to say yes.

5      Q.    Okay.  Now, did you take the most

6  recent promotional exam given in October of this

7  year?

8      A.    Yes.

9      Q.    And could you describe your

10  preparations for that examination?

11      A.    Yes.  I read the material.  I attended

12  the prep classes offered by MAMLEO.  And I also

13  had a study group.

14      Q.    And how often did you meet with your

15  study group?

16      A.    I believe we met like -- I don't

17  remember the exact days.  I do remember closer

18  to the end that we met every day up until the

19  exam, but prior to that, it was at different

20  intervals because of the classes that were given

21  on Saturday.

22      Q.    Do you remember when your study group

23  first formed and you started meeting regularly?

24      A.    It was after the Saturday classes had

Lynette Praileau

64

1    begun.

2        Q.    And do you remember when that was?

3        A.    The exact date, I don't remember off

4    the top of my head.

5        Q.    Was it in the summertime?

6        A.    It had to be probably around -- I

7    don't want to guess.  It could have been around

8    May or June.  I don't remember the exact date.

9        Q.    Would you say that the effort you put

10    into preparing for the 2008 sergeant promotional

11    exam was equal to the effort that you put into

12    the 2005 exam or different in some way?

13                MR. GLEASON:  Objection.

14        A.    I would say the effort was the same.

15        Q.    Okay.  Going back to the 2005

16    promotional exam.

17                After taking that exam, you recall

18    having -- do you recall where that exam took

19    place?

20        A.    The 2005?

21        Q.    Right.

22        A.    I believe it took place at the

23    Boston -- they call it the BCEC in South Boston,

24    the Boston Exhibition Center.

Lynette Praileau

65

1     Q.    Was that a full-day exam?

2     A.    If it was a full day?

3     Q.    Yes.

4     A.    I don't remember how many hours I was

5   there, but I know we usually go ahead there for

6   registration in the morning at eight, and they

7   usually start the exam around nine.  And I guess

8   based on when you finish your examination, you

9   are free to pass in your test and walk out.

10    Q.    Okay.  So you don't recall having had

11  inadequate time to take that exam?

12    A.    Off the top of my head, I don't

13  remember.

14    Q.    Okay.  After taking the exam, did you

15  believe that any of the questions you had been

16  asked were unfair in any way?

17          MR. GLEASON:  Objection as to time.

18  Is there a time frame on that, or is it open

19  ended?

20  BY MR. QUINAN:

21    Q.    Well, let meet me ask a preliminary

22  question.

23          Are you aware that candidates for the

24  promotional exams are entitled to appeal or

Lynette Praileau

66

1  challenge particular questions on the exam?

2      A.   Yes.

3      Q.   Okay.  So during that appeal period

4  that follows the examination, did you believe

5  that any of the questions you had been asked

6  were unfair in any way?

7      A.   No.

8      Q.   Did you have any concerns about the

9  exam as a whole in that time frame?

10     A.   Not that I can recall at this time.

11     Q.   When did you first learn of your

12 results in that examination?

13     A.   I don't remember the exact date that I

14 received the results in the mail.

15     Q.   Would it have been in the winter

16 following the October exam?

17     A.   I don't remember because it takes a

18 little while after you take the exam to receive

19 your score.  It's not like it comes right after

20 you take it.  I don't recall.

21     Q.   Do you recall getting your score at

22 the same time your study group colleagues and

23 other officers you know got their scores?

24     A.   Do I recall if we all received them at

Lynette Praileau

67

1    the same time?  I'm assuming so, because if

2    one's mailed out, you would think they were all

3    mailed out at the same time.

4        Q.    And how is it that you learned of your

5    ranking on the eligible list?

6        A.    There is a Web site.  You can create

7    an account and log in and actually print out a

8    list.

9        Q.    And did you access that account and

10   check your ranking as soon as that information

11   became available?

12       A.    Yes.

13       Q.    If the documentation I've seen is

14   correct, you were ranked 166th on the eligible

15   list.

16             Is that your recollection as well?

17       A.    I don't remember off the top of my

18   head what the number was.

19       Q.    Does that sound about right?

20       A.    Without seeing it --

21       Q.    Do you recall thinking when you

22   learned of your ranking on the list that you

23   would likely be promoted or likely not be

24   promoted?

Lynette Praileau

68

1    A.    I believe I had an opportunity to be.

2    Q.    Did you look into how many promotions

3  had been made off the prior eligible list and

4  compare your ranking with the last promoted

5  individual on the prior list?

6    A.    No.

7    Q.    When you said you believed you had an

8  opportunity to be promoted, was that based on

9  any information you gathered?

10   A.    On information?  Just by looking at

11 the fact what they got down -- I wouldn't say,

12 no, not based on information.  I just believed

13 that I passed the exam, and I had an opportunity

14 to be promoted.

15   Q.    So it was mainly a hope that you might

16 be promoted?

17        MR. GLEASON:  Objection.

18   A.    I wouldn't say it was a hope.  I

19 believed that they would have come down to that

20 section, and I would make it.

21   Q.    Okay.  So that's what you were

22 thinking when you saw your ranking on the list?

23   A.    Yes.

24   Q.    Why did you decide to become a

Lynette Praileau

69

1    plaintiff in this lawsuit?

2        A.    Why did I decide?

3        Q.    Yes.

4        A.    Because I feel that I should be a

5    sergeant.  I should have been promoted a

6    sergeant.  I believe I'm qualified to be a

7    sergeant.

8        Q.    When did you become aware that this

9    lawsuit was pending?

10       A.    When it was -- I don't recall.

11       Q.    Would you have known this time last

12   year that there was a lawsuit challenging the

13   promotional exam?

14       A.    I don't remember.

15       Q.    Are you personally aware of any

16   particular act on the part of the Boston Police

17   Department or the Commonwealth or HRD that took

18   place in the month of January 2008 in which you

19   believe constitutes an act of discrimination?

20           MR. GLEASON:  Objection because I

21   think this calls for legal opinion or expert

22   testimony.

23           But if you understand as a layperson,

24   you can answer.

Lynette Praileau

70

1   BY MR. QUINAN:

2       Q.    I'm asking if you are personally aware

3   of any act that occurred in January of 2008 that

4   in your mind constitutes an act of

5   discrimination?

6       A.    Am I aware?

7       Q.    Yes.

8       A.    I don't think so, no.

9       Q.    No?

10      A.    I'm not quite sure what you're asking

11  in that question.

12      Q.    I'm asking for your personal

13  knowledge.  And I'm hearing you say that no, you

14  are not aware of any particular act that

15  occurred in the month of January of 2008 that

16  constituted an act of discrimination?

17      A.    I think I'd rather defer that to the

18  attorneys, that question, because I'm not --

19      Q.    Well, no, because I'm asking whether

20  you are personally aware of anything.

21      A.    Okay.

22      Q.    So it's either a yes or no.

23      A.    I'm going to go with no then.

24      Q.    Apart from your personal belief that

Lynette Praileau

71

1  you have the qualifications to be a good police

2  sergeant, were there any other factors that went

3  into your personal decision to participate as a

4  party in this lawsuit?

5        MR. GLEASON:  You can answer that

6  question yes or no, but I just caution -- I'm

7  sorry, you can answer that question yes or no.

8     A.    Could you repeat that question,

9  please?

10        MR. QUINAN:  Could you read that

11  back, please?

12        (Record read)

13     A.    No.

14     Q.    Have you learned of the results of the

15  2008 sergeant promotional exam yet?

16     A.    No.

17        MR. QUINAN:  Well, I wish you all

18  the best.  It's been a pleasure to meet you.

19        I don't have any other questions.

20        MR. MORRIS:  Nothing further.

21        MR. GLEASON:  I have nothing.

22        (Whereupon the deposition was

23  concluded at 1:36 p.m.)

24

Lynette Praileau

72

1                    C E R T I F I C A T E

2        I, LYNETTE PRAILEAU, do hereby certify that

3  I have read the foregoing transcript of my

4  testimony, and further certify that it is a true

5  and accurate record of my testimony (with the

6  exception of the following corrections):

7  Page    Line                Correction

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19      Signed under the pains and penalties of

20 perjury this_____day of _____, 200__.

21

22

23          _____

24              LYNETTE PRAILEAU

Lynette Praileau

73

1    COMMONWEALTH OF MASSACHUSETTS)

2    SUFFOLK, SS.                    )

3

4        I, Daria L. Romano, RPR, CRR and Notary

5    Public in and for the Commonwealth of

6    Massachusetts, do hereby certify that there came

7    before me on the 2nd day of December, 2008, at

8    11:37 a.m., the person hereinbefore named was

9    duly sworn by me and that such deposition is a

10   true record of the testimony given by the

11   witness.

12       I further certify that I am neither related

13   to nor employed by any of the parties or counsel

14   to this action, nor am I financially interested

15   in the outcome of this action.

16       In witness whereof, I have hereunto set my

17   hand and seal this 4th day of December, 2008.

18

19

20   _____

21   Notary Public

22   My Commission Expires

23   March 15, 2013

24

COPY