# EXHIBIT P

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PEDRO LOPEZ, et al.<br>   Plaintiffs | )<br>)<br>) |
| v. | )<br>)<br>) Case No. 07-CA-11693-JLT |
| CITY OF LAWRENCE, MASSACHUSETTS,<br>et al.<br>   Defendants | )<br>)<br>)<br>)<br>) |

### AFFIDAVIT OF JOEL P. WIESEN, PH.D.

I, Joel P. Wiesen, depose and state as follows

1. **Topic of this Affidavit**
   I was asked by counsel to consider the earliest point in time an adversely affected minority applicant for promotion to Sergeant could notice and evaluate the overall level of adverse impact of the Commonwealth's examinations for promotions to Police Sergeant, and specifically the 2005 Sergeant examinations for the Boston Police Department (BPD), the Springfield Police Department (SPD), and the MBTA.

2. **My Qualifications**
   As stated in my expert report of Oct. 3, 2008, I have conducted several thousand adverse impact analyses of employment decisions, including analyses of numeric personnel data of various types (e.g., test scores).

3. **An Overview of the Civil Service Hiring Process for Police Sergeant**
   This section gives a non-evaluative summary of the Civil Service process[1] used to promote applicants to Police Sergeant based on the 2005, 2006, and 2007 exams.[2] The

---

[1] This process was used for most PDs. Exceptions to this process are rare. For example, in 2006 the Human Resources Department (HRD) allowed the Salem PD to also include an oral board as a weighted, graded component as part of the Sergeant exam.

[2] The SPD and the MBTA took part in the 2005 statewide exam. The 2005 Boston Sergeant exam and the 2005, 2006, and 2007 statewide Sergeant exams contained different

Page 1

process begins, in some respects, with the applicants taking a multiple-choice written examination and completing a "Rating Sheet" in order to claim education and experience (E&E) credit.[3] The grades on these two "weighted components" of the promotional examination are weighted and averaged to arrive at the overall examination score. Qualifying applicants can claim "Veteran's points"[4] or a promotional preference for 25 or more years of service. Both of these add 2 points to the overall examination score.[5] After the written test and the E&E Rating Sheets are scored, applicants receive notice from the Massachusetts Human Resources Department (HRD) of their grades on both graded components and their final grade (after averaging and adding any applicable special preference points, as just described). Once the grades are finalized, passing applicants are placed on an Eligible List for the PD to which they applied, in rank order of their examination grade (i.e., the overall examination score plus any special points, as just described).[6] The Eligible Lists for the various PDs that participated in an exam are usually established by HRD within a few days or weeks of each other.[7] When a PD wishes to make an appointment from an Eligible List, HRD issues a Certification

---

questions but all consisted of 80 multiple-choice questions based on specified, purportedly Sergeant-related reading material, and all covered the same Examination Subjects (as may be seen by comparing the examination announcements for one of the statewide exams and the Boston exam, Bates pages 00001 for the statewide exam and 1767 for the Boston exam.) The Boston exam had some questions on internal BPD polices and procedures whereas the statewide exams did not.

[3]This is stated on the examination announcement for each police department participating in the promotional examination. (See, for example, Bates pages 00001, 00040, 00045, and 00050. A copy of the Education and Experience Rating Sheet is at Bates page 00029 and the related instructions are at Bates 00020-00026.)

[4]This is stated on the examination announcement for each police department participating in the promotional examination. (See, for example, Bates pages 00003, 00042, 00047, and 00052.)

[5]See, for example, the Affidavit of Vivian Lee (Bates page 15) and the HRD Employment Verification Form (Bates page 00028).

[6]It is not possible to be promoted from one PD into another PD. The only way to move from one PD to another is by lateral transfer, and that is rare.

[7]For example, the 2006 Sergeant Exam was held on 10/21/06 and the Eligible List was established on 3/30/07 for many PDs (e.g., Andover, Arlington, Athol, Attleboro, and Auburn PDs), and on 5/1/07 for the Brockton PD (as shown in the Excel data file named "Data for Shortfall Analyses and FET.xls" that was submitted together with the report of Dr. Silva, an expert for the Defendants).

Page 2

including names from the top of the Eligible List in rank order. The PD is constrained to appoint from within the first 2n+1 persons willing to accept appointment.[8] Typically an Eligible List for a PD is in existence for about 2 years[9] after which another Eligible List is established based on a new exam held for that PD. The Eligible Lists resulting from the 2005 Sergeant exam for the MBTA and the SPD were established on 3/24/06 and new Eligible Lists for these PDs based on the 2007 Sergeant exam were established on 3/30/08, so these two 2005 Eligible Lists were alive for almost exactly 2 years.[10] The Eligible List resulting from the 10/22/05 exam for Sergeant, BPD was established on 2/13/06 and the most recent appointments from that list were made on 10/24/08.[11] I am informed that this Eligible List is still alive, so it has had a life of over 3 years.

I am informed that passing applicants have access to an HRD web page that contains a list of the names of passing applicants from their PD in the order they appear on the Eligible List. The Eligible List as it appears on that HRD web page does not indicate racial/ethnic group membership, the scores on the written test nor on the exam overall, and which persons on the list may be tied,[12] and it lacks any information on applicants who took the exam and failed. Also, applicants from one PD are not given information about the grades or number of applicants passing (or failing) in PDs other than their own. Presumably, applicants within a PD become aware of promotions of other applicants as they are made by that PD.

4. **Prescribed Method for Conducting an Adverse Impact Analysis**
The method for conducting an adverse impact analysis was promulgated by the federal agencies that enforce Title VII of the Civil Rights Act, as amended. Adverse impact is defined in the federal *Uniform Guidelines on Employee Selection Procedures* (*UGESP*, 1978), in Section 3.4, paragraph D, which begins as follows:

> Adverse impact and the "four-fifths rule." A selection rate for any race, sex, or

---

[8] This is described in the Personnel Administration Rules (PARs, for example, see Bates page 00229).

[9] Two years is mentioned in numerous places in MGL Ch 31 (see, for example, the third paragraph of Section 25).

[10] This assumes the MBTA and SPD 2005 Eligible Lists were alive until the establishment of the 2007 Eligible Lists.

[11] This date and other similar dates I refer to in this report are taken from the Excel data file named "Data for Shortfall Analyses and FET.xls" that was submitted together with the report of Dr. Silva, an expert for the defendants.

[12] The examination marks are presented on Eligible Lists in whole numbers (PARs, see Bates page 00247, paragraph numbered 4).

Page 3

ethnic group which is less than four-fifths (4/5) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by federal enforcement agencies as evidence of adverse impact. Smaller differences in selection rate may nevertheless constitute adverse impact, where they are significant in both statistical and practical terms or where a user's actions have discouraged applicants disproportionately on grounds of race, sex, or ethnic group.

Usually the federal enforcement agencies will not look at individual examination components if there is no bottom line adverse impact. The relevant portion of the UGESP reads as follows:

> The "bottom line." If the information called for by sections 4A and B of this section [on impact] shows that the total selection process for a job has an adverse impact, the individual components of the selection process should be evaluated for adverse impact. If this information shows that the total selection process does not have an adverse impact, the Federal enforcement agencies, in the exercise of their administrative and prosecutorial discretion, in usual circumstances, will not expect a user to evaluate the individual components for adverse impact, or to validate such individual components, and will not take enforcement action based upon adverse impact of any component of that process, including the separate parts of a multipart selection procedure or any separate procedure that is used as an alternative method of selection. However, in the following circumstances the Federal enforcement agencies will expect a user to evaluate the individual components for adverse impact and may, where appropriate, take enforcement action with respect to the individual components: (1) where the selection procedure is a significant factor in the continuation of patterns of assignments of incumbent employees caused by prior discriminatory employment practices, (2) where the weight of court decisions or administrative interpretations hold that a specific procedure (such as height or weight requirements or no-arrest records) is not job related in the same or similar circumstances. In unusual circumstances, other than those listed in paragraphs (1) and (2) of this section, the Federal enforcement agencies may request a user to evaluate the individual components for adverse impact and may, where appropriate, take enforcement action with respect to the individual component.[13]

5. **Data Required to Conduct An Adverse Impact Analysis**

This section enumerates the types of data needed to conduct adverse impact analyses. The next section asks when or whether these data were made available to applicants who took the 4 HRD exams being challenged.

---

[13]UGESP section 3.4C.

    a.    The primary adverse impact analysis described in the UGESP (see above) concerns bottom line hiring and thus requires knowledge of the number of people who applied and the number hired, broken down by racial/ethnic group.[14]

    b.    An adverse impact analysis of the written test scores requires knowledge of the written test scores for all applicants, broken down by racial/ethnic group.

    c.    An adverse impact analysis of the pass/fail decisions of the written test requires knowledge of the number of applicants that took the test and the number that passed and failed.

In all three of these types of adverse impact analysis, data are needed for both the applicant's own PD and for other PDs participating in the HRD Sergeant examination. This is because for all departments except Boston the number of applicants and the number of successful (promoted) applicants are small for the type of statistical analysis referred to in the *UGESP*[15] and commonly used in disparate impact[16] cases under Title VII. Statistical analyses conducted on small numbers of applicants are likely to be unable to identify true adverse impact when it exists. Statistical analysis of larger groups of applicants are much more likely to identify true adverse impact when it exists, and no more likely to incorrectly identify adverse impact when it does not exist.

6.    **When Were the Data Available to Conduct An Adverse Impact Analysis?**
This section evaluates when the data required to conduct an adverse impact analysis were available to applicants who took the 4 HRD exams being challenged.
    a.    The data required to conduct the primary adverse impact analysis for a given examination, that is, an analysis of the bottom line hiring, are only available after all the hiring based on the examination is completed. The data required are only fully available when the Eligible List expires. For the BPD, the Plaintiffs could not have had these data even today, since the Eligible List for the BPD is still alive and additional appointments may be made from it.[17,18] For the SPD and the

---

[14] Title VII of the 1964 Civil Rights Act, as amended, proscribes discrimination based on race, color, religion, sex, and national origin. I mention only the group membership relevant to this matter.

[15] As in Section 3.4, quoted above.

[16] Adverse impact is often also referred to as disparate impact. I use these terms synonymously.

[17] Based on the Excel file provided with Dr. Silva's expert report.

[18] The date of the last appointments made so far from the 2005 BPD exam is 10/24/2008.

Page 5

MBTA, the Plaintiffs could not have had these data until 3/30/2008, when the Eligible Lists based on the 2005 exam were replaced by Eligible Lists based on the 2007 Sergeant exam.[19,20] The earliest date by which applicants can calculate adverse impact in appointment is the date the Eligible List expires.

There is great variation between PDs in the timing of making appointments, as can be seen in the appointments based on the 2005 exam in the three PDs just mentioned: the SPD made all its appointments the very day the SPD Eligible List was established, the MBTA made appointments infrequently, 1 and 2 at a time, over an 18 month period, and the BPD made its last appointment well over 2 years after the day the BPD Eligible List was established.

Similarly, there is great variation within PDs in the making of appointments. For example, a number of PDs took part in the challenged Sergeant examinations but made no appointments at all from the resulting Eligible Lists.[21]

Further, as already mentioned, it is often necessary in doing adverse impact analyses to combine data across PDs when any one PD promotes only a handful of applicants, as is the case for the PDs that participated in the 3 statewide exams being challenged. The limited amount of data that was made available to applicants excluded data from PDs other than their own.

Given proper data, it is possible to undertake adverse impact analyses prior to the expiration of an Eligible List, but such analyses will be based on incomplete data, or on projections, and therefore may not reflect the actual adverse impact seen at the expiration of the Eligible List. Analyses based on incomplete data will have lower statistical power to detect adverse impact, as mentioned elsewhere in

---

[19] Although the only appointments made by SPD were on 3/24/06, the date the list was established, applicants could not know then that no additional appointments would be made from the list over its 2 year life.

[20] Although the MBTA made appointments over a period of 11.5 months, from 4/14/2006 to 3/20/2007, applicants could not know then that no additional appointments would be made from the list over its life.

[21] For example, the New Bedford PD (NBPD) took part in the 2005 Sergeant exam but made no appointments over the life of the resulting Eligibility List. Of the 43 NBPD applicants, 10 were minority and 8 of them failed the exam, including all 6 black applicants.

thisreport.[22]

b. The data required to conduct an adverse impact analysis of the written test scores requires knowledge of the written test scores for all applicants, broken down by racial/ethnic group. This information was never made available by HRD to applicants (other than an individual applicant's scores to that individual applicant). In fact, applicants had no official source of information on the number of failing applicants, much less their scores. Therefore, it was impossible for applicants to have conducted this type of adverse impact analysis.[23]

c. An adverse impact analysis of the pass/fail decisions of the written test requires knowledge of the number of applicants that took the test and the number that passed. Again, this information was not made available to applicants. Passing applicants were not given information on who failed or the number of applicants that failed.[24] Therefore, the Plaintiffs could not have conducted pass-fail adverse impact analyses.

It also may be noted that it is not necessarily the case that an applicant could tell how many applicants failed by comparing his or her observations of the other test takers at the HRD examination site with the number of names on the Eligible List. There are only a limited number of HRD examination sites in the Commonwealth. There were close to 50 applicants for the MBTA and for the SPD (precisely 46 and 47, respectively), and 628 applicants for the BPD exam. Applicants taking a test may well not attempt to count the number of other applicants in the test room and, even if they attempted to do so, it may be that not all the applicants from a given PD were seated in the same test room (and this is certainly true for the BPD applicants).

7. **My Opinion On When Necessary Data Were Available to Applicants**
Based on the above analysis, and absent information to the contrary, it is my opinion that the data needed to conduct adverse impact analyses for the 4 challenged Sergeant exams

---

[22]Projections would be based on several assumptions, each of which may not be correct, such as: that appointments will be made in strict rank order of exam score, and the number of appointments that will be made (which depends on retirements, medical leave, unforeseen changes in budget, and other factors, some unforeseeable).

[23]Even if the all examination marks were made known to all applicants (and they were not), these are a composite of at least the written test and the E&E scores. Therefore, adverse impact analyses of the written test scores would not be possible based only on these data.

[24]Each individual failing applicant did receive notice of his or her failing exam grade from HRD.

Page 7

were either only available after the expiration of the Eligible Lists, in the case of the number of appointments, or were not made available to applicants by HRD, in the case of the number of applicants passing and failing the exams and in the case of the grades on the written exams. Absent the necessary data, it is impossible for applicants (or anyone else) to evaluate the level of possible adverse impact of the written tests.

Signed under the pains and penalties of perjury this 26th day of February 2009.

_____
Joel P. Wiesen, Ph.D.