# United States Court of Appeals
## For the First Circuit

———————————————

No. 09-1664

PEDRO LOPEZ, ET AL.,

Plaintiffs, Appellees,

v.

COMMONWEALTH OF MASSACHUSETTS, ET AL.,

Defendants, Appellants.

———————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

———————————————

Before

Lynch, Chief Judge,
Torruella and Howard, Circuit Judges.

———————————————

Sookyoung Shin, Assistant Attorney General, and Robert L.
Quinan, Jr., Assistant Attorney General, with whom Martha Coakley,
Attorney General of Massachusetts, was on brief for appellants.
Harold Lichten, with whom Leah Berrault and Lichten & Liss-
Riordan, P.C. were on brief for appellees.

———————————————

December 3, 2009

———————————————

      **LYNCH**, **Chief Judge**.  Plaintiffs, minority police officers, have brought a disparate impact race claim under Title VII, 42 U.S.C. § 2000e-2(k)(1)(A)(i), against a state agency that prepares and administers promotional examinations for local police officers under the state civil service system.  The Title VII claim depends on the state being the "employer" of the officers.

      Plaintiffs have also sued their direct employers, various cities and the Massachusetts Bay Transportation Authority (MBTA), as the appointing authorities who make the police promotions decisions.  Plaintiffs make the same claim against the state agency and the appointing authorities: that the state promotions examinations have an impermissible disparate impact on minority candidates.  They seek the same relief against both sets of defendants.  Massachusetts and its agency, the Human Resources Division (HRD), deny they are an "employer" as that term is used in Title VII.  They say that the Eleventh Amendment therefore immunizes them from suit because Congress has not clearly expressed any intention to abrogate Eleventh Amendment immunity when the state functions as it did here.

      This case comes before us as an interlocutory appeal from the district court's denial of Eleventh Amendment immunity for the state defendants, the state of Massachusetts and Paul Dietl, who was sued in his official capacity as the Chief Human Resources

-2-

Officer of HRD.  The city defendants and the MBTA are not parties
to the present appeal.

        We have jurisdiction over this interlocutory appeal, and
we hold that the state defendants do not qualify as "employers" as
that term is used in Title VII.  Because the state defendants are
not "employers" under Title VII, we need not reach the
constitutional questions that would arise if the Title VII term
"employer" encompassed the state's activities here.

        Our holding that the state defendants are not plaintiffs'
"employers" for purposes of Title VII means that we dismiss
plaintiffs' suit only against these defendants.  Plaintiffs' claims
against the city defendants and the MBTA will still proceed.  Our
holding in no way evaluates the merits of these defendants' conduct
towards the plaintiffs.

        We also wish to be clear there is no claim made that
either the state defendants or the city defendants and the MBTA
have engaged in any form of intentional discrimination in violation
of the Equal Protection Clause.  If that were the case, such
conduct could be reached by suit under 42 U.S.C. § 1983.

### I. Procedural History

        This appeal is one small piece of much broader
litigation.  Plaintiffs are African-American and Hispanic police
officers employed by the cities of Boston, Lawrence, Lowell,
Methuen, Springfield, and Worcester, or by the MBTA, who did not

achieve the promotions to police sergeant they sought.  In 2007, they brought suit under Title VII against two classes of defendants: the state defendants, which included Massachusetts and Dietl, and the MBTA and the cities for whom the plaintiffs work.

Plaintiffs sued the state defendants on the theory that the 2005, 2006, and 2007 promotional exams for police sergeant administered by HRD, a state agency, had a disparate impact on the promotion of minorities by the MBTA and the city defendants and had no job-related purpose.  HRD, on plaintiffs' theory, violated Title VII and was responsible for the dearth of minority promotions in the MBTA and the cities specified in the complaint.[1]  Plaintiffs sought identical remedies against their direct employers and the state: declaratory and injunctive relief to remedy the effects of past discrimination resulting from these examinations.  They also claimed compensatory damages, including back pay, along with attorney's fees, against both sets of defendants.

---

[1]     Plaintiffs also sued all defendants under an analogous Massachusetts statutory provision which prohibits employers from engaging in discriminatory practices based on race.  See Mass. Gen. Laws 151B, § 4(1), (3), (5).  Neither party raises this claim in this appeal.  In any event, the Eleventh Amendment clearly bars such a claim in federal court against the state defendants.  "[A] claim that state officials violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment. . . . [T]his principle applies as well to state law claims brought into federal court under pendent jurisdiction."  Pennhurst State Sch. and Hosp. v. Halderman, 465 U.S. 89, 121 (1984).

After extensive discovery, on January 26, 2009, the state defendants filed a motion to dismiss, or for summary judgment in the alternative, on the grounds that they were immune from suit on all claims under the Eleventh Amendment. They argued that Title VII abrogates states' Eleventh Amendment immunity only when states function as "employers" as that term is used in Title VII. Because, they asserted, HRD is not plaintiffs' Title VII "employer" on the facts here, they remain immune from suit. They further argued that HRD's relationship to the plaintiffs cannot be construed as an employment relationship because such an interpretation of Title VII would flout congressional intent. The individual state official also contended the Eleventh Amendment protects him from suits for damages in his official capacity. The state defendants added that plaintiffs cannot use the doctrine of Ex Parte Young to obtain an injunction against the official for an ongoing violation of federal law because the state is not an employer for purposes of Title VII.

In a one-line order issued on April 6, 2009, the district court denied the state defendants' motion to dismiss and for summary judgment. Lopez v. City of Lawrence, No. 07-11693-JLT, at 1 (D. Mass. Apr. 6, 2009). On May 4, 2009, the state defendants filed an interlocutory appeal of the district court's denial of Eleventh Amendment immunity. On May 13, 2009, the district court ordered proceedings before it stayed until this court resolves the

-5-

appeal.  Lopez v. City of Lawrence, No. 07-11693-JLT, at 1 (D. Mass. May 13, 2009).

## II. Factual Background

We describe the material facts, as to which there is no dispute.  Indeed, the material facts are established by state civil service law and related administrative regulations, and by the parties' stipulations.

Whether the state, acting in the capacity alleged, acts as an "employer" within the meaning of Title VII turns upon HRD's role in the promotion of municipal police officers and its role in other aspects of plaintiffs' employment by the municipal defendants.

HRD's relationship with municipalities in the areas of police hiring and promotions have been discussed in many civil rights cases brought under various theories.[2]  None of these cases

---

[2]    See, e.g., Sullivan v. City of Springfield, 561 F.3d 7, 9-13 (1st Cir. 2009) (discussing, in a § 1983 suit against a city defendant only, HRD's role in the process of hiring of city police officers and the recruitment of minority police officers); Crete v. City of Lowell, 418 F.3d 54, 57-60 (1st Cir. 2005) (providing background about HRD's role in the hiring process for city police officers in a § 1983 and state law claim against a city defendant only); Cotter v. City of Boston, 323 F.3d 160, 164-66 (1st Cir. 2003) (explaining HRD's role in the promotions process in a § 1983 suit against city and state defendants claiming violations of plaintiff white police officers' civil rights when the city promoted minority police officers); Donahue v. City of Boston, 304 F.3d 110, 112-115 (1st Cir. 2002) (describing HRD's role in the appointment of city police officers in a § 1983 suit against a city defendant claiming that an affirmative action program for police hiring was unconstitutional).

raised or resolved the issue of whether the state was an "employer" of municipal police officers within the meaning of Title VII.

A.        The Relationship between HRD and Cities, Towns, and the MBTA under Massachusetts Civil Service Law

Under Massachusetts law, plaintiffs' positions as city and MBTA police officers are subject to the state civil service law.[3] See Mass. Gen. Laws ch. 31, § 48 (applying the civil service law to positions in the MBTA); id. § 51 (applying the civil service law to civil service offices in cities).

The state civil service law states that the purpose of its requirements is to ensure that employees in civil service positions are recruited, chosen, and promoted based on principles of merit, not on political affiliation, race, age, gender, religion, national origin, or other factors unrelated to individual ability.  Id. § 1.  "[T]he fundamental purposes of the civil service system [are] to guard against political considerations, favoritism, and bias in governmental employment decisions . . . and to protect efficient public employees from political control."

---

[3]     The litigants have consistently referred to the city defendants and the MBTA collectively as "municipalities" or "municipal defendants."  We do not address the issue of whether MBTA should be categorized as a municipality or differently for purposes of describing HRD's role in its promotions decisions. Whether this categorization is accurate, plaintiffs have waived any arguments to the contrary.  We do note that the MBTA is the direct employer of the MBTA police under state law.  Mass. Gen. Laws ch. 161A, § 2 defines the MBTA as "a political subdivision of the commonwealth;" under § 3(d), its powers include the authority "to appoint and employ officers . . . and to fix their compensation and conditions of employment."

<u>Cambridge</u> v. <u>Civil Serv. Comm'n</u>, 682 N.E.2d 923 (Mass. App. Ct. 1997).

This law also defines the relationship between the state agencies which administer the civil service system and cities, towns, and entities like the MBTA. The defendant cities function as "appointing authorit[ies]" under this law: they have "power to appoint or employ personnel in civil service positions." Mass. Gen. Laws ch. 31, § 1. The state civil service law governs all positions in all cities, including positions on a city police force.[4] As "appointing authorities," cities enjoy considerable discretion under the law to choose the system they will use to evaluate candidates for police promotions, to determine the criteria for selection, and to make the ultimate selection for a vacant position, as we discuss below.

State entities, of course, can also be "appointing authorities" for state employees. However, the state civil service law uses different language to describe the personnel these state entities appoint or employ. These personnel are within the "official service" of the Commonwealth or its "labor service," a distinction that turns upon whether the position is selected

_____

[4] Section 51 exempts labor service positions in cities with populations of less than one hundred thousand residents from the civil service law, unless the city chooses to make it applicable. However, that exception is not relevant here, since the law also excludes police officers from the definition of a "labor service position." Mass. Gen. Laws ch. 31, § 51; <u>see</u> <u>also</u> § 47 (defining "labor service positions").

through registration or competitive examination. Id. § 1. Examples of positions in the service of the Commonwealth include positions in the state's department of highways, the department of revenue, the department of environmental management, and in the department of public welfare. Id. § 48. The law explicitly distinguishes these personnel from city police, who are not in the service of the Commonwealth. Instead, by statute, city police occupy "[o]ffices and positions in the service of cities and towns," id., and they are subject to the state civil service law based on separate, significantly different sections of the law, id.; see also id. §§ 51-53.

HRD, in comparison, is a state agency with statutorily prescribed duties with respect to the administration of the state civil service system, including the preparation and administration of certain competitive promotions examinations. The civil service law identifies HRD as the "[a]dministrator," meaning "the personnel administrator of the human resources division," as distinct from an "appointing authority" with the "power to appoint or employ" the plaintiffs. Id. § 1. As the administrator, HRD has statutory authority to "make and amend rules which shall regulate the recruitment, selection, training and employment of persons for civil service positions." Id. § 3. HRD here is not being sued by its own HRD employees, but in its capacity as the administrator of the civil service system.

-9-

The law also directs HRD to make rules pertaining to promotional appointments, id. § 3(e), and for conducting appointment and promotion examinations, id. § 5(e).  HRD is also responsible for maintaining records of examinations, eligible lists resulting from those examinations, and the results of all appointment decisions in the civil service.  Id. § 5(h). Significantly, the law also mandates that HRD is "[t]o delegate the administrative functions of the civil service system, so far as practicable, to the various state agencies and cities and towns of the commonwealth."  Id. § 5(*l*).

HRD is not the only state agency responsible for the administration of the Massachusetts civil service system.  HRD shares this role with another agency, the Civil Service Commission. The Commission has the power to review any rules proposed by HRD, and, if the Commission concludes that a given rule violates a merit-based approach to employment decisions, it can, upon a three-fifths vote, disapprove of the rule.  Id. § 3.  The Commission can also affirmatively propose amendments to these rules if, in the Commission's view, those changes would reflect basic principles of merit and would serve the public interest.  Id. § 2(f).

Finally, the Commission, not HRD, is responsible for adjudicating disputes involving various aspects of employment, including disputes concerning the content and administration of promotions examinations.  Through this process, individuals who are

-10-

disappointed by employment decisions can challenge actions taken by a "local appointing authority" and those taken by HRD.  Id. § 2(b)-(c).

As part of this process, the Commission can also review the validity of HRD rules when an aggrieved individual challenges a rule.  Id. § 2(b).  The Commission has previously exercised this authority to scrutinize and ultimately uphold an HRD regulation, which we shall describe later, pertaining to the promotion of minority candidates.  See Brackett v. Civil Serv. Comm'n, 850 N.E.2d 533, 541, 553 (Mass. 2006) (describing the Commission's decision).  Beyond this, aggrieved individuals can appeal the Commission's decision in state court and allege that HRD's regulations, HRD's actions, or actions taken by local appointing authorities violated state law.  Id. at 553 (finding that the Commission properly concluded that an HRD rule concerning local affirmative action plans was a proper exercise of HRD's statutory authority).  The Commission is not a defendant in the present action.

B.    HRD's Role in the Promotion of City Police Officers

Under the civil service law, appointing authorities have considerable latitude over the process by which police officers are selected for promotion to sergeant.  Most importantly, municipalities are not required to use examinations prepared and administered by HRD to assess local candidates for promotion to

police sergeant.[5]  Cities and towns have long been able to opt out of the HRD-administered process and implement their own promotional examinations pursuant to an agreement with HRD.  See Mass. Gen. Laws ch. 31, § 5(*l*) (statutory authority for HRD to delegate administrative functions) and §§ 9-11 (setting out the general parameters for promotional examinations).

Under this option, municipalities assume the administrative functions that HRD might otherwise perform. Municipalities are still bound by the state civil service law and regulations requiring adherence to basic principles of merit.  But municipalities have flexibility in deciding how to satisfy these regulatory requirements.[6]

Cities have used this authority to develop and administer their own police promotional examinations or to rely on the HRD-

---

[5]     For the purposes of the promotions process, the state civil service law refers to "municipalities" and does not significantly distinguish between cities and towns.  Because plaintiffs have assumed that MBTA's promotions process is identical to the process that municipal police departments follow for promotions, we do not address MBTA's promotions process. Plaintiffs have conflated the two and any arguments to the contrary are waived.

[6]     For instance, while state law requires municipalities to continue making police officer promotions based upon competitive examinations, Mass. Gen. Laws ch. 31, § 59, municipalities, and not HRD, choose what form the examination will take, whether to make the HRD examination one part of the evaluation process, and whether to develop and administer an entirely different written examination.  Municipalities must also presumably comply with statutorily established hiring and promotion preferences for veterans and other specified groups.  See id. § 26 (setting out preferences).

administered examination in combination with other metrics. For instance, the cities of Leominster and Salem used a combination of the HRD examination and a simulated job scenario to evaluate promotion candidates in 2007. And in 2002, Boston developed and administered its own written examination.

This decentralized process reflects the future direction of the civil service administrative system. As of September 1, 2009, cities and towns no longer have the option of relying upon HRD to develop and administer hiring and promotions examinations for police sergeant or any other civil service positions, due to Massachusetts' budgetary constraints. Instead, municipalities have begun developing and administering their own processes. See Letter from Paul D. Dietl, Chief Human Res. Officer, HRD, to Mun. Appointing Auths., Human Res. Divs., Fire Chiefs, and Police Chiefs (Aug. 7, 2009), available at http://www.mass.gov/Eoaf/docs/hrd/cs/ information/cs_aug_7_2009.doc. Cities and towns must, of course, create processes that comport with state civil service laws. And state law still provides oversight over the process: people aggrieved by municipalities' appointment or promotion decisions can directly appeal to the Civil Service Commission. But HRD's role in the promotions process under this system is limited to providing technical assistance when asked. Id.

Until these recent changes, cities and towns could alternately make their police promotion decisions by relying in

-13-

part upon the results of a competitive annual examination administered by HRD. For 2005, 2006, and 2007, the years at issue in this suit, all the city defendants and the MBTA chose this option to evaluate candidates for promotion to police sergeant.

Municipalities that chose to use the HRD examinations nevertheless retained flexibility over key aspects of promotions, including the ultimate choice among candidates. They could also consider factors beyond performance on the HRD examination.

By law, municipal police promotions must be made on the basis of competitive examinations, whether on the basis of the HRD examination or some other test. Mass. Gen. Laws ch. 31, §§ 59, 65. HRD is given statutory authority to establish the form and content of these examinations. Id. § 16. However, HRD's discretion in this area is bounded. By statute, all examinations must "fairly test the knowledge, skills and abilities which can be practically and reliably measured and which are actually required" to perform the job, a requirement that may significantly limit both the form and the substance of an examination. Id. And HRD must consult with labor representatives and professionals in the field to determine what skills and abilities are relevant for promotion to police sergeant or any other position. Id.

For decades, HRD and its predecessor agency developed annual written examinations to evaluate candidates for police sergeant promotions. State civil service law and a consent decree

-14-

to which HRD's predecessor agency was a party shaped the content and form of these examinations. That consent decree, entered in 1980, arose from civil rights litigation involving the Boston police department, but, in general terms, HRD's predecessor agreed to develop and administer promotional examinations that complied with the Equal Employment Opportunity Commission's (EEOC) Uniform Guidelines on Employee Selection Procedures (1978), 29 C.F.R. § 1607.1-18. See Boston Police Superior Officers Fed'n v. City of Boston, 147 F.3d 13, 15, 17-18 (1st Cir. 1998) (describing the terms of the consent decree as it applied to HRD's predecessor). The Guidelines required, inter alia, maintaining records that show the impact that examinations have on applicants according to race, sex, or ethnic group, see 29 C.F.R. § 1607.4(A), and complying with stringent standards to verify that the substance and form of the examinations are significantly related to job performance, id. § 1607.5.

    Nothing in the civil service law, however, mandated that municipalities had to use the results of HRD's written examinations as the only criterion to evaluate merit. Section 3(e) states that promotional appointments must generally be made "on the basis of merit as determined by examination, performance evaluation, seniority of service or any combination of factors which fairly test the applicant's ability to perform the duties of the position as determined by the administrator." Mass. Gen. Laws ch. 31,

§ 3(e).  Section 6B further provides that HRD and collective bargaining representatives must jointly determine the weight that appointing authorities should give to performance evaluations as another basis for evaluating candidates.  Id. § 6B.

In any event, subject to these constraints, the police promotional examinations HRD developed in 2005, 2006, and 2007 consisted of one hundred multiple-choice questions derived from law enforcement textbooks.  The highest possible score on the test was 100, and 70 was the minimum passing score.  After developing the examinations, HRD was required by law to prepare a notice of the examination for promotion to police sergeant.  Id. § 19. Massachusetts civil service law also limited the possible pool of promotional candidates to only those officers who had served on the force for at least three years in most cities.  Id. § 59.

After administering these examinations, HRD was required under the civil service law to create and maintain "eligible lists" of candidates for possible promotion to police sergeant, broken down by police department.  Id. § 25 (generally discussing eligible lists).  While eligible lists ordinarily ranked promotion candidates in order of their written examination scores, id., the law also imposed a number of preferences that significantly affected candidates' rankings. Various categories of veterans, for instance, are given an absolute preference over other candidates, and candidates meeting that description are listed in order of

-16-

examination performance before any other candidates, even if other candidates received higher scores.  Id. § 26.  By virtue of these mandatory preferences, the top scorers on the HRD written examinations were not inevitably the candidates listed at the top of the eligibility list.  By law, an eligibility list produced in a given year also usually expired after two years, and such lists were available for public inspection.  Id. § 25.

Municipalities only saw these eligibility lists if they determined that they had a vacancy for police sergeant and decided to fill it through promotion by using the results of the HRD examination.  Promotion was not a police department's only option for filling such a vacancy; by law, police departments could also request a transfer from another department, subject to HRD's verification that the request was made for good reason and would not impose undue hardship on the transfer candidate.  Id. § 35.

Assuming that a local police department had opted to use the HRD examination process and wanted to promote officers to fill an open position for police sergeant, the department would notify HRD of the number of vacancies in the department through a requisition.  Id. § 7.  Pursuant to § 27, HRD would then certify from the relevant eligible list the names of the three candidates at the top of the list who confirmed that they were willing to accept the job.  Id.; id. § 27.  If a candidate did not so confirm, that name was removed, altering the rankings.  Id.  § 25.

-17-

HRD, under its rulemaking authority, also promulgated PAR.09 in its Personnel Administration Rules, a rule to clarify the number of names to be certified based on the number of vacancies a local police department identified. Human Res. Div., Personnel Administration Rules PAR.09 (2003). PAR.09, commonly referred to as the "2n + 1" rule, states that to fill a certain number of vacancies, a municipality can choose from a number of candidates from the ranked list equal to twice the number of vacancies plus one. Id. The rule extrapolates from the statutory requirement that HRD certify three candidates for a single vacancy. If there are two vacancies, the municipality must choose among the top five candidates, and so on. Id.

Even at this point, however, municipalities did not have to automatically promote the candidate at the top of the eligibility list. That is so for several different reasons. "Nothing in [the civil service law]," the Massachusetts Supreme Judicial Court has observed, "mandates that promotions be made in strict rank order based only on examination results." Brackett, 850 N.E.2d at 553. First, the civil service law allowed the police department to bypass the candidate at the top of the list, so long as the department, as the appointing authority, then provided HRD with a written statement of reasons. Mass. Gen. Laws ch. 31, § 27. Municipalities could bypass the top-ranked candidate on an eligibility list for many reasons, including a history of domestic

-18-

violence, past criminal charges, or any other grounds pertaining to
the candidate's ability to effectively perform in the job.  See
Crete, 418 F.3d at 59.   HRD could review a municipality's
explanation for a bypass only on extremely narrow grounds.   Its
review merely ascertained that the municipality's reasons were not
based upon political considerations, favoritism, or bias, and HRD
could not second-guess a municipality's judgment. Id. at 59 & n.9.
The bypassed candidate could then obtain a hearing before the Civil
Service Commission to challenge the municipality's statement of
reasons.   Mass. Gen. Laws ch. 31, § 27.   Importantly, "[w]hile
Massachusetts law requires an explanation for promotions made
outside of strict rank order, there is no prohibition on such out-
of-rank decisions." Cotter, 323 F.3d 160, 171-72.

Second, at least in limited circumstances, even if HRD
objected to a proposed bypass, municipalities could choose to
promote more than the estimated number of open positions for police
sergeant, thereby avoiding the bypass process entirely. See, e.g.,
id. at 164-65 (noting that in 1997, the City of Boston decided to
promote thirty-six sergeants instead of the initial thirty it had
intended after determining that the initial ranked list of
candidates included only one African-American in the top thirty
scorers).   Boston's race-conscious decisionmaking in Cotter was
ultimately upheld under the Equal Protection Clause as a
permissible race-based distinction that was justified by a

-19-

compelling and narrowly tailored government interest. Id. at 168-71.

Third, municipalities that wished to hire more minority candidates could do so pursuant to another HRD administrative rule, PAR.10. Human Res. Div., Personnel Administration Rules PAR.10. That rule allows police departments to make requisitions to fill positions included in their affirmative action plans so long as HRD substantiates that the department engaged in previous discrimination that was either unconstitutional or in violation of state or federal law. Id. HRD would then provide the police department with a separate, ranked list of candidates beyond the initial 2n + 1 rule who met the identified minority criteria and were otherwise eligible for the promotion. Id. The number of candidates on that separate list would also be determined by the 2n + 1 rule. Id. The Commission has upheld this rule as a valid exercise of HRD's rulemaking authority, and Massachusetts' highest court recognized it as a permissible means by which municipalities could consider race as a factor in promotion decisions. See Mass. Ass'n of Minority Law Enforcement Officers v. Abban, 748 N.E.2d 455, 461-62, 469 n.12 (Mass. 2001).

In short, even for police departments that chose to rely upon HRD-administered written examinations to evaluate candidates for promotion to police sergeant, these examinations were never wholly determinative of promotion decisions. These departments had

-20-

a number of ways they could consider other factors beyond examination scores and look beyond the top-ranked candidates on an eligibility list. And while the state imposed some limitations on municipalities' options, these were overwhelmingly the product of statutory requirements in the civil service law, not of HRD's administrative decisions. Municipalities must continue to comply with these requirements even when HRD plays virtually no role in the promotions process.

In other aspects of police employment, HRD also played a limited role. HRD developed, administered, scored, and distributed the results of hiring examinations just as it did in the promotions process. Mass. Gen. Laws ch. 31, §§ 5(e), 6. HRD also exercised authority to establish minimum standards and qualifications for police hires, including health and physical fitness standards. Id. § 61A.

Finally, the parties have stipulated to a number of important facts concerning HRD's role relative to the cities and the MBTA in other aspects of plaintiffs' employment. By law, HRD does not hire or pay police officers; the cities and MBTA do. HRD has no daily control over police officers' work activities, nor does it provide plaintiffs with any financial benefits. HRD is not responsible for police training, transfer decisions, work assignments or schedules, supervision, discipline, termination

-21-

decisions, fringe benefits, ERISA benefits, or workers'
compensation insurance.

### III. Interlocutory Appellate Jurisdiction

Plaintiffs first contend that this court lacks appellate
jurisdiction to hear this appeal on the grounds that (1)
interlocutory appeals from a denial of Eleventh Amendment immunity
are available only when the appeal raises a pure question of law
and (2) the resolution of this case turns on disputed issues of
fact. Neither contention is accurate.

The Supreme Court rejected the first proposition in P.R.
Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139
(1993).[7] There, the Court found "little basis" for distinguishing

---

[7]     Plaintiffs have confused the standard for interlocutory
appeals of qualified immunity, which does distinguish between
appeals grounded in disputed questions of fact and law, with
Eleventh Amendment immunity, which makes no such distinction.
Indeed, their brief relies upon qualified immunity cases. Compare
Rivera-Torres v. Ortiz Velez, 341 F.3d 86, 93 (1st Cir. 2003)
(holding that denials of qualified immunity are immediately
appealable only if they involve a disputed question of law) (citing
Mitchell v. Forsyth, 472 U.S. 511 (1985)), with Rosie D. ex rel.
John D. v. Swift, 310 F.3d 230, 233 (1st Cir. 2002) (stating that
"pretrial orders granting or denying Eleventh Amendment immunity
are immediately appealable" without qualification).
    The distinction between the standard for an interlocutory
appeal of a denial of qualified versus Eleventh Amendment immunity
exists for good reason. Qualified immunity, a judicially crafted
common law doctrine, protects officials against litigation when
they have acted reasonably under the law, whereas Eleventh
Amendment immunity is a constitutional doctrine that safeguards
states' sovereign dignity and the state treasury. See Will v.
Hallock, 546 U.S. 345, 352 (2006).
    A prior decision of this court stated that "[o]rders denying
claims of Eleventh Amendment immunity and qualified immunity, to
the extent they turn on issues of law, fall within the ambit of

between interlocutory appeals in cases where Eleventh Amendment
immunity "is bound up with factual complexities whose resolution
requires trial" and where immunity poses a purely legal question.
Id. at 147.  The Supreme Court concluded that when a state's claim
to Eleventh Amendment immunity depended upon a fact-specific
analysis of whether an agency was, for instance, an arm of the
state, it could immediately appeal a denial of immunity.[8]  Id.

       In any event, this case is not one where Eleventh
Amendment immunity depends on disputed facts.  Plaintiffs and the
state defendants vigorously dispute whether HRD is an "employer"
under Title VII and therefore amenable to suit because Congress
abrogated state employers' Eleventh Amendment immunity.  But they
do so by advancing different interpretations of the relevant
Massachusetts statutes and case law that describes HRD's functions

---

this exception, and are thus immediately appealable to this Court."
Asociación De Subscripción Conjunta Del Seguro De Responsabilidad
Obligatorio v. Flores Galarza, 484 F.3d 1, 13 (1st Cir. 2007).
That statement is accurate, but that case neither raised nor
discussed the issue addressed in P.R. Aqueduct and Sewer Auth.,
namely whether a fact-dependent issue of Eleventh Amendment
immunity could also be immediately appealed.  The language of that
previous opinion cannot be read to suggest that the standards for
interlocutory appeals of Eleventh Amendment and qualified immunity
are identical.

       [8]    It is unclear whether P.R. Aqueduct and Sewer Auth. would
deprive courts of interlocutory appellate jurisdiction of a denial
of Eleventh Amendment immunity where the case "implicates
extraordinary factual difficulty."  506 U.S. at 147.  That issue is
not present in our case.

and by proposing different legal tests to define an "employer." These are questions of law.

Plaintiffs secondarily argue that the state defendants are not entitled to an interlocutory appeal because there is no Eleventh Amendment immunity issue at stake. That too is incorrect. We have appellate jurisdiction over this case because of the nature of the Eleventh Amendment issue involved. The state defendants ask us to hold that the district court erroneously denied Massachusetts' Eleventh Amendment immunity on the grounds that HRD's actions here did not make it plaintiffs' "employer" under Title VII, and that Congress has limited its abrogation of states' Eleventh Amendment immunity in Title VII only to situations where states act as actual employers.

The state argues that as a matter of statutory interpretation, HRD does not meet the definition of an "employer" under Title VII on the facts of this case. The state urges that it enjoys Eleventh Amendment immunity because, in the first instance, it was not the intent of Congress in enacting Title VII even to attempt to abrogate Eleventh Amendment immunity with respect to the functions the state performs here, which are not functions performed as an "employer." The question is whether we can exercise pendent jurisdiction over these issues in the present appeal.

-24-

The Supreme Court has outlined two instances in which pendent appellate jurisdiction may be appropriate: when an issue is "inextricably intertwined" with a denial of immunity, and if review of the pendent issue "was necessary to ensure meaningful review" of immunity.[9]  Swint v. Chambers County Comm'n, 514 U.S. 35, 51 (1995).  We have interpreted that to mean pendent jurisdiction exists in such circumstances.  See Suboh v. Dist. Attorney's Office, 298 F.3d 81, 97 (1st Cir. 2002); see also Fletcher v. Town of Clinton, 196 F.3d 41, 55 (1st Cir. 1999).[10]

All other circuits have found that pendent jurisdiction exists in at least this situation.  See Morris-Hayes, 423 F.3d at 163-64 (2d Cir. 2005); E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin, 269 F.3d 187, 203 (3d Cir. 2001); Rux v. Republic of Sudan, 461 F.3d 461, 475 (4th Cir. 2006); Byrum v. Landreth, 566 F.3d 442, 449-50 (5th Cir. 2009); Crockett v. Cumberland Coll., 316 F.3d 571, 578-79 (6th Cir. 2003); Jones v. InfoCure Corp., 310 F.3d 529, 536 (7th Cir. 2002); Wright v.

_____

[9]    It has not held that courts of appeals are prohibited from exercising pendent jurisdiction over related issues in an interlocutory appeal.

[10]    Unlike the question of whether a denial of immunity is appealable at all, when the distinction between qualified and Eleventh Amendment immunity matters, the doctrine of pendent appellate jurisdiction in interlocutory appeals does not depend on the type of immunity involved.  See Morris-Hayes v. Bd. of Educ., 423 F.3d 153, 163-64 (2d Cir. 2005).  Once a court can hear the interlocutory appeal, pendent jurisdiction facilitates a full resolution of the issues at the crux of the appeal.

Rolette County, 417 F.3d 879, 883-84 (8th Cir. 2005); Hendricks v.
Bank of Am., N.A., 408 F.3d 1127, 1134-35 (9th Cir. 2005);
Timpanogos Tribe v. Conway, 286 F.3d 1195, 1200 (10th Cir. 2002);
Bryant v. Jones, 575 F.3d 1281, 1301 (11th Cir. 2009); Kilburn v.
Socialist People's Libyan Arab Jamahiriya, 376 F.3d 1123, 1133-34
& n.7 (D.C. Cir. 2004).[11]

        Our circuit has specifically held that we have pendent
jurisdiction over issues related to a denial of Eleventh Amendment
immunity on an interlocutory appeal so long as the two issues are
"inextricably intertwined." Nieves-Márquez v. Puerto Rico, 353
F.3d 108, 123 (1st Cir. 2003); see also Limone v. Condon, 372 F.3d
39, 50-51 (1st Cir. 2004). In Nieves-Márquez, we reasoned that a
claim that no cause of action for damages existed under the
relevant statutes was "inextricably intertwined" with the
constitutional immunity question because, if injunctive relief were
the only statutorily available remedy against the state officer
defendants, the Eleventh Amendment immunity issue in that case
would have necessarily disappeared. 353 F.3d at 123-24. Because
the statutory issue was both determinative and factually and

---

        [11]    In Kilburn, the D.C. Circuit recognized that unlike all
other circuits, it had previously entertained the possibility that
pendent appellate jurisdiction might also exist beyond the
circumstances identified in Swint, "when substantial considerations
of fairness or efficiency demand it." 376 F.3d at 1133-34
(internal quotation marks omitted). However, the court also noted
that in practice, its application of this standard was largely
confined to cases where the Swint conditions were present. Id. at
1334.

legally entwined with the Eleventh Amendment question, we exercised
pendent appellate jurisdiction.  Id.; see also Morris-Hayes, 423
F.3d at 163 (explaining that an "intertwined" claim is one with
significant overlap between the claim and the immunity issue);
Armijo by and Through Chavez v. Wagon Mound Pub. Sch., 159 F.3d
1253, 1264-65 (10th Cir. 1998) (holding an "inextricably
intertwined" claim "is coterminous with, or subsumed in," the
immunity issue raised on interlocutory appeal such that "the
appellate resolution of the collateral appeal *necessarily* resolves
the pendent claim as well") (internal quotation marks omitted).

    The doctrine of constitutional avoidance presents an
especially strong justification for exercising pendent appellate
jurisdiction when a statutory issue is "inextricably intertwined"
with an Eleventh Amendment immunity question, as is the case here.
Deciding an antecedent, interdependent statutory question provides
a possible non-constitutional means of avoiding the constitutional
immunity question.  This interest in avoidance is heightened in the
Eleventh Amendment context, where questions of immunity often
require a comparatively greater expenditure of judicial resources
and force defendants to extensively litigate the immunity question
just to avoid adverse precedent.  Nieves-Márquez, 353 F.3d at 124;
Parella v. Ret. Bd., 173 F.3d 46, 56-57 (1st Cir. 1999).

    We hold that in the present case, the statutory
interpretation of the term "employer" is "inextricably intertwined"

-27-

with the question of Eleventh Amendment immunity and, following Nieves-Marquez, that we have jurisdiction.

IV. Interpreting the Term "Employer" in Title VII

The central issue in this appeal is whether HRD's relationship to the plaintiffs makes HRD their "employer" under Title VII.

Title VII defines an "employer" as "a person who is engaged in an industry affecting commerce who has fifteen or more employees . . . and any agent of such a person." 42 U.S.C. § 2000e(b).  A "state" may be such a person.  Id. § 2000e(a).  The text ties the definition of an "employer" to the meaning of "employees."[12]

Title VII defines an "employee" only as "an individual employed by an employer."  42 U.S.C. § 2000e(f).  The Supreme Court has recognized that this definition "is completely circular and explains nothing."  Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323 (1992) (addressing the question of whether a person was an independent contractor or an employee under ERISA).

A series of Supreme Court decisions have established that when a statute contains the term "employee" but does not define it, a court must presume that Congress has incorporated traditional agency law principles for identifying "master-servant

_____

[12]    Title VII also applies to employment agencies and labor unions.  See 42 U.S.C. §§ 2000e(c)-(d).  HRD clearly is neither.

-28-

relationships."[13] See Clackamas Gastroenterology Assocs., P.C. v. Wells, 538 U.S. 440, 444-47 (2003); Walters v. Metro. Educ. Enter., Inc., 519 U.S. 202, 211-12 (1997); Darden, 503 U.S. at 322-23; Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 739-40 (1989). It is clear that the terms "employer" and "employee" under Title VII are to be defined with reference to these common law agency principles. See Walters, 519 U.S. at 211-12; De Jesús v. LTT Card Servs., Inc., 474 F.3d 16, 18, 22 (1st Cir. 2007); Alberty-Vélez v. Corporación De P.R. Para La Difusión Pública, 361 F.3d 1, 6 (1st Cir. 2004).

The Supreme Court has recognized a series of non-exclusive factors used under the common law test. In Reid, the Court listed thirteen possible factors to determine whether a person was an independent contractor or an employer for purposes of the Copyright Act. Those factors are set forth below.[14] Reid, 490

---

[13] The term "master-servant," while archaic and perhaps even offensive in modern usage, refers to the employer-employee relationship.

[14] Those factors were "the hiring party's right to control the manner and means by which the product is accomplished[;] . . . the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party." Reid, 490 U.S. at 751-52 (internal footnotes omitted).

U.S. at 751-52.  The Court in <u>Darden</u> then adopted and applied these factors as part of the common law test for determining whether a person was an employee under ERISA.  <u>Darden</u>, 503 U.S. at 323.

In <u>Walters</u>, the Supreme Court endorsed the common law test, as used in <u>Darden</u>, for the purpose of defining an "employer" under Title VII.  519 U.S. at 211-12.  Beyond that, the question of whether an employer "had" an employee--the criterion for being an "employer" under Title VII--turned upon whether an employment relationship existed on the day in question, regardless of whether the employee worked or was compensated on a given day.  <u>Id.</u>

In <u>Clackamas</u>, in deciding whether physician shareholders were employees or employers under the Americans with Disabilities Act (ADA), a statute that defines an "employee" and "employer" identically to Title VII, the Court again focused on the common law agency doctrine to define the term "employee" and cited to <u>Reid</u> and <u>Darden</u>.  538 U.S. at 444-45.  The Court rejected the argument that the term "employer" must be given a broader reading than the common law meaning in order to effectuate "the statutory purpose of ridding the Nation of the evil of discrimination."  <u>Id.</u> at 446.  Instead, it was swayed by "two countervailing considerations" in favor of the common law approach.  <u>Id.</u>  First, the Court observed, Congress's decision to limit the definition of an "employer" in Title VII to an entity with fifteen or more employees reflected its intent to limit liability and the costs of compliance and

litigation for very small firms.  Id. at 446-47.  Second, citing Darden, the Court again emphasized that congressional silence should be interpreted as an instruction to turn to the common law alone: "Congress has overridden judicial decisions that went beyond the common law in an effort to correct 'the mischief' at which a statute was aimed."  Id. at 447.

Clackamas also gave more specific guidance about what the common law test required:

> At common law the relevant factors defining the master-servant relationship focus on the master's control over the servant.  The general definition of the term "servant" in the Restatement (Second) of Agency § 2(2) (1957), for example, refers to a person whose work is "controlled or is subject to the right to control by the master."  See also id., § 220(1) ("A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control").  In addition, the Restatement's more specific definition of the term "servant" lists factors to be considered when distinguishing between servants and independent contractors, the first of which is "the extent of control" that one may exercise over the details of the work of the other.  Id., § 220(2)(a).  We think that the common-law element of control is the principal guidepost that should be followed in this case.

538 U.S. at 448.

In particular, the Court in Clackamas was persuaded that courts should look to the guidelines in the EEOC's Compliance Manual to address the question of when a person is an "employee."

Id. at 448-50.  Those guidelines, in their current form, list the following, non-exhaustive factors as indications that "a worker is in an employment relationship with an employer": "[t]he employer has the right to control when, where, and how the worker performs the job;" "[t]he work does not require a high level of skill or expertise;" "[t]he work is performed on the employer's premises;" "[t]here is a continuing relationship between the worker and the employer;" "[t]he employer has the right to assign additional projects to the worker;" "[t]he employer sets the hours of work and the duration of the job;" "[t]he worker is paid by the hour, week, or month rather than the agreed cost of performing a particular job;" "[t]he worker does not hire and pay assistants;" "[t]he work performed by the worker is part of the regular business of the employer;" "[t]he employer is in business;" "[t]he worker is not engaged in his/her own distinct occupation or business;" "[t]he employer provides the worker with benefits such as insurance, leave, or workers' compensation;" "[t]he worker is considered an employee of the employer for tax purposes;" "[t]he employer can discharge the worker;" and "[t]he worker and the employer believe that they are creating an employer-employee relationship." 2 Equal Employment Opportunity Comm'n, EEOC Compliance Manual, § 2-III, at 5716-17 (2008).  The guidelines emphasize that these criteria

should be viewed in light of the totality of the circumstances based on the parties' relationship.  Id. § 2-III, at 5717.[15]

It is clear that plaintiffs are not HRD's employees, and HRD is therefore not their "employer" for Title VII purposes, based on these factors.  The agreed stipulation of facts establishes as much.  HRD has no control over plaintiffs' day-to-day job performance and no right to exercise such control.  Municipal police officers do not work on HRD's premises and have no continuing relationship with HRD.  Instead, HRD affects plaintiffs only indirectly, and only to the degree that plaintiffs' local employers decide to involve HRD in various processes.  HRD has no right to assign plaintiffs any projects, nor does HRD set the hours of plaintiffs' employment.  Plaintiffs' work is certainly not part of HRD's regular business; HRD is a state regulatory body concerned with the administration of the civil service system, whereas plaintiffs, as police officers, are concerned with maintaining public safety.  HRD does not provide plaintiffs with any benefits, such as insurance or worker's compensation, nor does HRD consider plaintiffs its employees for tax purposes.  HRD has no role in

---

[15]    The events at issue in Clackamas occurred before 2000, and the opinion cited to an older, substantially similar version of these guidelines.  538 U.S. at 448-49 (citing to Section  605, the section replaced by the new § 2-III.)  We cite to the current version of these guidelines because the events at issue in this case occurred after they went into effect and reflect the EEOC's present guidance regarding statutory coverage.  These guidelines, as the Supreme Court noted in Clackamas, echo the Court's language in Darden.  538 U.S. at 449.

termination decisions.  Finally, neither HRD nor plaintiffs could
have reasonably believed that they ever established an employer-
employee relationship.  As a matter of state law, plaintiffs are
clearly described as the employees of "appointing authorities,"
whereas HRD is defined as the "administrator."  This definition
reflects the Massachusetts legislature's decision that it is these
local entities which are the employers of the local police.   See
Mass. Gen. Laws ch. 31, § 1.

    The Supreme Court has not recognized any other possible
means of interpreting either the term "employee" or the term
"employer" under Title VII and has rejected broader readings.  This
court, in turn, has applied common law principles of agency to
define the term "employee" under Title VII.  See De Jesús, 474 F.3d
at 21-24 (holding that when defining whether shareholder-directors
were "employees" for the purpose of determining whether a close
corporation was a Title VII "employer," we were bound by
Clackamas); Alberty-Vélez, 361 F.3d at 6-7 (applying the common law
agency test identified in Darden and later precedents to address
whether the plaintiff was an independent contractor or an
"employee" as defined under Title VII).

    Most other circuits have also concluded that under
Supreme Court precedent, the definition of an "employee" under
Title VII--and therefore the definition of an "employer"--is
restricted to its meaning at common law.  See, e.g., Gulino v. N.Y.

-34-

State Educ. Dep't., 460 F.3d 361, 377-78 (2d Cir. 2006) (applying
the common law agency test to define an "employee" under Title VII
because Supreme Court precedents "require adherence to common law
principles of agency in Title VII cases"); Smith v. Castaways
Family Diner, 453 F.3d 971, 975-76 (7th Cir. 2006) (relying upon
the common law factors the Supreme Court has outlined to determine
whether individuals were "employers" or "employees" under Title
VII); Shah v. Deaconness Hosp., 355 F.3d 496, 499-500 (6th Cir.
2004) (applying the common law agency test and suggesting that
other tests cannot be reconciled with Supreme Court decisions).

Plaintiffs' claim that HRD is their "de facto" employer
is likewise foreclosed. The plaintiffs incorrectly argue that
there is a de facto test which is an exception and an addition to
the common law test. That is not so. The de facto test is the
same as the common law test and stresses the importance of actual
circumstance of an entity's overall control over key aspects of an
employment relationship with a particular set of putative
employees.

An employee's status under Title VII must be determined
by the "actual circumstances of the person's relationship" with the
defendant and not just the label. Serapion v. Martinez, 119 F.3d
982, 987 (1st Cir. 1997). In Camacho v. P.R. Ports Auth., 369 F.3d
570 (1st Cir. 2004), we applied this analysis and looked to the
actual circumstances, and not the labels invoked, to determine when

-35-

an entity was an "employer" under Title VII and related statutes.
Camacho, which did not cite Clackamas but cited Darden and Reid,
phrased the question as whether the defendant "so extensively
controls an aggrieved party's employment relationship as to become
that party's de facto employer." Id. at 574. We stated that this
inquiry was "less an exception" to the common law and "more a
restatement of the rule." Id. at 575 n.3. And we held that "the
[state] agency does not become an employer of those individuals
whom it neither hires, compensates, nor supervises day-to-day even
though it licenses and regulates them." Id. at 578.

On the facts of Camacho, we held that the Puerto Rico
Ports Authority was not the actual or de facto "employer" of harbor
pilots, even though it controlled the issuance and revocation of
their licenses, set out standard procedures governing the boarding
of ships, and participated in the creation and administration of a
retirement plan for harbor pilots. Id. at 576-78. We found that
notwithstanding these regulations, harbor pilots retained control
over many of the relevant indicia of employment under the common
law test. Harbor pilots, for instance, provided their own tools,
training, and instruments for their work, controlled their own
schedules and routes, and were paid by shipowners, not by the Ports
Authority. Id. at 576. We also observed that the Authority did
not behave as the pilots' employer in any practical sense, since it
had no control over hiring or firing decisions, did not treat the

-36-

pilots as employees for tax purposes, and did not provide the pilots with any benefits or insurance. Id. at 577. All of these factors, we concluded, "militate strongly against a finding that the Authority functions as the de facto employer of the harbor pilots." Id.

In a somewhat parallel case, the Second Circuit recently rejected the contention that the New York State Education Department was a Title VII employer of public school teachers because it devised and administered a test that was mandatory for teachers to receive or retain teaching licenses. Gulino, 460 F.3d at 363-64. The plaintiffs claimed that this test had a discriminatory impact. The Second Circuit found the state could not be considered teachers' Title VII employer because it lacked control over public schools' daily operations, including ultimate decisions about teacher employment. Id. at 366-70, 376-80. It also contrasted the state's administrative role with the role that the New York City Board of Education played as the plaintiffs' direct employer. Id. at 380-81.[16]

The facts here weigh even more strongly against the state being the "employer" of the plaintiffs. HRD exercised no control,

---

[16]    While Gulino did not expressly invoke the "de facto" employer test, it considered, and rejected, all alternate tests for an "employer," 460 F.3d at 373-79, and also rejected the notion that the state was an "employer" under the common law test, id. at 379. Again, we focus on the reasoning of the opinion, not upon the labels attached to the analysis.

direct or indirect, over the factors relevant to the common law
agency test, as we have discussed above.  HRD therefore cannot be
deemed plaintiffs' "de facto" employer.  Even if we were to
consider control over promotions as a factor relevant to the
definition of an employment relationship--though neither agency law
nor the EEOC guidelines mention it--plaintiffs' argument still
fails.  For Massachusetts municipal police departments, the use of
HRD's state-prepared and administered promotions examination was
not mandatory.  Municipalities could opt to use their own system of
evaluations for police promotions independent of HRD's examinations
process.  And HRD did not control promotions decisions even for
municipalities that chose to use HRD-administered promotions
examinations.  While HRD provided municipalities with a ranked list
of candidates and their corresponding scores on the promotions
examination, state law dictated that veterans and other preferred
candidates had to be ranked first, even above higher-scoring
candidates.  Municipalities could choose among numerous candidates
on the eligibility list when filling a single vacancy, and HRD did
not dictate which individuals the city defendants or the MBTA were
to promote.  The bypass process also gave them even greater control
over the ultimate promotions decision and allowed the municipality
to look to other factors beyond examination scores when making
promotion decisions.  Indeed, municipalities historically relied on
the bypass process and their own flexibility in determining the

-38-

number of promotions to award to serve the aim of promoting more
African-Americans to police sergeant.  See Cotter,  323 F.3d at
164-65.

Plaintiffs present two alternate theories why HRD should
be considered their "employer" under Title VII, even though HRD is
not an employer under the common law tests.  First, plaintiffs
claim that under one of this court's precedents, Carparts Distrib.
Ctr. v. Auto. Wholesaler's Ass'n of New England, Inc., 37 F.3d 12
(1st Cir. 1994), so long as HRD controls even one significant
aspect of plaintiffs' employment, such as promotions, HRD can be
considered an "employer" for purposes of Title VII liability.
Second, they cite cases from other circuits that have articulated
an "interference theory" of employment.  Under the interference
theory, a party that significantly participates in and interferes
with an employment relationship may be subject to liability as an
employer.  We consider, and reject, each of these arguments in
turn.

Our decision in Carparts does not help plaintiffs.  All
that Carparts held was that based on the allegations in the
complaint, it was inappropriate to grant dismissal under Rule
12(b)(6) in the absence of any factual development.  37 F.3d at 17.
We hypothesized that an entity might be an "employer" under the ADA
and related statutes like Title VII if, inter alia, it "exercised

-39-

control over an important aspect of [the plaintiff's] employment."
Id.

        Carparts involved two private entities, an unusual set of
facts, and a particular procedural posture.  Carparts, an
automotive parts wholesale distributor, brought suit under the ADA
against an automotive wholesalers' trade association and the self-
funded medical benefits plan the association offered to its
members.  Id. at 14.  As a member of the medical benefits plan,
Carparts had allegedly delegated all healthcare coverage decisions
to the plan's trustees.  Our opinion suggested that if the trade
association and the medical benefits plan "exist[ed] solely for the
purpose of enabling entities such as Carparts to delegate their
responsibility to provide health insurance for their employees,"
these entities might have been "so intertwined" with Carparts that
they became an "employer" under the ADA.  Id. at 17.  Because the
case came before this circuit as an appeal from the district
court's grant of a motion to dismiss, we concluded that we lacked
sufficient facts to determine whether this test even applied to the
case at hand.  Id. at 18.  Carparts also did not rely on an
interference theory, which is plaintiffs' last straw.

        Finally, plaintiffs argue that the term "employer" under
Title VII is broader than the common law test and includes an
entity that significantly impacts or interferes with an
individual's employment opportunities.  Plaintiffs assert that

-40-

Case 4:07-cv-11693-GAO   Document 187   Filed 12/04/09   Page 41 of 43

HRD's role in the promotions process "interferes" with municipalities' employment of the plaintiffs, making HRD liable as an "employer" under Title VII.

The plaintiffs invoke the Ninth Circuit's opinion in Ass'n of Mexican-Am. Educators v. California, 231 F.3d 572 (9th Cir. 2000) (en banc), in which a divided court held that California and its teacher credentialing commission were employers of public school teachers when the state administered a test that was a prerequisite for a variety of teaching positions. Id. at 579-83. The court so held despite the fact that plaintiffs and defendants did not have a direct employment relationship and the fact that the plaintiffs were directly employed by individual local school districts. Id. at 580. We reject the reasoning of that court in support of that holding, which not only rested on the interference theory but failed to cite or discuss the Supreme Court's decisions in Reid, Darden, and Clackamas.

The interference theory has no basis in our circuit law, has never been adopted by this circuit, and contradicts Supreme Court case law. We flatly reject it now. This circuit never accepted the interference theory of employment even during its early heyday.[17]  Indeed, in Camacho, we declined to adopt this

---

[17]  See Spirt v. Teachers Ins. and Annuity Ass'n, 691 F.2d 1054, 1063 (2d Cir.1982), vacated on other grounds, 463 U.S. 1223 (1983) (adopting a variant on the interference theory on the express assumption that Congress intended to define the term "employer" well beyond its general common law definition); Sibley

theory and suggested that its validity as an exception to the common law test for employment was "dubious." 369 F.3d at 574 n.3. And in Carparts, a much earlier decision, we considered the interference theory but did not adopt it. 37 F.3d at 18.

We reject the interference theory as inconsistent with the Supreme Court case law we have discussed. The interference theory is entirely inconsistent with the use of the common law criteria the Supreme Court has identified. Further, the conceptual underpinning for the doctrine, that a broad reading of the terms "employee" and "employer" are supposedly justified by the remedial purpose of the statute, has been expressly rejected by the Supreme Court in Clackamas. 538 U.S. at 446-47.

Most other circuits have also repudiated the interference theory as an impermissible deviation from the common law agency approach. See, e.g., Gulino, 460 F.3d at 373-76 (limiting Spirt and rejecting the interference theory generally on the grounds that they are at odds with the common law agency test and raise constitutional concerns); Shah, 355 F.3d at 500 (suggesting that the interference theory is not consistent with the common law agency test); Bender v. Suburban Hosp., Inc., 159 F.3d 186, 189-90 (4th Cir. 1998) (narrowing Sibley to better comport with common law

Mem'l Hosp. v. Wilson, 488 F.2d 1338, 1340-41 (D.C. Cir. 1973) (first articulating the interference theory on the ground that Title VII's terms should be interpreted very broadly to achieve its non-discriminatory ends).

-42-

agency principles on the grounds that Title VII, Supreme Court, and circuit precedent so required).

Our decision that the state defendants are not "employers" within the meaning of Title VII on these facts rests on the statutory interpretation of Title VII mandated by the Supreme Court and by our own precedent.[18]

The district court's denial of the state defendants' motion to dismiss is <u>reversed</u>, and the case is remanded to the district court for entry of an order of dismissal under Title VII with prejudice with respect to the state defendants.

<u>So ordered</u>.

---

[18]   We do not think it helpful to reframe the applicable common law test in terms of whether HRD was acting in a merely "regulatory" capacity and so was not an employer.  Still, the reasoning of that line of cases, all rejecting employer status for states, is helpful support.  Those cases have held that when state agencies exercised a significant role in the regulation of salaries, hiring, and promotions, yet refrained from vicariously making particular hiring or firing decisions or setting individual salaries, the state was not functioning as an "employer."  <u>See, e.g.</u>, <u>Equal Employment Opportunity Comm'n</u> v. <u>Illinois</u>, 69 F.3d 167, 171-72 (7th Cir. 1995) (holding that when the state fixed public teachers' minimum salaries, set the number of days teachers must work, the amount of sick leave and sabbatical leave, terms of tenure, and other general factors pertaining to hiring, promotions, and firing, but did not "tell[] the local school districts whom to hire and fire and how much to pay them," it was not an "employer"); <u>United States</u> v. <u>Bd. of Educ.</u>, 911 F.2d 882, 891-92 (3d Cir. 1990) (holding that no employment relationship existed when the state regulated teachers, including the dress code, but did not exercise control over teachers' terms of employment in a non-regulatory capacity); <u>Fields</u> v. <u>Hallsville Indep. Sch. Dist.</u>, 906 F.2d 1017, 1020 (5th Cir. 1990) (finding no employment relationship when the state administered a compulsory certification examination for teachers but had no role in teachers' daily supervision).