## Supplemental Expert Report in Lopez et al. v City of Lawrence et al.

Joel P. Wiesen, Ph.D.
March 30, 2009

### Table of Contents

**Part One: Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 1

1. Summary of My Opinions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 1

2. Documents and Computer Files Reviewed or Used . . . . . . . . . . . . . . . . . . . . . . . . Page 1

**Part Two: Rebuttal to the Common Critiques of Dr. Outtz and Silva** . . . . . . . . . . . . Page 2

3. Critique of Combining Data Across Municipalities . . . . . . . . . . . . . . . . . . . . . . . . . Page 2

4. Aggregation of Data is Not Shown to be Unreasonable . . . . . . . . . . . . . . . . . . . . . Page 4

5. Dr. Silva Himself Aggregates Data Across Police Departments . . . . . . . . . . . . . . . . Page 6

6. HRD Conducts Aggregate Analyses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 6

7. Federal Court Use of Aggregated Data in Title VII Cases . . . . . . . . . . . . . . . . . . . . Page 6

**Part Three: Rebuttal to the Report by Dr. Outtz** . . . . . . . . . . . . . . . . . . . . . . . . . . Page 7

8. Repeated Use of "Shift of One Person" Data Correction . . . . . . . . . . . . . . . . . . . . Page 7

9. Overstatement of the Weight of Education and Experience . . . . . . . . . . . . . . . . . . . Page 7

10. Uncritical Claim of Validity of the Boston Sergeant Exam . . . . . . . . . . . . . . . . . . . Page 8

11. Dr. Outtz Ignored Major Flaws in Morris-McDaniel Job Analysis . . . . . . . . . . . . . . Page 8

12. Implausible (100%) Agreement of Raters in Morris-McDaniel Job Analysis . . . . . . . . Page 8

13. Used Implausible Ratings to Determine Exam Content . . . . . . . . . . . . . . . . . . . . . Page 9

14. Illogical Ratings of Tasks and KSAPs Go Without Comment . . . . . . . . . . . . . . . . . Page 9

15. Highly Unusual Rating Instructions Given to SMEs . . . . . . . . . . . . . . . . . . . . . . . . Page 11

16. Essential Linkages of Test Areas to Job Tasks Unreported . . . . . . . . . . . . . . . . . . . . . Page 11

17. Dr. Outtz Ignored Major Findings of Morris-McDaniel Job Analysis . . . . . . . . . . . . Page 12

18. No Professionally Acceptable Evidence for the Validity of Statewide Exams . . . . . . Page 12

19. No Professional Opinion on 2006 or 2007 Exam . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 13

20. Dr. Outtz Claims the Passing Score is Irrelevant . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 13

21. Limited Test Content and Artificially High Passing Point . . . . . . . . . . . . . . . . . . . . Page 13

22. Dr. Outtz' Support of the Use of Banding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 14

23. Dr. Outtz Says There is No "Guarantee" of Reduced Adverse Impact . . . . . . . . . . . Page 14

24. Individual Minority Applicants Hurt By High Passing Points . . . . . . . . . . . . . . . . . . Page 15

25. Inappropriate Defense of Content of Closed Book Exam . . . . . . . . . . . . . . . . . . . . . Page 15

26. Dr. Outtz' Claim of Adverse Impact of a Non-Police Test . . . . . . . . . . . . . . . . . . . . Page 15

27. Unsupported, Exaggerated Claim of Expense of Other Selection Procedures . . . . . . Page 15

28. Examples of Large Scale Non-Written Testing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 16

29. Simultaneous Administration of Oral Is a Straw Man . . . . . . . . . . . . . . . . . . . . . . . . Page 18

**Part Four: Rebuttal to the Report by Dr. Silva** . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 18

30. Dr. Silva Does Not Claim Content Validity for the Exams . . . . . . . . . . . . . . . . . . . . Page 18

31. No Professionally Acceptable Support for the Knowledge Test . . . . . . . . . . . . . . . . Page 18

32. Higher Passing Rate for Incumbent Sergeants May Not Indicate Exam Validity . . . . Page 18

33. Many Current Sergeants Fail the Exam for Promotion to Sergeant . . . . . . . . . . . . . . Page 19

34. No Criterion-Related Validation Study Provided . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 19

35. Dr. Silva's Shortfall Analyses Use Lenient Standards and Approaches . . . . . . . . . . . Page 20

36. No Minority Appointments in 13 of 15 PDs in 2006 . . . . . . . . . . . . . . . . . . . . . . . . . Page 21

ii

37. Dr. Silva Claims that an Oral Component will Not Reduce Adverse Impact . . . . . . . Page 21

38. Professional Literature and Thinking on Oral Examinations and Adverse Impact . . . Page 21

39. The 2002 Boston Oral Grades Show Least Minority/Non-Minority Differences . . . . Page 22

40. Dr. Silva Says There is No "Guarantee" of Reduced Adverse Impact . . . . . . . . . . . Page 22

**Part Five: Evaluation of Passing Rates of Incumbent Sergeants** . . . . . . . . . . . . . . . Page 23

41. Incumbent Sergeants Took the HRD Exams for Sergeant . . . . . . . . . . . . . . . . . . . . . Page 23

42. The Nature of the Content of the HRD Sergeant Exams . . . . . . . . . . . . . . . . . . . . . . Page 24

43. The Nature of the Passing Point in Civil Service Examining . . . . . . . . . . . . . . . . . . Page 25

44. Amount of Overlap Between the 2005 Boston Sergeant and Lieutenant Exams . . . . . Page 27

45. Complete Overlap Between Sergeant and Lieutenant Statewide Exams . . . . . . . . . . Page 27

46. High Failure Rate for Incumbent Sergeants Taking the Boston Sergeant Exam . . . . . Page 27

47. High Failure Rates for Incumbent Sergeants Taking the Statewide Exams . . . . . . . . Page 29

**Part Six: Update on Adverse Impact** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 29

48. Adverse Impact Update . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 29

**Part Seven: Conclusion and Opinions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 29

Attachment A: Case Documents Reviewed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 31

Attachment B: Example of Complete Agreement in Tallies of Job Task Ratings . . . . . . Page 36

Attachment C: Example of Complete Agreement in Tallies of KSAP Ratings . . . . . . . . Page 37

Attachment D: First Example of Data Aggregation by HRD . . . . . . . . . . . . . . . . . . . . . Page 37

Attachment E: Second Example of Data Aggregation by HRD . . . . . . . . . . . . . . . . . . . Page 40

## Supplemental Expert Report in Lopez et al. v City of Lawrence et al.

Joel P. Wiesen, Ph.D.
March 30, 2009

### Part One: Introduction

This report rebuts some statements made in the (separate) expert reports by Drs. Outtz and Silva, both dated February 9, 2009, and summarizes some of my evaluations of test data I received since submitting my expert report of October 2008.

### 1. Summary of My Opinions

The opinions expressed in my earlier report are unchanged after reading the expert reports of Drs. Outtz and Silva: the exams in question have adverse impact (AI) on minority applicants. The exams are not supported by professionally acceptable test validation efforts, and there are viable alternative selection procedures that are reasonably expected to reduce AI. My new data analyses of the grades of incumbent Sergeants who took the 2005, 2006 and 2007 statewide Sergeant exams and most of the 2005 Boston Sergeant exam (because of overlap in questions on the promotional exams for Sergeant and Lieutenant) indicate the passing points of 70% as set by the Human Resources Division (HRD) for each of the four challenged Sergeant exams are too high or the written tests are invalid, or both.

### 2. Documents and Computer Files Reviewed or Used

In preparing this report I reviewed the written reports of Drs. Outtz and Silva, the exam booklets, answers to exam questions by incumbent Sergeants, and refamiliarized myself with other documents produced in connection with this matter. More detail on this follows.

#### A. Case Documents Reviewed

I reviewed documents with Bates stamp page numbers 1 to 2595. A list of additional case documents I reviewed in the course of working on this case is presented in Attachment A, listed roughly in the order I received them.[1]

#### B. Examinations Reviewed

I reviewed the 2005 written exams for promotion to Sergeant and to Lieutenant in the Boston Police Department (PD). This review was conducted in the offices of HRD and the Attorney General.[2]

---

[1]There may be overlap of the documents listed in Attachment A and the documents with Bates numbers 1-1944, but I did not log the Bates numbers of documents and so cannot easily cull out the duplicate entries.

[2]I note that my ability to review the actual exams has been hampered by my being precluded from putting them into electronic form and reviewing them in my office.

### C. Computer Files

For the analyses of the passing rates of incumbent Sergeant reported herein I relied on HRD-supplied computer files that contained the answer choices (i.e., A, B, C, or D) given by each applicant for the 4 exams being challenged and similar computer files for all applicants for promotion to Lieutenant. Table 1 gives the names of these computer files and a brief description of their content.

| Table 1. Computer Files Used in Evaluating Passing Rates of Incumbent Sergeants | |
|---|---|
| File Name | Contents |
| Lts_answers_bos_2005.txt | Answer of each applicant to the 100 exam questions of the 2005 exam for Lieutenant, Boston PD. |
| 2005_swm_lieut_answers_1st _80_Qs.txt | Answer of each applicant to the first 80 exam questions of the 2005 statewide exam for Lieutenant. |
| 2006_lieut_answers_1st_80_ Qs_p.txt | Answer of each applicant to the first 80 exam questions of the 2006 statewide exam for Lieutenant. |
| 2007_lieut_answers_1st_80_ Qs_p.txt | Answer of each applicant to the first 80 exam questions of the 2007 statewide exam for Lieutenant. |

## Part Two: Rebuttal to the Common Critiques of Dr. Outtz and Silva

Drs. Outtz and Silva made two common critiques of my report that I respond to together: (1) my use of aggregation and (2) their repeated correction of data in calculating AI and my lack of doing this. I respond to these below. In Parts Three and Four of this report I respond to their other and unique claims.

### 3. Critique of Combining Data Across Municipalities

Dr. Outtz and Dr. Silva both claim that I inappropriately aggregated data across municipalities. However, aggregation is an approach often used to help detect patterns in statistical data. Aggregation can be appropriate in some situations and not appropriate in others.[3] It is true that applicants from one municipality were not competing for promotion with applicants from another municipality. It is also true that the ideal comparison would be within municipality, if there were large enough numbers of applicants and promotions in each municipality. However, since there was only a handful of applicants in most municipalities, and since there were few promotions, aggregation is a reasonable statistical approach to determine if the overall pattern of adverse impact (AI) seen in PDs statewide is statistically

---

[3]Drs. Outz and Silva each gave an example of a situation where it would not be appropriate to aggregate data. There are examples of "Simpson's Paradox" as I describe in the next numbered section.

significant.

Dr. Outtz and Dr. Silva both oppose my data aggregation for two stated reasons: (1) applicants competed for promotion within, rather than across, PDs, and (2) aggregation can lead to misleading interpretations. With respect to the first point, there is no need to aggregate to show that relatively fewer minority applicants are promoted. No minority applicants were promoted in 32 PDs. I aggregate only to determine if the pattern seen in so many PDs is statistically unusual. With respect to the second point, with certain unusual data sets aggregation can lead to mistaken interpretations. However, that was not the case here. Neither Dr. Outtz nor Dr. Silva show that Simpson's Paradox is operating here. To the contrary, Dr. Outtz argues a hypothetical, "To accept such an analysis would mean that a jurisdiction that promoted every minority applicant that applied would be treated exactly the same as a jurisdiction that promoted no minority applicants."[4] Unfortunately, there is no such jurisdiction where all minority applicants were appointed.

Dr. Outtz presents no evidence of different rates of adverse impact in the various PDs.[5] As Dr. Silva's Tables 2, 4 and 5 show, of the 38 PDs that took part in the 2005, 2006 or 2007 statewide exams, 32 PDs had AI ratios of zero; that is, 32 of the 38 PDs promoted no minority applicants. The data aggregation I did allows for a statistical test of this apparently high level of AI. The statistical analyses I reported show that it is statistically unusual to have this large a disproportionate promotion of white applicants.

In his example,[6] Dr. Outtz suggests it is inappropriate to combine data from PDs that made promotions but do not have any minority applicants with PDs that made promotions and do have minority applicants.[7] His example, and this critique, is irrelevant because I omitted from my analyses any Departments that had no minority applicants.[8] For example, my earlier report includes an AI analysis for the 2005 statewide exam that evaluates the AI among 207

---

[4]Outtz, 12.

[5]The observed AI will vary based on chance (as is true for most behavioral science statistics), and these chance variations are often large when there are small numbers of minority applicants since a change in one person selected can have a large impact on the AI ratio.

[6]Outtz, 14 (especially Figure 1).

[7]Outtz, 14 (especially Fig. 1).

[8]I state this on page 43 in footnote 31 of my report of 10/3/2008 (corrected on 10/6/2008).

applicants.[9]  A total of 618 applicants took the 2005 statewide exam, but only 207[10] of them were from PDs that both had at least one minority applicant and promoted at least one person from an Eligible List[11] that resulted from that exam.  So no PDs without minority applicants are included in my AI analysis for promotions from the 2005 statewide exam.  The same is true for the AI analyses I reported for promotions from the other three exams.

**4.  Aggregation of Data is Not Shown to be Unreasonable**

Drs. Outtz and Silva argue that it is inappropriate to aggregate exam data across jurisdictions.  Dr Silva begins his critique by saying that such aggregation "can be" misleading and erroneous.[12]  Dr. Silva concludes his argument by saying, "the inappropriateness of using aggregated data when calculating adverse impact is obvious."[13]  His second statement (flatly claiming aggregation is inappropriate) is unsupported by any citation of numeric data from this case and, as a general statement, is wrong.[14]  Dr. Outtz claims that aggregation is improper because applicants in any one PD did not compete for promotion with applicants from other PDs.  I aggregate to facilitate evaluating trends, not to try to replicate the decision making process.

Aggregation of data is a common approach to summarizing data in the social sciences. Statisticians in all fields routinely combine data across small groups to try to reveal the big picture.  Statisticians and others routinely summarize statistics at the city, state, national and international levels in order to reveal patterns that might not otherwise be observable or noticeably different from chance.  Newspapers and professional publications often show summaries of housing prices, high school graduation rates, divorce rates, salaries and the like.

---

[9]Wiesen, 25 (Figure 9a).

[10]There are some differences in the tallies of applicants reported by Dr. Outtz in his report and by me in my report of October 2008.  These differences are small and reflect differences in the data and differences in the definition of non-minority (I had used a data file with an earlier creation date and somewhat different content, and I define non-minority applicants to include all but Black and Hispanic while Dr. Outtz includes only white applicants).  At trial I plan to report revised AI analyses based on the updated data file submitted together with the expert reports by Drs. Outtz and Silva, or based on even more current data (as appointments may still be made from the 2006 and 2007 exams).

[11]An Eligible List is a roster established by HRD of applicants who passed the exam, listed in order of exam grade, from the highest scoring to the lowest scoring applicant.

[12]Silva report, page 1, second paragraph. Hereafter this will be denoted Silva 1, par 2.

[13]Silva 1, par 3.

[14]I know of no statistics text book that makes a statement as sweeping as Dr. Silva's.

Aggregation of data is often appropriate and useful.

Drs. Outtz and Silva consider only one type of unusual situation where aggregation is inappropriate. Specifically, they both present an example of what is known in the literature as "Simpson's Paradox."[15] Most data sets do not have the characteristics that underlie Simpson's Paradox. Drs. Outtz and Silva do not show that the exam data relevant to this legal matter have the specific, unusual characteristics that define Simpson's Paradox.

The American Psychological Association, an authoritative reference, says Simpson's Paradox "can occur when the raw data of two or more studies are merged, giving results that differ from those of either study individually" and goes on to qualify that with the caveat "when the data are merged in an inappropriate manner."[16] Clearly this does not suggest all data aggregation is inappropriate.

The federal Uniform Guidelines on Employee Selection Procedures (UGESP) encourage cooperative studies, which must involve data aggregation across employers, saying:
> "The agencies issuing these guidelines encourage employers, labor organizations, and employment agencies to cooperate in research, development, search for lawful alternatives, and validity studies in order to achieve procedures which are consistent with these guidelines."[17]

Further, five federal agencies support the use of aggregation of employment data.[18] In published guidance, in question and answer format, they say:

> "Q. What are the record keeping obligations of a user who cannot determine whether a selection process for a job has adverse impact because it makes an insufficient number of selections for that job in a year?
> A. In such circumstances the user should collect, maintain, and have available information on the impact of the selection process and the component procedures until it can determine that adverse impact does not exist for the overall process or until the job

---

[15]Both their examples involve hypothetical data, not data drawn from the exams being challenged. (Outtz, 14, Figure 1; Silva, 1, Table 1.)

[16]APA Dictionary of Psychology (2007), page 853.

[17]UGESP Section 3.8.

[18]The statement quoted speaks of aggregating across years and Dr. Silva speaks of aggregating across municipalities, but Simpson's Paradox can arise in either of these. The point is that the federal enforcement agencies support the use of aggregation of employment data.

has changed substantially."[19]

Drs. Outtz and Silva do not show that Simpson's paradox occurred in my adverse impact analyses. At most, they merely suggests it may have, without support by facts. Drs. Outtz and Silva provide no evidence or reason for thinking that the data from the four challenged exams fit the unusual characteristics that underlie Simpson's Paradox.

5. **Dr. Silva Himself Aggregates Data Across Police Departments**
Surprisingly, Dr. Silva himself aggregates data across PDs immediately after he says that such aggregation is inappropriate.[20] Dr. Silva aggregates pass/fail data across all the police departments (PDs) that took part in the 2005 statewide Sergeant exam, without discussing the possible risk of Simpson's Paradox. Dr. Silva's use of aggregation of data across PDs following his strong critique of such aggregation is puzzling, to say the least.

6. **HRD Conducts Aggregate Analyses**
The Human Resources Division (HRD) itself conducts aggregate analyses of the type Dr. Silva says are inappropriate. For example, in evaluating the impact of a passing score of 70% for the 2006 police promotional examinations, the HRD conducted analyses both across departments and across the three job titles of Sergeant, Lieutenant and Captain[21] (see Attachment D). Even more clearly, and apparently as a standard practice, HRD calculated adverse impact across all PDs for the 2003 and 2004 Sergeant exams[22] (see Attachment E). Clearly, HRD sees value in conducting analyses of aggregated employment data.

7. **Federal Court Use of Aggregated Data in Title VII Cases**
Drs. Outtz and Silva argue that it is inappropriate to aggregate exam data across jurisdictions. However, this approach is widely used to help notice and evaluate overall patterns or trends. For example, a federal court accepted just such an approach that I used in a recent case involving HRD's entry-level Firefighter exam, specifically aggregating data from applicants across municipalities.[23]

---

[19]Question 85 of a set of questions and answers (Q&As) on the UGESP, *Federal Register*, March 2, 1979.

[20]"I determined that on the 2005 statewide exam 79 percent of the current sergeants ... scored 70% or higher... In contrast only 51 percent of the police officers ... scored at or above 70 percent..." Silva 2, par 3.

[21]For example, Bates pages 1758-1765, especially pages 1764-1765.

[22]Bates 1816.

[23]Bradley v. City of Lynn, 443 F.Supp.2d 145 (D. Mass. 2006)

**Part Three: Rebuttal to the Report by Dr. Outtz**

Dr. Outtz critiques several aspects of my report. I respond below, generally in the order of the topics he raises.

8. **Repeated Use of "Shift of One Person" Data Correction**

Dr. Outtz repeatedly applies a correction to the promotion data, changing the data so that the AI analyses reflect one more minority and one fewer non-minority person promoted in each PD. (Dr. Silva also does this repeated changing of the data.) The repeated application of this data correction is inappropriate, for reasons that I describe in my rebuttal to Dr. Silva's report below. I note here my strong disagreement with Dr. Outtz' statement, "Table 1 shows that, for the 2005 examination, the selection rate for minority applicants is higher than that for non-minority applicants or satisfies the 4/5ths rule in every jurisdiction except for the City of Springfield." To the contrary, the actual data he presents result in AI ratios of zero for 12 of the 13 PDs in his Table 1, meaning no minority applicants were promoted. The AI ratios shown in Dr. Outtz' Table 1 are based on <u>hypothetical</u> data, that is, data after hypothetical switches of appointments from non-minority to minority.

9. **Overstatement of the Weight of Education and Experience**

Dr. Outtz claims the exams being challenged go beyond multiple choice (MC) exams because they include a rating of education and experience (E&E) as one of the two "principal components of the Police promotion process..."[24] However, the E&E component has relatively little impact on the grades for several reasons. First, the MC component has a nominal weight of 80%, or 80 points out of 100, and the E&E component has a nominal weight of 20%, or 20 points out of 100. Based on these nominal weights E&E has a much lower weight than the MC test. Second, everyone who is eligible to take the exam receives a score of at least 70% on the E&E component (or 14 points out the total possible 20 E&E points). That leaves a possible range of only 6 E&E points to differentiate people on E&E. We can compare that to the possible range of 80 points on the MC component. Looked at this way, we see the weight of the E&E component is 6%. Clearly E&E receives a very modest weight, and is weighted less in practice than the nominal 20% that appears on the official Examination Announcements. Dr. Outtz' says that the E&E "significantly expands the scope of the knowledges, skills and abilities measured beyond that measured by the written test alone."[25] The relatively small weight given to the E&E argues against his position.

---

[24]Outtz, 21.

[25]Outtz, 22.

## 10. Uncritical Claim of Validity of the Boston Sergeant Exam

Dr. Outtz claims that the HRD exams starting at least in 1991 were "valid and met the standards of accepted professional practice."[26] He bases his opinion on the "use of an appropriate job analysis to develop the job knowledge test, together with the measure of applicants' relevant training, experience and education."[27] However, in making this statement Dr. Outtz ignores both major flaws and major findings of the job analysis as I describe in the next seven numbered sections.

## 11. Dr. Outtz Ignored Major Flaws in Morris-McDaniel Job Analysis

Dr. Outtz relied on the Morris-McDaniel (MM) job analysis as support for the validity of the 2005 Boston Sergeant exam,[28] but this job analysis was flawed in at least four major ways: (a) the ratings were implausibly in agreement, (b) the ratings were illogical, (c) the instructions to the raters were biased in favor of one outcome, and (d) essential linkages between job tasks and written test areas were unreported.

## 12. Implausible (100%) Agreement of Raters in Morris-McDaniel Job Analysis

There was perfect agreement in the MM job analysis ratings. This level of agreement is unheard of and thus suspect. The job analysis ratings were made by incumbent Sergeants. Each of these Sergeants independently[29] rated how often they performed each of the job tasks and rated other aspects of the tasks and of knowledges, skills, abilities and other personal characteristics (KSAPs) based on their individual job assignments. The 11 Sergeants, also referred to as subject matter experts (SMEs), were currently serving in one of three different assignments: Patrol, Administrative, or Investigation.[30] That there was complete agreement on how often each task was performed[31] despite these different assignments is illogical and strains credulity. Further, in total the 11 Sergeants independently rated 218 job tasks using 5

---

[26]Outtz, 23.

[27]Outtz, 23.

[28]"The documentation regarding the job analysis...shows that the examination is content valid. (Outtz, 26.) "The 2005 examination was developed on the basis of a thorough job analysis..." (Outtz, 27.)

[29]The MM job analysis report describes the rating process in several places and includes the actual instructions in two appendices. In no place is there any indication of any group discussion or other consensus reaching process. (Bates 1561, 1566, 1567, 1604, 1605, 1634-1637.)

[30]Bates 1564.

[31]The ratings used a 3 points scale: Daily, Periodically (weekly or monthly) and Occasionally (less than monthly). Bates 1634.

rating scales and independently rated 160 KSAPs using a different 5 rating scales for a total of 20,790[32] ratings, and they did not disagree even once.[33] (Samples of the complete agreement in tallies of ratings for tasks and for KSAPs are shown in Attachments B and C.) Based on the varied job assignments of the 11 SMEs, the published professional literature on the reliability (agreement) of job analysis ratings and on my personal experience collecting such ratings, this is an absurdly high level of agreement. This 100% agreement in ratings by diverse incumbents strains belief. This alone calls into question the adequacy of the job analysis methodology and report.

### 13. Used Implausible Ratings to Determine Exam Content

There is a major problem with the implausibly unanimous ratings of each of the 155 KSAPs[34] that the MM job analysis identified as being required for successful job performance as a Sergeant. A job analysis of the type MM did was supposed to collect unbiased, independent judgements from people who are very familiar with the job and its requirements, such as job incumbents. If the study results are cannot be trusted, then the job analysis has no meaning and provides no professionally acceptable support for the validity of any exam based on it. Since the unanimity of the ratings is so unusual, the ratings should not be relied upon to determine exam content absent acceptable explicit reason or justification.

### 14. Illogical Ratings of Tasks and KSAPs Go Without Comment

A number of tasks were rated in ways that seem implausible. For example, seemingly unusual tasks are reported as being done daily. For example "Conducts internal investigations" was unanimously rated as being performed daily. (See Table 2 for other examples.) Even the SMEs serving in administrative roles reported performing daily tasks such as: setting up command posts,[35] supervising bomb threats,[36] giving direction to officers during arrests,[37] and participating in pre-planned raids.[38] These do not seem like tasks that Sergeants in administrative roles would perform daily. The job analysis report has no discussion of these and other unusual findings, nor does Dr. Outtz mention or discuss them.

---

[32](218 tasks x 5 ratings + 160 KSAPs x 5 ratings) x 11 SMEs =
$$(1,090 + 800 ) \times 11 = 1,890 \times 11 = 20,790$$

[33]A tally of the task ratings is on 1568-1590 and a tally of the KSAP ratings is on 1606-1618.

[34]Five of the 160 KSAPs were not rated as being required for successful job performance.

[35]Task 65.

[36]Task 72.

[37]Task 92.

[38]Task 87.

A social science research project (such as this job analysis) that does not note, comment on, and explain such illogical findings should not be relied upon to make operational decisions about exam content.

Every KSAP that was rated as being related to the job was also rated as differentiating between job performance levels at the maximum scale value (that is, having more of this KSAP leads a Sergeant to perform better on the job). I find it implausible that not one of these 155 KSAPs[39] would be rated at less than the maximal level on this scale.

Surprisingly, no KSAP was rated as learned on the job. A possible reason for this is presented in the next section.

| Table 2. Some Tasks Reported As Being Done Daily By Every Rater |
| --- |
| 32. Qualifies and/or engages in required practice of operation of firearms and other weapons. |
| 43. Investigates and resolves citizen complaints against police officers. |
| 65. Sets up command posts at scenes of robberies, homicides, fires, etc. |
| 66. Directs activities at the scene of major incidents (e.g., serious/fatal accident, crime, natural disaster, etc.) |
| 74. Conducts internal investigations. |
| 75. Investigates and prepares reports regarding misconduct by subordinates. |
| 88. Investigates use of force and injury to prisoner incidents and prepares reports for superiors as required. |
| 119. Recommends subordinates for commendations and disciplines them for dereliction of duty. |
| 133. Inspects licensed premises and prepares reports on violations if any are found. |
| 164. Talks with leaders of demonstrations. |

A number of tasks were rated as requiring oral communication, interpersonal skill, or other abilities that seem illogical. For example, "Cares for and cleans weapons" was unanimously rated as requiring both oral communication and interpersonal skills. (See Table 3 for other examples.)

The MM job analysis report has no discussion of these highly unusual ratings. That these go undiscussed indicates that the MM job analysis was done in a rote manner, not as a serious social science effort to uncover useful information about the job of Sergeant.

---

[39]Ratings are reported for 155 of the 160 KSAPs that were rated. None of these 155 KSAPs were rated as being learned on the job. These ratings for the other 5 KSAPs were not reported.

Page 10

| Table 3.  Some Tasks Reported As Requiring All Five Behavioral Dimensions* |
| --- |
| 27. Enters data into and accesses data from computer system.<br>31. Reads and writes incoming correspondence, inter-office memos, Department manuals, training bulletins, etc.<br>112. Monitors radio broadcasts of officers and dispatchers to ensure that proper codes are utilized.<br>136. Drives motor vehicle under non-emergency conditions.<br>147. Cares for and cleans weapons.<br>176. Pursues suspects on foot.<br>185. Maintains manuals by posting changes or additions<br>188. Complies with evidence handling and log-in procedures contained in Department Directives.<br>200. Keeps informed of current trends in law enforcement by reading relevant materials.<br>206. Maintains current information such as names, faces and previous arrest records of known criminals believed to be in the area. |

* Namely: (a) oral communication, (b) interpersonal skills, (c) problem identification and analysis, (d) judgment and (e) planning and organizing.

**15. Highly Unusual Rating Instructions Given to SMEs**

The instructions to the SMEs said, in effect, these are the ratings you must give if a topic is to be included on the exam, so rate them high enough if you want to see them on the exam.[40] This is highly unusual and seems to present the SMEs with not so subtle instructions as to what scale values to use, vitiating the system otherwise employed to identify important tasks and KSAPs.

**16. Essential Linkages of Test Areas to Job Tasks Unreported**

One important aspect of a job analysis such as conducted by MM is the demonstration that the KSAPs are required for the performance of specific job duties.  This provides support for the inclusion of the KSAPs in the exams and guides the test developer in creating questions with appropriate content and difficulty.  The only mention of task-KSAP linkages in the MM report is in this sentence:

"Social scientists from Morris & McDaniel, Inc. linked the KSAs[41] to the Work

---

[40]For example, one rating instructions for KSAPs reads "For the second scale, which asks when the KSA was learned, KSAs must be rated Before Assignment to be considered critical. KSAs rated After Assignment will be considered non-critical."  The instructions also say, "IF A TASK IS NOT DETERMINED TO BE CRITICAL, WE CANNOT TEST FOR IT."  To be fair, the instructions also say, "This is not in any way meant to suggest that you answer in a certain manner, but it is important that you understand the impact of your responses."  This caveat is also unusual.  (Bates 1681.)

[41]The MM report uses the acronym KSA where I use the acronym KSAP.

Page 11

Behaviors."[42]
These absolutely essential task-KSAP linkages are not further described in the report. Thus the reader has no way to evaluate the reasonableness of these linkages.

Further, even if we assume the linkages done by MM can be relied upon, Dr. Outtz does not report how the areas tested by HRD's Sergeant exams are related to the KSAPs in the MM job analysis report. For example, we do not know how many of the 155 KSAPs, identified by MM as important, are covered by the HRD exams. This is a major gap and deficiency in the test validation documentation.

### 17. Dr. Outtz Ignored Major Findings of Morris-McDaniel Job Analysis

The 11 Sergeants (hereafter also referred to as the subject matter experts or SMEs), as they rated each task, were asked to rate "which skills and abilities are relied on to perform the tasks" using a list of five "Behavioral Dimensions," namely; (a) oral communication, (b) interpersonal skills, (c) problem identification and analysis, (d) judgment and (e) planning and organizing. The SMEs rated these 5 as applicable to all 163 important tasks.[43] These are the only KSAPs that the SMEs linked to specific job tasks.[44] Omitting these 5 areas reduces the content validity of the exams. Dr. Outtz does not mention that these KSAPs are not measured by the HRD exams under challenge. In the 2002 Boston Sergeant exam, the oral area was weighted equal to the written test.[45] Since measures of these areas usually have less AI than written job knowledge tests, omitting these areas is likely to have led to higher levels of AI.

### 18. No Professionally Acceptable Evidence for the Validity of Statewide Exams

Dr. Outtz claims that the 2005 statewide exam is valid but does not back up his claim with professionally acceptable evidence. He speaks of 55% overlap in subject matter[46] between the 2005 statewide and Boston written tests as evidence for the validity of that statewide exam. This claim is flawed for at least two reasons. First, the validity of the 2005 Boston exam is unsubstantiated. (For example, the MM job analysis report does not present any linkages between exam subjects and specific job tasks.) Second, the similarity of the job of Sergeant in Boston to the job of Sergeant in other cities and towns and the MBTA has not been demonstrated. In fact, usually the duties of Sergeant are broader and less structured in a

---

[42]Bates 1605.

[43]MM determined that 163 of the 218 tasks were important.

[44]As just described, MM staff judged the relationship between job tasks and KSAPs; their judgments are not described or reported in the MM report.

[45]Silva, 6.

[46]Dr. Outtz does not describe the method he used to arrive at this number.

smaller jurisdiction than a larger one.

Dr. Outtz cites a memo from Sally McNeely to support his statement that the subjects of the exam were evaluated by SMEs and determined to be relevant.[47] The memo he cites merely calls for assistance to HRD in two areas. First, it requests Police Chiefs to indicate if they would like to continue using the textbooks on the existing reading list. However, asking Police Chiefs if they would like to continue using the current reading list is not in itself professionally acceptable support for the content validity of the written test. Further, this approach to determining the relevance of whole textbooks to the Sergeant exam does not follow an HRD internal report on such reading lists. That report suggests evaluation of individual chapters, not entire books.[48] Second, the McNeely memo seeks volunteers to provide assistance to HRD in its test development efforts. Neither Dr. Outtz nor the memo describe what role SMEs played in HRD's test development efforts. Issuing a request for volunteer SMEs as evidence of test validity is not professionally acceptable evidence for the validity of a test.

## 19. No Professional Opinion on 2006 or 2007 Exam
Dr. Outtz admits he did not respond to the critiques of Dr. Landy and myself concerning the lack of validity support for the 2006 and 2007 statewide exams.[49] Thus, the Defendants have provided no expert opinion in support of the validity of these two exams.[50]

## 20. Dr. Outtz Claims the Passing Score is Irrelevant
In smaller municipalities the minority applicants fail at a higher rate than non-minority applicants. That is one of the reasons for the AI ratios of zero in 32 of the 38 municipalities that had at least one minority applicant and at least one promotion. Not one minority was promoted in any of these PDs. For these municipalities, the passing point indeed is important as the minority applicants failed at a higher rate than the non-minority. The artificially high passing point can also be considered together with the questionable job-relatedness of the test, as I describe next.

## 21. Limited Test Content and Artificially High Passing Point
If the exams were more job related, covered more abilities (including oral communication and interpersonal skill) it is likely that the minority applicants, as a group, would have scored

---

[47]Outtz, 26.

[48]Report section titled, "B. ENTIRE TEXTS VERSUS SELECTED CHAPTERS" (Bates 00402).

[49]Outtz, 27 (Footnote 19).

[50]Dr. Silva does not opine on the validity of the 2006 or 2007 exams. In Part Four of this report I critique the little he says about the validity of the 2005 exams.

Page 13

higher than they did on the actual HRD exams. Higher grades combined with higher passing rates might well result in more minority applicants being promoted.

## 22. Dr. Outtz' Support of the Use of Banding

Dr. Outtz was an early supporter, and even an originator, of various methods of "banding" of test scores, an approach recently embraced by HRD for the 2008 Sergeant exam. In his published work on banding, Dr. Outtz recommends using bands consisting of a range of exam scores. Despite his widely published record on this, Dr. Outtz accepts the rule of 2N+1 as defining a band[51] even though in his professional publications he defines a band as a range of exam scores. Dr. Outtz has written,

> "What needs to be emphasized and reiterated with respect to the establishment of the band width is that the interval is not an arbitrary value. Rather, application of the standard error of the difference between two scores and the concept of reliability of measurement statistically determine the exact band width."[52]

In calling 2N+1 a band, Dr. Outtz is departing from his published record on the topic of banding.

Certification by bands or sliding bands can sometimes reduce AI while maintaining validity. Dr. Outtz does not discuss why this approach was not used, even though he has been a strong proponent of this approach in other settings, even though HRD considered banding for the 2005 exam,[53] and even though HRD used a banding approach for the 2008 statewide Sergeant exam.

## 23. Dr. Outtz Says There is No "Guarantee" of Reduced Adverse Impact

Dr. Outtz says that undertaking various other selection options was not reasonable because there was "no guarantee that the proportion of minority applicants selected would increase..."[54] However, using the standard HRD selection tools (traditional MC test and E&E) virtually assures that the AI seen in past years will continue with no improvement. As Dr. Outtz put it so clearly in a recent biographical narrative, "you will not find something that works unless you keep looking."[55]

---

[51]Outtz, 27 and 30.

[52]Social and technical issues in staffing decisions. (2004) In Aguinis (editor) *Social and Technical Issues in Staffing Decisions* (page 7-28, quote above from page 11).

[53]Bates 1782, 1965.

[54]Outtz, 28.

[55]Seldom If Ever Does Anything Work (2006), *The Industrial-Organizational Psychologist, 44,* 119-121.

**24. Individual Minority Applicants Hurt By High Passing Points**

Dr. Outtz says the Plaintiffs' experts have not identified any minority applicant who would have been selected but for the (artificially high) passing points of 70%. I was not given the scores of failing applicants, so I cannot do this by listing names. However, none of the minority applicants who failed were able to be considered for appointment, even if promotions were made. For example, in 2005 there were 4 applicants from Carver and 2 were promoted to Sergeant. The one minority applicant from Carver failed the MC exam. That applicant would have been certified within the rule of 2N+1 had he or she passed. Beyond that, what I have already described concerning the combination of limited exam content and the artificially high passing point is germane. It may well be that some minority applicants who failed would have scored relatively higher if the exams were more job related.

**25. Inappropriate Defense of Content of Closed Book Exam**

Dr. Outtz suggests that closed book exams are common. That is not the same as saying that it is appropriate to include questions on a closed book exam that typically are, or that could easily be, looked up on the job. It is my opinion that such questions are inappropriate on closed book police promotional exams. There were such questions on the Sergeant exams in question.

Dr. Outtz claims that a mechanical aptitude test I authored over 10 years ago has questions that require memorization.[56] He does not present any examples to support his claim, and I dispute his claim. In any case, Dr. Outtz does not explain why that is relevant to the current challenge to certain types of memorization questions in Sergeant exams.

**26. Dr. Outtz' Claim of Adverse Impact of a Non-Police Test**

Dr. Outtz says that a mechanical aptitude test I authored over 10 years ago has adverse impact, but he does not explain why that is relevant to the Sergeant exams being challenged.[57]

**27. Unsupported, Exaggerated Claim of Expense of Other Selection Procedures**

Dr. Outtz cites[58] a 1991 HRD report that claims the cost of administering an oral exam to the anticipated 1,400 applicants would be prohibitive. However, that report did not give any estimated costs.[59] (Dr. Outtz does not provide any of his own cost estimates for alternative selection procedures.) Further, the number of applicants for the 2005, 2006 and 2007 statewide exams totaled about 2,800 for the years 2003 through 2007, for an average of about 560 applicants per year.

---

[56]Outtz, 28.

[57]Outtz, 29.

[58]Outtz, 21.

[59]Bates, 00263.

A dismissal of an alternative selection procedure with less adverse impact based on an unexamined assertion of cost supports Dr. Landy's statement about the lack of change in HRD's police promotional system. Public safety promotional systems across the country have used such alternatives for many years.

## 28. Examples of Large Scale Non-Written Testing

Dr. Outtz said he is unaware of any jurisdictions that have upwards of 600 applicants that attempt to measure important skills or abilities that are not measured by a MC test, such as communication, negotiation and persuasion, that are equally valid and have less adverse impact.[60] I will respond to each of these topics: number of applicants, validity and adverse impact separately.

With respect to number of applicants, there are large PDs nationwide using oral exams, practical exercises of various types, and full assessment center exams. I gave a short list in my first report[61] and supplement that here. The San Francisco PD uses similar exercises and gets from 500-800 applicants per exam. The Houston PD uses an assessment center (including an oral board, tactical exercise and a citizen meeting/complaint exercise) and gets about 1,000 applicants per exam. The Miami PD uses an assessment center including several exercises (including a supervision simulation with live role player, a tactical exercise and a citizen meeting/complaint exercise) and has about 300 applicants per exam. The test is administered over 5 days.

Dr. Outtz was a participant in a professional conference symposium that included a discussion of 707 applicants going through a structured interview for the position of State Trooper that had no adverse impact.[62]

Dr. Outtz himself has used oral boards for large numbers of applicants. For Bridgeport Connecticut, Dr. Outtz developed an oral exam for the job of Firefighter.[63] This exam involved use of 14 oral boards that administered the oral exam over 4 days to the 610 individuals who qualified to take the test.

---

[60]Outtz, 30.

[61]Wiesen, 55.

[62]Validity and diversity goals: Innovative approaches to adverse impact reduction. Presented at the 2005 conference of the Society for Industrial and Organizational Psychology.

[63]Bolton v. Bridgeport, 467 F.Supp.2d 245.

Dr. Outtz has used an oral component in an exam for promotion to Police Sergeant in the Bridgeport PD, with more than 150 applicants talking the exam.[64]

The firm of EB Jacobs also developed an entry-level Trooper exam for the Delaware State Police that included an Oral Board component that included a Work Situation Exercise and a Structured Interview Exercise. The candidates were evaluated on oral expression, comprehension and reasoning, interpersonal interactions, and deciding and initiating action.

In addition, Dr. Silva's employer, the firm of EB Jacobs, developed several examinations that included individual exercises. The firm developed a 2008 promotional test for Captain for the Cleveland Police Department that included, among other components, an "Oral Board Test" consisting of three exercises: an incident command, a face-to-face meeting with a subordinate, and a group meeting. That exam ran on multiple days. The areas assessed included: oral expression, information analysis, interpersonal relations, judgement and decision making, planning and organizing, and resource management.

I have also developed and administered an oral board test to applicants for firefighter, in the Oklahoma City Fire Department. Some 500 applicants took the oral board test over several days in the mid-1990's. I included the oral test as a component in the selection process in an attempt to both improve validity and reduce adverse impact. Both goals were accomplished.

With respect to validity, the inclusion of live exercises and other components beyond a MC test allows the jurisdictions to measure more abilities and increases the content validity. A respected textbook summarizes the professional literature saying,

> "Research has demonstrated that adverse impact is less of a problem in an AC [assessment center] as compared to an aptitude test designed to assess the cognitive abilities that are important for the successful performance of work behaviors in professional occupations."[65]

With respect to decreasing AI, Dr. Outtz has published at least one article in the professional journal literature reporting that written tests of cognitive ability show racial differences 3 to 5 times that of structured interviews and that such interviews are valid predictors of job performance.[66] It is widely known in the field of industrial/organizational psychology that structured oral interviews show much smaller differences than commonly used written tests of cognitive ability in the mean scores of minority and non-minority job applicants for a wide

---

[64]Bridgeport Guardians v Bridgeport, 933 F.2d 1140.

[65]*Applied Psychology In Human Resource Management*, 6th ed, 2005, Cascio & Aguinis.

[66]The role of cognitive ability tests in employment selection. *Human Performance, vol 15*, 2002, 161-171.

Page 17

variety of jobs.[67]

## 29. Simultaneous Administration of Oral Is a Straw Man

Dr. Outtz suggests that it would be impractical to hold anything other than a written exam for many applicants. However, the additional components could be held for individual municipalities as needed, rather than held all at once. Beyond reducing AI, this might have other benefits, such as allowing the exam to address municipality-specific issues, thus increasing validity.

## Part Four: Rebuttal to the Report by Dr. Silva

Dr. Silva's report contains serious errors and misinterpretations. My critique and rebuttal of his report below generally follows the order of the topics in his report.

## 30. Dr. Silva Does Not Claim Content Validity for the Exams

Dr. Silva does not say the HRD exams are content valid. He does not say the exams cover all or most of the important knowledges, skills, abilities and personal characteristics needed to perform the duties of Sergeant.[68]

## 31. No Professionally Acceptable Support for the Knowledge Test

Dr. Silva conducts only one type of analysis in support of his claim of the effectiveness of the HRD multiple-choice (MC) knowledge tests: he says the passing rate is higher for incumbent Sergeants than for applicants for the job of Sergeant for the 2005 Boston and 2005 statewide exams. However, he takes a limited view in his analysis, ignoring the high overall failure rate of incumbent Sergeants (as I discuss further below when I report my own analyses of these passing rates), and ignoring other possible reasons why incumbent Sergeants might score higher than applicants for the job of Sergeant.

## 32. Higher Passing Rate for Incumbent Sergeants May Not Indicate Exam Validity

There are diverse possible reasons for the higher passing rate of current incumbent Sergeants as compared with applicants for promotion to Sergeant. First, it may well be that a group of people who have already passed an exam for Sergeant, and scored high enough to be promoted, will be more likely to do so again than people who have not done so, whether or not the content of the examination is related to their job duties. For example, if both MC

---

[67]For example, see this review article in the professional literature: Derivation and implications of a meta-analytic matrix incorporating cognitive ability, alternative predictors, and job performance. By Bobko, Roth & Potosky. *Personnel Psychology*. 1999, vol. 52, pages 561-589, especially page 569.

[68]His silence in this area is surprising to me in light of his attempt to evaluate the "Effectiveness of the Knowledge Test" (words that are usually meant to refer to validity). (Silva, 1.)

tests have unreasonably high reading levels, incumbent Sergeants should do better than applicants for Sergeant because current Sergeants are already screened for and have demonstrated a high level of reading ability. Second, it may be that incumbent Sergeants have more time to study than incumbent Police Officers, whether or not all the study material is job related. Third, it may be that incumbent Sergeants, as a result of repetition of job tasks, have memorized information that is tested by the exams but that need not be memorized for successful job performance (e.g., what form to use in a given administrative situation). Finally, nothing that Dr. Silva says about the passing rates mentions level of job performance in the job of Sergeant. It may be that some, or many, or all the people who scored below 70% could do the job of Sergeant at a fully acceptable level.

That a higher proportion of incumbent Sergeants than applicants for Sergeant passed the exam for Sergeant may be consistent with the exams being valid, but is not professionally acceptable evidence of the effectiveness (i.e., the validity) of the HRD MC exams. Dr. Silva does not present professionally acceptable evidence for the validity of the HRD MC exams for Sergeant, either collectively or individually.

**33. Many Current Sergeants Fail the Exam for Promotion to Sergeant**
Dr. Silva notes that of the current, incumbent Sergeants who studied for the 2005 statewide Lieutenant exam, 21%[69] did not even score 70% (passing) on the matching questions from the HRD exam for Sergeant. This indicates a serious problem with the Sergeant exams used. Current Sergeants should <u>at least</u> pass the HRD Sergeant exam, since the HRD exam is supposed to cover knowledges required on the job and the HRD passing point is supposed to identify people who have the knowledge to do the job. I explore and evaluate this for the 2005, 2006 and 2007 exams in more detail in Part Five of this report.

The problem of current Sergeants failing the HRD MC exam for Sergeant seems to be longstanding. A validation report produced by the Defendant HRD reports an analysis of the passing rate for incumbent Sergeants, similar to the analysis reported by Dr. Silva but for the 1991 Boston Sergeant/Lieutenant exam. In 1991, 40% of the incumbent Boston Sergeants failed the exam for Lieutenant. Further, <u>80%</u> of Black incumbent Boston Sergeants and <u>97%</u> of Hispanic Boston Sergeants failed that exam for Lieutenant.[70,71]

**34. No Criterion-Related Validation Study Provided**
No criterion-related validity study was presented that comports with professional standards or

---

[69]"I determined that 79 percent of the current sergeants...[passed]" (Silva, 2).

[70]These percentages are based on the means and standard deviations provided in the Validation Report, Bates 00381.

[71]These high failure rates go without comment in that HRD report despite all the incumbent Sergeants having previously passed an HRD exam for Sergeant.

federal guidelines. Specifically, Dr. Silva's comparison of the passing rates for Sergeants and applicants for Sergeant is not a standard or recognized form of criterion-related validity study. To the contrary, the high failure rates of current Sergeants[72] suggest the HRD exams are seriously flawed.

**35. Dr. Silva's Shortfall Analyses Use Lenient Standards and Approaches**
Dr. Silva's shortfall analysis is lenient (i.e., biased in favor of the Defendants) in several ways.

A. First, Dr. Silva calculates shortfall using an 80% equity standard rather than full equity in hiring. More specifically, Dr. Silva claims there is no short fall if the appointment rate of minorities is 80% that of the appointment rate of non-minorities. To the contrary, although such an outcome does not fail the 80% rule of thumb, it does not indicate equity.

B. A second indication of leniency in Dr. Silva's analyses involves repeated application of an approach described in Question 21 of the UGESP Q&As. The portion of that Q&A that is quoted by Dr. Silva reads:
> "Generally, it is inappropriate to require validity evidence or to take enforcement action where the number of persons and the difference in selection rates are so small that the selection of one different person for one job would shift the result from adverse impact against one group to a situation in which that group has a higher selection rate than the other group."

Dr. Silva does not quote the next (and last) paragraph on Q&A 21 which states:

> "On the other hand, if a lower selection rate continued over a period of time, so as to constitute a pattern, then the lower selection rate would constitute adverse impact, warranting the need for validity evidence."

This last paragraph of the Q&A does not suggest multiple applications of adjusting the data (specifically, pretending that there is a change of one promotion from white to minority). Yet Dr. Silva makes such adjustments multiple times whereas my adverse impact analyses make no such adjustments. Perhaps this is because Dr. Silva and I seek to answer somewhat different questions. He is asking if a given PD violated the 80% rule. I am asking if, overall, the observed adverse impact is statistically significant (that is, if it is unlikely to have arisen by chance). Dr. Silva's claims of little adverse impact can only be made with repeated changes to the data.

C. A third indication of leniency in Dr. Silva's analyses involves the use of a two-tailed rather than a one-tailed statistical test in evaluating the statistical significance of the AI

---

[72]I report some additional statistical analyses on the passing rates for incumbent Sergeants in Part Five of this report.

ratios. Two-tailed tests are appropriate when one is interested in identifying differences in either direction. One-tailed test is appropriate when the question is whether there is a difference that negatively impacts one group relative to another, as is the case here. When a two-tailed statistical test is used instead of a one-tailed test, there is a greater chance of not noticing a real difference when one exists. This is referred to in the profession as lower power of the two-tailed test. This lower power works counter to the intended purpose of conducting the statistical test.

## 36. No Minority Appointments in 13 of 15 PDs in 2006

A summary presented by Dr. Silva[73] shows that, from the 2006 statewide exam, not a single minority was promoted in 13 of the 15 PDs that had both promotions and minority applicants. Dr. Silva does not comment on the probability of this, but my first expert report said that this was statistically unusual.

Dr. Silva's presents a summary[74] that shows that only 1 PD promoted a minority applicant from the 2005 statewide exam, of the 13 PDs with both promotions and minority applicants. The 2007 exam fared better. Dr. Silva's summary[75] shows 3 PDs promoted a minority applicant from the 2007 exam, of the 10 PDs with both promotions and minority applicants.

## 37. Dr. Silva Claims that an Oral Component will Not Reduce Adverse Impact

Dr. Silva's claim[76] that including an oral component will not reduce adverse impact is based on a reanalysis of the Boston 2002 Sergeant exam and ignores the published literature on this topic. I will briefly summarize the published literature and professional thinking on including an oral component and then provide analyses that put Dr. Silva's analyses in a somewhat different perspective. Further, since adverse impact results from both the components of the examination and the manner in which the test scores are used, my comments (above) on banding are relevant here.

## 38. Professional Literature and Thinking on Oral Examinations and Adverse Impact

With good justification, it is widely thought among industrial psychologists that promotional exams that consist of or include an oral component are valid and have less adverse impact than promotional exams that consist totally or predominantly of a written MC exam. This approach has been implemented in public safety promotional exams nationwide, even by Dr. Outtz and the firm Dr. Silva works for (as described above in my rebuttal to Dr. Outtz, above). In addition, other examination tools have less adverse impact than the HRD MC test

---

[73]Silva 5, Table 4.

[74]Silva, 4, Table 2.

[75]Silva 6, Table 5.

[76]Silva, 6-7. Echoed by Dr. Outtz (Outtz, 26).

(as I describe above in my rebuttal to Dr. Outtz).

### 39. The 2002 Boston Oral Grades Show Least Minority/Non-Minority Differences

The most widely accepted, professional index of the relative size of minority/non-minority difference in mean test score is known as d (denoted by the lowercase letter d). The d index is calculated as a ratio of the size of the difference between mean scores to the amount of spread or variability in the scores. If there is no difference in the mean scores for minority and non-minority test takers, then d is zero. The d for each of the exam components for the 2002 exam and for the overall test is shown in Table 4. The AI ratio varies from application to application even with a fixed d. However, on average a smaller d will result in less AI. AI ratios vary both based on d and based on the proportion of applicants promoted.[77] All components of the exam and the overall scores show non-zero d values. The lowest d value is seen with the oral component.

| Table 4. Differences (d) Between Minority and Non-Minority Score Means* | |
|---|---|
| Written Test Alone | .55 |
| Oral Alone | .26 |
| E&E Alone | .45 |
| Special Points Alone | .40 |
| Final Grade | .47 |
| Final Grade without Oral | .61 |

\*  A smaller value of d indicates there is relatively less difference between the mean scores of minority and non-minority applicants.

In addition, I calculated the AI ratio for the 2002 Boston Sergeant exam based on its various exam components.[78] If the ranking of candidates was based on the oral score alone, the AI in promotions would be about .43, as compared to the actual AI (with the oral as a component) of .31. This AI ratio of .43 compares favorably with that of .25 for the 2005 Boston Sergeant exam which did not include an oral component. Now, .43 is not at equity, but it is closer than .31 or .25.

### 40. Dr. Silva Says There is No "Guarantee" of Reduced Adverse Impact

Dr. Silva says that adding an oral component "offers no guarantee that adverse impact would

---

[77]For example, if all applicants are hired the AI ratio will be 1 even if the d is large.

[78]The AI ratio is related to d and to the selection ratio, but not by a simple formula.

be reduced materially."[79]  However, using the standard HRD selection tools (traditional MC test and E&E) virtually assures that the AI seen in past years will continue with no improvement (as I observed above in connection with a similar statement by Dr. Outtz).  The UGESP say that, faced with a choice between using a selection system that will certainly have adverse impact and exploring and trying selection systems of equal, similar or greater validity with likely less adverse impact, the latter course is called for.

**Part Five: Evaluation of Passing Rates of Incumbent Sergeants**
     Based on written test data I received since submitting my expert report of October 2008, I evaluated the passing rates of incumbent Sergeants.  Before presenting the statistical evaluation, I present the background and context.

**41. Incumbent Sergeants Took the HRD Exams for Sergeant**
     Experienced, incumbent Sergeants studied for and took the HRD written exams for Sergeant, not as a research effort to help set the passing point for Sergeant but as applicants for promotion to Lieutenant.  The HRD Lieutenant exams included either the entire written exam for Sergeant (in the case of the 2005, 2006 and 2007 statewide exams) or 53 of the 80 questions that comprised the written exam for Sergeant (in the case of the 2005 Boston Sergeant exam).  Thus all the incumbent Sergeants who took the Sergeant exams were applicants for promotion to Lieutenant in various municipalities across the state.

     To help me evaluate the reasonableness of the passing point of 70%, as set by HRD for each of the four Sergeant exams, for each statewide exam I calculated the percent of incumbent Sergeants who failed the statewide exams for promotion to Sergeant.  Also, I calculated the percent of incumbent Boston Sergeants who scored lower than 70% on 53 questions of the promotional exam for Boston Police Sergeant.  Since the remaining 27 questions that make up the 80 question Boston Sergeant exam were a little more difficult than the 53 questions in common with the Sergeant and Lieutenant exams, I made statistical projections of the percent of incumbent Boston Sergeants who would fail the exam for promotion to Sergeant, Boston PD.

     I expected incumbent Sergeants to have very high passing rates as well as high scores on the HRD exams for promotion to Sergeant for the following reasons: the incumbent Sergeants who took the exams for promotion to Sergeant had at least several years of experience, they had a motivated opportunity to study for the exams, and the exams were meant to cover knowledges that are required to perform the tasks done frequently by Sergeants.

     Below I describe my analyses and findings, preceded by introductory information, covering the following topics:
     A.  The nature of the content of the HRD Sergeant exams.

---

[79]Silva, 8.

    B.  The nature of the passing point in civil service examining.
    C.  The amount of overlap between the 2005 boston sergeant and lieutenant exams
    D.  The complete overlap between sergeant and lieutenant statewide exams
    E.  High failure rate for incumbent Sergeants taking the Boston Sergeant exam
    F.  High failure rates for incumbent Sergeants taking the statewide Sergeant exams.

## 42. The Nature of the Content of the HRD Sergeant Exams

My opinions are based, in part, on the intended nature of the content of the test as mandated by Chapter 31, MGL and as described by HRD staff and documents. The exam content is to reflect the major duties of the job, not minor or ancillary duties.

According to Chapter 31:
> "Examinations shall fairly test the knowledge, skills and abilities which can be practically and reliably measured and which are actually required to perform the primary or dominant duties of the position for which the examination is held." (Section 16)

According to a 1991 validation report produced by HRD, the job analysis for the HRD Sergeant examinations attempted to identify the frequent and important tasks performed by Police Sergeants in civil service departments in Massachusetts.[80] The HRD identified test subjects deemed necessary to perform these tasks successfully.[81] The focus of the HRD exams is nominally on KSAPs essential to job performance, not merely desirable or nice to know.

According to the Personnel Administration Rules (the PARs) concerning the content of examinations:
> "All selection procedures shall be practical in character and shall relate directly to those matters which fairly determine the relative ranking of the persons examined based on the knowledge, abilities and skills required to perform the primary duties (critical and frequent tasks) of the position title or occupational group as determined by reliable and representative job information available to the administrator." (PAR .06, (2)(a))

In short, the HRD promotional exams are intended to test knowledges, skills, and abilities that are required to perform the dominant (i.e., frequent and important) tasks or duties of a Police Sergeant. They should cover topics that Sergeants deal with frequently, such as:

---

[80]"In this survey DPA attempted to measure both the frequency and importance of the tasks performed by incumbents of each of the ranks." *Validation Report for the 1991 Police Promotional Selection Procedures* (Bates stamp 00256).

[81]"In this survey DPA attempted to measure the importance of each KSAP [knowledge, skill, ability and personal characteristic] to the performance of duties of each of the five ranks, using a four point scale." *Validation Report for the 1991 Police Promotional Selection Procedures* (Bates stamp 00257).

search and seizure, patrol techniques, community relations, and supervision.

Given the intended nature of the HRD exams, I would expect virtually all experienced,[82] incumbent Sergeants at least to pass the HRD Sergeant exams without studying for the exam at all, and probably to score very highly. Among experienced incumbent Sergeants who studied, I would expect virtually all[83] current Sergeants to pass.[84,85]

### 43. The Nature of the Passing Point in Civil Service Examining

The nature or intent of a passing point for a civil service exam as described in the federal Uniform Guidelines on Employee Selection Procedures (UGESP), in HRD's PARs, Chapter 31, MGL, and by HRD staff and documents is relevant to evaluating the failure rate for incumbent Sergeants taking an exam for Sergeant. The passing point should be set at a point that will allow applicants who are basically competent to pass.

Concerning cutoff scores the UGESP state,

> "Where cutoff scores are used, they should normally be set so as to be reasonable and consistent with normal expectations of acceptable proficiency within the work force. Where applicants are ranked on the basis of properly validated selection procedures and those applicants scoring below a higher cutoff score than appropriate in light of such expectations have little or no chance of being selected for employment, the higher cutoff

---

[82]All or most HRD promotional examinations for Lieutenant require applicants to have at least three years of experience as a Sergeant to be eligible to take the exam (e.g., see the eligibility section of HRD Police Sergeant exam announcement #2454, Bates stamp 00001).

[83]Some small percentage of incumbent Sergeants may have very specialized assignments, and they may not frequently deal with the range of subject matter in an exam for Sergeant. But such Sergeants would recognize this and would be expected to address their relative lack of experience in preparation for a promotional exam.

[84]Perhaps a small number of Sergeant applicants may have taken the Lieutenant exams for practice and so were not motivated test takers. However, I saw indication of similarity in the test question difficulty in the data for both high and low scoring applicants. The correlation between the difficulty of the questions for the highest scoring 80% of the applicants and for the lowest scoring 20% of the applicants was .86, indicating a very substantial correlation. This shows that the lower scoring applicants were not merely guessing at the answers or answering randomly.

[85]HRD's promotional exams for Sergeant measure knowledge, not problem solving. I would expect a wider range of scores on a test of creativity or problem solving than a test of knowledge, other things being equal (e.g., given similar difficulty level of the tests) since even people who learn relatively slowly can be expected to master knowledge material they deal with frequently. This further supports my view that incumbent Sergeants should do well on an exam for promotion to Sergeant.

score may be appropriate, but the degree of adverse impact should be considered."[86]

The MGL, Ch 31 speaks of passing examinations in several places, all of which envision competence to do the job. Section 8 says,

> "... [an employee] shall demonstrate, by the passing of an examination prescribed by the administrator, that he possesses the qualifications and abilities necessary to perform the duties of the higher title..."

Section 22 makes it clear that a test should be

> "a fair test of the applicant's fitness actually to perform the primary or dominant duties of the position for which the examination was held..."

This type of wording is usually interpreted by the profession as directing that the passing point be set so that the minimally competent applicant will pass.

The UGESP also envisions a passing point as indicating the ability to do the job, saying,

> "If the selection procedure is used with a cutoff score, the user should describe the way in which normal expectations of proficiency within the work force were determined and the way in which the cutoff score was determined (essential). In addition, if the selection procedure is to be used for ranking, the user should specify the evidence showing that a higher score on the selection procedure is likely to result in better job performance."[87]

Finally, according to the PAR's,

> "The passing mark for each examination shall be established by the administrator in accordance with generally accepted selection procedures."[88]

In my experience, passing points generally are set in the public sector to allow minimally acceptable applicants to pass.

---

[86] Section 3.5 (H).

[87] Section 15C(7) Uses and applications.

[88] (3) Examination Results

Page 26

**44. Amount of Overlap Between the 2005 Boston Sergeant and Lieutenant Exams**
The HRD written exam for Lieutenant Boston PD consisted of 100 questions, 53 of which are virtually[89] identical to questions that appeared on the HRD written exam for Sergeant Boston PD. (I did an item by item comparison of the 2005 Boston Sergeant and Lieutenant exams documenting this commonality of items between the two exams. Since Dr. Silva has reached the same conclusion, I do not present that comparison here.)

**45. Complete Overlap Between Sergeant and Lieutenant Statewide Exams**
In 2005, 2006 and 2007 the HRD statewide written exam for Lieutenant consisted of 100 questions, the first 80 of which were identical to the 80 questions that comprised the statewide written exam for Sergeant. In short, the incumbent Sergeants who took a statewide exam for promotion to Lieutenant had to take the complete exam for promotion to Sergeant.

**46. High Failure Rate for Incumbent Sergeants Taking the Boston Sergeant Exam**
I projected the failure rate for incumbent Boston Sergeants for the 2005 Boston Sergeant exam. I used two different approaches, and the resulting failure rates are shown in Tables 5 and 6, 14.2% and 11.8%, respectively. Grading the incumbent Boston Sergeants on the 53 questions common to the Lieutenant and Sergeant exams shows that 11% fail at a passing score of 70%. All these rates are too high. Virtually all incumbent Sergeants should pass a written test for Sergeant, and all the more so for incumbent Sergeants who have studied for such a test.

---

[89]The answer choices were presented in different order on the two exams for some questions. Also, for some questions there were minor wording differences on the two exams that did not change the meaning of the questions, such as a choice using "he or she" versus "you."

Page 27

**Table 5.  Incumbent Sergeants Failing 2005 Boston Sergeant Exam by Method One: Projected Grade on Whole Sergeant Exam**

| Number Who Fail[90] | 18 |
|---|---|
| Number Who Pass | 109 |
| Total Test Takers | 127 |
| Percent Failing | 14.2% |

**Table 6.  Incumbent Sergeants Failing 2005 Boston Sergeant Exam by Method Two: Add 8.44 Points to Scores of Applicants on the Sergeant Exam**

| Number Who Fail[91] | 15 |
|---|---|
| Number Who Pass | 112 |
| Total Test Takers | 127 |
| Percent Failing | 11.8% |

Considering just minority applicants, 21.7% of incumbent Sergeants are projected to fail the Boston Sergeant exam (as compared to the 14.2% failure rate overall) using Method One.

---

[90]The failures were projected using actual mean grade of incumbent Sergeants on the 53 questions common to the Sergeant and Lieutenant exams and adding that to the expected mean score for the remaining 27 questions.  I got the expected mean score for the remaining 27 questions by assuming the incumbent Sergeants would score higher than the applicant for Sergeants by the same number of percentage points they did on the 53 questions in common.  In this way, the mean grade for incumbent Sergeants on all 80 questions was calculated to be 79.92, which is 2.43 points less than their mean for the 53 questions common to the two exams.  I then deducted 2.43 points from the scores of each of the incumbent Sergeants for the 53 questions in common and implemented a 70% passing point.  (Without including the harder 27 questions, the failure rate for incumbent Sergeants on just the 53 questions in common would be 11%.)

[91]The failures were projected using the 8.44 point difference between incumbent Sergeants and applicants for Sergeant on the 53 questions in common to the Sergeant and Lieutenant exams.  I added 8.44 points to each of the grades of applicants for Sergeant, in effect making them equivalent to incumbent Sergeants, and implemented a 70% passing point.

**47. High Failure Rates for Incumbent Sergeants Taking the Statewide Exams**

The failure rates for incumbent Sergeants who took the 2005, 2006 and 2007 Sergeant exams are shown in Table 7. The failure rate is as high as 18.4% (for 2005) and is 11.7% for all three exams combined. Again, this failure rate is too high in light of the content of the exams, the nature of the passing points, and the job experience of the test takers.

| Table 7. Incumbent Sergeants Failing Statewide Sergeant Exams | | | | |
|---|---|---|---|---|
| | **2005** | **2006** | **2007** | **Totals** |
| **Number Who Fail** | 30 | 24 | 37 | 91 |
| **Number Who Pass** | 133 | 310 | 241 | 684 |
| **Total Test Takers** | 163 | 334 | 278 | 775 |
| **Percent Failing** | 18.4% | 7.2% | 13.3% | 11.7% |
| **Percent Minority Failing** | 14.3% | 7.7% | 22.7% | |

The failure rate for minority Sergeants is higher in 2007 than in earlier years. There is only a small number of minority Sergeants, so the difference in failure rates is not statistically significant. However, if this trend continues when larger groups, the difference will be statistically significant.

**Part Six: Update on Adverse Impact**

**48. Adverse Impact Update**

Updated promotion data was provided to me together with the reports of Drs. Outtz and Silva. I used the data summaries provided by Dr. Silva[92] to calculate the AI ratios for the four challenged exams. These data show that there is still adverse impact for the 2005 Boston exam and for the 2005, 2006, and 2007 statewide exams (.27, .22, .27, and .78) and the adverse impact is severe for three of the exams.

**Part Seven: Conclusion and Opinions**

I remain of the opinion that the exams in question have adverse impact and that they are of undemonstrated validity. Overall, the adverse impact is pervasive, severe and statistically significant. The experts for the defense have presented no professionally acceptable support for the validity of any of the examinations. The examinations are either too difficult or not job-related, or both, as shown by the high level of failures by incumbent Sergeants. This is

---

[92]Silva, 5-6, Tables 2, 3, 4 and 5.

particularly worrisome as the failure rate is markedly high for minority incumbent Sergeants, despite their scoring high enough on similar, earlier HRD exams to be appointed in the past. I remain of the opinion that there are alternative selection procedures that are expected to have lower adverse impact and that could be used instead of HRD's traditional MC and E&E exam. Because these alternative selection procedures are used in various other PDs, large and small, nationwide, HRD could reasonably implement them.

Signed: _____    Date: _____ March 30, 2009 _____
           Joel P. Wiesen, Ph.D.

## Attachment A: Case Documents Reviewed

| Title of Document |
| --- |
| Departmental Promotional Exam Announcement #2454 |
| Exam Development Steps |
| Reading List Announcement |
| Summary of Reading List Survey for 2006-2008 |
| Assessment Centers-Use in Civil Service Promotions |
| Affidavit of Vivian W. Lee |
| Commonwealth of Massachusetts Human Resources Division Education and Experience Rating Sheet Instructions for Police Sergeant, Lieutenant, and Captain, Promotional Examination Date: October 20, 2006 |
| Commonwealth of Massachusetts Human Resources Division 2007 Police Promotional Exams for Sergeant, Lieutenant, and Captain Employment Verification |
| Commonwealth of Massachusetts Human Resources Division Education and Experience Rating Worksheet |
| Massachusetts Human Resources Division Reading List for Promotional Examinations for Sergeant, Lieutenant, and Captain, April 20, 2007 |
| Massachusetts PD- Sergeant- Task Survey Analysis: Sergeant Essential Tasks |
| Massachusetts Human Resources Division Departmental Police Sergeant Promotional Examination for Methuen, Announcement Number 7239, Examination Date: October 21, 2006 |
| Massachusetts Human Resources Division Departmental Police Sergeant Promotional Examination for Lowell, Announcement Number 1586, Examination Date: October 21, 2006 |
| Massachusetts Human Resources Division Departmental Police Sergeant Promotional Examination for Lawrence, Announcement Number 2454, Examination Date: October 21, 2006 |
| Massachusetts Human Resources Division Departmental Police Lieutenant Promotional Examination for Methuen, Announcement Number 7242, Examination Date: October 21, 2006 |

Page 31

| Attachment A: Case Documents Reviewed (continued) |
|---|
| Massachusetts Human Resources Division Departmental Police Lieutenant Promotional Examination for Lawrence, Announcement Number 2427, Examination Date: October 21, 2006 |
| Massachusetts Human Resources Division Departmental Police Captain Promotional Examination for Methuen, Announcement Number 7245, Examination Date: October 21, 2006 |
| Massachusetts Human Resources Division Departmental Police Captain Promotional Examination for Lawrence, Announcement Number 2426, Examination Date: October 21, 2006 |
| Massachusetts Human Resources Division 2006 Test Booklet Instructions for Applicants for Promotion to Police Sergeant, Lieutenant, and Captain |
| Third Revised TIA for Police Promotional Examination of October 21, 2006, Date of Third Revision: December 15, 2006,  Instrument Number 2629401 |
| Third Revised TIA for Police Promotional Examination of October 21, 2006, Date of Third Revision: December 15, 2006,  Instrument number 2629402 |
| Police Promotional Examination Subject Area Outline for October 21, 2006 |
| Revised Answer Key Dated October 18, 2006 for Police Promotional Examination Given on October 21, 2006 |
| DPX Police Examinations for October 22, 2005, List of Protested Items |
| April 3, 2006, letter to Robert F. Downing from Vivian Lee, Assistant Director, Civil Service/ Organizational Development Group, Massachusetts Human Resource Division re: Review of Examination Item 4; Announcement Number 6793 |
| December 28, 2006, letter to Daniel P. Dowd from Vivian Lee, Assistant Director, Civil Service/ Organizational Development Group, Massachusetts Human Resource Division re: Review of Examination Item(s); Announcement Numbers 1373; 1383 |
| Letter from Lee to Daniel P. Dowd Date: 3/9/07 |
| Massachusetts Human Resources Division's Response to a Number of Individual Protest Letters |
| Massachusetts Human Resource Division Personnel Administration Rules, Effective as of February 28, 2003 |

Page 32

| **Attachment A: Case Documents Reviewed (continued)** |
|---|
| Commonwealth of Massachusetts Department of Personnel Administration Validation Report for the 1991 Police Promotional Selection Procedures, October 1, 1991 |
| Police Promotional reading List Project, July 15, 1992, with Appendices |
| March 10, 1992, Revision of Police Sergeant, Lieutenant, and Captain Reading List for September 12, 1992 Examination |
| Department of personnel Administration Memorandum with 3 Attachments |
| Excerpt: The Criminal Investigation Process by Greenwood, Chaiken, and Petersilia Pages 313, 332, 339, 341, and 342  from book titled <u>Fundamentals of Criminal Investigation</u> |
| Sergeant Task Profile List |
| Sergeant KSAP Profile |
| Department of Personnel Administration's November 13, 1990, Memorandum re: KSAPS |
| KSAP and Task Linkage |
| KSAPs Produced by PSJA Team Analysis |
| Department of Personnel Administration's September 11, 1990, Memorandum re: Task Profiles with Attachments and Public Safety Job Analysis Project Classification Description for Sergeant, Public Safety Job Analysis Project Classification Description for Lieutenant, Public Safety Job Analysis Project Classification Description for Captain, Public Safety Job Analysis Project Classification Description for Deputy Chief, and Public Safety Job Analysis Project Classification Description for Chief |
| Civil Service Requisition (Form 13) filled out by 43 departments |
| Draft Response to Individual Protest Letters |
| Resume of Subject Matter Experts |
| 2006 Police Sergeant Exam List of Takers by Name |
| 2006 Police Sergeant Exam List of Exam Takers by Score |
| Protest letter regarding 2006 sergeant's promotional exam from William L. Schlieman, October 27, 2006 |
| October 24, 2006, letter to Vivian Lee, Massachusetts Human Resource Division from Andrew J. Sluckis, Auburn Chief of Police re: 2006 Promotional Exam |

| **Attachment A: Case Documents Reviewed (continued)** |
|---|
| Massachusetts Human Resources Division Departmental Police Sergeant Promotional Examination for Cambridge, Announcement Number 9557, Examination Date: October 20, 2007 |
| Reading List for October 20, 2007, Promotional Examinations |
| Education and Experience Rating Sheet Instructions for October 20, 2007 Promotional Examinations |
| Police Promotional Examination Subject Area Outline for October 20, 2007, Examination |
| TIA for Police Promotional Examination of October 20, 2007, Instrument Number 2729301 |
| Response Key Information for October 20, 2007 Departmental Promotional Examinations for Police Sergeant, Lieutenant, and Captain |
| December 28, 2007 letter from Vivian W. Lee, Human Resource Division to Thomas R. Ahearn re: Review of Examination Item; Announcement # 9557 |
| December 28, 2007 letter from Vivian W. Lee, Human Resource Division to Christopher M. Andrade re: Review of Examination Item; Announcement # 3540 |
| December 28, 2007 letters from Vivian W. Lee, Human Resource Division re: Review of Examination Item; Announcements [MISSING 122. Announcement #4222] and [INCORRECT 154. Letter from William Ward not Raymond Richardson] |
| ROSTER OF DOCUMENTS RELEVANT TO Lopez, et al. v. City of Lawrence, et al. U.S. Dist. Ct. No. 07-CA-11693-JLT (documents produced in first half of 2008) |
| SECOND ROSTER OF DOCUMENTS RELEVANT TO Lopez, et al. v. City of Lawrence, et al. U.S. Dist. Ct. No. 07-CA-11693-JLT (documents produced in July 2008) |
| Deposition of Sally McNeely |
| Deposition of Guy Paris |
| Deposition of Vivian Lee |
| Complaint and amended complaints |
| Joint Proposed Order on Document Discovery |
| Affidavit of Kenneth Gaines (undated and unsigned) |
| Letter of 9/16/08 to Barrault from Quinan |
| Expert report of Dr. Frank Landy, October 2008 (draft and final) |

| Attachment A: Case Documents Reviewed (continued) |
| --- |
| Letter of 4/16/08 from Barrault to Quinan |
| Supplemental Expert report of Dr. Frank Landy (draft) |
| Statute of limitations argument, 1/26/09 (pages 19-29) |
| Statement of Undisputed Material Facts, 1/27/09 |
| State Defendants' Opposition to Plaintiffs' Proposed Discovery Orders, 1/29/08 |
| Letter to Judge Tauro from Quinan, 5/19/08 |
| Privilege Log, March 2008 |
| Memo to 12/12/08 to Appointing Authorities and Police Chiefs from Sally McNeely |

## Attachment B: Example of Complete Agreement in Tallies of Job Task Ratings

**TABLE 5**

**SUMMARY OF SME TASK RATINGS**

**RATING SCALE FOR TASKS**

| TASK # | How often do you perform this task? Regularly (daily); Periodically (weekly, monthly); Occasionally (less than monthly) | | | How important is this task to the job? Very important; Important; Not important | | | Was it necessary for you to perform this task satisfactorily when you started the job? Necessary upon Entry to the job (although improvement may be expected); Not Necessary (this task is acquired only through training) | | What is this task's relationship to performance? 1. Performance of this task clearly separates the best workers. 2. Generally the better workers seem to perform this better than poor or marginal workers. 3. Most perform this task equally well. | | | DIMENSIONS Check all dimensions that apply to task: Oral Communication; Interpersonal Skills; Problem ID & Analysis; Judgment; Planning and Organizing. | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | R | P | O | V | I | N | NE | NN | 1 | 2 | 3 | ALL | O | I | P | J | O |
| 1 | 11 | | | | 11 | | 11 | | 11 | | | 11 | | | | | |
| 2 | 11 | | | 11 | | | 11 | | 11 | | | 11 | | | | | |
| 3 | | 11 | | | 11 | | 11 | | 11 | | | 11 | | | | | |
| 4 | 11 | | | 11 | | | 11 | | 11 | | | 11 | | | | | |
| 5 | 11 | | | 11 | | | 11 | | 11 | | | 11 | | | | | |
| 6 | | | 11 | 11 | | | 11 | | 11 | | | 11 | | | | | |
| 7 | | | 11 | | 11 | | 11 | | 11 | | | 11 | | | | | |
| 8 | | | | | | 11 | | | | | | | | | | | |
| 9 | | | | | | 11 | | | | | | | | | | | |
| 10 | | 11 | | 11 | | | 11 | | 11 | | | 11 | | | | | |
| 11 | | | 11 | | 11 | | 11 | | 11 | | | 11 | | | | | |
| 12 | | | 11 | 11 | | | 11 | | 11 | | | 11 | | | | | |
| 13 | 11 | | | 11 | | | 11 | | 11 | | | 11 | | | | | |
| 14 | 11 | | | 11 | | | 11 | | 11 | | | 11 | | | | | |
| 15 | | | | | | 11 | | | | | | | | | | | |
| 16 | | | 11 | 11 | | | 11 | | 11 | | | 11 | | | | | |
| 17 | | 11 | | 11 | | | 11 | | 11 | | | 11 | | | | | |

1568

15

Page 36

## Attachment C: Example of Complete Agreement in Tallies of KSAP Ratings

TABLE 7
SUMMARY OF SME KSA RATINGS

RATING SCALE FOR KNOWLEDGES, SKILLS, AND ABILITIES

| KSA # | Does this KSA relate to the job? Yes No | | When is this KSA learned? Before assignment After assignment | | How long does it take to learn? Longer than brief Orientation Brief Orientation | | How does having more or less of this KSA differentiate performance? High (Differentiates between performance levels to a great extent) Moderate (Differentiates between performance levels to a moderate extent) Little (Differentiates between performance levels to a very minor degree or not at all) | | | Is this KSA required to perform the job effectively? Required Desirable but not required Not required | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Y | N | B | A | L | B | H | M | L | R | D | N |
| 1 | 11 | | 11 | | 11 | | 11 | | | 11 | | |
| 2 | 11 | | 11 | | 11 | | 11 | | | 11 | | |
| 3 | 11 | | 11 | | 11 | | 11 | | | 11 | | |
| 4 | 11 | | 11 | | 11 | | 11 | | | 11 | | |
| 5 | 11 | | 11 | | 11 | | 11 | | | 11 | | |
| 6 | 11 | | 11 | | 11 | | 11 | | | 11 | | |
| 7 | 11 | | 11 | | 11 | | 11 | | | 11 | | |
| 8 | 11 | | 11 | | 11 | | 11 | | | 11 | | |
| 9 | 11 | | 11 | | 11 | | 11 | | | 11 | | |
| 10 | 11 | | 11 | | 11 | | 11 | | | 11 | | |
| 11 | 11 | | 11 | | 11 | | 11 | | | 11 | | |
| 12 | 11 | | 11 | | 11 | | 11 | | | 11 | | |
| 13 | 11 | | 11 | | 11 | | 11 | | | 11 | | |
| 14 | 11 | | 11 | | 11 | | 11 | | | 11 | | |
| 15 | 11 | | 11 | | 11 | | 11 | | | 11 | | |
| 16 | 11 | | 11 | | 11 | | 11 | | | 11 | | |
| 17 | 11 | | 11 | | 11 | | 11 | | | 11 | | |
| 18 | 11 | | 11 | | 11 | | 11 | | | 11 | | |
| 19 | 11 | | 11 | | 11 | | 11 | | | 11 | | |
| 20 | | 11 | | | | | | | | | | |
| 21 | 11 | | 11 | | 11 | | 11 | | | 11 | | |
| 22 | 11 | | 11 | | 11 | | 11 | | | 11 | | |
| 23 | 11 | | 11 | | 11 | | 11 | | | 11 | | |

1606

41

## Attachment D: First Example of Data Aggregation by HRD



Page: 1 Document Name: untitled

```
        ** ROUNDED SCORE **        ** NUM-OF-APPL **
                96                        1
                89                        4
                88                        3
                87                        1
                86                       14
                85                       14
                84                       26
                83                       18
                82                       11
                81                       25
                80                       33
                79                       24
                78                       44
                77                       13
                76                       41
                75                       51
                74                       47
                73                       45
                72                       25
                71                       43
                70                       35        51%
                69                       39
```

1764

Date: 11/3/2006 Time: 10:27:36 AM

**Attachment D: First Example of Data Aggregation by HRD** (continued)

Page 38



Page: 1 Document Name: untitled

| | |
|---|---|
| 68 | 49 |
| 67 | 9 |
| 66 | 37 |
| 65 | 25 |
| 64 | 25 |
| 63 | 17 |
| 61 | 13 |
| 60 | 11 |
| 59 | 14 |
| 58 | 12 |
| 56 | 11 |
| 55 | 7 |
| 54 | 7 |
| 53 | 7 |
| 51 | 4 |
| 50 | 4 |
| 49 | 2 |
| 48 | 4 |
| 46 | 2 |
| 45 | 1 |
| 43 | 2 |
| 38 | 1 |

821

63.1% passed @ 70

1765

Date: 11/3/2006 Time: 10:27:41 AM

**Attachment E: Second Example of Data Aggregation by HRD**

## APPLICANT-EXAM TAKER STATISTICS
### PROMOTION TO POLICE SERGEANT

EXAM DATE: 2003/10/18

| | NON-M | MIN | B | H | A | AI | CY | TOT |
|---|---|---|---|---|---|---|---|---|
| **APPLICANTS** | | | | | | | | |
| MALE | 635 | 99 | 35 | 48 | 13 | 3 | 0 | 734 |
| FEMALE | 42 | 6 | 5 | 1 | 0 | 0 | 0 | 48 |
| TOTAL | 677 | 105 | 40 | 49 | 13 | 3 | 0 | 782 |
| PER CENT | 86.57 | 13.43 | 5.12 | 6.27 | 1.66 | 0.38 | 0.00 | 100.00 |
| **TAKING EXAM** | | | | | | | | |
| MALE | 577 | 87 | 30 | 43 | 11 | 3 | 0 | 664 |
| FEMALE | 38 | 6 | 5 | 1 | 0 | 0 | 0 | 44 |
| TOTAL | 615 | 93 | 35 | 44 | 11 | 3 | 0 | 708 |
| PER CENT | 86.86 | 13.14 | 4.94 | 6.21 | 1.55 | 0.42 | 0.00 | 100.00 |
| **PASSING EXAM** | | | | | | | | |
| MALE | 492 | 56 | 21 | 27 | 6 | 2 | 0 | 548 |
| FEMALE | 31 | 2 | 1 | 1 | 0 | 0 | 0 | 33 |
| TOTAL | 523 | 58 | 22 | 28 | 6 | 2 | 0 | 581 |
| PER CENT | 90.02 | 9.98 | 3.79 | 4.82 | 1.03 | 0.34 | 0.00 | 100.00 |

MARKS SENT 01/12/2004
OVERALL, 82.06 % OF EXAM TAKERS PASSED THE EXAM
9.98 % OF APPLICANTS TOOK THE EXAM PASSED THE EXAM
ELIGIBLE LIST ESTABLISHED: 01/14/2004    PASSING SCORE: 70.00

## APPLICANT-EXAM TAKER STATISTICS
### PROMOTION TO POLICE SERGEANT

EXAM DATE: 2004/10/16

| | NON-M | MIN | B | H | A | AI | CY | TOT |
|---|---|---|---|---|---|---|---|---|
| **APPLICANTS** | | | | | | | | |
| MALE | 771 | 76 | 34 | 26 | 14 | 4 | 0 | 847 |
| FEMALE | 55 | 9 | 2 | 6 | 1 | 0 | 0 | 64 |
| TOTAL | 826 | 85 | 36 | 32 | 15 | 4 | 0 | 911 |
| PER CENT | 90.67 | 9.33 | 3.95 | 3.51 | 1.65 | 0.44 | 0.00 | 100.00 |
| **TAKING EXAM** | | | | | | | | |
| MALE | 725 | 75 | 34 | 23 | 14 | 4 | 0 | 800 |
| FEMALE | 52 | 8 | 2 | 5 | 1 | 0 | 0 | 60 |
| TOTAL | 777 | 83 | 36 | 28 | 15 | 4 | 0 | 860 |
| PER CENT | 90.35 | 9.65 | 4.19 | 3.26 | 1.74 | 0.47 | 0.00 | 100.00 |
| **PASSING EXAM** | | | | | | | | |
| MALE | 492 | 36 | 18 | 9 | 9 | 2 | 0 | 528 |
| FEMALE | 37 | 7 | 0 | 4 | 0 | 0 | 0 | 44 |
| TOTAL | 529 | 43 | 18 | 13 | 10 | 2 | 0 | 572 |
| PER CENT | 92.48 | 7.52 | 3.15 | 1.27 | 1.75 | 0.35 | 0.00 | 100.00 |

MARKS SENT 12/21/2004
OVERALL, 66.63 % OF EXAM TAKERS PASSED THE EXAM
PASSING SCORE: 70.00

1816