## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____
                                                        )
PEDRO LOPEZ, et al.                          )
   Plaintiffs,                                )
                                                        )      Civil Action No. 07-11693-JLT
v.                                                      )
                                                        )
CITY OF LAWRENCE, et al.                )
                                                        )
   Defendants.                            )
_____ )

### PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

### I. Introduction

Despite the First Circuit's clear statement that the municipal Defendants would remain in this Title VII disparate impact employment discrimination case, and despite this Court's (1) clear ruling that it would not permit motions for summary judgment and (2) scheduling this case for trial on July 12, the Defendants, without permission from this Court, have filed a motion challenging the evidence supporting the Plaintiffs' claims. They characterize this motion as a "Motion to Dismiss" even though it contains a number of factual assertions about their alleged lack of culpability. The crux of the Defendants' argument is that the Commonwealth, not them, is responsible for the discriminatory state-wide police sergeants examination and its rank-ordered scoring system, and that the municipal Defendants should not be held liable for the lack of minority promotions resulting from this discriminatory process. The municipal Defendants could have made this argument to the First Circuit, but they all remained silent.

1

As set forth below, the arguments made by the Defendants are in clear disregard of the opinion of the United States Court of Appeals in Lopez v. Commonwealth of Massachusetts, 588 F.3d 69 (1st Cir. 2009), and the opinions of every other court addressing this issue (including three Circuit Court opinions) which hold that an employer may not rely on a state law, policy or process that violates Title VII to defend its conduct.  Rather, Title VII, by its express language, preempts state laws, policies and practices that permit disparate impact employment discrimination.  See 42 U.S.C. §2000(h)-4.  The Courts have unanimously interpreted this provision as meaning that the strictures of Title VII trump conflicting state laws, policies, and practices, and therefore, an employer may not rely on such practices as a defense.  See Gulino v. New York State Education Department, 460 F.3d 361 (2d Cir. 2006) (affirming Title VII liability against New York City Board of Education as Plaintiff's "employer", even though the state agency that was responsible for administering challenged examination was found not to be employer); Boston Chapter NAACP v. Beecher, 371 F. Supp. 507 (D. Mass. 1974), aff'd 504 F.2d 1017 (1st Cir. 1974) (Boston Fire Department liable under Title VII even though it relied on state-created civil service exam which had a disparate impact); California Federal Savings & Loan Association v. Guerra, 479 U.S. 272, 282 (1987) (explaining Congress's intent that state laws in conflict with Title VII are preempted); EEOC v. Allegheny County, 705 F.2d 679, 682 (3d Cir. 1983) (rejecting state law as preempted because conflicted with the ADA).

Contrary to the municipal Defendants' position, Title VII simply does not shield a city from liability by virtue of the fact they utilized a state promotional exam to make discriminatory promotional decisions.  See Gulino, 460 F.3d at 380; see also Guardians

Association of New York City Police Department v. Civil Service Commission of City of New York, 630 F.2d 79, 104-05 (2d Cir. 1980) ("Title VII explicitly relieves employers from any duty to observe a state hiring provision which would require or permit any discriminatory employment practice").

Further, the Defendants' pleas of ignorance of the severe disparate impact resulting from the Commonwealth's police sergeant exam are hard to fathom.  At least three of the Defendants, Boston, Worcester, and the MBTA, have been directly involved in prior litigation where this evidence was undeniable.  The other Defendant municipalities have known about the problem from casual observation of the absence of minority police sergeants in their cities and the glaring absence of minority police sergeant candidates whose test scores were sufficiently high to give them any real opportunity to be promoted.  Moreover, in 2007, the Boston Globe ran a front page article detailing this very problem, with a graphic display showing the lack of minority representation in police departments.  See Brain R. Ballou, "Few minority police supervisors," Boston Globe, Oct. 31, 2007, with graphic enclosed, attached hereto as Exhibit A.

Finally, as set forth herein, the Defendants' argument regarding the Supreme Court's opinion in Ricci v. City of New Haven, 129 S.Ct. 2658 (2009) is entirely off-point. First, the Supreme Court expressly indicated in Ricci that its decision did not change in any respect an employers' legal obligation to utilize employment or promotional tests that were nondiscriminatory, as required by Title VII and the EEOC guidelines.  Indeed, Ricci was not a disparate impact case and did not involve a challenge by minority officers to an examination that clearly had a disparate impact.  Rather, Ricci was a case

of disparate treatment discrimination involving a City's decision to discard an examination after it had created and administered it solely because it was unhappy with the results that the exam produced.  While the Supreme Court acknowledged that such action would be justified in certain situations, the Plaintiffs here are not challenging the municipal Defendants actions after an exam was given and the results posted, but rather are challenging their repeated use of such discriminatory exams in the first instance.  Ricci clearly is inapplicable to such a case

## II. **Facts Relevant to this Motion**

A.    The Defendants Have Long Known of the Discriminatory Impact of the Police Sergeant Exam

Not only are Defendants' claims meritless given the overwhelming case law barring reliance on a discriminatory examination, but even more troubling may be the Defendants' disingenuous suggestion that they were unaware that their repeated use of the state's 80 question, text-book knowledge, multiple-choice police sergeant exam had a severe discriminatory impact on minority promotions.[1]  For example, since 1994, the City of Worcester has been in litigation over its failure to promote minority police sergeants, and for all these years its sergeant promotions have been made off of the rank-ordered list that results from the Commonwealth's written multiple-choice exam. See Harris and Tatum v. City of Worcester Police Department, Docket No. 94-SEM-0589, Findings of Fact, Conclusions of Law of the Hearing Officer, April 26, 2002,

---

[1] The Plaintiffs will not restate here the basic facts relating to the Commonwealth's use of an 80 question, multiple-choice, written text-book knowledge sergeant's promotional exam which the Defendant cities have chosen to utilize for the last 20 or more years and which have resulted in severe discriminatory impact.  Those facts are detailed in the First Circuit's Lopez decision.  See Lopez. 588 F3d. at 76-80.

attached hereto as <u>Exhibit B</u>.   The MCAD noted that in 1994 the City of Worcester had

no minority sergeants out of an approximate total of 60-65.  <u>Id</u>. at 4.  By 2000,

Worcester had 57 sergeants and still none were minorities and in July 2001, Worcester

had 65 police sergeants and only one was a minority.  <u>Id</u>. at 4-5.  Thus, Worcester can

hardly argue its surprise that the sergeant exam has had a severe discriminatory impact

on its promotions to sergeant.

As far back as the 1980s, the Boston Police Department was well aware that the

state-wide police sergeant promotional exam was having a significant disparate impact

on minority police officers.  <u>See</u> <u>Massachusetts Association of African American Police</u>

<u>Officers v. Boston Police Department</u>, 106 F.R.D. 80 (D. Mass 1985) (discussing

consent decree regarding minority sergeant promotions).  By 1997, the situation had not

improved at all.  At that time, as a result of the 1996 state-wide police sergeant

examination, "if promotions had been made in strict rank order, 29 non-African

American officers and 1 African American officer would have been promoted, and the

Department conceded that this would have violated the EEOC guidelines on adverse

impact on minority candidates."  <u>See</u> <u>Cotter v. City of Boston</u>, 223 F.3d 160, 164-165

(1st Cir. 2003).  Moreover, recently, the Boston Police Department again had the same

problem.  Based upon the most recent state-wide police sergeant examination, Boston

made 25 sergeant promotions, and only one of the officers was a minority.  <u>See</u> Ex. 1 to

Defendant City of Boston's Objections and Responses to Plaintiffs' Supplemental

Request for Production of Documents, attached hereto as <u>Exhibit C</u>.

The MBTA, also a Defendant in this case, was not only aware of the significant

discriminatory impact of the state-wide police sergeant exam, it actually conceded this

discriminatory impact when, in 1996, it asked the Commonwealth for a special list of minority police sergeants "because with respect to the 30 police officers occupying the positions of sergeant . . . only 2 officers . . . were minorities".  See Brackett v. Civil Service Commission, 447 Mass. 233, 237 (2006).

Moreover, in an article in the Boston Globe on October 31, 2007, titled "Few Minority Police Supervisors", the Globe described the shockingly low number of minority police sergeants throughout the state and laid the blame for this directly on "the exam which discriminates against minority groups and has prevented their advancement." See Ballou, supra, Exhibit A.  The Globe study found that outside of Boston there were only "25 minorities among the 519 officers with a rank of sergeant or above", and that "in Worcester police have just three minority supervisors in a department with 462 officers."[2]  Id.

Moreover, the fact that the state-wide police sergeant examination has a significant disparate impact on all the defendant police departments is evident from looking at the promotional lists generated from these state-wide exams.  Thus, for example, the state-wide 2006 police sergeant exam results which were provided to the City of Lawrence in early 2007 reflects that of the passing scores ranging from 87 – 70, 22 white officers received passing scores, while only 4 minority officers received passing scores, and even then their scores were 81, 75, 72, 70, respectively.  That

_____

[2] The Globe also documented that in cities like Brockton, which has a significant minority population, there were "no minority supervisors."  Id.  A chart in the Boston Globe article reflects that while 18% of the Lowell Police force is minority, only 2% (one actual person) were a minority police sergeant.  In Springfield, there were very few minority police sergeants despite having a minority police officer population of 32%.  Id.

same list reflects that in Lawrence more than 65% of the minority candidates taking the exam failed it, while only 35% of non-minorities did so.  <u>See</u> Lawrence Police Sergeant Exam Results, 2006, attached hereto as <u>Exhibit D</u>.  In Lowell, the highest ranking 21 candidates on the list (and the only ones that could possibly be reached for promotion) were all white while the highest minority score, 81, was well out of contention for promotion.  <u>See</u> Lowell Police Sergeant Exam Results, 2006, attached hereto as <u>Exhibit E</u>.[3]

It is downright disingenuous at best for the Defendants in this case to say that they were unaware of the severe adverse impact that has been resulting from the Commonwealth police sergeant examination over the last 15 years.[4]

      B.    <u>The Municipal Defendants' Role in Police Sergeants' Promotions</u>

Ironically, it was the Plaintiffs who contended on their appeal to the First Circuit that the Commonwealth exercised such pervasive control over the promotional process that it should be held liable under Title VII in this case.  The Commonwealth argued the opposite — claiming that it was the cities and towns that should be held responsible because they did not have to use the Commonwealth's police sergeant exam but were free — and indeed encouraged — to use alternative testing devices.  Since the municipal Defendants were parties to that appeal, they could have filed briefs in support

---

[3] The examination scores to which Plaintiff refers can be found under the "WR" column in the enclosed spreadsheet, which represents the raw score for the written sergeant promotional exam.

[4] Plaintiffs' experts have further highlighted the severe discriminatory impact resulting from the use of these past exams and the resulting discriminatory impact.  <u>See</u> Supplemental Expert Report of Joel Wiesen, March 30, 2009, attached hereto as <u>Exhibit F</u>; Expert Report of Frank Landy, attached hereto as <u>Exhibit G</u>.  (The Plaintiffs' expert reports based on the most recent sergeant promotional examination are currently being prepared.)

of the Plaintiff's position; however, they elected to do nothing.  In its decision, the First

Circuit clearly disagreed with the Plaintiffs and found that the facts demonstrated that

the municipal Defendants "have considerable latitude over the process by which police

officers are selected for promotion to sergeant."  Lopez, 588 F.3d at 74, 76-80.  The

First Circuit specifically found that the cities "are not required to use examinations

prepared and administered by HRD" but can "opt out of the HRD administered process

and implement their own promotional examinations pursuant to an agreement with

HRD."  Id.  The First Circuit also noted that the Defendants' "have flexibility in deciding

how to satisfy the regulatory requirements" concerning police promotions.  Id.  Further,

the First Circuit found that these municipalities still "retained flexibility over key aspects

of promotions, including the ultimate choice among candidates" and that they could

"consider factors beyond performance on the HRD examination."  Id. at 77.

In short, as explained by the First Circuit, the municipalities have "a number of

ways they can consider other factors beyond examination scores and look beyond the

top ranked candidates on an eligibility list."  Id. at 80.

### III. Procedural History

The Plaintiffs filed their initial complaint against Defendants, the Commonwealth,

and HRD in 2007.  On January 26, 2009, the Commonwealth filed a motion to dismiss,

arguing, *inter alia*, that HRD was not the Plaintiffs' employer under Title VII and

therefore had Eleventh Amendment immunity to suit.  See ECF Doc. 142.  The

municipal Defendants did not file any motions at the time. On April 6, 2009, this Court

denied the Commonwealth's motion to dismiss.  See ECF Doc. 168.

8

On May 4, 2009, the state defendants filed an interlocutory appeal of the District Court's denial of its motion to dismiss. <u>See</u> ECF Doc. 174. Arguments on the state defendants' motion was heard by the First Circuit on October 8, 2009, and on December 3, the First Circuit issued its decision. <u>See</u> <u>Lopez</u>, 588 F.3d 69. The decision reversed the District Court's denial of the state defendants' motion to dismiss, holding that "the state defendants do not qualify as 'employers' as that term is used in Title VII." Id. at 72. The First Circuit expressly stated that its decision "dismiss[ed] plaintiffs' suit only against these defendants," whereas "Plaintiffs' claims against the city defendants and the MBTA will still proceed." <u>Id.</u>

On February 1, 2010, this Court administered a status conference in this matter, at which it ordered the state defendants to be dismissed from this case under the First Circuit's mandate. This Court also determined that the remaining municipal Defendants would not be permitted to file summary judgment motions, but could raise any legal arguments prior to trial via motions *in limine*. On February 10, 2010, the municipal Defendants filed a motion asking this Court to reconsider its position and allow the filing of summary judgment motions. The Plaintiffs opposed this motion, and a ruling on it has not been issued. On February 16, 2010, the municipal Defendants filed their motion to dismiss, which the Plaintiffs now oppose.

### IV. <u>Argument</u>

A.    <u>The "Mandates of State Law" Are Not A Defense To Title VII Liability.</u>

The case law clearly holds that the municipal Defendants cannot shield themselves from liability by claiming compliance with the state civil service law, M.G.L. c. 31. This principle under Title VII jurisprudence is unassailable. "Title VII explicitly

relieves employers from any duty to observe a state hiring provision which purports to require or permit any discriminatory employment practice."  Gulino, 460 F.3d at 380; 42 U.S.C. § 2000h-4.

Nonetheless, the municipal Defendants argue that:

- "Title VII does not . . . make it unlawful for the Defendants to comply with the Commonwealth's state wide testing requirements." Def. Mtn. at 9;

- "[T]hey are employers that must comply with the state law that requires them to hire from the certified lists promulgate by HRD" and thus "are not liable under Title VII for complying with a facially-neutral state testing regime that limits the universe of potential employees to those who have complied with the Commonwealth's requirements."  Id. at 13; and

-  "[S]tates are not forbidden by the Constitution from enforcing testing requirements that have an unintentional disparate impact, and Title VII does not intrude on that traditional state authority."  Id.

All of these assertions are clearly refuted by the long history of Title VII jurisprudence, particularly in the context of state-sponsored employment testing.

The Second Circuit's Gulino decision most clearly shows the fallacy of the Defendants' position here.  In Gulino, the Second Circuit addressed a claim by minority school teachers of New York City that certain testing requirements imposed by the state violated Title VII.  See 460 F.3d 361 (2d Cir. 2006).  The district court had allowed the Title VII claim to proceed against both the state authority and the New York City Board of Education.  Gulino, 460 F.3d at 364.  The Second Circuit reversed the district court's decision concerning the state, ruling that it could not be liable under Title VII because it acted solely as a licensing authority, but affirmed the ruling against the city's Board of Education.  Id.  The Court held that "the mandates of state law are no defense to Title VII liability" and that "Title VII explicitly relieves employers from any duty to observe a

10

state hiring provision which purports to require or permit' any discriminatory employment practice." Id. at 380. The Second Circuit further ruled that the city's Board of Education was not "merely a licensing agency," but that its "purpose . . . is the education of students in the New York City public schools," and it "hires and compensates teachers as a means of accomplishing that objective." Id. at 381.[5]

Other circuits have issued similar rulings as Gulino. See EEOC v. Allegheny County, 705 F.2d 679, 682 (3d Cir. 1983) ("reliance on such an unconstitutional [state] statute cannot justify employment discrimination") (finding local authority violated Title VII by relying on state statute); Beecher 371 at 521, aff'd 504 F.2d 1017 (1st Cir. 1974) (consent decree issued requiring city to ensure that entrance examinations under state's civil service law complied with EEOC Title VII guidelines). At least three circuits, therefore, including the First Circuit, have firmly held that a local authority cannot rely on a testing regime administered by the state to determine employment decisions if such a regime causes disparate impact discrimination. The Plaintiffs' position follows these circuit decisions.

Moreover, as a general matter, it is "well-settled" that "a state statute which conflicts with a federal statute cannot stand." Allegheny County, 705 F.2d at 682. Whether the Defendants acted in good faith reliance on the state's civil service testing regime does not change this analysis, because "Title VII is not concerned with the

_____

[5] This aspect of the Gulino decision specifically rejects the Defendants' frivolous argument that it was acting "outside of an employment context" when relying on HRD's examinations to determine police sergeant promotions. See Def. Mtn. at 12. The entire purpose of the Defendants' police departments is to protect and serve their communities, and they hire, train, and promote officers to further that objective.

employer's good intent or absence of discriminatory intent." <u>EEOC v. Monarch Mach.</u>
<u>Tool Co</u>., 737 F.2d 1444, 1451 (6th Cir. 1980).

Here, the Plaintiffs' have claimed that the municipal Defendants discriminated in
their promotions of police officers to the rank of sergeant by relying on a state-
administered civil service examination that caused a disparate impact on minority
officers.  Thus, the claim clearly alleges that M.G.L. c. 31, the state law relied on for
such promotional decisions, conflicts with Title VII's prohibition against employment
practices resulting in disparate impact on minorities.  The municipal Defendants'
reliance on M.G.L. c 31 "stand[s] as an obstacle to the accomplishment and execution
of the full purposes and objectives of Congress" in enacting Title VII.  <u>Ewing v. Federal</u>
<u>Home Loan Bank of Des Moines</u>, 645 F. Supp. 2d 707, 721 (S.D. Iowa 2009)
(explaining when state law "conflicts" with Title VII).

While the Defendants may argue that HRD's civil service testing regime does not
explicitly conflict with Title VII, such a conflict is apparent from the testing regime's
effect.  A conflict between Title VII and state law can be found where the state law
"conflict[s] directly with federal law, such that compliance with both state and federal law
is impossible, *or state law may create an obstacle to the attainment of federal policy*
*goals.*" <u>Broughton v. Courtney</u>, 861 F.2d 639, 641 (11th Cir. 1988) (emphasis added);
<u>California Federal Sav. and Loan Ass'n</u>, 479 U.S. at 281 (state law can conflict where it
"stands as an obstacle to the accomplishment and execution of the full purposes and
objectives of Congress"); <u>Sosa v. Hiraoka</u>, 920 F.2d 1451, 1461 (9th Cir. 1990).

Moreover, the EEOC guidelines for Title VII directly address the issue presented
here by forbidding reliance on testing regimes that result in disparate impact.

> The use of any selection procedure which has an adverse impact on the
> hiring, promotion, or other employment or membership opportunities of
> members of any race, sex, or ethnic group will be considered to be
> discriminatory and inconsistent with these guidelines unless the procedure
> has been validated in accordance with these guidelines."

29 C.F.R. § 1607.3(A).  Under the EEOC guideline, the municipal Defendants are

"required to use any available alternate selection procedure to ameliorate the adverse

impact" of HRD's testing regime.  Brown v. City of Chicago, 8 F.Supp.2d 1095, 1112

(N.D. Ill. 1998).  They clearly have failed to do so.

> B.    The Defendants Do Not Actually Face A State Mandate Because They
>       Can Adopt Their Own Testing Regime.

Notwithstanding the foregoing, the Defendants take an untenable position in

relying on their compliance with M.G.L. c. 31 because that chapter does not mandate

adoption of the state's civil service testing regime.  In other words, the Plaintiffs do not

even need to show that the testing regime under M.G.L. 31 conflicts with Title VII,

because the Defendants "are *not* required to use examinations prepared and

administered by HRD."  See Lopez, 588 F.3d at 76 (emphasis in original).[6]

The Defendants' position that it is unfair to hold them liable under Title VII when

they are complying with state law thus ignores the findings made in the Lopez decision.

The "municipalities, and not HRD, choose the form the examination will take, whether to

make the HRD examination one part of the evaluation process, and whether to develop

and administer an entirely different written examination."  Id. at 76, n.6.  The municipal

---

[6] In Gulino, the Second Circuit "acknowledge[d] the difficult situation" that its finding of liability created for
the New York City Board of Education, given that the defendant was forced to comply with the state
mandate.  460 F.3d at 381.  The present dispute is not concerned with such a "difficult situation,"
however, because the municipal Defendants have willfully chosen HRD's testing regime in lieu of the
option of developing their own promotional process.

"departments had a number of ways they could consider other factors beyond examination scores and look beyond the top-ranked candidates on an eligibility list." Id. at 80, 87 ("HRD did not control promotions decisions even for municipalities that chose to use HRD-administered promotions examinations"). See infra at 6-8 (describing municipalities' control over sergeant promotions).[7]

The municipal Defendants' culpability for the discrimination here is far greater than that of the New York City Board of Education in Gulino, which was, in fact, complying with a *mandate* of state law. See Gulino, 460 F.3d at 380. The municipalities could decide whether or not to use HRD's examination. Even when they chose to use HRD's system, they had options regarding which factors to consider in making promotions. Holding the municipal Defendants accountable for their exercise of discretion cannot offend principles of fairness and justice.[8]

C.   Many Of The Municipal Defendants Have Faced Claims Of Discriminatory Hiring And Promotional Practices In Their Police Departments In The Past.

The fact that the municipal Defendants had the option of developing their own testing regimes but chose not to underscores their liability here. The unfortunate history of racial discrimination in the hiring and promotions of police officers throughout

_____

[7] To be clear, the Plaintiffs continue to believe that the Commonwealth exerted substantial control over the sergeant examinations, certainly sufficient to be liable under Title VII. Under the law of the case doctrine, however, the First Circuit's Lopez decision has resolved this issue for this matter.

[8] That the municipal Defendants had such clear discretion to develop the process for sergeant promotions plainly shows that the Plaintiffs claims are redressable here. See Def. Mtn. at 8 (arguing that no redressability exists against Defendants). The fact that "it is lawful, and indeed, the practice of most cities and towns" to rely on the HRD examination provides no response to the undisputed fact that the municipalities chose to use the HRD examination, could have developed their own examination procedures, and could have employed any of several regulatory mechanisms to bolster their minority sergeant ranks. Id.

Massachusetts is not a new revelation; despite this, the municipal Defendants have continued to rely on a testing regime that they know or should have known causes disparate impact in hiring and promotions.  Even those municipalities that did not face a specific claim certainly could see for themselves the virtual absence of minority sergeants in their police departments, and were aware or should have been aware of the regulatory means that the Legislature and courts have approved to address such disparate impact.  See infra, at 4-8.  Moreover, Boston, Worcester and the MBTA at the very least, have been involved in prior litigation regarding the disparate impact evident in their police departments.  Id.

The City of Boston's history of racial discrimination in its police department's employment practices has been extensively detailed by state and federal courts. Boston has been involved in a series of lawsuits in which minority officers' alleged racial discrimination in its police hiring and promotions.  See Massachusetts Association of African American Police Officers, 106 F.R.D. 80; Massachusetts Association of African American Police Officers v. City of Boston, 973 F.2d 18 (1st Cir. 1992).  In 1980, Boston agreed to a federal consent decree with the Massachusetts Association of African-American Police officers (now the Massachusetts Association of Minority Law Enforcement Officers, or MAMLEO), which was reaffirmed and amended in 1991.  See Massachusetts Association of African-American Police Officers, 973 F.3d at 19.

Boston has also defended itself against lawsuits by white officers when it has taken measures to address its past discrimination.  In 1998, the First Circuit affirmed the continued validity of the afore-mentioned consent decree and Boston's use of the decree to promote minority candidates over a challenge by white officers.  See Boston

15

Police Superior Officers Federation v. City of Boston, 147 F.3d 13, 22 -23 (1st Cir. 1998)

("This tortuous history [of implementing the consent decree], combined with the

persistent effects of discriminatory practices at the entry and sergeant levels, sufficiently

links the BPD's past discrimination and the statistical disparities contemporaneous with

[the minority candidate's] promotion"); Cotter, 323 F.3d at 168-171 (upholding promotion

of African-American police officers to sergeant out of rank order as "a permissible race-

based distinction that was justified by a compelling and narrowly tailored government

interest").

Despite this history, when the City of Boston promoted 25 officers to the rank of

sergeant last month, only one of the promoted officers was black.  See Ex. 1 to

Defendant City of Boston's Responses to Plaintiffs' Supplemental Request for

Production of Documents, attached hereto as Exhibit C.[9]

Even those municipalities that have not received a direct claim arising out of their

police department's employment practices cannot claim ignorance.  See Exhibits D and

E, attached hereto.  In Lowell, the 21 highest scoring officers on the 2006 promotional

exam were white.  Id.  In Lawrence, a city with a substantial minority population, see

www.cdc.gov/ REACH/ pdf/ MA_Greater_Lawrence.pdf (U.S. Center for Disease

Control and Prevention publication stating that 68.7% of Lawrence residents are Latino),

only four of the 26 highest scoring officers were minorities in 2006.  Id.  The fact is that

the municipal Defendants have witnessed firsthand, without resorting to disparate

---

[9] As shown by Exhibit C, Boston has promoted a total of 40 officers since January 1, 2008 to sergeant, only three of whom were minorities.

impact analysis, the observable disparate impact on minority officers caused by their strict reliance on the HRD written examination.

      D.     The Supreme Court's *Ricci* Decision Is Irrelevant.

As explained in the Plaintiffs' Opposition to the Defendants' Motion for Reconsideration, at 10-12, ECF Doc. 196, the Ricci v. New Haven decision concerns an entirely different species of employment discrimination claims. 129 S.Ct. 2658 (2009). That decision involved a city's affirmative act to prevent what it perceived to be a disparate impact resulting from its civil service examination. The issue concerned a municipality's willful refusal to certify the examination. The Supreme Court thus evaluated a disparate *treatment* claim by white firefighters, not a disparate impact claim. Id. at 2672 ("Petitioners raise a statutory claim, under the disparate-treatment prohibition of Title VII . . .").

The Plaintiffs' claims here present a straightforward disparate impact case. The issue is whether the exam the Defendants used to promote their officers had a disparate impact on minority applicants and was not sufficiently job related – not whether the Defendants' subsequent actions in response to an examination were permissible. As explained in Ricci, "Congress has imposed liability on employers for unintentional discrimination in order to rid the workplace of practices that are fair in form, but discriminatory in operation." Id. at 2676.[10]

---

[10] Thus, the fact that, as the Defendants argue, the Constitution does not prohibit disparate impact employment practices is irrelevant. See Def. Mtn. at 12. Title VII does expressly prohibit practices resulting in disparate impact.

In fact, the Supreme Court emphasized in <u>Ricci</u> that its decision did not constrain

an employer's authority to take "affirmative efforts" to ensure a fair hiring process.

> Nor do we question an employer's affirmative efforts to ensure that all
> groups have a fair opportunity to apply for promotions and to participate in
> the process by which promotions will be made. But once that process has
> been established and employers have made clear their selection criteria,
> they may not then invalidate the test results, thus upsetting an employee's
> legitimate expectation not to be judged on the basis of race.

<u>Id.</u> at 2677.  The Plaintiffs' claims here are thus expressly protected by the <u>Ricci</u>

decision.  They allege that *no* "process has been established" that "ensure[s] that all

groups have a fair opportunity to apply for promotions and to participate in the process

by which promotions will be made."  <u>Id.</u>  Such a claim certainly remains valid after <u>Ricci</u>,

as made clear by the Supreme Court's opinion.

> E.    <u>The Plaintiffs' Claims Under Chapter 151B Remain Against The Municipal
> Defendants.</u>

While the Defendants' motion to dismiss ostensibly seeks dismissal of both the

Title VII claim and the Chapter 151B claim, the motion does not offer any arguments

distinct to the Chapter 151B claim.  To the extent that any of the Defendants' arguments

on Title VII have merit (which they clearly do not), this is a fatal flaw.

Chapter 151B covers a far broader spectrum of entities in its prohibition against

discriminatory employment practices than does Title VII.  Chapter 151B prohibits any

"person" (which includes "all political subdivisions" of the state) from aiding and abetting

employment discrimination, and from interfering with the enjoyment of rights protected

or guaranteed under Chapter 151B.  <u>See</u> M.G.L. c. 151B, §§ 4(4A), 5.  These

prohibitions are expressly not limited in scope, as many courts have noted.  <u>E.g.</u>,

18

Beaupre v. Cliff Smith & Associates, 50 Mass.App.Ct. 480, 491 (2000) (Chapter 151B

"does not limit the categories of persons who may be individually liable"); Thomas

O'Connor Constructors, Inc. v. Massachusetts Commission Against Discrimination, 72

Mass.App.Ct. 549, 893 N.E.2d 80, 86 (2008) (noting that the scope of Section 4(4A)'s

prohibition on interference "is almost without limit").

On February 26, 2009, the Plaintiffs voluntarily dismissed their Chapter 151B

claim against the Commonwealth of Massachusetts and HRD, based on the state's

Eleventh Amendment immunity.  See Pl. Mem. of Law in Opp. to Def. Mtn. to Dismiss,

Feb. 26, 2009, at 3, ECF Doc. 163.  However, the Eleventh Amendment does not

provide immunity to municipalities in a federal action brought under state law.  See

Monell v. Department of Social Services of City of New York  436 U.S. 658, 691 (1978)

("Nor is there any basis for concluding that the Eleventh Amendment is a bar to

municipal liability").  Thus, the Plaintiffs' Chapter 151B claim against the municipal

Defendants remains.

> E.    The Defendants' Motion Raises Factual Issues And Thus Improperly
>        Seeks Summary Judgment In Disregard Of This Court's Order.

The Defendants' motion does not rely solely on the allegations but challenges the

factual basis for the Plaintiffs' claims.  See, e.g., Def. Mtn. at 5, 15 (arguing no evidence

of disparate impact for promotions to sergeant within the MBTA, and that Defendants

were not in the position to determine whether sergeant promotional examinations

caused disparate impact).  In raising the sufficiency of the evidence, the Defendants are

requesting, in fact, summary judgment.  However, this Court expressly stated at the

February 1, 2010 hearing that the Defendants would have the opportunity to file motions

*in limine* regarding any outstanding legal issues, but could not file for summary judgment. On February 10, the Defendants filed a motion requesting this Court to reconsider that procedural ruling. <u>See</u> ECF Doc. 194. The Plaintiffs opposed this motion. <u>See</u> ECF Doc. 196. As the Court has not yet ruled on the Defendants' motion to reconsider, the Defendants' current motion – ie. a motion for summary judgment disguised as a motion to dismiss – is improper and can be denied for this reason alone.

## V. <u>Conclusion</u>

The federal courts agree that the "mandates of state law" cannot excuse violations of Title VII. This alone is sufficient to doom the municipal Defendants' motion. But in fact, the municipal Defendants have never been forced to choose between violating state law and violating Title VII, because M.G.L. c. 31 allows them to develop and administer their own promotional examination procedures. The municipal Defendants have knowingly persisted in using a discriminatory employment practice even when nothing required them to do so. For the foregoing reasons, the Defendants' motion to dismiss should be denied in its entirety.

Respectfully Submitted,
PEDRO LOPEZ, et al., Plaintiffs,
By their attorneys,


 /s/ Joseph L. Sulman
Harold L. Lichten, BBO #549689
Shannon Liss-Riordan, BBO# 640716
Joseph L. Sulman, BBO #663635
LICHTEN & LISS-RIORDAN, P.C.
100 Cambridge Street, 20th Floor
Boston, MA 02114
Date:  April 7, 2010                    (617) 994-5800

20

## CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2010, a copy of this document was served by electronic filing on all counsel of record.

 /s/ Joseph L. Sulman
Joseph L. Sulman