# Second Supplemental Expert Report in Lopez et al. v City of Lawrence et al.

Joel P. Wiesen, Ph.D.
April 14, 2010

## Table of Contents

1. My Charge .................................................................. Page 2
2. Summary of Opinion ......................................................... Page 2
3. New Data Analyzed .......................................................... Page 3
4. Adverse Impact in Written Test Scores ...................................... Page 3
5. Adverse impact in Passing/Failing Exam ..................................... Page 4
6. Adverse Impact in Appointments ............................................. Page 6
7. Adverse Impact for Small, Individual Defendant Promotional Exams ........... Page 7
8. Summary and Conclusions .................................................... Page 9

## Second Supplemental Expert Report in Lopez et al. v City of Lawrence et al.

Joel P. Wiesen, Ph.D.
April 14, 2010

1. My Charge

I was asked by counsel to revisit the question of adverse impact (AI) based on new hiring data received since my most recent report, submitted over a year ago. I have repeated the types of AI analyses reported earlier based on new information[1] received from HRD and from one[2] municipality (Methuen) concerning appointments from the examinations in question. I reserve the right to update my analyses and review and perhaps modify my opinions concerning AI if and when additional data become available concerning appointments based on the exams in question.

2. Summary of Opinion

The exams in question, held by HRD from 2005 to 2008, statewide and for the City of Boston, have adverse impact against minority (i.e., Black and Hispanic)[3] applicants in average test score, in proportion passing, and in promotional appointments (hereafter referred to as appointments). For both the statewide exams and the Boston exams, the AI in appointments fails the 80% rule of the federal *Uniform Guidelines on Employee Selection Procedures*. The AI in appointments is highly statistically significant for the City of Boston.

---

[1] The new data set not only contained additional appointment information but also other small changes in the number of takers. It may be that those changes reflect corrections to the data file by HRD. However, in at least one area the data changed in ways that suggest error or oversight on the part of HRD or its expert. Dr. Silva reported 7 appointments made by Worcester based on the 2006 exam (see his Table 4) but the new HRD data file shows Worcester making no appointments from that exam. I note parenthetically that Dr. Silva reported an AI ratio of .76 for Worcester appointments from the 2006 exam, which fails the 80% rule of thumb of the federal *Uniform Guidelines on Employee Selection Procedures*.

[2] HRD "delegated" (i.e., stopped collecting and maintaining) information on appointments to Sergeant in the Fall of 2009. I am informed by counsel that such appointment information has been requested of each of the defendant departments, but so far only one municipality has responded.

[3] I categorized all Black and Hispanic applicants as minority and all other applicants as non-minority.

3. New Data Analyzed

The statistical analyses described in this report are based on data contained in two Excel files provided to me last month by counsel, named:

    Update_sgt_promos_05-07exams_030510.xls[4]
    2008 Sergeant Exam Data.xls

4. Adverse Impact in Written Test Scores

There is statistically significant adverse impact against minority applicants in the average written test score for each Sergeant exam from 2005 to 2008 (see Table 1). In each of these exams, the average[5] written test score for minority applicants was lower than the average for non-minority applicants, and the difference is statistically significant for each exam.

The minority-non-minority differences in average written test score have considerable practical import, as applicants can be appointed only if they rank within the top 2N+1 names on the eligible list (where N is the number of openings to be filled), and rank order placement on the list is based on exam grade. (Of course, only passing candidates are placed on an eligible list.) The written test comprises 80% of the exam grade, nominally. In practice, the written test comprises 93% of the exam grade,[6] aside from veterans' preference.[7] So the written test score drives the placement of applicants on an eligible list.

Additionally, the exam grade determines the order in which appointments are made, with applicants at the top of the eligible list appointed earlier than those further down on the list, in general. So AI in test scores often translates into delay in appointment. Many administrative decisions in a police department may be based on seniority, so delay in appointment may affect a Sergeant throughout his or her career.

---

[4] I received another HRD file named "2005 to 2007 Lopez data mar 8 2010.xlsx" with data from only a subset of this update file, however that file was missing one applicant for Springfield. It appeared that the update file was more complete, so I used the data in it.

[5] By average I refer to the sum of the scores divided by the number of test takers. Another word for this is the "mean".

[6] This is so because every applicant who is eligible to take the test receives 14 of the 20 points allotted to the "education and experience" component of the exam. So, the range of possible scores is from 14 to 100, a range of 86 points. The 80 points of the written test make up 93% of these 86 points (80 divided by 86 is 93.0%).

[7] A veteran who passes the exam may have 2 points added to his or her exam grade.

| Table 1. Adverse Impact in Written Test Score, by Examination | | | |
|---|---|---|---|
| Exam | Probability* | t value[8]** | d.f.[9]*** |
| 2005 Statewide | .000 | 4.6 | 616 |
| 2006 Statewide | .000 | 3.9 | 874 |
| 2007 Statewide | .000 | 3.6 | 745 |
| 2008 Statewide | .009 | 2.6 | 689 |
| 2005 Boston | .000 | 8.3 | 623 |
| 2008 Boston | .000**** | 9.0 | 502 |

Notes:
* The probabilities refer to the probability of observing, by chance, a difference between groups as large as seen in the data. The probability is determined mathematically, based on the data, using the t value and the d.f. A probability of 0.05 or less is typically considered statistically significant. Each of these probability values is much less than 0.05 and so all the minority-non-minority differences in average test score are statistically significant.
** The t value is calculated from the data. The t value is used, together with the d.f., to determine the probability.
*** The d.f. (i.e., the "degrees of freedom") values in this table reflect the number of applicants for each exam. The d.f. values are determined mathematically from the data.
**** This probability is reported in the table to 3 decimal places, as .000, which means the probability is less than .0005, but actually the probability is .000000000000000005 (that is 17 zeros to the right of the decimal place).

5.  Adverse impact in Passing/Failing the Written Test

Another meaningful way to look at the adverse impact of the written tests is in terms of the proportion passing and failing, since only applicants who pass can be appointed. In terms of passing rates, 5 of the 6 exams show AI against minority applicants. For all exams other than the 2008 statewide exam, either the AI ratio is less than .80 and the difference in passing rates is

---

[8] The t values reported here may be interpreted as "standard deviation units" that correspond to the probability value, as the US Supreme Court has referred to "two or three standard deviations" as a general rule for evaluating statistical significance (*Castaneda v. Partida*, 430 U.S. 482, 496-497, n. 17). The higher the number of standard deviation units the less probable the outcome is due to chance. The term "standard deviation" is used in other ways in some other contexts, but here standard deviation units reflect the probability of the results occurring based on chance.

[9] Professional guidelines recommend reporting both the t-value and the d.f. (degrees of freedom) when reporting analyses such as reported here.

highly statistically significant, or the AI ratio is at or near .80 and the difference in passing rates is statistically significant or highly statistically significant. (See Table 2.) Following the federal enforcement agencies,[10] I consider both the size and the statistical significance of the AI ratio in forming my opinion that 5 of the 6 challenged exams show AI against minority applicants with respect to passing and failing the written test.

| Table 2. Adverse Impact in Pass/Fail, by Examination | | | | | |
|---|---|---|---|---|---|
| Exam | Minority: Percent Pass | Non-Minority: Percent Pass | Adverse Impact Ratio | Probability[11] | Standard Deviation Units |
| 2005 Statewide Exam | 31.8% | 50.9% | .62 | .004 | 2.9 |
| 2006 Statewide Exam | 59.7% | 74.5% | .80 | .007 | 2.7 |
| 2007 Statewide Exam | 56.8% | 68.4% | .83 | .050 | 1.9 |
| 2008 Statewide Exam | 59.0% | 65.7% | .90 | .325 | 0.9 |
| 2005 Boston Exam | 43.3% | 70.3% | .62 | .000 | 4.1 |
| 2008 Boston Exam | 63.4% | 87.3% | .73 | .000 | 4.3 |

Note: The probabilities are based on Fisher's Exact Test, two-tailed.[12]

---

[10] The policies of the federal enforcement agencies are presented in the *Uniform Guidelines on Employee Selection Procedures*.

[11] The usual way social science researchers interpret a statistical test is based on the probability that the result would have occurred due to chance or random causes alone. The most usual standard is: if the probability associated with the observed data is less than or equal to 0.05, the result is called statistically significant.

[12] The t-test reported in Table 1 is not appropriate for categorical data. The Fisher Exact Test is commonly acknowledged to be appropriate for this type of categorical data.

6. Adverse Impact in Appointments

An analysis of the bottom line, or number of appointments, is the most basic approach to evaluating AI. Considering only departments (municipal or state) with at least 1 appointment and at least 1 minority applicant, all 6 exams show adverse impact, as described below. (See Table 3.)

Table 3. Adverse Impact in Appointment, by Examination, for Departments With Both Appointments and Minority Test Takers.

| Exam | Minority Percent Appointed | Non-Minority: Percent Appointed | Adverse Impact Ratio | Probability | Standard Deviation Units[13] |
|---|---|---|---|---|---|
| 2005 Statewide Sergeant Exam | 5.6% | 16.1% | .35 | .121 | 1.5 |
| 2006 Statewide Sergeant Exam | 1.6% | 12.1% | .13 | .011 | 2.5 |
| 2007 Statewide Sergeant Exam | 5.4% | 8.5% | .64 | .750 | 0.3 |
| 2008 Statewide Sergeant Exam | 0% | 6.7% | 0.0 | .358 | 0.1 |
| 2005, 2006, 2007, 2008 Statewide Sergeant Exams | 3.0% | 11.2% | .27 | .001 | 3.2 |
| 2005, 2007, 2008 Statewide Sergeant Exams | 3.9% | 10.6% | .37 | .029 | 2.1 |
| 2005 Boston Sergeant Exam | 4.0% | 14.2% | .28 | .000 | 4.1 |
| 2008 Boston Sergeant Exam | 0.5% | 8.6% | .06 | .000 | 4.3 |

Note: The probabilities are based on Fisher's Exact Test, two-tailed.

---

[13] Here, and for all similar statistical analyses reported below, I give the number of "standard deviation units" that correspond to the probability value, as the US Supreme Court has referred to "two or three standard deviations" as a general rule for evaluating statistical significance (*Castaneda v. Partida*, 430 U.S. 482, 496-497, n. 17). The higher the number of standard deviation units the less probable the outcome is due to chance. (The term "standard deviation" may be used in other ways in some other contexts, but here it reflects the probability of the results occurring based on chance.)

Page 6

Each of the 4 statewide exams show adverse impact against minority applicants in appointments, failing the 80% rule. The AI ratio for the 2006 statewide exam is statistically significant. The AI ratios for the other 3 statewide exams are not statistically significant. This may be due to the small number of appointments. For that reason, I aggregated the data for the 4 statewide exams, calculated the AI ratio, and performed a test of statistical significance (using the approach employed for the individual statewide exams). Parenthetically I note that this aggregation over time is supported by HRD's own policy, implemented occasionally, of merging the lists from 2 Sergeant exams, from 2 different years, into one new list. The AI ratio for all 4 statewide exams combined fails the 80% rule and is statistically significant. Since it is possible that the 2006 statewide exam is driving the statistical significance in the combination of the 4 statewide exams, I also aggregated only the data for the 3 statewide examinations that did not show statistical significance when analyzed separately. The AI ratio for these 3 statewide exams combined fails the 80% rule and is statistically significant.

Both the Boston exams show severe AI that is highly statistically significant.

7. Adverse Impact for Small, Individual Defendant Promotional Exams

Four defendant Police departments made appointments from the statewide exams in which they participated between 2005 and 2007, and two of these Police departments took part in two exams. Not a single minority was appointed by these Police departments from these exams. The adverse impact ratios for all six department promotional exams are zero. (See Table 4.)

Table 4. Adverse Impact in Appointment, by Examination, for Defendant Statewide Departments.

| Exam | Minority: Percent Appointed | Non-Minority: Percent Appointed | Adverse Impact Ratio |
|---|---|---|---|
| 2006 Lawrence Sergeant Exam | 0% | 8.1% | 0.0 |
| 2008 Lawrence Sergeant Exam | 0% | 3.7% | 0.0 |
| 2006 Lowell Sergeant Exam | 0% | 19.4% | 0.0 |
| 2005 MBTA Sergeant Exam | 0% | 15.8% | 0.0 |
| 2007 MBTA Sergeant Exam | 0% | 3.7% | 0.0 |
| 2006 Methuen Sergeant Exam | 0% | 5.3% | 0.0 |

These six outcomes show adverse impact, failing the 80% rule of the UGESP. The pattern of AI is striking, despite the small numbers of applicants involved.[14]

Additionally, if the appointment results of these six department promotional exams are combined and considered in one analysis, the AI ratio is still zero, failing the 80% rule, and that result is statistically significance, with $p=.016$.[15] Statistically, one would expect at least 4 minority promotions to result from these exams. Zero is too far from 4 to have occurred by chance.

This adverse impact in appointment is driven by the adverse impact in passing and in test score, described above.

8. Summary and Conclusions

There is a clear pattern of adverse impact against minorities due to the written test in Sergeant exams. Given the civil service appointment rule (the 2N+1 rule) that requires appointment from among the highest ranking (passing) applicants, this adverse impact in the written test must, in most cases, lead to adverse impact in appointment. This adverse impact in appointment is seen clearly and is statistically significant for statewide Sergeant exams 2005, 2006, 2007 and 2008 and for the Boston Sergeant exams of 2005 and 2008. When we consider only the applicants and appointments for individual defendant police departments, we see that all 6 promotional examination processes involving the defendant departments had adverse impact ratios of zero. If considered separately, these adverse impact ratios of zero are not statistically significant, but I attribute that to the small numbers involved. The pattern is clear: the written tests have adverse impact in average score and percent passing, and this, almost inevitably, causes adverse impact in appointments.[16]

Signed: _/s/ Joel P. Wiesen_  Date: April 14, 2010

---

[14] The number of applicants appointed and the total number of applicants, considered together, are too small to allow for statistical significance in a statistical analysis of any of these 6 exams considered alone. In the field of statistics this lack of ability to show statistical significance is well known and is referred to as "low statistical power" resulting from small sample size. The recommended solution to low statistical power is to combine statistical analyses in some logical fashion, as I did here by aggregating the data from the 6 Police departments, reported in the next paragraph. The several AI analyses presented earlier in this report as well as this one, indicate that the finding of an AI ratio of zero for each of the 6 exams is not just due to chance.

[15] This probability of 0.16 is based on Fisher's Exact Test.

[16] The adverse impact of the written test will not always result in adverse impact ratios of zero for appointments but will cause the AI ratios to be well below equity.

## Attachment A: Resume of Joel P. Wiesen, Ph.D.

27 Judith Road                                          (617) 244-8859 (work)
Newton, Massachusetts 02459-1715                        (617) 332-6984 (home)

| | |
|---|---|
| Education | Ph.D. in Psychology, Lehigh University, 1975<br>M.A. in Psychology, C. W. Post College, 1969<br>B.A. in Psychology, Stony Brook State University, 1967 |
| Employment History | Consultant in Industrial Psychology, 1977 - present<br>Consult to public and private organizations, primarily in the areas of personnel assessment, selection, and layoff; develop tests of knowledge, ability, aptitude, and work-style; conduct applied research concerning employment in organizational settings. (Full-time since 1/94.)<br><br>Director of Test Development and Validation, 1977 - 1993<br>Massachusetts Department of Personnel Administration<br>Develop, implement and evaluate employee selection, promotion, and performance evaluation tools and programs; conduct applied research concerning civil service employment. (Part-time position 1987 to 1993.) |
| Professional Accomplishments | Plan, develop and implement programs in support of excellence and fairness in human resource management: develop culturally fair personnel assessment, selection and promotion tests and systems; conduct validation research and statistical analyses; develop diagnostic math tests for use in school settings; conduct program evaluation and redesign; expert witness in employment discrimination and sobriety testing cases; develop employee performance evaluation programs; and publish/deliver reports, papers. |
| Teaching Experience | Northeastern University, School of Engineering,<br>Engineering Management Program<br>Lecturer, 1978 - 1994<br><br>Lesley College, School of Management<br>Adjunct Faculty, 1989 - 1994<br><br>Kings College, Psychology Department<br>Asst. Prof. and Acting Department Chair, 1969 - 1975 |
| Professional Associations | International Public Management Association for Human Resources Assessment Council, American Psychological Association, Association for Psychological Science, New England Society for Applied Psychology, Society of Industrial and Organizational Psychology, American Statistical Association. |
| Professional Honors | Past-President of IPMA-Assessment Council, Past-President of the New England Society of Applied Psychologists. |
| Licensure | Licensed as psychologist in two states (Massachusetts and Pennsylvania). |

## Attachment B: List of Papers and Publications

(1998, May) *Development of a New Test of Mechanical Aptitude.* Invited presentation to the New England Society of Applied Psychologists (NESAP), Newton, MA.

(1999, June) *A Review and Critique of Published Aptitude Tests for Computer Programmer.* Paper presented at the annual meeting of the International Personnel Management Association's Assessment Council, Trade Winds Resort, FL.

(1999, June) *The WTMA: a Measure of Mechanical Aptitude With Reduced Adverse Impact.* Paper presented at the annual meeting of the International Personnel Management Association's Assessment Council, Trade Winds Resort, FL.

(2000, June) *Content-Oriented Cultural Bias Review of Test Questions.* Paper presented at the annual meeting of the International Personnel Management Association's Assessment Council, Arlington, VA.

(2001) *Technical Manual for the Diagnostic Test of Pre-Algebra Math (DT-PAM).* Applied Personnel Research, Newton, MA.

(2001, April) *Reducing Adverse Impact While Maintaining Validity; The Public Sector Experience: Some Possible Reasons for Adverse Impact.* Paper presented at the Annual Conference of the Society for Industrial and Organizational Psychology, San Diego, CA.

(2001, May) *Using Tests to Minimize Adverse Impact While Maintaining Validity.* Invited presentation to the Recruitment and Hiring Seminar of the Massachusetts Chiefs of Police Association Westborough, MA.

(2001, June) *Development of a New Test for Computer Programmer/Analyst Aptitude.* Paper presented at the annual meeting of the International Personnel Management Association's Assessment Council, Newport Beach, CA.

(2001, June) *Tutorial: Review of Multiple-Choice Test Items, With Emphasis on Cultural Bias.* Presented at the annual meeting of the International Personnel Management Association's Assessment Council, Newport Beach, CA.

(2002, April) *Review of Written, Multiple-Choice Test Items, With Some Emphasis on Cultural Bias.* Paper presented at the Annual Conference of the Society for Industrial and Organizational Psychology, Toronto, Canada.

(2002, July) *Developing Defensible Written Test Questions: Art, Science, and Some Guidelines* (with I. Gast, Ph.D. and D. Hamill). Paper presented at the annual meeting of the International Personnel Management Association's Assessment Council, New Orleans, LA.

(2002, July) *The PCBS: A Quantified, Public Safety Candidate Background Self-Report Instrument.* Paper presented at the annual meeting of the International Personnel Management Association's Assessment Council, New Orleans, LA.

(2002, October) *Some Possible Reasons for the Black-White Mean Score Differences Seen With Many Cognitive Ability Tests.* Paper presented at the annual meeting of the Institute for the Study and Promotion of Race and Cultures, Boston, MA.

(2003) *How to Prepare for the Mechanical Aptitude and Spatial Relations Tests.* Barrons Educational Series, Hauppauge, NY.

(2003) *Technical Manual For The Diagnostic Test for High School Math (DT-HSM),* Applied Personnel Research, Newton, MA.

(2003) *Technical Manual For The Language-Free Computer Programmer/Analyst Aptitude Test (LPAT),* Applied Personnel Research, Newton, MA.

(2003) *Technical Manual For The Police Candidate Background Self-Report (PCBS),* Applied Personnel Research, Newton, MA.

(2003) *Guidelines and Suggestions for Avoiding Cultural Bias in Multiple-Choice Test Questions.* Reprinted by the ERIC Clearinghouse on Counseling & Student Services (ERIC/CASS), in the 2003 ERIC/CASS publication, Measuring Up: Assessment Issues for Teachers, Counselors, and Administrators, edited by Janet Wall and Garry Walz.

(2003, June) *An In Depth, Content Review of Spatial Ability Tests.* Paper presented at the annual meeting of the International Personnel Management Association's Assessment Council, Baltimore, MD.

(2003, June) *The Potential of Diagnostic Math Tests.* Paper presented at the annual meeting of the International Personnel Management Association's Assessment Council, Baltimore, MD.

(2004, October) *Adverse Impact: Theory & Practical Approaches.* Invited Address to the MAPAC Training Workshop, New York, NY.

(2005, June) *Innovative, Psychometrically Sound Approaches to Hiring Firefighters,* Member Showcase Presentation to the New England Society for Applied Psychology, Weston, MA.

(2005, June) *Statistical Support of Test Fairness Reconsidered.* Paper presented at the annual meeting of the International Personnel Management Association's Assessment Council, Orlando, FL.

(2005, June) *Minimizing Adverse Impact: Learning from some Serious Flaws in the Wonderlic Personnel Test.* Paper presented at the annual meeting of the International Personnel Management Association's Assessment Council, Orlando, FL.

(June, 2006) *Thinking Outside the Box in Merit Selection.* Paper presented at the 30th Annual IPMAAC Conference on Personnel Selection, Las Vegas, NV.

(June, 2006) *Benefits, Drawbacks, and Pitfalls of z-Score Weighting.* Paper presented at the 30th Annual IPMAAC Conference on Personnel Selection, Las Vegas, NV.

(October, 2006) *Limitations and Flaws in the Research Supporting Field Sobriety Tests.* Invited address presented at the National Association of Criminal Defense Lawyers/National College for DUI Defense Seminar, Las Vegas, NV.

(November, 2006) *Thinking Outside the Box in Personnel Selection.* Invited address presented at the MAPAC Fall Conference, Princeton, NJ.

(June, 2007) *Possible New Approaches to Reduce Adverse Impact.* Paper presented at the 31st Annual IPMAAC Conference on Personnel Assessment, St. Louis, MO.

(June, 2007) *Tips on Writing an Expert Witness Report.* Paper presented at the 31st Annual IPMAAC Conference on Personnel Assessment, St. Louis, MO.

(June, 2007) *Introduction to Using SPSS Command Files.* Paper presented at the 31st Annual IPMAAC Conference on Personnel Assessment, St. Louis, MO.

(August, 2008) *Six Alternative Methods of Use of Employee Selection Test Data.* Poster session at the 116th Annual Convention of the American Psychological Association.

**Publications and Papers Since October, 2008**

Joel P. Wiesen, Ph.D.
April 14, 2010

The following short list updates the list of publications and papers in Attachment B to my first expert report in Lopez et al. v City of Lawrence et al.

(November, 2009) *MAPAC invited address: The Recent Judicial Decision Concerning Two NYC Firefighter Exams.* MAPAC Fall Conference. Albany, NY

(April, 2010) *A Hypothetical, Novel Employee Selection System to Reduce Adverse Impact and Improve Job Performance for Fire Lieutenant: Musings of a Practitioner.* The Industrial-Organizational Psychologist. (Retrieved 4/14/10 from http://www.siop.org/tip/April10/03wiesen.aspx).

(April, 2010) *New Methods for Reducing Adverse Impact and Preserving Validity* (with H. Aguinis). Symposium presentation at the 25th Annual Convention Society for Industrial and Organizational Psychology, Atlanta, GA.