PEDRO LOPEZ, ET AL., Plaintiffs

v.

City of Lawrence, Massachusetts, et al. Defendants

Case No. 07—CA-11693-JLT

Report of Cassi L. Fields, Ph.D.

Prepared by:

Cassi L. Fields, Ph.D.
President/CEO
Fields Consulting Group, Inc.
7926 Jones Branch Drive
Suite 200
McLean, VA  22102

March 30, 2010

# Table of Contents

**Part One: Introduction** ........................................................................................... **4**
**Qualifications** ........................................................................................................... **4**
**Dr. Wiesen's Expert Reports** ................................................................................. **5**
**Statistical Analysis Framework** ............................................................................. **6**
**Pass/Fail Ratios for the Statewide Exam, by Ethnic Group** ................................. **7**
**Setting a Pass/Fail Score** ........................................................................................ **7**
**The Passing Value of 70** .......................................................................................... **8**
**Statewide and BPD Pass/Fail (P/F) Statistics for Police Officers and Police Sergeants**
**taking the Identical Police Sergeant Test Items** .................................................... **9**
2004 Statewide Exam Pass/Fail (P/F) Statistics, by Ethnic Group .......................... 9
2005 Statewide Exam P/F Statistics, by Ethnic Group ............................................ 10
2006 Statewide Exam P/F Statistics, by Ethnic Group ............................................ 10
Summary of Pass/Fail Data of the Massachusetts Police Sergeant Exam, 2004 - 2006 ......... 10
**Aggregation of Selection Rate Data** ...................................................................... **10**
Promotions from Statewide Exams 2003-2007, excluding BPD, by Ethnic Group .............. 11
Promotions from Statewide Exams 2006-2007, excluding BPD, by Ethnic Group ............. 12
2005 Boston Police Department (BPD) Sergeant Promotions, by Ethnic Group ................... 12
Promotions from Statewide Exams 2005-2007, excluding BPD and 2003-2004 Statewide
Exams, by Ethnic Group ........................................................................................... 13
Promotions from Statewide Exams 2005-2006, Excluding BPD, by Ethnic Group ............. 13
Promotions from the Statewide Exams, by Ethnic Group, by individual year, 2004-2006.... 14
Summary of Candidates Promoted From the Statewide Exam, by Ethnic Group, 2003-2007 .. 14
Dr. Outtz's and Dr. Silva's Shortfall Analysis ........................................................ 15
Summary of Candidates Promoted From the BPD Exam, by Ethnic Group, 2005 and 2008 .. 15
**Summary** .................................................................................................................. **16**
**What did Plaintiff's Expert Dr. Frank J. Landy Conclude About the 2005-2007 Police**
**Sergeant Exam, By Ethnic Group** .......................................................................... **16**
**CONTENT VALIDITY** .......................................................................................... **16**
A Review Of HRD's Content Validation Study, Step By Step ................................. 18
   1.   An analysis of the target position for which the test is intended for use. This
       analysis should include an analysis of the critical tasks, and important knowledge,
       skills, abilities and other characteristics (KSAs) needed in the target position. The
       job analysis must be thoroughly documented. ........................................................ 18
   2.   After a list of critical tasks and KSAs are identified, there must be a sound
       statistical or rational method to tie the KSAs to the critical tasks. Further, there
       must be a sound statistical or rational method to identify the relative importance of
       the KSAs. This must be thoroughly documented. ................................................ 19
   3.   The test developer must then identify a test plan based upon the important KSAs,
       and the best format for the test to measure the important KSAs. This must be
       thoroughly documented. ......................................................................................... 19
   4.   Next, the test developer should evaluate alternative test methods that would still
       measure the important KSAs, but potentially minimize group differences. This
       must be thoroughly documented. ........................................................................... 20

5.    Next, the test developer develops testing instruments, generally working with subject matter experts (SMEs) who assist with generating test content. This must be thoroughly documented...................................................................................... 25

6.    Once the draft test is developed, the test developer takes the SMEs through a series of content validation steps which should include formally linking the test content to the job content (i.e., job analysis), formally evaluating objective and subjective rating criteria for accuracy and difficulty, and formally linking those criteria to the job data. Each linkage step must be independent, unbiased and thoroughly documented.......................................................................................................... 26

**Other Issues that related to the Content Validity of the BPD Police Sergeant Exam ..... 27**

Open-Book v. Closed-Book Test Formats ............................................................................ 27

**Conclusions........................................................................................................................... 28**

**References ............................................................................................................................. 29**

**Attachment 1 ........................................................................................................................ 31**

**Resume of Dr. Cassi L. Fields .............................................................................................. 32**

**Materials Received and Reviewed ........................................................................................ 33**

**Compensation........................................................................................................................ 34**

## Part One: Introduction

The Commonwealth of Massachusetts Human Resources Division (HRD) has been administering Police Sergeant Exams for jurisdictions in the Commonwealth who request an exam for this rank since at least 1991. The Police Sergeant exam consists of a written test along with an evaluation of education and experience. Typically, the written test consists of 80 questions and is weighted 80% of the final combined score, and the education and experience component accounts for 20% of the final combined score. Jurisdictions have the option to add in additional components, such as an assessment component, if they choose.

I am not going to spend a significant amount of time reviewing the education and experience (E&E) test component since it had very little impact on the combined Sergeant Exam scores, or stated another way, it had minimal impact on the spread of candidate scores. The reason it had so little impact on the combined Sergeant test scores is that it possesses very little score variance. Scores on this component ranged from 14 to 20 points. When scores have so little variance, they do not have much influence on overall score or the spread of scores. In addition, the E&E component has moderate adverse impact, a bit less than the written test score adverse impact. If it had larger variance, the E&E would have caused a small reduction in the combined Sergeant test score adverse impact. But, with so little variance and with moderate adverse impact, it had almost no impact on the written test score's adverse impact. Therefore, my review focuses on the written test component which accounts for a much larger portion of the final Sergeant Exam scores.

## Qualifications

My area of expertise is public safety promotional testing. I received my Ph.D. in Industrial/Organizational Psychology in 1989 from the George Washington University. I am currently a member of several professional organizations including the American Psychological Association, the Virginia Public Safety Foundation (Board of Directors), the Virginia Police Chiefs, and the International Association of Police Chiefs (IACP). In 2007, I was appointed to the IACP Diversity Council by the President of the IACP, and I am still an active member. I served as the President of the Personnel Testing Council (PTC) of Metropolitan Washington in 2007, and held several PTC board member positions prior to that. I am frequently asked to make presentations to professional organizations such as the Commission on Accreditation for Law Enforcement (Summer 2009), and state fire and police chief organizations such the Florida Fire Chief Organization in 2007. I have developed, validated and administered promotional exams for the rank of Police Sergeant at least 50 times. The total number of pubic safety exams I have developed, validated and administered exceeds 500. Some of the police exams I have developed were for very large candidate pools, for example:

Memphis, Tennessee (approximately 1,000 candidates)
Fairfax County, Virginia (approximately 1,000 candidates)
Macon, Georgia (approximately 200 candidates)

Richmond, Virginia (approximately 200 candidates)
Prince Georges County, Maryland (approximately 200 candidates)
Charlotte, North Carolina (approximately 200 candidates)
St. Louis, Missouri Police Department (approximately 200 candidates)
Metro Washington Transit Authority (approximately 50 candidates)

Due to the passing of Frank Landy, an expert on the current case, I have been asked to step in to provide my expert opinion of the Massachusetts Police Sergeant Exams administered statewide in 2005, 2006 and 2007, and separately in the Boston Police Department (BPD) in 2005. I base my opinion on my review of the six expert reports that have been submitted to date, along with some data I received from Dr. Wiesen in March 2010 (Attachment 1). I have been asked to review the reports and this last set of data only. I do not have the supporting documentation for the reports such as the depositions that have been taken, job analysis studies, tests, or other information. Therefore, I reserve the right to modify or amend my conclusions should I receive additional information about this case.[1]

I reviewed the reports and the data I received in March 2010 to evaluate:

1) the adverse impact in the written tests,
2) the adverse impact in the selection rates from the HRD tests,
3) the validity of the HRD tests, and
4) potential alternatives not used by the HRD to maximize validity and minimize adverse impact.

## Dr. Wiesen's Expert Reports

In his first Expert Report dated October 3, 2008, Dr. Wiesen reviewed historical data from the Massachusetts HRD Police Sergeant exam from 2003 – 2007. He looked at each year individually and then combined the data for different set of years, with and without the Boston Police Department data, in preparation for objections that might be received by the Defendants. He also provided a Supplemental Expert Report on March 30, 2009. Initially, I was confused about inconsistencies in the adverse impact ratios reported in the 2005 and 2006 Statewide exams between Dr. Wiesen's report (October 3, 2008) and Dr. Silva's report (February 9, 2009). I have learned that Dr. Silva's report may be based upon a more accurate data set than Dr. Wiesen's. I have also learned that HRD's data are in a constant state of revision due to additional hires, corrections in inaccurate data, and due to the fact that the expiration dates of all promotional lists from each year are different. This means that some of the lists had not expired at the time Dr. Wiesen wrote his reports (October 3, 2008), and promotions were still being made and reported. I believe that Dr. Silva's data (February 9, 2009) are most current and accurate. My conclusions are based upon those data, and the data

---

[1] During the course of this case, I may be asked to calculate or confirm various statistics including, but not limited to, means, standard deviations, chi squares, probability values, adverse impact ratios and standard deviation units. I may also be asked to review the data used to write the reports by the various experts. In the event I do so, I reserve the right to revise my conclusions based upon those analyses.

I recently received from Dr. Wiesen in March 2010. I reserve the right to change or modify my conclusions as I receive more data or as more data become available.

# Statistical Analysis Framework

I concur with Dr. Wiesen's (October 3, 2008) three step analysis of adverse impact. These are described below.

1. One method to evaluate adverse impact is the 80% rule provided by *The Uniform Guidelines on Employee Selection Procedures* (henceforth, the *Uniform Guidelines*, EEOC, 1978) which states that if the selection rate for the group with the lower selection rate is less than 80% of the selection rate for the group with the higher selection rate, there is a practical difference in group selection rates.
2. A second method to evaluate adverse impact is the statistical significance of the selection rate differences which tell us whether the selection rate differences would likely occur by chance alone.
3. A third method to evaluate adverse impact is the number of standard deviation units that are equal to the statistical significance (probability). The reason this is important is because it tells us how far outside normal expectations the selection rate difference falls. It provides the same information as statistical significance in # 2 above, but in a slightly different manner. It also allows us to evaluate the adverse impact based upon the U.S. Supreme Court decision in Castaneda v. Partida, 430 U.S. 482 (1977) in which the Court said "if the difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that the [event] jury drawing was random would be suspect to a social scientist."

Based upon my experience in administering public safety exams to both small and large populations, I used the following criteria in my analyses:

- Adverse impact ratios at around .7 and higher generally indicate minimal adverse impact as it relates to the *Uniform Guidelines* (EEOC, 1978) 80% rule
- Adverse impact ratios at between about .5 and .7 generally indicate moderate adverse impact as it relates to the *Uniform Guidelines* 80% rule
- Adverse impact ratios lower than .5 generally indicate severe adverse impact as it relates to the *Uniform Guidelines* 80% rule
- Adverse impact ratios that are not statistically significant and fall within one standard deviation unit indicate no adverse impact
- Adverse impact ratios that are statistically significant and fall around or somewhat above two standard deviation units indicate minimal- moderate adverse impact
- Adverse impact ratios that are statistically significant and fall above three standard deviation units indicate severe adverse impact

When evaluating adverse impact ratios, we must examine the 80% rule in conjunction with statistical significance plus what the statistical significance equates to in terms of the number of standard deviation units.

In this report, I am looking at a pattern of adverse impact that has occurred over time. The reason I quantify the degree of adverse impact (minimal, moderate or high) is because it tells me how serious the adverse impact is, and it shows me whether or not HRD has made progress in minimizing it over time.

## Pass/Fail Ratios for the Statewide Exam, by Ethnic Group

Dr. Wiesen informed me that the test items for each Statewide test are identical within a specific year, but they are modified or changed from year to year. In his report (October 3, 2008), Dr. Wiesen also indicated that the outline and general test references (books the candidates must read to prepare for the exam) are similar, but not identical, year to year. The Boston Police Department Exam consists of unique test questions that assess the BPD specific policies and procedures. Their source material may have some overlap with the Statewide test, but that source material also includes specific material for their Department.

Given the fact that test items are different year to year, I decided to review the pass/fail data for each year individually from 2004 – 2007, understanding that 2004 is not central to this case. Dr. Landy (October 30, 2008) clearly explained that the passing score for each exam was set at 70. I will speak more to the passing value of 70 later in this report.

## Setting a Pass/Fail Score

When Industrial/Organizational Psychologists set passing scores, they generally use one of two professionally accepted methods – a rational method or a correlation method. In the rational method, subject matter experts are asked to independently quantify, for each item in the test, whether a "minimally competent" candidate would get the item correct. The rating scale might be five to seven points, where a rating of 1 means the minimally competent candidate is likely (100% chance) to get the item correct and would view it as easy, and 7 means the minimally competent candidate is unlikely to get the item correct (25% chance) and would view the item as hard. In order to estimate the overall difficulty of the test before the test is administered, these probability ratings are averaged. If a test developer was attempting to set the passing score to 70%, then the average of the estimated item difficulties for minimally competent candidates must be 70.

Another common method for setting passing scores is to conduct a correlation between the test scores and a job performance measure. When using this procedure, the test developer must collect test score data over time which was clearly available, and then this same group of candidates must be assessed on their job performance so the data from the test can be correlated with job performance. These correlations can be very informative about passing scores. The test user can verify whether persons achieving a score of 70% are successful at performing the job and at what level. If they are performing at a very high level, for example, then perhaps 70 is too high of a passing score. Or conversely, if they are performing at a very low level, perhaps 70% is too low of a passing score. These

7

correlations were never calculated so we cannot know if the passing score has any relation to job performance.

It is clear from the six reports I read, that there was no attempt to set the passing score of 70 using professionally sound methods. In his supplemental report (March 31, 2009), Dr. Landy concluded that the passing score and selection strategies used for the Sergeant exams are not supported by job analysis, reliability or validity data.

## The Passing Value of 70

The passing score was set to 70 based upon tradition (Dr. Wiesen, October 3, 2008), not based upon sound professional methodology. Dr. Outtz (February 9, 2009) viewed the passing score in the BPD and the other jurisdictions as irrelevant because the selection is based upon a banding procedure, and he concludes that the BPD, in particular, never gets to scores of 70 because there are not enough vacancies. So, in his opinion the 70 passing score is only figurative, not literal.

While the intention may have been to use banding, the selections were in actuality based upon strict rank-ordering, and, in this case, rank-ordering is not supported by any validity data. The bandwidth was quite small. If there was one vacancy, the bandwidth would be 3 (2N+1, N=1). Banding can be useful because it allows the selecting officials to consider other job-related factors when selecting from the band. In some instances, this may allow selecting officials to have more opportunity to consider minorities who score lower than non-minorities, with the added benefit of reducing adverse impact. But, when the bandwidth is this small, and minorities score much lower than non-minorities, than the opportunity to consider more minorities is diminished. Further, some selecting officials do not have clear job-related criteria for considering all individuals within the band, so they end up selecting in strict rank-order based upon the promotional test score. So, the combination of small bandwidth, much lower minority test scores than non-minorities, and a lack of job-related criteria from which to consider individuals lower in the band, practically excludes minorities from consideration.

I want to further demonstrate that few minorities relative to non-minorities who take the Police Sergeant Exam get into promotional range. For example in 2006, in 13 of 15 jurisdictions, there were zero minority candidates who were selected. In reviewing Dr. Silva's Table 4 on page 5 of his expert report (February 9, 2009), we can follow the pattern of how 67 minorities took the test across jurisdictions. Then, only 36 passed (Wiesen, p. 42, October 3, 2008) which is 5.4% of the total 2006 minority population, and then only 2 minorities were selected across all 15 jurisdictions (5.5% of those who passed and 2.9% of those who participated in the process). So, in jurisdictions where zero minorities were selected, it is likely that in many of those jurisdictions, there were zero minorities who passed and were in the consideration pool. I calculated this by multiplying .055 (the percent who passed) times the number of minority candidates who participated in each jurisdiction. For example, in a jurisdiction with 2 minority applicants, .11 (.055 times 2), or in other words near zero, of the applicants would be in the consideration pool. My example holds for the

8

2005, 2006 and 2007 Statewide exam results as well as the data reported by Dr. Silva in February 2009.

## Statewide and BPD Pass/Fail (P/F) Statistics for Police Officers and Police Sergeants taking the Identical Police Sergeant Test Items

There is an overlap in the test questions on the Statewide Police Sergeant Exam and the Statewide Police Lieutenant Exam, with 53 items that are the same in each exam. There is also overlap in the BPD Police Sergeant Exam and BPD Police Lieutenant Exam. In those exams, 80 items are matching. Dr. Silva (February 9, 2009) analyzed the responses for each of these exams and found that "89% of the current sergeants scored 70 percent correct or higher on the 53 matching items in the BPD Police Lieutenant Exam. In contrast, only 63% of the police officers scored at or above 70% correct on the same 53 items" (p. 2). From these data, I conclude that 11% of current sergeants scored below 70%, or failed, these items. This is a very large percentage of current sergeants who failed the same set of items that police officers are taking to become sergeants.

In the same report, Dr. Silva concluded that "79% of the current sergeants scored 70 percent correct or higher on the matching 80 items. In contrast, only 51% of the police officers scored at or above 70% correct on these 80 items" (p. 2). From these data, I conclude that 21% of current sergeants scored below 70%, or failed, these items. This is a very large percentage of current sergeants who failed the same set of items that police officers are taking to become sergeants.

I would expect that few, if any, current police sergeants would fail the same items that police officers are taking to become police sergeants.

Dr. Silva did not analyze pass/fail adverse impact rates in his expert report (February 9, 2009).

In the next section of this report, I discuss the high adverse impact in the Police Sergeant exam pass/fail rates in the years 2004-2006.

### 2004 Statewide Exam Pass/Fail (P/F) Statistics, by Ethnic Group

I am aware that the 2004 data are not part of the current case, however I reviewed the data to understand the historical nature of adverse impact in the Commonwealth of Massachusetts Police Sergeant Exams (statewide exam).

In 2004, the statewide exam was administered to 48 minority candidates and 331 non-minority candidates. The P/F adverse impact ratio is .59. This ratio had a probability of occurring less than .001 which would occur by chance 1 time in one thousand. This probability equates to 3.6 standard deviation units. According to the criteria I laid out above,

this is very high statistical adverse impact that is also practically significant and damaging to minorities.

### 2005 Statewide Exam P/F Statistics, by Ethnic Group

In 2005, the statewide exam was administered to 53 minority candidates and 193 non-minority candidates. When Dr. Wiesen conducted his 2008 analysis, the adverse impact ratio for P/F is .54. This ratio had a probability of occurring less than .028 which would occur by chance 2.8 times in one hundred. This probability equates to 2.2 standard deviation units. According to the criteria I laid out above, this is high adverse impact based upon the 80% rule and statistically moderate adverse impact. This adverse impact is also practically significant and damaging to minorities.

### 2006 Statewide Exam P/F Statistics, by Ethnic Group

According to Dr. Wiesen's Expert Report (October 3, 2008), the pass/fail rates demonstrate adverse impact against minorities in the 2006 statewide Police Sergeant Exam. The adverse impact ratio is .76. This ratio had a probability of occurring less than .006 which would occur by chance 6 times in one thousand. This probability equates to 2.74 standard deviation units. According to the criteria I laid out above, this is minimal adverse impact based upon the 80% rule, but it is statistically significant and would be considered moderate to high adverse impact. This adverse impact is also practically significant and damaging to minorities.

### Summary of Pass/Fail Data of the Massachusetts Police Sergeant Exam, 2004 - 2006

The pass/fail data from 2004 – 2006 suggest a problem. Therefore, I think examining how many minorities and non-minorities are selected across jurisdictions based upon these data is appropriate. Just because there are a relatively small number of minorities participating in these promotional processes does not unburden HRD from analyzing adverse impact.

I am not opposed to aggregating these data especially since that is how HRD has been analyzing the data (see Attachment E: Second Example of Data Aggregation by HRD, Dr. Wiesen's Supplemental Expert Report, March 2009). With or without aggregation, I think there is a clear pattern of adverse impact in pass/fail ratios.

# Aggregation of Selection Rate Data

Before I reviewed the aggregated data for selection rates across jurisdictions in the Commonwealth of Massachusetts, I looked at the data year by year which shows a definite pattern of adverse impact over time.

I entirely agree with the reasoning behind, and approach to, aggregating the selection rate data across jurisdictions in Massachusetts for the years 2005, 2006 and 2007 given the pattern of adverse impact that has emerged in both the pass/fail rates and the selection rates.

On page 13 of Dr. Outtz's Expert Report (February 2009), he quotes the answer to question number 21 from the *Adoption of Questions and Answers to Clarify and Provide a Common Interpretation of the Uniform Guidelines on Employee Selection Procedures (EEOC, 1978)*. The question asks what a test user must do when their sample size is "so small that it is more likely than not that the difference could have occurred by chance." Essentially, the answer says that if a test user does not have sufficient sample size to properly evaluate adverse impact, it is not required to do so nor to present a proper validation study. But Dr. Outtz left out the following concluding paragraph from his quote:

"On the other hand, if a lower selection rate continued over a period of time, so as to constitute a pattern, then the lower selection rate would constitute adverse impact, warranting the need for validity evidence."

I noted that Dr. Landy in his Supplemental Report (March 31, 2009) quoted the same information as I just quoted.

I also agree that Boston can and should be analyzed separately since their exam was customized to their department.

Why is aggregation psychometrically and practically appropriate? HRD appeared to have the following goals: 1) provide a qualified list of candidates for Sergeant positions throughout the Commonwealth, 2) develop a Police Sergeant Exam each year that was similar or parallel to previous years, 3) develop the exam based upon a consistent test outline, presumably to accomplish the first and second goal, and 4) to rely on the same set of reference material from which to draw test questions. Whether or not the HRD Police Sergeant Exams accomplish their goal of selecting qualified candidates for the position of Sergeant, these are still the apparent goals. Therefore, aggregating the data to analyze whether they are successful in identifying qualified candidates for promotion in an unbiased manner is perfectly justified.

## Promotions from Statewide Exams 2003-2007, excluding BPD, by Ethnic Group

The aggregated selection rate data from all HRD Police Sergeant Exams from 2003-2007, excluding the Boston Police Department, show very high adverse impact against minority candidates. Dr. Wiesen (October 3, 2008) conducted this analysis excluding BPD data in case the Defendant claims that the exam for BPD exam was dissimilar to the statewide exam. While the 2003 and 2004 statewide exams are not part of this case, these data contribute to my concern that there is a consistent pattern of adverse impact against minority candidates who are competing for Police Sergeant positions.

The total number of candidates who participated in the testing process over these five years is 1,391. Of these, 1,177 candidates are non-minorities and 214 candidates are minority. The total number of non-minority candidates selected is 192, and the total number of minority candidates selected is 18. The proportion of non-minority candidates selected is 16.3%, and

the proportion of minority candidates selected is 8.4%. When minority promotions are compared to non-minorities promotions, the adverse impact ratio is .52. This is statistically significant adverse impact. This ratio had a probability of occurring less than .004. This probability would occur by chance 4 times in one thousand. This probability equates to 2.9 standard deviation units. According to the criteria I laid out above, this is high adverse impact based upon the 80% rule and it is also statistically high adverse impact.

Only 18 minority candidates as compared to 192 non-minority candidates were selected across the entire Commonwealth of Massachusetts. This is statistically significant, practically significant and damaging adverse impact to minorities.

## *Promotions from Statewide Exams 2006-2007, excluding BPD, by Ethnic Group*

On March 16, 2010, I received additional data from Dr. Wiesen as shown in Attachment 1. Three jurisdictions – Lowell, Lawrence and the Massachusetts Bay Area Transit Authority (MBTA) reported promotions in 2006 and 2007. The pattern of adverse impact in promotions as I described above continues. Seventeen (17) of 121 non-minority candidates and zero (0) of 31 minority candidates are promoted. This is an adverse impact ratio of zero (0), which is statistically significant and has a probability value of .044. This means that this outcome would occur by chance about 4 times in 100. Statistically, I would classify this as moderate adverse impact, but practically significant and damaging to minorities.

## *2005 Boston Police Department (BPD) Sergeant Promotions, by Ethnic Group*

Given Dr. Wiesen's (October 3, 2008) exclusion of the BPD from his aggregated analysis above, I wanted to look directly at the selection data for Police Sergeant at the BPD. The selection data for the BPD Police Sergeant Exam in 2005, as reported by Dr. Silva (February 9, 2009), shows high adverse impact against minority candidates. There were 9 minority candidates selected from a pool of 226 minority candidates, and 57 non-minority candidates selected from a pool of 382 non-minority candidates. This adverse impact ratio is .28 which, according to the criteria I laid out earlier, is high adverse impact. It is also highly statistically significant. Based upon my experience, this adverse impact is extremely high.

Only 9 minority candidates as compared to 57 non-minority candidates were selected in the BPD in 2005. This is statistically significant, practically significant and damaging adverse impact to minorities, and it has lasting impact on diversity in that Department in upper ranks for years to come because there will be so few minority applicants eligible for future promotions at higher ranks.

On March 16, 2010, I received additional data for the 2005 and 2008 BPD Sergeant Promotional Exams (Attachment 1). The updated adverse impact ratio for 2005 is .28 which is highly statistically significant (probability = .00004 which means this would occur by chance 4 times in one million). This adverse impact is practically significant and damaging to minorities. In 2008, the adverse impact ratio is .05 (probability = .00002 which means this

would occur by chance 2 times in one million). This is one of the highest adverse impact ratios I have ever observed. This is statistically significant, practically significant and damaging adverse impact to minorities.

## *Promotions from Statewide Exams 2005-2007, excluding BPD and 2003-2004 Statewide Exams, by Ethnic Group*

In this analysis, Dr. Wiesen (October 3, 2008) excluded the BPD Police Sergeant Exam and the earlier 2003-2004 Statewide Police Sergeant Exams. These combined data show adverse impact. Based upon the new data I just received in Attachment 1, only 5 of 142 minority candidates as compared to 84 of 722 non-minority candidates were selected across the entire Commonwealth of Massachusetts from the 2005-2007 Statewide Exam. These numbers reflect the additional 31 minority candidates who took the Statewide Exam, and the 138 non-minority candidates who took the Statewide Exam. The adverse impact ratio is .33 which is severely high adverse impact according to the 80% rule. This is practical and damaging adverse impact to minorities. These data may be updated if I receive new information.

## *Promotions from Statewide Exams 2005-2006, Excluding BPD, by Ethnic Group*

In this analysis, Dr. Wiesen (October 3, 2008) combined the statewide Police Sergeant Exams for 2005 and 2006, excluding BPD. These combined data show adverse impact. The adverse impact ratio is .34 which is high adverse impact using the 80% rule. It is also statistically significant at the .04 level meaning that this outcome would occur by chance 4 times in 100. This probability equates to 2.1 standard deviation units. I conclude that, statistically, this adverse impact is moderately high.

Based upon the data I just received in Attachment 1, the pattern of adverse impact observed in 2005-2006 is consistent into 2007 across jurisdictions that are using the Police Sergeant Exam.

## Promotions from the Statewide Exams, by Ethnic Group, by individual year, 2004-2006

In my opinion, the selection rate data across all years should be aggregated. But, when analyzing the selection ratios for minority and non-minority candidates for each year the HRD Statewide Police Sergeant exam was administered, I still observe a pattern of adverse impact:

- The selection rate adverse impact from the 2004 exam is statistically significant, and I would characterize this adverse impact as severe (.36) when using the 80% rule.
- The selection rate adverse impact from the 2005 exam is statistically significant, and I would characterize this adverse impact as severe (.22).
- The selection rate adverse impact from the 2006 exam is statistically significant, and I would characterize this adverse impact as severe (.26).
- Recent data from 2006 and 2007 as shown in Attachment 1 show a similar pattern of adverse impact. Combined data from three local jurisdictions show significant adverse impact. No minorities were selected of 31 minorities, and 17 of 121 non-minorities were selected. The adverse impact ratio is zero (0). Practically, this is severe adverse impact. Statistically, this adverse impact is significant with a probability of occurring by chance equal to .04.

Even with these small sample sizes, we observe very high adverse impact in years 2004, 2005, 2006 and with the same pattern emerging in 2007. In 2004, only 36% of the minorities are selected as compared to the non-minorities. In 2005, only 22% of the minorities are selected as compared to the non-minorities. In 2006, only 26% of the minorities are selected as compared to the non-minorities. In addition, to any person involved in this process, they would observe that the absolute number of minority candidates selected are very low. The table below summarizes this pattern:

## Summary of Candidates Promoted From the Statewide Exam, by Ethnic Group, 2003-2007

| Year | Number of Minorities Selected | Number of Non-Minorities Selected |
|---|---|---|
| 2003 | 10 | 67 |
| 2004 | 3 | 58 |
| 2005 | 2 | 28 |
| 2006 | 2 | 29 |
| 2007 | 0 | 17 |
| TOTAL | 17 | 199 |

From this table and all of the other data discussed, I observe a pervasive pattern of adverse impact. Only 17 minority candidates were selected into the position of Police Sergeant in

14

four years out of 216 total selections, while 199 non-minority candidates were selected across the entire Commonwealth of Massachusetts. Over eleven times the proportion of non-minority candidates as compared to minority candidates was selected in those years (adverse impact ratio = .09). In 2007, no additional minorities were selected.

## Dr. Outtz's and Dr. Silva's Shortfall Analysis

I do not agree with Dr. Outtz's (February 9, 2009) or Dr. Silva's (February 9, 2009) method to consider what would happen if one additional minority and one less non-minority were promoted in each jurisdiction. The theory behind the shortfall analysis is that if one or two additional minorities were promoted or one or two non-minorities were not promoted in a particular jurisdiction, then the observed adverse impact is questionable because minor changes in selection rates would produce non-significant outcomes. But, this is not what Dr. Outtz or Dr. Silva did when they performed their shortfall analysis. They asked what would happen if one additional minority was hired and simultaneously one less non-minority was hired in 15 jurisdictions. This is not the addition of one or two more minorities or the subtraction of one or two non-minorities. This is, instead, the addition of 15 minorities and the subtraction of 15 minorities across 15 jurisdictions.

The shortfall analysis is also faulty because the pattern of zero minorities being selected is apparent. Dr. Silva's shortfall analysis assumes the pattern will be broken by the sudden selection of one minority across multiple jurisdictions. Why should we assume that one additional minority will be selected in each of these jurisdictions when not one minority, over several jurisdictions, has been selected for years? In addition, minorities fail the Police Sergeant Exam at a much higher rate than non-minorities and, as a result, fail to get into the consideration pool. The shortfall analysis misleads one into thinking that now suddenly more minorities will pass the exam and get into consideration range. This does not make sense.

## Summary of Candidates Promoted From the BPD Exam, by Ethnic Group, 2005 and 2008

Using the data I received on March 16, 2010 (Attachment 1), I see that the updated adverse impact ratio for the 2005 BPD Police Sergeant Exam is .28 which is highly statistically significant (probability = .00004 which means this would occur by chance 4 times in one hundred thousand). This adverse impact is practically significant and damaging to minorities. In 2008, the adverse impact ratio for the BPD Police Sergeant Exam is .05 (probability = .00002 which means this would occur by chance 2 times in one hundred thousand). This is one of the worst adverse impact ratios I have ever observed. This is statistically significant, practically significant and damaging adverse impact to minorities.

The 2008 data show that the adverse impact in selections for the BPD Police Sergeant Exam is getting worse. I can only conclude that the BPD is not making the effort needed to minimize group differences in its Police Sergeant promotional process.

## Summary

I conclude that there is a pattern of adverse impact in the selection of minority candidates for the position of Police Sergeant across the Commonwealth of Massachusetts in the years 2005-2007, and this pattern emerged earlier than 2005. There is also sufficient data from the Boston Police Department to conclude that there is significant adverse impact in the Boston Police Department against minority applicants applying for the position of Police Sergeant in 2005 and 2008.

I conclude that the picture is troubling when the selection data from the individual years are analyzed. When the entire picture is analyzed in aggregate, there can be no dispute that there is a pattern and practice that disproportionately selects out minority candidates who are attempting to get promoted in the BPD and in the Commonwealth of Massachusetts.

## What did Plaintiff's Expert Dr. Frank J. Landy Conclude About the 2005-2007 Police Sergeant Exam, By Ethnic Group

Dr. Landy focused on the years 2005-2007 and clearly concurred with Dr. Wiesen (October 3, 2008 and March 30, 2009). He concluded that there was adverse impact in pass/fail rates and in selection rates against minority candidates.

In his report, Dr. Landy (October 30, 2008) then went on to analyze whether there was sufficient validity evidence to support the use of exams with significant adverse impact. He noted many flaws in the HRD's validity study conducted in 2002 that was used for subsequent exams, and he noted many flaws in the historical validity data (prior to 2002) for the statewide Police Sergeant and the BPD exams.

Dr. Landy did not change his opinion in his Supplemental Report (March 31, 2009). He emphasized that there is substantial adverse impact in the 2005-2007 statewide exams and in the 2005 BPD exam. He reiterated the lack of content validity and the weakness of all previous content validation efforts. He re-emphasized the problem with the use of strict rank ordering of test scores since it is not substantiated by reliable data. He also reinforced the need to search for, and include alternatives, that may reduce adverse impact. In all of these conclusions, I agree entirely.

## CONTENT VALIDITY

In this section of the report, I analyze and evaluate the content validation study conducted by the Commonwealth of Massachusetts HRD for the Police Sergeant promotional examination.

Since at least 1991, the Police Sergeant Examination has consisted of a written exam, along with an assessment of education and experience (E&E). HRD based their test development for the statewide exams and the 2005 BPD exam on a job analysis conducted in 2002 by Morris & McDaniel, Inc.

An appropriate content validation study consists of at least the following steps (e.g., Goldstein, Zedeck, and Schneider, 1992):

1. An analysis of the target position for which the test is intended for use. This analysis should include an analysis of the critical tasks, and important knowledge, skills, and abilities (KSAs) needed in the target position. The job analysis must be thoroughly documented.
2. After a list of critical tasks and KSAs are identified, there must be a sound statistical or rational method to tie the KSAs to the critical tasks, thus providing evidence that critical tasks cannot be performed without possession of the KSAs. Further, there must be a sound statistical or rational method to identify the relative importance of the KSAs. This must be thoroughly documented.
3. The test developer must then identify a test plan based upon the important KSAs, and the best format for the test to measure the important KSAs. This must be thoroughly documented.
4. Next, the test developer should evaluate alternative test methods that would still measure the important KSAs, but potentially minimize group differences. The *Uniform Guidelines* (EEOC, 1978) places the burden for searching for equally valid alternatives with less adverse impact on the test user, but courts, in their Title VII rulings, have placed the burden on plaintiffs as well. Most professionals agree that it is good practice to search for alternatives that accomplish the intended goal of selecting qualified individuals but at the same time reducing adverse impact. This must be thoroughly documented. The reasons for this are evident: test developers who work for a client want their tests to be defensible and produce tests for their clients that accomplish the intended goals. When the search for alternatives is rigorous and properly documented, this will help the test developer continue to improve his/her testing instruments and reduce adverse impact in future administrations.
5. Next, the test developer develops testing instruments, generally working with subject matter experts (SMEs) who assist with generating test content. This must be thoroughly documented.
6. Once the draft test content is developed, the test developer takes the SMEs through a series of content validation steps which should include formally linking the test content to the job content (i.e., job analysis), and formally evaluating objective and subjective rating criteria for accuracy and difficulty. Each linkage step must be independent, unbiased and thoroughly documented.

### *A Review Of HRD's Content Validation Study, Step By Step*

**1. An analysis of the target position for which the test is intended for use. This analysis should include an analysis of the critical tasks, and important knowledge, skills, abilities and other characteristics (KSAs) needed in the target position. The job analysis must be thoroughly documented.**

In 2002, Morris & McDaniel, Inc. conducted a job analysis of the Police Sergeant position in the Boston Police Department. Apparently there is little dispute among the experts that a list of purported critical tasks and KSAs were developed.

At this point in the job analysis study, the experts strongly disagree as to whether the rating criteria for establishing the importance of the tasks and KSAs were professionally acceptable. Morris & McDaniel utilized 3-point rating scales giving the raters (11 current BPD Sergeants) only three options to choose from when assessing importance (very important, important, not important). Generally, a more reliable scale consists of more scale points because, as in this case, raters cannot always distinguish between important and not important since there are ratings in between (e.g., somewhat important).

Dr. Wiesen (October 3, 2008) indicated that raters were told that if tasks and KSAs were not rated high enough, then they would not be eligible for inclusion in the test. I did not review the "exact" instructions to the raters, but two things concern me. First, I agree with Dr. Wiesen that the instructions to these raters predisposed them to one outcome – a rating of very important. Second, Dr. Wiesen (October 3, 2008) reported that the raters made a combined total of 20,790 task and KSA ratings, and "they did not disagree even once." (p. 9 Supplemental Report of Dr. Wiesen, March 30, 2009). In 20 years of working with SMEs on these types of ratings, I have never had perfect agreement among my raters. Typically, there is substantial disagreement after independent ratings are given, and then a substantial amount of discussion and consensus is required, even re-writing, to obtain agreement.

Dr. Wiesen (October 3, 2008) reviewed individual subject matter expert (SME) ratings of specific tasks and identified highly unusual results. As I indicated earlier in this report, I have analyzed the position of Sergeant in numerous jurisdictions, small and large. I have never found Sergeants "supervising bomb threats" daily, or "participating in pre-planned raids" daily. All of the tasks that Dr. Wiesen (October 3, 2008) described as having been rated as performed daily, might (and this too is a stretch) be performed daily by specialty units, but not by an entire police force of Sergeants.

Dr. Outtz reported (February 2009) that the job analysis was "comprehensive" (p. 23) but this conclusion seems to be based upon a cursory review of the job analysis procedures. I agree with Dr. Outtz that there exists a list of critical tasks, and a list of knowledge skills and abilities, but where is his analysis of the procedures used to establish those? I conclude that the job analysis procedures are incorrect, and the job analysis data are insufficiently and uncritically analyzed.

2. **After a list of critical tasks and KSAs are identified, there must be a sound statistical or rational method to tie the KSAs to the critical tasks. Further, there must be a sound statistical or rational method to identify the relative importance of the KSAs. This must be thoroughly documented.**

Dr. Wiesen (October 3, 2008) described the linkage process conducted by Morris & McDaniel in 2002. In one step, SMEs (11 current BPD Sergeants) were asked to link five global KSAs to 163 critical tasks. These five KSAs are oral communication ability, interpersonal skills, problem identification and analysis, judgment, and planning and organizing. I found it unusual that there were two sets of KSAs from the same job analysis that are seemingly unrelated.

Dr. Wiesen looked at individual linkage data and found that all raters linked oral communication and interpersonal skills to the task "cares for and cleans weapons." Having been in the position of leading SMEs during the linkage process, I can attest to the fact that SMEs can justify the linkage of any KSA to any task. They say, for example, that "in order to clean my weapon, I have to obtain proper cleaning tools from Joe, and so I have to have clear communication skills with Joe, and I have to be nice to Joe so that he is willing to help me." This speaks to the fact that raters were not properly trained to conduct accurate, independent analyses. The raters should have been instructed to consider under what conditions or setting a particular task is performed. For example, they should consider whether a task is usually performed independently or in a group, whether it is typically performed with or without written/oral communication, etc. If raters are not properly trained to provide accurate ratings, their default is to link a majority of KSAs to a majority of tasks which results in a very faulty analysis of the important KSAs needed to perform the target job.

Dr. Wiesen also quoted the Morris & McDaniel job analysis report which stated "Social scientists from Morris & McDaniel, Inc. linked the 155 important KSAs to the Work Behaviors." (p.11-12 of Dr. Wiesen's Supplemental Expert Report). To me, this is a completely insufficient explanation of the process, and totally unacceptable documentation of the process. These types of linkages can number in the thousands and generally fill a large spreadsheet or multiple spreadsheets. Those data must be shown so that objective reviewers can assess their quality.

3. **The test developer must then identify a test plan based upon the important KSAs, and the best format for the test to measure the important KSAs. This must be thoroughly documented.**

After a comprehensive and accurate job analysis is completed, the job data must be incorporated into a test plan that identifies the methods that will be used to address the important KSAs and that includes methods to minimize group differences. I have already

commented on the flaws in the job analysis so I doubt that a valid test plan could have even been constructed. A test outline, as described by HRD, is not the same thing as a test plan.

A test plan that is designed to create a *valid test* provides the intended test format, content, intended KSAs to be measured, the weights of each test component and each KSA, and practices that will be implemented to ensure the administration is consistent. It also includes practices that will be implemented to minimize group differences.

A test plan that only includes a multiple-choice test of job knowledge does not address a sufficient portion of the job that is important, and therefore this process lacks content validity. While job knowledge is a predictor of job performance, it can and should be enhanced by the addition of other measures that test a broader set of KSAs. As Dr. Outtz notes (2009 SHL Conference), a measure of job knowledge alone favors those who have good memories for factual data. Candidates with other, equally important or more important, attributes cannot outperform others using this method alone.

Dr. Outtz appears to agree with what a good professional test plan should include based upon his presentation at the October 2009 SHL Group Conference. For example, he said that a good practice is to "convert the job analysis information, including context, into a valid, minimal adverse impact test plan" (slide 11). In this same slide, he notes that the test developer must determine the testing medium, determine the scope of KSAs that must be measured, and determine weights of the test components to be included. The scope of the KSAs measured in the Statewide and the BPD Police Sergeant Exam are too limited. Further, HRD's test plan does not meet professional standards as described by me above or as described by Dr. Outtz.

## 4. Next, the test developer should evaluate alternative test methods that would still measure the important KSAs, but potentially minimize group differences. This must be thoroughly documented.

### 4a. Test Methods that Reduce Adverse Impact

The field of Industrial/Organizational Psychology has come a long way in identifying, developing and using test methods that are valid and minimize adverse impact. There are both practices and products that work to reduce adverse impact. None of these practices or products, as I describe in this section, was followed for the Massachusetts Police Sergeant promotional exams.

Dr. Outtz points out several test methods that serve to reduce adverse impact in his presentation at the October 2009 SHL Group Conference. In slide 12, he provides seven methods to reduce adverse impact. He specifically said "Using of alternative modes to present test stimuli" and "Using a combination of methods of relevant constructs" will reduce adverse impact "moderately to substantially."

20

Examples of alternative modes are assessment centers, oral interview panels, video-based situational judgment tests, practical tests, and biographical data forms. Each of these has been shown to reduce adverse impact. For example, assessment centers have very high validity and produce lower adverse impact (e.g., Gaugler, et al., 1987; Goldstein, et al., 1998; Goldstein, et al., 2001; Hough, et al., 2001; Schmitt & Mills, 2001). Also, video-based situational judgment tests have been shown to have lower adverse impact (Nguyen and McDaniel, 2003). Oral interviews have also been shown to minimize group differences (e.g., Gatewood and Feild 2001; Hough, et al., 2001; Lowry, 2001)

One of the most unexpected and troubling conclusions made by Dr. Outtz (February 2009) and Dr. Silva (February 2009) was that HRD "attempted" to minimize adverse impact with an oral exercise in the 2002 BPD, found that it did not succeed as they had hoped, so they did not attempt to research or include another method to reduce adverse impact. The attempt to minimize group differences is not a "one-time" experiment. Their defense for this <u>one</u> attempt is that group differences were not minimized significantly and that it was too costly.

A way to examine the degree of adverse impact is with a statistic known as standardized mean differences. A standardized mean difference tells us the extent of the difference between minority scores and non-minority scores. A negative standardized mean difference shows that minority candidates outperformed non-minority candidates, a standardized mean difference of zero shows there is no difference between minority and non-minority candidates' scores, and a positive standardized mean difference shows that non-minority candidates outperformed minority candidates.

A standardized mean difference is also known as $d$. A $d$ between 0 and .3 means there is little to no difference between scores, a $d$ between .3 and .8 is a moderate difference, and generally $ds$ larger than .8 are large. The $d$ for the oral examination in the 2002 BPD Police Sergeant Exam was .26, a low difference. This tells me that if this portion of the exam had a higher weight, it might have helped reduced adverse impact in that total promotional process. It is very common that the oral portion of a Police Sergeant's Exam is weighted higher than job knowledge exams since this ability is essential to critical task performance. In most police departments, job knowledge is important and needed for the position of Sergeant. But in many police departments, the importance and need to talk/interact with citizens, coworkers, city and county managers, suspects, victims, witness, attorneys and the media in non-emergency and emergency situations is equally or more important. It is at least something that should have been considered then and in future BPD and the Statewide exams.

I also noticed from Dr. Wiesen's report (March 30, 2009), that the $d$ for the overall 2002 BPD Sergeant Exam including the oral component was .47, but without the oral component, the $d$ was .61. To me, these data clearly demonstrate that the oral

component did reduce adverse impact, and if considered for use in other ways, may have been even more successful at reducing adverse impact.

Minimizing group differences in any jurisdiction or location requires a concerted effort that may be timely and costly but not relative to the benefits. The first and perhaps largest benefit to minimizing group differences is that the organization has provided a more equal opportunity to all of its candidates. Another important benefit is that the organization can increase its diversity, and thereby improve its ability to serve the diverse community it serves. Another significant benefit that results when group differences are minimized is that litigation time and costs are reduced or eliminated. While more than one million dollars was spent on the 2002 project, I am aware of jurisdictions that have spent up to four million in legal fees, and up to 20 million in punitive damages for this type of litigation for just one rank. In some jurisdictions, this type of litigation has gone on for over 10 years which can logjam a jurisdiction's or entire State's promotions, cause a shortage in supervisors and managers, and decrease the morale of all personnel.

In past years, I have personally experienced implementing an alternative procedure that did not minimize group differences to the extent I hoped. Post-test analysis, however, showed me why this might be the case. For example, perhaps there was a problem with the instructions to the candidates or perhaps there was a problem with the rating criteria. I used these data to help improve validity and decrease adverse impact in the next cycle of testing, and continue to do so each time a new exam is given. To me, this is the professionally responsible approach to developing valid selection procedures that minimize group differences.

Utilizing a written, multiple-choice (job knowledge) exam alone to select candidates for the position of Police Sergeant is not a valid strategy. The measurement of job knowledge only captures one aspect of the job, leaving out other aspects of the job that are important, and if measured in a different format, would likely reduce adverse impact. The E&E points did not minimize group differences (see Table 4 on p. 22 of Dr. Wiesen's Supplemental Report, March 30, 2009), and provides little value-added to the job knowledge test. To completely assess police sergeants in a way that minimizes group differences requires, at a minimum, the addition of other test components with the inclusion of alternative methods to reduce group differences.

I want to add one more quote from Dr. Outtz who stated in his slide at the 2009 SHL Group Conference that "for many jobs, ..., selection systems that are too limited in scope and weighted toward paper-and-pencil multiple choice tests are, a) not valid, b) more likely to select candidates who are incompetent and c) unfair in that they give an advantage to certain candidates based on attributes that are not job related" (slide 31).

This is a powerful statement, and one with which I agree in whole. A multiple-choice test of job knowledge that is well-constructed, reliable and valid is a sound measure of job knowledge, but <u>only</u> job knowledge. While job knowledge is a predictor of job

performance, it can and should be enhanced by the addition of other measures that test a broader set of KSAs. As Dr. Outtz notes (2009 SHL Group Conference), a measure of job knowledge alone favors those who have good memories for factual data. Candidates with other, equally important or more important, attributes cannot outperform others using this method alone.

Section 3B of the *Uniform Guidelines* (EEOC, 1978) which must be followed summarizes my thoughts:

> "When two or more selection procedures are available which serve the user's legitimate interest in efficient and trustworthy workmanship, and which are substantially equally valid for a given purpose, the user should use the procedure which has been demonstrated to have the lesser adverse impact. Accordingly, whenever a validity study is called for by these guidelines, the user should include, as a part of the validity study, an investigation of suitable alternative selection procedures and suitable alternative methods of using the selection procedure which have as little adverse impact as possible, to determine the appropriateness of using or validating them in accord with these guidelines.....This subsection is not intended to preclude the combination of procedures into a significantly more valid procedure, if the use of such a combination has been shown to be incompliance with the guidelines."

## 4b.    Alternative Methods to Score Examinations that Can Reduce Adverse Impact

Another method to reduce adverse impact is in the scoring itself. Dr. Wiesen noted that, one method might be to use a multiple-choice job knowledge test (a well-constructed, reliable and valid one) as a hurdle, and then rank-order candidates using a measure with less adverse impact. I, personally, often combine the score from the job knowledge test with other measures which can minimize group differences. In addition, some of the test component weights that involve very important KSAs and tend to have lower adverse impact, like Oral Communication Ability or Interpersonal Skills, might be increased. This too can decrease adverse impact.

While some jurisdictions have stayed with traditional rank-ordered scoring, many have changed to some form of banding. Banding means that a range of test scores may be considered "equal" for purposes of selection, and then the selecting authority can use another job-related procedure to select a candidate for promotion from the band. For example, this second procedure might be a valid review of a person's accomplishments or a valid structured interview. I have found that these types of procedures can reduce adverse impact.

In the BPD, the bandwidth is very small and not useful in minimizing group differences since minorities did not fall within the bands, and since the selecting officials tend to default to strict rank-ordering since perhaps they have no job-related

criteria to use to select candidates from the bands. Further, strict rank-ordering for the Police Sergeant Exam is not supported by any validity data.

### 4c.    Alternative Test Administration Methods that May Reduce Adverse Impact

Another well-known practice is to include test orientation and/or test preparation classes. These programs are intended to provide information to candidates about the test process so they can properly prepare. They have the side benefit of reducing test anxiety, and possibly increasing test motivation both of which have been shown to improve test performance (Clause, Delbridge, Schmitt, Chan, & Jennings, 2001). There was no formal test orientation or test preparation offered for the Massachusetts Police Sergeant Exams.

### 4d.    Practical Feasibility of Using Alternative Methods with Equal Validity and Lower Adverse Impact

I have commented that cost should not prohibit the research of developing and implementing alternative procedures that minimize group differences. Section 3B of the *Uniform Guidelines* (EEOC, 1978) does state that if an alternative exists that has substantially equal validity and has less adverse impact, it should be used if it serves "the user's legitimate interest in efficient and trustworthy workmanship."

Do test alternatives exist that are cost effective, time efficient and trustworthy? Can an alternative be used, practically, in a place as large as the Commonwealth of Massachusetts? The answer to these questions is clearly yes. For example, test preparation can be offered to all candidates in a written manual or on video. A website can be established that allows for candidates to ask questions and receive answers.

A test such as a video-based situational judgment test, which standardized mean differences as low as .41 (Nguyen and McDaniel, 2003), can be administered with relative ease in any local jurisdiction, or to as many as 500 - 600 candidates in one testing room. I estimate the professional costs of development, validation and administration to be about $1,000 per candidate.

When I was providing valid tests to the Drug Enforcement Administration (1997-2002), I administered assessment centers to four hundred candidates at one time.

Several Cities in America are currently administering structured interview panels to hundreds, maybe thousands of candidates at one time (e.g., Pennsylvania, PA). I know of several jurisdictions that bring in applicants to one location to take interviews, or interviews can even be conducted over video teleconferencing (VTC).

These are just a few examples that show that a large selection process can be efficient, and are currently in use in many public safety departments (e.g., Charlotte,

NC Police Department, Memphis, TN Police Department, Pennsylvania State Police Department).

## 5. Next, the test developer develops testing instruments, generally working with subject matter experts (SMEs) who assist with generating test content. This must be thoroughly documented.

The test writers in HRD are not trained test writers (Dr. Wiesen, October 3, 2008). Further, it appears one person was assigned to write and compile the entire test each year, and it seems that individual worked generally without SME input during the test development part of the project. This concerns me on several levels. First, a test's reliability and validity is at least partially based upon multiple, independent reviews of the test content. Second, test writing is based upon scientific principles and an untrained person does not know these principles (Dr. Wiesen, October 3, 2008, p. 51).

For example, an item writer must construct items that directly assess the KSAs they are intended to measure. Each item must do that with the fewest and clearest words or it would be unlikely to accomplish its goal. In *Developing and Validating Multiple-Choice Test Items*, Haladyna (2004) recommends simplifying vocabulary and minimizing reading time for each question. He states "if reading comprehension is confounded with the achievement being measured, the test score will reflect a mixture of reading comprehension ability and the knowledge or ability you intended to measure" (p. 106). Confounded questions such as these would reduce reliability and validity, and may increase adverse impact.

Further, there are types of exam questions which require candidates to conduct an extensive analysis of what the question means rather than demonstrating they understand the material. Examples of these questions are those with stems that include "all of the following, except," and those with answers that include "all of the above," "none of the above," "only A and B," etc.. Most trained item writers know that it is best practice to include few, if any, of these types of questions in their exams. Dr. Wiesen (October 3, 2008) reported that many of the items had poor grammar and typographical errors. These types of problems also require the test taker to spend more time analyzing what the question means rather than demonstrating their knowledge. All of these types of questions tend to increase adverse impact. Apparently, some of these issues were improved in the 2007 Police Sergeant Exam, but this reinforces the problems in the 2005-2006 exams, and this does not mean that the 2007 Police Sergeant Exam was substantially more reliable or valid.

In addition, each test question and the whole test must be analyzed for reading level to be sure each item and the entire test matches the reading level needed for the target position. If the reading level is too high, then it could increase adverse impact.

In addition, if the goal of the test is identifying candidates with the highest probability of success in the job and exclude those with little to no chance of success in the job, then the test must be designed with high levels of variance. This requires estimating item difficulties and including items with low, medium and high levels of difficulty in the final test. I earlier

explained the proper rational method and the correlation method for estimating appropriate passing scores, and neither was performed by HRD.

Dr. Wiesen (October 3, 2008) reported that 22.5% of the answer key to the 2007 Police Sergeant Exam was modified, post-test. This is a much higher number of changes to an answer key than I have seen in my career. This makes me further question the test development methodology:

- one test writer wrote all the test questions
- there were no independent reviews of item validity by multiple reviewers
- there was no independent linkage of test items to KSAs, and
- there was an improper assessment of test item difficulty.

This development process is arbitrary so the outcome, including 22.5% changes to the answer key, would be expected.

Developing a test with this number of flaws leads me to believe the test is not valid.

6. **Once the draft test is developed, the test developer takes the SMEs through a series of content validation steps which should include formally linking the test content to the job content (i.e., job analysis), formally evaluating objective and subjective rating criteria for accuracy and difficulty, and formally linking those criteria to the job data. Each linkage step must be independent, unbiased and thoroughly documented.**

It is necessary to formally link the important KSAs to the critical tasks, and it also necessary to link the test content to the important KSAs. This provides important information about how well the test is measuring the important KSAs, and how many KSAs (what proportion of job requirements) are being assessed.

According to Dr. Wiesen, HRD did not describe how they linked the job content to the KSAs nor did the 2002 Morris & McDaniel report describe how many of the 155 KSAs that were needed for the position of Police Sergeant were measured in each exam including the 2005 BPD exam. Content validity may be considered on a continuum. An exam is most content valid when it <u>directly</u> measures a <u>substantial portion</u> of the important KSAs and provides clear justification for the exclusion of other important KSAs. Based upon the data supplied by HRD, we cannot assess how well the exams measure the content of the job.

However, we do know that five key KSAs (as identified in the job analysis) for the position of Police Sergeant were not measured. These are oral communication ability, interpersonal skills, problem identification and analysis, judgment, and planning and organizing. Apparently, the SMEs were asked to link these five KSAs to the critical tasks, and they were all rated as being necessary to successful task performance. Yet, they are not measured in the HRD exams that are currently being challenged. In total, about half of the 155 important

KSAs were not measured in the 2005 BPD Police Sergeant Exam. I cannot assess if the measurement of half the KSAs is content valid because I do not have documentation that shows that these KSAs were the most important KSAs, and/or if they were measured as a method to minimize group differences. I also cannot assess whether the Police Sergeant Exam directly assesses the remaining KSAs since there is no proper linkage data between the test questions and the KSAs. I would find it highly unusual that measuring half of the important KSAs is sufficient since many of the remaining KSAs are likely important to very important.

Dr. Outtz reported that adverse impact did not decrease significantly when a more broad scope of KSAs were included, specifically an oral exercise, in the 2005 BPD Police Sergeant Exam. As I discussed earlier, I thought that this one method was weak. Further, it appears that costs impacted the choices made for inclusion or non-inclusion of KSAs. Dr. Outtz supports my conclusion when he pointed out the "tremendous" (p. 25) costs of the 2005 BPD Police Sergeant Exam (February 9, 2009) as one of the reasons for eliminating the oral exercise. I conclude that about half of the KSAs were measured because the BPD did not wish to take the time nor spend the money to find a way to minimize adverse impact.

## Other Issues that related to the Content Validity of the BPD Police Sergeant Exam

### *Open-Book v. Closed-Book Test Formats*

I read Dr. Outtz's report (February 9, 2009) where he concluded that he has observed higher levels of adverse impact in open-book exams whereas Dr. Wiesen (October 3, 2008) suggested that using an open-book method might be more fair and more job-relevant. In my experience, it is more fair and more job-relevant to assess certain knowledge using an open-book format and other knowledge using a closed-book format. For example, Police Sergeants usually have the time during the course of performing their jobs to look administrative information up when needed. For example, when providing an oral counseling, a Sergeant would have time in advance to look up the procedures for proper counseling before meeting with his/her subordinate.

Other knowledge may have to be memorized, particularly knowledge related to emergency scenes, where time is of the essence. An example of this might be when a Police Sergeant enters a crime scene and must make certain immediate evaluations about the crime and the actions to take to mitigate the situation. This type of information must be memorized.

I, too, have observed higher levels of adverse impact, at times, with Police Sergeant candidates who are given an open-book format, but there are many methods to mitigate it. For example, proper test preparation training is helpful in reducing adverse impact. Also, clearly identifying what sections of the source material will be "open-book" well in advance of the test also helps reduce adverse impact. I saw no mention of test preparation for the Police Sergeant promotional exam.

# Conclusions

From the six expert reports I reviewed, I conclude:

1. there is adverse impact in pass/fail data in the relevant years, 2005-2007.
2. there is adverse impact against minority candidates in the selection rate data for Police Sergeant in the years 2005, 2006 and 2007 individually, and when the data are aggregated across the Commonwealth of Massachusetts, and in the 2005 and 2008 Boston Police Department Police Sergeant Exam.
3. test construction was performed without using known scientific methods or trained test writers, and without proper review by independent subject matter experts.
4. the content validation study is professionally unacceptable, and does not support the use of a test that produces adverse impact.
5. there was an insufficient search for alternatives to reduce adverse impact. The one "attempt" at using an oral exam was not fully analyzed and should not have been immediately discarded without an effort at improving its use, modifying it, using other acceptable alternatives, or some combination of these procedures. To me, this is one of the more troubling problems with the whole Sergeant exam process. It is always possible that a test might produce subgroup differences. However, it is incumbent upon jurisdictions that use tests to select personnel to spend the necessary money and time to minimize it to the extent possible. And further, test users are never unburdened from this requirement even if their test does not produce adverse impact during one administration. Tests can always be improved, test performance can always be improved, and adverse impact can be regularly examined and improved.
6. neither the relatively large number of candidates in Massachusetts nor the size of the Commonwealth precludes the use of alternatives with equal validity and less adverse impact.

Signed: _____    Dated: March 30, 2010 _____

# References

*Castaneda v. Partida* 430 U.S. 482 (1977).

*Connecticut v. Teal* 457 U.S. 440 (1982).

Clause CS, Delbridge K, Schmitt N, Chan D, & Jennings D. (2001). Test preparation activities and employment test performance. *Human Performance, 14(2),* 149-167.

Equal Employment Opportunity Commission, Civil Service Commission, Department of Labor & Department of Justice (1978). *The Uniform Guidelines on Employee Selection Procedures.* Federal Register, Vol. 43, p. 38290-38315

Equal Employment Opportunity Commission, Civil Service Commission, Department of Labor & Department of Justice (1979). *Adoption of Questions and Answers to Clarify and Provide a Common Interpretation of the Uniform Guidelines on Employee Selection Procedures.* Federal Register Doc. 79-6323.

Gatewood RD & Feild HS. (2001). *Human resource selection* (5th ed.). New York: Harcourt College Publishers.

Gaugler BB, Rosenthal DB, Thornton GC, & Bentson C. (1987). Meta-analysis of assessment center validity. *Journal of Applied Psychology, 72(3),* 493-511.

Goldstein, I.L., Zedeck, & Schneider, B. (1992). An exploration of the job analysis-content validity process. In Schmitt, N., & Borman, W.C. (Eds.), Personnel Selection. San Francisco, CA: Jossey-Bass.

Goldstein HW, Yusko KP, Braverman EP, Smith DB, & Chung B. (1998). The role of cognitive ability in the subgroup differences and incremental validity of assessment center exercises. *Personnel Psychology, 51,* 357-374.

Goldstein HW, Yusko KP, & Nicolopoulos V. (2001). Exploring black-white subgroup differences of managerial competencies. *Personnel Psychology, 54,* 783-807.

Haladyna, Thomas M. (2004). *Developing and Validating Multiple-Choice Test Items* (3rd edition). New Jersey: Lawrence Erlbaum Associates.

Hough LM, Oswald FL, & Ployhart RE. (2001). Determinants, detection and amelioration of adverse impact in personnel selection procedures: Issues, evidence and lessons learned. *International Journal of Selection and Assessment, 9(1/2),* 152-194.

Lowry PE. (1994). The structured interview: An alternative to the assessment center? *Public Personnel Management, 23(2),* 201-215.

Nguyen T & McDaniel MA. (2003.) Response instructions and racial differences in a situational judgment test. *Applied H.R.M. Research, 8(1),* 33-44.

Schmitt N & Mills AE. (2001). Traditional tests and job simulations: Minority and majority performance and test validities. *Journal of Applied Psychology, 86(3),* 451-458.

# Attachment 1

March 16, 2010 Spreadsheet
Created by Joel Wiesen, Ph.D.

# Resume of Dr. Cassi L. Fields

# Materials Received and Reviewed

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

**PEDRO LOPEZ, et cal., Plaintiffs**

v.

City of Lawrence, Massachusetts, et al., Defendants

Civil Action No. 07—CA-11693-JLT

Expert Report on Adverse Impact, Validity and Fairness of Four Promotional Examinations
for Police Sergeant Administered Pursuant to MGL Chapter 31
by Joel P. Wiesen, Ph.D.
October 3, 2008

Supplemental Expert Report in Lopez et al., v. City of Lawrence et al.
by Joel P. Wiesen, Ph.D.
March 30, 2009

Expert Report of Frank Landy, Ph.D.
by Frank Landy, Ph.D.
October 30, 2008

Supplemental Expert Report of Frank Landy, Ph.D.
by Frank Landy, Ph.D.
March 31, 2009

Report of Jacinto M. Silva, Ph.D.
by Jacinto M. Silva, Ph.D.
February 9, 2009

Report of James L. Outtz, Ph.D.
by James L. Outtz, Ph.D.
February 9, 2009

Updated Selection Data from Dr. Joel Wiesen
Spreadsheet, Received by Dr. Fields on March 16, 2010

## Compensation

I am being paid $350/hour to provide expert assistance in this case during calendar year 2010, and if it continues, calendar year 2011.

Dr. Cassi L. Fields
President/CEO, Fields Consulting Group, Inc.

## EDUCATION

| | |
|---|---|
| Ph.D. in Industrial/Organizational Psychology | |
| The George Washington University | 1989 |
| | |
| M. Philosophy in Industrial/Organizational Psychology | |
| The George Washington University A.B., Psychology | 1987 |
| | |
| B.A. with honors in Psychology | |
| Rutgers, the State University of New Jersey | 1985 |

## BUSINESS EXPERIENCE

**Fields Consulting Group, Inc.**
President/CEO                                                                                      5/92- present

Dr. Cassi L. Fields is a nationally known expert in the design, development, validation, and administration of large-scale public safety testing projects, with special expertise in promotional systems in at-risk organizations. Dr. Fields founded Fields Consulting Group in 1992 after an outstanding career in public service and academia.

As President and CEO of Fields Consulting Group (FCG), Dr. Fields serves as an expert advisor and consultant to numerous public sector executives and organizations, particularly those who have experienced repetitive employment discrimination lawsuits. For our other clients, Dr. Fields manages and directs leadership development training, expert witness services, the design and validation of promotion boards/programs and assessment centers, and other related services. FCG has established a reputation for achieving results where other firms encounter resistance; for providing fair opportunity to program participants; for developing innovative and highly effective testing and measurement tools; for pioneering the use of assessment center exercises to measure community-oriented policing competencies; and for directing and administering hundreds of assessment centers for Police, Fire, and Sheriff Departments throughout the U.S. Dr. Fields frequently directs critical client initiatives, while overseeing the quality of her staff's work on smaller testing projects. Due to the exemplary track record FCG has established, the company has grown to a staff of 14 that serves more than 30 clients. Dr. Fields served as the lead I/O Psychologist in the development of six assessment centers for the City of Macon (GA). The City of Macon chose FCG for this work because the City is under consent decree for discrimination and was contending with a reverse discrimination lawsuit.

Dr. Fields has designed performance evaluation systems for the Fairfax County (VA) Government, the Fairfax City (VA) Police Department, and the U.S. Capitol Police Department. The Prince William County Fire Department also took advantage of her knowledge and expertise to design a pay-for-performance system. For these systems, Dr. Fields trained first and second line supervisors and tracked data electronically. Each system designed by Dr Fields was constructed to ensure consistency. Each was also modified as needed.

## Dr. Cassi L. Fields
### President/CEO, Fields Consulting Group, Inc.

As an expert in Fire and Rescue and Police career development and evaluation, Dr. Fields has developed the *Critical Supervisory Skills* (Fields, C. August, 2007) course for these two Public Safety services. The course is designed to address and develop effective supervisory skills for both current supervisors and those who aspire to become a supervisor in the near future. Not only is this course designed to teach how to be an effective supervisory, but it also serves as a study tool for promotional testing exams (e.g., assessment centers, structured interviews).

Dr. Fields' primary functional areas of expertise include:

- Project management
- Creative solutions for historical employment discrimination
- Quality assurance management
- FCG personnel management
- Research and publication
- Business development
- Legal expertise

The following summarizes Dr. Fields' assessment center experience with Fields Consulting Group:

- Directed the development, validation and administration of over 500 assessment centers for public safety clients
- Designed and implemented large-scale content-oriented validation strategies to ensure that test systems appropriately represent the content domain of the job
- Directed and participated in the job analysis to support the validation work
- Led SME focus groups in the development of assessment centers
- Designed innovative assessment center exercises to measure management and leadership competencies
- Pioneered the use of assessment center exercises that measure community-oriented policing competencies
- Designed, validated and administered decentralized assessments for clients such as the Federal Aviation Administration and the Amtrak Police
- Conducted assessment center pilot tests to ensure the clarity, job relevancy, face validity, and reliability of assessment center exercises
- Conducted assessor training to ensure inter-rater reliability, rater accuracy and fairness
- Implemented assessment centers for candidates pools as large as 400 candidates
- Ensured all assessment centers were reliable, valid, perceived as valid and fair by both management and candidates, and as a result none have resulted in formal grievances or legal challenges
- Reported assessment center results including descriptive statistics and fairness analyses, and designed future methodology to improve validity and decrease adverse impact
- Designed procedures for providing consistent and accurate candidate feedback while protecting test security

## Dr. Cassi L. Fields
### President/CEO, Fields Consulting Group, Inc.

---

**Professional Development Associates, Inc.**
CEO                                                                                 12/98 - present

Dr. Fields created Professional Development Associates as a sister company to Fields Consulting Group to implement her vision of improved public safety career development and ensure that all members of the workforce have an equal opportunity to succeed. In her role with this company, Dr. Fields directs her staff in the development of test preparation training and career development programs for individuals and organizations.

**Fairfax County Office of Personnel**
Director of Testing                                                                 1990 - 1993

In her work for one of the country's premier public safety organizations, Dr. Fields personally developed, validated and defended the selection and promotion procedures for 20 public safety positions. Her exams were original, multi-components procedures including paper and pencil, practical, physical agility and assessment center portions.

Major functional areas include:

- Job analysis
- Test development, validation, and administration
- EEOC compliance
- Performance evaluation management
- Legal expertise

The following summarizes Dr. Fields' assessment center experience in Fairfax County:

- Directed the development, validation and administration of over 60 assessment centers for all ranks in the Police, Fire, and Sheriff Departments
- Performed job analysis for each rank and maintained a job analysis bank for all Departments
- Led SME focus groups to develop job-relevant assessment center exercises
- Conducted a content-oriented validation study for every assessment center
- Developed and ensured the consistent administration of high-fidelity exercises, which included mass causality incidents, structure fires, vehicle pursuits and trench rescues
- Conducted assessment center pilot tests to ensure the clarity, job relevancy, face validity and reliability of assessment center exercise
- Conducted assessor training to ensure inter-rater reliability, rater accuracy and fairness
- Analyzed all relevant assessment center data, including descriptive statistics and fairness analyses
- Used qualitative and quantitative data to design future methodology to improve validity and decrease adverse impact
- Delivered consistent and accurate candidate feedback
- Successfully defended all selection procedures in legal settings, particularly dealing with disparate treatment and impact cases

## Dr. Cassi L. Fields
### President/CEO, Fields Consulting Group, Inc.

---

**Human Systems Technology Corporation**
Project Manager/Staff Industrial Psychologist                        1987 - 1989

While working as a Staff Industrial Psychologist, Dr. Fields was responsible for human resource evaluation and training for electrical and nuclear power companies.

Major functional areas:

- Test development and validation
- Promotional system review and development
- Organization development

The following summarizes Dr. Fields' test development experience in Human Systems Technology Corporation:

- Developed and validated six levels of progression tests and training within the progression ladders of four technical public utility positions at Delmarva Power in Delaware
- Developed and validated four levels of progression tests within two progression ladders at consolidated Edison Corporation in New York
- Re-validated assessment centers and performance evaluation system for the Maryland State Police

### EXPERT TESTIMONY/ASSISTANCE

As an expert in her field, Dr. Fields consulted and coordinated with other Industrial/Organizational Psychologist experts on discrimination cases, reverse discrimination cases, and consent decree compliance. Some examples include:

- Macon, Georgia: Lead psychologist June 2003 – present, under consent decree with Department of Justice.
- Weathersby v. Secretary of the Interior, No. 02-141 (U.S. District Court for the District of Columbia, February 4, 2003). Dr. Fields testified in 2003.
- Caruth v. Ashcroft 01-0926 Department of Justice civil case (file #2001v00477). Dr. Fields testified in 2002.
- Federal Aviation Administration: Expert for FAA Management, Selection Case, July 2001. Provided expert testimony for the FAA. The FAA prevailed.
- Drug Enforcement Administration: Lead psychologist 1995 – 2000, during which time DEA was under consent decree.
- Fairfax County: As a lead psychologist for public safety with Fairfax County, testified multiple times in front of the Civil Service Commission on selection cases. Fairfax County prevailed in all cases. No cases were sent to Federal Court. From January 1990 – September 1993 Fairfax County was under a Department of Justice consent decree.

Dr. Cassi L. Fields
President/CEO, Fields Consulting Group, Inc.

**PUBLICATIONS AND PRESENTATIONS**

Fields, C. (2007 August). *Critical Supervisory Skills in Fire and Rescue*; McLean, VA. Multimedia skills training program for new supervisors.

Fields, C. (2007 August). *Critical Supervisory Skills in Police*; McLean, VA. Multimedia skills training program for new supervisors.

Fields, Laura E., Orvis, Karin & Fields, Cassi L. (2005). Toward an Understanding of Item-Level Subgroup Differences of In-Basket Exercises. Poster presentation, American Psychological Association.

Fields, Cassi L. (June 2004). The Assessment Center Process in Law Enforcement. Presentation at National Association of Black Narcotic Agents (NABNA) meeting.

Fields, Cassi L. (July 2003). Choosing the Right Selection Tool for Your Agency. Forum on Crime Lab Management for Criminal Justice Agencies, Arlington, VA. (Unpublished).

Fields, Cassi L. (March 2003). The Benefits of Test Preparation. National Summit on Human Resources for Law Enforcement, Performance Institute - Washington, DC. (Unpublished).

Fields, Cassi L. (June 2003). Job Analysis in the Real World. IPMAAC Conference on Personnel Assessment, Baltimore, Maryland. (Unpublished).

Orvis, Karin A., Fields, Laura E., & Fields, Cassi L. (June, 2003). Job Knowledge Versus Multiple-Choice In-Basket Exams: Which Format is a Superior Indicator of Job Knowledge Paper presented at the annual conference of the International Personnel Management Association Assessment Council, Baltimore, MD.

Havighurst, Lauren C., Fields, Laura E. & Fields, Cassi L. (June 2003). High Versus Low Fidelity Simulations: Does the Type of Format Affect the Candidate's Performance or Perceptions? IPMAAC Conference on Personnel Assessment, Baltimore, Maryland. (Unpublished).

Fields, Cassi L. (July, 2002). Preparing for Promotion: Taking Assessment Centers. National Organization of Black Law Enforcement Executives Conference, Tampa, FL. (Unpublished).

Fields, Cassi L. (1996-2003). Special Agent Promotional Programs (SAPPS) for Grade 14 and 15: Revision and Administration. The Drug Enforcement Administration final reports for eight promotional assessment centers, Washington, D.C. (Unpublished).

Fields, Cassi L. (March 2002). Job Analysis of Diversion Investigator GS-7-GS-12 Positions with Discussion of Job Satisfaction Issues, Final Report. The Drug Enforcement Administration, Washington, D.C. (Unpublished).

Dr. Cassi L. Fields
President/CEO, Fields Consulting Group, Inc.

Fields, Cassi L., Fields, Laura E., & Havighurst, Lauren C.. (February, 2002). <u>Preparing for Promotion in the Fire Service: Taking Assessment Centers, Interviewing, Writing Resumes</u>. State Fire Chiefs Association of Virginia Mid-Atlantic Symposium, Virginia Beach, VA.

Fields, Cassi L., Fields, Laura E.& Havighurst, Lauren C.. (February, 2002). <u>Seminar in Leadership</u>. State Fire Chiefs Association of Virginia Mid-Atlantic Symposium, Virginia Beach, VA.

Fields, Cassi L. & Fields, Laura E. (February, 2001). <u>Preparing for Promotion in the Fire Service: Taking Assessment Centers, Interviewing, Writing Resumes</u>. State Fire Chiefs Association of Virginia Mid-Atlantic Symposium, Virginia Beach, VA.

Fields, Cassi L. & Fields, Laura E. (February, 2001). <u>Seminar in Leadership</u>. State Fire Chiefs Association of Virginia Mid-Atlantic Symposium, Virginia Beach, VA.

Fields, Cassi L., Amendola, Karen L. & Horey, Jeff. (May, 2000). <u>Technology or Not?  Symposium on the Alternative Ways to Administer/Score In-Basket Exercises.</u> IPMA Conference, Washington D.C.

Leaming, Marj. P. & Fields, Cassi L. (May, 1996). <u>Building Community Partnerships</u>. Conference by the Police Foundation and the National Organization of Black Law Enforcement Executives. (NOBLE).

Fields, Cassi L. (June, 1992). <u>Alternative Assessment Methodology</u>. IPMA symposium presentation.

Fields, Cassi L. (September, 1989). <u>Employment Tests Used to Select Job Applications: Helping to Resolve the Legal and Professional Controversy.</u> Dissertation.

Tkacz, Sharon & Fields, Cassi L. (April, 1987) <u>Spatial Span</u>. The Eastern Psychological Association.

Fields, Cassi L., Sneed, Daria & Turner, Jocelyn. (August, 1987) <u>Lotus 1-2-3: A User's Guide and Practical Exercise.</u> U.S. Army Research Report.

**RESEARCH IN PROGRESS**

A Comprehensive Approach to Eliminating Adverse Impact in Public Safety Organization:  Method and Theoretical Underpinnings

An Exploratory Analysis of In-Basket Item Properties (Presented at APA, 2007)

Subgroup Differences and In-Basket Exercises: An Examination at the Item Level of Analysis

Improving Performance in Cognitive Ability Exams

Dr. Cassi L. Fields
President/CEO, Fields Consulting Group, Inc.

**PROFESSIONAL AFFILIATIONS**

- Personnel Testing Council, Metropolitan Washington - Personnel Testing Council, Metropolitan Washington – 2008 Past President
- Personnel Testing Council, Metropolitan Washington - Personnel Testing Council, Metropolitan Washington – 2007 President
- Personnel Testing Council, Metropolitan Washington, 2005-2006 Legal Chair for testing issues, 1993 Executive Board Member
- International Association of Chiefs of Police (IACP) – appointed by the President to the Diversity Council (September, 2006), appointed to 2006 National Committee to study police officer recruitment, retention, and selection and Virginia Association of Chiefs of Police (VACP)
- Northern Virginia EMS Council Leadership Development Team for Northern Virginia EMS Providers, current member
- Society for Industrial and Organizational Psychology
- Local Government Personnel Association - Nominated for Personnelist of the year (1992)
- International Public Management for Human Resources (IPMA-HR)
- Northern Virginia Police Chiefs, current member
- American Psychological Association