Joel P. Wiesen, Ph.D.

Volume:   I            Pages:  1-217      Exhibits:   1-8 [1]




              UNITED STATES DISTRICT COURT

               DISTRICT OF MASSACHUSETTS


Civil Action No. 07-11693-JLT

- - - - - - - - - - - - - - - - - - - - - - - x

PEDRO LOPEZ, et al.,


                   Plaintiffs,

      v.

CITY OF LAWRENCE, MASSACHUSETTS, et al.,


                   Defendants.

- - - - - - - - - - - - - - - - - - - - - - - x



          DEPOSITION OF JOEL P. WIESEN, Ph.D.

                Wednesday, June 9, 2010

                10:17 a.m. to 4:55 p.m.

                  MORGAN BROWN & JOY

                   200 State Street

                 Boston, Massachusetts

          Reporter:  Marianne R. Wharram, CSR/RPR

2
```
1   A P P E A R A N C E S

2            LICHTEN & LISS-RIORDAN, P.C.

3            (BY JOSEPH L. SULMAN, ESQ., and

4             HAROLD LICHTEN, ESQ.)

5            100 Cambridge Street, 20th Floor

6            Boston, MA   02114

7            (617) 994-5800

8            jsulman@llrlaw.com

9            Counsel for the Plaintiffs

10

11           MORGAN BROWN & JOY, LLP

12           (BY MARY JO HARRIS, ESQ., and

13            ROBERT MORRIS, ESQ.)

14           200 State Street, 11th Floor

15           Boston, MA   02109-2605; (617) 523-6666

16           Counsel for the City of Boston

17

18           MASSACHUSETTS BAY TRANSPORTATION AUTHORITY

19           (BY KEVIN S. McDERMOTT, ESQ.)

20           Ten Park Plaza, 7th Floor

21           Boston, MA   02116

22           (617) 222-4756; kmcdermott@mbta.com

23           Counsel for the MBTA

24   Continued.
```

121

1       A.  As would a structured interview.

2       Q.  And by structured interview, we're talking

3   about asking the same questions to all the

4   candidates, correct?

5       A.  Yes.

6       Q.  And giving or using a standardized grading

7   instrument?

8       A.  Yes.

9       Q.  Thank you, Dr. Wiesen.

10      A.  You're welcome.

11              MR. LICHTEN:  Why don't we take about a

12  five-minute break.

13              (Off the record.)

14              (Recess taken from 2:08 to 2:20.)

15              (Ms. Ventrella leaves deposition.)

16                   CROSS-EXAMINATION

17      Q.  (BY MS. ENGDAHL)  For the record, my name

18  is Laurie Engdahl.  I'm counsel for the City of

19  Worcester in this case.  I'm going to change the

20  subject a little bit from test validity.  First of

21  all, you had mentioned your educational background

22  in that psychometrics was part of your schooling.

23      A.  Right.

24      Q.  Did that include studies of statistics?

122
1     A.   Yes.

2     Q.   Okay.  So you're very familiar with

3   statistics?

4     A.   Reasonably familiar.

5     Q.   Okay.  Would you consider yourself an

6   expert in statistics?

7     A.   Some branches.

8     Q.   Do you know what a regression analysis is?

9     A.   Yes.

10    Q.   Okay.  We've been talking a lot about the

11   term adverse impact.  How do you define adverse

12   impact, or what is your understanding of adverse

13   impact under Title 7?

14    A.   Okay, so adverse impact of a selection

15   procedure, the bottom line is the selecting of

16   proportionately fewer minorities than

17   non-minorities.

18    Q.   Okay.  When you say selection, you mean the

19   actual hiring or --

20    A.   Right.

21    Q.   -- promotion?  By whom?

22    A.   Um, well, the selection would be by whoever

23   has the authority to hire.

24    Q.   Would that be a single employer?

123

1          MR. SULMAN:  Objection.

2          A.   That's a legal question, but I would think

3    it would be the appointing authority, perhaps the

4    municipality.

5          Q.   (BY MS. ENGDAHL)  And you conducted adverse

6    impact analysis for the Commonwealth of

7    Massachusetts for sergeant promotional examinations

8    given between 2003 and 2007; is that correct?

9          A.   '8.

10         Q.   And 2008?  When were you provided with that

11   data?

12         A.   When I started doing this, I think I just

13   got '3, '4, '5 and maybe '6, and at some point I

14   got '7, and at a later point I got '8.

15         Q.   You're referring to -- when you say three,

16   you mean 2003?

17         A.   2003.

18         Q.   And 2004 and 2005?

19         A.   '4, '5, '6, and then '7 and '8.

20         Q.   And when you refer to data from the exam,

21   2006 exam, you're referring to an exam given in

22   2006?

23         A.   Correct.

24         Q.   Okay.

124
1      A.   So the list might have been established in
2   2007.

3      Q.   Okay.  And the data relating to
4   examinations given between 2003 and 2006,
5   approximately when were you provided with that
6   data?

7      A.   Well, I think I wrote about it in my first
8   report, which was in '08, so it must have been
9   summer of '08, perhaps.

10     Q.   Okay.  And from that data that you were
11  given in approximately summer of '08, would you be
12  able to conduct a statistical analysis of adverse
13  impact of the use of these exams on hiring for each
14  municipality?  Do you have sufficient information
15  to do that analysis?

16          MR. SULMAN:  Objection.

17          MR. LICHTEN:  Could you read back that
18  question?

19          (Last question read back.)

20     A.   I believe so.

21     Q.   (BY MS. ENGDAHL)  Okay.  Now, you issued --
22  you released a report on October 3rd of 2008 and
23  you released a second report on March 30th of 2009.
24  Did you do an adverse impact analysis for each

1    defendant within that report?

2        A.   I believe I did.

3        Q.   Can you show me?  Other than Boston?

4        A.   It might be the 2010 that has the

5    individual departments.

6        Q.   Okay.  I'm referring to your 2008, 2009.

7        A.   Are you talking about -- um, I might not

8    have.

9        Q.   Okay.  Why not?

10       A.   Well, my understanding was at the time the

11   state was a defendant and the major focus was on

12   the adverse impact of the exam.  And maybe that's

13   still the major focus.  I don't know.  And so I

14   looked at -- I did an analysis that would help me

15   answer the question does the exam have adverse

16   impact.

17       Q.   Okay, so you didn't do any analysis that

18   would help answer the question whether the use of

19   the exam had -- would have an adverse impact in the

20   City of Worcester, for example?

21              MR. SULMAN:  Objection.

22       Q.   (BY MS. ENGDAHL)  Is that in either of

23   these reports?

24       A.   I don't believe it's in either of those

126

1   reports.

2       Q.   For Lowell?

3       A.   I did -- I did point out that there were no

4   minority appointments, for example, in 2006 in 13

5   of the 15 PD's that had appointments.

6       Q.   Correct, but you did not do -- perform an

7   analysis?  You stated that at the time the

8   Commonwealth was then a defendant and that was the

9   focus of the litigation.  Were you -- did you do an

10  adverse impact analysis for each of the other

11  defendants to determine whether the use of the

12  exams had an adverse impact on the hiring in the

13  defendant jurisdictions?  And that would include

14  Springfield, Lowell, MBTA, Boston, Worcester or

15  Methuen.

16      A.   I think I did a separate analysis for

17  Boston.

18      Q.   Other than Boston.

19      A.   Other than Boston, I don't think I did.

20      Q.   Okay.  And do you understand now that the

21  Commonwealth is not a defendant in this case?

22      A.   Yes.

23      Q.   Okay.  And do you understand that this is

24  not a class action?

127

1    A.  Yes.

2        Q.  Okay.  So there are seven individual

3    defendants?  That's your understanding?

4    A.  Yes.

5        Q.  On page six of your March 9 report --

6            MR. CARROLL:  Excuse me.  What year was

7    that?

8            MS. ENGDAHL:  March 30, 2009.  Sorry.

9    I just shortened that.

10       Q.  (BY MS. ENGDAHL)  The March 2009 report,

11   page six, paragraph seven, you make the statement

12   that it's appropriate to aggregate exam data across

13   jurisdictions.  Do you mean across employers?

14   A.  Yes.

15           (Interruption by cell phone.)

16           (Off the record.)

17       Q.  (BY MS. ENGDAHL)  I was drawing your

18   attention to page six, paragraph seven --

19   A.  Yes.

20       Q.  -- where you note the use of aggregated

21   data across exams by the federal courts, okay?  And

22   you cite to Bradley versus Lynn in support of that

23   statement.  Are you aware that in Bradley versus

24   Lynn as to liability against the City of Boston and

128

1   the City of Lynn the Court disaggregated the

2   statistics and looked only at the hiring data

3   within each of those municipalities?

4       A.   I'm not sure I was aware of that level of

5   detail.

6       Q.   Well, it's not just detail.  You use it to

7   support a statement that the federal courts have

8   supported the use of aggregated data among

9   different employers.  Do you know of any federal

10  courts that have used aggregated data across

11  multiple employers to support adverse impact

12  liability within one employer?

13           MR. SULMAN:   Objection.

14      Q.   (BY MS. ENGDAHL)   It's -- you --

15      A.   So my understanding of the adverse impact

16  of the entry level firefighter exam that's the

17  subject of Bradley versus Lynn is that the adverse

18  impact analyses that were considered by the Court

19  were adverse impact analyses that were done across

20  the municipalities in the Commonwealth.

21      Q.   For the purpose of determining liability

22  against the Commonwealth?

23      A.   I don't know what the purpose was.   I

24  thought the purpose was establishing adverse impact

129
1  of the examination, so the case would then proceed.
2  The next stage would be considering the validity of
3  the examination, but the adverse impact analysis
4  comes first and then the validity analysis comes
5  second. It sounds to me like you're talking about
6  maybe remedy at a later point.

7      Q.  No. I'm talking about liability.

8      A.  Okay.

9      Q.  And so I want to draw your attention to
10 Bradley versus Lynn, the paragraph starting right
11 after the arrow. Can you read that?

12     A.  Because this seems reasonable, the Court
13 examines the disaggregated hiring data of Boston.
14 The Court also examines the disaggregated hiring
15 data of Lynn, the municipality of the four named
16 plaintiffs. The data shows that the examination
17 had a disparate impact on the hiring of minorities
18 in both these municipalities.

19     Q.  Okay, so now that you've read that, your
20 statement in paragraph seven where you said the
21 federal court accepted your approach of aggregating
22 across jurisdictions in City of Lynn, would you
23 agree that that statement is not true?

24          MR. SULMAN: Objection.

130
1      A.   Well, I'm not an attorney.  I would have to
2   -- to read this a little bit more and try to digest
3   it and understand it, but I'm not as certain of
4   that statement as I was before.
5      Q.   (BY MS. ENGDAHL)  Do you know of any cases
6   where courts have accepted aggregated data of
7   multiple employers to support a liability against a
8   single employer?
9              MR. SULMAN:  Objection.
10     Q.   (BY MS. ENGDAHL)  Let me ask this a
11   different way.  I represent the City of Worcester.
12             MR. LICHTEN:  Well, hold on.  Just so
13   I'm clear, are you withdrawing that question?
14             MS. ENGDAHL:  I'm withdrawing that
15   question, because it just seemed that --
16             MR. LICHTEN:  Well, I don't know.  I'm
17   not sure that he didn't want to answer.  He may
18   have just been thinking.  You can withdraw it if
19   you want.  That's your privilege.  But if you want
20   to stick with the question, he gets to answer it.
21             MS. ENGDAHL:  I withdraw the question.
22             MR. LICHTEN:  Okay.
23     Q.   (BY MS. ENGDAHL)  Would you agree that your
24   two expert reports, dated October 2008 and March of

1  2009, don't contain any analysis for each of the

2  individual municipal defendants?

3      A.  Other than -- other than Boston?

4      Q.  Other than Boston, correct.

5      A.  Yes.

6      Q.  Okay.  Do you know, for example, whether

7  those statewide adverse impact analysis statistics

8  in your expert reports would be sufficient to find

9  adverse impact within each jurisdiction, or is more

10 needed?

11              MR. SULMAN:  Objection.

12     A.  I think that's largely a legal question and

13 I don't know the answer to that.

14     Q.  (BY MS. ENGDAHL)  Well, you -- you've read

15 Dr. Outtz's report, and he challenges the use of

16 aggregated statistics?

17     A.  Yes.

18     Q.  And I believe in your reports you -- you do

19 opine that you believe aggregated statistics

20 statewide are appropriate?

21     A.  Right.

22     Q.  Does that mean that the adverse impact of

23 hiring -- analysis of hiring within each

24 jurisdiction is not important to your overall

132
1  opinion as to whether --

2       A.   Well, I think there are two different

3  things I could have an opinion on.  One is does the

4  exam have an adverse impact, and with respect to

5  the question of whether the exam has an adverse

6  impact, I think the aggregation across all the

7  people that took the exam makes sense.  With

8  respect to, you know, is there adverse impact in an

9  individual municipality, well, with respect to the

10  hiring of that municipality, that would be a

11  different -- a different question, and there you'd

12  look at the hiring in the municipality.

13       Q.   Okay, so -- so you agree that in order to

14  determine whether a municipality, whether their

15  hiring promotion policies have adverse impact on

16  minorities, you agree you would have to look at the

17  statistics of hiring within that particular

18  municipality?

19            MR. SULMAN:  Objection.

20       A.   That would definitely be something to look

21  at, yes.  I would also look at the state-wide

22  information.

23       Q.   (BY MS. ENGDAHL)  Well, let me give you an

24  example.  If it were the case that one of the

133

1   defendants, their rate of hire of minorities

2   compared to whites off of one of these promotional

3   exams was 1.0. Notwithstanding that on a statewide

4   basis the exam may show adverse impact in hiring

5   statewide, would you agree that that defendant

6   should not be held liable if in fact within their

7   community there's no adverse impact?

8          MR. SULMAN: Objection. That's a legal

9   question.

10     A.  Well, I think it is a legal question. You

11  have the Teale decision that says that each of the

12  components has to be valid, the -- so if the

13  municipality managed to have an adverse impact

14  ratio of one, but the exam nevertheless had adverse

15  impact --

16     Q.  (BY MS. ENGDAHL) Where? When you say --

17  when you say but the exam nevertheless had adverse

18  impact, in another jurisdiction?

19     A.  No. Let's say the pass/fail rate in the

20  municipality. So I think the answer to your

21  question is that it's a legal issue. I'm not sure

22  my answers -- I can answer the legal aspect.

23     Q.  Okay, but you defined adverse impact when

24  we started the testimony as relating to rates of

134
1   hire, not pass/fail rates.

2        A.  Well, I started out and I said that that is

3   the basic or fundamental issue in adverse impact,

4   but I think that the pass/fail rates is also an

5   aspect of adverse impact.  So you could have

6   adverse impact against minorities in the pass/fail

7   rates even if perhaps you have no adverse impact in

8   appointments, and the extreme case of that is that

9   you don't make any appointments.

10       Q.  But adverse impact you've already said is

11  defined based on rates of hire, so if the rate of

12  hire is 1.0 --

13       A.  If you read back my answer, I didn't say

14  that it was only the rate of hire.

15       Q.  I think that's what it says in your report.

16       A.  I think you can have adverse impact in

17  pass/fail rates as well as adverse impact in rates

18  of hire.

19       Q.  So is it your testimony you weren't -- you

20  don't have an opinion on whether the rates of hire

21  within the City of Worcester demonstrate an adverse

22  impact?

23       A.  I received some data recently from each of

24  the defendant municipalities in the Answers to the

135

1  Interrogatories, and I've started looking at that,

2  but I've not finished that, and --

3      Q.  So other than the City of Boston, as of

4  this date you haven't conducted any analysis of --

5  on any of the municipal --

6      A.  I've done some preliminary analysis and it

7  appears to me that most, if not all of the

8  defendant municipalities have indication of adverse

9  impact, but I'll be writing up that analysis of the

10 latest sets of data.

11     Q.  You're familiar with shift of one?

12     A.  Yes.

13     Q.  Okay.  Can you explain how you would apply

14 a shift of one equation to an adverse impact

15 analysis and when you would do so?

16     A.  So the shift of one analysis I think is an

17 attempt to deal with small numbers of people, so

18 that if a shift in hiring of one person changes the

19 adverse impact ratio from well below .80 to well

20 above .80, perhaps -- the adverse impact ratio

21 perhaps is the function of small numbers of people

22 involved and chance.

23     Q.  Okay.  Is there an industry standard that

24 would tell you when the numbers are too small to be

136
1   statistically significant and when you would use
2   the shift of one?
3        A.   I think that if you had statistical
4   significance, you probably wouldn't use the shift
5   of one, so I would imagine you would only apply
6   that if you did not have statistical significance.
7        Q.   And what kind of numbers, if there are any
8   industry standards, would be considered too small
9   to have statistical significance?
10       A.   It depends on how many people are
11  appointed, so if you have a small handful of
12  appointments, one, two, three, maybe even four or
13  five, it's very difficult to show statistical
14  significance.  It also depends on the number of
15  minority and non-minority applicants or test
16  takers, so if you have only one or two minority
17  test takers and you're only appointing ten percent
18  of the people who applied, well, ten percent of one
19  person isn't very many people, so it's very hard to
20  find statistical significance if you have a very
21  small number of minorities.
22       Q.   Okay.  I'm going to show you a document.
23  It's the Report of James Outtz dated February 9th,
24  2009.  Do you have that document?

137

1    A.  Yes.

2        Q.  Okay.  I'd like to --

3            MR. SULMAN:  Is this an exhibit, or --

4            MS. ENGDAHL:  We can mark it as an

5    exhibit, but I think we know what everybody's

6    referring to.

7            (Exhibit 8 marked for identification.)

8        Q.  (BY MS. ENGDAHL)  I wanted to draw your

9    attention to a series of tables he has.  And you've

10   had an opportunity to read this, correct?

11       A.  I have.

12       Q.  Okay.  And in Table 2 --

13       A.  On page --

14       Q.  On page 17.  Sorry.  Table 2 is titled 2006

15   Statewide Adverse Impact Results By Department, and

16   I want to draw your attention down to the Worcester

17   Police Department.  And in 2008, you had the same

18   information that Dr. Outtz created this table from;

19   is that correct?

20       A.  Yes.  I might have updated information

21   since then.

22       Q.  Okay.  Assume these numbers are correct.

23       A.  Okay.

24       Q.  For the 2000 exam in the City of Worcester,

138
1   there were 11 minority test takers and one minority
2   was selected, and there were 50 non-minority takers
3   and six were selected.  Are you able to do off the
4   top of your head the adverse impact ratio for those
5   numbers?
6       A.  Well, let me get out my trusty calculator.
7   I get .76.
8       Q.  Okay.  And these are small numbers.  Would
9   you agree?
10      A.  Yes.
11      Q.  Okay.  Would you apply a shift of one to
12  those numbers?
13      A.  You could apply a shift of one to those
14  numbers.
15      Q.  Okay.
16      A.  I don't know if I would, but you could.
17      Q.  If one more minority were hired in
18  Worcester, what would that do to the adverse impact
19  ratio?
20      A.  It would increase it over .76.
21      Q.  Would it increase it over one?
22      A.  Yes.
23      Q.  Do you know if it would create an adverse
24  impact on whites?

1    A.   I don't think people usually calculate

2    adverse impact on whites, but it would.

3        Q.   Okay.  Based on the calculations you've

4    just done and the rates of hire in the City of

5    Worcester --

6        A.   Yes.

7        Q.   -- is it your opinion that the policy of

8    the City of Worcester in using the 2006 promotional

9    exam created an adverse impact on minorities?

10            MR. LICHTEN:   Just so I'm clear, you're

11   talking about the data in that data set, or the

12   updated data that he discussed?

13            MS. ENGDAHL:   Dr. Outtz always used the

14   updated data.  That's why I'm using Dr. Outtz's

15   report.

16            MR. LICHTEN:   Just the witness has said

17   that he looked at updated data, so I just want to

18   clarify.

19       Q.   (BY MS. ENGDAHL)   I'm asking you to assume

20   the data in Dr. Outtz's report is the updated data.

21       A.   So the reason for doing the shift of one is

22   described in those Q and A's that Dr. Outtz quotes.

23   And the reason for doing it is to try to address

24   the issue of chance, that maybe just by chance,

140
1   because they're very small numbers, you might have
2   selected one less rather than one more and
3   flip-flopped from not having adverse impact to
4   having adverse impact.
5        Q.   But you also testified that shift of one --
6             MR. LICHTEN:   Are you done with the
7   question -- uh --
8        A.   I wasn't done with it, the answer.
9        Q.   (BY MS. ENGDAHL)   Okay.   Sorry.
10       A.   So the shifting of one is an attempt to
11  deal with a statistical question of whether there's
12  just an effect of chance going on, and that assumes
13  you don't know anything else, but our state-wide
14  analysis shows that the exam has adverse impact.
15  So if the statewide analysis shows that the exam
16  has adverse impact based on lots of cases and it's
17  not a statistical fluke, and we also see that
18  there's adverse impact in Worcester, even if --
19  even if it would go away if you shifted one, the
20  reason for shifting one is that you don't have any
21  other information and you think that you don't want
22  to come to an erroneous conclusion if just shifting
23  one person is going to correct for chance, but here
24  we have some other information about the exam, so I

141

1   would not rely on the shift of one in Worcester for
2   that reason.

3       Q.   Dr. Wiesen, you testified that shift of one
4   is appropriate where, for example, it would
5   significantly change the adverse impact ratio, and
6   the calculation you just did showed that a shift of
7   one would go from an adverse impact on minorities,
8   slight, just under .8, to a significant adverse
9   impact on Caucasians.  Wouldn't that show you that
10  the numbers are so small that in fact shift of one
11  is appropriate for this sample?

12      A.   That would be an indication, but the
13  overall adverse impact of the examination is
14  another indication, and that -- that would indicate
15  that the adverse impact that we're seeing in a
16  municipality with small numbers is a real adverse
17  impact, not due to chance.

18      Q.   You didn't answer my question.

19      A.   I meant to.

20      Q.   Okay.  I'm asking you, based on these
21  statistics alone, the fact that when you shifted
22  one, I think the way you put it is that it goes
23  from well below to well above, that would indicate
24  that this is a small pool such that shift of one is

142
1    appropriate.  Do you agree?

2        A.  Well, when I tried to answer that question,

3    you told me I wasn't answering your question.

4        Q.  Yes or no?

5            MR. SULMAN:  Objection.

6        A.  I find it difficult to answer with a yes or

7    no.

8        Q.  (BY MS. ENGDAHL)  Okay.  Assume there is no

9    state-wide data.

10       A.  Oh, okay.

11       Q.  Assume Worcester is the only defendant

12   here.

13       A.  Okay.

14       Q.  Okay?  And they're using a test that no one

15   else has used.

16       A.  Yes.

17       Q.  Based on the calculations you just did,

18   isn't it true that this test has no adverse impact

19   on the rates of hiring for minorities to sergeant

20   in Worcester?

21       A.  Well, I think that it has an adverse impact

22   ratio of .76, which is less than the four-fifths

23   rule, but given the scenario you described, the

24   shift of one person would come into play.  And you

143

1    know, according to the uniform guidelines, the

2    federal enforcement agencies probably would not

3    consider that adverse impact.

4        Q.   Thank you.  Would you consider shift of one

5    an appropriate tool to use, or under industry

6    standards would it be appropriate to use a shift of

7    one in jurisdictions where there was only one or

8    two promotions total?  Would you agree that that's

9    small enough that in the industry shift of one

10   would be appropriate?

11       A.   Absent other information, yes.

12       Q.   Okay.  Okay.  Now, you've referred to your

13   statewide analysis shows adverse impact.  And I

14   read your report, and correct me if I'm wrong, that

15   based on your statewide analysis of rates of

16   hiring, you've concluded that the validity of the

17   test is the cause, or the lack of validity of the

18   test is the cause?

19       A.   No, the adverse impact analyses don't get

20   at validity.  They just get at adverse impact.

21       Q.   Do you think your analysis of adverse

22   impact done the way you did it on a statewide

23   basis, does that incorporate all factors that could

24   cause the adverse impact?  Are there other factors

144
1   that could cause that number to have a disparate

2   impact on minorities statewide?

3           MR. SULMAN:  Objection.

4       A.  Other factors than what?

5       Q.  (BY MS. ENGDAHL)  Well, I'm going to ask

6   you about the 2N+1 rule.  Would you agree that in

7   the jurisdictions you looked at, that overall,

8   minority test takers -- black test takers and

9   Hispanic test takers -- are a fraction of the white

10   or Caucasian test takers?

11       A.  Yes.

12       Q.  And you're aware that by law, the

13   jurisdiction/employer/appointing authority can only

14   look to the top three candidates when they're

15   making one appointment or one promotion?

16       A.  The rule of 2N+1, right.

17       Q.  Okay.  Suppose that one in ten test takers

18   is black, and everything being equal, are you able

19   to calculate the chances that a black candidate

20   would be in the top three if one in ten of the test

21   takers --

22       A.  So there are ten test takers?

23       Q.  Ten test takers; one is black.  What are

24   the odds that a black candidate would appear in the