IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

----------------------------------------------

PEDRO LOPEZ, et al.,

                Plaintiffs

     v.

City of Lawrence, Massachusetts, et al.

             Defendants.

----------------------------------------------

CIVIL ACTION NO. 07-CA-11693-JLT

# Report of Jacinto M. Silva, Ph.D.

Prepared by:

Jacinto M. Silva, Ph.D.
EB Jacobs
300 South Burrowes Street
State College, PA 16801

May 28, 2010

**PEDRO LOPEZ, et al., v. City of Lawrence, Massachusetts, et al.**

---

# Table of Contents

Introduction ........................................................................................................... 1

Worcester Promotion Results ............................................................................... 1

Correctness of Aggregating Data Across Jurisdictions and Exam Years ........................ 1

Effectiveness of the Knowledge Test ................................................................... 3

Banding ................................................................................................................. 3

Shortfall Analyses ................................................................................................. 4

    2005 Shortfalls by Jurisdiction ...................................................................... 5

    2006 Shortfalls by Jurisdiction ...................................................................... 6

    2007 Shortfalls by Jurisdiction ...................................................................... 6

    2008 Shortfalls by Jurisdiction ...................................................................... 7

Shortfalls and N+1 Analyses ............................................................................... 8

Fields Statistical Analysis Framework ................................................................. 9

Impact of Adding Components Proposed by Plaintiff's Experts ......................... 10

Conclusions ......................................................................................................... 11

References ........................................................................................................... 13

# Appendices

Appendix A:  Vitae ............................................................................................ A-1

Appendix B:  List of Documents and Data Relied Upon .................................... B-1

Appendix C:  Previous Testimony ..................................................................... C-1

Appendix D:  Compensation .............................................................................. D-1

# Electronic Computer File Attachment

An Excel workbook named "2005, 2006, 2007, and 2008 Police Sergeant Data with HRD Updates Through March 2010.xls" with Massachusetts sergeant promotion data with latest updates.

**Supplemental Report Regarding the Assessment of Promotional Processes as They Affect African-American and Hispanic Candidates in the 2005 to 2008 Commonwealth of Massachusetts Municipal Police Sergeant Promotional Examinations**

I started my career with the Army Research Institute conducting research studies in the field of Industrial and Organizational Psychology.  Currently I am a senior managing consultant at EB Jacobs LLC where I direct public safety selection and promotion projects and provide statistical analysis and expertise for clients.  My resume is attached in **Appendix A**.

<u>Introduction</u>

This report will address the recent reports of Dr. Cassie Fields (March 30, 2010) and Dr. Joel Wiesen (April 14, 2010).  My original report addressed police sergeant promotional processes for the years ranging from 2005 to 2007.  This report will, in addition, consider the 2008 police sergeant promotional process.  I will also address the critique of my earlier report by Drs. Fields and Wiesen.

<u>Worcester Promotion Results</u>

Dr. Wiesen indicated in his latest reports that there were no promotions in the jurisdiction of Worcester and that I or HRD are wrong.  There may have been an error in the data that was provided to Dr. Wiesen by HRD.  I have confirmed with HRD and Worcester that my numbers are correct.

<u>Correctness of Aggregating Data Across Jurisdictions and Exam Years</u>

In their reports, Drs. Fields and Wiesen continue to insist that it is correct and necessary to aggregate the candidates from the different jurisdictions into a single large group for a promotional exam even though promotions are solely made within each jurisdiction.  In addition, in the latest reports both experts argue for not only aggregating across jurisdictions but across jurisdictions <u>and</u> exam years.  They offer a weak rationale to support their assertions for aggregation across either jurisdiction or both jurisdiction and exam year.

The most cogent argument for aggregating across jurisdictions is made by Dr. Fields on page 11 of her report.  In summary, the strongest part of the argument is that the candidates prepare from the same materials and take the same exam.  The reality that candidates from one jurisdiction cannot be promoted in another jurisdiction is by all appearances irrelevant to these experts.  For both experts it also appears to be irrelevant that the same candidates participate in the exams from year to year and that the collapsed multi-exam data contains many of the candidates multiple times and further confounds the data. Even more disturbing is that in data that is aggregated across exams, many candidates appear as both promoted and non-promoted candidates.  The facts though are that by state law, appointments are made within jurisdictions and candidates from one jurisdiction are <u>not</u> eligible for promotions in other jurisdictions (Mass. Gen. Laws ch. 31, §§ 59 and 65).

Dr. Wiesen stated (page 7) that HRD has a policy of sometimes combining candidate scores from two exams into one list.  He then employs this as a basis for combining all of the data across exams and jurisdictions.  The only time this occurs is if a jurisdiction that has very few exam takers requests that the test be given again the following year to additional candidates.  The lists are then combined into a single list for the purpose of promotions.  According to HRD this has

1

happened only perhaps three times in the past two years and only in very small jurisdictions. It is only used if a jurisdiction has so few candidates that tested that it did not make the process competitive. It has never occurred in the defendant jurisdictions according to HRD. This practice hardly provides a basis for combining all jurisdictions across exam years. First, the candidates that are combined across exam years in these unusual cases are not repeated in the combined list as opposed to Dr. Wiesen's combined exam lists. Second, the fact remains that for nearly all jurisdictions analyzed, Dr. Wiesen's combined-exam approach does not reflect the reality of the actual process. If Dr. Wiesen would care to share information as to the handful of jurisdictions where this occurred I would, of course, want to analyze the data for those jurisdictions to reflect the actual process. However, given the parameters of this issue, the impact of this infrequent practice would have no impact on the results in my estimate.

I understand that it is more difficult for these experts to argue adverse impact when examining the data at the jurisdiction level within a single exam year. That is why these experts are citing untenable rationales to support aggregation of candidates across jurisdictions and exam years. After all, with larger samples even small average differences between groups become statistically significant. However, the reality of the actual promotion process should be respected in the analyses. Moreover, applying aggregation to a process where it is inappropriate can be extremely misleading and cause one to reach completely erroneous conclusions. The phenomenon has a name and it is known as Simpson's Paradox. Below I reiterate the jurisdiction aggregation example from my 2/9/2009 report in Table 1 to demonstrate this paradox.

*Table 1: Example That Demonstrates the Inappropriateness of Aggregation Across Jurisdictions*

|  | Jurisdiction 1 | | Jurisdiction 2 | |
|---|---|---|---|---|
|  | Minority | White | Minority | White |
| Number of Test Takers | 2 | 14 | 28 | 49 |
| Number of Candidates Promoted | 1 | 7 | 4 | 7 |

| Adverse Impact (AI) Within Jurisdiction | 1.00 | 1.00 |
|---|---|---|
| Adverse Impact (AI) Across Jurisdictions | 0.75 | |

In the example above, if adverse impact is computed within jurisdiction there is no adverse impact within either jurisdiction. However, if the two jurisdictions are combined and it is erroneously assumed that all candidates are eligible for promotions in either jurisdiction, then the adverse impact becomes 0.75 (below the "4/5ths rule of thumb," which holds that an adverse impact number below 0.80 is a *possible* indicator of discriminatory practices). The inappropriateness of using aggregated data when calculating adverse impact is thus obvious, not only because it erroneously assumes that candidates are eligible for promotion in any jurisdiction or exam year but also because as a result it leads to erroneous conclusions.

Although I strongly believe that the data should not be aggregated across jurisdiction or across exams and should reflect actual procedures, I am not insensitive to Drs. Wiesen and Fields' concerns about small datasets. I have therefore accepted, for my own analyses, Drs. Wiesen and Fields' choice to combine blacks and Hispanics together as a single minority group. It should be noted that the combination of minorities into a single group occurs occasionally in these types of cases but is not supported in the Guidelines and is highly unusual. I have made this concession because it allows for creating a larger group of minority candidates and provides some additional stability to the data while still retaining fidelity to the actual promotion process. If the data was analyzed separately for blacks and Hispanics, the statistical probability values (i.e., p-values) that I

2

will provide later in this report would be even higher, indicating even less support for the position that promotion rates differ between minority subgroups and whites.

<u>Effectiveness of the Knowledge Test</u>

Dr. Landy in his report (as adopted by Dr. Fields) characterized HRD's multiple-choice sergeant promotion test, which is largely a knowledge test, as ineffective.  In my original response I argued that if the sergeant's exam was ineffective then current sergeant incumbents at the state level and in Boston would perform no better than candidates for the sergeant position.  On the other hand, if the test was measuring knowledge used by incumbent sergeants then we would expect the incumbents to perform better than sergeant candidates.

In my original response I indicated that 89 percent of the Boston sergeant incumbents who took the exam performed passed (i.e., scored 70 percent or better on the 53 questions common to the sergeant and lieutenant exams), whereas only 63 percent of the sergeant candidates passed.  Similarly, at the state level (without including Boston candidates) 79 percent of the sergeant incumbents passed compared to 51 percent of the sergeant candidates.

Dr. Fields indicates that this leaves 11 percent of Boston incumbent sergeants and 21 percent of non-Boston incumbent sergeants who did not pass.  She argues that this "is a very large percentage of current sergeants" who failed.  Examined from the passing side, the percent that passed is very high.  In setting job performance cut score points industrial psychologists often use one standard deviation below the average job performance for a group to reflect poor performance.  This means that for a normally distributed population, about 16 percent of the incumbents are considered poor performers.  This 16 percent estimate is right in line with the two observed percentages of 11 percent for Boston and 21 percent statewide.  Furthermore, the argument I made does not rest on a 70 percent test score cutoff.  At any reasonable cutoff, more incumbents would always score above the cut score, still supporting the position that incumbent sergeants outperform incumbent police officers because of the relevance of the knowledge test to the sergeant position.  For example, if the cutoff was lowered to 65 percent in Boston, the percent of passing incumbent sergeants would be 95 percent compared to only 80 percent of sergeant candidates.

<u>Banding</u>

The process of banding to address imperfect reliability in any testing process is well established.  The idea behind score banding is that all testing involves some measurement error.  Therefore scores that differ by a few points should be considered equivalent.  Although some question the assumptions that underlie banding and appropriateness of using a single band width at all points on a score distribution, EB Jacobs recommends banding to many of our clients to make the process fairer to all candidates.

However, the use of banding to increase minority hiring is ineffective.  A low percentage of minorities in the pool of candidates (i.e., in Massachusetts from 2005 to 2007 the rate of promotions ranged from 6 to 11 percent by year) ensures that few minority candidates are in the top band.  The few minority candidates that would naturally make it into the top band would have to perform better than the remaining candidates on additional criteria used to decide amongst those candidates within that band.  Would the use of banding increase minority promotions?  Sometimes it might but the overall likelihood of making any substantial difference is small. The plaintiff's experts have not provided any analyses of the Massachusetts candidate data that indicate that there would be any impact, let alone a substantial impact.

It is also highly unlikely that absent a court order banding can be implemented in Massachusetts. The state attempted to implement a banding procedure for the 2008 exam and was barred from proceeding with banding of the 2008 scores after a petition to bar its use was filed on March 27, 2009 (Pratt *et al.* v. Dietl).  When the state held a public hearing on the banding process in December of 2009 I served as the state's expert in explaining the purpose and process of banding. I cannot recall even a single person from the public that spoke at the hearing in support of implementing the banding process.  The majority of those that spoke argued that allowing promotion decision makers to decide from amongst a group of candidates in a band would lead to favoritism and subjectivity in the promotion process.  They felt that his would eliminate the progress that has been achieved in making the process fair to everyone.  A state legislator also spoke at the hearing and indicated that there would be legislative action to counter it if the banding process was implemented.

<u>Shortfall Analyses</u>

In my earlier report I reported the "shortfalls" [1] from 2005 to 2007.  Below I will add to that presentation as well as present statistics for the 2008 promotion testing.

It is often incorrectly assumed that adverse impact will not be identified via the adverse impact ratio statistic when there is no average difference in test performance between the majority group and protected groups (i.e., would have a small false positive rate of just 5 percent or less, similar to the level encountered in traditional statistical testing).  This is not at all the case when the number of candidates is small (i.e., not at least close to 1,000 candidates), the number of minority candidates is small, or the number of promotions is small.  Roth, Bobko, and Switzer (2006) concluded based on their Monte Carlo analysis of the adverse impact ratio on page 519 of their paper:

> As noted above, there is a fairly high false positive rate for the 4/5ths rule used by itself (particularly when sample sizes are 200-400) and there are less than 50 hires.  Thus any literature that uses the 4/5ths rule as a criterion (or benchmark) should be aware of the measure's limitations.  Also, the fairly high false positive rate can result in decision makers having erroneous information to guide their allocation of resources to various actions or areas (e.g., decision makers could be advised that there is a problem when none may exist).  Considering the very high frequency of violations of the rule under operationally realistic conditions (see Study 2), regulatory agencies and lawyers have substantial prima facie support for conducting investigations and filing lawsuits in a great variety of situations (even when relatively diversity-friendly selection systems are devised).

Dr. Fields argues that adverse impact could be eliminated through the use of alternative testing. However, even eliminating all group average differences in tests would not likely eliminate observed adverse impact within jurisdictions.  In fact, it is extremely likely that that even in Dr. Fields' optimal scenario adverse impact would still be indicated.

---

[1]  My "shortfall" analysis should not be construed as any indication that an employer is obliged to appoint candidates in accordance with any set proportions or quotas drawn along racial or ethnic lines.  It is simply a statistical analysis designed to show what the numerical breakdowns of promotional appointments (Caucasian and minority) would be if they conformed perfectly with the "4/5ths rule of thumb" (i.e., the promotion rate for minority candidates was exactly 80% of the promotion rate for Caucasian candidates).

The last column labeled "Prob. Still Finding AI < 0.80″ in the tables below is new to this report. The data has also been updated with data provided by HRD through March 2010.  The values in the new column report the probability estimate of finding adverse impact against protected groups (i.e., using the adverse impact ratio calculation) <u>even</u> if no average test performance difference existed for the populations of candidates (i.e., candidates from each group were sampled from the <u>same</u> Normal distribution).  This probability is accurately estimated using a Monte Carlo technique where the scenario specific to the jurisdiction is simulated one million times and the probability of finding adverse impact against minorities is computed.  One million iterations were used to insure high stability for the estimate.

<u>2005 Shortfalls by Jurisdiction</u>

Examining the last column in the table below, we can see that in 2005 (for the jurisdictions that tested minority candidates and made at least one promotion), the probability of finding adverse impact in 12 of the 15 jurisdictions was more likely than not.  Furthermore, in six of the jurisdictions we would expect it over 75 percent of the time even if we were to completely eliminate group differences in test performance.  In one jurisdiction it would be exactly 0.50 (50/50), in another jurisdiction it would be slightly less than 50/50 (i.e., 0.47) and in one jurisdiction the likelihood would still be 0.22.  Thus, in the majority of the 2005 jurisdictions it was strongly more likely than not that one would find adverse impact <u>even if average test performance differences between minorities and whites were completely eliminated</u>.

*Table 2:  2005 Probability of Adverse Impact Even If Groups Performed Equally Well by Jurisdiction*[2]

| Jurisdiction | Takers B/H | Takers White | Appt B/H | Appt White | AI | AI (N+1) | Shortfall | Fisher's Exact Test P-Value | Prob. Still Finding AI < 0.80 |
|---|---|---|---|---|---|---|---|---|---|
| BOSTON POLICE DEPT | 224 | 381 | 9 | 57 | 0.27 | 0.30 | 12.11 | 0.00 | 0.22 |
| CARVER POLICE DEPT | 1 | 3 | 0 | 2 | 0.00 | 3.00 | 0.42 | 1.00 | 0.50 |
| CHELSEA POLICE DEPT | 10 | 15 | 2 | 1 | 3.00 | ND | -0.96 | 0.54 | 0.65 |
| EVERETT POLICE DEPT | 1 | 14 | 0 | 1 | 0.00 | ND | 0.05 | 1.00 | 0.93 |
| FALMOUTH POLICE DEPT | 2 | 8 | 0 | 3 | 0.00 | 2.00 | 0.50 | 1.00 | 0.47 |
| GREENFIELD POLICE DEPT | 1 | 10 | 0 | 1 | 0.00 | ND | 0.07 | 1.00 | 0.91 |
| MBTA POLICE | 10 | 34 | 0 | 6 | 0.00 | 0.68 | 1.14 | 0.31 | 0.59 |
| NATICK POLICE DEPT | 1 | 10 | 0 | 3 | 0.00 | 5.00 | 0.22 | 1.00 | 0.73 |
| QUINCY POLICE DEPT | 3 | 38 | 0 | 4 | 0.00 | 4.22 | 0.24 | 1.00 | 0.73 |
| RANDOLPH POLICE DEPT | 1 | 6 | 0 | 1 | 0.00 | ND | 0.12 | 1.00 | 0.86 |
| SPRINGFIELD POLICE DEPT | 18 | 28 | 0 | 6 | 0.00 | 0.31 | 2.04 | 0.07 | 0.56 |
| WAREHAM POLICE DEPT | 2 | 7 | 0 | 1 | 0.00 | ND | 0.19 | 1.00 | 0.78 |
| WELLESLEY POLICE DEPT | 1 | 8 | 0 | 2 | 0.00 | 8.00 | 0.18 | 1.00 | 0.78 |
| WEST SPRINGFIELD POLICE | 1 | 12 | 0 | 2 | 0.00 | 12.00 | 0.13 | 1.00 | 0.85 |
| WHITMAN POLICE DEPT | 2 | 10 | 0 | 2 | 0.00 | 5.00 | 0.28 | 1.00 | 0.68 |

---

[2] In Tables 2 through 5, the abbreviation "B/H" signifies Black and/or Hispanic candidates (test "takers").  The column headed "Appt B/H" identifies the number of Black and/or Hispanic candidates actually promoted in a given jurisdiction. The column headed "AI (N+1)" contains adverse impact ratios utilizing the "shift of one person" correction discussed in Answer 21 of the *Uniform Guidelines* (*Questions and Answers*).

## 2006 Shortfalls by Jurisdiction

In 2006, in the 17 jurisdictions that tested minority candidates and promoted at least one candidate, 13 would be more likely than not to have adverse impact even if we eliminated all group performance differences. In these 13, for 10 it would be more than 75 percent likely that we would still find an indication of adverse impact.

In the four jurisdictions where the likelihood of finding adverse impact would drop below 50 percent under optimal group difference conditions, three were 0.43 or higher (it should also be noted that for one of these cases, Framingham, the adverse impact ratio in 2006 was 2.00) and one was 0.26. Even in these four cases involving lower probability of adverse impact, we would still expect to have false positive rate of 41 percent (i.e., average of the lowest four probabilities below 0.50).

*Table 3: 2006 Probability of Adverse Impact Even If Groups Performed Equally Well by Jurisdiction*

| Jurisdiction | Takers B/H | Takers White | Appt B/H | Appt White | AI | AI (N+1) | Shortfall | Fisher's Exact Test P-Value | Prob. Still Finding AI < 0.80 |
|---|---|---|---|---|---|---|---|---|---|
| ANDOVER POLICE DEPT | 2 | 16 | 0 | 2 | 0.00 | 8.00 | 0.18 | 1.00 | 0.78 |
| BROCKTON POLICE DEPT | 15 | 45 | 0 | 7 | 0.00 | 0.50 | 1.47 | 0.18 | 0.43 |
| CHICOPEE POLICE DEPT | 1 | 16 | 0 | 1 | 0.00 | ND | 0.05 | 1.00 | 0.94 |
| FALL RIVER POLICE DEPT | 6 | 33 | 0 | 1 | 0.00 | ND | 0.13 | 1.00 | 0.85 |
| FITCHBURG POLICE DEPT | 2 | 6 | 0 | 1 | 0.00 | ND | 0.21 | 1.00 | 0.75 |
| FRAMINGHAM POLICE DEPT | 3 | 12 | 1 | 2 | 2.00 | 8.00 | -0.50 | 0.52 | 0.48 |
| LAWRENCE POLICE DEPT | 10 | 36 | 0 | 3 | 0.00 | 1.80 | 0.55 | 1.00 | 0.47 |
| LOWELL POLICE DEPT | 7 | 36 | 0 | 7 | 0.00 | 0.86 | 0.94 | 0.58 | 0.26 |
| MARLBOROUGH POLICE DEPT | 1 | 9 | 0 | 2 | 0.00 | 9.00 | 0.16 | 1.00 | 0.80 |
| NEEDHAM POLICE DEPT | 1 | 6 | 0 | 1 | 0.00 | ND | 0.12 | 1.00 | 0.86 |
| PEABODY POLICE DEPT | 1 | 18 | 0 | 2 | 0.00 | 18.00 | 0.09 | 1.00 | 0.89 |
| PLAINVILLE POLICE DEPT | 1 | 3 | 0 | 1 | 0.00 | ND | 0.21 | 1.00 | 0.75 |
| REVERE POLICE DEPT | 1 | 18 | 0 | 2 | 0.00 | 18.00 | 0.09 | 1.00 | 0.89 |
| SOMERVILLE POLICE DEPT | 3 | 28 | 0 | 3 | 0.00 | 4.67 | 0.24 | 1.00 | 0.73 |
| SUDBURY POLICE DEPT | 1 | 5 | 0 | 1 | 0.00 | ND | 0.14 | 1.00 | 0.83 |
| WHITMAN POLICE DEPT | 2 | 10 | 0 | 2 | 0.00 | 5.00 | 0.28 | 1.00 | 0.68 |
| WORCESTER POLICE DEPT | 11 | 50 | 1 | 6 | 0.76 | 1.82 | 0.05 | 1.00 | 0.63 |

## 2007 Shortfalls by Jurisdiction

In 2007 the effect is even more pronounced. In the 16 jurisdictions that tested minority candidates and promoted at least one candidate in 2007, 14 would be more likely than not to have adverse impact even if we eliminated all average group performance differences. In these 14, for 11 it would be more than 75 percent likely that we would still find an indication of adverse impact.

In the two jurisdictions where the likelihood of finding adverse impact would drop below 50 percent under optimal group difference conditions, one was still 0.34 and the other was 0.29 (it should also be noted that for this case, Southbridge, the adverse impact ratio in 2007 was 1.33).

*Table 4: 2007 Probability of Adverse Impact Even If Groups Performed Equally Well by Jurisdiction*

| Jurisdiction | Takers B/H | Takers White | Appt B/H | Appt White | AI | AI (N+1) | Shortfall | Fisher's Exact Test P-Value | Prob. Still Finding AI < 0.80 |
|---|---|---|---|---|---|---|---|---|---|
| AGAWAM POLICE DEPT. | 1 | 10 | 0 | 1 | 0.00 | ND | 0.07 | 1.00 | 0.91 |
| CAMBRIDGE POLICE DEPT | 6 | 30 | 0 | 3 | 0.00 | 2.50 | 0.41 | 1.00 | 0.57 |
| CHELSEA POLICE DEPT | 7 | 14 | 1 | 0 | ND | ND | -0.71 | 0.33 | 0.67 |
| FALMOUTH POLICE DEPT | 2 | 12 | 0 | 1 | 0.00 | ND | 0.12 | 1.00 | 0.86 |
| HOLDEN POLICE DEPT | 1 | 6 | 0 | 1 | 0.00 | ND | 0.12 | 1.00 | 0.86 |
| HOLYOKE POLICE DEPT | 6 | 23 | 0 | 1 | 0.00 | ND | 0.17 | 1.00 | 0.79 |
| LYNN POLICE DEPT | 1 | 31 | 0 | 3 | 0.00 | 15.50 | 0.08 | 1.00 | 0.91 |
| MBTA POLICE | 4 | 24 | 0 | 2 | 0.00 | 6.00 | 0.24 | 1.00 | 0.73 |
| SOUTHBRIDGE POLICE DEPT | 3 | 4 | 1 | 1 | 1.33 | ND | -0.25 | 1.00 | 0.29 |
| SPRINGFIELD POLICE DEPT | 15 | 20 | 1 | 6 | 0.22 | 0.53 | 1.63 | 0.20 | 0.34 |
| STOUGHTON POLICE DEPT | 1 | 15 | 0 | 2 | 0.00 | 15.00 | 0.10 | 1.00 | 0.88 |
| TEWKSBURY POLICE DEPT | 1 | 17 | 0 | 2 | 0.00 | 17.00 | 0.09 | 1.00 | 0.89 |
| WATERTOWN POLICE DEPT | 1 | 10 | 0 | 1 | 0.00 | ND | 0.07 | 1.00 | 0.91 |
| WESTFIELD POLICE DEPT | 1 | 10 | 0 | 2 | 0.00 | 10.00 | 0.15 | 1.00 | 0.82 |
| WEYMOUTH POLICE DEPT | 1 | 24 | 0 | 1 | 0.00 | ND | 0.03 | 1.00 | 0.96 |
| WOBURN POLICE DEPT | 1 | 10 | 0 | 1 | 0.00 | ND | 0.07 | 1.00 | 0.91 |

## 2008 Shortfalls by Jurisdiction

In the seven jurisdictions that tested minority candidates and promoted at least one candidate in 2008, six would be more likely than not to have adverse impact even if we eliminated all group performance differences. In these six, for five it would be more than 75 percent likely that we would still find an indication of adverse impact.

In only one of the jurisdictions would the likelihood of finding an indication of adverse impact drop below 50 percent. But even in that jurisdiction (i.e., Boston) the likelihood of finding an indication of adverse impact even after eliminating all group differences would still be 23 percent likely.

*Table 5: 2008 Probability of Adverse Impact Even If Groups Performed Equally Well by Jurisdiction*

| Jurisdiction | Takers B/H | Takers White | Appt B/H | Appt White | AI | AI (N+1) | Shortfall | Fisher's Exact Test P-Value | Prob. Still Finding AI < 0.80 |
|---|---|---|---|---|---|---|---|---|---|
| ANDOVER POLICE DEPT | 1 | 9 | 0 | 1 | 0.00 | ND | 0.08 | 1.00 | 0.90 |
| BOSTON POLICE DEPT | 213 | 275 | 1 | 25 | 0.05 | 0.11 | 8.95 | 0.00 | 0.23 |
| BROCKTON POLICE DEPT | 11 | 37 | 0 | 1 | 0.00 | ND | 0.19 | 1.00 | 0.77 |
| BROOKLINE POLICE DEPT | 1 | 17 | 0 | 3 | 0.00 | 8.50 | 0.13 | 1.00 | 0.83 |
| DARTMOUTH POLICE DEPT | 1 | 9 | 0 | 1 | 0.00 | ND | 0.08 | 1.00 | 0.90 |
| GLOUCESTER POLICE DEPT | 1 | 18 | 0 | 1 | 0.00 | ND | 0.04 | 1.00 | 0.95 |
| LAWRENCE POLICE DEPT | 15 | 27 | 0 | 1 | 0.00 | ND | 0.31 | 1.00 | 0.64 |

In summary, in 82 percent of the individual jurisdictions that promotion tested for the position of police sergeant between 2005 and 2008, the likelihood of a false finding of adverse impact would have been very high even in the absence of any average performance difference. This is because

we are generally dealing with small numbers of candidates in each jurisdiction and an even smaller number of promotions.

Shortfalls and N+1 Analyses

Dr. Fields stated on page 15 of her report that "The shortfall analysis misleads one into thinking that now suddenly more minorities will pass the exam and get into consideration range. This does not make sense."

Also on page 15, Dr. Fields states:

> The theory behind the shortfall analysis is that one or two additional minorities were promoted or one or two non-minorities were not promoted in a particular jurisdiction, then the observed adverse impact is questionable because minor changes in selection rates would produce non-significant results. But this is not what Dr. Outtz or Dr. Silva did when they performed their shortfall analysis. They asked what would happen if one additional minority was hired and simultaneously one less non-minority was hired in 15 jurisdictions.

Dr. Fields appears to be confusing shortfall analyses with N+1 analyses. It is not a shortfall analysis as Dr. Fields labels it. This is an N+1 analysis that follows from Question 21 in the Guidelines. My N+1 analyses added one minority promotion and subtracted one white promotion. Although as Dr. Fields acknowledged (and the Guidelines allow), I could have conducted the analysis by changing the promotions one or two additional minorities. I felt that I should take the more conservative approach and consider the addition of just one additional minority candidate.

Dr. Fields contends that the N+1 analysis is inappropriate if it is applied to many jurisdictions. But many jurisdictions are what are involved. We cannot perform the analysis on one jurisdiction and not in another. Nor can we combine candidates across jurisdictions if each candidate is not being considered for a position in multiple jurisdictions. Furthermore, if promoting one more minority candidate in place of a white promoted candidate can wildly change the adverse impact ratio (i.e., observed ratios literally changed from 0 to 2, 3, 5, 10 15, 17, 18 and everything in between) in so many jurisdictions, it is completely appropriate to consider the impact of switching one promotion from a white promotion to a minority promotion. Not only is it appropriate, it is something that the Guidelines specifically recommend to avoid false positives that result from small numbers. After all, it is already clear from the analyses in the previous section that even in the absence of any average group differences, in 82 percent of the jurisdictions examined from 2005 to 2008 there is a better chance of falsely finding adverse impact than not.

Dr. Fields believes that conducting an N+1 analysis on each jurisdiction is excessive. I believe that faced with 82 percent of the jurisdictions having a better than even chance (and often 75 percent chance or higher) of a false positive finding with regard to adverse impact, it would be remiss on my part not to conduct the N+1 analysis on all jurisdictions.

Dr. Fields also states on page 15:

> They asked what would happen if one additional minority was hired and simultaneously one less non-minority was hired in 15 jurisdictions. This is not the addition of one or two minorities <u>or</u> the subtraction of one or two non-minorities. This is, instead, the addition of 15 minorities <u>and</u> the subtraction of 15 minorities across 15 jurisdictions." *(Underlining added)*

Presumably Dr. Fields meant to say "subtraction of 15 non-minorities" and not "subtraction of 15 minorities" so I will assume that. What is confusing is that Dr. Fields seems to be arguing that the addition of a minority promotion should not have occurred together with the subtraction of a non-minority promotion. However, the example in the Guidelines makes it clear that the addition of a minority occurs together with the subtraction of a non-minority.

With regard to the shortfall analyses which Dr. Fields appears to have confused with the N+1 analyses, they are not unusual in this arena. The Department of Justice, for example, employs shortfalls to quantify potential adverse impact for organizations. There was no attempt to mislead anyone with the shortfall analysis. The shortfall analysis provides a person-based translation of all of the statistics. It is a simple way to boil everything down to actual number of minority candidates impacted. In cases where the shortfall is less than 0.50, it indicates that not even with rounding to the nearest whole candidate would one expect to promote a single minority candidate. For example, in 2008 the shortfalls in Table 5 above demonstrate that in six of the seven jurisdictions (i.e., all but Boston) you would not expect to promote a minority candidate. Except for Boston, in 2008 the shortfalls in the remaining jurisdictions are all less than a third of a candidate.

<u>Fields Statistical Analysis Framework</u>

Dr. Fields argues on page 6 of her report that she favors the three step analysis of adverse impact. The first step in this framework is to compute an adverse impact ratio. If this ratio falls below 0.80 then adverse impact is demonstrated. In the previous section I have illustrated how flawed this ratio is by demonstrating that even in cases where groups perform identically, on average, the adverse impact ratio in most jurisdictions indicates that adverse impact exists where it does not.

The second step according to Dr. Fields is to examine the statistical significance of group differences in promotion rates. I agree with this step. In fact statistical significance testing is the only method that controls the probability of a false positive to exactly 5 percent. A 5 percent false positive rate is the rate traditionally accepted in statistical significance testing.

The final step according to Dr. Fields is to evaluate the promotion rate difference in the second step in terms of standard deviation units. Although the results of the second step can indeed be interpreted in "standard deviation units" this is essentially another way to represent the results of the second step. It is not a third way to determine whether the group promotion rates differ.

In addition, the label "standard <u>deviation</u> units" is misused and could be misinterpreted by those who are used to referring to group differences in terms of standard deviation units. The correct term is "standard <u>error</u> units" when referring to standard deviation units of a <u>statistic</u> as this clearly is. Although I do not believe Dr. Fields is attempting to mislead since she later refers to differences in standard deviation units, it is important to note that standard error units are heavily impacted by the sample size while standard deviation units are not. With sufficiently large N, the smallest of differences (i.e., 0.01) could be shown to represent over three standard error units and happen by chance only 1 in a 1,000 times.

When someone is told that the difference is three "standard deviation units" when a more typical difference is a half unit or a full unit, one might believe that the difference is much larger than it is. Combined with the aggregation of data across jurisdiction (i.e., creating very large N) it would be very easy to believe that the differences cited by Drs. Fields and Wiesen are much larger than they are in reality.  Dr. Wiesen also uses this terminology.

The bottom line is that there are two approaches to establishing adverse impact.  The first is the adverse impact ratio and the second is statistical significance testing.  Given the large false positive rate associated with the adverse impact ratio metric, I believe the only fair approach is statistical testing which limits false positives to 5 percent.

Dr. Fields also cites various guidelines as to what she considers various levels of the adverse impact ratio to indicate.  For example, she proposes that adverse impact ratios between about 0.5 and 0.7 should indicate "moderate" adverse impact.  I would generally agree with this proposal if we were examining a single group of candidates from which all promotions were drawn and that group consisted of at least a thousand candidates of which 20 percent were minority and from which 20 percent were promoted.

However, the reality is that within the individual jurisdictions from which promotions are made in Massachusetts, the hiring of just one additional minority can change the adverse impact ratio from 0.00 to 4.22 (as in the 2005 Quincy Police Department).  There are examples of even larger swings in the adverse impact ratio in other jurisdictions (e.g., changed from 0.00 to 18.00 in the 2006 Peabody and Revere Police Departments).  The point is that when the adverse impact ratio swings so wildly with just a single minority promotion, the adverse impact ratio is not a reliable indicator.  In the case of the 2005 Peabody Police Department with an adverse impact ratio of 0.00, Fisher's statistical significance test indicates that one would expect to observe no minority promotions (i.e., an adverse impact ratio of 0.00) nearly 100 percent of the time.  The benchmarks for adverse impact ratios that Dr. Fields presents are meaningless in the context of each of the jurisdictions.

<u>Impact of Adding Components Proposed by Plaintiff's Experts</u>

Dr. Fields states in her report on page 21:

> One of the most unexpected and troubling conclusions made by Dr. Outtz (February 2009) and Dr. Silva (February 2009) was that HRD "attempted" to minimize adverse impact with an oral board exercise in the 2002 BPD, found that it did not succeed as they had hoped, so they did not attempt to research or include another method to reduce adverse impact.  The attempt to minimize group differences is not a "one-time" experiment.  Their defense for this one attempt is that group differences were not minimized significantly and that it was too costly.

Speaking for myself, my conclusions were completely reasonable.  I have worked in the field of selection for decades.  The fact is that when an organization is dealing with small promotion ratios, the chances of improving adverse impact are small even when components that have reduced group differences are added to the process.  Sometimes adding components such as incident command exercises, role-play exercises, and structured interview exercises improves adverse impact and sometimes it does not.  Although rare, I have observed the addition of these types of exercises on top of a written test actually reduce the number of minority promotions.  The cause for these results is a combination of a small selection ratio, small percentage of minority candidates, and higher score variability at the upper end of score distributions.

Even when this additional testing increases minority promotions, organizations are often placed in the position of spending $50K to $200K or even more to increase minority promotions by just one or two persons. Although adding these components can increase the adverse impact ratio by 20, 30, or 40 points, the reality is that these additional points represent just one or two additional minority candidates.

I demonstrated these results in the 2002 Boston Police Department in my earlier report when Boston attempted to enhance their testing in this fashion. I have also observed it in large state-wide and city-wide promotion exams even when selection ratios have approached 14 percent (higher than the highest selection ratio in Massachusetts). I cited a number of reasons above for these results. Another reason is that the initial group differences on the technical knowledge test are difficult to overcome. Typically these additional components although they have smaller average group differences, still have differences that are added to the technical knowledge differences (i.e., the correlation between a technical knowledge score and scores on plaintiff recommended components typically exceed 0.30). This occurs whether we include one, two, three, or four additional exercise components of the type indicated by the plaintiffs.

<u>Conclusions</u>

Based on the analyses described in this report I have come to the following conclusions:

1. My analysis of the Worcester data was challenged by Dr. Wiesen. I confirmed that my analysis was in fact correct.

2. Neither Dr. Wiesen nor Dr. Fields provides a valid argument for aggregating candidates across jurisdictions or across jurisdictions and exams. Promotions are made within jurisdiction. Candidates in one jurisdiction cannot be promoted in another jurisdiction. Candidates from one exam are also almost never considered with candidates from other exams. These processes must be respected in the analyses. Aggregation of data across jurisdictions and exams can lead one to identify adverse impact where there is none and lead to erroneous conclusions as was demonstrated.

3. The plaintiff's experts had an opportunity to demonstrate the potential impact of banding in the Massachusetts candidate data and did not. Banding, while appropriate from a psychometric perspective, is unlikely to increase minority promotions to any substantial degree. In addition, given the amount of resistance by unions, civic organizations, and even a state senator banding would very likely not be implementable without a court order.

4. HRD's 2005 police sergeant promotional exams effectively measured job knowledge required by current Boston and statewide sergeants. Even if Dr. Fields' criticism stands as to setting the cut point at 70 percent, more incumbent sergeants than sergeant candidates still exceeded the cut point even where the cut point was lowered.

5. The adverse impact ratio is not an accurate metric. It more often than not leads to a false indication of adverse impact. In 82 percent of the individual jurisdictions that promotion tested for the position of police sergeant between 2005 and 2008, the likelihood of finding a false indication of adverse impact would have been very high even in the absence of a group performance difference. For the reasons cited in conclusion 2 and the high false positive rate of the adverse impact ratio metric, a statistical significance test within each jurisdiction and exam year is the only fair process. A false indication of adverse impact occurs by design only 5 percent of the time in statistical significance testing.

11

6. Fisher's Exact Test, a statistical significance test used widely for determining adverse impact supports the existence of adverse impact only in Boston.

7. In light of the very excessive false positive rate that accompanies the adverse impact ratio, the individual N+1 analyses were appropriate and necessary. In addition, in response to Dr. Fields' suggestion that the analyses were computed incorrectly I have supported that they were computed correctly.

8. Adding additional oral components to the testing process offers no guarantee or even likelihood that adverse impact can be minimized. The Boston data from 2002 supports this conclusion. My experience with these enhanced and expanded exams indicates that rarely do additional components substantially increase the number of minorities promoted. This is primarily a result of the low selection ratio.

Respectfully submitted,

Jacinto M. Silva, Ph.D.

## References

Equal Employment Opportunity Commission, Civil Service Commission, Department of Labor, & Department of Justice (1978).  *Uniform guidelines on employee selection procedures*. Federal Register, Vol. 43, pp. 38290-38315.

Roth, P. L., Bobko, P., & Switzer, III, F. S. (2006).  Modeling the behavior of the 4/5ths rule for determining adverse impact:  Reasons for caution.  *Journal of Applied*, *91*, 507-522.

Appendix A

Vitae

# Jacinto M. Silva

3825 SW 91st Drive
Gainesville, FL 32608
(352) 332-9708

## Work Experience

**January 2004-**
**Present**

**Senior Managing Consultant**
**EB Jacobs, Gainesville, FL**
Manage development and research efforts to develop and validate various testing instruments. Design and manage development of computer applications and web platforms for testing and analysis. Provide statistical analysis expertise for use in projects within EB Jacobs and also to defend clients in legal actions. Direct, manage, and execute research projects involving testing and validation for various types of organizations (e.g., technology, biogenetic, public safety, and transit). Manage statistical and data management staff and prepare proposals for new work.

**February 1998-**
**December 2003**

**Managing Consultant**
**SHL, Gainesville, FL**
Directed, managed, and executed research projects developing selection and promotion tests for various types of organizations including technology, pharmaceutical, public safety, and transit. Managed development and research efforts to develop various testing instruments. Designed and developed computer applications for testing and analysis. Provided high end statistical analysis expertise to the organization and manage the statistical and data management staff.

**January 1997-**
**January 1998**

**Senior Research Scientist**
**Personnel Decisions Research Institutes, Inc., Arlington, VA**
Managed and participated in research projects for large organizations including GTE, FAA, FBI, State Department, Air Force, and CIA. Research efforts involved needs assessment and development in the areas of performance appraisal, employee development, job analysis, test development and validation, change implementation, and software development.

**June 1993-**
**December 1997**

**Consultant**
**Cinnamon Bay Solutions, State College, PA**
Collaborated with established research firms on projects. Projects include defining selection standards for bus operators, identifying performance goals, developing performance measurement instruments including development of a computerized Windows-based performance tracking tool, validating selection instruments, segmenting customers and markets based on prior purchase behavior, preparing and delivering presentations to clients, and preparing written reports.

**January 1989-**
**January 1997**

**Senior Research Psychologist**
**US Army Research Institute, Alexandria, VA**
Managed a wide range of research projects including selection test development, development of adaptability measures, development of physiological and psychological predictors of performance under stress, assessment of test bias, assessment of promotion system fairness, use of tests in placement and classification decisions, and development of measures to reduce turnover. Presented and reported research to high-ranking government decision-makers (military and civilian) on operational implications of research. Represented the Army at inter-service selection policy meetings. Served as a Chairperson on the Army Research Institute's Committee on Scientific Affairs.

**Fall 1991 &**
**Spring 1993**

**Instructor for Graduate Organizational Psychology Courses**
**George Mason University, Fairfax, VA**
Responsible for all aspects of teaching graduate level Organizational Psychology courses.

## Education

**1986-1988**  Ph.D. in Industrial/Organizational Psychology, The Pennsylvania State University, University Park, Pennsylvania.

**1983-1986**  Master of Science in Industrial/Organizational Psychology, The Pennsylvania State University, University Park, Pennsylvania.

**1979-1983**  Bachelor of Arts in Psychology, Rutgers University, New Brunswick, New Jersey.

## Professional Publications

Jacobs, R. R., Conte, J. M., Day, D. V., Silva, J. M., & Harris, R. (1996). Selecting bus drivers: Multiple predictors, multiple perspectives on validity, and multiple estimates of utility. Human Performance, 9, 199-217.

Silva, J. M., & Jacobs, R. R. (1993). Performance as a function of increased minority hiring. Journal of Applied Psychology, 78, 591-601.

Silva, J. M., & White, L. A. (1993). Relation of cognitive aptitudes to success in foreign language training. Military Psychology, 5, 79-93.

## Professional Presentations

Busciglio, H. H., Silva, J. M., & Walker, C. H.  (1990, June).  The potential of new Army tests to improve job performance.  Paper presented at the meeting of the Army Science Conference, Durham, NC.

Cascio, W. F., Jacobs, R., & Silva, J. (2010).  Validity, utility, and adverse impact: Practical implications from 30 years of data.  In J. L. Outtz (Ed.), Adverse impact: Implications for organizational staffing and high stakes selection (pp. 271-288).  New York, NY: Routledge.

Colvin, C., Silva, J. M., Thum, M., Matsumoto, D., Heslegrave, R., & Grogan, J. (1994, July).  Predicting performance in stressful occupations.  Symposium presented at the meeting of the International Congress of Applied Psychology, Madrid, Spain.

Farr, J., Colvin, C., Silva, J. M., James, K., & Matsumoto, D. (1995, September).  Fair treatment and stress for women and people of color. Symposium presented at the Work, Stress, and Health '95:  Creating Healthier Workplaces sponsored by the American Psychological Association, Washington, DC.

Harris, D. J., Colvin, C., Silva, J. M., & Rollock, D.  (1996, May).  Undoing affirmative action.  Symposium presented at the 73rd annual meeting of the American Orthopsychiatric Association, Boston, MA.

Schwartz, A. C., & Silva, J. M.  (1990, November).  The practical impact of selecting TOW gunners with a psychomotor test.  Paper presented at the meeting of the Military Testing Association, Orange Beach, AL.

Silva, J. M., & Busciglio, H. H. (1993, January).  Impact of practice and coaching.  Paper presented at the meeting of the Military Accession Policy Working Group, San Diego, CA.

Silva, J. M., White, L. A., & Rumsey, M. G.  (1991, August).  Relationship of cognitive aptitudes to success in foreign language training.  Presented at the meeting of the American Psychological Association, San Francisco, CA.

Silva, J. M., Windfelder, N. A., MacKinnon-Slaney, I. M., & Echemendia, J. M. (2000, April).  Assessment Center Performance Stability.  Symposium presented at the meeting of the Society for Industrial and Organizational Psychology, New Orleans, Louisiana.

Appendix B

List of Documents and Data Relied Upon

I relied on the following documents and Excel workbook in preparing my report:

1. Dr. Frank Landy's expert report for the current case.

2. Dr. Joel Wiesen's two expert reports for the current case submitted through April 2010.

3. 2005 Boston written test data for 53 common items for sergeant exam candidates and lieutenant exam candidates.

4. Dr. Cassi Fields's expert report for the current case submitted in April 2010.

5. An Excel workbook named "2005, 2006, 2007, and 2008 Police Sergeant Data with HRD Updates Through March 2010.xls" with Massachusetts sergeant promotion data with latest updates.

The Excel workbook in item 5 is being made available to all counsel of record in the form of electronic computer file.

Unless otherwise specified, all data utilized in the preparation of this report were supplied to me electronically by HRD and, with the exception of candidates' names, are reflected in the above-listed Excel workbook.

Appendix C

Previous Testimony

Listed below is the only case in which I was deposed or testified in within the past four years:

**Deposed**

April, 2005

<u>Jeffrey Locke vs. City of Miami</u>, Case No. 04-21348-CIV-GOLD

**Testified**

None.

Appendix D

Compensation

**Compensation**

In connection with my work on this matter, including the preparation of this report, I am being compensated at my usual hourly rate of $312.50 per hour.