COMMONWEALTH OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION

ANDREW HARRIS and SPENCER TATUM,
   Complainants

v.                                         DOCKET NO.  94-SEM-0589
                                                      94-SEM-0590

CITY OF WORCESTER POLICE DEPARTMENT,
   Respondent

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER OF THE HEARING OFFICER

I.     **PROCEDURAL HISTORY**

On September 15, 1994, Complainants Andrew Harris ("Harris") and Spencer Tatum ("Tatum") each filed nearly identical complaints with the Massachusetts Commission Against Discrimination ("Commission"), claiming that the City of Worcester Police Department ("the City" or "Respondent"), engaged in unlawful discrimination on the basis of race and color in violation of M.G.L. c. 151B, § 4(1), when it failed to promote them to the position of sergeant.

On February 14, 1996, the Commission found probable cause to credit Complainants allegations. On April 11, 2001, the Commission certified the case for Public Hearing. A Public Hearing was held before me on July 10, 2001. In deciding this matter, I have considered the entire record, including the testimony and exhibits introduced at hearing, and the stipulations of the parties. I have likewise considered the proposed Findings of Fact and Conclusions of Law submitted by the parties in reaching my decision. To the extent that the

proposed findings and conclusions are in accord with the findings herein, they are accepted; to the extent that they are not, they are rejected. Certain proposed findings have been omitted as not relevant or necessary to a proper determination of the material issues presented.

## II.    FINDINGS OF FACT [1]

1.      The Complainant, Spencer Tatum ("Tatum"), is an African-American male who has worked continuously as a police officer with the City of Worcester Police Department from March 17, 1987 to the present date. Tatum is an employee within the meaning of M.G.L. c. 151B, § 1(6).

2.      The Complainant, Andrew Harris ("Harris"), is an African-American male who has worked continuously as a police officer with the City of Worcester Police Department from October 27, 1980 to the present date. Complainant is an employee within the meaning of M.G.L. c. 151B, § 1(6).

3.      Respondent, City of Worcester Police Department, is a department of the City of Worcester, a municipal corporation and political subdivision of the Commonwealth of Massachusetts. The City employs more than six persons and is, therefore, an employer within the meaning of M.G.L. c. 151B, § 1(5).

4.      Tatum is a graduate of Burncoat High School in Worcester. Before joining the Worcester Police Department, he served in the United States Army where he received an honorable discharge. During his tenure as a police officer with the

---

[1]      Most of the facts in this case were largely undisputed and the parties jointly submitted most of the exhibits.

City, he has served in the Service Division, Operations Division or Patrol Division, Gang Unit, and on the SWAT Team. Tatum has an Associates Degree from Quinsigamond Community College and has Bachelor's and Master's degrees in criminal justice from Anna Maria College. At the time of the Public Hearing, Tatum had completed his first year of law school at Massachusetts School of Law.

5.      In 1990, after completion of three years of service with the City, Tatum became eligible to take the civil service promotional examination for the position of sergeant. He has taken the promotional exam for sergeant at least four times, including the September 1992 ("1992 exam") and October 1994 ("1994 exam") promotional exams. Tatum passed the promotional exam on each occasion.

6.      Harris graduated from Doherty Memorial High School in Worcester in 1974 and joined the police department in 1980. During his tenure as a police officer with the City, Harris has mostly worked in the Operations Division, although he has also worked in the Service Division and has performed background checks for the Internal Affairs Division. Harris began taking the civil service examinations for promotion to sergeant in the mid-1980s. Since then, he has taken the promotional exam for sergeant almost every time it has been offered, including the 1992 and 1994 exams, which he passed.

7.      Harris testified that when he graduated from the police academy in February 1981, no minorities held the position of sergeant or any other superior officer position. He claimed that in the mid-1980's, Loman Rutherford, an

3

African-American, became the first minority promoted to a superior officer's position.    When Tatum joined the police department in 1987, Rutherford was still the only minority working as a superior officer in the department.  In 1993, the City promoted Rutherford to lieutenant.  From 1993 to May 2001, no minority held the position of sergeant in the department and Lt. Rutherford was the only minority in a superior officer's position.  In approximately May 2001, the City promoted Officer John Lewis, an African-American, to sergeant.

8.      Pursuant to the 1990 census data for the City of Worcester, blacks comprised 4.5% of the general population, and hispanic's comprised 9.6% of the general population.  Consequently, "minorities", meaning blacks and Hispanics, accounted for 14.1% of the City's population.  During the eight-year period from 1993-2000, minority officers represented approximately 10.2% – 12.4% of all the officers in the department.  Specifically, in 1993, the police department had a total of 274 police officers (i.e., patrolmen) [2] and 28 of the 274 officers (10.2%) were minorities. In 1994, the department had approximately 60-65 sergeants and none were minorities.  In 1996, the department had a total of 381 police officers and 43 of the 381 officers (11.3%) were minorities. [3]  In 1997, the department had a total of 362 police officers and 45 of the 362 officers (12.4%) were minorities.  In 2000, the department had a total of 343 officers and 41 of the 343 officers (11.9%) were minorities.   In 2000, the department had between 55-57 sergeants and none were minorities.  In July 2001, the City employed

---

[2]       Although the 1993 Seniority List (Exhibit 17) lists 276 officers, two officers retired in 1993. The number of police officers or patrolmen specifically excludes superior officers.
[3]       Although the 1996 Seniority List (Exhibit 18) lists 389 officers, eight officers retired in 1996.

4

approximately 60-65 sergeants in the police department and only one, John
Lewis, was a minority.

9.     When making appointments and promotions in the police department, the
City must follow the provisions of the Massachusetts Civil Service Law, M.G.L. c.
31, and applicable regulations.  At all relevant times, any person who is currently
employed as a police officer in the City, and who desires to be promoted to a
higher ranking civil service position (e.g., from police officer to sergeant, or from
sergeant to lieutenant), is required to take and pass a civil service promotional
examination.  In order to be eligible to take a promotional examination to
sergeant, a candidate must have completed three years of service as a police
officer.

10.    The Commonwealth of Massachusetts Division of Human Resources,
("HRD"), administers the statewide civil service examination program and
ConTest, the statewide merit system continuous testing program.  The Division of
Human Resources was previously known as the Department of Personnel
Administration ("DPA").  HRD administers the statewide merit-based employment
system for 100 state agencies and more than 200 municipalities, including the
City of Worcester. It is statutorily responsible for the establishment and
maintenance of a merit system of personnel administration for the
Commonwealth, including the scheduling, preparation, development,
construction, administration and grading of all civil service tests.  HRD also
prepares appointment and promotional civil service lists for state and local
appointing authorities.  In addition, it handles and responds to inquiries by

persons who take civil service tests and provides personnel services for both state agencies and certain municipalities.

11.    HRD wrote the 1992 and 1994 promotional exams for sergeant. In general, prior to administering an exam, HRD reviews all exam questions for cultural bias and any questions that contain a cultural bias are re-written to eliminate the bias or are not used.  Tests are kept confidential until they are administered.  The City did not have any role in devising the civil service selection process, administering any of the promotional exams, or participating in the grading of the exams.  Complainants have not submitted any credible evidence that the specific questions contained in the 1992 or 1994 promotional exams were culturally biased against African-Americans.

12.    The 1992 promotional exam (Announcement Number 4856) consisted of a series of multiple-choice questions.  HRD scored the test by awarding points for number of questions that the candidate answered correctly.  The 1992 exam had a passing score of 70%, as is typical for a civil service promotional examination. The grade on the written test is the main component of the candidate's final civil service exam score, and in the case of the 1992 exam, accounted for 80% of the candidate's final score.

13.    The second component of the candidate's final civil service exam score comes from credit that the candidate may receive for training and experience. For the 1992 exam, credit for training and experience counted for 20% of the final grade.  To receive credit for training and experience, candidates must complete a

6

separate form called an Education and Experience Rating Sheet. Candidates who complete the form can receive credit for work experience, college degrees, and college courses. The amount of credit given for training and experience varies from test to test, depending on the position. Candidates are not given credit on the civil service test for informal education or training, except as such is reflected in the education portion of the test. Additionally, a candidate who is a qualified veteran or a candidate who has over 25 years of service may have two additional points added to their final exam score.

14. After taking a civil service test, HRD calculates a candidate's final score by adding the candidate's test score, training and experience points, and any veteran's points, pursuant to the values assigned to each component as described above. HRD then places the candidates on a list in order of scores, ranked from the highest to lowest. An appointing authority must use the most current list prepared by HRD for promotions. Civil service lists generally expire after two years and the list created from the 1992 promotional exam expired no later than October 1, 1995.

15. When making civil service promotions in a police department, appointing authorities, including the City of Worcester, must request a certification or "eligibility list" from HRD. The number of candidates on the eligibility list is determined by the "2n +1" formula. This formula enables the department to consider a number of candidates for promotion equal to two times the number of vacancies plus one. For example, if an appointing authority wanted to promote five persons, it may only consider the top eleven ((5 x 2) + 1 = 11) eligible

candidates on the list for promotion. If the appointing authority does not pick the highest ranked candidates on the eligibility list, it must justify the "bypass" of the higher scoring candidate by providing HRD with written reasons for the selection of the lower scoring candidate.

16.     The City of Worcester typically adheres to the policy of simply selecting the highest ranked candidates when making police department promotions without regard to any other consideration. On rare occasions, the City has bypassed a higher scoring candidate for performance reasons. As stated above, the promotional lists for sergeant prepared by HRD ranked the candidates by score with the highest scoring candidates at the top. Consequently, under the City's practice of selecting candidates solely by rank on the eligibility list, a police officer typically had to rank at least as high as the total number of positions being filled in order to obtain a promotion to sergeant.

17.     In accordance with this practice, the City made a total of eighteen (18) promotions from the eligibility list composed after the 1992 exam (Announcement No. 4856), which contained the names of 56 police officers.[4] On or about November 23, 1993, the City first promoted fourteen (14) police officers to sergeant and the persons promoted ranked 1 through 14, respectively, on the eligibility list. The officers selected for promotion had scores ranging from 92.66 through 87.13. All of the fourteen officers selected were white. Subsequently, on September 4, 1994, the City promoted another four police officers to sergeant

---

[4]     The civil service promotional and by-pass procedures utilized by the City of Worcester for the selection of sergeants from the 1992 promotional exam was discussed in detail in <u>Jackson v. City of Worcester</u>, 23 MDLR 243, 244-245 (2001).

using the same list. The officers selected for promotion ranked 15, 17, 18, and 21, and had scores ranging from 87.00 to 86.00. [5] Again, all four of the police officers selected (three (3) males and one (1) female) were white. No further promotions were made using Announcement 4856.

18.     Three minority officers passed the 1992 exam: Nelson Quinones[6] (scored 84.00 and ranked 32), Tatum (scored 74.00 and ranked 46), and Harris (scored 72.00 and ranked 53). No minorities were selected and all were ranked lower than the selected white candidates.

19.     Tatum prepared for the 1992 promotional exam by studying books listed on a recommended reading list. He also took a preparatory course. Tatum testified that he had obtained the reading list for the 1992 promotional exam in a timely manner to prepare for the test. He also prepared for the 1992 promotional exam by taking courses given by Pat Rogers of Command Presence. However, Tatum testified that prior to the 1992 promotional exam, he attended school at Anna Maria College and had childcare responsibilities for his three young children, ages 2, 5 and 7. Harris likewise prepared for the 1992 exam by reading recommended books and taking a two-day seminar from Pat Rogers, although Harris testified that he did not study consistently before taking the taking the test.

20.     As previously stated, Tatum and Harris also took and passed the 1994 exam. A total of 61 officers passed 1994 promotional exam. From the eligibility

---

[5]     The officers on the list ranked 17 - 21 all had the same test score (86.00). The City bypassed Linda Jackson ranked 16, with a score of 87.00. Officer Jackson subsequently filed a handicap discrimination claim against the City as a result of her non-promotion. Her claimed was dismissed after a public hearing. Jackson v. City of Worcester, 23 MDLR 242 (2001).
[6]     Officer Quinones is Hispanic.

list prepared by HRD after this exam, the City promoted 12 officers to sergeant and all 12 officers were white males. Consistent with the City's practice of selecting candidates by rank, the persons selected ranked 1 to 12, respectively, on the eligibility list and had scores ranging from 95.00 to 84.00. Five minority officers had passed the 1994 exam: Tatum (score 78.00, rank 29), Rosario (score 76.00, rank 39), Maddox (score, 76.00, rank 40), Logan (score 75.00, rank 42), and Harris (score 74.00, rank 49). Again, the City did not promote any candidate who ranked lower than any minority candidate.

21.    I find that the City did not promote any minority candidates to the position of sergeant following the 1992 and 1994 promotional exams because minority candidates failed to achieve a sufficiently high rank on the eligibility list as a result of their exam scores. Chief Gardella, who served as Chief of the police department from December 1991 through September 2000, testified credibly that no minority officer scored high enough on the promotional exams to be eligible for promotion to sergeant. Complainants have not submitted any credible evidence that the City's policy of simply taking the highest scoring candidates was developed or utilized for nefarious reasons. In addition, Complainants have not submitted any credible evidence that the City attempted to subvert any civil service rule or regulation and I specifically find that the City clearly complied with all applicable civil service laws and regulations in making these promotions.

22.    Although the City may not use by-pass procedures for the purpose of affirmative action, it could have requested, pursuant to Personnel Administration Rule PAR 10, the certification of an alternate promotional list for minorities. Rule

PAR 10 allows for special certifications (alternative lists) based on race, color, national origin or sex, as a tool to further affirmative action goals. In order to obtain a special certification from HRD, a municipality must submit a request in accordance with the appointing authority's affirmative action plan. HRD will then apply a statistical formula to review the need for a PAR 10 list. The formula for determining whether the City would qualify for a PAR 10 promotional list for sergeant is as follows:



$$\frac{\text{Number of minority sergeants}}{\text{Number of tenured police officers}} \div \frac{\substack{\text{Number of minority individuals} \\ \text{employed in the protective services EEO} \\ \text{category in Worcester's Standard} \\ \text{Metropolitan Statistical Area ("SMSA")}}}{\text{General population in Worcester's SMSA}}$$

23.     If the above formula produces a ratio less than .800 (using the four-fifths rule of thumb guideline set forth in the EEOC's Uniform Guidelines on Employee Selection Procedures), HRD will allow a municipality to make a sufficient number of minority promotions from an alternate list to achieve a ratio that meets the .800 guideline. The parties stipulated that HRD has no records indicating that the City of Worcester ever submitted a written request to HRD to use a PAR 10 list to promote minority officers to sergeant. Also, the parties did not submit any evidence indicating whether the City had an affirmative action plan on file with HRD.

24.     In 1988, the City of Worcester and the Commission entered into an Agreement "Relative to Equal Opportunity and Affirmative Action." The Agreement required the City to engage in "positive, aggressive measures to

ensure equal opportunity in the areas of hiring, promotion, demotion or transfer,

recruitment, layoff or termination, rate of compensation, in-service or

apprenticeship training programs, and all terms and conditions of employment..."

The Agreement further provided that the City:

> [A]dopt and keep in place departmental hiring goals, consistent with
> applicable affirmative action/equal opportunity regulations, for minorities
> until such time as parity is reached.

> In order to achieve hiring goals set forth in the City's Affirmative Action
> Plan, the City agrees to the Division of Personnel Administration Rules
> PAR 10, the Selective Certification option, and any other option
> reasonably designed to meet the goal of this Agreement as provided by
> law.

The parties have stipulated that under the Agreement's specific terms, the

Agreement expired in 1991 after its initial three (3) year period, and neither the

Commission nor the City of Worcester extended the agreement.

25.    Both Tatum and Harris testified, respectively, that each is qualified to be a

sergeant in the police department and "but for" their test scores and low rank on

the eligibility lists, no good reason existed to deny them a promotion to sergeant.

As a result of not being promoted, Harris and Tatum both lost the opportunity to

earn a higher salary. Since 1994, the pay differential between sergeants and

officers has been approximately $30-$40 per week.

26.    In addition, both Tatum and Harris claimed they suffered emotional

distress as a result of their not being promoted to sergeant. Tatum testified that

he has been frustrated and depressed about his inability to become a sergeant.

He thinks he would make a good sergeant and believes that only an "archaic

system that doesn't truly test a person's competence as a supervisor" has

12

prevented him from getting a promotion. He also believed that these frustrations contributed to his divorce. Harris testified that after it became known that he filed a complaint with the Commission, other officers "cammed" their radios whenever Harris attempted to use his radio to speak with his dispatcher. The "camming" threatened his ability to request assistance during an emergency and had the potential to endanger his life. In another incident, he stated that someone wrote an obscenity on his paycheck.    Harris has not filed a claim of retaliation as a result of these alleged incidents.


III.    **CONCLUSIONS OF LAW**

Pursuant to M.G.L. c. 151B, § 4(1), it is unlawful for an employer on the basis of race or color to refuse to promote any individual or to discriminate against such individual in compensation or in the terms, conditions, or privileges of employment unless based upon a bona fide occupational qualification.  In this case, Complainants have alleged that the City of Worcester's policy of using the results of the HRD administered exams to make promotions to sergeant constituted unlawful discrimination on the basis of race and color in violation of M.G.L. c. 151B, § 4(1) and Title VII of the Civil Rights Act of 1964.[7]

Complainants have premised their claim under the theory of disparate or adverse impact as opposed to disparate treatment, alleging that the City's facially

---

[7]    Complainants' Proposed Conclusions of Law did not contain any discussion or argument regarding M.G.L. c. 151B, § 4(1) or cite to any decisions of the Commission on the issue of adverse impact. Rather, Complainants confined their legal arguments solely to the alleged violation of Title VII and relied almost exclusively on Federal court precedent. Complainants then merely concluded that adverse impact discrimination under Title VII constitutes an unlawful practice under M.G.L. c. 151B, § 4.

neutral policy of making promotions based strictly on the results of the civil service promotional exams had a discriminatory impact on African-American police officers. *See, e.g.*, Bresnahan v. Route 114 Liquors, 17 MDLR 1129, 1133 (1995) (a neutral policy, not directed at any particular group, had an "adverse impact" on members of a particular class). Although no evidence of any discriminatory animus is present in this case, under M.G.L. c. 151B and Title VII, policies that have a disproportionate adverse impact on members of a particular protected group are unlawful even absent a showing of discriminatory intent unless justified by business necessity. Wible v. McDonough, 10 MDLR 1497, 1510-1511 (1988), *citing*, Griggs v. Duke Power, 401 U.S. 424, 429-430 (1971), School Committee of Brockton v. MCAD, 386 N.E.2d 1240, 1245 (1979), Smith College v. MCAD, 380 N.E.2d 121, 125 (1978).

In order to establish a claim of disparate impact, Complainants must show that the practice complained of had a substantial adverse impact on a legally protected class of which they are members. Griggs, 401 U.S. at 430, Bresnahan, 17 MDLR at 1133. In disparate impact cases, Massachusetts and Federal courts, and the Commission have followed the three-part burden-shifting framework set forth by the United States Supreme Court in Griggs v. Duke Power and Albemarle Paper Co. v. Moody. *See, e.g.*, EEOC v. Steamship Clerks Local 1066, 48 F.3d 594, 606 (1st Cir.), *cert. denied*, 516 U.S. 814 (1995); Cox v. New England Telephone and Telegraph Co, 414 Mass. 374, 385 (1993); Bresnahan, 17 MDLR at 1133-134; Richardson v. Brown Realty, 15 MDLR 1895, 1905-1906 (1993); Wible v. McDonough, 10 MDLR at 1511-1512.

14

In order for Complainants to establish a prima facie case of disparate impact discrimination, they must show that the practice complained of has a substantial adverse impact on a legally protected class of which they are members, namely African-Americans. Albemarle Paper Co., 422 U.S. 405, 425 (1975), Griggs, 401 U.S. at 430; Bresnahan, 17 MDLR at 1133-1134; Wible v. McDonough, 10 MDLR at 1511-1512. Complainants may rely on statistical data to prove a prima facie case and the precise impact of the policy need not be proved to a mathematical certainty. Bresnahan, 17 MDLR at 1512, citing, Griggs, 401 U.S. at 730; see, Stuart v. Roache, 951 F.2d 446, 451 (1st Cir. 1991), citing, Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 987 (1988) (the very purpose of "disparate impact" analysis is to use a numerical comparison that will help identify a possibly unfair, discriminatory hurdle interposed between the eligible minority applicant and success).

Once Complainants have established a prima facie case, the burden shifts to the City to demonstrate that its practice or policy is one of business necessity. If the City articulates a business necessity for its policy, then Complainant must prove that a less restrictive alternative existed which would not have had the same discriminatory impact on the protected class. Bresnahan, 17 MDLR at 1511-1512, citing, Albemarle Co., 422 US at 425-426, Griggs, 401 U.S. at 430.

I conclude that Complainants have established a prima facie case of unlawful discrimination. The 1990 census data for the City of Worcester showed that blacks consisted 4.5% of the general population, hispanic's 9.6%, and black

15

and hispanic's combined ("minorities"), 14.1% of the city's population.[8]  The data

for the City of Worcester Police Department revealed that for the years 1993 to

2000, approximately 10.2 –12.4% of all police officers in the City of Worcester

were minorities, roughly equivalent to the percentage of minorities in the city.

However, of the 55-65 sergeants employed by the City from 1993 to 2000, none

(0.00%) were minority and it appears the City employed only one minority

superior officer, Lt. Loman Rutherford.  Prior to promoting John Lewis to sergeant

in May 2001, the City had not promoted a minority to sergeant in more than a

decade.  In addition, during the thirteen-year period of 1987 to 2000, the City had

promoted only one minority to a superior officer's position, when it promoted

Rutherford to lieutenant in 1993.

The evidence also showed that in 1993, the City promoted 18 white

officers to sergeant from the eligibility list established after the 1992 promotional

exam.  Although three minority officers had passed the 1992 exam, including

Tatum and Harris, they did not score high enough to be considered for promotion

under the City's policy of selecting candidates in strict order of rank on the

eligibility list.  In 1995, the City promoted another 12 white officers to sergeant

from the eligibility list established after the 1994 promotional exam. Again, Tatum

and Harris and three other minority officers passed the 1994 exam, but they did

---

[8]      In their respective complaints, Complainants alleged that the City's promotional policies and
practices had an adverse impact on African-American police officers.  However, at the Public Hearing,
Complainants relied on statistics applicable to the larger "minority" community (African-American and
Hispanic) both in the general population and in the police department.  *See*, Castro v. Beecher, 459 F.2d
725 (1st Cir. 1972) (in case involving adverse impact toward black candidates for appointment, court relied
on figures representing the larger "minority" community in the general population and in the police
department).

not rank high enough on the eligibility list to be considered by the City for promotion.

Based on this evidence, I believe a gross disparity exists between the racial composition of the officers who were eligible for promotion to sergeant and the racial composition of the officers who actually worked as sergeants in the department. *See, e.g.*, <u>Castro v. Beecher</u>, 459 F.2d 725, 728 (1st Cir. 1972) (gross racial disparity in the Boston Police Department existed in 1970 where only 2% of officers were black or Latino, but these groups constituted 16% of the general population); <u>Stuart v. Roche</u>, 951 F.2d 446, 450 (1991) (a prima facie case of disparate impact exists where only one of 222 sergeants (0.45%) in Boston Police Department was black, yet 72 black officers (4.5%) were eligible for promotion); *cf*, <u>French v. Krajewski</u>, 12 MDLR 1041, 1061-1062 (1990) (statistical evidence presented was simply not sufficient to support conclusion that neutral policy had a disparate impact on females), *citing*, <u>Rix v. Vachon, Inc.</u>, 10 MDLR 1431 (1988). One need not be a statistician to conclude that the relevant percentages from 1993 to 2000 – 0.00% of minority sergeants in the department, 10.2–12.4% minority members in the department, and 14.1% minority population in the City of Worcester – constitutes persuasive evidence by which I may reasonably infer a prima facie case of unlawful discrimination in the promotion of minority officers.

The City raised a number of arguments in support of its position that Complainants have failed to establish a prima facie case of disparate impact. First, it contended that absent any evidence of how many black officers actually

took the promotional exams, the number and percentage of black officers who

actually passed the test is statistically insignificant. This issue was addressed by

the United States Circuit Court of Appeals for the First Circuit in <u>Boston Police</u>

<u>Superior Officers Fed'n v. City of Boston</u>, 147 F.3d 13, 25-26 (1st Cir. 1988)

(hereinafter "<u>Superior Officers</u>"). The court in <u>Superior Officers</u>, addressed

whether the promotional policies of the Boston Police Department had a

disparate impact toward the number of blacks promoted to lieutenant and held:

> "[W]hen special qualifications are required to fill particular jobs,
> comparison to the general population (rather than to the small group of
> individuals who possess the necessary qualifications) may have little
> probative value." [City of Richmond v. J.A. Corson Co., 488 U.S. 469, 501
> (1989)]. We think the comparison of sergeants who *passed* the civil
> service exam to those who the BPD promoted adequately captures the
> fact that the lieutenant position requires "special qualifications." Certainly,
> nothing compels the conclusion that finishing among the top forty-two
> candidates is any more a "qualification" than earning a passing score. It
> is the latter criterion that determines whether a candidate can ever be
> selected for promotion... (emphasis supplied).

Clearly, the rationale for relying on the number of black applicants who passed

the promotional exam for lieutenants in <u>Superior Officer's</u>, is applicable in the

case at bar. Consequently, the fact the Harris, Tatum and other minority officers

passed the promotional exams for sergeants is numerically relevant for purposes

of determining whether the City's promotional policy adversely impacted African-

American police officers.

Secondly, the City argued that the evidence clearly established that other

reasons, namely, Tatum and Harris's failure to adequately study for the 1992

promotional exam, resulted in Complainants getting low scores and, thus, not

being promoted. I find this argument unpersuasive. Although common sense

18

would dictate that the amount a person studied for an exam would have a direct relationship to one's performance on a test, neither party presented any evidence regarding such correlation. In addition, the City failed to present any evidence that the white officers who scored well on the exams actually studied more than Complainants. Similarly, many of the white officers who out performed Complainants on the exam may have had similar educational and childcare responsibilities. More importantly, a complainant who presents a statistical analysis of some challenged practice in a disparate impact case need not rule out all other variables to establish a prima facie case. USA v. City of Warren, 238 F.3d 1083, 1094 (6th Cir. 1998), citing, Bazemore v. Friday, 478 U.S. 385, 400 (1986) ("a plaintiff in a Title VII suit need not prove discrimination with scientific certainty; rather his or her burden is to prove discrimination by a preponderance of the evidence"); Bresnahan, 17 MDLR at 1134 (precise impact of policy need not be proved to a mathematical certainty). "This principle is particularly applicable where 'the evidence actually presented on its face conspicuously demonstrates...grossly discriminatory impact.'" City of Warren, 238 F.3d at 1094, quoting, Dothard v. Tawlinson, 433 U.S. 321, 331 (1977). I believe the lack of a single minority person holding the position of sergeant in the City of Worcester Police Department during the period of 1993 to May 2001, when the department had over 300 officers and minorities constituted 10% of the workforce, unmistakably demonstrates a clear example of gross adverse impact that obviates the need for a detailed statistical analysis.

Since Complainants have established a prima facie case of unlawful disparate impact discrimination, the burden shifts to the City to demonstrate that its practice or policy is one of business necessity.    I conclude that the City's practice of strictly promoting candidates by order of rank on the civil service eligibility list is a lawful business necessity.    The City must comply with the statutory mandate of adhering to "basic merit principles" when making appointments and promotions in order to assure the "fair treatment of all applicants and employees in all aspects of personnel administration without regard to political affiliation, race, color, age, national origin, sex, marital status, handicap or religion..." G.L. c. 31, § 1(e).  The fundamental purpose of the process and procedures of the Civil Service Laws is to guard against political considerations, favoritism and bias in governmental hiring.  Massachusetts Association of Minority Law Enforcement Officers v. Abban, 434 Mass. 256, 259 (2001) (hereinafter referred to as "MAMLEO"), citing, Cambridge v. Civil Serv. Comm'n., 43 Mass. App. Ct. 300, 304 (1997).   Thus, the City is, by necessity, required to comply with civil service rules and procedures.  Moreover, by making promotions strictly by rank on the eligibility list, the City ensures the exclusion of political considerations, favoritism and bias in the promotional process.

Most assuredly, having a racially diverse rank of superior officers and remedying the vestiges of prior discriminatory practices are meritorious.[9] However, the City cannot simply and blindly ignore mandated statutory civil service procedures to advance affirmative action goals.  See, Superior Officers,

---

[9]    Other than the specific issues raised in this case, Complainants have not introduced any evidence of prior discriminatory practices by the City.

147 F.3d at 25-26 ("to justify remedial action, the government cannot rely on a desire to correct generalized, amorphous wrongs").  Although in certain instances, appointing authorities have deviated from basic merit principles to promote minorities to rectify racial imbalance, such action generally requires the existence of a consent decree, an affirmative action plan, or some other enforceable agreement that would justify racial considerations when making promotions.  MAMLEO, 434 Mass. at 259.

If the City of Worcester had promoted Complainants or other minority candidates ahead of the higher scoring non-minority candidates, without the existence of a consent decree, affirmative action plan or binding agreement, then the City would have violated civil service laws and would have likely ended up in the same position as the City of Boston in MAMLEO.  In that case, the City of Boston attempted to achieve affirmative action goals and promote minorities to the ranks of superior officers by "bypassing" nonminority candidates with higher civil service exam scores in favor of minority officers.  The bypassed nonminority candidates appealed the promotions and both the Civil Service Commission and the Superior Court found that Boston improperly bypassed the higher scoring candidates solely on the basis of race.  Id. at 260-264.   The Supreme Judicial Court affirmed and held that without the mandate of a consent decree,[10] the bypass of higher scoring candidates based purely on race was inconsistent with basic merit principles and, thus, a violation of civil service law.  Id. at 264.

---

[10]    In 1980, the City of Boston entered into a consent decree requiring the promotion of a limited number of black officers to sergeant and lieutenant.  Although the consent decree was extended three times, it expired upon the creation of an eligibility list from the 1992 promotional examination. MAMLEO, 434 Mass. at 258, n. 5.

Although the court emphasized that Rule PAR 10 allows an appointing authority to consider the race of the candidates when making promotions as part of an approved affirmative action plan, Boston had no such plan at the time of the promotions and, therefore, the police department could not make promotions purely on the basis of the race of the candidate. *Id.* at 260.

Complainants in this case have not argued that a consent decree, affirmative action plan, or legal agreement mandated the City abrogate basic merit principles established under the civil service laws or compelled the City to use a Rule PAR 10 alternative list to promote minorities to the rank of sergeant. As discussed above, the Agreement between the City of Worcester and the Commission "Relative to Equal Opportunity and Affirmative Action", expired in 1991 after its initial three (3) year period, and neither the Commission nor the City of Worcester extended the agreement. Absent the existence of a consent decree, the City's policy of not considering the race or color of the candidate when making promotions to sergeant is a necessary part of the City's obligations under the Civil Service Law.

Once the City articulated a business necessity for its promotional policy, Complainants must prove that a less restrictive alternative existed that would not have had the same adverse impact on minority police officers seeking promotions to sergeant. Complainants did not address this issue in its post-hearing written submissions. In addition, at the Public Hearing, Complainants introduced minimal evidence on less restrictive alternatives and only provided vague testimony regarding "assessment centers" without any credible evidence

on how assessment centers would work or increase the promotional

opportunities of minority candidates.  In fact, the only somewhat credible

evidence on assessment centers – a report of the City's Director of Human

Resources – suggests, "assessment centers don't always increase the number of

minorities that are selected for supervisory positions."  Furthermore,

Complainants have not introduced any evidence that the City would have

qualified for an alternative promotional list for minorities under Rule PAR 10.

Moreover, considering that Complainants' scores were considerably lower than

the selected candidates, it remains to be seen whether they would have been

selected for promotion even if an alternative method were utilized.[11]

Consequently, Complainants have failed to prove that less restrictive alternatives

existed to the City's policy of promoting officers to sergeant in strict accordance

with a candidate's rank on the eligibility lists. I, therefore, conclude, that

Complainants have failed to establish that the City's promotional policy violated

the provisions of M.G.L. c. 151B, § 4(1) and Title VII of the Civil Rights Act of

1964.

---

[11]     The lowest scoring candidate of the 18 white police officers promoted by the City from the
eligibility list established after 1992 promotional exam, scored a 86.00 and ranked 21st.  Tatum scored a
74.00 and ranked 46th, and Harris scored a 72.00 and ranked 53rd.   Similarly, the lowest scoring candidate
of the 12 officers selected for promotion from the list established after the October 1994 promotional exam
scored a 84.00 and ranked 12th.  The highest scoring minority officer on the October 1994 exam, Tatum,
scored a 78.00 and ranked 29th.  Harris scored a 74.00 and ranked 49th.  Consequently, this is clearly not a
case where Complainants' scores were relatively equal or just below the selected candidates. See, e.g.,
Superior Officers, 147 F.3d at  (promoted minority candidate scored one point shy of bypassed white
candidate), Cotter v. City of Boston, Lawyers Weekly No. 02-092-02 (D. Mass., March 26, 2002, Young,
C.J.) (promoted black police officers had same scores as white officers); MAMLEO, 434 Mass. at 257
(promoted minority candidates scored two points lower than bypassed nonminority officers); cf., Stuart,
951 F.2d at 449 (consent decree permitted promotion of black officers ranked below the 2n + 1 civil service
rule cut-off point over higher scoring white candidates ranked above the cut-off point.).

## IV.    ORDER

For the reasons set forth above, the complaints in this matter are hereby dismissed. This decision represents the final order of the Hearing Officer. Any party aggrieved by this Order may appeal this decision to the Full Commission. To do so, a party must file a Notice of Appeal of this decision with the Clerk of the Commission within ten (10) days after the receipt of this Order and a Petition for Review within thirty (30) days of receipt of this Order.

So ordered this 26th day of April, 2002.

EDWARD R. MITNICK
Hearing Officer

24