**EXHIBIT E**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PEDRO LOPEZ, et al., | CIVIL ACTION NO. 07-CA-11693-JLT |
| Plaintiffs | |
| vs. | |
| City of Lawrence, Massachusetts, et al., | |
| Defendants. | |

**Report of James L. Outtz, Ph.D.**

Prepared by:

James L. Outtz, Ph.D.
Outtz and Associates
816 Connecticut Avenue, N.W.
Suite 800
Washington, D.C. 20006

February 9, 2009

## INTRODUCTION

### Purpose

The purpose of this report is to respond to plaintiffs' experts, Drs. Joel Wiesen and Frank Landy, with regard to their evaluations of the validity and fairness of promotional examinations for Police Sergeant administered in 2005, 2006, and 2007 by the Massachusetts Human Resources Division (HRD) and subsequent promotions of candidates to the position of Police Sergeant based on those examinations. Plaintiffs' experts address (a) the validity of the examinations, (b) the adverse impact of the examinations, and (c) possible alternative examination approaches that they assert could have been expected to have equal or greater validity and less adverse impact. In this report, I respond to plaintiffs' expert's assertions and demonstrate why their conclusions are based upon inaccurate assessments of adverse impact in this case or assumptions that are not supported by the facts in this case. This report also addresses the steps taken by HRD to comply with federal regulations and standards of accepted professional practice with regard to the development, validation, and use of the Police Sergeant examinations administered by the Commonwealth of Massachusetts in 2005, 2006, and 2007.

### Qualifications

I am an Industrial-Organizational (I/O) Psychologist in private practice in Washington, DC for over 29 years. Industrial-Organizational Psychology is the application of psychological principles, theory, and research to the world of work. I hold a Ph.D. in I/O Psychology, which I received from the University of Maryland in 1976.

3

sergeant compete within their jurisdiction and not between jurisdictions. This means that analyses of the results of any given examination must be *intra*-jurisdictional.

## Conclusions of Plaintiffs' Experts

In their reports, Plaintiffs' experts have put forth a number of conclusions regarding the 2005, 2006, and 2007 Police Sergeant Promotional Examinations developed and administered under the authority of the Human Resources Division of the Commonwealth of Massachusetts (hereafter, the "Examinations"). These conclusions are listed below. In the pages that follow, I will address each conclusion in turn.

1. Plaintiffs' experts contend that the Examinations show adverse impact against minority applicants; and further

2. The Examinations do not meet professional standards for validation, cannot be shown to be valid, nor shown to meet a legitimate business interest for selecting effective Police Sergeants.

   a. The HRD failed to follow best practice guidelines found in scientific authorities for test development of the Examinations.

   b. The HRD failed to meet the principles established by professional, scientific, and regulatory authorities establishing cut (i.e., pass/fail) scores for the Examinations.

   c. The HRD has no foundation for the practice of strict rank-ordered appointment procedures for the position of Police Sergeant.

   d. The HRD failed to distinguish between knowledge that must be memorized to be of value and knowledge that is passive (*i.e.*, the incumbent simply needs to know where to find the relevant technical

information but does not need to commit that technical information to memory). Plaintiffs' experts contend that this is a fatal flaw because the assumption that all knowledge sources must be memorized drove the testing method for Police Sergeants – a closed book test on generic textbooks. They conclude that HRD's Examinations should have included open-book testing.

e. The HRD ignored, in its assessment procedure, important skills such as communication, negotiation, and persuasion.

3. The HRD, according to plaintiffs' experts, failed to consider or use alternative valid examining methods that would have resulted in lesser adverse impact and equal or greater job relatedness.

## AN EVALUATION OF PLAINTIFFS' EXPERTS' CONCLUSIONS

### Adverse Impact

In support of their conclusions that the 2005, 2006, and 2007 Police Sergeant Examinations have adverse impact against minority applicants, Plaintiffs' experts provide statistical analyses conducted by Dr. Joel Wiesen. Dr. Wiesen correctly determines that the appropriate definition of adverse impact is contained in the *Uniform Guidelines on Employee Selection Procedures* (EEOC, 1978).[4] The *Uniform Guidelines* state the following, in Section II, with regard to adverse impact:

---

[4] Equal Employment Opportunity Commission (1978). *Uniform Guidelines on Employee Selection Procedures*. Washington, DC. This document incorporates a single set of principles that are designed to assist employers, labor organizations, employment agencies, and licensing and certification boards in complying with requirements of
... footnote continues on the next page ...

9

> The fundamental principle underlying the guidelines is that employer policies or practices which have an adverse impact on employment opportunities of any race, sex, or ethnic group are illegal under Title VII and the Executive order unless justified by business necessity. A selection procedure which has no adverse impact generally does not violate Title VII or the Executive order. This means that an employer may usually avoid the application of the guidelines by use of procedures which have no adverse impact. If adverse impact exists, it must be justified on grounds of business necessity. Normally, this means by validation which demonstrates the relation between the selection procedure and performance on the job.

Section II goes on to state:

> The guidelines adopt a "rule of thumb" as a practical means of determining adverse impact for use in enforcement proceedings. This rule is known as the "4/5ths" or "80 percent" rule. It is not a legal definition of discrimination, rather it is a practical device to keep the attention of enforcement agencies on serious discrepancies in hire or promotion rates or other employment decisions. To determine whether a selection procedure violates the "4/5ths rule", an employer compares its hiring rates for different groups.

In order to establish that the Police Sergeant Examinations had adverse impact against minority groups (African-American and Hispanic-American applicants), Dr. Wiesen conducted a series of "4/5ths rule" analyses. For each analysis (with the exception of the Boston Police Department), he aggregated examination data across all municipalities.[5] Dr. Wiesen offers the following rationale for aggregating data as part of his analysis:

> . . . without such aggregation, statistical analyses would be of no value due to the small numbers. (Only from 2 to 10 minority applicants were

---

federal law prohibiting employment practices that discriminate on grounds of race, color, religion, sex, and national origin. *The Guidelines* provide a framework for determining the proper use of selection procedures.

[5] Expert Report of Dr. Joel Wiesen, p. 9, paragraph 2.

promoted based on any of HRD's annual exams, in all municipalities combined.)[6]

After aggregating data across municipalities, Dr. Wiesen reaches the following conclusion:

> The analyses above reveal that there is adverse impact in hiring based on the HRD exams. Overall the adverse impact against minority applicants is statistically significant, and sizeable and of practical import. The overall finding is also seen in the statistical analyses for individual exams and for several groupings of those exams. . . .[7]

Dr. Frank Landy concurs with Dr. Wiesen regarding the aggregation of test data in order to assess adverse impact. Dr. Landy offers the following rationale for agreeing with Dr. Wiesen's methodology:

> Each of these tests was a closed book job knowledge test with 80 items for Police Sergeant applicants. Additionally the passing score was identically set at 70 on all tests, and the appointments from the resulting eligibility list were made in strict rank-order fashion on all tests. Thus from a psychometric perspective, it is appropriate to aggregate these tests and examine the collection of tests from 2003 to 2007 for purposes of identifying any patterns of impact.[8]

Drs. Wiesen and Landy are totally incorrect with regard to the appropriateness of aggregating data from the HRD Police Sergeant Examinations to assess adverse impact. Adverse impact is a comparative metric. What that means is that relevant groups of minority and non-minority candidates are compared to determine whether there are meaningful differences in bottom-line selection rates. It is critical, then, that the correct groups are compared. The correct comparison groups are determined first and foremost by one critical factor that supersedes any other factors such as similarity of test

---

[6] *Ibid.*

[7] Expert Report of Dr. Joel Wiesen, p. 27.

[8] Expert Report of Dr. Frank Landy, p.17.

11

characteristics or cut scores, etc. That factor is method of use.

In the present case, even though applicants may have taken similar written exams, they were not really all competing against each other for promotion. Promotions are made jurisdiction by jurisdiction. As an example, minority applicants in the Worcester Police Department are not competing with non-minority applicants in the Boston Police Department for Sergeant positions. The Worcester minority applicants are competing only against other applicants from the Worcester Police Department. This is mandated by state law, which establishes the qualifications that must be met in order to sit for a Police Sergeant examination in a given jurisdiction within the Commonwealth of Massachusetts. State law provides that, to sit for a given examination, each candidate must (a) be a permanent employee of the jurisdiction in which the vacancy exists, and (b) occupy the next lower rank (unless there are less than four employees at that rank, in which case persons at lower ranks in that same department may be eligible) (Mass. Gen. Laws ch. 31, §§ 59, 65). Therefore, to aggregate data as Dr. Wiesen did is to compare apples and oranges. That is, HRD Police Examinations cannot have adverse impact for every jurisdiction at issue simply because generally fewer minority than non-minority applicants were promoted. To accept such an analysis would mean that a jurisdiction that promoted every minority applicant that applied would be treated exactly the same as a jurisdiction that promoted no minority applicants.

The relevant question, in the first phase of any Title VII disparate impact case such as this, is which jurisdictions, if any, failed to promote minority applicants at a rate equal to 80% of the non-minority selection rate for that jurisdiction? When the data from the Police Sergeant Examinations are properly disaggregated, a totally different picture

12

emerges from the one presented by Drs. Wiesen and Landy.

It should be noted that the *Uniform Guidelines* recognize that small sample sizes may present unique problems when assessing adverse impact. *The Uniform Employee Selection Guidelines Interpretation and Clarification (Questions and Answers)* is a companion document to the *Uniform Guidelines* intended to clarify and interpret, but not modify the *Uniform Guidelines*. The *Questions and Answers* are important here because they directly address the issue of small samples and the assessment of adverse impact. Question and answer 21 state the following:

> 21. Q. Is evidence of adverse impact sufficient to warrant a validity study or an enforcement action where the numbers involved are so small that it is more likely than not that the difference could have occurred by chance?

For example:

| Applicants | Not hired | Hired | Selection rate percent hired |
|---|---|---|---|
| 80 White.... | 64 | 16 | 20 |
| 20 Black..... | 17 | 3 | 15 |
| White Selection Rate............. | | | 20 |
| Black Selection Rate............. | | | 15 |
| 15 divided by 20 = 75% (which is less than 80%). | | | |

> A. No. If the numbers of persons and the difference in selection rates are so small that it is likely that the difference could have occurred by chance, the Federal agencies will not assume the existence of adverse impact, in the absence of other evidence. In this example, the difference in selection rates is too small, given the small number of black applicants, to constitute adverse impact in the absence of other information (see Section 4D). If only one more black had been hired instead of a white the selection rate for blacks (20%) would be higher than that for whites (18.7%). Generally, it is inappropriate to require validity evidence or to take enforcement action where the number of persons and the difference in selection rates are so small that the selection of one different person for one job would shift the result from adverse impact against one group to a situation in which that group has a higher selection rate than the other group.

13

Figure 1 below illustrates how aggregating data from small samples can produce misleading results.  In Figure 1, Jurisdiction #1 had no minority applicants and sixteen non-minority applicants.  Assume that four of the sixteen non-minority applicants were promoted.  Given that there are no minority applicants, there is obviously no adverse impact based upon the 4/5ths rule.  Jurisdiction #2 has seven minority applicants of whom one was promoted.  In this jurisdiction, there were twelve non-minority applicants of whom two were promoted.  The selection rate for the minority applicants (.142) divided by the selection rate for the non-minority applicants (.166) yields an adverse impact ratio of .85, indicating no violation of the 4/5ths rule.  However, aggregating the data from the two jurisdictions results in a selection rate of .142 for minority applicants and .214 for non-minority applicants.  Dividing the minority selection rate by the non-minority selection rate yields an adverse impact ratio of .66, which is a violation of the 4/5ths rule.  Thus, aggregating the data makes it appear that there is adverse impact in both jurisdictions when in actuality there is no adverse impact in either jurisdiction.

Figure 1

| Jurisdiction #1 | | | | Jurisdiction #2 | | |
|---|---|---|---|---|---|---|
| | Applicants | Promoted | Selection Rate | Applicants | Promoted | Selection Rate |
| African American | 0 | 0 | ---- | 7 | 1 | 14.2% |
| White | 16 | 4 | 25% | 12 | 2 | 16.6% |
| | | | | | | Adverse Impact Ratio = .85 |

| Jurisdiction # 1 + Jurisdiction # 2 | | | |
|---|---|---|---|
| | Applicants | Promoted | Selection Rate |
| African American | 7 | 1 | 14.2% |
| White | 28 | 6 | 21.4% |
| | | | Adverse Impact Ratio =.66 |

14

Appendix D contains a listing of the numerous jurisdictions in this case (1) that administered a Police Sergeant Promotional Examination in 2005, 2006, or 2007, and (2) in which there were no minority applicants.

Given the small sample sizes in each of the jurisdictions in which the Police Sergeant Examinations were administered, I conducted the appropriate jurisdiction by jurisdiction 4/5ths rule adverse impact analyses for the 2005, 2006, and 2007 Police Sergeant Examinations using the "shift of one person" correction contained in the response to Question 21. The shift of one person was only applied where the initial selection rate for minority applicants was lower than that for non-minority applicants. For each 4/5ths rule analysis, one minority applicant replaced one non-minority applicant in the selected group. Tables 1 through 3 present the results for the 2005, 2006, and 2007 statewide Examinations respectively. Each table only includes jurisdictions for which there was at least one minority applicant.[9]

---

[9] Data for the analyses in Tables 1-3 were obtained from the Expert Report of Jacinto M. Silva, Ph.D., on the Assessment of Promotional Processes as they Affect African-American and Hispanic Candidates in the 2005 to 2007 Commonwealth of Massachusetts Municipal Police Sergeant Promotional Examinations, dated February 2009 (hereinafter, "Silva Expert Report"), Tables 2, 4, and 5.

Table 1.   2005 Statewide Adverse Impact Results by Department

| Jurisdiction | Takers B/H | Takers White | Takers Total | Selected Black/Hispanic | Selected White | Selected Total | Selection Rate[10] |
|---|---|---|---|---|---|---|---|
| CARVER POLICE DEPT. | 1 | 3 | 4 | 0 | 2 | 2 | B/H = 100% W = 33.3% |
| CHELSEA POLICE DEPT. | 10 | 15 | 25 | 2 | 1 | 3 | B/H = 20.0% W = 6.6% |
| EVERETT POLICE DEPT. | 1 | 14 | 15 | 0 | 1 | 1 | B/H = 100% W = 0.0% |
| FALMOUTH POLICE DEPT. | 2 | 8 | 10 | 0 | 3 | 3 | B/H = 50.0% W = 25.0% |
| GREENFIELD POLICE DEPT. | 1 | 10 | 11 | 0 | 1 | 1 | B/H = 100% W = 0.0% |
| MBTA POLICE | 10 | 32 | 42 | 0 | 5 | 5 | B/H = 10.0% W = 12.5% |
| NATICK POLICE DEPT. | 1 | 10 | 11 | 0 | 3 | 3 | B/H = 100% W = 20.0% |
| QUINCY POLICE DEPT. | 3 | 38 | 41 | 0 | 6 | 6 | B/H = 33.3% W = 13.1% |
| RANDOLPH POLICE DEPT. | 1 | 6 | 7 | 0 | 1 | 1 | B/H = 100% W = 0.0% |
| SPRINGFIELD POLICE DEPT.[11] | 18 | 28 | 46 | 0 | 6 | 6 | B/H = 5.5% W = 17.8% |
| WAREHAM POLICE DEPT. | 2 | 7 | 9 | 0 | 1 | 1 | B/H = 50.0% W = 0.0% |
| WEST SPRINGFIELD POLICE DEPT. | 1 | 12 | 13 | 0 | 2 | 2 | B/H = 100% W = 8.3% |
| WHITMAN POLICE DEPT. | 2 | 10 | 12 | 0 | 1 | 1 | B/H = 50.0% W = 0.0% |

[10]   This column reflects use of the "shift of one person" correction as discussed on page 15, *supra*.

[11]   If two Blacks or Hispanic candidates had been selected in Springfield, the selection rates would have been:  B/H = 11.1% and W = 14.2%, resulting in an adverse impact ratio of .78, which is within two percentage points of the 80% rule. If three Black or Hispanic candidates had been selected by Springfield, the selection rates would have been:  B/H = 16.6% and W = 10.7%, resulting in no adverse impact.

Table 2.  2006 Statewide Adverse Impact Results by Department

| Jurisdiction | Takers B/H | Takers White | Takers Total | Selected Black/Hispanic | Selected White | Selected Total | Selection Rate (see footnote 10) |
|---|---|---|---|---|---|---|---|
| ANDOVER POLICE DEPT. | 2 | 16 | 18 | 0 | 2 | 2 | B/H = 50.0%<br>W = 6.2% |
| BROCKTON POLICE DEPT. | 15 | 45 | 60 | 0 | 3 | 3 | B/H = 6.6%<br>W = 4.4% |
| FALL RIVER POLICE DEPT. | 6 | 33 | 39 | 0 | 1 | 1 | B/H = 16.6%<br>W = 0.0% |
| FITCHBURG POLICE DEPT. | 2 | 6 | 8 | 0 | 1 | 1 | B/H = 50.0%<br>W = 0.0% |
| FRAMINGHAM POLICE DEPT. | 3 | 12 | 15 | 1 | 2 | 3 | B/H = 33.3%<br>W = 8.3% |
| LAWRENCE POLICE DEPT. | 10 | 36 | 46 | 0 | 2 | 2 | B/H = 10.0%<br>W = 2.7% |
| LOWELL POLICE DEPT. | 7 | 36 | 43 | 0 | 7 | 7 | B/H = 14.2%<br>W = 16.6% |
| MARLBOROUGH POLICE DEPT. | 1 | 9 | 10 | 0 | 2 | 2 | B/H = 100%<br>W = 11.1% |
| NEEDHAM POLICE DEPT. | 1 | 6 | 7 | 0 | 1 | 1 | B/H = 100%<br>W = 0.0% |
| PLAINVILLE POLICE DEPT. | 1 | 3 | 4 | 0 | 1 | 1 | B/H = 100%<br>W = 0.0% |
| REVERE POLICE DEPT. | 1 | 18 | 19 | 0 | 2 | 2 | B/H = 100%<br>W = 5.5% |
| SOMERVILLE POLICE DEPT. | 4 | 27 | 31 | 0 | 2 | 2 | B/H = 25.0%<br>W = 3.7% |
| SUDBURY POLICE DEPT. | 1 | 5 | 6 | 0 | 1 | 1 | B/H = 100%<br>W = 0.0% |
| WHITMAN POLICE DEPT. | 2 | 10 | 12 | 0 | 2 | 2 | B/H = 50%<br>W = 10.0% |
| WORCESTER POLICE DEPT. | 11 | 50 | 61 | 1 | 6 | 7 | B/H = 18.1%<br>W = 10.0% |

17

Table 3.   2007 Statewide Adverse Impact Results by Department

| Jurisdiction | Takers B/H | Takers White | Takers Total | Selected Black/Hispanic | Selected White | Selected Total | Selection Rate (see footnote 10) |
|---|---|---|---|---|---|---|---|
| AGAWAM POLICE DEPT. | 1 | 10 | 11 | 0 | 1 | 1 | B/H = 100% W = 0.0% |
| CAMBRIDGE POLICE DEPT. | 6 | 30 | 36 | 0 | 1 | 1 | B/H = 16.6% W = 0.0% |
| CHELSEA POLICE DEPT. | 7 | 14 | 21 | 1 | 0 | 1 | B/H = 14.2% W = 0.0% |
| HOLDEN POLICE DEPT. | 1 | 6 | 7 | 0 | 1 | 1 | B/H = 100% W = 0.0% |
| HOLYOKE POLICE DEPT. | 6 | 23 | 29 | 0 | 1 | 1 | B/H = 16.6% W = 0.0% |
| LYNN POLICE DEPT. | 1 | 31 | 32 | 0 | 3 | 3 | B/H = 100% W = 6.4% |
| SOUTHBRIDGE POLICE DEPT. | 3 | 4 | 7 | 1 | 1 | 2 | B/H = 66.6% W = 0.0% |
| SPRINGFIELD POLICE DEPT. | 16 | 19 | 35 | 1 | 3 | 4 | B/H = 12.5% W = 10.5% |
| WATERTOWN POLICE DEPT. | 1 | 10 | 11 | 0 | 1 | 1 | B/H = 100% W = 0.0% |
| WESTFIELD POLICE DEPT. | 1 | 10 | 11 | 0 | 2 | 2 | B/H = 100% W = 10.0% |

Table 1 shows that, for the 2005 statewide examination, the selection rate for minority applicants is higher than that for non-minority applicants or satisfies the 4/5ths rule in every jurisdiction except for the City of Springfield.   For the Springfield Police Department, a shift of three selections instead of one would have resulted in no adverse impact.   See footnote 11, supra.   For the 2006 statewide Examination, the minority selection rate is higher than that for non-minority applicants for all jurisdictions except Lowell, Massachusetts.   For that jurisdiction, the minority selection rate is 85% of that for the non-minority applicants, thus satisfying the 4/5ths (80%) rule.   For the 2007 statewide Examination, the selection rate for minority applicants is higher than that for non-minority applicants for every jurisdiction.   Overall, the data in Tables 1 through 3 show that the statewide Examinations administered in 2005, 2006, and 2007 had adverse impact for only one jurisdiction, the Springfield Police Department and, in that case, a change of just two minority applicants selected would have resulted in almost no adverse impact. See footnote 11, supra.

There was only one more jurisdiction for which a Police Sergeant promotional examination was developed and administered under the authority of the HRD during the relevant time period.   That jurisdiction is the Boston Police Department.   Analysis of the 2005 examination administered to Boston Police Department sergeant candidates indicates that the examination had adverse impact.[12]   Therefore, in total there are only two instances in which the Police Sergeant Promotional Examinations had adverse impact against minority applicants, the examinations for the Springfield and Boston Police Departments.   The question then becomes whether these promotional examinations are valid.   The examinations were identical, except for the fact that the

---

[12] See Silva Expert Report, Table 3.

Boston Police Sergeant Examination contained test questions specifically related to that department's policies and procedures.

## Validity of the Boston Police Sergeant Examination

### Historical Perspective

The Human Resources Division and its predecessor, the Department of Personnel Administration, have overseen the development and validation of promotional examinations for Police Sergeant in the City of Boston for at least the past twenty years. These examinations have been based upon an analysis of the job of Police Sergeant. This complies with the requirements of the *Uniform Guidelines* as well as professional standards for best practices. As an example, in 1991, the Boston Police Sergeant Examination was developed on the basis of a job analysis that identified critical job tasks as well as areas of knowledge, skill, and ability required to perform the job successfully.[13] In developing this examination, a number of factors were considered in determining the most appropriate content and scope. The 1991 Boston Police Sergeant, Lieutenant, and Captain examinations consisted of two components: a written test and a rating of the applicant's training and experience.

The following reasons were given for using a written test:

1.   Job knowledge tests are generally valid for a very wide variety of jobs.

2.   Reading and writing are required on the job, so a written test was considered reasonable.

3.   The multiple-choice format is the most economical to administer to a large applicant population.

---

[13]   *See* Commonwealth of Massachusetts Department of Personnel Administration, Validation Report for the 1991 Police Promotional Selection Procedures (Bates 00246).

4. The cost of administering an oral exam to approximately 1400 participants was prohibitive and would unnecessarily delay the establishment of various eligible lists.

5. Assessment centers are popular but not well understood since it is not clear what the exercises are actually measuring; i.e., the possession of knowledge, skill or ability to perform the task or simply the task-specific behavior.

6. There was no persuasive evidence that other examination modes would have no or even less adverse impact than the method chosen.[14]

The rationales listed above were substantive and appropriate for the time frame of the early 1990s. More importantly, the fact that substantial consideration was given not only to the most technically feasible method of giving the examination, but also to (a) possible adverse impact and (b) possible alternatives that might have lesser adverse impact belies the assertion of Plaintiffs' expert Dr. Frank Landy that "the HRD has maintained an assessment system that has not been examined and/or modified in any possible way for almost 20 years." Clearly the HRD and its predecessor, the Department of Personnel Administration, were examining the Police Sergeant selection system at least fourteen years before the 2005 Boston Police Sergeant Examination. In addition, the HRD has used a written test and a rating of training and experience as the principal components of the Police Sergeant promotion process for Boston and other municipalities and authorities for a considerable amount of time. Plaintiffs' experts discuss the Police Sergeant promotion process as if it consists solely of a written test. This has not been the case for twenty years, if not longer.

---

[14] *Ibid.*, p. 00263.

The training and experience rating HRD utilizes is designed to measure each candidate's relevant training, experience, and education as they relate to the requirements of the Police Sergeant position. This instrument significantly expands the scope of the knowledge, skills, and abilities measured beyond that measured by the written test alone. As an example, applicants who took the 2005 Boston Police Sergeant Examination were asked to provide information such as whether they:

- graduated from a vocational or technical school
- had a degree or non-degree certificate above the high school level in a specific field of study
- had taken continuing education courses
- had taught courses
- had written any articles
- were a member of any professional organizations

The use of an appropriate job analysis to develop the job knowledge test, together with the measure of applicants' relevant training, experience, and education resulted, in my opinion, in a Police Sergeant selection process that, beginning at least as early as 1991 and going forward, was valid and met the standards of accepted professional practice. One would expect, however, that with advances in fields such as industrial and organizational psychology, Boston, with HRD's approval, would attempt to improve the validity of the process and further address the issue of adverse impact. Based on my review of documents in this case, that is precisely what occurred.

22

## Modifications to the Police Sergeant Promotional Examination

The Boston Police Department, with the approval of HRD, retained the services of a professional consulting firm (Morris & McDaniel, Inc.) to construct, validate, administer, and score a 2002 police sergeant promotional examination for the Boston Police Department.[15] As with prior examinations, this one was based on a job analysis. Indeed, in 2000-2001, Morris & McDaniel, Inc. prepared a comprehensive job analysis for the police sergeant position in which the important tasks and knowledge, skills, and abilities (KSAs ) required for the job were identified. A list of these KSAs is shown in Appendix F. Each task and KSA was rated by subject matter experts as to its importance and relevance to the job. The rating scales used to evaluate the tasks and KSAs are shown in Figures 1 and 2 below.

**FIGURE 1**
Rating Scales for Job Tasks

How often do you perform this task?
- Regularly (daily)
- Periodically (weekly, monthly)
- Occasionally (less than monthly)

How important is this task to this job?
- Very important
- Important
- Not important

Was it necessary for you to perform this task satisfactorily when you started the job?
- Necessary upon entry to the job (although improvement may be expected)
- Not necessary (this task is acquired only through training)

What is this task's relationship to performance?
- Performance of this task clearly separates the best workers
- Generally the better workers seem to perform this better than poor or marginal workers
- Most perform this task equally well

---

[15] *See* Delegation Agreement Between the Boston Police Department and the Massachusetts Human Resources Division (HRD), attached hereto as Appendix E.

**FIGURE 2**
Rating Scales for KSAPCs

1. Does this KSA relate to the job?
   - Yes
   - No

2. When is the KSA learned?
   - Before assignment to this job
   - After assignment to this job

3. How long does it take to learn?
   - Brief orientation period
   - Longer orientation period

4. How does having more or less of this KSA differentiate performance?
   - High (differentiates between performance levels to a great extent)
   - Moderate (differentiates between performance levels to a moderate extent)
   - Little (differentiates between performance to a very minor degree or not at all

5. Is this KSA required to perform the job effectively?
   - Required (it may be refined later through on the job training)
   - Desirable but not required
   - Not required

After completion of the job analysis, HRD provided oversight regarding the development of a test plan for the 2002 Boston Police Department examination. The outside consultant's responsibilities included determination of the knowledge, skills, abilities, and personal characteristics to be measured based on the job analysis, determination of the components of the examination process, and formulation of a test plan. The original test plan called for two new examination components: a structured oral interview and an assessment of prior job performance or "Performance Review System." Typically, two of the primary goals of adding such components are: (a) to expand the scope of KSAs covered by the examination, thus increasing content validity, and (b) to attempt to possibly reduce adverse impact. Given the number of applicants for the Boston Police Sergeant position, adding these components was done at a considerable cost both

24

financially[16] and in terms of human capital.   Unfortunately, addition of the new components proved problematic for a number of reasons.   First, the Boston Police Department withdrew the Performance Review System in May 2002 "based on a number of considerations, chief of which" was concern that litigation over that system (which had been filed in about April 2002) "would continue well past the time scheduled for the administration and grading of the examination."[17]   Second, analysis of the results of the remaining components (written test, education and experience rating, and structured interview), while improving the scope of the KSAs measured, did not materially reduce adverse impact.   This was a major disappointment given the tremendous expense involved.

### The 2005 Boston Police Sergeant Examination

Based on its experience with the 2002 promotional exams, the Boston Police Department, with HRD's approval, elected to return to the two-component format for the 2005 Boston Police Sergeant Examination.   Those components were the written test and an Education and Experience Rating.   The job analysis that was conducted for the 2002 examination was used as the basis for the 2005 process.   Given that the job analysis for the 2002 examination was completed in 2000/2001, a new job analysis for the 2005 examination was not necessary.   The results of this examination proved the wisdom of the decision to revert to the two-component model.   Data show that the number of promotions from, and the adverse impact associated with, this examination was similar to

---

[16] Boston paid the firm of Morris & McDaniel the sum of $1,258,812 for its work on the 2002 promotional exams.   Boston incurred other expenses in conjunction with these exams totaling approximately $30,000.   *See* Electronic File Attachment no. 6 to the Silva Expert Report.

[17] Commissioner's Memo 02-035, 5/29/02, Subject: Promotional Exam 2002, copy attached hereto as Appendix G.

that for the 2002 examination. *See* Silva Expert Report, Tables 3 and 6 and Electronic File Attachment no. 3.

The documentation regarding the job analysis, exam components, and exam context of the 2005 Boston Police Promotional Examination shows that the examination is content valid. Information regarding the 2005 Statewide Police Sergeant Examination supports the conclusion that it too is content valid. First of all, there was approximately 75% overlap in the content of the two examinations. They both consisted of a written test and the same education and experience rating. Second, there was 55% overlap in the subject matter covered by both written tests. Third, the subjects that were covered in the Statewide Examination only were evaluated by subject matter experts from throughout the Commonwealth of Massachusetts and determined to be relevant to the Police Sergeant position.[18] Finally, a comparative analysis of the performance of incumbent Sergeants and Sergeant candidates shows that the former group significantly outperformed Sergeant candidates on test questions that were common to both exams. *See* Silva Expert Report, p. 2. This means that the content of both exams was job related in that it addressed subjects commonly dealt with by incumbent Police Sergeants.

### Plaintiffs' Criticisms of the 2005 Examinations

Plaintiffs' experts have leveled a number of criticisms at the 2005 Police Sergeant Examination. Each of these criticisms is addressed below:

Plaintiffs' experts assert that the 2005 Boston Police Sergeant Examination does not meet professional standards for validation and cannot be shown to be valid. This is

---

[18] *See* Memo from Director Sally A. McNeely dated 2/14/05; Subject: Updating the Reading Lists for Promotional Examinations & Serving as a Subject-Matter-Expert for Police Promotional Examinations (Bates 2432); copy attached hereto as Appendix H.

not the case. The 2005 examination was developed on the basis of a thorough job analysis that identified important areas of knowledge, skills, and abilities. The reliability coefficient and item characteristics of the examination indicate that test items were professionally written and scored. The examination measures a sufficient number of KSAs to be content valid.[19]

Plaintiffs' experts assert that the HRD failed to meet the principles established by professional scientific and regulatory authorities for establishing cut (i.e., pass/fail) scores for the examination. The passing score for the 2005 Boston Police Sergeant Examination (as with the others) is a "nominal" score. It is not the actual score that determines whether an applicant is selected. The actual score is determined by the number of openings that exist. The Commonwealth of Massachusetts uses a band scoring system in which applicants can be appointed from within a band of scores that is equal to two times the number of vacancies plus one. As an example, if there are ten vacancies, the band of applicants eligible for appointment would include the top twenty-one scorers. Although the passing score for all Police Sergeant promotional examinations at issue in this case was set at 70%, the lowest score in the band of scores produced by the "2n+1" formula is the actual cut-off for any given jurisdiction. Based upon the typical differences between minority and non-minority applicants, it is unlikely that lowering the passing score would have any effect in terms of adverse impact (especially in a community the size of Boston). One solution to this problem would be to expand the types of exercises included in the examination (which the HRD has already tried) or to attempt to amend the "2n+1"

---

[19] Plaintiffs' experts' further criticisms specific to the 2006 and 2007 examinations (*see, e.g.*, Dr. Wiesen's report at pp. 49-53 and Dr. Landy's report at pp. 27-28) do not warrant a response as the examination data clearly indicate that any modest disparate impact associated with those examinations does not cross the threshold (*i.e.*, an adverse impact ratio below 0.80) requiring a validation defense.

regulation and make selections from all applicants who score above an administratively determined score (e.g., 70%, 65% or 50%). This would present the difficult question of what to base the final selection on, given that there would be many more eligible applicants than vacancies. No matter how this is done, there is no guarantee that the proportion of minority applicants selected will increase unless race/ethnicity is used as the determining factor. This would likely be unconstitutional or certainly would be subject to legal challenge. Finally, plaintiffs' experts failed to identify any minority applicant who would have been selected but for the nominal 70% cut score.

Plaintiffs' experts assert that the HRD failed to distinguish between knowledge that must be memorized and knowledge that can be looked up for purposes of application. Plaintiffs' experts further conclude that properly distinguishing between these two forms of knowledge should have led to part of the Examinations being open-book.

The use of closed-book examinations for purposes of selection is the case in the vast majority of circumstances in which such tests are employed. Whether one considers tests such as the Scholastic Achievement Test, medical licensure examinations, bar examinations, or most police promotions examinations, the tests are closed-book even though there may be situations in which, in actuality, the test taker may have the opportunity to refer to documents when applying the knowledge. Even plaintiffs' own expert, Dr. Wiesen, is the author of a test marketed nationwide that contains test items that require memorization when, in actuality, the test taker would probably refer to written material before having to address the problem covered in the questions.[20] Moreover, plaintiffs' experts have not presented any evidence showing that a closed-book

---

[20] *See* WTMA, Wiesen Test of Mechanical Aptitude, PAR Edition, Professional Manual, Psychological Assessment Resources, Inc. 1997.

test results in greater adverse impact than an open-book test.   In my professional experience I have found the opposite to be the case.   That is, open-book tests tend to produce greater adverse impact than closed-book tests because they place greater emphasis on reading ability under greater time constraints.   It should be noted that the test developed and marketed by Dr. Wiesen produces greater adverse impact against African Americans than the examinations at issue in this case.

Plaintiffs' experts assert that HRD ignored, in its assessment procedure, important skills such as communication, negotiation, and persuasion. First of all, the fact that HRD did not include measures of these abilities does not indicate that they were ignored.  As discussed earlier in this report, HRD, in conjunction with the appropriate jurisdictions, considered a number of factors in determining the most appropriate method of testing applicants for the Police Sergeant position, not the least of which was practical feasibility.   I am not aware of any jurisdiction that has the numbers of applicants comparable to those in this case -- typically upwards of 600 or more in dozens of communities -- and that attempts to measure abilities such as persuasion and negotiation. Moreover, plaintiffs' experts do not provide a single example of such a jurisdiction. Just as importantly, plaintiffs' experts do not provide any example of a case in which a selection process for Police Sergeant that measures such abilities produces less (or minimizes) adverse impact. With regard to the measurement of communication skills, Boston, with HRD's approval, retained a consulting firm that developed and administered an exercise, as part of the 2002 Boston Police Sergeant Examination, which measured this ability. The result was essentially *no* reduction in adverse impact against minority applicants.

Plaintiffs' experts assert that HRD has no foundation for the practice of strict rank-ordered appointment procedures for the position of Police Sergeant.  The selection

system used by the Commonwealth of Massachusetts does not mandate that selections be made in strict rank-order. An appointing authority can select any of the applicants who fall within the band defined by the "2n+1" formula.

Plaintiffs' experts assert that HRD failed to consider or use alternative valid examining methods that would have resulted in lesser adverse impact and equal or greater job relatedness. The discussion above of the 2002 Boston Police Sergeant selection process shows that Boston, with HRD's approval, did, in fact, consider and implement new selection methods of the kind described by plaintiffs' experts. The results were not what Boston or the HRD had hoped for. In addition, Plaintiffs' experts have failed to present a single example or a single iota of data showing a feasible alternative that has been used in an employment situation such as that faced by HRD (in particular, simultaneous administration of an examination to hundreds of candidates in multiple communities) that has less adverse impact and is equally valid.