UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| PEDRO LOPEZ, et al. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Civil Action No. 07-11693-GAO |
| v. ) | |
| ) | |
| CITY OF LAWRENCE, et al. ) | |
| ) | |
| Defendant. ) | |

**PLAINTIFFS' TRIAL BRIEF**

The thrust of this case is simply stated. For many years, Boston and the other defendant cities and towns have used a written multiple-choice test to decide who should be entrusted with the wide-range of leadership, command, organizational, communication, interpersonal, administrative, community, and other critical responsibilities performed by a police sergeant. The defendants' reliance on such a narrow test, which measures little more than an applicant's ability to memorize facts from a textbook, continues to this day, even though all of the experts agree that minority[1] candidates perform worse on such tests and even though all of the experts agree that there are more valid and less discriminatory testing methods.

The principal defenses are three-fold. First, although there is no dispute that the test has a disparate impact in Boston, some defendants seek to ignore what is universally-recognized – i.e., that minorities consistently perform worse on the type of test being challenged here – by arguing that the number of promotions in their municipalities are too small to prove statistically-significant disparate impact. This overly-narrow argument ignores well-established law that

---

[1] In this case, "minority" refers to black and Hispanic candidates. All other candidates are considered "non-minority."

1

disparate impact may be proven, and will be proven in this case, in multiple ways. The disparate impact of the written multiple-choice test is not surprising given that, as stated in a recent amicus brief co-authored by the Defendants' expert, "[i]t is well-established that minority candidates fare less well than their Caucasion counterparts on standardized written examinations, and especially multiple-choice…tests." Brief of Industrial Organizational Psychologists as Amici Curiae in Support of Respondents, Ricci v. DeStafano ("Outtz Brief"), 2009 WL 796281, *32 (2009). Indeed, that written multiple-choice tests place a greater burden on minority applicants has been recognized for over 40 years. See Boston Chapter, N.A.A.C.P., Inc. v. Beecher, 504 F.2d. 1017 (1st Cir. 1974) ("What in our view conclusively tips the scale in plaintiffs' favor is the uncontroverted testimony, from experts called by both sides, that black and Spanish surnamed candidates typically perform more poorly on paper-and-pencil tests of this type.") (citation omitted).

Second, all of the defendants argue that the test is "minimally" valid, notwithstanding a lack of proof that the test was properly validated and notwithstanding an overwhelming weight of authority that a written exam cannot test for critical skills, abilities, and personal characteristics. That authority includes the opinion of Defendants' expert that "written, pencil-and-paper tests, while able to measure certain cognitive abilities (e.g., reading and memorization) and factual knowledge, do not measure other skills and abilities critical to being an effective [public safety] officer." Outtz Brief, 2009 WL 796271 at *15.[2]

Third, the defendants argue that better tests are not feasible – that is, that there is no proof that the use of better tests would have made enough of a difference to justify the burden of developing them. In fact, there is proof all over the country, in the form of numerous

---

[2] The Outtz Brief addressed an examination for a fire officer. As will be demonstrated at trial, the need for a broad assessment of skills and abilities is as great for a police sergeant as it is for a fire officer.

jurisdictions that have successfully developed tests with greater validity and less adverse impact. There is also proof in learned treatises – including one edited by the Defendants' own expert[3] – that testing methods other than written multiple-choice tests are equally or more effective and have a lower disparate impact on minorities.

## Background

The cities of Lawrence, Methuen, Lowell, Worcester, Springfield, and Boston, as well as the Massachusetts Bay Transportation Authority ("MBTA"), along with many other cities and towns throughout the Commonwealth of Massachusetts, have voluntarily elected, pursuant to Mass. Gen. Laws, ch. 31, to rely on the Commonwealth of Massachusetts' Human Resources Division ("HRD") to create, design and administer promotional examinations for the position of police sergeant. Under chapter 31, municipalities in Massachusetts may develop and administer their own promotional exam, subject to approval by HRD.

The named plaintiffs are police officers for the cities of Lawrence, Methuen, Lowell, Worcester, Springfield, Boston, or the MBTA. Each plaintiff is each either black or Hispanic. The plaintiffs have taken the 2005, 2006, 2007 or 2008 HRD-administered police sergeant's examination for the position of police sergeant but have not been promoted.[4] Generally speaking, the HRD police sergeant examination consists of two elements: (1) an "education and experience" rating, which accounts for 20% of the exam score, and (2) a closed-book written test of approximately 80 multiple-choice questions, all of which ask about information taken directly from law enforcement and related textbooks. Because every applicant receives at least 14 of the 20 points allotted to the "education and experience" component, there are only 86 points to be

---

[3] James L. Outtz, ed., Adverse Impact: Implications for Organizational Staffing and High Stakes Selection, Society for Industrial and Organizational Psychology (2009), pp. 425-47.
[4] The City of Boston's exams for 2005 and 2008 were administrated by HRD, but those exams had some questions that differed from the statewide exam.

determined in each case, 80 by the written exam and 6 by the education and experience rating, meaning that the written test accounts for 93 percent (80 of 86 points) of the exam grade.[5]

Candidates must receive a score of 70 to pass the examination.[6] That cut-off score was not established based on any specific criteria. If a candidate passes the examination, he or she is then ranked by their score on the examination and placed on a list, which is provided by HRD to each jurisdiction. Selections for promotional positions are made by the respective jurisdiction from the top candidates on such list, typically using a rule known as "2N+1." For example, if there are three openings in a given jurisdiction, the three candidates selected from promotion are chosen from among the top seven candidates on that jurisdiction's list.

As a result of the use of the HRD police sergeant's promotional examination over the last 20 years or more, disproportionately few minorities, if any, have been promoted to the position of sergeant in the Defendant jurisdictions and elsewhere in municipalities throughout Massachusetts. As a result, there is a significant disparity between the number of minority police sergeants in Massachusetts and their corresponding numbers in entry-level police officer ranks, notwithstanding that there are significant number of qualified minority police officers who are otherwise qualified for such promotion.[7]

---

[5] Two points may be added for veteran status.
[6] For the 2008 examination, the passing score was lowered to 64.
[7] For example, as of 2008, about 37 percent of Boston police officers were minorities. As of 2010, about half that percentage (20%) of Boston police sergeants were minorities. From the 2008 sergeants exam for Boston, there have been 37 promotions to date, only of two of which were minority candidates. For Lawrence, the numbers are 28% (minority police officers) and 6% (minority police sergeants), respectively. Indeed, although Lawrence is a community in which minorities make up 74% of the population, only 1 of its 17 police sergeants is a minority, and no minority candidate has been promoted to police sergeant in the last 8 years.

**Legal Elements & Expected Proof**

1. <u>Overview of Disparate Impact Claims</u>

Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, prohibits any employment practice that has "a disparate impact on the basis of race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(k)(1)(A)(i).[8] Unlike disparate treatment claims, disparate impact claims do not require proof of intent to discriminate. <u>Bradley v. City of Lynn</u>, 443 F. Supp. 2d 145, 155 (D.Mass. 2006). The purpose of a disparate impact claim is to "'root[] out 'employment policies that are facially neutral in the treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.'" <u>Id.</u> at 155, <u>quoting</u> <u>EEOC v. Steamship Clerks Union, Local 1066</u>, 48 F.3d 594, 600-601 (1st Cir. 1995).

There are three steps in a disparate impact claim. <u>First</u>, the plaintiff has the initial burden of proving that a challenged employment practice has a disparate impact. <u>Id.</u> at 156, <u>citing</u> 42 U.S.C. § 2000e-2(k)(1)(A)(i). <u>Second</u>, once a plaintiff has demonstrated disparate impact, the employer has the burden of proving that the challenged practice is "job-related and consistent with business necessity." <u>Id.</u> at 157, <u>quoting</u> <u>Steamship Clerks</u>, 48 F.3d at 601-602. <u>See</u> <u>also</u> 42 U.S.C. § 2000e-2(k)(1)(A)(i) (requiring employer " to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity"); 42 U.S.C. § 2000e(m) ("The term 'demonstrates' means meets the burdens of production and persuasion."). <u>Third</u>, even if the employer meets this burden, a plaintiff can still prevail by demonstrating that

---

[8] Plaintiffs also bring, as Count II, a claim under Mass. Gen. Laws, ch. 151B. Massachusetts does not have a well-developed body of law on disparate impact. <u>See</u>, <u>e.g.</u>, <u>Sullivan v. Liberty Mut. Ins. Co.</u>, 444 Mass. 34, 38 n.10 (2005) (citing to federal law for description of disparate impact claims). As a result, the claim under chapter 151B is not separately analyzed here.

there is "another selection device without a similar discriminatory effect that would also serve the employer's legitimate interest." Bradley, 443 F. Supp. 2d at 156.

### 2. Disparate Impact

To prove disparate impact, a plaintiff's prima facie case consists of three elements: identification of a specific employment practice, the existence of a disparate impact, and a causal connection between the practice and the disparate impact. Id. at 156 (citation omitted). Courts have recognized that a plaintiff's burden of proving a prima facie case of disparate impact should not be placed too high: "When widespread minority underemployment is shown to exist in a given occupation, primary selection devices should not be immunized from study by placing unrealistically high threshold burden upon those with least access to relevant data." Id. at 170, citing Beecher, 504 F.2d at 1020-21.

A plaintiff need not prove to a scientific degree of certainty that a challenged employment practice caused a disparate impact; instead, the plaintiff must proffer evidence "which reveals a disparity substantial enough to raise an inference of causation." Id. at 157 (citations and internal quotation marks omitted). "[W]here the employment practice at issue dispositively excludes individuals…the disparate impact and causation elements appear to merge." Id. (citations omitted). In this case, the employment practice being challenged is the Defendants' use of the HRD examination for police sergeant promotions. Because the promotional examination plays such a determinative role in determining promotions, it "dispositively excludes individuals" for promotion, so there is no need for separate proof of causation. Once the Plaintiffs prove disparate impact, causation necessarily follows.

The proper focus of a disparate impact analysis is on the question of equal opportunity, not simply on bottom-line promotion statistics. Connecticut v. Teal, 457 U.S. 440, 450-51

(1982). This means that a plaintiff need not establish a bottom-line effect on promotions, and an employer cannot point to bottom-line statistics as a dispositive defense. Id. ("The suggestion that disparate impact should be measured only at the bottom line ignores the fact that Title VII guarantees these individual respondents the opportunity to compete equally with white workers on the basis of job-related criteria.") (emphasis in original). As a result, "individual components of a hiring process may constitute separate and independent employment practices subject to Title VII even if the overall decision-making process does not disparately impact the ultimate employment decisions." Bradley, 443 F. Supp. 2d at 158-59 (citations omitted).[9] When, as in this case, "an examination is a ranking mechanism that dictates whether and when passing candidates are reached for consideration, [a court] must determine whether it is a gate-way that has a disparate impact on minority hiring." Id. at 159.

There is no "single test" to establish disparate impact. Langlois v. Abington Hous. Authority, 207 F.3d 43, 50 (1st Cir. 2000), citing Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 995-96 n.3 (1988) (plurality). Instead, "courts appear generally to have judged the 'significance' or 'substantiality' of numerical disparities on a case-by-case basis." Watson, 487 U.S. at 995 n.3. When looking at evidence of disparate impact in a case such as this, it is important to keep the big picture in mind – as stated by the Supreme Court, the "'fine tuning of the statistics could not have obscured the glaring absence of minority'" hires. Bradley, 443 F. Supp. 2d at 166, quoting Int'l Brotherhood of Teamsters v. United States, 431 U.S. 324, 342 n.23 (1977).

One part of the big picture is a well-known history in Massachusetts of written exams having a disparate impact on minorities. That history reaches back to Beecher, supra, a 1974

---

[9] Similarly, even where minority candidates are eventually promoted, a disparate impact can still be established if the promoted minority candidates experienced delays in promotion. Id. at 168 (citations omitted).

case in which the First Circuit affirmed a finding that such an exam had a disparate impact on minority firefighter applicants. It continued with a consent decree in 1978, requiring the City of Boston to, among other things, "set specific goals and timetables for promotions of black officers to sergeant." See Boston Police Superior Officers Fed'n v. City of Boston, 147 F.3d 13, 15 (1st Cir.1998) (describing history of decree, including series of unsuccessful challenges to race-based promotions made under decree). And it continues as recently as Brackett v. Civil Service Commission, 850 N.E.2d 533 (Mass. 2006), when the Supreme Judicial Court upheld the MBTA's use of a separate promotion list for black police sergeants, given that the black applicants would not otherwise have been promoted given their lower test scores. Id. at 547 ("If the MBTA had based its promotion decisions on strict rank order...[n]o black officers would have been promoted to fill any of the seven sergeant positions."). See also Cotter v. City of Boston, 323 F.3d 160, 164-65 (1st Cir. 2003) (describing how City of Boston bypassed white police sergeant candidates based on disparate impact of using exam scores for strict rank ordering); Boston Police Superior Officers Fed'n, 147 F.3d at 20-25 (affirming City of Boston's bypassing of white police lieutenant candidates, even though not required by any consent decree, given the history of discrimination against black candidates).[10]

One common benchmark for measuring disparate impact is the "four-fifths rule," which comes from the Equal Employment Opportunity Commission's Uniform Guidelines on Employee Selection Procedures (1978) ("Uniform Guidelines"). 29 C.F.R. § 1607.4(D). The First Circuit has "approved use of the four-fifths rule as a pertinent benchmark in the employment context." Langlois, 207 F.3d at 50, citing Boston Police Superior Officers, 147 F.3d at 21. Under this rule, "[a] selection rate for any race…which is less than four-fifths (4/5)

---

[10]   In light of these cases, where the MBTA and the City of Boston acted in recognition of the disparate impact of promotional exams, they will be hard pressed in this case to deny that the promotional exam has a disparate impact.

(or eighty percent) of the rate for the group with the highest rate will generally be regarded…as evidence of disparate impact." 29 C.F.R. § 1607.4(D).  That a particular employment practice meets the four fifths test – that is, even if a test does not have an adverse impact as measured by the four fifths rule – does not prove a lack of discrimination.  As the Uniform Guidelines state, "Smaller differences in selection rate may nonetheless constitute adverse impact, where they are significant in both statistical and practical terms or where a user's actions have discouraged applicants disproportionately on grounds of race, sex, and ethnic origin." 29 C.F.R. § 1607.4(D).  See also Isabel v. City of Memphis, 404 F.3d 404, 411-13 (6th Cir. 2005) (finding disparate impact even where test satisfied four fifths rule).

Another method that courts have used to find disparate impact are statistical tests that examine "differences between what is expected and what is observed."  Bradley, 443 F. Supp. 2d at 161.  Generally, the greater the difference between what is expected to happen (e.g., whites and minorities receiving equal scores) and what actually happens (e.g., minorities receiving lower scores), the smaller the likelihood that the difference happened by chance, leading to a stronger inference that there is some other explanation (e.g., a test with a disparate impact).  Id. Under generally accepted standards, when there is less than a 5% likelihood (or, more conservatively, less than a 1% likelihood) that a particular outcome occurred by chance, one can make a "statistically significant" inference that the outcome was caused by something other than chance.

In this case, Plaintiffs will establish disparate impact in at least three ways, each of which is independently sufficient to meet the Plaintiffs' burden: the HRD examination has an adverse impact on minority police sergeant applicants in terms of (1) average test scores, (2) pass/fail rates, and (3) promotional appointments.

First, Plaintiffs' expert Joel Wiesen, Ph.D., is expected to testify that there is a statistically significant adverse impact against minority applicants in the average written test score for each exam from 2005 to 2008. In statistical terms, the likelihood that minority candidates received lower scores due to chance is so low that it is reasonable to infer that the written test has a disparate impact on minorities. Because candidates are selected for promotion based on rank-ordering (that is, based on their relative scores), having lower average scores means having fewer opportunities for promotion, resulting in a disparate impact. See Bradley, 443 F. Supp. 2d at 168 ("The effect of using examination scores…for rank ordering, is to bunch minorities at the bottom of the eligible list. … Ranking by examination score thus disproportionately has precluded minority candidates from hiring consideration…."). Indeed, even if a minority candidate ultimately is promoted, a lower score can result in delays that cause harm. Id. at 168-69 ("Even if hired in future classes, minorities as a class have been adversely and disparately impacted by loss of pay, benefits, and seniority caused by the delay.").

Second, Dr. Wiesen is expected to testify that there is a statistically significant adverse impact against minority applicants in the pass/fail rate for all exams except the 2008 statewide exam. Dr. Wiesen is also expected to testify that the pass/fail rates meet the EEOC's definition for adverse impact under the "four fifths rule." The pass/fail rate is plainly significant, because the disproportionately high number of minorities who fail the test are excluded from consideration for promotion. See Teal, 457 U.S. at 448-51 (disparate impact can be measured by reference to pass/fail rates, regardless of bottom-line promotions).

Third, Dr. Wiesen is expected to testify that each exam had a disparate impact on minorities in terms of bottom-line appointments, based on the "four fifths rule," on tests of

statistical significance, or both. As a result, even if the Defendants were entitled to rely on a defense based on bottom-line appointments, that defense would prove unavailing.

Plaintiffs will provide jurisdiction-specific evidence about average test scores, pass/fail rates, effective pass rates, and bottom-line appointments. With respect to Boston, it is undisputed that the 2005 and 2008 exams had a disparate impact. With respect to other municipalities, there is jurisdiction-specific evidence of disparate impact with respect to every exam at issue in this case.

Plaintiffs also will provide analyses based on data that is aggregated over time and across jurisdictions. The Uniform Guidelines specifically approve of aggregation:

> Where the user's evidence concerning the impact of a selection procedure indicates adverse impact but is based upon numbers which are too small to be reliable, evidence concerning the impact of the procedure over a longer period of time and/or evidence concerning the impact which the selection procedure had when used in the same manner in similar circumstances elsewhere may be considered in determining adverse impact.

29 C.F.R. § 1607.4(D). See also Adoption of Questions and Answers To Clarify and Provide a Common Interpretation of the Uniform Guidelines on Employee Selection Procedures, 44 Fed. Reg. 11996, 11999-12000 (1979) (Q21: "if a lower selection rate continued over a period of time, so as to constitute a pattern, then the lower selection rate would constitute adverse impact;" Q27: "[i]f the test is administered and used in the same fashion for a variety of jobs, the impact of that test can be assessed in the aggregate.").

Courts repeatedly have embraced aggregation as a reasonable way to examine disparate impact. See, e.g., Bradley, 443 F. Supp. 2d at 167 (finding aggregation reasonable), citing Vulcan Pioneers, Inc. v. N.J. Dep't of Civil Serv., 625 F. Supp. 527, 534-35, 544-45 (D.N.J. 1985) (finding aggregation across municipalities and across years appropriate where State administered firefighter promotion exam and exams were extremely similar across years). See

also Paige v. California, 291 F.3d 1141, 1148 (9th Cir. 2002) (concluding that "it is a generally accepted principle that aggregated statistical data may be used where it is more probative than subdivided data"); United States v. City of Yonkers, 609 F. Supp. 1281, 1289 (S.D.N.Y. 1984) (finding *prima facie* case under Title VII with aggregated data); NAACP v. City of Corinth, 83 F.R.D. 46, 61 (N.D. Miss. 1979) (finding that aggregated data across four years showed "a strong indication that the city's selection process operated to the detriment of black applicants"); Jones v. New York Human Resources Dep't, 391 F. Supp. 1064, 1074 (S.D.N.Y. 1975) (aggregating results of five exams to find that whites passed at a rate of three times the rate of minorities); League of United Latin American Citizens v. City of Santa Ana, 410 F. Supp. 873, 903 (C.D. Cal. 1976) (aggregating data across two exams in disparate impact case over defendant's objection that sample size was too small).

Aggregation has not been allowed where the individual tests or employment procedures at issue were too different. See, e.g., Bradley, 443 F.3d at 167, citing Fudge v. City of Providence Fire Dep't, 766 F.2d 650, 656-57 (1st Cir. 1985) (aggregation across jurisdictions was inappropriate where examinations were too different). But that problem does not exist in this case, where each year's exam was identical[11] and the similarities across years were substantial.

In terms of average scores and pass/fail rates, there is no rational argument against aggregation across jurisdictions. Those measures bear no relation to differences between individual municipalities, so there is no reason to avoid aggregation. If 1,000 applicants from around Massachusetts took the same written exam at the same time, it is plainly reasonable to compare how the scores of the minority test-takers compared to the scores of the non-minority

---

[11]   Boston's 2005 and 2008 exams had some questions that differed from the statewide exams given in those years, but those differences are not significant enough to make aggregation inappropriate.

test-takers, regardless of where each test-taker worked as a police officer. Indeed, the most reliable way to evaluate whether each exam had a disparate impact on minorities in terms of average scores and pass/fail rates is to look at the largest possible group of test takers.

In terms of bottom-line promotions, the argument against aggregation is that each jurisdiction should be liable for its own actions, not the actions of other jurisdictions. But that argument misses the point. The focus in this case is on whether *HRD's exam* provided a level playing field for minority applicants. One way – although it is neither the only way nor a required way – to answer that question is to look at how the exam impacted minorities across the state. If the exam resulted in disproportionately fewer minorities receiving promotions across the state, that fact serves as evidence that the exam was unfair to minorities. Once each of the Defendants decided to use that unfair exam, they put their minority applicants at a disadvantage, and they cannot seek to avoid the legal consequences of that decision by pointing to their own bottom-line promotions. That is precisely the type of argument rejected by the Supreme Court in Teal, supra.

    3. Validity

Once the Plaintiffs have proven that the HRD exams had a disparate impact, the burden shifts to the Defendants to prove that those exams were job-related and consistent with business necessity. Bradley, 443 F. Supp. 2d at 170 (citations omitted). The Defendants must do more than ask the Court "to undertake a leap of faith." Id. at 171 (citations and internal quotation marks omitted). Instead, this Court should look to the Uniform Guidelines to evaluate whether the examination has been properly validated. Id. See also Albermarle Paper Co. v. Halifax Local No. 425, 422 U.S. 405, 431 (1975) ("The message of these Guidelines is…that discriminatory tests are impermissible unless shown, by professionally accepted methods, to be

predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated.").

The Guidelines describe three methods of validation: criterion-related, content, and construct. 29 C.F.R. § 1607.5(A). In this case, Defendants contend that the HRD examination has been validated by the second of the these methods: content validation. According to the Guidelines, "[e]vidence of the validity of a test or other selection procedure by a content validity study should consist of data showing that the content of the selection procedure is representative of important aspects of performance on the job for which the candidates are to be evaluated." 29 C.F.R. § 1607.5(B). Generally, the Guidelines have two principal requirements: (1) compliance with proper validation procedures, and (2) documentation of the validation process. See generally 29 C.F.R. § 1607.14 (establishing minimum standards).

In terms of *minimal* validation procedures, the first step for content validation is a job analysis. 29 C.F.R. § 1607.14(C)(2). The next step is to ensure that there is a link between the selection procedure and the critical knowledge, skills, and abilities necessary for successful performance of the job (as identified by the job analysis). 29 C.F.R. § 1607.14(C)(4). Another step is to ensure that the selection procedure is reliable. 29 C.F.R. § 1607.14(C)(5). In addition, where a selection procedure relies on prior training or experience as a selection criterion, that criterion should be justified based on the relationship between that training and experience and the content of the job. 29 C.F.R. § 1607.14(C)(6). The use of a ranking device requires a separate demonstration that there is a relationship between higher scores and better job performance. 29 C.F.R. § 1607.14(C)(9). See also Brunet v. City of Columbus, 1 F.3d 390, 410 (6th Cir. 1993) (using exam score to rank candidates requires strong correlation between test score and job performance).

In terms of documentation, test administrators are required to maintain records of adverse impact determinations and documentary evidence showing content validity. 29 C.F.R. § 1607.15(A)(2)-(3). Documentary evidence of content validity should include, among other things, detailed records of the job analysis; complete descriptions of and justifications for the selection procedure; complete descriptions of what steps were taken to reduce adverse impact and to ensure reliability for relevant sub-groups; a complete description of alternative selection procedures that were investigated; a description of what selection procedures were considered (e.g., cutoff score, grouping, ranking, etc.) and why; and a description of steps taken to ensure accuracy and completeness of the data and results. 29 C.F.R. § 1607.15(C).

Plaintiffs experts, Dr. Wiesen and Cassi Fields, Ph.D., are expected to testify that the HRD examinations fail, in numerous ways, to comply with content validity standards. First, and most fundamentally, the written multiple-choice test did not test for skills and abilities that are critical for a police sergeant, such as oral communication ability, interpersonal skills, problem identification and analysis, judgment, and planning and organizing. As another district court concluded with respect to a firefighter exam: "[C]ognitive examinations do not predict how quickly a firefighter can climb stairs with equipment or raise a ladder. *Memorization skills only carry you so far*. Teamwork and physical prowess are even more highly correlated with job performance." Bradley, 443 F. Supp. 2d at 173 (emphasis added). This critique applies with equal force to police sergeants, whose successful job performance requires far more than memorizing facts.

Second, and more generally, HRD falls far short of providing the type of evidence necessary to prove minimal compliance with content validation procedures. What little evidence there is demonstrates just the opposite: the examination is not valid. Among other problems, the

15

job analyses and validation studies in this case contain clear defects and indications of impropriety. For example, an initial study upon which the Defendants rely, which was carried out in 1991, acknowledged that critical skills and abilities would not be tested. With respect to critical knowledge, skills, and abilities that it said would be tested, the written tests did not cover all those areas. As another example, when a group of subject matter experts independently reviewed a later job analysis to rate the relative importance of job tasks and knowledge, skills, and abilities, there was not a single instance of disagreement between them out of over 20,000 ratings, an unprecedented and unbelievable level of agreement. As a further example, the ratings in that later job analysis are plainly implausible, as demonstrated by a task like "supervising bomb threats" being something that sergeants supposedly are called upon to do "daily."

That the contested exams lack validity is further demonstrated by the fact that none of the experts in this case are aware of any other jurisdiction that places such heavy reliance on a written multiple-choice test. Reported cases make clear that exams with a greater diversity of methods have been in use for well over a decade. For example, in Brown v. City of Chicago, 8 F. Supp. 2d 1095 (N.D. Ill. 1998), the City of Chicago used a police lieutenant promotional exam in 1994 that included a written job knowledge test, an in-basket simulation, and an oral briefing exercise. Id. at 1099.

    4. Less Discriminatory Alternatives

The Plaintiffs "have no obligation to provide the exact floor plan" for an alternative test. Bradley, 443 F. Supp. 2d at 175. As a result, the Defendants cannot argue that Plaintiffs must identify specific questions, grading mechanisms, or other details of alternative selection processes. Id. It is sufficient, for example, for the Plaintiffs to offer proof that "other jurisdictions have managed to devise selection procedures to have a less adverse impact." Id.

The Plaintiffs expect their experts, and Defendants' expert Dr. Outtz, to testify about the availability of selection processes that have greater validity and less disparate impact. Indeed, none of the experts are aware of any other jurisdiction that places as much weight as the Defendants on a written multiple-choice test. Plaintiffs expert Dr. Fields has developed special expertise in the area of police sergeant examinations, and she has worked with other jurisdictions to develop about 80 police sergeant examinations that have greater validity and less discriminatory impact. Defendants' own expert, Dr. Outtz, also has developed police sergeant examinations for other jurisdictions. Notably, in none of those situations did he place the type of reliance on a written multiple-choice test that the Defendants do in this case. Instead, he relied on combinations of assessment tools like oral boards, video simulations, and role play exercises. Indeed, in one case (Bridgeport, CT), he eliminated the use of a written examination altogether. This is not surprising, for Dr. Outtz has repeatedly argued that minorities predictably do worse on written multiple-choice tests. Although Dr. Outtz will attempt to escape his long record of critiquing written multiple-choice tests by claiming that his criticisms were limited to fire service examinations, that attempt flies in the face of the evidence and common sense.

The Defendants may not rely on a defense that they are constrained by state law from using a less discriminatory alternative. See Brown, 8 F. Supp. 2d at 1111-13 (rejecting defendant's claim that state law precluded use of less discriminatory alternative), citing 42 U.S.C. § 2000e-7 ("Nothing in this subchapter shall be deemed to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of any State or political subdivision of a state, other than any such law which purports to require or permit the doing of any act which would be an unlawful employment practice under this subchapter.").

The Defendants also may not claim that a more valid and less discriminatory test is financially infeasible. According to all of the experts, every town or city of which they are aware, including municipalities in financial distress, has managed to develop promotional exams that include performance tests that include performance test components beyond a written multiple-choice test.

## Conclusion

For these reasons, this Court should find that the HRD examinations had a disparate impact on minority candidates, that those examinations are not job-related and consistent with business necessity, and that there are alternative examinations that have equal or greater validity and less discriminatory impact, all in violation of Title VII and Mass. Gen. Laws, ch. 151B.

Respectfully Submitted,<br>
PEDRO LOPEZ, et al., Plaintiffs,<br>
By their attorneys,<br>
<br>
/s/ Stephen S. Churchill<br>
Harold L. Lichten, BBO #549689<br>
Shannon Liss-Riordan, BBO# 640716<br>
Stephen S. Churchill, BBO#564158<br>
Joseph L. Sulman, BBO #663635<br>
LICHTEN & LISS-RIORDAN, P.C.<br>
100 Cambridge Street, 20th Floor<br>
Boston, MA 02114<br>

Date: July 9, 2010                                                        (617) 994-5800

## CERTIFICATE OF SERVICE

I hereby certify that on July 10, 2010, a copy of this document was served by electronic filing on all counsel of record.

/s/ Stephen S. Churchill<br>
Stephen S. Churchill