UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


PEDRO LOPEZ, Individually and on )
behalf of a class of individuals )
similarly situated, )
)
        Plaintiffs, )
)    Civil Action
v. )    No. 07-11693-GAO
)
CITY OF LAWRENCE, et al, )
)
        Defendants. )
)


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


STATUS CONFERENCE


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Wednesday, June 30, 2010
3 p.m.


Marcia G. Patrisso, RPR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1   APPEARANCES:

 2        LICHTEN & LISS-RIORDAN, P.C.
          By: Harold L. Lichten, Esq.
 3            Stephen S. Churchill, Esq.
              Joseph L. Sulman, Esq.
 4        100 Cambridge Street, 20th Floor
          Boston, Massachusetts  02114
 5        On Behalf of the Plaintiffs

 6        CITY OF LOWELL LAW DEPARTMENT
          By: Brian W. Leahey, Esq.
 7        City Hall
          375 Merrimack Street
 8        Lowell, Massachusetts  01852
          - and -
 9        OFFICE OF THE CITY ATTORNEY
          By: Richard J. D'Agostino, Esq.
10        200 Common Street, Suite 306
          Lawrence, Massachusetts  01840
11        On Behalf of the Defendant City of Lawrence

12        COLLINS, LOUGHRAN & PELOQUIN
          By: Laurie W. Engdahl, Esq.
13        320 Norwood Park South
          Norwood, Massachusetts  02062
14        On Behalf of the Defendant City of Worcester

15        MORGAN, BROWN & JOY, LLP
          By: Mary Jo Harris, Esq.
16            Robert P. Morris, Esq.
          200 State Street, 11th Floor
17        Boston, Massachusetts  02109
          On Behalf of the Defendant City of Boston
18
          MBTA LAW DEPARTMENT
19        By: Kevin S. McDermott, Esq.
          10 Park Plaza, 7th Floor
20        Boston, Massachusetts  02116
          On Behalf of the Defendant MBTA
21

22

23

24

25
```

```
 1        CITY OF SPRINGFIELD LAW DEPARTMENT
          By: Harry P. Carroll, Esq.
 2        36 Court Street
          Springfield, Massachusetts  01103
 3        - and -
          LAW OFFICE OF EDWARD M. PIKULA
 4        By: Edward M. Pikula, Esq.
          1350 Main Street, 15th Floor
 5        Springfield, Massachusetts  01103
          On Behalf of the Defendants City of Springfield
 6        and Mayor Sarno

 7        CITY OF METHUEN - OFFICE OF THE CITY SOLICITOR
          By: Peter J. McQuillan, Esq.
 8        The Searles Building, Suite 311
          41 Pleasant Street
 9        Methuen, Massachusetts  01844
          On Behalf of the Defendant City of Methuen
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  P R O C E E D I N G S
 2          THE COURT:  All rise.
 3          (The Court enters the courtroom at 3:03 p.m.)
 4          THE CLERK:  The United States District Court for
 5      the District of Massachusetts.
 6          Court is now in session.  Please be seated.
 7          For a final pretrial, the case of Lopez versus
 8      Lawrence, et al, 07-11693.
 9          Will counsel identify yourselves for the record.
10          MR. LICHTEN:  For the plaintiffs, Harold
11      Lichten.  With me is Steve Churchill and Joe Sulman from
12      our office.
13          MR. LEAHEY:  Good afternoon, your Honor.  Brian
14      Leahey on behalf of the City of Lowell.
15          MS. ENGDAHL:  Good afternoon.  Laurie Engdahl on
16      behalf of the City of Worcester.
17          MS. HARRIS:  Mary Jo Harris for the City of
18      Boston.
19          MR. MORRIS:  Robert Morris also for the City of
20      Boston.
21          MR. McDERMOTT:  Kevin McDermott representing the
22      MBTA defendant.
23          MR. CARROLL:  Harry Carroll.  I represent the
24      City of Springfield and Mayor Sarno.
25          MR. PIKULA:  Edward Pikula, City of Springfield.
```

1          MR. McQUILLAN:  Good afternoon, your Honor.

2     Peter McQuillan representing the City of Methuen.

3          MR. D'AGOSTINO:  Good afternoon, your Honor.

4     Richard D'Agostino representing the City of Lawrence.

5          THE COURT:  Okay.  Good afternoon, everyone.

6          If I held this at four o'clock, would I get more

7     papers in the meantime?

8          (Laughter.)

9          THE COURT:  Well, there are a number of issues.

10    I think the thing to do is perhaps just look at the

11    pending motion list and tic some of them off.

12         The first one is 212, which is a motion to file

13    a revised seventh amended complaint.  I don't know that

14    that's been opposed but the time has -- maybe it has.

15    Has it?

16         MS. HARRIS:  Sorry?

17         THE COURT:  Has it been opposed?

18         MS. HARRIS:  We did oppose it, your Honor.

19         THE COURT:  Let me hear you briefly on it, each

20    of you.

21         MR. LICHTEN:  The Court granted us leave to

22    amend our complaint to challenge the results of the 2008

23    exam, which are subsequent occurring events.  So while

24    we've done that -- and some of the plaintiffs that were

25    already plaintiffs in this case had taken that and so

1    are properly permitted to challenge it.  There were some

2    that had only taken the 2008 exam, and so they had to

3    exhaust their procedures before the MCAD and EEOC.  Once

4    they did that, we've now moved to amend them to add them

5    to the case.

6         It doesn't change anything in the case because

7    the Court's already granted us permission to challenge

8    the 2008 exam; it's just adding seven people who have

9    only taken that exam who couldn't have filed the

10   complaint until we've exhausted our procedures before

11   the MCAD and EEOC.

12        I don't see that it has anything -- that it will

13   impair in any way the Court's ability to hold the trial,

14   as it will, on the questions of liability, because this

15   is a disparate impact case and the individual issues

16   with respect to the clients would simply not come into

17   play in a disparate impact case.  So for that reason

18   we're seeking leave to file the seventh amended

19   complaint to add these potential plaintiffs.

20        If the Court were to deny it, the plaintiffs

21   would still be -- they would just have to file an

22   independent lawsuit; it wouldn't mean that their claims

23   would be lost.  So it wouldn't affect the docket at all.

24        MS. HARRIS:  Your Honor, these additional seven

25   defendants -- well, let me step back.  All of the

1    plaintiffs -- there are some 40 plaintiffs thus far in

2    the case, and all of those plaintiffs have been deposed.

3    And our position is that there are issues that go to

4    causation that are particular to each plaintiff; for

5    example, if somebody was bypassed for promotion because

6    of a disciplinary history or because they didn't study,

7    and some of the plaintiffs have acknowledged that

8    because they had no faith in the exam system, they

9    didn't bother to study for the exam.

10            And we think that those are issues that we're

11   entitled to explore, particularly where we're looking

12   not only at the disparate impact alleged in this exam,

13   but also whether and how many of these plaintiffs would

14   be entitled to go on to a remedy phase if this Court

15   were to rule in the plaintiffs' favor.

16            There is no reason why these seven plaintiffs

17   could not have filed their administrative charges before

18   now, and there's also no reason why they couldn't have

19   removed those charges from the commission and sought to

20   bring their action up into this court.

21            The serial disclosures of additional parties is

22   causing hardship on the defendants as we try to prepare

23   for this case, and for that reason we do oppose the

24   motion to amend.

25            THE COURT:  I think those are adequate reasons.

1    I agree with them.

2          We'll -- the approved amendment is to the first

3    version of the seventh amended complaint, essentially

4    for the reasons outlined, Ms. Harris.

5          Let me just say generally, as you know, we, from

6    the beginning, made clear that we were going to stick to

7    the schedule as it had been set, including the trial

8    date, and I've been rather ruthlessly enforcing that

9    against the defendants' wishes, and I think the same

10   rules have to apply to the plaintiffs as well in this

11   case.

12         So we're going to try the case as it was set up

13   when we were making the plans with the minor exception

14   that we did allow the seventh amended complaint because

15   I think there was no opposition to that at the time.  So

16   Number 212 is denied.

17         That -- well, okay.  So let's just move along

18   down the list here.  Let's -- and we can deal, I guess,

19   with -- there are perhaps several issues relating to

20   experts, so let's address those.

21         Who wants to -- I guess it's mostly -- well, I

22   don't know.  Maybe there's some on each side, I don't

23   know.

24         Ms. Engdahl?

25         MS. ENGDAHL:  Your Honor, the municipal

1　defendants and the MBTA, other than Boston, have filed a

2　joint motion in limine to preclude the plaintiffs'

3　expert testimony regarding aggregated data.  So is that

4　what you would like to hear?

5　　　　THE COURT:  Well, that's one of them.  But I see

6　there's a brand-new one that relates to expert -- I

7　guess the late Frank Landy's report, or something like

8　that.  That's a new one.  And then there's some motions

9　concerning potential discovery, additional discovery,

10　from experts who want to present supplemental reports.

11　　　　And so there are a number.  So maybe we

12　should -- maybe we should deal with the aggregated issue

13　first.

14　　　　MS. ENGDAHL:  Okay.  Your Honor,

15　defendants -- we filed a motion in limine to preclude

16　the expert testimony of the plaintiffs on the analysis

17　of aggregated data across jurisdictions.  And we filed

18　this motion both because the aggregated data, with

19　respect to these defendants, is not probative of

20　anything, and also, because we believe that the analysis

21　is flawed and actually distorts the data.

22　　　　With regard to relevance, the plaintiffs'

23　initial burden on a disparate impact case is to show a

24　practice, show disparate impact, and then to show

25　causation.  If plaintiffs can't present a prima facie

1   case of proof at this stage on those three elements, the

2   case goes no further, and that's been established under

3   the EEOC guidelines regarding employee selection

4   processes.

5        Here, the challenged practice with regard to

6   each of the municipal defendants and the MBTA is the use

7   of an exam developed and administered by HRD.  With

8   regard to the impact, the defendants anticipate that the

9   plaintiffs will argue that the data aggregated statewide

10  demonstrates adverse impact.  Because of a lack of

11  causation between the challenged practice and the

12  examination of data on a statewide basis, obviously the

13  City of Worcester's use of its exam didn't cause a

14  disparate impact statewide.

15       We think that the evidence itself is of limited

16  value, it's highly prejudicial and not probative of

17  anything.  I would like to point out also that the

18  municipalities never get that kind of statewide data

19  from HRD; the only thing the municipalities ever get is

20  a list of those who have passed the exam after it's

21  given.  So we believe that these plaintiffs' experts

22  have to be precluded from presenting aggregated

23  statistics because of their lack of relevance.

24       And I would point out, and we did in our brief,

25  that Bradley v. Lynn took the same approach.  While the

1    Commonwealth was there, and the judge in Bradley v. Lynn

2    did look at aggregated statistics when she was looking

3    at whether to impose liability on the two

4    municipalities, in that case she did look at the

5    disaggregated for each of those municipalities to

6    determine whether, in fact, there was a disparate impact

7    within that municipality.  I would also point out that

8    in Bradley v. Lynn there was even more reason there to

9    use aggregated statistics, and yet the judge still used

10   the disaggregated statistics.

11        That was an entry-level exam at issue where

12   candidates do compete across jurisdictions for

13   positions.  Here the promotional-level candidates are

14   only eligible for promotion within their respective

15   municipalities.  In that case also, obviously, the

16   Commonwealth was there, and that made a difference, too,

17   in terms of the evidence that the court was looking at.

18        I do want to say a word on why we think the

19   plaintiffs are focused on this aggregated data and

20   analysis.  And apart from Boston, this is because using

21   the four-fifths rule under the EEOC guidelines these

22   plaintiffs would be unable to establish a disparate

23   impact based on statistics relating to the

24   municipalities, and that is because the EEOC has

25   established guidelines which set forth the four-fifths

 1   rule.  And I assume you're familiar with that as well.

 2   That essentially says if you're looking at a small data

 3   set, there's a calculation you need to do before you

 4   determine whether you're going to use a four-fifths

 5   rule, and that's called a shift of one.

 6          And if you apply a shift of one, which means you

 7   replace one non-minority promotion or appointment with a

 8   minority promotion, and if that changes, the equation

 9   where it results -- where it goes from adverse impact

10   against one group to actually a higher selection rate

11   with respect to the other group, then you know your data

12   set is too small to be relevant or statistically

13   significant, and therefore, you don't use the

14   four-fifths rule, and you can't use that rule to

15   establish adverse impact based on those statistics

16   alone.  This is not subject to expert debate, this

17   is -- it is what it is, it's what the EEOC guidelines

18   have established and expect.

19          Because they can't show adverse impact within

20   each municipality using the guidelines, that's why they

21   argue that aggregating is necessary.  But the fact that

22   they are unable to establish a prima facie case using

23   this four-fifths rule doesn't mean that they get to use

24   flawed and irrelevant evidence to establish a prima

25   facie case against the municipalities.

1          Our second argument, as I noted, was that the

2    actual aggregated analysis really flaws and distorts the

3    pictures in a way that you can't -- you cannot reach any

4    conclusions as a matter of law with regard to adverse

5    impact.  The expert in the -- plaintiff's expert,

6    Dr. Wiesen, did an overly simplistic calculation based

7    upon the four-fifths rule.  He aggregated the data

8    across jurisdictions as though police officers are

9    eligible to compete for promotion in all jurisdictions.

10          And both defendants' experts, Dr. Outtz and

11   Dr. Silva, presented some simple and compelling

12   equations within their reports that you may have had a

13   chance to look at to show just how aggregating data --

14   when candidates don't compete across jurisdictions, how

15   aggregating that data can really distort evidence of

16   adverse impact.  And I think it's on page 2 of

17   Dr. Silva's latest expert report as well.  I'm not sure

18   if you want me to go into that or not or move on.

19          But one of the specific examples it's not just

20   theoretical of how this aggregate data presents a flawed

21   picture is the case of the City of Worcester.  Even

22   though we argue that in the case of all these

23   jurisdictions the numbers are just too small to be

24   useful for any purpose, if you look at the case of

25   Worcester, even without doing a shift of one or

1    acknowledging the small sample size, the statistics

2    within Worcester for the 2006 exam, which is at issue

3    here, shows there was no adverse impact on blacks alone,

4    on Hispanics alone, on blacks and Hispanics combined.

5    When it came to our rate of promotions, there was no

6    adverse impact in the pass-fail rate.  In fact, our

7    pass-fail rate, minorities passed at a higher rate than

8    whites.  If you were to even look back, there's some

9    evidence -- even though the 2004 exam is not at issue,

10   it was produced during discovery -- that we did equally

11   as well in that case, where there was no adverse impact

12   on blacks and Hispanics, either in our rates of

13   promotion or in our pass-fail rates.

14         We have made only one promotion off the 2008

15   list.  Obviously, one promotion by itself cannot make a

16   statistical analysis.  It's not statistically

17   significant.  In that case you would look back at what

18   we've done from 2006 and 2004.  When you aggregate

19   those, we actually have promoted for the last five or

20   six years minorities at -- blacks, Hispanics and whites

21   all at the same rate.

22         So my point in raising this is the only reason

23   Worcester is still here is because the plaintiffs are

24   clinging to this aggregated data which really presents a

25   distorted picture and can look like there's adverse

1    impact when there, in fact, is not against each of these

2    defendants.

3         We also would like to point out, as was pointed

4    out in our defendants' expert reports, that the

5    plaintiffs' calculations fail for other reasons beyond

6    the fact that the candidates don't compete for promotion

7    across jurisdictions, so it doesn't make sense.  We also

8    would like to point out that the low promotion rates of

9    sergeants compared to the total applicant pool just by

10   itself, everything being equal, would lead in many cases

11   to an appearance of adverse impact, and that's without

12   regard to whether the examination was flawed or perfect.

13   There was no holding for experience and education.

14        The other things we don't know in the other

15   jurisdictions that are not here whether is minorities

16   were bypassed for other reasons.  We just don't know why

17   there's the -- where there might have been a lack of

18   minorities promoted in those other jurisdictions.  You

19   just can't use a simple calculation when you don't know

20   what's going on to try and hold individual defendants

21   where they have -- you know, we've got individual

22   employees suing individually named defendants.  You

23   can't hold us liable based on what's happened in other

24   jurisdictions.  It's not relevant under the prima facie

25   case and, frankly, it's a distortion and unfair.

1           I would like to point out one more thing is that

2      after we filed this motion in limine, the plaintiffs did

3      present a report from their plaintiffs' expert,

4      Dr. Wiesen.  And I believe that was submitted along with

5      their opposition today.  And you'll see that it's dated,

6      I believe, June 25th.

7           We object to the introduction of that report for

8      a number of reasons.  This litigation has been going on

9      for a long time.  Dr. Wiesen has had every opportunity

10     to do a disaggregated analysis before this, and he's

11     focused on his aggregated analysis.  In his deposition

12     he said he did that because the focus of the case last

13     year was based on the Commonwealth.  So we would argue

14     that the fact that they finally woke up that there's a

15     problem with their prima facie case because they haven't

16     done any disaggregated analysis is not reason to allow

17     them to come in at this late date with these statistics.

18     It's too late.  We've had no opportunity to depose

19     Dr. Wiesen on this issue.

20          Beyond that, I would point out that even his

21     disaggregated analysis within that report is flawed in

22     and of itself.  Speaking again in the case of Worcester,

23     he failed to apply the EEOC guidelines to our 2006 exam

24     in terms of analyzing the data there.  He just simply in

25     one sentence, almost in a whisper, said that it

1    constituted adverse impact even though he told me in a

2    deposition it would not, under federal guidelines, say

3    that.

4         The other thing he did is he used the wrong data

5    for Worcester in 2004.  The plaintiffs are well aware we

6    made 14 promotions, two of them minorities, yet Dr.

7    Wiesen's report shows that we made no promotions.  So

8    it's not even based on accurate data.  So we think for

9    that reason that the late report of Dr. Wiesen should be

10   precluded as well.

11        So in sum, we think that the plaintiffs' expert

12   testimony with their aggregate analysis should be

13   precluded from evidence admissibility in this case.

14        MR. CARROLL:  Your Honor, Harry Carroll for the

15   City of Springfield.  I would like to add one further

16   example to what Attorney Engdahl had said.  In the City

17   of Springfield's case, we actually hired statistical

18   experts to focus on disaggregated data dealing

19   specifically with the City of Springfield.  They

20   submitted an expert report which says that the number of

21   minorities appointed is not statistically different from

22   the number of whites appointed.  And this is to the

23   sergeant's position in Springfield.

24        Minorities were no more or less likely to be

25   appointed once rank and exam was taken into account;

1    minorities were no more or less likely to be appointed

2    once rank, experience and educational background were

3    taken into account; and Springfield's appointments that

4    there were out of rank order did not negatively affect

5    minorities.

6         So it's just another example, as Attorney

7    Engdahl has mentioned, why, when you look at the

8    disaggregated data, which is the only relevant data for

9    appointments, to say that there's no adverse impact for

10   the City of Springfield.

11        THE COURT:  Mr. Lichten?

12        MR. LICHTEN:  What my colleagues have just said

13   is just factually untrue and a complete distortion.  For

14   example, let me just take what Mr. Carroll has just

15   said.  Their expert, Dr. Outtz, found that there was

16   disparate impact in the selection rates for the City of

17   Springfield.  Our experts found that there were

18   disparate impact.  In fact, what it shows is over the

19   last two exams there has been one minority promotion and

20   about 20 non-minority promotions in a city that is at

21   least 50 percent minority and has a police force which

22   is 30 or 40 percent minority.

23        What his expert did, and we're moving -- we're

24   filing a motion to exclude their particular expert in

25   Springfield, they take a position that you've already

1    rejected that because of state law they can only

2    consider the top three candidates for each open

3    position.  And their expert said if you look at who the

4    top candidates were, since there were only whites

5    certified, there's been no adverse selection because

6    there were no minorities not selected because there were

7    no minorities in the top ranking because as a matter of

8    law we couldn't get to minorities to select them.

9           You've already rejected that position.  This

10   case, as you've already found, is about the fact that

11   they should have done their own examination, not that

12   they should have taken the results of the Commonwealth's

13   examination and then been limited to only considering

14   the top three candidates.

15          So what Mr. Carroll just told you is simply

16   wrong.  There's huge statistical disparate impact with

17   respect to the City of Springfield promotional rates.

18   In fact, over the last two exams, I want to repeat that,

19   there's been one minority promotion to the position of

20   sergeant in a city that has so many minority police

21   officers, and approximately 20 non-minority promotions

22   for an incredibly disparate impact -- for an incredible

23   amount of disparate impact which our experts say is

24   statistically significant.

25          So I just want to, then, back up.  In this case

1   we have the City of Boston where the City of Boston

2   apparently is now going to concede, because as they

3   must, as their experts say, that there's significant

4   disparate impact in the selection rates for the position

5   of police sergeant in Boston.  Boston has conceded --

6   and, for example, in the last year on the new exam there

7   have been 35 promotions to the position of the City of

8   Boston --

9          MS. HARRIS:  We're not a party to this motion,

10  your Honor.

11         MR. LICHTEN:  In almost every jurisdiction that

12  we're talking about -- just take the 2008 exam which is

13  now part of this case -- there have essentially been

14  maybe two minority promotions of all these

15  municipalities despite the fact that non-minorities have

16  been promoted.

17         So let me back up and describe what this case is

18  about because I think it's been terribly distorted.

19  We're going to show disparate impact in three ways, and

20  those ways are all suggested by and adopted by other

21  judges in this court, including Judge Saris, and by the

22  EEOC regulations.

23         First, we're going to show -- and I think this

24  is really not conceded, that's why they're honing in on

25  selection rates -- that when you look at this 80

1    question pen-and-pencil technical knowledge memorization

2    test, it has a huge disparate impact on minority

3    test-takers.  And the exam is the same for every

4    municipality in this case.  The disparate impact ratios

5    are enormous, and even their experts agree that when you

6    give just a pen-and-paper multiple-choice technical

7    knowledge test, it will have a huge disparate impact on

8    minority test-takers.  So that's the first way we're

9    going to show it.

10          The second way we're going to show it is to say

11    that in each municipality involved -- and we've only

12    recently gotten the updated statistics because this is

13    an ongoing affair.  As you know, promotions are made

14    over three years.  So even promotions from the 2007 and

15    2008 exam are going on even to this date.  And because

16    the Commonwealth no longer compiles that data, we just

17    in late May-early June got the final data sets for the

18    last year that allowed us to compile this information.

19          With respect to each municipality, what they're

20    really saying is -- take Worcester, for example.  Our

21    expert said that there is adverse impact in selection

22    rates in Worcester off the latest -- off the last two

23    exams.  They say the selection ratio is .76, which is

24    below the four-fifths rule.  And in all the other cities

25    we can show -- and our experts have said and it's in

1    their reports -- that there is adverse impact.

2        What they're really saying is that because

3    there's only five or six or ten or 15 promotions in each

4    jurisdiction by exam, that if you disaggregate the data,

5    don't look over time, that is, exams they've given over

6    the years, or don't look at exams and combine it with

7    other cities, that the numbers are too statistically

8    small to get what's called statistical significance.  So

9    it's not that we can't prove disparate impact -- we can,

10   and our experts say that we will -- what they're really

11   saying is we can't prove statistical significance.

12       Now, the EEOC guidelines give help on this.  And

13   Judge Saris discussed this in her Bradley decision in

14   which she said, quote, "Given the statutory framework

15   mandating the HRD's involvement in the hiring process

16   across municipalities, the aggregation approach is

17   supported in this case by the EEOC guidelines and the

18   case law."  And that was in the entry-level hiring case

19   involving firefighters in the state of Massachusetts.

20       We've cited to you many other decisions,

21   Paige v. California and Vulkin Pioneers v. Department of

22   Civil Service, which is very similar to Massachusetts

23   because they use a statewide police and fire promotional

24   exam in which aggregation has been adopted because it's

25   the same exam and it's the same position.

1           But more importantly, your Honor, I want to draw

2      your attention to Rule -- I'm sorry -- to 29 CFR 1607.4,

3      which is in our brief, which is the EEOC's regulations

4      on how you prove disparate impact.  And it says, and I'm

5      quoting, "Where the user's evidence concerning the

6      impact of a selection procedure indicates adverse

7      impact" -- which is what we have here -- "but is based

8      upon numbers which are too small to be reliable,

9      evidence concerning the impact of the procedure over a

10     longer period of time and/or evidence concerning the

11     impact which the selection procedure had when used in a

12     similar manner, in similar circumstances elsewhere, may

13     be considered in determining adverse impact."

14          So what our experts are saying is:  One, when

15     you look at the exam itself, and you look at the mean

16     scores, there's a tremendous difference between the

17     scores of whites and minorities, and that's one

18     indicator of adverse impact.  Secondly, they're saying

19     when you look at each municipality you have adverse

20     impact in the selection rates, although in some

21     communities, because the selections have not been great,

22     you may have a problem with statistical significance.

23     But because you have it in each municipality, and it's

24     suggestive of discrimination, if you look on a wider

25     basis, that is, looking at the data over years or

1   looking at it over jurisdictions, you can then apply

2   this EEOC guideline and find the overall picture shows

3   that there's discrimination.

4        Now, let me take a step back.  We've cited to

5   you in various briefs that we've filed before this Court

6   and the First Circuit the fact that there's this huge

7   problem in Massachusetts.  The big picture in this case

8   is you have these large cities, Lowell, Lawrence, the

9   MBTA, where you have significant numbers of minority

10  police officers and you have hardly any -- for example,

11  Lawrence has one minority police sergeant in the whole

12  city of Lawrence.  Black or Hispanic, one minority

13  police sergeant.

14       Over time, the use of this pen-and-paper exam

15  has had this huge adverse impact on minorities being

16  placed in important sergeant positions because the

17  pen-and-paper test used has this horrible disparate

18  impact upon minorities.  But these municipalities want

19  to get out of this case by saying, "Ah-ha, if you only

20  look test-by-test at our city, you may have a

21  statistical significance problem," and, "Ah-ha, even

22  though you have disparate impact, you can't show that

23  it's statistically significant."

24       And we're saying that based on case law, that

25  utilizing these modalities that I've described, we can

1   show disparate impact even in those municipalities where

2   there's not statistical significance.  In Boston, and in

3   Springfield, we say we have both statistical

4   significance, and in Boston, Boston concedes that

5   there's disparate impact.

6           For all those reasons, your Honor, what I

7   request you do is listen to our experts.  Listen to them

8   discuss the EEOC guidelines and the SIOP, the Society of

9   Industrial and Organizational Psychologist principles,

10  and at the very least reserve deciding this issue, since

11  it's going to be a court trial anyway, until you've

12  heard a fully developed record.  I think it's extremely

13  premature to make such a determination at this point.

14          THE COURT:  Okay.  Let me just stop you right

15  there, because that's what I'm going to do.

16          MR. LICHTEN:  I should have gotten to the last

17  sentence first.

18          THE COURT:  You should have started there.

19          No, really.  I'm going to deny the motion, but

20  I'm not making a Daubert ruling in denying the motion.

21  So I'm not saying that the evidence qualifies, we're

22  just going to try it out.  It is a jury-waived case, I'm

23  going to hear all the evidence, and these issues are all

24  preserved for the trial.  I think it's a more reliable

25  way of doing it, to have the full presentation, than to

1  try to do it on an in limine basis.

2          Worcester, again, there's a rather small, I

3  think, motion with respect to one plaintiff's failure to

4  exhaust on '08.  Is that --

5          MS. ENGDAHL:  Correct.  And I would request some

6  additional time to respond to their opposition because

7  the one Worcester plaintiff failed to file a new charge

8  at the EEOC based on the 2008 exam.  My understanding is

9  others plaintiffs already in this case did so.

10          I have only recently gotten a chance to briefly

11  read the opposition, but I believe it fails to mention

12  that the Supreme Court in 2002 set the standard for

13  whether an employee has to go to the EEOC.  It was

14  National Railroad Passenger Corporation v. Morgan.  And

15  in that case they got rid of the standard whether

16  something was a systemic violation or a serial

17  violation, and the Supreme Court said that basically

18  discrete or discriminatory acts need to be filed on

19  their own each time one happens unless it's a hostile

20  work environment.

21          THE COURT:  Okay.  Let me just -- again, maybe

22  it's the same basis.  He's in the case on the earlier

23  exams --

24          MS. ENGDAHL:  Yes.

25          THE COURT:  -- anyway?

 1        Let's just decide it at trial.  I mean, it's not

 2   going to -- he's going to be there, the City's going to

 3   be there.  It's just an issue as to -- it's like whether

 4   one of his counts are sustained or not.

 5        Now, tell me about the -- what's going on with

 6   supplementing expert reports and motions to exclude and

 7   motions to admit.

 8        MS. HARRIS:  Your Honor, the City of Boston had

 9   flagged in their pretrial memorandum, we had the

10   depositions of the plaintiffs' experts.  Dr. Wiesen was

11   deposed on June 9th and I believe Dr. Fields was deposed

12   on June 18th.  And in both of their depositions they

13   alluded to information that they had reviewed subsequent

14   to their filing their expert reports.

15        Dr. Wiesen, as counsel --

16        THE COURT:  When were the expert reports

17   submitted?

18        MS. HARRIS:  Pardon me?

19        THE COURT:  When were the expert reports

20   exchanged?

21        MS. HARRIS:  I know that our deadline was May

22   28th by this Court's ruling, and we were given their

23   reports in early -- mid-April.  Mid-April.  And we

24   produced the defendants' reports by May 28th.

25        Dr. Wiesen produced two reports:  his original

1    and his supplemental.  He produced a third report last

2    week.  Dr. Fields, when she was deposed, indicated that

3    she had reviewed materials subsequent to her filing her

4    expert report, which I believe was on March 30th of this

5    year.  And she had revised her opinions based on the

6    material that she had reviewed.  She did not produce a

7    supplemental report and she testified that she was not

8    asked to produce a supplemental report.

9          Her deposition did not conclude due to her

10   travel restrictions, and the deposition was suspended.

11   But our position would be, your Honor, that we should be

12   given the opportunity both to get a supplemental report

13   from Dr. Fields and conclude her deposition, or that she

14   be precluded from testifying beyond the four corners of

15   her report.

16         And I say that without -- taking no position on

17   my colleagues who did not have the opportunity to fully

18   examine her.  But where we're looking at a trial date of

19   less than two weeks away, we're -- you know, it's one

20   thing for counsel to argue, as I suspect he will, that

21   it's a bench trial and we can sort it out at trial, but

22   we don't know what the opinions are as they change, as

23   they review different information.  So we anticipate

24   moving either to exclude the experts from testifying

25   beyond the four corners of their report or we ask for

1    the opportunity to both get a supplemental and to have

2    the opportunity to depose them.

3            And I would point out that yesterday, at least

4    for the City of Boston, for the first time the Attorney

5    General's Office and HRD agreed to give us the exam

6    questions that are at issue here.  And just to give you

7    some background, particularly with regard to Dr. Fields,

8    in her initial report she took issue with the job

9    analyses that were the bedrock of the exams that were

10   created, at least according to the State.

11           Subsequent to her filing her report, she had

12   access to the job analysis, which apparently she had not

13   reviewed prior to making her report, and she revised her

14   opinion at deposition to conclude that the analysis she

15   had no problem with, but it was really with the

16   questions that were developed as a consequence of that

17   job analysis that she now took issue with.  She's

18   testifying that the exam is not valid because those

19   questions, in her opinion, are flawed for a number of

20   reasons.

21           We received those questions for the first time

22   yesterday.  We would like, and we think that we're

23   entitled, to examine her about those questions with

24   specificity.  And in regards to that, and I don't want

25   to step on my colleague here who's filed the actual

1    motion, but we believe that we're entitled to look at

2    her work product that she is holding up as the standard

3    and to which she claims that the product produced by the

4    State doesn't meet, and for those reasons is invalid.

5        We also want to flag for the Court the attorney

6    general and the HRD have taken the position that the

7    exam questions are confidential, and have noticed us

8    that if we intend to use them in open court, that they

9    want an opportunity to be heard.  And I do want to put

10   it on the record, and I will advise them, we do intend

11   to examine with regard to those questions, because at

12   least as regards the validity portion of the case here,

13   it appears that that -- those questions are what the

14   plaintiffs are now basing their claim that these exams

15   are invalid.

16       So for all of those reasons, your Honor, just to

17   sum up, we believe that we're entitled to resume and

18   complete the depositions of these experts; we believe

19   we're entitled to Dr. Fields producing a supplemental

20   report or that she be precluded from testifying beyond

21   the terms of her original report; and we believe that

22   we're entitled to examine with regard to the test

23   questions, both the State's and the questions created by

24   Dr. Fields.

25       And related to that, your Honor, we -- depending

1  on how your Honor rules we would be looking for

2  additional time to complete those depositions before

3  starting the trial in this case, which we would

4  anticipate would take no more than approximately 30 days

5  for a new trial date.

6       MR. LICHTEN:  Your Honor, once again, I hate to

7  say this, but the defendants keep distorting the facts

8  of this case.  You asked us to -- because of the death

9  of Dr. Landy, you set a deadline for submission of

10  additional reports, and that deadline was set for April

11  1st for us.  And we complied with that.  We submitted

12  our additional reports by April 1st, I believe it was,

13  2010.

14       Their expert reports were due in late April.

15  They moved, and without permission from the Court who

16  gave it after the fact, they submitted their expert

17  reports on May 28th.  Now, in one of their expert

18  reports they included a whole new data set, and it was

19  dated May 28th, 2010, that had updated information on

20  promotions that we had been trying to get.  At the same

21  time, back in March or April we submitted new

22  interrogatories, with the Court's permission, to the

23  other side asking them for updated hiring data and

24  test-taking data so we could update our analysis.  For

25  reasons that I don't want to cast any aspersions, we

1  didn't get the last one until around June 1st or June

2  2nd, 2010.

3          We immediately, within two weeks, had our expert

4  analyze that data and issue an updated report based upon

5  the data that we just saw from their expert and which

6  our expert was finally able to obtain through the

7  interrogatories we produced to the defendant.  So we've

8  acted incredibly timely to get out timely reports

9  because, again, this is a -- this is an ongoing process.

10          The last data set we had was back a year ago.

11  There were many more promotions and non-promotions that

12  had occurred in the year, and we had to update our data

13  set.  And we didn't get that information until about

14  June 1st, and turned around the report within ten days

15  of that.  So we have not acted in any way

16  inappropriately; we've acted under the best of faith and

17  quickly.

18          Now, they have the same data set that we have.

19  With respect to the test questions, it's exactly the

20  same story.  We have been struggling to get the test

21  questions from HRD who's been very protective of their

22  test questions even though these are past tests.  We

23  finally were able to work out a deal, and only got the

24  test questions from HRD after agreeing to a very solid

25  protective order.

1          And we got them about two weeks ago and we

2     showed them to our experts.  And they had to sign

3     confidentiality -- and we've arranged -- the defendants,

4     my understanding, have also arranged to see those

5     questions.

6          Now, obviously, those questions -- I think both

7     sides agree they're important because that's what the

8     case, if it gets to validity, is about:  whether the

9     questions are valid questions or not valid questions.

10    So -- and both sides now have access to them and have

11    made judgments based upon them.  Their experts will, I

12    assume, and our experts will.  I don't know what more we

13    could do.

14         MS. HARRIS:  If I could speak very briefly, your

15    Honor.  The first issue that Mr. Lichten talks about,

16    the data set, that has to do with the statistical

17    analysis.  The thrust of my argument -- and, again, I

18    don't want to speak for my colleagues, has to do with

19    the expert report of Cassie Fields opining about the

20    validity of the job exam -- excuse me -- of the validity

21    of the exam test.

22         This is the first that I've ever heard that the

23    plaintiffs had access to the exam questions two weeks

24    ago.  I have been in communication with the general

25    counsel for HRD, as he told me on Friday that if I could

1    secure signatures of all the parties on his

2    confidentiality agreement, he would reveal those exam

3    questions to us.  And as I represented a moment ago, we

4    received that information yesterday.

5         The deposition of Dr. Fields, she testified that

6    she had reviewed the 1991 job analysis which was, again,

7    a document produced by HRD to the experts -- that she

8    had reviewed that and that she had reviewed these exam

9    questions, and that her opinions that were in her report

10   had changed.  She has not been asked, she has not

11   produced, a supplemental report.  It is -- particularly

12   with regard to Dr. Field's report, which has not been

13   addressed -- has not been changed to reflect the

14   additional information and the further opinions that she

15   holds and apparently is prepared to testify in this

16   court about that the defendants feel that we've been

17   prejudiced by not having that information.

18        THE COURT:  Let me just understand something.

19   So Dr. Fields has not produced a supplemental report?

20        MS. HARRIS:  That is correct.

21        THE COURT:  Dr. Wiesen has?

22        MS. HARRIS:  He has produced --

23        THE COURT:  So is he the only one?

24        MS. HARRIS:  Excuse me?

25        THE COURT:  He's the only one with a

1  supplemental report?

2       MS. HARRIS:  That's correct.

3       MR. LICHTEN:  The only thing I want to say is

4  Dr. Fields was deposed at length about those very things

5  that she had reviewed.  They got to depose her and she

6  had just seen them and she testified at length about it.

7       So if you want us to submit a supplement, we

8  will, but they did get to depose her on it.  She was

9  here all day.

10       THE COURT:  Mr. Leahey?

11       MS. HARRIS:  We didn't have the questions, your

12  Honor.

13       MR. LEAHEY:  Your Honor, just kind of -- the

14  City of Lowell on behalf of all the defendants filed a

15  motion regarding Dr. Fields, essentially, as counsel has

16  noted, that HRD finally gave all the parties the exams

17  yesterday.  Late yesterday afternoon is when I received

18  it.  I believe all the defendants, and it sounds like

19  all the plaintiffs, are going to want your Honor to see

20  those questions as the test is the large part of why

21  we're here.

22       That Dr. Fields was very specific in saying how

23  the test was inappropriate based on the knowledge,

24  skills and abilities and the job description, based on

25  Internet research I was able to find information -- and

1    it's listed in there -- between the pass rates in Macon,

2    Georgia, where all but one out of 73 people passed the

3    test, and in Memphis where there's concern as to the

4    questions were too easy and that it was designed that

5    way, that they be easy questions essentially based on

6    seniority.  So it's not about getting the best qualified

7    or following the basic merit principles under Civil

8    Service, it's going on seniority.

9            Since the test is now going to be introduced at

10   trial, it's the defendants' position that the person

11   who's saying these tests are invalid, yet she has

12   written tests that she has refused to provide any

13   information on saying it's confidential, that we're

14   willing to enter into the same type of confidentiality

15   agreement, but let's have what she says is a valid test

16   and the ones that she's designed that she testified that

17   none of her materials have been peer-reviewed, and get

18   those so they can be compared as to, all right, this is

19   what the HRD test is, this is what plaintiffs' expert

20   says is a valid test, and compare them.  Compare them

21   from the questions they ask, the test preparation

22   materials that are involved in both that are listed on

23   HRD stuff.  We have no idea of what Ms. Fields does in

24   terms of -- or Dr. Fields does in terms of preparation,

25   and also the scoring system, as to how those

1    scores -- how those tests are then graded.

2         With respect -- if I could just backtrack to

3    Dr. Wiesen's third report.  If this Court is inclined to

4    keep the date at July 12th, I would ask that

5    Dr. Wiesen's report that was just submitted June 25th

6    after -- approximately two weeks after his deposition be

7    excluded.  Counsel's saying that its recent data set is

8    true, but that's only with regards to 2008.  Prior to

9    that, Dr. Wiesen had written two reports, one in October

10   2008 and one in 2009, where he never disaggregated data

11   regarding any municipalities; it was always state,

12   state, state.

13        That was true when he did his -- I thought he

14   did three reports, but maybe he only did -- he did three

15   reports, one in October, one in 2010 and then the

16   supplemental one, that he reported he gave his report

17   that was required by this Court.  We then deposed him.

18   At the deposition he said he hadn't done any of that

19   information.  So that was at his deposition.  He said he

20   hadn't done any of the data.  Two weeks later, now he's

21   done the data, and it doesn't include just 2008, it goes

22   back to '05, '04.  It does all the years that should

23   have been done originally in his report.

24        And if he's now going to -- plaintiffs' going to

25   rely on a June 25, 2010, report that we didn't get until

1    after he was deposed, we should be entitled to depose

2    him anew on that which is why the case, if the Court is

3    inclined to allow it, should be extended to give us time

4    to depose him.

5         THE COURT:  Okay.  Well, it seems to me that

6    with every month that goes by, the case changes, and

7    that's the reason for adhering to all the deadlines we

8    set before.  In other words, it seems to me that we're

9    going to hold the trial date, and it will be tried on

10   the expert reports that were produced in accordance with

11   the schedule that was established in February.

12        I leave open the question of the supplement

13   because it may be a response to the late-filed defense

14   report.  I'll make a judgment as it's offered or the

15   testimony is offered.  But the basic ground rule will be

16   we're not going to keep revising the reports as we keep

17   gathering further -- at some point the discovery, the

18   trial preparation process has to be declared over, and

19   we have to go to trial on that basis.  And that's what

20   we're going to do.

21        So I don't think there's any need for further

22   depositions.  I'm not sure what that means for

23   Dr. Fields' testimony.  It probably limits it, but I'm

24   not sure enough to say that yet.  But we're going to try

25   it as the case was developed -- I mean, this is -- I

1    probably observed this before.  I know there was an

2    appeal in this case, but it's still an '07 case and

3    there's been plenty of time for it to be developed and

4    for the theories to be thought out and disclosed to the

5    other side, and so forth, and we're not going to just

6    keep shifting the ground.

7              MS. HARRIS:  Your Honor, may I just ask for

8    clarification?

9              THE COURT:  Yes.

10             MS. HARRIS:  With regard to the motion to compel

11   Dr. Fields to produce her exam questions, have

12   you -- does your --

13             THE COURT:  I don't think it's necessary in

14   light of what I just said because I don't think she

15   should be allowed to testify about it.

16             MS. HARRIS:  I see.  Okay.  Thank you.

17             THE COURT:  In other words, that's an expansion,

18   it seems to me, if I'm understanding it correctly.

19             MS. HARRIS:  That is our position.

20             THE COURT:  It's an expansion of her report.

21             MS. HARRIS:  Exactly.

22             THE COURT:  She's going to testify on the report

23   she filed.

24             MS. HARRIS:  Thank you.

25             THE COURT:  I think that may cover most of the

1    territory.  Is there something important that I've

2    missed?

3            MR. LICHTEN:  Can I -- I had a couple of simple

4    agenda items, your Honor.  Marking and exchanging

5    exhibits.  I assume you want us to do that before trial,

6    your Honor?

7            THE COURT:  Yes.

8            MR. LICHTEN:  Okay.  And then I think everybody

9    agrees but --

10           THE COURT:  It would be nice if they were in

11   digital form.

12           MR. LICHTEN:  We'll try to do that, your Honor.

13           THE COURT:  If it's possible.  I don't know

14   what --

15           MR. LICHTEN:  Okay.  And then I believe that

16   everybody's in agreement that this case is bifurcated.

17   This is the liability stage that would be tried before

18   the Court, not a jury.  I just want to make sure that

19   everybody is agreement with that.  But that's what Judge

20   Tauro had ordered and that's never been changed.

21           THE COURT:  That's right.

22           MR. LEAHEY:  I agree with that, your Honor;

23   however, I think we have a difference of opinion as to

24   whether or not the individual plaintiffs and the merits

25   of each of their particular claims could be raised.

1    It's the defendants' position that there should be

2    testimony -- like with regards to Lowell, one of

3    Lowell's defenses is that the plaintiff Alvarez is not

4    Hispanic.  Those are issues that the city would raise in

5    the liability phase as to other defenses, as to his test

6    preparation for the examination and questions along

7    those lines.

8         I think I heard counsel say earlier that it was

9    their opinion that those were not relevant to the

10   liability stage.  I just want to let the Court know

11   from -- at least the City of Lowell, and I believe the

12   other municipalities and the MBTA, would say that that

13   testimony from the plaintiffs and other persons

14   regarding their specific claims are part of the

15   liability stage.  I just wanted to let the Court know

16   that.

17        MR. LICHTEN:  That would certainly elongate the

18   trial by weeks and weeks beyond any comprehension

19   because that would mean I would have to put on 50

20   plaintiffs, which I can do, but I've never heard of it

21   being done in a disparate impact promotional exam case.

22   I've reviewed at least 100 promotional exam cases

23   decided by the federal courts and the circuit cases, and

24   I don't know of one case which has allowed such evidence

25   to be admitted at the liability stage in a trial in a

1    disparate impact case.

2         THE COURT:  Well, I guess maybe you'll have to

3    look at Judge Tauro's order.  I don't know.

4         Miss Engdahl?

5         MS. ENGDAHL:  Your Honor, I don't know if I'm

6    speaking out of turn but I would request that plaintiffs

7    first be required to prove their prima facie case before

8    moving on to the job-relatedness aspect of the case,

9    because we firmly believe Worcester will be out at that

10   stage if -- and, in fact, under the EEOC guidelines, you

11   don't get to validity or enforcement if the plaintiffs

12   don't first make out the prima facie case.

13        So is that how the trial is -- they'll be -- the

14   issue of the prima facie case first and then you decide

15   whether -- who stays in or gets out at that point?

16   Because despite what he said, he knows there's no

17   adverse impact in Worcester and he continues to press

18   his case against Worcester, so I would like to be out at

19   that stage of the litigation.

20        MR. LICHTEN:  Your Honor, first of all, our

21   experts, who obviously we're spending a lot of expense

22   on, would be testifying about both issues.  So trying

23   to, no pun intended, disaggregate that before the Court

24   I think would be extremely cumbersome.

25        THE COURT:  I think it probably would be.

1          MR. LICHTEN:  In addition to that, the City of

2    Boston has conceded that there is disparate impact, so

3    there is going to be a trial on the validity of the exam

4    anyway, so that's unavoidable; it's going to happen

5    regardless.

6          THE COURT:  Well, the question is going to be

7    staged in a way that would give Worcester an opportunity

8    to move to get out.  I mean, is there any -- I mean, I

9    gather from what you say that that would have to be

10   after the experts have testified but it could still be

11   before evidence -- well, I don't know.  I don't know if

12   it could be.  I'm not sure it's practical.

13         MS. ENGDAHL:  We talked yesterday about some of

14   the changes, so they know there's no prima facie case

15   on the two thousand --

16         THE COURT:  I don't know that it's practical.

17         MR. LICHTEN:  I do have one suggestion, your

18   Honor, because I have thought about this problem because

19   what Ms. Engdahl is saying is as follows:  The City of

20   Boston, which is by far the biggest defendant in the

21   case concedes, as they must, disparate impact, so there

22   will be a trial with respect to the validity of the

23   exam.  I understand, although there will be a big food

24   fight about this, that the other defendants are

25   contesting whether or not there's statistical

1  significance for disparate impact, an issue which is not

2  relevant to the City of Boston.

3       And I'm not suggesting the Court do this, but if

4  the Court wants to find a way to avoid these defendants

5  having to sit through something which may be

6  inappropriate, it would be to disaggregate the case by

7  having the trial against the City of Boston and to hold

8  for a while the issue of the case against the other

9  municipal defendants.  And if, obviously, the Court were

10  to find that the test was valid, then the case would be

11  over against essentially all the municipalities anyway

12  because that holding would be -- we would be stuck with

13  that holding.  I don't think that will happen, but that

14  is a possible way to try it and that -- because that

15  trial will only be against Boston, will only be relating

16  to the validity of the examination and will only involve

17  one defendant.

18       You can have sort of the first trial, which

19  would probably be done in a week or so, and then reserve

20  these other issues until later, and that -- I'm sure it

21  would give you a lot of knowledge about the case and

22  would make it unnecessary for these defendants to sit

23  through a big battle about validity if they think

24  they're going to get out on disparate impact.

25       So that is an idea.  I'm not suggesting you do

1    that, but that is an idea.

2         MS. HARRIS:  I would just point out that if we

3    don't win on validity -- and I'm just as confident that

4    we will as he is that we won't -- then the other

5    defendants would not have an opportunity to defend on

6    that piece of the case which --

7         THE COURT:  Well, they would.

8         MR. LICHTEN:  I'm not barring them.  They would

9    not be barred.

10        THE COURT:  I don't think they would be barred.

11   It would be redundant and it would be sort of -- but

12   if -- if it's the same fact-finder, it's going to be a

13   problem.

14        MS. ENGDAHL:  Could we have the first two days

15   on the prima facie case first and then make a

16   decision --

17        THE COURT:  Well, if it's separable, but I'm not

18   sure that it is from the way I hear -- that's my --

19   because -- unless you called the experts twice.  I guess

20   that's --

21        MS. ENGDAHL:  Well, they have one expert on

22   statistics and one expert on job validity, so they could

23   present it that way, and the same with defendants, I

24   think.

25        MR. CARROLL:  Your Honor, I believe Boston had a

1     different test to begin with; and secondly, all of the

2     defendants -- all of the individual defendants have an

3     interest in the validity of the exam.  So to say that

4     you're going to try the validity of the exam first only

5     against Boston would preclude us from, you know, the

6     legitimacy of our defense.

7          THE COURT:  It won't work.  It won't work.

8          Let me just call your attention to Rule 50(a)

9     with respect to the Worcester question.  And that is if

10    a party has been fully heard on an issue at trial and

11    the Court finds that a reasonable jury -- well, this was

12    a jury case, would -- maybe I should be looking at Rule

13    52.  I think there's a cognate provision.

14         But anyway, the point is you don't have to wait

15    until the complete end of the plaintiffs' case if a

16    particular issue has been fully tried out.  And perhaps

17    that's the way to deal with Worcester's concern.  And if

18    it can be accommodated, it makes sense.  I just don't

19    know whether it can be pulled apart in that way.  But it

20    isn't -- I think under both Rule 50 and 52, it's not

21    necessary to formally wait until the end of the

22    plaintiffs' presentation for such a motion.

23         MS. ENGDAHL:  Thank you.

24         MS. HARRIS:  Then just for logistics, then, your

25    Honor, would we still be going nine to one starting on

```
 1   the 12th?

 2          THE COURT:  Yes, nine to one starting on the

 3   12th except for the 19th, which is the following Monday.

 4   I have a habeas case that I've had to schedule in there.

 5   I think that's going to be one day, so...

 6          MR. LICHTEN:  What day is that, your Honor?

 7          THE COURT:  Monday, the 19th.  Just for expert

 8   planning, and so on and so forth.

 9          MR. LICHTEN:  So you would not hold trial that

10   day at all?

11          THE COURT:  No, we would skip trial that day for

12   this case.

13          MS. HARRIS:  Do you want openings or closings?

14          THE COURT:  Well --

15          MS. HARRIS:  And my suggestion would be for --

16   to the extent that you care what my suggestion would be,

17   is that we do some brief openings and then a closing --

18          THE COURT:  Yeah, that's fine.  Do whatever you

19   think is best to present your case.  I don't want

20   to -- I want to set other restrictions but I don't want

21   to control it.

22          And trial briefs, you know, at the opening of

23   trial.

24          MR. LICHTEN:  And the last thing, your Honor,

25   with respect to the examination, would the Court
```

 1  entertain a protective order since both parties want to

 2  use the examination?

 3         THE COURT:  Oh, sure.  Yeah, we can deal with

 4  that.  We could have it as a sealed exhibit, and so on

 5  and so forth.  We could control for that.  I think we

 6  could satisfy whatever interests the state authorities

 7  have.  I mean, even in the findings.  I mean, they can

 8  be redacted public findings and an unredacted version of

 9  the findings as well.  So that's not a problem.

10         MR. LICHTEN:  Thank you, your Honor.

11         THE COURT:  Okay.  I have other matters.

12         MR. LICHTEN:  Thank you very much, your Honor.

13         COUNSEL IN UNISON:  Thank you, your Honor.

14         (The proceedings adjourned at 3:59 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2

3          I, Marcia G. Patrisso, RMR, CRR, Official

4    Reporter of the United States District Court, do hereby

5    certify that the foregoing transcript constitutes, to

6    the best of my skill and ability, a true and accurate

7    transcription of my stenotype notes taken in the matter

8    of Civil Action No. 07-11693-GAO, Pedro Lopez, et al, v.

9    City of Lawrence, et al.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25