UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                                    )
PEDRO LOPEZ, ET AL                                  )
          Plaintiffs                                )
                                                    )          Civil Action No. 07-11693-GAO
          v.                                        )
                                                    )
CITY OF LAWRENCE, ET AL.                             )
          Defendants                                )
_____             )

SPRINGFIELD'S TRIAL BRIEF

## I.  Disparate Impact Issues.

A crucial issue in this case is whether plaintiffs can demonstrate the existence of a disparate impact on the basis of race.  If plaintiffs fail to show the existence of a disparity, their case will fail.  A proper disparate impact analysis involves a close examination of the constraints which operate to keep that analysis within its proper bounds.  In this case there are at least three issues which properly bound the disparate impact analysis: (1) how many exams apply to each party; (2) how wide is the data pool (the aggregation/disaggregation issue), and (3) how deep is the data pool (the certification issue).  Each of these important constraints on the disparate impact questions is discussed below.

### A.  Exams - no more than two out of four.

Plaintiffs[1], "Hispanic and African-American police officers in the Commonwealth of Massachusetts who have taken the Commonwealth's promotional examination for the

_____
[1]   Only six plaintiffs are Springfield police officers.  7th Am. Compl. ¶¶ 43-48.  Two of the six Springfield plaintiffs were promoted to police sergeant utilizing the certified lists resulting from the two challenged tests utilized by Springfield.  Answer to Sixth Amended Complaint of the City of Springfield and Mayor Sarno ¶¶ 6, 10 (stating

position of police sergeant in the years 2005, 2006, 2007 or 2008"[2], sued a number of governmental entities and officials including Springfield and its mayor[3], challenging

> the sergeant's promotional examination on the grounds that it has a disparate impact on minority test takers and cannot be shown to be job-related under applicable federal Equal Employment Opportunity Commission and Massachusetts General Laws Chapter 151B standards.[4]

Each of the sergeant's promotional examinations challenged in this case were created, designed and administered by the Commonwealth of Massachusetts, Human Resources Division ("HRD").[5] By

> law, municipal police promotions must be made on the basis of competitive examinations, whether on the basis of the HRD examination or some other test. HRD is given statutory authority to establish the form and content of these examinations. However, HRD's discretion in this area is bounded. By statute, all examinations must "fairly test the knowledge, skills and abilities which can be practically and reliably measured and which are actually required" to perform the job, a requirement that may significantly limit both the form and the substance

---

Springfield "further answers Paragraph 44 of the Plaintiffs' Sixth Amended Complaint by stating that Juan Rosario was promoted to the position of Springfield Police Sergeant" and "Springfield further answers Paragraph 48 of the Plaintiffs' Sixth Amended Complaint by stating that Julio M. Toledo was promoted to the position of Springfield Police Sergeant.").

[2]   7th Am. Compl. ¶ 1.  HRD used racial, ethnic and gender self identification to classify candidates in the police promotional examinations.  McNeely, April 2, 2010, Dep. 9, ll. 6-10.

[3]   *See* 7th Am. Compl. ¶¶ 49 (City of Lawrence, Massachusetts), 50 (Lawrence Mayor (William Lantigua), 51 William Manzi, III, Mayor of Methuen), 52 (City of Methuen, Massachusetts), 53-54 (City of Lowell, Massachusetts), 55 (Michael O'Brien, City Manager of the City of Worcester), 56 (City of Worcester, Massachusetts), 57 (City of Boston, Massachusetts), 58 (Massachusetts Bay Transportation Authority), 59 (Daniel Grabauskas the General Manager of the MBTA), 60 (MBTA Board of Trustees), 61 (City of Springfield), and 62 (Domenic Sarno, Jr., Mayor of the City of Springfield).

[4]   7th Am. Compl. ¶ 1.

[5]   7th Am. Compl. ¶ 69-70.

of an examination. And HRD must consult with labor representatives and professionals in the field to determine what skills and abilities are relevant for promotion to police sergeant or any other position.

For decades, HRD and its predecessor agency developed annual written examinations to evaluate candidates for police sergeant promotions. State civil service law and a consent decree to which HRD's predecessor agency was a party shaped the content and form of these examinations. That consent decree, entered in 1980, arose from civil rights litigation involving the Boston police department, but, in general terms, HRD's predecessor agreed to develop and administer promotional examinations that complied with the Equal Employment Opportunity Commission's (EEOC) Uniform Guidelines on Employee Selection Procedures (1978), 29 C.F.R. § 1607.1-18. The Guidelines required, inter alia, maintaining records that show the impact that examinations have on applicants according to race, sex, or ethnic group, and complying with stringent standards to verify that the substance and form of the examinations are significantly related to job performance.

*Lopez v. Massachusetts*, 588 F.3d 69, 77 (1st Cir. Mass. 2009) (citations omitted).

One of plaintiffs' experts, Joel P. Wiesen, Ph.D. ("Dr. Weisen")[6], describes the examination process utilized by HRD for civil service promotional exams:

HRD's practice is to hold a statewide examination for Sergeant every year. The exam is described in an official Examination Announcement that states the job title, job duties, test components (generally, and for all the examinations being challenged, there are just two components, a written multiple-choice test and an evaluation of education and experience, referred to below as E&E) and the like. Individual municipalities that wish to be included in the statewide examination file a request with HRD. On the exam day, HRD administers the exam in various locations across the Commonwealth. HRD grades the exams and reviews protests of specific questions, modifies the planned answer key as needed, and establishes passing points. Each passing applicant receives a grade on the examination overall as well as on each of the exam components. Qualified veterans receive an additional 2 points, added to their exam grade. (Failing applicants do not receive a score on the E&E nor an overall grade; they receive only a score on the written

---

[6]     For over 15 years Dr. Weisen "worked for the Department of Personnel Administration, later called the Human Resources Division, of the Commonwealth of Massachusetts." He "was hired to lead the effort to validate all civil service examinations, and, for some of my tenure, I was in charge of all test development and validation for civil service jobs in the Commonwealth." Dr. Weisen, October 3, 2008, Report 2 (Education, Professional Experience and Qualifications).

test.)  The E&E component is nominally weighted 20% but everyone who takes the written test receives a score of at least 70% on the E&E component, so this component contributes relatively little to the overall exam grade.  After HRD completes the grading process, "eligible lists" for the various municipalities that participated in the exam are established in accordance with MGL Chapter 31 and the Personnel Administration Rules (PAR).  When such a municipality has an opening, promotions may be made to vacant Sergeant positions, under which 3 names are certified for one opening, 5 names for two openings, etc. (following the formula 2N+1, where N is the number of openings).  Under usual circumstances the appointing authority is restricted to making promotions from the names certified, and many police departments make promotions in order of grade on the civil service exam.  The statewide exams for 2003-2007 were quite similar, relying on the same test outline, written by the same HRD employees, consisting of 80 multiple choice questions, and based on the same reading list (with minor updates).[7]

Although HRD holds state wide civil service examinations every year, the lists generated from a civil service examination are good for up to two years.[8]  Consequently only two of the four promotional tests being challenged were actually used by

---

[7]  Dr. Weisen, October 3, 2008, Report. 8-9 (footnotes omitted).

[8]  *See* M.G.L. ch. 31, § 25 (requiring the civil service administrator to "establish, maintain and revise eligible lists of persons who have passed each examination for appointment to a position in the official service" and to arrange the names of such persons on each such list ... in the order of their marks on the examination based upon which the list is established....  Persons on an eligible list shall be eligible for certification from such list for such period as the administrator shall determine, but in any event not to exceed two years....  Following the certification of names to an appointing authority, such appointing authority shall submit a written report to the administrator indicating (a) with respect to each person whose name was certified, whether such person appeared to sign the certification, (b) whether each person who so appeared declined or expressed willingness to accept employment, and (c) each person selected for appointment.  Such report shall include such verification as the administrator may require that each person willing to accept employment meets or fails to meet the entrance requirements for appointment designated by the administrator.  Failure to submit such report on or prior to the date of expiration of the eligibility of a person on such list shall nullify an appointment of such person.  The name of a person which was placed on an eligible list as the result of an examination for original appointment shall be removed from such list if the person fails to respond to a notice of certification or refuses to accept permanent or temporary employment after having previously expressed willingness to accept such employment....").

Springfield, specifically the 2005 and 2007 HRD exams.[9]  Civil service candidates are promoted to police sergeant based upon their relative ranking on the certified civil service list.[10]  This issue is particularly significant in the case of Springfield because "[b]efore beginning a Title VII suit, a plaintiff must first file a timely EEOC charge.  In this case, petitioners' charges were due within 300 days after the alleged unlawful employment practice occurred."  *Lewis v. City of Chicago*, 130 S. Ct. 2191 (2010) (citations, footnote and internal quotation marks omitted).  None of the six Springfield plaintiffs filed a timely EEOC charge with respect to the 2005 examination.[11]

---

[9]  *See* "Table 1. Defendant Police Departments Enrolled in HRD Sergeant Exams by Exam Year, with Date List Established."  Dr. Weisen's 3rd Supp. Rpt. 5.

[10]  *See* M.G.L. ch. 31, § 27 (specifying that "if the administrator certifies from an eligible list the names of three persons who are qualified for and willing to accept appointment, the appointing authority, pursuant to the civil service law and rules, may appoint only from among such persons....  If an appointing authority makes an original or promotional appointment from a certification of any qualified person other than the qualified person whose name appears highest, and the person whose name is highest is willing to accept such appointment, the appointing authority shall immediately file with the administrator a written statement of his reasons for appointing the person whose name was not highest.  Such an appointment of a person whose name was not highest shall be effective only when such statement of reasons has been received by the administrator.  The administrator shall make such statement available for public inspection at the office of the department."); *see also* M.G.L. ch. 31, § 59 (requiring that "promotional appointments in police ... forces of cities ... where such forces are within the official service ... shall be made only after competitive examination....  An examination for a promotional appointment to any title in a police ... force shall be open only to permanent employees in the next lower title in such force ...  provided, however, that no such examination shall be open to any person who has not been employed in such force for at least one year after certification in the lower title or titles to which the examination is open; and provided, further, that no such examination for the first title above the lowest title in the police ... force of a city or town with a population in excess of fifty thousand shall be open to any person who has not been employed in such force in such lowest title for at least three years after certification....").

[11]  Each of the Springfield's plaintiffs was deposed and their filings with the MCAD/EEOC were marked as an exhibit in their depositions.  The Springfield plaintiffs

*B.  The proper data pool width.*

Plaintiffs' experts utilize aggregated data to find adverse impact upon minority test takers.  Plaintiffs' expert, Dr. Wiesen, states that to "conduct adverse impact analysis, I had to identify the logically relevant group or groups of candidates.  For each exam, I aggregated exam data across all municipalities."  In footnote six of his report, Dr. Wiesen explained that "[w]ithout such aggregation, statistical analyses would be to no avail due to the small numbers. (Only from 2 to 10 minority applicants were promoted based on any of HRDs annual exams, in all municipalities combined.)".[12]  However, Dr. Wiesen's aggregation is illogical.   A defense expert, Jacinto M. Silva, Ph.D. ("Dr. Silva"), concludes that plaintiffs' experts approach to the:

> adverse impact ratio is not an accurate metric.  It more often than not leads to a false indication of adverse impact.  In 82 percent of the individual jurisdictions that promotion tested for the position of police sergeant between 2005 and 2008, the likelihood of finding a false indication of adverse impact would have been very high even in the absence of a group performance difference.  For the reasons cited ... a statistical significance test within each jurisdiction and exam year is the only fair process.  A false indication of adverse impact occurs by design only 5 percent of the time in statistical significance testing.[13]

Under Massachusetts civil service laws, police officers within local police departments do not compete for promotion against police officers from other local police departments.  The competition for a police promotion is not state wide; it is limited to each locality.  Under the civil service laws only the names of police officers employed

---

did not file with the MCAD/EEOC until 2008 well beyond the three hundred day limitations period for contesting the 2005 police promotional examination.

[12]  Dr. Weisen, October 3, 2008, Report. 9 at # 4.

[13]  Dr. Silva, May 28, 2010, Dep. 11, #5.

within each local department may appear on the eligible list issued for that employer.[14] Consequently the only relevant data pool in terms of Springfield consists of the Springfield police officers who took the 2005 and 2007 police sergeant promotional examinations.

Plaintiffs' experts by using a wider pool of data, consisting of every police officer from every police department with at least one minority candidate who took any of the four promotional exams, skewed the statistics to support their unfounded and unwarranted opinions relative to adverse impact. Thus, plaintiffs' expert opinions are unreliable because they are grounded upon statistical evidence which is misleading. Specifically, plaintiffs' experts improperly conflate the racial and ethnic background and test scores of candidates who are not eligible for promotion in the Springfield police department with the racial and ethnic background and test scores of Springfield police officers who are eligible for promotion in the Springfield police department. Plaintiffs' expert's statistical reports are unreliable under *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993) because they compare a data pool of police officer employees who are not similarly situated. To determine whether there is adverse impact within any specific police department the width of the relevant data pool can be no broader than the number of the candidates from that department who actually took the challenged examination.

---

[14]   M.G.L. ch. 31, § 59 (providing that an "examination for a promotional appointment to any title in a police or fire force shall be open only to permanent employees in the next lower title in such force"); *see also Goncalves v. City of Boston*, 66 Mass. App. Ct. 180, 185 (2006) (stating that "promotional appointments are open to employees in the next lower title in the same force).

Under Massachusetts civil service laws, candidates who take a police promotional examination in one local policing jurisdiction are not eligible for promotion in another policing jurisdiction. Candidates in one jurisdiction cannot be promoted in another jurisdiction. Candidates from one exam are also almost never considered with candidates from other exams. As noted by defense expert, Dr. Silva, aggregation of data across jurisdictions and exams can lead one to identify adverse impact where there is none and lead to erroneous conclusions.

### C. The correct data pool depth.

Plaintiffs' experts also improperly measure the depth of the relevant data pool in conducting their statistical analysis of adverse impact. Plaintiffs' experts use a data pool consisting of all the candidates who took the challenged civil service examinations. That data pool is far too deep as it includes candidates who failed the civil service examinations, candidates whose names are not on an eligible list and candidates whose names do not appear on a certified list. Plaintiffs' expert, Dr. Weisen, counted in his statistical analysis people who failed the exam – even if they failed the exam multiple times, if they took the exam two, three, four, five or eighteen times and failed every time.[15] Dr. Weisen admitted counting candidates as part of his statistical analysis even if their names did not appear on an eligible list or on a certified list.[16] Plaintiffs' expert admitted that he included in his data pool such names even though under Massachusetts civil service requirements there would be no chance they would ever be appointed to a

---

[15] Dr. Wiesen, Dep. 91, ll. 7-21.

[16] Dr. Wiesen, Dep. 91, ll. 22-24; 92, ll. 1-4.

civil service job.[17]  Such statistics based on an applicant pool containing individuals lacking minimal qualifications for the job have little, if any, probative value.  The proper depth of the data pool is determined by the requirement that plaintiffs confine their population data to those police officer promotional candidates who are both qualified and available for the jobs at issue, that is, the only relevant qualified labor market.

The Massachusetts Civil Service System is based upon basic merit principles.[18] The fundamental purpose of the civil service system is to guard against political considerations, favoritism, and bias in governmental hiring and promotion.[19]  This beneficial purpose is completely compatible with the requirements of Title VII.[20]  "After all, the Supreme Court has held that Title VII never forces an employer to accept an

---

[17]  Dr. Wiesen, Dep. 92, ll. 5-8.

[18]  *See* M.G.L. ch. 31, § 1 (defining 'basic merit principles' to "mean (a) recruiting, selecting and advancing of employees on the basis of their relative ability, knowledge and skills including open consideration of qualified applicants for initial appointment .... (e) assuring fair treatment of all applicants and employees in all aspects of personnel administration without regard to political affiliation, race, color, age, national origin, sex, marital status, handicap, or religion and with proper regard for privacy, basic rights outlined in this chapter and constitutional rights as citizens, and; (f) assuring that all employees are protected against coercion for political purposes, and are protected from arbitrary and capricious actions.").

[19]  *Mass. Ass'n of Minority Law Enforcement Officers v. Abban*, 434 Mass. 256, 259 (2001) (citation omitted).

[20]  *See* 42 USCS § 2000e-2 (h) (providing that notwithstanding "any other provision of this title [42 USCS §§ 2000e et seq.], it shall not be an unlawful employment practice for an employer to apply ... different terms, conditions, or privileges of employment pursuant to a bona fide ... merit system ... provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin, nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin....").

unqualified -- or even less qualified -- applicant in the name of non-discrimination. Moreover, the Supreme Court has noted that bright-line criteria, such as aptitude tests, are legitimate and useful hiring tools so long as they accurately measure a person's qualifications."[21]

Basic merit principles require that civil service appointments be made on the basis of rankings on civil service examinations, not on the basis of political considerations, favoritism, and bias. By including police promotional candidates who failed the civil service exam and were ineligible for appointment in the statistical analysis plaintiffs' experts use a data pool which is too deep and therefore materially flawed. "Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended, prohibits employment discrimination on the basis of race, color, religion, sex, or national origin. Title VII prohibits both intentional discrimination (known as "disparate treatment") as well as, in some cases, practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities (known as "disparate impact")."[22]  Title VII expressly prohibits discriminatory use of test scores, stating:

> It shall be an unlawful employment practice for a respondent, in connection with the selection or referral of applicants or candidates for ... promotion, to adjust the scores of, use different cutoff scores for, or otherwise alter the results of, employment related tests on the basis of race, color, religion, sex, or national origin.[23]

Plaintiffs' experts should not be permitted to inflate the depth of the data pool by using the names of persons who failed the civil service exam and who are not included on

---

[21]  *El v. SEPTA*, 479 F.3d 232, 242 (3d Cir. Pa. 2007) (citations and footnote omitted).

[22]  *Ricci v. DeStefano*, 129 S. Ct. 2658, 2672 (2009).

[23]  42 USCS § 2000e-2(l).

any eligible or certified civil service list for promotion to police sergeant in the relevant

local jurisdiction.

Dr. Wiesen explained his understanding of the distinction between an eligible and

a certified civil service list. "Everyone that passes the exam, as I understand it, is on the

eligible list, and the -- in rank order, and the -- when a certification is requested, the

names at the top of the eligible list are the names certified."[24] Dr. Wiesen's inclusion of

such data has no probative value. Plaintiffs' conclusions concerning adverse impact is an

indirect method of granting preferential treatment on account of existing numbers or

percentage imbalance which Title VII prohibits.[25]   Federal law does not permit a

government employer to use considerations of race, color, religion, sex, or national origin

in employment practices.

> Except as otherwise provided in this title [42 USCS §§ 2000e et seq.], an unlawful
> employment practice is established when the complaining party demonstrates that
> race, color, religion, sex, or national origin was a motivating factor for any
> employment practice, even though other factors also motivated the practice.[26]

---

[24]   Dr. Wiesen, Dep. 90 ll. 15-19.

[25]   "Nothing contained in this title [42 USCS §§ 2000e et seq.] shall be interpreted to
require any employer ... to grant preferential treatment to any individual or to any group
because of the race, color, religion, sex, or national origin of such individual or group on
account of an imbalance which may exist with respect to the total number or percentage
of persons of any race, color, religion, sex, or national origin employed by an employer ...
in comparison with the total number or percentage of persons of such race, color,
religion, sex, or national origin in any community, State, section, or other area, or in the
available work force in any community, State, section, or other area."  42 USCS § 2000e-
2 (j).

[26]   42 USCS § 2000e-2(m).

"[E]xpress, race-based decisionmaking violates Title VII's command that employers cannot take adverse employment actions because of an individual's race."[27]  The proper depth of the data pool is measured by the certified list because only the certified candidates can be considered for a promotional appointment by local police departments.

Dr. Wiesen agreed that in Massachusetts, for civil service jobs, appointments are made off of a certified list and that's the only list that they're made off of.[28]  The 2n +1 formula is applied to the eligible list, and then that gives you the certified list.[29] Springfield has no license

> to discard the results of lawful and beneficial promotional examinations even where there is little if any evidence of disparate-impact discrimination.  That would amount to a de facto quota system, in which a "focus on statistics . . . could put undue pressure on employers to adopt inappropriate prophylactic measures."  Even worse, an employer could discard test results (or other employment practices) with the intent of obtaining the employer's preferred racial balance.  That operational principle could not be justified, for Title VII is express in disclaiming any interpretation of its requirements as calling for outright racial balancing. The purpose of Title VII "is to promote hiring on the basis of job qualifications, rather than on the basis of race or color."[30]

When an actual rate of selection is different from an expected rate of selection, there is the possibility that the difference occurred by random chance.  Statisticians have devised a number of tests to determine the probability that an observed difference is due to chance factors.  These tests of statistical significance enable a statistician to state the probability that an observed difference between the actual selection rate and the expected

---

[27]  *Ricci v. DeStefano*, 129 S. Ct. 2658, 2673 (2009) (citation omitted).

[28]  Dr. Wiesen's Dep. 90 ll. 24; 91 ll. 1-6.

[29]  Dr. Wiesen's Dep. 90 ll. 20-23.

[30]  *Ricci v. DeStefano*, 129 S. Ct. 2658, 2675 (2009) (citation omitted).

selection rate occurred because of chance.  Typically in social science and natural science applications, differences between observed and expected values are often termed "statistically significant" if there is one chance in twenty or less that the difference is due to chance.  Such a difference is said to be significant at the .05 level.  When more certainty as to the significance of the result is required or desired, scientists will often look for significance at the .01 level, which indicates that there is only a one in a hundred (or less) probability that the difference is due to chance.

Springfield's experts plumbed the proper depth of the data pool and found the following among those qualified candidates who were certified to become sergeant in Springfield:

1. The number of minorities appointed is not statistically different from the number of whites appointed.

2. Minorities were no more or less likely to be appointed once rank on exam was taken into account.

3. Minorities were no more or less likely to be appointed once rank, experience and educational background were taken into account.

4. Springfield's appointments that were out of rank order did not negatively affect minorities.

Given the paucity and unreliability of plaintiffs' experts evidence regarding disparate impact, plaintiffs do not have a viable Title VII case against Springfield regarding either the 2005 or the 2007 police sergeant promotional examinations.  There is no objectively strong basis in evidence to find Springfield's 2005 and 2007 police promotional examinations inadequate with some consequent disparate-impact liability in violation of Title VII.  Consequently, Springfield cannot "engage in intentional discrimination for the asserted purpose of avoiding or remedying an unintentional

disparate impact" because Springfield does not "have a strong basis in evidence to believe it will be subject to disparate-impact liability if it fails to take the race-conscious, discriminatory action."[31]   Indeed when the proper data pool is utilized expert statistical analysis shows there is no adverse impact in the Springfield police sergeant promotional examinations for 2005 and 2007.

## II.  Valid and necessary police promotional exams.

Assuming, *arguendo*, that plaintiffs present a prima facie case of adverse impact regarding the 2005 and 2007 Springfield police promotional examinations, the evidence will establish that those challenged examinations are both job related and consistent with business necessity.   The statistical process of relating the employment practice to the requirements of the job is called validation.   There are three professional approaches to validation of tests used for personnel selection purposes: content validation, criterion-related validation, and construct validation.

HRD validated the promotional civil service examinations for police sergeant using the content validation approach; such an approach satisfies the EEOC guidelines.[32] The processes HRD followed in developing and administering the police promotional selection procedures for the rank of sergeant are detailed in a 1991 report:

> DPA [the predecessor to HRD] chose to validate these selection procedures by a content validity strategy.  In order to comply with the requirements of the Uniform Guidelines on Employee Selection Procedures (UGESP) with respect to content validity, DPA conducted a comprehensive job analysis study of all superior officer ranks , including

---

[31]   *Ricci v. DeStefano*, 129 S. Ct. 2658, 2677 (2009).

[32]   29 CFR 1607.5 A. (stating that for "the purposes of satisfying these guidelines, users may rely upon criterion-related validity studies, content validity studies or construct validity studies....").

sergeant, lieutenant, captain., deputy chief and chief.  The job content information gathered as a result of the job analysis study provided a foundation for the development of the initial selection procedures which included a written multiple choice examination and a training and experience (also called an education and experience) component.

Upon receipt of the job analysis data, the public safety selection unit reviewed the material, mindful of the requirements stated in the UGESP, in order to determine several factors: content for the examination announcement; what type of instrument(s) would be used for the examination; and the composition of the recommended reading list.  The written instrument used a banded examination approach; i.e., questions testing common knowledges, skills and abilities for all three levels being tested were answered by all applicants.  In accordance with the UGESP, the administration of the examination was standardized across the state.

Post examination work .included many varied analyses including: review of items identified by participants as potentially being flawed; performance statistics of each item; and adverse impact calculations relative to individual written items, education and experience ratings and passing point recommendations.  The examination items were also reviewed by panels of subject matter experts to determine any existence of cultural bias, to link the important job tasks with the knowledges, skills and abilities tested in the examination, and to review the content ·of the items ensuring that they tested what they purported to test.

Before a passing point could be recommended, the response key was amended to reflect outcome of the extensive test item analysis and the changes are summarized in this report.  The adverse impact at several potential passing points was determined and a recommendation made.  Finally, based upon the results of the varied scientific analyses, conclusions regarding the job-relatedness and content validity of the examination were written.[33]

The 1991 HRD Validation Report uses professionally acceptable methods and shows that the challenged written civil service sergeant promotional examinations are predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the police sergeant's job for which the candidates were

---

[33]     COMMONWEALTH OF MASSACHUSETTS DEPARTMENT OF PERSONNEL ADMINISTRATION VALIDATION REPORT FOR THE 1991 POLICE PROMOTIONAL SELECTION PROCEDURES, October 1, 1991, p. 00247.

evaluated. "Evidence of the validity of a test or other selection procedure by a content validity study should consist of data showing that the content of the selection procedure is representative of important aspects of performance on the job for which the candidates are to be evaluated."[34]   HRD compiled an extensive set of data which show that the content of the police promotional examinations are representative of important aspects of performance on the police sergeant's job.  The content validity of the entire process from job analysis through examination construction and administration was determined through the various analyses conducted and summarized in the 1991 Validation Report. Based upon this report the following conclusions are warranted:

> The recommended reading list generally covered the KSA's identified in the job analysis and contained in the test outline.

> The examination was based on police texts that were listed on the recommended reading list.

> The readability analysis indicated that the reading level of the examination and reference books was consistent with the work sample.  In fact, the work samples were rated higher than the exam and books.

> A generous time limit was given all applicants in which to complete the examination.· There is no evidence (based upon a review of the adverse impact analyses for each item) that an applicant who was unfamiliar with the exact meaning of· the more difficult polysyllabic, non-police words was prohibited from responding correctly to the items in which these words were contained.

> Minority SMEs found no cultural bias in the examination.  These SMEs addressed the reading level issue and noted that the examination was tied closely to and was reflective of the reading list materials.  It was their opinion that the textual material was equally difficult for all groups.

> The expert review of the examination items prior to its administration considered the linkage to the tasks as well as to the KSA's needed to perform the primary or dominant tasks of the position being tested.

---

[34]   29 CFR 1607.5.

An internal consistency analysis was completed. The reliability factor of this examination was .79; on a scale of 0 - 1 with 1 being perfect.  This rating of 79 is a wholly acceptable rating for the type of instrument used. (Reference: Content Validity: A Procedural Manual; International Personnel Management Association; 1973; pgs; 52-53.).

Any adverse impact found in the training and experience analysis was statistically not meaningful; especially when one considers that it only accounts for 20% of the final mark.

The evidence presented in this report demonstrates that a job related, content valid examination was administered on June 19, 1991, based upon accurate and comprehensive job analysis data.[35]

A defense expert, James L. Outtz, PhD. ("Dr. Outtz"), has correctly observed that the "Massachusetts General Laws dictate not only the use of examinations, but also what such examinations must measure.

Chapter 31 (section 16) specifies the following with regard to promotional examinations:

Examinations shall fairly test the knowledge, skills and abilities which can be practically and reliably measured and which are actually required to perform the primary duties of the position for which the examination is held.

This provision of state law is important because it points to practical limits that must be taken into account whenever measures such as promotional examinations are developed and used."[36]  Dr. Outtz is expected to testify that after "the 1991 validation study was completed, subsequent promotional examinations for police sergeant were developed based upon updates of the Job Analysis and adherence to the protocols established by the

---

[35]     Commonwealth Of Massachusetts Department Of Personnel Administration Validation Report For The 1991 Police Promotional Selection Procedures, October 1, 1991, p. 00382.

[36]  Dr. Outtz, February 9, 2009, Report 7 (footnote omitted).

validation study for establishing the validity of examination content."[37]   Dr. Outtz's expert review of the material in this case leads him to conclude that:

> 1. The Police Sergeant Promotional Examinations at issue in this case have not been shown to have adverse impact against minority candidates except in the Boston Police Department.
>
> 2. The Police Sergeant Promotional Examinations used by the defendants, including the Boston Police Department, have been shown to be valid.
>
> 3. Plaintiffs have not demonstrated that there is a selection procedure of equal validity and less adverse impact that defendants could have used.

Moreover Springfield is unable to adopt an available alternative employment practice which has less disparate impact and would still serve Springfield's legitimate needs for promoting qualified police candidates to the civil service position of Springfield police sergeant because no such feasible alternative is available.  Dr. Silva, is expected to testify, that

> Adding additional oral components to the testing process offers no guarantee or even likelihood that adverse impact can be minimized.  The Boston data from 2002 supports this conclusion.  My experience with these enhanced and expanded exams indicates that rarely do additional components substantially increase the number of minorities promoted. This is primarily a result of the low selection ratio.[38]

The Plaintiffs also ignore the reality that exam development, creation and validation is a costly expense for each municipality, and assume that Springfield and other co-Defendant municipalities, could afford to opt out of the HRD examination process.  For most Massachusetts municipalities, and Springfield in particular (just emerging from a financial crisis and oversights by a Financial Control Board) it is not

---

[37]   Dr. Outtz, May 28, 2010, Supplemental Report 26.

[38]   Dr. Silva, May 28, 2010, Report 12 #8.

financially feasible.[39]   The alternatives to the HRD examination, a written examination created by Springfield or the use of an assessment center examination, cannot be done without HRD oversight, and are not practical for Springfield, especially during the current economic climate.[40]   Sally McNeely testified during deposition that the cost of an assessment center depends on the number of candidates.   "Usually when there's an assessment center for sergeant, it's done by smaller departments, so the cost is about $10,000 for smaller departments.   When Boston did their assessment center in 2002, it was over a million dollars...."

Another theoretical alternative was a process that a municipality may employ for requesting the right to only hire from a group of minorities for promotional positions PAR 10, which is Personnel Administration Rule 10.   In order to successfully request a PAR10 list, a municipality supply data that justifies the use of the list.   Including data about the number of people in that title and their gender or racial designations then HRD determines whether the use of a PAR 10 list is justified.   There is also an additional requirement with the PAR 10 list is that the agency or the municipality has to admit to

---

[39]   *See* Chapter 169 of the Acts of 2004 where the legislature found that Springfield was in a "fiscal crisis" that "poses an imminent danger to the safety of citizens of the city and their property".

[40]   Assuming, *arguendo,* Springfield could afford to create its own written examination or assessment center for promotion to sergeant, the HRD would still be required to approve the process to ensure its validity and legality.   In addition, any "consultants" Springfield contracted with to construct the examination, whether written or assessment, would have to be approved by HRD before going forward with the process.   See McNeely Deposition, April 2, 2010, lines 17-24 at 28-29 ("The city or town, actually, contracts with the consultants.   We (HRD) do approve them.").   McNeely testified that "HRD reviews every step in the assessment center process.   So we would go through the initial steps to getting an assessment center going, and then we would review the content of the assessment center and the scoring scheme to make sure that it was legitimate.... HRD staff observe every assessment center and every exercise." McNeely *supra* 23-24.

past discrimination.  McNeely depo *supra* at 35-36.  As there is no history of past discrimination with regard to the promotion of police sergeants in Springfield, this alternative is not available in Springfield.  Instead of spending scarce taxpayer dollars on exam development, creation and validation, that still hinged on HRD approval, Springfield relied on the HRD to take on these costly undertakings.

### CONCLUSION

For the foregoing reasons, this Court should find that the Springfield use of the HRD promotional examinations for police sergeant did not have a disparate impact on minority candidates, that those examinations are job-related and consistent with business necessity, and that there were no alternative examinations which have equal or greater validity and less discriminatory impact and dismiss the complaint declaring that there was no violation of Title VII and Mass. Gen. Laws, ch. 151B concerning the challenged examinations.

**THE DEFENDANTS: CITY OF SPRINGFIELD AND MAYOR SARNO**

By, /s/_____            By, /s/_____
     Edward M. Pikula, Esq                         Harry P. Carroll, Esq.
     BBO# 399770                                   BBO # 076060
     City Solicitor                                Senior Legal Counsel

City of Springfield Law Department
36 Court Street, Room 210
Springfield, MA 01103
(413) 787-6085
Fax: (413) 787-6173

### CERTIFICATE OF SERVICE

I, Harry P. Carroll, hereby certify that this document(s), filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/_____
     Harry P. Carroll, Esq.,
     Senior Legal Counsel