UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

PEDRO LOPEZ, ET AL
Plaintiffs

v.

CITY OF LAWRENCE, ET AL.
Defendants

Civil Action No. 07-11693-GAO

**DEFENDANT CITY OF SPRINGFIELD'S OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE TO PRECLUDE THE CITY OF SPRINGFIELD FROM OFFERING EXPERT TESTIMONY**

Defendant City of Springfield OPPOSES the *Plaintiffs' Motion in Limine to Preclude the City of Springfield From Offering Expert Testimony* ("Plaintiffs' Motion").

Plaintiffs seek to exclude Springfield's expert testimony because the Plaintiffs assert that the Court should rely on an analysis of the entire distribution of candidates' test scores, regardless of whether they passed or failed and regardless of any ranking of their score.

Considering all candidates without giving consideration to whether they passed or failed, to whether they were sufficiently qualified, motivated, or capable, and to whether they had adequately prepared, indicates that the selection ratio analysis calculated by Plaintiff's experts overstates the disparate impact.

Initially, the relevant tests and data pool should be indicated. A 300-day deadline applies to petitioners' charges pursuant to 29 CFR §§ 1601.13(a)(4), (b)(1), 1601.80 (2009). Cf. EEOC v. Commercial Office Products Co., 486 U.S. 107, 112, 114-122, 108 S. Ct. 1666, 100 L. Ed. 2d 96 (1988). Each of the Springfield's plaintiffs was deposed and their filings with the MCAD/EEOC were marked as an exhibit in their depositions. The Springfield plaintiffs did not file with the

MCAD/EEOC until 2008 well beyond the three hundred day limitations period for contesting the 2005 police promotional examination.

As such, the only test at issue with regard to the Springfield plaintiffs is the 2007 examination, which, regardless of whether the pool of applicants is restricted to only those who passed the exam or not, there is no adverse impact with regard to the Springfield plaintiffs. No adverse impact results from the use of strict rank-ordered promotions in Springfield and there is no evidence of disparate impact because the difference in the actual results from the expected results, when comparing promotion levels of Blacks, Whites and Hispanics is not statistically significant.

However, since Plaintiffs' experts improperly measure the depth of the relevant data pool in conducting their statistical analysis of adverse impact, Springfield has submitted an additional expert report setting forth what it reasonably believes to be the proper data pool. Before reviewing the results of Springfield's experts, a review of Plaintiff's experts need to be discussed.

Plaintiffs' experts use a data pool consisting of all the candidates who took the challenged civil service examinations. That data pool is far too deep as it includes candidates who failed the civil service examinations, candidates whose names are not on an eligible list and candidates whose names do not appear on a certified list. Plaintiffs' expert, Dr. Weisen, counted in his statistical analysis people who failed the exam – even if they failed the exam multiple times, if they took the exam two, three, four, five or eighteen times and failed every time.[1] Dr. Weisen admitted counting candidates as part of his statistical analysis even if their names did not appear

[1] Dr. Wiesen, Dep. 91, ll. 7-21.

on an eligible list or on a certified list.[2] Plaintiffs' expert admitted that he included in his data pool such names even though under Massachusetts civil service requirements there would be no chance they would ever be appointed to a civil service job.[3] Such statistics based on an applicant pool containing individuals lacking minimal qualifications for the job have little, if any, probative value. The proper depth of the data pool is determined by the requirement that plaintiffs confine their population data to those police officer promotional candidates who are both qualified and available for the jobs at issue, that is, the only relevant qualified labor market.

The Massachusetts Civil Service System is based upon basic merit principles.[4] The fundamental purpose of the civil service system is to guard against political considerations, favoritism, and bias in governmental hiring and promotion.[5] This beneficial purpose is completely compatible with the requirements of Title VII.[6] "After all, the Supreme Court has

---

[2] Dr. Wiesen, Dep. 91, ll. 22-24; 92, ll. 1-4.

[3] Dr. Wiesen, Dep. 92, ll. 5-8.

[4] *See* M.G.L. ch. 31, § 1 (defining 'basic merit principles' to "mean (a) recruiting, selecting and advancing of employees on the basis of their relative ability, knowledge and skills including open consideration of qualified applicants for initial appointment .... (e) assuring fair treatment of all applicants and employees in all aspects of personnel administration without regard to political affiliation, race, color, age, national origin, sex, marital status, handicap, or religion and with proper regard for privacy, basic rights outlined in this chapter and constitutional rights as citizens, and; (f) assuring that all employees are protected against coercion for political purposes, and are protected from arbitrary and capricious actions.").

[5] *Mass. Ass'n of Minority Law Enforcement Officers v. Abban*, 434 Mass. 256, 259 (2001) (citation omitted).

[6] *See* 42 USCS § 2000e-2 (h) (providing that notwithstanding "any other provision of this title [42 USCS §§ 2000e et seq.], it shall not be an unlawful employment practice for an employer to apply ... different terms, conditions, or privileges of employment pursuant to a bona fide ... merit system ... provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin, nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or

held that Title VII never forces an employer to accept an unqualified -- or even less qualified -- applicant in the name of non-discrimination. Moreover, the Supreme Court has noted that bright-line criteria, such as aptitude tests, are legitimate and useful hiring tools so long as they accurately measure a person's qualifications."[7]

Basic merit principles require that civil service appointments be made on the basis of rankings on civil service examinations, not on the basis of political considerations, favoritism, and bias. By including police promotional candidates who failed the civil service exam and were ineligible for appointment in the statistical analysis plaintiffs' experts use a data pool which is too deep and therefore materially flawed.

An applicant pool of all test takers in no way reflects "the pool of *qualified* job applicants" Measuring alleged discrimination in the selection of police sergeants by comparing the number of nonwhites failing the HRD examination to the number of whites passing the exam is nonsensical. If the absence of minorities passing is due to a dearth of qualified nonwhite applicants (for reasons that are not Springfield's fault), Springfield selection of sergeants from the HRD certified list cannot be said to have had a "disparate impact" on nonwhites.

"Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended, prohibits employment discrimination on the basis of race, color, religion, sex, or national origin. Title VII prohibits both intentional discrimination (known as "disparate treatment") as well as, in some cases, practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities (known as "disparate impact")."[8] Title VII expressly prohibits

---

used to discriminate because of race, color, religion, sex or national origin....").

[7] *El v. SEPTA*, 479 F.3d 232, 242 (3d Cir. Pa. 2007) (citations and footnote omitted).

[8] *Ricci v. DeStefano*, 129 S. Ct. 2658, 2672 (2009).

discriminatory use of test scores, stating:

> It shall be an unlawful employment practice for a respondent, in connection with the selection or referral of applicants or candidates for ... promotion, to adjust the scores of, use different cutoff scores for, or otherwise alter the results of, employment related tests on the basis of race, color, religion, sex, or national origin.[9]

Plaintiffs' experts should not be permitted to inflate the depth of the data pool by using the names of persons who failed the civil service exam and who are not included on any eligible or certified civil service list for promotion to police sergeant in the relevant local jurisdiction.

Dr. Wiesen explained his understanding of the distinction between an eligible and a certified civil service list. "Everyone that passes the exam, as I understand it, is on the eligible list, and the -- in rank order, and the -- when a certification is requested, the names at the top of the eligible list are the names certified."[10] Dr. Wiesen's inclusion of such data has no probative value. Plaintiffs' conclusions concerning adverse impact is an indirect method of granting preferential treatment on account of existing numbers or percentage imbalance which Title VII prohibits.[11] Federal law does not permit a government employer to use considerations of race, color, religion, sex, or national origin in employment practices.

Except as otherwise provided in this title [42 USCS §§ 2000e et seq.], an unlawful

---

[9] 42 USCS § 2000e-2(l).

[10] Dr. Wiesen, Dep. 90 ll. 15-19.

[11] "Nothing contained in this title [42 USCS §§ 2000e et seq.] shall be interpreted to require any employer ... to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by an employer ... in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area." 42 USCS § 2000e-2 (j).

> employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.[12]

"[E]xpress, race-based decision making violates Title VII's command that employers cannot take adverse employment actions because of an individual's race."[13] The proper depth of the data pool is measured by the certified list because only the certified candidates can be considered for a promotional appointment by local police departments.

Dr. Wiesen agreed that in Massachusetts, for civil service jobs, appointments are made off of a certified list and that's the only list that they're made off of.[14] The 2n +1 formula is applied to the eligible list, and then that gives you the certified list.[15] Springfield has no license

> to discard the results of lawful and beneficial promotional examinations even where there is little if any evidence of disparate-impact discrimination. That would amount to a de facto quota system, in which a "focus on statistics . . . could put undue pressure on employers to adopt inappropriate prophylactic measures." Even worse, an employer could discard test results (or other employment practices) with the intent of obtaining the employer's preferred racial balance. That operational principle could not be justified, for Title VII is express in disclaiming any interpretation of its requirements as calling for outright racial balancing. The purpose of Title VII "is to promote hiring on the basis of job qualifications, rather than on the basis of race or color."[16]

When an actual rate of selection is different from an expected rate of selection, there is the possibility that the difference occurred by random chance. Statisticians have devised a number of tests to determine the probability that an observed difference is due to chance factors.

---

[12] 42 USCS § 2000e-2(m).

[13] *Ricci v. DeStefano*, 129 S. Ct. 2658, 2673 (2009) (citation omitted).

[14] Dr. Wiesen's Dep. 90 ll. 24; 91 ll. 1-6.

[15] Dr. Wiesen's Dep. 90 ll. 20-23.

[16] *Ricci v. DeStefano*, 129 S. Ct. 2658, 2675 (2009) (citation omitted).

These tests of statistical significance enable a statistician to state the probability that an observed difference between the actual selection rate and the expected selection rate occurred because of chance. Typically in social science and natural science applications, differences between observed and expected values are often termed "statistically significant" if there is one chance in twenty or less that the difference is due to chance. Such a difference is said to be significant at the .05 level. When more certainty as to the significance of the result is required or desired, scientists will often look for significance at the .01 level, which indicates that there is only a one in a hundred (or less) probability that the difference is due to chance.

Springfield's experts plumbed the proper depth of the data pool and found the following among those qualified candidates who were certified to become sergeant in Springfield:

> 1. The number of minorities appointed is not statistically different from the number of whites appointed.
>
> 2. Minorities were no more or less likely to be appointed once rank on exam was taken into account.
>
> 3. Minorities were no more or less likely to be appointed once rank, experience and educational background were taken into account.
>
> 4. Springfield's appointments that were out of rank order did not negatively affect minorities.

Given the paucity and unreliability of plaintiffs' experts evidence regarding disparate impact, plaintiffs do not have a viable Title VII case against Springfield regarding either the 2005 or the 2007 police sergeant promotional examinations. There is no objectively strong basis in evidence to find Springfield's 2005 and 2007 police promotional examinations inadequate with some consequent disparate-impact liability in violation of Title VII. Consequently, Springfield cannot "engage in intentional discrimination for the asserted purpose of avoiding or remedying an unintentional disparate impact" because Springfield does not "have a strong basis

in evidence to believe it will be subject to disparate-impact liability if it fails to take the race-conscious, discriminatory action."[17] Indeed when the proper data pool is utilized expert statistical analysis shows there is no adverse impact in the Springfield police sergeant promotional examinations for 2005 and 2007.

A defense expert, James L. Outtz, PhD. ("Dr. Outtz"), has correctly observed that the "Massachusetts General Laws dictate not only the use of examinations, but also what such examinations must measure.

> Chapter 31 (section 16) specifies the following with regard to promotional examinations:
>
> Examinations shall fairly test the knowledge, skills and abilities which can be practically and reliably measured and which are actually required to perform the primary duties of the position for which the examination is held.

This provision of state law is important because it points to practical limits that must be taken into account whenever measures such as promotional examinations are developed and used."[18] Dr. Outtz is expected to testify that after "the 1991 validation study was completed, subsequent promotional examinations for police sergeant were developed based upon updates of the Job Analysis and adherence to the protocols established by the validation study for establishing the validity of examination content."[19] Dr. Outtz's expert review of the material in this case leads him to conclude that:

> 1. The Police Sergeant Promotional Examinations at issue in this case have not been shown to have adverse impact against minority candidates except in the Boston Police Department.
>
> 2. The Police Sergeant Promotional Examinations used by the defendants,

---

[17] *Ricci v. DeStefano*, 129 S. Ct. 2658, 2677 (2009).

[18] Dr. Outtz, February 9, 2009, Report 7 (footnote omitted).

[19] Dr. Outtz, May 28, 2010, Supplemental Report 26.

including the Boston Police Department, have been shown to be valid.

3. Plaintiffs have not demonstrated that there is a selection procedure of equal validity and less adverse impact that defendants could have used.

## CONCLUSION

For the foregoing reasons, this Court should find that Springfield's expert witnesses utilized the proper data pool concerning the challenged examinations and Plaintiff's motion in limine to exclude their testimony should be denied.

**THE DEFENDANTS**
**CITY OF SPRINGFIELD AND MAYOR SARNO**

By, /s/_______________________
Edward M. Pikula, Esq
BBO# 399770
City Solicitor

By, /s/_______________________
Harry P. Carroll, Esq.
BBO # 076060
Senior Legal Counsel

City of Springfield Law Department
36 Court Street, Room 210
Springfield, MA 01103
(413) 787-6085
Fax: (413) 787-6173

CERTIFICATE OF SERVICE

I, Edward M. Pikula, hereby certify that this document(s), filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/____________________________
Edward M. Pikula, Esq.,
City Solicitor

Respectfully Submitted,
The Defendant
CITY OF SPRINGFIELD
By its Attorney:

/s/ Edward M. Pikula
Edward M. Pikula, Esq.
CITY SOLICITOR
City of Springfield, Law Department
36 Court Street
Springfield, MA 01103
Phone: (413) 787-6085
Fax: (413) 787-6173
BBO # 399770

Dated:

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he caused a true copy of the above described documents to be served upon all parties pursuant to Electronic Case Filing Administrative Procedures on ____________

/s/ Edward M. Pikula, Esq.
______________________________
Edward M. Pikula, Esq.