UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

PEDRO LOPEZ, Individually and on        )
behalf of a class of individuals        )
similarly situated,                     )
                                        )
          Plaintiffs,                   )
                                        ) Civil Action
v.                                      ) No. 07-11693-GAO
                                        )
CITY OF LAWRENCE, et al,                )
                                        )
          Defendants.                   )
                                        )

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

**DAY ONE**
**NON-JURY TRIAL**

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Monday, July 12, 2010
9:11 a.m.

Marcia G. Patrisso, RPR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1    APPEARANCES:

2        LICHTEN & LISS-RIORDAN, P.C.
         By: Harold L. Lichten, Esq.
3            Stephen S. Churchill, Esq.
             Joseph L. Sulman, Esq.
4        100 Cambridge Street, 20th Floor
         Boston, Massachusetts  02114
5        On Behalf of the Plaintiffs

6        CITY OF LOWELL LAW DEPARTMENT
         By: Brian W. Leahey, Esq.
7            R. Eric Slagle, Esq.
         City Hall
8        375 Merrimack Street
         Lowell, Massachusetts  01852
9        On Behalf of the Defendant City of Lowell

10       OFFICE OF THE CITY ATTORNEY
         By: Richard J. D'Agostino, Esq.
11       200 Common Street, Suite 306
         Lawrence, Massachusetts  01840
12       On Behalf of the Defendant City of Lawrence

13       COLLINS, LOUGHRAN & PELOQUIN
         By: Laurie W. Engdahl, Esq.
14       320 Norwood Park South
         Norwood, Massachusetts  02062
15       On Behalf of the Defendant City of Worcester

16       MORGAN, BROWN & JOY, LLP
         By: Mary Jo Harris, Esq.
17           Robert P. Morris, Esq.
         200 State Street, 11th Floor
18       Boston, Massachusetts  02109
         On Behalf of the Defendant City of Boston
19
         MBTA LAW DEPARTMENT
20       By: Kevin S. McDermott, Esq.
         10 Park Plaza, 7th Floor
21       Boston, Massachusetts  02116
         On Behalf of the Defendant MBTA
22

23

24

25

```
1       CITY OF SPRINGFIELD LAW DEPARTMENT
        By: Harry P. Carroll, Esq.
2       36 Court Street
        Springfield, Massachusetts  01103
3       - and -
        LAW OFFICE OF EDWARD M. PIKULA
4       By: Edward M. Pikula, Esq.
        1350 Main Street, 15th Floor
5       Springfield, Massachusetts  01103
        On Behalf of the Defendants City of Springfield
6       and Mayor Sarno

7       CITY OF METHUEN - OFFICE OF THE CITY SOLICITOR
        By: Peter J. McQuillan, Esq.
8       The Searles Building, Suite 311
        41 Pleasant Street
9       Methuen, Massachusetts  01844
        On Behalf of the Defendant City of Methuen

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2                    Direct   Cross   Redirect   Recross
     WITNESSES FOR THE
3       PLAINTIFFS:

4    THOMAS NOLAN

5        By Mr. Lichten        66              103, 105
         By Ms. Harris                 82
6        By Mr. Carroll                94                    104
         By Mr. Leahey                 97
7        By Mr. McDermott              99
         By Ms. Engdahl               102
8
     PEDRO J. LOPEZ
9
         By Mr. Churchill     106
10       By Mr. D'Agostino            114
         By Mr. Carroll               124
11       By Mr. Leahey                126

12

13

14   OPENING ARGUMENT BY MR. LICHTEN........................PAGE 9
     OPENING ARGUMENT BY MS. HARRIS........................PAGE 28
15   OPENING ARGUMENT BY MR. CARROLL.......................PAGE 35
     OPENING ARGUMENT BY MS. ENGDAHL.......................PAGE 41
16   OPENING ARGUMENT BY MR. McDERMOTT.....................PAGE 55
     OPENING ARGUMENT BY MR. McQUILLAN.....................PAGE 62
17   OPENING ARGUMENT BY MR. D'AGOSTINO....................PAGE 63

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | THE CLERK:  All rise. |
| 3 | (The Court enters the courtroom at 9:11 a.m.) |
| 4 | THE CLERK:  United States District Court for the |
| 5 | District of Massachusetts. |
| 6 | Court is in session.  Please be seated. |
| 7 | For a trial in the case of Pedro Lopez, et al, versus |
| 8 | the City of Lawrence, Massachusetts, and others, Docket |
| 9 | 07-11693. |
| 10 | Would counsel identify yourselves for the record. |
| 11 | MR. LICHTEN:  For the plaintiffs, Harold Lichten. |
| 12 | MR. CHURCHILL:  Steve Churchill for the plaintiffs, |
| 13 | your Honor. |
| 14 | MR. SULMAN:  Joseph Sulman. |
| 15 | THE COURT:  Good morning. |
| 16 | MR. PIKULA:  Edward Pikula, City of Springfield. |
| 17 | MR. CARROLL:  Harry Carroll, City of Springfield. |
| 18 | MS. HARRIS:  Mary Jo Harris, City of Boston. |
| 19 | MR. MORRIS:  Robert Morris, City of Boston. |
| 20 | MR. SLAGLE:  Eric Slagle, City of Lowell. |
| 21 | MR. LEAHEY:  Brian Leahey, City of Lowell. |
| 22 | MS. ENGDAHL:  Laurie Engdahl, City of Worcester. |
| 23 | MR. McDERMOTT:  Kevin McDermott for the MBTA. |
| 24 | MR. McQUILLAN:  Peter McQuillan for the City of |
| 25 | Methuen. |

```
 1          MR. D'AGOSTINO:  Richard D'Agostino for the City of

 2    Lawrence and its mayor.

 3          THE COURT:  Good morning, everyone.

 4          Mr. Lichten, did you want to make an opening or --

 5          MR. LICHTEN:  Yes.  Your Honor, there are a number of

 6    pending motions.  Do you want me to start?

 7          THE COURT:  Anything we need to do before openings?

 8          MR. LEAHEY:  Your Honor, if I may, Brian Leahey on

 9    behalf of the City of Lowell.  The defendants had filed one to

10    preclude testimony regarding Thomas Nolan, James Claiborne and

11    Paul Romano.  I don't know if you want to address that now, but

12    that would --

13          THE COURT:  I don't know why.  I mean, tell me about

14    it, why we should do it now.

15          MR. LEAHEY:  These were witnesses that were disclosed.

16    It appears from the defense standpoint only Mr. Claiborne has

17    testimony relevant to an examination of the test -- of the 2005

18    Boston examination based on my review of the records.

19    Claiborne and Nolan may also have factual evidence regarding

20    the City of Boston as they were Boston police officers;

21    however, based on an e-mail that Attorney Lichten sent, it

22    appears that Nolan would opine about being a police officer

23    within -- throughout the Commonwealth, and testify to some

24    other things that haven't yet been specified.  That he would

25    testify -- Nolan would testify about his running a study course
```

1    for the police promotional exam, and there may be a few more

2    points he would make, but he's not being called as an expert.

3         It's the defense opinion that anything other than

4    Boston he is being called as an expert and it violates the

5    disclosure rules on experts.  The first time any of the

6    defendants were notified of Mr. Nolan was June 25th of this

7    year.  With respect to Mr. Romano, Mr. Romano is the former

8    chief of police and apparently fire chief for the City of

9    Lynnfield, and we were informed he would testify as to the

10   duties of a police sergeant and compare them to a fire

11   lieutenant and fire captain.  Specifically, both Romano and

12   Nolan would rebut -- would rebut Dr. Outtz's statements

13   regarding his comments when asked about fire personnel.

14        Mr. Outtz is the defendants' expert, all of -- you

15   know, he's testifying as an expert.  It was in relation to the

16   questions asked by the plaintiffs that Mr. Romano cannot

17   testify anything other than what he did in Lynnfield and is not

18   qualified to testify as to the roles of anything in any other

19   municipality.

20        Based on the late disclosures, it's the defendants'

21   position that neither Romano, Nolan or Claiborne can testify on

22   anything other than what they have direct personal knowledge

23   of, which is limited to the City of Boston, on specific issues

24   that they may have personal knowledge of.

25        THE COURT:  Well, I guess I'm not clear what the issue

1    is.  Is this rebuttal evidence?

2         MR. CHURCHILL:  No, your Honor.  The simple answer to

3    this question is they're not being offered as experts and

4    they're not going to offer any expert testimony.  And I think

5    the defendants concede that to the extent they're offering

6    factual testimony, there's no basis for objecting in limine to

7    this evidence.

8         THE COURT:  Okay.  We'll see.  When would they be

9    called?

10        MR. CHURCHILL:  Nolan is going to be called today,

11   your Honor.

12        THE COURT:  All right.  And what was his -- what's the

13   gist of his testimony?

14        MR. CHURCHILL:  Officer -- well, Mr. Nolan was a

15   member of the Boston Police Department for a number of years

16   both as a patrol officer, as a sergeant, and then moved up the

17   ranks.  So he's going to offer factual testimony about the

18   requirements of being a police sergeant, which is obviously at

19   issue in this case.

20        THE COURT:  Is there an objection to that, that sort

21   of testimony?

22        MR. LEAHEY:  To Boston, no.  But if he's going to try

23   and opine and talk about on a statewide basis --

24        THE COURT:  I see what you're saying.

25        MR. LEAHEY:  -- to the other defendants.

1          THE COURT:  All right.  We'll see how it goes.  If it

2     creeps into expert testimony, then we can deal with it.

3          There is another issue -- I'm not sure how problematic

4     it will be -- is that the interests of the various defendants

5     are several.  I'm not sure it's profitable, as we go along, to

6     try to decide what -- which sentence of a witness's answer

7     applies to one defendant and not the others.  I think there are

8     probably ways of making sure that those defendants who think

9     that there's no evidence that directly affects them can make

10    the point without having to have a question-by-question

11    assessment of that.  I mean, it would be difficult to manage,

12    and I'm not sure it's worth the result, but I think at the end

13    of the -- when larger decisions can be made, the point from any

14    particular defendant could be argued that the evidence is

15    insufficient, for example, because it doesn't pertain directly

16    to that defendant in some way.

17         Okay.  Is there -- I mean, there are other pending

18    motions.  My inclination is to deal with them as the issues

19    arise in the course of the case partly because, as we see on

20    this motion in limine, it will depend on what happens, so...

21         MR. CHURCHILL:  We agree with that, your Honor.

22         THE COURT:  Okay.

23         MR. LICHTEN:  Can I use the podium, your Honor?

24         THE COURT:  I prefer you did.

25         MR. LICHTEN:  Your Honor, yesterday in Lawrence,

1    Massachusetts, there were no minority police supervisors on the

2    street in a city that has 80 percent Hispanic population.

3    You'll hear that in the city of Lawrence there is currently one

4    minority police sergeant in the entire department, and there

5    hasn't been a promotion to the position of police sergeant by a

6    minority candidate in the city of Lawrence in the last eight

7    years.  Next door, in the city of Methuen that shares a border

8    with Lawrence and shares a large minority population, you will

9    hear that there is zero minority police sergeants.  If you go

10   down the road of 495 a little way and get to Lowell, you'll

11   hear that there currently, in a city of that population with a

12   large minority population, only two minority police sergeants.

13        And then, your Honor, if you drive down 93 and come to

14   Boston, the situation is even worse.  You will hear that in

15   Boston, as a result of the last police sergeant's examination

16   which took place in 2008, there have been 37 promotions in a

17   city which is half minority and a department that is 40 percent

18   minority, and of those 37 promotions, your Honor, only two have

19   been minority.  So 35 non-minority, two minority, a ratio which

20   our experts will tell you is off the scales of showing adverse

21   impact.

22        Now, to borrow a phrase from the Talking Heads, how

23   did we get here?  What is going on in the Commonwealth of

24   Massachusetts?  And the answer is simple.  The fundamental

25   answer, the answer that you will be called upon to decide, is

1    that Massachusetts uses an antiquated, outdated promotional

2    examination for the position of sergeant that is so antiquated

3    and outdated that you will hear not only from our experts but

4    from the defendants' experts that there is literally no large

5    municipality or statewide law enforcement organization in the

6    whole United States that uses the system that is used in the

7    Commonwealth of Massachusetts, which is a pen-and-paper

8    multiple-choice test that tests for book knowledge and nothing

9    else, and because of that there is a huge and unremitting

10   disparate impact throughout the Commonwealth, and it is just

11   going to continue and continue and continue.

12          Now, your Honor, in order to understand this case, it

13   is necessary to understand the history that brings us here.  As

14   this Court is aware, about 40 years ago in NAACP v. Beecher and

15   Castro v. Beecher, the courts in this Commonwealth, the federal

16   courts and the First Circuit, threw out multiple-choice

17   entrance-level examinations for police officers and

18   firefighters that disproportionately excluded minority

19   candidates and which exams were not found to be predictive of

20   actual job performance.  And as a result of that various

21   consent decrees and orders were entered into.  And as the Court

22   is aware, as a result of that many minority police officers

23   were hired throughout the Commonwealth of Massachusetts, which

24   I think we can all agree is a good thing.

25          But by the late '70s one serious problem emerged, and

1    that was that although individuals were becoming police

2    officers, minority candidates were not being promoted to

3    sergeant because the Commonwealth was using this test, which is

4    essentially the test it still uses, which is a multiple-choice

5    test which tests your ability to memorize textbooks and rules

6    and regulations and laws.

7         And you will hear that over the course of the next 20

8    years, from the late '70s to the late '90s, many of the

9    municipalities who are defendants in this case were well aware

10   of this fact and indeed used this fact in court to try to get

11   permission to do minority hiring, specific minority hiring,

12   which would now be considered unconstitutional under

13   Ricci v. DeStefano.  You will hear, for example, in 1978 -- and

14   you will see cases on this -- that in the city of Boston,

15   Boston entered into a consent decree agreeing to validate their

16   examination process, something which never happened.  But what

17   did happen instead is the City of Boston instead used a

18   convenient device of agreeing to hire minority candidates

19   specifically because they were minority to achieve some goals

20   and quotas.  And that decree ended in 1990, and the City of

21   Boston went back to having a system that operated to exclude

22   minority sergeants.

23         You will hear that in the '90s -- and you were

24   actually involved in one of these cases, the City of Boston

25   would actually reach down below candidates that should have

1    been reached on the list, who were ranked lower, and

2    specifically hire minority candidates, and then they would be

3    sued by non-minority candidates for reverse discrimination.

4    They came into this court -- and there are a number of cases,

5    including Stewart v. Roache and Boston Police Superior Officers

6    Federation v. City of Boston, in which the City of Boston would

7    contend in this court that they had to do that because their

8    selection system had violated Title VII, and if they didn't

9    make these promotions, then they would be in violation of Title

10   VII.  On that narrow grounds, because it was a compelling state

11   interest, the First Circuit and the circuit courts here

12   approved that process.

13          You will hear that in the late 1990s the MBTA, because

14   they too had to admit that their selection process for police

15   sergeant discriminated against minority candidates, they went

16   to the Civil Service Commission and got permission to hire

17   three minority candidates, three minority police officers, and

18   promote them to the position of sergeant, and in that

19   proceeding they had to admit that the selection procedure they

20   were using violated Title VII, and therefore, they needed to

21   make these remedial promotions.  In 2006, in a case called

22   Brackett v. Civil Service Commission, the SJC of Massachusetts

23   upheld that.  And again, that's a holding that would no longer

24   be good law under Ricci v. DeStefano.

25          You will hear that in the city of Worcester a case

1    that's still pending today but started in 1994, you will see

2    a -- findings of the Mass. Commission Against Discrimination in

3    which the City of Worcester would hire, in the '90s 15, 13, 12

4    candidates off of an exam, all of which were non-minorities in

5    the city of Worcester, so that up until 2001 the City of

6    Worcester had zero minority police sergeants, in 2001 it has

7    one, and now it only has four.

8            So this problem that we're talking about, your Honor,

9    is not a new problem.  It's not a surprise to anyone.  It's

10   been going on for 25 years because no one has attacked what the

11   real problem is, and the real problem is an examination that

12   doesn't test for the actual abilities that are necessary to be

13   a police sergeant and has significant disparate impact on

14   minority candidates.

15           And, your Honor, I want to point out -- and all the

16   experts are going to be in agreement with this, the defendants'

17   experts and the plaintiffs' experts -- in 2005, 2006, 2007 and

18   2008 the Commonwealth didn't even have to administer this

19   examination to know that it was going to have discriminatory

20   impact because by that time so much literature had been

21   developed in the industrial psychology science that everyone

22   could have predicted before the exam was given that if you give

23   a multiple-choice rote memory -- memorization-of-textbook type

24   of examination, it's going to have a disparate impact on

25   minority candidates.  In other words, it was known before they

1    gave it that this would be the result.  It is always the

2    result, and you will hear studies and excerpts from the

3    professional literature that established that.  So everyone

4    knew this was going to be the problem.

5          Now, you might ask why is it that this problem exists?

6    Why do minorities not score as well on these type of tests?

7    That probably is a lurking question.  And ironically,

8    defendants' own expert, Dr. James Outtz, has an explanation for

9    that.  And you'll hear him describe why minorities are better

10   at what's called divergent thinking, where there's no one right

11   answer but you think through a problem and write down what you

12   believe the answer is; and the other type of test which is

13   convergent thinking where there's only one right answer.  And a

14   multiple-choice format is the antithesis -- I'm sorry -- is

15   exactly what convergent thinking is.  And minorities simply do

16   not do as well with respect to convergent-thinking type of

17   questions.

18         Now, that's his theory.  It's been widely respected.

19   And the proof of this -- and you'll hear about experts in the

20   literature -- the proof of this is that when industrial

21   psychologists have given the same information in a testing

22   format using this convergent strategy, a multiple-choice test,

23   and then dose the same thing using a divergent-thinking

24   strategy, minorities do just as well as non-minorities on the

25   test; in other words, it's the medium, not the subject matter,

1    that's being tested wrong.  And I'd ask you to keep that in

2    mind as you hear this case.

3         Now, I'd like to talk for a minute about the exam in

4    question.  And I think this Court is probably familiar with it.

5    Every year, 2005, 2006, 2007, 2008, the Commonwealth, and has

6    done so for years before, offers a police sergeant's

7    examination.  Now, a city has two options:  It can elect to do

8    its own examination, and this Court has written about that, and

9    a number of cities in Massachusetts do that, and in doing so

10   they use assessment centers which are supported by the

11   Commonwealth of Massachusetts.  The Commonwealth of

12   Massachusetts gives information to cities and towns as to how

13   to do assessment centers and non-multiple-choice examinations,

14   and some cities and towns do it, but in the cities and towns

15   that are defendants in this case, they've chosen to, instead,

16   use HRD's exam.

17        Now, HRD's exam is based upon a 1991 test outline.

18   And what happens is that there are 80 questions on the exam for

19   sergeant.  And before you take the exam, six months before

20   you're given a reading list, and the reading list includes

21   various criminal justice treatises and some rules and

22   regulations and statutes, and you're told to study them.

23        And the test-writer, who was deposed in this case,

24   will testify that he takes the answers almost verbatim out of

25   the textbooks and out of the rules and regulations, because if

1    someone appeals their score, the Commonwealth wants to be able
2    to justify the question and the answer by showing them where in
3    the book and the materials that answer lies.
4         For the lieutenant's exam, they're asked those 80
5    questions and 20 more questions, so 100 questions; for the
6    captain's exam it's those 80 questions the sergeant candidates
7    try to take, and then 20 more for lieutenants and 20 more for
8    the captain.  So the exams are very similar.
9         And as a result of that, you get a raw score, and
10   you're then ranked.  And the only other thing that contributes
11   to that score, the only other thing, is what's called
12   "education and experience," which the Commonwealth contends is
13   20 percent of your examination score, but, in fact, the
14   statistical scientist in this case will tell you it's actually
15   only 6 or 7 percent because everybody gets 70 percent on the
16   experience and training part.  So there's very little variance.
17   So this exam, without anything else, is the determining factor
18   as to where you get ranked on the Civil Service list.
19        Now, when a vacancy occurs, a city will ask for a
20   list, and they must hire from among the top three candidates on
21   the list under a formula called 2 N + 1.  So if there are two
22   vacancies, then you can look at five candidates, but you have
23   to look at the five candidates at the top of the list.
24        And in most cities and towns -- Worcester has admitted
25   that they do it this way, and the City of Boston will admit

1    that they do it this way except where there's a serious

2    disciplinary problem -- they just hire directly off the top of

3    the list.  So the driving force of the selection process is

4    your score on the exam.  There's no other way to look at that.

5         Okay.  Now, I want to spend just three minutes talking

6    about the legal framework which I think this Court will apply,

7    and I think this is well tried and ground.  The first question

8    in any disparate impact Title VII case is whether or not there

9    is disparate impact as a result of the selection process.  And

10   essentially -- and our experts will tell you this -- what one

11   is looking for if one finds a disparity in the selection

12   process between the selection of minorities and non-minorities,

13   is whether or not this disparity is explainable by something

14   relating to the test or whether it could be explainable by

15   chance or randomness.  And there are a number of sophisticated

16   statistical techniques to make that very analysis.

17        And here you will find that the disparate impact that

18   our experts have found is not possibly -- could not

19   statistically be possibly explained by randomness; it is

20   because of the examination.  And they will tell you that they

21   arrived at that conclusion by doing a number of very important

22   statistical analyses, all of which show that the examination

23   has disparate impact.  And I would like to discuss a few of

24   those.

25        First, they looked at the examination scores and the

1    selection rate statewide.  Originally this case was brought

2    against the state, as the Court knows, for the 2005, 2006,

3    2007, and later the 2008 exam was added.  And that statistical

4    analysis showed that there was adverse impact in every way that

5    you could make the calculation.  If you look at the pass/fail

6    rates for minorities, more minorities -- a statistically

7    significant number of minorities failed the test than

8    non-minorities, which under Connecticut v. Teal is, itself,

9    actionable.

10          If you looked at the mean differences in the score,

11   there was statistical significance in the mean differences of a

12   significant amount.  If you looked at what's called the

13   effective passing rate, that is the rate at which you actually

14   get promoted because you have to have a score much higher than

15   the pass/fail rate to actually end up getting promoted, there

16   is even greater disparate impact, and if you look at the

17   selection rates, that is the rates at which minorities and

18   non-minorities were getting selected, there was overwhelming

19   evidence of disparate impact statewide.  And our experts will

20   tell you that that is statistically significant and telling.

21          Now, as you know, there is going to be an argument by

22   the defendants that the use of aggregated data -- which is not

23   what we're going to rely on.  It's supportive but it's not the

24   only evidence we're going to rely on because we're going to

25   show disparate impact in each jurisdiction -- their contention

1    is that it's inappropriate to aggregate data.  And I think you

2    will find that the EEOC guidelines, the Uniform Guidelines of

3    Employment Selection which specifically referenced this issue,

4    clearly state that where you have small numbers, as we do in

5    some cities and towns but not in others, and you're trying to

6    determine whether or not there has been adverse impact, it is

7    appropriate to aggregate data if it's the same exam, which it

8    is, across jurisdictions and across years, which is what we

9    did.  And that's 1607.4 of the Uniform Guidelines which says,

10   and I'm quoting, "Where the user's evidence concerning the

11   impact of a selection procedure indicates adverse impact but is

12   based upon numbers which are too small to be reliable," which

13   is what the defendants are contending, "evidence concerning the

14   impact of the procedure over a longer period of time and/or

15   evidence concerning the impact which the selection procedure

16   had when used in the same manner in similar circumstances

17   elsewhere may be considered in determining adverse impact."

18         So the defendants are simply wrong to argue that

19   aggregation is not appropriate.  And Judge Saris in Bradley did

20   look at aggregated data.  But that's not where we're going to

21   stop, your Honor, because our experts also looked at the data

22   by municipality, and I want to discuss what that shows for one

23   minute.  First, in the city of Boston, the adverse impact is so

24   severe, so dramatic, that the City of Boston is not even

25   contending that there's no adverse impact in the city of

1    Boston.  And your experts will tell you that it's not something
2    about the city of Boston that makes this adverse impact so
3    severe; it's simply that in Boston there are larger numbers, so
4    the largest tell a clearer story of what's actually going on.
5            In 2005 -- you will hear that for the exam given in
6    Boston for 2005 the adverse impact ratio in promotional rates
7    is .28.  That is, relatively speaking, one-fourth as many
8    minority candidates as compared to the applicant pool for
9    sergeant were promoted as were non-minorities.  This is
10   considered to be severe disparate impact higher than in many
11   cases you will see reported in the textbooks.  Not only was
12   there adverse impact in 2005 in the promotion rates, but you
13   will hear that there was adverse impact in the passing rates of
14   significant statistical difference.  And in the effective
15   passing rate, that is the score that you needed to get hired,
16   and in the average mean score, there was a 6-1/2 point
17   differential of the average mean score.  And you will hear that
18   in 2008 the data is even worse, as I said before.  So you will
19   see that in the city of Boston minority candidates are being
20   underpromoted in numbers which are startling; in fact, one of
21   our experts are going to say they're the worst she's ever seen.
22           In other cities such as Lawrence, Lowell, the MBTA and
23   Methuen, what you're going to hear about is there have been no
24   minority promotions in the years that these exams have been
25   given, so the adverse impact ratio is zero.  Now, admittedly,

1   the numbers are small in those communities, but our experts

2   will tell you that, based upon other data, including the mean

3   score differences and the average -- the adverse impact in pass

4   rates which all show that minorities are doing worse, this

5   demonstrates that for those communities this underpromoting of

6   minority police candidates is not due to chance; it's due to

7   the effect of this discriminatory exam.

8          In Springfield you will hear defendants' own expert

9   say that at least for the 2005 examination there was adverse

10  impact -- statistically significant adverse impact in

11  Springfield, and he stood -- at his deposition Dr. Outtz stood

12  by that determination and said, "I find there was adverse

13  impact in the selection rate in Springfield for 2005," and for

14  2007 you will hear that there's adverse impact -- clearly

15  adverse impact, the defendants simply claim it's not

16  statistically significant.  And in those combined years there

17  have been one minority promotion in Springfield from those two

18  exams.

19         In Worcester, where the data shows that minorities

20  surprisingly did almost as well as non-minorities on the

21  examination, you will hear that there is still adverse impact

22  in the selection ratio which is .79, which still fails the

23  four-fifths rule, and on the current examination from which no

24  promotions have been made, there is no minority sitting close

25  to the top of the list, so every time they make their promotion

1    there will be adverse impact.  And you will hear that

2    statewide, whether you include Boston or don't include Boston,

3    there's adverse impact.  So there's no question that we're

4    going to demonstrate adverse impact, your Honor.

5           Now, the next question that you will have before you

6    is whether or not, if there is adverse impact, the defendants

7    can show that the test is a valid test.  The statute says that

8    it has to be shown to be a business necessity and job related.

9    And what the cases say is that that means that the

10   defendants -- the burden shifts to the defendants to prove that

11   the test is valid under the standards set forth by the EEOC and

12   the Uniform Guidelines on Employee Selection.

13          And I can make this very simple for the Court.  There

14   is a long way of showing you, and we will show you, that the

15   test is not valid for a multitude of reasons having to do with

16   the sloppiness in which the validity was attempted to be proved

17   by the Commonwealth because, remember, there's no validity that

18   was attempted by the defendants in this case.  They're relying

19   on an exam given by the Commonwealth of Massachusetts.  But the

20   simple answer, the very simple answer to this case, is that the

21   EEOC guidelines state that in order for an exam to be valid it

22   must test the skills and abilities necessary to perform the

23   job.  A representative sample, at least, or the important

24   skills and abilities.

25          And here -- and this is the key to the validity --

1  this exam tests for one knowledge only, and that is the ability

2  to memorize information from textbooks and regurgitate it on an

3  exam in a multiple-choice format.  It does not test for what

4  are really the most important abilities to be a police

5  sergeant, and you'll hear about that, and those are the ability

6  to command in the field, to make situational judgments, to make

7  critical incident judgments, to reason, to have good oral

8  communication, interpersonal skills.  All of these things are

9  not tested for, and for that reason alone the exam clearly is

10  not valid and cannot be shown to be valid.

11         And here's the ironic thing, your Honor, that you will

12  hear.  You will hear that all of defendants' experts, Dr. Outtz

13  and Dr. Silva and the firm that Dr. Silva works for -- none of

14  them give this kind of test.  In fact, they advertise on their

15  websites that they give these other types of tests, that test

16  for these other critical skills, because they concede that a

17  multiple-choice job knowledge test has -- is not valid and

18  increases disparity impact and decreases validity.  And that if

19  you add these other components, which I'll talk about in a

20  minute, where you test for the abilities and skills that are

21  really necessary to be a police sergeant, not only do you

22  decrease the adverse impact of the exam substantially, if not

23  wholly, but you increase the validity of the examination

24  because you're now testing for more of the essential skills and

25  abilities necessary for the job.

1          In fact, your Honor, you're going to hear Dr. Outtz,

2     their expert on validity, say that he wrote a brief.  He

3     organized and wrote a brief to the U.S. Supreme Court in the

4     Ricci case.  He was very interested in it.  And in that brief

5     he stated that a job-knowledge multiple-choice test standing

6     alone could never be a valid test under the EEOC guidelines,

7     and therefore, the U.S. Supreme Court, which did not listen to

8     him, except Justice Ginsburg did, that the test should have

9     been thrown out anyway, the test in that case.

10          And you will hear that in deposition he simply tried

11     to say, "Well, that was a fire lieutenant's exam but the

12     critical judgments they have to make are different than a

13     police sergeant."  And I submit to you that you will hear

14     evidence that that's hogwash, that the critical judgments that

15     a police sergeant has to make in a big city are much more

16     critical, or as critical, than any fire lieutenant has to make.

17     They have to make life-and-death decisions all the time and yet

18     those abilities are not tested for.

19          You will hear the police commissioner of the City of

20     Boston -- to his credit, Commissioner Davis, you will hear

21     excerpts from him, on Fox TV, on the Globe, at the city council

22     in which he said he does not believe in the validity of these

23     examinations because they only test for memory, job knowledge,

24     and they don't test for any of these critical things, and that

25     he is a big fan of assessment centers.  He wants assessment

1    centers and other devices that will test for these critical

2    skills.  So I suggest to you that when all the evidence is

3    over, the Court will be convinced that this test does not have

4    validity.

5         Now, you will also hear a laundry list -- it will be a

6    little technical but a laundry list -- of other reasons why the

7    test that the Commonwealth gave does not meet validity

8    standards, and among those are the fact that the outline that

9    was being used purports to test for items that cannot be tested

10   by multiple choice; it concedes that it's not testing for other

11   skills found to be important; and it suggests that the

12   experience and training scores that you get, those six points

13   that I talked about, have been validated as testing for other

14   skills, which, as you'll hear, make no sense.  And you'll hear

15   a number of other criticisms of that by our experts.

16        And one last thing on that, your Honor.  You will also

17   hear that the expert hired by the Commonwealth and who is

18   the -- who Dr. Silva, their expert now works for, he, on the

19   2008 exam for the Commonwealth of Massachusetts and the City of

20   Boston, found that the exam was so unreliable as a rank order

21   scoring device that he recommended, and the Commonwealth

22   attempted to institute, a banding system which you'll hear

23   about, a banding system for that examination because he found

24   that there was no essential difference in a score of, let's

25   say, 100 or 94 on the exam, that it was not predictive of

1    performance; therefore, it could not be used as a rank order

2    device.  So you could actually find in this case that while the

3    test was valid, although I don't think you will, it is not

4    valid when used as a strict rank order device, and that would

5    still fail the validity requirements of Title VII.

6            Finally, your Honor, under the law if you find

7    disparate impact, which Boston has already conceded, and even

8    if you would somehow find that the exam met the validity

9    standards, the plaintiffs still prevail if we can show that

10   there are reasonable alternative methods that could have been

11   used to test for police sergeant that had less discriminatory

12   impact and were as valid or more valid.

13           And, your Honor, on this question, I don't think it

14   will be a close call.  And the proof of the pudding on that,

15   your Honor, is that there is no other city in the United

16   States, or state law enforcement agency, that uses this system.

17   The experts that the defendants have hired will tell you that

18   they go around the country devising these alternative selection

19   systems to decrease adverse impact and increase validity in all

20   the cities and towns where they work.

21           Dr. Outtz will tell you about his experiences in New

22   Orleans; he'll tell you about his experience in Bridgeport;

23   he'll tell you about his experiences in Detroit.  Dr. Silva

24   will tell you about his experiences in Miami.  They all use

25   alternative selection devices.  Our experts all use alternative

1   selection devices because of the significant disparate impact

2   of the multiple-choice exam.  And so it seems the height of

3   idiocy for the defendants to be able to contend that it's not

4   feasible to do this when they're the only ones who are not

5   doing it, your Honor.

6          So I submit to you, your Honor, when the evidence is

7   all done, we will prevail on each of the tests we have to show

8   you under Title VII.  It is time not to put Band-Aids on this

9   problem of the lack of minority promotions.  It's not

10  appropriate to say, "Okay.  Well, let's just appoint several

11  minorities because they're minorities," because that's no

12  longer legal under Ricci v. DeStefano and that does cause anger

13  among non-minorities.  Rather, you have to attack the problem

14  at its cause, and the cause is the exam.  And if the exam is

15  not changed, if nothing happens, communities will continue to

16  discriminate and exclude qualified minority candidates for

17  years to come.  And if the defendants other than the City of

18  Boston can escape liability by saying, "Well, we have small

19  numbers," then they could continue to have small numbers for

20  the rest of the city's existence and can continue to escape

21  responsibility for the fact that they have fewer known minority

22  police sergeants.

23         Thank you very much, your Honor.

24         THE COURT:  Okay.

25         MS. HARRIS:  Good morning, your Honor.  Again, Mary Jo

1    Harris for the City of Boston.

2          The one thing that I think we can agree on with

3    Mr. Lichten is that testing processes in Massachusetts have

4    been very vexing.  What we don't agree on is that there's a

5    clear silver-bullet solution.  And I suggest that Mr. Lichten's

6    experts will agree as well, that testing processes in the

7    public sector that rely on objective measures of merit carry

8    with them difficulties in assessing between candidates to

9    identify those who are most qualified and therefore most

10   appropriate for selection.

11         They'll agree that this is an evolving process within

12   the industrial psychology industry, and that the use of

13   assessment centers, while attractive to people particularly

14   because it's believed, although it hasn't been shown, that it

15   can reduce adverse impact, remains very much in flux and

16   remains very much a testing mechanism that will never meet the

17   validity standards of a written exam.  And I think that that's

18   important to bear in mind as we go forward here.  I think I

19   agree also that the history here is important, although I do

20   part from Mr. Lichten's description of that history.

21         In the city of Boston, the consent decrees that were

22   alluded to in the 1970s were followed by an effort in the late

23   1980s by the Boston Police under a delegation agreement with

24   the HRD to create a performance assessment for promotion that

25   included assessment centers.  Like every other exam that has

1    ever been administered in the city of Boston, that was met with

2    litigation.  In the course of that litigation, it was found

3    that the minority officers actually performed better on the

4    written test than they did on the assessment center.  And like

5    every other exam that I'm aware of, that test with the

6    assessment center had adverse impact.

7            Following that, and following litigation through the

8    1990s, the city did promote under a consent decree.  And when

9    that consent decree expired, meaning that the use of two

10   separate race-based lists was inappropriate, the city again in

11   the year 2000 got a delegation agreement from HRD and designed

12   a performance-based assessment section to go with their written

13   exam.  That exam was challenged by Mr. Lichten on behalf of the

14   Superior Officers Federation.  And as a result, when that exam

15   was finally scored and the performance piece was taken out

16   because it was in conflict with collective bargaining

17   agreements and with state law, a combined written exam and

18   assessment center had adverse impact.

19           That exam was finally ranked, I believe in the year

20   2003.  And then for the year 2005, since the city had spent

21   over a million dollars on a testing process that did nothing to

22   increase diversity in the ranks that resulted, the city relied

23   on HRD to create the exams in 2005 and in 2008.  But I think

24   it's significant to note that in each of these exams,

25   regardless of the way in which they were administered or the

1    components that were involved, adverse impact was not mitigated

2    by the use of these other selection processes.  And as you'll

3    hear from one of the experts who's called for the plaintiffs,

4    the most reliable indicator of job performance, particularly

5    for the rank of sergeant, is the use of a multiple-choice exam.

6         I think it's important to focus on the job that this

7    case is about.  It's not about firefighters who need to know,

8    to assess if a building is about to crumble or where to put a

9    ladder or what kind of velocity a hose needs; it's not about

10   captains who are managing budgets for district stations.

11   Police sergeants are front-line supervisors.  They work 24

12   hours a day -- they cover the city 24 hours a day.  They are

13   the people that patrol officers turn to to find out if they can

14   enter a building without a search warrant, if they can arrest,

15   and if they arrest, what charges to bring.  They are required

16   to memorize the Constitution and the laws of the state and the

17   laws of this country.  That knowledge is fundamental and

18   elemental to the job that they are required to perform, and

19   they need to know that knowledge on the day that they begin

20   work.

21        You're going to have the exams that are being

22   challenged here, and you'll see the kinds of questions that are

23   asked, and you'll be able to hear people explain whether or not

24   these questions properly relate to the job of a sergeant.

25   You'll also have before you the reading lists that are used in

1    the examinations at issue, and at least as for Boston, you'll

2    find that in addition to the textbooks that outline the

3    criminal laws and the constitutional laws and the rights and

4    responsibilities and the limits on police authority, these

5    officers are also charged with reviewing the rules and

6    regulations that govern the operation of the Boston Police

7    Department.

8         I would point out that those are rules and regs

9    they're expected to know and follow as police officers, so the

10   fact that they're being tested for it on a sergeant's exam

11   should not be an undue burden.  They're supposed to know this

12   stuff anyway.  They're also going to be on the reading list

13   management texts that outline theories of management, and

14   you'll hear that when the Boston Police Department promotes its

15   sergeants it doesn't expect them to be supervisors on the day

16   that they begin; it expects them to know the law, but then it

17   sends them to training for a month to go over those supervisory

18   skills and abilities that they've already been expected to

19   learn the theories of before they're promoted into the

20   position.

21        Ricci is the case that I think that stands over this

22   entire proceeding because what Ricci has really laid out here

23   is that you can have an exam that has adverse impact.  And in

24   Ricci, a firefighter test, by the way, Ricci had a written

25   portion and an assessment portion, the kind of exam that

1    Mr. Lichten is advocating here, and it had adverse impact.  It

2    had adverse impact.  And the court said the fact that you have

3    adverse impact does not mean that the test is invalid; it does

4    not mean that you throw out the test or start a different

5    selection process.  Because people are competing for these

6    positions.  It's a competitive exam.  And at least here in

7    Massachusetts, and I believe in New Haven, you're operating

8    under a series of merit-based principles that require people to

9    compete for a very limited number of jobs.  That's the reality

10   of the way these forces work.

11          In Boston you'll hear that there are over 600

12   candidates for each of the two exams that are at issue here.

13   So for each of these 600 people, there's a requirement that the

14   testing process assure that the candidates that are most at the

15   top of the list and most likely to be reached for promotion

16   actually have the knowledge to perform the job that they're

17   being selected for.

18          And as Ricci tells us, if the exam process -- whether

19   you look at it at the pass/fail rate or at the selection rate,

20   if there's adverse impact that may be a prima facie case for

21   the plaintiff, but that does not mean that there's a strong

22   basis in evidence to believe that that exam is invalid or that

23   those people who have been identified as the top performers on

24   the exam are not qualified for the positions that they're

25   seeking to hold.

1          The commissioner is going to testify here, and he'll

2     testify as Mr. Lichten alluded to, to frustrations that these

3     exam processes don't end up delivering more diverse lists.  But

4     I think it's important here to, again, focus on the position at

5     issue.  A sergeant's position is not the same as a lieutenant's

6     or as a captain's, and the methods by which people are assessed

7     for the different ranks are not the same.  The fundamental

8     knowledge base may be the same, but there are fundamental

9     differences in each of those positions, and I think that that

10    will illuminate the testimony that you hear from the police

11    commissioner.

12          And I understand that you'll be hearing from a number

13    of my colleagues, so I won't belabor the points much further,

14    your Honor, except to say that to suggest that there's an easy

15    solution to this that was available to each of the defendants

16    at the time that these exams were undertaken simply

17    oversimplifies this to a point that's not helpful for anybody.

18    These are departments that have ongoing operational needs, that

19    while they understand that the development of industrial

20    psychology is an ongoing process and exams may be developed

21    over time, when you have a need for a promotional exam you

22    can't wait five or ten years to wait for the science to catch

23    up.  These departments use the resources that are available to

24    them, operating under the budgets that they work under under

25    the state.  They relied on the state in these cases to perform

1    the promotional testing that they're mandated by state law to

2    perform.  And I think that you'll find at the end of the day

3    that these exams are valid.  Thank you.

4        MR. CARROLL:  Good morning, your Honor.  May it please

5    the Court, Harry Carroll, senior legal counsel for the City of

6    Springfield.  Seated with me at counsel table today is Edward

7    M. Pikula, Springfield City Solicitor.  Solicitor Pikula

8    periodically will be here in court but primarily will be

9    coordinating the city's long-distance defense from Springfield.

10        In this case plaintiffs are alleging disparate impact

11    and unfairly interfering with their ability for advancement.

12    And specifically, the plaintiffs -- and there's a large group

13    of plaintiffs -- point to Title VII and Chapter 151B.  What the

14    Court will find is that of all of the plaintiffs, only six of

15    them are actually Springfield plaintiffs, that the others are

16    members of different police forces:  MBTA, Boston, Methuen,

17    Lawrence and Lowell.  The evidence on disparate impact should

18    be carefully considered, and there are a couple of points that

19    we would urge the Court to pay particular attention to as the

20    evidence comes in.

21        The first point is what I call "no more than two out

22    of four."  And what I mean by that is that there are four

23    examinations given by HRD which the plaintiffs are challenging:

24    2005, 2006, 2007, 2008.  But the evidence in this case will

25    show that the defendants, each of the defendants, at most

1    participated in only two out of the four examinations.  In

2    Springfield's case, the only examinations which Springfield

3    police officers took was the 2005 and 2007 examinations.  So

4    any issues involving the 2006 and 2008 examinations are just

5    completely irrelevant to Springfield, and the Springfield

6    plaintiffs, they didn't take those examinations.

7          Now, that's important because the Supreme Court in the

8    Lewis v. City of Chicago case recently said that in order for

9    plaintiffs to have a prima facie case, they must make a timely

10   filing with the EEOC.  And the evidence in this case will show

11   that not one of the six Springfield plaintiffs made a timely

12   EEOC and/or MCAD filing for the 2005 examination.  None of them

13   filed.  So all of a sudden you're down to one exam for

14   Springfield, which is 2007.

15         Now, adverse impact involves statistical evidence.

16   And there are two particularly important issues for statistical

17   evidence, and we would urge the Court to give this very careful

18   consideration.  The first is what I call the "data pool width."

19   And what I mean by that is that the competition on a police

20   promotional examination under the Civil Service system of

21   Massachusetts is departmental only.  A Springfield officer who

22   takes a promotional exam has no chance of ever being promoted

23   to a sergeant in Boston or on the MBTA police force or anywhere

24   else.  So the only relevant data pool involves the departmental

25   data pool.

1         Now, what plaintiffs' expert did, Dr. Wiesen, he

2    looked at all of the departments.  And that's what his

3    statistical analysis is based upon, a data pool which is far

4    too wide because it consists of candidates from all the

5    departments.  Even though the individual candidates never

6    compete against other departments, the competition is limited

7    to each individual department.

8         So that those expert reports which rely upon a data

9    pool that's too broad, that the width of it is too broad, are

10   unreliable; they compare dissimilar police positions.  A police

11   sergeant in Springfield is not the same as a police sergeant in

12   Lowell or Methuen or Boston or in the MBTA.  They're different

13   jobs, although it's a statewide test.  So that's the first

14   issue statistically that the Court will need to come to grips

15   with.  It's the so-called aggregation issue.

16        And I believe Dr. Silva, who will be called by the

17   defense, is expected to testify that the aggregation of data

18   across jurisdictions and exams can lead one to identify adverse

19   impact where none exists and lead to erroneous conclusions.  So

20   that's the width issue.

21        The second statistical issue that Springfield believes

22   is quite significant is the depth of the data pool.  And what I

23   mean by that is how many candidates go into the appropriate

24   data pool.  Now, what the plaintiffs' experts have done is

25   they've just simply taken everybody that took the exam, and

1    that's their data pool.  The problem with that is that it

2    includes people who failed the test.  It includes people who

3    were not eligible.  They are not listed on the eligible list.

4    It includes people who were not certified.  They're not on the

5    certified list.

6         And I think everyone will acknowledge that a candidate

7    in Massachusetts for police sergeant, who takes a police

8    promotional examination and fails it, who is not eligible and

9    who is not certified has absolutely no chance of ever being

10   appointed to a Civil Service position.  You fail the test, you

11   don't get appointed.  So the inclusion of that depth of data by

12   the plaintiffs' expert is invalid because it's misleading.  It

13   has little, if any, probative value.

14        Now, when you look at the correct data pool, at the

15   correct depth, that is, the candidates within a jurisdiction

16   who are certified to be appointed under the 2 N + 1 rule that

17   the state uses, what you find is that there is no adverse

18   impact in the city of Springfield for the Springfield

19   candidates.  Springfield has hired an expert, Dr. William

20   Fairley, who will testify that when you look at the data pool,

21   the number of minorities appointed is not statistically

22   different from the number of whites appointed.  Minorities were

23   no more or less likely to be appointed once rank, experience

24   and educational background are taken into account.

25   Springfield's appointments that were out of rank order did not

1    negatively impact minorities.

2         There's no objectively strong evidence that

3    Springfield's 2005 and 2007 police promotional examinations had

4    an adverse impact upon any of the Springfield plaintiffs.  And

5    so that should be enough.  But assuming arguendo it's not, and

6    the Court wishes to take a look at the examinations themselves,

7    which will be put into evidence, the challenged examinations

8    are job related and consistent with business necessity.

9         The first piece of evidence, and quite significant, is

10   a report that was done in 1991 by the Human Resources Division.

11   It's an extensive report with a large appendix, and it studied

12   everything there is to study about a police sergeant's job:

13   What are the important knowledge, skills and abilities,

14   personal characteristics that are needed to be a police

15   sergeant in the Commonwealth of Massachusetts -- anywhere?  And

16   they broke it down and analyzed every part of the sergeant's

17   job.

18        And that 1991 validation report shows that the

19   challenged written Civil Service examinations are predictive of

20   or relevant to the police sergeant's job.  They're correlated

21   with important work behaviors for being a sergeant in

22   Massachusetts, a police sergeant.  They are representative of

23   the important aspects of a police sergeant's job.

24        After the 1991 validation study was drawn up, HRD used

25   that essentially as a template for preparing these other

1    examinations in subsequent years.  But they did updates of the

2    job analysis to add new refinements to the exams and to the

3    materials as that became necessary.  And Dr. Outtz, who's a

4    renowned national testing industrial psychologist, will testify

5    that the police sergeant's promotional examinations used in

6    this case by all the defendants, including that of the Boston

7    Police Department, have been shown to be valid.  Dr. Outtz will

8    also testify that the plaintiffs have not demonstrated that

9    there's a selection procedure of equal validity that has less

10   adverse impact that the defendants could have used.

11        So there's nothing else that the defendants could have

12   done.  And additional evidence will show that there just is no

13   feasible alternative in Springfield's case to the HRD

14   examination.  Springfield is just coming out from under the

15   thumb of -- or I suppose supervision by a state control board,

16   financial control board.  There's not a lot of money in

17   Springfield to throw around for creating, designing tests.  The

18   evidence shows that one of these tests can cost anywhere from

19   $10,000 to over a million dollars.  It's just not feasible for

20   Springfield to spend that type of money for tests which really

21   is shown to have no less disparate impact on anyone.

22        The final alternative that the plaintiffs may point to

23   is Paragraph 10 of the Civil Service rules.  Now, that's a

24   paragraph under which there's one minority appointment for one

25   white appointment that's allowed.  And in order to qualify to

1    use that, there has to be a history and data supporting a

2    history of discrimination employment.  In Springfield, for

3    police sergeants, there is none.  So that that is not a viable

4    alternative either.

5            Consequently, at the end of the case I will ask the

6    Court to enter judgment in favor of the City of Springfield and

7    dismiss all of the plaintiffs' claims against the City of

8    Springfield and its mayor, Domenic Sarno.

9            Thank you, your Honor.

10           MS. ENGDAHL:  Good morning, your Honor.  Laurie

11   Engdahl.  I'm here on behalf of the City of Worcester and the

12   city manager, Michael O'Brien.

13           The Worcester plaintiff is a black police officer,

14   Spencer Tatum.  The plaintiff claims that the City of Worcester

15   utilizes an examination for the purposes of selecting from

16   among candidates for promotion to sergeant that has an adverse

17   impact on minorities, both Hispanics and blacks.  The plaintiff

18   has made it clear that he intends to establish liability

19   against the City of Worcester based on the promotion data of

20   other employers.  Now, a lot of people have been using the term

21   "across jurisdictions," but what that really means is using

22   data that's applicable to other employers to try and make a

23   prima facie case against another employer.

24           In so doing, the plaintiff is asking you to ignore

25   Worcester's own data and its record of promoting minorities for

1    the past five years to reach a conclusion that there should be

2    liability against Worcester.  Quite frankly, the -- and I say

3    not plaintiffs, but plaintiff Tatum argues this because

4    Worcester should be saddled with statewide statistics because

5    they have no other way to show adverse impact because, in fact,

6    over the last three exams there has been no adverse impact in

7    rates of promotion or pass/fail rates in Worcester.  And I'll

8    get to that in a little while.

9         Plaintiff claims that you need to aggregate the data

10   because the data sets are too small in the individual

11   municipalities, and they argue that this has been done before

12   so, therefore, it should be done here.  Again, I like to draw

13   your attention that the term "aggregation" really actually is a

14   misnomer because it suggests it's simply a look at a wider pool

15   of similarly situated candidates for promotion to sergeant.

16   And, in fact, what the plaintiffs mean when they talk about

17   aggregating -- using aggregated statistics, is they're asking

18   you to compare candidates who are not similarly situated,

19   compare a pool of candidates that aren't employed by the same

20   employer and don't compete with each other for promotions.

21        The evidence will show through defendants' experts

22   that you cannot create a pool of candidates for the purposes of

23   measuring adverse impact when that applicable pool has nothing

24   in common.  As is noted, they work for different employers and

25   they do not compete with each other for promotion.  Even if you

1    were to accept the plaintiffs' view that you can aggregate data

2    across different employers and make one employer responsible

3    for the hiring data of another employer, the overly simplistic

4    calculation that was done here by plaintiffs' experts really

5    distorts the evidence.  And plaintiffs -- defendants' experts,

6    Dr. Silva and Dr. Outtz, will show exactly how this distorts

7    the data.  You're weighting representation of minorities in

8    different jurisdictions the same even though they may need

9    different percentages competing within each jurisdiction, even

10   though the selection ratios may be much different within each

11   jurisdiction.  It just doesn't work.

12           Additionally, we've -- some of the other defendants

13   have talked about the Ricci case.  This is important because

14   you need to know that one of the reasons aggregating data

15   across jurisdictions is inappropriate is because the individual

16   municipal defendants don't have access to this data.  The only

17   information that is shared with the municipalities by HRD is a

18   list of their own candidates within house that pass the

19   examination.  We don't know what the examination questions are,

20   how they're developed, don't know how candidates are doing

21   statewide; we don't even know who failed within our own

22   jurisdiction.  We simply get a list of those candidates who

23   passed within our jurisdiction.

24           So this is important because basically we are in the

25   position of the City of New Haven in Ricci in that the only

1    information we have would be the information we have once the

2    results are certified to us.  And so the plaintiffs are asking

3    us to make the decision that once the results are certified, we

4    should throw them out.  And the Supreme Court has recently made

5    that clear, that that is a race-conscious decision and you need

6    to have some substantial basis in evidence for doing that.  In

7    Worcester, as in all the other cities, there simply is no

8    evidence on which to base a claim that we should have thrown

9    out these exams once they were certified to us.

10        Another reason you need to -- why aggregated data is

11    insufficient and simply not relevant here is because the

12    plaintiffs are asking you to ignore a very important aspect of

13    their prima facie case, and that is causation.  Plaintiffs must

14    point to a challenged employment practice, they must point to a

15    disparate impact, and they must show that it's our

16    challenged -- that the challenged employment practice caused

17    the disparate impact.  If you're looking at statewide

18    statistics, there's no causation.  The City of Worcester's use

19    of these exams at issue did not cause a statewide problem.  You

20    look at what happened within the City of Worcester.

21        I'm going to talk about Worcester's statistics in a

22    minute, but it can hardly be said that the city's use of the

23    examinations at issue caused a problem in Worcester.

24        The challenge here to Worcester is to its use of the

25    2006 examination certified by HRD and the more recent 2008

1    exam.  If you look at the pass/fail rates for minorities in

2    Worcester, on the 2006 exam you'll see that minorities passed

3    at the rate of 92 percent of the rate of whites.  Blacks in

4    particular, which is the protected category that Spencer Tatum

5    falls within, passed the examination at the rate of 94 percent.

6    So if you look at the pass/fail rates in Worcester, you have no

7    adverse impact.

8            Now, I was surprised to hear Attorney Lichten tell you

9    that adverse impact from the 2006 exam in Worcester is .79.  In

10   fact, if you look at the rates of promotion from the list

11   established in Worcester, the rates at which minorities were

12   promoted is 95 percent of the rate of whites.  What Attorney

13   Lichten is looking at is, more recently as HRD has provided

14   updated documentation of these lists, they have included an

15   additional black candidate that was not there.

16           In fact, in the 2006 exam, on the earlier production

17   from the Commonwealth, there were ten minority candidates.

18   Attorney Lichten knows this.  In subsequent updates, suddenly

19   there's an additional black candidate.  This is a white

20   candidate, Steven Donelan, Officer Steve Donelan.  I will bring

21   him in and he will say he's white and we can get rid of that

22   issue, but it is an issue that Attorney Lichten is aware of,

23   and he's very well aware that we had ten candidates from that

24   2006 list and that the ratio is much higher than 79.  I was

25   surprised to hear him give you that statistic.

1          Even if these numbers are too small to reach any

2     conclusions from the 2006 exam, your only alternative is not to

3     look at statewide statistics.  What the plaintiff will not tell

4     you -- what Attorney Lichten will not tell you is he has

5     information on what happened when Worcester used the 2004 exam.

6     That information was presented to them through discovery from

7     the human resources department.

8          If you were to look at the 2004 exam in Worcester, you

9     will see that minorities passed the exam at the rate of 126

10    percent of the rates of whites.  They did better.  If you were

11    to look at the promotions from that 2004 exam, you would see

12    that Worcester promoted minorities at the rate of 81 percent of

13    the rate of whites, above the rule of thumb set forth in the

14    EEOC's guidelines.  Plaintiff knows this, and Worcester is

15    still here.

16         Plaintiffs are challenging the new 2008 exam.  I would

17    like to point out that no minorities failed this exam in

18    Worcester, eight whites failed the exam.  We have made one

19    promotion off that list.  Obviously, one promotion, not enough

20    to make a statistical case, but Attorney Lichten has before him

21    our experience of what happened with the 2004 and 2006 cases.

22    If you're going to aggregate data, I'd suggest that you can

23    aggregate the data that you have before you within the City of

24    Worcester.  You can look at how many promotions were made off

25    the 2004, 2006, 2008 exam, and the evidence will show that

1    Worcester promoted whites, Hispanics and blacks at exactly the

2    same rate.

3         Attorney Lichten will try to tell you that for the

4    2008 exam you should look at hypothetically what would happen

5    if we were to make further use of this exam.  And I can tell

6    you that the EEOC guidelines suggest no such guessing or

7    hypotheticals.  I would add that if Worcester were to promote

8    14 candidates off the 2008 list as it did off the 2004, we

9    would actually reach two minorities, as we did in 2004 -- a

10   Hispanic candidate and Spencer Tatum, the black plaintiff here,

11   and therefore, there wouldn't be any adverse impact.

12        I'm not sure when Attorney Lichten has represented to

13   you that if we were to further use the exam we wouldn't be able

14   to reach minorities except that I think he's referring to the

15   fact that the Hispanic candidate is from Spain.  But I

16   understand that they are making the allegation that Spain

17   counts with respect to the Lowell plaintiff.  So I would

18   suggest that you need to include that as well.

19        The sole reason, the only reason that the plaintiff

20   Tatum is asking you to look at promotion rates and what happens

21   in other employing units is because its statistics don't

22   support adverse impact in Worcester, and it's nothing more than

23   that.  Had this case been brought against the City of Worcester

24   by itself, it never would have gotten this far.  The plaintiff,

25   however, no matter how many defendants he's suing, whether it's

1    the Commonwealth or multiple defendants, has the same duty of

2    due diligence before bringing suit against a party regardless

3    of how many other parties are joined together.

4         I would also like to add there are numerous issues

5    that may be at play here with regard to Worcester's success in

6    using this exam.  We just don't know.  Worcester has a

7    residency preference in its initial rates of hire.  One of the

8    reasons why it's not appropriate to aggregate across

9    jurisdictions is the Worcester candidates are unique to the

10   city of Worcester.  We draw from candidates within the city of

11   Worcester.  Presumably, they've all gone to the same Worcester

12   schools, grown up in the same neighborhoods, and perhaps this

13   accounts for why Worcester has done so well.  It's simply not

14   appropriate to compare Worcester with other candidates who

15   aren't even applicable for promotion within the city of

16   Worcester.

17        I would like to tell you also what Worcester has done

18   since 2004 when Chief Gary Gemme became chief of the

19   department.  He instituted a new minority recruitment program

20   to recruit more minorities at the entry level, and we've been

21   very successful in doing this.  We believe that by increasing

22   the pool of minorities at the entry level and improving the

23   quality of candidates, that we'll see the rates of promotion

24   continue to rise and we'll continue to have success in our

25   promotion rates as we have had in the past five or six years.

1          Worcester would also like to suggest to you that we

2     use the exam out of business necessity, which has been alluded

3     to by my colleagues here.  The purpose of General Laws Chapter

4     31 is to assure fairness in appointments and promotions, to

5     eliminate political and discriminatory decision-making so that

6     all candidates are assessed on the basis of their own merit.

7          Worcester looks to HRD to develop and administer these

8     examinations out of business necessity.  HRD is statutorily

9     charged with this mission; they exist for this purpose.

10    Worcester is entitled to rely on their expertise under the law,

11    which has been developed and honed over numerous years.

12         Worcester is in an odd position.  We've had success

13    utilizing these exams.  Were Worcester to begin engaging in its

14    own test development and administration, there's simply no

15    guarantee that it can construct an exam that would do even

16    better and there's significant risk that we'll end up doing

17    worse, as you will hear from the evidence.  In fact, the

18    evidence will show that other municipalities, such as Boston,

19    have at great cost attempted to develop their own exams and

20    these examination processes have not had the effect of reducing

21    adverse impact.

22         In summary, Worcester submits that plaintiff Tatum has

23    brought this claim in error, without a basis for doing so, and

24    continues to litigate against Worcester despite the knowledge

25    that there is no adverse impact in Worcester.  They

1    continue -- Worcester has worked hard in the last few years to

2    improve its minority recruiting, to increase the pool of

3    minorities available for promotion, and we think that this has

4    had a positive effect in our promotion rates of minorities in

5    the past few years.  Thank you.

6         MR. LEAHEY:  Good morning, your Honor.  Brian Leahey

7    on behalf of the City of Lowell.  I'll try not to repeat a lot

8    of the same arguments and just echo what co-counsel have said

9    regarding the test.

10        But by way of background, this is Lowell's first time

11   we've been sued on a race-based challenge regarding promotional

12   exams, that Lowell has used and relied on HRD to examine -- to

13   administer the examination, to score it and to create it.  That

14   we've relied on that for years.  That at some point -- and now

15   Commissioner Davis, who was then superintendent, will testify

16   that in the fall of 1999 there was a discussion in Lowell where

17   minority officers had complained that there were not enough

18   minority officers in promotional positions.  This came as a

19   result that one minority officer, Angel Otero, who had scored

20   high enough on the list was going to be promoted off the 1998

21   list; however, due to a pending disciplinary action was

22   bypassed.  He subsequently appealed and he was made a sergeant,

23   but he was going to be promoted in that 1998 exam.

24        There was then a discussion as to whether or not

25   then-Chief Davis would try to petition HRD for a par 10, you

1    know, special minority test.  The minority officers were

2    adamantly opposed to that procedure; they wanted to keep with

3    the procedure that was in place, which was the HRD examination.

4    And since that time Lowell has continued to use that same

5    examination, period.

6          The only issue before you today with regards to Lowell

7    is the 2006 examination.  And based on what counsel have said,

8    the city would join in that disaggregate data is the way to

9    analyze Lowell.  Based on that, there is no adverse impact on

10   the examination.  Further, that because HRD has to comply with

11   the basic merit principles that are required by law, and based

12   on the testimony you'll hear that the test was valid, that it

13   was a business necessity and was also job related.

14         With respect to -- there was also no reasonable

15   alternative.  When they talk of, well, they could do an

16   assessment center because HRD allows you to do an assessment

17   center.  Yes, HRD does allow you to do an assessment center;

18   however, even in the documents they'll submit, they give a

19   cautionary tale on one of them saying, "You may want to talk to

20   your union because this could be an issue for bargaining."

21         In Massachusetts under General Law Chapter 150E if you

22   change the hiring or promotion of an employee, that's subject

23   to bargaining.  In Lowell, we have collective bargaining

24   agreements.  Lowell has used the assessment center for captain

25   and deputy superintendent in the past; however, it was always

1    done at the bargaining table.  Always done at the bargaining

2    table, never done unilaterally.  No municipality here could

3    unilaterally go into an assessment center because it would

4    violate 150E and the collective bargaining agreements.

5         Also, an assessment center would have to meet -- if

6    someone wanted to appeal based on the subjectivity that's

7    inherent in any assessment center would have to prove to the

8    Civil Service Commission that it met the basic merit

9    principles.  So that's also something that's in here.  It's not

10   something that we could just do it and it's real simple.  You

11   have to comply with state law, you have to comply with your

12   collective bargaining agreement, and you have to get the

13   blessing of Civil Service because they could throw it out.

14        But before you get to that, also you have to factor

15   into why did the person score the way they did.  The city will

16   introduce evidence to -- the sole plaintiff in this case

17   against Lowell is Robert Alvarez -- reasons as to why he did

18   poorly on the test.  You'll hear -- he'll admit that he's taken

19   tests in the past.  That in 1998 he got a 85; in 2000, he

20   didn't study; 2003, he didn't study.  And you'll hear him

21   testify to that because he knew he wasn't going to be promoted

22   based on his disciplinary record.

23        But again, before you even get to that, the

24   fundamental question you have to ask or determine is whether or

25   not Robert Alvarez is Hispanic as defined by HRD.  That is the

1    question before you, that the seventh amended complaint pled by

2    the plaintiffs does not challenge HRD's definition of Hispanic,

3    that HRD definition is a racial classification and it's used by

4    government entities.  Whenever a government entity uses a

5    racial classification, an employment has to be

6    strictly -- "survives strict scrutiny, has to be tailored

7    measures that further compelling governmental interests."

8           In this case it goes back to -- as Attorney Lichten

9    said, it goes back to the Castro-Beecher consent decrees and

10   the litigation in the 1970s.  Interestingly, at the time the

11   judge who heard the case, the bulk of the case, was Judge

12   Wyzanski who, on November 17, 1971, in Footnote 2 explained

13   what Spanish surnamed persons were.  At that point it was a

14   group of plaintiffs of blacks and Spanish surnames.

15          And he wrote, "'Spanish surnames persons' is a term

16   which would apply to a Native American with a Spanish surname

17   whose ancestors had for generations lived in the United States

18   to a person with a Spanish surname born in Madrid and educated

19   at its famous university and to many others who obviously are

20   not in the same class as any of the named plaintiffs.  What the

21   pleaders presumably meant were persons who were born or whose

22   parents were born in Puerto Rico, Cuba or other Caribbean

23   countries whose primary language is Spanish and who have not

24   had the education and training comparable to that received by

25   most mainstream white Americans."

1          As a result of the Castro lawsuits HRD came up with a

2     definition for "Hispanic":  That you have to be from the

3     western hemisphere, that you either speak Spanish or came or

4     grew up in a family whose -- grew up in a household whose

5     primary language was Spanish.  Those were the requirements of

6     what you have to meet.

7          Mr. Alvarez cannot meet those terms.  If he's allowed

8     to introduce admissible evidence, which the city doesn't think

9     he can, he may argue either Philippines or Spain.  Either case

10    is out.  He readily admits he didn't grow up in a home that

11    speaks Spanish, he speaks no Spanish whatsoever, and that he is

12    bound by the definition of -- HRD's definition of "Hispanic"

13    and he cannot meet that definition.

14          If the plaintiffs are trying to argue that somehow the

15    definition should be expanded, they would need to provide

16    compelling evidence to you that there was discrimination either

17    against Spaniards in this state or Filipinos in this state.

18    That's their burden of what they would have to show to you.

19    Also, if they try to do an expanded definition outside of what

20    HRD does, the city would counter that based on the laws as it

21    sees it, that Portuguese should count in any expanded

22    definition based on regulations promulgated by the Department

23    of Transportation, case law regarding racial classifications

24    from the Second and Ninth Circuit, as well as a decision in

25    this court in 1981 on a criminal case where the federal

1   government argued that in a jury selection case Portuguese

2   would count as Hispanic, and that the judge in that case,

3   again, took the answer that the plaintiffs -- excuse me -- the

4   defendants in that case had argued and said that -- the

5   definition that they advocated, which was "or some other

6   Spanish," included Portuguese, the government argued that it

7   should, and based on the definition of "Hispanic," it has roots

8   in Spain and Portugal.  If you include Spain and Portugal in

9   the equation, Lowell numbers automatically go up that Lowell

10  has had numerous Portuguese sergeants and superior officers

11  over the last 20 years.

12         Based on all of the evidence that you will hear, at

13  the close of the case the city will ask for a judgment in its

14  favor both on that Mr. Alvarez has no standing and was not

15  harmed because he is not Hispanic as defined by HRD, and also

16  that the test did not have adverse impact, and it was also a

17  valid test and there was no reasonable alternative.

18         Thank you, your Honor.

19         THE COURT:  All right.

20         MR. McDERMOTT:  Good morning, your Honor.  My name is

21  Kevin McDermott.  I represent the MBTA defendants, and they are

22  the Massachusetts Bay Transportation Authority, Dan Grabauskas

23  as general manager of the MBTA, and the MBTA Board of

24  Directors.  And for the convenience of the Court, I will refer

25  to them in this opening and throughout trial as the "MBTA."

1          The evidence will demonstrate, your Honor, that as of

2    May 2010 the MBTA had ten minority and 24 non-minority

3    sergeants for a 29.4 percent minority representation within the

4    rank of sergeant.  Further, the evidence will show that there

5    was no adverse impact for the promotions in the 2003 HRD exam

6    that occurred, and the promotions from that exam occurred

7    between March 2004 and March 2006 when the MBTA had a

8    significant number of promotions to sergeant.

9          Moreover, the evidence will show that aggregating the

10   promotional data for the MBTA from the 2003, 2005, 2007 HRD

11   exams that it utilized, the data proves that there was no

12   adverse impact in the promotions to sergeant within the MBTA.

13   The years 2006 and 2008 are not at issue for the MBTA, your

14   Honor, because it only utilizes the HRD testing every two

15   years, in odd-numbered years.  Such evidence will come from,

16   among other sources, your Honor, the plaintiffs' own expert,

17   Joel Wiesen.  If the MBTA were the only defendant, there would

18   be no trial because the plaintiffs cannot prove a prima facie

19   case against the MBTA.

20          I am now going to spend just a moment, your Honor, to

21   speak broadly about my client and about this cause of action

22   against the MBTA.  First, the term "minority" in this case

23   includes only African-American and Hispanic individuals, not

24   Asian or other minorities.  And I know that because the MBTA

25   has done a remarkable job in bringing true diversity throughout

1    its ranks.  The MBTA Transit Police Department employs 203

2    sworn police personnel among all ranks, and they are

3    responsible for policing the geographical area of 175 cities

4    and towns.  They are dedicated, professional and highly trained

5    police officers, and my clients are thankful for the manner in

6    which they carry out their duty.  Included among their ranks

7    are the two plaintiffs who are employed by the MBTA Transit

8    Police Department:  Royline Lamb and Lynn Davis.  They are

9    hard-working, dedicated and dutiful police officers and,

10   likewise, we appreciate their service to the public.

11          Secondly, your Honor, the issue of adverse impact when

12   testing for police Civil Service promotions has been litigated

13   for over half a century.  There's a considerable body of case

14   law on it, and the experts in this case gave depositions and

15   have testified that, speaking very broadly, adverse impact

16   still exists to some extent in all types of examinations

17   everywhere in the country.  We should all acknowledge that when

18   discussing adverse impact and the testing, there are social

19   issues that are complex and profound and which are beyond the

20   evidence that will be given in this case.

21          Again, broadly speaking, the ideal of Title VII is to

22   assure a fair opportunity for all when competing for promotion,

23   and the ideal of the Civil Service law in Massachusetts is to

24   assure that promotions are merit-based.  The MBTA assuredly

25   embraces both of those ideas when considering promotional

1    processes within the MBTA Transit Police Department.

2          Specific to this case, your Honor, the plaintiffs have

3    filed a trial brief which artfully lays out the standards of

4    analysis of claims under Title VII.  Mr. Lichten touched on

5    those this morning.  They point out that the factors for the

6    Court to consider when addressing disparate impact are the

7    percentages of African-American and Hispanic minorities versus

8    the percentages for everyone else in different aspects of the

9    statewide HRD testing:  pass/fail rates, average score rates

10   and promotional rates.

11         One problem with the plaintiffs' trial brief and this

12   analysis, your Honor, is that it does not apply to the MBTA.

13   This is so because the MBTA stands before the Court as a

14   defendant who, pursuant to the law in Massachusetts, relied

15   upon HRD examinations to provide candidates for promotion to

16   sergeant, and made such promotions without adverse impact

17   within the last six years when a majority of the promotions to

18   sergeants took place.

19         Also, concerning the MBTA's use of the HRD exams for

20   the years 2003, 2005 and 2007, the MBTA had no knowledge of the

21   statewide pass/fail rates of the minorities, or statewide

22   average scores of minorities, or even the promotional rates of

23   minorities among other jurisdictions that use HRD exams.  The

24   knowledge that the MBTA has and did have is that there was no

25   adverse impact in its own promotion to sergeant since at least

1    2003.  Accordingly, there is no reason -- or was no reason for

2    the MBTA to believe in 2005 or thereafter that adverse impact

3    was inherent in the HRD testing for sergeant position.  So

4    there is no reason for the MBTA to use alternative

5    examinations.  We used HRD testing to qualify candidates for

6    consideration for the promotion to sergeant.

7            And this is important to note, your Honor, because the

8    plaintiffs will try to impute knowledge of adverse impact from

9    the use of HRD exams to the defendants going back for 20 years.

10   They've alleged this in the complaint.  However, in regard to

11   the MBTA, the only knowledge that it had was that the HRD

12   process had no adverse impact on the MBTA's own promotions to

13   sergeant over the past six years.  To try to impute knowledge

14   of alleged adverse impact in statewide pass/fail rates for

15   minorities or alleged adverse impact in statewide average

16   scores for minorities, or even alleged adverse impact for the

17   promotional rates of minorities among all the jurisdictions

18   that use HRD exams, to the MBTA is unnecessary, it's wrong,

19   it's irrelevant and it's highly prejudicial to the MBTA.

20           And therefore, your Honor, for those reasons the MBTA

21   will have a standing objection to any evidence concerning the

22   creation of the HRD examinations, the evidence concerning the

23   statewide pass/fail rates for minorities, or the statewide

24   average scores of minorities, or even promotional rates of

25   minorities among other jurisdictions within -- that took the

1    HRD exams.  And, your Honor, you did touch upon this

2    appropriately this morning, and I'll be looking for guidance,

3    as the other defendants will be, on how to handle that

4    situation.

5         I note that the defendants have filed a Rule 12(b)(6)

6    motion in this case, your Honor, and we will argue that motion

7    at the appropriate time, but I mention that motion because the

8    arguments made in support of it cogently explain the untenable

9    position the MBTA is in trying to defend an HRD testing regime

10   that it did not create or administer and which, most notably,

11   did not result in adverse impact on the promotion of sergeant

12   within the MBTA.

13        Your Honor, if the MBTA somehow is not dismissed at

14   the end of plaintiffs' case in chief, it will call Dolores

15   Ford-Murphy, a retired deputy chief of the MBTA Transit Police

16   Department.  And she was in charge of the promotional processes

17   at all relevant times.  She will explain that the process for

18   promotion to sergeant since 2003 is that police officers

19   competed on the HRD testing exams every two years, in the

20   odd-number years; when sergeant promotions became available the

21   MBTA would request a certification list using the 2 N + 1

22   formula.

23        And contrary to the plaintiffs' assertion, the MBTA

24   did not hire in rank order.  Instead, with the permission of

25   HRD, it utilized scoring from structured oral boards and

1    scoring of several different skill sets by supervising

2    lieutenants of the candidates.  In essence, the candidates on a

3    certification list stood on equal footing, and the subsequent

4    combined scores of the oral board and the scores of the

5    supervisors determined who was selected.

6         Delores Ford-Murphy will testify that since at least

7    2003 there has been no adverse impact and there is diversity

8    within the sergeant rank.  She will also testify that the

9    majority of the currently working minority sergeants were

10   promoted from the 2003 HRD test, and she will testify that

11   utilizing HRD testing to qualify candidates for consideration

12   for promotion to sergeant is efficient and a business

13   necessity, especially now, your Honor, post Ricci.

14        In summary, the MBTA should not be on trial.  There's

15   been no adverse impact for the promotion to sergeant within the

16   last six years.  The HRD examination process is valid and a

17   business necessity as far as can be known to the MBTA.  And my

18   clients have done nothing wrong.  In fact, they have worked

19   diligently and successfully and within the confines of the law

20   including, as noted by Mr. Lichten, the use of a HRD par 10

21   concerning the establishment of three special certifications

22   list which included minority and gender in 1996, and that was

23   in the Brockett case.  That's old history, your Honor.  The

24   MBTA now has used them -- HRD testing since at least 2003

25   without adverse impact.

1          And, your Honor, I must say on behalf of my clients,

2     they should be commended, not accused, for the diversity

3     they've brought to the force.  Thank you.

4          MR. McQUILLAN:  Good morning, your Honor.  Peter J.

5     McQuillan for the City of Methuen.  I'll be as brief as

6     hopefully the case against Methuen should be, your Honor,

7     because it is the position of Methuen that it is, in fact, a

8     non-factor in this case.

9          The only sergeant's promotional exam that's pertinent

10    to the City of Methuen is the 2006 sergeant's promotional exam,

11    where in the city of Methuen there were 23 test-takers, three

12    minorities and only one appointment being made from that test.

13    The evidence will clearly show that contrary to the assertions

14    of Methuen's plaintiffs, both officers Abel Cano and Charles

15    deJesus, that, number one, Methuen was justified in using this

16    exam developed and administered by HRD.  They neither knew or

17    had reason to know that the exam in question had any

18    significant adverse impact upon any minority test-takers or

19    that the same was not a valid predictor of the performance of a

20    police sergeant.

21         The evidence of all the experts to be heard in this

22    case will clearly show that Methuen is, for all intents and

23    purposes -- whether it be effective passing rates, promotional

24    rates or average test scores, because of the figures they

25    cannot show a statistically significant case on all levels.

1    There is no mathematical power to show any adverse impact on

2    any level committed by Methuen.

3         You're going to hear about application of several

4    standards of analysis:  the KAI factor, the Simpson's paradox,

5    Fisher's Exact Test value.  No matter what criteria is applied,

6    your Honor, again, Methuen is not a factor.  There is no

7    statistical significance in any of the numbers regarding the

8    singular photograph of Methuen as a result of the

9    administration -- or the taking and the document test of HRD in

10   2006.  Methuen cannot be found responsible any unlawful

11   disparate impact either under Title VI or Chapter 151B and,

12   again, at the end of the plaintiffs' case we will be looking

13   for a directed verdict.  Thank you.

14        MR. D'AGOSTINO:  Good morning, your Honor.  Richard

15   D'Agostino for the City of Lawrence and its mayor, formerly

16   Michael J. Sullivan, presently William Lantigua.  Your Honor,

17   I'm also going to be brief and not attempt to reiterate much of

18   what has been said that obviously affects all defendants and

19   our position.

20        The number of promotions in Lawrence are too small to

21   prove a statistically significant disparate impact.  Pursuant

22   to Chapter 31, Lawrence relies upon the Mass. Human Resource

23   Division to create, design and administer promotional exams for

24   the position of sergeant.  The evidence will show that no less

25   discriminatory alternative is available.  In fact, such an

1    alternative may lead to disparate treatment of those taking the

2    exam, and that is something that certainly is not an acceptable

3    alternative to disparate impact, as the Ricci case shows.  The

4    exam, as provided by HRD, is job-related and consistent with

5    business necessity even if it were proven to create an adverse

6    impact.

7              Lawrence's plaintiff police officers will be unable to

8    provide evidence that their inability to acquire a higher grade

9    on the sergeant's promotional exam is a result of their

10   minority status.  Officer Richard Brooks admitted in deposition

11   testimony that he didn't study for some of the exams in 2000

12   and 2004.  Officer Pedro Lopez cited a lack of time or

13   opportunity to properly prepare for these exams.  The Lawrence

14   plaintiffs will also be at a loss to provide evidence of any

15   discriminatory practices by their supervisors or their chief,

16   John Romero, who, himself, is a member of the minority class.

17   The evidence will further show the Court that the 2006 and 2008

18   HRD exams are valid and job-related.

19             Your Honor, the financial woes of the City of Lawrence

20   have been well documented and well publicized throughout the

21   last several months, starting right in January of this year.

22   The bankrupt City of Lawrence cannot afford to experiment with

23   another method of testing that proves more discriminatory and

24   less valid than the current Human Resources Division exam.

25             We will also be moving at the end of evidence, your

```
 1   Honor, for dismissal.  Thank you very much.
 2          THE COURT:  Okay.  Thank you all.  We're just about at
 3   eleven o'clock.  Why don't we take a quick morning recess and
 4   then we'll begin with the evidence.
 5          THE CLERK:  All rise.  The Court will take the morning
 6   recess.
 7          (The Court exits the courtroom, and there is a recess
 8   in the proceedings at 10:52 a.m.)
 9          (After recess:)
10          THE CLERK:  All rise.
11          (The Court enters the courtroom at 11:15 a.m.)
12          THE CLERK:  Please be seated.
13          MR. LICHTEN:  Your Honor, just a very quick procedural
14   thing.  Our second witness was going to be Commissioner Davis.
15   He has an important engagement apparently at twelve, and both
16   counsel and I think it unlikely we could fit him in.  But we
17   think we have enough to take us till one, but if it's till
18   12:30, we don't want to be --
19          THE COURT:  I see.  If you excuse him and --
20          MR. LICHTEN:  Yeah.
21          THE COURT:  That's fine.  Don't worry about it.
22          MR. LICHTEN:  The plaintiffs call Thomas Nolan.
23                  THOMAS NOLAN, duly sworn
24          THE CLERK:  Please be seated.  State your name, spell
25   your last name for the record, keep your voice up and speak
```

```
1    into the mic so everyone can hear you.
2              THE WITNESS:  Thomas Nolan, N-O-L-A-N.
3                         DIRECT EXAMINATION
4    BY MR. LICHTEN:
5    Q.   Mr. Nolan, what do you do for a living?
6    A.   I'm an associate professor of criminal justice at Boston
7    University.
8    Q.   And prior to that, what did you do?
9    A.   I was a City of Boston Police Officer.
10   Q.   And for how long were you a City of Boston Police Officer?
11   A.   For 27 years.
12   Q.   Okay.  Can you tell me when you -- where you first went to
13   college?
14   A.   I went to -- I graduated from the University of
15   Massachusetts in 1977.
16   Q.   And when did you begin the police force?
17   A.   In January of 1978.
18   Q.   Okay.  And when you began as a police officer, were you
19   that, a police officer?
20   A.   Yes, I was.
21   Q.   Okay.  And where were you assigned?
22   A.   My first assignment was to South Boston.  South Boston
23   District police station.
24   Q.   And how long did you remain in that assignment?
25   A.   Approximately a year.
```

1    Q.    Where did you go next?

2    A.    I was assigned to the mobile operations patrol, the

3    motorcycle unit.

4    Q.    And what does that unit do?

5    A.    Crowd control, tactical operations, SWAT kind of stuff,

6    mainly traffic enforcement.

7    Q.    What was your next position?

8    A.    I was assigned to the District 1 downtown station in

9    Government Center for eight years.

10   Q.    Okay.  How large a district is that in Boston?

11   A.    At the time I believe there were approximately 160 police

12   officers assigned there.

13   Q.    And is that considered a large district?

14   A.    It's one of the -- it's one of the larger districts.  It

15   covers the downtown area:  Beacon Hill, Chinatown, Charlestown

16   at the time, and also East Boston.

17   Q.    And what were your duties as a patrol officer in District

18   1?

19   A.    Mainly in uniform patrol, most often in a two-officer car,

20   in uniform, responding to 911 calls.

21   Q.    What was your next assignment?

22   A.    From there I was promoted to sergeant in 1988, and

23   assigned to Area B, the district that covers Roxbury, Mattapan

24   and Dorchester.

25   Q.    Okay.  And do you recall how many times before you were

1    promoted to sergeant you took the sergeant's exam?

2    A.    I took it twice.

3    Q.    Okay.  In what years did you take it?

4    A.    I took it in 1985 and 1987.

5    Q.    Okay.  In 1987, was that a different kind of exam from the

6    one you'd taken in '85?

7    A.    The 1987 exam was a written-only exam.

8    Q.    Okay.  Do you recall taking an exam where there was also

9    an assessment center of video exercises?

10    A.    Yes, I do.

11    Q.    And when was that?

12    A.    There were several.  I've probably taken eight of these

13    exams.

14    Q.    Okay.  Just going back to the 1980s, do you recall if --

15    at some point in time an assessment center being thrown out by

16    the department?

17    A.    Yes, I do.

18    Q.    Can you recall what happened?

19    A.    I believe the scores were recalculated and reordered as a

20    result of the assessment center portion of the exam being

21    thrown out by the court.

22    Q.    And so what was counted?

23    A.    The training and experience portion, which was 20 percent

24    of the grade, and 80 percent of the grade was the written

25    responses to these multiple-choice questions.

1   Q.   Okay.  So you say that, all told, you've taken about how
2   many promotional exams?
3   A.   About eight.
4   Q.   Okay.  And other than the one involving assessment
5   centers, what did they consist of?
6   A.   There were different versions of role-play exercises that
7   were audio-recorded and video-recorded.
8   Q.   I said other than the assessment center.
9   A.   Other than the assessment center?  Just the written form
10  of the -- written examination.
11  Q.   Okay.  And did you -- how many did you take for sergeant?
12  A.   Two.
13  Q.   And how many did you take for lieutenant?
14  A.   Two.
15  Q.   Okay.  When you became a sergeant, what was your
16  assignment?
17  A.   I was assigned to Area B as a patrol supervisor at
18  Roxbury, Mattapan, Dorchester.
19  Q.   And how long did you continue in that assignment?
20  A.   Approximately two years.
21  Q.   Okay.  What did you do next?
22  A.   I volunteered for and was assigned at the time to the
23  newly formed Youth Violence Strike Force.
24  Q.   And what did that do?
25  A.   It was basically a gang unit.

1    Q.    And what was your job as the supervisor in that unit?

2    A.    I was a plainclothes supervisor.  We primarily focused our

3    patrol function in Roxbury, Mattapan, Dorchester.  And I would

4    respond, as needed, to situations involving my subordinate

5    officers.

6    Q.    Okay.  When you were a patrol sergeant in Area B, I

7    neglected to ask you what you did at that point in time.

8    A.    I was in uniform.  I rode alone.  And I was responsible

9    for supervising, at various times 20, sometimes up to 40

10   subordinate police officers.

11   Q.    Okay.  And were you on the road, were you in the station?

12   How did that work?

13   A.    I was on the road.

14   Q.    Okay.  And when would you have to respond to an emergency

15   situation?

16   A.    I would respond as needed to routine calls to ensure that

17   the officers under my supervision were doing what was expected

18   and required of them, and I was also required in my role as the

19   patrol supervisor to respond to all of the more serious events

20   that would occur in the district.

21   Q.    And when you say "more serious events," what do you mean?

22   A.    Incidents of aggravated assault; certainly any and all

23   homicides that occurred; shootings; sexual assaults; community

24   disorders which are racially-motivated incidents; incidents

25   where police officers discharged their firearm; incidents where

1    police officers were injured; armed robberies; most felonies.

2    Q.    And what did you do in the gang unit?

3    A.    We collected intelligence for the large part.  We would

4    respond to any 911 calls that seemed to indicate some kind of

5    gang activity.  But basically, with routine patrol we would

6    stop individuals who we believed to be members of gangs and

7    collect intelligence on these individuals and the groups that

8    they belonged to or we thought they belonged to.

9    Q.    What was your next position after you were in the gang

10   unit?

11   A.    I was assigned to the Anti-Corruption Division of the

12   Office of Internal Investigations.

13   Q.    And for how many years were you assigned to that job?

14   A.    About four and a half years.

15   Q.    And what were your duties in that job?  And in that job

16   were you a sergeant or something else?

17   A.    I was designated a sergeant detective in that position.

18   Q.    Okay.  And how does one go from being a sergeant to

19   sergeant detective in the Boston Police Department?

20   A.    It's at the pleasure of the police commissioner,

21   basically.

22   Q.    Okay.  So he could just appoint you to the position of

23   sergeant detective?

24   A.    That's correct.

25   Q.    There was no examination process?

1    A.    No examination.

2    Q.    Okay.  And did that remain the same until you left to go

3    to Boston University?

4    A.    No.  I was promoted from that --

5    Q.    No.  I'm sorry.  I meant to say, the process for being

6    appointed to a superior detective, did that remain the same

7    while you were at the department?

8    A.    Yes, it did.

9    Q.    Okay.  Eventually did you become a police lieutenant?

10   A.    Yes, I did.

11   Q.    And when was that?

12   A.    In February of 1995.

13   Q.    Okay.  And when you became a police lieutenant, where were

14   you assigned?

15   A.    To District 4 in the South End -- Back Bay, Fenway,

16   Kenmore -- area of the city.

17   Q.    And what were your jobs as a police lieutenant?

18   A.    Initially, I was the shift commander for the overnight

19   shift, the midnight shift.  I was responsible for approximately

20   35 police officers and three patrol supervisor sergeants under

21   my management.

22   Q.    Okay.  And would you stay mainly in the station or go out

23   of the station?

24   A.    I would go out periodically, but largely I remained in the

25   station.

1    Q.   Okay.  So can you compare during that period of time the

2    difference between what a police lieutenant does in the city of

3    Boston and a police sergeant does in the city of Boston?

4    A.   The role of a sergeant is more akin to a supervisor,

5    someone who has day-to-day oversight and supervisory

6    responsibility for patrol officers that are assigned to his or

7    her squad.  The department is organized along platoons and

8    squads, and each squad may have six police officers and one

9    sergeant.  There are three squads with various numbers of

10   police officers who are organized under the command or the

11   management of a police lieutenant.

12        So the lieutenant has overall managerial responsibility

13   for the sergeants, the detectives and the sergeant detectives

14   and the police officers and detectives under his or her

15   command, whereas the sergeant has more direct-line supervisory

16   responsibilities, more direct contact and direct oversight of

17   the subordinate police officers that he or she supervises.

18   Q.   Okay.  And then let me ask you with respect to the

19   obligation to respond to an emergency that is called in, who

20   has that responsibility, a patrol sergeant or a lieutenant or

21   both?  Can you explain that?

22   A.   Primarily, a patrol supervisor would be the one charged

23   with responding to serious events in the field, on the street.

24   Q.   And how often did that happen when you were a patrol

25   sergeant?

1   A.   Often.  It would be something that would -- you could

2   expect would occur several times over the course of any given

3   shift.

4   Q.   Okay.  And what were the abilities that you needed to

5   handle those situations?

6   A.   Certainly good judgment, experience, wisdom, strong

7   communication skills, the ability to take control of a

8   situation in the street, to be decisive, to display discernment

9   and to be able to take over a situation and to make very quick

10   decisions.

11   Q.   Now, you recall taking the police sergeant's exam; is that

12   correct?

13   A.   Yes.

14   Q.   And the police lieutenant's exam?

15   A.   Yes.

16   Q.   Do you recall any of the questions that you took eliciting

17   those abilities from you?

18         MS. HARRIS:  Objection.

19         THE COURT:  Sustained.

20   BY MR. LICHTEN:

21   Q.   Let me move on.  How long did you remain as a police

22   lieutenant?

23   A.   Almost ten years.

24   Q.   And at some point in time did you leave the police

25   department?

A.    Yes, I did.

Q.    And about how many years, all told, were you in the police department?

A.    About 27.

Q.    And why did you leave the police department?

A.    I accepted a faculty position at Boston University.

Q.    And where was the faculty -- what was the position that you accepted?

A.    Associate professor in criminal justice.

Q.    And have you kept that position to the present day?

A.    Yes, I have.

Q.    Okay.  And do you teach criminal justice courses?

A.    Yes, I do.

Q.    Involving police departments?

A.    I have police officers who are students in my classes, yes.

Q.    Okay.  At some point in time did you become involved in attempting to help minority police officers in Boston study for a police sergeant's examination?

A.    Yes, I did.

Q.    Can you tell me how that came about, please.

A.    In the spring of 2008 I was approached by representatives of the Massachusetts Association of Minority Law Enforcement Officers, and asked if I would interested in setting up a course to help members of their organization study for the 2008

1    promotional exam.

2    Q.    And did you do that?

3    A.    Yes, I did.

4    Q.    And can you tell the Court what you did specifically?

5    A.    I designed a study course that was modeled on, say, an

6    undergraduate college course.  I designed a syllabus based on

7    the reading list that the human resources department at the

8    state had provided, and I had a registration period that

9    members -- or actually anybody who was interested could sign up

10   for this course.  And I held classes for approximately 26

11   weeks, on Saturday afternoons at the MAMLEO headquarters in

12   Dorchester.  The classes ran two to three hours a week.  And we

13   basically broke the books down, chapter by chapter, and went

14   through them with an eye toward teaching the student police

15   officers means of identifying pertinent information from the

16   books that would be subject to questions on the written

17   examination.

18   Q.    Let me ask you a question.  First, you used the term

19   "MAMLEO," and the Court may not know, is that the Massachusetts

20   Association of Minority Law Enforcement Officers?

21   A.    That's correct.

22   Q.    And their headquarters is where?

23   A.    It's on Columbia Road in Dorchester.

24   Q.    And about how many students participated in your course?

25   A.    Approximately 80 students signed up initially, but on any

1    given week approximately 50 students, police officers, would

2    show up.

3    Q.   And how rigorous was the course that you designed?

4         MS. HARRIS:  Objection.

5         THE COURT:  Sustained to the form of the question.

6    BY MR. LICHTEN:

7    Q.   All right.  Can you tell us what you required of your

8    students?

9    A.   They had weekly reading assignments, and we would come

10   together and go through the chapters and the different books

11   that they were required to study for the exam.  I would help

12   them identify factoids, if you consider it that way, salient

13   points that would lend themselves to being put to a question on

14   the exam.  It was a fairly rigorous process.

15   Q.   Okay.  And did the students stay with it for the whole

16   time?

17        MS. HARRIS:  Objection.  We don't even know who these

18   people are.  This is not a class action.

19        THE COURT:  Well, go ahead.  You may answer that.

20        THE WITNESS:  Approximately 50 students stayed with it

21   from April through October.

22   BY MR. LICHTEN:

23   Q.   Okay.  Now, how did you know what text to teach?

24   A.   The human resources department at the state who

25   administered the test provided a reading list.

1    Q.    And that was the reading list for that examination?

2    A.    That's correct.

3    Q.    And do you recall what was on the reading list?

4    A.    Yes.  For Boston specific, the rules and procedures of the

5    Boston Police Department, there were some -- there was a law

6    book; there were, I think, five or more hardcover textbooks.

7    One of them was a book on community policing; one of them was a

8    book on criminal investigation; one of them was a book that's

9    been around for many, many years called the "Supervision of

10   Police Personnel" by Iannone -- the Iannone brothers; another

11   book was a police management book.  I think I've got just about

12   all of them.

13   Q.    Okay.  And how would you teach these books?  What would

14   you do to teach individuals these books?

15             MS. HARRIS:  I object.

16             THE COURT:  Overruled.

17             Go ahead.

18             THE WITNESS:  Most of the books -- they're

19   undergraduate college textbooks; they're modeled on a 14-week

20   typical college course.  So they typically have --

21             MS. HARRIS:  Objection.  There's no foundation for

22   what these textbooks are or what kind of a course they're

23   designed for.

24             THE COURT:  Okay.  Overruled.

25   BY MR. LICHTEN:

1    Q.    You may answer it.

2    A.    So they would have 14 to 16, maybe 18 chapters in each

3    book.  So I would assign four -- typically four chapters a

4    week, and we would come together as a class and we would go

5    through the four chapters for that week.

6    Q.    And how did you know what type of questions would be on

7    the exam or what type of questions to give your students in

8    practice exams?

9    A.    From having taken many of these exams myself, the format

10   historically has not varied, as well as my experience

11   in -- I've taught undergraduate courses as well as graduate

12   courses -- my experience in designing examinations for my

13   college students.

14   Q.    Okay.  And during the time that you took police sergeant

15   exams and police lieutenant exams, what was the format of the

16   questions that you took?

17   A.    The sergeant's exam would be 80 questions, they're

18   multiple-choice questions that offer four possible answers; for

19   the lieutenant's exam, it is 100 questions; and for captain

20   120.

21   Q.    And where would the answers come from for the

22   multiple-choice questions?

23   A.    From the books that are assigned for -- to be studied.

24   Q.    And I take it the exam was given; is that correct?

25   A.    Yes.

1    Q.    Okay.  Did you make up mock exams?

2    A.    Yes, I did.

3    Q.    Okay.  Can you tell me about that, please?

4    A.    Every week we would go through the chapter for that week,

5    as I testified to, and at the end of that period -- at the end

6    of our going through the chapters for the week I would go

7    through, paragraph by paragraph, and educate the students as to

8    how to identify possible areas for -- that would be a question,

9    or a possible question, on the exam.  And then I would give

10   them -- every week we would have 20 or 25 mock questions.  The

11   students would take the mock question exam, and we would then

12   go through the questions and the correct responses.

13   Q.    Okay.  And let me ask you:  To what extent did the

14   information that you taught the class for the exam translate to

15   the actual job as had you performed it as a police sergeant?

16          MS. HARRIS:  I object.

17          THE COURT:  Sustained.

18   BY MR. LICHTEN:

19   Q.    Let me ask it this way:  You'd been -- you were a police

20   officer, police sergeant, police lieutenant, taught criminal

21   justice.  Can you explain to the Court what are the most

22   important attributes necessary to be a good police sergeant?

23          MS. HARRIS:  Objection.

24          MR. LEAHEY:  Objection.

25          THE COURT:  Yeah, I think this is getting into the

 1   area that was objected to, which is an opinion area.

 2        MR. LICHTEN:  Your Honor, from their openings my

 3   understanding is that they intend to call witnesses from their

 4   departments to --

 5        THE COURT:  It's not a question of the relevance -- or

 6   potential relevance of the testimony, but whether the expert --

 7   rules of expert disclosures were --

 8        MR. LICHTEN:  But I'm not asking him as an expert,

 9   your Honor.  I just want to get his --

10        THE COURT:  I think it is.  I think this was probably

11   within 702.

12        MR. LICHTEN:  Okay.

13        May I have just a moment with my colleagues?

14        (Counsel confer off the record.)

15   BY MR. LICHTEN:

16   Q.   Let me ask it this way:  When you were on the street

17   working as a patrol sergeant, how often did you actually have

18   to use the information that you had studied while taking the

19   sergeant's exam?

20        MS. HARRIS:  Objection.

21        THE COURT:  Overruled.

22        You may answer it.

23        THE WITNESS:  The only actual material that I would

24   use as a patrol supervisor sergeant would be the criminal

25   procedure and the criminal law portion of what was assigned to

1    be read and studied.

2    BY MR. LICHTEN:

3    Q.    How about the stuff in the textbooks; how often would you

4    use that?

5    A.    None of it.

6             MR. LICHTEN:    Thank you.    I have nothing further.

7                         CROSS-EXAMINATION

8    BY MS. HARRIS:

9    Q.    Hi, Lieutenant Nolan.

10   A.    Hi.

11   Q.    How are you?

12   A.    Good.  How are you?

13   Q.    Lieutenant, I believe that you testified -- excuse me --

14   Professor, when you testified on direct, you mentioned that you

15   had taken a number of Civil Service exams during your career.

16   And did I understand you correctly to say that several of those

17   exams that you took had assessment center components to them?

18   A.    Yes.

19   Q.    Can you tell me how many times you took exams that had

20   assessment center components to them?

21   A.    Four, I believe.

22   Q.    And what are the years that you took those exams?

23   A.    1987, '85, I took the sergeant's exam; 1993 and '94, I

24   believe, I took lieutenant exams; 2002 and I think 1999 or 2000

25   I took captain exams.

1    Q.    And in '99, did that also contain an assessment center

2    component, to your memory?

3    A.    One of the two captain's exams I took, I believe it was

4    1999, did have an assessment-center-type exercise, yes.

5    Q.    And I believe that you testified on direct with regard to

6    the exam of 1987, that there was a challenge to that exam and

7    it was thrown out.  Do you recall that testimony?

8    A.    Yes.

9    Q.    And just to refresh you, is that the exam where there was

10   a superintendent who ran training courses and there was some

11   concern about the integrity of the exam?

12   A.    I believe so, yes.

13   Q.    Okay.  And is it your memory that that exam ended up going

14   forward on a final basis only on a written portion of the exam?

15   A.    I believe so.

16   Q.    Okay.

17   A.    Yes.

18   Q.    Do you recall whether there was a challenge brought at the

19   Civil Service Commission about it being unfair, that the

20   assessment center was thrown out and then that those points

21   were ultimately folded back into the exam?

22   A.    It may have.

23   Q.    Okay.  But as you sit here today, you don't remember one

24   way or another?

25   A.    I remember -- every one of these exams has gone through

1    litigation in various forms.  I don't remember the specifics,

2    but I do remember there was an exam that there was an

3    allegation that there had been some tutorials going on and that

4    there were ultimately, I think, three different versions of a

5    certified list as a result of the litigation.  And I'm not sure

6    if that's the 1987 exam, but it could very well have been.

7    Q.   Okay.  Fair enough.  But in any event, you recall having

8    an exam with an assessment center in the late '80s, in the mid

9    '90s, and then again in the late '90s; is that correct?

10   A.   Yes.

11   Q.   And obviously all of these exams you took as a member of

12   the Boston Police Department?

13   A.   Yes.

14   Q.   Do you have any information about what the racial

15   breakdown was of any of those assessment center exams?

16   A.   No.

17   Q.   Do you recall, Lieutenant Nolan, in 2000 -- or excuse

18   me -- about 2002-2003 testifying at the Civil Service

19   Commission about an effort the police department had put in

20   place to add a performance review component to a promotional

21   exam?

22   A.   I don't recall specifically.

23   Q.   Okay.  Do you recall that in 2000 the promotional exam as

24   initially put together contemplated that candidates could put

25   together a binder of their performance to demonstrate their

1    leadership and their supervisory abilities?

2    A.    Yes, I do.

3    Q.    And you, in fact, prepared one of those booklets, I

4    believe, correct?

5    A.    Yes, I did.

6    Q.    And do you recall testifying at the Civil Service

7    Commission about your concerns that candidates wouldn't be

8    judged fairly because of the factions within the Boston Police

9    Department?

10    A.    I don't recall.

11    Q.    Let me just take a moment.  Actually, I'll come back to

12    this.

13        I believe, Lieutenant Nolan, you testified that you became

14    a sergeant detective at some point in your career.

15    A.    That's correct.

16    Q.    And I think I understood you to say that you were

17    appointed at the discretion of the police commissioner; that

18    there's no exam to become a superior detective, correct?

19    A.    That's correct.

20    Q.    But it's the case, isn't it, that you become a superior

21    detective only after having worked in an investigatory capacity

22    for six months, correct?

23    A.    Not necessarily.  I think it's mandated if you work in an

24    investigatory capacity for six months.  But, for example, in my

25    case, I was given -- designated a sergeant detective after two

1    or three months.

2    Q.    Okay.  And that was in 19- -- I think you said -- -89; is

3    that correct?

4    A.    I think it was 1991.

5    Q.    Excuse me.  And that's when you went to the

6    Anti-Corruption Division?

7    A.    That's correct.

8    Q.    Now, when you were serving as a sergeant at the police

9    department, you were first assigned to Area B2.  Do I have that

10   right?

11   A.    There was no area -- there was only one station when I

12   first was assigned there, Area B.  It was Area B2, yes.

13   Q.    Okay.  And what geographic area of the city did that area

14   cover?

15   A.    At the time it covered Roxbury, parts of Dorchester and

16   all of Mattapan.

17   Q.    And when you were first assigned there, you were assigned

18   as a uniformed sergeant?

19   A.    That's correct.

20   Q.    How many uniformed sergeants were assigned to Area B when

21   you began working there?

22   A.    Probably 16 to 18.

23   Q.    And that's for the entire area and all shifts?

24   A.    That's correct.

25   Q.    And how many lieutenants were there?

1    A.    Probably four.

2    Q.    So when you were working at Area B as a uniformed

3    sergeant, you were really the first-line supervisor for the 20

4    or -- 20 to 40 police officers under your direct command,

5    correct?

6    A.    That's correct.

7    Q.    Would you review search warrants?

8    A.    As a uniformed sergeant occasionally but not typically.

9    Q.    And if you didn't, who did?

10   A.    A sergeant detective.

11   Q.    Okay.  And if there were arrests that were being made on

12   the street and there were questions that patrol officers had

13   about the proper way to proceed, would you be the person that

14   the uniformed officers would call upon?

15   A.    Yes.

16   Q.    And you mentioned a couple of critical incidents that you

17   might be called out to.  One of them, you said, was all serious

18   felonies, correct?

19   A.    That's correct.

20   Q.    And when you were called out to a serious felony, the

21   purpose of having a uniformed sergeant on the scene is to make

22   sure that the patrol officers are doing their jobs correctly,

23   right?

24   A.    That's correct.

25   Q.    And you described that there would be other incidents like

1   homicides where you might be called out to a scene.

2   A.    That's correct.

3   Q.    And when a homicide occurred, there would be other

4   higher-ranking officers that responded to those kinds of

5   events, wouldn't there?

6   A.    Not necessarily.

7   Q.    Well, the homicide team would be called out, correct?

8   A.    Yes.

9   Q.    And that would include sergeant detectives and possibly

10  lieutenant detectives?

11  A.    Not a lieutenant detective.  It would include a team of --

12  a homicide team typically consists of a sergeant detective and

13  two detectives.

14  Q.    And it would also include a member from the district

15  attorney's office, correct?

16  A.    Yes.

17  Q.    So a lawyer would respond to those scenes as well?

18  A.    Yes.

19  Q.    And, again, when we're talking about firearm discharges,

20  those are discharges by officers in the course of their duties?

21  A.    That's correct.

22  Q.    And for firearm discharges, there would be a response team

23  that would include the sergeant but would also include

24  supervisory personnel from the Department of Internal Affairs,

25  correct?

1    A.    In 1988?

2    Q.    Uh-huh.

3    A.    I'm not sure if that policy was in place at that time.

4    Q.    Okay.  Do you recall responding to firearm discharges in

5    the late 1980s?

6    A.    Yes, I do.

7    Q.    Do you recall whether there were any supervisory

8    personnel, whether it would be Internal Affairs or deputy

9    superintendents, superintendents, the police commissioner

10   responding to those scenes?

11   A.    They might.  They could be, but there was no mandate that

12   anyone else respond.

13   Q.    Do you recall ever going to a firearm discharge where a

14   police officer discharged his firearm --

15   A.    Yes.

16   Q.    -- and the highest-ranking people on-scene were sergeants?

17   A.    Yes.

18   Q.    Can you tell us when that occurred?

19   A.    I have a specific memory of responding to a detective

20   having shot an individual in the Franklin Hill Housing Project,

21   and I was the highest-ranking officer who responded to the

22   scene of that.

23   Q.    And no other higher-ranking officer ever appeared at that

24   scene?

25   A.    Not at that scene, no.

1    Q.   I think you described -- when you were listing the kinds

2    of attributes that you brought to the position of sergeant, you

3    listed good judgment, wisdom, experience.  When you said

4    "experience," what were you referring to?

5    A.   Experience as a patrol officer in the street responding to

6    911 calls.

7    Q.   When you describe "experience," you're referring to the

8    fact that a sergeant has worked as a police officer prior to

9    assuming the position of sergeant --

10   A.   Yes.

11   Q.   -- is that correct?

12        Do you consider among the attributes that a sergeant has

13   to have that they need to have knowledge of the constitutional

14   laws?

15   A.   Yes.

16   Q.   And knowledge of the criminal laws?

17   A.   Yes.

18   Q.   Do you value those as as important, more important or less

19   important than good judgment and wisdom?

20   A.   I would say less important.

21   Q.   You would?

22   A.   Yes.

23   Q.   And explain why.

24   A.   Well, the judgment that you need to be possessed of in the

25   street will enable you to make the decisions that need to be

1    made on the scene.  If there was a question regarding the law,

2    that information can be obtained at a later time, if necessary.

3    Q.   So to undo an arrest that shouldn't have been made?

4    A.   I'm sorry?

5    Q.   For example, you can undo an arrest that should not have

6    been made on the street?

7    A.   You can, yes.  Sure.

8    Q.   And this is for the role of a sergeant that we're talking

9    about, not a police officer?

10   A.   Yes.

11   Q.   Okay.  Now, when you were describing your work history to

12   us, you explained that you had been promoted to lieutenant and

13   that you were assigned to the Back Bay area for a period of

14   time as the overnight commander, correct?

15   A.   Yes.

16   Q.   And you considered that to be a retaliatory assignment,

17   didn't you?

18   A.   No, I did not.

19         MS. HARRIS:  Can I approach the witness?

20   BY MS. HARRIS:

21   Q.   I've put before you a transcript of the testimony that you

22   provided in the matter of the Boston Police Superior Officers

23   Federation versus the Boston Police Department in May of 2002.

24   And I'll ask you first, Mr. Nolan, in 2002 you were working as

25   a full-time release officer with the Boston Superior Officers

1    Federation, correct?

2    A.    That's correct.

3    Q.    And you actually held the elected position of vice

4    president of the Superior Officers union; is that right?

5    A.    That's correct.

6    Q.    And Mr. Lichten was representing the Superior Officers

7    Federation at that time; is that right?

8    A.    That's correct.

9    Q.    Now, when you were called as a witness in this matter --

10   and I will direct your attention -- the copy I've given you is

11   a mini-script, but I'll direct your attention to page 169.

12          MS. HARRIS:  May I use the ELMO for this, your Honor?

13          THE COURT:  Sure.

14   BY MS. HARRIS:

15   Q.    And you were asked the question by Mr. Shapiro, who

16   represented the Patrolman's Association, "Sir, how did you get

17   on -- you were a midnight supervisor for -- duty supervisor

18   lieutenant.  How did you get to midnights?"  Can you read your

19   answer?

20   A.    "I imagine I crossed paths with someone somewhere along

21   the line."

22   Q.    And by that answer didn't you mean that you felt that you

23   had been subjected to a retaliatory assignment by the police

24   department?

25   A.    Not necessarily.

1          MS. HARRIS:  If you would just give me a minute, your

2     Honor, to confer with my co-counsel, I may be done.

3          (Counsel confer off the record.)

4     BY MS. HARRIS:

5     Q.    Mr. Nolan, you testified that in 2008 you ran a study prep

6     course.  Did you ever run a course like that while you were

7     working with the Boston Police Department?

8     A.    No.

9     Q.    Why not?

10    A.    Typically I would be in a position where I would be

11    competing for one of the promotions, so it just never occurred

12    to me.

13    Q.    Do you know who the plaintiffs in this case are from the

14    Boston Police Department?

15    A.    Not exactly.  I don't.

16    Q.    I'm going to put on the ELMO here a listing of individuals

17    who I'll represent to you are plaintiffs from the Boston Police

18    Department in this case.  I'm going to ask you:  Did any of

19    these people attend your course?

20    A.    Are they here?  Is that --

21    Q.    I believe so.

22          MS. HARRIS:  Is it up on his screen as well?

23          THE WITNESS:  Some of them, yes.

24    BY MS. HARRIS:

25    Q.    Okay.  Can you tell me who was in your course?

1    A.    Gwendolyn Brown, Gloria Kinkead, Lynette Praileau, I think

2    David Singletary, Julian Turner, Karen VanDyke, Angela Mitchell

3    Williams, and there may be others on this list who I don't

4    recall.  I didn't know all of the students individually by

5    name.

6    Q.    Did you charge a fee for the course?

7    A.    I did not.

8    Q.    I don't have anything further.  Thank you, Lieutenant.

9              THE COURT:  Mr. Carroll?

10             MR. CARROLL:  Just a couple of questions, your Honor.

11             THE COURT:  All right.

12                         CROSS-EXAMINATION

13   BY MR. CARROLL:

14   Q.    Good morning, Professor Nolan.  My name is Harry Carroll.

15   I'm with the City of Springfield.  I only have a few questions

16   for you, but my first question is:  You said you gave some sort

17   of preparatory course for minority students to help them pass

18   the state Civil Service exam; is that correct?

19   A.    Yes.

20   Q.    And how many of your students actually passed this Civil

21   Service exam, the ones that took your course?

22   A.    I don't know.

23   Q.    Did any Springfield students ever take your course?

24   A.    No.

25   Q.    And you mentioned in your direct testimony, I believe,

```
 1   that you were a Boston police officer for a period of time; is
 2   that correct?
 3   A.   Yes.
 4   Q.   And a police sergeant and a police sergeant detective and
 5   lieutenant, correct?
 6   A.   Yes.
 7   Q.   And during your entire career were you ever on the
 8   Springfield police force?
 9   A.   No.
10   Q.   Now, you mentioned that you took several police
11   promotional examinations; is that correct?
12   A.   Yes.
13   Q.   And were those statewide Civil Service examinations?
14   A.   Some of them were, yes.
15   Q.   And did you review the eligible lists when they came out?
16   A.   Yes.
17   Q.   Did you review the certified lists when they came out?
18   A.   Yes.
19   Q.   And did you see the names of any officers from the city of
20   Springfield on the eligible list or the certified list of the
21   examinations that you took as a police candidate?
22            MR. LICHTEN:  Your Honor, that's a little rhetorical.
23            THE COURT:  No, overruled.
24            You may have it.
25            MR. LICHTEN:  Okay.
```

```
 1              THE WITNESS:  I took a couple of deputy chief, chief
 2    exams --
 3    BY MR. CARROLL:
 4    Q.   Well, let's focus just on the exams for sergeant that you
 5    took.  How many of those were there?
 6    A.   Two.
 7    Q.   Okay.  And in regard to -- those were promotional exams,
 8    were they --
 9    A.   Yes.
10    Q.   -- is that correct?
11         Were there any officers on the eligible list other than
12    from the City of Boston Police Department?
13    A.   No.
14    Q.   And did you review the certified list when it came out for
15    the sergeant's position?
16    A.   Yes.
17    Q.   And were there any officers other than -- on the certified
18    list other than from the City of Boston Police Department?
19    A.   No.
20    Q.   And is it your experience that the only people who were
21    appointed to the positions were those whose names appeared on
22    the certified list?
23    A.   Yes.
24    Q.   Did you take the 2005 police promotional examination for
25    sergeant?
```

```
 1  A.   No.

 2  Q.   Did you take the 2007 police promotional examination for

 3  sergeant?

 4  A.   No.

 5  Q.   Have you reviewed either of those examinations?

 6  A.   No.

 7        MR. CARROLL:  No further questions.

 8                    CROSS-EXAMINATION

 9  BY MR. LEAHEY:

10  Q.   Lieutenant Nolan, my name is Brian Leahey.  I represent

11  the City of Lowell.  I just have a couple questions for you.

12        Following what Attorney Carroll asked you, did you take

13  the -- along similar lines, did you take the 2006 police

14  sergeant examination?

15  A.   I did not.

16  Q.   Have you seen the 2006 police sergeant exam?

17  A.   I have not.

18  Q.   In response to questions from Attorney Harris, at some

19  point you were a ranking officer of the Boston Federation

20  Police union, or some name of that fashion?

21  A.   The Boston Police Superior Officers Federation, yes.

22  Q.   And how long were you an officer of that entity?

23  A.   I was the vice president for three, four years.

24  Q.   And how long were you in that union -- or that

25  organization?
```

1    A.    On and off for 12 years.

2    Q.    Was that organization -- was it a union?

3    A.    Yes.

4    Q.    And who was the attorney -- how many -- Attorney Lichten

5    represented you in the 2002 deposition that Attorney Harris

6    referenced?

7              MR. LICHTEN:  Objection.  Relevancy.

8              THE COURT:  Overruled.

9              THE WITNESS:  Attorney Lichten represented the

10   Superior Officers Federation, yes.

11   BY MR. LEAHEY:

12   Q.    And did he represent you at that deposition?

13   A.    He may have.

14   Q.    Has Attorney Lichten represented you at any other times

15   other than possibly that deposition?

16   A.    I'm sure he's represented -- I've worked with Attorney

17   Lichten on many occasions in my capacity as a constitutional

18   officer of the police union, yes.

19   Q.    Has he represented you in any type of suit or proceeding?

20   A.    Yes.

21   Q.    How many times?

22   A.    Could be several.

23   Q.    How would you define "several"?

24   A.    More than two, less than five.

25   Q.    What's the time frame?

1    A.    From 2000 through when I left the police department in

2    2004.

3    Q.    When did you learn that you would testify in this case?

4    A.    Last week.

5    Q.    And how did you learn that?

6    A.    I received a phone call -- or an e-mail, actually, from

7    one of Attorney Lichten's associates.

8    Q.    And prior to that phone call you'd had no conversations

9    with anyone regarding this lawsuit?

10   A.    That's correct.

11         MR. LEAHEY:  Thank you.  That's all I have.

12                        CROSS-EXAMINATION

13   BY MR. McDERMOTT:

14   Q.    Hi, Professor Nolan.  I'm Kevin McDermott of the MBTA.

15         Professor Nolan, is it fair that -- you teach criminal

16   justice; is that fair to say?

17   A.    Yes.

18   Q.    And are most of your students police officers?

19   A.    No.

20   Q.    And you have a fair amount of police officers that attend

21   your criminal justice courses?

22   A.    There have been a fair amount over the years, yes.

23   Q.    And generally many police go for advanced degrees because

24   of the Quinn Bill.  Are you familiar with that?

25   A.    I am.

1    Q.    And can you describe what the Quinn Bill is?

2    A.    It's police career incentive pay program.  It's an

3    enactment of the Massachusetts legislature that authorizes

4    participating departments to grant significant pay raises to

5    officers who complete college degree programs at certain

6    designated colleges and universities.

7    Q.    So it's fair to say that education is a -- the education

8    of police is a very strong ideal in the Commonwealth of

9    Massachusetts; is that fair to say?

10            MR. LICHTEN:  Objection.

11            THE COURT:  Sustained.

12   BY MR. McDERMOTT:

13   Q.    Professor Nolan, did you charge money for the study group

14   that you had?

15   A.    I did not.

16   Q.    And do you have any educational -- degrees in education?

17   A.    Yes, I do.

18   Q.    And what degree is that?

19   A.    I have a master's degree and a doctoral degree in

20   education.

21   Q.    And when you -- in your study group, did you have any

22   members from the MBTA?

23   A.    I'm not sure.

24   Q.    Did you know anything about the MBTA promotional processes

25   when you conducted these study groups?

1    A.    Not specifically relating to the MBTA, I did not.

2    Q.    And have you written any scholarly works, any textbooks in

3    regard to police supervisory practices?

4    A.    I have.

5    Q.    And what books are those?

6    A.    I have a book sitting on the bench over there in which I

7    wrote a chapter entitled "Police Organization and

8    Administration" that just came out within the last two or three

9    months.

10   Q.    And who publishes that?

11   A.    I believe it was Sage Publications.

12   Q.    And other than that chapter, have you had any other

13   published works?

14   A.    I have.

15   Q.    And what were those?

16   A.    I had a journal article published in a journal called "Men

17   and Masculinities" on the "Blue Wall of Silence" last December;

18   I have had several research studies that have been published:

19   I have one coming out in the "International Criminal Justice

20   Review" on the use of policewomen as decoy prostitutes.  I have

21   published several academic pieces relating to that specific

22   topic.

23   Q.    Have you ever written any scholarly works that were

24   critical of the texts used by HRD in testing?

25   A.    Critical of the texts?

1    Q.    Yes.  You said that -- I believe your testimony was that

2    much of the theories that were used in the text regarding

3    police supervisory skills were not of any use to you; is that

4    fair to say?

5    A.    Yes.

6    Q.    And in light of that, have you ever published any works

7    that were critical of the books used in HRD testing procedures?

8    A.    I have not.

9            MR. McDERMOTT:  I have no other questions, your Honor.

10           MR. McQUILLAN:  Nothing from the City of Methuen, your

11   Honor.  Thank you.

12           THE COURT:  Okay.

13                         CROSS-EXAMINATION

14   BY MS. ENGDAHL:

15   Q.    I just have a question.  I'm Laurie Engdahl with the City

16   of Worcester.  I just have a few clarifying questions.

17        With regard to your course that you gave in 2008, who was

18   invited to attend that course?

19   A.    Actually, anyone who wanted to participate could enroll in

20   the course.  Members of the Massachusetts Association of

21   Minority Law Enforcement Officers, the plan at the time was

22   that they would charge a fee.  It was offered to their members

23   on a pro bono basis, but for those who were not members of

24   MAMLEO, there was some kind of fee arrangement.  I'm not aware

25   of what it was.  But individuals who weren't members would have

1    to pay MAMLEO a certain amount of money.

2    Q.   Okay.  How were people invited; how did they become aware

3    that you were giving the course?

4    A.   It was basically word of mouth, e-mail.

5    Q.   And were you paid by MAMLEO?

6    A.   Pardon me?

7    Q.   Were you paid by MAMLEO?

8    A.   I wasn't paid at all.

9    Q.   Okay.

10            MS. ENGDAHL:  I have nothing further.

11            THE COURT:  Mr. D'Agostino?

12            MR. D'AGOSTINO:  I have nothing further, your Honor.

13            THE COURT:  Redirect?

14            MR. LICHTEN:  Can I do it from here, your Honor?

15            THE COURT:  I'd rather not.

16            MR. LICHTEN:  Okay.

17                        REDIRECT EXAMINATION

18   BY MR. LICHTEN:

19   Q.   You were asked a question about whether you had published

20   anything about the police promotional exam process.  Have you

21   published anything involving the Civil Service and police?

22   A.   I've published a chapter on "Police Organization and

23   Administration" in which Civil Service is referenced, yes.

24   Q.   What did you say in that article?

25            MS. HARRIS:  Objection.

1         MR. LICHTEN:  Your Honor, they've raised it.  I didn't

2    raise this.

3         THE COURT:  Sustained.

4    BY MR. LICHTEN:

5    Q.   So have you written about the Civil Service promotional

6    system?

7    A.   Yes, I have.

8    Q.   And what was the name of the book that you published that

9    in?

10   A.   "Critical Issues in Criminal Justice, Thought, Policy and

11   Practice."

12        MR. LICHTEN:  Thank you very much.  Nothing further.

13        MR. CARROLL:  Nothing further.

14        THE COURT:  Ms. Harris, do you have anything further?

15        MS. HARRIS:  I have nothing further.

16        THE COURT:  All right, Mr. Carroll.

17                        RECROSS-EXAMINATION

18   BY MR. CARROLL:

19   Q.   Professor Nolan, you were asked some questions by Attorney

20   Lichten regarding the Civil Service system.  Is that the

21   Massachusetts Civil Service system that you were talking about

22   or is it another one?

23   A.   Massachusetts.

24   Q.   Okay.  And that's the subject matter of the chapter you

25   wrote about?

1    A.    In part.

2    Q.    In part.  And do you understand that the Civil Service

3    system has, in effect, two components; the HRD and the Civil

4    Service Commission?

5    A.    Yes, I do.

6    Q.    And how do those two relate to each other?

7              MR. LICHTEN:  Objection.

8              THE COURT:  Sustained.  I think it's beyond the scope

9    of redirect.

10             MR. CARROLL:  With that, I have no further questions.

11             THE COURT:  Anyone else?

12             MR. LICHTEN:  Your Honor, may I ask one last question?

13             THE COURT:  Wait a minute.  Let me get from the

14   defense.

15             MR. LICHTEN:  May I ask one last question?

16             THE COURT:  Go ahead.

17                      REDIRECT EXAMINATION

18   BY MR. LICHTEN:

19   Q.    You were asked whether I had ever represented you before,

20   and you said a couple of times.  Was that in connection to your

21   duties as a police union official?

22   A.    Yes.

23   Q.    Not personally?

24   A.    No.

25             THE COURT:  All right, sir.  Thank you.  You may step

1    down.

2            (The witness is excused.)

3            MR. CHURCHILL:  Your Honor, the plaintiffs call Pedro

4    Lopez.

5                    PEDRO J. LOPEZ, duly sworn

6            THE CLERK:  Please be seated.  State your name, spell

7    your last name for the record, keep your voice up and speak

8    into the mic so everyone can hear you.

9            THE WITNESS:  My name is Pedro J. Lopez.

10                       DIRECT EXAMINATION

11   BY MR. CHURCHILL:

12   Q.   Mr. Lopez, are you a plaintiff in this case?

13   A.   Yes, I am.

14   Q.   And what is your race?

15   A.   I'm sorry.  I didn't hear you.

16   Q.   What is your race?

17   A.   I'm Puerto Rican.

18   Q.   Do you consider yourself Hispanic?

19   A.   I consider myself Puerto Rican.

20   Q.   Okay.  And do you speak Spanish?

21   A.   Yes, I do.

22   Q.   At what level of fluency?

23   A.   Fluent.

24   Q.   Are you currently employed?

25   A.   Yes, I am.

```
1    Q.    Where are you employed?

2    A.    City of Lawrence Police Department.

3    Q.    And what is your position with the City of Lawrence Police

4    Department?

5    A.    Patrol officer.

6    Q.    Okay.  Let's back up a bit and briefly go through your

7    background.  When did you first start working in law

8    enforcement?

9    A.    In 1988.

10   Q.    And what -- where was that?

11   A.    I started working at the Middlesex County Sheriff's

12   Department.

13   Q.    And how long did you work for the sheriff's department?

14   A.    Four years.

15   Q.    And what was your position there?

16   A.    I was a deputy sheriff.

17   Q.    And where did you work after the Middlesex Sheriff's

18   Department?

19   A.    Chelsea Housing Authority.

20   Q.    When did you start working there?

21   A.    1990.

22   Q.    Until what time?

23   A.    I was there until 1994.

24   Q.    And what was your position with the Chelsea Housing

25   Authority?  What was your initial position?
```

1    A.    Patrolman.

2    Q.    And at some point did your position change?

3    A.    Yes, it did.

4    Q.    And when did it change?

5    A.    I believe it was at the end of '91.

6    Q.    And what position did you move into?

7    A.    Patrol supervisor sergeant.

8    Q.    Okay.  And was that promotion pursuant to an examination

9    that was given?

10   A.    Yes.

11   Q.    And was there a written component to that examination?

12   A.    Yes, there was.

13   Q.    And were there components in addition to a written

14   component?

15   A.    Yes, there was.

16   Q.    What were those other components?

17   A.    There was a role-playing component; there was oral boards.

18   Q.    How many times did you take that examination?

19   A.    I took that once.

20   Q.    All right.  And where did you go after leaving the Chelsea

21   Housing Authority?

22   A.    City of Newton Police Department.

23   Q.    What year did you begin with the City of Newton?

24   A.    1994.

25   Q.    And what did -- until what year did you work for the City

1    of Newton?

2    A.    Until 1998.

3    Q.    And what was your position with the City of Newton?

4    A.    Patrolman.

5    Q.    And was that true during your entire tenure there?

6    A.    That is correct.

7    Q.    And where did you next work after Newton?

8    A.    City of Lawrence Police Department.

9    Q.    What year did you start working for the City of Lawrence

10   Police Department?

11   A.    1997.

12   Q.    Okay.  So from 1997 until the present you've been working

13   as a patrol officer in the city of Lawrence?

14   A.    Yes.

15   Q.    And describe your duties as a patrol officer.

16   A.    I'm a line officer.  I handle calls for service, 911

17   calls; I patrol an assigned area of the city.

18   Q.    All right.  And who is your immediate supervisor when

19   you're on patrol?

20   A.    It would be one of three sergeants.

21   Q.    Okay.  And with respect to the sergeants who have

22   supervised you over the 13 years that you've worked there, what

23   are the duties of that sergeant position?

24   A.    To the best of my knowledge, is to respond to calls

25   requiring a supervisor, serious calls, felony calls.

1    Q.    All right.  When you say to respond to calls required for

2    a supervisor, what type of calls are required for a supervisor?

3    A.    Shootings; accidents that are severe; accidents involving

4    police officers; on occasions, domestics; serious robberies.

5    Q.    When you say "domestics," what does that mean?

6    A.    Domestic relations calls.

7    Q.    And how many patrol officers do sergeants in the city of

8    Lawrence supervise?

9    A.    It varies.  It can be from six to ten.

10   Q.    Okay.  And how many areas or districts are there in the

11   city of Lawrence for the police department?

12   A.    There are six.

13   Q.    And over the course of your 13 years there, have you

14   worked in each of those six areas?

15   A.    Yes.

16   Q.    During the time that you have worked for the City of

17   Lawrence, have there been any Hispanic sergeants?

18   A.    Yes.

19   Q.    All right.  And are there currently any Hispanic sergeants

20   serving?

21   A.    Yes.

22   Q.    How many?

23   A.    Currently, there's only one.

24   Q.    And what is that sergeant's name?

25   A.    Jose Orlando Martinez.

1    Q.    And how many total sergeants are there at this time?

2    A.    I believe there's about 16 or 17.

3    Q.    All right.  And when was Sergeant Martinez promoted to a

4    sergeant position?

5    A.    Approximately ten years ago.

6    Q.    So is it correct, then, that Sergeant Martinez is the last

7    Hispanic who's been appointed as a sergeant in the city of

8    Lawrence?

9    A.    Yes.

10   Q.    And during that ten-year period following his promotion to

11   sergeant, approximately how many people have been promoted to a

12   sergeant position?

13   A.    After him I would say I believe it's about ten.

14   Q.    All right.  And all ten of those appointments have been

15   non-minorities; is that correct?

16   A.    That's correct.

17   Q.    Now, based on your experience working as a police officer

18   in the city of Lawrence, approximately what percent of the

19   population that you deal with are Hispanic?

20   A.    I would say about 90 percent of the people I deal with are

21   Hispanic or Hispanic descent.

22   Q.    And is that true with respect to all of the six districts

23   that you've worked with?

24   A.    I would say for about four of them of the total six -- of

25   the six districts.

1    Q.    Are all six districts over 50 percent minority?

2    A.    I believe five with the exception of one.

3    Q.    All right.  And in your work with the Hispanic population

4    in Lawrence, are you called upon to use your Spanish

5    language-speaking skills?

6    A.    Every day.

7    Q.    All right.  And with respect to the white sergeants who

8    have acted as your supervisors, in the time that you've been

9    there have any of those white sergeants ever spoken Spanish?

10            MR. D'AGOSTINO:  Objection.

11            THE COURT:  You may answer it.

12            THE WITNESS:  No.

13    BY MR. CHURCHILL:

14    Q.    All right.  And in what -- based on your experience

15    working for the City of Lawrence, in what ways is your ability

16    to speak Spanish important to the performance of your duties as

17    a police officer?

18    A.    There's a large portion of the community that I police

19    that don't have an understanding of the -- or command of the

20    English language, which makes communicating with them and

21    providing law-enforcement services impossible if you don't

22    understand or speak their language.

23    Q.    And so when a sergeant is called out to an incident where

24    they're a Spanish-speaking population, how is the sergeant able

25    to communicate with the population?

```
 1              MR. D'AGOSTINO:  Objection.

 2              THE COURT:  Overruled.

 3              THE WITNESS:  They would request a Spanish-speaking

 4    officer.  If there was a person who spoke Spanish and English

 5    on scene, they would, on occasions, use them.

 6    BY MR. CHURCHILL:

 7    Q.   And with respect to Sergeant Martinez, he's the person

 8    who's currently a Hispanic sergeant?

 9    A.   Yes.

10    Q.   And does he speak Spanish?

11    A.   Yes, he does.

12    Q.   Have you taken the examination for promotion to sergeant?

13    A.   Yes.

14    Q.   On how many occasions?

15    A.   I believe on three occasions.

16    Q.   When was the most recent occasion?

17    A.   The 2008 exam.

18    Q.   All right.  And did you pass or fail that exam?

19    A.   I failed that particular exam.

20    Q.   And when was the test most recent before that that you

21    took for the sergeant position?

22    A.   2006.

23    Q.   All right.  And did you pass or fail that exam?

24    A.   I passed that particular exam.

25    Q.   And based on your having taken those two exams, were they
```

1   essentially the same?

2   A.   Yes, they were.

3   Q.   And with respect to the 2000 *[sic]* exam that you passed,

4   approximately how many people were on the list in front of you

5   for promotion?

6   A.   I'm not sure of the exact number.  I estimate it was

7   probably 20 or more.

8   Q.   Okay.  And of those 20, approximately how many were

9   reached for promotion?

10  A.   In the exam that I passed?

11  Q.   Yes.

12  A.   I would say about five.

13  Q.   All right.  Thank you, Officer Lopez.  I have no further

14  questions.

15          THE COURT:  I'm going to let Mr. D'Agostino go first

16  since it's his city.

17                      CROSS-EXAMINATION

18  BY MR. D'AGOSTINO:

19  Q.   Good afternoon, Officer Lopez.  Richard D'Agostino for the

20  City of Lawrence.

21      Officer Lopez, would you tell us some of your educational

22  background?

23  A.   I'm a high school graduate.  I've attended the

24  Massachusetts Department of Correction Academy for correction

25  officer; I've attended Northeast Regional Police Institute

1    Reserve Initiate Police Officer program; I'm a graduate of the

2    Mass. Criminal Justice Training Council, basic police recruit;

3    I've taken courses with the National White Collar Crime Center

4    for computer forensics; I've attended promotional patrol

5    supervisor courses at Fort Hood in Texas put on by the FBI

6    leader program; and other courses relative to some of the

7    functions that I do as a police officer with respect to rape

8    investigator, criminal investigator, narcotics investigator.

9    Throughout my career I've attended numerous courses put on by

10   the state police, some federal agencies, district attorney's

11   office.

12   Q.   Did you have to take written examinations for any of those

13   courses?

14   A.   On some of them.

15   Q.   And how did you fare when you took the examinations?

16   A.   I got a passing grade.

17   Q.   Did you feel you did well?

18           MR. CHURCHILL:  Objection.

19           THE COURT:  Sustained.

20   BY MR. D'AGOSTINO:

21   Q.   Were the grades you obtained sufficient in order for you

22   to continue in your duties?

23   A.   Yes.

24   Q.   Where were you educated?

25   A.   City of New York.

```
 1   Q.   And how far did you go in school?

 2   A.   I went to the ninth grade.

 3   Q.   How do you feel you perform in tests you have taken

 4   throughout your educational life?

 5   A.   I think I've done okay.

 6   Q.   You've testified you took the sergeant exam three times?

 7   A.   I believe it was three times.

 8   Q.   In 2006 you did pass the exam?

 9   A.   That's correct, sir.

10   Q.   In 2008 you failed?

11   A.   That is also correct.

12   Q.   Why do you believe you failed the exam in 2008 as opposed

13   to 2006 as you testified it was the same exam?

14            MR. CHURCHILL:  Objection.

15            THE COURT:  Overruled.

16            You may answer.

17            THE WITNESS:  Well, the exams weren't exactly the

18   same.  I believe the format that I took, it is not -- I'd say

19   not relevant to what I was doing as a police officer.

20   BY MR. D'AGOSTINO:

21   Q.   Did you study for the exam?

22   A.   I've obtained study material for it, yes.

23   Q.   Did you take any courses?

24   A.   Yes, I did.

25   Q.   What type of study materials did you obtain?
```

1    A.    Audiotapes, books.

2    Q.    What was the source of these materials?

3    A.    There are different sources.  One was Law Enforcement

4    Dimensions, Hanrahan Consulting, and there was a third one.  I

5    don't recall the material provider.

6    Q.    What course did you take, or courses did you take, to

7    prepare for the exams?

8    A.    I took seminars for criminal procedures.

9    Q.    Who were those seminars given by?

10   A.    Attorney Scheft from Law Enforcement Dimensions and by

11   Hanrahan Consulting.

12   Q.    Does the time factor that you have in which to study or

13   prepare for the exam have an impact upon your ability to take

14   the exam?

15   A.    I believe so.  The more time you have, the better prepared

16   you are, I guess.

17   Q.    Did you feel you had more time to take -- to prepare to

18   take the 2006 exam as opposed to the 2008 exam?

19   A.    No, I had the same working conditions, so...

20   Q.    When you say you had the same working conditions, how

21   would the working conditions affect your ability to prepare for

22   the exam?

23   A.    Well, just by the position that I was particularly in.  I

24   had to attend court on numerous occasions where if I didn't

25   have court for a case that was assisting the prosecution, I

1   would have had, I believe, more time to dedicate to it.

2   Q.   So is the only time that you would attempt to dedicate to

3   studying or preparing for the exam during work hours?

4   A.   Negative.  I've studied when I've had my off time.  When I

5   wasn't at work, I studied.

6   Q.   Would you take vacation time to study?

7   A.   Yes, I did.

8           MR. CHURCHILL:  Your Honor, I was going to object to

9   that.

10           THE COURT:  Overruled.

11  BY MR. D'AGOSTINO:

12  Q.   So you don't feel there was any difference between the two

13  exams and the time you took to prepare.  Is that your

14  testimony?

15  A.   No, the exam content to me appeared a little different

16  but --

17  Q.   In what way?

18  A.   Versions of the book changed; they weren't the same

19  material.  There was new --

20  Q.   What versions?  What material?  What type?

21  A.   Some of the books.  I don't recall the exact books, but I

22  know that the same reading list wasn't the same one from one

23  exam to the other.

24  Q.   And the reading list you mention, what is that reading

25  list?  Who provides that?

1    A.    Human resources.

2    Q.    And are the questions on the examination directly from

3    those materials?

4    A.    I believe so.

5    Q.    So, then, basically both times the questions were for

6    materials that you did study?

7    A.    Yes.

8    Q.    Do you feel that knowledge of the law and procedure is

9    very important to the performance of the duties of sergeant?

10   A.    I believe they play a part.

11   Q.    A major part?

12   A.    An equal part.

13   Q.    Are there police officers that work for the city that

14   speak Spanish?

15   A.    We have some.

16   Q.    About how many?

17   A.    I believe at this current time we have maybe about 14.

18   I'm not sure of the exact number, but it hovers around there.

19   Q.    So they don't require anyone to interpret for them at the

20   scene of a crime or an incident, do they, if the individuals

21   involved speak Spanish?

22   A.    No, not all of them.

23   Q.    Are you familiar with the name Melix Bonilla?

24   A.    Yes, I am.

25   Q.    Would you tell us who Mr. Bonilla is?

1    A.    He's the Lawrence Police Department's deputy chief.

2    Q.    And do you recall how long he's held that position?

3    A.    I believe he was -- he's held it ever since January of

4    2010.

5    Q.    And what was his position prior to that?

6    A.    He was a sergeant.

7    Q.    So he was a sergeant in addition to the sergeant you

8    previously testified that was the only sergeant, Latino

9    sergeant, in the police department in Lawrence?

10   A.    Prior to January when the new administration came in, he

11   was a sergeant, and he got promoted after the new

12   administration --

13   Q.    Promoted to deputy chief?

14   A.    -- promoted him to deputy chief.

15   Q.    Are you aware of whether he took the examination to be

16   promoted to sergeant?

17   A.    No, I'm not.

18   Q.    You never studied with Mr. Bonilla?

19   A.    Yes, I have.

20   Q.    And you studied for what?

21   A.    I studied for sergeant.

22   Q.    Was Mr. Bonilla taking the exam at the same time as you at

23   that time you were studying together?

24   A.    I believe he was, but it wasn't for the same exam that I

25   was taking.

1   Q.   So, then, is it your testimony that your preparation for

2   the exam is the true impact of how you perform on the exam as

3   opposed to the fact that you're a minority?

4          MR. CHURCHILL:  Objection.

5          THE COURT:  Sustained.

6   BY MR. D'AGOSTINO:

7   Q.   Is it your testimony that your preparation time for the

8   exam has a dramatic impact upon your performance in the exam?

9          MR. CHURCHILL:  Objection.

10         THE COURT:  You may answer that.

11         THE WITNESS:  I believe that plays a part.

12  BY MR. D'AGOSTINO:

13  Q.   A large part, a small part?

14  A.   It depends on the individual.

15  Q.   Well, what else would play a role in your success on the

16  examination?

17         MR. CHURCHILL:  Objection.

18         THE COURT:  Overruled.

19         THE WITNESS:  Well, some of it's not relevant to what

20  I do as a police officer.

21  BY MR. D'AGOSTINO:

22  Q.   Well, the relevancy as a police officer, certainly it's

23  not the exact same duties as a sergeant; is that correct?

24  A.   That's correct.

25  Q.   What are some of the sergeant's duties?

1   A.    Well, it would be overseeing of the patrol personnel;

2   assigning certain tasks, inspections of police personnel; and

3   depending on the type of call, he would take over a particular

4   scene and direct the officers as to what their functions are

5   going to be during that particular incident.

6   Q.    So the sergeant would have to have a great knowledge of

7   the law and procedure?

8   A.    Yes.

9   Q.    And that is tested upon the examination given by Human

10  Resources Division for sergeant promotion in the Commonwealth?

11  A.    Some of that's tested, yes.

12  Q.    What else do you believe are the good requirements or

13  characteristics that a person should maintain in order to be a

14  police sergeant?

15  A.    I believe that he has to be open-minded, he has to be the

16  type of person who has good communication skills, he has to be

17  able to think outside the box.

18  Q.    What do you mean when you say that, "think outside the

19  box"?

20  A.    A lot of situations are different.  Every call you go to,

21  it's never the same exact call.  You can go to ten different

22  disturbances and not one is going to be exactly like the last

23  one you went to.  The supervisor has to be able to adapt and

24  overcome, act fast, make quick decisions.  You never know what

25  you're going to walk into until you get there, and what

1   decisions you're going to have to make.  And I don't think

2   the -- at least the exams I've taken, kind of prepare you for

3   that.

4   Q.   Do you think being disciplined is a characteristic or a

5   quality a sergeant should have?

6   A.   You'd have to define what you mean by "discipline."

7   Q.   Well, do you think that that person should be capable of

8   giving orders, leading by example, following orders,

9   maintaining their control, their composure, their temper?

10   A.   I believe so.

11   Q.   Do you believe you fit those qualifications?

12   A.   Yes, I do.

13   Q.   Have you ever been disciplined in your role as a police

14   officer in the Lawrence Police Department?

15          MR. CHURCHILL:  Objection.  It's not relevant to the

16   issues in this case.

17          MR. D'AGOSTINO:  Your Honor, discipline, maintain of

18   control, temper, temperament, he's testified that these are all

19   important for a sergeant.  If he carries those qualifications,

20   then --

21          THE COURT:  Okay.  No, the objection is sustained.

22   BY MR. D'AGOSTINO:

23   Q.   Have you always been respectful of the officers above you

24   in command?

25          MR. CHURCHILL:  Objection.

1          THE COURT:  Sustained.

2   BY MR. D'AGOSTINO:

3   Q.   Just a couple of others.  Am I correct in understanding

4   that you don't consider yourself a Hispanic?

5   A.   I consider myself Puerto Rican.

6   Q.   So you do not consider yourself Hispanic, then?

7   A.   Not me being in the context you're probably using.

8   Q.   And what is the race of the chief of police in Lawrence?

9   A.   To the best of my knowledge he's, we'll say, half Puerto

10  Rican, half Dominican descent.  I believe he was born in New

11  York.

12  Q.   So he would fit the Hispanic compilation?

13  A.   My interpretation probably won't fit what he describes

14  himself as, so...

15          MR. D'AGOSTINO:  Thank you, Officer.  Nothing further

16  at this time.

17          MS. HARRIS:  I have nothing, your Honor.

18          THE COURT:  More or less let's keep the same order,

19  but go ahead.

20                      CROSS-EXAMINATION

21  BY MR. CARROLL:

22  Q.   Good morning, Officer Lopez.  My name is Harry Carroll.  I

23  represent the City of Springfield.

24  A.   Good morning.

25  Q.   And I believe you testified that you took three of the

1  police departmental promotion exams; is that correct?

2  A.   Yes.

3  Q.   And one was the 2008 exam, and you failed that; and one

4  was the 2006 exam, and you said you passed that?

5  A.   Yes.

6  Q.   What was the third exam?  What year did you take it?

7  Would that have been 2004?

8  A.   I believe it was 2004.

9  Q.   Okay.  And did you pass or fail that?

10 A.   I failed that particular exam.

11 Q.   So considering for a moment just the 2006 exam that you

12 had passed, I believe you said there were 20 or more people on

13 the list?

14 A.   Yes.

15 Q.   And would that be the eligible list or the certified list?

16 A.   I believe it was the certified list.

17 Q.   Okay.  And there were only five jobs that were open; is

18 that correct?  Five appointments that were made, I thought you

19 said?

20 A.   To the best of my recollection, yes.

21 Q.   Okay.  And what was your rank on the 2006 list?

22 A.   I want to say it was close to around 20.  I'm not exactly

23 sure where I stand.

24 Q.   Okay.  And the people who were actually appointed as

25 sergeants off of that list, would they have been the top five

1  scorers on the list, do you know?

2  A.   I believe they were in rank order.

3  Q.   So 1, 2, 3, 4, 5?

4  A.   I believe so.

5  Q.   And there were no Springfield police officers on that

6  list; is that correct?

7  A.   No, that list was only relevant to Lawrence.

8            MR. CARROLL:  Thank you.  No questions.

9            MS. ENGDAHL:  I have no questions, your Honor.

10            MR. LEAHEY:  I only have a few.

11            THE COURT:  Go ahead.

12                         CROSS-EXAMINATION

13  BY MR. LEAHEY:

14  Q.   Sir, you testified that earlier you had worked at the

15  Chelsea Housing Authority?

16  A.   Yes, sir.

17  Q.   As a police sergeant?

18  A.   Yes.

19  Q.   Do you know whether or not that was a Civil Service

20  entity?

21  A.   They were not.

22  Q.   When you went to -- after that you went to Newton -- the

23  City of Newton, correct, or town of Newton?

24  A.   City of Newton.

25  Q.   Do you know whether or not that's a Civil Service

1   community?

2   A.   Yes, it is.

3   Q.   So Newton was the first Civil Service position that you

4   held?

5   A.   Yes.

6   Q.   And you testified earlier that in your role as a police

7   officer in Lawrence, you often go and serve people who speak

8   Spanish?

9   A.   Yes.

10  Q.   And that you speak Spanish?

11  A.   Fluent.

12  Q.   Do you consider that to be an asset for you in that you

13  are able to communicate with the citizens in Lawrence in one of

14  the languages that they speak?

15  A.   Yes.

16  Q.   You testified that you went up to the ninth grade in high

17  school?

18  A.   That's correct.

19  Q.   Did you complete that?

20  A.   I left at the ninth grade.

21  Q.   Did you complete the ninth grade or did you leave during

22  the ninth grade?

23  A.   I completed ninth grade.

24  Q.   Okay.  Since that time have you received any other formal

25  education in a school environment?

```
 1   A.   I've taken college courses.

 2   Q.   Do you have your GED?

 3   A.   Yes, I do.

 4   Q.   When did you get that?

 5   A.   I believe I had obtained that in 1983.

 6   Q.   Are you familiar with the Quinn Bill?

 7   A.   Yes.

 8   Q.   Do you have any degrees that fall in the compensation of

 9   the Quinn Bill?

10   A.   Not at this time.

11   Q.   Are you working towards any?

12   A.   Yes.

13   Q.   Are you working to an associate's degree in criminal

14   justice?

15   A.   Eventually I would like to get that, yes.

16   Q.   Well, what are you working on right now?

17   A.   Currently, nothing.

18   Q.   All right.  So you're not -- currently you're not taking

19   any educational courses that can be credited towards

20   compensation under the Quinn Bill?

21   A.   Earlier -- I'm not enrolled in a college.

22   Q.   When was the last time you were enrolled in a class that

23   would be credited towards the Quinn Bill?

24   A.   I want to say about, maybe, 2001.

25   Q.   And in a question from Attorney D'Agostino, I think you
```

1  said at one time that your studies were impacted -- your

2  ability to study was impacted because you had to go to court

3  and testify.  Did you testify to that earlier today?

4  A.   Yes.

5  Q.   Was that because you worked nights and had to go into

6  court during the day?

7  A.   That's correct.

8  Q.   Because court's only open from 8:30 in the morning until

9  4:30 in the afternoon?

10  A.   In Massachusetts, yes.

11  Q.   And did that -- what years did that going in and working

12  on a case and testifying in court -- what years did that affect

13  your ability to study for?  Was it the 2004 test, 2006 test,

14  2008 or all three?

15  A.   You never know when you're going to have to go to court.

16  I would say all three.

17  Q.   Do you currently work nights now?

18  A.   Yes.

19          MR. LEAHEY:  Thank you.

20          MR. McDERMOTT:  Your Honor, no questions from the

21  MBTA.

22          MR. McQUILLAN:  Nothing from the City of Methuen, your

23  Honor.

24          THE COURT:  Anything else?

25          MR. CHURCHILL:  I have no further questions, your

1    Honor.

2         THE COURT:  All right, sir.  You're excused.  You may

3    step down.

4         (The witness is excused.)

5         THE COURT:  Are we at that point you referred to

6    earlier?

7         MR. LICHTEN:  Yes, your Honor.

8         THE COURT:  All right.  We'll end for the day here,

9    then, and resume at nine.

10        MS. HARRIS:  I'm sorry, your Honor.  Before we

11   adjourn, I just wanted to bring to the Court's attention some

12   scheduling issues, particularly with regard to witnesses for

13   the defense.  I expect that we're probably going to reach the

14   defense case next week.  But our Dr. Outtz, who is one of the

15   two expert witnesses that the defense will call, is only

16   available Tuesday of next week.  He has to -- his personal

17   circumstances are compelling, and if you need me to tell you

18   about them, I will.

19        MR. LICHTEN:  We're not going to raise a problem.

20   We'll take him out of turn, if necessary.

21        MS. HARRIS:  And so to that end, if we could have some

22   assurance of what the order is going to be so that we can make

23   sure that we have the people available who need to be

24   available, that would be appreciated.

25        THE COURT:  I was with you right up until the end.

1           MS. HARRIS:  Pardon?

2           THE COURT:  I was with you right up until the end.

3      You were talking about one witness and then you were talking

4      about an order of witnesses.

5           MS. HARRIS:  We would like to know who is going to be

6      called tomorrow, for example.  It would be helpful.

7           MR. LICHTEN:  When I get back to the office, it's my

8      practice to e-mail the other side as to who we -- the range of

9      people we intend to call.

10          MS. HARRIS:  But the range has fluctuated quite

11     considerably.

12          MR. LICHTEN:  It's going to be two or three people.

13     We're definitely calling Dr. Wiesen.  Dr. Wiesen is going to be

14     our main witness tomorrow.  We may -- if we get through him,

15     there may be one or two others.  I will provide those names.

16          THE COURT:  Okay.  I'm not sure it's still in the

17     local rules.  There used to be a two-day notice requirement.

18     It's certainly been the tradition here; it may still be in the

19     local rule.

20          MR. LICHTEN:  I haven't given notice that Dr. Wiesen

21     was going to testify; I gave it last week.

22          THE COURT:  All right.  Anyway...

23          MR. LICHTEN:  Thank you, your Honor.

24          THE COURT:  Thanks.

25          MS. HARRIS:  Thank you.

```
 1              THE CLERK:  All rise.

 2              Court is in recess.

 3              (The Court exits the courtroom and the proceedings

 4     adjourned at 12:45 p.m.)

 5

 6                      C E R T I F I C A T E

 7

 8              I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

 9     the United States District Court, do hereby certify that the

10     foregoing transcript constitutes, to the best of my skill and

11     ability, a true and accurate transcription of my stenotype

12     notes taken in the matter of Civil Action No. 07-11693-GAO,

13     Pedro Lopez, et al, v. City of Lawrence, et al.

14

15     /s/ Marcia G. Patrisso_____
       MARCIA G. PATRISSO, RMR, CRR
16     Official Court Reporter

17
       Dated: 7/12/10
18

19

20

21

22

23

24

25
```