UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


PEDRO LOPEZ, Individually and on        )
behalf of a class of individuals        )
similarly situated,                     )
                                        )
        Plaintiffs,                     )
                                        ) Civil Action
v.                                      ) No. 07-11693-GAO
                                        )
CITY OF LAWRENCE, et al,                )
                                        )
        Defendants.                     )
                                        )


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


DAY TWO
NON-JURY TRIAL


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Tuesday, July 13, 2010
9:05 p.m.


Marcia G. Patrisso, RMR, CRR
Lee A. Marzilli, RPR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1    APPEARANCES:

2         LICHTEN & LISS-RIORDAN, P.C.
          By: Harold L. Lichten, Esq.
3              Stephen S. Churchill, Esq.
               Joseph L. Sulman, Esq.
4         100 Cambridge Street, 20th Floor
          Boston, Massachusetts  02114
5         On Behalf of the Plaintiffs

6         CITY OF LOWELL LAW DEPARTMENT
          By: Brian W. Leahey, Esq.
7              R. Eric Slagle, Esq.
          City Hall
8         375 Merrimack Street
          Lowell, Massachusetts  01852
9         On Behalf of the Defendant City of Lowell

10        OFFICE OF THE CITY ATTORNEY
          By: Richard J. D'Agostino, Esq.
11        200 Common Street, Suite 306
          Lawrence, Massachusetts  01840
12        On Behalf of the Defendant City of Lawrence

13        COLLINS, LOUGHRAN & PELOQUIN
          By: Laurie W. Engdahl, Esq.
14        320 Norwood Park South
          Norwood, Massachusetts  02062
15        On Behalf of the Defendant City of Worcester

16        MORGAN, BROWN & JOY, LLP
          By: Mary Jo Harris, Esq.
17             Robert P. Morris, Esq.
          200 State Street, 11th Floor
18        Boston, Massachusetts  02109
          On Behalf of the Defendant City of Boston
19
          MBTA LAW DEPARTMENT
20        By: Kevin S. McDermott, Esq.
          10 Park Plaza, 7th Floor
21        Boston, Massachusetts  02116
          On Behalf of the Defendant MBTA
22

23

24

25

```
 1        CITY OF SPRINGFIELD LAW DEPARTMENT
          By: Harry P. Carroll, Esq.
 2        36 Court Street
          Springfield, Massachusetts  01103
 3        - and -
          LAW OFFICE OF EDWARD M. PIKULA
 4        By: Edward M. Pikula, Esq.
          1350 Main Street, 15th Floor
 5        Springfield, Massachusetts  01103
          On Behalf of the Defendants City of Springfield
 6        and Mayor Sarno

 7        CITY OF METHUEN - OFFICE OF THE CITY SOLICITOR
          By: Peter J. McQuillan, Esq.
 8        The Searles Building, Suite 311
          41 Pleasant Street
 9        Methuen, Massachusetts  01844
          On Behalf of the Defendant City of Methuen
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2                        Direct   Cross   Redirect   Recross
   WITNESSES FOR THE
3    PLAINTIFFS:

4  JOEL WIESEN

5      By Mr. Lichten              17

6                      E X H I B I T S

7  PLAINTIFFS'
     EXHIBIT        DESCRIPTION                 FOR ID   RECEIVED
8
   No. 3    State exam outline 2005                        9
9
   No. 4    Boston exam outline 2005                       9
10
   No. 5    Boston sergeant examination announcement 2005  9
11
   No. 6    Boston exam results 2005                       9
12
   No. 7    State exam results 2005                        9
13
   No. 8    Report and analysis on BPD 2005 results        9
14
   No. 9    Exam outline 2006                              9
15
   No. 10   2006 exam reading list                         9
16
   No. 11   E&E rating sheet instructions, scoring grid and
17           rating worksheet 2006                         9

18 No. 12   Booklet pages for 2006 exam                    9

19
   No. 17   2007 exam outline                              9
20
   No. 18   2007 exam reading list                         9
21

22 No. 19   E&E rating sheet instructions 2007             9

23 No. 20   Sample 2007 appeal letter responses            9

24 No. 21   E&E rating worksheet 2007                      9

25 No. 22   2008 state exam outline                        9

| 1  | No. 23 | 2008 BPD outline | 9 |
| 2  | No. 24 | 2008 state exam reading list | 9 |
| 3  | No. 25 | Update_sgt_promos_2005-07exams_030510 | 9 |
| 4  | No. 26 | 2008 sergeant exam data | 9 |
| 5  | No. 27 | Boston's response to plaintiff's supplemental discovery, 3/22/10 | 9 |
| 6  | No. 28 | Boston sergeant promotions 6/19/10 | 9 |
| 7  | No. 29 | Boston sergeant promotions 7/7/10 | 9 |
| 8  | No. 30 | List of Boston police officers and sergeants 2004-2008 | 9 |
| 9  | No. 31 | Springfield's response to plaintiffs' supplemental discovery 4/28/10 | 9 |
| 10 | No. 32 | Worcester's response to plaintiffs' supplemental discovery 4/28/10 | 9 |
| 11 | No. 33 | List of Worcester police officers and sergeants 2004-2008 | 9 |
| 12 | No. 34 | Lowell's response to plaintiffs' supplemental discovery 4/29/10 | 9 |
| 13 | No. 35 | List of Lowell's police officers and sergeants 2004-2008 | 9 |
| 14 | No. 36 | MBTA's response to plaintiffs' supplemental discovery 5/7/10 | 9 |
| 15 | No. 37 | Methuen's response to plaintiffs' supplemental discovery 4/8/10 | 9 |
| 16 | No. 38 | Lawrence's response to plaintiffs' supplemental discovery 6/4/10 | 9 |
| 17 | No. 39 | List of Lawrence police officers and sergeants 2004-2008 | 9 |
| 18 | No. 40 | 1991 validation report | 9 |
| 19 | No. 41 | Appendix to 1991 report | 9 |

No. 42    Job analysis report for police sergeant by
          Morris & McDaniel, with appendix               9

No. 44    Sealed exam questions 2008                     9

No. 45    Sealed Boston exam questions 2008              9

No. 46    Sealed exam questions 2007                     9

No. 47    Sealed exam questions 2006                     9

No. 48    Sealed exam questions 2005                     9

No. 50A   Curriculum vitae                              20

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                   P R O C E E D I N G S
2            THE CLERK:  All rise.
3            (The Court enters the courtroom at 9:05 a.m.)
4            THE CLERK:  For a continuation of the Lopez trial.
5    Please be seated.
6            THE COURT:  Good morning.
7            COUNSEL IN UNISON:  Good morning, your Honor.
8            MR. CHURCHILL:  Just a few logistical items, your
9    Honor, in terms of exhibits.  We have identified exhibits by
10   plaintiffs' proposed ID number, and on a number of them I
11   believe we've agreed with the parties that they can be entered
12   into evidence.  I wanted to put that in the record.  And those
13   would be Plaintiffs' ID No. 3 through 15, I don't believe there
14   have been any objections to.
15           And I understand the Court's preference here is to
16   mark them using an exhibit number which corresponds to the ID
17   number, which makes perfect sense.
18           THE COURT:  Yes.  Yes.
19           MR. CHURCHILL:  Also, proposed Exhibits 17 through 42,
20   I don't believe there have been any objections to.
21           There are a series of exhibits that have not been
22   objected to but we're asking that they be admitted under seal.
23   These are the exams themselves that were provided by HRD, and
24   they requested that they be -- the confidentiality of those
25   exhibits be maintained.  And those would be Exhibits 44 through
```

1  49.

2          THE COURT:  Is there any objection to that way of

3  handling them?  I'm not sure -- we'll do that initially.  I

4  reserve the right to change my mind about that when I've seen

5  them.

6          MR. CHURCHILL:  Not surprisingly, our confidentiality

7  agreement gives you that power, your Honor.

8          THE COURT:  All right.  There may be a public interest

9  in it; that is my only point.  I understand the desire -- this

10  is the desire of the testing authorities, to keep them

11  confidential, to protect possible future tests.

12          MR. CHURCHILL:  Exactly.

13          THE COURT:  Right.  Okay.

14          MR. CHURCHILL:  Which hopefully will be in a different

15  form, your Honor.

16          Also, there are four exhibits which are pronounced

17  from a spreadsheet.  This is the underlying data that relate to

18  expert reports.  And these are proposed Exhibit Nos. 74 through

19  77.  I just wanted to give counsel a chance to object.  These

20  were -- we sent these over yesterday.

21          MS. HARRIS:  I haven't looked at them.

22          MR. CHURCHILL:  These are the data that the experts

23  relied on in -- all of the experts relied on in their more

24  recent reports.  If there's any objection, then we'll defer it

25  until --

```
 1              MR. PIKULA:  We object.

 2              THE COURT:  Okay.  I guess we'll hold off on those.

 3              (Plaintiff's Exhibit Nos. 3 through 13, 17 through 42,

 4      and 44 through 49, received into evidence.)

 5              MR. CHURCHILL:  That's fine, your Honor.  And then

 6      finally, with respect to Commissioner Davis who we had intended

 7      to call as a witness yesterday and didn't reach because of the

 8      scheduling issues, there are two items that we're moving to

 9      admit as statements of a party opponent:  One is a Fox News

10      interview in which he was commenting on the sergeant

11      promotional process.  We have audio of that, but we also have

12      transcribed Commissioner Davis's comments, so it seems more

13      practical to move the transcription into evidence.

14              And the second item, and I know that there will be

15      objections to these, is testimony that Commissioner Davis gave

16      at a Boston City Council meeting earlier in June also relating

17      to the sergeant promotional exam process.  And again, we have a

18      video of that testimony which we could certainly admit in the

19      form of a disk or we could admit the transcript of the relevant

20      portion -- the portions that we believe are relevant.  And we

21      understand that under Rule 106 if the defendants want to

22      introduce any additional portions of that testimony, we would

23      not object to it.

24              MS. HARRIS:  And we would object to it, your Honor,

25      primarily because the plaintiffs' characterization of it
```

1    overstates it.  These are statements that the commissioner made

2    when he was subpoenaed by the city council to talk about

3    diversity in the police department overall, and I think it

4    tends to confuse and distort, perhaps, the testimony of the

5    commissioner, to allow that in in that fashion.

6           I understand that we would have the right to call him

7    to have him fully explain those statements in the defense case,

8    but I think the best evidence about what the commissioner knows

9    or believes or thinks or opines is best introduced through his

10   live testimony.

11          I would also point out that to the extent the

12   commissioner states he has concerns about the promotional

13   process, he's never seen the exams at issue, he's not a testing

14   expert -- he's a political figure in the City of Boston -- and

15   I would suggest that the appropriate way for his to testimony

16   to come in before the Court on the issue is through live

17   testimony.

18          So for both of those reasons we object.

19          MR. PIKULA:  I object on behalf of the City of

20   Springfield for the same reasons as my sister, but obviously, I

21   think this is another backdoor way to try to get in some expert

22   testimony or perceived expert testimony.  Certainly it has

23   nothing to do with the City of Springfield.

24          THE COURT:  Well, I'm not sure it's hearsay.  It

25   depends on what he says, I guest.

```
 1          MS. HARRIS:  I'm not arguing that it's hearsay, your
 2   Honor.  I'm arguing --
 3          THE COURT:  I mean, I'm not sure it's offered for the
 4   truth of -- I mean, I don't know what it is, so...
 5          MS. HARRIS:  I think that is what they're arguing.
 6          THE COURT:  Well, I guess it depends on what the
 7   statement is.  If it's an "I believe" statement, then I guess
 8   the question is:  Is it true that he believes it?  That will be
 9   the truth proposition.  I think we could probably accept that,
10   maybe, that he would say in public what he truly believes.
11   Beyond that, I don't know whether -- if it's a statement about
12   desirable policy, I don't know.  That's not a truth statement.
13   I don't know how particularly relevant it is.
14          MS. HARRIS:  I would suggest, your Honor, that it
15   doesn't really illuminate the central issue here, which is
16   whether these particular exams that he's never seen, one of
17   which was administered before he was commissioner -- whether
18   his opinions about them have any bearing toward the ultimate
19   decision in the case.
20          MR. CHURCHILL:  I would say two things, your Honor:
21   First of all, it's actually not hearsay, not because it's not
22   being offered for the truth of the matter, but because under
23   801(d) it's a statement of a party opponent.
24          THE COURT:  Well, okay.  That's true, but that's not
25   what I was getting at.  What I meant was it's not being offered
```

1    to prove the substance of the testimony is true as a fact in

2    the case.

3           Tell me why it's relevant.

4           MR. CHURCHILL:  Well, Commissioner Davis, as the head

5    of the Boston Police Department, is taking the position in the

6    statements that these tests are flawed.  In one instance he's

7    addressing the use of an assessment center for detectives

8    saying that that's been very successful for the city, that it's

9    led to improvements in terms of diversity in the ranks.  And it

10   very centrally addresses the issue of validity, in our view.

11          THE COURT:  Well, it seems to me if he wants to

12   testify about his experience using different techniques and

13   what they may or may not show as a matter of his historical

14   experience, then I guess he could testify to that live.  It

15   does possibly raise the concern that Mr. Pikula was raising,

16   which is the proffer of this as expert testimony, of a sort.

17   If he was going to give an opinion that, for example,

18   assessment centers are superior to written tests, that I think

19   would be in the 702 category, wouldn't it?  And so therefore,

20   if he's not been designated as an expert, I don't think he

21   should be allowed to give expert testimony.

22          Now, we had -- the first witness, Mr. Nolan, testified

23   about some facts of his experience as a police officer.  If

24   Commissioner Davis wants to talk about his experience as a

25   police officer through commissioner, I guess that would be

1    okay.

2          MR. CHURCHILL:  Well, I think particularly with

3    respect to his discussion of their use of assessment centers

4    with respect to detectives, he's relating his experience with

5    these exams, and that's one of the statements we're seeking to

6    admit.

7          THE COURT:  Right.  And I think his historical

8    experience would be fact testimony.  His opinion about whether

9    it's better than some other method, I'm not sure is admissible.

10          MR. CHURCHILL:  Well, one of the statements that he

11    made at the city council hearing was addressing his

12    experience -- the department's experience with the use of

13    assessment centers as a factual matter, and that's one of the

14    statements that we're seeking to admit here.

15          THE COURT:  Well, why can't he just testify to it?  Do

16    you think he's going to say something different than he said at

17    the city council?

18          MR. CHURCHILL:  I mean, we had him here yesterday to

19    testify and --

20          THE COURT:  Oh, you want to use this instead of him

21    testifying?

22          MR. CHURCHILL:  Correct.

23          THE COURT:  No, I don't think so.

24          MS. HARRIS:  Yeah, we object.

25          THE COURT:  I'm sorry for the inconvenience of the

1   commissioner, but he has to be here.

2        MR. CHURCHILL:  Okay.

3        MS. HARRIS:  And as I represented to counsel and to

4   the Court, he's available any time this week and he could be

5   here within 15 minutes, and he knows he's on call.

6        MR. CHURCHILL:  That's fine, your Honor.  We'll call

7   him.

8        MR. LEAHEY:  Your Honor, I just have one quick

9   clarification with regard to the exhibits.  I'm sure this is

10  the same for other municipal defendants, but we didn't have

11  objections that -- you know, obviously the stuff that pertains

12  to Worcester is not relevant to Lowell.  At least that's the

13  position of the city that -- look, whatever relates to the City

14  of Lowell, it's fine with, but to say that the city didn't

15  object to stuff regarding Worcester, Lowell -- excuse me --

16  Worcester, Lawrence, the other municipalities, the City of

17  Lowell informed them that we had -- said that -- we were of the

18  position that they were not applicable.

19       So I just want to make that note for the record, that

20  the City of Lowell didn't agree to all of these exhibits, only

21  the ones that pertained to it.

22      THE COURT:  Well, I don't know with respect to any

23  particular exhibit whether it has meaning beyond the particular

24  city that it's offered as to.  I don't think I can say that.  I

25  certainly can't say it out of knowledge of the exhibits because

1    I haven't looked at them, but I doubt that it's categorically

2    true.  There may be some exhibits, particularly on the issue of

3    aggregation or not, depending on how that comes out -- there

4    may be some exhibits that pertain to everybody.  So I don't

5    think we can make that as a general statement.

6            MR. LEAHEY:  Then there may be some that the City of

7    Lowell will object to because we didn't agree to all the ones

8    that were listed.  I can give you a list of the ones that the

9    city did agree to, but there are certain ones that -- again,

10   anything involving the Boston exam, the city took the position,

11   in correspondence with the plaintiffs, that they were not

12   applicable and the city had no position on that.

13           THE COURT:  Well, of course any defendant can argue

14   that certain evidence doesn't affect the assessment of the

15   plaintiffs' case against that defendant.

16           MR. LEAHEY:  That's fine, your Honor.

17           THE COURT:  It's another matter to try to police --

18   excuse the expression.

19           (Laughter.)

20           THE COURT:  -- the admission of the evidence.

21           I think we'll treat the exhibits as admitted, those

22   that were announced.

23           MR. CHURCHILL:  Thank you, your Honor.

24           THE COURT:  Mr. McDermott?

25           MR. McDERMOTT:  Yes, your Honor, I just had one

1    concern just following what he just stated, your Honor.

2         I understand these exhibits -- I have the same -- and

3    we all have the same -- concern that Mr. Leahey voiced.  And

4    I'm wondering, your Honor, whether we can take a standing

5    objection so that at the end of the trial to the extent -- that

6    we preserve our objections so that at the end of the trial if

7    there's a piece of evidence such as, perhaps, an aggregation

8    that we may object to, we're not up against, "Well, you didn't

9    object to it when it came in."

10        THE COURT:  Well, I think we have to distinguish

11   between the question of admissibility and the question of

12   probative value.  Now, obviously there's some overlap in those

13   matters because things without probative value are generally

14   not admitted.  But putting aside the relevance to particular

15   claims, if they're otherwise admissible under the various

16   rules, whether it's hearsay, authenticity, whatever else might

17   apply, except for the zone of probative value.

18        So, yes, as to probative -- so in other words, if

19   someone objects on a hearsay ground as well as relevance, then

20   I guess we have to resolve that.  The relevance, because it

21   doesn't -- this particular piece of evidence doesn't touch me

22   or my client and, therefore, I don't want it in, I think we'd

23   have to do that in a slightly different way than we would if

24   there was only one defendant in the case.

25        MR. McDERMOTT:  Yes, your Honor.

```
 1              THE COURT:  So at the end of the case if there's some

 2     points along -- I mean, you'll be making those points in either

 3     motions or in your general request for findings, I would

 4     suspect.

 5              MR. McDERMOTT:  Thank you.

 6              THE COURT:  Okay.

 7              Now, are we ready for a witness?

 8              MR. LICHTEN:  Yes, your Honor.  We call Dr. Joel

 9     Wiesen.

10                        JOEL WIESEN, duly sworn

11              THE CLERK:  Please be seated.  State your name, spell

12     your last name for the record, keep your voice up and speak

13     into the mic so everyone can hear you.

14              THE WITNESS:  Okay.  My name is Joel Wiesen,

15     W-I-E-S-E-N.

16                        DIRECT EXAMINATION

17     BY MR. LICHTEN:

18     Q.   What do you do for a living, Dr. Wiesen?

19     A.   I'm a consultant.

20              MR. LICHTEN:  Was the witness sworn in?  I just --

21              THE COURT:  Yes.

22     BY MR. LICHTEN:

23     Q.   And a consultant in what?

24     A.   In areas of testing and, specifically, employment testing.

25     Q.   And do you have professional degrees?
```

1    A.    I do.

2    Q.    And what are the degrees that you have?

3    A.    I have a bachelor's degree in psychology, a master's

4    degree in psychology and a Ph.D. in psychology.

5    Q.    And is there a subspecialty within the field of psychology

6    that your degrees are in?

7    A.    There are no subspecialties for the bachelor's and

8    master's.  For the Ph.D., I minored in psychometrics.

9    Q.    Okay.  And what kind of a psychologist are you?

10   A.    Industrial psychologist.

11   Q.    And can you tell the Court what an industrial psychologist

12   does?

13   A.    An industrial psychologist applies psychology to the realm

14   of work.

15   Q.    Okay.  And where is your Ph.D. from?

16   A.    Lehigh University.

17   Q.    And where's your master's degree from?

18   A.    C. W. Post College of Long Island University.

19   Q.    And where's your bachelor's from?

20   A.    Stony Brook University.

21   Q.    And how long have you been practicing as an industrial

22   psychologist?

23   A.    Since 1975.

24   Q.    Do you have any particular specialties within the field of

25   industrial psychology that you specifically work on?

1    A.    Industrial psychology is very broad.  It includes

2    organizational design and then job satisfaction, and what have

3    you.  I specialize in assessment, in testing.

4    Q.    And how long have you been involved in that field?

5    A.    Since 1975.

6    Q.    Okay.  What was your first professional position after you

7    obtained your Ph.D.?

8    A.    I worked for a consulting firm in the Philadelphia area.

9    Q.    And what did you do in that firm?

10   A.    That firm consulted to the military and to large

11   organizations such as, back then, Bell Telephone, in the area

12   of assessment -- selecting and evaluating new employees or

13   existing employees.

14   Q.    What did you do after that?

15   A.    I came to Massachusetts.

16   Q.    Let me ask you first, if you could turn -- you have a

17   vitae, is that correct, that you attached to your report?

18   A.    Yes.

19   Q.    Okay.  And if you could turn to -- if you see a bunch of

20   exhibit books there -- Exhibit 50.  And if you could turn to

21   the end, is your vitae attached there?

22   A.    Yes.

23   Q.    Okay.  And is that an accurate description of your vitae

24   as it existed in October of 2008?

25   A.    Yes.

1          MR. LICHTEN:  Your Honor, may I move that to be

2     introduced?

3          THE COURT:  "That" being?  It sounded to me this was a

4     portion of an exhibit?

5          MR. LICHTEN:  Just the vitae itself.  Just that

6     portion, that's all I'm moving right now.

7          THE COURT:  Which has not been separately marked?

8          MR. LICHTEN:  Which has not been separately marked.

9          THE COURT:  I think if we're going to admit it, we'll

10    have to do that.  We'll call it 50A.  Can we do that?

11         MR. LICHTEN:  50A, yeah.

12         THE COURT:  Okay.

13         (Plaintiffs' Exhibit No. 50A received into evidence.)

14    BY MR. LICHTEN:

15    Q.   Have you taught college-level courses?

16    A.   Yes, I have.

17    Q.   And where have you taught?

18    A.   I taught at Kings College in Wilkes-Barre, Pennsylvania,

19    as a full-time faculty member, and I've taught part time in the

20    Boston area at Northeastern University and Lesley College.

21    Q.   Have you held any offices in professional associations?

22    A.   Yes.  I was president of the New England Society for

23    Applied Psychology, which is mainly a Boston-area organization;

24    and a national organization called the International Personnel

25    Management Association Assessment Council, which is a group of

1    some 500 or so assessment -- mainly public-sector assessment

2    specialists across the country.

3    Q.    Have you presented -- do you hold any positions in

4    other -- in any national or international organizations?

5    A.    I think that's it.

6    Q.    Okay.  What is the Society for Industrial Organizational

7    Psychology?

8    A.    That is the major professional organization for industrial

9    and organizational psychology in the country.

10   Q.    And we call that SIOP for short?

11   A.    We call it SIOP for short.

12   Q.    Do you regularly attend SIOP conferences?

13   A.    I attend SIOP conferences, I've been on the program

14   committee for SIOP, I've been on at least one other committee

15   for SIOP.

16   Q.    And have you made presentations at SIOP conferences?

17   A.    And I've made several presentations at SIOP conferences,

18   most recently, the last conference.

19   Q.    Approximately how many presentations have you given at

20   conferences?

21   A.    As a guess, I would say 30 or so.

22   Q.    And in what areas are these that are relevant to this

23   case?

24   A.    I'm either presenting either a description of a testing

25   program that I've developed that I think has some -- be of some

1    interest to the audience, which would mean perhaps it has some

2    unusual components to it, or I might be undertaking an

3    evaluation of an existing test or practice.  And one of the

4    areas that I focus on is ways of reducing adverse impact.

5    Q.    Have you been involved in the design of public safety

6    selection procedures?

7    A.    Yes.

8    Q.    Can you tell me what you've done in that regard?

9    A.    Yes.  So with the Commonwealth of Massachusetts, which we

10   haven't gotten into yet, part of my job responsibilities

11   involved overseeing the selection -- developing the selection

12   test for entry-level and promotional job titles.  Beyond that,

13   I've developed a entry-level firefighter exam; and I have

14   developed promotional exams for sergeant, lieutenant, captain

15   and police chief; and contributed to an examination for state

16   police, I think lieutenants and captains, as well as some

17   military titles.

18   Q.    Okay.  And have you served as an expert witness in cases

19   involving disparate impact?

20   A.    Yes, I have.

21   Q.    And do you recall some that come to mind?

22   A.    Yes.  There was one here in Massachusetts, Bradley,

23   involving an entry-level firefighter.  There was a case in New

24   York City involving also an entry-level firefighter.

25   Q.    Both those resulted in plaintiffs' verdicts?

1    A.    The one in New York City could still be appealed, but the

2    ruling was very strong, yes.

3    Q.    And were you involved in a case that made its way all the

4    way up to the U.S. Supreme Court?

5    A.    I was.  And that was Teal v. Connecticut.

6    Q.    And what was at issue in Teal v. Connecticut?

7    A.    The issue from the point of view of the industrial

8    psychologist was the validity of the test and the passing

9    point.  But I think the legal import was -- had to do with

10   whether each portion of a selection procedure must be valid.

11   Q.    Okay.  Now, let me --

12   A.    Whether or not there's a bottom-line adverse impact.

13   Q.    Gotcha.  Let me go back to what you've done since you got

14   your Ph.D.  After you worked for this firm in Philadelphia,

15   what was your next full-time position?

16   A.    I came to the Commonwealth of Massachusetts and worked for

17   the predecessor agency to HRD.  It was called the Department of

18   Personnel Administration.  And I think my first time title

19   there was chief of test validation.

20          MR. LICHTEN:  Your Honor, is his voice loud enough for

21   you?

22          THE COURT:  Mostly.

23          MR. LICHTEN:  Okay.

24   BY MR. LICHTEN:

25   Q.    Dr. Wiesen, because this is a big courtroom, could you try

1   to keep your voice up?

2   A.    I will do that.  Is this better?

3   Q.    That's better.  Well, it's up to the judge.

4         How long did you work for the Commonwealth of

5   Massachusetts?

6   A.    Well, I got there in '77 and I left early '93, as I

7   recall.  And the last six years or so I worked part time, so it

8   was, you know, about 15 years.

9   Q.    Okay.  At some point in time were you involved in public

10  safety promotional testing for the Commonwealth of

11  Massachusetts?

12  A.    For part of that time I was involved with public safety

13  promotional testing.

14  Q.    Okay.  And at other times you were not?

15  A.    Correct.

16  Q.    And when was it that you were not involved with that?

17  A.    When I first came to the Commonwealth, the major interest

18  was in entry-level exams, and so I spent my

19  time with entry-level exams.  At some point in the '80s I

20  developed performance evaluation systems for state managers and

21  state non-managers and for -- and those could be applicable

22  also to municipalities.  And I spent several years developing

23  those performance evaluation systems.

24  Q.    Okay.  And what were the actual titles you held with the

25  Commonwealth of Massachusetts?

1    A.    Well, I'll see if I could remember them.  There was chief

2    of test validation and then there was chief of test development

3    and validation; there was director of planning and research.

4    And it was while I was planning -- director of planning and

5    research that I developed the performance evaluation systems.

6    There might have been some variance on the first two titles,

7    but those are the ones I'm fairly confident of.

8    Q.    Okay.  Were you the only industrial psychologist at the

9    Department of Personnel Administration at the time?

10   A.    I was the only Ph.D. level.  There were two master's-level

11   folks, and there was -- for a while there was another Ph.D.,

12   but not in -- not, per se, in industrial psychology.

13   Q.    Okay.  Now --

14   A.    And later on there was one Ed.D.

15   Q.    At some point in time, were you asked to become involved

16   in this case?

17   A.    Yes.

18   Q.    Okay.  And do you recall approximately when that was?

19   A.    Sometime in '08.

20   Q.    Okay.  And did you review materials relating to this case?

21   A.    I did.

22   Q.    And are they listed somewhere?

23   A.    Yes.  Most of the materials I reviewed are in the first

24   expert witness report.

25   Q.    So is that Attachment B to Exhibit 50?  I'm sorry.  That's

1    wrong.  Can you tell me where that is, please, in your report?

2    A.    So in my report of March 30th I have a list of documents I

3    reviewed starting on page 31.

4    Q.    For the record, that's Exhibit 51; is that right?  Exhibit

5    51.  On what page does that start?

6    A.    On page 31.

7    Q.    Okay.

8    A.    And it goes for several pages.

9    Q.    Okay.  And I don't want to spend a lot of time -- can you

10   tell us the types of documents, all told, that you looked at

11   and reviewed in this case?  What were the various types of

12   documents?

13   A.    I was interested in reviewing the documents related to the

14   test validity, and I was given and reviewed many documents

15   related to that, and I was also asked to look at the impact of

16   the examination.  And so I was given and reviewed data on how

17   the test-takers did on the various tests.  Much of that was in

18   the form of computer files, but some of it was written.

19   Q.    Okay.  So you received statistical data.  And who was that

20   from that you received it?

21   A.    You.  But it seemed like it came from HRD.

22   Q.    Okay.  And did you review statistical data provided to you

23   by defendants' own expert?

24   A.    Well, anything I got, I actually got from you, but as I

25   understand it, Dr. Silva provided --

1          MR. CARROLL:  Objection.

2          THE COURT:  Overruled.

3          THE WITNESS:  -- a computer file with his last expert

4    witness report.  And I relied on that computer file largely in

5    doing my analyses -- my most recent analyses.  And I relied on

6    earlier files produced by HRD for the earlier analyses.

7    BY MR. LICHTEN:

8    Q.    Okay.  And do you recall if HRD changed its record-keeping

9    procedure at some point in time that made your life more

10   difficult?

11   A.    Yes.

12   Q.    Can you tell the Court about that, please?

13   A.    Yes.  Sometime in the last few months of '09, I believe,

14   the HRD stopped keeping records of who was appointed from the

15   eligible lists that resulted from the examinations.  So up

16   until that point in time, with the exception of a few

17   communities I believe that were del- -- were delegated, HRD had

18   information on all of the appointments made in any Civil

19   Service town or city in the state.

20   Q.    Okay.  And after the fall of '09?

21   A.    After the fall of '09 I think HRD sporadically got some

22   reports, but there was no central repository any longer.

23   Q.    Okay.  And do you recall reviewing answers to

24   interrogatories sent out by the plaintiffs to the various towns

25   that were defendants in this case to get updated information on

1    hiring?

2    A.    Yes.  I received updated information in May, and I think

3    also one in June of this year.

4    Q.    Okay.  And do you recall receiving an expert report from

5    Dr. Silva in late May of 2010?

6    A.    Right.  That was the report that had the data file

7    associated with it.

8    Q.    Okay.  And that had data files in that?

9    A.    One data file.

10    Q.    Okay.  And did you review that?

11    A.    I based my -- all my analyses after that point in time on

12    that data file.

13    Q.    Okay.  Now, let me move on from the data files.  Did you

14    look at material from HRD relating to how it constructed the

15    various examinations that are at issue in this case?

16    A.    Yes.

17    Q.    And can you tell us what you reviewed in that regard?

18    A.    I reviewed, I think, everything that they produced with

19    respect to the validity of the examinations in question.  The

20    two major documents are a 1991 validation study and a study

21    about 2002 done by an outside consulting firm called

22    Morris & McDaniel.

23    Q.    And how many pages of documents are those, hundreds,

24    thousands?

25    A.    The validity study itself is perhaps, I don't know, 50

1    pages.  The various attachments provided, I'd say, maybe four

2    to five hundred pages.  And the Morris & McDaniel study, I'd

3    say maybe it's -- maybe it's under a thousand pages.

4    Q.    Okay.  Just so I'm clear, the study that you reviewed from

5    HRD in the early '90s, was that for a specific town or city or

6    generally for the position of police sergeant?

7    A.    That validation study -- it was called a validation

8    study -- it was -- described the recommended test development

9    process for police promotional exams across the state.

10   Q.    And the 2002 Morris & McDaniel study that you looked at,

11   was that for a specific city or town within the Commonwealth?

12   A.    Yes.  That was done specifically for the City of Boston

13   and considered only the City of Boston.

14   Q.    Okay.  Did you attend depositions in this case?

15   A.    I did.

16   Q.    Okay.  And who did you -- let me ask just -- did you

17   attend the deposition of Guy Paris?

18   A.    Yes.

19   Q.    And did you know Mr. Paris when you were at HRD?

20   A.    I knew him well.

21   Q.    And did you attend the deposition of Sally McNeely?

22   A.    I did.

23   Q.    And can you just identify -- she was not at HRD when you

24   were there?

25   A.    She was there when I was there in a different capacity.

1    Q.   Can you just identify who they were as of '05, '06, '07,

2    '08, what their responsibilities were?

3              MS. HARRIS:  Objection.

4              THE COURT:  Overruled.

5              MS. HARRIS:  Before -- this is after he was long gone

6    from the agency.

7              MR. LICHTEN:  Sorry.

8              THE COURT:  Yeah, okay.  Sustained.

9              MR. LICHTEN:  Okay.

10   BY MR. LICHTEN:

11   Q.   Were you at their depositions where they explained what

12   they did in those years?

13   A.   Yes.

14   Q.   Okay.  Can you explain what they provided?

15             MS. HARRIS:  Objection.  It's hearsay, your Honor.

16             THE COURT:  Sustained.

17             MR. LICHTEN:  I think an expert is allowed to testify

18   from hearsay.  It's the kind of thing that he was --

19             THE COURT:  Well, he can support his opinions with

20   non-admissible evidence, but you want to get into the actual

21   fact of what they did.  That's different.

22   BY MR. LICHTEN:

23   Q.   Well, let me ask you this:  Did you rely, in part, on what

24   Mr. Paris described he did or did not do with respect to the

25   writing of the examinations?

1  A.    Yes.

2  Q.    Okay.  And was that one of the factors that you focused

3  on?

4  A.    Yes.

5  Q.    Okay.  Did you actually look at the test questions?

6  A.    I looked at many of them.

7  Q.    Okay.  So which test did you actually look at?

8  A.    I recall specifically looking at the statewide '05, the

9  Boston sergeant '05, and the statewide '06 and '07.  I'm not

10  sure about the others.

11  Q.    Okay.  So you looked at at least three of the tests

12  yourself?

13  A.    I think that's four.

14  Q.    Four.  Sorry.  Okay.

15        And did you look at any documentation relating to how the

16  so-called experience and education component of the exam is

17  created?

18  A.    What do you mean by "created," sir?

19  Q.    "Created" was a bad word.  How it's utilized in the

20  examination process.

21  A.    Yes.

22  Q.    And what did you look at in that regard?

23  A.    Well, I looked at the 1991 validation study that described

24  what the education and experience component of the examination

25  was intended to measure, and then I looked at the -- some

```
 1   materials that described how the education and experience
 2   component is implemented -- or was implemented.
 3   Q.   Okay.  And just while we're on it, let me just ask you to
 4   describe that component.  Was that component in effect when you
 5   were at HRD?
 6   A.   Yes.  I think then it was called T&E, rather than E&E, for
 7   training and experience.
 8   Q.   Okay.  Same basic thing?
 9   A.   Yes.
10   Q.   Okay.  And can you explain for the Court what the T&E is,
11   how it's weighted, how you get points for that?
12   A.   Yes.
13   Q.   Okay.
14   A.   The T&E is a -- or the E&E is a component that, if memory
15   serves, is required by Chapter 31.
16   Q.   Chapter 31 is the Civil Service statute?
17   A.   The Massachusetts General Laws, which is the Civil Service
18   statute.
19   Q.   Is this something that the experts created or was it just
20   in the statute and it had to be applied?
21   A.   This is a requirement of the statute --
22   Q.   Okay.  Go ahead.
23   A.   -- for all promotional exams, I believe.
24        The -- what was the question again?  I'm sorry.
25   Q.   Sure.  Why don't you explain to the Court --
```

1    A.    How it works?

2    Q.    -- the E&E component, how it works.

3    A.    Okay.  So in this exam, and in many of the public safety

4    promotional exams, the E&E works as follows:  There's an

5    eligibility requirement to take the examination.  The

6    eligibility requirement is typically three years at a lower

7    rank, although that can change if there are not enough people

8    in the lower rank to hold the exam.

9         The E&E is graded on a zero-to-100-point scale, and then

10   the E&E grade is averaged together with a grade on the other

11   components of the examination.  Typically -- or in this

12   case -- these cases, the exams under contention were written

13   multiple-choice examinations, and so both components of the

14   examination yielded a score from zero to 100, although the E&E

15   never used the grades zero to 69.

16        The way the E&E was configured and scored, if you met the

17   eligibility requirements to take the exam, you were given a 70.

18   So your score on the E&E could range, potentially,

19   theoretically, from 70 to 100.  And people -- some people who

20   took the exam actually did get a 70.  Very few people actually

21   got 100.

22   Q.    And did you --

23   A.    And there were weights for those two components.  And the

24   weight for the education and experience was 20 percent and the

25   weight for the written multiple-choice examination was 100

1    percent.  So another way of looking at that is that the written

2    exam made up 80 points out of the 100, and the education and

3    experience made up 20 points out of the 100.

4    Q.    Okay.  And I'm going to stop you there and ask you if

5    you've heard of a term in your profession called "variance"?

6    A.    Yes.

7    Q.    Can you tell the Court what "variance" is, please?

8    A.    Yes.  If you have a group of numbers, you can describe

9    that group of numbers by trying to summarize them.  The most

10   common summary of numbers is an average.  And the average tells

11   you something about the middle point of that group of numbers,

12   and there will be numbers above and below the average.

13        "Variance" describes how much spread there is in the

14   scores:  Are they tightly bunched around the average or are

15   they widely spread out on both sides of the average?

16   Q.    And did you perform some calculations as to what -- I hope

17   I'm using the right term -- variance, if any, there was with

18   respect to the E&E score?

19   A.    I looked at the distribution of the E&E scores.

20   Q.    And what did you determine?

21   A.    Well, the range of scores, which was potentially six

22   points -- sometimes it was less than six points -- and there

23   were relatively few people at the very top of that

24   distribution.  So the rate -- so scores were sort of bunched

25   up.

1    Q.    Okay.  So what -- can you describe for us in lay terms how

2    that lack of variance affects the actual amount of score that

3    one would attribute to the training and experience mark on

4    these exams?

5    A.    Okay.  So you're asking about the impact of the training

6    and experience on the combined score on the exam?

7    Q.    Exactly.

8    A.    Okay.  So the combined score on the exam is

9    calculated -- is an average of the multiple choice and the E&E,

10   and then there's a statutory preference for some veterans, and

11   they get, I think, two points that's added on after the exam

12   process is -- the grading process is done.

13       The -- if you think of the multiple-choice component as

14   adding 80 points and the E&E as adding six points, because the

15   other 14 points of the E&E you -- and a candidate got by virtue

16   of qualifying to take a test, so that's a total possible points

17   of -- 80 plus 6 is 86.  So the E&E has about a -- comprises

18   about 7 percent of the test.  That would be 6 over 86.  I did

19   that calculation on my calculator, not in my head.

20       So already the E&E has a somewhat minimal weighting in the

21   examination.  And then if the scores are bunched up on the E&E,

22   the impact on the results will be smaller.

23   Q.    Okay.  So based upon your calculations of the E&E and the

24   other component of the sergeant's exam, and I think you've sort

25   of said this, what is the percentage that is, in fact,

1    attributable to the multiple-choice component of the exam and

2    what is the percentage that is effectively attributed to the

3    E&E component?

4    A.    Based on the weighting, the multiple-choice exam would get

5    93 percent of the weight and the E&E would be 7 percent.  And

6    with respect to variability, that would vary -- those

7    weights -- relative weights would vary a little from exam to

8    exam.

9    Q.    Okay.  Gotcha.  And we'll get back to that later.

10        Okay.  Now, can you -- you're familiar -- are you familiar

11   with the process for getting appointed in cities and towns,

12   what the process has been at HRD based upon your experience

13   there and based upon your involvement in this case?

14   A.    Generally, yes.

15   Q.    Okay.  Can you explain that to the Court, please?

16   A.    Yes.  When the examination is graded -- when the grading

17   process is done and any special veterans' preferences -- or any

18   preferences are factored in to the grade, HRD establishes an

19   eligible list.  And that's a rank order list of the test-takers

20   who passed, from the highest to the lowest.

21        And then if an appointing authority has an opening or a

22   number of openings, the way the process worked, the appointing

23   authority was given a certain number of names and had to choose

24   within a certain number of names who to appoint.  And there was

25   a formula for deciding how many names, and that formula is

1    2 N + 1.  So if there was one opening, the appointing authority

2    would get three names and would have to choose --

3    Q.    Those would be the top three names?

4    A.    That would be the top three names, from the top of the

5    list working down, and the appointing authority would have to

6    appoint one of the top three.  Say there were three openings,

7    then the appointing authority would get seven names.

8    Q.    And did you notice when you looked at the actual data

9    whether there were towns or cities -- what the regularity of

10   appointing from the top of the list was as opposed to bypassing

11   people and going lower on the list under this 2 N + 1 formula?

12   A.    I did take a look at that.  Some jurisdictions go very

13   strictly in order of score, but some jurisdictions skip over

14   people, bypass -- of course, they have to stay within the rule

15   of 2 N + 1.

16   Q.    And did you notice particularly with Boston, whether there

17   was a pattern in Boston?

18   A.    Boston generally went in rank order.

19   Q.    Okay.  So bear with me.  I'm now going to ask you some

20   technical terms so we all are working off the same terms, okay?

21   So is there a term in industrial psychology known as "adverse

22   impact"?

23   A.    Well, I think "adverse impact" is a legal term, and it

24   looms large in the field of industrial psychology.

25   Q.    Okay.  And can you explain to the Court what the concept

1    is?

2    A.    Yes.    In terms of the bottom line, "adverse impact" is a

3    ratio of the percent of the protected group that's hired or

4    promoted over the comparison group.    So usually this is

5    minorities and non-minorities, occasionally it's men and women.

6    So, for example, if half of the minorities -- half of the

7    minority applicants were hired and half of the non-minorities

8    were hired, you would have .5 over .5, which would be 1, so

9    that would be equity because both groups are hired at the same

10   rate.

11       If one-tenth of the minorities were hired and one-half of

12   the non-minorities are hired, you'd have .1 over .5, which

13   would be .2.    So .2 is less than .1, and .2 would mean that the

14   minorities are hired at a lower rate.    And so that would

15   be -- that would either be adverse impact or it would be an

16   indication of adverse impact.

17   Q.    Okay.    And is "adverse impact" and "disparate impact" --

18   are those interchangeable terms?

19   A.    I believe so.

20   Q.    Can you describe for the Court the concept of statistical

21   significance?

22   A.    Yes.

23   Q.    Okay.    Would you do that, please?

24   A.    Whenever you collect data, you have the numbers in front

25   of you.    You can perform your calculations, you get averages or

1    you can get the percent selected or not selected.  And whenever

2    you compare two groups, they'll never be exactly the same.

3        So, for example, if you were comparing the height of first

4    graders in one town with the height of first graders in another

5    town, and you find the average for Town 1 and Town 2, those

6    averages are not going to be precisely the same.  So then the

7    question is:  Is the amount of difference that I noticed

8    between the two groups just a result of chance or is it not

9    reasonably attributable to chance and is it more reasonably

10   attributed to some difference between the groups?

11       So here we have two hiring rates:  one for minorities, one

12   for non-minorities.  So here the question is:  Are those two

13   different hiring rates different due to chance or are those two

14   different hiring rates not reasonably ascribed to chance and,

15   therefore, due to something else?

16   Q.   Okay.  And how does one -- what are the steps that an

17   industrial psychologist or a statistician takes to figure out

18   if some -- something they see is due to an event or due to

19   randomness or chance?

20   A.   There are tools called "statistical tests" that are used

21   to answer the question I just described, and there are various

22   computer software packages that help implement these

23   statistical tests.  So after you find out what the question is

24   that you want to answer, you choose the appropriate statistical

25   test, you run the numbers through the statistical test.

1    There's no subjectivity here; it's all a matter of calculation.

2    You get out -- depending on the test, you either get out the

3    answer to your question in terms of a probability or you get

4    the results of the statistical test in terms of a number -- a

5    statistic which is then turned into a probability.

6         So if the probability of the difference -- and that

7    probability that you get out, is the probability of the

8    difference being -- due to chance.  If that probability is

9    below .05, five times in 100, then the accepted practice is to

10   conclude that the differences were not due to chance.

11   Q.    Gotcha.  Okay.  Can you explain to us what the Uniform

12   Guidelines in employee selection are, please?

13   A.    Yes.  So the 1964 Civil Rights Act set some -- created

14   legislation -- created law concerning employment

15   discrimination, Title VII.  And then there were several federal

16   agencies that enforced that law including the EEOC and the

17   Department of Justice and the Department of Labor, and perhaps

18   one other small agency.

19        The Uniform Guidelines on Employee Selection Procedures

20   were jointly published by the federal agencies that oversee

21   Title VII of the 1964 Civil Rights Act plus some other

22   employment law, and they try to provide guidance to test users

23   as to what the enforcement agencies think is proper -- a proper

24   approach to testing.

25   Q.    And do industrial psychologists such as yourself regularly

1    refer to and use the Uniform Guidelines in making analyses?

2    A.    Yes.

3    Q.    And is there another set of guidelines that industrial

4    psychologists use when doing disparate impact and validity

5    analysis?

6    A.    There are two major professional documents:  One, the

7    Standards for Educational and Psychological Testing which

8    includes a section on occupational testing, and that is a

9    document that's now been revised several times and in existence

10   for some 25 or more years, and is jointly published by several

11   national organizations including the American Psychological

12   Association and two others, National Council on Measurement and

13   Education and the AERA, American Educational Research

14   Association.

15        The professional organization you mentioned before, SIOP,

16   also publishes a set of principles related to employment

17   testing specifically.

18   Q.    And are you familiar with the concept of small numbers and

19   aggregation?

20   A.    Yes.

21   Q.    And first, can you tell me what are the small numbers?  I

22   mean, it's obvious, but if you could give us a professional

23   view of what "small numbers" is?

24   A.    Okay.  It's difficult to make firm decisions about small

25   numbers.  So, for example, let's say that --

1    Q.    How about trying a coin toss, for example?

2    A.    Sure.  Let's say you tossed a coin twice and it came up

3    two heads.  Well, that's 100 percent heads, but it's only two

4    tosses, and that's going to happen by chance 25 percent of the

5    time.  Now, if you tossed that coin ten times and came up with

6    ten heads, that would be very different.

7         So the impact of larger numbers is very noticeable when

8    you have very small numbers.  So when you go from two tosses to

9    ten tosses, that's a very -- statistically, that's a very

10   important difference.  The difference from 100 tosses to 110

11   tosses isn't very important.

12        So let's say you had a biased coin and you flipped it

13   twice.  Well, let's say it was biased in favor of heads and the

14   data you have in front of you is you've got two heads.  Well,

15   from a statistician's point of view, if that is all the

16   information you have, you can't say that coin isn't fair

17   because a fair coin would come up two heads 25 percent of the

18   time.  So that's a bit frustrating for a statistician, and so

19   someone with statistical training might look around to see if

20   there's any other way to evaluate that coin:  Did you flip it

21   yesterday, or whatever.

22        So the problem with small numbers is that the tests of

23   statistical significance that I described briefly before don't

24   do a very good job of identifying a situation where there is an

25   unexpected difference -- an unexpected deviation from what was

1    expected.

2    Q.    Are there ever times when industrial psychologists

3    aggregate data to determine whether something they're seeing is

4    a product of chance or a product of something more?

5    A.    Many times.

6    Q.    Can you give the Court some examples of that, please?

7    A.    Sure.  So when ETS evaluates the validity of the SATs,

8    they go to 100 different colleges and universities across the

9    country and gather data from as many as they can.  When

10   the -- if you have a published test, for example, a test of

11   mechanical aptitude, you might summarize the validity of that

12   test of mechanical aptitude.  One study might have been done in

13   a diesel engine manufacturing plant, another study might have

14   been done in a carpet manufacturer, but you would collect all

15   of the studies that were done in different jurisdictions or

16   different enterprises and that summary would be valuable in

17   evaluating the validity of the test.

18   Q.    Okay.  And is aggregation of data done all the time by

19   industrial psychologists, where appropriate?

20   A.    Oh, yes.

21   Q.    Okay.  And do the Uniform Guidelines on Employee Selection

22   provide for instances where it may be appropriate to aggregate

23   data?

24   A.    Yes.

25   Q.    Okay.  And can I -- I think you have the Uniform

1   Guidelines in front of you, do you not?

2   A.   I do.

3        MR. LICHTEN:   I'm just going to put these up on the

4   screen, with the Court's permission.

5   BY MR. LICHTEN:

6   Q.   And if you would go to 1607.4D.  Do you have that?

7   A.   Yes.

8   Q.   Okay.  And on -- at the top of page 10, do you see where

9   it says, "Where the user's" -- do you see that?

10  A.   Yes, it's in the middle of the paragraph.

11  Q.   Can you read that, please?

12  A.   Yes.  "Where the user's evidence concerning the impact of

13  a selection procedure indicates adverse impact but is based

14  upon numbers which are too small to be reliable, evidence

15  concerning the impact of the procedure over a longer period of

16  time and/or evidence concerning the impact which the selection

17  procedure had when used in the same manner in similar

18  circumstances elsewhere may be considered when determining

19  adverse impact."

20  Q.   And do you agree with those principles?

21  A.   Yes.

22  Q.   Now, you've reviewed, I think you've said, four tests in

23  this case; is that correct?

24  A.   I've looked at the actual test questions, yes.

25  Q.   You reviewed four of the police sergeant's exams, right?

1    A.    Correct.

2    Q.    And statewide each year the same exam is being used, other

3    than in Boston, for each jurisdiction?

4    A.    There is one exam produced each year by HRD, and for the

5    position of promotion to police sergeant, and any municipality

6    or any police department that wants to can request to be a part

7    of that examination and use that examination.  So it's given on

8    one day.

9    Q.    Do you have an opinion based upon your experience as an

10   industrial psychologist, your knowledge of the employee

11   guidelines and your knowledge of the test, as to whether or not

12   it is or not appropriate if you're trying to determine the

13   adverse impact of any from one of these tests as to whether or

14   not aggregation of data across jurisdictions is appropriate?

15           MR. CARROLL:  Objection.

16           THE COURT:  Overruled.

17           THE WITNESS:  Yes.

18   BY MR. LICHTEN:

19   Q.    And what is your opinion?

20   A.    My opinion is that if you are trying to find out if the

21   examination adversely affects minorities, the best approach

22   would be to use all the data from all of the applicants that

23   took that examination.

24   Q.    Why?

25   A.    Because the more data you have, the better your

1    statistical test will be at detecting a real difference, if

2    there is a real difference.

3    Q.    Now, I'm getting ahead of myself a little bit, but did you

4    do a statistical adverse impact analysis for the City of

5    Boston?

6    A.    Yes.

7    Q.    For the 2005 exam?

8    A.    Yes.

9    Q.    And we're going to get back to this, but what -- can you

10   just tell us in one second what you found with respect to the

11   2005 exam in Boston?

12   A.    Well, I did a number of things.  I don't know about two

13   seconds, but I'll keep it short.

14   Q.    Well, what I'm trying to get at:  What were the numbers in

15   the city of Boston?

16   A.    Okay.  So in the city of Boston, minorities were promoted

17   from police officer to sergeant at a rate much lower than the

18   rate of promotion for non-minorities.  The adverse impact

19   ratio, I think, for one exam was around .3 and the other exam

20   was less than .1, so the adverse impact -- I would describe the

21   adverse impact as severe in appointments.

22   Q.    Okay.

23   A.    In promotions.

24   Q.    And what were the numbers you were dealing with?

25   A.    There were several hundred candidates, maybe something in

1    the neighborhood of 500 for both of the two Boston exams.

2    Q.    And what impact, if any, did the numbers have on your

3    assuredness of the adverse impact?

4    A.    Well, when you have large numbers, chance variation is

5    less likely to obscure real differences or less likely to make

6    apparent differences when there aren't any.  So just as when

7    you flip the coin a thousand times, you're more certain that

8    it's -- if it's fair or not; when you have data from a thousand

9    people, you're more certain that the difference that you're

10   seeing between two groups is real or not.

11   Q.    Okay.  And then drilling down a little deeper, with

12   respect to aggregating over time, that is, different

13   examinations for different years, as opposed to statewide, do

14   you have an opinion whether one is more appropriate than the

15   other or are both appropriate in the situation that we're

16   talking about in this case?

17            MR. CARROLL:  Objection.

18            MS. ENGDAHL:  Objection.

19            THE COURT:  Overruled.

20            THE WITNESS:  The aggregation depends on the question

21   that you want to answer and also depends on the data.  So I

22   think that the cleanest approach is the aggregation across

23   everyone that took one exam, because you could perhaps think

24   that the exam in '07 was somewhat different than the exam in

25   '06, whereas if you just looked at the '06 exam, everyone took

1    the same exam.  Also, if you combined across two years, let's

2    say '06 and '07, some of the same people took the '06 and '07

3    exam, and so you're, to some extent, double counting.

4         So I think the best approach to the aggregation is

5    statewide within any one year; however, to get the best

6    overview of the situation, I think that you could aggregate

7    over jurisdictions as well as over years.

8    BY MR. LICHTEN:

9    Q.   And did you do it both ways?

10   A.   I did.

11   Q.   Okay.  And just so we're clear, did you also do disparate

12   impact analysis by jurisdiction?

13   A.   I did.

14   Q.   Okay.  I'd like to ask you first if you could turn to

15   where in your report you did the statewide aggregated data

16   analysis.  Is that in your first report?

17   A.   Well, I did a number in the first report.  I think I did

18   some in the second report.

19   Q.   I believe that's Exhibit 50 and 51, if you could look at

20   that.

21        MS. HARRIS:  And just for the record, they have not

22   been entered and they're not stipulated.

23        THE COURT:  They're not in evidence, correct.

24        MR. LICHTEN:  I was going to offer them.  I don't know

25   what the Court's position is.

```
 1            THE COURT:  I was going to wait until I heard the
 2    objection.
 3            MS. HARRIS:  We would object, your Honor.  The witness
 4    is here to testify about the reports.
 5            MR. LICHTEN:  I would offer the reports.
 6            MS. HARRIS:  And other defendants may have different
 7    feelings about it.
 8            MR. LEAHEY:  All would join the objection that they're
 9    inadmissible, they're hearsay.  The expert is here to testify.
10            THE COURT:  I think that's the usual rule.
11            MR. LICHTEN:  Okay.
12            (There is a pause.)
13            THE WITNESS:  Okay.  In the March 30th, '09, report,
14    on page 29.
15    BY MR. LICHTEN:
16    Q.   Okay.  So that would be Exhibit 51 for ID.  We'll stay on
17    ID.  What page?  I'm sorry.
18    A.    Twenty-nine.
19        That's the sergeant -- those are all sergeants.  That
20    comes a little bit later.  So maybe I should be looking at the
21    first report.
22    Q.   Actually, why don't you stay on that exhibit for a while
23    and -- so that I can -- while we're there, let me ask you about
24    that.
25            MS. ENGDAHL:  Do you have a page?
```

```
 1              MR. LICHTEN:  It's Exhibit 51 for ID, page 29.
 2              MS. HARRIS:  March 30th.
 3              MR. LICHTEN:  March 30th.  Yes.  Sorry.
 4    BY MR. LICHTEN:
 5    Q.   And let me ask you:  At some point in time did you review
 6    an analysis of how sergeants taking the lieutenant's exam did
 7    on the sergeant's portion of the exam?
 8    A.   Well, I did the analysis.  I didn't really review it; I
 9    did it.
10    Q.   Okay.  And let me -- just to clear this up for the Court,
11    what was the relationship -- I think this has been testified
12    to, but just so we're clear, what was the relationship between
13    the sergeant's exam and the lieutenant's exam, the one that was
14    given in '05, '06, '07, '08?
15    A.   They were -- in the statewide exam, there were 80
16    questions on the sergeant's exam, and the applicants for
17    sergeant answered those 80 questions; there were 100 questions
18    on the lieutenant's exam.  The 100 questions on the
19    lieutenant's exam included the same 80 questions that were on
20    the sergeant's exam plus 20 more for lieutenant.
21         So all of the applicants for lieutenant were current,
22    incumbent sergeants with at least three years of experience,
23    and the first 80 questions comprised the same examination as
24    the applicants for sergeant took for promotion to sergeant.
25    Q.   Okay.  And given that you had incumbent sergeants who were
```

1    presumably working in the role of sergeant taking this exam for

2    lieutenant, and presumably studying since they were taking the

3    exam themselves for lieutenant, what would your expectation

4    have been as to the number of sergeants -- incumbent sergeants

5    passing the sergeant's portion of the exam when they took the

6    lieutenant's exam?

7    A.    Just passing?  I would have thought something in the high

8    90s.

9    Q.    And why is that?  Can you tell us why that is?

10    A.    Well, if the sergeant exam is supposed to be testing what

11    you need to be able to do the job of sergeant, and these folks

12    have been doing the job of sergeant for at least three years,

13    perhaps you would think some incumbents might not score 100 or

14    90 or 95, but you'd think at least the current incumbent

15    sergeants would pass the examination for sergeant.

16    Q.    And what did you actually determine happened?

17    A.    A fair proportion of current sergeants failed the exam for

18    sergeant.

19    Q.    Statewide or Boston or both?

20    A.    These charts are the statewide.

21    Q.    Okay.  And what did they reveal?

22    A.    For '05 --

23    Q.    I'm just going to put this up on the screen, too.

24    A.    For '05, 18.4 percent of the current sergeants failed the

25    exam for sergeant.  That went down to 7.2 in '06, up to 13.3 in

1    '07, and was 11.7 on average.

2    Q.    And that was for statewide?

3    A.    That was statewide.  Boston is on the previous page.

4    Q.    And what was that?

5    A.    Calculating the failure rate for the statewide exams, this

6    is very straightforward because the -- all the lieutenant

7    applicants took all of the questions in the sergeant's exam.

8    That wasn't true in the Boston exam.  In the Boston exam, there

9    were 53 questions in common between the sergeant and lieutenant

10   exam.  So you could look at just those 53 questions, which I

11   did, and then I noticed that the 53 questions, I think, were

12   either a little easier or a little harder than the remaining

13   questions.  And so you could make an adjustment for that change

14   in difficulty, and I made the adjustment two ways.  And

15   depending on which adjustment you use, the failure rate for the

16   Boston incumbent sergeants went -- ranged from either 11.8 to

17   14.2.

18   Q.    Thank you.  What conclusions, if any, did you draw from

19   the results of the statewide incumbent sergeants taking the

20   sergeant's portion of the lieutenant's exam, and the same for

21   Boston?

22   A.    Well, it raises questions.  That's a very high proportion

23   of incumbent sergeants that you are claiming are not basically

24   competent.  So it could be that the passing score was set too

25   high or it could be that the content of the examination doesn't

1    reflect the content of the job closely enough.

2    Q.    Gotcha.  While we're on passing score, let me just spend

3    some time on that and get done with that.  Was there a passing

4    score set with respect to the exams for 2005, 2006, 2007 and

5    2008?

6    A.    Yes.

7    Q.    Okay.  And for 2005, 2006, 2007, what was the pass/fail

8    score?

9    A.    70 percent.

10   Q.    Okay.  And let me digress for a moment.  Is there a

11   professionally accepted method that industrial psychologists

12   use to actually set an appropriate pass/fail rate -- pass/fail

13   mark?  Excuse me.

14   A.    There are several professionally accepted approaches, yes.

15   Q.    Can you describe to the Court what those are, please?

16   A.    Yes.  Perhaps the best approach would be based on actual

17   data on how test-takers in the past perform on the job.  And

18   you could see how people who perform on the job acceptably did

19   on the test.  In this case, we didn't have that, that type of

20   data on job performance, and so passing points for

21   content-valid examinations are based on judgment.

22         And there are a few methods that have been developed that

23   try to provide some structure and rigor to the judgmental

24   process.  Perhaps the most widely used process is one that was

25   developed by Dr. Angoff who worked at ETS and who passed away

1    some number of years ago, and his process, known as the Angoff

2    process, tries to collect in a systematic way opinions from

3    people who know the job well concerning each individual test

4    question, and then that information is aggregated to come up

5    with an indication of what an appropriate passing score might

6    be.

7    Q.   Okay.  Let me ask it this way:  Was any professionally

8    accepted method utilized with respect to the 2005, 2006, 2007

9    police sergeant's exam both statewide and for Boston?

10           MR. CARROLL:  Objection.

11           THE COURT:  Overruled.  I'll permit it.

12           THE WITNESS:  I can answer?

13   BY MR. LICHTEN:

14   Q.   Yes, you may answer.

15   A.   No.

16   Q.   And of what import is that, in your opinion?

17   A.   Well, that means that you have no reason to believe that

18   the people who pass are competent or that people that fail are

19   incompetent to do the job.

20   Q.   Why not?

21   A.   Because the passing point was arbitrary, or at least was

22   not related to job performance.

23   Q.   Are you aware that the passing point was changed in 2008?

24   A.   I don't have any clear recollection of that.

25   Q.   Okay.  Okay.  Now, before I get into this data, I just

1    want to go over two other concepts that you mentioned.  Once we

2    get all of these concepts out of the way, I think I'll roll

3    quicker.

4         You mentioned criterion validity and content validity.

5    Are you familiar with those terms?

6    A.    Yes.

7    Q.    Okay.  And can you tell -- let me back up a minute first.

8    Let me ask you:  What is validity under the Uniform Guidelines

9    on Employee Selection and under Title VII?  What is it?

10   A.    It's a fairly sophisticated question, but to answer it in

11   a basic way, is the test actually testing for what it purports

12   to, and are the scores of the test going to be -- I try not to

13   use the word "valid" -- appropriate for the intended use of the

14   test?

15   Q.    Okay.  And are there guidelines telling you what

16   "validity" is?

17   A.    Yes.

18   Q.    Okay.  Now, let's talk first about criterion validity.

19   Can you describe for the Court what "criterion validity" is,

20   please?

21   A.    Yes.  In criterion validity, you compare the scores of

22   people who took the test with the scores of those same people

23   who are employed on the job.  So you need a score from the test

24   and you need a score from job performance.  The score from job

25   performance could take the form of supervisor evaluations.

1    Some jobs have indices of job performance built into them.  For

2    sales jobs, you might have amount sold; for postal workers, you

3    might have letters sorted.  Sometimes absenteeism is something

4    that you're trying to predict.  But whatever it is, you're

5    trying to get a numerical value of -- that encompasses what

6    you're interested in with respect to job performance, and you

7    have the numerical value of the test, and then you do a

8    mathematical correlation.

9    Q.   And if you find a good correlation or a high correlation

10   between performance and score on the test, what does that mean?

11   A.   That means that the test is a predictor of job

12   performance.

13   Q.   Okay.  So what you're trying to find out is whether the

14   test is predicting good job performance?

15   A.   Correct.  Or poor job performance, if you have a low

16   score.

17   Q.   And is criterion validity the gold standard of validity?

18   A.   Criterion validity, I think, is widely accepted as the

19   gold standard for validity.

20   Q.   Okay.  Now, the validity that the defendants are putting

21   forward as having been done in this case, is that criterion

22   validity?

23   A.   No.

24   Q.   What is it?

25   A.   It's something called "content-related validity."

1  Q.    Okay.  And can you explain to the Court what the concept

2  of content-related validity is?

3  A.    Simply put, the question is:  Does the content of the test

4  reflect the content of the job?

5  Q.    And how does one go about doing that?

6  A.    The profession has developed a set of general procedures,

7  many of which are outlined in the Uniform Guidelines, which in

8  turn drew on the Professional Standards and Principles, but in

9  brief, you go through a systematic process of studying the job,

10  identifying the frequent and important, or critical, job duties

11  or tasks.  Often, then, you go one step further and you try to

12  determine the knowledge, skills, abilities and personal

13  characteristics of people that are required to perform those

14  important jobs, tasks or duties.

15  Q.    And I'm going to ask you to turn to --

16  A.    Wait.  One more.

17  Q.    I'm sorry.

18  A.    That's okay.  Then when you have that list of important

19  knowledge, skills, abilities and personal characteristics,

20  sometimes referred to KSAPs, you then have to find a reasonable

21  way to measure those knowledge, skills, abilities and personal

22  characteristics.

23  Q.    I'm going to ask you to turn to page 22 of the Uniform

24  Guidelines on Employee Selection.  I'm putting it up on the

25  screen.  Do you see that?

```
 1   A.    Yes.

 2   Q.    And the second sentence says, "A selection procedure can

 3   be supported by a content validity strategy to the extent that

 4   it is a representative sample of the content of the job."  Do

 5   you see that?

 6   A.    Yes.

 7   Q.    Is that what you were saying before?

 8   A.    Yes.

 9   Q.    Okay.  So what would be a representative sample of a job?

10   What would that be?

11   A.    Well, if a -- the example in the Uniform Guidelines is a

12   bit dated.  It was talking about a typist, and said if you have

13   a job and the job consists mainly of typing material, if you

14   had a test that gave the candidates something to type and you

15   scored that, that would be a reasonable reflection of the job.

16   Q.    Okay.  Well, let me ask you this:  Take that example of a

17   typist where you give someone a typing test.  I assume that

18   would measure the critical work functions of a typist; is that

19   right?

20   A.    Well, depending on what the test consisted of, yes.

21   Q.    Okay.  What if you gave someone a multiple choice test

22   that said, "Do you know where the A is?"  Do you know where the

23   B is on the typewriter?"  Do you know how to put your fingers

24   on a typewriter?"  Why wouldn't that be an appropriate test to

25   determine whether someone would be a good typist?
```

1    A.    Since content validity is a judgmental process, the closer

2    the test reflects the actual job tasks, the more content

3    validity the test has.  So as you get further and further away

4    from how you actually performed the task or the job, your

5    content validity is less.  And there is a body of research that

6    has followed up on content-valid tests and done

7    criterion-related studies, and the -- that body of literature

8    shows that as the test is removed from the types of tasks done

9    on the job, the validity drops.

10   Q.    Okay.  I wanted to ask you briefly, under Section 2 it

11   talks about job analysis and content validity.  The last

12   sentence, could you read that, please?

13   A.    "The work behaviors selected for measurement should be

14   critical work behaviors and/or important work behaviors

15   constituting most of the job."

16   Q.    Okay.  And what does that mean?

17   A.    I think that's saying you shouldn't be selecting people

18   for a job based on a small slice of what's needed to do the

19   work.

20   Q.    Okay.  And then if you go to the bottom of page 23 -- I'm

21   sorry -- the bottom of Paragraph 4 on page 23, first paragraph.

22   Can you read that, please?

23   A.    "For any selection procedure, measuring a knowledge, skill

24   or ability, the user should show that, A, the selection

25   procedure measures and is a representative sample of that

1    knowledge, skill or ability and, B, that knowledge, skill or

2    ability is used in and is a necessary prerequisite to

3    performance of critical or important work behaviors."

4    Q.   Okay.  And then finally, the bottom of that next

5    paragraph, could you read that, "The closer"?

6    A.   "As the content of the selection procedure less resembles

7    a work behavior, or the setting and manner of the

8    administration of the selection procedure less resembles the

9    work situation, or the result less resembles a work product,

10   the less likely the selection procedure is to be content valid,

11   and the greater the need for other evidence of validity."  And

12   by "other evidence of validity" they're talking about a

13   criterion-related validity study where you actually have job

14   performance information.

15   Q.   Okay.  And do you agree with these principles?

16   A.   Yes.

17   Q.   And is there a -- you keep mentioning the term "knowledge,

18   skills and ability."  Can you tell us the difference between a

19   knowledge, skill and ability, if there is one?  I don't know.

20   A.   Well, there is.  The definitions of "knowledge, skills and

21   abilities" varies from document to document.  I think that

22   the -- there isn't a completely accepted definition.  Some

23   people use the term "skill" to refer to a psychomotor ability:

24   hand/arm coordination, steadiness, endurance -- physical

25   endurance.  Other people use the term "skill" more generically

1    in terms of implementing whatever knowledge and ability you

2    might have.

3    Q.   Okay.  Let me do it this way:  You've looked at the 1991

4    validation report for the position of police sergeant in the

5    Commonwealth of Massachusetts?

6    A.   Yes.

7    Q.   Did that identify some skills and abilities that did not

8    purport to be tested for?

9    A.   Yes.

10   Q.   Can you tell me what those are?  Just some of them.

11   A.   Yes.  There was -- there were some problem-solving; some

12   handling of incidents in real-time, fast-moving; there was

13   something related to -- you might summarize it as command

14   presence, the ability to motivate and coordinate your

15   subordinates, things like that.

16   Q.   And these were identified as skills and abilities

17   necessary of a police sergeant?

18   A.   Correct.

19   Q.   And were they tested for it?

20   A.   No.

21   Q.   Okay.  We'll get back to that.

22        I'd like you now, at long last, to turn back -- if you

23   could find in your report the statewide data that you analyzed.

24   A.   Okay.  It's in two reports.  It's in the October '08 and

25   the June '10.

1  Q.    Okay.  Let's start with the October '08.  What page?

2  That's 50 for ID.

3  A.    Well, the one of June '10 is more succinct.

4         MR. LEAHEY:  Objection.

5         MS. ENGDAHL:  Your Honor, you've excluded that report

6  from evidence.

7         MR. LICHTEN:  You haven't excluded the report, your

8  Honor.

9         MR. LEAHEY:  Your Honor, if I may, we had filed a

10  motion that the June 2010 report claimed information that was

11  not in any of his three previous reports and nothing that he

12  testified to at his deposition on June 18th.

13         Based on your ruling, you said that unless it's

14  specifically addressed, something in to rebut the May 28th

15  reports of the defense experts that he -- that that report and

16  the information contained in it was out because it didn't

17  comply with the timeliness since it was on the eve of trial, it

18  was beyond the scope of discovery on the expert

19  deposition -- or expert discovery.

20         MR. LICHTEN:  Your Honor, as I explained, and as I

21  thought the Court indicated, that to the extent that he was

22  updating data because of the defendant -- because of the delay

23  in getting data -- he just testified earlier that he received

24  the data set from defendants' own expert on May 28, 2010, when

25  their expert report came in 60 days late without permission

1    from the Court for doing so, and that some of the defendants

2    did not answer their interrogatories providing updated

3    information until early June.

4         And he provided a supplemental report which just has

5    some numbers, which I think is fully appropriate because this

6    is a -- you know, it's a moving ball because you continue to

7    get results.

8              MR. LEAHEY:  Judge --

9              THE COURT:  Yeah, go ahead.

10             MR. LEAHEY:  -- if I may respond, with respect to --

11   and I agree it was to supplement some data; however, a couple

12   of things:  The new report, the June report, goes back and

13   talks about data from '05, '06, '07, which Dr. Wiesen had

14   literally years ago, years ago from '05, '06, '07, that he did

15   not disaggregate until June of 2010.

16        With regards to the 2008 information, a lot of that,

17   according to an e-mail that I have from HRD, on March 9th,

18   2010, they sent to plaintiffs' counsel all of the data as of

19   March 2010, which was at least a month, five weeks before

20   Dr. Wiesen's April 14, 2010, report.

21        Notably, with respect to Lowell, all seven

22   promotions -- the last promotion Lowell ever made off the 2006

23   list was July of 2009, which was before the fall of 2009 when

24   HRD stopped gathering the data.  So at least as of March 9th,

25   2010, with respect to Lowell, Dr. Wiesen had every piece of

1    information he ever needed and yet it didn't make it into his

2    April 14th, 2010, report, didn't have the information at his

3    June 18th or 17th information, and only materialized in his

4    June 22, 2010, report.

5         That's the objection that the City of Lowell has.

6         THE COURT:  I'm actually looking at the transcript of

7    the status conference, so if you'll give me a minute to find

8    where we had a discussion of this.

9         (Pause.)

10        THE COURT:  Here's -- I don't know if anyone has the

11   transcript.  It doesn't tell me what the page is.  Page 38.

12        I restricted further depositions of experts but left

13   open the question of the supplemental report, so it hasn't been

14   addressed.  So he wasn't foreclosed by ruling at the pretrial.

15   So...

16        MR. LEAHEY:  Your Honor, based on -- I mean, if you

17   want to take it now, I can show that the information regarding

18   the Lowell, he had at least five weeks before his April report.

19   If you want to take it in and --

20        THE COURT:  The report itself isn't going to be

21   admitted, in any event.

22        MR. LEAHEY:  Right.  But the underlying facts

23   pertaining to it he had all of it before, didn't disclose it

24   until June 25th.  It's the city's position that it should have

25   been produced well in advance, and it's not -- at least with

```
 1   respect to Lowell --

 2           THE COURT:  All right.  Fine.  I understand.  I think

 3   the most efficient is to take the evidence and I'll -- your

 4   argument, again, can continue throughout the evaluation of the

 5   evidence.

 6           MR. LEAHEY:  Thank you, your Honor.

 7   BY MR. LICHTEN:

 8   Q.   Do you understand the question?

 9   A.   Is it possible to take a short break?

10   Q.   It might be possible to take a short one or a longer one,

11   depending on what the Court says.

12           THE COURT:  No, we're close to the morning recess, but

13   I didn't know if you left it at a place where you want an

14   answer.

15           MR. LICHTEN:  I'm happy to take the break now.

16           THE COURT:  All right.  We'll take a recess.

17           MR. LICHTEN:  Thank you, your Honor.

18           Fifteen minutes, your Honor?

19           THE COURT:  Yes.

20           THE CLERK:  All rise.

21           The Court will take the morning recess.

22           (The Court exits the courtroom at 10:48 a.m.)

23           (There is a recess in the proceedings at

24   10:48 a.m.)

25           (Resumed, 11:17 a.m.)
```

```
 1              THE CLERK:  Continuation of the Lopez trial.  Be

 2    seated, please.

 3    BY MR. LICHTEN:

 4    Q.   We had that whole colloquy, Dr. Wiesen, about where you

 5    have your statewide data, and you said it was in a June, 2010

 6    report, but can you turn actually to your April, 2010 report.

 7    A.   Sure.

 8    Q.   I think that's 52 for Identification.  And Page 3, do you

 9    have that?

10    A.   Yes.

11    Q.   And is that the statewide data that you reanalyzed?

12              (Witness examining document.)

13    A.   This is -- you mean that No. 3 on Page 3?

14    Q.   Yes.

15    A.   Those are the data files that I analyzed for this, yes.

16    Q.   Okay.  And then if you turn to Page 4, is that the

17    statewide data that you were referring to?

18    A.   Yes.

19    Q.   Okay.  So just so I'm clear, this was an updated analysis

20    of an analysis you made earlier?

21    A.   Correct.

22    Q.   Okay.  And you got more recent data just before making

23    this?

24    A.   Yes.  Since some of these lists were still alive, meaning

25    the appointing authorities could still make appointments off
```

1    the lists, enough time had passed since the previous report --

2    it seemed like appointments had been made here and there --

3    that we got another data set.  The 2008 sergeant exam data was

4    not in the earlier data set that I received from HRD, and since

5    this, we got an even more updated data set.

6    Q.    Okay, okay.  So based upon this, did you make an analysis

7    of the statewide data with respect to demonstrating whether or

8    not the data on the '05, '06, '07, and '08 exams had disparate

9    impact with respect to minority candidates for sergeant?

10   A.    Yes.

11   Q.    Okay.  And where is that chart located?

12   A.    On Page 4, Table 1.

13   Q.    Put that up, please.  Okay, and what did you determine

14   with respect to those examinations?

15            MR. CARROLL:  Objection.

16            THE COURT:  Overruled.

17   A.    I performed an analysis to compare the written test scores

18   for minority applicants, black and Hispanic applicants, and

19   everyone else on each of the four statewide exams and the two

20   Boston exams; and what I found was, there were discrepancies,

21   there were differences in the means for minorities and

22   non-minorities, and those differences were highly statistically

23   significant.  They were not likely to have occurred by chance.

24   Q.    Okay.  And before I go further, I just want to go over the

25   various methods that you used to determine whether there was

1    disparate impact in the statewide exam.  One, obviously, was

2    mean differences.  You just testified about that; is that

3    correct?

4    A.    Right.

5    Q.    Did you stop there, or did you do other statistical

6    analysis?

7    A.    I took a look at the adverse impact in terms of passing

8    and failing the statewide exams as well.

9    Q.    Okay.  And did you also look at the data with respect to

10   selection rates, at least up until some date?

11   A.    Yes.

12   Q.    Okay.  And were you limited in your ability to do adverse

13   impact by selection rate after a certain date?

14   A.    Well, at some point HRD stopped getting the data, so they

15   no longer could provide in one-stop shopping all the data on

16   appointments.

17   Q.    Statewide?

18   A.    Statewide.

19   Q.    Okay.  So the data that you got on statewide selections

20   was up until when?

21   A.    The fall of '09.

22   Q.    Okay.  So that would have included at least the '05, '06,

23   '07, and some of the data on the '08 exam?

24   A.    Well, I think the '07 list might still have been alive.

25   Q.    Okay.  So it would have been a larger portion from '07 but

1   not all of the data from '07?

2   A.   It might not be all the data from that.

3   Q.   Because people are still --

4   A.   Well, the exam was given in '07, but it often takes the

5   better part of a year for HRD to grade it and groom the list

6   and whatever.  So if a list was established in '08 and it has

7   typically a two-year life, that brings it to 2010.

8   Q.   Okay, okay.  You've talked about the average and mean

9   differences.  Can you go over this chart that's on Page 4 so we

10  can understand.  When you have the probabilities of .000, what

11  does that mean?

12  A.   So that's the probability of getting a difference as large

13  or larger than the observed difference between minorities and

14  non-minorities by chance.  So the computer program that I used

15  for this summarized that and said that the probability was less

16  than .001, and it reports that as .000.  So the probability was

17  less than one in a thousand for each of those.  And I noted

18  with respect Boston 2008, that although that computer program

19  only reported the probability to three decimal places, the

20  actual probability is point -- and then 17 zeros and a 5, so

21  that would be, you know, I don't know, the trillions or

22  something?

23  Q.   It's very significant?

24  A.   Yes, highly statistically significant.

25  Q.   Okay.  And let's just talk, what is the t-value?  Can you

1    tell us what the t-value is in this chart, please.

2    A.    Yes.  I debated whether or not to include that.  It's

3    usually suggested when reporting statistical analyses that you

4    provide enough information about the analyses so that somebody

5    who understands statistics will know what you have done.

6         So the t-value is a statistic that's produced by the

7    t-test, as it's called, and it's an indication of the

8    probability that the observed difference is due to chance.  But

9    you need to turn that t-value into a probability value, and you

10   do that with the last column, which it's called "Degrees of

11   Freedom," but it basically reflects the number of people

12   involved, the number of test takers.

13   Q.    Okay, so just try to put this in lay terms for us.  Did

14   you make a determination as to whether, to a reasonable degree

15   of scientific certainty, there was a statistically significant

16   difference in the mean score of minority and non-minority

17   candidates on the 2005, 2006, 2007, 2008 statewide police

18   sergeant's exam and the 2005 and 2008 Boston sergeant's exam?

19   A.    Yes, I did.

20   Q.    And what was your conclusion, sir?

21   A.    That there is a statistically significant difference

22   between the means for minorities and the means for

23   non-minorities on each of these exams, and that means that

24   those differences are highly unlikely to have happened by

25   chance.  Something else was going on that caused those

1    differences.

2    Q.    Okay, you said you also looked at the data with respect to

3    pass/fail; is that correct?

4    A.    Yes.

5    Q.    Okay.  And where is that data located?

6    A.    I think that's on the next page.

7    Q.    That's Page 5?

8    A.    Yes.

9    Q.    Okay.  And can you tell me what the Table 2 on Page 5 is,

10   please.

11   A.    So that looks at the adverse impact in passing and failing

12   the examination.  So for the '05 statewide exam, 31.8 percent

13   of the minorities passed; 50.9 percent of the non-minorities

14   passed.  So to get the adverse impact ratio, you divide the

15   31.8 by the 50.9.

16        The probability of that happening by chance is well below

17   the accepted value of .05, and I think both Dr. Outtz and

18   Dr. Silver also ascribe to that .05 value.  And I also reported

19   that probability of .004 in standard deviation units because

20   there's a -- I think it's a U.S. Supreme Court decision in

21   *Hazelwood* that talks about two to three standard deviation

22   units.

23   Q.    Okay.  And let me ask you, with respect to the 2005

24   statewide examination, what was the adverse impact ratio?

25   A.    .62.

1    Q.    And that's statistically significant?

2    A.    And that's statistically significant.

3    Q.    Okay.  And when you say -- you were just mentioning the

4    standard deviation unit.  Can you explain what a standard

5    deviation unit is.

6    A.    Sure.  Standard deviations are used in different ways in

7    different circumstances, but here the standard deviation unit

8    is another way of expressing the probability, it's another way

9    of expressing how unusual it would be to get a difference this

10   big by chance.

11   Q.    Okay.  And for the 2005 Boston exam, what did you find?

12   A.    I found that 43.3 percent of the minorities passed, but

13   70.3 percent of the non-minorities passed.  When you divide

14   43.3 by 70.3, you get .62, and that's the adverse impact ratio,

15   at least for pass/fail for that examination.  And the

16   probability of that happening by chance is extremely small, and

17   in terms of standard deviation units, that would be 4.1.

18   Q.    Now, there's been some discussion of the fourth-fifths

19   rule.  Can you explain that, please.

20   A.    Yes.  The fourth-fifths rule came into being with the

21   federal enforcement agencies for Title VII of the 1964 Civil

22   Rights Act; and the Uniform Guidelines, when discussing adverse

23   impact, say that generally the enforcement agencies will use an

24   adverse impact ratio of .8 as a rule of thumb to decide whether

25   they will think there is adverse impact taking place with any

1  given selection system.

2      They also have some description of when they'll have a

3  finding of adverse impact if the adverse impact ratio is

4  greater than .8 and when they might have an administrative

5  ruling that there is no adverse impact even if the adverse

6  impact ratio is less than .8.

7  Q.   Okay.  And are you familiar with a concept of effective

8  pass rate?

9  A.   Yes.

10 Q.   And can you tell us what that is, please.

11 A.   Yes.  In many testing situations where the selection is

12 topped out in order of score, the appointments or the hiring or

13 the promotions never reach people who just pass.  Perhaps

14 passing is whatever, 80, but the people who are hired all

15 scored in the high 90s.  So if, let's say, the person with the

16 lowest score who was hired got a 96, so 96 becomes the

17 effective cut score.  No one below 96 was hired, only people

18 above 96.

19 Q.   Okay.  And have you made calculations of the adverse

20 impact of effective cut scores?

21 A.   Not statewide.

22 Q.   Okay.  Would you expect those to go up or down?

23         MR. LEAHEY:  Objection, your Honor.

24         MR. LICHTEN:  I'll withdraw the question.  I have

25 another way to do it.

```
 1              THE COURT:  Go ahead.
 2    Q.    I'm going to show you another document.  Are you familiar
 3    with this document?
 4    A.    I've seen it before.
 5    Q.    Okay.  And what is it?
 6    A.    It's a score distribution.  So we have in the left-hand
 7    column all the possible scores on the test, and then in the
 8    next column you have the frequency that people got that score.
 9    So you have one person who got a 94.  You also have one person
10    that got a 93.  In the next column you have a cumulative total.
11    So for the 94 you have a 1 in both columns, but in the 93
12    there's a 2 in the second column because there are two people
13    that scored 93 or above.  There are two people that scored 92
14    or above.  There are four people who scored 91 or above because
15    there are two people that scored 91.
16    Q.    And this was a document prepared by HRD?
17    A.    Yes.  It was produced by HRD.
18    Q.    Okay.  And this relates to the 2005 Boston Police
19    Department examination?
20    A.    That's what it says at the top of the page.
21    Q.    Okay.  Does that relate to what you were talking about
22    before about the effective cut score?  Does this have some
23    relation to that concept?
24    A.    Yes.
25    Q.    Okay, can you describe that for the Court, please.
```

1    A.    Well, let's say that Boston is going to promote 100

2    sergeants, just to pick a number.  So if you go down that third

3    column, you can get to 104, which is close.  So in appointing

4    100 sergeants, they would get to a score of 83.

5    Q.    So at 83, what was the disparity in minority and

6    non-minority scores?

7    A.    Well, the adverse impact ratio is in that right-hand

8    column, so the adverse impact ratio would be .27.

9    Q.    Okay.  And in lay terms, what does that mean, that what

10   percent of minorities achieved that score and what percent of

11   non-minorities achieved that score?

12   A.    About 24 percent of the minorities and about 33 percent of

13   the non-minorities.

14   Q.    Can you say that again, please.

15   A.    Oh, about 16 percent of the -- about 17 percent of the

16   minorities and about 23 percent of the non-minorities.

17   Q.    Okay.  And if you go down to the score of 80, what do you

18   see?

19   A.    Well, the adverse impact ratio is about .3 in the

20   right-hand column, and the actual percent passing would be

21   24 percent for the minorities and 33 percent, rounded to the

22   nearest number, for the non-minorities.

23   Q.    Okay.  And does this document show a relationship between

24   the scores and adverse impact?

25   A.    Yes.

1    Q.   And can you tell us what that is, please.

2    A.   Well, if you look in the right-hand column, at the very

3    top in the '90s, in '91, '93, '94, the adverse impact ratio is

4    zero.  There are no minorities there.  When you hit '90 and a

5    little bit below, you start having adverse impact ratio

6    generally in the .1 range.

7    Q.   Okay.  And that's a greater adverse impact than .2 or .3?

8    A.   I use the term "more severe" because "greater" gets

9    confusing when you have numbers that are worse when you get

10   lower.

11   Q.   Right.

12   A.   So there's more severe adverse impact there.  Then if you

13   go down a little bit more, you start seeing things in the 2s

14   and the 3s.  You go down a little further, you see things in

15   the 4s and the 5s.  You go down a little further, you see

16   adverse impact ratios in the 6s and 7s.  And you have to go

17   down to a score of 61 before you see an adverse impact ratio of

18   greater than .8.

19   Q.   Okay, what does that tell you about the distribution of

20   minority and non-minority scores?

21         MS. HARRIS:  Your Honor, I'm just objecting because

22   we've stipulated to adverse impact for the city of Boston.

23         THE COURT:  Overruled.  You may go ahead.

24   A.   So this implies to me that minorities did not do as well

25   as non-minorities in the city of Boston on average.

1    Q.    On average.  And with respect to various levels of scores,

2    what does it show you?  Is there a pattern that you were able

3    to discern?

4    A.    Yes.  The adverse impact is more severe the higher score

5    on the test.

6    Q.    Okay.  And this pattern, did you notice this pattern on

7    other tests?

8    A.    Yes.

9    Q.    And which ones, if you recall?

10   A.    I believe all of them.

11   Q.    Okay.  And I think it may be obvious, but can you tell us

12   the relationship between this pattern, distribution of adverse

13   impact, and how that affects promotional rates when a

14   promotional list comes out and promotions begin to be made?

15   A.    Yes.  The first few promotions in an exam such as this

16   would not include any minority promotions because there are no

17   minorities situated high enough on the list in the very upper

18   range.  As you start making more promotions off the list,

19   you'll start having severe adverse impact, at least will be

20   greater than zero; and it wouldn't be until you made many, many

21   appointments that the adverse impact would be basically gone.

22   Q.    Okay.  And are you familiar with the concept of delay?

23   A.    Yes.

24   Q.    And did you testify about delay in the *Bradley* case?

25   A.    Yes.

1    Q.    Can you tell me what that is, please.

2    A.    Yes.  In police and fire departments, often decisions

3    about job assignments and other occupational decisions are

4    based in part or totally on your seniority.  So if minorities

5    are appointed later than non-minorities, they're still

6    appointed, but even though they're appointed, they have some

7    lower status in the department that stays with them for their

8    whole career.

9    Q.    And when you analyzed this data, did you notice such a

10   pattern?

11   A.    I did.

12   Q.    And what was that pattern?

13   A.    That minorities tend to be appointed later than

14   non-minorities.

15   Q.    Thank you.  Going back to the statewide data, did you look

16   at adverse impact with respect to selection rates statewide?

17   A.    Yes.

18   Q.    Okay.  And where is that data found?

19   A.    On Page 6.

20             (Discussion off the record.)

21   Q.    Can you tell me what Table 3 is, please.

22   A.    Yes.  This is a table I compiled to report the adverse

23   impact in appointment by examination year; and in doing this

24   table, I looked only at police departments that had both

25   appointments and minority test takers.  There are some

1    departments that never use the list, they have no appointments,

2    and there are some departments that had no minority test

3    takers; and I thought, for this particular analysis, it would

4    make sense not to include them.

5    Q.    Okay.  And can you tell us for the 2005 sergeant's exam

6    statewide what you found doing this analysis.

7    A.    Yes.  Statewide, 5.6 percent of the minorities were

8    appointed and 16.1 percent of the non-minorities were

9    appointed.  When you make that into a ratio, 5.6 over 16.1 is

10   .35, and that's well below the .8.  The probability of this

11   happening by chance was .12, which is greater than .05, so this

12   is not statistically significant, and the standard deviation

13   units would be 1.5.

14   Q.    An adverse impact ratio of .35, in what range is that

15   adverse impact?

16   A.    It's not the most severe that you could possibly get --

17   that would be closer to zero -- but it's quite sizable adverse

18   impact.

19   Q.    And the fact that it's not statistically significant, it's

20   .12, what conclusions, if any, do you draw from that?

21   A.    Well, there are several possible things you can decide

22   based on that.

23   Q.    Let me ask you before we get to -- this is excluding the

24   Boston data?

25   A.    Correct.

1  Q.   Okay, so if you included the Boston data in here, would

2  you have gotten to statistical significance?

3  A.   Oh, yes.  I report that elsewhere.

4  Q.   Okay, so this was without the Boston data?

5  A.   Correct.

6  Q.   Okay.  So even though you have a .12 statistical

7  significance quotient, do you have an opinion as to whether or

8  not this demonstrates adverse impact or not in selection

9  statewide?

10  A.   Yes.

11  Q.   What is your opinion?

12        MR. D'AGOSTINO:  Objection.

13        THE COURT:  Overruled.

14  A.   My opinion is that this indicates adverse impact, severe

15  adverse impact statewide.

16  Q.   Why?

17  A.   There are two reasons.  One, the adverse impact ratio of

18  .35 is substantially below .8.  And the second reason gets into

19  the question of, why are we doing a statistical test?  So here

20  we're doing a statistical test to see if a difference that

21  large would occur by chance, as if we knew nothing else about

22  the situation.  If we had no other data and looked only at

23  this, what's the mathematically appropriate conclusion?

24        But we saw in Table 2 for the same exam that minorities

25  and non-minorities scored on average differently, and

1    minorities scored lower, and the probability of that happening

2    was less than 4 in 1,000.  So if all I had to look at was this

3    first line of Table 3, I would say the difference was not

4    statistically reliable.  It's a low adverse impact ratio.  But

5    when I look at Table 2, I say the reason that you find

6    statistical significance in Table 2 and you don't in Table 3 is

7    that the number that you're looking at in Table 3 is a simple

8    yes/no decision; you only have two points on your scale.

9    Whereas, the number that we're looking at in Table 2 is a score

10   on the exam, and the score on the exams go from zero to 100, at

11   least theoretically.  So you have much finer data in Table 2

12   than Table 3.  So taking the two of them together, I would say

13   there's severe adverse impact in the '05 statewide sergeant

14   exam in appointments, considered collectively.

15   Q.    Okay.  Let me ask you the following to try to clarify

16   that:  In communities where the selection ratio is fewer --

17   that is, let's say only 10 or 15 percent of people who have

18   taken and passed the exam are getting selected -- what effect,

19   if any, does that have with respect to mean differences?  That

20   is, are mean differences more or less important, depending upon

21   the ratio of selection?  I hope I asked that okay.

22   A.    Let me think about that a moment.  Are the mean

23   differences more or less -- okay, mean differences are somewhat

24   less important for small departments because you have fewer

25   people, and the difference between people in a small department

1    might just, for any of various unknown reasons, not reflect the

2    overall pattern that you see with the exam statewide.

3    Q.    Okay.  And let me ask you, you mentioned that you were

4    trying to determine that notwithstanding that you didn't have

5    statistical significance with the selection rate, whether or

6    not you still thought there was adverse impact, and your answer

7    was "yes."  Let me ask you the following:  Was there literature

8    generally available at the time in 2005 which would assist

9    anyone to predict whether or not the use of a multiple-choice

10   job knowledge test would have an adverse impact on minority

11   candidates, even before it was administered?

12   A.    Yes.

13   Q.    Can you tell me about that, please.

14   A.    Yes.  I think there were two strong indications that this

15   '05 statewide sergeant exam would have adverse impact.  First,

16   there's the research literature; perhaps you can call it the

17   academic or scholarly literature that industrial psychologists

18   produce that shows that nationwide multiple-choice tests tend

19   to have adverse impact on minority candidates.

20        And then you have the experience of Massachusetts before

21   '05.  There were exams given in each year, you know, and there

22   was an exam given in '91, yearly exams for the past at least

23   fifteen years that we know of.  And I looked at two of them

24   specifically.  I think it was the '02 and '03 or '03 and '04.

25   And the statewide exams for sergeant that HRD administers have

1   adverse impact each year.  So if you give another one that

2   looks basically the same as the earlier ones, you would expect

3   the same thing to happen.

4   Q.   Okay.  You mentioned scholarly works.  Were there

5   scholarly reputable works that had studied the effect of

6   multiple-choice knowledge tests such as this on adverse impact

7   scores?

8   A.   Yes.

9   Q.   And can you think of any of those as you sit here right

10  now?

11  A.   Yes.

12  Q.   Can you think of any from defendants' expert?

13  A.   Dr. Outtz has spent much of his career wrestling with the

14  problem of adverse impact and trying to find ways of reducing

15  adverse impact.  He recently edited a highly respected textbook

16  on adverse impact.  He contributed a chapter himself, and there

17  were several other -- there were some, I don't know, twenty

18  chapters, and he edited that book, and the book is highly

19  respected.  It reports findings on adverse impact for different

20  approaches to testing.

21  Q.   And how long was this data available, this information,

22  these studies?

23  A.   I think the field started noticing this very acutely in

24  the '90s.

25  Q.   So let me ask you this:  As an industrial psychologist in

1    this field, prior to even the administration of the 2005 exam,

2    would you have been able to predict with a reasonable degree of

3    scientific certainty whether there was going to be adverse

4    impact if a sergeant's exam was given that had only a multiple-

5    choice job knowledge test?

6            MR. CARROLL:  Objection.

7            THE COURT:  Overruled.

8    A.    I would not have been able to make a numeric prediction

9    because adverse impact is very complex.  For example, it

10   depends on the number of people you appoint, just as we went

11   over with that frequency distribution.  In the extreme, if a

12   department were to appoint all the people that took the test,

13   then a hundred percent of the minorities would be selected, a

14   hundred percent of the non-minorities.  That would be 1 over 1.

15   It would be perfect equity.  So the same test can have

16   different adverse impact ratios depending on the appointment

17   process.  But in terms of the impact of the test on the grades,

18   on the average grades for minorities and non-minorities, you

19   definitely could predict that the test would adversely affect

20   the minorities; and given some reasonable assumptions about

21   what proportion of people might be promoted, you could make a

22   reasonable guess as to the actual adverse impact.

23   Q.    Let me ask you about the 2006 statewide exam.  Did you

24   make an analysis of that?

25   A.    I did.

1    Q.    And what were your conclusions?

2    A.    That it had even more severe adverse impact, and that was

3    statistically significant.  There was 1.6 percent of the

4    minorities were appointed as compared to 12.1 percent of the

5    non-minorities, and that ratio is .13.

6    Q.    And what did you find the probability of that happening by

7    randomness?

8    A.    The probability of that happening by randomness, by

9    chance, is .01.

10   Q.    And do you have an opinion to a reasonable degree of

11   scientific certainty as to whether that adverse impact ratio

12   for the 2006 statewide exam is the product of randomness?

13   A.    Yes.

14   Q.    And what is your opinion?

15   A.    That that adverse impact ratio is not the result of

16   randomness; something else was causing it.  And presumably the

17   something else that was causing it was the difference in mean

18   score for minority and non-minority as described in Table 2.

19   Q.    And how significant is the adverse impact that you found

20   from the 2006 statewide exam in selection rates?

21   A.    That's very severe.  I mean, that's not a scientifically

22   defined adjective.  I would describe it as very severe.

23   Q.    And for 2007 statewide, what did you find?

24   A.    The adverse impact ratio there is .64, which is less than

25   .8.  So in terms of the adverse impact ratio, there was adverse

1    impact.  The probability was quite high, .75, so that's not

2    statistically significant.  Nevertheless, when you look at the

3    Table 1 and you find for the '07 exam the adverse impact in

4    written test score was highly statistically significant, I

5    would conclude that that .64 is not due to chance; it's real

6    adverse impact.

7    Q.   Based upon your analysis of the statewide data -- and I'll

8    get to Boston in a second -- do you have an opinion to a

9    reasonable degree of scientific certainty as to whether there

10   was adverse impact in the selection rates for each year of the

11   exam and cumulatively?

12   A.   Yes.

13   Q.   And what is your opinion?

14        MR. CARROLL:  Objection.

15        THE COURT:  Overruled.

16   A.   That there is adverse impact in appointment as a function

17   of the examination each year and cumulatively.

18   Q.   Let me ask you the same question with respect to pass/fail

19   rates.

20   A.   For the '05, '06, '07 statewide exams and the '05 and '08

21   Boston exams, there is statistically significant adverse impact

22   in the pass/fail.  For the '08 statewide exam, the adverse

23   impact is not statistically significant; but if you look at the

24   actual adverse impact in the scores on the test in the '08 exam

25   from Table 1, that is statistically significant.  So I would

1    suggest that the reason that the adverse impact ratio was less

2    than 1 in the '08 exam is not due to chance.

3    Q.    Okay.  And, finally, based on your review and analysis of

4    the data, do you have an opinion to a reasonable degree of

5    scientific certainty as to whether there was an adverse impact

6    with respect to the mean score differences of minority and

7    non-minority candidates on each of these statewide exams?

8    A.    Yes.

9    Q.    What is that opinion?

10            MR. CARROLL:  Objection.

11            THE COURT:  Overruled.

12    A.    That the mean score differences that we're seeing between

13    minorities and non-minorities on these exams was not due to

14    chance; it was due to something else.

15    Q.    Now, are you aware of the defendants' expert's criticism

16    of the use of aggregated data statewide?

17    A.    Yes.

18    Q.    And what is your view of that opinion?

19    A.    I --

20    Q.    Let me ask you, do you disagree with that opinion?

21    A.    I disagree with that opinion in part.

22    Q.    And can you tell us why.

23    A.    Yes.

24            MR. CARROLL:  Objection, your Honor.  Can there be a

25    foundation as to what defendant they're disagreeing with?

1          THE COURT:  Well, there is, although it's a pretty

2    general foundation.  It's what the defense experts are expected

3    to say.  I don't know what that is, but maybe all of you do.

4    Q.   Well, let me withdraw that question and ask it this way:

5    Do you believe that it is appropriate to analyze this statewide

6    data to determine whether or not there was adverse impact

7    resulting from these examinations statewide?

8    A.   Yes.

9    Q.   And putting aside what the defendants' expert thinks, why

10   do you think this?

11   A.   The test that was given in the various municipalities was

12   the same test.  So if we want to find out what the impact of

13   that test is, the best way to do that is to get as much data as

14   we can about that test, and that would be to look at the data

15   from every person that took the test.  And by looking at the

16   data from every person that took the test, we would have the

17   most reasonable set of data to evaluate the adverse impact, if

18   any, of that statewide test.

19   Q.   Okay, let's turn to Boston.  Did you do an analysis of the

20   Boston examination data?

21   A.   I did.

22   Q.   And where is that located, please?

23   A.   It's the last two lines of the three tables we just talked

24   about.

25   Q.   Okay.  And let's start back on Page 4, Table 1.  Just to

1    put this in practical terms, did you calculate the average

2    point differences or the mean point differences between

3    minority and non-minority test scores on the '05 and '08 exam?

4    A.    I did.

5    Q.    And do you know where that is, please?

6    A.    It might be in that -- the answer is, not off the top of

7    my head.

8    Q.    Okay, let me see if I can -- could you turn to Page 10 of

9    your June 25 report.

10   A.    Yes.

11   Q.    And did you determine the point spread for minorities and

12   non-minorities for the Boston 2005 and 2008?

13   A.    Not on Page 10.

14   Q.    Oh, I'm sorry.  I'm sorry, Table 2 on Page 10 where it

15   says "adverse impact" and "average test score"?

16   A.    Right, but this was aggregated over a number of years.

17   Q.    Okay.

18   A.    But the difference that you see there aggregated over a

19   number of years for Boston is basically what you see for the

20   Boston exams.

21   Q.    Okay, so that's for '05 and '08?

22   A.    Correct.

23   Q.    So what does that figure tell us, please?

24   A.    So, on average, the minority candidates scored about six

25   points lower than the non-minority candidates.

1    Q.    Okay, is that significant?

2    A.    It's highly statistically significant.  It's not likely to

3    have happened by chance.  So that's one salient observation.

4    Another is, it's not a huge number of points.  I mean, there

5    are only 80 questions on the test, so each question is worth

6    more than one point, so a difference of six points is less than

7    six questions.

8    Q.    Okay.  And did you review how the tests were actually

9    marked and graded?

10   A.    I did to some extent.

11   Q.    And did it always ends up being 80 questions, or did it

12   end up being less on occasions?

13   A.    There were some occasions, I think for each of the exams,

14   that questions were not included in the scoring.

15   Q.    Can you explain why that is, please.

16   A.    Yes.  HRD decided that the questions were faulty, and they

17   did not want to use the faulty questions to form grades.

18   Q.    And the fact that some questions are thrown out, how does

19   that affect the scoring pattern?  Let me withdraw that question

20   and ask it a different way.  Do you recall any test that had a

21   lot of questions thrown out?

22   A.    Yes.  One of the exams I think had 18 questions thrown

23   out, which was some 22 percent of the exam, and I think the

24   effect of that -- there are at least two effects I can think of

25   right now.  One is that people tended to have higher scores,

1    and, two, the intended coverage of the test shifted basically

2    haphazardly.

3    Q.    Okay, so going back to Boston for 2005, did you calculate

4    the pass/fail differences?

5    A.    Yes.

6    Q.    And where is that located, please?

7    A.    I think that's in the April 14 report on Page 5.

8    Q.    Okay.  And what did you determine, please?

9    A.    For the '05 Boston exam, the minority passing rate was

10   43.3.  The non-minority was 70.3.  So that's whatever, close to

11   a 30 percent difference.  And the adverse impact ratio is .62.

12   That's highly statistically significant and corresponds to 4.1

13   standard deviation units.

14   Q.    And, again, that was one of the tests where 70 was set as

15   the passing rate?

16   A.    Correct.

17   Q.    Did you see any evidence in any of the documents that you

18   reviewed that provided a scientific basis for using 70 as a

19   cutoff score in that fashion?

20   A.    No.

21   Q.    And how significant would you characterize the difference

22   in pass/fail rates between minority and non-minority for the

23   2005 Boston exam?

24   A.    That's a fairly dramatic difference.

25   Q.    Okay.  Let me ask you for 2008, did you calculate the

1    pass/fail rate between minorities and non-minorities?

2    A.    I did.

3    Q.    And what was it?

4    A.    Well, you had 63 percent of the minorities passing,

5    87 percent of the non-minorities passing, and the adverse

6    impact ratio is .73.

7    Q.    And let me ask you, are you aware as to whether the

8    pass/fail rate was lowered on that test from the 2005 test?

9    A.    The pass/fail rate, you mean the cut point?

10   Q.    The cut point.  Sorry.

11   A.    The '08 exam passed more people, and as you pass more

12   people, you tend to have less adverse impact.

13   Q.    Do you remember what the pass/fail score was?

14   A.    No.

15   Q.    Okay.  And was that finding statistically significant?

16   A.    Yes.

17   Q.    And to what extent?

18   A.    It was highly statistically significant.

19   Q.    Okay.

20   A.    The .000, if you actually carried it out, you'd have more

21   zeros there.

22   Q.    Okay.  And, finally, with respect to the 2005 and 2008

23   Boston sergeant's exam, did you calculate the adverse impact

24   ratio for selection rates for each year?

25   A.    I did.

1    Q.   And where is that?

2    A.   That's in Table 3.

3    Q.   And what did you determine?

4    A.   For the Boston exam in '05, 4 percent of the minority test

5    takers were promoted; 14 percent of the non-minority test

6    takers were promoted.  And that ratio 4 over 14 is .28.  That's

7    highly statistically significant and corresponds to 4.1

8    standard deviation units.

9    Q.   And how severe would you characterize the adverse impact

10   in selection rates from that exam on minority candidates?

11   A.   .28 is definitely severe.

12   Q.   And is there any explanation from the concept of

13   randomness that would explain that?

14   A.   The statistical --

15         MS. HARRIS:  Objection because I don't understand the

16   question.

17         THE COURT:  Sustained to the form of the question.

18   Q.   Could that difference be explained by the concept of

19   randomness?

20   A.   It's possible.  The statistical analysis, however,

21   indicates that that is highly, highly unlikely to have occurred

22   by chance.

23   Q.   And what does that mean, "highly, highly unlikely"?

24   A.   Well, the probability is less than .001, and it's

25   actually -- I didn't put in all the zeros, but it's

1    considerably less than .001.

2    Q.    Okay, so it's statistically significant?

3    A.    Highly statistically significant.

4    Q.    Okay.  Now, for 2008, I just want to be clear, did you get

5    some subsequent data subsequent to this report that caused you

6    to redo your numbers?

7    A.    At one point I received some updated information from the

8    City of Boston, and I think it was after this report, yes.

9    Q.    Okay.  So this was --

10   A.    This report was based on the HRD file that I mentioned

11   early on in the report, and we since then got an updated file.

12   Q.    Okay.  And do you know where your updated analysis is?

13   A.    Well, it must be the June 25.

14   Q.    Okay, could you look at your June 25 report and see if you

15   have updated information for Boston.

16             (Witness examining document.)

17   Q.    Page 9.

18   A.    I'm getting there.

19             MS. HARRIS:  For the record, I'm going to object to

20   the use of the Boston '08 data just because that list is live,

21   and so to draw conclusions from it for appointment purposes I

22   think is prejudicial, since the list I think has another year

23   and a half left to be --

24             THE COURT:  That goes to the weight rather than the

25   admissibility of the evidence.

```
 1            MS. HARRIS:  Thank you.

 2   Q.   Do you see that page?

 3   A.   I'm getting there.

 4            (Witness examining document.)

 5   A.   Okay.  So on Page 9 in the June 25, 2010, the numbers are

 6   slightly different than the earlier report, yes.

 7   Q.   So what did you determine with respect to the selection

 8   rate and whether there was adverse impact for the position of

 9   police sergeant in Boston with respect to the hiring data that

10   was available up until June of 2010?

11   A.   That there was severe adverse impact with respect to the

12   Boston 2008 sergeant's exam with respect to promotion rates.

13   And the adverse impact ratio is .05, so that's less than .1,

14   it's considerably less than .8, and you can't get much lower

15   because the lowest is zero.

16   Q.   Okay.  And do you know what the raw numbers were; that is,

17   what we're talking about for 2008?

18   A.   I think there was something like 30 or so minorities

19   appointed, and --

20   Q.   So you said 30 or more minorities --

21   A.   I'm sorry.  Thirty or more non-minorities appointed and

22   one or two minorities.  I don't recall offhand.  I think I

23   prepared a chart with that.

24            MR. LICHTEN:  Just one minute, your Honor.

25            (Pause.)
```

1  Q.   Let me move on.  Did you look at the list to see whether

2  or not, even assuming they made five or ten or fifteen more

3  promotions, there would still be statistically significant

4  adverse impact from the 2008 exam?

5  A.   Yes.

6  Q.   And what did you determine?

7  A.   Well, I mean, "determine" is a little strong because we

8  don't know how many additional appointments the city might

9  conceivably make; but if they used the list in a rank order

10 fashion and make some reasonable number of appointments, the

11 adverse impact would continue.  It might not stay as low as

12 this.

13 Q.   Okay.  And does this have any effect on the delay factor

14 that you mentioned?

15 A.   Yes.  I mean, the --

16 Q.   What is that?

17 A.   Well, if you get, as you would usually, less adverse

18 impact as you reached further down on the eligible list, you

19 still have the first appointments going to non-minorities

20 predominantly.

21 Q.   Okay.  And let me show you the following.  I think I found

22 what I was looking for.  I'm showing you a chart.  What is

23 this?

24 A.   Okay, so this is -- if you go up to the very top of the

25 page, that's for the Boston Police Department.  And if you look

1    at the first column, if you look at the first column of that

2    Boston Police Department page, we have three tables:  one for

3    the '05 exam, one for the '08 exam, and one for the combined

4    '05 and '08 exams.

5    Q.    Let me ask you, does this document reflect in raw numbers

6    the adverse impact percentages that you were talking about

7    earlier?

8    A.    These raw numbers are what I used to calculate the adverse

9    impact.

10   Q.    Okay.  And, again, so for the 2005 exam, trying to use raw

11   numbers rather than percentages and adverse impact ratios, can

12   you tell us how many minorities were promoted out of how many

13   who took the exam, we're saying for non-minorities for 2005?

14   A.    Right, for 2005, 9 minorities were appointed out of 224.

15   Q.    That's 224 who took the exam?

16   A.    224 minorities took the exam.  57 non-minorities were

17   appointed out of a total of 401 people who took the exam.  So

18   you have less than twice as many non-minorities as minorities;

19   but if you compare the 9 to the 57, 57 is several times the 9.

20   So the percent of minorities that took the exam that were

21   promoted is 4.  14 percent of the non-minorities were promoted.

22   The adverse impact ratio is the 4 over 14, and the 4 over 14 is

23   what was reported in that previous chart.

24   Q.    Okay.  All right, now, let me move on.  Did you attempt to

25   calculate the adverse impact for the city of Springfield,

1    Massachusetts?

2    A.    Yes.

3    Q.    And where is that?

4    A.    Well, let's see.  On the June 25, I have something on that

5    on Page 7.

6    Q.    And do you have a chart that shows that?

7    A.    On Page 9.

8    Q.    Okay, first, can you tell us what exams the city of

9    Springfield participated in?

10   A.    The '05 and '07.

11   Q.    And did you calculate -- which items did you calculate?

12   Let me ask it that way.

13   A.    Okay, so I looked at the adverse impact ratio for

14   appointments.  I also looked at the adverse impact ratio for

15   passing grades and for the effective passing score, and I also

16   looked at the difference between minorities and non-minorities

17   in the average test score.

18   Q.    Okay.  So let's take it from the far right.  You say

19   average impact and average test score, and for Springfield you

20   have 6.9 points and 8.7 points.  What does that represent?

21   A.    So on the '05 test, minorities scored on average about

22   7 points lower than the non-minorities.  On the '07, the gap

23   widened a little bit to 8.7 points.

24   Q.    Is that significant?

25   A.    And both of those are statistically significant.

1    Q.    Okay.  Did you calculate the adverse impact in passing

2    rates for minorities and non-minorities for Springfield?

3    A.    I did.

4    Q.    And what did you find?

5    A.    For the '05 exam and the '07 exam, minorities passed at a

6    lower rate than non-minorities.  The actual adverse impact

7    ratios were .81, which is not statistically significant, and

8    .47, which is statistically significant.

9    Q.    And how severe is that disparate impact?

10   A.    Well, in itself, it's noticeable.  The bottom line in

11   terms of appointments depends on how many appointments the city

12   makes, but compared to the most severe adverse impact possible,

13   the .81 would be considered mild.  The .47 -- there's no

14   standard terminology to describe, you know, adverse impact of

15   .5 versus .4 versus .3.  It's a noticeable amount of adverse

16   impact.

17   Q.    Okay, and how about with respect to selection rates?  Did

18   you calculate whether there was adverse impact in Springfield

19   in '05 and '08?

20   A.    '05 and '07, yes.

21   Q.    '05 and '07, excuse me.

22   A.    Yes, the adverse impact in promotion rates was zero in

23   '05.  That means that no minorities were promoted, but some

24   non-minorities were promoted.  And in '07 the adverse impact

25   ratio is .23, which means there were at least some minorities

1    promoted in Springfield, but they were not promoted at the same

2    rate as non-minorities.

3    Q.    Okay.  And to put that in raw numbers, I think we have

4    something on our computer that --

5           MR. CHURCHILL:  Your Honor, can you switch to the

6    prosecution, or plaintiff in this case.

7           THE COURT:  Are you sure it's prosecution?

8           MR. CHURCHILL:  Let's try the other one.

9           THE COURT:  Is that you?

10           MR. CHURCHILL:  No.

11           THE COURT:  That's the defense.  That's Springfield, I

12    think.

13           (Laughter.)

14           THE COURT:  It's set for prosecution.

15           MR. CHURCHILL:  Let me try. . .

16           MR. LICHTEN:  Ah, wow.

17    Q.    I just wanted to try to put these ratios into raw numbers,

18    so does this document tell you how many candidates we're

19    actually talking about that form these ratios?

20    A.    Yes.

21    Q.    Okay.  And for 2005, what were those numbers?

22    A.    For 2005, zero out of 18 minorities were promoted, and 7

23    out of 29 non-minorities were promoted.

24    Q.    Okay.  And do you consider this statistically significant?

25    A.    So the adverse impact ratio would be zero over 24 percent,

1    and that would, of course, be zero, and that is statistically

2    significant.

3    Q.    Therefore, with respect to the 2005 statewide police

4    sergeant's examination, do you have an opinion to a reasonable

5    degree of industrial psychology certainty as to whether or not

6    there was adverse impact in selection rates with respect to the

7    city of Springfield?

8    A.    Yes.

9    Q.    And what is that opinion?

10   A.    There was adverse impact in the promotion rates.

11   Q.    And putting aside that particular data, is there any

12   supporting data which leads you to believe that that is not the

13   product of randomness?

14   A.    Yes.

15   Q.    What is that?

16   A.    Well, we'd already looked at the 6.9-point difference in

17   average test score for minorities and non-minorities and the

18   difference in passing rates, and I don't know if we looked at

19   the difference in effective passing rates, but there is also a

20   difference in effective passing rates.

21   Q.    And let me ask you, for 2007, what were the raw numbers?

22   A.    One minority out of 15 was promoted, and 6 non-minorities

23   out of 21 were promoted.

24   Q.    Okay.  And if you add that all up, what do you --

25   A.    So 15 and 21 aren't that different, but 1 and 6 are.  So

1    you have 7 percent of the minorities and 29 percent of the

2    non-minorities, and you can form a ratio of the 7 to the 29,

3    and you find that there's adverse impact for Springfield.  It's

4    not statistically significant, however.

5    Q.   Even though it's not statistically significant, do you

6    have an opinion to a reasonable degree of industrial psychology

7    certainty as to whether or not that selection ratio

8    demonstrates or does not demonstrate adverse impact with

9    respect to the 2007 statewide exam?

10   A.   I do.

11        MR. CARROLL:  Objection.  It's not statistically

12   significant, your Honor.

13        THE COURT:  I'll admit it.

14   A.   Yes.  We have more data than just that 2-by-2 table.  We

15   actually know more about these 36 people than whether they were

16   promoted or not promoted.  So, for example, we know how they

17   actually scored on the test, and we know that minorities scored

18   8.7 points on average lower than non-minorities.  We know that

19   the passing rate for minorities was half that of -- a little

20   less than half that of the non-minorities.  So when you put

21   that all together, it's clear that .23 didn't just happen due

22   to randomness.  It's a real effect.

23   Q.   And did you aggregate the data over years at Springfield

24   to determine whether or not that would support your analysis?

25   A.   I did.

1    Q.    And what, if anything, did you determine?

2    A.    I determined that if you aggregate it, the adverse impact

3    ratio is .13, and that is statistically significant.

4    Q.    And do you think the aggregation of data in Springfield

5    over these two exams is appropriate based upon your

6    professional standards?

7    A.    I think it's not ideal, but I think it is appropriate.

8    The reason it's not ideal is, there might be some people who

9    are counted twice in the first exam, the '05, and then again in

10   the '07.  On the other hand, if you want to get a picture of

11   what happened in the two exams, putting the data together gives

12   you an overall picture of what happened in the two exams.

13   Q.    And let me ask you this:  If Springfield is permitted to

14   continue to use multiple-choice 80-question exams based upon

15   the format that the Commonwealth used and that Springfield

16   therefore used in 2005 and 2008, do you have an opinion as to

17   whether or not this pattern would continue?

18              MR. CARROLL:  Objection.

19              THE COURT:  Overruled.

20   A.    Based on everything I know from the testing literature and

21   experience is, the pattern definitely will continue.

22   Q.    Thank you.  Let me turn to Lawrence for a moment.  Did you

23   do a statistical analysis for Lawrence?

24   A.    I did.

25   Q.    Okay.  And where is that found, please?

A.    One is reported on Page 9 of that June 25, 2010 report.

Q.    Okay.  And what kinds of analysis did you do for Lawrence?

A.    Well, I did the same analyses for all of the defendant departments.  I looked at the adverse impact in promotion rates, in passing rates, in effective passing rates, and in average test score.

Q.    Okay, let's talk about average test scores.  Did you find any differences?

A.    For Lawrence in '06, I found that minorities scored some 6 points lower than non-minorities on average, and that is statistically significant.  In '08 I found that the mean for minorities was still lower than non-minorities but only by 3.3 points, and that was not statistically significant.

Q.    And did you look at pass/fail rates?

A.    And I looked at pass/fail rates, and the pass/fail rate in '06 was .46, which means the minorities passed at less than half the rate of the non-minorities.  That popped up to .84 in '08.

Q.    Okay.  And are either of these statistically significant?

A.    No.

Q.    Okay.  Notwithstanding that they're not statistically significant, do you have an opinion to a reasonable degree of industrial psychology certainty whether or not there's adverse impact of the pass/fail rates for the '06 and '08 exams given in Lawrence?

1    A.    Yes.

2              MR. D'AGOSTINO:  Objection.

3              THE COURT:  Overruled.

4    Q.    What is that?

5    A.    I think that the differences that are reflected here with

6    the lower passing rates and the lower promotion rates for

7    minorities in Lawrence are not due to chance.

8    Q.    Why?

9    A.    Well, first, within the city of Lawrence itself, you have

10   the 6.0-point discrepancy in average score for the '06 exam,

11   and that is statistically significant.  And then you have the

12   all of the results not in favor of the minorities, so that in

13   itself is unusual.  And then you have the analyses that were

14   done statewide of the '06 and '08 exams, and what you see in

15   Lawrence is consistent with what you see statewide; that

16   minority candidates score a few points lower; the minorities as

17   a group pass at a lower rate and are appointed at a lower rate.

18   Q.    And did you do an analysis of whether there was adverse

19   impact at the selection rate for police sergeant in the city of

20   Lawrence?

21   A.    I did, yes.

22   Q.    And what did you determine?

23   A.    That the adverse impact ratio in Lawrence for both exams

24   was zero, which means that no minorities were appointed and

25   some non-minorities were appointed.

1    Q.    Okay.  And just again to put this into -- give it some raw

2    data, I'm showing you a chalk for Lawrence Police Department.

3    Did you put that together?

4    A.    I did.

5    Q.    Okay.  And what does it shop with respect to the actual

6    numbers of promotions and people taking the exam?

7    A.    Okay, so in the upper left-hand corner, that's the number

8    of promotions from the '06 exam, and there were 4

9    non-minorities promoted out of 37 and no minorities promoted

10   out of 10.

11   Q.    And how about for 2008?

12   A.    And for 2008, there were no minorities appointed out of 15

13   and 1 non-minority appointed out of 27.  And those are very

14   small numbers.  One person appointed out of 42 is a very small

15   number.  You can't get much smaller, and, as I mentioned,

16   statistical tests are not very good at detecting real

17   differences when you have small numbers.

18   Q.    Okay.  Did you look at the list in '08 to see what would

19   happen if two or three or four promotions are next made in

20   Lawrence?

21   A.    Yes.

22   Q.    And what did you find?

23            MR. D'AGOSTINO:  Objection.

24            THE COURT:  Overruled.

25   A.    The non-minorities tend to be populating the top of the

1  list and the minorities lower on the list.

2  Q.   So if more promotions are made off this list, do you think

3  the pattern of adverse impact would continue?  Do you have an

4  opinion?

5          MR. D'AGOSTINO:  Objection.

6          THE COURT:  You're asking about the actual composition

7  of the list?

8          MR. LICHTEN:  Yes.

9          THE COURT:  Go ahead.  You may have it.

10  A.   It depends on how many more appointments are made.  If a

11  small number of appointments are made, it would not result in

12  the adverse impact going away.

13  Q.   Okay.  Recognizing that the numbers are small in Lawrence,

14  do you have an opinion as to whether the lack of any promotions

15  in Lawrence for '06 and '08 demonstrates adverse impact?

16  A.   Well, with numbers this small, chance can play a role; but

17  since we see the 6-point difference for the '06 exam between

18  minorities and non-minorities on average, and that is

19  statistically significant, I think that 6-point difference is

20  driving the adverse impact ratio of promotions of zero.

21  Q.   And do you have an opinion as to what, if anything, would

22  happen with respect to the promotions of sergeants in the city

23  of Lawrence if the same exam format which is currently being

24  used, an 80-question multiple-choice job knowledge test,

25  continues to be used in the present way it's being used?

```
 1            MR. D'AGOSTINO:  Objection.

 2            THE COURT:  Overruled.

 3   A.   I think that you would see adverse impact continuing with

 4   a new exam.

 5   Q.   I don't believe you were here yesterday, but assume for a

 6   moment that there hasn't been a minority sergeant promoted in

 7   the city of Lawrence in the last nine years, would that affect

 8   your opinions that you've just given?

 9   A.   It depends how many minority applicants there are, but it

10   gives no reason to think they're going to be promoting

11   minorities in the future if they haven't for the last nine

12   years.

13            MR. D'AGOSTINO:  Objection.  Move to strike.

14            THE COURT:  Yes, I'll strike that.

15   Q.   Okay, let me move on to Lowell, please.

16            MR. LEAHEY:  Your Honor, I believe you've ruled on

17   this.  I would just ask that I have a standing objection to

18   these line of questions to save time.

19            THE COURT:  Fine.

20   Q.   Did you do an analysis for Lowell?

21   A.   I did.

22   Q.   And did you look at the difference in test scores?

23   A.   I did.

24   Q.   And what, if anything, did you find?

25   A.   I found that there was a 9.1-point difference between the
```

1    means for minorities and non-minorities in Lowell in favor of

2    the non-minorities, and that was statistically significant.

3    Q.    And how significant do you think that point difference is?

4    A.    Well, 9 points is --

5          MR. LEAHEY:  Objection.

6    A.    In terms of practical import, 9 points on average is

7    pretty dramatic.

8    Q.    Did you look at the pass/fail ratios?

9    A.    I did.

10   Q.    And what, if anything, did you find?

11   A.    The pass/fail ratio had an adverse impact of .78 in

12   Lowell.

13   Q.    And do you have the raw numbers for that; that is, what

14   the percent of failures were?

15   A.    I did prepare a chart on that.

16   Q.    Okay.  Well, I'm showing you a little chalk.  Can you tell

17   me what that is, please.

18   A.    Sure.  It's similar to the ones we've seen earlier.

19   Q.    All right, go ahead.

20   A.    So in the Lowell Police Department, Lowell only

21   participated in one exam of the exams that are being

22   challenged, and that's the '06 exam, and there were 10

23   appointments of non-minorities, 10 appointments out of 36.  So

24   about 28 percent of the non-minorities were appointed, none of

25   the minorities were appointed out of the 7 minority test

1    takers; and the adverse impact ratio is zero over 28, which is

2    zero.

3    Q.    And did you look at the pass/fail ratio?

4    A.    And I looked at the pass/fail ratio.

5    Q.    And what did it show?

6    A.    That 71 percent of the minorities passed at the official

7    passing point of 70, and 92 percent of the non-minorities

8    passed at that official passing rate of 70, so that's 5 out of

9    seven and 33 out of 36.

10   Q.    What does that yield for an adverse impact ratio?

11   A.    .78.

12   Q.    Okay.  And that's below the fourth-fifths rule?

13   A.    That violates the fourth-fifths rule, yes.

14   Q.    Okay.  So based upon all of this data, do you have an

15   opinion as to whether or not the 2006 exam in Lowell had an

16   adverse impact upon minority test takers?

17   A.    Yes.

18   Q.    And what is that opinion?

19   A.    My opinion is that the 2006 examination did have adverse

20   impact on minority test takers in Lowell.

21   Q.    And, again, if Lowell is permitted to use the

22   Commonwealth's 80-question multiple-choice exam going forward,

23   do you have an opinion as to whether or not there will be

24   adverse impact in the future examinations?

25           MR. LEAHEY:  Objection.

1          THE COURT:  Overruled.  You may have it.

2    A.    Yes.

3    Q.    And what is that opinion?

4    A.    That there will be continuing adverse impact similar to

5    what's seen in the statewide.

6    Q.    Okay.  Did you do an analysis for the MBTA?

7    A.    I did.

8    Q.    Okay.  And did you look at point spreads?

9    A.    I did.

10   Q.    And what did you find?

11   A.    I found 3.3-point difference in average scores for the

12   2005 exam and 1.8 points for the '07 exam, and in both cases,

13   that was in favor of the non-minorities.

14   Q.    Okay.  Did you look at passing rates?

15   A.    I did, and I found --

16   Q.    What did you determine?

17   A.    I found the adverse impact in passing rates was .32 for

18   the '05 exam and .96 for the '07 exam, which are both in favor

19   of non-minorities, that .32 obviously is much smaller than the

20   .96.

21   Q.    Okay.  And did you look at selection rates for the MBTA?

22   A.    I did, and in both cases there were no minorities

23   appointed, and so the adverse impact ratio was zero.  It goes

24   zero divided by anything is zero.

25   Q.    Okay.  Now, I just want to clear up something.  This data

1    that you used to do these calculations, where did this data

2    come from?

3    A.    This data came from you, but it was provided by HRD in --

4                (Witness examining document.)

5    A.    -- in an Excel file.  And I updated the data in the HRD

6    Excel file to reflect the answers to interrogatories provided

7    by defendants in May and the beginning of June.  So it's a

8    combination of electronic data files and the answers to the

9    interrogatories, and some of the answers to the interrogatories

10    in fact I think were clarified by e-mail back and forth between

11    the attorneys, and at some point I was informed what the

12    consensus of the attorneys was.

13    Q.    Okay.  Let me ask you this:  Are you aware that there's

14    now some sort of dispute as to whether or not there was a

15    minority promotion in the MBTA?  Have you recently been made

16    aware of that?

17    A.    Yes.

18    Q.    And did you go back and look at the files from HRD to see

19    whether you could find this candidate?

20    A.    Yes.

21    Q.    And did you search for that candidate?

22    A.    All right, so the files I got from HRD for each exam year

23    were split in half.  The names of the test takers were in one

24    place, and the scores on the exam were in another place.  So

25    all the statistical analyses I did on the scores, but I

1   didn't -- I was not given from HRD any link between the two,

2   but I was given all the names.  So I looked for the person's

3   name among the test takers in '05, and he was not there, and I

4   looked for that person's name among the test takers in '07, and

5   he was not there.  So I presumed that although he was promoted,

6   it was not off the '05 or '07 exam.

7   Q.   And therefore you did not include it in your analysis?

8   A.   And so I didn't include him.

9   Q.   Because it would not show there was adverse impact

10  resulting from the exam?

11  A.   Correct.

12  Q.   Okay, so you stand by this calculation?

13  A.   Well, I stand by the calculation.  The calculation is only

14  as good as the data that HRD provided.

15  Q.   Okay.  And do you have any reason to believe that HRD

16  cooked the data?

17  A.   I don't think HRD is necessarily perfect, but I don't

18  think they cooked the data, no.

19  Q.   So trying to put this in raw numbers, what did you find

20  with respect to the '05 exam?

21  A.   That the adverse impact ratio was zero.

22  Q.   Okay.  And how many minorities and non-minorities took the

23  exam, and what numbers were actually promoted?

24  A.   Okay, so for MBTA, zero out of 10 minorities were

25  appointed in '05; 7 out of 38 non-minorities were appointed in

1    '05; zero out of 4 minorities were appointed in '07; and 3 out

2    of 27 non-minorities were appointed in '07.

3    Q.    And what was the adverse impact ratio for '05?

4    A.    Zero.

5    Q.    And how about for '07?

6    A.    Zero.

7    Q.    Okay.  Now, are these numbers statistically significant?

8    A.    Not in themselves.

9    Q.    Okay.  Even though they're not statistically significant,

10   do you have an opinion to a reasonable degree of industrial

11   psychology certainty as to whether or not there was adverse

12   impact resulting from the 2005 and 2007 sergeant's exam for the

13   MBTA?

14   A.    Yes.

15   Q.    And what is that opinion?

16   A.    I think that the data from MBTA in '05 and '07 that shows

17   minorities doing less well than non-minorities is reflective of

18   what we see statewide with minorities doing less well than

19   non-minorities, and it's statistically significant statewide,

20   and I think we're seeing the same effect with the MBTA.  Even

21   though there's no statistical significance for that department

22   alone, I think they're just reflecting the overall adverse

23   impact.

24          MR. McDERMOTT:  Your Honor, I'd move to strike based

25   on the comparison, one with the state's statistics, and there

1    being not a statistically significant factor in the opinion.

2            THE COURT:  All right, the motion is denied.  The

3    answer will stand.

4    Q.   And, finally, do you have an opinion as to whether or not

5    there would continue to be a pattern of adverse impact if the

6    MBTA is permitted to utilize a multiple-choice 80-question HRD

7    exam?

8            MR. McDERMOTT:  Objection, your Honor.  It's

9    speculative, for one, and, two, I think it assumes that the

10   MBTA promotes out of rank order, and that's not going to be the

11   evidence.

12           THE COURT:  All right, overruled.

13   Q.   You can answer.

14   A.   I can answer.  So if nothing changes, it's my opinion that

15   you will continue to have adverse impact in the MBTA if the

16   same type of exam is used again.

17   Q.   Okay.  Did you do an analysis for Methuen?

18   A.   I did.

19   Q.   Okay.  And did you do an analysis of average impact in

20   test score differences for Methuen?

21   A.   I did.

22   Q.   And what did that show?

23   A.   The difference it was .2 points, less than a point

24   difference in average test score, but still in favor of

25   non-minorities in '06; and it was 5.9, close to 6 points, in

1    '08.

2    Q.    And did you look at the adverse impact, if at all, in

3    selection rates for Methuen?

4    A.    Yes.

5    Q.    And what did you find?

6    A.    So Methuen, the adverse impact ratio for Methuen in '06 is

7    zero.  They made no appointments of minorities.  From the '08

8    list, there seemed to be no promotions as of the time I wrote

9    this report, and so there is no adverse impact ratio.  You

10   couldn't calculate an adverse impact ratio because there was no

11   one promoted.

12   Q.    Okay.  And if you recall, did you look at where minorities

13   and non-minorities stand on the '08 list?

14   A.    I do.  I looked at that, and I summarized that on Page 7

15   of my report.

16   Q.    And what did you find?

17   A.    That Methuen would have to make 7 appointments, if they

18   went in order, to reach a minority test taker.  But Methuen,

19   according to the information I was given, has only 12 incumbent

20   sergeants, so it's unlikely to appoint 7 new sergeants over the

21   life of the list.  So if Methuen makes less than 7 promotions

22   in order from that '08 exam, the adverse impact ratio would

23   still be zero, or would be zero.

24          MR. McQUILLAN:  Your Honor, I move to strike that as

25   being speculative.

```
 1              THE COURT:  All right, denied.
 2   Q.   And if Methuen continues to use HRD's 80-question
 3   multiple-choice test, do you have an opinion as to whether or
 4   not there will be adverse impact in the future on minority test
 5   takers?
 6   A.   Yes.
 7              MR. McQUILLAN:  Objection.
 8              THE COURT:  Overruled.
 9   Q.   What is that opinion?
10   A.   That the adverse impact will continue.
11   Q.   And, finally, let me get to Worcester.  Did you do this
12   analysis for Worcester?
13   A.   I did.
14   Q.   And can you tell me what you found with respect to average
15   test score differences.
16   A.   Yes.  In 2006 in Worcester, there was a 1-point difference
17   on average in favor of non-minorities.  In '08, the difference
18   was actually in favor of minorities, and it was 4.3 points.
19   Q.   Okay.  And what about with respect to passing rates?
20   A.   And the adverse impact ratio for passing rates was .97
21   for '06 and 1.36.  So in '08 minorities passed at a higher rate
22   than non-minorities.
23   Q.   Okay.  And what about with respect to selection rates?
24   A.   The adverse impact in promotion rates was .79 for '06 and
25   zero for '08.
```

1   Q.   Okay.  And, now, did you become aware of a question that

2   was raised with respect to the data in Worcester on selection

3   rates?

4   A.   Yes.

5   Q.   And what are you aware of in that regard?

6   A.   I was just aware that there was an issue.  I believe that

7   a person who was reported as a minority and not appointed, not

8   promoted, was actually a non-minority and not appointed.

9   Q.   Okay.  And would that change the analysis somewhat?

10  A.   Yes.

11  Q.   Okay.  And have you done that analysis in your head?

12  A.   Yes, yes.

13  Q.   And what would that analysis be?

14  A.   Well, that was from the '06 exam, and the .79 would go up

15  to I believe .88.

16  Q.   Okay.  Now, have you looked at the list for and have there

17  been appointments from the '08 list for Worcester?

18  A.   Yes.

19  Q.   Okay, let me see if I have that.  And what do those

20  appointments reflect?

21  A.   I'm not sure what that question means.

22  Q.   Well, let me try to find it.  Looking at the 2006 data,

23  can you tell us what it shows, please --

24  A.   Yes.

25  Q.   -- for selections?

1    A.    Yes.  One out of 11 minorities was promoted, and 6 out of

2    52 non-minorities were promoted.

3    Q.    And with respect to the '08 exam, did you see whether any

4    promotions were made from there?

5    A.    It appears there were no promotions from '08.

6    Q.    Okay.  Now, with respect to the '08 list, have you looked

7    at the list to determine what will happen once promotions are

8    made?

9    A.    Well, I can't tell exactly what will happen, but I have

10   looked at the list, and the first minority is in position 15.

11   So if Worcester goes in order, they would have to make many

12   appointments before they reached the first minority.

13   Q.    Okay, if so Worcester were to make 7 or 8 or 9

14   appointments, would they reach a minority?

15   A.    Well, I took the average turnover rate nationwide, which

16   is about 10 percent a year.  And Worcester has 48 incumbent

17   sergeants, so if the national turnover rate applied to

18   Worcester, there would be about 5 sergeants for the year or so

19   that the list still has a life, so they would not be able to

20   appoint a minority.

21        MR. LICHTEN:  Your Honor, may I confer with my

22   colleague for just a moment, please?  Thank you, your Honor.

23        (Discussion off the record between plaintiff counsel.)

24   Q.    Based upon this data that you have reviewed with us here

25   today and based upon the Worcester results that you've

1   described here today, do you have an opinion as to what drives

2   that Worcester data?

3           MS. ENGDAHL:  Objection.  That's a vague question.

4           THE COURT:  I'm not sure what "drives" means.

5   Q.   Do you have an opinion as to whether or not there is

6   disparate impact in the city of Worcester with respect to

7   selection for police sergeant?

8   A.   There seems to be mixed messages coming from the data from

9   the city of Worcester, so it's not clear to me if there would

10  be -- if there is adverse impact for the '06 and '08 exams in

11  Worcester.

12  Q.   Okay.  And do you have an opinion as to the relationship

13  between the Worcester exam results and the statewide results?

14  A.   Yes.

15  Q.   And what is that?

16  A.   I think that the Worcester results don't mirror the

17  statewide results precisely.  They do mirror them to some

18  extent, in that, as I mentioned, you have to go down 15 places

19  to reach the first minority on the '08 exam, so you might still

20  have some pretty nasty adverse impact in the '08 exam.  But

21  that the non-minorities outscored the minorities on average is

22  unusual in light of the statewide exam, and it was not

23  statistically significant.  It could have happened by chance,

24  but it doesn't reflect the statewide exam.

25  Q.   Okay.  And in determining adverse impact in this case for

1   these communities that have small numbers, do you have an

2   opinion as to whether it is appropriate to use some of the

3   aggregated test data results that you've gone over today in

4   making the determination as to whether there's adverse impact?

5           MR. CARROLL:  Objection.

6           THE COURT:  Overruled.

7   A.   Yes.

8   Q.   What is that opinion?

9   A.   Well, the Uniform Guidelines suggest that when you have

10  small numbers, it is appropriate to look at other places that

11  the same test was used; and when you do that, then you start

12  seeing a general pattern.  And that general pattern was adverse

13  impact of the examination, and that's the same examination that

14  was used in Worcester.

15          MR. LICHTEN:  Your Honor, I have a whole other area I

16  wanted to turn to, so this might be a good time to stop.

17          THE COURT:  That's fine.  We'll recess for the day and

18  resume tomorrow at 9:00.

19          THE CLERK:  All rise.  Court is in recess.

20          (Adjourned, 12:57 p.m.)

21

22

23

24

25

1                     C E R T I F I C A T E

2

3            We, Marcia G. Patrisso, RMR, CRR, and Lee A. Marzilli,

4    Official Reporters of the United States District Court, do

5    hereby certify that the foregoing transcript constitutes, to

6    the best of our skill and ability, a true and accurate

7    transcription of our stenotype notes taken in the matter of

8    Civil Action No. 07-11693-GAO, Pedro Lopez, et al, v. City of

9    Lawrence, et al.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13   /s/ Lee A. Marzilli
     LEE A. MARZILLI, RPR, CRR
14   Official Court Reporter

15
     Dated: 7/13/10
16

17

18

19

20

21

22

23

24

25