```
            UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF MASSACHUSETTS




                                   )
PEDRO LOPEZ, Individually and on   )
behalf of a class of individuals   )
similarly situated,                )
                                   )
         Plaintiffs,               )
                                   ) Civil Action
v.                                 ) No. 07-11693-GAO
                                   )
CITY OF LAWRENCE, et al,           )
                                   )
         Defendants.               )
                                   )



     BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
            UNITED STATES DISTRICT JUDGE


                    DAY THREE
                  NON-JURY TRIAL


       John J. Moakley United States Courthouse
                 Courtroom No. 9
                 One Courthouse Way
             Boston, Massachusetts  02210
               Wednesday, July 14, 2010
                    9:04 a.m.



            Marcia G. Patrisso, RMR, CRR
              Lee A. Marzilli, RPR, CRR
             Official Court Reporters
          John J. Moakley U.S. Courthouse
           One Courthouse Way, Room 3510
            Boston, Massachusetts  02210
                 (617) 737-8728

        Mechanical Steno - Computer-Aided Transcript
```

```
 1   APPEARANCES:

 2       LICHTEN & LISS-RIORDAN, P.C.
         By: Harold L. Lichten, Esq.
 3           Stephen S. Churchill, Esq.
             Joseph L. Sulman, Esq.
 4       100 Cambridge Street, 20th Floor
         Boston, Massachusetts  02114
 5       On Behalf of the Plaintiffs

 6       CITY OF LOWELL LAW DEPARTMENT
         By: Brian W. Leahey, Esq.
 7           R. Eric Slagle, Esq.
         City Hall
 8       375 Merrimack Street
         Lowell, Massachusetts  01852
 9       On Behalf of the Defendant City of Lowell

10       OFFICE OF THE CITY ATTORNEY
         By: Richard J. D'Agostino, Esq.
11       200 Common Street, Suite 306
         Lawrence, Massachusetts  01840
12       On Behalf of the Defendant City of Lawrence

13       COLLINS, LOUGHRAN & PELOQUIN
         By: Laurie W. Engdahl, Esq.
14       320 Norwood Park South
         Norwood, Massachusetts  02062
15       On Behalf of the Defendant City of Worcester

16       MORGAN, BROWN & JOY, LLP
         By: Mary Jo Harris, Esq.
17           Robert P. Morris, Esq.
         200 State Street, 11th Floor
18       Boston, Massachusetts  02109
         On Behalf of the Defendant City of Boston
19
         MBTA LAW DEPARTMENT
20       By: Kevin S. McDermott, Esq.
         10 Park Plaza, 7th Floor
21       Boston, Massachusetts  02116
         On Behalf of the Defendant MBTA
22

23

24

25
```

```
 1        CITY OF SPRINGFIELD LAW DEPARTMENT
          By: Harry P. Carroll, Esq.
 2        36 Court Street
          Springfield, Massachusetts  01103
 3        - and -
          LAW OFFICE OF EDWARD M. PIKULA
 4        By: Edward M. Pikula, Esq.
          1350 Main Street, 15th Floor
 5        Springfield, Massachusetts  01103
          On Behalf of the Defendants City of Springfield
 6        and Mayor Sarno

 7        CITY OF METHUEN - OFFICE OF THE CITY SOLICITOR
          By: Peter J. McQuillan, Esq.
 8        The Searles Building, Suite 311
          41 Pleasant Street
 9        Methuen, Massachusetts  01844
          On Behalf of the Defendant City of Methuen

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2                          Direct   Cross   Redirect   Recross
   WITNESSES FOR THE
3      PLAINTIFFS:

4   JOEL WIESEN, resumed

5        By Mr. Lichten (cont'd)  10
         By Ms. Harris                88

6

7                        E X H I B I T S

8
    PLAINTIFFS'
9     EXHIBIT      DESCRIPTION                        ID   RECEIVED

10  No. 74   2005 HRD test data                            6

11  No. 75   2006 HRD test data                            6

12  No. 76   2007 HRD test data                            6

13  No. 77   2007 HRD test data                            6

14  No. 78   Pages 4-6 of Wiesen expert report             8

15  No. 79   Pages 9-10 of Wiesen's Third supplemental report   8

16  No. 80   Two pages of charts for BPD                   8

17  No. 81   Two pages of charts for Lawrence              8

18  No. 82   Two pages of charts for Lowell                8

19  No. 83   Two pages of charts for MBTA                  8

20  No. 84   Two pages of charts for Methuen               8

21  No. 85   Two pages of charts for Springfield           8

22  No. 86   Two pages of charts for Worcester             8

23

24

25

```
 1                    P R O C E E D I N G S

 2            THE CLERK:  All rise.

 3            (The Court enters the courtroom at 9:04 a.m.)

 4            THE CLERK:  For a continuation of the Lopez trial.

 5   Please be seated.

 6            THE COURT:  Good morning.

 7            MR. LICHTEN:  Ready, your Honor?

 8            Dr. Wiesen.

 9            MR. CHURCHILL:  Your Honor, we just had a few exhibit

10   items to go over first.  First of all, we wanted to move into

11   evidence the data that the experts relied on to generate the

12   reports.  This is data from HRD.  It would be Exhibits 74, 75,

13   76 and 77, which refer to the exams for 2005, 2006, 2007 and

14   2008 respectively.

15            MS. HARRIS:  No objection.

16            THE COURT:  Any objection from any defendant?

17            MS. ENGDAHL:  No objection except a clarification,

18   that Dr. Wiesen testified that one of the numbers -- one of the

19   candidates on the Worcester was inadvertently listed as black,

20   and he's white.  So that's fine, just noting that.

21            THE COURT:  Fine.  Which exhibit is that, do you

22   remember?

23            MS. ENGDAHL:  The exam data for 2006.

24            MR. CHURCHILL:  It's the 2006 list, which would be

25   Exhibit 75.
```

1          THE COURT:  So that 74 through 77 tracks 2005 through

2     2008, in the same order?

3          MR. CHURCHILL:  Yes.

4          THE COURT:  Okay.

5          (Plaintiffs' Exhibit Nos. 74 through 77 received into

6     evidence.)

7          MR. CHURCHILL:  And then, in addition, your Honor, we

8     wanted to move into evidence the tables from Dr. Wiesen's

9     reports that he was referring to, none of the text that

10    precedes or follows it, but just the numbers on there for

11    everyone's benefit so we can all be on the same page in terms

12    of what he was looking at and describing.

13         MR. PIKULA:  I just have one issue with one of them

14    which I had discussed with counsel.  I'm not sure if it's one

15    you intend to introduce or whether it's just the chalk that

16    Mr. Wiesen had utilized.  There was an error as to one of the

17    Springfield numbers, which I have conferred -- and I think

18    we've located the source of the error and we're trying to work

19    that out.  I believe Mr. Lichten was actually going to make a

20    phone call to confirm that.

21         MR. LICHTEN:  I'm trying to work that out, your Honor.

22         MR. CHURCHILL:  So for the Springfield-specific data,

23    we've agreed to hold off on that one for now.

24         MR. LEAHEY:  Your Honor, with respect to Lowell,

25    yesterday Dr. Wiesen testified that there were ten promotions,

1    and the chalk that he had reflected ten promotions, which is

2    actually incorrect.  It's seven.  Today it does say seven,

3    which I'm glad it says seven because that's the right number;

4    however, the numbers have actually changed to what he testified

5    to yesterday.  I'm comfortable with this going in, but I do

6    plan to ask him questions that it has changed.

7         And also, I point this out -- again, I would just note

8    my objection from yesterday that this data wasn't done timely,

9    and I'll just note my standing objection on that, but on the

10   second chart regarding the Lowell Police Department that

11   Dr. Wiesen did not testify to in any way, shape or form

12   yesterday, and the data that was on yesterday's chalk that he

13   did not use is different from the exhibit listed in here.

14        And I don't know, he's still on examination, so he can

15   talk about it, but I just want to raise those points because

16   those are points that I will put on the record, but I just

17   wanted to note that what was provided yesterday is

18   different -- with respect to Lowell -- is different from what

19   was provided today.

20        MS. HARRIS:  And I'll chime in.  My objection, your

21   Honor, would be that these are chalks which are not

22   traditionally admitted as substantive evidence, so I would

23   object to that.  And then to the extent that Dr. Wiesen and the

24   plaintiffs are offering the charts from his reports, I would

25   object because the reports have not been admitted and he's

1    testifying to the substance of the reports.  And I'd note that

2    there is text in that there are footnotes and explanatory notes

3    describing what these chalks represent.  So I would object.

4         THE COURT:  Well, I'm not looking at any of these.

5    I'm remembering some from when they were used yesterday, and

6    there were two kinds:  There were -- a typical table that were

7    various pages of one or more of Dr. Wiesen's reports, and then

8    there were some data presented in the form of cells in a larger

9    chart.

10        MR. CHURCHILL:  That's correct, your Honor.

11        THE COURT:  Are you offering both things?

12        MR. CHURCHILL:  Yes.

13        THE COURT:  Okay.  I think each of them probably

14   qualifies as a summary exhibit for admission either under Rule

15   1006 or as a non-Rule 1006 summary.  Anyway, so I'll admit

16   them.

17        (Plaintiffs' Exhibit Nos. 78 through 86 received into

18   evidence.)

19        MS. HARRIS:  May I still press the objection on the

20   text that's in the summary?

21        THE COURT:  No, the summary can include enough

22   explanation to make the summary -- now, not that I'm probably

23   going to do it, but the underlying data is now in evidence?

24        MR. CHURCHILL:  It is, your Honor.

25        THE COURT:  And the rule is that the summaries are not

1    additional evidence but simply a compilation of the underlying

2    data, and to the extent there's a contradiction, the summary

3    doesn't prevail over the underlying data.  Now --

4         MS. HARRIS:  The text I'm objecting to is to

5    quotations from Supreme Court law and how the Supreme Court

6    recommends that these data be interpreted.

7         THE COURT:  Well, okay.  That particular objection I

8    would sustain.  So if you want to excise it and submit a

9    redacted copy that omits any legal proposition, that would be

10   fine.

11        MR. CHURCHILL:  That's fine, your Honor.

12        So just for the record, Exhibit 78 will be pages 4, 5

13   and 6 from what was marked as ID Plaintiff's 52.  We'll submit

14   clean copies for the Court and we will redact Footnote 8 on

15   page 4, which is the footnote that Ms. Harris was referring to;

16   Exhibit 79 are pages 9 and 10 from what had been marked as

17   Plaintiff's ID 53; Exhibit 80 will be two pages of charts for

18   the Boston Police Department; Exhibit 81 will be two pages of

19   charts for Lawrence; Exhibit 82 will be two pages of charts for

20   Lowell; Exhibit 83 will be two charts for the MBTA; Exhibit 84

21   will be two pages of charts for Methuen.  I've lost track.

22   Exhibit --

23        THE COURT:  85.

24        MR. CHURCHILL:  -- 85 -- thank you -- will be two

25   pages for Springfield; and Exhibit 86 will be two pages for

1    Worcester.

2         MS. HARRIS:  And we can probably work this out

3    ourselves, but there are additional footnotes that talk about

4    the usual way social science researchers interpret, et cetera,

5    and I would press the objection on all of the footnotes that do

6    anything other than reflect the data.

7         THE COURT:  Why don't you see if you can work it out.

8    If there are particular issues, then we can --

9         MR. CHURCHILL:  I'm sure we can, your Honor.

10        MR. LICHTEN:  Are you ready, your Honor?

11        THE COURT:  Yes.

12                    JOEL WIESEN, resumed

13               CONTINUED DIRECT EXAMINATION

14   BY MR. LICHTEN:

15   Q.   Good morning, Dr. Wiesen.  I understand there were three

16   fire alarms last night at the Seaport Hotel, so I hope,

17   notwithstanding that, you got a good rest.

18   A.   It's a very nice hotel.

19   Q.   You should get some money back for three alarms.

20        I just have a very few questions left on disparate impact,

21   then I'm going to move on to an entirely new subject.  But what

22   I wanted to do first is just ask you about one exhibit that you

23   already identified which is in evidence as part of Exhibit 8.

24   And because it's very fuzzy, I just want to show you the actual

25   hard copy of it.

1          Do you recognize what this document is, please?

2    A.    It's a frequency distribution for the '05 Boston sergeant

3    examination, the written examination.

4    Q.    Okay.  And that was prepared by the Commonwealth of

5    Massachusetts?

6    A.    It was produced by the Commonwealth, so I presume they

7    prepared it.

8    Q.    Okay.  And I had asked you before about at various levels

9    what the percentage of minorities and non-minorities reaching

10   that level.  Do you recall those questions?

11   A.    Yes.

12   Q.    Okay.  And if you go to, let's say, the level of 85 -- a

13   score of 85 -- do you know what the difference is in the

14   percentage of minorities who reached the score of 85 and the

15   percent of non-minorities who reached the score of 85?

16   A.    Yes.  And I had a little trouble with the column headings

17   yesterday because they weren't perfectly clear, so I might have

18   read from the wrong columns, but at a score of 85, 11.1 percent

19   of the non-minorities would pass, and about 3.7 percent of the

20   minorities would pass.

21   Q.    Okay.  And is that significant adverse impact?

22   A.    So that adverse impact ratio is .33.  And I'm sure that

23   that is statistically significant, but I have not run the

24   analysis on that particular set of data.

25   Q.    If we go to, let's say, the score of -- I'll do this one

1  more time -- of 83, I believe I asked you yesterday, could you

2  run that same analysis, please?

3  A.    Okay.  At a score of 83, 22.8 percent of the

4  non-minorities pass, and 6.15 percent of the minorities pass.

5  The adverse impact ratio drops down a little bit, to .27 --

6  Q.    Okay.

7  A.    -- which is --

8  Q.    So minorities did about one-fourth as well at that level

9  as non-minorities?

10  A.    In terms of passing?

11  Q.    Yes.

12  A.    Yes.

13  Q.    I'm sorry.  In terms of obtaining that score.

14  A.    In terms of obtaining that score.

15  Q.    Okay.  And is that significant disparate impact, in your

16  opinion?

17  A.    Yes.

18  Q.    Thank you.  Let me move on.

19       Now, are you aware of an analysis done by Dr. Silva and

20  Dr. Outtz on this statewide data in which they moved numbers

21  around?

22  A.    I think they analyzed the data for different departments.

23  Q.    And can you tell the -- are you aware of this rule of one

24  that they used?

25  A.    Yeah, that seems to have originated in the questions and

1  answers to the Uniform Guidelines, and I've read that question.

2  Q.    Okay.  And can you explain to the Court what their

3  analysis was in that regard?

4  A.    Yes.

5         MR. LEAHEY:  Objection, your Honor.

6         THE COURT:  Overruled.

7         THE WITNESS:  So the concern of the Uniform Guidelines

8  in that particular question and answer is addressing the

9  situation where you have small numbers, and it could be that a

10 change in one person makes a big difference.  So if you hired

11 two minorities out of four, that's a much larger percentage

12 than hiring one minority out of four.  So the Uniform

13 Guidelines Q&A wanted to provide some safeguard against a

14 finding of adverse impact based just on chance of who was

15 appointed.

16        And so it said one way of checking to see if this was

17 perhaps just due to chance is to switch one appointment.  In

18 this case you'd have one more minority, one less non-minority.

19 And if, when you switch one appointment, the adverse impact

20 disappears, then the Uniform Guidelines Q&A suggests that that

21 might not be real; it's just arisen due to chance.

22 BY MR. LICHTEN:

23 Q.    And did they do such switching in their analysis?

24 A.    Oh, yes.

25 Q.    And how often did they do such switching?

1   A.   I think they did it for all departments they considered.

2   Q.   And did they do it just for the departments that are

3   defendants here or did they also do it for departments that are

4   in the Commonwealth of Massachusetts but are not in this case?

5   A.   They did it for many communities in the Commonwealth.

6   Q.   So do you remember how often they switched one?

7   A.   Well, they probably did it anywhere from 15 to 25 times

8   for each of the exams they looked at --

9   Q.   Okay.  So they --

10  A.   -- as a guess.

11  Q.   They did analysis of statewide data in which on 15 to 25

12  occasions they assume that there was one less minority

13  promotion -- I'm sorry -- they assume there was one more

14  non-minority promotion -- explain it to me.  Sorry.

15  A.   They assume there was one less non-minority promotion and

16  one more minority promotion.

17  Q.   Okay.  Do you agree or disagree with the way they did

18  their analysis?

19  A.   I see what they did and I see why they did it.  I don't

20  think in this case it was a reasonable analysis, so I disagree.

21  Q.   And why is that?

22  A.   So what they did was apply that question -- that the rule

23  of shifting one from the Q&A's, and they did it because any

24  defendant with a small number would do that; however, when you

25  do it so many times, I think that you're biasing the outcome.

1    And just the fact that there were so many municipalities that

2    had an adverse impact ratio of zero is itself statistically

3    unusual.

4         And then, in addition, the other things we talked about --

5    we testified to yesterday in terms of there being a difference

6    in average score on the test and a difference in passing rates

7    on the test, both of those indicate that the adverse impact in

8    appointment is not just due to chance.

9    Q.   Okay.  And had -- in your experience had you ever seen

10   that rule of one applied as they did it over a 15 -- I'm

11   sorry -- 18 to 25 jurisdictions?

12   A.   No.

13   Q.   Okay.  And had you ever -- are you aware of any literature

14   that supports that use over and over again like they did it?

15   A.   I've never seen that discussed --

16   Q.   Okay.

17   A.   -- or recommended.

18   Q.   Let me move on to something entirely different.

19        You testified earlier that you reviewed a bunch of

20   material relating to how the exam was constructed; do you

21   recall that?

22   A.   Yes.

23   Q.   Okay.  Can you just briefly inform the Court what

24   documentation you reviewed that supported the construction and

25   design of the exam?

1  A.   Yes.  I was given -- I guess it was produced in

2  discovery -- I was given a copy of a 1991 validation study.

3  And I actually received that in two installments:  one, just

4  the body of the report itself, and then at some future point I

5  received the voluminous appendices to that study.

6          MR. LICHTEN:  Did something happen to the microphone,

7  your Honor?

8          THE COURT:  Well, we're getting a little feedback

9  which is exacerbated if you're wearing earphones, so I'm trying

10  to tune it down just a little bit just to see if we could

11  adjust that.

12          MR. LICHTEN:  Is it possible to turn it slightly back

13  up?

14          THE COURT:  Well, I'll be playing with it as we go

15  along.

16          MR. CARROLL:  It wasn't the defense this time, your

17  Honor.

18          THE COURT:  Go ahead.  If you were in the middle of --

19          (The preceding answer was read back by the reporter.)

20          THE COURT:  The 1991 validation studies.

21          THE WITNESS:  And then, in addition to that, I

22  received a study done by Morris & McDaniel, Incorporated, I

23  believe in -- it was dated 2002, and that was also a reasonably

24  voluminous study, a good few hundred pages, and then I received

25  numerous other documents, some -- many charts, some data files,

1   many handwritten notes, many e-mails, many copies of letters.

2   BY MR. LICHTEN:

3   Q.   Okay.  And based upon all of that, do you have -- did you

4   also attend the depositions of Ms. McNeely and Mr. Paris?

5   A.   I did.

6   Q.   Okay.  And did you hear them testify as to how the -- or

7   at least did you hear Mr. Paris testify as to how he wrote the

8   questions?

9   A.   I did.

10  Q.   Okay.  Based upon your expertise in the field and based

11  upon all that you reviewed in this case and based upon your

12  review of their depositions and of the material, have you

13  reached a conclusion to a reasonable degree of industrial

14  psychology certainty as to whether the 2005, 2006, 2007, 2008

15  statewide and 2005 and 2007 Boston police exam meet the

16  validity standards of the Uniform Guidelines?

17            MS. HARRIS:  Objection.

18            MR. PIKULA:  Objection.

19            MR. CARROLL:  Objection.

20            THE COURT:  Overruled.

21            You may answer.

22            THE WITNESS:  Yes.

23  BY MR. LICHTEN:

24  Q.   And what is that opinion?

25  A.   I do not think that they meet the requirements of the

1    Uniform Guidelines.

2    Q.    And is there one reason for that or multiple reasons for

3    that?

4    A.    Multiple reasons.

5    Q.    Okay.  Can we just take them in order?  What's the first

6    reason?

7    A.    Well, the Uniform Guidelines, as I read yesterday, call

8    for the selection instrument to be a reflection of the breadth

9    of the job, and the selection instrument was not; the Uniform

10   Guidelines talk about methods of setting passing points, and

11   the method that was used does not comport with that; the

12   Uniform Guidelines talk about providing a clear and

13   well-organized validation report, and that was not done.  There

14   were many papers with handwritten annotations, and it was not

15   at all clear what those were.  The Uniform Guidelines also call

16   for a contact person to be identified for each report.  It

17   didn't seem like that was happening for the 1991 report or

18   whatever happened subsequent to the 2002 report.

19        Now, the 2002 report doesn't stand on its own.  That was

20   the Boston study.  HRD used the 2002 report in developing the

21   '05 and '08 exams, as I understand it, but the method by which

22   they used that wasn't documented in a narrative report.  Some

23   of the materials that they used were produced, but, as I said,

24   they were very disorganized.

25        The Uniform Guidelines say that ranking based on a

1    multiple-choice job-knowledge test is something that has to be

2    well documented or supported because it usually is a weakness

3    in content-validity studies.  And I might be forgetting one or

4    two things.

5    Q.    Okay.  Let me try to go over those.  First of all, let me

6    ask you about the E&E portion of the exam.  Do you have an

7    opinion as to whether that portion was properly validated?

8    A.    Now that I mention E&E, let me add to my previous answer.

9    And the Uniform Guidelines also have a little treatment of

10   education and experience, and what was done in the 1991 study

11   doesn't comport with that either.

12        So you asked about the education and experience grading

13   system?

14   Q.    Yes.

15   A.    I have taken a look at it, yes.

16   Q.    And do you have an opinion as to whether that part of the

17   exam was properly validated?

18   A.    I do.

19   Q.    And what is that opinion?

20   A.    It was not.

21   Q.    And why not?

22   A.    The typical way that education and experience is evaluated

23   nowadays is by linking -- identifying the knowledge, skills,

24   abilities and personal characteristics that you want to measure

25   and then identifying activities, accomplishments, experiences

1    that would indicate that somebody has that ability.

2         And Dr. Outtz, in his deposition, mentioned one example.

3    He said that if you wanted to assure -- you wanted to be sure

4    that your candidates have oral communication ability, you could

5    have in your education and experience grading process a

6    question that asks, "Have you ever taught a class" --

7    "instructed a class?"  And if someone had instructed a class,

8    that would be an indication that they have oral communication

9    ability.

10        The education and experience -- you could do that for all

11   the different KSAPs.

12   Q.   Let me ask you, for example, does the education and

13   experience portion have anyplace where you can get credit or

14   points for speaking multiple languages such as Spanish?

15   A.   I don't believe so.

16   Q.   Would that be another example?

17   A.   Well, I don't recall that coming up as a KSAP in the job

18   analysis study, but had it come up, that would have

19   been -- then you would have had a -- trying to link something

20   in the E&E to that.

21   Q.   Okay.  Okay.  Now, you mentioned, first off --

22   A.   May I make just one --

23   Q.   I'm sorry.  Sure.

24   A.   Okay.  So as we're talking about the topic, another aspect

25   of the exam that I think runs afoul of the Uniform Guidelines

1    is the weighting process for the two components.

2         MR. LEAHEY:  Your Honor, if I may object.  With

3    regards to Dr. Wiesen's testimony as to his analysis on the

4    education and experience component of the test, I would object

5    that in his multiple reports I do not see this anywhere at all.

6         MR. PIKULA:  This is the first time.

7         MR. LEAHEY:  This is the first time he's ever

8    testified to any of that.  It's in no reports.  It was never

9    brought up on cross-examination because in the three reports

10   that existed at the time of his deposition, he had no opinion

11   on it, did no analysis.  There was nothing on it.  This is the

12   first time that the defendants have heard this testimony, and I

13   would move to strike it in its entirety regarding the education

14   and experience component.

15        THE COURT:  Mr. Lichten?

16        MR. LICHTEN:  I'm not sure that's correct.  I would

17   have to read his hundred pages of reports.

18        THE COURT:  I'll tell you what.  We'll move on.  If it

19   is true, I will strike it, because if it is true, it was

20   absent.

21        MR. McDERMOTT:  Your Honor, a little more specific,

22   just a prior answer in regard to the use of Spanish.

23        THE COURT:  Right.

24        MR. McDERMOTT:  I believe Dr. Wiesen testified that it

25   was not an example of the KSAPs, and if it wasn't in there,

1    your Honor, it's not in there because --

2              THE COURT:  Well, that's his answer.  I mean --

3              MR. McDERMOTT:  So I just move to strike it.

4              THE COURT:  I won't strike that for that separate

5    reason, but that would be included in Mr. Lahey's reason.

6    BY MR. LICHTEN:

7    Q.   Let me ask you, Dr. Wiesen -- you may have read your

8    reports.  Do you recall discussing the E&E part of the exam?

9    A.   Well, it was covered in my deposition.  I don't recall

10   offhand.  The reports are somewhat -- many pages, so I just

11   don't recall.

12   Q.   Okay.

13             THE COURT:  Let's do it this way, Mr. Lichten:  As

14   I've said, I'll reserve on it and give you the opportunity to

15   find it.  You show me where it is, either in the depositions or

16   the reports, and that will affect the matter.  If you're unable

17   to show it, then I'll strike the testimony.

18             MR. LICHTEN:  Yes.  I understand, your Honor.

19   BY MR. LICHTEN:

20   Q.   Okay.  Let me move on.  One of the first things you

21   mentioned is that the test does not test for many parts of the

22   job; is that correct?

23   A.   Correct.

24   Q.   Okay.  And did you find somewhere in the report -- in the

25   materials, the so-called 1991 validation report, a list of the

1    attributes, the skills and abilities that HRD determined were

2    appropriate and necessary for a police sergeant to have?

3    A.    Yes.

4    Q.    And is that contained somewhere?

5    A.    Yes.  There's an attachment EE that lists all of the

6    knowledge, skills, abilities and personal characteristics.

7    Q.    Okay.  And I'm going to ask you to look at Exhibit 41.

8    It's in the...

9          I can just give you a copy, too.

10   A.    Okay.  Can I write on this?

11   Q.    Sure.

12          MR. LICHTEN:  This is 41E?  41EE.

13   BY MR. LICHTEN:

14   Q.    Okay.  Can you tell me what this document is, please?

15   A.    Yes.  This is titled a "Testability Analysis," and this is

16   a key point in the job analysis.  At this point the tasks --

17   the important and frequent tasks, the tasks that are critical

18   for a police sergeant have been identified.  The knowledges,

19   skills, abilities and personal characteristics required have

20   been identified and rated.  So we now have whittled down a

21   larger list of, I think, 187 knowledges, skills, abilities and

22   personal characteristics to maybe 150 or so.  So these numbers,

23   if you notice, skip every now and then.  For example, there's

24   13, and then there's no 14 and 15 but there's a 16.  So 14 and

25   15 dropped out.

1          Then in the last three columns you have an indication of

2     how the authors of the 1991 study planned -- or recommended

3     testing for the various knowledges, skills and abilities listed

4     there.  And the three choices in the column -- three columns --

5     is test the -- test it with a written test, test it with

6     education and experience or not test it.

7     Q.    Okay.  So where the box is "Not tested," it may be

8     obvious, but what does that mean?

9     A.    That means that knowledge, skill and ability was not

10    measured by either the written or the E&E, and so did not

11    affect the grade for any of the candidates.

12    Q.    Okay.  Now, the first page, those are "knowledges"; is

13    that correct?

14    A.    Yes.

15    Q.    And I take it that some of those are testable on a

16    multiple-choice format?

17    A.    Yes.

18    Q.    Okay.  Are there other places where they go over the

19    skills and abilities?

20    A.    Yes.

21    Q.    And can you show me where that starts?

22    A.    It seems to start with Number 81.

23    Q.    Okay.  And can you give us some -- can you give us some

24    examples of that?

25    A.    Yes.

1  Q.   Skills.

2  A.   So there's one:  "Skill in identifying problems, securing

3  relevant information from both oral and written sources,

4  identifying possible causes of problems and analyzing and

5  interpreting data and complex situations involving conflicting

6  demands, needs or priorities."  That's Number 84.  And that was

7  indicated as it would be measured by the written test.

8  Q.   And --

9  A.   Should I go on?

10 Q.   Just one second.  I just want to go back to the Court's

11 concern about whether the E&E was addressed by you.  Can you

12 turn to your second report, page 7, and then we'll go back to

13 this.

14        MR. PIKULA:  What's the date of that one?  Excuse me.

15        MR. LICHTEN:  Page -- it's Exhibit 51, page 7.

16 BY MR. LICHTEN:

17 Q.   Do you have that?

18 A.   I do.

19 Q.   Okay.  And did you address the education and experience in

20 your report?

21 A.   There's a Paragraph No. 9 on the education and experience.

22 Q.   And if we're just clear, can you tell me -- I want to do

23 this -- can you tell me what you addressed in your report?  You

24 can take a minute to look at it.

25        MR. LEAHEY:  Well, your Honor, if I may object, what

1    he talks about in Paragraph No. 9 is the weight assigned to the

2    education and experience, not to the validity of it.

3            THE COURT:  I agree.

4            MR. LICHTEN:  Okay.  Fine.

5    BY MR. LICHTEN:

6    Q.   Okay.  Let's go back to the testability analysis.  I was

7    asking you -- you were talking about some of the skills.

8    A.   Yes.

9    Q.   I see that there are Xs where they talk about some of the

10   abilities.  Do you see that?

11   A.   Yes.

12   Q.   And what does that reflect?

13   A.   That reflected the judgment of the authors of the 1991

14   study as to the testability of that KSAP by a written test, if

15   it's in the first column, by E&E if it's in the second column.

16   Q.   Okay.  And I see a lot of Xs in the far right-hand column.

17   What does that signify?

18   A.   Again, that means that that knowledge, skill and ability

19   is not measured.

20   Q.   Okay.  And if you go to the next page, page 5 -- and we'll

21   come back to page 4 -- again, where the far right is, that

22   means that those skills were not tested for?

23   A.   Yes.

24   Q.   And the same on the next page?

25   A.   Yes.

1  Q.   The same on the next page?

2  A.   Yes.

3  Q.   Okay.  Now, have you, yourself, studied the skills and

4  abilities necessary -- well, strike that.

5       Before I get to that, can you tell us what some of the

6  skills and abilities were that the department -- I'm

7  sorry -- that HRD determined were necessary to be a police

8  sergeant that don't appear to be tested for?

9  A.   Yes.

10  Q.   And can you tell us that, please?

11  A.   Well, we could take Number 108, which is the ability to

12  develop alternative solutions to problems, to evaluate courses

13  of action and to reach logical decisions based on information

14  at hand.  It seems to be a problem-solving...

15  Q.   Okay.  And let me ask you, for example -- I'm sorry.  Go

16  ahead.

17  A.   Okay.  Number 127:  Ability to develop new policies and

18  procedures, to achieve department goals and objectives; Number

19  126:  Ability to plan, organize and control the use of

20  manpower, equipment and budgetary resources to achieve

21  department goals and objectives; ability to communicate

22  thoughts and ideas clearly to others in a confident manner;

23  ability to present a positive and confident impression in

24  dealing with others; ability to organize and present

25  information in a convincing manner or to modify the approach to

1  gain agreement or acceptance; ability to accomplish a specific

2  goal.

3      I'm not exactly sure what that means, but it wasn't

4  tested, and there are many others.

5          MS. HARRIS:  Objection.

6          MR. LEAHEY:  Objection.

7          MS. HARRIS:  Your Honor, this witness testified that

8  he hasn't reviewed the 2008 Boston exam, so I don't know how he

9  can testify what was or was the not tested by that exam having

10  not seen it.  That's my objection.

11          MR. LEAHEY:  Your Honor, with respect to the City of

12  Lowell, if he says the ability -- his question regarding goals

13  wasn't tested but he doesn't understand what it means, he can't

14  testify that it wasn't tested because he doesn't know what it

15  means.

16          THE COURT:  Okay.  This sounds like cross-examination

17  by objection.  I think we'll leave it till then.

18  BY MR. LICHTEN:

19  Q.  Okay.  Well, I want to pay attention to -- one of the

20  objections was that the objection was to "many others."  So I

21  hate to do this, but because this is a court of law I would

22  like you to go down and tell us every skill and ability that is

23  listed here as necessary -- as HRD determined was necessary to

24  be a patrol sergeant that you believe was not or could not have

25  been tested for by a multiple-choice job-knowledge test.

```
 1          MS. HARRIS:  I'll object to the question.  "Was not

 2     tested" is different from "cannot be tested."  I would just

 3     like clarity on that.

 4          THE COURT:  Well, they may ask two different things so

 5     it would be a multiple question.

 6          But let me ask another clarification:  Any written

 7     test, is that the question?

 8          MR. LICHTEN:  No, the multiple-choice job knowledge --

 9          THE COURT:  I'm sorry.  Any multiple-choice

10     job-knowledge test?  Any, not necessarily the four involved, or

11     six, or whatever it is, involved in this case?

12          MR. LICHTEN:  Yes.

13          THE COURT:  You mean as a generic matter?

14          MR. LICHTEN:  Yes.

15          THE COURT:  Okay.  Then break it up to...

16          MR. LICHTEN:  Sure.

17     BY MR. LICHTEN:

18     Q.   Right.  Do you understand the question?

19     A.   If you would repeat it, that would be helpful.

20     Q.   Sure.  Just because we're in a court of law and we have to

21     have everything on the record, you can't say "and many others,"

22     so I would like you to go down and list all of the skills and

23     abilities which you do not believe can be tested on a

24     multiple-choice technical knowledge test.

25     A.   Okay.  So that doesn't include the ones that they chose
```

1    not to test.

2    Q.    The ones they chose not to test -- the way I'm asking the

3    question, it's the ones they chose not to test and the ones

4    they say they were testing through a multiple-choice test but

5    you believe could not be tested.

6              MS. HARRIS:  Objection.

7              THE COURT:  Substantive or form?

8              MS. HARRIS:  Substantive.

9              THE COURT:  Overruled.

10             THE WITNESS:  Okay.

11             MR. McDERMOTT:  Your Honor, I would object to the

12   form.  If you could just clarify what the question is.

13             THE COURT:  Maybe you could break it into two.  Why

14   don't you ask about the not-tested category and then the

15   written-test category separately.

16             MR. LICHTEN:  Okay.

17   BY MR. LICHTEN:

18   Q.    Could you put on the record all of the skills and

19   abilities, not knowledges, that the testability outline

20   demonstrates the department -- I'm sorry -- HRD was not

21   attempting to test for?

22   A.    Yes.  So Number 80, skill in interviewing and

23   interrogation was not tested by the written test; skill in

24   driving a patrol car was not tested at all; skill in use of

25   firearms was not tested at all, per this attachment EE; skill

1    in perceiving and reacting to the needs of others was not

2    tested by the multiple-choice exam; ability to read, for

3    example, to review subordinates' reports, department policies,

4    was not tested; the ability to write was not tested by the

5    multiple-choice exam; ability to make and carry out decisions

6    quickly was not tested; ability to be confidential was not

7    tested by the multiple-choice exam; ability to be objective,

8    impartial, avoid preconceived opinions was not tested; ability

9    to follow policies and procedures was not tested by the

10   multiple-choice exam; ability to compute basic arithmetic was

11   not tested by the multiple-choice exam; ability to give clear,

12   concise verbal orders was not tested by the multiple-choice

13   exam; ability to -- that was not tested at all.

14       Ability to define problems was not tested; ability to be

15   objective was not tested; ability to communicate orally and in

16   writing was not tested; ability to accomplish a specific goal

17   was not tested; ability to organize and present information in

18   a convincing manner or modify the approach to gain agreement or

19   acceptance was not tested.

20       I think I might have left out ability to accept

21   responsibility, Number 103, was not tested by the written exam.

22       I think I was up to 115.  The ability to organize and to

23   present information in a convincing manner or to modify the

24   approach to gain agreement or acceptance, that was not tested;

25   ability to interpret policy was not on the multiple-choice

1    exam; ability to present a positive and confident impression in

2    dealing with others was not tested; ability to communicate

3    thoughts and ideas clearly to others in a confident manner was

4    not tested; ability to bring calm to control surroundings when

5    in stress-producing situations was not tested; ability to apply

6    high standards of work performance accuracy and completeness of

7    detail was not tested; ability to understand complex oral and

8    written instructions was not tested; ability to establish

9    rapport with persons from different ethnic, cultural and/or

10   economic backgrounds was not tested; ability to detect and

11   identify drugs and alcohol by smell was not tested; and the

12   ability to work independently was not tested.

13       The ability to understand written sentences and paragraphs

14   was not tested; the ability to use English words or sentences

15   in speaking so others will understand was not tested.  I guess

16   I skipped two.  136:  The ability to work accurately with

17   names, numbers, codes and/or symbols was not measured by the

18   multiple-choice exam; the ability to understand spoken English

19   words and sentences was not measured by the multiple-choice

20   exam; the ability to produce a number of ideas about a given

21   topic was not tested; the ability to come up with creative

22   solutions to problems or to develop new procedures for

23   situations where standard operating procedures do not apply was

24   not tested; the ability to remember information such as words,

25   numbers, pictures and procedures was not tested.

```
 1        The ability to apply general rules to specific problems to

 2   come up with logical answers was not tested; the ability to

 3   correctly follow a rule or set of rules to arrange things or

 4   actions in a certain order was not tested; ability to combine

 5   and organize different pieces of information into one

 6   meaningful pattern quickly was not tested; the ability to

 7   detect a known pattern that is hidden in other material was not

 8   tested; and the ability to tell where you are in relation to

 9   the location of some object or to tell where the object is in

10   relation to you was not tested; the ability to move controls of

11   a machine or vehicle was not tested.  And that would seem to

12   have gotten into --

13        MR. CARROLL:  Objection, your Honor.  It seems like

14   the witness is just simply reading a written list.  And the

15   document speaks for itself.  I'm sure the Court is capable of

16   reading the list just as anyone else.

17        MR. LICHTEN:  Fine, your Honor.  I'll move on.  I only

18   did it because there was an objection to him saying "and many

19   others."

20   BY MR. LICHTEN:

21   Q.   Now, do you agree that there are a number -- putting aside

22   this document, do you agree that there are a number of skills

23   and abilities that were not tested by the multiple-choice job

24   knowledge tests?

25   A.   You mean skills and abilities required to be a police
```

1    sergeant?

2    Q.    Skills and abilities required to be a police sergeant.

3    A.    Yes.

4    Q.    And can you describe, not in reference to this, but what

5    your belief is of what skills and abilities cannot be tested by

6    a multiple-choice job knowledge test?

7    A.    I can give you some examples.  So oral communication;

8    leadership; some types of problem-solving, particularly in

9    unstructured settings where a sergeant might say, "Oh, I need

10   some more information.  Go get me information on this" -- and

11   maybe as part of that problem-solving you'd have creativity or

12   judgment, or maybe those would be separate -- the ability to

13   remain calm in an emergency situation; various interpersonal

14   skills.

15   Q.    Okay.  Are you familiar with attachment AA to the

16   validation study from 1991?

17   A.    I don't recall what AA consists of.

18   Q.    Let me give you a copy of it.

19         Have you seen that document before?

20   A.    Yes.

21   Q.    Okay.  And I'm going to ask you to turn to page -- what is

22   this document, just so the record is clear?

23   A.    There was a group discussion about the exam program.  So

24   the HRD staff spoke with sworn officers and tried to glean

25   information about the -- their opinions of the examination.

1    Q.    Okay.  And do you see a section called "Job relatedness"?

2    A.    Yes.

3    Q.    And it says, "Although most SMEs" -- those are

4    subject-matter experts?

5    A.    Yes.

6    Q.    -- "felt the testing ability" -- "that testing ability to

7    supervise and to manage would improve the job relatedness of

8    the exams, they also felt that it could not be done effectively

9    with a written instrument.  They felt that much of the current

10   test examines for rote memory and not for the application of

11   concepts."  Do you see that?

12   A.    I do.

13   Q.    Now, do you agree or disagree with that statement?

14   A.    That they felt that way or that you can't test that?

15   Q.    No, do you agree with what they said?

16   A.    I think that you can test some aspects of supervision and

17   management with a written test, and then I think there are

18   aspects that you cannot test with a written test.

19   Q.    Gotcha.  Okay.  Now, going back to Exhibit EE for a

20   second, do you see that there are instances where the -- the EE

21   reflects that they're going to try to test -- or they're going

22   to test on the written exam for certain skills and abilities?

23   A.    Yes; that's that first column.

24   Q.    Do you have an opinion as to whether that is

25   accomplishable?

1  A.    Yes.

2  Q.    And what is that?

3  A.    It depends on which knowledge, skill, ability we're

4  talking about.

5  Q.    Okay.  Can you give me some examples of that, please?

6        MS. HARRIS:  Objection.

7        THE COURT:  Overruled.

8        THE WITNESS:  Okay.  So "Ability to develop new

9  policies and procedures to achieve department goals and

10 objectives."  I've written many multiple-choice test questions

11 on many topics.  Developing a question to test the ability to

12 develop new policies, I think, would be impossible because in a

13 multiple-choice question you provide answers.  So the most you

14 could test, it appears to me, would be the ability to recognize

15 plausible or good new policies, but not the ability to generate

16 them.  So I think 127, for example, is not something you can

17 actually test with a multiple-choice test.

18        Number 84, "Skill in identifying problems, securing

19 relevant information from both oral and written sources,

20 identifying possible courses of problems and analyzing and

21 interpreting data in complex situations involving conflicting

22 demands, needs or priorities."  I think that's an important

23 skill or ability, but securing relevant information from

24 various sources means identifying the sources from which you'd

25 request that information, or secure that information, and if

 1    you presented a long-enough scenario you could perhaps describe

 2    a complex situation with conflicting demands, needs or

 3    priorities, but when you gave your choices in terms of the

 4    answers, you'd just be asking the test-taker to identify the

 5    sources as opposed to what happens in real life which is the --

 6    in this case, the sergeant would have to decide, without

 7    prompting, what sources to go to for what information.  So I

 8    think 84 would be very difficult to test with a multiple-choice

 9    test, if not impossible.

10         Number 90, "The ability to confront problems, take

11    charge, assume responsibility."  I think you could have a

12    choice on the exam that says, "I'll take charge and assume

13    responsibility," but I think that's very different than the

14    person actually, in real life, being able to take charge and

15    assume responsibility.  So I don't think it would be possible

16    to measure number 90 with a written test.

17         Number 108, "The ability to develop alternative

18    solutions to problems, to evaluate courses of action and to

19    reach logical decisions based on the information at hand."

20    Well, if the test-taker is going to develop the alternative

21    solutions, it's very hard to put the alternative solutions in

22    the answer choices, and if the -- if you want to test the

23    ability to reach logical decisions, that's different than the

24    ability to identify which of four given decisions might be most

25    logical.  So I don't think you could measure 108.

1          109:  "Ability to maximize human potential of

2     subordinates through training and developmental activities."

3     Perhaps you could measure some small aspects of that with a

4     multiple-choice exam in terms of knowledge of what training

5     exists and what priority you would give to the training

6     function, but I think that, as written, it really goes beyond

7     those simple knowledges and speaks to understanding the

8     motivations of individuals and trying to use those together

9     with training to help individuals develop and to help maximize

10     their potential.

11          111:  "Ability to efficiently establish an appropriate

12     course of action for self or others."  Either you could measure

13     that in part with a multiple-choice exam, but I think that

14     the -- as I read that ability statement, it's more than "Can I

15     arrest the person?"  An appropriate course of action for

16     self/others, I see that as -- I would view that as a more

17     complex undertaking.  And if that's what it is, then I think it

18     would be very difficult, if not impossible, to measure with a

19     written test.

20          "Ability to approach work in a logical and organized

21     manner."  Well, I guess you could measure some aspects of that

22     with a multiple-choice test, but, again, I think that that

23     ability might well envision something on a larger scale than,

24     you know, "What do we do first after roll call?"

25          "Ability to influence others towards goal attainment."

1    I think that phrase "influence others" indicates interpersonal

2    skills, and I don't think you can measure interpersonal skills

3    very well with a job-knowledge test.

4         "Ability to understand the needs and motivation of

5    others."  Again, I think that includes interpersonal

6    sensitivity and perception, and perhaps you could measure a

7    small part of that with a multiple-choice examination, but I

8    don't think you get to the essence of that.

9         "Ability to deal effectively with the public," I think

10   much of that is oral communication, it's interpersonal

11   relations.  I think that there are some aspects of that you

12   could measure with a multiple-choice examination, but you

13   wouldn't be getting at the crux of that ability on a

14   multiple-choice examination.

15   BY MR. LICHTEN:

16   Q.   Let me stop you there.  I want to just move on because --

17   A.   Okay.

18   Q.   Okay.  So I want to go back to attachment AA for a minute.

19   And do you have that in front of you?

20   A.   Yes.

21   Q.   And I want to draw your attention to what's Bates-stamped

22   4132 at the bottom.

23        MR. CARROLL:  Your Honor, just for a second, not an

24   objection, but just a point that I would like to, I guess, put

25   on the record.  It's my understanding that defendants, perhaps

1    through inadvertence, omitted to provide the -- I'm sorry --

2    the plaintiffs, through inadvertence, omitted to provide

3    defense counsel with one of the pages specifically dealing with

4    the numbers between 80 and 111 -- I forget the page number --

5    as an exhibit.  They handed out a CD disk with the exhibits,

6    but at least in Springfield's case, we didn't have it.  So I

7    just wanted to make the Court aware of --

8              MR. LICHTEN:  We'll take care of it, your Honor.

9              MR. CARROLL:  I'm sorry, your Honor.  It's been

10   advised that it's out of order on some of the defendants'.

11             THE COURT:  Go ahead.

12   BY MR. LICHTEN:

13   Q.   Do you see the discussion of the ability testing by the

14   SMEs?

15   A.   On page 1432?

16   Q.   4132.

17   A.   Yes; at the bottom.

18   Q.   Okay.  And it says most SMEs felt that this was impossible

19   to include in a written test?

20   A.   Yes.

21   Q.   Do you agree or disagree with that?

22   A.   It depends on the individual ability, but I think in many

23   cases that's true.  I agree.

24   Q.   And what about the second part, testing for personal

25   characteristics?

1    A.    So again, the SMEs felt it was impossible to test for

2    personal characteristics, and I think with a typical

3    job-knowledge test, you can't do that.

4    Q.    Okay.  Now, let me move on.  You've actually read some of

5    these examinations; is that correct?

6    A.    Correct.

7    Q.    Okay.  And just remind us what examinations you've

8    actually looked at.

9    A.    Okay.  So I had the examinations for a somewhat restricted

10   period of time, and so I didn't have a chance to study them in

11   great detail.  So I recall the '05 exams, both statewide and

12   Boston, and the '06 and the '07 exam.  And I thought about it

13   more last night, and I believe I also saw the '08 exam and the

14   '08 Boston exam.

15   Q.    Okay.  And these were provided to you by HRD under some

16   confidentiality order?

17   A.    Correct.

18   Q.    Okay.  Okay.  So I'm not -- to try to deal with HRD's

19   concern, I'm not going to ask you any specific questions, okay?

20   But can you remind the Court how these questions were phrased;

21   that is, what kinds of questions were these and how would you

22   know the answers?

23   A.    Okay.  The questions generally had a pattern, and they

24   would start out with a phrase, "According to Iannone."  Iannone

25   was the senior author of one of the books on -- particularly on

1    police supervision.  So "According to Iannone" -- I'll make

2    something up -- "when supervisors evaluate subordinates, there

3    can be some subjectivity.  And sometimes a supervisor will rate

4    their subordinates higher than the other supervisors, and this

5    is a problem.  What is the name given to this problem?"  And

6    then the choices might be "halo" or "subjectivity," and so on.

7    Q.    And where do the answers come from?

8    A.    It appears that the -- from reading the questions, that

9    the questions and the answers came very directly as quotations,

10   or very close paraphrases, of the textbooks.  And Guy Paris, in

11   his deposition, said that's actually how he creates them.

12            MS. HARRIS:  Objection.

13            MR. CARROLL:  Objection.

14            MR. LICHTEN:  Your Honor, I think --

15            THE COURT:  That's all right.  You may have it.

16   BY MR. LICHTEN:

17   Q.    You may finish that thought.

18   A.    Well, I finished it.

19   Q.    There were so many objections.

20            (Laughter.)

21            THE WITNESS:  I could say it again.

22            So it appeared to me that whoever wrote the questions

23   in this case -- it was my understanding it was Guy Paris --

24   looked for parts of the textbook that would lend themselves to

25   being quoted and included in a test question.  The questions

1    read like textbooks read -- they're somewhat academic and the

2    vocabulary is somewhat obscure -- and so the questions

3    basically were paraphrases, quotes of the text --

4    BY MR. LICHTEN:

5    Q.   And how does that --

6    A.   -- many times.

7    Q.   Yeah.  And how does that format relate, if at all, to the

8    question of whether some of these skills and abilities that you

9    were just testifying about could properly be tested for in that

10   format?

11   A.   So many of the skills and abilities that I went over I

12   don't think lend themselves to being tested by that type of a

13   job-knowledge test.

14   Q.   Okay.  Now, moving on, these skills and abilities that

15   we've been discussing, do you consider them, the ones that you

16   described, important or critical to being a police sergeant?

17   A.   They are extremely important.

18   Q.   Okay.  And are there methods that have been developed

19   across the country that actually test for these skills and

20   abilities?

21   A.   Yes.

22   Q.   And can you describe what some of those are?

23   A.   Yes.

24   Q.   Okay.  And before you get to that, does the literature

25   also discuss the level of adverse impact that one can expect

 1    from these various types of testing mechanisms?

 2              MS. HARRIS:  Objection.

 3              THE WITNESS:  Yes.

 4              MS. HARRIS:  I just think it's too vague.

 5              THE COURT:  Overruled.  You may have it.

 6    BY MR. LICHTEN:

 7    Q.    What's the most -- what does the literature tell us is the

 8    mechanism that has the most adverse impact?

 9    A.    Well, there's fairly voluminous literature, but it has

10    been summarized a few times, including recently by Dr. Outtz.

11    And the multiple-choice cognizability, or job-knowledge test,

12    has the highest level of adverse impact, at least according to

13    a summary that Dr. Outtz made.

14    Q.    Okay.  And is there a particular article that you were

15    referring to by Dr. Outtz?

16    A.    I think that was in a chapter in an edited book, and it

17    was about eight or ten years ago.  But the answer is I don't

18    recall the --

19    Q.    Let me --

20              MR. LICHTEN:  Your Honor, I have put a list of -- a

21    group of journal articles before the doctor.  May he look

22    through them to find the article?

23              THE COURT:  All right.

24    BY MR. LICHTEN:

25    Q.    Is it an article called "Testing Medium Validity and Test

1    Performance"?

2    A.    What tab is that?

3            MS. HARRIS:  Give him a page number.

4            THE WITNESS:  Is that Tab 3?  Oh, here we go.  Yes,

5    that's Chapter 5, and that was from a 1998 edited textbook.

6    BY MR. LICHTEN:

7    Q.    Okay.  Can you just tell us what the name of that article

8    is?

9    A.    "Testing Medium Validity and Test Performance," and it was

10   written by Dr. Outtz.  And it talks about traditional test

11   characteristics and subgroup performance and non-traditional

12   tests and subgroup performance and testing medium and method

13   variance.  The chart I'm looking for I haven't found yet.  Here

14   it is.  Okay.

15          So on page 55, which is the back of that --

16   Q.    I'm going to put just a copy up.

17   A.    Okay.  Can you move that down on the page a little bit?

18   Q.    Yeah.

19   A.    Okay.  A little more.  No, down.  Down.  The other down.

20   Good.

21          So Dr. Outtz provided classification of tests into high

22   and low subgroup differences, and that's the title of

23   the -- that's what it says in the title.  And in the left-hand

24   column we have "Subgroup Differences," and the top is "High,"

25   and then halfway down is "Low."  The examples of employment

1    tests that Dr. Outtz said show high subgroup differences

2    include cognizability tests or written job-knowledge tests, and

3    the type of -- the examples of employment tests that Dr. Outtz

4    suggest have low subgroup differences include structured oral

5    interview or trainability tests or assessment centers or

6    multimedia tests or work samples.

7         So I think that this summary of the literature is

8    reasonable and reflects a reasonable consensus of the

9    profession.  I might say that it depends on how the tests were

10   developed.  It's possible to develop a good multiple-choice

11   test, and it's also possible to develop a multiple-choice test

12   that isn't that good.  And, in fact, if you look at the

13   validities for the cognizability test, there's a wide range of

14   validity, from .1 to basically .5, and I think that reflects

15   test development.

16        And likewise, for the structured orals and the

17   trainability test and assessment centers and the multimedia

18   tests and the work samples, those are -- can also be put

19   together better or they can be poorly crafted.

20        So I think this is a reasonable summary of the literature,

21   but you can't assume that every test that you produce is going

22   to reflect this.  Probably, the tests that are described in the

23   literature that this summarizes are the better-developed tests.

24   Q.   Okay.  And so just so I'm clear, this data is based upon

25   actual studies of actual performance and how much adverse

1    impact they had?

2    A.    Correct.

3    Q.    Okay.  So just to summarize, if a community is giving only

4    a job-knowledge multiple-choice test and not giving -- strike

5    that.  Let me ask a question before.

6        A lot of these skills and abilities that you were

7    referencing that are important for being a police sergeant, can

8    they be better tested utilizing these non-multiple-choice

9    job-knowledge tests?

10   A.    Yes.

11   Q.    Okay.  And will those testing mechanisms, according to the

12   literature, have more or less adverse impact upon minorities?

13   A.    They will have less adverse impact on minorities.

14   Q.    So what, if anything, is the effect of only using a

15   job-knowledge test to test for whether or not -- where someone

16   ranks on a police sergeant's list?

17   A.    One of the effects of using a written multiple-choice

18   job-knowledge test is that you're virtually assured of adverse

19   impact.

20   Q.    Now, is there literature as to whether utilizing multiple

21   components of an exam, job knowledge, assessment centers, these

22   other things you say, whether or not the combination increases

23   or decreases the validity of the exam?

24   A.    Yes.

25   Q.    And can you tell us what that literature is, please?

1    A.    Yes, I can.  And, in fact, Dr. Outtz testified before the

2    EEOC in May of 2007 and he touched on that very topic.  And

3    what he said was that validity increases as you increase the

4    breadth of coverage of the testing instruments.

5    Q.    Okay.  And I'm going to -- is that on page 4?

6    A.    Yes.  There's a Section 2 -- paragraph section -- entitled

7    "Reducing Adverse Impact by Expanding the Selection Process."

8    Q.    Okay.  And this is Dr. Outtz, defendants' expert in this

9    case?

10   A.    Correct.

11   Q.    And do you agree with his statement, by the way?

12   A.    I do.

13   Q.    And what does he say?

14   A.    Well, let me clarify my answer.

15   Q.    Yes.

16   A.    I think that it's possible that when you expand the

17   selection process to cover more areas, you can reduce adverse

18   impact.  I think it's also possible that you could have poor

19   test development no matter what approach you use.  But if you

20   do the test development well, I think that expanding the

21   selection process tends to reduce adverse impact.

22   Q.    Okay.  Now, what does it do to validity?  Does it

23   increase, decrease or keep validity the same?

24   A.    And it increases validity, which is wonderful, increasing

25   validity and decreasing adverse impact.

1    Q.    Gotcha.   Now, I'm sorry, I interrupted you.   You were

2    talking about the various components that one could utilize to

3    test the skills and abilities for a police sergeant, and I

4    wanted to go over each one with you.

5         Can you describe what an assessment center is for the

6    Court?

7    A.    Yes.   An assessment center has a generally accepted

8    definition, that it involves several different ways of

9    assessing a candidate.   So one of the exercises in an

10   assessment center might be a little job simulation.   You might,

11   for example, be given some briefing material and put in front

12   of a microphone and need to address the press.   There may or

13   may not be actual role-players playing the role of the press,

14   but there might be, and the press might interrupt you by asking

15   you questions, might be hostile, and then you would have to

16   deal with that situation.   So that would be a job simulation.

17   Not every assessment center has a job simulation and not every

18   job simulation is part of a formal assessment center.

19        Other assessment center exercises would include

20   other -- usually they're job simulations.   So, for example, you

21   might have a planning exercise.   You're given information about

22   a hypothetical police department, and a hypothetical

23   organizational chart and hypothetical resources, and then

24   you're given some background information on the problem, what's

25   happened over the last years and now what's happened most

1    recently, and you're asked to develop a plan, or a procedure,

2    to deal with the situations.  That might be a paper-and-pencil

3    exercise, although that's becoming a dated term.

4        You might have a -- what's referred to as an inbox

5    exercise, and in an inbox exercise you would have both paper,

6    and nowadays also computer-based e-mail and telephone-based

7    information that you need to understand, integrate, prioritize

8    and respond to.  So an assessment center would involve several

9    of those, and similar, exercises.  And I think the term is now

10   just used to refer to a number of different assessment tools

11   being used and differentiates it from just one of them.

12       In the past, the assessment center had a somewhat larger

13   definition.  It involved the use of assessors who assessed the

14   candidates in various areas on various dimensions and then have

15   a group meeting where they discuss the candidates and reach

16   consensus.  But after some number of years it was decided that

17   some assessment centers seem to be perfectly valid without the

18   discussion period and candidates could be graded using

19   checklists in a fairly mechanical fashion.  And so that's no

20   longer part of the definition of an assessment center.

21   Q.   Okay.  I want to turn your attention for a moment to the

22   concept of critical judgments and situational judgments.  Are

23   you familiar with those terms?

24   A.   Yes.

25   Q.   Okay.  And are there ways to test for the ability to make

1    critical judgments and situational judgments?

2    A.    Okay.  I'm not sure that there's a technical definition of

3    "critical judgment" and "situational judgment."  I think the

4    term is basically not a psychological terminology, but it

5    refers to dealing with problems in the real world.

6    Q.    Okay.  And are there other methods, for example, that

7    Dr. Outtz uses, to test for one's ability to make critical

8    judgments or situational judgments?

9    A.    As I understand it, he uses a video-based test.  And I

10   think his preference in video-based tests is to have longer

11   video-based tests with the possibility for some deeper, richer

12   material than a very brief video-based test.  But in any case,

13   a video-based test would be one possibility, and there you

14   would have -- for example, you observe one of your police

15   officers on patrol interacting with citizens in some emergency

16   setting and you have to decide what you're going to do.  Are

17   you going to just observe, let the officer handle the

18   situation, are you going to intervene, how are you going to

19   follow up if the officer didn't do well or did very well, how

20   are you going to follow up back at the station?  That would be

21   an example.

22   Q.    Okay.  And is there literature on the adverse impact, if

23   any, of situational judgment tests or components that are

24   provided through video scenarios?

25   A.    Yes.  It seems like the video produces less adverse impact

1    than the multiple-choice test.  It's a little complex and a

2    little surprising.  So much of the literature that we have

3    compares apples and oranges.  You have a multiple-choice test

4    in Jurisdiction 1 and you have an assessment center or video

5    exercise in Jurisdiction 2, and let's say that the video

6    exercise in Jurisdiction 2 has less adverse impact; perhaps

7    it's not measuring the same thing as the multiple-choice test.

8        So a lot of effort has been spent on accumulating

9    summaries of mean group differences as well as adverse impact.

10   And usually the research looks at mean group differences rather

11   than adverse impact because adverse impact depends so much on

12   how many people you appoint.

13       But there is a small literature, some of it funded by the

14   U.S. military, that has looked at the mode of testing.  So we

15   have a team of researchers who develop a multiple-choice test

16   to develop -- to test certain knowledges, skills and abilities

17   and also develop a video exercise to measure the same

18   knowledges, skills and abilities.  And that literature was

19   summarized also in the -- in a book that Dr. Outtz authored.

20       And the finding was that the --

21   Q.   Do you recall what the name of that book was, please?

22   A.   Yes.  "Adverse Impact."

23   Q.   And is it -- do you find that in the notebook that I

24   provided?

25   A.   I think so.  Let's see.  Okay.  It's Chapter 16

1    of the -- it's in Chapter 16 of the textbook that Dr. Outtz

2    edited that came out in '09, and it's on page 433 -- oh, it's

3    there already.

4    Q.    Gotcha.

5    A.    So, now, Dr. Outtz himself did not write this chapter,

6    although since he edited the book he certainly reviewed the

7    chapter.  The chapter was written by Neal Schmitt and one of

8    Neal Schmitt's colleagues.  And Neal Schmitt is one of the

9    major luminaries in industrial psychology, particularly in

10   testing.

11       So in Table 16.2 we have "Use of alternative modes of

12   presenting test stimuli."  And in that first entry, Chan and

13   Schmitt, we had a situational judgment test that was presented

14   in a paper-and-pencil fashion and a situational-judgment test

15   that was presented in a video fashion.  And the reduction in D

16   was .74.  Now, D is the mean difference between the groups

17   being compared.  The adverse impact depends on D, but it also

18   depends on how many people are appointed -- what percent of

19   people are appointed and a few other variables.  So when doing

20   research, industrial psychologists look at D rather than

21   adverse impact because D doesn't bounce around with the

22   situation.

23       And just to give one more example, O'Neal and Brown, which

24   is the second study cited, by different authors, used a

25   multiple-choice test of math and an open-ended test of math.

1    Looking only at Hispanics, they found a reduction in D of .66.

2    Now, the reduction in D of something in the neighborhood of .7

3    or .6 or .5 or .4 is a huge reduction.

4    Q.   Let me see if us laypeople can understand this.  So is

5    this comparing the same material that needs to be tested for

6    using different vessels to test for it?

7    A.   Yes.

8    Q.   Okay.  And as a result of this chapter and this summary

9    graph, what do the authors conclude about the ability to test

10   for the same information using different formats and obtaining

11   a reduction in adverse impact?

12              MR. LEAHEY:  Objection, your Honor.

13              THE COURT:  Overruled.

14   BY MR. LICHTEN:

15   Q.   You may answer.

16   A.   What the authors are saying is that -- and what Dr. Outtz

17   himself has said is that multiple-choice tests tend to reduce

18   adverse impact more than similar tests that are video-based --

19   Q.   Okay.

20   A.   -- or orally administered.

21   Q.   And are you aware of any published literature by Dr. Outtz

22   or anyone else that tries to give an explanation for why this

23   might be the case?

24   A.   Dr. Outtz has some theories --

25              MS. HARRIS:  I object, your Honor.  I think this is

1    beyond the scope of the report quite considerably, all the

2    reports that were filed by Dr. Wiesen.  I mean, it might be

3    interesting to hear Dr. Outtz --

4            MR. LICHTEN:  I'll move on, your Honor.

5            THE COURT:  Can I clarify one thing?

6            MR. LICHTEN:  Yes.

7            THE COURT:  I'm getting real-time text here, and I'm

8    not clear whether you used the word "produce" or "reduce."

9            THE WITNESS:  Oh.

10           THE COURT:  The answer, as recorded, is that tests --

11   multiple-choice written exams, tend to reduce adverse impact,

12   but I --

13           THE WITNESS:  Okay.  What I meant to say is that when

14   tests -- when multiple-choice tests are given, they tend to

15   have high adverse impact and you can reduce adverse impact with

16   other testing modes.

17           THE COURT:  Okay.

18   BY MR. LICHTEN:

19   Q.   Okay.  So the answer specifically, because I don't have

20   the real-time transcript, did you mean to say that

21   multiple-choice tests reduce adverse impact when material's

22   tested in that fashion?

23   A.   No, I meant "produce."

24   Q.   Okay.  Now, are you aware that in 2002 the City of Boston

25   did give a component to their police sergeant's exam that had a

1  component other than a written multiple-choice job-knowledge

2  test?

3  A.    Yes.

4  Q.    Okay.  What did they do in that regard?

5  A.    My understanding is that they had what they called an oral

6  exam, and the candidates were videotaped, and then the

7  videotapes were scored off-site.

8  Q.    Okay.  And have you, yourself, attempted to compute how

9  the adverse impact, if any, from that exam compared with the

10  adverse impact for that Boston exam as it compared to the

11  written multiple-choice test?

12  A.    Yes.

13  Q.    And can you tell the Court what you found?

14  A.    The adverse impact that -- the group differences on the

15  oral were less than the group differences on the

16  multiple-choice exam.

17  Q.    And can you quantify that, please?

18  A.    I didn't prepare an exhibit on that.  I think it was

19  something like .4 and .6, but I'm not sure.

20  Q.    Okay.  Well, just so -- okay.  So can we go to your

21  report.  And it's in your report; is that correct?

22  A.    Well, there were four reports.  It might be.

23  Q.    Yes.  I think it's page 39 of your second report.

24  A.    You mean Number 39?

25  Q.    Number 39.  I'm sorry.

1   A.    Okay.  Yes, I did.

2           MS. HARRIS:  The March 30th report?

3           MR. LICHTEN:  Yes.  I'm sorry about that.

4           THE WITNESS:  Okay.  So the data for the 2002 Boston

5   sergeant exam was produced through discovery and didn't have

6   the names of the test-takers associated with the scores, but it

7   had all the scores on the various parts of the test and the

8   ethnic identification.  And so I looked at the size of the

9   difference between the mean scores for minority and

10  non-minority test-takers.  And the difference, based on the

11  written test alone, was .55; the difference based on the oral

12  alone was .26.  So .26 is at the high end of the range of

13  adverse impact for oral-structured interview-type questions,

14  but it's less than half the difference that you see with the

15  written test alone.

16          Now, those numbers are adjusted for -- to make the

17  scores comparable.  So your oral test might not have been

18  scored on a zero-to-a-100 scale -- it might have been scored on

19  a zero-to-50 scale -- the -- so there are -- the scores are

20  standardized so that those numbers are numbers that you can

21  directly compare.  So .55 is basically twice as much as .26.

22  BY MR. LICHTEN:

23  Q.    Okay.  So is it fair to say that they cut the adverse

24  impact in half by using an oral assessment center -- an oral

25  board?

1    A.    No.

2    Q.    What is fair to say?  Sorry.

3    A.    Well, the final grade -- the exam itself still had an

4    adverse impact.

5    Q.    Let me rephrase the question using the concept of mean

6    difference.  I think that's what I screwed up.  Were they able

7    to cut in half the mean differences by using an oral board as

8    opposed to a written multiple-choice test?

9    A.    Yes.  The scores on the oral alone had a much smaller gap

10   between minority and non-minority than the scores on the

11   written test alone.

12   Q.    I want to ask you a few more questions about these various

13   components.  Is there a type of component utilized for police

14   sergeants throughout the country that involve structured

15   interviews?

16   A.    Yes.

17   Q.    Okay.  Can you describe that, please, for the Court?

18   A.    Yes.  So a "structured interview" is the name of a mode of

19   testing just as a "multiple-choice test" is a name of a mode of

20   testing.  You can test many different things with a

21   multiple-choice test and you can have many different types of

22   questions on a multiple-choice test.  Likewise, with a

23   structured interview, you can test many different things and

24   you can have many -- you can cover many different topics and

25   try to measure different knowledges, skills, abilities and

1    personal characteristics.

2        What defines a structured interview as a structured

3    interview is that the questions that will be posed have been

4    formulated in advance and are systematically asked of each

5    candidate in the same order.  Depending on what the questions

6    are and the test developer's approach, there might be standard

7    follow-up questions as well as non-standard follow-up

8    questions.  The non-standard follow-up questions might be, to

9    some extent, standardized in the instructions to the people

10   administering the oral exam.  "If the candidate doesn't talk

11   about this, say this."  "If the candidate doesn't talk about

12   that, ask about that."  So a structured interview is an oral

13   testing process that is standardized in its test administration

14   and perhaps also in its test scoring.

15   Q.   And is there literature on the adverse impact, if any --

16   the relative adverse impact -- of using structured interviews?

17   A.   Structured interviews, it was noticed over the years, tend

18   to have much smaller group differences than most other -- or

19   perhaps almost all other testing --

20   Q.   I see.

21   A.   -- modes.

22       So one summary article places it at about .1, which would

23   be considerably less than what we saw with the '02 exam.

24   Q.   .1 being the D?

25   A.   The D.

1    Q.    I'm learning.

2    A.    Right.

3    Q.    Okay.

4    A.    And I've seen estimates as high as about .25.

5    Q.    But comparing the structured interview to the

6    multiple-choice job-knowledge test, what does the literature

7    show to be the relative difference in adverse impact?

8    A.    When you look at summaries of the literature, the Ds are

9    always smaller with the structured oral than with the

10   multiple-choice exams, and the research is often, from public

11   sector/public safety examining.

12   Q.    And is there literature on whether or not there is

13   validity to the structured interview?

14   A.    Yes.

15   Q.    And can you tell me about that, please?

16   A.    Yes.  The summaries of the literature indicate that the

17   validity of the multiple-choice exam and the structured

18   interview are about -- very close to equal.

19   Q.    Really.  So in summary, then, if one used a structured

20   interview process in place of a written multiple-choice

21   job-knowledge test, would one expect to obtain a decrease in

22   mean differences of the scores?

23   A.    If you use one instead of the other, yes.

24   Q.    Okay.  And the validity would stay about the same?

25   A.    Correct.

1    Q.    Okay.  Now, with respect to -- have you looked

2    at -- strike that.

3          You've gone to SIOP conferences; is that correct?

4    A.    Yes.

5    Q.    You've made presentations at SIOP conferences, correct?

6    A.    Yes.

7    Q.    You've contracted with other communities to do promotional

8    tests?

9    A.    Occasionally.

10    Q.    And you've studied the literature; is that correct?

11    A.    Yes.

12    Q.    Do you know of anywhere -- any large city or state

13    law-enforcement agency in the country that relies solely on a

14    multiple-choice job-knowledge test to select police sergeants?

15    A.    Yes.

16    Q.    Where?

17    A.    There was, I think, a state police department in the

18    Midwest -- I perhaps can remember which one.  Maybe it's

19    Kansas -- that still uses just a multiple-choice job-knowledge

20    test for promotion to sergeant.

21    Q.    Other than that, do you know of any?

22    A.    There are a number of smaller jurisdictions that still use

23    just a multiple-choice job-knowledge test for promotion to

24    sergeant that I know of.

25    Q.    Do you know of any large jurisdictions that do it?

1    A.    Well, other than that state police agency, none that I can

2    think of.

3    Q.    Okay.

4    A.    But that's a change.  I mean, in the '80s it was much more

5    prevalent.

6    Q.    Have you studied what is typically used in most large

7    cities?

8    A.    I've not conducted a survey, an empirical investigation,

9    but I've become aware of what's being used in various

10   jurisdictions.

11   Q.    Okay.  Now, let me ask you this:  Are there various ways

12   to use a multiple-choice job-knowledge test as a component of a

13   selection procedure for police sergeant?

14   A.    Yes.

15   Q.    And what are the various ways it can be used?

16   A.    Well, it can be used as a weighted, graded component where

17   the score from the multiple-choice exam is combined with a

18   score for other components and enters into the final grade, or

19   it can be used as a pass/fail hurdle, and once you pass the

20   multiple-choice test it has no further influence on your grade

21   and your grade is determined by the other components.

22   Q.    Okay.  And so if it's used as a hurdle, how does that

23   work?  What does one have to obtain on the job-knowledge test?

24   A.    Well, there are at least two ways that you can use the

25   multiple-choice test as a hurdle, one I think more defensible

1  than the other.  So one approach that's been used somewhat

2  widely is to just decide how many people you want to assess

3  with the other testing instruments.  Sometimes the other

4  testing instruments are labor-intensive and expensive.  So you

5  might just put a cap and say, "All right.  We'll test the top,"

6  whatever, "500."

7      The other possible approach, which I think is more

8  scientifically defensible, is to try to decide what performance

9  on a multiple-choice test would indicate competence and allow

10  everyone who has demonstrated some level of competence to

11  proceed to the rest of the exam.

12  Q.   And are there jurisdictions that do it -- utilize the

13  job-knowledge test as a hurdle as opposed to a graded, weighted

14  component?

15  A.   Yes.  Yes.

16  Q.   Are you aware of the EB Jacobs firm that Dr. Silva works

17  for?

18  A.   I'm aware of it.

19  Q.   Okay.  Do you know what -- whether they -- how they use

20  job-knowledge tests, if at all?

21  A.   I think that it depends on what project they're working

22  on.

23  Q.   Okay.  Okay.  Let me move on.

24      Are you familiar with the concept of banding?

25  A.   Yes.

1    Q.    Okay.  And let me first ask you, can you describe the -- I
2    think you described this a little bit yesterday -- the subject
3    of reliability; that is, what "reliability" means as it relates
4    to a test, let's say, a written multiple-choice test?
5    A.    Yes.
6    Q.    Okay.  What is that?
7    A.    So reliability of measurement has a specific meaning in
8    industrial psychology; it might not be the same as the
9    definition of "reliability" in other fields.  "Reliability of a
10   test" refers to the degree to which you would expect candidates
11   to get the same score if they were tested again using a similar
12   test.  You wouldn't use exactly the same test because they've
13   just seen it, but...
14        So the question is:  Are those measurements replicable?
15   And it's usually indexed on a scale of zero to 1, where 1 is
16   perfect agreement on re-testing and zero is no agreement on
17   re-testing.
18   Q.    And then how does banding relate to reliability?
19   A.    Well, I guess I'd have to describe banding a bit.
20   Q.    Okay.
21   A.    In banding, which is a concept that now has been around
22   for, I don't know, well over ten years.  And Dr. Outtz was one
23   of the early proponents and developers of some of the banding
24   literature.  In banding you say that small differences in test
25   scores really are not particularly meaningful.  So if you have

1    somebody who scored a 77 on the test and somebody who scored a

2    78 on the test, well, they do have different scores and one is

3    a little higher than the other, but it could be for a given

4    test that a one-point difference is really a very small

5    difference.  And the -- and it doesn't -- it might be so small

6    that with the reliability of the test, if you were to give the

7    test again, those two people might turn out flipped

8    with -- they might arrive at one point in the other direction.

9        So banding says, let's look at differences in scores that

10   we really think are important and use a mathematical approach

11   based on the reliability coefficient that I mentioned that goes

12   from zero to 1.  And when applied in the real world, the band

13   size might be three, seven, 12 points, more or less, and then

14   everybody who scores within a band would be considered equal.

15       So if you had a band of seven, and you thought that based

16   on the reliability of measurement people within a band

17   of -- within seven points of each other are basically

18   indistinguishable, then if you were using a rank-order approach

19   as is used in Massachusetts, everybody within seven points of

20   100 would be in the first band, and they would be considered

21   tied, and then you would have another band seven points below

22   that and another band seven points below that.

23       And there are various -- banding is a somewhat new area.

24   There are various bells and whistles that you can place on

25   bands:  Sometimes the bands aren't the same because the

1    reliability of the test varies depending on the test score,

2    some people like to use sliding bands, but the basic concept is

3    you form groups of scores you think are basically comparable.

4    Q.    Okay.  Now, let me ask you:  If you -- are there

5    communities that use the banding approach to police and fire

6    promotional exams?

7    A.    Nationwide?

8    Q.    Yes.

9    A.    Yes.

10   Q.    Okay.  And just so we're clear, if you then have people

11   that are considered to be tied within a band, what is the

12   process -- what professional processes are there for then

13   determining who to promote from those within those bands?

14   A.    There are various options, and different jurisdictions

15   handle it differently.  Sometimes there is an interview

16   process; sometimes there's a -- I think interview is probably

17   the most common.

18   Q.    Okay.  Now, I'd like you to turn to Exhibit 70, please.

19        THE COURT:  Is this a new topic?  It's eleven o'clock.

20   Maybe it's a good point to take a break before we get to

21   Exhibit 70, or is it related to the banding issue?

22        MR. LICHTEN:  It's related to the banding, your Honor,

23   and then we'll complete this area.

24        THE COURT:  Go ahead.

25        MR. LICHTEN:  I know the cafeteria might fill up.

1    BY MR. LICHTEN:

2    Q.    Have you seen Exhibit 70 before?

3    A.    I have.

4    Q.    And what is Exhibit 70?

5    A.    Exhibit 70 is a letter authored by Dr. Jacobs, a

6    consultant to the HRD, to the personnel administrator, the

7    agency head for HRD.

8    Q.    Okay.  I just want to -- so Dr. Jacobs consulted to HRD;

9    is that correct?

10   A.    My understanding, he's consulted with them on a number of

11   topics, yes.

12   Q.    Okay.  And Dr. Silva, who's one of the defendants' experts

13   in this case, he works for EB Jacobs, the firm?

14   A.    Correct.

15   Q.    And Dr. Jacobs is the head of EB Jacobs?

16   A.    Correct.

17   Q.    And are you familiar with what Dr. Jacobs recommended with

18   respect to the 2008 examination?

19        MR. CARROLL:  Your Honor, I object to this hearsay

20   going into evidence.

21        MS. HARRIS:  This is also not a stipulated exhibit.

22        THE COURT:  It can be used as a basis for his opinions

23   until Rule 703.  It is not otherwise admitted.

24        MR. LICHTEN:  I would move it in, your Honor.  It's a

25   recommendation by HRD's consultant, so I think it qualifies as

1    business records -- I think it qualifies as a business record,

2    your Honor.

3            MR. CARROLL:  Your Honor, there's no foundation for

4    this to be admitted as a business record, one; two, HRD's not a

5    defendant in this case; and, three, it's just pure rank

6    hearsay.

7            THE COURT:  Well, again, I'm not sure whether it is

8    hearsay or not; it might be an event.

9            MR. LICHTEN:  Let me -- I won't offer it.

10            THE COURT:  But we're going to have Mr. Dietl on the

11    stand, aren't we, at some point?

12            MR. LICHTEN:  I'm not sure.

13            THE COURT:  You're not?  He's on the list; that's why

14    I ask.

15            MR. LICHTEN:  Other than identifying this letter,

16    we're not sure what information he would add to the case.

17            I won't offer it at this time.  Let me move on.

18    BY MR. LICHTEN:

19    Q.   What did Dr. Jacobs recommend?

20    A.   Dr. Jacobs --

21            MS. HARRIS:  Objection.

22            I'm sorry.  Go ahead.  What did Dr. Jacobs recommend?

23            THE WITNESS:  Dr. Jacobs recommended using a banding

24    approach.

25    BY MR. LICHTEN:

1   Q.   Okay.  And did he provide a scientific basis for why that

2   would be appropriate for this exam?

3   A.   He described the reason, generally, yes.

4   Q.   And what was that?

5        MR. CARROLL:  Again, your Honor, it's just the same

6   thing only now it's hearsay compounded by his

7   characterization --

8        THE COURT:  Yeah, I think it can be admitted -- and

9   this probably goes to the letter as well as this witness's

10  testimony as to what the letter says -- as something that

11  occurred in the development of the test, whether it's true or

12  not.  I mean, it's not...

13       MS. HARRIS:  It's actually after the test was

14  developed.

15       THE COURT:  Well, whatever.  For the fact of its

16  having been said, let me put it that way, rather than for the

17  truth of the matter asserted.

18       THE WITNESS:  So the third paragraph says about what I

19  said before, that score banding recognizes error in measurement

20  and creates a range of observed scores that are functionally

21  the same.  So he doesn't present a very formal mathematical

22  presentation of banding, but he presents the general concept.

23       MR. LEAHEY:  Your Honor, I'd just ask if it could be

24  put on the -- it had been on the screen.

25       MR. LICHTEN:  I'm sorry.  Okay.

1              Your Honor, this would be an appropriate time to
2    break.  Thank you.
3              THE COURT:  All right.  We'll take the morning recess.
4              THE CLERK:  All rise.  The Court will take the morning
5    recess.
6              (The Court exits the courtroom and there is a recess
7    in the proceedings at 11:02 a.m.)
8              (Resumed, 11:24 a.m.)
9              THE CLERK:  All rise.  Continuation of the Lopez
10   trial.  Please be seated.
11             THE COURT:  Go ahead, sir.
12             MR. LICHTEN:  Thank you.
13   BY MR. LICHTEN:
14   Q.   All right, Dr. Wiesen, I want to put on the bar a chart.
15   Are you familiar with this publication?
16   A.   Yes.  I think that was 1997.
17   Q.   Okay.  And can you just tell me what this publication is,
18   please.
19   A.   It's one of the summaries of the literature that I
20   mentioned to you, and this one tries to summarize the
21   interrelationship of many different modes of testing and the
22   validity of each of the modes of testing, as well as the
23   subgroup differences.
24   Q.   Okay.  And is the name of this article "Validity --"
25   A.   Is the name of the article --

```
 1   Q.   Can you give me the name of the article?

 2   A.   It's Schmitt, Chan, and somebody.  Let's see.

 3   Q.   Let me just show you a document and ask you if that

 4   refreshes you on what the article is.

 5   A.   No, it's not that article.

 6   Q.   Okay.

 7   A.   It's Schmitt spelled differently.

 8   Q.   Okay, let me move on to something else while we straighten

 9   that technical difficulty out.  You mentioned before in your

10   testimony that you had a number of concerns about the validity

11   of the examinations in question.  Do you recall that?

12   A.   Generally, yes.

13   Q.   Okay.  And we got to your testimony that you did not

14   believe it measured for many of the characteristics, the test

15   didn't measure for many of the skills and abilities necessary

16   for the job of police sergeant.  Do you recall that?

17   A.   Yes.

18   Q.   Okay.  You also mentioned that you had other concerns

19   about the examination; is that right?

20   A.   Yes.

21   Q.   Okay.  And I'm going to show you -- are you familiar with

22   the test outline?

23   A.   Yes.

24   Q.   Okay, I'm going to put up a document and ask you if you

25   recognize this document.
```

1    A.    Can you move it down on the page just a tad.

2    Q.    Yes.

3            (Witness examining document.)

4    A.    All right, it looks like a test outline for one of the

5    Boston promotional exams.  I don't know if it's the '05 or '08.

6    I don't see any identification.

7    Q.    Okay.  And that's Exhibit 4 which is in evidence, and I

8    believe that's the state exam.

9    A.    Could you push that up a little bit.

10            (Witness examining document.)

11   Q.    So do you recognize the document?

12   A.    It's an HRD test outline.

13   Q.    Okay.  And have you reviewed these outlines?

14   A.    I have.

15   Q.    And was there a test outline similar to this for every

16   exam?

17   A.    Yes.  The outline for the statewide exams appeared to be

18   unchanged.

19   Q.    Okay.  And did you hear in his deposition Mr. Paris

20   testify as to how he would use the outline to develop the test

21   questions?

22   A.    Yes.

23   Q.    And what did you understand that he did from his

24   testimony?

25   A.    He used the test outline together with the reading

```
 1    material that was announced to the test takers.  And he was not
 2    given any definitions of the testing areas, was not given the
 3    job analysis that was related to the test outline, but he used
 4    his best judgment to try to select material from the textbooks
 5    to cover the competency areas.
 6    Q.   Okay, so let me see if I understand that.  He would take
 7    these outlines for each year; is that right?
 8    A.   Basically the same outline for each year.
 9    Q.   Okay.  And then he would try to do what from that outline?
10    A.   He would try to use the --
11         MR. CARROLL:  Your Honor, I would object to this
12    witness testifying about what he remembers Mr. Paris said at
13    apparently a deposition in which Dr. Wiesen was present.  It's
14    just nothing but hearsay.
15         MR. LICHTEN:  Your Honor, it's foundational for an
16    opinion I'm going to ask him for, and it's permitted.
17         THE COURT:  Yes, overruled.  You may have it.
18    Q.   Go ahead.
19    A.   Okay, so it's basically what I had already described.  He
20    would look at the reading material on the announced reading
21    list, and then choose something under, say, employee
22    development.  It appears for employee development for
23    sergeants, three questions would be on the test.  And he would
24    look at the textbook, try to find something related to employee
25    development, and turn it into a test question.
```

1    Q.    And do you believe this was an appropriate way to put

2    together the questions for these examinations?

3    A.    I think that it's flawed.

4    Q.    Okay, can you tell us why.

5    A.    Yes.  The state, HRD, went to considerable efforts to

6    identify the knowledge, the skills, abilities, and personal

7    characteristics required for someone who wants to be a police

8    sergeant.  And we just went over that list of 187 -- actually,

9    probably around 150 or so, and a number of those were indicated

10   as they would be tested on the written exam.  Well, the level

11   of detail in these knowledge, skill, and ability statements is

12   much finer than just employee development.  So the "employee

13   development" is a shorthand notation for some number of these

14   knowledges, skills, and abilities that go into more detail.

15         So it would have been much better, had Mr. Paris had

16   access to this list of knowledges, skills, and abilities, when

17   he saw "employee development" here, he would go back to the

18   detailed statement of what he was trying to measure and be

19   guided by that detailed statement.  Given that that didn't

20   happen, it's almost as if the job analysis was never done.

21   Q.    And do you think that's appropriate?

22   A.    No.

23   Q.    So how should it have been done?

24   A.    The job analysis information, both the tasks and the KSA,

25   should have been available to Mr. Paris when he was writing

1    items.  He could then understand the nuances of the KSA better

2    with a more complete description, and he could then see which

3    tasks were related to that KSA and make sure that the question

4    that he wrote covered the KSA and was related to the

5    appropriate types of tasks.

6    Q.    Okay.  You testified that you also reviewed the Morris &

7    McDaniel study from 2002; is that correct?

8    A.    Yes.

9    Q.    Okay.  And did you come across anything when you reviewed

10   that that gave you concern?

11   A.    I did, two things.

12   Q.    Can you tell us what that is.

13   A.    Many things but two major things.

14   Q.    Okay.

15   A.    In the Morris & McDaniel study, a group of eleven SMEs --

16   Q.    Those are subject matter experts?

17   A.    Subject matter experts -- sergeants -- I don't know if

18   they also had some lieutenants -- rated job duties or job tasks

19   to try to determine which of those would be considered

20   important, and also rated knowledges, skills, and abilities to

21   determine which of those would be important.  And each one of

22   the tasks and the knowledges, skills, and abilities were rated

23   on several different scales, and the SMEs were chosen to

24   reflect a reasonable range of the types of assignments that

25   sergeants had.  So some of them were desk sergeants, and some

1    of them had administrative posts.  And there is another type.

2    I forget what the third type was.

3        So there were two aspects of the data that I thought was

4    so unusual that I thought it was suspect.  So all together

5    those eleven SMEs made over 20,000 ratings on the rating scale,

6    and the report included tables with the actual ratings of each

7    of the tallies of the ratings of each of the eleven raters.

8    There was complete agreement between the eleven raters.  There

9    was no disagreement among the raters in the 20,000 ratings that

10   they made.  So getting that level of agreement is highly

11   unusual, to say the least.  The instructions for the raters did

12   not have a direction to make the ratings, discuss them, come to

13   consensus, so there was no indication that there was a

14   consensus exercise going on.  Presumably they would make

15   independent ratings, and that just strains credulity.

16       And then when you take a look at the ratings themselves,

17   they didn't make sense.  And I think I report that in my second

18   report, if I could refer to that.

19   Q.   Page 9, I think it is.

20   A.   Thank you.  So, for example, "Conducts internal

21   investigations" was unanimously rated as being performed daily.

22   "Qualifies and/or engages in required practice of operation of

23   firearms and other weapons" was reported as being done daily by

24   all of the raters.  "Investigates and resolves citizen

25   complaints against police officers" was also reported as being

1    done daily.  "Sets up command post at scenes of robberies,

2    homicides, fires, et cetera," well, the sergeants with

3    administrative posts, I just can't understand how they would

4    say that they set up command posts on a daily basis.  "Directs

5    activities at the scene of major incidents, e.g., serious fatal

6    accident, natural disaster, conducts internal investigations,

7    investigates and prepares reports regarding misconduct by

8    subordinates, investigates use of force and injury to prisoner

9    incidents and prepares reports for superiors, recommends

10   subordinates for commendations and disciplines them for

11   dereliction of duty," all of these were indicated unanimously

12   as being done daily by all raters, no matter what their

13   assignment.  "Inspects licensed premises and prepares reports

14   on violations, if any are found, and talks with leaders of

15   demonstrations."  So --

16   Q.   And those are all reported as being done on a daily basis?

17   A.   On a daily basis, and there was complete unanimity among

18   the eleven.

19   Q.   And do you have an opinion as to whether that could

20   possibly be true?

21           MR. PIKULA:  Objection.

22           THE COURT:  No, overruled.

23   A.   It seems highly implausible, so it makes me suspect the

24   data; and if you don't trust your data, nothing that comes

25   after that is worth anything.  I mean, it's sort of like you're

1    pouring concrete to build a building, and after you pour the

2    concrete, you put the building on top.  But before you put the

3    building on top, usually somebody, an inspector from the city,

4    comes and looks at the concrete.  And if the concrete is no

5    good, you're not going to put the building up because he's not

6    going to let you.  Well, here no inspector came by to inspect

7    the data before they developed the exam and the test outline,

8    but I would not personally trust this data set.

9    Q.   Okay.  And just remind us again.  Do the Uniform

10   Guidelines on Employee Selection tell us what should and should

11   not be in a validity report?

12   A.   Yes.

13   Q.   And what do they tell us should be in a validity report?

14   A.   Well, there are many things.  It goes on for a few pages.

15   Q.   Well, let me do it this way:  Are there things which the

16   Uniform Guidelines tell us should be in a validity report which

17   you could not find with respect to the 1991 so-called

18   validation study by the Commonwealth?

19   A.   Yes.

20   Q.   Can you tell us what those are, please.

21        MS. HARRIS:  I'm sorry.  This is the '91?

22        MR. LICHTEN:  That's what I said.

23   A.   Okay, one thing would be a contact person to ask questions

24   about the report.  The '91 study was fairly comprehensive.  I

25   think its flaws are more in terms of what it did than leaving

1    out topics entirely.

2    Q.    And with respect to the 2002 Morris & McDaniel report, do

3    you consider that a validation study?

4    A.    Yes.

5    Q.    Okay.  And were there things that should have been in that

6    report which were not?

7    A.    Again, I think it covered many topics.  I think the major

8    problems with that report are how it did what it did rather

9    than the topics that were addressed.  And then there is a gap

10   between the Morris & McDaniel study of '02 and the

11   implementation of that in terms of a test outline for the

12   Boston Police exams, so the '02 document doesn't explain how

13   the document was used to develop the '05 exam or the '08 exam.

14   Q.    Okay.  And are you aware of whether Mr. Paris wrote the

15   questions at least for the Boston '05 exam?

16   A.    He said he did, yes.

17   Q.    Okay.  And did you see anything or find anything that

18   demonstrated that he had gone back and reviewed the Morris &

19   McDaniel study or made an analysis of it before writing the

20   questions?

21   A.    Well, there were many pages given to me with handwriting

22   annotations, often not interpretable.  So the answer is, I

23   don't know.

24   Q.    Okay.  Now, in addition to your concerns about the

25   validity reports themselves and the fact that the exam did not

1    test for many of the attributes necessary to be a police

2    sergeant, did you have any other concerns which go to the

3    validity of the police sergeant's examination other than those

4    which you've already testified to?

5    A.    Yes.

6    Q.    What were they, please?

7    A.    Well, one is readability.

8    Q.    Explain that, please.

9    A.    I will.  So the questions on the exams were very verbose.

10   They had academic sentence construction, obscure words.  I

11   think I have a little list of obscure words in my report.  They

12   were not obscure words because they were police science words;

13   they were just obscure words.

14        The justification in the 1991 study for the high reading

15   level of the questions was that some of the reading material

16   that sergeants encounter also is obtuse and not easy to read,

17   perhaps because it was written by lawyers.  But the test-taking

18   situation is very different than a situation where a sergeant

19   on the job has to wade through some difficult reading material.

20   If there is a word that the sergeant on the job doesn't know,

21   you know, he or she can go to the computer or the dictionary,

22   if they still have one of those, and find out what the word

23   means.  If the sentence is very convoluted and it was not clear

24   what it means, a sergeant could go to a lieutenant and say,

25   "Hey, Louie, I don't understand this at all.  Can you explain

1    it to me?"

2        On the test, the applicants for sergeants had none of

3    those resources.  They couldn't look anything up.  They

4    couldn't ask for assistance.  So having the test be at the same

5    reading grade level as some of the more difficult material that

6    has to be read on the job has an apparently unforeseen effect,

7    and that is that the questions measure word knowledge and

8    reading rather than the knowledge that the questions were

9    intended to measure.

10   Q.    Let me ask you on that point, are there such things as

11   open-book examinations?

12   A.    Yes.

13   Q.    Okay.  And are those used in police promotional

14   examinations?

15   A.    Sometimes.

16   Q.    And what would be the reasons that you would use open book

17   as opposed to closed book or have part open and part closed?

18   A.    Open-book sections of examinations are typically used when

19   you want to test some familiarity with a subject matter but you

20   don't think that that subject matter has to be memorized and

21   then used for memory by an incumbent sergeant.  So, for

22   example, it could be some detail of medical leave.  You'd like

23   the sergeant to know where to go to look for it and to

24   understand it when it's read, but, you know, it might come up

25   infrequently and it's not the type of thing they need to know

1    to handle an emergency, so it suffices to let them have the

2    material and look it up and provide the answer to the

3    questions.

4        Now, some people feel that that type of material isn't

5    worth putting on an exam and so have just a closed-book exam

6    with only material that an incumbent really needs to have

7    memorized.  If the closed-book exam includes questions of the

8    type that are generally looked up, that's a weakness in the

9    exam.

10   Q.   And are there methods that can be used to determine which

11   job knowledges are appropriately tested through open book and

12   which could be appropriately tested through closed book?

13   A.   It's possible to craft questions in the job analysis that

14   would get at that, yes.

15   Q.   Okay.  And are you aware, for example, whether

16   Dr. Silver's firm, one of the defendants' experts in this case,

17   whether they use open-book exam formats?

18   A.   I believe they use different formats for different

19   projects.

20   Q.   I wanted to show you for a moment Attachment JJ to the

21   1991 validity study.  Are you familiar with that?

22   A.   I've looked at it.  Where would I find it here?  Is it

23   here?

24   Q.   It's 41.  We'll get it for you.  41-J, I think.

25           MR. CARROLL:  41-JJ.

1          (Witness examining document.)

2    Q.    Are you familiar with that document?

3    A.    I've read it.

4    Q.    Okay.  And what is that document, sir?

5    A.    It's a set of guidelines for writing multiple-choice test

6    questions.  It's called "items," but "items" and "questions"

7    are used synonymously.

8    Q.    Okay.  And do you have an opinion as to the

9    appropriateness of the Guidelines which were in the 1991

10   validity study for the Commonwealth?

11   A.    I think they're reasonable.

12   Q.    Okay.  And do you believe they were followed?

13   A.    No.

14   Q.    Can you tell us why.

15   A.    Well, it would vary question by question.  But, for

16   example, No. 8 says "None of the above" and "Any of the above,"

17   and "All the above" should not be used, but I think that that

18   was used.  The No. 1, "The item stem should include a clear

19   central problem," many of the questions didn't have a clear

20   central problem.

21        So ideally, when asking a multiple-choice question, a

22   competent test-taker could answer the question without looking

23   at the choices because the question is clear in the way it's

24   presented.  If you have to look at the choices to figure out

25   what the question is really asking, that's not a clear central

1    problem.

2         "Repetition of the same phrases or identical words should

3    be avoided; the constructors should avoid the inclusion of

4    excessive terminology or unnecessary verbiage that's not needed

5    to test the knowledge," that seemed to be violated.

6         So this brief set of guidelines, which doesn't go into

7    great detail, it's only three pages, but what it presents is

8    reasonable, did not seem to me to be really followed.

9    Q.   Okay, thank you.  Just briefly, if you go to your first

10   report dated October 3, 2008 -- do you have that?

11   A.   I do.

12   Q.   Page 51?

13   A.   Yes.

14   Q.   I just wanted to ask you a couple of questions.  You say

15   in Section D that "There was no assistance from experts in

16   cultural bias or readability."  Let me ask you, do you have any

17   evidence that for the 2005 -- have you seen anything that

18   indicates that for the 2005 and 2006 exams, the 2005 both

19   Boston and statewide, there was any attempt to have the

20   questions read and examined and edited for either cultural bias

21   or readability?

22   A.   I don't recall anything that had the questions reviewed

23   for cultural bias; and with respect to readability, I think

24   that there were some ratings of readability done by chiefs, but

25   I don't recall which exams those were done for.

1  Q.    Okay.  And below that you talk about "and the immediate

2  supervisor lacked relevant training."  What do you mean by

3  that?

4  A.    Well, Mr. Paris was developing a test, and the Uniform

5  Guidelines are an important reference in testing, as are the

6  SIOP principles, the APA standards.  Those are the three

7  fundamental documents used by the profession, by test

8  developers in doing test evaluation, test validation.  So the

9  immediate supervisor, Vivian Lee, in deposition said that she

10 had no training in any of those.

11 Q.    Okay.  And if you look at Page 52 of your report, you

12 reference the question of the large number of changes to the

13 2007 answer key.  Do you recall that?

14 A.    I do.

15 Q.    And could you refresh our memory as to what that was?

16 A.    Yes.  In the 2007 exam, the state department, HRD, after

17 the exam was given decided that 18 of the 80 questions were

18 flawed.  That comes out to about 22 percent of the 80

19 questions.  And they did one of two things with those flawed

20 questions:  They either gave everybody credit for any answer or

21 for no answer, or they gave credit for more than one answer.

22 Q.    And what, if anything, does that tell you about the

23 reliability or validity of the examination?

24 A.    Well, when you throw out 20 some percent of the test, you

25 definitely are wreaking havoc on the test outline, on the

1    proportion of questions on each of the topics; and it also

2    brings into question the quality control in the development of

3    the test in general.

4    Q.    Okay.  And then, finally, can you turn to Page 55 of your

5    first report.

6    A.    Okay, now, in the very next paragraph, there are the

7    examples of some of the unnecessarily difficult words that

8    appear on some of the exams:  homogeneous, adhere, unequivocal,

9    apportioned.  Those are the ones I didn't recall off the top of

10   my head.

11   Q.    Okay, turn to Page 55 of your October report.

12   A.    Yes.

13   Q.    And you have a section called "Alternatives Are

14   Practical."  Do you see that?

15   A.    Yes.

16   Q.    Okay.  Do you have an opinion as to whether it would have

17   been practical for the City of Boston and the other defendants

18   in this case, either individually or collectively, to have used

19   alternative testing procedures?

20              MR. CARROLL:  Objection.

21              THE COURT:  Overruled.

22   A.    I don't know much, if anything, about the financial

23   situation in the various municipalities.  What I can say is

24   that municipalities across the country find it practical to use

25   alternative selection procedures, so it would be surprising if

1    none of the defendants were able to do that.

2    Q.    Okay.  Have you yourself used assessment centers and other

3    components in small communities?

4    A.    Yes.

5    Q.    And you give some examples of other communities, larger

6    communities that use multiple components; is that correct?

7    A.    Yes.

8    Q.    And what are some of those that you gave examples of?

9    A.    Here I mentioned Philadelphia, Dallas, Denver, Miami, and

10   a few more.

11   Q.    Okay.  And you mentioned Miami.  Were you aware that

12   defendants' expert, Dr. Silver, was the person who designed the

13   examination procedure for Miami?

14   A.    I think he said that in his deposition.

15   Q.    Okay.  And do you recall what Miami uses?

16   A.    No.

17          MR. LICHTEN:  All right, Dr. Wiesen, thank you very

18   much.  I have no further questions.

19          May I confer with my co-counsel first?

20          THE COURT:  Yes.

21          MR. LICHTEN:  Sorry.

22          (Discussion off the record between plaintiff counsel.)

23          MR. LICHTEN:  I still have no further questions.

24          THE COURT:  Okay.  Ms. Harris, are you going first?

25          MS. HARRIS:  I am.  Thank you, your Honor.  If I may

1  have just a moment.

2         THE COURT:  All right, go ahead.

3                        CROSS-EXAMINATION

4  BY MS. HARRIS:

5  Q.   Good afternoon, Dr. Wiesen.

6  A.   Good afternoon.

7  Q.   One of the topics that Mr. Lichten just asked you about

8  piqued my curiosity.  You had been asked about banding and had

9  given your opinion that banding can be an appropriate way to

10 grade applicants when you look at their exam questions and

11 assess whether or not they're fundamentally the same.  Do you

12 remember generally that testimony?

13 A.   Yes.

14 Q.   Now, you worked for the Department of then Public

15 Administration and now HRD for some period of time, correct?

16 A.   It was called Department of Personnel Administration,

17 right.

18 Q.   Okay.  And it's now called HRD, correct?

19 A.   Correct.

20 Q.   And what are the years that you worked there?

21 A.   I think it was '77 to '93.

22 Q.   And what was the position that you held when you were

23 working for the DPA?

24 A.   There were various job titles.  I did some varied

25 things --

1   Q.   I'm sorry, I don't mean to cut you off, and I'll try not

2   to speak quickly.

3   A.   I did varied things when I was with the department.

4   Q.   Okay.  You served as the director of validation for a

5   period of time?

6   A.   So I was in charge of validation for a few years.

7   Q.   And when you were the director of validation, what was the

8   scope of your job responsibility?

9   A.   Most of my efforts were directed towards validating the

10  entry-level police and fire exam and developing psychological

11  screening standards and overseeing a psychological screening

12  program.  And then there were smaller assignments during that

13  period of time.  There might be a delegated exam or an oral

14  exam, but those were the larger responsibilities.

15  Q.   Okay.  And during the period of time that you were the

16  director of validation, looking to both the entry-level exams

17  and the promotional exams, did you ever use banding?

18  A.   No.

19  Q.   And is that because it's prohibited by state law?

20  A.   Well, I'm not sure banding existed back then.

21  Q.   Are you aware that currently choosing candidates from a

22  band is prohibited by state law?

23       MR. LICHTEN:  Objection, your Honor.  First, under

24  Title VII, it wouldn't matter, and she's asking for a legal

25  conclusion.

```
 1              THE COURT:  Overruled.  Go ahead.
 2              MS. HARRIS:  Thank you.  If I may, your Honor.
 3    Q.    Dr. Wiesen, when you were the director of validation, you
 4    were working under the governance of Chapter 31, correct?
 5    A.    Correct.
 6    Q.    And you were familiar with the requirements of Chapter 31,
 7    I presume, correct?
 8    A.    Yes.
 9    Q.    And we've talked a little bit in your examination about
10    the 2 N + 1 system of candidate selection for promotions?
11    A.    Yes.
12    Q.    Now, I've put before you Chapter 31, Section 27, and I'm
13    going to crib a little bit.  And it says, "If the administrator
14    certifies from an eligible list --" and I think we can agree
15    the eligible list is the list of candidates that's selected
16    after the administration of an exam, correct?
17    A.    Where are you reading from, the first paragraph, second
18    paragraph?
19    Q.    The first sentence of the first paragraph reads --
20    A.    Oh, you started in the middle.  I got it.
21    Q.    "If the administrator certifies from an eligible list the
22    names of three persons who are qualified for and willing to
23    accept any appointment --" and the three persons who are
24    qualified for and willing is the 2 N + 1 formula, correct?
25    A.    Correct.
```

1    Q.    "-- the appointing authority may appoint from these

2    persons."  So, first, the eligible list is created using the

3    formula 2 N + 1, right?

4    A.    The eligible list?  No.  The certification.

5    Q.    Okay, if the administrator certifies from an eligible

6    list, all right, my apologies.  The certified list is the list

7    that goes to the appointing authority?

8    A.    Right.

9    Q.    And it's created by the administrator, by HRD?

10   A.    Right.

11   Q.    And HRD chooses the names that go onto the eligible list?

12   A.    Right.

13   Q.    And the appointing authority only receives the certified

14   list?

15   A.    These are the names that go on the certification.  They

16   choose the names from the eligible list that goes on a

17   certification.

18   Q.    Yes, thank you.  Then the appointing authority -- let me

19   make it simple.  If you have three vacancies -- I believe this

20   was your example from yesterday -- if you have three vacancies,

21   the administrator will give the appointing authority a list

22   containing seven names?

23   A.    Correct.

24   Q.    Okay.  And the appointing authority may only choose from

25   those seven?

1   A.   Well, I think that there's one wrinkle, and that is that

2   if there are people tied with a lowest-ranked person, I think

3   the certification will include the people who are tied for that

4   position.

5   Q.   Okay, then maybe instead of using "people," I should say

6   the administrator will choose the top three "scores" for each

7   vacancy.

8   A.   No, that's not correct.  That's not correct because it

9   could be that you have 20 people tied for 100, so I think in

10  that case, only the people who scored 100 would be certified.

11  Q.   Okay, I'll accept your correction.  You're more familiar

12  with this than I am, clearly.  So if the appointing authority

13  said, "I would like a band of all the persons who are eligible

14  or who are roughly equivalent to those who scored 100," what

15  would the administrator do?

16  A.   Probably say that's not the way the system was designed.

17  Now, there might be a way for the agency to do that, but I

18  don't think it would be at the request of the appointing

19  authorities.

20  Q.   And would it be consistent with Section 27 of Chapter 31?

21  A.   It might well be.

22  Q.   And explain to me how that can be.

23        MR. LICHTEN:  Objection.  It calls for a legal

24  conclusion.

25        THE COURT:  Overruled.

1    A.    Well, all of the grading is done using a procedure
2    designed by the test developers.  So if you have an oral
3    interview and you use a scale that goes from zero to 7, you are
4    basically creating bands.  You're not getting 100 points out of
5    that zero to 7.  So I'm not a lawyer, I don't know if this
6    would actually be legal, but I could see HRD perhaps saying,
7    before they issue the eligible list, that these people are
8    tied; and we'll call the first group tied in position one and
9    the second group tied in position two.  So it might work.  I
10   don't know.
11   Q.    Do you know if that's ever been done in Massachusetts?
12   A.    Not that I know of.
13   Q.    And going on in Chapter 31, Section 27, it states, "The
14   appointing authority, subject to the Civil Service law and
15   rules, may only appoint from among such persons.  If such
16   eligible list contains the names of fewer than three such
17   persons, the appointing authority may appoint from among those
18   persons or request a provisional appointment."  And then in the
19   second paragraph it states that "If making an original or
20   promotional appointment from a certification list, if the
21   appointing authority chooses a qualified person other than the
22   qualified person whose name appears highest, the appointing
23   authority shall immediately file with the administrator a
24   written statement of his reasons for appointing the person
25   whose name was not highest."

1       And I'll ask you, Dr. Wiesen, doesn't effectively this

2   section require the appointing authority to appoint in rank

3   order?

4   A.   Well, the appointing authority either appoints in rank

5   order or has to defend his or her decision not to go in rank

6   order.

7   Q.   And in defending the reason that they're not going in rank

8   order, the appointing authority has to explain what the

9   qualifications are of the person or the deficiencies, I should

10  say, of the person that's not selected, correct?

11  A.   I'm not familiar with the actual policy that HRD has in

12  terms of those justifications, but it would have to talk about

13  the qualifications.

14  Q.   Okay.  It would not be appropriate for the appointing

15  authority to say that they're choosing a minority instead of a

16  Caucasian or a white person, correct?

17  A.   Correct.

18  Q.   Now, when you were working for the DPA, do I understand

19  you to say that you were not responsible for overseeing the

20  validation of promotional examinations other than those that

21  were delegated to the appointing authorities?

22  A.   No.  For a period of time the examiners who developed the

23  promotional exams, the people who would be doing basically what

24  Mr. Paris did for some of these exams, reported to me.

25  Q.   Did Mr. Paris report to you?

1    A.    He did, but he was not at that time doing exams.

2    Q.    Okay, what was he doing when he reported to you?

3    A.    He helped with the psychological screening program.  He

4    helped with the development of the performance evaluation

5    systems.

6    Q.    Okay.  Did you have any responsibility for the validation

7    of the 1991 exam?

8    A.    Well, I've asked myself that question as well.  When I

9    read that report, I was very curious about it because I did not

10   have any recollection of working on it.  I did see my name,

11   however, here and there in that report; and on reflection, I

12   believe I provided some textbooks on job analysis, and I think

13   I also advised on the sampling of SMEs from different size

14   jurisdictions across the state.  But I was not on a planning

15   board; I didn't review and edit the document.  As I recall, my

16   involvement was fairly minor.

17   Q.    Do you have any recollection, Dr. Wiesen, of what prompted

18   the undertaking for the 1991 job analysis?

19   A.    Well, the state had just finished a statewide job analysis

20   effort to try to reclassify state positions.  There were some

21   2,500 different job titles in the state, and those were

22   consolidated into some, I don't know, perhaps 700 job titles,

23   making the classification system much more manageable and

24   making the examination program potentially more manageable.

25   So, one, the agency had the experience of doing job analyses;

1    and I really don't know the impetus for the '91 study, but I

2    imagine somebody thought that the examinations, the promotional

3    examinations would be better if they were grounded in a job

4    analysis research.

5    Q.    But that person wasn't you?

6    A.    No.

7    Q.    Okay.  Do you recall working with Boston Police for the

8    administration of delegated exams prior to the 1991 analysis,

9    in the 1980s?

10    A.    A number of times.

11    Q.    Okay.  Do you recall an exam that was delegated to Boston

12    to create, sometime in the mid-1980s, that involved -- well, it

13    involved an assessment center, it involved an exam where the

14    questions were mistakenly mailed to the union instead of to the

15    police department?

16    A.    I think what actually happened was, the questions were

17    mailed to the Boston Police Department and were opened,

18    disappeared for a few hours, and then reappeared.  And so those

19    questions were supposed to have been sent to HRD or DPA,

20    whatever it was called at the time, and so that was a breach of

21    security.  That particular set of questions couldn't be used.

22    Q.    Okay.  And as a result, as you said, of that breach, the

23    exam itself was scrapped, and a new process was begun, correct?

24    A.    No.  What happened was that those questions were

25    distributed to all test takers, and a new set of written

1     questions was developed by the consultant.

2     Q.    Do you recall who the consultant was who did this exam?

3     A.    It might have been the consultant in Florida.  I think the

4     contact there was Mike Struth, S-t-r-u-t-h, but I'm not sure.

5     Q.    Okay.  Do you recall whether or not that exam when it was

6     finally administered had adverse impact on minority test

7     takers?

8     A.    I do not.

9     Q.    Okay.  Do you recall that in the late 1980s, Boston again

10    sought a delegation agreement and this time hired Morris &

11    McDaniel to correct an exam?

12    A.    Yes.

13    Q.    And when that exam was delegated, you, as in the first

14    exam, you were working with Boston as the HRD or then the DPA

15    person responsible for overseeing the delegation agreement,

16    correct?

17    A.    Yes.

18    Q.    And you worked with Morris & McDaniel in putting together

19    what I'll call the 1987 exam?

20    A.    Yes.

21    Q.    And do you recall that in the administration of the 1987

22    exam -- or pardon me -- after the exam itself was administered,

23    that there were some questions about whether portions of the

24    exam had been compromised?

25    A.    Yes.

1  Q.   And do you recall that the exam as it was put together and

2  as it was intended to be used was a written exam with an

3  assessment center component?

4  A.   My memory of this exam is not all that clear, but that's

5  my recollection.

6  Q.   Okay.  And the question of security surrounded the

7  assessment center portion of that exam, correct?

8  A.   Correct.

9  Q.   Now, when the exam came to be challenged -- well, first,

10 do you have a recollection of whether there was a union

11 challenge to the administration of that exam?

12 A.   No, I don't recall.

13 Q.   Okay.  Do you recall being asked to give an affidavit in

14 support of using an assessment center in response to a

15 challenge by incumbent officers who felt that the assessment

16 center would not be a fair test of abilities?

17 A.   I don't recall.  It's the type of thing that the agency

18 might have asked me to do.

19      MS. HARRIS:  Can I have just a moment.

20      (Pause.)

21      MS. HARRIS:  It's not readily at hand.  I'm going to

22 come back to that.

23 Q.   In any event, do you recall being asked in 1987 whether or

24 not, in your professional opinion, the exam as constructed with

25 a multiple choice and an assessment center was an appropriate

1    testing vehicle?

2    A.    Who would ask me that?

3    Q.    Civil Service perhaps at a hearing?

4    A.    I testified before the Civil Service Commission with

5    unfortunate frequency on many different cases, and a few of

6    them concerning assessment centers.  I don't have clear

7    recollection of which hearings on which exams covered which

8    topics.  I'm sure if I testified concerning that exam, that

9    that's a likely topic for a line of questioning, but I really

10   don't recall.

11        MS. HARRIS:  If I could just have a moment, your

12   Honor.

13        (Pause.)

14   Q.    Dr. Wiesen, do you recall again in -- I'll give you the

15   name of the case.  It's the Paul Carr versus the Civil Service

16   Commission or versus the HRD.  Do you recall that the decision

17   was made by your recommendation to throw out the assessment

18   center exercises because of the belief that there had been a

19   taint?  Do you recall that in general?

20   A.    I'm not sure if I would have been the person that would

21   have made that decision.  An issue that large I'm sure went to

22   higher levels in the agency.  But I'm sure that if there was a

23   real concern about security, I would not have favored using the

24   part that was compromised.

25   Q.    Okay, let me, if I may, I'm going to show you a portion of

1    your testimony, and this was on July 1 of 1988.  This is

2    In Re:  Superior Court Case No. 90-0515, but I'll represent

3    that the testimony was given at Civil Service.

4            MR. LICHTEN:  Obviously this can be used, but I would

5    think the courtesy would be to give us a copy of it.

6            MS. HARRIS:  This is prior testimony of Dr. Wiesen

7    where he was examined by Mr. Lichten, so I assumed that he had

8    it.

9            THE COURT:  No, but just for convenience so he knows

10   what you're going to ask about, do you want to take a peek at

11   it?

12           MR. LICHTEN:  I would like a copy of it if possible.

13           THE COURT:  Is there a copy?

14           MS. HARRIS:  I don't have a copy, but I would be happy

15   to move off this and come back, if that would be convenient for

16   the Court.

17           THE COURT:  I do think it's customary for people to

18   have the ability to follow along as the questions are being

19   asked, so --

20           MS. HARRIS:  And I assumed because it's his witness

21   and he was the attorney here --

22           THE COURT:  Well, he may not know what materials you

23   have assembled for cross-examination, so --

24           MR. LICHTEN:  It's only twenty-two years ago, your

25   Honor.

1          MS. HARRIS:  Okay.

2     Q.   So, Dr. Wiesen, in 1988, do you recall testifying to the

3     Civil Service Commission that, in your opinion, the written

4     test could go forward as an appropriate test of the knowledge,

5     skills, and abilities without the assessment center component?

6          MR. LICHTEN:  And I object.  Again, it's not clear

7     what exam she's talking about because my recollection is, this

8     case involved a lieutenant's exam, not a sergeant's exam.  The

9     people I represented were sergeants.

10         THE COURT:  Overruled.  You may have it.

11    A.   Unfortunately, my memory of that Civil Service Commission

12    proceeding is virtually zero.

13    Q.   Do you recall whether or not the *Carr* decision was used as

14    one of the things that the 1991 test assessors considered in

15    their development of the exam in 1991?

16    A.   I believe the introduction to the 1991 report mentions the

17    *Carr* decision.

18    Q.   And I'm going to -- excuse me one moment.  And,

19    Dr. Wiesen, would it have been part of the consideration in

20    putting together the first Morris & McDaniel exam, I'll call

21    it, would it have been part of the motivation on the part of

22    the DPA in putting together this delegated exam to try to

23    mitigate an adverse impact in the testing process?

24    A.   Well, it was a long time ago.  My recollection of the

25    reason for this is, again, nonexistent.  It was a request by

1   the city.  The impetus did not begin with HRD, so the city

2   approached HRD and said, "Could we have a delegated exam?"  And

3   there may be something in the report that talks about the

4   reason, but I don't recall it.

5   Q.    Okay.  Do you recall that when you were directing

6   validation for the entry level for police and fire, that the

7   Commonwealth was under a consent decree?

8   A.    Two consent decrees.

9   Q.    Two consent decrees.  And those consent decrees had to do

10  with the --

11  A.    Two court orders.

12  Q.    -- with the representation of minorities and the adequacy

13  of the testing instruments that were used to assess them for

14  entry-level positions in police and fire?

15  A.    Yes.

16  Q.    And do you recall as well that there were consent decrees

17  governing the selection of police supervisory personnel, at

18  least for the Boston Police Department, in that same general

19  time frame?

20  A.    I recall one.

21  Q.    Having to do with the sergeants?

22  A.    Concerning the Boston sergeants.

23  Q.    And do you recall looking at the results of the exams, the

24  delegated exams that were administered under your direction for

25  Boston, to see whether or not the use of the additional

1    components had an ability to mitigate or reduce adverse impact?

2    A.    Well, there was an industrial psychologist who I think

3    represented or was hired by MAMLEO who looked at that aspect,

4    but I have no recollection now of his findings or analyses.

5    Q.    Do you recall whether or not the Civil Service Commission

6    in the *Carr* matter made a finding as to whether or not

7    minorities fared better on the written or the assessment center

8    portion of that exam?

9    A.    I have no recollection of that.

10   Q.    I'm going to show you the front page of the decision -- I

11   think I am anyway -- *Carr,* and this is Page 3577 from the

12   validation appendices which indicates this is the *Paul Carr, et*

13   *al v. The Department of Personnel Administration, et al*, and

14   this is part of what the 1991 appendices contain.  And I'm

15   going to direct you to Paragraph 44 of the fact-finding in this

16   case, which is a difficult copy, but I'll read it:  "Minority

17   candidates for promotion to BPD lieutenant scored better as a

18   group on the examination without the performance components

19   than they did with the performance components included."

20        Do you see where I'm reading?

21   A.    I do.

22   Q.    And does that refresh your recollection as to whether or

23   not the 1987 delegated examination use of assessment centers

24   was successful in reducing adverse impact, at least in the use

25   of those alternative exercises?

1  A.    It seems like from what you just read it was not

2  successful for lieutenant.

3  Q.    In your mind, is there a difference between a lieutenant's

4  exam and a sergeant's exam?

5  A.    There were certainly differences between the lieutenant

6  and sergeant's exams, yes.

7  Q.    And in assessing the differences, are you focusing on the

8  rank as being a reason for differences in the two exams?

9  A.    Yes.

10 Q.    And tell me in general what the differences would be

11 between a lieutenant's rank and a sergeant's rank, if you

12 would.

13 A.    Well, this is not something I consider myself an expert

14 in, but the sergeant does much more day-to-day supervision of

15 police officers out on patrol, and lieutenants do more planning

16 and organizing.

17 Q.    When you were describing earlier some of the assessment

18 center exercises that you've seen, you described one that I

19 believe you said would be an "in" box with different tasks that

20 need to be addressed.  Did I capture that correctly?

21 A.    Correct.

22 Q.    And is that the sort of assessment center exercise that

23 you would expect to see in a lieutenant's exam?

24 A.    I think you could see that at perhaps any level, but the

25 content of the "in" box might be different.  The problems that

1    are presented and have to be dealt with might be different.

2    Q.    Do you recall what the assessment center exercises were in

3    the 1987 delegated exam?

4    A.    One of the Morris & McDaniel exams involved a video

5    presentation that the candidates had to respond to, and they

6    were in turn videotaped and again scored off site.  And there

7    was at least another exercise, but that's the only one that I

8    recall, and my recollection of it is fairly minimal.

9    Q.    Okay, fair enough.  It is a long time ago.  Dr. Wiesen,

10   you're aware that in Massachusetts the administration of

11   promotional practices -- well, it's a competitive process,

12   correct?

13   A.    Correct.

14   Q.    And the statute requires that the personnel administrator

15   "provide a test that fairly tests the knowledge, skills, and

16   abilities that can practically and reliably be measured"?

17   A.    Yes.

18   Q.    And in looking at skills and abilities that can

19   practically and reliably be measured, you're looking both at

20   measures that -- when we're talking about practicality,

21   measures that can be assessed without going to the ends of the

22   earth.  Is that fair to say?  That's probably an awkward

23   question.  I'll rephrase it.

24            MR. LICHTEN:  Objection.

25   Q.    You described earlier being able to put together

1    assessments that, for example, included things like structured

2    oral interviews?

3    A.    Yes.

4    Q.    And you said that if you used a structured oral interview

5    instead of a written exam, you could look to reduce adverse

6    impact?

7    A.    Correct.

8    Q.    And if you're assessing in this case statewide 1,200, or

9    even just for the Boston Police, 600 candidates for the

10   position of sergeant, would it be practical to do structured

11   oral interviews for 600 candidates for the position of

12   sergeant?

13   A.    Many other municipalities do it.  I haven't done a -- I

14   haven't created a budget for the City of Boston.  Boston did

15   request and did implement a number of delegated exams that went

16   beyond just multiple choice, so at least in those years it was

17   feasible for Boston.

18   Q.    In the years that you're discussing, do you recall Boston

19   using a structured oral interview without use of a

20   multiple-choice exam for 600 or more candidates?

21   A.    No.

22   Q.    Okay.  And when you say that many other jurisdictions do

23   it, are you saying that there are many other jurisdictions that

24   process that number of candidates using only a structured

25   interview with no multiple-choice component?

1  A.   "Many" would perhaps be overstating it.  There are not

2  that many jurisdictions that are large enough to have a

3  sergeant's exam with 500 candidates, but there are reasonable

4  size jurisdictions across the country that do not use a

5  multiple-choice test.

6  Q.   For the position of sergeant?

7  A.   For sergeant.

8  Q.   And do you know any that are the size of Boston with 600

9  candidates that have used only a structured interview without a

10 multiple-choice exam for the position of sergeant?

11 A.   Off the top of my head, I really don't know.  I would have

12 to check my files.

13 Q.   Have you ever administered one?

14 A.   Yes, but not for sergeant.

15 Q.   For 600 candidates?

16 A.   Five hundred.

17 Q.   And where was that?

18 A.   In Oklahoma City.

19 Q.   For what position?

20 A.   Firefighter.

21 Q.   Have you ever administered an exam for police sergeant --

22 A.   Yes.

23 Q.   Let me finish -- with 600 candidates where you've done

24 only a structured oral interview and no multiple-choice exam?

25 A.   No.

1    Q.    Do you know of any administration of such an exam for the

2    position of police sergeant?

3    A.    That used the structured interview and not a multiple

4    choice --

5    Q.    Correct.

6    A.    -- and had 600 candidates?

7    Q.    Yes.

8    A.    As I said, none come to mind.

9    Q.    Okay.  When you were referring to your report, there were

10   a number of jurisdictions that you alluded to.  I think Miami

11   was one, San Francisco was another.  And is it your testimony

12   that in those jurisdictions, there's no use of a multiple-

13   choice examination for the position of sergeant?

14   A.    I think I gave those as examples of jurisdictions that go

15   beyond the multiple-choice test, so at the very least, they

16   have other components.  I don't know off the top of my head if

17   any of them do not use a multiple-choice test at all.

18   Q.    Okay.  Do you know if any of them have had adverse impact

19   in the results of their examinations?

20   A.    Uhm. . .I don't have any extensive understanding of that.

21   I think that Dr. Silver said that in Miami, which he's

22   responsible for, they still have some adverse impact.  So I

23   wouldn't be surprised if there was some level of adverse impact

24   with those exams, but I really don't know.

25   Q.    Okay, but you listed these as practical alternatives that

1    the police department or at least the Commonwealth should have

2    considered, correct?

3    A.    Not -- I wasn't suggesting that the Commonwealth just go

4    to Miami and say, "Could we please use your exam?"  I was just

5    giving those municipalities, jurisdictions as examples of

6    places that have used more than just a multiple-choice test.

7    Q.    Like Boston has used more than just a multiple-choice

8    test?

9    A.    Yes.

10   Q.    And I believe that when we talked to you at deposition,

11   you were asked whether they had used multiple-choice exams in

12   addition to other components and whether they experienced

13   adverse impact or not, and your answer was, "I presume that

14   they did."  And is that consistent with what you've just said?

15   A.    Yes.  But what I just said was that basically that I

16   presume they did, and that the adverse impact is probably less

17   than you would have seen with just the multiple-choice test.

18   Q.    And do you know that to be true, or is that a guess?

19   A.    I have at professional conferences heard reports delivered

20   to the conference on the examinations done by sometimes the

21   internal staff of a jurisdiction, sometimes by consultants,

22   where they show the reduction in adverse impact.

23   Q.    Okay.  But in your report, on Page 55 of the first report,

24   you list specific jurisdictions:  -- Philadelphia, Dallas,

25   Denver, Miami, Jefferson County, Alabama, and the state of

1    Tennessee -- and you're listing these jurisdictions and stating

2    that "There are practical alternatives, and it's clear from

3    their widespread use across the nation."  And I guess the

4    question is, these practical alternatives, are these

5    alternatives that you can sit here and tell the Court have

6    reduced adverse impact through the use of a multiple-choice

7    exam with alternative components?

8    A.    Yes.

9    Q.    And what are you basing that on?

10   A.    As I say, at various conferences, different internal

11   government employees and sometimes consultants describe the

12   various approaches they used in developing an exam to try to

13   promote validity and simultaneously reduce adverse impact, and

14   sometimes the results seem very impressive.

15   Q.    Okay.  I believe you testified earlier, and maybe this was

16   yesterday, about the various types of validation that can

17   occur, and I believe that you said you have content validation,

18   criterion validation.  Was there a third validation effort that

19   you had described?

20   A.    And there was a third.  Can I supplement my last answer?

21   Q.    I'm sorry?

22   A.    Can I supplement my last answer?

23   Q.    Sure, go ahead.

24   A.    Okay.  One of the presentations that I heard was by

25   Dr. Outtz at a conference in the SIOP, I think it was 2005,

1    where he was describing some of the things he has done to try

2    to reduce adverse impact, and he reported some degree of

3    success.

4    Q.    And was that with Philadelphia, Dallas, Denver, Miami,

5    Jefferson County, or the state of Tennessee?

6    A.    I don't think so, but I don't know.

7    Q.    When we were talking about validation, there's content

8    validation, criterion, and did you describe a third?

9    A.    The third type of validation, the third type of approach

10   to validation that's mentioned in the Uniform Guidelines is

11   construct validation.

12   Q.    Excuse me, construct validation.  And I believe that you

13   said yesterday that criterion validation is the gold standard

14   in your field, correct?

15   A.    Yes.

16   Q.    Criterion validation involves following an exam, checking

17   the career of the person that was promoted to see if their

18   performance matched their placement on the exam; is that right?

19   A.    That is one of two ways of implementing criterion

20   validity.

21   Q.    And what's the other way?

22   A.    Using your current incumbents.  So you would give the exam

23   to your current incumbents and see if there is a relationship

24   between test performance and job performance.  There are pros

25   and cons to using either the predictive validity where you hire

```
 1   people and you wait some number of months or years, or using
 2   what's called concurrent validity where you use incumbent
 3   employees, but those are the two approaches.
 4   Q.   And are you aware of criterion validity ever being used in
 5   measuring performance in the police field?
 6   A.   No, not at the supervisory level.
 7   Q.   Are you aware of it ever being used at the entry level?
 8   A.   Yes.
 9   Q.   That is to say, following identification of recruits and
10   then seeing if they succeed in their careers?
11   A.   Correct.
12   Q.   Okay.  But at the supervisory level, you have not seen
13   that?
14   A.   No.
15   Q.   So the fact that it's the gold standard doesn't mean it's
16   the gold standard for the type of exam that we're talking about
17   here?
18   A.   Well, I think it still is the gold standard.  I think
19   there are very few jurisdictions that are large enough to do
20   it.  Perhaps Boston is large enough.  I'm not sure.  I think
21   it's large enough to do with a concurrent study.  It might not
22   be large enough to do with a predictive study.
23   Q.   And when you were the head of validation, did you ever
24   attempt to do a criterion study on police supervisory
25   promotions?
```

1    A.    No, I did not.

2    Q.    Now, I believe you testified yesterday that you had

3    reviewed the 2005 exam, but you had not reviewed the 2008 exam?

4    A.    Correct.

5    Q.    And when you testified today, you've testified that you

6    have in fact reviewed the 2008 exam?

7    A.    Correct.  I think that the -- I got all of those exams and

8    didn't have a huge amount of time to review them, but had they

9    been incomplete or missing, I probably would have noticed.  So

10   my best recollection is that I looked at them all.

11   Q.    And when you say that you've looked at them all, you've

12   looked at all of the exams for all of the defendants; so, in

13   other words, the statewide exams for every year that's at issue

14   here as well as the two Boston Police exams?

15   A.    Correct.

16   Q.    And having looked at those exams, is it your testimony

17   that you don't believe -- and here I'll restrict myself just to

18   Boston -- that you don't believe that those examinations test

19   the primary duties of the police sergeant position?

20   A.    They definitely omit many of the primary duties.

21   Q.    Okay.  Is there any requirement in the field that you have

22   to test for every important duty of a position in order to have

23   a valid exam?

24   A.    Well, the Uniform Guidelines definitely support that idea.

25   Q.    Do they require it?

1    A.    I think that there are portions of the Guidelines that

2    definitely say that.  There are some portions of the Guidelines

3    that seem to say that you need not test for every aspect of the

4    job.

5    Q.    So when we were looking at the testability analysis --

6    well, first, when we were looking at the testability

7    analysis -- and do you have that in front of you?

8    A.    I do, Attachment EE.

9    Q.    It's, yes, Attachment EE.  Well, first, let me ask you,

10   the testability analysis contains a list of the agreed

11   knowledge, skills, and abilities and personal characteristics

12   that were identified in the 1991 job analysis, correct?

13   A.    Correct.

14   Q.    And when we look at the columns, "Written Test, Education

15   and Experience," and "Not Tested" column, those check marks are

16   relating to the exam that was developed after the 1991

17   analysis, correct?

18   A.    Correct.

19   Q.    In other words, these checks are specific to the

20   examination that was developed as a result of this analysis?

21   A.    Well, as part of this 1991 study, a test outline was

22   produced, and that test outline is extremely similar to the

23   test outline that was used in 2005, 2006, 2007, and 2008.

24   There are small differences.

25   Q.    Okay.  Well, you wouldn't expect an analysis of this type

1    to be done every year, correct?

2    A.    Correct.

3    Q.    And HRD is responsible for making available, at any rate,

4    promotional examinations for jurisdictions who seek to

5    participate on an annual basis?

6    A.    That's what HRD does, yes.

7    Q.    So when one performs an analysis like the one that we have

8    from 1991, it's expected to be applicable to a number of exams,

9    not just the first exam that's developed from it; is that fair

10   to say?

11   A.    Yes.

12   Q.    And when we're looking at the testability analysis chart

13   and looking at "Written Test, Education and Experience," and

14   "Not Tested," is it a fair read to say that these check marks

15   reflect what the first exam developed from this analysis was

16   intended to cover?

17   A.    At least, yes.

18   Q.    Okay.  So when we look at the KSAs that were talked about

19   here or that you talked about in your earlier testimony -- for

20   example, I think you started with No. 84, "Skill in identifying

21   problems, securing relevant information, et cetera," and you

22   indicated that you didn't believe that that had been tested,

23   you were referring to the materials that you actually reviewed,

24   correct; in other words, the testing instruments that are at

25   issue in this case?

1    A.    Correct.

2    Q.    Okay.  So the fact that it's checked off as having been

3    tested in the written test in the 1991 analysis, you're not

4    quarreling with the check mark in this box for that exam?

5    You're saying you didn't see it in the exams that are at issue

6    here?

7    A.    Correct.

8    Q.    And when you went on to say items like No. 94 --

9    A.    Although if you were to ask me, the 1991 report described

10   how they wrote the test questions; and from the description of

11   how they wrote the test questions, I don't believe they tested

12   that.

13   Q.    Well, happily we're not defending the 1991 test here,

14   so --

15   A.    Okay.

16   Q.    When we look at the testability analysis, and I believe

17   you had also questioned No. 94, "Ability to follow policies and

18   procedures," and you said that that wasn't tested, you're

19   referring to the check marks here, not to the exam that you

20   actually reviewed, correct?

21   A.    When I went through this, I was just referring to the

22   testability analysis, yes.

23   Q.    Okay.  And I think the questions were, was this tested in

24   the written test?  And you said it wasn't, but were you

25   referring to where the check marks are here, or were you

1    referring to the exams that you actually reviewed?

2    A.    I was referring to the Attachment EE itself.

3    Q.    All right, so let me see if I understand.  When you

4    testified that from looking at Attachment EE that there were

5    abilities that were not tested by the written instrument, you

6    were referring to the document that said Item 94, "Ability to

7    follow policies and procedures," this wasn't tested in the

8    written instrument according to this document?

9    A.    Correct.

10   Q.    So you're not saying that the exams at issue here did not

11   test ability to follow policies and procedures?

12   A.    Well, I think that I am because this testability analysis

13   was turned into a test outline, and the test outline was used

14   to develop the test.  So if the ability to follow policies and

15   procedures was not included in the test outline, then unless it

16   happened somewhat accidentally, it was not an examination

17   subject, and nobody would have written questions to try to test

18   the ability to follow policies and procedures.

19   Q.    So when you're looking at the testability outline, did you

20   actually take this document and refer it to the exams that you

21   looked at on an item-by-item basis?

22   A.    No, not exhaustively.

23   Q.    If there was a question that said, hypothetically,

24   "According to BPD special order -- blank -- which of the

25   following statements is true concerning what sexual harassment

1    is and how can it occur or how can it be prevented?" with a

2    series of items afterward, would you consider that to be a test

3    of whether one could follow policies or procedures?

4        MR. LICHTEN:  Your Honor, that's a perfectly valid

5    question.  I just want to remind the Court of the -- HRD put us

6    under some confidentiality obligation.  If that's an actual

7    question, I guess the Court said it was going to deal with the

8    problem, and this would have to be dealt with.  We don't object

9    to the questions being asked, but we've signed a

10   confidentiality order, and that's how we got the exams, and

11   part of that order says that we're not allowed to use the exam

12   questions without providing notice to HRD.  And I think all the

13   parties signed such a thing.

14       MS. HARRIS:  I've provided notice to HRD that I intend

15   to use them, but since we haven't worked this out in advance,

16   I've twisted the question so it's not exactly like he did in

17   the report, just to try to circumvent that; but I would

18   appreciate the Court's guidance because I think it is necessary

19   for us to actually enter these and use them in the examination

20   of witnesses.

21       THE COURT:  Well, you say you've given notice.  Can

22   you amplify that?

23       MS. HARRIS:  I got no reply, but I told them.

24       THE COURT:  How did you do it?

25       MS. HARRIS:  I sent an e-mail to the general counsel

1   saying that we intended to use these at trial, and that if he

2   had any issue, that we were starting on Monday of this week,

3   and I had no --

4          THE COURT:  When did you send the e-mail?

5          MS. HARRIS:  Last week.  I can follow up with him

6   today, but if silence is the response, I -- I'd be happy if we

7   can circulate these and not have them be broadcast to the

8   courtroom or whatever this Court thinks is appropriate.

9          THE COURT:  Well, how much is there?  How much of the

10  oral examination of witnesses will involve quoting from, I

11  guess, the sealed exhibits?

12         MS. HARRIS:  From my perspective, I would say, I don't

13  know, maybe fifteen to twenty minutes.

14         THE COURT:  Mr. Leahey?

15         MR. LEAHEY:  Your Honor, Lowell, I would also have

16  probably less than twenty minutes but at least ten minutes on

17  questions pertaining to the examination itself.

18         THE COURT:  Well, I don't know.  I'll accept

19  suggestions.  There are a variety of ways we could do it, I

20  guess.

21         MR. CARROLL:  Your Honor, I'm not sure whether we're

22  going to cross-examine on the questions, but I think there's no

23  question that we have a right to do so.  One way to do that

24  while preserving confidentiality would be to close the

25  courtroom, if the Court is so inclined.  The other way would

1    just be to view it that the Commonwealth has had notice, and if

2    they want to be heard, this is the opportunity for them to be

3    here and hear it.  If not, we'll put it into evidence.

4         THE COURT:  Yes, that's possible too.  Another way is

5    to give the witness a written question and say, "I direct you

6    to Question No. 1," and ask him.  But the witness's answer

7    might have to be explicit, so it might be one of the two that

8    Mr. Carroll identifies.

9         MR. LICHTEN:  Like the defendants, we also gave notice

10   on Thursday night to HRD that we intended to use the questions

11   at trial.  We sent an e-mail to general counsel and have not

12   heard back.  Is that accurate?  So we do believe that we've

13   satisfied our obligation like the defendants do.

14        THE COURT:  Refresh my recollection about the

15   confidentiality agreement.  Do we have that in the record?  Is

16   that in the docket, or is that just --

17        MR. CHURCHILL:  It's not in the record, your Honor.

18        THE COURT:  Do I have a copy?

19        MS. HARRIS:  We have a copy.

20        THE COURT:  Do you know if I have a copy?  I'd like to

21   review it, and maybe we can address this first thing in the

22   morning.

23        MS. HARRIS:  If you'd like, your Honor, I can just

24   move on to --

25        THE COURT:  We've got about ten minutes left.  So you

1    can go to something else, and then we can address this in the

2    morning.

3              MS. HARRIS:  Okay, that's fine.

4    Q.   We'll put that aside for the moment, Dr. Wiesen.

5    Dr. Wiesen, is it your opinion as a professional in the field

6    that written multiple-choice examinations standing on their own

7    as the examinations here, a written exam with the training and

8    education component to it, can never be a valid assessment of

9    the skills of a sergeant?

10   A.   Well, I spent a fair amount of time recently thinking

11   about that question because I thought somebody would ask me.

12   Q.   Very predictive of you.

13   A.   And I have been involved in promotional examinations for

14   sergeant for some over twenty-five years and have done the

15   exams both ways.  The field has, I think, changed its

16   understanding of what is professionally acceptable.  So there

17   are two ways to try to -- for me in my own mind to try to

18   answer that.  One is for me to just think about the topic and

19   see what I think, and another is to see what colleagues might

20   think of this.  What Dr. Outtz said in his deposition is that

21   he thought that with an education/experience component, a test

22   that was comprised of that and a multiple-choice job knowledge

23   test could be minimally valid, and I have a fair amount of

24   respect for Dr. Outtz.

25   Q.   Okay, but my question was, what do you believe?

1    A.    So as I think I said earlier, validity isn't all or none.

2    There's a range of validity.  There would be some level of

3    validity.  Whether it's enough validity to rely on to show that

4    the candidates are qualified to do the primary and dominant

5    duties of the position is another matter.  So I think that

6    there would be some level of validity between a well-developed

7    multiple-choice exam with respect to job performance, but

8    whether that would be a sufficient amount of validity to

9    satisfy Chapter 31 or just to satisfy the basic idea of what a

10   test is, I think not.

11   Q.    Okay, I'm going to show counsel -- I only have one copy

12   with me, so -- Dr. Wiesen, do you remember being involved in

13   litigation that followed the administration of the Morris &

14   McDaniel 2002 exam?

15   A.    There was some litigation that involved the performance

16   review system, I believe.

17   Q.    Okay.  And just to set the stage, there was a challenge

18   brought by members of the Boston Superior Officers Federation

19   about the allocation of weights in that examination, and you

20   provided testimony as to the correct apportionment of weights.

21   Do you remember that generally?

22   A.    Yes.

23   Q.    And I deposed you about that?

24   A.    Yes.

25   Q.    Okay.  And Mr. Lichten was representing you at the time,

1    correct?

2    A.    Representing me?

3    Q.    Or you were -- you guys were together in my office, just

4    to put it in context.  Okay, I'm going to direct you to your

5    testimony at that time.  The question that I posed to you at

6    the bottom of Page 24 of this deposition, which was February 17

7    of 2006, "Am I understanding you to say that you haven't been

8    given enough information --" sorry.  Oh, I'm sorry, Page 25:

9    "Do you have an opinion as to whether a straight written exam

10   without an assessment center or any more subjective component

11   would be an appropriate way for testing for police supervisory

12   personnel?"  And can you read your answer starting at Line 5.

13   A.    "Well, the multiple-choice test, again, can cover a wide

14   range of topics and can be done well or less well, and the

15   literature shows that the job knowledge tests are, if not the

16   most valid test, very close to the most valid predictors of

17   future job performance."

18        So I think that the answer to your question is, yes, I

19   think that multiple-choice examinations can be used by

20   themselves to develop a roster of people for promotion.

21   Q.    And then I said, "I just want to make sure I understood.

22   Is it your opinion, your opinion is that the multiple-choice

23   test by itself is the best indicator of future performance?  I

24   just want to make sure -- I'm not sure if I misunderstood you."

25   A.    And I said, "It's either the best or one of the best

1    predictors of future job performance."

2    Q.   So in giving your opinion in these cases having to do with

3    these exams, is it your position, Dr. Wiesen, that a straight

4    written examination can never be the basis for a valid

5    selection procedure, or is it your position that the way these

6    exams were developed makes them invalid?

7    A.   Well, what I said was that a multiple-choice examination

8    would have some level of validity, but by itself, it would not

9    suffice to say that the candidates are competent to perform the

10   primary and dominant duties of the job.  It's not a broad

11   enough instrument.  Uhm. . .what was the first of the question?

12   Q.   I'm not sure I understood you.  Are you saying that your

13   testimony was that the multiple choice can't be used as a

14   roster, to create a roster of candidates?

15   A.   My testimony about multiple-choice questions in general

16   for promotion to sergeant?

17   Q.   Yes.

18   A.   Okay, and what I'm saying is that the multiple choice, in

19   the ideal, with a well-developed multiple-choice test, you

20   would be measuring some very important knowledges and abilities

21   required of a sergeant.  You'd also be leaving out some very

22   important knowledges, skills, and abilities for the position of

23   sergeant.  There would be some validity, if you used that

24   multiple-choice exam, that people who scored high on it would

25   probably on average do better on the job than people who scored

1    low on it; but if your goal is to produce a roster of people

2    that you think are qualified to perform the primary and

3    dominant duties of the job and you haven't tested a large chunk

4    of those duties, then using a multiple-choice test alone would

5    not suffice.

6    Q.    Then why did you testify in 2006 that using a

7    multiple-choice examination by itself can be used to develop a

8    roster of people for promotion?

9    A.    Well, I think that the test has some level of validity.

10   The people who do better on the test will do better on the job

11   on average.  And I think that my thinking with respect to

12   sergeant promotional exams perhaps has been evolving over the

13   years.  There was a point in time when I thought the

14   multiple-choice examination was ideal and that other types of

15   examining would actually dilute the validity of the test, and

16   over the years research was done and experiences were reported

17   nationwide that indicated that in fact these other instruments

18   did not dilute the validity of the multiple-choice test but

19   improved the validity.  So perhaps between this testimony and

20   now, I've sort of continued that evolution.

21   Q.    Okay.  So in this testimony you stated that the written

22   test was either the best or one of the best predictors of

23   future job performance, right?

24   A.    Yes.

25   Q.    And this testimony was given in 2006?

1    A.    Yes.

2    Q.    So that was your opinion in 2006?

3    A.    Yes.  Well, I still think that the multiple-choice test is

4    a good predictor.

5    Q.    Is it the best predictor?

6    A.    It's one of the best.  The assessment centers are also

7    very good predictors.

8            THE COURT:  A good place to stop?

9            MS. HARRIS:  That's fine.

10           THE COURT:  Okay, it's just about 1:00.  We'll recess.

11   So I don't know if you have it now or we could get a copy of

12   the confidentiality agreement.

13           MS. HARRIS:  Yes, Mr. McDermott has one.

14           THE COURT:  And we'll take a look at it, and we will

15   discuss the issue in the morning.

16           MR. LICHTEN:  Your Honor, I would just ask that --

17   it's fine to cross-examine with these materials, but I ask that

18   we get a full copy of them.  I think that's the appropriate

19   practice.

20           THE COURT:  Talk to your sister about it.

21           MR. LICHTEN:  Thank you.

22           THE COURT:  All right, we'll be in recess.

23           THE CLERK:  All rise.

24           (Adjourned, 12:58 p.m.)

25

1                    C E R T I F I C A T E

2

3            We, Marcia G. Patrisso, RMR, CRR, and Lee A. Marzilli,

4    RPR, CRR, Official Reporters of the United States District

5    Court, do hereby certify that the foregoing transcript

6    constitutes, to the best of our skill and ability, a true and

7    accurate transcription of our stenotype notes taken in the

8    matter of Civil Action No. 07-11693-GAO, Pedro Lopez, et al, v.

9    City of Lawrence, et al.

10

11    /s/ Marcia G. Patrisso
      MARCIA G. PATRISSO, RMR, CRR
12    Official Court Reporter

13    /s/ Lee A. Marzilli
      LEE A. MARZILLI, RPR, CRR
14    Official Court Reporter

15
      Dated: 7/14/10
16

17

18

19

20

21

22

23

24

25