```
              UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS




                                    )
PEDRO LOPEZ, Individually and on    )
behalf of a class of individuals    )
similarly situated,                 )
                                    )
        Plaintiffs,                 )
                                    ) Civil Action
v.                                  ) No. 07-11693-GAO
                                    )
CITY OF LAWRENCE, et al,            )
                                    )
        Defendants.                 )
                                    )
```

**REDACTED TRANSCRIPT**


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


DAY FOUR
NON-JURY TRIAL


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Thursday, July 15, 2010
9:08 a.m.


Marcia G. Patrisso, RMR, CRR
Debra M. Joyce, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2        LICHTEN & LISS-RIORDAN, P.C.
          By: Harold L. Lichten, Esq.
 3            Stephen S. Churchill, Esq.
              Joseph L. Sulman, Esq.
 4        100 Cambridge Street, 20th Floor
          Boston, Massachusetts  02114
 5        On Behalf of the Plaintiffs

 6        CITY OF LOWELL LAW DEPARTMENT
          By: Brian W. Leahey, Esq.
 7            R. Eric Slagle, Esq.
          City Hall
 8        375 Merrimack Street
          Lowell, Massachusetts  01852
 9        On Behalf of the Defendant City of Lowell

10        OFFICE OF THE CITY ATTORNEY
          By: Richard J. D'Agostino, Esq.
11        200 Common Street, Suite 306
          Lawrence, Massachusetts  01840
12        On Behalf of the Defendant City of Lawrence

13        COLLINS, LOUGHRAN & PELOQUIN
          By: Laurie W. Engdahl, Esq.
14        320 Norwood Park South
          Norwood, Massachusetts  02062
15        On Behalf of the Defendant City of Worcester

16        MORGAN, BROWN & JOY, LLP
          By: Mary Jo Harris, Esq.
17            Robert P. Morris, Esq.
          200 State Street, 11th Floor
18        Boston, Massachusetts  02109
          On Behalf of the Defendant City of Boston
19
          MBTA LAW DEPARTMENT
20        By: Kevin S. McDermott, Esq.
          10 Park Plaza, 7th Floor
21        Boston, Massachusetts  02116
          On Behalf of the Defendant MBTA
22

23

24

25
```

1    CITY OF SPRINGFIELD LAW DEPARTMENT
     By: Harry P. Carroll, Esq.
2    36 Court Street
     Springfield, Massachusetts  01103
3    On Behalf of the Defendants City of Springfield
     and Mayor Sarno
4
     CITY OF METHUEN - OFFICE OF THE CITY SOLICITOR
5    By: Peter J. McQuillan, Esq.
     The Searles Building, Suite 311
6    41 Pleasant Street
     Methuen, Massachusetts  01844
7    On Behalf of the Defendant City of Methuen

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

                              Direct   Cross   Redirect   Recross
WITNESSES FOR THE
  PLAINTIFFS:

JOEL WIESEN, resumed

     BY MS. HARRIS (cont'd)          5
     BY MR. CARROLL                 57


                        E X H I B I T S


PLAINTIFFS'
  EXHIBIT     DESCRIPTION              MARKED    RECEIVED

(There were no exhibits marked.)

1                    P R O C E E D I N G S

2              THE CLERK:  All rise.

3              (The Court enters the courtroom at 9:08 a.m.)

4              THE CLERK:  For a continuation of the Lopez trial.

5    Please be seated.

6              THE COURT:  Good morning, everyone.

7              COUNSEL IN UNISON:  Good morning, your Honor.

8                    JOEL WIESEN, resumed

9                 CONTINUED CROSS-EXAMINATION

10   BY MS. HARRIS:

11   Q.   Dr. Wiesen, good morning.

12   A.   Good morning.

13   Q.   When we finished up last evening, or yesterday afternoon,

14   we were talking about the use of the multiple-choice exam as a

15   predictor of future job performance.  And I believe that you

16   stated that you agreed that the written test is one of the most

17   if not the most valid predictor of job performance; is that

18   correct?

19   A.   Correct.

20   Q.   And would you agree with me that the purpose of the Civil

21   Service examination is to identify people who are qualified and

22   competent for the position for which they're testing?

23   A.   That is part of it.  And also to identify the better

24   performers from the minimally qualified.

25   Q.   Better performers.

1      And in doing this, would you agree with me particularly at

2  the sergeant level that it would be impossible to do the

3  sergeant's job competently without expertise in the areas of

4  constitutional law, criminal law, state law, things of that

5  nature?

6  A.   Yes.

7  Q.   And is it true that the multiple-choice examination is the

8  predominant method by which that technical knowledge component

9  is measured?

10  A.   Yes.

11  Q.   So in looking at the types of examinations that are used

12  for promotion, would you agree with me that particularly for

13  the sergeant level, which is the promotion for which we're

14  speaking about in this case, that you would need to have a

15  multiple-choice component to any exam that's administered?

16  A.   Well, my thought on that is a little more complex than yes

17  and no.  The measure of the application of the Court precedence

18  and the constitutional law relates to search and seizure and

19  preservation of evidence and other legal things, can also be

20  measured with situational exercises.  And the measurement there

21  might be more demanding in some respects because you have to

22  pick out the important aspects of the situation.

23      I think that a multiple-choice test of law is efficient; I

24  can ask lots of questions in a short period of time.  It's hard

25  to ask a lot of situational questions because it takes people

1    time to absorb those.  I think that in the 1991 validation

2    study at least some legal areas were targeted as being measured

3    by the E&E, the education and experience.

4        So I think that a multiple-choice test is a very good way

5    of testing some aspects of knowledge of the law, but it might

6    be that other methods are also available that might measure the

7    same knowledge in a more practical setting.

8    Q.    Okay.  But I think that in part of your answer you noted

9    that there's an efficiency involved in being able to test with

10   a multiple-choice exam for these technical-knowledge

11   components, correct?

12   A.    It's correct.  And it's very important, because you can

13   learn more when you ask 20 questions than when you ask four

14   questions.

15   Q.    And when you are designing an assessment center that's

16   designed to measure these technical competencies -- well,

17   really in any assessment center that's devised to gain the

18   candidate's knowledge of these technical areas, the more

19   technical knowledge one has, the better one will do on the

20   assessment center as well, correct?

21   A.    To the extent that the assessment center measures just the

22   technical knowledge, the answer is yes.  To the extent that the

23   assessment center also measures problem sensitivity and problem

24   solving, I think the knowledge will be helpful but it won't be

25   determinative.

1    Q.    Okay.  When you're designing an assessment center -- I

2    believe we had talked about this in your direct testimony.  You

3    had talked about reviewing the 2002 exam assessment center

4    components, and you noted that the assessment center exercises

5    themselves had less adverse impact than the multiple-choice

6    component of that exam; is that correct?

7    A.    Right.

8    Q.    And is it your opinion that when you measure together --

9    or when you blend together, if you will -- the results of a

10   multiple-choice exam with the assessment-center exam, that you

11   can reduce adverse impact in the exam grade overall?

12   A.    It turns out that it's a more complicated topic than you

13   would think.  What you would think is if you had test component

14   A with high adverse impact and test component B with low

15   adverse impact, and you add them together, you get something in

16   between.  It turns out that's not always the case; sometimes

17   you can get something with more adverse impact.  It depends on

18   the correlation -- on the statistical correlation of the two

19   tests.  In general, though, I think you do get something in

20   between.

21   Q.    Okay.  So when one is putting together an assessment

22   center component for an examination, the multiple-choice test

23   and the assessment center component together, there's no

24   guarantee that that will result in an exam that has less

25   adverse impact overall?

1    A.    Yes, that's true.  Adverse impact ratios are very

2    sensitive to things that you might not have control over, so

3    they do vary by -- situation to situation.

4    Q.    And would you agree with me as well that in putting

5    together the assessment centers, because of the complexities

6    that you've described, that their reliability is still

7    considered lower than the reliability of the written test, at

8    least as for predicting future performance?

9    A.    Well, let's see.  The reliability of the written test

10   reported in the 1991 study was .79.  .79 is in the ballpark of

11   the reliabilities that you would get from an assessment center.

12   I think in general, multiple-choice examinations have higher

13   reliability than various situational exercises; however, over

14   the years, people have developed -- that was a major problem

15   when assessment centers were first introduced.  But I think

16   over the years people have developed ways of structuring the

17   weighting process to improve the reliability.

18   Q.    And when we talked about the reliability of assessment

19   centers in 2006 -- excuse me -- in 2006, you said, "I think the

20   field is struggling with coming up with better ways of

21   measuring what are sometimes called the softer areas."

22         And would you agree with that now, that these softer

23   areas -- interpersonal skills, judgment -- the skills that are

24   traditionally or often related to the assessment center, that

25   the field is still struggling with ways to come up to measure

1    those?

2    A.    I think the field is still wrestling with that.  I think

3    there's a way to go in that area.  But I think that we have

4    structured checkoff lists that have been developed with a pool

5    of experts and supplemented after using assessment exercises in

6    real life with videotaping so that you cannot rely on the

7    judgments of the assessors who are right there in the room and

8    can never be second-guessed because no one else could see the

9    applicant's performance.  And I've used some videotapes.  I

10   think we're making reasonable advances in addressing that

11   problem.

12   Q.    And are you aware that in the 2002 exam for sergeant, that

13   the assessment center piece of that exam was videotaped?

14   A.    Yes.

15   Q.    And does that give you any assurance as to the reliability

16   of the scoring that was used in those exercises?

17   A.    It did not -- I did not see anything from the 2002 exam

18   that -- of the type of a sort of experimental evaluation of the

19   reliability of the grading.  I didn't see, for example, two

20   dozen tapes being shown to all of the graders independently and

21   blindly, and then the ratings of those -- I don't know how many

22   panels there were; there must have been more than one -- and

23   then a comparison of how well those panels agreed.

24        So I think that the videotapes provided the opportunity to

25   do some very careful evaluations of the reliability of grading,

1    but I didn't see that that was actually done.

2    Q.   Okay.  And that's an interesting point because you've

3    described previously that you can have an exam that has great

4    reliability but has no validity; is that correct?

5    A.   In the extreme, you can.

6    Q.   Okay.  And if you had an exam, for example, where the

7    passing score was set so low that everybody passed, would you

8    question the validity of that exam?

9    A.   The two are -- at least for industrial psychologists, the

10   two questions are separate.  I would question, perhaps, the

11   passing point, but not the validity.

12   Q.   Okay.  And the point of having a passing point, if you

13   will, is to distinguish between those who are clearly competent

14   and able to do the job for which they're testing and those who

15   are not clearly competent to do the job.  Is that a fair

16   statement?

17   A.   I think that that's the concept of "passing point" in the

18   public sector.  I think in the private sector, that might not

19   be the definition.

20   Q.   Okay.  But in the public sector, when you're administering

21   one of these exams, really the purpose is to be able to compare

22   the candidates.  And one way that one does that is by

23   identifying who possesses at least the minimum competencies to

24   do the job upon the date of promotion, correct?

25   A.   I think that's what Chapter 31 envisions that would test

1  them on.  You want to produce a list of people who are

2  competent to do the primary dominant duties of the position.

3  Q.   And would you agree that part of the point of ranking

4  these individuals is to say:  Of those who are clearly

5  competent, we have those who are minimally and those who are

6  more competent?

7  A.   Yes.

8  Q.   It seems obvious, but with the plan being that those who

9  are the most competent are selected for the position first?

10 A.   Correct.

11 Q.   And we've talked again about this being a sergeant's exam,

12 and part of what Rule 31 -- excuse me -- what Chapter 31

13 requires is that the exam be a fair test, correct?

14 A.   Yes.

15 Q.   And in testing for supervisory skills, would it be

16 consistent with your understanding of the law enforcement

17 positions in Massachusetts, patrol officers don't have a

18 opportunity to learn supervisory tasks on the job?  Would you

19 agree with that?

20 A.   I think that's generally true.  I think that's a problem.

21 Q.   And would you agree that testing about how one performs as

22 a supervisor at the rank of sergeant could be challenged as

23 being an unfair test of that person's abilities to perform as a

24 sergeant?

25 A.   Well, I think it might be challenged as unrealistic.  I

1  mean, how is someone supposed to gain the supervisory abilities

2  if they don't have supervisory training, they don't have

3  supervisory experience in a setting where they, you know, can't

4  do harm?  But "unfair" means that different people are treated

5  differently, so I'm not sure I would call it unfair.

6      Now, perhaps you'll have some police officers who

7  moonlight in various other organizations and actually are

8  supervisors.  I would imagine that they would do better on

9  these assessments and probably do better initially as

10  sergeants.  I think the whole idea of asking applicants to

11  learn by themselves how to be sergeants is illogical and just a

12  holdover from tradition.  There are very few other occupations

13  where -- I guess at one point you could read law, but even in

14  reading law, you had an attorney who was guiding you.  Nowhere

15  do you have, you know, "Study up and take the bar."

16      So if I were designing the selection system for sergeant,

17  it would be very different.

18  Q.   In reviewing the exams that are at issue here, there were

19  reading lists that were produced for each of the exams.

20  A.   Yes.

21  Q.   And for the reading list, they contained supervisory

22  texts.  Would you agree?

23  A.   At least one, yes.

24  Q.   Okay.  And would it be appropriate, in your view, to

25  assign for this reading -- for the reading period, which

1  generally runs between three to six months depending on the

2  agency, correct?

3  A.    I think HRD tries to give at least several months, perhaps

4  six.

5  Q.    Okay.  And when they administer the -- excuse me.  When

6  they publish the reading list, they're identifying the types of

7  texts from which the exam will be drafted, correct?

8  A.    I think they're doing more than that; they're identifying

9  the texts.

10  Q.    I'm sorry?

11  A.    I think you said "identifying the types of texts."  I

12  think they're actually identifying the text.

13  Q.    I misspoke.  They're actually identifying the texts from

14  which the exam questions will be designed?

15  A.    Correct.

16  Q.    And in doing so, when they put out supervisory texts,

17  would you agree with me that that's a way to measure the

18  candidate's ability to learn -- to read and learn the

19  supervisory principles that are contained within those texts?

20  A.    That is the intention.  And whether that works depends on

21  the quality of the textbook, and whether it's tested on the

22  exam depends on the quality of the textbook and the text

23  questions that are written.

24  Q.    But it's a way, would you agree, that -- it's one way in

25  which the test administrator can gauge the individual

1   candidate's exposure to and knowledge of the types of

2   supervisory principles that presumably would be applied in the

3   job of sergeant?

4   A.   Yes.

5   Q.   And in the exams that you've overseen, you've approved

6   promotional exams that have tested supervisory skills in that

7   manner, correct?

8   A.   Yes.

9   Q.   Now, we talked for a bit in the past couple of days about

10   the Uniform Guidelines.  And -- well, first, let me ask:  Is it

11   your sense that the Uniform Guidelines are mandatory in the

12   field of industrial psychology?

13   A.   Well, I think to answer that question you really have to

14   answer a different question, which is how much difference is

15   given to the Uniform Guidelines in courts of law?  If there

16   were no courts of law and the Uniform Guidelines were published

17   by a private organization rather than the federal government, I

18   think they would get much less deference than they do now.  I

19   think that now they get considerable deference.

20        They are somewhat old.  They came out in 1978.  There are

21   some people in the field who are exercised about that and would

22   like to abolish them, and several presidents over the last 20

23   years have thought of modifying them and haven't.  And then in

24   reading them, I find that there's also a considerable amount of

25   wisdom in the Uniform Guidelines.

1          But to answer your question, they get a fair amount of

2     deference from industrial psychologists, even the ones that

3     hate them.

4     Q.   And would you agree with me that in the field of

5     industrial psychology, that the guidelines that are

6     contained -- or the requirements that are contained in the

7     guidelines are difficult, at least, to meet?

8     A.   I think that they are comprehensive and demanding; yes.

9     Q.   And do you recall testifying earlier that they're really

10    not a set of guidelines for test development but rather a set

11    of guidelines for litigation?

12    A.   I definitely have heard them described that way.  I've

13    described them that way myself.

14    Q.   And would you agree with me that you know of no exam that

15    meets the requirements of the Uniform Guidelines?

16    A.   Well, people now have spent many, many years living with

17    those guidelines, and a lot of very bright people have analyzed

18    those guidelines in great detail and try very, very hard to

19    live up to them.  So the answer is that was certainly true ten,

20    15 years ago.  I think nowadays, competent validation studies

21    very arguably comply with the guidelines.

22    Q.   Okay.  I'm going to show you your deposition testimony

23    from February of 2006 at page 105.  And at the top of this

24    page -- and I'll just -- the question that I had, that I posed

25    to you is, "Explain to me that" -- "your statement that it's

1    appropriate to try to adhere as much as possible to these

2    standards," and "these standards" being the standards contained

3    within the Uniform Guidelines.

4         And at page 105, starting at the end of line 7, you state,

5    "The consensus of the field is that they are really a set of

6    guidelines for litigation.  They are not helpful hints for how

7    to develop personnel selection procedures.  So they are

8    extremely conservative.  They don't recognize any new

9    developments in the field or the possibility of new

10   developments in the field.  And there actually have been some

11   since 1978, but since the guidelines haven't been substantially

12   modified, they don't reflect any of those new developments.

13   And the requirements that they do have are very difficult to

14   meet."

15        And then you went on to say, "There are statements in the

16   literature that there is no examination that meets the

17   standards of the Uniform Guidelines in existence, although

18   people have tried very diligently to try to meet these.

19   Despite their being a roadmap to litigation rather than helpful

20   hints, I think that there's value in trying to adhere to them

21   because at least to some extent they reflect the law of the

22   land, at least the federal law of the land."  And that was the

23   thinking behind that sentence, "that sentence" being the one I

24   asked you about.

25   A.   Was there a question there?

1  Q.   Yes.  Your critique of the exams at issue here focused on

2  the fact that they didn't meet some of the requirements of the

3  Uniform Guidelines; is that correct?

4  A.   That's part of it.

5  Q.   And you had commented that you felt that the job analyses

6  were disorganized, that there was not a contact person listed

7  on the top of the validation study.  You had looked at the

8  testability analysis and found that not all of the knowledges,

9  skills, abilities and personal characteristics contained in the

10 testability analysis were covered by the written exams.  And

11 those, I presume, are requirements that you feel are contained

12 within the Uniform Guidelines themselves, correct?

13 A.   Correct.

14 Q.   And is it fair to say that an exam may be entirely valid

15 even if it doesn't meet all of the requirements of the Uniform

16 Guidelines?

17 A.   Well, I'm not sure how to answer that.  If as a scientist

18 I think something is A, and the legal system says it's not A,

19 it sort of puts me in a bind.  Now, the Uniform Guidelines,

20 which I said are getting old -- and '78, '88, '98, 2008,

21 they're getting old -- the major new development in the field

22 of testing is something called "validity generalization."  And

23 "validity generalization" is a catchphrase for the position

24 that cognizability tests are generally valid for all jobs.

25      And there have been enough validity studies done in enough

1   organizations with enough different jobs, there are not that

2   many published texts of mental ability used for employment

3   testing.  So the validity generalization literature and

4   components suggest that all of the validation requirements in

5   the Uniform Guidelines are basically obsolete because we now

6   know that cognizability tests are valid for all jobs.

7       And my own thinking in that regard has waxed and waned

8   over the years.  I was once more impressed with that literature

9   than I am now.  I think that -- it appears to me that the

10  literature ignores some major problems in conducting validity

11  research.  One of the main problems is one that Dr. Outtz

12  points to in his book, and that is that the mean score

13  difference in test performance for minorities compared to

14  non-minorities is twice as large as the mean score difference

15  in job performance for minorities and non-minorities.

16      And there's been a number of very insightful, although

17  mathematically very complex, publications over the last couple

18  of years by a university professor by the name of Herman

19  Aguinis that show that the research into the fairness of the

20  tests that has been done in the past is all basically following

21  a misguided conception.

22      Well, the validity generalization proponents say that Test

23  1 are valid for all jobs and that all the previous research

24  shows that the tests are fair; that they don't discriminate

25  against minorities.  So the recent literature seems to call,

1    definitely, the fairness into question.

2    Q.    I think from your answer I'm going to try to give you the

3    unprofessional review of what I think you just said.  Are you

4    saying that the field is in flux, and that not meeting all of

5    the requirements of the Uniform Guidelines doesn't mean that a

6    test is good or bad, but that there's more to it; it's a more

7    complex question than just giving it a thumbs up or a thumbs

8    down?

9    A.    I think if a test met the requirements of the guidelines,

10   I think everyone would agree that it is valid.  If it doesn't

11   meet the requirement of the guidelines, then I said I'm in a

12   little bind between, you know, the legal definition and then

13   the professional definition.

14   Q.    Okay.  And I believe that your testimony from 2006 said

15   that there are opinions in the field, or in the literature,

16   that are of the opinion that there is no test in existence that

17   meets the requirements of the Uniform Guidelines?

18   A.    There are people who have railed against the very exacting

19   requirements of the Uniform Guidelines and have said that, yes.

20   Q.    Now, I believe your private business -- you're a

21   consultant, but you also have put out a mechanical test; is

22   that correct?

23   A.    Correct.

24   Q.    And I know that this is a subject that was raised in both

25   your report and Dr. Outtz's report.  Does your mechanical test

1    have adverse impact?

2    A.    On what groups?

3    Q.    On any groups?  Women?  Minorities?

4    A.    Mechanical aptitudes tests in general show male/female

5    differences, and mine show -- and one reason that I developed

6    my test was to -- in an attempt to reduce the adverse impact on

7    women.  It actually -- the inception of it was a firefighter

8    exam I was putting together, and I found that mechanical

9    aptitude was important for firefighters.  And I knew that the

10   jurisdiction that I was working for was interested in hiring

11   women as firefighters, and so I tried to develop a mechanical

12   aptitude test that -- with questions that were different than

13   the existing mechanical aptitude test, that might have less

14   adverse impact on women.  And, in fact, the test I produced has

15   less adverse impact on women.  And the test does have some

16   adverse impact on minorities.

17   Q.    And is it fair to say that for any test developer, an

18   industrial psychologist or anyone who's professionally engaged

19   in the business of creating exams, that the goal is to strive

20   to reduce adverse impact?

21   A.    Well, the goal is to try to eliminate it.  Often that's

22   not achieved, but reducing is definitely a realistic goal.

23   Q.    And you're not going to know if you've achieved that goal

24   until after the exam is administered, correct?

25   A.    That's correct.

1    Q.    And just focusing for a moment on your own experience --

2    A.    But can I say one more thing about that?

3    Q.    Sure.  Go ahead.

4    A.    But there are reasonable ways to try to predict the level

5    of adverse impact before you administer the test.

6    Q.    Okay.  And I think you testified earlier that

7    administering a multiple-choice exam, you know that you will

8    have adverse impact at the end of it, correct?

9    A.    Depending on the content of that multiple-choice exam,

10    that's generally true.

11    Q.    And focusing here in the law enforcement profession,

12    administering a multiple-choice exam, you know that you will

13    have adverse impact?

14    A.    That is generally true, yes.

15    Q.    And likewise, in administering an assessment center in the

16    law enforcement context, you know that you'll have adverse

17    impact?

18    A.    Well, I think that depends on what the exercises are in

19    the assessment center.  So structured interviews, the

20    literature shows minority/non-minority differences.  One

21    article suggested the D would be .09; another suggested that

22    the D would be .25.  They were both reviewing the literature.

23    I'm not sure which one to trust.  Perhaps you could take an

24    average of the two.  Some exercises, however, have larger Ds;

25    some have smaller Ds.

1    Q.    Okay.  Now, focusing on the validity of the exams at issue

2    here, I believe that one of the suggestions that you had

3    offered in your direct testimony was to compare the incumbent

4    performance -- that is to say, those individuals who are

5    currently sergeants who are testing for lieutenant -- to

6    compare those incumbent performances against the performance of

7    the patrol officer candidates striving for the sergeant's exam;

8    is that correct?

9    A.    I didn't really suggest using the lieutenants to compare

10   them with the police officers, but rather, to use the

11   applicants for lieutenant to help set the passing point.

12   Q.    Okay.  So forgive me.  That's -- that was the cadre of

13   people I was talking about.

14        And have you looked at the performances of the incumbent

15   sergeants testing for lieutenant and looked at the relationship

16   between their answers on those overlapping -- let me strike

17   that.

18        Let's start from the presumption here that the exam that

19   was administered was in multiple stages; that is to say, 80

20   questions were designed for the candidates testing for

21   sergeant, 100 questions were designed for the candidates

22   testing for lieutenant.  So 20 extra on top of the 80 that were

23   taken by the patrol officers, and then another 20 or so

24   questions were added on for the candidates that were testing

25   for captain.

1   A.   That was true for the statewide exams, yes.

2   Q.   And would it be fair to say that if the majority of the

3   sergeants testing for lieutenant were able to answer the

4   questions that were posed for the police officers testing for

5   sergeant, that that would give you an assurance of validity of

6   the questions that were being posed for the candidates testing

7   for sergeant?

8   A.   That's not one of the recognized research designs for

9   validity.  I think if the current sergeants flunked the exam,

10  it would definitely raise some red flags.  If they all passed,

11  I'm not sure that would indicate that the exam is valid.  So

12  I'd say even though it's not one of the recognized paradigms

13  for conducting validation research, you could glean some

14  information from it, and the most salient information would be

15  if a whole bunch of them flunked, you'd wonder about

16  the -- some aspect of the testing.

17  Q.   Okay.  And are you aware that at least as it pertains to

18  the 2005 exam, that 89 percent of the incumbent sergeants in

19  the Boston Police Department passed the sergeant's exam?

20  A.   Okay.  There were only 53 questions, right?  Is that the

21  one that had the 53 questions in common?

22  Q.   The 53 questions in common, correct.

23  A.   Right.  So you asked me about the percentage.  I did have

24  a table on that that we looked at yesterday.  I don't recall

25  where it is.

1    Q.    The question that I have for you is that if you assume

2    that 89 percent of the incumbents were able to answer

3    successfully the question that was posed to the police officer

4    candidates for sergeant, would that give you an assurance about

5    the validity of the questions that were posed?

6    A.    It would not be a strong indication of assurance.

7    Q.    Would you have -- in calculating the passing point -- you

8    would use that information to determine whether the passing

9    point was set appropriately?

10   A.    That would be a reasonable -- the performance of the

11   incumbents would be a reasonable way to help you set the

12   passing point.  In setting a passing point on a content

13   validity test, you're often reduced to judgment because you

14   don't have any hard numbers relating to job performance.  And

15   so testing of incumbents provides some actual hard data.  So I

16   would give some deference to the scores of incumbents in

17   setting the passing score for the sergeant's exam.

18   Q.    In determining whether or not the exam that's administered

19   to the sergeant candidates is an effective means of measuring

20   the knowledges -- excuse me -- in distinguishing between the

21   candidates who have knowledge that's necessary for advancing to

22   the actual rank of sergeant, would you expect that the

23   incumbent sergeants would perform better than the police

24   officer candidates assuming that the incumbents are actually

25   doing the job?

1    A.    Yes.

2    Q.    And maybe I'm misremembering your testimony, but it is my

3    memory that when you testified on direct, that one of the

4    critiques that you had of the exams was that incumbents were

5    not passing at the rate that you would have expected them to?

6    A.    Correct.

7    Q.    And I guess the question then is if 89 percent of the

8    incumbents are actually answering the questions correctly, does

9    the -- is 89 percent, in your view, not enough incumbents

10   passing the job *[sic]* in order to make you have confidence in

11   the testing instrument itself?

12   A.    Correct.

13   Q.    You don't think 89 percent is enough of the incumbents?

14   A.    Well, the 89 percent means that people are at least barely

15   adequate, so that would mean that 11 percent of the applicants

16   for lieutenant who studied the same reading list and who -- if

17   police lore is to be -- L-O-R-E -- is to be believed, posit

18   themselves in their -- by their desk and then digest their

19   books for months and months, and they have been doing the job

20   of sergeant for at least three years, so they should know how

21   to do the most important critical things, and if there are any

22   knowledges, skills, abilities required to do that --

23   particularly knowledges because that's what the multiple-choice

24   test measures -- they should have mastered those knowledges

25   unless they're so rare that they come up less than -- you know,

1    just less than once every three years.  So I would have

2    expected a much higher passing rate for incumbent sergeants who

3    studied for the exam and have years of experience.

4    Q.   Okay.  And you're assuming, then, that everybody has

5    studied for the exam?

6    A.   It could be there are some people that just decide they

7    want to see what the exam is like and they'll study for the

8    next one.

9    Q.   And in your experience -- is that a common occurrence, in

10   your experience?

11   A.   I have no firsthand knowledge, but I've heard that there

12   are people who do that.

13   Q.   And would you expect that a candidate testing for

14   lieutenant who has been a sergeant would ace the sergeant's

15   exam; would get every question right?

16   A.   Practically.

17   Q.   Would that be a valid exam, in your view, if they could

18   answer every question right?

19   A.   Well, the topic you're asking about in the professional

20   literature is mastery testing versus norm-referenced testing.

21   And in mastery testing the answer to your question would be

22   yes, the incumbent sergeants should get all those questions

23   right.  The -- if you are really competent to do the job, and

24   this is what you need to do the job, you know the answers to

25   those questions.  And I'm partial to that mastery approach.  In

1  real life what usually happens, even if you attempt to create a

2  mastery exam, you find that there are gaps in people's

3  knowledges, and things that appear to be things you absolutely

4  and definitely would know if you were doing the job some people

5  don't know.

6      So the answer to your question is:  dependent on the

7  quality of the questions that are asked.  It could be that if

8  the questions are too picayune, you'd have a lower passing rate

9  for incumbents than if they were more central and important.

10  So it's -- as many topics in the world and many topics related

11  to testing, it's a somewhat complex question.

12  Q.   Okay.  When you describe it as mastery testing, it sounds

13  to me like you're assuming if one is an incumbent one is a

14  master of the position that one currently holds.  Is that the

15  premise behind that theory?

16  A.   I think if you're an incumbent and you have a number of

17  years of experience, that would be a definition of a master.

18  Q.   If you're an incumbent and you have a number of years of

19  experience -- by that -- just by those two facts, you're an

20  incumbent and you've been there three years, you should be a

21  master of the position?

22  A.   Yes.

23  Q.   And in your experience -- well, the purpose of these

24  tests, again, is to distinguish between candidates of different

25  abilities, correct?

1    A.    Yes.

2    Q.    And you would assume, would you not, that some of the

3    people who are testing for lieutenant, for example, are not

4    going to be possessed of the qualities that will bring them to

5    the next lieutenant rank, correct?

6    A.    Yes.

7    Q.    And they may not be the best sergeant in the world either,

8    correct?

9    A.    Yes.

10   Q.    I mean, you would assume that within those 200 or so

11   people who are sergeants testing for lieutenant, some are going

12   to be better than others --

13   A.    Yes.

14   Q.    -- in the real world?

15         Even if they've been a sergeant for three years?

16   A.    Yes.

17   Q.    So the idea that they would all be a group of people who

18   are masters and should be able to ace the sergeant's exam.

19   A.    Well, as I said, if the job analysis identifies the

20   frequent, the critical, the important aspects of the job duties

21   and tasks, identifies the requisite knowledges, skills and

22   abilities and personal characteristics, and you have somebody

23   who's been doing the job for several years, hasn't been fired,

24   hasn't been demoted, hasn't resigned, you would think that they

25   would have strengthened any of their weaknesses in terms of the

1    knowledges, in particular, because the test covered mainly

2    knowledges.  So I would -- I would have thought that, given a

3    reasonable test, a higher proportion would pass.

4    Q.    A higher proportion than 89 percent?

5    A.    Yes.

6    Q.    Now, when we're talking about this, we're talking a bit

7    about experience, and I want to talk a little bit about the

8    education and experience component of the exam.  And I believe

9    that you had testified, or referred to in your report, that you

10   questioned the weight that was given to the education and

11   experience component; is that correct?

12   A.    Correct.

13   Q.    And isn't it so, Dr. Wiesen, that you, yourself, were a

14   part of the group that designed, or identified, the weights

15   that would be apportioned to the education and experience piece

16   of the exam?

17   A.    I saw my name in that report in several places, but I have

18   no recollection of actually partaking in a task force.  It

19   could well be that they asked me what I thought.

20   Q.    Give me just a sec, if you would.

21        In putting together the weights for the education and

22   experience, is it your position that the appropriate way to

23   weight the education and experience portion would be to link it

24   to a knowledge, skills and abilities assessment?

25   A.    Yes.  And that's what the 1991 study tried to do in that

1    testability analysis.

2    Q.    Okay.  I'm going to refer you to -- excuse me -- the

3    testimony that was given on July 6th of 1988.

4              MS. HARRIS:  And for counsel, this is at pages 31 to

5    33.

6    BY MS. HARRIS:

7    Q.    Well, let me ask you, do you recall in 1985 working --

8    putting together the education and experience component of the

9    exam?

10   A.    Of which exam?

11   Q.    I'm sorry.  Of the 1985 exam.  But I'll refer you to the

12   bottom of page 31, this is -- there are a series of questions

13   about the education and experience portion of the exam.  And

14   you were asked, around the middle of the page, "Did

15   Morris & McDaniel" -- the consultants who developed the 1985

16   exam -- "change one of the weights around?"  And your answer

17   was, "I think they did make a small change, yes."

18        The question is, "That was the training and experience,

19   was it not?"  And your answer is, "It was.  As I recall the

20   change -- we had rounded in 1985 and decided not to round this

21   time.  So there was a small difference in the weights.  I don't

22   recall exactly where it came out."  And then the questions went

23   on.

24              MR. LICHTEN:  What page is that?

25   BY MS. HARRIS:

```
 1   Q.   Let's explore that for a moment.  In 1985 --
 2            MR. LICHTEN:  I just don't know what page that is.
 3            MS. HARRIS:  32 of the second day.
 4            MR. LICHTEN:  Thank you.
 5            MS. HARRIS:  The page numbers that I'm referring
 6   to -- it's at the bottom.
 7            MR. LICHTEN:  Thank you.
 8   BY MS. HARRIS:
 9   Q.   "A weighting of 20 percent was given to the training and
10   experience portion of the overall exam results; is that
11   correct?"  And the question goes on, "You were involved closely
12   in the construction of that exam.  You collected the data."
13   I'm just skipping for convenience.
14       "So you actually collected the data, so you were quite
15   familiar with it, were you not?  And you opted to use a 20
16   percent weighting for training and experience; is that
17   correct?"
18       And then the question, "Your data didn't show that the 20
19   percent should be accorded for training and experience; it
20   showed that 13.5 percent should be accorded for training and
21   experience.  And you rounded it off because you believed that
22   traditionally officers were used to seeing the 20 percent, and
23   you thought you should carry on that tradition."
24       And then your answer, "The process was a collaborative one
25   with the then-consultant group, myself, experts for the
```

1    plaintiffs as well as lawyers for both groups, but the final

2    decision was to go with the 20 percent, yes."

3          So my question, Dr. Wiesen, is the process that you

4    described in 1988 -- was that an appropriate way to set the

5    education and training experience, at 20 percent?

6    A.   I don't recall what the data was that was collected.  I

7    don't know if the -- if that's a part of the Morris & McDaniel

8    validation study.  So to answer your question I would need to

9    know what the data was that was collected, what were the

10   questions that were asked, and what were the numerical values

11   of those data.

12         So my very vague recollection was that Morris & McDaniel

13   wanted -- or undertook a process that I assisted with to

14   develop the weights for the examination components, but I

15   recall nothing beyond that.

16   Q.   Okay.  The decision to weight the exam was related to the

17   1985 exam, correct?

18   A.   From what I just saw, yes.

19   Q.   Okay.  And when you were testifying in 1988, you were

20   talking about the exam that was created in 1987 using the

21   weights that had been apportioned in 1985, correct?

22   A.   I recall a reference in what you showed me to the 1985

23   study.

24   Q.   Okay.  So there is some transportability, if you will, and

25   I'm probably using the term incorrectly, but you were able to

1  borrow the weights that were apportioned in 1985 and apply it

2  to a later exam, correct?

3  A.   Right.  The 1985 exam -- if the research was sound for the

4  '85 exam, you wouldn't have expected changes by '87.

5  Q.   And is it your testimony, then, to use the 20 percent in

6  the exams that are at issue here in 2004, 2005 through 2008,

7  that there's something wrong with using that 20 percent now?

8  A.   Correct.

9  Q.   Okay.  In deciding --

10  A.   And what is wrong is that it's not supported, as I could

11  see, from any of the validation research that was produced by

12  HRD, and some of the validation research that was produced by

13  HRD calls it into question specifically, that testability

14  analysis.

15  Q.   So let's talk about the testability analysis for just a

16  moment.  Is it your position that every knowledge, skill and

17  ability that's listed on the testability analysis should be

18  tested for in the exam itself?

19  A.   Well, ideally it would be, but I think there are

20  practicalities that preclude that.

21  Q.   And when we talk about "ideally," there's a difference,

22  isn't there, between the ideal, or the perfect exam, and an

23  exam that's reasonable, reliable, fair and valid?

24  A.   Right.  And even the Uniform Guidelines talk about a

25  representative sample as opposed to an exhaustive coverage.

1    Q.    So even under the Uniform Guidelines, if you don't test

2    every single knowledge, skill and ability, it will still even

3    pass their demanding standards?

4    A.    As I say, the Uniform Guidelines talk about a

5    representative sample and do not require comprehensive

6    coverage.

7    Q.    Do they give a numerical amount of what a representative

8    sample would be?

9    A.    I don't recall.

10    Q.    And looking for just a moment at the testability analysis,

11    if you could, which is EE, I believe.  At Item 94, "Ability to

12    follow policies and procedures," the checkmark indicates that

13    that's going to be tested by education and experience.  Do you

14    see where I am?

15    A.    Excuse me.  What page are we on?

16    Q.    The Bates number is 4275 at the bottom left-hand corner.

17    This is -- it's -- in the appendix it's EE.  So Item No. 94,

18    "Ability to follow policies and procedures" -- I think we had

19    talked about this yesterday -- the checkmark is listed under

20    "Education and experience."  So can we assume from this that

21    the test administrators, or the test developers, presumed that

22    the education and experience component would assess one's

23    ability to follow policies and procedures?

24    A.    Yes.

25    Q.    And do you disagree with that assessment?

1  A.   Are you asking me does the EE have the capability to

2  follow policies and procedures?

3  Q.   Yes.

4  A.   Well, as designed, the EE is basically giving credit for

5  years of experience and for education; it differentiates a

6  little bit between types of experience and differentiates

7  somewhat between types of education.  That type of a system of

8  E&E is called a "point system," and the literature's not very

9  supportive of a point system.  Years of experience seems to be

10 of more importance to lower-level jobs than higher-level jobs;

11 the value of additional experience drops off after a few years.

12     There's another approach to education and experience, the

13 approach that Dr. Outtz talked about in his deposition, where

14 you craft inquiries that become part of the education and

15 experience grading schedule targeted at each of the knowledges,

16 skills and abilities.  And I think the example he gave was if

17 you want to assure that someone -- you want to measure someone

18 has oral communication skills, you might have a question on the

19 E&E, "Have you served as an instructor in a course?"

20     So there is no specific part of the E&E that seems to be

21 targeted at following policies and procedures.  So if there's

22 any relationship between the E&E and the ability to follow

23 policies and procedures, it's definitely not clear and strong.

24 Perhaps somebody who's in the department and hasn't been fired

25 must at least be following policies and procedures to a certain

1    extent.

2    Q.   In the E&E that you participated in developing, was there

3    an assumption that if you had served for three years and you

4    hadn't been demoted, you hadn't been fired and you hadn't

5    resigned your position, so therefore at least you're a master

6    police officer under the mastery theory, would that comport

7    with the ability of the training and education to assess

8    whether or not you're able to follow policies and procedures?

9    A.   As I said, I don't recall being part of that task force.

10   I don't recall meetings; I don't recall deliberations; I don't

11   recall designing the E&E, considering various options.  But I

12   think perhaps you could say that someone who's been a police

13   officer for several years must at least at some level follow

14   policies and procedures.

15   Q.   And likewise, at Item No. 136, the ability to work

16   accurately with names, numbers, codes and symbols, it's checked

17   that that's tested by the education and experience.  And would

18   you assume that someone who's been a police officer for three

19   years would know how to work accurately with names, numbers,

20   codes and symbols?

21   A.   I think that there are simple, straightforward tests of

22   that ability.  And I -- perhaps somebody who has been a police

23   officer for several years has at least some level of competence

24   in that.

25   Q.   You mean the people who put together the exam presumably

1    are familiar with the police function, correct?

2    A.    The people who put together the exam are employees of HRD,

3    and they're not sworn officers, but they have some familiarity,

4    yes.

5    Q.    So would it be a more efficient way to test, for example,

6    whether someone knows the code for going on a lunch break, to

7    put it as something that's tested by education and experience

8    rather than delivering a written exam or a situational exercise

9    to determine whether they're able to work with symbols and

10   codes?

11   A.    Which number was that again?

12   Q.    136.

13   A.    Thank you.  Well, it wasn't worded in terms of knowledge

14   of symbols and codes; it was working accurately with them.  So

15   I think the example you gave might not fit under that ability.

16   "Ability to work accurately with names, numbers, codes and/or

17   symbols."  I'm a little surprised that that came out as -- that

18   it was ever considered in the job analysis; it's a somewhat

19   unusual knowledge or ability.

20        But your question was, would someone who's worked on the

21   job for some number of years -- could they be presumed to have

22   an adequate level of that ability?  And probably.  I don't know

23   if I would use that ability to try to separate the best from

24   the poorest candidates for sergeant.

25   Q.    And is that -- when we talked yesterday about the items

1    that were listed as not tested, would that be one reason that

2    some of the knowledge, skills, abilities and personal

3    characteristics would not be tested because they wouldn't help

4    distinguish between candidates for sergeant?

5    A.   No, I think that all of these were meant to be important

6    and meant to distinguish.  I think the ones that weren't

7    tested, weren't tested basically for practical reasons.

8    Q.   So things like, for example, 162, the ability to keep the

9    hand and arm steady, that's not tested although --

10   A.   But I think that's related to the use of firearms.

11   Q.   And 184, the ability to see objects in the presence of

12   glare or bright ambient lighting was also -- judgment was used

13   to say that there's no need to test that skill?

14   A.   Well, I don't think the judgment was that there was no

15   need.  I think that the judgment was whether it wasn't

16   practical to test it with a multiple-choice test, which is what

17   was envisioned when they started the project.  So that ability,

18   you know, might come into play at night when you have a stop

19   and then there are bright lights from the vehicles.  And so it

20   wasn't tested, but I'm not sure it wasn't thought to be

21   important.

22   Q.   When you -- I think you said just a moment ago that it was

23   envisioned to be tested when they put the job analysis

24   together.  Did I get that right?

25   A.   I think that they started out with a list of the

1    knowledges, skills, abilities and personal characteristics and

2    they decided, looking at each one, if they could test it with a

3    written test and if it could be tested with education,

4    experience, and if it couldn't be tested with one of those two

5    modes, they would indicate "not tested."  I don't think they

6    were making an additional judgment as to which ones are more

7    important; I think the SMEs already made that judgment.

8    Q.    Now, I would agree that all of the items listed are

9    important.  My question, I guess, is whether or not all of the

10   items were intended to be covered by a competitive exam.

11   A.    Well, I think when they set out to do the project they

12   realized -- or they were working under the premise that the

13   test would be a multiple-choice test, and the knowledges,

14   skills and abilities that didn't fit within a multiple-choice

15   test they would just indicate as "not tested."  They knew they

16   were there but they wouldn't be tested.

17   Q.    Okay.  And some of the qualities that are listed there

18   include -- and I'm not going to go through each of these -- but

19   things like decisiveness and interpersonal relationships or

20   leadership.  I think we had talked about some of these

21   yesterday.

22         And the question that I have for you is:  Is there an exam

23   that you're aware of that measures, reliably and validly,

24   qualities like decisiveness; in other words, are these

25   qualities that can be tested with any reliable and practical

1    instrument?

2    A.    There are police promotional exams across the country that

3    do try to measure those areas.  I have had -- I've been at

4    conferences where the tests have been described, the grading

5    process has been described at some level.  And so the answer is

6    yes, but my level of personal contact with those exams is

7    somewhat limited.

8    Q.    Interpersonal relationships:  Do you think that's a skill

9    that can reliably be measured?

10   A.    Well, I think that the wording for these knowledges,

11   skills and abilities and personal characteristics was somewhat

12   unclear.  As I mentioned yesterday, I didn't know what one of

13   them meant at all.  I think that the -- it would be greatly

14   helpful if there would be a description of what level of

15   interpersonal skill you're talking about and a little bit more

16   description of who these persons are that you're being "inter"

17   with.  Are you talking about subordinates?  Are you talking

18   about coworkers?  Are you talking about citizens?  Suspects?

19   Prisoners?  So it's a somewhat general statement; I would have

20   liked more specificity.

21        But I think you could try to go back and see which tasks

22   that KSA was tied to, and if the tasks that it was tied to

23   were, for example, subordinates, you could then try to measure

24   your interpersonal relationships with subordinates.  It might

25   be with a counseling exercise.  Maybe you have a subordinate

1    with some difficulty, on the job, off the job that's affecting

2    job performance.  So I think you could definitely measure that

3    if you work at it.

4    Q.   Do you recall testifying about interpersonal relationships

5    as a skill to be measured in 1988?  And on the second day of

6    testimony at page 55 the question was, "Interpersonal

7    relationships:  Do you agree that that's a skill which is

8    important to measure for a lieutenant?"  And your answer was,

9    "I think that if it could be measured reliably, it would be

10    very nice to measure it as it pertains to the job.  I'm not

11    sure that you can do either of those."

12        And then when you were asked to illuminate that you stated

13    on page 56 -- excuse me -- the bottom of page 55, the question

14    was, "You agree that it's an important element of the job for

15    police lieutenant.  Your question is whether or not there is a

16    valid instrument to test for that; is that correct?"  And your

17    answer is, "That's the first concern.  The second is

18    identifying those aspects of interpersonal relations.  If you

19    had two people with two different personalities, different

20    interpersonal styles, they might both be able to handle the

21    job."

22        And would you agree with that assessment now, that testing

23    for interpersonal relationships skills could be complicated by

24    the fact that you're measuring people's personalities and their

25    styles?

1    A.   I think that you would definitely have to make allowances

2    for different approaches, and there might well be, in an

3    interpersonal exercise, alternate approaches that would receive

4    full credit.  I think at the time I was testifying in the

5    middle '80s the whole topic, the whole assessment center

6    movement, was reasonably young; the nationwide experience with

7    practical exercises was just getting underway.  It was nowhere

8    near as developed as it did through the '90s and into the

9    2000s.

10        There was debate as to what was being measured.

11   Specifically, the assessment centers try to measure traits, try

12   to measure leadership, judgment, problem solving, oral

13   communication.  And usually there were several exercises, and

14   people were graded on each of those abilities in the several

15   exercises.  What the research showed was that there was a

16   higher correlation within an exercise of the ratings of

17   different abilities than the correlation of the same ability

18   across exercises.

19        And so it seemed like, although people set out to measure

20   interpersonal skills, what they were really measuring instead

21   was a task-related ability, so that your interpersonal skills

22   in counseling might be very different than your interpersonal

23   skills in making a presentation to the news media.

24        So the research in the '80s on assessment centers was -- I

25   don't know if I should say it was on the fence or whether there

1    were camps.  Some people were very impressed with it and saw no

2    problems, and other people saw all of the problems.  I think

3    that the field has come to accept assessment centers now at

4    a -- much more completely than they did now.

5    Q.    I think one of the other traits that you said was not

6    tested by this exam happened to be leadership.  And there was a

7    question posed to you in 1988.  "Leadership:  Do you believe

8    that it's an important" -- "that it's important for a Boston

9    police lieutenant to have leadership" -- this is page 57 of the

10   second day.  And your answer was, "I don't think I really know

11   what it means to have leadership."

12        And then you were asked, "Well, let me ask you to assume

13   that leadership is the ability to command respect in a fair way

14   from the persons who are working for you.  Would that be a fair

15   description of leadership?"  And your answer was, "No."

16   A.    Well --

17   Q.    I have a question.  The question I have for you is:  Isn't

18   it true, Dr. Wiesen, that the difficulty that you have in

19   measuring what we've termed the softer skills, the supervisory

20   skills, is that there's a lack of agreement overall as to what

21   these skills are?

22   A.    I think that there is some lack of agreement.  I think

23   that if you want to try to measure command presence, you'd have

24   to define "command presence."  I don't think command presence

25   necessarily overlaps completely with leadership.  And

1    definitely the definitions of the softer skills -- you'd have

2    to be quite precise in articulating what you want to measure or

3    you will not have a very good chance of measuring it, and

4    one-word characteristics are not very precise definitions.

5    Q.    When we spoke in 2006 I asked you if there was any

6    agreement about what was the ideal method of measuring job

7    performance, and you told me that you would -- you agreed that

8    there was only modest agreement in your field as to what the

9    ideal measure of job performance is.  And now four years later

10   would you still agree with that statement?

11   A.    By "job performance," you mean somebody actually doing the

12   job or do you mean predicting?

13   Q.    Predicting how somebody was actually going to do the job.

14   A.    Because I think there's still controversy in the field as

15   to how to measure job performance, how do you actually measure

16   the quality of work done by an employee in any job, in this

17   case police sergeant.  And of course you want to try to think

18   of criterion validity.  The criterion-related validity research

19   is no better than the measure of job performance.

20       If you're asking is there an ideal way of predicting job

21   performance, I think that there is general consensus in the

22   field that more measurement tools are better than fewer

23   measurement tools to a point, that relying on a single

24   measuring instrument is often unwise, and that a broader

25   coverage of the job is better than a narrow coverage of the

1    job.  But when you get into the actual nitty-gritty of what

2    exercises should you use and what definition should you use, I

3    don't think the field has a definitive answer yet.

4    Q.   Now, one of the things that we had talked about a little

5    bit is the practicality of the testing instrument.  And the

6    tests here were administered to large bodies of candidates.  So

7    one of the things that the -- one of the things that Chapter 31

8    requires is that the test be for the practical -- for the

9    abilities that are -- can practically and reliably be measured.

10   And that is one of the things that's considered when you're

11   putting together the type of examination that's being

12   administered, correct?

13   A.   "Large" is a relevant term.  So New York City is

14   considerably larger than Boston and it has used assessment

15   exercises for its public safety positions.  But practicality is

16   always a consideration, yes.

17   Q.   And practicality would include things like the size of the

18   candidate pool as well as the financial resources available to

19   design the instrument, correct?

20   A.   As well as other things.

21   Q.   As well as -- it's not exhaustive.  So you're looking at

22   the number, the financial constraints, you're looking at the

23   constraints of your local governments, correct?

24   A.   I was thinking of psychometric considerations, the

25   security.  But, yeah, practicality is important.

1    Q.    And whatever local law allows would also be part of the

2    consideration for the test consultant putting together an exam?

3    A.    Yes.

4    Q.    For example, when you were the director of validation at

5    HRD, you were there until 1993, correct?

6    A.    Right.

7    Q.    And during the entire time that you were there did you

8    ever design an assessment center that was administered, paid

9    for, run by HRD either for the recruit level or for any of the

10   promotional exams?

11   A.    No, they were always funded by an outside agency.

12   Q.    And is that because HRD didn't have the resources to fund

13   this kind of an assessment?

14   A.    I'm not sure that's true.  Some years at HRD we seemed to

15   have no money at all; some years we did seem to have money.  I

16   think it was a matter of priorities.  New York State had a unit

17   that administered oral examinations for their Civil Service

18   entry-level and promotional exams, and did so reasonably

19   economically.  So I think it was a matter of -- largely a

20   matter of will and nobody was pushing for it.

21   Q.    Were you pushing for it?

22   A.    I was not.  At the time I was much more enamored with the

23   multiple-choice job-knowledge test than I've become over the

24   years.

25   Q.    And was that because you had faith -- excuse me -- you had

1    testified that as the director of validation, you validated the

2    entry-level exams that were administered for police and fire?

3    A.    Right.

4    Q.    And the police and fire exams were multiple-choice exams;

5    is that correct?

6    A.    Yes.

7    Q.    And was part of your being enamored with the

8    multiple-choice exam is that your follow-up of the candidates

9    who passed the written entry-level exam did perform as the exam

10   had predicted?

11   A.    Well, unfortunately, validity is always modest.  I mean,

12   the highest validity that people ever report finding, whose

13   reports are credible, is a correlation of .5.  And usually the

14   correlation is in the .2-to-.4 range.  The understanding of

15   that, however, is not -- should not be in terms of that number

16   but in terms of the square of that number.  So if your

17   correlation is .5, .5 squared is .25, your test is explaining

18   one-quarter of the variability in job performance.  So that

19   means three-quarters of variability in job performance is not

20   being accounted for.

21        I think that the field is wrestling with that; is very

22   uncomfortable with explaining only one-quarter of the

23   variability in job performance.  I think that's part of the

24   impetus behind developing alternative selection procedures that

25   measure wider ranges than the multiple-choice test to try to

1    move the empirical -- the criterion-related validity

2    coefficients to much higher levels.

3    Q.    So why were you enamored with the multiple-choice exam,

4    then?

5    A.    Because in the field, if you found a correlation of .3,

6    that was very impressive.  When the U.S. government did a

7    validation of the GATB, arguably --

8    Q.    What is -- I don't know the acronym.

9    A.    The General Aptitude Test Battery, one of the -- it was

10   the battery used by the Department of Labor to try to place

11   people, and it was used by the Division of Employment Security.

12   It's a very large-scale testing program.  When they did a

13   validation study that -- and it was used across a wide range of

14   jobs in a wide -- over a wide -- you know, many geographic

15   areas, the average validity was .23.

16        Well, .23 became, as a result of that study, a reasonable

17   level of validity.  Well, if you square .23, I mean, that's

18   definitely -- you know, 6 percent of the variability in job

19   performance is being explained by that test.  But there was

20   a -- by the federal government.  But a lot of time, effort and

21   research in developing that test.  That was not a haphazardly

22   slapped-together test; that was developed through a team of

23   very competent people over many years.

24        But the validity was very modest.  So looking back, it

25   would seem like the test didn't cover enough areas.

1   Q.   Okay.  So can I take from that that the reason that you

2   were comfortable with the multiple-choice exam in the period of

3   time that you were at DPA is because there was abundant

4   evidence at the time that led you to believe that that test was

5   a valid and adequate predictor of future performance?

6   A.   It was as good as people were doing back then.

7   Q.   Okay.  Now, we had talked a bit yesterday and the day

8   before about the imposition of a passing score.  And I believe

9   that you had said that one of your concerns with the validity

10  of the examinations was that you didn't have faith in the

11  passing score being set because it was set at 70.

12  A.   Right.

13  Q.   Is that fair to say?

14  A.   Yes.

15  Q.   And is it your experience -- or was it your experience

16  when you were at DPA that 70 was the traditional passing score

17  that was used for both the entry-level and the promotional

18  exams?

19  A.   Yes.  There were some -- some times when that was not

20  followed.  It caused considerable outcry from the public, from

21  employees.  They got all excited.  I think there was a

22  firefighter exam that was administered before I began my

23  employment with the Commonwealth, and --

24  Q.   Dr. Wiesen, I don't mean to interrupt, and I

25  don't -- honestly, I don't want to be incorrect, but my

1    question was:  Was 70 used as the traditional passing score for

2    the recruit and promotional exams when you were at DPA?

3    A.    Most of the time.

4    Q.    And is it fair to say that at least in the populations of

5    candidates that we're talking about here, that the number of

6    candidates vastly outnumbers the number of vacancies for which

7    people will be selected to fill?

8    A.    For Boston, yes.

9    Q.    Okay.  Now, when you were calculating the range of people

10   who were selected for these positions, you were looking at the

11   way that the scores would affect their placement on the list,

12   and then appointment in rank order likewise would affect

13   whether or not they would be reached for promotion.

14   A.    Correct.

15   Q.    So with that, small variances in the grades would have a

16   big impact, at least, on the individuals; is that correct?

17   A.    Correct.

18   Q.    And when we're looking at the way that the scores are

19   administered under the Civil Service system in Massachusetts, I

20   believe that you had stated that 20 percent for the education

21   and experience that we talked about -- that each candidate, by

22   virtue of having the sufficient number of years to qualify to

23   take the exam, will automatically go in with 14 points?

24   A.    Correct.

25   Q.    And the remaining six points are apportioned depending

1    upon one's years of experience and one's level of education

2    attained?

3    A.    Correct.

4    Q.    So there's a possible range of six points that candidates

5    can achieve?

6    A.    Correct.

7    Q.    And likewise, under the Massachusetts Civil Service

8    system, there's a requirement that anyone who is a veteran gets

9    a -- two points added to their final score?

10   A.    Correct.

11   Q.    So we have these -- these points that are in flux that

12   have nothing to do with the exam can total eight points.  Would

13   you agree?

14   A.    Right.  But six of them are related to the exam; two of

15   them are not related to the exam.

16   Q.    That's fair.  Thank you.

17        So if we have two candidates and we -- take two candidates

18   who get the exact same score on the written exam, answer every

19   question exactly the same, and presume that both of them have

20   earned a 70 on the written exam, and presume again that one of

21   those individuals has a ninth grade education and has no

22   further education, he'll get the 14 points by virtue of the

23   fact that he served in his capacity for three years?

24   A.    There might be a high school requirement for police

25   officer.

1    Q.    Okay.  Assume he has a GED.

2    A.    Okay.

3    Q.    A GED will qualify you to become a police officer in

4    Massachusetts, correct?

5    A.    I believe so.

6    Q.    Okay.  So assume that we have a candidate who has earned a

7    70 on the exam, he earns 14 points because he's been a police

8    officer for three years and he doesn't have a veteran's status.

9    So that will give him a total exam score of 84.  Would you

10   agree?

11   A.    We went from 70 to 84?

12   Q.    Yes.  I gave him 14 points for being a three-year veteran

13   of the police force.

14   A.    Okay.  So all he has is -- he had zero points on the

15   education and experience beyond the minimum requirement?

16   Q.    Correct.  Then your other candidate who scored a 70,

17   presume, has a law degree, so he'll earn 20 points on the

18   education and experience, correct?

19   A.    I'm not familiar enough with the scoring scheme to

20   calculate that off the top of my head.  Presumably, he'll get

21   some points.

22   Q.    Let's presume there's a candidate who earns every point

23   that's available under education and experience and he's also a

24   veteran.  So that brings his score to a 92 even though both

25   performed exactly the same on the written test itself.

1   A.   Right.  But the veteran's points and then the E&E, I
2   think, are separate.
3   Q.   Right.  That's why I'm giving him 20 for the E&E and two
4   for the veteran, so that brings him to a 92.
5   A.   Okay.
6   Q.   So even if these two candidates performed exactly the same
7   on the written exam, their placement on the list is going to be
8   quite dramatically separate, would you agree?
9   A.   Well, the fellow who got zero additional credit on the E&E
10  would have gotten an 84, and the other fellow got a 90 --
11  Q.   He got a 92?
12  A.   He got 90 on the exam, and then he got two more points for
13  statutory reasons.  So that's the difference, yes.
14  Q.   Yes.  And that difference would not be related to any bias
15  that's contained in the written instrument, correct?
16  A.   Correct.
17  Q.   So when we were talking about adverse impact yesterday and
18  you were looking at the numbers, you said that when you have
19  adverse impact it makes you look to see what is this something
20  else that's going on.  And I guess my question would be that
21  "something else" can be any number of things, can't it?
22  A.   Yes.
23  Q.   It can be education?
24  A.   Yes.
25  Q.   It can be experience?

1  A.    It might be.

2  Q.    It can be obtaining statutory preferences in the veterans

3  points?

4  A.    Oh, you're suggesting that the adverse impact could be due

5  to veterans preference?

6  Q.    It could be due to many factors other than a faulty or

7  invalid exam.

8  A.    The adverse impact analyses I was doing was on the test

9  score of the written exam itself, when I was dealing with the

10 written test alone.  I also did adverse impact analyses on the

11 whole examination in terms of the appointments.  So at least

12 some of the analyses I did weren't mixed together with an E&E

13 and some were.

14 Q.    Well, you did analyses on the written portion of the exam

15 and you did written analyses on the pass/fail point and at the

16 selection point?

17 A.    Right.

18 Q.    And the example I've just given you would affect placement

19 for selection, would it not?

20 A.    Yes.

21 Q.    And that was one of the categories where you found that

22 there was adverse impact?

23 A.    Yes.

24 Q.    And one of the explanations for the adverse impact at the

25 selection point could fall to preferences, it could fall to

1  education and experience separate and apart from any deficiency

2  within the written exam itself, correct?

3  A.   Yes.

4  Q.   And looking at the written exam itself, even if we have

5  candidates that don't earn the same scores, would you agree

6  with me that a candidate who has a graduate-level education

7  would be predicted to outperform someone who has a GED on a

8  written test?

9  A.   I would think so.

10          MS. HARRIS:  If I could just have a moment, your

11  Honor.

12          (Pause.)

13          MS. HARRIS:  Dr. Wiesen, thank you.  I don't have any

14  further questions.

15          THE COURT:  Mr. Carroll?

16          MR. CARROLL:  Thank you, your Honor.  If I may just

17  have a moment.

18          THE COURT:  Fair enough.

19          MR. CARROLL:  I have some multimedia.

20          THE COURT:  All right.  I look forward to it.

21          What connection will you be using, the podium?  Do you

22  know?

23          MR. CARROLL:  Primarily, yes, your Honor.

24          THE COURT:  Okay.

25          MR. CARROLL:  I'm just not sure how to do it.

```
 1              (Pause.)

 2              MR. CARROLL:  This is to the podium, I hope?

 3              THE COURT:  I hope so.

 4                              CROSS-EXAMINATION

 5   BY MR. CARROLL:

 6   Q.   Good morning, Dr. Wiesen.

 7   A.   Good morning.

 8              THE COURT:  Mr. Carroll, let's just make sure your

 9   equipment is working.  Do you have an image on your laptop?

10              MR. CARROLL:  No.  I can put one up.

11              THE COURT:  Why don't you put one up so I could test

12   it.

13              (Pause.)

14              MR. CARROLL:  I have one now, your Honor, on Podium 1.

15              THE COURT:  No.

16              MR. CARROLL:  Well, perhaps, your Honor, we could --

17   I'll talk during the break and I could ask a few questions

18   beforehand.

19              THE COURT:  Fine.  Let's go ahead with that.

20              MR. CARROLL:  This will be old school for a while.

21              THE COURT:  Okay.  Go ahead.

22   BY MR. CARROLL:

23   Q.   Dr. Wiesen, could you explain to us the difference between

24   practical significance and statistical significance?

25   A.   Sure.  Statistical significance is something that is
```

1    calculated.  There are criteria -- mathematical criteria for

2    statistical significance.  Practical significance is a judgment

3    that's made.  Sometimes there are rules of thumb for the

4    practical significance.  So in the Uniform Guidelines, 80

5    percent, or the four-fifths rule is a practical -- is a rule of

6    thumb for practical significance.  But that's the difference:

7    One is a mechanistic mathematical calculation, and the other is

8    judgmental.

9    Q.   Okay.  So if you have a measurement with great statistical

10   significance, that's one that's unlikely to have occurred by

11   chance; is that correct?

12   A.   Correct.

13   Q.   And if you have a measurement with great practical

14   significance, that's one of significant magnitude or great

15   magnitude?

16   A.   Correct, basically.

17   Q.   Okay.  So a high level of statistical significance does

18   not necessarily imply great practical significance --

19   A.   Correct.

20   Q.   -- correct?

21       And a low level of statistical significance may cause one

22   to doubt the practical significance of the measurement because

23   it may not be accurate?

24   A.   The way the statistical significance works, it's all or

25   none, at least as it was designed.  So if you have a

1  statistical significance, your conclusion is that there's a

2  real difference there.  But I guess if you're more -- if you

3  place more faith in something that has higher statistical

4  significance, I guess you'd place less faith in something that

5  has lower statistical significance, but the way the hypothesis

6  testing approach in statistics was developed, it was an

7  all-or-none proposition.

8  Q.  Either it was statistically significance or it wasn't,

9  correct?

10  A.  Correct.

11  Q.  So just to bring that home with a practical example, if

12  you had an earthquake on the Richter scale that was 1.5 and it

13  was an extremely accurate measurement, okay, statistically

14  speaking, that may not have any practical significance at all

15  because there's earthquakes like that every day and it's not

16  even reported.

17  A.  Okay.

18  Q.  So if you had an earthquake that measured 12.0 on the

19  Richter scale, that would have great practical significance but

20  it may not -- if it's not statistically accurate, it would be

21  an unreliable number that wouldn't necessarily indicate

22  anything, correct?

23  A.  So your measurement instrument said that you had an

24  earthquake of 12 and --

25  Q.  The measuring instrument was chronically wrong.

1    A.    -- the measuring instrument was wrong.

2    Q.    Yes.

3    A.    And it was or was not statistically significant.

4    Q.    Well, I'm talking about practical significance now, not

5    statistical significance.  The statistical significance is a

6    1.5, completely accurate, very, very precise; it has no

7    practical significance because it's a minor tremble.

8    A.    You can have an incorrect measurement, yes.

9    Q.    Okay.  Now, did I understand your testimony earlier today

10   that you were the person who designed the T&E weighting

11   requirements for DPA when you were there?

12   A.    No.

13   Q.    Did you play any role in that?

14   A.    On occasion I suggested that we reevaluate the T&E

15   weighting process, but the response of the administration was

16   "It's not busted.  Let's not fix it."

17   Q.    Would it be fair to say that the cities and towns didn't

18   play a role in that process?

19   A.    At what point in time?

20   Q.    At the point in time where the T&E weights were being

21   developed.

22   A.    The T&E weights were developed before I joined the agency

23   in '77, and had been there for many years before that.  I have

24   no idea what the input from the municipalities was.

25   Q.    While you were there, do you know if the DPA consulted

1   with the city of Springfield as to what the proper weights

2   given on the T&E should be?

3   A.   I do not know.  I would doubt it, but I have no idea.

4   Q.   And, in fact, it's quite unlikely they would have

5   consulted with Methuen or the MBTA or the other defendants in

6   this case with regard to that question too, correct?

7   A.   Well, if municipalities were consulted, there would have

8   probably been a statewide letter, it would have gone to

9   everybody and whatever.  And so if one municipality was

10  consulted, then all the others would have been.

11  Q.   And would it be fair to say that you've never seen such a

12  letter?

13  A.   That's correct.

14       MR. CARROLL:  I'm going to try the other part of the

15  tact, your Honor.

16       THE COURT:  Okay.

17       (Pause.)

18  BY MR. CARROLL:

19  Q.   Dr. Wiesen, I believe earlier in your testimony, perhaps

20  yesterday, on direct examination when Attorney Lichten was

21  asking you some questions, you mentioned Dr. Schmidt and

22  Hunter; is that correct?

23  A.   Yes.

24  Q.   And are they prominent in the field of --

25  A.   Let me -- I know that I mentioned an article by Schmidt.

1    I don't think we actually discussed the Schmidt and Hunter

2    article.  I think that Mr. Lichten gave me a copy of it, but

3    that was not the article I was referring to.

4    Q.    Okay.  Let me ask what I hope is a clear question.  Have

5    you heard that Dr. -- well, do you know a Dr. Pearlman?

6    A.    Doctor --

7    Q.    Pearlman.

8    A.    Pearlman?  First name?

9    Q.    I'm not certain.

10   A.    There was a Dr. Kenneth Pearlman who worked for the U.S.

11   Department of Personnel Management and occasionally publishes.

12   Q.    Okay.  And have you ever read an article by him in the

13   Journal of Applied Psychology that he wrote with Dr. Schmidt

14   and Hunter entitled "Validity generalization results for tests

15   used to predict job proficiency and training success in

16   clerical occupations"?

17   A.    Yes.

18   Q.    Are you familiar with that article?

19         And are you aware that in that article Dr. Schmidt and

20   Hunter argued that the variance in the outcome of validity

21   studies for similar jobs and tests is, quote, "largely an

22   illusion created by statistical artifacts"?

23   A.    Yes.

24   Q.    Do you agree with that?

25   A.    That's a very easy question to ask; it's a harder question

1    to answer.  It's a more complex answer.

2    Q.    Can you answer yes or no?

3    A.    My answer is a little bit more complex than yes or no.  I

4    think I -- I understand the evidence that would indicate that

5    that's true and also some of the evidence that would indicate

6    that it's not true.  And, in fact, that was a topic of a little

7    discussion with your predecessor at the...

8    Q.    Well, let me shift, then, to a different issue.

9          With regard to candidates who take the examination, as I

10   understood your testimony earlier, you indicated that the idea

11   of Civil Service, at least in theory, is to predict the best

12   qualified candidates, which theoretically would be the top

13   scorers on an exam.  Would that be accurate?

14   A.    That is definitely a goal, yes.

15   Q.    And --

16   A.    Perhaps the major goal.

17   Q.    Okay.  And do the Uniform Guidelines prohibit, to your

18   knowledge, the use of the best qualified candidates for a

19   particular job?

20   A.    Well, from a practical point of view, the answer might be

21   yes; from a maybe theoretical point of view, the answer could

22   be no.  And the reason that I say that is that the Uniform

23   Guidelines have some very strong language about ranking based

24   on content validity.  And the Uniform Guidelines seem to be

25   the -- the authors of the Uniform Guidelines seem to be

1    skeptical of content-valid tests that do not resemble the

2    content of the job.

3    Q.    Okay.  Well, let me ask you to assume a content-valid

4    examination.  Would you make that assumption for the purpose of

5    answering a question?

6    A.    Okay.

7    Q.    And that being the assumption, would you say that for

8    content-valid examinations, the Uniform Guidelines prohibit, or

9    inhibit, the use of the best qualified candidates?

10   A.    I don't think that's what the framers of the guidelines

11   meant to do.

12   Q.    Okay.  So the Uniform Guidelines aren't designed, then, to

13   prohibit government entities, say, police forces, from getting

14   the best qualified people to be their officers.  Would that be

15   correct?

16   A.    Correct.

17   Q.    And under the state Civil Service law, that, at least in

18   theory, is determined by highest scorers on examinations?

19   A.    Correct.

20   Q.    And under the state Civil Service laws, the municipalities

21   that have Civil Service positions are required, really by state

22   law, to choose among the candidates on the certified list?

23   A.    Correct.

24   Q.    And that's related to the 2 N + 1 rule?

25   A.    Yes.

1    Q.    And that relationship is 2 N + 1 is the certified list,

2    correct?

3    A.    Correct.

4    Q.    And so everybody who --

5    A.    Where N is the number of people certified.

6    Q.    Yes.

7    A.    Oh, no, the number of openings.

8    Q.    The number of candidates for --

9    A.    And then 2 N + 1 is the number of people certified.

10   Q.    The number of people.

11         And it's not limited to three.  Let's say you're only

12   talking about one position, but as a matter of practice HRD or

13   DPA would include anybody who gets the same score, that's

14   tied --

15   A.    Correct.

16   Q.    So you could get 15 people under the 2 N + 1, it's just

17   all of them got tie scores?

18   A.    Correct.

19   Q.    And that's the only group of people, though, that a

20   municipality such as Springfield can appoint under state law;

21   is that correct?

22             MR. LICHTEN:  Your Honor, I object.  This gets to a

23   motion in limine that's pending before you, our position being

24   that under the First Circuit decision -- under your decision --

25   they're trying to retry an issue which you've already decided,

1    which is as employers, they're responsible for the examination

2    they chose to use.

3           This whole line of evidence goes to an argument, which

4    again, I believe the First Circuit has rejected, that they

5    can't say "We're not liable because we were just following what

6    the state did."  Title VII of the supremacy clause would take

7    precedence over any state regulation.

8           THE COURT:  Well, those arguments are arguments that

9    you have, and we'll resolve them in the case, but I don't think

10   it's a basis for objecting to the examination.

11          MR. LICHTEN:  Thank you, your Honor.

12   BY MR. CARROLL:

13   Q.   Can you answer the question, Dr. Wiesen?

14   A.   Would you repeat it, please?

15   Q.   Would you repeat it, please?

16          (The reporter reads the pending question.)

17          THE WITNESS:  Yes, when the examination gets to that

18   point, that would be the only group of people.

19   BY MR. CARROLL:

20   Q.   Okay.  And before it gets to that point no appointments

21   can be made, correct?

22   A.   No Civil Service appointments, right.

23   Q.   Right.  And so the only time a municipality gets involved

24   in making an appointment is after they get the certified list

25   from the state, correct?

1    A.    I think that's the way it worked back then, yes.

2    Q.    Okay.  And even then when they get the certified list,

3    their hands are tied by the certified list; that is, they can

4    only appoint off the certified list?

5    A.    Correct.

6    Q.    And under the state Civil Service law, if you bypass a

7    candidate on that certified list who scores higher, then that

8    candidate has a right to appeal to the Civil Service

9    Commission, correct?

10   A.    I believe that's correct.

11   Q.    And the community has to have valid reasons for bypassing

12   a higher-scoring candidate in order for the Civil Service

13   Commission to uphold the bypass on appeal, correct?

14          MR. LICHTEN:  Objection.  All these questions call for

15   legal conclusions.

16          THE COURT:  No, I think they're within the witness's

17   experience.

18          You may have it.

19          MR. CARROLL:  Thank you, your Honor.

20          THE WITNESS:  I apologize, but could you repeat that?

21          MR. CARROLL:  Could I ask you to read back, please?

22          (The reporter reads the pending question.)

23          THE WITNESS:  Yes.

24   BY MR. CARROLL:

25   Q.    And are you aware that actually Springfield had bypassed

1    the -- back in 2004 the two top-scoring white candidates to

2    appoint a minority candidate?  Are you aware of that?

3    A.    It's not something I recall.

4    Q.    Okay.  And would it surprise you to learn that the Civil

5    Service Commission in that case overturned the bypass appeal,

6    saying we couldn't do it?

7               MR. LICHTEN:  Same objection.

8               THE COURT:  Overruled.

9               THE WITNESS:  I was not aware.

10    BY MR. CARROLL:

11    Q.    Okay.  Are you aware -- I believe you indicated you've

12    read the Springfield supplemental answers to the

13    interrogatories which had attached as Exhibit 1 to it -- and I

14    apologize for not being able to graphically portray it at this

15    point, but that Exhibit 1 was a written list and it had, at the

16    top, two names that were handwritten on it.  And those two

17    names said "Put to the top of the list."  Do you recall seeing

18    that?

19    A.    I recall handing in names.

20    Q.    Okay.  And are you aware that those are the two names of

21    the white candidates who scored on an earlier exam, and the

22    Civil Service Commission ordered the city to put them to the

23    top of the next Civil Service list?

24    A.    Oh, so you're saying they didn't actually take that exam?

25    Q.    They did not take the exam, they took the prior exam on

1  2004 or even earlier because it takes a while for these Civil

2  Service Commission decisions to work out any decision.  And the

3  end result of the bypass appeal was the Civil Service

4  Commission ordered Springfield to put these two candidates to

5  the top of the list.

6           MR. LICHTEN:  Sorry.  Is there a question there, your

7  Honor?

8           MR. CARROLL:  Is he aware of that.

9           THE WITNESS:  I was not aware of that.

10 BY MR. CARROLL:

11 Q.   Okay.  And would that make any difference in the way you

12 calculated your database?

13 A.   Yes.

14 Q.   Okay.  And how would that transpire?

15 A.   Well, if they didn't take the exam, then I think you would

16 want to exclude them from the analysis.

17 Q.   But, in fact, in your analysis you included them, correct?

18 A.   Correct.

19 Q.   And --

20          THE COURT:  I don't mean to cut you off, but it is

21 almost eleven, and since you're having some difficulties, why

22 don't we take -- with the equipment, let's take the recess now

23 and maybe we could get some help.

24          MR. CARROLL:  Thank you, your Honor.

25          THE COURT:  We'll take the recess.

1          THE CLERK:  All rise.  We'll take the morning recess.

2          (The Court exits the courtroom and there is a recess

3     in the proceedings at 10:54 a.m.)

4          (After recess, start at 11:30 a.m.)

5          MR. LEAHEY:  Your Honor, if I may interrupt.  I spoke

6     to HRD yesterday.  One of the questions at the end yesterday

7     was what to do about the exam questions.  And I spoke with

8     Attorney Carroll, who was planning to ask Dr. Wiesen about the

9     exam questions.  I spoke to HRD, I sent an e-mail to everyone

10    saying that they wanted to protect the exam questions as best

11    as possible.  They appreciated having the courtroom closed.

12    They considered that to be a first step.  They would also ask

13    that either the specific question or a portion thereof be

14    redacted from the official transcript that's available to the

15    general public and that when the questions in this testimony

16    comes up, they would ask that only -- that the plaintiffs,

17    because they are potential test takers on some type of exam

18    that HRD may or may not do in the future but it may include

19    questions similar to that, that they be excused from the

20    courtroom.

21          This is what HRD represented to me.

22          THE COURT:  Just on that last point, anyone who took

23    an exam once would have an idea what the questions are going to

24    be like next time.  I don't know how serious an objection that

25    is.  I know you're just the messenger.

1          My inclination is not to close the courtroom but

2     simply -- but to seal portions of the transcript.  I don't

3     think there's a great danger of harming the test exam by

4     someone in the audience hearing the oral testimony.  And I can

5     do that over your objection if you're worried about a breach of

6     the confidentiality agreement.

7          MR. LEAHEY:  Actually, that would be preferable,

8     actually.

9          THE COURT:  So I take it there's an objection and it's

10    overruled.  I'm strongly in favor of open courtrooms.  I know

11    there are reasons why sometimes we would close it, trade

12    secrets would be one.  I don't think this is so sensitive.  I

13    understand the HRD's interest in not having it widely

14    disseminated, but, as I say, it's not like it's something that

15    nobody ever finds out.  It's not the actual exam that will be

16    given at some future time, it's a past exam, and there are lots

17    of people who have seen the past exams, including those in the

18    departments of the various defendants.  So --

19         MR. D'AGOSTINO:  Your Honor, may we all be on record

20    as objecting so we'll be protected?

21         THE COURT:  Fair enough.

22         We will seal a portion of the transcript and redact it

23    from distribution which we'll have to do -- I don't want to do

24    it as we go along.  It's probably more reliable for people to

25    take a look at it and then designate what portions should be

1    redacted afterwards.

2            MR. CARROLL:  Thank you, your Honor --

3            THE COURT:  Are you technically proficient at this

4    time?

5            MR. CARROLL:  I believe so, your Honor.  I figured out

6    what 2 and 5 are, but I'm not a statistician.

7            (Discussion off the record.)

8            MR. CARROLL:  I'm not quite as proficient as one might

9    like.

10   BY MR. CARROLL:

11   Q.   All right.  Dr. Wiesen, I'm going to show you a portion of

12   a document that's labeled Table 1 Defendant Police Departments

13   Enrolled in HRD Sergeant Exams by Exam Year With List

14   Established.  Do you see that, sir?

15   A.   I do.

16   Q.   And is this table 1 a chart that you prepared?

17   A.   Yes.

18   Q.   And would it be fair to say that this chart reveals that

19   no more than two out of four exams were given by any single

20   defendant in this case?  I'm sorry, that the officers from the

21   defendant communities did not take more than two out of four

22   exams?

23   A.   Yes.

24   Q.   So that in Springfield's case, you're only looking at the

25   examination that was given in 2005 and 2007, correct?

1    A.    Correct.

2    Q.    Okay.  And before we move on, a couple of questions.

3          First of all, I noticed that you have a large number

4    of notebooks in front of you.  Are those notebooks that you

5    prepared?

6    A.    These?  No.

7    Q.    Okay.  So they were some things prepared by counsel for

8    you?

9          MR. LICHTEN:  They're just the exhibits, your Honor.

10          MR. CARROLL:  I want to find out what they are.

11          MR. LICHTEN:  They're labeled exhibits.

12          MR. PIKULA:  I have trouble seeing from here.

13    A.    I didn't bring notes with me to the stand.

14    Q.    Okay.  So it's your testimony, then, that nothing that you

15    have before you is anything that you personally prepared?

16    A.    I have written on some of these.

17    Q.    Okay.  And can I see the ones you have written on?

18          MR. CARROLL:  May I approach the witness, your Honor?

19          THE COURT:  All right.

20          THE WITNESS:  These would be the ones that I have

21    written on.

22          (Pause.)

23    BY MR. CARROLL:

24    Q.    In earlier testimony, Dr. Wiesen, I believe you testified

25    about the KSAPs, the KSAPs?

1          MR. LICHTEN:  Your Honor, he's certainly allowed to

2     look at them, but I'm not sure it's appropriate to take them

3     away.

4          THE COURT:  What's your intention?

5          MR. CARROLL:  Well, your Honor, my intention was to

6     look through them, read some of the notes, and see if there are

7     any questions for cross-examination.  But I didn't want to

8     waste a lot of the Court's time looking through this pile of

9     papers looking for individual notations.  I thought I might do

10    that at the break this afternoon.

11         THE COURT:  Well, if you're not going to use them now,

12    then I guess you can put them back.

13         (Pause.)

14         MR. CARROLL:  Perhaps I will and it will just be more

15    efficient to use them now.

16         THE COURT:  All right.

17    BY MR. CARROLL:

18    Q.   Dr. Wiesen, on the back of the testability analysis, which

19    is marked attachment EE, you made some written notations; is

20    that correct?

21    A.   I did.

22    Q.   And that's your handwriting, correct?

23    A.   Yes.

24    Q.   And can you read what this notation says?

25    A.   Yes.  The first phrase is a little hard to read but refers

1    to practical significance.  And the second one, the second line

2    there is statistical significance.

3    Q.    Okay.  And that relates to the questions I asked you

4    earlier today?

5    A.    That's correct.

6    Q.    And can you tell us what the note in the far right-hand

7    corner says?

8    A.    It says that the pass point changed over time.

9    Q.    Pass point changed over time.

10    A.    That's what I wrote.

11    Q.    And what did you mean by that?

12    A.    That says "exam questions."

13    Q.    No, I'm sorry, what did you mean by pass point changed

14    over time?

15    A.    Oh, what I meant was that a different proportion of people

16    passed the exam in different years.  I think the overall rate

17    of passing varied by as much as 20 percent.  I think in one

18    year it was around 50 percent, another year it was around 70

19    percent, and that that would, in my opinion, not reasonably be

20    attributed to differences in the quality of the applicant

21    groups since the applicant groups, I would think, would be

22    about the same from year to year.  So that would be an

23    indication that the passing point changed over time, even

24    though it was 70 for most of those years, 70 did not really

25    mean the same thing in different years.

1    Q.    You're talking about the effective passing --

2    A.    Not the effective passing rate.  That relates to who was

3    reached, what's the lowest score that was reached.  This is the

4    actual official passing point of 70 percent.  That passing

5    point of 70 percent failed a larger percent of people some

6    years than other years.

7    Q.    Okay.  Is it true that in more recent years more people

8    passed or did more people fail?

9    A.    I think the trend was that there were more people passing.

10   Q.    Okay.  So as the years went by, the passing point grade of

11   70, the cut point, stayed the same at 70, correct?

12   A.    Well, numerically it was 70.

13   Q.    Numerically it didn't change --

14   A.    Except for Boston.

15   Q.    -- but the number of candidates that actually passed the

16   examination increased as time went by?

17   A.    Well, I have a chart on that in my report so I could

18   verify that, but I think that's true.

19   Q.    And could you read to us what this next note says?

20   A.    Yes.  That says "exam questions."

21   Q.    Okay.  And what does that signify?

22   A.    I was wondering if anyone was going to ask me about the

23   exam questions.

24   Q.    Well, I think I will save some time and do that right now.

25   A.    Okay.

1    Q.    After I return the file with notes.

2    A.    Thank you.

3    Q.    Before displaying my technical wizardry again, Dr. Wiesen,

4    let me ask you a question as to how you -- what you mean by

5    content validity specifically?

6    A.    Content validity is a judgmental process that evaluates

7    how well the content of the test corresponds to the content of

8    the job in terms of the requirements to do the important tasks

9    and duties of the job.

10   Q.    Okay.  And when you say the important tasks and duties of

11   the job, in professional terms we're talking about the KSAPs;

12   is that correct?

13   A.    Some people that develop tests don't use KSAPs.

14   Q.    Okay.  Let me just ask a better question.  What I'm

15   talking about is the Commonwealth of Massachusetts DPA and HRD

16   and the documents that we have in evidence which have to do

17   with the so-called testability analysis.  And if my memory

18   serves me correct, these are the KSAPs, correct?

19   A.    Yes.

20   Q.    Okay.  How are those KSAPs determined?

21   A.    My understanding is the KSAPs were originally determined

22   by the HRD staff, they then gathered ratings of those KSAPs

23   from SMEs.  As some point in the process the SMEs were allowed

24   to add and suggest rewording of the KSAPs.

25   Q.    When you say "SMEs," you're talking about Subject Matter

1    Experts?

2    A.    Correct.

3    Q.    And in this case do you know who the SMEs were?

4    A.    I do not.

5    Q.    Typically what would HRD or DPA in the time you were there

6    consider -- what were the types of people that would be

7    considered as SMEs?

8    A.    Incumbents and supervisors.

9    Q.    And when you say "incumbents and supervisors," for police

10   can you give us an idea what specifically you are talking

11   about?

12   A.    So for police officers it would be sergeants and it can be

13   lieutenants and captains, perhaps higher ranks.

14   Q.    So the idea would be to get somebody who knows something

15   about the job to be an SME.  You wouldn't just pull somebody

16   off the street and ask them what a sergeant does.

17   A.    Correct.

18   Q.    So these SMEs develop the KSAPs, and that's the list we

19   looked at the other day --

20   A.    It was developed by HRD but the SMEs had some input.

21   Q.    And how would that work if HRD staff people developed the

22   KSAP and an SME took a look at it and said you're all wet, a

23   police sergeant doesn't do this.  How would that process work?

24   A.    Well, I think the -- if I were doing it, the input from

25   the SME that would be most valuable is not we don't do that or

1   don't need that, but this isn't clear to me as it's written and

2   it would be more clear if you wrote it this way.  Because we

3   don't want the results of the job analysis to be a function of

4   one person's opinion, but rather, the reason you have a

5   questionnaire is to collect information from many people.

6          I don't know exactly how HRD organized the input from

7   the SMEs.  It wasn't perfectly clear to me from reading the

8   report.

9   Q.   When you reviewed attachment EE, did that help clarify it

10  at all?

11  A.   Attachment EE came at a point in the process much further

12  along.  At that point the KSAPs were all written; they had been

13  sent out to the various SMEs to be rated; the ratings had come

14  back; there had been a statistical analysis done; some criteria

15  had been established to decide which would be considered

16  important, which would not be considered important; and that --

17  so there's no input from the SMEs as to the wording or

18  additional KSAPs at the point of appendix E.

19  Q.   So the testability analysis would be the end product of

20  the input of the SMEs and the -- HRD would initial it, it would

21  go out in a survey to the SMEs, they would respond and all of

22  that data would be analyzed and determined and the result of it

23  would be the testability analysis that you talked about

24  yesterday?

25  A.    Not exactly.  So --

1  Q.   How would it work then?

2  A.   The way it would work is the full list of knowledge,

3  skills, and abilities would be sent out to be rated, and the

4  incumbents would indicate which of those knowledge, skills, and

5  abilities and personal characteristics are important to do the

6  work.  There would also be a process of linking the knowledge,

7  skills, and abilities to specific job tasks to confirm that

8  those knowledge, skills, and abilities are really needed.  The

9  statistical analysis would be done of those ratings, the

10  importance of the knowledge, skills, and abilities.  The

11  subject matter experts would not be the people who determined

12  whether or not the KSAPs were testable.  That was done by the

13  HRD staff.

14  Q.   Okay.  But the knowledge, skills, and abilities that went

15  into the testability analysis, would those be items that the

16  SME believed would be important components of, say, the police

17  sergeant's job?

18  A.   I think that the initial list of knowledge, skills, and

19  abilities was developed by the HRD staff and they thought that

20  the -- that that list was a plausible list of abilities that

21  might be needed.  And I believe that that was -- there was an

22  opportunity for SMEs to supplement that list.

23       So I think every item -- every KSAP on that list was

24  thought by somebody to potentially be important for a sergeant

25  to possess.

1   Q.   And would it be fair to say that as best you can tell

2   someone from HRD went down through the list of KSAPs and tried

3   to boil them down and sum it up and made some notes which are

4   contained in the exhibits or the appendices to the 1991 report?

5   A.   I think after the testability analysis was completed a

6   test outline was formulated, and that would be a summary of

7   some of the material in attachment EE.

8   Q.   Okay.  And as you sit here today do you know whether --

9   strike that.

10        At the time you worked for DPA was when the 1991

11  report was developed and issued; is that correct?

12  A.   I was working there, yes.

13  Q.   And you knew the people at DPA who would have been

14  responsible for that work?

15  A.   Yes.

16  Q.   And do you think those people were competent to make an

17  assessment of the KSAPs that were important to the police

18  sergeant's job?

19  A.   They had some level of competence.

20  Q.   And would your -- what I'm trying to get to, maybe I'm

21  just not asking the question clear enough, is whether those

22  KSAPs reflected at the time the primary duties of a police

23  sergeant, at least in the opinions of the people at HRD with

24  some knowledge and competence in the level of police examining

25  and the SMEs who were outside experts as you've described?

```
 1              MR. LICHTEN:  I object to the form because he's asked
 2    that question as to the opinion of the people at HRD, not his
 3    opinion, and how would he know what their opinions are.
 4              THE COURT:  Overruled.
 5    BY MR. CARROLL:
 6    Q.   You can answer, Dr. Wiesen.
 7    A.   If you would, could you say that --
 8              MS. HARRIS:  Could you read back the last question,
 9    please.
10              (Record read.)
11    A.   I think that the project staff that put this together were
12    experienced in job analysis, and I think they were particularly
13    experienced in the task questionnaires.  They had some
14    knowledge of the KSAP areas as well and they, I'm sure, tried
15    as hard as they could to come up with a list of knowledge,
16    skills, and abilities that was appropriate for the tasks that
17    had already been identified as important.  Now, whether they
18    did a perfect job or not, that's another matter, but I'm sure
19    that's what they strived to do.
20    Q.   And would the same thing be said of the subject matter
21    experts to whom these SMEs were -- the SMEs to whom these KSAPs
22    were sent out and reviewed?
23              MR. LICHTEN:  Objection to the form.  I don't know of
24    the same.
25              THE COURT:  Well, you may answer it if you understand
```

1    it.

2    A.    Well, if you're asking did the SMEs answer the

3    questionnaire honestly, I think that HRD probably assumed that

4    the SMEs were answering honestly.  They weren't trying to

5    Mickey Mouse the system.

6    Q.    Okay.  And have you ever seen any evidence anywhere that

7    indicates to you that either the HRD folks that were preparing

8    these KSAPs or the SMEs who were consulted and reviewed the

9    KSAPs were trying to ask questions or identify important KSAPs

10   that were unimportant to being a police sergeant?

11   A.    I think that there might be two aspects to the answer.

12   One is that everybody might have their own personal biases and

13   opinions and think that some abilities are more important than

14   other abilities and not everybody would agree with everybody

15   else, and that would be a matter of honest disagreement.  Then

16   there's a possibility that people for one reason or another

17   want to see or not see various KSAPs being included in the exam

18   process.

19           So with respect to the first, I think many people have

20   their own idiosyncratic opinions for various reasons.  And with

21   respect to the second, I think on rare occasion there were

22   indications that perhaps the SMEs were not being forthright.

23   Q.    Okay.  But you've had a chance to review the 187 KSAPs

24   that were listed in the 1991 validation report; is that

25   correct?

1    A.    Yes.

2    Q.    And did you find anything in there that was unrelated to a

3    police job?

4    A.    Well, since the SMEs cited that it was related, I didn't

5    really focus on that.  There was nothing just glaring on the

6    page that I thought could be -- just couldn't possibly be true.

7    Q.    Would you say that they're all probably important for the

8    job of police sergeant?

9    A.    Yes.  I mean, some of them weren't perfectly clear, maybe

10   I don't understand exactly what the authors meant by some of

11   them, but I think they were all meant to be clear and be

12   important.

13   Q.    And they were determined by the job analysis to be related

14   to the police job, correct?

15   A.    Sergeant, lieutenant, captain.  This particular one is

16   sergeant.

17   Q.    Now I want to move to the end of the process after the

18   examination is over and the certified lists are prepared and

19   distributed to the communities and it's time for the

20   communities -- when I use the word "community," I include the

21   MBTA, which is also a defendant -- to actually make

22   appointments to the police sergeant.  And I believe earlier

23   this morning you indicated that those appointments would all be

24   made off the certified list provided by HRD or the DPA,

25   correct?

1   A.   Unless you had a delegated community, I think Worcester,

2   perhaps, created its own eligible list.  I'm not sure.

3   Q.   Well, apart from Worcester, then.  So the answer would be

4   yes?

5   A.   Yes.

6   Q.   Okay.  And what would be the next step, if you know, in

7   making appointments, say, in Springfield from that certified

8   list?

9   A.   I have very little knowledge of how Springfield would go

10   about doing that, other than the appointing authority has the

11   authority to choose.

12   Q.   Okay.  Do you know who the appointing authority for police

13   sergeants in the City of Springfield is?

14   A.   I do not.

15   Q.   Do you know before making an appointment to police

16   sergeant the City of Springfield would get recommendations from

17   the supervisors of the candidates?

18   A.   I think you might have mentioned something like that at my

19   deposition, but I did not have any other knowledge.

20   Q.   Okay.  And that would actually improve the validity of the

21   appointment?

22   A.   That definitely has the potential of improving the

23   validity process, yes.

24   Q.   Can you explain why that is?

25   A.   Well, the test measured a somewhat narrow slice of the

1  candidate.  First, it's only one performance on one day, and

2  then the multiple choice test measured a fairly circumscribed

3  area of knowledges.  They might have been important, but it was

4  circumscribed.  So the supervisors of the applicants would be

5  able to comment on many other aspects of the candidates from

6  the mundane as in terms of attendance and promptitude to

7  thoroughness to ability to interact with citizens.  So the

8  supervisors would have a rich source of information about the

9  candidates that the test would not reflect.

10  Q.   And if a structured interview was used by the City of

11  Springfield in reviewing the certified candidates for

12  appointment, how would that impact upon the validity of the

13  exam?

14  A.   It would improve the selections from among the people

15  certified, but it would not improve the overall exam as much

16  because the people who weren't certified weren't part of that

17  structured process.

18  Q.   Okay.  But you've testified the people who weren't

19  certified essentially could not be appointed to the position

20  because of the Civil Service law.

21  A.   Under the exam that the city signed up for, that's

22  correct.

23  Q.   Okay.  So under the promotional exam for sergeant, would

24  it be your view that a structured interview in conjunction with

25  the recommendations from supervisors of the candidates would

1    enhance the validity of the appointment?

2    A.    It would definitely make the selections from amongst the

3    people who were certified more informed and I think probably

4    better decisions.

5    Q.    And it's just your testimony you don't know whether in

6    fact that was done by the City of the Springfield or not?

7    A.    Correct.

8    Q.    Okay.  I want to turn now to demonstrate -- well, let me

9    show you a document that's been marked as one of the many

10   exhibits somewhere.  This is -- do you recognize this document?

11   A.    It looks like an examination announcement.  I can't see

12   the year.

13   Q.    Would this be -- well, let me pull it down a little.

14          THE COURT:  Actually, I'm going to amend my order

15   slightly by shutting down the gallery camera for this.

16          MR. CARROLL:  Can the witness see?

17          THE COURT:  The witness can see.  Everybody but the --

18          MR. CARROLL:  -- the audience.

19          MR. LICHTEN:  Can we just know what test it is so we

20   can get it out?

21   BY MR. CARROLL:

22   Q.    I don't have the exact number, but this is the examination

23   from the 2005 state Civil Service examination, correct?

24   A.    Yes, I see it.

25   Q.    And I guess my question is:  It says, "Note on

1    Abbreviations Used in This Examination."  Do you see that?

2    A.    Yes.

3              (Discussion off the record.)

4    Q.    What I'm trying to focus on is the one that says, "Note on

5    Abbreviations of the Examination."  Do you see that?

6    A.    Yes.

7    Q.    And do you know what the function of that is?

8    A.    Yes.

9    Q.    And can you explain that to the Court?

10   A.    Well, it's the function of any explanation of

11   abbreviations -- the abbreviations are used in the test

12   questions, and this explains what the abbreviations mean.

13   Q.    Okay.  And so I guess my question to you is:  Do you see

14   that first one where it says, "CI refers to Criminal

15   Investigation"?

16   A.    Yes.

17   Q.    Eighth edition, 2003, Swanson, Chamelin, and Territo?

18   A.    Yes.

19   Q.    And are you familiar with that text?

20   A.    I have seen it.

21   Q.    And is that an authoritative text in the field of police

22   science?

23   A.    Most texts that are in the eighth edition are

24   authoritative.

25   Q.    Okay.  And do you have an understanding as to whether in

1    1991 that would have been an authoritative text at the time the

2    job analysis study was prepared?

3    A.    Well, it's eighth edition, probably was around in '91.

4    Q.    Okay.  And I would just ask you for the sake of saving a

5    few minutes to look at all of the texts that are listed in

6    these notes on abbreviation and tell us if there are any in

7    there that you do not believe were authoritative texts in

8    police science at the time the 2005 examination was given.

9    A.    I think you could quibble with any given textbook,

10   complain about how it treats this or that or -- I have some

11   quibbles with some of the material in the books that are in

12   multiple editions that they haven't pruned the very dated

13   references.  But all of those books are respected textbooks

14   used in colleges and universities across the country as well as

15   in police departments.

16   Q.    So those --

17   A.    Of the ones I recognize.  So I recognize the Swanson, the

18   first one we already mentioned.

19   Q.    That's the Criminal Investigation?

20   A.    Right.

21   Q.    What about the Chief's Guide to Massachusetts Criminal

22   Investigation Procedure 2004 to 2005, do you recognize that

23   one?

24   A.    I do not.

25   Q.    Okay.

1    A.    And likewise, I don't recognize the third --

2    Q.    The Chief's Guide to Massachusetts Criminal Laws 2004 to

3    2005, you don't recognize that?

4    A.    Correct.

5    Q.    What about Community Policing:  A Contemporary

6    Perspective?

7    A.    I have at least heard of that textbook.  I haven't

8    reviewed it in detail.

9    Q.    Police Juvenile Issues Field Manual 2005.

10   A.    I'm unfamiliar with that.

11   Q.    You're unfamiliar or familiar with it?

12   A.    I am not familiar with that.

13   Q.    Okay.  Do you think juvenile issues and how they're dealt

14   with in the field might be a subject that would be important

15   for a police sergeant to know something about?

16   A.    Yes.

17   Q.    And of course you've heard of the Mass. General Laws?

18   A.    Yes.

19   Q.    Motor Vehicle Law Cruiser Guide 2005?

20   A.    I'm not familiar with the Cruiser Guide.

21   Q.    Okay.  Would that be something, a topic generally you

22   would expect a police sergeant to know something about?

23   A.    I presume that that tries to summarize the law in a

24   certain area.

25   Q.    Okay.  And with regard to Police Administration?

1    A.    I have looked at that textbook.

2    Q.    Okay.  Is that a standard reference work in the field of

3    police science?

4    A.    I believe so.

5    Q.    And finally, Supervision of Police Personnel, is that a

6    work with which you're familiar?

7    A.    Yes.

8    Q.    Is that a standard reference text in the field of police

9    science?

10   A.    It has been for many years.

11   Q.    And so the purpose of this note is to reference those

12   texts that at least someone felt were important for the police

13   candidates to have some familiarity with; is that correct?

14   A.    Yes, yes.

15   Q.    Okay.  And they were to be used in preparation for the

16   examination for police sergeant in 2005, correct?

17   A.    Well, if I were a candidate and I was told the questions

18   were to come from those books, I would definitely study those

19   books.

20   Q.    Okay.  And so the police examination, when it contains

21   those references or the abbreviations in the question would

22   refer to the texts that we just discussed; is that correct?

23   A.    Yes.

24   Q.    Okay.  So I'd ask you to take a look at the first question

25   on the 2005 police examination.

```
 1   A.    Yes.

 2   Q.    Could you just take a moment and read that?

 3   A.    Yes.

 4         (Pause.)

 5   Q.    Would it be fair to say --

 6   A.    One more moment.

 7   Q.    Please, take your time.

 8         (Pause.)

 9   A.    Yes.

10   Q.    ████████████████████████████████████████████

11   ███████████████████████████████████████████

12   ███████████████████████?

13   A.    Yes.

14   Q.    Okay.  And the question that's asked of the --

15   A.    Let me comment.  I really don't know the legal definition

16   of kidnapping, but, you know, in it's non- -- from a layman's

17   point of view, yes.

18   Q.    ████████████████████████████████████████

19   ████████████████████████████████████████████

20   ████████████████████████████████████████████████

21   ████████████████████████████████████████████

22   ████████████████████████████████████████

23   ██████████████████████████████████?

24   A.    Yes.

25   Q.    And then there are a series of choices; is that correct?
```

1    A.    Yes.

2    Q.    And would this be something that you would expect a police

3    sergeant to know?

4    A.    Yes.

5    Q.    And so this candidate -- this question is related to the

6    job duties of a police sergeant; is that correct?

7    A.    Yes.  I think the question could be better, but I think

8    the question is something a sergeant should know.

9    Q.    Okay.  And now I want to direct your attention to the next

10   question, question 2, and ask you to take a moment and read

11   that.

12   A.    Okay.  Could I just finish my -- add something to my

13   answer to the first one?

14   Q.    No, I think you answered the question and it's related to

15   the job of a police sergeant.  I think that was the tenor of my

16   question.  You know, you'll have a chance on redirect

17   examination to add additional comments should you and your

18   attorney decide that that's best.

19           But for now I'm just looking for answers to my

20   questions.

21           According -- well, strike that.

22           Let me ask you --

23   A.    Did you ask me to read that?

24   Q.    Yes, please.

25   A.    Excuse me.

```
1              (Pause.)
2    A.    I've read it.
3    Q.    ████████████████████████████████
4    ██████████████████████████████████████████
5    ███████?
6    A.    Yes.
7    Q.    And then there are a series of choices presented to the
8    candidates for promotion, correct?
9    A.    Yes.
10   Q.    And would it be fair to say that the level of force that
11   can be used in making an arrest is related to the job of a
12   police sergeant?
13   A.    Knowledge of that area is important, yes.
14   Q.    Okay.  And directing your attention to question 3, can you
15   take a moment and read that, sir?
16   A.    Yes.
17             (Pause.)
18   A.    I've read it.
19   Q.    ████████████████████████████████
20   ████████████████████████████████████████████
21   ████████████████████████████████████████████████
22   ████████████████████████████
23   ███   ██████
24   ███   ██████████████████████████████████████
25   ██████████████████████████████████████████████
```

1  requirements do you have regarding this incident?

2  A.   That's what the question says.

3  Q.   And then there are a series of choices for the candidates;

4  is that correct?

5  A.   Yes.

6  Q.   And is it -- would it be fair to say that question 3 is

7  related to the job of police sergeant?

8  A.   I think a sergeant needs to know that.

9  Q.   Okay.  I'm going to show you question 4 and ask you to

10 take a moment and read that.

11 A.   Okay.

12      THE COURT:  While he's doing that, let me just note

13 for the record, I was just looking at the exhibit list, this is

14 Exhibit 48 --

15      MR. CARROLL:  Thank you, your Honor.

16      THE COURT:  -- in the list of exhibits.  Or actually,

17 it's not.  Exhibit 48 is the same test as these questions.

18      MR. CARROLL:  Thank you, your Honor.

19 A.   Okay.  I've read it.

20 Q.   ███████████████████████████████████████████████████████

21 ███████████████████████████████████████████████████████

22 ███████████████████████████████████████████████████████

23 ███████████████████████████████████████████████████████████

24 ███████████████████████████████████████████████████████████

25 ███████████████████████████████████████████████

1    ██████████████████████████████████████████?

2    A.    That is the question, yes.

3    Q.    Okay.  And then there are a series of choices, correct?

4    A.    Yes.

5    Q.    Is this question related to the job of a police sergeant?

6    A.    I think the subject matter of the question is related to

7    the job of a sergeant.  It could have been worded better, but

8    it's something the sergeant should know.

9    Q.    Okay.  And just while we're there, is there a process

10   under the Mass. General Laws where if a person takes a Civil

11   Service examination, promotional examination for police

12   sergeant, and they're unhappy with the way the question is

13   worded on the exam that they can file an appeal with the Civil

14   Service Commission?

15   A.    I think they're allowed to protest test questions.

16   Q.    And do you know the process that happens when the

17   questions are protested?

18   A.    I think that the candidate sends a letter to the

19   department, the department responds to that letter.  If the

20   candidate thinks the response is not responsive, the Civil

21   Service Commission is the appeal body.

22   Q.    And then there's a hearing and they go through the whole

23   business --

24   A.    And then there's a hearing.

25   Q.    And if the candidate is still unhappy, they can appeal to

1    the superior court, that's -- would that be a fair statement of

2    the process?

3    A.    I am unfamiliar with the court structure.

4    Q.    Okay.  But if a candidate felt that this question 4 -- if

5    a candidate had some quibbles with the way the question's

6    worded, they would have the ability to file an appeal of that

7    to the Civil Service?

8    A.    They would be able to protest to the agency and appeal if

9    they didn't like that, yes.

10   Q.    Okay.  So a multilevel process administratively that could

11   be followed, correct?

12   A.    Correct.  Although it's a little difficult to do.

13   Q.    But, nonetheless, it's available?

14   A.    It's possible.

15   Q.    And has it been your experience that officers in the

16   police forces generally are able to follow that process?

17   A.    Many try and some definitely do it successfully, but it is

18   somewhat cumbersome.

19   Q.    And there are a number of lawyers around that can assist

20   them in that effort as well?

21   A.    Yes.

22   Q.    ████████████████████████████████████████████████████████

23   ████████████████?

24   A.    Yes.

25              (Pause.)

1    A.    I've read it.

2    Q.    ████████████████████████████████████████████

3    ████████████████████████████████████████████████?

4    A.    Yes.

5    Q.    And is that something that you think a police sergeant

6    should know?

7    A.    Yes.

8    Q.    So that's related to the job of police sergeant as best

9    you understand it?

10   A.    That subject is related to the job of a police sergeant.

11   Again, I think the question could be worded better, but it's a

12   legitimate topic.

13   Q.    ████████████████████████████████████████████

14   ████████████████████████████████████████████

15   ████████████████████████████████████████████

16   ████████████████████████?

17   A.    Correct.

18   Q.    Okay.  Could you take a look at question 6 and read that

19   to yourself, please?

20   A.    Yes.

21         (Pause.)

22   A.    Okay.

23   Q.    ████████████████████████████████████████████

24   ████████████████████████████████████████████

25   ████████████████████████████████████████████

1   ███████████████████████?

2   A.   Yes.

3   Q.   And is that something that you think a police sergeant

4   should know?

5   A.   Yes.

6   Q.   So that's job related?

7   A.   I think that, again, is something the sergeant should

8   know, yes.

9   Q.   Okay.

10       Could you take a moment and read question number 7,

11  please?

12  A.   Yes.

13       (Pause.)

14       THE COURT:  Are we going to do 80 questions?

15       MR. CARROLL:  Well, your Honor, I was going to try to

16  do a representative sampling.  And maybe the easiest way to do

17  it is -- let me try and save some time here.

18  BY MR. CARROLL:

19  Q.   Dr. Wiesen, have you read the 80 questions from this

20  examination for 2005 that candidates for promotion to police

21  sergeant were given?

22  A.   Yes.

23  Q.   Can you go down and point to which ones were not job

24  related to being a police sergeant?

25       THE COURT:  He has to have the document to be able to

```
 1    do that.
 2              MR. CARROLL:  It's Exhibit Number 40.
 3              MS. HARRIS:   48.
 4              THE COURT:  48 is a version of the document you've
 5    been using.
 6    BY MR. CARROLL:
 7    Q.   Would you look, Dr. Wiesen, at Exhibit Number 48 which is
 8    a version of the 2005 state Civil Service promotional
 9    examination for the duties of police sergeant.  Take a few
10    minutes and read through that and tell us which, if any, of the
11    questions are unrelated to the job of being a police sergeant.
12    A.   I think that the subject matter of the questions is all,
13    as my recollection is, the subject matters all related to the
14    job of a police sergeant.  To the extent that the questions
15    might be worded in a confusing manner, it would detract from
16    the validity of the exam.  I think the subject matter was
17    appropriate.
18    Q.   Okay.  And have you read the 2007 examination for police
19    sergeant?
20    A.   Yes.
21    Q.   And --
22              MR. CARROLL:  Bear with me for a second, your Honor.
23    Q.   Exhibit 46.
24    A.   Yes.
25    Q.   And you've read all the questions in Exhibit 46?
```

1    A.    Yes.

2    Q.    And can you identify for us any question which is

3    unrelated to the job of a police sergeant?

4    A.    Well, let's take a look at number 26.

5    Q.    Okay.

6    A.    Which I just turned to randomly.  I didn't have that

7    memorized.

8            May I read it?

9    Q.    No, I'll ask a question.  We're going to turn to the

10   question first and bring it up and see what we're talking about

11   here.

12           (Pause.)

13   Q.    ████████████████████████████████████████████████████

14   ████████████████████████████████████████████?

15   A.    That's what the sentence says, yes.

16   Q.    ██████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████

19   ██████████████████████████████████████████████?

20   A.    Yes.

21   Q.    And is it your testimony that that's not job related to

22   the duties of a police sergeant?

23   A.    Well, to answer that question we would need to know what

24   knowledge, skill, and ability that was trying to measure.

25   Q.    Let me put it this way.  Does a police sergeant that's --

```
 1    A.    I was --

 2    Q.    Excuse me.

 3    A.    Could I finish the sentence?

 4    Q.    Well, no, I don't think you were answering the question,

 5    so I think I'll ask a better question.

 6              MR. LICHTEN:  Your Honor, I object, ongoing --

 7              THE COURT:  Go ahead.  You can substitute a question.

 8              MR. CARROLL:  Thank you, your Honor.

 9              MR. LICHTEN:  So is the other question withdrawn?

10              MR. CARROLL:  I thought the other question was --

11              THE COURT:  It's not answered so there's no evidence

12    from it.

13    BY MR. CARROLL:

14    Q.    ████████████████████████████████████████████████████

15    ██████████████████████████████████████████████████████

16    ████████████████████████████████████████████████████?

17    A.    A police sergeant should be able to supervise the

18    officers, yes.

19    Q.    ████████████████████████████████████████████████████

20    ████████████████████████████████████████████████████████

21    ████?

22    A.    Yes.  I don't see the relevance to the question, but, yes.

23    Q.    ████████████████████████████████████████████████

24    ██████████████████████████████████████████

25    something that a police sergeant should be able to direct his
```

1    officers to --

2    A.    Yes.

3    Q.    Okay.  So --

4    A.    But those aren't the points of the question.

5    Q.    So what do you think -- you're talking about -- what's

6    your quibble with this question, I guess is the best way to put

7    it?

8    A.    Thank you.  The first quibble is the synoptic approach.

9    Q.    Okay.  You don't like the word "synoptic" I take it?

10   A.    I have no idea what the synoptic approach is to planning

11   and I have taken some courses in planning and read some texts

12   on the topic.  So it seems like it's perhaps esoteric.

13   Q.    Go ahead.

14   A.    And it's testing a knowledge of a process which isn't the

15   same as testing whether you could actually implement that

16   planning process.  So if the -- let's say the answer was B, to

17   identify problems as they arise.  Well, it's easy to say I'll

18   identify the problems when they arise.  It's a lot harder to

19   actually identify the problems as they arise.

20   Q.    Okay.  Let me ask another question.  And you had mentioned

21   earlier that you were familiar with one of the editions to

22   Police Administration, eighth edition, 2005 by Swanson,

23   Territo, and Taylor; is that correct?

24   A.    I have seen that book.  I think I own a copy.

25   Q.    Okay.

1    A.    It may be an earlier edition.

2    Q.    Okay.  And would it be fair to say that the question

3    specifically references according to PA to that particular

4    text?

5    A.    Yes.

6    Q.    So the question really involves according to that text can

7    they answer the question?

8    A.    Correct.

9    Q.    And the answer to the question would appear in the text?

10   A.    I'm certain it does.

11   Q.    Okay.

12   A.    Which doesn't mean the question is valid.

13   Q.    Well, are you aware as to whether or not anyone filed a

14   challenge to the DPA regarding that particular question?

15   A.    I am unaware.

16        Should I continue with the answer to the question you

17   asked earlier which is which questions I think are not valid?

18   Q.    Well, just one second, if I could.

19   A.    Okay.

20        (Discussion off the record.)

21   Q.    Would it surprise you to learn --

22        MR. LICHTEN:  Your Honor, I object.  The question was

23   asked.  If he wants to withdraw the question, he can withdraw

24   the question, but he can't just get one question and one

25   answer --

```
 1            THE COURT:  You can follow up.  You can follow up.
 2   BY MR. CARROLL:
 3   Q.   I believe I asked you something about whether someone
 4   could challenge that question, whether they had.  Would it
 5   surprise you to learn that someone did challenge that question?
 6   A.   No.
 7   Q.   Okay.  And do you know what kind of solution DPA would
 8   employ in that situation?
 9   A.   Probably the answer to the protest would be to quote the
10   textbook.
11   Q.   Okay.  And would it be possible if there was more than one
12   answer that it would be double keyed?
13   A.   Yes, that's possible.
14   Q.   And could you explain what double keying means?
15   A.   Yes.  When the test item writer wrote the question -- the
16   challenging part in writing the question is to come up with
17   plausible wrong answers.  Sometimes when coming up with
18   plausible wrong answers you actually come up with an answer
19   that is correct and then all of a sudden there are two correct
20   answers.
21   Q.   And so in that situation HRD would credit as correct
22   anyone that gave either answer, either of the correct answers;
23   is that correct?
24   A.   Yes.
25   Q.   ████████████████████████████████████████████████████████
```

1  ████████████████████████████████

2  ██    ████████████████.

3  Q.    And again, this is a question that's directed to --

4  according to SPP, which is a reference to one of the texts that

5  the candidate are given to study in preparation for the

6  examination; is that correct?

7  A.    Yes.

8  Q.    █████████████████████████████████████

9  ████████████████████████████████████████

10  █████████████████████████?

11  A.    Yes.

12  Q.    And can you explain what a line-type organization is?

13  A.    I believe it's a type of organizational structure.

14  Q.    Is that like a military command system sort of?

15  A.    Yes.

16  Q.    Okay.  And that's the way police organizations are

17  organized, correct?

18  A.    Yes.

19  Q.    Okay.  So police sergeant candidate would be expected to

20  be aware of that, would they?

21  A.    █████████████████████████████████

22  ████████████████████████████████

23  █████████████████████████████████

24  ████████████████████████████████████

25  ████████████████████████████████████

1 ████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ████████████████████████████████████████████

4 ████████████████████?

5          So perhaps there's a nugget of information there that

6 is important for a sergeant to know but I don't think that

7 question tests it.

8 Q.   Well, this, again, asks about a specific reference book;

9 is that correct?

10 A.   Yes.

11 Q.   And that would be a specific reference book that the

12 candidates all had an equal opportunity to acquire ahead of

13 time, read, and try and understand in preparation to take this

14 examination; is that correct?

15 A.   Yes.

16 Q.   And so these questions, where the answers generally come

17 where it says according to -- in this says SPP, a specific

18 text, would the answers generally come directly from that text?

19 A.   Yes.

20 Q.   So it would be your understanding, then, that the answer

21 to this question would be in the text that the candidates

22 should have read, studied in anticipation and preparation for

23 taking the examination; is that correct?

24 A.   Yes.

25 Q.   It's just you have a quibble with the way the question's

1    worded?

2    A.   Or the subject matter of the question itself.  There are

3    many things in the text that perhaps aren't job related.

4    Q.   And SPP refers to a text called Supervision of Police

5    Personnel, would that be your understanding of it?

6    A.   Yes.

7    Q.   And is that a standard text in the field of police

8    science?

9    A.   Yes.

10   Q.   And that standard police text contains language indicating

11   the correct answer in the questions asked here, and it's your

12   testimony that that's not related to the job of police

13   sergeant?

14   A.   It may not be.  It's a text in the field of police

15   science, but it's not a text that's designed for police

16   sergeants.  It's used in many college courses.  It has a wide

17   coverage, and it includes many things that a sergeant doesn't

18   need to know.

19   Q.   Okay.  But it is a standard text in the field, correct?

20   A.   Yes.

21   Q.   And the question's taken directly from the standard text?

22   A.   Yes.

23   Q.   And the answer is taken directly from the standard text?

24   A.   Yes.

25   Q.   And if a candidate didn't like the way the question was

1    worded or the subject matter of the question, they could have

2    protested that to the DPA or HRD, correct?

3    A.   Yes.  I'm not completely familiar with what the nature of

4    protests are, that wasn't part of the work that I did at the

5    agency.  So I don't know if they are allowed to -- I don't

6    think they're allowed to protest the validity of the question.

7    I think they're only allowed to protest the accuracy, but I'm

8    not sure.

9            MR. CARROLL:  And, your Honor, would it be possible to

10   see if we could display Exhibit 20?

11           Do we have Exhibit 20 in paper somewhere?

12           I'll try and do it, your Honor, on the Elmo.  I think

13   that's probably the easiest way.

14           (Discussion off the record.)

15   BY MR. CARROLL:

16   Q.   Dr. Wiesen, let me ask you one or two prefatory questions

17   about the appeal process.

18           You had reviewed the appendices that were provided to

19   the 1991 validation study; is that correct?

20   A.   I did.

21   Q.   And one of those appendices which has now been marked into

22   evidence as Exhibit 20 is a series of letters; is that correct?

23   A.   Yes.

24   Q.   And did those letters contain examples of -- the letter

25   I'm showing you is the December 28, 2007 letter -- example of

1    how to protest a question?  Is that what this is, a form letter

2    that would be used if a candidate was unhappy with the

3    examination?

4    A.    No, this is the response.

5    Q.    Okay.  So this is the response.  Okay.  Got it.

6          So the materials don't have the form, a standard form

7    letter that a candidate can use to protest a question but they

8    have standard responses that HRD can use to reply; is that

9    correct?

10   A.    Well, there's some -- in any bureaucracy people have form

11   letters that start out with "dear" and then "with respect to"

12   and whatever, but the letters are tailored for each applicant.

13   Q.    And it's up to the candidate to say why they disagree with

14   a particular question, put it in writing, and send it to HRD?

15   A.    Yes.

16   Q.    And so if they disagree with the subject matter, they can

17   tell that to HRD and then it's up to HRD to decide what to do

18   about it, isn't it?

19   A.    I don't -- I was not involved with the appeal process.

20   It's my very vague recollection that validity wasn't subject to

21   protest.

22   Q.    Well, if HRD denies the protest, can the candidate -- on

23   validity, can the candidate appeal that issue to the Civil

24   Service Commission?

25   A.    I'm unfamiliar with the policies or the rules of the Civil

1    Service Commission in that regard.

2    Q.    Okay.  To get back on track here, are there other

3    questions in the exhibits that you have a quibble with that we

4    haven't discussed; that is, from the 2007 state police

5    promotional examination for sergeant?

6    A.    ██████████.

7    Q.    Okay.  Could you take a moment and read 31, please?

8    A.    Thank you.

9          (Pause.)

10   Q.    Have you had an opportunity to review the question?

11   A.    I have.

12   Q.    ████████████████████████████████████████████████

13   ████████████████████████████████████████████████████?

14   A.    Yes.

15   Q.    And a police sergeant is a front-line police supervisor

16   for a police organization?

17   A.    Yes.

18   Q.    ████████████████████████████████████████████████████

19   ███████████████████████████████████████?

20   A.    Yes.

21   Q.    ████████████████████████████████████████████████

22   █████████████████████████████████████

23   ████████████████████████████████████████████████████████

24   ████████████████████████████████?

25   A.    Correct.

1    Q.    And again, this question is one that comes from a specific

2    text, PA, and that's for Police Administration, right?

3    A.    Correct.

4    Q.    And that's a standard text in the field of police science?

5    A.    Yes.

6    Q.    ██████████████████████████████████████████████████████

7    ████

8    █ ██████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████

10   ███████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████

12   █████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████

14   ███████████████████████████████████████████████████████

15   ██████████████████████

16   █████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████████

18   ███████████████████████████████████████████████

19   █████████████████████████████████████████████████████

20   █████████████████████

21   Q.    Well, that's just a statement, isn't it?

22   A.    Yeah, but it's an introductory statement to the question.

23   Q.    That's right.

24   A.    So if the introductory statement is unnecessary, it

25   shouldn't be there.  And if it is necessary, then I don't -- I

```
 1    don't know what the several qualifications are, but it would
 2    seem like the choices would be qualifications.  So I don't see
 3    how the first sentence, which is introductory, fits with the
 4    question.  And it appears to me that this might be a
 5    higher-level question that shouldn't have been asked of
 6    sergeants.  I'd like to ask sergeants, you know, questions more
 7    to the direct supervision of their staff --
 8    Q.   Okay.  Well --
 9    A.   -- rather than a theoretical question.
10    Q.   Okay.  Are you finished with your answer?
11         Okay.  A police sergeant is a front-line supervisor in
12    the police department, correct?
13    A.   Yes.
14    Q.   And so it's important that the police management,
15    particularly their front-line manager, be able to effectively
16    control the officers under their command in that organization;
17    isn't that a fact?
18    A.   Yes.
19    Q.   Because if they don't, you know, a lot of unfortunate
20    events could occur, correct?
21    A.   Yes.  But they're not designing the system, they're just
22    implementing the system that exists.
23    Q.
24
25
```

1  A.  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

2  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

3  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

4  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

5  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓

6  Q.    Okay.  In a police organization one of the controls is the

7  rules and regulations that the police officers have to follow,

8  isn't it?

9  A.    Yes.

10  Q.    In other words, they don't have a badge, they don't have a

11  gun, all of that sort of thing, the cruiser is out of gas, all

12  the various events that are regulated by any particular set of

13  regulations, those are something that a sergeant, a front-line

14  supervisor, has to know, isn't it?

15  A.    The sergeant has to be able to support and implement the

16  rules and regulations, yes, but not design the system.

17  Q.    This doesn't ask him how to design the system --

18  A.    Well, it says --

19  Q.  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

20  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

21  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

22  ▓▓▓▓▓

23  A.  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

24  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

25  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

1 █████████████████████████████████████████

2 ███████████████████████████████████

3 ████████████████████████████████

4  Q.   Well, if the regulation to be implemented is comprehensive

5  and complex, that would be one choice as to whether you can

6  control your officers that way, right?

7  A.   That's one of the choices.

8  Q.   Okay.  Another one is whether they're specific and

9  economical?

10  A.   Yes.

11  Q.   Temporary and at the immediate discretion of the police

12  organization?

13  A.   Yes.

14  Q.   General and applicable to the entire organization?

15  A.   Yes.

16  Q.   So those are your options.  And this text tells us which

17  one in the author of the text's opinion it should be, correct?

18  A.   Well, I think, one, that's true; and, two, you probably

19  don't need to read the text to answer the question, which is

20  unfortunate.

21  Q.   Well -- all right.  Why don't we move on, then, to the

22  next question -- well, strike that.

23         Before we do, it would be fair to say that a candidate

24  who had some concerns about this question could file a letter

25  of protest to the DPA or the HRD; is that correct?

1  A.   I believe there are aspects of questions that can be

2  protested and there are aspects that can't.

3  Q.   But you're not sure on that.

4  A.   Correct.

5  Q.   Okay.  Is there another question that you have a quibble

6  with from the 2007 exam?

7  A.   Yes.

8  Q.   And which number would that be?

9       (Pause.)

10 A.   34.

11 Q.   You've had an opportunity to review that question; is that

12 correct?

13 A.   Yes.

14 Q.   ███████████████████████████████████████████

15 ████████████████████████████████████████████

16 ██  █████████████████████

17 ██  ████████████████████████████████████████████

18 ████████████████████████████████████████████

19 ██████████████████████████████?

20 A.   Yes.

21 Q.   And those choices are taken from the textbook, the SPP, to

22 use the initials?

23 A.   Well, the correct answer would be taken from the textbook.

24 Q.   Okay.  And can you tell -- well, let me ask you this:

25 ████████████████████████████████████████████

1   █████████████████████████████████████████████████

2   ██████████████████████████████████?

3   A.   In a general way knowing limitations is always good.

4   Q.   And in a general way is this question related to that job

5   responsibility?

6   A.   ████████████████████████████████████████████

7   ████████████████████████████████████████

8   ██████████████████████████████████████████████

9   ██████████████████████████████████████████████

10  ███████████████████████████████████████████

11  ████████████████████████████████████████████

12  ██████████████████████████████████████████████

13  ███████████████████████████████████████████

14  ██████████████████████████████████████████████

15  ███████████████████████████████████████████████

16  ███████████████████████████████████

17  ██████████████████████████████████████████████

18  ███████████████████████████████████████████

19  █████████████████████████

20  Q.   Again, this references a text, a specific text in the

21  field of police science; is that correct?

22  A.   That is true.  The text probably has a paragraph that says

23  this.  But that paragraph wasn't meant to be used as a

24  question.  So it was organized to let the author explain a

25  topic.  And I think that this question is confusing as a

1    result.

2    Q.    All right.  Well, let me ask you this:  Is it unknown

3    for -- in a police organization or in any organization really

4    for a miscommunication as to responsibilities to cause friction

5    amongst the staff?

6    A.    There are lots of reasons for friction and

7    miscommunication could be one of them.

8    Q.    Well, just so we're clear on this, your quibble with the

9    question has to do with what?

10   A.    Well, I think you asked me to identify questions I thought

11   were invalid.

12   Q.    Okay.

13   A.    So I think the question isn't clear.  And if the question

14   isn't clear, it can't be valid.

15   Q.    If the question's not clear -- go ahead.

16   A.    And the -- and it's a very academic orientation, the

17   ███████████████████████████████████████████████████

18   █████████████████████████████████████████████████████████

19   ██████████████████████████████████████████████

20   ████████████████████████████████████████████████████

21   ████████████████████████████████████████

22   ████████████████████████████████████████████

23   ██████████████████████████████████████████████████████

24   ███████████████████████████████████████████████.

25   Q.    And if one of the candidates who took the examination

1  believed that this question was not appropriate or was unclear,

2  they could file an appeal with the HRD or DPA protesting the

3  question; is that correct?

4  A.    If they were sophisticated enough to understand that, yes.

5  Q.    Okay.  And if they didn't like the HRD's decision, they

6  could appeal that to the Civil Service Commission, correct?

7  A.    Yes.

8  Q.    And if they didn't like the Civil Service Commission's

9  decision, they could appeal that to the superior court.

10  A.    That's -- as I said, I'm not familiar with the appeal

11  process from the Commission, but I assume you can go to court

12  after that, yes.

13  Q.    And could we move to the next question --

14  A.    Yes.

15  Q.    -- that you have difficulty with?

16  A.    36, 37, and 38.

17          MR. LICHTEN:  I just want the Court to know there are

18  a number of scheduling issues that we need to deal with before

19  we leave today.  We're backed up on witnesses.

20          THE COURT:  Go ahead.

21  BY MR. CARROLL:

22  Q.    Okay.  You've read question 36?

23  A.    So let me explain my concern because I don't think you

24  have to read them all carefully.

25          The concern is that you have three questions here on

1   training, and my concern is that perhaps three questions on

2   training, when you only have a limited number of questions on

3   supervision, means that you are not touching on some other

4   aspects of supervision.  So it seems like you might be

5   overweighting training.  So perhaps one of those would be

6   appropriate as opposed to three.

7   Q.   Okay.  I think I have your concern.  Your concern is there

8   are too many questions on training regarding a police sergeant;

9   is that correct?  Is that what your quibble with these three

10  questions has to --

11  A.   That's my concern.

12  Q.   Okay.  Is it your understanding that a line supervisor, a

13  front-line supervisor, like a sergeant in a police force, one

14  of their primary duties is to train the rookies and the

15  officers under their command?

16  A.   Surely.

17  Q.   And so in terms of being a police sergeant, you have to

18  have the knowledge, skill, and ability, personal

19  characteristics to be able to train the officers to make them

20  good police officers, don't go around violating people's civil

21  rights and doing things that causes problems for the employer,

22  correct?

23  A.   Correct.

24  Q.   And so it's just your -- your point is you don't think

25  that that responsibility is worth three questions on an

1  80-question test for police sergeant for promotion?

2  A.   That's my concern.

3  Q.   Okay.  Any other questions that you have a quibble with?

4  A.   39.

5       (Pause.)

6  Q.   And you've read that question; is that correct?

7  A.   I've read the question.

8  Q.   ████████████████████████████████████████████████████

9  ███████████████████████████?

10 A.   Yes.

11 Q.   And again, it references a specific text in police

12 science, PA, or Police Administration, correct?

13 A.   Yes.

14 Q.   That's where the correct answer could be found?

15 A.   I presume.

16 Q.   ████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████

18 ██  ██████████████████████████████████████████

19 ██  █████████████████████████████████████████████

20 █████████████████████████████████████████████████████

21 ████████?

22 A.   Yes.

23 Q.   And why do you say that you have some quibble with this?

24 A.   Well, this says, according to the reference, an ideal

25 performance evaluation program should foster mutual

1    understanding between supervisors and personnel.  It sounds

2    like this is addressed to somebody who is at a higher level who

3    is trying to put together a good performance evaluation program

4    that the sergeants will eventually implement.  I'm not sure

5    that the sergeants have the option of not using the performance

6    evaluation program if they don't think it's ideal.  So I think

7    this, again -- that textbook is used for college courses, it's

8    used for -- the reference for several different ranks in

9    Massachusetts, and it has material that's relevant to different

10   ranks.  I'm not -- I don't think that designing a performance

11   evaluation program is something sergeants generally do.

12   Q.   ████████████████████████████████████████████████████████

13   ███████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████████████

15   ███████████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████?

17   A.   Yes, but that's not one of the things that the question is

18   asking about.  It's just saying it's true.

19   Q.   The question, correct?

20   A.   What?

21   Q.   ████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████

23   ████████████?

24   A.   Right, but that's the answer.

25   Q.   ████████████████████████████████████████████████████████████

```
1   ██████████████████████████████████████████
2   ████████████████████████████████████████████████
3   ████████████████████████?
```

4    A.   That's not part of the question.  That's not part of

5    what's being asked.  That's the introduction to the question.

6    Q.   Okay.

7    A.   So, yes, that is --

8    Q.   That's something -- that part's relevant.  And then there

9    are a series of choices, correct?

10   A.   Yes.

11   Q.   And is there one of those choices that you believe that

12   the Police Administration text would have said is the right way

13   to go in this situation?

14   A.   Yes, and I don't think you need to have read the textbook

15   to figure out which one it was.

16   Q.   Well, it wouldn't hurt to read the textbook that they cite

17   as the source, would it?

18   A.   No.

19   Q.   Okay.  And --

20        THE COURT:  We're at 1:00.

21        MR. CARROLL:  Just one final question.

22        THE COURT:  On this question.

23        MR. CARROLL:  On this question.  Thank you.

24   BY MR. CARROLL:

25   Q.   While you were at DPA you were aware that this text,

1    Police Administration, was a standard text in the field and

2    used on statewide Civil Service examinations, correct?

3    A.    Yes.

4    Q.    And did you ever express to Mr. Haley or the other powers

5    that be at DPA or HRD that this was too academic a textbook for

6    these candidates who wanted to be a sergeant to review?

7    A.    We had discussions about reading lists for public safety

8    examinations, both fire and police, and one of the things we

9    were concerned about in the reading lists were the -- how

10   academic it was.  So that was a topic that was occasionally

11   discussed.

12   Q.    And as a result of all these discussions within the staff,

13   including your staff at DPA and HRD, the upshot of it was that

14   the text, Police Administration, was included in the textbooks

15   that is still on the list or that was on the list in 2007, 2005

16   for the candidates to study, correct?

17   A.    Correct.

18            MR. CARROLL:  Okay.  Thank you.  I think it's an

19   appropriate time to break.

20            THE COURT:  We'll pause here now.

21            Mr. Lichten.

22            MR. LICHTEN:  Your Honor, the following scheduling

23   problems:  I expect or hoped that Dr. Wiesen would be done

24   today, I understand he's not.  We have Dr. Fields, who has been

25   here since yesterday who lives, obviously, out of state.  And I

1    have Kathy O'Toole, the former police commissioner, who is

2    coming in from Ireland tonight.  She's here to go to her home

3    on the Cape, and she was just going to stay in Boston.  I

4    promised her I would get her on and off tomorrow morning.  Of

5    course, we have Dr. Wiesen.  So I'm struggling with the

6    scheduling mechanics.

7                 THE COURT:  How long will former Commissioner O'Toole

8    be?

9                 MR. LICHTEN:  She will be very short, your Honor.

10                THE COURT:  Does anybody have an objection to

11    interrupting Dr. Wiesen?

12                MR. CARROLL:  No the at all.

13                THE COURT:  I think we can give preference to

14    international travelers.

15                MR. LICHTEN:  And then the second issue is whether --

16    I don't know how long they're going to be so I don't know

17    whether to send Dr. Fields home tonight, which I don't want

18    to --

19                THE COURT:  I've got a guess.

20                MR. LICHTEN:  What?

21                (Laughter.)

22                MR. LICHTEN:  We're only on 2007.

23          Obviously it costs a lot of money to hold her here,

24    but I don't want to be in a position of having air time.

25                THE COURT:  Well, at the rate we're going, we're not

1    going to have much air time it doesn't look like, particularly

2    if we interrupt for the other witness.

3              You will just recall that we're not sitting on Monday.

4              MR. LICHTEN:  Right.

5              THE COURT:  Because I have a habeas case that I have

6    to schedule in there.  So the next day after tomorrow will be

7    Tuesday.

8              MR. LICHTEN:  So I would propose, with your

9    permission, and I would propose to release Dr. Fields and have

10   her there on Tuesday.

11             THE COURT:  Does anybody disagree with that in terms

12   of --

13             (Discussion off the record.)

14             THE COURT:  Now, more globally, this is looking like

15   more than a two-week case.  We have the next week after next

16   week, that is the third week, so I'm not concerned about

17   colliding with anything, but that doesn't mean we should not be

18   as efficient as we can.

19             MR. LICHTEN:  We don't have that many more witnesses,

20   your Honor.

21             THE COURT:  I think some of the parties might.

22             MR. LICHTEN:  And counsel for the Boston Police

23   Department and I were talking and because there are also

24   scheduling problems with their expert witnesses, Dr. Outtz and

25   Dr. Silva, and because it is a court trial, we had a query

1    whether the Court would be amenable to going on days that may

2    not be in order if one of their experts can't be here next week

3    but could be here at a time the Court can sit.

4         THE COURT:  Yes, we can be flexible, more flexible

5    than a jury trial, with that.  So as a general matter.

6    Whatever the specific ideas are we can talk with.

7         MR. LICHTEN:  We'll talk about it.

8         THE COURT:  I do want -- my larger picture is that

9    we'll complete the evidence in a bench trial like this

10   typically, I would then after the evidence ask the parties to

11   submit proposed findings, and then we would have argument after

12   the findings, so we wouldn't go right in -- so we would just

13   get the evidence done.  In a general scheme, I'd like to get

14   the evidence done.

15        MR. LICHTEN:  Yes.

16        THE COURT:  I'd rather not have too much air between

17   any parts of the evidence.  A day or two is not too much air.

18        MR. LICHTEN:  Thank you, your Honor.

19        MS. HARRIS:  Thank you, your Honor.

20        MR. CARROLL:  And I would ask the Court to include

21   Springfield's expert in that flexibility as well.  He's coming

22   up from Pennsylvania.

23        MR. LICHTEN:  There's still a motion in limine on

24   that, so we'll see.

25        THE COURT:  All right.  We'll reassemble tomorrow at

1    9:00.

2            THE CLERK:  All rise.  Court is in recess.

3            (Court adjourned at 1:06 p.m.)

4

5                    C E R T I F I C A T E

6

7            We, Marcia G. Patrisso, RMR, CRR, and Debra M. Joyce,

8    RMR, CRR, Official Reporters of the United States District

9    Court, do hereby certify that the foregoing transcript

10   constitutes, to the best of our skill and ability, a true and

11   accurate transcription of our stenotype notes taken in the

12   matter of Civil Action No. 07-11693-GAO, Pedro Lopez, et al, v.

13   City of Lawrence, et al.

14

15   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
16   Official Court Reporter

17
     /s/ Debra J. Joyce
18   DEBRA M. JOYCE, RMR, CRR
     Official Court Reporter
19
     Dated: July 15, 2010
20

21

22

23

24

25