UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


PEDRO LOPEZ, Individually and on            )
behalf of a class of individuals           )
similarly situated,                        )
                                            )
          Plaintiffs,                      )
                                            ) Civil Action
v.                                          ) No. 07-11693-GAO
                                            )
CITY OF LAWRENCE, et al,                    )
                                            )
          Defendants.                      )
                                            )


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


DAY FIVE
NON-JURY TRIAL


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Friday, July 16, 2010
9:06 a.m.


Marcia G. Patrisso, RMR, CRR
Debra M. Joyce, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2         LICHTEN & LISS-RIORDAN, P.C.
           By: Harold L. Lichten, Esq.
 3              Stephen S. Churchill, Esq.
                Joseph L. Sulman, Esq.
 4         100 Cambridge Street, 20th Floor
           Boston, Massachusetts  02114
 5         On Behalf of the Plaintiffs

 6         CITY OF LOWELL LAW DEPARTMENT
           By: Brian W. Leahey, Esq.
 7              R. Eric Slagle, Esq.
           City Hall
 8         375 Merrimack Street
           Lowell, Massachusetts  01852
 9         On Behalf of the Defendant City of Lowell

10         OFFICE OF THE CITY ATTORNEY
           By: Richard J. D'Agostino, Esq.
11         200 Common Street, Suite 306
           Lawrence, Massachusetts  01840
12         On Behalf of the Defendant City of Lawrence

13         COLLINS, LOUGHRAN & PELOQUIN
           By: Laurie W. Engdahl, Esq.
14         320 Norwood Park South
           Norwood, Massachusetts  02062
15         On Behalf of the Defendant City of Worcester

16         MORGAN, BROWN & JOY, LLP
           By: Mary Jo Harris, Esq.
17              Robert P. Morris, Esq.
           200 State Street, 11th Floor
18         Boston, Massachusetts  02109
           On Behalf of the Defendant City of Boston
19
           MBTA LAW DEPARTMENT
20         By: Kevin S. McDermott, Esq.
           10 Park Plaza, 7th Floor
21         Boston, Massachusetts  02116
           On Behalf of the Defendant MBTA
22

23

24

25
```

```
 1        CITY OF SPRINGFIELD LAW DEPARTMENT
          By: Harry P. Carroll, Esq.
 2        36 Court Street
          Springfield, Massachusetts  01103
 3        On Behalf of the Defendants City of Springfield
          and Mayor Sarno
 4
          CITY OF METHUEN - OFFICE OF THE CITY SOLICITOR
 5        By: Peter J. McQuillan, Esq.
          The Searles Building, Suite 311
 6        41 Pleasant Street
          Methuen, Massachusetts  01844
 7        On Behalf of the Defendant City of Methuen

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2                              Direct   Cross   Redirect   Recross
     WITNESSES FOR THE
 3     PLAINTIFFS:

 4   KATHLEEN O'TOOLE

 5       By Mr. Lichten            5

 6   JOEL WIESEN, resumed

 7       By Mr. Carroll (cont'd)       23
         By Mr. McQuillan             74
 8       By Ms. Engdahl              83

 9


10                        E X H I B I T S

11

12   PLAINTIFFS'
       EXHIBIT      DESCRIPTION            MARKED    RECEIVED
13

14              (There were no exhibits marked.)

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2            THE CLERK:  All rise.
 3            (The Court enters the courtroom at 9:06 a.m.)
 4            THE CLERK:  For a continuation of the Lopez trial.
 5   Please be seated.
 6            THE COURT:  Good morning, everyone.
 7            COUNSEL IN UNISON:  Good morning, your Honor.
 8            THE COURT:  Do you have something before we resume the
 9   evidence?
10            MR. LICHTEN:  Yes.
11            THE COURT:  Okay.
12            MR. LICHTEN:  As per the agreement yesterday, we're
13   calling Kathy O'Toole.
14            THE COURT:  Oh, that's right.  I'm sorry.  I'd
15   forgotten that.  I beg your pardon.
16            MR. LICHTEN:  Thank you.  Kathy O'Toole.
17                   KATHLEEN O'TOOLE, duly sworn
18            THE CLERK:  Please be seated.  State your name, spell
19   your last name for the record, and speak into the microphone.
20            THE WITNESS:  Kathleen O'Toole, O-'-T-O-O-L-E.
21                      DIRECT EXAMINATION
22   BY MR. LICHTEN:
23   Q.   And I take it you have no relation to the judge.
24   A.   Not that I'm aware of.
25            THE COURT:  Not this side of the Atlantic, anyway.
```

```
 1              (Laughter.)
 2   BY MR. LICHTEN:
 3   Q.   Okay.  And while I'm on that, I've never represented you
 4   in anything; is that correct?
 5   A.   No.
 6   Q.   What do you do for a living?
 7   A.   I currently work for the Irish Department of Justice as
 8   chief inspector of the Garda Síochána, the Irish National
 9   Police Service.
10   Q.   Okay.  And can you tell us very briefly what that details?
11   A.   The Garda Síochána stands for "guardians of peace."  It's
12   a 17,000-member organization.  It's a national police service.
13   They are responsible for everything from rural policing to city
14   policing to national security.
15        I was recruited in 2006 to play an oversight role there,
16   to advise the minister of justice on policing, and to make
17   recommendations to modernize the police service and to make it
18   operate more effectively and efficiently.
19   Q.   And if you were to try to compare that organization most
20   closely with a police organization in the United States, what
21   would it be?
22   A.   Well, it's interesting because in terms of national
23   security it would be similar to the FBI; in terms of urban
24   policing it would be similar to the Boston police; and in terms
25   of rural policing it would be similar to smaller cities and
```

1    towns in Massachusetts.  So while we have federal, state and

2    local law enforcement here in the United States, it's just one

3    police service there in Ireland.

4    Q.    Okay.  Now, let me ask you:  You're here today -- do you

5    have -- are you under a subpoena?

6    A.    Yes, I am.

7    Q.    Okay.  And just so we're clear, did you have plans to be

8    in Massachusetts this week anyway?

9    A.    Yes, I did.

10   Q.    Okay.  And those are vacation plans?

11   A.    Well, vacation and business.  I have to be in New York

12   State on business next week.

13   Q.    Okay.  But you agreed to testify here today?

14   A.    Yes.

15   Q.    Okay.  I want to take you through your career just very

16   briefly.  How did you start out in law enforcement?

17   A.    I accepted a job with the Boston Police Department as a

18   patrol officer in 1979.

19   Q.    And what was your next position?

20   A.    Well, I was laid off from the Boston Police -- as a Boston

21   police officer in 1981 as a result of the Proposition 2-1/2

22   layoff.  So I went to the MBTA and worked as a decoy officer

23   for a year, and then I returned to the Boston Police Department

24   in 1982.

25   Q.    And at some point did you receive a promotion in the

1   Boston Police Department?

2   A.   I did.  I was promoted to detective probably in -- it's a

3   long time ago -- probably 1984-'85.  And I took the sergeant's

4   exam and was promoted to sergeant -- I believe it was in early

5   1986.

6   Q.   Did you work as a police sergeant for the Boston Police

7   Department?

8   A.   I did.

9   Q.   And for how many years did you do that?

10  A.   Probably for a year -- approximately a year.

11  Q.   Okay.  What happened next in your career?

12  A.   I was recruited by Bill Bratton to go to the Metropolitan

13  Police as one of his deputies.

14  Q.   And when did you do that, what year?

15  A.   I did that in summer 1986.

16  Q.   And how long were you at the Metropolitan Police

17  Department and what were your titles there?

18  A.   Well, I started there in 1986 and I was a deputy

19  superintendent, but I still maintained my Civil Service

20  sergeant rank.  While I was at the Metropolitan Police as a

21  deputy superintendent I took both the Civil Service

22  lieutenant's exam and the Civil Service captain's exam, and I

23  was promoted to both of those ranks, also serving as deputy

24  superintendent.

25       I served as chief of administrative services for my first

1    two years there and then as chief of patrol operations for

2    about a year and a half.  And then when Bill Bratton left for

3    New York City, I became the superintendent, or the chief, of

4    that department.

5    Q.    Okay.  Now, currently, as I understand it, the

6    Metropolitan Police Department has been merged into the state

7    police; is that correct?

8    A.    That's correct.

9    Q.    But when you were there it was its own standalone police

10   department?

11   A.    It was.

12   Q.    And the examination procedures for sergeant, were they the

13   same Civil Service police sergeant's examinations?

14   A.    Boston at the time offered its own exam, but they were all

15   administered by the -- by DPS at the time.  I believe it's

16   called HRD now.  But it was all part of the Civil Service

17   system, yes.

18   Q.    After you were superintendent of the Metropolitan Police

19   Department, where did you go next?

20   A.    I actually took a career break to the private sector and

21   worked at Digital Equipment for two years before returning to

22   state service.  And I -- I returned to state service to help

23   consolidate the four state police entities, so I assumed the

24   position of lieutenant colonel in the Massachusetts State

25   Police.

1    Q.    And what year was that?

2    A.    In 1992.

3    Q.    Okay.  And at some point in time were you appointed to the

4    position of Commissioner of Public Safety?

5    A.    Actually, it was Secretary of Public Safety.

6    Q.    Secretary.  Sorry about that.

7    A.    That was in July of 1994.

8    Q.    Okay.  You were appointed by what governor?

9    A.    Governor Weld.

10   Q.    And how long did you -- were you the Secretary of Public

11   Safety?

12   A.    For approximately four years.  Probably a little bit more

13   than four years.

14   Q.    Okay.  And what were your duties as the Secretary of

15   Public Safety for the State of Massachusetts?

16   A.    Well, at that time there were 20 agencies, boards and

17   commissions in the secretaria including the state police.  We

18   also had responsibility for oversight of parole, corrections,

19   Registry of Motor Vehicles, fire services, emergency management

20   and several -- National Guard.  Several agencies.

21   Q.    Okay.  And after you were Secretary of Public Safety, what

22   was your next position?

23   A.    I went to Northern Ireland to work on the peace process,

24   and worked as part of a commission to develop a new framework

25   for policing in Northern Ireland, and did that for

1   approximately 18 months.  While I did that I was also employed
2   by Boston College.
3   Q.   And what was your next position?
4   A.   I went to work for Tom O'Neill's firm for a short period
5   of time before I started my own business.  I started my own
6   business in the aftermath of my work in Northern Ireland.  It
7   was a consulting business.  Then in 2004 I became Boston Police
8   Commissioner.
9   Q.   And who appointed you to be Boston Police Commissioner?
10  A.   Mayor Tom Menino.
11  Q.   And you remained Boston Police Commissioner from when to
12  when?
13  A.   From the first part of February in 2004 until June 30th,
14  2006.
15  Q.   Okay.  So 27 months; is that right?
16  A.   Yes.
17  Q.   And why did you leave the Boston Police Department?
18  A.   I was recruited to the position in Ireland.
19  Q.   Okay.  And that's the position you hold now?
20  A.   Yes.
21  Q.   Okay.  Now, back around 1999 or 2000, do you recall being
22  appointed to a panel to investigate the Boston Fire Department?
23  A.   Yes.  Mayor Menino asked me if I would chair a commission
24  to look at fire department management and operations.
25  Q.   And did you do that?

1    A.   Yes, I did.

2    Q.   And did the panel issue recommendations?

3    A.   Yes, we did.

4    Q.   And did you issue findings?

5    A.   Yes, we did.

6    Q.   And did you report those publicly?

7    A.   Yes, we did.  We issued a report.

8    Q.   And was one of those findings relating to the promotion

9    system in the Boston Fire Department?

10   A.   I'm sure -- I remember commenting on that, so I'm sure

11   there was a finding.  I haven't looked at the report recently,

12   but I'm absolutely certain there was commentary and

13   recommendations relating to promotions.

14   Q.   Okay.  Have you recently -- have I shown you a newspaper

15   article relating to that?

16   A.   Yes.

17   Q.   Okay.  And I'll get back to that in a second.

18        Let me ask you:  Are you getting paid in any way to be

19   here today?

20   A.   No.

21   Q.   And are any of your expenses being paid to be here today?

22   A.   No.

23   Q.   I'm going to show you -- I'll put it up on the ELMO.

24            MS. HARRIS:  Your Honor, I'll object to relevance.

25            THE COURT:  I don't know what it is.

```
 1           MS. HARRIS:  Well, as I look at it, it's a newspaper
 2    article about changing the fire department.
 3           THE COURT:  Oh, there it is.
 4           MR. CARROLL:  I would also object, your Honor.
 5           THE COURT:  How do you propose to use it?
 6           MR. LICHTEN:  It's just to refresh the witness's
 7    memory.  If you want to see the operable parts, it would be the
 8    bottom of the third page.
 9           I can give you -- do we have an extra copy?
10           THE COURT:  We're not there, I don't think.  I don't
11    know that the witness's memory is exhausted.  So far it doesn't
12    appear it needs refreshing, but go ahead.
13           MR. LICHTEN:  Okay.
14    BY MR. LICHTEN:
15    Q.   Let me ask you:  Do you recall making recommendations
16    relating to the problem of the Civil Service promotional exams
17    in the Boston Fire Department?
18    A.   I can't remember exactly what recommendation we made, but
19    I know that I commented about my concerns about the process.
20    Q.   And what were they?
21    A.   Well, I've commented several times about promotions based
22    on written test scores alone.
23    Q.   And what were the comments you made with respect to the
24    fire department promotional system and the written test scores
25    alone being utilized?
```

1          MS. HARRIS:  I object, your Honor.  This is a police

2     case, not a fire case.

3          MR. CARROLL:  I would object, too.

4          THE COURT:  Overruled.

5          MR. LEAHEY:  And, your Honor, if I may just comment at

6     this point, I guess I go back to the standing objection from

7     the first day that -- on the probative value, that you'll take

8     it in, but probative value, it may or may not apply to any of

9     the defendants.  I just don't want it to be, "Well, this came

10    in and you didn't object.  So it's applicable to one of the

11    other defendants."

12         THE COURT:  Noted.

13    BY MR. LICHTEN:

14    Q.   You may continue.

15    A.   I don't remember what I said verbatim, but I have said on

16    several occasions that I feel that written test scores alone

17    are not a good basis for promotion because we cannot test one's

18    integrity, one's leadership ability, one's interpersonal

19    skills, one's work ethic in a written test, and I feel that a

20    more comprehensive system should be used for promotion.

21    Q.   Okay.  And I'm just going to show you the third page of

22    this article.  And this is purporting to quote you.  And I'd

23    just like to ask you --

24         MR. McDERMOTT:  Objection, your Honor.  She's here.

25         THE COURT:  Right.

1              MR. LICHTEN:  Your Honor, she said she did not

2     remember her exact words.

3              THE COURT:  Okay.  All right.

4              MR. LICHTEN:  And there's --

5              MR. McQUILLAN:  Your Honor, I believe she said she

6     remembered exactly what she said.  I believe she was precise.

7              THE COURT:  Well, no, she gave the substance of the

8     comments.  I don't know whether the exact words matter that

9     much, but go ahead.

10             MR. LICHTEN:  Okay.

11    BY MR. LICHTEN:

12    Q.   I just -- there appears to be a quote from you in this

13    article.  Can you look at that?  It's on the screen.

14             MS. HARRIS:  Again, I'll object.  It's a quote from

15    the commission; it's hearsay.

16             MR. CARROLL:  And I would join that objection.

17             THE COURT:  Well, go ahead.  Overruled.

18             Is there a question?

19             MR. LICHTEN:  I'm just asking her to look at the

20    purported quote.

21             THE WITNESS:  Yes, I've read it.

22    BY MR. LICHTEN:

23    Q.   Okay.  Do you recall stating as a result of this report of

24    the commission that was called to study the fire department

25    that the current system is unfair to all races and genders?

```
 1   A.   Yes.

 2   Q.   And do you recall saying that promotions are made in the

 3   fire department strictly on the results of the written tests?

 4   A.   Yes.

 5   Q.   Okay.  And did you say, and there are quotes around this,

 6   quote, "The ability to score well on a test, while important in

 7   school, is not the method by which we choose our political,

 8   industrial or military leaders"?

 9   A.   Yes, I have said that.

10   Q.   Okay.  And then below that it says, "We believe" -- I

11   assume this is the commission.  "We believe the existing

12   promotional system lacks the tools to evaluate candidates for

13   such basic qualities as leadership ability, ethics,

14   interpersonal skills, and understanding of the management

15   process"?

16   A.   Yes.

17   Q.   And did you believe that at the time?

18   A.   Yes.

19   Q.   And do you believe that now?

20   A.   Yes.

21   Q.   Okay.  And then below that -- do you recall talking about

22   assessment centers?

23   A.   Yes.

24   Q.   Okay.  And do you recall what, if anything, you said about

25   assessment centers?
```

1    A.    Well, I feel assessment centers are another tool that

2    could be used in a comprehensive -- a more comprehensive

3    process for promotion.

4    Q.    Okay.  Now, you got to the police department as

5    commissioner -- the Boston Police Department in 2004; is that

6    correct?

7    A.    Yes.

8    Q.    Okay.  And when you got to the Boston Police Department,

9    you, yourself, made a number of attempts to diversify the top

10   parts of the organization; is that right?

11   A.    Yes, I did.

12   Q.    And can you tell us what you did in that regard?

13   A.    Well, first of all, I promoted several people of color,

14   and several women as well, to the command staff.  I promoted

15   several white men as well.  But I felt that we did

16   have -- after my promotions we did have a command staff that

17   was more representative of the community that we served.

18   Q.    Now, let me ask you some questions about that so the Court

19   can understand this.  The positions that you promoted these

20   individuals to, these were non-Civil Service positions?

21   A.    Yes.  They were positions of deputy superintendent and

22   superintendent in the police department.

23   Q.    So when you promote someone to the position of

24   superintendent or deputy superintendent, that does not have to

25   be based upon an exam; is that correct?

1    A.    That's correct.

2    Q.    And you made that judgment based on who you thought would

3    be best for those positions?

4    A.    Yes, I did.

5    Q.    And a number of those individuals were minority police

6    officers?

7    A.    Yes, they were.

8    Q.    And can you tell us who -- was one of those Michael Cox?

9    A.    Yes, that's correct.

10   Q.    One of them was Bruce Holloway?

11   A.    Yes.

12   Q.    And how did they perform in their positions?

13   A.    Extremely well.

14   Q.    Okay.  Now, at some point in time you knew there was going

15   to be a 2005 set of promotional examinations; is that right?

16   A.    Yes.

17   Q.    And that was during your tenure?

18   A.    It was.

19   Q.    Okay.  And did you make some inquiry as to whether or not

20   you could implement -- strike that.  Let me go back.

21        You were aware that you could request a delegation

22   agreement from HRD and Boston could do their own exam; is that

23   correct?

24   A.    I was aware of that.

25   Q.    Okay.  And at some point in time in '04 or '05 did you

1    make inquiries as to whether -- or did you recommend -- make

2    any recommendations that Boston be permitted to do such an

3    examination procedure?

4    A.   I don't recall if I made any specific -- any formal

5    request.  I certainly discussed it with several people.

6    Q.   And were you able to do it?

7    A.   No.

8    Q.   And you were told that they didn't want to spend the money

9    to do it?

10             MS. HARRIS:  Objection.

11             MR. McDERMOTT:  Objection.

12             THE COURT:  Sustained.

13   BY MR. LICHTEN:

14   Q.   What were you told?

15             MS. HARRIS:  Objection.

16             THE COURT:  Sustained.

17   BY MR. LICHTEN:

18   Q.   Can you tell us what you recall doing in that regard?

19   A.   I recall discussing the promotional process with several

20   people internally in the organization.  I know I discussed it

21   with people at city hall, and I know I discussed it with people

22   in the human resources division at the state level.

23   Q.   And do you recall if you, yourself, recommended that there

24   be some sort of alternative assessment procedure for the 2005

25   examination process?

1    A.    I just recall saying that I didn't think a written test

2    alone was appropriate.

3    Q.    And the upshot was what?

4    A.    No money.

5    Q.    Okay.  Okay.  Now, I wanted to ask you, do you recall

6    approximately what your operating budget was for the police

7    department in fiscal year 2005 and 2006?

8              MS. HARRIS:  Objection.

9              THE COURT:  No, you may answer whether you recall.

10             THE WITNESS:  I don't recall exactly.  I could

11    estimate.

12    BY MR. LICHTEN:

13    Q.    What would your estimate be?

14    A.    It would be over a hundred and twenty million dollars.

15    Q.    I'm going to show you a document and ask you if this

16    document helps to refresh your memory about what the operating

17    budget was of the Boston Police Department during the years you

18    were commissioner.

19    A.    Yes.  I presume these are fiscal years, so, yes, it does

20    refresh my memory.

21    Q.    Okay.  And it looks like that for fiscal year '06, which

22    would be the budget period -- I think I got this right -- July

23    1, 2005, to July 1, 2006, the total operating budget was $234

24    million?

25    A.    Yes, that's correct.  Oh, I'm sorry.  Yes, it is.

```
 1   Q.   And just so we're clear, the year before that, it looks
 2   like the budget was $224 million; is that right?
 3   A.   That's correct.
 4   Q.   And do you know what the total operating budget of the
 5   City of Boston is?
 6   A.   No, I do not.
 7   Q.   Commissioner, I want to turn to something else.  Given
 8   your long career in public law enforcement service, what are
 9   the duties that a Boston police sergeant must perform?  What
10   are the knowledges, skills and abilities that they must have to
11   perform their job properly?
12   A.   Well, first, I would say that a police sergeant needs to
13   be a good role model and needs to have integrity, would need to
14   have very strong interpersonal skills and leadership ability,
15   would have to have a knowledge of the law.
16   Q.   Okay.  And when you were police commissioner, did you
17   believe that the examination that people were taking to be
18   sergeants produced people with all of those qualities?
19   A.   Sometimes it did.
20   Q.   And other times?
21   A.   Well, the exam was limited to assessment of one's ability
22   to study the books and the law and answer questions relating to
23   those.
24   Q.   And did that cause you some concerns?
25   A.   Yes.  I've always been concerned that the exams do not
```

1    measure one's ability to lead and do not measure people's

2    integrity, do not measure people's work ethic and performance.

3    Q.    Okay.  In Ireland, is there a process for becoming a

4    police sergeant?

5              MS. HARRIS:  Objection.

6              MR. LEAHEY:  Objection, your Honor.

7              THE COURT:  I'm not sure of the relevance.

8              MR. LICHTEN:  What?

9              THE COURT:  What's the relevance?

10             MR. LICHTEN:  Feasibility.

11             MS. HARRIS:  In Ireland?

12             THE COURT:  No.

13             MR. LEAHEY:  And, Judge, I would just note again --

14             THE COURT:  The objection is sustained.

15             MR. LEAHEY:  I just don't want any expert testimony --

16             THE COURT:  Yeah, I think --

17             MR. LICHTEN:  It wasn't expert; I was asking what the

18    actual system was.

19             THE COURT:  We're near to that line.

20             Anyway, this objection is sustained.

21             MR. LICHTEN:  Thank you, your Honor.

22             May I have just a moment, your Honor?

23             THE COURT:  All right.

24             (Counsel confer off the record.)

25    BY MR. LICHTEN:

```
 1   Q.   Commissioner O'Toole -- I guess it's still okay to call

 2   you "Commissioner O'Toole."  Thank you very much for being

 3   here.  I'm sure some of the other attorneys will have some

 4   questions for you, but thank you very much.

 5   A.   Thank you.

 6            MS. HARRIS:  I have no questions, your Honor.

 7            MR. CARROLL:  No questions, your Honor.

 8            MS. ENGDAHL:  No questions, your Honor.

 9            THE COURT:  Mr. Leahey?

10            MR. LEAHEY:  No, your Honor.

11            MR. McDERMOTT:  MBTA has no questions, your Honor.

12            MR. McQUILLAN:  No questions for Methuen.

13            MR. D'AGOSTINO:  Lawrence has no questions, your

14   Honor.

15            THE COURT:  All right.  That completes your testimony.

16   Thank you.  You are excused.

17            THE WITNESS:  Thank you, your Honor.

18            (The witness is excused.)

19            THE COURT:  We can resume the testimony of Dr. Wiesen.

20            MR. CARROLL:  Thank you, your Honor.

21            Your Honor will be pleased to note that I left my

22   computer at counsel's desk.

23            (Laughter.)

24                      JOEL WIESEN, resumed

25                   CONTINUED CROSS-EXAMINATION
```

```
1    BY MR. CARROLL:

2    Q.    Good morning, Dr. Wiesen.

3    A.    Good morning.

4    Q.    Dr. Wiesen, just rather briefly to -- I have a quick

5    point.  You recall yesterday I asked you a question regarding

6    two names that were put to the top of the list?

7    A.    Yes.

8    Q.    And you had an opportunity to review the City of

9    Springfield's supplemental answers to interrogatories; is that

10   correct?

11   A.    Yes.

12   Q.    And one of those supplemental answers had a document

13   that's labeled Exhibit 1 attached to it; is that correct?

14   A.    I don't know what it was labeled, but that looks like it,

15   yes.

16   Q.    Well, let me show you a document that's labeled Exhibit 1

17   and ask you if you've ever seen it before.

18   A.    Yes.

19   Q.    And do you see where it says "Top of list" underlined?

20   A.    Yes.

21   Q.    And has two names there?

22   A.    Yes.

23   Q.    Now, yesterday we spoke about an issue where there's a

24   bypass appeal by Civil Service, and the Civil Service

25   Commission orders a local community to put names to the top of
```

1   the list, correct?

2   A.   Yes.

3   Q.   And you said if that happened, then it would not be

4   appropriate to count them -- in this case, two white

5   officers -- in the database of statistics you used for a

6   different exam because they didn't take the exam.

7   A.   If they didn't take the exam, then they should not be

8   included in the analysis.

9   Q.   Okay.  Just briefly, you've prepared Civil Service exams

10   for different communities throughout the country?

11   A.   Several.

12   Q.   And can you give us an idea of what your costs are or --

13   strike that -- what your charges are for doing that?

14   A.   Well, let's see.  I think the last Civil Service exam I

15   developed was for a promotion in the -- probably in the -- let

16   me think.  Probably the fire department in a small town in New

17   Hampshire, Windham, New Hampshire.  There were a handful of

18   candidates.  I forgot if it was a deputy chief position or

19   lower-level position.  I think it was a lower-level position.

20   Maybe they had five applicants.

21        And there was a written job-knowledge test, an oral job

22   simulation -- a series of job simulations -- and a structured

23   oral board.  And I think the cost for that was something in the

24   neighborhood of $7,000.

25   Q.   Okay.  And you've done other exams for a slightly larger

1  pool of applicants, in four or five, where the cost would be

2  greater; is that correct?

3  A.  Yes.

4  Q.  And do you have some sort of salary -- strike that -- cost

5  schedule to indicate what you would charge, say, were there 30

6  or 40 applicants for a position?

7  A.  It would depend what the components of the examination

8  were.  And there's some economy of scale when you use more

9  candidates.  There's also some more complexities when you use

10  more candidates.  So with five candidates, you don't have to

11  deal with the complexities of having multiple panels and trying

12  to assure that the different panels all are using the same

13  yardstick and some are not being tougher and some are not being

14  more lenient.  On the other hand, if you're developing a

15  written test, you can use the same written test for all your

16  candidates.

17  Q.  Well, I guess what I'm trying to get to is an

18  understanding of what you charge for designing and implementing

19  one of these Civil Service promotional examinations.  And is

20  there a -- as I understand it, what you're saying is there's a

21  range of cost that you charge depending upon the amount of work

22  that you have to do.  Is that --

23  A.  Well, I don't do it frequently enough.  I thought when I

24  left the Commonwealth I would be doing this as my major

25  consulting practice, but it turned out the private sector is

1    more lucrative and easier to get work in the private sector.

2    So I don't have just a -- you know, a basic fee schedule for

3    exams of this size or the next size.  And each exam that I'm

4    asked to bid on -- and I don't bid on very many of them, but I

5    do bid on several, occasionally -- I develop a budget for that

6    project.

7    Q.    Okay.  Well, in terms of the exams that you have done,

8    you've mentioned the one that you charged, I believe you said,

9    $7,000 for the small community in New Hampshire.  What would be

10   an amount that you've charged for the largest of the exams

11   you've developed?

12   A.    Well, the largest exam I worked on I think was in the

13   early-mid '90s, and that was the Oklahoma City firefighter

14   exam.  And they had, oh, something around 1500 applicants.  And

15   we used a written exam and an oral board and a physical ability

16   test.  And that was the first project I had after I left the

17   employment of the state.  And I think the total cost for that

18   was something under $30,000.

19   Q.    Did you say 130 --

20   A.    Something under $30,000.

21   Q.    Something under 30,000.  Okay.

22         And have you talked with other industrial psychologists at

23   the various gatherings, the folks that actually design and

24   implement as often as they can these public sector police-type

25   promotional exams?

```
1    A.    Often?  Yes.

2    Q.    And have you gotten an understanding, or developed an

3    understanding, of what generally would be charged in the

4    industry for that type of work?

5    A.    No.

6    Q.    Okay.  In your opinion does the 1991 validation study

7    comply with the Uniform Guidelines?

8    A.    No.

9    Q.    Okay.  And you'll recall that back on June 9th of this

10   year your deposition was taken, correct?

11   A.    I recall being deposed, yes.

12   Q.    Okay.  And during the course of that, your deposition, we

13   had some discussion with respect to the 1991 report; do you

14   recall that?

15   A.    Not specifically.

16   Q.    Well, do you recall that I showed you a copy and marked it

17   as Exhibit 7 in your deposition and asked you to identify it?

18   A.    I apologize, but there were seven attorneys --

19   Q.    Sure.

20   A.    -- on that day, and I don't really recall who did what.

21   Q.    I understand.  It's difficult to recall.

22         Well, let me see if I can help refresh your recollection

23   just a bit.  And I would direct your attention to line 14 in

24   your deposition which is a question that I asked you.  And it

25   says, "Dr. Wiesen, I'm going to show you a document that's been
```

1   marked as Wiesen Exhibit 7.  And can you identify that, sir?"

2   Do you see that?

3   A.   I do.

4   Q.   And can you read your answer?

5   A.   "It's titled 'Validation Report for the 1991 Police

6   Promotional Selection Procedures,' and it's dated October 1,

7   1991."

8   Q.   Okay.  And my next question was, "And you reviewed Exhibit

9   7 in preparation of your reports that you've submitted in this

10  case; is that correct?"

11  A.   Yes.

12  Q.   And your answer was "yes"?

13  A.   Yes.

14  Q.   Okay.  And then I said, "And earlier today in answer to

15  Attorney Harris' questions, or some of them, you testified

16  about some of the problems you saw with Exhibit 7.  That's the

17  document that's been marked as Exhibit 7; is that correct?"

18  A.   Yes.

19  Q.   "Yes."

20       And then I asked you a question that says, "And focusing

21  on the exhibit itself, which is dated October 1, 1991, can you

22  explain what your role in this report was?"  Do you see that?

23  A.   I do.

24  Q.   And can you read your answer to that, sir?

25  A.   "When I first saw this report it was not anything that I

1    had seen before, and I -- I read it with interest because I had

2    been at the -- I was at that agency at that time and I was

3    impressed with the amount of work that had gone into it.  But I

4    have -- other than as I mentioned, providing some reference

5    material when some -- when asked, which I think probably

6    included some of the books listed on page 254, I don't recall

7    having any involvement."

8    Q.    Okay.  And then we go on for a little while about trying

9    to get to whether or not you were actually involved in that

10   process; do you recall that?

11   A.    I recall that line of questioning.

12   Q.    Okay.  And then we come up to a question which says, "And

13   while you were at the DPA, did you confer with anybody with

14   regard to the preparation of this report?"  Do you see that?

15   A.    Yes.

16   Q.    And can you read your answer to that?

17   A.    "I was not aware that this report was being developed.  I

18   knew, I think, all of the professionals in the organization.

19   And would run into them on a regular basis, and folks felt free

20   to interact with other people in the department, ask questions

21   if they had questions.  But I was -- as I said, I don't recall

22   this report being prepared.  I was not on a task force that

23   oversaw the report.  I didn't review the report.  And when I

24   read it -- when I first saw it I read it with interest and

25   tried to answer the question, perhaps, that you're getting at,

1   which is, did I have anything to do with this."

2   Q.   And then you had said, "I do not think I had anything to

3   do with this report"; is that correct?

4   A.   That's correct.

5   Q.   Okay.  And then there's a question involving -- well,

6   strike that.

7        Then after some further back-and -- further discussion

8   between us, we get to the question -- and here I'm asking about

9   the relationship between the 1991 report and the Uniform

10  Guidelines.  And it says, "And do you see anything in it,"

11  meaning the validation report, "that does not comply with those

12  guidelines?"  And what was your answer to that, sir?

13  A.   I said, "It was a reasonably well-done research effort

14  that tried very hard to comply with the guidelines.  I think

15  the major shortcomings we've already discussed a little earlier

16  today, so if I were to fault this at all, it would be in the

17  last stages of turning the job analysis into a test plan."

18  Q.   And then I asked you, "Okay.  But the process itself as

19  described by the report you would agree complies with the UGESP

20  guidelines."  And there was an objection.  And what was your

21  answer?

22  A.   I said, "Right.  I think that it -- it definitely tried to

23  comply with those standards, and it was reasonably

24  competent -- did a reasonable job until the very end."

25  Q.   Okay.  So at least at the time of your deposition when I

1    asked you if the report -- you would agree whether the report

2    complies with the guidelines, your answer was "right," and then

3    you went on and said you think it definitely tried to comply

4    with those standards.

5            MR. LICHTEN:   Objection.   It mischaracterizes his

6    testimony.

7            THE COURT:   Sustained.

8    BY MR. CARROLL:

9    Q.   So just so we're clear on this, is it your testimony today

10   that you had nothing to do -- that you can recall, other than

11   providing some reading materials -- with that 1991 report?

12   A.   I believe over the last while, I think perhaps during some

13   questioning perhaps at my deposition, I had some -- this was

14   '91, and this was a while ago -- I had some recollection of

15   being asked about the sampling plan, to whom the questionnaires

16   should be sent across the state:   the large municipalities, the

17   small ones; the geographic distribution; how many were

18   necessary.   But as I said, I don't have any recollection of

19   being on a steering committee or offering sections of it or

20   reviewing drafts of it or having meetings, discussing the

21   outcomes or helping with the data analysis.

22   Q.   In preparing the 1991 report, was there a work plan

23   prepared for that report?

24   A.   I saw a work plan.

25   Q.   And can you explain what a work plan is?

1    A.    In this case it broke the work down into a number of

2    sequential steps.

3    Q.    Okay.  And let me show you a document that's been marked

4    as Attachment D to Exhibit 41.  And would you read Number 1 for

5    us, please, sir?

6    A.    "Develop staffing patterns and determine sample."

7    Q.    And there's a target date for completion of that.  Do you

8    see that?

9    A.    Yes.

10   Q.    And then it says "Resources required."  Do you see that?

11   A.    Yes.

12   Q.    And then it lists some names?

13   A.    Yes.

14   Q.    And can you tell us who Dori is?

15   A.    I have no recollection of who Dori is.

16   Q.    Okay.  Vita?

17   A.    I'm not sure who Vita is.

18   Q.    Mary Ann?

19   A.    I presume that was Mary Ann Gilmore, who I think was

20   heading the project.

21   Q.    And then Joel.  That would be you; am I correct?

22   A.    And I think I was the only Joel in the agency.

23   Q.    So does this refresh your recollection as to whether you

24   were involved at all in developing the staffing plans and

25   determining the sample work that went into that 1991 validation

1    report?

2    A.    As I said, I think I have some vague recollections of

3    having discussions about sampling.

4    Q.    And do you see where there's what appears to be a series

5    of steps that went into the makeup of developing the staffing

6    patterns and determining the sample?  Do you see those steps?

7    A.    I do.

8    Q.    And can you tell us which of those you were involved with?

9    A.    I think perhaps my opinion was solicited on the

10   next-to-last one.

11   Q.    Okay.  "Establishing rules or criteria for selecting

12   sample"?

13   A.    Yes.

14   Q.    And what actually did that work involve?

15   A.    I think that one of the employees at HRD came to my office

16   at one point and we had a discussion about alternative

17   approaches of sampling SMEs for a survey, a statewide survey.

18   Q.    Now, is it your understanding that this work plan outlines

19   the steps that actually went into the work that was performed

20   for preparing the 1991 validation report?

21   A.    It was a work plan.  I have no idea to what extent it was

22   implemented.

23   Q.    Wasn't that the purpose of a work plan, to try and outline

24   the steps and give specific deadlines and identify who's going

25   to do what and what steps are to be taken to do it?

1   A.   That might be the intent, but I have no idea what was

2   actually done, and many plans don't actually get implemented as

3   written.

4   Q.   Okay.  But you do have a recollection of meeting with some

5   people regarding the rules or criteria for selecting the sample

6   that went into developing the staffing patterns and determining

7   the sample; is that correct?

8   A.   Or some aspects of that.

9   Q.   Okay.  And did you do any work regarding developing the

10  methodology for determining frequent and critical tasks of the

11  job, the comprehensive task inventory questionnaire using OP

12  scannable answer sheets and multilevel scales, and including

13  room for SMEs to add tasks if necessary?

14  A.   I have no recollection of having involvement with that.

15  Q.   Okay.  Well, let me ask you to look at Item 8 on this

16  Exhibit.

17  A.   Yes.

18  Q.   This is the one that we've been looking at, the work plan.

19  And do you see where it -- the work plan envisions that being

20  done?

21  A.   I see VIII.

22  Q.   Okay.  And there's a specific target date for completion?

23  A.   Yes.

24  Q.   And it says "Resources required"?

25  A.   Yes.

1    Q.    Can you tell us who Wayne was?

2    A.    Wayne Moy was an employee in the classification bureau.

3    Q.    And you don't recall who Vita was?

4    A.    No.

5    Q.    Okay.  But, then, Joel, that would be you?

6    A.    Correct.

7    Q.    And Mohammed?

8    A.    Mohammed was, I believe, in the IT area.

9    Q.    Okay.  And can you look down at the first two steps -- and

10   I'll show you the next two later -- and tell us if you were

11   involved with those, or which of those you were involved with?

12   A.    I don't have any recollection of being involved in either.

13   Q.    Okay.  Well, let me show you the next two.  Do you see

14   where it says "Develop scale, multilevel frequency, and

15   criticality factors"?

16   A.    Yes.

17   Q.    Is that something that you would have been involved with?

18   A.    I have no recollection of being involved in that aspect of

19   this project.

20   Q.    Okay.  Do you know what a rating frequency is?

21   A.    Where are we reading, please?

22   Q.    The same sentence.  It says, "Multilevel frequency and

23   criticality factors - separate answer sheets to be used for

24   rating frequency and criticality of tasks."  Do you see that?

25   A.    Right.  Yes.  So "rating" means collecting -- allowing the

1    SMEs to make ratings, and they're making ratings of frequency

2    and then they're also making ratings of criticality.

3    Q.    Okay.  And what does "criticality" mean?

4    A.    Well, some tasks might not occur very often, but the few

5    times they occur they might be very important.  And if you just

6    focus on frequency you might get a lot of humdrum job duties

7    and tasks coming out as important and miss some others that are

8    only used occasionally.

9    Q.    Well, was that one of your concerns, the rating frequency

10   and the criticality of tasks as part of this effort?

11   A.    I believe in the previous page you showed me there was a

12   statement that they were going to use the methodology of the

13   statewide study, abbreviated, SWS.  And I think, in fact,

14   that's what the report did.

15   Q.    Okay.  And what are the methodologies used in the SWS?

16   A.    It basically began with a comprehensive task

17   questionnaire.  That comprehensive task questionnaire was sent

18   out to SMEs who rated the frequency in the criticality.  There

19   was a data analysis system that was developed by a professor at

20   Yale, I believe, and -- I take that back.  I think he did the

21   clustering.  So the clustering wouldn't come into play here.

22        So the statewide study developed the rules of thumb as to

23   what level of frequency was going to be considered frequent

24   enough to be included, what level of criticality was going to

25   be considered critical enough to be included.  So it looks to

1    me like they used the methodologies in the statewide study and

2    tweaked them a little bit for this effort.

3    Q.    Okay.  And other than you, who else at the agency at the

4    time was familiar with this type of work, reviewing

5    methodologies used in the statewide system?

6    A.    I think at this point in time the classification staff at

7    the agency had recently completed a statewide reclassification

8    program which involved surveying all state employees -- the

9    jobs for all state employees, and reduced the number of job

10   titles from something in the neighborhood of two to three

11   thousand to something under a thousand?

12        So there were many people in the agency that were very

13   familiar with the particular methodology that the statewide

14   study employed.

15   Q.    Okay.  And going back to the list of resources for

16   performing these tasks, we talked about Wayne, Vita, Joel and

17   Mohammed?

18   A.    Yes.

19   Q.    And can you tell us which of those people other than

20   yourself might have been performing that particular step?

21   A.    Well, Wayne Moy was an employee in the classification

22   bureau for I think as long as I was at the agency, but at least

23   for many years.  And he's listed first, so I presume that

24   he's -- although it's not in alphabetical order.  So I presume

25   that he took the lead on that.

1   Q.   Okay.  Would it be your understanding, then, that the

2   listing of the names would correspond to the listing of who was

3   going to perform which step?

4   A.   It might.

5   Q.   Okay.  And so you appeared to be on the list third,

6   correct?

7   A.   Right.

8   Q.   And so the third step would consist of "Develop

9   scale" -- whoops.  "Develop scale, multilevel frequency and

10  criticality factors.  Separate answer sheets to be used for

11  rating frequency and criticality of tasks."  Do you see that?

12  A.   I do.

13  Q.   And does that refresh your memory as to whether or not you

14  were the person responsible for that step?

15  A.   I have no recollection of doing -- developing any

16  job-rating, task-rating forms or scales.

17  Q.   Okay.  And do you know if factually -- strike that.

18       Let me come back to that.  Let me direct your attention to

19  Number 10.  Do you see that?

20  A.   I do.

21  Q.   And it says "Develop a critical incident methodology" --

22  A.   Yes.

23  Q.   -- correct?

24  A.   Yes.

25  Q.   And the resources required were Mary Ann, Joel and Vita?

1    A.    Yes.

2    Q.    And can you explain to us what a "critical incident

3    methodology" is?

4    A.    Yes.

5    Q.    And what is that?

6    A.    It is a form of job analysis which is very different than

7    the structured questionnaire where you just provide statements

8    and ask the subject matter experts to rate them.  The question

9    that's asked in a critical incident approach -- and it's often

10   done person to person, but sometimes it's done remotely by

11   distributing forms.  The question that's asked of the SMEs is

12   something along these lines:  "Give me an example of an

13   instance where -- that you know of or that you took part in

14   where the incumbent did a particularly good or particularly

15   poor job."

16   Q.    Okay.  And was it your responsibility in the group to

17   develop the critical incident methodology?

18   A.    I recall at one point someone came to me and asked me if I

19   had an example of critical incident forms, and I provided some

20   examples of critical incident forms.

21   Q.    And let me show you the steps that were involved in that

22   process.  Can you look at that, sir, and tell us -- the first

23   one says, "Develop the structure of the CIT method."  Do you

24   see that?

25   A.    Yes.

1    Q.    And can you explain to us what the CIT method is?

2    A.    Well, I imagine it's a methodology to try to collect

3    critical incident techniques.

4    Q.    And was that one of your responsibilities to develop that?

5    A.    No.  The total involvement that I recall is somebody

6    asking me for -- if I had ever used a critical incident

7    approach, and when I said yes, they asked if I had any

8    examples.  And I went home and from my consulting file found

9    some examples and provided them.

10   Q.    Okay.  And it says, "Develop materials detailing the

11   criteria for a well-written incident."  And would that have

12   been your responsibility as supplying those materials from your

13   resources?

14   A.    I think that's a very nice step.  I do not know of any

15   such criteria.  Had I found those criteria, I would have

16   squirrelled those away in my computer for future use.  I have

17   no recollection of having any involvement with that.

18   Q.    Okay.  And "Developing training materials to train

19   individuals who will administer the CIT."  Did you have any

20   involvement with that task?

21   A.    I have no recollection of having any involvement with that

22   task.

23   Q.    Well, let me move down the list here to Number 12.  And do

24   you see where it says, "Develop methodologies for determining

25   KSAPs required at hire and weighting them as to their relative

1   importance to the tasks performed and linking them to frequent

2   and critical tasks"?  Do you see that?

3   A.   Yes.

4   Q.   And the resources required are Dori, Vita, Mary Anne and

5   Joel, correct?

6   A.   Yes.

7   Q.   And I'm sorry.  Do you recall who Dori was?

8   A.   The name sounds somewhat familiar, but I do not know.

9   Q.   Okay.  And you don't recall who Vita was but you remember

10  Mary Ann?

11  A.   Well, there was an admin support person by the name of

12  Vita, but I don't know if you would list admin support people,

13  so I don't know if that's the person it's referring to.

14  Q.   But in any event, you do recall Mary Ann?

15  A.   Mary Ann Gilmore was a high-level person in the

16  classification bureau.

17  Q.   Okay.  And what was the classification bureau's job at the

18  time?

19  A.   The classification bureau established the classification

20  plan for state and local employees.  So in Civil Service titles

21  if you want to hire somebody as a -- whatever, a computer

22  programmer -- that title has to exist.  And there's a job

23  specification that had to be approved by the classification

24  bureau and they would maintain the classification system.  They

25  also set salary levels for all the state employees.  And the

1    salary levels were, in part, linked to the job

2    descriptions -- job specifications.

3    Q.   Okay.  And those would all have to be approved by Mary

4    Ann, or her department or division or whatever you call it?

5    A.   I don't recall who headed that bureau.  It might have been

6    Mary Ann; it might have been someone else.

7    Q.   Okay.  But it was someone in the state who would review

8    those job descriptions, say, for police sergeant, and determine

9    whether or not it was appropriate?

10   A.   There was an official state description for police

11   sergeant.  It was used -- I don't know what its legal import

12   was.  I don't know if it had to be used in all of the

13   municipalities, I don't recall if it was used verbatim on the

14   examination announcement, but I know there was an official job

15   description --

16   Q.   Could you --

17   A.   -- specification.

18   Q.   Thank you, Dr. Wiesen.

19        Would you look at the first two steps at the bottom of

20   page 3612 here and tell us, were both of those your

21   responsibilities or just the first one?

22            MR. LICHTEN:  I object to the form of the question,

23   actually.

24            THE COURT:  Sustained.

25   BY MR. CARROLL:

1   Q.    Well, which were your responsibilities, Dr. Wiesen?

2   A.    I have no recollection of being involved in developing

3   methodologies and determining the KSAPs required at hire,

4   neither of those steps.

5   Q.    Okay.  Did you review the methodologies for rating?

6   A.    As I said, employees in the agency felt free to interact

7   with and ask questions of other employees, but I have no

8   recollection of sitting down with a draft and going over it and

9   either annotating it or providing feedback or rewriting it or

10  being part of a task force or a committee that discussed it,

11  which is not to say that it could not have possibly taken place

12  and I just don't recall it, it was not a -- we did a lot of

13  proof work, but I don't recall.

14  Q.    Okay.  Would you say that, generally, the weighting -- the

15  reviewing of methodologies for examinations, the rating, the

16  weighting and the linkage are the types of tasks that fall

17  within the purview of industrial psychologists?

18  A.    Yes.

19  Q.    And other than you, was there anyone else at the agency at

20  the time that had a Ph.D. in industrial psychology?

21  A.    There was no one else at the agency who had a Ph.D. in

22  industrial psychology.

23  Q.    Okay.  Let me show you the next page of tasks.

24  A.    But there were many people who were involved with job

25  analysis.

1    Q.    Okay.  But you were the top dog; you were the doctor.

2    A.    But the agency was split into the classification side and

3    the examination side.  And this was a project done by the

4    classification side, so none of the staff there came from the

5    examination side.

6    Q.    Well, as a professional licensed doctor of industrial

7    psychology, if you saw something that was wrong on a project of

8    this size, would you have brought it to the attention of the

9    higher-ups in the organization?

10   A.    If it had come to my attention, I definitely would have

11   mentioned something.

12   Q.    Okay.  And it's just at this point you don't recall if you

13   actually reviewed it or not?

14   A.    Correct.

15   Q.    Okay.  Well, if we could take a moment, then, and look at

16   the tasks listed at the top of page 7 which are a continuation

17   of what we just were discussing, can you identify which of

18   those you were involved with?

19   A.    I have no recollection of being involved with any of those

20   steps.

21   Q.    Okay.  And, again, would it be your understanding that the

22   decision on the scales for rating and weighting would be

23   something that would fall within the purview of an industrial

24   psychologist?

25   A.    Well, I think it would.

1    Q.    Okay.  And what about the "Develop rating, linkage and

2    weighting schemes for determining KSAPs required at hire for

3    each level and the relative importance of these"?

4    A.    I think it would.

5    Q.    And "developing instructions for SMEs and agency task

6    force personnel"?

7    A.    It might.

8    Q.    Okay.  And "develop training for professionals to

9    administer weighting and linkage methods"?

10   A.    It might.

11   Q.    And when you were involved in developing the test -- the

12   few tests that you mentioned for the public service sector, are

13   these tasks that you performed in developing your test?

14   A.    Most of them.

15   Q.    Let me show you another page from the work plan and ask

16   you to read Item 16.

17   A.    Out loud?

18   Q.    "Developed method for validating training and experience

19   schedules."  Do you see that?

20   A.    Yes.

21   Q.    And it's correct to say that you were listed as one of the

22   three resources for that task, correct?

23   A.    Yes.

24   Q.    And would you look at the first two steps?  Do you see

25   those?

1    A.    Yes.

2    Q.    Does that refresh your recollection as to whether or not

3    you performed either of those?

4    A.    No.   Now, the topic of training and experience was the

5    subject of various meetings in the agency from time to time,

6    and I took part in some of those meetings and discussed

7    the -- some of the options, but I have no recollection of being

8    part of a public safety promotion task force working on

9    training, experience, schedules or promotional exams.

10   Q.    And as I recall your testimony from the other day when

11   Attorney Harris was asking you some questions, you mentioned

12   that at one point you were director of validation for the

13   Commonwealth -- for the DPA; is that correct?

14   A.    For the agency, yes.

15   Q.    And so developing a method for validating training and

16   experience schedules would be something that generally would

17   fall within the purview of an industrial psychologist, correct?

18   A.    I would hope so.   It doesn't always happen, but I would

19   hope so.

20   Q.    Do you recall who at the agency took over as director of

21   validation after you were assigned to other duties?

22   A.    I don't think that position was filled.

23   Q.    Okay.   So then you continued to perform the director of

24   validation duties and additional duties were added to your

25   responsibilities.   Is that the way it worked?

1    A.    No.

2    Q.    Okay.

3    A.    My primary duties changed.  Perhaps on a project basis I

4    would be involved with some -- examining projects, but I didn't

5    just get an expanded job.

6    Q.    Okay.  Do you recall developing any methods for validating

7    the training and experience schedules?

8    A.    I don't remember any of the -- anything related to that

9    step.

10   Q.    Okay.  Well, let's look at the three resources that were

11   required to perform that step.  There's you, and you had held

12   at the time, or just prior to that time, the title of director

13   of validation; and there's Vita that you mentioned was a

14   clerical person; and there's Mary Ann that you said had some

15   functions for -- I'm not -- I don't recall exactly what.  Was

16   she a validation person?

17   A.    Okay.  So Mary Ann Gilmore began her career as a junior

18   Civil Service examiner writing Civil Service exams, and she had

19   a promotional opportunity to move to the classification bureau.

20   And she moved to the classification bureau and rose through the

21   ranks in the classification bureau.  And a bright person.  And

22   rose reasonably high in the classification bureau.

23        I don't have a very clear recollection of Vita.  I don't

24   know if it's the Vita that I recall as being an admin person --

25   I don't know if she was able to get a promotion to a

1   non-clerical job -- or if that's a different person.

2   Q.    Okay.  But at the time there were three people,

3   essentially, who are the resources, and you're the one with the

4   doctorate in industrial psychology.  Do you know what Mary

5   Anne's background was?  Did she have any industrial psychology

6   education or professional degrees?

7   A.    No, I think she had a bachelor's degree in a liberal arts

8   area.

9   Q.    And Vita, you just don't recall what she did -- unless

10  it's the clerical person, correct?

11  A.    Correct.

12  Q.    And you wouldn't expect a clerical person would have

13  training as an industrial psychologist, correct?

14  A.    That's absolutely correct.

15  Q.    Let me show you a few more of the tasks that went into

16  that.  It says "Develop the structure for the T&E method."  Do

17  you see that?

18  A.    I do.

19  Q.    And is that something that ordinarily an industrial

20  psychologist would do?

21  A.    Yes.  I would hope so.

22  Q.    And you just don't recall whether or not you did that for

23  the 1991 report?

24  A.    I have no recollection of doing that.  And I think if I

25  were -- if I had done it, I would have done a good job and I

1  would have kept it in my files for resale to clients.

2  Q.   And if someone else had done it and you were aware of it,

3  and they had done a bad job, you would have pointed that out to

4  them, correct, so they wouldn't make a serious mistake in a

5  project of this magnitude?

6  A.   Yes.

7  Q.   And you see where it says "Develop the materials detailing

8  the criteria for T&E method"?

9  A.   Yes.

10  Q.   And is that something -- is that the type of task that

11  ordinarily an industrial psychologist would perform?

12  A.   I don't know what that means.

13  Q.   Okay.  Do you recall ever asking anybody, "What are you

14  talking about?  I don't understand what that task is"?

15  A.   No.

16  Q.   And focusing on the last task, "Develop training materials

17  to train individuals and will administer the T&E method," is

18  that the type of task that industrial psychologists perform?

19  A.   Sometimes, yes.

20  Q.   And you don't recall whether or not you performed this

21  task on the preparation work for this 1991 report?

22  A.   That's a large enough chunk of work that I think if I had

23  been involved with it, I probably would remember it.  But, no,

24  I have no recollection.

25  Q.   All right.  Dr. Wiesen, I'm going to move away from the

1    specific task now and go to sort of the general issue that we

2    started out with on the validation or the consistency of the

3    1991 report with the Uniform Guidelines.  And I guess my series

4    of questions to you really is I'm trying to get an

5    understanding of whether this 1991 report followed the steps,

6    first of all, in this work plan.  And you've had an

7    opportunity, haven't you, to review the 1991 report and review

8    all of the appendices attached to it?

9    A.    I have.

10   Q.    And so the first task up is "Develop staffing patterns in

11   determining sample."  And is that something that the Uniform

12   Guidelines expect to be done?

13   A.    The Uniform Guidelines call for a job analysis to be done.

14   They don't specifically say how to do that job analysis.

15   Q.    Okay.  In reviewing the 1991 report, there's a provision

16   for job analysis, correct?

17   A.    Yes.

18   Q.    And did you have an opportunity to review that?

19   A.    I did.

20   Q.    And is that job analysis consistent with the Uniform

21   Guidelines?

22   A.    It depends on how broadly you define "job analysis."

23   Q.    Let's start with how broadly the Uniform Guidelines define

24   it.

25   A.    May I look at the guidelines?

1    Q.    If you have a copy, I would urge you to.

2    A.    So the approach that was used by the Commonwealth in this

3    study was a content validity approach.

4    Q.    Okay.  And content validity, I believe from your earlier

5    testimony, requires that the job or that the examination test

6    responsibilities of the job; is that correct?

7    A.    Yes.

8    Q.    And in order to figure that out, you have to do a job

9    analysis?

10   A.    Yes.

11   Q.    And there was a job analysis done here; is that correct?

12   A.    Correct.  However, the Uniform Guidelines -- and this is

13   one of the aspects that the people who don't like the Uniform

14   Guidelines rail against -- make a distinction between

15   knowledges, skills and abilities that are very closely linked

16   to job tasks, and knowledges, skills and abilities and personal

17   characteristics that are less closely linked to job tasks, and

18   it calls the latter "constructs."

19   Q.    Okay.  Well, I certainly appreciate --

20   A.    May I finish my answer?

21   Q.    Well, you answered my question with the word "correct"

22   when I asked about whether the 1991 report had a job analysis

23   in it.  And I believe you said "correct."

24   A.    Yeah, but the job analysis --

25   Q.    And now you're talking about a professional disagreement

1    amongst academics in the industrial psychology organization

2    about the validity of the Uniform Guidelines.  And that might

3    be appropriate for another discussion, but really, I just want

4    to focus in on my questions, if we could.  So let me ask

5    another one.

6        The "Developing staffing patterns and determining a

7    sample," that would be part of the job analysis, correct?

8    A.    Correct.

9    Q.    And that was done in this case in the 1991 validation

10   report?

11   A.    Correct.

12   Q.    And with regard to "Conducting a literature search in

13   order to obtain information on police work, job analysis,

14   reading list material and ac-" -- help me out here.  I can't

15   pronounce the word.  Academics, essentially.

16   A.    There's nothing on the screen.  I don't --

17   Q.    Oh, let me help you out here.  I'm sorry.  I'm sure with

18   all this, I'm glad someone can pronounce it.

19   A.    Academicians.

20   Q.    -- "academicians in the field of police science."  Do you

21   see that?

22   A.    Yes.

23   Q.    And is that part of the job analysis?

24   A.    That's a reasonable part of the job analysis.

25   Q.    Okay.  And if you look at the tasks that are -- the steps

1  that are listed underneath that as part of the work plan, would

2  that be some of the things -- or would that be the things that

3  would go into that step -- that part of the job analysis?

4  A.    Those would be reasonable steps.  I don't know if they're

5  exhaustive, but those would be reasonable steps.

6  Q.    Okay.  And in your review of the 1991 validation report,

7  do you know if this step was performed -- or if this part of

8  the work plan was performed, I should say?

9  A.    I presume it was.  I don't recall all the appendices.  I

10  don't recall an appendix summarizing this, but that may just be

11  my recall.

12  Q.    And with regard to "Conduct survey of other

13  jurisdictions," do you see that?

14  A.    Yes.

15  Q.    And would that be part of conducting a professional job

16  analysis?

17  A.    That would be a good idea.

18  Q.    Okay.  And in reviewing the 1991 report, do you know if

19  that was done?

20  A.    I don't have any specific recollection of what they did

21  there.

22  Q.    Okay.  Did you review the appendices -- and that's that

23  rather large file that was -- yes -- was presented to everyone

24  on the day of your deposition.  You've had a chance to review

25  that, though?

1    A.    I have looked through it, but I did not really pore over

2    every page.

3    Q.    Okay.  Do you recall seeing in there a survey of other

4    jurisdictions?

5    A.    I do not have any distinct recollection of that.

6    Q.    Okay.  Well, would that be typically something that's done

7    by telephone?

8    A.    It could be done by telephone.

9    Q.    And would that something -- would that be something that's

10   ordinarily done by interns?

11   A.    It could be done by interns.

12   Q.    And do you remember an intern at the agency named Wayne?

13   A.    No.

14   Q.    Okay.  And going down to the next --

15   A.    I didn't know all of the interns.

16   Q.    I understand.  Going down to the next part of the work

17   plan where it says "Gather existing job content information for

18   use in the development of job analysis tools and methods," do

19   you know if that was done as part of this 1991 validation

20   report?

21   A.    I presume it was.

22   Q.    And you see where it says "Develop database of contacts

23   for each database needed"?

24   A.    I see that.

25   Q.    Okay.  And what does that mean?

1    A.    I don't know.

2    Q.    Okay.  That wouldn't be anything you were involved with,

3    the database work?

4    A.    I presume they were just making a list of either people

5    and telephone numbers or street addresses or e-mail addresses.

6    Maybe not e-mail addresses at that point in time.

7    Q.    Would that be a good thing to do when conducting a job

8    analysis?

9    A.    Well, if you wanted to take a survey of -- a nationwide

10   survey of other municipalities, for example, you would want at

11   least a list of the municipalities, how to contact them, yes.

12   Q.    So that would be consistent with what the Uniform

13   Guidelines -- they wouldn't frown upon that, I take it?

14   A.    As I said, the Uniform Guidelines does not give very

15   specific guidance as to how to conduct the job analysis.

16   Q.    Okay.  And so looking at the next step in the work plan,

17   "Developing support, liaisons and agency task force for and

18   market the project," what does that actually mean?

19   A.    Well, the project depends on cooperation from other

20   agencies -- other independent agencies and entities, so the

21   in-house staff could work as hard as they can, but if they

22   don't get cooperation from the SMEs, they won't have any SME

23   input.  So they undertook an effort to try to maximize the

24   receptivity of the groups that would be impacted or interested.

25   Q.    And do you recall someone at the agency at the time named

1    Susan?

2    A.    I have no recollection of a Susan.

3    Q.    Okay.  But you do recall Mary Ann?

4    A.    Yes.

5    Q.    And that would be something generally that she would be

6    involved with?

7    A.    Well, as I said, Mary Ann was a competent person and I'm

8    sure she would be very good at that.

9    Q.    And she was a high-level person as well in the

10   organization?

11   A.    Well, maybe in '91 she wasn't, but by the time I

12   left -- well, '91 is close to the time I left, so I would say

13   yes.

14   Q.    And you see on the work plan where it says "Develop the

15   systems support for analyzing the survey data"?

16   A.    Yes.

17   Q.    And I believe you indicated that that was one of

18   Mohammed's responsibilities; he was the IT person?

19   A.    I think he reported to the person who was in charge of IT

20   for the agency.

21   Q.    Okay.  And might that have been someone named Michael?

22   A.    No, it was not Michael.  That was Edward Ruddy.

23   Q.    Okay.  Do you know who Michael was?

24   A.    I don't recall anyone at the agency that was referred to

25   as "Michael."  But the agency was somewhat -- somewhat

1   separated; the classification folks and the examination folks

2   didn't interact with each other as much as they did within the

3   group.

4   Q.    But on a project the size of the 1991 validation report,

5   developing system support for analyzing survey data would be

6   something that would be needed, correct?

7   A.    You would need system support, yes.

8   Q.    In your review of the 1991 report, do you know if that was

9   done?

10  A.    It must have been done; they did data analyses.

11  Q.    And is data analyses something that would be consistent

12  with the Uniform Guidelines in developing a valid professional

13  validation study?

14  A.    It depends on how it was done.

15  Q.    Well, would you expect in a project of this size to have

16  survey data analysis by hand?

17  A.    I hope not.

18  Q.    Okay.  Because you're talking about, what, thousands of

19  people?

20  A.    I do not know.

21  Q.    Large amounts of data?

22  A.    Yes.

23  Q.    And do you see the portion of Number 8 that talks about

24  developing the methodology for determining frequent and

25  critical tasks of the jobs --

1    A.    Yes.

2    Q.    -- comprehensive task force inventory questionnaire using

3    OP scannable answer sheets?  "OP," does that stand for optical

4    equipment?

5    A.    I think so.

6    Q.    Okay.  And do you know if this step in the work plan was

7    something that would be consistent with the Uniform Guidelines

8    for developing a viable, valid validation survey?

9    A.    It would depend on how it was done.

10   Q.    Okay.  Well, you reviewed how it was done in this case.

11   Would that be consistent with the Uniform Guidelines?

12   A.    No.

13   Q.    Okay.  Well, is developing a methodology for determining

14   frequent and critical tasks of the job something that is

15   consistent with the Uniform Guidelines?

16   A.    Yes.

17   Q.    Okay.  And do you know if that was done in this case?

18   A.    Yes.

19   Q.    Do you know if there was a comprehensive task inventory

20   questionnaire?

21   A.    Yes.

22   Q.    And is that consistent with the Uniform Guidelines?

23   A.    Yes.

24   Q.    Now, the Uniform Guidelines, I take it, don't get into the

25   level of detail about using optical, scannable answer sheets;

1    is that correct?

2    A.    Correct.

3    Q.    But that's not inconsistent with the guidelines, is it?

4    A.    No.

5    Q.    What about multilevel scales, is that something that's

6    consistent with the Uniform Guidelines?

7    A.    I don't think the guidelines talk about -- get into that

8    level of detail.

9    Q.    Okay.  But they don't discourage it, do they?

10   A.    No.

11   Q.    And what about including room for SMEs to add tasks, if

12   necessary?  Is that consistent with the Uniform Guidelines?

13   A.    As I said, I don't think the Uniform Guidelines get into

14   that level of detail.

15   Q.    Okay.  But it's not inconsistent with the Uniform

16   Guidelines?

17   A.    No.

18   Q.    Okay.  Let me direct your attention to Item No. 9 in the

19   work plan, "Implement a task inventory methodology"?

20   A.    Yes.

21   Q.    Do you see that?  Can you explain to us what that is?

22   A.    Well, let me read the steps and perhaps I can figure it

23   out.  Just the title doesn't really tell me.

24        It seems this was the heart of the project, or a large

25   part of the project.

1  Q.   And do you know if implementing these steps and, in

2  particular, this general task, implementing a task inventory

3  methodology, is something that's consistent with the Uniform

4  Guidelines?

5  A.   It is not.

6  Q.   It is not.  So did the Uniform Guidelines frown upon

7  implementing task inventory methodology?

8        MR. LICHTEN:  Objection to the form.

9        THE COURT:  Overruled.

10       THE WITNESS:  The Uniform Guidelines call for a job

11  analysis.  They don't go into the details of how to perform the

12  job analysis.  I don't think they get into the level of detail

13  of this topic.

14  BY MR. CARROLL:

15  Q.   Are you saying that implementing a task inventory

16  methodology under the steps described in this portion of the

17  work plan are inconsistent with the Uniform Guidelines?

18  A.   Oh, well, I have some knowledge of how it was implemented.

19  So just the implementation, I think, is consistent with the

20  Uniform Guidelines.

21  Q.   Okay.  So this portion of the work plan is consistent with

22  the Uniform Guidelines?

23  A.   Yes.  It could be.  It depends on how it's implemented.

24  Q.   Okay.  But generally the Uniform Guidelines don't get into

25  this level of detail, correct?

1   A.   They just basically call for a job analysis.

2   Q.   And given these steps described in "Implementing the task

3   force inventory methodology," it's certainly not inconsistent

4   with that, is it?

5   A.   The goal is appropriate.

6   Q.   Okay.  And directing your attention to Number 10, do you

7   see that?

8   A.   Yes.

9   Q.   "Develop a critical incident methodology"?

10  A.   Yes.

11  Q.   And that's something that we talked about a little bit

12  before?

13  A.   Yes.

14  Q.   Okay.  And is that consistent with the Uniform Guidelines?

15  A.   It's an approach to job analysis, and so it would be an

16  approach to try to meet the job analysis requirements of the

17  guidelines, yes.

18  Q.   And directing your attention to Number 11, do you see

19  that?  It says "Implement the CIT"?

20  A.   Yes.

21  Q.   And the CIT is what again?

22  A.   Critical incident something.

23  Q.   Training?

24  A.   Training, technology.

25  Q.   Okay.  And taking a look at the steps under that portion

1  of the work plan, do you see those steps?

2  A.    Yes.

3  Q.    And is there anything in there that appears to you to be

4  inconsistent with the Uniform Guidelines?

5  A.    No.

6  Q.    So would you say that Step 11, implementing the CIT, is

7  consistent with the Uniform Guidelines?

8  A.    Depending on how it's implemented, yes.

9  Q.    And looking at Number 12, do you see that?

10  A.    Yes.

11  Q.    "Develop the methodologies for determining the KSAPs

12  required at hire and weighting them as to their relative

13  importance to the tasks performed and linking them to frequent

14  and critical tasks."  Is that something that is called for by

15  the Uniform Guidelines?

16  A.    I think "called for" would be too strong a description

17  but --

18  Q.    Well, is it something that's frowned upon by the Uniform

19  Guidelines?

20  A.    No, depending on how it's done.

21  Q.    And is that something that you would ordinarily do in

22  preparing tests?

23  A.    Depending on the test, yes.

24  Q.    And what about a written Civil Service examination for

25  police -- promotional examination for police sergeant?

1    A.    I would probably do that.

2    Q.    And that would not be inconsistent with the Uniform

3    Guidelines, correct?

4    A.    Correct.

5    Q.    In fact, that would be consistent with the Uniform

6    Guidelines, correct?

7    A.    Depending on how it's done, yes.

8    Q.    Now, directing your attention to the portion 13 in the

9    work plan, do you see that?

10   A.    Yes.

11   Q.    And it says "Implement KSAP methodologies and analyze

12   results"?

13   A.    Yes.

14   Q.    And is doing that and performing these steps something

15   that's inconsistent with the Uniform Guidelines?

16   A.    No.

17   Q.    Is it something that's consistent with the Uniform

18   Guidelines?

19   A.    Yes.

20   Q.    And it's something actually that you do yourself; is that

21   correct?

22   A.    Correct.

23   Q.    Directing your attention to Item 14 in the work profile,

24   "Develop reading list review method," do you see that?

25   A.    Yes.

1    Q.    And is that inconsistent with the Uniform Guidelines?

2    A.    I don't recall anything in the guidelines that talk about

3    reading lists, but I don't think it's inconsistent.

4    Q.    Well, is it good professional practice to develop reading

5    list review methods?

6    A.    If you have a reading list, I think reviewing it is a good

7    idea.

8    Q.    And, in fact, on promotional examinations for police

9    sergeant in the Commonwealth of Massachusetts there is a

10   reading list, correct?

11   A.    Yes.

12   Q.    And that calls for -- well, typically it involves texts

13   that are standard reference works in the field of police

14   science; is that correct?

15   A.    Most of them, some of them.

16   Q.    And some of those we talked about yesterday, right?

17   A.    Yes.

18   Q.    And that was done in this case; is that correct?

19   A.    What was done?

20   Q.    Developing reading list review method.

21   A.    Yes.

22   Q.    And directing your attention to Number 15, "Conduct review

23   of the reading lists and analyze results."  Do you see that?

24   A.    Yes.

25   Q.    And is that consistent with the Uniform Guidelines?

1    A.    I don't think the Uniform Guidelines addresses itself to

2    this, so it's not inconsistent.

3    Q.    It's not inconsistent with it, it's just the Uniform

4    Guidelines don't get into this level of detail; is that

5    correct?

6    A.    Correct.

7    Q.    And if you look at the steps involved under Number 15,

8    "Select individuals to administer the review method, schedule

9    sessions with SMEs, distribute instructions to group leaders,

10   administer review, gather results, analyze results, produce

11   lists of potential books to selection section," those

12   are -- there's nothing inconsistent with doing that as part of

13   performing a valid job analysis under the Uniform Guidelines,

14   is there?

15   A.    Depending on how it's done, that would be just fine.

16   Q.    And directing your attention, then, to Step 16 in the work

17   plan, "Develop method for validating training and experience

18   schedules," do you see that?

19   A.    Yes.

20   Q.    And that's something we talked about before where it lists

21   you as one of the resources?

22   A.    Yes.

23   Q.    And is that inconsistent with anything in the Uniform

24   Guidelines?

25   A.    Well, the Uniform Guidelines do talk about that a little

1    bit, so it would depend on how it was implemented.

2    Q.   Well, let me ask you this:  Is that consistent with the

3    Uniform Guidelines?

4    A.   It would depend on how it's implemented.

5    Q.   Well, as part of the listed resources here, if it was

6    inconsistent with the Uniform Guidelines in a project of this

7    size, wouldn't you have gone to Mr. Haley and told him -- he

8    was the head honcho over there at the time -- "This is wrong"?

9    A.   Had I been involved, I probably would have added a step at

10   the beginning that said something like "Review the relevant

11   portions of the Uniform Guidelines."

12   Q.   Okay.  And that's not here?

13   A.   Correct.

14   Q.   And do you recall ever advising anyone to write that down

15   and put it here?

16   A.   No.

17   Q.   Do you think they might have relied upon you as the

18   resource for this, who's the individual with the doctorate in

19   industrial psychology who's been serving as the

20   head -- director of validation for the Commonwealth, to perform

21   that task?

22   A.   As I said, I have no recollection of this.  But in terms

23   of relying on me as the resident industrial psychologist, the

24   agency was doing a wide range of things, and there were more

25   projects than I could reasonably be involved with.

1    Q.    But you wouldn't say that developing a methodology for

2    validating training and experience schedules is inconsistent

3    with the Uniform Guidelines, would you?

4    A.    I think the goal is fine.

5    Q.    It's consistent with the Uniform Guidelines?

6    A.    Yes.

7    Q.    Let me direct your attention, then, to Step 17 and the

8    work plan.  It says "Implement the T&E method"?

9    A.    Yes.

10   Q.    Do you see that?

11   A.    Yes.

12   Q.    And the "T&E" would be training and education method?

13   A.    I think it was training and experience method.

14   Q.    Training and experience method.

15         And is that inconsistent with the Uniform Guidelines?

16   A.    It depends on what the method is.

17   Q.    Well, when you look through the steps, can you ask, "Are

18   those appropriate for determining the T&E method or for

19   implementing the T&E method?"

20   A.    I think those steps would help implement a T&E method.

21   Q.    And you've reviewed the 1991 report; is that correct?

22   A.    Yes.

23   Q.    And can you determine from reviewing that report whether

24   it implements a T&E method?

25   A.    It does implement a T&E method.

1    Q.    And would you say that implementing the T&E method is

2    inconsistent with the Uniform Guidelines?

3    A.    It depends on what the T&E method is.

4    Q.    Okay.  Would you look at the next item, "Develop method

5    for review of open chief" -- it looks like "ER"?

6    A.    I see that.

7    Q.    What does that mean?

8    A.    My guess is that "ER" in that phrase means "entrance

9    requirements."

10   Q.    And "open chief ER"?

11   A.    And by "open" I think they're discussing an examination

12   which is open to employees -- for people who are not employees

13   of the department.  So you have open exams and promotional

14   exams.  And most of the exams in the public safety area are

15   promotional exams and only people in the department are allowed

16   to compete.  So if you want to be a sergeant, you have to be a

17   police officer in that department.  Chief's level, it seems

18   there are some open exams, and I guess they thought they needed

19   a review of the entrance requirements for the level of chief.

20   Q.    Okay.  But for promotional examinations for police

21   sergeant in the Commonwealth of Massachusetts, those types of

22   examinations, the competition is only within the department?

23   A.    Correct.  That's by definition.  A promotional exam is

24   only open to people in the department.

25   Q.    That's by state law too, isn't it?

1    A.    By definition.  You could have an open exam for sergeant,

2    but it's not done.

3    Q.    Well, do you know if "promotional departmental

4    examinations" is defined in Chapter 31 of the General Laws?

5    A.    It is.

6    Q.    Okay.  So by definition, then, the promotional examination

7    is a type of exam that's limited only to candidates within the

8    department, correct?

9    A.    Correct.

10    Q.    So just so I'm clear on this, if you have a candidate in a

11    promotional -- a departmental promotional examination, say a

12    Springfield candidate, and, you know, they're out there and --

13    well, I'll save the folks commentary.  If you have someone in

14    Springfield who scores a bit lower on a departmental

15    promotional examination than a candidate in Boston who takes

16    the same test and gets a higher score -- do you understand the

17    predicate here?

18    A.    Yes.

19    Q.    -- would that candidate in Boston be appointed sergeant in

20    Springfield?

21    A.    No.

22    Q.    And if the story was vice-versa, so that the Springfield

23    individual scored higher than the Boston individual, would the

24    Springfield person on that promotional examination be promoted

25    to sergeant in Boston?

```
1    A.    No.

2    Q.    Now, directing your attention to Item 19 on the work plan,

3    do you see where it says "Review open chief ER"?

4    A.    Yes.

5    Q.    And this 1991 study involved more than just the police

6    sergeant's job, didn't it?

7    A.    It appeared to involve all the promotional titles.

8    Q.    All the promotional titles.  So this Item 19 probably

9    isn't relevant to the examinations here; is that correct?

10   A.    Correct.

11   Q.    Okay.  So let's move to the next one.  "Deliver materials

12   for police sergeant to selection section"?

13   A.    Yes.

14   Q.    Do you see that?

15         What's the selection section?

16   A.    Well, as I said, the department was -- basically had two

17   functional units.  And perhaps it dated back to the combination

18   of two agencies before I joined the employment of the

19   Commonwealth of Massachusetts.  There was an agency that

20   developed examinations and there was an agency that did job

21   analysis and classification and pay.  And those two agencies

22   were consolidated.  But within the DPA and HRD, at least as

23   long as I was there, there were still functional areas that

24   were fairly separate.  And so the selection section was the

25   section that was involved in the Civil Service examining that
```

1    would develop the test.

2    Q.    Okay.  So 20, 21, it looks like 22 and 23 would all be

3    sort of internal administrative pieces of the work plan; is

4    that correct?

5    A.    Yes.

6    Q.    And that wouldn't be addressed by the Uniform Guidelines?

7    A.    Correct.

8    Q.    But they certainly wouldn't be inconsistent with the

9    Uniform Guidelines, would they?

10    A.    Correct.

11    Q.    Okay.  Now, turning to the final point, it says, "Write

12    final report on phase one (police promotions) of the job

13    analysis study."  Do you see that?

14    A.    Yes.

15    Q.    And is that something that's inconsistent with the Uniform

16    Guidelines?

17    A.    Depending on how it's done, that's very important.

18    Q.    And you've reviewed the 1991 validation study that's in

19    evidence in this case, correct?

20    A.    Yes.

21    Q.    And do you know from your review whether or not that was

22    done?

23    A.    Whether it was done?

24    Q.    Yes.

25    A.    It certainly appears to have been done.

1    Q.    And, in fact, that's the 1991 report itself, is it not?

2    A.    Correct.

3    Q.    Dr. Wiesen, thank you.  I have no further questions.

4              THE COURT:  Do you have some -- we're at eleven

5    o'clock.  We'll take the break.

6              THE CLERK:  All rise.

7              The Court will take the morning recess.

8              (The Court exits the courtroom and there is a recess

9    in the proceedings at 10:54 a.m.)

10             (After recess, start at 11:25 a.m.)

11             MR. LICHTEN:  May I raise a scheduling issue, your

12   Honor, very briefly?

13             THE COURT:  Yes.

14             MR. LICHTEN:  Dr. Wiesen has indicated a strong desire

15   to try to be done by today.  He hasn't been home for a number

16   of days.  He's got a lot of personal issues that need to be

17   dealt with.  So I'm wondering if there's a possibility of

18   ensuring that.  Also, I had Dr. Fields completely rearrange her

19   schedule so she'll be back on Tuesday.

20             THE COURT:  Well, how much more is to be done here?

21             MR. McQUILLAN:  Your Honor, Peter McQuillan from the

22   City of Methuen.  I have only 20 minutes.

23             MS. ENGDAHL:  Your Honor, I suspect I have at least an

24   hour on cross-examination.

25             MR. LEAHEY:  I would also guess I have between 45

1    minutes and 80 minutes, in that area.

2              MR. McDERMOTT:  Kevin McDermott.  I think I can be

3    done in 30 minutes.

4              MR. D'AGOSTINO:  And mine will be 15, 20 minutes,

5    also, your Honor.

6              THE COURT:  That's not going to happen today, unless

7    we go until 8:00 at night, on those estimates.  I don't know

8    how realistic those estimates are.

9              MR. LICHTEN:  I'm just not sure Dr. Wiesen can

10   physically be here next Tuesday, and I did --

11             THE COURT:  I guess we can suspend and bring him back

12   when it's convenient.  That's the freedom we have in a

13   jury-waived trial.

14             MR. LICHTEN:  Okay.

15             THE COURT:  Not the best arrangement, but --

16             MR. LICHTEN:  We're willing to stay later today, too,

17   if that will help.

18             THE COURT:  I would if it would get it done, but it

19   doesn't look like it's going to.

20             MR. LICHTEN:  Thank you, your Honor.  And so then --

21   anyway.  Okay.

22             MR. McQUILLAN:  Thank you, your Honor.

23                         CROSS-EXAMINATION

24   BY MR. McQUILLAN:

25   Q.   Good morning, Doctor.

1   A.   Good morning.

2   Q.   Doctor, my name is Peter McQuillan.  I'm the city

3   solicitor for the City of Methuen.

4        You were asked by my esteemed colleague Mr. Carroll

5   from Springfield the definition of "statistical significance."

6   I'm going to conversely ask you if you would please provide us

7   with a definition of the term "statistical insignificance," if

8   you will.

9   A.   Well, it's just anything that isn't statistically

10  significant.

11  Q.   Perhaps we can elaborate.

12       Is it fair for me to say or accurate for me to say

13  that it's data that shows no clear pattern or no clear

14  correlations?

15  A.   I think it would be correct to phrase it that way.  Or to

16  say that there is no reliable statistical indication that the

17  differences could not have arisen based on chance.

18  Q.   In layman's terms would you agree with me that it's simply

19  unreliable data?

20  A.   That the data isn't reliable enough for you to say that

21  there's a real difference.

22  Q.   Thank you.  Can you also give me the definition of

23  "statistical power"?

24  A.   Yes.

25  Q.   And what would that be, please?

1    A.    Statistical power relates to the ability or the

2    probability that the statistical procedure will detect a real

3    difference if it exists.  You do a statistical test because you

4    don't know if there's a real difference or not, and you try and

5    decide whether there is a real difference.  As the sample sizes

6    get larger, statistical power increases.

7              So if you have large sample sizes, such as in Boston

8    or New York City to use a larger jurisdiction, if there's a

9    real difference between, say, two subgroups, minorities and

10   non-minorities, with a large enough sample the statistical

11   analysis will detect that.  With a small enough sample, even if

12   there's a real difference, the statistical analysis will not

13   detect it.

14   Q.    In layman's terms the more power, the more significance.

15   Fair statement?

16   A.    In layman's terms I think that's okay.

17   Q.    Thank you.  Doctor, in your June 25, 2010 report, page

18   3 -- I'm going to put it up on the Elmo.  In paragraph 2, where

19   it's entitled "Summary of Opinion," I'd like to invite your

20   attention to the beginning of the last sentence where it says,

21   "The adverse impact in promotions is highly statistically" --

22   do you see where I'm reading?

23   A.    Yes.

24   Q.    And it refers to the AI situation in the cities of both

25   Boston and Springfield.  I'm going to bring your attention to

1    the next sentence where it begins "There are statistically

2    significant differences in passing rates and average test

3    scores for several other departmental exams."  That's the other

4    page.  Do you see that?

5    A.    I do.

6    Q.    Would you agree with me that those several other

7    departmental exams does not include the City of Methuen?

8    A.    May I review that?

9          (Pause.)

10   A.    For the City of Methuen there were no statistically

11   significant findings.

12   Q.    So that would be a fair statement when you made reference

13   to the other departmental exams, that would not include the

14   City of Methuen, correct?

15   A.    Correct.

16   Q.    I'm going to refer also, Doctor, to page 7 of the same

17   report, number 10.  Here it reads, the first sentence directly

18   under that, "For the 2006 Methuen PD departmental exam there is

19   an adverse impact in terms of a difference in favor of

20   non-minorities in the average test score.  There is adverse

21   impact on minorities in the promotion rates in so far as the

22   adverse impact ratio is zero and so fails the 4/5ths rule."

23         Having read that, Doctor, would you agree with me that

24   because Methuen's numbers are so small there just isn't enough

25   mathematical power to show any statistical significance?  Fair

1    statement?

2    A.    I think so.

3    Q.    I'm going to show you what's been marked as Exhibit 79 by

4    the plaintiff, which was a table incorporated into the recently

5    just previously referred to June report.  And would you agree

6    with me, Doctor, for the purposes of analysis to determine

7    adverse impact as it applies to Methuen only that for the

8    promotion rates, the passing rates, the effective passing

9    rates, and the average test scores, that they are all

10   statistically insignificant?

11   A.    There no is statistical significance for any of them, yes.

12   Q.    Doctor, when there are numbers as small as these, are

13   there other criteria that you apply for the purposes of

14   determining over and above those indicators whether there was

15   any statistical significance regarding Methuen's numbers?

16        If I may, did you make a comparison between the ethnic

17   composition of the police department in relation to incumbent

18   sergeants?

19   A.    Not for Methuen.

20   Q.    Okay.

21   A.    That I recall.

22   Q.    Do you know the makeup of the Methuen police department,

23   Doctor?

24   A.    No.  If I knew that, I would have done the comparison.

25   Q.    Okay.  Another criteria that you could have -- or could

1    use is a comparison with incumbent sergeant in relation to the

2    population of the municipality in which they serve.

3    A.    Yes.

4    Q.    Did you make such a comparison?

5    A.    No, I did not have that data.  I did not make that

6    comparison.

7    Q.    Okay.  Well, I'm going to show you, again, from your June

8    25, 2010 report page 15, number 19 in particular, where, in

9    fact, you did make a comparison.

10   A.    Okay.  I stand corrected.

11   Q.    Okay.  The comparison of racial/ethnic composition of

12   sergeants with census data.  And you state there is a clear

13   pattern of proportionally fewer minority sergeants than

14   minority residents living in the communities they serve.  And

15   you state this was obtained from the census, I believe the

16   footnote will say the 2008 census.  And the differences are

17   statistically significant for six of the seven PDs.  And then

18   you refer to table 8, which is the next page.  Do you recognize

19   that table, Doctor?

20   A.    I do.

21   Q.    And I would ask you to note the asterisk on the bottom of

22   that table.  And could you please read that?

23   A.    "All these ratios are highly statistically significant

24   except for Methuen."

25   Q.    Thank you.  Do you know the population makeup of Methuen?

1    A.    Beyond what is in that table, I do not.

2    Q.    Do you know how many residents there are in the City of

3    Methuen?

4    A.    Not off the top of my head, no.

5    Q.    Doctor, you testified on Tuesday on direct examination

6    from your counsel, you were asked if you did an analysis of the

7    average impact -- I'm sorry, the adverse impact in test score

8    differences for Methuen.  And you answered that you did, and

9    you've already testified that those were, in your opinion, or

10   in your statement, at least, significant -- statistically

11   insignificant, correct?

12   A.    They're not statistically significant, correct.

13   Q.    Thank you.  Now, I'm going to show you, again, Exhibit 79

14   marked by the plaintiff.  You did testify that you made a --

15   did an analysis for the average test score, and it was -- it

16   showed adverse impact and also for promotion rates.  However,

17   you weren't asked if you did an analysis for passing rates.

18   And looking at this chart is it a fair statement to say that

19   you did, in fact, conduct an analysis regarding passing rates

20   for the City of Methuen?

21   A.    I calculated passing rates, yes.

22   Q.    Looking at the figures for Methuen, 2006, the figure being

23   1.19 and in 2008 1.11, would you agree with me that these

24   figures show that minorities in Methuen passed at a higher rate

25   than the non-minorities in both tests?

1   A.    Yes.

2   Q.    And those figures are statistically insignificant,

3   correct?

4   A.    The way it's phrased it's not statistically significant.

5   Q.    Do those test results or those results reflect the

6   statewide results of 2006 and 2008?

7   A.    Only in part.

8   Q.    And in what part, please?

9   A.    Well, the difference in average test score for the 2008

10  exam was 5.9 points.  That's roughly comparable to what you saw

11  for the whole state.  And the difference in test score for

12  2006, which is small, .2 points, at least is in the same

13  direction as is seen with the whole state, which is in favor of

14  non-minorities.

15  Q.    Thank you.  We can degree, Doctor, that all these results,

16  again, have no statistical significance?

17  A.    Correct.

18  Q.    I'm going to ask you again to look at page 8 of your

19  report.  13.  I'm sorry, page 8, number 13.  I apologize.  The

20  penultimate paragraph, the second-to-last paragraph, Doctor,

21  reads, "Although not being challenged now, we can add some

22  historical perspective by considering the adverse impact of the

23  2003 and 2004 exams for each of the seven defendants.  There

24  are strong indications of adverse impact in 4 of these 6 older

25  exams, and some of those are statistically significant."  And

1    you refer to table 2b, which is the second page of Exhibit 79.

2         I'm going to draw your attention to those figures that

3    you determined as they apply to Methuen and ask you, again, is

4    it not true that those figures are statistically insignificant?

5    A.    There's no statistical significance for Methuen in table

6    2b.

7    Q.    Thank you.  Doctor, did you have any opportunity to

8    interview the two Methuen plaintiffs in this case, Officer Abel

9    Cano and Officer Charles DeJesus?

10   A.    No.

11   Q.    Doctor, by your own definition of statistical power would

12   you agree with me that there is no reasonable mathematical

13   possibility of finding any statistical significance from the

14   data resulting from any adverse impact analysis of the City of

15   Methuen?

16   A.    I would have to review another exhibit, but at the very

17   least the statistical power is low.

18   Q.    But would you agree with me that every result and every

19   difference that you determined as a result of all your adverse

20   impact analyses as it applies to the City of Methuen, those

21   results, those differences had no statistical significance?

22   A.    There was no statistical significance in the analyses that

23   we just discussed, and those were the ones that I did, yes.

24   Q.    Would you agree with me, Doctor, that there are no

25   statistically reliable indicators that show minority applicants

1    in Methuen were adversely affected by the use of the 2006

2    sergeant's promotional exam?

3    A.    Yes.

4    Q.    And would that also apply to the use of the 2008 exam?

5    A.    So far, yes.

6    Q.    Do you have any knowledge, Doctor, whether Methuen knew or

7    should have known that the use of either the 2006 or the 2008

8    exam would have an impact on minorities in the Methuen police

9    department?

10   A.    I do not know.

11            MR. McQUILLAN:  I have no further questions, your

12   Honor.  Thank you, Doctor.

13            THE WITNESS:  Okay.

14                    CROSS-EXAMINATION

15   BY MS. ENGDAHL:

16   Q.    Good afternoon, Dr. Wiesen.  Laurie Engdahl for the City

17   of Worcester.

18   A.    Good afternoon.  Good morning.

19   Q.    Oh, I thought it was afternoon.

20            Okay.  You've already testified you're familiar with

21   the EEOC guidelines on the municipal employee selection and

22   procedure?

23   A.    Yes.

24   Q.    You're familiar with what's also called the questions and

25   answers on the EEOC guidelines?

1    A.    Yes.

2    Q.    And did you make an effort to adhere to those guidelines

3    in conducting your analyses of the data presented to you for

4    purposes of this case?

5    A.    Yes.

6    Q.    Okay.  In October of 2008 you conducted adverse impact

7    analysis for the plaintiffs in this case, correct?

8    A.    One of them, yes.  One of the analyses.  I've done a

9    number.

10   Q.    In October of 2008 you submitted a report on behalf of

11   plaintiffs in this case providing analyses of the data?

12   A.    Correct.

13   Q.    You just said you did the analysis for one of the

14   plaintiffs?

15   A.    No, I said I've done more than one set of analyses.

16   Q.    Okay.  At the time that you did your analysis in October

17   of 2008 would you agree that you had received data from the

18   Commonwealth of Massachusetts on all examinations given

19   beginning in 2003 --

20   A.    Yes.

21   Q.    -- through 2007 at the time, I believe.  Okay.  And this

22   report -- I'm not sure what plaintiffs' exhibit, but this --

23   I'm going to refer to the report dated October of 2008, and I

24   think it's been identified --

25              (Discussion off the record.)

1    Q.    For purposes of identification it's expert -- it's

2    Plaintiffs' Exhibit 50.

3              In this report you did not do an analyses for each

4    individual defendant in this case; is that correct?

5    A.    Correct.

6    Q.    You did analysis for the Commonwealth?

7    A.    I did.

8    Q.    And you did a disaggregated analysis for Boston?

9    A.    Yes.

10   Q.    Now, before one undertakes an analysis of data, you first

11   have to determine what is the relevant pool of candidates or

12   relevant pool that you are comparing; isn't that correct?

13   A.    Yes.

14   Q.    Okay.  And how did you go about determining that statewide

15   aggregation of test takers for these tests would be the

16   relevant pool?

17   A.    Well, one of the possibilities was that the statewide

18   examination itself was attributing to adverse impact against

19   minority test takers.  So I wanted to look at the data from the

20   statewide exam itself.  And when looking at data, it's helpful

21   to look at as much data as possible.  The statistical analyses

22   are more authoritative and more powerful if you have more data,

23   and so I looked at the data from all of the people who took the

24   statewide exam for each of the exams.

25   Q.    I'm going to show you this for purposes of our discussion.

1    You remember being deposed in June of this year in connection

2    with this case?

3    A.    I remember the deposition.

4    Q.    And do you remember I also asked you at that time how you

5    made the determination in October of 2008 to conduct a

6    statewide analysis only?

7            MR. LICHTEN:  Can you please give us the page?

8            MS. ENGDAHL:  It's page 124, my question.

9            MR. LICHTEN:  Thank you.

10   A.    I don't remember that question clearly.

11   Q.    Okay.  On page 124 of your deposition transcript, I'm just

12   going to read you my question.  I asked -- now you issued --

13   you released a report on October 3rd of 2008 and you released a

14   second report on March 30th of 2009.  And I asked you if you

15   did an adverse impact analysis for each defendant.  And

16   initially you stated that you felt you did, which you later

17   clarified.  And then I asked, "Okay.  Why not?"  And can you

18   read for us what your reasoning then was the basis for you

19   determining the pool of candidates, the relevant pool of

20   candidates was a statewide test takers?

21   A.    "Well, my understanding was at the time the state was a

22   defendant and the major focus was on the adverse impact of the

23   exam.  And maybe that's still the major focus.  I don't know.

24   And so I looked at -- I did an analysis that would help me

25   answer the question does the exam have adverse impact."

1    Q.   So at that time in June when I asked you the question, you

2    didn't -- you didn't respond that you had done -- made a

3    determination that the statewide pool was relevant, only that

4    it was relevant because the focus of this litigation was

5    against the Commonwealth of Massachusetts?

6    A.   I think if the state was not a defendant at that time I

7    still would have wanted to analyze the data from the statewide

8    exam.

9    Q.   Did you determine at that time that analyzing the data

10   defendant by defendant would not be useful?

11   A.   No.  I did notice that they were small numbers and that

12   the adverse impact analyses would be hampered by the small

13   numbers.  But I didn't at that time conduct those analysis or I

14   would have reported them.

15   Q.   And you issued the second report in March of 2009?

16   A.   Sounds right.

17   Q.   I think that's Plaintiffs' Exhibit 51.  It's hard to tell.

18        And in that report did you conduct any kind of

19   analysis of the data for each municipal defendant other than

20   Boston?

21   A.   I did some statewide analyses.

22   Q.   Did you do any analyses for each municipal defendant in

23   that March 2009 report?

24   A.   No.

25   Q.   And you testified earlier that aggregation can be

1    appropriate, that statisticians aggregate all the time.  I

2    think you gave an example of S.A.T. results aggregating across

3    universities.  Dr. Wiesen, isn't it true that even if

4    aggregation is appropriate, you still need to consider whether

5    there are subgroups within your aggregated pool?

6    A.    I'm not quite sure what the question means.

7    Q.    Okay.  Aggregation alone, though, isn't entirely the

8    answer.  In other words, it's not a choice between aggregating

9    an overall pool of candidates, simply adding them up, and

10   dividing them.  There are other ways to aggregate; isn't that

11   true?

12   A.    Yes.

13   Q.    Okay.  Can you consider different characteristics of

14   subgroups if you identify subgroups --

15   A.    Yes.

16   Q.    -- and analyze the data that way?

17          And at the time that you conducted your analyses in

18   October of 2008 and March of 2009 you were aware that the

19   candidates that you were comparing statewide don't actually

20   compete with each other for promotion; is that correct?

21   A.    Correct.

22   Q.    So that within your statewide pool of data there are

23   subgroups, one subgroup is the individual employing units of

24   these officers, correct?

25   A.    You mean the municipalities?

1    Q.    Yes.

2    A.    Yes.

3    Q.    And you're aware that these different defendants are

4    geographically distinct?

5    A.    Yes, most of them.

6    Q.    Excuse me?

7    A.    Most of them.

8    Q.    And they're distinct employers?

9    A.    Yes.

10    Q.    And are you aware of whether anyone used selection

11    procedures in addition to the written test when selecting the

12    applicant for promotion?

13    A.    I am not aware.

14    Q.    What is Simpson's Paradox?

15    A.    Simpson's Paradox refers to a counterintuitive finding

16    that sometimes can occur when you do statistical analyses of

17    different groups combining them.  And the reason that it is a

18    paradox -- maybe it shouldn't be called a paradox because a

19    paradox is difficult to understand.  It's something that could

20    be described as, say, incorrect conclusion based on aggregating

21    data.

22    Q.    Right.  So you can -- applying the same analysis to

23    subgroups of a particular larger pool might yield a different

24    result when you examine the larger pool as a whole?

25    A.    So there -- it's possible to have two groups with -- that

1    are, say, at parity, where the -- in this case minority and

2    non-minority subgroups are at complete equality or parity in

3    two subgroups and when you combine the two subgroups into one

4    larger group there is apparent inequity.

5    Q.    And that happens when there are characteristics within

6    each subgroup that are not similar to the group as a whole,

7    correct?  That can happen?  When there are variables present in

8    certain of the subgroups but not in others, that can affect the

9    outcome?

10   A.    Yes.

11   Q.    And so by aggregating an entire population and not looking

12   at different variables present within some of the subgroups,

13   you can overlook variables that might have resulted in the

14   conclusions or the analysis you reach from looking at the data?

15   A.    That's theoretically possible.

16   Q.    So would you say it can be present when data is overly

17   simplistically put together based on population as a whole,

18   that you could come up with a result that distorts what's

19   actually happening?

20   A.    That is theoretically possible, yes.

21   Q.    Dr. Wiesen, are you familiar with a famous case involving

22   sex bias at the University of California Berkeley?

23   A.    No.

24   Q.    Really?

25   A.    Really.

1    Q.   If I were to refresh your recollection, there was some

2    concern that women were not being admitted to the University of

3    California Berkeley at the same rates as men.  And when the

4    overall statistics was disaggregated and looked at department

5    by department, they actually found that women were admitted at

6    a slightly higher rate than men.  Does that refresh your

7    recollection as to whether you've heard of that case?

8    A.   Well, I've heard of that type of thing happening.  But it

9    doesn't refresh my memory concerning that university.

10   Q.   Okay.  But you agree that within the statewide population

11   of test takers that you aggregated that the individual

12   employing unit represents a distinct subgroup, right?

13   A.   Yes.

14   Q.   And one difference in these populations might be that

15   there are different proportions of minorities within each

16   employing unit, so that, for instance, I believe in Chelsea

17   they have a much higher proportion of minorities to whites

18   taking the test versus in the City of Greenfield, for example.

19   Would you agree that among the group that you aggregated there

20   are big differences in the proportion of minorities who were

21   eligible to take those tests?

22   A.   Yes.

23   Q.   Is it possible that combining the data of a jurisdiction

24   such as the City of Chelsea where there are high proportion of

25   minorities competing for promotion with a small town like

1    Greenfield where there are relatively few minority promotions,

2    would you agree that aggregating those two employers together

3    could distort the results?

4    A.    Under certain circumstances, it could, but not under all

5    circumstances.

6    Q.    And would you agree that within that large statewide pool

7    that you looked at, each municipality might have a different

8    selection ratio?  And by selection ratio I mean that proportion

9    of applicants who are actually promoted to the total number in

10   the applicant pool.

11   A.    Yes.

12   Q.    And would you agree that comparing two municipalities or

13   aggregating statistics where there might be a selection ratio

14   that is quite high in one and in another jurisdiction the

15   selection jurisdiction is low, that that could distort the

16   aggregated results?

17   A.    Well, it would only distort the results if there was no

18   difference between the municipality -- between the minorities

19   and non-minorities in some jurisdictions or there was a

20   difference in the other or -- but in the tables in the Outtz

21   and Silva reports, the adverse impact ratios for 95 percent of

22   the municipalities listed was zero.  So it wasn't like there

23   was parity in all of those municipalities and the discrepancy

24   just magically appeared because of Simpson's Paradox.  There

25   was adverse impact in almost all the municipalities.

1  Q.  We'll get to that because I haven't asked you that.

2  A.  Okay.

3  Q.  But you agree, and I think you actually testified, that

4  selection ratios can significantly affect the appearance of

5  adverse impact?

6  A.  Yes.

7  Q.  So comparing two municipalities where the selection ratios

8  are quite different could yield a different picture when you

9  aggregate those two, correct?

10 A.  It's possible.

11 Q.  Okay.  And selection ratios can vary from year to year as

12 well, correct?

13 A.  Yes.

14 Q.  Okay.  So aggregating across years could distort the data

15 when the selection ratios across years even within a

16 municipality are aggregated, correct?

17 A.  Well, I think it depends on the question you want to

18 answer.  If the question you want to answer is was there

19 adverse impact in hiring, then -- that you hired more people

20 one year than another year or a higher percentage one year than

21 another year perhaps isn't relevant.  But perhaps for different

22 questions that difference would be very important.

23 Q.  The total number of applicants within each municipality,

24 again, a subgroup of this statewide data that you looked at,

25 can vary widely, correct?  So the City of Brockton is going to

1    have many more test takers and applicants eligible for

2    promotion than perhaps in Methuen, correct?

3    A.    Yes.

4    Q.    And comparing those and aggregating that data could

5    distort the AI results.  Would you agree with that?

6    A.    There is that potential.

7    Q.    And when you aggregated statewide, did you control for any

8    of the factors or the variables that could be present or and,

9    in fact, I think are present in each of the different

10   municipalities?  That is, the difference in proportions of

11   minorities, the different selection ratios, the different

12   selection ratios from year to year, and the total number of

13   applicants, does your statewide analysis control or factor in

14   any of those variables?

15   A.    Well, I considered them.  I didn't exactly control them or

16   factor them in.  But I did check to see whether it seemed like

17   some municipalities were skewing the results.

18   Q.    And I think you referred to a concern with Dr. Outtz and

19   Dr. Silva's analysis where they looked at -- I think you

20   mentioned that you looked at data where the actual AI was zero

21   in many municipalities.  And there were many municipalities

22   that were included in your statewide analysis that went to the

23   exam list only once, correct?  That is, that they made one

24   promotion off the list.

25   A.    Yes, there were.

1    Q.    Okay.  And would you agree that a community that promoted

2    one applicant have a low selection ratio, such as the City of

3    Methuen that was just discussed, would you agree you can't

4    accord any kind of statistical significance to that data

5    standing by itself?

6    A.    Not standing by itself.

7    Q.    Okay.  So in aggregating this data you included a number

8    of municipalities, several, in fact, that by themselves would

9    show no statistical significance?

10   A.    Correct.  By this analysis you mean the statewide

11   analysis.

12   Q.    The analysis you did in your 2008 report, yes.  The

13   various analysis you did there.

14   A.    Yes.

15   Q.    Okay.  You didn't control for any of these factors, but

16   can a statistician control for these factors to come up with

17   relevant analysis?

18   A.    If it seems like the factors are going to deduce a

19   misleading result, you would try to plan your analysis so you

20   would not yield a misleading result.

21   Q.    So you decided that none of the variables that we just

22   went through was going to distort your statewide data so you

23   decided not to account for those variables?

24   A.    Simpson's Paradox only arises --

25   Q.    Can you answer my question?

1          MR. LICHTEN:  Objection, your Honor.  I think it was

2    responsive to the question.

3          THE COURT:  Put the question again.

4          MS. ENGDAHL:  Okay.

5    BY MS. ENGDAHL:

6    Q.   The question was that you decide -- I think the answer to

7    the prior question was if you think these are going to distort

8    the data, that you could incorporate them into your analysis.

9    So I'm asking you, did you decide that none of the variables

10   that we just discussed was sufficient to distort the data so

11   that you decided not to control for any of those variables in

12   reaching your conclusions statewide?

13   A.   And what I'm saying was that the concern that the overall

14   analysis would be distorted I think doesn't exist here because

15   the differences between minority and non-minority candidates

16   was not zero in all of the -- or the majority of the

17   departments and then somehow when you put the data together, as

18   that admissions case you mentioned, all of a sudden spurious

19   differences appear.  The differences were pervasive.

20   Q.   So you didn't control for any of those factors in

21   aggregating --

22   A.   I didn't.  I just combined the data.

23   Q.   I'm going to show you an analysis done by Dr. Silva.  And

24   what I have up here is Dr. Silva's May 28, 2010 report.  And

25   you've had a chance to look at this, correct?

1  A.   What exhibit is that, please?

2  Q.   I don't think it's in as an exhibit right now, so I've got

3  it up just for purposes of our discussion.

4        You've seen Dr. Silva's report and this table.

5  A.   I have.

6        MR. LICHTEN:  Can we have a page?

7        MS. ENGDAHL:  It's page 2.

8  BY MR. SLAGLE:

9  Q.   Okay.  In this analysis when you look at jurisdiction 1

10 and jurisdiction 2 separately, they are -- they appear to be

11 promoting whites and minorities at exactly the same rate; is

12 that correct?

13 A.   Yes.

14 Q.   And when Dr. Silva aggregated the two together, there

15 appears a slight small adverse impact of .75; is that correct?

16 A.   Yes.

17 Q.   Now, in his example would you agree that the proportion of

18 minorities between jurisdiction 1 and jurisdiction 2 is quite

19 variable?  In other words, jurisdiction 2 has a higher

20 proportion of minorities present in their workforce?

21 A.   That's one of the differences, yes.

22 Q.   And would you also agree that the overall numbers are

23 different in that jurisdiction 2 is a much larger jurisdiction

24 than jurisdiction 1?

25 A.   Yes.

1    Q.   And would you also agree that the selection ratio actually

2    in jurisdiction 1 is higher than it is in jurisdiction 2?

3    A.   Yes.

4    Q.   Okay.  Can you discern from this what could be responsible

5    for the distorted -- the distorted result there from

6    aggregating it?

7    A.   Yes.

8    Q.   What?

9    A.   Well, I think what's happening is in jurisdiction 2 you

10   have a lower selection rate than jurisdiction 1.  So many of

11   the minorities in jurisdiction 2 are not promoted, just as they

12   aren't in jurisdiction 1.  So it's just a mathematical quirk

13   that when you put them together the -- and so he doesn't have a

14   column of the numbers when you put them together, I believe.

15   But when you put them together -- so there would be 30

16   minorities and test takers and 5 appointments, and there would

17   be 53 white test takers and 14.  So the ratios are thrown off

18   because of the quirk of the data.  But that quirk didn't drive

19   the statewide analyses in '05 through '08.

20   Q.   How do you know that, Dr. Wiesen?

21   A.   Because if you look at the individual tables in that

22   report, maybe a page or two later, he has a set of tables --

23   there we go -- you look at the first one on the page -- can we

24   start with '05?

25            Okay.  So lower it down a little bit so you can see

1    the column headings.

2         Okay.  So the adverse impact ratios for most of those

3    departments -- you can disregard Boston because they were

4    analyzed separately.  The adverse impact ratios, the first

5    yellow column were all zeros, except for Chelsea.  And the same

6    pattern was seen for the other exams as well.

7         So for Simpson's Paradox to be working, the adverse

8    impact ratios would all be 1, but when you average them

9    together, there would be a finding of adverse impact.  So that

10   would be a paradox of something unexpected.  But when you

11   average together the whole bunch of departments with adverse

12   impact ratios of zero and you find the overall adverse impact,

13   that's not surprising.

14   Q.   Okay.  You have the adverse impact being zero in a number

15   of these communities, correct?

16   A.   I didn't hear that, I'm sorry.

17   Q.   You have adverse impact as being zero in a number of these

18   communities; is that correct?

19   A.   Yes.

20   Q.   And you would agree that it doesn't get any more severe

21   than that?

22   A.   Yes.

23   Q.   Okay.  But -- and again, you testified on direct that the

24   selection ratios can affect adverse impact and it's varied,

25   correct?

1    A.    Yes.

2    Q.    So, for example, in the Chicopee police department -- and

3    I'm going to the 2006, that's because that's the list that is

4    being challenged here -- you have one black Hispanic test

5    taker, 16 white test takers, and one appointment.

6    A.    Yes.

7    Q.    What's the percentage of whites that were actually

8    appointed off that list in Chicopee?  And do you have a

9    calculator, Dr. Wiesen?

10   A.    I don't have a calculator right here.

11            MS. ENGDAHL:  Can I hand this to the Doctor?

12            (Discussion off the record.)

13   Q.    We're looking at Chicopee.

14   A.    You were looking at Chicopee, and you asked what percent

15   of the white test takers were promoted.  And the answer is 6.25

16   percent.

17   Q.    So the difference -- would you say that in this case where

18   Chicopee went to the list once during its life and promoted one

19   person, that the zero adverse impact number really exaggerates

20   what is happening here?  In other words, only 6 percent of

21   whites are being promoted off that list.

22   A.    Well, I think that the zero when you only have one

23   appointment is not as impressive a zero as when you have 10

24   appointments.

25   Q.    Exactly.  You may recall during your deposition in June I

1    gave you a scenario where you had a municipality where one in

2    ten test takers was a minority.

3    A.   Yes.

4    Q.   And because of the state law requirement under Chapter 31,

5    where the employer is confined to promoting from among the

6    first three applicants when there's one position to fill, would

7    you agree that where there is only one in ten minorities,

8    because of the sheer small proportion of minorities taking

9    these tests, that a minority has a significantly lower chance

10   of appearing in that top three than a white applicant just by

11   virtue of the low numbers compared to whites?

12   A.   Well, two things.  First, I'm not sure it's state law, I

13   think it's a rule from HRD.  And, yes, if you had ten people

14   with equal ability and you're only choosing three of them and

15   the group had one minority and nine non-minorities, if you're

16   just choosing by chance, you're more likely to get a

17   non-minority than a minority.  And likewise, if you were

18   choosing a group of three from that group of ten, the minority

19   is not going to be amongst every group of three.

20   Q.   So you agree that in that scenario a white candidate --

21   there's a 100 percent chance that a white candidate will appear

22   in the top three, right?

23   A.   Correct.

24   Q.   And what is the chance -- everything else being equal,

25   perfect test being given, just by virtue of the sheer numbers

1   and only one appointment to fill -- that you would have a

2   minority candidate appear in the top three?

3   A.   .7.

4   Q.   .7?

5   A.   .7.

6   Q.   Okay.  Do you recall in a deposition telling me it was .5?

7   A.   I do, and I recall the error I made and I plan to correct

8   that when I submit the corrections to the depositions.  But I

9   think I had --

10  Q.   I'm looking for your June report.

11  A.   I think I have the June report.

12  Q.   On page 11 --

13  A.   I'm wrong.

14  Q.   -- of your June report.  I think you said it was .3 chance

15  of being in the top three?

16  A.   Yeah, let me --

17  Q.   And this is page 11 of Dr. Wiesen's June 25th --

18  A.   .3.

19  Q.   Okay.  So when you're looking at municipality with --

20  A.   Okay.

21  Q.   -- a low proportion of minorities to white applicants,

22  where there's a low selection ratio and they go to the list

23  only once, everything being equal, even if there's no flawed

24  test, right off the bat you have a minority having a .3 chance

25  of appearing in the top three and a white person having a

1  hundred percent chance; is that correct?

2  A.    Which is fair based on the proportion of minorities in the

3  applicant pool.

4  Q.    Okay.  But that's -- that explains why low selection rate

5  and low proportion of minorities might affect AI, correct?

6  A.    Not at all.

7  Q.    Okay.

8  A.    I think if you work within a rule of 2 N + 1 or if you

9  don't work within the rule of 2 N + 1, the 2 N + 1 does not

10  drive the adverse impact at all.  Because the minority will

11  appear in the top three names in a frequency that reflects the

12  proportion of minorities among the applicant group.

13  Q.    But when you're going to the list once and you're looking

14  at one list --

15  A.    So it's not to say that the first time you go to the list

16  you'll never have a minority in the top three.  The minority

17  will be amongst the top three a --

18  Q.    Thirty percent of the time?

19  A.    A mathematically fair number of times based on the number

20  of minorities in the applicant pool.

21  Q.    Okay.  But I'm giving you a scenario where -- which was

22  quite common among the group of employers that you compared,

23  where an employer goes only once to that list.

24  A.    Right.

25  Q.    And you agree that there's a .3 chance -- in the scenario

1    I gave you where there's one in ten minorities, there would be

2    a .3 chance that you would have a minority in the top three and

3    a hundred percent chance that you would have a white person in

4    the top three; is that correct?

5    A.    That's correct.

6    Q.    Okay.

7    A.    But the result you get if you go -- use that process is

8    exactly the same as the result you would get if you were to

9    choose randomly from the group of ten with no restrictions.

10   Q.    Correct.  Not the result of a flawed test, but numbers.

11   A.    So it's a fair outcome.  2 N + 1 is not a driving adverse

12   impact.

13   Q.    And neither would a flawed test in that example be

14   driving --

15   A.    Neither would a flawed test.  What do you mean by a flawed

16   test?

17   Q.    You said that would occur by random anyway in that

18   scenario.  And that's fair?

19   A.    Right.  So I was using random selection as an

20   indication -- as the gold standard for fairness, and I was

21   saying that the 2 N + 1 approach does not come -- give you a

22   different outcome than just choosing randomly.  And so the 2 N

23   + 1 is not driving adverse impact overall.  Now, in any one

24   certification, if the appointing authority has three

25   non-minorities, it might appear to them that the rule of 2 N +

1  1 is causing adverse impact, but it's not from a statistical

2  point of view.

3  Q.   Okay.  Thank you.

4       I'm going to show you also -- this is just something I

5  put together for ease of questioning.  I can do it verbally,

6  but if no one objects, I prefer a visual.

7       You testified how -- I believe you said that

8  aggregating over time across examinations is appropriate but

9  not ideal, I believe were your words, because you could end up

10  counting someone more than once if they took the test more than

11  once; is that correct?

12  A.   Correct.

13  Q.   Okay.  So I have an example here, Dr. Wiesen.  I'd like

14  you to look at where you actually have two minority test takers

15  who took the exam three times and you have six white test

16  takers who took the exam different number of times, two of them

17  took it twice, four of them took it once.

18       I'm going to ask you to assume that one minority

19  officer is promoted in this particular jurisdiction and two

20  white officers are promoted in this jurisdiction.  Okay?  This

21  is one jurisdiction.

22       Now, when you aggregated across examinations, just to

23  be clear, you discounted all test takers.  You didn't account

24  for how many times an individual may have taken a test; is that

25  correct?

1   A.    Right.

2   Q.    Okay.  So if you were to aggregate these three tests the

3   way you aggregated your statewide statistics, would there

4   appear to be adverse impact from these rates of promotion

5   between minorities and non-minorities?

6            (Pause.)

7   A.    No.  If I do -- if I did the math right, we would have

8   counted six minorities.  So the -- and one of them was

9   promoted?

10  Q.    Yes.

11  A.    So that would be a selection rate of 20 percent.

12  Q.    I have .16.

13  A.    One out of -- okay.  One out of six.  Okay.  So that would

14  be 16 percent.

15  Q.    That's what I get.

16  A.    Okay.  And then for the whites it would be eight --

17  Q.    And two whites were promoted.

18  A.    You said two whites.

19  Q.    Yes.

20  A.    I'm sorry, I thought you said one.

21            So two whites were promoted.  So that would be two out

22  of eight or one quarter.  So that would be -- give you adverse

23  impact, yes.

24  Q.    And if you actually looked at the people who are available

25  for promotion and those who were promoted, so you have one out

1    of two minorities being promoted and two out of six whites

2    being promoted --

3    A.   Two out of eight --

4    Q.   No, six.

5    A.   Weren't there eight white -- I'm sorry, I counted everyone

6    in the column.  Two out of six, right.  So that would be 50

7    percent over a third.

8    Q.   So in this scenario, minorities would be promoted actually

9    at a higher rate than whites?

10   A.   In this scenario that would be true.

11   Q.   So is this what you meant when you said that aggregating

12   over time across tests can yield a distorted picture?

13   A.   Yes.

14   Q.   Okay.  And yet, you did aggregate the tests in this way in

15   your analysis that appears in your October 2008 report?

16   A.   Well, some of those and on some other aggregations that

17   don't have that concern.

18   Q.   What ones did have that concern?  I'm excluding Boston in

19   this.

20   A.   Well, I aggregated across exam years, but I also

21   aggregated across departments within an exam year.

22        So for 2006 I compared across different jurisdictions,

23   all the cities and towns.

24   Q.   Yes.  Yeah, you just added it all up?

25   A.   Right.  So that didn't have that possibility of people

1    contributing data more than once.

2    Q.   Say that again.  So, for example, when you were

3    aggregating -- I'm just going -- I want to be clear -- the data

4    across exams statewide, you only looked at one Worcester exam

5    to do that?

6    A.   No.  When I looked at the impact of the 2006 exam across

7    the state and I did that by combining the data from all the

8    municipalities that took the exam.  There were no people who

9    were counted twice.

10   Q.   Correct.  I'm referring only to your aggregated analysis

11   across the exam years.

12   A.   Right.

13   Q.   Okay.

14        Okay.  And I think you testified that you complied

15   with the EEOC guidelines in conducting your AI analysis,

16   correct?

17   A.   I tried to.

18   Q.   And you're familiar with the questions and answers.  And I

19   apologize for my highlighting there.

20        I believe when you were on direct examination with

21   Attorney Lichten you testified that aggregating across

22   different employer units might be more useful than aggregating

23   through time.  Do you recall saying that?

24   A.   Not specifically, but I don't have a strong objection.  I

25   think aggregating is helpful and each type of aggregating has

1  its pros and cons.

2  Q.   I'm showing you for ease of asking you questions -- this

3  comes from the questions and answers to clarify and provide

4  common interpretation of the Uniform Guidelines.

5  A.   Yes.

6  Q.   Do you recognize question 21 here?

7  A.   Yes.

8  Q.   And can you read the question for the Court, please, in

9  bold next to 21?

10  A.   Yes.

11  Q.   What does that say?  Can you read that?

12  A.   It says, "Is evidence of adverse impact sufficient to

13  warrant a validity study or an enforcement action where the

14  numbers involved are so small that it is more likely than not

15  that the difference could have occurred by chance?"

16  Q.   And what is the answer?

17  A.   "No."

18  Q.   Okay.  Now, when numbers are small -- and they gave you an

19  example of small numbers here, and I think that you would

20  probably agree that the numbers used even in this example of

21  the Uniform Guidelines are larger than the municipal defendants

22  other than Boston that you were working with generally?

23  A.   Yes.

24  Q.   Okay.  And even the EEOC considers these small numbers?

25  A.   Yes.

1   Q.    Okay.  In determining AI when working with small numbers,
2   what does this question and answer suggest you do?
3   A.    It suggests that -- it has a couple of ideas.  In the last
4   paragraph it suggests if the --
5   Q.    No, before you get there, before you get there --
6   A.    Okay.  So which part would you like me to direct my
7   attention to?
8   Q.    Well, let's read it.  It says, "If the numbers in the
9   different selection rates are so small that it's likely that it
10  could have occurred by chance, the federal agencies will not
11  assume the evidence of adverse impact in the absence of other
12  evidence."  And then they go over the example.  And then it
13  says, "If only one more black had been hired instead of a
14  white, the selection rate for blacks would be higher than that
15  for whites.  Generally it is inappropriate to require validity
16  evidence or to take enforcement action where the number of
17  persons in the different selection rates are so small that the
18  selection of one different person for one job would shift the
19  result from adverse impact against one group to a situation in
20  which that group has higher selection rates than the other
21  group."
22          This is referred to as the shift of one.  Would you
23  agree?
24  A.    Yes.
25  Q.    Can you explain the shift of one to the Court?

1  A.   Well, it's basically what you just described.  If you have

2  small numbers and in the absence of other evidence you might

3  change one selection hypothetically and see what the impact

4  would be on your adverse impact ratio.

5  Q.   Okay.  And if there is a big difference in adverse impact

6  ratio, what does that tell you?

7  A.   And this says that the enforcement agencies would say that

8  probably that difference to begin with wasn't a big enough

9  difference to trigger their attention.

10 Q.   Okay.  I'm going to draw your attention back to your June

11 25th report.  And this is looking at page 8 of your June 25th

12 report, your summary of AI analysis for the City of Worcester?

13 A.   Yes.

14 Q.   And there you say, "For the 2006 Worcester PD department

15 there's AI in terms of a difference in favor of non-minorities

16 in the average test score."  And we'll agree that you were

17 working with what we agree are the wrong numbers at this point

18 in time?

19 A.   Correct.

20 Q.   Okay.  So you had come up, even though it doesn't appear

21 here, with a .76 or a .79 AI in Worcester?

22 A.   Correct.

23 Q.   In coming up with that conclusion that there was AI in

24 Worcester, did you conduct a shift of one?

25 A.   So in reading that over, did we switch from the test score

1    to the adverse impact in promotions?

2    Q.    That's what I assume you're looking at, yup, adverse

3    impact on minorities in promotion rates as far as AI fails the

4    4/5ths rule.

5    A.    But you also read something about the non-minorities and

6    average test score.  So we're focusing now, you're asking about

7    the .79.

8    Q.    I am, yes.  I'm asking about the selection rate.

9    A.    And what are you asking me?

10    Q.    I'm asking you when you reached this conclusion that there

11    was AI on minorities of promotion rates failing the 4/5ths

12    rule, before reaching that conclusion did you conduct a shift

13    of one as --

14    A.    No.

15    Q.    -- suggested by -- why not?

16    A.    Because of the phrase "in the absence of other evidence."

17    Q.    Doesn't question 21 tell you that if you conduct a shift

18    of one and there is a significant change in the results that

19    you're not going to be able to show AI because the numbers are

20    too small?

21    A.    Well, my understanding of question 21 is that it's

22    concerned about being fair to employers, as much as that might

23    surprise some people who hate the Uniform Guidelines.  And it's

24    saying that -- it's providing the employer with some protection

25    against being subjected to an EEOC investigation or action of

1    some sort based on numbers that are unreliable, might just be

2    due to chance.  But I also take that "in absence of other

3    evidence" to mean that if there is other strong indication

4    that, despite the small numbers, the adverse impact is real,

5    that you would not undertake a hypothetical numerical analysis

6    of the type described there.

7    Q.   So you're taking the position that question 21 doesn't

8    require you to conduct a shift of one analysis before

9    determining AI when you're dealing with small numbers; is that

10   your testimony?

11   A.   Because of that phrase "in absence of other evidence" I'm

12   saying just that, yes.  When there is evidence that there is

13   something causing the adverse impact, then you would not -- I

14   don't think that question 21 applies.

15   Q.   And what evidence was that in the City of Worcester?

16   A.   Well, Worcester took part in the 2006 and 2008 exams and

17   both the 2006 and 2008 exams had mean score differences between

18   minorities and non-minorities.  The -- so given that mean score

19   difference between minorities and non-minorities you would have

20   some reason to suspect there would be adverse impact in

21   appointments.

22   Q.   So in this case you're saying shift of one is not required

23   by the Uniform Guidelines?

24   A.   Right.

25   Q.   And that's why you didn't do it for any of the smaller

1   municipalities in reaching your conclusions in your report?

2   A.   Yes.

3   Q.   Okay.  So you didn't do shift of one at all.

4   A.   No.

5   Q.   When you're dealing with small numbers, is looking at what

6   happens in other employer units the only way the guidelines

7   suggest you can examine the data?  And I'm going to draw your

8   attention to that last paragraph of --

9   A.   No, you could also look over time.

10  Q.   Okay.  And you already testified, I believe it's in your

11  first report, that you had data from 2003, 2004 in conducting

12  your analysis, correct?

13  A.   Correct.

14  Q.   Okay.  So when determining AI in Worcester, did you look

15  back in time at the data of Worcester -- of the experience

16  Worcester had with the 2004 exam to come up with a more

17  meaningful AI?

18  A.   At some point I decided to focus on the '05 through '08

19  exams.  So the answer is I don't know if I did that.

20  Q.   Yet, when you did the statewide aggregate, you included

21  the 2003 and 2004?

22  A.   Correct.

23  Q.   But you didn't when you disaggregated for the

24  municipalities; is that correct?

25  A.   Correct.

1    Q.    Is that because it didn't help the plaintiffs' case?

2    A.    At some point I decided just to look at '05 through '08,

3    and it could be that the earlier exams didn't add to that

4    analysis.

5    Q.    So you're saying that when you're dealing with small

6    numbers from a 2006 exam in Worcester, looking at what happened

7    with the 2004 exam wouldn't have yielded more significant

8    results?

9    A.    It might have been a good idea.

10   Q.    But you didn't do it?

11   A.    No.

12   Q.    Or did you do it and decided not to include it in your

13   report?

14   A.    I think I actually did it at some point.  I don't know if

15   I did it for all the municipalities or I tried to do it so --

16   so as I sit here I don't recall the results of those.

17   Q.    Okay.  We'll get to that later.

18         Can you describe what is a shortfall analysis?

19   A.    Yes.

20   Q.    And what is that?

21   A.    A shortfall analysis asks the question:  How many

22   minorities in this type of a situation -- how many minorities

23   would have been hired if the hiring was being done at a fair

24   rate ?

25   Q.    Okay.  And did you conduct such an analysis in examining

1    the data?

2    A.    I did.

3    Q.    You did?

4    A.    I did.

5    Q.    Is that in any of your reports?

6    A.    No.  The statistical program that I used sometimes just

7    spits that out.

8    Q.    Why didn't you include it in your reports?

9    A.    I thought that would be getting at the remedy rather than

10   the adverse impact.

11   Q.    Well, isn't it some evidence of the degree of adverse

12   impact occurring within each of the municipalities?

13   A.    It's not the typical way you look at adverse impact.

14   Q.    Okay.  In your April 2010 report you did some

15   disaggregated analysis, right, of the municipal defendants?

16   A.    Yes.

17   Q.    I'm looking at page 7.

18   A.    Yes.

19   Q.    And why did you include only four defendants?

20   A.    Well, let's see.  There were some defendants that didn't

21   have appointments.

22   Q.    And that was based on the data that the Commonwealth

23   supplied to you, correct?

24   A.    Correct.

25   Q.    And you later determined that there had been appointments,

1    correct?

2    A.    Correct.

3    Q.    Would that have been in Worcester and in Springfield also?

4    A.    Yes.

5    Q.    Okay.  When you conducted your statewide aggregated data

6    in your earlier reports, was that based on that information

7    that we now know was not correct, that Worcester and

8    Springfield hadn't had any appointments when they had?

9    A.    Yes.

10   Q.    So even your statewide analysis you would agree is based

11   on inaccurate data?

12   A.    It was based on the most accurate data that the HRD had at

13   the time and provided.

14   Q.    Do you know how many other jurisdictions would -- might

15   have been similar to Worcester and Springfield that hadn't

16   provided their promotion data to the Commonwealth at the time

17   that it was provided to you?

18   A.    Well, HRD stopped collecting information from

19   municipalities on promotions in the fall of '09.  So the

20   analyses for the '05 exam probably are -- have complete data

21   set.  It could be that some of the later exams didn't have the

22   data from HRD after HRD stopped collecting the information.

23   Q.    Did you make any effort to collect --

24   A.    Probably '06 -- at least the '05 exam would be complete.

25          Did I make an attempt to get more data from all of the

1    cities and towns?

2    Q.    You did get more --

3    A.    No, is that what you're asking?

4    Q.    Yeah, and what effort did you make in collecting that

5    data, including your aggregated analysis?

6    A.    I relied on the data file that Dr. Silva provided with his

7    expert report and supplemented that with the hiring from the

8    defendant departments.

9    Q.    Okay.  Now, finally -- in your June 25, 2010 report you

10   finally did a comprehensive disaggregated analysis --

11   A.    Yes.

12   Q.    -- municipality by municipality.  You previously stated,

13   and I believe it was in your first report, that you did not

14   feel the small statistics would yield statistical significance.

15   Now, in conducting your disaggregated analysis in June of 2010

16   did you change your mind?

17   A.    No, I think you still generally don't find statistical

18   significance with very small numbers.  Sometimes, if the

19   numbers are very extreme, you will find statistical

20   significance.  And perhaps -- perhaps that's why the Uniform

21   Guidelines has a two-prong approach to determining adverse

22   impact, where it has a 4/5ths rule as well as a statistical

23   significance rule.

24   Q.    Okay.  Now, I'm not sure whether it's better to put up

25   your --

1                (Discussion off the record.)

2    Q.   Now, you had the 2004 exam data before you as of as early

3    as 2008 from the Commonwealth from discovery?

4    A.   Right.

5    Q.   Now, I'm not quite sure the best way to do this, but I

6    have a document from the Commonwealth entitled "Test Results

7    Data For All Candidates Who Sat For the 2004 Sergeant

8    Promotional Exam."  It begins at page 1854, the Bates stamp,

9    production -- produced by the Commonwealth.

10              Does anybody have a problem if I put some of this up?

11              MR. LICHTEN:  Is this an exhibit?

12              MS. ENGDAHL:  You didn't put it in your exhibit list.

13   I thought you had.  This is 1854 from the Commonwealth

14   production.

15   BY MR. SLAGLE:

16   Q.   Dr. Wiesen, what I'm trying to put up is the document that

17   you had -- I believe you had from -- the Commonwealth portion

18   of it, there's a couple of pages here, from the document

19   beginning with Worcester these are the -- this is the data that

20   represents the race and ethnicity of the test takers along with

21   their scores.  And this is the second page of the Worcester

22   data.

23              (Discussion off the record.)

24   Q.   Okay.  For the purposes of this question I'm going to ask

25   you to make some assumptions that I will show from this data

1    that will eventually go in, that in 2004 there were 49 whites

2    who took this exam and there were 10 minorities who took the

3    exam.  Assume that Worcester promoted two minorities off this

4    examination, two of ten, and we promoted 12 white applicants

5    off this examination, 12 of 49.

6            (Pause.)

7    Q.    Dr. Wiesen, did you come up with an AI information

8    promotion based on the numbers I gave you?

9    A.    About 82.

10   Q.    So that wouldn't indicate an adverse impact under the EEOC

11   guidelines, correct?

12   A.    Correct.

13   Q.    So had you aggregated the 2006 exam and the 2004 exam as

14   suggested on the Q and A of the EEOC guidelines where you're

15   dealing with small numbers, there likewise would have been no

16   adverse impact in Worcester, correct?

17           I think you testified the other day that the adverse

18   impact in promotion rates from the 2006 exam was .88.

19   A.    Yes, there would not have been.

20   Q.    Okay.  If I were to ask you to assume on this 2004 exam

21   that only one in ten of the minority candidates failed that

22   exam and conversely -- well, nine out of ten passed and 35 out

23   of 39 whites passed that exam, would you be able to tell me

24   quickly whether that shows an adverse impact in passing rates

25   from that 2004 exam?

```
 1   A.    It sounds like a higher proportion of minorities passed.
 2   Q.    Okay.
 3         I'm looking -- I believe this is the June 25th report.
 4   Your table 2b, summary of AI analyses by police department for
 5   exam years 2003-2004.
 6   A.    Right.
 7   Q.    And if you look at what you have next to Worcester, you
 8   have "no promotions."
 9   A.    Right.
10   Q.    On what did you base your conclusion that there were no
11   promotions in Worcester in 2004?
12   A.    On the data file that was provided by HRD.
13   Q.    Were you provided any data from the City of Worcester
14   regarding the 2004 promotions?
15   A.    No.
16   Q.    So you didn't have -- let me be clear.
17         So in reaching the conclusion about promotion rates
18   off that 2004 list, nobody provided you with any information on
19   whether we had actually promoted anybody off that list?
20   A.    Well, in the data file that I got from HRD it did not
21   appear -- all the other municipalities had indications of
22   promotion in terms of data promoted.  So I took the data
23   promoted as an indication that there were promotions, and there
24   were no -- there were no promotions indicated for Worcester.
25   Q.    And you had no other information on promotions from
```

1    Worcester other than that came from the Commonwealth in

2    reaching the conclusions here?

3    A.    Well, the file that I relied on was the computer file.

4    Q.    Would it surprise you if I told you that plaintiffs did

5    have such information?

6    A.    It's always possible that I've made an error.

7    Q.    Would this 2004 data show no promotions from the City of

8    Worcester when, in fact, there were 14 and two minorities

9    promotions?  Would that have been included in your statewide

10   aggregated analysis as well?

11   A.    Yes.

12   Q.    And the fact that there were no promotions, that didn't

13   cause you suspicion that there might be some error in the

14   promotion data?

15   A.    I had just presumed that the data I got from the state was

16   correct.

17   Q.    So I'm going to draw your attention to table 2c, updated

18   AI analysis by PD over 2003 to 2008.  And you have an AI

19   promotion rate there for Worcester of a .70.

20   A.    Right.

21   Q.    Okay.  Knowing what you now know, that there were 14

22   promotions from that list, two of them to minorities, and it

23   would be, I think you did the calculation, yielding an AI

24   of .82 from the 2010 list, can you say that .70 number is

25   inaccurate?

1  A.   Yes.

2  Q.   Are you able to say with certainty today whether that AI

3  number is actually well over .8?

4  A.   Not with certainty, but I wouldn't be surprised.

5  Q.   Okay.  And you have here AI and passing rates 1.18 for

6  Worcester?

7  A.   Yes.

8  Q.   What would that mean?

9  A.   That means that the minorities passed at a higher rate

10  than non-minorities.

11  Q.   And that's over the course of three different exams --

12  A.   Correct.

13  Q.   -- that you were looking at?

14      What does it mean AI and average test score where you

15  have a negative .9 there for Worcester?

16  A.   On average across the exams minorities scored about one

17  point better than non-minorities.

18  Q.   And that's across the three exams that you have

19  information on that Worcester participated in?

20  A.   Correct.

21      MS. ENGDAHL:  I'm almost done.

22  A.   I --

23  Q.   There's no question before you.

24  A.   I would like to correct one of my previous answers, if I

25  could.  One of my previous answers.

```
 1    Q.    Your counsel will get you on redirect?

 2          THE COURT:  Can I ask where you are?

 3          MS. ENGDAHL:  I'm almost done.  If we could go about

 4    ten minutes over.

 5          THE COURT:  Yes, to finish your examination.

 6          MS. ENGDAHL:  Thank you very much.

 7    BY MS. ENGDAHL:

 8    Q.    Okay.  I'm going to ask you to look at a document that's

 9    up that's been put in by plaintiffs for the counsel -- I mean

10    counsel for the plaintiffs, excuse me.

11          Looking at table B3, you show that one minority failed

12    the 2008 exam in Worcester.  Where did you -- what information

13    did you rely on to reach that conclusion?

14    A.    The HRD data file.

15    Q.    Okay.

16          I think that data file is Plaintiffs' Exhibit 77.  And

17    I'm going to put that up.  I'm not sure how to show the whole

18    thing.  I guess I'll go down.

19          You can see in this data file that HRD has the exam

20    information in descending order of score from highest to

21    lowest.

22    A.    Yes.

23    Q.    After they've set apart whites from minorities.

24          I'm going to ask you to look at that data.  At the top

25    they have a list of minorities and how they scored.  The bottom
```

1    half represents the whites and how they scored.  And you can

2    see, I believe, there are eight whites who failed that exam.

3    Can you show me where it shows a minority failing that exam?

4    A.   I don't see that there.

5    Q.   So, in fact, no minorities failed the 2008 Worcester exam?

6    A.   This does not show a minority failing.

7    Q.   And if that's accurate, then your table B3 is inaccurate?

8    A.   Correct.

9    Q.   I'm going to draw your attention to the 2000 (sic.) June

10   report again.

11   A.   To what, please?

12   Q.   Your June 2010 report.  And I'll draw your attention to a

13   page in a moment.

14        Okay.  Section 12 there, paragraph 12, you have

15   summary of AI analysis for the City of Worcester.  In your

16   third paragraph you say, "Worcester has made only one

17   appointment from the 2008 exam.  That list was established in

18   May 2009 so can be expected to be active until May of 2011."

19        You write, "If Worcester promoted five new sergeants,

20   no additional minority test takers would be promoted."  And you

21   say also that the first minority is in position 15.

22        What did you base that conclusion on?  What document

23   were you looking at?

24   A.   I think I was given a document titled "Police Sergeant

25   Active Standing List" by counsel.

1    Q.    Okay.  So in reaching this conclusion, unlike every other

2    conclusion -- unlike every other analysis you did, you relied

3    on data other than what was given to you by the Commonwealth of

4    Massachusetts; is that correct?

5    A.    Well, I presume the Police Sergeant Active Standing List

6    was from the Commonwealth of Massachusetts originally.  But,

7    yes, it was not the same data file.

8    Q.    Okay.  This was a document entitled "Police Sergeant

9    Active Standing List"?

10   A.    That was the title.

11   Q.    And you didn't look at this document to reach that

12   conclusion?  (Indicating.)

13          This is Plaintiffs' Exhibit 77, which you based some

14   of your analysis on, you said.  But when it came to predicting

15   what would happen, you didn't look at this document or you

16   didn't rely on it.

17   A.    That's correct.

18   Q.    Okay.  Would it surprise you if I told you that the

19   incumbent that you referred to as being number 15 is actually

20   number 13 on the list?

21   A.    I would be surprised to a certain extent, yes.

22   Q.    And I know we're nearing the end of the day and I don't

23   want to go over this, but if I were to ask you to assume when

24   you're looking at these test scores and you synthesize them

25   with the test scores of whites that there's actually a Hispanic

1    candidate who appears higher on the list than number 13.  So if

2    I asked you to assume that there's a Hispanic candidate higher

3    than number 13 on the list and number 13 on the list is, in

4    fact, plaintiff Spencer Tatum, who is black, if, in fact,

5    Worcester were to have made 14 appointments off this list, as

6    it made 14 appointments off the 2004 list, and since we're

7    guessing, that wouldn't yield adverse impact; is that correct?

8    A.    So you would have two minorities appointed --

9    Q.    Two of four minorities appointed from this list.

10   A.    And how many non-minorities?

11   Q.    I believe there are ten.

12   A.    And how many non-minorities would be appointed?

13   Q.    Twelve in my hypothetical.

14   A.    Twelve non-minorities would be appointed out of how many?

15   Q.    Forty-seven.

16   A.    So that's approximately 1/4 of the non-minorities and it

17   was two out of 12?  So the two out of 12 would be --

18   Q.    Two out of ten minorities.

19   A.    Two out of ten minorities.  We'd be looking at 12 out of

20   47.  So that would be .2 over .25, which would be exactly .8.

21   Q.    Okay.  In your analysis, then, of the 2008 exam, that's

22   just a guess, correct?  You don't know whether Worcester is

23   ever going to go back to that list for one more or 14 more,

24   correct?

25   A.    Correct.

1  Q.   So you don't know whether Worcester's use of the 2008 exam

2  would yield an adverse impact; is that correct?

3  A.   That's correct.

4  Q.   So looking at the 2006 exam, which is the first exam

5  challenged here by the plaintiff, we agree that there's no

6  adverse impact in rates of promotion in Worcester?

7  A.   Well, in my table 2a I have a zero for adverse impact for

8  promotion rates.  So --

9  Q.   Where are you looking?

10  A.   So you have no promotions in 2008.

11  Q.   I think that's from your first draft.  I think you changed

12  that in your second draft.

13  A.   Okay.  So if there are no promotions in 2008, then we have

14  no reason to calculate, no way to calculate an adverse impact

15  ratio.

16  Q.   Okay.  But I was asking about 2006.

17  A.   And 2006.  And when you change that, the 2006 becomes .88.

18  Q.   Correct.

19  A.   Right.

20  Q.   And in 2006 there was no adverse impact in passing rate?

21  A.   Correct.

22  Q.   Okay.  And if you were to use the question and answers in

23  number 21 and look back at Worcester's use of the prior exam,

24  likewise, there's no adverse impact in rates of selection?

25  A.   Correct.

1    Q.    Or passing rates?

2    A.    I didn't look at the passing rates.

3    Q.    Well, we just went over it, and actually you did, it's in

4    one of your tables in your June, I think -- 1.27 in favor of

5    minorities, I think?

6    A.    Okay.  Then there's no adverse impact there.

7    Q.    And I believe, although there was only one promotion off

8    the 2008 list, with regard to passing rates -- and let's show

9    you here in Worcester you have that minorities passed at a

10   higher rate than non-minorities, correct?

11   A.    Yes.

12   Q.    Okay.  Yesterday you were asked -- maybe it was Tuesday --

13   by your counsel what message these statistics from Worcester

14   send?  And I think you said they send a mixed message.

15   A.    Okay.

16   Q.    How do they send a mixed message?

17   A.    Well, at that time I thought the adverse impact ratio

18   was .79.

19   Q.    Without applying shift of one.

20   A.    Right.  And to some extent I was surprised by Worcester,

21   still surprised.  I don't know why statewide exam shows so

22   clear a mean difference in test score for minorities and

23   non-minorities in one direction and in Worcester it appears to

24   be the other direction.  So it's somewhat confusing.

25   Q.    You testified -- and actually, it was after you

1  acknowledged that the new data showed that AI from the 2006

2  exam, which showed the selection rates was .88, not .79, and

3  you still testified that those results sent a mixed message,

4  and I'm asking you what you meant by that.

5  A.    Well, looking over the data for Worcester, that the

6  difference in favor of the non-minorities in several areas and

7  nothing very strongly indicating a difference in favor of

8  non-minorities, perhaps I would like to change that evaluation.

9  It does not appear to be from what I see right now any

10  indication of adverse impact there.

11  Q.    And in fact, when you say you don't know why, you don't

12  know what efforts Worcester may be taking to achieve a

13  different result; is that correct?

14  A.    Correct.

15          MS. ENGDAHL:  Thank you very much.  I have nothing

16  further.

17          THE COURT:  All right.  We'll pause for the day.

18          What I'd like to do -- have you do, counsel

19  collectively, is talk about scheduling, having in mind the

20  interests of the witnesses.

21          We'll start on Tuesday with Dr. Fields, I guess,

22  and --

23          MR. LEAHEY:  So Dr. Wiesen is not coming back on

24  Tuesday.

25          THE COURT:  Well, that's what I thought was the sense.

1    I'll leave it to you to discuss.  I'm happy to have him come

2    back if that works out and he can be finished and then proceed

3    to Dr. Fields, too.  I don't mean to say that's not an option.

4    I took it to be that was going to be a problem.

5            MR. LICHTEN:  That's my understanding.  If I

6    understand it, if he's not back on Tuesday, it's with the

7    Court's permission as long as we're --

8            THE COURT:  Right.  And we'll have to finish the

9    testimony at some point.

10           MR. LICHTEN:  Yes, of course.  Of course.

11           THE COURT:  But that's something I think all of you

12   may be able to discuss having in mind all your witness problems

13   from whatever source.

14           MR. LICHTEN:  Thank you.

15           THE COURT:  Okay.  All right.  Thanks.  We'll see you

16   Tuesday.

17           (Court adjourned at 1:12 p.m.)

18

19

20

21

22

23

24

25

1                       C E R T I F I C A T E

2

3            We, Marcia G. Patrisso, RMR, CRR, and Debra M. Joyce,

4    RMR, CRR, Official Reporters of the United States District

5    Court, do hereby certify that the foregoing transcript

6    constitutes, to the best of our skill and ability, a true and

7    accurate transcription of our stenotype notes taken in the

8    matter of Civil Action No. 07-11693-GAO, Pedro Lopez, et al, v.

9    City of Lawrence, et al.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13
     /s/ Debra J. Joyce
14   DEBRA M. JOYCE, RMR, CRR
     Official Court Reporter
15
     Dated:  July 16, 2010
16

17

18

19

20

21

22

23

24

25