UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

PEDRO LOPEZ, Individually and on          )
behalf of a class of individuals          )
similarly situated,                        )
                                           )
          Plaintiffs,                      )
                                           ) Civil Action
v.                                         ) No. 07-11693-GAO
                                           )
CITY OF LAWRENCE, et al,                   )
                                           )
          Defendants.                      )
                                           )

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY SIX
NON-JURY TRIAL

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Tuesday, July 20, 2010
9:02 a.m.

Marcia G. Patrisso, RMR, CRR
Debra M. Joyce, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1   APPEARANCES:

 2        LICHTEN & LISS-RIORDAN, P.C.
          By: Harold L. Lichten, Esq.
 3            Stephen S. Churchill, Esq.
              Joseph L. Sulman, Esq.
 4        100 Cambridge Street, 20th Floor
          Boston, Massachusetts  02114
 5        On Behalf of the Plaintiffs

 6        CITY OF LOWELL LAW DEPARTMENT
          By: Brian W. Leahey, Esq.
 7            R. Eric Slagle, Esq.
          City Hall
 8        375 Merrimack Street
          Lowell, Massachusetts  01852
 9        On Behalf of the Defendant City of Lowell

10        OFFICE OF THE CITY ATTORNEY
          By: Richard J. D'Agostino, Esq.
11        200 Common Street, Suite 306
          Lawrence, Massachusetts  01840
12        On Behalf of the Defendant City of Lawrence

13        COLLINS, LOUGHRAN & PELOQUIN
          By: Laurie W. Engdahl, Esq.
14        320 Norwood Park South
          Norwood, Massachusetts  02062
15        On Behalf of the Defendant City of Worcester

16        MORGAN, BROWN & JOY, LLP
          By: Mary Jo Harris, Esq.
17            Robert P. Morris, Esq.
          200 State Street, 11th Floor
18        Boston, Massachusetts  02109
          On Behalf of the Defendant City of Boston
19
          MBTA LAW DEPARTMENT
20        By: Kevin S. McDermott, Esq.
          10 Park Plaza, 7th Floor
21        Boston, Massachusetts  02116
          On Behalf of the Defendant MBTA
22

23

24

25
```

```
1        CITY OF SPRINGFIELD LAW DEPARTMENT
         By: Harry P. Carroll, Esq.
2        36 Court Street
         Springfield, Massachusetts  01103
3        On Behalf of the Defendants City of Springfield
         and Mayor Sarno
4
         CITY OF METHUEN - OFFICE OF THE CITY SOLICITOR
5        By: Peter J. McQuillan, Esq.
         The Searles Building, Suite 311
6        41 Pleasant Street
         Methuen, Massachusetts  01844
7        On Behalf of the Defendant City of Methuen

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              I N D E X

2                              Direct   Cross   Redirect   Recross
   WITNESSES FOR THE
3    PLAINTIFFS:

4  CASSI LYNN FIELDS

5      By Mr. Lichten            23
       By Ms. Harris                    124
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2            THE CLERK:  All rise.
 3            (The Court enters the courtroom at 9:02 a.m.)
 4            THE CLERK:  For a continuation of the Lopez trial.
 5    Please be seated.
 6            THE COURT:  Good morning, everyone.
 7            Mr. Churchill?
 8            MR. CHURCHILL:  Yes.  We have a few things I just
 9    wanted to go over before we call Dr. Fields to the stand.
10            THE COURT:  All right.
11            MR. CHURCHILL:  First of all, on some exhibits -- and
12    this is all with a mind towards expediting things to the extent
13    possible, which I assume everyone is in favor of.
14            THE COURT:  I'm in favor of that.
15            MR. CHURCHILL:  The first is we wanted to introduce
16    the MCAD complaints that all of the plaintiffs filed.
17    Obviously, we're not seeking to introduce them for the truth of
18    the matter asserted but for the limited purpose of showing that
19    they were filed and when they were filed.  Some of the
20    defendants have objected; some haven't.  So I don't know if you
21    want to hear what objections there are, but certainly some of
22    them are stipulated to.
23            MR. CARROLL:  From Springfield's perspective, your
24    Honor, we have no objection other than if they're admitted
25    solely and for the limited purpose of showing the dates of
```

 1    filing.  But in terms of everything else in the complaint,

 2    there's just no relevancy.

 3            THE COURT:  I assume that the historical fact, a

 4    complaint or -- a complaint was filed, and when it was filed is

 5    not controversial?

 6            MR. CARROLL:  Not from Springfield's perspective, your

 7    Honor.  The four complaints --

 8            THE COURT:  I know that there's some -- one or two who

 9    say that there was none.  I've forgotten who it was.

10            MR. CARROLL:  Well, I said there were none in 2005.

11            THE COURT:  Right.  But I mean, with respect to some

12    of the plaintiffs, there's some claims that as to some exams

13    there was not a claim and so on and so forth.  But anyway, what

14    I'm getting at is could there just be a stipulation, plaintiff

15    by plaintiff, as to --

16            MR. CARROLL:  That would be our preference.

17            THE COURT:  -- when it was filed, and the significance

18    of it can be determined later?

19            MR. CHURCHILL:  That's fine, your Honor.

20            THE COURT:  Then we don't need to clutter it up with

21    paper.

22            MR. D'AGOSTINO:  I think that would be preferable,

23    your Honor.

24            MR. McQUILLAN:  Also, for the City of Methuen, we are

25    more than ready to stipulate, your Honor.

1          MS. ENGDAHL:  Your Honor, the City of Worcester will

2     stipulate to --

3          THE COURT:  I mean, that seems to be the necessary

4     fact to get in, so I think you could probably just prepare a

5     stipulation.

6          MR. CHURCHILL:  That's fine, your Honor.  Then I

7     think, with respect to all plaintiffs except for plaintiff

8     Alvarez from Lowell, that the defendants have stipulated to the

9     race of the plaintiffs.  I want to make sure that's correct.

10          THE COURT:  That includes the fellow from Worcester?

11     Wasn't there someone from Worcester, or was it Springfield?

12          MS. ENGDAHL:  No, I answered -- I admitted in my

13     complaint that he is black.

14          THE COURT:  No, there is someone else I'm thinking of.

15     Donelan.  Who's Donelan?

16          MR. CHURCHILL:  He is not a plaintiff.

17          THE COURT:  Oh, he's not a plaintiff?  Okay.

18          MS. ENGDAHL:  We stipulated that that was a mistake

19     and that he is, in fact, white.

20          THE COURT:  That was the numerical correction that was

21     made?

22          MS. ENGDAHL:  Yes.  Yes, thank you.

23          THE COURT:  Okay.  So -- and with Alvarez, what, there

24     will be some evidence?

25          MR. CHURCHILL:  Yes, we're going to call him.

1           And then secondly, there were a couple of exhibits

2    that we had earlier marked as proposed exhibits that we wanted

3    to move into evidence.  I know there are objections.  The first

4    one is Exhibit ID No. 1.  And what this is is a three-page

5    description of assessment centers and a list of towns that have

6    used assessment centers using HRD's delegation process.

7           I assume that the only objection to this is relevance,

8    and the relevance of it is clearly to show that there are

9    alternatives to the pure -- to the use of a pure written exam.

10   And it's an alternative that HRD makes available and that other

11   towns have taken advantage of.  So that's the purpose of this

12   exhibit.

13           THE COURT:  Is there an objection?

14           MS. HARRIS:  Boston objects on the relevance of the

15   assessment center because I think it's uncontroverted that HRD

16   informs communities that they can do an assessment center at

17   their own cost and their own discretion.

18           THE COURT:  What is it -- what's the harm in letting

19   the document in?

20           MS. HARRIS:  I don't think it's relevant, at least as

21   to Boston.

22           MR. CARROLL:  And I would join as to Springfield.  In

23   addition, your Honor, we haven't seen -- Springfield hasn't

24   seen the exhibit.

25           THE COURT:  I guess my question is:  What does it do

1    more than what Boston says is --

2             MR. LEAHEY:  Your Honor, at least from Lowell's

3    perspective, some of it is for 2007, which is after Lowell's

4    date, and also includes positions other than sergeant's

5    examinations.  It includes a lot on fire, that it's not just a

6    sergeant's examination assessment center; it's an assessment

7    center for everything HRD has done over a four- or five-year

8    period.

9             THE COURT:  Let me see it so I can understand it.

10            (Pause.)

11            THE COURT:  Well, if the only objection is relevance,

12   I'll admit it and you can argue its -- the weakness of its

13   relevance at the appropriate time.

14            MS. ENGDAHL:  Okay.  Your Honor, Worcester's objection

15   is based on relevance, but also that it's undated and there's

16   no evidence as to how this is communicated, or if it's

17   communicated, to the municipalities.

18            MR. McDERMOTT:  Following up on Worcester's objection,

19   I think letting it in without any testimony of relevance to it

20   is highly prejudicial and its probative value, at least with

21   the MBTA, is outweighed by its prejudicial --

22            THE COURT:  Well, those are foundation objections

23   and -- they actually sound, it seems to me.

24            I don't know.  Is there going to be an HRD

25   representative?

1          MR. CHURCHILL:  Your Honor, going back to what we said

2     initially, we're trying to expedite matters.

3          THE COURT:  Is there someone who could put it in

4     context?

5          MR. CHURCHILL:  There was someone who was deposed,

6     Sally McNeely, and this was marked at her deposition.  We were

7     trying to avoid the need to call her again just to expedite

8     matters.

9          THE COURT:  Well, if there's an objection I think I

10    would sustain the foundation objection, not the relevance

11    foundation.  We have to know what it is.  It's not

12    self-apparent; it's not self-authenticating.

13         MR. CHURCHILL:  All right.

14         THE COURT:  So it could eventually come in with the

15    proper foundation.

16         MR. CHURCHILL:  All right.  Well, then, the other

17    three exhibits are going to be the same --

18         THE COURT:  Same thing.

19         MR. CHURCHILL:  -- issue, so I'll save everybody's

20    time.

21         We also wanted to address, given where we are in the

22    trial, your Honor, some of the outstanding motions that were

23    pending.  The first one was Boston's motion for a protective

24    order.  And the background for this is Commissioner Davis, back

25    in June, was giving testimony at a city council hearing and he

1    testified to -- it was a short squib, so I'll just -- so I

2    don't misrepresent what he said, I'll just read what he said.

3    He was asked a question about assessment centers and he said,

4    "I'm a big advocate of assessment centers.  I think we have

5    evidence here in the City of Boston, because one other area

6    that we test in -- it's outside the Civil Service testing but

7    it's done by the city itself -- is the area of detective

8    testing.  And we have used assessment center components in the

9    detective testing process that has been very effective and has

10   led to a much more diverse pool of candidates entering into the

11   detectives' positions that we've had entering into the superior

12   officers' positions.  So I think we've learned a lesson in

13   Boston that there's a superior way to make this happen.

14   There's been very little litigation around it and I think it's

15   something that will be informative to us as we move forward."

16          So in light of that testimony we had served a subpoena

17   on the city asking for information about the detective's exam

18   in which they've used in the assessment center and which

19   Commissioner Davis touted the effectiveness of.  And so Boston

20   filed a motion for a protective order and has obviously not

21   produced that information yet.

22          MS. HARRIS:  Your Honor, we had moved for a protective

23   order for a couple of reasons:  One is that the request came in

24   in June, and the detective's exam was given in, I believe,

25   2007.  And it was announced to the police department as a

1    whole, so the plaintiffs individually were on notice that the

2    detective's exam was being administered in 2007.  So we

3    objected to the discovery as being untimely, coming as it did

4    on the eve of this time.

5         Substantively, we object because the detective's exam,

6    as Commissioner Davis reported at the city council hearing, is

7    conducted outside of the Civil Service system.  There are

8    various substantive reasons why the process that was used for

9    the detective's exam is not available in Civil Service, chief

10   among them being that there is a performance component of the

11   detective's exam which is prohibited by patrolmen's contract.

12   The detectives are a subgroup of the patrolmen's association,

13   so their contract, at least to the extent it prohibits the use

14   of promotional examinations based on performance assessments,

15   would prohibit the department from using that kind of

16   subjective component in the exams at issue here.

17        And, in fact, in the 2002 exams which were performed

18   under a delegation agreement the department tried to insert the

19   sort of subjective component that it uses in the detective's

20   exam, and that was challenged by the Superior Officers

21   Federation.  So we don't think that it's comparing apples and

22   oranges, and coming as it did in 2007, it has no bearing on the

23   decision-making that was present for the 2005 exam and, in

24   fact, came really late enough in the process for the 2008 exam

25   that it also doesn't provide much indicia of what would be

1    available for the department to engage in in the 2008 exam.  So

2    for those sort of procedural and substantive reasons, we moved

3    for a protective order.

4         I would note that the commissioner has been subpoenaed

5    by the plaintiffs and they're certainly free to ask him about

6    what he's done and why he's done it, but I would suggest that

7    the wholesale request for all of the documentation reporting

8    the detective's exam is unduly burdensome at this stage in the

9    proceedings and is not relevant to the exams -- the issue here

10   because it couldn't be used in these exams and, in fact, by the

11   timing of it, could not practically be of use in the

12   decision-making.

13        MR. CHURCHILL:  And I just want to --

14        MR. McDERMOTT:  Your Honor, just a further objection

15   from the MBTA.  It really follows the argument made by

16   Ms. Harris that because it's a detective's exam and it's not on

17   a Civil Service, it's like saying, you know, if we didn't have

18   Chapter 31 we could run our own.  Well, that's a huge impact on

19   this case, your Honor.  We're here precisely because we have to

20   follow the dictates of Chapter 31.  And, again, letting that

21   testimony in about testing that can be done outside of Chapter

22   31 is prejudicial, and it's not probative at all to the issues

23   in this case.

24        Thank you, your Honor.

25        MR. CHURCHILL:  A central issue in this case, your

1    Honor, is whether alternatives to written exams are feasible

2    and effective.  And here we have Commissioner Davis himself

3    taking the position that when asked about assessment centers

4    generally, that they're both feasible and effective based on

5    their experience with the detectives.  So it's clearly

6    premature for us to move to admit any of this stuff, but we

7    haven't seen any of the documents, and that's what we're asking

8    for.

9         THE COURT:  That's actually my problem with it.  This

10   sounds like discovery rather than true trial subpoena.  This

11   sounds like use of a trial subpoena to get information to open

12   an issue which had not been explored during discovery, and it

13   just seems too late for this.

14        MR. CHURCHILL:  Well, your Honor, this came up because

15   Commissioner Davis --

16        THE COURT:  I know.  I know he said it late, but that

17   happens.  As I said earlier, at some point the table has to be

18   set for the trial at hand, and in a world where things change

19   and developments happen, there are things that you wish you had

20   thought of earlier and so on.  But I just think it's not simply

21   to obtain evidence to prove what has already been explored in

22   discovery but to open a whole new area -- it would seem to me

23   that if we got into this, then the defendants would be asking

24   for and probably entitled to the opportunity to conduct their

25   own discovery on these new issues.

1          It just seems it's -- this specific issue is a new

2     issue.  I think it's too -- it's not a true trial subpoena and

3     is rather discovery, so on that basis I would sustain the

4     objection.

5          MR. CHURCHILL:  Just note our objection for the

6     record, your Honor.

7          Secondly, we had filed a motion to preclude the

8     Springfield experts from testifying.  And simply, the basis for

9     this is the issue in this case is with respect to the different

10    municipalities, whether the group of people who sat to take the

11    exam were affected, the group of minorities who sat to take the

12    stand were affected.  And that calls for looking at how that

13    group as a whole was affected.  So in Springfield, for example,

14    for 2005 and 2007, there was a group of 83 police officers who

15    sat to take the exam.  And so the appropriate analysis is to

16    look at what happened with those 83 folks.

17         What the Springfield experts do is they say, "We don't

18    want to look at that big group.  Let's look at the group that

19    was actually on the certified list sent to the city to see if

20    among that group blacks and Hispanics were somehow treated

21    differently than others," which is really not the issue in this

22    case, because that completely ignores the issue of how blacks

23    and Hispanics were kept off those certified lists in the first

24    place.  And that's the sole province of what the Springfield

25    folks purport to look at in their report, and that's just not

1    relevant for this case, your Honor.

2         THE COURT:  Mr. Carroll?

3         MR. CARROLL:  Thank you, your Honor.  Springfield

4    would urge the Court to deny the motion to preclude

5    Springfield's expert.  In this case really the only relevant

6    issue is whether the data pool that has been aggregated is

7    appropriate to the analysis.

8         The Court has already heard evidence before the

9    defense experts, and witnesses who have even testified, that no

10   one in Massachusetts who fails his Civil Service exam gets

11   appointed to a Civil Service job.  The Court has heard evidence

12   so far that the only people who are eligible for appointment to

13   a Civil Service position on a professional examination to

14   police sergeant are those who are certified, on the certified

15   list.

16        Essentially, what they're trying to do is to preclude

17   Springfield from providing the Court with the only relevant

18   data and evidence regarding a lack of adverse impact.  Not the

19   only evidence, but certainly major evidence, and as far as

20   Springfield is concerned.  The information clearly is relevant

21   because no one can be appointed if they failed the test.  So as

22   you've heard Dr. Wiesen say, he just took everybody, even those

23   people across the Commonwealth who failed the test, rolled them

24   into one ball and pretended, I guess, that someone from

25   Springfield can be appointed to a sergeant's position in Boston

1   and Methuen, the MBTA police force, et cetera, when the reality

2   is that cannot happen under the Massachusetts Civil Service

3   laws as written.

4        We've provided ample evidence for that.  The Court has

5   heard testimony from several witnesses thus far.  We believe

6   that we should have the right to present our expert evidence

7   based upon the findings that they've made regarding the

8   relevant data pool in this case.  I mean, essentially what

9   happened is that the plaintiffs' experts used the wrong data

10  pool and tried to make a case where there is none.

11       THE COURT:  I've denied the defendants' motion with

12  respect to the plaintiffs' expert on the grounds -- on

13  similar -- it was made on similar grounds, including Daubert

14  grounds, on the theory that I was going to hear everything and

15  decide how much it meant.  And I think the same rule applies to

16  this.  If it means nothing, it won't be persuasive.

17       There's a fight over some of these things, and rather

18  than decide them on the surface, on rather truncated

19  presentations like this, I'll hear it all, and then the

20  argument can be made again that it should -- the evidence

21  should be discarded because they're using the wrong pools,

22  they're applying the wrong test, and so forth and so on.  Both

23  sides are going to do that to each other.  And I think the same

24  reason that led me to deny the defendant's motion would lead me

25  to deny this motion.

1              MR. CARROLL:  Thank you, your Honor.

2              MR. CHURCHILL:  We're just doing our best to expedite

3    matters, your Honor.

4              The final issue, just to wrap this up, is we had moved

5    to admit the expert report of Dr. Landy, who passed away in

6    January.  Dr. Landy -- I'm sure the Court is familiar with

7    him -- has testified in many other cases and spent 40 years of

8    his life focusing in on these issues, collected data on

9    hundreds of police organizations and developed dozens of

10   professional exams for police promotions.

11             Now, clearly, admission of his report would preclude

12   the defendants from cross-examining him; that can't be done.

13   And we understand that Judge Tauro initially precluded any

14   expert depositions, which is why the depositions weren't taken.

15             I think, because this is a bench trial, the risk of

16   your Honor being unduly influenced by the report is obviously

17   different than it would be if it were a jury, and you'll be

18   able to accord whatever weight you think it's due in

19   recognition of the defendants' inability to cross-examine him.

20             The Court has discretion to admit the report under

21   Rule 807, which is the catch-all, or residual exception to the

22   hearsay rule.  His testimony goes to material facts in this

23   case, the three material ones, which is existence of adverse

24   impact, the validity of the exam and the existence of less

25   discriminatory alternatives.  Its probative -- its unique

1    probative value is it's Dr. Landy and he's providing the

2    benefit of his experience, having worked in this area for over

3    40 years and having studied this area extensively.

4        Obviously, this case raises very important issues for

5    police officers in towns across the Commonwealth, and in the

6    interest of justice and the fair resolution of this case that

7    you have the benefit of whatever information is out there in

8    terms of expert reports.  We know that he spent a substantial

9    amount of time developing these reports and providing the

10   opinions, so it's for those reasons that we move to admit it.

11       MR. MORRIS:  Your Honor, I would be responding, at

12   least for Boston.  We oppose this motion to admit the report.

13   We don't believe that Rule 807 applies here.  The rule talks

14   about evidence of a material fact.  Obviously, Dr. Landy was

15   just providing his opinion, not providing any evidence of

16   material fact.

17       In addition, plaintiffs have obviously secured a

18   replacement expert in the person of Dr. Fields, who is

19   obviously prepared to testify regarding the issues as we

20   understand it that Dr. Landy covered.

21       And there is, I think, an equitable issue here.  As

22   Mr. Churchill noted, Judge Tauro did not allow depositions, and

23   so through no fault of the parties Dr. Landy could not be

24   deposed before his death.  So essentially a report would be

25   going into evidence.  Regardless of the weight you give it, it

1    would still be going into evidence without any opportunity for

2    cross-examination of Dr. Landy.

3           This is not to denigrate Dr. Landy's ability and his

4    expertise, but no expert reports have been admitted into

5    evidence in this action.  Plaintiffs have secured a replacement

6    for Dr. Landy, and we just don't believe that the report should

7    be accepted.

8           MR. CARROLL:  Springfield joins Boston's objection and

9    adds to that that we believe the right to cross-examination is

10   fundamental to a fair trial.  We've never had an opportunity to

11   meet or cross-examine the late Dr. Landy.  We don't mean

12   to -- we're not going to cast any aspersions on him; however,

13   that report is not admissible.  Under the rules of evidence

14   it's simply hearsay, and it's hearsay which Springfield has

15   never had a right to cross-examine.  And to allow it in denies

16   us a right to a fair trial and we object to it.

17          MR. McDERMOTT:  Your Honor, if I may read a note from

18   Rule 702 regarding expert opinions.  "The rule precludes the

19   offering of direct examination in civil actions of expert

20   opinions, or the reasons or bases for opinions, that have not

21   been adequately or timely disclosed in advance of trial.  It

22   has not been unusual for the testimony given at trial by an

23   expert to vary substantially from that provided under former

24   Federal Rule 26(b)(4)(A)(5), or at a deposition of the expert."

25          Your Honor --

1              THE COURT:  What was that you were --

2              MR. McDERMOTT:  I'm sorry, your Honor.  I think the

3      notes --

4              THE COURT:  That was the advisory committee notes?

5              MR. McDERMOTT:  Yes, your Honor.

6              THE COURT:  Okay.  I just want to be clear what you're

7      reading.

8              MR. McDERMOTT:  I'm sorry.  I'm sorry.

9              So, your Honor, we have a report of an expert but we

10     haven't deposed the expert; he hasn't been under the scrutiny

11     at all prior to discovery.  We don't know if Dr. Landy, he were

12     to testify, would give the same testimony as in the report.

13     And following, again, Ms. Harris's objection, we have

14     Dr. Fields here who looked at Dr. Landy's report and is -- can

15     be under the scrutiny of cross-examination to see if the expert

16     opinion that she has from Dr. Landy's report would withstand

17     scrutiny.

18             For those reasons, your Honor, the MBTA would object

19     to having that report entered.

20             THE COURT:  Mr. Leahey?

21             MR. LEAHEY:  Lowell would just join -- and I'm sure

22     the other defendants would also just join the arguments that

23     Boston, Springfield and the MBTA made.

24             THE COURT:  Okay.  Are you aware of any case that's

25     used 807 to admit an expert report like this?

```
 1            MR. CHURCHILL:  Your Honor, I could never find a case
 2    that prohibited it nor allowed it, so the answer is no.
 3            THE COURT:  There still is none that admits it.
 4            MR. CHURCHILL:  But this could be that case, your
 5    Honor.
 6            THE COURT:  I know.
 7            MR. CHURCHILL:  There has to be one somewhere.
 8            THE COURT:  I'm not so sure.
 9            (Laughter.)
10            THE COURT:  No, I think the objection -- first of all,
11    I think it may be right, as Mr. Morris points out, that the
12    rule is intended for fact evidence and not opinion evidence,
13    Rule 807 itself.  It certainly would be unorthodox.  And I
14    think, as Mr. Carroll points out, the important role that
15    cross-examination plays in our adversary system is not to be
16    lightly disregarded.
17            So the report itself may not be admitted into
18    evidence.
19            MR. CHURCHILL:  All right, your Honor.  That's it in
20    terms of the preliminary matters.
21            THE COURT:  Okay.
22            MR. LICHTEN:  Are you ready, your Honor?  Dr. Cassi
23    Fields.
24                    CASSI L. FIELDS, duly sworn
25            THE CLERK:  State your name, spell your last name for
```

1  the record, keep your voice up and speak into the mic so we

2  could hear you.

3          THE WITNESS:  Dr. Cassi Lynn Fields, F-I-E-L-D-S.

4          MR. LICHTEN:  Your Honor, before I start, Dr. Fields

5  has asked me to just raise with the Court the fact that she's a

6  diabetic and has to check her blood sugar every hour.  It just

7  takes a couple of minutes.  And she's asked to take a fruit

8  juice up with her --

9          THE COURT:  That's fine.

10          MR. LICHTEN:  -- in case she feels light-headed or

11  anything.

12          THE COURT:  That's fine.  Just let me know when you

13  need to have a short break.

14          THE WITNESS:  Thank you.

15                      DIRECT EXAMINATION

16  BY MR. LICHTEN:

17  Q.   Can you state your name for the record, please?

18  A.   Dr. Cassi Lynn Fields.

19  Q.   And what do you do for a living, Dr. Fields?

20  A.   I'm an industrial organizational psychologist.

21  Q.   And do you work for someone or do you have your own firm?

22  A.   I have my own firm.

23  Q.   Okay.  What is the name of that firms?

24  A.   Fields Consulting Group, Inc.

25  Q.   And where is it located?

1    A.    In McLean, Virginia.

2    Q.    And how large is Fields Consulting Group, Inc.?

3    A.    About 12 employees, give or take.

4    Q.    Okay.  And are there other professionals other than

5    yourself in the organization?

6    A.    Yes, there are.

7    Q.    And how many other professionals are there?

8    A.    There are -- of the 12, there are three administrative

9    staff, so approximately nine.

10   Q.    Okay.  What is Fields Consulting Group, Inc., in the

11   business of doing?  What do you actually do?

12   A.    We develop, validate and administer promotional exams and

13   some selection exams for predominantly fire and police

14   departments.

15   Q.    Okay.  So let's break that down.  Do you do some work

16   outside of the police and fire arenas?

17   A.    Occasionally.

18   Q.    Okay.  So what percent of your work would you estimate is

19   devoted to police and fire assessment?

20   A.    98 percent.

21   Q.    Okay.  And of that 98 percent, what percent is devoted to

22   police and fire promotional exams as opposed to entry-level

23   exams?

24   A.    Promotional exams might be 3 to 5 percent -- 3

25   percent -- 5 percent, approximately.

1  Q.   I'm sorry.  What was that?  I didn't hear that.

2  A.   Somewhere between 3 and 5 percent are for selection exams

3  and the remainder for promotional exams.

4  Q.   Okay.  And with respect to the -- it sounds like you were

5  still over 90 percent that's devoted to police and fire

6  professional exams.  How much of that is devoted to police

7  promotional exams as opposed to fire promotional exams?

8  A.   It's probably around a 60 percent to 30 percent split,

9  maybe 65/25, something like that.

10  Q.   Okay.  In favor of?

11  A.   In favor of law enforcement.  I'm sorry.

12  Q.   Okay.  In favor of police?

13  A.   Yeah.  Correct.

14  Q.   Okay.  Approximately how many police promotional exams

15  would you say that you've been actively involved with the

16  design and administration of?

17  A.   For police promotional, I would say it's in the range of

18  300 to 350 exams.

19  Q.   Okay.  And do these range from small to large cities?

20  A.   Yes, they do.

21  Q.   Okay.  Okay.  I'll get back to that in a second.  What is

22  your educational background, please?

23  A.   I have a Ph.D. in industrial organizational psychology.

24  Q.   And where is that from?

25  A.   The George Washington University.

1   Q.   And do you have a master's degree?

2   A.   Yes, that degree is a combined master's/Ph.D program.

3   Q.   And is that also from George Washington?

4   A.   Yes.

5   Q.   And where did you go to undergraduate school?

6   A.   Rutgers University.

7   Q.   Okay.  Can you tell me what you first did after you

8   received your Ph.D.?  What was your first job assignment?

9   A.   After I received my Ph.D. I joined a small consulting firm

10  in Columbia, Maryland, called Human Systems Technology.  And

11  that company was a very -- it was a very small consulting firm.

12  Q.   And what year did you get your Ph.D.?  I forgot to ask you

13  that.

14  A.   1989.

15  Q.   What was the next job that you had after you worked for

16  the small consulting company?

17  A.   I became the director of public safety testing for Fairfax

18  County, Virginia.

19  Q.   And for those of us who are not familiar with Fairfax

20  County, Virginia, can you give us an idea of what the size of

21  the police and fire departments were in Fairfax County?

22  A.   Back when I was working there in the early '90s --

23  Q.   Yes.

24  A.   -- there were around 1,000 to 1,200 uniformed officers in

25  each of those -- there were fewer in fire.  Maybe around a

1    thousand in fire and 11- or 1200 in police.

2    Q.    Okay.  And how many years were you the director of

3    personnel testing for that county?

4    A.    For four years.

5    Q.    Okay.  And during that four years were you involved in the

6    creation, design and administration of police promotional

7    exams?

8    A.    Yes.

9    Q.    And the same for fire?

10   A.    Excuse me?

11   Q.    The same for fire?

12   A.    Yes.

13   Q.    After -- at some point in time you left Fairfax County, I

14   take it?

15   A.    Yes.

16   Q.    And what did you do next?

17   A.    I began my firm, which is Fields Consulting Group.

18   Q.    And what year was it that you began your firm?

19   A.    I incorporated while I was still working for Fairfax

20   County in May of '92, and I left Fairfax County January '94.

21   So I began work in my firm towards the end of '93 into the

22   beginning of '94.

23   Q.    Okay.  Now, I want to take you through some of the work

24   that you've done with respect to promotional selection.  And

25   let me ask you first:  Have you worked for the federal

1    government?

2    A.    Yes, I have.

3    Q.    Not as an employee but in your consulting business?

4    A.    Yes, I have.

5    Q.    Okay.  Can you tell me what you've done in the field of

6    law enforcement and promotional testing for the United States

7    federal government?

8    A.    I have done promotional exams at the Drug Enforcement

9    Administration, at the Secret Service, at the Library of

10   Congress Police, Bureau of Engraving Police and U.S. Capitol

11   Police, and currently I'm working for the U.S. Park Police, all

12   in law enforcement.

13   Q.    I'm not sure we realized there were that many police

14   departments.

15   A.    There are.

16   Q.    And in addition to that, have you ever been retained in

17   cases by the Department of Justice?

18   A.    Yes.

19   Q.    And how have you been so retained and what kind of cases?

20   A.    They hired me two times for disparate treatment cases, to

21   act as -- to serve as an expert in those cases.

22   Q.    In addition to working for -- doing police promotional

23   testing for the federal government, have you performed police

24   promotional testing for various governmental entities such as

25   municipalities and counties?

A.    Yes, I have.

Q.    Okay.  And can you try to provide us with various towns
and cities and counties and governments for which you've done
police promotional testing other than what you've already
described?

A.    In addition to the federal agencies I described, I have
done work for some large counties including Fairfax County,
since I left Fairfax County, Virginia; Loudoun County,
Virginia; Montgomery County, Maryland; Howard County, Maryland;
Prince George's County, Maryland.  I think those are the
counties.

       The cities I have developed police promotional exams and
selection exams for include -- these are some of the smaller
cities -- the city of Falls Church, Virginia; Frederick City,
Maryland.  Some of the larger cities are the City of Memphis,
Tennessee; the City of Charlotte, North Carolina; the City of
St. Louis, Missouri; the City of Macon, Georgia; the City of
Fairfax, which is within the County of Fairfax, Virginia.  I'm
sure there's -- the City of Alexandria, Virginia.  There will
probably be a couple more that I'll think of as I go, but those
are off the top of my head.

       And then I have done some work in some smaller towns such
as the Town of Vienna, Virginia; the town of Warrenton,
Virginia -- I just remembered the town of Fredericksburg,
Virginia.  The City of Richmond, Virginia, is a larger one.

1    I'm sorry I'm intermixing.

2        I have also done some work for some transit departments

3    including the Metropolitan Washington Transit Police, the

4    Metropolitan Washington Airports Authority Police and Amtrak

5    police.

6    Q.    Okay.  And just to help you out here, have you ever done

7    work for the FAA law enforcement authority?

8    A.    The Federal Aviation Administration, I believe FAA is, was

9    not law enforcement work, but I have done a supervisory

10   selection program there, yes.

11   Q.    Okay.  How about the City of St. Louis?  Have you done

12   work for them?

13   A.    Yes.  I mentioned them, I think.

14   Q.    Okay.  And what did you do for the City of St. Louis?

15   A.    I developed promotional exams for police, sergeant,

16   lieutenant and captain.

17   Q.    Okay.  And -- okay.  All told -- let me just focus a

18   minute for police sergeant's exams -- how many police sergeant

19   exams have you been involved in constructing?

20   A.    About 80.  8-0.

21   Q.    And with respect to the larger cities that you named, does

22   that include the City of Memphis?

23   A.    Yes, it does.

24   Q.    The City of St. Louis?

25   A.    Yes.

```
 1   Q.   Charlotte?

 2   A.   Yes.

 3   Q.   Charlotte, North Carolina?

 4   A.   We're in the process of writing one right now.

 5   Q.   Okay.  Richmond?

 6   A.   Yes.

 7   Q.   And Macon, Georgia?

 8   A.   Yes.

 9   Q.   And for these other -- these counties that you mentioned

10   already?

11   A.   Yes.

12   Q.   In addition to your activities that you've described, do

13   you belong to any law enforcement organizations from which you

14   glean knowledge of the job of a police sergeant?

15   A.   Yes.

16   Q.   Can you tell me about that, please?

17   A.   I am a member of the International Association of Chiefs

18   of Police.  I serve -- I was appointed by the president of the

19   IACP, which is the International Association of Chiefs of

20   Police, to the diversity council for that organization; I work

21   for the Virginia Public Safety Foundation, which is a

22   foundation that provides money to officers' families who died

23   in the line of duty; I am a member of the Virginia Chief of

24   Police Organization; I -- that's all I can think of right now.

25   Q.   Okay.  In the course of your work have you had occasion to
```

1  study the job of a police sergeant?

2  A.    I have been studying that position for 20 years.

3  Q.    Okay.  And can you tell the Court briefly what kinds of

4  things you've done to assess what the job of a police sergeant

5  is?

6  A.    I and my employees have gone out and interviewed police

7  sergeants while they were performing their duties.  We have

8  observed them and participated in their job tasks; we have -- I

9  have talked to many police sergeant supervisors, including

10  lieutenants and captains and majors and deputy chiefs and

11  chiefs, about the position of police sergeant.

12  Q.    Have you actually gone out and watched police sergeants

13  perform their job?

14  A.    Yes.

15  Q.    How often have you done that?

16  A.    An uncountable number of times.

17  Q.    Okay.  Do you meet with so-called subject-matter experts

18  who are discussing what the duties of police sergeants are?

19  A.    Yes.

20  Q.    And how often have you done that?

21  A.    Sometimes on a weekly basis.

22  Q.    Let me ask you the same thing just very briefly for fire

23  lieutenants.  Have you done -- have you assessed what fire

24  lieutenants do?

25  A.    Yes.

1    Q.    And how often have you done that?

2    A.    Almost as often as police sergeant.

3    Q.    Okay.  And let me ask you:  Have you ever been retained

4    before by a private plaintiff, other than the government, to be

5    an expert witness for a plaintiff in a disparate impact case?

6    A.    I have not.

7    Q.    Okay.  Have you been retained by government entities to be

8    an expert witness before today?

9    A.    I was once by the City of Macon.

10   Q.    Okay.  So what percent -- what percentage of your work

11   would you say is so-called forensic work, that is, being an

12   expert witness, being retained by somebody?

13   A.    1 or 2 percent of my time.

14   Q.    Okay.  Why did you agree to become an expert witness in

15   this case?

16   A.    As I recall, Dr. Wiesen contacted me and we discussed that

17   Dr. Landy had passed away and that he was interested if I would

18   be interested in replacing Dr. Landy in this case.  So I asked

19   him to please provide me with some of the materials that were

20   available, such as the expert reports which were available at

21   the time, so I could read them and see what the case was about.

22   Q.    And did you review the expert reports for both sides?

23   A.    I think so, yes.

24   Q.    And based upon that, did you come to a decision as to

25   whether you would agree to be an expert witness in this case?

1    A.    I think that we had a discussion, you, Dr. Wiesen and I,

2    and we discussed it.  And I was very surprised about the amount

3    of adverse impact that I saw in the reports, and I was also

4    surprised that to me there did not appear to be validity

5    evidence to support the exams.  But I think the reason I really

6    wanted to become a part of this case is because it seemed to me

7    that this situation, the adverse impact and the lack of

8    validity, had gone on for more years than -- I couldn't imagine

9    that, if it were me developing the exam, I could get away with

10    such level of adverse impact and no validity for so many years.

11    Q.    Let me ask you:  You said you've -- I think you said about

12    three -- you designed and administered about 300 police

13    promotional exams; is that correct?

14    A.    300 to 350, I think.

15    Q.    For the positions of sergeant, lieutenant, captain, deputy

16    and chief?

17    A.    And major.

18    Q.    And major.

19          And in all those examinations that you've done over your

20    career, have any of them only had a multiple-choice

21    job-knowledge test and a training, experience or seniority

22    rating?

23    A.    No, none of it.

24    Q.    Are you aware of any -- strike that.

25          I take it you get -- you look at requests for proposals

1    all the time from governmental agencies who are seeking to

2    design police promotional exams?

3    A.    Yes.

4    Q.    Okay.  And can you just tell us how that works?  How do

5    you know that a community wants to do a police promotional

6    exam?

7    A.    Well, early in my career my work -- I think people just

8    heard about me in the D.C. metropolitan area, so it's more word

9    of mouth.  And then as my company grew and I got the Drug

10   Enforcement Administration, which is a very large job, we grew

11   and we had some staff -- and I actually hired a person to look

12   for contracts.  And I still have that person.  And there

13   are -- there are websites where you can search for requests for

14   proposals in this domain.

15   Q.    Okay.  And do you go to SIOP conferences?

16   A.    Yes, sometimes.

17   Q.    And do you go to other conferences relating with law

18   enforcement promotional selection techniques?

19   A.    Yes.  I was the president of the Personnel Testing Council

20   of Metropolitan Washington, and I went to many, many luncheons

21   and conferences for that organization for the last -- since I

22   went to graduate school, so back since the early -- in the mid

23   '80s; and the American Psychological Association.

24   Q.    Let me ask you based on your work in the field and your

25   knowledge of requests for proposals that are being put out, do

1    you know of any large jurisdiction -- governmental jurisdiction

2    anywhere in the United States that only uses a police

3    promotional exam for sergeant that consists only of a

4    multiple-choice job-knowledge test and a seniority or training

5    and experience rating?

6    A.    I do not.

7    Q.    Would you ever recommend such a process?

8    A.    No, I would not.

9    Q.    And we'll get back to that.  Let me ask you while I finish

10   out your background:  Have you given talks and lectures in the

11   field of police promotional selection techniques?

12   A.    Yes.

13   Q.    And what have you done in that regard?

14   A.    That reminds me of another organization which I

15   participate in, and that's the Commission on Accreditation for

16   Law Enforcement accreditation.  I always forget what those

17   letters -- and there I present -- they have sections of their

18   accreditation procedures on how to validate promotional

19   procedures, and I give presentations that give practical

20   methods to police organizations and police chiefs on how to go

21   about validating promotional procedures.

22        I give supervisory courses to law enforcement personnel;

23   in fact, I'm giving one in the next month.  I give some

24   leadership courses.  I just developed a technical training

25   program for police working with subject-matter experts.  For

1    detectives, actually.

2    Q.    And have you published any books for police officers and

3    firefighters who are seeking to take promotional exams?

4    A.    Yes.

5    Q.    What have you published in that regard?

6    A.    I published a book recently on how to prepare for

7    assessment centers and interviews.

8    Q.    And why did you prepare that book, other than to make some

9    money, I suppose?

10   A.    I prepared that book because people that I work with

11   expressed a need for that kind of information.

12   Q.    And have you done the same for fire -- in the fire

13   service?

14   A.    Yes.

15   Q.    All right.  Now, with respect to this case, what materials

16   have you reviewed?

17   A.    I have reviewed the expert reports of Dr. Landy and his

18   supplement; Dr. Outtz and his supplement; Dr. Silva and his

19   supplement; Dr. Wiesen and his now, I believe, three

20   supplements.  I have reviewed the job analysis report from 1991

21   produced by HRD; I have reviewed the 2002 Morris & McDaniel job

22   analysis report; I have reviewed the 2005, 2006, 2007, 2008 HRD

23   police sergeant exams for the state, and also the 2005 and 2008

24   exams for Boston for police sergeant; and I have also looked at

25   the T&E -- I called it the T&E.  T&E and E&E, they're

1    interchangeable.  Education and experience, training and

2    experience, those are commonly interchanged.

3    Q.    And have you consulted any -- let me ask more directly:

4    Have you consulted the Uniform Guidelines on employee selection

5    in coming to your conclusions in this case?

6    A.    Yes.

7    Q.    And finally, have you looked at any of the literature

8    relating to the subject in coming to your conclusions in this

9    case?

10   A.    Yes.

11   Q.    Okay.  And can you just tell us briefly what are some of

12   those articles and books that you looked at in connection with

13   this case?

14   A.    Yes.  There is an article by Irv Goldstein, Zedeck and

15   Schneider that was published in '93 that talks about how you

16   take job analysis data and create a content-valid test.  And

17   that is an article that I rely on in my day-to-day work.  I

18   reviewed -- also, Irv Goldstein's son, Harold Goldstein,

19   produced an article in 1999 on assessment centers and things

20   that can cause adverse impact in assessment centers.

21        A man named Phil Lowry published an article in '84 on

22   structured panel interviews and how they can be less costly

23   than assessment centers but they are equally valid.  There is a

24   1991 article by Hugh Oswald and Ployhart which is an extremely

25   thorough review of adverse impact and how you ameliorate it.

1          There is an extremely comprehensive article that came out

2    in 2008 by, I believe, Holtz and Ployhart that talks about the

3    validity adverse impact dilemma; there is an article that I

4    reviewed -- there was a book chapter in Dr. Outtz's recent book

5    on validity, utility and adverse impact.  I believe that was by

6    Casio and Jacobs and Dr. Outtz himself.  There was -- there's a

7    book I rely on when I write job-knowledge tests by Haladyna

8    which is published -- I think their recent edition might be

9    2004-ish, that talks about how to construct proper

10   multiple-choice test questions.

11         I employed the "Principles and Use and Validation of Test

12   Procedures" which is written by the Society of Industrial

13   Organizational Psychology.  I feel like there's a few -- oh, I

14   was also looking at some articles on situational judgment

15   tests, and they would be by McDaniel and Guyon and also by

16   Schmitt and Chan, and a few other -- Polokus and Wetzel, all of

17   them have studied situational judgment tests.

18         I could stop now.

19   Q.   Okay.  That's fine.  McDaniel that you referred to, that's

20   different from the Morris and McDaniel that's come up in this

21   case?

22   A.   Yes, it is.

23   Q.   Okay.  I just want to -- and have you also reviewed a

24   presentation that was given by SHL before Dr. Landy's death?

25   A.   Yes.  The 2009 presentation by Dr. Outtz, yes.

```
 1        And also, one last thing, the brief in Ricci v. DeStefano.
 2   Q.   Okay.  That was the brief by seven eminent industrial
 3   psychologists?
 4   A.   The amicus brief.
 5   Q.   The amicus brief.  All right.  We'll get back to that.
 6        I would like to ask you first:  In the police promotional
 7   examinations that you've designed, have you utilized components
 8   in your examination procedures other than a multiple-choice
 9   job-knowledge test?
10   A.   Yes.
11   Q.   Okay.  And is there a reason why you have done that?
12   A.   Yes.
13   Q.   And can you tell me what the reasons are, please?
14   A.   Because a job-knowledge test only measures job knowledge
15   and the position of -- all of the positions that I design tests
16   for that are in the supervisory ranks require many other
17   knowledge, skills and abilities other than just job knowledge.
18   Q.   Okay.  We'll get back to that.  But can you tell me what
19   some of the components -- other components are that you've
20   added to police promotional exams?
21   A.   Yes.  I have developed predominantly assessment centers.
22   That is my biggest area of work; also, structured panel
23   interviews; also, situational judgment tests in written and
24   video format.  I have used accomplishment records which
25   essentially are candidates providing information about
```

1  themselves regarding the necessary KSAOs -- knowledges, skills,

2  abilities, other characteristics.  "KSAPs" sometimes they're

3  called, "competencies" they're sometimes called, "job

4  dimensions."  And I use those interchangeably.  I apologize,

5  sometimes I forget.  So they talk about their own competencies

6  in an accomplishment record; I have used physical exams in the

7  past -- not for supervisory positions.  I think that's the

8  majority of them.

9  Q.    Okay.  And have you used techniques for preparing officers

10  for a promotional exam that you have found effective?

11  A.    Yes.

12  Q.    Can you tell us about that, please?

13  A.    Yes.  There's a great deal of research that says test

14  preparation can help improve job -- test performance.  And I

15  have -- some of the literature that has come out in recent

16  years sort of describes what I've been doing all of these

17  years, because I've been doing this since I've been at Fairfax

18  County.  Because what I noticed is test preparation gives a

19  little bit of exposure to the test format to candidates.  So it

20  allows them to demonstrate their true knowledge, skills and

21  abilities when they're in the test environment because they're

22  not so anxious about the format, and they're also given study

23  methods so that they can prepare themselves properly to take

24  whatever the promotional process would be.

25  Q.    And are these mandatory meetings that officers have to go

1    to or non-mandatory?  Do you have to pay for it?  Can you take

2    us through that, how it actually works in practice?

3    A.    There is -- different police chiefs, I would say, more so

4    than -- this would be more in the hands of -- police chiefs

5    have different philosophies about whether a test prep class

6    should be mandatory or not mandatory.  Some of the more

7    traditional beliefs are that it should be not mandatory, and if

8    you want to go, you could go on your own time on your own dime.

9         I am of the belief that if you would like to improve

10   adverse impact you should make the courses mandatory because

11   then everyone is given equal footing for the exam.  So if I can

12   convince the police chief that it should be mandatory, I would

13   rather have it be mandatory.

14   Q.    Okay.  Now, I want to take some of these up.  And let me

15   ask you first a general question:  Have you reviewed evidence,

16   and in your own personal work have you been able to determine

17   the relative disparate impact, or adverse impact, between these

18   types of assessment centers and situational judgment tests and

19   structured interviews versus multiple-choice job-knowledge

20   tests?

21             MR. LEAHEY:  Objection.  Foundation.

22             MS. HARRIS:  Objection.

23             MR. CARROLL:  Objection.

24             THE COURT:  Overruled.

25             THE WITNESS:  Can you please repeat the question?

```
 1          MR. LICHTEN:  I can rephrase the question, although
 2     then I'll maybe get some more objections, so since I have your
 3     endorsement...
 4          THE COURT:  Go ahead.
 5          (The reporter reads the pending question.)
 6          THE WITNESS:  The answer is yes.
 7     BY MR. LICHTEN:
 8     Q.   And what have you determined?
 9     A.   When I look at the adverse impact of each of these
10     components, I generally look at a statistic known as
11     "standardized mean differences," which we call D for shorthand.
12     And just briefly, a D ranges from negative one -- that's not
13     true.  It goes from negative to positive.  And the more highly
14     positive the more Caucasians outperform minorities; zero means
15     there's no difference; and a negative -- the higher the
16     negative, it means that minorities outperformed Caucasians on
17     whatever the device was.
18          And we find different results, but in general the
19     assessment center exercises -- many of them have very, very
20     little -- small Ds, near-zero Ds.  Anywhere from zero to .3 or
21     .4 would be what I would consider good.  Or sometimes they're
22     negative, meaning minorities outperform Caucasians.  We
23     sometimes -- the job-knowledge tests range anywhere from .5 to
24     sometimes 1 or a little over 1, which is a little -- that's a
25     little bit higher than the assessment center type Ds.
```

 1          The structured panel interviews have generally low mean
 2     score differences between minorities and non-minorities.  The
 3     accomplishment records have little to no difference between
 4     minorities and non-minorities.  Situational judgment tests I
 5     have found is consistent with the literature that I've read,
 6     and heavy knowledge items may have more mean score differences
 7     than what we call "behavioral tendency items," which are items
 8     where you watch a video and you ask a candidate, "What are you
 9     most likely to do to respond to this situation?"  That's a
10     behavioral tendency item and those tend to have very little
11     difference between minorities and non-minorities.  But if you
12     ask them what procedure you would apply to the situation or
13     what specific knowledge is required for the video they are
14     watching, then sometimes that has higher mean score
15     differences.
16     Q.   Now, I want to try to take you through some of these
17     individual -- other mechanisms that you've talked about.  Let's
18     start with the situational judgment test because it -- first,
19     can you just describe for the Court what a situational judgment
20     test or question is as opposed to a multiple-choice job
21     knowledge question?
22     A.   Yes.  A situational judgment test -- we don't want to
23     confuse the format of the test with the type of test question
24     we're talking about.  So there's different formats that a
25     situational judgment test question can be asked in.  But what

1    it generally is, a situational judgment test question provides

2    a situation that a candidate might find him or herself in in

3    his or her job and asked what is the correct response, what is

4    the best response, what might they do.

5    Q.    Okay.  And can these questions be asked either on paper or

6    in some other format?

7    A.    There are many ways you can ask the questions.

8    Q.    Okay.  Can you give us some examples of how the questions

9    are asked?

10   A.    Okay.  We'll talk about paper-and-pencil styles first.  So

11   you would read a scenario, hopefully short and sweet and to the

12   point, ask "How would you respond?"  And then the way you are

13   asked how you would respond could be different:  One way is

14   just a straight multiple-choice question.  "How would you

15   respond?" and there was one correct answer.  Another way is,

16   "Here are several answers.  What is the best one?" and

17   candidates would choose the best one, but they may get points

18   if they choose the second-best one or the third-best one.  So

19   that's what we call the scaled response.  You could also ask,

20   "What would you do?" and let them write an essay.  So

21   that's -- those are the paper-and-pencil formats.

22        A video format would be you watch something that you might

23   encounter in the real world, and then the question styles are

24   the same.  You could either be asked a multiple-choice question

25   about that video that you just watched and asked, "What would

```
 1    you do?" one right answer in a multiple-choice format, or "What
 2    is the best thing you could do to handle the situation?" and
 3    then there could be scaled responses:  a best answer, a
 4    second-best answer, a third-best answer, a fourth-best answer;
 5    and then there is just an open-ended response where you could
 6    just write, "Here's what I would do."  And there would be no
 7    limits to that.
 8    Q.    Could you speak into a camera saying what you would do?
 9    A.    Yes.
10    Q.    Okay.  And is that another format that's used?
11    A.    Yes.
12    Q.    Now, just so we're clear, the information that you're
13    trying to elicit with these situational judgment tests, is it
14    similar or different to the type of information that you're
15    trying to elicit with these supposed multiple-choice
16    job-knowledge tests?
17    A.    Could you please rephrase that question?
18    Q.    Sure.  What are you -- what are you seeking to test the
19    candidate for when you provide these situational judgment
20    tests?
21    A.    What are you seeking -- I'm sorry -- one more -- what are
22    you seeking --
23    Q.    Yeah.  What are you testing for?  What kinds of
24    knowledges, skills and abilities are you testing for when you
25    give a situational judgment test?
```

1    A.    Well, you're generally testing for knowledge and

2    reasoning.  If it's a paper-and-pencil format, it's going to be

3    pretty much limited to those two things.  If it's a video

4    format or you can speak orally, then you can go beyond those

5    skills to oral skills, and perhaps even planning and

6    decision-making.  If it's oral, you have more options.

7    Q.    Okay.  So my question is:  When you give a multiple-choice

8    job-knowledge test, I assume you're testing for job knowledge;

9    is that accurate?

10    A.    Correct.

11    Q.    When you give a situational judgment test in some of the

12    formats that you've described, can you also be testing but in a

13    different way for these same knowledges?

14    A.    Yes.

15    Q.    Is there evidence in the field, or based upon your

16    experience, as to the disparate impact of situational judgment

17    tests and responses as compared to job-knowledge

18    multiple-choice tests?

19    A.    Yes.

20    Q.    And can you tell me about that, please?

21    A.    The literature does say that placing someone in a

22    situation and asking them how they would respond, whether

23    they're telling you about their knowledge or their behavior, is

24    more relevant to the job and it does result in less adverse

25    impact.  Now, that is dependent upon how well those items are

1    constructed.  If they are constructed simply and to the point

2    so that it's not a reading test so that you don't have to waver

3    through a tremendous amount of material, then ultimately you

4    would expect that the adverse impact would be low.

5    Q.    Has that been your actual experience?

6    A.    Yes.

7    Q.    And is there literature -- authoritative literature that

8    supports that proposition?

9    A.    Yes.

10   Q.    Can you discuss -- are you familiar with what some of

11   those articles are?

12   A.    Well, I mentioned McDaniel, and his co-author was Guyon.

13   I think that was a 2003 article.  They talked about this very

14   topic.  I believe also Chan and Schmitt in the late '90s or

15   around 2000 also talked about this very topic.  And I think the

16   broad-based article in 2008 talked -- for Holtz and Ployhart

17   talked a lot about SJTs -- situational judgment tests -- having

18   less adverse impact than regular job-knowledge-type items.

19   Q.    And you may have said this, but do you yourself have an

20   opinion as to the relative adverse impact, if any, between

21   situational judgment tests, the tests for knowledge, and

22   multiple-choice job-knowledge tests such as are involved in

23   this case?

24              MS. HARRIS:  Objection.

25              MR. CARROLL:  Objection.

1           THE COURT:  Overruled.

2           THE WITNESS:  I'm sorry.  Can you please repeat that

3    question?

4           (The reporter reads the pending question.)

5           THE WITNESS:  It is my experience that situational

6    judgment test questions have less adverse impact and are

7    perceived by applicants to be fairer and perhaps even, they've

8    said, easier to take.

9    BY MR. LICHTEN:

10   Q.   Okay.  And do you have an opinion as to why that is?

11   A.   Yes.

12   Q.   What is that?

13   A.   I believe that anything that is closer in proximity to the

14   job is fairer to all applicants because it has higher realism

15   and it's based upon things they actually do on -- in their

16   jobs.

17   Q.   Now, I want to switch subjects just for a minute to the

18   question of validity.  In your experience and based on the

19   literature that you've reviewed, is there validity to

20   situational judgment tests?  And before you -- well, let me ask

21   you that first:  Is there validity to situational judgment

22   tests?

23   A.   Yes.

24   Q.   And just as a preface, can you describe to the Court how

25   you define "validity," so we're all on the same page?

1    A.    "Validity" is research that proves or demonstrates that

2    your test -- the inferences you make from your test are

3    accurate, so whatever you're using your test for is accurate.

4    Q.    Okay.  And what is the research, if any, on situational

5    judgment tests?

6    A.    The validity of?

7    Q.    Yes.  Sorry.

8    A.    I believe the validity of SJTs are considered about

9    equivalent to assessment centers -- now, this would be the

10   criterion-related validity coefficients, but they're in their

11   high .3s, like .37, .40, in that vicinity.

12   Q.    Okay.  I want to move on for a moment to structured

13   interviews.  Can you describe first to the Court what the

14   structured interviews are, the type that you're talking about

15   that are used in police promotional procedures?

16   A.    Structured panel interviews are -- what makes them

17   structured are that they're standardized from candidate to

18   candidate.  So every candidate generally receives the identical

19   questions and are rated on the same criteria with the exception

20   that if you have many, many candidates and they have to go over

21   a period of days, you might have to develop parallel forms.

22   But they would be measuring precisely the same thing.

23        And the interview would be administered precisely the same

24   way for every candidate.  And a panel of judges, or raters or

25   assessors, all interchangeable, again, would be trained to use

1    the rating criteria to accurately rate the candidates.  And the

2    rating panels are -- there are different numbers of raters

3    depending on the desires of the jurisdiction you're in.  But

4    you want it to be a diverse panel.

5    Q.    And with respect to the question of whether this panel

6    should be external to the agency involved or internal, how is

7    that usually done or what is the standard procedure?

8    A.    The majority of police departments that I work for have

9    gone all external, meaning that no internal employees will

10   assess candidates.

11   Q.    And you recommend that in your practice?

12   A.    I do.

13   Q.    And why is that?

14   A.    Just because the preparation of bias from the candidate

15   population is so strong that it's -- even if there is no bias,

16   it's not really overcomable.

17   Q.    Two questions about that:  How do the external panel

18   numbers know what the practices or what the right answers are

19   in the police department for which they're being invited to be

20   panel members?

21   A.    That's a good question.  The -- we bring out for the

22   questions the actual procedures from the department.  Like, for

23   example, the general orders we would bring out and have the

24   raters read the general orders and study them for the relevant

25   questions that they are going to score.  If there

1    is -- sometimes there's terminology -- one of my favorite

2    examples is "make the scene."  In Memphis, they make the scene.

3    I don't think anybody else in the country makes a scene.  It

4    means respond to the scene or go to the scene.  And when other

5    raters hear "make the scene," they honestly don't know what

6    that means, and so you call in a high-ranking official and ask

7    them, "What does 'make the scene mean'?"

8         So we work out terminology and we work out an

9    understanding of the general orders and the jurisdiction and

10   the community, et cetera, before we administer the process as

11   part of the training.

12   Q.   And then putting aside the terminology, how do you train

13   them on what the right answers are for these panel interviews?

14   A.   Well, we develop a rating scale.

15   Q.   I see.

16   A.   And the rating scale has behavioral benchmarks in it that

17   provide examples for the raters of exceptional levels of

18   performance, moderate levels of performance or minimally

19   competent levels of performance, and then ineffective

20   performance.  And what we do is we train the panel with live

21   candidates who are not real candidates -- they are just

22   practice candidates -- who will take the process for the panel

23   and they will answer the questions, and the panel practices

24   scoring them using the rating criteria, again and again, until

25   they consistently understand the rating scale and can provide

1    consistent ratings.

2    Q.    Okay.  Now, how do you guard against -- I think I have

3    this term right -- "interrater reliability"; that is, if you

4    have a large jurisdiction and need more than one panel of

5    external assessors, how do you ensure that one group isn't a

6    hard judge and one group isn't an easy judge?

7    A.    What we do is we statistically calculate the means for

8    each one of the rating panels to see if they are statistically

9    significantly different.

10   Q.    I see.

11   A.    And if they are, there is a process called

12   "standardization," and that is a whole statistical process of

13   putting the data on the same scale for each panel, which is a

14   widely accepted professional practice.

15   Q.    Okay.  Now, again, turning to a large jurisdiction, let's

16   say like the City of Boston, what about a concern that if you

17   did structured external interview panels it would be infeasible

18   because you couldn't do enough in a day, and if you did it more

19   than one day people -- word would leak out to what has gone on?

20   What would be your response to that?

21   A.    Well, first of all, this -- I do this all the time, so

22   it's doable, and here's how.  You -- for example, here's one

23   strategy, and there's many:  You can tape -- you get a large

24   number of rooms, say 30 rooms.  And so 30 candidates --

25   Q.    We have a couple of colleges here in Boston.

1    A.   You could use a middle school; you could use a college;

2    you could use a high school; you could use a convention center;

3    we do this -- I can't even admit where I've done all of these

4    tests all over the place.  And you need a place with a large

5    number of rooms.  That sets the key.

6        And then 30 candidates, 40 candidates, 50 candidates can

7    go at one time.  They're being videotaped in each one of those

8    rooms simultaneously.  You sequester them, meaning you just

9    hold them until all of the groups have gone.  And so if you

10   were going to do 600, which I know is the number we've been

11   talking about in Boston, you divide by -- we'll just divide by

12   any number, 50 in this case, or 40 or 30.  And then that would

13   tell you how many groups you would have to do and how long

14   candidates would have to wait before they would be excused for

15   the day.  So in theory, you could do a structured panel

16   interview for all 600 in a day.

17   Q.   Okay.  So how do they get scored, then, if they're being

18   videotaped?

19   A.   Well, we have backup systems.  So we don't just use one

20   video camera; we have two video cameras at a minimum in each

21   room.  And then we have a quality-control procedure to make

22   sure that the candidates have been successfully videotaped and

23   audiotaped before they leave.

24       Then we take all these tapes and we can -- oftentimes I go

25   back to Washington, and in Washington we bring -- that's where

1   we bring the assessors, and we stay there for whatever number

2   of days it takes to do that scoring.

3   Q.   How prevalent is the practice of structured interview

4   panels along the lines that you've just suggested in police

5   promotional exams?

6   A.   I think they're very prevalent.  I don't have an exact

7   number but...

8   Q.   And are they prevalent in large cities as well as small

9   cities?

10  A.   Yes.

11  Q.   Now, is there literature -- and based upon your own

12  personal experience in the field, do you have an

13  opinion -- let's talk first about validity -- about the

14  validity of structured interview panels?

15  A.   My opinion of the literature or both?

16  Q.   Both.  Is it different or the same?

17  A.   The literature says that structured panel interviews are

18  equally valid to -- or more so than job-knowledge tests.

19  Q.   Okay.  So let's just focus on that for a minute.  The

20  literature establishes what again?  Just say that again?

21  A.   That structured panel interviews are more valid -- they

22  are considered -- according to one article, Schmitt and Hunter

23  1998, which is a review of the utility and validity of many,

24  many different alternatives, the SPI, the structured panel

25  interview, is right up there with general mental ability which

1  is the -- according to them, the highest criterion-related

2  validity.

3  Q.   Okay.  And what is the coefficient, just so we're clear of

4  what we're talking about?

5  A.   .51.

6  Q.   So structured panel interviews have been shown to have a

7  .51 validity?

8  A.   Yes.

9  Q.   Okay.  And remind us again of what job-knowledge tests

10  have been shown in the literature to have for a validity

11  coefficient?

12          MR. CARROLL:  Objection.

13          THE COURT:  Overruled.

14          THE WITNESS:  In that same article it's reported to be

15  .48, but there in recent years that ranges have been everywhere

16  from .1 to .48.

17  BY MR. LICHTEN:

18  Q.   Okay.  So let's -- your opinion as opposed to the

19  literature's opinion, what is your opinion based upon your

20  personal experience as to the validity of structured panel

21  interviews as opposed to job-knowledge multiple-choice tests?

22          MS. HARRIS:  Object.  It goes beyond the scope of her

23  report.

24          THE COURT:  How can I tell that?

25          MR. LICHTEN:  I didn't hear the objection.

```
 1              THE COURT:  It goes beyond the scope of her report.
 2              MS. HARRIS:  It goes beyond the scope of the expert
 3    report that was provided.
 4              THE WITNESS:  Can I review my report for a minute?
 5    Because I think I talked about alternative strategies.
 6              MS. HARRIS:  She did talk about alternative
 7    strategies, but I was not aware there was ever an opinion that
 8    there was alternative strategy that replaced --
 9              THE COURT:  I'll tell you what.  I'll take it and you
10    can address it on cross.
11    BY MR. LICHTEN:
12    Q.   You can answer the question.
13    A.   Can you repeat the question, please.
14              (The reporter reads the pending question.)
15    BY MR. LICHTEN:
16    Q.   Just remember that whatever you write down, Mr. Carroll is
17    going to want to see.
18    A.   I know.
19              (Laughter.)
20              MR. CARROLL:  And not from the podium, either.
21              THE WITNESS:  The validity of content valid- -- well,
22    structured -- I have been able to have highly
23    content-valid structured -- I've been able to develop and
24    implement highly valid structured panel interviews and
25    job-knowledge tests.  I think they enhance -- the validity of
```

1    each enhances each other.  Rather than compare them, I'd rather

2    say that when combined, they enhance each other.

3    BY MR. LICHTEN:

4    Q.   Now, let me -- while you mention that, let me ask you:  In

5    your test that you give, particularly in the large cities, in

6    Richmond, Charlotte, Memphis, St. Louis, Macon, do you use one

7    component or multiple components?

8    A.   All of them have multiple components.

9    Q.   Okay.  And can you describe for us whether when you give

10   multiple components -- the effect that has on validity; that

11   is, does it enhance or increase validity when you give multiple

12   components?

13   A.   According to the literature, it definitely enhances

14   validity.

15   Q.   Can you describe why that is, please?

16   A.   Yes.  Because you can measure almost all of the critical

17   knowledge, skills and abilities and other characteristics when

18   you use multiple components.

19   Q.   I see.  And what about your experience?  Based upon your

20   experience, do you have an opinion as to whether giving more

21   than one component enhances or decreases validity?

22   A.   I believe it definitely enhances validity because I am

23   able to measure most to all, and I do try to measure all of the

24   critical knowledge, skills, abilities and other

25   characteristics.

1    Q.    Okay.  Let me ask you next about the adverse impact, if

2    any, from the use of structured interview panels.  Is there

3    literature on the adverse impact from such a process?

4    A.    Yes.

5    Q.    Can you tell me what that is, please?

6    A.    What is the adverse impact number?

7    Q.    What does the literature tell us about the adverse impact?

8    A.    That it's low.  That it's relatively low.  It's -- I

9    believe the point -- this is the standardized mean difference

10   between about .2 and .3, which is considered low.

11   Q.    Okay.  And that compares how to multiple-choice

12   job-knowledge testings?

13   A.    It is lower.

14   Q.    It is lower for the structured panel interviews?

15   A.    Yes.

16   Q.    Okay.  I want to go on and ask you about assessment

17   centers.  Now, you say you use assessment centers all the time;

18   is that correct?

19   A.    That is correct.

20   Q.    I just want to be clear.  Have you also used, in your law

21   enforcement promotional exam, situational judgment tests and

22   structured panel interviews?

23   A.    Yes.

24   Q.    Okay.  Can you describe for the Court what an assessment

25   center is?

 1   A.    Yes.  An assessment center is a very realistic set of

 2   simulations that a candidate might find him- or herself in.  So

 3   they are -- there could be anywhere from two to, I would say,

 4   four simulations that represent critical duties of the position

 5   and measure the full -- they can measure the full range of

 6   knowledge, skills, abilities and other characteristics.  That

 7   the assessment center can measure all of them.

 8        It is a -- the way it's defined formally, it's multiple

 9   methods with multiple raters, and the beauty of it is that

10   you're putting candidates in multiple situations, and it's

11   compensatory such that if you're weak in one area, you can be

12   strong in another and you could still do well, which is more

13   realistic than, in my opinion, a hurdle approach.  And it is

14   less biased than many methods because there are so many

15   assessors or raters judging a candidate that you are using a

16   number of judgments that you're taking away from human bias.

17   Q.    And what are the types of knowledges, skills or abilities

18   that one can assess using an assessment center?

19   A.    Let me give you some examples of some exercises, and I'll

20   tell you the kinds of things they can measure.

21   Q.    Sure.

22   A.    You can have a role-play exercise, and a candidate comes

23   in and they are meeting with a trained role player who could be

24   their subordinate, who could be their superior, who could be a

25   community member.  And that -- during that role play the raters

1    can assess oral communication skills, interpersonal skills,

2    supervisory skills, leadership skills, in some cases the

3    ability to negotiate and persuade, reasoning and judgment and

4    problem-solving.  And that's just a few of the many.

5         Another good example of a simulation is an emergency

6    incident simulation in which a candidate is placed into a

7    typical simulation in which an emergency is occurring and the

8    emergency itself is not as important as what you're asking the

9    candidate to do, such as request resources, take command,

10   organize and plan.  Again, you know, they're issuing commands

11   so, again, we can measure oral communication ability and

12   leadership ability and definitely reasoning and judgment.  And

13   whether they set up perimeters in a safe location, for example,

14   is a reasoning.  Knowledge of department operations can be

15   measured in that particular exercise.

16        We have another kind of exercise which is typical called

17   an in-basket exercise which is a simulation of the documents

18   you might find on your desk in the morning when you come in.  A

19   police sergeant's -- probably, I would say, most police

20   sergeants say that the number-one most frequently performed

21   task is reviewing their subordinates' incident reports.  So you

22   could put a stack of incident reports in their inbox or their

23   in-basket and ask them to assess what's wrong and right about

24   them.  That would be an in-basket exercise.

25        You could also ask them to write a memo or a letter or a

1    narrative of some sort and measure their written communication
2    skill in such an exercise, you could put them in front of a
3    pretend citizen group and have them make an oral presentation
4    about community issues and crime and methods that the police
5    department is taking to solve those crimes, and, again, you
6    could measure speaking skills, interpersonal skills, knowledge
7    of department operations, negotiate and persuade, reasoning and
8    judgment.  Almost all of the knowledges, skills and abilities
9    can be measured in those formats.
10   Q.   So that was my next question.  Comparing that to a
11   multiple-choice job-knowledge test, some of the things that you
12   test for using a multiple-choice job-knowledge test, can you
13   test for those same things using the different format of an
14   assessment center?
15   A.   Yes.
16   Q.   Now, with respect to assessment centers, let me ask you
17   several questions:  First, what is the feasibility of doing
18   those on the same large-scale basis that we're talking about --
19   and let's take Boston -- let's say you get five, six hundred
20   applicants.  Can it be done for a large-scale process such as
21   that?
22           MR. CARROLL:  Objection, your Honor.  Rather than the
23   word "feasibility" -- it goes to the form of the question of
24   "feasibility."  Feasibility of the community or of the doctor?
25           MR. LICHTEN:  I'll rephrase the question.

```
 1              THE COURT:  Okay.  Go ahead.
 2              MR. LICHTEN:  No problem.
 3    BY MR. LICHTEN:
 4    Q.   Can it be done for a large department such as Boston?
 5    A.   Yes.
 6    Q.   Okay.  And how -- can you describe how it can be done in
 7    that fashion?
 8    A.   Yes.  I'm going to tell you a couple of different ways.
 9    Q.   Sure.
10    A.   In some large jurisdictions, there is a cut score for the
11    written job-knowledge piece, and only a certain number of
12    people can go on.  And my experience with that is that --
13    that's not my favorite approach but it's my second-favorite
14    approach when there are truly limited resources because as long
15    as you take a sufficient number in the top, you can have a
16    diverse pool move on to the next stage.
17    Q.   Okay.  So let me -- that's the so-called term "hurdle"
18    that we've been hearing about?
19    A.   Yes.
20    Q.   Okay.  Go ahead.  I'm sorry.
21    A.   And you could do some research in advance to determine a
22    good number to send on to the assessment center or the
23    phase -- let's call it Phase 2, whatever that consists of.
24    Q.   Gotcha.  And when you use it as a hurdle, are you scoring
25    the job-knowledge test or is it a pass/fail, or could it be
```

1    either?

2    A.    It could be either.

3    Q.    Gotcha.  Go ahead.

4    A.    Okay.  The other option, which is the one I usually try to

5    use for goodwill, is a compensatory model which is you let

6    everybody who passes the job-knowledge test move to the Phase 2

7    component, whatever that is.  So if you have a lot of

8    candidates -- let's just assume for sake of argument you have

9    five to six hundred candidates -- you would probably limit the

10   number of assessment center exercises or the number of

11   structured panel interview questions, but you would make it so

12   that it was feasible to test a candidate perhaps in an hour

13   time frame, maybe two, and then continue with the taping

14   process that I told you earlier.

15       You need an extensive number of rooms, you tape the

16   candidates taking their exercises simultaneously, you sequester

17   them, and then the next group comes through, and so on until

18   you get through.  And just like I said earlier, you take those

19   videotape tapes and you go back to Washington, which is what I

20   do, and the assessors go to that location, and whatever amount

21   of time it takes to score, it takes.

22   Q.    And how prevalent is the use of assessment centers with

23   respect to police sergeant promotional selection procedures

24   throughout the United States?

25   A.    I think they're very prevalent based upon my own

1   experience and I guess the request for proposals I've read.

2   Q.   And is there literature with respect to the validity of

3   assessment centers?

4   A.   Yes.

5   Q.   And what does that literature tell us?

6   A.   That they are -- again, in that Schmitt and Hunter

7   article, the criterion-related validity coefficient was .37,

8   which I said is very similar to what the structured panel

9   interview coefficient is.

10  Q.   And lastly on this subject is there -- strike that.

11       Do you have an opinion as to the validity of assessment

12  center panels if done appropriately?  I'm sorry.  Assessment

13  center exercises if done appropriately.

14  A.   I think that is -- that they have the highest validity, in

15  my experience.

16  Q.   Now, let me ask you with respect to adverse impact.

17  First, in the literature, is there literature on the adverse

18  impact of assessment centers as compared to multiple-choice

19  job-knowledge tests?

20  A.   Yes.

21  Q.   And can you tell us about that, please?

22  A.   The adverse impact of assessment centers is lower

23  than -- generally lower than that of job-knowledge tests.

24  Q.   And what about your personal experience in administering

25  these assessment centers -- based on your experience is there a

1    difference with respect to the adverse impact of assessment

2    centers as opposed to multiple-choice job-knowledge tests?

3    A.    There is a difference.

4    Q.    And what is the difference -- or the difference in favor

5    of which?

6    A.    If constructed well, an assessment center can have very,

7    very low adverse impact.

8    Q.    Have you had that experience?

9    A.    Yes.

10   Q.    Okay.  And again, combining an assessment center with

11   other components, such as a job-knowledge test and training and

12   experience, does that increase or decrease the validity of the

13   overall process?

14   A.    I think it's almost unanimous at this point in the field

15   that it enhances validity.

16   Q.    Gotcha.  And finally on this subject, you talked about

17   another type of test where people talk about their

18   accomplishments.  I forgot the name that you gave about that.

19   A.    It's called an "accomplishment record" and it's also

20   referred to as a "bio data instrument."

21   Q.    Can you tell us about that, please, how it actually works

22   with respect to police promotional selection procedures?

23   A.    Yes.  I'm going to tell you about one that I've developed,

24   so that's about all I could do.  It's a

25   question -- essentially, it's a questionnaire that asks

1    candidates about their years of experience on the job; what

2    they did while they were performing in those years on the job,

3    what assignments they had; asked to describe the assignments

4    relative to the actual knowledge, skills and abilities that we

5    want to assess.  So if you've had an experience, we want to

6    know how it helped you demonstrate one of those knowledge,

7    skills and abilities or other characteristics.

8         We may ask them a page or two on describing two or three

9    examples of how they do, in their current job, demonstrate the

10   knowledge, skills and abilities and other characteristics.  And

11   that can be done in writing or that can be done orally -- I do

12   it using both strategies.  I have them fill out the form and

13   then present their accomplishments.  And, again, it is scored

14   by a panel of raters.

15   Q.   And how does the panel know how to rate the

16   accomplishments in a non-subjective way?

17   A.   They are trained and they have rating criteria.

18   Q.   And can these type of -- can this format be used with

19   respect to large groups, such as five or six hundred

20   applicants, for police sergeant?

21   A.   Yes.

22   Q.   And how is that done?

23   A.   It would be done very similarly to how I described with

24   the structured panel interview.  It could -- if it was -- if it

25   was strictly written, then all we would do is collect their

1    written documents and the assessors would score those; if it

2    was taped, we would videotape it with a backup videotape and we

3    would take it off-site and score it with a trained panel of

4    raters.

5    Q.    Okay.  And when you get this information from candidates,

6    can it include things like whether they speak more than one

7    language, things of that nature?

8    A.    Yes.

9    Q.    And does it include accomplishments outside of the police

10   realm?

11   A.    It can.  Everything that we request in an accomplishment

12   record would be tied specifically to a knowledge, skill,

13   ability or other characteristic that we wanted to assess.

14   Q.    Is there literature in the field that you rely on that has

15   assessed the validity or predictability of using this -- I'll

16   call it bio data procedure, in police promotional selection

17   procedures?

18   A.    Also, in the Schmitt and Hunter article there is a -- I

19   believe it has a criterion-related validity of .35.

20   Q.    And in your experience do you believe that using this

21   component as one of several selection procedures for police

22   promotions is valid?

23   A.    Yes.  I believe that as long as each one of the components

24   you're using are assessing important knowledge, skills,

25   abilities and other characteristics needed for the job, and

1   each are measuring unique ones, that together the validity will

2   be enhanced or increased.

3   Q.   Okay.  And I know there's been some -- you're aware of the

4   T&E component in this case; is that correct?

5   A.   I am.

6   Q.   Do you have an opinion as to the usefulness of this bio

7   data selection component in relation to a T&E component?

8   A.   Do I have an opinion?  Yes.

9   Q.   And what is that opinion?

10          MR. CARROLL:  I object.

11          THE COURT:  Overruled.

12          THE WITNESS:  Was the opinion --

13          Would you repeat the question, please.

14          (The reporter reads the pending question.)

15          THE WITNESS:  Usefulness in relation to a T&E

16   component?

17   BY MR. LICHTEN:

18   Q.   Let me say "validity."  Let me change that to "validity."

19   A.   This T&E does not appear to have been validated to me.  It

20   does not look valid.

21          MR. LEAHEY:  Objection, your Honor.

22          THE COURT:  Overruled.

23   BY MR. LICHTEN:

24   Q.   And do you believe that a -- this bio data component that

25   you've talked about has more validity?

1    A.    The one that I've developed or --

2    Q.    Yes.

3    A.    -- the types I've developed?

4    Q.    Yes.

5    A.    Since I link it and tie it directly to the important

6    knowledge, skills, abilities and other characteristics required

7    for the position of police sergeant, yes.

8    Q.    And finally on this subject, is there literature in the

9    field which you rely on that assesses the relative adverse

10   impact, if any, by the use of these bio data procedures in

11   police promotional selection?

12   A.    Yes.

13   Q.    And what does that literature tell us?

14   A.    That there is almost no difference between minorities and

15   non-minorities on bio data instruments.

16   Q.    I'm going to move on to something entirely different now.

17   A.    Okay.

18   Q.    Okay?  When you are hired to put in place a police

19   sergeant promotional system, are there a series of steps that

20   you're required to go through in order to do it properly

21   according to promotional standards?

22   A.    Yes.

23   Q.    Okay.  And can you describe for the Court what it is that

24   you have to do?

25   A.    Yes.  Let me preface this by saying that the Uniform

1    Guidelines require that a content-valid measure represent the

2    job for which it is being used be representative.  There is

3    published literature on different ways to do that.  The one I

4    rely upon -- and they all have much in common.  The one I rely

5    upon is the Goldstein, Zedeck, Schneider article in 1993 which

6    tells us how to specifically link the job analysis to the test.

7    And so what you're doing is you're linking the job content to

8    the test content, which is exactly what content validity is.

9        So here are the steps that it suggests we follow:  First,

10   we conduct an extensive job analysis.  And the job analysis

11   begins with the interview and observation of job incumbents.

12   And there are many considerations in everything -- every step

13   of the process has many, many considerations.  And since

14   content validity is a judgmental process, what we want to make

15   sure is that we collect as many judgments in the most accurate

16   and independent fashion, which is what the Goldstein, et al,

17   article really says.  It must be accurate and independent.

18       And so the first step is going to see incumbents

19   independently and collecting information about their position.

20   And you want to go see a representative number of those

21   incumbents who are representative of the geographic makeup of

22   the jurisdiction; of the different jobs, because police

23   sergeant has specialties within the jurisdiction; you want to

24   also make sure that you speak to people of different ethnic and

25   gender backgrounds so that you get everyone's perspective on

1    the position, a very complete picture.  And you observe them,

2    because what's interesting is that incumbents will often tell

3    us things that, when you watch it, you -- they don't

4    necessarily coincide.

5        So you're collecting all this task information and you're

6    collecting -- while you're watching them, you ask questions

7    such as, "Okay.  I see that in this task you are speaking to

8    so-and-so, so obviously you need oral communication skills

9    here."  And they will say "Yes."  So you're collecting the

10   knowledge, skills and abilities at the same time you're

11   analyzing tasks.

12       We come back to our office and we write down all of the

13   tasks and all of these knowledge, skills and abilities and

14   other characteristics that we have observed and discussed with

15   the incumbents.  And, you know, if we're involved in a case

16   that's very -- it really requires a level of rigor, we might

17   speak to all the supervisors as well just to double-check back

18   on what the subordinate sergeants have said.  We may even speak

19   to subordinate officers.  We want a real full 360 opinion of

20   what the job is.

21       So we collect all that information, put it into lists, a

22   task list and a KSAO list -- we're calling them KSAPs here, I

23   believe.  And this list is a very first step.  The next step

24   with these lists is to have all of the incumbents, or as many

25   of the incumbents as possible, give an opinion about those

1  tasks and those KSAOs.  And, again, here's another collection

2  of independent judgments.  So we're not just asking one

3  person's opinion; we're not asking just a few people's opinion;

4  we're asking the whole population, "What do you think about

5  these tasks?  Do you think they're important and necessary to

6  be a successful police sergeant?  How frequently do you perform

7  them?"  And perhaps that one person in a police substation that

8  is very far out somewhere never gets to perform a task, for

9  example.

10      We ask them about the knowledge, skills and abilities.  We

11  ask, "Are these important?"  We ask, "Do you need them on the

12  day that you are promoted?  Are they necessary the first day

13  you are police sergeant?  Do they distinguish between high

14  performers and low performers," because if they do, those are

15  good assessment KSAs to incorporate into an exam.  And we also

16  ask them, especially for the knowledge areas, "Do you have to

17  memorize these knowledge areas or do you have time to look

18  these up when it comes up in the job?"

19  Q.   Let me just stop you there because -- why do you do that?

20  Why do you want to know if you have to memorize it or look it

21  up -- you can look it up?

22  A.   Because part of the decision for the job-knowledge test is

23  whether or not we're going to have a part open-book/part

24  closed-book exam, an all closed-book or an all open-book exam.

25  Q.   And is that something that's determined by this job

1    analysis and the linking of the KSAOs?

2    A.   That evaluation of whether the knowledge has to be

3    memorized or looked up is very key -- I worked for a

4    jurisdiction once in which they carried around a very small

5    handbook and they -- it was tiny, and they kept it in their

6    pocket.  They could look up almost every single solitary thing,

7    and they did.  I mean, it was very little thinking on their

8    feet that was required in that jurisdiction.  So there wasn't

9    even enough material for a closed-book exam in that particular

10   location.  So it's that information that helps you make that

11   determination.

12   Q.   Okay.  And just again from your experience around the

13   country, is it common to have, even for job-knowledge

14   multiple-choice tests, parts of the test that are open book and

15   parts of the test that are closed book?

16   A.   It's common.

17   Q.   And again, I think you've already said this, but what

18   determines whether it's closed or open book?  What is the

19   driving force behind that?

20   A.   That part of the job analysis that analyzes the knowledge,

21   and the incumbents are telling us whether they have time to

22   look it up or not.

23            MR. LICHTEN:  Would this be a good time --

24            THE COURT:  You're about to make a shift?

25            MR. LICHTEN:  Well, I'm not really about to make a

```
 1   shift.
 2            THE COURT:  Well, go a few more minutes.
 3   BY MR. LICHTEN:
 4   Q.   I'm sorry.  I interrupted you --
 5   A.   And I feel good, so we could keep going.
 6   Q.   Okay.  Go ahead.
 7   A.   Okay.  So we are at the stage in which we are sending out
 8   a survey to all the job incumbents and we are asking them their
 9   opinions on all of these individual questions.  And so they
10   will individually fill out their survey.
11        The survey is returned to me and my staff, and we analyze
12   the tasks and we analyze the KSAOs for these various questions
13   that we ask.  And then we take one more step, which is the
14   final step of the job analysis part, and we ask a group of
15   subject-matter experts, who are generally some very experienced
16   sergeants, perhaps one or two lieutenants and/or a captain, to
17   come in and serve as the expert panel who really know the
18   position and supervise the position or participate in the
19   position of police sergeant.
20        And we ask them to tell us for each one of the knowledge,
21   skills and abilities whether you need it to perform one of the
22   tasks that were identified as critical by the job incumbents.
23   And this is important because it's very easy to say, you know,
24   "I need to have good oral communication skills."  You know,
25   "I'm a file clerk, I need to have good oral communication
```

1    skills."  Well, when you dig a little deeper and you find out

2    that the person is locked up in a room by him- or herself all

3    day filing and never speaks to anyone, you wonder sometimes why

4    that would be an important skill for that person.  So we go

5    another step and we make sure that they need these KSAOs for

6    the tasks.  That's the final step.  And that, again, is in that

7    Goldstein article.

8        So now we know which are the important knowledge, skills,

9    abilities and other characteristics, and we know which ones are

10   linked to the critical tasks and we make a test plan.  And a

11   test plan, we work with the subject-matter experts and we talk

12   about -- this is where our feasibility conversation will come

13   in.  "We would like to do an assessment center and a

14   job-knowledge test, and we want to do a four exercise

15   assessment center."  And they say, ""Well, it would be better

16   if we did three exercises because of A, B, C and D."  And I

17   say, "Okay.  Then we'll put more information into one of the

18   exercises."  Or they may say, you know, "We would like to also

19   have a structured panel interview," and then we'll say, "Okay.

20   Then we'll spread the knowledge, skills and abilities we want

21   to measure across multiple instruments."

22       It's -- I'm not sure why different jurisdictions have

23   different preferences, but as long as we can measure all the

24   KSAOs that are important is all that matters.

25       Do you want me to keep going?

1    Q.    Yeah.  Go ahead.  What's the next step?  Let me ask you

2    this:  You now have these knowledge, skills and abilities,

3    you've had the subject-matter experts review them, but how do

4    you translate those into actual test questions both -- in all

5    of these formats that you've described?

6    A.    Translate.  Okay.  Before I answer that, let me just

7    finish on that test plan and then I will go right into that.

8          The test plan -- also as part of the test plan, we are

9    trying to determine instruments in that location that we

10   believe will have as little adverse impact as possible but as

11   much validity as possible.  So if there has been some sort of

12   history which happened in Memphis, for example, in which

13   certain instruments produced high adverse impact, we would

14   avoid using those same instruments, we would use some

15   alternative to measure the same knowledge, skills and

16   abilities.

17   Q.    And do the Uniform Guidelines on employee selection

18   instruct you to look for low adverse impact alternatives?

19   A.    Yes.  The Uniform Guidelines says specifically that if you

20   can use an instrument that has substantially equal validity and

21   that has lower adverse impact, you're obligated to do so.

22   Q.    Okay.  And I want to show you an excerpt -- I'll find it

23   after.

24            THE COURT:  I'll tell you what.  We'll take the break

25   and you could look for it.  How's that?

1            All right.  We'll take the morning recess.

2            THE CLERK:  All rise.

3            The Court will take the morning recess.

4            (The Court exits the courtroom and there is a recess

5     in the proceedings at 10:56 a.m.)

6            (After recess, start at 11:25 a.m.)

7     BY MR. LICHTEN:

8     Q.   When we broke, you had testified that in the process of

9     looking for how you're going to design the test, you look for

10    components which would have lesser adverse impact.  Do you

11    recall testifying about that?

12    A.   Yes.

13    Q.   And you also testified that you would look at whether

14    the -- what the jurisdiction's experience had been with certain

15    components?

16    A.   Yes.

17    Q.   Okay.  Just tell me how you do that and why you do that.

18    A.   I ask the jurisdiction for any reports or any documents it

19    has from prior tests if they were not mine, and I look to see

20    if any of the components or all of the components appear to be

21    valid, job related, and if they resulted in adverse impact.

22    Q.   And if you find from that historical -- those historical

23    documents that there was a component but that it had

24    substantial adverse impact, of what relevance is that to you in

25    your assessing what to do next?

1  A.    It depends.  If I did not think the simulation or the test

2  component solicited the knowledge, skills, abilities, and other

3  characteristics as well as it could have, I might either try to

4  improve that simulation or develop something that I think would

5  do better.

6  Q.    And then do you believe that that process is required by

7  the Uniform Guidelines?

8  A.    Looking at the history?

9  Q.    No, looking to try to -- looking for methods that have

10 less adverse impact.

11 A.    Yes.

12 Q.    And I just happen to put up a section of the Uniform

13 Guidelines which I believe are section 1607.3B of the Uniform

14 Guidelines.  Are you familiar with those?

15 A.    Yes.

16 Q.    Okay.  And you quoted this section in your report; is that

17 correct?

18 A.    I believe so.

19 Q.    Okay.  And I'm not going to ask you to read this into the

20 record, but can you tell us in your view what this requires an

21 industrial psychologist such as yourself to do when looking at

22 various and potential components from a police promotional

23 exam?

24 A.    It requires you to review the existence of testing

25 instruments and what their literature says about their validity

1    and adverse impact.  I consider the work an investigation of

2    suitable alternatives to also mean you can experiment and

3    develop something new.  I believe that you can look at the

4    history of that jurisdiction and investigate what worked there

5    and what has not worked there.  So that to me would be your

6    investigation of suitable alternatives.

7    Q.    And is this a one-time process or is it an ongoing

8    process?

9    A.    In my opinion, tests can always be improved in terms of

10   validity and the reduction of adverse impact.  So it's an

11   ongoing process forever.

12   Q.    Okay.  So if you're involved in devising, administering a

13   police promotional exam in a particular jurisdiction and you

14   give a particular component, done the best job you can but you

15   find that it nevertheless has a reasonable amount or

16   substantial amount of adverse impact, you just say, well, we're

17   just going to go with this next time and keep using it, or do

18   you do something else?

19   A.    I would never do the former, I would do something

20   different.

21   Q.    And why is that?

22   A.    Because if you do the same thing over and over again, you

23   can't expect a different result, which is one of my favorite

24   sayings.  And it's true, that if I were to give the same type

25   of instrument again in the same jurisdiction, I would expect a

1  similar outcome.

2  Q.   Now, are you aware in this case that the City of Boston

3  has contended that they utilized an oral component or an

4  assessment center component in 2002, still got adverse impact,

5  and, therefore, do not believe it would be feasible or

6  reasonable to utilize that again because it had adverse impact?

7  Are you aware of that argument that's being made?

8           MS. HARRIS:  Objection.

9           THE COURT:  Overruled.

10 A.   Yes.

11 Q.   And did you see that argument in any of the expert reports

12 submitted by the defendants?

13 A.   Yes.

14 Q.   And do you agree with that?

15          MS. HARRIS:  Objection.

16 A.   Do I agree with what?

17 Q.   Well, let me back up and ask a different question.

18          First of all, did you review the experience of the

19 City of Boston in giving some type of assessment center in

20 2002?

21 A.   Yes.

22 Q.   Okay.  And what do you understand was given and what do

23 you understand the results to be for 2002?

24          MS. HARRIS:  Objection.

25          THE COURT:  Overruled.

1    A.    I understand that an oral component which consisted of

2    some parts was administered along with a written exam, and I

3    believe the T&E was also administered.

4    Q.    And are you aware as to what the mean difference was with

5    respect to that oral component as opposed to the multiple

6    choice job knowledge test?

7    A.    In Dr. Wiesen's report he reported that the job knowledge

8    mean score difference was .55 for the job knowledge test and

9    for the structured -- I'm sorry.  For the oral exercise it

10   was .26.

11   Q.    So we're all on the same page, that score or mean

12   difference of .26, what does that tell you as an industrial

13   psychologist?

14   A.    I consider those extremely low differences between

15   minorities and non-minorities.

16   Q.    Okay.  So showing less adverse impact than multiple choice

17   job knowledge tests?

18   A.    In general, yes, and in that case specifically, yes.

19   Q.    Okay.  And are you aware of what the -- I hope I get this

20   right -- mean difference was for the job knowledge test?

21   A.    .55.

22   Q.    Okay.  So what is the relationship of those two results?

23   A.    That the --

24   Q.    How much of a difference is that?  I'm sorry.

25   A.    Well, the standardized mean difference was larger for the

1    job knowledge test, much larger.

2    Q.    Okay.  And what conclusion, if any, have you drawn from

3    the fact that the City of Boston used that -- an oral component

4    and got a mean difference of .26?  What, if anything, did you

5    conclude from that?

6    A.    My conclusion was that that was a very encouraging result

7    and one of the methods for reducing adverse impact, which I

8    believe -- the field has become -- at least -- I don't know if

9    "proponent" is the right word, but everybody is aware that

10   explicit weighting of predictors, which means -- I'm sorry --

11   you know, assigning weights to especially higher weights to

12   things with lower adverse impact can substantially reduce

13   adverse impact for the total test score.  And I think in

14   Dr. Outtz' presentation in 2009 he specifically suggested that

15   was one of the methods to reduce adverse impact.  And in the

16   2008 article that I referred to, the Ployhart and Holt article,

17   they also talk about explicit predictor weighting.  So I was

18   thinking when I had seen that .26 why didn't anyone try to

19   improve upon whatever that process was, consider explicit

20   predictor weighting, and continue to improve it because it was

21   so encouraging.

22   Q.    Okay.  Just to clear up something.  When you say

23   Dr. Outtz' 2009 presentation, what are you referring to?

24   A.    I'm talking about his SHL conference presentation.  It was

25   a PowerPoint slide show that I believe was very similar, if not

```
 1   identical, to one he gave to the Personnel Testing Council in
 2   Washington, D.C. last summer in August.
 3   Q.   And I'm just going to -- I may have a better one.
 4         Do you see that slide?
 5   A.   Yes, I do.
 6   Q.   And this is a slide from Dr. Outtz' presentation?
 7   A.   Yes.
 8   Q.   And can you read that first bullet point?  I'm sorry, the
 9   second bullet point.
10   A.   "For many jobs, including fire officer positions,
11   selection systems that are too limited in scope and weighted
12   toward paper-and-pencil multiple choices are, a, not valid, b,
13   more likely to select candidates who are incompetent, and, c,
14   unfair in that they give an advantage to certain candidates
15   based on attributes that are not job related."
16         This is not related to the last statement I made about
17   explicit predictor weighting.
18   Q.   Sorry, I'll try to get the other one.  Let me ask you,
19   since we have it up, do you agree with this statement that he
20   made?
21   A.   Yes, to some extent I do.
22   Q.   Okay.  And can you tell us what you agree with and what
23   you do not agree with?
24   A.   Well, I, myself, have written that a selection system that
25   is too limited in scope and weighted towards paper-and-pencil
```

1    multiple choice tests are not valid.  I don't know if they're

2    more likely to select candidates who are incompetent, but I do

3    know that they are likely to have many candidates selected who

4    are incompetent and only book smart and perhaps missing some of

5    the necessary skills to be a competent supervisor.  And I do

6    believe that they are not fair.

7    Q.    Now, I'll get to the next slide in a minute, but let me

8    ask you:  Do you know what the weighting was for the 2002

9    Boston Police sergeant's exam; that is, how much weight was

10   assigned to the job knowledge multiple choice test as opposed

11   to how much was assigned to the oral component?

12   A.    I cannot recall off the top of my head.

13   Q.    Okay.  Assuming -- I'd like to ask you to assume that 50

14   percent of the exam was weighted to the multiple choice job

15   knowledge test and only 30 percent was weighted to the oral

16   component, would that accord with what you've done in your test

17   designs?

18   A.    Generally, no.

19   Q.    Okay.  Can you tell us what the range of weights you've

20   attributed to a multiple choice job knowledge test on those

21   occasions when you've used it as a written scored instrument?

22   A.    Mostly it has been somewhere between 20 and 40 percent of

23   the total test score, and I think probably it is fair to say

24   that it averages around 30 percent.

25   Q.    And then what comprises the other percentages?

1    A.    Depending on which other test components we selected, if

2    it's an assessment center only, that would be the 70 percent.

3    If it was -- in some cases there's some seniority points,

4    perhaps it would be 60 percent, an assessment center, an

5    instruction panel interview, and 10 percent seniority.  The

6    live component is generally the highest weighted component.

7    Q.    We're going to get back to that.  I think I located the

8    slide you were talking about.  Is this the slide you were

9    talking about?

10   A.    This is the slide I was referring to.

11   Q.    Is this also from Dr. Outtz' presentation?

12   A.    Yes, it is.

13   Q.    Sorry about that.

14         Can you tell us what this slide shows?

15   A.    Yes.  This slide is entitled "Test Design/Implementation,

16   Validity and Adverse Impact State of the Art."  And this is

17   very consistent with what is recorded in the 2008 Ployhart and

18   Holtz article that I keep referring to that talks about

19   validity and adverse impact.  He suggests that strategies on my

20   left are using alternative modes to present test stimuli.

21         So what that's saying, when I described earlier the

22   video test versus the paper and pencil, reading the situational

23   judgment test versus watching the situation in a video, this

24   describes that those are two different modes to present the

25   test material.  And video presentation has become more and more

1    popular because people are finding, as it says to the right,

2    that it has a moderate to substantial impact on validity, on

3    reducing validity.  And then the second strategy is using a

4    combination of measures of relative constructs, which is what

5    we've been talking about in terms of using a job knowledge test

6    and a structured panel interview and/or an assessment center

7    and/or an accomplishment record, seniority points, et cetera.

8    And combining those will have a moderate to substantial

9    reduction in adverse impact.

10           If you use differential weighting, which I call

11    explicit weighting of predictors, you can have a small to

12    moderate reduction in adverse impact.  If you extend time

13    limits, you can have a small, according to Dr. Outtz, a small

14    reduction in adverse impact.  If you remove bias items, you can

15    have a small reduction in adverse impact.  And if you do test

16    coaching as the type of test prep I talked about earlier, you

17    can have a very small reduction in adverse impact.  But what

18    this slide is concluding, that if you use all of these methods,

19    which I do when I develop exams, plus even more than that is

20    listed here, you can get a 50 percent or greater reduction in

21    adverse impact.

22    Q.   That is, if you combine all of these strategies in a

23    police promotional exam, you can achieve that kind of

24    reduction?

25    A.   Yes.

1  Q.    And do you agree with this slide?

2  A.    Yes.

3  Q.    And putting aside whether you agree or disagree with the

4  slide, what has been your experience in your professional work

5  designing police promotional examinations?

6  A.    Well, I've had a great deal of success reducing adverse

7  impact in places that have struggled with adverse impact.  And

8  I have used these strategies and more together to reduce them.

9  And I have really -- you know, in addition to all of this is

10  the historical analysis of what has occurred in the

11  jurisdiction and trying to address what has occurred either

12  through training or developing testing instruments that are

13  appropriate for that jurisdiction.

14  Q.    Is it ever appropriate, in your opinion, to give one

15  alternative component test, decide that the results were not

16  what had been hoped for with respect to reduction of adverse

17  impact, and then just pack it in and not do it anymore?

18  A.    Well, let me just say it depends.  Because if for some

19  unanticipated reason the exam was not good and I can obtain

20  some feedback and realize that it was not good, perhaps we

21  would not use it again.  If, for example, like the exam we're

22  talking about here, which has been used before and the

23  literature indicates it could be very problematic, I would

24  unlikely use it again.  But in cases that I saw encouraging

25  differences between minorities and non-minorities, small to

1    moderate, I would continue to work on reducing them to the

2    extent that I could by obtaining feedback from the candidates,

3    by obtaining feedback from management, by determining what was

4    the cause, essentially conducting a bias review in trying to

5    figure out what are the causes and what are some potential

6    solutions.

7    Q.    Okay.  Now, let me move on to something else.

8         You were -- I interrupted you when you were taking us

9    through the various stages that you used to get to the final

10   product, which is the test itself.  And I think we had gone

11   through the job analysis, the review by SMBs, and I think you

12   were on how you translate that into the actual test format.  So

13   could you continue on that, please?

14   A.    Yes.  So we have completed the job analysis at this stage,

15   and we have what we know to be from the job incumbents the

16   important -- we call them critical tasks, and the critical

17   knowledge skills and abilities and other characteristics needed

18   for this position, the target position.

19        So we made a test plan and we determined strategies

20   that we could use to solicit the important knowledge, skills,

21   abilities, and other characteristics and that were feasible and

22   that would minimize group differences to the extent we thought

23   possible.  And we sit down with the subject-matter experts and

24   we have the knowledge listed and we treat the knowledge -- we

25   write the knowledge slightly differently than we write the

1    skills and ability.  We write each individual knowledge

2    statement, such as knowledge of use of force, knowledge of

3    domestic violence procedures, knowledge of arrest procedures,

4    knowledge of search and seizure.  And the reason we do that is

5    we sort of follow what the department's general order knowledge

6    areas are.  And then on the second page we have the skills,

7    such as oral communication skills or abilities, supervisory

8    skills, leadership skills, written communication skills,

9    reasoning judgment and problem solving, the ability to plan,

10   organize, prioritize.  We have these two separate critically

11   important lists.

12        So the knowledge list is going to essentially be

13   translated into the written job knowledge test.  And the way we

14   do that is we generate questions, preferably situational

15   judgement test questions.  If we cannot think of one, we will

16   write a factual question.  And a factual question is just a

17   straight fact from a book.  And it doesn't require a lot of

18   words, it's just a very short, simple question about a fact.

19        After we -- this is the key, though.  After we

20   generate -- say we're going to write a hundred questions for

21   this multiple choice test with four alternatives for each

22   question.  The key is for each one of those questions to be

23   independently evaluated by preferable subject-matter experts.

24   If it's not -- I mean, I think personnel psychologists,

25   industrial psychologists can to it.  I don't think they do it

1    as well as the subject-matter experts, because the

2    subject-matter experts are intimately familiar with the job.

3    And they each independently -- and I can't stress that enough,

4    and this comes from Goldstein, et al., in 1993 -- sit and

5    evaluate each item that has been drafted.  And they evaluate it

6    for what knowledge is it directly assessing?  Not maybe

7    assessing, not indirectly assessing, but directly assessing.

8         So I give you an example where things can really go

9    awry.  You could write a use of force -- I could generate a use

10    of force question, but what I end up writing about is the use

11    of force investigation or report that the sergeant has to do.

12    Well, to be honest, the subject-matter experts are going to

13    link that to report writing.  They're not going to link it to

14    knowledge of use of force.  Because what you have to know is

15    the report writing, not the use of force.

16         So I miswrote the question but it gets linked properly

17    to the knowledge that it was -- that it should be measuring by

18    the subject-matter experts.

19         So when we write the questions, we have these

20    independent judges linking them back to the knowledge, skills,

21    and abilities.

22         And if we have -- we generally do have around 50

23    knowledge statements, somewhere between 50 and a hundred.  If

24    you're going to write a hundred-item test, a hundred-question

25    test, you'll write about one or two questions per each one of

1  these important knowledge areas.  And that's just the knowledge
2  part.
3          And they also -- let me just say, they assess
4  independently again the items for many other characteristics.
5  They analyze them for difficulty, whether a minimally competent
6  person might get this item correct if they took it.  And in our
7  work we would call this the Modified Angoff Procedure after a
8  man named Angoff.  And what we're trying to figure out is what
9  the passing score should be for a minimally competent person.
10 Because we don't want anyone who is less than minimally
11 competent to get the job ultimately.  And that takes -- that's
12 quite a difficult judgment process and it takes training of the
13 incumbent subject-matter experts to properly make that
14 judgment.
15         And then they assess the items for relevance,
16 sometimes they will tell you that we wrote something that's
17 minutia, totally not critical or central, even though it's
18 tapping a knowledge, skill, ability.  So we wouldn't include
19 that.  Sometimes they tell us that one of the alternative
20 responses is also correct in advance so we have two
21 alternatives that is correct.  So we would change one of them
22 and edit it.
23         The items are rigorously reviewed.  And then my staff
24 does a reading level analysis of those items to make sure that
25 they are less than or equal to the reading requirements of the

1    job.  So we would sample job reading material and then we would

2    sample the items on the test to make sure they at least match.

3         So that is the rigorous process on the job knowledge

4    side.

5    Q.   Okay.  What about on the other skills and abilities that

6    you're measuring that are not measured by the job knowledge

7    test, how do you go about putting together the final exam

8    components for that?

9    A.   Okay.  Say we're going to write a role play exercise and

10   in that role play -- I'm just making a note -- going to measure

11   leadership, oral skills, interpersonal skills, and reasoning

12   and judgment.  Those were the four KSAs we intended to measure.

13        We draft up a scenario that a sergeant might encounter

14   in his or her job, and we create a dialogue for this role

15   player to play.  And then we bring it to the subject-matter

16   experts who help us refine it and make it -- and customize it

17   for their jurisdiction.  And then we ask them independently

18   again, using survey methodology, this is all independent

19   evaluations, is this role play indeed directly assessing

20   leadership, oral skills, interpersonal skills, and reasoning

21   and judgment?  And if they say it's not, then we have to do one

22   of two things:  We have to revise it or we have to measure one

23   of those skills somewhere else.  So that's, again, independent

24   evaluations and judgments.

25        And then the next part of that is developing the

1   ratings scales.  And I know this probably doesn't sound

2   realistic to you, but, honestly, for every single content

3   validation process I do, which is all the time, for every

4   single test, we then write the ratings scales that the

5   subject-matter experts help us generate what are examples of

6   very good performance, moderate performance, and ineffective

7   performance.  And once we've drafted all those responses, the

8   raters have to do yet another survey, and they do it

9   independently, and they mark whether the exceptional behaviors

10  are actually exceptional, and they mark whether the moderate

11  behaviors are actually moderate and if the ineffective

12  behaviors are truly ineffective and whether the behaviors are

13  reflective of the competency they're intended to demonstrate,

14  such as reasoning and judgment.

15          And let me tell you that all the time, not some of the

16  time, they don't agree.  They don't agree on what's

17  exceptional, moderate, and ineffective; and they don't agree

18  that these benchmarks directly link to the ratings scale

19  they're intended to be linked to.  So there's massive editing

20  that occurs until we get it right.

21          And then sometimes after that there's a pilot test.

22  It depends on the security of the jurisdiction if I can do an

23  external pilot test but it's not my preference because I'd like

24  internal people to tell me if it's realistic.

25          What we do do if we are -- if we can't use internal

1    subject-matter experts, which I frequently cannot, then the day

2    the test is being given to the candidates and before it's being

3    scored by the raters, we have internal people look at it at

4    that exact moment so that there can be no security breach, and

5    then when -- if they say there's something not good about some

6    aspect of the test, we can modify it before the raters ever see

7    it.

8    Q.    Okay.  Now, I take it that brings us to the end of the

9    test design; is that right?

10   A.    I'm sure I forgot something, but that's most of it.

11   Q.    Okay.  So let me move on.  Based upon your experience in

12   the field and your design of 300 police promotional exams and

13   many police sergeant exams, do you have an opinion to a

14   reasonable degree of industrial psychology certainty as to what

15   the critical skills and abilities are of a police sergeant?

16         MR. CARROLL:  Objection.

17         MS. HARRIS:  Objection.

18         THE COURT:  Overruled.

19   A.    Yes.

20   Q.    Can you tell me what they are, please?

21   A.    At least the following:  Reasoning, judgment and problem

22   solving; decision making; command presence; leadership skills;

23   supervisory skills; oral communication skills; written

24   communication skills; interpersonal skills; planning,

25   organizing, and prioritizing if I didn't say that already;

1    knowledge of department operations; knowledge of administrative

2    procedures; knowledge of laws; in some cases the ability to

3    persuade and negotiate; flexibility; stress -- ability to

4    manage stress.  Those are at least -- those are most of them.

5    Q.    Okay.  And do you have an opinion to a reasonable degree

6    of industrial psychology certainty as to whether a police

7    sergeant promotional exam that only has a multiple choice job

8    knowledge component and a T&E component can test for the

9    knowledge, skills, and abilities which you believe are critical

10   for a police sergeant?

11         MR. CARROLL:  Objection.

12         THE COURT:  Overruled.

13   A.    Can you rephrase, please?

14   Q.    Do you want it rephrased or do you want it read back?

15   A.    Rephrase, please.

16   Q.    Do you have an opinion to a reasonable degree of

17   industrial psychology as to whether a police sergeant

18   promotional exam which consists only of a job knowledge

19   multiple choice exam and a T&E component can adequately test

20   for all of the knowledge, skills, and abilities necessary to

21   perform the duties of a police sergeant?

22         MR. CARROLL:  Objection.

23         THE COURT:  Overruled.

24   A.    I have an opinion.

25   Q.    What is that opinion?

1   A.    I don't believe so.

2   Q.    Can you tell us why?

3   A.    May I use the example in this case?

4   Q.    Sure.

5   A.    The job knowledge test, if it were what I would consider

6   valid, and the T&E, if I were to consider valid, does not

7   assess all of the critical knowledge, skills, abilities, and

8   other characteristics necessary for the position of police

9   sergeant.

10  Q.    Why not?

11  A.    First of all, both of them are indirect measures.  Neither

12  one of them are direct.  And neither one of them are linked

13  directly to the KSAOs that are required for the position.  I

14  have not seen that linkage.  And they -- neither one of them

15  can measure things such as interpersonal skills or oral

16  communication skills or command presence or leadership skills,

17  for example.  Well, maybe T&E, but not this T&E.

18  Q.    Now, I wanted to show you a section of the Uniform

19  Guidelines.  And I've outlined a few points.

20        Do you believe that the opinion you just gave is

21  supported by the Uniform Guidelines on employee selection?

22  A.    Yes.

23  Q.    And I've shown you section (C)(1) where it talks about the

24  appropriateness of validity studies.  Do you see that?

25  A.    I do.

1   Q.   Okay.  And it says in here that a selection procedure can

2   be supported by a content validity strategy to the extent that

3   it is a representative sample of the content of the job.

4        Do you see this?

5   A.   Yes.

6   Q.   And do you agree with that provision?

7   A.   Yes.

8   Q.   Do you believe that a multiple choice job knowledge test

9   alone with a T&E component alone -- strike that.  Let me

10  rephrase the question.

11       Do you believe that a multiple choice job knowledge

12  test and a T&E component combined can meet the requirements of

13  the Uniform Guidelines that it provide a representative sample

14  of the content of the job?

15       MR. CARROLL:  Objection, speculation.

16       MR. McDERMOTT:  Objection.

17       THE COURT:  Overruled.

18  A.   Not the one that I reviewed for this case.

19  Q.   Okay.  And then if you go to --

20       MS. HARRIS:  Move to strike, your Honor.

21       THE COURT:  No, that may stand.

22  BY MR. LICHTEN:

23  Q.   Well, can you explain what you mean by your answer,

24  please?

25  A.   Well, it is not out of the question that a T&E might be

1  able to assess some of the important skills, abilities, and

2  other characteristics, but it would still be indirect.  That

3  might be acceptable, but I am not sure.  This one does not

4  measure those.

5  Q.  And I ask you to go to (C)(1)(2), where it says "job

6  analysis for consent validity."  Do you see that?

7  A.  Yes.

8  Q.  And it talks about the work behaviors selected for

9  measurement should be critical work behaviors and/or important

10  work behaviors constituting most of the job.  Do you see that?

11  A.  Yes.

12  Q.  Do you believe that a multiple choice job knowledge test

13  appropriately tests for the critical work behaviors or

14  important work behaviors constituting most of the job?

15  A.  No.

16       MR. CARROLL:  Objection, speculation.  Move to strike.

17       THE COURT:  Overruled.

18  BY MR. LICHTEN:

19  Q.  Why not?

20  A.  Because it only measures job knowledge, and that is not

21  most of the job.

22  Q.  Now, you mentioned before that you had reviewed a brief

23  submitted to the Supreme Court by Dr. Outtz and a number of

24  colleagues by Dr. Outtz; is that correct?

25  A.  Correct.

1    Q.   And I want to show you that for a second.

2         MS. HARRIS:  Your Honor, I object.  This is beyond the

3    scope of her report.

4         THE COURT:  It's not in the report?

5         MS. HARRIS:  It's not in the report.

6         MR. LICHTEN:  Your Honor, her opinion of the validity

7    of the test is in her report.

8         MS. HARRIS:  Yes, her opinion about the Richie brief

9    is not in the report.  It's not one of the documents she

10   reviewed and it's got -- it's nowhere listed --

11        MR. LICHTEN:  If I may, your Honor.

12        I wasn't able to depose Dr. Outtz until July 1st of

13   this year.  I'm only asking about this because he made a

14   statement in his deposition regarding that brief in which he

15   tried to say, well, what I said in that brief was I only meant

16   to apply to fire lieutenants, not police sergeants.  And I only

17   knew that became his opinion on July 1st, after Dr. Fields'

18   report, after she was deposed in this case.

19        This is really rebuttal -- I agree it's more in the

20   nature of rebuttal testimony, but I'm trying to avoid the

21   requirement of bringing Dr. Fields back.  It simply has to do

22   with her rebutting a statement which I assume Dr. Outtz is

23   going to make that while I did say this in the Supreme Court

24   brief, I meant it only to apply to fire lieutenants, not to

25   police sergeants.

 1          MS. HARRIS:  I press the objection, your Honor.  This

 2    is asking her opinion about what Dr. Outtz meant when he wrote

 3    a brief to the Supreme Court.  I think it's pretty far afield.

 4    If he wants to ask Dr. Outtz --

 5          MR. LICHTEN:  Okay.  Let me ask another question.

 6    BY MR. LICHTEN:

 7    Q.   You've studied both the job of a police sergeant, have you

 8    not --

 9    A.   Yes.

10    Q.   -- and the job of a fire lieutenant?

11    A.   Yes.

12          MR. LEAHEY:  Objection, your Honor.  This is similar

13    to what counsel for Boston said.  Nothing of the fire position

14    is anywhere listed in any reports of Dr. Fields -- in

15    Dr. Fields' reports.  I would echo Boston.

16          Now we're going into -- if he wants to ask Dr. Outtz

17    about the difference between police and fire, which he did at

18    the deposition, but prior to that, that wasn't in Dr. Outtz'

19    report, it was raised by counsel during examination of

20    Dr. Outtz.  We're going into stuff that's not in any police

21    report -- excuse me, in any expert report and it was not

22    disclosed pursuant to the rules.

23          Along similar lines, I did hear counsel talk to -- in

24    documents that Dr. Fields represented or read she mentioned the

25    '05, '06, '07, '08 examinations in the Boston examinations.

1    Again, none of that was in her original report.  Started to

2    testify to that at her deposition.  Based on that, the

3    defendants brought a motion to you regarding getting her

4    reports or her examination questions.  You ruled at that time

5    that if it wasn't in the report, she could not testify to it,

6    and based on that, there was no need to address the defendants'

7    concerns to get her examinations.

8         I just want to raise this.  There's been a lot of

9    testimony so far that's been beyond the report.  However,

10   arguably you could say it's background information.  Now we're

11   getting into substantive issues that are in no way, shape, or

12   form contained within the four corners of her report, and I

13   think I speak for all the defendants that we would object to

14   that.

15        MR. LICHTEN:  Your Honor, I just want to be clear that

16   this is rebuttal -- first of all, so far she's testified within

17   the four corners of her report.  She hasn't said anything

18   specific about the 2005, 2006, 2007, 2008 exams.  What I've

19   asked her about, about her opinions of these various

20   alternative selection procedures and the critical knowledge,

21   skills, and abilities all has been within the four corners of

22   her report.

23        Now, I agree what I'm about to ask her is in the

24   nature of rebuttal, although I think I would be entitled to

25   call her as a rebuttal witness.  By way of an offer of proof,

1    on July 1st, when I deposed Dr. Outtz about a brief that he

2    wrote for the Supreme Court in which he said that you could not

3    have a valid examination for the position in question in the

4    Richie case, which was a fire lieutenant, which he said it did

5    not test for some of the necessary skills and abilities

6    required for the fire lieutenant position which he identified

7    has these command judgment responsibilities, he said, well,

8    that only applied to fire lieutenant, and therefore, it doesn't

9    apply to police sergeant.

10            I want to use this witness just to establish that the

11    skills and abilities necessary of a police sergeant in this

12    regard are just as critical as the knowledge, skills, and

13    abilities as a fire lieutenant simply to rebut that in advance.

14    I realize it's in advance, but I don't want to call her back.

15            THE COURT:  You may have it as advance rebuttal.

16            MR. LICHTEN:  Thank you.

17    BY MR. LICHTEN:

18    Q.    So let me try to shorten -- do you recall reading

19    Dr. Outtz' brief to the United States Supreme Court?

20    A.    Yes.

21    Q.    And have you read his deposition?

22    A.    Yes.

23    Q.    And are you aware of him stating in that brief that the

24    test in question there could not be valid because it did not

25    test critical qualifications such as command abilities?

1   A.   Yes.

2   Q.   And are you also aware that in his deposition he said that

3   he was only referring to the job of police lieutenant, that

4   that -- I'm sorry -- to fire lieutenant, that that would not

5   apply to the job of police sergeant?

6   A.   Yes.

7   Q.   Okay.  And do you have an opinion regarding -- strike

8   that.

9        Do you have an opinion regarding the critical command

10  abilities of a fire lieutenant and a police sergeant and which

11  require more command abilities?

12            MS. HARRIS:  Objection.

13            MR. CARROLL:  Objection.

14            MR. D'AGOSTINO:  Objection.

15            THE COURT:  Sustained to the form of the question.

16            MR. LICHTEN:  Let me rephrase it.

17  BY MR. LICHTEN:

18  Q.   Are you familiar with the job of police sergeant?

19  A.   Yes.

20  Q.   Are there certain critical abilities that are needed to

21  perform on the job in a critical situation or emergency

22  situation?

23  A.   Yes.

24  Q.   And what are those?

25  A.   Those are some of the ones we've already referred to,

1   which are reasoning and judgment, decisiveness, leadership,

2   supervisory skills, oral skills, interpersonal skills, as

3   examples.

4   Q.   And how often might a police sergeant in a big city

5   encounter such critical situations?

6   A.   A police sergeant in any location would require those on a

7   minute-to-minute basis, because even on a traffic stop you need

8   a command presence.  You need to have control.  In a domestic

9   violence situation, which is a very dangerous situation, you

10  need to have those types of skills.  In a bar scene, on a

11  street corner.  I mean, it's -- no matter what the size of the

12  incident, no matter what the size of the city I would say.

13  Q.   Can, in your opinion, a multiple choice job knowledge test

14  test for these critical abilities of a police sergeant?

15           MR. CARROLL:  Objection.

16           THE COURT:  Overruled.

17  A.   No.

18  Q.   Let me ask you to compare that to a fire lieutenant.  Are

19  there critical abilities -- strike that.

20           How many fire lieutenant examinations have you been

21  involved in the development and administration of?

22  A.   I need a minute.

23  Q.   Give me a ballpark number.

24  A.   I can't do those ballparks.

25           (Pause.)

A.    Let's say 40, 50.

Q.    And what are the critical abilities, if any, necessary for a fire lieutenant?

A.    Some of the ones that I just described.  I will say that fire lieutenants can have different responsibilities in different departments.  They -- in some cases they are not perhaps as -- they have higher status in some departments than others.  So they may have more subordinates in some departments than others.  In some departments, for example, there are still fire sergeants, in Macon, Georgia, as an example.  So a fire lieutenant is more administrative there and probably only need -- well, would utilize his or her command presence and leadership skills and oral skills probably in the station and on the scene.  And in many departments a fire lieutenant is a crew leader.  And in that case they -- they are the leader on a piece of apparatus, where there could be three or four staff, fire staff.  And then when they arrive -- so they're in charge of that crew.  And then when they arrive on the scene, they -- they may or may not, depending on the size of the department, the size of the jurisdiction, take command of the entire incident.  They may take command of a portion of the incident.  They may take it just as a police sergeant does temporarily until relieved by a higher command, such as a fire captain or police lieutenant.  So they have some of the same skills and abilities in common.

1   Q.   And do you believe there are any differences, and, if so,

2   what, between the skills and abilities -- the critical skills

3   and abilities necessary for a fire lieutenant at the scene of

4   an emergency incident and the skills and abilities necessary

5   for a police sergeant at the scene of an emergency incident?

6   A.   Excluding knowledge?

7   Q.   Yes.

8          (Pause.)

9   A.   They have a majority of those skills and abilities in

10  common.  Just applied slightly differently.

11  Q.   Okay.  Okay.  I want to show you -- I want to move on to

12  something else.  I want to show you -- you mentioned Ployhart

13  and Holtz before, and I just wanted to show you a section from

14  that article.  Is that the article that you were referring to?

15  A.   Yes.

16  Q.   And this is from 2008 Personnel Psychology?

17  A.   Yes.

18  Q.   That's a peer-reviewed journal I take it?

19  A.   Yes.

20  Q.   And is this the article you were referring to earlier?

21  A.   Yes.

22  Q.   And what is this list that we see in this article?

23  A.   This is a list of recommendations for what an organization

24  might do to consider -- to minimize adverse impact and to

25  maintain validity.

1    Q.    And do you agree with what they list in here?

2    A.    Yes.

3    Q.    And can you just quickly go over these -- I think there's

4    six points.

5    A.    Yes.

6    Q.    Go ahead.

7    A.    Number one is use job analysis to carefully define the

8    nature of performance on the job, being sure to recognize both

9    technical and nontechnical aspects of job performance.  I've

10   already gone over the job analysis procedures and how important

11   I think they are and the fact that they need to be linked to

12   the job -- to the test content.

13          Number two, using cognitive and non-cognitive

14   predictors to measure the full range of relevant cognitive and

15   non-cognitive KSAOs as much as practically realistic, which is

16   what we've been talking about all morning.  A cognitive measure

17   would be a job knowledge test, and a non-cognitive measure

18   would be oral skills, interpersonal skills, leadership skills

19   as examples.

20          I just have to clarify that if you require -- you can

21   add in cognitive requirements to those oral interpersonal and

22   leadership skills, but I'm saying that if you reduce the

23   cognitive requirements -- that's what this is saying -- reduce

24   the cognitive requirements on those skills and use the

25   cognitive requirements for the job knowledge skills.

1          Use alternative predictor measurement methods such as

2     interviews, situational judgment tests, bio data,

3     accomplishment record, assessment centers when feasible.

4     Supplementing a cognitive predictor with alternative predictor

5     measurement methods can produce sizable reductions of adverse

6     impact if they are not too highly correlated.

7          Let me just explain that is what I said earlier when I

8     said as long as you're not measuring the same thing in each of

9     the predictors, which would mean they're all correlated, that

10    you could expect an increase in validity and a reduction in

11    adverse impact.

12         Then it says but the specific reductions are variable.

13         Using alternative predictor measurements is costly but

14    effective because they measure multiple KSAOs, reduce reading

15    requirements, and have higher face validity.  And face validity

16    is what -- a face validity means the test appears to be job

17    related.  So it's not really important for technical validity,

18    but it improves candidates' perceptions of the fairness and

19    validity of the exam.

20         Among the best alternative predictor measures are

21    interviews, SJTs and assessment centers.

22    Q.   SJTs are situational judgment tests?

23    A.   Yes.

24         Nevertheless, the data are unclear about work samples

25    which may have less validity and larger racioethnic subgroup

1    differences than prior research indicated.

2            We haven't talked about work samples, and I think that

3    work samples to me are unclear because I think a number of

4    things could be a work sample.  So -- and this is what the

5    literature is currently saying about work samples.

6            Decrease the cognitive loading of predictors and

7    minimize verbal ability and reading requirement to the extent

8    supported by a job analysis.  For example, if a job analysis

9    indicates the need for a high school reading level, ensure the

10   predictors do not require a college reading level.  Doing so

11   may involve lowering the reading level of instructions and

12   items, allowing constructed response options, or using video

13   formats.  But, again, this must be consistent with the job

14   analysis finding.

15           Number five.  Enhance applicant reactions.  Although

16   this strategy has only a minimal effect on subgroup

17   differences, it does not reduce validity and is almost

18   invariably beneficial from a public relations perspective.

19   Simply using face valid predictors such as interviews and

20   assessment centers goes a long way toward enhancing these

21   perceptions.  And some approaches are free, e.g., giving

22   explanations for why the selection procedure is being used.

23   Sensitivity review panels may help ensure content validity and

24   legal defensibility.

25           And six is consider banding.  We emphasize the word

1    "consider" because this remains a controversial strategy among

2    IO psychologists and will substantially reduce subgroup

3    differences only where there is explicit racioethnic minority

4    or female preference in final hiring decisions.  And I do not

5    agree with that statement.  I will explain in a minute.  Only

6    in limited instances will it be possible to justify such

7    preferences.

8    Q.    Okay.

9    A.    I have used banding without specific racial or female

10   preference, and I have been successful in reducing adverse

11   impact.  So I think that's why it's controversial amongst us

12   all.

13   Q.    Okay.  So let me ask you quickly about banding.  Is

14   banding a method that has the ability to reduce adverse impact?

15   A.    Yes.

16   Q.    And have you yourself been involved in jurisdictions where

17   banding has been used?

18   A.    Yes.

19   Q.    And how does one determine as an industrial psychologist

20   what the band might -- what the bandwidth might be?

21   A.    There are two methods.  One method is using past history

22   to define a fixed bandwidth.  And those are generally referred

23   to as rules, and you can have a rule of three, a rule of five,

24   a rule of ten, a rule of 20.  And that means that every time

25   the test is, given that rule will be applied.  And in my

1    experience, police personnel in general like rules such as

2    those because it won't change from test to test.

3            So the way that works is if you have a rule of three,

4    the top three scores would be considered equal and could be

5    considered for promotion, or the top ten or whatever the number

6    should be.  And that would happen each time.  That's one way to

7    determine the bandwidth.

8            And the other way to determine the bandwidth is to use

9    the reliability of the exam to determine the standard error of

10   measurement and then it's a statistical formula to determine

11   what the bandwidth should be.

12   Q.   And do you know what the reliability, if any, formally is

13   in a job knowledge multiple choice test?

14   A.   They're generally high.

15   Q.   Okay.  Okay.  I just want to show you -- the article that

16   you just were talking about, the six things, is this the title

17   of the article?

18   A.   Yes.

19   Q.   And is this the most recent article which discusses and

20   summarizes the literature on what can be done to reduce adverse

21   impact in selection procedures?

22   A.   That I know of.

23   Q.   Now I want to move on to, I think, my final topic.

24           Now, you designed by your own testimony many, many

25   police promotional examinations; is that correct?

1  A.    Yes.

2  Q.    And when you come into a jurisdiction -- strike that.

3         Have you come into jurisdictions and been under

4  consent decrees or have undergone litigation and so the adverse

5  impact of prior examinations has been at issue?

6  A.    Yes.

7  Q.    Could you give me a couple of examples where you've been

8  involved in such situations?

9  A.    When I was the director of Public Safety Testing for

10  Fairfax County, they were under consent degree.  When I was

11  hired by the Drug Enforcement Administration, they were under

12  consent decree.  And the City of Macon had been under a very,

13  very long-term consent decree.

14  Q.    And how about Memphis?

15  A.    They had a history of consent decrees and litigation.

16  When I was hired, the litigation was extensive and injunctions

17  had been placed on all tests, so the -- although there was no

18  consent decree, and there is currently no consent decree, there

19  has been in the past.

20  Q.    And in other places where you're hired to put together the

21  police promotional examination system, do you try to

22  familiarize yourself with what has been done previously and

23  what those results have been vis-à-vis adverse impact of

24  minority candidates?

25  A.    Yes.

1   Q.   And just remind us again how many police sergeant

2   promotional exams you believe you personally have been involved

3   in designing and administering.

4   A.   It's around 80.

5   Q.   And when you do these police promotional examinations for

6   police sergeant, is one of your goals to attempt to reduce

7   adverse impact from prior examinations?

8   A.   Yes.

9   Q.   And can you tell us based upon the work that you've done

10  how often you've been successful, in your opinion, in reducing

11  adverse impact with a police promotional sergeant's exam that

12  you've designed from what had been done previously?

13           MS. HARRIS:  Objection.

14           THE COURT:  Overruled.

15  A.   I don't have an exam number, but I have -- I have been

16  successful many times, and I -- I can recall specific instances

17  where we had data and we looked at exercise components or test

18  components and that could have been from a previous consultant

19  or myself, and tried to generate information about why that

20  occurred and tried to address it in the next round of testing.

21  Q.   And how successful or unsuccessful would you say you have

22  been in reducing adverse impact in jurisdictions when you've

23  put together the type of multicomponent examination process

24  that you've testified here to today?

25           MS. HARRIS:  Objection.

```
 1          THE COURT:  Overruled.
 2   A.   I have been successful.  In most cases I have been
 3   successful.  St. Louis was an example where the multicomponent
 4   process was already in place and I think I might have improved
 5   it slightly or it's around the same.  It was the same before I
 6   got there.  But, in general, when I came in, did a
 7   multicomponent process and it was a very comprehensive process,
 8   we were able to minimize the differences.
 9   Q.   And let me ask you to assume for a moment that in
10   Massachusetts all of the defendants in this case use an
11   examination process that is a job knowledge multiple choice
12   test and a T&E -- let me back up.  Let me strike that question
13   and back up.
14          You're familiar with the T&E component used in
15   Massachusetts?
16   A.   Yes.
17   Q.   So you've reviewed that?
18   A.   Yes.
19   Q.   Okay.  I want you to assume that you're in a jurisdiction
20   that uses a job knowledge multiple choice test, such as is used
21   in the Commonwealth of Massachusetts; and a T&E component, such
22   as is used in the Commonwealth of Massachusetts; and those are
23   the only components that are used for their promotional system;
24   and that it's an 80/20 split, 80 percent for the job knowledge
25   multiple choice test and 20 percent for the T&E component.  Do
```

1    you have an opinion to a reasonable degree of industrial

2    psychology certainty whether if you came into such a

3    jurisdiction and added the types of alternative components that

4    you've described whether or not you could be successful in

5    reducing adverse impact?

6              MR. CARROLL:  Objection.

7              MR. McDERMOTT:  Objection.

8              THE COURT:  Overruled.

9    A.   Added alternatives to the existing job knowledge and the

10   T&E --

11   Q.   Yes.

12   A.   -- to the existing one?

13   Q.   Well, let me ask it first that way.

14   A.   I'm not sure.

15   Q.   Okay.  What if you revised the T -- the job knowledge

16   test?

17             MS. HARRIS:  Object.

18   A.   I believe that we could reduce adverse impact.

19             THE COURT:  Overruled.

20   Q.   And why is that?

21   A.   Because of my experience and because of what the

22   literature says and -- that's it.  I mean, I've had experience

23   in doing so.

24   Q.   Okay.  And let's just discuss that.

25             What are the things that you would do to the multiple

1    choice job knowledge test in order to assist in reducing

2    adverse impact, assuming you were going to keep that as part of

3    the test?

4           MS. HARRIS:  Objection.

5           THE COURT:  Overruled.

6    A.   I would develop an exam as I described in the test element

7    portion of my testimony that consisted of mostly situational

8    judgment test questions, that were short, to the point, that

9    did not require a higher level reading ability than the job

10   required, and even if it was equal to the reading ability that

11   the job required, I would still not require extensive reading.

12   I would -- obviously I would be concerned about grammar, I

13   would be concerned about using what I call, you know, law

14   enforcement lingo.  I would want to keep it very job related

15   and very, very close to the job.  Even though it's an indirect

16   measure as direct as it can be in its format.  I would keep

17   four alternatives, and I would do the review process with the

18   subject-matter experts that I discussed.  If I had the option,

19   I would turn it into a video situational judgment test.

20   Q.   And do you think those measures that you described would

21   increase -- I'm sorry, would reduce the adverse impact of the

22   job knowledge component -- job knowledge multiple choice

23   component of a system?

24           MR. CARROLL:  Objection.

25           THE COURT:  Overruled.

1    A.    I think it would.

2    Q.    Now, what about the weighting of the job knowledge

3    multiple choice test, do you have an opinion as to what an

4    appropriate weighting of such a test might be?

5    A.    As I indicated earlier, I find that it generally should be

6    in the 20 to 40 percent range of the total test score, and my

7    job analysis would indicate specifically what it would be.

8    Q.    And do you have an opinion as to whether if you reduced

9    the weighting of the job knowledgeable multiple choice test

10   that would have an effect in reducing adverse impact if you

11   utilized these other components to be the rest of the

12   examination process?

13            MR. CARROLL:  Objection.

14            THE COURT:  Overruled.

15   A.    Well, based on the 2002 data alone we know if we increase

16   the weight of the oral component in that particular exam, we

17   can reduce group differences.

18   Q.    Okay.  Let me move on to something else.

19            Do you have an opinion as to whether it's feasible to

20   have a multicomponent examination process in cities, such as

21   Boston and in smaller cities such as are defendants in the case

22   here, who have populations, let's say, between 40 and 150,000

23   inhabitants?

24   A.    Well, I described most of my clients to you, and the

25   department sizes range from 15 to 2,700, 15 people to 2,700

1   uniforms.  So since I do it in all of those, I would say it's

2   feasible.

3   Q.   And I'd like to ask you something about the cost.  How

4   does one determine the cost of these examinations?  How is it

5   done?  Is it a bidding process?

6   A.   It's a bidding process.

7   Q.   So communities put out a request for proposal?

8   A.   Not always.  Some places who have been in extensive

9   litigation and have tried to use many, many, many consultants

10  have gone to a sole source process.

11  Q.   Okay.  And jobs that you've gotten, how have you gotten

12  those jobs, the many jobs that you've had?

13  A.   Mostly through bidding, sometimes through sole source.

14  Q.   Okay.  And in the large jurisdictions where you

15  successfully bid, have you been able to -- has it been feasible

16  to have an examination process that has multiple components

17  along the lines that you've testified here today?

18  A.   Yes.

19  Q.   And I think you've already covered this.  Is it possible

20  to do all the oral or non-written components in one day for

21  security purposes?

22  A.   Yes.  And what you can do is if -- it sometimes takes two

23  days, you do one oral exercise for all the candidates on day

24  one, and you do a second oral exercise for all the candidates

25  on day two, and perhaps a written portion may be an in-basket

1    exercise on day three.

2    Q.    So based upon that, do you have an opinion whether it

3    would be feasible to give a multicomponent examination process

4    measuring the types of non-job knowledge skills and abilities

5    necessary to be a police sergeant in the Commonwealth of

6    Massachusetts?

7    A.    Yes.

8    Q.    And what is your opinion?

9              MR. CARROLL:  Objection.

10             THE COURT:  Overruled.

11   A.    Well, it's my understanding that there are approximately

12   600 candidates, which are fewer than many of my candidate

13   populations, and so I do believe it would be feasible because

14   we would use similar types of strategies we use in other

15   jurisdictions, such as using schools when they're out of

16   session, high schools, middle schools, colleges.  Many police

17   academies are more than willing to lend their resources.  Many

18   convention centers who are run by the city government often

19   will loan themselves to a testing process.  We have the video

20   equipment.  The equipment and the resources appear to be there.

21   Q.    Now, do you have an opinion to a reasonable degree of

22   industrial psychology certainty as to -- strike that.

23             Do you have an opinion to a reasonable degree of

24   industrial psychology certainty as to whether you would

25   increase or decrease the validity of a multiple choice job

1    knowledge examination with only a T&E component if you added

2    the components to the examination that you've described to test

3    for these other skills and abilities?

4    A.    If constructed well --

5    Q.    Yes.

6              MR. CARROLL:  Objection.

7              THE COURT:  Overruled.

8    A.    -- you would increase the validity.  You would increase

9    the content validity for sure.

10   Q.    And why is that?

11   A.    Because you are measuring directly the other important

12   knowledge, skills, and other characteristics of the position.

13   Q.    So as you increase components from -- just let's say going

14   from a job knowledge multiple choice test and you add these

15   other components in that you've testified to, that increases

16   validity?

17   A.    Based upon what the Uniform Guidelines say, which is that

18   if you -- you have to represent a sufficient portion of the job

19   and then that later portion, which we discussed earlier, which

20   is it said the work behavior -- report behaviors that

21   constitute most of the job, then adding these components on

22   means that we are measuring a representative sample of the job

23   or most of the job.

24   Q.    Okay.  Let me ask you, conversely, if the defendants in

25   this case were to continue to only use as their promotional

1    process a multiple choice job knowledge test, such as the

2    testimony presented in this case shows that they use, do you

3    have an opinion as to whether that would meet the validity

4    criteria and the Uniform Guidelines of employee election?

5              MR. CARROLL:  Objection.

6              THE COURT:  Overruled.  You may answer.

7    A.    I believe it would not.

8    Q.    And tell us why it would not.

9    A.    Because the job knowledge test only measures job knowledge

10   and it measures none of the critical knowledge, skills,

11   abilities, and other characteristics.  And the T&E measures

12   experience and education but I cannot and I don't think any

13   reasonable person can ascertain what knowledge, skills,

14   abilities, and characteristics those are assessing.

15   Q.    But can't the job knowledge test -- if you ask a

16   question -- let me withdraw that and ask it this way.

17              If you ask a question on supervision, as to whether

18   someone knows the principles of police supervision, can't that

19   demonstrate that they have supervisory ability?

20   A.    Because you know something does not mean you can do

21   something.  So the knowledge of police supervision, and

22   especially if it was direct knowledge of police supervision, we

23   would not know if they would be successful supervisors.  I can

24   give you an example.

25   Q.    Go ahead.

1    A.    Most police departments have a disciplinary policy called

2    progressive discipline, and progressive discipline essentially

3    means in your first infraction, you get an oral reprimand; your

4    second infraction, you get a written reprimand; and the third

5    time you do it, you're basically out, either you get a

6    suspension or you might even get fired.  It's progressing, the

7    level of discipline will progress.

8          So you can know all about those principles if you take

9    a job knowledge test.  But I have seen many, many a police

10   sergeant sit down and actually try to discipline someone and

11   administer that discipline and it requires an extreme amount of

12   composure, it requires interpersonal skills, it requires oral

13   communication skills, stress management, and oftentimes it

14   requires an extreme level of reasoning and judgment because the

15   person who is being disciplined can get either emotional or

16   angry.

17         So the written test, while you may be able to say that

18   you know what and how to give progressive discipline, the

19   actual doing is an entirely different thing.

20         MR. LICHTEN:  Your Honor, may I just have a moment to

21   confer?

22         (Discussion off the record.)

23         MR. LICHTEN:  Thank you very much, Dr. Fields.  I have

24   no further questions at this time.

25         THE COURT:  Ms. Harris.

```
 1              MS. HARRIS:  Thank you, your Honor.
 2                        CROSS-EXAMINATION
 3   BY MS. HARRIS:
 4   Q.    Good morning, Dr. Fields.
 5   A.    Good morning.
 6   Q.    I believe you testified a little bit earlier about the
 7   numbers of jurisdictions where you have some experience, and I
 8   just wanted to talk about those for a minute.
 9              You testified that you were the director of selection
10   procedures in Fairfax County; is that correct?
11   A.    Public Safety Testing.
12   Q.    Public Safety Testing, excuse me.
13              And at the time that you were there, Fairfax County
14   was operating under a consent decree; is that correct?
15   A.    Correct.
16   Q.    Did that consent decree dictate the measures that you had
17   available to you to put in place in your promotion practice
18   exams?
19   A.    I don't recall.
20   Q.    Do you recall whether any of the exams that you developed
21   in Fairfax County had adverse impact?
22   A.    We analyzed the extent to which minorities were being
23   promoted off our lists; and, as I recall, we were meeting the
24   Department of Justice's requirements.
25   Q.    Do you recall what those requirements were?
```

1    A.    No, I do not.

2    Q.    Do you recall if they were more stringent or less

3    stringent than the -- than the recommendations in the Uniform

4    Guidelines?

5    A.    I don't recall.

6    Q.    Okay.  And I believe that you had also testified that

7    you've constructed promotional examinations for other

8    communities.  Do I have it right that Memphis, Tennessee was

9    the most recent promotional examination for the police service

10   that you've designed?

11   A.    No.

12   Q.    What is the most recent one that you've designed?

13   A.    I think Prince George's County, Maryland might be.

14   Q.    And how many candidates went through that process?

15   A.    Seven hundred, but I believe, and I'm not sure, that that

16   is for sergeant, lieutenant, and captain.  All of those

17   assessment centers and written tests were given over the same

18   period of time.

19   Q.    And when was that exam given?

20   A.    Over the last month.

21   Q.    Have you -- have you reviewed the results of that to

22   determine whether or not you've had adverse impact in any of

23   the ranks for which you tested?

24   A.    We're not done.

25   Q.    Am I correct that Memphis is the most recent concluded

1  exam that you've done for the promotional service for the

2  police promotional service?

3  A.    I'm not sure, maybe.  We do an awful lot of these police

4  sergeant exams.

5  Q.    Okay.  Well, let's focus on the Memphis exam.  I believe

6  that when we -- when we all met with your deposition about a

7  month or so ago you testified that in Memphis you had

8  approximately a thousand candidates who were testing for the

9  sergeant position; is that accurate?

10 A.    We started with 1,200 and our final number was around 900.

11 Q.    And the 900 were individuals who took a written exam to

12 determine whether or not they could proceed to the assessment

13 center component; is that correct?

14 A.    That is not correct.

15 Q.    The written exam was administered to all 900; is that

16 correct?

17 A.    We gave a video situational judgment test.

18 Q.    The video situational judgment test was a multiple choice

19 exam; is that correct?

20 A.    Yes.

21 Q.    So that was the job knowledge component?

22 A.    That was a combination of behavior consistency items and

23 job knowledge.

24 Q.    And of the 900 who went through that process, how many

25 were eligible for promotion?

1    A.    How many eligible in what respect?

2    Q.    How many of those individuals were eligible to be selected

3    for promotion?

4    A.    If you mean was there a passing score?

5    Q.    Sure.  Was there a passing score?

6    A.    There was no passing score.

7    Q.    Okay.  So how did you determine who was eligible to be

8    promoted from that exam?

9    A.    The police director determined the number of vacancies he

10   had to fill.

11   Q.    And what was that number?

12   A.    It -- I don't know.

13   Q.    Did you do an assessment to determine whether or not that

14   examination had adverse impact?

15   A.    Yes.

16   Q.    And did it?

17   A.    It did not.

18   Q.    And what did you use to determine the point at which you

19   examined whether adverse impact resulted from that exam?

20   A.    We looked at mean score differences and we looked at

21   various selection ratios, depending on what the police director

22   might select.

23   Q.    Okay.  Have any selections been made from that

24   examination?

25   A.    Yes.

1    Q.    And do you know how many selections have been made?

2    A.    165 or 166.

3    Q.    And of the -- did you examine the test results looking at

4    the 165, 166 persons who were selected for promotion to

5    determine whether or not there was adverse impact at that

6    selection point?

7    A.    Yes.

8    Q.    And can you tell us what the results of your review were?

9    A.    I don't recall, but I think at that level there was none,

10   but I'm not sure.

11   Q.    Now, when we've been talking this morning or when you've

12   been talking to Mr. Lichten about the examinations that you've

13   put in place, the term "feasibility" has come up a number of

14   times.  And can you tell me how you determine or how you define

15   the term "feasibility"?

16   A.    "Feasibility" means, to me, whether you can physically

17   test the people you need to test, so you need space.  It means

18   what is the willingness or ability of your jurisdiction to

19   test, and that could be either simple willingness or cost.

20   Then there is the issue of security, test security.  I would

21   say that's it.

22   Q.    Would you look at things like the local laws that govern

23   the selection procedures, if there were any, in determining

24   what's feasible for putting together an examination?

25   A.    Yes.

1  Q.  Would you look at the collective bargaining agreements to

2  determine whether or not there were union restrictions on the

3  kind of selection procedures that could be used?

4  A.  Yes.

5  Q.  You're aware, I assume, that in Massachusetts one of the

6  issues in this case is that there's a state statute that

7  requires merit-based selections for promotion in the police

8  service.  Is that your understanding?

9  A.  I'm aware of that.

10 Q.  And do you understand that at least as it's been applied

11 in these cases that the merit-based selection requirements

12 requires a competitive examination to determine who will be

13 eligible for promotion?

14 A.  Yes.

15 Q.  And that that eligibility requirement translates into a

16 list of applicants who have passed an exam and who are then

17 considered for promotion in top-down rank order?

18 A.  Yes.

19 Q.  Okay.  And have you designed an examination that has been

20 subject to that kind of a state law requirement?

21 A.  I believe so.  I mean, I think Fairfax County is an

22 example because it, too, operated under the Civil Service.

23 Q.  And it was also operating under a consent decree at that

24 time, correct?

25 A.  Correct.

1    Q.    Did that consent decree affect the manner in which the

2    state Civil Service system worked for the selection process?

3    A.    I think I already said I'm not sure, but I do know that

4    that system remained in place after the consent decree was

5    lifted, so I don't know the answer.

6    Q.    Okay.  And is it your understanding that the Civil Service

7    system remained in full force and effect consistent or

8    contemporaneously with the requirements of the consent decree?

9    A.    Could you repeat one more time?  Sorry.

10    Q.    Sure.  When there was a consent decree in place in Fairfax

11    County, did the Civil Service laws and regulations remain in

12    full force and effect during the time period that that consent

13    decree was operational?

14    A.    I believe so.

15    Q.    Have you designed -- strike the question.

16           Have you designed an examination in jurisdictions like

17    those that are present in this case where there are

18    multijurisdictions availing itself of a Civil Service system

19    designed by the state?

20    A.    I don't think so.

21    Q.    And would you consider -- in assessing feasibility would

22    you consider the fact that there are multiple jurisdictions

23    that draw upon the services of HRD in using their selection

24    procedures?

25    A.    Would I consider it?

1    Q.    Would you consider that when you're assessing feasibility?

2    A.    Yes.

3    Q.    And I believe that you testified earlier that one of the

4    things that you would require as an industrial psychologist

5    creating an examination is spending time in the field with the

6    persons for whom you're going to be designing the selection

7    process; is that right?

8    A.    Correct.

9    Q.    So if you were designing an examination for HRD to

10   administer in the Commonwealth, would that mean that you would

11   have personnel assigned to the different jurisdictions within

12   the Commonwealth that use the HRD promotional system to

13   determine how the job is done in the various jurisdictions?

14   A.    Yes.

15   Q.    And how would you -- you have 12 staff, I think, that you

16   said work for your company?

17   A.    Yes.

18   Q.    Would you devote the resources of your staff to do that

19   sort of street level fact-finding?

20   A.    We wouldn't need every person, and we also could use some

21   police subject-matter experts that are in my firm.

22   Q.    Can you assess, based on the kind of work that you've

23   done, if you were to -- if you were to review a request for

24   proposal from HRD that stated, you know, we want to perform

25   annual promotional exams for the Commonwealth of Massachusetts

1    Civil Service HRD system, can you give an assessment --

2    terrible choice of words -- can you give an estimate about what

3    kind of cost that would require, to do the kind of job analysis

4    that you've described previously today?

5    A.    And are we talking -- I'm sorry, what specifically would

6    you like me to estimate?

7    Q.    I'd like you to estimate how much -- well, let's take it

8    in pieces.  What kind of cost would be involved in doing a job

9    analysis, assuming that the state is looking to you to create

10   an examination that has multiple components?

11   A.    I really -- I would have to calculate hours and time.  I

12   put in my expert report that I estimated about a thousand per

13   candidate.  I'm not sure that translates to the statewide exam.

14   But that would be development costs and the job analysis would

15   be part of those development costs for the whole development

16   process.

17   Q.    I thought that you had estimated a thousand dollars per

18   candidate to go through an assessment center.  Is it your

19   testimony that it would be -- okay.  I'm looking at page 24 of

20   your report.  Do you have that in front of you?

21   A.    Yes.

22   Q.    You estimated a test, such as a video-based situational

23   judgment test, can be administered to as many as 500 to 600

24   candidates in one room.  I estimate the professional cost of

25   development, validation, and administration to be about a

1    thousand dollars per candidate.  So I read that to mean that

2    situational judgment test would cost about a thousand dollars

3    per candidate.  Am I misreading your report?

4         (Pause.)

5    A.   For that -- yes, you can interpret it to mean that, but

6    that would include all the development, validation and

7    administration.

8    Q.   Of every component for the exam?

9    A.   For that exam.  For that situational judgment test video

10   test.

11   Q.   So if you had an examination that had a situational

12   judgment video test, am I safe to assume that it would have

13   other components as well?

14   A.   More than likely.

15   Q.   Okay.  And so can you give me an estimate about what the

16   total cost would be from soup to nuts putting together an

17   examination, a multiple component examination, for the state?

18   A.   I cannot estimate that.

19   Q.   Can you tell us --

20   A.   Let me just explain why.

21   Q.   Go ahead.

22   A.   It depends on too many factors.

23   Q.   Well --

24   A.   It depends on how many exercise components, it depends on

25   how many raters, it depends on too many -- there's too many

1    considerations.

2    Q.    Okay.  Now -- and that's kind of the point that I'm

3    getting to.

4          If you have -- I'll represent to you that I believe

5    for each annual exam that's been administered in the -- the HRD

6    process that we're here for, there have been at least 1,200 to

7    1,500 candidates, and this is for the sergeant level

8    examination.  We're not talking about lieutenant and captain,

9    which are administered simultaneously.

10          If you're going to run a promotional test system for

11   1,200 candidates to 1,500 candidates, I'm assuming that you're

12   looking at factors such as complying with local law and the

13   collective bargaining agreements, you're looking at if you're

14   going to have any of the assessment center type exercises that

15   you've described today, you're looking at staffing above and

16   beyond what would be necessary for the administration of a

17   paper exam, correct?

18   A.    Well, we have many considerations.  What if we have --

19   we're only taking a top number of candidates?  That's why

20   there's so many variables in this equation.

21   Q.    Okay.  And in the example that we were talking about a

22   little bit earlier in Memphis, as I understand it, there were

23   multiple components that have been in place in that exam,

24   correct?

25   A.    No.  There was just the video -- the main component was

1  the video situational judgment test.  We required mandatory

2  training to prepare for the exam.  So, yes, in that respect

3  there were many components.

4  Q.   And how much has it cost the City of Memphis to put this

5  exam together?

6  A.   I don't know the total cost.  I think we discussed that it

7  was around -- a little over a million dollars.

8  Q.   And is this an examination that they'll be able to

9  administer year to year or will they incur the same costs on a

10 year-to-year basis when they put out a new exam?

11 A.   They will not incur the same costs.  We have developed a

12 system that can be modified and reused.

13 Q.   Now, in the city of Memphis -- so am I correct in

14 understanding that the city requires that seniority be factored

15 into its final candidate eligibility list?

16 A.   Yes.

17 Q.   And how does seniority affect -- how does seniority affect

18 the adverse impact analysis of the eligibility list at the end

19 of the day?

20 A.   Seniority had literally zero adverse impact, and it had a

21 wonderful positive impact on test scores.

22 Q.   And by that can I assume that you mean that the African

23 American candidates and the non-African American candidates

24 were roughly on par or at parity in terms of their years of

25 seniority?

1    A.    Exactly.

2    Q.    And did you consider that the calculation of seniority

3    into the ultimate establishment of the eligibility list to be

4    reflective of important knowledge, skills, and abilities for

5    that position?

6    A.    Seniority has been shown -- and, again, we can go back to

7    the Hunter article -- as being valid.  It has very minimal

8    validity, but it is valid.

9    Q.    And do you recall -- when you were looking at the results

10   of your examination, did you do your adverse impact

11   calculations prior to calculating in the seniority points for

12   the candidates?

13   A.    Yes.

14   Q.    And do you recall whether or not there was any change to

15   your adverse impact calculations after you calculated in the

16   seniority benefits?

17   A.    Yes.

18   Q.    And what was that change?

19   A.    The adverse impact was reduced.

20   Q.    So the inclusion of the seniority reduced adverse impact?

21   A.    Yes.

22   Q.    Can I assume that it increased, at least in some way, the

23   validity of the examination overall?

24   A.    I would say yes.

25   Q.    Now, we talked a little about the T&E component of the

1    examination that HRD has prepared, and I believe that you

2    stated that you were familiar with it and that you felt that it

3    had -- that it measures experience in education but that you

4    didn't feel that it added to the validity of the examination

5    that HRD has delivered.  Do I have that right?

6    A.    Yes.

7    Q.    And can you tell me, the T&E -- do you understand that the

8    T&E in this case measures seniority?

9    A.    Yes.

10   Q.    And it measures one's attainment of formal education?

11   A.    Yes.

12   Q.    And is it your sense that measuring seniority or formal

13   education would not improve the validity of an examination?

14   A.    This particular T&E is not linked to any knowledge,

15   skills, or abilities.

16   Q.    And when you say that, am I safe to assume when you wrote

17   your expert report you hadn't looked at any of the job analyses

18   that are at issue in this case, correct?

19   A.    When I wrote my expert report?

20   Q.    Yes, in March of this year.

21   A.    I reviewed a small section of the 1991 job analysis report

22   in 2002 from Dr. Wiesen's report, I believe.

23   Q.    You had looked at the expert reports that were prepared by

24   the other experts in this case, but you didn't look at any of

25   the underlying data upon which their reports were based; is

1  that correct?

2  A.   They had some appendices that had some data in it.  That

3  was it.

4  Q.   And you haven't looked at anything other than what was

5  included in their appendices?

6  A.   Correct.

7  Q.   And by that -- and I'll note at page 5 of your report you

8  state, "I base my opinion on the review of the six expert

9  reports that have been submitted to date, along with some data

10  I received from Dr. Wiesen in March of 2010."  Correct?

11 A.   That is correct.  Where is that?

12 Q.   On page 5 in the first full paragraph.  It's the --

13 A.   Yes, I see it.  Yes, I wrote that.

14 Q.   So your testimony that the T&E is not linked to any of the

15 KSAs in this case is based upon the information that you

16 learned from Dr. Wiesen as of March of 2010?

17 A.   I learned more information about the T&E after that.

18 Q.   And that information is information that you were never

19 asked to provide to the defendants in a supplemental report,

20 correct?

21 A.   Correct.

22 Q.   Now, are you aware that the T&E also measures whether one

23 has lectured or taught courses in a criminal justice setting?

24 A.   Yes.

25 Q.   And are you aware that it also provides credit for anyone

1    who has been certified as an emergency medical technician or an

2    instructor in life support?

3    A.    Yes.

4    Q.    And would you agree that teaching or being an instructor

5    in basic life support would be evidence of oral skills?

6    A.    No.

7    Q.    Or communication skills?

8    A.    No.

9    Q.    And would you -- are you aware that the assessment of

10   education and experience is something that's required by state

11   statute in Massachusetts?

12   A.    Am I aware that what?

13   Q.    That the providing benefits or points for education and

14   experience is something that's required by state statute in

15   Massachusetts?

16   A.    I think I did know that, yes.

17   Q.    And let me ask you, in the Memphis example that we've

18   spoken about, the seniority factor is required by the

19   collective bargaining agreement; is that right?

20   A.    Correct.

21   Q.    And is it linked to the examination as well?

22   A.    No.

23   Q.    It's just a standalone 10 points that one gets for

24   seniority?

25   A.    Correct.

1    Q.   And in your mind it still, even though it's not linked

2    back to the exam, it still lends itself to increasing the

3    validity of the exam overall?

4    A.   I would say minimally.

5    Q.   And your quarrel with the T&E in this case is it's not

6    linked back to anything in the exam that's been administered

7    here?

8    A.   Not the exam, the job.

9    Q.   The job.  Again, the seniority piece in Memphis is not

10   linked back to the job, correct?

11   A.   The seniority piece doesn't need to be.  It's -- seniority

12   just in itself just with points is -- has some criteria related

13   validity that has already been demonstrated and shown through

14   metaanalysis used.  That T&E is asking about specific

15   information such as you just read that's not showing me where

16   in the job and exactly how often in the job, you know,

17   emergency medical response by a police officer is required.

18   Q.   Well, the T&E also credits for experience, correct?  For

19   number of years in service, which is typically seniority,

20   correct?

21   A.   Yes.

22   Q.   And in that sense, is it different from the seniority

23   benefit that is available in the Memphis?

24   A.   That piece of it is not.  Although I think that experience

25   piece has different levels.  So I don't know how that is

1    justified.

2    Q.   Now, I think we were talking about the size of the

3    municipalities that you have designed promotional exams for.

4    And you've listed in your report that in Memphis, like you just

5    testified, there are approximately a thousand candidates, and

6    in Fairfax County as well there are about a thousand

7    candidates.  And in the other municipalities that you talked

8    about with Mr. Lichten in Macon, Georgia you estimated there

9    were approximately 200 candidates.  And I'm assuming that's for

10   the entire promotional process, not just for sergeant?

11   A.   I believe it was around that.

12   Q.   In Richmond, that's 200 candidates.  Charlotte, North

13   Carolina, approximately 200 candidates.  St. Louis,

14   approximately 200 candidates.  So is it safe to assume that the

15   next largest communities that approximate the communities with

16   the size candidate pool that we're talking about here would be

17   your work in Memphis and then Fairfax County?

18   A.   And I would say Prince George's.

19   Q.   You listed Prince George's in your report as being

20   approximately 200 candidates?

21   A.   That is just sergeants.  And my staff just informed me

22   that we do seven to 800 all in a weekend for all ranks.

23   Q.   Seven to 800 assessment center exercises?

24   A.   Yeah, I wasn't sure if they do the written one.  They do

25   the written exam, they may do the written exam the second time.

1    Q.    When we talked about the different components that you put

2    into your promotional exams, we talked -- or you and

3    Mr. Lichten talked about components that were distinct from the

4    multiple choice exam.  And just so that we're all talking about

5    the same thing, the job knowledge component of a promotional

6    exam in this case, in the ones that we're here about today, has

7    been measured by a written examination.  Do I understand your

8    testimony to be that in Memphis you put together a situational

9    judgment exercise that captures the job knowledge component of

10   the job as well as other components and is assessed with the

11   use of a multiple choice exercise that -- well, strike it --

12   that's assessed by a multiple choice exercise?

13   A.    It's a -- it's situational videos and the responses to

14   those videos are scaled response items.  They are not standard,

15   one answer multiple choice responses.

16   Q.    Okay.  So to make sure that I have it correct, in Memphis,

17   the candidate observes a situational exer -- a situational

18   scenario?

19   A.    Yes.

20   Q.    And is given four, A, B, C, D, answers that he or she can

21   select?

22   A.    Correct.

23   Q.    And there's no one right answer.  The candidate can get

24   credit if they choose a second-best answer in that situation?

25   A.    That is correct.

1  Q.    But regardless of the format in which it's given, it's a

2  job knowledge test, at least in part?

3  A.    Part of it is job knowledge and part of it is measuring

4  other characteristics.

5  Q.    Okay.  So when we talk about examinations like the 2002

6  examination that was administered by the Boston Police

7  Department, and we talk about the assessment center component

8  and the multiple choice component, it's not your position, and

9  you would not advocate that there should be no element of the

10  assessment that -- strike that.

11        It's not your position that a job knowledge component

12  is inappropriate to use in a promotional exam?

13  A.    For police sergeant I am for a job knowledge test as part

14  of the promotional exam.

15  Q.    Okay.  And you would agree that for police sergeant or a

16  front-line supervisor, being able to assess that the candidate

17  has the requisite knowledge of the laws, the local ordinances,

18  and the department rules and regulations would be essential to

19  determining whether or not that candidate was at least

20  minimally qualified for the job?

21  A.    In most cases, yes.

22  Q.    Okay.  Can you think of a case where a police sergeant

23  would not need to have knowledge of local laws, constitutional

24  laws, and rules and regulations of the department in order to

25  be minimally qualified for the job?

1  A.   I cannot think of that example, but I can think of

2  examples in which that knowledge may have been tested in

3  earlier positions, such as the position of corporal or master

4  police officers, and may not be necessary to test it again.

5  Q.   Okay.  But if we're talking about the kind of situation

6  that we have here, where you've got entry-level civilians who

7  test to become police officers and then the next test is a

8  sergeant's exam to become a front-line supervisor, you would

9  agree that you would want to have a knowledge -- a job

10  knowledge test that assured that they had at least the minimal

11  qualities in order to become a police sergeant?

12  A.   Yes.

13  Q.   And would you agree that in a Civil Service system that's

14  merit-based, that while you may set your cut score to determine

15  that there's nobody who can't meet those minimal standards, the

16  likelihood of promotion is going to go to those who are the

17  most well-qualified or at least those that can demonstrate

18  their qualifications in the selection process?

19  A.   Can you please repeat that?

20  Q.   I'll try.

21       When we've talked about examinations in the

22  establishment of a cut score or a pass/fail score, it's my

23  understanding that you're looking to see what are the questions

24  that one has to answer in order to be minimally qualified for

25  the job.

A.    Correct.

Q.    Now, my question is in a merit-based system, such as the one we have here where there's a top-down selection, would you agree that regardless of the placement of the cut score the individuals who are -- that the system is designed to identify for promotion are those who can demonstrate that they are the most qualified using the selection instrument that's in play?

A.    What I would say is that candidates have to get into a consideration band, which is your 2 N + 1, which is depending on the number of vacancies, that's what they have to achieve.

Q.    And do you understand that in Massachusetts under the 2 N + 1 band that the appointing authority has to proceed in strict rank order unless they can justify bypassing somebody?

A.    Yes.

Q.    Okay.  So in order to get into the band for selection, one has to get into the band but then one also has to be at the top of the band barring any reason to disqualify a candidate?

A.    I don't think I agree with that.  Why can't there be another process that is a fair and job-related objective process to select out of a band?

Q.    Because then the candidate that is bypassed can challenge that for being a bypass despite the qualifications, unless there is a disqualifier such as discipline or other poor performance issues.

A.    But candidates can challenge any portion of the exam.

1    Q.   They certainly can and do.

2            THE COURT:  With that, Ms. Harris, we've gone past

3    1:00.

4            MS. HARRIS:  I apologize.

5            THE COURT:  We'll take our recess and resume tomorrow

6    at 9:00.

7            THE CLERK:  All rise, court is in recess.

8            (Court adjourned at 1:06 p.m.)

9

10                    C E R T I F I C A T E

11

12            We, Marcia G. Patrisso, RMR, CRR, and Debra M. Joyce,

13    RMR, CRR, Official Reporters of the United States District

14    Court, do hereby certify that the foregoing transcript

15    constitutes, to the best of our skill and ability, a true and

16    accurate transcription of our stenotype notes taken in the

17    matter of Civil Action No. 07-11693-GAO, Pedro Lopez, et al, v.

18    City of Lawrence, et al.

19
     /s/ Marcia G. Patrisso
20   MARCIA G. PATRISSO, RMR, CRR
     Official Court Reporter
21

22    /s/ Debra J. Joyce
     DEBRA M. JOYCE, RMR, CRR
23   Official Court Reporter

24   Dated: 7/20/10

25