UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

PEDRO LOPEZ, Individually and on    )
behalf of a class of individuals    )
similarly situated,                 )
                                    )
        Plaintiffs,                 )
                                    ) Civil Action
v.                                  ) No. 07-11693-GAO
                                    )
CITY OF LAWRENCE, et al.,           )
                                    )
        Defendants.                 )
                                    )

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY EIGHT
NON-JURY TRIAL

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Thursday, July 22, 2010
9:01 a.m.

Marcia G. Patrisso, RMR, CRR
Debra M. Joyce, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1    APPEARANCES:

2        LICHTEN & LISS-RIORDAN, P.C.
         By: Harold L. Lichten, Esq.
3            Stephen S. Churchill, Esq.
             Joseph L. Sulman, Esq.
4        100 Cambridge Street, 20th Floor
         Boston, Massachusetts  02114
5        On Behalf of the Plaintiffs

6        CITY OF LOWELL LAW DEPARTMENT
         By: Brian W. Leahey, Esq.
7            R. Eric Slagle, Esq.
         City Hall
8        375 Merrimack Street
         Lowell, Massachusetts  01852
9        On Behalf of the Defendant City of Lowell

10       OFFICE OF THE CITY ATTORNEY
         By: Richard J. D'Agostino, Esq.
11       200 Common Street, Suite 306
         Lawrence, Massachusetts  01840
12       On Behalf of the Defendant City of Lawrence

13       COLLINS, LOUGHRAN & PELOQUIN
         By: Laurie W. Engdahl, Esq.
14       320 Norwood Park South
         Norwood, Massachusetts  02062
15       On Behalf of the Defendant City of Worcester

16       MORGAN, BROWN & JOY, LLP
         By: Mary Jo Harris, Esq.
17           Robert P. Morris, Esq.
         200 State Street, 11th Floor
18       Boston, Massachusetts  02109
         On Behalf of the Defendant City of Boston
19
         MBTA LAW DEPARTMENT
20       By: Kevin S. McDermott, Esq.
         10 Park Plaza, 7th Floor
21       Boston, Massachusetts  02116
         On Behalf of the Defendant MBTA

22

23

24

25

```
 1    CITY OF SPRINGFIELD LAW DEPARTMENT
      By: Harry P. Carroll, Esq.
 2    36 Court Street
      Springfield, Massachusetts  01103
 3    - and -
      LAW OFFICE OF EDWARD M. PIKULA
 4    By: Edward M. Pikula, Esq.
      1350 Main Street, 15th Floor
 5    Springfield, Massachusetts  01103
      On Behalf of the Defendants City of Springfield
 6    and Mayor Sarno

 7    CITY OF METHUEN - OFFICE OF THE CITY SOLICITOR
      By: Peter J. McQuillan, Esq.
 8    The Searles Building, Suite 311
      41 Pleasant Street
 9    Methuen, Massachusetts  01844
      On Behalf of the Defendant City of Methuen
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                            I N D E X

2                        Direct   Cross   Redirect   Recross
   WITNESSES FOR THE
3      PLAINTIFFS:

4
   Cassie Lynn Fields
5
        By Mr. Leahey                5
6       By Mr. McDermott            73
        By Mr. McQuillan            84
7       By Mr. D'Agostino           88
        By Mr. Lichten                        90
8       By Ms. Harris                                   108
        By Ms. Engdahl                                  117
9       By Mr. Leahey                                   119

10  Spencer Tatum

11      By Mr. Churchill      126
        By Ms. Engdahl                149
12

13

14                        E X H I B I T S

15
   PLAINTIFFS'
16    EXHIBIT        DESCRIPTION              MARKED    RECEIVED

17  64              Findings of fact, conclusions
                    of law issued by MCAD 4/26/02        136
18
    65              Findings of fact, conclusions
19                  of law issued by MCAD 8/13/04        137

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2              THE CLERK:  All rise.
 3              (The Court enters the courtroom at 9:01 a.m.)
 4              THE CLERK:  For a continuation of the Lopez trial.
 5   Please be seated.
 6              COUNSEL IN UNISON:  Good morning, your Honor.
 7              THE COURT:  Dr. Fields?
 8              THE COURT:  All right, Mr. Leahey.
 9              MR. LEAHEY:  Thank you, your Honor.
10                    CASSIE LYNN FIELDS, resumed
11                    CONTINUED CROSS-EXAMINATION
12   BY MR. LEAHEY:
13   Q.   Good morning, Dr. Fields.
14   A.   Good morning.
15   Q.   In reviewing your report, it appears that one of your
16   opinions in this case is a concern that there's a lack of
17   documentation with regarding to an issue of linkage; is that
18   correct?
19   A.   Yes.
20   Q.   And you're aware in this case that HRD has these records
21   and that none of the municipal defendants have those records,
22   correct?
23   A.   Yes.
24   Q.   Strike that.
25        You're aware that the records that you're referring to
```

1    when you say there's a lack of documentation refer to records

2    maintained by HRD, correct?

3    A.    I'm not sure who has the records.

4    Q.    Did you get any records from the municipalities with

5    respect to -- or with respect -- on the statewide test, did you

6    get any records from the municipalities regarding the test

7    examination either building it or -- either building it or

8    scoring it?

9    A.    From the municipalities did I get the actual construction

10   materials?

11   Q.    Yes.

12   A.    No.

13   Q.    Are you aware that with respect to the municipal

14   defendants, who used the statewide examination, that they only

15   got the materials as a result of signing confidentiality

16   agreements with HRD with respect to this lawsuit?

17   A.    They only got what with -- for their confidentiality

18   agreement?

19   Q.    The documents from HRD regarding the test construction and

20   scoring of the exam.

21   A.    I'm not really aware of how that all happened.

22   Q.    I believe you testified that generally you advised your

23   clients to set an overall passing grade; is that correct?

24   A.    Oftentimes.

25   Q.    Generally speaking?

1    A.    I don't know -- sometimes.

2    Q.    And the point of that is, again, to distinguish between

3    persons who are -- and I believe you testified on Tuesday to

4    screen out those who have exceptional levels of performance,

5    moderate levels of performance, minimally competent versus

6    those of ineffective performance; is that correct?

7    A.    That's not what a passing score's for.

8    Q.    What does -- what is a passing score for?

9    A.    A passing score is to differentiate between those who are

10   competent versus not competent.

11   Q.    So you want to screen out those who are not minimally

12   competent with a passing score, correct?

13   A.    Correct.

14   Q.    And on assessment centers, I think you testified that in a

15   structured oral interview that each candidate would require

16   their own room?

17   A.    That's correct.

18   Q.    And that they'd have to have their own equipment so that

19   they could record that interview?

20   A.    That's one method.

21   Q.    Well, if you were going to do what you testified earlier

22   that you would get a bunch of the videos, and then you'd take

23   them back to Washington and review them, you would obviously

24   have to have equipment in the room to do that, right?

25   A.    Yes.

1    Q.    When you have raters reviewing videotape, do you have

2    multiple raters rate each performance or do you just have one

3    rater rate one video?

4    A.    You have multiple raters review each performance.

5    Q.    And that's to compensate for the different scoring systems

6    that one may have, one may be -- one rater may be an easier

7    grader, another may be a harder rater, it's more to validate it

8    by having multiple raters review the videotape?

9    A.    That's one reason why you do it.

10    Q.    What's another reason that you do it?

11    A.    To ensure that you have diversity in representation of the

12    candidate pool and to make sure that the ratings are -- you

13    were speaking of bias, you also want to make sure that they are

14    accurate.

15    Q.    So how many -- in a video review how many raters would you

16    have review each particular video?

17    A.    I would say it depends.  Two to -- I've seen people use

18    many, many raters.  I don't agree with that.  No more than

19    three.

20    Q.    Two to three?

21    A.    That -- that's for me.

22    Q.    And would those two or three raters do all 800 or would it

23    be two or three raters for -- if there were 800 videos done,

24    would two or three do all 800 or would two or three do 100,

25    another two or three would do a second set of 100, how would

1    that work?

2    A.    We would have multiple panels doing subsets of the

3    candidates, yes.

4    Q.    So if you were doing an exam for approximately a

5    hundred or -- excuse me -- 800 people, it may well be that

6    you'd have anywhere from 10 to 20 raters depending on the

7    circumstances?

8    A.    Correct.

9    Q.    Doctor, you also testified about the 80 percent rule from

10   the EEOC guidelines?

11   A.    Yes.

12   Q.    And you're aware that that four-fifths rule is just a rule

13   of thumb, correct?

14   A.    Yes.

15   Q.    That -- that there was no validity testing to establish

16   that 80 percent rule, was there?

17   A.    I don't understand your question.

18   Q.    Did you -- do you know -- are you aware of any study that

19   shows the four-fifths rule was scientifically valid?

20   A.    Valid for what?

21   Q.    In terms of a reliable measure of whether or not there's

22   adverse impact?

23   A.    I am aware of some studies that evaluate its -- its

24   statistical appropriateness, let's say.

25   Q.    What study is that?

1    A.    There's a recent publication by -- I think it's Dr. Silva

2    that talks about whether the -- how the

3    four-fifth -- four-fifths rule operates.

4    Q.    Right.  Not how it operates.  I'm talking about how it was

5    actually created, and I'm asking you whether or not you're

6    aware of any scientific data that shows if we're analogizing it

7    to the pass/fail score how -- whether or not there's any type

8    of scientific validity as to how that 80 percent rate was set?

9    A.    How it was set was, I believe, not based on a statistical

10    analysis.

11    Q.    Right, no -- there's no science behind the four-fifths

12    rule, correct?

13    A.    That's my understanding.

14    Q.    It's an administrative rule of thumb?

15    A.    I agree.

16    Q.    In fact, the EEOC guidelines in the question and answer

17    describe the 80 percent rule as a rule of thumb, correct?

18    A.    I agree.

19    Q.    Turning to the position of police officer, would you agree

20    with me that the position -- the -- and you've done testing for

21    entry-level positions of police officers, correct?

22    A.    Correct.

23    Q.    Would you agree with me that the duties of a police

24    officer include making arrests?

25    A.    Yes.

1    Q.    Directing traffic?

2    A.    Yes.

3    Q.    Investigating crimes?

4    A.    Yes.

5    Q.    Writing reports?

6    A.    Yes.

7    Q.    Assisting citizens?

8    A.    Yes.

9    Q.    Serving warrants?

10   A.    Yes.

11   Q.    Conducting searches?

12   A.    Yes.

13   Q.    Preserving crime scenes?

14   A.    Yes.

15   Q.    And responding to any type of emergency?

16   A.    Yes.

17   Q.    Would you also agree with me that a police officer, an

18   entry level police officer, needs to have interpersonal skills?

19   A.    Yes.

20   Q.    That a police officer also needs to have command presence

21   with respect to at least citizens?

22   A.    Yes.

23   Q.    And that a police officer has to have an ability to work

24   under pressure, correct?

25   A.    Yes.

1  Q.   And a police officer also has to show good judgment,

2  correct?

3  A.   Yes.

4  Q.   And you'd agree with me that a police officer has to act

5  in real time in terms of making decisions, correct?

6  A.   Yes.

7  Q.   But they have to know at a certain moment whether or not

8  probable cause exists or not whether to arrest a person,

9  correct?

10  A.   They have to evaluate whether they have probable cause to

11  make an arrest.

12  Q.   Right.  And it has to be at that moment in real time,

13  correct?

14  A.   Correct.

15  Q.   The same way they need to know and make a decision of

16  whether or not they can search a person and -- or make any

17  search, correct?

18  A.   Correct.

19  Q.   And that they need to have a good understanding of the

20  laws that pertain at least to search and arrest, correct?

21  A.   Correct.

22  Q.   And you'd agree with me that a police officer needs to

23  know how to write a report, correct?

24  A.   Yes.

25  Q.   And that a police officer needs to know basic grammar,

1  correct?

2  A.    Yes.

3  Q.    And that when a police officer writes a report, he has to

4  put -- he or she has to put all information that's relevant to

5  that type of report inside the four corners of that report,

6  correct?

7  A.    Well, he has opportunities to write a supplement, so, yes,

8  and with the opportunity to write additional information.

9  Q.    Right.  But whatever's in the report -- whether it's one

10 report or supplemental reports, it has to contain the required

11 information for whatever that report concerns, correct?

12 A.    Yes.

13 Q.    So with respect to an arrest report, it would need to

14 contain all the elements necessary to justify that arrest,

15 correct?

16 A.    Correct.

17 Q.    And if it was a missing juvenile report, it would need to

18 contain all the information relating to that missing juvenile,

19 correct?

20 A.    Correct.

21 Q.    Yesterday or -- excuse me -- two days ago, at some point

22 you talked about discipline in a sergeant's role, and I'm not

23 sure if you testified that a sergeant under a progressive

24 discipline, a sergeant could suspend or terminate an officer;

25 is that -- is that your testimony or is that a misstatement?

1    A.    Misstatement.

2    Q.    Are you aware in Massachusetts that a sergeant can't

3    suspend or terminate a police officer?

4    A.    That's true in most places.  I'm not aware of

5    Massachusetts.

6    Q.    Is it fair to say that all a sergeant can do is give an

7    oral reprimand or perhaps a written warning to a police

8    officer, and any other discipline would have to go further up

9    the chain other than a sergeant?

10   A.    That's typical.

11   Q.    With respect to things you're looking for in a sergeant,

12   is one of the things that you're looking to test for is whether

13   or not an individual can learn from their mistakes?

14   A.    I don't know that I test for that, per se.

15   Q.    Do you think with regards to your -- your knowledge and

16   experience with regards to police sergeants, do you think it's

17   an important -- or a critical task of a sergeant to be able to

18   learn from his or her mistakes?

19   A.    Yes.

20   Q.    And do you think it's important for them to admit when

21   they make a mistake as opposed to denying that they made any

22   type of mistake?

23   A.    Yes.

24   Q.    And, Dr. Fields, you talked about banding previously, and

25   you were asked questions about it.  And you said that

```
1   candidates traditionally don't like banding.  Do you remember
2   testifying to that yesterday?
3   A.   No.
4   Q.   Do you remember testifying to that on Tuesday?
5   A.   No.
6   Q.   Is it your -- is it your understanding that candidates
7   prefer banding?
8   A.   No.
9   Q.   Do you have an opinion -- do you have an understanding of
10  what candidates based on your training, experience in your
11  interviews with the various police departments in preparing
12  tests, do you have an opinion as to whether or not candidates
13  like or dislike banding?
14  A.   I think some like it and some do not.
15  Q.   And who are the people that like it?
16  A.   Could you be more specific?
17  Q.   Well, does it go -- does banding -- people who like
18  banding and who dislike banding, does it go by race?
19  A.   I never noticed that.
20  Q.   What, if anything, did you notice about the people who are
21  for banding?
22  A.   That they understand that a test score is a one-day or
23  two-day event, and it may not capture everything about them
24  that there is to capture.
25  Q.   And banding helps that?
```

1    A.    Yes.

2    Q.    How does banding help that?

3    A.    Because when you're being considered from the band, either

4    related job performance measures can be considered.

5    Q.    Are you aware that banding is not legal in Massachusetts?

6          MR. LICHTEN:  Objection.

7          THE COURT:  Rephrase it.

8    BY MR. LEAHEY:

9    Q.    Are you aware that in April of 2009 a Supreme Court judge

10   enjoined HRD from using banding in this state?

11   A.    I have heard about that.

12   Q.    And who did you hear that from?

13   A.    I think it's in Dr. Silva's report.

14   Q.    Are you aware that the reason that injunction was granted

15   was because the judge found it violated the basic merit

16   principles of Civil Service?

17   A.    I don't know all the details of the case.

18   Q.    You're aware even under a -- even using banding that

19   minorities can be excluded from promotional opportunities,

20   correct?

21   A.    Correct.

22   Q.    And that in some ways banding can be more or -- or banding

23   is more subjective than using a strict rank order numbering of

24   candidates, correct?

25   A.    I don't agree with that.

1    Q.    Why don't you agree with that?

2    A.    Because you can use objective measures to select from the

3    band -- select from the band.

4    Q.    Would you agree with me that regardless of the criteria

5    that you use, at least using banding can be viewed as more

6    subjective than using rank numbering of candidates?

7          MR. LICHTEN:  Objection to the form of the question.

8    Used by whom?

9          THE COURT:  Overruled.  You may answer it.

10         THE WITNESS:  Can you repeat the question, please.

11         MR. LEAHEY:  Read the question back, please.

12         (The reporter reads the pending question.)

13         THE WITNESS:  Perceived as subjective by whom?

14   BY MR. LEAHEY:

15   Q.    By the candidates.

16   A.    I think some candidates could perceive it that way, yes.

17   Q.    And you'd agree with me that in banding it allows for

18   individual biases of the person who's making the selection to

19   come into play as opposed to if they had to use strict rank

20   order they wouldn't be able to use that subjectivity?  Would

21   you agree with that?

22   A.    No.

23         MR. LEAHEY:  May I have a moment, your Honor?

24         (Pause.)

25   BY MR. LEAHEY:

1   Q.   Turning to the issue of content validity, I believe you

2   were asked questions about the EEOC guidelines that talk about

3   the test to the content validity should be a representative

4   sample of the content of the job; is that correct?

5   A.   Yes.

6   Q.   And that the work behavior selected for measurement should

7   be critical work behaviors or important work behaviors that

8   constitute the exam; is that correct?

9   A.   Yes.

10  Q.   If there's good content validity in an exam, would you

11  expect a person as they're on -- if they take multiple exams

12  and learn more job skills during their employment that their

13  grades would increase over time, if they took the test multiple

14  times?

15  A.   The exact same test?

16  Q.   Not the exact same test but a similar test.

17  A.   I need more specifics.  If it was identical, yes.

18  Q.   What about -- what -- would the tests in question here, if

19  someone took the '05, '06, '07, '08 test, if they took those

20  four tests in a row, would you expect their grades to go up

21  each year that they took it just based on the job skills that

22  they learned over that previous year?

23  A.   Maybe they would go up.

24  Q.   If they were using the same HRD test for a period of

25  years, whether it's twice in a six-year period or three times

1    in a ten-year period, and it's basically the same HRD

2    examination, would you -- if it was a content valid exam would

3    you expect the grades to rise over time?

4    A.    The reason why I'm -- I'm pausing is because these are

5    police officers taking a sergeant's exam so it depends on the

6    amount they study.

7    Q.    Right.  Putting -- right, studying is obviously of

8    critical importance.  But I'm saying just generally speaking

9    assuming the study level stayed the same, if they are taking

10   essentially the same test every couple of years but

11   are -- every time they take it, they have more training and

12   experience because they've been a police officer for, you know,

13   two to three years, generally speaking would you expect their

14   grades to rise?

15   A.    Yes.

16   Q.    And when you're preparing a content-valid exam, do you

17   assume that a test-taker the first time -- strike that.

18        And conversely, again, back to that same question I was

19   asking about if they study the same, and it's essentially the

20   same exam over time or the same HRD type of exam, that a poor

21   or mediocre person at a certain point who is not minimally

22   competent would either stay the same or possibly regress?

23              MR. LICHTEN:  Objection to the form of "poor or

24   mediocre person."  I don't know what that means.

25              THE COURT:  Rephrase it.

1    BY MR. LEAHEY:

2    Q.    Would you expect that using your terms of a person with an

3    ineffective performance or person -- strike that -- a person

4    who was minimally competent, would you expect if they were

5    minimally competent at some point that their grades would not

6    increase over time?

7    A.    If they remained minimally competent, then they would not

8    raise that much.

9    Q.    And someone who was, to use your term, if we use an

10   exceptional level of performance over time that person would,

11   if they used the same test, that the person who is exceptional

12   will go ahead of the person who is minimally competent; is that

13   correct?

14   A.    There are -- there are way more assumptions you have to

15   put into these questions in order to answer them.

16   Q.    But generally speaking would that be fair to say or is

17   that unfair to say?

18   A.    It depends on their -- it depends -- like we said, it

19   depends on their studying, and it depends on what they're doing

20   on the job.  If they're improving on the job and they're

21   learning and they're getting better and they're going from one

22   level to another, then I would expect their job -- their test

23   performance to improve.

24   Q.    And, again, is it my understanding of your testimony that

25   every question that's on an exam, a promotional exam, must be

1   linked to the critical tasks to be tested; is that correct?

2   A.   I think it has to be linked to the critical knowledge

3   statement that it's testing.

4   Q.   And the point of that is to try and test every important

5   knowledge, skill and ability of the job; is that correct?

6   A.   Correct.

7   Q.   And one of the things that you do in preparing your

8   examinations is the readability factor of an exam; is that

9   correct?

10  A.   Yes.

11  Q.   And that you want the reading level to be equal or less to

12  the level needed?

13  A.   Correct.

14  Q.   With respect to the state examinations in this case, are

15  you aware that HRD conducted a survey in February 2005 with the

16  police chiefs regarding the reading material for the

17  promotional exams?

18  A.   I know that the police chiefs reviewed test material.  I

19  don't know specifically what and when.

20  Q.   So are you aware of a survey being sent to the chiefs of

21  police in February 2005 regarding the reading materials for the

22  2006 to 2008 state examinations?

23  A.   I think so.  I think I read about it.

24  Q.   And that as a result of the information that HRD got back

25  from that survey, they compiled the reading list for the 2006,

1    2007 and 2008 HRD examination, correct?

2    A.    I believe so.

3    Q.    Dr. Fields, are you familiar with the Quinn Bill in

4    Massachusetts?

5    A.    Excuse me?

6    Q.    Are you familiar with the Quinn Bill in Massachusetts?

7    A.    No.

8    Q.    The Quinn Bill, and I'll represent to you the Quinn Bill

9    is a bill that encourages police officers to attain post-high

10   school degrees, and includes additional compensation into their

11   base pay based on their level of post-high school degree.  And

12   it can range from an associate's degree, a bachelor's degree

13   and a postgraduate degree.

14       My question to you is:  Do you think that is a good thing

15   to give to police officers so that they can further their

16   educational studies?

17   A.    Yes.

18   Q.    Would you agree with me that that also would be helpful

19   for officers to gain additional schooling in order to deal with

20   the various statutes and laws that they have to enforce,

21   correct?

22   A.    Not necessarily.

23   Q.    Well, would you agree with me that most laws are written

24   by legislative bodies that include lawyers?

25   A.    Sure.

1    Q.    Okay.  And that lots of statutes can be voluminous, wordy

2    and difficult to understand?

3    A.    Yes.

4    Q.    Are you familiar with General Laws Chapter 209A in

5    Massachusetts?

6    A.    No.

7    Q.    Are you familiar with General Laws Chapter 90C in

8    Massachusetts?

9    A.    No.

10   Q.    Are you familiar with General Laws Chapter 90 in

11   Massachusetts?

12   A.    No.

13   Q.    And with respect to appellate decisions and case law

14   that's written, you would agree with me that those are written

15   by judges, correct?

16   A.    Yes.

17   Q.    And those -- some of them can be more difficult to read

18   than others, correct?

19   A.    Yes.

20   Q.    And despite whatever difficulties there are in the

21   language, whether it's a statute or case law, a police officer

22   is required to know those laws and statutes that apply to his

23   or her job, correct?

24   A.    Not necessarily through reading them.

25   Q.    They need to know them, right?

1   A.   Yes.

2   Q.   And one of the ways that you would learn what you need to

3   know is through reading, correct?

4   A.   Yes.

5   Q.   And you'll agree with me that in law enforcement there is

6   certain terminology that is required for the job in terms of

7   legal phrases, correct?

8   A.   Yes.

9   Q.   And questions regarding legal terms or legal requirements,

10  are they subject to any type of cultural bias review?

11  A.   I don't understand the question.

12  Q.   Well, my question to you is:  If you need to know the law,

13  it's irrelevant whether or not there's a cultural bias, right?

14  You either know the law or you don't know the law?

15  A.   I agree.

16  Q.   I'm going to read to you a statement and ask whether or

17  not you agree with it:  "The ultimate aim of all police

18  departments should be that all personnel with general

19  enforcement powers have baccalaureate degrees."

20       Do you agree with that statement?

21  A.   Bachelor's degrees?

22  Q.   Yes.

23  A.   No.

24  Q.   Why don't you agree with that statement?

25  A.   I know many, many police chiefs who do not have bachelor's

1    degrees so I would say that it is possible to do the job

2    without one.

3    Q.    Is that in Massachusetts or is that in other states?

4    A.    That is in other states.

5    Q.    I will represent to you that that statement is contained

6    in the Beecher v. Castro (1975) First Circuit case in

7    Massachusetts.

8         Does that change your opinion as to whether or not having

9    a bachelor's degree is a good thing in Massachusetts or not?

10   A.    For -- for the business of policing?

11   Q.    For the ultimate aim of all police departments should be

12   that all personnel with general enforcement powers have

13   baccalaureate degrees?

14   A.    I don't necessarily agree with the statement.

15   Q.    Do you believe that a high level of education for police

16   officers is a central concern of their job?

17   A.    A high level of?

18   Q.    A high level of education is required -- is a central

19   concern for police administration regarding their police

20   officers?

21        MR. LICHTEN:  Objection to the form.

22        THE COURT:  Overruled.

23        THE WITNESS:  Please repeat.

24   BY MR. LEAHEY:

25   Q.    Sure.  I will tell you, again, going back to the Castro

1    First Circuit case from 1975, they talk about how education was

2    an important factor in policing for Massachusetts, and they

3    commented, the court commented that these reports and the

4    subsequent actions of the Massachusetts legislature constituted

5    a deliberate value judgment that professionalization of the

6    police is a major goal in our increasing complex society.

7        And I guess my question to you is:  Do you agree with that

8    statement?

9    A.    The only issue I have with the statement is that

10   bachelor's degrees, particularly these days, can be in many,

11   many areas that -- I mean, I know someone who has a bachelor's

12   degree in bowling; I know somebody who has a bachelor's degree

13   in saxophoning; I know someone who has a bachelor's degree in

14   cooking, and I'm not sure those are central to the position of

15   law enforcement officers.

16   Q.    Putting out -- putting aside bachelor degrees in those

17   fields, but in terms of a bachelor degree with regards to

18   something that relates or can be used in law enforcement, would

19   you agree with that?

20   A.    I think it's helpful.

21             MR. LICHTEN:  Objection to form.

22             THE WITNESS:  I'm sorry.

23             THE COURT:  Overruled.  Go ahead.

24             THE WITNESS:  I think it can be -- it can be -- it can

25   be demonstrated to be helpful.

1    BY MR. LEAHEY:

2    Q.    And, again, you testified that you're not familiar with

3    the Quinn Bill, so you don't know which degrees it gives

4    additional compensation for and which degrees it does not,

5    right?

6    A.    I know which degrees gives points on the T&E.  I do not

7    know whether are the same as from that bill.

8    Q.    Right.  You don't know one way or the other?

9    A.    No, I do not.

10   Q.    Dr. Fields, you were hired by Memphis to create some exams

11   for various positions, correct?

12   A.    Yes.

13   Q.    And you said in questions from, I believe it was Attorney

14   Harris, that you were creating a template that could be

15   exported to future exams?

16   A.    Yes.

17   Q.    That they wouldn't need to incur additional costs because

18   they could use that exam that you did as a template?

19   A.    What do you mean by "additional costs"?

20   Q.    Well, they won't have to pay $1.2 million every time they

21   want to do a sergeant's exam?

22   A.    I do not expect they would.

23   Q.    Now, when you were doing -- what was your first exam that

24   you worked on in Memphis?

25   A.    Major, police major.

1   Q.   And did you, in preparing that, did you export any of that

2   information to the sergeant's test?

3   A.   No.

4   Q.   And I believe you testified to it, either yesterday or the

5   day before or both, that you're aware that Memphis has had a

6   long history of litigation regarding promotional examinations,

7   correct?

8   A.   Yes.

9   Q.   And that history has included minorities suing under

10  Title VII claiming that the examinations discriminate

11  against -- because of adverse impact, correct?

12  A.   Included, yes.

13  Q.   All right.  And that has also included white officers

14  suing that under Title VII that their rights have been violated

15  as a result of the police promotional exam test, correct?

16  A.   Correct.

17  Q.   Is it fair to say that when you were hired for the police

18  sergeant's exam that the primary goal of the Memphis Police

19  Department was not to get sued again?

20  A.   They specifically said that they wanted to find someone

21  who could give them a valid exam that minimized group

22  differences.

23  Q.   Right.  And you were hired originally for -- you were

24  hired, I believe you said, under the bidding process originally

25  in Memphis, correct?

1    A.    No.

2    Q.    You weren't hired originally -- not for the sergeant's

3    exam but for --

4    A.    No.  The city conducted interviews with multiple firms.

5    So it wasn't a bidding process.  It was -- they were -- they

6    were searching for someone who they thought could assist them

7    with their problems.

8    Q.    And their problems were their various multiple exams that

9    had led to multiple lawsuits?

10   A.    That -- that had either no valid -- low validity, no

11   validity, high adverse impact or had led to litigation for

12   other reasons.

13   Q.    Right.  And you're aware that, again, that you were hired

14   by Memphis due to the litigious outcomes of past testing

15   procedures for the police services division, the city was

16   instructed by the courts to come up with a testing procedure

17   that was different from past processes; is that correct?

18   A.    Yes.

19   Q.    And that in December of 2008, the City of Memphis gave you

20   a sole-source vendor contract to administer and create the

21   police sergeant's examination, correct?

22   A.    I don't recall the date.

23   Q.    Dr. Fields, I've placed this in front of you and ask you

24   to look at it.  And I'll ask you after you're done looking at

25   it whether or not that refreshes your memory as to the date.

1        I'm sorry.  Have you been able to read it through my

2    manipulations?

3    A.    Yes, I can read it.  Thank you.  I'm not done.  I never

4    saw this document.

5            MR. LEAHEY:  Your Honor, may I approach?

6            THE COURT:  (Nonverbal response.)

7    BY MR. LEAHEY:

8    Q.    Dr. Fields, I'm placing a document in front of you and ask

9    you to look at it.  It's several pages.  Can you just look that

10   over?

11           (Pause.)

12           THE WITNESS:  Okay.

13   BY MR. LEAHEY:

14   Q.    And you recognize that document to be a copy of the

15   contract that you signed with Memphis regarding the sergeant's

16   promotional exam?

17   A.    Yes.

18   Q.    And that December 4, 2008, letter is part of this

19   document?

20   A.    Yes.

21   Q.    So is it possible that you've seen this document before,

22   the December 4, 2008, document?

23   A.    I don't think I've ever seen this document before.

24   Q.    Now, when you were hired in 2007, Memphis was actually in

25   litigation over its major's examination from 2005, correct?

1    A.    Correct.

2    Q.    And that's the <u>Oakley v. The City of Memphis</u> case?

3    A.    Yes.

4    Q.    And are you aware that that case is still pending?

5    A.    Yes.

6    Q.    And you're aware that case involves -- the plaintiffs are

7    black, white, male and female, who are suing because the 2005

8    major's test was thrown out by the City of Memphis, and they

9    want those test results used for promotional purposes, correct?

10   A.    Yes.

11   Q.    I believe you testified yesterday that you charged Memphis

12   approximately $1.2 million for your police sergeant's exam,

13   correct?

14   A.    Correct.

15   Q.    Would it be fair to say the exact number that you charged

16   was $1,155,184.41?

17   A.    I don't recall.

18   Q.    I'm placing before you a document that I'll represent that

19   it's from the City of Memphis, and it's a purchase order, and

20   it's the first page, and I'd ask you to look this over.  I

21   don't know how I'm going to do this, but that you can see on

22   the right-hand column there's $770,000 -- it says "Development

23   for police sergeant promotional process, term one year," and it

24   says $770,185, correct?

25   A.    Yes.

1    Q.    Okay.  And underneath that, then it says "Amendment No.

2    1," and that's 279,999.41, correct?

3    A.    Correct.

4    Q.    Then turning to page 2 of the purchase order, then there's

5    an amount for encumbrance for $45,000, and then there's another

6    encumbrance for $60,000, and then the total is $1,155,184.41;

7    is that correct?

8    A.    Correct.

9    Q.    Does that refresh your memory as to the exact cost for the

10   police sergeant's exam that you administered?

11   A.    It does not.  I have not seen that, and I don't know that

12   I billed that amount.  I don't even think we've used all the

13   funds from that contract.  I don't know.

14   Q.    You also, on the police major exam, is it fair to say that

15   the purchase order for the major's exam was $926,314.32?

16   A.    I don't recall.

17   Q.    I'm placing in front of you another purchase order from

18   the City of Memphis, and this is for police major promotional

19   testing process.  And I'd ask you to look on the right-hand

20   side.  It says $904,314.32 for police major promotional testing

21   process part 2, and then -- well, I guess -- how many -- how

22   many parts was the police promotional major's exam in Memphis?

23   A.    I don't understand this at all.

24   Q.    Have you ever seen this document before?

25   A.    Never.

1  Q.   Who does the billing at Fields Consulting Group?  Who gets
2  the bill?
3  A.   Who invoices?
4  Q.   Right, if this document, which is -- the supplier is
5  Fields Consulting Group, Inc., and then the --
6  A.   This is a Memphis document.
7  Q.   Right.  From the City of Memphis.  It's a purchase order.
8  But would you get a copy of this document?
9  A.   No.
10  Q.   As you sit here today, what is your memory as to how much
11  you charged Memphis for its major's promotional exam?
12  A.   I don't recall.
13  Q.   Would it be fair to say that it was more than half a
14  million dollars?
15  A.   Yes.
16  Q.   Would it be fair to say it's more than $750,000?
17  A.   I'm not sure.
18  Q.   What is the best estimate that you can give, as you sit
19  here today, as to how much Fields Consulting charged for the
20  police promotional exam for major in Memphis?
21  A.   I honestly don't know.
22  Q.   And you also did an examination for lieutenant colonel in
23  Memphis?
24  A.   It's not done.
25  Q.   Right.  That just started, correct?

```
1    A.    It's almost done.

2    Q.    Okay.  Did you sign a contract with them sometime after

3    April of 2010?

4    A.    April 2010?

5    Q.    Yes.

6    A.    I think that was re-signed because the administration

7    changed and -- yes, I may have.

8    Q.    Let me show you -- have you seen this document before?

9    A.    I never saw this document.

10   Q.    This document indicates that for police lieutenant colonel

11   promotion, it was an extended price of $531,100.  Do you know

12   if that was the amount that Fields Consulting Group charged for

13   preparing the lieutenant colonel examination?

14   A.    That's pretty close.

15   Q.    Between the sergeant's, lieutenant colonel and major's

16   exams that you have designed for Memphis, can you estimate how

17   much you have billed for those three exams to date?

18   A.    Probably in the neighborhood of $2 million.

19   Q.    It probably could be higher though, right?

20   A.    Yes.

21   Q.    Probably not lower?

22   A.    Maybe.  I don't know.

23   Q.    Well, if we added -- if those numbers that I had shown you

24   are correct, that would add up to be approximately 2.6 million,

25   if those numbers were correct?
```

1    A.    Yes.

2    Q.    And were all three tests that you're designing, are they

3    all video -- video multiple-choice tests?

4    A.    No.

5    Q.    What is the major's test?

6    A.    The major's test consisted of a -- this is where we began

7    a very, very comprehensive process of developing an orientation

8    program, a test preparation session with -- that took several

9    days to administer that included example exercises of -- about

10   five exercises, I believe, that were assessment center-type

11   exercises, that -- so that after that training occurred, then

12   we gave candidate feedback on that training.  We developed a

13   website for this project in order to communicate with the

14   candidates.  After that we gave our first formal practice test

15   and then provided feedback to candidates after that, and used

16   that material to design a final test, and then the final test

17   was administered.

18   Q.    The final test for Memphis for majors, what did that

19   consist of?

20   A.    I think the final test may have consisted of -- I don't

21   recall.  It's either three or four assessment center exercises.

22   Q.    Okay.  And the final test is what ended up being graded

23   for the promotional process, correct?

24   A.    Correct.

25   Q.    Was seniority factored into that major's test?

1    A.    No.

2    Q.    For the lieutenant examination, did that -- the final

3    test, did that include an assessment center component?

4    A.    What lieutenant test?

5    Q.    The lieutenant colonel test, or is that in development

6    now?

7    A.    The lieutenant colonel test is an assessment center.

8    Q.    Just an assessment center?

9    A.    It's -- it's very similar to the major's process that I

10   just described.

11   Q.    Okay.  Did that have a seniority component to it?

12   A.    No.

13   Q.    And I believe you testified to this yesterday, but it's

14   your understanding that the Memphis City Charter requires

15   competitive examinations?

16   A.    Yes.

17   Q.    And for police sergeants, that's why you ended up using a

18   multiple-choice video situational judgment test; is that

19   correct?

20   A.    I don't understand that question.

21   Q.    Well, because the charter requires a competitive

22   examination, my question to you is:  Is that why for police

23   sergeants in Memphis, you administered a video situational

24   judgment test that was multiple-choice?

25   A.    No.

1    Q.    Why did you administer a video situational judgment test

2    with multiple-choice in Memphis?

3    A.    Due to the size of the candidate population.  And, in

4    addition, I was giving a training program, and I did not have

5    the resources I needed to train in other -- in the live

6    exercises like I would have wanted to because there were so

7    many people to schedule and to get -- it was -- it was

8    logistically impossible.

9    Q.    Due to the size of the test -- the people to be tested?

10   A.    To do the type of training that I wanted to do, yes.

11   Q.    Was there a problem with the Memphis police officers that

12   they weren't minimally competent even to be police officers?

13   A.    I don't understand the question.

14   Q.    Well, you said you had to do a lot of job training for the

15   officers training for sergeant, correct?

16   A.    Correct.

17   Q.    And I'm asking why.

18   A.    The conclusion -- one of the conclusions for the reasons

19   for the adverse -- the high levels of adverse impact in Memphis

20   was because it was felt that all officers at the police officer

21   level did not get exposure and information about the position

22   of police sergeant, so we were trying to bridge that gap.

23   Q.    Doctor, I'm placing in front of you what was attached to

24   Exhibit A, your scope of work for the police sergeant

25   examination, and I just wanted to go, and I wanted to ask you

1   first just to look this over and let me know when you're done

2   reviewing it.

3   A.   (Witness complies.)  Okay.  I've read it.

4   Q.   Okay.  And this is the scope of work that you proposed for

5   Memphis for the police sergeant's exam, correct?

6   A.   Correct.

7   Q.   And did you implement this plan?

8   A.   It was modified pretty significantly but it was in general

9   this is -- this is it.

10   Q.   Was it -- the first step was develop three sergeant

11   technical training modules, training units, focusing on the

12   critical KSAOs needed to perform at a minimal level as a police

13   sergeant; is that correct?

14   A.   Correct.

15   Q.   So the test was designed to find who was able to reach the

16   minimum level required of police sergeant, correct?

17   A.   That's an incorrect characterization.

18   Q.   How -- how would you describe -- how would you

19   characterize this sentence?

20   A.   When -- you -- you are incorrectly stating it.  We are

21   looking --

22   Q.   Did I read it incorrectly?

23   A.   Well, the KSA -- you're -- what you're saying is not

24   accurate.  The -- we identified the KSAOs that you need to have

25   at a minimal -- you have to be minimum at these KSAOs to

1    perform at the job.  So when you give the test, the people who

2    are going to excel at the job excel at the test, and they come

3    out the highest.  And so we're looking for the people who come

4    out the highest on the exam.

5    Q.    But you want to promote those who did the best on the

6    exam, right?

7    A.    Correct.  And the exam is not designed to only -- to test

8    at the minimally competent level; it's identified so that

9    people who come out the highest on the test are the most

10   competent.

11   Q.    And those, the most competent persons, would be the ones

12   who would be promoted to sergeant in Memphis based on this

13   examination?

14   A.    Correct.

15   Q.    And that as part of this, you were going to work with a

16   Memphis SME and two SMEs from Fields Consulting to develop a

17   technical training curriculum; is that correct?

18   A.    Correct.

19   Q.    And that you were then going to create format training

20   curriculum for video production, correct?

21   A.    Correct.

22   Q.    And then you were going to edit the video, correct?

23   A.    Correct.

24   Q.    And then you were going to conduct quality control

25   evaluation of the training modules, correct?

1    A.    Correct.

2    Q.    And that's to make sure that the information that was in

3    the training modules was appropriate for the police sergeant

4    examination, correct?

5    A.    Correct.

6    Q.    And that you also were to develop facilitator manuals and

7    student manuals, correct?

8    A.    Correct.

9    Q.    What's a facilitator manual?

10   A.    It's the person at the front of the room who administered

11   the training module.

12   Q.    Like the proctor?

13   A.    More so.  It's the administrator.  Proctor, make sure the

14   candidates aren't talking.  The administrator has to

15   turn the -- has to say things, how to conduct exercises, how to

16   turn the video on and off, et cetera.

17   Q.    Okay.  Turning to the next page, under "steps."  The

18   second sentence says, "These exams will consist of

19   job-knowledge multiple-choice test items and situational

20   judgment items."  Do you see that?

21   A.    Yes.

22         MR. LEAHEY:  Whoop.  Sorry.  Thank you.  I forgot

23   that.

24   BY MR. LEAHEY:

25   Q.    So the original design was to have the test

1    multiple-choice for job knowledge and for situational judgment

2    items, correct?

3    A.    Correct.

4    Q.    Is it my understanding based on your prior testimony that

5    the job knowledge multiple-choice components was removed from

6    the final examination that was administered?

7    A.    That is incorrect.

8    Q.    So the test that was administered for police sergeant in

9    Memphis contained job knowledge multiple-choice questions in

10   addition to the situational judgment multiple-choice questions,

11   correct?

12   A.    The majority of the test was situational judgment test

13   items that measured knowledge and that measured other KSAOs.

14   Q.    The majority of the test measured situational knowledge,

15   situational judgment?

16   A.    No, the -- the test was intermixed.  It was almost all

17   situations because they were watching the situations on video,

18   and the questions were either getting at knowledge or they were

19   getting at other abilities and skills.

20   Q.    Going down to the second line -- or excuse me, the second

21   step, the second sentence, "We anticipate approximately 100 job

22   knowledge multiple-choice test items and at least 60

23   situational test items."  Did I read that line correctly?

24   A.    Correct.

25   Q.    Did the final examination for the police sergeant in

1  Memphis include approximately 100 job-knowledge multiple-choice

2  test items?

3  A.    No.  It included 100 situational judgment test items that

4  measured the two things I just told you -- the three things I

5  just told you.

6  Q.    So there ended up being a hundred questions on the exam?

7  A.    Yes.

8  Q.    Administered in Memphis?

9  A.    Yes.

10  Q.    And all of them were situational judgment questions?

11  A.    Yes.

12  Q.    But they may have incorporated job knowledge components?

13  A.    Measured job knowledge.

14  Q.    And that -- it also talks about how that -- you would --

15  again, you would validate the practice examination as well on

16  Step III?

17  A.    Yes.  Yes.

18  Q.    Could I have you turn to page -- the last page, Step III,

19  where it says, "Number 2, continue to meet with union and union

20  attorneys in a manner designated by the City to obtain

21  continued buy-in and discuss alternative testing solutions."

22  Do you see that sentence?

23  A.    I do.

24  Q.    Did I read that correctly?

25  A.    Yes.

1    Q.    What does this Number 2 mean?

2    A.    The union -- there was -- there was a statement in the

3    union contract that said they were required to be informed

4    about everything that was being done in a timely fashion.

5    There was some time period associated with it.  So everything I

6    was doing, we were communicating, and they -- we were trying to

7    obtain their agreement.

8    Q.    You were?

9    A.    Yes.

10   Q.    You were required to obtain their agreement to administer

11   the 2007 sergeant's examination?

12   A.    2009 sergeant's exam.

13   Q.    Excuse me.  2009.

14   A.    We were -- we were searching for ways to find agreement,

15   yes.

16   Q.    And that had the union not agreed, would you have been

17   able to administer the 2009 police sergeant's examination in

18   Memphis as you designed it?

19   A.    I think an attorney would have to answer that question.

20   Q.    Would it be fair to say that would have caused some

21   concerns, and you don't know what the legal outcome would be

22   then?

23   A.    I do not know.

24   Q.    When it says "obtain continued buy-in," do you see that

25   where it says?

1    A.    Yes.

2    Q.    "Buy-in," is that with respect to any type of seniority?

3    A.    No.

4    Q.    What does the "buy-in" refer to?

5    A.    Looking for solutions and agreements.

6    Q.    With the union?

7    A.    Correct.

8    Q.    Now, are you familiar with the requirements that one has

9    to have in order to apply to become a police officer in

10   Memphis?

11   A.    The entry-level requirements?

12   Q.    Yes.

13   A.    They're being revised as we speak, but generally.

14   Q.    So you know what they are -- prior to -- putting aside

15   what the revisions are, you know what they currently are,

16   correct?

17   A.    Not exactly.  I know some.

18   Q.    Well, you know they have to be at least 21 years old when

19   they graduate from the Memphis police academy, correct?

20   A.    I didn't know that.

21   Q.    You know they have to have a driver's license?

22   A.    I knew that.

23   Q.    And you're aware that there's no requirement to become a

24   Memphis police officer that requires either a high-school

25   diploma or a GED, correct?

1    A.    I'm not aware of that.

2    Q.    With regards to the examination that you administered for

3    police sergeant in 2009, are you aware as to how long an

4    individual had to have been on the Memphis police force to be

5    eligible to take that promotional exam?

6    A.    I -- I don't recall.

7    Q.    Do you recall whether or not the cutoff was anyone who

8    graduated from the Memphis police academy 1995 or earlier was

9    eligible to take the police sergeant's examination?

10   A.    I don't recall.

11   Q.    Do you recall any period of time for which an officer had

12   to be with the Memphis Police Department before they were

13   eligible for the promotional exam in 2009?

14   A.    The number of years as a police officer, is that the

15   question?

16   Q.    To be eligible to take the police promotional exam.

17   A.    I just don't remember.

18   Q.    But you -- you put in -- you designed the test for police

19   promotional sergeant, correct?

20   A.    But I don't determine the minimum qualifications.

21   Q.    That was going to be my next question.  So you're not

22   involved with that?

23   A.    I generally am in discussions about it, but I'm not

24   usually the one who makes the determination in Memphis.

25   Q.    Do you design your testing based on the number of years

1    someone has to be eligible for a police promotion?

2    A.    No.

3    Q.    So it wouldn't matter -- when you're designing your test,

4    it wouldn't matter if you've been a police officer for a day or

5    15 years, you'd design the test exactly the same?

6    A.    Well, I -- I mentioned earlier that I take context into

7    consideration for everything.  So I -- that might come in.  I

8    don't know.

9    Q.    Right.  So my question is:  If they told you that you had

10   to be a police officer for either five years before you're

11   eligible to take the test or for 14 years to be eligible to

12   take the test, my question to you is:  Do you factor in that

13   training and experience in preparing your examination for

14   police sergeant?

15   A.    If I'm training -- what was the question?  One more time.

16   Q.    Right.  The exams that you give, when you're developing

17   the questions for it, do you consider that if there's an

18   eligibility requirement that you have to be a police officer

19   for a minimum of five years, do you start at the base level of

20   what should a police officer know that's been there for at

21   least five years in developing your promotional exam for

22   sergeant?

23   A.    No.

24   Q.    So how long an individual has been a police officer is not

25   relevant to your preparation of the examination?

1    A.    It's not central.

2    Q.    It's not a critical component?

3    A.    No.

4    Q.    Is it any component?

5    A.    No.

6    Q.    In your practice tests, I believe you testified that prior

7    to preparing any type of test, you do an extensive job analysis

8    for the position?

9    A.    Correct.

10   Q.    And that you identify the critical task for that position?

11   A.    Correct.

12   Q.    And from there you institute a training program?  If

13   you're designing one that has a training component, you would

14   then create a training program for it?

15   A.    I -- that program that I developed for police sergeant in

16   Memphis was unique.  No one's ever done anything like it that I

17   know of, and it was completely invented.  So that -- for that

18   one, yes.

19   Q.    And Memphis stands alone in terms of your

20   test prepara- -- your examinations?

21   A.    For sergeant.

22   Q.    For sergeant.  And that's because of the prior litigation

23   that Memphis had had, correct?

24   A.    Yes.  And I just want to clarify that the training is

25   not -- was not based on the task.  We did a training needs

 1   analysis as part of our job analysis, so we did a two -- a
 2   two-pronged job analysis.
 3   Q.    And that I believe you testified in Memphis that there was
 4   a study and memorization classes for the test and part of the
 5   test preparation?
 6   A.    Correct.
 7   Q.    And that you did a practice test that also helped, you
 8   know, one of the goals was to lower their anxiety for their
 9   ability to take the test on the exam day?
10   A.    Correct.
11   Q.    And also I believe you testified that you gave them some
12   study tips of how to approach a multiple-choice examination,
13   correct?
14   A.    The type I was giving.
15   Q.    Right, the type you were giving.  And the point of all
16   that was to demonstrate what they have learned, correct, with
17   the practice examination?
18   A.    The point of all what?
19   Q.    The point of an individual taking a practice exam in
20   Memphis on the 2009 sergeant's exam, it was to demonstrate what
21   they had learned through the training program, correct?
22   A.    That was only one of many reasons for the practice test.
23   Q.    But that's one of the reasons?
24   A.    Yes.
25   Q.    And I believe you said it was mandatory test prep time in

1    Memphis?

2    A.    Yes.

3    Q.    Do you know whether or not that issue was addressed with

4    the Memphis police union?

5    A.    Yes.

6    Q.    Are you aware that that had to be bargained with the

7    Memphis Police Department?

8    A.    It did not.

9    Q.    Are you aware of Massachusetts General Law 150E that

10   regulates labor relations between unions and employers?

11   A.    No.

12   Q.    The mandatory component of training, did that produce an

13   additional cost for Memphis?

14   A.    No.

15   Q.    How were they able to get mandatory training and not

16   increase the cost of the examination process?

17   A.    Our promotional exam is a choice.  You are not forced to

18   take a promotional exam.  And this was a comprehensive

19   promotional exam, and that was part of it.

20   Q.    But it had a mandatory -- if you wanted to voluntarily

21   take this test, there was a mandatory component for which the

22   officers were not compensated?

23   A.    It was a part of the promotional process.

24   Q.    And the officers were not compensated for that mandatory

25   training?

1    A.    Correct.

2    Q.    And I believe you testified at your deposition that

3    practice test in Memphis allowed you to evaluate the scores and

4    determine if equal weights -- equal weighting was best for

5    validity and minimizing group differences.  Do you recall

6    testifying to that at your deposition?

7    A.    I don't recall that, but that's true.

8    Q.    And that with regards to the test that you administered in

9    Memphis, were they -- and I'm not clear based on the testimony

10   that you've given, were the answers scaled or not?

11   A.    A combination.

12   Q.    Some were scaled, and some were specific one-answer

13   questions?

14   A.    Correct.

15   Q.    Were those specific one-answer questions, were those job

16   knowledge questions?

17   A.    I don't recall if all of them were.

18   Q.    And on the Memphis test, there was no assessors involved,

19   correct?

20   A.    Correct.

21   Q.    It was just an objective scoring of how well you did on

22   the video multiple-choice test?

23   A.    Correct.

24   Q.    And I believe you testified that that was the first

25   sergeant's test that Memphis had had in some time?

1   A.   Yes.

2   Q.   Would it be fair to say that's the first time they've had

3   a promotional exam since 2003?

4   A.   I think it's earlier than that.

5   Q.   After the tests were administered, were there concerns in

6   the City of Memphis that the test may have been too easy?

7   A.   Yes.

8   Q.   And that Memphis Councilor Shea Flinn made comments as

9   to -- wondering whether or not the test was testing the

10  knowledge that they needed them to have or was just too easy

11  and designed to pass.  Do you recall him saying -- making that

12  comment?

13  A.   Who -- who was that?

14  Q.   Memphis City Councilor Shea Flinn?

15  A.   No.

16  Q.   Do you remember a Memphis City Councilor Jim Strickland

17  also being critical of the promotional process?

18  A.   No.

19  Q.   Do you remember some Memphis city councilor saying, "We

20  ought to have stringent tests, and the folks who score the best

21  should be our sergeants?"

22  A.   Yes.

23  Q.   Do you agree with that statement?

24  A.   Yes.

25  Q.   Do you recall hearing a statement:  "Apparently the test

1    is so easy that almost every single person passed, and the

2    test -- the test leaving seniority is the only factor?"  Do you

3    recall him --

4    A.    Who said that?

5    Q.    Memphis City Councilor Jim Strickland.

6    A.    I do not recall.

7    Q.    And do you recall comments that Memphis Police Association

8    president J.D. Sewell made, S-E-W-E-L-L?  That was for the

9    stenographer, for the court reporter.

10   A.    I don't think that's how you spell it, but go ahead.

11   Q.    That -- do you recall him saying that the goal of the exam

12   was to make it simple enough and fair enough for everyone that

13   hopefully there will be no grounds to challenge it in court?

14   A.    I don't recall him saying those words.

15   Q.    Do you recall him saying that the union was in agreement

16   with the test because they proposed that it be easy, and they

17   go by seniority because then there's no discrimination?

18   A.    No.

19   Q.    You said seniority gave ten points to the examination?

20   A.    Correct.

21   Q.    But the final score of the exam was based on a zero to 100

22   score, correct?

23   A.    Correct.

24   Q.    So -- and you said seniority counted for ten points?

25   A.    Correct.

```
 1   Q.   How much weight was that -- those ten points afforded in
 2   the examination process?
 3   A.   The written test score, the highest score, could be 90,
 4   and the highest points for seniority could be ten.  So
 5   90 percent, 10 percent.
 6   Q.   Okay.  So whoever got a 99 would be based on getting
 7   essentially either an 89 out of 90 points or getting nine out
 8   of ten points, but if someone got a 99 they only missed one
 9   point on either the seniority component or the examination
10   component, correct?
11   A.   A 99 combined?
12   Q.   Yes.
13   A.   Ah, yes.
14   Q.   What was -- how did one get the ten points for seniority?
15   What was the breakdown for point allocation?
16   A.   I don't recall.
17   Q.   Was there a minimum level of points that someone could
18   get?
19   A.   Yes.
20   Q.   And what was that?
21   A.   I think -- I think it was one, but I -- I'm not sure.
22   Q.   And how long would you have had to have been a police
23   officer to get that one point?
24   A.   I don't recall.
25   Q.   And you're aware that in Memphis there ended up being 859
```

```
1   people who completed the test, correct?
2   A.   I'm not sure if that's the final number.  It sounds low.
3   I think it was 883, but who's counting.
4   Q.   And you're aware that 91 percent of the test-takers scored
5   at least a 90 or better, correct?
6   A.   No, I'm not aware of that.
7   Q.   What were the scores on the Memphis test?
8   A.   There was 880 of them.  I don't recall.
9   Q.   Well, you did IA [sic] analysis on the scoring, correct?
10  A.   Adverse -- AI, adverse impact analysis?
11  Q.   Yes.
12  A.   Yes.
13  Q.   So what were the scores that you determined whether or not
14  there was adverse impact on?
15  A.   Those scores.
16  Q.   What scores?
17  A.   Mean scores --
18  Q.   What were those mean scores?
19  A.   I don't recall.
20  Q.   Do you recall that only three out of the people who took
21  this test scored less than an 83?
22  A.   That's not true.
23  Q.   How many scored less than 83?
24  A.   I don't know.
25  Q.   Do you have any data that could tell us how people scored
```

1    on the Memphis examination?

2    A.    I do not.

3    Q.    None with you here or none exists?

4    A.    I -- I do have data but I -- that's not mine to give.

5    Q.    If you were required to give it, would you give it?

6    A.    It is confidential.

7    Q.    The raw numbers as to how people did in Memphis in their

8    scoring, you believe that's confidential?

9    A.    Yes.

10   Q.    If you got a court order, would you produce it?

11            MR. LICHTEN:  Objection, your Honor.

12            THE COURT:  Sustained.

13   BY MR. LEAHEY:

14   Q.    Dr. Fields, I'm showing you an article captioned "Easy

15   Sergeant's Test Results Are In," and actually --

16   A.    It's blurry.

17   Q.    I will try and -- it's titled "Easy Sergeant's Test

18   Results Are In," and this was an article posted on a website on

19   March 29, 2010.

20        Have you seen this article before?  And I'll represent

21   it's different than the one we discussed at your deposition.

22   A.    I don't think I ever saw this article.

23   Q.    And do you see where it says, "Pass they did.  Of the 859

24   test-takers, 91 percent of them scored a 90 or better on the

25   test"?

1    A.    I do see that.

2    Q.    And you disagree with that statement, correct?

3    A.    I don't know if that's true.

4    Q.    Is it possible that that's true?

5    A.    I don't know.

6    Q.    And the next line says "only three people scored less than

7    an 83." Do you see that?

8    A.    Yes.

9    Q.    Do you agree or disagree with that statement?

10   A.    I don't think it's true.

11   Q.    Okay. And can you estimate how many people scored less

12   than an 83 on the test?

13   A.    I already told you I cannot.

14   Q.    And then going down, do you see where it says "but one of

15   the people who scored the best on the test, a 99, did not make

16   the cut." Do you see that?

17   A.    Yes.

18   Q.    Do you know whether or not anyone who scored a 99 on the

19   test was not promoted out of the 165 promotions that you

20   testified to earlier?

21   A.    I do not.

22   Q.    It's your understanding that you would believe that anyone

23   who scored, based on your prior testimony, that anyone who

24   scored a 99 would have been promoted to sergeant, correct?

25   A.    I do not know.

```
 1   Q.   Would it surprise you that a person scored a 99 on the
 2   test and didn't get promoted?
 3   A.   I don't know.  If -- I don't know if that happened in this
 4   case.
 5   Q.   It says that the person who scored a 99 did not have
 6   enough seniority points and that -- or do you see that, didn't
 7   have enough --
 8   A.   Where are you?
 9   Q.   It's the next line.  "It's because she did not have enough
10   seniority points?"
11   A.   Yes, I see it.
12   Q.   And again, as you sit here today, you're unable to tell
13   the Court what the scoring mechanism was for the seniority
14   points, correct?
15            MR. LICHTEN:  Objection.
16            THE WITNESS:  I told you.
17            MR. LICHTEN:  That's not the evidence, your Honor.
18            THE COURT:  Sustained.
19   BY MR. LEAHEY:
20   Q.   As you sit here, you cannot tell -- well, do you know what
21   the weight of the seniority points, the 10 seniority points
22   were?  Was it just 10 percent since it was just tacked onto the
23   90 points, was the seniority essentially 10 percent of the
24   test?
25   A.   Yes.
```

1    Q.    And then underneath it says, "52 people got a score of 98

2    or better on the test, 25 did not make the cut to be sergeant

3    because of seniority."  Do you see that?

4    A.    I do.

5    Q.    Do you know whether or not that's an accurate statement?

6    A.    I do not.

7    Q.    Do you know anyone who would know whether or not that's an

8    accurate statement?

9    A.    I -- I cannot tell you sitting here today.

10   Q.    Do you recall whether or not City Councilor Flinn made a

11   comment, "When you see the highest scores be passed over,

12   you've got to wonder if we're doing the right thing."  Do you

13   see that?

14   A.    I don't.  Where are you?

15   Q.    The very last part of the article that's in yellow

16   highlight.

17   A.    I see that.

18   Q.    Do you recall Councilor Flinn making a comment like that?

19   A.    No.

20   Q.    Doctor, I'm placing in front of you a document entitled

21   "Police Test So Easy, It's a Joke."  And you've seen this

22   document before, correct?

23   A.    Correct.

24   Q.    You saw it at your deposition?

25   A.    Yes.

1    Q.    And you had seen it prior to your deposition, correct?

2    A.    Yes.

3    Q.    And in this article, it gives a sample practice question.

4    Do you see that where it says:  "A search warrant is a document

5    that gives permission to conduct a search?"

6    A.    Yes.

7    Q.    And you testified that that is a question that may have

8    been on the practice exam but was not on the final exam,

9    correct?

10   A.    It was not on either.

11   Q.    Do you recall testifying at your deposition that may have

12   been on the practice exam?

13   A.    Yes.

14   Q.    And -- but it's your testimony now that it definitely was

15   not on the practice exam?

16   A.    Yes.

17   Q.    How do you know that?

18   A.    I looked it up.

19   Q.    You looked up the practice exam for Memphis?

20   A.    Yes.

21   Q.    While not this specific question -- well, strike that.

22         Do you have a professional opinion on whether or not

23   Question 1, if that was a question asked, would be an

24   appropriate question for a police sergeant's exam?

25              MR. LICHTEN:  Objection, your Honor.

1          THE COURT:  Sustained.

2     BY MR. LEAHEY:

3     Q.    Directing your attention -- there's a second question here

4     where it says, "Select the word to complete the following

5     sentence:  Citizens should always look" -- blank -- "vehicles

6     and secure valuables in it --

7          MR. LEAHEY:  What did I say?  Oh, I'm sorry.

8     BY MR. LEAHEY:

9     Q.    "Citizens should always lock" -- blank -- "vehicles and

10    secure valuables in the trunk."  And do you recall testifying

11    at your deposition that this question may have been on the

12    practice exam but was not on the final examination?

13    A.    Yes.

14    Q.    Was this question -- is this similar to the last, did you

15    check to see whether or not this question was on the practice

16    exam?

17    A.    Yes.

18    Q.    Was this question on the practice exam?

19    A.    No.

20    Q.    Why did you say this question, at your deposition, may

21    have been on the practice exam?

22    A.    I think what I said was it may -- I didn't recall it being

23    on it, and I wasn't sure, and I wasn't sure if they used

24    questions that I had used.  And then when I looked at the date

25    of this, I realized that this was before the final test was

1  given, and I don't know where these questions -- well, I wrote

2  well over 500 questions for this process, so I don't know where

3  they had come from.

4  Q.   Is that also the same with the next question where it

5  says, "A search warrant must be issued by either an impartial

6  citizen, the court, a lawyer or a senior police official?"  Do

7  you see that question?

8  A.   Yes.

9  Q.   Again, at your deposition you testified that this question

10 may have been on your practice exam.  Is it your testimony now

11 that after going back and checking, this question was not on

12 the practice exam?

13 A.   Yes.

14 Q.   And is the reason you're changing your testimony now the

15 same reason as you changed your testimony regarding the last

16 question?

17 A.   Yes.

18 Q.   And finally, the question says, "A complete sentence must

19 include:  A, a subject; B, a verb; C, a pronoun; D, both A and

20 B."  Again, at your deposition you thought this was a question

21 that may have been asked on a practice exam, but is it your

22 testimony now that you've since gone back, checked the practice

23 exam, and this question was not on that practice exam?

24 A.   Correct.

25 Q.   And again, the reason you're changing your testimony is

1    for the same reasons that you've testified to just moments ago?

2    A.    Correct.

3    Q.    Would you agree with me that when a police sergeant is

4    reviewing a police officer's report, the primary focus of the

5    sergeant's job is to make sure that the police officer covers

6    all the required information that's contained in the report and

7    is less concerned about grammatical errors?

8    A.    I would not agree with that.

9    Q.    Would you agree that the primary duty on, say, an arrest

10   report, the primary duty of a police sergeant in reviewing the

11   report is to make sure that the elements of the crime are

12   listed within the four corners of the police report whether

13   it's the original police report or a supplemental police

14   report, correct?

15   A.    Primary?

16   Q.    Yes.

17   A.    It has to be grammatically correct also.

18   Q.    Could it be grammatically correct and not hit an essential

19   element of a crime and be okay?

20   A.    Could it be grammatic -- no.

21   Q.    All right.  If you had to -- do you know whether or not a

22   case could get thrown out if there's a grammatical error in a

23   police report versus missing a critical element of an arrest?

24   A.    Let me give you an example of one.

25   Q.    Can you answer my question?

1   A.    I think one could be, yes.

2   Q.    Okay.  And what's the answer?

3   A.    A typical problem that occurs in Memphis is the confusion

4   of pronouns.  So I'll give you the following example.  Two

5   victims were walking down the street, and they were attacked by

6   a suspect, and the suspect ultimately took one of the victim's

7   purse.  And then she told the police that the suspect was a

8   white male.  That is how those are written.  And I don't think

9   that a court or a judge or anyone reviewing that report would

10  know who the victim was, and I don't think that they would

11  accept that -- that report.

12  Q.    And that's why police officers are instructed to use last

13  names and then qualify it.  But going back to my original

14  question was if there's an element missing -- putting aside

15  they're not sure who made the statement, if there's an element,

16  say it's a robbery, and they miss a critical element so that

17  there's actually based on the four corners of the police report

18  there is no basis to conclude there was a robbery, do you

19  consider that to be something that the police officer's primary

20  duty, the sergeant's primary duty, should be for reviewing

21  elements of the crime as opposed to grammar?

22  A.    They review both.

23  Q.    Going back to the prior promotions in Memphis that caused

24  the several lawsuits, are you aware of the case of Isabel v.

25  City of Memphis?

1   A.   Yes.

2   Q.   And that was a lawsuit over the 2000 Memphis Police

3   Department lieutenant's exam, correct?

4   A.   Correct.

5   Q.   And that included -- that test that had originally had

6   been administered included a written test, correct?

7   A.   Yes.

8   Q.   Okay.  A practical video test?

9   A.   Yes.

10   Q.   A performance evaluation test, correct?

11   A.   Yes.

12   Q.   And seniority credit, correct?

13   A.   I don't -- I don't remember the exact components.  Yeah,

14   that sounds right.

15   Q.   And based on that examination, the test was challenged

16   for -- based on adverse impact, correct?

17   A.   Correct.

18   Q.   And you're also aware of the lawsuit of Johnson v. City of

19   Memphis?

20   A.   Yes.

21   Q.   And that was a lawsuit that involved the 2000 and 2003

22   police sergeant's examination?

23   A.   I don't understand the 2003.

24   Q.   Do you know that involved two -- the Johnson case involved

25   two police promotional examinations that were attacked under

1    Title VII?

2    A.    Yes.  I thought -- I thought it was one sergeant exam, but

3    okay.

4    Q.    Or at least one.  You don't -- you know of at least one.

5    And you think it was 2000?

6    A.    Yeah.  Or 1999.

7    Q.    And that 2000 examination included a written test,

8    correct?

9    A.    I believe so.

10   Q.    A practical test?

11   A.    Yes.

12   Q.    A performance evaluation?

13   A.    I don't remember the exact components.

14   Q.    Do you recall that a practical test portion of the test

15   got leaked?

16   A.    That may have been part of that one -- that case,

17   possibly.  I thought it was the written component, but okay.

18   Q.    And that as a result of that test in 2000, that whites

19   were promoted two to one over black candidates.  Do you recall

20   that?

21   A.    Were they promoted?

22   Q.    Yes.

23   A.    I didn't remember that.

24   Q.    Well, they were promoted, and then 59 sergeants were

25   demoted?

1   A.    Yeah, I vaguely remember that.

2   Q.    And that those 59 sergeants who were demoted then sued,

3   correct, the City of Memphis?

4   A.    Yeah.

5   Q.    And that as a result of that case, the city was ordered to

6   rehire back those 59 sergeants, correct?

7            MR. LICHTEN:  Your Honor, this whole line of

8   questioning about an exam that she wasn't involved in that

9   happened before her involvement with Memphis and is apparently

10  contained in case law that anyone can look up seems that it's

11  going somewhat afar, and I would object.

12           THE COURT:  I would agree.  Sustained.

13  BY MR. LEAHEY:

14  Q.    Now, Dr. Fields, you were asked questions regarding a

15  presentation that Dr. Outtz made in October of 2009?

16  A.    Yes.

17  Q.    And you were shown a chart -- well, I won't show it to you

18  because I can't find it, but you were shown a chart, which you

19  actually had quoted for, in verbatim, in your report that you

20  prepared in March 2010 with one exception, correct?

21  A.    Correct.

22  Q.    That you had deleted the part of Dr. Outtz's comment that

23  said "for fire promotions," correct?

24  A.    Including fire promo -- fire officers, I believe, or fire

25  positions.

1    Q.    And you knew, and you were shown at your deposition, a

2    copy of that complete presentation that Dr. Outtz had given in

3    October 2009, correct?

4    A.    Correct.

5    Q.    And is it fair to say from reviewing that document, that

6    it pertained to assessment centers for the fire department,

7    correct?

8    A.    The document did, yes.

9    Q.    And earlier you testified that in terms of an assessment

10   center, you thought, using the numbers from Memphis, that there

11   were approximately 1200 candidates that started out in the

12   sergeant promotion, that you estimated that an assessment

13   center would cost roughly $1,000 per person?

14   A.    Correct.

15   Q.    And it's your testimony that approximately 1200 candidates

16   started the promotional process but only 900, or approximately

17   900 or between 859 and 883, went to the testing component?

18   A.    Went through all phases of the program.

19   Q.    Right.  And so at approximately -- at some point between

20   300 and 350 people did not complete the entire process,

21   correct?

22   A.    Correct.

23   Q.    Did you do an adverse impact analysis regarding the 300 to

24   350 people who did not complete the process?

25   A.    No.

1    Q.    Why not?

2    A.    They self-selected out of the program.

3    Q.    But that they were part of the initial process, correct?

4    A.    Yes.  Well, they were eligible and they -- I think around

5    1180 started in the process.

6    Q.    Well, you included them in your budget.  You said there

7    were 1200 people that you started with, correct?

8    A.    Correct.

9    Q.    And I believe you testified at some point that you did

10   adverse impact checks at various cut points throughout the

11   process, correct?

12   A.    I didn't say that.

13   Q.    Well, I guess my question is:  Why didn't you do an

14   adverse impact analysis on the 300 to 350 people who dropped

15   out of the promotional process?

16   A.    I don't understand why I would.

17   Q.    Well, they had been part of the original process, correct?

18   A.    The only adverse impact -- the final -- the analysis of

19   the items were for -- when they were there, they were part of

20   the analyses; when they were not there, they could not be part

21   of the analyses.

22   Q.    And one of the things that you were doing, though, in

23   this, you wanted to do a mandatory training component so that

24   they could learn the various job-knowledge tests and

25   situational judgment tests, correct?

1    A.    Correct.

2    Q.    So my question is:  When those people dropped out during

3    this process, why didn't you do adverse impact to see whether

4    or not those components of the test were leading to adverse

5    impact?

6    A.    I do not understand what you're asking.

7    Q.    So your adverse impact analysis that you did were only for

8    the people who actually completed the examination to the very

9    end, correct?

10   A.    Which adverse impact analyses?

11   Q.    Well, you said you did adverse impact analysis on the 2009

12   sergeant's promotional test in Memphis, and you said there was

13   no adverse impact, correct?

14   A.    On the final eligibility list, is that what you're asking

15   me?

16   Q.    Well, originally you testified that you had done adverse

17   impact analysis at multiple cutoff levels as part of the police

18   sergeant's exam in Memphis, right?

19   A.    Yes.

20   Q.    Okay.  And you did that based on the people who completed

21   all portions of the test, correct?

22   A.    On the eligibility -- those who were on the eligibility

23   list, correct.

24   Q.    Is it fair to say that everyone who completed the

25   eligibility -- when you say "the eligibility list," were all

1    eligible -- everyone who completed all the components were

2    technically eligible for promotion?

3    A.    Yes.

4    Q.    So there were 800 -- 800 to 900 minimally competent police

5    officers who could have been sergeants in Memphis?

6    A.    There was a range of competency, and, yes, they could have

7    all been promoted.

8    Q.    But going back for the 350 people, who didn't make it to

9    the final cut, you did not do any type of adverse impact on

10   those people?

11   A.    They didn't attend on their own volition, so

12   that's -- that's the first point.  But the second point is if

13   they took a practice exam or they took a module test exam, they

14   would have been included in my analyses of the test, the items,

15   the race differences, the gender differences, et cetera.

16   Q.    Right.  But as you sit here today, it's your testimony

17   that you did not do any adverse impact on the 300 to 350 people

18   who ended up not completing all the tests, right?

19   A.    I do not understand that question.  You keep asking that.

20   I don't get it.

21   Q.    You only did adverse impact for the people who completed

22   all portions of the test, correct?

23   A.    I did adverse impact analyses throughout the entire

24   process.  If they were there, they were included; if they

25   weren't there, they weren't included.

```
 1    Q.   Well, how can you distinguish between the people who ended

 2    up self-selecting out?

 3    A.   How do I distinguish what?

 4    Q.   Whether or not there's any adverse impact rate in their

 5    dropout rate?

 6    A.   I did not calculate whether the dropout had an -- the

 7    self-selection had an adverse impact.

 8    Q.   Okay.  And you're aware that the EEOC guidelines tell you

 9    that you're supposed to break out the different minority groups

10    involved, correct?

11    A.   Correct.

12    Q.   But you're not supposed to lump blacks and Hispanics in

13    one minority pool, correct?

14    A.   It doesn't say that, I don't believe.

15    Q.   Doctor, just going back to the last set of questions

16    regarding the people who had dropped out, you testified earlier

17    that the training was mandatory in Memphis, correct?

18    A.   Correct.

19    Q.   Okay.  And your testimony is that you did not do any type

20    of adverse impact regarding the mandatory training component

21    and whether or not that had any adverse impact?

22    A.   Whether what had adverse impact?

23    Q.   The mandatory training component.

24    A.   I -- I sound like I'm being difficult.  I'm not following

25    you.
```

1    Q.   You didn't do any type of adverse impact as to how the

2    mandatory training component affected a particular group's

3    compliance or working through the steps to ultimately complete

4    the promotional exam?

5    A.   I did not calculate who dropped out and -- and -- and

6    their characteristics.

7    Q.   Doctor, I'm placing in front of you what is the question

8    and answer -- question and answers for the EEOC guideline, and

9    specifically, drawing your attention to Question 11.  Do you

10   see that?

11   A.   Yes.

12   Q.   And it says, "What is a substantially different rate of

13   selection?"  Do you see that?

14   A.   Yes.

15   Q.   Okay.  And it gives for an example on the second paragraph

16   if the hiring rate for whites other than Hispanics is

17   60 percent, for American Indians 45 percent, for Hispanics

18   48 percent and for blacks 51 percent, and each of these groups

19   constitutes more than 2 percent of the labor force in the

20   relevant labor area, a comparison should be made in the

21   selection rate for each group with that of the highest group."

22   Do you see that?

23   A.   Yes.

24   Q.   Does it tell you when you're doing your analysis for

25   adverse impact that you need to break it down by each

1    particular subgroup?

2    A.   I don't think -- I don't view that as limiting.  I view

3    that as a way, one method.

4    Q.   But you'd agree it says here, at least on the answer to

5    the question and answer for the EEOC guidelines tell you that

6    it should be broken down for each group, correct?

7    A.   It should.

8            MR. LEAHEY:  Thank you, Doctor.  That's all that I

9    have.

10           THE COURT:  Mr. McDermott?

11           MR. McDERMOTT:  Yes.

12                          CROSS-EXAMINATION

13   BY MR. McDERMOTT:

14   Q.   Good morning, Dr. Fields.

15   A.   Good morning.

16   Q.   Dr. Fields, I'm Kevin McDermott.  I represent the MBTA.

17       Dr. Fields, I just have a couple of general questions to

18   ask you and then a few questions specific to the MBTA.

19       Dr. Fields, based upon the authoritative literature in the

20   field of industrial psychology, in general, adverse impact

21   exists to some degree in all types of promotional exams for

22   police sergeant; is that fair to say?

23   A.   It can, yes.

24   Q.   And, Dr. Fields, again, based on the authoritative

25   literature in the field of industrial psychology, there is no

1    one definitive scientific explanation for the existence of

2    adverse impact in such exams; is that fair to say?

3    A.    Yes.

4    Q.    And in your testimony, Dr. Fields, I just want to

5    paraphrase your opinions.  You gave an opinion that one would

6    expect that using the Commonwealth of Massachusetts HRD exams

7    for a promotion to sergeant, that adverse impact would result

8    because of the aggregated analysis you did of the HRD data; is

9    that fair to say?

10   A.    I just missed the beginning part of the question.

11   Q.    Oh, I'm sorry.

12   A.    Okay.

13   Q.    I was just trying to paraphrase your opinion.  You gave an

14   opinion basically that said that we could expect adverse

15   inference -- I'm sorry -- adverse impact in the results of the

16   HRD testing based on your analysis of aggregating all the

17   statewide HRD data?

18   A.    That is partially true, and I think it's also true that

19   the -- the individual defendants in this case -- there was some

20   pattern indicated there individually, and that the mean score

21   differences were consistently significantly different.  So it

22   was looking at it in an aggregated and a disaggregated fashion.

23   Q.    In your report, however, you only use the aggregated HRD

24   data; is that fair to say?

25   A.    I don't think that's true.

```
 1   Q.    In your report, Dr. Fields, when you aggregated -- you did

 2   aggregate the data across jurisdictions statewide for looking

 3   at the adverse impact of that data; is that fair to say?

 4   A.    I reviewed Dr. Wiesen's aggregation data, and I commented

 5   on his aggregation data.

 6   Q.    Okay.  And he did include aggregation of data across the

 7   jurisdictions in his analysis; is that fair to say?

 8   A.    Yes.

 9   Q.    And in your report you went back to the 2003 and 2004

10   exams even though this case deals specifically with the 2005,

11   2006, 2007 and 2008 exams; is that true?

12   A.    That is true.

13   Q.    And just so I understand the reason you did that,

14   Dr. Fields, is that the more data you have, the more

15   reliability in the results; is that fair to say?

16   A.    Yes.

17   Q.    And is it fair to say, Dr. Fields, that the logic in

18   giving your opinion is that you would expect that the -- the

19   patents that you saw on the aggregated data would be followed

20   by the different jurisdictions involved and the different

21   defendants involved in this case; is that fair to say?

22   A.    Not exactly.  I think the aggregated data demonstrated

23   that the exam itself was continually resulting in an adverse

24   impact.  I think once you look at that, you have to look at the

25   disaggregated data and see how it's performing in each of the
```

1  locations as well and look at the sample sizes and look at the

2  mean score differences and all of the individual

3  characteristics in addition to the aggregated characteristics.

4  Q.   Dr. Fields, what I'm displaying on the ELMO machine is

5  page 10 of Dr. Wiesen's June 25, 2010, report.  And for the

6  purposes of my questions, Dr. Fields, I'm going to ask you to

7  assume Dr. Fields -- I mean, Dr. Wiesen's analysis and data are

8  accurate.

9       Looking at this -- looking at Table 2C, down -- Table 2C,

10  the heading on it is "summary of updated adverse impact

11  analysis by police department aggregated over 2003 to 2008

12  exams."  And looking down at the bottom of 2C, we see

13  statewide, but not including Boston, adverse impact analysis.

14  And for statewide aggregated analysis, the -- it's .35.  And

15  I'm going now to the first row, "adverse analysis and

16  promotional rates."  Do you see that, Dr. Fields?

17  A.   I do.

18  Q.   Okay.  So we see the statewide statistic's .35, and that

19  shows adverse inference?

20  A.   Adverse impact?

21  Q.   Adverse impact?  I'm sorry.

22  A.   Yes.

23  Q.   And looking down at the police department, the first

24  column, "police department," we find the MBTA four spots down.

25  In reading across, we find under adverse -- the first column

1    "adverse impact in promotional rates .95."  Do you see that,

2    Dr. Fields?

3    A.    I do.

4    Q.    And does that signify that there was no adverse impact in

5    the promotions at the MBTA aggregated from 2003 to 2008?

6    A.    It does.

7    Q.    In looking at these numbers, Dr. Fields, it's fair to say

8    that anything over .8 would signify that there is no adverse

9    analysis?

10    A.    That is the four-fifths rule.  Sometimes you have to go

11    further and look at the mean score differences, but here I

12    don't see a mean score difference that is significant.

13    Q.    Okay.  And when we do an adverse impact, for instance, in

14    the criteria of just promotion rates, would it be fair to say

15    just in that criteria a .8 or below would show adverse analysis

16    but anything above would show no -- I mean, adverse

17    impact -- anything below would show no adverse impact?

18    A.    You need to -- as I said earlier, you need a little bit

19    more, but in general, yes.

20    Q.    Okay.  And following along with the aggregated data of

21    2003 to 2008, that's in Table 2C, the MBTA over that course of

22    time in the next column, "adverse impact in passing rates .83."

23    Does that mean, Dr. Fields, that for the MBTA there was no

24    adverse impact in the passing rates from 2003 to 2008?

25    A.    Yes.  That means that there was no adverse impact.

1    Q.   And looking at Table 2C, going to the third column,

2    "adverse impact in average test scores," it shows 2.0 -- 2.0

3    points.  Is that a -- does that connote a big test score

4    difference between minority and non-minority?

5    A.   No.

6    Q.   And in this case, Dr. Fields, when we talk about minority,

7    we're talking specifically about African-American and Hispanics

8    only; is that fair to say?

9    A.   Yes.

10   Q.   It does not include other subgroups that may be considered

11   minority in the ordinary jargon, for instance, Asians and other

12   subgroups; is that fair to say?  They would be considered

13   non-minority in this analysis?

14   A.   What -- what report did you take this from?

15   Q.   The table -- this table is page 10 of Dr. Wiesen's

16   June 25th, 2010, report.

17   A.   Is that his third supplemental?

18   Q.   I can tell you in a minute.  I don't -- yes, it is.

19   A.   I believe that it only includes African-Americans and

20   Hispanics in the subgroup.

21   Q.   Looking at the Table 2C, Dr. Fields, it's fair to say the

22   MBTA certainly would know who it's promoting.  And going into

23   the first column of the adverse impact for promotional rates,

24   that's something that would certainly be known by the police

25   department; isn't that fair to say?

1    A.    Yes.

2    Q.    I know it seems rhetorical.

3    A.    Yes.

4    Q.    But going to the next column, "adverse impact in passing

5    rates," it's .83, but passing rates in the system utilized in

6    Massachusetts, the appointing authority wouldn't particularly

7    know what the passing rates were for -- on any particular year

8    for the exam; is that fair to say?

9    A.    Is it not generally well known that 70 percent is the cut

10   score?

11   Q.    No, that's not what I'm talking about.  I'm talking about

12   how in a comparison of how minorities bid against

13   non-minorities, the appointing authority wouldn't particularly

14   know who didn't pass or who did pass because in Massachusetts

15   what the appointing authority sees when they requisition for a

16   promotion is a certification list, which only has the group to

17   be considered under a 2 N + 1 score; is that fair to say?

18   A.    Well, I don't know the answer to that question because in

19   my world they -- we may.

20   Q.    Let me -- if -- if when a promotion comes up, the

21   appointing authority requisitions for a certification list, and

22   the only names that appear on a certification list are the

23   names of the top scorers pursuant to the 2 N + 1 rule, isn't it

24   fair to assume that the appointing authority wouldn't know who

25   passed the exam or what the passing rates of the exam are if

1  they're only looking at the certification list?

2          MR. LICHTEN:  Your Honor, I object.  The witness has

3  already said she doesn't know what happens.

4          THE COURT:  No, you may have that question.

5          On the assumptions contained in the question.

6          MR. McDERMOTT:  On the assumptions contained, yes.

7          THE WITNESS:  I -- I would assume that the appointing

8  authority knows only the race of those in that certification

9  band.

10 BY MR. McDERMOTT:

11 Q.   And going to the next category, I have generally the same

12 question, the adverse impact of average test scores, the

13 appointing authority wouldn't know the average test scores,

14 again, assuming that all the appointing authority gets is a

15 certification list that it requisitioned pursuant to openings

16 for promotions; is that fair to say?

17 A.   Yes.

18 Q.   And just to bring your attention, Dr. Fields, while we're

19 here, we have Table 2B.  It's a summary of the adverse impact

20 analysis by police department for the exam years 2003 and 2004.

21 And, again, under the first column, "police department," the

22 third police department down is the MBTA.  Do you see that,

23 Dr. Fields?

24 A.   I do.

25 Q.   And in the exam year 2003, and I will assume -- I'll have

1    you assume that the MBTA only does -- conducts exams during

2    odd-numbered years, every two years, but for the exam year 2003

3    going to the next column, "adverse impact in promotion rates,"

4    it's 1.2.  Do you see that, Dr. Fields?

5    A.    I do.

6    Q.    Does -- now, Dr. Wiesen testified, told us what 1.0 is

7    here.  I think he referred to it as perfect equity, that means

8    the same rate of minorities are passing with the same rate of

9    non-minorities.  Is that a fair -- is that a fair explanation

10   of what 1.0 means?

11   A.    Yes.

12   Q.    And do I look at this 1.2 -- can I assume that 20 percent

13   more minorities were being promoted than non-minorities?

14   A.    Yes, more -- I don't know if it's 20 percent right off the

15   top of my head, but more minorities than non-minorities.

16   Q.    Well, 1.2, what does that signify to you, Doctor?

17   A.    It's the proportion of minorities who are being hired

18   compared to the non-minorities.

19   Q.    Okay.  So I may have misspoke then.  I didn't mean by

20   number -- so the rates -- the rate of hire was 20 percent

21   better for minorities than non-minorities looking at that 1.2?

22   A.    The proportion of minorities are 1.20 more than the

23   promotion of non-minorities, so, yes, that's a 20 percent

24   increase.

25   Q.    And, again, just to look across the board at what the MBTA

1    did as far as the 2003 exam, the average -- I mean -- I'm

2    sorry.  The adverse impact in the passing rates was .84.  Does

3    that signify that there was no adverse impact in the passing

4    rates?

5    A.    Yes.

6    Q.    And the adverse impact in the effective passing rates was

7    .82.  Dr. Fields, does that indicate that there was no adverse

8    impact in the passing rates?

9    A.    Yes.

10   Q.    And in the adverse impact in the average test score

11   column, it says 3.4 points.  Is that a significant point

12   differential, Dr. Fields?

13   A.    It does not appear to be.

14   Q.    Dr. Fields, looking at the -- going back to Table 2C, it's

15   fair to say that the MBTA did not follow the pattern that's

16   shown by the statewide aggregated adverse impact analysis from

17   2003 to 2008; is that fair to say?

18   A.    Yes.

19   Q.    As a matter of fact, it's in opposite to what the

20   statewide pattern is because in the MBTA there was, in fact, no

21   adverse impact in any of the categories listed; is that fair to

22   say?

23   A.    Yes.

24   Q.    So, Doctor, your premise on the -- on your opinion that if

25   anyone relies on the HRD testing to promote, that they ought to

1    expect adverse impact would not hold true at the MBTA

2    considering the aggregated results from 2003; is that fair to

3    say?

4    A.   We're looking at 2003, and we're looking at aggregated

5    data 2003 to 2008, and just based upon those data, there's no

6    adverse impact there.

7    Q.   Well, my question was, however, because the MBTA did not

8    follow the statewide pattern of adverse impact, that your

9    opinion being based upon the statewide pattern of adverse

10   impact would not apply to the MBTA; is that fair to say?

11   A.   I'm not sure.  I need to see the rest of the data.

12   Q.   Well, the data that's in front of you, and I'll say,

13   assume that it's true, Dr. Wiesen said under the aggregated

14   data from 2003 to 2008 there is no adverse impact in any of the

15   criteria that he listed?

16   A.   I agree with that statement.

17   Q.   Okay.  So the -- your opinion that you gave as far as to

18   expect that anyone using the HRD examination should expect

19   adverse impact, my question is considering the data from

20   Dr. Wiesen's Table 2C concerning the MBTA, your opinion, the

21   logic of your opinion would not follow -- would not attach to

22   the MBTA; is that fair to say?

23   A.   Well, prior to that, though, I said that we should look at

24   the aggregated and the disaggregated.  So based on the

25   aggregated data, I would -- I would agree with you, but I

1    need --

2    Q.    Based on what you see in Table 2C?

3    A.    Yes.

4    Q.    Thank you.

5            MR. McDERMOTT:  Can I have a moment, your Honor, just

6    to check my notes?

7            (Pause.)

8            MR. McDERMOTT:  Your Honor, I believe I have no

9    further questions.

10           THE COURT:  All right.  This is perhaps a good time to

11   take the morning recess.

12           THE CLERK:  All rise.

13           (The Court exits the courtroom at 11:02 a.m.)

14           THE CLERK:  The Court will take the morning recess.

15           (There is a recess in the proceedings at 11:02 a.m.)

16           (After recess, start at 11:30 a.m.)

17           THE COURT:  Mr. McQuillan.

18           MR. McQUILLAN:  Good morning, your Honor.

19                        CROSS-EXAMINATION

20   BY MR. McQUILLAN:

21   Q.   Dr. Fields, my name is Peter McQuillan, and I represent

22   the City of Methuen.  I just have a couple of questions.

23           You are aware that the City of Methuen is a defendant

24   in this case?

25   A.    Yes.

1    Q.    And you are aware the two tests that apply to Methuen in

2    this case are the 2006 and 2008 sergeant promotion

3    examinations.  Did you perform any adverse impact analysis

4    specifically for the City of Methuen as it relates to those two

5    exams, Doctor?

6    A.    I only reviewed the data by the other experts.

7    Q.    But did you review any specific data as it relates to

8    Methuen?

9    A.    I believe I did.

10   Q.    And did you have a break down of that data?

11   A.    I think in one of the spreadsheets that I received I did.

12   Q.    Would you agree with me that based upon your review of

13   that data and any and all results that were conducted by

14   Dr. Wiesen at any adverse impact analyses, that any and all

15   ratios and results of those analyses showed that all the

16   differences in all the ratios in all the results as they

17   applied to the City of Methuen were not statistically

18   significant?

19   A.    I cannot recall it off the top of my head.

20   Q.    I'm going to ask you to assume, Doctor, that as a result

21   of all the adverse impact analyses conducted by Dr. Wiesen that

22   those results and those ratios were, in fact, not statistically

23   significant.  Okay?

24   A.    Okay.

25   Q.    And given that premise, I'm going to ask you:  Would you

1    agree with me that without those results that are statistically

2    significant, one cannot state with any reasonable certainty

3    that minorities in the Methuen Police Department suffered any

4    adverse impact by the use of the 2006 and the 2008 sergeant

5    promotion exams?

6    A.    Just to be clear, this is in all areas, mean score

7    differences --

8    Q.    Yes.

9    A.    -- this is passing rates --

10   Q.    Passing rates, average test scores, every imaginable front

11   as a result of the analyses.  In all analyses, including the

12   4/5ths Rule, the Chi ratio, again, assuming all resulted in

13   statistics being insignificant.

14   A.    Then I would say that there was no adverse impact from

15   2006 and 2008.

16   Q.    And it would be -- by virtue of that statistical

17   insignificance, it would be impossible to determine adverse

18   impact, wouldn't it?

19   A.    By virtue of?

20   Q.    All that data being statistically insignificant.

21   A.    If it's looked at and it's disaggregated, yes.

22   Q.    However, but based upon an aggregated study and in

23   aggregated test results, Methuen being incorporated into that

24   aggregation, it would show adverse impact wouldn't it?

25   A.    Not necessarily.

1    Q.   In this particular case, has it not, in fact, shown that

2    as a result Dr. Wiesen's analyses, his aggregated analyses?

3    A.   I wish we could look at the data so I could recall

4    exactly.

5    Q.   If it did, would that be an erroneous conclusion?

6    A.   That for 2006 and 2008 there was no adverse impact?  I

7    would say that there would still be no adverse impact if there

8    was no adverse impact.  But if it was aggregated for Methuen

9    and across the state and there was adverse impact, that might

10   lead you to believe there was adverse impact because the end

11   size -- the sample size would be large enough to show you that

12   it was.

13   Q.   But that conclusion would be erroneous as it applies to

14   Methuen, wouldn't it?

15   A.   But I'm saying was it -- was it combined for Methuen?  And

16   was it combined for --

17   Q.   Let's assume that Methuen is part of the aggregated

18   analysis and it shows on a statewide basis that there is

19   adverse impact.  But, however, isn't that an erroneous

20   conclusion as it applies to the City of Methuen, Massachusetts?

21   A.   Based upon what you say, I think so.

22   Q.   Thank you, Doctor.

23          MR. McQUILLAN:  Your Honor, I have no further

24   questions.

25          THE COURT:  All right.  Mr. D'Agostino.

1          MR. D'AGOSTINO:  Thank you, your Honor.  I'll be very

2     brief.

3                         CROSS-EXAMINATION

4     BY MR. D'AGOSTINO:

5     Q.   Good afternoon, Dr. Fields.  I'm Richard D'Agostino.  I'm

6     the Assistant City Attorney for the City of Lawrence and I

7     represent the City of Lawrence here today and I have yet to be

8     accused of misrepresenting them.  But the jury may still be

9     out.

10          Dr. Fields, did you do an adverse impact analysis for

11    the 2006 and 2008 police sergeant's promotional exam for the

12    City of Lawrence specifically?

13    A.   No.

14    Q.   Do you submit that tests can be devised that reduce

15    adverse impact?  I'm sure that's been your testimony.

16    A.   Yeah.

17    Q.   Do you know of any exam that guarantees the elimination of

18    adverse impact?

19    A.   No.

20    Q.   With regard to police promotional exams or any public

21    safety exam, any area at all?

22    A.   There are no guarantees.

23    Q.   When you do a statistical analysis of a police promotional

24    exam to determine its adverse impact, do you interview the

25    candidates at all who took the exam?

1    A.    Yes, I have.

2    Q.    Have you interviewed any of the Lawrence candidates or

3    plaintiffs in this case?

4    A.    No.

5    Q.    So you haven't interviewed them to determine their study

6    habits, the time allotted to study, the materials reviewed in

7    preparation for the exam, the candidate's education,

8    background, experience, veteran status, none of that?

9    A.    I have looked at some of their -- the veteran status and

10   their racial background and some of that information, but

11   not -- I have not interviewed them.

12   Q.    Would you take those issues into account in an adverse

13   impact analysis?

14   A.    Would I look at whether they study and things along those

15   lines?

16   Q.    Yes.

17   A.    Yes.

18   Q.    And that would play into your result or your outcome in

19   determination with regard to adverse impact?

20   A.    Not statistically but it might assist me in making

21   interpretations.

22   Q.    It does not play on a statistical level.

23   A.    No.

24   Q.    Dr. Fields, do you have any reason to know whether

25   Lawrence knew or should have known that the use of either the

1   2006 or 2008 Massachusetts police sergeant promotional exams

2   would have an adverse impact upon minorities in the Lawrence

3   Police Department?

4   A.    Would I have an opinion about that?

5   Q.    Do you have any reason to know?

6   A.    I think they could know but I don't know if they did know.

7   Q.    You don't have any personal knowledge that the city knew?

8   A.    I do not have any personal knowledge.

9   Q.    Or any reason to believe?

10  A.    No.

11        MR. D'AGOSTINO:  Thank you very much, Doctor.

12        Nothing further, your Honor.

13        THE COURT:  Mr. Lichten.

14                    REDIRECT EXAMINATION

15  BY MR. LICHTEN:

16  Q.    I just have a few questions, Dr. Fields.  I'm going to

17  talk quickly so I don't risk going into another day.

18        Do you recall being asked by Ms. Harris, the attorney

19  for the City of Boston, about the various validity coefficients

20  of job knowledge tests or cognitive ability tests versus

21  structured interview tests?

22  A.    Yes, I do.

23  Q.    Okay.  And she referred you to a deposition that you had

24  given in 2006 in Georgia.  Do you recall that?

25  A.    Yes.

1   Q.    And I want to show you part of that deposition and ask you

2   if you can look at your answer, which actually is just a page

3   from the answer that she asked you about.

4           MS. HARRIS:  What page is this, please?

5           MR. LICHTEN:   This is page 45.

6   BY MR. LICHTEN:

7   Q.    Do you see that?

8   A.    Yes.

9   Q.    And what did you say there?

10  A.    "A job knowledge test is slightly -- or approximately

11  equal or slightly in the same domain as structured employment

12  interviews according to the same article.  In this particular

13  article structured interviews have a validity of .51 and a job

14  knowledge test .48."

15  Q.    And does that confirm the testimony you gave when I was

16  asking you questions about the relative strength of validity

17  between structured interview and a job knowledge test?

18  A.    Apparently I corrected myself later in this testimony.

19  Q.    I see.  So just so -- my last question on this.  With

20  respect to whether the coefficients of validity for those tests

21  are relatively equal or not equal, what was your testimony back

22  in 2006 ?

23  A.    That they were relatively equal.

24  Q.    And is that your testimony -- was that your testimony here

25  in this case?

1   A.   Yes.

2   Q.   And that remains your testimony?

3   A.   Yes.

4   Q.   Okay.  You were asked some questions about the T&E.  Do

5   you recall that?

6   A.   Yes.

7   Q.   And first, what are the SIOP principles?

8   A.   The SIOP principles are a set of principles that are

9   written by the Society of Industrial Organizational

10  Psychologists, and they are to us, to make an analogy, what the

11  Uniform Guidelines are to you.  They are what we must follow

12  when we are in the test development process professionally.

13  Q.   Okay.  And do you remember, I think it was yesterday,

14  being asked a bunch of questions as to why you couldn't simply

15  assume that the T&E ratings somehow demonstrated certain skills

16  and abilities that could not be tested by job knowledge tests?

17  Do you recall that?

18  A.   Yes, I do.

19  Q.   Okay.  And I'm showing you a section of the SIOP

20  principles, and do these -- does this section address that

21  concern?

22  A.   Yes, it does.

23  Q.   And can you tell me what the SIOP principles provide with

24  respect to just assuming such a relationship?

25  A.   May I read the relevant portion?

1    Q.    Sure.

2    A.    Okay.  So we're in the last paragraph.  And it says, The

3    validity of job requirements assessed by other than formal

4    tests may be established on the basis of their content.

5    Requirements for or evaluation of personal history variables,

6    such as specific prior training, experience, or achievement can

7    be justified on the basis of the relationship between the

8    content of the personal history experience and the content of

9    the job for which they are evaluated or required.  To justify

10   such relationships, more than a superficial resemblance between

11   the content of the personal history variables and the content

12   of the job is required.  For example, things like courses --

13   course titles -- excuse me -- and job titles may not give an

14   adequate indication of the content of the course or the job or

15   the level of proficiency an applicant has developed in some

16   critical areas.  The critical consideration is the similarity

17   between the behaviors, products, knowledge, skills, or

18   abilities demonstrated in the personal history variable and the

19   behaviors, products, knowledge, skills, or abilities required

20   on the job, whether or not there is a close resemblance between

21   the given personal history variable as a whole and the job as a

22   whole.

23           And that -- what I was trying to say exactly yesterday

24   or the day before, that just because someone has taken a

25   course, we cannot assume they have a qualification.

1           And a good example that we're all familiar with is how

2     in the job market there's been a great deal of media about how

3     new labor in the labor market has very poor writing skills, and

4     yet, most of them have a high school if not a college

5     education, and yet, still they have poor writing skills.

6           So just because you completed education doesn't

7     necessarily mean you can do something such as write.

8           And just to take that one step further, in this

9     particular T&E you get more credit for having a PhD than a

10    master's.  Well, I have a PhD, so I would get more credit; yet,

11    a person with a master's in criminal justice will get less.

12    And, to me, that is not a validated -- it's not a validated

13    process.

14    Q.   Quickly I want to move on.  You were asked some questions

15    about some adverse impact analysis that you did in Macon,

16    Georgia.  Do you recall that?

17    A.   I do.

18    Q.   I think it sounded like some confusion.

19          As I understand it, you first did an adverse impact

20    analysis for what the first 25 promotions would be; is that

21    correct?

22    A.   That's correct.

23    Q.   And you did that based upon where minorities and

24    non-minorities ranked on the test?

25    A.   Yes.

1   Q.    Okay.  And what did you determine with respect to whether

2   there would be adverse impact in the first 25 promotions?

3   A.    We determined that the selection ratio would be .81 and it

4   was not statistically significant, so there would be no adverse

5   impact.

6   Q.    And then you were asked some questions about a second

7   adverse impact analysis that you did for -- and this is where I

8   think there was some confusion.  I'll show you this.  Do you

9   recall being asked about this little chart?

10  A.    Yes, I do.

11  Q.    Okay.  And that showed a ratio of .21.  What was that

12  referring to?

13  A.    That table is not a professionally or even a legally

14  accepted practice.  This is a -- what I did was -- somebody

15  must have instructed me to do this.  This is how many people

16  are left on the list and if you were to select just from who's

17  left on the list, what would be the adverse impact ratio?  But

18  that is not how it's done.  The way it is done is you look

19  at -- if you add another three selections, how would that

20  impact the entire selection ratio.

21  Q.    So if I understand what you're saying, this would have

22  been the next three selections after those 25 selections?

23  A.    Correct.

24  Q.    And if you wanted to figure out what the total adverse

25  impact would be from those 28 selections, you would do it

1    combined?

2    A.    See, here I did it off 46 remaining.  But there were 72 in

3    the population, and I should have used the entire 72 if it was

4    done appropriately.

5    Q.    And if you had done it as to all 28 -- the first 28

6    promotions to be made, what would the adverse impact have

7    turned out to be?

8    A.    Well, in next three vacancies?

9    Q.    Yes.

10   A.    In the worst case, if all three were Caucasians, it was

11   a .77 or a .78, something along those lines.  And it may be

12   that one of those was a minority.

13   Q.    So it was around the 4/5ths?

14   A.    Approximately.  And it was not statistically significant.

15   Q.    Now just moving on quickly.  This is the validation report

16   you did for the City of Macon?

17   A.    Yes.

18   Q.    And is this what a validation report should look like?  I

19   don't mean with the pictures of the fire --

20   A.    The job analysis report is not incorporated in this report

21   but it's in a separate binder that's as large as this report.

22   But, yes, this contains everything the Uniform Guidelines

23   requires that it contain.

24   Q.    Okay.  And when you look at the so-called validation

25   report that HRD allegedly did in I think 1991, did that contain

1   this information?

2           MS. HARRIS:  I'll object.  It's outside the scope of

3   her report.

4           THE COURT:  Overruled.

5           MR. LICHTEN:  They raised it.

6           THE COURT:  Go ahead.

7   A.   I think most of the information was in the 1991 job

8   analysis -- validation report.  Most but not every single

9   solitary thing but most.

10  Q.   Did you see any assessment of selection rates in the 1992

11  Commonwealth validation report?

12  A.   They did some adverse impact analyses in that report, I

13  think.

14  Q.   Okay.  And let me see if I can go to that.

15          Now, do you understand that in that 1991 validation

16  report they were looking at the adverse impact of a test they

17  had given in 1991, a written test?

18  A.   Or 199 -- around that time, maybe 1990.

19  Q.   Okay.  And I'm going to show you -- and this is in

20  evidence -- I think it's Exhibit 40 -- and I'm going to show

21  you this little chart.  Do you see that?

22  A.   Yes, I do.

23  Q.   Okay.  And do you know what this is?

24  A.   Yes, I do.

25  Q.   And what is it?

1    A.    This is analysis of the adverse impact at various passing

2    points for three different exams, 1985, 1987, and 1991.

3    Q.    Okay.  And I take it if this was done in 1991, then the

4    '85 and '87 had already been given and the 1991 was the one

5    they were doing the validation report for; is that accurate?

6    A.    That is correct.

7    Q.    And do you see adverse impact -- strike that.

8          Does this relate to adverse impact in the pass/fail

9    rate or just in the selection rate?

10   A.    It appears just passing point.

11   Q.    Okay.  And can you tell from this whether or not the

12   Commonwealth is going to experience, based upon this report,

13   significant adverse impact if they go forward with the results

14   of this examination?

15   A.    Well, in 1991 there was significant adverse impact

16   because .16 ratio is quite low for adverse impact.

17   Q.    So if they set the passing score at 70, there would have

18   been .16 adverse impact as a result of that 1991 examination?

19   A.    Yes.  And I think -- isn't that what they did?  I think

20   that's what they did.

21   Q.    We'll get to that in a second.

22          How significant is that adverse impact?

23   A.    That's a very, very high severe level of adverse impact.

24   Q.    And even if they went down to 70, do you see where they

25   tried to see what the adverse impact would be at the score of

1  60 -- I'm sorry, 60?

2  A.   I can't read it, but it's .34 maybe.

3  Q.   I think it says .30.  Assume that says .30.

4  A.   .30 is very significant adverse impact, very serious

5  adverse impact.

6  Q.   Okay.  And would you expect if the adverse impact at the

7  pass/fail rate is as severe as it is here, how that would play

8  out in selection rates?  That is, could we expect it to be

9  greater or lesser?

10  A.   We would expect it to be greater or it certainly would

11  contribute to serious adverse impact in the selection rates.

12  Q.   Okay.  So in 1991, based upon this, would the Commonwealth

13  know -- and I believe this relates to the City of Boston

14  examination -- would anyone who read this, would anyone who

15  read this know based upon this written test, based upon this

16  test format is going to have significant adverse impact on

17  minority candidates if this format is used for years to come?

18          MR. CARROLL:  Objection.

19          MS. HARRIS:  Objection.

20          THE COURT:  Overruled.

21  A.   You could make a very good guess that it would continue to

22  have adverse impact.

23  Q.   Okay.  And then, finally, let me just ask you quickly.  Do

24  you see that in 1985 at the passing point of 65 there's much

25  less adverse impact?

1   A.   Yes, there is no adverse impact at the passing rates.

2   Q.   Okay.  Were you aware that in 1985 the City of Boston, as

3   others have testified to, gave a promotional exam that had

4   multiple components other than a written exam?

5   A.   Yes, I'm aware of that.

6   Q.   Okay.  And what conclusions, if any, would you draw from

7   the fact that a multiple component exam is given in 1985 and

8   that the passing rate at 65 there's an adverse impact ratio

9   of .85, and in 1991, when only a written exam is given, they

10  have potential adverse impact ratios of .16 and .30?

11          MR. CARROLL:  Objection.

12          THE COURT:  Overruled.

13  A.   What conclusion would I draw?

14  Q.   Yes.

15  A.   That the 1985 exam with its multiple components minimized

16  group differences significantly.

17  Q.   Okay.  And assuming that for the 2005 Boston exam the

18  adverse impact ratio after all selections had been made is .28,

19  how significant would you consider that adverse impact?

20  A.   I consider that very severe adverse impact.

21  Q.   Okay.  Now, you were asked some questions about whether

22  there were cost effective or cheaper ways of changing the 2002

23  examination that could have resulted in less adverse impact.

24  Was there a method that could have been used in 2002 that would

25  have cost hardly anything that could have even more greatly

1    improved the adverse impact from what it was?

2    A.    Yes.

3    Q.    And what was that?

4    A.    Assuming that the job analysis was carefully looked at, if

5    it was justified and the weights could be altered, all that it

6    would take would be to alter the weights and make the oral

7    component a higher weight than it was and the written exam a

8    lower weight than it was, and that would surely minimize group

9    differences and reduce adverse impact.

10   Q.    Is that consistent with your research that the oral

11   component could have justified a higher weight than it was

12   given by the City of Boston and HRD in 2002?

13   A.    Yesterday -- I think it was yesterday -- we were told it

14   was a 40 percent and a 40 percent weighting, and so I think, if

15   that is accurate, that it certainly could have been lower for

16   the written and higher for the oral based upon my experience.

17   Q.    Just very briefly --

18            THE COURT:  May I just ask on this.  Would you

19   recommend an altering of the weighting to reduce adverse impact

20   at the expense of degrading the validity?

21            THE WITNESS:  No.

22            THE COURT:  So it's a condition to your proposition

23   that there be no degradation of the validity in the weighting.

24            THE WITNESS:  Correct.  And to be very clear, never

25   after the exam is administered and the results are known.  This

1    would be something to use and consider for a future

2    administration.

3    BY MR. LICHTEN:

4    Q.    And just to follow up on that question by the Court, based

5    upon your experience in the field and the tests that you've

6    written, where a job knowledge test, a test that you use as a

7    scored component, what is the normal weight that you've

8    accorded it in your examinations?

9    A.    Like I said, it's usually between 20 and 40 percent, but

10   generally around 30.

11   Q.    And does that -- is that -- again, to follow-up the

12   Court's question, is that based upon your assessment of what

13   skills and abilities an oral component is testing and what

14   skills and abilities a job knowledge test is testing?

15   A.    Yes.  It's the relative -- actually, it's an analysis of

16   the entire set of important knowledge, skills, and abilities

17   and their relative importance.

18   Q.    Okay.  Just very briefly, with respect to Macon that you

19   were asked a lot of questions about yesterday, can you just

20   tell us what the components were of your police sergeant's exam

21   in Macon?

22   A.    It was a multiple choice job knowledge test, a supervision

23   exercise, an oral presentation exercise, and an emergency

24   incident exercise.

25   Q.    And the job knowledge test, do you recall what percentage

1  weight that was accorded as opposed to these other exercises?

2  A.   I think it only had a 20 percent weight, but I don't

3  recall.

4  Q.   Okay.  You were asked -- I think you were asked a question

5  about St. Louis.  In St. Louis what were the components of the

6  exam that you gave there?

7  A.   There was three main components.  There was a multiple

8  choice job knowledge test, an assessment center, and what they

9  call an internal review board.

10  Q.   And what would you -- do you recall what the weights were

11  that were recorded there?

12  A.   I'm not sure exactly, but the written exam was only around

13  30 percent or so.

14       And let me just add in that job knowledge can be

15  tested, as I said in my testimony on the previous days, in

16  these other formats.  So you have -- you can test job knowledge

17  verbally, at least -- not the full set of job knowledge, but

18  part of the job knowledge in other components.  So you can take

19  away some of its weight in the written paper-and-pencil exam

20  which we know is going to result in adverse impact and you can

21  move it into some of these other oral components and reduce

22  adverse impact that way.

23  Q.   I want to change gears, I think, to my last line of

24  questioning, maybe next-to-last line of questioning.

25       You were asked a lot of questions yesterday and maybe

1    today, I can't remember, about the T&E ratings.  Do you recall

2    that?

3    A.    Yes.

4    Q.    And have you reviewed the T&E sheet for Massachusetts that

5    tells you how they accord points and for what?

6    A.    Yes, I did.

7    Q.    Okay.  Now, let's just take Mr. -- do you remember being

8    shown a sheet of Mr. Robert Alvarez?  He was the head of a SWAT

9    team on a number of occasions.

10   A.    Yes, I do.

11   Q.    Okay.  So I want you to assume for a moment, just for this

12   example, that Robert Alvarez ran a SWAT team as a supervisor of

13   a regional SWAT team for five-and-a-half months, a total of

14   five-and-a-half months' worth of days.  Okay?  Have you

15   calculated how much -- how much credit he would get on the T&E

16   for having done that feat?

17   A.    Just one point of clarification, it has to be -- they call

18   it recent and old.  So this is beyond a certain period of time,

19   so it's the older experience, so that would give him .05

20   points.

21   Q.    For five-and-a-half months of running a SWAT team he would

22   get .05 points?

23   A.    .05.

24   Q.    Okay.  That's 1/20th of a point?  Help me out.

25   A.    Everyone keeps making me do math right on the spot.  I

1    want a calculator.

2    Q.    Okay.  Let's say Mr. Alvarez went on and got a PhD in

3    criminal justice.  Have you calculated how many points he would

4    get for that?

5    A.    Yes, I have, but I have to get the sheet out because I

6    don't remember off the top of my head.  Here is the sheet.  Oh,

7    wait a minute.

8          (Pause.)

9    A.    He has a PhD in what?

10   Q.    Let's say he got a PhD in criminal justice.

11   A.    I think he gets 12 points for that.

12   Q.    Right.  And then those 12 points are then scaled?

13   A.    Well, all of these points are multiplied by .2, because

14   it's 20 percent of the entire grade.

15   Q.    So if we multiply 12 by .2 --

16   A.    Here we go again.

17   Q.    That would be the calculation?

18   A.    That is correct.

19   Q.    So I think that's about two points?

20   A.    Yes, 2.4.

21   Q.    So does the T&E drive one's score in any substantial

22   fashion?

23   A.    The T&E, based upon my looking at candidates' scores, does

24   very little.  I mean, once you convert it to 20 percent of the

25   grade, it appears to me that sergeant candidates, in

1    particular, can only get between about two or three points

2    added on to their written score.  Two to three, it looks to me

3    to be the max.  I'm not sure.  There might be some that's a

4    little bit higher, but it's very difficult to get much above

5    that.

6    Q.   Okay.  And I want to look at an actual example.  I'm going

7    to take Lowell, since Lowell happened to ask you the questions.

8    And what exhibit is this?

9         Actually, it comes out pretty good on this, so I was

10   going to say the Court could look at 75, but I think we can

11   actually see it better on here.

12        So if you look at this -- if we look at the Lowell

13   Police Department, and this is for the 2006 exam, and can you

14   see on here what someone's written score was and their T&E

15   score and then what the combined score came out to be?

16   A.   Yes.

17   Q.   Okay.  So if we take the top person on the list for the

18   Lowell Police Department, is it accurate that they got an 88.75

19   on their written score?

20   A.   Yes.

21   Q.   And an 87 before it's scaled on their T&E score?

22   A.   Yes.

23   Q.   And so their final score is what?

24   A.   89.

25   Q.   Okay.  So it looks like the T&E put them up a quarter of a

1    point; is that right?

2    A.   Well, the 88.75 is scaled and, yes.  It had little impact

3    on the written score.

4    Q.   Okay.  And let's take someone who had -- in looking at

5    this, I found that about as high as you could get was about a

6    90, 91 on the T&E.  Is that what you found?

7    A.   Yes.

8    Q.   Okay.  So let's go down a couple places and we get to

9    someone who had a 90.  It's the person who was appointed on

10   10/21/2006 who had an 83.75 for a written score and a T&E of

11   90.40.  Do you see that?

12   A.   Oh, yes.  83.75, did you say?

13   Q.   Yes.

14   A.   And 90.4, did you say?

15   Q.   Right.

16   A.   Yes.

17   Q.   And the 90.4 is about as high as you can get?

18   A.   There's one here that was a 91.20.  But 90, 91 was the

19   highest we saw on these.

20   Q.   So what was his final score as a result of his written

21   score and his T&E score?

22   A.   We just moved the whole thing.  I'm completely lost right

23   now.  Where is he again?

24        Where is it?  Here he is, 90.4.  His final grade was

25   an 85.

1   Q.   So with the high score on the T&E of 90, how high did that

2   drive his score?

3   A.   He went from an 83.75, which I understand is rounded

4   anyway, an 84 to an 85.

5   Q.   So what does that tell us, if anything, about the validity

6   of the T&E as it relates to assessing so-called knowledge,

7   skills, and abilities that may be sought to be assessed through

8   a T&E and allegedly critical for the job?

9        MR. CARROLL:   Objection.

10       THE COURT:   Overruled.

11  A.   Could you rephrase, please?

12       MR. LICHTEN:   Can you read back the question, please?

13       (Record read.)

14  A.   Okay.  What it tells you -- what I said earlier about the

15  validity of the T&E is that it is not measuring what it

16  purports to measure on that, which we haven't reviewed yet.  It

17  doesn't measure the things that it says it's going to measure.

18       What it says about what it does to the score is

19  virtually nothing to the score.  It doesn't change it in any

20  significant way.

21  Q.   Okay.  And finally on this, let me move on for a moment to

22  Lowell -- I'm sorry, Lawrence.  Actually, I think Lawrence

23  is --

24       Do you see Lawrence?

25  A.   Yes.

1    Q.    Sorry for all those arrows.

2            THE COURT:  You can clear them.

3            (Discussion off the record.)

4    Q.    Dr. Fields, let me ask it this way.  Have you looked at

5    the Lawrence list of written scores and how, if at all, that

6    changed when the T&E was added in?

7    A.    Well, as we just discussed, the scores did not change very

8    much at all, and I, actually, just for my own interest I wanted

9    to see how the rank order changed.  And what I found was the

10   rank order really did not change.  The only thing that happened

11   was occasionally somebody moved into a tied position with

12   someone.  But nobody flipped from a higher score to a lower

13   score than someone else.  Virtually everyone stayed almost in

14   the exact same position.

15   Q.    And that just -- that's confirmatory of what you testified

16   to just a couple of minutes ago?

17   A.    Yes, that it doesn't have a significant impact on these

18   test scores.

19           MR. LICHTEN:  May I have just one moment, your Honor?

20           (Discussion off the record.)

21           MR. LICHTEN:  Thank you, Dr. Fields.  That's all I

22   have.

23           May it be shown I spent eight minutes up there?

24                      RECROSS-EXAMINATION

25   BY MS. HARRIS:

1    Q.    Dr. Fields, a moment ago Mr. Lichten asked you if there

2    could be an adjustment made to the 2002 exam for virtually no

3    cost.  And I believe the answer had to do with justifying a

4    movement of the weights.  And would you agree with me that in

5    order to move the weights, as you commented, you can't do it

6    after the administration of the exam, correct?

7    A.    Correct.

8    Q.    And to change the weights would require making a

9    professional judgment about what the weights ought to be,

10   correct?

11   A.    Correct.

12   Q.    So one can't just say the next time we administer this

13   test we'll allot 20 points or 20 percent to the written test

14   and 60 percent to the performance piece.

15   A.    Correct.

16   Q.    So you would have to go through an analysis to determine

17   what the weights of the exam ought to be given the intent of

18   the design of the exam?

19   A.    The weights -- we refer to as validating the weights, and

20   they have not been validated that I can see.

21   Q.    So in order to change them, they would have to be

22   validated?

23   A.    Correct.

24   Q.    And in order to do that would require the expense of

25   hiring a professional industrial psychologist to perform that

1  work?

2  A.   Correct.

3  Q.   And the change -- so there would be a cost associated,

4  fair so say, with the change of the weights of the exam.  And

5  then administering the exam, the city would incur the same

6  costs that were associated in 2002 with administering the exam?

7  A.   Well, I don't know the answer to the latter question.  But

8  the cost of the change would -- there would be some cost,

9  minimal cost, I would think.

10  Q.   And then if the exam were to be readministered -- and I'll

11  represent to you the way the exam was administered in 2002, a

12  convention center was rented, assessors were recruited from

13  across the country, brought to Boston, trained, housed, fed,

14  went through the process of assessing.  So you would agree with

15  me that there are costs associated with that portion of the

16  grading, the scoring of the exams?

17  A.   Yes.

18  Q.   And in doing all of that, is there any guarantee that the

19  results would have been any different than they were in 2002?

20  A.   It's just extremely encouraging.

21  Q.   But you can't say what the results would have been?

22  A.   There's no guarantees.

23  Q.   Did you look at any of the performance piece data for any

24  of the Boston plaintiffs in this case?

25  A.   I'm sorry, one more time.

1    Q.    Yes.  In this case did you look at the performance data

2    from the 2002 exam for any of the Boston plaintiffs in this

3    case?

4    A.    I think I looked at some.

5    Q.    Did you do a reapportionment of the weights just to test

6    the theory with regard to the 2002 exam; that is to say, if the

7    written portion of the exam had been weighted less and the

8    assessment center had been weighted more, whether there would

9    have been any significant change in their placement?

10   A.    Dr. Wiesen did.

11   Q.    Okay.  Did you do that with regard -- pardon me.

12        Did Dr. Wiesen do that with regard to the plaintiffs

13   in this case to your knowledge?

14   A.    With regard to the plaintiffs in the case?

15   Q.    Yes.  The individuals from the Boston Police Department

16   who are individually bringing the suit.

17   A.    He just did on the 2002 data.

18   Q.    Now, I think when we were talking -- excuse me.  When

19   Mr. Lichten was talking to you about the weights that you

20   apportioned in the Macon test that we spent some time talking

21   about, is it fair to a say that the weights that you assigned

22   in Macon were based upon the assessment that you did in Macon

23   and the validation that you did to support the weights that you

24   apportioned in that exam?

25   A.    Yes.

1    Q.    And one couldn't take the weights that you used in Macon

2    and put it on a Boston-based exam without doing that validation

3    process?

4    A.    Correct.

5    Q.    And similarly, for the work you did in St. Louis, you

6    can't transplant the validation of the weights that you did for

7    the St. Louis exam and impose it on a Boston or a Commonwealth

8    exam?

9    A.    Correct.

10   Q.    And I believe that you had testified that you were

11   disappointed about the results that you had received in the

12   St. Louis exam regardless of the fact that there was a 30

13   percent weight given to the written portion of that test; is

14   that right?

15   A.    Yes.

16   Q.    Do you remember what that result was?

17   A.    I do not.  I think it was moderate adverse impact.  I

18   think it was less than it had been in the past.  And I had a

19   number of concerns about the internal review board.  That was,

20   I think, some of my concern.

21   Q.    And is the concern you had about the internal review board

22   was that it wasn't properly linked to the weights that were

23   apportioned to it?

24   A.    No, I was less concerned about validity and just more

25   concerned about having internal assessors and the issues with

1    that.

2    Q.    And I believe that you were -- in speaking about the T&E

3    in response to the questions that Mr. Lichten had for you, you

4    were testifying that you didn't believe that those points were

5    linked to what they were intended to measure, or what they're

6    represented to measure.  And my question is:  What is the

7    seniority that was allotted 10 points in Memphis?  What KSAs

8    was that seniority point range linked to in Memphis?

9    A.    I tried to explain this, and I will try to make it clear.

10   The seniority is just years --

11   Q.    Yes.

12   A.    -- nothing else.  Has a criteria related validity

13   coefficient of .1.  And in the Schmidt and Hunter article that

14   I continually refer to, that's where that's listed.  And so it

15   is known amongst the people in the profession that if you use

16   experience, it has some validity.  And if you added on to

17   whatever you're using, it will add some validity.  But it's

18   only a very small piece and it's not measuring any of the KSAs

19   that are listed.  It measures none of them.  It just measures

20   job experience.

21        So you don't have to do a separate linkage of job

22   experience to knowledge, skills, and abilities.  The education

23   has to be linked.  Like, for example, the courses taught that

24   is in that document would have to be linked to specific

25   knowledge, skills, and abilities.

1   Q.   But what I'm curious about is in Memphis, seniority, which

2   is years, experience is weighted -- is given 10 points.

3   A.   Correct.

4   Q.   What is that weighted to?  What KSA does that support?

5   A.   I thought I just explained that.

6   Q.   I thought you were talking about the T&E.

7   A.   No, no.  The experience in Memphis is experience per se.

8   Q.   Right.

9   A.   Job years, years on the job.

10  Q.   Does it link to a KSA at all?

11  A.   It is a known valid predictor in and of itself.

12  Q.   A predictor --

13  A.   Job performance.

14  Q.   But is it linked to job knowledge, supervisory skill -- is

15  it linked to any of the separate KSAs as you've described as

16  being critical to the job of a sergeant?

17  A.   No, it is just job experience.

18  Q.   So you just get a flat benefit.  And that doesn't cause

19  you to have any concern about the weight validity that's given

20  to the seniority component?

21  A.   You know, seniority is a very sensitive issue amongst

22  police officers, which I think we all know.  And they usually

23  want some credit for time and grade.  And since it has

24  validity, you know, most of us in the profession believe that

25  it's acceptable to add it on.  And I was okay with it because

1   it's been proven to be valid.

2   Q.   And would that be -- would your assessment of that be the

3   same for the T&E here where we have established that from the

4   get-go anybody that's eligible to take the sergeant's exam

5   starts with 14 points on the E&E?

6   A.   The E&E as just experience is just experience, but it's

7   not a measure of the things that it purports to measure, like

8   oral skills and ability to supervise and the things that it is

9   purportedly linked to.

10  Q.   Okay.

11       MS. HARRIS:  Okay.  Thank you, your Honor.  Thank you,

12  Dr. Fields.

13       THE COURT:  Doctor, when you say it adds validity

14  because it has some so it adds it, you don't mean add in

15  strictly the mathematical sense.  You mean it contributes some

16  validity -- in other words, would it be in the way as we looked

17  at the Lawrence and Lowell adjustments on the scores, it would

18  be -- in other words, if you had a pre -- whatever the other

19  components were, validity of .35 and you had .1 from the

20  seniority, you wouldn't have .45.

21       THE WITNESS:  It doesn't add like that.

22       THE COURT:  I just wanted to be clear the word "add"

23  wasn't a strict mathematical operation.

24       THE WITNESS:  The term we use is "incremental

25  validity."  It would incrementally add a very, very minor

1    amount.

2         THE COURT:  I just wanted that to be clear for the

3    record.

4         THE WITNESS:  And I just wanted to be clear that it's

5    not measuring the constructs that we've been talking about.

6         THE COURT:  Anyone else?

7         MR. CARROLL:  No questions.

8         MS. ENGDAHL:  I just have a quick question just for

9    clarification.  I just want to clarify something that you had

10   said.

11                    CROSS-EXAMINATION

12   BY MS. ENGDAHL:

13   Q.   On the T&E, did you say you looked at all these and

14   everybody remained in the same rank order, whether you were

15   looking at their raw score or their T&E?

16   A.   I was it was very similar.  I think some people moved up

17   into tying positions, but I don't think there was flip-flopping

18   on the Lawrence data that I looked at.

19   Q.   But you can't say that for all the data?

20   A.   No, I cannot.

21   Q.   Oh, okay.  So I just -- this data from the 2006 sergeant's

22   exam for Worcester.  And so I just want to draw your attention

23   here.  This is -- the person's raw score is 79 and the final

24   score is an 83?

25   A.   Yes.

1    Q.    So it looks as though that person jumped quite a few

2    people, those 82 down.  Does that -- what does that tell you?

3    A.    Okay.  That person did jump a number of locations and

4    there's a number of people moved into tied positions.  But the

5    one thing that we haven't been able to establish is that if you

6    were to correlate the list, the final score list with the

7    original score list, you would find that they're very highly

8    correlated because there's not -- even with that one big

9    movement there is not enough of an enormous movement from that

10    small contribution of the T&E to really change the score

11    distribution, if I could put it that way.

12    Q.    Okay.  I see there was another person here with a raw

13    score of 78, he was given an 82.  That person appears to move

14    above the next three.

15    A.    Well, I don't think that's exactly right.  And it's hard

16    to do it like this.  Because they're all moving, but they're

17    moving --

18    Q.    Well, that person scored lower than the 80, 79, 80 below

19    but, yet, ended up with a final score of 82, which is a higher

20    final score than those.  So that's a significant change in that

21    person's rank?

22    A.    Well, it doesn't look like the person moved on the list.

23    Q.    Why do you say that?

24    A.    Because he or she is still in the same position.

25    Q.    That person wouldn't have been below number 80 and 79,

1  79 --

2  A.   See, that's what I'm saying, I can't -- all of those

3  people moved as well, so I can't see what happened to them

4  from -- I would rank order the scores and then rank order the

5  final, so you have to look at the two next to each other.

6          Where did --

7  Q.   Just this little snapshot doesn't change your opinion of

8  what you said before, that --

9  A.   I'm not seeing significant changes because everybody is

10  moving maybe one or two spots, but the order is remaining not

11  that different.

12  Q.   Okay.  Well, it looks at least, for example, the person

13  who had a raw score of 80 and final score of 81, at least two

14  people moved above him that weren't near him or her?

15  A.   Yes, I would agree with that.

16  Q.   Does that change your conclusions about --

17  A.   That's just not a lot of movement.

18          MS. ENGDAHL:  I have nothing further.

19          MR. LEAHEY:  I have a couple of questions.

20                    RECROSS-EXAMINATION

21  BY MR. LEAHEY:

22  Q.   Dr. Fields, first with respect to some questions that

23  Attorney McDermott had asked you, fair to say that you did not

24  do any independent analysis of the raw data in your reports and

25  that you relied on the information from either Dr. Silva or

Dr. Wiesen?

A.    I think I mentioned to you that in my first report there

is an Excel spreadsheet that I attached, and I did do some

minimal data analysis on those data.

Q.    That was statewide data?

A.    There was also Boston data, both.

Q.    Just statewide and Boston.  No individual defendants in

this case?

A.    There were some individual defendants in this case.

Q.    As far as -- I thought you told that -- in response to

Attorney McDermott that you had relied on the data that was

done by -- that was provided by Dr. Silva and Dr. Wiesen.

That's not correct?

A.    That is the majority of the data that I utilized, yes, by

far.

Q.    Was that the most recent data that you had used, from

Silva or Wiesen?

A.    I saw the recent data.

Q.    Fair to say that in your March 2010 report you do not have

statistical breakdowns regarding each municipal defendant,

correct?

A.    Correct.

Q.    You were also asked questions from Attorney Lichten

regarding the training and experience and the weight afforded

the training and experience component with regards to the

1   written test component?

2   A.   Yes.

3   Q.   You were asked those questions?

4        You would agree that in a strict rank order proceeding

5   a difference of a single point, while not -- will make a

6   difference with regards to promotions, correct?

7   A.   Yes.

8   Q.   And that depending on where you are -- did you see

9   Dr. Wiesen's table that he did in his -- I believe it's his

10  April -- April 2010 report where he put a table together, table

11  4.  Do you recall seeing this table?

12  A.   Which report was this one?

13  Q.   This is the April 2010?

14  A.   Yes.

15  Q.   Do you recall seeing this table?

16  A.   Yes.

17  Q.   And in this table it appears that Dr. Wiesen combines the

18  test results from the 2006 Lawrence sergeant's exam, the 2008

19  Lawrence sergeant's exam, the 2006 Lowell sergeant exam, the

20  2005 MBTA sergeant exam, 2007 MBTA sergeant exam, and the 2006

21  Methuen sergeant exam in his analysis.  In the next page he

22  states, "These six outcomes show adverse impact, failing the 80

23  percent rule of the guidelines."

24       Do you see that?

25       MR. LICHTEN:  Beyond the scope, your Honor.

1          THE COURT:  I'm not sure what the point is, so it's

2     hard to rule.

3          MR. LEAHEY:  It's going to questions asked about

4     whether or not there's differences in promotional rates.

5          THE COURT:  Go ahead, you can have it.

6     BY MR. LEAHEY:

7     Q.   Fair to say you really can't look at a promotion from 2008

8     and insert it back in time to another test, correct?

9     A.   Can you please restate that question?

10    Q.   Sure.  One of the things in here that -- strike that.

11         You talk about how there's not any movement in the

12    test measures, correct?  That the training, experience doesn't

13    really move any of the numbers?

14    A.   Doesn't move them much, I said.

15    Q.   Okay.  This is 2006 statewide exams.  I just want to take

16    you to the first page.  This is all I was able to do in the

17    short order.  But just looking at Andover, do you see right

18    here where it says the weight of the score is an 85 and then

19    the training experience is 79?  Do you see that?

20    A.   I do.

21    Q.   And then his end up score ends up being an 84?

22    A.   Yes.

23    Q.   So based on this individual's lack of training experience,

24    he actually loses a point as a result of factoring in the

25    training experience component, correct?

1    A.    Correct.

2    Q.    Then going down to the next two, you see someone who got a

3    77.50 on the written, his training experience got a 90 and he

4    ended up getting an 80 on the exam and that boosted his total

5    by three points, correct?

6    A.    A little less than -- a tiny bit more than two points.

7    Q.    Well, he went from -- two-and-a-half points?

8    A.    Okay, we'll compromise.

9    Q.    Well, 9,000 minus 7,750 is 250, right?

10    A.    Yeah.

11    Q.    So that would be 2.5.

12          And then the same thing happens for this next person

13    who also does the same thing.  He ends up going two-and-a-half

14    points, but if you go 2.5 and you round up, actually, that

15    would be three points, right, if you round up?

16    A.    Okay.

17    Q.    And did you do -- and turning to the next one I was able

18    to find, which is Cohasset, do you see that there's an

19    individual who scores an 81.25, correct?

20    A.    Correct.

21    Q.    And that person ends up scoring an 83 on the exam based on

22    his training and experience.  Do you see that?

23    A.    Yes.

24    Q.    And he ends up getting promoted on October 20, 2008.  Do

25    you see that?

1    A.    Yes.

2    Q.    And the person directly below him actually scored better

3    on the test, an 82.5, but because of his lack of seniority he

4    actually scored -- he didn't get any additional points as a

5    result of the test, and he actually was rounded down, correct,

6    from 82.5 to 80?

7    A.    Yes.

8    Q.    And he ended up getting promoted on March 3, 2009.

9          So you agree that with just these two individuals

10   based on the score alone they would have flip-flopped, correct?

11   A.    Yes, I do agree with that.

12   Q.    Okay.  And that would be -- fair to say that would be true

13   for any number which a similar pattern occurs throughout any of

14   the documents as to promotional opportunity based on the test,

15   correct?

16   A.    Correct.

17   Q.    And you're aware that Massachusetts has a strict -- or has

18   a 2 N + 1 rating, correct?

19   A.    Yes.

20   Q.    And that if there are five promotions -- strike that.

21         If there were two promotions, five individuals would

22   be considered for that position, correct?

23   A.    Yes.

24   Q.    And they would take -- if there were two people at 83, one

25   at 82, and seven at 80, because of how 2 N works, actually all

1    of those names who were tied would be considered as part of

2    that band, correct?

3    A.    Would you repeat your example?

4         MR. McQUILLAN:  Can you read that question back,

5    please?

6         THE COURT:  Why don't you try it again.

7    BY MR. LEAHEY:

8    Q.    That if there are five positions that have -- HRD has to

9    give you five names to comply with 2 N + 1.  If the last name

10   ends up being tied with six other individuals, isn't it true

11   under 2 N + 1 that all of the individuals, including all of

12   those who tie for the single last spot, make it on an

13   eligibility list?

14   A.    Yes.

15   Q.    And so if someone was able even to bump up a point just to

16   make it into the 2 N + 1, that that would increase their

17   opportunity -- well -- strike that.

18        By getting within that 2 N + 1 range allows them to be

19   considered for a promotion that they wouldn't otherwise be

20   considered for, correct?

21   A.    Correct.

22   Q.    Did you do any analysis to compare -- since you did a

23   statewide analysis of the adverse impact and passing rates, did

24   you do any analysis regarding how a candidate in Lowell would

25   have fared in the promotional process in any other of the

1   municipalities that took the Civil Service test?

2           MR. LICHTEN:  Objection.  Beyond the scope.

3           THE COURT:  Sustained.

4           MR. LEAHEY:  Thank you, your Honor.  I have nothing

5   further.

6           THE COURT:  Mr. McDermott?

7           MR. McDERMOTT:  Your Honor, the MBTA has no further

8   questions.

9           MR. McQUILLAN:  Methuen has no further questions.

10          MR. D'AGOSTINO:  Lawrence has no further questions.

11          THE COURT:  Thank you, Dr. Fields.  Your testimony is

12  concluded and you're excused.

13          MR. CHURCHILL:  Your Honor, the plaintiffs call

14  Spencer Tatum to the stand.

15          SPENCER TATUM, having been duly sworn by the Clerk,

16  was examined and testified as follows:

17          THE CLERK:  Please be seated.  State your name and

18  spell your last name for the record.

19          THE WITNESS:  Spencer Tatum, T-a-t-u-m.

20                          DIRECT EXAMINATION

21  BY MR. CHURCHILL:

22  Q.   Mr. Tatum, good afternoon.

23  A.   Good afternoon.

24  Q.   Are you currently employed?

25  A.   Yes, I am.

1    Q.   Where are you employed?

2    A.   I'm a police officer for the City of Worcester.

3    Q.   And are you a plaintiff in this case?

4    A.   Yes, I am.

5    Q.   And let's go through some of your background, if we can.

6         What is your educational background, starting with

7    high school?

8    A.   I graduated from high school, 1980, Burncoat Senior High.

9    I have an associate's degree from Quinsigamond Community

10   College, a bachelor's degree from Anna Maria, and I completed

11   one year of law school at Mass. School of Law.

12   Q.   And do you have any background in the military?

13   A.   Yes.  I was in the United States Army from 1981 to 1987.

14   Q.   All right.  When did you begin your career in law

15   enforcement?

16   A.   March of 1987.

17   Q.   And where did you begin working in 1987?

18   A.   In Worcester.

19   Q.   Okay.  So from March of 1987 up until the present, during

20   that entire time, you've been a police officer in the City of

21   Worcester?

22   A.   Yes.

23   Q.   Okay.  And if you can you tell us in approximate numbers,

24   how many police officers are there in Worcester?

25   A.   Approximately 450.

1  Q.  Okay.  And of those approximately 450, approximately how

2  many are minorities, black or Hispanic?

3  A.  About 75 to 80.

4  Q.  All right.  And how many sergeants are there in the City

5  of Worcester?

6  A.  Minority sergeants?

7  Q.  No, how many sergeants total?

8  A.  Oh, sergeants, probably about 60.

9  Q.  And of those 60, how many are minority?

10  A.  Four.

11  Q.  Okay.  And with respect to the sergeant who has the most

12  seniority, who's been in that position the longest, who is

13  that?

14  A.  John Lewis.

15  Q.  And when was Mr. Lewis promoted to a sergeant position?

16  A.  I believe in 2001.

17  Q.  Prior to the time that Mr. Lewis was appointed in 2001,

18  when most recently before that --

19       MS. ENGDAHL:  Objection.  Objection as to relevance.

20  The allegations of the complaint are that Worcester --

21  Worcester's use of the 2006 and 2008 exam had disparity impact

22  on the hiring -- the rates of hiring of minorities.  Going back

23  prior to 2000 only -- it's not going to generate any relevant

24  evidence, and this is an effort on the part of the plaintiffs

25  to produce only prejudicial and non-probative evidence.

```
 1            THE COURT:  All right.  The objection is overruled.
 2    I'll take it.
 3    BY MR. CHURCHILL:
 4    Q.   So the question, which is only halfway through, was:  Prior
 5    to 2001 when Mr. Lewis became a sergeant, when most recently
 6    before that was it that there was last a minority sergeant in
 7    the city?
 8    A.   1993.
 9    Q.   So from 1993 to 2001 there were no minority sergeants in
10    the City of Worcester; is that correct?
11    A.   That's correct.
12    Q.   And following Mr. Lewis' promotion to sergeant, you said
13    there were a total of four, so that means three other
14    minorities have been promoted; is that right?
15    A.   Yes.
16    Q.   And when were the next two promoted after Mr. Lewis?
17    A.   2006.
18    Q.   Okay.  Now, have you taken the exam, the police sergeant
19    promotional exam?
20    A.   Yes.
21    Q.   And approximately how many times have you taken that test?
22    A.   About seven.
23    Q.   Okay.  And when most recently did you take the test?
24    A.   The last one was in 2008.
25    Q.   And did you also take the 2006 exam?
```

1    A.    Yes.

2    Q.    And have you passed the exam each time that you've taken

3    it?

4    A.    Yes.

5    Q.    All right.  And at any given time during the day in the

6    City of Worcester about how many police officers are out on the

7    street?

8    A.    Approximately about 125 each shift.

9    Q.    All right.  And how many sergeants are out there

10   supervising the folks on their shifts?

11   A.    Maybe 20 to --

12           MS. ENGDAHL:  Objection as to relevance.

13           THE COURT:  Overruled.  Go ahead.

14   A.    Approximately 20 to 25 sergeants.

15   Q.    And based on your experience in working in Worcester for a

16   number of years, are you familiar with the duties of a police

17   sergeant in Worcester?

18   A.    Yes.

19   Q.    Can you describe those duties?

20   A.    Yes.  Police sergeant is the first-line supervisor.  They

21   supervise police officers.  If there's questions or problems, a

22   police officer goes to a sergeant for guidance.

23   Q.    All right.  Based on your having taken the sergeant's exam

24   for -- on a number of occasions, what connection have you seen

25   between the information in that exam and what you have seen a

1   police sergeant doing on the job?

2           MR. CARROLL:  Objection.

3           THE COURT:  I'll permit it.  Go ahead.

4   A.   The tests that I've taken, very little.  I don't see much

5   with the exams and the duties of a police sergeant.

6   Q.   Are you currently assigned to a particular unit?

7   A.   Yes.

8   Q.   What unit are you assigned to?

9   A.   I'm assigned to the gang unit.

10  Q.   And how long have you been assigned to that unit?

11  A.   About 18 years.

12  Q.   And is that assignment something that's considered an

13  honor or prestigious?

14  A.   Yes.

15  Q.   All right.  Now, at some point you filed suit -- in

16  addition to this case that we're here for today, you filed a

17  complaint of discrimination against the City of Worcester?

18  A.   Yes.

19  Q.   And what year was that complaint filed?

20  A.   1994.

21  Q.   And that case is still going on today?

22  A.   Yes.

23          MS. ENGDAHL:  Objection to this line of testimony.

24  It's --

25          THE COURT:  Sustained.  Sustained to that.

1          MR. CHURCHILL:  The reason I'm asking, your Honor, is

2     to lay the foundation for -- there's a couple of MCAD decisions

3     that talk about the history of promotion of minorities to

4     sergeant positions in Worcester.  And I think they're

5     admissible in terms of hearsay under an exception to the

6     hearsay Rule 803(8) I think is a public record where an

7     investigation was conducted.

8          And the relevance really is in a couple of different

9     ways.  On cross-examination Dr. Wiesen was criticized for

10    truncating his analysis and not going back far enough in terms

11    of the history, specifically of Worcester.

12         There's also an issue that's come up through a lot of

13    questions about the knowledge of these different departments

14    about what affect promotional exams are having on minority

15    promotion rates.  And there also is case law that suggests that

16    the courts should look beyond statistics to assess the overall

17    situation in different towns to evaluate the existence of

18    adverse impact.

19         So what I aim to do is just to establish that there

20    was this case, offer in a couple different MCAD decisions, and

21    then let those decisions spell out the details.

22         MS. ENGDAHL:  If I may, your Honor.  Those decisions

23    are published decisions, so I suppose you could take judicial

24    notice of those decisions.  They began with lawsuits initiated

25    probably about 16 years ago by Officer Tatum and another

1    officer.

2         First, Dr. Wiesen was criticized because during the

3    course of discovery there was certain information sought by the

4    plaintiffs from both the Commonwealth and from the City of

5    Worcester and that information went back to 2004, perhaps 2003

6    as it involves other defendants.

7         My criticism of Dr. Wiesen was when it suited him, he

8    only looked at 2006 and 2008.  And I asked him to look at the

9    2004.  I did not criticize him for going beyond that because

10   there is no information beyond that.

11        And one of the things in admitting a line of testimony

12   along this is you're going to get anecdotal evidence that's not

13   going to tell you how many minorities were competing for

14   promotion compared to whites off these lists.  You're going to

15   get bits and pieces that is going to be highly prejudicial and

16   really not probative of what was happening in 2006 when Officer

17   Tatum filed at the end of 2007.  And I think you're going back

18   too far looking for anecdotal evidence, and I think it's highly

19   prejudicial.

20        THE COURT:  All right.  Well, I doubt the relevance,

21   but I'll admit it for whatever value it may have so the

22   plaintiffs may put in their best case.  But I will say I doubt

23   the relevance of it.

24        MR. McDERMOTT:  Your Honor, could I also object to the

25   testimony.  It's not a case that's been finally resolved;

```
 1    therefore, any finding of fact or anything from the case should
 2    not -- should not be allowed in because it's still being
 3    adjudicated at another forum.
 4            So for that further reason, your Honor, I object to
 5    it.
 6            THE COURT:  Well, if that's an objection that it
 7    doesn't qualify under Rule 803, I don't know yet.  I can't
 8    tell.  His testimony isn't offered under that.  That would be
 9    the MCAD reports.
10            MR. McDERMOTT:  No, I was anticipating what the
11    testimony was going to be.
12            MR. CARROLL:  Your Honor, with respect to a similar
13    objection.  I'm not sure even what they're proposing to offer.
14    If it's just an MCAD complaint from 19 -- I don't know -- 80 --
15            THE COURT:  What is it, a finding of probable cause?
16            MR. CHURCHILL:  No, no, no.  I would never offer
17    something like that.
18            It's after an adjudicatory hearing at the MCAD, the
19    hearing officer issued findings of fact.
20            MR. McDERMOTT:  Your Honor, that gets to -- I don't
21    believe that those facts were adopted finally by a body.
22    I'm --
23            THE COURT:  I don't know yet.
24            MR. McDERMOTT:  Some clarification on that.
25            MR. CHURCHILL:  I'm trying to get there, your Honor.
```

 1          MS. ENGDAHL:  Your Honor, the case is still under

 2    appeal.  It was heard at the MCAD on a disparate impact theory.

 3    Worcester prevailed.  It was appealed to a full commission.

 4    The full commission sent it back to look at it on the disparate

 5    treatment theory.  Again, the City of Worcester prevailed

 6    before the hearing officers, affirmed on appeal by the full

 7    commission, it has gone up to superior court and was sent back

 8    down.  It is still on appeal.

 9          MR. LEAHEY:  Your Honor, just for the record, the City

10    of Lowell would join Attorney McDermott's objection.

11          THE COURT:  It's not clear without looking at the

12    cases deciding whether 803(8) applies.  It does not appear the

13    rule itself has a finality requirement.

14          MR. CHURCHILL:  I agree.  It's not a claim preclusion

15    or a res judicata type of question where you do have to show

16    finality.

17    BY MR. CHURCHILL:

18    Q.   So I don't know where I was, but I'll start from the

19    beginning.

20          At some point you filed a complaint of discrimination

21    at the MCAD against the City of Worcester?

22    A.   Yes.

23    Q.   And that case eventually went to hearing, you had a trial

24    at the Commission; is that correct?

25    A.   That's correct.

1  Q.   And as a result of that trial, there were findings of fact

2  and conclusions of law issued by the hearing officer?

3  A.   Yes.

4  Q.   All right.  And behind you you see a series of binders.  I

5  want to see if you can find the binder that has Exhibit 64 and

6  65 in it.

7           (Pause.)

8           (Discussion off the record.)

9  Q.   And if you can turn first to Exhibit 64.

10 A.   Okay.

11 Q.   And my question is:  Do you recognize this as a copy of

12 the findings of fact and conclusions of law that were issued by

13 the hearing officer on -- and the date's at the end -- April

14 26, 2002?

15 A.   Yes.

16           MR. CHURCHILL:  Your Honor, I'd move this into

17 evidence.

18           THE COURT:  All right.  Over objection I'll admit it.

19           (Exhibit 64 received into evidence.)

20 BY MR. CHURCHILL:

21 Q.   And then if you can turn to the next exhibit, which is

22 Exhibit 65.  And let me back up a second.

23           The decision in 64 that we talked about was appealed

24 to the full commission and there was a order remanding some

25 aspects of the case back to the hearing officer; is that right?

1    A.    Yes.

2    Q.    And Exhibit 65 is a copy of the findings of fact and

3    conclusions of law that were issued on remand by the hearing

4    officer on August 13, 2004; is that right?

5    A.    Yes.

6              MR. CHURCHILL:  I'd offer this in well, your Honor.

7              THE COURT:  Okay.  Same ruling.

8              MS. ENGDAHL:  Objection.

9              (Exhibit 65 received into evidence.)

10              MR. CHURCHILL:  If I can have just a minute, your

11    Honor.

12              (Discussion off the record.)

13              MR. CARROLL:  Your Honor, while we've got a second,

14    could the record reflect Springfield's objection to the

15    admission of these MCAD cases against Springfield, period, just

16    due to relevance.

17              THE COURT:  Well, I think it's clear they're offered

18    for the case against Worcester.

19              MR. CARROLL:  I just wanted to make sure the record

20    was clear.

21              MR. CHURCHILL:  And I'll make sure that is clear,

22    we're only offering them with respect to Worcester.

23              I have no further questions, Officer Tatum.  Thank you

24    very much.

25              THE COURT:  Now will be Ms. Engdahl, because obviously

1    it implicates her first.

2              MS. ENGDAHL:  I'm sorry --

3              THE COURT:  We had previously done that with respect

4    to Lawrence.

5                        CROSS-EXAMINATION

6    BY MS. ENGDAHL:

7    Q.    Good morning, Officer Tatum.  We've met before, Laurie

8    Engdahl for Worcester.

9    A.    Yes.

10   Q.    I'm going to ask you just a few questions, actually.  I

11   don't have too much.

12             Who is Gary Gemme?

13   A.    He's the police chief of the City of Worcester.

14   Q.    Do you know when Chief Gemme was promoted to chief?

15   A.    I don't.

16   Q.    For the 2006 examination -- you obtained the reading

17   materials for the 2006 exam?

18   A.    I did.

19   Q.    And do you recall what you studied?

20   A.    Yes, the books on the reading list.  And I may have a copy

21   of the reading list here.

22             Actually, I do not.

23   Q.    But you studied a reading list that was provided by HRD --

24   A.    Yes.

25   Q.    -- for that exam --

1    A.    Yes.

2    Q.    -- in 2006.  Do you recall approximately how many hours

3    per day did you study for the exam?

4    A.    Yes, approximately two hours a day.

5    Q.    Okay.  Did you take a review course for the 2006 exam?

6    A.    I have taken review courses in the past, I don't remember

7    if it was for the 2006 exam.

8    Q.    Did you study with others for that 2006 exam?

9    A.    No.

10   Q.    Okay.  Isn't it true that you studied for the 2006 exam,

11   the two hours that you've described a day that you studied,

12   that that was the first time you really sat down and studied

13   hard for a test?

14   A.    No.

15   Q.    Okay.  I'm going to draw your attention to your deposition

16   transcript.

17             It's page 19.

18             (Discussion off the record.)

19   Q.    Okay.  Can you take a look at that?  Near the bottom

20   there's a question asked of you:  How many days a week would

21   you study or how many hours a week?

22   A.    Yes.

23   Q.    Do you recall the answer there, "The 2006 exam," could you

24   read that, please?

25   A.    Yes, it says, "The 2006 exam I studied like no other test

1   I had taken.  I studied probably like two hours a day for that

2   exam."

3   Q.   So is it fair to say that for any prior exam you never

4   studied even two hours a day?

5        MR. CHURCHILL:  Objection just as to the form.  I

6   think it's confusing what she's asking.

7        THE COURT:  Overruled.  You may answer.

8   A.   My testimony on that, that's what I said so that would

9   probably be accurate.

10  Q.   Okay.  And do you know who Miguel Lopez is?

11  A.   Yes.

12  Q.   Who is Miguel Lopez?

13  A.   He's a sergeant in Worcester Police Department.

14  Q.   Do you work with him in the gang unit?

15  A.   I do.

16  Q.   Do you know if he's Hispanic?

17  A.   I believe he is Hispanic.

18  Q.   Have you studied for the sergeant's exam with Sergeant

19  Lopez?

20  A.   We brought study material together.  I haven't studied

21  with him.  We shared study material.

22  Q.   Have you ever discussed with him his recommendations for

23  number of hours or weeks or months you need to put in?

24  A.   No.

25  Q.   Do you attribute your higher score on the 2006 exam to

1    your extra studying for that exam?

2    A.    No.  I'm sorry.  You know, every exam I've taken I have --

3    I think I studied the same.  So I think the tests -- it's -- it

4    is what it is.  Every exam I approach the same study-wise,

5    so --

6              MR. SLAGLE:  If I can have a moment.

7              (Pause.)

8    Q.    Again, your deposition testimony.  I was asking you about

9    the 2004 exam and how did you prepare for that exam.  And can

10   you read your answer for the Court, please?

11   A.    "The same way, reading the texts.  But the 2004 exam I

12   didn't study extensively as I did for the 2006 exam."

13   Q.    Okay.  And you scored higher on the 2006 exam than you had

14   scored on prior exams; is that correct?

15   A.    I would have to review the -- my score.  I don't know what

16   I got.

17   Q.    Do you know who John Lewis is?

18   A.    Yes.  He's a sergeant in the Worcester Police Department.

19   Q.    And I think you testified he was promoted in 2001?

20   A.    I believe it was 2001.

21   Q.    Do you know if he has a special assignment within the

22   department?

23   A.    He works out of the detective bureau.

24   Q.    Does he also work on minority recruitment for the

25   department?

1   A.    I believe he does.

2   Q.    Have you ever heard Sergeant Lewis speak about strategies

3   for studying for the sergeant's exam?

4   A.    No.

5   Q.    Never heard him speak of hours a day?

6   A.    No.

7   Q.    Have you ever spoken to anybody else about their study

8   habits and what they feel is required to score high on the

9   sergeant's exam sufficient to be reachable?

10  A.    I may have.  I just don't recall.

11  Q.    What have other people said about what's required in terms

12  of studying?

13            MR. CHURCHILL:  Objection.  Hearsay.

14            THE COURT:  No, overruled.

15  A.    I don't know what other people say.

16            (Pause.)

17            MS. ENGDAHL:  I have nothing further.

18            THE COURT:  Top of the list.  Ms. Harris.

19            MS. HARRIS:  No questions, your Honor.

20            THE COURT:  Anybody else?

21            MR. CARROLL:  None from Springfield.

22            MR. LEAHEY:  None from Lowell.

23            MR. McDERMOTT:  No, your Honor.

24            MR. McQUILLAN:  No, your Honor.

25            MR. D'AGOSTINO:  No, your Honor.

1          THE COURT:  Mr. Churchill, anything else?

2          MR. CHURCHILL:  No further questions.

3          THE COURT:  Mr. Tatum, you may step down.

4          MR. LICHTEN:  This might be an appropriate time --

5          THE COURT:  I was going to say, we only have five

6    minutes left.

7          MR. LICHTEN:  I was going to inform the Court of where

8    we are.

9          So we're happy to say that we believe that there's

10   been some progress in agreeing to some of those exhibits from

11   HRD about the delegation agreements.  Assuming we get that

12   agreement about putting those documents in, then I believe

13   we're down to Mr. Alvarez, who will be our next witness, and

14   Commissioner Davis, who is available tomorrow.  And then other

15   than Dr. Wiesen and barring some surprise, that's it.  So you

16   could actually -- the cities might have time to start calling

17   witnesses tomorrow.

18         THE COURT:  Okay.

19         MS. HARRIS:  As for Boston, your Honor, we would

20   prefer to start the defense case after the plaintiff finishes

21   with Dr. Wiesen because that may influence who we call and what

22   they testify about.

23         THE COURT:  Are there people -- are there witnesses

24   who, say, are not statistical witnesses who could be called

25   that wouldn't affect the fact that Wiesen isn't completed yet?

```
 1              MS. HARRIS:  Obviously I'll examine Commissioner Davis
 2     if the questioning leads to anything that I need to address in
 3     his testimony tomorrow, but the -- depending on where we're
 4     going with this, and it seems if this is the end of the
 5     plaintiffs' case but for Wiesen, the only witness I would
 6     anticipate calling from the city would be our director of human
 7     resources.  But he would be speaking directly to his experience
 8     with the 2002 exam, and I need to know how Wiesen is going to
 9     conclude his testimony before I bring Mr. Callahan in.  He's on
10     vacation and he's coming back for the purposes of testifying.
11     I just want to bring him back once.
12              THE COURT:  That's fair.
13              MR. LICHTEN:  I'm not suggesting it should just be
14     Boston.
15              MS. HARRIS:  I'm just speaking because I'm first on
16     the list.
17              THE COURT:  So let me understand, is that the only
18     witness you would call?
19              MS. HARRIS:  From the city itself.  That is my
20     expectation, other than the expert witnesses.
21              THE COURT:  Who's going to carry the ball with the
22     experts from the defense side?  I've heard reference to
23     Dr. Silva and Outtz, who's calling them?  Who's doing the
24     primary exam of those people?
25              MS. HARRIS:  I'm doing the primary for Outtz.
```

```
 1            MS. ENGDAHL:  Your Honor, for Silva, I think the MBTA
 2    would do it, and Worcester.
 3            MS. HARRIS:  And Springfield has an expert as well.
 4            MR. CARROLL:  And Springfield will deal with
 5    Dr. Fairley.
 6            THE COURT:  Okay.  And so putting aside the experts,
 7    we have the personnel director, is that what he's called?
 8            MS. HARRIS:  Yes.
 9            THE COURT:  What other non-expert witnesses might be
10    called by any of the defendants that we might plug in just to
11    use our time?  That's really the question.  If we fall short
12    tomorrow, is there somebody whose testimony won't be
13    substantially dependent on what further may be testified by
14    Dr. Wiesen?
15            MR. LEAHEY:  Judge, if I may just make a suggestion.
16    I don't know how long Officer Alvarez will go.  I expect to
17    call the superintendent of police from Lowell.  My two cents
18    would be if it's possible to get a witness from maybe the MBTA,
19    just because they're close by, as opposed to having -- I'm just
20    trying to raise a practical issue --
21            THE COURT:  Fair enough.
22            MR. LEAHEY:  -- on short order.
23            THE COURT:  Let's see if Mr. McDermott wants to
24    produce somebody.
25            MR. McDERMOTT:  I approached my witness, Delores
```

1  Ford-Murphy.  She is retired deputy chief.  She just explained

2  the procedures at MBTA.  She was in charge of administration

3  for promotion.  So I think she is available tomorrow.  Her

4  preference would be, because she is now working quite a

5  distance from the city, if she could come in around break time,

6  10:30 or so.  And from the sounds of it, your Honor, that

7  would --

8          THE COURT:  That sounds about right.

9          MR. McDERMOTT:  And she would be available to testify,

10 and I anticipate, your Honor, that I would have her on direct

11 exam for about an hour.

12         THE COURT:  Why don't we do that.  That should be

13 enough, actually.

14         MR. McDERMOTT:  It may be -- one of the plaintiffs has

15 been unavailable.  I sent a summons.  If she is available to

16 testify, her testimony would take literally no more than three

17 minutes.  I just want her -- on and off.  So if she's here, I

18 may call her first just to --

19         THE COURT:  Fine.

20         MR. LICHTEN:  Your Honor, the rule is we're supposed

21 to know who the witnesses are going to be ahead of time.

22         THE COURT:  We're shuffling.  You know, this is out of

23 their order.

24         MR. LICHTEN:  But I don't want a mysterious witness to

25 show up.

1           THE COURT:  He's going to talk to you about it.

2           MR. McDERMOTT:  Yes, your Honor.

3           THE COURT:  Dr. Wiesen, anymore than Monday?

4           MR. LICHTEN:  No, don't even --

5           THE COURT:  Good.  That's the right answer.

6           All right.  Thank you.  We'll see you tomorrow.

7           THE CLERK:  All rise.  Court is in recess.

8           (Court adjourned at 1:00 p.m.)

1              C E R T I F I C A T E

2

3          We, Marcia G. Patrisso, RMR, CRR, and Debra M. Joyce,

4    RMR, CRR, Official Reporters of the United States District

5    Court, do hereby certify that the foregoing transcript

6    constitutes, to the best of our skill and ability, a true and

7    accurate transcription of our stenotype notes taken in the

8    matter of Civil Action No. 07-11693-GAO, Pedro Lopez, et al, v.

9    City of Lawrence, et al.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13
     /s/ Debra J. Joyce
14   DEBRA M. JOYCE, RMR, CRR
     Official Court Reporter
15
     Dated: July 22, 2010
16

17

18

19

20

21

22

23

24

25