```
                UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS



                                        )
PEDRO LOPEZ, Individually and on        )
behalf of a class of individuals        )
similarly situated,                     )
                                        )
        Plaintiffs,                     )
                                        ) Civil Action
v.                                      ) No. 07-11693-GAO
                                        )
CITY OF LAWRENCE, et al.,               )
                                        )
        Defendants.                     )
                                        )



        BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
              UNITED STATES DISTRICT JUDGE


                        DAY NINE
                     NON-JURY TRIAL



         John J. Moakley United States Courthouse
                    Courtroom No. 9
                   One Courthouse Way
              Boston, Massachusetts  02210
                 Friday, July 23, 2010
                      9:07 a.m.



              Marcia G. Patrisso, RMR, CRR
               Debra M. Joyce, RMR, CRR
               Official Court Reporters
            John J. Moakley U.S. Courthouse
            One Courthouse Way, Room 3510
             Boston, Massachusetts  02210
                   (617) 737-8728

       Mechanical Steno - Computer-Aided Transcript
```

```
 1   APPEARANCES:

 2        LICHTEN & LISS-RIORDAN, P.C.
          By: Harold L. Lichten, Esq.
 3            Stephen S. Churchill, Esq.
              Joseph L. Sulman, Esq.
 4        100 Cambridge Street, 20th Floor
          Boston, Massachusetts  02114
 5        On Behalf of the Plaintiffs

 6        CITY OF LOWELL LAW DEPARTMENT
          By: Brian W. Leahey, Esq.
 7            R. Eric Slagle, Esq.
          City Hall
 8        375 Merrimack Street
          Lowell, Massachusetts  01852
 9        On Behalf of the Defendant City of Lowell

10        OFFICE OF THE CITY ATTORNEY
          By: Richard J. D'Agostino, Esq.
11        200 Common Street, Suite 306
          Lawrence, Massachusetts  01840
12        On Behalf of the Defendant City of Lawrence

13        COLLINS, LOUGHRAN & PELOQUIN
          By: Laurie W. Engdahl, Esq.
14        320 Norwood Park South
          Norwood, Massachusetts  02062
15        On Behalf of the Defendant City of Worcester

16        MORGAN, BROWN & JOY, LLP
          By: Mary Jo Harris, Esq.
17            Robert P. Morris, Esq.
          200 State Street, 11th Floor
18        Boston, Massachusetts  02109
          On Behalf of the Defendant City of Boston
19
          MBTA LAW DEPARTMENT
20        By: Kevin S. McDermott, Esq.
          10 Park Plaza, 7th Floor
21        Boston, Massachusetts  02116
          On Behalf of the Defendant MBTA
22

23

24

25
```

```
 1        CITY OF SPRINGFIELD LAW DEPARTMENT
          By: Harry P. Carroll, Esq.
 2        36 Court Street
          Springfield, Massachusetts  01103
 3        - and -
          LAW OFFICE OF EDWARD M. PIKULA
 4        By: Edward M. Pikula, Esq.
          1350 Main Street, 15th Floor
 5        Springfield, Massachusetts  01103
          On Behalf of the Defendants City of Springfield
 6        and Mayor Sarno

 7        CITY OF METHUEN - OFFICE OF THE CITY SOLICITOR
          By: Peter J. McQuillan, Esq.
 8        The Searles Building, Suite 311
          41 Pleasant Street
 9        Methuen, Massachusetts  01844
          On Behalf of the Defendant City of Methuen

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

I N D E X

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| WITNESSES FOR THE PLAINTIFFS: | | | | |
| EDWARD F. DAVIS, III | | | | |
| By Mr. Lichten | 5 | | 91 | |
| By Ms. Harris | | 48 | | |
| By Mr. Carroll | | 69 | | 85 |
| By Mr. Leahey | | 79 | | 99 |
| By Mr. D'Agostino | | 85 | | |
| ROBERT E. ALVAREZ | | | | |
| By Mr. Churchill | 102 | | 145 | |
| By Mr. Leahey | | 111 | | 151 |

E X H I B I T S

| DEFENDANTS' EXHIBIT | DESCRIPTION | RECEIVED |
|---|---|---|
| No. 133 | Collective Bargaining Agreement | 102 |
| No. 135 | Robert Alvarez training and experience | 107 |
| No. 136 | Robert Alvarez birth certificate | 115 |
| No. 137 | Civil Service document from Town of Groton | 122 |
| No. 138 | Lowell fingerprint application 2/17/94 | 125 |
| No. 139 | Waltham fingerprint application | 128 |
| No. 140 | Groton fingerprint application | 129 |
| No. 146 | Letter to Robert Alvarez from Superintendant Davis | 149 |
| No. 147 | Personnel record of Robert Alvarez | 150 |

```
 1                    P R O C E E D I N G S
 2              THE CLERK:  All rise.
 3              (The Court enters the courtroom at 9:07 a.m.)
 4              THE CLERK:  For a continuation of the Lopez trial.
 5              Please be seated.
 6              MR. CARROLL:  Good morning, your Honor.
 7              THE COURT:  Good morning.
 8              MR. LICHTEN:  We're calling Commissioner Edward Davis.
 9              THE COURT:  Okay.
10                    EDWARD F. DAVIS III, duly sworn
11              THE CLERK:  Please be seated.
12              THE WITNESS:  Thank you.
13              THE CLERK:  State your name and spell your last name
14     for the record, please.
15              THE WITNESS:  Edward F. Davis, D-A-V-I-S.
16                         DIRECT EXAMINATION
17     BY MR. LICHTEN:
18     Q.   Good morning, Commissioner Davis.  Thank you for being
19     here.  Would you state your full name for the record, please.
20     A.   Edward F. Davis, III.
21     Q.   And are you employed, and if so, where are you employed?
22     A.   I am employed by the City of Boston as police
23     commissioner.
24     Q.   And how long have you held that job?
25     A.   A little over three and a half years.
```

1   Q.   So just to do the math correctly, you started in 2006 or

2   2007?

3   A.   December of 2006.  Yes, sir.

4   Q.   And for the record, you and I have never met and discussed

5   this case; is that correct?

6   A.   That's correct.

7   Q.   You are being represented today by the City of Boston's

8   counsel; is that right?

9   A.   That's correct.

10  Q.   And you have met to discuss this case with that counsel;

11  is that correct?

12  A.   Correct.

13  Q.   Okay.  What is your educational background, sir?

14  A.   I have a bachelor's degree from New Hampshire College and

15  a master's degree from Anna Maria College.

16  Q.   In what year did you get your bachelor's degree?

17  A.   It was '86.

18  Q.   Okay.  And what year did you get your master's degree from

19  Anna Maria?

20  A.   A couple of years later.  In '88, I believe.

21  Q.   Okay.  And at the time you received your bachelor's degree

22  and master's degree, were you already a police officer?

23  A.   Yes, sir, I was.

24  Q.   Okay.  And I take it that you were aware at the time that

25  you could get Quinn Bill money if you got a bachelor's degree

1    and master's degree?

2    A.    That's correct.

3    Q.    All right.  What was your first job as a law enforcement

4    officer?

5    A.    I was a part-time officer in Tewksbury, Massachusetts, in

6    1977.

7    Q.    Okay.  And what was your next position after that?

8    A.    In 1978 I was hired as a Lowell police officer full time,

9    and I worked my way up through the ranks in the Lowell Police

10   Department.

11   Q.    Okay.  And when did you become a sergeant on the Lowell

12   Police Department?

13   A.    I believe it was 1986.

14   Q.    Okay.  So from 1978 to 1986, you were a patrol officer for

15   Lowell; is that right?

16   A.    That's correct.  I was a patrol officer for three years,

17   and then the remainder of the time I was a detective before I

18   was promoted to sergeant.

19   Q.    Okay.  You were a sergeant from when to when, sir?

20   A.    I was a sergeant from '86 to 1990.  Around 1990 I was

21   promoted to lieutenant.  I was a lieutenant for a period of

22   time.  I was promoted to captain in '93, I believe.  '92 or

23   '93.

24   Q.    And you became chief of Lowell at some point in time?

25   A.    Right.  In 1994.

1    Q.    And you remained as chief in Lowell from 1994 until 2007?

2    A.    That's correct.

3    Q.    Of 2006?

4    A.    Right.

5    Q.    Okay.  And the exams that you took to become a sergeant,

6    were those the multiple-choice written tests or were they

7    something else?

8    A.    They were the multiple-choice written test administered by

9    Civil Service at the time.

10   Q.    Okay.  You say Civil Service, but you mean HRD -- well --

11   A.    It wasn't HRD, it was personnel-administered -- Department

12   of Personnel Administration back then; it's now human

13   resources.

14   Q.    Okay.  Gotcha.  And when you became a lieutenant, same

15   thing, same kind of test?

16   A.    Correct.

17   Q.    And captain, same kind of test?

18   A.    Correct.

19   Q.    Okay.  During your -- and chief, same kind of test?

20   A.    No.  Chief was an assessment center.

21   Q.    Okay.  So when you became a chief in Lowell, that was done

22   through an assessment center process?

23   A.    That's correct.

24   Q.    Okay.  And that would have been in 1993 or 1994?

25   A.    Correct.

1    Q.    And do you recall, was there an outside consultant hired

2    to run that assessment center?

3    A.    Yes, there was.

4    Q.    And do you recall what the name of the company was?

5    A.    It was the International Association of Chiefs of Police.

6    Q.    I see.  So the International Association of Chiefs of

7    Police has its own assessment center process that a city or

8    municipality can partake in?

9    A.    Yes.

10   Q.    And what did the assessment center consist of that you

11   went through to become chief?

12   A.    It consisted of a series of tests.  They did a structured

13   interview, there was a mock press conference, there was an

14   in-basket, there was also an essay component.

15   Q.    And putting aside that you were the one selected from that

16   process, did you consider it a fair process?

17   A.    I did.

18   Q.    And did you consider it a useful process?

19   A.    I did.

20   Q.    During the time that you were chief of the City of Lowell,

21   did you ever -- did your department ever utilize an assessment

22   center for any position?

23   A.    Yes, we did.

24   Q.    And what positions were those?

25   A.    The positions of lieutenant, captain and deputy

1    superintendent.

2    Q.    Okay.  And were you instrumental in getting those

3    assessment centers used?

4    A.    Yes.

5    Q.    Okay.  That is, you recommended them?

6    A.    I did.

7    Q.    Okay.  And can you recall what years you utilized the

8    assessment center for lieutenants and captains and deputies?

9    A.    It was several years after I was sworn in.  We may have

10   gone through a round of testing in the normal way first,

11   through the HRD.  But at some point in time, maybe in the late

12   '90s, we did the assessment center process.

13   Q.    Okay.  And I just want to go into how the process went

14   about -- did you put out what's called an RFP to start?  Was

15   that the start of the process?

16   A.    Not really.  The start of the process required planning

17   with the city manager's office, budgeting for the potential

18   test, and then ultimately negotiating with the unions to get

19   the okay to go forward with the process.

20   Q.    Okay.  And I take it you did all that successfully?

21   A.    Yes, sir.

22   Q.    Okay.  And then at that point did you put out an RFP?

23   A.    That's correct.

24   Q.    And do you recall who bid on the RFP?

25   A.    I know IACP did.  I don't recall who the other agencies

1    were.

2    Q.    Okay.  And I take it one of the reasons for putting out an

3    RFP is you're looking for -- you're trying to get people to

4    compete on price as well as other factors; is that accurate?

5    A.    That's correct.  It's compliance with the Massachusetts

6    requirements for contracts.

7    Q.    Right.  But I take it the idea being if you put out an RFP

8    and people know they're bidding against other competitors,

9    they're going to hone their price a little bit to be the lowest

10   bidder?

11   A.    That's most likely the reasoning of the law, yes.

12   Q.    And who won the bid in Lowell?

13   A.    The IACP.

14   Q.    Okay.  So it was the same organization that had done the

15   chief's exam?

16   A.    Yes, that's correct.

17   Q.    And was there someone particular there who you worked with

18   in developing the test?

19   A.    It was a gentleman by the name of Kim Kohlhepp.

20   Q.    Kim Kohlhepp?

21   A.    Correct.

22   Q.    And did -- is that a he or she?  I'm sorry.

23   A.    He.

24   Q.    Was he responsible for the lieutenants, captains and

25   deputies, or were there different people responsible for each?

1  A.    My recollection is that it was the same firm.

2  Q.    Okay.  And do you recall what the components of the exam

3  were?

4  A.    I do not.

5  Q.    Okay.  Do you recall any of the components, whether there

6  was a structured interview, an assessment center?  Do you

7  recall what they were?

8  A.    I didn't go through the exam myself so I don't really

9  recall exactly the way it was set up.  It was an assessment

10  center, I do know that, but I don't remember what the

11  structure -- what the individual components were of those

12  exams.

13  Q.    Okay.  So let me see if I have this correct.  In order to

14  do the assessment center process, do you recall that you had to

15  request -- you had to go to HRD, or DPA at the time, whatever

16  it was, and request permission to do a delegated test?

17  A.    Yes.

18  Q.    And you did that?

19  A.    We did.

20  Q.    And I take it HRD gave you no problem allowing that; is

21  that right?

22  A.    Well, their response was, "As long as the unions have

23  agreed with it, we'll allow it."

24  Q.    So HRD allowed it; is that correct?

25  A.    Correct.

```
 1    Q.   And so if I understand it, other than looking at the test
 2    format and what you were doing, the responsibility for the
 3    actual test was on your consultant and the City of Lowell?
 4    A.   That's correct.  The testing process was delegated to us
 5    by Civil Service, so our contractor developed a test that we
 6    administered.
 7    Q.   Gotcha.  And was the HRD written test used at all in this
 8    assessment center or not?
 9    A.   No, it was not.
10    Q.   Okay.  And so was there a written component at all to the
11    lieutenant's and captain's and deputy's promotional exam in
12    Lowell during these years or was there no written exam?
13    A.   I do not recall.
14    Q.   Okay.  You do not recall whether there was a written exam?
15    A.   Correct.
16    Q.   Okay.  The fact that you were not involved, I take it,
17    means that the people doing the assessing of the assessment
18    center were external assessors, meaning they weren't part of
19    the City of Lowell?
20    A.   That's correct.  As part of the agreement with the union
21    we hired people from across the country.  No one from
22    Massachusetts could be part of the assessment.
23    Q.   In other words, the thinking being that if you had people
24    external, who didn't know anybody, the process would likely be
25    fairer because there wouldn't be people knowing people who knew
```

1  people?

2  A.    I assume that was the union's concern.

3  Q.    Okay.  And then what happened?  Were you presented with a

4  list, or how did the process end?

5  A.    We were presented with a list, and we ultimately hired

6  from that list.

7  Q.    Okay.  And did you hire, as far as you can recall, in rank

8  order from that list, or did you do any other assessment after

9  you received the list?

10  A.    I believe that we hired in rank order.  There are always

11  assessments made when the final determination to promote is

12  being made, and so there was no further testing.  But a review

13  of the officer's background, any recent disciplinary issues,

14  that component of it was still done, but there was no

15  additional testing.

16  Q.    Okay.  So as far as you can remember, if I understand your

17  testimony, you may have looked at their backgrounds, found that

18  they were qualified, the assessment center had found them to be

19  ranked highest on the list, and as far as you remember, you

20  promoted based upon their rank on the list?

21  A.    I don't recall if there were any bypasses.

22  Q.    Okay.  And do you recall in how many rounds of exams you

23  used the assessment center for, let's say, for lieutenant?

24  A.    I believe it was just a single round.

25  Q.    Okay.  So that was in 1998, you believe?

1  A.    In the late 1990s.

2  Q.    Okay.  And did you use it any other time, the assessment

3  center?

4  A.    No, not that I recall.

5  Q.    Were you pleased with the results of the assessment

6  center?

7  A.    Yes.

8  Q.    And by that I mean you thought the assessment center, by

9  and large, got the right candidates at the top of the list?

10 A.    I was surprised with some of the promotions but I was

11 satisfied that they were the right people.

12 Q.    Okay.  And do you remember how much it cost the City of

13 Lowell to do this?

14 A.    I haven't checked this.  It may have been $300,000.  That

15 number sticks in my mind, but I'm not positive if that's the

16 number.

17 Q.    And that was for all three promotional levels:  captain,

18 lieutenant and deputy?

19 A.    I believe the whole contract was $300,000.

20 Q.    Okay.  And then if I understand your testimony, in

21 subsequent years, after the year 2000, the test went back to

22 being just the HRD multiple-choice test?

23 A.    That's correct.  A new city manager was appointed, and the

24 unions made it clear to him that they wanted to go back to the

25 old way of doing business.

```
 1   Q.   Okay.  Did you recommend an assessment center?
 2   A.   Yes.  My recommendation was to stay with the assessment
 3   center process.
 4   Q.   Okay.  Let me move on for a second.  Back in the late
 5   1990s when you were commissioner -- I'm sorry.  You were police
 6   chief in Lowell, correct?
 7   A.   Superintendent of police.
 8   Q.   I'm sorry.  I gave you a new position.
 9        -- do you recall there being some friction, or perceived
10   friction, between minority officers and non-minority officers
11   in your department?
12   A.   Yes.
13   Q.   Okay.  And do you recall, to your credit, trying to hold
14   meetings with minority officers to hear their concerns and
15   address their concerns?
16   A.   I did.
17   Q.   Okay.  And do you recall holding a meeting specifically
18   with minority officers, only inviting minority officers, to
19   hear what their concerns were?
20   A.   Yes.
21   Q.   Okay.  And I'm going to show you a document and ask you if
22   you recognize this document.
23   A.   I do.
24   Q.   And what is that document?
25   A.   This is a copy of the letter invitation that was sent out
```

1   in September 1999 for the meeting.

2   Q.   And it says in the second paragraph, "I am convening a

3   follow-up meeting limited to minority status officers as

4   defined by Civil Service."  Do you see that?

5   A.   Yes.

6   Q.   And just so that I understand, the reason that you wanted

7   to meet with minority officers is because you wanted them to be

8   able to speak freely about what their concerns were?

9   A.   That's correct.

10  Q.   Okay.  And you had that meeting; is that correct?

11  A.   I did.

12  Q.   And in that meeting do you recall one of the issues that

13  was brought up by the minority officers is their, at least

14  perception, that there was not much progress being made in

15  Lowell with respect to police promotions?

16  A.   Yes, that's correct.

17  Q.   And at the time, this would be 1999, you only had one

18  minority police sergeant; is that correct?

19  A.   That's correct.

20  Q.   Okay.  And you agreed with their concern; is that correct?

21  A.   I did.

22  Q.   And you told them that you thought that it should be

23  looked into whether something could be done to increase

24  minority hires in the City of Lowell -- minority promotions in

25  the City of Lowell Police Department; is that true?

1   A.   That's correct.

2   Q.   And did you do anything in that regard?

3   A.   Well, I suggested that we -- that we could look into the

4   possibility of asking for a designated list, a list of minority

5   candidates.  I also --

6   Q.   That's a so-called Par 10 list?  That's what they call it?

7   A.   I guess, yes.

8   Q.   I'm sorry.  Go ahead.

9   A.   So we talked about that.  We had a discussion about that.

10       The minority officers dismissed it almost to a person with

11   one exception.  The minority officers said that they felt that

12   that would -- the perception of them being promoted without

13   earning it would be detrimental to their long-term relationship

14   with people in the department; they didn't want us to go down

15   that road.

16   Q.   So let me see if I understand that.  The minority officers

17   thought that if they were promoted simply because they were a

18   minority, not because of their score on some fair examination

19   process, that that could taint them and mark them for the rest

20   of their careers; is that right?

21   A.   That was the perception in the room at that time during

22   that discussion.

23   Q.   And I take it you agreed with that concern; that seemed

24   like a reasonable concern by them?

25   A.   It did.

1    Q.    And was there discussion in this meeting where you recall

2    raising the topic of using an assessment center for police

3    sergeant so that a fairer exam could be used that had at least

4    the possibility of promoting more minority police sergeants?

5    A.    There was discussion about assessment centers.  There was

6    always a question as to whether or not it should be used at the

7    sergeant level.  I don't recall exactly what we talked about on

8    that issue.  I know that over time we've talked about

9    assessment centers.  I also recall that because of two main

10   reasons the assessment center idea at sergeant is difficult.

11   One is because of the volume of people that take the test.

12   It's extremely expensive to do a wholesale assessment center

13   with a large number of individuals; and then the other issue is

14   around the -- let's see, there was the cost of it with the

15   number of people.

16        And also around the issue of, you know, the basic

17   fundamental knowledge that's needed to be in a supervisory rank

18   in a police department, there's been a lot of conversation over

19   the years that a written exam should be a component of the

20   entry level to supervisory ranks, because that basis of

21   knowledge is so important to the day-in-and-day-out work of the

22   individual who supervises.

23   Q.    That wasn't my question but I'm glad you got that out.

24        Did you do anything back in -- after this meeting to

25   inquire about utilizing an assessment center for the position

1    of police sergeant in the City of Lowell?

2    A.    I don't believe I did.

3    Q.    Okay.  Let me move on to something else.  When someone

4    applies for a promotional position in the police department,

5    they have to pay a fee; is that correct?

6    A.    Yes.

7    Q.    Okay.  And is it currently $175?

8    A.    I'm not certain.

9    Q.    Okay.  And that $175 --

10          THE COURT:  Are we still talking about Lowell or are

11   we talking about his current position?

12          MR. LICHTEN:  I'm sorry, your Honor.  That's a great

13   point.

14   BY MR. LICHTEN:

15   Q.    Are you aware generally -- let me rephrase it.

16          Are you aware generally whether if someone applies in any

17   city to take the HRD promotional exam, whether they have to pay

18   a fee?

19   A.    I know that the price has gone up recently quite a bit.

20   People have complained about it.  I don't know exactly what the

21   cost is.

22   Q.    And my next question is:  Do you know if that's $175

23   currently?

24   A.    Again, I don't.  I'm not certain.

25   Q.    And currently -- if HRD gives the exam, I take it that

1  money goes to HRD, is that correct, or the Commonwealth?

2  A.    I assume it goes to the Commonwealth.

3  Q.    Okay.  When a city gets a delegated agreement and gives

4  its own exam, the city can charge an amount in lieu of the

5  Commonwealth's fee; is that correct?

6          MR. CARROLL:  Objection.

7          THE COURT:  Overruled.

8          You may answer, if you know.

9          THE WITNESS:  I don't know.

10 BY MR. LICHTEN:

11 Q.    Do you know when you gave the exams in Lowell, whether the

12 City of Lowell charged people trying to becomes captains,

13 lieutenants or deputies?

14 A.    I don't really recall.  If there was a fee associated with

15 it, it would have been a minor -- it wouldn't have really

16 offset the amount of money that we were spending for it.  So I

17 don't really recall what they did back then.

18 Q.    Sure.  Well, it wouldn't have paid for it, but it might

19 have subsidized it somewhat; is that correct?

20 A.    If it's possible, sure.

21         MS. HARRIS:  Objection.

22         THE COURT:  Overruled.

23 BY MR. LICHTEN:

24 Q.    When the assessment center was given in Lowell for

25 lieutenants, captains and deputies, do you recall how many

1  candidates there were for those three positions total?

2  A.    I do not.

3  Q.    Do you recall back then, let's say through the late '90s

4  and the early 2000 period, what the number -- the total number

5  of sergeants were in the Lowell Police Department?

6  A.    I believe it was around 30.

7  Q.    Okay.  And generally when you would give a promotional

8  exam, do you recall what percentage would apply to be sergeants

9  and study?

10  A.    There was no set percentage.  It would vary test by test.

11  I don't really -- I couldn't say exactly how many would take

12  the test.

13  Q.    A half, two-thirds?  Do you remember what the average was?

14  A.    I do not.

15  Q.    Okay.  So if you had given an assessment center for police

16  sergeant in the City of Lowell during the time that you were

17  chief, you would have expected, I take it just doing the

18  logical math, downwards of 30 people.  That would have been

19  less than 30 people; is that right?

20          MR. LEAHEY:  Objection, your Honor.  Speculation.

21          THE COURT:  Well, I'm not sure it was a clear

22  question.  Why don't you try the question again.

23          MR. LICHTEN:  Okay.

24  BY MR. LICHTEN:

25  Q.    Back in the late '90s and early 2000 period you said you

1  had approximately 30 police sergeants; is that correct?

2  A.    Correct.

3  Q.    My question is:  How many police officers did you have at

4  the time?

5          MR. LICHTEN:   I realize what my mistake was.

6  BY MR. LICHTEN:

7  Q.    How many police officers did you have at the time?

8  A.    Two hundred and fifty.

9  Q.    And do you recall how many would actually take the police

10  sergeant's exam when it was offered?

11  A.    At the sergeant level?  That's a different --

12  Q.    Yes.

13  A.    Usually at the entry level, about half the department

14  signs up for it.

15  Q.    Okay.  So you would have expected perhaps 100 to 125

16  candidates for the position of police sergeant?

17  A.    Right.  For entry into the supervisory ranks, about half

18  of the department would take the test.

19  Q.    Gotcha.  Okay.  Now, after, in the year -- after

20  you -- strike that.

21      During the time that you were police chief in the City of

22  Lowell, other than using the written multiple-choice test for

23  police sergeant, did the -- did you or anyone on your command

24  staff add any other components to determine who to promote

25  other than the results of that written test?

1    A.    No, we did not.

2    Q.    Okay.  Now I think I can move on.

3          Your budget for the Boston Police Department, is it

4    approximately $300 million now?

5    A.    Yes, it is.

6    Q.    And in FY '09, which is the period July 1st, 2008, to

7    June 30, 2009, is it fair that your budget -- your entire

8    budget for the police department was approximately $297

9    million?

10   A.    That's correct.

11   Q.    Okay.  And recently I saw in the paper you were kind

12   enough to give a number of your nonunion deputy superintendents

13   and superintendents a raise; is that correct?

14   A.    That has not happened yet, but we're in the process of it

15   happening.

16   Q.    Okay.  And I believe -- I think they deserve it, I'm not

17   suggesting otherwise, but the number of people who fit into

18   that category was approximately, what, 15?

19   A.    No, more than that.  I think closer to 20.

20   Q.    Twenty?  And let me just see if I understand that.  You

21   have the right as police commissioner to pick a command staff

22   which is made up of superintendents and deputy superintendents;

23   is that correct?

24   A.    That's correct.

25   Q.    And you are not bound by the Civil Service rules when you

1  do that; is that right?

2  A.   Only that I have to pick from the supervisors in the

3  department, so sergeants, lieutenants and captains.

4  Q.   And you make an assessment of who would be the right

5  person for the job; is that correct?

6  A.   That's correct.

7  Q.   And you then promote them to that position.  And it's a

8  non-Civil Service position out of the bargaining unit, correct?

9  A.   Right.

10 Q.   And as part of that process you've used that to increase

11 the number of minorities on the command staff; is that correct?

12 A.   That's correct.

13 Q.   And you did that for a variety of reasons, one of which

14 was that you thought that the command staff should reflect the

15 city; is that right?

16 A.   Correct.

17 Q.   And can you just name me some of the minorities that you

18 promoted to the -- your command staff?

19 A.   Sure.  Minorities that I've promoted, some were on the

20 command staff, some were not, but some were promoted from

21 deputy superintendent to superintendent.  So Ken Fong, Bruce

22 Holloway, Willy Gross, Nora Baskin, Michael Cox.  There's a

23 number of -- about 40 percent of the command staff are

24 minorities.

25 Q.   Okay.  And they've done a good job; is that correct?

1    A.    Yes.

2    Q.    And you made the decision -- you didn't give a test for

3    these people; is that correct?

4    A.    Correct.

5    Q.    But I did take it you met with command staff personnel and

6    tried to go through a judgmental process as to who would be the

7    right people for the right jobs?

8    A.    That's right.

9    Q.    And you assessed various qualities and attributes that

10   these people had?

11   A.    Yes.

12   Q.    And I take it when you made this decision, you didn't go

13   back and look at their scores on a promotional exam, written

14   multiple-choice test; is that right?

15   A.    Correct.  I did not.

16   Q.    Okay.  So if -- you've recommended to the mayor that he

17   approve this 14 percent increase over, I think, four years; is

18   that right?

19   A.    Correct.

20   Q.    And has he approved that yet, the mayor?

21   A.    He has not.

22   Q.    Okay.  But you expect him to; is that right?

23   A.    I hope he does.

24   Q.    Okay.  And that would be close to a million dollars?

25   A.    Right.

1    Q.   And because these individuals -- and again, they deserve

2    the raise, I'm not suggesting they don't deserve the

3    raise -- but because these people are not the bargaining unit,

4    they don't have a right to the raise; is that right?

5    A.   Only if they were to go back to the ranks that they came

6    from.

7    Q.   But in their current position?

8    A.   Currently they do not; that's correct.

9    Q.   Okay.  Let me move on to something else.

10        And recently -- or maybe not so recently, but about a

11   year, year and a half ago, the same approximate 14 percent pay

12   raises over several years were negotiated for the unions, is

13   that correct, the patrol officers, the superior officers?

14   A.   That's correct.

15   Q.   And as a result of those raises, the 14 percent raises,

16   that cost the city approximately how much?

17   A.   I don't recall.

18   Q.   Was it over $50 million?  Is that fair?

19   A.   It's a significant amount of money in the budget.  I

20   wouldn't disagree with the $50 million assessment.

21   Q.   Okay.  And just so I'm clear, the budget of the police

22   department is made up of a number of factors.  First, there's

23   state aid that the city receives and some of which goes to the

24   police department; is that right?

25   A.   State and federal aid, yes.

1   Q.   State and federal aid.  That was my next question.  And

2   you get federal aid too; is that correct?

3   A.   Yes.

4   Q.   And it looked to me from the last budget that you get

5   maybe $24 million in state aid for your police department?

6   A.   Quite possibly.

7   Q.   And then you can charge fees for some things; is that

8   correct?

9   A.   Yes, we can.

10  Q.   Hackney fees?

11  A.   Correct.

12  Q.   And what does the city receive in fees from the various

13  things for which people have to pay fees for to the police

14  department?

15  A.   Off the top of my head, I couldn't tell you.

16  Q.   Over $20 million?

17  A.   I really don't know.

18  Q.   And do those fees go to the general fund or do they stay

19  in the department?

20  A.   Well, it depends on the fee.  The hackney fee goes to a

21  special account that's maintained by the police department for

22  training of taxi drivers and improvement of that service, but

23  most fees go back to the city.

24  Q.   Very good.  Let me move on to something else.

25       At some point in time you became aware, did you not,

1    that -- strike that.  Let me go back.

2        For 2008, during the time that you were commissioner, a

3    police exam for police sergeant in the City of Boston was

4    given; is that right?

5    A.    That's correct.

6    Q.    And did you make a recommendation of any kind to use an

7    assessment center or an alternative component exam prior to the

8    administration of that exam?

9    A.    I did not.  We didn't have the time to put it together.

10   Q.    Okay.  And at some point in time did you become aware that

11   HRD had concluded that it was going to band the scores for both

12   the Boston Police Department and statewide?

13   A.    Yes, I did.

14   Q.    And how did you become aware of that, sir?

15   A.    Through the newspaper.

16   Q.    Okay.  So you didn't have any special calls or anything?

17   A.    No, sir.  I read it in the paper.

18   Q.    Okay.  So I take it you were not --

19   A.    That happens a lot, but...

20   Q.    I'm sorry.  It what?

21   A.    It happens a lot.

22   Q.    Okay.  And so I take it from that that you were not

23   consulted about that decision?

24   A.    I was not.

25   Q.    Okay.  Once you found out about the decision, did you do

1   anything to look into it to determine what the police

2   department's position was going to be on it?

3   A.   I did.  I spoke to union officials who had serious

4   concerns about it; I talked to members of my command staff and

5   to other police administrators, police chiefs throughout the

6   Commonwealth.  And although the idea of banding is appealing to

7   me, and something that I think has some value, the fact that

8   Civil Service decided to do this after the results of the test

9   came out I thought were extremely problematic, and I

10  recommended against going in that direction for that particular

11  test because it had not been announced prior to the test being

12  given.

13  Q.   So let me just take that up.  So as I understand it, what

14  happened there was -- the exam was announced well in advance of

15  the exam being given in the fall of '08; is that right?

16  A.   Correct.

17  Q.   It had the standard announcement, it told you what books

18  to read and things like that, and there was no -- is that

19  right?

20  A.   Right.

21  Q.   Okay.  Sorry.

22  A.   That's right.

23  Q.   And then there was no mention at all that they were

24  thinking of banding.  Then the results came out, and after the

25  results came out, they announced after the fact that they were

1    going to band.  And that, to use a mild phrase, set a lot of

2    people off?

3    A.    Correct.

4    Q.    Okay.  And the concern was that if they were going to have

5    done this, they should have let people know in advance that

6    they were going to do it; is that correct?

7    A.    That is correct.

8    Q.    Okay.  And, in fact, the court agreed with that; is that

9    right?

10   A.    The superior court, yes, sir.

11   Q.    And you read the superior court decision; is that correct?

12   A.    I don't recall if I read the whole decision.

13   Q.    Okay.  Well, let me -- I'm going to show you the -- so

14   the -- let me see if I've got -- some of the unions went to

15   court to try to stop the use of banding; is that correct?

16   A.    That's correct.

17   Q.    And first it went to the Civil Service Commission; is that

18   correct?

19   A.    Yes.

20   Q.    And the Civil Service Commission dismissed the union's

21   petition saying that banding was lawful; is that right?

22   A.    Yes.

23   Q.    Then some people who were not happy with that, I guess

24   Mr. Pratt and others, took it to court; is that right?

25   A.    That's correct.

1    Q.   And the argument was, as I understand it, that if HRD was

2    going to do banding, it had to have notice and an opportunity

3    to be heard for people, sort of rulemaking notice, have -- hear

4    what people had to say and then make a decision before the exam

5    was given; is that correct?

6    A.   That's correct.

7    Q.   Okay.  And if we go to page 10, you see where the court

8    says, "The proposed banding may well prove to be a better and

9    fairer approach to assessing candidates for promotion within

10   the Civil Service framework, and Massachusetts may well join

11   the numbers of other jurisdictions which have adopted the

12   banding approach; however, such a significant alteration in the

13   manner in which scores are reported and in which eligibility

14   lists are established should have put through the review

15   process set out in the legislature in Chapter 31, Section 4"?

16   A.   Yes.

17   Q.   So is it a fair statement that as far as you know, the

18   court did not outlaw banding in Massachusetts, it simply said

19   if they were going to do banding, it had to go through a

20   hearing process?

21   A.   That's my understanding yes, sir.

22   Q.   Okay.  And that decision was in April of '09.  Nothing's

23   happened in that score; is that correct?

24   A.   That's correct.

25   Q.   Okay.  Now, you've been an advocate of assessment centers

1    for many years; is that correct?

2    A.    Yes, I have.

3    Q.    And you've spoken out in favor of assessment centers on a

4    number of occasions; is that correct?

5    A.    Yes.

6    Q.    Okay.  You had an interview not too long ago on Fox News,

7    and you talked about the value of assessment centers; is that

8    right?

9    A.    Correct.

10   Q.    You appeared very recently before the city council; is

11   that correct?

12   A.    Yes.

13   Q.    And the city council held a -- I don't know if you call it

14   a meeting or a hearing -- I guess it was a hearing -- on the

15   lack of minority supervisors in the police department; is that

16   correct?

17   A.    That's correct.

18   Q.    And you spoke frankly and honestly at that meeting; is

19   that right?

20   A.    Yes, I did.

21   Q.    Okay.  And you have spoken to the newspapers from time to

22   time about the need for alternative selection procedures; is

23   that right?

24   A.    I have.

25   Q.    Okay.  And you also have mentioned that you've had success

1  in using an assessment center process yourself in the Boston

2  Police Department; is that correct?

3  A.    Yes.

4  Q.    And that's for what position?

5  A.    Detective.

6  Q.    Okay.  So when did you institute an assessment center for

7  the position of detective, Commissioner?

8  A.    It was actually instituted and negotiated before I arrived

9  here, but just after I arrived we administered the test.  And

10  it's not technically an assessment center; it's more of a

11  shorthand for the way it's run, but --

12  Q.    Okay.  I'll get to it in a sec.  I just want to ask you a

13  couple of questions, and you can fully describe.

14      Detectives are in a union; is that correct?

15  A.    That's correct.

16  Q.    And to become a detective, you presumably are a member of

17  the patrolmen's union before that; is that correct?

18  A.    That's correct.

19  Q.    So you said it had to be negotiated; is that right?

20  A.    Yes.

21  Q.    So it was negotiated successfully with those two unions, I

22  take it?

23  A.    That's correct.

24  Q.    And they agreed to it?

25  A.    Yes.  I believe it's in the patrolmen's actual contract.

1    Q.    Okay.  And, now, I think you wanted to describe the

2    process, so let's just focus on -- you've presided over one

3    such exam?

4    A.    Right.

5    Q.    What year was that?

6    A.    2007, I believe?

7    Q.    Okay.  And was there one before that?

8    A.    There was.

9    Q.    But you weren't involved in it?

10   A.    I was not involved in it.  It was many years before.

11   Q.    Let's just talk about the one you were involved in.  Tell

12   us what the components were of that process.

13   A.    Well, there was a written exam.  And then after that was

14   administered there was a -- what they call an assessment

15   center, but really it was more a presentation by the candidate,

16   going over the candidate's career, what they've done in their

17   career and why they want to be a detective.  That was evaluated

18   by three members of the police department and the command

19   staff, and then a score was put together as a result of those

20   two components.

21   Q.    And then was there such a thing called bonus points or

22   commissioner points?

23   A.    I believe there was a possibility of awarding those points

24   but we did not do that.

25   Q.    Okay.  I didn't realize that.  So in the past you were

1  aware that there had been these bonus points or commissioner
2  points being awarded at the end of the process; is that right?
3  A.   Yes.
4  Q.   And I take it -- I'm just taking a guess here -- but you
5  thought that might add a perception of unfairness to the
6  process, so as a matter of equity you decided to do away with
7  that?
8  A.   We decided not to do it.
9  Q.   Okay.  So the two components were how you scored on this
10  interview process and how you did on this written examination?
11  A.   Correct.
12  Q.   And did you hire a firm to help you construct this
13  process?
14  A.   We did.
15  Q.   And was that EB Jacobs?
16  A.   I believe it was.
17  Q.   And do you recall who at EB Jacobs helped you through the
18  process?
19  A.   I do not.
20  Q.   Okay.  And the assessors were trained, I take it?
21  A.   Yes.  There's a training component to any assessment
22  that's done, so they were done -- that was done the day before.
23  Q.   Okay.  And do you recall what the relative weights were?
24  A.   I don't recall.
25  Q.   And do you recall -- so you don't recall if they were

1    50/50 or 60/40, you don't recall what they were?

2    A.    I don't recall.

3    Q.    And then you received a list; is that right?

4    A.    Correct.

5    Q.    And as a result of your receiving that list, did you make

6    appointments in rank order?

7    A.    Yes.

8    Q.    Okay.  And about how many detectives did you promote?

9    A.    The first class was large; there hadn't been any

10   promotions made.  But I don't recall exactly what the number

11   was.  I was at that class.  There might have been 40 people

12   there.  But I'm not positive of the exact number.

13   Q.    Okay.  And you were very pleased with the number of

14   minority promotions that you were able to make using this

15   procedure, weren't you, sir?

16   A.    Yes, I was.

17   Q.    And do you recall how many minority promotions you were

18   able to make?

19   A.    I don't recall.

20   Q.    But as I understand it, you were actually able to make

21   more minority promotions than the percentage of minority police

22   officers in the department; is that correct?

23   A.    That's correct.  That promotional process has resulted in

24   a much more diverse detective pool than we had prior to the

25   examination occurring.

1    Q.    Right.  So let's just review this.  I take it you take

2    some pride in those results; is that correct?

3    A.    I'm happy we were able to accomplish that.

4    Q.    And with respect to the quality of the work so far as you

5    know it from the officers promoted using this process, you have

6    no quarrel with that; is that correct?

7    A.    That's correct.

8    Q.    And as far as the fairness of the process, you have no

9    quarrel with that either; is that correct?

10   A.    I've received no complaints about it, so I don't perceive

11   any problem with it.

12   Q.    Right.  And you do agree that by having this -- the part

13   of the test that has this interview process, it allowed police

14   officers who maybe don't score that well on a written test to

15   demonstrate other attributes that they may have that qualify

16   them to be a detective?

17   A.    Yes.  And also the fact that they use internal evaluators

18   I thought was a step in the right direction.

19   Q.    Because why?

20   A.    Well, because I think it -- I think that in any business,

21   management has played a role in promotions.  It's only in the

22   Civil Service environment where it's heavily unionized and

23   heavily regulated that this concern about fairness and equity

24   is brought to the extreme that it's brought to.  I think that

25   the managers in the department should play a bigger role in

1    picking who is getting promoted so that things like work ethic

2    and integrity and background of the individual is taken into

3    consideration.

4    Q.    And those are important criteria, in your opinion; is that

5    right?

6    A.    That's correct.

7    Q.    So the written test was created by EB Jacobs; is that

8    correct?

9    A.    I believe it was, sir.

10   Q.    And do you know if it was based upon a job analysis of the

11   position of detective?

12   A.    Yes, it was.

13   Q.    And do you recall approximately how many applicants you

14   had for the position of detective when you gave the exam in

15   2007?

16   A.    It was a large number.  We had to do it at the -- at a

17   large hall.  I don't know exactly how many people came in for

18   it, though.

19   Q.    But we're talking hundreds, not less than a hundred, and

20   we're not talking thousands; is that right?

21   A.    Yeah, hundreds.

22   Q.    And was it done in one day, the interviews, or over a

23   stretch of days?

24   A.    I think there were at least two days, but I don't recall

25   exactly.

1    Q.    Okay.  And I'm taking a wild guess here, but I take it you

2    had more than one interview panel; is that right?

3    A.    Yes, that's correct.

4    Q.    How many interview panels did you have?

5    A.    I don't recall exactly.  There were a number of them.

6    Q.    And throughout this whole process you received no

7    complaints about any perceived unfairness in this process; is

8    that right?

9    A.    That's correct.

10    Q.    And it was received well, it sounds like, by the

11    department and by the police officers in the department?

12    A.    Correct.

13    Q.    Do you know how much you paid for it?

14    A.    I do not.

15    Q.    Do you recall -- do you have any guess what you paid for

16    it?  Strike that.

17          So you have no -- so you have no knowledge whatsoever what

18    you paid for it?

19    A.    I just don't recall.  I delegated that work to a different

20    level.  I don't remember exactly what we paid for it.

21    Q.    And do you remember whether you put out a request for

22    proposal to do that?

23    A.    Yes, that was part of the process.

24    Q.    Now, let me ask you one more question about that.  Do you

25    remember what the kinds of questions were that were on the

1    exam?

2    A.    I do not.

3    Q.    Okay.  Now, you've expressed some concerns in these

4    various meetings that you've gone to about the use of what you

5    say is just the cognitive ability test that HRD uses for

6    promotion to a police supervisor; is that correct?

7    A.    That's correct.

8    Q.    Because you don't -- you feel that people who are good at

9    memorizing tests can get a high grade on that even though they

10   may not be the best police supervisor; is that right?

11   A.    You made a phrase that -- can you just rephrase that?  I

12   do believe that people who studied hard for it and can memorize

13   by rote do get a high score, but I believe that there are other

14   things that should be taken into consideration.

15   Q.    And people who can study hard and memorize by rote, you've

16   stated, may not be the best -- may not end up being the best

17   police supervisor; is that correct?

18   A.    Yes.

19   Q.    And you've also talked about your desire to have more

20   flexibility to promote supervisors who you believe would be

21   better at the job; is that right?

22   A.    Yes.  With very defined parameters, correct.

23   Q.    Right.  You don't want it to just -- and what are the

24   defined parameters that you would like to see in place that

25   would allow you to choose the best candidates for police

1  promotional positions?

2  A.    Things like educational history, not only degrees but

3  training that's been taken in specialty police areas; things

4  like -- especially past performance; an officer's work ethic

5  and their attendance record and their connection with the

6  community.  All of those things should play a role in it.  But

7  it shouldn't be arbitrary; it should be well defined and

8  measurable so that it can be done without any indication of

9  favoritism or bias.

10  Q.    Gotcha.  And right now the system that you operate under

11  for -- to promote police sergeant doesn't allow you to take

12  into consideration many of these factors; is that right?

13  A.    Correct.

14  Q.    You've also mentioned in the press that you would prefer

15  an assessment center method of testing; is that correct?

16  A.    I have.

17  Q.    Excuse me?

18  A.    Yes, I have.

19  Q.    Okay.  And how would you like to administer an assessment

20  center?  How would you like it to work?

21         MS. HARRIS:  I object.

22         THE COURT:  No.  But are you focusing only on

23  sergeants at this point?

24         MR. LICHTEN:  Yes.  Sorry.

25  BY MR. LICHTEN:

1   Q.   For sergeants.

2   A.   At the level of sergeant, similar to the detective's exam,

3   I think there should be a strong written component so that

4   there is a recognition that the individual understands

5   the -- you know, the statutes, the constitutional law that's

6   necessary to doing the job, the various administrative rules

7   and regulations of the police department, the city ordinances,

8   the individual things that that sergeant is called upon to be

9   the expert on on the street.

10       The officers that are doing this very important job day in

11   and day out in the middle of the night, when they get confused

12   or they don't understand something, the first thing that they

13   do is call that sergeant.  So that sergeant really has to have

14   a strong basis of knowledge of all the rules and regulations

15   and constitutional protections that are afforded the citizens

16   of the Commonwealth to do the job properly.

17       Beyond that, I think we should look at things like

18   communication skills; I think we should look at the work ethic

19   of the individual; whether or not they have espoused the

20   directives that are sent from the chief's office and the

21   command staff so that implicating things like community

22   policing and doing outreach to the community are an integral

23   part of what we're trying to get accomplished.  All of those

24   things have to be measured to get the best candidate out there

25   on the street.  But a fundamental understanding of the

1    business, of the rules and regulations and how things work is

2    really a critical component.

3    Q.    Do you understand in this case no one's suggested that

4    there not be some technical knowledge component of an

5    examination process?  Do you understand that or --

6                MS. HARRIS:  Objection.

7                MR. CARROLL:  Objection.

8                THE WITNESS:  I do.

9                THE COURT:  Sustained.

10   BY MR. LICHTEN:

11   Q.    So if I understand what you would like to see is a

12   multicomponent process, that has a technical knowledge

13   component, which is important, and then another process that

14   tests for these other skills and abilities; is that fair?

15               MS. HARRIS:  Objection.

16               THE WITNESS:  Correct.

17               THE COURT:  No, overruled.

18               The answer may stand.

19   BY MR. LICHTEN:

20   Q.    And you've mentioned these other skills and abilities in

21   the paper such as the ability to lead, which is important; is

22   that correct?

23   A.    Yes.

24   Q.    The ability to motivate; is that correct?

25   A.    Correct.

1   Q.    The ability to communicate?

2   A.    Correct.

3   Q.    And the ability to demonstrate that you've done something

4   with your career or your life that demonstrates a commitment to

5   the community?

6   A.    Correct.

7   Q.    And you've lamented in the papers that the Civil Service

8   exam process doesn't allow for many of these attributes to be

9   shown; is that right?

10          MR. CARROLL:  Your Honor, I object to the question.

11  We're here for a trial by the Court under the rules of

12  evidence, not trial by newspaper as to what the commissioner

13  said or didn't say to some unknown newspaper at some unknown

14  time, which the Court I believe has already ruled.

15          THE COURT:  Why don't you rephrase the question,

16  Mr. Lichten.

17          MR. LICHTEN:  I'll ask a different question.

18  BY MR. LICHTEN:

19  Q.    You don't believe that the current Civil Service exam

20  allows for a testing of some of those other attributes; is that

21  correct?

22  A.    Yes.

23  Q.    In addition to that, you are personally concerned about

24  the lack of diversity in minority ranks in police supervisor

25  positions in the Boston Police Department; is that correct?

1  A.   Yes.

2  Q.   And you're aware, for example, that as a result of the

3  2008 exam you've made 37 police promotions -- I'm

4  sorry -- sergeant promotions; is that right?

5  A.   I wouldn't argue with the number.  I don't know exactly,

6  but...

7  Q.   And I take it you were very disappointed that only two of

8  those have been minority candidates?

9  A.   Yes.

10 Q.   And you believe that, quote, something needs to be done

11 quickly about this issue; is that right?

12 A.   I do.

13         MS. HARRIS:  Objection.

14         THE COURT:  Overruled.

15         MS. HARRIS:  I don't know what the quote is --

16         THE COURT:  Overruled.

17 BY MR. LICHTEN:

18 Q.   And you also -- you're concerned that because of the

19 strictures that you have from the current Civil Service system,

20 you may not be able to make the changes that you want to make;

21 is that fair to say?

22 A.   There's more than Civil Service involved in it.  But there

23 are a lot of reasons why it's difficult to change this process.

24 Q.   Okay.  And do you agree or disagree with the proposition

25 that the current HRD police exam relies more on rote

1    memorization of facts about law enforcement rather than on real

2    world situations faced by officers?

3            MS. HARRIS:  Objection.

4            MR. CARROLL:  Objection.

5            MS. HARRIS:  I don't believe the commissioner has seen

6    the exams that are at issue in this case because they're

7    confidential.

8            THE COURT:  Sustained.

9    BY MR. LICHTEN:

10   Q.    Have you -- do you recall commenting on the fact that you

11   have concerns about the fact that the HRD exam relies heavily

12   on rote memorization of facts about law enforcement rather than

13   on real world situations faced by officers?

14           MS. HARRIS:  Objection.

15           THE COURT:  Sustained.

16   BY MR. LICHTEN:

17   Q.    Have you done anything yourself to investigate what is

18   currently on the police promotional exam to sergeant?

19   A.    Yes.

20   Q.    What have you done?

21   A.    I've asked questions of my command staff as to the type of

22   questions.

23   Q.    Okay.  And have you received answers as to what kinds of

24   questions are currently on, let's say, the 2008 Boston police

25   promotional exam?

 1          MS. HARRIS:  Objection.

 2          MR. D'AGOSTINO:  Objection.

 3          THE COURT:  Sustained.

 4          MR. LICHTEN:  Just one moment, your Honor.

 5    BY MR. LICHTEN:

 6    Q.   In the Boston Police Department you can't become a

 7    lieutenant or a captain without becoming a sergeant; is that

 8    correct?

 9    A.   Correct.

10    Q.   So the number of minority sergeants ultimately determines

11    the number of minorities in higher ranks; is that correct?

12    A.   That's the pool that we have to choose from; that's

13    correct.

14    Q.   Okay.  And another concern that you've expressed, is it

15    not, that if you don't get more minority sergeants into the

16    ranks of sergeants, that will hamper you in your ability to get

17    people into higher ranks; is that correct?

18    A.   Yes.

19          MR. LICHTEN:  May I have a moment, please?

20          (Counsel confer off the record.)

21          MR. LICHTEN:  Commissioner, thank you very much.  I

22    appreciate your time here today.

23          THE WITNESS:  Thank you, counsel.

24                         CROSS-EXAMINATION

25    BY MS. HARRIS:

1    Q.   Good morning, Commissioner.

2    A.   Good morning, counsel.

3    Q.   Commissioner, during counsel's questioning you were asked

4    about your experiences when you were the police chief in the

5    City of Lowell.  And I think one of the questions that you were

6    asked is the process by which you were promoted to the chief's

7    position.  And I believe you testified that that was through an

8    assessment center process, correct?

9    A.   That's correct.

10   Q.   How many people were in that process along with you?

11   A.   It started out with three and then one dropped out.  There

12   were two of us at the end of the process.

13   Q.   Okay.  So the assessment center that was devised to

14   identify who should be promoted for chief was concerned with

15   ultimately -- well, initially three people, and then down to

16   two people?

17   A.   Correct.

18   Q.   Do you know how long that process took from the creation

19   of the assessment center process through to the point where you

20   were chosen for promotion?

21   A.   It took a couple of months from the time that they first

22   went out to the RFP until the actual test was administered.

23   Q.   Okay.  And by a couple of months, do you mean two or three

24   months?

25   A.   Correct.

1   Q.   And do you know what the cost was of running that

2   assessment center?

3   A.   I do not.

4   Q.   When you were talking about the assessment center portion

5   of the examination that was used, again, while you were in

6   Lowell, I believe you stated that it was used for the ranks of

7   lieutenant, captain and deputy?

8   A.   That's correct.

9   Q.   And I believe you said that in Lowell, at least at the

10  time that you were there, the sergeant ranks were made up of

11  approximately 30 individuals?

12  A.   That's correct.

13  Q.   Do you know how many lieutenant -- incumbent lieutenants,

14  roughly, were in the ranks when you were there?

15  A.   Incumbent?  Well, that would be about a dozen.

16  Q.   And do you know how many captains you had?

17  A.   Seven.

18  Q.   And I'm assuming, and correct me if I'm wrong, that the

19  people who were testing to become deputy were drawn from the

20  captain rank; is that right?

21  A.   Yes.

22  Q.   And then captains drew from the lieutenant rank?

23  A.   Correct.

24  Q.   So for the exams that you were referring to, the exams to

25  become lieutenant, captain and deputy -- the math in this case

1    is killing me, I've got to tell you -- you were looking at a

2    total pool of approximately 49 people?

3    A.    Yes.

4    Q.    And of those 49 people, I believe you testified that the

5    testing process had a job knowledge or technical knowledge

6    component along with other components that comprised the

7    assessment center process?

8    A.    That's correct.

9    Q.    Now, I believe you stated that for the sergeant -- or

10   excuse me -- the pool that you had -- that you would draw from

11   from sergeant promotions in Lowell, that you estimated between

12   125 or 150 police officers would traditionally test for the

13   sergeant rank?

14   A.    That's about right.

15   Q.    And do I understand it that the decision was made in

16   Lowell not to use an assessment center for the sergeant rank

17   both because the candidate pool was too large and that it would

18   be prohibitively expensive?

19   A.    Correct.

20   Q.    And also that you felt that for -- you described an

21   entry-level sergeant or supervisory position as being one in

22   which the important skills that you were testing for were the

23   technical or job-knowledge component; is that correct?

24          MR. LICHTEN:  It's a little leading, your Honor.

25          THE COURT:  Well, it is, and I think it's probably not

1    appropriate under these circumstances, although the usual mode

2    of cross-examination is leading.

3            I will say that most of the -- what's just been given

4    was already given on direct examination anyway, so...

5            MS. HARRIS:  Okay.  Fair enough.

6    BY MS. HARRIS:

7    Q.   Let's talk about the detective's exam in the City of

8    Boston.  You described for counsel the process by which you ran

9    a detective's examination.  And you used the words "promoted,"

10   but can you tell us just for clarification, there's a

11   difference, is there not, between an appointment to the

12   detective rank and a Civil Service promotion?

13   A.   Right.  I misspoke if I said "promoted."  It really is an

14   appointment.  The detectives are still, in the eyes of Civil

15   Service, patrol officers.  They have another assignment, they

16   receive a stipend for that assignment, but it's really not a

17   promotion; it's simply another assignment of a patrol officer

18   performing that role.

19   Q.   I'm sorry.  And the officers who took the test for the

20   detective's exam -- who was the detective exam open to?  What

21   officers in the police department were eligible to take the

22   detective's exam?

23   A.   Patrol officers.

24   Q.   Any superior officers eligible to take the detective's

25   exam?

1  A.    No.

2  Q.    And as a consequence of successfully taking the

3  detective's exam and being appointed to the position -- is that

4  a supervisory position?

5  A.    No.

6  Q.    Do the detectives have any supervisory or traditional rank

7  over any of the other sworn officers within the police

8  department?

9  A.    They do not.

10 Q.    Do they supervise any clerical staff or civilian staff?

11 A.    They don't supervise, no.

12 Q.    Okay.  So how do you distinguish the detective position

13 from the patrol officer function?

14 A.    Basically, by the duties that they're responsible for.

15 They are responsible for investigations.  They don't respond to

16 calls for service, they don't do random patrol.  They are in

17 plainclothes and they are charged with -- usually it's the

18 retrospective analysis of a case that's -- a crime that's

19 already been committed.

20        In some cases, like a narcotics assignment, they do

21 proactive investigations, but primarily it's detective work:

22 investigation, statements, witness identification, things like

23 that.

24 Q.    And can you tell us a little bit more about -- I think

25 that you called it an interview, or I may have that wrong.  But

1    the component that you were talking about where the detective

2    candidates were interviewed by members of the command staff,

3    how did that work?

4    A.    The prospective candidate was asked to do a presentation

5    on their career -- what they've done, or the highlights of

6    their career -- and why they want to be a detective, and that

7    presentation was evaluated by the panel of three superior

8    officers.

9    Q.    And the three superior officers, who chose them to listen

10   to the presentation by the candidates?

11   A.    They were selected by the administration and trained.

12   Q.    And I believe that you stated that you were pleased at the

13   outcome.  Is this a process that you would like to see

14   implemented in the Civil Service system?

15   A.    Yes.

16   Q.    And what's your sense, at least as it stands right now, as

17   to whether you have the legal ability to -- let me just

18   finish -- if you have the legal ability to condition Civil

19   Service promotions, in part, on an officer's performance within

20   the department?

21   A.    Well, that would be a very difficult thing to do right

22   now.  I believe that it would be impossible with the law

23   written the way it is, and also, with the necessity of input

24   and agreement from the unions.  I think it's virtually

25   impossible at this point in time.

1  Q.   Now, we're talking in this case, as you know, about

2  promotions to the rank of sergeant.  And just for the record,

3  the people that you would be concerned about working within

4  developing any changes to promotion to sergeant would be the

5  patrol officers; is that correct?

6  A.   That's correct.

7  Q.   And I'm going to show you a copy of a section of the

8  collective bargaining agreement between the City of Boston and

9  the Boston Police Patrolmen's Association.  It's an integrated

10 document in effect from July 2002 through June 30, 2006.  And I

11 am going to show you Section 22.  Section 22 is titled "Career

12 Evaluation, Development and Tracking System."

13      And I'm going to draw your attention to the second

14 paragraph where I've underlined it.  It states, "The department

15 shall neither discipline a member as the result of a subpar

16 evaluation nor take such evaluations into account in

17 promotions."

18      Do you see where I'm reading that?

19 A.   Yes.

20 Q.   And is it your understanding, that at least as the

21 contracts between the unions currently stand, that you don't

22 have the ability to take a police officer's performance

23 evaluation into consideration in determining placement on a

24 promotion eligibility list?

25 A.   That's correct.

1    Q.    Now, you testified that --

2            MR. LICHTEN:  Your Honor, can we put it into evidence,

3    because it may be hard when we're writing briefs to refer to in

4    this --

5            MS. HARRIS:  I have an extra copy.  I'd be happy to

6    mark it.

7            THE COURT:  The entire agreement?

8            MR. LICHTEN:  That section is okay.  Or the entire

9    agreement.  I'm just trying to think if we're writing briefs,

10   it's going to be hard --

11           THE COURT:  No, I agree with you.

12           MS. HARRIS:  I'll offer the entire agreement.  That's

13   fine.

14           THE COURT:  Is it presently marked as a proposed

15   exhibit?

16           MS. HARRIS:  It's not but I will.

17           THE COURT:  We'll admit it and you can --

18           MS. HARRIS:  Work out the number after the fact?

19           THE COURT:  Yeah.  Get it marked.

20           MR. LICHTEN:  Thank you.

21           MS. HARRIS:  I lost my train of thought.  Excuse me.

22   BY MS. HARRIS:

23   Q.   So when you were putting together the examination for

24   detective, is it your understanding that -- well, strike that.

25           Putting together the examination for detective does not

1    quantify -- does not qualify as a promotion, as you've

2    previously stated, correct?

3    A.    Correct.

4    Q.    And when we were talking -- when you were talking a moment

5    ago about making promotions from the eligibility list that

6    Civil Service -- or that HRD creates from the promotional exam,

7    that you have some authority to bypass for discipline; is that

8    correct?

9    A.    Correct.

10    Q.    And can you just explain for the Court what the parameters

11    of your discretion are in those circumstances?

12    A.    Sure.  For each person that you're about to promote, you

13    can pick from the top three.  If you take someone who has a

14    score that is lower than the individual who's being

15    bypassed -- they call it a bypass.  And when you do a bypass,

16    you have to go to a hearing before Civil Service, and you have

17    to state your reasons for doing that.

18         And it's very difficult to get over that hurdle that they

19    place for the administration.  You usually have to be able to

20    prove bad conduct or bad work record.  Things like performance

21    don't get taken into consideration.

22    Q.    And when you say "things like performance don't get taken

23    into consideration," do I -- is it fair to say that if you had

24    a list of three candidates and you personally thought the

25    person that was second or third on the list was the best person

1    for the job, that if you bypassed the number one person you

2    would not be able to successfully promote the second or third

3    person on the list?

4    A.    That's correct.

5    Q.    And have you had occasion where you have had -- where you

6    have made bypass decisions based on cause, as you previously

7    described, and have been unsuccessful in defending those

8    bypasses at the Civil Service Commission?

9    A.    Yes.

10   Q.    And what happens if you can't defend successfully a bypass

11   decision at Civil Service?

12   A.    The individual is placed at the top of the list and gets

13   the next position.

14   Q.    So if you were to make a bypass decision and have your

15   decision overturned, you're actually increasing the number of

16   people at the top of the list; is that fair to say?

17   A.    Correct.

18   Q.    Now, in talking -- just to finish this point on the

19   detective's examination, I'm going to show you another section

20   of the contract, which is listed as Section 2(a) on page 45.

21   And this section states that the department shall establish and

22   conduct a competitive examination process for the appointment

23   of police officers to the position of police officer-detective.

24   The process shall consist of a written examination which shall

25   consist of at least 60 percent of the total examination mark,

1    and training, education and experience.  Appointments as a

2    detective shall be made only according to rank by mark after

3    the examination process has been completed and the results

4    published on a list by the police commissioner.

5        And I'll ask you:  Is the examination process that you

6    described earlier one that was developed in accordance with the

7    requirements of the collective bargaining agreement with the

8    patrolmen's association?

9    A.   Yes, it was.

10   Q.   And the training, education and experience component, is

11   that the piece that you talked about where the candidate makes

12   a presentation about his or her background and other

13   experiences to the members of the command staff?

14   A.   Yes, it was.

15        THE COURT:  Ms. Harris, I think you said it, but could

16   you remind me what the period covered by the CBA is?

17        MS. HARRIS:  Yes.  The period is 2002 to 2006, but

18   it's my understanding that those provisions have been

19   incorporated into subsequent contracts.  And I'm not an expert

20   in the labor piece of it, but it's my understanding that the

21   contract remains in full force and effect.

22        THE COURT:  It has been extended?

23        THE WITNESS:  It has a green clause, they call it.

24   Yes.

25        MS. HARRIS:  Yes.  It covered these exams, is my

 1  understanding, and it's still in effect.

 2  BY MS. HARRIS:

 3  Q.   Now, Commissioner, realizing that you weren't here in

 4  2002, do you have any knowledge about the examination process

 5  that the city engaged in in 2002 for that exam?

 6  A.   I know that they gave an assessment center.

 7  Q.   And tell me -- what is the sense that you have?  What

 8  knowledge do you have about the exam that was given in 2002?

 9        MR. LICHTEN:  Well, I'd ask that -- because the

10  foundational --

11        THE COURT:  Basis for knowledge first and then the

12  knowledge.

13        MR. LICHTEN:  Yes.

14        MS. HARRIS:  Okay.

15  BY MS. HARRIS:

16  Q.   How is it that you came to know about an examination that

17  was given in Boston in 2002?

18  A.   I was advised by my command staff and by the members of my

19  administrative services division.

20  Q.   And were you aware that there was an assessment center

21  component to the 2002 examination?

22  A.   Yes.

23  Q.   Is it -- was it something that you explored when you

24  became police commissioner in December of 2006 when you were

25  considering -- or any -- to the extent that you were

1  considering changing the examination process in Boston?

2  A.   Yes.

3  Q.   And tell me what your sense is of what the cost of the

4  2002 exam was.

5         MR. LICHTEN:  Objection.  Foundation and hearsay.  He

6  said the only information he had --

7         THE COURT:  Yeah, sustained.  Sustained.

8  BY MS. HARRIS:

9  Q.   Did your -- did the information that you gathered about

10 the 2002 examination process -- has that played a role in any

11 of your decision-making about examination processes going

12 forward?

13 A.   Yes, it has.

14 Q.   And can you explain how?

15 A.   Two ways:  One is the excessive cost, and the other is the

16 fact that there was no increased diversity in the --

17        MR. LICHTEN:  Objection.  Move that it be stricken.

18 It's just another way of getting at --

19        THE COURT:  Sustained.

20 BY MS. HARRIS:

21 Q.   When you began working in the Boston Police

22 Department -- I believe you stated that you started in December

23 of 2006?

24 A.   Correct.

25 Q.   And you're aware that one of the exams at issue here was

1    administered in October of 2008?

2    A.    Correct.

3    Q.    And in your experience with Civil Service, do you know how

4    much lead time is given between the publication of the reading

5    list and the actual administration of the exam?

6    A.    I don't know what the legal parameters are, but I know

7    that routinely people study for a test for a year or so.  So I

8    don't -- I can't give you the exact book and page as to how

9    many days is required before the announcement.

10   Q.    Okay.  Do you have a sense as to whether you had the

11   opportunity in December of 2006 to make any changes to the

12   examination process that was the foundation for the October of

13   2008 exam?

14           MR. LICHTEN:  Objection to the form.

15           THE COURT:  Overruled.

16           You may answer that.

17           THE WITNESS:  I was unable to change the 2008 process

18   in that period of time.

19   BY MS. HARRIS:

20   Q.    And I think you testified that in your experience that the

21   examination process is run on a -- strike that.

22           Do you know how frequently Boston engages in the

23   examination process?

24   A.    Every two years.

25   Q.    And in -- is it your sense that -- or strike that.

1       This may go without saying, but the purpose of the

2   examination process is to provide you with a list of people who

3   are eligible for promotion?

4   A.    That's correct.

5   Q.    Would it impose any kind of difficulty for the police

6   department if promotions were not to be made on a two- to

7   three-year cycle?

8   A.    Yes.

9   Q.    And explain how that would cause a problem.

10  A.    There would be a loss of supervision on the street; we

11  wouldn't be able to promote people into positions for vacancies

12  due to retirements and illnesses.  And very quickly the level

13  of supervision would drop, which would create a problem in the

14  ability to provide police service to the community.

15  Q.    So is it fair to say there's an operational need for you

16  to engage in a promotional process on a somewhat regular basis?

17  A.    Absolutely.

18  Q.    And have you considered, going forward, whether you're

19  going to continue working with the Civil Service -- or the HRD

20  examination process?

21  A.    We've made a determination and noticed the unions that we

22  will be asking for a delegation of that exam to the city.

23  Q.    Now, have you -- since you've become commissioner, have

24  you been engaged in conversations with a group called the

25  Diversity Council?

1   A.   Yes.

2   Q.   And can you describe for the Court what that group is and

3   what its purpose is?

4   A.   Yes.  We assembled a group of citizens and members of the

5   academic community and the business community to help us

6   through some problems with diversity in the department,

7   particularly the testing process, but with other issues.  That

8   group was first assembled in the latter part of 2009, and we've

9   had six or seven meetings since that initial conversation.

10      During the course of that time we've outlined to them some

11  of the rules and regulations and the court decisions around the

12  whole promotional process, and we've asked them for advice and

13  counsel on how we can move forward in a way that will be

14  acceptable and, quite frankly, better around the issue of

15  diversity, but also around the issue of having competent, able

16  police supervisors.

17  Q.   And who are the -- just in general, who are the entities

18  that are invited to participate in this group?

19  A.   There are -- the police unions are at the table; we have

20  representatives from community groups; we have a couple of

21  political figures that have asked to come on the committee, two

22  city councilors; we have police administrators and academic

23  individuals.  The group is moderated by Professor Jack McDevitt

24  from Northeastern University, and there are several other

25  attorneys and academics that are informing the process.

1    Q.    Is MAMLEO a --

2    A.    That's correct.  MAMLEO is also at the table, yes.

3    Q.    You were asked by Mr. Lichten about the raises that are

4    being advocated for your command staff, and you were also asked

5    about raises that are in place for the members of your

6    organized officers.  And can you tell me if the -- if the

7    officers on your command staff were still members of their

8    various collective bargaining units, they would be eligible for

9    raises as a part of the step increases that the contracts

10   provide for; is that correct?

11   A.    That's correct.

12   Q.    And can you tell me if you were not to be advocating for

13   raises for your command staff, would they be making more, less,

14   or the same as the members of their -- of the unions over which

15   they're supervising now?

16   A.    Well, right now they are making less than the people they

17   supervise.  In addition to that, they are not eligible for

18   overtime as command staff members.  And so there's definitely a

19   financial impact that would be -- make it difficult to hire

20   members of the command staff, ultimately.

21   Q.    And I understand that you identified these folks -- you

22   have the discretion to choose the people who serve on your

23   command staff, correct?

24   A.    That's correct.

25   Q.    And I assume, also, that they have the ability to decline

1    should they not want to accept the honor, correct?

2    A.    They do.

3    Q.    Okay.  So for you -- is it fair to say that operationally

4    it's important for you to be able to compensate these folks in

5    line with what they would be earning had they declined to join

6    the command staff?

7    A.    That's correct.

8    Q.    And you were asked about the total budget that the police

9    department operates under.  And can you tell me, Commissioner,

10   if you were to begin a request for bids to create an

11   examination process, what is the process by which you go about

12   securing funds to do that?

13   A.    Well, it starts, you know, quite a period of time before

14   the budget is put into place.  Around January of the prior

15   fiscal year we start planning for what that budget will look

16   like.  It's actually voted on by the city council sometime

17   before July 1st, but the period from January to March is when

18   we're most intimately involved in the preparation for that next

19   fiscal year.

20         So if we wanted to do something in fiscal year 2010 to

21   2011, that planning would take place between January and March.

22   Once that budget is voted on, it can't be increased, and there

23   would have to be a special appropriation put together for

24   anything that we wanted to do in that fiscal year.

25         So it's really a year or so out when we're planning a big

1    ticket item like this.

2    Q.   And you were asked if the budget for the current fiscal

3    year is about $300 million, which you said you thought was

4    about accurate.  And can you tell me, how does that work?  Does

5    the city just give you $300 million and say, "Go to town.  You

6    know, use this as you see fit"?

7    A.   No.  The budget is heavily weighted towards salaries and

8    wages, so approximately 90 percent of that money is already set

9    aside for salaries and wages of existing personnel.  The other

10   10 percent is used for things like buying police cars and

11   keeping up buildings and other responsibilities that we have in

12   running the police department.  So there's not a lot of

13   discretionary money there at all.

14   Q.   And in the years that you've been the police commissioner,

15   have you seen any restrictions caused by the fiscal concerns

16   facing the city in your operations?

17   A.   Yes.  We've made substantial cuts over the last three or

18   four years.  We've cut things like the cadet program; we've

19   shut down the mounted unit; we've cut way back on expenditures

20   on cars; we've entered into negotiations with the unions on

21   wage freezes and wage delays.  There's been a significant

22   amount of pressure put on the budget.

23   Q.   And when you say that -- you've cancelled the cadet

24   program; is that correct?

25   A.   Correct.

```
1    Q.    And did that involve layoffs of any incumbent personnel?

2    A.    It did.

3    Q.    Did you have to cancel any recruit classes?

4    A.    We've delayed them.  We definitely are down officers at

5    this point in time.

6    Q.    Now, you were asked a couple of questions about the idea

7    of banding.  And just as background, you stated that you

8    were -- well, let me ask you:  Do you have a position about

9    whether or not banding would be a tool that you would be happy

10   to have as the police commissioner?

11   A.    I do.  I would be happy to have that.

12   Q.    And do you know whether or not -- when you received the

13   2008 exam list, whether the -- whether banding was a tool that

14   was available to you at that time?

15   A.    It was suggested as a tool by HRD.  They attempted to put

16   it in place but it was quickly stopped.

17   Q.    Okay.  And do you know whether or not -- I believe that

18   you stated that you had spoken to the unions, the command staff

19   and other chiefs within Massachusetts.  Do you know whether or

20   not any rulemaking hearings have been held to discuss the issue

21   of banding?

22   A.    I'm not aware of that.

23   Q.    Okay.

24         THE COURT:  And the reason you're interested in

25   banding is that it relieves you of the strict rank order
```

1    requirement, is that it?

2             THE WITNESS:  That's correct, your Honor.

3             MS. HARRIS:  If I could have just a moment, your

4    Honor.

5             (Pause.)

6             MR. LICHTEN:  I hope you brought your overnight bag.

7             MS. HARRIS:  I'm sorry?

8             (Pause.)

9             MS. HARRIS:  Okay.  Thank you.

10            Thank you, Commissioner.

11            THE WITNESS:  Thank you, counsel.

12            THE COURT:  Mr. Carroll?

13            MR. CARROLL:  Thank you, your Honor.

14                        CROSS-EXAMINATION

15   BY MR. CARROLL:

16   Q.   Good morning, Commissioner.

17   A.   Good morning, counsel.

18   Q.   My name is Harry Carroll.  I represent the City of

19   Springfield.  And I have a few questions for you this morning.

20        As I recall on your direct examination, Attorney Lichten

21   showed you a letter concerning a meeting that you held with

22   some minority officers, I believe it was in Lowell, that had

23   some concerns; is that correct?

24   A.   That's correct.

25   Q.   And as I recall it, you mentioned something about you

1  floated out the idea of an alternate promotional method, the

2  so-called Par 10 issue?

3  A.   That's correct.

4  Q.   And can you tell us, if you can recall, what specifically

5  the minorities thought about that?

6  A.   Well --

7           MR. LICHTEN:  That was asked and answered, I think.

8           THE COURT:  No, that's all right.  He can explore it.

9           THE WITNESS:  They indicated that they didn't want to

10 be perceived as receiving an undue benefit based strictly on

11 race; they wanted to earn their position.  And they asked that

12 we not do that.

13 BY MR. CARROLL:

14 Q.   Okay.  So would it be fair to say that the minority

15 officers that you met with, when the idea of a Par 10 method

16 was floated, essentially rejected that idea because they felt

17 it would create problems for them in the long term, they didn't

18 like it?

19           MR. LICHTEN:  Objection.  Relevancy.

20           THE COURT:  Overruled.  You may answer.

21           THE WITNESS:  That's my recollection of it, yes, sir.

22 BY MR. CARROLL:

23 Q.   And there's been some discussion about assessment centers.

24 And I understand generally you favor those; is that correct?

25 A.   Yes, sir.

1  Q.    Okay.  With regard to the position of police

2  sergeant -- you've been a sergeant, worked your way up through

3  the ranks, correct?

4  A.    That's correct.

5  Q.    Is it fair to say that the position of police sergeant is

6  someone that the officers under their command come to when they

7  have questions, technical, legal questions:  "Can we make a

8  search, you know, can we stop and frisk this fellow?" that type

9  of thing?

10  A.    Yes, that's correct.

11  Q.    And would it be your understanding that the knowledge of

12  the law and the Constitution are the types of things that a

13  police sergeant should know?

14  A.    Yes; they're critical.

15  Q.    And on the statewide Civil Service exams that you took,

16  were those items tested?

17  A.    Yes, they were.

18  Q.    And did you consider those items to be related to the job

19  of a police sergeant?

20  A.    Yes, I did.

21  Q.    Okay.  And you, of course, are an example of a person who

22  came up through the system, so to speak, started off as a

23  police officer, worked your way up by taking Civil Service

24  exams, statewide multiple-choice exams and were promoted to

25  sergeant?

1    A.    Yes, that's correct.

2    Q.    And served in that position for a period of time?

3    A.    Yes.

4    Q.    Now, as I understand it, you indicated that in Boston you

5    have flexibility when it comes to appointing your own command

6    staff; that is, captains, lieutenants and whatever higher ranks

7    that you have?

8    A.    Only deputies and superintendents.

9    Q.    Okay.  And you would use the assessment centers for the

10   lower rank, say, of lieutenant and captain?

11   A.    I used them in Lowell, yes.

12   Q.    But a sergeant -- those officers, the lieutenants and the

13   captains, they would have already taken and demonstrated their

14   knowledge of the law that's tested on these multiple-choice

15   tests; is that correct?

16   A.    That's correct.

17   Q.    And they would have to do that in order to be promoted as

18   sergeant, correct?

19   A.    Correct.

20   Q.    And so in light of that would it be appropriate, do you

21   feel, to test for the so-called softer skills, command

22   presence, leadership, that sort of thing that are typically

23   used in an assessment center?

24   A.    Yes.  But you should -- it should be noted an assessment

25   center can test for knowledge of individual items also.  I

1    mean, it's not exclusively one or the other.  But that's

2    correct.  I think that in a written exam it's hard to measure

3    communication skills.  It's hard to measure leadership ability.

4    An assessment center does that better.

5    Q.    Okay.  And under the Civil Service laws as you understand

6    them, when a, say, promotional -- police promotional exam for

7    sergeant is given, there's a requirement that the communities

8    appoint basically in rank order unless they can justify a

9    reason for bypass?

10   A.    Yes.

11   Q.    And do the communities have any authority to change that

12   law?

13   A.    They do not.

14   Q.    Okay.  So as a police commissioner, you follow the laws,

15   as do the other commissioners and chiefs throughout the state?

16   A.    Yes.

17   Q.    And did you mention that it cost approximately $300,000 in

18   Lowell to do the assessment center that was done there?

19   A.    The one for lieutenants, captains and deputies.  That's my

20   recollection of the expense.

21   Q.    And do you recall how many appointments were made for that

22   $300,000 test?

23   A.    I do not.

24   Q.    Do you know if it was more than 50?

25   A.    Oh, no.  Much less than that.

1   Q.    Less than ten?

2   A.    It was more than ten but less than 50.  You know,

3   somewhere in the, maybe, dozen to two dozen.

4   Q.    Okay.  At a cost of $300,000?

5   A.    Correct.

6   Q.    And when you, as commissioner, go to plan for promotions,

7   you realize, of course, that your ranks -- you don't have

8   enough supervisors and you need more, can you describe as best

9   you can what you have to go through to get an officer appointed

10  as a, say, sergeant in Boston?

11  A.    Well, you know, normally we would ask for a list from

12  Civil Service, but there has to be a current list available.

13  So the first step, really, is asking Civil Service, or HRD, to

14  schedule an exam.  Once they schedule the exam, the test is

15  taken, the list is established.  And then as the vacancies

16  become available, we send in for a list of individuals who are

17  eligible to be promoted.

18      The process involves examining their backgrounds, whether

19  or not there's been any recent discipline, and then sending a

20  request back to Civil Service for certification of certain

21  names.  And once that certification comes back, we can make the

22  appointment.

23  Q.    Okay.  And in making the appointment, you're required to

24  follow the 2 N + 1 rule.  You appoint only off the certified

25  list; is that correct?

1    A.    That's correct.

2    Q.    And to the best of your knowledge, that's the requirement

3    throughout the Commonwealth under Civil Service promotion?

4    A.    That's correct.

5    Q.    Now, when you go to use an alternative method of, say, the

6    assessment center process that I believe you've indicated

7    you've used in Lowell, can you describe what kind of steps you

8    have to go through for that?

9    A.    You first send a request for a delegation of authority to

10   do the test in the city.

11   Q.    Well, do you have to ask for money in order to do it?

12   A.    Certainly.  The very first step is to get an idea of what

13   it would cost to do such a thing, plan that out in the

14   fiscal -- in the time prior to the fiscal year that you're

15   going to ask for the exam to be given and sort of plan the

16   testing process.  Once the city has the money available, then

17   you ask for a delegation of the responsibility to the city.

18   Q.    Okay.  And as I understand it, the process is somewhat

19   complicated.  You don't, as a police chief or police

20   commissioner, just simply ask for a pile of money and they give

21   it to you, you have to justify on a line-item basis every item

22   that goes into your budget; is that correct?

23   A.    Right.  There's a very rigorous process of budget

24   preparation that every city and town police administrator goes

25   through to have funds available.

1   Q.   And when budgets are tight in municipalities -- is that

2   something that was the case in Lowell when you were there?

3   A.   Yes.

4   Q.   And that's the case now in Boston?

5   A.   Correct.

6   Q.   -- it becomes -- or could become a political issue as to

7   whether the politicians want to give you the money to do an

8   assessment center, correct?

9   A.   Correct.  Absent a crisis, innovation is not something

10  that comes easy.

11  Q.   And it's easier to sell officers on the street boots on

12  the feet enforcing the law than it is to spend, say $300,000 or

13  a million dollars or two million dollars on industrial

14  psychologists to do a test that may or may not work; is that

15  correct?

16  A.   That's correct.

17  Q.   And I believe you indicated in Boston you have more

18  flexibility to appoint your command staff.  You didn't have

19  that same flexibility in Lowell, I take it; that was a Civil

20  Service community?

21  A.   That's correct.

22  Q.   And under Civil Service, it's not ever a situation where,

23  as you have the luxury in Boston, you can, you know, consider

24  the factors you believe are important, it's one where they take

25  a Civil Service test and you have to appoint off the certified

1    list, correct?

2    A.    You do.

3    Q.    And to the best of your knowledge, that's the case

4    throughout the Commonwealth?

5    A.    Correct.

6    Q.    And finally, on the police promotional evaluations, those

7    are interdepartmental only when it comes to promotions; is that

8    correct?

9    A.    That's correct.  You can only take -- you can only test

10   the people in your department; that's correct.

11   Q.    So a --

12         THE COURT:  Just for the record to be clear, I think

13   you said "interdepartmental"; I think you meant

14   intradepartmental.

15         MR. CARROLL:  Intradepartmental.  Thank you, your

16   Honor.  Thank you, your Honor.  I do appreciate that.  I stand

17   corrected.

18   BY MR. CARROLL:

19   Q.    With that correction that we're talking intradepartmental.

20         So a police officer who scores an 85, say, on an exam when

21   you add all the points up, would never be appointed as sergeant

22   in Boston who only scored an 80 even though he ranked higher on

23   the test, correct, because you only pick from within the

24   department?

25   A.    That's correct.  That's correct.  Was your question if

1    someone scored higher in another department?

2    Q.    Yeah.  In other words --

3    A.    Yes.

4    Q.    -- say you get a candidate from Springfield, who is a

5    really bright individual, and he scores 100 on the test, a

6    veteran, gets all the points right down the line; and you get

7    someone from Boston, and the highest score is 90 or 92.  The

8    fellow with the 100 in Springfield is never going to be

9    appointed in Boston, correct?

10   A.    That's correct.  The only time that happens is in a

11   chief's exam when they ask for an open competitive exam across

12   cities but --

13   Q.    But it never happens on a departmental promotional

14   examination under the Civil Service?

15   A.    That's correct.

16   Q.    It can't, right?

17   A.    It cannot.

18   Q.    So the names aren't even on the certified list?

19   A.    Right.

20   Q.    So when you look at scores across years and across

21   jurisdictions, it doesn't really mean much, as a practical

22   matter, because the only people that are appointed are the ones

23   who were certified, and those are the only ones within each

24   given policing jurisdiction; is that correct?

25   A.    Yes.

```
 1              MR. CARROLL:  Thank you, Commissioner.  No further
 2    questions.
 3              THE WITNESS:  Thank you, counsel.
 4              MS. ENGDAHL:  Worcester has no questions, your Honor.
 5              THE COURT:  All right.  Mr. Leahey?
 6              MR. LEAHEY:  Thank you.
 7                        CROSS-EXAMINATION
 8    BY MR. LEAHEY:
 9    Q.   For the record, Brian Leahey for the City of Lowell.
10         Good morning, Commissioner Davis.
11    A.   Good morning, Mr. Leahey.
12    Q.   And if I inadvertently call you "Chief," I apologize.
13         With respect to the questions regarding Lowell, you were
14    talking about how Lowell used, when you were there, the HRD
15    promotional exam.  And I believe Attorney Lichten asked you if
16    the results were based -- promotional results were based solely
17    on the written examination.
18         Do you know whether or not there is another component to
19    the HRD test aside from the written test itself?
20    A.   Training and experience.
21    Q.   So that's another component that was factored into the HRD
22    exam that you -- that you understand?
23    A.   Yes.
24    Q.   And that's what the promotions were made off of when you
25    were superintendent in Lowell, correct?
```

1    A.    Right.  There's a formula that HRD plugs in, people's time

2    on the job and any advanced degrees that they have, yes.

3    Q.    And you were also asked questions about banding.  And

4    you're aware of the decision in the superior court for 2009,

5    the Pratt case.  You were asked questions about that?

6    A.    Yes.

7    Q.    Do you know who the lawyers were who were involved in that

8    case?

9         MR. LICHTEN:  Objection.  Relevancy.

10         THE COURT:  Sustained.

11   BY MR. LEAHEY:

12   Q.    Commissioner, you're aware that under General Laws

13   Chapter 31 that regardless of whatever decision HRD makes or an

14   appointing authority makes, that that decision is subject to

15   challenge by the Civil Service Commission, correct?

16   A.    Before the Civil Service Commission, yes, sir.

17   Q.    Right.  And they have the authority to strike down

18   anything that either an appointing authority does or any

19   decision by HRD, correct?

20   A.    Yes.

21   Q.    And I believe you testified that you're not currently

22   aware of any status before either HRD or Civil Service

23   regarding the current status of banding?

24   A.    I'm not aware of where it stands right now.  That's

25   correct.

1    Q.    You were also asked questions regarding a meeting that

2    took place in the fall of 1999 in Lowell --

3    A.    Yes.

4    Q.    -- where it was for minority status officers.

5          What were the races and ethnicities of the individuals who

6    were at that meeting, as you understand?

7    A.    There were African-American officers, there were Cambodian

8    officers, there were Spanish -- Hispanic officers.  I

9    believe -- I believe that's it.

10   Q.    When you say "Cambodian," do you mean Asian officers?

11   A.    Well, you said race and ethnicity.  Yes, there are

12   actually Asian officers who come from Cambodia.

13   Q.    Using HRD's definitions, were there blacks, Hispanics and

14   Asian officers at that meeting?

15   A.    Yes.

16   Q.    And those officers told you that they did not want a

17   special list for promotional exams, correct?

18   A.    That's correct.

19   Q.    Did they tell you that they wanted to keep the present HRD

20   test that Lowell was using for promotions to sergeant?

21   A.    Yes.

22   Q.    And what was the reason these meetings started?

23   A.    There was -- there were a series of letters that were sent

24   and allegations that were made by the union at the time that

25   there was a lack of diversity in the command staff of the

1    police department and that minority officers weren't happy.

2    Q.    Does that in any way, shape or form relate to an incident

3    that happened in October 1998 where discipline was involved

4    involving union officials?

5    A.    I believe it stemmed from that.

6    Q.    And was one of the issues that you discussed at this

7    meeting the lack of promotion to a Hispanic officer as a result

8    of the discipline that happened from that October 1998

9    incident?

10   A.    That was one of the issues, yes, sir.

11   Q.    And you're aware that based on where someone sat -- where

12   an officer sat as respect -- to the pre-nineteen -- or sometime

13   where they stood on the certified list in 1998, that one of the

14   individuals would have been promoted to sergeant but for a

15   disciplinary measure that resulted in October of 1998?

16   A.    Yes.

17   Q.    And that officer who was not promoted as a result of the

18   disciplinary measure, was that a Hispanic officer?

19   A.    That's correct.

20   Q.    And you also testified that one of the things you're

21   looking for in an assessment center is to test the officers'

22   abilities and to get into their background; is that correct?

23   A.    Yes, their job performance.

24   Q.    Job performance.  Is disciplinary issues something that

25   you would look to address in an assessment center?

A.    I don't understand what you mean by that.

Q.    In an assessment center would you look into the disciplinary history of an individual applicant?

A.    No.

Q.    You would not look into whether or not that applicant had good job performance?

A.    Not at the assessment center phase.  The assessment center is in place to measure knowledge, skills and abilities outside the written exam.  That's what I think the benefit of that -- components of the testing is.  The evaluation of the officers' disciplinary record comes into play at appointment time.  If you're talking about the officers' work habits and their performance, that's all measured in the evaluation phase of the assessment center.

      So if your question is about -- specifically about discipline, that's figured into the equation at the appointment time.

Q.    Pre-appointment time?

A.    Right.

Q.    It's probably one of the last stages that you address?

A.    That's correct, yup.

Q.    With regards to job performance and the knowledge, skills and ability and the assessment center, would you factor into whether or not the candidate has the ability to recognize when he or she has made a mistake?

1    A.    Yes.

2    Q.    And would it test whether or not the candidate has the

3    ability to learn from a past mistake?

4    A.    Ideally, yes.

5    Q.    You were also asked questions about whether or not an

6    assessment center -- you want to see whether or not the

7    individual espouses the directives of the chief's office.  Do

8    you recall testifying to that?

9    A.    Yes.

10   Q.    And in Lowell you implemented a community policing model?

11   A.    That's correct.

12   Q.    And was that different from your predecessor's theory of

13   policing?

14   A.    Yes, it was.

15   Q.    And, Commissioner Davis, when you worked in Lowell, did

16   you know a patrolman by the name of Robert Alvarez?

17   A.    Yes.

18   Q.    Did you have personal contact with him during your years

19   as superintendent of the Lowell Police Department?

20   A.    Occasionally.

21   Q.    Do you know whether or not officer Alvarez espoused the

22   directives of your office with regard to community policing?

23        MR. LICHTEN:  Objection.  Relevancy.  I don't think in

24   a disparate impact case it's appropriate to go into --

25        THE COURT:  Sustained.

1          MR. LEAHEY:  Your Honor, I would just point out one of

2     the arguments in the plaintiffs' complaint is that they are

3     otherwise qualified for promotion.  And I think it is relevant

4     to go to questions as to whether or not he is otherwise -- at

5     least with respect to Officer Alvarez, whether or not he is

6     otherwise qualified for promotion.

7          THE COURT:  All right.  I'll take that as an offer of

8     proof, but the objection is sustained.

9          MR. LEAHEY:  Just note my objection.

10         Thank you, Commissioner.

11         THE WITNESS:  Thank you, counsel.

12         THE COURT:  Mr. McDermott?

13         MR. McDERMOTT:  Your Honor, the MBTA is not

14    cross-examining Commissioner Davis.

15         MR. McQUILLAN:  Your Honor, the City of Methuen has no

16    questions.

17         MR. D'AGOSTINO:  Your Honor, the City of Lawrence does

18    have a few.

19                        CROSS-EXAMINATION

20    BY MR. D'AGOSTINO:

21    Q.   Good morning, Commissioner.  My name is Richard

22    D'Agostino.  I represent the City of Lawrence.

23    A.   Good morning, counsel.

24    Q.   Commissioner, when you were asked by Mr. Lichten about

25    whether you were satisfied with the assessment centers, you

1   seemed to hesitate before you responded.  Did you have some

2   concerns?  What were you concerns?

3            MR. LICHTEN:  Objection to form.

4            THE COURT:  Overruled.

5            THE WITNESS:  I'm not an expert in testing.  I've had

6   concerns over the years.  The lack of diversity in the test in

7   Boston that occurred is of concern to me.  The exact type of

8   testing that's used in the -- under the title of "assessment

9   centers" I think is of concern; and also making sure that

10  officers have the requisite knowledge of the constitutional law

11  that is so important to the advice that they give to the

12  officers on the street.  The sergeant's position is really

13  where the rubber hits the road as far as supervising

14  individuals, and it's really the most important rank.  So they

15  really have to have a clear basis of knowledge as to where

16  they're -- it's okay to be a leader but you have to know where

17  you're leading.

18  BY MR. LEAHEY:

19  Q.   So that written exam, then, is very, very important to the

20  performance of the job duties of a police sergeant?

21  A.   It is, especially at the first-level supervision.

22  Q.   In 2000 you had stated that the unions voted to go back to

23  the multiple-choice exam.  I believe it was -- was that when

24  you were in Lowell?  I'm sorry.

25            MR. LICHTEN:  Objection.  There's been no testimony of

1    a vote.

2           MR. D'AGOSTINO:  I'm sorry, your Honor.  I didn't hear

3    the objection.

4           THE COURT:  The objection was to the use of the word

5    "vote."

6    BY MR. LEAHEY:

7    Q.   Okay.  The unions reported that they were going back

8    to -- or preferred the multiple-choice exam?

9           MR. LICHTEN:  Objection.  I'm not sure that -- there's

10   been no testimony that the unions had the right to make

11   that -- any determination.  The way the question is phrased --

12          THE COURT:  That's overruled.  You can answer.

13          THE WITNESS:  The unions lobbied the city manager to

14   change the process back to where it was, and he did that.

15   BY MR. LEAHEY:

16   Q.   Did you report that to anyone or was that direct contact

17   with the unions and the city manager?

18   A.   It was direct contact with the unions and the city

19   manager.

20   Q.   Do you recall the premise that they indicated why they

21   preferred the multiple-choice exam?

22          MR. LICHTEN:  Objection.  Hearsay.

23          THE COURT:  Sustained.

24   BY MR. LEAHEY:

25   Q.   Do you have any personal knowledge as to the reasons why?

1  A.    I do not.

2  Q.    You stated that the people who studied hard and memorized

3  by rote may not be the best supervisors.  That was your

4  testimony, correct?

5  A.    Correct.

6  Q.    But you also stated you were surprised by some of the

7  individuals who were selected or recommended by the assessment

8  center on another occasion?

9  A.    Correct.

10 Q.    Were you surprised because they, perhaps, put forth some

11 candidates who you felt were also not good candidates for

12 promotion?

13 A.    I was surprised at the final list, but I may have been

14 missing important components of the individual's ability, and I

15 trusted the testing process.

16 Q.    So the assessment center certainly is not a cure-all?

17 A.    No, it's not.

18 Q.    Have you found that the assessment centers guarantee more

19 minority promotions?

20 A.    No, I have not found that.

21 Q.    And it's fair to say, Commissioner, that the assessment

22 centers are very expensive to maintain in testing for a local

23 community?

24 A.    That's correct.

25 Q.    And certainly in these budgetary times, certainly in a

1    cash-strapped city or a city on the verge of receivership,

2    would have a difficult time implementing such a component for

3    examination?

4              MR. LICHTEN:  It calls for him to know what other

5    city's budgeting situation is.

6              THE COURT:  Overruled.  He may answer generally.

7              THE WITNESS:  It is very difficult in these budgetary

8    times.

9    BY MR. LEAHEY:

10   Q.   And because the communities that you served, and served

11   in, Tewksbury, Lowell and Boston, have all had collective

12   bargaining agreements with the unions?

13   A.   Yes, they have.

14   Q.   So because of the collective bargaining agreements with

15   the unions, it's fair to say you would not be able to use an

16   assessment center in testing or change the exam without the

17   unions' agreement; is that correct?

18             MR. LICHTEN:  Your Honor, there's only one collective

19   bargaining agreement that's now in evidence.  We don't know

20   what the other collective bargaining agreements say, so it's

21   asking him to speculate as to what unknown collective

22   bargaining agreements may say.

23             THE COURT:  Sustained.

24             MR. D'AGOSTINO:  I have nothing further, your Honor.

25   Thank you very much.

1              Thank you, Commissioner.

2              THE COURT:  Mr. Lichten?

3              MR. LICHTEN:  Do you want to proceed on, your Honor?

4              THE COURT:  Yes.  I would like to get the commissioner

5     on his way as soon as we can.

6              MR. LICHTEN:  Thank you, your Honor.  So would I.

7              THE COURT:  Prove it.

8              (Laughter.)

9              THE WITNESS:  Please.

10             MR. LICHTEN:  I'll be brief.

11                         REDIRECT EXAMINATION

12    BY MR. LICHTEN:

13    Q.   Let me take first off this question of the budgeting.

14    Now, you were called before the city council to discuss the

15    absence of -- or the relatively low numbers of minority police

16    supervisors in the police department; is that correct?

17    A.   Correct.

18    Q.   You were peppered with a number of questions by a bunch of

19    city councilors; is that correct?

20    A.   No, I was asked -- there were questions that were asked,

21    and we had an opportunity to respond to them.  I wouldn't term

22    it "peppered."

23    Q.   Peppered?  Sorry.  That's my mistake.

24         And the city council is the funding entity in the City of

25    Boston; is that correct?

1    A.    They have final approval on the budget, yes.

2    Q.    That is, if you want to submit a line-item request for an

3    assessment center, what you do is -- it goes in the

4    budget -- either the regular budget or a supplemental

5    budget -- and then it goes to the city council, and the city

6    council is the entity that ultimately determines whether to

7    fund that; is that correct?

8    A.    There are many other steps in the process.  Ultimately, it

9    ends up at the city council, but it has to go through the

10   financial office of city hall, the mayor has to sign off on it.

11   So there are -- there's a significant amount of conversation

12   that has to happen prior to the city council getting it.

13   Q.    And then the city council determines whether to fund that

14   line item or to reject the funding for that line item; is that

15   right?

16   A.    Ultimately, yes.

17   Q.    So during the entire time that you've been police

18   commissioner, did you ever put in a request for a line item for

19   an assessment center for the City of Boston for police sergeant

20   and give the city council, the funding entity in the city, the

21   opportunity to vote yes or no to such a request?

22   A.    I did not.

23   Q.    And as far as you know from the meeting that you had with

24   the city council, they would look favorably on the request to

25   have an assessment center; isn't that correct?

```
 1              MS. HARRIS:  Objection, your Honor.

 2              MR. CARROLL:  Objection, your Honor.

 3              THE COURT:  Sustained.

 4     BY MR. LICHTEN:

 5     Q.   All right.  Let me ask it this way:  The City of Boston is

 6     more than 50 percent minorities, isn't that correct?  The

 7     population of the City of Boston is more than 50 percent

 8     minority; is that correct?

 9     A.   That's correct.

10     Q.   And there are a large number of minority city councilors,

11     are there not?

12              MS. HARRIS:  Objection.

13     BY MR. LICHTEN:

14     Q.   Let me ask it this way:  You're aware that there are many

15     districts in which minorities are the majority population in

16     various districts throughout the City of Boston; is that right?

17     A.   Yes.

18     Q.   All right.  So you have no reason to believe that the city

19     council would react negatively to a request to fund an

20     assessment center that would have the possibility of getting

21     more minority supervisors promoted; isn't that right?

22              MR. CARROLL:  Objection, your Honor.  Speculation.

23              MS. HARRIS:  Objection.

24              THE COURT:  Sustained.

25              MR. LICHTEN:  Your Honor, with all fairness, they
```

1    asked a ton of questions about the fiscal problems and how

2    difficult it would be, so it seems to me they asked questions

3    like that.

4         THE COURT:  Well, I think the answer that he has not

5    submitted the proposal was sufficient for your purpose.

6         MR. LICHTEN:  Okay.

7    BY MR. LICHTEN:

8    Q.   Okay.  Let me move on to something else.  You were asked

9    questions about the fact that the detectives are not

10   supervisors, they're -- although they perform an important role

11   in the police department, they don't perform a supervisory

12   role; is that correct?

13   A.   Correct.

14   Q.   Yet you use a form of the assessment center in that

15   appointment process; is that right?

16   A.   People are referring to it as an "assessment center."  I

17   went through assessment center training and --

18   Q.   Let me withdraw the question.

19   A.   So I would say no.  The answer is no.

20   Q.   Whatever the process is that you use, that's a process

21   that you used for the detectives in a non-supervisory position;

22   is that correct?

23   A.   Correct.  They made a presentation.  Yes.

24   Q.   Right.  So wouldn't it be more important, not less

25   important, if you're trying to figure out a proper assessment

1   for police sergeants, who have to utilize supervisory abilities

2   to have an assessment component that can test for those skills,

3   which detectives may not need because they're not supervisors?

4           MS. HARRIS:  Objection.

5           THE COURT:  Overruled.

6           You may answer.

7           THE WITNESS:  I don't know that I understand the

8   question.  I --

9   BY MR. LICHTEN:

10  Q.   Let me break it down.  That's fine.

11      The main job of a sergeant is being a first-line

12  supervisor for the people under his or her command; is that

13  correct?

14  A.   Yes.

15  Q.   So to determine who the best sergeants are, you would want

16  a component that tests for that supervisory ability in some

17  way; is that right?

18  A.   Yes.

19  Q.   Okay.  For police detectives that need to test for

20  supervisory ability may not be there because they're not acting

21  as supervisors; is that correct?

22  A.   Correct.

23  Q.   Okay.  So if you're comparing detectives to sergeants, you

24  would want more of a test -- you would want a test more so for

25  police sergeants that tested for supervisory ability than a

1    test for detectives; is that right?

2    A.    Yes.

3    Q.    Now, you were asked some questions about the rank order.

4    I want to understand this.  I think what your testimony is that

5    you feel hampered by the law, by the Civil Service Commission,

6    by HRD, in that you generally do all your promoting in rank

7    order on the list except where someone has a significant

8    disciplinary problem.  Did I hear that correctly?

9    A.    Yes.

10   Q.    Okay.  And did I sense there was some frustration on your

11   part that you're hampered in that regard?

12   A.    No.

13   Q.    Okay.  But your practice is to go down the list and

14   hire -- promote in rank order unless there's something

15   significant in the person's history that would disqualify them?

16   A.    That's correct.

17   Q.    So you have -- even though you may have the 2 N + 1

18   discretion, you rarely exercise it; is that right?

19   A.    Yes.

20   Q.    So given that lack of discretion that you have, wouldn't

21   you want a police promotional exam system for sergeant that has

22   already factored in some of these components because you can't

23   exercise that discretion yourself?

24          MS. HARRIS:  Objection.

25          THE COURT:  Overruled.

1            You may answer it.

2            THE WITNESS:  Some of what components?

3    BY MR. LICHTEN:

4    Q.   Components that are choosing people who have not shown

5    themselves to be a problem in the past?

6            MS. HARRIS:  Objection.

7            THE COURT:  Sustained.

8            MS. HARRIS:  I just don't understand this.

9            THE COURT:  Sustained.

10   BY MR. LICHTEN:

11   Q.   Because -- let me ask it -- let me rephrase the question.

12       Because you have very little discretion even under the

13   2 N + 1 formula, wouldn't you prefer to have a promotional

14   system where the candidates that are given to you in rank order

15   have been judged to have the best knowledge, skills and

16   abilities to perform the duties of sergeant?

17           MS. HARRIS:  Objection.

18           THE COURT:  Overruled.

19           You may answer that.

20           THE WITNESS:  Yes.

21   BY MR. LICHTEN:

22   Q.   Okay.  Ms. Harris asked you some questions about going

23   forward.  Do I understand your testimony to be that you have

24   decided to seek a delegation agreement for a test?

25   A.   Yes.

1    Q.    For a police sergeant's test?

2    A.    Yes.

3    Q.    And have you appropriated money, or socked away money, for

4    that purpose?

5    A.    We have not.

6    Q.    And this is a test that would be given in 2011?

7    A.    We hope.

8    Q.    Okay.  So you testified earlier -- this may have been a

9    mistake -- that you give your test every two years.  It's

10   actually every three years, isn't it?

11   A.    That's correct.

12   Q.    Okay.  And you came into the department in December of

13   2006; is that correct?

14   A.    Yes.

15   Q.    And the exam that was first given after you came into the

16   department was given in October of 2008; is that correct?

17   A.    Correct.

18   Q.    So it was nearly two years after you came into office; is

19   that correct?

20   A.    Correct.

21   Q.    And the announcement for the exam came out in the spring

22   of '08; is that correct?

23   A.    Yes.

24   Q.    Okay.  So you were in office in December of 2006, but the

25   announcement for the exam for 2008 came out in March of 2008,

1    approximately a year and four months after you were in office;

2    is that correct?

3    A.    That's right.

4    Q.    And during that time, your testimony is that you never

5    made a request to have an assessment center or a multicomponent

6    exam; is that right?

7    A.    We discussed it but there was never a formal request made

8    to the mayor's office; that's correct.

9              MR. LICHTEN:  May I have just one moment, your Honor?

10             (Counsel confer off the record.)

11             MR. LICHTEN:  Thank you, your Honor.  Nothing else.

12             MS. HARRIS:  I have no questions, your Honor.

13             MR. CARROLL:  I just have one or two, your Honor.

14                       RECROSS-EXAMINATION

15   BY MR. CARROLL:

16   Q.    Commissioner, on, I believe, redirect, you were asked some

17   questions about your preference in regarding what you would do,

18   I gather, in an ideal world.  But the world we live in, the

19   police chiefs in Massachusetts are required to follow the Mass.

20   general laws in making promotional appointments; is that

21   correct?

22   A.    That's correct.

23   Q.    And those laws require that appointments be made off the

24   certified list, correct?

25   A.    Correct.

1    Q.   And the certified list is formulated under the 2 N + 1

2    rule?

3    A.   That's correct.

4    Q.   And the training and educational requirements are

5    established by the state?

6    A.   Yes, sir.

7    Q.   So it's not really a situation where this is an ideal

8    world, it's a situation where the police departments in the

9    Commonwealth operate under the laws of the Commonwealth of

10   Massachusetts, and the chiefs are required to obey those in

11   making appointments, correct, sir?

12   A.   Correct.

13            MR. CARROLL:  No further questions.

14            Thank you, your Honor.

15            Thank you, Commissioner.

16            MR. LEAHEY:  Very briefly, your Honor.

17                          RECROSS-EXAMINATION

18   BY MR. LEAHEY:

19   Q.   Commissioner Davis, you were asked questions by counsel

20   for Lawrence regarding collective bargaining and what happened

21   with assessment centers in Lowell in the 1990s.  Is it your

22   testimony that originally the assessment centers for deputy

23   superintendent, lieutenant and captain were bargained between

24   the city and the union?

25   A.   Yes.

1    Q.   And are you familiar with the process of how a collective

2    bargaining agreement is ratified?

3            MR. LICHTEN:  Objection.  Well beyond the scope.

4            THE COURT:  Overruled.

5            You may have it.

6            THE WITNESS:  Yes.

7    BY MR. LEAHEY:

8    Q.   And how is a collective bargaining agreement ratified?

9    A.   By a vote of membership.

10   Q.   Of the union?

11   A.   Correct.

12   Q.   And then it's signed by the union and the city?

13   A.   Correct.

14   Q.   Okay.  And was that same process followed with regard to

15   removing the assessment center with respect to deputy

16   superintendent, captain and lieutenant?

17   A.   I don't know.  I wasn't there when it was removed.

18   Q.   I'm showing you a copy of a Memorandum of Agreement

19   between the City of Lowell and the Lowell Police Superior

20   Officers Association.  Directing your attention to the first

21   paragraph -- and this is for the effective date of July 1,

22   2000, and expiring June 30, 2003 -- where it says, "The

23   cognitive testing procedure utilized by the Massachusetts

24   Department of Personnel Administration shall replace the

25   current assessment center test to establish a list of eligible

1    candidates to promotion to the rank of lieutenant, captain and

2    deputy superintendent." Do you see that?

3    A.    I do.

4    Q.    After seeing that, is it still your testimony that the

5    removal of the assessment center for deputy superintendent,

6    captain and lieutenant occurred after you left?

7    A.    It apparently it did not; it occurred while I was still

8    there.

9    Q.    And for it to be in a collective bargaining agreement,

10   again, that would have to be ratified by the union?

11   A.    Correct.

12   Q.    Thank you.

13            MR. LICHTEN:  I would ask that that document go in

14   too, for the record.

15            THE COURT:  Okay.  All right.

16            MR. LEAHEY:  I only have one copy with a yellow

17   highlight.  I could take care of it --

18            THE COURT:  That's fine.  It should be admitted.

19            Okay.  No other questions?  All right.

20            MS. ENGDAHL:  None from Worcester.

21            MR. McDERMOTT:  No questions.

22            MR. McQUILLAN:  No questions.

23            THE COURT:  All right.  Commissioner, you're excused.

24            THE WITNESS:  Thank you, your Honor.  I appreciate it.

25            THE COURT:  Okay.  We'll take the recess.

1          THE CLERK:  All rise.  The Court will take the morning

2     recess.

3          (The Court exits the courtroom and there is a recess

4     in the proceedings at 11:17 a.m.).

5          (After recess, start at 11:39 a.m.)

6          (Exhibit 133 received into evidence.)

7          THE COURT:  Mr. Churchill.

8          MR. CHURCHILL:  Your Honor, the plaintiffs call Robert

9     Alvarez.

10         ROBERT E. ALVAREZ, having been duly sworn by the

11    Clerk, was examined and testified as follows:

12         THE CLERK:  Please be seated.  State your name, spell

13    your last name for the record, keep your voice up, and speak

14    into the mic.

15         THE WITNESS:  My name is Robert E. Alvarez,

16    A-l-v-a-r-e-z.

17                         DIRECT EXAMINATION

18    BY MR. CHURCHILL:

19    Q.   Good morning, Mr. Alvarez.

20    A.   Good morning.

21    Q.   Are you currently employed?

22    A.   Yes, I am.

23    Q.   Where are you employed?

24    A.   The City of Lowell Police Department.

25    Q.   And what is your position with the City of Lowell Police

1   Department?

2   A.    I'm a patrolman.

3   Q.    And you're a plaintiff in this case; is that correct?

4   A.    Yes, I am.

5   Q.    And what is your race?

6          MR. LEAHEY:  Objection, your Honor.  Basis of

7   knowledge.

8          THE COURT:  Overruled.

9   A.    Hispanic.

10  Q.    Can you describe your educational background starting with

11  high school?

12  A.    I graduated from Chelmsford High School.  I attended

13  Middlesex Community College.  I graduated from there.  I

14  graduated from University of Lowell, bachelor's degree.  And I

15  received my master's degree from Anna Maria College.

16  Q.    And have you also served in the military?

17  A.    Yes.  I was a platoon sergeant in the Marine Corps.

18  Q.    How long did you serve in the military?

19  A.    Six years.

20  Q.    And as a platoon sergeant did you have supervisory

21  responsibilities?

22  A.    Yes.  I supervised and trained 40 Marines in a state

23  platoon, surveillance and target acquisition.  That's also

24  without a platoon commander, which is usually filled by a

25  lieutenant.  I filled that spot.

1          THE COURT:  Officer Alvarez, will you move the

2    microphone a little closer to you so it will pick up your voice

3    better?

4    BY MR. CHURCHILL:

5    Q.   Also, if you speak a little more slowly, we can better

6    understand.

7    A.   Slowly.

8    Q.   So I'm going to get back to that in a minute.

9          Have you applied for promotion to sergeant position

10   since working in the City of Lowell?

11         MR. LEAHEY:  Objection, your Honor.

12         THE COURT:  Overruled.

13         MR. LEAHEY:  Your Honor, I would object to the form of

14   the question, in that he can say he applied for a sergeant

15   promotion test but he did not apply for promotion to sergeant

16   in Lowell.  He has to take the test before he can be eligible

17   for promotion.

18         THE COURT:  Overruled.

19   A.   I've taken the sergeant's exam.

20   Q.   Okay.  On how many occasions have you taken the sergeant's

21   exam?

22   A.   Five.

23   Q.   And have you passed that exam?

24   A.   Yes, each time.

25   Q.   When did you most recently take the sergeant's exam?

1    A.    2009.

2    Q.    And when most recently before then had you taken it?

3    A.    2006.

4    Q.    Okay.  And when before then?

5    A.    2003.

6    Q.    Okay.  And you passed on each of those occasions?

7    A.    Yes.

8    Q.    And as part of the exam process are you required to

9    complete a form relating to your education and experience?

10   A.    Yes.

11   Q.    All right.  So going back to your experience as a platoon

12   sergeant in the Marines, is that experience reflected in any

13   way on the education and experience form that you complete?

14   A.    No.

15   Q.    Do you have any other supervisory experience?

16   A.    I had worked for American International Security

17   Corporation.  I was a supervisor of approximately 100

18   personnel.  And I was a detail leader for executive protection

19   of General Schwarzkopf and Prime Minister Benjamin Netanyahu.

20   Q.    And in those latter assignments did you supervise

21   personnel?

22   A.    I did.

23   Q.    How many?

24   A.    During a detail between 15 and eight.  When I was

25   supervising a facility, probably 50 at one time.

1    Q.    And when were these supervisory experiences?

2    A.    '96 and '97.

3    Q.    All right.  And then going back again to the education and

4    experience form that you complete as part of the sergeant exam,

5    are those supervisory experiences ones that you get any credit

6    for?

7    A.    No.

8    Q.    All right.  I'm showing you a document.  I'm putting the

9    document up on the screen here.  Do you recognize this

10   document?

11   A.    Yes, I see it.

12   Q.    And is this a document you prepared?

13   A.    Yes.

14   Q.    And what does it show?  You don't have to read everything,

15   but what does it show?

16   A.    Training, my training and experience.

17   Q.    And this is training and experience from what period of

18   time to what period of time?

19   A.    1979 to 2006.

20   Q.    All right.  And with respect to the education and

21   experience form that you complete as part of the sergeant's

22   exam, do you receive credit for any of the training reflected

23   on this document?

24   A.    No, I do not.

25            MR. CHURCHILL:  Your Honor.  I'd offer this as an

1    exhibit.

2              THE COURT:  Okay.

3              MR. LEAHEY:  No objection, your Honor.

4              THE COURT:  No objection, fine.  Will it be the

5    next --

6              MR. CHURCHILL:  This will be 134 for the plaintiffs.

7              MR. LEAHEY:  Your Honor, I think it's 135.  I think

8    what we had discussed --

9              THE CLERK:  You're right.  It's 135.  135.

10             (Exhibit 135 received into evidence.)

11             THE COURT:  Okay.

12   BY MR. CHURCHILL:

13   Q.   All right.  Just to back up a minute, Officer Alvarez.

14   When did you first start working in law enforcement?

15   A.   1987.

16   Q.   And where did you work at that time?

17   A.   The Groton Police Department.

18   Q.   How long did you work for the Groton Police Department?

19   A.   Four years.

20   Q.   So from '87 until what year?

21   A.   '91.

22   Q.   And where did you go at that point?

23   A.   I transferred to the Waltham Police Department.

24   Q.   And how long did you work for the Waltham Police

25   Department?

1    A.    Three years.

2    Q.    All right.  Until 1994?

3    A.    Yes.  And then I transferred to Lowell Police Department.

4    Q.    And you've worked at the Lowell Police Department

5    consistently from 1994 up until the present?

6    A.    Yes.

7    Q.    Officer Alvarez, are you familiar with the duties of a

8    sergeant in Lowell?

9    A.    Yes.

10   Q.    Police sergeant?  And can you describe what those duties

11   are?

12   A.    Assign -- issue assignments to personnel, supervise them

13   on the street, supervisor is the -- supervises all sudden

14   deaths and all use of force incidents, homicides and critical

15   incidents.

16   Q.    How many sergeants are there in the City of Lowell?  How

17   many police sergeants?

18   A.    I believe there's 30.

19   Q.    And of those 30 police Sergeants how many are minorities?

20   A.    Two.

21   Q.    Okay.  And who are those two?

22   A.    Angel Otero and Jose Torres, who's been out injured for

23   the last four years.

24   Q.    All right.  And when was Angel Otero appointed to a

25   sergeant position?

```
 1            MR. LEAHEY:  Objection, your Honor.
 2            THE COURT:  Overruled.  If you know.
 3   A.   2007.
 4   Q.   All right.  And with respect to Jose Torres, when was he
 5   appointed to a sergeant position?
 6   A.   October 2003.
 7   Q.   Prior to 2003 had there ever been a minority police
 8   sergeant in Lowell during the time you worked there?
 9   A.   No, there was never.
10   Q.   How many police officers are there in the City of Lowell,
11   approximately?
12   A.   The compliment right now is probably between 230, 250.
13   Q.   And approximately how many of those police officers are
14   minority?  Approximately how many of those police officers are
15   minorities?
16   A.   Approximately 30.
17   Q.   All right.  You indicated before, Mr. Alvarez, that your
18   race is Hispanic; is that right?
19   A.   Yes.
20   Q.   And why do you say that?
21   A.   My father was Spanish.
22            MR. LEAHEY:  Objection, your Honor.  As offer of
23   proof, Mr. Alvarez has never spoken to his father, never met
24   his father.
25            THE COURT:  Overruled.
```

1          MR. LEAHEY:  Your Honor, I would just say that under

2    federal Rule 804 that he has to show -- if he's going to do any

3    information regarding his heritage, he has to show that the

4    declarant is unavailable, but it has to be first layer of

5    hearsay.  I don't believe he can testify to anything his father

6    has ever said or his father's pedigree.  What he can say or

7    what he's done previously in another court which was admitted

8    as state of mind evidence is that he only knows about his

9    father from either his brother or his mother, neither of whom

10   are available to testify.  And the city would object to this as

11   hearsay, your Honor.

12          MR. CHURCHILL:  And, your Honor, I don't think I've

13   ever had cause to invoke this provision before, but there's an

14   exception in 803 for information about family history,

15   reputation as to family history, and I think this falls

16   squarely within that exception.

17          THE COURT:  I agree.

18   BY MR. CHURCHILL:

19   Q.   Did you come to learn what languages your father spoke?

20   A.   Yes.

21   Q.   What languages did he speak?

22   A.   He spoke Spanish and English.

23          MR. CHURCHILL:  I have no further questions at this

24   time, your Honor.

25          MR. LEAHEY:  Your Honor, with respect to what his

1  father had said, I don't believe it's in 803.  I believe it's

2  in 804, and the declarant has to be declared unavailable, and I

3  would just note that on the record.

4           THE COURT:  Okay.

5           MR. LEAHEY:  For the record, Brian Leahey for the City

6  of Lowell.

7                        CROSS-EXAMINATION

8  BY MR. LEAHEY:

9  Q.    Good morning, Officer Alvarez.

10 A.    Good morning.

11 Q.    With respect to Jose -- you know Sergeant Jose Torres,

12 correct?

13 A.    Yes, I do.

14 Q.    And he speaks Spanish fluently?

15 A.    Yes.

16 Q.    He's bilingual?

17 A.    Yes.

18 Q.    You also known Sergeant Angel Otero, correct?

19 A.    Yes.

20 Q.    He speaks Spanish?

21 A.    Yes.

22 Q.    He speaks Spanish fluently?

23 A.    Yes.

24 Q.    You say that Angel Otero was appointed to police sergeant

25 in 2007, correct?

```
1    A.   I believe that's the date.  I'm not --

2    Q.   Are you aware that that relates to a bypass of Angel Otero

3    of 1998?

4    A.   Yes.

5    Q.   Where the city had tried to bypass him due to a

6    disciplinary reason but he appealed to Civil Series and he was

7    ordered reinstated?

8    A.   That's correct.

9    Q.   Excuse me, ordered promoted.

10   A.   He wasn't reinstated.  He was promoted, yes.

11   Q.   Are you aware since you've been employed by the City of

12   Lowell that several sergeants, while you've been employed by

13   the City of Lowell, are Portuguese?

14   A.   Several sergeants?  I'm not aware of them.

15   Q.   Do you know Sean Santos?

16   A.   Yes.

17   Q.   Do you know whether or not he's Portuguese?

18   A.   I don't know.

19   Q.   Do you know -- did you know sergeant Duarte, who retired

20   approximately two years ago?

21   A.   Yes, I knew him.

22   Q.   Do you know whether or not he was Portuguese?

23   A.   No, I didn't.

24   Q.   Did you know sergeant George Santos?

25   A.   Yes.
```

1    Q.    Do you know whether or not he was Portuguese?

2    A.    No, I don't.

3    Q.    Do you know a former employee of the City of Lowell whose

4    last job was deputy superintendent, Robert DeMoura?

5    A.    Yes.

6    Q.    Do you know whether or not he was Portuguese?

7    A.    I believe from previous testimony that he is Portuguese,

8    yes.

9    Q.    And fair to say that you do not speak Spanish, correct?

10   A.    That's correct.

11   Q.    In fact, you have never spoken Spanish other than taking a

12   class or two in either high school or college, correct?

13   A.    That's correct.

14   Q.    And you were not raised in a home where Spanish was the

15   primary language, correct?

16   A.    Yes, that's correct.

17   Q.    Do you know whether or not HRD has a definition for

18   Hispanic?

19   A.    No.

20   Q.    Do you know whether or not HRD has a specific definition

21   for what classifies as a veteran?

22   A.    I'm familiar with it, yes.

23   Q.    Because you tried -- even though you had served six years

24   in the military, you tried to get veteran status from HRD, and

25   they did not allow that, correct?

1  A.   Right.  I thought there was a change in it, and I thought
2  I may -- I may apply, but I did not.
3  Q.   Right.  So even though you were a veteran and that you
4  served, you were not deemed to be a veteran by HRD under their
5  definition, correct?
6  A.   That's correct, yes.
7       MR. LEAHEY:  Your Honor, I have one question.  I have
8  a birth certificate of Officer Alvarez.  I have not redacted
9  the date of birth.  I certainly can.  My thought was it's, you
10  know, a birth certificate so I didn't know -- I certainly can
11  redact it.  I would just ask whether or not I should.
12       THE COURT:  Well, yes, you should.
13       I mean, we can take an unredacted under seal, but if
14  there's one in the public record, it would have to be redacted.
15       MR. LEAHEY:  It's the only other record -- all the
16  other records I have, dates of birth, Social Security Numbers
17  have been redacted.  On this one I had not done that, but I
18  just did.
19  BY MR. LEAHEY:
20  Q.   Officer Alvarez, I'm placing before you a document.  Do
21  you recognize what this document is?
22  A.   Yes, it's my birth certificate.
23  Q.   And this is a copy of your birth certificate that you
24  submitted when you applied to the Groton Police Department, the
25  Waltham Police Department, and the Lowell Police Department?

1    A.    Yes, it's the same.

2    Q.    And this document shows that your father was -- place of

3    birth was Manila, Philippines?

4    A.    Yes.

5          MR. LEAHEY:  Your Honor, I don't know if there's an

6    objection to this or whether or not I can introduce it into

7    evidence.

8          THE COURT:  Mr. Churchill?

9          MR. CHURCHILL:  No objection.

10         MR. LEAHEY:  No objection or objection?

11         THE COURT:  No objection.

12         (Exhibit 136 received into evidence.)

13   BY MR. LEAHEY:

14   Q.    And you're aware of -- you said your father spoke Spanish.

15   You're aware your father was from the Philippines; is that

16   correct?

17   A.    Yes, he was born in the Philippines.

18   Q.    And that at your deposition you testified that your

19   father -- excuse me -- that your father's family was from the

20   Philippines; is that correct?

21   A.    Yes.

22   Q.    Again, you have never -- you never met your father,

23   correct?

24   A.    That's correct, I never met him.

25   Q.    Never spoke to your father, correct?

1    A.    Never met him, never spoke to him.

2    Q.    Do you have any photographs of your father?

3    A.    There's one photograph, my half-brothers and sisters gave

4    me his passport.

5    Q.    And do you recall at your deposition that your attorney

6    asked to get a copy of that, Ms. Barrault was representing you,

7    asked to get a copy of that passport?

8    A.    You have a copy.

9    Q.    I have a poor copy of it.  I'm asking for -- I think your

10   attorney asked for an actual copy of the passport?

11   A.    My attorney?

12   Q.    Yes.

13          MR. CHURCHILL:  Objection.  I'm not sure what the

14   question is.

15          THE COURT:  Well, I'm not sure there's a pending

16   question.  It's been answered.

17   BY MR. LEAHEY:

18   Q.    Directing your attention to your deposition, do you

19   recall -- going down to -- on page 127, line 14,

20   cross-examination by Ms. Barrault.  Do you see that?

21   A.    Yes.

22   Q.    And she was your attorney who represented you?

23   A.    Yes, that's correct.

24   Q.    Do you remember the question:  "Do you have that passport

25   of your father?"

```
 1          And your answer was:  "I don't know.  You got a copy
 2    of" --
 3    A.   "I don't know.  You got a copy"...
 4    Q.   And the question:  "It's a poor quality.  If you have it,
 5    could I get a better quality because it's hard to see the
 6    picture."
 7          Do you see that question?
 8    A.   Yes.  And I responded:  "All right."
 9    Q.   My question is:  Did you give your attorney a better copy
10    of that photograph?
11    A.   No, I did not.
12    Q.   Fair to say in that photograph of your father that he
13    looks Filipino?
14    A.   He looks Hispanic.
15    Q.   So he doesn't look Filipino in that photograph?
16    A.   He looks Filipino also.
17    Q.   Can you produce that photograph?
18    A.   At this moment, no.
19    Q.   Could you produce that photograph?
20    A.   I believe I could.
21          MR. CHURCHILL:  Objection, your Honor.  I'm not sure
22    what -- if he can or can't, how it matters at this point.
23          THE COURT:  No, the answer may stand.  The question
24    and answer.
25    BY MR. LEAHEY:
```

1  Q.    I believe you testified that your family is from a large

2  Spanish population in the Philippines that are fairly affluent

3  which would be similar to the whites of South Africa.  Do you

4  recall testifying to that?

5  A.    Yes.

6  Q.    So your family from the Philippines is an affluent family?

7  A.    Yes.

8  Q.    And outside of -- strike that.

9         You're aware that most of the people in the

10  Philippines who have Spanish surnames are not, in fact,

11  Spanish, are you aware of that?

12         MR. CHURCHILL:  Objection.

13         THE COURT:  Sustained.

14  A.    No, I'm not sure of that.

15         THE COURT:  The objection was sustained.

16         THE WITNESS:  I'm sorry.  I got to pay attention.

17  BY MR. MORRIS:

18  Q.    Didn't you do some genealogy into your family?

19  A.    Yes.

20  Q.    Did that genealogy include looking into Spanish surnames

21  of persons in the Philippines to locate your family?

22  A.    No.

23  Q.    And you testified that -- is it true that you grew up in

24  Somerville until the age of 12?

25  A.    Yes.

1   Q.   And then you lived in Billerica for approximately a year?

2   A.   Yes.

3   Q.   And then you attended Chelmsford High School?

4   A.   Yes.

5   Q.   Attended Chelmsford High School all four years?

6   A.   Yes.

7   Q.   At some point have you gone by a name other than Robert

8   Alvarez?

9   A.   I've always gone by Robert Alvarez.

10  Q.   Have you also gone by the name Robert Ilvarek?

11  A.   My nickname was Ilvarek.

12  Q.   Fair to say you introduced yourself to people as Robert

13  Ilvarek?

14  A.   Oh, I'd introduce myself as Robert Alvarez.  As they knew

15  me, Ilvarek would at some point be introduced.

16  Q.   At some point you worked at St. John's Hospital as a

17  security guard in the early 1980s?

18  A.   Yes.

19  Q.   You worked with Kenneth Levallee?

20  A.   Yes.

21  Q.   And he's currently the superintendant of police in Lowell?

22  A.   Yes.

23  Q.   Did you also work with Deputy Superintendent Arthur Ryan

24  at St. John's Hospital?

25  A.   Yes, I did.

```
1    Q.    Did you introduce yourself as Robert Ilvarek?

2    A.    I introduced myself as Robert Alvarez.  As I became

3    acquainted with them, I introduced my nickname from the Marine

4    Corps, Ilvarek.

5    Q.    So it's your testimony --

6              THE COURT:  Could we, for the record, have the

7    spelling of that?

8              MR. LEAHEY:  I think -- well, it's come down as

9    I-l-v-a-r-e-k.

10             THE WITNESS:  It's a Norwegian pronunciation of

11   Alvarez.

12             THE COURT:  As you've used it, is that the spelling

13   that you would use?  It's never written --

14             MR. LEAHEY:  It's spelled the same --

15             THE WITNESS:  It's spelled I-l-v-e-r-a-k.

16             THE COURT:  All right.  I just want the record to have

17   a word that we can use, that's all.

18             MR. LEAHEY:  I can just tell you in other forms it's

19   come up as I-l-v-a-r-e-k.

20             THE COURT:  I think that's the one we have.

21             Okay.  Go ahead.

22   BY MR. LEAHEY:

23   Q.   And it's your testimony that you introduced yourself to

24   them as a nickname and not as the correct pronunciation of that

25   as your name; is that correct?
```

1    A.    Correct.  I was hired as Robert Alvarez.  I had to fill

2    out an application, I used my name, Robert Alvarez.

3    Q.    Right.  My question to you is:  When you spoke to Levallee

4    and Ryan, you told them that Ilvarek was your nickname; is that

5    fair to say?

6    A.    Yes.

7    Q.    When you applied for your position in Groton, had you

8    taken a Civil Service examination?

9    A.    Yes, I had.

10   Q.    Did you list yourself on that Civil Service examination as

11   Hispanic?

12   A.    Yes, I did.

13   Q.    Placing in front of you what was Exhibit 6 at your

14   deposition, I ask you to look at that.  Do you see -- I'm going

15   to cross out your address.

16         Do you see your name on that list?

17   A.    Yes.

18   Q.    Do you see an "H" on that list?

19   A.    Yes, I do.

20   Q.    Do you know what that "H" stands for?

21   A.    I would presume Hispanic.

22         MR. CHURCHILL:  Your Honor, can we mark that as an

23   exhibit?

24         MR. LEAHEY:  Sure.

25         THE COURT:  What is it?

```
 1              MR. LEAHEY:  I think this is -- description of what it
 2      is?
 3              THE COURT:  Yes.
 4              MR. LEAHEY:  This is a Civil Service document from the
 5      Town of Groton dated January 15, 1987.  And I do have copies of
 6      all this I can give to the court reporter when I'm done.
 7              THE CLERK:  We'll mark this 137.
 8              (Exhibit 137 received into evidence.)
 9      BY MR. LEAHEY:
10      Q.   And you testified that you had gone to Middlesex Community
11      College; is that correct?
12      A.   Yes.
13      Q.   And did you get an associate's degree in liberal arts
14      there?
15      A.   Yes, I did.
16      Q.   And did you also attend University of Lowell?
17      A.   Yes, I did.
18      Q.   Did you get a bachelor's degree in sociology?
19      A.   That's correct.
20      Q.   And that you went to Anna Maria College?
21      A.   Yes.
22      Q.   Did you get a master's in criminal justice?
23      A.   Yes, I did.
24      Q.   Was that in 1993?
25      A.   Yes.
```

```
 1    Q.   And do you know what the Quinn Bill is?
 2    A.   Yes, I do.
 3    Q.   The Quinn Bill compensates police officers for attaining
 4    post high school degrees?
 5    A.   Correct.
 6    Q.   And you have -- do you know whether or not you have the
 7    highest degree that is awarded compensation under the Quinn
 8    Bill?
 9    A.   I believe -- a doctorate -- you can get credit for a
10    doctorate.
11    Q.   You get 25 percent increase in salary based on having your
12    master's degree in criminal justice?
13    A.   Yes, that's correct.
14    Q.   Is 25 percent the highest an individual can get under the
15    Quinn Bill?
16    A.   I'm getting 25, I don't know if there's a higher --
17    Q.   If I told you there were rates of 10 percent, 20 percent,
18    and 25 percent, would that sound familiar?
19              MR. CHURCHILL:  Objection as to relevance.
20              THE COURT:  Overruled.  You may answer it.
21    A.   Yes.
22    Q.   Now, you had to file an application when you transferred
23    from Waltham to the City of Lowell, correct?
24    A.   Yes.
25    Q.   Placing in front of you -- or on the Elmo, placing in
```

1   front on the Elmo a copy of -- have you seen this record?

2   A.    Yes.

3   Q.    Do you recognize it?

4   A.    Yes.

5   Q.    Is this a copy of your fingerprint application that you

6   submitted as part of being processed into the Lowell Police

7   Department?

8   A.    That's correct.

9   Q.    And this is a form that you filled out yourself?

10  A.    Yes, I did.

11  Q.    Directing your attention -- directing your attention to --

12  where it says "sex," you put "male," correct?

13  A.    Yes.

14  Q.    And for race, do you see that?

15  A.    Yes.

16  Q.    Did you put a "W" there?

17  A.    Yes.

18  Q.    Is that for white?

19  A.    Yes, it is.

20  Q.    Fair to say that your race is white?

21  A.    In order to process this card, yes, it has to be white.

22  Q.    You're saying -- why didn't you put Hispanic on this form?

23  A.    Because in order to process an AFIS card, the computer

24  only takes black or white.

25  Q.    And you see the date on this is February 17, 1994.  Do you

1    see that?

2    A.    Yes.

3    Q.    So this is -- that's the date that you filled this out?

4    A.    Yes.

5    Q.    And it's your testimony that you had to put white there

6    because this form did not recognize Hispanic?

7    A.    That's correct.

8            MR. LEAHEY:  Your Honor, I'd move this into evidence

9    as the next exhibit.

10            MR. CHURCHILL:  No objection, your Honor.

11            THE COURT:  Okay.

12            THE CLERK:  It will be 138.

13            (Exhibit 138 received into evidence.)

14            MR. CHURCHILL:  Your Honor, I don't know if the

15    redaction rules apply to fingerprints.

16            THE COURT:  I don't think they do.

17            MR. LEAHEY:  I'm sorry?

18            THE COURT:  The redaction rules do not bar the

19    introduction of fingerprints as far as I know.

20            MR. LEAHEY:  But I did redact address and date of

21    birth on that information, your Honor.

22    BY MR. LEAHEY:

23    Q.    Officer Alvarez, placing in front of you a document, I ask

24    you to take a look at this document, and I'll represent to you

25    that this document is from Officer Jose Torres' personnel file

1    at the City of Lowell, and that he filed it on February 9,

2    1994.  I'd ask to direct your attention to where it says

3    "race."  Do you see that?

4    A.    Yes.

5    Q.    Do you see Officer Torres wrote "HSP"?

6    A.    Yes.

7    Q.    He did not put a "B" or "W" there, did he?

8    A.    No, he did not.

9    Q.    And that Officer -- there's not two officer Torreses in

10   the City of Lowell Police Department, are there?

11   A.    No.

12   Q.    Showing you another document that, again, I will represent

13   to you is from the personnel file of Angel Otero, Jr., that was

14   filed February 8, 1994.  Again, I'll direct your attention to

15   where it says "race."  Do you see that?

16   A.    Yes, I do.

17   Q.    Do you see that he wrote "Hisp"?

18   A.    Yes.

19   Q.    And he did not put "B" or "W" there, did he?

20   A.    No, he put "Hisp."

21   Q.    And that Angel Otero, Jr., that's the other sergeant from

22   the Lowell Police Department aside from Officer Torres?

23   A.    Yes.

24   Q.    Officer Alvarez, going back to your birth certificate, do

25   you see where it lists the race of your father?

1    A.    Yes.

2    Q.    Do you see it says "white"?

3    A.    Yes, that's correct.

4    Q.    And it also lists the race of your mother?

5    A.    Yes, white.

6    Q.    That also says "white."

7          Officer Alvarez, when you were with the Waltham Police

8    Department, you filled out a similar form when you were going

9    through Waltham; is that correct?

10   A.    Fingerprint card?

11   Q.    Yes.

12   A.    Yes.

13   Q.    Placing this in front of you.  Do you recognize this

14   document?

15   A.    Yes.

16   Q.    Do you recognize this document to be your fingerprint

17   application from the Waltham Police Department?

18   A.    Yes.

19   Q.    Do you see it lists your sex there as male?

20   A.    Yes.

21   Q.    And you see it lists your race?  You see that?

22   A.    Yes.

23   Q.    You list "W" there?

24   A.    Yes.

25   Q.    And what's for white?

1    A.    That's correct.

2    Q.    And this was filed --

3    A.    '91.

4    Q.    In 1991; is that correct?

5    A.    Yes.

6    Q.    And you also filled out a similar form in Groton, correct?

7    A.    Yes.

8          MR. LEAHEY:  Your Honor, with respect to the Waltham

9    one, the city would move to introduce that exhibit into

10   evidence.

11         MR. CHURCHILL:  No objection.

12         THE COURT:  Okay.

13         THE CLERK:  139.

14         (Exhibit 139 received into evidence.)

15   BY MR. LEAHEY:

16   Q.    Officer Alvarez, do you recognize this document?

17   A.    Yes.

18   Q.    Do you recognize this as your fingerprint application to

19   the Groton Police Department?

20   A.    Yes.

21   Q.    And do you see where it says "sex" it says "male"?

22   A.    Yes.

23   Q.    And then you see "race," correct?

24   A.    Correct.

25   Q.    And that is not filled out, is it?

1    A.    No, it is not.

2    Q.    And this is when you were hired off the list that said you

3    were Hispanic?

4    A.    Yes.

5    Q.    Why didn't you fill out that form?

6    A.    I don't fill it out.

7    Q.    You did not fill out this form?

8    A.    No.  John Sabold filled it out.

9    Q.    Did you say anything as to why the race was left blank?

10   Did you have any discussion as to why that is left blank?

11   A.    There was no discussion at all.

12        MR. LEAHEY:  Your Honor, the city would -- or Lowell

13   would move to introduce this into evidence.

14        THE COURT:  All right.

15        THE CLERK:  140.

16        (Exhibit 140 received into evidence.)

17   BY MR. LEAHEY:

18   Q.    Now, as part of your training in Lowell, fair to say that

19   you have received -- well, in your training in both Groton,

20   Waltham, and Lowell that you received specialized police

21   training?

22   A.    Yes.

23   Q.    And that includes NMLEC SWAT activities?

24   A.    Yes.  I failed to testify to that earlier.

25   Q.    And also NMLEC motorcycle responsibilities?

1    A.    Yes.

2    Q.    And from October 2004 until the time you were taking the

3    test you were on the NMLEC motorcycle unit?

4    A.    Yes.

5    Q.    And that required monthly training?

6    A.    Yes.

7    Q.    And that was approximately between eight to 12 hours a

8    month in monthly training?

9    A.    Yes.

10   Q.    And that fair to say that when you were training on the

11   motorcycle unit that you were not performing your duties as a

12   patrol officer on the streets of Lowell; is that correct?

13   A.    That's correct.

14   Q.    You testified earlier on direct that you had taken several

15   promotional examinations from HRD, correct?

16   A.    Yes.

17   Q.    And before that you had actually taken several entry-level

18   examinations from HRD, correct?

19   A.    Yes.

20   Q.    I place in front of you a record from -- and I will

21   represent from HRD that was produced as part of a 2002

22   lawsuit -- and ask you if you recognize this document?

23   A.    Yes.

24   Q.    Do you recognize this document that pertains to your

25   original examination that you -- the HRD test that you took in

1   October -- excuse me, in March of 1986?

2   A.   Yes.

3   Q.   And this records the score that you got on the HRD

4   entry-level police officers examination?

5   A.   Yes.

6   Q.   And that you scored a 91 on that examination?

7   A.   Yes.

8   Q.   And also directing your attention to the bottom of the

9   page, do you see where it says, "not a vet, not a war-time

10  service"?  Do you see that?

11  A.   That's correct.

12  Q.   Is that referring to what you testified earlier of you

13  tried to get classification as a veteran and that was not

14  allowed?

15  A.   Right.

16  Q.   Turning to the next line over, to says, "June 2, 1987

17  ethnic ID change per LGLC."  Do you see that?

18  A.   Yes, I do.

19  Q.   I believe you've testified previously that you don't know

20  why that's there?

21  A.   That's correct.

22  Q.   You have no idea how that information got contained on

23  this form from HRD, correct?

24  A.   That's correct.

25  Q.   And you're aware on this form it lists your race as white?

1    A.    Yes, this form, yes.

2    Q.    Okay.  And the date here, June 2, 1987, that's

3    approximately one month after you started work with the Groton

4    Police Department?

5    A.    That's correct.

6    Q.    Placing in front of you a second document I will also

7    represent is an HRD document that was produced as part of a

8    prior lawsuit.  Do you see this document?

9    A.    Yes, I do.

10   Q.    Do you recognize this document?

11   A.    Yes.

12   Q.    This document reflects an open competitive entry exam that

13   you took in March of 1988, correct?

14   A.    Yes.

15   Q.    And on this entry-level exam you scored a 97; is that

16   correct?

17   A.    Yes.

18   Q.    And this examination that you took, that was an HRD

19   multiple choice job knowledge test, correct?

20   A.    Job knowledge?  I thought this was an entry exam.

21   Q.    Right.  It was -- well, was that test similar in format as

22   to the promotional tests that you have taken?

23        MR. CHURCHILL:  Objection.

24        THE COURT:  Overruled.

25   A.    Similar to the promotional exam?

1    Q.    Yeah, the 2006 promotional exam.  Similar in that it was

2    80 questions, multiple choice, that asked you a series of

3    questions.

4    A.    I don't believe that they are the same.

5    Q.    My question to you is:  The 1988 examination, was that an

6    80-question multiple choice test?

7    A.    I thought it was a hundred multiple choice, yes.

8    Q.    But it was multiple -- putting aside the number of

9    questions, was it similar in format to a police sergeant's in

10   that it only was a multiple choice examination?

11   A.    In format, yes.

12   Q.    Okay.  And that's similar to the 1986 test that you scored

13   a 91 on, correct?

14   A.    Yes, format, yes.

15   Q.    Okay.  And on this document it lists your race as white,

16   correct?

17   A.    Yes.

18   Q.    Again, placing another document in front of you, this is,

19   again, another open competitive examination.  This is from

20   October of 1999, correct?

21   A.    Yes.

22   Q.    And you've seen this document before, correct?

23   A.    Yes.

24   Q.    Okay.  And on this entry-level test you scored a 97,

25   correct?

1    A.    Yes.

2    Q.    And on this your race is listed as Hispanic, correct?

3    A.    Correct.

4          MR. CHURCHILL:  Your Honor, I think he said 1999.  I

5    just want the record to reflect the correct date on the form.

6          THE COURT:  Which was?

7          MR. CHURCHILL:  It was, I think, 1990.

8          MR. LEAHEY:  It's 1990.  If I said it or Mr. Alvarez

9    said -- it was 1990.  When I go through with this, I am going

10   to seek to introduce all of these documents.  So they will be

11   in the record assuming there's no objection.  Otherwise, I'll

12   just mark them from ID and I'll move on with it.

13         MR. CHURCHILL:  I am going to object to these in terms

14   of lack of foundation in terms of how the information got in

15   there in the first place.

16         THE COURT:  I would sustain that objection.  I don't

17   think there's a sufficient foundation to authenticate these.

18         MR. LEAHEY:  I'll just ask that they be marked for

19   identification.

20         THE COURT:  They may be marked for identification.

21         MR. LEAHEY:  I guess I was hoping there would be a

22   stipulation for HRD.  But I can get someone from HRD to testify

23   to this.

24   BY MR. LEAHEY:

25   Q.   Officer Alvarez, I'm placing another document in front of

1    you.  Again, this was produced by HRD in a prior lawsuit.  Have

2    you seen this document before?

3    A.   Yes.

4    Q.   This document relates to your 1998 promotional

5    examination, correct?

6    A.   Yes.

7    Q.   Okay.  And that was a multiple choice, 80 questions

8    administered by HRD?

9    A.   That's correct.

10   Q.   And on this test you scored an 85, correct?

11   A.   Yes.

12   Q.   And you listed -- your race here is listed as white?

13   A.   I didn't list my race as white.

14   Q.   I'll get to that.  But it's listed here as white?

15   A.   Yes.  It's listed as white, yes.

16   Q.   And you're aware that -- based on other information you're

17   aware that at the time HRD maintained these records, that if

18   you did not enter black or Hispanic or Asian, it would default

19   to white, correct?

20   A.   Under optional information.

21   Q.   Right.  If you put nothing in, it would default to white,

22   right?

23   A.   That's right.  If it's left blank, it defaults to white.

24   Q.   So if you didn't fill it out, it would default to white?

25   A.   You don't have to fill it out.  If you don't fill it out,

1    it defaults to white.

2    Q.    I'm showing you another document.  Do you recognize this

3    document?

4    A.    Yes.

5    Q.    Do you recognize this document to be the October 21, 2000

6    record regarding your taking the test on the --

7    A.    Yes.

8    Q.    -- the 2000 sergeant's promotion?

9    A.    Yes.  Sorry.  Yes.

10   Q.    And it lists your score as 76?

11   A.    That's correct.

12   Q.    And you've testified that it's your memory that you

13   actually scored a 79 on the 2000 --

14   A.    I thought I got a 79, but the score here shows a 76.

15   Q.    With regards to your promotional exam, the first

16   promotional HRD examination that you took was 1998, correct?

17   A.    Yes.

18   Q.    And that you studied hard for that examination, correct?

19   A.    Yes, I did.

20   Q.    You produced index cards to study with, flash cards?

21   A.    Yes.

22   Q.    You also took a class from Patrick Rogers?

23   A.    Yes.

24   Q.    And you took two promotional seminars and bought a number

25   of study aids, correct?

1    A.    Yes, I did.

2    Q.    And you also took -- in October 2000 you took your second

3    promotional exam, correct?

4    A.    Yes.

5    Q.    Fair to say that you did not study for that 2000

6    examination, correct?

7    A.    No, I didn't study for that one.

8    Q.    Right.  You did not study?

9    A.    I did not.

10   Q.    Right.  And in 2003, October 2003, you took your third

11   promotional exam, correct?

12   A.    Yes.

13   Q.    And you did not study for that examination either,

14   correct?

15   A.    I took a class, but I didn't put into effort into

16   studying.

17   Q.    Do you recall testifying at your deposition where you

18   testified:  "I really didn't study hardly at all as I did with

19   the '98 exam"?

20   A.    Yes, that's correct.

21   Q.    And I believe you testified you didn't start studying

22   until September 2003?

23   A.    Yes.

24   Q.    And that the reason you didn't study hard was because of a

25   disciplinary issue that you had with the Lowell Police

1    Department, correct?

2    A.    Yes.

3    Q.    As you knew disciplinary issues could affect whether or

4    not you were promoted, correct?

5    A.    Yes.  It was expressed to me that I wouldn't get promoted.

6    Q.    But you're aware that disciplinary can be factored into

7    whether or not a person is promoted to sergeant, correct?

8    A.    Yeah.  I was told by the union that I wouldn't be

9    promoted.

10           MR. LEAHEY:  Your Honor, I don't believe you allowed

11   me to ask Commissioner Davis about this, but I do have a line

12   of questions regarding discipline.

13           If your Honor is inclined to deny that line of

14   questioning, I would just ask that my objection be noted and I

15   had documents and I could just have those marked as exhibits

16   and I could move onward to another exhibit.

17           THE COURT:  The objection is to relevance, I think.

18           MR. CHURCHILL:  Yes, I'm going to object.

19           THE COURT:  What's the relevance of it?

20           MR. LEAHEY:  Your Honor, again, it goes back to my

21   offer of proof previously, otherwise qualified for the

22   promotion.  That's one of the allegations that they make in the

23   four corners of the complaint.

24           You denied that when I raised that issue in front of

25   superintendent -- or Commissioner Davis.  I just want to put it

1    on the record -- I'll put something in.  I just want to note it

2    on the record and I'll move on with it.

3              THE COURT:  Okay.  Noted.  I would make the same

4    ruling.

5              MR. LEAHEY:  Thank you, your Honor.

6    BY MR. LEAHEY:

7    Q.   Officer Alvarez, you're aware that at the Lowell Police

8    Department that taking the HRD competitive multiple choice test

9    is something that the officers take very seriously, correct?

10   A.   Yes.

11   Q.   And the people who are taking the promotional exams

12   routinely take preparatory classes, correct?

13   A.   Yes.

14   Q.   And they study -- they put in -- the people who are taking

15   the test put in long hours?

16   A.   Yes.

17   Q.   And in Lowell it's very competitive taking these tests?

18   A.   Yes.

19   Q.   In your capacity in NMLEC have you had the opportunity to

20   talk to other departments about the scores they receive on

21   police promotional examinations?

22   A.   Yes.

23   Q.   Fair to say in your conversation with them that the scores

24   seem to be higher in Lowell than in other communities?

25              MR. CHURCHILL:  Objection.

1                  THE COURT:  Sustained.

2    BY MR. LEAHEY:

3    Q.   You're aware that Lowell uses a strict rank order of

4    appointment in terms of going for sergeant based on the HRD

5    test results?

6    A.   Am I aware?  I don't believe that's completely accurate.

7    Q.   Well, you're aware that -- do you know whether or not the

8    City of Lowell follows the 2 N + 1 rule?

9    A.   I don't know what that is.

10   Q.   You don't -- fair to say, then, you don't know how

11   promotions are made in the City of Lowell to sergeant?

12   A.   I'm not familiar with that ruling.

13   Q.   What is your understanding of how sergeant promotions are

14   made in the City of Lowell?

15                  MR. CHURCHILL:  Objection as to relevance.

16                  THE COURT:  Sustained.

17   BY MR. LEAHEY:

18   Q.   With respect to the 2006 test preparation that you took,

19   fair to say that you started studying for that examination in

20   July 2006?

21   A.   Yes.

22   Q.   And that the reading list came out in April of 2006?

23   A.   Yes.

24   Q.   Do you know when the reading list came out?

25   A.   I don't know when it came out.

1    Q.    Do you know whether or not a reading list was posted in

2    the City of Lowell or in the Lowell Police Department?

3    A.    It was posted, yes.

4    Q.    But you don't know when that was?

5    A.    No, I don't.

6    Q.    When in July did you start studying?

7    A.    I don't know.

8    Q.    How often did you study for that examination?

9          MR. CHURCHILL:  Objection.

10         THE COURT:  Overruled.

11   A.    Approximately two hours a day.

12   Q.    Every day?

13   A.    Yes.

14   Q.    So you studied more for the 2006 exam than you did for the

15   2000 and 2003 police sergeant exam?

16   A.    That's correct.

17   Q.    Why did you study more in 2006 than you had in 2002 and

18   2003?

19   A.    I had won a lawsuit against the city for the discipline,

20   and I believed that if I had reached a competitive score, the

21   discipline wouldn't have made a difference and I would have

22   been able to get promoted.

23   Q.    With respect to that prior lawsuit, you're aware that you

24   challenged the disciplinary action that was taken in April of

25   1997 and that disciplinary action remained, correct?

1    A.    That's correct.

2    Q.    And you're aware that the superintendent of police at the

3    time of your lawsuit was Ed Davis, correct?

4    A.    Yes.

5    Q.    And at the time you started studying in July 2006, he was

6    still the superintendent of police in Lowell, correct?

7    A.    What was the date?

8    Q.    July, 2006.

9    A.    I'm not sure when he left.

10   Q.    I don't know if you were here.  He testified he started in

11   Boston December 2006?

12   A.    If he wasn't there, you know, then he wasn't there.

13   Q.    Did you take some practice exams in 2000 for the 2006

14   examination?

15   A.    Yes, I did.

16   Q.    One of those tests that you took, was that a 2004 exam

17   reincarnation?

18   A.    Yes.

19   Q.    Showing you a document, start of a document, "2004 Exam

20   Reincarnation."  Do you see that?

21   A.    Yes.

22   Q.    Have you seen this document before?

23   A.    Yes, I have.

24   Q.    Is this a document you produced at your deposition?

25   A.    Yes.

1    Q.    And this reflects a practice run of the 2004 examination?

2    A.    Yes.

3    Q.    For HRD for sergeant?

4    A.    Yes.

5    Q.    And this indicates that you took it Thursday, October 5,

6    2006?

7    A.    Yes.

8    Q.    And it was a raw score of 82 out of 89.  Do I read that

9    correctly?

10   A.    Yes.

11   Q.    And the grade there is a 92 out of a maximum out of a

12   hundred?

13   A.    Yes.

14   Q.    Did I read that correctly?

15          Is it fair to say that this test that you took

16   mirrored the sergeant police promotional exam from HRD?

17          MR. CHURCHILL:  Objection.

18          THE COURT:  Overruled.  He may answer it.

19   A.    No.

20   Q.    Well, the point of you taking this test was to do a dry

21   run for the 2006 sergeant police promotional exam, correct?

22   A.    Yes.

23   Q.    Looking at the first question here, where it says,

24   "According to Police Administration the role of the change

25   agent is to assist in resolving organizational problems.  When

1  acting as a change agent, which of the following would be a

2  serious error:"  Do you see that?

3  A.   Yes.

4  Q.   And do you see that there's a list of answers, and you

5  apparently checked c?

6  A.   Yes.

7  Q.   It says, "Become tied prematurely to a particular set of

8  strategies and tactics"?

9  A.   Yes.

10  Q.   And over in the right-hand column it says, "Police

11  Administration page 760."  Do you see that?

12  A.   Yes.

13  Q.   Do you know if that indicates where that this question is

14  found in the Police Administration book?

15  A.   Yes.

16  Q.   This type of question here appears to be from the Police

17  Administration textbook; is that fair to say?

18  A.   That's correct.

19  Q.   This type of question, where it lists a reference to a

20  book and then asked a question about that book and then gives

21  you four options to choose, is that a similar form of question

22  that was on the 2006 HRD police sergeant examination?

23  A.   Format, yes.

24  Q.   I'm not asking that this exact question was asked on the

25  exam but this format --

1    A.    This format, yes, multiple choice, structured very

2    similar, yes.

3    Q.    Mr. Alvarez, am I correct in stating that you have a

4    theory as to why some people do better on the HRD police

5    examinations in Lowell than other officers?

6                MR. CHURCHILL:  Objection.

7                THE COURT:  Sustained.

8                MR. LEAHEY:  May I have a moment, your Honor?

9                (Pause.)

10   BY MR. LEAHEY:

11   Q.    Have you ever said that you believe people who are

12   assigned to the Detective bureau have an easier chance or have

13   a better chance to do well on the police examination?

14               MR. CHURCHILL:  Objection.

15               THE COURT:  Sustained.

16               MR. LEAHEY:  Thank you.  I have nothing further.

17               THE COURT:  Any other defense counsel have any

18   questions of this witness?

19               Nothing, okay.  Mr. Churchill.

20               Go ahead.

21                         REDIRECT EXAMINATION

22   BY MR. CHURCHILL:

23   Q.    Mr. Alvarez, you testified on cross that you were not

24   raised in a Spanish-speaking household; is that correct?

25   A.    That's correct.

1   Q.   Were you raised by your birth father?

2   A.   No, I was not.

3   Q.   Were you raised by a foster family?

4   A.   Yes, I was.

5   Q.   And you were shown a copy of your birth certificate.  Do

6   you recall that?

7   A.   Yes.

8   Q.   And is there any indication on the birth certificate that

9   your father signed that birth certificate?

10   A.   He did not.

11   Q.   All right.  Let me show you the fingerprint card that

12   counsel for Lowell showed to you.  And you see it indicates

13   there that your race is white.  Do you see that?

14   A.   Yes.

15   Q.   And you testified that this was -- this document is

16   prepared as part of an AFIS I think you said?

17   A.   Yes, national fingerprint.  I'm not sure what the rest of

18   it is.

19         MR. LEAHEY:  Objection, your Honor.  Basis of

20   knowledge.

21         THE COURT:  Overruled.  To that anyway.

22         MR. CHURCHILL:  That was the next question.

23   BY MR. CHURCHILL:

24   Q.   Did you have knowledge at that time about this system?

25   A.   Yes, I did.

1    Q.    And how did you know about this system?

2    A.    When I worked in Waltham, I worked in dispatch, and we

3    also ran the police computers.  So I knew that in order to

4    submit a fingerprint card, it only took black or white as a

5    race.

6    Q.    Are you familiar with what's called a LEAP system?

7    A.    Yes.

8    Q.    What is that?

9    A.    I can't remember the acronym, but it's the law enforcement

10   computer statewide that we utilize to run warrant checks and

11   license checks.

12   Q.    Okay.  And I've put a document up on the screen here.  Do

13   you recognize this as a document from the LEAP system?

14   A.    Yes.

15   Q.    And I'll just point out to you that the names over on the

16   left are all last name Alvarez; is that right?

17   A.    Yes, that's correct.

18   Q.    And the first names are -- there's a number of them, but

19   they include Jose, Reinaldo, Carmen, Jose, Carmen.  Do you see

20   that?

21   A.    Yes, I do.

22   Q.    And if you go over to the column that indicates race, what

23   is in that race column?

24   A.    White.

25   Q.    And there's a couple of entries that are "U."  Do you see

1    that?

2    A.    Yes.

3    Q.    Do you know what that stands for?

4    A.    I believe it's unknown.

5    Q.    Let me show you a document that came up earlier today.  Do

6    you recognize this document?

7    A.    Yes, I do.

8    Q.    And this is a document that was sent out by Superintendent

9    Davis back --

10   A.    Yes.

11   Q.    -- in September of 1999; is that right?

12   A.    That's correct.

13   Q.    And this is a letter that was sent out to minority status

14   officers?

15   A.    Yes.

16         MR. LEAHEY:  Your Honor, I object as beyond the scope

17   of the direct examination.  He had an opportunity to introduce

18   this in direct and chose not to do it.

19         THE COURT:  Overruled.

20   BY MR. CHURCHILL:

21   Q.    And you received a copy of this letter back in September

22   of 1999; is that right?

23   A.    Yes.

24         MR. CHURCHILL:  I would ask that this be marked as an

25   exhibit.

```
 1              MR. LEAHEY:  Other than what I just said --

 2              THE COURT:  Other than that objection is there any

 3    other?

 4              MR. LEAHEY:  No.

 5              THE COURT:  It will be admitted.

 6              THE CLERK:  It's going to be 146.

 7              (Exhibit 146 received into evidence.)

 8    BY MR. CHURCHILL:

 9    Q.   And, Officer Alvarez, I'm showing you a document which is

10    entitled "Personnel Record."  Do you recognize this document?

11    A.   Yes, I do.

12    Q.   And is this your handwriting?

13    A.   Yes.

14    Q.   And directing your attention to the section where it asks

15    "Hispanic yes or no," what did you write there?

16    A.   "Yes."

17    Q.   And if I can direct your attention up to the block that

18    says "ethnicity."  First of all, do you see a choice there for

19    Hispanic?

20    A.   No, I don't.

21    Q.   And did you write this -- what did you write in there?

22    A.   "Other."

23    Q.   What does "HW" stand for?

24    A.   I didn't write that.

25    Q.   Okay.
```

```
 1              MR. CHURCHILL:  I would ask that this be entered as an
 2    exhibit.
 3              MR. LEAHEY:  Your Honor, may I see this exhibit?
 4              (Discussion off the record.)
 5         THE CLERK:  What is that, a personnel record?
 6         MR. LEAHEY:  I have no objection to this document.
 7         THE CLERK:  I just need a description of it.
 8         MR. CHURCHILL:  It's entitled "Personnel Record."
 9         THE CLERK:  147.
10              (Exhibit 147 received into evidence.)
11    BY MR. CHURCHILL:
12    Q.   Finally, Mr. Alvarez, I think you testified on cross you
13    had filed suit against the City of Lowell?
14    A.   Yes.
15    Q.   And what claims did you bring against Lowell?  We don't
16    want a complete description of the claims, but what types of
17    claims were they?
18    A.   Discrimination and unlawful employment practice.
19    Q.   And with respect to discrimination, that was based on what
20    theory?  In other words, age, sex, race?
21    A.   Hispanic.
22              MR. LEAHEY:  I'll object, your Honor.
23              THE COURT:  Overruled.
24    BY MR. CHURCHILL:
25    Q.   And did a jury render a verdict in that case?
```

1    A.    Yes.

2              MR. LEAHEY:  Objection, your Honor.

3              THE COURT:  Sustained to that.

4    BY MR. CHURCHILL:

5    Q.    Well, let me ask this, Mr. Alvarez.  In that case are you

6    aware of the jury being asked to render a verdict as to your

7    being in a protected class?

8    A.    Yes.

9    Q.    And what did they find in that regard?

10   A.    They found I was in a protected class.

11             MR. CHURCHILL:  I have no further questions, your

12   Honor.

13             MR. LEAHEY:  Your Honor, I have -- I have a couple of

14   follow-up questions.  It will be brief.  It will be less than

15   ten minutes.

16             (Discussion off the record.)

17                       RECROSS-EXAMINATION

18   BY MR. LEAHEY:

19   Q.    Mr. Alvarez, you were asked questions about this document

20   where you list your race as Hispanic.  Do you see that?

21   A.    Yes.

22   Q.    Or, excuse me, you check off "yes" to whether or not you

23   are Hispanic?

24   A.    Yes.

25   Q.    And you're aware this document was created on December 10,

```
 1   2002?

 2   A.   You'll have to move it because I don't see the date.

 3   Q.   Right at the very bottom.

 4   A.   Very bottom.  Yes.

 5   Q.   And fair to say that by December 1, 2002 you had received

 6   notice from the City of Lowell that it was contesting whether

 7   or not you were Hispanic as part of the prior lawsuit, correct?

 8   A.   2002, yes.

 9   Q.   So when you wrote this, you had already gotten information

10   from the city where the city claimed that you were not

11   Hispanic, correct?

12   A.   Yes.

13   Q.   And you were asked questions about the prior lawsuit,

14   correct?

15   A.   At what time?

16   Q.   Just on cross-examination?

17   A.   Yes.

18   Q.   And do you recall at that trial the city specifically

19   asked for a question as to whether or not you were Hispanic and

20   the Court did not allow that question?

21   A.   I thought it was allowed.

22   Q.   You're aware that the question in the prior case was not

23   necessarily whether or not you were Hispanic, the question was

24   whether or not you were -- you believed to be Hispanic,

25   correct?
```

1   A.   Whether or not I believed I was Hispanic?

2   Q.   Yes.

3   A.   The question was whether or not I believed I was Hispanic?

4   Q.   Were you present for discussion as to jury instructions

5   that were discussed?

6   A.   Yes.

7   Q.   Do you remember the question the judge raised, the issue

8   is whether he is Hispanic or is believed to be Hispanic,

9   correct?  Do you remember that being discussed?

10  A.   Let me read this, please.

11       (Pause.)

12  A.   Yes, yes.

13  Q.   But this is a question.  And then your attorney said

14  "believed to be, yes"?

15  A.   Yes.

16  Q.   So it wasn't necessarily a question to determine what your

17  race was, it was a question that was included in that what you

18  were believed to be, correct?

19  A.   At that point, yes.

20  Q.   And you're aware that under -- well, you said earlier that

21  you don't know whether or not HRD has a definition for

22  Hispanic, correct?

23  A.   Definition, no, I don't know their definition.

24  Q.   You would agree with me that as a person who is hired

25  through the Civil Service, through the HRD promotional -- or

1  excuse me, through the entry-level process of HRD that any

2  definition that HRD have would apply to you as a police

3  officer, correct?

4          MR. CHURCHILL:  Objection.

5          THE COURT:  Sustained.

6  BY MR. LEAHEY:

7  Q.  And, Officer Alvarez, are you aware whether or not whites

8  can sue for discrimination as a protected class?

9          MR. CHURCHILL:  Objection.

10          THE COURT:  Sustained.

11  BY MR. LEAHEY:

12  Q.  Fair to say in that ruling where it ruled that you were a

13  member of a protected class it did not specify what protected

14  class you were, correct?

15          MR. CHURCHILL:  Objection.

16          THE COURT:  Sustained.

17          MR. LEAHEY:  Your Honor, I'm asking -- he was asked on

18  redirect whether or not he was a member of a protected class.

19  I just want to make sure the record is clear it was not -- he

20  was not asked specifically what that protected class was.

21          THE COURT:  Okay.  Objection is sustained.

22          MR. LEAHEY:  I have nothing further.  Thank you, your

23  Honor.

24          THE COURT:  All right.  Officer Alvarez, thank you.

25  You may step down.

1          I believe that's as far as we'll go today.

2          Mr. Lichten, where are we on Monday?

3          MR. LICHTEN:  We have Dr. Wiesen coming back Monday.

4          THE COURT:  He'll be the first witness in the morning?

5          MR. LICHTEN:  Yes.  And then Mr. Churchill has been

6    working with the defendants on these documents from HRD in

7    order that -- Dr. Wiesen would be our last witness.  I'm not

8    sure where that stands.

9          MR. CHURCHILL:  Yes, there's -- we had -- we sought to

10   admit some exhibits earlier in the week for HRD and there was

11   some objections.  I know that at least as with respect to

12   Boston and the MBTA there are no objections with respect to the

13   documents we wanted to admit.  So at a minimum we'd like to

14   admit them with respect to those defendants, and I'd also like

15   to find out if there are objections from any of the other

16   defendants.

17         THE COURT:  So you'll continue to explore that then.

18         MR. LICHTEN:  So if -- so if we get those in, then

19   Dr. Wiesen, I believe, is our last witness.  Is that right?

20   The completion of Dr. Wiesen's cross.

21         THE COURT:  Who had last -- just remind me who had

22   left off with the cross.

23         MR. LEAHEY:  I would be starting off on cross.

24         THE COURT:  You'll be starting with him, okay.

25         Okay.

1          MR. CHURCHILL:  There's just one other item, your

2     Honor.

3          We -- on the Friday before we started trial, the

4     defendants filed a 12(b)(6) motion to dismiss which was a

5     renewed motion based on the fact that we had filed an amended

6     complaint, but the motion to dismiss raised the same argument

7     that's been raised before, that the defendants are just

8     doing -- using the exam that HRD requires them to use.  I'm

9     obviously greatly summarizing the argument.

10          Our opposition would be due today.  So I want to see

11     if we can get some relief on that in terms of --

12          THE COURT:  Yes.  I'm not sure it's even necessary to

13     oppose it.  In other words, we're into the trial now.  As with

14     many of the other issues, the viability of the plaintiffs' case

15     is adjudged now on the trial record rather than on a pleading

16     matter.  So I guess on that basis I would just deny the motion

17     because 12(b)(6) is not the way that the issue will be

18     presented.  That's not a preclusive ruling against the

19     defendants' position on the ruling, it's simply that the issue

20     is going to be determined on the trial evidence rather than as

21     a pleading matter.

22          MR. CHURCHILL:  Thank you, your Honor.

23          MR. McDERMOTT:  Just a point of clarification your

24     Honor.  I assume because we did file a motion, our argument on

25     that is protected.  Otherwise I could, perhaps, bring it up on

 1    a directed verdict just so that it's part of the trial record.

 2            THE COURT:  Well, we're not yet at the stage of

 3    motions.  At the conclusion of the plaintiffs' case you will

 4    have that opportunity.

 5            MR. McDERMOTT:  Thank you, your Honor.

 6            THE COURT:  That's a ruling -- just to put it in the

 7    proper box, that's a ruling based on the trial evidence rather

 8    than the pleading.

 9            MR. McDERMOTT:  Thank you, your Honor.

10            MS. ENGDAHL:  Your Honor, I'm not sure if this is a

11    dumb question or not.  Should we go ahead and answer the

12    seventh amended complaint?

13            THE COURT:  Well, the seventh amended complaint that

14    was proposed and proffered last April or whatever it was -- do

15    you need to answer it?  Yes, I guess you do need to answer it.

16            That motion was allowed.  Then there was a second

17    motion to revise the seventh amended complaint, which was

18    denied.

19            So to the extent there's a seventh amended compliant

20    that requires some new allegations that weren't in the sixth

21    amended complaint to be answered, I guess you have to answer

22    those just to complete the record.

23            MR. LEAHEY:  You Honor, my understanding is the

24    seventh amended complaint only added some plaintiffs with

25    regard to Boston.

1            THE COURT:  I think that's probably right.

2            MR. LEAHEY:  So if you're not Boston, do you need to

3       answer the complaint?  I guess that's the question.

4            MR. LICHTEN:  We won't default anyone for not

5       answering.  I'll say that on the record.

6            THE COURT:  And even Boston's answer may not need to

7       be any -- I don't know if there's specific address in the

8       answer to the new plaintiffs.

9            MR. MORRIS:  I don't believe there's any new

10      allegations.

11           THE COURT:  Except maybe the allegations the plaintiff

12      acts as a police officer in the City of Boston.

13           MR. CARROLL:  Your Honor, just as a practical

14      suggestion, if I could, perhaps the Court would consider

15      instead of denying the 12(b)(6) motion, just defer any action

16      on it, then that way there would be no need for a flood of new

17      paperwork in terms of answers to the seventh amended complaint

18      since the 12(b)(6) would technically be pending, and then the

19      Court could just rule on it at a later time.

20           THE COURT:  I don't know if that solves the problem.

21           I think that maybe you can file a one-sentence

22      response saying the answer to the sixth amended complaint or

23      the last complaint that was answered remains.

24           MR. LICHTEN:  We'll assent to that.

25           'MR. CARROLL:  Thank you, your Honor.

1          THE COURT:  All right.  Have a good weekend.  We'll

2     see you Monday.

3          THE CLERK:  All rise.  Court is in recess.

4          (Court adjourned at 12:52 p.m.)

5

6               C E R T I F I C A T E

7

8          We, Marcia G. Patrisso, RMR, CRR, and Debra M. Joyce,

9     RMR, CRR, Official Reporters of the United States District

10    Court, do hereby certify that the foregoing transcript

11    constitutes, to the best of our skill and ability, a true and

12    accurate transcription of our stenotype notes taken in the

13    matter of Civil Action No. 07-11693-GAO, Pedro Lopez, et al, v.

14    City of Lawrence, et al.

15

16    /s/ Marcia G. Patrisso
      MARCIA G. PATRISSO, RMR, CRR
17    Official Court Reporter

18    /s/ Debra J. Joyce
      DEBRA M. JOYCE, RMR, CRR
19    Official Court Reporter

20    Dated: July 23, 2010

21

22

23

24

25