```
              UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS


                                    )
PEDRO LOPEZ, Individually and on    )
behalf of a class of individuals    )
similarly situated,                 )
                                    )
        Plaintiffs,                 )
                                    ) Civil Action
v.                                  ) No. 07-11693-GAO
                                    )
CITY OF LAWRENCE, et al.,           )
                                    )
        Defendants.                 )
                                    )


      BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
              UNITED STATES DISTRICT JUDGE


                     DAY SEVEN
                   NON-JURY TRIAL


        John J. Moakley United States Courthouse
                    Courtroom No. 9
                   One Courthouse Way
              Boston, Massachusetts  02210
                Wednesday, July 21, 2010
                      9:29 a.m.


               Marcia G. Patrisso, RMR, CRR
                Debra M. Joyce, RMR, CRR
                 Official Court Reporters
              John J. Moakley U.S. Courthouse
               One Courthouse Way, Room 3510
                Boston, Massachusetts  02210
                     (617) 737-8728

        Mechanical Steno - Computer-Aided Transcript
```

1    APPEARANCES:

2        LICHTEN & LISS-RIORDAN, P.C.
         By: Harold L. Lichten, Esq.
3            Stephen S. Churchill, Esq.
             Joseph L. Sulman, Esq.
4        100 Cambridge Street, 20th Floor
         Boston, Massachusetts  02114
5        On Behalf of the Plaintiffs

6        CITY OF LOWELL LAW DEPARTMENT
         By: Brian W. Leahey, Esq.
7            R. Eric Slagle, Esq.
         City Hall
8        375 Merrimack Street
         Lowell, Massachusetts  01852
9        On Behalf of the Defendant City of Lowell

10       OFFICE OF THE CITY ATTORNEY
         By: Richard J. D'Agostino, Esq.
11       200 Common Street, Suite 306
         Lawrence, Massachusetts  01840
12       On Behalf of the Defendant City of Lawrence

13       COLLINS, LOUGHRAN & PELOQUIN
         By: Laurie W. Engdahl, Esq.
14       320 Norwood Park South
         Norwood, Massachusetts  02062
15       On Behalf of the Defendant City of Worcester

16       MORGAN, BROWN & JOY, LLP
         By: Mary Jo Harris, Esq.
17           Robert P. Morris, Esq.
         200 State Street, 11th Floor
18       Boston, Massachusetts  02109
         On Behalf of the Defendant City of Boston
19
         MBTA LAW DEPARTMENT
20       By: Kevin S. McDermott, Esq.
         10 Park Plaza, 7th Floor
21       Boston, Massachusetts  02116
         On Behalf of the Defendant MBTA

22

23

24

25

1       CITY OF SPRINGFIELD LAW DEPARTMENT
        By: Harry P. Carroll, Esq.
2       36 Court Street
        Springfield, Massachusetts  01103
3       On Behalf of the Defendants City of Springfield
        and Mayor Sarno
4
        CITY OF METHUEN - OFFICE OF THE CITY SOLICITOR
5       By: Peter J. McQuillan, Esq.
        The Searles Building, Suite 311
6       41 Pleasant Street
        Methuen, Massachusetts  01844
7       On Behalf of the Defendant City of Methuen

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         I N D E X

2                    Direct   Cross   Redirect   Recross
   WITNESSES FOR THE
3     PLAINTIFFS:

4  CASSI LYNN FIELDS

5      By Ms. Harris              5
       By Mr. Carroll            81
6      By Ms. Engdahl            94
       By Mr. Leahey            100

7

8                      E X H I B I T S

9

10 DEFENDANTS'
    EXHIBIT      DESCRIPTION                    RECEIVED
11
   No. 131  Macon, Georgia Validity Study         81
12
   No. 132  Officer Alvarez training             116
13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2            THE CLERK:  All rise.
 3            (The Court enters the courtroom at 9:29 a.m.)
 4            THE CLERK:  Continuation of the Lopez trial.
 5            Please be seated.
 6            THE COURT:  Good morning.
 7            COUNSEL IN UNISON:  Good morning, your Honor.
 8            THE COURT:  We were having technical difficulties, I
 9    hear.  We're going to just get going.  They can't fix it; it's
10    overstressed.
11            So we'll just have to do without it, so...
12            MS. HARRIS:  That's fine.
13            THE COURT:  Dr. Fields, if you'd resume the stand,
14    please.
15                    CASSI L. FIELDS, resumed
16                        CROSS-EXAMINATION
17    BY MS. HARRIS:
18    Q.   Good morning, Dr. Fields.
19    A.   Good morning.
20    Q.   When we left off speaking yesterday afternoon, we were
21    talking about the Memphis Police Department and the work that
22    you had done there.  And I believe that you testified that
23    Memphis had been under a consent decree and in conjunction with
24    its efforts to lift that consent decree they hired you to
25    create a promotional process for them; is that correct?
```

1  A.    That's -- that's Macon.

2  Q.    I'm sorry.  That's Macon.  Oh, Memphis did not have a

3  consent decree?

4  A.    They did many years ago.

5  Q.    Okay.  Do you know how long it had been in Memphis since

6  the last promotional series prior to your coming in to design

7  the series that you've testified about here?

8  A.    I'm sorry.  How many years?

9  Q.    It had been since there had been a promotional -- a

10 promotional exam or promotions from a valid list in Memphis?

11 A.    For what rank?

12 Q.    The rank of sergeant.

13 A.    I believe it had been approximately ten years.

14 Q.    So is it fair to say that there were a number of

15 outstanding vacancies that were present in Memphis when you

16 were hired to create the promotional system?

17 A.    Yes.

18 Q.    I think you had told us that when you went into Memphis

19 that you used a multi-component promotional system?

20 A.    Yes.

21 Q.    And am I right that the multi components that you're

22 referring to are a video-based multiple-choice exercise?

23 A.    A video-based situational judgment test.

24 Q.    That involved multiple-choice answers?

25 A.    Yes.

1    Q.    And were there other components to the promotional system

2    that you designed?

3    A.    No.

4    Q.    Okay.  So one's score --

5    A.    Oh, let me -- let me backtrack and say there was --

6    Q.    Okay.

7    A.    -- there were other components that I designed, but they

8    weren't part of the final score.

9    Q.    Okay.  So the -- the final score was based upon the

10   candidate's performance on the video-based situational judgment

11   exercise?

12   A.    Correct.

13   Q.    Okay.  And seniority also factored into the final score in

14   addition to the written or -- strike that -- the seniority

15   factored into one's final score in addition to the score that

16   one received from those exercises?

17   A.    Correct.

18   Q.    And I believe that the other components that you testified

19   to were -- or the other components that you designed were

20   pretest training; is that correct?

21   A.    Yes.

22   Q.    And when you describe pretest training, am I correct in

23   understanding that you put together a training program that

24   candidates who wished to take the exam have to undergo in order

25   to be eligible to take the exam?

1    A.    Yes.

2    Q.    And the design that you created for Memphis, am I correct

3    it was only for the rank of sergeant?

4    A.    Not exactly.  I did it for other ranks.  It -- it

5    was -- it was different but it was -- but similar.  Different

6    but similar.

7    Q.    Okay.  Focusing then just on the sergeant's examination in

8    Memphis, you designed pretest training that was mandatory.  And

9    I believe that you said that there some 900 candidates who were

10   eligible to at least begin this process, take your training and

11   then opt to continue in the examination process?

12   A.    1200.

13   Q.    1200?  Okay.  And how many actually did attend the

14   training, if you know?

15   A.    They dropped out over time so I don't know the exact

16   numbers until the end, which we had close to 900, who took the

17   final test.

18   Q.    Okay.  And of that 900 that took the final test, I believe

19   you testified that ultimately 165 have been promoted following

20   the completion of the examination process?

21   A.    Correct.

22   Q.    And that 165, was that a one-time promotion?

23   A.    I don't think so.

24   Q.    Okay.  Do you recall when the -- when the results of the

25   examination were certified?

1  A.    I published my list in March of 2010.

2  Q.    Okay.  So these 165 promotions have been made at any point

3  from March of this year to the present?

4  A.    Correct.

5  Q.    And do you know if there have been any in addition to the

6  165 promoted?

7  A.    I don't know.

8  Q.    The total cost for developing this program for the Memphis

9  sergeant's exam I believe you testified was roughly

10  $1.2 million; is that correct?

11  A.    Correct.

12  Q.    So that -- that number, that figure, represents putting

13  together the pretest training and the administration of the

14  situational judgment exercises?

15  A.    Correct.

16  Q.    And I believe that you testified that you did not need to

17  use external assessors for the video-based exercise because of

18  the way you designed it; it's a choice, as opposed to an oral

19  component that needs to be judged by a human, for lack of a

20  better word?

21  A.    Correct.

22  Q.    Did you factor into the cost that you estimate Memphis was

23  charged for putting this exam together any cost for -- for the

24  personnel -- for the mandatory training for police personnel;

25  in other words, the fact that the police personnel would be

1  paid overtime or compensated in some way for the city for

2  submitting to the training?

3  A.   They were not compensated.

4  Q.   Okay.  So it was mandatory to take the exam, but they had

5  to do it without compensation from the city?

6  A.   Correct.

7  Q.   So the 1.2 million covers your job analysis, the pretest

8  training, and the examination itself?

9  A.   I believe so.

10  Q.   Okay.  I believe yesterday when I was asking you about

11  this exam, I asked if you had seen adverse impact at the

12  selection rate, at the 165, and if I recall correctly your

13  answer was that you did not?

14  A.   I do not recall, but I do not think so.

15  Q.   Okay.  Did you run any tests or run any cuts of the

16  results of this examination process where you did find adverse

17  impact?

18  A.   Yes.

19  Q.   And can you tell us where did you find adverse impact?

20  A.   I cannot recall.

21  Q.   Do you know if you, in looking at the results of this

22  promotional examination -- well, you have one exercise that's

23  actually administered, the situational judgment exercise,

24  correct?

25  A.   Correct.

1    Q.    What other data would you be looking at to determine

2    whether or not there was adverse impact at any point in this

3    promotional process?

4    A.    I'm not sure I understand your question.

5    Q.    Okay.  You mentioned that seniority factors in ten points,

6    and I'm assuming that you looked to see if seniority had

7    adverse impacts?

8    A.    Correct.

9    Q.    And if I recall correctly you testified that there was

10   parody between the minority officers -- or the African-American

11   officers and the Caucasian officers as it relates to seniority?

12   A.    Correct.

13   Q.    So I'm assuming from that that seniority didn't

14   impact -- didn't affect adverse impact one way or the other?

15   A.    That's not correct.

16   Q.    Okay.  Then can you explain to me how the seniority would

17   have impacted adverse impact?

18   A.    When you -- when we combined the standardized mean

19   difference of the situational judgment test with the

20   standardized mean difference of the seniority combined they had

21   a -- they minimized group difference because that was a zero.

22   The D was zero for the seniority points.

23   Q.    Okay.  So the seniority points actually helped reduce

24   adverse impact on the overall exercise once it was factored in?

25   A.    Correct.

1    Q.    Okay.  When you did your adverse impact analysis, did you

2    do a calculation based solely on the examination exercises

3    without factoring in seniority?

4    A.    Yes.

5    Q.    And at that calculation did you find adverse impact?

6    A.    There was not -- there was very little mean score

7    difference between minorities and non-minorities.

8    Q.    Did you ever look at these numbers to calculate whether if

9    you had had the number of vacancies that would correlate to the

10   number of vacancies that Boston had for the two exams at issue

11   here, which is approximately 600 candidates for approximately

12   60 positions, so roughly one-tenth, would -- do you know

13   whether the results that you received in Memphis would have

14   shown adverse impact at the one-tenth selection ratio?

15   A.    Not exactly.  I do not know at the one-tenth selection

16   ratio.

17   Q.    And if I recall correctly, you testified that in Memphis

18   you needed to do a rank order top-down promotion choice; is

19   that correct?

20   A.    Correct.

21   Q.    Can you tell us how long it took you to develop the

22   examination that was delivered in Memphis?

23   A.    Starting from what point?

24   Q.    From when you were contracted by Memphis to -- to prepare

25   the process?

```
 1    A.    I can't answer exactly.  I can tell you that when I was
 2    hired by Memphis it was 2007, and the city had had difficulty
 3    defending the validity of its exams, and it had difficulty in
 4    minimizing adverse impact, so they asked me to take my time in
 5    analyzing the entire environment.  So I began my analysis in
 6    2007.  I administered the process in two thousand -- over the
 7    course of 2009 into 2010.
 8    Q.    And is the process at an end point now?
 9    A.    Yes.
10    Q.    As far as your involvement in it?
11    A.    Yes.  Oh, that's not true.  I'm sorry.  We have military
12    makeup exams.
13    Q.    Okay.  But aside from just, you know, one or two makeups,
14    essentially you don't foresee or forecast that your consulting
15    company will be doing any more work as it relates to this
16    particular examination for Memphis?
17    A.    That -- that confuses me a little bit because the makeups
18    will be incorporated into this so -- it still -- it includes
19    makeups.
20    Q.    Okay.  All right.  But there's nothing else that you're
21    forecasting doing?
22    A.    Correct.
23    Q.    For the sergeant's exam?  Okay.
24          Now, when you say that they had had difficulty with
25    validating their previous exams and with adverse impact, has
```

1  that been your experience with the clients that you've

2  consulted with generally, that they have had unsuccessful

3  efforts in putting together validated exams that had less

4  or -- or little adverse impact on their -- their candidate

5  pool?

6  A.    Some of them.

7  Q.    You -- I believe, what we've talked about Memphis, but

8  then you mentioned Macon was under a consent decree when you

9  were hired to work with Macon.  And do you know whether in that

10 jurisdiction there had been problems with the examination prior

11 to your joining them?

12 A.    Yes, I do know.

13 Q.    And did they have problems?

14 A.    Yes, they did.

15 Q.    Do you know prior to your going to Macon how long it had

16 been since their last examination?

17 A.    I don't -- ah, yeah.  Let me think.  I think it was about

18 eight years.

19 Q.    And was that for all ranks or just for the sergeant rank,

20 if you know?

21 A.    All ranks.

22 Q.    And just in your experience working with law enforcement

23 agencies, is it -- do you have a sense of how frequently an

24 agency generally does its promotions for the superior officer

25 rank?

1  A.    I would say the most common is every two years.  There are

2  some that do it every year, and there are some that do it every

3  three.

4  Q.    Okay.  So for some -- for an agency, particularly an

5  agency of some size, to go approximately eight years without

6  making promotions would you expect to see an unusual number of

7  vacancies?

8  A.    Yes.

9  Q.    And was that the case when you started work with Macon as

10 well?

11 A.    Yes.

12 Q.    Now, I believe when you were testifying yesterday, there

13 were a number of components that you mentioned that as an

14 industrial psychologist you look at using in order to minimize

15 adverse impact in putting an examination plan together.  And I

16 just want to talk about a couple of those for a minute, if I

17 could.

18      When you talked about assessment centers, I understand

19 assessment centers not to refer to a type of test, but rather a

20 number of types of tests distinguished from written

21 examinations; is that a fair summary?

22 A.    In the field we define an assessment center as a method.

23 It is a method of testing.

24 Q.    And by that you mean it's a method that involves more

25 interaction by the candidate than just checking off a box?

1   A.   Yes.

2   Q.   So let's come back to that in just a sec, but you also

3   mentioned structured interviews.  And as I understood your

4   testimony, you described structured interviews as being an

5   exercise that can be standardized so that you trained the

6   people who are interviewing candidates to normalize the

7   process, I assume?

8   A.   Standardize.

9   Q.   Standardize.  So that they're asking the same questions of

10  the candidates as they process through the program?

11  A.   Correct.

12  Q.   And when you use the people who are doing the -- the

13  interviewers, they're raters, I believe?

14  A.   Yes.

15  Q.   Is that the term for those folks?

16  A.   Yes.

17  Q.   And you would be identifying these people and training

18  them to perform the function of the structured interview?

19  A.   Correct.

20  Q.   And I believe when you were talking about it yesterday,

21  you were asked by Mr. Lichten whether it would be possible to

22  do structured interviews for a very large candidate pool such

23  as the pool that we're talking about here, and I understood you

24  to say that yes, that you can use a college facility or a

25  convention center, and you can process between 30 and 50

1    candidates at a time; is that right?

2    A.    Correct.

3    Q.    Now, in doing 30 to 50 candidates at a time, and you did

4    mention videos, I'm assuming that you don't have raters

5    assigned to do the live structured interview with each of the

6    candidates; am I correct in making that assumption?

7    A.    There are so many ways to do it.  Two -- two examples.

8    The raters would not be rating at that time.  They would be

9    rating the tapes at a later time -- the candidates on

10   tape -- excuse me.  But you can have trained interviewers

11   sitting in the room and/or sometimes we videotape the

12   interview, and the candidates will just listen to the interview

13   on a videotape, on an audio video.

14   Q.    The raters would listen to the interview?

15   A.    No, the candidates.  I'm sorry.  Did I say --

16   Q.    No.  I'm just trying -- so the questions then would be on

17   a tape recorder read to the candidate, who would then respond,

18   and their response would be tape-recorded?

19   A.    Correct.  Or video.  Not an audio, a video.

20   Q.    A video, okay.  So when we're talking about doing 30 to 50

21   candidates at a time, we're talking about the latter exercise

22   that you've just described --

23   A.    Correct.

24   Q.    -- as opposed to a live exchange?

25   A.    Or there could be a live interviewer in each room, who is

1    just the -- the person who -- the messenger, who's just giving

2    the questions.  They're not the assessor.

3    Q.   Okay.  And in doing so, then, you would be hiring between

4    30 and 50 people to be the live interviewer for each of these

5    exercises?

6    A.   In that case, yes.

7    Q.   And have you ever done that?

8    A.   I have.

9    Q.   And when you hire these folks, who are interviewers, are

10   they -- what kind of individuals are these folks?

11   A.   Generally, I use police personnel.

12   Q.   And you would be using them from outside the jurisdiction

13   for which you're doing the testing, correct?

14   A.   Correct.  That would be my least favorite way to go, I

15   mean, because now with video technology, we can put the

16   interviewer right on a tape, everyone has the exact same

17   interviewer, it's very inexpensive to tape and to deliver.

18   Q.   Okay.  And that was actually one of the questions because

19   it seemed to me that if you're going to be using 30 to 50

20   raters live that this would be an extraordinary cost for any

21   jurisdiction?

22   A.   Sometimes.  I mean, sometimes you would be surprised that

23   jurisdictions will volunteer to offer assistance, and we can

24   hand pick people who will through mutual aid agreements

25   will -- will help.

1    Q.   Now, in doing structured interviews like this, have

2    you -- and I may have misunderstood the testimony yesterday,

3    but have you used these structured interviews to tap or to

4    assess the candidates' job knowledge in -- in lieu of doing a

5    written multiple-choice exam?

6    A.   We assess job knowledge but not in lieu of a

7    multiple-choice exam.

8    Q.   Okay.  So when you were asked if -- the validity of the

9    structured interviews, as opposed to the multiple-choice

10   examination, you were not advocating that you could use the

11   situation -- the structured interview in lieu of a

12   multiple-choice examination?

13   A.   No, I was not.

14   Q.   And would you agree with me that an oral exercise like the

15   structured interview is not as valid as a traditional job

16   knowledge exam?

17   A.   I would not agree with that.

18   Q.   Okay.  But if we're looking at validity as

19   being -- assessing the general mental ability or the cognitive

20   ability of a candidate, would it be your position that the

21   structured interviews are as predictive of a candidate's job

22   knowledge?  Would you -- strike that question.  I'm sorry.

23        Would you agree, or would you dispute, I suppose, that the

24   oral exercises will be able to be as predictive as a written

25   multiple-choice exam in determining the cognitive ability of

1    the candidate?

2    A.    Could you repeat the question again.

3         MS. HARRIS:  I don't think I can actually.  Would you

4    please read it back for me.

5         (The reporter reads the pending question.)

6         THE WITNESS:  They can be equally valid and equally

7    predictive, but they don't necessarily predict the same

8    ability, skill and knowledge.  Is that what you're asking me?

9    BY MS. HARRIS:

10   Q.    I'll take that.

11   A.    No, they don't necessarily predict the same thing, but

12   they are equally predictive of job performance.

13        THE COURT:  Just to be clear, Doctor, some predict

14   some aspects of job performance, and others predict other

15   aspects of job performance; is that what you're saying?

16        THE WITNESS:  A job-knowledge test is a cognitive

17   measure, and it measures cognitive ability, and I don't know

18   that we would say that it predicts cognizant ability on a job,

19   but it's predictive of successful job performance.  A

20   structured panel interview assesses some knowledge, some other

21   skills and some other abilities, and it is predictive.  It

22   measures those things, it's valid for those things, and it also

23   is predictive of future job performance.  What parts of the job

24   it is predictive of, I don't know if you can say specifically.

25   Q.    When we're talking about these structured interviews, is

1  it fair to consider a structured interview to be an oral

2  exercise?

3  A.   Could you please be more specific?  I'm not sure I follow.

4  Q.   Well, in asking you these questions, I'm looking at

5  structured interviews as distinguished from written

6  job-knowledge tests as being oral exercises as opposed to

7  written exercises.  And I'm asking if that's a fair assumption

8  for me to make, that situational interviews -- or excuse

9  me -- that structured interviews are oral exercises?

10  A.   If you mean that the candidate orally responds or verbally

11  responds, the answer is definitely yes -- well, that is not

12  true.  Sometimes people in structured panel interviews ask

13  candidates to write some things, and sometimes they ask them to

14  respond orally, and the same could be said for a written exam.

15  Q.   Okay.  Directing your attention for a moment to the work

16  that you did in Macon, do you recall at some point in the

17  process that the Macon police -- that the county, I guess, or

18  the City of Macon was putting together this promotional

19  process, that there was some litigation by some of the

20  stakeholders involved in the promotional process?

21  A.   I don't know if it was litigation.  I don't know how to

22  quantify it because we were -- there was an injunction.  We

23  were trying to have the injunction lifted.  It was lifted so

24  that we could administer the exam, and then there was questions

25  to make sure that it was consistent with the consent decree.

1    So I don't know if it was challenged, per se.

2    Q.    Okay.  Do you recall giving testimony with regard to the

3    system that you had designed?

4    A.    Ultimately, I gave testimony in front of the judge

5    to -- but it was not about the validity.  I actually don't -- I

6    was asked to -- I don't even remember what the specific -- I

7    was up there for a very short period of time and -- and maybe

8    some people -- I really don't recall why we testified, except

9    for us getting -- trying to lift the consent decree, I -- I

10   don't remember any other actual aspect of it.

11          MS. HARRIS:  Your Honor, could I approach since we are

12   without the ELMO and just give a copy to counsel?

13          THE COURT:  Yes.

14          (Pause.)

15          MS. HARRIS:  And just for the record, this is

16   deposition testimony in the U.S. District Court for the Middle

17   District of Georgia, Macon Division, and it's Dudley, et al.,

18   versus Macon, et al.  And I'll be referring, Doctor -- excuse

19   me.

20          THE WITNESS:  I forgot -- your Honor, I forgot my

21   glasses in my purse.

22          THE COURT:  Okay.

23          THE WITNESS:  Thank you.

24          (Pause.)

25   BY MS. HARRIS:

1  Q.   I'm directing you to page 42 at line 10, and I'll share

2  with you, if you don't mind.  The question was "You used oral

3  exercises to screen candidates for several of the police and

4  fire positions.  In your opinion can job knowledges be validly

5  assessed through an oral examination?"

6       And your answer?

7  A.   "The application, well, yes, I think so."

8  Q.   And then the question was "Do you have any evidence that

9  indicates that oral exercises are less valid predictors of job

10  knowledge than multiple-choice formats?"

11  A.   "They are not as quite as valid as job-knowledge tests

12  according to the literature."

13  Q.   Okay.  And then they ask you some questions about the

14  literature, which I'm not going to ask you to go through.  And

15  then on page 44, I'm going to direct you to line 12, right

16  about the middle, and the question was "I think we were talking

17  about cognitive knowledges, and you can test it with a piece of

18  paper or you can have a chat with the person or you can have an

19  interview?"

20       And your answer?  Just this section.

21  A.   "Okay.  I thought we were comparing interviews and

22  assessment centers, though.  I got confused here.  So" -- do

23  you want me to read it?

24  Q.   Yes.

25  A.   "So general mental ability or cognitive ability is more

1    predictive than interviews; and for example, Schmitt and Hunter

2    1998."

3    Q.    And off the transcript for just a minute, the Schmitt and

4    Hunter literature to which you're referring was an article that

5    you referred to in your testimony yesterday; is that right?

6    A.    Correct, and I believe that article says they both have a

7    .51 predictive validity, and I must have been mistaken here.

8    Q.    Okay.  Well, just let me give you your full answer.

9    A.    Okay.

10   Q.    The question then was to ask you to repeat.  And then at

11   the bottom at line 24 can you just read your answer?

12   A.    "Generally, with general mental ability tests, which are

13   cognitive ability tests, are more valid than structured

14   interviews which have a validity of the -- the cognizant

15   ability is .56, and the structured interviews have about a

16   .35."

17   Q.    Okay.  So -- and just off the transcript for a second, the

18   testimony that you gave in Macon suggests that -- states that

19   the structured interviews have less validity than the general

20   mental ability or cognitive ability tests.  Is that a fair read

21   of the testimony that we just went over?

22   A.    That's what I said there.

23   Q.    And do you take -- or do you not agree with the testimony

24   that you gave in Macon?

25   A.    I believe I just reviewed that Schmitt and Hunter article,

1    and they're both .51.

2    Q.    Okay.

3    A.    And that's general mental ability.

4    Q.    Okay.  Okay.  And then I asked you I think a couple of

5    minutes ago whether one can tap the knowledge domain using a

6    structured interview, and I'll indicate for you on page 46 in

7    the same line of testimony, and I'm going to start with the

8    question at line 4 but just go to the tail of it where the

9    question actually is.  And it's oral examinations which are

10   seeking to get the same kind of knowledge that one would

11   normally get through a written multiple-choice, we're talking

12   about the same body of knowledge?

13         And your answer to this trail of questions, I would direct

14   you to line 18, please.

15   A.    "I will tell you, though, that the ability to tap the

16   knowledge domain using a structured panel interview is not

17   possible in my opinion to represent it and to tap it properly.

18   That's the entire knowledge domain."

19   Q.    Okay.  Using the structured interview?

20   A.    Which is what I said earlier.

21   Q.    Okay.  So if I understand then your testimony, you're

22   saying that you wouldn't be able to tap the entire domain with

23   the oral exercise, but you would use it in conjunction with

24   another -- another component?

25   A.    And I would say that you can measure job knowledge, which

1    I frequently do, in addition to the multiple-choice

2    job-knowledge test, and the reason you want to do that is

3    because it gives candidates an opportunity to demonstrate they

4    have the knowledge orally in addition to using a written paper

5    and pencil.  So what you just asked me to read was can you tap

6    the entire knowledge domain, and I said no, which is what I've

7    been saying, and then -- but I also am saying that you can tap

8    some of it and you -- and I -- and I like to.  So that I give

9    candidates an opportunity to verbally demonstrate their

10   knowledge in addition to the paper and pencil.

11   Q.   Okay.  And the issue about the validity of the oral

12   exercises, you now disagree with the testimony that you gave

13   previously?

14   A.   I don't know where I got that .35.  The .35 was on bio

15   data in that Schmitt and Hunter article so I must have

16   misspoke.  It's, I believe, .51 for both.

17   Q.   And when -- you've mentioned bio data, that's the

18   performance or -- strike that term -- the bio data are the

19   exercises that you described yesterday where a candidate can

20   put together almost it sounds like an application for the job

21   where they describe their abilities and their experiences in an

22   effort to demonstrate their ability for the position for which

23   they're competing; is that correct?

24   A.   It would be structured so they wouldn't just put anything

25   on there they wanted.

1  Q.   Okay.  I'm just distinguishing the bio data from the

2  situational -- or the structured interviews.  They're not the

3  same thing?

4  A.   No.

5  Q.   Okay.  Focusing for a second back to the other

6  assess -- or the other exercises that you described yesterday,

7  you also mentioned a situational judgment exercise.  And as I

8  understood your description of a situational judgment exercise,

9  you posit a scenario to a candidate, and then they are

10  presented with four options.  One way of doing this is that

11  they're given four options, one right answer and three wrong

12  answers; and the other, which I think you described as a scaled

13  response is they're given a question, four possible answers,

14  and they range in quality, I suppose, from the best answer to

15  the less good answers.  Is that a fair summary?

16  A.   And that is the way I do it.  It is done many, many, many

17  ways in the -- in the business.

18  Q.   Okay.  So the way that you do it is the latter

19  description, it's a scaled response?

20  A.   Sometimes I use a single response as well.  Sometimes a

21  combination.

22  Q.   Okay.  And when you've used the situational judgment

23  exercises, have you used them both in a written form and in an

24  oral form?

25  A.   In a video form and a written form, and when you say an

1    oral form, I'm not sure what you mean.

2    Q.    Okay.  Maybe I'm talking about the video form where the

3    information is given to the candidate not on a piece of paper

4    but it's actually presented to them in an oral fashion, or is

5    that not how the video works?

6    A.    Well, the video is a -- is a video.  It's a -- it's like a

7    mini movie.

8    Q.    Is it like a PowerPoint where --

9    A.    No.  No.  It's a -- you watch an actual acting scenario.

10   Q.    Okay.  And when you were describing the test that you put

11   together for Memphis and said that the examination process

12   there was a video multiple-choice component, is it fair for me

13   to assume, then, that the exercises in Memphis consisted of a

14   situational judgment exercise with a mini movie shown to the

15   candidate and then a scaled response for them to choose the

16   best response down to the less good or the worse response?

17   A.    Multiple mini movies, some scaled responses, some single

18   responses.

19   Q.    Okay.  Now, in your opinion, in using a situational

20   judgment exercise like this, like the one that you've done in

21   Memphis, can you access the same amount of knowledge?  Can you

22   glean from the candidate the same range of knowledges as -- as

23   you could in a paper test?

24   A.    Yes.

25   Q.    And in doing that, I think you described in Memphis that

1    you had about 900 people go through this.  So 900 people went

2    through this video exercise and were prompted to give their

3    responses?

4    A.    Correct.

5    Q.    And in Macon you've made a conscious choice not to do it

6    this way, correct?

7    A.    Yes.

8    Q.    And that, I believe, if I understand your report, is

9    because using this kind of situational judgment exercise would

10   not be able to tap the quantity of knowledge that was necessary

11   to assess the candidates in Macon?

12   A.    That's not accurate.

13   Q.    Okay.  What was the reason that you decided not to use the

14   situational video exercises in Macon?

15   A.    In hindsight, I think I would, actually, because when I

16   first came to Macon, as I mentioned, they did not have valid

17   exams, and they had high levels of adverse impact, and they

18   were under a consent decree, and they hadn't given a test in a

19   number of years, and there was significant educational

20   problems, and I was informed of all of this, and I was informed

21   about other issues and problems that occurred in the city.

22        And by collecting the kind of data that -- that I

23   described earlier, I -- these are the methods that I decided to

24   try based upon the information I had gleaned from job

25   incumbents and managers and politicians in the City of Macon.

1  And so that was my first examination there.

2      When we gave follow-up examinations for other ranks, we

3  did make modifications based upon what we learned the first

4  time.  And a situational video judgment test might be very good

5  in the future.

6  Q.   Okay.  Having gone through the -- the report that you

7  prepared for Macon, is it fair to say that when you -- when you

8  first were retained by the city to go in and to do your

9  assessment, you learned that there was a belief within the

10  organization that there was a serious lack of job knowledge in

11  the workforce?

12  A.   I was told that, yes.

13  Q.   And did any of the work that you did in preparing the

14  promotional process give you any reason to disbelieve that

15  opinion?

16  A.   No.

17  Q.   And given that one of the big concerns that was raised by

18  the community was that there was a lack of response or a lack

19  of job knowledge in the ranks, was it part of your mandate to

20  use the promotional process as a way to increase knowledge?

21  A.   No.  And it wasn't the community's concern.  It was the

22  department's concerns.

23  Q.   Did that concern play a role in any of the exercises that

24  you decided to recommend to the city to use?

25  A.   Could you please ask that question again?

1  Q.    Sure.  Did the opinion of the force itself or the people
2  that you spoke with in the force that there was a serious lack
3  of job knowledge within the -- the ranks themselves, did that
4  information play a role in the exercises that you recommended
5  to the city?
6  A.    Yes.
7  Q.    And how did it play a role?
8  A.    We decided that we were definitely going to measure job
9  knowledge.  We were not going to teach job knowledge, because
10  tests -- tests don't teach; tests just indicate who might be
11  successful in the position.
12  Q.    Then why do you do the training program that you've
13  testified about?
14  A.    The training program that I testified, we only talked
15  about one, and that was in Memphis, and that was a technical
16  training program that included test preparation, very unique.
17  I had never done it before.  The other test preparation
18  training that I do is how to study and prepare for a test.  And
19  in Macon I did how to study and prepare for the test.
20  Q.    But that's not the same as studying and learning the
21  information that you need to be a police officer --
22  A.    Correct.
23  Q.    -- or a sergeant?
24      Okay.  Okay.  You were -- again, referring to this same
25  deposition when you were questioned, I believe, by counsel for

1    the Department of Justice, and this is at page 156.  You

2    were -- there was a series of questions about why you had

3    decided to use a written job-knowledge test.  I'll refer you to

4    the question at line 11 that states, "Were there other test

5    instruments that could have been used to capture job knowledge

6    other than written multiple-choice job-knowledge tests?"

7        And could you read your answer?

8    A.    "There was a huge amount of job knowledge that the job

9    analysis indicated, and I indicated that I was uncomfortable

10   with the idea, but professionally I felt that given that it was

11   between 35 and 40 percent of all the knowledge, skills and

12   abilities statements I felt it showed a great deal of

13   importance in these jobs based upon the job analysis data, and

14   to sample all of that the best method and one of the highest

15   validity and the highest utility would be that of a

16   job-knowledge test."

17   Q.    Okay.  So in the recommendations that you made to Macon

18   about how to put together the most -- a test that had the

19   highest validity and the highest utility for tapping the job

20   knowledge component was the written exam?

21   A.    Correct.

22   Q.    And the written -- do you recall what the weight of the

23   written examination was in Macon?

24   A.    I believe it came out lower than that.

25   Q.    Lower than 35 to 40 percent?

1    A.    I think so.

2    Q.    When we talked again, going back to the testimony that you

3    gave yesterday, you had indicated that it's your -- it's your

4    practice to test all of the knowledge, skills and abilities

5    that you can in a performance -- in a promotional performance

6    examination?

7    A.    Correct.

8    Q.    And I think Mr. Lichten had asked you about the Uniform

9    Guidelines that state that it would be valid for an examination

10   if it tested the representative knowledge, skills and

11   abilities.  So in saying that you prefer to test all of the

12   knowledge, skills and abilities, in your opinion, are you going

13   above and beyond what's required by the Uniform Guidelines?

14              MR. LICHTEN:  Objection to the form.

15              THE COURT:  Overruled.

16              THE WITNESS:  I -- I need you to restate the question.

17   I'm sorry.

18   BY MS. HARRIS:

19   Q.    That's okay.  We looked at the Uniform Guidelines

20   yesterday and noted that it requires or recommends that a

21   promotional examination should test a representative sample of

22   the knowledge, skills and abilities that are necessary to

23   perform the job.  And your testimony yesterday was that your

24   preference or your professional -- the standard to which you

25   hold yourself is to test all of the knowledge, skills and

1    abilities for a given position.  Is that --

2    A.    I said "most all."

3    Q.    Okay.  And in -- in doing so, in testing most all, would

4    that be going above and beyond what, in your opinion, the

5    Uniform Guidelines call for?

6    A.    Most all of the critical knowledge, skills and abilities?

7    No, I do not think so.

8    Q.    You think that's the standard to which an

9    examination -- any examination ought to be held?

10   A.    It's the standard to which I hold myself because if I were

11   to be challenged I think that's defensible.

12   Q.    Do you recall putting together a validation report for the

13   City of Macon?

14   A.    Yes.

15   Q.    And I'm going to show you, I believe, a copy of that.

16   A.    Thank you.

17          (Pause.)

18   BY MS. HARRIS:

19   Q.    And -- excuse me.  Dr. Fields, I'm going to ask you to

20   turn to page 32 of the validation report.  And this document is

21   a chart, and it states at the top -- it's titled "Final KSA

22   Analysis For Police Sergeant, Lieutenant and Captain."  And at

23   the bottom of the chart that lists out KSAs, it's written for

24   police sergeant, we measured ten, or 56 percent of 18 of these

25   PS -- KSAs in the promotional examination.  Do you see where

1    I'm reading?

2    A.    I see.

3    Q.    So in the Macon test that you prepared, you didn't test

4    the majority of the KSAs or all of the KSAs, you tested

5    58 -- excuse me -- 56 percent of the KSAs that had been

6    identified?

7    A.    I think it's not accurate.  I think that was this portion

8    of the exam; and then later when we developed the banding

9    procedure and selection from the banding procedure, we tested

10   additional KSAs.  And I think later in the report you would

11   find that, but I don't -- this is, you know, almost ten years

12   ago now.  Well, I wrote it in 2003 or '4.

13   Q.    The cover page, it's dated 2003 to 2006?

14   A.    We actually started in 2000, and it took a very long time

15   before the courts allowed us to administer.  It would take me

16   some time, but I believe we measured more of them.

17   Q.    Well, page 132 states this report is based on the data

18   collected from June '03 until April '06.

19   A.    Okay.

20   Q.    And there is a section about the selection procedures

21   considered, which we will look at.  And I'll represent to you

22   that it contains a -- on page 128 proposed selections and how

23   the data will reflect the differences in passing scores

24   and -- et cetera, between the candidates.  So I would ask you,

25   looking at page 32, the final KSA analysis, whether it's

1    accurate or inaccurate that when it states that 56 percent of

2    the total KSAs were tested for the position of sergeant?

3                MR. LICHTEN:  Objection to the form.

4                THE COURT:  Overruled.

5                THE WITNESS:  I need a moment because I'm not sure.

6                (Pause.)

7    BY MS. HARRIS:

8    Q.   I don't know if this is helpful, but I could direct you to

9    page 41, which is where you give explanations for the pieces

10   that were dropped.

11   A.   But I'm -- I'm fairly certain that when we -- in court

12   when we created the banding rule and we used a new training and

13   experience and education piece that we measured additional

14   KSAs, and that was the intent at the time.

15        Well, it will take me quite a long time, but at the end of

16   the report it is additionally linked to additional knowledge,

17   skills, and abilities, the conclusion of the exam so that we

18   could try to tap more.

19   Q.   Okay.  Why don't we go on with some of the questions that

20   I have about this report, and then we can maybe revisit this

21   after the break so we're not wasting time.

22   A.   Okay.

23   Q.   I'll ask you to look, please, at page 41.  And this is a

24   chart that on the left-hand side states "AI reduction

25   strategy," which I assume means adverse impact reduction

1    strategy?

2    A.    Correct.

3    Q.    And the first item there states "eliminate the in basket

4    for police sergeant and create an alternative training course

5    for the KSAs measured in this exercise."  And then on the right

6    the explanation, it states, "although this exercise had been

7    fully developed and validated, FCG remained concerned about

8    KSAs that were measured in this exercise that had a high

9    cognitive load" -- and you have a citation -- "with particular

10   concern for the ability to communicate in writing and the

11   ability to organize, plan, and prioritize."

12        And off the report for a moment, the ability to

13   communicate in writing and the ability to organize, plan and

14   prioritize are two of the KSAs that were listed as not being

15   tested on page 32.

16        And then it goes on, on page 41, to state, "As a result,

17   we eliminated this exercise prior to the pilot since these two

18   KSAs were rated as important and needed at entry.  The police

19   chief agreed to provide training in these two areas for these

20   two KSAs to candidates who were promoted to sergeant to ensure

21   that they had the necessary ability."

22        And I'll ask you first if reading that AI reduction

23   strategy and explanation if that refreshes your recollection as

24   to whether written communications and organized plan and

25   prioritize KSAs were deleted from this -- this examination

1  process?

2  A.   I am sure that the ability to communicate in writing was

3  eliminated.  I do not know about the ability to organize, plan

4  or prioritize.

5  Q.   Okay.  And when you put together the validation report

6  that contains this chart, was it acceptable to you as a

7  professional to have these necessary skills and abilities,

8  KS -- knowledge, skills and abilities, covered by a training

9  program post-promotion?

10  A.   It was an agreement I made -- the police chief wanted to

11  do it, and I thought it was a good idea.

12  Q.   Okay.  So the fact that it wouldn't actually be tested in

13  a competitive measure didn't affect, in your mind, the validity

14  of this examination going forward?

15  A.   One of the best parts of promotional procedures are

16  when -- are the -- is the probationary period that candidates

17  are placed into after they're promoted, and it gives the chief

18  an opportunity to see if they have all of the necessary

19  qualifications and to either remediate or to demote if they

20  don't.  So in this department that was the decision that they

21  would use the probationary period and evaluate candidates as to

22  whether they could succeed in these areas.

23  Q.   Okay.  So if I understand your testimony, in Macon, if

24  somebody was promoted off an exam and turned out not to perform

25  as anticipated, their promotion could be stripped from them?

1    A.    Correct.

2    Q.    Okay.  And do you understand that that's not the case in

3    Massachusetts?

4    A.    I do not know that.

5    Q.    Okay.  But in any event, in Macon, the fact that these two

6    skills were identified as being important prior to the

7    administration of the exam, their importance could be

8    adequately addressed in a post-promotional training program, as

9    opposed to in the examination itself?

10   A.    Yes.

11   Q.    Okay.  And then looking back on page 32, there are

12   other -- in the -- in the columns listed -- listing the KSAs

13   that were not measured in the promotional examination itself

14   included flexibility, accountability and the ability to

15   function under stress.  And the reason given is that these

16   measures are more appropriately -- are more appropriate for

17   selection of police officers or in other types of evaluation

18   tools.  Do you see where I'm reading?

19   A.    Yes, I do.

20   Q.    And is it your memory that in the Macon police sergeant

21   exam the qualities of flexibility, accountability and the

22   ability to function under stress were not, in fact, measured by

23   the testing instrument?

24   A.    I do not recall.

25   Q.    Would it be an appropriate reason for them not to be

1    measured; that they're more appropriately measured at the

2    selection, which I assume is at the recruitment initial hire

3    stage?

4    A.   My recollection is that I probably discussed with the

5    police chief if these things were being assessed in his

6    selection program; and if they were, I may have said this would

7    be -- there would be no reason to retest for that.

8    Q.   Okay.  And do you know if Macon had a provision in its

9    entry-level assessment for psychological screening for

10   candidates who were becoming police officers?

11   A.   I don't recall.

12   Q.   If they did have a psychological screen at the recruitment

13   level, would that address in some way the ability to function

14   under stress?

15   A.   I don't recall.  I don't know.

16   Q.   But do you know as a professional whether a psychological

17   screen would be able to assess somebody's ability to perform

18   under stress?

19   A.   Some of the psychological screens that I've seen do, some

20   don't.  I don't really -- I'm not -- that's not my area of

21   expertise.

22   Q.   Okay.  When you say that the police chief would have

23   informed you whether these things were assessed at the police

24   officer level, what manner would those skills be assessed at

25   the police officer level?

1    A.    I'm sorry.  What --

2    Q.    In what manner would those qualities be measured at the

3    police officer level?

4    A.    I don't know.

5    Q.    Okay.  But would you have wanted some assurance from him

6    that that was something that actually was measured in order to

7    go forward with an examination that didn't test these measures?

8    A.    I would have probably asked for those things, yes.  And

9    again, I'm not sure -- I really don't have a very good

10   recollection because we did this pretty extensive selection

11   procedure out of the banding, and we may have measured some of

12   them then.  So there could have been some consideration of

13   those things in the banding procedure.

14   Q.    Okay.  But as far as anybody testing to get into the bands

15   that would be eligible for selection in the first place, it's

16   not measured according to this document?

17   A.    Correct.

18   Q.    And then the -- under reason, again, it states that these

19   qualities are more appropriate for other types of evaluation

20   tools, and is the other type of evaluation tool to which you're

21   referring the banding post certification of the eligible list?

22   A.    I don't recall.  There was a lot of context involved in

23   this situation, so I don't recall.

24   Q.    We talked about written communication, organize, plan and

25   prioritize.  The third box includes not measured KSAs, ability

1   to negotiate with and persuade others and political awareness,

2   and the reason given for its not being tested is that it's

3   better measured at a higher rank.  Do you see that?

4   A.    I do.

5   Q.    And is it fair to say if there are qualities that may be

6   rated as important at the sergeant rank, that if they are also

7   important at the higher ranks that you can forgo testing for it

8   at the sergeant rank?

9   A.    I believe this was a subject matter expert opinion, so

10  I -- I wouldn't agree with what you just stated.  It just

11  depends on what the subject-matter experts would say in this

12  environment.

13  Q.    And then the fourth column, or the fourth box, rather,

14  lists organizational commitment, and the reason that that was

15  not tested for is because it's better measured during selection

16  from the eligibility list.  And is that, again, referring to

17  the banding procedure that you mentioned earlier?

18  A.    Probably, yes.

19  Q.    Okay.  So we can take from this, I assume, that testing

20  56 percent of the KSAs that were identified by the

21  subject-matter experts as being important to the job would be a

22  sufficient test of these KSAs or a representative sample of

23  these KSAs such to satisfy your professional standards?

24  A.    As I indicated, I like to measure most to all in a

25  selection process, and I believe we did to the extent that

1    the -- that the context that I was in wanted us to, or needed

2    us to, and that the data told us to.  I was definitely looking

3    for methods to reduce adverse impact because I was under

4    Department of Justice guidelines at the time, and I was going

5    to try to include it at the end of the process to the extent

6    possible.  So these KSAs were spread along the whole selection

7    process and put into a training program, if necessary.

8    Q.    And when we talk about compensatory models, would having

9    the training program be part of a compensatory model to ensure

10   that you're getting the full spectrum of the knowledge, skills

11   and abilities to do the job, even if it's not contained in the

12   actual competitive examination itself?

13   A.    Would it be part of the compensatory -- I don't know if I

14   would -- if I would characterize it that way.

15   Q.    But in any event, in this example, including some of these

16   KSAs and assessing them in a supervisory preparation class or

17   assessing them after the eligibility list has been created

18   would be satisfactory in terms of the overall validity of this

19   testing process?

20   A.    It was satisfactory to all the parties involved and to me

21   at the time, yes.

22   Q.    Just a moment.

23          (Pause.)

24   BY MS. HARRIS:

25   Q.    Just going back for just a minute to some of the other

1    assessment tools that you've mentioned.  When you talk about

2    accomplishment records and bio data, I'm -- I'm thinking of

3    those as being sort of synonymous; is that fair?

4    A.    I'm sorry.  Could you repeat that one more time.

5    Q.    Sure.  Accomplishment records and bio data are they

6    essentially the same thing?

7    A.    I consider them very similar, yes.

8    Q.    Okay.  And let me see if this description is accurate.  In

9    putting together an accomplishment record, the onus is on the

10   candidate to present their professional and other

11   accomplishments as they relate to the position.  Is that

12   generally accurate?

13   A.    But it's structured.

14   Q.    Okay.

15   A.    Okay.

16   Q.    And that's my next question to you.  When you say that

17   it's structured how is the candidate informed about how to

18   structure their accomplishment record?

19   A.    Well, this is very common practice that I use and that the

20   federal government uses, for example, for all of their

21   credit -- I don't know if you've ever heard the term crediting

22   plans, but for most jobs in the federal government you have to

23   complete a crediting plan, which is very similar to an

24   accomplishment record.  And the method asks candidates specific

25   questions, and it's structured so that they will respond, and

1   many people -- many organizations, me included, give training

2   on how to organize your response, prepare.

3   Q.   I'm sorry.  Is this an oral presentation or is it a

4   written submission or can it be both?

5   A.   It can be both.

6   Q.   And did you look at doing an accomplishment record when

7   you were putting together the selection process in Macon?

8   A.   Yes.

9   Q.   And do you recall the reasons that you decided not to do

10  it?

11  A.   I don't recall.  I think the Department of Justice and I

12  had conversations about that piece, and ultimately they were in

13  favor of command staff recommendations.

14  Q.   Okay.  We've talked a little bit about the 2002

15  examination that the Boston Police Department attempted, which

16  included an assessment center.  And are you aware that at least

17  as initially proposed it include -- it included a provision

18  called a performance review system where the candidates could

19  present their qualifications similar to the bio data record

20  that we're talking about here?

21  A.   I heard about it, but I don't know the specifics.

22  Q.   Do you know that it ended up not being part of the final

23  examination after various challenges were filed?

24  A.   I do know that.

25  Q.   Okay.  And do you know that the weights that had been

1  accorded to the performance review system were put into the

2  assessment center, as opposed to the written examination?

3  A.    Were put where?

4  Q.    Into the assessment center, the oral component?

5  A.    I did not know that.

6  Q.    I'll refer you to page 16 of the report in Macon, which

7  discusses, and this is the section that is -- starts at page

8  10, consideration of test alternatives.  And on page 16, you

9  discuss your interest in doing the accomplishment record but

10 then go on to say, "There are numerous problems associated with

11 accomplishment records including the degree to which candidates

12 had the ability to describe their previous accomplishments

13 verbally or in writing; for example, candidates with better

14 writing skills or oral communication skills might appear," in

15 italics, "to be better candidates whether or not their

16 accomplishments are better than other candidates."

17      And off this document for just a moment, would you agree

18 that that's one of the problems with using an accomplishment

19 record?

20 A.    Which is why we provide training and why most people who

21 use them now have started to provide candidate training for

22 these things.

23 Q.    Okay.  And then down at the bottom of that paragraph, or

24 excuse me, just continuing on, you write, "In addition, if

25 minority candidates had lower writing or oral skills, this

1    could lead to adverse impact.  We had attended -- intended to

2    address this issue with training, both candidates and

3    assessors; however, the costs associated with the development,

4    validation and training were prohibitive."  And then you go on

5    to say, "With well over 300 candidates in the process, the

6    selecting officials did not have the records, means or the time

7    to conduct full validity checks."

8        And is that a fair summary about the reasons why you

9    declined or decided against going with using the accomplishment

10   records?

11   A.   I do believe that Macon said they did not want to do this

12   process because they don't want to pay for another component.

13   Q.   And when you talk about the feasibility of some of these

14   components, is it fair to say that the cost of putting these

15   things together is something that has to be considered in

16   determining whether or not they're feasible?

17   A.   Yes.

18   Q.   And here putting together a training and -- for candidates

19   and for assessors for the accomplishment record for 300

20   candidates was simply prohibitive in the assessment of the city

21   here?

22   A.   Yes.

23   Q.   Did you agree with that assessment?

24   A.   No.

25   Q.   Did you suggest to them that they should consider -- that

1    they should invest the resources to produce this component of

2    the examination?

3    A.   I believe after I did -- like I said earlier, when I spoke

4    to the Department of Justice and they said you could -- they

5    were in favor of command staff recommendations, I decided to go

6    that route, and I did build another tool, which I believe ended

7    up costing about the same as the accomplishment record would

8    have.

9    Q.   And what tool is that?

10   A.   It was the selection criteria out of the -- the band.

11   Q.   Okay.  So again we're looking at the candidates that made

12   it into the band --

13   A.   Yeah.

14   Q.   -- as opposed to those who were competing in the

15   examination itself?

16   A.   Correct.

17            THE COURT:  May I ask just a couple of questions?

18            MS. HARRIS:  Of course.  Yes.

19            THE COURT:  On the accomplishment records, does that

20   typically include negative accomplishments such as a

21   disciplinary record?

22            THE WITNESS:  It can.

23            THE COURT:  Well, typically?

24            THE WITNESS:  Well, I happen to be using one right now

25   that does include a disciplinary review.  Uh-huh.

1          THE COURT:  That's it.

2          MS. HARRIS:  I'm sorry?

3          THE COURT:  That was the only question I had.

4    BY MS. HARRIS:

5    Q.   Now, in talking about the preparation technique that

6    you've testified to yesterday and a little bit today, the

7    training that your company puts together is designed, as I

8    understand it, to train the candidates on how to take the exam;

9    is that correct?

10   A.   Take and prepare for.

11   Q.   And what kind of elements does your training program

12   cover?

13   A.   For example, methods to review general orders, study and

14   memorize and learn when they -- when they are not -- when they

15   do not understand the material, methods to practice live

16   exercises so that anxiety doesn't interfere with test

17   performance.  That's the test prep side.

18        And sometimes we will give them what I would call mini

19   examples so that they can get a feel for what they might see.

20        Then -- and then we give them test taking strategies,

21   things that could help them find, for example, a keyword in a

22   question or how to review alternatives and try to select the

23   best answer if they -- they can whittle it down to two

24   alternatives; or if they don't know one part of the exam and

25   they could move on to another and come back to -- how to review

1    an entire exam before they start taking it.  Those are just

2    some -- some few examples.

3    Q.    And I know that you testified that the program that you

4    ran in Memphis was a little bit different?

5    A.    It was very different.

6    Q.    Okay.  So focusing on Macon, is it fair for me to assume

7    that the work that you did in Macon was similar to what you've

8    just described?

9    A.    Yes.

10   Q.    And can you estimate what the cost was for your producing

11   that training program for Macon?

12   A.    I don't know what the exact cost was.

13   Q.    Okay.  Do you have a rough estimate of what it cost for

14   300 candidates that I believe you testified were in the overall

15   all-ranks pool?

16   A.    It was included as the overall part of that contract.  I

17   don't remember what the specific part of it was.

18   Q.    Okay.  Are you aware that at least with regard to the '05

19   and '08 exams in the Boston Police Department that -- that

20   Boston provided training for the examinations to take the

21   examinations in their training academy that was not mandatory

22   but open for anybody that was interested in taking the

23   training?

24   A.    I did not know that.

25   Q.    In your view, in providing the training that you've

1    described, does that help to increase the validity of the

2    examination once administered?

3    A.    I don't think it increases the validity.

4    Q.    Does it increase the reliability?

5    A.    It probably increases the reliability.

6    Q.    And is the main purpose in doing it to help reduce adverse

7    impact?

8    A.    I think, just to go back to the concept of reliability,

9    it's both reliability and -- and perhaps validity as well

10   now -- let me -- let me think for a minute.  I think

11   reliability, validity and adverse impact because the goal of

12   testing is -- and, you know, this is the fundamental underlying

13   goal of all testing, we want to know candidates' true

14   knowledge, skills, abilities and other characteristics.  And if

15   there's anything preventing those from being demonstrated

16   during a testing process, then that would reduce the

17   reliability, validity, and it may cause adverse impact.  So the

18   test preparation, I would say, allows candidates -- what it's

19   designed to do is allow them to demonstrate what it is they

20   have so it increases all the above.

21   Q.    And would you still consider that to be true if the

22   training is voluntary as opposed to mandatory?

23   A.    It would -- it might cause difficulty if it's not

24   mandatory because those who go have a better opportunity to

25   demonstrate than those who do not.

1    Q.    But if it's voluntary, doesn't that factor into, for

2    example, one's organizational commitment if one's not willing

3    to voluntarily avail themselves of training that's made

4    available?

5    A.    There are so many reasons why people do and do not attend

6    training programs that I would say I can't guess why.

7    Q.    Okay.  I think one of the other components that you talked

8    about yesterday was the use of a physical abilities exercise,

9    but is it fair for me to assume that you've never recommended a

10   physical abilities exercise in the police function as opposed

11   to the fire function?

12   A.    I've never recommended one for promotion.

13   Q.    In any --

14   A.    For no position.

15   Q.    Okay.  Do you recall talking yesterday about using

16   physical ability exams in the promotional process?

17   A.    No.

18   Q.    Maybe -- maybe my pen was running ahead of you, so...

19           THE COURT:  May I ask on that?

20           MS. HARRIS:  Yes.

21           THE COURT:  Is that because you think it's adequately

22   tested at the selection level?

23           THE WITNESS:  Yes, I do.  And also many departments

24   these days have health programs and physical programs that go

25   throughout the ranks, and that's for me a separate function.

1   BY MS. HARRIS:

2   Q.   I'm sorry.  Could you say that again?  I didn't catch the

3   beginning of your answer.

4   A.   Many departments have physical health programs and regular

5   in-house testing or evaluations of those sorts, and even in

6   some departments, if you do not maintain certain physical

7   standards at all levels, you -- you can be fired.  So I -- I

8   don't usually focus on that.

9   Q.   I don't know that it's relevant here, but I can assure you

10  that that is not something that we have in Massachusetts, and I

11  don't cast dispersions at anybody in saying that.

12  A.   We'd better not go on.

13          (Laughter.)

14  BY MS. HARRIS:

15  Q.   Some of the other aspects of the examination process that

16  you've talked about in relation to the Uniform Guidelines and

17  then just in general are steps that are taken to reduce adverse

18  impact.  And I'm assuming that this is separate from the other

19  assessment-type exercises that we've just described.  And I'll

20  ask you one of the topics that you talked about was the

21  readability of a written portion of an examination.  And do you

22  recall that generally from yesterday?

23  A.   Yes, I do.

24  Q.   And when you were describing assessing readability, I

25  believe you said that you wanted to link or measure the

1    readability of the testing instrument to the materials that the

2    candidate is likely to have to use in their job; is that right?

3    A.    Yes.

4    Q.    And do you know what the reading level is in the Boston

5    Police Department for the rules and regulations that govern the

6    operation of the department?

7    A.    I have not sampled that material, no.

8    Q.    Okay.  Now, in Macon, if you look at page 40 of your

9    report, and you're talking here -- it starts on page 39, steps

10   to reduce adverse impact.  You talk about the job knowledge

11   multiple-choice examinations and the concerns that you had.

12   And I'll direct you just to the bottom third of this page where

13   you state that you selected the job knowledge multiple-choice

14   examination as one component in five of the promotional exams

15   because this measure of job knowledge generally has high

16   validity and relatively low cost; however, we were concerned

17   about the possibility that it would produce adverse impact.

18             MR. LICHTEN:  At what page, please?

19             MS. HARRIS:  Page 39 at the bottom.

20             MR. LICHTEN:  Thank you.

21   BY MS. HARRIS:

22   Q.    And then you state to address this potential

23   problem -- and by you I'm referring to FCG, which I understand

24   is your company -- you implemented the following:  You limited

25   the length of each test to 50 items to reduce the cognitive

1  requirements of reading a long exam; and you provide

2  justification for that; and then in the second item, you state

3  that most of the items were situational type items, which may

4  help to reduce adverse impact.  They were drafted in common

5  public safety language.  Items had low cognitive processing

6  requirements, and items had relatively easy reading

7  requirements, less than sixth grade for fire and around eighth

8  grade for police.  Each of these procedures contributes to

9  reducing adverse impact.

10      And then the third item that you list is that you limited

11  the reference material to four or fewer texts and in some cases

12  use chapters rather than whole textbooks.

13      And I'll ask you would it be appropriate to use an eighth

14  grade reading level for the multiple-choice exam if the reading

15  level for the general orders that govern the jurisdiction are

16  written at a college grade level?

17  A.    It could be some of the items wouldn't be necessarily the

18  whole exam.

19  Q.    And by some of the items, which items would it be

20  appropriate to lower the reading rate for?

21  A.    You -- you wouldn't choose a specific item.  You just want

22  to make sure that your combined items together produce a

23  reading level that is at or below the requirements of the job.

24  Q.    So if the requirement of the job is at the college level,

25  is there a standard reduction that would be appropriate beyond

1    which it wouldn't be appropriate to go, if you understand the

2    question?

3    A.    No.

4    Q.    You can bring it down to sixth grade level without having

5    that jeopardize the validity of the examination -- or the

6    appropriateness of the instrument?

7    A.    I believe you could.

8    Q.    Is it possible to make a test that would be too easy to be

9    a valid selection instrument --

10   A.    Yes.

11   Q.    -- in your opinion?

12         And how -- what are the indications that you would have

13   that an exam is too easy for the purpose for which it's being

14   used?

15   A.    If every single item were -- had a very high pass rate.

16   And there was no items that, what we say in the business,

17   discriminates between high and low performers.

18         And then on the assessment center, if, again, you didn't

19   have enough score variance and -- it depends what you want to

20   do.  I mean, if you had an easy -- in Memphis, for example, we

21   wanted to train the people to successfully get high scores.

22   That was our goal because it was a training program so we

23   wanted the test scores to go up and up and up, which

24   demonstrated that they learned the training material.  But if

25   you want variance and you want to discern between higher or

1    lower performers, then you may want to ensure that your items

2    have varying levels of difficulty.

3    Q.   In Macon, because I want to distinguish that for just a

4    moment, were you looking to distinguish between your high and

5    lower performers?

6    A.   In Macon, I was concerned that the top performers would

7    get to the top of the list.  I didn't -- I wasn't concerned

8    with failing people.

9    Q.   But when you say that you were concerned that the top

10   performers would get to the top of the list, that

11   was the -- you don't mean that as a negative?  That wasn't a

12   negative concern?

13   A.   That was -- that was -- that's what a valid exam does,

14   yeah.

15   Q.   To get the top performers to the top of the list?

16   A.   Correct.

17   Q.   Now, in the example of Macon, there were 74 candidates for

18   the position of sergeant.  I believe 73 went through the entire

19   process, and of those 73, 72 passed the exam, correct?

20   A.   Can you tell me where you're looking?

21   Q.   Yes, in just -- I'll show this to you.  Give me just one

22   sec to make sure I grabbed the right document.

23          (Pause.)

24   BY MS. HARRIS:

25   Q.   Now, the stack that I just gave you, Dr. Fields, has all

1    of the ranks, but I'd ask you to page in to the table that's

2    labeled Table PD 18, and it's titled "Adverse Impact Analysis

3    of the Passing Score for the Sergeant Promotional Process."  Do

4    you have that?

5    A.    I'm there.

6    Q.    Okay.  And so looking at this, it states white, the number

7    taking the exam, 51, 51 passed; and then black, 22 took the

8    exam, and 21 passed.

9    A.    Correct.

10   Q.    Have I read that correctly?

11       Does the fact that all but one of the people -- and this

12   is an examination that included the mandatory training that

13   you've discussed.  Does the fact that all but one of the people

14   who took the sergeant's exam passed the exam cause you any

15   concern about whether or not the exam was too easy?

16   A.    The exam may have had too low a passing score, and we

17   would have evaluated that for the next exam, but, again,

18   passing and failing is -- is -- is not necessarily the criteria

19   for this particular project.  This project was to identify who

20   was the most qualified and get them into a banding process and

21   to consider their qualifications from that point.

22   Q.    Okay.  So clearly the fact that everybody passed meant

23   that there was no adverse impact?

24   A.    In the passing rates, correct.

25   Q.    In the passing rates.

1     And then you looked at the adverse impact analysis at the

2  selection rate, or the selection pool, rather, and this is

3  Table 19 where you have number of eligible candidates:  White,

4  51, the number in the selection pool were 24; and then black,

5  21 eligible, and eight were in the selection pool.  And then

6  your selection ratio is .8.

7     And first, can I assume that these are individuals who are

8  actually selected for promotion, or is this the individuals who

9  were in the band who were eligible for promotion?

10 A.   I can only tell you what the table says because I don't

11 recall, but it's in parenthesis for 25 vacancies as of

12 January 1, 2006.  I do not know if those 25 vacancies were

13 filled.

14 Q.   Okay.  And then the next chart is labeled PD 20, "Adverse

15 Impact Analysis of the Proposed" -- Proposed Initial Selections

16 for 25 Vacancies as of January 1, 2006."  And can you tell me

17 in this chart whether this reflects the selection for these

18 vacancies?

19 A.   It says "Proposed Initial Selections."  I am assuming that

20 those were selected and so, yes.

21 Q.   Okay.  And then the selection ratio is .89, correct?

22 A.   Correct.

23 Q.   So the candidate population shows no adverse impacts.  And

24 then the selection ratio at the very last column of this chart,

25 selection ratio, paren, selection pool has a Figure 1.1.  And

1    can you tell by looking at this what that indicates?

2    A.    That means that those who got into the band, we compared

3    the number selected compared to those who got into the band, so

4    blacks were selected at a higher rate than whites.

5    Q.    Okay.  And then the last document that I'd like to look at

6    in this series is Table PD 21, which is adverse impact analysis

7    of the selection pool over the life of the list.  And it

8    indicates for three projected vacancies due to retirement.  And

9    I'll ask you first whether you know if the life of this list

10   was intended to be a two-year -- a two-year life to the list?

11   A.    It was a three-year list, ultimately.

12   Q.    Three-year list.  And then can I assume from this chart

13   that they were projecting that there would be three additional

14   vacancies while this list remained viable for selection of

15   candidates?

16   A.    That's what I assume.

17   Q.    Okay.  And then it indicates that of these remaining

18   candidates, there would be 32 whites and 14 blacks remaining

19   for selection, and the projected selection pool had 11 of the

20   32 whites and one of the 14 blacks, and then the ratio at the

21   end is a .21, correct?

22   A.    That's what it appears.

23   Q.    Okay.  And would that indicate that the next choice or

24   next anticipated vacancies from this test would indicate severe

25   adverse impact in this selection?

1  A.   When we talked about this in the deposition, I didn't

2  understand it, and I'm still not sure I do, but that's not how

3  I read it.  I think that this -- if you just looked at the

4  ratio, just from that remaining pool which is not how it would

5  be done, then I guess the next ratio would be .21, but the way

6  it is done is you add all the numbers together for the entire

7  list.

8  Q.   And when you say you add all the numbers together, you

9  mean for making an adverse impact calculation?

10  A.   Yes.

11  Q.   And you're looking at the list as a whole both at the

12  pass/fail point to determine whether there's adverse impact at

13  that point, correct?

14  A.   Correct.

15  Q.   And then when you look at the other -- I think you called

16  them cuts, how do you determine where you appropriately look

17  for assessing selection cuts for adverse impact?

18  A.   Just based on projected vacancies, which are based on

19  who's going to retire, who's on, you know, extended injury

20  leave and things along those lines.

21  Q.   So it's a fairly smooth calculation it sounds like?

22  A.   It is.

23  Q.   It's not one cut or one stagnant cut?

24  A.   Correct.

25  Q.   And it depends on variables, like the number of vacancies

1    that you have and the number of vacancies that will occur

2    during the life of the list?

3    A.    Correct.

4    Q.    Okay.  That's all I had on that piece.

5          You talked a number of times about -- about the systems

6    that you put in place in Macon for selection, and I'd like to

7    look at those for just a moment.

8          One of the topics that you've mentioned is banding, and

9    what -- if we can talk about banding for just a second, I

10   believe that you testified yesterday that bands can come in

11   various widths, if that's, you know, an appropriate term.  So

12   you can have a band of three, where three candidates are

13   eligible for consideration, a band of five, and I think you

14   said as big as a band of ten; is that right?

15   A.    I've seen bands as big as 20 and more.

16   Q.    Okay.  And I believe you testified yesterday that there

17   are two ways that bands can be identified, and one is creating

18   a statistical band, which as I understand it a testing expert

19   looks at the range of scores and assesses whether certain -- a

20   certain number of scores in a given width are functionally

21   equivalent, and by that I mean like if someone gets a 90 and

22   somebody else gets a 91, that there's a way to look at the

23   numbers that are fairly close together and say for all

24   practical purposes these people are equal?

25   A.    And when you're doing it statistically, which is what you

1    said, that would be a statistically insignificant difference.

2    Q.    Okay.  So that would define one band.  That's one way of

3    doing a band?

4    A.    Correct.

5    Q.    And then I believe that you also described a sliding band?

6    A.    I didn't talk about a sliding band yesterday.

7    Q.    Okay.  So if we're talking about a band other than that

8    statistical band where people who have insignificant

9    differences are in one group, what is the other type of banding

10   that is possible?

11   A.    The one that you said the rule of three, the -- a

12   predefined band width.

13   Q.    And so that kind of a band doesn't -- it's not saying that

14   we're agreeing that these people who got these scores are

15   technically, statistically equivalent, but we're saying that

16   for purposes of practicality we're going to look at people

17   within this range as being the functional equivalent of one

18   another?

19   A.    Exactly.

20   Q.    Do you recall what the band width or -- strike that.

21       Do you recall what kind of banding was used in Macon, a

22   statistical band verus -- is it fair -- is it a sliding band?

23   A.    No, a sliding band is -- is an -- is how you use the band.

24   The band width is the size of the band.  So sliding is

25   separate -- a separate issue.

1    Q.    Okay.  So with the second type of a band, would be that a

2    rule-based band?  I'm just trying to look for the technology

3    for it?

4    A.    A rule-based band, yes.  That's a rule -- yes.

5    Q.    Okay.  So in Macon you used a rule-based band?

6    A.    I think so.  Did -- I mean, I didn't read it.  I believe

7    it was a fixed rule.

8    Q.    And in -- in Macon, did you have, or did the community

9    have the discretion to determine how wide the band would be for

10   purposes of consideration for selection?

11   A.    Did -- did who have input?

12   Q.    Did the city have discretion to determine how wide they

13   wanted their band to be?

14   A.    I don't know if it was -- if it was the city.

15   Q.    Okay.  I'm going to ask you to look at page 110, and this

16   is in the overall section that is Section 7, the certification

17   of the rule of five.  And on page 110, at the bottom quarter of

18   the page, it states, "The rule of five rather than the rule of

19   three or ten was selected by officials in Macon because of

20   Macon's size and the size of the candidate populations.

21   Furthermore, a rule of five is a manageable number from which

22   to select."

23        And does that assist you in determining whether Macon had

24   the discretion to choose how wide they wanted their band width

25   to be?

1   A.   The officials would have included the judges and the

2   attorneys and everyone who was involved in the case, so there

3   was a -- there was a number -- there was a number of people

4   involved.

5   Q.   Okay.  Do you know -- I know we talked yesterday about the

6   2 N + 1 system in Massachusetts.  And do you understand that

7   that -- well, first, is that a band technically?

8   A.   I consider that a band.

9   Q.   Okay.  And is it your understanding or are you aware that

10  that band is established by state statute?

11  A.   I think you told me that yesterday.

12  Q.   And in the rule of five band, as it was used in Macon,

13  does -- well, is the appointing authority in Macon the police

14  commissioner?

15  A.   Police chief and fire chief.

16  Q.   Okay.  So once the rule of band is established under the

17  Macon system, does the police chief have discretion to choose

18  candidates from among those five?

19  A.   He has a procedure --

20  Q.   Okay.

21  A.   -- that I established.

22  Q.   Okay.  And let's talk about that.  The next section, which

23  starts on page 115, it's entitled "Section 8 - Selection From

24  the Eligibility List."  And just as a preliminary matter, the

25  process of selection from the eligibility list was something

1  that was created by you for the city?

2  A.   Correct.

3  Q.   Okay.  So it's not something that's dictated by state law

4  or by collective bargaining agreements because I think, for

5  example, in Memphis you talked about how the collective

6  bargaining agreement requires one for one rank order selection.

7  There was nothing like that governing --

8  A.   That's not a collective bargaining agreement, but that was

9  a memo of understanding agreement, okay, yes.

10  Q.   Okay.  So there was nothing like that that controlled the

11  way that the procedure would work in Macon?

12  A.   I don't believe so, no.  There was a city charter, I

13  believe, and I don't remember what the city charter said.

14  Q.   Did it restrict you in any way from being able to make

15  recommendations to Macon about how they could best proceed?

16  A.   I don't recall.

17  Q.   Okay.  Starting on page 115, you talk about the -- and

18  this is the bottom third of the page -- the structured

19  selection criteria form and selection matrix that you

20  considered mandatory training, non-mandatory training, job

21  assignments, project assignments, commendations, formal

22  education, preferred qualifications and discipline, and I'm

23  assuming that those items are listed as different

24  considerations that you initially proposed as ways to sort of

25  cabin the discretion of the police chief in making his

1    selection from the rule of five?

2            MR. LICHTEN:  What page is that?

3            MS. HARRIS:  This is 115.

4            THE WITNESS:  That proposal was discussed with many,

5    many people, yeah.

6    BY MS. HARRIS:

7    Q.    And so as you go through the section here, Section 8, you

8    discuss the various merits of each of these pieces.  And on

9    page 118, under non-mandatory training, you note that in the

10   police department Caucasians and African-American candidates

11   seem to take training courses on a more equal basis.  Training

12   is tied to incentive pay, and police department employees can

13   take advantage of this opportunity to obtain more pay.  So

14   ultimately you conclude that non-mandatory training is one of

15   the factors that the police chief can use in exercising his

16   discretion in making selections?

17   A.    Correct.

18   Q.    And you also considered under -- on page 119, under job

19   assignments for the police department, the police chief

20   indicated that candidates have always been encouraged to

21   transfer into different divisions and specialty divisions to

22   broaden their knowledge.  I'm skipping through this last

23   paragraph.  Job assignments were included as one of the police

24   structured selection criteria rating.  We limited the number of

25   assignments to five because the police chief indicated he could

1    differentiate between candidates who had held up to five

2    assignments.

3          So from this I'm concluding that the police chief has

4    available to him to inform his discretion the candidates'

5    non-mandatory training and the assignments that they held

6    within the organization?

7    A.    I'm confused by what you mean by "discretion."

8    Q.    Okay.  I'm assuming that in putting together the selection

9    from the eligibility criteria form and selection matrix that

10   part of what you were providing to the city was a way for them

11   to make choices about who would be appointed so as to

12   distinguish between the candidates who were in the band of

13   five --

14   A.    Correct.

15   Q.    -- is that right?

16   A.    But, again, very structured and very linked to specific

17   things.  So he didn't just pull records and count courses.  He

18   had a form, and he -- it was structured to indicate what

19   courses they were, and there was only certain ones that were

20   considered relevant, et cetera.

21   Q.    Okay.  And that's a -- that's a fair correction.  So the

22   pieces that I'm talking about here are the post-exam eligible

23   list, and then these are the different qualifications that the

24   police chief and you sort of formulated in order to determine

25   how the selection process should work?

1    A.    Well, yes, and subject-matter experts and again all these

2    other officials and attorneys and Department of Justice that

3    was involved.  I sent every -- every form and every concept to

4    them for review and discussion.

5    Q.    Okay.  So I'm taking from that that there was general

6    agreement from all of these different stakeholders that this

7    non-mandatory training defined however, you know, whatever

8    those items were that you determined were appropriately linked

9    to the job, and then assignments constituted valid and

10   preferred qualifications that the police chief could consider

11   in making his assessment?

12   A.    Correct.

13   Q.    And then on page 121, you indicate that discipline was a

14   factor and that the police chief was -- and this is at the

15   bottom of page 121 -- was able to evaluate a number of

16   disciplinary actions, types of offenses, and so on, when he was

17   comparing candidates for promotion.

18         So discipline, as well, was factored in to the selection

19   matrix?

20   A.    Correct.

21   Q.    And then on page 123, using the selection matrixes under

22   the caption police department, it states the police selection

23   matrix consists -- excuse me -- the police selection --

24   A.    I'm sorry.  Where are you reading?

25   Q.    On page 123 under police department.

1    A.    Okay.

2    Q.    And the matrix contains three final sets of numbers to be

3    considered.    These are, number one, the combination of

4    preferred qualifications and assignment points; number two, the

5    promotion test score; and, number three, discipline.    There is

6    an explanation of how these numbers should be considered and

7    the directions for the matrix when there are situations in

8    which there is no clear candidate with the most points, the

9    highest test score and the least disciplined, the police chief

10   uses his judgement to decide who is best qualified for the

11   position.

12       And does that adequately summarize the way that the police

13   chief will be able to make selections from his examination?

14   A.    That is what I recall.

15   Q.    Okay.

16       THE COURT:    Ms. Harris, I think we'll take the morning

17   recess at this point.

18       MS. HARRIS:    Okay.    Thank you.

19       THE CLERK:    All rise.

20       The Court will take the morning recess.

21       (The Court exits the courtroom, and there is a recess

22   in the proceedings at 11:07 a.m.).

23       (After recess, start at 11:35 a.m.)

24   BY MS. HARRIS:

25   Q.    Dr. Fields, just before we leave the issue of the Macon

1    report, I'd like to draw your attention to page 97 of the

2    report at the very bottom of the page, and this is where you're

3    reporting out your test results.  And it's page 97.

4         And starting with the paragraph that begins at the

5    bottom of page 97, you write, the standard -- "The final

6    standardized mean difference between African Americans and

7    Caucasian candidates was .74 with Caucasians outperforming

8    African Americans."

9         And then on the next page, you write, "In all

10   exercises in the multiple choice tests, Caucasians outperformed

11   African Americans (oral presentation the D was .52, emergency

12   incident the D is .49, the supervision exercise the D is .08,

13   multiple choice test the D is 1.23.)"  You write, "The

14   differences in the supervised -- in the supervision exercise

15   are not statistically or practically significant.  The largest

16   difference by far was in the job knowledge exam.  African

17   Americans had more seniority than the Caucasians did at this

18   rank."

19        And I'll ask you, given the results that you found

20   with the examination itself, would it be your opinion that you

21   could design a test for the Commonwealth under the restrictions

22   that the Commonwealth operates under that would have less

23   adverse impact than the exam -- the exams that are the issue

24   here?

25   A.   Yes, I believe I could.

1  Q.   And the piece of information that we just read from the

2  validation report dealt only with the test results themselves,

3  correct, not the selection criteria?

4  A.   Correct.

5  Q.   Okay.  So when you received these results from the

6  examination itself, you then went on to use the selection

7  criteria that you described, that would be the preferred

8  qualifications, the discipline components.

9  A.   Correct.

10 Q.   And is it consistent with your understanding of the way

11 Massachusetts works that in Massachusetts under the Civil

12 Service system the examination score is the sole basis upon

13 which individuals are put on the ranging list, the eligibility

14 list?

15 A.   It is my understanding it's combined with the T&E.

16 Q.   The examination that I'm describing, that's correct.  The

17 multiple choice exam and the T&E component combined make up the

18 final examination score, and it's that score that governs the

19 placement of an individual on the eligibility list?

20 A.   And we're not talking about veteran preferences at this

21 time.

22 Q.   Not yet.  I was going to add that on.

23 A.   Okay.  Yes.

24 Q.   So those are the components that determine the final

25 score?

1    A.    Okay.

2    Q.    And in Massachusetts, although there is the 2 N + 1, there

3    is also a requirement in Civil Service law that if you're not

4    going to appoint in strict rang order that you have to justify

5    the decision not to select, as oppose to justifying the reasons

6    to select the lower ranking person?

7    A.    Yes.

8    Q.    And with those restrictions it is still your position that

9    you would be able to create an exam that has less adverse

10   impact?

11   A.    Yes.

12   Q.    Are you -- strike that.

13          We talked a little bit about the Boston exam from

14   2002, and with regard to the Boston exam of 2002, that exam

15   cost approximately $1.2 million to design, create, and

16   implement for the city.  And that's all three ranks.  And are

17   you familiar with the results of that examination process as it

18   pertains to sergeants?

19   A.    Yes.

20   Q.    And I believe that you reviewed the report of Dr. Silva

21   where he looked at the components of the examination and

22   performed an adverse impact analysis.  And this is --

23          MS. HARRIS:  And I apologize, your Honor, I just have

24   my copy of the report.  I was going to put this up on the Elmo,

25   so I'll just recite it out.

1    Q.    As you mentioned yesterday, the -- excuse me, just one

2    sec.

3            And as you had mentioned yesterday, I believe you had

4    looked at the mean difference between African American and

5    Caucasian officers at the assessment center and found that it

6    was a .25, I believe, and then for the multiple choice

7    examination you found the mean difference was a 55.  And I

8    believe that your testimony was that you found these to be very

9    encouraging results.

10   A.    Yes.

11   Q.    Do you know that the outcome -- well, strike that.

12           Are you aware that the final test score was achieved

13   by weighting the assessment center 40 percent, the multiple

14   choice 40 percent, and then the training and education at 20

15   percent of the total value of that exam?

16   A.    I did not know the exact weights.

17   Q.    Does that change your assessment one way or the other as

18   to whether the results of the examination were encouraging?

19   A.    Yes.  It's still -- no.  Excuse me.  It confirms my belief

20   that they're encouraging.

21   Q.    Okay.  And are you aware that in Dr. Silva's adverse

22   impact assessment of these examinations that the 2002 exam

23   compared to the exams that we're here about today finds that

24   one additional minority was promoted as a result of the

25   multidimensional 2002 examination as compared to the exams that

1    are at issue here?

2    A.    I remember that statement, yes.

3    Q.    So there's a gain of one additional minority.

4    A.    Yes.

5    Q.    And in your assessment, looking in particular at the

6    feasibility aspect of conducting these examinations, would

7    it -- in your experience would you find it reasonable or

8    feasible for a community to spend $1.2 million at every

9    two-year promotional cycle to try to achieve less adverse

10   impact when it has achieved the results that we've described in

11   2002?

12   A.    We're not comparing apples to apples, though.  So we

13   achieve one more minority compared to the 2002 exam, which I

14   thought was encouraging and could be improved potentially.

15   Q.    And when you say that the 2002 could potentially be

16   improved, what in your estimate would it cost to improve that

17   exam?

18   A.    I don't know.

19   Q.    I'm sorry, I had one more question about Macon.

20          You had said that when you were putting together the

21   selection criteria to guide the chief's selection at the end of

22   the process, that those selection criteria were selected by a

23   number of individuals.  I believe you said subject matter

24   experts, the chief, input from the Department of Justice, and

25   other city officials; is that correct?

1   A.   And the attorney I was working with.

2   Q.   Okay.  And were those -- was the input from those

3   different individuals captured in the validation report?

4   A.   I believe -- I don't know if I wrote them down

5   specifically.  I said Macon officials, I believe.

6   Q.   Okay.  And I'm assuming that the validation report itself

7   refers to the fact that there are appendices in other documents

8   that are maintained your office.  So this is not the sum total

9   of the work that was performed, correct?

10  A.   Correct.  And I believe the job analysis is not in this

11  report at all.

12  Q.   Okay.

13  A.   Is it?  I don't recall.  I thought there was another whole

14  binder.  There was a job analysis.

15  Q.   I'll represent to you this is what I was able to get from

16  the court.

17  A.   Okay.

18  Q.   Okay.  I just have, I think, one final piece to go over.

19          You were testifying yesterday, I think, in

20  anticipatory rebuttal to the testimony that is anticipated to

21  be offered by Dr. Outtz, and that's in regard to comparing the

22  police sergeant and the fire lieutenant positions.  Do you

23  recall that testimony generally?

24  A.   Generally, yes.

25  Q.   And again, looking at Macon, part of your job mandate in

1    Macon was to develop examinations for both the police and the

2    fire departments, correct?

3    A.    Correct.

4    Q.    And again, I had anticipated putting these up on the

5    board, but this is actually in the validation report, as I look

6    at it.

7           If I could refer you for just one second to page 32 of

8    the validation report, which we had looked at previously.  This

9    lists the KSAs for the police sergeant, lieutenant, and

10   captain.  And the importance ratings are shown in parenthesis.

11   And looking at the police sergeant, the first most important

12   category is, as I read it, looking -- referring to the weights,

13   is organizational commitment, which is weighted 3.38.  The

14   second is interpersonal relations rated at 3.24.  And the third

15   is ability to function under stress at 3.32.  And then on the

16   following page you list the fire sergeant, lieutenant, and

17   captain KSAs.  And for fire -- well, fire sergeant and

18   lieutenant, is there a distinction between the two ranks in

19   Macon?

20   A.    Yes.

21   Q.    And which would be the equivalent to the position that you

22   were comparing yesterday?

23   A.    Fire sergeant would be closer.

24   Q.    So looking at fire sergeant, the first critical, most

25   heavily weighted task is knowledge behavior.  Knowledge of fire

1    behavior at 3.33.  The second most important task knowledge,

2    skill, and ability is knowledge of emergency medical care at

3    3.28.  And the third is ability to function under stress at

4    3.28.  And, like in the police exam, for the fire sergeant, the

5    ability to function under stress was not measured.  But I note

6    that in the listing of the important KSAs for fire sergeant,

7    you list items such as operation of fire ground operations;

8    knowledge of emergency medical care; knowledge of tools,

9    equipment, and apparatus; skill and rescue techniques; and

10   building inspection and fire prevention.  And my question to

11   you, Dr. Fields, is:  There are a number of significantly and

12   heavily weighted KSAs listed under the fire service that show

13   up nowhere on the police sergeant, lieutenant, and captain

14   service, would you agree?

15   A.   Yesterday what I said was that the knowledge areas would

16   be extensively different but some of the main competency areas

17   would have a lot of overlap.

18   Q.   So the main competency areas that you're focusing on are

19   those that refer to supervision, correct?

20   A.   Oral communication ability is just -- it refers to the

21   entire job.  For example, written communication ability, the

22   whole job.  Reasoning, judgment, and problem solving, the whole

23   job.  Interpersonal relations would be the whole job, et

24   cetera.

25   Q.   And again, looking at fire sergeant, it was decided to

1    measure 55 percent of the total KSAs.  And those KSAs not

2    measured include flexibility; accountability; ability to

3    function under stress; written communication; organization,

4    plan, and prioritize; ability to negotiate with and persuade

5    others; organizational commitment; and knowledge of city and

6    department policies and guidelines.

7              And would you agree that although listed as important

8    measures, that you were satisfied with the examination that you

9    put together for the fire service even though those KSAs were

10   not measured?

11   A.   Was it valid?  Yes.  And was measured elsewhere.

12   Q.   Forgive me if I'm repeating myself.

13             In Memphis -- you testified yesterday or today that

14   the total cost of designing exams in Memphis is approximately

15   $1.2 million, which is similar to what Boston spent in 2002.

16   Do you have a sense of what it would cost to create the kind of

17   examination that you think Boston or the Commonwealth could put

18   together to reduce adverse impact?

19             MR. LICHTEN:  Objection to the form as it asks two

20   questions at once.

21             THE COURT:  You mean Boston and the Commonwealth?

22             MS. HARRIS:  I can break it.  I'll break it.

23   BY MS. HARRIS:

24   Q.   If you were going to design a test, knowing what you do

25   know about the test that's been administered in the

1  Commonwealth and the restrictions that are imposed by state

2  law, if you were going to design an examination for 1,200

3  candidates, which would be the sergeant rank, do you have an

4  estimate of what that would cost the Commonwealth?

5  A.    In my expert report I estimated using the Memphis data

6  that it would cost about a thousand per candidate.  And we

7  reviewed that, I think, yesterday, that that was development

8  and administration.

9  Q.    So for the Commonwealth you would estimate -- my math is

10 terrible.  What would it be?

11 A.    For the Commonwealth.

12 Q.    For the Commonwealth.

13 A.    There are so many variables.  Are we giving an exam in

14 each separate jurisdiction?  Are we regionalizing?  Are we

15 giving maybe multiple regional exams?  Are we doing one core

16 exam?  Are we doing specialty area exams?  So many questions.

17 What types of formats of the process would we give?

18 Q.    So these are all factors that would influence the cost at

19 the end of the day?

20 A.    Yes.

21 Q.    Dr. Fields, thank you.  I don't have any more questions.

22 I appreciate your patience.

23        MR. LICHTEN:  Your Honor, we would like to move in

24 this validation report.  It's been extensively referred to,

25 and, therefore, I think it should go in the evidence.

```
 1            MS. HARRIS:  I have no objection.

 2            Anybody else?

 3            THE COURT:  No objection?  It may be admitted.

 4            MS. HARRIS:  This is the Macon report, I believe?

 5            MR. LICHTEN:  Yes.

 6            MS. HARRIS:  No objection.

 7            MR. LICHTEN:  Do you have a copy?

 8            MS. HARRIS:  I do.

 9            THE COURT:  What number would it be?

10            MR. CHURCHILL:  It should be 87, your Honor.

11            THE CLERK:  87 is something else.

12            MR. CHURCHILL:  Remember yesterday we had offered the

13   MCAD complaints for all the defendants --

14            THE COURT:  So there's no confusion, let's go to the

15   end of that list.

16            MR. CHURCHILL:  Then we're up to some big numbers

17   here.

18            So that would be 131 then.

19            THE CLERK:  Thanks.

20            THE COURT:  The Macon Validation Study is 131.

21            (Exhibit 131 received into evidence.)

22                         CROSS-EXAMINATION

23   BY MR. CARROLL:

24   Q.   Good morning, Dr. Fields.

25   A.   Good morning.
```

1    Q.    I just have a few questions for you this morning.

2          During your testimony you indicated that you designed

3    Civil Service tests and that's the main portion of your work,

4    as I understood it.  And by you I mean you and your company.

5    A.    I design mostly exams for police and fire departments,

6    yes.

7    Q.    And I believe you said you had designed about 300 of

8    those, approximately?

9    A.    Law enforcement would be 300 to 350.

10   Q.    Okay.  And of those 300 to 350, how many were for the

11   Commonwealth of Massachusetts?

12   A.    None of them.

13   Q.    How many of them were involved in states that use a Civil

14   Service system based upon merit principles?

15   A.    The only one that I think equates is Fairfax County.

16   Q.    Virginia?

17   A.    Yes.

18   Q.    And basic merit principles, that's you take the top

19   candidate or explain the reasons why?

20   A.    Well, they used a banding approach even in that Civil

21   Service environment.

22   Q.    Well, in addition to the banding approach, which in

23   Massachusetts is the 2 N + 1 rule that's been discussed,

24   there's also the requirement under the basic merit principles

25   that you take the top candidate, the highest-scoring candidate,

1  or else you have to justify why you bypass that candidate to

2  the state Civil Service Commission.  Do you understand that?

3  A.    I understand that.

4  Q.    And is that the same as in Fairfax?

5  A.    Let me say this:  The top-scoring candidate, it sounds

6  like you're equating with definitely the best performer.  They

7  are going to be the best performer.  And I don't think that's

8  what testing is all about.  That is just one of the criteria.

9        So in Fairfax they use that as one of the criteria

10 along with other criteria to determine who is best for the

11 position.

12 Q.    Okay.  But in Massachusetts we follow the basic merit

13 principles that's part of the Chapter 31 of the Massachusetts

14 General Laws.  In fact, it's defined in that.  And it requires

15 that a policing jurisdiction appoint from the certified list;

16 that is, the list that's established by the 2 N + 1 rule.  And

17 we not only have to appoint from that list, but there's a

18 requirement that you start at the top and go down.  And

19 whenever you want to pass by a higher-scoring candidate to

20 reach the next candidate, you have to have a valid, justifiable

21 reason and a candidate can appeal that bypass, what's typically

22 called a bypass appeal, and appeal it to -- by writing a letter

23 first to HRD, and if they don't like HRD's resolution, appeal

24 that to the Mass. Civil Service Commission, which can hold a

25 hearing on the bypass appeal.  And if you don't like that, you

1    can appeal it to the superior court and so on, up through the

2    state judicial system.

3            So I guess my question to you is whether the Fairfax

4    system has that same basic merit principles piece to it?

5    A.   I'm sorry, but I really truly am a little confused,

6    because if we have a 2 N + 1, are those people not considered

7    equivalent?

8    Q.   Those people are the only people from whom a municipality

9    can make a choice.  Okay?  But in making that choice you're

10   restricted by basic merit principles to appointing in rank

11   order, unless you have a reason, a justifiable reason, for

12   bypassing a candidate.

13   A.   I would say that for all the systems I work in where there

14   is a rule such as that, there can be criteria and justifiable

15   criteria for selection and non-selection of the people within

16   that grouping.

17   Q.   Okay.  And is one of those criteria the race of the

18   individual candidates?

19   A.   No.

20   Q.   Is one of those criteria the ethnicity of one of the

21   individual candidates?

22   A.   No.

23   Q.   And so you would agree with me that that cannot be

24   considered as a determining factor in bypassing a candidate,

25   correct?

1   A.    That's my understanding.

2   Q.    Okay.  And that's -- well, strike that.

3          Could disciplinary records be considered?

4          MR. LICHTEN:  Objection to the form.

5          THE COURT:  Yes, sustained.

6   BY MS. HARRIS:

7   Q.    In bypassing a higher-scoring candidate, could the

8   appointing authority consider the candidate's disciplinary

9   record with the department?

10          MR. LICHTEN:  Objection.

11          THE COURT:  In what --

12          MR. CARROLL:  In the Fairfax department that she's

13  talking about.

14  A.    Yes.

15  Q.    And can you tell us what the other considerations are that

16  are used in Fairfax?

17  A.    Well, this is back when I was there.  It was a command

18  staff recommendation that was recommended to the chief of

19  police for who was ready for promotion.  And it was based on a

20  review on the personnel file of each individual.

21  Q.    And do you know if, in fact, the City of Springfield

22  engaged in that process?

23  A.    I do not.

24  Q.    Do you know whether any of the communities that are

25  involved in this case had any other process for appointing

1    candidates in addition to the Civil Service 2 N + 1 and the

2    rank ordering?

3    A.   I have read and been told that there are some additional

4    processes for people who have already made it into the band of

5    2 N + 1.

6    Q.   And considering the supervisory officer's recommendations

7    based upon the candidate's specific job performance, would that

8    be a way of adding validity to the examination?

9    A.   For those three people.

10   Q.   Okay.  And that would be a way of testing so-called soft

11   skills?

12   A.   For those three people.

13   Q.   Okay.  And those -- by soft skills I'm talking about the

14   ones, of course, that are typically measured in the assessment

15   center method?

16   A.   If those are being assessed, yes.

17   Q.   Okay.  Well, if you have an officer who responds to a case

18   where there's a distraught individual and the individual is out

19   of control, the way in which the officer responds gets written

20   up in the police report, and that would go on their record and

21   be part of this record, right?

22   A.   Yes, but that is not necessarily a direct measure of the

23   specific skill or ability you refer.  I don't know.

24   Q.   What does that measure?

25   A.   I don't know.

1    Q.    Does it measure judgment?

2    A.    I don't know.

3    Q.    Well, it could measure judgement, correct?

4    A.    Yes.

5    Q.    So if he shoots the suspect, maybe that's one measure of

6    judgment; and if he puts his arm around the disturbed person

7    and talks them down and brings them into the proper medical

8    care, that's another type of judgment, isn't it?

9    A.    I would ask subject matter experts to determine if that

10   was a measure of reasoning directly.

11   Q.    Okay.  Let me turn now to a different question.

12          I believe in writing your report one of the things you

13   indicated you relied on was Dr. Wiesen's reports; is that

14   correct?

15   A.    Yes.

16   Q.    Okay.  And one of Dr. Wiesen's reports, the second

17   supplemental report that is dated April 2010 -- is that one of

18   the ones you read?

19   A.    Yes.

20   Q.    And just before we get to that, you didn't personally

21   review the raw data that Dr. Wiesen had reviewed; is that

22   correct?

23   A.    He sent me one or two Excel spreadsheets with some data,

24   and I ran a couple of -- a couple of very small analyses just

25   to see what the percent minority past versus the percent

1    non-minority past.

2    Q.    I guess my question is kind of more fundamental than that.

3    You didn't do any investigation, independent investigation to

4    determine how accurate that data was, did you?

5    A.    No.

6    Q.    So if the data itself was flawed and opinions were based

7    upon that data, then that would cause one to be at least

8    skeptical of the opinions; is that correct?

9    A.    If the data was flawed, yes.

10   Q.    And it's just you don't know whether or not the data that

11   was provided, say, made mistakes concerning Springfield?

12   A.    All I know is the reports that Dr. Silva and Dr. Wiesen

13   provided were consistent or were indicating about -- were

14   talking about those data.

15   Q.    Okay.  But you don't know anything about the data itself,

16   correct?

17   A.    I don't have the raw data.

18   Q.    Okay.  So -- and directing your attention now to

19   Dr. Wiesen's supplemental report of April 14, 2010 --

20   A.    Should I get it out?

21   Q.    Sure, if you would, please.  If you have it with you.

22   A.    I don't know how to do that.

23          MR. CARROLL:  Your Honor, if I could approach the

24   witness, I could show her a copy.

25          THE COURT:  Go ahead.

```
 1            MR. LICHTEN:  I think it's 52, your Honor.

 2            MR. CARROLL:  Can't put it on the screen.

 3            THE COURT:  She has it in front of her in one of

 4    those.

 5            (Discussion off the record.)

 6            THE WITNESS:  Okay.

 7    BY MR. CARROLL:

 8    Q.   Dr. Fields, looking at the front sheet of that exhibit,

 9    and I believe it's Exhibit -- oh, it's just marked for

10    identification, it's not actually in evidence, but it's the

11    second supplemental expert report in Lopez by Dr. Wiesen dated

12    April 14, 2010.  I believe you just indicated that you reviewed

13    this document in preparing your work for this case, correct?

14    A.   Correct.

15    Q.   Directing your attention to page 1, item 6, it says,

16    "Adverse Impact in Appointments."  Is that something you gave

17    consideration to?

18    A.   Yes.

19    Q.   Okay.  And would you -- do you agree with Dr. Wiesen's

20    description of standard deviation units?  And to help you with

21    that, I would ask you to look at page 4, footnote 8.

22            (Pause.)

23    A.   Yes, I agree with that.

24    Q.   Okay.  So he basis his description on the Supreme Court

25    language reference which says two or three standard deviations
```

1    as a general rule for evaluating statistical significance.  And

2    you would accept that as being accurate?

3    A.   As one assessment of adverse impact.

4    Q.   All right.  And essentially what -- the way Dr. Wiesen

5    described it, he says the higher the number of standard

6    deviation units, the less probable the outcome is due to

7    chance, correct?

8    A.   Correct.

9    Q.   And you would agree with that, I gather?

10   A.   Yes.

11   Q.   Okay.  Can you describe for us how a standard deviation

12   unit is derived?

13   A.   A standard deviation is the -- the formula I don't know

14   off the top of my head, but if you look at a bell curve, you're

15   comparing how far a score in this case would be from the mean.

16   So standard deviations are a description of how far the mean of

17   what the something is.

18   Q.   And does that have to do with finding the square root of a

19   number?

20   A.   Square root of what number?

21   Q.   The probability number?

22   A.   No.

23   Q.   Okay.  What number is involved in finding the square root,

24   if you know?

25   A.   I'm not sure what you're referring to.

1    Q.    Okay.  Have you ever heard the use of square roots in

2    standard deviation and how arithmetically it's derived?

3    A.    Yes.

4    Q.    Okay.  And can you explain that?

5    A.    I'm not sure I understand your question.

6    Q.    Well, is there a mathematical formula for deriving

7    standard deviation units?

8    A.    Are you referring to variance?

9    Q.    No, I'm referring to standard deviation units.

10   A.    Standard deviation is the square root of the variance.

11   Q.    Is the square root of variance?

12   A.    Yes.

13   Q.    Okay.  Then I guess I am talking about the variance.

14   A.    I'm not sure where we're going.

15   Q.    Okay.  And what I really want to do is to get to this

16   issue of adverse impact and appointments.  And Dr. Wiesen says

17   an analysis of the bottom line or number of appointments is the

18   most basic approach to evaluating AI.  That's on page 6.  Do

19   you see that?  It's the first sentence there under item 6.

20   A.    I'm sorry, where is it?

21   Q.    It's number 6 at the top, and it's the very first

22   sentence.

23   A.    Oh, yes, I see it.

24   Q.    Okay.  And would you agree with Dr. Wiesen on that point.

25   That an analysis of the bottom line or number of appointments

1    is the most basic approach to evaluating AI?

2    A.   I don't know if I'd use the term "basic," but I would say

3    it is definitely one approach.

4    Q.   Okay.  And can you take a look at a little further down on

5    the page at table 3.  Do you see that, Dr. Wiesen's table 3?

6    A.   I do.

7    Q.   And I want to direct your attention to the -- what he

8    labels as the 2007 statewide sergeant exam.  Do you see that?

9    A.   Which year?

10   Q.   2007.

11   A.   Yes.

12   Q.   And can you tell us what the standard deviation units

13   were?

14   A.   .13.  I'm sorry, .3.  Excuse me.

15   Q.   It's 0.3, correct?

16   A.   0.3.

17   Q.   Is that more or less than two standard deviation units?

18   A.   Less than.

19   Q.   And under this Supreme Court decision, if it's less than

20   two or three units, then it's not likely -- well, what's the

21   ramification of that?

22   A.   Evaluating the standard deviation units, that would not

23   indicate adverse impact.

24   Q.   Okay.  And so then using table 3 on this report for the

25   2007 statewide sergeant's exam, would it be fair to say that

1    the -- at least using the standard deviation units, no adverse

2    impact?

3    A.    Yes.

4    Q.    And the final thing I want to talk with you about this

5    morning, Dr. Fields, is the costs.  And Attorney Harris asked

6    you some questions about some of the costs you've designed.

7    And your range for doing this work depends upon the amount of

8    effort involved, correct?

9    A.    Correct.

10   Q.    And whether or not you do a front end as well as a back

11   end piece to the work?

12   A.    The variables include whether -- what type of test

13   preparation it is.  So if it's plain test preparation and it's

14   not technical training, those are different costs.  The next

15   question is:  What are the components of the exam that best

16   suits the location and the situation that you're in?  And then,

17   you know, the job analysis is standard, the development of an

18   eligibility list is standard, and then the degree to which the

19   jurisdiction wants candidate feedback.

20   Q.    Okay.  So all of those factors go into the puzzle?

21   A.    Correct.

22   Q.    And in pricing the jobs you do, would it be fair to say

23   that those costs range from, say, $30,000 a test up to a

24   million and a half?

25   A.    That's fair to say.

```
 1    Q.   And that would be for the police sergeant promotional
 2    exams?
 3    A.   Yes.
 4    Q.   And what would be the average cost, the mean cost?
 5    A.   I couldn't say.
 6              MR. CARROLL:   Thank you, Dr. Fields.
 7              MS. ENGDAHL:   I just have a few quick questions.
 8                        CROSS-EXAMINATION
 9    BY MS. ENGDAHL:
10    Q.   Dr. Fields, on direct examination you testified generally
11    about different components that could reduce adverse impact.
12    What did you mean by reducing adverse impact?  Were you
13    referring to adverse impact in selection rates, pass rates,
14    average test scores?
15    A.   All of the above.
16    Q.   Okay.  And do you analyze adverse impact for all those
17    categories after you've developed and administered a test?
18    A.   Not all of them.
19    Q.   What do you typically look at?
20    A.   Almost always the mean score differences, because those
21    are at my disposal.  And when I have selection rate data,
22    selection rate data.
23    Q.   Okay.  Do you look at pass/fail rates?
24    A.   Yes.
25              THE COURT:   Let me just ask on that question.  When
```

1  you have a variety that you can measure of information

2  available --

3            THE WITNESS:  When I have --

4            THE COURT:  When you have a variety of points in

5  judgment, selection rate, pass rate, so on, so forth, and you

6  can determine the adverse impact ratio for each of them, are

7  there some that are more important to you than others?

8            THE WITNESS:  That's a good question.  They're all

9  important for different reasons.  Generally, if your selection

10 rate has no adverse impact, then there will not be litigation.

11           THE COURT:  That's the bottom line.

12           THE WITNESS:  That would be the bottom line.  But the

13 other -- all those other indications tell you about your

14 process, and they're very informative in terms of whether the

15 process has differences and where and whether the passing point

16 might have to be adjusted if it was needed.  So they all have

17 probative and informative pieces to the puzzle.

18 BY MS. ENGDAHL:

19 Q.   You testified that you have used banding and have been

20 successful in reducing AI.  Again, is that AI in selection

21 ratios, in mean test scores?

22 A.   The banding comes at the selection point, so it's

23 selection ratios.

24 Q.   And I think you testified that police personnel generally

25 like this approach?

1    A.    That's not what I said.

2    Q.    Okay.  Can you clarify for me?

3    A.    Police personnel prefer that if there is going to be

4    banding, that the banding is a defined fixed width in advance

5    of the test so they can figure out if their score is going to

6    get them into that band.

7    Q.    Okay.  And by police personnel, who are you referring to?

8    A.    I'm referring to clients and police professional -- who

9    are associates and friends.

10   Q.    You're not referring to necessarily the people who are

11   taking the exam?

12   A.    Which exam?

13   Q.    Okay.  You had testified that you used banding and you've

14   been successful in reducing AI and that police personnel

15   generally like this.  I'm just trying to clarify whether the

16   persons who took the exam is who you're referring to when you

17   say police personnel generally like this approach?

18   A.    If there is going to be banding -- because they're not

19   always in favor of banding --

20   Q.    Who is not always in favor of banding?

21   A.    The candidates and management.  I mean the whole police

22   profession, some are in favor of banding, some are not.  But

23   the size -- how the band is applied, police are more favorable

24   toward a fixed defined bandwidth in advance of a test than they

25   are for the rule to be announced after the test based upon the

1    test reliability.

2    Q.    Okay.  I'll move on.

3          You also on direct stated that you have been very

4    often -- successful many times in reducing AI.  And just for

5    clarification, what do you mean when you say you've been

6    successful?  Is that in reducing AI at all or what do you

7    define as success?

8    A.    Well, it's -- it's very good if we do not get challenged.

9    It is -- that's the best measure.  It is good if the minority

10   candidates believe they have been treated fairly and they had

11   an opportunity to be promoted.  Those are favorable impressions

12   by the candidates.  I would call that successful reduction in

13   AI.  Management, if they're able -- they frequently will tell

14   me, for example, that more minorities got into the promotable

15   range and they're satisfied with that.  That would be someone

16   who would be satisfied.  And I would say that any improvement,

17   you know, one, two minorities is good, because the more

18   minorities that get promoted, then the more minorities that can

19   get promoted into management who can coach and mentor younger

20   officers.  So there is a whole progression of successes when

21   that happens.

22   Q.    Okay.  And I think you testified, particularly with regard

23   to St. Louis -- what does success mean there?  You said you

24   were successful in St. Louis?

25   A.    I said I was not as successful as I wish I had been.  I

1    had moderate adverse impact, probably .6 or .7, that D we have

2    been discussing.

3    Q.    That's not the 4/5ths rule?

4    A.    I'm sorry?

5    Q.    Do you know what the impact was in terms of the 4/5ths

6    rule?

7    A.    I do not because I do not know what the selection rate

8    was.  But they had a -- I believe it was a reliability based

9    sliding band system in which candidates were placed into

10    multiple highest qualified, qualified, next qualified bands.

11    And so the goal was to -- in the adverse impact aspect, the

12    validity goal was to increase validity.  The adverse impact

13    goal was to try to -- hopefully minorities would get into the

14    upper bands for selection.

15    Q.    Okay.  So you were not successful in St. Louis?

16    A.    I was not as happy as I would have liked to be.

17    Q.    Okay.

18    A.    And that process existed -- I didn't invent that process.

19    I was using a procedure that was already predefined.

20    Q.    Okay.  And you've reviewed the reports of Dr. Joel Wiesen

21    and Dr. Outtz, as well as Dr. Silva?

22    A.    Yes.

23    Q.    Okay.  And are you aware that for these 2006 and 2008

24    exams that there was no adverse impact within the City of

25    Worcester either in selection rates, mean scores, or passing

1    rates?

2    A.    I don't recall off the top of my head what those numbers

3    were, but I would recall them if I saw them.

4    Q.    But right now you're not aware as to whether there's any

5    adverse impact in the City of Worcester based on selection

6    rates from those tests or mean scores or passing rates?

7    A.    I don't recall for that test.

8    Q.    And you've talked a lot about -- you measure adverse

9    impact in terms of the means score differences.  Do you ever

10   measure adverse impact using the 4/5ths rule?

11   A.    Just to clarify.  The 4/5ths rule only comes into play

12   when selections are made.

13   Q.    Okay.

14   A.    You can't calculate it before selections are made, while

15   unless -- I'm sorry, that's not really accurate.

16            You can calculate on a passing rate as well.

17   Q.    Okay.

18   A.    Okay.  Yes, I use the 4/5ths rule if there is a passing

19   rule.

20   Q.    So when you measure your success in reducing AI, do you

21   ever look at the 4/5ths rule either in selection rate, passing

22   rate, or means score differences?

23   A.    I do and I think my export report says that.

24   Q.    And you've testified about your study programs where you

25   help prepare candidates to learn how to study and learn how to

1  take the test.  And have you determined that this, in fact, is

2  effective in reducing adverse impact somewhat?

3  A.    I have found it to be successful.

4  Q.    So you would agree that you would expect to see someone

5  who didn't study as many hours as another candidate to not

6  perform as well on the test?

7  A.    In general, yes.

8          MS. ENGDAHL:  I have nothing further.

9                    CROSS-EXAMINATION

10  BY MR. LEAHEY:

11  Q.    For the record, Brian Leahey for the City of Lowell.  Good

12  afternoon, Dr. Fields.

13  A.    Good afternoon.

14  Q.    Going back to something Attorney Harris had raised

15  originally on what I also called an anticipatory rebuttal

16  evidence regarding the similarities between a supervisor in the

17  fire department and a police sergeant, do you recall being

18  asked that question, both today and yesterday?

19  A.    Yes.

20  Q.    You would agree with me that on a fundamental level the

21  duties of a firefighter and a police officer are not the same,

22  correct?

23  A.    I think we would have to spend some time thinking about

24  what a supervisor does.  I mean, in many jobs supervisors do

25  the same things, such as conduct performance evaluations.

1  Q.   My question to you was:  Is there a fundamental difference
2  between a firefighter and a police officer?
3  A.   Yes.
4  Q.   And they have different job descriptions, correct?
5  A.   Correct.
6  Q.   And they go to different academies, correct?
7  A.   Correct.
8  Q.   And they don't have you design entry-level tests for both
9  police and fire, correct?
10  A.   I have.
11  Q.   And they're not the same tests, right?
12  A.   Correct.
13  Q.   And you're saying that some of the supervision is similar.
14  That's what I'm hearing you tell, from a supervisory position
15  that some of the skills are the same.  Is that what I'm hearing
16  you testify to?
17  A.   The underlying knowledge, skills, and abilities it takes
18  to supervise and lead, there are some commonalities, yes.
19  Q.   Right.  There are some commonalities just generally as
20  good leadership, ability to command, and ability to perform
21  under stress.  Those would be some of the examples that you're
22  talking about?
23  A.   Correct.
24  Q.   Okay.  But it's fair to say that there are other examples
25  of supervision that are completely separate and distinct.  With

1    respect to -- I believe you talked about -- for sergeants you

2    talked about being at traffic or domestic scenes.  And you

3    talked about the need to supervise those scenes, correct?

4    A.    Correct.

5    Q.    And those scenes have to do more with interpersonal skills

6    and the relationships between the parties involved, correct?

7    A.    More so than what?

8    Q.    More so than a fire person who came on the scene would be

9    involved in a medical assessment or any type of natural

10   potential disaster that could happen in terms of the car, there

11   could be an issue with the car where they need to move someone

12   out.  The police and fire, police would deal with the people as

13   to how they're interrelating with each other, but the fire

14   personnel would be more of a treatment and rescue issue.  Would

15   you agree with that?

16          MR. LICHTEN:  Your Honor, I object --

17   A.    I do not agree.

18          MR. LICHTEN:  This like the third time, the questions

19   go on for so long, it's hard to know what the person is

20   agreeing to or not agreeing to.

21          MR. LEAHEY:  I'll move on.

22          THE COURT:  Okay.

23   BY MR. LEAHEY:

24   Q.    At a fire scene, would you agree with me at the

25   supervision of a fire scene the lieutenant would be focused on

1    what the condition of the fire was, what the color of the fire

2    was, correct, color of the smoke?

3    A.    Yes.

4    Q.    The wind conditions?

5    A.    Yes.

6    Q.    And where the smoke would be coming from in terms of the

7    building?

8    A.    Yes.

9    Q.    And all those have to do with natural elements that the

10   fire supervisor would have to deal with, correct?

11   A.    Yes.

12   Q.    Okay.  And a police supervisor wouldn't have to deal with

13   any of those issues, correct?

14   A.    That's not correct.

15   Q.    With regards to the condition of the smoke, the location

16   of the fire, and the wind conditions, you're saying a police

17   sergeant would be involved in those conditions?

18   A.    A police sergeant or supervisor would be involved in

19   assessing the situation and the weather would actually come

20   into play.

21   Q.    But in that scenario a police sergeant wouldn't tell a

22   lieutenant you don't go into a building, would he?

23   A.    I'm sorry?

24   Q.    A police sergeant wouldn't trump a fire lieutenant in

25   terms of whether or not to enter into a building, would he?  Or

1   she?

2   A.   I don't know.

3   Q.   But you'd agree with me that there are some supervisory

4   skills that are different between a fire lieutenant and a

5   police sergeant, correct?

6   A.   Some that are different?

7   Q.   Yes.

8   A.   Yes.

9   Q.   With regards to your test model, I believe you said your

10  preferred model is a compen --

11  A.   Compensatory.

12  Q.   -- compensatory model, correct?

13  A.   Yes.

14  Q.   And the goal of that is to keep in as many candidates as

15  possible; is that correct?

16  A.   Yes.

17  Q.   And the point is to determine, I believe you said it was

18  the minimally competent for the position.  Is that what a

19  compensatory model does?  It assesses the minimal skills that

20  one needs for the position?

21  A.   No.

22  Q.   Okay.  You didn't testify yesterday that it sets the

23  criteria for minimally competent for the position?

24  A.   No.

25  Q.   Have you ever heard that phrase, "minimally competent for

1    the position"?

2    A.    Yes.

3    Q.    What does that mean to you?

4    A.    That means someone who is -- can just do the basics of the

5    job, no more, no less.

6    Q.    How does a compensatory model -- strike that.

7          You also said that you don't want someone to go to a

8    sergeant if they're not minimally competent.  Did you testify

9    to that?

10   A.    Yes.  I don't know if I said that yesterday, but I agree

11   with that.

12   Q.    How does a compensatory model -- well, strike that.

13         Does a compensatory model have a pass/fail number?

14   A.    It can.

15   Q.    Did you use a compensatory model in Macon?

16   A.    Yes.

17   Q.    Did it have a pass/fail score?

18   A.    Yes.

19   Q.    And what was that?

20   A.    I don't recall.

21   Q.    In Memphis did you use a compensatory model?

22   A.    For sergeant?

23   Q.    Yes.

24   A.    No.

25   Q.    What model did you use in Memphis?

1    A.    You received a score on each component.  They were

2    combined, and then people were rank ordered.

3    Q.    You use the term "compensatory model."  So I'm asking

4    you -- you didn't use compensatory model in Memphis, so what

5    model did you use in Memphis?  Did you use a hurdle?

6    A.    There was no hurdle.

7    Q.    If it wasn't a hurdle model or a compensatory model, what

8    model did you use in Memphis?

9    A.    We combined both scores.  I guess that can be classified

10   as compensatory because if you had a lot of seniority and a low

11   test score, that would raise your score.  So, okay, we'll call

12   it a compensatory model.

13   Q.    Are you guessing as to what model you used?

14   A.    Well, it's that we didn't attribute -- we didn't -- we

15   didn't have multiple, multiple components where we were

16   combining many things.  We had one test and seniority points.

17   So that's not normally considered a compensatory model.  But I

18   think it would fit the definition.

19   Q.    So when you designed the Memphis sergeant's test, it

20   didn't comply with any model that you had previously used?

21   A.    I don't understand that question.

22   Q.    Well, when you designed the Memphis test, you didn't have

23   a particular model in mind that you were using in designing

24   that test; is that fair to say?

25   A.    I did not -- I knew that I was developing a video

1    situational judgment test, and we were going to add seniority

2    points.  And generally, by the definition of compensatory,

3    since no one was eliminated from the process, we can call that

4    a compensatory model.

5    Q.   And when you designed -- generally speaking, when you

6    design a test, you want to get the knowledge, skills, and

7    abilities for that job, correct?

8    A.   Correct.

9    Q.   And that at some point you said -- I guess this is before

10   you formalized the actual examination process, you said you sit

11   down and evaluate each item so that as directly assessing the

12   necessary skills.  Is that a correct statement?

13   A.   So that it is -- it is measuring the intended knowledge,

14   skill, or ability.

15   Q.   And once you come up with that, that is in the test

16   development stage, correct?

17   A.   Correct.

18   Q.   If you could turn to I believe it's Exhibit 11 in the book

19   that you have.

20           I'm just referencing it for everyone because I only

21   have one copy with me.

22           And that's the education and experience rating

23   instruction sheet.

24   A.   That's not my 11.

25           MR. LEAHEY:  All right.  May I approach, your Honor?

1          THE COURT:  You may.

2          (Discussion off the record.)

3    Q.    And you have before you the education and experience

4    rating sheet instructions?

5    A.    I do.

6    Q.    And it's approximately nine pages?

7    A.    Yes.

8    Q.    Okay.  And you testified as to this component of the

9    examination process yesterday.  Do you recall that?

10   A.    I do.

11   Q.    And you're aware that filling out this form in and of

12   itself is part of the test, correct?

13   A.    Correct.

14   Q.    Because it says -- if you go down one, two, three, four --

15   the fifth paragraph above the "Please, no phone calls," it

16   says, "Complete your ratings sheet on your own to the best of

17   your ability."  Then it says, "Accurate completion of the

18   education and experience ratings sheet is considered part of

19   the examination."

20          And then, skipping the next sentence, it talks about

21   positions in the police captain, police lieutenant, and police

22   sergeant classifications require ability to read and understand

23   instructions and take necessary steps to remember and implement

24   them.  Do you see that?

25   A.    I do.

```
 1    Q.   Is it fair to say that this part of the examination
 2    actually tests their ability to remember and implement
 3    instructions?
 4    A.   Can you use these instructions while you're filling in the
 5    form?
 6    Q.   Does this -- do you agree with that statement that you
 7    have to be able to understand instructions and then implement
 8    the instructions in filling out this form?  Do you agree with
 9    that statement?
10    A.   Yes.
11    Q.   In fact, if you don't follow, it tells you if you don't
12    follow this -- the next line is, "Failure to follow any
13    instructions within this examination component is cause for
14    disqualification."  Do you see that?
15    A.   I see that.
16    Q.   So if a person doesn't follow this form, they would not
17    get any points for the education experience; is that correct?
18    Is that your understanding of what that sentence means?
19    A.   It's cause for disqualification, so, yes.
20    Q.   Turning to the next page under "General Instructions
21    Continued," the first line where it says, "The human resource
22    division requires the submission of supporting documentation
23    for all claims presented on your ratings sheet."  Do you see
24    that?
25    A.   I do.
```

1    Q.   And do you know whether or not that means that as far as

2    getting their education and experience points, that the

3    candidates are allowed to submit documentation as part of the

4    examination process?

5    A.   It sounds as if they must.

6    Q.   And going down to the next paragraph, it actually talks

7    about how HRD will accept electronic documents via e-mail

8    attachments for experience and education verification.  And it

9    says, "The electronic version of a completed employee

10   verification form or an official employee verification letter

11   should be submitted directly to the appointing authority or his

12   or her designee.  Similarly, letters that verify an applicant's

13   teaching experience would be submitted directly from the

14   teaching or by the teaching institutions."  Do you see that?

15   A.   Yes.

16   Q.   Based on your training and experience, that would lead you

17   to believe that, again, these are the types of letters that an

18   applicant is allowed to submit that show their teaching

19   experience -- or, excuse me, their educational experience or

20   training components that are not tested in the job knowledge

21   test; is that correct?

22   A.   Yes.

23   Q.   Turning to the third page where it says, "Work

24   Experience," do you see that?

25   A.   Yes.

1  Q.   And then it talks about crediting work experience and then

2  it gives you special instructions for category 6.  Do you see

3  that?  It's the second paragraph under "Work Experience."

4  A.   What is it I'm looking for?

5  Q.   "Special instructions for category 6."  It's capitalized,

6  bold.  It's the second paragraph under the heading Roman

7  numeral three, "Work Experience"?

8  A.   Yes, I see it.

9  Q.   And then it gives special instructions for category 6 as

10 to log in your credit for experience within the specified

11 department.  Correct?  Do you see that?

12 A.   Correct, yes.

13 Q.   And that allows an officer to delineate the experience

14 that he or she has in their department as opposed to other

15 candidates, correct?

16 A.   Correct.

17 Q.   And then if you could turn to Bates stamped 0024, which is

18 the fifth page, you see that category 6, again, talks about

19 experience in the specified department in a permanent full-time

20 position of police officer or higher.  You see that?

21 A.   I do.

22 Q.   And that would allow an applicant to submit documentation

23 regarding all the experience they have in the specific

24 department as part of a category 6 submission for their

25 education and experience rating, correct?

1    A.    Correct.

2    Q.    And then in category 7 it talks about experience outside

3    the specified department in a recognized federal, state, or

4    municipal department in a supervisory capacity.  Do you see

5    that?

6    A.    Yes, I do.

7    Q.    And category 7, again, would allow an applicant to submit

8    documentation that shows their work as a police officer in a

9    supervisory capacity, correct?

10   A.    Correct.

11   Q.    And then category 8, it talks about experience outside the

12   specified department in a recognized federal, state, or

13   municipal police department in a non-supervisory capacity.  Do

14   you see that?

15   A.    I do.

16   Q.    Again, that would allow the applicant to submit

17   documentation that shows their work in an outside agency that

18   they've been assigned to in a non-supervisory capacity,

19   correct?

20   A.    Correct.

21        MR. LEAHEY:  Your Honor, may I approach?

22   Q.    Dr. Fields, I'm placing before you a document entitled

23   "Northeastern Massachusetts Law Enforcement Council."  It's

24   "Tactical Police Officer Force Special Operations Unit" and it

25   pertains to Officer Robert Alvarez.  And I'd just ask you to

1    take a minute and read that document to yourself, and please

2    let me know when you're finished reading it.

3            (Pause.)

4    A.   Okay.

5    Q.   Okay.  And I will represent to you that this is a letter

6    that Officer Alvarez submitted as part of the promotional

7    process in 1998.

8            Looking at this, would you agree with me that this is

9    a document that explains the role that Officer Alvarez has

10   played on the NMLEC SWAT team, and it has delineated and

11   explained when he has supervised other officers and served as a

12   team leader; is that correct?

13   A.   Yes.

14   Q.   And it also talks about how when he's been an officer in

15   charge and of training as a team leader, correct?

16   A.   Yes.

17   Q.   And it lists the number of days and the assignments when

18   he served as a supervisory authority, correct?  Or in a

19   supervisory position?

20   A.   Yes.

21   Q.   So if this document was submitted as part of an education

22   and experience component, the examination -- or the grader

23   would see that they would be able to judge at least some

24   information as to what experience the candidate has had in a

25   supervisory role, correct?

1    A.    Correct.

2    Q.    And looking at this, you'd be able to deduce that because

3    he had been a team leader and been in training that he must

4    possess at least minimally competent qualifications with regard

5    to the ability to communicate, correct?

6    A.    No.

7    Q.    You think that someone who served as a supervisor of 8 to

8    12 police officers and also served as a team leader and SWAT

9    roundup in Orlando, Florida and an officer in charge of

10   training, you don't think that this would allow someone to

11   determine that the person who performed these things was

12   minimally competent in communication of others?

13   A.    See, what you're asking me to do is not possible.  The --

14   you can't guess what skills anyone has from these assignments

15   unless you've done a thorough analysis of the assignment and

16   you have directly assessed that oral skills are a component of

17   it, and then you directly assess oral skills.  So it's not

18   possible to do for me.

19   Q.    Putting aside industrial psychology, on a common sense

20   level, if you're looking at this and you're seeing that he's

21   been a supervisor of eight to 12 police officers in tactical

22   operations of a SWAT team, it's your testimony that you cannot

23   ascertain from that whether or not a person has good oral

24   communications and good oral skills with others?  Is that your

25   testimony?

1    A.    That's my testimony.

2    Q.    Is it also your testimony that you wouldn't be able to

3    ascertain whether or not this person would be a good supervisor

4    based on the information that's contained in this document?

5    A.    That's correct.

6    Q.    And that you wouldn't be able to tell whether or not a

7    person, again, who has supervised eight to 12 police officers

8    in SWAT operations, it's your testimony that this person --

9    this is not an appropriate gauge to see whether or not they

10   have an ability to act well under pressure?  Is that your

11   testimony?

12   A.    I think you're asking me to make an educated guess, which

13   would not be appropriate.  I don't have enough information to

14   make it.

15   Q.    I'm asking you based on this you're saying -- again, I'm

16   trying to find out whether or not this documentation would

17   allow -- is a fair examination or tests for supervisory skills.

18   And you're saying no?

19   A.    I'm saying no.

20   Q.    Okay.

21         MR. CHURCHILL:  Your Honor, can we ask that this

22   document be admitted as an exhibit?

23         MR. LEAHEY:  Sure.

24         THE COURT:  Okay.  This will be defense exhibit --

25         MR. LEAHEY:  I didn't know if I'd be first, I didn't

1    know how the Court would want to do it.  I have numbers from

2    Lowell, or it could be Defense Exhibit -- I don't know if you

3    want to do Lowell Exhibit 1 or however the Court wants to do

4    it.

5            MR. CHURCHILL:  Can we just mark it as 132?

6            MR. LEAHEY:  That's fine.

7            (Exhibit 132 received into evidence.)

8    BY MR. LEAHEY:

9    Q.   Dr. Fields, it's your testimony that you do not believe

10   the education and experience portion of the HRD examination is

11   valid, correct?  Is that my understanding of your testimony?

12   A.   Based upon what it is shown to measure in that appendix in

13   that 1991 job analysis report, it does not measure those

14   things.

15   Q.   Is this education and experience -- would you agree with

16   me that this education and experience component is better than

17   the seniority component that you used in Memphis?

18   A.   No.  Sometimes you ask me to make judgments that take

19   analysis.  I don't think so, though.

20   Q.   Let me break it down for you, then.

21           If I understand you correctly, in Memphis one of the

22   two components of the test was based strictly on seniority,

23   correct?

24   A.   Correct.

25   Q.   And seniority literally means date of hire, right?

1    A.    It means years of service.

2    Q.    Right.  Whoever has been the longest, that's what

3    seniority is, correct?

4    A.    Correct.

5    Q.    And you're saying that that methodology of whoever has

6    been there longest is better than an education and experience

7    process that requires you to fill out specifically how long

8    you've been there and then submit documentation as to your

9    educational background and experience that you've had in

10   supervisory and other police departments.  You're saying the

11   seniority is better?

12   A.    I'm saying that there is research evidence that years of

13   experience correlates with job performance, and it only

14   minimally does so.  I'm saying that the things that are

15   contained within this training and education component are not

16   directly linked to the requirements of the job.  So I don't

17   know why certain college degrees and certain associate degrees

18   are required and how they're linked to the job.

19   Q.    And you're saying that because you didn't see any document

20   that actually linked it in.  You're talking -- am I

21   understanding you correctly that your concern over this

22   education and experience component has to do more with form

23   than substance, in that you don't see a linkage?

24   A.    Well, I don't --

25   Q.    Yes or no, Doctor?

1  A.    Ask the question again, please.

2          MR. LICHTEN:  Objection, the way the question was

3  asked --

4          THE COURT:  He's going to ask it again, we'll see how

5  it sounds.

6          MR. LEAHEY:  Could I have the last question read back

7  to me?

8          (Record read.)

9  BY MR. LEAHEY:

10  Q.    Doctor, is it fair to state that your concern over the

11  education and experience ratings sheet has to do more with form

12  over substance in that you don't see a linkage from this to the

13  job description?  Yes or no?

14  A.    My concern is with form and substance.

15  Q.    But one of the forms is the linkage itself, correct?

16  A.    I'm sorry, what do you mean "the linkage itself"?

17  Q.    You testified one of your concerns about this education

18  experience was there was no linkage to the job, correct?

19  A.    It is purportedly linked.  I mean, for example, one of the

20  things it was linked to was knowledge of department operations.

21  So it's similar to what you were asking me earlier with the

22  example you gave of Officer Alvarez, you know, can assume that

23  people have knowledge of department operations because they

24  filled in this form?  And the answer is I cannot assume that.

25  Q.    Okay.  So there is -- are you saying there is some linkage

1    then -- I can't tell whether or not you're saying there is

2    linkage of this to the job analysis or there isn't linkage to

3    the job analysis?

4    A.    There is a chart that shows it is linked to the job

5    analysis.

6    Q.    With respect to a police officer and police department,

7    fair to say that in -- I believe you've testified to this --

8    that for job knowledge -- strike that.

9         Would you agree that a job knowledge test is more of a

10   hard skill that can be testified -- tested for in a multiple

11   choice job knowledge examination?

12             MR. LICHTEN:  Objection to the form.

13             THE COURT:  Sustained.

14   BY MR. LEAHEY:

15   Q.    A multiple choice test, would you agree that it tests --

16   strike that.

17        Is a job knowledge test considered to be a measurement

18   of what one would consider a hard skill?

19   A.    No.

20   Q.    If I use the term "hard and soft skill" in terms of

21   testing, do you know what I'm referring to?

22   A.    We generally refer to soft -- I know what you're referring

23   to when you say soft skills.

24   Q.    What is your understanding of soft skill?

25   A.    Soft skill would be oral communication ability,

1    interpersonal skills, leadership skills.

2    Q.    And what's a hard skill?

3    A.    I've just never heard that term, so --

4    Q.    How about -- what would you consider job knowledge?

5    A.    Job knowledge.

6    Q.    Well, how could you test for job knowledge?

7    A.    You could test for job knowledge using a multiple choice

8    job knowledge test.  You could test for job knowledge using a

9    situational judgment test in multiple different formats that

10   we've discussed, including video and paper and pencil.  You

11   could test it but you couldn't test it -- as much of it using

12   every other format that we've discussed.  You just can't

13   measure quite as large of a sample of knowledge in some of

14   these other measures that we've talked about.

15   Q.    In a smaller police department, say a police department

16   with 250 or less officers, would you agree that there's more

17   familiarity between the management and the lower ranks in terms

18   of the ability to know who are the people you are working with?

19   A.    Than?

20   Q.    Than if you worked in a big department with, say, 2,000

21   police officers where the command staff may not know any of

22   the, you know, front-line police officers?

23   A.    I would agree with you.

24   Q.    And if the supervisors know the police officers and see

25   them on a regular basis, would you agree with me that they

1    have -- at least the front-line supervisors have some

2    rudimentary understanding of the skill sets that each

3    individual officer possesses?

4    A.    The level of those skill sets, yes.

5    Q.    And that in police departments, you're aware that police

6    officers who don't go up in promotion are still eligible for

7    specialty positions, correct?

8    A.    Correct.

9    Q.    And that when someone is assigned to a specialty position,

10   that obviously who they are and their background would be

11   considered as to whether or not it's appropriate to consider

12   that person to a specialty position?

13           MR. LICHTEN:  Objection.  It calls for this witness to

14   know what a department would do.

15           THE COURT:  Overruled.

16   A.    Can I hear that question again, please?

17           (Record read.)

18           MR. LEAHEY:  That was a bad question.  I didn't think

19   it was bad until it was read back, and it was horrible.

20           THE COURT:  I thought it was fine.

21           (Laughter.)

22   BY MR. LEAHEY:

23   Q.    Dr. Fields, based on your training and experience that

24   when a person applies for a specialty position, that person's

25   background is considered as to whether or not the assignment is

1    appropriate for that individual, correct?

2    A.    Most likely, yes.

3    Q.    And that would include whether or not the person was

4    assigned to teach a class or give instruction to other police

5    officers, correct?

6    A.    Generally, yes.

7    Q.    And also, if an officer went to some type of in-service

8    training or recertification and got a certification from that

9    class, that would show, again, they were at least minimally

10   competent to get that certification?

11   A.    Yes.

12   Q.    Would you agree with me that a person who applies or takes

13   a promotional -- generally speaking, a person who applies for a

14   promotional examination at least in his or her mind believes

15   that they are competent to be that position for which they are

16   applying?

17   A.    Generally.

18          THE COURT:  Mr. Leahey, we're at 1:00.  I don't know

19   how much you have.

20          MR. LEAHEY:  I won't finish today, your Honor.

21          THE COURT:  Okay.  We'll suspend.

22          I'm sorry we couldn't finish today, but it is what it

23   is.

24          May I know where we're going?

25          MR. LEAHEY:  Your Honor, I have --

```
 1              THE COURT:  Not you.

 2              MR. LICHTEN:  Your Honor, when Dr. Fields is done, I

 3    believe we have one or two, possibly three very short

 4    witnesses, which can be done in, like, ten, really, literally

 5    10-, 15-minute increments.  And then, my understanding is,

 6    Commissioner Davis can't be here tomorrow, because we would

 7    otherwise do him tomorrow so we could almost get done

 8    everything, but could be here Friday.  Do I have that right?

 9              MS. HARRIS:  That's correct.

10              MR. LICHTEN:  And then the only other person is

11    Dr. Wiesen finishing.  He'll be here Monday.  We've arranged

12    for that.  It is quite possible, depending upon how this goes

13    tomorrow, although predictions haven't been that good, that we

14    could be at the end of our case other than Commissioner Davis

15    and Dr. Wiesen by tomorrow.

16              THE COURT:  And how long do you expect Commissioner

17    Davis to be?  Previously you said not that long.

18              MR. LICHTEN:  About as long as commissioner O'Toole

19    was, that was, I think, about 15, 20 minutes.

20              THE COURT:  Okay.  So there's a possibility then that

21    but for Dr. Wiesen, you'd be done by early on Friday.

22              MR. LICHTEN:  That would be our intention.  It's even

23    possible --

24              THE COURT:  Is there defense evidence at that point?

25              MR. LEAHEY:  Your Honor, if I may.  I believe one of
```

1    the witnesses they were calling was Officer Alvarez.  I don't

2    expect his testimony to be completed in 10 to 20 minutes.  I

3    would expect it to be, depending on what the arguments are,

4    that I would expect my cross of him to be 45 minute to an hour.

5              THE COURT:  Well, that's tomorrow.

6              MR. LEAHEY:  Right.  But just in terms of when he was

7    representing that the witnesses would be quick.  At least for

8    Officer Alvarez --

9              THE COURT:  I'm more concerned about Friday.

10             MS. HARRIS:  Yes, your Honor.  For Boston, at least,

11   we would anticipate calling Ed Callahan, who is the -- is sort

12   of the repository of historical knowledge, and I can make him

13   available for Friday.  And I can reassess -- I know that

14   Dr. Outtz is unavailable this week.  He is available the latter

15   part of next week, I believe.  And the other expert, Dr. Silva,

16   have to confirm his availability.  I don't know off the top of

17   my head.

18             MR. MORRIS:  The following week.

19             THE COURT:  Well, we run into trouble the follow week.

20   We have next week, but I have a jury trial scheduled for the

21   2nd.  I also have one scheduled for the 9th.  My guess is that

22   will go away.  So we potentially can -- if we don't finish next

23   week, we may be skipping until the week of the 9th.  From the

24   looks on your faces, that may not be a possibility.

25             MS. ENGDAHL:  Your Honor, it's the summertime, and

1    I've made plans, including childcare plans based on this going

2    a certain amount of time and even added on to it.  So August

3    9th is going to leave me --

4            THE COURT:  All right.  We can talk about that.

5            We do have flexibility because it's a non-jury trial.

6            Okay.  I guess that answers my question, which is,

7    where are we?

8            MR. CARROLL:  Your Honor, if it might assist things, I

9    can contact Dr. Fairley and see when he will be available in

10   the next two weeks.

11           THE COURT:  Is he local?

12           MR. CARROLL:  He's in Pennsylvania.  I was just

13   thinking, we want to get as much done as possible this week.

14           THE COURT:  If people are available to fit in, that

15   would help.

16           The other matter is the system, we're going to try to

17   have people here to look at it during the lunch hour.  I have a

18   hearing this afternoon that I would expect counsel want to use

19   it.  If it's not fixed by then, I think we're going to move

20   into another courtroom to try it use it.  If they can't fix it

21   today, I suggest we may do that tomorrow, but it will depend on

22   what courtrooms are available.  I know you've got tons of stuff

23   here and you all fit here, so I don't know whether that's going

24   to be feasible or not.  Hopefully they can fix the system and

25   we'll be back here tomorrow.

1          MR. LICHTEN:  Thank you, your Honor.

2          THE COURT:  Thanks.

3          THE CLERK:  All rise, Court is in recess.

4          (Court adjourned at 1:05 p.m.)

5

6                  C E R T I F I C A T E

7

8          We, Marcia G. Patrisso, RMR, CRR, and Debra M. Joyce,

9   RMR, CRR, Official Reporters of the United States District

10  Court, do hereby certify that the foregoing transcript

11  constitutes, to the best of our skill and ability, a true and

12  accurate transcription of our stenotype notes taken in the

13  matter of Civil Action No. 07-11693-GAO, Pedro Lopez, et al, v.

14  City of Lawrence, et al.

15

16  /s/ Marcia G. Patrisso
    MARCIA G. PATRISSO, RMR, CRR
17  Official Court Reporter

18
    /s/ Debra J. Joyce
19  DEBRA M. JOYCE, RMR, CRR
    Official Court Reporter
20
    Dated: July 21, 2010
21

22

23

24

25