```
              UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS



                                        )
PEDRO LOPEZ, Individually and on        )
behalf of a class of individuals        )
similarly situated,                     )
                                        )
          Plaintiffs,                   )
                                        ) Civil Action
v.                                      ) No. 07-11693-GAO
                                        )
CITY OF LAWRENCE, et al.,               )
                                        )
          Defendants.                   )
                                        )



        BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
               UNITED STATES DISTRICT JUDGE


                        DAY TEN
                     NON-JURY TRIAL


          John J. Moakley United States Courthouse
                      Courtroom No. 9
                    One Courthouse Way
               Boston, Massachusetts  02210
                   Monday, July 26, 2010
                        8:58 a.m.


               Marcia G. Patrisso, RMR, CRR
               Cheryl M. Dahlstrom, RMR, CRR
                  Official Court Reporters
               John J. Moakley U.S. Courthouse
               One Courthouse Way, Room 3510
                Boston, Massachusetts  02210
                      (617) 737-8728

          Mechanical Steno - Computer-Aided Transcript
```

```
 1    APPEARANCES:

 2        LICHTEN & LISS-RIORDAN, P.C.
          By: Harold L. Lichten, Esq.
 3            Stephen S. Churchill, Esq.
              Joseph L. Sulman, Esq.
 4        100 Cambridge Street, 20th Floor
          Boston, Massachusetts  02114
 5        On Behalf of the Plaintiffs

 6        CITY OF LOWELL LAW DEPARTMENT
          By: Brian W. Leahey, Esq.
 7            R. Eric Slagle, Esq.
          City Hall
 8        375 Merrimack Street
          Lowell, Massachusetts  01852
 9        On Behalf of the Defendant City of Lowell

10        OFFICE OF THE CITY ATTORNEY
          By: Richard J. D'Agostino, Esq.
11        200 Common Street, Suite 306
          Lawrence, Massachusetts  01840
12        On Behalf of the Defendant City of Lawrence

13        COLLINS, LOUGHRAN & PELOQUIN
          By: Laurie W. Engdahl, Esq.
14        320 Norwood Park South
          Norwood, Massachusetts  02062
15        On Behalf of the Defendant City of Worcester

16        MORGAN, BROWN & JOY, LLP
          By: Mary Jo Harris, Esq.
17            Robert P. Morris, Esq.
          200 State Street, 11th Floor
18        Boston, Massachusetts  02109
          On Behalf of the Defendant City of Boston
19
          MBTA LAW DEPARTMENT
20        By: Kevin S. McDermott, Esq.
          10 Park Plaza, 7th Floor
21        Boston, Massachusetts  02116
          On Behalf of the Defendant MBTA
22

23

24

25
```

CITY OF SPRINGFIELD LAW DEPARTMENT
By: Harry P. Carroll, Esq.
36 Court Street
Springfield, Massachusetts  01103
On Behalf of the Defendants City of Springfield
and Mayor Sarno

CITY OF METHUEN - OFFICE OF THE CITY SOLICITOR
By: Peter J. McQuillan, Esq.
The Searles Building, Suite 311
41 Pleasant Street
Methuen, Massachusetts  01844
On Behalf of the Defendant City of Methuen

1                           I N D E X

2                    Direct   Cross   Redirect   Recross
   WITNESSES FOR THE
3    PLAINTIFFS:

4  JOEL WIESEN

5      By Mr. Leahey               5
       By Mr. McDermott            85
6      By Mr. D'Agostino          115

7                       E X H I B I T S

8
   DEFENDANTS'
9    EXHIBIT     DESCRIPTION                      RECEIVED

10
   No. 148   Compilation of MBTA data for appointments to
11           sergeant                                92

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          P R O C E E D I N G S

2                 THE CLERK:  All rise.

3                 (The Court enters the courtroom at 8:58 a.m.)

4                 THE CLERK:  For a continuation of the Lopez trial.

5        Please be seated.

6                 THE COURT:  Good morning.  Good morning, Dr. Wiesen.

7                 THE WITNESS:  Good morning, your Honor.

8                 THE COURT:  Go ahead, Mr. Leahey.

9                          JOEL WIESEN, resumed

10                          CROSS-EXAMINATION

11       BY MR. LEAHEY:

12       Q.    For the record, Brian Leahey for the City of Lowell.  Good

13       morning, Dr. Wiesen.

14       A.    Good morning.

15       Q.    Dr. Wiesen, you were the director of test development and

16       validation for HRD for approximately ten years; is that

17       correct?

18       A.    I worked for HRD and its predecessor organization, but my

19       title did not remain the same over that period of time nor did

20       my duties.  So I think ten years is probably a little too long.

21       Q.    But when you were at HRD, your focus was on validation of

22       examinations; is that correct?

23       A.    Much of the time, but not all the time.  There was a

24       period of time when I was developing performance evaluation

25       programs.

1  Q.   Do you know whether or not when you were first hired by

2  HRD or the Personnel Administrator -- I'll use "HRD" but it

3  includes its predecessor -- do you know whether or not your

4  hiring had anything to do with the Castro v. Beecher lawsuits?

5  A.   I think it did.

6  Q.   Was that in HRD's response that they needed to be more

7  professional in how they tested their -- and prepared their

8  examinations?

9  A.   I think so.

10 Q.   And are you familiar with the Castro v. Beecher cases?

11 A.   I have some familiarity.

12 Q.   When you were designing your -- the tests that you did for

13 HRD, were you aware that they needed to comply with the

14 Castro v. Beecher requirements?

15 A.   So this was the entry-level tests.  So my memory of the

16 details of the Castro and NAACP v. Beecher court orders is a

17 little old and fuzzy, so I'm not sure I recall what they

18 required.

19 Q.   Did you, when you were doing -- even though the Castro

20 consent decree only applied to entry-level examinations, when

21 you were at HRD did you address any concerns that the Castro

22 cases had for the examinations that weren't just for

23 entry-level?

24        MR. LICHTEN:  Objection to the form.

25        THE COURT:  Sustained.

BY MR. LEAHEY:

Q.   Did you prepare any of the promotional exams using any of the concerns that were raised in the Castro consent decree?

A.   I don't think specifically.

Q.   When you were at HRD was it your duties to develop and validate examinations?

A.   Yes.

Q.   Did you supervise and manage a staff of examiners who developed Civil Service examinations?

A.   Some years I did.

Q.   What years did you?

A.   Maybe from about 1980 to about 1987?

Q.   When HRD hired outside consultants regarding any type of Civil Service examination, did you have oversight and review of those examinations prepared by consultants?

A.   At least usually, yes.

Q.   And during your time with HRD would you advise HRD and serve as an expert in matters relating to test development and validation?

A.   Yes.

Q.   On your first day of testimony I believe that you said that you were an expert -- that you've testified in expert -- in matters that not only apply to cases of adverse impact but also other types of validation issues; is that correct?

A.   I don't recall that answer specifically.

1    Q.    Have you ever testified as an expert regarding the

2    validation and scientificness of field sobriety tests?

3    A.    Yes.

4    Q.    Is that in USA versus Horn?

5    A.    Well, I didn't actually testify.  I wrote an expert

6    report.

7    Q.    And in that expert report you wrote that the walk and

8    turn, one-legged stand and the finger dexterity and alphabet

9    tests were not scientifically valid; is that correct?

10   A.    That expert report was a while ago also, but I recall I

11   was not impressed with the field sobriety tests in general.

12   Q.    Dr. Wiesen, I've placed in front of you a 13-page

13   document.  I'd just ask you to look that over and let me know

14   when you're done reviewing it.

15   A.    I've taken a quick look at it.

16   Q.    And does this -- is this a copy of the affidavit that you

17   submitted in the U.S. v. Horn case?

18   A.    It seems to be.

19   Q.    And if you'd look at page 13, it's dated October 31, 2001.

20   Do you see that?

21   A.    Yes.

22   Q.    That would be the date -- although it's unsigned, is that

23   the date that you prepared the affidavit?

24   A.    If it's not the exact date, it must be -- it's close.

25   Q.    And then turning to page 2, it says, "My charge:  I was

1    asked by the office of the federal public defender to review

2    certain publications, and based on those publications to

3    evaluate the field sobriety test as I would evaluate any other

4    test of human capacity, report on its quality and validity as a

5    test, and offer my opinion as to whether the FST meets the

6    scientific standards of my profession."

7         Did I read that correctly?

8    A.    Yes.

9    Q.    Does that refresh your recollection as to what your role

10   was with regards to the field sobriety tests in USA v. Horn?

11   A.    I recall my role.

12   Q.    And that was that it was your opinion that the field

13   sobriety tests were not scientifically valid; is that correct?

14   A.    The reports that were submitted in support of the field

15   sobriety tests were very weak reports.

16   Q.    Thank you, Dr. Wiesen.  I'm done with that exhibit.

17        And in this case you were hired to -- in this particular

18   case that you're testifying to today, you were hired to lead

19   the efforts to validate -- strike that.

20        With regards to the 1991 validation study, in your role in

21   this case you've had a chance to review that -- those documents

22   and the appendices to it?

23   A.    Yes.

24   Q.    Is it fair to say it's very thorough?

25   A.    It's extensive.

1    Q.    When you were at HRD, did you have anything comparable to

2    the 1991 validation study?

3    A.    With respect to?

4    Q.    Validation of exams.

5    A.    Yes.

6    Q.    What did HRD have at the time when you were there?

7    A.    There was a job analysis undertaken before the '91 study,

8    as I recall, of public safety promotional jobs.  I recall

9    specifically the job analysis for the fire service.  I'm not

10   sure if there was a similar effort for the police service.

11   Q.    So is your testimony that as you sit here today you do not

12   recall whether or not HRD had some type of validation study for

13   the police position?

14   A.    That's correct.

15   Q.    So if that's the case, would it be fair to say that the

16   1991 validation report was better than what HRD had prior to

17   the validation report?

18   A.    Yes.

19   Q.    Do you have -- I'm not sure where it's located.  I want to

20   refer to Attachment D of the 1991 validation study.  I can show

21   you on the -- would you look at Exhibit 41.

22   A.    I think I found Attachment D.

23   Q.    Turning to page 4 of that where it says VIII.

24   A.    Yes.

25   Q.    And that's under the -- directing your attention where it

1    says "Resources Required," and then there's a colon.  Do you

2    see that?

3    A.    Yes.

4    Q.    And then it just lists "Wayne, Vita, Joel and Mohammed"?

5    A.    Yes.

6    Q.    And you've testified earlier that that Joel is you.  Is

7    that your understanding?

8    A.    Yes.

9    Q.    And that your name is listed several times where it says

10   "Resources Required."  Specifically, if you'd turn to page 5,

11   you're listed on page 5 as well, correct?

12   A.    Yes.

13   Q.    Turning under X, turning to XII, you're also listed there,

14   correct, on page 6?

15   A.    Yes.

16   Q.    On page 8 under XVI, your name is listed there as well,

17   correct?

18   A.    Yes.

19   Q.    And then on all of these places where your name is

20   mentioned as "required resources," would you agree with me that

21   there is no number or letter assigned to each of the names;

22   it's literally just the names of the persons?

23   A.    Yes.

24   Q.    And if we were to analogize the listing of these names

25   where it just says here Mary Ann, Vita and Joel as resources

1    required -- if we were to analogize it to the issues in this

2    case, would you consider this to be consistent with banding,

3    where it just lists individuals' names under a particular

4    category and has no other distinguishing information as to the

5    rank of the particular names?

6              MR. LICHTEN:  Objection.  Relevancy.

7              THE COURT:  Sustained.

8    BY MR. LEAHEY:

9    Q.   You'd agree with me that there's nothing here to

10   distinguish what order -- or whether or not there is even an

11   order as to who's more significant or less significant as a

12   required resource, correct?

13   A.   Well, as I read it, I presume that the first person listed

14   is the primary person, but it's not listed in alphabetical

15   order.  But that's just a presumption.

16   Q.   Didn't you testify last week that you didn't know Vita's

17   last name?

18   A.   Correct.

19   Q.   So you don't necessarily know if this is in alphabetical

20   order, do you?

21   A.   Oh, it could be alphabetical of the last name.  That

22   wouldn't work because sometimes the names are in different

23   orders.

24   Q.   Is it fair to say you can't tell from this document

25   whether or not there is any order as to the participants for

1    the required -- resources required, correct?

2    A.    I can't be sure.

3    Q.    I believe you testified that -- it's your testimony that

4    you do not recall seeing the 1991 validation study until this

5    lawsuit, correct?

6    A.    Correct.

7    Q.    And you said that -- I believe you testified last week

8    that HRD was so big and there were so many projects that some

9    of them never landed on your desk; is that correct?

10   A.    Certainly there are projects going on that did not land on

11   my desk.

12   Q.    Again, you were the only person at HRD who had a Ph.D. in

13   industrial psychology, correct?

14   A.    I was the only person trained in psychometrics, yes.

15   Q.    And you were involved with validation during your time at

16   HRD, correct?

17   A.    Yes.

18   Q.    Is it fair to say that you were the head person in charge

19   of validation while you were at HRD, correct?

20   A.    Yes.

21   Q.    Is it fair to say that if your main duties are validation

22   and a validation study came in while you were at HRD, that that

23   is a type of document that would certainly land on your desk,

24   correct?

25   A.    Well, this was 1991.  I think '91 was a point in time when

1    I was developing the performance evaluation programs for state

2    and municipal employees and managers.  So this -- at another

3    point in time this, I would have hoped, would have landed on my

4    desk.

5    Q.   Even if you weren't -- if you didn't have that same title,

6    isn't this a document that should have landed on your desk

7    given your prior involvement with HRD?

8            MR. LICHTEN:  Objection.  Relevancy.

9            THE COURT:  Overruled.

10           THE WITNESS:  I think it would have made sense.

11   BY MR. LEAHEY:

12   Q.   And going back to when you were designing and validating

13   tests for HRD, you're aware that all of your tests had to

14   comply with the basic merit principles under chapter -- General

15   Laws 31?

16   A.   Yes.

17   Q.   I'm placing in front of you a copy of the Personnel

18   Administration Rules Part II and ask you, directing your

19   attention to where it says "Basic merit principles," do you see

20   that?

21   A.   Yes.

22   Q.   Do you recognize those six paragraphs that are lettered?

23   A.   I don't recognize them, but I'm sure that I read them at

24   some point.

25   Q.   As you sit here today do you know what the basic merit

1    principles are?

2    A.    Well, there's a set of federal merit principles that apply

3    at least nominally to state and local government.

4    Q.    I'm asking specifically the basic merit principles under

5    Chapter 31 of the Mass. General Laws.

6    A.    Well, I see the six that are listed here.

7    Q.    The first one which says "Recruiting, selecting and

8    advancing of employees on the basis of their relative ability,

9    knowledge and skills including open consideration of qualified

10   applicants for initial appointment," do you recall whether or

11   not that was a basic merit principle when you were at HRD?

12   A.    Not specifically.  I don't remember specifically.

13   Q.    Going to Basic Merit Principle C where it says "Providing

14   of training and development for employees, as needed, to assure

15   the advancement of high quality performance of such employees,"

16   do you see that?

17   A.    I do.

18   Q.    Do you recall whether or not that was a basic merit

19   principle when you were at HRD?

20   A.    I do not recall that specifically.

21   Q.    Directing your attention to letter E which says "Assuring

22   fair treatment of all applicants and employees in all aspects

23   of personnel administration without regard to political

24   affiliation, race, color, age, national origin, sex, marital

25   status, handicap or religion, and with proper regard for

1    privacy, basic rights outlined in MGL c 31 and constitutional

2    rights as citizens," do you see that?

3    A.    I do.

4    Q.    Do you recall whether or not that letter E was a basic

5    merit principle while you were employed at HRD?

6    A.    I do not recall that item E --

7    Q.    Going to letter F --

8    A.    -- specifically.

9    Q.    Going to letter F, it says, "Assuring that all employees

10   are protected against coercion for political purposes, and are

11   protected from arbitrary and capricious actions," do you see

12   that?

13   A.    Yes.

14   Q.    Do you know whether or not that was a basic merit

15   principle when you worked at HRD?

16   A.    I do not specifically know.

17   Q.    It's fair to say based on your prior testimony that

18   whatever the basic merit principles were while you were

19   employed by HRD, you followed those principles, correct, in

20   your test development and validation of exams?

21   A.    Yes.

22   Q.    I believe -- I'm not sure what day, but I'm going to go

23   with last week -- that you also testified regarding the cut

24   grade or cutoff grade for creating an exam, correct?  You

25   testified about that?

1    A.    Yes.

2    Q.    And that the point of a cut grade is to separate

3    individuals who have the necessary skills for whatever the test

4    is designed to capture versus those who don't necessarily have

5    those skills; is that correct?

6    A.    That is a theory, yes.

7    Q.    But is that the theory behind a cutoff score?

8    A.    And that's the concept behind a cutoff score, yes.

9    Q.    And I believe you testified last week that a

10   multiple-choice job-knowledge test helps separate individuals

11   who have the hard knowledge skills versus someone who doesn't

12   have those hard knowledge skills; is that correct?

13   A.    Yes.

14   Q.    With respect to multiple-choice job-knowledge tests, is it

15   fair to say that there's no scientific reason why adverse

16   impact is found on such examinations?

17   A.    I presume there is a scientific reason.  People have been

18   looking for that for a long time.  I don't think there's a -- I

19   don't think the reason for the difference is well understood.

20   Q.    Do you recall testifying at your deposition where you said

21   there was no scientific reason why there is adverse impact on

22   multiple exam questions *[sic]*?

23   A.    I don't recall exactly that, no.

24   Q.    If you'd give me a moment.

25         Directing your attention to page 159, the question says,

1    "Within your question *[sic]*, Doctor, you've anticipated my next

2    question.  Why?  I mean, is there anything in the science that

3    you're aware of that can explain why that is?"  And it's

4    referring to the multiple-choice questions.  And you say, "I've

5    not seen compelling explanation of why that is, but it does

6    seem to be the case."

7        Did I read that correctly?

8    A.    Yes.

9    Q.    And then you also go on to explain that there could be any

10   number of factors regarding differences in test examinations,

11   that one of the things that you were concerned about could be

12   the geographic location, correct?

13   A.    Yes.

14   Q.    Also, it could be the school system that was involved with

15   the individual -- what their educational background was?

16   A.    Yes.

17   Q.    And you also said it could be differences from

18   jurisdiction to jurisdiction, correct?

19   A.    Yes.

20   Q.    Dr. Wiesen, are you familiar with the Quinn Bill?

21   A.    I have a passing familiarity.

22   Q.    Is that passing familiarity that the Quinn Bill is

23   designed to encourage police officers to attain post-high

24   school degrees and when they attain those they can receive

25   additional percentage increases in their base salary?

1    A.    Yes.

2    Q.    Going back to differences on the tests between minority

3    and non-minority, would you agree, then, in taking any type of

4    multiple-choice examination, or any type of standardized test,

5    that there are study aids that an individual can purchase and

6    review in preparation for such a test?

7    A.    Yes.

8    Q.    And there are also books that can be purchased to help

9    them prepare for the examination?

10   A.    Well, there's the reading list for the examination itself.

11   Q.    Right.   So there are books that they can purchase to help

12   them prepare for the examination, correct?

13   A.    Yes.

14   Q.    And there are also classes that an individual can take to

15   help prepare for a test?

16   A.    Yes.

17   Q.    And also, you can learn, again, study tricks as to how to

18   mentally approach an exam, correct?

19   A.    Yes.

20   Q.    At some point last week you were asked to -- a

21   hypothetical question and asked to assume that a sergeant

22   studying for -- excuse me -- a sergeant applying for a

23   lieutenant's promotion studied for that promotion, and that you

24   testified that assuming -- making an assumption that the

25   sergeant studied for the lieutenant, you expected a -- that the

1    individual would have gotten at least 90 percent of the

2    questions that pertain to the incumbent position.  Do you

3    recall testifying to that?

4    A.   I recall testifying that I would think that such a person

5    would score very high.

6    Q.   I'll ask you to make that same analysis but assuming that

7    the incumbent sergeant did not study at all.  What do you

8    expect that individual -- how they would perform on the

9    incumbency questions?

10   A.   I would think at the very least they would pass based on

11   their experience on the job, and of course the previous exam

12   they took.  Perhaps they wouldn't score in the high 90s, but I

13   would be very surprised if they scored less than 80.

14   Q.   So somewhere between 70, which is passing, and in the 80s.

15   Is that your testimony?

16   A.   No.  I would think -- I would expect an incumbent sergeant

17   who doesn't study, just takes the exam to see what it's like,

18   to score above 80.

19   Q.   So only a 10-point differential for a sergeant between

20   studying and not studying.  Is that your testimony?

21   A.   Well, it's hard to get higher than 100, so if you

22   are -- if one group is in the 80s, you can't go that much

23   higher.

24   Q.   Right.  But I'm asking you the difference between -- based

25   on your testimony if you think a sergeant who does not study

1    can get an 80, at least an 80, and a lieutenant who studied --

2    or excuse me -- a sergeant who studies can get a 90, I'm asking

3    you is the difference between studying and not studying 10

4    percent?

5    A.   Well, these are really, maybe, informed guesses.  The

6    grades would also depend on the difficulty level of the test,

7    the quality of the test, the extent to which the test is trying

8    to measure essential knowledges for the job as opposed to

9    obscure esoteric things.  But I would think that given a

10   reasonable test, a lieutenant who -- an applicant for

11   lieutenant who studied would score very, very high, and an

12   incumbent sergeant, at the very least, would have a solid

13   passing score.

14   Q.   And a solid passing score would be anything above 70,

15   correct?

16   A.   Well, I would say above 80.

17   Q.   So, again, going back to my original question, then,

18   the -- based on your last answer that the difference would be

19   actually less than 10 points between studying and not studying.

20   A.   Well, I guess in the 80s and the upper 90s.  It could be

21   in the neighborhood of ten points, yes.

22   Q.   Last week Attorney Harris asked you about mechanical

23   aptitude tests that you had created that had adverse impact.

24   Do you recall being asked questions about that?

25   A.   Yes.

1   Q.   And that is also -- a mechanical aptitude test that you

2   administered was also mentioned on page 15 of your two

3   thousand -- your March 30, 2009, report; is that correct?

4   A.   I think I mentioned something about it in rebuttal to the

5   experts for the defense.

6   Q.   And what you wrote was the test that you administered was

7   over ten years old and had nothing to do with the sergeant's

8   examination; is that correct?

9   A.   It certainly has nothing to do with the sergeant's

10  examination.  It's over ten years old.

11  Q.   What is a mechanical aptitude test?

12  A.   A mechanical aptitude test tries --

13          MR. LICHTEN:  Can we can clarify whether he's asking

14  in general or about his test because I think the --

15          THE COURT:  Fair enough.  In general?

16          MR. LEAHEY:  I'll go with his test.  Or in general.

17  I'll go with in general.

18          THE WITNESS:  A mechanical aptitude test tries to

19  measure an untrained ability to successfully use mechanical

20  devices, understand them, perhaps repair them.

21  BY MR. LEAHEY:

22  Q.   And is it your testimony -- let me show you -- this is

23  page 15 of your March 30, 2009, report, where under 26 it says,

24  "Dr. Outtz says that a mechanical aptitude test I authored over

25  ten years ago has adverse impact but he does not explain why

1    that is relevant to the sergeant exams being challenged."

2         Do you see that?

3    A.    Yes.

4    Q.    Did you write that because a mechanical aptitude test is

5    not a proper test to administer for the position of police

6    officer?

7    A.    I said it wasn't relevant to sergeant.

8    Q.    Right.  So it's not relevant to sergeant.  But now I'm

9    asking you is that because such a test isn't even relevant to

10   being a police officer?

11   A.    I didn't think of its relevance to being a police officer

12   when I wrote that it wasn't relevant to being a sergeant.

13   Mechanical aptitude, I think, is widely used for firefighter

14   selection.  I don't recall seeing it used for police officer

15   selection, although I guess you could make some case for it.

16   Q.    Okay.  From reading this, it looks like you're saying that

17   mechanical aptitude test is not relevant to a sergeant's

18   promotional exam.

19   A.    Correct.

20   Q.    And I'm wondering, I'm just trying to find out, is that

21   because a mechanical aptitude test isn't relevant to the

22   position of police officer?

23              MR. LICHTEN:  Objection.  Asked and answered.

24              THE COURT:  Sustained.

25   BY MR. LEAHEY:

1  Q.   Dr. Wiesen, have you prepared any type of study aid for

2  mechanical aptitude tests?

3  A.   Yes.

4  Q.   Showing you what appears to be a Barron's "How to Prepare

5  for the Mechanical Aptitude and Spatial Relations Test."  Do

6  you see that?

7  A.   Yes.

8  Q.   And you see underneath it says "By Joel Wiesen"?

9  A.   Yes.

10 Q.   Is this a copy of a Barron's study prep guide that you did

11 for mechanical aptitude and spatial relations tests?

12 A.   Yes.

13 Q.   And in this study guide, is it fair to say that what you

14 test involves questions about gears and -- let me just pull

15 this up.  And that there's a -- do you recognize this page?

16 A.   Yes.

17 Q.   This is a page from the Barron's guide that you authored?

18 A.   Yes.

19 Q.   And explains what mechanical aptitude tests are?

20 A.   Yes.

21 Q.   And it says "Questions about gears" -- at the bottom, the

22 second paragraph under "What are mechanical aptitude tests?"

23      "Questions about gears, pulleys and tools make up a large

24 part of some tests.  This book has a chapter on each of these

25 topics, including short lessons in many of them."

1        Did I read that correctly?

2   A.   Yes.

3   Q.   So this book is all about the science of gears and pulleys

4   and similar tools, correct?

5   A.   It goes beyond that, but that's a good chunk of it.

6   Q.   How does it go beyond it?

7        MR. LICHTEN:  Objection.  Relevancy.

8        THE COURT:  What is the relevance of this, Mr. Leahey?

9   BY MR. LEAHEY:

10  Q.   Dr. Fields, do you recognize this page --

11       THE COURT:  Mr. Leahey, before we go further, what is

12  the relevance of this?

13       MR. LEAHEY:  The relevance is this is a book that he

14  prepared himself, and in it he says that this is good testing

15  for the position of police officer.

16       THE COURT:  Okay.  Go ahead.

17  BY MR. LEAHEY:

18  Q.   Dr. Fields -- excuse me -- Dr. Wiesen, do you recognize

19  this page?

20  A.   Yes.

21  Q.   And it talks about "Employers often give mechanical

22  aptitude tests and spatial ability tests to applicants in many

23  fields for many different jobs, such as the following."

24       Do you see that?

25  A.   Yes.

1   Q.   And then going down on the right-hand side, the fourth one

2   down, do you see where it says "police officer"?

3   A.   Yes.

4   Q.   So is it fair to say that you believe that mechanical

5   aptitude testing can be relevant to the position of police

6   officer?

7   A.   When I put this table together I must have had a source

8   that said that such tests were sometimes used for police

9   officer.

10  Q.   Was this book written in 2003?

11  A.   Approximately.

12  Q.   Is one of your criticisms of the HRD test that it does not

13  include any type of mechanical aptitude testing?

14  A.   That was not one of my --

15        MR. LICHTEN:   Objection.   Which HRD test?

16  BY MR. LEAHEY:

17  Q.   The four statewide tests that are the subject of this

18  litigation.

19  A.   That was not one of my specific critiques.

20  Q.   Your original report is dated October -- in this case --

21  is dated October 3, 2008, correct?

22  A.   I think that's correct.

23  Q.   And that prior to -- it's approximately 66 pages.   Does

24  that sound correct?

25  A.   Yes.

1    Q.    Prior to -- and in that report I believe you provide a

2    number of statistical charts, a number of them, correct?

3    A.    Yes.

4    Q.    And before you provided this report, is it fair to say

5    that you reviewed it for accuracy?

6    A.    Yes.

7    Q.    And that you edited it for accuracy?

8    A.    Yes.

9    Q.    And I believe you also testified that one of the things

10   that industrial psychologists look for is as much data as

11   possible; is that correct?

12   A.    Yes.

13   Q.    Do you have that report in front of you?

14   A.    I'm sure it's here.  Do you know what number it is?

15   Q.    Exhibit 50 marked for identification.

16         Directing your attention to page 2 where it says

17   "Alternative valid examination method with less adverse impact

18   not used," do you see that?

19   A.    Yes.

20   Q.    And in it you say, "Across the nation, large and small

21   jurisdictions are holding examinations for promotion to police

22   sergeant that include practical exercises, structured oral

23   boards, and the like, which tend to have less adverse impact on

24   minority applicants and add to the validity of the

25   examinations."

1           Did I read that correctly?

2    A.    Yes.

3    Q.    Okay.  And in this report, or in this section here, there

4    is no cite or example of a large or small jurisdiction and any

5    results regarding adverse impact; is that correct?

6    A.    Not in this summary section.

7    Q.    Well, do you give specific examples in this document as to

8    specific findings of any municipality?

9    A.    What do you mean by "finding"?

10   Q.    That support your statement "that tend to have less

11   adverse impact on minority applicants."

12   A.    The examples I give are examples of jurisdictions where

13   they're used and examples of the instruments.  I don't think I

14   have statistics here on lower adverse impact.

15   Q.    Right.  That's my question, that you don't provide

16   statistics on the adverse impact, correct?

17   A.    Not in this report.

18   Q.    Do you provide that in any of your reports?

19           (Pause.)

20   A.    Well, I talk about it a little bit on page 21.

21   Q.    Of which report?

22   A.    Of the -- sorry -- of the March 30, 2009, report.

23   Q.    On page 21?

24   A.    Correct.

25   Q.    But nowhere on this page do you actually give examples of

1    small or large jurisdictions regarding adverse impact, correct?

2    A.   Well, on the next page, on page 22 in Table 4, I analyze

3    the data from the 2002 Boston exam, and I show that the oral

4    grades alone have much smaller differences between minority and

5    non-minority score means.

6    Q.   Other than Boston and its 2002 examination, you didn't do

7    any -- you didn't provide in any of your reports any specific

8    information regarding the comment that you originally made in

9    your first report about alternatives which tend to have less

10   adverse impact on minority applicants; is that correct?

11   A.   No.  I summarize the literature and I say that that's

12   widely found, but I don't have a specific reference to it here,

13   to the published report here.

14   Q.   Right.  You say it's widely found but you provide no

15   specific examples, correct?

16   A.   Correct.

17   Q.   And you also -- just going back to your original report,

18   you use the phrase "which tend to have" to describe the less

19   adverse impact.  You're not actually saying that it will

20   produce less adverse impact; you're saying it essentially may

21   possibly have less adverse impact; is that correct?

22        MR. LICHTEN:  Objection to the form, "it."  It's not

23   clear what "it" is.

24        THE COURT:  Overruled.

25        You may answer.

1          THE WITNESS:  Adverse impact is a function of many

2    things, and for example, just the proportion of people who are

3    hired or promoted.  And the test instruments are usually

4    developed anew for each testing program, so it's not like

5    you're using an absolutely tried and true assessment device.

6          So the summaries of the literature indicate that there

7    are smaller mean differences between minorities and

8    non-minorities on most testing instruments other than a

9    multiple-choice knowledge or cognitive ability test, but there

10   will be variability, and you can't be certain of the size of

11   the adverse impact that you will get, although you can predict

12   it.

13   BY MR. LEAHEY:

14   Q.   But going back to my question, is it fair to say that the

15   phrase "tend to have less adverse impact" is a cautious

16   statement?

17   A.   Yes.

18   Q.   And it's not a bold endorsement; it's essentially saying

19   it may possibly have less adverse impact, correct?

20   A.   On average such tests will have less adverse impact.  Any

21   given test may have -- may deviate from the general finding.

22   Q.   But your report doesn't say "will have less adverse

23   impact," right?  That's not what it says.

24   A.   Correct.

25   Q.   What it says is "tend to have less adverse impact."

1   A.    Yes.  And I think that's what I mean.

2   Q.    Doctor, you also wrote a March 31 [sic], 2009, report,

3   correct?

4   A.    March '09, yes.

5   Q.    And in neither your October 2008 report nor your March

6   30th, 2009, report did you ever disaggregate data with respect

7   to the individual defendants, correct?

8   A.    Correct.  Other than Boston.

9   Q.    And that is also true with respect to your April 2010

10  report, correct?  Strike that.

11       Actually, in your April 2010, that's the first time that

12  you included some type of basic data pertaining to each

13  municipality, correct?

14  A.    Yes.

15  Q.    And that disaggregate data was attributed to Table 4,

16  correct?

17  A.    Yes.

18  Q.    Other than Table 4, you do not talk about -- with the

19  possible exception of Boston, you do not talk about adverse

20  impact for each of the individual defendants, correct?

21  A.    Right, with the exception of Table 4 and the surrounding,

22  you know, narrative.

23  Q.    Going back to the April 14, 2010, report, on page 3,

24  directing your attention to Footnote 4, do you see that?

25  A.    Yes.

1    Q.    And it says, "I received another HRD file named 2005 to

2    2007 Lopez data Mar 8, 2010."  Do you see that?

3    A.    Yes.

4    Q.    Does that refer to data that you received from Dr. Silva

5    regarding those examinations, and that you received it sometime

6    in March of 2010, approximately March 8th?

7    A.    I think so.

8    Q.    So you had -- at that point you had -- with respect to the

9    '05, '06, '07 and '08 examinations, you had that data for all

10   of the defendants but did not include any type of analysis on

11   those defendants in this report, correct, other than Table 4?

12   A.    Right.  Other than Table 4 and the surrounding narrative.

13   Q.    Going back to your March 30, 2009, report, on page 1 under

14   "Case documents reviewed," it says you reviewed documents with

15   a Bates-stamp page numbers 1 through 2595, correct?

16   A.    Yes.

17   Q.    I'm going to show you a document with the Bates-stamp

18   number of 1320 and ask you to look at that.

19   A.    Okay.

20   Q.    Is that one of the documents that you reviewed as part of

21   your March 2009 report?

22   A.    I did look at that data, yes.

23   Q.    Okay.  And this data involves the Lowell Police

24   Department, correct?

25   A.    Yes.

1  Q.   And you see on the far right-hand side that there are five

2  dates in the column with the letter K.  Do you see that?

3  A.   Yes.

4  Q.   And I'll represent to you that on the larger Bates

5  document, that talks about promotions that were made, and the

6  letter L is the type of promotion that was made.  So my

7  question to you is:  If you had this document prior to your

8  March 2009 report, why didn't you include information regarding

9  the disaggregate data of Lowell in your March 2009

10 examination -- or excuse me -- report?

11 A.   Well, the numbers for most of the defendant departments

12 were very small, and it's easier to see patterns when you

13 aggregate the data, and I aggregated.

14 Q.   Right.  My question is:  You actually had the information

15 regarding Lowell but was too -- was it too statistically

16 insignificant to include in your March 2009 report?

17 A.   With very small numbers you typically do not find

18 statistical significance, yes, in promotion data.

19 Q.   Just to be clear, you had this information on Lowell but

20 did not put specific findings or opinions about Lowell in your

21 March 2009 report, correct?

22 A.   Well, so these five people who are indicated as promoted

23 are, it seems, all white; the grades seem to be in descending

24 order; the first minority seems to be way down on the list

25 there.  But they're very small numbers and my first approach

1    that I used in this report was to aggregate.

2    Q.   Right.  And my question to you is:  You had this

3    information and chose not to put it in your report, correct?

4    A.   Correct.

5    Q.   And similarly, with respect to the updated data that you

6    received from Dr. Silva on March 8, 2010, you did not include

7    that similar data in your April 2010 report concerning Lowell,

8    correct?

9    A.   Well, other than that Table 4.

10   Q.   Right.  Other than that Table 4 that just talks about the

11   2006 examination.  But no specific information that, say,

12   contained in your June 2010 report, correct?

13   A.   Well, I mean, the adverse impact ratio appears in both

14   reports.  The adverse impact ratio that's in Table 4, they're

15   all zeros.  They're also in the later report.

16   Q.   But again, in your April 14th report, the only time that

17   Lowell is specifically mentioned is Table 4, correct?

18   A.   Correct.

19   Q.   And that's actually the only time that, with the possible

20   exception of Boston, any of the other defendants are mentioned

21   in this report, correct, this April 2010 report?

22   A.   Correct.

23   Q.   And in all of your analyses that you provided, you grouped

24   Hispanics and blacks together in your analyses, correct?

25   A.   Correct.

1  Q.   Now, are you aware whether or not the Uniform Guidelines

2  inform you that you are supposed to separate out the individual

3  subjects that are part of the adverse impact analysis?

4  A.   Well, the Uniform Guidelines talks about a protected group

5  and the comparison group.

6  Q.   Are you familiar with the questions and answers of

7  the -- questions and answers for the Uniform Guidelines?

8  A.   I've read them.

9  Q.   Are you familiar with Question 11 which is, "What is a

10  substantial deviation rate of selection?"

11  A.   I've seen Question 11.

12  Q.   And is a "substantial different rate of selection" another

13  phrase that can be used for "adverse impact"?

14  A.   Yes.

15  Q.   Do you see the answer for Question 11 where it talks about

16  "The agencies have adopted a rule of thumb under which they

17  will generally consider a selection rate for any race, sex or

18  ethnic group which is less than four-fifths"; do you see that?

19  A.   Yes.

20  Q.   Then going -- after the answer in the next paragraph it

21  gives you an example.  It says, "For example, if the hiring

22  rate for whites other than Hispanics is 60 percent; for

23  American Indians, 45 percent; for Hispanics, 48 percent; and

24  for blacks, 51 percent, and each of these groups constitutes

25  more than 2 percent of the labor force in the relevant labor

1  area, a comparison should be made of the selection rate for

2  each group with that of the highest group."

3       Did I read that correctly?

4  A.   Yes.

5  Q.   Does that mean that you should be doing an analysis

6  between blacks and Hispanics independently?

7  A.   Well, I think that HRD, and maybe the defendant

8  organizations, should be doing that.  But in that first

9  paragraph it says, "This rule of thumb is not intended as a

10  legal definition but a practical means of keeping attention of

11  the enforcement agencies on serious discrepancies."

12       So this is not a -- the analyses I undertook are not a

13  generic set of analyses under the Uniform Guidelines; they're

14  informed by the complaint in this case.  And the -- and I

15  consulted with counsel about how to define "minority" and

16  "non-minority."

17  Q.   Well, you did not do any type of analysis with regards to

18  blacks as an individual racial group, did you?

19  A.   No.  And as a matter of fact, the expert for the defense

20  lumped the black and Hispanic candidates together as well.

21  Q.   Right.  And you're aware that the defense experts' reports

22  came as a result of your report and Dr. Fields' report?

23  A.   Yes.  And Dr. Landy's.

24  Q.   You did no independent analysis with regards to Hispanics,

25  correct?

1  A.    Correct.

2  Q.    And earlier you said that the four-fifths rule is a rule

3  of thumb, correct?

4  A.    Yes.

5  Q.    And you'll agree with me that the four-fifths rule is not

6  a scientifically valid principle, correct?

7  A.    I think it had its origins in the enforcement agencies,

8  and I don't think they were applying a scientific methodology.

9  Q.    So the answer would be, yes, you agree that it is not a

10  scientifically valid principle, correct?

11  A.    No, it's an administrative tool.

12  Q.    And you'd also agree that it's actually not a legal

13  definition; it's literally what it says here, it is a rule of

14  thumb, correct?

15  A.    Correct.

16  Q.    Would you agree with me that a rule of thumb, essentially,

17  is a starting point and is not, in and of itself, dispositive?

18  A.    I think so.

19  Q.    Again, just to illustrate that point, Question 20 of the

20  question and answer says, "Why is the four-fifths rule called a

21  'rule of thumb'?"  And it says, "Because it is not intended to

22  be controlling in all circumstances."

23        Did I read that correctly?

24  A.    Yes.

25  Q.    And you agree with that statement, correct?

1    A.    Yes.

2    Q.    And it's based on that, then you look to other factors; is

3    that fair to say?  If there's a violation of the four-fifths

4    rule you merely go in to look further, correct?

5    A.    Yes.

6    Q.    Earlier you'd also talked about the small numbers, when

7    you were talking about Lowell, and the information that you had

8    on that Bates stamp.  I believe it was 1320, that page?

9    A.    Yes.

10    Q.    And the guidelines -- excuse me -- the questions and

11    answers give you some information as to what to do when there

12    are small numbers, correct?

13    A.    It talks about small numbers.

14    Q.    And in Question 21 of the questions and answers it

15    specifically talks about small numbers, correct?

16    A.    Yes.

17    Q.    And it says, "Is evidence of adverse impact sufficient to

18    warrant a validation study or an endorsement action where the

19    numbers involved are so small that it is more likely than not

20    that the difference could have occurred by chance?"

21        Did I read that correctly?

22    A.    Yes.

23    Q.    And then it gives an example as to what small numbers are,

24    and it's using 100 whites and 20 blacks, correct?

25    A.    Eighty whites.

1    Q.    Do you see where it says "for example" then on -- it's in

2    the grid; it's a little dark?

3    A.    Yes.

4    Q.    Where it says "Applicants:  80 white, 20 black"?

5    A.    Yes.

6    Q.    Is it fair to say that this small number that Question 21

7    is using is actually based on 100 individuals, right?

8    A.    Yes.

9    Q.    And then the answer that it gives is -- to that question

10   that was asked is, "No."  And then it talks about, "If the

11   numbers of the persons and the difference in selection rates

12   are so small that it is likely that the difference could have

13   occurred by chance, the federal agencies will not assume the

14   existence of adverse impact in absence of other evidence."

15        Did I read that correctly?

16   A.    Yes.

17   Q.    And then it goes on to say, "One of the things that you

18   can do when a selection rate is too small is" -- it goes on to

19   say, "If only one more black had been hired instead of a white,

20   then the selection rate for blacks would be higher than it is

21   for whites."

22        Do you see where I read that?

23   A.    Yes.

24   Q.    Is that describing what is known as the "shift of one"?

25   A.    Yes.

1  Q.   And would you agree that with small numbers it is

2  appropriate to include a shift-of-one analysis when you're

3  looking at small numbers and adverse impact?

4  A.   In some cases.

5  Q.   And it says after that, "If there is no" -- "If the shift

6  of one results in no adverse impact," it says, "generally, it

7  is inappropriate to require validity evidence or to take

8  enforcement action where the number of persons and the

9  difference in selection rates are so small that the selection

10  of one different person for one job would shift the result from

11  adverse impact against one group to a situation in which that

12  group has a higher selection rate than the other group."

13      Did I read that correctly?

14  A.   Yes.

15  Q.   So in cases where shift of 1 can make a difference,

16  according to this question and answer, that there is no need

17  for any action to be taken if the shift of 1 changes the

18  numbers; is that correct?

19  A.   No.

20  Q.   That's not correct?

21  A.   No.

22  Q.   I'm not getting to the next part where it says "On the

23  other hand," but just generally speaking, doesn't it say that

24  if the shift of 1 results in no adverse impact, which is a

25  violation of the four-fifths rule, then there is no adverse

1    impact, correct?

2    A.    Well, there is that phrase that says "in the absence of

3    other evidence" in the third line of that first paragraph.

4    Q.    Right.  And that would be going down to where it says, "On

5    the other hand, if a lower selection rate continued over a

6    period of time so as to constitute a pattern, then the lowest

7    selection rate would constitute adverse impact warranting the

8    need for validity evidence."

9          Have I read that correctly?

10   A.    You've read that correctly.

11   Q.    So that's the issue that you're looking for with respect

12   to going over a period of time; that's the other evidence,

13   correct?

14   A.    That's one type of other evidence.

15   Q.    And again, under any impact -- excuse me -- any analysis

16   for adverse impact, the numbers involved have to be

17   statistically significant, correct?

18   A.    No.

19   Q.    They don't have to be statistically significant for a

20   finding of adverse impact?

21   A.    No.

22   Q.    Dr. Wiesen, are you aware that a few municipalities in

23   Massachusetts have used assessment centers for police

24   sergeants' examinations?

25   A.    Yes.

```
1    Q.    And you're aware that would be Leominster, Salem and
2    Salisbury?
3    A.    I am not particularly aware of those assessment centers.
4    Q.    Did you do any analysis as to whether or not there was
5    adverse impact with regards to those municipalities in
6    Massachusetts that used assessment centers for police
7    sergeants' examinations?
8    A.    Just Boston.
9    Q.    Putting aside Boston, did you do any other municipality in
10   Massachusetts that use an assessment center for police
11   sergeants' promotions?
12   A.    I did not look at them separately, no.
13   Q.    Do you know whether or not Leominster used an assessment
14   center in 2004?
15   A.    No.
16   Q.    Do you know whether or not Salem actually used an
17   assessment center?
18   A.    No.
19   Q.    Directing your attention to the 2008 -- excuse me -- 2006
20   police promotional examination statewide, I'm placing in front
21   of you the results of the police sergeant's exam.  Do you see
22   where it says "Salem"?
23   A.    Yes.
24   Q.    And do you see where it has "WR"?
25   A.    Yes.
```

1    Q.    Is it your understanding that that stands for the written

2    test result?

3    A.    Yes.

4    Q.    Okay.  And the next one is "TE."  Do you see that?

5    A.    Yes.

6    Q.    Is it your understanding that stands for the training and

7    experience component of the examination process?

8    A.    Yes.

9    Q.    And turning to the left now where it says "OT."  Do you

10   know what that "OT" stands for?

11   A.    I presume that stands for "other."

12   Q.    Do you know whether or not that includes the assessment

13   center portion for the Salem Police Department?

14   A.    I would presume so.

15   Q.    But you're just guessing based on what this document says.

16   You don't know anything other than what this document says?

17   A.    I've not gotten any description of the Salem assessment

18   center process, correct.

19   Q.    In preparing an assessment center, approximately how

20   long -- generally speaking, how long does it take to prepare

21   and design a test for an assessment center promotion?

22   A.    You mean to create the test itself?

23   Q.    Yes.

24   A.    Well, there's a job analysis, and then following the job

25   analysis there's a test development process.  Do you mean

1    calendar time?

2    Q.    Calendar time, yes.

3    A.    If you had good cooperation and no unanticipated glitches,

4    I think you could prepare an assessment center examination for

5    a -- for many municipalities in three months.

6    Q.    And that's after it had gone through a bidding procedure?

7    A.    That's actually working on the project itself, not

8    selecting a vendor.

9    Q.    Okay.  And you're familiar, then, that in Massachusetts

10   they have a process for municipalities to either go out for an

11   invitation to bid or request for proposals?

12   A.    Many jurisdictions have that.

13   Q.    Do you know the difference between a request for proposal

14   and an invitation for bid?

15   A.    I'm not sure I know the legal difference.

16   Q.    Okay.  If I were to tell you that a request for proposal

17   requires an assessment as to which proposal is the best and not

18   necessarily the cheapest, is that your understanding of what a

19   request for proposal is?

20   A.    It's not something I really know.

21   Q.    Okay.  Is it fair to say that your three-month period

22   isn't including the time that the individual governmental

23   entity would need to prepare internally what it needs to

24   solicit a bid or proposal, correct?

25   A.    Correct.

Q.   And I believe you testified previously that for any type
of test you have to give some type of lead time to the
candidates as to what information they need to study in
preparation for whatever the promotional exam consists of,
correct?
A.   That is definitely kind to the candidates.  I would
recommend that.
Q.   Generally speaking, are you aware that in Massachusetts
HRD has, as always, used a six-month lead period time?
A.   I think that's a rule of thumb that I recall from my time
with the agency.
Q.   Now, you've been involved with assessment centers; is that
correct?
A.   Yes.
Q.   Have you ever had any problems or concerns about how
assessment centers are scored?
A.   Definitely concerns.
Q.   Have you ever had any problems in the scoring of an
assessment center that you've been involved with?
A.   Are you referring to assessment centers that I developed
as a consultant or when I was working for the state?
Q.   I refer you to an article from the Assessment Council News
from 2007, and an article captioned "Technical Affairs," where
the question was, "Is there a minimum value for reliability
coefficient that would generally be accepted by testing

1  experts?  If so, what is it?"

2      Directing your attention, do you see where it says "Joel

3  Wiesen"?

4  A.   Yes.

5  Q.   Okay.  Do you recall giving answers to questions from the

6  Assessment Council News in October 2007?

7  A.   Yes.

8  Q.   And that -- directing you where it's highlighted you say,

9  "In my expert work, I have seen changes of 20-plus points on a

10  100-point scale on rescoring an assessment center after an

11  appeal."  Do you see that?

12  A.   Yes.

13  Q.   So going back to my prior question of problems with

14  scoring assessment centers, what problems have you seen where

15  you've seen a 20-point swing on rescoring an assessment center?

16  A.   Could you rephrase that?  I didn't quite follow that.

17  Q.   Sure.  You say here that you have seen changes of 20

18  points on a 100-point scale on rescoring of assessment centers

19  after an appeal.  Do you see that?

20  A.   Yes.

21  Q.   What did that 20-point swing concern?

22  A.   It concerned the grade on the 100-point possible scale.

23  Q.   Would you agree with me that a 20-point swing on a

24  100-point scale is statistically significant?

25  A.   I would agree that it's of concern.

1    Q.    Is a 20-point difference on a 100-point exam -- is that

2    statistically significant?

3    A.    "Statistically significant" concerns whether it's likely

4    to have occurred by chance, and so I don't know the answer to

5    that question.

6    Q.    But a 20-point change, essentially, that's 20 percent of

7    an exam score, correct?

8    A.    Right.

9    Q.    And that's 20 percent of a perfect exam score, correct?

10   A.    Right.

11   Q.    And then where it says, "Large changes on regrading give

12   rise to applicant perception that the assessment center is

13   capricious," did I read that correctly?

14   A.    Yes.

15   Q.    Okay.  Is it fair to say that if you had an assessment

16   center where there's a 20-point change on rescoring, that there

17   is some concern about how that assessment center was developed

18   and administered, correct?

19   A.    That's correct.  I had that concern.

20   Q.    In fact, one of the concerns is you don't want to have an

21   assessment center be viewed as capricious, correct?

22   A.    Correct.  Not the grading.

23   Q.    Also in this article, on Question 6, it talks about "If a

24   valid" -- validly *[sic]* -- "coefficient is statistically

25   significant, is that enough to imply job-relatedness?  If not,

1    what other factors would you consider in determining if the

2    test is job related and has practical significance?"  Do you

3    see your answer?

4    A.    Yes.

5    Q.    Your answer is, "I see 'job related' as synonymous with

6    'valid,' so see my answers to the questions above.

7    Additionally, we may want to consider how much of the job the

8    test and the criterion cover; however, this may go beyond your

9    question," correct?

10   A.    Yes.

11   Q.    Is it fair to say that you see "job-relatedness" -- well,

12   do you still consider "job-relatedness" to be synonymous with a

13   valid examination?

14   A.    I think so.

15   Q.    Going to your April -- going back to your April 2010

16   report, going back to Table 4, do you see how in this report --

17   or in this table you combine 2006 Lawrence -- 2006 and 2008

18   Lawrence examinations with the 2006 Lowell examination, the

19   2005 and 2007 MBTA sergeant's exam and the 2006 Methuen

20   sergeant's exam?  Do you see that?

21   A.    I don't combine them; they were all presented in the

22   chart.

23   Q.    Turning to the next page, you write, "These six outcomes

24   show" no [sic] "adverse impact, failing the 80-percent rule.

25   The pattern of AI is striking despite the small numbers of

1    applicants involved."

2        Did I read that correctly?

3    A.    So the six outcomes show adverse impact, right.

4    Q.    Right.  But you're combining the six of them together,

5    correct?

6    A.    Well, each one fails the 80-percent rule.

7    Q.    Directing your attention to Footnote 14 where it says,

8    "The number of the applicants appointed and the total number of

9    applicants considered together are too small to allow for

10   statistical significance in a statistical analysis of any of

11   these six exams considered alone."  Do you see that?

12   A.    Yes.

13   Q.    Is it fair to say, then, when you're giving your opinion

14   as to these six tests, you're actually combining the '05, '06,

15   '07 and '08 examinations over four municipalities, correct?

16   A.    Well, I'm noticing a pattern in the six exams from the

17   four municipalities, yes.

18   Q.    So you're comparing -- you're finding a pattern based over

19   studying and using data from four different municipalities over

20   four different years and combining them together, correct?

21   A.    Well, I'm not combining them together just in Table 4, but

22   I am looking at them together, yes.

23   Q.    And you're aware that in Massachusetts an individual going

24   for a sergeant's exam in Lawrence cannot apply for a sergeant's

25   position in Lowell, correct?

1    A.    Correct.

2    Q.    And you'll also agree with me that it's impossible -- even

3    if you could be in the same jurisdiction, that you couldn't

4    promote someone off the 2008 Lawrence sergeant's exam in 2006

5    in Lawrence, correct?

6    A.    Correct.

7    Q.    And you talk about the pattern that you found was,

8    again -- I believe you used the term "the pattern is striking,"

9    correct?

10   A.    Yes.

11   Q.    You're aware that if you were allowed to group all of

12   these entities together, that -- and compare them as apples to

13   apples regardless of time, that promotions could be made off of

14   test results from these municipalities that could be inserted

15   into the other municipalities that you cite here.

16   A.    I didn't follow that question.

17   Q.    Let me show -- here's the 2008 examination for Lawrence.

18   And do you see where this individual received an 88?

19   A.    Yes.

20   Q.    And that person's Hispanic, correct?

21   A.    Yes.

22   Q.    Again, for the assumption of this line of questions I'll

23   ask you to assume that all the municipalities appoint off of

24   strict rank order.  This is the 2005 MBTA police sergeant's

25   examination.  Do you see where they've appointed -- all of

1    their appointments were less than 88.  Do you see that?

2    A.    Yes.

3    Q.    So if somehow -- if we could ignore the jurisdictional

4    questions and the questions of time, that the Hispanic male who

5    scored an 88 in Lawrence in 2008 would get a job at the MBTA in

6    2005, correct?

7          MR. LICHTEN:  I'm going to object to that because it's

8    asking how someone who took the test three years later could

9    have gotten appointed off a list three years before.  It's

10   metaphysical.

11         THE COURT:  I think it's an assumption in the

12   question -- I understand the question to be going to the

13   methodology of the table.  I'll permit it.

14         You may have it.

15         MR. LEAHEY:  Thank you.

16         THE WITNESS:  Well, the different exams have different

17   difficulty levels, so the means for the exams are different.

18   So they're not -- comparing the absolute scores on the 2006

19   exam with the absolute scores on the 2005 or '07 or '08 exams I

20   think is, you know, not appropriate.

21   BY MR. LEAHEY:

22   Q.    Right.  The same way it wouldn't be appropriate to compare

23   any data regarding Lawrence to Lowell, correct, as you do in

24   Table 4?

25   A.    Well, I thought it was appropriate to note a pattern here.

1    I mean, all of the defendants took the statewide exam and so

2    they're all, you know, biting from the same apple.  And I was

3    just wondering if the apple is making them sick.

4    Q.    Right.  And the pattern that you're basing it on is

5    examinations from '05, '06, '07 and '08, correct?

6    A.    Right.

7    Q.    And that pattern is also predicated on the jurisdictions

8    of Lawrence, Lowell, the MBTA and Methuen, correct?

9    A.    Yes.

10   Q.    So why is it fair for you to make that analysis but that

11   you're unable to make that same analysis which would actually

12   apply to a promotion using the same methodology that you use in

13   Table 4?

14   A.    Could you say that again, please?

15   Q.    Sure.  You're saying that it's unfair to use the 2008

16   Lawrence exam in 2005, promotional, in the MBTA, correct?

17   That's what you just testified to?

18   A.    What I said were that the absolute grades aren't

19   comparable because the means of the tests are different.

20   Q.    If we use the grades -- but you would agree with me that

21   if time and space were not a factor and you went simply on rank

22   order, a person with an 88 would be promoted for any

23   municipality regardless of the year of jurisdiction in which

24   the person who ended up getting the promotion was 87 or lower,

25   correct?

1    A.    Well, if I were going to try to combine the grades for the

2    different exams, I would try to adjust for the difference in

3    difficulty before I do the combination.

4    Q.    Well, let's look at the 2006 examination, then.

5          And you're aware -- directing your attention -- this is

6    the 2006 examination in Lowell.  You're aware that a black

7    female scored an 82, correct?

8    A.    I see that.

9    Q.    Okay.  And the examination that that individual took would

10   be consistent with anyone else who took -- you don't worry

11   about mean score differences or any of the concerns with

12   examinations -- strike that.  Strike that entire question.

13         Using the 2006 examination, you're not concerned as to

14   differences in the test if everything is predicated on the 2006

15   examination, correct?

16   A.    I think you compare scores as long as people are taking

17   the same exam, yes.

18   Q.    Okay.  So if we were doing some type of analysis on the

19   examination, for example, on a statewide basis, again, if we're

20   going on strictly rank order, that the woman who scored an 82

21   in Lowell, had she worked in Arlington who promoted someone

22   with a 79 to sergeant, that if the Lowell officer was able to

23   get promoted, she could have gotten promoted in Arlington,

24   correct?

25   A.    Yes.

```
 1   Q.   And the same would go for -- in an effort to save time,
 2   you would agree with me, again, that if it was based on strict
 3   rank order, any municipality that's listed here that promoted
 4   someone to sergeant with a score of 81, that if it was going on
 5   strict rank order, the Lowell officer who scored an 82 would
 6   have been promoted, correct?
 7   A.   Yes.
 8   Q.   Okay.  And any place that promoted someone with an equal
 9   score of 82, the Lowell officer would have been eligible for
10   promotion, correct?
11   A.   Yes.
12   Q.   In fact, with the 2 N + 1 rule, depending on how many
13   candidates actually scored higher than an 82, that Lowell
14   officer, if she fell within the band of 2 N + 1, would be
15   eligible for promotional opportunity, correct?
16   A.   Yes.
17   Q.   And that would include -- if there were one position
18   available, the 2 N + 1 rule means three candidates have to be
19   considered, correct?
20   A.   Yes.
21   Q.   And so if one candidate scored an 85, one candidate scored
22   an 84 and three candidates scored an 83, because of the way
23   Civil Service works all five of those individuals would be
24   considered for the promotion, correct?
25   A.   That's my understanding.
```

1    Q.    Turning to the examination questions themselves, or the

2    tests -- I'm not going to ask questions about -- the exact

3    questions, but talking about the '05, '06, '07, '08 statewide

4    exams and the questions that pertain to -- strike that.

5          Just regarding the state exams for '05 through '08, you

6    got those examinations at some time before October 2008, the

7    first time you reviewed them?

8    A.    Yes.

9    Q.    Okay.  And you were able to review them only after signing

10   a confidentiality agreement with the state, correct, or someone

11   signing a confidentiality --

12   A.    Some confidentiality agreement, yes.

13   Q.    And you're aware from your time at HRD that HRD does not

14   provide copies of the examinations to any of the Civil Service

15   communities, correct?

16   A.    Correct.

17   Q.    And is it fair to say that you reviewed these examination

18   questions and you found all of the questions on the HRD

19   examinations to be police oriented?

20   A.    Yes.  Not necessarily job related but police oriented.

21   Q.    Did you review the reading list materials for the

22   examinations?

23   A.    Some of them.

24   Q.    Which ones did you review -- strike that.

25         Let me direct your attention to the 2006 reading list,

```
 1    which I believe is one of the first...
 2                MS. HARRIS:  Exhibit 10.
 3                MR. LEAHEY:  I was going to say Exhibit 10 but I
 4    wasn't sure.
 5                May I approach, your Honor?
 6                THE COURT:  You may.
 7                THE WITNESS:  Okay.  For this project I reviewed the
 8    textbook "Supervision of Police Personnel" by Iannone.
 9    BY MR. LEAHEY:
10    Q.   You reviewed this reading list or you reviewed the books
11    that are contained in this reading list?
12    A.   Well, I looked at the reading list, and I actually secured
13    a copy of Iannone and looked at that.
14    Q.   And when did you do that?
15    A.   Well, I've owned Iannone for many years.  I probably got
16    it when it first was published.  So I just took it off my
17    bookshelf.
18    Q.   Okay.  So are you familiar with the Iannone book?
19    A.   Yes.
20    Q.   And do you think that is an appropriate book to include,
21    the Iannone "Supervision of Police Personnel," an appropriate
22    source from which to base a sergeant's promotional exam on?
23    A.   It has strengths and weaknesses.  I think that if you use
24    it judiciously, it could be a reasonable book to have on the
25    reading list.  But it has pros and cons.
```

1    Q.    How about, are you familiar with "Community Policing:  A

2    Contemporary Perspective"?

3    A.    No.

4    Q.    How about "Criminal Investigation" by Swanson?

5    A.    I think I've seen earlier editions of the two Swanson

6    books.

7    Q.    And is that "Criminal Investigation" and "Police

8    Administration"?

9    A.    Yes.

10   Q.    At least with the titles, "Community Policing," would you

11   agree that that would be an appropriate subject matter to put

12   on a sergeant's promotional test?

13   A.    I think the subject matter is appropriate.

14   Q.    The same goes for criminal investigation?

15   A.    Yeah, I think the general subject is appropriate.

16   Q.    And the same would also be true for police administration?

17   A.    It depends what level of material is covered in the

18   textbook.  I mean, I think the reading lists here is for

19   sergeant, lieutenant and captain.  So HRD thought that these

20   books had material in them that was appropriate for sergeant,

21   and also material that's appropriate for lieutenant and

22   presumably not sergeant, and material that's appropriate for

23   captain and not lieutenant or sergeant.  So the challenge to

24   the person developing the test is to select material that's

25   appropriate for the job.

```
1    Q.   And you'd also agree that the Mass. General Laws, that

2    would be an appropriate subject matter for a police sergeant's

3    examination?

4    A.   Generally, yes.

5    Q.   Are you familiar with "Motor Vehicle Law:  Cruiser Guide

6    2006"?

7    A.   No.

8    Q.   But generally speaking, you would agree that "Motor

9    Vehicle Law" would be an appropriate subject matter to include

10   on a police promotional examination, correct?

11   A.   Yes.

12   Q.   Are you familiar with the "Juvenile Law:  Field Manual"?

13          MR. LICHTEN:  Your Honor, these questions were asked

14   by other counsel, these same exact questions.

15          THE COURT:  I do think this has been covered to some

16   degree.

17          MR. LEAHEY:  I will move on, then, your Honor.  If it

18   has been covered, I will move on.

19   BY MR. LEAHEY:

20   Q.   Dr. Wiesen, is it my understanding that for content

21   validity, it's based on the content of the test that correlates

22   to the important tasks and duties of the job?

23   A.   That's part of it.

24   Q.   Is that the primary part of it?

25   A.   I think generally stated, the degree of correspondence
```

1    between the test content and the job content is the essence of

2    content validity, and you can look at that in terms of the

3    subject matter, and also in terms of the task that it presents

4    to the test-taker and the job incumbents.

5    Q.   If a test contains good valid content, would you expect a

6    person -- we'll take a good, valid content examination for

7    police sergeant.  Would you expect that from the first time an

8    individual takes the test to subsequent testing, that if it is

9    content valid, that given the additional years of training,

10   knowledge and skills and abilities that the candidate gathers

11   over the years, would you expect, based on your training and

12   experience, that their scores would increase over time given

13   their increased duties, knowledge and ability?

14   A.   Well, if they were enrolled in a formal training program I

15   would expect that.  If they were trying to teach themselves,

16   perhaps not.  And in any case, difficulty level of examinations

17   can vary from year to year, so if the exam happened to be

18   harder one year than the previous year, perhaps everyone's

19   scores would go down.  But if someone was studying and

20   preparing in some effective way, their scores should tend to go

21   up with time.

22   Q.   But generally speaking, just assuming that test doesn't

23   vary much year to year, would you expect that a score -- an

24   individual score would keep going up each time he takes

25   it -- he or she takes it each year given the additional

1    training and experience that they gather as a police officer?

2    A.   Well, the training as a police officer might not be what's

3    tested on the exam for sergeant.  So I think just experience as

4    a police officer might not be enough to expect the grade to go

5    up.

6    Q.   So you wouldn't see that if someone's grades improve over

7    time on a police promotional exam, you don't have an opinion

8    one way or another what that actually means with regard to the

9    content validity of the examination?

10   A.   Correct.

11   Q.   Earlier I think you testified that you would expect

12   incumbents to -- even if they didn't study, to at least get 80

13   percent of -- a sergeant who's studied for the lieutenant's

14   exam, to get at least 80 percent of the sergeant's questions

15   correct; is that a fair statement?

16   A.   I went beyond that.  I said an applicant for lieutenant

17   who studied I would expect to do quite well.  It's an incumbent

18   sergeant who didn't study I thought would at least get a good,

19   solid passing grade.

20   Q.   But that's based on the test being content valid and that

21   they should end up mastering those skills and so that's why

22   they should do higher, correct?

23   A.   Correct.

24   Q.   So wouldn't the same be true for an individual who's just

25   taking their first promotional exam, that even though they

1    haven't attained the new rank, if they're still performing the

2    job and learning skills, shouldn't their grades similarly

3    correlate and go up?

4    A.    Well, the incumbent sergeants are doing sergeant's work

5    and the test is supposed to test the knowledge and skills and

6    abilities needed to do sergeant's work.  So if they're doing

7    the sergeant's work, I would expect them to pass.

8         Now, the police officers aren't doing sergeant's work,

9    they're doing police officer work, so they might not learn

10   what's needed to do sergeant work just from doing their work as

11   a police officer.

12   Q.    If you can't glean anything regarding content validity by

13   an individual whose scores go up over time, how about if at one

14   point -- again, taking it that some individual scores go up

15   during that multiple -- taking multiple sergeant's exams and

16   other scores go down, does that help you assess whether or not

17   there's content validity in such an examination?

18   A.    That's not one of the accepted approaches to evaluating

19   content validity.

20   Q.    On a job-knowledge test do you expect one of the

21   measurements to be -- again, to separate out those who can

22   perform the necessary job skills and those who can't perform

23   the necessary job skills?

24   A.    That's the intent behind setting a passing score.

25   Q.    One of the opinions that you have, I've noted -- problems

1  with the examinations is the readability of the examination; is

2  that correct?

3  A.   Yes.

4  Q.   Is it fair to say that a police sergeant needs to know

5  various specific general laws of Massachusetts that can

6  be -- strike that.

7       You're aware that a police officer has to be -- in

8  Massachusetts has to be familiar with basic general laws?

9  A.   Yes.

10  Q.   Such as General Law 209A?

11  A.   I'm not familiar with that law.

12  Q.   Okay.  Are you familiar specifically with any state

13  general laws that a police officer should have some fundamental

14  knowledge of?

15  A.   Definitely not by the chapter number.

16  Q.   Domestic violence.  Would you agree that an officer --

17  both an officer and a sergeant have to have a good working

18  knowledge of the domestic violence laws?

19  A.   Yes.

20  Q.   Would you agree that both a sergeant and a police officer

21  have to have good working knowledge of motor vehicle law?

22  A.   Yes.

23  Q.   Would you agree that both a police officer and a sergeant

24  have to have a good working knowledge of the drug laws in

25  Massachusetts?

1  A.   Yes.

2  Q.   Is it fair to say, based on your not knowing General Law

3  Chapter 209A, that you haven't read General Law Chapter 209A?

4  A.   I don't know.

5  Q.   Were you aware, generally speaking, and based on your

6  training and experience, that some statutes are not easy to

7  read?

8  A.   Yes.

9  Q.   And despite however hard or easy a state -- or a statute

10 is, depending on what that statute pertains to, a police

11 officer or sergeant has to know that material?

12 A.   Yes.

13 Q.   And has to be able to read it?

14 A.   Well, I mean, there are training courses that -- the

15 police academy in Boston, for example, has training courses on

16 laws, and they go over the elements of crime, and so they

17 dissect the law and summarize the court precedence.  So there's

18 some assistance given to police officers and sergeants, at

19 least in some jurisdictions, in learning and using the laws.

20 Q.   So it's your testimony that a police officer or a sergeant

21 doesn't actually have to be able to read the applicable state

22 statute?

23 A.   Well, I think that if they read it and they don't

24 understand it, they'll ask somebody for help.

25 Q.   You're also aware that police officers and sergeants also

1    have to know constitutional law as developed by the case law,

2    correct?

3    A.    Yes.

4          MR. LICHTEN:  Your Honor, again, these are questions

5    that have all been asked.  I remember a series of questions

6    about constitutional law.

7          MR. LEAHEY:  I don't remember questions regarding the

8    readability of the constitutional law.

9          THE COURT:  Go ahead.

10   BY MR. LEAHEY:

11   Q.   Are you aware that police officers and sergeants have to

12   be able to read and understand constitutional principles as set

13   forth in case law?

14   A.    They definitely need to be familiar with the

15   constitutional law.  And as with the other question you asked

16   on reading the law, if they are reading something and they

17   don't understand it, there are secondary sources, there are

18   textbooks, there's a -- you know, their peers, their superiors,

19   they can get some help, but certainly you wouldn't want a

20   sergeant who couldn't read.

21   Q.   Well, you wouldn't want a police officer who couldn't read

22   either, right?

23   A.    Correct.

24   Q.   So, again, are you saying that a police officer and

25   sergeant do not have to be able to read and understand

1   constitutional principles as set forth in the case law?

2   A.    What I said was, and what I think, is that if they're

3   reading that material and they have a question, they are not

4   forced to figure it out by themselves; they can seek

5   assistance.

6   Q.    But you're aware at some point they do have to learn that

7   information, correct?

8   A.    Oh, yes.

9   Q.    And that applies to both officers and sergeants, correct?

10  A.    Yes.

11  Q.    In your 2008 report you write that "The

12  HRD-written" -- and I apologize for the circles -- but "The

13  HRD-written tests contain a number of unnecessarily difficult

14  words such as 'unequivocal,' 'intrusiveness,' 'inherent,'

15  'adhere,' 'homogenous' and 'apportioned.'"

16      Did I read that correctly?

17  A.    Yes.

18  Q.    And then you write in the footnote, "All of these words

19  appeared in the first 35 questions of the 2007 exam."

20      Did I read that correctly?

21  A.    Yes.

22  Q.    What is difficult about the word "unequivocal"?

23  A.    Well, from a testing point of view, if you want to measure

24  reading ability, you should measure reading ability.  If you

25  want to measure supervision, then the accepted wisdom of the

1    profession is that you measure that with lower reading grade

2    level than is -- than might be required elsewhere on the job

3    because you want to measure supervision; you don't want to

4    measure readability *[sic]*.  If you use the highest reading

5    grade level for all the different parts of the exam, then

6    basically you're measuring all the different knowledges, skills

7    and abilities mixed together with reading ability, where

8    reading ability, perhaps, is its own separate ability, and

9    maybe you should have a little section on the exam on reading

10   ability.  And it would be there that you would have the

11   questions at the difficulty level that you think are

12   appropriate for measuring whether someone could read the

13   material that's necessary to read on the job.

14        But on the other portions of the exam where that's not the

15   intent, you're not trying to measure readability, the accepted

16   professional thinking is that you should word questions in a

17   simple fashion with -- in a way that's easy to understand, and,

18   in fact, that those guidelines are contained in the appendices

19   to the 1991 validation study.

20   Q.   Are you aware that the word "unequivocal" is part of a

21   legal term as part of "clear and unequivocal"?  Like if

22   "unequivocal" related to a legal terminology that a police

23   officer must know as to whether or not a post-Miranda statement

24   was done so clearly and unequivocally, would you consider that

25   to be an appropriate question to ask on a police sergeant's

1   examination?

2   A.   If it was part of a legal question perhaps so, or it could

3   be that -- if you want to know that they understand the

4   concept, there might be a way of asking the question with a

5   situation to see if they could apply the principle without

6   necessarily using the word.

7          THE COURT:  Mr. Leahey, I think we'll take the morning

8   recess.

9          MR. LEAHEY:  And I think I can cut down a couple of

10  different areas if we break now.

11         THE COURT:  All right.  We'll take the recess.

12         THE CLERK:  All rise.

13         (The Court exits the courtroom at 10:57 a.m.)

14         THE CLERK:  The Court will take the morning recess.

15         (There is a recess in the proceedings at 10:57 a.m.)

16         (The Court entered the room at 11:20 a.m.)

17  BY MR. LEAHEY:

18  Q.   Doctor Wiesen, turning back to these words, "unequivocal,"

19  "intrusiveness," "inherent," "adherence," "homogeneous" and

20  "apportioned," would it be fair to say that if these words are

21  part of the legal jargon that police officers use that asking

22  questions regarding these terms would be appropriate on a test?

23  A.   It could be, yes.

24  Q.   I'm just trying to figure out ways to speed up this

25  process.

1          Did you give a speech before the MAPAC fall conference on

2    November 5, 2009, regarding two firefighter examinations in New

3    York?

4    A.    Yes.

5    Q.    Placing in front of you on the ELMO a heading that says,

6    "The Recent Judicial Decision Concerning Two NYC Firefighter

7    Exams," do you see that?

8    A.    Yes.

9    Q.    Is this part of a presentation that you gave in Albany,

10   New York, on November 5, 2009?

11   A.    Yes.

12   Q.    One of the topics that you discussed regarding the

13   examinations was the readability of the examinations?

14   A.    Yes.

15   Q.    You see this document that's entitled, "Hard Words"?

16   A.    Yes.

17   Q.    At the bottom it has a web address which is

18   appliedpersonnelresearch.com.  Do you see that?

19   A.    Yes.

20   Q.    Is that your website?

21   A.    Yes.

22   Q.    Across from that it says, "Wiesen 2009 MAPAC Fall

23   Conference."  Do you see that?

24   A.    Yes.

25   Q.    Is this something that you prepared?

1    A.    Yes.

2    Q.    It lists a number of hard words.  I want to read them for

3    the record:  "accordance, adjoining, adjoins, allegation,

4    amended, ascend, constitute, debris, emit, enables, ensure,

5    fluctuating, imminent, instituted, inverted, obligation,

6    paraphernalia, partitioned, procurement, profusely, solely,

7    stabilize and subsequently."  Did I read that correctly?

8    A.    Yes.

9    Q.    What do you mean that those words are "hard words"?

10   A.    Those are what I might describe as academic words.

11   They're not the type of words you'd necessarily hear your

12   sports commentator use, and I thought that they were

13   inappropriate for an entry-level firefighter exam.

14   Q.    So these words may be inappropriate for an entry-level

15   firefighter position.  But do you know whether or not any of

16   these words are inappropriate for a police sergeant's

17   examination?

18   A.    That wasn't why I assembled this list.  I mean, I could

19   look at it.

20   Q.    The word "solely" -- and you put a star next to that and

21   put "27 times."  What is hard about the word "solely"?

22   A.    Well, for people who understand the word, it's not hard at

23   all.  If you're not quite sure what the word means, and the

24   word is being used in a test question, now you're in a dilemma.

25   You can't go ask someone for help.  You can't look it up.  And

1   you don't really understand the test question perfectly, and

2   you might know the answer to the question if it were asked

3   differently.  But you're now measuring reading word knowledge

4   together with whatever other knowledge.  So let's say that this

5   word appeared in a question that was supposed to measure

6   spatial ability, which is an ability firefighters need to know.

7   Well, all of a sudden you're measuring word knowledge together

8   with spatial ability.

9   Q.   Are there any words in this document that you would think

10  would be hard words for a candidate applying for a police

11  sergeant's examination?

12  A.   Well, "fluctuating" isn't a -- I don't think it's a term

13  of art in police science, and you could ask a question about

14  something that's fluctuating using a simpler term.  And if that

15  was trying to measure a supervisory ability, I think it would

16  be better to measure it with a simpler word or phrase so that

17  you're not measuring -- you're not confounding or conflating

18  your measurement of the supervisory ability with your word

19  knowledge.

20  Q.   Anything other than "fluctuating" as a word that would be

21  inappropriate for a police sergeant's exam?

22          MR. LICHTEN:  I would object on relevancy grounds.

23  This is an entry-level firefighter exam, so there's no evidence

24  before you that any of these words were on the police

25  sergeant's exam in issue.

```
 1              THE COURT:  Sustained.

 2              MR. LEAHEY:  Your Honor, just so -- I'm not doing it

 3    here, but at some point in the trial brief, I may pick out

 4    words that are on the promotional sergeant's exam.  I only have

 5    the 2006, but I know some of these words are on the 2006 exam.

 6              THE COURT:  Well, at least without that, the questions

 7    are irrelevant.

 8              MR. LEAHEY:  I will move on, then, your Honor.

 9    Q.   Doctor Wiesen, you have a website for your Applied

10    Personnel Research, correct?

11    A.   Correct.

12    Q.   And one of the items that you offer potential customers is

13    an off-the-shelf multichoice test, correct?

14    A.   Certainly.

15    Q.   With your multiple choice test that you offer, if you

16    click on the link, it directs you to this page.  It has a

17    sentence I'd like to read or two sentences.  "People with

18    higher general and specific mental abilities generally perform

19    better over their entire work careers."  You see that?

20    A.   Yes.

21    Q.   What do you mean by that?

22    A.   Well, I mean that people who are brighter tend to learn

23    things faster, remember them better, other things being equal,

24    and do the cognitive parts of a job better.  And many jobs are

25    mainly cognitive.
```

1    Q.    It's fair to say that that statement is true regardless of

2    a person's race, ethic group or gender, correct?

3    A.    Yes.

4    Q.    And it also says, "This is especially true today due to

5    new and rapidly changing products and shorter product

6    lifecycles that requires employees to learn new methods more

7    often and more quickly."  Did I read that correctly?

8    A.    Yes.

9    Q.    What does that sentence mean?

10   A.    It means that jobs are changing.  There are new software

11   packages that you might need to master no matter what type of

12   job you have.  There might be new government regulations that

13   come out.  It sort of says what it says.

14   Q.    Turning to some chalks that you did -- originally, I

15   believe you brought them in on Tuesday of last week.  I'm going

16   to show you what was originally provided on Tuesday regards to

17   Lowell, and then you revised it and brought a new one in on the

18   following day.  I believe this is Exhibit 82 if you want to

19   look for the document in the binder.

20   A.    Okay.

21   Q.    I don't know if you want to use the ELMO.

22   A.    I can.

23   Q.    Okay.  And do you see the number -- and I believe you

24   testified that the information was gained for these charts by

25   both Doctor Silva's information and from the answers provided

1    from the individual defendants, is that correct?

2    A.    Correct.

3    Q.    And do you see on the top one, the original one that you

4    had prepared, you have, "Promoted in Lowell, non-minorities";

5    you have ten.  Do you see that?

6    A.    Yes.

7    Q.    And on the one that actually got admitted into evidence,

8    you have a new number.  It's seven.  Do you see that?

9    A.    Yes.

10   Q.    My question to you is:  Where did you get that ten number?

11   A.    Well, the -- compiling the data was a bit of a challenge.

12   What I did was use the file that Doctor Silva used, which I

13   presume came from HRD, and I read that into a statistical

14   analysis software package to come up with a tallies and check

15   that with manual counts in Excel.  However, when trying to

16   update that with the answers to the interrogatory, it was

17   sometimes not perfectly clear who the additional people

18   appointed might correspond to in the HRD file because the HRD

19   file didn't have names.  And the -- or did not have a social

20   security number, didn't have an identifying number.  So I don't

21   recall specifically what happened here, but I imagine that

22   there was some lack of definitiveness in the information, and I

23   interpreted it as best I could.  And it turned out that it was

24   not correct.

25   Q.    You're aware that in the City of Lowell, additional

1    discovery that was provided in April of 2010, the City

2    identified seven individuals who were promoted to sergeant off

3    the 2006 exam, isn't that correct?

4    A.    That's what's there, yes.

5    Q.    Just going back, placing in front of you on the screen,

6    I'll represent to you again that this is the data that Doctor

7    Wiesen (sic) provided in March of 2010.  Do you see the bottom

8    of the page?  It says, "Lowell Police Department"?

9    A.    Yes.

10   Q.    You see there's one date that has "appointment" there?

11   A.    Yes.

12   Q.    And that's the date of the appointment under the "0"

13   heading; do you see that?

14   A.    Yes.

15   Q.    That's one.  And then if you scroll down to the next page,

16   you can see that's two, three, four, five, six, seven; you see

17   that?

18   A.    Yes.

19   Q.    Between Doctor Silva's report that indicates there are

20   seven promotions off Lowell and Lowell's answers in April that

21   there was seven promotions off it, do you know why it was hard

22   for you to determine the number where you were confused and

23   originally put ten?

24   A.    Well, do you have the answers to the interrogatories for

25   Lowell?

1  Q.   They are in exhibit.  I believe they're Exhibit 34 maybe,

2  30s.

3  A.   So it seems from Answer No. 1 that there were five people

4  listed there as promoted, but two of them are listed twice.

5  Stephen Coyle was appointed temporarily and then he was

6  appointed permanent; and James Latham was appointed temporary

7  and then got a permanent appointment better part of a year

8  later.

9  Q.   Right.  And do you see where -- that's giving a listing of

10  when the appointments were.  Do you see where it says right

11  under that, prior to the 2008 appointment, Peaslee, Levasseur

12  and Penrose were all appointed as "temporary sergeants"?  Do

13  you see that?

14  A.   Yes.

15  Q.   The next sentence it says, "In all, seven individuals who

16  identified their race as white were appointed to the position

17  of sergeant as a result of the 2008 sergeant's examination.

18  Peaslee, Coyle, Latham, Levasseur, Penrose, Quidlock (ph) and

19  Noone.  Do you see that?

20  A.   Yes.

21  Q.   It's your testimony that you were confused as to whether

22  or not this meant there were ten promotions or seven

23  promotions?

24  A.   I think what I tried to do was match the appointment date

25  with the dates in the HRD file and -- this list was supposed to

1    be people who were appointed after 1/1/08, so I must have found

2    people in the HRD file that had appointments before 1/1/08 and

3    supplemented these.

4    Q.   But you agree now that seven is the correct number, right?

5    This is your revised --

6    A.   That's correct.

7    Q.   -- number?  Okay.

8         Then you did this table as to the Lowell Police

9    Department.  And I just wanted to go through this with you,

10   that looking at it, on the value, you find adverse impact for

11   the ratio of promotion.  That's zero because there was no

12   appointment, correct?

13   A.   There were no minority appointments.

14   Q.   Right.  So that's why it has zero there, correct?

15   A.   Right.  The ratio is the proportion of minorities over the

16   portion of non-minorities.  And if the numerated is zero, then

17   the fraction is zero.

18   Q.   And then if you go to statistical significance, you see

19   it's .17, correct?

20   A.   Yes.

21   Q.   And that is higher than the .05 threshold, correct?

22   A.   Correct.

23   Q.   So there's no statistical significance in that AI ratio

24   for promotion, correct?

25   A.   Correct.

1    Q.   Then going over is the number of standard deviations

2    units.  You see that correctly?

3    A.   Yes.

4    Q.   I believe earlier you testified that the Supreme Court

5    uses a standard deviation of two to three as acceptable where

6    they're showing there's no significance in the number, is that

7    correct?

8    A.   In Hazelwood, the Supreme Court talked about using two to

9    three standard deviations as an indication of statistical

10   significance.

11   Q.   And you would agree with me that this 1.3 is lower than

12   two to three, correct?

13   A.   Yes.

14   Q.   So there's no statistical significance in that number of

15   standard deviation units, correct?

16   A.   Correct.

17   Q.   And fair to say, if a shift of one was done -- analysis

18   was done for the AI ratio of promotion, that there wouldn't be

19   any adverse impact even under the value row where it's a zero,

20   correct?

21   A.   Well, I didn't do that so I don't know.

22   Q.   You put zero there because there was no promotion,

23   correct?

24   A.   Correct.

25   Q.   If one was there, you would agree with me that that would

1    not be adverse impact, correct?

2    A.    Yes.

3    Q.    Going to the next line, it says, "AI ratio at the

4    effective passing point."  Do you see that?

5    A.    Yes.

6    Q.    Again, you have a zero there because the effective passing

7    rate essentially is the rate they needed for promotion,

8    correct?

9    A.    The grade they needed for promotion, yes.

10   Q.    So that number is actually fairly consistent with the AI

11   ratio for promotion than the one above it; is that fair to say?

12   A.    Yes.

13   Q.    If you go to the next one over, statistical significance,

14   it's 0.8.  Do you see that?

15   A.    Yes.

16   Q.    Again, that's higher than the 0.5 cutoff?

17   A.    Correct.

18   Q.    So that's not significantly significant, correct?

19   A.    Correct.

20   Q.    Then going to the number of standard deviation units, do

21   you see that?

22   A.    Yes.

23   Q.    And that is 1.5, correct?

24   A.    Yes.

25   Q.    And that is below the two or three standard deviation

1    units that you talked about in -- I believe it was Castello

2    or --

3    A.    Hazelwood?

4    Q.    I believe it was a different case that you gave.  Lower

5    than the two or three standard deviation units, correct?

6    A.    Yes.

7    Q.    And then you have the AI ratio for official passing point

8    of 70 degrees -- or 70 percent.  Do you see that?

9    A.    Yes.

10   Q.    And you put it -- for Lowell, it's at .78, is that

11   correct?

12   A.    Yes.

13   Q.    And that is below the 80-percent rule by two

14   one-hundredths of a point, correct?

15   A.    Correct.

16   Q.    Are you aware how many people -- how many minorities

17   passed the 2006 police promotional exam in Lowell?

18   A.    I think I did summarize that, but I don't recall it

19   offhand.

20   Q.    Would five out of seven sound correct?

21   A.    Could be.

22   Q.    And then going over, looking at that number, the seven,

23   eight, the statistical significance of it is .18, correct?

24   A.    Yes.

25   Q.    That's above the .05 threshold, correct?

1    A.    Yes.

2    Q.    So that number is not statistically significant, correct?

3    A.    Correct.

4    Q.    Going to the number of standard deviations, that is also

5    below the two or three standard deviation number, correct?

6    A.    Yes.

7    Q.    So that's not statistically significant, correct?

8    A.    Correct.

9    Q.    Then going to the difference in average test score, you

10   see you have 9.1 for Lowell?

11   A.    Yes.

12   Q.    Did you do the -- how did you do the calculations?  Did

13   you simply add up the -- all the written -- the R -- the WR

14   scores for all the white candidates or non-black and Hispanic

15   candidates and come up with a number and divide it by the

16   number of non-minority candidates?

17   A.    That would be how I got the average for the

18   non-minorities, yes, and I did the same for the minorities.

19   Q.    That was my next question.  Thank you.

20         Do you know if the number that you got for white officers

21   in Lowell was 80.38?

22   A.    I don't know that.

23   Q.    Do you know if the number that you got for the black and

24   Hispanics officers in Lowell was 71.25?

25   A.    I don't know that off the top of my head.

1   Q.   Did you do a comparison of how other minorities and

2   non-minorities scored in municipalities as to what the average

3   score was for whites in a particular municipality?

4   A.   I looked at the difference in the means statewide.

5   Q.   Did you look at the difference in the means for both

6   minority and non-minority?

7   A.   Yes.

8   Q.   Fair to say that 80.38 rate was higher in Lowell than for

9   the average mean rate for other whites throughout the

10  Commonwealth?

11  A.   Well, what I see on the chart here is that the difference

12  in means -- the difference in average test scores for

13  minorities and non-minorities in Lowell was 9.1 points, and

14  statewide the difference was 3.9 points.  But I don't know what

15  caused that difference.

16  Q.   So you didn't do any analysis as to what the general

17  scores in Lowell were regardless of minority and non-minority

18  as compared to other municipalities?

19  A.   Correct.

20  Q.   And, similarly, fair to say that you did no similar

21  assessment for how the Lowell minority officers fared compared

22  to the minority officers of other municipalities?

23  A.   Correct.

24  Q.   You don't know if the numbers in Lowell for its minority

25  officers was higher than for other minority officers throughout

1    the Commonwealth; is that fair to say?

2    A.    Correct.

3    Q.    Is it your understanding that -- my notes here, it says

4    the U.S. court said two to three deviations were the standard

5    norm.  Does that sound correct?

6    A.    Well, it's not the way a statistician would say it, but I

7    think I understand the thrust.

8    Q.    Well, if a three -- if a two or three deviation was the

9    norm, looking at this last line where it says "three," if two

10   to three deviations are the norm, this would be within that

11   norm component, correct?

12   A.    Well, if the cutoff is .05, the significance here is .002,

13   which is well below the .05.

14   Q.    That's below it.  But I'm asking about the next one.  If

15   two to three standard deviations is the norm --

16   A.    Two to three standard deviations is the range that would

17   indicate statistical significance according to the U.S. Supreme

18   Court in that case.

19   Q.    And so the only -- you agree with me that the only issue

20   that even pertains to Lowell as statistically significant is

21   the difference in the average test score, correct?

22            MR. LICHTEN:  Objection to the form.

23            THE COURT:  Sustained.

24   Q.    Doctor, is it fair to say that the only statistically

25   significant portion of this chart pertains to -- as it pertains

1    to Lowell, excluding the last line about the statewide, is the
2    difference in the average test score?  Is that correct?
3    A.    Yes.
4    Q.    And you're aware that the average test score on a
5    promotional exam is irrelevant to whether or not a promotion
6    actually occurs, correct?
7    A.    No.
8    Q.    You know you don't look at an average in promoting someone
9    to a position, correct?  You look at their actual score?
10   A.    Yes.
11   Q.    I believe, also, you did an analysis of Lowell in your
12   June 2010 report where you compare the number of minority
13   sergeants and non-minority sergeants, correct?
14   A.    Yes.
15   Q.    Fair to say that the ratio of minorities -- you wrote --
16   it's your opinion that the ratio of minority sergeants to
17   minority officers of lower rank is .35?  Is that correct?
18   A.    Right.
19   Q.    And you write, "This is an indication that the minority
20   officer is not being promoted proportionately to their
21   numbers," correct?
22   A.    Correct.
23   Q.    Then you going to note, "However, this difference is not
24   statistically significant," correct?
25   A.    Correct.

1    Q.    And that if we -- did you apply a shift-of-one analysis to

2    this at all?

3    A.    No.

4    Q.    Fair to say if you applied a shift-of-one analysis the

5    numbers would be -- show even less of a difference in

6    proportion of promotions between minority and non-minority,

7    correct?

8    A.    It would be less, correct.  It would still be there, but

9    it would be less.

10    Q.    And it would still be statistically insignificant, right?

11    A.    Correct.

12    Q.    I believe at one point -- and I will say I probably have

13    maybe five minutes left -- you were talking about testifying

14    before the Civil Service Commission before, and I believe you

15    used the term "unfortunately" regarding the frequencies of

16    which you testified before the Civil Service Commission.

17    A.    I might have.

18    Q.    That was in your role at HRD?

19    A.    I testified before the Civil Service Commission in my role

20    at HRD, yes.

21    Q.    Are you aware that under General Law Chapter 31, even

22    whatever HRD decides to come up with, whether it's a rule or a

23    practice, that it can go before the Civil Service Commission

24    and whatever action HRD takes can be halted and stopped by the

25    Civil Service Commission?

1  A.   I'm not really conversant with the intricacies of the law,

2  but I think that's my general understanding.

3        MR. LEAHEY:  Thank you, Doctor.  That's all I have.

4  CROSS-EXAMINATION BY MR. McDERMOTT:

5  Q.   Good morning, Doctor Wiesen.  I'm Kevin McDermott.  I

6  represent the MBTA.

7        Doctor Wiesen, I -- you just testified about how difficult

8  the compilation of data was from the HRD data that you

9  received.  Am I correct that you received two sets of

10  voluminous HRD data which contained statewide data from all

11  jurisdictions that had at least one minority taking the

12  sergeant promotional exams concerning the 2003 through 2008

13  exams?  Is that fair to say?  I can reword it if --

14  A.   Yes.  I received data from HRD for those examinations.

15  Q.   Okay.  And this data was organized by jurisdiction?

16  A.   It was in an Excel file, so the jurisdictions were

17  identified.

18  Q.   One set of data had a list of test-takers with their race

19  and ethnicity, dates of appointment.  Then another set of data

20  had the test-takers with their names; is that a fair summary?

21  A.   Correct.

22  Q.   And you relied on such data to conduct your various

23  statistical analyses concerning the adverse impact; is that

24  fair to say?

25  A.   Yes.  I supplemented that with the answers to the

1    interrogatories and some other information.

2    Q.    Doctor Wiesen, in relation to the two plaintiffs who are

3    employed by the MBTA, Royline Lamb and Lynn Davis, did you take

4    note to see when and if they -- they were -- how they did on

5    the test exams in 2005 and 2007?

6    A.    I did not.

7    Q.    Are you aware that Lynn Davis took the -- only the 2005

8    test and did not pass?

9    A.    I did not check.

10   Q.    Are you aware that Royline Lamb took the 2005 and 2007

11   exam and did not pass?

12   A.    I did not check his grade.

13   Q.    Doctor Wiesen, when you did the analysis of the MBTA

14   promotions to sergeant, from the results of the 2003, 2005 and

15   2007 exams, did you find that there was no adverse impact?

16   A.    Well, the 2005 and 2007, the adverse impact ratios were

17   zero, and the adverse impact in the passing rate --

18   Q.    Doctor Wiesen, I was asking about the results from the

19   aggregated data from 2003, 2005 and 2007.  I believe that's

20   Page 10 of your June 25 report.

21   A.    So in Table -- which table are you looking at?

22   Q.    Table 2C .

23   A.    In Table 2C, there was no adverse impact in the promotion

24   rate.  There was no adverse impact in the passing rate.  There

25   was a small difference in the average test score for minorities

1    and non-minorities.

2    Q.   And the data from Table 2C comes from the HRD data that

3    you've described?

4    A.   Yes.

5         MR. McDERMOTT:  Your Honor, I would like to enter

6    Table 2C and Table 2B into evidence as a compilation of data

7    from the HRD exams.  I believe, your Honor, that the

8    compilation -- similar tables were entered into evidence by the

9    plaintiff on the idea that they are summarized or compile the

10   data from the HRD exams.  This was used in the report that was

11   proposed as Plaintiff's Exhibit 53.  This is an excerpt, Page

12   10, of that report, so I'd move to have Page 10 of the June 25,

13   2010, report, Tables 2B and 2C, entered into evidence.

14        MR. LICHTEN:  I would ask that the other tables

15   relating to the MBTA go in as well if that's the case.

16        MR. McDERMOTT:  I'm sorry, your Honor.  I didn't hear

17   the objection.

18        MR. LICHTEN:  I would ask that the other tables

19   related to the MBTA that Doctor Wiesen compiled go in as well.

20        MR. McDERMOTT:  Your Honor, I believe that Exhibit No.

21   53 are such tables.  There were tables regarding the MBTA

22   entered into --

23        THE COURT:  Well, I don't know what other tables there

24   are, I guess, so it's hard for me to say.

25        MR. LICHTEN:  I will work it out with Mr. McDermott.

```
 1            MR. McDERMOTT:  Your Honor, it's been clarified.  I'm
 2    informed that this is already in as -- it's proposed.
 3            MR. LICHTEN:  It's already in, your Honor.
 4            MR. McDERMOTT:  Sorry, your Honor.  Confusion.  I'm
 5    told it's already in as Exhibit 79.
 6            THE COURT:  79?
 7            MR. McDERMOTT:  Tables from Wiesen's report.
 8            THE COURT:  It is 9 and 10 from Exhibit 53.  My notes
 9    reflect that.
10            MR. McDERMOTT:  I would offer this into evidence, and
11    I'm informed that it is already in evidence as Exhibit 79.
12            THE COURT:  It is.  I believe it's 79.
13            MR. McDERMOTT:  Sorry for the confusion, your Honor.
14    Q.   Doctor Wiesen, I just want to take your attention to Table
15    2B.  It's a summary of the adverse impact analysis by police
16    department for the exam years 2003 and 2004.  I want to take
17    your attention to the first column, "Police Department."  Three
18    down is the MBTA.  Do you see that?
19    A.   Yes.
20    Q.   That's for the exam year 2003?
21    A.   Yes.
22    Q.   The adverse impact and promotion rates there is 1.2?
23    A.   Yes.
24    Q.   And, Doctor Wiesen, is it fair to say that that is -- that
25    reflects that regarding promotions from the 2003 exam that
```

1    non-minorities were promoted at a 20 percent higher rate than

2    -- I'm sorry, strike that -- that minorities were promoted at a

3    20 percent rate higher than the promotional rate of

4    non-minorities?

5    A.    Yes.

6    Q.    Doctor, when you looked at the HRD data stemming from the

7    2003 exams, did you note that there was a large number of

8    promotions from the 2003 exam considering the size of the MBTA

9    Police Department?

10   A.    Yes.

11   Q.    Doctor Wiesen, have you reviewed the Proposed Trial

12   Exhibits No. 2 and 3 from the MBTA regarding the names and

13   demographic data of sergeants promoted within the MBTA since

14   2003 through March 2010?

15   A.    Would you show those to me, please, or do I have them

16   here?

17   Q.    I was wondering if you reviewed the MBTA's Proposed

18   Exhibits 2 and 3.  If I may, Doctor, have you seen MBTA's

19   Proposed Exhibit No. 3 which is on the screen now?

20   A.    I've seen it.  I did not really review it.

21   Q.    Doctor Wiesen, in prior testimony you've -- you spent some

22   time testifying that the aggregation of data is necessary to

23   provide greater reliability for the analysis from the data; is

24   that fair to say?

25   A.    Yes.

1    Q.    So when -- the larger the number, the more reliable the

2    conclusions.  So in looking at exams, it's better to look at

3    two exams than one exam; better to look at three exams than two

4    exams; better to look at four exams than three exams and so on?

5    A.    Other things being equal, yes.

6    Q.    Doctor Wiesen, I'm showing you MBTA's Proposed Exhibit No.

7    3.  It is a compilation of the data for the appointments to

8    sergeant as kept in the normal course of business at the MBTA.

9    And does this list of promotions comport with data that you saw

10   -- that you reviewed at the -- from the HRD data?

11   A.    Not completely.  I'm not exactly sure which exams these

12   people are promoted from, however.

13   Q.    I'll get to that.  But as far as just strictly promotions,

14   does this list comport to what you reviewed in the HRD data?

15   A.    I can't tell without knowing what exams these people were

16   promoted from.

17   Q.    Do you have any reason to disagree with this list as far

18   as actual promotions made at the MBTA?

19        MR. LICHTEN:  Your Honor, the witness has said he's

20   not seen this document.

21        THE COURT:  Well, the objection to the question is

22   sustained.

23        MR. McDERMOTT:  Your Honor, I'd request that Proposed

24   Exhibit 3 be marked as an exhibit, and I will inform the Court

25   that I will have a witness who has knowledge of the data and to

1    testify that it's an accurate compilation of the demographic

2    data from promotions to sergeant that is kept in the normal

3    course of business at the MBTA.  And it concerns all promotions

4    from sergeant -- in the MBTA from the year 2003 through the

5    year 2009, and includes up to March 2010.

6              THE COURT:  Is there any objection?

7              MR. LICHTEN:  Is it being sought to be admitted, your

8    Honor?

9              THE COURT:  That's what I gather.

10             MR. LICHTEN:  I strenuously object to it.  I want to

11   make clear that the issue in this case is how people got

12   promoted after exams.  You will hear evidence that the MBTA,

13   illegally in some cases, promoted people above other people and

14   found to have violated the law by the Civil Service Commission.

15   Names were put back on lists and subsequently promoted, but

16   they weren't promoted off the exam.  The problem in this case

17   is we're attacking exams.

18             THE COURT:  Where there's an objection, I won't admit

19   it.  You want to lay a foundation in your case and you think

20   you can get it in --

21             MR. McDERMOTT:  I was wondering if it could just be

22   marked for identification for now, your Honor.

23             THE COURT:  Certainly, it can be marked for

24   identification.

25             THE CLERK:  Can we make it the next number?

1          THE COURT:  Have we been numbering defense exhibits as

2     a group or by city or --

3          MR. LEAHEY:  Your Honor, I think it's just been

4     numerical.

5          THE COURT:  For everybody, okay.  Then make it the

6     next number.  That means -- it's only for identification.

7          MR. McDERMOTT:  It's only for identification.  I had

8     marked it and shown it to all counsel, your Honor, as Proposed

9     Exhibit 3, MBTA Exhibit 3.

10         THE COURT:  Just make it the next number, which is?

11         THE CLERK:  148.

12    (Exhibit No. 148 marked for identification.)

13    Q.   Doctor Wiesen, the chart that you see in front of you, it

14    has a list of promotions to the rank of sergeant by date; by

15    ethnic group; employee number, which doesn't matter in this

16    case; and by name.  Do you see that?

17    A.   Yes.

18    Q.   It does not purport to tell us what -- from what exam a

19    particular person was promoted from; do you see that?

20    A.   I don't see an exam identification.

21    Q.   Okay.  We're going to get into that.

22         You have previously testified that you notice that from

23    the 2003 exam there was a notable -- notably large number of

24    people who were promoted.  Doctor Wiesen, based on your

25    experience in HRD, is it fair to say that the promotional exams

1    given by HRD are conducted generally the same time every year?

2    It's about the third weekend in October?

3    A.    Yes.

4    Q.    Is it fair to say that the eligibility list that comes

5    from the examination that is given in October is generally

6    established in March the following year?

7    A.    Give or take, yes.

8    Q.    And the MBTA, I'll submit to you, does a promotional exam

9    every two years on odd-numbered years.  The eligibility list

10   from, for instance, the 2003 examination would be established

11   in March 2004 and would extend to March 2006; is that fair to

12   say?  And then it would -- then it would be followed by the --

13   the eligibility list from the examination given in October

14   2005.  That list would be established in about March of 2006,

15   and that would extend to March of 2008.  And the eligibility

16   list from the 2007 exam would likewise follow the same pattern.

17   That would be established in the year -- in March of --

18   A.    8.

19   Q.    March of 2009 and extend to 2011?

20   A.    I think we're talking about 8 going to 10.

21   Q.    2010.  I skipped an exam year.  Sorry about that.  That's

22   generally the eligibility we could expect to be from March of

23   the following year that was given and extended for two years;

24   is that fair to say?

25   A.    Right.  There's a little complexity if you have an

1    outstanding certification, but, yes, that's generally so.

2    Q.    Okay.  That doesn't mean, however, that a person on an

3    eligibility list would necessarily have taken the prior exam?

4    For instance, a person who -- I think -- I believe there was

5    testimony the other day -- you may have not been here,

6    Doctor -- that a person in Lowell was bypassed in, I think,

7    1998 was subsequently promoted, placed on an eligibility list

8    and promoted in 2006.

9        So regards to bypasses, Doctor Wiesen, the remedy to a

10    bypass is that the person is placed on the next -- on top of

11    the next certified list?

12    A.    I've seen that happen, yes.

13    Q.    Okay.  Looking at the chart in front of you, Doctor

14    Wiesen, if the exam was given in October 2003, we could expect

15    that the eligibility list then became in March of 2004.  And if

16    we look at the promotions -- well, I look at the date on July

17    15, 2004, there were 12 promotions.  Do you see that?

18        MR. LICHTEN:  Your Honor, again, the witness has said

19    he doesn't recognize this.  We object to the document and

20    believe we can present evidence to explain the document.  I

21    don't see these questions about the document that he doesn't

22    recognize are appropriate.  There are HRD documents that are

23    actual promotional records which are in evidence relating to

24    the MBTA.

25        MR. McDERMOTT:  Your Honor, the reason I'm going

1    through this exercise, there are tables in evidence that are

2    not self-explanatory:  the table in Exhibit 79 that we just

3    saw; there are the tables in Exhibit 83.  What I'm trying to do

4    by going through this, your Honor, is bring some practical

5    information about what those tables entail.  I figure while

6    Doctor Wiesen is on the stand, I believe -- I believe this

7    chalk will be helpful in determining what is some possible

8    explanations about what those tables speak of.

9        THE COURT:  Well, I'm going to permit it as a

10   practical matter subject to being stricken perhaps if this

11   never comes in or there's not an adequate foundation for it.

12   But just so there's no problem of having to have Doctor Wiesen

13   back potentially to get examined about something that later

14   comes into evidence, we'll do it sort of on spec.  As I say, if

15   it doesn't get in, then the testimony can be stricken.

16       MR. LICHTEN:  Your Honor, I just want to make clear

17   that the reason for my objection is, by Mr. McDermott's own

18   admission -- and it sounds like he was suggesting that -- that

19   there are people on here who may have been promoted because of

20   something that happened four years before; and, therefore, it's

21   not relevant to the analysis in this case.

22       THE COURT:  Well, okay.  Noted.  Go ahead.

23       MR. McDERMOTT:  Thank you, your Honor.

24   Q.   Doctor Wiesen, going back to the -- to the list of

25   promotions within the MBTA, we were just talking about the date

1   of July 15, 2004, and there were 12 promotions.  Do you see

2   that?

3   A.   Yes.

4   Q.   And of those 12 promotions, seven were white?

5   A.   Yes.

6   Q.   And five were minority?

7   A.   Yes.

8   Q.   And then going to the next calendar year, you see on June

9   8, 2005 --

10  A.   Yes.

11  Q.   -- there were seven promotions?

12  A.   Yes.

13  Q.   Six were white?

14  A.   Yes.

15  Q.   One was black?

16  A.   Yes.

17  Q.   Would the rate of promotions, if we were to consider those

18  promotions from the 2003 test, hypothetically, would those

19  promotions comport with the table that we just saw from the

20  Table 2B for the exam year 2003?  The adverse impact and

21  promotion rate, you have 1.2?

22  A.   So what is the question again?

23  Q.   Well, does -- do the numbers in the chart for the MBTA

24  promotions, does it comport with your finding about adverse

25  impact and promotion rates in Table 2B?

1  A.   Well, the calculation of adverse impact considering the

2  people who are not promoted as well as the people who were

3  promoted because you need to get the promotion rate for

4  minorities and the promotion rate for non-minorities.  So the

5  table you showed me with just the promotions wouldn't be enough

6  data to calculate adverse impact.

7  Q.   Okay.  So I'm looking at, now, Table 2B, the 1.2.  That's

8  not actual promotions?  That's 1.2 --

9  A.   That's adverse impact in promotion rates, yes.

10  Q.   But one has to be actually promoted to have that counted

11  as a -- right.  So you take -- well, let me back up, Doctor

12  Wiesen.

13       How do you come to the 1.2 figure that's in 2B?

14  A.   I calculated the promotion rate for minorities and the

15  promotion rate for non-minorities, and I divided the first by

16  the second.

17  Q.   When you say "promotion rate" --

18  A.   The percent of people in that group who were promoted.

19  Q.   When you say "that group," you're talking about all

20  test-takers or those who passed?

21  A.   So it would be all test-takers.  So of all the minority

22  test-takers, you would find the percent that were promoted.  Of

23  all the non-minority test takers, you find the percent that

24  were promoted, and you divide the first by the second.

25  Q.   Okay.  Doctor Wiesen, do you know that during the time in

1    question on this chart that we've been just talking about, July

2    15, 2004, and June 8, 2005, that the MBTA did not hire in rank

3    order?

4    A.    I have not personally looked at that hiring record.

5    Q.    I just -- looking at this chart, hypothetically, Doctor --

6    I will accept as a hypothetical that the MBTA would receive a

7    certified list for promotion using the 2 N + 1, and based on

8    the promotions made on 7/15/2004 that certification list would

9    contain at least 25 names; is that fair to say?

10   A.    Yes.

11   Q.    Two times the number of positions, 12, plus one, 25?

12   A.    Yes.

13   Q.    Assume that the 25 people on the certification list, each

14   had a different score from 1 to 75, okay; and assume that the

15   MBTA did not hire in rank order but rather hired as a result of

16   considering everyone on the certification list on equal footing

17   and then doing structural oral boards and doing scoring from

18   supervisors on specific skills.  And then the MBTA added the

19   scoring from the oral boards and scoring from the supervisors

20   to determine the MBTA's order of hiring.

21        Would you assume -- and assume in doing that, Doctor

22   Wiesen, that the MBTA hired the person who had scored 75 in our

23   example.  In our example, Doctor Wiesen, it would be 12 police

24   officers who had the -- who had reason to file a bypass appeal?

25   A.    Who might want to file a bypass appeal, yes.

1    Q.   And the point I'm making, Doctor Wiesen, if you're not

2    hiring in rank order in Massachusetts, if you are devising some

3    other type of alternative testing, one of the -- one of the

4    things that may happen, and one would probably expect to

5    happen, is that you would have a number of bypass appeals; is

6    that fair to say?

7    A.   I could see that happening, yes.

8    Q.   And you have a number of bypass appeals, Doctor Wiesen.

9    When you look at the chart of who was actually promoted year by

10   year, you would expect that there would be some number of

11   successful bypass appeals among those promoted; is that fair to

12   say?

13   A.   If you have a whole bunch of appeals, you might expect

14   someone to be successful, yes.

15   Q.   And the people who are successful at bypass appeal would

16   be hired out of the expected -- let me put it this way:  If

17   somebody were to have a successful bypass appeal because they

18   were not promoted from the 2003 certification list, they may be

19   hired five or six years later; is that fair to say?

20   A.   If the appeal took that long.

21   Q.   Now, Doctor, on the HRD data that you had, one data had

22   the list of the appointments by date and the ethnicity.  The

23   other had a list of appointments by name.  Is it fair to say

24   that you could go back and review this data?

25   A.   Yes.

1  Q.   Is it fair to say that you yourself, with some effort, I

2  know, could actually make out this chart by going -- by relying

3  on HRD data, assuming that since -- it's a big assumption --

4  that since July 15, 2004, all appointments were either made off

5  the 2003, the 2005 or the 2007 exam?

6  A.   I think the answer is no for a couple of reasons.  One,

7  generally, I can't match up the names of people with the

8  appointment dates from the data file that I have.

9  Q.   Okay.

10  A.   And, two, I'm not sure that HRD maintains the 2003 and

11  2004 -- the earlier exam files when bypass appeals are made and

12  people are then appointed.  In any case, the -- so I just don't

13  know.

14  Q.   Doctor Wiesen, paying attention to the chart in front of

15  you, we've gone through --

16  A.   With some more information, I would perhaps be able to

17  verify it, so perhaps with the seniority date for the people, I

18  might be able to identify the people based on seniority date,

19  but that's an inexact way of identifying people because you've

20  got more than one person with the same seniority date, and you

21  probably do, since agencies hire in groups.

22  Q.   For instance, everyone hired on July 15, 2004, would have

23  the same seniority date for the sergeant --

24  A.   The seniority date is the original seniority date, when

25  they entered the agency.

1   Q.   Again, you'd have large groups of people because they're

2   all going into the academy and graduating together, with the

3   same seniority date?

4   A.   Right.

5   Q.   So I can understand your testimony, Doctor Wiesen, you may

6   have the names of the people on the HRD data, but you wouldn't

7   be able to find them because you don't have the dates of their

8   seniority or dates of appointment?

9   A.   And there's -- right, no identifier.  So the two files

10  that HRD -- the two pages in the Excel file that I have for

11  each exam from HRD, one is a list of all the names and no

12  indication of their scores or appointments.  And then another

13  is a list of all the scores and appointments with no indication

14  of their names.

15  Q.   Doctor Wiesen, I just want to quickly run through this

16  because I'll come back with some other questions.  So we've

17  gone through the appointments of June 8, 2005.  Going to the

18  calendar year 2006, there were two appointments on two

19  different dates.  Both were white officers; is that fair to

20  say?

21  A.   I see that.

22  Q.   Going to March 30 of 2007, there were three appointments

23  and three white officers?

24  A.   I see that.

25  Q.   And there was another appointment August 13, 2007, also a

1    white officer?

2    A.    I see that.

3    Q.    Then in September -- on September 20, 2008, there were

4    three appointments.  One officer was black; two were -- one

5    officer was black; one officer was Asian; and one officer was

6    white?

7    A.    I see that.

8    Q.    And then in the next calendar year, there were two

9    promotions both on March 14, 2009.  One is Asian; one is white.

10   A.    I see that.

11   Q.    And then on January 2, 2010, there was one promotion of a

12   white officer?

13   A.    I see that.

14   Q.    And I would propose to you, Doctor Wiesen, given the

15   eligibility list time that we've gone over that the eligibility

16   list for the 2007 exam expired in March of 2010, and that's why

17   we go up to that date.

18   A.    Aha.  I recognize Robert Don.  I'm not sure -- are you

19   saying that Don was appointed from the --

20   Q.    No.  I didn't say anyone -- what I'm saying is there's a

21   time when there is -- the eligibility list exists stemming from

22   an exam but that the promotions from that list do not

23   necessarily reflect that those people took the test for 2007?

24   A.    Because some people who appealed could be at the top of

25   the list because of a Civil Service Commission decision.

1  Q.   Yes, exactly, right.  When you were testifying about the

2  MBTA last week, Doctor Wiesen, you had noted that there was one

3  minority appointment that you did not see in the HRD data.  And

4  I think you were referring to Darren Keith, who was promoted on

5  September 20, 2008?

6  A.   Correct.

7  Q.   Did you look back to see if he was in the -- was a bypass

8  appeal from 2003?

9  A.   I only checked to see if he took the exam, and he had not

10  taken the exam.

11  Q.   When you say he had not taken -- he had not taken the 2005

12  exam?  Or was that the 2007 exam for that time period?

13  A.   I think it was the 2007.  I'm not sure.

14  Q.   Did you go back further to see if he took the 2005 or 2003

15  exams?

16  A.   I didn't go to the 3.  I just looked at the 5 and 7.

17  Q.   You testified the other day that you didn't know the

18  reason for there being a minority appointment and, therefore,

19  you ignored that appointment; is that fair to say?

20  A.   So when I first saw it I was confused, but now I think I

21  understand why it's there.

22  Q.   Doctor Wiesen, you submitted tables as Exhibit 83.  I just

23  want to show that to you briefly.  It's concerning the MBTA

24  Police Department.  And you have, on Table A1, you have the

25  promotions from the 2005 exam?

1   A.    Yes.

2   Q.    And it reflects that no minorities were promoted from that

3   exam?

4   A.    Correct.

5   Q.    And then on Table B1, you have promotions from the 2007

6   exam?

7   A.    Right.

8   Q.    And it shows that there were no minority promotions from

9   the 2007 exam?

10  A.    Correct.

11  Q.    And Table C1, it combines the 2005 exam and the 2007 exam?

12  A.    Correct.

13  Q.    And you determined that there were no promotions from

14  either one of those exams; is that fair to say?

15  A.    No minority promotions.

16  Q.    Now, given the time of the eligibility list within the

17  MBTA for the 2005 -- stemming from the 2005 through the

18  eligibility list from the 2007 exams, that time period for

19  those eligibility lists would be from March of 2006 through

20  March of 2010?

21  A.    Okay.

22  Q.    And we've already established, looking at that, that, in

23  fact, in September 20, 2008, that there was an appointment?

24        MR. LICHTEN:  Your Honor, we haven't established that

25  at all.  I object to the form of the question.

1          THE COURT:  Okay.  We have assumed it.

2          MR. LICHTEN:  That's certainly true.

3    Q.    Doctor Wiesen, I want you to assume, looking at the list,

4    and assume that the list is correct, one of the -- one of the

5    issues from your tables from Exhibit 53 showing that no

6    minorities were appointed, I want you to look at the chart.

7    And it's fair to say, Doctor Wiesen, that appointments can only

8    be made from the certified lists from HRD?

9    A.    Correct, as far as I know.

10   Q.    And looking at the chart in front of you, if I were to ask

11   a hypothetical, perhaps -- if you were to ask the police chief

12   in December -- of the MBTA, in December of 2009, about his

13   efforts to bring diversity to the ranks of sergeant, the police

14   chief could look at the promotions he made over the last two

15   calendar years, in 2008 and 2009, and can truthfully say that

16   he promoted five sergeants, that two are white, two are Asian

17   and one is black.  So that in the MBTA view of minority hiring,

18   three are minorities -- the two Asians and the one black -- for

19   60 percent hiring; or in the plaintiffs' view of minority

20   hiring, one out of five promotions, being 20 percent of the

21   promotions made during those two calendar years, were minority;

22   is that fair to say?

23          MR. LICHTEN:  Your Honor, I object to that question in

24   so many multiple levels.

25          THE COURT:  I think this sounds more like argument

1    than questioning.

2         MR. McDERMOTT:  Well, the reason I say that, your

3    Honor, if we look at the charts that have been admitted into

4    evidence, and knowing when the eligibility list -- it would

5    appear that there were no promotions made during the time from

6    March of 2006 through March of 2010.  And that's -- my point is

7    that is not the case.

8         MR. LICHTEN:  Your Honor --

9         THE COURT:  Well --

10        MR. McDERMOTT:  And I have follow-up.

11        THE COURT:  Establish it other than through this

12   witness perhaps.

13   Q.   Well, Doctor Wiesen, let me ask you this:  Considering

14   your -- the tables that were submitted as Exhibit No. 53 show

15   that there are no promotions from the test given in 2005 and

16   2007.  Is it fair to say that that -- relying just on those

17   tables would not give you a full picture of the actual

18   promotions of the MBTA during the calendars years from 2006 to

19   2010?

20        MR. LICHTEN:  Your Honor, I object.  Our case is

21   promotions from exams.  That's what a disparate impact case is.

22   So the case doesn't involve whether someone was promoted for

23   some other reason if they weren't promoted from the exam.  It's

24   irrelevant to this case for better or for worse.

25        MR. McDERMOTT:  Your Honor, I was just going to tie in

1    the relevance now with the different charts.

2            THE COURT:  I think you're both doing a little arguing

3    of the case.  So go ahead, Mr. McDermott.

4    Q.   I'm going to show --

5    A.   Do you want me to answer that question?

6    Q.   I'm sorry, Doctor Wiesen.  We got caught up in the

7    discussion about the appropriateness of the case.  But what is

8    the answer to the question?

9    A.   Okay.  So the charts don't reflect that there are no

10   promotions but rather there were no minority promotions from

11   those two exams.

12   Q.   Right.  But my question was:  Given that the eligibility

13   list from those two exams extended from that four calendar

14   years from March of 2006 to March of 2010, if you just looked

15   solely at your table, one would have the impression that no

16   minority promotions were made during that time; is that fair to

17   say?

18   A.   Right.  My table does not reflect people who are not

19   test-takers for those two exams and are appointed off those two

20   lists.

21   Q.   Okay.  Going back to the table that's been marked into

22   evidence as Exhibit No. 79, Table 2C, Doctor Wiesen, it's fair

23   to say that when looking at adverse impact, you have more

24   reliability when you have more data, and you would have more

25   reliability in making an analysis when you depend on three

1  exams rather than two exams; is that fair to say?

2  A.    Other things being equal, yes.

3  Q.    And the table on 2C, you, in fact, aggregated data over

4  three exams?

5  A.    Correct.

6  Q.    I note it says, "Aggregated from 2003 to 2008."  But the

7  MBTA only takes exams on odd-numbered years, so we're talking

8  2003, 2005 and 2007; is that fair to say?

9  A.    Yes.

10  Q.    Based on the analysis that you did on the aggregated data,

11  which has more reliability, is it fair to say that the MBTA did

12  not have adverse impact stemming from the promotions from exams

13  over the period of time from the 2003 through the 2007 exams?

14  Is that fair to say?

15          MR. LICHTEN:  Your Honor, that was asked and answered

16  an hour ago or half hour ago.

17          THE COURT:  Well, all right.  It would be harmless to

18  answer it again.

19  A.    So there's a .95 adverse impact in promotion rate that

20  does not trigger the 80-percent rule, and it's not

21  statistically significant.  The adverse impact for passing rate

22  is .83, and that doesn't trigger the 80-percent rule.  It's not

23  statistically significant.  And there's a two point difference

24  in the average test score in favor of non-minorities, and

25  that's not statistically significant but it is, in fact, of

1    non-minorities.

2    Q.    Doctor Wiesen, you gave an opinion about the adverse

3    impact on the MBTA in a prior -- last week that was based on

4    the tables submitted in Exhibit No. 53.  Doctor Wiesen, it

5    would be better judgment to base your opinions based on the

6    aggregated data that had more reliability that is shown in

7    Table 2C?

8    A.    I guess that depends on whether the 2003 exam and the

9    appointments from that should, in fact, be combined with the

10   other two exams.  And I've not seen the Civil Service

11   Commission decision concerning the 2003 appointments, and so --

12   and I didn't know about that decision when I aggregated the

13   data.  So other things being equal, you would look at more data

14   to get a big picture.  If there's something unusual about the

15   2003 exam, then perhaps aggregating with it would not be

16   appropriate.

17   Q.    There's nothing unusual about the 2003 exams that you know

18   of; is that fair to say?

19   A.    I've not seen that Civil Service Commission decision,

20   correct.

21   Q.    Just again, Doctor Wiesen, the best judgment when giving

22   an opinion whether or not there's adverse impact on the MBTA is

23   to look at the Table 2C rather than the Table 53 that you

24   relied on when you gave your opinion; is that fair to say?

25   A.    Yes, although the details of the data are still of some

1    interest.  I mean, they still have the adverse impact ratio of

2    zero for 2005 and 2007.  So the 2003 seems to be overpowering

3    the other two and maybe that's -- maybe it's appropriate, maybe

4    not.

5    Q.   Well, looking -- staying with Table 2C, we have -- you

6    looked at adverse impact on promotional rates for the MBTA.

7    Now, the promotion rate, the actual promotions would be known

8    by the chief of police of the MBTA; is that fair to say?

9    A.   Surely.

10   Q.   Rhetorical question, I know.  However, the AI passing

11   rates, the appointing authority -- in this case the police

12   chief of the MBTA -- really wouldn't know about passing rates.

13   That's not information that's given to the MBTA; is that fair

14   to say?

15   A.   I think that that is correct.  I think HRD does not hand

16   out grades for people who failed.

17   Q.   That's true.  Even though there's no adverse impact and

18   all the -- on the MBTA, the fact is the MBTA wouldn't really

19   know about the passing rates; that's fair to say?

20   A.   Yes, and maybe not about the promotion rates either.

21   Q.   Okay.  And going to average impact -- adverse impact for

22   test scores, likewise, the MBTA wouldn't know what the average

23   test scores are at a -- on an HRD exam; is that fair to say?

24   A.   Yes.

25   Q.   You say the MBTA wouldn't know whether or not it has --

1    strike that.

2        You just said the MBTA wouldn't know what the promotional

3    rates was necessarily; is that fair to say?

4    A.    Yes.

5    Q.    What the MBTA does know are the actual promotions that it

6    makes; is that fair to say?

7    A.    That's what it would officially be notified of, yes.

8    Q.    And the actual promotions is just what's been shown on the

9    chalk for the -- I'm sorry -- shown on the exhibit that we have

10    of promotions from the MBTA?  That's what the MBTA knows; is

11    that fair to say?

12    A.    That's what you've told me, yes.

13    Q.    Okay.  And that gets me to what was proposed -- MBTA

14    Proposed Exhibit No. 2.  And what I did just to make this

15    statistical analysis real was to make a snapshot on --

16    concerning sergeants in the MBTA.  These are compilations of

17    the data from the last day of the year, 12/31/03.  And I made a

18    compilation of the data going back every year, until 12/31/09.

19    And just to continue with the eligibility list, I went to March

20    of 2010.  And this is what the MBTA knows about its promotions

21    to sergeant ; is that fair to say?

22        MR. LICHTEN:  Objection.  He hasn't identified the

23    document so how would he know?

24        THE COURT:  Sustained.

25        MR. McDERMOTT:  I'm sorry.  Your Honor, again, I will

1    submit to you that this chart is a compilation of the data that

2    is known to the MBTA.  We have a witness -- I'd ask it to be

3    marked for identification.  We'll have a witness from the MBTA

4    who knows about the promotions and the promotions from the list

5    of promotions that we just made.  And what was done, your

6    Honor, is to take the position of sergeant, which goes from

7    about 20 to about 34, depending on the year, and just break it

8    down to Asian, black, Hispanic and white.  It's a very simple

9    calculation.  It's based on the existing sergeants on 12/31 of

10   the respective year.  I thought that was the best way to sort

11   of view what was happening at the MBTA and what the MBTA knew

12   during these years from -- because we just -- during these

13   years at issue.

14           We just had testimony from Doctor Wiesen that the MBTA

15   wouldn't necessarily know the scores, the other -- the data

16   even, according to Doctor Wiesen, we wouldn't necessarily know

17   the adverse impact promotional rate but what we would know is

18   this, your Honor.

19           THE COURT:  I understand your intentions with respect

20   to the chart.  What does it have to do with the witness, is the

21   question.

22           MR. McDERMOTT:  It goes back to -- we have two tables

23   in front of the Court, your Honor.  We have Exhibit No. 53,

24   which is two years of data, which the witness has already said

25   doesn't necessarily indicate all the promotions made in that

1    year even though one could look at it and infer there were no

2    such promotions.

3              THE COURT:  Right.

4              MR. McDERMOTT:  And we have --

5              THE COURT:  Is his testimony contributing something to

6    the body of evidence that's relevant?  That's the question.  I

7    understand what you want to contribute through your own

8    witnesses, but that's different from what this witness can do.

9              MR. McDERMOTT:  Yes.  Well, I just want him to accept

10   the data as true and take a look at the -- what the MBTA is --

11             THE COURT:  Ask him to assume and ask him a question

12   about it.

13             MR. McDERMOTT:  I'm sorry, your Honor.

14             THE COURT:  Ask him to assume it's true and ask him a

15   question based on that.

16   Q.   I want to show you a chart that's been proposed as MBTA

17   Exhibit No. -- Exhibit 2.  I would ask you, Doctor Wiesen, to

18   assume that on the last day of the year, 12/31, starting in

19   2003, we look at the number of sergeants in the MBTA.  And

20   assume as true that the categories -- Asian, black, Hispanic

21   and white -- are an accurate reflection of the demographics of

22   sergeant from 2003 to March of 2010.  Do you understand that,

23   Doctor Wiesen?

24   A.   I think so.

25   Q.   Okay.  And, Doctor Wiesen, beginning on March 31, 2003,

1    there were 20 police sergeants in the MBTA, you see by this

2    number here?

3    A.   Yes.

4    Q.   And that's -- and there were no Asians.  There were three

5    black, two Hispanic and 15 white.

6           MR. LICHTEN:  Your Honor, what he's asking is

7    inconsistent with your instruction.

8           THE COURT:  You're asking him to assume that.  He

9    can't testify to that.

10          MR. McDERMOTT:  I'm sorry, your Honor.  I thought I

11   made it clear that this is assuming this was true.  I thought I

12   made a blanket statement.

13          THE COURT:  Assuming it's true, then what's the

14   question?

15   Q.   The question is:  In 2003, is it fair to say that 75

16   percent of the sergeants at the MBTA were white and 25 percent

17   were minority?

18   A.   Yes.

19   Q.   And going through to the same day, 12/31, in the calendar

20   year 2009, looking -- we now have 33 sergeants in the MBTA, and

21   one is Asian.  We'll count that as non-minority.  Is it fair to

22   say that looking at that chart that the non-minorities are 22

23   and the minority sergeants are 11?

24   A.   Yes.

25   Q.   And that's adding the 3.03 to the 6 -- it comes out to

1    about 66 and 33 and -- it's roughly two-thirds of the force are

2    non-minority and one-third of the force are minority; is that

3    fair to say?

4    A.    Yes.

5    Q.    Is it fair to say, Doctor, in light of the constraints we

6    have with the HRD examinations and in light -- if this were

7    true, in light of the concerns that have been discussed about

8    the HRD examinations, nevertheless, based on using the HRD

9    examinations, the MBTA has done a commendable job in keeping

10    diversity within the rank of sergeant; is that fair to say?

11    A.    Yes.

12        MR. McDERMOTT:  If you'd just give me a second, I

13    think we're done.

14        Your Honor, we're done, from the MBTA.

15    CROSS-EXAMINATION BY MR. D'AGOSTINO:

16    Q.    Doctor Wiesen, good afternoon.  My name is Richard

17    D'Agostino.  I represent the City of Lawrence.

18        Doctor Wiesen, is it fair to say that if analysis of a

19    particular exam result is not statistically significant it

20    shows no clear pattern?

21    A.    Taken alone, yes.

22    Q.    It's then insignificant, is that correct?

23    A.    Taken alone, if it's not statistically significant, then

24    it's not statistically significant.

25    Q.    I believe that you've testified that statistical

1    significance means there is no reliable statistical indication

2    that the differences could not have arisen based on chance, is

3    that correct?

4    A.    Correct.

5    Q.    So, therefore, Doctor, you would agree that the data is

6    simply unreliable in the instance of not being statistically

7    significant?

8    A.    Which data?

9    Q.    The data that would be designated as statistically -- not

10   statistically significant.

11   A.    This is a hypothetical?

12   Q.    Yes, sir.

13   A.    Okay.  If there's no other data to consider, then if it's

14   not statistically significant, then it's -- could have arisen

15   by chance.

16   Q.    Thank you.  And it shows no real difference then at that

17   point, correct?

18   A.    Well, no statistically significant difference.  I mean, it

19   might show a real difference.  You could have an adverse impact

20   ratio of zero, and it's really zero but it might be that it's

21   not statistically significant.

22   Q.    I believe, Doctor, you've testified that statistical power

23   relates to the ability or probability that the statistical

24   procedure will detect a real difference if one exists, is that

25   true?

1    A.    Correct.

2    Q.    So, therefore, as the sample sizes get larger, the

3    statistical power increases, is that correct?

4    A.    Correct.

5    Q.    So it's fair to say that because of the concept of

6    statistical power, when a sample is small enough and the

7    statistical analysis -- I'm sorry -- the statistical analysis

8    will not detect it?

9    A.    Correct, will not detect a real difference even if it was

10   there.

11   Q.    Right.   Thank you.   Doctor Wiesen, would you agree that

12   the statistical power for the statistical analysis from the

13   results from the City of Lawrence is low?

14   A.    Yes.

15   Q.    Would you agree with me, Doctor, that there is no

16   statistical significance for the analysis to determine adverse

17   impact as it applies to Lawrence for the pass/fail rates for

18   the 2006 and 2008 exams?

19   A.    Yes.

20   Q.    Doctor Wiesen, would you agree that because Lawrence's

21   numbers are so small, there isn't enough statistical power to

22   show any statistical significance?

23   A.    It's very low power for the promotion rates, yes.

24   Q.    And you agree that Lawrence has very small numbers,

25   correct?

1    A.    Lawrence has small numbers, yes.

2    Q.    You also testified that statistical tests are not very

3    good at detecting real differences when you have small

4    numbers --

5    A.    Correct.

6    Q.    -- is that correct?

7          And, Doctor Wiesen, I believe when my esteemed colleague,

8    Laurie Engdahl, from Worcester questioned you, you stated that

9    adverse impact analyses are hampered by small numbers, is that

10   correct?

11   A.    Correct.

12   Q.    Doctor, I'm not truly sophisticated enough to understand

13   all the theories used in compiling the statistical data.  But

14   would you agree that the theory of the shift of one is to be

15   used in calculating adverse impact when the statistical data

16   numbers are small?

17   A.    In certain circumstances, yes.  It may be.

18   Q.    Those numbers -- as the small numbers are for most of the

19   defendants in this case, isn't that correct, with the exception

20   of Boston, I would say?

21   A.    Yes.

22   Q.    And as the numbers are small for the City of Lawrence,

23   correct?

24   A.    Yes.

25   Q.    In fact, I think you testified on direct exam that you

1    couldn't get much smaller; do you recall that?

2    A.    No.  It's been a long testimony.

3          MR. D'AGOSTINO:  I could put it up, your Honor.  I'm

4    sorry -- your Honor and Doctor Wiesen.  I could put it up on

5    the ELMO.  In the sake of time, I will not.

6    A.    That's okay.

7    Q.    So you didn't apply the shift of one when calculating the

8    adverse impact analyses on the City of Lawrence's small

9    numbers, did you, Doctor?

10   A.    No.

11   Q.    Yet, you've testified that you complied with the EEOC

12   guidelines in conducting your adverse impact analyses, isn't

13   that true?

14   A.    I think so.

15   Q.    And it's the EEOC guidelines that advocate the use of this

16   concept, correct?

17   A.    Well, advocated is maybe a little strong, but they present

18   it as an option in appropriate circumstances.

19   Q.    I think it's been discussed.  It certainly is useful when

20   the numbers are small, correct?

21   A.    Yes.

22   Q.    Doctor, is the reason that you didn't apply the

23   shift-of-one calculation despite the small numbers is because

24   it didn't help the plaintiffs' case in this regard?

25   A.    That's not the main reason.

1   Q.   It is one of them, is that correct?

2   A.   Yes.

3   Q.   Doctor, did you identify or interview -- I'm sorry.

4   Strike.

5        Doctor, did you interview any of the Lawrence plaintiffs

6   that are involved in this case?

7   A.   No.

8   Q.   Wouldn't an interview of these individuals assist in your

9   statistical analysis of the 2006 and 2008 promotional exams?

10  A.   No.

11  Q.   You don't believe that the study habits, the time spent

12  studying, the preparation materials and other factors are

13  important information that would help you arrive at a more

14  accurate analytical result?

15  A.   Well, the adverse impact analysis just talks about the

16  numbers.  Once you get past the numbers, then you might talk

17  about what's causing the adverse impact.

18  Q.   I guess if you didn't have the information --

19         MR. LICHTEN:  Your Honor -- I don't think he was done,

20  your Honor.

21         THE COURT:  Had you furnished, Doctor Wiesen?

22         THE WITNESS:  I was done.

23         MR. D'AGOSTINO:  I thought so, your Honor.  Thank you.

24  Q.   If you didn't have that information, then, certainly when

25  you determined that someone had a difficult time or did not

1   pass the exam, you just attribute it to adverse impact.

2   Doesn't that kind of skew the results of the analysis?

3   A.   I think the way the court cases proceed, as I understand

4   it, is first you have an opportunity to show adverse impact;

5   and then if you do show adverse impact as the plaintiff, then

6   the defendants have an opportunity to explain why the adverse

7   impact took place.

8   Q.   But it certainly could have resulted -- or rather the lack

9   of success in taking the exam and ranking high enough certainly

10  would be impacted by the habits and factors that I delineated,

11  isn't that correct?

12  A.   It could be.

13  Q.   Did you interview any non-minorities who failed the exam

14  or did not rank high, Doctor?

15  A.   No.

16  Q.   Did you interview anyone who took the 2006 and 2008

17  Lawrence police promotional exam?

18  A.   No.

19  Q.   Doctor Wiesen, I'm going to call your attention to

20  Lawrence's supplemental discovery responses marked as

21  Plaintiffs' Exhibit 38.  Doctor, you see where I marked the

22  arrows on the ELMO here, on my copy?

23  A.   Yes.

24  Q.   Are you aware, Doctor, that Lawrence promoted a female, a

25  woman, Amanda Burke, to the rank of sergeant?

```
 1              MR. LICHTEN:  Objection, relevancy.

 2              THE COURT:  Overruled.

 3    A.   I see that.  I was a little confused about that promotion,

 4    but I see it there.

 5    Q.   You're confused about the promotion?  Why is that?

 6    A.   Because the date she was promoted and the date she took

 7    the exam, so my recollection was -- I think she took the 2006

 8    exam or maybe she took the 2008 exam, and she's being appointed

 9    at a time when she would have been appointed from the 2006

10    exam.  There was something unusual about her.  I don't recall.

11    Q.   I think, Doctor, we've had testimony that, obviously, when

12    folks take an exam in one year, it's usually not for some time

13    until their actual appointment, the list comes out and all

14    that.  That's correct, no?  Do you agree with that, Doctor?

15    A.   Right.  It takes a certain amount of time for the HRD to

16    actually establish the list.

17    Q.   Thank you.  Did you account for any women who were

18    appointed as sergeant in your statistical analysis?

19              MR. LICHTEN:  Objection, relevancy.

20              THE COURT:  What's the relevance?

21              MR. D'AGOSTINO:  It's coming, your Honor.

22    Q.   Are women members of the protected minority class?

23              MR. LICHTEN:  Objection, relevancy.

24              THE COURT:  Overruled.  Go ahead.

25    A.   I did not consider gender in my analyses.
```

```
1    Q.    So they don't count then as a minority?

2          MR. LICHTEN:  Objection.

3          THE COURT:  Overruled.

4    Q.    Wouldn't that also skew your analysis and results since

5    women were considered non-minorities for the purposes of your

6    study?

7          MR. LICHTEN:  Objection.

8          THE COURT:  Overruled.

9    A.    Well, I was trying to evaluate adverse impact on

10   minorities.  And so if a person was a minority, I classified

11   them as minority.  If they were a non-minority, I classified

12   them as a non-minority.  I did not consider gender.

13   Q.    Does she have to be a plaintiff in this case in order to

14   be brought into the analysis?

15         MR. LICHTEN:  Objection.

16         THE COURT:  I don't understand the question.

17         MR. D'AGOSTINO:  In order to receive consideration,

18   your Honor, in the analysis, did she have to be a plaintiff

19   here?

20         THE COURT:  Go ahead.

21   Q.    Doctor --

22   A.    I tried to make the adverse impact analyses relevant to

23   the legal issue as I understood it.

24   Q.    Doctor --

25         THE COURT:  Mr. D'Agostino, we're at 1:00.
```

1          MR. D'AGOSTINO:  Yes, your Honor.  I'm almost done.  I

2    don't have much more.

3          THE COURT:  All right.  Go ahead.

4    Q.   You're aware that Lawrence is an individual defendant in

5    this case?

6    A.   Yes.

7    Q.   While there are multiple defendant cities in a

8    governmental agency, you understand, Doctor, this is not a

9    statewide class action suit, correct?

10   A.   Yes.

11   Q.   Do you have any personal knowledge, Doctor Wiesen, whether

12   Lawrence knew or should have known that the use of the either

13   the 2006 or 2008 exam would have an adverse impact on

14   minorities from the Lawrence Police Department?

15   A.   I have no personal knowledge.

16   Q.   Doctor Wiesen, it's your position that tests can be

17   devised that reduce adverse impact, is that correct?

18   A.   Yes.

19   Q.   In a law enforcement promotional context, there's no exam

20   guaranteed to eliminate that adverse impact, is there?

21   A.   No.

22          MR. D'AGOSTINO:  Thank you, Doctor.  I have nothing

23   further.

24          THE COURT:  I guess we're going to have to finish up

25   in the morning.  So we'll do that.  Then assuming Doctor Wiesen

1    finishes at a reasonable time tomorrow, since we're assuming

2    here this afternoon, what could we expect next?  You'll rest.

3            MR. LICHTEN:  We're going to rest.

4            MS. HARRIS:  Your Honor, for Boston, we intend to have

5    our director of human resources available tomorrow to testify.

6    So our intention would be that after plaintiff rests that we

7    would begin and that we would call Mr. Callahan as our first

8    witness.

9            THE COURT:  Okay.

10           MR. CARROLL:  Springfield would anticipate calling our

11   police chief out of order just to keep things rolling right

12   after Mr. Callahan.

13           MR. LICHTEN:  I didn't hear that.

14           MR. CARROLL:  The police commissioner.

15           THE COURT:  Okay.

16           MS. ENGDAHL:  Your Honor, if we have time, Worcester

17   anticipates filing a motion for judgment at the close of

18   business.

19           THE COURT:  That was one of the things I was wondering

20   about.  Will we have motions?  And I think the answer is yes.

21   And should we expect to spend some time on those?  I don't know

22   whether it will be practical or not or we may get them filed

23   and go on with the evidence.  I'm not sure.  Okay.  Thank you.

24   (Whereupon, at 1:03 p.m. the trial recessed.)

25

1                    C E R T I F I C A T E

2

3

4            We certify that the foregoing is a correct transcript

5    of the record of proceedings in the above-entitled matter to

6    the best of our skills and ability.

7

8

9

10

11    /s/Marcia G. Patrisso

12    Marcia G. Patrisso, RMR, CRR

13    Official Court Reporter

14

15

16    /s/Cheryl Dahlstrom

17    Cheryl Dahlstrom, RMR, CRR

18    Official Court Reporter

19

20

21    Dated:  July 26, 2010

22

23

24

25