## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PEDRO LOPEZ, ET AL., | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| v. | ) |
| | ) **Case No. 07-11693-GAO** |
| CITY OF LAWRENCE, | ) |
| MASSACHUSETTS, ET AL., | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## DEFENDANTS CITY OF WORCESTER AND CITY MANAGER MICHAEL O'BRIEN'S MOTION FOR A DIRECTED VERDICT

Defendant City of Worcester and Defendant Michael O'Brien (hereinafter collectively referred to as "Worcester") pursuant to FRCP 52(c), hereby move the Court to enter Judgment in favor of Worcester on Counts I and II of the Complaint, on the following grounds:

1.      Plaintiff failed to present evidence sufficient to support Plaintiff's prima facie case that use of the 2006 and 2008 Sergeant promotional examinations (developed and administered by the Commonwealth of Massachusetts Human Resources Division ("HRD")) adversely impacted the rate of minority promotions to the position of Sergeant within the City of Worcester.

2.      Plaintiff's evidence based on an analysis of adverse impact aggregated across municipalities is insufficient to support Plaintiff's burden of proof to set forth a prima facie case of disparate impact.

3.      Worcester cannot be held liable for following a state-wide testing regime that is mandated by M.G.L. c. 31 § 1 et seq. Pursuant to said statute, examinations were created and

administered by the state for the very purpose of selecting candidates for promotion based upon merit.

## I.     STATEMENT OF THE CASE.

Plaintiff Spencer Tatum (hereinafter the "Plaintiff") claims the City of Worcester's ("Worcester's") use of the promotional examinations developed and administered by the Commonwealth of Massachusetts Human Resources Division ("HRD") in 2006 and 2008 have had a disparate impact on the rate of promotion of minorities (Blacks and Hispanics) within the City of Worcester; that this disparate impact is the result of flawed examinations; and that Worcester has alternatives other than the examinations developed and administered by HRD to reduce adverse impact.  [Seventh Amended Complaint at ¶¶ 73-79].

## II.     PROPOSED FINDINGS OF FACT.

A.     Pass – Fail Rates for Minorities and Non-Minorities from Worcester.

1.     In Worcester, minority test-takers passed the 2004 Sergeants' examination at higher rates (i.e., in a higher proportion) than non-minorities passed the examination (adverse impact ratio of 1.27) [Plaintiffs' Exhibit 79, at page 2].

2.     In Worcester, the rate at which minority test-takers passed the 2006 Sergeants' examination compared to non-minority test-takers was nearly the same. [Wiesen Testimony, Trial Transcript 2-117:20 through 2-117:22; Plaintiffs' Exhibit 86]. [1]

3.     In Worcester, minority test-takers passed the 2008 Sergeants' examination at higher rates than non-minorities passed the examination (adverse impact ratio of 1.28) [Plaintiffs' Exhibit 86; Wiesen Testimony, Trial Transcript 2-117:20 through 2-117:22]

---

[1] While Dr. Wiesen's testimony and the Plaintiffs' table show that minorities passed at 97% of the rate that whites passed the 2006 examination, the parties stipulated that the number of minority test-takers was 10 and not 11.  The resulting ratio of passing rates is actually closer to 93% (7 of 10 minorities passing divided by 39 of 52 whites passing).

B.      Average Scores for Minorities and Non-Minorities from Worcester.

1.      In Worcester, non-minority and minority test-takers of the 2006 Sergeants'
examination had approximately equal test-scores; that is, minority test takers scored less than a
point (.97th of a point) lower than non-minorities on the 2006 examination.  [Plaintiffs' Exhibit
86; Wiesen Testimony, 2-117:16 through 2-117:18].

2.      In Worcester, minority test-takers of the 2008 examination outscored non-
minority test-takers by 4.3 points (adverse impact ratio of 1.36).  [Plaintiffs' Exhibit 86; Wiesen
Testimony, Trial Transcript at 2-117:16 through 2-117:18].

C.      Selection Rates for Minorities and Non-Minorities By Worcester.

1.      The adverse impact on the rate of promotions of minority test-takers to the
position of Sergeant resulting from Worcester's use of the 2004 Sergeants' promotional
examination was .82, above the 4/5ths "rule of thumb" set forth in the Uniform Guidelines on
Employee Selection Procedures (2 of 10 minority test-takers were promoted; 12 of 51 non-
minority test-takers were promoted).  [Exhibit 156, 2004 Test Results Data for all candidates
who sat for the 2004 sergeant promotional examination, from Commonwealth production at
Bate-stamped pages 1854-1877, showing number of Worcester test-takers; Trial Transcript at 5-
122)[2]].

2.      The adverse impact in the rate of promotions of minority test-takers to the
position of Sergeant resulting from Worcester's use of the 2006 Sergeants' promotional
examination was .88, above the 4/5ths "rule of thumb" set forth in the Uniform Guidelines on
Employee Selection Procedures.  [Wiesen Testimony, Trial Transcript 2-118:14 through 2-
118:15]

---

[2]   Although in this portion of the trial transcript, Dr. Wiesen is asked to assume that 2 minorities and 12 non-
minorities were promoted from the 2004 list, Plaintiffs are not anticipated to dispute this fact.  [Trial Transcript 11-
40:4 through 11-40:9].

3.      Worcester has appointed one (1) Sergeant from the list generated from the 2008 Sergeants' promotional examination.  The Sergeant promoted was a non-minority.  [Plaintiffs' Exhibit 32].

4.      The appointment of one (1) Sergeant is too small a number to be statistically significant.  See *Questions and Answers on the Federal Executive Agency Guidelines On Employee Selection Procedures,* 44 Fed. Reg. 11,996 (1979), Question 21.

5.      Under the *Questions and Answers on the Federal Executive Agency Guidelines On Employee Selection Procedures,* 44 Fed. Reg. 11,996 (1979), Question 21, when a data set is small, validity evidence is warranted only where the lower selection rate continues over time.

6.      Accordingly, in aggregating selection data from the 2008 examination with selection data from the prior two examinations (2004 and 2006), there is no evidence of adverse impact in selection rates among the three examinations together.

D.      <u>Summary of Indicators of Adverse Impact between 2006 and 2008 examinations Based on Worcester Statistics</u>.

1.      Dr. Wiesen found the adverse impact ratio for promotions in Worcester when aggregating the 2006 and 2008 examinations to be .82, above the 4/5[th]s "rule of thumb." [Plaintiffs' Exhibit 86].

2.      In aggregating the 2006 and 2008 examinations, Dr. Wiesen found that the difference in points earned by minorities and non-minorities at the effective passing point was 2.1 points (out of 100 points).  [Plaintiffs' Exhibit 86].

3.      In aggregating the 2006 and 2008 examinations, Dr. Wiesen found that the difference in points earned by minorities and non minorities at the actual official passing point was 1.1 points (out of 100 points).  [Plaintiffs' Exhibit 86].

    E.    <u>Summary of Dr. Wiesen's Aggregated Statistics for 2006 and 2008 Examinations Utilized By The Worcester</u>.

1.    Statewide, the adverse impact in pass/fail rates of minorities compared to non-minorities taking the 2006 Sergeants' promotional examination was .80, which does not fail the 4/5ths rule.  [Plaintiffs' Exhibit 78]

2.    Statewide, the adverse impact in pass/fail rates of minorities compared to non-minorities taking the 2008 Sergeants' promotional examination was .90, which does not fail the 4/5ths rule.  [Plaintiffs' Exhibit 78].

3.    Police officers compete for promotion only within the municipality that employs them.  Police officers in different municipalities and jurisdictions do not compete for promotion with each other.

4.    Dr. Wiesen's aggregated analysis of promotional rates state-wide did not account for the fact that police officers do not compete across employers or jurisdictions. [Wiesen Testimony, Trial Transcript at 5-88:21, 5-94:7 through 5-94:17, July 16, 2010].

5.    Dr. Wiesen's aggregated analysis of promotional rates state-wide did not consider or account for different selection ratios (selection ratio is defined as the number of appointments relative to the number of applicants competing for those appointments) among the various municipalities. [Wiesen Testimony, Trial Transcript at 5-92:6 through 5-93:10, 5-94:7 through 5-94:17]

6.    Dr. Wiesen's aggregated analysis of promotional rates state-wide did not consider or account for the different sized pools of candidates among the various municipalities.  [Wiesen Testimony, Trial Transcript at 5-93:23 through 5-94:6, 5-94:7 through 5-94:17].

7.    Dr. Wiesen's aggregated analysis of promotional rates state-wide did not consider or account for the different proportions of minorities to non-minorities competing for promotion

that may exist among the various municipalities. [Wiesen Testimony, Trial Transcript at 5-91:14 through 5-92:5, 5-94:7 through 5-94:17].

8.      Dr. Wiesen's aggregated analysis of promotional rates across time (e.g., across multiple examinations 2003-2008) did not account for the fact that test-takers who took these examinations multiple times will be counted more than once.  Dr. Wiesen admits such aggregation could distort the data. [Wiesen Testimony, Trial Transcript at 5-106:1, 5-107:13, 5-94:7 through 5-94:17]

9.      Several of Dr. Wiesen's calculations were based on inaccurate data, including his calculation of adverse impact in promotions from Worcester's use of the 2004 examination as set forth in Plaintiffs' Exhibit 79, which also was incorporated into his state-wide aggregated analyses. [Plaintiffs' Exhibit 79]

10.      Dr. Wiesen's finding that one Worcester minority failed the 2008 examination is wrong, and is not reflected in the data that he relied on, which reveals that no Worcester minorities failed the 2008 examination.  [Plaintiffs' Exhibit 86].

11.      Dr. Wiesen's testimony that the highest scoring minority on the 2008 examination is ranked 15th on the certified list is wrong, as the data supplied from the Commonwealth (Plaintiffs' Exhibit 77), which was available to Dr. Wiesen, reveals that there is a Hispanic candidate in 12th place and a Black candidate (the Plaintiff) tied for 13th place.

### III.     THE PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CASE OF DISPARATE IMPACT DISCRIMINATION AGAINST WORCESTER BECAUSE WORCESTER'S ADMINISTRATION OF THE HRD PROMOTIONAL EXAM DID NOT HAVE AN ADVERSE IMPACT ON WORCESTER MINORITIES.

The framework for proving unlawful discrimination based on disparate impact is set forth in 42 U.S.C. § 2000e-(k)(1)(A).  A disparate impact claim arises when an employer's otherwise neutral policy has a "significantly disproportionate impact on a protected class".  42 U.S.C. § 2000e-(k)(1)(A)(i); Albermarle Paper Company v. Moody, 422 U.S. 405 (1975).

In order to establish a prima facie case of discrimination, a plaintiff must (1) identify the challenged employment practice or policy; (2) demonstrate a disparate impact on a group that falls within the protective ambit of Title VII; and (3) demonstrate a causal relationship between the identified practice and the disparate impact.  42 U.S.C. § 2000e-(k)(1)(A)(i).

Plaintiffs have failed to offer any statistical evidence or expert opinion that supports a finding that Worcester's promotional exams had an adverse impact on minorities.   In fact, Plaintiffs' expert testified that there was no evidence of adverse impact in Worcester, whether the applicable measure is the passing rate, average test scores or selection rates.

### 1.     Plaintiffs' Prima Facie Case Requires Proof That Defendants' Use of HRD's Examination Has An Adverse Impact On Minority Rates of Hire Within The Employing Unit.

Plaintiff cannot prove disparate impact without first proving that the challenged practices, the use of promotional exams in 2006 and 2008, actually has an adverse impact on the protected class, Blacks and Hispanics.  Bradley v. City of Lynn, 443 F.Supp.2d 145, 160 (D. Mass. 2006) (holding that as part of the prima facie case the plaintiffs must demonstrate that the exams had both an adverse and disparate impact, specifically that the adverse effects of the practice fall more heavily on members of the protected class than they fall on nonmembers who are similarly situated).

Plaintiffs frequently will seek to prove disparate impact using a calculation known as the "4/5[th] Rule" which comes from the Equal Employment Opportunity Commission's (EEOC's) Uniform Guidelines on Employee Selection Procedures. 29 C.F.R. § 1607.4(D); *Bradley v. City of Lynn*, 443 F.Supp.2d 145. 160 (D. Mass. 2006).   This calculation compares the rates of hiring of minority and non-minority candidates for promotion or hire; if the resulting ratio is less than .80 (meaning the rate of hiring for minorities is less than 80% of the rate of hiring for non-minorities), such a result may indicate that the challenged employment practice has an adverse impact on minority employment and promotion opportunities.   *Bradley*, supra.   The rule, however, "has not provided more than a rule of thumb for the courts."   *Bradley*, 443 F.Supp at 161 (citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 995 n. 3 (1988)) .

Under any measure, as set forth in Section II, <u>Proposed Findings of Fact</u>, Worcester's use of the 2006 and 2008 promotional examinations did not adversely affect actual minority rates of promotion or their opportunity to compete for promotion.  There is no measure of the Worcester data which fails the 4/5ths rule, regardless of whether one examines pass/fail rates, average test scores, selection rates, data applicable to individual exam years (2004, 2006 or 2008), or data aggregated across examination years.

**2.      The Standard of Proof in Disparate Impact Discrimination Cases Precludes The Plaintiffs From Supporting Their Claims Based On Promotional Data Aggregated Across Jurisdictions.**

Here, the challenged employment practices against each of the Defendants is their use of an examination (or examinations) developed and administered by HRD.  [Complaint at ¶¶ 73-79].  The burden on Plaintiff thus is to demonstrate that the challenged employment practices have a disparate impact on the rates of minority hiring within the employing unit.   More

particularly, as part of its prima facie case, Plaintiffs must show that the challenged employment practices <u>caused</u> the discriminatory impact that they seek to prove.

Plaintiffs' proof based on state-wide adverse impact statistics lacks any connection to the challenged employment practices, because it can hardly be argued that Worcester's use of these examinations could have caused a state-wide problem. In this sense, it cannot be said that any appearance of adverse impact on a state-wide basis was the result of Worcester's use of the examination. Such an argument is obviously illogical and not reasonable - - the City of Worcester's two challenged employment practices of utilizing HRD's 2006 and the 2008 examination affect only the promotions of its own officers within its jurisdiction.

In *Bradley v. City of Lynn*, supra, plaintiffs brought a class action under Title VII against the Commonwealth of Massachusetts and the City of Lynn, alleging that the civil service examination for entry level firefighters had a disparate impact on minorities. In that case, in determining whether disparate impact existed for the purpose of liability against the individual municipalities, Judge Saris examined the data on a disaggregated city-by-city basis:

> ". . . the Court finds that the statewide aggregated approach advocated by the plaintiffs and the disaggregated municipality approach advocated by the HRD are both useful in this case . . . The decision process in hiring firefighters in Massachusetts, however, contains multiple steps that span both the state and municipal levels. . . The HRD argues that statistical evidence aggregated on a statewide basis is flawed because hiring decisions are made individually in each municipality at the local level and because a large municipality can distort the whole adverse impact analysis. Dr. Jacobs asserts that aggregation 'allows one single jurisdiction to have a major influence on the entire system leading to a conclusion of adverse impact for the entire Commonwealth when a single community is responsible for the outcome.' . . . Because this seems reasonable, the Court examines the disaggregated hiring data of Boston. The Court also examines the disaggregated hiring data of Lynn, the municipality of the four named plaintiffs. The data shows that the examination has a disparate impact on the hiring of minorities in both of these municipalities."

*Id* at 165.

9

Here, the evidence supporting disaggregation of the data is even more compelling than in *Bradley v. Lynn*. As noted, unlike the entry level firefighter positions at issue in *Bradley v. Lynn*, police officers in different police departments do not compete against each other for promotion. Candidates eligible to compete for entry level firefighter are eligible for appointment across jurisdictions. This distinction is not minor. When applicants who are not competing with each other for the same positions are added up and divided as though they do, such aggregation of promotion rates can significantly distort the conclusions that may appear as a result of the aggregation. Further, unlike in *Bradley v. Lynn*, the entity responsible for the state-wide examination, the Commonwealth of Massachusetts, is no longer a party to this case. Thus, while aggregation of minority selection rates may be "useful" against a state-wide actor, such data has no relevance to the individual municipalities.

Not only does *Bradley* require disaggregation of data for the purpose of determining liability among the individual Defendants, common sense also dictates this result. If the Court were to hold individual municipalities liable based on what may be happening on a state-wide level, there would be no difference between the municipality that promotes all of its minority candidates and the municipality that may be promoting many candidates but where minority promotions fail the 4/5ths rule to a statistically significant degree. Such a conclusion would be fundamentally unfair and would be inconsistent with the prima facie case which requires the Plaintiff to prove causation. Moreover, because Plaintiff made no effort to determine, through discovery or otherwise, what contributes to the appearance of adverse impact from municipality-to-municipality, it may be the case that a particular municipality has made efforts in conjunction with its use of the examination (such as concentrated effort to recruit at the entry level increasing

minority pool size and candidate quality) that accounts for no adverse impact within its borders despite the appearance of adverse impact that may appear in other jurisdictions.

Plaintiff is expected to rely on *Vulcan Pioneers v. New Jersey Department of Civil Service*, 625 F.Supp. 527 (D. N.J. 1985), to support its claim that data aggregated across different employers can be used to prove a prima facie case of disparate impact. Worcester first notes that this case is District Court decision from another Circuit and is 25 years old, and so has little precedential value in any event. More significantly, however, that case did not decide the proof required in a prima facie case under Title VII. In that case, defendants were the State of New Jersey and approximately twelve municipalities. Although the court relied on some data aggregated across municipalities (and some disaggregated data) in reaching its conclusions, the posture of that case is entirely different from the claims under Title VII in this instant case. In *Vulcan Pioneers*, the parties had previously entered into a consent decree, which required, among other things, the State of New Jersey to develop a valid, job-related promotional examination with the goal of eliminating adverse impact. *Vulcan Pioneers*, 625 F.Supp. at 531-532. The court was looking at whether the State of New Jersey had met its obligations under the consent decree, and was not considering whether plaintiffs in that case had established a prima facie case under Title VII, or whether there existed causation between the aggregated statistics and the disparate impact within each defendant municipality. *Vulcan Pioneers*, 625 F.Supp. at 531. Interestingly, it appears that, while the examination was given state-wide, only the municipalities which were parties to the consent decree were affected by the decision (which found that the examination was not valid).

Simply put, Plaintiff cannot support a prima facie case based on disparate impact statistics which are not Worcester's and which lack any connection to Worcester's use of the 2006 and 2008 examinations.

In any event, even if the Court were to look beyond the fact that the Plaintiff's lead expert admits that Worcester's use of promotional exams did not adversely impact minorities, the overly simplistic calculation of Dr. Wiesen in reaching his state-wide conclusions is of limited value, because it cannot be determined whether the failure of Dr. Wiesen to consider and account for varying characteristics of the municipal subgroups distorted his conclusions.   Dr. Wiesen acknowledged in his testimony that he did not consider or account for the numerous characteristics of each subgroup (i.e., the different employers) and that it is possible that simply aggregating these groups could "possibly" yield a distorted result.

In fact, if one were interested in looking at what happened state-wide when municipalities utilized the examinations at issue, one could easily look at the evidence jurisdiction-by-jurisdiction to determine whether the examinations yielded unacceptable state-wide impact.  Dr. Wiesen's so-called "aggregation" does not add any additional reliable information to consideration of this issue, and likely distorts the findings.  The sole reason, however, that the Plaintiff sought to lump these employers together in a single calculation is that Plaintiff understands he could not ask the court to find Worcester liable merely because it appears in certain other cities and towns using the tests there was evidence of adverse impact.

Accordingly, the state-wide aggregated statistics proffered by Plaintiff to support his prima facie case are insufficient for this purpose.  Moreover, the manner in which the Plaintiff aggregated the statistics was overly simplistic and likely has distorted the appearance of adverse impact.

**IV.    THE DEFENDANTS CANNOT BE HELD LIABLE FOR FOLLOWING A STATE-WIDE TESTING REGIME THAT IS MANDATED BY M.G.L. C. 31 § 1 ET SEQ. PURSUANT TO SAID STATUTE, EXAMINATIONS WERE CREATED AND ADMINISTERED BY THE STATE FOR THE VERY PURPOSE OF SELECTING CANDIDATES FOR PROMOTION BASED UPON MERIT.**

On or about July 9, 2010, the Defendants (including Worcester) filed a Motion To Dismiss All Defendants Pursuant to FRCP 12(b)(6) and a Memorandum in support thereof.  In order to avoid lengthy duplication of the facts and arguments set forth in that Motion, Worcester hereby incorporates the points and authorities set forth therein and renews its argument, as if fully set forth herein.

That Motion, in sum, acknowledges Worcester is an employer and therefore subject to Title VII's prohibitions. Title VII does not, however, make it unlawful for Worcester to comply with the Commonwealth's state wide testing requirements at issue.   In the present case, the HRD promotional examinations were conducted *outside of an employment context* and do not give rise to a cause of action under Title VII as that statute prohibits an "employer" from engaging in specified "unlawful employment practice[s]." 42 U.S.C. 2000e-2(a).   As other courts have recognized, Title VII does not restrict a sovereign's exercise of its traditional police powers, including the promulgating and enforcement of testing requirements, in a non-employment capacity. *See*, *e.g., Camacho v. Puerto Rico Ports Auth.,* 369 F.3d 570, 578 (1st Cir. 2004) (noting "long line of cases" holding that testing authorities are not subject to Title VII).   Because nothing in Title VII manifests a clear intent to impose further restrictions on the states' exercise of their sovereign police power to test or license professionals including police officers, Title VII should not be read to intrude on such matters of core state authority. See *Bass,* 404 U.S. at 349; cf. *Gregory v. Ashcroft,* 501 U.S. 452, 460-461 (1991) (holding that Congress's intent "to alter

the usual constitutional balance between the States and the Federal Government" must be "unmistakably clear in the language of the statute") (citation omitted).

Worcester is an employer that must comply with the state law that requires it to hire from the certified lists promulgated by HRD. Worcester thus acted *only* as Plaintiff's employer, not as a testing body. It necessarily follows that Worcester is not liable under Title VII for complying with a facially-neutral state testing regime that limits the universe of potential employees to those who have complied with the Commonwealth's requirements.

## V.    CONCLUSION

Accordingly, because Plaintiff's prima facie case against Worcester requires him to demonstrate a causal relationship between an identified practice of Worcester and a disparate impact in Worcester's hiring, the Plaintiff can only do so by disaggregating the promotional data, and analyzing the data applicable to Worcester.

To this end, there simply is no dispute that Plaintiff has not met his burden of proof that there exists any evidence of adverse impact based on the selection rates of minorities compared to non-minorities, or based on any other adverse impact measure, including pass/fail rates and average test scores. In fact, the Plaintiff's own lead expert, Dr. Joel Wiesen, admitted during trial that while he believed statewide data showed a clear mean difference in test for minorities and non-minorities in one direction (adverse impact), in Worcester the impact appears to be the opposite direction (adverse impact on non-minorities).

WHEREFORE, Defendant City of Worcester and Michael O'Brien request that the Court enter a directed finding in Defendants' favor on Plaintiff's claims under both Title VII of the

Civil Rights Act of 1964 and M.G.L. c. 151B, and further that the Court award Worcester its attorneys fees and costs.[3]

Respectfully submitted,

CITY OF WORCESTER,

By its attorneys,

/s/Laurie W. Engdahl
Laurie W. Engdahl
B.B.O. #554635
Collins, Loughran & Peloquin, P.C.
320 Norwood Park South
Norwood, MA 02062
(781) 762-2229

Date:   July 28, 2010

---

[3]  Following the entry of Judgment in favor of Worcester, Worcester intends to file a separate Motion under FRCP Rule 54 for such attorneys' fees and costs.

## <u>CERTIFICATE OF SERVICE</u>

I, Laurie W. Engdahl, certify that on July 28, 2010, this document filed electronically through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to any persons indicated as non-registered participants.

/s/Laurie W. Engdahl
Laurie W. Engdahl