UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| PEDRO LOPEZ, et al., ) | |
| ) | |
| Plaintiffs ) | C. A. # 07-11693-JLT |
| ) | |
| v. ) | |
| ) | |
| CITY OF LAWRENCE, MASSACHUSETTS, ) | |
| et al., ) | |
| Defendants ) | |

**MOTION FOR JUDGMENT
BY THE MBTA DEFENDANTS**

Now come the Massachusetts Bay Transportation Authority ("MBTA") Defendants[1], and respectfully move this Honorable Court to enter Judgment in favor of the MBTA Defendants on Counts I and II against the Plaintiffs[2], Royline Lamb and Lynn Davis, in accordance with Rule 52 (c) of the Federal Rules of Civil Procedure, on the following grounds:

1. The Plaintiffs have not proven, by a preponderance of the evidence, that the MBTA has had disparate impact[3] against minorities[4] in its promotional rate to sergeant when aggregating the data from the results of the HRD examinations from 2003, 2005, and 2007. In fact, the evidence from their own experts proves that the MBTA did not

---

[1] The MBTA Defendants are: Massachusetts Bay Transportation Authority), Daniel Grabauskas in his capacity as General Manager of the MBTA, and the Board of Trustees for the MBTA.
[2] The only Plaintiffs who are employed by the MBTA are Royline Lamb and Lynn Davis. They appear, respectively, in paragraphs 41 and 42 of the Seventh Amended Complaint as filed on February 17, 2010.
[3] During trial testimony, the terms disparate impact and adverse impact have been used interchangeably.
[4] "Minorities" in this case refers to Black and Hispanic and not to any other group often considered to be a minority.

have any adverse impact in any category of measurement when aggregating its promotions from such examinations. [See, Table 2c, Exhibit 79 (from Dr. Wiesen's June 25, 2010 Report)];

2. That the Plaintiffs' experts rendered opinions regarding the expectation that there would be adverse impact in the future promotional rates of minorities at the MBTA if it continued to use HRD examinations. Such opinions were given during direct testimony. These opinions were based, in large part, upon the pattern of adverse impact found in the promotional rates for minorities in the analysis of state-wide data aggregated across jurisdictions and across years.[See, Table 2c, Exhibit 79] On direct examination, both experts *assumed* that such pattern of adverse impact against minorities statewide was expected to be similar at the MBTA. However, on cross-examination, both experts admitted that the pattern of adverse impact for minorities at the MBTA was not similar in any respect to the pattern found in the state-wide, cross-jurisdictional data for the 2003, 2005 and 2007 exams [See, Table 2c, Exhibit 79].[5] In fact, the MBTA had no adverse impact when aggregating such data. Therefore, the opinions expressed by the experts were not based upon accurate assumptions;

3. The MBTA cannot be liable to the Plaintiffs employed by the MBTA (Royline Lamb and Lynn Davis) because they did not pass the mandated state-wide testing and, therefore, the MBTA could not, as a matter of law, consider them for promotion to the rank of sergeant;

4. The Defendants cannot be held liable for following a state-wide testing regime that is

---

[5] In addressing the statewide data, aggregated across jurisdictions, from exams given in 2003 through 2008 and the MBTA data aggregated from the 2003, 2005 and 2007 exams, as such data appears in Table 2c(Exhibit 79), Dr. Wiesen noted that the MBTA had a point difference in test scores of 2.0, but he admitted that that difference has no statistical significance. (Transcript p. 11-83, line 24 to p. 11-84, line 1.)

mandated by M.G.L. c. 31, § 1 et seq. Pursuant to said statute, examinations were created and administered by the state for the very purpose of selecting candidates for promotion based upon merit.

## LEGAL ANALYSIS

As laid out in Title VII of the Civil Rights Act of 1964, an employer is not allowed to use "..any employment practice that has a disparate impact on the basis of race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(k)(1)(A)(i); *Albermarle Paper Company v. Moody*, 422 U.S. 405 (1975).

In order to prove a violation of Title VII, the Plaintiffs must prove disparate impact that was caused by a specific employment practice. *Id.* Under a Title VII disparate impact claim, three steps are to be proven. *Bradley v. City of Lynn*, 443 F. Supp.2d 145, 160 (D. Mass. 2006). The first step is that plaintiff has the initial burden of proving that a challenged employment practice has disparate impact. *Id.* If disparate impact is proven, then the defense must prove that such challenged employment practice was "job related and consistent with business necessity." *Id.* Finally, the plaintiff must prove that another selection device would not have similar discriminatory effects. *Id.* In Massachusetts, it has been the general practice of the Supreme Judicial Court to apply federal case law regarding Title VII when interpreting analogous provisions of M.G.L. c. 151B. *See, MBTA v MCAD*, 450 Mass. 327, 337-338, 879 N.E.2d 36 (2008). Therefore, the argument is the same for both Count I and Count II.

## ARGUMENT

**1. THERE WAS NO DISPARATE IMPACT ON MINORITIES FOR THE PROMOTIONS TO SERGEANT WITHIN THE MBTA AS SHOWN BY TABLES 2c AND 2b OF EXHIBIT 79 (FROM DR. WIESEN'S REPORT OF JUNE 25, 2010).**

3

Plaintiffs claim that the HRD examinations utilized by the MBTA had an adverse impact on the promotional rates of minorities to the position of sergeant, that such adverse impact was the result of flawed examinations and that the MBTA had alternatives to utilizing the examinations created and administered by HRD. However, the testimony from the Plaintiffs' own experts is that, when analyzing the data regarding the MBTA, there was no adverse impact for minorities on the promotional rates, there was no adverse impact for minorities on the pass/fail rates, there was no adverse impact for minorities on the average test score, and there was no adverse impact for minorities on the point differential. [See, Table 2c, Exhibit 79]

The facts clearly show that the MBTA, pursuant to state law, did not create or administer the exams and relied upon HRD to provide the MBTA with a certified list of candidates for promotion to sergeant. Moreover, the MBTA would not have had reason to expect that relying on HRD to administer the examinations would result in adverse impact. To the contrary, the results for minority promotions to sergeant at the MBTA not only had no adverse impact, but were commendable when taking into consideration the constraints imposed by the merit-based promotional process that M.G.L. c. 31, § 1 et seq. requires. (Transcript, p. 10-115, lines 5-11) Moreover, Dr. Wiesen testified that the appointing authority (at the MBTA, the Chief of Police) would not know the promotional rates, the average test score, the pass/fail rates, or the point differential between minorities and non-minorities. (Transcript, p. 10-110, line 5 through p. 10-111, line 7) The appointing authority only knows who is on the certification list and who it promotes. (Transcript, p. 10-111) All promotions are made only from certification lists. When aggregating the promotional data for the MBTA from the 2003, 2005, and 2007 HRD exams that it utilized, the data shows that there was no adverse impact in the promotions to sergeant within the MBTA. [See, Table 2c, Exhibit 79]. Therefore, it was quite impossible for the MBTA to

4

suspect adverse impact as a result of using the HRD examinations. It is notable that when testifying, Dr. Wiesen was asked to assume that the data in Exhibit 149 was accurate, and from it he determined that the percentage of minorities within the rank of sergeant in the MBTA Transit Police Department increased from 5 of 20 (25%) on December 2003 to 11 of 33 (33%) in December 2009. (Transcript, p. 10-113, line 6, to p. 10-115, line 4).

Pursuant to M.G.L c. 31, the MBTA relied upon HRD examinations to determine eligible candidates for promotion to sergeant. The HRD examinations at issue were multiple choice tests that were created and administered by the state. According to Dr. Wiesen, the Plaintiffs' expert, multiple choice tests are *"either the best or one of the best predictors of future job performance."* (Transcript, p. 3-125: line 21 to p. 3-126: line 6)

In order to determine whether there is adverse impact occurring with any given selection system, enforcement agencies generally use the four-fifths rule. (Transcript, p. 2-72: line 18 to p. 2-73: line 1) If the resulting ratio is less than .80, then such a result indicates that the challenged employment practice has an adverse impact. A resulting ratio of 1 over 1 is considered by Dr. Wiesen to be "perfect equity" (Transcript, p.2-84: line 15).

The Plaintiffs have identified a specific employment practice which is the utilization of the HDR Police Sergeant Promotional Exams ("the exams"). However, the Plaintiffs have not produced any evidence that the MBTA's utilization of the exams produced an adverse impact. Plaintiffs seek to prove disparate impact using a calculation known as the four-fifths rule, which comes from the Equal Employment Opportunity Commission's ("EEOC") Uniform Guidelines on Employee Selection Procedures. *Bradley v. City of Lynn*, 443 F. Supp.2d 145, 160 (D. Mass. 2006). This calculation compares the rates of hiring of minority and non-minority candidates for promotion or hire. *Id.*

When referring to Table 2c of Dr. Wiesen's June 25, 2010 Report (Exhibit 79), Dr. Fields

5

testified that the number .95 in the column *Adverse Impact for Promotions* for the MBTA signified that **there was no adverse impact in the promotions from the exams**. (Transcript,8-77: lines 1-6). Per Table 2c, there is a .95 for the MBTA's aggregated promotional rates for minorities and .83 for the aggregated passing rates for minorities. (Transcript, 8-77: lines 20-25). Similarly, Dr. Fields distinguished the MBTA from the other defendants when asked if the MBTA had no adverse impact in the passing rates from 2003-2008 she replied: "Yes. **That means that there was no adverse impact.**" Both Dr. Wiesen and Dr. Fields have confirmed that the MBTA does not have adverse impact for the exams from 2003-2008. [Table 2c, Exhibit 79]. Also, Dr. Wiesen has determined that when aggregating the data from 2003 to 2008, the MBTA's adverse impact ratio for average test score was 2.0 points. (See, Table 2c). Dr. Fields testified *that 2.0 points for average test scores does not connote a big test score difference between minorities and non-minorities.* (Transcript, p. 8-78: lines 1-5).

The Plaintiffs simply have failed to meet the prima facie element of a disparate impact claim because there is no evidence that the MBTA's employment practice produced a disparate impact.

> 2  WHEN RENDERING OPINIONS ON DIRECT EXAMINATION, BOTH EXPERTS ASSUMED THAT THE MBTA'S PATTERN OF ADVERSE IMPACT IN THE PROMOTIONAL RATES FROM THE 2003, 2005 AND 2007 WOULD BE SIMILAR TO THE PATTERN OF SUCH ADVERSE IMPACT FROM THE ANALYSIS OF THE DATA STATEWIDE, AGGREGATED OVER YEARS AND ACROSS JURISDICTIONS. IN FACT, THE MBTA HAD NO ADVERSE IMPACT WHEN AGGREGATING ITS DATA FROM THE EXAMS. THEREFORE, THE OPINIONS EXPRESSED BY THE EXPERTS WERE BASED UPON A MISTAKEN ASSUMPTION. MOREOVER, BOTH EXPERTS ADMITTED THAT THE ANALYSIS ON TABLE 2c, (EXHIBIT 79) HAD MORE RELIABLITY AND IS THE BETTER ANALYSIS TO USE THAN EXHIBIT 53.

On Transcript 2-82, Dr Wiesen explained, in reference to his opinion that the

MBTA should have expected that utilizing 2005 HRD exam would have resulted in adverse impact that *(italics supplied)*:

> Q. Can you tell me about that, please.
>
> A. Yes. I think there were two strong indications that this '05 statewide sergeant exam would have adverse impact. First, there's the research literature; perhaps you can call it the academic or scholarly literature that industrial psychologists produce that shows that nationwide multiple-choice tests tend to have adverse impact on minority candidates. *And then you have the experience of Massachusetts before '05. There were exams given in each year, you know, and there was an exam given in '91, yearly exams for the past at least fifteen years that we know of. And I looked at two of them specifically. I think it was the '02 and '03 or '03 and '04. And the statewide exams for sergeant that HRD administers have adverse impact each year. So if you give another one that looks basically the same as the earlier ones, you would expect the same thing to happen.*

At the time that he gave this answer, which essentially suggests that this Court should assume that the MBTA would follow the pattern of adverse impact from the statewide data, Dr. Wiesen had already done an analysis that demonstrated that the MBTA did not, in fact, follow the pattern of adverse impact found in the statewide data analysis when aggregating the data from the 2003, 2005, and 2007 exams. [Table 2c, Exhibit 79]

Likewise, in his testimony on direct in regard to the 2005 and 2007 exams, he testified at Transcript 2-114, lines 3-23, as follows *(italics supplied)*:

> Q. And what was the adverse impact ratio for '05?
> A. Zero.
> Q. And how about for '07?
> A. Zero.
> Q. Okay. Now, are these numbers statistically significant?
> A. Not in themselves.
> Q. Okay. Even though they're not statistically significant, do you have an opinion to a reasonable degree of industrial psychology certainty as to whether or not there was adverse impact resulting from the 2005 and 2007 sergeant's exam for the MBTA?
> A. Yes.
> Q. And what is that opinion?

> *A. I think that the data from MBTA in '05 and '07 that shows minorities doing less well than non-minorities is reflective of what we see statewide with minorities doing less well than non-minorities, and it's statistically significant statewide, and I think we're seeing the same effect with the MBTA. Even though there's no statistical significance for that department alone, I think they're just reflecting the overall adverse impact.*

Again, Dr. Wiesen suggests that the MBTA would be assumed to follow the statewide pattern of adverse impact. As discussed above, he is again suggesting that this Court should assume that the MBTA would follow the pattern of adverse impact from the statewide data when he had done an analysis to the contrary.

Dr. Wiesen, on cross-examination Monday, July 26, 2010, agreed that the Tables in 2c had more reliability than the tables entered as Exhibit 53. Moreover, he agreed that it is better judgment to rely on Table 2c when rendering an opinion. His view follows that of Dr. Fields, as discussed above, that Table 2c shows that the MBTA has no adverse impact in any of the criteria analyzed by the experts. Simply, the MBTA had no adverse impact, and the Plaintiffs' experts admitted that the MBTA pattern of adverse impact does not follow the statewide data aggregated over years and across jurisdictions. Therefore, their opinions rendered on the assumption that the MBTA would follow the statewide pattern of adverse impact are based upon a fundamentally faulty assumption. Table 2c proves such opinions to be in error.

### 3. THE MBTA COULD NOT PROMOTE THE PLAINTIFFS EMPLOYED BY THE MBTA BECAUSE NEITHER ONE OF THEM PASSED THE HRD EXAM

In its Answer to the Seventh Amended Complaint, the MBTA responded that neither Plaintiff employed by the MBTA passed the HRD examinations in question (See, Response to Paragraph # 75). In accordance with M.G.L. c. 31, employers are allowed to rely on the HRD promotional police exams and the practice in Massachusetts has been to rely on the expertise of

8

HRD and the exams created and administered by HRD. Generally, deference may be given to an administrative agency because of their expertise in the areas in which they oversee. *Massachusetts Association of Minority Law Enforcement Officers v. Abban*, 434 Mass. 256, 748 N.E. 2d 455 (2001). The MBTA utilized the HRD exams in good faith and reasonably relied on HRD's expertise in creating and administering such exams.

The MBTA had no reason to question the validity of the exam that was developed and administered by HRD. The Plaintiffs' own experts have testified that there was no disparate impact at the MBTA when utilizing the HRD exams. The MBTA has not been given a reason to seek out any alternative methods of testing for promotional candidates. Moreover, the evidence is that the MBTA could not consider the Plaintiffs employed by MBTA for promotion because they did not pass the exams and, therefore, they could not be placed upon a certified list for promotion. The MBTA can only consider candidates who appear on the certified list. The MBTA was justified in relying on the HRD exams because there has been no adverse impact and, when relying on such exams, it could not have promoted the MBTA Plaintiffs.

4. **THE DEFENDATS CANNOT BE HELD LIABLE FOR FOLLOWING A STATEWIDE TESTING REGIME THAT IS MANDATED BY M.G.L. c. 31, § 1 et seq. PURSUANT TO SAID STATUTE, EXAMINATIONS WERE CREATED AND ADMINISTERED BY THE STATE FOR THE VERY PURPOSE OF SELECTING CANDIDATES FOR PROMOTION BASED UPON MERIT.**

The Defendants are employers and therefore subject to Title VII's prohibitions. Title VII does not, however, make it unlawful for the Defendants to comply with the Commonwealth's statewide testing requirements at issue.

In their opposition to the Defendants' Motion for Reconsideration, the Plaintiffs cited to *Gulino v. New York State Education Department*, 460 F.3d 361 (2006) for the proposition that a

Case 1:07-cv-11693-GAO   Document 277   Filed 07/28/10   Page 10 of 20

municipality may be responsible under Title VII as an employer when it complies with a law that requires it to use statewide testing when that testing proves to have a disparate impact upon minorities. In that case, the State of New York passed a law that required that the New York State Education Department ("SED") create and administer tests that all public school teachers had to pass to be certified. The New York City Board of Education ("BOE") employed public school teachers in New York City. It complied with that law and required that its teachers pass the SED tests before being certified as full-time permanent teachers. In addition, BOE decertified teachers who had been certified as permanent because they did not pass the SED testing. The plaintiffs in *Gulino* were Black and Hispanic teachers employed by BOE, some of whom had been decertified, who did not pass the SED tests and therefore worked as substitute teachers which paid less than permanent teachers. They sued SED and BOE under Title VII claiming that the SED tests had a disparate impact on Black and Hispanic teachers. There was a lengthy trial and both defendants participated. The district court found the defendants not liable. The plaintiffs appealed to the Second Circuit.

On appeal, the *Gulino* court relied upon common law principles to find that SED was not an employer for purposes of Title VII. Accordingly, SED was dismissed from the suit. It also found that the lower court had made legal and factual errors regarding the SED testing and the legal significance of BOE's decertifying teachers. Accordingly, the lower court decision was vacated and the case was remanded. *Id.* at 388.

As to BOE, the *Gulino* court held that it was an employer within the meaning of Title VII. It explained that, while BOE had "argued in the district court that it should not be held liable for an employment practice required by state law," that argument was rejected and BOE "does not appear to challenge this finding of the district court." *Id.* at 380. The *Gulino* court

10

briefly noted, however, that "the district court was correct in holding that the mandates of state law are no defense to Title VII liability." *Id.*

As to the argument that BOE advanced on appeal, the *Gulino* court stated that, "[o]n appeal, BOE appears to change its tack. Instead of arguing lack of discretion, BOE asserts that Title VII does not apply because BOE's use of certification tests for licensing 'is a capacity separate and distinct from that of employer under Title VII.'" *Id.* at 380. The court rejected that argument on the ground that BOE is "not merely a licensing agency," but instead "acts as plaintiffs' 'employer' in the word's ordinary meaning." *Id.* at 381. The court "acknowledge[d] the difficult situation that" its holding "creates for" BOE - by requiring it to defend the results of a test that it did not design and does not administer - but concluded that "Title VII requires this result." *Id.*

Accordingly, the *Gulino* court vacated the trial court decision and remanded for further proceedings. *Id.* at 388. In so doing, the court noted that it did not reach plaintiffs' contention that BOE had misused the tests by, among other things, demoting teachers from permanent to substitute status and then paying them less. *Id.* at 370. Instead, the court explained that, "[i]f appropriate, the district court may need to address this argument on remand." *Id.* at n 9.

A Petition for A Writ of Certiorari was filed in the Supreme Court. It was denied. *Board of Education of the City of New York v. Gulino*, 128 S. Ct. 2986 (2008). Significantly, the United States Solicitor General filed an amicus brief opposing the petition for a writ of certiorari. In it, the Solicitor General provided cogent argument as to why the *Gulino* court was plainly wrong in its holding that BOE's compliance with a facially-neutral public education state licensing requirement can give rise to Title VII disparate impact liability. The Defendants' argument below adopts much of the argument made by the Solicitor General.

Even though the *Gulino* court was wrong to hold BOE liable under Title VII for compliance with a facially-neutral public education state licensing requirement, the Solicitor General opposed the petition for certiorari because BOE had, curiously, abandoned the appeal of this argument in the Second Circuit. Therefore, the case provided a poor vehicle for considering the question. Also noted by the Solicitor General as a reason for opposing certiorari was that the case was in an interlocutory posture and the lower courts had not yet resolved plaintiffs' contention that BOE misused the testing in ways *not* required by state law. Accordingly, the Solicitor General argued that the petition for a writ of certiorari should be denied.

In the present case, the HRD promotional examinations were conducted *outside of an employment context* and do not give rise to a cause of action under Title VII as that statute prohibits an "employer" from engaging in specified "unlawful employment practice[s]." Title VII thereby restricts employers' employment practices. As other courts have recognized, Title VII does not restrict a sovereign's exercise of its traditional police powers, including the promulgating and enforcement of testing requirements, in a non-employment capacity. *See, e.g., Camacho v. Puerto Rico Ports Auth.,* 369 F.3d 570, 578 (1st Cir. 2004) (noting "long line of cases" holding that testing authorities are not subject to Title VII).

That result draws support from the Supreme Court's cases suggesting that intent to rework the federal-state balance should not be lightly inferred. *See, e.g., United States v. Bass,* 404 U.S. 336, 349 (1971). In this case, the state acted pursuant to its traditional police powers in performing a core state function - regulating the qualifications of its police supervisors. This is a traditional state function. *See, Lopez v. Commonwealth of Massachusetts,* 588 F. 3d 69, 73-81 (1st Cir. 2009.

The Constitution, of course, constrains the exercise of that traditional police power by

12

prohibiting intentional discrimination on the basis of race (and 42 U.S.C. 1983 furnishes a cause of action to address such discrimination), but the Constitution does not proscribe disparate impact. *Washington v. Davis,* 426 U.S. 229, 241-242 (1976). Indeed, in *Davis* the Court relied in part on concerns about how such liability would affect state licensing and testing statutes and other traditional state functions. *Id.* at 248. Because nothing in Title VII manifests a clear intent to impose further restrictions on the states' exercise of their sovereign police power to test or license professionals including police officers, Title VII should not be read to intrude on such matters of core state authority. See *Bass,* 404 U.S. at 349; cf. *Gregory v. Ashcroft,* 501 U.S. 452, 460-461 (1991) (holding that Congress's intent "to alter the usual constitutional balance between the States and the Federal Government" must be "unmistakably clear in the language of the statute") (citation omitted).

The inapplicability of Title VII to a state providing testing under its police power, rather than as employer, supported the dismissal of the Commonwealth from this action. However, the Defendants did not devise and did not administer the promotional examinations in question. Therefore, they are employers that must comply with the state law that requires them to promote from the certified lists promulgated by HRD. The Defendants thus acted *only* as plaintiffs' employer, not as a testing body. The Defendants are not liable under Title VII for complying with a facially-neutral state testing regime that limits the universe of potential employees to those who have complied with the Commonwealth's requirements. Several considerations support that result.

First, any other conclusion would effectively result in the same reworking of the federal-state balance as a regime making the states liable directly for their facially-neutral testing schemes. As discussed above, states are not forbidden by the Constitution from enacting or

13

enforcing testing requirements that have unintentional disparate impact, and Title VII does not intrude on that traditional state authority. That state authority would be vitiated if employers could be held liable under Title VII for complying with facially-neutral state testing laws, because the threat of such liability would frustrate compliance with such state laws.

    Second, holding employers liable for the consequences of a state law that narrows the universe of prospective employees would conflict with basic notions of fairness and causation. As noted previously, it is a general principle that "where [a defendant] has no ability to prevent a certain effect due to its limited [legal] authority over the relevant actions, the [defendant] cannot be considered a relevant 'cause' of the effect," and thus ordinarily is not liable. *Department of Transp. v. Public Citizen,* 541 U.S. 752, 770 (2004). Congress legislated against the backdrop of that practice when it enacted Title VII. Cf. *Goodyear Atomic Corp. v. Miller,* 486 U.S. 174, 184-185 (1988). And there is no evidence that Congress intended to depart from that principle in Title VII, with the indirect consequence of interfering with a state's ability to conduct facially-neutral exams. Moreover, this requirement of causation could also be read into the prohibitions that give rise to disparate-impact liability. Cf. *Holmes v. Securities Investor Prot. Corp.,* 503 U.S. 258, 265-266 (1992) (reading proximate causation into civil RICO action). For example, the basic liability provisions from which disparate-impact liability have been derived address an employer's effort "to limit, segregate, or classify his employees or applicants," 42 U.S.C. 2000e-2(a)(2), but it is the state's statutory provisions vesting HRD with testing and HRD providing certified lists, not the actions of the employer Defendants, that limit the pool of qualified applicants.

    Third, such a result is reinforced by the business-necessity defense. That defense provides an employer with a defense to a disparate impact claim if it shows that the challenged business

14

practice is job related and consistent with business necessity. 42 U.S.C. 2000e-2(k)(1)(A)(ii). If the mandatory state testing requirement is taken as a given, then that defense would be satisfied as a matter of course, because compliance with a valid facially-neutral state mandate is a business necessity to which there is no reasonable alternative. If, instead, the defense requires an inquiry into whether the test itself is justified, then the employer - who is not the one who created the test - would be placed in an untenable position.

At all times pertinent to this case, the Defendants were not in the position to determine whether the Commonwealth-mandated HRD exams had an impermissible disparate impact, or whether the other criteria for disparate-impact liability, such as business necessity, are satisfied. The Defendants did not create or administer the HRD exams, and therefore were not privy to the data and testing methodologies underlying the exams. The Defendants were never realistically in a position to know whether the exams had an impermissible disparate impact under traditional validation methodology, much less to defend the exams in Court. Yet, that is precisely the untenable and impossible situation of the Defendants.

Further, even if adherence to state law is not required, it is consistent with business necessity that the Defendants utilize the examinations developed by HRD. Under M.G.L. c. 31, HRD is charged with the responsibility and authority to develop examinations that "fairly test the knowledge, skills and abilities which can be practically and reliably measured." *Boston Police Superior Officers Federation v. Civil Service Commission*, 35 Mass. App. Ct. 688, 692 (1993). M.G.L. c. 31, § 16 delegates the determination of the 'form, method and subject matter' of promotional examinations to the Administrator of the Human Resources Division. *Id.* The Administrator is the skilled professional who is authorized to decide technical matters such as scoring and interpreting the examinations. *Id., See, Lopez, supra,* at 73-81

15

The Defendants should not be required to prove the content or construct validity of the Commonwealth's examinations in order to prove business necessity. The Commonwealth is not a party to this case. The Plaintiffs cannot dispute that the Defendants played no role in the creation, administration or scoring of any of the HRD-developed examinations.[6] In fact, it is not in dispute that the Commonwealth, to ensure the security and confidentiality of examination questions among other matters, does not - - at any time - - share such information with the jurisdictions that make use of its examinations. The Commonwealth shares with municipalities and the MBTA only the results relating to persons eligible for promotion within their respective units. As the Commonwealth is no longer a party to the litigation, the Defendants' ability to access such information has been limited.

Fourth, under the present posture of this case, all employers face great legal uncertainty. An employer that complies with state examination requirements could be liable for back pay and other monetary relief under Title VII if the courts later determine that the state created and administered examinations had an impermissible disparate impact. This resulting uncertainty could jeopardize not only the employer, but also the state's vital interest in regulating numerous professions for a variety of reasons, including the health and safety of medical patients, teachers, firefighters and police. That traditional police power would be ill-served by subjecting employers to liability for the examinations created and administered by the states. To avoid liability under Title VII, some employers might choose not to follow important testing requirements, and thereby prompt state enforcement actions, with the public health and safety potentially suffering

---

[6] The 2005 Boston exam should not be treated any differently than the statewide exams placed at issue by Plaintiffs. While 50% of the questions on Boston's 2005 exam dealt with Boston Police rules and procedures, and Boston Police Captains acted as subject matter experts on the "Boston" portion of the exam, there is no dispute that the remaining 50% of the Boston exam questions were identical to questions on the statewide exam for that year. Moreover, as with the statewide exams administered in 2005 and other years, HRD prepared and administered the 2005 Boston exam pursuant to G.L. Ch. 31.

during the ensuing litigation. This could happen in any number of situations involving state regulated professions. Under the rationale of the present case, law firms and government legal offices could be subjected to Title VII litigation alleging that bar examinations created disparate impact. Health care providers could likewise be subjected to litigation alleging disparate impact liability on the basis of medical, dental, or veterinary testing requirements. And so on. The potentially sweeping implications of holding employers liable under Title VII for any disparate impact stemming from a state-created and administered testing is another indication that Congress did not intend that result, because there is no evidence in the text or history of Title VII that Congress intended such effects.

      Fifth, as discussed above, trying this case has posed and continues to pose serious practical problems. The Defendants bear the burden of proof on the business-necessity defense, 42 U.S.C. 2000e-2(k)(1)(A)(i), but the Defendants are ill equipped to shoulder that burden with respect to HRD examinations for the reasons discussed above. Before the First Circuit dismissed the Commonwealth defendants, HRD was defending its own examinations and the non-state Defendants were, for all practical purposes, nominal parties. Now, the non-state Defendants have to defend the HRD examinations. This further underscores the extent to which imposing Title VII liability in the present context would be an improper end-run around state authority and would punish employers without regard to their own culpability. Moreover, Congress imposed the burden on employers to establish the business-necessity defense in large part because it contemplated that the employer would have been responsible for creating or selecting the requirements and defending that practice. *See*, H.R. Rep. No. 644, 101st Cong., 2d Sess. Pt. 2, at 14 (1990) (stating that the employer should bear the burden of proof because it "has control over the employment process, selects the practices used to make an employment decision, and is more

likely to be aware of the relative costs and benefits of the practices used and of the alternative practices that were not used in making the employment decision(s)"). There is no evidence that Congress contemplated requiring an employer to bear the burden in defending examinations that it did not create and did not administer. And it strikes against basic issues of fairness and due process for the Defendants to be put in such a position.

### THE RECENT DECISION OF THE SUPREME COURT IN *RICCI V. DESTEFANO* CLARIFIES THAT EMPLOYERS MUST SHOW A SUBSTANTIAL BASIS IN EVIDENCE THAT A JOB-RELATED EXAMINATION HAS A DISPARATE IMPACT BEFORE SUCH TEST RESULTS MAY BE DISCARDED.

The Defendants submit that the landmark ruling of the Supreme Court in *Ricci v. DeStefano*, __ U.S. __, 129 S.Ct. 2658 (2009) lends support in favor of granting Judgment for the Defendants. The Plaintiffs' argument is nearly identical to the claim made by the City of New Haven to support its decision *not* to utilize the results of an examination for vacant positions of Lieutenant and Captain in the New Haven Fire Department, to wit: after testing was done, the test results could be ignored because of concerns whether there was a disparate impact. However, in that case, the City of New Haven created, administered and scored its own promotional examination, after which it was determined that the "racial adverse impact" was "significant."[7] *Ricci* at 2677. The City of New Haven decided, after considering the adverse impact of the test results, that it would not utilize the examination for promotional purposes. The Supreme Court ruled that such a decision was a "race based" decision, which was unsustainable absent a substantial basis in evidence that the employer would be liable for disparate impact

---

[7] Unlike the Defendants in the present case, the City of New Haven administered the examination in question and, therefore, it had the data and expertise to defend its examination. Moreover, the arguments regarding whether employers can be liable under Title VII for adhering to state law whereby the state regulated and provides testing were not an aspect of *Ricci, supra*.

18

discrimination.

The Plaintiffs in the instant case argue that, like the City of New Haven, the Defendants should have ignored the results of the HRD testing. And, by not rejecting the results of the examinations created and administered by HRD based upon the "evidence" of disparate impact[8], the Defendants must be held liable under Title VII and M.G.L. c. 151B. As noted, however, any decision by the Defendants to reject the results of the examinations due to concerns whether the results had a disparate impact upon minorities would have constituted a race-based decision that can be justified only if there is a substantial basis in evidence of disparate impact discrimination. *Id* at 2677. *See, Humphries v. Pulaski County Special School District,* 508 F.3d 688, 693 (3d Cir. 2009) "We now join our sister circuits in concluding that evidence that an employer followed an affirmative action plan in taking a challenged adverse employment action may constitute direct evidence of unlawful discrimination. If the employer defends by asserting that it acted pursuant to a valid affirmative action plan, the question then becomes whether the affirmative action plan is valid under Title VII and the Equal Protection Clause."

Upon analyzing the evidence which the Supreme Court deemed insufficient to raise a material issue of fact for trial, it is clear that the evidence in *Ricci, supra*, was far more compelling than the evidence produced by the Plaintiffs in this case. This adds more support as to why it is fundamentally unfair, as well as a contravention of Title VII, to hold the Defendants liable for the examinations created and administered by HRD.

### THE PLAINTIFFS HAVE A REMEDY

The Defendants remind the Court that at the status conference on February 1, 2010, the

---

[8] As noted earlier in the memorandum, the Defendants did not have access to the examination data, including the validation studies and, especially, the results of the examination statewide. Therefore, it was quite impossible for the Defendants to have any basis in evidence to suspect that the HRD examinations had an adverse impact when making promotions to sergeant.

Plaintiffs acknowledged that they have a lawsuit pending in the Massachusetts Suffolk Superior Court alleging state-law claims that are identical to the claims raised in this suit concerning the disparate impact of the promotional examinations administered by HRD in 2005, 2006, and 2007 against the Commonwealth Defendants, who were dismissed from this case on the ground of the Eleventh Amendment. The Plaintiffs have a remedy, but that remedy cannot be against the Defendants in this Court.

## CONCLUSION

For all the reasons in the foregoing reasons Judgment should enter in favor of the MBTA Defendants on all Counts.

                Respectfully submitted
                for the MBTA Defendants
                by their attorney,

                /s/ Kevin S. McDermott
                Kevin S. McDermott, BBO#544513
                Assistant General Counsel
                Meghan Ventrella and
                Whitney Eng, *on brief*
                MBTA Law Department
                Ten Park Plaza, Suite 7760
                Boston, MA 02116
                Tel: (617) 222-4756
Dated: July 28, 2010      Email: kmcdermott@mbta.com

## *CERTIFICATE OF SERVICE*

I hereby certify that on July 28, 2010 this document was filed through the ECF system and thus copies will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                /s/ Kevin S. McDermott