```
                 UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS




                                      )
PEDRO LOPEZ, Individually and on      )
behalf of a class of individuals      )
similarly situated,                   )
                                      )
          Plaintiffs,                 )
                                      ) Civil Action
v.                                    ) No. 07-11693-GAO
                                      )
CITY OF LAWRENCE, et al.,             )
                                      )
          Defendants.                 )
                                      )



        BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
              UNITED STATES DISTRICT JUDGE


                       DAY ELEVEN
                     NON-JURY TRIAL


        John J. Moakley United States Courthouse
                    Courtroom No. 9
                  One Courthouse Way
               Boston, Massachusetts  02210
                 Tuesday, July 27, 2010
                      9:31 a.m.



               Marcia G. Patrisso, RMR, CRR
               Cheryl Dahlstrom, RMR, CRR
                 Official Court Reporters
              John J. Moakley U.S. Courthouse
              One Courthouse Way, Room 3510
               Boston, Massachusetts  02210
                    (617) 737-8728

        Mechanical Steno - Computer-Aided Transcript
```

```
 1   APPEARANCES:

 2        LICHTEN & LISS-RIORDAN, P.C.
          By: Harold L. Lichten, Esq.
 3             Joseph L. Sulman, Esq.
          100 Cambridge Street, 20th Floor
 4        Boston, Massachusetts  02114
          On Behalf of the Plaintiffs
 5
          CITY OF LOWELL LAW DEPARTMENT
 6        By: Brian W. Leahey, Esq.
               R. Eric Slagle, Esq.
 7        City Hall
          375 Merrimack Street
 8        Lowell, Massachusetts  01852
          On Behalf of the Defendant City of Lowell
 9
          OFFICE OF THE CITY ATTORNEY
10        By: Richard J. D'Agostino, Esq.
          200 Common Street, Suite 306
11        Lawrence, Massachusetts  01840
          On Behalf of the Defendant City of Lawrence
12
          COLLINS, LOUGHRAN & PELOQUIN
13        By: Laurie W. Engdahl, Esq.
          320 Norwood Park South
14        Norwood, Massachusetts  02062
          On Behalf of the Defendant City of Worcester
15
          MORGAN, BROWN & JOY, LLP
16        By: Mary Jo Harris, Esq.
               Robert P. Morris, Esq.
17        200 State Street, 11th Floor
          Boston, Massachusetts  02109
18        On Behalf of the Defendant City of Boston

19        MBTA LAW DEPARTMENT
          By: Kevin S. McDermott, Esq.
20        10 Park Plaza, 7th Floor
          Boston, Massachusetts  02116
21        On Behalf of the Defendant MBTA

22

23

24

25
```

1    CITY OF SPRINGFIELD LAW DEPARTMENT
     By: Harry P. Carroll, Esq.
2    36 Court Street
     Springfield, Massachusetts  01103
3    On Behalf of the Defendants City of Springfield
     and Mayor Sarno
4
     CITY OF METHUEN - OFFICE OF THE CITY SOLICITOR
5    By: Peter J. McQuillan, Esq.
     The Searles Building, Suite 311
6    41 Pleasant Street
     Methuen, Massachusetts  01844
7    On Behalf of the Defendant City of Methuen

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              I N D E X

2                              Direct   Cross   Redirect   Recross
    WITNESSES FOR THE
3     PLAINTIFFS:

4   JOEL WIESEN, resumed

5        By Mr. Lichten                           7
         By Ms. Harris                                            51
6        By Mr. Carroll                                           62
         By Ms. Engdahl                                           69
7        By Mr. Leahey                                            72
         By Mr. McDermott                                         78

8
    EDWARD P. CALLAHAN
9
         By Ms. Harris            86
10       By Mr. Lichten                  117

11
                           E X H I B I T S
12

13  PLAINTIFFS'
      EXHIBIT      DESCRIPTION                  FOR ID   RECEIVED
14
    No. 150  Graph contained in Schmidt & Hunter article   18
15

16  DEFENDANTS'
      EXHIBIT
17
    No. 151  Delegation Agreement between BPD and
18           HRD                                           101

19  No. 152  Spreadsheet detailing dates and  cost of
             2002 examination                              105
20
    No. 153  Document dated 6/24/08              109
21

22

23

24

25

```
 1                     P R O C E E D I N G S
 2            THE CLERK:  All rise.
 3            (The Court enters the courtroom at 9:31 a.m.)
 4            THE CLERK:  For a continuation of the Lopez trial.
 5   Please be seated.
 6            COUNSEL IN UNISON:  Good morning, your Honor.
 7            THE COURT:  Good morning.
 8            MR. LICHTEN:  Your Honor, I have one scheduling issue,
 9   if I may.  Prior to the start of this trial I was involved in a
10   termination arbitration proceeding, and I guess in retrospect
11   stupidly got all the parties to agree to put it over while I
12   did this trial till Friday, July 30th, which seemed like plenty
13   of time.
14            I've now since tried to reschedule it again,
15   recognizing that the case has gone on longer, and have been
16   unable to do so because of the parties' schedule and the
17   arbitrator's schedule, and I will incur a substantial fee from
18   the arbitrator.  In any event, but even then, we can't get
19   another date, and it involves someone -- a very important case.
20            So I've conferred with the other parties, and the
21   question is whether the Court would consider the possibility of
22   not proceeding on Friday given this problem.
23            THE COURT:  Well, I don't think it will make a
24   difference if we tried to.  In other words, the way things
25   look, we're not going to finish with or without Friday.
```

```
 1              MR. LICHTEN:  Right.

 2              THE COURT:  So it doesn't change -- so I don't think

 3    there's a problem with not sitting.  I mean, if we were within

 4    an inch of the goal line, then it might be a different story,

 5    but we're apparently on the 35 at this point.

 6              (Laughter.)

 7              MR. LICHTEN:  I think the 55.

 8              THE COURT:  So we'll talk again, maybe at the end of

 9    the day, about other scheduling issues and what we do about

10    that.

11              MR. LICHTEN:  I appreciate that, your Honor.

12              THE COURT:  But Friday, rest easy.

13              MR. LICHTEN:  Thank you, your Honor.  I appreciate

14    that.  I'm sure everyone else will be very upset to have Friday

15    off.

16              (Laughter.)

17              THE COURT:  I'm sure.  Everybody.

18              MR. D'AGOSTINO:  We'll be attempting a 60 field goal.

19              THE COURT:  Mr. McQuillan, was it your turn?  I've

20    lost track.

21              MR. McQUILLAN:  No.

22              THE COURT:  I'm sorry.  It was Mr. D'Agostino and

23    then --

24              MR. D'AGOSTINO:  I was completed, your Honor.

25              THE COURT:  I'm sorry.  You're finished?  Okay.
```

```
 1                      JOEL WIESEN, resumed

 2                    REDIRECT EXAMINATION

 3   BY MR. LICHTEN:

 4   Q.   It's nice to see you again, Dr. Wiesen.

 5   A.   Good morning.

 6   Q.   Okay.  I'm going to try to be very brief.  You recall

 7   being asked questions by Ms. Harris about your opinions in 1988

 8   regarding assessment centers; do you recall that?

 9   A.   Yes.

10   Q.   And she showed you some selected parts of testimony that

11   you gave; do you recall that?

12   A.   Yes.

13   Q.   And I just want to show you another part of that.  And

14   this is your testimony from July 1, 1988.  So that would be

15   almost -- a little over 22 years ago.

16            MS. HARRIS:  Page?

17            MR. LICHTEN:  What?

18            MS. HARRIS:  Page?

19            MR. LICHTEN:  Oh, I'm sorry.  Page 37.

20   BY MR. LICHTEN:

21   Q.   Do you remember your testimony from 22 years ago?

22   A.   I'm beginning to recall it.

23   Q.   Okay.  And I'm going to show you a question by Margaret

24   Dale.  Do you remember who Margaret Dale was?

25   A.   She was the legal counsel for HRD.
```

1    Q.   And her question was, "What is your opinion of the use of

2    assessment centers in public safety promotional examinations?"

3    Do you see that?

4    A.   I do.

5    Q.   Okay.  And I want to show you your answer.  And you start

6    off by saying -- would you read that into the record, please?

7    A.   "The field is sharply divided on the use of assessment

8    centers in general, and in police promotional examinations

9    also.  There are some people who feel very strongly that they

10   are essential, and there are other people who very seriously

11   question their theoretical underpinnings and then their actual

12   implementation."

13   Q.   Okay.  And she apparently wasn't satisfied with your

14   answer there and she then said, "You were asked for your

15   opinion."  Do you see that?

16   A.   Yes.

17   Q.   And then you provided a follow-up answer.  Could you read

18   that into the record, please?

19   A.   "And I, quite frankly, am not sure whether assessment

20   centers are a promising advance in the field of testing, or

21   whether, with some further research, say in another five or ten

22   years, we will decide that assessment centers are -- were a

23   passing fad that looked promising but just didn't -- the

24   promise wasn't ever proven or realized.

25        "It's really, as I see it, not enough evidence in the

1    literature to make a firm decision either way."

2    Q.   And was that your opinion then?

3    A.   Yes.

4    Q.   And that was based on the scientific evidence that existed

5    at that time?

6    A.   Yes.

7    Q.   And over -- very briefly, over the 22 years that have

8    elapsed since that time, has the scientific literature

9    developed and made progress with respect to the use of

10   assessment centers?

11   A.   Yes.

12   Q.   And what does -- what has that taught you, if anything?

13   A.   I think the professional consensus now is that assessment

14   centers can be valid and they can measure things that are not

15   measured with a -- they can reliably measure things that were

16   not measured with a multiple-choice examination, and they are a

17   valuable and even essential component in many examining

18   situations.

19   Q.   And you, yourself, have been using them in promotional

20   exams that you have designed?

21   A.   I have.

22   Q.   And with respect to their validity, has the literature

23   established their validity?

24   A.   Well, assessment centers are only a type of test, they're

25   not a specific test, just as multiple-choice tests are just a

1    type of test.  So the validity of assessment centers varies

2    greatly depending on what exercises are used in the assessment

3    center and how well they are implemented.  But the -- in

4    general, the assessment centers have what's considered

5    respectable validity.

6    Q.    Okay.  Now, I also want to show you an affidavit that you

7    submitted in 1987.  So just to -- just so the Court can focus

8    on this, in 1987 the City of Boston was going to give an

9    assessment -- a multicomponent promotional examination; do you

10   recall that?

11   A.    Yes.

12   Q.    And do you recall that the -- a police union, which I did

13   not represent at the time, went into court trying to stop that,

14   just trying to get a written test?

15   A.    Yes.  Yes.

16   Q.    And you gave an affidavit in support of going forward with

17   the assessment center?

18   A.    Yes.

19   Q.    Okay.  And I want to ask you to turn to -- I want to ask

20   you to turn to page 5.  I want you to look at page 5.  And if

21   you could turn to the very bottom of that, can you read that

22   Paragraph E into the record, please?

23   A.    "I conducted a mini-survey of the practices in promotional

24   examinations for police lieutenant in a number of police

25   jurisdictions across the country.  This modest telephone survey

1    was undertaken last week in preparation for this affidavit.  It

2    indicates that heavily weighting the supervisory component

3    rather than the technical knowledge component is at least

4    frequent and may even be the prevalent practice.

5         "Five jurisdictions were contacted and described here.

6    (Another jurisdiction also fit this pattern, but since the

7    current consultants had also done the work there, it is not

8    reported here.)  The California Highway Patrol weights a

9    multiple-choice 50 percent and an interview by a panel of

10   examiners 50 percent.  The New York City Civil Service weights

11   a technical multiple-choice test 21 percent, a multiple-choice

12   in-basket 46 percent, and an oral, interactive test 33 percent.

13   Oakland, California, weights a multiple-choice technical

14   knowledge test 12.2 percent, and uses an assessment center to

15   measure decisiveness, interpersonal relations,

16   judgment/decision-making, leadership, oral communication,

17   planning and organizing, problem analysis and written

18   communication, which together received the remaining weight for

19   the examination.

20        "The Kansas City Police Department weights its technical

21   knowledge test 35 percent and an assessment center with several

22   exercises 65 percent, and also uses a review of past job

23   performance and recommendations on a pass/fail basis.  The

24   Connecticut Department of Administrative Services conducts

25   examinations for a number of municipal police departments in

1    Connecticut.  The most recent such examination weighted an oral

2    component measuring supervisory management and planning ability

3    50 percent and a structured in-basket with such items as a

4    letter from an irate citizen and a discipline problem at 50

5    percent.

6        "The apparent strong preference of some applicants for the

7    promotional examinations for the Boston Police Department that

8    the supervisory component be accorded relatively low weight

9    seems to be mostly based on their being accustomed to this type

10   of weighting and desirous of completely objective scoring of a

11   type which is only possible with the technical knowledge test.

12       "Tests have changed over the past 20 years largely in

13   response to the higher standards set by Title VII of the 1964

14   Civil Rights Act as amended.  These standards have led many

15   police departments appropriately to more accurately reflect the

16   supervisory nature of the job in their examinations.  In some

17   cases, this has resulted in reduced adverse impact in Civil

18   Service examinations.

19       "Overall, the practices across the country do not agree

20   with the desire on the part of some Boston police officers for

21   a test which is primarily a written, multiple-choice test of

22   technical knowledge."

23   Q.    Thank you.  And does that accurately reflect your opinion

24   at the time?

25   A.    Yes.

```
 1   Q.    Now, just to follow up, at some point in time there was
 2   some allegation of taint of the oral exercises in '87?
 3   A.    Taint of some of the non-written, yes.
 4   Q.    Okay.  And your boss, Mr. Haley, made a decision to only
 5   go with the written part of the examination?
 6   A.    Since the security of the test was compromised, that
 7   decision was reached, yes.
 8   Q.    Okay.  And just so we're clear, the case that you
 9   testified in before the Civil Service Commission, did that
10   involve the sergeant's exam or only the lieutenant's exam?
11   A.    I think that was a lieutenant's exam.
12   Q.    So you were never asked any questions specifically in that
13   Civil Service case about the sergeant's exam?
14   A.    Not that I recall.
15   Q.    Thank you.  Okay.  Moving on, you were also asked about a
16   deposition you gave in February of 2006; do you recall that?
17   A.    Yes.
18   Q.    And, again, you were shown some selected portions of your
19   testimony.  And I want to ask you about some of the other
20   portions of the testimony that you gave in 2006.  Now, again,
21   this had to do with the lieutenant's exam; is that correct?
22   A.    I believe so.
23   Q.    Okay.  And I'm going to show you -- and this is Ms. Harris
24   questioning you.  And I want to ask you to go to page 25.  And
25   if you could read that into the record, please?
```

A.   "Assessment centers have been subjected to research for
the last 50 years" --

Q.   I'm sorry.  Could you read the question first?

          MR. CARROLL:  Excuse me, your Honor.  I object to the
witness reading answers to a deposition from 2006 into the
record in this case.  I don't think that that has any relevancy
at all; and moreover, it's just -- doesn't accurately deal with
the issues confronting the Court now and is, I believe, to be
prejudicial.

          THE COURT:  What's the evidentiary purpose?

          MR. LICHTEN:  Sure, your Honor.  All I'm doing now,
which I understand is what one does on cross-examination, is
Ms. Harris had the witness read from certain parts of his
deposition trying to lay the suggestion, because of, in my
opinion, the selectivity, that he was against assessment
centers.  And I'm trying to show on redirect that when you read
other parts, it says just the opposite.

          THE COURT:  You may have it.

          MR. LICHTEN:  Okay.

BY MR. LICHTEN:

Q.   Can you read the question first, please?

A.   "Do you have an opinion overall, Dr. Wiesen, about whether
or not assessment centers should be used in promotional exams
in law enforcement?"

Q.   And your answer?

1    A.    "Assessment centers have been subjected to research for

2    the last 50 years or so, and they vary very widely.  Some

3    assessment centers are very thoughtfully and planfully put

4    together, and others are less well done.

5         "So there's a wide range of quality of assessment centers,

6    but I think that the assessment centers that have been studied

7    and reported on in the professional literature have added to

8    the validity of traditional job-knowledge multiple-choice tests

9    and appear to be fair to the candidates, and so they add to the

10   information that the appointing authority has to rely on in

11   making promotions."

12   Q.    And was that your opinion in 2006?

13   A.    Yes.

14   Q.    Okay.  And then I want you -- I want you to turn to page

15   29.  And if you could read the question starting on page 24 --

16   page 28.  Your answer is on page 29.

17   A.    I don't see 29 -- page 28.

18   Q.    It's just on top of page 29.

19   A.    Oh, I see.  "And is it possible to tell me, you know, if

20   you have a preference one way or the other yourself, as a

21   professional, between purely written exams and exams that use

22   assessment centers?"

23        And my answer was, "I think the multiple-choice exam

24   itself doesn't capture the whole job, and so some other

25   assessment process would round out the areas assessed and it

1    might be an assessment center, it might be an oral board,

2    structured oral interview.  Going beyond a multiple-choice

3    examination, in general, I think is a positive thing to

4    consider."

5    Q.   And was that your opinion in 2006?

6    A.   Yes.

7    Q.   Let me move on.  You were asked some questions about the

8    so-called T&E system used in this case; do you recall that?

9    A.   Yes.

10   Q.   And first of all, is there literature that establishes the

11   validity or lack of validity of the -- of a T&E system?

12        MR. LEAHEY:  Objection, your Honor.  I don't believe

13   any question was asked regarding validity of Dr. Wiesen on the

14   training and experience because it wasn't in any of his

15   reports.  I believe the questions regarding training and

16   experience had to do with scoring weighting, but there's no

17   evidence on either direct or cross regarding the validity of

18   the training and experience components from Dr. Wiesen.

19        MR. LICHTEN:  Your Honor, I specifically checked that

20   fact and I found four places where he was cross-examined about

21   the T&E.  And if you'd give me a minute, I can find that.  But

22   we specifically checked that.

23        THE COURT:  All right.  Go ahead.

24   BY MR. LICHTEN:

25   Q.   I'm going to show you a graph from the Schmidt and Hunter

1    article.  Are you familiar with that?

2    A.    At Table 1?

3    Q.    Yes.

4    A.    Yes.

5    Q.    And this is an article from Schmidt and Hunter in 1998.

6    Do you consider that an authoritative work?

7    A.    This is considered an authoritative work.

8    Q.    Okay.  And in that article -- in that graph does it have

9    the latest data on what the validity is, if any, for a T&E?

10   A.    Yes.

11   Q.    And what is that?

12   A.    Well, there are two general approaches that are reported

13   on there for implementing a T&E or an E&E component of an

14   examination, and the two approaches are called the "behavioral

15   consistency method" and the "point method."  The validity is

16   reported for both of those methods.  The validity for the

17   behavioral consistency method is .45, and for the T&E point

18   method it's .11.

19   Q.    And what is the method used here?  Is it a point method or

20   some other method?

21   A.    A point method.  By "here," you mean by HRD and the

22   examinations that are being challenged.

23   Q.    And just remind us again what a .11 validity means?  Is

24   that low or high or what does it mean?

25   A.    .11 is low.  To interpret the usefulness, called the

1    utility of a correlation of an examination with a given

2    correlation coefficient in this case of .11, you square the

3    correlation coefficient.  And when you square .11, you get .01.

4    So about 1 percent of the variability in job performance is

5    explained by the typical point method T&E.

6              MS. HARRIS:  Can I ask that that chart be entered in

7    as an exhibit, your Honor?

8              MR. LICHTEN:  I'm sorry.  I didn't hear it.

9              MS. HARRIS:  I said could I have that chart that he's

10   just testified to entered as an exhibit, please?

11             MR. LICHTEN:  Yes, of course.  We'll make a -- we'll

12   get it copied and put it in.

13             THE COURT:  Can we have a number for it now?

14             MR. LICHTEN:  Sure.

15             THE CLERK:  It will be 150.

16             (Exhibit No. 150 received into evidence.)

17   BY MR. LICHTEN:

18   Q.   And your opinion of a -- the validity of a T&E system,

19   does that comport with what Schmidt and Hunter found?

20   A.   I don't have an independent reason to evaluate the

21   validity of T&E separately from the studies that Schmidt and

22   Hunter relied on.  That was a study done by Schmidt, Hunter and

23   McDaniel.

24   Q.   I'm also going to show you part of your testimony from

25   July 6, 1988, when you were testifying before the Civil Service

1    Commission.  And this is page 122 of your testimony.

2        And do you see where you commented on T&E, the validity of

3    T&E, back then in 1988?

4    A.    Yes.

5    Q.    And what did you say?

6    A.    "The research is not favorable to training experience

7    evaluations.  It has quite low criterion-related validity."

8    Q.    So you held that view for a long time?

9    A.    The view of the point method?  Yes.

10   Q.    One or two last questions --

11            THE COURT:  Dr. Wiesen, the table that was just

12   entered that you referred to from the article earlier, was that

13   assessing validity as criterion validity as opposed to content

14   validity?

15            THE WITNESS:  Yes.  All of the entries there were

16   criterion-related validity studies.

17   BY MR. LICHTEN:

18   Q.    And just remind us, criterion are considered better than

19   content-validity studies?

20            MS. HARRIS:  Objection.

21            THE COURT:  Sustained.

22            MR. LICHTEN:  I'll move on.  Okay.

23   BY MR. LICHTEN:

24   Q.    My last question on the E&E, you remember the famous

25   Appendix EE that you testified about, you were asked questions

1  about?

2  A.   Attachment EE, yes.

3  Q.   Yes.  And have you -- did you attempt to calculate how

4  many knowledge, skills and abilities this Appendix EE found

5  could be tested by education and experience?

6  A.   I counted up the number of Xs in that middle column under

7  E&E.  An X indicated that HRD thought that they would measure

8  that particular knowledge, skill, ability or personal

9  characteristic with the E&E, yes.

10  Q.   And how many were there?

11  A.   Twenty-four.

12  Q.   And what's the significance of that?

13  A.   Well, there were 60 of the knowledges, skills and

14  abilities that they said they would measure with the

15  multiple-choice test.  So in total, the 60 and 24 is 84, and 24

16  over 84 is about 29 percent.  So if you were to try to estimate

17  the importance of the E&E by just that percentage, the E&E

18  should have a 29 percent weight in the composite score as

19  opposed to the 7 percent which it has now.

20  Q.   And what's the significance of that?

21  A.   Well, the --

22          MR. CARROLL:  I object, your Honor.  I think at this

23  point we're well beyond not only the scope of

24  cross-examination --

25          MR. LICHTEN:  I'll move on.

```
 1              MR. CARROLL:  -- but the reports as well.
 2              THE COURT:  All right.
 3  BY MR. LICHTEN:
 4  Q.   And my last question:  Did the Uniform Guidelines permit
 5  the assumption that training and experience, a point system,
 6  have validity?
 7  A.   The Uniform Guidelines do not allow any assumptions that a
 8  selection process has validity; they require a demonstration of
 9  validity whenever it's in question.
10  Q.   Okay.
11  A.   And I talk about training and experience --
12              MS. HARRIS:  Objection.  There's no question before
13  him.
14              THE COURT:  Well, he may complete the answer if he
15  hadn't completed it.
16              THE WITNESS:  In Section 14(C)(6).
17  BY MR. LICHTEN:
18  Q.   Okay.  Let me move on, Doctor.  You testified extensively
19  both on direct and cross-examination about the so-called
20  validity report that the Commonwealth did in 1991; is that
21  correct?
22  A.   Yes.
23  Q.   Okay.  And you were asked a number of questions about it.
24  And I want to show you page 330 of that validity report.  Do
25  you see that?
```

```
 1    A.    Yes.

 2    Q.    Okay.  And you were at HRD in 1985; is that correct?

 3    A.    Yes.

 4    Q.    Okay.  Do you recall that Boston gave an examination in

 5    1985 that had multiple components?

 6    A.    I believe in 1985 Boston contracted with a firm in Florida

 7    to develop a promotional examination.

 8    Q.    Okay.  And do you see what the adverse impact ratio was at

 9    the passing point for that year?

10    A.    Yes.

11    Q.    And what was it?

12    A.    .85.

13    Q.    And what, if anything, does that tell you?

14    A.    Well, that's above the .8 rule of thumb from the Uniform

15    Guidelines.  That's much less adverse impact than many other

16    examinations, including some we're considering here.

17    Q.    Okay.  And then in 1987, and we've talked about that, they

18    tried to give a multicomponent examination but went with the

19    written.  And what was the adverse impact of the passing score?

20    A.    .5.

21    Q.    And then in 1991, when they did the validity report on the

22    exam that they gave in 1991, what did they find?

23    A.    Well, it seems like they report here the adverse impact

24    ratio for sergeant at two possible passing points.  At 70 the

25    adverse impact was .16; at 60 the adverse impact ratio was
```

```
 1   .3 -- I think that's .34.
 2   Q.   Now, remind us again when you do -- when one does a
 3   validity report for an examination, do the Uniform Guidelines
 4   on employee selection have provisions for addressing the
 5   question of looking at the question of adverse impact and
 6   attempting to deal with it, if possible?
 7   A.   The Uniform Guidelines do ask that you look at the adverse
 8   impact of the examination and talks about possible ways of
 9   dealing with adverse impact.
10   Q.   Okay.  And did you see anything in the validity report
11   that you reviewed from 1991 that's been admitted in this case
12   suggesting that the Commonwealth of Massachusetts did anything
13   to reduce these levels of adverse impact from this 1991
14   examination based upon their job analysis, the design of the
15   exam and their validity report?
16   A.   No.  Well, I take that back.  They had a cultural review
17   panel review the multiple-choice questions.  I think the goal
18   there was to try to make sure that none of the questions had
19   any content that was culturally biased.  Other than that, I
20   don't think they did anything.
21   Q.   And how significant is the adverse impact which they found
22   in 1991?
23   A.   Well, I think if they used that 60 as the passing point,
24   the adverse impact ratio would be .34.  .34 is better than
25   zero, but it's still severe adverse impact.
```

```
 1    Q.    And if the adverse impact is .34 at the passing rate of

 2    60, would that increase or decrease at the selection ratio?

 3    A.    At the effective passing point, which is going to be a

 4    higher score than the minimal passing point, the adverse impact

 5    would be worse.

 6    Q.    Thank you.  Okay.  Now, way back last week Mr. Carroll

 7    asked you some questions about the 2007; do you recall that?

 8    A.    No, not specifically.

 9    Q.    Okay.  Let me see if I can refresh your memory.  Do you

10    remember being asked some questions regarding this 2007

11    examination and whether there were any questions you thought

12    were inappropriate or not valid?

13    A.    Yes.

14    Q.    Okay.  And as far as I can tell from the transcript, I

15    think you got up to Number 40; do you recall that?

16    A.    Yes.

17    Q.    And then after that I believe there was no further

18    question that permitted you to go beyond 40; do you recall

19    that?

20    A.    I think it was we ran out of time.

21    Q.    Whatever.  If you had been permitted to finish your

22    answer, did you find any other questions after Number 40 that

23    you believed on the October 2007 statewide exam were

24    inappropriate?

25    A.    Yes.
```

```
 1          MR. CARROLL:  Objection, your Honor, to the form of

 2    the question.  There's no indication he wasn't permitted to

 3    finish his answer.  And, indeed, I believe he was permitted to

 4    finish his answer.

 5          THE COURT:  All right.

 6          MR. LICHTEN:  Your Honor.

 7          THE COURT:  You can have the question without the

 8    preamble.

 9          MR. LICHTEN:  All right.  Thank you.

10    BY MR. LICHTEN:

11    Q.   And how many -- I'm going to make this very brief.  How

12    many other questions after 40, assuming the ones you've already

13    testified to, you've already testified to -- but how many after

14    that did you find that you believe were inappropriate?

15    A.   At least ten.

16    Q.   Okay.  Now, I want to ask you about Boston for a second.

17    You were asked some questions about the 2002 Boston exam; do

18    you recall that?

19    A.   I don't remember any of the specific questions.

20    Q.   Okay.  Well, let me just ask you this:  With respect to

21    the 2002 examination, do you recall how many people -- how many

22    minorities got promoted off of that 2002 examination?

23    A.   I believe it was 11.

24    Q.   Okay.  Eleven minorities.  And do you recall where the

25    last place was that a minority got promoted from?
```

1    A.    Sixty-seventh.

2    Q.    So in 2002 Boston promoted 11 minorities, and the last

3    minority promoted was in the 67th place?

4    A.    Correct.

5    Q.    Okay.  Have you looked at the 2008 examination results,

6    the selection results?

7    A.    Yes.

8    Q.    And at the -- are you aware that so far there have been 37

9    promoted?

10    A.    Yes.

11    Q.    And two of those are minorities?

12    A.    Yes.

13    Q.    Have you looked at how many minorities would be promoted

14    from 2008 if the City of Boston gets to that 67th person?

15    A.    Yes.

16          MS. HARRIS:  Objection.

17          THE COURT:  Overruled.

18    BY MR. LICHTEN:

19    Q.    And how many would be promoted?

20    A.    Five.

21    Q.    So 11 were promoted in 2002, and if they get to the same

22    67th person, five minorities would be promoted on the 2008

23    exam?

24    A.    Correct.

25    Q.    I want to show you your Table 2A that you corrected.  Do

1    you recall this?

2    A.    I do.

3    Q.    Okay.  And you were asked a bunch of questions from

4    Lowell -- from the attorney for Lowell -- about the numbers

5    that you found; do you recall that?

6    A.    Yes.

7         MR. LEAHEY:  I would object.  I didn't ask a single

8    question regarding Table 2A.  It was regarding his charts.

9         MR. LICHTEN:  Your Honor, Lowell asked --

10        THE COURT:  Overruled.

11        You may have it.

12        MR. LICHTEN:  Thank you.

13   BY MR. LICHTEN:

14   Q.    Let me go first:  What was the adverse impact in average

15   test scores that you found for Lowell?

16   A.    So the adverse impact for Lowell was zero; the adverse

17   impact in terms of test score, there was a difference of 9.1

18   points between the average, or mean, for the minorities, and

19   the average or mean for the non-minorities.

20   Q.    And is that statistically significant?

21   A.    And that is statistically significant.

22   Q.    And what, if anything, does it tell you or lead you to

23   believe as an industrial psychologist?

24   A.    That -- it tells us that minorities on average scored

25   lower on the written test in 2006.  And I think that that's the

1    reason that there was adverse impact in the promotion rates.

2            MR. LEAHEY:  Objection, your Honor.

3            THE COURT:  Overruled.

4    BY MR. LICHTEN:

5    Q.    So Lowell -- as I understand it, Lowell promoted seven

6    people off the 2006 exam and none of those were minorities?

7    A.    I thought it was six, but none of them were minorities.

8    Q.    Okay.  And there was adverse impact at the passing rate?

9    A.    And there was adverse impact of .78, which is just a tad

10   below the .8 rule of thumb.

11   Q.    Okay.  Now, do you recall how other attorneys yesterday

12   suggested that you should go back in time to look at the true

13   picture?

14   A.    Yes.

15   Q.    Okay.  And I'm going to show you 2003 for Lowell.  This is

16   the results of the 2003 test.  And did Lowell make any minority

17   promotions in 2003?

18   A.    Can you move that over just a little bit to the -- okay.

19   It doesn't seem like it's indicated on this page, but I think

20   that Lowell made six promotions in 2003.

21   Q.    And none of those were minorities?

22   A.    And they were all white.

23   Q.    Okay.  And if you look at this list, and assuming this

24   list is accurate, how far would Lowell have to have gone down

25   to even reach a minority for promotion?

1    A.    I think the first minority is in position 15.

2    Q.    Okay.  So they would have had to make 15 promotions to

3    even reach their first minority?

4    A.    If they were in appointing order, they would have to make

5    15 promotions, yes.

6    Q.    What, if anything, does this suggest to you, the 2003

7    information?

8              MR. LEAHEY:  Objection, your Honor.

9              THE COURT:  It's a little open-ended.

10             MR. LICHTEN:  All right.  I'll try not to lead.

11             THE COURT:  Fair enough.  Could you put a topic in

12   there?

13   BY MR. LICHTEN:

14   Q.    With respect to the issue of adverse impact and your

15   conclusions regarding Lowell, what, if anything, does this

16   suggest to you?

17   A.    Well, I think that this is part of the pattern of adverse

18   impact that we are seeing in the use of the HRD multiple-choice

19   examinations.  So it fits that pattern.

20   Q.    Okay.  And let me show you Lawrence for a second.  I want

21   to go back to '03.  Do you know if Lawrence made any promotions

22   in 2003 for minorities, any minority promotions in 2003?

23   A.    Yes.

24   Q.    And what is the answer?

25   A.    I believe they made no promotions; all the promotions were

1  non-minorities.

2  Q.   And going to your chart in Lawrence in 2006 and 2008, did

3  Lawrence make any minority promotions?

4  A.   No.

5  Q.   And assume for a moment that there's been testimony in

6  this case that Lawrence has made no minority promotions from

7  2000 to the present, what, if anything, does that do with

8  respect to your views of whether or not the data for Lawrence

9  shows adverse impact?

10  A.   Again, it fits the pattern of adverse impact, and it would

11  make me think that those zeros that are not statistically

12  significant did not occur just due to chance.

13  Q.   And then I want to ask you for a moment about Springfield.

14  At some point in time you revised your data with respect to

15  Springfield?

16  A.   Yes.

17  Q.   And does this chart show the right data?

18  A.   Yes.  Could you move it over just a bit?

19  Q.   Sure.  And with respect to Springfield, what did you find

20  for the 2005 examination?

21  A.   Well, there was an adverse impact ratio of zero, and there

22  was a difference in the mean test score for minorities and

23  non-minorities of 6.9 points, and that difference was

24  statistically significant.

25  Q.   And what about for the selection rate, was that

1    statistically significant?

2    A.    Could you move that up just a tad?  Okay.  That zero

3    adverse impact ratio had a P value, a probability value, that

4    is statistically significant if you consider a one-tailed

5    approach, a one-tailed test.

6    Q.    And what about the passing rate data?  Was that

7    statistically significant?

8    A.    For 2007 the adverse impact of the passing rate was

9    statistically significant, and that was .54, and for '05, it

10   was not statistically significant.

11   Q.    Okay.  I also want to ask you about the MBTA for a minute.

12   And you were asked a lot of questions yesterday about the MBTA.

13   First of all, do you know anything about the history of the

14   MBTA and their use of PAR.10 lists or special lists to promote

15   minorities?

16          MR. McDERMOTT:  Objection, your Honor.  It was never

17   raised.

18          THE COURT:  Sustained.

19   BY MR. LICHTEN:

20   Q.    Well, let me -- you were asked about -- do you remember

21   being asked about the total numbers of minority police

22   sergeants in -- on the MBTA?  And Mr. McDermott asked you

23   doesn't this seem like a reasonable amount, or a good number or

24   something like that?

25   A.    Yes.

1    Q.    Okay.  Were you aware that a number of those minorities

2    were only appointed because of the MBTA in the '90s requesting

3    and getting a so-called PAR.10 list that allowed them to make

4    minority-only promotions?

5              MR. McDERMOTT:  Objection, your Honor.  We --

6              THE COURT:  No, overruled.

7              You may have it.

8              THE WITNESS:  I've no personal knowledge of any PAR.10

9    use by the MBTA.

10   BY MR. LICHTEN:

11   Q.    Okay.  But if that was done -- I realize you don't know

12   that, but if that was done, would that affect your judgment as

13   to whether the number of minorities was a reasonable amount

14   based upon their being selected from the exam?

15             MR. McDERMOTT:  Objection, your Honor.

16             THE COURT:  Overruled.

17             You may answer it.

18             THE WITNESS:  Yes.

19   BY MR. LICHTEN:

20   Q.    Okay.  Now, according to some of the documents that

21   Mr. McDermott showed you yesterday, it looked like there were,

22   since '03 or '04, about 32 MBTA sergeants; is that correct?

23   A.    Thirty-two incumbents or 32 appointments?

24   Q.    No, 32 incumbents.  Sorry.

25   A.    Yes.

1          MR. McDERMOTT:  I'm sorry.  It's not clear to me when

2    he says "incumbents," does that mean present incumbents?  I

3    just object to the question.

4          THE COURT:  Yeah, it's not a clear question.  Re- --

5          MR. LICHTEN:  Okay.  I can make it clearer.

6    BY MR. LICHTEN:

7    Q.   Mr. McDermott showed you this document.  Do you recall it?

8    A.   Yes.

9    Q.   And do you see where it has the number of police sergeants

10   at the bottom, the total numbers?

11   A.   If you move the table over a little bit to the left.

12   Okay.  So, yes, the last line is the sum of the breakdown of

13   sergeants.

14   Q.   Okay.  So it looks like since 2004 it's averaged about 32;

15   is that right?

16   A.   It's in the 30s, yes.

17   Q.   In the low 30s; is that correct?

18   A.   In the low 30s.

19   Q.   All right.  And he then asked you about what happened in

20   2003, and I think you gave an answer, something like all things

21   being equal or all things being considered, that was -- you

22   know, they had a good number of minority promotions.  Do you

23   recall that?

24   A.   I think I used the phrase "all things being equal" when he

25   asked me about combining the results of three exams.

1    Q.    I'm sorry.  I misstated the question.  He asked you about

2    the appropriateness of combining the 2003 data, is that

3    correct, to the 2005 and 2007?

4    A.    Correct.

5    Q.    And you said something like "all things being equal"?

6    A.    Right.

7    Q.    How many promotions were made off that 2003 list?

8    A.    I think there were 18.

9    Q.    And is that -- would that be normal for a department of 32

10   or 33 sergeants, to have 18 promotions off of one list?

11          MR. McDERMOTT:  Objection, your Honor.

12          THE COURT:  Sustained.

13   BY MR. LICHTEN:

14   Q.    Let me ask you to assume that that's an extremely abnormal

15   number of promotions that would be made in a department of 32

16   sergeants from one list, 18 sergeants.  What effect, if any,

17   did that have on the answer that you gave Mr. McDermott?

18          MR. McDERMOTT:  Objection, your Honor.  I'm not sure

19   what he's talking about with regard to the answer.

20          THE COURT:  Overruled.

21          THE WITNESS:  So he asked if it made sense to -- I

22   guess the question is does it make sense to combine the results

23   of the three exams.  And if one of the exams is being used in a

24   very different way than the other, that would affect the

25   adverse impact ratio.  The adverse impact ratio is sensitive to

1    the number of people who are appointed.  So in the extreme, if

2    you appointed all the people, the adverse impact ratio would be

3    1.  With more appointments you are -- the appointing authority

4    is able to -- or has to go further down on the rank order list

5    to the lower-scoring people.  And when you have adverse impact

6    in the test score, as we've seen with the test means in a

7    number of cases, minorities are lower down on the list.

8          So if you have a larger number of appointments, you go

9    down lower on the list, you'll reach more minorities and the

10   adverse impact ratio would be less severe.  So in that respect,

11   combining the results of the three tests to get an overall

12   adverse impact is somewhat misleading.

13   BY MR. LICHTEN:

14   Q.   Let me add to that a moment.  Did you actually look at the

15   list showing where the promotions were made from '03?

16   A.   Yes.

17   Q.   And did you see numbers of white people who were bypassed

18   or skipped over that year for promotion?

19   A.   There were ten that were not promoted --

20   Q.   Okay.  And --

21   A.   -- but who scored high enough to be promoted.

22   Q.   Okay.  And I'd like to ask you to assume for a moment that

23   in a case called Maynard versus the MBTA the Civil Service

24   Commission specifically ruled that the MBTA skipped over a

25   number of non-minority candidates solely to get to minority

1    candidates.  Would that also -- assuming that were true, would

2    that affect your opinion as to the appropriateness of using

3    that data?

4            MR. McDERMOTT:  Objection, your Honor.

5            THE COURT:  Overruled.

6            THE WITNESS:  Yes.

7    BY MR. LICHTEN:

8    Q.   And how would it affect your opinion?

9    A.   Well, doing that would make the adverse impact ratio less

10   severe, and so combining a less severe adverse impact ratio

11   that was accomplished by illegal methods with the adverse

12   impact of other exams would not be appropriate.

13   Q.   And with respect to 2005 and 2007, the exams that are at

14   issue in this case, did the MBTA promote any minority

15   candidates?

16   A.   No.

17   Q.   And with respect to the MBTA, did you find adverse impact

18   in the passing rates?

19   A.   For the 2005 exam the adverse impact of the passing rate

20   was .32.

21   Q.   Okay.  And with respect to the adverse impact, if any, in

22   test scores, did you find adverse impact in test scores?

23   A.   There was a 3.3-point difference on the 2005 exam, a

24   difference between the means for minorities and non-minorities,

25   and there was a 1.8-point difference between the means for

1    minorities and non-minorities on the 2007 exam.

2    Q.    Therefore, based upon all of that evidence, what

3    conclusions, if any, have you drawn with respect to the

4    city -- I'm sorry -- with respect to the MBTA Police

5    Department?

6            MR. McDERMOTT:  Objection, your Honor, to the form of

7    the question.

8            THE COURT:  Overruled.

9            THE WITNESS:  With respect to the adverse impact for

10   the '05 and '07 exams at the MBTA, it appears to me that there

11   is adverse impact in the exams in that agency.

12   BY MR. LICHTEN:

13   Q.    Okay.  Also, I also want to ask you about the City of

14   Worcester.  I want you to assume for a minute that there's

15   evidence in this case in an MCAD decision entered in this case

16   that shows for the years 1992, 1994 and the exams leading up to

17   2001, each of those exams there were a number of promotions

18   made off the list, from 10 to 14, and no minorities promoted

19   off that list, and the first minority sergeant in Worcester did

20   not occur until 2001.

21        What, if anything, would that evidence add or subtract

22   with respect to your opinions regarding Worcester?

23            MS. ENGDAHL:  Objection, your Honor.  There is

24   no -- this calls for complete speculation.  There's no evidence

25   as to who were the test-takers on those -- during those exams,

1  whether there were any minorities or how many minorities took

2  those exams.  We just don't know what happened during those

3  years and there's no evidence on the record regarding those

4  tests.

5          MR. LICHTEN:  Well, your Honor, that's not true.

6  You --

7          THE COURT:  Never mind.  I don't think it has to be in

8  the record for the witness to give a Rule 702 opinion.

9          So the objection's overruled.

10 BY MR. LICHTEN:

11 Q.   You may answer the question.

12 A.   So the -- a precise evaluation of the adverse impact for

13 those years is not possible because we don't know the number of

14 minority candidates or the number of non-minority candidates.

15 And I don't have the details of exactly how many non-minority

16 candidates were promoted, but that there were no minorities

17 promoted for that time period is consistent with a pattern of

18 adverse impact in the City of Worcester.

19 Q.   Okay.  And have you compared -- there's been testimony in

20 this case that there are currently approximately 75 minority

21 police officers and four minority sergeants and approximately

22 350 to 400 police sergeants who are non- -- I'm sorry -- police

23 officers who are non-minority, and approximately 54 or 55

24 police sergeants.

25          Do you recall making a tally of the ratios of minorities

1    to minority police sergeants and non-minority police officers

2    to non-minority police sergeants?

3    A.    Yes.

4    Q.    And what did you find?

5            MS. ENGDAHL:  Objection, your Honor.  The basis for

6    the objection is this is a disparate impact case, and it's:

7    Has the use of the exam disparately impacted those who have

8    applied for the job?  How many we had who didn't apply for the

9    job is irrelevant.

10           THE COURT:  Okay.  It sounds to me the question asks

11   simply for a mathematical --

12           MR. LICHTEN:  That's all it is, your Honor.

13           THE COURT:  -- calculation, so I'll allow it.

14           THE WITNESS:  So when you compare the ethnic makeup of

15   the police officer to sergeant, you have a ratio of minority

16   sergeants to minority officers of .41.

17   BY MR. LICHTEN:

18   Q.    Okay.  And can you just tell us how you derived at .41?

19   A.    Yes.  So the proportion of police officers in Worcester is

20   17 percent, 17.2, so that's 65 out of 378 police officers in

21   Worcester are minority, and at the sergeant level four out of

22   57 sergeants are minority; that's 7 percent.  And so just as

23   informing the adverse impact ratio, the 7 percent over the 17.2

24   percent is .41.

25   Q.    Okay.  And finally, you were asked questions by

```
 1   Ms. Engdahl about two minority hires in 2004.  Do you recall
 2   that?
 3   A.   Not specifically.
 4   Q.   It was a while ago.  But you were asked some questions
 5   about two minority hires that occurred in Worcester.  Off the
 6   2004 exam I believe the testimony was that they were promoted
 7   in 2006.  Have you, yourself, looked at when the
 8   minorities -- two minority promotions were made in Worcester
 9   off the 2004 exam?
10   A.   No.
11   Q.   Okay.  I'm going to ask you to look at this, which is the
12   2004 list from Worcester.  And do you see where the minorities
13   are listed on this --
14   A.   Yes.
15   Q.   -- Dr. Wiesen?
16        And where are they listed?
17   A.   Well, if you would move that over a little bit so I can --
18   there we go.  So those scores are listed in order of the
19   overall grade.  The top grade is 93 and then it goes down from
20   there.  So the two minority officers appear at the lowest level
21   there.
22   Q.   And would that delay their promotion?
23        MS. ENGDAHL:  Objection.
24        THE COURT:  You may answer.
25        THE WITNESS:  So if all the promotions were made on
```

1    one day, then they would have been part of the promotions on

2    that day, and I do not know how seniority in that case would be

3    calculated.  But if the promotions were made on more than one

4    day, then those two minority officers would have lower

5    seniority than some or all of the other promotions.

6    BY MR. LICHTEN:

7    Q.    Thank you.  Just a few more questions and I'll be done.

8    You were asked a number of questions by Mr. Carroll about a

9    week ago about the fact that in the validity report for 1991

10   there were all these documents relating to critical incidents.

11   Do you recall those questions?

12   A.    Not specifically.

13   Q.    Well, let me ask it this way:  Do you recall looking at

14   the voluminous, thousands of pages of documents that you

15   reviewed relating to the 1991 so-called validity report and

16   seeing documents relating to so-called critical incidents?

17   A.    Yes.

18   Q.    Okay.  And can you just refresh us what those documents

19   were?

20   A.    Yes.  The job analysis included collection of critical

21   incidents and the forms used in collecting the critical

22   incidents were presented.  The method that was used was

23   described and the actual critical incidents that were collected

24   were presented, or at least some of them were presented.

25   Q.    Okay.  Now, putting aside what actually happened, would it

1   be, in your opinion, a good idea to try to test for judgment

2   and critical incidents on a written multiple-choice test, if

3   possible?

4   A.   Yes.

5   Q.   Okay.  And was it -- from the documents that you reviewed,

6   was it done on any of these exams that we're talking about?

7          MR. CARROLL:  Objection.

8          THE COURT:  Well, if you can tell from the documents,

9   you may answer.

10          THE WITNESS:  It did not appear to me that that was

11   done.

12   BY MR. LICHTEN:

13   Q.   Why do you say that?

14   A.   Well, the critical incidents are usually somewhat rich and

15   have a less academic flavor than the questions that I saw on

16   the HRD examinations.

17   Q.   Okay.  I just have one last question, Doctor:  You

18   understand that a number of towns and -- I'm sorry -- a number

19   of cities in this case are claiming that, "Well, you know,

20   maybe we don't have any minority promotions in the years in

21   question, but the numbers are just too small to be

22   statistically significant."

23          You're aware of that argument; is that correct?

24   A.   Yes.

25   Q.   Okay.  Doctor, assume we have a city and every year they

```
 1    make -- you know, they have a sizable minority population -- a
 2    sizable number of minority police officers, but every year they
 3    make five or -- only five or six promotions, and year after
 4    year after year no minorities get promoted to sergeant but
 5    every year you don't have statistical significance.
 6        What do you -- what is your opinion regarding such a
 7    situation?  Do we have no adverse impact or can we show adverse
 8    impact?  What is your opinion?
 9            MR. CARROLL:  Objection.
10            MR. McDERMOTT:  Objection, your Honor, as it applies
11    to the MBTA.
12            MR. McQUILLAN:  Objection.
13            MR. D'AGOSTINO:  Objection.
14            THE COURT:  Sustained.  Sustained.
15    BY MR. LICHTEN:
16    Q.    Let me rephrase the question.  Assuming you have that
17    situation, where you have, exam after exam, no minority
18    promotions but you don't have statistical significance.  Do you
19    have an opinion as to whether or not it is still possible to
20    show adverse impact under the Uniform Guidelines?
21            MR. CARROLL:  Objection.
22            THE COURT:  No, you may answer that question.
23            THE WITNESS:  Yes.
24    BY MR. LICHTEN:
25    Q.    And can you explain that to us, please?
```

1    A.    Yes.  I think the way the Uniform Guidelines define

2    adverse impact, there are two ways you can show adverse impact:

3    You can show adverse impact with a finding of statistical

4    significance no matter what the adverse impact ratio itself is

5    or you can show adverse impact by violating the 80 percent rule

6    of thumb for adverse impact.

7    Q.    And do you have an opinion in this case as to whether

8    in -- strike that -- for example, in Lowell where we just

9    discussed, do you have an opinion as to whether or not there is

10   disparate impact?

11              MR. LEAHEY:  Objection, your Honor.

12              THE WITNESS:  Yes.

13   BY MR. LICHTEN:

14   Q.    And what is that opinion?

15   A.    There seems to be disparate impact that was not due to

16   chance.

17   Q.    What about Lawrence?

18   A.    Also.

19   Q.    Thank you very much, Dr. Wiesen.  That's all I have.

20              THE COURT:  Before you get up, would you, Mr. Lichten,

21   put Table 2A back on the screen?

22              MR. LICHTEN:  Yes.

23              THE COURT:  I have a few questions about it.  I hope

24   this is not going to open up a detour.

25              (Pause.)

```
 1            MR. LICHTEN:  Sorry, your Honor.  We're looking for
 2    it.
 3            THE COURT:  The revision may not matter for purposes
 4    of my questions.  My questions have to do with the right-most
 5    column.
 6            MR. LICHTEN:  Sorry, your Honor.
 7            THE COURT:  Can you zoom out so we see the whole
 8    thing?
 9            The questions relate to the average -- the difference
10    in average test scores that are reported in the right-most
11    column.  And I obviously haven't had an opportunity to study
12    this in any detail, nor am I necessarily equipped to conduct
13    any sophisticated analysis of it, but I couldn't help noticing
14    there seems to be, at least for the '06 -- and this is from
15    kind of a superficial assessment of the chart -- for the '06
16    exam and the '08 exams, a range of the differences in average
17    test scores or the average -- for example, from the high in the
18    '06 exam of a 9.1-point difference for Lowell and a 0.2-point
19    difference for Methuen, and on the '08 exam it looks like from
20    a high of 6.6 points for Boston and a low of -4.3 points for
21    Worcester.  So that for both years there is a difference in the
22    extremes of about nine or ten points.
23            And my question is:  Are you able to tell whether
24    that -- those differences are statistically significant in that
25    they are not likely the product of chance or, conversely,
```

1    whether they're not statistically significant because they are

2    the product of chance?

3           THE WITNESS:  That is something that could be looked

4    at in terms of a statistical test.  I did not look at it.

5           THE COURT:  And, again, you're the expert, not me, but

6    from the data in the chart, it's not apparent, you would have

7    to do some other operations to do that or...

8           THE WITNESS:  So the question that you could ask is:

9    Is the difference that you see of, for example, 6.4

10   points -- well, let's not use Boston.  Let's use Lawrence.  Is

11   the difference of 6 points for Lawrence an unusual size

12   difference given the difference for the whole state taken

13   together?  That's one question.

14          THE COURT:  Well, it is --

15          THE WITNESS:  Another question you could ask is:  Is

16   the difference between the 6 points for Lawrence and the 9.1

17   point for Lowell and the .2 for Methuen and the 1 for Worcester

18   for the '06 exam -- are those large enough differences to be

19   statistically significant or is that the size difference that

20   you're likely to get by chance?  And I didn't do that analysis.

21          THE COURT:  Okay.  Well, I don't necessarily want you

22   to do it on the fly.

23          THE WITNESS:  I have no way of doing that on the fly.

24          THE COURT:  You mentioned the statewide, which might

25   be interesting although this chart has a statewide figure only

1    for the five- or six-year spread, '03 to '08, rather than

2    isolated for '06, and the '06 might be interesting, but what

3    was interesting to me -- and, again, I'm an amateur at this --

4    if you look at the difference between Methuen at .2 and Lowell

5    at 9.1 for the same test, that is, the performance, it would

6    suggest two possible hypotheses, that the cohort of

7    non-minorities did appreciably worse in Methuen or, conversely,

8    the cohort of minorities did appreciably better in Methuen than

9    compared to Lowell.

10        And I guess, are there differences that need to be

11   accounted for in -- among the cohorts of both minority and

12   non-minorities when they're broken out by municipality to

13   determine whether the differences are chance differences or

14   something having to do with the composition, for example, of

15   the cohort?

16        THE WITNESS:  Well, I think it's an interesting

17   question.  I think it's a relevant question.  With the small

18   numbers that you have, say, in Methuen, it could be that one or

19   two people throw off the averages.  I think whenever you take a

20   fairly small sample from a large group of numbers, you're going

21   to get, you know, some variability.  So I'm not surprised by

22   that amount of variability, but I did not do a test to see if

23   it's reliable.

24        So maybe we could take a look at -- Methuen in '06 was

25   .2, but Methuen in '08 was 5.9.  Well, if it had been .2 in one

1  year and -.2 in another year, that would have been more

2  consistent than .2 and 5.9.  So that, perhaps, is an indication

3  that what we're seeing is just due to chance.

4          THE COURT:  Okay.  Thank you.

5          MR. LICHTEN:  May I follow up on that?

6          THE COURT:  Yes, you may.

7  BY MR. LICHTEN:

8  Q.   Did you do statewide analyses for these tests --

9  A.   Yes.

10 Q.   -- to test that proposition to determine whether the

11 results in these towns are random or not random?

12 A.   I didn't compare the results for these municipalities to

13 the statewide results.

14 Q.   Did you look at the statewide results?

15 A.   I did.

16 Q.   Okay.  And did you look at the Boston results where there

17 are larger numbers?

18 A.   Yes.

19 Q.   And can you just explain to us again what you found when

20 you looked at the statewide results for these tests?

21 A.   The average for non-minorities was always lower than the

22 average -- the average for non-minorities was always higher

23 than the average for minorities.  The minorities did worse on

24 these tests on average each year.

25 Q.   Okay.  And is that in a chart somewhere?

1    A.    Yes.

2    Q.    And can you show us where that is, please?  I'm going to

3    put something up.  Is that it?

4    A.    Oh, you found it.  Yes.

5    Q.    Good.  It's Exhibit 52.  Is that what you were looking

6    for, Doctor?

7    A.    Yes.

8    Q.    Okay.  And what does this show us?

9    A.    So I did a comparison of the means for minority and

10   non-minority test-takers.  And I report here the probability of

11   finding the differences in means as large as we observed, and

12   the probabilities were extremely small.  The computer program

13   that I was using only reported them to three decimal places, so

14   for several of them -- for most of them it was reported as

15   .000, which would mean that it was less than .0005.  And the T

16   values there give you an indication of how many standard

17   deviation units that corresponds to.  It's not precisely

18   standard deviation units -- that would be a Z value and this is

19   a T value -- but they're close.  So there are many standard

20   deviation units between the mean for minorities and

21   non-minorities.

22   Q.    Okay.  So trying to, then, sum this up and trying to

23   answer the Court's question, by looking at the statewide data

24   on the results of minorities and non-minorities taking these

25   various tests, and then looking at the results in various

```
 1   cities, does that assist you in drawing conclusions as to

 2   whether or not the results in these cities are chance or

 3   reflect something more?

 4   A.   The size of the difference in the various cities is

 5   similar to what we see statewide, but for at least some of the

 6   years for some of the defendants, the difference is different

 7   enough from the statewide that a statistical comparison might

 8   be made to see if those are statistically significant or not.

 9   But I did not do that analysis.

10   Q.   Thank you.  But with respect to the statewide data, you

11   did find statistically significant mean differences in minority

12   and non-minority scores?

13   A.   Oh, yes.

14   Q.   And my final question:  What, if anything, does that lead

15   you to believe with respect to the use of the written

16   multiple-choice job-knowledge test on the promotional

17   opportunities of minorities if allowed to continue?

18            MR. CARROLL:  Objection.  It calls for speculation.

19            THE COURT:  Overruled.

20            You may answer.

21            THE WITNESS:  I think that the impact is clear, and

22   that is that there will be continuing adverse impact in the

23   promotional decisions that are based on the test scores if the

24   system doesn't change.

25            MR. LICHTEN:  That's all I have.  Thank you very much.
```

1              THE COURT:  Ms. Harris?

2              MS. HARRIS:  Harold, may I see that chart that was

3    marked 150, please?

4              (Pause.)

5                        RECROSS-EXAMINATION

6    BY MS. HARRIS:

7    Q.   While counsel is looking for that, I'll ask you, you were

8    asked a couple of questions about the 1991 job analysis report.

9    And in particular, you were asked to comment on the adverse

10   impact of that exam.  Do you recall Mr. Lichten asking you

11   those questions?

12   A.   Yes.

13   Q.   And I'm going to ask you -- well, first let me ask you

14   this:  I'm assuming, and correct me if I'm wrong, that the

15   adverse impact was calculated after the examination was

16   administered?

17   A.   Surely.

18   Q.   Right.  And you were asked whether you saw anything in the

19   job analysis report that indicated that HRD took any efforts to

20   reduce adverse impact that it found after the administration of

21   the exam.

22        And would you agree with me that HRD was not in a position

23   to do anything about changing the adverse impact of the

24   examination after it was administered?

25   A.   Well, the only thing they could do, and I think what they

1    did do was they considered a lower passing point than was

2    traditional, and I think they set the passing point at 60

3    rather than 70.

4    Q.    Okay.  But they were not in a position to add components

5    or to reweight the examination after it was administered; is

6    that correct?

7    A.    I think that's correct.

8    Q.    Okay.  Now, I'm going to ask you to look, if you would, at

9    this.  This is the entire sheet.  And at the top of this page

10   it indicates "Written Examination Items," that "Each of the 125

11   written examination items was analyzed for adverse impact for

12   all Boston applicants according to the examination title for

13   which they applied.  When the various subtests were analyzed

14   according to test titles, only slight adverse impact occurred

15   in several subtests."  And then at the bottom of that paragraph

16   it states, "Based on this analysis, no reweighting of the

17   examination subtests was warranted."

18        And I'll ask you:  Do you recall that from looking at the

19   job analysis report, that HRD actually examined each of the

20   test items to determine whether there was adverse impact at

21   each question?

22   A.    I think I recall that they did that, yes.

23   Q.    Okay.  And I'm going to show you the breakdown of those

24   subtests which indicates at the sergeant level that in the

25   section of exam questions that focused on police duties, there

1    was a total adverse impact ratio of .82, for supervision there

2    was an adverse impact of .75, at law, .75, and the overall

3    adverse impact ratio was .78.  Do you see that?

4    A.    Yes.

5    Q.    And would you agree with me that the adverse impact that

6    was examined at the passing point is based upon the questions

7    and answers that make up this adverse impact ratio?

8    A.    Yes.

9    Q.    So in other words, one could have very little -- and in

10   the case of police duties, no -- adverse impact on the actual

11   component, but at the overall scoring and imposition of a cut

12   of the pass/fail score, one could see adverse impact?

13   A.    Correct.

14   Q.    And would that be true as well with a test that includes

15   assessment centers and a written component, that one could have

16   low adverse impact at each of the components but the total exam

17   score may still show adverse impact?

18   A.    Yes.

19   Q.    Now, you were also asked as to whether or not HRD

20   conducted a cultural bias review, or perhaps better stated, you

21   testified that HRD did do a cultural bias review as one effort

22   to address adverse impact in this examination.  And do you

23   recall what the results of the cultural bias review were?

24   A.    I think that the people who did the cultural bias review

25   didn't identify items that minorities had found more difficult.

1    I don't remember the details of the methodology.

2    Q.   Okay.  I'm going to show you a summary -- this is at page

3    89 of the validation report, and I'll draw your conclusion to

4    the -- excuse me -- I'll draw your attention to the items that

5    are highlighted at the bottom of the page that state the fact

6    that the reading level was tied closely to and reflective of

7    the reading list on which it was based.  Let me strike that.

8         Going up to the last sentence of that concluding

9    paragraph.  "The general feeling that the test required a high

10   level of reading ability which minority officers might not

11   possess due to perceived deficiencies in the educational

12   systems for which they had been exposed was dismissed by the

13   SMEs for the following reasons:  the fact that the reading

14   level was tied closely to and reflective of the reading list on

15   which it was based; and number two, the fact that a fair

16   proportion of the most difficult textual material appearing on

17   the examination was equally difficult for all candidates,

18   regardless of ethnic or racial background, for valid

19   job-related reasons."

20        And does that comport with your recollection of the result

21   of the cultural bias review that was performed?

22   A.   Yes.

23        MS. HARRIS:  Excuse me for just one second.

24        Mr. Sulman, the document I was looking for was the

25   chart from the Schmidt article that was marked 150.

```
 1            MR. SULMAN:  Oh, I'm sorry.

 2            (Pause.)

 3   BY MS. HARRIS:

 4   Q.   Dr. Wiesen, I believe at the beginning of your examination

 5   Mr. Lichten asked you to review the evolution of your opinion

 6   about assessment centers from the time that you were working at

 7   HRD to the present, and I believe that you stated that

 8   assessment centers can be valid measures of things that may not

 9   be as well tested for in the multiple-choice exam.  Is that a

10   fair statement?

11   A.   That's true.

12   Q.   And I believe that you stated that you believed that the

13   assessment center was an essential component of a valid job

14   examination.

15   A.   I think that a component beyond the multiple-choice exam

16   is needed to try to assure that the candidates can actually

17   perform the job, yes.

18   Q.   Okay.  And when did your opinion change to find that it

19   was an essential component of a job examination?

20   A.   Well, it definitely wasn't in the '80s.  In the '80s, as

21   my testimony indicated, the field was sharply divided.  And

22   definitely through the '90s it became clearer that these

23   alternate methods of assessing candidates could be done

24   reliably.  And I think as recently as two years ago some

25   reviews of the literature were published, further supporting
```

1    the use of these, what in the past would have been called

2    non-traditional testing approaches.  And I think that even as

3    recently as this month I've been thinking about whether a

4    multiple-choice test by itself could be considered an adequate

5    way of assessing candidates for -- particularly for promotion

6    to police sergeant.

7    Q.    Okay.  And the examinations that we're talking about were

8    conducted in 2005 through 2008?

9    A.    Yes.

10   Q.    So as of the time that these examinations were

11   administered it was your opinion, was it not, that a

12   multiple-choice examination standing alone, or with the

13   training and education component, could be a viable and

14   appropriate mechanism for testing for police sergeant.

15   A.    I think it -- in the mid 2000s, which wasn't that long

16   ago, I thought that a multiple-choice test, though thought

17   ideal, could be used for promotion, and that if you did use it,

18   you'd have to do that with your eyes open realizing the pros

19   and cons of doing that.

20   Q.    Well, you would have to do that with any examination

21   that's being administered, correct?

22   A.    Correct.  But this has specific, very obvious pros and

23   cons.

24   Q.    Okay.  Well, I'm going to direct you again to your

25   deposition of February 17th, 2006, when we were talking about

1    Boston's use of examinations in particular at -- in 2006, so

2    after the administration of the 2005 examination.  And my

3    question, which begins at the bottom of page 25, states, "Do

4    you have an opinion as to whether a straight written exam

5    without an assessment center or any other more subjective

6    component would be an appropriate way for testing for police

7    supervisory personnel?"

8         And could you read your answer, please?

9         MR. LICHTEN:  Your Honor, this was read -- this exact

10   section was read into evidence on the first day of

11   cross-examination.

12        THE COURT:  I think that's right, isn't it?

13        MS. HARRIS:  I think that's right.  But, your Honor,

14   Dr. Wiesen, I believe, is testifying that his opinion in 2006

15   was that the use of a written examination would be one that

16   would be fraught with peril.

17        THE COURT:  Go ahead.  Go ahead.

18   BY MS. HARRIS:

19   Q.   Dr. Wiesen?

20   A.   "Well, the multiple-choice test, again, can cover a wide

21   range of topics and can be well done or less well.  And the

22   literature shows that the job-knowledge tests are, if not the

23   most valid test, very close to the most valid predictors of

24   future job performance.  So I think the answer to your question

25   is yes.  I think that multiple-choice examinations can be used

1    by themselves to develop a roster of people for promotion."

2    Q.   And, Dr. Wiesen, you were asked again by Mr. Lichten to

3    refer to the affidavit that you filed in 1987 with regard to

4    your opinion about the use of assessment centers.  And the

5    question I have for you now, sir, is in determining whether or

6    not to use assessment centers, or indeed to devise any

7    promotional examination, isn't it appropriate for the

8    appointing authority, or the employer, to consider factors

9    including the time that one has within which to conduct the

10   examination; the resources, financial and personal to support

11   the examination; and the operational needs of a department that

12   serves a public safety function on a daily basis?

13   A.   I think that practicalities definitely have to be

14   considered in making decisions of all types, including testing

15   decisions.

16   Q.   And in 1987 -- I'm directing you now to Paragraph C of

17   your affidavit.  I'll try to make that legible -- you wrote, in

18   part, the press of time is an important factor -- "but the

19   professional guidelines" -- and here I'm assuming you're

20   referring to the Uniform Guidelines -- "do not presume that any

21   test development effort will have an ideal level of funding or

22   time to complete the project.  The ideals of professional

23   practice are always weighed against the costs of time and a

24   professional judgment made as to how or whether to proceed with

25   the project."

1     And I would ask you, Dr. Wiesen, you would agree, would

2  you not, that in order to determine the ideal, or the best

3  examination that can be administered, that one has to look at

4  all of these factors:  the cost, the gains and the time within

5  which the exam can be conducted?

6  A.    Yes.

7  Q.    And some of those considerations I think we elicited

8  testimony from earlier factored in to the examination that was

9  administered by Boston in 2002.  And I believe that we

10  examined -- or we asked you questions about the cost of the

11  assessment center in 2002.

12     Do you recall those series of questions?

13  A.    Not specifically.

14  Q.    Do you recall learning that the examination process in

15  2002 cost the city approximately $1.3 million?

16  A.    I recall being surprised at the cost of the exam, yes.

17  Q.    And would you agree with me that within your field of

18  industrial psychology, that there remains still only modest

19  agreement as to what would constitute the best examination to

20  be used?

21  A.    Yes.

22  Q.    And would you agree as well, Dr. Wiesen, that in

23  considering issues such as reliability and validity,

24  that -- strike that.  I was about to ask a terrible question.

25  I don't even make sense to myself.

1      And I'm going to show you the chart that was shown to you

2  earlier today.  And I'm going to ask you, Dr. Wiesen, in the

3  personnel measure just above the T&E point method, there's

4  listed "assessment centers"?

5  A.   Yes.

6  Q.   And I'll ask you to look across to the percent increase in

7  validity.  So we see that the T&E point method adds 2 percent

8  to the validity of the personnel examination and the assessment

9  center is listed as adding 4 percent increase in validity; is

10 that correct?  Do you see where I am?

11 A.   Yes.  I'm not sure what that percent increase in validity

12 refers to, but I see the entries, yes.

13 Q.   And then I'll draw your attention up to the seventh item,

14 job-knowledge tests.  And if you look across, it has a 14

15 percent validity.  Do you see that?

16 A.   Yes.

17 Q.   And is that consistent with your understanding of the

18 overall validity of the various testing instruments that we've

19 talked about in this case; in other words, that the

20 job-knowledge test is considerably more valid, or considered

21 more valid than other testing measures?

22 A.   Across the spectrum of jobs, and this study -- the

23 research that's summarized here includes jobs that could range

24 from nursing to metalworking to computer jobs or whatever, but

25 across the range of jobs, job-knowledge tests are one of the

```
 1   most valid tests.
 2   Q.   And then finally, Dr. Wiesen, you were asked some
 3   questions by counsel for Lowell with regard to an article that
 4   appeared in the International Public Management Association for
 5   Human Resources in October of 2007.  And I'm going to show you
 6   a question that appears at page 8 of that article.
 7           MR. LICHTEN:  Your Honor, this goes beyond the scope
 8   of my cross.
 9           THE COURT:  Yeah, sustained.
10           MS. HARRIS:  Okay.  I'll ask the question, then.
11   BY MS. HARRIS:
12   Q.   Would you agree with me, Dr. Wiesen, that one guaranteed
13   way of ensuring that a selection process does not have adverse
14   impact is to engage in random selection; in other words, pull
15   names out of a hat?
16           MR. LICHTEN:  I would object.  This goes beyond the
17   scope.
18           THE COURT:  Overruled.
19           You may answer that.
20           THE WITNESS:  Random selection would be expected to
21   yield, on average, no adverse impact.
22   BY MS. HARRIS:
23   Q.   And random selection would also not distinguish at all
24   between the candidates' abilities to perform the job, correct?
25           MR. LICHTEN:  Objection.
```

```
 1              THE COURT:  Overruled.
 2              THE WITNESS:  And the random selection would not
 3    distinguish between the ability of candidates at all.
 4    BY MS. HARRIS:
 5    Q.   And the point of having these examinations in the first
 6    place is to distinguish between the qualifications of people
 7    who are competing for a position, correct?
 8    A.   Yes.
 9              MS. HARRIS:  I have no further questions, your Honor.
10              THE COURT:  Mr. Carroll?
11              MS. HARRIS:  Thank you, Dr. Wiesen.
12              THE WITNESS:  You're welcome.
13                            RECROSS-EXAMINATION
14    BY MR. CARROLL:
15    Q.   Good morning, Dr. Wiesen.
16    A.   Good morning.
17    Q.   I'm going to not ask you about all the 80 questions and
18    the some 70 questions which you don't have any quibble with and
19    I take it you would consider to be job related and valid.
20    We're on the 2005 and 2007 exams.  Instead, I want to focus --
21              MR. LICHTEN:  Your Honor, I would request that be
22    stricken.  That's just a speech.
23    BY MR. CARROLL:
24    Q.   Well, are you aware of that? if you need a question.
25              THE COURT:  Go ahead.
```

1          THE WITNESS:  Was there a question for me to answer?

2          THE COURT:  He hasn't asked one yet.

3    BY MR. CARROLL:

4    Q.    Were you aware of that?

5    A.    No.

6    Q.    Okay.  What I would like to do, Dr. Wiesen, is focus upon

7    some charts that were given to me yesterday which I believe you

8    drew up based upon corrected data and related directly to

9    Springfield.

10          THE COURT:  Let me just say, this is not going to be

11    as brief as I had hoped it would be.  We're going to take the

12    morning recess and come back to it.

13          THE CLERK:  All rise.

14          (The Court exits the courtroom at 11:06 a.m.)

15          THE CLERK:  The Court will take the morning recess.

16          (There is a recess in the proceedings at 11:06 a.m.)

17          (The Court entered the room at 11:22 a.m.)

18          MR. CARROLL:  Thank you, your Honor.

19    BY MR. CARROLL:

20    Q.    Doctor Wiesen, let me show you a chart that you prepared

21    which was given to me yesterday.  And can you identify this

22    chart for me, please, sir?

23    A.    Yes.  It's a --

24    Q.    What is this chart?

25    A.    It's a summary of the -- some of the adverse impact

1    analyses that I've done for the City of Springfield.

2    Q.    Directing your attention to the first AI ratio for

3    promotion, where it says .07 --

4    A.    Yes.

5    Q.    -- can you tell us if that number is statistically

6    significant?

7    A.    .07 is the probability, and it's higher than the cutoff

8    that's traditionally used for statistical significance, which

9    is .05.

10   Q.    It's a fact that a probability of .05 or less is typically

11   considered statistically significant, correct?

12   A.    Yes.

13   Q.    So if it's greater than .05 -- if it's .05 or more, then

14   that will typically be considered not statistically

15   significant, is that correct?

16   A.    If it's greater than .05, yes.

17   Q.    And you would agree with me that the .07 is greater than

18   .05?

19   A.    Yes.

20   Q.    Not statistically significant?

21   A.    Correct.

22   Q.    Okay.  And with regard to the number of standard deviation

23   units, do you see that, sir?

24   A.    Yes, I do.

25   Q.    And that number is 1.8?

1    A.    Yes.

2    Q.    Would you say that the lower the number of standard

3    deviation units, the more probable the outcome is due to

4    chance?

5    A.    Yes.

6    Q.    And gauging that by -- I believe you mentioned in your

7    report in a couple of different footnotes the Castaneda case

8    where the Supreme Court said it's -- two or three standard

9    deviations is the point where, if it's higher than that,

10   there's a problem; if it's lower than that there's not,

11   correct?

12   A.    Yes.

13   Q.    And you would agree with me that 1.8 is lower than the two

14   or three standard deviation units that the Supreme Court uses

15   as the general rule for determining significance, correct?

16   A.    Yes.

17   Q.    So not statistically significant would be the conclusion

18   there?

19   A.    The 1.8, yes.

20   Q.    All right.  And directing your attention down to -- I'm

21   sorry.  Before we leave that, the first table is the table that

22   you did for the 2005 exam alone, is that correct?

23   A.    Correct.

24   Q.    And now we're going to take a look at the next table,

25   which is Table D2.  And I guess the first point that you have

1    there for the 2007 table is the AI ratio for promotions, is

2    that correct?

3    A.    Yes.

4    Q.    And the statistical significance, .26?

5    A.    Yes.

6    Q.    And, again, based upon the rule that's generally

7    considered amongst statisticians for statistical significance,

8    this would be not statistically significant?

9    A.    Correct.

10   Q.    And regarding the Supreme Court's general rule, the AI for

11   promotions is 1.1, correct?

12   A.    Yes.

13   Q.    And that's lower than the two or three standard deviation

14   units that is kind of the general rule that the Supreme Court

15   uses for determining statistical significance?

16   A.    Yes.

17   Q.    Not statistically significant would be the conclusion

18   there?

19   A.    Yes.

20   Q.    Okay.  And directing your attention down to the next

21   column, which is the AI ratio at the effective passing point,

22   do you see that?

23   A.    That row, yes.

24   Q.    And do you see where it says .26?

25   A.    Yes.

1  Q.   And that would not be statistically significant, correct?

2  A.   Correct.

3  Q.   And the 1.1 standard deviation units, not statistically

4  significant, correct?

5  A.   Yes.

6  Q.   The .09 AI ratio for official passing point of 70, not

7  statistically significant?

8  A.   Correct.

9  Q.   The 1.7 standard deviation units, not statistically

10 significant?

11 A.   Correct.

12 Q.   And the difference in average test scores in the P.D.,

13 there you have .1?

14 A.   Yes.

15 Q.   Not statistically significant?

16 A.   Correct.

17 Q.   And the number of standard deviation units, 1.6, not

18 statistically significant?

19 A.   Correct.

20 Q.   And it's only by aggregating the test scores statewide

21 that you find any statistical significance with regard to

22 Springfield, is that correct, on the 2007?

23 A.   Put that chart back for a moment.

24 Q.   The last column.

25 A.   Well, that's not just for Springfield.

1    Q.    Right.   That's what I mean.   It's for all the cities and

2    towns?

3    A.    Considering just 2007 alone, yes.

4    Q.    Right.   So by looking at just Springfield's numbers alone,

5    no statistical significance, less than the general rule adopted

6    or used by the Supreme Court for finding statistical

7    significance in terms of the number of standard deviation

8    units, and it's only when you aggregate the community that that

9    result changes, correct?

10          MR. LICHTEN:   Objection to the form.

11          THE COURT:   Overruled.   He may answer it.

12   A.    Well, the question you asked was with respect to

13   Springfield.   We reviewed that 2007 block.   We didn't review

14   the last block.

15   Q.    Well, what I'm interested in -- and, really, my question

16   has to do with the 2007 block.

17   A.    Okay.

18   Q.    And so when you look at that and look at Springfield alone

19   and the 2007 Springfield police promotional results for the

20   sergeant's examination, essentially, in all the categories, by

21   either the general statistical rule of thumb of the .05 or by

22   the Supreme Court's general rule of standard deviation units,

23   you find no statistical significance, correct?

24   A.    Correct.

25   Q.    And it's only by aggregating that data with other

1    communities, apart from Springfield, that you reach a different

2    result?

3    A.    For 2007, yes.

4    Q.    Okay.

5         MR. CARROLL:  Thank you, Doctor Wiesen.  No further

6    questions.

7         THE WITNESS:  Thank you.

8    RECROSS-EXAMINATION BY MS. ENGDAHL:

9    Q.    Good morning, Doctor Wiesen.

10   A.    Good morning.

11   Q.    Laurie Engdahl from Worcester.

12        You were asked some questions about some examinations

13   given in 1992 and 1994 in Worcester; do you recall that on

14   redirect?

15   A.    Yes.

16   Q.    Do you know how many minority candidates took that exam?

17   A.    I do not.

18   Q.    I believe you were asked a question about -- or actually

19   asked to assume that there was -- one black officer was

20   promoted to sergeant in 2001; do you recall that?

21   A.    Yes.

22   Q.    Do you know what list that sergeant was promoted off of?

23   A.    No.

24   Q.    Do you know how many other minorities were competing for

25   promotion with him?

1    A.    I do not.

2    Q.    Do you know how many other whites were competing for

3    promotion with him?

4    A.    I do not.

5    Q.    You were also asked about the ethnic makeup of the City of

6    Worcester Police Department, and I think this was the chart you

7    created for Worcester that you were testifying about.  I

8    believe you testified that police officers --

9    A.    Yes.

10    Q.    -- that minorities represent approximately 17 percent of

11    police officers.  Is that in 2010?

12    A.    I believe it is.

13    Q.    Do you know what percentage of the police department

14    minorities comprised in the rank of police officer, say, in

15    2005?

16    A.    No.

17    Q.    Or 2000?

18    A.    No.

19    Q.    And you understand that in order to be eligible for

20    promotion to sergeant, you have to have been a police officer

21    for at least three years?

22    A.    Yes.

23    Q.    Are you aware of any efforts by the City of Worcester to

24    recruit police officers -- minority police officers at the

25    entry level?

1    A.    No.

2    Q.    So you don't know whether the 17 percent in 2010

3    represents a significant rise from prior years?

4    A.    That's correct.

5          MR. ENGDAHL:  If you could bear with me for one

6    minute.

7          I'm actually looking for Plaintiffs' Exhibit 78.  It

8    is from the 410.

9    Q.    You were asked some questions about Worcester's use of the

10   2004 exam.

11         MS. ENGDAHL:  This is Page 10 of the June report.  I

12   had planned on asking another question, and then I -- it's

13   Exhibit 79.  This is the one that you -- okay.

14   Q.    I want to draw your attention to the passing rates of

15   minorities compared to non-minorities in Worcester for that

16   exam --

17   A.    Yes.

18   Q.    -- which you just commented on.  What does 1.27 mean in

19   terms of passing rates for that exam?

20   A.    It means the passing rate for minorities is higher than

21   the passing rate for non-minorities.

22   Q.    Do you know when -- what the seniority dates are for

23   individuals promoted off of that 2004 list?

24   A.    When I prepared this table, it didn't seem like there were

25   any promotions from the list.

1    Q.    Right.  And we've determined that's in error.

2    A.    Okay.

3    Q.    You testified about some minorities being near the bottom.

4    Do you know anything about the seniority dates?

5    A.    No.  I don't know what the seniority dates are for those

6    two people.

7         MS. ENGDAHL:  I have nothing further.

8    RECROSS-EXAMINATION BY MR. LEAHEY:

9    Q.    Good morning, Doctor Wiesen.

10   A.    Good morning.

11   Q.    I believe Attorney Lichten asked you some questions

12   regarding Lowell and -- clarification of some numbers regarding

13   Lowell.  Do you remember that testimony this morning?

14   A.    Yes.

15   Q.    I believe we were actually talking about Table -- excuse

16   me, Exhibit 82 and not Table 2 -- Table 2A.  But directing your

17   attention -- yesterday I was asking you questions about the AI

18   ratios for promotions where the statistical significance was 17

19   and the number of standard deviations was 1.3.  Do you remember

20   that from yesterday?

21   A.    Not --

22   Q.    You were asked questions about that?

23   A.    Not specifically.

24   Q.    I'll represent to you that actually those numbers were

25   based on had there been ten promotions and that I came across

1    the actual data for the seven promotions.  I just wanted to go

2    over that with you briefly.

3         You see down at the bottom that what had been

4    statistically significant as a .17 jumps to a .58 based on the

5    analysis of seven promotions, is that correct?

6    A.    Yes.

7    Q.    Again, 0.5 (sic) is the cutoff for statistical

8    significance?

9    A.    Correct.

10   Q.    Fair to say that .58 is significantly higher than .05?

11   A.    Yes.  Well, it's higher.

12   Q.    And that the number of standard deviations with seven

13   promotions is actually .5, correct?

14   A.    Yes.

15   Q.    And that is lower than the 1.3 previously testified to?

16   A.    Correct.

17   Q.    You were also asked questions about the difference in

18   scores regarding Lowell and the 9.1 difference in the average

19   score.  Do you remember that?

20   A.    Yes.

21   Q.    Fair to say that that -- your evaluations in that included

22   the individuals who failed the scores -- or failed the test?

23   A.    Yes.

24   Q.    And you're aware, are you not, that no municipality that

25   uses the statewide examination gets access to the individual

1    test scores, correct?

2    A.    For the passers or the failers or --

3    Q.    For anyone.

4    A.    For anyone.  I don't know the details of how the scores

5    are kept.

6    Q.    Are you aware that the municipalities that used the state

7    -- or the government entities who use the statewide examination

8    only get -- get limited information as to people who actually

9    pass and get no information on the people who fail?

10   A.    That was the policy that was in place when I was at the

11   agency.

12   Q.    If I were to ask you to assume that a government entity

13   that uses the HRD promotional process does not get any

14   information regarding the test scores of their individual

15   applicants, on that assumption, will you agree with me that

16   it's not possible for a municipality to know the average pass

17   scores for whites versus non-whites, correct?

18   A.    The passing rates, you mean?

19   Q.    Well, the 9.1 figure.

20   A.    The mean test score?

21   Q.    Right.  If the municipality gets no information from HRD

22   regarding that written test component, fair to say the

23   municipality would have no information as to any difference in

24   the scoring between minorities and non-minorities, correct?

25   A.    They would -- if they don't get the information from HRD,

1    then they don't get the information from HRD.  I mean, over the

2    years, they probably realized the minorities are lower down on

3    the list, and that has to be because the minorities have lower

4    scores.  But they don't have a numeric handout from HRD that

5    gives them that.

6    Q.    I appreciate your opinion there.  But my question to you

7    was:  If they didn't get that information from the test score,

8    they wouldn't know -- when you say there's a 9.1 difference in

9    the 2006 exam, on the test score itself, if Lowell doesn't get

10   that information from HRD, Lowell doesn't even know that

11   there's a difference between minority and non-minority?  Yes or

12   no.

13   A.    They don't know it from HRD.

14   Q.    Do you know whether or not HRD keeps that information

15   confidential?

16   A.    As I said, when I was there, the -- no information was

17   handed out concerning people who fail.  And I don't -- I wasn't

18   really involved with the certification part of the function, so

19   I don't know exactly what municipalities got.

20   Q.    When you were there, do you know whether or not

21   municipalities got information as to how individual candidates

22   scored solely on the multiple-choice test component?

23   A.    No.  I think the lists were just final grade.

24   Q.    Do you have any reason to believe that the HRD processes

25   with regards to the written tests have changed from when you

```
 1    were there, as you sit here today?
 2              MR. LICHTEN:  Objection.
 3              THE COURT:  Overruled.  You may answer that.
 4    A.    I really don't know.
 5    Q.    You also talked about how the 9.1 was statistically
 6    significant, correct?
 7    A.    Yes.
 8    Q.    If you were to assume that the difference between white --
 9    and you also mentioned Lawrence in your discussion when you
10    talked about score differences, correct?
11    A.    I'm not sure.
12    Q.    If I were -- if you were to assume that the difference
13    between white officers' scores in Lowell in the 2002 exam and
14    white officers in Lawrence, the difference is 8.13 points,
15    would you consider that to be statistically significant?
16    A.    That's something that could be analyzed statistically.  I
17    didn't compare the municipalities.
18    Q.    But if -- would you consider a difference between white
19    officers in Lowell and white officers in Lawrence as 8.13 --
20    would you consider that to be statistically significant?
21    A.    You're saying that the average score for the white
22    officers in Lowell is 8.1 -- on average, 8.1 points higher?
23    Q.    Higher than Lawrence.
24    A.    Higher than in Lawrence.  Okay.  And that's something that
25    could be tested with a test of statistical significance, but I
```

1    didn't compare across the municipalities.

2    Q.    But it's fair to say, making that assumption, that while

3    it may be statistically significant, you can't glean what that

4    actually means, can you?

5    A.    What do you mean "means"?

6    Q.    The difference between why white officers in one

7    municipality score 8 points higher than whites in another

8    municipality on the same testing instrument.

9    A.    Well, I didn't make that comparison.  If you're getting

10   that 8.1 point difference from my statistics, then I think that

11   you're not interpreting them consistent with the way I prepared

12   them.

13   Q.    Well, assuming that -- I believe you testified earlier

14   that the way you counted was you took all of the scoring under

15   the WR category for each municipality and then added them all

16   up for blacks and Hispanics, divided by the number of blacks

17   and Hispanic test-takers and did the same exact methodology for

18   all the other officers, correct?

19   A.    Correct.

20   Q.    And assuming that was done for Lawrence in 2006, and the

21   difference is 8.13 lower than what Lowell is, that Lowell would

22   be -- using that formula, would be 80.36 and that Lawrence

23   would be 73.13, the difference would be -- excuse me.  Lawrence

24   would be 72.23.

25   A.    Are you reading those numbers off a page in one of my

1    reports?

2    Q.   I'm not.  I'm asking you to assume that I have added up

3    those numbers.  They're not actually in your report.  And I'm

4    asking -- again, I'm just trying to find out if there's a

5    statistical difference between Lawrence and Lowell, the white

6    officers, that that statistical difference alone, you can't

7    glean what that actually signifies, correct, other than that

8    it's just statistically significant?

9    A.   You're saying that I should assume that there's higher

10   average of the white officers in one department than another

11   department?

12   Q.   Yes?

13   A.   And that difference is 8.13 points?

14   Q.   Yes.

15   A.   And you're telling me that it's statistically significant

16   or you're asking me?

17   Q.   I'm asking you:  Is that difference, 8.13, statistically

18   significant?

19   A.   Okay.  What I'm saying is that that question can be

20   submitted to a test of statistical significance.  I didn't

21   compare across departments, so I don't know if that difference

22   would be statistically significant.

23           MR. LEAHEY:  Thank you, Doctor.  That's all I have.

24   RECROSS-EXAMINATION BY MR. McDERMOTT:

25   Q.   Doctor Wiesen, good afternoon.  Doctor Wiesen, this

1    morning Mr. Lichten showed you -- well, asked you if you had

2    knowledge of the use of Par 10 promotions from the Brackett

3    case.  Do you have knowledge of what happened on the Brackett

4    case?

5    A.    No.

6    Q.    Let me just say to you that in Brackett -- the Brackett

7    case concerned the MBTA's use of PAR.10 for appointments back

8    in 1996, and it was a case that became somewhat notable because

9    it went to the Supreme Judicial Court, which upheld the use of

10   PAR.10s in 1996.  Do you know whether or not -- you were at HRD

11   during the time of 1996, Doctor Wiesen?

12   A.    No.

13   Q.    Mr. Lichten showed you what's been identified as

14   Defendant's Exhibit 149.  It's a chart of sergeants.  And he

15   asked you, in regard to the use of PAR.10s, whether any of the

16   sergeants on the chart could have been promoted by the -- by

17   the use of a PAR.10 list, which is a special list for

18   minorities or women, or they were promoted from HRD eligibility

19   lists.  Do you recall that?

20   A.    I don't recall him asking me that.

21   Q.    Let me ask you to assume that the Brackett case concerned

22   promotions from PAR.10 lists for minorities, promotions for

23   PAR.10 lists for gender.  There were three promotions

24   altogether from those lists.  Looking at the Defendant's

25   Exhibit 149, in the first year that we have a tabulation for

1  sergeants, which is December 31, 2003, there are 20 sergeants.

2  Do you see that?

3  A.   Yes.

4  Q.   Of those 20 sergeants, we don't know whether or not those

5  20 sergeants are -- include those who are appointed in 1996 as

6  a result of PAR.10 lists; is that fair to say?

7  A.   I don't know.  Correct.

8  Q.   It's fair to say, when you look at this list, that the

9  individuals who were appointed to sergeant don't always remain

10  sergeants?  You can be promoted; you can be demoted; or you can

11  leave the service of the MBTA through retirement or otherwise.

12  Is that fair to say?

13  A.   Yes.

14  Q.   So it's not a static list, but it's a -- so we look at the

15  -- after the 12/31/03 tabulation in the first column, is it

16  fair to say, Doctor Wiesen, the changes -- I'll represent to

17  you this is the chart we looked at the other day that's marked

18  as -- in evidence as Exhibit No. 148.  This chart of the

19  appointments to sergeant at the MBTA from the calendar year

20  2003, through March of 2010, that does not include anyone who

21  was selected as a result of PAR.10; is that fair to say?

22  A.   I have no knowledge of the PAR.10 being used at MBTA other

23  than what I've heard in court.

24  Q.   I'm going to go back to Table 2A -- I'm sorry.  I have --

25  the table I have is a marked version, but just ignore that.

1    That was a correction that was made subsequent to your report.

2        Looking at the MBTA on Table 2A, you see that in 2005 it

3    had zero AI promotion rates?

4    A.    Yes.

5    Q.    And zero AI promotion rates for 2007?

6    A.    Yes.

7    Q.    It's fair to say, going across to the different AI passing

8    rates and AI effective passing rates, that the numbers we're

9    dealing with were statistically insignificant?

10   A.    Yes.

11   Q.    And going to the AI, in average test score in 2005, it was

12   3.3; in 2007, it was 1.8.  Those are not large numbers, are

13   they, Doctor Wiesen, when considering adverse impact?

14   A.    Well, a difference of three points on the exam would --

15   depending on how people score, could displace people up or down

16   the list considerably.

17   Q.    Okay.  Are those average test scores shown for 2005, 2007,

18   are they based on statistically significant data?

19   A.    Those differences are not statistically significant.

20   Q.    And I want to bring your attention to the bottom of 2A.

21   And it has statewide, not including Boston, from 2003 to 2008.

22   And you have adverse impact in promotion rates, adverse impact

23   in passing rates.  Do you see that, Doctor?

24   A.    Yes.

25   Q.    Doctor Wiesen, when you gave an opinion in regarding the

1    MBTA, you based your opinion on the chart in -- the chart in

2    2A.  You said, although it was not statistically significant in

3    determining adverse impact on the MBTA, nevertheless, you found

4    that there should be -- should expect future adverse impact at

5    the MBTA because of combining this -- the data from 2005 and

6    2007 and looking at the pattern of adverse impact from the

7    statewide exams from 2003 to 2008; is that fair to say?

8              MR. LICHTEN:  Your Honor, I don't think he was ever

9    asked a question about the future of the MBTA.

10             THE COURT:  Well, you may have the question.

11   A.   If I understood the question correctly, the answer is yes.

12   Q.   And, Doctor -- Doctor Wiesen, I'm going to show you

13   Exhibit No. 79.  Doctor Wiesen, in Exhibit No. 79, you have the

14   same statewide data on the bottom that you had in Table 2A?

15   A.   Okay.

16   Q.   If you want to look, I can show you 2A.

17   A.   Yes.

18   Q.   2A, the data says statewide, not Boston, 2003 to 2008, .35

19   AI in promotion rate and .77 AI in passing rate, okay.  And in

20   2C, it's the identical data.  Do you see that?

21   A.   Right.

22   Q.   Doctor Wiesen, when you gave an opinion that the MBTA

23   would be assumed to follow the statewide pattern, you see that

24   you did an aggregated analysis from 2003 through 2008 for the

25   MBTA in Table 2C?  Do you see that?

1   A.   Yes.

2   Q.   And that data, as we established from testimony yesterday,

3   the data in 2C is much more reliable than the data that appears

4   in 2A for the two exams; is that fair to say?

5   A.   We had talked about that, and I said that, other things

6   being equal, the combined data would be more reliable than the

7   smaller data set.  There's some reasons to think that perhaps

8   we shouldn't be combining those.

9   Q.   Well, Doctor, when you made your opinion about the MBTA,

10  you made it on the assumption that the MBTA would follow the

11  statewide data concerning AI; but, however, when you made that

12  opinion, you had already done the calculations on 2C, which

13  show that when aggregating the data likewise to the state for

14  the same years the MBTA, in fact, does not follow the pattern

15  of adverse impact that the statewide data follows, is that

16  true?

17  A.   Well, there's still a difference in the average test

18  scores between minorities and non-minorities.  Although it's

19  not statistically significant and it's not quite as large as

20  the statewide difference, it's in the same direction.  So as

21  long as there's a difference in average test score, I think

22  that it's almost unavoidable that over time that will be

23  reflected in the pass rates and the promotion rates.

24  Q.   So you're saying that the two points difference in average

25  test score is significant?

1    A.    It's not statistically significant.

2    Q.    Doctor, just to clarify, in regards to the aggregated data

3    for the MBTA for 2003 to 2008, in fact, for adverse impact on

4    promotion rates, the MBTA did not follow the statewide data for

5    the same years; is that fair to say?

6    A.    It was not less than .8.  It was less than 1.0, but it was

7    definitely not less than .8.

8    Q.    .95?

9    A.    Correct.

10    Q.    That's pretty good for --

11    A.    Yes.

12    Q.    -- for these exams.

13          And then the adverse impact for passing rates on the MBTA

14    from 2003 to 2008 is .83, and that does not follow the pattern

15    of the statewide exams in the same period of time, .77; is that

16    fair to say?

17    A.    The .83 and the .77 are not that far apart.  They are on

18    different sides of .8, but they're not far apart.

19    Q.    We're using .8 as the drawing line for whether or not

20    there is or is not adverse impact; isn't that fair to say?

21    A.    We are using it as a rule of thumb for the -- for adverse

22    impact, but if you're asking if the test results for the MBTA

23    are similar to the test results statewide, I think, you know,

24    comparing the actual numbers makes sense.

25                MR. McDERMOTT:  Your Honor, I have no further

```
 1    questions of Doctor Wiesen.

 2             MR. McQUILLAN:  Your Honor, the City of Methuen has no

 3    further questions for the doctor.

 4             MR. D'AGOSTINO:  Your Honor, the City of Lawrence has

 5    no further questions for the witness.

 6             THE COURT:  Doctor, you are excused.

 7             THE WITNESS:  Thank you.

 8             MR. LICHTEN:  The Seaport Hotel is going to be very

 9    sad.

10             Your Honor, we are prepared to rest with just some

11    housekeeping things.  But what I suggest we do just to -- with

12    the Court's permission, I would formally rest tomorrow so I can

13    try to work out --

14             THE COURT:  That's fine.

15             MR. LICHTEN:  -- the various documents that need to be

16    worked out.

17             THE COURT:  That's fine.  With no jury here, we don't

18    have to observe the niceties we might otherwise have to do.

19             MR. LICHTEN:  I have no further witnesses.

20             MS. HARRIS:  Thank you, your Honor.  The City of

21    Boston would call Edward Callahan.

22             EDWARD P. CALLAHAN, Sworn

23             THE CLERK:  Please be seated.  State your name; spell

24    your last name for the record.  Keep your voice up and speak

25    into the mic.
```

 1             THE WITNESS:  My name is Edward P. Callahan.  That's

 2    C-a-l-l-a-h-a-n.

 3    DIRECT EXAMINATION BY MS. HARRIS:

 4    Q.    Good afternoon, Mr. Callahan.

 5    A.    Good afternoon, Counselor.

 6    Q.    Mr. Callahan, could you please inform the Court, are you

 7    currently employed?

 8    A.    Yes, I am.

 9    Q.    What is your position?

10    A.    Acting Bureau Chief for the Bureau of Administration and

11    Technology for the Boston Police Department.

12    Q.    The Bureau of Administration and Technology encompasses

13    Human Resources?

14    A.    Yes, it does.

15    Q.    Among other things, I assume?

16    A.    Yes.

17    Q.    And Mr. Callahan, can you tell the Court when you first

18    began working for the Boston Police Department?

19    A.    I first became an employee of the Boston Police Department

20    September of 1986.

21    Q.    When you were hired in September of 1986, what position

22    did you hold?

23    A.    My title was Director of Personnel.

24    Q.    Director of Personnel.  Was that within the Bureau of

25    Administration and Technology?

1    A.    Yes.

2    Q.    Just for the sake of brevity, is it fair to say that your

3    position with the Boston Police Department from September of

4    1986 to the present was in the area of Human Resources within

5    the department itself?

6    A.    Yes.

7    Q.    Can you tell us, in that position, have you always held a

8    supervisory position?

9    A.    Yes, I have.

10   Q.    Focusing your attention for just a moment in the 1986

11   area, are you familiar with or can you inform the Court as to

12   how the Boston Police Department hired sworn officers?

13   A.    Sworn officers of the Boston Police Department were hired

14   during that era, through the provisions of the

15   Castro vs. Beecher consent decree which required that for every

16   white candidate, for every non-minority candidate on the Civil

17   Service list, there had to be a corresponding black or Hispanic

18   candidate.

19   Q.    When you say that, was there a requirement that there be

20   one-for-one hires into the police department?

21   A.    No.

22   Q.    And just explain, if you would, how the selection process

23   worked at the recruit level.

24   A.    The selection process required the Boston Police

25   department to review the Civil Service list in a top-down

1    fashion and to select candidates in that order.  But there was

2    no specific requirement to hire candidates in a one-for-one

3    basis.

4    Q.    So would the police department get two lists?

5    A.    No.  We'd get one list.  It was integrated with all the

6    names upon it.

7    Q.    So the list that you received was one-for-one

8    non-minority, minority and so on down the --

9    A.    That's correct.

10   Q.    And can you tell us, Mr. Callahan, when you received the

11   list from Civil Service, did you receive test scores?

12   A.    We did not.

13   Q.    To your knowledge, has the consent decree that governed

14   recruit-level hires, that is what -- has that consent decree

15   expired?

16   A.    Yes, it has.

17   Q.    Do you know when that list expired?

18   A.    I believe it was in 2005, the fall of 2005.

19   Q.    And do you know how it expired?

20   A.    Excuse me?

21   Q.    Can you tell the Court how it was that the consent decree

22   came to expire?

23   A.    I believe that following the lawsuit, that Judge Saris

24   ruled that the provisions of the consent decree had been met,

25   that is, that the number of minority officers in the City had

1    met or nearly met the percentage of minority residents who

2    resided in Boston.

3    Q.    To your knowledge, is that what the requirement of the

4    Castro vs. Beecher decree was, that there be hiring until a

5    certain level of parity had been reached?

6    A.    Yes.

7    Q.    And just briefly, Mr. Callahan, Boston is a Civil Service

8    department, correct?

9    A.    Yes.

10   Q.    And by that we mean that, at least as it applies to sworn

11   personnel, personnel are hired after they go through an

12   examination process administered by the Commonwealth?

13   A.    That's correct.

14   Q.    And can you tell the Court, after a candidate places on

15   the eligibility list, what is the process for hiring that the

16   department applies to the candidates?

17           MR. LICHTEN:  If it's hiring, I would object, your

18   Honor, relevancy.

19           THE COURT:  Overruled.

20   A.    If a candidate is on the Civil Service list and his name

21   is high enough to put him or her in contention, the Boston

22   Police Department conducts a background investigation.  It's

23   fairly exhaustive.  If the candidate passes the background

24   investigation, he or she is awarded a conditional offer of

25   employment.  Then the candidate must pass the medical,

1  psychological and physical abilities -- physical abilities test

2  to be afforded a final offer of employment.

3  Q.   Okay.  And just briefly, can you tell the Court, when you

4  reference a medical and a psychological test, what kind of

5  assessment is made of the candidate prior to the final offer of

6  employment being made?

7  A.   The medical guidelines produced by the Commonwealth, and

8  each candidate must meet the guidelines and prove to be

9  medically sound to be a police officer.  The next step would be

10 the psychological evaluation of the candidates.  HRD approves a

11 psychological plan.  Candidates must prove to be emotionally

12 stable.  The final process there is the physical abilities

13 test, which is, in fact, a series of exercises that should show

14 that the candidate has the physical ability to perform the role

15 of a police officer.

16 Q.   And then after the final formal offer of employment is

17 made, is there a police academy training that the candidate --

18 that the then recruit officers go through?

19 A.   Yes, there is.

20 Q.   Can you tell the Court how long does the police academy

21 take?

22 A.   The class -- police academy class would go a minimum of 26

23 weeks and maybe up to 30 weeks on occasion.

24 Q.   Is there also a probationary period that attaches before

25 an officer becomes tenured, for lack of a better word?

1    A.    Yes.  The probationary period commences upon the date of

2    graduation of the officer.

3    Q.    When the officer goes through the police academy, Mr.

4    Callahan, is there -- this is an academic academy, I assume?

5    A.    It's both.  It's both a physical fitness program as well

6    as an academic program.

7    Q.    Do you know, are there testing components to the police

8    academy prior to the candidate actually graduating from the

9    academy?

10   A.    Yes, there is.

11   Q.    Now, we talked -- I want to direct your attention if I

12   could now to the issue of promotional practices within the

13   department.  And you're aware that this suit is about the

14   promotional practice to the level of sergeant in the police

15   department, correct?

16   A.    Yes.

17   Q.    In your career as the Director of Personnel and then later

18   as the Bureau Chief for Administration and Technology, are you

19   aware of the fact that the police department has been engaged

20   in litigation with regard to promotional examinations?

21   A.    Yes, I have.

22   Q.    I'd like to ask you, first, to -- focusing just on the

23   sergeant level, are you aware of -- are you aware of a consent

24   decree that governed promotional practices within the police

25   department in the 1980s time period?

1    A.    Yes, I am.

2    Q.    Just briefly, can you tell us what your understanding is

3    of what that consent decree required as it pertains to the

4    sergeant?

5    A.    It was called MAAAP vs. Jordan, and it required that -- it

6    gave the Boston Police Department the option of selecting black

7    candidates for sergeant out of strict rank order.

8    Q.    When you state "out of strict rank order," are you

9    referring to the certification list that's produced by Human

10   Resources?

11   A.    Yes, I am.

12   Q.    When you say the department was given the opportunity to

13   select out of rank order, can you describe just what that means

14   for people who may not be as intimately familiar with the

15   process?

16   A.    In the usual course of business, we would be required to

17   select individuals strictly in rank order.  If we bypassed

18   somebody, we would have to have a just cause for doing so.  The

19   decree allowed us the opportunity to select individual black

20   sergeant candidates out of the strict rank order, so they may

21   have scored somewhat lower than some of the non-minority

22   candidates.  And my recollection was that we were allowed to

23   select -- up to 20 percent of all of our selections would be

24   African-American or black candidates.

25   Q.    When you reference the bypass procedure, were you involved

1    in providing the statement of reasons for bypass to HRD?

2    A.   Yes, I was.

3    Q.   Just briefly, can you tell us the process by which you

4    would provide information to HRD regarding the reasons for

5    bypass?

6    A.   Well, in the usual course of business, we would have to

7    write a -- draft a definitive statement why somebody was not

8    selected.  Under the provision of MAAAP vs. Jordan, my

9    requirement would be to draft a letter to HRD simply stating

10   that we had selected, and I would articulate the names of the

11   black sergeant candidates in the correspondence, indicating

12   that these individuals were selected under the provisions of

13   MAAAP vs. Jordan.

14   Q.   Now, I want to draw your attention specifically to a

15   sergeant exam process that was conducted in 1987, and I'll ask

16   you first:  Do you recall whether or not Boston participated in

17   a delegated promotional examination at that time?

18   A.   Yes, we did.

19   Q.   This, I assume, is shortly after you began working for the

20   police department, is that right?

21   A.   That's correct.

22   Q.   Can you tell me, was the delegated exam process already

23   underway when you joined the police department?

24   A.   Well, it was.  And, specifically, the consultant who was

25   going to develop and administer the exam had been selected

1    prior to my arrival.

2    Q.    And can you tell the Court what the 1987 examination

3    consisted of?  In other words, what kind of a tool?  What kind

4    of exam was contemplated?

5    A.    In the first instance, there was, of course, a written

6    exam, and then we administered an assessment center with

7    various exercises that went on in the summer of 1987.  It was

8    administered in the summer of 1987.  I believe there was a

9    leaderless group discussion, which is an exercise that's used

10   in the assessment centers, and other types.  I believe an

11   in-basket exercise was used as well.

12   Q.    What was your role with regard to the 1987 examination?

13   A.    My role was to assist with the administration and

14   logistics of the exam, to find a building, building or

15   buildings, to do the exams in, to provide the support staff,

16   those sorts of administrative logistical tasks.

17   Q.    Do you recall whether at the time that you were working --

18   with regard to this examination, was Doctor Wiesen working with

19   HRD at the time, or DPA as it was then known?

20   A.    Yes, he was.

21   Q.    Did you work with him with regard to the oversight that

22   DPA provided to the examination process?

23   A.    Yes, I did.

24   Q.    Are you aware of whether or not there was a legal

25   challenge brought at the conclusion of that examination

1    process?

2    A.    I am aware that there was one.

3    Q.    Do you recall what the result of that legal challenge was?

4    A.    The result was that the DPA, or HRD, removed, if I recall,

5    much of the assessment center portion, if not all of it, from

6    1987.

7    Q.    Without going into the reasons for the change to the

8    examination process, as it finally was -- as a certification

9    list was finally developed from that examination, do you know

10   whether or not the exam had adverse impact against minority

11   applicants?

12   A.    Well, I wouldn't know the actual statistical numbers, but

13   there was a decided lack of minority officers on these lists.

14   Q.    Okay.

15         MR. LICHTEN:  Objection to the Best Evidence Rule.  He

16   says he doesn't have the numbers.

17         THE COURT:  Overruled.

18   Q.    Following the administration of the 1987 exam, Mr.

19   Callahan, are you aware that there was an examination for

20   sergeant administered in 1992?

21   A.    Yes, I am.

22   Q.    Again, we're focusing only on Boston, correct?

23   A.    Yes.

24   Q.    And in 1992, are you aware of whether or not there was an

25   examination -- and this is for the rank of sergeant -- that

1  included an assessment center exercise?

2  A.   Well, there was a structured oral board that was

3  administered in 1992, which would not be a full-blown

4  assessment center.

5  Q.   Can you describe for the Court what that -- what the 1992

6  process entailed?

7  A.   Following the administration of a written exam, the

8  candidates were participating in making a presentation before a

9  group of live assessors to determine whether they were

10 potentially suitable to be a police officer.

11 Q.   Where were these assessors -- where did they come from?

12 Were they interdepartmental supervisors or command staff?

13 A.   No.  They were police commanders from about Massachusetts

14 and New England, from around the New England area.

15 Q.   Do you recall what the logistics were with regard to this

16 process?

17 A.   Well, logistically, it was a cumbersome process as we had

18 a very high number of candidates who had to go through this

19 testing device.  And given the fact that there were live

20 assessors, live panels, there was a lot -- it had bogged down

21 with respect to getting the process completed in a timely

22 fashion.

23 Q.   Do you recall -- you said you had large numbers.  Do you

24 recall how many, roughly, candidates went through this process?

25 A.   I think for sergeant, I believe we had approximately 300;

1    and for the other two ranks, obviously, there were much less,

2    much fewer candidates.

3    Q.   Do you recall where the exercises were held?

4    A.   They were held at the Hynes Convention Center in Boston.

5    Q.   Do you recall what the cost was of the 1992 examination?

6    A.   I don't recall the exact cost, but I believe it was in the

7    half-a-million-dollar range.

8    Q.   Following the administration of the 1992 examination, are

9    you familiar with whether the results of that examination

10   process demonstrated adverse impact on minority officers?

11        MR. LICHTEN:  Objection, your Honor.

12        THE COURT:  Overruled.

13   A.   Once again, there was tremendous discussion about adverse

14   impact during the final -- when that list was finally produced.

15   Again, I don't know the specifics in terms of numbers, but it

16   precipitated a very long delay in hiring and promoting Boston

17   police.  It lasted from 1992 to February of 1995.

18   Q.   When you say that it "precipitated a long delay in

19   promotions," was that the result of a legal challenge?

20   A.   Yes.  There were legal challenges at that point.

21   Q.   Do you recall -- well, first of all, are you familiar with

22   the group MAMLEO?

23   A.   Yes, I am.

24   Q.   Is it your recollection that MAMLEO was involved in the

25   challenge to the results of the 1992 -- the 1992 promotional

1    exercises that included the interview process that --

2    A.   Yes.

3    Q.   Is it your testimony that from the date of that

4    examination's results in 1992, until 1995, there were no

5    promotional appointments made within the City of Boston Police

6    Department?

7    A.   Yes.

8    Q.   Do you recall in 1995 what it was that prompted promotions

9    to resume?

10   A.   Well, 1995, I think that then Police Commissioner Paul

11   Evans had determined that there was a public safety need to

12   make promotions, and he ultimately prevailed upon HRD to

13   provide him with certifications so that he could promote.  And

14   that's what happened.

15   Q.   Now, do you recall, following the administration of the

16   1992 examination, were you involved in any discussions with

17   HRD, or DPA as it was maybe then called, about ways that the

18   resulting list from the 1992 examination could be used to allow

19   for promotions?

20   A.   Yes.

21   Q.   Can you just tell the Court briefly what kind of

22   discussions those involved?

23   A.   Well, HRD had retained Doctor Frank Landy, who was a

24   well-known industrial psychologist, to serve as their expert in

25   trying to resolve what apparently had been an impasse that had

1    gone on for quite some time.  Doctor Landy recommended that we

2    use a sliding --

3              MR. LICHTEN:  Objection, hearsay.

4              THE COURT:  Overruled.

5    A.   Doctor Landy recommended that we use a sliding band

6    methodology to make selections.  That was really HRD's primary

7    way of -- hope of resolving this problem.

8    Q.   And during this time period, you were representing the

9    Boston Police Department in its discussions with HRD, correct?

10   A.   I was involved as was the department's legal staff and

11   others.

12   Q.   Okay.  And do you recall whether the Boston Police

13   Department took a position on whether the use of a band would

14   be acceptable to it in its use of the promotion -- the

15   eligibility list for promotions?

16   A.   I think that there was confusion about the use of the

17   sliding band method.  I think that -- I think there probably

18   wasn't strong support among the hierarchy for the use of the

19   sliding band.

20   Q.   Do you recall whether or not that there was a position

21   taken either by MAMLEO or by the unions with regard to banding?

22   A.   I believe MAMLEO was in support of the use of sliding

23   bands, but the police and the various collective bargaining

24   units within the Boston Police Department were not.

25   Q.   Do you know if banding was ever used to administer the

1   1992 exam list?

2   A.    It was not.

3   Q.    Following the 1995 decision by then Commissioner Evans to

4   engage in promotional appointments, did the Boston Police

5   Department participate in subsequent promotional examinations

6   in the 1990s?

7   A.    I believe in 1998 we participated in the statewide exam.

8   Q.    In 1998, did the police department use any form of an

9   assessment center in the administration of that examination?

10  A.    No.

11  Q.    Following the 1998 exam, can you tell the Court what was

12  your next involvement with the promotional examination process?

13  A.    In 2001, Commissioner Evans empanelled a group of

14  individuals to serve on a committee, a diversity committee, in

15  an effort to see how we could increase diversity at the

16  promotional ranks.  And I was asked to serve on that committee.

17  Q.    And did that committee ultimately recommend that focusing

18  just on the promotional practices that another stab should be

19  taken at the examination process?

20  A.    Yes.

21  Q.    And can you tell the Court what that decision was?

22  A.    Well, the decision was to administer both a written exam

23  and a full assessment center for all three ranks.

24  Q.    Now, when we talk about doing a written exam with a full

25  assessment center, that is -- that is a process that, under

```
1   HRD's rules, is the responsibility of the police department to
2   fund and to administer, is that correct?
3   A.   Yes.
4   Q.   Is it fair to say that HRD also plays an oversight role in
5   the development and administration of the examination?
6   A.   Yes.
7   Q.   I'd like to show you a document that I propose to offer as
8   an exhibit.  This is a Delegation Agreement.  Have you seen
9   this document before, Mr. Callahan?
10  A.   Yes, I have.
11       MS. HARRIS:  I'll just put it up on the screen.
12  Q.   This is a Delegation Agreement between the Boston Police
13  Department and the Human Resources Division.  And I'm going to
14  turn your attention to Page 2 of this document.
15  A.   Yes.
16  Q.   And in the middle portion of the document, it indicates --
17       MR. LICHTEN:  I don't object to this if this is in.
18       MS. HARRIS:  I'm sorry?
19       MR. LICHTEN:  Is this an exhibit?  I'm not going to
20  object to it.
21       THE COURT:  Let's have it marked.  Then there's no
22  question about the contents.
23       THE CLERK:  151.  Just mark it so we have it on --
24  (Exhibit No. 151 received into evidence.)
25  Q.   Mr. Callahan, at Paragraph 2 it reads, "The BPD authorizes
```

1    Edward P. Callahan, Director of Human Resources Division, to

2    act as its representative in all matters relative to this

3    Delegation Agreement."  That is referring to you, correct?

4    A.    Yes.

5    Q.    And then on the bottom of this document, it lists the

6    promotional examinations for the BPD will consist of the

7    following.  And directing your attention to the block that

8    references sergeant, it reads that the written tests will be 40

9    points; the assessment center, 32 points; the Performance

10   Review System, 8 points; and education and experience, 20

11   points.  Do you see where I'm referring you?

12   A.    Yes.

13   Q.    And can you tell the Court, what was the Performance

14   Review System?

15   A.    Well, the Performance Review System was a system developed

16   by Doctor David Morris with the firm of Morris and McDaniel at

17   the request of then Commissioner Paul F. Evans.  The

18   fundamental idea was to somehow potentially quantify the work,

19   the work histories of promotional candidates into a system

20   whereby those points could be integrated into the final score.

21   Q.    And, ultimately, was the Performance Review System -- did

22   that remain part of the examination to the final end -- to the

23   end of the exam?

24   A.    It did not.

25   Q.    Can you tell the Court just briefly what happened to that

1   piece of the examination?

2   A.   Well, I believe that the Boston Police Superior Officers

3   Federation in particular filed litigation at the Civil Service

4   Commission, and my recollection is that the City ultimately

5   pulled the plug on the program.

6   Q.   Okay.  But the examination did go forward on the written

7   exam, the assessment center, and the education and experience

8   piece?

9   A.   Yes, it did.

10  Q.   And do you recall what -- let me strike that.

11      As part of the assessment center exercise, do you recall

12  whether or not -- what the components -- how the components

13  were administered?

14  A.   Well, they were administered at the what was called then

15  the Fleet Center.  They were videotaped.  Exercises, assessment

16  center exercises, that were videotaped, and then the tape

17  stored and maintained until a group of assessors from around

18  the country could come in and make an assessment of the

19  performance of the candidates.

20  Q.   Do you recall when the examination -- when the written

21  examination was administered?

22  A.   The written exam was administered in, I believe, June --

23  I'm sorry, April, April of 2002.

24  Q.   That's off the normal HRD exam cycle, is that correct?

25  A.   Yes.

1    Q.    Is it fair to assume that the assessment center exercises

2    were conducted at some point after the written examination?

3    A.    Yes.

4    Q.    And do you recall, Mr. Callahan, ultimately what the total

5    cost of the 2002 examination process was?

6    A.    The City spent $1.3 million on the administration of both

7    the written exam and the assessment center, but most of the

8    costs were for the assessment center.  I don't think that would

9    count the cost of litigation that went on for several years

10   thereafter.

11   Q.    And do you recall following the -- following the

12   administration of the 2002 examination whether or not the

13   results of that examination showed adverse impact?

14   A.    Once again, it was pretty clear that there were -- the

15   fundamental goal had been to find individuals who were high

16   performance and enhance the level of diversity in the

17   department.  But particularly with the sergeants' list and

18   really the three ranks, that simply didn't happen.

19        MS. HARRIS:  I'd like to offer as the next exhibit a

20   spreadsheet, your Honor, detailing the dates and the cost of

21   this 2002 examination.  I believe this is an attachment to the

22   --

23        MR. LICHTEN:  Your Honor, I've never seen this before,

24   and it wasn't -- I'm not aware of it being noticed as an

25   exhibit.  That being said, I think --

1              MS. HARRIS:  This is part of the --

2              MR. LICHTEN:  I think -- I've never seen it before.  I

3    think it's consistent -- it looks like it's 1.2 million for

4    that exam, and that's consistent with the testimony, so I'm not

5    sure it's a big deal.

6              THE COURT:  Is that a non-objection?

7              MR. LICHTEN:  Yes, because Miss Harris has been so

8    nice to me.

9              THE COURT:  Okay.

10             THE CLERK:  This will be City of Boston's 152.

11   (Exhibit No. 152 received into evidence.)

12   Q.    Then just for the record, Mr. Callahan, this document

13   indicates that the firm Morris and McDaniel began billing the

14   police department in August of 2000.  Do you see that, the

15   first item listed?

16   A.    Yes, I do.

17   Q.    And I'll just direct you to the final sheet on the second

18   page.  The final invoice submitted by Morris and McDaniel was

19   submitted on January 31 of 2003, and then the grand total for

20   this project is 1,258,000-and-some-odd dollars, is that

21   correct?

22   A.    That's correct.

23   Q.    So this entire examination process took some two and a

24   half years from start to finish, is that correct?

25   A.    Yes, it did.

1    Q.   Now, following the administration and the development of

2    an eligible list from the 2002 examination, did the department

3    again go through a promotional exercise?

4    A.   Following 2002?  Yes.  In 2005.

5    Q.   Can you tell us what was -- what type of examination was

6    engaged in in 2005?

7    A.   2005, we went back to the statewide written exam because

8    the 20 percent for the training and education.

9    Q.   Can you tell the Court why it was that in 2005 the Boston

10   Police Department went back to the HRD examination?

11            MR. LICHTEN:  Objection, foundation.

12            THE COURT:  Overruled.

13   A.   Primary reason was a financial reason.

14   Q.   And can you explain to the Court, were there financial

15   concerns that the department was operating under in the time

16   period that we're talking about here, 2003 to 2005?

17   A.   Yes, there were.

18   Q.   What kinds -- directing your attention to the summer of

19   2003, was there an offer made for early retirement for the

20   police department?

21   A.   Yes, there was.

22   Q.   Just explain to the Court what that entailed and why it

23   was done.

24   A.   For the first time, I believe, in the history of the

25   department, an offer went out to sworn officers in an attempt

1    to convince those who had many years of service to retire

2    rather than potentially lay off younger police officers.  And

3    we had about 90 police officers retire in a single day.

4    Q.   When you describe the cost that was entailed in the

5    examination for 2002, was there any budgeting available within

6    the police department to engage in a similar process for the

7    2005 examination?

8    A.   There was not.

9    Q.   I'll focus you again on 2008.  Did the department engage

10   in a 2008 examination?

11   A.   Yes.

12   Q.   And can you tell us what that examination consisted of?

13   A.   Once again, we participated in the statewide HRD written

14   and T&E exam.

15   Q.   Now, Mr. Callahan, are you aware of efforts that the

16   Boston Police Department makes to assist its officers in

17   preparing to take the promotional examinations?

18   A.   Yes, I am.

19   Q.   And what kind of effort does the department engage in?

20   A.   Well, the Boston Police Department engages an outside

21   consultant to provide very extensive tutoring for any police

22   officer who would like to participate.

23   Q.   To your knowledge, did that tutoring exist -- or was that

24   offered to officers in anticipation of the 2005 examination?

25   A.   Yes, it was.

1    Q.    And those classes are held at the Boston Police Academy?

2    A.    Actually, they were held normally at the police academy

3    but, I believe, other locations as well.

4    Q.    And in anticipation of the 2008 examination, to your

5    knowledge, does the Boston -- did the Boston Police Department

6    offer study assistance?

7    A.    Yes, we did.

8    Q.    What did the department offer?

9    A.    Again, we offered extensive tutorial work for any officers

10   who would wish to participate.  Based on the fact that our

11   officers work three main shifts, we offer that training

12   extensively for anybody who would like to participate.  Many

13   do.

14   Q.    I didn't mean to cut you off.

15   A.    Many officers do participate.

16   Q.    Do you know, Mr. Callahan, whether or not the Boston

17   Police Department makes study material available?

18   A.    Yes, we do.

19   Q.    I'm going to show you a document which is dated June 24,

20   2008.

21        MS. HARRIS:  And I would offer this document.

22        MR. LICHTEN:  Your Honor, what I propose to do is I'll

23   consult with my clients, some of whom are here today, about

24   whether they've seen this.  I've never seen this before.  It's

25   never been offered.  It's never been given to us.  I'll try to

1   agree to it by tomorrow.  I can't agree to it right now until I

2   consult with my clients.

3           THE COURT:  Why don't you use it and we'll --

4           MR. LICHTEN:  I'll ask them after today.

5   Q.   Just simply, Mr. Callahan, does this document indicate

6   that the Boston Police Department has study materials that are

7   available for officers who may wish to pick it up?

8   A.   Yes, it does.

9   Q.   Okay.  And those are study materials that are made

10  available to police officers at no cost to themselves, is that

11  correct?

12  A.   At no cost to themselves.  It could be used virtually

13  anywhere.

14  Q.   And the other training sessions that you've described, are

15  those sessions also held at no cost to the police officers who

16  wish to participate?

17  A.   Yes, they are.

18  Q.   Mr. Callahan, in all of the work --

19          THE COURT:  We should give that document a number,

20  whether it's admitted now or just marked for identification,

21  just so it's clear for the record.

22          THE CLERK:  It will be marked as 153.

23          MS. HARRIS:  153 for identification.

24          THE COURT:  For ID right now, subject to --

25  (Exhibit No. 153 marked for identification.)

1    Q.    Mr. Callahan, as the Director of Personnel at the Boston

2    Police Department, do you have familiarity with a state law

3    provision called the Quinn Bill?

4    A.    Yes, I do.

5    Q.    And can you tell the Court what the Quinn Bill entails?

6    A.    The Quinn Bill is an educational incentive program that

7    all of our officers have an opportunity to participate in.

8    Basically, if a police officer has a degree in criminal

9    justice, an associate's degree, that officer gets 10 percent of

10   his base pay per year.  If he has a degree in criminal justice

11   at the bachelorette level, he gets 20 percent increase in pay.

12   If he has a master's degree in criminal justice or a law

13   degree, he gets a 25 percent increase in his base pay.

14   Q.    To your knowledge, have police officers taken advantage of

15   this incentive?

16   A.    Many have.

17   Q.    And do you know -- well, as the Director of Personnel,

18   your office is responsible for ensuring that officers who are

19   Quinn Bill eligible actually receive the incentivized packages

20   that you've just described, right?

21   A.    Yes.

22   Q.    And do you know what the proportion of officers of color

23   who are Quinn Bill eligible compared to their number -- their

24   strength in the force?

25   A.    Approximately 50 percent of minority officers participate

1   in the Quinn Bill.

2   Q.    And, similarly, for non-minority officers, do you know

3   what percentage of those officers participate in the Quinn

4   Bill?

5   A.    Approximately 75 percent.

6   Q.    75 percent of the white officers?

7   A.    Yes, right, of the eligible white officers.

8   Q.    Now, can you tell us, Mr. Callahan, in the creation of the

9   -- or the participation, I should say, of the Boston Police

10  Department in the examinations that are administered by HRD,

11  does the police department have any role in developing those

12  examinations?  And I'm talking here about the exams that HRD

13  does, not those under a Delegation Agreement.

14  A.    We do assist HRD by providing subject matter experts who

15  will review questions particularly if they're related to the

16  Boston component of these exams.

17  Q.    And has the Boston Police Department provided subject

18  matter experts to HRD in the 2005 and 2008 examinations?

19  A.    Yes, we did.

20  Q.    And when you reference the Boston component, can you just

21  describe for the Court what you're referring to?

22  A.    So-called Boston component is a -- are a number of

23  questions that are added onto the state list that are drawn

24  from Boston Police Department's source documents, particularly

25  from training manuals or special orders, for the various rules

1    and procedures of the department.

2    Q.   And the rules and procedures, special orders, et cetera,

3    these are all documents that are the -- the working documents

4    of the Boston Police Department, correct?

5    A.   That's correct.

6    Q.   And the -- when one goes through the police academy, are

7    the Boston Police Department rules and regulations part of sort

8    of the entry-level package that recruit officers are required

9    to study and to learn?

10   A.   Yes, they are.

11   Q.   To your knowledge, are the -- is the Boston component

12   drawn from the rules and regulations and the special orders of

13   the Boston Police Department?

14   A.   All of the questions in the Boston component are drawn

15   from Boston Police Department source documents.

16   Q.   And, obviously, any officer who works for the Boston

17   Police Department has access to those documents, correct?

18   A.   Yes.

19   Q.   And, in fact, they're required to be familiar with those

20   documents as part of their daily operations as police officers

21   regardless of which rank they hold, correct?

22   A.   Yes, they are.  They're, in essence, the standard

23   operating procedures of the department.

24   Q.   Now, Mr. Callahan, when the Boston Police Department

25   engages in a promotional examination, it's fair to say that it

1    promotes only Boston police officers who tested and were placed

2    on the eligibility list, correct?

3    A.    Yes.

4    Q.    And as you know, there are a multitude of defendants here.

5    But Boston has never promoted an officer, say, from Springfield

6    or from Worcester into a supervisory position within the Boston

7    Police Department, correct?

8    A.    That's correct.

9    Q.    And you have no knowledge or -- strike that.

10         Does the Boston Police Department get information from HRD

11   concerning the results of its test as it applies in other

12   communities?

13   A.    No.

14   Q.    Do you understand what I'm saying?  Okay.

15         And aside from lateral hires -- strike that.

16         Can you describe for the Court what a lateral hire at the

17   Boston Police Department is?

18   A.    A lateral hire is the selection of a police officer from

19   another community in Massachusetts who is working in a Civil

20   Service community.  Happens fairly rarely.  We've done it at

21   least once in the last 25 years, but we did hire a good number

22   of suburban police officers to come to work for us in 2005.

23   Q.    And do you know, under Civil Service law, if a police

24   officer is laid off in another community, does he or she have a

25   preference in hiring at another Civil Service department?

```
 1   A.   Any laid-off police officer in Massachusetts who is
 2   working in a Civil Service community is placed on a
 3   reemployment list and has first option of any police job that's
 4   available in the Commonwealth.
 5   Q.   When the Boston Police Department engaged in lateral
 6   hires, as you've just described, do you know if it was in the
 7   context of reemployment of officers who had been laid off?
 8   A.   It was not.
 9   Q.   Okay.  Do you know or can you tell us whether -- in the
10   lateral hires that the BPD engaged in, whether there were
11   lateral hires at a supervisory level?
12   A.   There were not.
13   Q.   They were all at the patrol officer level?
14   A.   Yes.
15        MS. HARRIS:  All right.  Thank you, Mr. Callahan.  I
16   have no further questions.
17        MR. CARROLL:  Springfield has no questions.
18        THE COURT:  Can I just ask a couple questions about
19   the Boston component, Mr. Callahan.  I wasn't clear.  Those
20   questions are administered -- part of the test is administered
21   by HRD?
22        THE WITNESS:  Yes, they are.
23        THE COURT:  Add-on to bring the number up from 80 to
24   some other number?
25        THE WITNESS:  Yes.
```

1          THE COURT:  What's the number?

2          THE WITNESS:  I believe it's 25, 25 additional.

3          THE COURT:  Who develops those questions?

4          THE WITNESS:  HRD does this consultation with subject

5    matter experts from the Boston Police Department.

6          THE COURT:  Okay.

7          MS. HARRIS:  Just one follow-up.

8    Q.   Mr. Callahan, just in response to the Court's inquiry,

9    have you actually seen any of the examinations?

10   A.   No.

11   Q.   So as far as your awareness of how the Boston component

12   fits into it, this is your assumption, but you've actually

13   never seen the examinations themselves?

14   A.   I have not reviewed any test questions during my time with

15   the department.

16   Q.   To your knowledge, is that at least in part due to the

17   fact that HRD considered the test questions to be confidential?

18   A.   Yes.

19          MS. HARRIS:  Just for the Court's information, I

20   believe that Mr. Callahan's testimony, with all deference to

21   Mr. Callahan's experience, is incorrect.  But I can confer with

22   Mr. Lichten.  We may be able to stipulate.

23          THE COURT:  There may be an agreed answer to my

24   question?

25          MR. LICHTEN:  There's 80 questions.

```
1              THE COURT:  Fine.
2              MR. LICHTEN:  80 questions, whether statewide or
3    Boston.
4              THE COURT:  Miss Engdahl?
5              MS. ENGDAHL:  No questions.
6              MR. LEAHEY:  No questions, your Honor.
7              MR. McDERMOTT:  No questions, your Honor.
8              MR. McQUILLAN:  No questions, your Honor.
9              MR. D'AGOSTINO:  No questions.
10             THE COURT:  Mr. Lichten?
11             MR. LICHTEN:  You want me to start now, your Honor?
12             THE COURT:  Yeah.
13             MS. HARRIS:  If I may, perhaps before Mr. Lichten
14   begins, Mr. Callahan is here from Falmouth on vacation.  I
15   would like not to eat up two days of his vacation if it's at
16   all possible.  And I don't want to raise this issue in the
17   middle of Mr. Lichten's cross.
18             MR. LICHTEN:  There's no way that I can finish today,
19   your Honor.  They brought up stuff regarding examinations as
20   far back as 20 years without telling me what they were going to
21   testify about.
22             THE COURT:  What's your time estimate?  More than an
23   hour?
24             MR. LICHTEN:  No, I don't think more than an hour.
25             THE COURT:  We can do it at 2:00.
```

1          MS. HARRIS:  It's fine with me.

2          MR. LICHTEN:  Your Honor, I -- in all fairness, you

3     know, I didn't know what they were going to ask him.  I would

4     like some time to prepare some of my cross-examination.  He's

5     talking about exams from very far back.

6          THE COURT:  Okay.  We'll do it tomorrow.  Do ten

7     minutes now and we'll -- it is what it is.  Maybe you can

8     charge this as a workday.

9          MR. LICHTEN:  They can give him another vacation day.

10    CROSS-EXAMINATION BY MR. LICHTEN:

11    Q.    You came to the department in what year?

12    A.    1986.

13    Q.    In 1986, you were in the middle of an exam, is that

14    correct?

15    A.    Well, I believe the department was preparing for an exam

16    in 1987.

17    Q.    Let me ask it this way:  The consent decree that you've

18    described, that's a consent decree from 1979, is that correct?

19    A.    I believe that is the date, yes.

20    Q.    Okay.  And that consent decree required -- strike that.

21          As I understand it, in 1978 or thereabouts, MAMLEO sued

22    the City of Boston saying that the police department's

23    pen-and-pencil sergeant 's promotional exam discriminated

24    against minority candidates, is that correct?

25    A.    I'm not familiar with the lawsuit itself, Counselor.

1    Q.   Are you familiar with the consent decree -- since you were

2    involved in the consent decree, were you not?

3    A.   I was involved with assisting in the administration of the

4    exams.

5    Q.   Well, let me ask it this way:  Were you aware that one of

6    the things that the City of Boston was required to do under

7    this examination was to -- that they were barred from using

8    non-validated tests and required to validate all -- they were

9    required to validate all upcoming promotional tests?

10   A.   I believe that would be true, yes.

11   Q.   Okay.  And isn't it a fact that the United States Court of

12   Appeals for the First Circuit found that from 1979 to 1985 the

13   City of Boston violated the decree by failing to validate any

14   exam or to give any validated exam between 1979 and 1985?

15        MS. HARRIS:  I object, your Honor.  I think the

16   consent decrees say what they say.  Mr. Callahan's --

17        THE COURT:  That's all right.  You're right, and so

18   does the opinion of the Court of Appeals.  But go ahead.  You

19   can answer that.

20   A.   I would not be aware of that, Counselor.  I didn't join

21   the department until 1986, so I had no previous knowledge.

22        MR. LICHTEN:  Your Honor, can we switch to Mr.

23   Sulman's computer?

24        THE COURT:  What's it called?  Here it is.

25        MR. LICHTEN:  Can you move it?

1    Q.    Okay.  And I'm looking at the decision of the United

2    States Court of Appeals in -- is this <u>Stuart vs. Roache</u> --

3    <u>Stuart vs. Roache</u>.  Mickey Roache was the police commissioner,

4    is that right?

5    A.    Yes, he was.

6    Q.    And it says, "During the decree's initial life between

7    1980 and 1985" -- and that's talking about this consent decree

8    that I just showed you -- "The Department failed to give any

9    'validated-fair' examinations, and it failed to meet the

10    consent degree's numerical goals."  Do you see that?

11    A.    Yes, I do.

12    Q.    My question is:  Do you recall that as being correct?

13    A.    Yes, I do.

14    Q.    And then it says, "As a result, MAAAP successfully

15    petitioned the Court to extend the decree's life until 1990 and

16    modify its goals and timetables."  Do you see that?

17    A.    Yes, I do.

18    Q.    By that, I take it there was an agreement made to continue

19    to permit the City of Boston to hire minority sergeants based

20    on some numerical goal, is that accurate?

21    A.    Yes, it is.

22    Q.    So the minorities that were getting promoted during this

23    time were not getting promoted as a result of some validated

24    examination, but they were getting promoted as a result of some

25    numerical goals that had been approved by the court?

1    A.    I do recall the goals and timetables, yes.

2    Q.    And then it says, "Between 1985 and 1990, the Department

3    successfully administered one 'validated-fair' examination."

4    Do you see that?

5    A.    Yes, I do.

6    Q.    Okay.  And that is the 1985 examination, is it not?

7          MS. HARRIS:  Objection.

8          THE COURT:  Well --

9    A.    Well, there was a 1987 exam, but I don't know which one of

10   these exams would be the fair validated exam.

11   Q.    Let's see if we can explore that.  In 1987, what happened

12   was there was going to be a multi-component examination, is

13   that correct?

14   A.    Yes.

15   Q.    And just so that we understand what happened -- you

16   testified about this -- in 1987, after hiring Morris and

17   McDaniel and putting together a process that would have had

18   multi-components, an allegation arose that a Captain Sweeney

19   had tainted the oral exercises, the in-basket and video

20   exercises, is that right?

21   A.    That's my recollection, yes.

22   Q.    And as a result of that, you said there was litigation.

23   But there wasn't actually litigation.  Wasn't it the fact that

24   David Haley, the personnel administrator in conjunction with

25   the Boston Police Department, made a decision to throw out all

1    of the video exercises and all the in-basket exercises and only

2    go with the written examination?

3             MS. HARRIS:  Your Honor, I object.

4             THE COURT:  Overruled.

5    Q.   Isn't that what happened?

6    A.   He did do that, yes.  But there was subsequent litigation,

7    as I understand.

8    Q.   There was subsequent litigation, but that litigation was

9    challenging the decision to throw out those exercises and oral

10   assessment centers, isn't that correct?

11   A.   Yes, it is.

12   Q.   So, in fact, the sequence of events, so that we're clear,

13   is that before there was any litigation a decision was made by

14   Haley to throw out all the video and assessment and in-basket

15   assessment, is that correct?  Is that correct?

16   A.   Yes.

17   Q.   After that some people brought an action trying to get

18   those portions restored?

19   A.   Yes, they did.

20   Q.   Okay.  And that case went to the Civil Service Commission;

21   do you recall that?

22   A.   Yes, I do.

23   Q.   And the Civil Service Commission ruled, did it not, that

24   the test with only the written component was not a fair

25   assessment of the duties and responsibilities of a Boston

1    Police supervisor, isn't that correct?

2            MS. HARRIS:  I'll object.  It states what the decision

3    says.

4            THE COURT:  No.  You may answer.

5    A.   I don't, quite frankly, remember what the Commission said,

6    but I do know they did put the other component back in place.

7    Q.   The Commission said that in order to have a fair

8    examination you had to put those portions back in; isn't that

9    what they said?

10           MS. HARRIS:  Object.

11           THE COURT:  I'll sustain that objection.

12           MR. LICHTEN:  Well, I'll have it by tomorrow, the

13   decision.

14   Q.   But, in fact, the only people affected by that decision

15   were the few people who appealed.  The department never went

16   back and rescored everybody and gave them the videos and the

17   oral components back and then made new promotional decisions,

18   isn't that correct?

19   A.   I believe that's correct.

20   Q.   Okay.  So in this court decision, when it talks about the

21   one "validated-fair" examination, it is talking about 1985, is

22   it not, because 1987 was not that examination, was it?

23   A.   It would appear --

24           MS. HARRIS:  Objection.

25           THE COURT:  Overruled.

1    A.    It would appear to be the 1985 exam.

2    Q.    And it says in here, "The number of blacks promoted during

3    this time, however, still fell short of the decree's numerical

4    goals."  Do you see that?

5    A.    Yes.

6    Q.    Do you know, as you sit here today, what the results were

7    with respect to that 1985 validated-fair examination?

8    A.    I would have no idea.

9    Q.    Have you looked for those results in any way?

10   A.    No, I have not.

11         THE COURT:  Maybe that's a place to stop.

12         MR. LICHTEN:  That's fine, your Honor.  I'll look for

13   those.

14         THE COURT:  All right.  We'll resume with the witness

15   tomorrow.

16   (Whereupon, at 1:00 p.m. the trial recessed.)

17

18

19

20

21

22

23

24

25

1                   C E R T I F I C A T E

2

3          We, Marcia G. Patrisso, RMR, CRR, and Cheryl

4   Dahlstrom, RMR, CRR, Official Reporters of the United States

5   District Court, do hereby certify that the foregoing transcript

6   constitutes, to the best of our skill and ability, a true and

7   accurate transcription of our stenotype notes taken in the

8   matter of Civil Action No. 07-11693-GAO, Pedro Lopez, et al v.

9   City of Lawrence, et al.

10

11  /s/ Marcia G. Patrisso
    MARCIA G. PATRISSO, RMR, CRR
12  Official Court Reporter

13
    /s/ Cheryl Dahlstrom
14  CHERYL DAHLSTROM, RMR, CRR
    Official Court Reporter
15

16  Dated:  July 27, 2010

17

18

19

20

21

22

23

24

25