UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| PEDRO LOPEZ, Individually and on behalf of a class of individuals similarly situated, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Action ) No. 07-11693-GAO |
| CITY OF LAWRENCE, et al., | ) ) |
| Defendants. | ) ) |

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY TWELVE
NON-JURY TRIAL

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Wednesday, July 28, 2010
9:03 a.m.

Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1   APPEARANCES:

 2        LICHTEN & LISS-RIORDAN, P.C.
          By: Harold L. Lichten, Esq.
 3            Joseph L. Sulman, Esq.
          100 Cambridge Street, 20th Floor
 4        Boston, Massachusetts  02114
          On Behalf of the Plaintiffs
 5
          CITY OF LOWELL LAW DEPARTMENT
 6        By: Brian W. Leahey, Esq.
              R. Eric Slagle, Esq.
 7        City Hall
          375 Merrimack Street
 8        Lowell, Massachusetts  01852
          On Behalf of the Defendant City of Lowell
 9
          OFFICE OF THE CITY ATTORNEY
10        By: Richard J. D'Agostino, Esq.
          200 Common Street, Suite 306
11        Lawrence, Massachusetts  01840
          On Behalf of the Defendant City of Lawrence
12
          COLLINS, LOUGHRAN & PELOQUIN
13        By: Laurie W. Engdahl, Esq.
          320 Norwood Park South
14        Norwood, Massachusetts  02062
          On Behalf of the Defendant City of Worcester
15
          MORGAN, BROWN & JOY, LLP
16        By: Mary Jo Harris, Esq.
              Robert P. Morris, Esq.
17        200 State Street, 11th Floor
          Boston, Massachusetts  02109
18        On Behalf of the Defendant City of Boston

19        MBTA LAW DEPARTMENT
          By: Kevin S. McDermott, Esq.
20        10 Park Plaza, 7th Floor
          Boston, Massachusetts  02116
21        On Behalf of the Defendant MBTA

22

23

24

25
```

```
 1          CITY OF SPRINGFIELD LAW DEPARTMENT
            By: Harry P. Carroll, Esq.
 2          36 Court Street
            Springfield, Massachusetts  01103
 3          - and -
            LAW OFFICE OF EDWARD M. PIKULA
 4          By: Edward M. Pikula, Esq.
            1350 Main Street, 15th Floor
 5          Springfield, Massachusetts  01103
            On Behalf of the Defendants City of Springfield
 6          and Mayor Sarno

 7          CITY OF METHUEN - OFFICE OF THE CITY SOLICITOR
            By: Peter J. McQuillan, Esq.
 8          The Searles Building, Suite 311
            41 Pleasant Street
 9          Methuen, Massachusetts  01844
            On Behalf of the Defendant City of Methuen
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2                              Direct   Cross   Redirect   Recross

3
   WITNESSES FOR THE
4    DEFENSE:

5  EDWARD P. CALLAHAN, resumed

6        By Mr. Lichten                7
         By Ms. Harris                                    33
7
   WILLIAM FITCHET
8
         By Mr. Pikula             52
9        By Mr. Lichten                   88

10 DELORES FORD-MURPHY

11       By Mr. McDermott          99
         By Mr. Lichten                   111              133
12       By Mr. McDermott                            122
                          E X H I B I T S
13

14 PLAINTIFFS'
    EXHIBIT      DESCRIPTION                   FOR ID   RECEIVED
15
    1   Assessment Centers Information FY03-08            45
16
    2   Delegation Agreements                             45
17
    3   State Exam Outline 2005                           45
18
   63   Worcester 2007 and 2009 Eligibility Lists         40
19
   68   Guidelines and Ethical Considerations for Assessment
20      Center Operations                                 45

21 70   March 30, 2009 letter from Rick Jacobs to Paul Dietl  45

22 71   January 22, 2009, email from Vivian Lee to John
        Marra with attachment                             45
23
   72   October 1, 2007, letter from Sally McNeely to Police
24      Officer Applicant                                 45

25

| | | | |
|---|---|---|---|
| 1 | 73 | February 3, 2009, letter from Sally McNeely to Paul Dietl | 45 |
| 2 | | | |
| 3 | 79A | Revised table from Wiesen 4/10 report | 42 |
| | 85A | Revised table from Wiesen report re: Springfield | 42 |
| 4 | | | |
| | 154 | City of Boston/Dr. Silva documents relating 2002 exam | 16 |
| 5 | | | |
| | 155 | 2003 test results for sergeant promotion | 39 |
| 6 | | | |
| | 156 | 2004 test results for sergeant promotion | 39 |
| 7 | | | |
| | | DEFENDANTS' | |
| 8 | | <u>EXHIBIT</u> | |
| 9 | 149 | Chart showing ethnic background of sergeants | 111 |
| 10 | 153 | City of Boston document re: study material availability | 47 |
| 11 | | | |
| | 157 | City of Boston study seminars re: promotional | |
| 12 | | examinations | 47 |
| 13 | 158 | City of Boston sergeant's training | 48 |
| 14 | 159 | City of Springfield ordinance | 54 |
| 15 | 160 | City of Springfield Chapter 169 of the Acts of 2004 | 55 |
| 16 | 161 | City of Springfield Authorization of Employment form dated 4/3/06 | 63 |
| 17 | | | |
| | 162 | City of Springfield Form 14 dated 3/14/07 | 64 |
| 18 | | | |
| | 163 | City of Springfield Form 14 dated 8/24/08 | 67 |
| 19 | | | |
| | 164 | City of Springfield Form 14 dated 11/19/09 | 67 |
| 20 | | | |
| | 165 | Job description for sergeant | 80 |
| 21 | | | |
| | 169 | Springfield P.D. rosters, 2006-2009 | 81 |
| 22 | | | |
| | 170 | Massachusetts HRD Sergeant Task Survey Analysis | 81 |
| 23 | | | |
| | 171 | Summary of roster data for the Springfield P.D. by race, sex, and position | 84 |
| 24 | | | |
| 25 | 172 | April 2010 roster of sergeant | 84 |

```
 1                    P R O C E E D I N G S

 2            THE CLERK:  All rise.

 3            (The Court enters the courtroom at 9:03 a.m.)

 4            THE CLERK:  For a continuation of the Lopez trial.

 5            Be seated.

 6            COUNSEL IN UNISON:  Good morning, your Honor.

 7            THE COURT:  Good morning.

 8            MR. LICHTEN:  Your Honor, just a brief

 9    scheduling -- all the parties have conferred but we don't know

10    what the Court's schedule is, obviously, and it sounds like all

11    the remaining experts and everybody could be -- make themselves

12    available for the full week of September 13th, which we think

13    would be the final week and the evidence would close, but we

14    don't know if the Court has that date available.

15            (Laughter.)

16            MS. HARRIS:  We're not doing it without you.

17            MR. LICHTEN:  We couldn't call you up last night.

18            THE COURT:  I expect we -- I have a case scheduled for

19    that time, and the parties were here yesterday because they

20    want to adjust it.  And I just wanted to let them know that if

21    they did, they would lose that date until sometime later and we

22    could use it for this case.

23            MR. LICHTEN:  Perfect.  Wow, that's just amazing.

24            THE COURT:  So I'm -- that's tentative because I want

25    to hear back from them.  It's a serious case because it
```

```
 1    involves a civil commitment on a federal prisoner, and so time
 2    might be important to them, but I suspect that they will rather
 3    have the preparation time and take a later date.  But we'll
 4    know later today.
 5              But that's exactly the week I was thinking of.
 6              MR. LICHTEN:  Great.
 7              THE COURT:  I don't want to encourage anybody too
 8    much, but we actually -- I think we had blocked off two weeks
 9    for that case --
10              MR. LICHTEN:  Please don't say that.
11              THE COURT:  -- so it creates a two-week hole.
12              MS. HARRIS:  I'm scheduled for a trial in Fall River
13    that week, but I know that the Fall River Superior Court is
14    moving, and I've heard from the clerk that that could be
15    tentative.  But I just flag that as a potential issue, but I'm
16    assuming that I could get protection from the Court.
17              MR. LICHTEN:  Under the supremacy clause, I think.
18              THE COURT:  Well, I think under the
19    already-in-progress rule.
20              MS. HARRIS:  Yes.
21              THE COURT:  Okay?
22              MR. LICHTEN:  Thank you, your Honor.
23              THE COURT:  Mr. Callahan.
24                        EDWARD P. CALLAHAN, resumed
25                      CONTINUED CROSS-EXAMINATION
```

```
 1    BY MR. LICHTEN:

 2    Q.   Good morning, Mr. Callahan.

 3    A.   Good morning, counsel.

 4    Q.   You were shown this delegation agreement yesterday; do you

 5    recall that?

 6    A.   Yes, I do.

 7    Q.   Okay.  And if I understand this, Morris & McDaniel were

 8    responsible under this delegation agreement for doing the job

 9    analysis, doing the validation and doing the whole examination;

10    is that right?

11    A.   That's correct.

12    Q.   Okay.  And then there's also in evidence Exhibit 42, which

13    I'm just going to put up here.  They've put together a

14    voluminous job analysis report for police sergeant.  Do you

15    recall that?

16    A.   Yes.

17    Q.   Okay.  That's Exhibit 42.  And as I understand what they

18    did, they went through a very detailed process for figuring out

19    what the knowledge, skills and abilities were for the position

20    of police sergeant in Boston, and then ranking those

21    knowledges, skills and abilities through some methodology; is

22    that correct?

23    A.   As I understand it, yes.

24    Q.   Okay.  And you were the point person for them on that; is

25    that right?
```

1    A.    My responsibility was to ensure that we had police

2    officials participate, so I scheduled the events with the

3    subject matter experts primarily.

4    Q.    Okay.  And obviously that work preceded the examination in

5    2002; is that right?

6    A.    Yes.

7    Q.    Okay.  And you were asked questions about why the work

8    seems to go back even to the year of 2000.  And the reason is

9    because they were doing all this preparatory work; is that

10   correct?

11   A.    Yes.

12   Q.    Okay.  And if we look at the -- their bill, we can see

13   this is -- it says "budget year"; is that correct?  Is that the

14   same as fiscal year?

15   A.    Yes, it is.

16   Q.    So when it says "2001," that's actually July 1st, 2000,

17   until June 30th, 2001; is that correct?

18   A.    Yes.

19   Q.    Okay.  So we see that -- and the exam wasn't actually

20   given until October of 2002, which would be in fiscal year of

21   2003; is that correct?

22   A.    Yes.

23   Q.    So it looks to me that a lot of their preparatory work,

24   nearly one million of it, took place before the exam; is that

25   correct?

1    A.    Yes.

2    Q.    And a large chunk of it, 520,000, took place in fiscal

3    year 2001, which would be July 1, 2000, until June 30, 2001; is

4    that correct?

5    A.    It would appear so, yes.

6    Q.    So I take it that what we know from that is that a lot of

7    their money -- a lot of their charge went to developing this

8    job analysis; is that right?

9    A.    Well, it could be.  I'm not certain whether -- the time

10   frame when they submitted these bills.  But I think a lot of it

11   was for the preliminary work.

12   Q.    Okay.  Now, you're aware, are you not, that once a job

13   analysis is done, that determines what the knowledge, skills

14   and abilities of a police sergeant are in the City of Boston,

15   that job analysis can last for five, six, seven, eight years

16   before it has to be redone; is that correct?

17             MS. HARRIS:  Objection.

18             MR. CARROLL:  Objection.

19             THE COURT:  Sustained.

20             MR. LICHTEN:  Okay.

21   BY MR. LICHTEN:

22   Q.    Do you know what the lifespan of a job analysis is under

23   the Uniform Guidelines?

24   A.    Well, I've heard that five years is -- five to ten years

25   is the lifespan.

1   Q.    Okay.  So if a job analysis was done in 2000 or 2001, that

2   job analysis could be valid for the 2002 exam; is that correct?

3   A.    Yes.

4   Q.    The 2005 exam; is that correct?

5   A.    Yes.

6   Q.    And the 2008 exam; is that correct?

7   A.    Yes.

8   Q.    So if Morris & McDaniel or another reputable industrial

9   psychology firm had been asked to develop a exam by the City of

10  Boston for 2005 and 2008, it would have been able to use the

11  job analysis that had already been done in 2000 and for which

12  you, the City of Boston, had paid handsomely; isn't that

13  correct?

14  A.    Yes.

15  Q.    So, in fact, if the City of Boston had decided to do an

16  exam itself in 2005 and 2008, it wouldn't have paid $1.2

17  million in 2005 and 2008; it would have paid substantially less

18  than that if it had utilized the job analysis that had already

19  been done by Morris & McDaniel in the early 2000 -- in the

20  2000-2001 period; is that correct?

21              MR. CARROLL:  Objection.

22              THE COURT:  Overruled.

23              THE WITNESS:  If the city had decided to use the older

24  job analysis, it would have reduced the cost, yes.

25  BY MR. LICHTEN:

1    Q.    And in 2005 and 2008, did the city take any steps

2    whatsoever to seek RFPs or requests -- invitations to bid to

3    determine what the cost might be to administer a multicomponent

4    examination using the job analysis that had already been

5    prepared --

6    A.    No.

7    Q.    -- by Morris & McDaniel?

8    A.    No, they did not.

9    Q.    So as to what the cost would have been, you simply do not

10   know; is that correct?

11   A.    That's correct.

12   Q.    Now, looking at this delegation agreement for a moment,

13   and I want to go to page 2, I see in here that the points

14   allotted to the various components had already been determined

15   by this time; is that correct?

16   A.    Yes.

17   Q.    Okay.  And just so that I'm clear, do you know who

18   recommended that the apportionment be 40 points -- for the

19   sergeant's exam 40 points for the written test, 32 points for

20   the assessment center, and eight points for the performance

21   review system?

22   A.    That was Dr. David Morris.

23   Q.    Okay.  So that apportionment was recommended by the

24   expert, Dr. Morris, I take it based on his job analysis; is

25   that right?

1    A.    That would be my understanding, yes.

2    Q.    Okay.  And if I understand it, after the performance

3    review system points, which were going to be eight points, were

4    taken out, is it a fair statement that those were then

5    apportioned to the assessment center, not to the written test?

6    A.    That's correct.

7    Q.    Okay.  And that was -- again, that recommendation, if you

8    weren't going to use the PRS, where to put the points, I take

9    it that was again made by Morris & McDaniel; is that right?

10   A.    Yes.

11   Q.    So in 2002, you were being told by your expert industrial

12   psychologist that a fair apportionment of the weightings of the

13   components of the assessment center would be 40 percent for the

14   assessment center, 40 percent for the written job-knowledge

15   test, and 20 percent for the training and experience; is that

16   right?

17   A.    Yes.

18   Q.    Did Morris & McDaniel ever provide you with the opinion

19   subsequent to that that it was okay to have 80 percent of that

20   attributed to the job-knowledge test alone and have no points

21   attributed to an assessment center?

22            MS. HARRIS:  Objection.

23            THE COURT:  Overruled.

24            You may answer.

25            THE WITNESS:  No.

1    BY MR. LICHTEN:

2    Q.   So who made the decision, if anybody, to disregard the

3    recommendation that Morris & McDaniel had made in 2002 for the

4    weightings with respect to the 2005 and 2008 examination?

5            MS. HARRIS:  Objection.

6            THE COURT:  Sustained.

7            MS. HARRIS:  They're two different exams.

8            MR. LICHTEN:  I'm sorry.

9            THE COURT:  The objection was sustained.

10            MR. LICHTEN:  But I didn't hear the grounds for it.

11   I'm sorry.

12            MS. HARRIS:  They're different exams.

13            MR. LICHTEN:  Yes.

14   BY MR. LICHTEN:

15   Q.   Let me ask it this way:  Did anybody, any industrial

16   psychologist or expert in the field that you're aware of, make

17   a recommendation to you that it was okay to change the

18   weighting for the 2005 and 2008 exam to 80 percent technical

19   knowledge multiple-choice and zero percent to an assessment

20   center?

21            MS. HARRIS:  Objection.

22            THE COURT:  No, you may answer that.

23            THE WITNESS:  No.

24   BY MR. LICHTEN:

25   Q.   Okay.  Now, finally on this particular area, with respect

1    to the 2002 exam, the questions in that exam for the written

2    portion were written by Morris & McDaniel; is that correct?

3    A.    Yes.

4    Q.    And as you sit here today you don't know what those

5    questions were; is that correct?

6    A.    That's correct.

7    Q.    Do you even know if they tested for situational judgment

8    or job knowledge or a combination, do you know?

9    A.    I do not know.

10   Q.    Okay.  But for the 2005 and 2008 examination, I take it it

11   is fair to state that there wasn't -- the City of Boston did

12   not retain a firm such as Morris & McDaniel to write those

13   questions.  It relied on HRD; is that right?

14   A.    Yes.

15   Q.    So what the difference in the questions were, if any, the

16   type of questions, you don't know?

17   A.    That's correct.

18   Q.    Now, turning to the results of the 2002 examination -- and

19   I'm not going to ask you very much about this.  This is

20   Exhibit --

21            MR. LICHTEN:  Did you offer this in?

22            MS. HARRIS:  I don't.  I can't even -- I can't read

23   it.

24            MR. LICHTEN:  This is the 2000 -- you gave us this.

25            MS. HARRIS:  If I can confer with him for just a

1    moment?

2            THE COURT:  Go ahead.

3            (Counsel confer off the record.)

4    BY MR. LICHTEN:

5    Q.   I'm going to show you what will now be marked as

6    Exhibit --

7            MR. LICHTEN:  Are we up to 154?

8            THE CLERK:  154.

9            MR. LICHTEN:  154.  First, I would offer this in.

10   These are the -- these are documents provided to us by the City

11   of Boston and Dr. Silva relating to the 2002 exam, your Honor.

12   And we'll get a copy for the Court.

13           (Plaintiffs' Exhibit No. 154 received into evidence.)

14   BY MR. LICHTEN:

15   Q.   My question is simply:  Did you ever undertake, after

16   2002, to see how minorities fared on the assessment portion of

17   the 2002 exam compared to how they fared on the written portion

18   and compare that with how non-minorities fared on each?

19           MS. HARRIS:  I'll object.  There's no foundation.  I

20   don't believe that this -- first, I don't think this

21   information was provided by the City of Boston.  I believe it

22   was provided by HRD, which, under the delegation agreement, was

23   the entity that received all of the scored data.

24           MR. LICHTEN:  I'll rephrase the question, then, your

25   Honor.

BY MR. LICHTEN:

Q.   After the 2002 exam was administered -- you've been asked
some questions by Ms. Harris and you said that basically you
weren't that happy with the results and so you went back to the
2005 HRD exam.  Did I hear that right?

A.   It was the combination of both the results and the
financial cost.

Q.   Okay.  So how did you know what those results were?  Did
Morris & McDaniel report to you or did you review the Boston
Police Department -- did it review the results of the 2002
examination?

A.   Well, we had the eligible list that we reviewed which
showed that typically the top of the sergeant's list was
overwhelmingly made up of white candidates.

Q.   Right.  And you actually promoted off the 2002 exam.
You'd promoted 11 minority candidates; is that correct?

A.   I believe that's the number, yes.

Q.   Okay.  So my question is a little different.  I understand
that you had the raw scores, which would have had the training
and experience, the written and the oral component mixed, but
my question is:  Did you ever analyze the assessment center
portion of the exam to see how minorities did on that portion
of the exam compared to how they did on the written exam and
compare that to how non-minorities did on both?

         MS. HARRIS:  Objection.

```
 1              THE COURT:  You may answer whether you did or not.
 2              THE WITNESS:  I did not, no.
 3    BY MR. LICHTEN:
 4    Q.   Did anyone, to your knowledge, at the City of Boston make
 5    that analysis?
 6    A.   Not to my knowledge.
 7    Q.   I'm going to show you an article that I found in the
 8    Boston Globe.  And I just want to ask you --
 9              MS. HARRIS:  Your Honor, I'd object.
10              THE COURT:  Well, let's hear what the question is.
11    BY MR. LICHTEN:
12    Q.   I wanted to go back to 1987 again.  And that was the year
13    that I think we established that the City of Boston also
14    retained Morris & McDaniel; is that right?
15    A.   Yes.
16    Q.   By the way, while I'm on Morris & McDaniel, let me ask
17    you:  In 2002 when you hired Morris & McDaniel, did you make
18    the request for proposals and receive proposals from around the
19    country or did you just select Morris & McDaniel?
20    A.   I sent out -- I sent out requests for proposals to more
21    than 50 test development companies and only two companies
22    responded.  Morris & McDaniel was the low bidder.
23    Q.   Okay.  You're saying only two companies responded in --
24    A.   That's correct.
25    Q.   Okay.  Now, it's interesting, both me and Mr. McDermott
```

1    are quoted in this article, but what I wanted

2    to -- Morris & McDaniel constructed the exam in 1987 too; is

3    that correct?

4    A.    Yes, they did.

5    Q.    Okay.

6          MS. HARRIS:  Your Honor, I object to this document

7    being used.  It's hearsay --

8          THE COURT:  It's not being used yet.

9          MS. HARRIS:  I object to it being on the screen, I

10   guess.

11         THE COURT:  Well, I'm not looking at it.

12         MR. LICHTEN:  It's like cross-examining someone with a

13   ham sandwich, your Honor.

14   BY MR. LICHTEN:

15   Q.    My question is:  Do you recall in 1987 Dr. Morris

16   testifying before the Civil Service Commission that it would

17   be -- it would not be a fair examination to have an examination

18   for police supervisor that only had a written component and not

19   a supervisory component?

20         MS. HARRIS:  Objection.

21         MR. CARROLL:  Objection.

22         THE COURT:  Sustained.

23   BY MR. LICHTEN:

24   Q.    Do you recall -- let me ask you this:  Do you recall

25   consulting with Dr. Morris in 1987 to determine whether or not

1  to throw out the non-written portions of the examination?

2          MS. HARRIS:  Objection.

3          THE COURT:  What's the relevance?

4          MR. LICHTEN:  I'm trying to show that their own

5  expert, Dr. Morris, at the time opined that you could not have

6  a fair police supervisory exam that did not have a supervisory

7  component attached to it.

8          MS. HARRIS:  And I object to Dr. Morris --

9          THE COURT:  Sustained.  If that's the purpose, the

10  objection will be sustained.

11          MR. LICHTEN:  Okay.

12  BY MR. LICHTEN:

13  Q.   Okay.  Now, I wanted to go back over this history a little

14  bit so that I could understand it a little better.  And I must

15  say it's a little confusing.

16  A.   Sure.

17  Q.   As far as I can tell, in 1985 it appears that there was an

18  examination given that had multi-components; is that correct?

19  A.   That's my understanding as well.

20  Q.   Okay.  And I showed you -- and I can show it to you again

21  if you want, but I showed you a recitation of those events from

22  a court decision that suggested that it was in and around that

23  time that the first fair and validated examination was given by

24  the Boston Police Department; do you recall that?

25  A.   I recall reading that yesterday, yes.

1  Q.   Okay.  And was that the 1985 examination?

2  A.   I believe it was.

3  Q.   Okay.  And do you recall what the components were of that

4  examination?

5  A.   No.  I was not employed by the Boston Police Department

6  during that period of time.

7  Q.   Okay.  Do you know why the Boston Police Department did

8  not continue to give that type of examination, the one it gave

9  in 1985, if a court had found it to be fair and validated?

10       MS. HARRIS:  Objection.

11       THE COURT:  I think the question has to be more

12  precise.

13       MR. LICHTEN:  Sure.

14  BY MR. LICHTEN:

15  Q.   In 1987 did the department give any consideration to

16  giving the same type of exam, with the same person who

17  constructed the exam, in '87 that it gave in 1985?

18       MS. HARRIS:  I'll object.

19       THE COURT:  Overruled.

20       You may answer that.

21       THE WITNESS:  Quite frankly, I don't know what they

22  gave in 1985.  Whether it was the same type of an exam in '85

23  as in '87, I don't know.

24  BY MR. LICHTEN:

25  Q.   In '87 we know that there was a swinging problem and all

1    but the written component got thrown out for the sergeant's

2    exam; is that correct?

3    A.    Yes.

4    Q.    Following that test being -- following the decision to

5    throw out all but the written component, that action was

6    challenged by individuals who wanted the oral component placed

7    back in; is that correct?

8    A.    Yes.

9    Q.    And that was the so-called Carr case; is that right?

10   A.    Yes.

11   Q.    And you testified in that case?

12   A.    I may have; I don't remember.

13   Q.    Okay.  And then that decision of the Civil

14   Service -- strike that.

15       The Civil Service Commission agreed that the test was not

16   a fair test under Chapter 31 without a supervisory component;

17   is that correct?

18           MS. HARRIS:  I'll object, your Honor.

19           MR. CARROLL:  Objection.

20           MS. HARRIS:  The decision is actually in evidence, and

21   I believe, again, that Mr. Lichten is mischaracterizing the

22   decision.  The decision --

23           THE COURT:  Well, you're right.  The decision is the

24   decision and it's evidence of itself.  I think a summary

25   question can be asked of a witness and he can...

```
 1              THE WITNESS:  I believe that's true.
 2    BY MR. LICHTEN:
 3    Q.   And then that decision was affirmed by the appeals court
 4    in Boston Police Superior Officers Federation versus Civil
 5    Service Commission; is that correct?
 6    A.   I remember that, yes.
 7    Q.   And I'm just showing you a portion of that appeals court
 8    decision.  And it says -- it ruled that "The Civil Service
 9    Commission, contrary to the administrator's ruling that the
10    multiple-choice examination component and training and
11    experience component without the performance component did not
12    constitute a fair test for the position of a BPD lieutenant
13    because those components did not adequately test for
14    supervisory skills."  Do you see that?
15    A.   Yes, I do.
16    Q.   Okay.  Now, if by 1993 -- and you were aware of that
17    decision, were you not?  It involved the City of Boston.
18    A.   Yes, I have recollection of it.  Sure.
19    Q.   The City of Boston participated in those Civil Service
20    Commission proceedings; isn't that right?
21    A.   Yes.
22    Q.   Okay.  So isn't it a fair statement that by 1993 you, as
23    personnel director, were aware that it was not a fair
24    examination to have for a police supervisor's examination a
25    test which was only written and did not test for the
```

1    supervisory components of the job.  Weren't you aware of that?

2              MS. HARRIS:  I object.

3              THE COURT:  You may answer.

4              THE WITNESS:  I'm aware that there was significant

5    debate about that, and probably is till this day, but there

6    were obviously cases that indicated that.

7    BY MR. LICHTEN:

8    Q.    But in 1996 the Boston Police Department went with only a

9    written multiple-choice job-knowledge test administered by HRD;

10   isn't that correct?

11   A.    Yes.

12   Q.    And then when was the next test after that, 1999?

13   A.    I believe the next exam after that was 1998.

14   Q.    And that also was a written multiple-choice job-knowledge

15   test administered by HRD; is that correct?

16   A.    Yes.

17   Q.    Okay.  And then 2002 we've discussed, and then 2005 and

18   2008 the department went with a written multiple-choice

19   job-knowledge test composed by HRD; is that correct?

20   A.    Yes.

21   Q.    Okay.  Now, moving a little back in time so I can

22   understand this, in 1991 there was another police

23   department -- sorry -- police sergeant promotional exam for the

24   City of Boston; is that correct?

25   A.    Yes.

1    Q.   And I'm going to show you a document which is already in

2    evidence, which is the validation report, and that was

3    a -- that validation report was prepared by the Boston -- by

4    the Human Resources Division of the Commonwealth; is that

5    correct?

6    A.   Yes.

7    Q.   Or the Department of Personnel Administration?

8    A.   Yes.

9    Q.   Okay.  And that was only a validation report for a written

10   examination; is that correct?

11        MS. HARRIS:  I object to a lack of foundation.  I

12   don't know if this witness has ever even seen this document.

13        THE COURT:  You need a foundation.

14   BY MR. LICHTEN:

15   Q.   You were the personnel director in 1991; is that correct?

16   A.   Yes.

17   Q.   Okay.  And an exam was given for the Boston Police

18   Department, sergeant's promotional exam, in 1991; is that

19   correct?

20   A.   Yes.

21   Q.   And that was a written multiple-choice job-knowledge test

22   alone; is that correct?

23   A.   Yes.

24   Q.   Okay.  And then, if I understand what happened, in 1992,

25   just -- well, strike that.

```
 1        MAMLEO objected to that examination; is that correct?
 2   A.   I believe that is correct, yes.
 3   Q.   And what then happened was, as a result of that objection,
 4   through negotiations between the Boston Police Department and
 5   the unions and MAMLEO, it was decided to create a new
 6   examination for 1992 just one year later.
 7   A.   My understanding, there was a judicial order to have a new
 8   exam in 1992.  That's my recollection.
 9   Q.   Was it an order or was it an agreement or do you not
10   recall?  And I do have some documents I can try to refresh --
11   A.   I tend to recall we were mandated to have a new exam in
12   1992.
13   Q.   Okay.  And in 1992, I think you testified that you had a
14   new examination that had a structured oral interview; is that
15   correct?
16   A.   Yes.
17   Q.   Okay.  And that was an exam that was devised, again, by
18   some industrial psychologist; is that correct?
19   A.   Yes.
20   Q.   Do you recall who the industrial psychologists were?
21   A.   It was the firm of Morris & McDaniel.
22   Q.   Back in 1991 and -- I'm sorry.  Back in 1992?
23   A.   That's correct.
24   Q.   And so in 1992 they ran this structured interview panel as
25   well as a written test that they created?
```

1    A.    I believe that they did write the written test.  That's my

2    recollection.

3    Q.    That they did?

4    A.    They did.

5    Q.    And you believe -- the Boston Police Department believed

6    that to be a fair and valid examination, did it not?

7    A.    Dr. Morris's 1992 exam?

8    Q.    Yes.

9    A.    Yes.

10   Q.    So why did not the department in 1996, 1998, 2005 and 2008

11   go with that structured exam given that you had hired an

12   industrial psychologist, Morris & McDaniel, and they had come

13   up with a format that they believed was fair and valid?

14   A.    Well, at that point, from 1992 -- from October of '92

15   through February of 1995 there was a -- protracted discussions

16   with MAMLEO, HRD and others how to resolve the problems ensuing

17   from the 1992 exam and how to go forward.  The city made the

18   decision to go back to the statewide exam in 1996.

19   Q.    Okay.  There then ensued a series of cases through the

20   '90s in which the police department would bypass a number of

21   non-minority candidates in order to get to minority candidates

22   to meet the four-fifths rule; is that correct?

23   A.    Yes.

24   Q.    So let me first ask you about -- so to take this

25   backwards -- <u>Cotter versus City of Boston</u>.  Do you recall the

1    case of Cotter versus City of Boston?

2    A.    I recall the name of the case, yes.

3    Q.    Okay.  And do you recall what happened in Cotter versus

4    City of Boston?

5    A.    No, I don't.

6    Q.    All right.  Do you recall that this was based upon the

7    1996 examination?

8    A.    I believe it was.

9    Q.    Okay.  And do you recall that what happened was that in

10   order to meet the four-fifths rule the Boston Police

11   Department, using the written multiple-choice test of the

12   Commonwealth, skipped over about 17 non-minority officers for

13   the position of police sergeant so that it could reach some

14   minority officers with lower scores and then achieve the

15   four-fifths rule?

16   A.    I remember that, yes.

17          MS. HARRIS:  Your Honor, I'll just object.  These

18   cases are available -- they're cases of the First Circuit.

19   They're available.

20          THE COURT:  Go ahead.  You can examine him about them.

21   BY MR. LICHTEN:

22   Q.    And I want to draw your attention to one portion of Judge

23   Young's decision.  And it says here, "Before making the

24   promotions, however" -- strike that.

25          Just before we get to that, this was after you had gone

1    back to a written multiple-choice examination given by HRD; is

2    that correct?

3    A.    Yes.

4    Q.    Okay.  And it says, "Before making the promotions,

5    however, the department discovered that if it promoted in

6    strict rank order from 1 to 30, 29 black *[sic]* officers and

7    only one black officer would be promoted."  Do you see that?

8    A.    Yes.

9    Q.    And you were involved in that case; is that correct?

10    A.    Yes, I was.

11    Q.    And you knew that -- using the 1996 HRD written exam, you

12    knew that based upon the results of that if you promoted in

13    strict rank order, you would reach only one minority and 29

14    non-minorities which would have huge, huge adverse impact;

15    isn't that right?

16    A.    Yes.

17    Q.    So by 1996, and by this court's decision, weren't you

18    keenly aware as the personnel director for the City of Boston

19    that if the City of Boston continued to use the HRD written

20    examination it was going to have significant adverse impact on

21    minority candidates?

22    A.    Well, we were having significant adverse impact, it

23    seemed, no matter what the testing methodology was we were

24    using.

25    Q.    Well, with respect to 2002, you've just testified that you

1   don't know what the results were vis-a-vis minorities and

2   non-minorities, with respect to the assessment center; is that

3   correct?

4          MS. HARRIS:  Objection.

5          THE COURT:  Overruled.

6          THE WITNESS:  Well, to that specific component, yes.

7   BY MR. LICHTEN:

8   Q.   So you weren't aware as to whether the assessment center

9   was having a beneficial effect on minority scorers; is that

10  correct?

11  A.   Well, the eligible list didn't have a great deal of

12  diversity upon it, so...

13  Q.   You got 11 minority appointments out of the 2002 exam;

14  isn't that correct?

15  A.   I think that more than 80 percent of the appointments to

16  sergeant were from white candidates -- the white candidates.  I

17  think it was 84 percent.

18  Q.   And 20 percent minority?

19  A.   I believe so.

20  Q.   Okay.  Well, that's better than -- I mean, I'm no

21  mathematician, but if I do the 29 and one, that sounds to me

22  like about 3 or 4 percent minority.  That's a lot worse than 20

23  percent; isn't it?

24  A.   It is.  But that list remained in effect, I think, for

25  more than three years, which allowed us to dig a little deeper.

1    Q.    Well, the 2002 exam was just a three-year cycle; is that

2    correct?  You did it in 2002, and then you had a new one by

3    2005.  So that was a regular cycle, wasn't it?

4    A.    I don't think the 2005 results were available until

5    sometime in 2006.

6    Q.    Well, all the exams are given in the fall of '05 -- in the

7    fall of the year are not available until the next year; isn't

8    that correct?  There was nothing unusual about the 2005 exam,

9    was there?

10    A.    We've been on more of a three-year cycle since 2002.  But

11    historically it would be a two-year cycle.  We asked that the

12    2002 list remain in effect for the next few years, and it

13    seemed to have stayed on that schedule at this point.

14    Q.    I'm sorry.  I don't mean to belabor this, but you said you

15    gave an exam in 1998, 2002, 2005, 2008.  It sounds to me that

16    you're on a fairly regularized schedule.

17    A.    More since 2002.

18    Q.    Do you recall the Abban case?

19    A.    I'm familiar with the name of the case but the

20    specifics -- there are so many cases, it escapes me.

21    Q.    Okay.  Do you recall -- just so I can finish off this line

22    of questioning, you gave the exam in 1992; is that correct?

23    A.    Yes.

24    Q.    And then what happened to the 1991 exam compared to the

25    1992 exam?  Did you merge the list?  Did you make promotions

1    off of '91 and '92?  What did you do?

2    A.    I believe that we made no promotions from the fall of 2002

3    [sic] up until February of 1995.  That's my recollection.

4    Q.    The fall of 1992?

5    A.    From the fall of 1992 till February of 1995.

6    Q.    Okay.  So let's say that's correct.  So what happened to

7    the '91 list?  Were promotions ever made off the '91 list or

8    were they not made off the '91 list?

9    A.    I would expect some promotions were made, but I don't know

10   how many.

11   Q.    And then what about off the 1992 list?  Were promotions

12   made off of that list?

13   A.    Yes.  In February of 1995 a very substantial number of

14   promotions were made from the 1992 exam.

15   Q.    Okay.  But I just want to be clear on this because you had

16   the '91 list, and you said you didn't make any promotions off

17   of that list until 1995, then you had the 1992 list, and you

18   said no promotions were made until 1995.  I'm just trying --

19   A.    I'm sorry.  With respect to 1991, I really don't remember

20   how many promotions were made.  But from the fall -- when the

21   exam process was completed in 1992, which was October of 1992,

22   through February of 1995, no promotions were made whatsoever.

23   Q.    And then when you made promotions in 1995, if I understand

24   it, it was in accord with an extended consent decree that you

25   had entered into between the various parties to this

1    litigation, and there were a number of minority promotions

2    made; is that correct?

3    A.    Yes.

4    Q.    And they were made out of sequence; that is, out of rank

5    order?

6    A.    That's my recollection, yes.

7    Q.    And was the number about 25, do you recall?

8    A.    I believe it was.  And I believe we had ultimately reached

9    the goal that was established in the goals and time tables.

10   Q.    And then in 1996 you went back to the HRD exam?

11   A.    That's correct.

12        MR. LICHTEN:  Just one moment, your Honor.  I may be

13   done.

14        (Pause.)

15        MR. LICHTEN:  Thank you very much, Mr. Callahan.  I

16   hope you enjoy your vacation now.

17        THE WITNESS:  Thank you, Counsel.

18                    REDIRECT EXAMINATION

19   BY MS. HARRIS:

20   Q.    Mr. Callahan, you were asked a couple of questions about

21   the Civil Service decision in the Carr litigation from the late

22   1980s.  And I'm going to show you page 22 of that decision.

23        MS. HARRIS:  And this is -- for counsel, this is

24   included in the appendices to the 1991 job analysis.

25   BY MS. HARRIS:

1    Q.    And directing your attention, Mr. Callahan, to page 22,

2    directing you to the bottom paragraph, it states, "The

3    inadequacy of substitute screening devices in this case does

4    not mean that an assessment center is a necessary part of every

5    police promotional examination.  It is certainly possible to

6    develop a multiple-choice exam that adequately tests for

7    supervisory abilities.  The use of hypothetical or situational

8    questions, for instance, would require that examinees apply

9    principles of supervision to real-life scenarios and, thus,

10   exercise judgment in selecting the correct answer."

11        Mr. Callahan, you were asked -- first, Mr. Callahan, is it

12   your understanding that there was ever a ruling by any court

13   that said that if the police department utilized examinations

14   that did not have an assessment center component, that they

15   would not be administering a fair exam?

16   A.    No.

17   Q.    And you were asked a couple of questions about some of the

18   various pieces of litigation that occurred during the 1990s.

19   And I'll ask you, sir, in any of those pieces of litigation was

20   it ever communicated to the City of Boston that they had to

21   file a specific testing regime in order to comply either with

22   Civil Service or with the various consent decrees that were in

23   effect?

24   A.    Not to my knowledge, no.

25   Q.    You were also asked a number of questions about the

1    examination that was developed for 2002, and in particular,

2    your attention was drawn to the spreadsheet of the costs that

3    were incurred as part of that exam.  And I'll ask you,

4    Mr. Callahan, do you recall that the written test in 2002 was

5    administered separately from the assessment center -- at a

6    separate time than the assessment center?

7    A.   Yes, it was.

8    Q.   And do you recall that the written test was administered

9    in April of 2002?

10   A.   I do.

11   Q.   And that the various challenges that we've already talked

12   about started to occur in -- subsequent to the administration

13   of the written exam but prior to the completion of the

14   assessment center component?

15   A.   Yes.

16   Q.   And I believe that you testified yesterday that part of

17   the costs that were associated with the assessment center had

18   to do with finding a facility and -- in which to hold the

19   examinations and to bring in assessors from across the country

20   to actually perform the assessment?

21   A.   Yes.

22   Q.   And can you tell us, did the costs for the assessment

23   center piece go through Morris & McDaniel?

24   A.   Yes, they did.

25   Q.   Okay.  And drawing your attention to the document that

1  we've marked in this case, if the examination is

2  administered -- the written examination is administered in

3  April of 2002, can you note for the Court that -- well, I

4  suppose just drawing your attention to this document -- that

5  the April costs are on the first page in the first quarter of

6  this two-page spreadsheet of costs, correct?

7  A.   Yes.

8  Q.   And is it fair to say that the costs that are incurred

9  following April of 2002 were related to the development and the

10 administration and the grading of the assessment center

11 component?

12       MR. LICHTEN:  It's very leading, your Honor.

13       THE COURT:  It is.

14 BY MS. HARRIS:

15 Q.   Can you tell us what the costs that were incurred after

16 the written examination were attributable to?

17 A.   Well, most of the costs, of course, after the written exam

18 would have been related to the assessment center and the

19 process of bringing in a very large number of assessors into

20 the city.  Actually, we brought them in to New England and

21 sequestered them to review the tapes.

22 Q.   And then finally, Mr. Callahan, I believe you were asked

23 about the results of the 2002 examination.  And you stated that

24 you were able to go deeper on that list than a normal

25 promotional cycle?

1  A.   We did, because I remember specifically asking the

2  Commonwealth's Human Resource Division to extend the life of

3  the list for one additional year.

4  Q.   And do you recall testifying yesterday, Mr. Callahan,

5  about some budgetary issues that had affected the city in the

6  spring/summer of 2003?

7  A.   Yes.

8  Q.   And do you recall testifying that there were a number of

9  incentive packages for retirements?

10  A.   Yes, there was.

11  Q.   And can you tell us, Mr. Callahan, did the police

12  department's operational needs change or reflect any -- strike

13  that question.

14       Can you tell us whether the city's operational needs

15  affected the ability of the city to go deeper on the 2002 list?

16  A.   Well, I think they did.  I mean, it was something that we

17  wanted to do for two reasons:  One, we had invested a great

18  deal of money in the 2002 exam, and we felt that we should

19  yield as many officers as we could from it.

20  Q.   And did the retirement incentive package in 2003 provide

21  you with that opportunity?

22  A.   It prevented us primarily from laying off nearly 100

23  police officers that were scheduled to be laid off, and it did

24  afford us the opportunity to move forward on the list.

25            MS. HARRIS:  I have no further questions.  Thank you,

1  Mr. Callahan.

2          THE COURT:  Anything else from anybody?

3          MR. CARROLL:  No questions, your Honor.

4          THE COURT:  All right, Mr. Callahan.  Thank you.

5  You're excused.

6          (The witness is excused.)

7          MR. LEAHEY:  Your Honor, I just have one point.

8  Yesterday plaintiff's counsel did not technically rest; they

9  had some exhibits, and I think --

10          MR. LICHTEN:  Yes.

11          THE COURT:  Yeah.

12          MR. LICHTEN:  Do you want me to address that now, your

13  Honor?

14          THE COURT:  Sure.

15          MR. LICHTEN:  We wanted to offer, since it's been

16  discussed by various witnesses, the 2003 and 2004 exam data

17  that Dr. Wiesen was crossed on and directed on, and I'm sure

18  other witnesses will be, just for the completeness of the

19  record.  My understanding is that no one has really objected to

20  that.

21          THE COURT:  Are you talking about the raw data, those

22  spreadsheets that showed all the score results, and so on?

23          MR. LICHTEN:  Yes.  Right.  The kinds of things we've

24  been looking at.

25          THE COURT:  Is there any objection to that?  Two

1    separate exhibits?

2            MR. LICHTEN:  Yes.

3            MR. LEAHEY:  I may argue probative value, but nothing,

4    you know...

5            THE COURT:  Sure.

6            MR. LICHTEN:  Sure.  No.

7            THE COURT:  All right.  So --

8            THE CLERK:  Let's mark these first.

9            THE COURT:  So sequentially 2003 and 2004.

10           THE CLERK:  155 and 156.

11           (Plaintiffs' Exhibit Nos. 155 and 156 received into

12   evidence.)

13           MR. LICHTEN:  The next one is, your Honor, we're

14   offering Exhibit 63, which is the Police Sergeant Active

15   Standing List established from the 2008 exam with respect to

16   the City of Worcester, and for '06 too.  Both of those.

17           MS. ENGDAHL:  Can I see them?

18           MR. LICHTEN:  What?

19           MS. ENGDAHL:  Can I see what you've got?

20           THE COURT:  Is that what's referred to as --

21           MR. LICHTEN:  What?

22           THE COURT:  Is that what's referred to as the

23   certified list?  Is that what you're talking about?

24           MR. LICHTEN:  It's the eligibility list, not the

25   certified list.

1           THE COURT:  Eligibility list?  Okay.

2           MS. ENGDAHL:  I have no objection.

3           THE COURT:  All right.

4           THE CLERK:  The next one will be 157.

5           THE COURT:  No, I think that's 63.  It's premarked.

6           THE CLERK:  This one that he just handed up?

7           THE COURT:  I believe so.

8           THE CLERK:  Was this premarked?  What was this one

9  marked as?

10          MR. SULMAN:  That's 63.  It was already in as ID.

11          THE CLERK:  So you want a label on it?

12          MR. SULMAN:  Yes, a label.

13          THE CLERK:  So this is just 63?

14          MR. SULMAN:  Yes.

15          (Plaintiffs' Exhibit No. 63 received into evidence.)

16          MR. LICHTEN:  Quickly, your Honor, we're offering

17  revised Springfield data that I believe has been agreed to by

18  counsel for Springfield, Exhibit 79 and 85.

19          THE COURT:  Are these substituting for exhibits

20  already in?  Is that it?  Is that right?  In other words, 79

21  and 85 are already in?

22          MR. LICHTEN:  Yes.

23          THE COURT:  You're just substituting revised versions?

24  Is that by agreement of everybody?

25          MR. McDERMOTT:  If I may just -- I just wanted to see

1    what was being substituted.

2              MR. LICHTEN:  Springfield.

3              THE COURT:  Well, 85 is --

4              MR. McDERMOTT:  If it's just Springfield, that's fine.

5              THE COURT:  85 is data for Springfield, and 79

6    is -- has multiple --

7              MR. LICHTEN:  There's no change.

8              MR. McDERMOTT:  If it doesn't refer to the MBTA, your

9    Honor...

10             (Counsel confer off the record.)

11             MR. McDERMOTT:  Your Honor, I have no objection.

12             MS. HARRIS:  No objection.

13             THE COURT:  Well, wait a minute.  Let's just take them

14   one at a time.  85, these are tables, I think, right?

15             MR. LICHTEN:  Yes.

16             THE COURT:  The cell, sort of, tables for Springfield

17   only?

18             MR. LICHTEN:  Yes.

19             THE COURT:  All right.  And so the former one is taken

20   out and the revised one is in, but there's no changing in the

21   numbering.

22             79 is a table that includes multiple jurisdictions?

23             MR. LICHTEN:  Yes.

24             THE COURT:  Okay.  And there's a new 79 being put

25   in --

```
 1              MR. LICHTEN:  Right.

 2              THE COURT:  -- which reflects changes in the data

 3    regarding Springfield only?

 4              MR. LICHTEN:  Correct.

 5              THE COURT:  Okay.  How will we know for record

 6    purposes, and maybe it won't matter, what the prior versions

 7    were?  In other words, the record will have the substituted

 8    exhibits so it will show what the most-recent version is.  It

 9    won't necessarily show what the prior ones are --

10              MR. LICHTEN:  We'll do whatever you want us to do,

11    your Honor.

12              THE COURT:  I don't know whether it will matter.

13              MR. CARROLL:  Maybe one is A and one is B?

14              MR. PIKULA:  Your Honor, I would suggest --

15              THE COURT:  Then let's make the new one 79A.

16              (Plaintiffs' Exhibit No. 79A received into evidence.)

17              THE COURT:  And I guess the same should be true of 85,

18    85A.

19              THE CLERK:  So 79A is in, revised, and this is, what,

20    85?  85A?

21              MR. SULMAN:  No, that's 79A.  Here's 85.

22              THE CLERK:  And this one's 85?  We're marking this one

23    85A?

24              MR. SULMAN:  Yes.

25              (Plaintiffs' Exhibit No. 85A received into evidence.)
```

1          MR. LICHTEN:  And then we've already introduced today,

2     and it's in the 2002 Boston exam data, so that's in, so that

3     takes care of that.

4          And then finally, we're also trying to offer the 1980

5     consent decree that's been talked about.  I have a version but

6     I'm not sure it's complete, so I just wanted to be able to get

7     it in.  I'll go over it with counsel for the City of Boston and

8     make sure we have the right set of documents, but I didn't want

9     to rest without that reservation.

10          MS. HARRIS:  I have no objection to reserving on it,

11     but I haven't seen it and have not been able to locate the file

12     from 1980.  There was a flood at city hall, so our historical

13     files have been lost.  But I have no problem with us

14     conferring, and if we could come to agreement, being able to do

15     that.

16          THE COURT:  Okay.  Okay.  Fine.  We can take that

17     version, if you want, provisionally, to be substituted if you

18     verify something else or --

19          MR. LICHTEN:  In fairness, I should show it to

20     Ms. Harris first.

21          MS. HARRIS:  I've not seen it.

22          THE COURT:  I guess we can hold a spot for the true

23     1980 consent decree.

24          MR. LICHTEN:  Right.

25          THE COURT:  All right?  If and when it's found.

1          MR. LICHTEN:  Right.

2          THE COURT:  Okay.  And by the way, I don't know

3    whether it can be found among the court records.  I'm not sure

4    myself what would be true of 1980.

5          MS. HARRIS:  Right.

6          THE COURT:  At the very best, they'll be in storage

7    someplace, but I don't know.

8          MS. HARRIS:  Not having seen it, you know, I can't

9    agree that I would find it relevant and wouldn't object for

10   those reasons, but I think we could work this out.

11         MS. ENGDAHL:  Your Honor, is this just a Boston

12   consent decree we're talking about?

13         MR. LICHTEN:  Yes.

14         MS. HARRIS:  Yes.

15         MR. LICHTEN:  Finally, your Honor -- I'm sorry -- my

16   understanding is that all the parties have agreed that the

17   following documents, which are in the folders and have been

18   electronically filed, can now go into evidence.  And those are

19   Exhibits 1, 2, 68, and 70 to 73.

20         THE COURT:  Okay.

21         MS. ENGDAHL:  Can you say that again?

22         MR. LICHTEN:  Exhibit 1, 2, 68, 70 to 73.

23         MS. ENGDAHL:  72, 73?

24         MR. LICHTEN:  70, 71, 72 and 73.

25         MS. ENGDAHL:  Okay.

1              (Plaintiffs' Exhibit Nos. 1, 2, 68, 70, 71, 72 and 73

2       received into evidence.)

3              MR. LICHTEN:  And I think that's it, your Honor.

4              THE COURT:  Okay.

5              MR. LICHTEN:  And with that, the plaintiffs --

6              MS. ENGDAHL:  Your Honor, we're not challenging the

7       authenticity of it, but we're reserving the right to challenge

8       foundation and the value of it.

9              THE COURT:  Well, the meaning I understand.  I mean,

10      significance and so on.  But agreeing to the admission is not

11      objecting on the basis of those rules which would govern

12      admission which -- one of which would be foundation.

13             MR. CARROLL:  Perhaps, if I might, your Honor, I

14      believe that the objections -- we don't agree -- I'm sorry.

15      We're not going to challenge the authenticity of the documents;

16      however, their relevancy to this particular matter hold a

17      different kettle of fish.  And I think the defendants would

18      reserve the right to dispute the relevancy of the documents

19      that were offered.

20             THE COURT:  Well, relevance as a criterion for

21      admission is something that has to be dealt with before they're

22      admitted.  Relevance as significance to the outcome of the

23      issues is a matter of argument on the evidence as it's been

24      admitted.  You certainly have the second, notwithstanding

25      having allowed them into the record.  If you want to stand on

1  the relevance as a criterion for admission, then we'll have to

2  deal with that.

3        MR. CARROLL:  That would be our understanding, your

4  Honor, is that we will reserve our rights on the second aspect

5  of relevance, I suppose its probative value.

6        THE COURT:  All right.

7        MR. LICHTEN:  That's not what we understood, but

8  obviously -- we had shown these documents to everyone, had

9  discussed them with them, and we understood they were not

10  objecting to the admission.

11        But what does the Court want to do?

12        THE COURT:  Well, I think from what Mr. Carroll says,

13  I think the defendants are content to have them in the record

14  but will argue that they don't mean anything.

15        MR. LICHTEN:  That's fine.  That and everything else.

16        (Laughter.)

17        THE COURT:  Okay.

18        MS. HARRIS:  And, your Honor, I understand that at

19  this point we're going to discuss some motions, but I just did

20  want to put on the -- I guess put on the record that

21  we -- counsel for plaintiffs and for the Boston Police

22  Department have reached an agreement on some additional

23  documents that will obviate the need for Boston to call its

24  witness, the executive officer of the police academy.  And

25  since Lieutenant Chapman is here, I wanted the Court's

1    permission to release him so that we could then go into the

2    motions.

3           MR. LICHTEN:  That's fine.  I've said we'll -- we seem

4    to have an agreement on those documents.

5           THE COURT:  It was just to put in documents?

6           MS. HARRIS:  Yes.

7           THE COURT:  Well, why don't we do that.

8           MS. HARRIS:  Okay.  I'll offer -- we had offered

9    provisionally yesterday Number 153 for identification, which is

10   a police commissioner's memorandum dated June 24th of 2008

11   regarding promotional examination study material availability.

12          MR. LICHTEN:  Yes.  That may go in, your Honor.  No

13   objection.

14          THE COURT:  Okay.

15          (Defendants' Exhibit No. 153 received into evidence.)

16          MS. HARRIS:  And we're also offering a police

17   commissioner's memorandum dated April 21, 2005, "Re: Study

18   Seminars Regarding Examination for Sergeant, Lieutenant and

19   Captain."  So that would --

20          THE COURT:  That would be a new number.

21          MS. HARRIS:  -- be a new number.

22          MR. LICHTEN:  Right.

23          THE CLERK:  So we'll make that 157.

24          (Defendants' Exhibit No. 157 received into evidence.)

25          MS. HARRIS:  Okay.  And then finally, your Honor,

1    we're offering --

2            MR. LICHTEN:  May I just be heard on that one

3    document?  I thought there was also a stipulation that there

4    was a training conducted at the academy in '05, but in '08

5    there was just a disk given, not the training.

6            MS. HARRIS:  That's correct.  We'll stipulate to that.

7            MR. LICHTEN:  That was the agreement.

8            MS. HARRIS:  And finally, your Honor, we're offering

9    the police academy syllabi as one document, and this spans the

10   years 2005 through 2010, and it reflects supervisory training

11   that is provided to recently promoted officers.

12           THE CLERK:  This will be the next number.

13           MS. HARRIS:  That will be 158.

14           THE CLERK:  And so then this was --

15           MS. HARRIS:  157.

16           THE CLERK:  -- 157.

17           MR. LICHTEN:  May I see it, Mary Jo?

18           MS. HARRIS:  Which one?

19           (Counsel confer off the record.)

20           MR. LICHTEN:  This is fine.  This is fine.

21           THE CLERK:  158.

22           (Defendants' Exhibit No. 158 received into evidence.)

23           THE COURT:  Okay.  Now, well, with respect to motions,

24   I mean, this proceeding is governed by Rule 52 of the Civil

25   Rules, and as may be pertinent to what we're accustomed to as

1   motions following a plaintiff's case, the portion of the rule

2   that's pertinent is Part C which is captioned "Judgment on

3   Partial Findings," and reads, "If a party has been fully heard

4   on an issue during a non-jury trial and the court finds against

5   the party on that issue, the court may enter judgment against

6   the party on a claim or defense that, under the controlling

7   law, can be maintained or defeated only with a favorable

8   finding on that issue.  The Court may, however, decline to

9   enter any judgment until the close of the evidence.  A judgment

10  on partial findings must be supported by findings of fact and

11  conclusions of law as required by Rule 52(a)."

12          So the rule really does not contemplate the kind of

13  motion -- judgment as a matter of law under Rule 50 that would

14  pertain in a jury case; rather, it calls it "judgment on

15  partial findings" because it permits the finding to be made not

16  just as a matter of law but a matter of fact-finding because

17  the court is a fact-finder as well.

18          One consequence of that is that it's not necessary for

19  people to preserve their rights at this point by making

20  motions.  It, of course, can be done, and we can do it, but the

21  formality that we all probably grew up learning is not

22  necessarily applicable under the modern Rule 52.  I just say

23  that by way of preface to whatever else anybody else wants to

24  say.

25          Miss Harris?

1          MS. HARRIS:  We're content, your Honor, to follow --

2          THE COURT:  What I would think was -- I mean, there

3    may be some -- I suspect there are some of you, probably

4    excluding Boston, who think that the procedure outlined in Rule

5    52(c) may afford them an early exit.  I think Worcester might

6    think that.

7          MS. ENGDAHL:  Yes.

8          MR. McDERMOTT:  The MBTA does.

9          THE COURT:  I think maybe others do as well.

10         I would suggest the way to do it is rather than making

11   oral motions is that maybe you prepare a written submission

12   which can be responded to in writing and we can deal with that.

13         Now, as a practical matter if we're operating on the

14   schedule we're talking about, perhaps some of those matters can

15   be addressed before we reconvene for the resumption of the

16   trial.  And, again, we can fine-tune the details of that.

17         MR. McDERMOTT:  Your Honor, the MBTA does have a

18   submission for the Court, and it's based truly on the experts

19   saying that -- testifying that there was no adverse impact.

20   But I do have copies for Mr. Lichten.  And if I understand the

21   Court, I should file my motion now?

22         THE COURT:  You certainly may.  And then that will

23   begin the time for the plaintiffs to respond to it.  I'm not

24   sure a trial motion like this has the same time periods that

25   non-trial motions would have.  We can talk about the response

1    time.

2          So if you have motions that you want to file now or in

3    the near future, you can go ahead; otherwise, we'll proceed

4    with the evidence, I think is the best approach.

5          MR. McDERMOTT:  May I approach with the motion?

6          THE COURT:  Yes.  Go ahead.

7          MS. ENGDAHL:  Your Honor, has the plaintiff rested?

8          THE COURT:  Yes, the plaintiff has rested.  And by the

9    way, for Rule 52(c) purposes, it doesn't matter whether the

10   plaintiff has rested.  That significance is gone too.

11         What the rule says is "when a party has been fully

12   heard on an issue," and, in fact, I've -- I think I made

13   findings before the end of a plaintiff's case when, on a

14   particular issue, the plaintiff could not prevail.

15         MR. CARROLL:  Your Honor, if I may, Springfield will

16   file a summary motion to submit.

17         THE COURT:  Yeah.  Yeah.  There's no need to hand them

18   up since we're not going to consider them right now.  I mean, I

19   think the usual filing, electronically, should be done.

20         MR. McDERMOTT:  Yes, your Honor.  Understood.

21         THE COURT:  There's no need to have paper copies since

22   they'll be filed in the system.

23         MR. McDERMOTT:  I've been at it for a long time, your

24   Honor.  I'm old school.  Thank you.

25         THE COURT:  Okay.  So we'll proceed with the evidence

```
 1   presentations.
 2            MR. PIKULA:  Your Honor, by agreement I brought the
 3   Springfield Police Commissioner, William Fitchet.
 4            THE COURT:  Okay.  Fine.
 5            MR. PIKULA:  And I would call him.
 6            THE COURT:  All right.  Fine.
 7                     WILLIAM FITCHET, duly sworn
 8            THE CLERK:  Please be seated.
 9            State your name, spell your last name for the record,
10   keep your voice up and speak into the mic so everyone can hear
11   you.
12            THE WITNESS:  William Fitchet, F-I-T-C-H-E-T.
13                     DIRECT EXAMINATION
14   BY MR. PIKULA:
15   Q.   Good morning, Commissioner.
16   A.   Good morning.
17   Q.   Where are you employed?  Where are you employed, sir?
18   A.   Springfield Police Department.
19   Q.   And could you -- your title is police commissioner,
20   correct?
21   A.   Yes, sir.
22   Q.   Could you tell us briefly what the duties are of the
23   police commissioner?
24   A.   The police commissioner in Springfield is the chief
25   executive officer of the police department responsible for
```

1    budgeting, deployment, discipline and any criminal matters that

2    are at issue with the City of Springfield.

3    Q.    Would it be similar to the police commissioner in Boston?

4    A.    Yes, sir.

5    Q.    Or a police chief in other jurisdictions?

6    A.    That's correct.

7    Q.    And who is the appointing authority for purposes of Civil

8    Service and promotions in the Springfield Police Department?

9    A.    The police commissioner.

10   Q.    And has it always been that way?

11   A.    No, sir.

12   Q.    And how long has it been that the police commissioner is

13   the appointing authority?

14   A.    Since July 1st of 2005.

15   Q.    And is that pursuant to the ordinances of the City of

16   Springfield?

17   A.    Yes, it is.

18   Q.    And I want to show you Ordinance 200.58.04, and that

19   establishes the police commissioner as having authority for

20   appointments, establishing and organizing the police department

21   of the city?

22   A.    That's correct.

23          MR. PIKULA:  Your Honor, I'll just offer the ordinance

24   for the city.

25          MR. LICHTEN:  I think judicial notice could be taken.

1          THE COURT:  I'm not sure.

2          MR. LICHTEN:  What?

3          THE COURT:  I'm not sure.  Municipal law, I think, has

4   to be in evidence.

5          Any objection?

6          MR. LICHTEN:  No.

7          THE COURT:  Okay.  Next.

8          THE CLERK:  This will be defendant City of Springfield

9   159.

10         (Defendants' Exhibit No. 159 received into evidence.)

11  BY MR. PIKULA:

12  Q.   Now, Commissioner, who is your appointing authority?

13  A.   My appointing authority at the time was the control board

14  in the City of Springfield.

15  Q.   All right.  And could you just briefly describe what the

16  control board for the City of Springfield was?

17  A.   The control board was five members that had taken over the

18  financial responsibility of the City of Springfield due to a

19  financial crisis in the city where the city faced potential

20  bankruptcy.

21         MR. PIKULA:  Your Honor, just again for purposes of

22  the record, I don't know if you can take judicial notice of

23  this or not, but Chapter 169 of the Act of 2004 creating the

24  control board.

25         THE COURT:  Okay.  I think I can notice state law, but

1    if you want to put it in the record, that's fine.

2            MR. PIKULA:  All right.

3            THE CLERK:  This will be City of Springfield's Exhibit

4    160.

5            (Defendants' Exhibit No. 160 received into evidence.)

6    BY MR. PIKULA:

7    Q.   Now, Commissioner, the control board, you said, appointed

8    you.  And what year was that?

9    A.   2008.

10   Q.   All right.  And prior to 2008 what was your position?

11   A.   I was a deputy chief of police.

12   Q.   And how long had you been deputy chief of police

13   altogether?

14   A.   About 15 years.

15   Q.   And was there some period of time where you had some -- an

16   acting capacity as police commissioner?

17   A.   Yes, there was.

18   Q.   And what were those periods?

19   A.   July 1st of 2005 to about March 17th or 18th of 2006.

20   Q.   And in 2006 was a permanent commissioner appointed?

21   A.   Yes, sir.

22   Q.   And who was that?

23   A.   Edward Flynn.

24   Q.   And he had been the former executive secretary for public

25   safety in the Commonwealth of Mass.?

1    A.    Yes, sir.

2    Q.    And then Commissioner Flynn left when, sir?

3    A.    He left in January 2008.

4    Q.    And then were you then selected as police commissioner?

5    A.    First in an acting capacity for about four months, sir.

6    Q.    And then appointed in 2008 as a permanent?

7    A.    Yes, sir.

8    Q.    When you became police commissioner, did you have to go

9    through any sort of assessment process?

10   A.    There was an interview -- several interview processes that

11   the candidates went through.

12   Q.    And was there a written component?

13   A.    No, sir.

14   Q.    Now, in your experience how long -- how long had you

15   actually been involved in law enforcement?

16   A.    A little over 37 years.

17   Q.    And has it always been with the Springfield Police

18   Department?

19   A.    Yes, sir.

20   Q.    So 1973 you started as a Springfield police officer?

21   A.    That's correct.

22   Q.    And could you briefly describe the various ranks that

23   you've served through the department and the dates?

24   A.    Appointed a patrol officer in April of 1973; promoted to

25   sergeant in 1979; promoted to lieutenant in 1982; promoted to

1    captain in 1987; and promoted to deputy chief in 1992; and then

2    permanently promoted to commissioner in April of 2008.

3    Q.   And so when you became a sergeant, did you take a written

4    promotional exam?

5    A.   Yes, sir.

6    Q.   And the same thing for lieutenant?

7    A.   Yes, sir.

8    Q.   And for captain?

9    A.   Yes, sir.

10   Q.   How about for deputy?

11   A.   It was the same, sir.

12   Q.   Who was the chief of police before Edward Flynn?

13   A.   Chief Meara.

14   Q.   And is the control board -- when they changed the title or

15   the position from chief of police to police commissioner,

16   that's when Commissioner Flynn came in and Chief Meara left?

17   A.   No, there was an acting period that I was acting on July

18   1st of 2005.  That started her retirement and it started the

19   police commissioner's position.

20   Q.   Asking you just some questions about some of the history

21   of the police department, who was the appointing authority

22   under Chief Meara?

23   A.   There was a five-member police commission that was

24   appointed by the mayor.

25   Q.   And if you were appointed acting in '05, that would

1  have -- the police commission, the civilian commission, existed

2  until 2004 -- or through 2004?

3  A.    It was dissolved a few days after July 1st of 2005.

4  Q.    Now, when you became acting commissioner in 2005 -- let me

5  get a few more things -- what's your educational background?

6  A.    I have a master's degree in criminal justice and a

7  bachelor's degree in criminal justice.

8  Q.    All right.  Now, when you became police commissioner in

9  2005, did you have occasion to make any promotions?

10          MR. LICHTEN:  Your Honor, I thought he said he became

11  police commissioner in 2008.

12          MR. PIKULA:  Well, acting.  Excuse me.

13          THE COURT:  There was a period of acting.

14          MR. LICHTEN:  Sorry.

15  BY MR. PIKULA:

16  Q.    When you were acting police commissioner in 2005, did you

17  have occasion to make any promotions?

18  A.    Yes, sir.

19  Q.    And at that time was there an active -- well, what is the

20  process for promotions -- did you make any promotions to

21  sergeant?

22  A.    I believe I did, yes, sir.

23  Q.    What is the promotional process for promoting sergeants in

24  Springfield?

25  A.    There has to be a vacancy occur, which usually results as

1    a result of a retirement.  Then we have to petition the policy

2    board to fill that vacancy.  The mayor's office is represented

3    in that policy board.

4    Q.   And is that a budgetary matter, to make sure there's funds

5    for it?

6    A.   That's correct.  If that policy board approves filling

7    that vacancy, our personnel department petitions Civil Service

8    for an eligibility list.  Depending on the number of vacancies

9    that you're trying to fill, they will send you a list.  If it's

10   only one position, it would be three people.  If it's more than

11   that, it's two times the number of positions plus one.

12        That list is sent to the police department through the

13   personnel department, and officers that are willing to accept

14   that appointment will sign off on that list.  At some point

15   after they sign off on the list, an interview process is

16   scheduled.

17   Q.   Can I just ask you in terms of an interview process, could

18   you describe what the structure of that interview entails?

19   A.   The interview process is a three-member board of command

20   staff of the Springfield Police Department, captains or deputy

21   chiefs or the commissioner, and they interview potential

22   candidates for the position that they're applying for by asking

23   a series of questions and noting what their replies were and

24   marking their replies with a numerical rating.

25   Q.   And are these a set of questions, that everyone gets the

1  same questions?

2  A.    Everyone gets the same questions, yes.

3  Q.    All right.  And what are the subject matters of the

4  questions?

5  A.    General police operations and organization and situational

6  questions as to what process the potential candidate might take

7  in a given scenario, things of that nature.

8  Q.    And then are the answers graded by the interviewers on a

9  scale?

10  A.    Yes, sir.

11  Q.    A numerical scale?

12  A.    That's correct.

13  Q.    And other than the interview process, is there any

14  background check that goes on?

15  A.    Yes, there is.

16  Q.    And what does that entail?

17  A.    It entails review of the officers' performance, sick time,

18  injured-on-duty time, any internal affairs investigations, any

19  disciplinary action, and recommendations from the commanding

20  officers of the officers that are the candidates.

21  Q.    And is that the process that you followed in 2005?

22  A.    Yes, it is.

23  Q.    Or -- if you recall.

24  A.    Yes.

25  Q.    Actually, because I think it was 2006.

1        Now, did you have to -- at the time that you became police
2   commissioner, was there an active Civil Service promotional
3   list in Springfield, if you know?
4   A.   My recollection is that there was, yes.
5   Q.   Let me see if I could figure this out.  Would you look at
6   the screen in front of you?  It's marked COS7.  Do you
7   recognize this as a -- it says "Department of Personnel
8   Administration," but is this from an HRD form that they used
9   to -- for authorization of sergeants who had been appointed to
10  the position?
11  A.   Yes.
12  Q.   And this form that has a date on it of April of '06,
13  that's signed by Commissioner Flynn at the time; is that
14  correct?
15  A.   Yes, sir.
16  Q.   So actually, it wasn't you who did these promotions; it
17  was Commissioner Flynn?
18  A.   Yes, sir.
19  Q.   And was that general process that you described, was that
20  followed back for these promotions, it looks up here to be June
21  of '06?
22  A.   He changed it slightly from the format that I used.
23  Q.   Okay.  What were the changes?
24  A.   I used a numerical rating system for responses to the
25  questions and he used a more general rating system:  excellent,

1  very good, good, fair, poor.  He used those terms instead of a

2  numerical rating system.

3  Q.   If I could actually turn to the third page of this, do you

4  recognize this as the eligibility list that HRD provides?

5  A.   Yes, sir.

6  Q.   And does this rank them in terms of their scores?  This

7  one has a high of 90 and down to a 78?

8  A.   Yes, sir.

9  Q.   Let's see.  That's one, two, three, four, five, six,

10 seven, eight, nine, ten, 11 names on this list.  So it would be

11 fair to say that there are approximately five openings that

12 this list was used for?

13 A.   Yes, sir.

14 Q.   And that would follow the 2 N + 1?

15 A.   That's correct.

16 Q.   And so from this list, if we look at the first page,

17 appointments made were Duda, Zarelli, Kane, Pelchar and Hitas;

18 is that correct?

19 A.   Yes, sir.

20 Q.   And Duda, Zarelli, Kane, LaBelle, Pelchar, Hitas.  So

21 would that indicate that LaBelle had been bypassed --

22 A.   Yes, sir.

23 Q.   -- by the commissioner?

24      So when Commissioner Flynn made these appointments, he

25 generally followed the rank order by bypassing LaBelle and

1  making the fifth appointment by having Hitas and Pelchar jump

2  Patrolman LaBelle?

3  A.   Yes, sir.

4  Q.   And looking down this list two minority -- are there -- is

5  it fair to say that you recognize these names, that there's two

6  minorities on this list, Devon Williams and David Arroyo?

7  A.   Yes, sir.

8  Q.   And they are ranked 10 and 11 on this, correct?

9  A.   Yes, sir.

10         MR. PIKULA:  I'll offer this, your Honor.

11         MR. LICHTEN:  Fine, your Honor.  No objection.

12         THE CLERK:  Defendant City of Springfield 161.

13         (Defendants' Exhibit No. 161 received into evidence.)

14  BY MR. PIKULA:

15  Q.   Commissioner, I would like to show you another exhibit

16  dated March 14, 2007, again, during the tenure of Edward Flynn.

17  Looking at the certified list, would it indicate that there

18  were four people on that list, Richard LaBelle, Richard Hottin

19  and Stephen Hill and John Kent, and they were ranking in scores

20  from 79 to 84?

21  A.   Yes, sir.

22  Q.   And it looks like there was one appointment, for

23  Mr. Hottin.  And that was made by Commissioner Flynn?

24  A.   Yes, sir.

25  Q.   There were -- are there any minorities on that list, the

1    third page of that list, LaBelle, Hottin, Hill and Kent?

2    A.   No, sir.

3         MR. PIKULA:  I'm going to offer all of these lists,

4    Judge.  I've got just a few more.

5         MR. LICHTEN:  Your Honor, one thing you may not have

6    known, we've stipulated to their expert's report.  You'll

7    recall we moved to exclude it, and we've now agreed to its

8    admission.  I believe all this stuff that they're doing now is

9    just to verify what their expert is saying, which we've now

10   allowed to go in, which we're not contesting, which is that

11   with respect to those who were certified for appointment, we're

12   not alleging discrimination -- intentional discrimination with

13   respect to those people.

14        MR. PIKULA:  I think there's more of a point to it

15   than that, Judge.

16        THE COURT:  It may be a bit redundant, but we'll go as

17   what Mr. Pikula has --

18        MR. LICHTEN:  I just want you to know we have agreed

19   to go with their expert's report.

20        THE CLERK:  And this is defendant City of

21   Springfield's Exhibit 162.

22        (Defendants' Exhibit No. 162 received into evidence.)

23   BY MR. PIKULA:

24   Q.   And I want to show you another appointment list.  And

25   again, looking at the eligibility on this one, I draw your

1    attention to the names Richard Randolph and James Shewchuk.

2    Now, they're both listed as 82s, correct?

3    A.    Yes, sir.

4    Q.    And is it fair to say that they appear at the top of this

5    list as a result of an order of the Civil Service decision?

6    A.    That's correct, sir.

7    Q.    And had they been bypassed in an earlier exam -- or I'm

8    sorry -- earlier promotional process?

9    A.    Yes, sir.

10   Q.    And was that a promotional process that appointed David

11   Arroyo above them -- I'm sorry -- it was Ayalla?

12   A.    Yes.

13   Q.    And is Mr. Ayalla Hispanic?

14   A.    Yes, sir.

15   Q.    And Shewchuk and Martin are both white?

16   A.    Yes, sir.

17   Q.    And they had appealed on the grounds that they felt that

18   the promotional bypass was political and that they were

19   successful in their appeal?

20   A.    They were successful in that they were ordered to be put

21   at the top of the next list.

22   Q.    And then the very next name after that is David Martin,

23   and with a 93, correct?

24   A.    Yes, sir.

25   Q.    And is Mr. Martin black?

1    A.    Yes, sir.

2    Q.    And then Steven Kent is white; Richard LaBelle, white;

3    Sean Arpin, white?

4    A.    Yes, sir.

5    Q.    David Barton, is he white?

6    A.    Yes, sir.

7    Q.    And Jeffrey Martucci?

8    A.    Yes, sir.

9    Q.    White?  And John Kent?

10   A.    Yes, sir.

11   Q.    And is Juan Rosario Hispanic?

12   A.    Yes, sir.

13   Q.    And Julio Toledo Hispanic?

14   A.    Yes, sir.

15   Q.    And so from this list there's -- these promotions were

16   made November of '08, correct?

17   A.    Yes, sir.

18   Q.    And so it's fair to say that you did appoint Randolph, you

19   bypassed Shewchuk again, correct?

20   A.    Yes, sir.

21   Q.    And David Martin.  And then you took them in order?

22   A.    David Martin was promoted, sir.

23   Q.    He was promoted?

24   A.    Yes.

25   Q.    And then Kent and LaBelle and Arpin were the next ones in

1    rank order, correct?

2              MR. PIKULA:  And I'll offer this.

3              MR. LICHTEN:  No objection.

4              THE CLERK:  This will be Exhibit 163.

5              (Defendants' Exhibit No. 163 received into evidence.)

6    BY MR. PIKULA:

7    Q.   And I want to show you a list of appointments and

8    certifications, November 19th of 2009.  And again, this was

9    during your tenure?

10   A.   Yes, sir.

11   Q.   And this eligibility list has Barton, Martucci, Kent,

12   Rosario, Toledo, and then looking at the appointments made,

13   Martucci, Kent, and Rosario was bypassed and Toledo was

14   appointed, correct?

15   A.   Yes, sir.

16             MR. PIKULA:  I'll offer this.

17             MR. LICHTEN:  No objection.

18             (Defendants' Exhibit No. 164 received into evidence.)

19   BY MR. PIKULA:

20   Q.   Now, just briefly, for some explanation, I just wanted to

21   show you, and I don't think you've ever seen this before, but

22   it's Plaintiffs' Exhibit 76, and it's page 9.  And I want to

23   point out to you the list of what it says is police sergeants,

24   Springfield.  And if I told you that this was a list of all the

25   persons who took the 2007 exam -- let me first ask you, did you

1    ever see this list before?

2    A.    No, sir.

3    Q.    Is this a list that HRD distributes, as far as you know?

4    A.    No, I don't think they do, sir.

5    Q.    All right.  And if I wanted to point out to you the

6    underline, a number here, a 93, right, and that next to it says

7    "White," and if I told you -- and if I -- if we looked at these

8    scores, just going down the list you could see that's the only

9    93 in the list, and previously we had shown you that David

10   Martin had gotten a 93, and he's actually black, correct?

11   A.    Yes, sir.

12   Q.    All right.  So this data that HRD had was incorrect?

13           MR. LICHTEN:  Objection.  Objection, your Honor.

14           MR. PIKULA:  No, we stipulated to this.  This is the

15   revision.

16           THE COURT:  No, I think he can answer that.

17           THE WITNESS:  It appears that it's incorrect, yes.

18   BY MR. PIKULA:

19   Q.    Now, I want to point out to you that these numbers that

20   are listed in this column -- and if I point out that the WRs --

21   if I told you that that stands for "written," and the 57.5, it

22   looks like 66.25, 66.5, all of these being under 70, and then

23   it goes from 70 up to that 93, and if I told you that

24   represents the written scores -- let me ask you this:  Whenever

25   there is a call for Civil Service lists, are you ever provided

1    the scores that people have if they've flunked?

2    A.    No.

3    Q.    Do you even know who the people are that took the exam

4    that flunked?

5    A.    I may know if they have a conversation with me about it,

6    but not officially through notification process.

7    Q.    So you request the human resource department of the city

8    to obtain a list from civil service and they provide you the

9    list that we've just gone through, correct?

10   A.    That's correct, sir.

11   Q.    All right.  Now, in terms of taking a promotional exam for

12   sergeant in Springfield, is it -- how competitive is it?  Are

13   there a lot of people that apply that you know of or --

14   A.    There's not a tremendous amount that apply.

15   Q.    Have you done any recruiting to try to get people to

16   apply?

17   A.    I've had the deputy chiefs conduct classes where officers,

18   patrol officers, can attend the classes and get pointers from

19   the deputy chiefs regarding promotional processes, expectations

20   if they are promoted, interview processes and things of that

21   nature.  So those classes have been held.

22   Q.    Now, if I were a patrol officer in Springfield and wanted

23   to apply for promotion to sergeant, is there a higher pay grade

24   for sergeant?

25   A.    Yes, there is.

1  Q.   But can the promotion to sergeant actually be a decrease
2  in pay?
3  A.   It can be a decrease in pay as the result of overtime
4  opportunities.
5  Q.   And as a supervisor, it's fair to say you don't have as
6  many overtime opportunities as you would as a patrol officer?
7  A.   That would be a fair statement, yes, sir.
8  Q.   So a patrol officer can have a higher income for the year
9  than the sergeant; is that correct?
10         MR. LICHTEN:  Your Honor, practically every question
11  is leading; the last three have all been leading questions.
12         MR. PIKULA:  Well, no jury, but fine.
13         THE COURT:  All right.
14  BY MR. PIKULA:
15  Q.   With regard to changes in shift for a newly promoted
16  sergeant, what occurs?
17  A.   Generally, the newly promoted sergeants are assigned to
18  the midnight to 8 a.m. uniform division.
19  Q.   And is that a favorable shift?
20  A.   Most personnel on the police department don't consider it
21  a favorable shift.
22  Q.   Is there a nickname for it?
23  A.   It's called the "Dog Watch."
24  Q.   What is the budget process in the Springfield Police
25  Department?

1  A.   We receive -- the department heads in the City of

2  Springfield receive a directive from the mayor of Springfield

3  to prepare a budget.  We have a business and technology

4  civilian that works with myself and the deputy chief to prepare

5  a budget.  We receive information as to what the parameters are

6  of that budget, be it level-funded or reduction, and we present

7  that to the mayor, and at some point it goes before the city

8  council.

9       The city council can examine that budget, ask questions of

10  the department head, of the police commissioner, and they can

11  reduce the budget, but they can't add to the budget.

12  Q.   And what is the current budget for FY '11 for the

13  Springfield Police Department?

14  A.   It's about $38,953,000.

15  Q.   And what is the source of the revenues for that?

16  A.   General fund.

17  Q.   Are there any other sources of revenue available to the

18  police department?

19  A.   We've obtained some grants and grant money that we're able

20  to use, structured money that is allocated for specified

21  reasons.  It doesn't necessarily coincide with the fiscal year.

22  The grant award doesn't always match the fiscal year; it can

23  last longer or shorter than the fiscal year.

24  Q.   What is the approximate amount of grant funding that the

25  Springfield Police Department has in any given year?

1    A.    Well, it varies year to year.  There was stimulus money

2    last year.  But in the vicinity of four and a half to five

3    million dollars.

4    Q.    And what are the various components of the budget that

5    those revenues are used for?  What are the expenses?  What's on

6    the expense side?  How is that broken down?

7    A.    The expenses are broken down in great detail, but

8    primarily in two large sections:  the salary component, which

9    is the largest component, and then what we call OTPS.

10   Q.    Other-than-personal-services?

11   A.    Other-than-personal-services.

12   Q.    Looking at the personal services portion, what percentage

13   of your budget goes for personal services?

14   A.    92 percent.

15   Q.    And what are the components that make up other than

16   personal services?

17   A.    Other-than-personal-services are all the expenditures

18   separate from salaries.  That would entail paying for police

19   cruisers, uniforms, ammunition, training, supplies, gasoline,

20   electricity, heating the building.  Anything that has to do

21   with running the physical plant of the police department.

22   Q.    And what -- how would you describe the budget of the

23   Springfield Police Department?

24   A.    It's very lean.  It's a lean budget.

25   Q.    And what parameters did the mayor give you, or has the

1    mayor given you, since you've been police commissioner in the

2    preparation of your budget?

3    A.    He's asked that we prepare a level-funded budget, which

4    means that the funding has to be the same as the year before,

5    and also to prepare budgets with a 5 percent reduction and with

6    a 10 percent reduction.

7    Q.    Now, other than the position of police commissioner, has

8    the City of Springfield utilized an assessment center or

9    assessment process for any other positions of rank?

10   A.    Yes, we have.

11   Q.    What position?

12   A.    In 1995 for the position of chief of police there was an

13   assessment center, and in 2008 there was an assessment center

14   for the position of deputy chief of police.

15   Q.    Going back to 1995, did you participate in that assessment

16   process?

17   A.    Yes, I did.

18   Q.    You were a candidate at that time?

19   A.    Yes, sir.

20   Q.    And how long was that after you had been a deputy?

21   A.    About three -- about three years after.

22   Q.    How many candidates were there for the chief of police at

23   that time?

24   A.    I believe there were ten candidates.

25   Q.    And could you describe what the assessment process

1    entailed?

2    A.    The first step of the assessment center process was an

3    orientation where all the candidates met at a location and were

4    briefed regarding what the expectations were regarding the

5    assessment center:  locations, time frames, when you were to

6    report, and a brief overview as to what the assessment center

7    would entail, exercises.

8    Q.    What were the components of the assessment center?

9    A.    There were several components of the assessment center,

10   yes, sir.

11   Q.    What were they?

12   A.    There was an in-basket exercise in which each one of the

13   candidates were given -- my recollection is 17 in-basket

14   problems, and you were required to rate them as far as priority

15   and importance, and then route them appropriately and then make

16   appropriate notifications regarding what each one of those

17   problems entailed.  There was a public meeting component in

18   which you conducted a public meeting.  It was basically a

19   role-playing exercise.  There was another role-playing exercise

20   in which an IIU, or an internal investigation unit, was

21   required in which a role-player would confront the candidate

22   and present a problem -- a very difficult internal affairs

23   problem, and you would work through that problem in front of

24   the assessors.  And then there was a take-home component which

25   was a grant application with a very short time frame that you

1   had to present the grant.  In other words, you left that

2   evening, and that morning you had to come up with a grant

3   proposal, and it was a very comprehensive grant proposal.

4   Q.   And what observations did you make as to the assessment

5   process, in general?

6              MR. LICHTEN:  Objection to the form.

7              THE COURT:  No, overruled.

8              THE WITNESS:  I was dissatisfied with some of the

9   components of the assessment center.  I felt that the

10  role-playing components weren't necessarily testing properly

11  for the position that was being applied for.  I wasn't

12  satisfied with -- well, ultimately, with the marking of the

13  assessment center.  There was no objective component; there was

14  no written component to the assessment center.  I thought that

15  was -- made the assessment center incomplete or made the

16  testing process incomplete.

17             The total promotion process relied on that, those four

18  descriptions that I gave on the assessment center.  I didn't

19  feel that that tested appropriately.

20  BY MR. PIKULA:

21  Q.   Now, with regard to the other assessment center, I believe

22  that was, you said, for deputies?

23  A.   Yes, sir.

24  Q.   All right.  And was that during your tenure?

25  A.   Yes, it was.

1    Q.    And was that under the control board?

2    A.    Yes, it was.

3    Q.    All right.  And so as a result, was the decision to have

4    the assessment center yours or the control board's decision?

5    A.    I was required by the control board to have the assessment

6    center.

7    Q.    All right.  And could you describe -- and this was for

8    deputy chiefs?

9    A.    Yes, sir.

10   Q.    And how many openings were there at that time?

11   A.    Four openings.

12   Q.    And could you describe what that assessment center

13   consisted of?

14   A.    I didn't personally participate in that assessment center;

15   however, I did meet with the consultant that was preparing the

16   assessment center and he gave me a brief overview.  There was

17   another component, a role-playing component, at what was

18   characterized to me by the candidates as a hostile meeting;

19   there was an in-basket exercise, and there were a couple of

20   other exercises which I'm not knowledgeable about.

21   Q.    All right.  And were those candidates ranked by assessors

22   or interviewers?

23   A.    Yes, sir, they were.

24   Q.    And was a ranking provided to you for consideration?

25   A.    Yes, sir, it was.

1   Q.  And did you feel that that ranking matched what you would

2   have -- what you considered to be the ranking of the quality of

3   each of those candidates?

4         MR. LICHTEN:  Objection.

5         THE COURT:  Overruled.

6         You may answer.

7         THE WITNESS:  I didn't believe that it accurately

8   depicted the qualities of each one of the candidates.

9   BY MR. PIKULA:

10   Q.  And why not?

11   A.  Well, in particular, there was one captain who had 40

12   years' experience, led the detective bureau, had a vast amount

13   of knowledge and expertise, and he flunked the assessment

14   center.  And I found that to be incredible.

15   Q.  And so was that individual not, then, provided to you as

16   certified for appointment?

17   A.  He was not provided to me, no.

18   Q.  All right.  How about for the candidates that were

19   provided to you for certification for your appointment, how

20   would you describe that ranking based on your experience and

21   knowledge of these -- of working with these officers or --

22         MR. LICHTEN:  Objection, your Honor.

23         THE COURT:  Overruled.

24         THE WITNESS:  I found that some very -- or extremely

25   competent captains were ranked very low.  I believe that all of

1    the captains were competent leaders and competent captains;

2    however, I had some very experienced captains that ranked very

3    low on the list, and it surprised me.

4    BY MR. PIKULA:

5    Q.   And did you follow the ranking that was provided to you by

6    the certification when you made your appointments?

7    A.   No, I didn't.

8    Q.   And why not?

9    A.   I had an interview process with the deputies.  I knew what

10   their work product was.  I had worked with most of them for

11   over 30 years.  And I chose those candidates that I thought

12   were best qualified for that position.

13   Q.   Now, with regard to the position of sergeant in the City

14   of Springfield, let me just -- do you recognize this as the job

15   description prepared by the human resource department?

16   A.   Yes, sir.

17   Q.   And could you briefly, in your own words, describe to us

18   what the work of a sergeant is in the Springfield Police

19   Department?

20   A.   Well, as the list indicates, it's very comprehensive, but

21   sergeant is a first-line supervisor, generally detailed to the

22   street duty although occasionally detailed to the booking

23   process.  When the officers run into a difficult situation,

24   they call for the sergeants.  The sergeants rely on their

25   experience and their expertise to give advice to the patrol

1    officers regarding whatever problem's on the street.

2        I have a large number of sergeants that are in the

3    detective division as investigators that have a high-level of

4    expertise and have investigative skills that they utilize not

5    only to present cases in court and to effect arrest, but also

6    to teach patrol officers regarding their amount of knowledge.

7        They respond to hazardous material spills, they respond

8    to -- they're first responders to major crime scenes, to major

9    disturbances, and they, by and large, direct the operations at

10   the street level during those type of events that are happening

11   on the street.

12       They are in charge of the cell block, prisoner safety, are

13   concerned with needs for medical attention for prisoners, the

14   welfare and well-being of the prisoners, all of the various

15   complicated tasks of being a booking sergeant with the logs and

16   the logging process.  So it's a very comprehensive job.

17           MR. PIKULA:  And let me offer the job description as

18   an exhibit.

19           MR. LICHTEN:  Your Honor, I object.  I've never seen

20   it before.

21           MR. PIKULA:  I'll give you a copy.  I did e-mail it to

22   you.

23           MR. LICHTEN:  Oh, you did?  I have all the documents

24   that you have -- a lot of the documents go back -- I don't want

25   a document to go in that I've never seen before.

```
 1              THE COURT:  I'll tell you what:  Let's take the
 2    morning recess.  Why don't you look at it and see if, having
 3    looked at it, your objection endures.
 4              We'll take the morning recess.
 5              THE CLERK:  All rise.
 6              (The Court exits the courtroom at 10:58 a.m.)
 7              THE CLERK:  The Court will take the morning recess.
 8              (There is a recess in the proceedings at 10:58 a.m.)
 9              (The Court entered the room at 11:27 a.m.)
10         MR. PIKULA:  Your Honor, I believe Mr. Lichten has
11    withdrawn his objection as to the job description of sergeant.
12              I have some other documents, by agreement, that we can
13    put in.
14              THE COURT:  Let's just deal with that one.  What
15    number will that be, the job description?
16              THE CLERK:  It's going to be 165.  Counsel, do you
17    have that so I can mark it?
18         MR. PIKULA:  I thought I gave it to you.  I didn't
19    leave it up there?  Here's one.
20              THE CLERK:  Defendant City of Springfield's 165
21    admitted.
22    (Exhibit No. 165 received into evidence.)
23         MR. PIKULA:  And then, by agreement, your Honor, I
24    will be introducing -- I believe these are actually some
25    materials that were subpoenaed by Mr. Lichten in an earlier
```

1    time -- rosters of the Springfield Police Department, 2006, 7,

2    8 and 9.

3            MR. LICHTEN:  Those are fine, your Honor.

4            THE CLERK:  166 through 169, City of Springfield

5    exhibits.

6    (Exhibit Nos. 166-169 received into evidence.)

7            MR. PIKULA:  Also, by agreement, your Honor, I have

8    the Massachusetts HRD Sergeant Task Survey Analysis.  It's a

9    list of the essential functions of a sergeant.

10           MR. LICHTEN:  Is this a copy for me?

11           MR. PIKULA:  No.

12           MR. LICHTEN:  That's fine, your Honor.

13           THE COURT:  Is it dated?

14           MR. PIKULA:  It's the most recent.

15           THE CLERK:  That's going to be 170.

16   (Exhibit No. 170 received into evidence.)

17           THE COURT:  Go ahead.

18           MR. PIKULA:  I also have, your Honor, a summary of the

19   roster data for the Springfield Police Department broken down

20   by race, sex, and position, which I believe is also some data

21   that Mr. Lichten had subpoenaed.  So this will go in by

22   agreement.

23           THE COURT:  Current profile?

24           MR. PIKULA:  Yes.

25           MR. LICHTEN:  Your Honor, I don't dispute that it's a

1    current profile.  However, it's different than the profile that

2    was -- the document that was provided to me by the defendants

3    in April of 2010.  Specifically, in April of 2010, I received a

4    document from them breaking down the number of sergeants.  It's

5    clear that there are one, two, three -- looks like four

6    minority police sergeants on that list.

7            This list is inconsistent with that, and I think what

8    this means is that they're trying to provide some data through

9    the back door with respect to the 2009 examination which is not

10   part of this case, which I'm sure you would not have allowed me

11   to add in 2010 as part of this case.  And I don't see how they

12   can do that either.  On that basis, I would object.

13           I don't object to this generally, but to the extent

14   that they're trying to add data from an exam that I've never

15   seen, that I've never challenged, and there's been no discovery

16   on, I think, is inappropriate.

17           THE COURT:  The latest roster that was just offered

18   was 2009?

19           MR. PIKULA:  Yes.

20           MR. LICHTEN:  I agree with that.

21           THE COURT:  This summarizes something else?

22           MR. LICHTEN:  That's what I'm figuring out from --

23           THE COURT:  I'm asking Mr. Pikula.

24           MR. PIKULA:  Your Honor, we do not have a 2010 roster,

25   and this is the most current.  It was actually prepared -- I

```
1     can do some questioning on this, actually, but this was
2     prepared from the records of the Springfield Police Department
3     at the request of the Commissioner in response to a subpoena
4     that I received from Mr. Lichten.
5            MR. LICHTEN:  Well, your Honor, I may have given them
6     a subpoena.  I never got the documents.  I just saw this today.
7     I'm happy with the April 2010, the data prior to the newest
8     exam, but after that, I think it's inappropriate.
9            THE COURT:  Well, on objection as a summary, it would
10    be excluded.  There are two ways a summary can be introduced.
11    It could be a summary of what is already in evidence -- and
12    apparently it is not that -- or it could be a summary of
13    documents that have been made available for inspection by the
14    opponent, and it sounds like that's not -- Rule 1006 --
15           MR. LICHTEN:  Here's what I'm willing to do.  I'm
16    willing for that to go in recognizing this difference with the
17    April 2010 roster of sergeant, so you can see how things stood
18    on April --
19           THE COURT:  That's fine, too, if you want to do that.
20           MR. PIKULA:  That's fine with me.
21           THE COURT:  By agreement, okay.
22           MR. LICHTEN:  I have both exhibits.  Should I --
23           THE COURT:  Why don't you -- we can do the marking 171
24    and 172 or 171 and 171(a) if you think you want to show that
25    nexus.
```

```
 1              THE CLERK:  This is 171.
 2      (Exhibit No. 171 received into evidence.)
 3              MR. LICHTEN:  171(a).
 4              THE COURT:  What's 170?
 5              THE CLERK:  170 is --
 6              MR. PIKULA:  Essential functions, HRD essential
 7      functions.
 8              THE COURT:  Yes, fine.  Okay.  You want them 1 and
 9      1(a) or 1 and 2?
10              MR. LICHTEN:  172.
11              THE COURT:  Okay.
12              THE CLERK:  Defendant's 172 is in.
13      (Exhibit No. 172 received into evidence.)
14              MR. LICHTEN:  I just want to make clear, your Honor, I
15      am objecting to any evidence relating to anything that's
16      happened with respect to the 2009 sergeant's exam, which is not
17      at issue in this case, which I've not analyzed, which I've not
18      been permitted to amend the complaint to add to the various
19      defendants in the case.
20              MR. PIKULA:  May I be heard on that, Judge?
21              THE COURT:  Okay.
22              MR. PIKULA:  While we were out, there were some other
23      documents I wanted to show him.  I wanted to show him the most
24      current list for certification from HRD and a summary of all of
25      the lists that I've put in evidence including that current
```

1  list.  That includes data from a 2009 exam.  I am not here to

2  litigate the 2009 exam.  But the expert that -- Doctor Wiesen

3  testified about some definite trends as to adverse impact

4  continuing into the future.  And if that question is

5  admissible, I think I get to say, well, let's see who's on the

6  list currently that are the next potential applicants.

7        Doctor Wiesen said he had reviewed that material, is

8  my recollection of the -- and I believe he went through every

9  jurisdiction and said, Do you expect adverse impact to continue

10  into the future if this list -- if the test is continued to be

11  used?  And he -- "most definitely."  So from that standpoint, I

12  want to show boots on the ground.  Here's the names; here's the

13  list.  What's the definite -- what's the thing that's most

14  definitely going to happen in the next promotions that are

15  coming up and when are those promotions coming.  So that's

16  where it's relevant.  It's --

17        MR. LICHTEN:  Your Honor, first of all, what he stated

18  is not true.  Doctor Wiesen did refer to some of the 2008

19  lists, which are in evidence, and which is being litigated in

20  this case, and described what would happen if one continued to

21  go down those lists.

22        Your Honor, I know nothing about the 2009 exam.  I

23  don't have the HRD lists.  I don't have -- I don't know

24  anything about the exam.  I don't have any data on that.  We

25  haven't analyzed any data.  I'm sure you would not have

1    permitted any data on this case.  For them to try to litigate a

2    2009 when I have no documentation of this, and they provided

3    this information -- the first time I heard of this was seven

4    days into the trial of this case.  I think that's

5    inappropriate.

6              THE COURT:  The objection is sustained.  I think it's

7    beyond the scope, and I don't think it's necessary to meet

8    whatever it was that Doctor Wiesen said.  So the objection is

9    sustained --

10             MR. PIKULA:  May I make an offer of proof?

11             THE COURT:  -- as to current data.

12             MR. PIKULA:  May I make an offer of proof, Judge?

13             THE COURT:  Go ahead.

14             MR. PIKULA:  If allowed to testify as to the current

15   existing live certified list on the Springfield Police

16   Department for promotion to sergeant, evidence would be

17   elicited to show that of the next three names the first is

18   white and then the next two are black.

19             Further, the evidence would show that there will be

20   two openings for sergeant as of this Friday and that another

21   one would be -- as two people are retiring, and there will be

22   another one coming up in August.  That would be my offer.

23             THE COURT:  All right.

24   Q.   Commissioner, I just want to show you this summary.  Does

25   this represent the current makeup of the Springfield Police

1    Department?

2    A.    As of last week, yes.

3    Q.    Was this generated by an employee of your office at your

4    request?

5    A.    Yes, sir.

6    Q.    In terms of looking at the numbers in the Springfield

7    Police Department in relation to its budget, I wanted to ask

8    you:  Over the past ten years, from 2000 to 2010, how do the

9    numbers in the department now compare to how they were in 2000,

10   ten years ago?

11   A.    We have less patrol officers, less sergeants, less

12   lieutenants, and less captains.

13   Q.    What's the reason for that?

14   A.    The reason is because those positions over that ten-year

15   span have been eliminated from our organizational chart.

16   Q.    Is that related to financial conditions?

17   A.    Yes.

18   Q.    When was the last layoff in the Springfield Police

19   Department?

20   A.    2003.

21   Q.    How many layoffs of police officers were there in 2003?

22   A.    I believe it was 76 patrol officers.

23   Q.    Comparing the numbers we have now over the past ten years,

24   are you now up to a full complement of officers compared to

25   what you had then?

1    A.    No, sir.

2    Q.    How many officers are you down?

3    A.    Well, positions, probably about 60, and we're carrying

4    about 25 vacancies right now, so a total of about 85 positions.

5    Q.    Now, as to the costs for an assessment center, you

6    indicated the City of Springfield utilized an assessment center

7    for the deputies, although you did not follow the ranking that

8    was provided, correct?

9    A.    Yes, sir.

10   Q.    Was there a consultant who was retained to conduct that

11   assessment center?

12   A.    Yes, there was.

13   Q.    What was the cost of that consultant?

14   A.    I believe it was $42,450.

15   Q.    On the average, what does an entry-level police officer in

16   Springfield get paid?

17   A.    Approximately a little over $50,000, depending on

18   education that he might have, which would be compensated

19   through the Quinn Bill.

20         MR. PIKULA:  May I have a moment, Judge?

21         That's all I have, Judge.

22   CROSS-EXAMINATION BY MR. LICHTEN:

23   Q.    Good morning.  How are you?

24   A.    Good morning, Counselor.

25   Q.    You mentioned the assessment center.  Was that for -- did

1   you go through an assessment center for your position?

2   A.   I went through an assessment center for the position of

3   chief of police in 1995 but not for this current position that

4   I'm holding.

5   Q.   Okay.  Gotcha.  Is there no longer a chief's position; is

6   that what I understand?

7   A.   That's correct, sir.

8   Q.   But you weren't hired for that chief's position?

9   A.   I was not.

10  Q.   So when you were telling us your concerns about the

11  chief's assessment center, I take it you thought you were the

12  best qualified candidate?

13  A.   Well, I don't know if I thought I was the best qualified

14  candidate.  I was dissatisfied with the process.

15  Q.   The assessment center result did not rank you as high as

16  you thought you deserved to be ranked?

17  A.   I was ranked second, so I was pretty satisfied with the

18  ranking, but I wasn't satisfied with the assessment center.

19  Q.   But did the first -- the person first on the assessment

20  center get the position of chief?

21  A.   Yes, sir.

22  Q.   Now, I vaguely recall that there was some litigation

23  around the chief's position, is that correct?

24  A.   Yes, there was.

25  Q.   And a woman filed a lawsuit alleging discrimination?

1   A.   I think --

2   Q.   Or some men filed a lawsuit alleging reverse

3   discrimination?  Can you just remind me what happened?

4   A.   Well, it was -- it was an appeal that was filed with the

5   Civil Service Commission regarding the assessment center in

6   that there was no objective component, no written component to

7   that assessment center.  A ruling was made that there would be

8   a written component and one was eventually given.

9   Q.   Okay.  Was that appeal -- who was that appeal filed by?

10  A.   It was filed by about four captains and two deputies -- or

11  three captains and two deputies.

12  Q.   Were you one of those people?

13  A.   Yes, sir.

14  Q.   So let me see if I understand this.  After the assessment

15  center was rendered, the result was that a -- someone was

16  picked for the chief's position.  Who was that?

17  A.   Chief Meara.

18  Q.   What?

19  A.   Chief Meara, M-e-a-r-a.

20  Q.   Him or her?

21  A.   That's a woman, female.

22  Q.   What was her first name?

23  A.   Paula.

24  Q.   After she was selected based upon this assessment center,

25  a group of you filed a challenge with the Civil Service

1   Commission alleging that the assessment center was not fair or

2   proper, is that correct?

3   A.   I believe the process was started before the appointment

4   was even made, however.

5   Q.   Okay.  And you were one of those appellants, is that

6   correct?

7   A.   Yes, I was.

8   Q.   I take it your position was that -- strike that.

9        I take it you weren't claiming that there shouldn't be any

10  type of assessment center.  You were complaining there should

11  have been a written component as well as an oral component?

12  A.   Primarily a written component and objecting to the way

13  some of the components were processed to the candidates.

14  Q.   Was there a decision by the Civil Service Commission?

15  A.   There was a decision, yes.

16  Q.   Just so I'm clear, was the decision in your favor, that

17  they ruled that the assessment center, as administered, was not

18  fair and appropriate?

19  A.   They ruled that there should be a written component.  I

20  don't think they necessarily ruled that it was on -- that the

21  portion of it that we took was unfair, but there should be an

22  additional written component to the assessment center.

23  Q.   I see.  Did they order any relief for you or any of the

24  others?

25  A.   No financial relief, no.

1  Q.   Any other relief?  Putting you on the top of the next list

2  or anything like that?

3  A.   No.  They just ordered a written component.

4  Q.   Now, you've testified about the duties of a sergeant.  And

5  I understand essentially, particularly given the budget

6  constraints, your sergeants are out on the street, is that

7  correct?

8  A.   Yes, sir.

9  Q.   It's the lieutenants who might sit behind the desk in the

10 station, but the sergeants are out patrolling and responding to

11 serious problems, is that correct?

12 A.   With some exceptions, like the booking sergeant.

13 Q.   Gotcha.  Most of your sergeants, they're out on the street

14 patrolling, is that correct?

15 A.   Yes, sir.

16 Q.   And I'm looking at this description of the duties of a

17 sergeant, and it says some of the abilities -- it says, for

18 example, "Ability to perform arduous tasks requiring physical

19 endurance and agility frequently."  Do you see that?

20 A.   Yes, sir.

21 Q.   And it says, "Ability to establish and maintain effective

22 working relationships with departmental personnel and the

23 general public"?

24 A.   Yes, sir.

25 Q.   And it talks about the "ability to maintain and accept

1   discipline and to execute orders and to make decisions in

2   emergent and frequently hazardous situations"?

3   A.   Yes, sir.

4   Q.   You would agree these are all important tasks?

5   A.   Yes, sir.

6   Q.   Now, I want to ask you -- you said that when -- after an

7   exam is given that you don't see the list; is that your

8   testimony?

9   A.   I don't see the list of people that failed the exam.

10  Q.   Okay.  But you do see -- you do have available to you the

11  entire list, is that correct?  You can go on HRD's website and

12  get the entire list of people who passed, is that correct?

13  A.   You can do that, but the only list I see is the one that

14  they send me for promotions with the 2 N + 1 rule.

15  Q.   I just want to be clear on this.  If a city wants to know

16  who's on the list, say, the 30 people who pass the exam, there

17  is a website -- I'm sorry.  You can go to the HRD's website.

18  You can put in a code, and then you can see who's on the list,

19  who's above who and where people rank on the list, is that

20  right?

21  A.   That's my understanding.  I've never done it personally,

22  sir.

23  Q.   If you know someone's taken the exam but you don't see

24  them on the list, the likelihood is that those people have

25  failed, is that correct?

1    A.    Yes, sir.

2    Q.    And are you aware of who signs up for the exam, of who

3    goes and takes the exam?

4    A.    I'm not personally aware, no, sir.

5    Q.    Now, as I understand it, the City of Springfield was under

6    the Beecher decree for a long period of time, is that correct?

7    A.    Castro vs. Beecher, yes.

8    Q.    Castro vs. Beecher.  And City of Springfield was one of

9    those few cities who was actually getting lists for a

10   one-for-one basis; in other words, one minority for every one

11   non-minority, is that right?

12   A.    Yes, sir.

13   Q.    Looking at your latest document, I've tried to do the

14   math.  It looks to me that the number of black and Hispanic

15   officers is a little over one-third of your department.  Does

16   that seem accurate to you?

17   A.    Approximately.

18   Q.    Yes.  That is, if I've done the math, it looks like it's a

19   little over -- it looks like 133 -- 135 black and Hispanic

20   officers out of a total number of officers of 360, is that

21   right?  It's about one-third?

22   A.    It's about that, yes, sir.

23   Q.    As of April of 2010 -- this is a document provided to me

24   by the City.  As of April 2010, so just a couple -- I keep

25   doing that, my yellow stickers.  As of April of 2010, it looked

1    to me that you had four minority officers, a Paul Brown, a

2    David Kane, a Perry Michael, and a Julio Toledo?

3    A.    That's not Paul Brown.  That's Roy Carter that's the

4    minority.

5    Q.    Excuse me.  But four, is that correct?

6    A.    You're talking about just sergeants though, right?

7    Q.    Yes, just sergeants.

8    A.    Yes.

9    Q.    Did the City of Springfield ever consider, either in

10   conjunction with other cities or alone, requesting to do an

11   assessment center for the position of sergeant in either 2005

12   or 2007?

13   A.    Not that I'm aware of, sir.

14   Q.    I take it by that you never put out requests for proposals

15   or got bids or anything like that, is that correct?

16   A.    That's correct, sir.

17   Q.    Okay.  With respect to 2003, the last exam being 2003, do

18   you know if you made any promotions off that list?

19   A.    If I personally did?

20   Q.    No, no, if the City made any promotions off the 2003 list.

21   A.    I believe they did, yes, sir.

22   Q.    Do you know how many they made?

23   A.    I don't, sir, no.

24   Q.    None of those were minorities, is that correct?

25   A.    Well, I don't know, sir.  I'm not sure what promotions

1    they made.

2    Q.    Have you ever looked at the 2003 list to see whether there

3    were any minorities reachable?

4    A.    I don't think I did because it wasn't under my authority

5    to promote.

6    Q.    Okay.  Let me turn to something else.  Do you belong to

7    the Massachusetts Association of Major City Chiefs?

8    A.    I belong to it, yes.

9    Q.    You do belong to it?

10   A.    Yes.

11   Q.    How long have you belonged to it?

12   A.    Probably for about two years or so.

13   Q.    Okay.  I didn't see your name on the document involving

14   the Massachusetts -- is there a reason that Springfield is not

15   listed on there?

16   A.    We might not have paid our dues.

17   Q.    Okay.  Do you go to their meetings?

18   A.    I haven't gone to the meetings, sir, no.

19   Q.    I'm sorry.  What?

20   A.    I have not, no.

21   Q.    Are you aware -- have you been involved in any of the

22   discussions that that association has had relating to coming

23   out for and proposing the use of an assessment center?

24   A.    No, sir.

25   Q.    So although you belong, you haven't been involved in any

1    of those meetings, is that correct?

2    A.    That's correct, sir.

3    Q.    Okay.  Just, finally, you said there was an assessment

4    center -- was it for the position of deputy that cost 42,000?

5    A.    Yes, sir.

6    Q.    Who did that assessment center?  Who was the consultant

7    that was hired?

8    A.    Mass. Municipal Association, MMA.

9    Q.    I see.  So the Mass. Municipal Association.  I know of an

10   MMA, Mass. Municipal Association that is, of which

11   municipalities within the Commonwealth are members of, and

12   that's sort of an agency that works in their behalf.  Is that

13   the same Mass. Municipal Association?

14   A.    I believe it is, sir, yes.

15   Q.    So they have sort of a consulting sector that does police

16   promotional exams?

17   A.    Well, assessment centers.

18   Q.    Assessment centers.  And do they do assessment centers for

19   the position of sergeant?

20   A.    I'm not certain if they do, sir.

21   Q.    Okay.  Have you ever inquired of the Mass. Municipal

22   Association whether they do alternative component police

23   sergeant examinations --

24   A.    No, sir.

25   Q.    -- for sergeant?

1    A.    No, sir, I have not.

2    Q.    Do you know who the person is that ran the assessment

3    center for the City of Springfield and what their background

4    is?

5    A.    I believe the gentleman's name was Mark Morris.

6    Q.    Mark Morris?

7    A.    With MMA.

8    Q.    Okay.  Do you know him to be recognized in the field of

9    police promotional examinations?

10   A.    Yes.  Assessment centers, that component, the assessment

11   center.  I know him to be affiliated with assessment centers.

12   Q.    And your testimony is you have no idea what using multiple

13   components for police sergeants examination in Springfield --

14   what it would cost if you used Mass. Municipal Association?

15   A.    I don't know, sir.

16          MR. LICHTEN:  Thank you very much.  I have nothing

17   further.

18          THE COURT:  Anybody else before Mr. Pikula?  No.

19          MR. PIKULA:  No questions, your Honor.

20          THE COURT:  Okay.  Thank you, Commissioner.  You may

21   step down.

22          MR. McDERMOTT:  Your Honor, just for the record, we're

23   going a bit out of order to accommodate the schedules of the

24   witnesses.  The MBTA will be calling Delores Ford-Murphy.

25          THE COURT:  All right.

1          <u>DELORES FORD-MURPHY, Sworn</u>

2          THE CLERK:  State your name; spell your last name for

3     the record.

4          THE WITNESS:  Delores Ford-Murphy.  F-o-r-d -

5     M-u-r-p-h-y.

6          THE CLERK:  Thank you.

7     <u>DIRECT EXAMINATION BY MR. McDERMOTT:</u>

8     Q.   Good afternoon, Miss Ford-Murphy.  Are you presently

9     employed?

10    A.   No.

11    Q.   Have you been employed at the MBTA Transit Police

12    Department?

13    A.   Yes.

14    Q.   Can you briefly describe your work history at the MBTA

15    Transit Police Department?

16    A.   I was hired in 1981.  I was promoted to deputy in 1983; to

17    lieutenant in 1984; to captain in 1986; and to deputy chief in

18    2003.

19    Q.   For how long were you deputy chief from your appointment

20    in 2003?

21    A.   2003 till 2008, June.

22    Q.   Miss Ford-Murphy, could you briefly describe the

23    organizational structure at the MBTA during the time that you

24    were deputy superintendent from 2003 to 2008?

25    A.   There was a Patrol Division, an Investigative Services

```
1    Division, and an Administrative Services Division, with the
2    chief overseeing.
3    Q.    Any other ranks within the MBTA Transit Police Department
4    covered by the Civil Service law?
5    A.    Yes.
6    Q.    What ranks are those?
7    A.    That's police officers, sergeant, lieutenant, captain.
8    Q.    Are any ranks within the MBTA Transit Police Department
9    not covered by Civil Service?
10   A.    Yes.
11   Q.    What ranks are those?
12   A.    Deputy chief and chief.
13   Q.    While you were deputy chief from 2003 to 2008, will you
14   briefly describe what your job duties were in that position?
15   A.    I oversaw the Planning and Research Unit; the Training
16   Unit; the academy; the Professional Standards Unit; the
17   Technical Services Unit; and the civilian staff.
18   Q.    Just to back up a little bit, Miss Ford-Murphy, what is
19   your educational background?
20   A.    I have a bachelor's in criminal justice and a master's in
21   criminal justice.
22   Q.    What is the highest Civil Service rank that you achieved?
23   A.    Captain.
24   Q.    Is that the highest Civil Service rank?
25   A.    Unless a department has a deputy chief or chief's position
```

1    in Civil Service, which we did not.

2    Q.    In your capacity as deputy chief from 2003 to 2008, did

3    you have any duties specifically in regard to the promotion of

4    police officers to the rank of sergeant?

5    A.    Yes.

6    Q.    And can you describe what those duties were?

7    A.    I was a liaison to the Human Resources Division, and I

8    also administered the process and oversaw the process, the MBTA

9    specific portion of the review.

10   Q.    When you became a deputy chief in 2003, what date was

11   that, if you recall?

12   A.    December 19 of 2003.

13   Q.    And can you describe what the process was then for the

14   selection of police officers to the rank of sergeant within the

15   MBTA police?

16   A.    Officers that were successfully -- had successfully

17   completed the Civil Service component would then participate in

18   a process, an oral board process, that included a review of

19   departmental records and supervisory recommendations if they

20   were provided.

21   Q.    Now, during the time that you were deputy chief, were

22   promotions to sergeant made from the certification list by HRD?

23   A.    Yes.

24   Q.    Can you describe, Miss Ford-Murphy, what a certification

25   list is and, if you know, how a certification list is created?

1   A.    A certification list is a list of candidates that the

2   department may look at for a particular promotion.  It would be

3   given to us based on the number of vacancies that we were

4   seeking using the 2 N + 1 and any ties.  In addition, there may

5   also be somebody who had successfully appealed a bypass, and

6   they might be added to the top of the list as well.

7       The list was prepared based first on the department having

8   -- requesting to participate in the testing process for a

9   particular rank.  They would provide us with an announcement,

10  which we were required to post throughout the station in

11  various units and substations and also provide a list -- we had

12  to provide a list to HRD of all of the candidates that were

13  eligible to take the test.

14      HRD would hold the test.  At some point we would request

15  -- we would identify that we had a vacancy.  They would provide

16  us with a list based again on the number of positions that we

17  were seeking.

18  Q.   And you testified that you had posted internally

19  throughout the MBTA Transit Police Department.  Was that for

20  the purpose of informing police officers of the opportunity to

21  take the test?

22  A.    Yes.  We also posted it on a memorandum, which officers

23  are required to read daily whenever they're in work,

24  identifying the reading materials and the eligibility

25  requirements, et cetera.

1  Q.   And what was the frequency of utilizing the HRD testing at

2  the MBTA police?

3  A.   Approximately every two years, usually on odd years.

4  Q.   The HRD test, was that generally given about the same time

5  every year?

6  A.   Yes, generally in October.

7  Q.   After a test was given, approximately when would you

8  expect the eligibility list from that test to be created?

9  A.   It was generally due in March, but it could take a couple

10 of extra months.

11 Q.   And would the eligibility list that's created from a test

12 expire at any time?

13 A.   Generally two years, but it would extend until the next

14 certified list was prepared.

15 Q.   And you mentioned that a person could be placed on a

16 certification list because of a bypass.  Could you just explain

17 what a bypass is?

18 A.   If an officer had taken the exam and had a -- and the

19 successful candidate for the promotion had a score lower than

20 that person that was bypassed, they had the right to appeal to

21 HRD and the Civil Service Commission.

22 Q.   When the MBTA Transit Police Department received a

23 certification list from HRD, from the time it received the

24 list, what was the process used at the police department to

25 determine who from the list should be promoted?

1    A.   We had initially just an oral board process which, as I

2    said, included a personnel records review and supervisory

3    recommendations if they were provided.  Eventually, we did

4    change the process as we went along.

5    Q.   How was the process changed?

6    A.   We added a separate and distinct -- first, we asked all

7    the supervisors to provide supervisory recommendations.  Prior

8    to that, we had allowed officers to solicit a recommendation

9    from their supervisor.  We initially required the supervisors

10   to provide a recommendation.  During the following process, we

11   then required them to rank them in order in which they would

12   promote them.  We then changed the process again to have them

13   rank them in the order in which they would promote them based

14   on specific criteria.  And eventually we had them rank them

15   with criteria with an answer sheet with actual sample responses

16   that would be fair, average or excellent.

17   Q.   And were the oral boards -- how were the oral boards

18   conducted?

19   A.   The oral boards were conducted by a panel of three

20   superior officers.  Initially, it was the deputy chiefs.  And

21   after the first process, I think, we provided lieutenants to

22   participate in that board.

23   Q.   How were oral board questions created?

24   A.   They were created by generally the command staff,

25   including our attorney when we did get one on board, and

1    provided to the oral board.

2    Q.   And you mentioned there was a supervisory scoring.  How

3    was that created?

4    A.   Well, you heard the evolution.  Each time we had a bypass

5    hearing and we received input and feedback from -- whether it

6    was the Civil Service Commissioner or sometimes the Plaintiffs'

7    attorneys or the plaintiff, we looked to see how we could

8    improve it to take as much of the subjectivity away, so we were

9    moving further along as we went just to try and tighten up the

10   process.

11   Q.   How was the scoring done from the process that you've just

12   described?

13   A.   The scoring, when we moved to a separate component with

14   supervisory, we had the oral board component as a -- count as

15   one portion and the supervisory recommendations were given a

16   value of three.

17   Q.   They had a value of three.  And what was the value of the

18   oral board?

19   A.   One.

20   Q.   In regard to the certification list, did it rank officers

21   in order of their test scores from the HRD exam?

22   A.   Yes.

23   Q.   Was the order in which the officers rank taken into

24   consideration by the MBTA transit police when it did the

25   process that you just described?

1  A.    No.  Essentially they were on an even base when they came

2  into the MBTA specific process.

3  Q.    And did you consult with others in regards to how the

4  testing should be done?

5  A.    Yes.

6  Q.    Within the MBTA, with whom did you discuss the testing

7  process?

8  A.    Our Human -- I'm sorry, our labor relations attorneys who

9  generally worked with us on the bypass situations.  In

10  addition, we had an in-house attorney, and the deputy chiefs

11  were involved in the process.  We also had from time to time

12  the Planning and Research Unit seek information and research

13  from other agencies that were conducting processes.

14  Q.    Did you have any opportunity to consult with agencies

15  outside of the MBTA in regard to the testing process?

16  A.    With HRD.

17  Q.    With whom did you discuss the testing process with at HRD?

18  A.    Regina Caggiano was our rep for some period of time, then

19  Richard Courier.  I also had occasion to speak to Sally McNeely

20  and some of her staff.

21  Q.    Miss Ford-Murphy, I'd like to show you what's been marked

22  as Exhibit 148.  Do you recognize this list?

23  A.    Yes.

24  Q.    Is this list a fair and accurate record of the police

25  officers promoted or appointed to the rank of sergeant from

1    2003 to March 2010?

2    A.    Yes.

3    Q.    I want to take you -- Miss Ford-Murphy, you said you were

4    appointed on December 19, 2003?

5    A.    Yes.

6    Q.    I see the first name on this list is John Mahoney.  Was he

7    on this list as a result of HRD testing?

8    A.    No.

9    Q.    How was he on this list?

10   A.    He was on the list as a result of a -- he was demoted, for

11   lack of a better word.  He was a deputy chief, and he was

12   demoted when the deputy chiefs were selected for the new

13   regime.

14   Q.    It's fair to say that he returned to his rank, Civil

15   Service rank?

16   A.    Yes.

17   Q.    Looking at this list, were all the other officers listed

18   on this list promoted as a result of promotions off a

19   certification list from HRD?

20   A.    Yes.

21   Q.    At the time December 19, 2003, who was the police chief at

22   the MBTA?

23   A.    Joseph Carter.

24   Q.    What race was Chief Carter?

25   A.    He's black.

1   Q.   Is he still the police chief of the Transit Police

2   Department?

3   A.   No.

4   Q.   Do you know approximately when he served?

5   A.   Early 2003 to, I believe, early 2008.

6   Q.   And do you know the reason for him leaving?

7   A.   He was appointed to -- as commander of the National Guard.

8   Q.   That's the Massachusetts National Guard?

9   A.   Yes.

10  Q.   Before we -- you worked as a deputy chief until 2008.

11  What happened in 2008?

12  A.   I retired.

13  Q.   In your capacity as deputy chief, Miss Ford-Murphy, when

14  you received a certification list, would you necessarily know

15  who -- what police officers in the Transit Police Department

16  took the test but failed?

17  A.   No.

18  Q.   In your position as deputy chief, would you know what the

19  promotional rate for minority test-takers was at the MBTA?

20  A.   No.

21  Q.   In your position as deputy chief, would you have reason to

22  know of the results of HRD testing in other jurisdictions?

23  A.   No.

24  Q.   In your capacity as deputy chief, Miss Ford-Murphy, did

25  you have reason to review or keep track of the ethnic and

1   racial composition within the rank of sergeant?

2   A.   Yes.

3   Q.   Was that done in the normal course of duty?

4   A.   Yes.

5   Q.   How often was -- well, describe how that process took

6   place.

7   A.   We maintained a spreadsheet that was updated whenever

8   there was a promotion or a retirement.  In addition, we entered

9   all of that information into the MBTA's Peoplesoft program

10  which is run out of Human Resources.

11  Q.   I show you what's been marked as Exhibit No. 149.  Just

12  looking at the rank of sergeants, because that's all we're

13  concerned about, would such -- is this the type of compilations

14  that you would conduct at the MBTA in the normal course of

15  business?

16  A.   Yes.

17  Q.   And looking at this Exhibit No. 149, it is a -- well, can

18  you describe to us what this is?

19  A.   It's -- it gives information regarding the ethnic

20  background of sergeants from 2003 through 2007.

21  Q.   And it's done on the December 31st of each year from 2003?

22  A.   This particular version of it was actually --

23  Q.   You could do the same for any particular -- you could pick

24  any day and do the same thing on Peoplesoft?

25  A.   On Peoplesoft data.

```
 1   Q.   Is this what -- the information that is in Exhibit 149, is
 2   it accurate information about --
 3   A.   Yes.
 4   Q.   -- about the rank of those who were in the rank of
 5   sergeant at the MBTA police?
 6        THE COURT:  I'm not sure there was an answer to that
 7   question.
 8        MR. McDERMOTT:  I'm sorry.  I think she answered in --
 9   Q.   Is the data and information that is contained in Exhibit
10   No. 149 an accurate compilation of the data that is retained in
11   the normal course of business by the MBTA Transit Police?
12   A.   I believe so.
13   Q.   Does this data comport with your experience while deputy
14   chief at the MBTA police?
15   A.   Yes.
16   Q.   During the time from 2003 through March 2010, did the
17   percentage of African-American officers who are sergeants in
18   the MBTA increase or decrease?
19   A.   Increase.
20   Q.   Within the MBTA are Asians considered a minority?
21   A.   No.
22        MR. LICHTEN:  Objection, your Honor.
23        THE COURT:  Overruled.  The answer may stand.
24   Q.   Are Asians considered minorities?
25   A.   At the Authority, yes.
```

1   Q.   Did you have reason to believe during 2003 to your

2   retirement in June 2008 that African-American or Hispanic

3   officers were being -- were not being promoted because of the

4   results of HRD testing?

5   A.   Can you just repeat the question?

6   Q.   Well, did you have any reason to believe that as a result

7   of HRD testing there was an imbalance in the number of

8   promotions between white officers and non-minority officers?

9   A.   No.

10          MR. McDERMOTT:  Your Honor, I would move to have

11  Exhibit No. 149 entered into evidence.  I believe we marked it

12  as an exhibit yesterday.

13          MR. LICHTEN:  He worked so hard for it, I think I

14  should agree to it.

15  (Exhibit No. 149 received into evidence.)

16          MR. McDERMOTT:  If you'd just give me one moment, your

17  Honor, I believe I'm done with my questioning.

18          I have no further questions, your Honor.

19  CROSS-EXAMINATION BY MR. LICHTEN:

20  Q.   Good afternoon.  You were deputy from when to when?

21  A.   From December of 2003 till June of 2008.

22  Q.   Okay.  What was your position just before that?

23  A.   Captain.

24  Q.   In your position as deputy, did you have some sort of

25  human resource function?

1    A.    Yes.

2    Q.    That was to be -- have some responsibility for promotions

3    or running the promotions operation?

4    A.    Yes.

5    Q.    Who was the actual appointing authority?  The chief?

6    A.    Delegated to the chief from the Authority.

7    Q.    Did I just hear you say a minute ago that the MBTA

8    considers Asians to be minorities?

9    A.    Yes.

10   Q.    Are you aware that that's diametrically opposite to the

11   position the MBTA took before the Supreme Judicial Court of

12   Massachusetts?

13           MR. McDERMOTT:  Objection, your Honor.

14           THE COURT:  Sustained.

15   Q.    Well, let me put up the decision.  I'm asking you to look

16   at Footnote 5.  This is the decision of the Supreme Judicial

17   Court of Massachusetts issued in 2006 in the case of Brackett

18   vs. Civil Service Commission.  Footnote 5 says, "The MBTA

19   considers minority officers to be those who are black and

20   Hispanic."  Do you see that?

21           MR. McDERMOTT:  Objection, your Honor.  It's out of

22   time and place, and she's already --

23           THE COURT:  Well, go ahead.

24   Q.    Did you testify --

25           MR. McDERMOTT:  I'm sorry.  Is the question:  Is that

1    what it says?

2         THE COURT:  The question is:  Did you see the

3    footnote, I guess is the question.

4    Q.   Did you see that footnote?

5    A.   No.

6    Q.   Does this refresh your memory that the MBTA takes the

7    position that blacks and Hispanics are minorities, not Asians?

8         MR. McDERMOTT:  Objection, your Honor.  This is a -- I

9    believe from a 1996 decision.

10        MR. LICHTEN:  No.  It's from a 2006 decision, your

11   Honor.

12        THE COURT:  Well, at any rate --

13        MR. McDERMOTT:  The appointments were 1996.

14        THE COURT:  That was not clear.  Ask another question.

15   Q.   My question is:  Does this footnote refresh your memory

16   that the MBTA takes the position that blacks and Hispanics are

17   minorities, not Asians?

18        MR. McDERMOTT:  Objection, your Honor.  She didn't

19   have any problem --

20        THE COURT:  She may answer it.

21   A.   I believe this had to do with Civil Service, and Civil

22   Service is -- for purposes of Civil Service, I believe that's

23   where it's from.  That's my best knowledge.

24   Q.   Well, I guess my question is simply:  What was the MBTA's

25   position in the year 2005 with respect to whether only blacks

1    and Hispanics were minorities or whether Asians were also

2    minorities?  What was the MBTA's position?

3              MR. McDERMOTT:  Objection, your Honor.

4              THE COURT:  Overruled.  You may answer.

5    A.   We tracked the information as part of a diversity program.

6    Did I consider Asian as a minority?  Yes.

7    Q.   What about the MBTA?  I'm not so concerned about you but

8    the MBTA's official position, if you know.

9    A.   I believe the MBTA did not consider the -- I'm sorry.

10   Q.   Did not consider Asians to be a minority, is that what you

11   were going to say?

12   A.   They did -- I don't know.

13   Q.   That's fair enough.

14   A.   Back and forth.

15   Q.   An honest answer.

16        Now, you were the deputy when the Brackett decision came

17   down, is that correct?

18   A.   Yes.

19   Q.   And you obviously, as a -- someone involved in personnel,

20   you made yourself familiar with that decision, is that correct?

21   A.   I --

22              MR. McDERMOTT:  Objection, your Honor.

23              THE COURT:  Overruled.  You may answer.

24   A.   I don't recall specifically.

25   Q.   Well, do you recall that in the Brackett decision what

1   happened was that in the latter part of the '90s the MBTA had

2   promoted three minority officers, that is black or Hispanic, to

3   the position of police sergeant even though they were not from

4   a special list?

5           MR. McDERMOTT:  Objection, your Honor.  I'm not even

6   sure that's the facts of the case.  I think there were three --

7           THE COURT:  She can say so if it isn't.

8   A.    I'm not that familiar with the case.

9   Q.    Okay.  Well, let me ask it this way:  Weren't you familiar

10  that in that case the MBTA, in order to use such a list, had to

11  admit that it had been unable to reach minority -- qualified

12  minority police sergeants utilizing the regular HRD list?

13  Didn't you know that?

14          MR. McDERMOTT:  Objection, your Honor.

15          THE COURT:  You may answer.

16  A.    I wasn't involved in that particular process at that time.

17  Q.    Well, you've come here today, and as I understand your

18  testimony, your testimony is you weren't aware there was a

19  problem getting qualified minority candidates off the HRD list.

20  Do I understand that correctly?

21          MR. McDERMOTT:  Objection, your Honor.

22          THE COURT:  Sustained.

23  Q.    Well, let me ask it this way:  Were you aware that in

24  1996, at least, 24 percent of the police officers on the MBTA

25  were minority police officers?

1        MR. McDERMOTT:  Objection, your Honor.  I think that's

2   beyond the scope.  She limited it to 2003 to --

3        THE COURT:  No.  I won't limit the scope that way.

4   You may have the question.

5   A.   Based on this information, I would say yes.

6   Q.   And is that still about the population of minority police

7   officers; it's about 25 percent of the force?

8        MR. McDERMOTT:  Objection, your Honor.

9        THE COURT:  Overruled.  You may answer.

10  A.   I think so.

11  Q.   So it looks like that's stayed fairly static.  About 25

12  percent of the police officers, not supervisors but police

13  officers, for the MBTA are minorities, is that right?

14  A.   Yes.

15  Q.   Just so we're clear, I'm talking about blacks and

16  Hispanics, is that right?

17  A.   Yes.

18  Q.   Okay.  And according to this decision at the time only 6

19  percent or 6.6 percent of all of the MBTA's police supervisors

20  were minority, is that correct?

21  A.   Yes.

22        MR. McDERMOTT:  Just a general objection, your Honor,

23  to the relevance of going back to 1996.

24        THE COURT:  Okay.  Overruled.

25  Q.   So isn't it a fair statement that the MBTA was aware by --

```
 1   by the 2000s that there had historically been a problem in

 2   getting qualified minorities just using a regular HRD police

 3   sergeant's list that resulted from the HRD examination?

 4           MR. McDERMOTT:  Objection, your Honor.

 5   Q.   Weren't you aware of that?

 6           MR. McDERMOTT:  Objection.

 7           THE COURT:  Overruled.  You may answer.

 8   A.   It was my experience that we had ample candidates and that

 9   we were proceeding through the process.

10   Q.   Let me talk about that.  You were more directly involved

11   in 2003, is that correct?

12   A.   Excuse me?

13   Q.   You were more directly involved in the promotion practice

14   -- promotional practice of the MBTA in 2003, is that right?

15   A.   Yes.

16   Q.   And, therefore, you're familiar with several Civil Service

17   decisions, Tuohey vs. MBTA and Maynard vs. MBTA, is that

18   correct?

19   A.   Yes.

20   Q.   And in those cases white individuals claimed that they

21   were higher on the HRD Civil Service list but were not promoted

22   in favor of some minority candidates who were lower on the

23   list, is that correct?

24   A.   Yes.

25   Q.   And HRD -- I'm sorry, HRD.  The Civil Service Commission
```

1    upheld that decision and ordered those individuals placed at

2    the top of the next list, and they were eventually promoted in

3    2007, is that right?

4            MR. McDERMOTT:  Objection, your Honor.

5    A.    I think there may be two different years, but they were

6    eventually promoted.

7    Q.    And they were specifically contesting the promotions of

8    someone by the named of Manes Cadet and Sosa, is that correct?

9    A.    Yes.  But they were both bypassed more than once.

10   Q.    They were both bypassed more than once.  So in this --

11   these promotions that occurred in 2003 and 2004, there were a

12   number of whites who were skipped to reach some minority

13   candidates, is that correct?

14           MR. McDERMOTT:  Objection, your Honor.

15           THE COURT:  Overruled.

16   A.    They were selected before the other candidates.  They

17   scored higher in the process.

18   Q.    Well, just so we're clear, that's not what the Civil

19   Service Commission found.  The Civil Service Commission found,

20   did it not, that these individuals were bypassed so that the

21   department could reach persons specifically because of their

22   minority status, isn't that correct?

23           MR. McDERMOTT:  Objection, your Honor.  We don't have

24   that -- I don't know what he's referring to.

25   Q.    Let me withdraw that question and let me ask you:  Is it

1  your testimony here today that the minorities who were hired --

2  who were promoted to the position of sergeant who were lower

3  down on the list than these two individuals had actual higher

4  scores on the interviews than these candidates?  Is that your

5  testimony?

6  A.   Yes.

7  Q.   Okay.  Now, the process that you've described -- I'm

8  sorry, the interview process that you've described, who

9  designed that process?

10  A.   The process was in place.  The actual questions

11  individually as each process came about were prepared by the

12  deputy chiefs with consultation with the Planning and Research

13  Department that gave us samples from different venues.

14  Q.   How long have these -- how long has this interview process

15  been utilized by the MBTA?

16  A.   As long as I can remember.

17  Q.   So going back to the '90s perhaps?

18  A.   Going back to the '80s.

19  Q.   Going back to the '80s.  Is it true that the MBTA

20  specifically applied to HRD for permission to utilize this

21  process in addition to the written test that HRD administers?

22  A.   I don't know.

23  Q.   Okay.  Were you aware that HRD -- I'm sorry, that the MBTA

24  had specifically requested permission to do this from HRD and

25  received permission to do that?  Or you're simply not aware of

1    that?

2    A.    I don't remember.

3    Q.    So your testimony is you don't know whether this process

4    has or has not been approved by HRD as part of a Delegation

5    Agreement?

6    A.    It was in place when I got there.  I assume it was.

7    Q.    How long does the process take?  How long did the

8    interviews take?

9    A.    It can be 20 minutes.  It can be 15 minutes.  It depends

10    on the candidates sometimes.  They're scheduled approximately

11    25 minutes to a half hour long.

12    Q.    Is the candidate given any information in advance of the

13    interview, any information about, you know, what they should be

14    prepared for, anything like that?

15    A.    No, not by the administration.

16    Q.    Okay.  So they come and they sit down for the interview.

17    The interviewers are staff from the MBTA?

18    A.    Yes.

19    Q.    And they're officers or superior officers for the MBTA?

20    A.    Yes.

21    Q.    And is there any rule regarding whether the superior

22    officer has worked with or has not worked with the candidate

23    who's coming in for the interview?  That is, is there anything

24    to prevent against favoritism?

25    A.    No.

1    Q.    All the interviewers have rating sheets, is that correct?

2    A.    Yes.

3    Q.    And the kinds of questions that are asked, what kinds of

4    questions are they, if you know?

5    A.    Generally they're related to the mission statement,

6    transit police policy.  It might be diversity related, sexual

7    harassment issues, things like that.

8    Q.    Let me see if I can hone in on that.  Are they situational

9    questions like assume -- we say that a lot here in this

10   courtroom -- assume that you're a police sergeant and you're

11   faced with this person who comes in and there's a problem.

12   What do you do?  Or are they not those types of questions?

13   A.    Some are.

14   Q.    And are all the candidates asked the same questions?

15   A.    Yes.

16   Q.    And how many questions are there generally?

17   A.    Generally, I believe there's between seven and ten, I

18   think.

19   Q.    Have you found this to be a fair process; that is, that

20   the addition of this -- I'll call it a structured interview for

21   want of a better word -- that this structured interview

22   succeeds in picking better candidates for the position of

23   sergeant?

24   A.    We were satisfied, yes.

25   Q.    And do you also have an opinion as to whether or not it's

1    nondiscriminatory; that is, that it tends to select minority

2    candidates, if they're in the interviews, just as predominantly

3    as non-minority candidates?

4    A.    I believe it's nondiscriminatory.

5    Q.    The MBTA has been very satisfied with this process?

6    A.    Yes.

7    Q.    But as I understand it, unless you're within the 2 N + 1

8    band, you can't sit for this interview, is that correct?

9    A.    Correct.

10   Q.    So if there's one opening, HRD will simply certify you the

11   top three people based on their scores on the written test, and

12   those people have to be -- those are the only people who can be

13   interviewed, is that correct?

14   A.    Except that if there's a tie, you might get additional

15   candidates.

16        MR. LICHTEN:  Thank you very much.  That's all I have.

17   Thank you.

18        MR. McDERMOTT:  Very briefly, your Honor, a few

19   questions.

20   REDIRECT EXAMINATION BY MR. McDERMOTT:

21   Q.    Miss Ford-Murphy, looking at the chart, Exhibit No. 149,

22   we were looking only at sergeants for the purpose of the -- my

23   questioning before.  But I notice above that, for officers,

24   there are indications there for American Indian, Asian, black,

25   Hispanic, white, and nonspecified.  Is it fair to say, Miss

1    Ford-Murphy, that those are the categories that the MBTA Human

2    Resources Office requires you to track?

3    A.    Yes.

4    Q.    Is it fair to say that the reason for tracking this

5    information is to keep track of the personnel within the MBTA

6    to see if affirmative action and other EEO policies are

7    satisfied?

8    A.    Yes.

9    Q.    In regard to the bypasses, I'm going to show you again

10   Exhibit No. 148, and I note there that in November -- I'm

11   sorry, July 15, 2004, there were 12 appointments -- or 12

12   promotions to the position of sergeant?

13   A.    Yes.

14   Q.    Was that a notable increase from the normal number of

15   sergeants one would expect to be promoted?

16   A.    Significant.

17   Q.    And what was the reason for that?

18   A.    The department had just changed its patrol plan to a

19   district process as opposed to we had previously been two

20   separate areas.  It was changed to five, which required an

21   entire new command staff and additional sergeants to adequately

22   supervise it.  More of a community-based.

23   Q.    Just quickly referring back to Exhibit No. 149, it's fair

24   to say that from the calendar year 2003 to the calendar year

25   2004, the rank of sergeant increased from 20 to 32?

1    A.    Yes.

2    Q.    And that was because of the reorganization of the MBTA

3    Transit Police Department?

4    A.    Yes.

5    Q.    Now, when we have 12 appointments being -- or promotions

6    being made, is it fair to say that the certification lists

7    would have to have at least 25 names?

8    A.    At least, yes.

9    Q.    And it would probably be more considering that the 25th

10   person would likely have others tied -- with a tie score?

11   A.    It could have been.  I don't recall specifically if there

12   was a tie at the end of that particular list.

13   Q.    Is it fair to say that among those who were bypassed,

14   minorities were also bypassed?

15   A.    Yes.

16   Q.    And during your tenure as a deputy chief, you, in fact,

17   did -- the MBTA Transit Police did bypass the minority police

18   officers?

19   A.    Yes.

20   Q.    Look at Exhibit No. 148.  I bring your attention to the

21   promotions made on September 20, 2008.  Do you know whether or

22   not Robert Don, Asian, was he placed on the certification list

23   because of a bypass?

24   A.    Yes.

25   Q.    And Darren Keith, black officer, promoted to sergeant in

1    September of 2008, was he placed on the certification list as a

2    result of a bypass?

3    A.    Yes.

4    Q.    And on March 14, 2009, Dennis Hong, was he placed on the

5    certification list as a result of bypass?

6    A.    Yes.

7    Q.    And you discussed in your direct, Miss Ford-Murphy, that

8    the process used at the MBTA evolved with discussions with

9    people within the MBTA and with people with HRD.  Did the

10   activity for the bypass appeals affect the process -- affect

11   the evolution of the process that was used at the MBTA?

12   A.    Yes.

13   Q.    I'm going to show you excerpts from appellant's

14   post-hearing brief in the Christopher Maynard vs. the MBTA --

15        MR. LICHTEN:  Objection.

16        THE COURT:  I don't know what the purpose is here yet.

17   Q.    Are you familiar with the arguments made by Christopher

18   Maynard's attorneys in regard to what they found were points of

19   contention regarding the process utilized by the MBTA in the

20   promotions?

21   A.    Yes.

22   Q.    Is it fair to say that their arguments were contained in

23   the post-hearing brief?

24        MR. LICHTEN:  Objection.

25        THE COURT:  You may answer that.

1    A.    Yes.

2    Q.    And in light of those arguments, were there discussions

3    that you were involved in that affected how the process of

4    promotion was done within the MBTA?

5    A.    Yes.

6    Q.    Let me show you some excerpts of this.  It's Page 6.

7          MR. LICHTEN:  Your Honor, I have no objection to her

8    testifying what these changes were, but I don't see the value

9    in showing her a brief written by the lawyer for one of the

10   appellants.  I don't see how that relates to these -- how it's

11   helpful.  Why don't we just get at the changes themselves.

12         MR. McDERMOTT:  Well, I just thought in how these

13   discussions took place, there were points made by the

14   attorneys.  And if, in the course of discussions, the process

15   at the MBTA Transit Police was changed in regard to promotions

16   to sergeant.

17         THE COURT:  Because of the points that had been made

18   in the briefs?

19         MR. McDERMOTT:  Because Miss Ford-Murphy testified

20   that one of the people -- one of the groups that she consulted

21   were the labor relations lawyers who did the --

22         MR. LICHTEN:  She hasn't suggested that her memory is

23   exhausted on this.

24         THE COURT:  It's to draw your attention to an argument

25   that's been made and to draw her attention to the argument.

1    That's what I gather the question --

2              MR. McDERMOTT:  Yes.

3    Q.   As a result of the post-hearing brief on the Christopher

4    Maynard bypass appeal, I'll bring your attention to the

5    indented language that the plaintiffs pointed out that was in

6    the submission, the HRD submission, regards to some of the

7    factors that took place in the promotion of Manes Cadet.  That

8    is spelled C-a-d-e-t, but it's pronounced Caday (ph).  Is that

9    fair to say?

10   A.   Yes.

11   Q.   One of the arguments was that in the submission the MBTA

12   -- I'll quote what the MBTA had in its submission.  "The MBTA

13   has a high Haitian constituency.  Officer Cadet will be a

14   valuable resource as the police department partners with the

15   Haitian community.  As a Haitian police supervisor" -- and that

16   emphasis was added by the attorney -- "he can serve a dual role

17   as liaison to the community and a role to Haitian youths."

18        Were you responsible for including that information in the

19   HRD documents?

20   A.   Yes.

21   Q.   And did Officer Cadet, when he was going through the

22   promotional process at the Transit Police Department, did he

23   receive any extra scoring because of his race?

24   A.   No.

25   Q.   Was he promoted because of the results of the scores he

1    had with the oral board and the supervisory review?

2    A.    Yes.

3    Q.    So his race had nothing to do with the score that he

4    ultimately was promoted for; is that fair to say?

5    A.    No.  The score had nothing to do --

6    Q.    His race had nothing to do with it?

7    A.    His race.

8    Q.    Is this a fair criticism of the -- let me -- when a person

9    is bypassed, what type of document has to go to HRD?

10            MR. LICHTEN:  Objection.  Way outside the scope.

11   A.    We have to provide --

12            THE COURT:  Wait a minute.  Overruled.

13            MR. McDERMOTT:  I just want to put it in context.

14   Q.    What type of documents go to HRD?

15   A.    We provide a document that positively states why we

16   promoted particular individuals, and then we also include a

17   reason for a bypass on the individual that wasn't selected.

18   Q.    In regards to this, there was discussion that perhaps it

19   was fair to Officer Maynard, that when we considered, you know,

20   Officer Cadet being a liaison to the community and a role model

21   to Haitian youth that Officer Maynard could not be such a role

22   model or liaison; is that fair to say?

23   A.    Correct.

24   Q.    So it was a fair criticism?

25   A.    Yes.

1   Q.   After Sergeant Cadet was promoted, did you ever include

2   any such references in any subsequent bypass material?

3   A.   No.

4        MR. McDERMOTT:  Your Honor, I'm going to go quickly

5   just through the head notes here.

6   Q.   One of the reasons pointed out by the appellant's attorney

7   was that, "The department cannot reasonably justify the

8   promotional bypass based on foreign language skills because

9   such qualifications are not required for the sergeant

10  position."  Do you recall that as being one of the points of

11  discussion that emanated from this appeal?

12  A.   Yes.

13  Q.   And as a result of the discussions that you had, is it

14  fair to say that language skills were not -- no longer

15  considered as one of the factors that you would use in the

16  documents regarding bypass?

17  A.   Correct.  The language skills were not a part of the

18  grading process.  It was offered as a positive reason.

19  Q.   Okay.

20  A.   Erroneously.

21  Q.   So the person -- the people who this applies to -- and we

22  know Manes Cadet was a French Haitian -- they did not receive

23  extra scoring because of their language skills; is that fair to

24  say?

25  A.   Yes.

1   Q.   But as a result of this, the language skills was no longer

2   listed as a factor in the bypass?

3   A.   Correct.

4   Q.   All right.  Another aspect that was brought to the

5   attention through the Maynard bypass appeal, "The department

6   violated basic merit principles in the second promotional

7   bypass of Maynard by applying an unstructured and unreasonable

8   scoring system."

9        As a result of this bypass appeal, did the scoring system

10  change somewhat at the MBTA Police Department?

11  A.   Yes.

12  Q.   Can you describe how it changed?

13  A.   We provided guidelines as to specific characteristics that

14  were supposed to be looked at relative to the rating and also

15  provided answer sheets to the oral boards.  We provided answer

16  sheets to the -- or sample ratings, which included fair,

17  average, and excellent, so that it would give them a kind of a

18  barter.

19  Q.   So instead of being ranked in order, they actually

20  received a score?

21  A.   A score, exactly.

22  Q.   And just for completeness, these concerns were raised by

23  Plaintiffs' attorney Alfred Gordon, Pyle, Rome, Lichten,

24  Ehrenberg and Lis-Riordan; is that fair to say?

25  A.   Yes.

```
 1              MR. McDERMOTT:  No further questions, Judge.
 2              MR. LICHTEN:  Although I didn't write the brief, I'm
 3    glad to see it had so much affect on the MBTA's promotional
 4    practices.
 5    RECROSS-EXAMINATION BY MR. LICHTEN:
 6    Q.   Let me ask you the following:  Just in follow-up, so from
 7    the exams that we're talking about in this case, which would be
 8    the 2005 and 2007 exams, I've now understood you to say that
 9    Maynard, Tuohey, Darren Keith, Don, and Hong were all promoted
10    not as a result of their score but as a result of successful
11    bypass appeals; do I have that right?
12    A.   No.
13    Q.   Okay.  So can you help me out so I can understand it?  Who
14    of the people that have been promoted since the 2005 exam went
15    into effect were promoted as a result of bypass appeals and not
16    because of their scores in the 2005 exam?
17    A.   No one.
18    Q.   I'm sorry.  No one?
19    A.   They were placed at the top of the list, and then they
20    were screened as equal candidates for the positions as they
21    came open.
22    Q.   Okay.  They were only at the top of the list, if I
23    understand your testimony, because of their bypasses, not
24    because of their score on the 2005 exam, is that right?
25    A.   Yes.
```

1    Q.    Okay.  So my question is -- maybe I phrased it badly --

2    but which of these people were promoted as a result of them

3    successfully pursuing a bypass appeal and then being placed at

4    the top of the list from the 2005 exam?

5    A.    I believe it was Maynard.

6    Q.    Right.

7    A.    Tuohey.

8    Q.    Right.

9    A.    Don.

10   Q.    Right.

11   A.    Keith.

12   Q.    Right.

13   A.    I think Donovan -- if you could pull it up a little

14   higher.

15   Q.    Donovan.

16   A.    Hong.

17   Q.    Hong.

18   A.    And I'm not certain on Flanagan.

19   Q.    So if I understand your testimony, actually, there have

20   been no minorities promoted from the 2005 -- as a result of

21   their score on the 2005 and 2007 exam, is that correct?

22   A.    I'm not sure.  I'd have to look at the certification list.

23   Q.    This was given to us, and these were the promotions that

24   were made, right?

25   A.    That doesn't reflect the actual certification list and

1    where they might have --

2    Q.    That's not what I asked.  I asked you who was promoted.

3    There were no minority promotions made from the 2005 and 2007

4    list as a result of their actual scores in the 2005 and 2007

5    exams, is that correct?

6    A.    Officer Keith was in the running at the time of his

7    bypass.  I'm not sure where you're headed with this.

8    Q.    I thought you just told us that Keith was placed at the

9    top of the list as a result of a bypass appeal.

10   A.    Yes.

11   Q.    Okay.  So isn't it a fair statement that no minority was

12   promoted from the 2005 and 2007 list as a result of their score

13   on the 2005 or 2007 examination?  Isn't that a correct

14   statement?

15   A.    Yes.

16        MR. LICHTEN:  Thank you.  I have nothing further, your

17   Honor.

18        MR. McDERMOTT:  Just one question, your Honor.

19   FURTHER REDIRECT EXAMINATION BY MR. McDERMOTT:

20   Q.    Miss Ford-Murphy, regardless of whether Mr. Keith was

21   placed at the top of the certification list because of bypass,

22   he also took the 2005 and 2007 exams and was also on -- in the

23   running to be appointed or promoted regardless that he was

24   placed on -- I mean, his score -- my question is:  Was his

25   scoring on the test sufficient to put him on the certifying

1   certification list even if he didn't get bypassed?

2   A.   Yes.

3           MR. McDERMOTT:   Thank you.   No further questions, your

4   Honor.

5           MR. LICHTEN:   May I have a moment, your Honor?

6           THE COURT:   No.   Enough is enough.

7           MR. LICHTEN:   Your Honor, I have reason to believe

8   that what she said is not true.   I just want to check that.

9   She just said he took the exam in 2005.   I don't know that to

10  be true, and I want to check the list.

11          THE COURT:   Go ahead.

12          MR. LICHTEN:   Give me one second.   I'm sorry.

13          I can't find it right now, your Honor.

14          THE COURT:   Okay.   Thank you, Miss Ford-Murphy.   You

15  may step down.   I think that's it for witnesses today anyway.

16  What do we look like for tomorrow?

17          MR. LEAHEY:   Your Honor, originally, the defendants

18  had been working on the position that we were going Thursday

19  and Friday and Doctor Outtz would be testifying Thursday and

20  Friday.   That changed yesterday, which led to the rearrangement

21  of witnesses for today.

22          I can have the superintendent for Lowell tomorrow.

23  Based on how we're going I actually had originally told him he

24  could come down late morning.   I didn't think we would be where

25  we are now.   I would expect him to be maybe a half hour,

1    forty-five minutes.  If it goes similar to the way it's been

2    going, maybe that's an hour and ten, an hour and fifteen.

3            I believe Worcester has availability for one witness

4    who would also be short.  Speaking with co-counsel, I don't

5    think Methuen and Lawrence have anyone.

6            MR. McQUILLAN:  Methuen doesn't have any witnesses

7    planned, your Honor.

8            MR. LEAHEY:  If we go tomorrow, I think it would be a

9    short day.

10           THE COURT:  Then it would just be experts?

11           MS. ENGDAHL:  I want to be clear, I do intend to call

12   at least the chief of the Worcester Police Department, but

13   I'm --

14           THE COURT:  Of what?

15           MS. ENGDAHL:  I do plan on calling the chief of the

16   Worcester Police Department, but I don't have him ready for

17   tomorrow.  I was anticipating testimony.  I do have an HR

18   person who will come down and testify.

19           MR. PIKULA:  Your Honor, we had anticipated an HR

20   person coming in to testify.  I do not have her ready for

21   tomorrow, nor do I think I could arrange to have her --

22           MR. LEAHEY:  For Lowell, I do have one other issue

23   pertaining to an Hispanic issue that I hope to at least resolve

24   some of that, or try to, with counsel during the time we break.

25   So I just don't know whether or not -- how you want to proceed

1    tomorrow, but I wanted to let you know that I don't think it

2    would be a full day tomorrow.

3              THE COURT:  Okay.  So then -- we've heard from counsel

4    in the other case that I was mentioning for the trial currently

5    scheduled for September 13th.  They would rather have their

6    discovery then hold the September 13th.  We'll use September

7    13th as the continuation date, day to day as is needed, for

8    this case.

9              MR. LICHTEN:  So we were not going tomorrow?

10             THE COURT:  Yes, we are, but it doesn't sound like we

11   have a full morning tomorrow.

12             So when September 13th comes, we'll have those one or

13   two witnesses from the municipalities perhaps, then the

14   experts:  Doctor Outtz, Doctor Silva.  Is it Doctor Silva?

15   Anybody else?  Mr. Lichten referred to agreeing to a

16   Springfield expert's report.

17             MR. LICHTEN:  Yes.  We have agreed.

18             THE COURT:  Is that in lieu of a witness?

19             MR. LICHTEN:  Yes.

20             MR. McQUILLAN:  I'm sorry, your Honor.  Did you

21   indicate earlier that you will be entertaining -- or the Court

22   will be entertaining 52 motions prior to September 13th?

23             THE COURT:  Yes.  I thought people were filing them

24   now, some people anyway.  Others can file them.  As they come

25   in, we'll deal with them.  Now, I guess some will be filed

1    today?

2            MR. McQUILLAN:  Yes.  I will file mine tomorrow, no

3    later than tomorrow.

4            THE COURT:  Then we'll -- I guess my thought was,

5    after they're filed and opposed, they may be resolvable before

6    September 13th.  I think that -- I don't know how feasible it

7    will be.  I'll have to see them before we do that.  But that --

8    so that it might be that by September 13th, depending on

9    rulings on the motions, the contours of the case may have

10   changed as a consequence or not.  I don't know.

11           MR. McQUILLAN:  Thank you, Judge.

12           THE COURT:  That's possible.  Okay.  We'll adjourn for

13   now and see you tomorrow.

14   (Whereupon, at 12:58 p.m. the trial recessed.)

15

16

17

18

19

20

21

22

23

24

25

1                 C E R T I F I C A T E

2

3          We, Marcia G. Patrisso, RMR, CRR, and Cheryl

4    Dahlstrom, RMR, CRR, Official Reporters of the United States

5    District Court, do hereby certify that the foregoing transcript

6    constitutes, to the best of our skill and ability, a true and

7    accurate transcription of our stenotype notes taken in the

8    matter of Civil Action No. 07-11693-GAO, Pedro Lopez, et al v.

9    City of Lawrence, et al.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13
     /s/ Cheryl Dahlstrom
14   CHERYL DAHLSTROM, RMR, CRR
     Official Court Reporter
15
     Dated:  July 28, 2010
16

17

18

19

20

21

22

23

24

25