UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                                    )
PEDRO LOPEZ, Individually and on    )
behalf of a class of individuals    )
similarly situated,                 )
                                    )
          Plaintiffs,               )
                                    ) Civil Action
v.                                  ) No. 07-11693-GAO
                                    )
CITY OF LAWRENCE, et al.,           )
                                    )
          Defendants.               )
                                    )
```


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


DAY THIRTEEN
NON-JURY TRIAL


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
July 29, 2010
9:10 a.m.


Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1    APPEARANCES:

2         LICHTEN & LISS-RIORDAN, P.C.
          By: Harold L. Lichten, Esq.
3         100 Cambridge Street, 20th Floor
          Boston, Massachusetts  02114
4         On Behalf of the Plaintiffs

5         CITY OF LOWELL LAW DEPARTMENT
          By: Brian W. Leahey, Esq.
6         City Hall
          375 Merrimack Street
7         Lowell, Massachusetts  01852
          On Behalf of the Defendant City of Lowell
8
          OFFICE OF THE CITY ATTORNEY
9         By: Richard J. D'Agostino, Esq.
          200 Common Street, Suite 306
10        Lawrence, Massachusetts  01840
          On Behalf of the Defendant City of Lawrence
11
          COLLINS, LOUGHRAN & PELOQUIN
12        By: Laurie W. Engdahl, Esq.
          320 Norwood Park South
13        Norwood, Massachusetts  02062
          On Behalf of the Defendant City of Worcester
14
          MORGAN, BROWN & JOY, LLP
15        By: Mary Jo Harris, Esq.
          200 State Street, 11th Floor
16        Boston, Massachusetts  02109
          On Behalf of the Defendant City of Boston
17
          MBTA LAW DEPARTMENT
18        By: Kevin S. McDermott, Esq.
          10 Park Plaza, 7th Floor
19        Boston, Massachusetts  02116
          On Behalf of the Defendant MBTA
20
          CITY OF SPRINGFIELD LAW DEPARTMENT
21        By: Harry P. Carroll, Esq.
          36 Court Street
22        Springfield, Massachusetts  01103
          On Behalf of the Defendants City of Springfield
23        and Mayor Sarno

24

25

1      CITY OF METHUEN - OFFICE OF THE CITY SOLICITOR
       By: Peter J. McQuillan, Esq.
2      The Searles Building, Suite 311
       41 Pleasant Street
3      Methuen, Massachusetts  01844
       On Behalf of the Defendant City of Methuen

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

WITNESSES FOR THE
  DEFENSE:

NINA GALICA

| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| By Ms. Engdahl | 8 | | 31 | |
| By Mr. Lichten | | 13 | | 32 |

KENNETH LAVALLEE

| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| By Mr. Leahey | 33 | | 94 | |
| By Mr. Lichten | | 73 | | |


E X H I B I T S

DEFENDANTS'

| EXHIBIT | DESCRIPTION | FOR I.D. | RECEIVED |
|---|---|---|---|
| 173 | Certification list for 2006 exam | | 12 |
| 174 | Certification list for 2007 exam | | 14 |
| 175 | Spreadsheet | | 15 |
| 176 | Spreadsheet | | 18 |
| 177 | Court order | | 54 |
| 178 | 2000 HRD list | | 59 |
| 179 | Document relative to candidates that were eligible for promotion | | 72 |

```
 1                    P R O C E E D I N G S
 2           LAW CLERK:  All rise.
 3           (The Court enters the courtroom at 9:10 a.m.)
 4           LAW CLERK:  The United States District Court for the
 5    District of Massachusetts.  Court is in session.  Please be
 6    seated.  For a continuation in the Lopez trial.
 7           THE COURT:  Good morning.
 8           COUNSEL IN UNISON:  Good morning.
 9           MR. LICHTEN:  Your Honor, I just have a preliminary
10    matter.  As you'll recall, at the end of yesterday there
11    was -- the witness testified on redirect that she believed that
12    a certain candidate, a Mr. Keith, who is a minority, had taken
13    the 2005 or 2007 exam and had placed high enough to be reached
14    anyway despite the fact that he was reached only because of a
15    bypass.  Yesterday, I retrieved the Excel file provided to me
16    from the Attorney General's Office, which we've been using to
17    do the calculations, and it shows the MBTA exam participants in
18    those years, and the names, and Mr. Keith is not on it.  So
19    I've asked -- I've sent an e-mail to the MBTA asking that they
20    agree voluntarily to retract that statement.  If not, I'd like
21    to put this document in.
22           THE COURT:  Mr. McDermott?
23           MR. McDERMOTT:  Your Honor, the question is did
24    Mr. Keith take the -- take the exam in '07.  I can -- it's true
25    that would be rebuttal but I can speak to Sergeant Keith, and
```

1  I'll stipulate that -- I could stipulate if Sergeant Keith

2  tells me he didn't take it.

3          THE COURT:  Did not?

4          MR. McDERMOTT:  Did not take the exam, I could

5  stipulate, but I haven't spoken to him.

6          THE COURT:  Well, what about the records?  Do the

7  records Mr. Lichten was referring to, do they establish whether

8  he did or didn't?

9          MR. McDERMOTT:  I have not reviewed the records, your

10 Honor, but I -- I will -- I will speak to office -- to Sergeant

11 Keith, and whatever stipulations are appropriate, I'll make

12 with Mr. Lichten.  I just haven't looked at the records, and I

13 haven't spoken to Sergeant Keith.

14         THE COURT:  Okay.  Work on it.

15         MR. LICHTEN:  Okay.  We'll work on that, your Honor.

16         And finally, with respect to the motions to dismiss

17 that keep coming across my -- we were wondering if we could

18 have until August 30th to respond to them.  Putting aside

19 vacation schedules, the fact that Mr. Churchill, who has done

20 most of the brief writing is in France, and the fact is that

21 each seem to be raising unique issues; and I, with vacation

22 schedules, I would ask the Court's indulgence for August 30th

23 to respond to all three or four or six --

24         THE COURT:  I haven't looked at them.  Let me look at

25 them myself first.

```
 1          MR. LEAHEY:  Lowell hasn't filed it yet.  I expect to

 2   file it this afternoon, but I didn't get a chance to file it

 3   yesterday.

 4          THE COURT:  I mean, I guess I think it's a reasonable

 5   request.  I was hoping that I might be able to resolve them one

 6   way or another by the 13th, and that just makes that time a

 7   little tight, that's all.  So let me get a sense of them.

 8          MR. LICHTEN:  All right.  So should I wait for the

 9   Court's signal?

10          THE COURT:  Yeah.  Let me -- yeah.

11          MR. LICHTEN:  Thank you, your Honor.  Thank you.

12          MR. McDERMOTT:  Your Honor, just on that note, one of

13   the aspects of the MBTA's filing is bringing up what was

14   brought up in our 12(c) and 12(b)(6) motion.  I just wanted to

15   put it on the record, and it's already been -- so anyway, the

16   point I'm making, your Honor, it's mostly a factual -- you

17   know, based on the testimony, a factual argument.  Although we

18   included that argument, it's territorial.  We've already gone

19   over months ago, your Honor.  I just wanted to preserve it for

20   the record.  So --

21          THE COURT:  Okay.

22          MR. McDERMOTT:  -- that's the reason it's in there.

23   Thank you.

24          THE COURT:  All right.  Whom do we have this morning?

25          MS. ENGDAHL:  Your Honor, I have Nina Galica from
```

1    Worcester as a witness.

2              THE COURT:  Okay.

3              MS. ENGDAHL:  And then Lowell is going to put on...

4              THE COURT:  All right.

5                        NINA GALICA, duly sworn

6              LAW CLERK:  Please be seated.  State your name, and

7    spell your last name for the record.

8              THE WITNESS:  Okay.  My name is Nina Galica,

9    G-A-L-I-C-A.

10                        DIRECT EXAMINATION

11   BY MS. ENGDAHL:

12   Q.   Nina, are you currently employed?

13   A.   Yes.  I work for the City of Worcester, human resources

14   department.

15   Q.   And what position do you hold in the City of Worcester

16   human resources department?

17   A.   My job classification is coordinator of employment for

18   human resources department.

19   Q.   And how long have you held that position?

20   A.   The specific job title since 2005, but I've been with the

21   department since 1993.

22   Q.   Okay.  And what are some of the duties of your position?

23   A.   As part of my job responsibilities, I coordinate the

24   entire certification process for the Civil Service original

25   appointments and promotions, public safety and nonpublic safety

1    of Civil Service.  I coordinate the administration of the Civil

2    Service examinations, delegated examinations for different

3    specific classifications, mostly clerical, custodial, public

4    works promotions.  I maintain the Civil Service lease; I'm the

5    contact person with HRD; I update Civil Service reports.

6    Q.    Okay.  Thank you.  So you serve as liaison with HRD?

7    A.    Yes.

8    Q.    Okay.  And so you're familiar with appointments and

9    promotions that occur within the Worcester Police Department?

10   A.    Yes, I am.

11   Q.    And are those appointments and promotions made pursuant to

12   Civil Service law?

13   A.    Yes, they are.

14   Q.    And the City of Worcester police officers, do they

15   participate or take examinations that are administered by HRD

16   for appointment or promotion?

17   A.    Yes, they do.

18   Q.    Okay.  And how are police officers notified of an upcoming

19   exam?

20   A.    After HRD schedule promotional examination based on our

21   request, they notify the candidates.  HRD does the notification

22   process.

23   Q.    Okay.  And how frequently does Worcester participate in

24   promotional examinations to sergeant?

25   A.    Every -- every two years.

1  Q.   Okay.  And do you know what time of year these

2  examinations are typically given?

3  A.   October.

4  Q.   Okay.  After the test is given, who -- who scores the

5  test?

6  A.   HRD, Civil Service unit.

7  Q.   How is Worcester notified of the scores on the test and

8  the candidate's available for promotion?

9  A.   HRD would issue the Civil Service promotional list and

10  certify the list once, send it to us with all the candidates

11  that passed the Civil Service and list it according with their

12  score.

13  Q.   Okay.  I'm going to show you some documents and ask you if

14  you've seen these before.  I realize -- Nina, do you recognize

15  this document?  It's actually the first page of a five-page

16  document.

17  A.   Yes, this is the certified list after HRD established a

18  promotional list after completing the examination process.

19  Q.   And is this what you had just testified that HRD sends a

20  list?  Is this the list that they would send?

21  A.   Yes, the certification list based on the scoring.

22  Q.   Okay.  I'm going to show you another, again, I believe a

23  four or five-page document similar to the one I just showed

24  you.  Have you seen this document before?

25  A.   Yes.

```
1    Q.   And what is this document?
2    A.   It's the certification list sent by HRD to our office
3    after the completion of the promotional examination.
4         MS. ENGDAHL:  I'd like to offer these two as exhibits.
5    They're the certification list sent to Worcester by HRD for the
6    2004 examinations issued in 2005, and for the 2006 examination
7    scored in 2007.  I'm not sure what we're up to.
8         MR. LICHTEN:  Your Honor, I saw these within the last
9    couple of days.  They weren't on the -- Worcester's list;
10   however, I don't disagree with their authenticity, and as you
11   indicated that others could do it, I would reserve the right to
12   argue their relevancy, but I don't have to do it now.
13        THE COURT:  Okay.  We'll admit them.  Let me just be
14   clear.  Which exams do they relate to?
15        MS. ENGDAHL:  Actually, I only have the ones -- maybe
16   I only should put in the one for the 2006 exam.  I'm using them
17   by way of example, but I have the one that was issued pursuant
18   to the 2006 exam, and I also have the one that was issued
19   pursuant to the 2004 exam, which albeit that was not at issue
20   in this case, but it's there for illustrative purposes to show
21   what HRD actually sends to Worcester.  So one is fine.
22        THE COURT:  So the '06?
23        MS. ENGDAHL:  Yeah.
24        THE COURT:  Okay.  That will be the next number,
25   whatever that is.  Oh, we don't have -- we don't have access to
```

1    the list?

2              That will be 173.  173.

3              (Exhibit No. 173 received into evidence.)

4    BY MS. ENGDAHL:

5    Q.   Okay, Nina, just for clarification, although I think

6    you've already testified to this, who appears on this list of

7    candidates that we receive from HRD?

8    A.   Excuse me.  I didn't hear.

9    Q.   Who -- who actually appears on this list that we receive

10   from HRD?

11   A.   Only the candidates that pass the examination.

12   Q.   Okay.  Does HRD inform you who took the examination?

13   A.   No.

14   Q.   Do they inform you who failed the examination?

15   A.   No.

16   Q.   Okay.  Does HRD provide you with test results from

17   municipalities other than Worcester?

18   A.   No, they don't.

19   Q.   Okay.  Does HRD provide you with any statewide results or

20   statistics?

21   A.   No.

22   Q.   And who is eligible to take the promotional exam for

23   sergeant in Worcester?

24   A.   Police officers that have been on the job on a permanent

25   appointment for at least three years after police academy

1    graduation.

2    Q.    Okay.  And that is police officers who have been

3    permanently appointed within Worcester?

4    A.    Yes, only Worcester.

5    Q.    Okay.

6    A.    It's a departmental promotional exam, Worcester only.

7    Q.    Okay.  I'm going to show you a document.  And this is

8    page 1 of a two-page document.  And I'm going to ask you if

9    you've seen this document before?

10    A.    Yes.  It's a spreadsheet that I prepared after we received

11    the certification list from HRD based on the examination that

12    took place in 2006.

13    Q.    Okay.  And what does this document show?

14    A.    It shows the candidates -- a list of the candidates that

15    passed the examination in order of their scoring.

16    Q.    Okay.  And what are the notations in the column, which is

17    labeled "MIN," what does B and H stand for?

18    A.    Race or ethnicity.

19    Q.    Okay.  And over in this column to the far right, what does

20    that represent?

21    A.    It's the date of promotion.

22    Q.    Okay.  Is that --

23    A.    If they were promoted.

24    Q.    Okay.  Does that reflect everyone that was promoted off

25    this 2007 list?

1   A.   Yes.

2            MS. ENGDAHL:  I'd like to offer this into evidence.

3            MR. LICHTEN:  The same issue, that it wasn't

4   provided -- it wasn't noted as -- as an exhibit for the case.

5   I got it recently, several days ago.  But that being said,

6   she's identified it, so...

7            MS. ENGDAHL:  It was on my list of exhibits,

8   but -- and I have been working with Joe to see if we could get

9   it in.

10           THE COURT:  All right.  We'll -- we'll admit it as

11   174.

12           LAW CLERK:  Exhibit 174 is admitted.

13           (Exhibit No. 174 received into evidence.)

14   BY MS. ENGDAHL:

15   Q.   And, Ms. Galica, I'm going to show you another document

16   and ask you if you recognize that document?

17   A.   Yes, it's a spreadsheet that I put together after

18   receiving the certification list from HRD based on the

19   examination that took place in October 2008.

20   Q.   Okay.  And over to the right here there's a notation over

21   promotion date?

22   A.   Yes, only one candidate was promoted.

23   Q.   Okay.  Off this list?

24   A.   Off this list.  This is actually the current list.

25   Q.   Okay.  So this is still an active list?

```
 1   A.    Yes.

 2              MS. ENGDAHL:  I'd like to offer this as 175.

 3              MR. LICHTEN:  That's fine.

 4              THE COURT:  All right.  175.

 5              LAW CLERK:  Exhibit 175 is admitted.

 6              (Exhibit No. 175 received into evidence.)

 7              MR. LICHTEN:  There's a change on this from what I was

 8   given before.

 9              MS. ENGDAHL:  Do you know what?  It's not a change

10   from what I gave you yesterday, and it's just a slightly

11   different notation.  The "H" is in red, and I guess I didn't

12   really focus in on that.  There is an individual here, James

13   Guittar, who's marked with an "H" with an asterisk, and I

14   actually was doing that for the benefit of the plaintiffs

15   because he's listed as Hispanic for HRD purposes, but it came

16   out that Spencer Tatum, and in Dr. Wiesen's report who believed

17   there were no minorities above Spencer Tatum on this list, and

18   so we looked into it; and as it turned out, James Guittar is

19   actually from Spain, born in Spain, grew up in a

20   Spanish-speaking household and speaks fluent Spanish.  And I've

21   tried to get their position on it.  So I'm -- I'm only

22   highlighting it, actually, to make sure that they don't think

23   I'm trying to do anything underhanded, that it was an issue

24   that we discussed.

25              THE COURT:  May I see the exhibit, Jane?
```

1            (Pause.)

2            MS. ENGDAHL:  On the -- on the documents provided by

3    HRD that are already in evidence, he is listed as Hispanic, but

4    I'm only -- I can take the star -- I wanted it not to look like

5    I -- I was ignoring the conversations we had about it, if I

6    didn't do that.

7            MR. LICHTEN:  Your Honor, I don't know if Mr. Guittar

8    is or is not.  I have no evidence of that.  On the spreadsheets

9    that we got from HRD that were used to do the calculations, he

10   was not.  He may be but I can't stipulate to something that I

11   have no knowledge of.

12           MS. ENGDAHL:  Okay.  As I said --

13           THE COURT:  Well, I don't think you're being asked to

14   stipulate about it.

15           MS. ENGDAHL:  No, he's listed as Hispanic --

16           THE COURT:  That's really the question.

17           MS. ENGDAHL:  This is reflecting the data given to us

18   by HRD on those lists --

19           THE COURT:  The only question is whether there's a

20   problem with the exhibit, which has been admitted.  I mean,

21   this is evidence from Worcester.  You can counter it with other

22   evidence at some point, I suppose.

23           MR. LICHTEN:  Okay.

24           THE COURT:  The only question is the admissibility of

25   the exhibit, and you raised the question of it was different

1    from what you had seen before.

2         MR. LICHTEN:  Yes.

3         THE COURT:  And that's a fair point that can be -- the

4    significant of which can be assessed, but we're not necessarily

5    deciding the appropriateness of the designation at this point.

6         MR. LICHTEN:  Right.  Well, to the extent that this is

7    being submitted for the truth of the matter asserted therein

8    with respect to Mr. Guittar, I would object on that basis;

9    otherwise, I don't object.

10        THE COURT:  Okay.  Well, I'll overrule that objection

11   on the understanding that the designation comes from HRD's --

12        MS. ENGDAHL:  HRD's records, yes.

13        THE COURT:  -- exhibits.

14        MR. LICHTEN:  And that's not my understanding.

15        MS. ENGDAHL:  You can look at them, Harold.  They're

16   there.

17        THE COURT:  All right.  Okay.  Go ahead.

18   BY MS. ENGDAHL:

19   Q.   Ms. Galica, I'm showing you another document and ask you

20   if you recognize this document?

21   A.   I do.  It's a spreadsheet established after the

22   publication of the promotional list from the 2004 exam.

23   Q.   And you prepared this document?

24   A.   Yes, I did.

25   Q.   Okay.  And over to the right in "promoted," does that

1    reflect everyone that was promoted off this list?

2    A.    Yes.

3    Q.    Okay.  And is that the minority or non-minority

4    designations?

5    A.    Yes.

6    Q.    Okay.  And where it's left blank, are we to assume those

7    candidates are white?  If you look, some of them are left

8    blank.

9    A.    Yes, they are.

10            MS. ENGDAHL:  I'd like to offer this as 177?

11            THE COURT:  It would be 176, I believe.

12            (Exhibit No. 176 received into evidence.)

13            LAW CLERK:  176 is admitted.

14    BY MS. ENGDAHL:

15    Q.    Okay.  Thank you, Ms. Galica.  I have nothing further.

16                        CROSS-EXAMINATION

17    BY MR. LICHTEN:

18    Q.    I just have a few questions.  How long have you held the

19    position that you currently hold?

20    A.    Since 2005.

21    Q.    And what did you do before that?

22    A.    I worked for the HR department doing mostly the same thing

23    but under a different title.

24    Q.    Okay.  And for how many years did you do essentially the

25    same thing but for -- with a different title?

1    A.    Since October 1993.

2    Q.    Okay.  And this -- these lists that you've been preparing

3    that are now admitted as 173 to 176, did I hear you say that

4    you've been doing this in every year?

5    A.    Not every year.  Every time we receive --

6    Q.    Oh, right.

7    A.    -- the certification list, and I keep updating the

8    information based on the promotions and...

9    Q.    Okay.  So just so I'm clear, this -- I just want to be

10   clear, this document that is now admitted as 176, if you went

11   back in time, you would have a document like this with the

12   promotions put in for every year that you're aware of back to

13   '93?

14   A.    Something like this, yes.

15   Q.    Okay.  And how did you know to do that?  That is, had

16   someone done that before you came into your position in 1993?

17   A.    It was done before, but based on the program, the computer

18   program we used, we started to use Excel and merge with the

19   documents, make our life easier, in order to not find the

20   candidates at the time of vacancies.

21   Q.    Okay.  Well, was this done based on the 1992 exam?

22   A.    I don't know.  I wasn't there.

23   Q.    How about the '94 exam?

24   A.    Probably in document form, yes.

25   Q.    And the '96 exam, '98 exam?

1    A.    Yeah.

2    Q.    2000 exam?

3    A.    Yeah.

4    Q.    Okay.  So -- and in your role, in your position, have you

5    been aware of the case called Harris and Tatum versus City of

6    Worcester Police Department?

7    A.    I heard about it.

8    Q.    Did you testify in the case?

9    A.    No.

10   Q.    Okay.  Were you aware that as a result of the 1992 exam,

11   the '94 exam, the '96 exam and the '98 exam, there were no

12   minority promotions to the position of sergeant in the

13   Worcester Police Department?

14          MS. ENGDAHL:  Objection.

15          THE COURT:  Overruled.

16          You may answer that.

17          THE WITNESS:  I looked -- recently, I looked into it.

18   I checked the Civil Service promotional list, and I noticed

19   that a very limited number of candidates, minority candidates,

20   took the exam -- passed the exam that were listed on the list.

21   And they were promoted, as far as I know, 2001, 2006, 2008, as

22   far as I remember.

23   BY MR. LICHTEN:

24   Q.    Okay.  Well, now, if you would listen to my question.

25   Let's just go back to it.

1    A.    Okay.

2    Q.    My question was:  In nineteen ninety -- when you went back

3    and did this analysis, I take it you found that in 1992, 1994,

4    1996, 1998, for all of those exams for sergeant no minorities

5    were promoted to the position of sergeant; is that correct?

6    A.    Correct.  They were promoted based on the standing on the

7    Civil Service -- yes, Civil Service list.

8    Q.    And just to -- actually, I thought Ms. Engdahl was going

9    to establish this from you.  But the City of Worcester takes

10   the position, rightly or wrongly, that it promotes in rank

11   order; is that correct?

12   A.    Correct.

13   Q.    Okay.  So they don't really use the 2 N + 1 formula, they

14   take the person who's at the top of the list?

15   A.    We do.  We do follow 2 plus 1.  We have to.  We notify 2

16   plus 1, and most of the time we follow the higher score.

17   Q.    Okay.  But I thought there was an arbitration decision

18   from an arbitrator named Buckalew involving the City of

19   Worcester that went to court and was affirmed by the court that

20   said that absent some serious misconduct, the City of Worcester

21   has to hire from the top of the list.  Do I have that right?

22   A.    The practice has been to hire based on the highest score,

23   yes.

24   Q.    Just so I'm clear, the reason that you hire from the top

25   of the list is because an arbitrator has ordered you to do

1   that, and a court affirmed that arbitration award?

2   A.   I'm not aware of it.

3   Q.   You're not aware of the court decision?

4   A.   No.

5   Q.   Okay.  In any event, if I understand your testimony, you

6   are aware that in the years '92, '94, '96 and '98, no minority

7   sergeants were promoted; is that correct?

8   A.   Correct.

9        MS. ENGDAHL:  Your Honor, just for the record, I'm

10  objecting to this whole line of questioning.

11       THE COURT:  All right.  Overruled.

12  BY MR. LICHTEN:

13  Q.   And you're aware, are you not, until the year 2001 there

14  was no minority sergeant in the City of Worcester, that is,

15  from 1990 until 2001, there was no minority sergeant in the

16  City of Worcester; is that correct?

17  A.   Correct.

18  Q.   Okay.  And were you aware that the MCAD in 2003 ordered an

19  investigation regarding the City of Worcester's promotional

20  practices to the position of police sergeant?

21       MS. ENGDAHL:  Objection.

22       THE COURT:  Overruled.

23       You may have it.

24       MS. ENGDAHL:  There's no evidence in the record

25  that --

 1          MR. LICHTEN:  I have the order, your Honor.

 2          THE COURT:  Well, the question is whether it happened,

 3    so the witness can answer it.

 4    BY MR. LICHTEN:

 5    Q.    Were you aware that the City of Worcester's promotional

 6    practices to the position of police sergeant were ordered to be

 7    investigated by the MCAD, that is --

 8    A.    No, I'm not.

 9    Q.    You're not aware of that?

10    A.    No.

11    Q.    So as I understand it, the first minority promotion to the

12    position of police sergeant occurred in 2001; is that correct?

13    A.    Correct.

14    Q.    And that person was Mr. Lewis?

15    A.    I think so, yes.

16    Q.    Okay.  And he was promoted off a 2000 list?

17    A.    I don't recall.  I have to look at the list.

18    Q.    And do you recall where on the list he was; that is, was

19    he the first one promoted, in the middle, or the last one

20    promoted off that list?

21    A.    I don't recall without seeing the list.

22    Q.    Now, currently, if I understand it, there were four

23    minority police sergeants in the entire City of Worcester; is

24    that correct?

25    A.    Correct.

1    Q.    Okay.  And if I understand the numbers, as of 2004 there

2    were approximately 57 minority police officers in the Worcester

3    Police Department?

4    A.    I know that up to date there are 68 minorities in the

5    police department.

6    Q.    Right.  Do you know what it was in 2004?

7    A.    No, I don't recall.

8    Q.    Do you know what it was in 2005?

9    A.    I think the number has been pretty much the same, but I'm

10   not sure.

11   Q.    So somewhere in the high 50s, low 60s?

12   A.    In the 60s.

13   Q.    Okay.  And with respect to non-minority police officers,

14   is the number in, around, 300?

15   A.    Yes, correct.  It would be -- yeah.

16   Q.    Do you know currently what the percentage of minority

17   police sergeants is to the total number of minorities in the

18   police department?

19   A.    Currently there are four police sergeant minorities out

20   of --

21   Q.    Sixty-eight?

22   A.    -- 68 minorities, but -- yeah.

23   Q.    So it's about 7 percent?

24   A.    Yeah.

25   Q.    And with respect to non-minority police officers currently

1  there are approximately 57 non-minority police sergeants; is

2  that correct?

3  A.    Probably 50 -- 51, 52.

4  Q.    Fifty-one, 52?

5  A.    I think the total number is 55 or so.  I'm not sure.

6  Q.    Fifty-one, 52, and there are about 300 non-minority police

7  officers; is that right?

8  A.    Correct.

9  Q.    So have you done a calculation of what percent that is?

10 A.    Of the minority?

11 Q.    Yes, of the non-minority?

12 A.    Non-minority?  For the entire?

13 Q.    Yes.

14 A.    About 84 percent for the entire department, non-minority.

15 Q.    What I'm asking you if you know what the percentage is of

16 the police sergeants for non-minority compared to their total

17 population in the department?

18 A.    I don't have the number right on...

19 Q.    Okay.  Now, at any time from 1993, when you obtained this

20 position to the present, has the City of Worcester ever made

21 any attempt to consider using its own promotional examination

22 for the position of police sergeant?

23 A.    We've never had the delegation to administer the

24 promotional exams for police department or any other public

25 safety.  I don't recall to request such delegation.

1    Q.    Okay.  Do you ever recall it being discussed -- strike

2    that.  Let me go back.  You said "delegation."  So you were

3    aware that Worcester could request a delegation agreement to

4    have its own promotional procedure; is that correct?

5    A.    Yes, we do have a delegation for different other nonpublic

6    safety, but not for public safety.

7    Q.    Okay.  And my question is:  Did -- was there ever any

8    consideration of that by the City of Worcester from 1993, when

9    you came on, until the present, of asking HRD for a delegation

10   agreement so that the City of Worcester could conduct its own

11   promotional examination for the position of police sergeant?

12   A.    We've never asked officially to do something like that.

13   Q.    Okay.  And I -- I just want to be clear.  My

14   question -- my question is whether it was ever considered.  I

15   understand you never asked for it, but my question is simply

16   was it ever discussed?  Was it ever considered?

17            MS. ENGDAHL:  I object to the form of the question.

18   By whom?

19            THE COURT:  Why don't you amend it just to add "by

20   whom."

21   BY MR. LICHTEN:

22   Q.    Were you ever involved in any discussions with anyone

23   regarding the possibility of requesting a delegation agreement

24   for the purpose of conducting your own police sergeant

25   promotional exams?

1    A.   At one point in time, probably around 2004, I was asked by

2    the HR director to contact HRD and look into whatever

3    information they have regarding the assessment center, using

4    assessment centers.  I received the information and gave it to

5    the HR director, but that was for public safety -- the

6    possibility of using assessment center as part of the

7    departmental promotional exam or in lieu of departmental but

8    for higher levels of public safety titles like chief and deputy

9    chief.

10   Q.   And who asked you to do that?

11   A.   The HR director, Kathleen Johnson.

12   Q.   And did you do that?

13   A.   Yes.

14   Q.   And what did you supply to her?

15   A.    I contacted HRD, talked to someone from Civil Service unit

16   that submitted to us some information, documents, delegation

17   agreement sample, information regarding what options of

18   assessment center, a list of providers, things like this.  I

19   submitted everything without any analyzed or -- analyzing or

20   anything to the HR director in order to study the cost, the

21   efficiency, and I've never heard anything after.

22   Q.   Okay.  Now, going to these years of 1993, 1994, 1995, all

23   the way up to 2003, let's say, for about ten years, did anyone

24   in your department ever discuss or consider the fact that there

25   were so few minority -- well, there were actually no, and then

1  maybe one in 2001 -- that there were so few minority police
2  sergeants in the City of Worcester and what, if anything, could
3  be done to assist that situation?
4  A.   Yes.  If it you look at the numbers, they're a limited
5  number of minority candidates for the departmental promotional
6  exams in police departments, especially sergeant.  In those
7  years, in the '90s, there were about four candidates that
8  passed the exam every single time.  The number has doubled in
9  the past years, and it's due mostly to initiate the -- the
10 action that was initiated by the chief in cooperation with HRD
11 to improve the recruitment of the candidates for entry
12 level -- minority candidates for entry level police officer.
13 And if you look at -- at the last year's numbers, the number
14 actually doubled of the participants.
15 Q.   Let me ask my question again.  My question was that, in
16 this period of time from 1993 to 2003, was there discussion in
17 the City of Worcester about the fact that there were so few
18 minority police sergeant promotions?
19 A.   I wasn't involved in any.
20 Q.   Okay.  Now, to get to another point you just made.  Do you
21 know in the years 1992, '94, '96, '98, 2000, how many minority
22 police sergeant applicants or candidates there were who took
23 the exam?  I know you talked about -- you focused on the people
24 who passed the exam, but let me ask you that question with
25 respect to who took the exam.  Do you know how many minority

1    police candidates took the exam in those years?

2    A.   No.  We don't have that information of the number of

3    people that took the exam, only the number of people that

4    passed the exam.  That's private information, and HRD does not

5    provide that.

6    Q.   Okay.  And did you ever attempt to find out from HRD or

7    anyone else the numbers of minorities who were failing the exam

8    during the '90s and through 2001?

9    A.   No.

10          MR. LICHTEN:  Thank you very much.  I have nothing

11   further.

12          MS. ENGDAHL:  Redirect?

13          THE COURT:  Just before you do, can I clear up one

14   thing?  I don't know whether it's important or unimportant for

15   the record, but I noticed yesterday in the MBTA charts that

16   there was a category for Asians, and apparently in the

17   Worcester data there are blanks, I guess, which designate white

18   candidates and then B for black and H for Hispanic.  Are the

19   blanks to be taken literally as white candidates or just as

20   non-black/non-Hispanic?

21          MS. ENGDAHL:  Your Honor, I -- there might be some

22   Asians -- I'm just --

23          THE COURT:  Yeah, I was asking the witness.

24          MS. ENGDAHL:  Okay.  All right.

25          THE COURT:  She prepared the charts.

 1              THE WITNESS:  Oh, the question's for me?

 2              THE COURT:  Yeah.

 3              THE WITNESS:  They are whites.

 4              THE COURT:  Okay.  Is that because you know from your

 5    work that there are no Asians?

 6              THE WITNESS:  No, I just wanted to identify the

 7    minorities only on the --

 8              THE COURT:  The question is:  Are there any Asians,

 9    and how are they accounted?

10              THE WITNESS:  On those list?

11              THE COURT:  In the department?  Yeah, well, fine, on

12    the promotional list, sure.

13              THE WITNESS:  Yes.  Yes, there are two Asians.

14              THE COURT:  And -- but they're counted as white?

15              THE WITNESS:  No, they are counted as A, Asian.

16    It's --

17              THE COURT:  Are they high on the list?  Maybe I didn't

18    look at the list.

19              MS. ENGDAHL:  I think there is at least one Asian on

20    the list, and I can help.  The reason I didn't separately

21    identify them is because --

22              THE COURT:  Fine.  So it's consistent with the method

23    apparently --

24              MS. ENGDAHL:  Yes.

25              THE COURT:  -- used by the MBTA in their charts?

1    That's all I was getting at.  Again, I don't know the

2    significance.  I just wanted to see whether the counting is the

3    same.  That's all.

4          MS. ENGDAHL:  The plaintiffs have been counting Asians

5    as whites, so I didn't bother asking her to segregate it out,

6    so...

7          THE COURT:  Okay.  Go ahead.

8                    REDIRECT EXAMINATION

9    BY MS. ENGDAHL:

10   Q.   Hi, Ms. Galica.  You were given some numbers about

11   minority police officers, there being, I think, 57 minority

12   officers in 2004 and 68 today.  Are all of those minority

13   officers taking the promotional examination?

14   A.   No.  Actually, if you look at all the promotional sergeant

15   exams since 1994, for example, there is a total number of 15

16   minorities that passed the examination, took and passed the

17   examination, and are listed on the promotional exam, the same

18   15 that actually took the exam since, you know, 1994.

19   Q.   Okay.

20   A.   One person taking the exam three times, four times, and so

21   on.

22   Q.   Okay.  And knowing that your information is only

23   those -- you're only given those who pass the examination?

24   A.   Correct.

25   Q.   So prior to 2004, we don't have complete information on

1    everyone who took the examination --

2    A.    Correct.

3    Q.    -- correct?  Okay.  But I think what I hear you saying is

4    of those that you could see who passed the examination, there's

5    a total of 15.  Is that 15 between 19 --

6    A.    1994 -- starting with the 1994 exam till 2008 --

7    Q.    Okay.

8    A.    -- fifteen minorities, I counted.

9    Q.    Okay.  Okay.  And how many of those are now sergeant?

10   A.    Four.

11   Q.    Okay.  Thank you very much.  I have nothing further.

12            MR. LICHTEN:  I'll just --

13                         RECROSS-EXAMINATION

14   BY MR. LICHTEN:

15   Q.    But during that time, you never attempted to count up or

16   even determine how many minorities may have failed the exam?

17   A.    Correct.  We've never done that.

18   Q.    So as you sit here today, you have no idea how many

19   minorities actually took the exam in those years?

20   A.    No, we didn't have the information.

21            MR. LICHTEN:  Thank you.

22            THE COURT:  Okay, Ms. Galica.  Thank you.  You may

23   step down.

24            (The witness is excused.)

25            MR. LEAHEY:  The City of Lowell will call

1    superintendent Kenneth Lavallee.

2                    KENNETH LAVALLEE, duly sworn

3           LAW CLERK:  Please be seated.  Please state your name

4    and spell your last name for the record.

5           THE WITNESS:  My name is Kenneth Lavallee,

6    L-A-V-A -- and that's a lower case V -- L-L-E-E.

7                    DIRECT EXAMINATION

8    BY MR. LEAHEY:

9    Q.   Mr. Lavallee, are you employed by the City of Lowell?

10   A.   Excuse me?

11   Q.   Are you employed by the City of Lowell?

12   A.   I am.

13   Q.   In what capacity?

14   A.   I'm the superintendent of the Lowell Police Department.

15   Q.   And Superintendent Lavallee, how long have you had that

16   position?

17   A.   I've been superintendent since December 1st of 2006.

18   Q.   And how was it that you came to have that title?

19   A.   I was the deputy superintendent of the Lowell Police

20   Department when Ed Davis left, became commissioner of the

21   Boston Police Department.  The city manager appointed me as the

22   acting superintendent on December 1st of 2006, and ultimately

23   in 2007, I was made the permanent superintendent.

24   Q.   Was there any -- how did you become the permanent

25   superintendent in Lowell?

1    A.    The city manager began a process of looking at the

2    candidates within the Lowell Police Department, captains and

3    deputy superintendents.  I was an applicant, and I was

4    selected.

5    Q.    Is your position Civil Service?

6    A.    It is not.

7    Q.    Do you know whether or not that position was Civil Service

8    under your predecessor Superintendent Davis?

9    A.    Yes, it was.

10   Q.    Do you know how it came to be that your position is no

11   longer Civil Service?

12   A.    When Superintendent Davis left and went to Boston, the

13   city manager made a decision to remove the position from Civil

14   Service.  He solicited the city council.  They approved that

15   decision, then he had to forward a request for legislation to

16   the -- to the state, to the governor.  That took quite some

17   time.  It was eventually approved, and the position was removed

18   from Civil Service.

19   Q.    By state statute or by state law?

20   A.    State law, state statute, correct.

21   Q.    What are your duties as superintendent for the City of

22   Lowell Police Department?

23   A.    Well, I'm the -- obviously, the CEO, so to speak, of the

24   entire police department.  We have a police department of

25   approximately 300 personnel, both sworn and non-sworn.  We

1    provide all the police services for the City of Lowell.

2    Obviously, my duties are to oversee this entire organization

3    and all of its functions.

4    Q.    With respect to handling matters involving promotions, do

5    you play a role in that?

6    A.    I do.

7    Q.    And what role do you play?

8    A.    When we -- we announce examinations for various ranks

9    within the Lowell Police Department through my office and then,

10   of course, we receive from Civil Service, HRD, the test scores

11   and ultimately select candidates for promotion.

12   Q.    Has the city manager delegated this process to you for

13   asking for when you call a list from HRD?

14   A.    Yes.  It's pretty much my call.  We work in concert with

15   the human resources division or the human resources office for

16   the City of Lowell as well.

17   Q.    Does the city -- but the city manager has the final

18   appointing authority; is that correct?

19   A.    Correct.  He's the appointing authority.

20   Q.    Prior to being superintendent in Lowell in 2006, were you

21   previously employed by the city?

22   A.    Yes.

23   Q.    In what capacity?

24   A.    Deputy superintendent.

25   Q.    And how -- when were you appointed -- or how long were you

1    deputy superintendent?

2    A.    I believe I was appointed as a deputy superintendent in

3    1999.

4    Q.    Did you take a test to become deputy superintendent?

5    A.    I took an assessment center.

6    Q.    And that was in -- sometime before you were appointed in

7    1999?

8    A.    I was appointed in 1999, approximately, yes.

9    Q.    Prior to being a deputy superintendent, what was your

10   position with the City of Lowell?

11   A.    Captain.

12   Q.    How long were you a captain with the City of Lowell?

13   A.    For about four years.

14   Q.    Do you know when you were appointed captain?

15   A.    Approximately 1995.

16   Q.    Did you take a test to become captain?

17   A.    I did.

18   Q.    What test did you take?

19   A.    The written exam promulgated through HRD.

20   Q.    That would be known as a multiple-choice examination that

21   HRD administers on a statewide basis?

22   A.    Correct.

23   Q.    And prior to the rank of captain, were you employed by the

24   City of Lowell?

25   A.    Yes.

```
 1   Q.   And what rank were you employed by the City of Lowell?

 2   A.   I was a lieutenant.

 3   Q.   And when were you appointed to lieutenant?

 4   A.   1990, I believe.

 5   Q.   Did you take a test with regards to that promotion?

 6   A.   Yes, I did.

 7   Q.   And what test did you take?

 8   A.   The written exam as well.

 9   Q.   That you previously testified for captain?

10   A.   Correct.

11   Q.   And prior to being lieutenant, were you employed by the

12   City of Lowell?

13   A.   Yes.

14   Q.   And in what capacity?

15   A.   Sergeant.

16   Q.   And to get that promotion, did you take a test?

17   A.   I did.

18   Q.   What test did you take?

19   A.   The written exam.

20   Q.   Again, the same written exam that you testified to for

21   captain and lieutenant?

22   A.   Yes.

23   Q.   When were you first hired by the City of Lowell?

24   A.   I was hired in January of 1984.

25   Q.   And that was as a police officer?
```

1    A.    Correct.

2    Q.    And did you take a test to become a police officer with

3    the City of Lowell?

4    A.    I did.

5    Q.    And what test did you take?

6    A.    That was a statewide Civil Service exam for police

7    officer.

8    Q.    And that was, again, similar to the test that you talked

9    about for captain, lieutenant and sergeant?

10   A.    Well --

11   Q.    As far as the format?

12   A.    -- it was an entry-level exam, right.  Yes, it was

13   multiple-choice.

14   Q.    Prior to coming to work for the City of Lowell, did you

15   have any prior experience in the field of law enforcement?

16   A.    Yes.

17   Q.    What was that experience?

18   A.    I had worked prior to coming to Lowell as a police officer

19   in Manchester, New Hampshire; for a brief period of time, I was

20   a police officer in Carlisle, Massachusetts; and I worked as a

21   security director at a hospital called St. John's Hospital.

22   Q.    How long were you at St. John's Hospital?

23   A.    I was the security director there for three years.

24   Q.    From what time frame?

25   A.    From 1980 to 1983.

1    Q.    Can you please give the Court a brief description of your

2    educational background starting from when you graduated high

3    school?

4    A.    Yes.  I graduated from high school in 1973, Bishop Guertin

5    High School in Nashua, New Hampshire.  I then went to -- on to

6    Northeastern University, obtained a bachelor's degree in

7    criminal justice from Northeastern and then pursued a master's

8    degree in criminal justice at Boston University, which I

9    received in 1991.

10   Q.    Earlier you mentioned that you gave a brief overview of

11   the Lowell Police Department.  With respect to police officers

12   in the sergeant and entry-level rank, do you know how many

13   black -- or persons who have identified themselves as black are

14   employed by the City Lowell?

15   A.    Black police officers in the City of Lowell?

16   Q.    Yes.

17   A.    I believe the number's approximately five.

18   Q.    And how about the number of persons who have identified

19   themselves as Hispanic in the City of Lowell -- or excuse

20   me -- in the Lowell Police Department in the officer and

21   sergeant rank?

22   A.    In the officer and sergeant rank?

23   Q.    Yes.

24   A.    That number is more than 30.

25   Q.    And does --

1          THE COURT:  Just on that, was the number five just

2    officers or officers and sergeants?

3          THE WITNESS:  The number five, Judge, was just

4    officers.

5    BY MR. LEAHEY:

6    Q.   Does Lowell have any Asian police officers?

7    A.   Yes, we do.

8    Q.   Do you know how many individuals have identified

9    themselves as Asian?

10   A.   There are about five Asian officers in the Lowell Police

11   Department.

12   Q.   And with respect to a person's racial -- racial

13   identification or ethnic identification, do you know how that

14   information is provided to the Lowell Police Department?

15   A.   It's provided by the individual.

16   Q.   That self-identification?

17   A.   Yes.

18   Q.   Does the Lowell Police Department have any type of

19   specialty positions?

20   A.   Yes, we do.

21   Q.   And what are those specialty positions?

22   A.   Well, we have many specialty positions; for example, we

23   have detectives in the Lowell Police Department assigned to

24   various units such as drug enforcement, criminal

25   investigations, family services.  We have officers in the

1    Lowell Police Department, who are involved in training

2    scenarios.  We have -- we run a Lowell police academy.  We run

3    an in-service academy so we have many officers who are employed

4    at our department who participate in training for not only our

5    officers but officers in the region as well.

6    Q.   When you say Lowell has a Lowell police academy and an

7    in-service training academy, can you just explain what those

8    two academies are?

9    A.   Sure.  The Lowell police academy is a recruit academy.

10   The recruit academy is for entry-level people.  Currently, we

11   have an academy underway with approximately 50 student officers

12   in attendance from police departments across the region, some

13   as far away as Brockton and even over on, I believe, Nantucket.

14   And then we have an in-service facility that we run an academy

15   at for about 27 cities and towns in the Lowell area, who come

16   to us, pay tuition, and come for the 40 hour in-service each

17   and every year.

18   Q.   With respect to the specialty positions of detective and

19   teaching positions, how are those individuals selected?

20   A.    Well, we -- we basically, when we have an open position,

21   we'll send out a posting within the police department, and

22   people who are interested in a particular position will send a

23   request into the superintendent's office.  We review that

24   request, we make a determination on who we believe would be the

25   best candidate for the job.  Obviously, certain skill sets are

1    required to do certain positions.  People who apply to be

2    detectives, let's say, in the family services unit, the skill

3    to be able to communicate and speak with young people, for

4    example, who may be victims of crime, is very important.  So we

5    look for individuals who have a certain set of skills that

6    would be hopefully successful in the job they applied for.

7    Q.   With respect to the teaching positions, what types of

8    skills are you looking for?

9    A.   Well --

10              MR. LICHTEN:  Objection.  Relevancy.

11              THE COURT:  Overruled.

12              You may have it.

13              THE WITNESS:  Well, basically, again, you know, people

14   who teach have to have a proficiency in the course that they

15   teach.  It's very important to have these officers have a very

16   strong background in the -- in typically certifications.  For

17   example, people who teach in our first responder and CPR

18   program at the Lowell in-service academy are all EMTs and

19   certified to teach the subject matter.  So they have to have

20   certifications and strong knowledge of the subject matter in

21   order to teach it.

22   BY MR. LEAHEY:

23   Q.   And generally speaking, are you familiar with all of the

24   police officers within the City of Lowell?

25   A.   I am.

```
 1    Q.   And how do you know that?
 2    A.   Well, I know them because I make it my business to know
 3    them.  I know them personally.  I'm on a first-name basis with
 4    all 226 officers in the Lowell Police Department.
 5    Q.   With respect to police officers, the entry level police
 6    officers, do you have certain expectations as to what their
 7    knowledge, skills and abilities should be upon their becoming
 8    police officers with the City of Lowell?
 9    A.   Yes.
10    Q.   What are those knowledge, skills and abilities that you
11    expect?
12    A.   Well, I think that it's critically important that an
13    entry-level officer have the ability to communicate with
14    people, interpersonal skills, the ability to take a very
15    emotional situation and kind of deescalate the issue that
16    they're dealing with.  Our officers certainly need to have a
17    knowledge of the law.  I think that's critically important.  I
18    also think they need to be able to deal with stressful
19    situations in a way that, you know, deescalates and resolves
20    the issue without making things worse.  And, you know, police
21    work can be stressful at times, and you need to have certain
22    abilities to deal with those issues.
23    Q.   Is that because police officers interact with members of
24    the general public and have to have those skill sets?
25    A.   That's correct.
```

1    Q.   And turning to the expectations that you have for a

2    sergeant, can you explain what knowledge, skills and abilities

3    that you expect from a sergeant in the Lowell Police

4    Department?

5    A.   Well, I think that the enhancement of those attributes

6    that we talked about earlier is critically important.  I think

7    that a sergeant, in my opinion, is a -- basically, a first-line

8    supervisor, who really interacts on a regular basis with

9    the -- the officers on the street.  That sergeant is really, in

10   my mind, a coach, someone who those officers can go to and be

11   comfortable with and run a question by, deal with a critical

12   situation when there is an incident in the City Lowell that is

13   of major significance, then obviously the sergeant's on-scene

14   working with the officers to resolve whatever issues are taking

15   place.

16   Q.   With respect to the knowledge, skills and abilities that

17   you previously testified as applicable to police officers,

18   would you expect those same knowledge, skills and abilities for

19   police sergeant in the City of Lowell?

20   A.   Yes, and more than that as well.

21   Q.   And what additional factors?

22   A.   Well, I think they -- they have to be -- those skills have

23   to be enhanced.  For example, if we talk about the knowledge of

24   the law, I expect every police officer to know the law but

25   there are sometimes intricate matters of the law that a

1    sergeant needs to really be aware of, and certainly if he is

2    not aware of it, he has to know where he could go to get the

3    information to resolve an issue.  For example, when an officer

4    is writing a report, it's necessary that the sergeant who

5    reviews that report makes sure that all the necessary

6    information is obtained in that report, particularly the

7    elements of the crimes and things along those lines.

8    Q.    As a result of this lawsuit, have you had an opportunity

9    to review the names of the individuals who are sergeants with

10   the Lowell Police Department?

11   A.    I do know who the sergeants are on the Lowell Police

12   Department, correct.

13   Q.    Have you had an opportunity to check whether or not those

14   individuals receive compensation under what is known as the

15   Quinn Bill?

16   A.    Yes.

17   Q.    And how many of those individuals who are sergeants

18   receive Quinn Bill compensation?

19   A.    All sergeants in the Lowell Police Department receive

20   Quinn Bill compensation for college education with the

21   exception of one.

22   Q.    Who is that one exception?

23   A.    His name is Norman Levasseur.

24   Q.    And do you know what Mr. Levasseur's race is, or Sergeant

25   Levasseur's race is?

```
 1    A.    He's white.

 2    Q.    And in your capacity as a superintendent for the City of

 3    Lowell, do you have an opinion as to whether or not it is good

 4    for superior officers or sergeants to have either college or

 5    post-college degrees?

 6    A.    Yes, I do.

 7    Q.    And what is that opinion?

 8    A.    I think it's -- it's very necessary.  I think that

 9    typically sergeants are dealing with very, very sophisticated

10    situations on a regular basis.  I think that a sergeant on the

11    street can be involved in a domestic violence issue that is

12    problematic and can become, you know, worse if it's not handled

13    properly.  I think sergeants deal with points of law.  I think

14    sergeants deal with situations that require a certain knowledge

15    base, you know, if a sergeant takes courses in psychology,

16    sociology, criminal law matters, you know, dealing with problem

17    employees.  That is -- that's a major issue that our

18    supervisors and sergeants have to deal with on a regular basis.

19    And how to deal with the employee who may have issues of, you

20    know, a drinking issue, or something along those lines, those

21    are things that sergeants would learn typically by going to a,

22    you know, a good college and taking courses that resolve those

23    issues.

24    Q.    Do you know whether or not Lowell has any minorities as

25    sergeants?
```

1    A.    Yes.

2    Q.    And how many officers in Lowell are minorities?

3    A.    The total number of minorities in the Lowell Police

4    Department?

5    Q.    Who are sergeants.

6    A.    Two.

7    Q.    Who are those individuals?

8    A.    One is Sergeant Angel Otero, and the other one is Sergeant

9    Jose Torres.

10   Q.    Do you know what compensation Angel Otero gets under the

11   Quinn Bill?

12   A.    I think he's compensated for having a master's degree, so

13   that would be 25 percent.

14   Q.    A master's degree is a degree above a college degree?

15   A.    It's above a bachelor's degree, right.

16   Q.    And with respect to Sergeant Torres, do you know if he

17   gets any compensation under the Quinn Bill?

18   A.    Yes, he does.

19   Q.    What is that compensation?

20   A.    His compensation would be 20 percent, so that would be for

21   a bachelor's degree.

22   Q.    With respect to sergeants in the Lowell Police Department,

23   upon becoming sergeant, do they receive any type of special

24   training?

25   A.    Yes, they do.

1    Q.    And what training do they receive?

2    A.    It's typically entitled a sergeant's leadership school.

3    They vary across the state.  We will send a newly promoted

4    sergeant as soon as a school is available to this particular

5    school to give them a knowledge base for becoming a sergeant

6    and issues that they must deal with.

7    Q.    Turning to the issue of how -- can you explain, generally

8    speaking, how the promotional process for sergeant works in the

9    City of Lowell?

10   A.    Well, we give the exam every couple of years, typically.

11   Those people who are interested in taking the sergeant's exam

12   are notified through postings and e-mail in the Lowell Police

13   Department.  They would apply through HRD.  They would

14   hopefully prepare for the exam.  It takes, you know, quite some

15   time to study and prepare for this test.  And then they would

16   take the test, and eventually a list would be established so

17   when we do have openings for a sergeant's position after the

18   list is established, we would call for that list, and that

19   would be forwarded to us by the HRD.  We would make promotions

20   off that list.

21   Q.    Earlier you said "we give a test."  When you say "we," who

22   do you mean?  You said, "We give a test."

23   A.    If I said "we give a test," that was incorrect.  We don't

24   give the test; HRD gives the test.

25   Q.    And you talked about -- I believe you say at some point

1    you get a certified list from HRD?

2    A.    Yes.

3    Q.    And what's a certified list?

4    A.    Well, it's basically a list of all the individuals who

5    have successfully passed the exam, and they are listed by their

6    exam scores, typically.

7    Q.    Okay.  Are you familiar with a term 2 N + 1?

8    A.    Yes.

9    Q.    And what does 2 N + 1 mean?  What's your understanding of

10   2 N + 1?

11   A.    Well, when we would call for a list, let's say if we were

12   going to promote one candidate, they would send us two names,

13   the two top names, plus one other name, so there would be three

14   names on that list for promotion for one position in the Lowell

15   Police Department.  So we would be getting three names for one

16   promotion.  And we would have to promote amongst that top

17   three.

18   Q.    I'm just placing in front of you a document.  And is this

19   similar to -- or is this the type of document you're talking

20   about when you receive a list from HRD regarding appointment

21   under 2 N + 1?

22   A.    Yes.

23   Q.    Okay.  And on this one, there's actually six names listed;

24   is that correct?

25   A.    That's correct.

1    Q.    And just for identification, this is a HRD document dated

2    September 18th, 2000.  And do you see that there are six names

3    listed?

4    A.    Yes.

5    Q.    Okay.  And it says one permanent full-time sergeant

6    selection must be one of the first three highest that we'll

7    accept.  Do you see that?

8    A.    Yes.

9    Q.    And then there's some scores.  There are two 86's and then

10   four 85's?

11   A.    Correct.

12   Q.    Do you know why that there are -- is there a reason

13   there's six names here because there are two people tied at

14   two, and that would be the first part of the 2 N, and then

15   because of the plus 1 where there were four ties at 85 that all

16   of the names go on the list?

17   A.    That's correct.

18   Q.    And you just get this information on, say the -- where it

19   says score, for Thomas Kennedy, it says 86?

20   A.    Right.

21   Q.    Is that the only score that you get from HRD?

22   A.    Yes.

23   Q.    Do you get any information from HRD -- well, previously

24   you've testified that you've taken a sergeant's exam previously

25   from HRD, correct?

1    A.    Yes.

2    Q.    What did that examination consist of?  What parts

3    consisted of that examination?

4    A.    Well, there are two parts, basically.  There's the -- the

5    written score from the exam that you take, and then there's the

6    portion called training and experience.  So of the overall

7    score, 80 percent is accounted for in the written exam that you

8    take and what score you receive there, and the other 20 percent

9    is accounted for in training and experience, and they give you

10   points based on what training and experience you have.

11   Q.    Does HRD give you any information as to how individuals

12   did on the individual written test component?

13   A.    No.

14   Q.    Does HRD give you any information as to how individuals do

15   on the training and experience component?

16   A.    No, they don't.

17   Q.    Do you know whether or not -- well, strike that.

18         And I believe you -- did you testify that -- strike that.

19         Turning to the Lowell minority police sergeants, Sergeant

20   Otero, do you know when Sergeant Otero was promoted to

21   sergeant?

22   A.    He was promoted probably two years ago, approximately.

23   Q.    And do you know how his promotion came about?

24   A.    His promotion came about as a result of a lawsuit that was

25   filed by Sergeant Otero.

1  Q.   Did it relate to him being bypassed based on a prior

2  examination?

3  A.   Yes.

4  Q.   Do you know which examination he had filed his bypass on,

5  which -- what year it was administered by HRD?

6  A.   It was prior to 1996.  I'm not sure exactly which exam it

7  was, but it was in that time frame.

8  Q.   Okay.  And Mr. Otero -- or Sergeant Otero --

9  A.   Excuse me.  Strike that.  Prior to 1998.  I apologize.

10  1998 or just prior to that.

11  Q.   So it was -- it was before the 1998 HRD examination?

12  A.   I believe so.  It could have been the '98 exam or

13  somewhere in that time frame.  I can't be -- I can't be

14  specific at this time.

15  Q.   Are you aware as part of the agreement in that case that

16  he was given a retroactive seniority date?

17  A.   Yes.

18  Q.   Do you know what that date was?

19  A.   It was in 1999.

20  Q.   Is your present memory exhausted as to the exact date?

21  A.   I don't have the exact date.

22  Q.   I'm placing in front of you a document.  Just look at that

23  directing your attention to Paragraph 8 -- or excuse me, 10.

24         MR. LICHTEN:  Your Honor, we should at least see the

25  front of the document to know what it is.  Thank you.

1    BY MR. LEAHEY:

2    Q.    Showing you a document that says <u>Otero v. Martin</u> and

3    <u>Fuller v. Martin</u>, and it is a court order.  Do you see that?

4    A.    Yes.

5    Q.    And it's an order from U.S. District Court in Boston?

6    A.    Right.

7    Q.    Directing your attention to Paragraph 10, do you see where

8    it says, "The promotion of Angel Otero and Scott Fuller, both

9    temporary and permanent, will be made with all seniority and

10   salary benefits of the position of sergeant as if Otero was

11   promoted as of January 10th, 1999?"

12   A.    Yes.

13   Q.    Do you see that?

14   A.    Yes.

15   Q.    Does that refresh your memory as to the date that Angel

16   Otero was promoted retroactively to sergeant?

17   A.    It does.

18   Q.    Okay.  And what date is that?

19   A.    January 10th of 1999.

20         MR. LEAHEY:  Your Honor, I would seek to introduce

21   this order into evidence.  I don't know if you want to take

22   judicial notice of it.  I mean it's a court order from this

23   court.

24         THE COURT:  No, we could make it an exhibit, whatever

25   the next number is.  Is it 177?

```
 1            MR. LEAHEY:  Do you want me to bring it up to you, or
 2    do you want me --
 3            LAW CLERK:  177 is admitted.
 4            (Exhibit No. 177 received into evidence.)
 5    BY MR. LEAHEY:
 6    Q.   And, Superintendent, looking at that date of January 10,
 7    1999, does that help you determine what test -- or what year
 8    the HRD test that Sergeant Otero took for promotion?
 9    A.    Likely in 1998.
10    Q.    Do you know what -- when the exams are given, if an exam
11    is given by HRD in January, do you know generally when those
12    tests are scored?
13    A.    It actually takes quite some time, yeah.  So it would
14    probably -- if it's given in October, the exam scores are
15    probably not received until December, maybe January.  So, you
16    know, the possibility existed that this exam could have been
17    prior to the 1998 exam as well.
18    Q.    And do you know whether or not Angel Otero speaks Spanish?
19    A.    He does.
20    Q.    Is he fluent?
21    A.    Yes, he is.
22    Q.    Is he bilingual in English and Spanish?
23    A.    Correct.
24    Q.    And you're also familiar with Sergeant Torres?
25    A.    I am.
```

1    Q.    Do you know when Sergeant Torres was promoted?

2    A.    He was promoted in the early 2000s.

3    Q.    Is your present memory exhausted as to when he was

4    promoted?

5    A.    I don't have the specific date.

6    Q.    Directing your attention to what I'll represent to you is

7    an HRD document, do you recognize this type of document?

8    A.    I do.

9    Q.    What do you recognize it to be?

10   A.    This would be the -- the individuals who had been selected

11   for promotion on a particular date forwarded to HRD authorized

12   by the city manager, John Cox.

13   Q.    And do you see the name Jose Torres?

14   A.    I do.

15   Q.    And do you see the date next to his name as October 5,

16   2003?

17   A.    I do.

18   Q.    Does that refresh your recollection as to when Sergeant

19   Torres was promoted to sergeant in the City of Lowell?

20   A.    Yes.

21   Q.    And when was that?

22   A.    October 5th of 2003.

23   Q.    Do you know what exam -- based on this document are you

24   able to tell what examination Sergeant Torres took that he was

25   promoted off of?

1    A.    Likely in 2002.

2    Q.    If I told you that Lowell did not -- Lowell had an

3    examination in 2000, 2003, would you be able to determine what

4    examination Sergeant Torres was promoted off of?

5    A.    That probably would have been 2000, then.

6    Q.    Because this employment -- if a test from HRD is

7    administered in October of the year, this employment date is

8    the beginning of October, correct?

9    A.    Correct.

10   Q.    And do you actually see -- no, you don't see.  And do you

11   see the date in the upper right-hand column as to when Lowell

12   made this request?

13   A.    Yes.

14   Q.    And what date is that?

15   A.    September 29th of 2003.

16   Q.    So it's fair to say based on that date it's not possible

17   that Sergeant Torres was promoted off the 2003 HRD examination,

18   correct?

19   A.    Correct.

20         MR. LEAHEY:  Your Honor, I would also seek to

21   introduce this document into evidence.

22         MR. LICHTEN:  Your Honor, I object on a number of

23   bases.  First of all, I only saw it last night for the first

24   time, but more fundamentally, they're admitting it was based

25   upon a 2000 list.  They've never produced the 2000 information

1  that would show where he stood on the list, how many were

2  promoted in that year, all of the data sets that would be

3  necessary to do that.  They've selectively picked out a

4  certification without supplying any of the other documentation,

5  and I only saw it last night.  So I would object unless -- I

6  would object on that basis.

7         MR. LEAHEY:  Judge, if I can explain.  Two days ago

8  was the first time that I learned that the 2003 information

9  regarding Lowell was going to be introduced into evidence.

10 Based on that -- because I thought I was here to defend a 2006

11 exam.  However, the 2003 exam came in.  And I believe an

12 argument's going to be somewhere down the line, well, based on

13 the '03 and '06 Lowell should have known that there was

14 discrimination.  Based on that, I went back and got information

15 regarding Otero.  Otero came off before the 1998 list.  I don't

16 know if it was '95, '96.  I haven't been able to find that on

17 short notice.  On this one, it's relevant from the city because

18 there is going to be a whole argument that the city should have

19 known what was going on.  This is off the 2000 list.  It's

20 relevant to the claim of what the city knew, what information

21 we had, because as an offer of proof, I will show that the city

22 promoted off of the pre-1998 HRD list, promoted a minority

23 candidate, promoted a minority candidate off the 2000 HRD list;

24 and when I get to Officer Alvarez, he was eligible for

25 promotion.  Putting aside disciplinary issues, he at least made

1    the band of 2 N + 1 on the 1998 examination.  So if counsel is

2    going to argue anything about 2003 and what the city should

3    have known, I think it's important that the city can point out

4    what information it had regarding the three preceding

5    examinations.

6           As regard to the underlying data, the city has what it

7    has.  We don't get it from HRD.  I don't have the underlying

8    data.  All I have is at the end of October 3rd, 2003, the city

9    made eight promotions.  I can tell you that there was one

10   promotion before that, so based on that I do have in the

11   documents that are underneath this, we have Torres was fourth.

12   So if there's one promotion that was preceding that, and I will

13   get that, I didn't have time to get it on the short notice, he

14   was, Torres was fifth on that list.  I think this information,

15   again, if plaintiff's counsel is going to argue what's happened

16   in the past on 2000 or 2003 for completeness, for true

17   completeness, we need to go back a couple of lists to show what

18   information the city actually received from HRD.

19          MR. LICHTEN:  I don't disagree with the premise.  If

20   they want to go back, I'm happy to try their record of lack of

21   minority promotions.  The point is they're selectively picking

22   a document.  But what you don't know is the 2000 list, how many

23   minorities took the exam, how many passed the exam.  We know

24   this is the very last -- this is probably the last appointment

25   off that exam because it's 2000 to 2003.  We don't know any of

1     the underlying data.  So for them to come up with a document

2     last night without any of the underlying data that lets me

3     explore what really happened to those examinations and what the

4     numbers was, that's what I think is inappropriate.

5          THE COURT:  Okay.  The objection's overruled.  I'll

6     admit the document.

7          MR. LEAHEY:  Thank you, your Honor.

8          MR. LICHTEN:  Your Honor, based upon that, can I ask

9     that they be requested to at least produce all of the

10    certifications from that exam year so that I can explore in the

11    intervening time their contention?

12         MR. LEAHEY:  There's one other promotion, it was

13    Thomas Lombard.  I can fax it to counsel, but there was one

14    promotion off of that, and these are the others.  There were no

15    other promotions.  And other than those, the documents on these

16    people and the one on Lombard, Lowell doesn't have any other

17    documents other than that's what we got from HRD.

18         THE COURT:  All right.  He'll produce the other

19    certification or requisition, I guess is what it is, actually.

20         MR. LEAHEY:  And I didn't -- this actually goes with

21    the other one.  I forgot that one.

22         LAW CLERK:  Exhibit 178 is admitted.

23         (Exhibit No. 178 received into evidence.)

24    BY MR. LEAHEY:

25    Q.   And, Superintendent Lavallee, do you know Sergeant Torres?

1   A.   I do.

2   Q.   Do you know whether or not had he speaks Spanish?

3   A.   He does.

4   Q.   Does he speak it fluently?

5   A.   He does.

6   Q.   Is he bilingual in Spanish and English?

7   A.   Yes.

8   Q.   Previously, you testified that you had taken a sergeant's

9   promotion test sometime in the 1980s; is that correct?

10  A.   Yes.

11  Q.   And that test consisted of a written test?

12  A.   Right.

13  Q.   And also a training and experience component?

14  A.   Right.

15  Q.   At the time did you believe, and looking back with the

16  position that you are now, do you believe that test was a fair

17  measure of -- for the skills, abilities and knowledge that a

18  sergeant should have?

19          MR. LICHTEN:  Objection.

20          THE COURT:  Sustained.

21  BY MR. LEAHEY:

22  Q.   With respect to your taking the sergeant's, lieutenant's

23  and captain's HRD examinations, can you explain to this

24  Court -- or did you do any -- well, strike that -- did you do

25  any study preparation when you were preparing for those

1  examinations?

2  A.    I did.

3  Q.    Can you explain -- or tell the Court what those practices

4  consisted of?

5  A.    Well, each and every time I prepared for a written exam,

6  you know, I looked upon this as a kind of a marathon.  I needed

7  months in advance to get ready to take this test, and I would

8  typically establish a strategy, a written strategy that I would

9  follow that would allow me to read a certain number of chapters

10  each and every week that would make sure I would complete all

11  the reading material by the end of the time frame from which

12  I'm now approaching the exam.  I'd also include several weeks

13  of review prior to the test.  I would buy study guides that go

14  along with each and every book that I was reading.  I would

15  also attend courses that I would pay for myself to attend to

16  make sure that I had the insight and the knowledge necessary to

17  be successful with this exam.

18  Q.    Okay.  In your test preparation, did that impact your

19  ability as a police officer?

20  A.    Well, what it did impact was my ability to work overtime

21  or details.  I made the decision that I would sacrifice the

22  extra money to put the time in to study for these exams because

23  I knew they were strenuous, I knew they were not going to be

24  easy, and I needed to be fully prepared to be successful in a

25  very competitive environment, which the Lowell Police

1    Department is.  So I would forgo working the extra work and put
2    that extra time into studying and preparing for these exams.
3    Q.    Did this preparation include any sacrifices in your
4    personal life?
5    A.    Oh, of course.
6    Q.    Can you explain what you -- what sacrifices that you made
7    in your personal life?
8    A.    Well, I guess the most significant sacrifice was as I was
9    preparing for my lieutenant's exam and was going to take that
10   exam in October of 1989, I was married in September of '89, and
11   a decision was made -- thankfully, we're still married -- by my
12   wife that we would forgo our honeymoon and we would not go on
13   our honeymoon until the exam was complete and all of my study
14   preparation was concluded.  So I took an exam late in October
15   on Saturday, and the following day on Sunday we were off on our
16   honeymoon.  So she was very understanding and appreciative of
17   the fact that, you know, this was a difficult process, and I
18   needed to put a lot of time into it, and it worked out well for
19   us.
20   Q.    Turning back to the issue of sergeants, do you know
21   whether or not individuals who have identified themselves as
22   Portuguese to you have been sergeants in the Lowell Police
23   Department?
24   A.    Yes.
25   Q.    Can you think of any particular names?

1    A.    Names that come to mind include George Santos, Charles

2    Duarte, Sean Santos and Robert DeMaura.

3    Q.    Is Sean Santos any relation to George Santos?

4    A.    No.

5    Q.    Are any of these individuals still employed by the Lowell

6    Police Department?

7    A.    One is.

8    Q.    And who is that?  Is that Sean Santos?

9    A.    Sean Santos is still a sergeant.

10   Q.    When did George Santos retire?

11   A.    He retired several years ago.  I don't know the exact

12   date.

13   Q.    How about Chuck Duarte?

14   A.    Chuck Duarte left the police department last year, retired

15   last year.

16   Q.    And how about Robert DeMaura?

17   A.    Robert DeMaura was ultimately promoted to captain and left

18   the police department two years ago to become the police chief

19   in Fitchburg.

20   Q.    Turning to the issue of assessment centers, you're aware

21   that the Lowell Police Department has used assessment centers

22   in the past, correct?

23   A.    Yes.

24   Q.    Okay.  Do you know what positions the Lowell Police

25   Department has used assessment centers for?

1    A.    For the -- for the ranks of lieutenant, captain, deputy

2    superintendent and superintendent.

3    Q.    And do you know prior to using the assessment whether or

4    not the Lowell Police Department or the City of Lowell had to

5    do any preliminary work with regards to unions regarding these

6    promotions or using assessment centers?

7    A.    Yes.

8    Q.    And what is -- what is your understanding of what the city

9    had to do with the unions?

10   A.    Well, each and every time it was a collective bargaining

11   issue so the city manager would sit down with the superior

12   officers union and negotiate to allow for in the contract the

13   ability to take an assessment center for promotion in lieu of a

14   written exam.

15   Q.    And you're aware under -- are you aware under

16   Massachusetts law and under the collective bargaining

17   agreements that any type of change in the way that the City of

18   Lowell promotes persons to promotional ranks in the police

19   department has to be bargained?

20   A.    Yes.

21   Q.    And you have not used -- or you're not aware that Lowell

22   has used an assessment center for sergeant; is that correct?

23   A.    We have not.

24   Q.    Do you know why they have not used an assessment center

25   for sergeant?

```
 1    A.   Well, that certainly has not entered into the realm of
 2    collective bargaining with the people who would be affected.
 3    The costs associated with an assessment center for large
 4    numbers of individuals is certainly a factor.
 5    Q.   Any other factor aside from cost?
 6    A.   None that I can think of.
 7    Q.   You think the written multiple-choice test that is given
 8    for sergeant is adequate measurement for the knowledge, skills
 9    and abilities for a police sergeant?
10    A.   Yes.  That's -- that's a valid point.  The exam that we
11    give for sergeant, that written exam, certainly tests the
12    knowledge one needs to have to become a successful sergeant.
13    Q.   Turning to issues that you just talked about when you
14    talked about the costs, are you aware as to what the bottom
15    line funding amount was for the Lowell Police Department in
16    fiscal year 2007?
17    A.   I believe the total amount of funding we had, which
18    included the city's budget as well the funding sources from
19    grants, was about $24 million.
20    Q.   Are you aware what that number was in fiscal year 2010?
21    A.   That has dropped to, I believe, in the range of about
22    $21 million.
23    Q.   Do you know what a percentage cut that was from 2007?
24    A.   Seven, 8 percent.  I'm not 100 percent sure.  That's just
25    a guess.
```

1  Q.   During this time, during the past four fiscal years, has

2  Lowell been able to fill all of its -- well, has Lowell been

3  able to fill all of its positions for police officers?

4  A.   No.

5  Q.   Do you know how many current positions are unfilled?

6  A.   Our staffing level is indicated at 260 sworn personnel.

7  Currently, we're at about 226.  So we're far below the level

8  that we once were at.

9  Q.   And previously you've testified about the sergeants having

10  received additional compensation for Quinn Bill?

11  A.   Yes.

12  Q.   Do you know in FY 0 -- FY 2009 approximately how much

13  money the city -- or do you know whether or not the City of

14  Lowell receives any money from the state towards paying the

15  Quinn Bill -- the Quinn Bill additional compensation?

16  A.   Well, it used to receive over a million dollars from the

17  Commonwealth to fund the Quinn Bill, but as you -- as we all

18  know, the Quinn Bill funding has been drastically cut, and that

19  funding has dropped to approximately 200, $250,000 from the

20  state.

21  Q.   Do you know what percentage decrease that Lowell has gone

22  from from what it used to receive to what it currently receives

23  from the state?

24  A.   The percentage decrease?

25  Q.   Yes.

1    A.    80 percent, approximately, 85.  I don't know.

2    Q.    And is that an additional cost -- do you know whether or

3    not the city has to make up the difference between what the

4    state gave and what the city is obligated to pay under the

5    collective bargaining agreements?

6    A.    Yes.

7    Q.    And what's that?

8    A.    Well, the collective bargaining agreement calls for full

9    Quinn Bill payment for all our officers, regardless of state

10   compensation, so the city now picks up the tab for what the

11   state used to pay for, that million-dollar-plus bill.

12   Q.    This lawsuit that you're here today, is this the lawsuit

13   that you're aware of that has challenged Lowell's use of HRD's

14   promotional exam by HRD based on the theory of discrimination

15   on minorities?

16   A.    Yes.

17   Q.    Superintendent Lavallee, I'm placing in front of you a

18   document that I will represent is a copy of the 2006 reading

19   list for promotional positions for sergeant, lieutenant and

20   captain.  Do you see that?

21   A.    I do.

22   Q.    Okay.  With respect to the position of sergeant, I just

23   want to go down the reading materials and ask whether or not

24   you think the reading material is an appropriate subject matter

25   to test candidates for police sergeant on.

1          Are you familiar with Community Policing:  A

2    Contemporary Perspective by Kappeler and Gaines?

3    A.   I'm aware of it.

4    Q.   Do think that is an appropriate book to be on a reading

5    list for candidates to sergeant?

6    A.   Yes.

7    Q.   Do you see Criminal Investigations by Swanson, Chamelin

8    and Territo?

9    A.   I do.

10   Q.   Are you familiar with that book?

11   A.   I am aware of it.

12   Q.   Do you think that book is an appropriate reference point

13   to be tested for candidates for sergeant?

14          MR. LICHTEN:  Your Honor, the witness said that he was

15   aware of it.  He hadn't said he read it.  So based on that, I

16   object.

17          THE COURT:  Sustained.

18   BY MR. LEAHEY:

19   Q.   Have you read the criminal investigation book?

20   A.   Not that version.

21   Q.   When you say "not that version," what do you mean, the

22   predecessor --

23   A.   I read a predecessor version; that's correct.

24   Q.   Do you know what predecessor version you read?

25   A.   I don't recall.

1  Q.   Okay.  Was that predecessor version that you read an

2  appropriate reading material for a candidate for sergeant's

3  promotion?

4  A.   Yes.

5  Q.   Have you read Police Administration, the sixth edition, by

6  Territo and Taylor?

7  A.   I've read a Police Administration, but not the sixth

8  edition.  One prior to that.

9  Q.   Okay.  The fifth edition?

10 A.   I'm not sure.

11 Q.   The prior edition of Police Administration by Swanson, did

12 you think that was an appropriate reading material to test on

13 for the position of sergeant?

14 A.   Yes.

15 Q.   And to speed this up, are you familiar with the

16 Supervision of Police Personnel, sixth edition, of Iannone?

17 A.   I am familiar with Supervision of Police Personnel.  Prior

18 editions, I have read.

19 Q.   All right.  On the prior editions that you have read, do

20 you think the Supervision of Police Personnel is an appropriate

21 reading material for candidates for sergeant position?

22 A.   I do.

23 Q.   Skipping the Mass. General Laws, are you familiar with the

24 Motor Vehicle Law Cruiser Guide 2006?

25 A.   I am not.

1    Q.    Are you familiar with that guide at all?

2    A.    I am not.

3    Q.    How about the Juvenile Law Field Manual 2006?

4    A.    I'm not familiar with it.

5    Q.    And not familiar with any type of previous versions of

6    that?

7    A.    I am not.

8    Q.    How about the police desk reference to Criminal

9    Investigation Procedures, 2005 to 2006?

10   A.    I'm aware of it but I've not read it.

11   Q.    Okay.  How about the police desk reference to

12   Massachusetts criminal law?

13   A.    I'm aware of it, again, but have not read it.

14   Q.    Earlier, Superintendent Lavallee, you testified that you

15   worked at St. John's Hospital as the director of security in

16   the early 1980s -- 1980 to 1983; is that correct?

17   A.    Correct.

18   Q.    At that time did you come to know the plaintiff in this

19   case for the City of Lowell, Robert Alvarez?

20   A.    Yes.

21   Q.    And how did you -- how did you know -- did he work at St.

22   John's Hospital?

23   A.    He did.

24   Q.    Did he work for you?

25   A.    He did.

1   Q.   Did he go by the name Robert Alvarez when he worked for
2   you?
3   A.   He did not.
4   Q.   What name did he go by?
5   A.   Robert Alvarez.
6   Q.   Did he tell you that was a nickname?
7   A.   No.
8   Q.   Did he tell you that's how to correctly pronounce his last
9   name?
10  A.   Yes.
11  Q.   And his last name was spelled the way it's spelled today,
12  as Alvarez?
13  A.   Yes.
14  Q.   I'm placing in front of you a document I had previously
15  shown you and identified as the date was September 18th, 2008,
16  and I'd ask you to look at this document.  On this document do
17  you see Robert Alvarez's name on it?
18  A.   I do.
19  Q.   Based on the date of this document which is September --
20  September 18th, 2000, do you know what test that this HRD
21  document relates to?
22  A.   I do not.
23  Q.   Do you know whether it relates to -- if I were to
24  represent to you that Lowell used a police sergeant's test in
25  1998 and in 2000, are you able to identify from this document

1    which test it applied to it assuming that the test occurred in

2    October of each year?

3    A.    It would be 1998.

4    Q.    And do you know what this document is?

5    A.    This is the document we would receive from HRD relative to

6    candidates that were eligible for promotion.

7    Q.    And putting aside issues of discipline, based on this

8    document would you agree that Robert Alvarez is within the

9    2 N + 1 rule and was at least eligible for promotion to police

10   sergeant?

11   A.    Yes.

12          MR. LEAHEY:  Your Honor, I seek to introduce this

13   document into evidence.

14          MR. LICHTEN:  The same objection as before, your

15   Honor.

16          THE COURT:  All right.  I'll admit it.

17          179?

18          LAW CLERK:  179 is admitted.

19          (Exhibit No. 179 received into evidence.)

20          MR. LEAHEY:  Your Honor, I just have one last point,

21   and I can correct it later.  I had talked to Attorney Sulman

22   yesterday.  Apparently, on Alvarez, I put the same exhibit in

23   for 138 and 139.  I can wait until he comes back and talk about

24   it, but I will need to change that at one point.

25          MR. LICHTEN:  That's fine.

1          MR. LEAHEY:  So I just wanted to --

2          THE COURT:  Do you want to inquire about that; is that

3    the idea?

4          MR. LEAHEY:  No, I just wanted you to know I'm done

5    with my questions; but as long as I was up here, I just wanted

6    to make note of that.

7          THE COURT:  All right.  We're close enough to 11:00

8    why don't we take the morning recess before cross-examination.

9          LAW CLERK:  All rise.

10          (The Court exits the courtroom at 10:44 a.m.)

11          (There is a recess in the proceedings at 10:44 a.m.)

12          LAW CLERK:  All rise.

13          (The Court enters the courtroom at 11:09 a.m.)

14          LAW CLERK:  For a continuation of the Lopez trial.

15          You may seated.

16          THE COURT:  Mr. Lichten?

17          MR. LICHTEN:  The court reporter says she's going to

18    be back in September because she doesn't want to miss the

19    ending to this great drama.

20          (Laughter.)

21                         CROSS-EXAMINATION

22    BY MR. LICHTEN:

23    Q.   Good morning, Chief --

24    A.   Good morning.

25    Q.   -- or -- I'm sorry -- Superintendent.

1    A.    Either way.

2    Q.    Do you belong to the Massachusetts Association of Major

3    City Chiefs?

4    A.    Yes, I do.

5    Q.    Okay.  And do you go to their meetings?

6    A.    Yes, I do.

7    Q.    Okay.  And I'd like to show you a document, and I just

8    want to show you that it was adopted on July 20, 2010.

9         Are you familiar with the resolution passed by the

10   Massachusetts Association of Major City Chiefs regarding

11   assessment centers?

12   A.    I am familiar with it, yes.

13   Q.    Okay.  And first, if we just turn to the last page of this

14   document where it tells us who you guys are, it lists who the

15   MMCC members are.  And Lowell is one of those members; is that

16   correct?

17   A.    Yes, it is.

18   Q.    Along with most of the other large cities in Massachusetts

19   and the MBTA?

20   A.    Correct.

21   Q.    Okay.  And as I understand it, for some time this -- your

22   association has been considering this issue of promotions; is

23   that correct?

24   A.    Promotions and a number of other issues as well.

25   Q.    A number of other -- I didn't mean to suggest that was the

1   only issue.

2        And if I could draw your attention to page 7 -- this is

3   page 7 -- there's a statement on diversity; is that correct?

4   A.   Yes.

5   Q.   And obviously, you and the other chiefs of this

6   association are committed to creating greater diversity in your

7   police departments; is that right?

8   A.   We're committed to reflecting the diversity of the

9   communities we serve.

10  Q.   Sure.  And then there's a section on promotions.  Do you

11  see that?

12  A.   Yes.

13  Q.   Okay.  And in this resolution that your organization

14  passed, it came out strongly for the right of police chiefs to

15  utilize greater assessment tools than just the written exam; is

16  that right?

17  A.   Yes.

18  Q.   And it cites favorably to the dissent -- Justice

19  Ginsburg's dissent in the Ricci case; is that right?

20  A.   Yes.

21  Q.   And it quotes favorably from language in that, talking

22  about the fact that written tests aren't the best tools to

23  select supervisory officers; is that accurate?

24           MR. LEAHEY:  Asking what it says?

25           MR. LICHTEN:  Yes.

1          THE WITNESS:  Can you point out where it says that,

2   please?

3   BY MR. LICHTEN:

4   Q.   Sure.

5          MR. LEAHEY:  Is this page 9?

6          MR. LICHTEN:  Yes, page 9.

7   BY MR. LICHTEN:

8   Q.   There's writing in here, "Relying heavily on written tests

9   to select fire officers is a question" -- well, strike that.

10         Do you see at the top it says -- let me show you, just for

11   completeness, it says at the very -- sorry about this -- at the

12   very bottom of this page it says, "We agree with these

13   justices.  As you read, insert the words 'police commander' or

14   'supervisor' wherever you see 'fire officer' in the text,"

15   Justice Ginsburg writes.  Are you familiar with this?

16   A.   Yes.

17   Q.   And then it says, "Relying heavily on written tests to

18   select fire officers is a questionable practice, to say the

19   least."  Do you see that?

20   A.   I do.

21   Q.   And do you agree with that?

22   A.   Well, I agree that there are other options available for

23   police promotion --

24   Q.   Okay.

25   A.   -- written tests are a part of.

1        So this basically says, "Relying heavily on written tests

2    is a questionable practice, based on the words of the

3    Justice" -- Justice Ginsburg, I believe.

4    Q.    Correct.  So if I understand what you're saying, written

5    knowledge -- I mean, knowledge of the laws and the various

6    practices is important and should be tested as part of a

7    multifaceted testing process.  Is that what you're saying?

8    A.    A multifaceted testing process is, I believe, a good

9    option for us.

10    Q.    Okay.  And it says in here that "The ability to lead

11    personnel effectively and maintain discipline, promote harmony,

12    exercise sound judgment and cooperate with other officials are

13    also important."  And you agree with that, I take it?

14    A.    I do.

15    Q.    And the Lowell Police Department has been not without its

16    problems over the last ten or 15 years; is that correct?

17            MR. LEAHEY:  Objection, your Honor.

18            THE COURT:  Overruled.

19            You may answer it.

20            THE WITNESS:  (No response.)

21    BY MR. LICHTEN:

22    Q.    Well, specifically, there was an Otero lawsuit; is that

23    correct?  The Angel Otero lawsuit, that was a discrimination

24    lawsuit in federal court?

25    A.    That's correct.

1    Q.   And then there was the Alvarez lawsuit which resulted in a

2    jury verdict in Mr. Alvarez's favor against the Lowell Police

3    Department?

4         MR. LEAHEY:  Objection, your Honor, as to the

5    "resulted in."

6         MR. LICHTEN:  Well, there was a jury verdict.

7         MR. LEAHEY:  It's under appeal.

8         THE COURT:  You may answer it.

9         THE WITNESS:  Repeat the question, please?

10   BY MR. LICHTEN:

11   Q.   Yeah.  In addition to this -- let me strike that and ask

12   you:  The Otero case.  Mr. Otero was claiming discrimination;

13   is that correct?

14   A.   I believe so.

15   Q.   And then Mr. Alvarez also claimed discrimination and a

16   jury returned a verdict in his favor; is that correct?

17        MR. LEAHEY:  Objection, your Honor.  It misstates --

18   the jury specifically rejected a claim on discrimination; they

19   found retaliation but there was no -- they specifically

20   rejected discrimination.

21   BY MR. LICHTEN:

22   Q.   The jury found that Mr. Alvarez had been retaliated

23   against; is that correct?

24   A.   Apparently so.

25   Q.   And not too long ago there was a case in which members of

 1    the Lowell Police Department were found to have acted

 2    inappropriate towards a female police officer which also

 3    resulted in a large jury verdict against the police union; is

 4    that correct?

 5            MR. LEAHEY:  Your Honor, I would just object.  The

 6    verdict was against the police union; there was nothing

 7    involving the City of Lowell in that regard.  So I'm not sure

 8    what the question is.  But the union got sued --

 9            THE COURT:  I don't know how important any of this is,

10    but you may answer the question.

11    BY MR. LICHTEN:

12    Q.    Is that right?

13    A.    I'm sorry.  Would you repeat again?

14    Q.    There was an incident in which a number of Lowell police

15    officers were accused of -- and a jury found against them with

16    respect to their conduct with respect to another female Lowell

17    police officer; is that right?

18    A.    Yes.

19    Q.    Okay.  And so these interpersonal skills -- the ability to

20    not create these problems, these are important skills to test

21    for when you decide who's going to be a police supervisor in

22    Lowell; is that correct?

23    A.    Yes.

24    Q.    And a written test doesn't have the capacity to capture

25    all of these attributes that are necessary; isn't that right?

```
 1              MR. CARROLL:  Objection.

 2              THE COURT:  Sustained.

 3    BY MR. LICHTEN:

 4    Q.   Except, of course, with respect to yourself.

 5         Now, I want to draw your attention to the recommendation

 6    as a result of this resolution.  And if we look at the end of

 7    this article -- sorry -- this resolution, there's a section for

 8    promotion.  Do you see that?

 9    A.   Yes.

10    Q.   And the resolution is that "Police chiefs be granted the

11    lawful authority to use a comprehensive set of assessments and

12    examinations to ensure that we are promoting the right people

13    into the right roles."  Do you see that?

14    A.   Yes.

15    Q.   And you support that part of the resolution?

16    A.   I do.

17    Q.   And the second thing it says is, "We think that

18    policymakers should look to the opinion of Justice Ginsburg in

19    the most recent promotional case, the New Haven Ricci v.

20    DeStefano case, for wisdom on ensuring a process that would

21    ensure true equal opportunity and excellence in making

22    promotions to supervisory and command ranks."  Do you see that?

23    A.   I cannot see it.

24    Q.   Oh, sorry.  Do you see that.

25    A.   I see that.
```

1    Q.    And then below that there are a series of recommendations.

2    And the first one is, "Promotions should be made based upon

3    relevant, demonstrated experience and completion of continuing

4    education units."  Do you see that?

5    A.    I do.

6    Q.    And then going to the next page, it says "Written

7    examinations, 40 percent, that is tailored to each community's

8    concerns"?

9    A.    Yes.

10   Q.    And then below that, "The use of assessment centers, 40

11   percent.  The assessment center should examine officers'

12   knowledge, appropriate to the rank that they seek, in criminal

13   law, court decisions and department policies and procedures."

14   Do you see that?

15   A.    I do.

16   Q.    Sorry.

17   A.    I see that, right.

18   Q.    And do you agree with all that?

19   A.    I do.

20   Q.    Are you aware of any attempt by the City of Lowell in the

21   last 15 years to request the right to do an assessment center

22   or to have a delegated agreement from HRD for the purposes of

23   doing a police sergeant's examination?

24   A.    No.

25   Q.    Have you, yourself, since you've been superintendent ever

1   made such a request?

2   A.   For a police sergeant's assessment center?

3   Q.   Yes.

4   A.   I have not.

5   Q.   Okay.  You were asked earlier about the qualities

6   necessary for a police sergeant in the City of Lowell, and I

7   tried to take good notes on this, and you said that the ability

8   to communicate was important.  Do I have that right?

9   A.   Uh-huh.

10  Q.   Good interpersonal skills.  Did I hear that right?

11  A.   Yes.

12  Q.   The ability to deescalate situations; is that correct?

13  A.   Correct.

14  Q.   The ability to deal with stressful situations?

15  A.   Right.

16  Q.   And then, finally, I think you said the ability to deal

17  with critical situations; do you recall that?

18  A.   Yes.

19  Q.   And that's critical, I take it, because as a street police

20  sergeant -- strike that.

21       Your police sergeants are on the street; is that right?

22  A.   All police sergeants?

23  Q.   Most of your police sergeants.

24  A.   The vast majority are on patrol; that's correct.

25  Q.   And one of the most important things that they have to do

1  is know how to deal with a critical situation if it develops;

2  is that right?

3  A.   That's one of their job responsibilities, correct.

4  Q.   Now, in the City of Lowell are promotions made in strict

5  rank order?  Promotions to sergeant.  Let's just stick with

6  police sergeant.

7  A.   Typically.

8  Q.   Okay.  And I take it what you mean by that is absent some

9  serious -- absent something serious on an individual's record,

10  the policy has been to go down the list; is that correct?

11  A.   Correct.

12  Q.   You don't have an interview process or some sort of

13  structured process where you take the people in the 2 N + 1 and

14  then make them go through something else; is that right?

15  A.   Only in the event of a tie.  Let's say if we had two

16  people tied and one opening, we would conduct an interview

17  process amongst the two candidates.

18  Q.   But, for example, in the situation that Mr. Leahey asked

19  you about, the promotions on this document which come from 2000

20  were made in rank order; is that correct?  The 86 got it, not

21  the 85?

22  A.   That's correct.

23  Q.   And that's what normally happens absent either a tie or

24  some compelling circumstance?

25  A.   Yes.

1    Q.   And is that an agreement with the union or just the

2    practice in the department?

3    A.   It's just a practice in the department.

4    Q.   Okay.  Now, you were asked about the obligation to bargain

5    with the union.  Has the City of Lowell, since you've been

6    superintendent or when you were deputy superintendent, ever

7    gone to the union and asked whether or not it would bargain

8    for -- bargain over and agree to the use of a multi-assessment

9    process for the selection of police sergeant?

10   A.   No.

11   Q.   Okay.  And when Mr. Leahey asked you questions about your

12   obligation to bargain, do you understand that your obligation

13   is simply to bargain but that you can bargain to impasse and

14   then unilaterally implement under the labor laws?

15   A.   I'm aware of that.

16   Q.   Okay.  Now, there was some testimony you gave earlier

17   about the Quinn Bill.  And I wasn't quite clear on this.  Were

18   you suggesting in any way that minority officers have less

19   education than non-minority officers?

20   A.   No.

21   Q.   For instance, Mr. Alvarez testified he has a master's

22   degree also; is that correct?

23   A.   He may.

24   Q.   So you haven't found a discrepancy in your department

25   between minority and non-minority officers with respect to the

1    educational attainments that they've achieved, have you?

2    A.    I have not.

3    Q.    And, in fact, in your department where you pay the full

4    Quinn Bill, many, many, many of your officers have gone and got

5    college degrees because it can mean up to 20 or 25 percent

6    additional income for them; is that right?

7    A.    That's correct.

8    Q.    And many of them get their degrees from various schools,

9    including Anna Maria College; is that correct?

10   A.    I believe some do have master's degrees from Anna Maria.

11   I can't specifically say how many.

12   Q.    So the department doesn't distinguish between where you

13   went to school.  If you have a master's degree from Anna Maria,

14   you get the Quinn Bill, and if you have a master's degree from

15   Harvard, you get the Quinn Bill; is that correct?

16   A.    Actually, the state promulgates the schools that are

17   accepted into the Career Incentive Pay Program.  I don't

18   believe Harvard is one.

19   Q.    Harvard may not be one.

20   A.    I will tell you that they have a criteria, and the program

21   that -- you know, a criminal justice degree from a certified

22   accredited school is required.  And I believe that you have to

23   apply -- the school has to apply to be eligible, but of course

24   now that's all water over the dam.

25   Q.    Okay.

1    A.    At least the new hires.

2    Q.    Now, speaking of school, if I heard your testimony, once

3    you have promotions you send those promoted sergeants to some

4    sort of school or academy; is that right?

5    A.    Yeah, we send them to a leadership school.  I wouldn't

6    consider it an academy.  An academy is associated with a

7    lengthier process.  This is more a one- or a two-week program.

8    Q.    And where is that program?

9    A.    It varies across the state.  It could be held at the

10   Reading Police Academy, it could be held in Lowell.  For

11   example, in September the Lowell Police Department is

12   sponsoring a sergeant's leadership course, it's open to area

13   police departments.  Lowell will send their three newest

14   sergeants to this particular academy, and there will be other

15   agencies attending as well.

16   Q.    Who teaches that program?

17   A.    That particular program is instructed by a gentleman by

18   the name of Jim Jordan.

19   Q.    Jim Jordan.  That's a Jordan who was commissioner of the

20   Boston Police Department?

21   A.    No relation.

22   Q.    And in any event -- and you have a Lowell police academy,

23   correct?

24   A.    We do.

25   Q.    And the Lowell police academy is a 26-week program with

1    instructors where entry-level officers come to learn the job;

2    is that correct?

3    A.    That's correct.

4    Q.    And you have instructors there that teach many of those

5    books that were on the reading list; is that correct?

6    A.    I don't know if those books are on the reading list for

7    instruction at our police academy.  I would tend to think not

8    only because it's an entry-level program and these are, more or

9    less, for supervisory-level programs; in other words,

10   "Supervision of Police Personnel" by Iannone would not

11   necessarily be something a student officer would need to learn

12   while in the police academy.

13   Q.    But the statute they would need to know; is that correct?

14   A.    Oh, the statutes, yes, of course.  Mass. criminal law,

15   motor vehicle law, absolutely.

16   Q.    So has Lowell -- so Lowell has an academy.  Has it ever

17   considered, once someone becomes a police sergeant, having an

18   academy, whether it's one weeks or two weeks, to teach them

19   some of these essential knowledges that you think they might

20   have to have on the job as a police sergeant, such as statutes

21   and motor vehicle codes or anything like that?

22   A.    We actually ran a program called the "Massachusetts Police

23   Leadership Institute" in Lowell.

24   Q.    Yes.

25   A.    That program was more or less government philosophy.  It

1  didn't get into the specifics of motor vehicle and criminal

2  law, but it was intended for supervisors, and many of our

3  supervisors in the Lowell Police Department did, indeed,

4  attend.  But the more technical aspects of being a sergeant are

5  usually relegated to the program -- the sergeant's leadership

6  or sergeant's, you know, supervisory school.

7  Q.    Right.  So if you promoted individuals to sergeant, you

8  could require them to go to a leadership school, or a school

9  for one or two weeks, to bone up on essential knowledges that

10 they might need in order to carry out their functions as a

11 police sergeant; is that correct?

12 A.    Yes.

13 Q.    Okay.  Now, I want to go over some of the testimony you

14 gave about the sequence of events.  If I understand it,

15 Torres -- I'm sorry -- Otero was promoted in 2008; is that

16 correct?

17 A.    You know, again, I said a couple of years ago I don't have

18 the specific date.  It would have been 2008/potentially 2007,

19 but it was in that time frame.

20 Q.    Well, the order by Judge Gertner is February of 2008.  So

21 I take it from that, that he wasn't promoted until after the

22 court entered the order; is that right?

23 A.    That's correct.  That's correct.

24 Q.    So that refreshes your memory that it occurred in 2008?

25 A.    Right.

1    Q.    All right.  So when Otero was promoted in 2008, it wasn't

2    as a result of any score he received on the 2006 examination,

3    it was as a result of a federal court order which related to

4    something that happened in the late '90s; is that right?

5    A.    Yes.

6    Q.    And then Torres was promoted, as I understand it, in

7    September of 2003; is that correct?  I'll just show you the --

8    A.    Yes, I believe so.

9    Q.    Okay.  And your counsel reminded you that his promotion in

10   2003 was off of a 2000 list; do you recall that?

11   A.    Right.  Yes.

12   Q.    Okay.  So if I understand it, when Torres was promoted in

13   2003, he was in the last group of officers promoted off of that

14   2000 list, very close to the expiration of that list; is that

15   right?

16   A.    I don't know.

17   Q.    Well, if I understand how the process works, if the exam

18   was given in 2000, the new exam would have been given in

19   October of two thousand and --

20   A.    Oh, I see what you're saying.  In other words, that list

21   was getting ready to expire?

22   Q.    Yes.

23   A.    Oh, I understand.  Right.  Right.

24   Q.    But you agree with that?

25   A.    I understand that.  Correct.

1    Q.    Now, if we go to some of the information that's been

2    provided to me by the City of Lowell -- I just want to show you

3    this.  These are documents provided to me by the City of Lowell

4    in answers to interrogatories.  And this is -- this particular

5    document is for 2004.  And I can -- you don't have to take my

6    word for it, but if you see the first page it says "2004."  Do

7    you see that?

8    A.    I do.

9    Q.    So in 2004 -- as of 2004, as I understand it, there were

10   155 sworn non-minority officers in the City of Lowell; is that

11   correct?  Oh, I'm sorry.  There were 155 sworn non-minority

12   officers?

13   A.    That's what that says, right.

14   Q.    And there were 24 non-minority sergeants; is that correct?

15   A.    Right.

16   Q.    And there were 36 sworn minority sergeants; is that right?

17   A.    No, I think you're saying there were 36 sworn minority

18   officers.

19   Q.    That's what I meant to say.  36 sworn minority

20   sergeants -- I'm sorry -- sworn minority police officers.

21   A.    Correct.

22   Q.    Okay.  It's late; we're almost done.

23         And there was only one minority sergeant?

24   A.    Yes.

25               THE COURT:  Does the term "sworn" include both patrol

1    officers and sergeants?

2            THE WITNESS:  That's correct, Judge.  "Sworn" is both.

3    But they break it down here.  I think that -- in my estimation

4    it looks like sergeants are separate from "sworn," "sworn"

5    being police officers only.

6            MR. LICHTEN:  Does that answer your question, your

7    Honor, or not?

8            THE COURT:  Well, I gather the answer is that as a

9    general matter, in general usage apart from this chart, "sworn"

10   would refer to both police officers and sergeants?

11           THE WITNESS:  "Sworn" would include all ranks.

12           THE COURT:  Including lieutenants and --

13           THE WITNESS:  Oh, sure.  Yeah.

14           THE COURT:  So then the question is:  How was it used

15   in the chart?

16           MR. LICHTEN:  That's what I understood the question to

17   be.

18   BY MR. LICHTEN:

19   Q.   I think what the Court is asking, just so that we're

20   clear, is that 37 number for minorities, is that 36 sworn

21   minority officers plus one minority sergeant for 37, or is it

22   36 total, one of those being a minority sergeant, if you know?

23   A.   Yeah, that's a good question.

24           MR. LEAHEY:  Judge, I will represent --

25           THE COURT:  The answer is probably in the math.

1          MR. LEAHEY:  Judge, I'll represent that the
2    Superintendent was not involved with this, but it is 37 -- that
3    it's --
4          MR. LICHTEN:  That's fine.
5          MR. LEAHEY:  -- in this --
6          THE COURT:  That's how the total works.
7          MR. LEAHEY:  Yes.
8          MR. LICHTEN:  Gotcha.
9          THE COURT:  Okay.
10   BY MR. LICHTEN:
11   Q.   Now, back at this time in 2004, you were a deputy; is that
12   correct?
13   A.   That's correct.
14   Q.   Did it concern you at all that there was only one minority
15   sergeant in the whole City of Lowell Police Department?
16   A.   In what way?
17   Q.   That there was an underrepresentation of minority police
18   sergeants in the ranks.
19          MR. LEAHEY:  Objection to the word
20   "underrepresentation."
21          THE COURT:  Sustained.
22   BY MR. LICHTEN:
23   Q.   Did it concern you that there was only one minority police
24   sergeant in the City of Lowell Police Department back at that
25   time?

1    A.    Well, I think I need further explanation on that question

2    before I could answer it.  I'm not quite sure what you mean by

3    "concern."

4    Q.    All right.  Well, I'll withdraw that question, then, and

5    let me move on.

6          Okay.  I now want to show you the same data from 2005.

7    And in 2005 it looks like the data remained essentially the

8    same; is that correct?

9    A.    Yeah, it appeared that there had been a decrease in the

10   numbers of officers in the department, but correct.

11   Q.    So just to recap and put on the record, as of 2005 there

12   were 150 sworn non-minority officers and 26 non-minority

13   sergeants; is that correct?

14   A.    Twenty-six non-minority sergeants, correct.

15   Q.    And there were 37 minority police officers and one

16   minority sergeant in the department; is that correct?

17   A.    Yes.

18   Q.    And as I understand it, just to speed things up, that

19   pattern continued until a second officer was made in 2008, that

20   person being Otero, who was not hired off of the exam in 2006

21   but was hired as a result of Judge Gertner's order; is that

22   right?

23   A.    Yes.

24   Q.    I just have a very few questions and then we'll be done.

25   Are you familiar with the concept of a regional assessment

1    center?

2    A.    I am not.

3    Q.    Okay.  Are you aware of HRD putting out information

4    relating to the concept of a regional assessment center, that

5    being an assessment center a number of communities in a

6    contiguous geographic area can put together themselves?

7    A.    I'm not aware of that.

8    Q.    Superintendent, thank you very much.  I really appreciate

9    it.

10   A.    You're welcome.

11          MR. LEAHEY:  Very briefly, your Honor?

12          THE COURT:  Go ahead.

13                    REDIRECT EXAMINATION

14   BY MR. LEAHEY:

15   Q.    Chief, you were shown a copy of, apparently, a Briefing

16   Paper No. 1, of a Massachusetts Association of Major City

17   Chiefs that's entitled "Police Personnel Standards for the 21st

18   Century"?

19   A.    Yes.

20   Q.    And that document was, apparently, approved July 20, 2010?

21   A.    That's correct.

22   Q.    Is it fair to say that this document is a wish list of how

23   the major chiefs would like the system to work?

24   A.    Yes.  That's basically how -- we've adopted suggestions

25   for the Commonwealth, and certainly as a -- the leaders of law

1    enforcement in this Commonwealth we felt it was necessary for

2    us to get our message across, and that's how we decided to do

3    that.

4    Q.    But you're also aware that you need to comply with the

5    laws of the Commonwealth and of the Constitution, correct?

6    A.    Oh, of course.

7    Q.    And that also this takes into no -- this is a

8    perfect-world scenario; is that fair to say?

9    A.    That's pretty much how we would like to see it happen, but

10   it's certainly -- I agree with your assessment, in the perfect

11   world.

12   Q.    Where money's no object?

13   A.    Certainly that is an issue.  And, right, where money is no

14   object; that's correct.

15   Q.    Directing your attention to page 11, I see one of the

16   recommendations is that you want for -- if I scroll up to the

17   top where it says "Entry requirements."

18   A.    Yes.

19   Q.    If you go down to the bottom, one of the things that you

20   want is, it says, a "B.S. or B.A. degree, preferably with a

21   certificate of concentration in policing to be completed in the

22   junior and senior years."  Did I read that correctly?

23   A.    Yes.

24   Q.    And does "B.S." mean a bachelor of science?

25   A.    That's correct.

```
 1    Q.    B.A. is bachelor of arts?

 2    A.    That's also correct.

 3    Q.    So this is a recommendation that every police officer have

 4    a college degree, correct?

 5    A.    That's correct.

 6    Q.    And that you want it specifically with a certificate of

 7    concentration in policing for the junior and senior years,

 8    correct?

 9    A.    Preferably.

10    Q.    And then you list the concentrations that you'd want each

11    candidate to have; is that correct?

12    A.    Yes.

13              MR. LEAHEY:  Thank you.  That's all I have.

14              MR. LICHTEN:  Nothing further, your Honor.

15              THE COURT:  Thank you, Commissioner.  You may step

16    down.

17              (The witness excused.)

18              THE COURT:  Is that as far as we go today with

19    witnesses?

20              MR. LEAHEY:  Yes, your Honor.

21              THE COURT:  Okay.  In the interim I've thought about

22    it, the suggestion about August 30th, and that's fine.  You can

23    have until August 30th.

24              MR. LICHTEN:  Thank you very much, your Honor.

25              THE COURT:  And I noticed a couple have been filed.
```

1    If there are others coming, sooner is better than later.

2         MR. LEAHEY:  I will file mine this afternoon.  I just

3    didn't get a chance to do it yesterday.

4         THE COURT:  And other than that, I guess we'll plan to

5    reassemble on September 13th at 9 a.m.  If there's a need for a

6    status conference or anything before that to deal with any

7    technical or operational problems, let us know and we'll do

8    that.

9         MR. LICHTEN:  Thank you very much, your Honor.

10         COUNSEL IN UNISON:  Thank you, your Honor.

11         LAW CLERK:  We'll be in recess.

12         (The Court exits the courtroom at 11:42 a.m.)

13         LAW CLERK:  All rise.

14         (The proceedings adjourned at 11:42 a.m.)

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2

3          I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4    the United States District Court, do hereby certify that the

5    foregoing transcript constitutes, to the best of my skill and

6    ability, a true and accurate transcription of my stenotype

7    notes taken in the matter of Civil Action No. 07-11693-GAO,

8    Pedro Lopez, et al, v. City of Lawrence, et al.

9

10   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
11   Official Court Reporter

12
     Dated:  7/29/10
13

14

15

16

17

18

19

20

21

22

23

24

25