**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| PEDRO LOPEZ, et al. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Civil Action No. 07-11693-GAO |
| v. ) | |
| ) | |
| CITY OF LAWRENCE, et al. ) | |
| ) | |
| Defendant. ) | |

**PLAINTIFFS' OMNIBUS OPPOSITION**
**TO DEFENDANTS' MOTIONS FOR JUDGMENT**

**Introduction**

Plaintiffs oppose the Defendants' motions for judgment under Fed. R. Civ. P. 52(c). All Defendants, with the exception of the City of Boston, have filed motions for judgment. Because all of the motions share common arguments, the Plaintiffs are submitting this omnibus opposition to avoid burdening the Court with repetitious briefs. To the extent several of the Defendants raise arguments that are jurisdiction specific, those arguments and facts are addressed in supplemental oppositions.

The central argument made by all Defendants is that the Plaintiffs' evidence is insufficient to establish a prima facie case of disparate impact. The Plaintiffs have established two key facts that are sufficient, standing alone, to defeat this central argument. First, there is evidence that written multiple-choice tests have a consistent and predictable adverse impact on minority[1] applicants. Second, consistent with that expected outcome, there is uncontroverted and highly statistically significant evidence that black and Hispanic applicants achieved lower mean scores on the written multiple-choice tests at issue in this case, thereby putting them at a

---

[1] In this case, "minority" refers to black and Hispanic people.

1

disadvantage compared to non-minority applicants.  Although this evidence is sufficient to establish disparate impact, the Plaintiffs' case is supported by numerous other forms of evidence, all of which must be considered here.

As a result of taking an exam that was skewed against them, the black and Hispanic applicants who sat to take these tests, *regardless of where they happened to work*, began the application process with a built-in disadvantage.  It is as if the minority and non-minority candidates lined up to run a race, but with a requirement that minority candidates carry an additional ten pounds on their back and jump a series of hurdles: the results might vary, but the competition was structurally unfair.  It is precisely this lack of fairness that runs afoul of state and federal discrimination law.  As the Supreme Court made clear long ago, Title VII guarantees "equality of opportunity and the elimination of discriminatory barriers to professional development."  Teal v. Connecticut, 457 U.S. 440, 449 (1982).

Given the uncontroverted evidence that minority applicants as a whole performed worse on the examinations being challenged in this case, any argument based on the small numbers of any individual community must fail.  Under relevant law, it is inappropriate to take an overly myopic view of a small sub-set of data; instead, it is appropriate to consider the totality of available evidence to determine the existence of adverse impact.  When considering the totality of circumstances in this case – including the long-standing and profound lack of minority sergeants in all of the defendant communities – the statistical evidence is reinforced by other evidence showing a lack of equal opportunity.  That a plaintiff happened to apply in Boston, which has large enough numbers to reveal the dramatic level of adverse impact on minority candidates, or in smaller communities, which may *never* have sufficiently large numbers to

establish statistical significance at a jurisdiction level, should not determine which minority

applicants are protected from a fundamentally unfair process.

Although the Defendants raise a number of other arguments in support of their motions –

including, for example, their oft-raised and repeatedly rejected argument that they were simply

following the requirements of Mass. Gen. Laws, ch. 31 – none of those arguments entitle any of

the Defendants to judgment.  As a result, all of the Defendants' motions must be denied.

### Summary of Relevant Evidence

#### Statewide Evidence

**1.      Adverse Impact of Written Multiple Choice Tests Generally**

Scholarly literature in the industrial psychology field establishes that written multiple

choice tests have produced high levels of adverse impact on minority candidates.  (2:82-84; 3:43-

46, 55, 60; 10:30).  Based on this well-established fact, multiple choices tests have a predictable

effect on minority applicants: as Dr. Wiesen emphasized, "[o]ne of the effects of using a written

multiple-choice job-knowledge test is that you're virtually assured of adverse impact."  (3:47).

Not surprisingly, continued use of multiple choice tests can be expected to result in ongoing

patterns of disparate impact.  (2:103, 107-108, 110-11, 115, 117).

**2.      Evidence of Disparate Impact Statewide**

Dr. Wiesen performed statewide analyses comparing how minority and non-minority

applicants performed on the examinations.  He opined that it is appropriate to conduct an

aggregated analysis in this case, because "if you are trying to find out if the examination

adversely affects minorities, the best approach would be to use all the data from all of the

applicants that took the examination."  (2:45; see also 2:48, 88; 5:85).  His opinion about the

appropriateness of aggregation is supported by accepted practice among industrial psychologists and by the Uniform Guidelines.  (2:43-44, 121).

In his evaluation of each of the examinations, Dr. Wiesen found "highly statistically significant" differences in the mean scores for minorities (black and Hispanic) and non-minorities.  (2:66-67, 70-71, 86-87; 11:48-50; Exhs. 78, 79).  The probability that the differences occurred by chance was less than .001 (i.e., less than 1 out of 1,000), which is far more significant than the accepted cut-off for statistical significance, which is .05 (i.e., less than 5 out of 100).  (2:40, 69; Exh. 78).

Dr. Wiesen also found adverse impact when looking at pass rates and selection rates. (2:71-72, 78-80, 84-87; Exh. 78).  Although some of his statewide findings were not statistically significant, that fact is of no consequence given the surrounding facts that support a finding of adverse impact.  (2:80-81, 84-85).  The same is true with respect to analyses that were limited to particular jurisdictions.  (2:102, 105, 107, 114).  Testing for statistical significance is not done in a vacuum; it is done as one part of a more global analysis to determine what is happening in a given situation.  (2:80-81, 102, 105, 107, 114, 121).  Given the highly statistically-significant differences in the average test scores of minorities compared to non-minorities across the state, the lack of statistical significance in small communities does not preclude a finding of disparate impact, because there was a clear pattern of such impact.  (2:105, 114, 121; 3:15; 11:27-30, 38).

Looking at the overall picture, Dr. Wiesen summarized his opinion by stating, "I think that the impact is clear, and that is that there will be continuing adverse impact in the promotional decisions that are based on the test scores if the system doesn't change."  (11:50).

Jurisdiction-Specific Evidence

1.    **Boston**

For the 2005 and 2008 promotional examinations given to Boston police officers, there are consistent and dramatic measures of disparate impact.  In terms of promotion rates, the adverse impact ratio (that is, the promotion rate of minority applicants divided by the promotion rate of non-minority applicants) was 0.28 for 2005 and 0.05 for 2008.  (Exh. 79).  In terms of passing rates, the adverse impact ratio was 0.62 for 2005 and 0.73 for 2008.  (Id.).  In terms of effective passing rates,[2] the adverse impact ratio was 0.29 for 2005 and 0.08 for 2008.  (Id.).  Finally, in terms of average test score (also known as "mean score difference"), non-minorities had an average score that was 6.4 point higher than minorities in 2005 and 6.6 points higher in 2008.  (Id.).  All of these measures are statistically significant.  (Exh. 79).  Indeed, the difference in average test scores between minority and non-minority applicants for the 2008 exam was so significant that the probability of the difference occurring by chance was 0.000000000000000005 (that is, 17 zeros to the right of the decimal place).  (Exh. 78).

Boston's Police Commissioner, Edward Davis, testified that he is concerned about the lack of diversity in police supervisor positions in the Boston Police Department.  (9:45-46).  He is disappointed, for example, that only two of 37 promotions resulting from the 2008 examination have gone to minorities.  (9:46).  His disappointment should reach back decades.  There is a long history of litigation against the City of Boston resulting from the discriminatory effects of multiple choice exams.  That history reaches back to Boston Chapter, N.A.A.C.P., Inc. v. Beecher, 504 F.2d 1017 (1st Cir. 1974), a case in which the First Circuit affirmed a finding that such an exam had a disparate impact on minority firefighter applicants.  Id. at 1020-21.  It

---

[2]     The effective passing rate looks at how many applicants scored above and below the lowest score at which an applicant was promoted.  (2:73).

continued with a consent decree in 1978, requiring the City of Boston to, among other things, "set specific goals and timetables for promotions of black officers to sergeant." Boston Police Superior Officers Fed'n v. City of Boston, 147 F.3d 13, 15, 20-25 (1st Cir.1998) (describing history of decree, including series of unsuccessful challenges to race-based promotions made under decree; affirming City of Boston's bypassing of white police lieutenant candidates, even though not required by any consent decree, given the history of discrimination against black candidates).  See also Cotter v. City of Boston, 323 F.3d 160, 164-65 (1st Cir. 2003) (describing how City of Boston bypassed white police sergeant candidates based on disparate impact of using exam scores for strict rank ordering).

**2.     Lawrence**

  A.  Under-Representation of Minority Police Sergeants

Of Lawrence's 17 sergeants, only one (6%) is a minority.  (Exh. 38).  The one minority sergeant, Jose Martinez, was promoted approximately ten years ago.  (1:111).  In 2008, the last year for which such data is in evidence, Lawrence had 124 patrol officers, 35 of whom (28%) were minorities.  (Exh. 39).  According to census data, 74% of the population in Lawrence is minority: 70.8% is Hispanic or Latino, and 3.2% is Black or African-American.  See Census Data (Lawrence, MA) (available at http://factfinder.census.gov).[3]

---

[3]      The Court may take judicial notice of census data pursuant to Fed. R. Evid. 201.

B.  Examination Data

On the 2003 examination, the adverse impact ratio for promotions was 0.74*[4], the adverse impact ratio in the passing-rate was 0.46*, the adverse impact ratio for the effective passing rate was 0.46, and the difference in average test scores was 7.7 points.  (Exh. 79).  The 2006 and 2008 examinations also reflected an adverse impact against minorities.  No minorities were promoted from either examination (the eligibility list from the 2008 examination remains in effect), making the adverse impact ratio for promotions equal to 0*.  (Exh. 79; 2:104-106).  The adverse impact ratio for the passing rate was 0.46* for the 2006 examination, and 0.84* for the 2008 examination.  (Exh. 79).  The adverse impact ratio for the effective passing rate was 0* for both years.  (Id.).  The difference in average test scores was 6 points in 2006, which was statistically significant, and 3.3* points in 2008.  (Id.).

The aggregated results from the three most recent examinations – 2003, 2006, and 2008 – show severe adverse impact.  The adverse impact ratio for promotions was 0.28*, the adverse impact ratio for the passing rate was 0.6, and the difference in average test scores was 5.3 points. (Exh. 79).  The adverse impact ratio for the passing rate and the mean score difference are both statistically significant.  (Id.).

The raw data from the examinations demonstrates the real-world effects of a test that is biased against minority candidates.  For the 2003 examination, out of the 15 highest-scoring candidates, only one was Hispanic.  (Exh. 155).  Out of the 11 candidates who failed the exam, four were Hispanic.  (Id.).  For the 2006 examination, no minorities were promoted out of the 10

---

[4]     When a number is designated with an asterisk, that indicates the underlying numbers were not large enough – as they were statewide and in Boston – to be statistically significant.  These numbers are included because they are consistent with an overall pattern of disparate impact.  (2:80-81, 102, 105, 107, 114, 121; 3:15; 11:27-30, 38).  For example, as Dr. Wiesen testified at one point, "[W]hat you see in Lawrence is consistent with what you see statewide, that minority candidates score a few points lower; the minorities as a group pass at a lower rate and are appointed at a lower rate."  (2:105).

minority test-takers, whereas 4 out of the 37 non-minority test-takers were promoted.  (Exh. 81).

Only three of the 10 (30%) minority test-takers passed the examination, compared to 24 of the 37

(65%) of the non-minority test-takers.  (Id.).  Combined, 25 minorities took the sergeant

examination in 2006 and 2008, and none were promoted.  (Id.).  In contrast, 64 non-minorities

took the examination, and five were promoted.  (Id.)  More telling, while only 40% of minorities

passed the examinations, 61% of non-minorities passed the examinations.  (Id.).

**3.      Lowell**

    A.  Under-Representation of Minority Police Sergeants

Lowell has two minority sergeants out of a total of 30, meaning only 6.6% of Lowell's

sergeants are minorities.  (Exh. 35; 9:108).  In 2008, Lowell had 181 patrol officers, 35 of whom

(19%) were minority.  (Exh. 35).  According to census data, about 22% of the population in

Lowell is minority: 15.9% are Hispanic or Latino, and 6% are Black or African-American.  See

Census Data (Lowell, MA) (available at http://factfinder.census.gov).

Lowell has not made any minority appointments from a sergeant examination since 2003,

when the city promoted Jose Torres.  (9:109).  A second minority sergeant, Angel Otero, was

appointed in 2008 (Exh. 34), but he was not promoted as a result of the 2006 examination or any

recent examination.  Otero was appointed retroactive to 1999 as a result of a court order in a

lawsuit that he filed.  See Otero v. City of Lowell, Civil Action No. 00-10777, Slip. Op. (D.

Mass. Feb. 5, 2008).

B.  Examination Data

On the 2003 examination, the adverse impact ratio for promotions was 0*, the adverse impact ratio for the passing rate was 0.69*, the adverse impact ratio for the effective pass rate was 0*, and the difference in average test scores was 8.7, which was statistically significant. (Exh. 79).  On the 2006 examination (Lowell did not offer an examination in 2008), the adverse impact is also evident.  No minorities were promoted, making the adverse impact ratio for promotions equal to 0*.  (Exh. 79).  The adverse impact ratio for the passing rate was 0.78*, and the adverse impact ratio for the effective pass rate was 0, which was statistically significant. (Id.).  The difference in average test scores was 9.1 points, which was not only statistically significant, but "dramatic."  (Exh. 79; 2:109).  Dr. Wiesen also opined that the  adverse impact would continue if Lowell continues to use the same type of sergeant promotional examination in the future.  (2:110-111).

The combined results from the two examinations – 2003 and 2006 – also shows significant levels of adverse impact.  The adverse impact ratio for promotions was 0, the adverse impact ratio for the passing rate was 0.73, and the difference in average test scores was 8.9 points.  (Exh. 79).  All of these measures were statistically significant.  (Id.).

The raw data from this examinations are equally telling.  For the 2003 exam, the highest-scoring 18 candidates were non-minorities.  (Exh. 155).  Out of the remaining 22 candidates, eight were minorities, and two of the six test-takers who failed were minorities.  (Id.).  For the 2006 exam, no minorities were promoted out of the seven minority test-takers, whereas seven out of the 36 non-minority test-takers (28%) were promoted.  (Exh. 82; 2:109).  Five of the seven minorities passed the examination (71%), compared to 33 out of 36 non-minorities who passed

(92%). (Id.). No minorities scored within the top 24, the highest scoring minority being 25th on the list. (Exh. 75).

**4.    Springfield**

A.  Under-Representation of Minority Police Sergeants

Of Springfield's 40 sergeants, only four (10%) are minorities. (12:94-95). In contrast, minorities comprise approximately one-third (33%) of the patrol officers in Springfield. (Id.). According to census data, meanwhile, about 56% of the general population is minority (34.8% are Hispanic or Latino, and 21.3% are Black or African-American). See Census Data (Springfield, MA) (available at http://factfinder.census.gov).

B.  Examination Data

For the 2003 examination, the adverse impact ratio for the passing-rate was 0.59, and the difference in average test score was 10.4 points, both of which are statistically significant. (Exh. 79). For the 2005 examination, no minorities were promoted out of 18 minority test-takers, while six non-minorities were promoted out of 29 non-minority test-takers, resulting in an adverse impact ratio for promotions of 0. (Exhs. 79A, 85A). The adverse impact ratio for the effective passing rate was also 0. (Exh. 79A). The difference in average test scores was 6.9 points. (Exh. 79A; 2:98, 101). All of these numbers are statistically significant. (Exh. 79A). For the 2007 examination, two minorities were promoted out of 16 test-takers, while six non-minorities were promoted out of 20 test-takers, resulting in an adverse impact in promotions of 0.42*. (Exh. 79A, 85A). The adverse impact ratio for the passing-rate was 0.54, which was statistically significant, and the adverse impact ratio for the effective passing point was 0.42*. (Exh. 79A). The difference in average test scores was 5.7* points. (Exh. 79A). When combined, the results of the 2005 and 2007 examinations show an adverse impact ratio for

promotions of 0.24 and an adverse impact ratio for the passing rate of 0.68, and both of these results are statistically significant.  (Exh. 85A).

The raw data from these examinations further demonstrates the problem.  For the 2003 examination, out of the 28 highest-scoring candidates, only one was minority.  (Exh. 155).  Of the lowest-scoring 26 candidates, 16 were minorities.  (Id.).  Out of the 12 candidates who failed, eight were minorities.  (Id.).  On the 2005 examination, the ten highest-scoring candidates were non-minorities.  (Exh. 74).  Of the 17 candidates who failed the examination, eight were minorities.  (Id.).  On the 2007 examination, ten minorities failed compared to only 6 non-minorities who failed.  (Exhs. 76, 85A).  Although plaintiff Julio Toledo, a Hispanic, was promoted from the 2007 examination, his relatively lower score delayed his promotion until November 2009, one year after five higher-scoring candidates were promoted from the same examination.  (Exhs. 163, 164).

**5.    Methuen**

A.  Under-Representation of Minority Police Sergeants

Methuen has no minority sergeants out of a total of 12, and there is no evidence that Methuen has ever had a minority sergeant.  (Exh. 37).  This contrasts with the minority representation in Methuen's general population, which is over 21%: 20% Hispanic or Latino, and 1.3% Black or Africa-American.  See Census Data (Methuen, MA) (available at http://factfinder.census.gov).

B.  Examination Data

For the 2004 examination, the two minority candidates failed the examination, and therefore could not have been considered for promotion.  (Exh. 156).  The difference in average test scores was 8.5* points.  (Exh. 79).  The results from the 2006 and 2008 examinations are not statistically significant.  (Id.).  The difference in average test scores was 0.2* points on the 2006 examination and 5.9* points on the 2008 examination.  (Exh. 79).   Since only one promotion, a non-minority, has been made from either examination, an adverse impact ratio for promotions cannot be determined.  (2:116).  When combined, all three examinations show an adverse impact ratio for promotions of 0*, an adverse impact in the passing-rate of .91*, and a difference in average test score of 3.8* points.  (Exh. 79).

Based on the 2006 examination results, Methuen would have had to make six sergeant promotions, if it promoted in rank order, to reach a minority.  (Exh. 75).  Considering that Methuen has 12 sergeants total, no minority realistically had the opportunity to be promoted from the 2006 examination.  Based on the 2008 examination results, Methuen would have to make seven promotions, if it promoted in rank order, to reach a minority.  (Exh. 77; 2:116).  Based on a consideration of all of the data he evaluated, Dr. Wiesen opined that the adverse impact will continue if Methuen uses the same type of examination in the future.  (2:115-17).

6.     **MBTA**

A.  Under-Representation of Minority Police Sergeants

In 1996, minorities represented 27.6% of patrol officers in the MBTA police (fifty officers out of 181), but only 7% of all sergeants (one sergeant out of fourteen).  Brackett v. Civil Service Commission, 447 Mass. 233, 245 (2006).  In recognition of this problem, the MBTA in 1996 invoked Personnel Administration Rule ("PAR") 10 to obtain a list of black sergeant

candidates from an existing eligibility list.  Using this list, the MBTA promoted three black officers to sergeant on October 5, 1996, out of seven total sergeant promotions.  Id. at 237.  Notably, had the MBTA promoted in strict rank order from the existing eligibility list, no minority officers would have been promoted to sergeant, and minority sergeant representation would have decreased to 4.8% (one sergeant out of 21).  Id. at 246.  These promotions resulted in a challenge by white officers, which the Supreme Judicial Court rejected, finding that the promotions were a narrowly-tailored means of remedying the "past hiring and promotion practices of the MBTA police department [that] had resulted in discriminatory treatment of minorities."  Id. at 257.

    In 2004, the MBTA again took proactive measures to address its lack of minority sergeants.  On July 15, 2004, based on the eligibility list established from the 2003 sergeant examination, the MBTA made 12 sergeant promotions.  The two minorities who were promoted, Miguel Sosa and Manes Cadet, ranked lower on the eligibility list than several non-minority candidates, but were promoted due to their ability to speak Spanish and Cadet's Haitian national origin.  See Maynard v. MBTA Police Dept., G2-05-12, G2-05-177, ¶¶20-21, Civil Service Commission, attached hereto as Exhibit A.  The Civil Service Commission, after a challenge by one of the bypassed candidates, ruled that the MBTA improperly bypassed the non-minority candidate in favor of the minorities.  Id.  Cadet and Manes would not have been promoted on July 15, 2004 except for this improper bypass.

    Moreover, there is evidence that the MBTA reached these two minorities by substantially deviating from its normal rate of promotions.  The MBTA increased its total number of sergeants from 20 on December 31, 2003 to 32 on December 31, 2004.  (Exh. 149). The number of sergeants has thereafter remained around 32 (id.), demonstrating that the large number of

13

promotions made from the 2003 examination was an exception to the MBTA's normal practice.

The one minority officer appointed following the exams at issue in this case – Darren Keith – was not promoted based on his score from either the 2005 or 2007 examinations. (12:133). Rather, he was promoted based on a bypass appeal that resulted in him being placed at the top of the eligibility list from the 2005 examination. (12:131-32). In other words, Keith's score on the 2005 examination did not get him promoted. (12:132).

   B. Examination Data

In 2005, 48 officers took the examination, 10 of whom were minority; seven non-minorities (18%) were promoted and none of the minorities. (Exh. 83). Only one of the 10 minorities (10%) passed the examination, while 12 of the 38 non-minorities (31.5%) passed. (Id.) This resulted in adverse impact ratio for promotions of 0*, an adverse impact ratio in passing rates of .32*, and an adverse impact ratio for the effective passing rate of 0*. (Exh. 79). The difference in average test scores was 3.3* points. (Id.).

In 2007, 31 officers took the examination, four of whom were minorities; two of the non-minorities were promoted and none of the minorities. (Exh. 83). Two of the four minorities passed the exam, while 14 of the 27 non-minorities passed. (Id.). This resulted in adverse impact in promotions of 0*, an adverse impact ratio in passing rates of 0.96*, and an adverse impact ratio for the effective passing rate of 0*. (Exh. 79). The difference in average test scores was 1.8* points. (Id.).

7.     **Worcester**

    A.  <u>Under-Representation of Minority Police Sergeants</u>

Currently, Worcester has 52 sergeants, only four of whom (7.6%) are minorities.  (Exh.

32).  This reflects a significant under-representation compared to the minority population among

police officers and in the community: 17% of all Worcester police officers are minorities (Exh.

33), and approximately 28% of Worcester's general population are minorities.  <u>See</u> Census Data

(Worcester, MA) (available at http://factfinder.census.gov).

Worcester has a long history of minority under-representation among its police sergeants.

As of 2004, it had only one minority sergeant out of 55.  (Exh. 33; 8:129).  Prior to 2001,

Worcester had never had a minority sergeant.  (8:129; 13:23).  Worcester's history in terms of

minority promotions is described in findings issued by the Massachusetts Commission Against

Discrimination ("MCAD") following an administrative trial.  (Exhs. 64, 65).  Those findings

arose from a complaint brought by Spencer Tatum – a plaintiff in this case – and another

minority officer in Worcester concerning the sergeant examinations.  In its findings, the MCAD

provided the following data from the 1992 and 1994 examinations: in 1992, the highest

minorities ranked 32, 47, and 53 based on their examination scores; in 1994, the highest

minorities ranked 29, 39, 40, 42, and 49.  (Exh. 64 at ¶ 20).  The MCAD condemned Worcester's

history of failing to promote minorities into its sergeant ranks.  <u>Tatum v. Worcester</u>, 2006 WL

662739, *4 (Mass. Comm'n Against Discrim. March 6, 2006).  Specifically, the MCAD noted

Worcester's "problematic record of in promoting minorities *over a significant period of time*,"

and "strongly encouraged" Worcester to take advantage of civil service rules which, at the time,

allowed for special eligibility lists for minority candidates.  <u>Id.</u>  (emphasis added).  The MCAD

also authorized an investigation into the City's promotional practices.  <u>Id.</u>

The MCAD decision was issued on March 6, 2006. Id. On September 21, 2006, six months later, Worcester made its next round of sergeant promotions, in which seven officers were promoted to sergeant, two of whom were minorities, Miguel Lopez (Hispanic) and Anthony Maddox (Black). (Exh. 32). These promotions were based on the results of 2004 sergeant examination. As the data show, the top minorities from the 2004 examination ranked 13th (Hispanic, i.e., Miguel Lopez) and 15th (Black, i.e., Anthony Maddox) based on their scores. (Exh. 156). (As reflected in this exhibit, the other seven minorities who took the examination scored much lower, and were never considered for promotion.) Lopez and Maddox were barely reached for promotion, and only because Worcester made an unusually large number of promotions. There were a total of 14 promotions from the 2004 examination. (Exh. 166). In comparison, Worcester made only seven promotions from the 2006 examination and has made only one promotion from the 2008 examination. (Exhs. 63, 86; 5:125).

B. Examination Data

None of the disparate impact analyses for Worcester are statistically significant. (Exh. 79). Based on the available evidence, Worcester has promoted one minority (Kevin Davenport) to sergeant out of a total of eight promotions from the 2006 and 2008 examinations. (Exh. 86). Worcester's adverse impact ratio for the 2006 examination is higher than 0 only because Davenport happened to score high enough to be ranked fourth and therefore to be reached for promotion. (Exhs. 32, 63). Only one non-minority has been promoted from the 2008 examination, preventing an adverse impact analysis. (5:125). Tatum, the only plaintiff from Worcester, was ranked 13th on the 2006 eligibility list, and therefore did not place high enough to be considered for promotion. (Exh. 63).

## Argument

**1.    Legal Standards**

A.  Rule 52(c) Standard

Under Fed. R. Civ. P. 52(c), a court may enter judgment on partial findings "[i]f a party has been fully heard on an issue during a nonjury trial."  Even where such judgment is theoretically possible, a court "may…decline to render any judgment until the close of evidence."  Id.  When judgment is entered under Rule 52(c), it "must be supported by findings of fact and conclusions of law as required by Rule 52(a)."  Id.

B.  Standard for Proving Prima Facie Case of Disparate Impact

Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, prohibits any employment practice that has "a disparate impact on the basis of race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(k)(1)(A)(i).[5]  Unlike disparate treatment claims, disparate impact claims do not require proof of intent to discriminate.  Bradley v. City of Lynn, 443 F. Supp. 2d 145, 155 (D.Mass. 2006).  The purpose of a disparate impact claim is to "'root[] out 'employment policies that are facially neutral in the treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.'"  Id. at 155, quoting EEOC v. Steamship Clerks Union, Local 1066, 48 F.3d 594, 600-601 (1st Cir. 1995).

There are three steps in a disparate impact claim.  First, the plaintiff has the initial burden of proving that a challenged employment practice has a disparate impact.  Id. at 156, citing 42 U.S.C. § 2000e-2(k)(1)(A)(i).  Second, once a plaintiff has demonstrated disparate impact, the

---

[5]    Plaintiffs also bring, as Count II, a claim under Mass. Gen. Laws, ch. 151B.  Massachusetts does not have a well-developed body of law on disparate impact.  See, e.g., Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34, 38 n.10 (2005) (citing to federal law for description of disparate impact claims).  As a result, the claim under chapter 151B is not separately analyzed here.

employer has the burden of proving that the challenged practice is "job-related and consistent with business necessity."  Id. at 157, quoting Steamship Clerks, 48 F.3d at 601-602.  See also 42 U.S.C. § 2000e-2(k)(1)(A)(i) (requiring employer " to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity"); 42 U.S.C. § 2000e(m) ("The term 'demonstrates' means meets the burdens of production and persuasion.").  Third, even if the employer meets this burden, a plaintiff can still prevail by demonstrating that there is "another selection device without a similar discriminatory effect that would also serve the employer's legitimate interest."  Bradley, 443 F. Supp. 2d at 156.  The Defendants' motions focus on the first of these steps: proof of disparate impact.

To prove disparate impact, a plaintiff's prima facie case consists of three elements: identification of a specific employment practice, the existence of a disparate impact, and a causal connection between the practice and the disparate impact.  Id. at 156 (citation omitted).  Here, the specific employment practice is the Defendants' use of promotional exams that rely almost entirely on written, multiple choice questions.  The disparate impact is that minority applicants fare worse than non-minority applicants on these exams.  In this case, the causal connection is clear, because the scores from these tests are used to determine who is promoted and when.

Courts have recognized that a plaintiff's burden of proving disparate impact should not be placed too high.  For example, "[w]hen widespread minority underemployment is shown to exist in a given occupation, primary selection devices should not be immunized from study by placing unrealistically high threshold burden upon those with least access to relevant data."  Id. at 170, citing Beecher, 504 F.2d at 1020-21.  More generally, a plaintiff need not prove to a scientific degree of certainty that a challenged employment practice caused a disparate impact;

instead, the plaintiff must proffer evidence "which reveals a disparity substantial enough to raise an inference of causation." Id. at 157 (citations and internal quotation marks omitted).

One common benchmark for measuring disparate impact is the "four-fifths rule," which comes from the Equal Employment Opportunity Commission's Uniform Guidelines on Employee Selection Procedures (1978) ("Uniform Guidelines"). 29 C.F.R. § 1607.4(D). The First Circuit has "approved use of the four-fifths rule as a pertinent benchmark in the employment context." Langlois, 207 F.3d at 50, citing Boston Police Superior Officers, 147 F.3d at 21. Under this rule, "[a] selection rate for any race…which is less than four-fifths (4/5) (or eighty percent) of the rate for the group with the highest rate will generally be regarded…as evidence of disparate impact." 29 C.F.R. § 1607.4(D). That a particular employment practice meets the four fifths test – that is, even if a test does not have an adverse impact as measured by the four fifths rule – does not prove a lack of discrimination. As the Uniform Guidelines state, "Smaller differences in selection rate may nonetheless constitute adverse impact, where they are significant in both statistical and practical terms or where a user's actions have discouraged applicants disproportionately on grounds of race, sex, and ethnic origin." 29 C.F.R. § 1607.4(D). See also Isabel v. City of Memphis, 404 F.3d 404, 411-13 (6th Cir. 2005) (finding disparate impact even where test satisfied four fifths rule).

Another method that courts have used to find disparate impact are statistical tests that examine "differences between what is expected and what is observed." Bradley, 443 F. Supp. 2d at 161. Generally, the greater the difference between what is expected to happen (e.g., whites and minorities receiving equal scores) and what actually happens (e.g., minorities receiving lower scores), the smaller the likelihood that the difference happened by chance, leading to a stronger inference that there is some other explanation (e.g., a test with a disparate impact). Id.

Under generally accepted standards, when there is less than a 5% likelihood that a particular outcome occurred by chance, one can make a "statistically significant" inference that the outcome was caused by something other than chance.

There is no "single test" to establish disparate impact. Langlois v. Abington Hous. Authority, 207 F.3d 43, 50 (1st Cir. 2000), citing Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 995-96 n.3 (1988) (plurality). Instead, "courts appear generally to have judged the 'significance' or 'substantiality' of numerical disparities on a case-by-case basis." Watson, 487 U.S. at 995 n.3. Courts have made clear, in fact, that disparate impact can be established though a wide range of evidence. In Beecher, for example, the First Circuit approved the district court's reliance on census figures to find disparate impact. Id. at 1020 & n.4. The First Circuit also relied on evidence that the types of exams in dispute were known to have a disparate impact on minorities. Id. at 1021. See also Dothard v. Rawlinson, 433 U.S. 321, 329-30 (1977) (allowing use of general population data to show disparate impact of height and weight requirement on women); Phillips v. Cohen, 400 F.3d 388, 401 (6th Cir. 2005) (relying on non-statistical evidence, including information about actual hiring and employment practices, to support finding of disparate impact); Banks v. East Baton Rouge Parish School Bd., 320 F.3d 570, 579 (5th Cir. 2003) (courts may rely on "statistical or non-statistical evidence [to establish] a prima facie case of disparate impact") (citation omitted); U.S. v. City of New York, 683 F. Supp. 2d 225, 240-42 (E.D.N.Y. 2010) (supporting finding of disparate impact discrimination based on history of hiring, population data, and comparisons to hiring practices of other large municipal agencies).

Asking whether a plaintiff has established a prima facie case of disparate impact discrimination is different than asking whether an employer will be held liable for such discrimination. The purpose of the prima facie test is merely to determine whether the employer

should shoulder the burden of justifying its use of a challenged business practice.  As the district court "correctly noted" in Beecher:

> Such a finding [i.e., that the plaintiffs have made a prima facie showing of disparate impact] is not determinative of the issue but merely shifts the burden to the defendant to justify the use of the exam.  This is a burden a public employer should not be unwilling to assume.

Beecher, 504 F.2d at 1020 (citation and internal quotation marks omitted).  The First Circuit went on to say that "[d]isproportionate impact or prima facie discrimination are simply labels that aid in singling out qualifications which it is reasonable to ask an employer to justify."  Id. For the reasons discussed below, all of the Defendants in this case should assume the burden of justifying their use of the challenged exams.

**2.      This Court Should Exercise Its Discretion To Await The Close Of The Evidence.**

Under Rule 52(c), this Court may decline to render any judgment until the close of the evidence.  Fed. R. Civ. P. 52(c).  That would be the prudent course in this case.  The Plaintiffs are satisfied that they have offered ample evidence to make a prima facie showing of disparate impact against all of the Defendants, but as is made clear by the parties' voluminous filings, the factual and legal issues relevant to disparate impact are complex.  Rather than attempting to resolve this issue now, while the trial is ongoing, the better course would be to await the close of all evidence and give all parties, and the Court, sufficient time to consider these complex issues. Indeed, although the Plaintiffs have rested, the remaining witnesses include two experts who are expected to provide further evidence on the question of disparate impact.  It would be in the better interests of justice to await a full airing of these issues before rendering any dispositive rulings.

3.      **There Is Sufficient Evidence Of Disparate Impact In This Case Given That
        Minorities Were Shown To Have Fared Significantly Worse On All Of The
        Challenged Examinations.**

The proper focus of a disparate impact analysis is on the question of equal opportunity,

not simply on bottom-line promotion statistics.  Connecticut v. Teal, 457 U.S. 440, 450-51

(1982).  This means that a plaintiff need not establish a bottom-line effect on promotions, and an

employer cannot point to bottom-line statistics as a dispositive defense.  Id. ("The suggestion that

disparate impact should be measured only at the bottom line ignores the fact that Title VII

guarantees these individual respondents the *opportunity* to compete equally with white workers

on the basis of job-related criteria.") (emphasis in original).  See also Beecher, 504 F.2d at 1019,

1021 (plaintiff must demonstrate only that challenged test "is more of a hurdle for minority

members than for others;" and "question is whether the test denied applicants equal protection of

the laws by creating 'built-in headwinds'").  As a result, "individual components of a hiring

process may constitute separate and independent employment practices subject to Title VII *even

if the overall decision-making process does not disparately impact the ultimate employment

decisions*."  Bradley, 443 F. Supp. 2d at 158-59 (citations omitted; emphasis added).  To the

extent the Defendants premise their arguments on a bottom-line defense, therefore, those

arguments must fail.[6]  In terms of disparate impact, the central question in this case is this: did

the exams give minority applicants an equal opportunity for promotion?  The answer is "no."

---

[6]      For example, Worcester incorrectly argues that the "burden on Plaintiff thus is to demonstrate
that the challenged employment practices have a disparate impact *on the rates of minority hiring* within
the employing unit."  (Worcester Motion, p.8) (emphasis added).

A.  <u>High Levels of Disparate Impact Associated With Multiple Choice Tests</u>

In considering whether the multiple choice exams in this case had a disparate impact, it is appropriate to consider evidence about the predicted effects of such exams.  See <u>Beecher</u>, 504 F.2d at 1021 ("What in our view conclusively tips the scale in plaintiffs' favor is the uncontroverted testimony, from experts called by both sides, that black and Spanish surnamed candidates typically perform more poorly on paper-and-pencil tests of this type.").  What happened in Massachusetts, both in the years in question and in earlier years, was entirely consistent with the well-known effects of multiple choice tests.  (2:82-83).  Those effects – i.e., that minority applicants perform worse – have been recognized for decades, as demonstrated by the First Circuit's recognition of this problem as early as 1974, close to 40 years ago.  <u>Id.</u>  The problem continues.  As established through expert testimony at trial, the scholarly literature in the industrial psychology field establishes that written multiple choice tests tend to have high levels of adverse impact on minority candidates.  (2:82-84; 3:43-46, 55, 60; 10:30).  For example, Dr. Wiesen testified that "the summaries of the literature indicate that there are smaller mean differences between minorities and non-minorities on most testing instruments other than a multiple-choice job knowledge or cognitive ability test."  (10:30).  Indeed, based on a literature summary prepared by Dr. Outtz, "the multiple-choice cognizability, or job-knowledge test, has the highest level of adverse impact."  (3:44-46).

Consistent with the body of expert knowledge, the 1991 Validation Report – on which the Defendants rely to prove validity – provides further evidence that the multiple choice tests it spawned were going to produce discriminatory tests.  The report notes that the 1991 exam had an adverse impact ratio of 0.16 at the traditional passing point of 70, which is not only far worse

than the acceptable level of 0.80 but which was worse than the multiple-component exams from

the 1980's against which the 1991 exam was being compared.  (Exh. 40, pp.82, 101).

Multiple choices tests, therefore, have a predictable effect on minority applicants: "in

terms of the impact of [a multiple choice] test on the grades, on the average grades for minorities

and non-minorities, you definitely could predict that the test would adversely affect the

minorities."  (2:84).  Indeed, as Dr. Wiesen emphasized, "[o]ne of the effects of using a written

multiple-choice job-knowledge test is that you're virtually assured of adverse impact."  (3:47).

Not surprisingly, then, continued use of multiple choice tests can be expected to result in

ongoing patterns of disparate impact.  (2:103, 107-108, 110-11, 115, 117).  As another of the

experts, Dr. Fields, stated, "[I]f you do the same thing over and over again, you can't expect a

different result."  (6:80).

B.  Mean Score Differences

In cases involving test scores, courts have long looked to mean score differences to find

disparate impact.  See, e.g., Police Officers for Equal Rights v. City of Columbus, 644 F.Supp.

393, 433 (S.D. Ohio 1985) (relying on difference in mean scores, among other evidence, to find

disparate impact); Walls v. Mississippi State Dept. of Public Welfare, 542 F.Supp. 281, 293

(N.D. Miss.), aff'd in relevant part, 730 F.2d 306 (5th Cir. 1984) (same); Burney v. City of

Pawtucket, 559 F.Supp. 1089, 1096, 1099-1100 (D.R.I. 1983) (same, rejecting "bottom line"

defense).  There is uncontroverted evidence that minority applicants achieved lower mean scores

on the exams than non-minority applicants.  Based on one large dataset – i.e., statewide data,

excluding Boston, for the years 2003 to 2008 – minority applicants scored on average 4.4 points

lower (on an 80 question test) than non-minority applicants.  (Exh. 79).  Indeed, for each of the

exams at issue in this case, minority applicants achieved lower average scores than non-minority

24

applicants. (Exh. 78). Looking at the numbers for Boston, which are smaller than the statewide numbers but still significant given their size, minority applicants had average scores that were 6.4 points lower for the 2005 exam and 6.6 points lower for the 2008 exam. All of these outcomes are highly statistically significant, with odds of less than 1 in 1,000 that they occurred by chance. (2:40, 69; Exh. 78). The inescapable bottom line: minorities do worse on these tests.

The adverse consequences of lower mean scores flow from the way in which exam scores are used. In Massachusetts, government authorities use exam scores to make appointments under the rule of "2N+1." (2:36-37). When an authority has three openings, for example, it is given a list of the seven (2 times 3, plus 1) candidates with the highest exam scores, and it must select from among those seven candidates to fill the openings. (Id.). Even with the limited flexibility provided by the 2N+1 rule, many jurisdictions select candidates in strict rank order. (2:37). As a result, an applicant's exam score bears directly on their opportunities for promotion. An applicant whose exam score is even one point lower than another applicant may result in a lost promotion opportunity. This result is plain to see, and courts previously have recognized it. See, e.g., Bradley, 443 F. Supp. 2d at 168 ("The effect of using examination scores…for rank ordering, is to bunch minorities at the bottom of the eligible list. … Ranking by examination score thus disproportionately has precluded minority candidates from hiring consideration…."); Sanchez v. City of Santa Ana, 928 F.Supp. 1494, 1502 (C.D. Cal. 1995) (noting that while being on an eligibility list made one technically qualified for promotion, "an applicant's placement on the eligibility list clearly determined whether he had a realistic opportunity for promotion").

Even if a minority applicant ultimately receives a promotion, any delays that resulted from a lower exam score would adversely affect the applicant, because the applicant would have a lower seniority status. (2:77-78; 11:40-41). See Bradley, 443 F. Supp. 2d at 168-69 ("Even if

hired in future classes, minorities as a class have been adversely and disparately impacted by loss of pay, benefits, and seniority caused by the delay."); <u>Guinyard v. City of New York</u>, 800 F.Supp. 1083, 1088-89 (E.D.N.Y.1992) (finding that delay in promotions of minority candidates to police captain may constitute adverse and disparate impact).

In addition to the Supreme Court's command to focus on equal opportunity instead of bottom-line promotions, there is another reason to look to mean score differences when evaluating disparate impact: it is the most robust number. The bottom-line effect of lower mean scores will vary depending on how many appointments are made – i.e., as you start making promotions, you'll have high levels of bottom-line differences; as you make more and more appointments, the bottom-line differences will get smaller. (2:77). In other words, "[t]he adverse impact ratio is sensitive to the number of people who are appointed." (11:34-35). Given that the bottom-line impact of an exam will "bounce around with the situation" (depending on how many appointments are made), industrial psychologists prefer to look at mean differences in test scores, which are a more reliable indicator of how different groups performed on the exam. (3:53).

C. <u>Other Statistical Measures</u>

The Plaintiffs also introduced evidence of disparate impact when looking at statewide pass rates and selection rates. (2:71-72, 78-80, 84-87; Exh. 78). Minorities had lower pass rates than non-minorities for every exam at issue in this case:

| EXAM | MINORITY<br>% Pass | NON-MINORITY<br>% Pass |
|---|---|---|
| 2005 Statewide | 31.8 | 50.9 |
| 2006 Statewide | 59.7 | 74.5 |
| 2007 Statewide | 56.8 | 68.4 |
| 2008 Statewide* | 59.0 | 65.7 |
| 2005 Boston | 43.3 | 70.3 |
| 2008 Boston | 63.4 | 87.3 |

(Exh. 78). Similarly, minority applicants were selected in lower proportions than non-minority applicants following every exam. (Exh. 78). Although the selection rate ratios were not statistically significant for some exams, that fact is of less consequence given the surrounding facts that support a finding of disparate impact. (2:80-81, 84-85).

     D. <u>Aggregation</u>

Although the Defendants challenge the appropriateness of looking at statewide data, aggregation is supported both by social science and by legal authority. First, Dr. Wiesen ably explained the basis for using statewide data. He opined that it is appropriate to conduct an aggregated analysis, because "if you are trying to find out if the examination adversely affects minorities, the best approach would be to use all the data from all of the applicants that took the examination." (2:45). More specifically, Dr. Wiesen testified that "the best approach to the aggregation is statewide within any one year." (2-48). As Dr. Wiesen further explained:

> The test that was given in the various municipalities was the same test. So if we want to find out what the impact of that test is, the best way to do that is to get as much data as we can about that test, and that would be to look at the data from every person that took the test. And by looking at the data from every person that took the test, we would have the most reasonable set of data to evaluate the adverse impact, if any, of that statewide test. (2:88).

From a social science perspective, the reason to look at as much data as possible is that "[t]he statistical analyses are more authoritative and more powerful if you have more data." (5:85). His opinion about the appropriateness of aggregation is supported by accepted practice among industrial psychologists. (2:43-44, 121).

Second, there is ample legal authority to support the use of aggregated statistics. Courts have recognized the fundamental principle that large sample sizes are preferable: "[l]arger sample sizes create a greater likelihood that random differences between individuals will even

out among all groups, and a lower likelihood that significant differences between the

performance of racial or ethnic groups will have resulted from chance."  One way to achieve

large sample sizes, of course, is through aggregation.  The Uniform Guidelines specifically

approve of this practice:

> Where the user's evidence concerning the impact of a selection procedure indicates
> adverse impact but is based upon numbers which are too small to be reliable, evidence
> concerning the impact of the procedure over a longer period of time and/or evidence
> concerning the impact which the selection procedure had when used in the same manner
> in similar circumstances elsewhere may be considered in determining adverse impact.

29 C.F.R. § 1607.4(D).  See also Adoption of Questions and Answers To Clarify and Provide a

Common Interpretation of the Uniform Guidelines on Employee Selection Procedures, 44 Fed.

Reg. 11996, 11999-12000 (1979) (Q21: "if a lower selection rate continued over a period of

time, so as to constitute a pattern, then the lower selection rate would constitute adverse impact;"

Q27: "[i]f the test is administered and used in the same fashion for a variety of jobs, the impact

of that test can be assessed in the aggregate.").

Courts repeatedly have embraced aggregation as a reasonable way to examine disparate

impact.  See, e.g., Bradley, 443 F. Supp. 2d at 167 (finding aggregation reasonable), citing

Vulcan Pioneers, Inc. v. N.J. Dep't of Civil Serv., 625 F. Supp. 527, 534-35, 544-45 (D.N.J.

1985) (finding aggregation across municipalities and across years appropriate where State

administered firefighter promotion exam and exams were extremely similar across years).  See

also Paige v. California, 291 F.3d 1141, 1148 (9th Cir. 2002) (concluding that "it is a generally

accepted principle that aggregated statistical data may be used where it is more probative than

subdivided data"); Eldredge v. Carpenters 46 N. California Counties Joint Apprenticeship and

Training Comm., 833 F.2d 1334, 1339 (9th Cir. 1987) ("Aggregated data presents a more

complete and reliable picture."); Lilly v. Harris-Teeter Supermarket, 720 F.2d 326, 336 n.17 (4th

Cir. 1983) ("[B]y significantly increasing the absolute numbers in the data, chance will more readily be excluded as a cause of any disparities found."); Capaci v. Katz & Besthoff, 711 F.2d 647, 654 (5th Cir. 1983) (permitting aggregation in order to accomplish meaningful statistical analysis); United States v. City of Yonkers, 609 F. Supp. 1281, 1289 (S.D.N.Y. 1984) (finding prima facie case under Title VII with aggregated data); NAACP v. City of Corinth, 83 F.R.D. 46, 61 (N.D. Miss. 1979) (finding that aggregated data across four years showed "a strong indication that the city's selection process operated to the detriment of black applicants"); Jones v. New York Human Resources Dep't, 391 F. Supp. 1064, 1074 (S.D.N.Y. 1975) (aggregating results of five exams to find that whites passed at a rate of three times the rate of minorities); League of United Latin American Citizens v. City of Santa Ana, 410 F. Supp. 873, 903 (C.D. Cal. 1976) (aggregating data across two exams in disparate impact case over defendant's objection that sample size was too small).

Aggregation has not been allowed where the individual tests or employment procedures at issue were too different.  See, e.g., Bradley, 443 F.3d at 167, citing Fudge v. City of Providence Fire Dep't, 766 F.2d 650, 656-57 (1st Cir. 1985) (aggregation across jurisdictions was inappropriate where examinations were too different).  But that problem does not exist in this case.  Indeed, in terms of statewide aggregation for each exam, all applicants took the exact same test, so there were no differences.  In terms of aggregation across years, each year's exam was substantially similar in content and identical in structure.

In terms of average scores and pass/fail rates, there is no rational argument against aggregation across jurisdictions.  Those measures bear no relation to differences between individual municipalities, so there is no reason to avoid aggregation.  If 1,000 applicants from around Massachusetts took the same written exam at the same time, it is plainly reasonable to

compare how the scores of the minority test-takers compared to the scores of the non-minority test-takers, regardless of where each test-taker worked as a police officer. Indeed, the most reliable way to evaluate whether each exam had a disparate impact on minorities in terms of average scores and pass/fail rates is to look at the largest possible group of test takers.

In terms of bottom-line promotions, the argument against aggregation is that each jurisdiction should be liable for its own actions, not the actions of other jurisdictions. But that argument misses the point. The focus in this case is on whether the *exam* provided a level playing field for minority applicants. One way – although it is neither the only way nor a required way – to answer that question is to look at how the exam impacted minorities across the state. If the exam resulted in disproportionately fewer minorities receiving promotions across the state, that fact serves as yet another piece of evidence that the exam was unfair to minorities. Once each of the Defendants decided to use that unfair exam, they put their minority applicants at a disadvantage, and they cannot seek to avoid the legal consequences of that decision by pointing to their own bottom-line promotions. That is precisely the type of argument rejected by the Supreme Court in <u>Teal</u>, <u>supra</u>.

The Defendants also attack aggregation by arguing that it fails to address causation. For example, Worcester argues that "Plaintiffs' proof based on state-wide adverse impact statistics lacks any connection to the challenged employment practices, because it can hardly be argued that Worcester's use of these examinations could have caused a state-wide problem." (Worcester Motion, p.9). This argument misconstrues what causation means in this case. The Plaintiffs are not arguing that any of the Defendants *caused* the test to be unfair to minority applicants. Instead, as discussed above, the Plaintiffs' argument proceeds in multiple parts: the Defendants opted to use certain tests; minorities faced a "built-in headwind" when taking those tests (i.e.,

they received lower scores relative to their non-minority peers); and because relative test scores affected promotional opportunities, minority applicants suffered a disadvantage as a result of the unfair tests.  The causal element of the prima facie case is satisfied by the last part of this argument.

      E.  <u>Small Numbers Do Not Provide A Defense In This Case</u>

With statistics, size matters.  As Dr. Wiesen said, "The statistical analyses are more authoritative and more powerful if you have more data." (5:85).  In this case, the picture of adverse impact becomes most clear when looking at the biggest groups of data, including statewide statistics or statistics that are aggregated over time.  Similarly, because Boston has the biggest numbers, it provides a picture of disparate impact that is so clear it is not even being contested.  Based on the evidence in this case, it is reasonable to conclude that as the numbers became larger in any Massachusetts jurisdiction that uses written multiple choice tests, the picture of disparate impact would become equally clear.

As one would expect, the smaller Defendants have numbers that do not allow for a picture that is equally clear.  The Defendants seek to take advantage of that situation in mutually-inconsistent ways.  Some Defendants, such as Methuen, argue that the numbers are too small in their jurisdictions to permit a finding of disparate impact.  Other Defendants, such as Worcester, seek to rely on the unpredictability that results from small numbers to argue that the statistics prove a lack of disparate impact.  Neither argument has merit.

If a plaintiff never could establish disparate impact without a statistically-significant outcome at the jurisdiction level, the effect would be to insulate some employers from liability, even in the face of other evidence suggesting a disparate impact.  Some employers will never have a large enough data pool to allow for a statistically-significant test.  If there were a

complete absence of any other evidence to support a showing of disparate impact, then that

small-number problem may be more troublesome.  But where, as in this case, there is other

evidence pointing to a test that is structurally unfair to minority applicants, that other evidence

should be sufficient to put the burden on the employer to justify its use of the challenged process.

Courts repeatedly have recognized that employers should not be able to find cover behind

statistical obstacles or formalities.  As stated by the Supreme Court, the "'fine tuning of the

statistics could not have obscured the glaring absence of minority'" hires.  Bradley, 443 F. Supp.

2d at 166, quoting Int'l Brotherhood of Teamsters v. United States, 431 U.S. 324, 342 n.23

(1977).  See also Bunch v. Bullard, 795 F.2d 384, 395 (5th Cir. 1986) (Title VII does not "permit

an employer to escape liability for discriminatory tactics merely because his work force is not

vast enough to provide meaningful data for a sophisticated statistical evaluation.")  The Uniform

Guidelines contemplate this problem and identify a solution: aggregation.  29 C.F.R. §

1607.4(D).

The Defendants' attempt to hide behind small numbers also ignores how their long-time

reliance on an unfair testing process may lead to smaller numbers.  The striking lack of minority

sergeants in jurisdictions across the Commonwealth is a fact that cannot be lost on minority

police officers.  Faced with a decision about whether to spend hours per day, for months on end,

to study for a test that is biased against them, it is not unreasonable to expect that some minority

officers would chose not to take the exam.  Those decisions would lead to smaller sample sizes

and, potentially, to an underestimate of the size of the disparate impact, because "only especially

motivated and competent minority members [would take] the test."  Beecher, 504 F.2d at 1021

n.6.  The First Circuit recognized that these possibilities create another reason for not giving

employers cover based on a myopic focus on small sample sizes.  Id.

Given that some of the Defendants strenuously point to the unreliability of small numbers, it is ironic that other Defendants seek to rely on small numbers when those numbers happen to go their way. The very nature of statistics is that small numbers may lead to unexpected results. In Worcester, for example, if one were to ignore all of the evidence introduced during this trial, as well as the evidence described in court decisions stretching back decades and arising from jurisdictions around the country, demonstrating that written multiple choice tests are biased against minorities, one might take comfort in statistics that seem to suggest there is no problem. If the nine minorities who took the exam in Worcester in 2008 achieved a higher average score than non-minorities on an exam (Exhs. 79, 86), how can that exam be biased against them? Those statistics, however, do not provide a defense. In the absence of other corroborating evidence, it would be inappropriate to draw any conclusions from them, because the probability that those numbers occurred by chance is simply too great. In contrast to the multiple pieces of evidence demonstrating that written multiple choice tests are unfair to minority applicants, there is not one piece of reliable evidence that these tests allow minorities to perform on a level playing field.

**4.    The Defendants' Knowledge And Intent Is Irrelevant.**

It is well established that an employer's knowledge and intent is irrelevant in a disparate impact case. Beecher, 504 F.2d at 1021. The question is whether a challenged test denied applicants equal opportunities "by creating 'built-in headwinds'" for minority applicants. Id. "If it did, the inequality may be remedied without regard to office malice, specific intent, or actionable neglect." Id. As a result, all of the Defendants arguments about what they knew or intended are misplaced. (See Lawrence Motion, p.11; Methuen Motion, p.13; MBTA Motion, pp.4-5, 9, 15; Lowell Motion, pp.1, 7-8, 12).

5.      **The Massachusetts Civil Service Law Does Not Provide A Defense.**

The Defendants once more raise the argument that they cannot be liable for discrimination because they were merely following the requirements of Mass. Gen. Laws, ch. 31. (See Lawrence Motion, pp.10-11; Methuen Motion, pp.12-13; MBTA Motion, pp.9-18; Lowell Motion, pp.9-15; Springfield Motion, pp.1-2; Worcester Motion, pp.13-14 ). This issue has been briefed repeatedly, so the Plaintiffs will rely on their prior submissions.

6.      **The Supreme Court's *Ricci* Decision Has No Bearing On This Case.**

Two of the Defendants argue that they cannot be held liable based on the Supreme Court's decision in Ricci v. DeStefano, ___ U.S. ___, 129 S.Ct. 2658 (2009). (See MBTA Motion, pp.18-19; Lowell Motion, pp.15-16). Specifically, they argue that they could not lawfully have discarded the results of the challenged examinations. (Id.). This argument disregards the holding of Ricci and the point of this case.

Ricci considered whether a government employer that engaged in race-conscious hiring could defend against a claim of disparate treatment discrimination by establishing that its actions were necessary to overcome a discriminatory testing process. The Court held that this defense is available, but only when "the employer can demonstrate a strong basis in evidence that, had it not taken the action, it would have been liable under the disparate-impact statute." Id. at 2664. Here, the Plaintiffs are seeking to establish that the Defendants *are* liable under a disparate impact theory. If the Plaintiffs succeed, then Ricci provides no defense. If they do not succeed, then Ricci is of no consequence. As a result, Ricci does not help the Defendants. See U.S. v. Vulcan Society, Inc., 637 F. Supp. 2d 77, 83 (E.D.N.Y. 2009) (in disparate impact case, noting that Ricci does not provide a defense).

7.    **The Plaintiffs State Court Action Against The Commonwealth Of Massachusetts Does Not Warrant Dismissal Of Any Claims Against The Defendants.**

The Defendants suggest that the Plaintiffs have an alternate remedy in the form of a lawsuit against the Commonwealth of Massachusetts.  (See MBTA Motion, pp.19-20; Lowell Motion, pp.16-17).  The Plaintiffs' case against the Commonwealth, which is brought exclusively under Massachusetts law, is in its early stages, and there have been no findings or rulings.  The Commonwealth has filed a motion to dismiss on the grounds that it is not an employer under Mass. Gen. Laws, ch. 151B, and that motion is pending.  This Defendants' point in raising the pendency of this lawsuit is unsupported by any argument or legal authority demonstrating why this fact has any bearing on this case.  The reason for that omission is simply stated: the Plaintiff's other lawsuit provides no basis for any findings or rulings under Fed. R. Civ. P. 52(c).

**Conclusion**

For the foregoing reasons, together with the reasons set forth in the supplemental oppositions filed with this opposition, the Defendants' motions should be denied.

Respectfully Submitted,
PEDRO LOPEZ, et al., Plaintiffs,
By their attorneys,


/s/ Stephen S. Churchill
Harold L. Lichten, BBO #549689
Shannon Liss-Riordan, BBO# 640716
Stephen S. Churchill, BBO#564158
Joseph L. Sulman, BBO #663635
LICHTEN & LISS-RIORDAN, P.C.
100 Cambridge Street, 20th Floor
Boston, MA 02114
Date: August 30, 2010                              (617) 994-5800

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 30, 2010, a copy of this document was served by electronic filing on all counsel of record.

 /s/ Stephen S. Churchill
Stephen S. Churchill