COMMONWEALTH OF MASSACHUSETTS

| | |
|---|---|
| SUFFOLK, SS | CIVIL SERVICE COMMISSION<br>One Ashburton Place<br>Room 503<br>Boston, MA 02108 |
| CHRISTOPHER MAYNARD,<br>    Appellant | |
| | Docket Number G2-05-12<br>Docket Number G2-05-177 |
| MBTA POLICE DEPARTMENT,<br>    Appointing Authority | |
| Appellant's Attorney | Alfred Gordon, Esq.<br>Pyle, Rome, Lichten,<br>Ehrenberg & Liss Riordan, P.C.<br>18 Tremont Street, suite 500<br>Boston, MA 02108 |
| Respondent's Attorney | Patricia M. Lucek, Esq<br>Massachusetts Bay<br>Transportation Authority<br>Ten Park Plaza<br>Boston, MA 02116-3974 |
| Commissioner | John E. Taylor |

## DECISION

Pursuant to the provisions of G.L. c. 31, s. 2(b), the Appellant, Christopher Maynard (hereinafter "Appellant"), is appealing two (2) decisions of the Appointing Authority, Massachusetts Bay Transportation Authority Police Department (hereinafter "MBTA"). The first (Docket No. G2-05-12) was the decision of the MBTA to bypass Appellant for a promotion of one (1) of twelve (12) Sergeant positions. The second (Docket No. G2-05-177) was the decision of the MBTA to bypass Appellant for a promotion of one (1) of seven (7) Sergeant positions. For the purpose of judicial economy, these appeals were consolidated and a full hearing was held on November 16,

2005 at the offices of the Civil Service Commission. Two (2) tapes were made of the hearing. Both parties submitted post-hearing briefs. Nineteen (19) exhibits were stipulated to by the parties and entered into the record.

**FINDINGS OF FACT:**

Based on the documents entered into evidence as Joint Exhibits 1 through 19, and the testimony of Appellant, Christopher Maynard; Ann McCall – Lieutenant, MBTA Police Department; Gary Fredericks – Lieutenant, MBTA Police Department; John Martino – Deputy Chief, MBTA Police Department; and Robert Lenehan – Lieutenant, MBTA Police Department, I find the following:

1. The MBTA is the appointing authority for the MBTA Police Department.
2. Appellant was appointed an MBTA Transit Police Officer on November 30, 1998. (Appellant Testimony)
3. Appellant came to the MBTA with four years of U.S. Army experience, during which he had approximately a year-and-a-half of supervisory experience, supervising up to six (6) people. (Id.)
4. When Appellant joined the Department, he chose to work on what the MBTA calls the "last half" shift — 11:30 p.m. to 7:30 a.m. A primary reason Appellant chose the last half shift was to accommodate his family life — i.e., to balance his work schedule with childcare responsibilities and to enjoy a home life where he could actually eat dinner with his family. Another part of the reason Appellant chose the late shift was to enable him to pursue his education. (Id.)
5. Because of the hours of operation of the MBTA, with decreased ridership in the evenings and no overnight service, the MBTA staffs the last half shift with a much smaller force than during the day and evening. (Martino Testimony)
6. Because the last half shift has less activity, the MBTA assigns only one lieutenant to the shift, and during the time period in question, the lieutenant permanently

assigned to the shift infrequently worked the shift himself, so it was covered on an overtime basis by several other lieutenants.  (Id.)

7. In addition, because there is much less MBTA service during these hours, officers have less opportunity to interact with the MBTA's actual ridership (as opposed to those non-riders hanging about the MBTA's property during off-hours) and thus have less of an opportunity to assist the public or to generally to get noticed.  (McCall Testimony, Martino Testimony)

8. Though his shift precluded him from having greater interaction with the traveling public, Appellant made a concerted effort to increase his interactions with the rest of the MBTA staff.  To accomplish this goal, Appellant volunteered to coordinate the Department's Wellness Committee/ Fitness Program and he was selected for this position upon the recommendation of Lieutenant Salisbury. (Appellant Testimony)

9. With little or no direction from his superiors, Appellant researched the pertinent physical fitness standards, wrote up those standards for use by the MBTA and administered the tests and scored the participants.  While he was paid for his time working on this project, Appellant received no additional or special compensation for this volunteer position.  (Maynard Testimony)

10. Toward the end of 2003, Appellant chose to sit for the promotional examination to be considered for a promotion to MBTA Police Sergeant.  Even though he knew a promotion would likely mean a schedule change away from the last half shift (which provided him so much flexibility in his family and academic life), Appellant chose to seek a promotion because he was dedicated to advancing his career, thought he would be a successful sergeant for the MBTA and because he was excited about the possibility of a new challenge.  (Id.)

**The June 2004 Promotion (Docket No. G2-05-12)**

11. In June 2004, the MBTA sought a certified list of promotional candidates from the Massachusetts Department of Human Resources, (hereinafter "HRD") seeking to promote ten (10) Transit Police Officers to the rank of Sergeant.  Ultimately, twelve (12) Transit Police Officers were promoted to the rank of Sergeant. (Exhibit 1)

12. On or about June 3, 2004, the MBTA received Certified List #240566 from the HRD. The Certification contained the names of twenty three (23) MBTA Transit Police Officers. (Exhibit 1)

13. Appellant, with a score of 85 on the relevant Civil Service Examination, was ranked in the sixth position on the certification[1]. (Exhibit 1)

14. On or about June 10, 2004, the HRD amended Certified List #240566 by adding an additional twenty-one (21) candidates, each of whom was ranked below Appellant. (Exhibit 1)

15. On June 16 and 17, 2004, the MBTA Police Department's three deputy chiefs – John Martino, Dolores Ford-Murphy, and Thomas McCarthy – conducted interviews of all the candidates. (Martino Testimony, Exhibits 3, 4 and 5)

16. The interviews were all conducted using the same list of questions and a major focus was given to the new Transit Police Service Area (TPSA) Plan of Action. Deputy Chief Martino indicated during his testimony that Appellant gave "thoughtful responses" and demonstrated a good understanding of the TPSA Plan of Action. In addition, the three deputy chiefs' written notes on Appellant's interview sheets indicate that he answered all the questions fully, including the last question about the obstacles that could prevent the Plan of Action from being successful. (Martino Testimony, Exhibits 3, 4 and 5)

17. At some point after the interview, Deputy Chief Martino told Appellant that he had a "very good interview," and at no time did anyone say anything critical to Appellant about how the interview went. (Appellant Testimony)

18. In addition to conducting the interviews, the deputy chiefs reviewed certain other factors such as the candidates' use of sick leave, commendations and discipline, and driving history, and the deputy chiefs then ranked the candidates for promotion. (Martino Testimony; Exhibits 6 and 7)

19. Thereafter, on or about July 1, 2004, the Department selected twelve (12) candidates for promotion to Sergeant. Of the twelve (12) candidates selected, seven (7) appeared below Appellant on the certification list below (Exhibit 2)[2]

---

[1] It is noted that one candidate ranked ahead of Appellant (Lewis Best) was ineligible, as he had been previously promoted to Sergeant. As a result, Appellant ranked sixth on the certification.

4

20. By submission dated July 1, 2004, the MBTA submitted its promotion list and "reason for bypass" letter to HRD, wherein it explained the reasons for selecting the seven lower-ranked candidates ahead of Officer Maynard. The MBTA noted as one reason for bypass that both Kenneth Sprague and Manes Cadet (two lower ranked candidates promoted ahead of Appellant) used no sick days over a period of two or three years; however, there was no information presented as to the sick-time usage of the other promoted candidates or of Appellant. (Id.)

21. In addition, the MBTA relied on the fact that Miguel Sosa and Manes Cadet (two lower ranked candidates promoted ahead of Appellant) were both bilingual as reasons for the bypasses. However, the MBTA presented no evidence that speaking another language was a requirement of the Sergeant position. Nor did the MBTA seek any selective certification for Spanish or Haitian-Creole speaking candidates when it requested the certification from HRD. (Id.)

22. Additionally, in promoting Manes Cadet ahead of Appellant, the MBTA specifically noted Officer Cadet's national origin (Haitian) as a factor in its promotion decision without resort to, or reliance on, any approved affirmative action plan. (Id.)

23. The MBTA's submission to HRD states, in pertinent part

> The MBTA has a high Haitian constituency. Officer Cadet will be a valuable resource as the Police Department partners with the Haitian community. ***As a Haitian Police Supervisor***, he can serve a dual role as a liaison to the community and a role model to Haitian youth. (emphasis added)

This language makes clear that the MBTA based its hiring decision not merely on Officer Cadet's ability to speak Haitian Creole or his knowledge of the Haitian community, but rather on Officer Cadet's national origin as a Haitian. (Exhibit 2)

24. In an attempt to buttress its bypass decisions, the MBTA also indicated in the July 1, 2004 HRD submission its alleged reasons for bypassing Appellant – i.e., the critical nature of his interview responses. (Exhibit 2)

---

[2] Two other candidates were also bypassed, but Officer Maynard was the highest ranked among the three bypassed candidates.

25. However, this narrative is at odds with the contemporaneous interview notes of the deputy chiefs, which indicate the ways in which Appellant explained how he would be a positive leader. [Exhibit 3 ("support plan by example"; "maintain good attitude"); Exhibit 4 ("keep the right attitude"; "positive feedback"); Exhibit 5 ("lead by example"; "address problems without it becoming adversarial").]

26. The MBTA's July 1, 2004 submission is also belied by the nature of the questions asked in the interview, such as the final question about the obstacles preventing the implementation of the TSPA plan. (Exhibit 3)

27. Such a question, by its very nature, requires a critical response, and this was the only example of a negative response the Department offered in evidence at the hearing. (Martino Testimony)

28. Thereafter, Appellant timely filed an appeal.

### The May 2005 Promotion (Docket No. G2-05-177)

29. In March 2005, the MBTA sought a certified list of promotional candidates from the HRD seeking to promote five (5) Transit Police Officers to the rank of Sergeant. Ultimately, seven (7) Transit Police Officers were promoted to the rank of Sergeant. (Exhibit 8)

30. On or about March 30, 2005 the MBTA received Certified List #250275 from the HRD. The Certification contained the names of twenty three (23) MBAT Transit Police Officers. (Exhibit 8)

31. Appellant, with a score of 85 on the relevant Civil Service Examination, was ranked in the first position on the certification. (Exhibit 8)

32. Although Appellant appeared as the first eligible candidate in rank order on the list,[3] two other candidates ultimately appeared ahead of him due to Civil Service Commission rulings in their favor. (Exhibits 9 and 10)

33. Purportedly based on advice received from the Civil Service Commission (although it was entirely unclear from whom this advice came and when), the

---

[3] Again, Officer Lewis Best appears alphabetically before Officer Maynard on the list, but Officer Best had previously been promoted and thus was not eligible for this promotion. [Jt. Ex. 8.]

6

MBTA undertook a completely different selection approach for this new round of promotions.[4]  (Martino Testimony)

34. There were two components to this promotion round: (1) a mandatory ranking of all the candidates by <u>all</u> of the lieutenants; and (2) interviews conducted by three lieutenants (as had been conducted by the deputy chiefs in the previous promotional round.)  The candidate ranking comprised seventy five percent (75%) of the candidates' scores, with the interview comprising only twenty-five percent (25%) of the scores.  (<u>Id</u>.)

35.  As to the first factor – the mandatory rankings by all lieutenants – Deputy Chief Ford-Murphy sent a message to all lieutenants on March 31, 2005, directing each lieutenant to rank all of the sergeant candidates in the order in which the lieutenants would recommend them for promotion.[5]  (Exhibit 12)

*36.* Deputy Chief Ford-Murphy explained that each lieutenant could refrain from ranking a candidate "of whom you have little direct knowledge or contact" and instructed the lieutenants to provide narratives justifying their rankings or their reasons for not ranking each candidate.  (<u>Id</u>.)

*37.* As a general matter, a number of the lieutenants had concerns about this type of selection process when it was unveiled several months earlier for the promotions to lieutenant.  (Fredericks Testimony)

38. A number of the superior officers complained to their union president, Lieutenant Gary Fredericks, that the process was too subjective.  In this regard, Lieutenant Fredericks testified that it was quite difficult to rank someone as number three or number four when the candidates were equally qualified.  Lieutenant Fredericks presented the concerns of his membership to Deputy Chief Ford-Murphy, but the MBTA continued with the process both for the lieutenants' promotion and for the sergeants' promotion that is the subject of this case.  (Fredericks Testimony)

---

[4] Deputy Chief Martino testified that he thought this advice came to Deputy Chief Ford-Murphy during the bypass appeal hearing of Officer Michael Tuohey, but he was unable to offer any other specifics about who suggested these changes or why.

[5] Though authored by Deputy Chief Ford-Murphy, the email actually came from the address of Patricia Gulino, who is Deputy Chief Ford-Murphy's secretary.

7

39. As to the sergeant promotion process itself, while most of the lieutenants followed Deputy Chief Ford-Murphy's instructions, several lieutenants failed to heed her directions and ranked all of the candidates even if they had little direct experience with them. (Exhibit 18)

40. For example, Lieutenant Fredericks ranked Appellant 13th out of 15 candidates, even though he admitted in his testimony and in an email to Deputy Chief Ford-Murphy that he had very little interaction with Appellant.[6] (Fredericks Testimony, Exhibit 19)

41. Similarly, Lieutenant Mark Gillespie ranked Appellant 14th out of 15 candidates even though the two men had very little interaction. Notably, Appellant testified that he had an equal amount of interaction with Lieutenant Gillespie as he did with Lieutenant Robert Lenehan, who chose not to rank Officer Maynard due to this lack of interaction. (Appellant Testimony; Exhibits 18, 19)

42. Further, Lieutenant Gillespie's ranking of Appellant cannot be reconciled or explained in any way because Lieutenant Gillespie failed to provide the required narrative justifying his rankings.

43. In addition to the lieutenants' general rankings, three of the lieutenants conducted interviews of all the candidates in early April 2005. (Lenehan Testimony, Martino Testimony)

44. After the interviews, each of the three lieutenants ranked each candidate in order based on the results of the interview.[7] (Exhibit 18)

45. The end result of this process was a poorly conceived numerical computation. As noted above, the lieutenants ranked the candidates in order from one (1) to fifteen

---

[6] Notably, in his rankings, Lieutenant Fredericks used identical narratives for his three lowest candidates (including Appellant), each of whom he "did not have much interaction with". (Exhibit 19)

[7] At hearing, the MBTA called interviewer Lieutenant Robert Lenehan to testify in support of his rankings from his interview with Appellant. However, Lt. Lenehan admitted that he recalled no specifics from the interview. Further, his testimony was at odds with the contemporaneous notes of the other two interviewers. For example, Lt. Lenehan testified that Appellant was not in full uniform, yet Lt. Salisbury's notes indicate that Appellant was in full uniform with the new Transit patch. (Exhibit 13). In addition, Lt. Lenehan testified that Appellant said he would refuse to enforce an unpopular order from his superiors. Conversely, both of the other interviewers' notes indicate that Appellant stated following orders was the most important obligation of a sergeant to his superiors and that he would discipline a subordinate if need be to ensure that the objective was met. (Exhibits 13 and 14)

(15), and these rankings were added up, averaged out, and then multiplied by three (3) to give them three-fourths of the total weight (when added to the exam rankings).

46. However, the numbers resulting from this computation are essentially meaningless as they are average *ranks*, not average *scores*. The lieutenants were not instructed to *score* the candidates on any scale (such as a scale of 1 to 10, or 1 to 100), but rather were instructed to *rank* the candidates in order. Therefore, there was no way to indicate candidates who were equally qualified for promotion or to indicate minor differences in qualification. In this regard, there could have been only a small difference between the best and worst candidate, yet the worst candidate ended up with a score that was 15 times higher (worse) than the best candidate.

47. The same problem occurred with the scoring of the interviews. Instead of giving each candidate a scaled score (such as 1 to 10, or 1 to 100), the three interviewers ranked each candidate from 1 to 15, and those ranks were improperly used as scores comprising one-fourth of the total score for each candidate. Again, these "scores" do not actually grade the candidates against a set scale; rather, they are merely rankings with meaningless numerical value. (Exhibit 18)

48. The inherent flaws with the ranking system employed by the MBTA were further complicated by the failure of certain lieutenants to refrain from ranking candidates they had little or no experience with. As discussed supra, both Lieutenant Fredericks and Lieutenant Gillespie had very few dealings with Appellant, yet they chose to rank him anyway and put him at the bottom of their rankings (likely due to their lack of knowledge of his work). (McCall Testimony, Exhibit 18)

49. However, had these two lieutenants refrained from ranking Appellant, his average ranking[8] would have jumped from a very low 8 to a much better 5.8.[9] Then when weighted together with his interview rankings, Officer Maynard would have had a

---

[8] Assuming *arguendo*, that that the ranking system was not already tragically flawed.
[9] Removing Gillespie's and Fredericks's rankings would have given Maynard a **raw score** of **29** [3 + 3 + 3 + 12 + 8] and a resulting **average rank** of **5.8** [raw score (29) ÷ total number of rankings (5)].

combined score of 26.73, making him the sixth highest candidate and thus would have been one of the seven that were ultimately selected.[10]

50. On or about May 16, 2005, the Department sent HRD its list of seven (7) selected promotional candidates and "reasons for bypass" letter. Based specifically on the rankings, calculated and weighted as herein described, the MBTA again bypassed Appellant, in favor of five (5) candidates who scored lower on the promotional examination.

51. Thereafter, Appellant timely filed an appeal.

52. At hearing, Deputy Chief Martino credibly testified as to the screening process (flawed as it was) employed by the MBTA and conducted of all candidates, including Appellant.

53. Lieutenant Lenehan credibly testified that he did not recall many specifics about Appellant's interview. Indeed, his admitted inability to recall details was clearly established on cross-examination, when Lieutenant Lenehan's memory of Appellant's interview proved to be at odds with the contemporaneous, written notes of his fellow lieutenant interviewers.

54. Appellant credibly testified in a forthright manner as to his background and the varying amounts of interaction he had with many of his superior officers.

55. Lieutenant Ann McCall credibly testified as to Appellant's qualifications, based on her experience as his direct supervisor.

56. Lieutenant Fredericks credibly testified as to his concerns about the selection process employed by the MBTA, particularly the high level of subjectivity. Lieutenant Fredericks also credibly testified regarding the difficulty inherent in ranking the equally qualified candidates

**CONCLUSION**

In the context of reviewing a bypass decision by an Appointing Authority, the role of the Civil Service Commission is to determine "whether the appointing authority has

---

[10] Maynard's average rank times the multiplier [5.8 x 3 = **17.4**], plus his average interview rank [**9.33**] equals a total score of **26.73**.

sustained its burden of proving that there was reasonable justification for the action taken by the appointing authority." City of Cambridge v. Civil Service Commission, 43 Mass. App. Ct. 300, 304 (1997).  Town of Watertown v. Arria, 16 Mass. App. Ct. 331 (1983). McIsaac v. Civil Service Commission, 38 Mass. App. Ct. 473, 477 (1995).  Police Department of Boston v. Collins, 48 Mass. App. Ct. 411 (2000).  City of Leominster v. Stratton, 58 Mass. App. Ct. 726, 728 (2003).  An action is "justified" when it is "done upon adequate reasons sufficiently supported by credible evidence, when weighed by an unprejudiced mind; guided by common sense and by correct rules of law."  City of Cambridge at 304, quoting Selectmen of Wakefield v. Judge of First Dist. Ct. of E. Middlesex, 262 Mass. 477, 482 (1928). Commissioners of Civil Service v. Municipal Ct. of the City of Boston, 359 Mass. 211, 214 (1971).

Basic merit principles, as defined in G. L. c. 31, §1, require that applicants be selected and advanced on the basis of their relative ability, knowledge and skills, assured fair and equal treatment in all aspects of personnel administration without regard to political affiliation, race, color, age, national origin, sex, marital status, handicap, or religion, and that they be protected from arbitrary and capricious action. Tallman v. City of Holyoke, et al., G-2134, and compare Flynn v. Civil Service Commission, 15 Mass. App. Ct. 206, 444 N.E.2d 407 (1983).  Accordingly it is a violation of basic merit principles under G.L. Chapter 31 to make personnel decisions based on any of these enumerated characteristics.  See Abban v. Boston Police Dept., 11 MCSR 361 (1998) (finding a bypass based on race unjustified when based on an expired federal court consent decree), *affirmed sub nom.* Mass. Ass'n of Minority Law Enforcement Officers v. Abban, 434 Mass. 256 (2001).

Nevertheless, it is recognized that an appellant's "expectation of [selection] based on 'his position on a civil service list' does not rise to the level of a 'property interest' entitled to constitutional protection." Stuart *v.* Roache, 951 F.2d 446 (1st Cir. 1991). Candidates simply have certain expectations that are substantially diminished by the ability of the appointing authority under state law to consider subjective factors in addition to the written examination score. Burns *v.* Sullivan, 619 F.2d 99 (1st Cir. 1980).

11

Those factors must adhere to the intent of the civil service system. City of Cambridge *v.* Civil Service Commission, 43 Mass. App. Ct. 300 (1997).

As the Commission and the Supreme Judicial Court have recognized, the Commonwealth's Personnel Administration Rules allow appointing authorities to seek "special certifications" based on factors such as race, color, national origin, or sex to remedy previous discrimination perpetrated by the appointing authority, but only when the appointing authority has an approved affirmative action plan on file with HRD. *See* Personnel Administration Rules, PAR.10; Brackett v. MBTA, 10 MCSR 289, 290-291 (1997); Abban, 434 Mass. at 261, n. 12. In order to take such discriminatory factors into account, the appointing authority must at the very least make a good faith effort to comply with the requirements of PAR.10, which include petitioning HRD for permission to take such action. Sands v. Medford Fire Dept., 12 MCSR 71, 72 (1999).

Civil Service law traditionally affords management a considerable degree of latitude in making selection decisions. "The appointing authority...may select, in the exercise of broad discretion, among persons eligible...or may decline to make an appointment." Goldblatt *v.* Corporate Counsel of Boston, 360 Mass. 660 (1971), citing Commissioner of the Metropolitan District Commission *v.* Director of Civil Service, 348 Mass. 184 (1964).

Ordinarily, this tribunal cannot "substitute its judgment about a valid exercise of discretion based on merit or policy considerations by an appointing authority." City of Cambridge at 304. However, given the evidence of unacceptable errors in the process committed by the Respondent, we hereby ***allow*** this appeal.

When an appointing authority recognizes the need for a special qualification, such as certain language skills, the Commonwealth's Personnel Administration Rules allow for the appointing authority to requisition a "selective certification" from HRD based on the special needs of the position to be filled. *See* PAR.08(3). When such a selective certification is requisitioned and approved, only the candidates who possess that qualification even appear on the certification form provided by HRD, so there is no need

12

to "bypass" individuals without the identified special skill.  Id.  If an appointing authority fails to specify this type of requirement or preference in a job posting and fails to obtain a selective certification approved by HRD, the appointing authority cannot reasonably justify the bypass of individuals merely because they lack such characteristics.  Panuski v. Dept. of Mental Health, 10 MCSR 264, 265-266 (1997) (allowing a bypass appeal because the appointing authority failed to specify in advance language skills and other criteria later used to justify a bypass).

It is the conclusion of this Commission that the Respondent has not met its burden of proving that there was a reasonable justification for bypassing Appellant for the position of Sergeant under either the June 2004 bypass or the May 2005 bypass decisions.

Regarding the June 2004 bypass, the MBTA plainly violated basic merit principles by taking into account national origin in deciding to bypass Appellant to promote Officer Cadet.  The MBTA explained in its submission to HRD that it decided to promote Officer Cadet because of the benefit of having him as a "Haitian Police Supervisor."  (Exhibit 2).  Such consideration of national origin in the MBTA's promotional decision was not based on any special certification approved by HRD or tied in any way to an affirmative action plan on file with HRD.  Therefore, the MBTA's consideration of national origin in its promotional decision cannot be justified under PAR.10 and amounts to a clear and patent violation of the basic merit principles defined in Chapter 31.

Nor was the MBTA justified in its June 2004 bypass of Appellant in favor of Officers Sosa and Cadet due to those candidates' ability to speak other languages – Spanish and Haitian Creole, respectively.  The MBTA failed to provide any evidence that being bilingual was a necessary or preferred qualification for the position of police sergeant, nor did the MBTA take the appropriate steps to requisition a selective certification from HRD for bilingual candidates.  In addition, there is no evidence that the MBTA ever questioned the candidates about their language skills during the selection process, and its bypass submission to HRD failed to mention the language skills of any other candidates, either selected or non-selected.

13

In bypassing Appellant based on the other candidates' language skills, the MBTA penalized Appellant for not having a qualification that was not demonstrated as necessary to the position; was not selectively certified by HRD; and was not applied to all candidates consistently. The MBTA cannot therefore reasonably justify the June 2004 bypass decision based on the candidates' language skills.

Similarly, with regard to the May 2005 bypass, while nothing in Chapter 31 specifically requires a strictly structured selection process, decisions of the Commission and the courts certainly "indicate a preference for one." Bannish v. Westfield Fire Dept., 11 MCSR 157 (1998), citing Flynn v. Civil Service Commission, 15 Mass. App. Ct. 206 (1983). Both the Appeals Court and the Commission cited with approval the testimony of an expert witness in the Flynn case noting that a numerical grading system in interviews could be preferable because such a procedure would more likely be clear and explicit. Bannish, 11 MCSR at 158, Flynn, 15 Mass. App. Ct. at 208. In general, the Commission applies the reasonable-justification standard to any weighted grading system and to the reasons the appointing authority puts forward to substantiate such a system. See Mawn v. Norwood Police Dept., 11 MCSR 74 (1998).

In the second bypass, while the Department certainly applied a number-driven, mechanical process, there actually exists no rational basis for the way in which the numerical "scores" were derived or weighted. The numbers applied to the candidates were actually rankings, not scores, and thus had no substantial value. It is impossible to compare the relative merits of individual candidates when all you know about them is the order in which each lieutenant would promote them. There is no real meaning attached to the numbers of the rankings, since the difference between candidates 3 and 4 could be miniscule while the difference between candidates 4 and 5 could be gargantuan. In addition, one lieutenant might think his candidate number 8 is as worthy of promotion as candidate 1, while another lieutenant might think his candidate number 8 would not be an effective supervisor. It is therefor unreasonable to compare these numbers as if they truly mean something.

The numerical system used by the MBTA in this case is completely unlike the grading system applied in <u>Mawn</u>, which the Commission upheld as reasonable. In that case, the appointing authority applied a numerical grading system to the questions asked in an interview and weighted each question based on the importance of each factor to the appointing authority. 11 MSCR at 75. Here, neither the lieutenants' individual rankings nor the interviewers' rankings are based on any scale or grading system. Were the candidates ranked on a scale, such as from 1 to 10, the lieutenants could have assigned *actual values* to the candidates that could be compared, as opposed to rank numbers with no inherent meaning. Because the numbers derived from this process have absolutely no meaning, they cannot be substantiated as part of a reasonable justification for a bypass appeal.

Moreover, the ranking system employed by the MBTA was inherently flawed in that it allowed lieutenants with little or no interaction with certain candidates to rank those candidates in the same way as the lieutenants ranked the candidates they worked with every day. For a candidate like Appellant, who worked on the last half shift and thus had contact with fewer superior officers, this process amounted to a death knell for his candidacy. Two lieutenants whom he very rarely worked with ranked him at the bottom of their promotional lists, weighting him down and out of consideration. Had those two lieutenants followed directions and refrained from ranking him, Appellant would not have been bypassed at all. Thus, the results of the ranking system applied in the second promotion cannot be used to reasonably justify the bypass of Appellant.

For all the foregoing reasons, the MBTA violated basic merit principles in bypassing Appellant for promotion based on unlawful and improper criteria and thus cannot sustain its burden of proving reasonable justification for the bypass.

It is the function of the agency hearing the matter to determine what degree of credibility should be attached to a witness' testimony. <u>School Committee of Wellesley v. Labor Relations Commission</u>, 376 Mass. 112, 120 (1978). <u>Doherty v. Retirement Board</u>

15

of Medicine, 425 Mass. 130, 141 (1997).  The hearing officer must provide an analysis as to how credibility is proportioned amongst witnesses.  Herridge v. Board of Registration in Medicine, 420 Mass. 154, 165 (1995).

Here, the Commission finds the testimony of all witnesses to be highly credible. Deputy Chief Martino credibly testified as to the screening process (flawed as it was) employed by the MBTA and conducted of all candidates (including Appellant). Lieutenant Lenehan credibly testified that he did not recall many specifics about Appellant's interview.  Indeed, his admitted inability to recall details was clearly established on cross-examination, when Lieutenant Lenehan's memory of Appellant's interview proved to be at odds with the contemporaneous, written notes of his fellow lieutenant interviewers.

Appellant credibly testified in a forthright manner as to his background and the varying degrees of interaction he had with many of his superior officers.  Lieutenant Ann McCall credibly testified as to Appellant's qualifications, based on her experience as his direct supervisor.  Lieutenant Fredericks credibly testified as to his concerns about the selection process employed by the MBTA, particularly the high level of subjectivity. Lieutenant Fredericks also credibly testified regarding the difficulty inherent in ranking the equally qualified candidates.

For all of the above stated reasons, it is found that the Respondent has not established by a preponderance of the reliable and credible evidence in the record that it had just cause to bypass Appellant for the position of Sergeant. Therefore, these appeals on Docket No. G2-05-12 and Docket No. G2-05-177 are ***allowed.***

In light of the foregoing, the Commission, pursuant to the powers of relief inherent in Chapter 534 of the acts of 1976, as amended by Chapter 310 of the acts of 1993, hereby directs the Human Resources Division to place the name of Appellant, Christopher Maynard, at the top of the current certification list in effect for Sergeant with the MBTA Police Department, and, in the event Appellant is not offered a position as

Sergeant by the MBTA Police Department prior to expiration of the current certification list, then the Human Resources Division is further directed to place the name of Appellant at the top of the next certification list for Sergeant with the MBTA Police Department issued thereafter.  Further, Appellant's seniority date, should he be promoted to sergeant, shall be made retroactive to the date of the original bypass.

Civil Service Commission

_____
John E. Taylor
Commissioner

By vote of the Civil Service Commission (Bowman, Guerin and Marquis; Commissioners [Taylor, Commissioner, absent) on March 15, 2007.

A True Record.  Attest:

_____
Commissioner

Either party may file a motion for reconsideration within ten days of the receipt of a Commission order or decision.  A motion for reconsideration shall be deemed a motion for rehearing in accordance with G.L. c. 30A, s. 14(1) for the purpose of tolling the time of appeal.

Pursuant to G.L. c. 31, s. 44, any party aggrieved by a final decision or order of the Commonwealth may initiate proceedings for judicial review under G.L. c. 30A, s. 14 in the Superior Court within thirty (30) days after receipt of such order or decision.  Commencement of such proceeding shall not, unless specifically ordered by the court, operate as a stay of the Commission's order or decision.

Notice To:
   Alfred Gordon, Esq.
   Patricia M. Lucek, Esq.