UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

PEDRO LOPEZ, Individually and on        )
behalf of a class of individuals        )
similarly situated,                     )
                                        )
        Plaintiffs,                     )
                                        ) Civil Action
v.                                      ) No. 07-11693-GAO
                                        )
CITY OF LAWRENCE, et al.,               )
                                        )
        Defendants.                     )
                                        )

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

**DAY SIXTEEN**
**NON-JURY TRIAL**

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Wednesday, September 15, 2010
9:00 a.m.

Marcia G. Patrisso, RMR, CRR
Debra M. Joyce, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1   APPEARANCES:

 2        LICHTEN & LISS-RIORDAN, P.C.
          By: Harold L. Lichten, Esq.
 3            Stephen S. Churchill, Esq.
              Joseph L. Sulman, Esq.
 4        100 Cambridge Street, 20th Floor
          Boston, Massachusetts  02114
 5        On Behalf of the Plaintiffs

 6        CITY OF LOWELL LAW DEPARTMENT
          By: Brian W. Leahey, Esq.
 7        City Hall
          375 Merrimack Street
 8        Lowell, Massachusetts  01852
          On Behalf of the Defendant City of Lowell
 9
          OFFICE OF THE CITY ATTORNEY
10        By: Richard J. D'Agostino, Esq.
          200 Common Street, Suite 306
11        Lawrence, Massachusetts  01840
          On Behalf of the Defendant City of Lawrence
12
          COLLINS, LOUGHRAN & PELOQUIN
13        By: Laurie W. Engdahl, Esq.
          320 Norwood Park South
14        Norwood, Massachusetts  02062
          On Behalf of the Defendant City of Worcester
15
          MORGAN, BROWN & JOY, LLP
16        By: Mary Jo Harris, Esq.
              Robert P. Morris, Esq.
17        200 State Street, 11th Floor
          Boston, Massachusetts  02109
18        On Behalf of the Defendant City of Boston

19        MBTA LAW DEPARTMENT
          By: Kevin S. McDermott, Esq.
20        10 Park Plaza, 7th Floor
          Boston, Massachusetts  02116
21        On Behalf of the Defendant MBTA

22

23

24

25
```

```
1        CITY OF SPRINGFIELD LAW DEPARTMENT
         By: Harry P. Carroll, Esq.
2        36 Court Street
         Springfield, Massachusetts  01103
3        On Behalf of the Defendants City of Springfield
         and Mayor Sarno
4
         CITY OF METHUEN - OFFICE OF THE CITY SOLICITOR
5        By: Peter J. McQuillan, Esq.
         The Searles Building, Suite 311
6        41 Pleasant Street
         Methuen, Massachusetts  01844
7        On Behalf of the Defendant City of Methuen

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      I N D E X

 2                  Direct  Cross  Redirect  Recross

 3   WITNESSES FOR THE
      DEFENSE:
 4
     JAMES LAWRENCE OUTTZ, Ph.D.
 5
          By Mr. Lichten (Cont'd)        5
 6        By Ms. Harris                        121
          By Mr. Leahey                              157
 7        By Mr. Lichten                                   166

 8                    E X H I B I T S

 9
     PLAINTIFFS'
10    EXHIBIT     DESCRIPTION                MARKED  RECEIVED

11   No. 193  Document taken from the website of the
                Commonwealth of Massachusetts Human
12              Resources Division for Fire Chief, Deputy
                Chief and District Chief - Promotional Exam    42
13
     DEFENDANTS'
14    EXHIBIT

15   No. 194  Commissioner's memo dated 5/29/02
                (Attachment G to Dr. Outtz's report)          156
16
     No. 195  Report of Analysis and Inferences, Inc.         188
17

18

19

20

21

22

23

24

25
```

```
 1                     P R O C E E D I N G S

 2              THE CLERK:  All rise.

 3              (The Court enters the courtroom at 9:00 a.m.)

 4              THE CLERK:  For the continuation of the Lopez trial.

 5    Please be seated.

 6              THE COURT:  Good morning.

 7              COUNSEL IN UNISON:  Good morning, your Honor.

 8                     CONTINUED CROSS-EXAMINATION

 9    BY MR. LICHTEN:

10    Q.   Good morning, Dr. Outtz.

11    A.   Good morning.

12    Q.   We talked yesterday about a case that you were involved

13    in, and that was the Bridgeport Guardians case.  And I'm just

14    putting the front page of that decision up there.  And do you

15    recall your testifying in that case?

16    A.   Yes.

17    Q.   Okay.  I'm going to show you a page from that opinion.

18    And it says, "During the" -- I'm sorry -- "In the course of

19    developing an examination in November of 1988" -- this is a

20    police sergeant's exam; is that correct?

21    A.   Yes.

22    Q.   Okay.  -- "Dr. Outtz recommended to the defendants that

23    video simulations be used in place of an oral test in order to

24    improve the examination and reduce the possibility of adverse

25    impact."  Do you see that?
```

1   A.   Yes.

2   Q.   And do you agree that that's what you did?

3   A.   Yes; I did make that recommendation.

4   Q.   Okay.  And then it says, "Despite Outtz's recommendation

5   and the efforts of the commission personnel director to

6   convince Bridgeport mayor to adopt the video simulations, the

7   mayor's office" -- and then it goes on to say they refused to

8   go along with it for budgetary reasons; is that right?

9   A.   It says the video simulations concept.

10  Q.   Right.  And that's the case in which you actually offered

11  to not charge a fee for those video simulations in order to get

12  that to be utilized; is that correct?

13  A.   Yes, or at least to delay my fee.

14  Q.   Delay your fee.  (Laughter.)  I stand corrected.

15       And then going on in the opinion, you recommended, in

16  writing, to your client that it use banding in making

17  promotions from the pass list rather than promoting in strict

18  rank order fashion, and now I'm quoting, "in recognition of the

19  fact that certain differences in test scores may not be

20  significant."  Do you see that?

21  A.   Yes.

22  Q.   And that is accurate?

23  A.   Yes.

24  Q.   And despite your recommendation, the appointing authority

25  did not follow that recommendation; is that right?

1    A.    Yes.

2    Q.    And they promoted in strict rank order fashion; is that

3    correct?

4    A.    I think so, yes.

5    Q.    And then I'm showing you the -- another page of the

6    opinion.  In the yellow-lined part it says, "As noted

7    previously, Dr. Outtz recommended in August 1989 that banding

8    be used stating that" -- and I think they're quoting you

9    here -- 'employment tests cannot be justified as valid for the

10   specific use of strict rank ordering.'"  Do you see that?

11   A.    Yes.

12   Q.    Does that accurately reflect your opinion at that time?

13   A.    Yes.

14   Q.    Okay.  So let me see if I can explore that for a minute.

15   So you can have a test that is valid generally, but that may

16   not make it valid for use as a strict rank ordering device; is

17   that correct?

18   A.    That is true.  That's stipulated in the guidelines.

19   Q.    Okay.  For instance, a test could be valid at the passing

20   point, it could meet validity requirements, but that doesn't

21   make it valid when used as a strict rank ordering device if

22   there -- if used as a strict rank ordering device, the top

23   score and the score after that doesn't necessarily predict who

24   the best candidate would be; is that right?

25   A.    Not quite.  They do predict but not -- maybe not at the

 1    level of specificity that this strict rank ordering dictates.

 2    So that if you have a test that's valid -- it's valid to some

 3    degree.  You can use it in different ways, and the ways that

 4    you use it may or may not be appropriate given its level of

 5    validity, is the way I would put that.

 6    Q.   And that, again, ties back to the concept of reliability,

 7    correct?  That you cannot use it as a strict rank ordering

 8    device, it would not be valid if the reliability does not

 9    permit you scientifically to make the assumption that the

10    highest score will do the best on the job?

11    A.   That's partially correct.  You can use it as a ranking

12    device; in other words, according to the Uniform Guidelines, if

13    it's valid you can use it in a number of ways, and you can use

14    it as a ranking device if you have specific information to

15    justify the kind of ranking that you're doing.

16         If you're talking about strict rank ordering; that is, any

17    difference in the scores is treated as meaningful, that's one

18    kind of ranking.  You can have bands, Bands A, B and C, and

19    that's another form of ranking; pass/fail is a form of ranking,

20    basically.  So that you can different forms of ranking, and the

21    strict rank ordering may not be the best way to use this test

22    or as valid or even meet minimal validity depending upon what

23    the test is.  So that's the way I would put that.

24    Q.   Gotcha.  And in this case you said that "the employment

25    test cannot be justified as valid for the specific use of

1    strict rank ordering."

2    A.    That test in that situation, used in strict rank order,

3    "that test" meaning something other than the video-based

4    component and whatever other components I recommended.

5    Q.    Well, this was your test; is that correct?

6    A.    Well, what was used was my test.  What was proposed to be

7    included in my test, was not.  My obligation in that case was

8    to, obviously, do the best I could for that client.  I had

9    developed a test before, a lieutenant's test just prior to the

10   sergeant's test, and I used video.  And it worked very well.

11   So -- in terms of validity and in terms of reducing adverse

12   impact.  So now this --

13   Q.    Doctor, I just asked you if this was your test.  That's

14   all I asked you.

15   A.    I'm sorry.

16   Q.    Was this your test?

17   A.    Yes.

18   Q.    Okay.  So even though you were the author of this test and

19   you created this test, nevertheless, you believe it was not

20   justified to be used as strict rank ordering and that you would

21   not find it valid if used as a strict rank ordering device?

22   A.    Yes.

23   Q.    Okay.  And you then recommended that they use a banding

24   method; is that correct?

25   A.    Correct.

1    Q.   Okay.  And what happened in that case was that while the

2    court found that the test had validity, that it was valid, it

3    was not valid used as a strict rank ordering device.  The

4    Supreme Court, in essence, agreed with your opinion?

5    A.   That's correct.

6    Q.   And therefore, ruled that the city had violated Title VII

7    because it did not adopt your banding recommendation?

8    A.   Correct.

9    Q.   Have you studied for the Boston police sergeant's -- I'm

10   sorry -- for the police sergeant's exam, both Boston and

11   statewide, what the reliability coefficient was for any of

12   these tests?

13   A.   Yes; I've looked at the data on the reliability

14   coefficient.

15   Q.   And it's about .8; is that correct?

16   A.   It varies.  .8 or higher.

17   Q.   Okay.  So if it's .8, that means that scores within -- I'm

18   no mathematician -- between 5 and 10 points may not be

19   predictive of who the best performer is?

20   A.   That really isn't correct.  First of all, you're right,

21   the reliability is the issue.  A .80 or higher reliability

22   means that there is a narrow range in which the scores may vary

23   by chance and, therefore, if you select people in strict rank

24   order within that random chance, it could be that for those two

25   people, they might flip-flop.  Maybe one might be slightly more

1  qualified than the other, but as a general rule, as you go from

2  top to bottom, you're getting the best people at the top and

3  fewer qualified people as you go down the list.

4      That principle still holds because the test is basically

5  valid.  The issue is within specific comparisons Candidate No.

6  1 versus Candidate No. 2, you cannot always assume that you're

7  correct that Candidate No. 1 is ahead of Candidate No. 2 any

8  time because of this random chance fluctuation in scores.

9  Q.   Okay.  Well, I'm no mathematician, you're the expert, but

10  when I hear ".8," I think, then, there's a 20 percent

11  variability.

12  A.   That is incorrect.

13  Q.   So much for my math ability.

14      THE COURT:  Can you explain what -- how the .8 is

15  derived; what does it mean?

16      THE WITNESS:  Yes.  The .8 can be derived in a number

17  of ways.  It's typically derived by looking at the internal

18  consistency of the test.  If you have a test that measures job

19  knowledge, and all the items measure job knowledge in some way,

20  you would expect those items to be related to each other.  You

21  would expect my performance on one test item to be somewhat

22  correlated with my performance on another test item, because

23  we're all measuring job knowledge.  So you wouldn't expect me

24  to necessarily miss ten items and then make 100 percent on

25  another ten items or miss half the items on the test and get

1    100 percent correct on the other half of it.  There should be

2    some correlation there because all the items measure the same

3    thing.

4             This reliability coefficient, this internal

5    consistency reliability coefficient tells me that the average

6    correlation between items -- the average relationship.  When I

7    look at all 100 items and I see how they relate to each

8    other -- is about 80 percent; in other words, there's a

9    relationship there.  It's not perfect, right?

10            So now I know that since it isn't perfect, there's

11   some variation in my performance on this test that may not

12   really reflect where I stand on this test.  The more reliable

13   the test is, the more confident I am that there's not much of

14   that going on.  If the test reliability is low, then I know

15   that my score from one time to the next may change a great

16   deal.  If the reliability is relatively high, like 80 percent

17   or higher, there's going to be a relatively narrow range in

18   which my score is going to vary.

19            And so this reliability coefficient is a very useful

20   index of the quality of this test.  If these written tests here

21   had a reliability coefficient of .50, that would be a problem.

22   It would mean that scores had fluctuated all over the place

23   from one administration to the next indicating that I'm not

24   really sure that one person's level of knowledge is higher than

25   another's.

1   BY MR. LICHTEN:

2   Q.   Let me ask it this way:  Given that the reliability

3   coefficient is around -- let's assume it's around .80 for these

4   police sergeants' exams, and it's based upon a 100-point

5   system, what would be the point spread that would be justified

6   in being used as a band based upon that reliability factor of

7   .8?

8   A.   I can't do that math in my head but I can tell you the

9   formula that you would use to do it.  The formula would be, you

10   would take --

11   Q.   I'm going to ask Mr. Churchill to take notes on this.

12   A.   You would calculate the square root of 1 minus the

13   reliability coefficient, and then you would multiply that by

14   1.96 to get a confidence interval.  All of that would be

15   laborious to explain, but you would get a confidence interval

16   that would tell you within a 95 percent level of confidence

17   what the range ought to be in scores such that you ought

18   to -- you can consider them relatively close enough not to

19   warrant making distinctions.

20   Q.   All right.  And just so I'm clear, did you do that in the

21   Bridgeport case?

22   A.   Yes.

23   Q.   Okay.  And isn't that what Dr. Jacobs did with respect, at

24   least, to the 2008 Boston police sergeant's exam?

25   A.   I think so.

1    Q.    And do you recall that his recommendation, based upon that

2    reliability analysis, was to band in approximately 7-point

3    spreads?

4    A.    I don't remember the exact number but I remember they were

5    fairly wide bands.

6    Q.    Okay.  And that would be a legitimate industrial

7    psychologist's tool to determine a banding formula; is that

8    correct, by looking at the reliability?

9    A.    Yes.

10   Q.    And you -- from what you saw from what Dr. Jacobs did and

11   his recommendation to the City of Boston and to HRD in 2008, I

12   take it you didn't have any quarrel with his analysis?

13   A.    I did not.

14   Q.    Thank you.  Okay.  I believe you testified about this

15   presentation that you gave earlier in your direct testimony; do

16   you recall that?

17   A.    Yes.

18   Q.    And this is something you testified about after the Ricci

19   decision had been decided; is that correct?

20   A.    I don't understand your question.  I testified about this

21   in this case.

22   Q.    I'm sorry.  I misstated the question.  When you gave this

23   presentation, it was post Ricci?

24   A.    Yes.

25   Q.    And you were asked some questions about that.  I want to

1    draw your attention to your summary.

2    A.    Yes.

3    Q.    And you say, and this is after Ricci, and within the last

4    year, "For many jobs, including fire officer positions,

5    selection systems that are too limited in scope and weighted

6    toward paper-and-pencil multiple-choice tests are, A, not

7    valid; B, more likely to select candidates who are incompetent;

8    and, C, unfair in that they give an advantage to certain

9    candidates based on attributes that are not job related."  Do

10   you see that?

11   A.    Yes.

12   Q.    And do you still hold to that opinion?

13   A.    Yes.  For many jobs that is true.  Or that is my opinion.

14   Q.    Thank you.  Very quickly, I wanted to show you a table

15   from Dr. Wiesen's report and ask you quickly about this.  Are

16   you familiar with this table?

17   A.    Yes.

18   Q.    This purports to respond to an analysis, or a comment,

19   that you made in your report about the 2002 exam; is that

20   correct?

21   A.    I think so, yes.

22   Q.    Okay.  And first of all, do you have any quarrel with his

23   figures, that is, that the difference -- or as I understand the

24   D, which is part of a standard deviation; is that right?

25   A.    Yes.  I'm sorry.  Could you repeat that?

1    Q.    Sure.  When we talk about the difference, the D that it

2    talks about here, we're talking about standard deviations?

3    A.    We're talking about a difference measured in standard

4    deviation units.

5    Q.    Right.  So the higher -- just because some things

6    are -- the higher the difference, the greater the difference;

7    is that correct?

8    A.    The higher the difference, the greater the average impact.

9    Q.    The higher the number, the greater the difference?

10    A.    That's correct.

11    Q.    So he says that if you just look at the written test alone

12    from the 2002 exam, the D was .55; is that correct?

13    A.    I see that.

14    Q.    Okay.  That's a significant difference, in your opinion?

15    A.    Yes.

16    Q.    Okay.  He says that if you just look at the oral portion

17    of that 2002 test, the D was .26; is that correct?

18    A.    Yes.

19    Q.    So that is half the difference of the written test alone;

20    is that correct?

21    A.    Yes.

22    Q.    Okay.  And then if we go to the E&E alone, that had a D of

23    .45; is that correct?

24    A.    Yes.

25    Q.    So the E&E also appears to have had difference in terms of

1    performance between minorities and non-minorities; is that

2    correct?

3    A.    Correct.

4    Q.    And in your experience, when you've been involved in cases

5    having an E&E, experience and training component, has that been

6    your finding, that there's disparate impact in the training and

7    experience component?

8    A.    Typically some difference.  It varies.

9    Q.    Okay.  Going back to that book that you testified about.

10   I think that's the book that had the Barrett article, and then

11   yesterday we talked about your article in the same book; is

12   that correct?

13   A.    Chapters.

14   Q.    Chapters.  And this book came out in 2010; is that right?

15   A.    Correct.

16   Q.    Okay.  There's also an article -- a chapter in there by

17   Schmitt; is that correct?

18   A.    Yes.

19   Q.    And Schmitt is a very respected researcher in this field;

20   is that correct?

21   A.    Yes.  Well, he's more a practitioner, I think, than a

22   researcher.

23   Q.    But you've quoted some of his articles; is that right?

24   A.    No, this is Mark Schmitt, not Neal Schmitt.

25   Q.    I should have known that.  But is he a respected

1    practitioner in the field?

2    A.    Yes.

3    Q.    And I'm showing you a page from his -- this is a table in

4    his book.  And he has a section on assessment centers -- or in

5    the table is assessment centers.  And he says -- and this is

6    him saying this in a book that's published in 2010, that

7    "assessment centers have low adverse impact, a valid predictor

8    of performance and high face validity."  Do you see that?

9    A.    Yes.

10    Q.    Do you agree with that?

11    A.    No.

12    Q.    So you think he's wrong?

13    A.    I think that -- and I -- it's apparent from all the things

14    that have been presented here there are differences of opinion

15    about assessment centers.  And that's the issue.  You won't

16    find a 100 percent consensus that assessment centers

17    automatically have less adverse impact.  You will find

18    practitioners like Schmitt who think that they're low; you find

19    others who take a database, like a metaanalysis and find that

20    they're not so low.

21        So that that means that one should be very cautious in

22    assuming -- or make sure you don't assume what you're going to

23    get with an assessment center.  And I think this chapter, and

24    the other chapters we've talked about, show that.

25    Q.    Well, not to open a wound, but the chapter that you talked

1    about yesterday that you thought stood for the proposition that

2    assessment centers did not have low adverse impact was based on

3    two studies from 1992?

4    A.    That chapter was, yes.

5    Q.    Okay.  Okay.  Moving right along.  You've testified a lot

6    about the training and experience portion or component of this

7    exam, and I want to ask you some questions about that.  First

8    of all, I believe you mentioned Attachment EE.  I just want to

9    show you, that's Attachment EE, and that's called the

10   testability analysis.  Do you remember that?

11   A.    Yes.

12   Q.    And you found that there were certain things that the

13   people putting together this exam in 1991 determined that they

14   could test through the training and experience component; is

15   that correct?

16   A.    Correct.

17   Q.    And I wanted to ask you about that.  If you look at Number

18   4, "Knowledge of local ordinances" --

19        Do you see that?

20   A.    Yes.

21   Q.    -- how did they decide that that was testable through the

22   training and experience portion of the exam, not through the

23   written test or not not tested?

24   A.    I think that the 1991 study is where this emanates from.

25   That's where this local -- knowledge of local ordinances comes

1     from as something important, first of all.  And then how you

2     measure it is a professional assessment by the test developer

3     as to what you think this, in this case, E&E is going to

4     measure.  If you understand that the E&E component requires you

5     to have a certain amount of experience as a police officer in

6     order to get credit on the E&E, right -- so I think it's three

7     years.  If you've been a police officer for three years, I

8     don't think it's a stretch to assume you have knowledge of

9     local ordinances.  And I think that that was the logic behind

10    this match.  To me, that's a normal process and I think it's a

11    reasonable assessment.

12    Q.   Well, if you look at Number 1, it says, "Knowledge of

13    Massachusetts General Laws pertaining to public safety," and

14    they say that's measurable on the written test.  Wouldn't that

15    be just as measurable, under your analysis, under the training

16    and experience?

17    A.   It could.

18    Q.   Isn't this completely illogical to say some knowledges are

19    tested by the education and experience and some by the written

20    test?

21    A.   Not really, because what's missing here is a refinement in

22    classification.  In later studies such as this, you will see,

23    "We think this particular knowledge is primarily measured by

24    this device; it may secondarily measure some other knowledge."

25    That's not here.  So it's not a cut-and-dried either/or

1    situation.  But in answer to your question, no, I don't think

2    it's illogical.

3    Q.   But isn't it arbitrary that they put some knowledges as

4    testable by training and experience, some knowledges not tested

5    at all, and some knowledges tested by the written test?  Wasn't

6    it a completely arbitrary exercise on their part?

7    A.   I would disagree with that.  I think that the care with

8    which this study was done would indicate to me that very little

9    was done arbitrarily.

10   Q.   Well, let me ask you this:  Under "Knowledge of bail

11   procedures," they have not tested at all.  Why wouldn't that be

12   just as relevant to your having three years on the job so

13   presumably you know what the bail procedures are?

14   A.   They made the judgment that you may not know what the bail

15   procedures are as a police officer.

16   Q.   Well, if you look at Number 19, "Knowledge of department

17   procedures regarding receipt of bail money," they say "not

18   tested."  Why wouldn't that be testable by training and

19   experience?

20   A.   I can only assume that in their judgment in this instance

21   that wouldn't be directly measured by the E&E.

22   Q.   And then if you look at Number 7, "Knowledge of state and

23   local laws" -- and I believe a local law is an ordinance.

24   "Knowledge of state and local laws relating to youths and their

25   offenses," that's indicated as being tested on the written test

1    and not on the education and experience.

2    A.    I think what's happening here is that where you have

3    something measured by a written test, we know for a fact that

4    there's a document, a book, a reference or something that's

5    given to the candidate to study.  It may very well be that this

6    test developer felt that there was no such book associated with

7    local ordinances but the person would have to know the local

8    ordinances by virtue of having been a police officer.

9        I'm just trying to give you an idea of what I think their

10   judgment was.  I disagree with your opinion that it's

11   illogical.  I don't think it's illogical at all.

12   Q.    Well, let me ask you this:  You talked several times about

13   this three-year requirement.  The three-year requirement is

14   what you need, according to your testimony, just to take the

15   exam; is that correct?

16   A.    My understanding is that your years of experience count --

17   Q.    Please answer my question, Dr. Outtz.

18   A.    I'm sorry.

19   Q.    My question is simply:  Isn't it true that in order to

20   take the police sergeant's exam -- this was your testimony --

21   you have to have three years on the job to begin with?

22   A.    I don't remember that as being my testimony.  If it was, I

23   would like to correct it.  What I'm saying, is with regard to

24   the E&E, experience as a police officer, and I think it's

25   three -- you have to have been in the position of a -- I know

1    you have to be in the position at least three years, I think,

2    to apply, but that would apply to the E&E.  If you're asked,

3    "How much experience do you have," you know that those folks

4    have at least three years' experience as a police officer.

5    Q.   But everybody -- it doesn't differentiate between more

6    qualified and less qualified, because everybody taking the exam

7    has three years.  So how would that help to differentiate

8    between who's qualified and who's not qualified to be a police

9    sergeant if you can't even take the test unless you have three

10   years?

11              MS. HARRIS:  Objection.

12              (No verbal ruling.)

13   A.   It simply means that everybody has -- should have some

14   knowledge about the local ordinances, that's all.

15   Q.   Okay.  I'm going to the second page of this same analysis.

16   "Knowledge of proper behavior in the courtroom," and that is

17   listed as being testable on education and experience.  Do you

18   see that?

19   A.   Yes.

20   Q.   You could be a police officer for three years and never

21   have been in a courtroom.  You could be in a specialized unit

22   or on a desk; isn't that correct?

23   A.   That's true.  But you could have more than three years'

24   experience and put it on the E&E.

25   Q.   You could have more than three years' experience and put

1    it on the E&E?

2    A.    The E&E isn't limited to people who have three years'

3    experience.  People could have five years' experience.

4    Q.    How do you know that it was determined that knowledge of

5    proper behavior in the courtroom be assessed on an education

6    and experience component that asks things about your level of

7    education and your years on the job?

8    A.    The years doing -- I spent doing job analyses for police

9    officer and police sergeants' jobs.  In a police officer's job,

10   if you're on the job long enough you're going to be involved in

11   court cases and going to court and those kinds of things.

12   There's some things you don't pick up as a police officer

13   strictly from the policies and procedures of the department or

14   rules and regulations; you pick them up by doing it.

15        And I, having done a job analysis, know that police

16   officers and police sergeants are going to be called, sooner or

17   later, to come into court and work with a prosecutor to

18   prosecute a case.

19   Q.    But again, Dr. Outtz, if everyone on the department has

20   been there three years in order to take the sergeant's exam,

21   how does this in any way determine who could be more or lesser

22   qualified for the job if they've all done it for three years?

23   A.    The E&E gives you credit for the level of experience that

24   you have.  You can have more than three years.  I think it's

25   safe to assume that the longer a person has been -- and that's

1    probably the premise of this.  The longer the person has been

2    in a police officer's job beyond the minimum of three years,

3    the more likely it is they have this kind of knowledge.

4         So they would differentiate between -- you're not

5    guaranteed to have this by virtue of having been a police

6    officer for three years, but if you've been longer, you're more

7    likely to have it.  And it would differentiate less-experienced

8    police officers from more-experienced police officers in terms

9    of this particular knowledge.

10   Q.   And then if you go to the bottom one, Number 50,

11   "Knowledge of the various communities within the department's

12   jurisdiction and the factors which make them unique," and that

13   is purported to be tested on the training and experience; is

14   that correct?

15   A.   Yes.

16   Q.   But, in fact, if you're a minority growing up in the

17   Roxbury section of Boston or the Brighton section of Boston,

18   you may have more knowledge of the various communities within

19   the department's jurisdiction than someone who wants to

20   be -- who is a Boston police officer and grew up in the suburbs

21   and has only been a police officer for three, four or five

22   years; isn't that correct?

23   A.   I'm not sure that is correct.  Could you say that again?

24   I'm sorry.

25              MR. LICHTEN:  Could you read back the question,

 1   please.

 2               (The reporter reads the pending question.)

 3               THE WITNESS:  That's possible.

 4   BY MR. LICHTEN:

 5   Q.   And then if you go to 33, for example, "Knowledge of the

 6   town and city growth and how it affects police response," which

 7   seems similar to 50, they say that's not tested for at all.  Do

 8   you see that?

 9   A.   Yes.

10   Q.   Why isn't that testable in the training and experience?

11   A.   These are judgments made by individuals who were involved

12   in developing this examination.  I think there are reasonable

13   assessments to be made.  You could question them one way or

14   another, but to the best of my ability it seems to me these are

15   reasonable assessments.  I think that the E&E reasonably

16   assesses the things assigned based upon my experience over 20

17   years of looking at police sergeants and police lieutenants and

18   police captains and police officers, so...

19   Q.   Let me ask you, when you put together your promotional

20   test, do you write the questions yourself?

21   A.   No.

22   Q.   Who writes them?

23   A.   They're written by subject matter experts in conjunction

24   with me.

25   Q.   So you have people who have worked in the field write the

1    questions?

2    A.    I help them and they help me and we get -- we write the

3    questions.

4    Q.    Okay.  Do you know who wrote the questions in the cases

5    that we're dealing with here today?

6    A.    I think they were HRD personnel or someone like that.

7    Q.    A bureaucrat from HRD; is that correct?

8    A.    I don't know whether the person would be classified as a

9    "bureaucrat," but...

10   Q.    Do you know whether that person had ever worked as a

11   police officer?

12   A.    I don't know that.

13   Q.    Now I'm looking at the -- page 5 of this testability

14   analysis.  And Number 122, I want to bring your attention to,

15   it says "The ability to understand the needs and motivation of

16   others."  Do you see that?

17   A.    Yes.

18   Q.    And that's listed as being tested on the written test.

19   You don't agree with that, do you?

20   A.    To some extent you can measure that.  There are textbooks

21   on supervision that measure Theory X and Theory Y, and those

22   management theories cover the needs and motivations of others.

23   To some degree you can measure that.

24   Q.    You think you can test for the ability to understand the

25   needs and motivation of others using a written multiple-choice

1    job-knowledge test?

2    A.    In parts you can, yes.

3    Q.    Why wouldn't that be training and experience?  The more

4    you've worked on the job, the more you would understand the

5    needs and motivation of others.

6    A.    I don't have an answer to that question.  You would have

7    to ask the people who made those linkages.  All I could say is

8    I agree with the linkages they've made.

9    Q.    And then if you look at 138, one of the tasks is the

10   ability to understand spoken English words and sentences, and

11   that's delineated as being tested under training and

12   experience.

13   A.    Yes.

14   Q.    How is that logical?

15   A.    Very logical.  If you're a police officer, you are

16   definitely going to have to have the ability to understand the

17   spoken English -- spoken English.  The written test can't

18   measure spoken anything, so how do you get at spoken English?

19   It would be:  Do you have experience as a police officer that

20   you can understand spoken English?

21   Q.    How does one know that if one has been on the job for

22   three or four or five years, they understand spoken English

23   better than anyone else?

24   A.    Because you have to draw -- that's a reasonable inference,

25   that if you are a police officer and you're functioning in that

```
 1   job, you understand, to some degree, spoken English.
 2   Q.   And then if we look at Number 144, the ability to remember
 3   information such as words, numbers, pictures and procedures.
 4   Do you see that?
 5   A.   Yes.
 6   Q.   That's indicated as not being tested at all.  Do you see
 7   that?
 8   A.   Yes.
 9   Q.   But isn't that being tested for in the written test where
10   you have to memorize text and then regurgitate them back when
11   you take the test?  Isn't that one of the prime things being
12   tested for in the written test?
13   A.   I think that's probably true to some extent.
14   Q.   Now, moving on with the training and experience, I believe
15   this is one of the charts that you referred to in your
16   testimony; is that correct?
17   A.   Yes.  I believe this comes from Schmidt and Hunter.
18   Q.   I think this is Schmidt and Hunter; that's correct.  And
19   you testified about this in your testimony; is that correct?
20   A.   I did.
21   Q.   Okay.  And if we go to -- down to -- and as I understand
22   this, this has -- talks about the validity and the gain in
23   validity from adding an additional component as a supplement to
24   a cognitive ability test; is that correct?
25   A.   Correct.
```

1    Q.   And here it's talking about the T&E point method system;

2    is that correct?

3    A.   One of the personnel measures is a T&E test method.

4    Q.   I just want to make sure I'm clear.  They're talking here

5    about the validity and gain in validity from a T&E point method

6    system; is that correct?

7    A.   Yes.  And adding that system to a general mental ability

8    test.

9    Q.   Exactly.  And if you go to the third column, they're

10   saying that the gain in validity from adding a T&E point method

11   system to a cognitive ability test is .01?

12   A.   Yes.

13   Q.   That's a very, very small gain in validity; is that

14   correct, .01?

15   A.   True.

16   Q.   Yet in this case you've testified that if the written test

17   were the only test given in -- to the Boston Police Department

18   for the sergeant's exam and in the Commonwealth for the

19   sergeant's exam, you would find that to be not valid; it's the

20   training and experience that takes you over the line and makes

21   it minimally or adequately valid; is that right?

22   A.   I said the training.  I'm sorry.

23        MR. CARROLL:  I was just going to say "objection,"

24   your Honor.  I don't recall him saying that.

25        THE COURT:  Overruled.

1          He may answer it.

2          THE WITNESS:  I said that with regard to the E&E in

3    this case added to the job-knowledge test.  I didn't testify

4    about adding in this case a point method that you've described

5    here to the job-knowledge test in this case.

6    BY MR. LICHTEN:

7    Q.    Well, is it your testimony that this is not a point method

8    training and experience test?

9    A.    Yes.

10   Q.    All it does, this training and experience, is you put in

11   factors and it gives you points; is that correct?

12   A.    The point method would be more detailed than the E&E in

13   this case.  It would have more categories, it would have more

14   levels within each category for which you could give points.

15   Q.    So you're saying that -- so this is less valid than the

16   point method you're talking about because this differentiates

17   even less than the one that you're thinking about?

18   A.    No.

19   Q.    Or the one that this is thinking about?

20   A.    No, I'm not saying that.

21   Q.    You just said that the one in this case doesn't

22   differentiate as much as the point system being described in

23   the study.  Did I just hear you correctly?

24   A.    I said that, but I said nothing about validity.

25   Q.    So the T&E method used in this case would have lower

1   additional validity than the T&E point method that they're

2   talking about that is more refined and -- well, more refined?

3   A.    Exactly the opposite.  I testified yesterday that the

4   components in this table that are represented by the E&E are

5   years of experience and years of education.  And if you look at

6   the validity coefficient for those and the incremental validity

7   from the combination of those, it's about four -- adding about

8   4 percent to the job-knowledge test.  And I think that in that

9   combination you have enough validity to have acceptable

10  validity.  I used the term "minimal," "acceptable," whatever.

11  Q.    Let's just be clear what we're talking about.  Let's talk

12  about that 4 percent for a moment.  I think when you referred

13  to the term "4 percent," you're not --

14        MR. LICHTEN:  May I have that chart again?

15  Q.    You're not referring to a statistical measure of the added

16  validity, you're talking about how many points can be driven by

17  the training and experience.  And I believe you just said it

18  was 4 percent.  That would be four points if it's a 100-point

19  scale, right?

20  A.    No.  I'm saying if you look at this table and if you look

21  at job experience, which the E&E measures in years, you see a

22  validity coefficient of .18, and you see that the incremental

23  validity is .03.  And if you look at years of education you see

24  a validity coefficient of .10, and you see an incremental

25  additional validity of .01.  And you could estimate that

1    together with the job-knowledge test, those incrementally add

2    about 4 percent.

3    Q.    Let me see if I understand what you're saying.  Are you

4    saying that this is a -- that the training and experience

5    system being used in this case is a behavioral consistency

6    method?

7    A.    I am --

8    Q.    Is that what you're telling us?

9    A.    I am testifying that the E&E in this case measures two of

10   the personnel measures labeled in this study:  One is years of

11   experience, and the other is years of education.

12   Q.    And years of education has .01 also; very low.

13   A.    I just testified that it has an incremental validity of

14   .01, and years of experience has an incremental validity of

15   .03.  And an estimate of -- combining those with a

16   job-knowledge test would be an incremental increase of .04.

17   Q.    I guess I'm confused because when this article, which you

18   testified about, says that the training and experience point

19   method yields an additional validity over a cognitive ability

20   test of .01, what would it be referring to if not your years of

21   experience and education?  What else is training and

22   experience?

23   A.    If it were referring to that, they wouldn't have listed

24   experience separately.  Why do they list them separately?

25   Because they treat them separately.

1   Q.   So what is training and experience, then?  And what is the

2   training and experience point method system that they're

3   referring to, Doctor?

4   A.   They're referring to whatever studies they can find that

5   have training and experience categorized in various ways.  And

6   this is the article -- again, I'm simply looking at the table

7   that you presented to me, these authors.  And I know Schmidt

8   and I knew Hunter.  And if those -- if T&E point method was

9   supposed to mean years of education and years of experience,

10  they would have combined it in there and given you the data

11  only for that one variable.

12  Q.   But you do agree that according to the -- you do agree

13  with their determination that years of education also adds only

14  .01 to a cognitive ability -- cognitive ability tests, as we've

15  established yesterday, have high predictive value; is that

16  correct?

17  A.   Yes.

18  Q.   They're saying if you add years of education or

19  experience, either one, to a cognitive ability test, the gain

20  in validity is only .01; is that correct?

21  A.   That's correct.  And the reason for that is you're talking

22  about a cognitive ability test not a job-knowledge test.  And

23  the cognitive ability test has high validity already.  So

24  adding anything to it is not going to improve it very much,

25  because it's probably one of the purest, best predictors we

1    have.

2    Q.   A job-knowledge test doesn't have high validity?

3    A.   It doesn't have as high validity as a cognitive ability

4    test.

5    Q.   So it has lesser validity than a cognitive ability test?

6    A.   I don't understand.  I don't understand.  Your question

7    apparently is does the job-knowledge test have less

8    predictability than a job-knowledge test.  I don't understand.

9    Q.   I'm sorry.  Does a job-knowledge test have less predictive

10   ability than a cognitive ability test?

11   A.   Yes.

12   Q.   Now, have you studied the point method used in the

13   Commonwealth of Massachusetts for the training and experience,

14   how you get the points?

15   A.   Yes.

16   Q.   Okay.  And first of all, were you aware that -- I'm

17   putting a document up which is taken from the website of the

18   Commonwealth of Massachusetts Human Resources Division for Fire

19   Chief, Deputy Chief and District Chief - Promotional Exam.

20   Were you aware that the T&E point method for fire promotional

21   positions is exactly identically the same as for police

22   sergeants, lieutenants and captains?

23            MS. HARRIS:  I object.

24            MR. PIKULA:  I will object as well, your Honor.

25            THE COURT:  No, overruled.

```
 1              You may answer that.
 2              THE WITNESS:  I'm not aware of that.
 3    BY MR. LICHTEN:
 4    Q.   You testified yesterday that the fire position -- the fire
 5    lieutenant position is significantly different than the police
 6    sergeant's position; is that correct?
 7    A.   Yes.
 8    Q.   Well, wouldn't it concern you if the positions are
 9    different, that the same exact training and experience rating
10    is used for fire lieutenant as is used for police sergeant?
11              MR. CARROLL:  I object, your Honor.
12              MS. HARRIS:  I object.
13              MR. CARROLL:  The table clearly doesn't say anything
14    about a fire lieutenant; it says "fire chief, deputy chief and
15    district chief."
16              MS. HARRIS:  Also to foundation.
17              MR. LICHTEN:  Strike that.  I'll rephrase the
18    question.
19    BY MR. LICHTEN:
20    Q.   Would it concern you that the same point method is used
21    for fire chief, deputy chief and fire district chief as is used
22    for police sergeant, the same exact point system?
23    A.   No.
24    Q.   It wouldn't surprise you?
25    A.   It wouldn't surprise me, no.
```

1    Q.   But wouldn't that indicate to you that there was no

2    attempt to differentiate in a training and experience rating

3    those attributes in a training and experience rating which are

4    peculiar or important for police sergeants as opposed to other

5    public safety personnel?

6    A.   That might be the case.  I don't know from what you've

7    shown me what you mean by "identical."  "Identical" would mean

8    that you get the same credit for the same kinds of degrees, you

9    get whatever.  But for the police sergeant, those were linked

10   to police sergeant jobs.  I don't know what they were linked to

11   here.  I'm sorry, I don't -- I can't relate those two.

12        My opinion of the E&E, as it relates to the police

13   sergeant's job in this case, is based upon the linkage of those

14   E&E subjects to a police sergeant's job.

15   Q.   But if the same -- if every public safety position in the

16   Commonwealth, fire or police, had the same T&E point system

17   with the same amount of points for the same attributes,

18   education or teaching a course, wouldn't that suggest to you

19   that it's not, in fact, linked appropriately but it's simply

20   arbitrarily administratively set by the state?

21   A.   There's no such thing to me in terms of this case.  In

22   terms of this case, in looking at the data in this case, it was

23   linked to the police sergeant job, and that's the way it was

24   supposed to be done.

25   Q.   But isn't the right way to do it is first you look at the

1  job, and based on the job you set what the T&E should be, not

2  the opposite, you take a T&E that's been in use for 20 years

3  and then try to justify it by having people rate it?

4          MS. HARRIS:  I object.

5          THE WITNESS:  I don't know whether that was the case,

6  but you could go either way with that.  There are, for example,

7  consulting firms that have selection systems on the shelf that

8  they can pull out to use for any given job that they study at

9  some point.

10         MR. LICHTEN:  Your Honor, I would move to admit this

11 document.

12         MS. HARRIS:  I would object.  There's no foundation

13 for it.

14         THE COURT:  Sustained.

15         MR. LICHTEN:  Your Honor, may I be heard?

16         THE COURT:  Yes.

17         MR. LICHTEN:  Mr. Churchill has a case on this decided

18 by you.

19         THE COURT:  I make mistakes sometimes.

20         (Laughter.)

21         MR. LICHTEN:  He wanted to top his genealogy.

22         MR. CHURCHILL:  Your Honor, the basis for it is it's

23 taken from a government website so it's something that the

24 Court can take judicial notice of.  And there was a recent

25 First Circuit decision on this issue.  It's taken from the

1    Mass.gov --

2          THE COURT:  Well, I guess the question may be what is

3    it intended to -- what's the purpose of it?  To simply show

4    that the rating system exists?

5          MR. LICHTEN:  And that it's identical to --

6          THE COURT:  I don't know about the identical part, but

7    that would have to be by comparison to something, I guess,

8    right?

9          MR. LICHTEN:  We would address that in our brief, but

10   we would need this in.

11         MS. HARRIS:  Again, your Honor, I mean, there's

12   nothing to indicate, first, that a 2010 chart for fire chief is

13   relevant in any way to this case, nor is there any indication

14   about how these scores were identified.  Mr. Lichten argues

15   that they're arbitrarily set, but we don't know where these

16   came from.

17         THE COURT:  Yeah, I don't have any idea what this

18   means, okay?  The question is whether there's some basis for

19   admitting it because of its sourcing.

20         MR. LICHTEN:  Your Honor.

21         THE COURT:  I don't know that we have that foundation.

22   I mean, there's a representation that it comes from a website.

23   I think you might need -- on objection, you might need somebody

24   to establish that.

25         MR. CARROLL:  And, your Honor, furthermore, I would

1    just suggest to the Court that because the Court may take

2    judicial notice of something doesn't mean that the Court has to

3    take judicial notice of it.  And certainly, under the

4    circumstances as exist here, no identification, hearsay and,

5    you know, representations with regard to a website

6    somewhere that the Court should.

7         MR. LICHTEN:  Your Honor, it's on the HRD website now.

8    If you want us to get another copy that shows that, we're happy

9    to do it.  If you want us to bring in the computer, if you want

10   us to get it up now on the screen, we're happy to do that.

11        If we want to argue in our brief, and there's

12   obviously going to be a long brief in this case, that this is

13   an example of how the T&E scores are arbitrary and not valid,

14   we should at least be permitted to make that.  But in order to

15   make that, we would have to have this document either

16   judicially noticed, which is actually what happened in the

17   case -- you judicially noticed that -- or admitted.

18        MS. HARRIS:  And my argument, your Honor, I have no

19   dispute that this may very well be an HRD document.  But the

20   inferences that -- or the probative value that Mr. Lichten is

21   proposing to use it for, I think, is not established by

22   anything.  It's a piece of paper that --

23        THE COURT:  That's an argument.  We'll come to that at

24   some point, whether it has any meaning or not.  The question

25   was whether it should be admitted at this point, meaning can --

1    the likelihood of meaning is a consideration and admission, but

2    it's more of a consideration in a jury trial than it is here.

3    I'm inclined to have a fairly low standard of relevance for

4    admission purposes.  We'll figure out whether it has any

5    significance in decision-making at a later stage.

6              So if there's no objection to the source, there's no

7    authenticity objection, then I guess it can be admitted for

8    whatever meaning it may have.

9              MS. HARRIS:  I'm not going to object to the source of

10   it.

11             MR. CARROLL:  No, my objection is -- I accept Attorney

12   Lichten's representation, or Attorney Churchill's

13   representation that they got it off the computer.  I don't have

14   any grounds for denying that.  My objection, again, goes to the

15   discretionary of judicial notice, one; and, two, to the

16   foundation for admitting this even under judicial notice.  This

17   witness has testified, as I understand it, that the value of

18   the T&E is because it's keyed or tied directly to the job

19   duties of sergeant.  Here there's just a chart or a table from

20   an article, I suppose, with no such foundation at all saying

21   it's linked to these jobs which aren't even police jobs,

22   they're fire jobs, in which they're not even fire lieutenant

23   jobs, they're captains and chiefs and --

24             THE COURT:  I understand your view on that, and I

25   don't think it's a reason for excluding it from evidence.

```
 1              MR. LICHTEN:  Should I proceed, your Honor?
 2              MR. CHURCHILL:  193?  I think that's what I --
 3              THE COURT:  Yes, I think that's right.
 4              (Plaintiffs' Exhibit No. 193 received into evidence.)
 5    BY MR. LICHTEN:
 6    Q.    Speaking about the training and experience rating, did you
 7    review the testimony of Robert Alvarez in this case?  I'll try
 8    to -- let me put it up on the screen.
 9    A.    Thank you.
10    Q.    Yes.  Sorry.  He is a police officer from the City of
11    Lowell who's taken the sergeant's exam, I think he testified,
12    five times.  I won't tell you what nationality he is, but I
13    just want to ask you if you reviewed his description of his
14    background.
15    A.    I don't remember reviewing the description.
16    Q.    Well, he says in here that he was a platoon sergeant -- if
17    you look at page 17, that he was a platoon sergeant in the
18    Marine Corps.  Do you see that?
19    A.    Yes.
20    Q.    Now, would you agree that if someone is a platoon sergeant
21    in the Marine Corps, that would show a level of training and
22    experience that would likely be relevant to the position of
23    police sergeant in the Lowell Police Department?
24    A.    Yes.
25    Q.    And do you know how much credit he gets on the training
```

1    and experience point system used by the Commonwealth with

2    respect to his score on the police sergeant's exam?

3    A.    I do not.

4    Q.    It's zero, is it not?

5    A.    I just testified I don't know.

6    Q.    Okay.  Well, I asked you before if you had studied the

7    training and experience rating for the police sergeant's exam

8    in the Commonwealth, and you said you had.  But I take it you

9    haven't studied it in that level of detail?

10   A.    I studied it in great detail.  I thought your question was

11   do I know how much credit this individual received.  I don't

12   know.

13   Q.    Well, do you know how much credit an individual receives

14   for being a platoon sergeant in the United States training

15   troops?

16   A.    I'd have to go back and look at the E&E in terms of how it

17   treats military experience to answer that question.

18   Q.    The answer is zero; is that correct?

19            MS. HARRIS:  Objection.

20            THE WITNESS:  I don't know whether the answer is zero

21   or not.  I would have to look at the document to see if they

22   would get no credit anywhere for military experience or six

23   years as a platoon sergeant.  They may get credit for military

24   service but no further credit for being a platoon sergeant.

25   BY MR. LICHTEN:

```
 1   Q.   Are you aware that Alvarez testified that he got no points
 2   whatsoever on training and experience either for being in the
 3   military or for being a platoon sergeant or for training 60
 4   people under him?
 5   A.   I'm not -- I didn't focus specifically on this
 6   individual's testimony.
 7   Q.   So you can't tell me as you sit here today whether or not
 8   he is correct or incorrect when he testified he got no points
 9   for any of that experience; is that correct?
10   A.   That's correct.
11   Q.   And just so we're clear, if he says on the bottom of this
12   page that "I supervised and trained 40 Marines in a state
13   platoon, surveillance and target acquisition" --
14        Do you see that?
15   A.   Yes.
16   Q.   Now, if one were creating a valid training and experience
17   point system, wouldn't you expect that this would be something
18   that should get significant credit?
19             MS. HARRIS:  I'll object.
20             THE COURT:  Overruled.
21             You may answer.
22             THE WITNESS:  Not necessarily.  If --
23   BY MR. LICHTEN:
24   Q.   I'm sorry?
25   A.   Not necessarily.  If you're developing a valid system, it
```

1    doesn't mean it's going to be perfectly valid.  There may be

2    some things that you missed that ought to be on there.  So I

3    would want to look into this to see why it isn't on there, but

4    you can certainly have a valid E&E without this being on there.

5    It may be more valid with this being on there.

6    Q.    Okay.  He testified -- "Question:  So going back to your

7    experience as a platoon sergeant in the Marines, is that

8    experience reflected in any way on the education and experience

9    form that you complete?"  And his answer was "no."  Do you see

10   that?

11   A.    Yes.

12   Q.    And does that refresh your memory that there is no place

13   on the training and experience form that you submit to list

14   your military experience or the rank that you attained in the

15   military or the number of people that you supervised in the

16   military?

17   A.    It suggests that.  I don't have the document in front of

18   me, so...  It suggests that.

19   Q.    Okay.  Then he was asked -- Mr. Alvarez was asked whether

20   or not he had supervisory experience outside of the military.

21   And he testified that he had worked for a security company

22   before he went -- became a police officer in which he had

23   supervised approximately 100 personnel.  And as part of that,

24   he testified in this court that he led a detail that provided

25   executive protection for General Schwarzkopf and Prime Minister

1    Benjamin Netanyahu.  Do you see that?

2    A.    Yes.

3    Q.    Would you expect on a valid training and experience system

4    used for police promotions, that someone would get credit for

5    that type of experience?

6    A.    Not necessarily.

7    Q.    Not necessarily?

8    A.    Right.

9    Q.    Okay.  Now, I'm also putting in front of you --

10          MR. LICHTEN:  Can you reduce this?  Okay.  That's

11    good.

12    Q.    -- Mr. Alvarez -- this is admitted, Exhibit 135.  This is

13    a list of all of Mr. Alvarez's training that he's submitted to

14    try to get credit on when he applied to become a police

15    sergeant and took the test.  Do you see this?

16    A.    Yes.

17          MR. LEAHEY:  Objection, your Honor.  Your Honor, I'll

18    represent I don't believe he submitted this.  My understanding

19    of this record is this is kept by the Lowell Police Department

20    and it wasn't submitted -- I'll make this as a

21    representation -- it wasn't submitted as part of any

22    promotional exam.  This is maintained by the City of Lowell as

23    to his certifications.

24          MR. LICHTEN:  I may be mistaken.  Can I just --

25          Mr. Churchill, do you recall if he --

1          MR. CHURCHILL:  I don't think so.

2          MR. LICHTEN:  But it's in evidence.

3          THE COURT:  Okay.

4          MR. LICHTEN:  I apologize for that.

5          Thank you, Mr. Leahey.

6    BY MR. LICHTEN:

7    Q.   Do you believe that training such as is on here -- and let

8    me give you some examples, being a semi-auto pistol shotgun

9    instructor, being a defensive tactics instructor, being on a

10   SWAT roundup team, being a -- having taken a course in federal

11   firearms investigative techniques, taking a basic

12   investigator's course, being to police training officer's

13   school and that's superior officer, not police officer -- do

14   you believe that any of these things would, in your opinion, be

15   appropriate to count on a training and experience point system

16   for the position of police sergeant?

17   A.   They could be.

18   Q.   Are you aware that none of them are?

19   A.   I don't remember seeing anything on the E&E that

20   specifically allows for credit for any of these specific

21   categories.

22   Q.   So if it doesn't allow for it, presumably you can't get

23   credit for it; is that right?

24   A.   That is correct.

25   Q.   So if I understand it, this training and experience point

```
 1   system that we're talking about in this case doesn't give you
 2   credit for military experience and military supervision
 3   experience, doesn't give you credit for supervisory experience
 4   in the private world, and doesn't give you any credit for
 5   taking various courses relating to police work; is that right?
 6   A.   That's not my understanding.  It does give you credit for
 7   taking certain courses, or policemen's -- police -- it might be
 8   police related, like law enforcement or criminology.
 9   Q.   Certain college courses; isn't that right?
10   A.   True.
11   Q.   But isn't real-world experience courses more -- and
12   supervisory experience more important than your sitting in a
13   human services class in a community college?
14   A.   I don't know the answer to that question.
15   Q.   Now, in fact, you looked at what the -- as to how many
16   points you could, in actuality, pick up having the training and
17   experience, and you found that generally there was only a
18   two-point variance; is that correct?
19   A.   Approximately, yes.
20   Q.   Okay.  That is, when you looked at this, you found that it
21   could only drive your score about two points?
22   A.   That's correct.  Your overall score.
23   Q.   Right.  So just to make that clear, if you had on your
24   written score a 90, it might -- based upon your experience and
25   training when they averaged it out, it might get you down to
```

1   89, it might get you up to 91, but it could only drive you two

2   points in either direction?

3   A.   Generally it only drove people two points.

4   Q.   And just to look at that visually, I'm showing you --

5   A.   I can't read that.  Sorry.

6   Q.   Okay.  I'm showing you what is in evidence as Exhibit 154,

7   which are the results of the 2002 examination.  And the only

8   reason I'm showing you this and not 2005 and 2008 is this

9   happens to break down in actual points the training and

10  experience.  It's a document produced by the Boston Police

11  Department, submitted by them.

12       And if you look at this document -- and I'm showing you

13  about the first 40 people on the Boston police sergeant's exam.

14  If you look at their training and experience mark, it doesn't

15  vary more than two points; that is, from 16 to 18.  There's no

16  one greater than 18 and there's no one lower than 16; is that

17  right?

18  A.   That's not completely accurate.  I mean, there's some

19  people who are greater than 18.  They don't reach 19, but

20  they're greater than 18, so you'd have to say 18 and something.

21  Q.   But you know how these figures are rounded off?

22  A.   That's fine.  If they rounded them off, then it would be

23  exactly what you said.

24  Q.   Okay.  So if you're a minority police officer with

25  tremendous experience in your past but you don't score well on

1    the written job-knowledge test, you cannot count on the

2    training and experience to help you get to a place where you

3    might get promoted, can you?

4    A.    I think that's true.

5    Q.    Okay.  Now, I'm going to show you the document which is in

6    evidence as Exhibit 11.  And this is the education and

7    experience rating sheet instruction form.  This is the document

8    that you've looked at; is that correct?

9    A.    I'm sorry.  Can I see the heading of this?

10   Q.    Sure.  I'm sorry.

11   A.    Yes.

12   Q.    And first of all, you're aware that the exact same rating

13   sheet is used for the position of police sergeant, police

14   lieutenant and police captain; is that correct?

15   A.    That's my understanding.

16   Q.    And do you think that's appropriate, to use the same exact

17   scoring method for each level of authority within the police

18   department?

19   A.    Yes.

20   Q.    Okay.

21   A.    Because the document was linked to each one of these

22   ranks.

23   Q.    I see.  Linked after the fact or before the fact?

24   A.    It was linked in 1991 to each one of these ranks.

25   Q.    Do you know if it was linked before the fact or after the

1  fact?

2  A.   Before which fact?

3  Q.   That is, do you know whether or not the methodology had

4  been set in 1991 and it was then justified by a validation

5  study, or do you know whether or not there was a validation

6  study, SMEs were consulted, and then they set the training and

7  experience methodology?

8  A.   It is my understanding that this E&E was in existence

9  prior to 1991, and that the individuals who were looking at it

10 and asked to make the links were doing so at that period of

11 time, but that wasn't the initial existence of the device.

12 Q.   In fact, it's been in existence for 25, 30 years, hasn't

13 it?

14 A.   I assume so.  I don't know the exact number of years it's

15 been around.

16 Q.   Now, if you go to page 7 of this document, there's a

17 category for collateral skills.  Do you see that?

18 A.   Yes.

19 Q.   And I thought I heard you saying yesterday in your direct

20 testimony -- maybe it was Monday -- that if you've taught a

21 course, for example, that would be an indication of certain

22 abilities which are reflective of what a police sergeant needs

23 to have to be a police sergeant; is that correct?

24 A.   I don't know whether I said it would be reflective of

25 certain abilities.  I may have said it would be reflective of

1    communication skills.

2    Q.    Okay.  Do you know how many points you get for having

3    taught a course?

4    A.    I don't remember offhand, but it's on here somewhere.

5    Q.    Okay.  Well, if you look at this, I just want -- it says

6    "Collateral skills," that's V, Category 1.  And it talks about

7    business administration, management, public administration,

8    political science -- do you see those -- criminal justice,

9    criminology?

10   A.    Yes.

11   Q.    So those would be the most important ones for the position

12   of police sergeant; is that right?

13   A.    Those are the ones that were linked to the position of

14   police sergeant in the validation study.

15   Q.    Okay.  And then if you go under "Collateral skills" to

16   "Courses taught," do you see where it says that if you've

17   taught one course in one of these areas, that you get 0.2 of a

18   point?

19   A.    Yes.

20   Q.    But it's actually not 0.2 that you get.  You then have to

21   divide that by five because it's only counting for 20 percent,

22   and you end up with under .0 something; is that correct?

23   A.    That's my understanding.

24   Q.    So it doesn't drive your score at all; is that right?

25   A.    It's not correct.  It drives your score to some degree.

1    Maybe not as much as you might like, but it drives it.

2    Q.    Don't they round off the scores?

3    A.    They can -- they do round off the scores, but this is

4    added into whatever else -- wherever kinds of experiences you

5    have.  And the total is then weighted by .20 and rounded off.

6    Q.    So let's say you've taught as many as three courses, three

7    college-level courses.  You would get .6 for that; is that

8    correct?

9    A.    Yes.

10    Q.    And then if you divide that or multiply -- however

11    you -- if you then take 20 percent of that, you're down to .1

12    of a point; one tenth of a point?

13    A.    If you did that, yes.

14    Q.    Now, if you look at the work experience, if I understand

15    it, if you look at -- I asked you to look at the point that's

16    yellow-lined, Number 4, which is, I believe -- corresponds to

17    work experience as a police officer.  If you've had 36 months

18    on the job, which is what you have to have on the job in order

19    to take the exam in the first place, you get 4.2 points for

20    that; is that right?

21    A.    Yes.

22    Q.    Okay.  And again, 20 percent of that would be a little

23    less than 1 point; is that right?

24    A.    It would be if you multiply that by 20 percent.

25    Q.    And then if you go to someone who has more experience on

1    the job, 48 to 59 months, they only get another 1.2, which

2    again, when you only take 20 percent of that is, again, far

3    less than a point?

4    A.    Yes.

5    Q.    And even if you've -- just to carry this out --

6          And it's your testimony that this training and experience

7    component that we've just talked about takes a written

8    job-knowledge multiple-choice test that you would find to be

9    invalid in and of itself for police sergeant in the

10   Commonwealth of Massachusetts and tips the balance to make it

11   valid.  That's your testimony in this case?

12   A.    That's correct.

13   Q.    So if, in fact, the Court were to find that the training

14   and experience component itself is not a valid predictor of job

15   performance, then you would agree, would you not, that the

16   written test standing alone would not be a valid predictor of

17   job performance and would not meet validity criteria?

18   A.    That is correct.

19   Q.    I'll move on to something else.  This is an article that

20   you wrote; is that correct?

21   A.    Yes.

22   Q.    And I think we've talked about this some.  This is your

23   article on "Testing medium, validity and test performance"; is

24   that correct?

25   A.    Yes.  It's a chapter in a book.

1   Q.   Okay.  And how long ago was this written?

2   A.   I don't remember.  I think it was 1998, somewhere around

3   there.

4   Q.   Okay.  And one of the purposes of this chapter was for you

5   to write about the fact that the way that you test for a

6   knowledge could determine one's performance on it, and that may

7   be independent of whether they actually have the knowledge?

8   A.   That's correct.

9   Q.   And if you -- if we go to page 48 of your article.  And in

10  the middle it says -- you're talking about a study that was

11  done on multimedia tests; is that right?

12  A.   Yes, a study that was done in 1994.

13  Q.   Okay.  And you -- I'm quoting here.  It says, "The

14  patterns of adverse impact were different for each racial

15  group.  As an example, the multimedia tests produced smaller

16  differences between African-Americans and whites than did the

17  traditional tests of tables and graphs, arithmetic and reading

18  comprehension"; is that correct?

19  A.   Yes.

20  Q.   And what you conclude from that is that if one is giving

21  some type of selection or promotional testing, it would be

22  appropriate to try to test, where possible, using multimedia or

23  visual techniques because it may reduce adverse impact; is that

24  correct?

25  A.   Could you repeat that question, please.

1          MR. LICHTEN:  Could you read it back.

2              (The reporter reads the pending question.)

3    A.   It depends on the job you're testing for.

4    BY MR. LICHTEN:

5    Q.   Well, you certainly believe that for the position of a

6    fire officer; is that correct?

7    A.   Correct.

8    Q.   And you believe it too, for the position of police

9    officer, don't you -- police sergeant?

10   A.   Yes.

11   Q.   Finally, I want to show you -- now, this is a chart that

12   you made; is that right?

13   A.   Yes.

14   Q.   It's at Table 5.1 of your article.  And --

15   A.   Let me be precise, it's a table that I constructed, and it

16   says at the bottom of the table it's based upon information or

17   validity coefficients from other sources.  I want to correctly

18   attribute the table to who had -- the data to the person.

19   Q.   You were reporting what others found?

20   A.   There you go.

21   Q.   Thank you.  And at the top you list cognitive ability

22   tests or written job-knowledge tests.  Do you see that?

23   A.   Yes.

24   Q.   And first I'd like to ask you about this coefficient of

25   validity.  That coefficient of .10 to .49 seems quite wide.  I

1    mean, .10 would seem to me to be not great validity and .49, as

2    I understand it, is fairly high validity; is that correct?

3    A.    Yes.

4    Q.    Okay.  So is the reason you have such a wide discrepancy

5    is because there are good tests and bad tests that fit within

6    these categories and you can't make a single -- a specific

7    judgment unless you know what the test was?

8    A.    No, it means that those are derived from studies of

9    different kinds of jobs, and the tests have different levels of

10   correlation with performance depending upon the job.  So if

11   you're talking about the job of a street cleaner, the cognitive

12   ability test may have less of a correlation than if you're

13   talking about the job of a bank examiner.

14   Q.    Gotcha.  And you -- sorry.  And in this you group

15   cognitive ability tests with written job-knowledge tests; is

16   that correct?

17   A.    Yes.

18   Q.    And you say for both of them, that they have high

19   subsidiary group differences; is that correct?

20   A.    Yes.

21   Q.    So, in fact -- and you say this article is from 1998; is

22   that right?

23   A.    I think so.  I don't have the article in front of me.

24   Q.    Okay.  So, in fact, if anyone took the time to research

25   the literature in 2004, they would have known based upon the

1    scientific literature that was out there that if they gave a

2    written job-knowledge multiple-choice test, you could almost

3    say for certainty that it would have high adverse impact; is

4    that correct?

5    A.    They wouldn't know that from reading this.  This is one

6    chapter by one IO psychologist, and they would -- I would

7    suspect they would go read other articles by other IO

8    psychologists and --

9    Q.    They may say the same thing?

10    A.    They may or may not and say it in the same way.

11    Certainly, they wouldn't say it in the same way as this one.

12    This one -- this was considered a relatively novel approach to

13    looking at the question of adverse impact and validity.

14    Q.    But I thought that this chart that you put together was

15    based on the studies of others so you were relying on other

16    people's studies?

17    A.    It was based on the studies of others but those studies

18    had never really combined the two notions of validity and

19    adverse impact and method of medium.  That was the value of

20    this chapter.

21    Q.    No.  No, but that's not the question I'm asking you.  All

22    I'm asking you right now is if anyone had bothered to study the

23    literature in 2004 in preparation for a 2005 police sergeant's

24    test --

25    A.    Yes.

1    Q.    -- to determine what the likelihood was of having high

2    adverse impact by using a multiple-choice job-knowledge test,

3    using convergent thinking --

4    A.    Yes.

5    Q.    -- the literature was there by that time to show that it

6    could be predicted highly likely to have significant adverse

7    impact on minorities; is that correct?

8    A.    That's correct.

9    Q.    Okay.  I'm going to ask you if you have ever seen an

10   article relating to an assessment of utility -- an assessment

11   of utility of using an assessment center for the promotion of

12   police sergeants.  I'm asking you right now whether you're

13   aware of the study?

14   A.    No.

15   Q.    Okay.  Do you know Professor Thornton?

16   A.    I do.

17   Q.    From Colorado State University?

18   A.    I do.

19   Q.    Okay.  And how do you know him?

20   A.    I have given presentations and been on panels with him at

21   SIOP, or at least one panel.

22   Q.    All right.  And have you -- so are you familiar with his

23   work on studying the question of utility, that is, the

24   cost-effectiveness of using an assessment center for the

25   position of police sergeant?

1    A.    Yes.

2    Q.    Okay.

3    A.    I'm familiar with his work on the utility of assessment

4    centers, not necessarily specifically for police sergeant.

5    Q.    Okay.  And are you aware that his conclusion has been that

6    using an assessment center to select candidates for police

7    sergeant is cost-effective; that is, the money that you spend

8    to do it will result in savings in the long run because you get

9    better police sergeants?

10   A.    I'm aware of that.

11   Q.    And you agree with that?

12   A.    As a general proposition.  It may or may not be

13   cost-effective.

14   Q.    But let's face it, police sergeants can get departments in

15   a lot of trouble; is that correct?

16   A.    True.

17   Q.    Okay.  So if on the beginning you spend $750 or $1,000 in

18   a promotional process per candidate to try to figure out who

19   would be the best police sergeants, who were less likely to

20   beat up a suspect improperly or to knock down a door when it's

21   illegal do so, that might be cost-effective even though you're

22   spending $750 or $1,000 on the front side, you're saving

23   yourself what could be thousands or millions of dollars in

24   liability on the back side; is that right?

25         MR. CARROLL:  Objection.

1            MS. HARRIS:  Objection, hyperbole.

2            MR. LEAHEY:  Objection.

3            THE COURT:  Overruled.  You may answer it.

4            THE WITNESS:  That -- that could be true.  I mean, the

5    question is a little more complex than that.  The -- it's

6    cost -- is it more cost-effective than taking a

7    paper-and-pencil test that will get you the same -- pretty much

8    the same place at 20 times less the money, so...

9    BY MR. LICHTEN:

10   Q.   Let me ask you a couple of specifics.  If you look at the

11   fourth paragraph down, he says that studies have found that

12   assessment centers range from a low of $506 per candidate to a

13   high of $3,000 per candidate.  Do you see that?

14   A.   Yes.

15   Q.   And do you think that's an accurate assessment of the

16   range?

17   A.   I will take Dr. Thornton's word for that.  I don't -- I

18   haven't made such an assessment so I have no reason to disagree

19   with it.

20   Q.   Well, let me ask it this way:  When you have done

21   promotional assessment centers, have you found that there's an

22   average cost per candidate that you've seen in your own work?

23   A.   Yes.

24   Q.   And what is that?

25   A.   It could range, I suppose, from several hundred dollars to

1    maybe $500, the cost in terms of doing the whole thing.

2    Q.    Okay.  You said $500?

3    A.    Yes.  For --

4    Q.    And is there economies of scale?

5    A.    Yes.  "Economies of scale" meaning at a certain point it's

6    no longer cost-effective, or do you mean an economy of scale in

7    the sense that the -- that --

8    Q.    The more you do it --

9    A.    -- do it --

10   Q.    -- the less --

11   A.    -- the less it --

12   Q.    -- it might cost --

13   A.    Yes.

14   Q.    -- because you're not repeating things?

15   A.    True.

16   Q.    So let's take your figure of 500 -- 500.  So let's say

17   this -- per candidate.  So if the City of Boston were to test

18   600 candidates at 500 per candidate, what would that be?

19   A.    If they were to test 600 candidates?

20   Q.    Yes.

21   A.    30,000 -- I mean, $300,000, I think.

22   Q.    Okay.  Do you think that's prohibitive?

23   A.    I don't -- that depends on the City of Boston.  I don't

24   know.

25   Q.    Well, just one last thing.  His last concluding sentence

1    is, and he's talking about the assessment center for the Dallas

2    police department, police sergeant position, "The assessment

3    center was expensive but darn well worth it."  Do you see that?

4    A.    I see that.

5    Q.    Okay.  And do you agree that using an assessment center is

6    worth it?

7    A.    It can be.

8    Q.    Okay.

9    A.    Sometimes it's not.

10   Q.    I'm showing you an article that I believe you also wrote.

11   Do you recall that article?

12   A.    It's a chapter in a book, I think.

13   Q.    Okay.  And that's in the -- that's actually in a journal?

14   A.    It is an article.

15   Q.    Is that correct?

16   A.    Yes.

17   Q.    Okay.  And you say in this article, and this is -- the

18   title of this article is "The Role of Cognitive Ability Tests

19   in Employment Selection."  And you say in the second paragraph

20   on the first page you say, "Given that, A, cognitive ability

21   tests can be combined with other predictors such that adverse

22   impact is reduced while overall validity is increased; and B,

23   alternative predictors with less adverse impact can produce

24   validity coefficients comparable to those obtained with

25   cognitive ability tests alone, sole reliance on cognitive

1   ability tests when alternatives are available is unwarranted."

2   Do you see that?

3   A.   Yes.

4   Q.   Do you still hold to that belief?

5   A.   Yes.

6   Q.   If you hadn't written so much, Doctor, I'd be done a lot

7   quicker.

8        You also gave a presentation to the EEOC in 2007.  I think

9   you described this at one point in your testimony; is that

10  right?

11  A.   Yes.

12  Q.   And you were asked to talk about employment testing and

13  screening?

14  A.   Yes.

15  Q.   Okay.  And I want to draw your attention to -- you

16  addressed the question of reducing adverse impact by expanding

17  the selection process, is that right, and using alternative

18  test media; is that right?

19  A.   Yes.

20  Q.   And I just wanted to turn to the bottom part using

21  alternative test media.  You said, "A number of researchers

22  have investigated the effects of varying the testing medium on

23  validity and adverse impact," and you talked about the Pulakos

24  and Schmitt study.  They found that video-based tests resulted

25  in significant reductions in adverse impact; is that right?

1   A.   Yes.

2   Q.   And you agree -- and you yourself have recommended in

3   various police promotional tests that such video medium be used

4   to test job knowledge; is that correct?

5   A.   Correct.

6   Q.   Including in Bridgeport; is that right?

7   A.   Yes.

8   Q.   Because you believe that it would tend to have less

9   subgroup differences; is that right?

10  A.   I believe that, yes.

11  Q.   Okay.  Now, I just want to ask about this for a second.

12  In a police promotional setting, how would these visual

13  exercises run?  That is, would there be a screen and someone

14  would be watching the screen and writing down the answers or

15  giving the answers orally or could it be both?  How would it

16  actually work?

17  A.   It can be done both ways, and I've done it both ways.

18  Q.   Okay.

19  A.   You can have the video and then have a person give an oral

20  response to a panel as to how they would handle that particular

21  situation, or you can have a video and have them choose between

22  a number of strategies as to how they would handle that

23  particular scene on the video, or you can have a video and have

24  them speak into an audiotape saying what they would do, or you

25  can have them watch the video and have a videotape of what they

1    say they would do.

2    BY MR. LICHTEN:

3    Q.    Okay.  And I take it before it's scored the expert running

4    the exam has met with a panel of reviewers and has gone over

5    what the right -- what more correct and less correct answers

6    would be; is that correct?

7    A.    Sometimes before, sometimes after.

8    Q.    Okay.  And could there also be a visual exercise shown and

9    a multiple-choice test, with either divergent or convergent

10   thinking on the test, where someone writes down the response

11   and that could be computer scored?

12   A.    Yes, when you say write down their response, I assume you

13   mean --

14   Q.    Yeah, they mark A, B, C or D --

15   A.    Correct, yes.

16   Q.    And those are actually used in numerous jurisdictions

17   throughout the United States; is that correct?

18   A.    I haven't surveyed numerous jurisdictions but it's my

19   experience at the time I was most heavily involved in this is,

20   yes, that departments have gone to that to the greatest extent

21   that they can.  I don't know how extensive it is.  Sorry.

22   Q.    And then I'm trying to get to the end of your article, and

23   you say, and I'm quoting you here, "Although minimizing adverse

24   impact and sustaining validity have traditionally been

25   considered, 'conflicting goals' -- I'm sorry -- 'conflicting'

1    goals, the trend in thinking today is that the simultaneous

2    achievement of these two goals may be possible at least to a

3    significant degree.  Advances in understanding the

4    multidimensionality of job performance have made it possible to

5    identify the best predictors for the facets of performance most

6    important to the organization."  Do you see that?

7    A.    Yes.

8    Q.    So what I understand that you're saying is in the olden

9    days, industrial psychologists, and that's before you, of

10   course, Dr. Outtz, thought that there was a tradeoff between

11   adverse impact and validity; is that correct, in job

12   relatedness?

13   A.    That's not correct in the sense that I'm not aware of the

14   olden days, number one; and number two, there really is no

15   clear demarcation.

16   Q.    Okay.

17   A.    It has been an evolution is what I'm saying.

18   Q.    I was just trying to be light, but -- in other words, what

19   you're saying in this article is that there doesn't have to be

20   a tradeoff between reducing adverse impact and increasing

21   validity; is that correct?

22   A.    That's correct.

23   Q.    You can achieve both goals at the same time by increasing

24   the components and the dimensions tested for the job?

25   A.    I believe that is possible.

1    Q.    Okay.  And even if you don't achieve the first reducing

2    adverse impact, you're at least likely to achieve the second,

3    which is creating a more valid test; is that correct?

4    A.    I believe that is possible, yes.

5    Q.    And therefore, even if you don't reduce adverse impact,

6    you may end up getting better police sergeants; is that right?

7    A.    I think that's true.

8    Q.    You also wrote an article about less adverse alternatives

9    making progress and avoiding red herrings.  Do you see that?

10   A.    This is an article that I wrote in the -- I guess you

11   would call it the bulletin for the Society for Industrial and

12   Organizational Psychology.  There's a periodical that's

13   basically a bulletin.  It's called TIP, and I put the article

14   in there.

15   Q.    So the article -- that's SIOP's magazine?

16   A.    Yes, it is.  It's not really a referee journal, it's a --

17   it's an informative sort of -- I can't think of the word.  Not

18   brochure but message board sort of.

19   Q.    Okay.  And in there you describe the case of Marilyn

20   Johnson versus City of Memphis; is that correct?

21   A.    Yes.

22   Q.    And that was a police promotional exam; is that correct?

23   A.    Yes.

24   Q.    And what happened in that case -- and what are you citing

25   this for the principle of?  Why were you citing the Johnson

1  <u>versus City of Memphis</u> case?

2  A.   I'd have to read it first to find out what I was citing it

3  for.

4        (Pause.)

5  A.   I have to wait for you to quit moving it around for me to

6  read it.

7  BY MR. LICHTEN:

8  Q.   I'm sorry.  I'm just trying to make it more readable for

9  you.

10        (There is a pause.)

11        THE WITNESS:  I cite this case for giving some

12  perspective as to how courts look at some of the issues in the

13  Title VII cases.

14  BY MR. LICHTEN:

15  Q.   And what has happened in that case was that the City of

16  Memphis had used a promotional exam for the position of police

17  sergeant in the early '90s that had fairly low adverse impact,

18  but then in the next round of promotions they had gone to an

19  exam that had higher adverse impact; is that correct?

20  A.   Yes.

21  Q.   And the court said in that case, and you agree with this,

22  that because they could have gone back to the exam that they

23  had used before that had lower adverse impact there were other

24  feasible alternatives and, therefore, they violated Title VII?

25  A.   I agree with that.  I agree that that was the court's

1    interpretation, yes, or at least my understanding of it.

2    Q.   And by the way, just so we're clear, in that article you

3    also described Bradley versus City of Lynn; is that correct?

4    A.   Yes.

5    Q.   So I can collect my royalty on that at some point?

6         (Laughter.)

7    BY MR. LICHTEN:

8    Q.   Okay.  Moving on, you gave a presentation in Dallas,

9    Texas; is that correct?

10   A.   I have given -- I did give a presentation in Dallas,

11   Texas.

12   Q.   Okay.  Do you recall giving this slide presentation?

13   A.   I remember giving this as a preconference workshop at the

14   SIOP annual conference.

15   Q.   Okay.  So it's a preconference workshop?

16   A.   Yes.

17   Q.   Okay.  And this is one of the slides that you gave; is

18   that correct?

19   A.   Yes.

20   Q.   And you say in here, "When the use of a test results in

21   outcomes that affect the life chances or educational

22   opportunities of examinees, evidence of mean test score

23   differences between relevant subgroups of examinees should,

24   when feasible, be examined for that construct-irrelevant

25   variance"; is that correct?

```
1   A.   Yes, that's taken from the standards for educational and
2   psychological testing.
3   Q.   Okay.  And you intended it to apply to employment
4   opportunities, too; is that correct?
5   A.   Yes.  What I was doing was making a comparison between the
6   adverse impact between the Uniform Guidelines and the standards
7   for educational psychological testing and the division for team
8   principles.  These are typically the documents that folks in my
9   profession turn to when trying to determine best practices, and
10  so at the conference I was trying to explain or at least look
11  at how they compare with each other.
12  Q.   So looking at test score mean differences, is one of the
13  techniques you yourself used to determine whether a test has a
14  potential for disparate impact or adverse impact against
15  minorities; is that correct?
16  A.   Yes.
17  Q.   Okay.  So you wouldn't quarrel with the fact that it would
18  be appropriate in this case, for example, to look at mean
19  differences or test differences between minorities and
20  non-minorities in determining whether or not this police
21  sergeant's exam had the potential for adverse impact; is that
22  right?
23  A.   As you state it, that's correct.  Whether it has a
24  potential for it.  The adverse impact itself is determined by
25  the actual selections.
```

1    Q.   Now, you talk about being examined for

2    construct-irrelevant variance.  What is "construct-irrelevant

3    variance"?

4    A.   Every test is designed to measure some characteristic

5    about people which psychologists call a construct.  Either it

6    could be -- the construct could be intelligence, the construct

7    could be mechanical ability, the construct could be reading

8    comprehension.  So that's the attribute that you may be trying

9    to measure.  There are many attributes that psychologists try

10   to measure.  We call them constructs.

11       When you give a test, it is rare, if ever possible to give

12   a test that only measures the construct you are interested in.

13   By virtue of testing itself, it measures some other kinds of

14   things.  So you may have variability in test scores that's due

15   to the construct that you're interested in or it may be due to

16   constructs that you're not interested in, but they are an

17   inherent part of that test.  That's variability in test scores

18   that's caused by a construct that's irrelevant to what you're

19   interested in, and we refer to it as construct-irrelevant

20   variance.

21   Q.   I'm not sure I understood the answer, but I should

22   probably move on.

23       As part of the same presentation you talked about that

24   "Black/Hispanic individuals, subgroup, perform .35 standard

25   deviations better on a multiple list divergent test response

1  format than on the multiple-choice convergent format."  Do you

2  see that?

3  A.   Yes.

4  Q.   And what are you referring to?  Is this some study that

5  you're referring to or a group of studies or a metaanalysis?

6  A.   This is a study that I conducted with a professor at City

7  University of New York and a graduate student.

8  Q.   And is that published?

9  A.   No.

10  Q.   And then you say on this "Black/Hispanic divergent group

11  outperformed white/Asian convergent subgroup by .22 standard

12  deviations on the multiple list divergent test response

13  format."  Is that the same study?

14  A.   Yes.

15  Q.   I'm trying to move through this quickly.  You

16  testified -- I'm sorry.  You submitted an expert report in

17  a -- for the plaintiffs in a case involving the State of New

18  York; is that correct?

19  A.   Yes.

20  Q.   And you were an expert for the plaintiffs in that case in

21  2008; is that correct?

22  A.   Yes.

23  Q.   And that was state Civil Service supervisory positions; is

24  that right?

25  A.   Throughout the State of New York, yes.

```
1   Q.   And what the state used in that case was a written

2   multiple-choice test.  That was the test you would take for

3   promotional opportunity; is that correct?

4   A.   Yes.

5   Q.   And you testified that you didn't think that was valid

6   because there should have been other components to the exam

7   that better assess supervisory ability; is that right?

8   A.   Yes, they had done that before, and I had questioned why

9   they couldn't have continued to do it.  And I found that there

10  was no basis for them to shift to the written test only.

11  Q.   And you found that the written test standing alone was not

12  valid; is that right?

13  A.   Correct.  For those jobs throughout the state.

14  Q.   I believe you testified about this already.  This is the

15  presentation you gave in October of 2009 at the SHL conference?

16  A.   Yes.  I can't read that, actually.

17  Q.   It's been a little -- can you read it now?

18  A.   No.  Maybe if I put my glasses on.  I can now, yes.

19  Q.   Okay.  I just wanted to ask you about some of the slides

20  in here very briefly.  This was -- do you remember this slide?

21  A.   Yes.

22  Q.   Okay.  And if I understand this, what you were saying in

23  this slide -- was this -- just so I'm clear, was this an actual

24  assessment center that you conducted or was this a theoretical

25  assessment center or was it based on studies?  What was it
```

1   based on?

2   A.    It was an actual assessment center that I conducted.

3   Q.    For what city?

4   A.    Bridgeport.

5   Q.    Okay.  So this was based on actual data that you had from

6   Bridgeport?

7   A.    Correct.

8   Q.    Okay.  And I assume Bridgeport is maybe a fifth or a half

9   the size of Boston?

10  A.    Maybe a fifth, I think.

11  Q.    Okay.

12  A.    The police department, you mean?  You mean the city itself

13  or -- I'm sorry.

14  Q.    Sorry.  Let me clarify that.  That was a bad question.  Do

15  you remember how many officers there were in the fire --

16  Bridgeport fire department, total number?

17  A.    Yes.  Approximately 200.

18  Q.    Okay.  Okay.  And --

19  A.    Do you -- I'm sorry.  Are you talking about fire officers

20  or firefighters?

21  Q.    Total fire department personnel?

22  A.    Oh, I'm sorry.  Then it's -- I see.  It's approximately, I

23  would say, 350 or something like that.

24  Q.    Okay.  So it's maybe one-fourth the size of Boston.

25        Now, showing you this chart, what you're portraying here

1    is that if you had only used the written test score, I assume

2    this was a job-knowledge test, not a cognitive ability test; is

3    that correct?

4    A.    That's correct.

5    Q.    That -- and if you only were able to promote so many

6    people off that exam, you would have gotten zero percent

7    minorities; is that correct?

8    A.    That's correct.

9    Q.    And then if you then added in an assessment using a

10   weighted assessment center, you get the next page's result; is

11   that correct?

12   A.    Yes.

13   Q.    And that would be 13 percent minority candidates; is that

14   correct?

15   A.    Correct.

16   Q.    Okay.  And what were the weights that you were using to

17   achieve that result?

18   A.    Oh, there were, like, four exercises.  I don't remember

19   the exact weights for the exercises.  There was a fire scene

20   simulation exercise which gained the most weight, which is

21   emphasized in this slide presentation.

22   Q.    Let me just ask, is it similar to the testimony you've

23   already given about Bridgeport?  I won't go into it if it is.

24   A.    What do you mean similar to it?  Similar to what?

25   Q.    I asked you about police.  Do you know what the weight was

1    of the written test when you weighted it and then found that it

2    would result in 13 percent cand- -- of the minority candidates?

3    A.    I don't remember the exact weight.  Relatively weights,

4    the fire scene simulation had the most weight.  The written

5    test had some weight that was, I believe, an in-basket had more

6    weight than the written test, and there was a report review

7    exercise that had the least weight.

8    Q.    Well, let me ask it this way:  Do you believe that the

9    weights that you utilized to get the 13 percent minority

10   candidates in the mix for promotion was an appropriate

11   weighting based upon the job analysis?

12   A.    The weighting was based on the job analysis, period.  It

13   wasn't weighted to get minorities into anything.

14   Q.    Gotcha.  So it was a -- in your opinion, it was a valid

15   weighting that you used?

16   A.    Correct.

17   Q.    And then I want to ask you about a workshop that you gave

18   in Pretoria, South Africa.  Do you recall that?

19   A.    Yes.

20   Q.    And I assume that was a great experience, was it not?

21   A.    Yes.

22   Q.    Okay.  And you gave that in 2007?

23   A.    Great experience meaning the presentation or South Africa?

24        (Laughter.)

25   BY MR. LICHTEN:

1   Q.   Both.

2   A.   Yes.

3   Q.   And this was a slide presentation that you gave; is that

4   right?

5   A.   Yes.

6   Q.   Okay.  And I just want to go over just a couple of points

7   that you made in this.  Now, is this -- was the purpose of this

8   presentation to talk about how one reduces adverse impact

9   hoping that it would be of use to governmental and private

10  agencies in South Africa?

11  A.   Yes, for -- in large measure, yes.

12  Q.   Okay.  And you wanted to talk about some of the

13  experiences that you and others had had in the United States?

14  A.   Correct.

15  Q.   Okay.  And if you look at this slide, you say when a

16  construct can be measured in different ways that are

17  approximately equal in their degree of construct-irrelevant

18  variance, and we've already talked about that, "evidence of

19  mean score differences across relevant subgroups of examinees

20  should be used in deciding which test" -- and I assume that's

21  used, but I don't have that?

22  A.   That's the same core that I had -- that comes from the

23  standards for educational and psychological testing, the same

24  core.

25  Q.   Okay.  So when the Commonwealth of Massachusetts or the

1    City of Boston was deciding what test to use for 2005 and 2008,

2    it would have been appropriate for them to look at mean score

3    differences from previous tests to decide what test -- type of

4    test to use; is that right?

5    A.    Yes.

6    Q.    Okay.  Very quickly -- I'm sorry this got a little cut

7    off, but in this slide you're talking about your experience and

8    others' experience with situational judgment tests; is that

9    correct?

10   A.    This is chopped off.  I don't -- I don't know.  I can't

11   put this in perspective with it.

12   Q.    Let me ask this this way:  Aren't you saying here that you

13   have found that situational judgment tests have a validity

14   coefficient of approximately .34?

15   A.    Without looking at the context of this, I'm either saying

16   that's what I found or that's what the literature shows in

17   combination with what I found.

18   Q.    As you sit here today on the witness stand do you think

19   that's a fair estimate of the validity coefficient for

20   situational judgment tests?

21   A.    I think a fair estimate of the validity of a situational

22   judgment test would be a composite of what the literature shows

23   today.  I think I gave this talk in 2007, and that's why I keep

24   emphasizing that it depends on when you ask the question.  This

25   is 2010.  You've already cited several chapters in books about

```
 1    situational judgment tests in 2010.  And I would look at that
 2    literature, combine it with this and then make my assessment
 3    today.
 4    Q.   But you don't know whether you agree or disagree that
 5    that's the validity of situational judgment tests?
 6    A.   I think this is in the ballpark.  I don't know whether it
 7    would be revised upward or downward.
 8    Q.   Okay.  But you would agree that situational judgment tests
 9    have relatively high validity?
10    A.   Yes.
11    Q.   Okay.  Moving on.  This is also one of the slides that you
12    presented.  And here you're talking about the D effect size of
13    various types of tests that have been administered for the
14    position of fire lieutenant.  Do you see that?
15    A.   Yes.
16    Q.   Okay.  And, again, is this based on your data or based
17    upon the literature or combination of both?
18    A.   This, I think, is based on my data.
19    Q.   Okay.  From Bridgeport?
20    A.   Yes.
21    Q.   Okay.  So you -- and then the multiple-choice test that
22    you're talking about here, is it fair to say that the
23    multiple-choice test would have been a convergent thinking
24    multiple-choice test that is just one right answer given in a
25    written format?
```

1    A.    Yes.

2    Q.    And it would have been a job-knowledge test, not a

3    cognitive ability test; is that correct?

4    A.    Correct.

5    Q.    And what you found is that when such a test is given, the

6    effect size is 1.13; is that correct?

7    A.    I found that -- I'm sorry.

8    Q.    You found that the effect size was 1.13 standard

9    deviations; is that right?

10   A.    Yes, for this test.

11   Q.    For this test.  And that's a very large effect?

12   A.    It is.

13   Q.    Okay.  Then with respect to report writing which was part

14   of the exercise that these fire lieutenant candidates were

15   given, the effect size was approximately half that; is that

16   correct?

17   A.    Yes.

18   Q.    When you get to an oral situational judgment test, you

19   found that the effect size was less than a quarter of the size

20   of the written multiple-choice test; is that correct?

21   A.    That's correct.

22   Q.    And if you used an oral visual situational judgment test

23   you were able to reduce that effect size in half; is that

24   correct?

25   A.    Yes.

1    Q.    Okay.  Now, just so I'm clear, this oral/visual

2    situational judgment test that you describe here, is that with

3    people writing down their answers on an answer sheet or giving

4    the answers visually -- I'm sorry -- orally or some other way?

5    A.    They see a particular scene and give their answers orally

6    to a panel that's in the room when they look at it.

7    Q.    That has to qualitatively judge the answer?

8    A.    They have to judge the answer based on a specified scoring

9    key.

10   Q.    Now, just so that I'm clear because I was curious about

11   this, did you give -- was this all part of one test that you

12   gave, were these all components?

13   A.    Yes.

14   Q.    Or were these taken from different years?

15   A.    No, they're all one component.

16   Q.    Okay.

17   A.    They make up a process that was given at the same time.

18   Q.    Okay.  And does this relate to that chart I showed you

19   before where you were able to get with just the written test

20   zero percent of the candidates and then 13 percent of the

21   candidates when you went to a multiple component test or is

22   this different?

23   A.    I'm not certain of that.  It may be the same.

24   Q.    Okay.

25         MR. LICHTEN:  Your Honor, if this is acceptable, this

 1    might be a time to be a break, and I can consolidate what I

 2    have left.

 3         THE COURT:  Okay.  All right.  We'll take the morning

 4    recess.

 5         MR. LICHTEN:  Thank you.

 6         THE CLERK:  All rise.

 7         (The Court exits the courtroom at 10:55 a.m.)

 8         THE CLERK:  The Court will take the morning recess.

 9         (There is a recess in the proceedings at

10    10:55 a.m.)

11         (After recess, start at 11:26 a.m.)

12                   CONTINUED CROSS-EXAMINATION

13    BY MR. LICHTEN:

14    Q.   I just want to go back to this Thornton article, because I

15    think I made a mistake, and if I show you that --

16         I said according to this article the cost of an

17    assessment center was from $506 to $3,000.  Do you remember me

18    asking you that?

19    A.   Yes.

20    Q.   But as I look at this I think I misread it.  It looks like

21    Professor Thornton is saying that the utility per selectee from

22    various studies have been found to range from 506 to 3,036; is

23    that correct?

24    A.   Again, I haven't read this study.  The first I've ever

25    seen of it is this morning.  I don't know if that's correct or

1    not.

2    Q.   Let me ask a simple question.  A utility is the benefit,

3    not the cost; is that correct?

4    A.   That's correct.

5    Q.   I may have asked you the wrong question.  It seems to be

6    saying that it's the benefit from giving the test ranges from

7    500 to 3,000 per candidate?

8    A.   I don't have the whole article.  If I read the whole

9    article, I can answer that question.

10   Q.   Okay.  I just wanted to clarify that.

11        In the late 1990s, early 2000 period you were involved

12   in designing promotional exams for the San Francisco Fire

13   Department; is that correct?

14   A.   Yes.

15   Q.   And the components of that exam were a fire scene

16   simulation, a training exercise, a disciplinary simulation, and

17   a counseling exercise; is that correct?

18   A.   Yes.

19   Q.   And you did not have a written job knowledge

20   multiple-choice test component for that exam; is that correct?

21   A.   Yes.

22   Q.   Now, as you sit here today you don't know of any large

23   police department in the entire United States -- and I define

24   large as a population of, let's say, over 500,000 -- who only

25   uses a written multiple-choice job knowledge test and a

1  training and experience rating or grade to determine who will

2  be police sergeants, lieutenants, and captains; is that

3  correct?

4  A.   That's correct, I don't know one way or the other.

5  Q.   And based upon all the work that you do in the field and

6  your study in the field, you don't know of any large city where

7  that is what is used, is that correct, only a multiple-choice

8  job knowledge test and a training and experience, other than

9  the Commonwealth of Massachusetts?

10  A.   That's correct, I don't know one way or the other.

11  Q.   When you say you don't know one way or the other,

12  Dr. Outtz, you go to all these conferences; is that correct?

13  You hear what people are doing out there, don't you?

14  A.   I go to conferences for the Society For Industrial and

15  Organizational Psychology.  There are a lot of conferences that

16  are going -- I don't go to -- I wouldn't characterize it as all

17  those conferences is what I'm saying.

18  Q.   Let me ask it this way.  In fact, you don't know of a

19  jurisdiction, that is, a city of over 100,000 in population,

20  where all they use is a multiple-choice job knowledge test and

21  a training and experience rating other than the Commonwealth of

22  Massachusetts to determine who gets to be a police sergeant; is

23  that right?

24  A.   My answer would be the same, I don't know one way or the

25  other.

1    Q.    And finally, I just wanted to ask you about this brief

2    that was submitted to the U.S. -- United States Supreme Court

3    and that was quoted by Justice Ginsburg in her dissent.  You're

4    familiar with this brief, I take it?

5    A.    Yes.

6    Q.    And you read the brief and approved of the brief; is that

7    correct?

8    A.    Yes.

9    Q.    And this brief was submitted by a group of -- it's called

10   *amici curiae*, and what that means is you and six other

11   distinguished industrial psychologists were the amici curiae,

12   that is, you were the people who submitted the brief; is that

13   right?

14   A.    We were the people who contributed to the brief.  The

15   attorneys submitted the brief.  That was a law firm that was

16   retained to provide an amicus brief associated with the Ricci

17   case with regard to the validity of the current process.  That

18   law firm contacted me, I put together a team of IO

19   psychologists, we contributed to that brief.  The law firm

20   wrote the brief.

21   Q.    That wasn't really my question.  My question was if you

22   look right here, it says *amici* or experts.  Do you know what

23   *amici* means?

24   A.    Friends.

25   Q.    That is the people submitting this brief were you and the

1   group of experts that you recruited; is that correct?

2   A.    Yes.  I'm trying to clarify by what you mean by

3   "submitted."  That's a legal term.  You know, semantics here, I

4   don't know how to work that out.

5   Q.    Okay.  And you reviewed the brief, you read it, and you

6   approved of it; is that right?

7   A.    Yes, the team read it and approved it.

8   Q.    Okay.  I want to quote from some of the parts of this --

9   I'm looking on the right-hand side here of the second page of

10  the brief.  And it says, "Petitioners" -- and I think that's

11  talking about the plaintiffs in the New Haven case which were a

12  group of mainly non-minority individuals -- "claim the decision

13  not to certify test results constituted deviation from

14  merit-based selection" -- I'm sorry.  "Petitioners' claim that

15  the decision not to certify the test results constitute

16  deviation from merit-based selection is inaccurate because of

17  these clear and serious flaws in the design of the test and the

18  proposed use of the test scores."  Do you see that?

19  A.    Yes.

20  Q.    And what had been used in New Haven, just to remind

21  ourselves, was they had a multiple-choice job knowledge test

22  that accounted for 60 percent of the exam; is that correct?

23  A.    Yes.

24  Q.    And they had a structured oral interview process that

25  accounted for 40 percent of the exam; is that correct?

1  A.   Correct.

2  Q.   And that was devised by an industrial psychology

3  association, IO Associates or something like that; is that

4  right?

5  A.   Yes.  I believe it's IO Solutions.

6  Q.   IO Solutions.

7       And going to the next paragraph it says, "Moreover,

8  several of the tests' flaws, namely the unsubstantiated

9  weighting of the test components and use of strict

10 rank-ordering, contributed to their adverse impact on racial

11 subgroups, specifically African American and Hispanic

12 candidates."

13 A.   Yes.

14 Q.   Do you see that?  So if I understand what you are saying

15 here, that the weighting had not, in your opinion, been

16 substantiated by valid measures; is that right?

17 A.   The weighting was not substantiated by the job analysis.

18 Q.   Right.  That is, you believe that the written test

19 component should have lesser weight, not greater weight,

20 because that would have been recommended by reason of the job

21 of a fire lieutenant?

22 A.   Correct.

23 Q.   And you opined -- your belief was that without that proper

24 weighting you can't have a valid test; is that correct?

25 A.   For that job, correct.

1    Q.    But, generally speaking, you can't have a valid test if

2    the weighting is unsubstantiated for any test, for any

3    promotional exam; isn't that correct?

4    A.    You are more likely to have a valid test if the weighting

5    derived directly from the job analysis.  If you don't have the

6    weighting substantiated, it may be valid but it may be

7    coincidence that it is valid.

8    Q.    In this case, in the brief submitted to the Supreme Court,

9    you were saying that the failure to substantiate the weighting

10   resulted in your having the opinion that it was not a valid

11   exam; isn't that correct?

12   A.    That's correct, for that job.

13   Q.    Then you continue, and I'm reading, "Thus, the test not

14   only failed to support an inference of superior job

15   qualification from higher scores, but also simultaneously

16   introduced a likely source of bias against minority

17   candidates."  You see that?

18   A.    Yes.

19   Q.    And what was that likely source of bias?

20   A.    That for that job you were favoring something that wasn't

21   related to the job for which minorities might be at a

22   disadvantage.

23   Q.    And was that the multiple-choice job knowledge test?

24   A.    Yes.

25   Q.    Okay.  So that's what you were referring to there; is that

1    right?

2    A.   I'm sorry, let me look at that sentence.  Where is that

3    sentence?

4    Q.   I'll withdraw that question.  I think you already answered

5    it.

6         The brief goes on to say, "In a predominantly minority

7    city, such as New Haven, bias against minority promotion

8    exacerbates the public-safety risks of flawed tests by

9    undermining the perception of fairness and cohesiveness among

10   firefighters and by impairing the overall public effectiveness

11   of the department."  Do you see that?

12   A.   Yes.

13   Q.   And did you believe that then?

14   A.   Yes.

15   Q.   Do you believe that now?

16   A.   Yes.

17   Q.   What do you mean by that?

18   A.   I mean -- we mean by that that where you have a city that

19   has a particular demographic and you have a department that

20   serves the city, it can be detrimental to the effectiveness of

21   that organization to not have throughout its ranks employees

22   who are representative of that population.

23   Q.   And that would apply with equal force to the City of

24   Boston, the City of Lawrence, the City of Lowell, City of

25   Worcester, City of Springfield; is that correct?

1    A.    Yes.

2    Q.    And it might even apply with more force in a department

3    where most -- a lot of the trouble is in inner city areas where

4    it's helpful to have people who know those areas interact with

5    individuals; is that right?

6    A.    Yes.

7    Q.    Okay.  Then you go on to say in the last paragraph on this

8    page, "The city could (and properly should) have adopted an

9    alternative method of promotional selection to reduce the

10   tests' adverse impact.  At the very least, the city should have

11   used scientifically substantiated weightings for the test

12   components, which would likely have led to a reduced emphasis

13   on the written component."  Do you see that?

14   A.    Yes.

15   Q.    Why did you say that if they had done a proper weighting,

16   it would have resulted in a reduction in the use of the written

17   component?

18   A.    Because I had done that in a neighboring jurisdiction and

19   I knew that about that job, and I was very certain about that.

20   Q.    And that was Bridgeport?

21   A.    Correct.

22   Q.    And you had done that also for the Bridgeport Police

23   Department; is that correct?

24   A.    Done what?

25   Q.    You had done that same weighting and determined that the

1   written component should have less than 60 percent for the

2   Bridgeport Police Department sergeant's exam; is that right?

3   A.   I had done that for -- that's true, given the components

4   of the sergeant's process.

5   Q.   You found it would be more appropriate, based on your job

6   analysis, the job of a Bridgeport police sergeant, the more

7   proper weighting would be in the range of 30 percent for the

8   written multiple-choice job knowledge test; isn't that correct?

9   A.   That's true.

10  Q.   And then you go on to say, "Also, it could have discarded

11  rank-ordering in favor of a banding approach which treats

12  candidates as equally qualified."  Do you see that?

13  A.   Yes.

14  Q.   And you believed that then and you believe that now; is

15  that correct?

16  A.   Yes.  Let me read this.

17          (Pause.)

18  A.   Yes, and for that particular Civil Service we believe they

19  could have done that.

20  Q.   Okay.  And the reason, and I think you give it on the next

21  sentence, is because "a banding approach which treats

22  candidates as equally qualified if their scores lie within a

23  certain range reflecting the test's error of measurement."

24  A.   Yes.

25  Q.   Do you recall what the reliability quotient was on that

1   test in New Haven?

2   A.    I don't.  I remember that the reliability for the oral

3   situational -- the oral board was relatively low.  I remember

4   that the reliability for the written test, I believe, was not

5   as high as I would have liked to have seen.

6   Q.    Do you remember what it was?

7   A.    I don't, maybe in the 70s, 75, something like that.  Maybe

8   70s or lower.

9   Q.    I'm sorry, 70s, 75, what was it?

10  A.    I don't remember exactly what it was.

11  Q.    Okay.  Very good.

12          And then you go on, I'm looking at the next page, you

13  say, "Banding has been demonstrated in some circumstances to

14  produce modest reductions in the averse impact without

15  compromising the validity of the testing procedure in

16  question."  Do you see that?

17  A.    Yes.

18  Q.    And you go on to say -- I'm sorry.  And did you believe

19  that and do you believe that now?

20  A.    Yes.

21  Q.    Okay.  And you go on to say -- the brief goes on to say,

22  "Moreover, the city could have adopted other options such as an

23  assessment center that included behavioral simulations of

24  critical job components as part of the exams."  Do you see

25  that?

1    A.    Yes.

2    Q.    And then you say, Over the last 30 years, industrial

3    organization psychology research has robustly confirmed that a

4    properly validated assessment center can substantially reduce

5    the adverse impact against minority contexts (sic.) in the

6    context of jobs such as firefighting.  Do you see that?

7    A.    Yes.

8    Q.    And do you stand by that statement today?

9    A.    Yes.

10   Q.    And you go on to say in the next sentence -- I'm sorry,

11   the brief goes on to say, "In sum, given the flaws in the New

12   Haven fire department exams which exacerbated the adverse

13   impact on minority candidates, and given the availability of

14   proven alternative selection methods, the city had reasonable

15   race-neutral grounds for deciding against certifying the

16   results of the flawed tests."  Do you see that?

17   A.    Yes.

18   Q.    And then you go on to say -- I'm sorry, the brief goes on

19   to say, "Indeed, under Title VII of the Civil Rights Act of

20   1964, it" -- meaning the city -- "had no choice but to decline

21   to certify the results."

22   A.    Yes.

23   Q.    And what you meant by that was based upon your study of

24   that test you didn't believe it was valid under Title VII and

25   the Uniform Guidelines; is that correct?

```
 1   A.   Yes.

 2   Q.   And even if it was valid, you believed that there were

 3   alternative, feasible, less discriminatory alternatives, and

 4   that was the second reason why you believed it violated Title

 5   VII; is that right?

 6   A.   That's correct.

 7   Q.   Okay.  Now, going down to the bottom of that column, you

 8   say under applicable industrial organizations psychology

 9   principles and legal standards there was, quote, no legal --

10   I'm sorry -- no reasonable likelihood that the city could have

11   demonstrated that the New Haven Fire Department promotional

12   examinations were valid.  Do you see that?

13   A.   Yes.

14   Q.   And you go on then to present four reasons why you

15   believe -- why your group believed that to be the case; is that

16   right?

17   A.   Yes.

18   Q.   Going to the next page, about half the way down,

19   two-thirds of the way down, you say, "Validation is especially

20   critical in the context of promotional exams for important

21   public-safety leadership positions, such as fire company

22   officers."  Do you see that?

23   A.   Yes.

24   Q.   And that "ensuring the selection of the most qualified

25   fire officers saves lives."  Do you see that?
```

1    A.    Yes.

2    Q.    And you believed that to be true then and you believe that

3    to be true now; is that correct?

4    A.    That's correct.

5    Q.    And you would say that applies with equal force to a

6    police department, particularly a large, urban police

7    department; is that right?

8    A.    I agree.

9    Q.    Okay.  Then moving over to the next column, about halfway

10   down, I'll point where I am, you say, "Contrary to petitioners'

11   assertions" -- and those were the people supporting the exam --

12   "conducting a job analysis -- while in most cases necessary to

13   a test's validity -- is not alone sufficient to demonstrate

14   validity."  Do you see that?

15   A.    Yes.

16   Q.    And what you mean by that is because that's only one step

17   in the process.  The next step in the process that has to be

18   followed is to take the results of that job analysis and then

19   put it into test formats that test for a representative

20   sampling of the attributes found to be critical for the job; is

21   that right?

22   A.    Put it into a test -- the format is part of it, but

23   putting it into tests or measures that measure those KSAs and

24   the format is part of that.

25   Q.    And then if we go to the next page, and the subsection

1  heading of this next section is "The Test Designer Conceded

2  That the Exams Did Not Attempt to Measure Command Presence, a

3  Critical Job Attribute."  Do you see that?

4  A.   Yes.

5  Q.   Okay.  So let me see if I can understand.  There was a

6  structured oral interview --

7  A.   Yes.

8  Q.   -- in that case; is that right?

9  A.   That is correct.

10 Q.   And what was the structured oral interview designed to

11 test, if you recall?

12 A.   It's not that I don't recall it, there was limited amount

13 of information as to what it was designed to elicit that was in

14 the record.  All we had was the record.  And from what we could

15 tell it was designed to measure a couple of things, excluding

16 something called command presence.

17 Q.   Okay.  Just what do you recall that the structured oral

18 interview in New Haven tested for?

19 A.   Oral -- I believe oral communication skills and some other

20 characteristics that I don't remember exactly.

21 Q.   Okay.  As you sit here today you don't really recall, is

22 that --

23 A.   I don't really recall the specifics of what they said it

24 tested for.

25 Q.   Okay.  But there was one attribute that was conceded that

1    it did not test for; is that correct?

2    A.    I don't know whether it was conceded.  We determined that

3    in our opinion it didn't test for.

4    Q.    Okay.  And that was command presence?

5    A.    That's correct.

6    Q.    And your opinion was, the group of you, if that was a

7    critical attribute to the job of fire lieutenant and the test

8    did not properly test for that one attribute, that made the

9    entire examination invalid under Title VII principles; is that

10    right?

11    A.    Pretty much so, because for the fire lieutenant's job, and

12    I keep saying fire lieutenant's job, I determined that there

13    was --

14          MR. LICHTEN:  I'm sorry, can you read back the

15    question, please?

16    Q.    Well, let me move on.  I'm just asking -- just answer my

17    question.  I think you answered.  The answer was yes?

18    A.    The answer was yes, for that job.

19    Q.    But you do agree that in any public safety promotional job

20    if there is one attribute, let's say it's something else, but

21    if there's one critical attribute for that job analogous to

22    command presence and a test doesn't pretend to even test for

23    that, that could make the examine invalid?

24    A.    It could, it could if that critical KSA has been

25    determined to be so critical that it would indicate the person

1    can't perform well in that job.

2    Q.   And is it your testimony as you stand here today that for

3    the job, the important job of police sergeant in big cities in

4    the Commonwealth of Massachusetts and in the City of Boston,

5    that having command judgment, command presence is not a

6    critical or important skill or ability for the position of

7    police sergeant?

8    A.   Not the way it's measured for fire lieutenant.  It may be

9    an important KSA, but not like it is for a fire lieutenant.

10   Q.   Okay.  Now, going on on this paragraph, you say, "The

11   omission from the testing domain of a KSAO" -- I assume that's

12   knowledge, skills, abilities -- and what's the O?

13   A.   And other characteristics.

14   Q.   Other characteristics.  -- "that is an important job

15   prerequisite known in IO psychology as criterion deficiency

16   vitiates the entire justification for the employment test which

17   is to select individuals accurately based on their capacity to

18   perform the job in question.  A test that makes no attempt to

19   measure one or more critical KSAOs cannot be validated under

20   established standards."

21   A.   That is correct, depending upon the criticality of the

22   KSAO.

23   Q.   Okay.  And you believed that then and you still believe

24   that; is that correct?

25   A.   For that job today, yes, and in the past I believed it.

1    Q.   I just want to be clear, the principle you believe in, if

2    there is a job, whatever the job is, and one of the most

3    critical elements of the job is not tested for, it vitiates the

4    whole reason for the test?

5    A.   No.  If there is a KSA that not only is critical but

6    becomes vital to that job and you don't measure it, you, in my

7    opinion, don't have a valid process for that job.

8    Q.   For that job?

9    A.   For that job.

10    Q.   Whatever that job is?

11    A.   Whatever that job is.  If you establish that for that job.

12    Q.   Yes.  This principle is not unique to just a fire

13    lieutenant's position?

14    A.   It's unique to the job that you're studying.

15    Q.   To the job that you're studying.

16         Okay.  And then you go on to say here, "As the cities

17    then-corporate counsel Thomas Ude recognized, the

18    distinguishing feature of the job of a fire officer as opposed

19    to an entry-level firefighter is responsibility for supervising

20    and leading other firefighters in the line of duty."

21    A.   Yes.

22    Q.   And do you agree with that?

23    A.   Yes.

24    Q.   And do you agree that the distinguishing factor of a

25    police sergeant also is the ability or responsibility for

1  supervising and leading other police officers in the line of

2  duty?

3  A.   In -- not in the same way but generally, yes.

4  Q.   Okay.

5  A.   But not in the same way as a fire lieutenant.

6  Q.   And then going on, right here you say, "Simply put,

7  command presence is a hallmark of a successful fire officer."

8  Do you see that?

9  A.   Yes.

10 Q.   And then you go on to cite some studies showing that

11 that's the case; is that correct?

12 A.   Yes.

13 Q.   Now, when you did work for Bridgeport and other places,

14 Detroit, when you studied the job of a police sergeant, you're

15 aware that a street sergeant is called to emergencies; is that

16 correct?

17 A.   Yes.

18 Q.   And when the sergeant gets there, he doesn't -- the police

19 sergeant doesn't know what he or she is going to confront; is

20 that correct?

21 A.   They may or may not.

22 Q.   And when they get there, they're going to look at a scene,

23 and there could be chaos at the scene; is that correct?  There

24 could be people fighting, there could be people arguing, there

25 could be someone with a knife.  You don't know; is that

1    correct?

2    A.   That could be, yes.

3    Q.   And it's the street sergeant, not the lieutenant or the

4    captain of the police department, but it's the street sergeant

5    who has to take command of that scene, isn't it?

6    A.   When that scene occurs, yes.

7    Q.   And that requires command presence, the ability to take

8    charge of the scene, tell people what to do, and to communicate

9    with the -- either the victims or the perpetrators; is that

10   right?

11   A.   When that occurs, yes.

12   Q.   And that's a critical, if not the most critical, job of a

13   police sergeant, isn't it?

14        MS. HARRIS:  I'll object.

15        THE COURT:  You may answer.

16   A.   It may or may not be.  Police sergeants don't do that as

17   often as fire lieutenants.  It's the structural part of the job

18   of a fire lieutenant, not of a police sergeant.  That can

19   happen for a police sergeant.  When that sergeant takes command

20   of that situation, typically whatever needs to be done has

21   already been started by the police officer and the sergeant is

22   there to come and determine whether that was the right thing or

23   wrong thing to do and to clean it up.  That doesn't happen for

24   a fire lieutenant.  The firefighters aren't going to do

25   anything until the fire lieutenant tells them, and they better

1    not do anything unless the fire lieutenant told them.

2    Q.   Do you understand what the operational procedures are in

3    the big city police departments in Boston, Lowell, Lawrence,

4    Springfield, Methuen, Lawrence, Lowell -- you understand what

5    the procedures are for police sergeant?

6    A.   I haven't read the procedures specifically for those

7    jurisdictions other than how they are expressed in the items in

8    the exam for those jurisdictions, but I'm aware of the policies

9    and procedures of police departments based on the 15 or so

10   cities that I've done exams in.

11   Q.   Let me ask it this way.  Are you aware that there are

12   certain types of emergency calls, for example, domestic

13   violence calls, where on the initial call, not on a subsequent

14   call, but on the initial call a sergeant must report crime in

15   progress, rape, anything that's of a serious nature, the

16   sergeant has to be the first responder along with his men or

17   women, not a backup responder?

18        MS. HARRIS:  Objection to foundation for that.

19        THE COURT:  I think that's the question, whether he

20   knows it.

21   A.   Now could you repeat the question?

22        (Record read.)

23   A.   I'm aware of that for police departments, and if -- I'm

24   aware of that for police departments generally.  I haven't

25   studied the policies and procedures of each jurisdiction in

1    this case.

2    Q.   Okay.  Let me move on.  You go to the second argument for

3    why the New Haven test was not valid, and the section heading

4    for that is "The weighting of the multiple-choice and oral

5    interview portions of the exams was arbitrary and could not be

6    validated"; is that correct?

7    A.   Yes.

8    Q.   And here you're talking about the 60/40 weightings; is

9    that correct?

10   A.   Yes, I am.

11   Q.   And basically what your testimony was, that these were

12   preordained weightings, they weren't set using an appropriate

13   industrial organizational psychological method; is that right?

14   A.   It's a legal technicality.  That's what the brief says.  I

15   don't know whether that represents testimony.  That's what the

16   brief says.

17   Q.   I'm just asking you, is that the position that you and

18   your group were taking in this case?

19   A.   In the brief.  You preface it by saying "testimony."  I

20   don't know whether that's considered testimony.

21   Q.   I'm sorry, I misspoke.  I meant is that the position you

22   were taking in the brief?

23   A.   In the brief that is the position we were taking.

24   Q.   Okay.  And that's based upon what you understand the

25   Uniform Guidelines to require, that the weightings have to be

1   set through appropriate industrial psychology methodology; is

2   that right?

3   A.   They have to be set through appropriate methodology,

4   whether it's IO psychology or not.

5   Q.   And the problem here was the 60/40 simply came from some

6   practice of the parties; is that right?

7   A.   Came from a union agreement from what we understood.

8   Q.   Came from a union agreement.  And you believe that

9   violated Title VII principles; is that correct?

10  A.   I believed that this was inappropriate given the

11  professional standards in terms of validation and IO

12  psychology.

13  Q.   But, Dr. Outtz, isn't that what happened here in the

14  Commonwealth of Massachusetts and the City of Boston, the 80/20

15  split wasn't set using some empirical scientific industrial

16  psychology methodology, it was a historical has been that had

17  been used for the last 30 years?  Isn't that what happened?

18        MR. PIKULA:  Objection.  There's been no testimony

19  really as to how that's ever been set.  No one from HRD has

20  testified and no document in evidence on it.

21        THE COURT:  Overruled.  You may answer it.

22  A.   My understanding of how it was set was that it existed for

23  a long time, which, quite frankly, disturbed me.  I wanted to

24  know what more went into setting it than that.  When you look

25  at the actual job analysis from 1991, and we've looked at

1    attachment EE, and the attachment EE divides the things

2    measured by the education and experience as opposed to the

3    written test and a number of KSAs measured.  And when you look

4    at those, if you just took a mathematical calculation of how

5    many Xs there are in each of those columns, you would attribute

6    24 of the Xs to the E&E and about 60 of the Xs to the written

7    exam.  If you did the math, you would say that comes out to be

8    about 29 percent but the weight it's being given is 20 percent.

9    That's fairly close to the weight you'd get if you derived it

10   appropriately just using those Xs.  And so that led me to

11   believe that there was -- that those weights are relatively

12   close to what they ought to be and close enough that I wouldn't

13   invalidate the process because of the weights.

14   Q.   So I just want to be clear on what your testimony is here

15   today.

16        Is it your testimony that the 80/20 weighting of the

17   Boston Police sergeant's exam and the Commonwealth police

18   sergeant's exam from 2005 and 2008 were set using a methodology

19   that you as an industrial psychologist would approve of?

20   A.   I don't know from the data exactly precisely how they were

21   set.  I know the data that could be used to set it, and when

22   you use that data, the outcome is not far from what it is.

23   Q.   Just so I'm clear, just counting up on the -- and appendix

24   EE the various tasks is not the proper way to do it because you

25   also have to account for the importance of each of those

1    skills, the skill of knowing how to find a bail bondsman is

2    different from the skill of knowing how to make a command

3    judgment; is that correct?

4    A.    You are exactly right, and that's why it could be 20

5    percent and not 29 percent.

6    Q.    Or it could be that an appropriate weighting for these

7    police sergeant's exams would be five or ten percent for the

8    training and experience, 30 or 40 percent for a job knowledge

9    test, and the rest could be used by situational judgment test

10   or an assessment center or something that tests for other

11   skills and abilities not readily testable by a written test;

12   isn't that right?

13   A.    It could be true but unlikely.  Unlikely because you have

14   a subset of KSAs to be measured.  If they're all important, you

15   can measure a representative sample of them and divide them

16   through the -- based on the exercises that you have.

17          There was some attempt to determine what each one

18   measured, and when you look at those Xs, those Xs come out to

19   about 29 percent.  You're absolutely right -- I think it

20   probably -- that is an overestimate because it doesn't look at

21   the actual importance of the KSAs.  If some of the KSAs are

22   more important than others and most of the KSAs are measured by

23   the written test.  You're likely to have the written test pick

24   up more weight than the E&E, and in my opinion the combination

25   of the written test and the E&E, because of the representative

1    sample of the KSAs measured, meets professional standards for

2    acceptable validity.

3    Q.   If that's true, why don't you know of one city in the

4    United States that has a population of over 100,000 people that

5    only uses that same methodology?

6    A.   First of all, I consider it irrelevant whether departments

7    use the same methodology.  It's use methodology that's

8    appropriate for their department.  So that to me is an

9    irrelevant issue.

10   Q.   Let me move on.

11        Okay.  Moving on to the next page, you say on the

12   second paragraph, right here, "Moreover, there is no indication

13   that the 60/40 weighting at issue in this case, which gave

14   predominance to the multiple-choice component of the exams, was

15   appropriate for the relevant job.  It is well-recognized by I/O

16   psychologists and firefighters alike that written,

17   pen-and-paper tests, while able to measure certain cognitive

18   abilities (example, reading and memorization) and factual

19   knowledge, do not measure other skills and abilities critical

20   to being an effective fire officer as well as alternative

21   methods of testing do."  Do you see that?

22   A.   Yes.

23   Q.   And do you stand by that statement?

24   A.   I do.

25   Q.   And do you agree with that statement?

1  A.   I do.

2  Q.   So you do agree, do you not, that written pen-and-paper

3  tests, while able to measure certain cognitive abilities,

4  example reading and memorization, that is, you believe these

5  written multiple-choice tests are measuring reading and

6  memorization; is that correct?

7  A.   What we're saying is that's an example of what they're

8  measuring.  It doesn't mean they're only measuring or they're

9  always measuring that.

10 Q.   But that's an example?

11 A.   It's one example.

12 Q.   And given the sergeant's exam here, a big part of what

13 they're measuring is the ability to memorize because most of

14 the questions are taken from the text.

15 A.   A part of what they are measuring is memorization.  The

16 big part is whether they understand what they read given that

17 they can remember it.  I think the bigger part is whether they

18 understand what they read.  If they remember it and don't

19 understand it, it does them little good.

20 Q.   And then you go on, this brief goes on to describe some of

21 the literature that supports this position, and you quote -- in

22 parens you have there's a study you say describing the

23 criticism of written tests as producing firefighters who are

24 book smart and street dumb.  Do you see that?

25 A.   Yes.

1  Q.   And isn't that, in fact, what this exam does that we're

2  about here in this case, it gets you book smart and potentially

3  street dumb police sergeants?

4  A.   No, because for the sergeant's position book smart might

5  make you a much better sergeant than it would make you a fire

6  lieutenant.  Because the books you use as a sergeant, the laws

7  of the State of Massachusetts, the ordinances of the city that

8  you're working in, those become very, very critical, those

9  written documents.  In the fire service, written documents

10  carry very little weight in terms of what you're going to do.

11  You got to use your vision, your sense of smell, all kinds of

12  things that you don't have to read anything to do, but they

13  become critical and could get somebody killed if you can't do

14  that.  Has little to do with what you read.

15  Q.   That doesn't apply to police sergeants?

16  A.   It doesn't apply to the same degree with police sergeants,

17  based on my experience with the police sergeant position.

18  Q.   And then you go on, the brief goes on at the bottom to

19  say, "The Uniform Guidelines and the federal courts have

20  similarly recognized that written tests do not correspond well

21  to the kills and abilities actually required for the job of a

22  fire officer and are thus poor predictors of which candidates

23  will make successful fire lieutenants and captains."  Do you

24  see that?

25  A.   Yes.

1   Q.   And you cite the EEOC interpretive guidance of the Uniform

2   Guidelines which states, quote, paper-and-pencil tests of ...

3   ability to function properly under danger, (example

4   firefighters) generally are not close enough approximations of

5   work behaviors to show content validity."

6          So, as I understand it, here you're citing the

7   interpretive guidance of the Uniform Guidelines as saying when

8   the job in question requires one to react in dangerous

9   situations, the use of pen-and-paper tests will not suffice.

10  Did I read that correctly?

11  A.   My understanding of the guidelines, and I think it's

12  interesting that they mentioned specifically jobs in the fire

13  service and not jobs in police work, which I think is very

14  instructive and accurate, is that if you are looking at a job

15  like the job in the fire service and you're using only a

16  paper-and-pencil measure, it may be quite appropriate.  I think

17  it's quite instructive that even in the Uniform Guidelines they

18  don't mention police jobs.  They could, they don't, they

19  mention fire jobs.

20  Q.   Dr. Outtz, they say, e.g., meaning for example

21  firefighters?

22  A.   Right, and they could have said for example fire fighter

23  and police sergeant.

24  Q.   Dr. Outtz, do you seriously contend before this Court that

25  police sergeants in large urban cities are not in the position

1    of having to function properly under danger?  Is that really

2    what you're telling us here today?

3    A.    I'm saying that the danger and the situation and how one

4    reacts is different for a fire lieutenant.  That is why I

5    joined --

6    Q.    That's not my question.  My question was:  Are you

7    contending before this Court that large urban -- in large urban

8    cities in Massachusetts police sergeants do not have to

9    function properly under danger?

10   A.    No.

11   Q.    Okay.  Let me try to speed this up.  You also go on to

12   say -- I'm looking at footnote 10, and I'm looking at this page

13   here.  You go on to say that another flaw that makes the exam

14   in New Haven not valid is the arbitrary use of a cutoff score

15   of the score of 70; is that right?

16   A.    Where is that?

17   Q.    Well, if you look at this whole column and if you look at

18   footnote 10, your discussion of arbitrary cutoff scores alone

19   can undermine a test's validity.  First line in footnote ten.

20   That was one of your other criticisms of the test; is that

21   right?

22   A.    Let me check the wording of that.

23              I can't read this, by the way.

24   Q.    I'm sorry.

25              (Pause.)

1    Q.    If you look at here --

2    A.    I see it.  Thank you.

3    Q.    -- down to footnote 10.

4          (Pause.)

5    A.    I can't read it if you're moving it.

6          (Pause.)

7    A.    The paragraph talks about a combination of setting the

8    score -- the cutoff score at a particular level, and also that

9    this particular consulting firm, in our opinion, admitted to

10   going ahead and making the test more difficult in addition to

11   setting those cutoff scores and the combination of that,

12   setting the cutoff score at that level and making the exam more

13   difficult to screen out more people, exacerbated adverse

14   impact.

15   Q.    Don't you agree with the statement on footnote 10 that

16   arbitrary cutoff scores alone can undermine a test's validity?

17   A.    They can, yes.

18   Q.    And wasn't the score of 70 set in 2005, 2006, 2007

19   statewide on the Boston Police Department's statewide exam

20   completely and utterly arbitrary?

21   A.    I believe they were administratively set, and I don't know

22   whether they were arbitrary.

23   Q.    They were set meaning they were set by the state?

24   A.    They were set based upon consideration of the number of

25   people that might be screened, I suppose, based upon that

1    cutoff.

2    Q.    And there was adverse impact for at least some of those

3    exams at the cutoff score of 70; is that correct?

4    A.    That's my understanding.

5    Q.    Okay.  Moving on, I'm almost done.

6          Principle number 4 of the brief, the section 4 was the

7    New Haven fire tests could not have been validated for strict

8    rank-ordering of candidates.  Do you see that?

9    A.    Yes.

10   Q.    And you say, quote, Under accepted standards, not only

11   must an exam's content be properly validated, but the use of

12   the scores must be scientifically justified."  Do you see that?

13   A.    Yes.

14   Q.    As you say -- the brief goes on to say the Uniform

15   Guidelines state, "The use of a selection procedure on a

16   pass/fail screening basis may be insufficient to support the

17   use of the same procedure on a ranking basis under these

18   guidelines."  Is that correct?

19   A.    Yes.

20   Q.    And then you -- the brief goes on to say that because they

21   were using that test as a rank order device, it was not valid

22   because you could not justify small differences in scores as

23   producing the better candidate; is that right?

24   A.    Particularly given the flaws in that test.

25   Q.    Right.  And there was a rule of three in New Haven; is

1    that correct?

2    A.    It's my understanding.

3    Q.    Okay.  Moving on.  Subsection A about the exacerbation of

4    the promotional exam on minority candidates.  The brief says --

5    you can see I thought this was important, I circled and starred

6    it four times so I won't forget about it.  "It is

7    well-established that minority candidates fair less well than

8    their Caucasian counterparts on standardized written

9    examinations and especially multiple-choice as opposed to

10   write-in tests."  Do you see that?

11   A.    Yes.

12   Q.    And that's partly based upon some of the studies that

13   you've done, right?

14   A.    It was primarily based on the work of Winfred Arthur

15   that's cited there.

16   Q.    When you say, "especially multiple-choice as opposed to

17   write-in tests," you're saying that write-in tests may have

18   less adverse impact than the use of the multiple-choice

19   convergent thinking principle; is that right?

20   A.    That's possible, yes.

21   Q.    And then you go on -- the brief goes on to say, "Moreover,

22   studies suggest that racial minorities are less test-wise than

23   white test takers and it is widely recognized as a form of the

24   multiple-choice test is susceptible to specific test-taking

25   strategies or test wiseness."  Is that right?

1    A.    Yes.

2    Q.    And why is it that you think minorities may not have test

3    wiseness as much as non-minorities?  Is it because of the

4    schools they went to or the courses they may have taken or

5    what?

6    A.    It's because of the probable lack of comparable

7    educational experiences, and the educational experiences

8    provide obviously test-taking behaviors, and you can hone those

9    behaviors the more education you have and the higher level of

10   education you have.

11   Q.    Okay.  If you go on to the next page it says, "Regardless

12   of the exact cause of the disparity, it is clear that the use

13   of written multiple-choice tests, beyond what is justified by

14   the commands of a particular job, has the effect of

15   disproportionately excluding minority candidates without any

16   corresponding increase in job performance."  Is that correct?

17   A.    What you read is correct, and I agree with that.

18   Q.    And then you say, "Changing the weighting of the exams" --

19   on the next paragraph -- "to more accurately reflect the

20   content of the job almost certainly would have reduced their

21   adverse impact by reducing the weight of the written component,

22   and thus constituted a less discriminatory alternative that the

23   city would have been obligated to use under Title VII."  Is

24   that correct?

25   A.    Correct, for this job.

1  Q.   So if a job analysis does not justify the use of a written

2  multiple-choice test as being 80 percent of the component of

3  the test, then that would violate the less discriminatory

4  alternative principles of Title VII; is that right?

5  A.   Could you read that back?

6       (Record read.)

7  A.   If the job knowledge -- if the job analysis does not

8  substantiate that weighting, that in and of itself wouldn't

9  represent a violation, it would represent a violation if there

10 was a lower weighting that would be justified that had less

11 adverse impact.

12 Q.   Well, that's exactly what happened in this case with the

13 Boston Police Department, isn't it, sir?

14 A.   What exactly happened?

15 Q.   Morris & McDaniel did a job analysis in 2000 and they

16 conducted a test in 2002 and according to their weighting a

17 written multiple-choice test was only to account for only 40

18 percent of the exam.  So haven't they already established what

19 you just said?

20 A.   What they did is to establish weights or accept weights

21 that were given to them at the outset of the project without it

22 being related to the job analysis, and those weightings we were

23 able to determine critically affected one's ranking in that

24 process.  So it was actually shown statistically had you used

25 different weights, the rankings would have been slightly

1    changed and more minorities would have been promoted.  So that

2    would fit your situation of saying there was a less

3    discriminatory alternative.  They could have used weights, for

4    example, and changed them and it had no effect on adverse

5    impact.

6    Q.   Well, I'm confused.  Morrison & McDaniel was hired by the

7    City of Boston to do a job analysis in 2000; is that correct?

8    A.   Yes.

9    Q.   And the job analysis is the precursor of constructing the

10   exam, it's from the job analysis and getting the critical

11   knowledge, skills, and abilities from which then one constructs

12   an exam and determines what the weights were; is that correct?

13   A.   Yes.

14   Q.   And Morris & McDaniel, respected industrial psychology

15   firm, did this properly, they took their job analysis from

16   2000, compared it to 1991, as you said, and then constructed a

17   test format based upon those critical skills and abilities; is

18   that correct?

19   A.   Correct.

20   Q.   And what they did when they came to construct that exam is

21   they proposed to use 40 percent written exam, 32 percent

22   assessment center, and eight percent performance review system

23   based upon their own study of the critical components of the

24   job; isn't that accurate?

25   A.   They did that based upon their study of the critical

1  components of the job and what they intended to put in each

2  exercise.  They could have come up with different weights had

3  they decided to put different KSAs in the exercises.

4  Q.   But doesn't that prove the very point that you were making

5  in the brief, that in this case the City of Boston at least

6  already had a test outline which showed that you could lessen

7  the amount of weight given to a written multiple-choice test

8  that would likely have more adverse impact on minorities and,

9  therefore, under Title VII they were required to use that

10  alternative weighting system or be in violation of Title VII?

11  A.   Not unless they had data showing that the alternative

12  weighting system did, in fact, reduce adverse impact.

13  Q.   Well, they hadn't given the 2002 exam yet, so they would

14  have had every reason, based upon all the studies that you have

15  written about, to think that by reducing the weighting of the

16  multiple-choice test and using an assessment center or other

17  type of non-written multiple-choice assessors they would reduce

18  adverse impact because they would have had available to them

19  all of your writings that told them that that would be a likely

20  result; isn't that correct?

21        MS. HARRIS:  I object.

22  A.   That is totally -- I'm sorry.

23        MS. HARRIS:  I think there's a series offer errors in

24  the question, so I object.

25        THE COURT:  I think it was multiple anyway --

1          MR. LICHTEN:  I'll withdraw the question, your Honor.

2     It was also rhetorical.

3     BY MR. LICHTEN:

4     Q.   And then, finally -- you can see I thought this was

5     important because I circled it many times -- you say that one

6     alternative before the city was the assessment center which, if

7     designed properly, would measure a broader sense of KSAOs and

8     also be less discriminatory.  Do you see that?

9     A.   Yes.

10    Q.   And then you go into the history of assessment center

11    model and the fact that assessment centers have demonstrated

12    validity in the context of a fire promotion.  Do you see that?

13    A.   Yes.

14    Q.   And you stand by all that; is that right?

15    A.   Yes.

16    Q.   And then -- and this is very important -- if you go to

17    section C, you then have -- there's another section in the

18    brief that was written in 2009, assessment centers have been

19    proven to reduce adverse impact on minorities.  Do you see

20    that?

21    A.   Yes.

22    Q.   And do you stand by that?

23    A.   I do.

24          MR. LICHTEN:  Can I have one moment, your Honor?

25          (Discussion off the record.)

```
 1            MR. LICHTEN:  Dr. Outtz, thank you very much for your
 2    time.  I have no further questions.
 3            THE WITNESS:  You're welcome.
 4            THE COURT:  Ms. Harris?
 5                        REDIRECT EXAMINATION
 6    BY MS. HARRIS:
 7    Q.   Dr. Outtz, since we've just been talking a bit about
 8    firefighters.  Can you tell the Court what the differences are
 9    between the position between fire lieutenant and the position
10    of police sergeant as it would be of relevance to you as a test
11    designer.
12    A.   The difference between the two positions based upon the
13    job analyses that I've done over the years is the reliance on
14    the visual analysis of problems as a police lieutenant -- I'm
15    sorry, as a fire lieutenant.  That a fire lieutenant's job,
16    basically in fire suppression particularly, is to use his or
17    her senses more, visual and smell and touch, to actually
18    determine what is going on and commanding units, not -- in
19    other words, a lieutenant in the fire service would routinely
20    come upon a scene and have to command 15, 20 people, 25 people
21    and not just one or two, for example, police officers
22    determining whether you should arrest somebody for domestic
23    violence situation, as a routine part of that lieutenant's job.
24    And it becomes critical that the lieutenant make those kinds of
25    assessments in such a manner not only as to prevent losing his
```

1    life or her life, but the lives of firefighters, multiple, and

2    citizens.

3         So that in doing a police sergeant's job, the police

4    sergeant has a squad of six, seven, eight, ten people.  The

5    sergeant comes to a scene, there may be two officers at that

6    scene, maybe one officer at that scene.  Typically the sergeant

7    would have to handle that, determine what's going on, tell me

8    what's happening, and I'll tell you what we need to do.

9         That's not the same as a command, command presence,

10   command of units and lives that occurs routinely for a fire

11   lieutenant.  And that is why the assessment of this -- we call

12   it command presence, I didn't particularly like that term in

13   the brief, but the attorneys thought that would be better to

14   phrase it that way.  It's the capacity to command people based

15   upon visual analyses and command lots of people in situations

16   that are routinely dangerous.

17   Q.   Now, when we talked about fire lieutenant, I believe it

18   was yesterday, and in relationship to the presentation that you

19   gave, you included in your presentation a photograph of a house

20   that's on fire.  Do you recall that slide?

21   A.   Correct, yes.

22   Q.   Can you tell us when a police lieutenant gets a call that

23   there is a house on fire --

24   A.   A fire lieutenant you mean?

25   Q.   Excuse me, the fire lieutenant.  How does the response of

1    the fire department -- what is the response of what the fire

2    department does in getting a call that there's a house on fire?

3    A.    If there is a call for service in terms of a building on

4    fire, there is written in the procedure a protocol for who's

5    going to respond to that.  The lieutenant doesn't have any

6    control over that at all.  There are certain units that by

7    virtue of the policies and practices of the department all of

8    those units are going to respond period.  And when they do --

9    Q.    Excuse me for interrupting.  When you say the unit, what

10   is the unit?

11   A.    It could be a fire engine, it could be a fire truck, it

12   could be an ambulance, it could be a rescue squad.  Typically

13   it would be all of those responding to that fire.  And that's

14   going to happen whenever that lieutenant goes out.  And so you

15   have all of these people there looking to this lieutenant to

16   tell them what to do.  And the lieutenant has to size up the

17   situation and tell all of those folks and their commander where

18   they're even going to place their units, where they're going to

19   get water, what they're going to do if the building needs --

20   all those kind of things.  That requires a certain degree of

21   analysis and command of the situation that if is not done

22   properly can get people killed, a lot of people killed.

23          So it becomes critical based upon subject matter

24   experts in developing exercises to measure supervision as a

25   fire lieutenant, that you have to be able do this and, in their

1    language, we don't care what else you could do, you have to be

2    able to do this.

3    Q.    What percentage of the fire lieutenant's job is based on

4    responding to calls for service as opposed to performing other

5    tasks that are related to the fire lieutenant position?

6    A.    It's disproportionate.  They don't respond to fires as

7    much as they do other things, but when they do respond to

8    fires, that becomes the issue.  It's something that -- it is

9    the essence of the job, and if you can't do that, in the

10   language of subject matter experts over the years and fire

11   chiefs, we don't care what else you can do.

12   Q.    Is there an analogous task that's related to the position

13   of police sergeant as being a command presence?

14   A.    Not that I know of.

15   Q.    In comparing the two positions does a fire lieutenant ever

16   guard prisoners?

17   A.    No.

18   Q.    Does a fire lieutenant ever oversee the interrogation of

19   suspects?

20   A.    No.

21   Q.    Does the fire lieutenant have responsibility for ensuring

22   that correct charging decisions are made by those people

23   working under his or her command?

24   A.    No.

25   Q.    Does the fire lieutenant have responsibility in the formal

1    course of his or her duties to provide evidence in court about

2    observations or about charges that are being brought against

3    individuals?

4    A.    No.

5    Q.    Is there the same requirement that a fire lieutenant have

6    the capacity to understand and apply the Constitution or the

7    laws of the state?

8    A.    No.

9    Q.    As there are for a police sergeant?

10   A.    No.

11   Q.    And when you were working with the team that put together

12   the brief in the Ricci case, were you focusing on the

13   particular position that was at issue in the Ricci case, that

14   is, the fire lieutenant's position?

15   A.    That was the only position I was focusing on.

16   Q.    And in addition to looking at that position were you

17   looking at that position in the context of the New Haven Fire

18   Department?

19   A.    Yes.

20   Q.    Now, we talked about the significance of context in the

21   course of developing the job analyses and developing the

22   promotional examinations that we've talked about throughout

23   this case.  And is it your understanding that in the City of

24   New Haven that the city had the ability to use banding as one

25   way of going through their promotional process based on this

1    examination?

2    A.    It was our understanding that there were few, if any,

3    inhibitions or constraints in terms of possibly using banding.

4    Q.    And do you have an understanding as to whether or not the

5    defendants in this case had the ability to use banding?

6    A.    It's my understanding that in this case the defendants did

7    not and do not have the capacity to simply use banding.

8    Q.    And in the course of the testimony that you've given in

9    this case have you had an opportunity to review a document that

10   I'm putting on the board, which is a motion for preliminary

11   injunction brought by a number of Boston and other police

12   officers to prohibit the use of banding in the selection of

13   candidates from the 2008 exam?

14   A.    Yes.

15   Q.    And do you have -- have you had an opportunity to

16   determine what the Superior Court said in response to the

17   Commonwealth's proposal based on Dr. Jacobs' recommendation to

18   use banding as a selection method after the 2008 examination?

19   A.    It's my understanding that the Court ruled --

20          MR. LICHTEN:  Your Honor, that was a yes or no

21   question.

22          THE COURT:  All right.

23          MS. HARRIS:  I didn't hear the objection.

24          THE COURT:  That it's a yes or no question.

25          MS. HARRIS:  Okay.

1  BY MS. HARRIS:

2  Q.   Have you had an opportunity to review it?

3  A.   Yes.

4  Q.   Do you know what the Superior Court said or do you know

5  what the Superior Court ruled when the HRD attempted to rank

6  order the candidates in bands as opposed to in rank -- strict

7  rank order under the Civil Service laws?

8  A.   Yes.

9  Q.   What was it?

10 A.   That --

11      MR. LICHTEN:  Your Honor, the document speaks for

12 itself.

13      THE COURT:  It would, I guess, but if it's a predicate

14 for an opinion, I guess we can --

15 BY MS. HARRIS:

16 Q.   Do you have an opinion, Dr. Outtz, as to whether or not it

17 would have been feasible for any of the defendants in this case

18 to use banding as recommended by Dr. Jacobs in their selection

19 of individuals from the 2008 examination?

20 A.    It's my opinion that they would not have had that leeway

21 to do that.

22 Q.   And is that because there is an order from the Superior

23 Court prohibiting them from doing so?

24 A.   That is correct.

25 Q.   Now, when we talk about the examinations that you've

1   reviewed here, Dr. Outtz, as I understand it, your opinion as

2   to the validity of the examinations here is based upon your

3   review of the job analyses and the other documents that were

4   provided to you by the HRD?

5   A.   That's correct.

6   Q.   And it is -- is it your opinion that under the context

7   with which we're operating here there is no similar testing

8   mechanism that would have had less adverse impact that was

9   available to the Commonwealth and to the defendants here in the

10  2005, 2008 scenario?

11  A.   That is correct.

12  Q.   And, Dr. Outtz, in the course of reaching your opinion,

13  have you had the opportunity to review the materials that were

14  created by Dr. Silva in this case?

15  A.   Yes.

16  Q.   Now, Mr. Lichten was asking you a couple of questions

17  about the experience that the Boston Police Department had in

18  2002, and, as I understand it, Mr. Lichten suggested that the

19  police department was on notice that it did have an alternative

20  testing system available to it that would have likely reduced

21  adverse impact because it had gone through that process in

22  2002.  Do you remember those series of questions?

23  A.   Yes.

24  Q.   Do you think that Mr. Lichten's premise is correct?

25  A.   No.

1    Q.    And why don't you think that's correct?

2    A.    Because the data that I reviewed indicates that an

3    examination -- an analysis was made of the 2002 process in

4    which the scores were looked at in two ways.  Let's look at the

5    scores without the addition of the exercises that constituted a

6    change, and let us look at the scores simply based upon the

7    components that represented the old process.  This is a direct

8    comparison, one of the best comparisons I think you could make

9    to determine whether these new processes did any good.  You

10   would expect then that when you look at the selections based

11   upon this new 2002 process with the injection of the new

12   exercise would have resulted in a greater number of African

13   Americans, for example, being promoted as opposed to when you

14   analyze it without that; that is, the old process, how many

15   African Americans got promoted.  As it turns out, the exact

16   same number of African Americans got promoted.  That would

17   indicate that this exercise added nothing in terms of improving

18   adverse impact.

19   Q.    I'm going to show you what's page 7 of Dr. Silva's report

20   of February 9, 2009.

21         I'm directing you to the top of the page, method 1

22   referring to his chart in the middle of the page.  Method 1

23   includes the structured interview and its corresponding

24   weighting of components, i.e., the way it was actually done in

25   2002.  And as you see in referring to the chart here, method 1,

1    nine African Americans were promoted, two Hispanic, and that

2    reads 58 Caucasian.  Do you see where I'm referring you?

3    A.    Yes.

4    Q.    Then on method 2, he states he's removing the structured

5    interview and its corresponding weighting.  In this approach

6    the written test was assigned a weight of 80 percent and

7    education and experience was assigned a weight of 20 percent.

8    These are the same weights that were used in most jurisdictions

9    in each of the years 2005 through 2007.  And that method 2,

10   which produces the results of the 2002 exam as though it were

11   administered as the later exams were, reflect that there were

12   nine African Americans promoted, one Hispanic, and 59

13   Caucasians.  So looking at those two charts, Dr. Outtz, can you

14   tell the Court what opinion, if any, you draw about the

15   efficacy of the assessment center exercises in the 2002

16   examination that the city produced at a cost of $1.3 million?

17   A.    The efficacy was nothing in terms of the objective of

18   having more African Americans promoted.  That's just a

19   devastating finding.

20   Q.    And having reviewed the results of the 2002 examination,

21   is it surprising to you that the police department declined to

22   continue using the 2002 type exercises in its next two rounds

23   of promotions?

24   A.    It would have surprised me if they didn't.

25   Q.    If they didn't what?

1   A.   Elect not to go that route again.  Not to go through using

2   a 2002 process again.

3   Q.   Does anything about this data, Dr. Outtz, tell you about

4   whether or not the testing instrument is the reason why the

5   results of these tests are so disappointing from an adverse

6   impact --

7   A.   You have a direct comparison of two samples, same time

8   frame, everything is the same.  What's the difference?  One

9   exercise protocol versus another.  The so-called new exercise

10  versus the old exercise.  It's the best comparison you could

11  have.  You could compare, for example, this year of 2002 to,

12  say, 2005 or 2008, but whatever differences you find may be due

13  to differences in who took the exams, not in the exam itself.

14        In this assessment the only thing that differs is the

15  exercise, is the process itself.  So you find that you didn't

16  gain anything by having this new exercise.

17  Q.   Now, you had --

18  A.   In terms of adverse impact.

19  Q.   Sorry.  And that's a fair point, because you have been

20  asked a series of questions today about whether or not you

21  would have a better exam in terms of a better assessment of the

22  better candidates for promotion to sergeant if you included

23  different variables.  Do you remember that testimony?

24  A.   Yes.

25  Q.   And do you see a distinction in your field between

1  developing an ideal test and developing a test that meets the

2  validity requirements of the Uniform Guidelines?

3  A.    There is a definite distinction, and I've testified as to

4  that distinction.  If --

5  Q.    Go ahead.

6  A.    An organization isn't required to maximize validity as a

7  general principle based on the Uniform Guidelines.  Uniform

8  Guidelines say they're basically irrelevant to the validity

9  question.  It's only when the adverse impact comes into play

10  that the guidelines speak to validity.

11  Q.    When we're talking about the guidelines -- and this is

12  also from the Ricci brief -- and I draw your attention to the

13  lower corner of page 7 where it states, "The Uniform Guidelines

14  specifically redirect the use of casual reports of a test's

15  validity, such as testimonial statements or credentials of IOS,

16  and non-empirical or anecdotal accounts such as the comments of

17  the chief," and so on.  "What the Uniform Guidelines and the

18  principles require is a rigorous analysis of the design and

19  proposed use of the exam according to accepted principles of IO

20  psychology."  Did I read that correctly?

21  A.    Yes.

22  Q.    Is it fair to say that the Uniform Guidelines don't

23  require a municipality to rely on reports of what might be

24  better, that in terms of identifying a testing instrument that

25  has similar validity and it may have less adverse impact, that

1    employers are not required to explore every report about what

2    might be acceptable or what might reduce adverse impact?

3    A.    That is true.

4    Q.    Instead, they're required -- that the requirement attaches

5    when there is evidence of a testing instrument that can meet

6    these requirements?

7    A.    That is true, yes.

8    Q.    Go ahead.  I don't mean --

9    A.    That's the requirement of the Uniform Guidelines, and

10   having attempted to develop alternatives for 20 years, I don't

11   expect people to accept something as an alternative just

12   because I say it is.  I expect them to look at the data that

13   I've produced for that exercise or that process for that job

14   under similar circumstances, which was the case under Ricci.

15   That in Ricci it was one of the few cases which I knew I had

16   developed a selection procedure for the same job under the same

17   conditions, had developed weights that were based on a job

18   analysis, and had come up with an exercise that actually

19   measured competency in a way that it measured negligence, so

20   that it would be dangerous to hire people just on the written

21   test.  All of those things went into my opinion about the Ricci

22   case and that job.

23   Q.    Now, when we were talking about the effect of the 2002

24   tests and its inclusion of an assessment center, have you also

25   had an opportunity to look at the numerical results of the 2005

1    test?

2    A.   Yes.

3    Q.   Which is a written test with the training and education

4    component.

5    A.   Yes.

6    Q.   And do you recall running the numbers on this?  And I'll

7    show you -- this is, again, from Dr. Silva's report of February

8    2009 at page 4, where he breaks out the test takers and the

9    appointments?

10   A.   Yes.

11   Q.   And do you recall that when we looked at these data that

12   in 2002 -- and I can switch between the two -- I can switch

13   between the two charts -- in 2002 there were a total of 311

14   black/Hispanic officers who took the test and a total of 517

15   white officers who took the test, and then a total of nine

16   black/Hispanics promoted from that exam?

17   A.   Yes.

18   Q.   And when we looked at 2005, we had a total of 226

19   black/Hispanics taking the exam, 382 white officers taking the

20   exam.

21   A.   Yes.

22   Q.   And then we had nine black/Hispanics who were promoted

23   from that test.

24   A.   Yes.

25   Q.   And from that we concluded -- and you can check my math --

1    that in 2002 3.5 promotions went to minorities, but in 2005 4

2    percent of the promotions went to minorities?

3    A.    Yes.  In 2002 there was a smaller percentage of minorities

4    based upon the minority sample that got promoted than in 2005.

5    Q.    So the 2002 examination did not have any practical effect

6    of increasing the representation of African Americans in the

7    sergeant's rank as compared to 2005?

8    A.    That is my understanding.

9    Q.    Now, you were shown a document yesterday, which is also

10    Exhibit G to your first report -- I'm forgetting the date --

11    and I'm going to put this up here.  This is a commissioner's

12    memorandum dated May 29, 2002.  And although you read from most

13    of this yesterday, we didn't focus yesterday on the reasons why

14    the performance review systems were being withdrawn from the

15    2002 examination.  And I draw your attention to the second

16    paragraph, which states in part, "This promotional process

17    cannot be allowed to become mired in litigation for months or

18    years.  It has become apparent that this litigation would

19    continue well past the time scheduled for the administration

20    and grading of the examination.  I have been in this department

21    for 31 years and understand that legal challenges to exams has

22    been the norm and not the exception, but even by these

23    standards this litigation posed an incredible challenge to the

24    promotional process.  To delay this process further jeopardizes

25    the good management of the department."

1           And I would ask you, Dr. Outtz, when you're

2    considering the feasibility of the examination components that

3    you're putting into place, is one of the factors that you

4    consider the ability to actually succeed with the examination

5    instrument that you're proposing?  And by succeed I mean be

6    able to complete it and use it as a ranking instrument?

7    A.    Yes.

8    Q.    And would you consider the history that the department

9    that you're consulting with in coming up with proposed design

10   of different instruments that would be used on a going-forward

11   basis?

12   A.    Yes.

13   Q.    In making your consideration of testing instruments to

14   propose to departments would you also look at the candidate

15   pool that you're going to be examining?

16   A.    Yes, I testified to that the other day.

17   Q.    Now, when you were talking, I believe it was yesterday,

18   you mentioned at one point that in looking at the performance

19   of candidates over time -- and you were asked to look

20   specifically at the 1991 job analysis that reflected the 1985

21   examination results, the '87, the '91 results and so on -- I

22   believe you had mentioned that you had questions about what the

23   candidate pool was made up of.  Do you remember that?

24   A.    Yes.

25   Q.    And can you tell the Court what those questions were that

1    you had?

2    A.   I had -- I wanted to know what's the status of the samples

3    coming into the process?  There's some preconditions that can

4    limit the opportunity to reduce adverse impact.  For example,

5    if you have minorities who are not on the same footing as

6    non-minorities going into the process, either in terms of their

7    educational background or their ability to deal with structured

8    assessment processes, you're going to have a problem trying to

9    reduce adverse impact no matter what you do, no matter what

10   exercise you develop, whether it's a written test, whether it's

11   an assessment center, whether it's an in basket.  So you want

12   to know that.  I want to know that so I can give the employer a

13   realistic estimate of how much or how little you can reduce

14   adverse impact.  So I've been interested in that issue since I

15   joined this case.

16   Q.   And do you recall being asked by Mr. Lichten if you had

17   any familiarity with the Cotter case yesterday?

18   A.   Yes.

19   Q.   And did you have a chance to review that case yesterday

20   afternoon?

21   A.   Yes.

22   Q.   And what did you learn from reviewing the Cotter case?

23        MR. LICHTEN:  Your Honor, I object because you

24   precluded me, and I went on to something else.

25        THE COURT:  Well, I don't know about that.  The

1  question itself, just an open-ended what did you conclude from

2  the case, is an objectionable question.

3  A.   From the --

4       THE COURT:  The objection is sustained.

5       MS. HARRIS:  I'm sorry.

6  BY MS. HARRIS:

7  Q.   Are you aware, Dr. Outtz, that there was a consent decree

8  that began in the late 1970s that governed hiring within

9  certain civil service police departments including Boston?

10 A.   Yes.

11 Q.   And does the fact that there was a consent decree that the

12 governed the hiring at the recruit level starting in the late

13 1970s give a context about your review to the promotional

14 practices in the '80s and following?

15 A.   It does.

16 Q.   Can you tell the Court how that context affects your

17 opinion about the efficacy of efforts to reduce adverse impact?

18 A.   It's my understanding that this consent decree called for

19 one-to-one consideration by race of individuals coming into the

20 police department, which would be police officers.  These would

21 be the candidate pool for sergeant's exam.  So you have

22 minorities coming in whose qualifications may not be the same

23 as non-minorities coming in because -- and they were brought in

24 because all things being equal in terms of their other

25 characteristics the consent decree said bring them in one for

1    one with whites.

2           So now you have a differential in terms of the kinds

3    of things measured at least at the entry level in terms of

4    certain abilities, and these people now are in the department

5    and you're going to give them a structured evaluation to become

6    a police sergeant.  You're starting out with candidates who are

7    unequal in the first place in terms of the kind of structured

8    exercises that you're going to put in front of them.  You're

9    not going to make up for that by saying, well, let's shift the

10   weight to this exercise or that exercise.  As I said before,

11   the exercises correlate with each other.  There's no such thing

12   as one exercise standing alone, and, really, if you shift

13   everything to some other exercise, everything will be better in

14   terms of the performance of these two -- these groups.

15          So this inequality in terms of the capacity to deal

16   with certain kinds of exercises and even in terms of the

17   knowledge base or being able to process information, read and

18   comprehend and so forth, is going to carry through no matter

19   what you do at the next level.  It will carry through for a

20   long, long time.

21          It's my understanding that this settlement agreement

22   was in place for almost 20-something years.  You have all the

23   people in the department at the police rank now who are in

24   position to take each sergeant's exam.  That's -- that is a

25   scenario that would indicate to me extreme difficulty in

1    reducing adverse impact no matter what you do.

2    Q.   Now, are you aware of the testimony of -- or have you

3    reviewed the testimony of Mr. Callahan, the director of -- at

4    one point the director of human resources for the Boston Police

5    Department with regard to an educational incentive program that

6    is run by the Boston Police Department?

7    A.   Yes.

8    Q.   And from reviewing Mr. Callahan's testimony, are you aware

9    that roughly 50 percent of the African American and Hispanic

10   members of the department have obtained graduate-level degrees

11   as compared to 75 percent of the officers who are non-minority?

12   A.   I'm aware of that.

13   Q.   Of the department.  And does that educational disparity

14   also factor into the -- your consideration of the context as an

15   industrial psychologist in designing systems, testing systems

16   that would reduce adverse impact?

17   A.   It does.

18   Q.   And can you just tell us how that would affect your

19   assessment of those possibilities?

20   A.   Based upon my experience, it would make it extremely

21   difficult to change the testing system and reduce adverse

22   impact.  I will say it would be very, very difficult to do

23   that.

24   Q.   Now, when you were at deposition and this issue was

25   discussed, Mr. Lichten asked you whether that educational

1    disparity, and presumably with that one's familiarity with

2    standardized testing and all of the stressors that go along

3    with it, whether that isn't something that would -- that would

4    suggest putting less weight and less emphasis on the written

5    portion of the examination?

6    A.    It is something --

7    Q.    Do you recall that question?

8    A.    Yes, I remember that question, yes.

9    Q.    What is your response?  Is that one way you can sort of

10   adjust for the inequities in the candidates' educational

11   backgrounds?

12   A.    You cannot.  That's going to generalize across whatever

13   exercise you're using.  It won't just be for the written test,

14   it will be for the in basket, it will be for the structured

15   interview, or whatever you're using.  And so you have very

16   little, in terms of methods, if any, that would allow you to

17   overcome that differential that these candidates have going in

18   and reducing adverse impact.  So --

19   Q.    Well, explain that a little further because it seems that

20   the difference between a multiple-choice examination and a less

21   structured examination modality would be testing different

22   things.

23   A.    It would be testing different things, but take an oral

24   board, for example, in which you ask a person to either read or

25   listen to this situation and then tell me what you would do.

1    That still requires relatively rapid analytical skills to

2    determine what the situation is, what the most important parts

3    of it are, how you would break it down, and then determine what

4    you ought to do.  Those are things you would typically do more

5    in certain educational environments than in other -- than in

6    lesser educational environments.  So there's still an

7    advantage.  It's not as much of an advantage as it is for the

8    written test, but it's still an advantage.  If you have a role

9    play, it's still a structured situation.  In order to be a

10   test, it has to be structured.

11        So that there will be an advantage for someone who's

12   more accustomed to dealing with problems in that structured

13   situation than those who aren't.  So that you can't propose

14   shifting the problem to other exercises.  If you do propose

15   that, let's see data that shows the shifting has done the

16   correcting in terms of adverse impact.  You can't simply assert

17   that that would happen.  I'm pretty sure it won't happen, but

18   you can assert it.  Where is the data to back that up?

19   Q.   And have you seen data in similar circumstances where you

20   have the information that you have about this candidate pool

21   that's been able -- that there has been a testing instrument

22   designed that makes that adjustment?

23   A.   That makes the adjustment and reducing adverse impact?

24   Q.   Correct.

25   A.   No.

1          THE COURT:  Let me just be clear.  That all assumes an

2     actual difference between the pools.

3          THE WITNESS:  That all assumes there is something that

4     differentiates --

5          THE COURT:  Some difference.

6          THE WITNESS:  -- some differences between the pools

7     that really goes beyond the test.

8     BY MS. HARRIS:

9     Q.   And let me, if I may, just to follow up on that.  In your

10    review, Dr. Outtz, of the data underlying the 2002 and the 2005

11    test results, so the examination with the assessment center

12    component and the examination without it, is there anything in

13    that data that indicates to you that the problem that leads to

14    the adverse impact result is based on the test?

15    A.   Nothing.  I mean, the test is what it is, but the problem

16    goes beyond the test.

17    Q.   Now, as an industrial psychologist there are different

18    types of testing modalities that we've talked about.  And you

19    were asked a bunch of questions about cognitive ability tests

20    and job knowledge tests.  Do you recall that line of

21    questioning?

22    A.   Yes.

23    Q.   And can you tell the Court, are those two -- do those two

24    terms -- are they synonymous?

25    A.   No.

1    Q.    What's a cognitive ability test?

2    A.    A cognitive ability test is more akin to an IQ test.  It

3    is more a test of abstract constructs, reasoning ability,

4    analytical ability, to some extent mathematical ability.  A job

5    knowledge test measures your acquisition of knowledge from

6    sources that you've been -- that have been identified for you

7    in this context, and it's more akin to an achievement process

8    or achievement test.  How much have you been able to learn if

9    we've targeted what it is we want you to learn and understand?

10   Q.    Okay.  And when we were talking yesterday, I believe that

11   you were asked whether or not it was true that there is a one

12   standard deviation difference between whites and blacks and

13   cognitive ability tests?

14   A.    Yes.

15   Q.    And I'm going to show you -- this is, again, the Ployhart

16   and Holtz article that we've referred to a few times.  And this

17   is at table 1 where the predictor -- and I've highlighted it to

18   make it a little easier to see -- the predictor on the left is

19   general cognitive ability, and I'm assuming that refers to a

20   cognitive ability test?

21   A.    Yes.

22   Q.    And it indicates that the D value is .99.

23   A.    Correct.

24   Q.    And does that represent that the D value, meaning the

25   difference between white and black performance on a cognitive

1    ability test, is one standard deviation?

2    A.    Approximately it's one standard deviation, yes.

3    Q.    And when we look lower on this chart, there's a test, a

4    job knowledge listed, correct?

5    A.    Yes.

6    Q.    And the D there is .48, correct?

7    A.    Correct.

8    Q.    And what does that signify?

9    A.    It signifies that the effect size for a job knowledge test

10    based upon this metaanalysis is half that for a cognitive

11    ability test.  That becomes important because if you're saying

12    I want to improve, improve adverse impact, well, improving over

13    a one standard deviation difference is a lot easier than

14    improving over a .48 standard deviation difference.

15    Q.    Why is that?

16    A.    Because you've already cut in half the adverse impact if

17    you're talking about job knowledge versus a cognitive ability

18    test.  Now you're talking about trying to reduce it more.  As I

19    testified on Monday, all the data put forth in this case in

20    front of the Court shows that all of these exercises have some

21    degree of adverse impact.  That's the critical issue.

22            So when you combine them, you're going to have some

23    level of adverse impact.  The question is:  How much can you

24    reduce?  What restrictions are you under?  What's the selection

25    ratio?  And just as importantly, what's the status of the

1    people coming into the process?

2    Q.    Now, looking also at the second page of this table in the

3    Ployhart and Holtz article, they have listed modalities at the

4    top, situational judgment video where the D is .3?

5    A.    Yes.

6    Q.    So that would be, what, about a --

7    A.    A third of a standard deviation.

8    Q.    Okay.  And then situational judgment written is at .4?

9    A.    Yes.

10   Q.    And then at the bottom they list assessment center, and

11   they have a .6 or less standard deviation depending on the

12   exercise.  Do you see that?

13   A.    Yes.

14   Q.    So how does that compare to the D in the job knowledge

15   test?

16   A.    All of these have some degree of adverse impact.  They may

17   be lower than the job knowledge test, but the issue is when you

18   combine them with the job knowledge test, what do you get?

19   I've seen -- seldom, if ever, have I seen a selection system

20   for police sergeant that didn't have a job knowledge test

21   because it's so critical to measure job knowledge.  So the

22   issue really is what are you going to combine with that?

23   You're typically going to combine some assessment center

24   exercises or situational judgment test or whatever, and you're

25   going to have some level of adverse impact.

```
 1            I think what's also important is to understand that
 2    the viewpoint as to the adverse impact of assessment center is
 3    not a forgone conclusion.  The data presented in this case, the
 4    studies presented in this case, all show that there can be
 5    differences of opinion within my field as to how much you can
 6    expect to reduce adverse impact from an assessment center.
 7    What does that mean?  It means if you are asking an employer to
 8    consider using an adverse impact, the employer would do well to
 9    consider the fact that there's a lot of variation and opinion
10    as to the potential for reducing adverse impact, and that if
11    you're talking about expending a great deal of money, that
12    should weigh in your decision.  If you have data from your own
13    jurisdiction that shows that at least going down the road of
14    instituting an assessment center gets you nothing, the question
15    is now do you have reason to think you really ought to keep
16    going in that direction or find some new direction or use what
17    you have that is, in my opinion, at least acceptably valid.
18    Q.   Now, there was a fair amount of attention spent today on
19    the educational and experience rating sheet.  Do you recall
20    that?
21    A.   Yes.
22    Q.   Now, you were shown --
23            THE COURT:  Ms. Harris, before you get into that,
24    because you may have a number of questions, let me just call
25    your attention to the time and get a sense of what you have.
```

```
 1          MS. HARRIS:  I probably have about 20 minutes in
 2   total, and I know that my colleagues have questions as well.
 3   And I am moving into a different topic if this would be an
 4   appropriate time.  I can also represent we have -- Dr. Silva is
 5   going to be here to go on immediately following Dr. Outtz.
 6          THE COURT:  How much total additional time for
 7   Dr. Outtz?
 8          MS. HARRIS:  For myself 15, 20 minutes.
 9          THE COURT:  For everybody?
10          MR. PIKULA:  I don't have long, your Honor.
11          MR. LEAHEY:  I could cut it down to five to ten
12   minutes.
13          THE COURT:  What I'm wondering is if we went an hour
14   this afternoon, which I have available, maybe Dr. Outtz
15   wouldn't have to come back tomorrow.
16          MS. HARRIS:  That's fine with me.
17          THE COURT:  We're close enough we can get him out
18   without killing another day.
19          MS. HARRIS:  That would be great.
20          THE COURT:  Do I have the permission of the court
21   reporter to do that?
22          COURT REPORTER:  Of course.
23          THE COURT:  That was a good answer, wasn't it?
24          Why don't we do that.  Why don't we come back at 2:00
25   and try to wrap it up at 3:00, say.
```

1          MS. HARRIS:  That's fine.  Thank you.

2          THE CLERK:  All rise.  Court is in recess.

3          (Court recessed at 12:58 p.m.)

4          (After luncheon recess:)

5          (Mr. D'Agostino is not present)

6          LAW CLERK:  All rise.

7          (The Court enters the courtroom at 2:07 p.m.)

8          LAW CLERK:  For a continuation of the Lopez trial.

9          You may be seated.

10          MS. HARRIS:  Thank you, your Honor.

11                  CONTINUED REDIRECT EXAMINATION

12   BY MS. HARRIS:

13   Q.    Dr. Outtz.

14   A.    Yes?

15   Q.    Are you all set?

16   A.    I am.

17   Q.    Right before the lunch break we had just begun talking

18   about the education and experience rating that you reviewed in

19   the -- in the course of your review of the text -- the test at

20   issue here.  And I just want to be clear.  It's your opinion

21   that the education and experience rating is, itself, valid; is

22   that correct?

23   A.    Yes.

24   Q.    And your assessment or your opinion of the rating given to

25   the education and experience component of this examination is

1    based on your review of the documents that you've previously

2    discussed in this case, correct?

3    A.    Correct.

4    Q.    And can you just tell us in general form what those

5    documents are that you reviewed?

6    A.    I reviewed the documents describing how this E&E for 1991

7    was linked to each of the ranks, sergeant, lieutenant and

8    captain; and how each of the, for example, majors in college

9    was linked, say, with a specific question, "Does this enhance

10   your capacity to perform in this job?" you know, on some scale,

11   a lot, a little, whatever.

12        So that for each of -- and I -- the documents I reviewed

13   showed that where there must have been a low rating of a

14   particular major or subject area, you didn't see that on the

15   E&E.  It was eliminated if it had ever been on there, if they

16   were considering putting it on there.  For example, civil

17   engineering was one of the things that they evaluated.  And if

18   you look at E&E, civil engineering is not one of the things

19   you'll get credit for on the E&E, but on the job analysis they

20   did, in fact -- they were asked the question, "Is civil

21   engineering related to this?" and a couple of other topics,

22   indicating that that was some systemic methodology designed to

23   link this E&E subject matter and then majors, and so forth, to

24   the actual job.

25        And once you do that, once I reviewed those documents,

1    there were documents describing considerations of various

2    aspects of the E&E and whether there ought to be additional

3    categories put in the E&E or not.  So there was some

4    considerable thought.  And then that was carried over from year

5    to year after 1991.

6    Q.   And when you were describing the check sheet that we were

7    looking at, the Attachment EE from the 1991 analysis, you

8    indicated that if you counted up each of the Xs that were

9    apportioned to the E&E component of the exam, that you got to

10   about 28, 29 percent; is that right?

11   A.   Correct.

12   Q.   And here, as we know, the E&E is apportioned 20 percent

13   weight for the total exam, correct?

14   A.   Correct.

15   Q.   Is it fair to say that the creation of the testing

16   instruments, while a professional exercise is not an exact

17   science -- in other words, if it's a 29 percent on those check

18   boxes, it need not correlate to 29 percent of the weight of the

19   exam in order to be valid; is that right?

20   A.   That's true.  It should be close but it doesn't have to be

21   precise.

22   Q.   And is it true that the development and the use of a job

23   analysis in some respects is a work of art in the field?

24   A.   It should be more than art.  But there's judgment,

25   professional judgment, more so involved in that than some of

1    the other aspects of it, like the actual development of an

2    examination, assessing reliability and things like that.

3    There's a lot more professional judgment involved in the job

4    analysis.

5    Q.    Excuse me.  That's the point I was getting to.  There's a

6    role for subject matter experts to play, but as the

7    professional involved in overseeing the subject matter experts

8    and in deciding whether and how to put together the components

9    of the examination, there is a role for the professional

10    judgment of the test creator?

11    A.    There is a critical role for the professional judgment of

12    the test developer.

13    Q.    Now, when you were being asked about the E&E by

14    Mr. Lichten earlier, you were asked whether or not this is just

15    routinely applied as part of a longstanding bureaucratic

16    practice; do you recall that testimony?

17    A.    Yes.  Yes.

18    Q.    Do you recall that questioning?

19        I'm going to direct you to -- this is Exhibit -- I think

20    it's Exhibit 11.  It's the 2006 rating sheet.  And in the

21    middle where I've highlighted, it indicates the instructions

22    for Section IV, education and training, are different from the

23    past for the 2006 exam series.  "HRD will grant education and

24    experience points only for whole and conferred degrees from

25    recognized (accredited) higher education institutions and not

1  for individual semester hours or degree credits.  Semester

2  hours earned in an unfinished degree program or in a non-degree

3  (certificate) program are not eligible for E&E credit."

4      And I'll ask you, Dr. Outtz, is that limitation on the

5  items that will be considered for credit in the E&E consistent

6  with what you have seen in other similar education and

7  experience components of examinations?

8  A.   Yes.

9  Q.   And can you explain why it would be that credit would not

10  be given for coursework as opposed to completed degree

11  programs?

12  A.   There's a lot more variance in the kinds of courses people

13  can take.  And how would you assess -- if somebody took 25

14  courses in different subject matters, how would you really

15  assess whether that's tapping the kinds of knowledges that come

16  from the job?  They didn't complete a degree.  So it becomes

17  more judgmental as to exactly what that means.

18      However, you have a uniform sort of assessment if you say,

19  Yes, we pursued this degree in this major and we obtained this

20  degree.  From person to person, that means more of the same

21  thing than sort of a potpourri of courses that different people

22  took that you have to then decide whether they get credit for.

23  Q.   And then on the second page of the general instructions,

24  at the top where I've highlighted it reads, "The Human

25  Resources Division requires the submission of supporting

1    documentation for all claims presented on your rating sheet."

2    And is it consistent with what you've seen in other

3    jurisdictions that if credit is going to be given for

4    coursework or for other experiences, that the candidate would

5    have to not only fill in the blank saying that "I have this

6    coursework" or "I have this credit," but that he or she would

7    also have to substantiate that claim with the supporting

8    documentation?

9    A.    Yes.

10   Q.    And then on the next page of the document, under Category

11   8, it's listed that for types of experience that will be

12   granted credit, it includes experience outside the specified

13   department in a recognized federal, state or municipal

14   department in a non-supervisory capacity which involved full

15   police powers.  And it goes on to list the types of positions.

16   And then further, it goes on to say one could obtain credit if

17   they had been a special agent employed by a branch of the

18   United States government and lists the agencies.

19        And is it -- well, first I'll ask you:  Is that consistent

20   with the types of education and experience components that

21   you've seen in other jurisdictions using this type of an

22   assessment?

23   A.    Yes, it is.

24   Q.    And by the way, are you aware that in Massachusetts, that

25   in all of the promotional examinations in the police service,

1    at least, there's an automatic two-point preference given to

2    people who are veterans?

3    A.   Yes, I am.

4    Q.   And in any of the work that you've had to review for this

5    case, have you had to review anything that indicates what the

6    validity is for assigning two points to veteran status?

7    A.   I've not seen documents establishing the validity of the

8    veteran's preference itself.

9    Q.   Nonetheless, the veteran's preference can account for two

10   points towards one's total overall grade, correct?

11   A.   That's correct.

12   Q.   And have you looked at anything that would indicate

13   whether or not there's a racial disparity in people who are

14   eligible for a veteran's preference?

15   A.   I have not.

16   Q.   And finally, Dr. Outtz, I'm going to show you a document.

17   Mr. Lichten had asked you about the point spread that one can

18   earn for various levels of experience, and he was directing you

19   to the collateral skills.  I'll ask you to look under Section

20   IV for education, and does this indicate that one can obtain a

21   certain pointage for having various degrees:  an associate's

22   degree, bachelor's, master's, and a doctorate, and so on?

23   A.   Yes.

24   Q.   And is it fair to say that as one achieves these degrees,

25   that one is going to increase the weight that the total E&E

1    will account for their total grade?

2    A.    Yes.

3    Q.    And is it fair to say that this will account for some

4    variance between the populations, even assuming that they all

5    have the minimum three years' experience to be eligible for the

6    exam in the first place?

7    A.    That's correct.

8    Q.    And in your experience, is providing credit for grades

9    like this in the subject matters that we've discussed earlier

10   consistent with your conclusion that the E&E has validity as

11   it's been applied in this examination?

12   A.    It is.

13         MS. HARRIS:  Your Honor, I'd like to offer the

14   commissioner's memo, the May 29, 2002, document that we'd

15   reviewed earlier, which is Attachment G to Dr. Outtz's report

16   and which was referred to.

17         And with that, I don't have any further questions for

18   Dr. Outtz.

19         THE COURT:  Okay.  I think that will be 194.

20         MS. HARRIS:  That's right.

21         (Defense Exhibit No. 194 received into evidence.)

22         MR. CARROLL:  No questions, your Honor.

23         THE COURT:  No questions?  Okay.  Mr. Leahey?

24         MR. LEAHEY:  Thank you, your Honor.

25                         RECROSS-EXAMINATION

1    BY MR. LEAHEY:

2    Q.    Good afternoon, Dr. Outtz.

3    A.    Good afternoon.

4    Q.    Earlier today you were asked questions from Attorney

5    Lichten with respect to a passing grade with respect to the

6    exams at issue in this case.  The passing grade in this case is

7    70.  As part of your review in this matter, did you investigate

8    how the passing score of 70 relates to the selection ratio for

9    candidates for promotion?

10   A.    It's my understanding from looking at the data in this

11   case it's not really relevant.  You don't reach that point in

12   the selection process, that most of the selections are already

13   made; that is, because there's such a low selection ratio and

14   few vacancies, you seldom go down far enough on the list to

15   even get close to that 70.  So the issue becomes the 2 N + 1

16   rule; that is, the lowest level at which there is a vacancy.

17   And that's typically well above the 70 percent.

18   Q.    When you're talking about the 70 percent, you're talking

19   about promotions that are made with individuals scoring in the

20   90s or the 80s?

21   A.    That's correct.

22   Q.    And so there's no need to go to 70, or below 70 to 65?

23   A.    It typically is not done.

24   Q.    And just briefly, with respect to questions you were asked

25   regarding -- I believe it was a Gordon who had done an analysis

1   in 2010 regarding Fort Worth.  Do you recall being asked

2   questions about that?

3   A.   Yes.

4   Q.   Do you know if that police examination at the assessment

5   center in Fort Worth, do you know if that was 2008?

6   A.   I don't know.  I don't remember when it was.

7   Q.   And, Doctor, with respect to what you testified to

8   yesterday, you spoke about how there's a difference between

9   what the EEOC requires and what you make in terms of

10  recommendations to your clients; is that correct?

11  A.   Yes.

12  Q.   Okay.  And you were asked yesterday a question about a

13  2010 article that you had written.  And I will tell you that

14  based on what I saw from what was able to be put on the screen,

15  I saw words that included "moral and ethical" in that article.

16       And my question to you is:  With respect to the 2010

17  article that Attorney Lichten was asking you about regarding

18  obligations as to what should be done, did that include -- was

19  that just the legal analysis or did that include -- a legal

20  requirement that the EEOC requires -- or did that include moral

21  and ethical things that you think should be included?

22  A.   That chapter -- I don't think it's an article -- includes

23  what I am admonishing my profession to do.  That's what I was

24  asked to do.  What should we be trying to do?  Where are we?

25  It certainly did not constitute my description of the legal

1    requirements for an employer in a selection situation.  Most of

2    the time in my career I do things, recommend things far beyond

3    what's required in the Uniform Guidelines.

4    Q.    Would you describe that as a chapter that you wrote in a

5    perfect -- if the world were perfect, this is what would be

6    done?

7    A.    I wouldn't say that.  I mean, I'm trying to say what ought

8    to be done in my opinion.  That's what I was asked to do.

9    Q.    Would you describe that chapter, then -- would you

10   describe it as aspirational?

11   A.    Yes.

12   Q.    And yesterday you were also asked questions

13   regarding -- well, do you know what the term "a briefing paper"

14   is?

15   A.    I've heard the term "a briefing paper," yeah.

16   Q.    What is your understanding of what a briefing paper is?

17   A.    A paper that basically introduces a topic and gets one

18   oriented to a particular subject.

19   Q.    Do you know whether or not that's consistent -- similar to

20   a position paper?

21   A.    Yes.

22   Q.    And yesterday you were asked questions regarding "Police

23   Personnel Standards for the 21st Century" that was put out from

24   the Massachusetts Association of Major City Chiefs.  Do you

25   recall being asked questions about this document?

1    A.    Yes.

2    Q.    And this is a document that was apparently adopted --

3    according to what it says on it, it was July 20th, 2010?

4    A.    I see.

5    Q.    Okay.  And that Attorney Lichten had asked you questions

6    about certain pages of this document, and my notes indicate

7    that one of the critiques you had of the statements contained

8    in it was that it ignored the constraints that are currently

9    available; is that correct?

10   A.    Yes.

11   Q.    Turning to -- is it fair to say that the only parts of

12   this document you have seen are what you were shown yesterday?

13   A.    Yes.

14   Q.    Okay.  Directing your attention to the highlighted

15   portion -- this is in the "Overview" where it says "That is why

16   the MMCC has proposed what we see as important and necessary

17   changes in the way we recruit, form, train and promote police

18   officers."  Do you see that?

19   A.    Yes.

20   Q.    Does that indicate to you that this is talking about

21   making changes in the way police officers are recruited,

22   apparently formed, trained and promoted?

23   A.    That's what it says.

24   Q.    And that you were specifically asked questions regarding

25   promotions where you were asked to comment on a statement that

1  said "To fulfill our commitment to the best possible executive

2  leadership and accountability, we should enjoy the latitude in

3  terms of policy and procedure to combine a number of approaches

4  to assess, test and promote the most qualified personnel."  Do

5  you see that?

6  A.   Yes.

7  Q.   Okay.  But you weren't asked to read the two -- if you

8  look back, the two lines that precede that sentence, it says,

9  "As chiefs, we hold ourselves accountable for the actions of

10  all our personnel."  Do you see that?

11  A.   Yes.

12  Q.   And afterwards it says, "We know where the buck stops."

13  And then it includes the sentence that you were asked about

14  yesterday, and then it concludes with, "As Yogi Berra once

15  remarked in reference to George Steinbrenner's well-known

16  impulse to micromanage, 'I would rather be fired for my own

17  mistakes, not someone else's.'"  Do you see that?

18  A.   Yes.

19  Q.   Now, putting that in context, is it fair to say that this

20  paragraph is talking about how the police chiefs want the

21  powers for themselves to change, and they want to be held

22  responsible like Yogi Berra?  Is that a fair read of this

23  paragraph?

24  A.   My understanding of this paragraph is that the fire

25  chiefs -- I mean, these chiefs, not fire chiefs, but these

1   chiefs -- they hold themselves accountable for all the actions

2   of the personnel in the department, and they want the leeway

3   to -- not try to move things ahead in how those people are

4   either selected or promoted.

5   Q.   And then turning to page 11, it's talking about -- it's a

6   summary, and it says -- talking about a summary of better

7   aligning skills and competencies for future police recruits.

8   That's the first paragraph under the summary.  Then it goes on

9   to say, "In these fields, employers expect candidates for entry

10  to arrive at their front doors with certain educational

11  credentials and professional certifications in hand.

12  Currently, all one is required to have at the front door of the

13  police station is a General Educational Development diploma

14  (GED).  We can think of no other profession or calling in which

15  so much is expected of people allowed to start with so little."

16  Do you see that?

17  A.   Yes.

18  Q.   And is that -- if there was a requirement -- I believe you

19  testified in relation to questions from Attorney Harris

20  regarding when people come into the system, they come in

21  differently.  If they were required to have some college

22  requirement, would that level the playing field for when

23  persons come into the police environment?

24  A.   If they were required to do that it would level the

25  playing field, yes.

1    Q.    Okay.  I'm directing your attention to the next page to

2    show you that it's a recommendation.  And one of the things

3    that they -- the police chiefs recommend is that actually

4    candidates have either a BS or BA degree, preferably with a

5    certificate of concentration in policing, be completed in

6    junior and senior years, and then it lists the areas of

7    concentrations that would include constitutional law, social

8    history of U.S. policing, human behavior, deviance in human

9    behavior, sociology or social psychology, and juvenile

10   psychology.  Do you see that?

11   A.    Yes.

12   Q.    So, again, this is a recommendation for what the police

13   chiefs would like to see?

14   A.    That's what it appears to me to be.

15   Q.    Would this be -- and I will also represent to you that

16   Superintendent Lavalle testified regarding this on July 29th of

17   this year, and that asking him about this document -- and I

18   said, "Is it fair to say" -- and I asked him the question, "Is

19   it fair to say that this document is a wish list of how the

20   Major Chiefs would like the system to work?"

21        And his answer was, "Yes, that's basically how.  We've

22   adopted suggestions for the Commonwealth.  And certainly as

23   a -- as the leaders of law enforcement in this Commonwealth, we

24   felt it was necessary for us to get our message across, and

25   that's how we decided to do it."

1       And then there's a further question that, "You're also
2   aware that you need to comply with the laws of the Commonwealth
3   and of the Constitution, correct?"  And the answer from
4   Superintendent Lavalle was, "Of course."
5       And then the next question was, "This is a perfect-world
6   scenario; is that fair to say?"  The answer was, "That's pretty
7   much how we would expect to see it happen but it's
8   certainly -- I agree with your assessment, in a perfect world."
9       And the next question, "Where money is no object?"  And
10  the answer is, "Certainly that is an issue and, right, where
11  money is no object.  You're correct."
12      Is it fair to say from what Superintendent Lavalle has
13  said about the Mass. Chiefs Police Personnel Standards for the
14  21st Century, that that is consistent with that chapter that
15  you had written about where you talk about what it should be as
16  opposed to what is legally required?
17  A.   It's along the same lines but...
18  Q.   But what?
19  A.   Chiefs would like a lot of things.  The question is:  How
20  do you measure those things and is it fair to measure them?  So
21  I would take this document and determine whether, from a job
22  analysis, those things are, in fact, required and then they
23  would have more substance, as far as I'm concerned.  I
24  understand what they -- whether they're aspirational or whether
25  they represent what these people really want or whatever, to

1    me, would be irrelevant.  The question is:  If you do a job

2    analysis, would these things show up as being required for the

3    job.  And the chapter that I wrote is more akin to these are

4    things that we are likely to have to do at some point, we might

5    as well get about the business of doing them.

6    Q.   And then that leads me to the last area I just want to

7    speak about.  I believe you were asked questions about how the

8    police chiefs recommended that experience and completion of

9    continuing education units would be -- if there was a

10   promotion, that the promotions would be graded where relevant,

11   demonstrated experience and completion of continuing education

12   units would be 20 percent, a written examination that is

13   tailored to each community's concern would be 40 percent, and

14   then the use of assessment centers would be 40 percent, that

15   would focus on the officer's knowledge, appropriate to the rank

16   they seek in criminal law, court decisions and department

17   policies and procedures.  And then it proceeds to say that

18   "Candidates will be required to pass each step with a grade of

19   90 percent or better before going on to the next step."

20        Is it fair to say that if you were designing

21   or -- designing a promotional test for police sergeant, that

22   you would not rely on any of this information if it came solely

23   from the police chiefs, but instead, you would go -- start with

24   the job analysis, and then the weights would be assigned based

25   on what the job analysis is going to test on the examination?

1    A.    That is correct.

2              MR. LEAHEY:  Thank you, Doctor.

3              THE WITNESS:  You're welcome.

4              THE COURT:  Ms. Engdahl?

5              MS. ENGDAHL:  Nothing for Worcester.

6              MR. McDERMOTT:  Nothing for the MBTA, your Honor.

7              MR. McQUILLAN:  Methuen has no questions.

8              THE COURT:  Nor does Lawrence, I take it.

9              (Laughter.)

10             THE COURT:  Go ahead, Mr. Lichten.

11                        RECROSS-EXAMINATION

12   BY MR. LICHTEN:

13   Q.    Dr. Outtz, what do you actually know about the non-written

14   component of the test that was given for the City of Boston in

15   2002?

16   A.    I know what documents describe as the elements of that

17   process.

18   Q.    What was the non-E&E, the non-written test, what was that

19   component?

20   A.    It was a video-based structured interview.

21   Q.    Okay.  Do you know how many questions there were on it for

22   sergeants?

23   A.    I don't.

24   Q.    Do you know about the litigation that resulted in the

25   Civil Service Commission finding that two of the three

1    questions were improper because individuals were not told to

2    study that information?

3    A.   I don't know of that.

4         MS. HARRIS:  I'll object.  I don't think that's

5    accurate.

6         THE COURT:  Sustained.

7    BY MR. LICHTEN:

8    Q.   Were you ever provided by anyone for whom you served as an

9    expert witness in this case with the Civil Service decision

10   relating to that -- those video exercises?

11        MR. CARROLL:  Objection, your Honor.  I think we're

12   way beyond the scope of the redirect at this point.

13        THE COURT:  Go ahead.  You may have it.

14        THE WITNESS:  Anything I was provided would have been

15   listed in the documents attached to my report.

16   BY MR. LICHTEN:

17   Q.   Okay.  But let me ask you this:  Do you know how many

18   questions there were on these video exercises?

19   A.   I don't remember how many questions there were.

20   Q.   Do you know whether there was anything else other than

21   some video exercises?

22   A.   To my understanding, it consisted of video-based scenarios

23   that people responded to, and that was videotaped and that was

24   scored by a panel of assessors.

25   Q.   Okay.  And do you know how many questions there were?

1    A.    I don't know how many questions there were.

2    Q.    Do you know how it was scored?

3    A.    I don't know precisely how it was scored.

4    Q.    Have you done anything to satisfy yourself that that

5    assessment center was properly conducted in a way that you

6    would have conducted a situational judgment test?

7    A.    My understanding -- the documents that I read indicated

8    that it followed the kinds of professional practices that I

9    would typically see, that it was -- the job analysis dictated

10   the video scenarios; the video scenarios had answers to them

11   that were based on certain dimensions that were to be measured;

12   the dimensions were then translated into a rating form; raters

13   were formed as to how to use the form; once they saw the video

14   of the person on the screen they were -- there was training

15   associated with the typical kinds of rater errors you would

16   find to sort of minimize those.

17        So those are the kinds of things that I looked at that

18   indicated to me it was professionally developed.

19   Q.    But you never looked at the questions?

20   A.    I have not.  I'm not sure I was ever provided the

21   questions, actually.

22   Q.    Do you know if the same questions were used for sergeant,

23   lieutenant and captain, or whether they were different

24   questions?

25   A.    I don't know the answer to that question.

1  Q.   So, in fact, you really haven't studied the video

2  exercises that were done for the City of Boston in 2002?

3  A.   I have studied them to the extent that I've just

4  described.

5  Q.   Let me see if I understand what you're saying in this

6  case.  Let's assume for a moment that you're correct, that

7  there was these video exercises done in 2002, and combined with

8  the written test had adverse impact -- significant adverse

9  impact on minorities.  If I understand your testimony, you're

10  saying, then, that it was appropriate for the City of Boston to

11  say, "Shucks, we tried it.  It didn't work.  Now let's go back

12  to a written multiple-choice job-knowledge test"; is that

13  correct?

14  A.   That's not my testimony.

15  Q.   I thought that's what you're saying in this case?

16  A.   What I'm saying in this case is that a process was put in

17  place with the hope, I suppose, that it would be just as valid,

18  if not more valid, than the prior process and would have less

19  adverse impact.  It was put in place; one component of it was

20  discarded because it was challenged in court, the other

21  components were, in fact, used.  If they were defective, I

22  would assume that the review of them would have resulted in it

23  being removed also.  So apparently, it passed muster enough to

24  be used.

25       Once it was used, it did have a video component.  It was

1    not paper-and-pencil based.  The -- it was -- you saw a

2    scenario and you gave an oral response as to what you saw and

3    what you would do.  So there was no written component in it

4    like the written test, with the assumption that if you didn't

5    have the reading component and reading level, it would have

6    less adverse impact.  My understanding is that it didn't have

7    less adverse impact.

8    Q.   Let's get back to my question.

9         MR. LICHTEN:  Could you read back what the question

10   was.

11        (The reporter reads the pending question.)

12   BY MR. LICHTEN:

13   Q.   All right.  So my question is, I want you to focus on, if

14   I understand the testimony you're giving in the case, having

15   tried one video exercise component in 2002 and finding that it

16   still had adverse impact, it was appropriate -- at least

17   lawfully appropriate -- in your opinion, and professionally

18   acceptable to then say, "It did not work.  We tried it.  Let's

19   go back to a written multiple-choice test and be done with it"?

20   A.   That is incorrect.

21        MS. HARRIS:  Objection.

22        (No verbal ruling.)

23   BY MR. LICHTEN:

24   Q.   Let me ask you this:  Is it your opinion that because one

25   time an additional component in 2002 was tried and was not

```
 1    successful in significantly reducing adverse impact, that it's
 2    now okay for the next five, ten, 15 or 20 years for the City of
 3    Boston, in your opinion, to simply go back and continue to use
 4    this multiple-choice job-knowledge test with a 20 percent
 5    training and experience that has been shown time and time again
 6    to have significant impact upon minorities?
 7    A.    That's not my testimony.
 8    Q.    Then what is your testimony?  What is supposed to be done
 9    in this situation?
10    A.    First of all, what I would like or not like is not the
11    same as the Uniform Guidelines.  The answer to that question is
12    what do the Uniform Guidelines require --
13    Q.    Fine.  Let's stick with that.
14    A.    And if I can complete my answer.
15    Q.    Let's stick with that.
16    A.    What do the Uniform Guidelines require.  And I have
17    responded in both dimensions:  What I thought I would do and
18    what I think the Uniform Guidelines require.  I think what the
19    Uniform Guidelines require is what's relevant in this case.
20         It is my understanding, and this is what I am saying ought
21    to be done, to comply with the Uniform Guidelines that the
22    employer in this case, having given a 2002 exam, would be
23    required to look at other processes that show evidence of less
24    adverse impact in this situation and consider those.  I have
25    seen no evidence that that's been presented to this employer
```

1    for consideration, nor any evidence of the likelihood it would

2    be successful in reducing adverse impact.

3    Q.    Let me see if I understand that.  So in 2005 and 2008,

4    you're saying that the city still had an obligation to search

5    the literature and to search around what was being done to see

6    if there were other alternatives that could have been used

7    knowing that the written test with the training and experience

8    had adverse impact, and they had an obligation to do that both

9    in 2005 and 2008?

10   A.    I'm saying that according to the Uniform Guidelines --

11   Q.    Okay.

12   A.    -- if this process in 2002 was valid, which I think it

13   was, under the guidelines they're not required to search for

14   anything.

15   Q.    They just use the 2002 over again because it's valid,

16   correct?

17   A.    That's not what I testified to.  I testified that the

18   Uniform Guidelines do not require this employer to continue

19   looking for alternatives if the employer has used a valid

20   system and attempted to reduce adverse impact and it didn't

21   reduce adverse impact.  They're not required to continually

22   make that search.  That's in the questions-and-answers section

23   of the Uniform Guidelines.  Now -- that's the answer to your

24   question.

25   Q.    Okay.  Now I'm totally confused because I just want to

1    understand what you're saying.  According to your testimony,

2    there has been -- there has been a history of using a written

3    component with a training and experience that has had adverse

4    impact.  In 2002, according to your testimony, the City of

5    Boston used an additional component which had some video

6    exercises and continued to experience significant disparate

7    impact.  We agree on that so far, right?

8    A.    Yes.  Yes.

9    Q.    And I'm asking you, and I thought I understood what you

10   were saying, in 2005, 2008, 2011, 2014, are you saying that

11   having tried in 2002 to add this one additional component and

12   not having been successful in significantly reducing adverse

13   impact, the City of Boston is well within its rights under the

14   Uniform Guidelines to just continue on using a multiple-choice

15   job-knowledge test and the training and experience because they

16   tried it once and it didn't really work?

17            MS. HARRIS:  Objection.

18            THE COURT:  Overruled.

19            You may answer.

20            THE WITNESS:  I haven't said that and I haven't -- I'm

21   not saying it now.  Let me try one more time.

22            This employer after 2002 under the Uniform Guidelines

23   is not required to make a continual search for alternatives.

24   That's number one.  That is in perpetuity.  Number two, this

25   employer is not required to experiment with alternatives.  That

1     is, "Well, let's try this and see if it works."  So they're not

2     required to do that either.

3           What they are required to do is at some point see if

4     there is an alternative, and if there is an alternative, does

5     it match in terms of reducing adverse impact the context in

6     which this device was used, and is there data showing it had

7     less adverse impact.  And at some point I think this employer

8     would be required to take a look at that.

9           But at this stage, for example, for 2005, the

10    questions and answers in the Uniform Guidelines clearly state

11    that if the employer has tried something and the system that

12    they tried is both valid and they attempted to reduce adverse

13    impact, they're not required to continually search for

14    something that reduces adverse impact.  They're certainly not

15    required to experiment with things that reduce adverse impact.

16    BY MR. LICHTEN:

17    Q.    Can you point me to the section of the Uniform Guidelines

18    that says that?

19    A.    I can indeed.  I believe it's Question 29.

20    Q.    Question 29?

21    A.    I think so.

22    Q.    Okay.  Okay.  Moving on.  You were asked about how

23    individuals have gotten hired into the Boston Police

24    Department, and I believe you said that you were familiar with

25    the fact that there had been a history of discrimination in the

1    Boston Police Department that resulted in a consent decree that
2    required the hiring or the consideration of minorities and
3    non-minorities on a one-to-one basis up until fairly recently;
4    is that correct?
5    A.    I did not.
6    Q.    You didn't say that?
7    A.    My recollection of what I said is that there had been a
8    settlement agreement based upon some litigation; I don't know
9    if I said that there had been past discrimination.  And I said
10   that as part of that settlement agreement the requirement was
11   that applicants from racial groups, minorities and
12   non-minorities, had to be considered on a one-to-one basis.  I
13   didn't say they had to be hired, I said they had to be
14   considered.
15        And as a result of being considered, at the end of the day
16   you would -- you have had minorities being hired with
17   qualifications lower than -- at least based upon the
18   entry-level procedures, lower than those of whites.
19   Q.    Well, let me try to explore that one-by-one very quickly.
20   First of all, you're not aware of the Beecher -- a decision in
21   which the City of Boston and other communities throughout the
22   Commonwealth were found guilty of discrimination in their
23   entry-level hiring.  You're not aware of that case?
24   A.    I'm not aware of that case.  I'm aware of it, I don't know
25   the details of it.  I'm aware of it.

1           (Mr. D'Agostino enters the courtroom.)

2    Q.   Okay.  Secondly, when you say minorities have not done as

3    well as non-minorities with respect to the entry-level

4    requirements, do you know what those requirements were?

5    A.   It's my understanding that those requirements included

6    some paper-and-pencil screening or police officer examination.

7    Q.   Are you aware that that was it, that the whole thing was

8    based upon your -- how you did on a cognitive ability test?

9    That's the entry-level exam that's given, a pen-and-paper

10   entry-level test?

11   A.   I'm aware of that.

12   Q.   So it doesn't test for other attributes.  It doesn't test

13   whether you've gone to college or whether you've done other

14   things, it simply is a score that you get on a cognitive

15   ability test; is that right?

16   A.   That's any understanding.  I don't know whether it's

17   "simply."  It's your score on that test, whatever that test

18   consists of.

19   Q.   So you're just hypothesizing that minority candidates who

20   are coming into the police department under the consent decree

21   are not as qualified as non-minority.  You don't actually know

22   that to be the case, do you?

23   A.   We've spent all three days that I've been here verifying

24   the fact that cognitive ability tests and job-knowledge tests

25   produce adverse impact.  That means that the performance of --

1    Q.   That's not my question, Dr. Outtz.  My question is simply:

2    Is it your testimony here today that you believe the problem in

3    the Boston Police Department and other departments are that the

4    candidates -- the minority candidates who are hired under this

5    consent decree were not as qualified to be police officers as

6    the non-minorities because they didn't score as well on this

7    written cognitive ability test?

8              MR. CARROLL:  Objection.  Argumentative.

9              THE COURT:  Overruled.

10             THE WITNESS:  My assessment is that if you had this

11   test, from what we know about cognitive ability tests, I don't

12   have to see the test to predict that the scores of

13   African-Americans will be lower than the scores of whites,

14   number one.  So that if those scores are lower, then by that

15   standard -- and if this test had some validity at all, and if

16   it was a cognitive ability test it probably had some validity,

17   you would have minorities coming in with lower scores on that

18   test.  I didn't say whether they were less qualified to be a

19   police officer.  I said no such thing.  I said they would have

20   lower scores.

21             If you then have exercises similar to those at the

22   promotion level, they're going to have lower scores because

23   they're already coming in with less skill sets in terms of

24   those kinds of tests.  And in this case you're measuring

25   adverse impact by their performance on structured assessment

1    devices, at least for 2002.

2    BY MR. LICHTEN:

3    Q.   I thought you said that cognitive ability tests were not

4    like job-knowledge tests?

5    A.   I didn't say they weren't like them in terms of producing

6    adverse impact.  I didn't say that.

7    Q.   All right.  Now, do you know across the Commonwealth of

8    Massachusetts and in the cities that are here today -- do you

9    know about the Quinn Bill, first of all?

10   A.   I don't know --

11   Q.   Do you know that there's a statutory program out there

12   which rewards in significant ways; that is, you can get 15

13   percent, 20 percent of your actual salary for getting college

14   degrees?

15   A.   In the department.  In the Boston Police Department.

16   Q.   In the Boston Police Department and other departments

17   throughout the state.

18   A.   I know about it for the Boston Police Department.

19   Q.   Do you know what the percentage of officers is, both

20   minority and non-minority, throughout the Commonwealth who have

21   college degrees as a result of the Quinn Bill, if not having

22   them when they're hired, get them in their first several years

23   so they can increase their salary by a significant amount?

24   A.   I don't know that for the State of Massachusetts.

25   Q.   Do you know that for Boston?

1   A.   I've looked at information for Boston indicating a higher

2   number of people have degrees.

3   Q.   And what is this document you looked at?

4   A.   I looked at information I requested from counsel in this

5   case, the records --

6   Q.   Do you have the documents somewhere, because I've never

7   seen it.

8          MS. HARRIS:  I'll stipulate that I gave him the

9   testimony of Callahan.

10  BY MR. LICHTEN:

11  Q.   Okay.  So you haven't seen a document; isn't that correct?

12  A.   I have seen a document that describes figures showing the

13  number of personnel in the Boston Police Department who have

14  various degrees.

15  Q.   You haven't seen a data compilation that tells you how

16  many minorities and non-minorities in the Boston Police

17  Department have degrees and what degrees they have; is that

18  correct?

19  A.   I have.  I have.

20  Q.   Where is that document, sir?

21  A.   I can't put my -- I don't have it here with me but I've

22  seen it, and that's the basis for what I've said here.

23         MR. LICHTEN:  Your Honor, I would request that

24  document be produced because I've never seen it.

25         MS. HARRIS:  I'll have to confer with the witness

 1    because I'm not sure what he's talking about.
 2              THE COURT:  All right.
 3              MS. HARRIS:  May I give him the Uniform Guidelines,
 4    while we're pausing, that counsel asked him about?
 5              MR. LICHTEN:  Would you show it to Mr. Churchill
 6    first?
 7              MS. HARRIS:  Uh-huh.
 8              THE COURT:  The Question 29 issue?
 9              MS. HARRIS:  Yes.
10    BY MR. LICHTEN:
11    Q.   I'm going to -- I will get back to this in a minute.  I
12    promise you.
13        Now, what, if anything, do you know about the history of
14    the consent decree for police sergeants in the City of Boston?
15    A.   Very little.
16    Q.   Were you aware that in 1985 there was a consent
17    decree -- there was a lawsuit and then a consent decree which
18    required the promotion of minority police sergeants?
19    A.   I'm not aware of that.
20    Q.   Okay.  And are you aware of any study or analysis as to
21    the capabilities or the abilities of those minorities who are
22    hired pursuant to a consent decree and not by reason of their
23    relative score on a promotional examination to perform the job
24    of sergeant?
25    A.   No.

1   Q.   Have you been told anything by your clients that current

2   minority police sergeants in the City of Boston perform any

3   less well than non-minority police sergeants?

4   A.   No.

5   Q.   Okay.  So you don't know anything about the numbers of

6   minority police sergeants that were hired pursuant to the

7   consent decree; is that correct?

8   A.   Hired from the outside or promoted?

9   Q.   Hired from -- promoted from police officer positions to

10  police sergeants.

11  A.   Yes, I don't know that.

12  Q.   Okay.  Do you know that there were also cases in the '90s

13  in which minority police officers were promoted to sergeant in

14  which non-minority police officers were bypassed with higher

15  scores on the promotional test?

16  A.   I have heard something to that effect.

17  Q.   And have you had any information, or have you been told

18  anything by the clients for whom you're working for in this

19  case, about the relative capabilities of those police officers?

20  A.   No.

21  Q.   And are you aware as to how many or how few minority

22  police sergeants there would actually be in the City of Boston

23  if you stripped away from the current number of Boston police

24  sergeants all of the minority police sergeants who are hired

25  either as a result of the consent decree in 1985 or the

1    bypassing of non-minority candidates in the '90s?

2    A.    I don't know the answer to that.

3    Q.    Okay.  Assume for a moment that if you did all that you

4    would have extremely few minority police sergeants in a city

5    which has a significant minority population.  Would that

6    concern you?

7              MR. CARROLL:  Objection.

8              MS. HARRIS:  Objection.

9              THE COURT:  Sustained.

10   BY MR. LICHTEN:

11   Q.    Okay.  I'd like to -- you have the Uniform Guidelines up

12   there?

13   A.    I do.

14   Q.    I would like you to turn to Question 91, sir.

15   A.    Yes.

16   Q.    And 91 seems to be -- it says, "What constitutes a

17   reasonable investigation of alternatives as that phrase is used

18   in the answer to Question 49."  Do you see that?

19   A.    Yes.

20   Q.    And it says, "The Uniform Guidelines call for a reasonable

21   investigation of alternatives for proposed selection procedure

22   as part of any validity study."  Do you see that?

23   A.    Yes.

24   Q.    "A reasonable investigation would begin with a search of

25   the published literature, test manuals and journal articles to

1    develop a list of currently available selection procedures"; is

2    that right?

3    A.    Yes.

4    Q.    Can you show me -- have you been shown any document by any

5    of your clients in this case, any of the cities or the City of

6    Boston, that shows that in 2005 they made any such search

7    whatsoever as opposed to simply the city's making an

8    administrative determination they were going to go with the

9    written test of HRD?

10         MR. CARROLL:    Objection.    There's no foundation, your

11   Honor, that any of the cities, with the possible exception of

12   Boston, had any obligation to make any search.    You know, if he

13   wants to ask whether HRD made a search before they gave the

14   examination they gave, fine.    But how are the cities --

15         MR. LICHTEN:    Very well.    I'll --

16         THE COURT:    I think it should be limited to Boston.

17         MR. LICHTEN:    Well, let me -- I was actually going to

18   pick up on a suggestion that Mr. Carroll made, so let me do it

19   both ways.

20   BY MR. LICHTEN:

21   Q.    First, with respect to the City of Boston, are you aware

22   of -- have you been given any documents or shown anything to

23   show the search that they made before giving the test in 2005?

24   A.    No.

25   Q.    Okay.    Originally you were hired by the Commonwealth of

1    Massachusetts HRD; is that correct?

2    A.    Yes.

3    Q.    Were you given any documents by your then-client, the

4    Commonwealth of Massachusetts HRD, to show any search that they

5    made in 2005 for these alternatives that are referenced in

6    Question 91?

7    A.    No.

8    Q.    It then says -- I'm picking up here -- maybe I should put

9    this on the screen.  I guess the Court might not have them --

10   "A further review would then be required of all selection

11   procedures at least as valid as the proposed procedure to

12   determine if any offer the probability of lesser adverse

13   impact."  Do you see that?

14   A.    Yes.

15   Q.    "And where the information of the proposed selection

16   procedure indicates a low degree of validity and high adverse

17   impact, and where the published literature does not suggest a

18   better alternative, investigation of other sources, for

19   example, professionally available unpublished research studies

20   may also be necessary before continuing use of the proposed

21   procedure can be justified."

22   A.    Yes.

23   Q.    And I think you've already said that with respect to the

24   written tests that are at issue in this case, the written tests

25   themselves would not have sufficient validity to meet Title VII

1  standards, and with the E&E they have minimal or acceptable

2  validity; is that correct?

3  A.   That's correct.

4  Q.   So that would be low validity; is that right?

5  A.   It would be acceptable validity.

6  Q.   So they would be under the obligation to do what Question

7  91 tells them to do; is that right?

8  A.   No.

9         MS. HARRIS:  For completeness, your Honor, can I ask

10  that the Question 49 that the witness initially alluded to be

11  included in this presentation?  This question is a follow-up

12  on --

13         THE COURT:  Well, he could either do it now or you

14  could do it when Mr. Lichten is finished, whichever -- I give

15  him the option.

16         MS. HARRIS:  I didn't know I could get up again,

17  that's why I was asking.

18         THE COURT:  I would allow it for this.

19         MR. LICHTEN:  If you said you wouldn't allow it, then

20  I wouldn't ask him the question, but since you've indicated

21  that the goose is cooked...

22         (Laughter.)

23  BY MR. LICHTEN:

24  Q.   Question 49, is this what you were referring to?

25  A.   Yes.

1    Q.    Okay.  It says, "Do the guidelines call for a user to

2    continually investigate suitable alternative selection

3    procedures and suitable alternative methods of using the

4    selection procedure which have as little adverse impact as

5    possible?"  And the answer, "No.  There is no requirement for

6    continual investigation.  A reasonable investigation of

7    alternatives is called for by the guidelines" --

8         Is that what you're referring to?

9              MS. HARRIS:  The answer continues.

10              MR. LICHTEN:  Yes.  I'm going to get to it.  I'm

11    turning the page.

12    BY MR. LICHTEN:

13    Q.    -- "as part of any validity study."  Do you see that?

14    A.    Yes.

15    Q.    "Once the study is complete and validity has been found,

16    however, there is generally no obligation to conduct further

17    investigations."  Do you see that?

18    A.    Yes.

19    Q.    But there was no validity study done of the 2005

20    examination; is that correct?

21    A.    I was talking about the 2002 examination.

22    Q.    No.  But they didn't use the 2002 examination.  They had

23    found that to be valid, but they decided to use the written

24    test without this additional component.  And for that they

25    never did a validity study in 2005, did they?

1   A.   I totally don't understand your question.

2          MR. CARROLL:  Objection.

3          THE WITNESS:  I'm sorry.

4          MR. LICHTEN:  I'll withdraw it.  I have nothing

5   further.

6          THE COURT:  All right.  I think that's it, Dr. Outtz.

7   Your testimony is over.  You're excused.

8          THE WITNESS:  Thank you.

9          (The witness is excused.)

10         THE COURT:  Let me just ask about -- I assume

11  Dr. Silva tomorrow?  And then there's some other witnesses from

12  some of the municipalities?  Is it -- are we in jeopardy of not

13  finishing in the next two days?  It sounds that way to me.

14         MR. CARROLL:  I don't believe so, your Honor.  I would

15  simply like to offer an exhibit into evidence, in lieu of

16  calling a witness, which would help expedite the matter.  I

17  don't believe there's any objection --

18         MR. LICHTEN:  We've already agreed to it.

19         THE COURT:  What is it?

20         MR. CARROLL:  Excuse me?

21         THE COURT:  What is it?

22         MR. CARROLL:  It's a report of Analysis and

23  Inferences, Inc., the expert statistician firm hired by the

24  City of Springfield.  This is a --

25         THE COURT:  So you'll accept the report in lieu of

1    testimony; is that it?

2         MR. LICHTEN:  Yes; we've already agreed to that.  We

3    discussed that last July.

4         THE COURT:  All right.  That will be the next number,

5    which I think is 195.

6         MR. CARROLL:  195?  Thank you, your Honor.

7         (Defense Exhibit No. 195, received into evidence.)

8         MS. HARRIS:  We have Dr. Silva and no other witnesses.

9    At least from our perspective, we would expect to be finished

10   this week, easily.

11        THE COURT:  Okay.

12        MR. LEAHEY:  With respect to Lowell, the only person

13   I'd be calling would be Sally McNeely from HRD.  I proposed an

14   affidavit to counsel that literally is just to authenticate and

15   some foundation for records that I tried to introduce earlier

16   and couldn't get, but also the HRD definition of "Hispanic" and

17   "Asian."  I'd be calling her for that limited purpose.

18        Either we can do it by agreement or I could call her

19   for that limited purpose.  I would expect it to take 15

20   minutes.

21        MR. LICHTEN:  We're working on the affidavit.  The

22   first draft was not quite --

23        THE COURT:  All right.

24        MS. ENGDAHL:  Your Honor, at this point I had planned

25   to bring on Worcester's chief for his limited testimony, but

1    what I'd like to do is actually see how we do with Dr. Silva

2    tomorrow and make a judgment.  I think we can be done by

3    Friday, is what I'm saying.

4        THE COURT:  Okay.  Well, let me just tell you our

5    schedule.  I have a jury trial scheduled for Monday in an FELA

6    case.  It probably won't take the week.  The following week I

7    have a criminal case scheduled to begin on Monday which I

8    expect is going to be continued.  So the week of the 27th would

9    be possible if we needed to overflow.

10        MR. LICHTEN:  We're committed to having it be done

11    this week, your Honor.

12        THE COURT:  That's fine.  I have no objection to that

13    commitment whatsoever.  But I just didn't want you to feel that

14    there was an absolute deadline, and we do have a little

15    expansion and can still get it done in September.

16        MS. HARRIS:  And I would just --

17        MR. LICHTEN:  Please don't tell us.

18        MS. HARRIS:  I have many reasons for me to want to get

19    it done this week including I'm scheduled to be on trial in

20    Suffolk Superior on a last best date and, again, would be

21    coming to you for protection if we didn't.  It's my best hope

22    that we will be.

23        MR. CARROLL:  I like to sleep late in the morning,

24    Judge, so that's my excuse.

25        THE COURT:  You know, our United States marshal comes

1    from the Springfield area, and he's here, like, at seven in the

2    morning because he gets up at four or something.

3           MR. CARROLL:  I get up at 4:30 and I'm lucky to walk

4    through the door by nine, but I take the bus and the MBTA.

5           (Laughter.)

6           THE COURT:  All right.  I'll see you tomorrow.

7           LAW CLERK:  All rise.  Court is now in recess.

8           (The proceedings adjourned at 3:01 p.m.)

9

10                  C E R T I F I C A T E

11

12          We, Marcia G. Patrisso, RMR, CRR, and Debra M. Joyce,

13    RMR, CRR, Official Reporters of the United States District

14    Court, do hereby certify that the foregoing transcript

15    constitutes, to the best of our skill and ability, a true and

16    accurate transcription of our stenotype notes taken in the

17    matter of Civil Action No. 07-11693-GAO, Pedro Lopez, et al, v.

18    City of Lawrence, et al.

19    /s/ Marcia G. Patrisso
      MARCIA G. PATRISSO, RMR, CRR
20    Official Court Reporter

21
      /s/ Debra M. Joyce
22    DEBRA M. JOYCE, RMR, CRR
      Official Court Reporter

23

24    Dated:  September 15, 2010

25