UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


PEDRO LOPEZ, Individually and on          )
behalf of a class of individuals          )
similarly situated,                       )
                                          )
          Plaintiffs,                     )
                                          ) Civil Action
v.                                        ) No. 07-11693-GAO
                                          )
CITY OF LAWRENCE, et al.,                 )
                                          )
          Defendants.                     )
                                          )


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**DAY SEVENTEEN**
**NON-JURY TRIAL**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Thursday, September 16, 2010
9:12 a.m.


Marcia G. Patrisso, RMR, CRR
Debra M. Joyce, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2         LICHTEN & LISS-RIORDAN, P.C.
           By: Harold L. Lichten, Esq.
 3             Stephen S. Churchill, Esq.
               Joseph L. Sulman, Esq.
 4         100 Cambridge Street, 20th Floor
           Boston, Massachusetts  02114
 5         On Behalf of the Plaintiffs

 6         CITY OF LOWELL LAW DEPARTMENT
           By: Brian W. Leahey, Esq.
 7         City Hall
           375 Merrimack Street
 8         Lowell, Massachusetts  01852
           On Behalf of the Defendant City of Lowell
 9
           OFFICE OF THE CITY ATTORNEY
10         By: Richard J. D'Agostino, Esq.
           200 Common Street, Suite 306
11         Lawrence, Massachusetts  01840
           On Behalf of the Defendant City of Lawrence
12
           COLLINS, LOUGHRAN & PELOQUIN
13         By: Laurie W. Engdahl, Esq.
           320 Norwood Park South
14         Norwood, Massachusetts  02062
           On Behalf of the Defendant City of Worcester
15
           MORGAN, BROWN & JOY, LLP
16         By: Mary Jo Harris, Esq.
               Robert P. Morris, Esq.
17         200 State Street, 11th Floor
           Boston, Massachusetts  02109
18         On Behalf of the Defendant City of Boston

19         MBTA LAW DEPARTMENT
           By: Kevin S. McDermott, Esq.
20         10 Park Plaza, 7th Floor
           Boston, Massachusetts  02116
21         On Behalf of the Defendant MBTA

22

23

24

25
```

```
 1        CITY OF SPRINGFIELD LAW DEPARTMENT
          By: Harry P. Carroll, Esq.
 2        36 Court Street
          Springfield, Massachusetts  01103
 3        On Behalf of the Defendants City of Springfield
          and Mayor Sarno
 4
          CITY OF METHUEN - OFFICE OF THE CITY SOLICITOR
 5        By: Peter J. McQuillan, Esq.
          The Searles Building, Suite 311
 6        41 Pleasant Street
          Methuen, Massachusetts  01844
 7        On Behalf of the Defendant City of Methuen

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              I N D E X

2                    Direct   Cross   Redirect   Recross

3     WITNESSES FOR THE
        DEFENSE:

4
     JACINTO MANUEL SILVA

5
          By Ms. Engdahl          5
6         By Mr. Carroll               36
          By Mr. Leahey                47
7         By Mr. McDermott             51
          By Mr. McQuillan             58
8         By Mr. D'Agostino            62
          By Ms. Harris                67
9         By Mr. Churchill             99

10                            E X H I B I T S

11

12   DEFENDANTS'
        EXHIBIT      DESCRIPTION                    MARKED  RECEIVED
13
     No. 196   Dr. Silva's curriculum vitae                  9
14
     No. 197   Tables 2 and 3:  2005 and 2006 Probability
15             of Adverse Impact                            26

16   No. 198   Table 1:  Example that Demonstrates the
               Appropriateness of Aggregation Across
17             Jurisdictions                               31

18   No. 199   Table re Methuen                            62

19   No. 200   Chart prepared by Dr. Silva                 85

20

21

22

23

24

25

```
 1              P R O C E E D I N G S
 2          (The Court enters the courtroom at 9:12 a.m.)
 3          THE CLERK:  For a continuation of the Lopez trial.
 4          Please be seated.
 5          COUNSEL IN UNISON:  Good morning, your Honor.
 6          THE COURT:  Good morning.
 7          MS. ENGDAHL:  Your Honor, the defendants call Jacinto
 8  Silva to the stand as a witness.
 9          JACINTO MANUEL SILVA, Ph.D., duly sworn
10          THE CLERK:  Please be seated.  State your name, spell
11  your last name for the record, keep your voice up and speak
12  into the mic.
13          THE WITNESS:  My name is Jacinto Manuel Silva.  My
14  last name is spelled S-I-L-V-A.
15                      DIRECT EXAMINATION
16  BY MS. ENGDAHL:
17  Q.   Dr. Silva, are currently employed?
18  A.   Yes, I am.
19  Q.   And with whom are you employed?
20  A.   I'm employed with EB Jacobs, it's a firm that does public
21  safety testing, in Pennsylvania.
22  Q.   And where are you based?
23  A.   We're based in State College, Pennsylvania.  And we have
24  offices in Gainesville, Florida, and also in Seattle,
25  Washington.
```

1    Q.    And what is your current title?

2    A.    My current title is senior managing consultant.

3    Q.    And how long have you been with EB Jacobs?

4    A.    In its various incarnations I've been with them for 12

5    years.  Within the firm of EB Jacobs itself, I've been with

6    them for six and a half years.

7    Q.    And prior to your employment with EB Jacobs, have you held

8    similar positions?

9    A.    I have.

10   Q.    Okay.  Describe your employment history for the Court.

11   A.    After my doctorate I began my employment with the U.S.

12   Army Research Institute where I did research with the Army on a

13   number of topics such as adaptability measurement; the work on

14   fairness of promotion systems; bias in testing; various

15   selection -- development of selection tools for positions such

16   as Morse interceptor, toe-gunner and other Army positions.  It

17   was mainly a research type of position with a lot of practical

18   applications.

19        Following the Army, I went to work for a company called

20   Personnel Decisions Research, Incorporated, also known as PDRI.

21   And there I worked for a year, and worked more on general

22   projects with the overall federal government.  I worked for

23   agencies such as the State Department, the FBI, the CIA, FAA.

24   I also worked for private organizations such as GTE.  We did

25   job analysis, selection, performance appraisal, needs

1    assessment and things of that sort.  So pretty much in the same

2    IO field.

3         Following that I did go to work for a company called Andy

4    Jacobs, which then became SHL shortly after I arrived.  And

5    there I did a lot of public safety testing but also worked with

6    private organizations such as the hospitality industry; worked

7    with technology firms and biogenetic firms; pharmaceutical

8    companies, doing assessment centers for them.  So, again, a lot

9    of selection work, a lot of performance appraisal work, and

10   just IO kinds of tasks and projects.

11        Once we became EB Jacobs -- we became EB Jacobs by

12   splitting back out of SHL.  We were originally acquired by SHL

13   in 1998, and in 2004 we bought ourselves back out of the

14   company and became EB Jacobs.  We couldn't take the original

15   name because of legal reasons, so we named ourselves EB Jacobs.

16   But it's essentially the same company doing a lot of the same

17   work in public safety.

18        So in summary of that whole period from '98 to the

19   present, I've essentially worked for the same company doing

20   public safety work for about 12 years.

21   Q.   Okay.  And what is your educational background?

22   A.   I obtained my doctorate from Pennsylvania State University

23   in 1988, I believe.  Prior to that, I obtained my

24   master's -- that was in industrial psychology -- industrial

25   organizational psychology, I should say.  And prior to that I

1    obtained my master's in 1986, also in industrial organizational

2    psychology.  And prior to that I obtained my master's in

3    psychology from Rutgers University in 1983.

4    Q.    Did any of your degrees or education include emphasis on

5    statistical analyses or degrees in statistical analyses?

6    A.    Yes.  My doctorate had an emphasis on statistical --

7    basically statistics.  We're required to take extensive

8    statistics coursework and complete a minor project in

9    statistics.

10   Q.    And have you published papers in the field of industrial

11   organizational psychology?

12   A.    I published a few.  I've had papers in JAP, Human

13   Performance.  And there's -- basically it's during the

14   selection area.  My Journal of Applied Psychology paper was in

15   what's essentially my dissertation focusing on minority hiring

16   and the utility of that and the trade-offs that exist between

17   increasing minority hiring and loss of utility in some cases.

18        I've also recently had a book chapter on adverse impact

19   and utility and validity.  That's in 2010.

20   Q.    Okay.  And who was the author of that book?

21   A.    It was myself, Dr. Jacobs and Dr. Wayne Cascio.

22        MS. ENGDAHL:  Okay.  I'd like to introduce Dr. Silva's

23   resumé or CV into the record as an exhibit.

24        MR. CHURCHILL:  No objection.

25        THE COURT:  Okay.  It will be the next number.

1          THE CLERK:  It will be 196.

2          (Defense Exhibit No. 196 received into evidence.)

3    BY MS. ENGDAHL:

4    Q.   Dr. Silva, what percentage of your work involves the

5    development or analysis of public safety exams?  That would be

6    police and fire.

7    A.   Currently it's about 50 percent of my time.  I do mostly

8    promotional types of exams at this point.  But it's about 50

9    percent overall of my time.  The rest of my time I spend on

10   analytical work and development work.

11   Q.   And who do you do work for?  Who are EB Jacobs' clients?

12   A.   We've had many clients over the years.  I think in all of

13   the states that -- the United States, the 50 states, we've

14   worked in all but one of those states in the 30 years that

15   we've been in business.

16        Currently we are working with the Milwaukee Police

17   Department; Cleveland Fire Department; Massachusetts Fire;

18   Suffolk County Police; New York State Police; all of New Jersey

19   law enforcement; Miami; also a subcontractor on a project with

20   LA Police.  So we're pretty much across the board.

21   Q.   When you refer to Suffolk County, are you referring to

22   Massachusetts or another state?

23   A.   Massachusetts Fire --

24   Q.   Okay.

25   A.   -- entry.

```
 1              THE COURT:  Well, the question is about Suffolk
 2    County.  I assumed Suffolk County, New York.
 3              THE WITNESS:  Suffolk County, New York.  Yeah, sorry.
 4    BY MS. ENGDAHL:
 5    Q.   Oh, okay.  That's what I was trying to get at.
 6    A.   Sorry.
 7    Q.   And do you have a particular expertise within EB Jacobs?
 8    A.   I'm basically their statistics/psychometrics expert.
 9    Issues that come up in various projects, I'm usually brought in
10    to help make decisions and to do analysis of a more advanced
11    nature.
12    Q.   And what is the goal of the work that you do for EB
13    Jacobs?  What is the --
14    A.   Essentially, we try to develop tests that are as valid as
15    possible, are as fair as possible to candidates and that have
16    the minimum adverse impact to the extent possible.
17    Q.   Okay.  What do you understand adverse impact to mean when
18    you use the term "adverse impact"?
19    A.   Adverse impact is when there is different rates of
20    promotion or of hiring in different groups of individuals such
21    as African-Americans, Hispanics, whites, males versus females,
22    and so forth.
23    Q.   And what methods do you use to determine if adverse impact
24    is present?
25    A.   There are essentially two methods that are used:  One is
```

1    the adverse impact ratio and the other is significance testing.

2    The adverse impact ratio was a method that was originally

3    developed in California and was later adapted by the federal

4    guidelines in setting some criteria as to determine as to

5    whether adverse impact is present in a specific organizational

6    context.  And as such it has, you know, no statistical

7    properties that have been examined until recently.  It was

8    mainly used as a rule of thumb in making decisions as to

9    whether adverse impact was present within an organizational

10    selection setting.

11        Basically, the adverse impact ratio, you simply compute

12    the proportion of non-minorities -- sorry -- of minorities that

13    are promoted and divide that by the proportion of

14    non-minorities that are promoted.  And that ratio, if it falls

15    below .8, it is said, then, that there is adverse impact

16    present within that data set, within that selection process.

17        The second approach is more founded in statistics and in

18    some ways we have a better understanding of it.  It basically

19    compares two samples and determines -- and compares them on

20    some characteristic.  In this case we're looking at the

21    proportions between two different groups.  So we have a

22    proportion for non-minorities and a proportion for minorities,

23    and that proportion is the proportion of people who are

24    promoted.

25        And we compare those two proportions and determine whether

1    it's likely that those two samples came from an underlying

2    population where there is no difference in the proportions that

3    would be hired or promoted.  And with any sample, it's possible

4    that it came from a population that had no difference, but as

5    you begin to observe larger and larger differences in the

6    sample, it begins to show smaller and smaller probability that

7    that sample could really have been drawn from populations where

8    there is no difference.  And as that probability drops below 5

9    percent, we'd say that there is statistical significance and

10   we'd conclude that there is a difference in the underlying

11   populations in terms of promotion rates.  Failing to meet that

12   criteria, we accept the null hypothesis that there is no

13   difference in the underlying populations.

14        There is also, more recently, a trend to indicate the

15   number of standard deviations difference between subgroups.

16   That really isn't a new method; it's just a different

17   manifestation of significance testing.  When you do

18   significance testing, you can either quantify it as a 5 percent

19   probability or below 5 percent probability, and there describe

20   it as significant, or you can find, you know, two standard

21   deviations difference between the subgroups.  And if that's the

22   case, then you can argue that that is also significant.

23        So basically, either you find lower than 5 percent

24   probability associated with the significance test or you find

25   two standard deviations difference between the groups, and in

1    both cases you can say that they're statistically significant.

2    So they're just two sides of the same coin, but it's just a

3    significance determination.

4    Q.   Okay.  And when you refer to the term "AI ratio," is that

5    also known as the four-fifths rule?

6    A.   Yes.

7    Q.   Okay.  And what specific statistical test do you use in

8    your significance testing?

9    A.   I use the Fisher's Exact P.  It's more appropriate in

10   context where there are small sample sizes.  You can also use

11   the KAI square test, but the KAI square test requires that one

12   of the assumptions is that the expected cell values, each have

13   to be at least 5.  And in many of these jurisdictions that

14   simply isn't the case.  So the Fisher's Exact Test is a more

15   precise test of the difference between two proportions.

16   Q.   Okay.  In this case there's been reference to something

17   called a P-value.  What is a P-value, as you understand it?

18   A.   The "P" refers to a probability value.  And essentially,

19   as I indicated earlier, with significance testing you're always

20   testing against the null hypothesis.  And the null hypothesis

21   in the Fisher's Exact P is that you -- you have -- that the two

22   proportions are essentially equal.

23        So any sample that's drawn from two populations, say a

24   population of minorities and a population of non-minorities,

25   can be -- you know, can represent that there's no difference

1    between the groups; however, as that observed -- as those

2    observed samples have proportions that are more and more

3    divergent from each other, one is lower and one is higher, you

4    begin to find more evidence that the samples really do differ.

5        And so when that probability goes as low -- or goes below

6    5 percent, that's the P-value that we're talking about.  So

7    when it goes below .05, we say that we can no longer hold to

8    the belief that the two proportions, the minority proportion of

9    promotions and the non-minority proportion are equal.  We can

10   no longer hold to that belief.  So that P-value, when it falls

11   below .05, basically forces us to discard the null hypothesis

12   that they are equal.

13   Q.   Are there particular challenges to analyzing small samples

14   of data?

15   A.   Yes.  With small samples of data it's just really very

16   hard to know whether the observed results are due to simple

17   chance fluctuation or due to a real difference in the

18   underlying populations.

19   Q.   In analyzing small samples, what tests would you typically

20   apply to conduct an analysis of something involved in the small

21   sample size?

22   A.   Well, with small sample sizes, especially when it comes to

23   the adverse impact ratio, one of the suggestions in the Uniform

24   Guidelines is that you use a shift-of-one analysis.  And a

25   shift-of-one analysis is where you add a minority candidate to

1  the promoted side and take a white or non-majority *[sic]*

2  candidate from the promoted side.  So you're basically trading

3  a non-minority person, if they haven't been promoted, to a

4  non-minority, so you're just swapping two people, and then you

5  recompute the AI ratio.  And if that AI ratio at that point

6  goes above .8, then the guidelines say that the sample is too

7  small to make a determination about adverse impact.

8  Q.    Okay.  What's a shortfall analysis?

9  A.    A shortfall analysis is essentially an attempt to quantify

10  how many non-minorities should have been promoted if there was

11  to be no adverse impact, so that the ratio would have been .8

12  or higher.  So it's just an attempt to quantify the number of

13  non-minorities which are affected by the lack of parity in the

14  proportions, or the promotion rates.

15          THE COURT:  You mean non-minorities or minorities?

16          THE WITNESS:  I'm sorry?

17          THE COURT:  You said "non-minorities."  Do you mean

18  that, which you might, or do you mean minorities?

19          THE WITNESS:  I meant compare non-minorities to

20  minorities.  And it's an -- if that ratio goes above .8 -- I'm

21  sorry -- that was a different question.

22          It's an attempt to show how many minorities there are

23  in the shortfall.  So if that number is negative, it would mean

24  that there's actually an excess number of minorities; if it's

25  positive, it means that there's a small number of minorities.

1    Or it could actually be -- in most of these cases you'll see

2    that it's less than a person, maybe .05 or .3, and that would

3    be the shortfall.

4         So if we had hired -- say, for example, that we had

5    hired one person, and that to avoid the AI rule what we should

6    have done is to perhaps hire .3 of a minority and .7 of a

7    non-minority, which isn't possible.  But mathematically that's

8    what would have been required.  So the shortfall in that

9    case -- if you had hired a full minority, the shortfall would

10   have been .3, because you really should have hired .7 of a

11   non-minority and .3 of a minority.

12   BY MS. ENGDAHL:

13   Q.   And would you do significance testing when faced with a

14   small sample size of data?

15   A.   You certainly can do it, and you're most likely not going

16   to find significance in the data.

17   Q.   Have you had an opportunity to look at data resulting from

18   police sergeant examinations given by the Massachusetts Human

19   Resources Division in this case?

20   A.   I'm sorry.  I didn't understand.

21   Q.   Have you had a chance in this case to look at data --

22   A.   Oh, yes.

23   Q.   -- from the sergeant police examination?

24   A.   Yes, I have.

25   Q.   Okay.  Do you recall what data you examined?

1   A.   The last data set that I examined was data that was

2   provided by HRD in March of 2010, and that's the data set that

3   my May 2010 report is based on.

4   Q.   Okay.  Do you know what particular examinations, or what

5   years the examinations were given that you looked at?

6   A.   I was only provided data for, I guess, the years that the

7   court case goes on, for 2005 to 2008.

8   Q.   And the most updated information you received was in March

9   of --

10  A.   In March 2010.  And that was the data set that I provided

11  along with the report from May 2010.

12  Q.   I'm going to show you a document.  There's

13  actually -- it's a two-page document, and there are tables.  Do

14  you recall this document?

15  A.   I do.  It's from my May 2010 report.

16  Q.   Okay.  And did you create these tables?

17  A.   I did.

18  Q.   And why did you create these tables?  What do they show?

19  A.   It was a way to summarize the results in all of the

20  jurisdictions in a concise manner.  And basically, on the left

21  side under the darker blue area, those are the -- that's

22  basically the summary of the data that I had for each

23  jurisdiction in terms of the number of candidates that took the

24  test by group.  So I have -- for example, for Boston, there

25  were 224 black/Hispanic test-takers, or candidates; and under

1    the second column, there were 381 white test-takers in Boston.

2         As far as the appointments on the last two columns, there

3    were nine appointments for candidates that were black or

4    Hispanic, and the last number in that grouping is the number of

5    appointments for white candidates.

6         So that's the data that I started with.  And the analysis

7    that follow, or the numbers that follow to the right on that

8    table, are based on those four elements.

9    Q.   Okay.  And -- okay.

10        Now, you calculated -- "AI" here refers to adverse impact?

11   A.   Yes.

12   Q.   And in the column next to it you have "AI N + 1."  What

13   does that column represent?

14   A.   The N + 1 column is essentially the shift-of-one analysis

15   that the guidelines talk about in the questions and answers in

16   the Uniform Guidelines, and that's that Question 21, and it

17   follows that procedure.

18   Q.   Okay.  And what do the Uniform Guidelines say, if

19   anything, regarding what they consider a small sample size and

20   when shift of one would be appropriate?

21   A.   Well, actually, in Question 21 -- the guidelines never

22   actually ask -- I'm sorry -- never actually state what a small

23   sample size is, but they illustrate a small sample size in

24   Question 21.  And in that sample they cite 80 whites, and I

25   believe 20 minorities or 20 blacks, specifically.  And they

1    show 19 promotions on that example.  So they basically are

2    implicitly indicating that they consider a small sample size to

3    be 100 or perhaps less than that.  So by that definition, many

4    of these samples are very small sample sizes.

5    Q.    Okay.  And what does the N + 1 ratio reflect; in other

6    words, if there is a significant difference between AI as

7    calculated based on the data and AI based on a shift of one,

8    what does that tell you about the sample size?

9    A.    Well, the guidelines in Question 21 explicitly state that

10   if there is a change in the AI ratio from being below .8 to

11   going above .8, then that indicates that the sample is too

12   small to determine adverse impact.  In these particular -- like

13   in 2005, for example, Carver Police Department goes from zero

14   to three.  That indicates that the sample is just too small to

15   make a determination according to the guidelines' Question 21.

16   Q.    Does that mean that if they had hired one more minority

17   instead of a white, the adverse impact on non-minorities would

18   be three?

19   A.    Yes.

20   Q.    Okay.  I'm going to draw your attention to the next

21   column, and it's entitled "Shortfall."  And this is an analysis

22   you did of the data here on the tables.  And what does that

23   analysis show?

24   A.    As I indicated earlier, it's just an attempt to quantify

25   the number of non-minorities that would have been promoted in

 1   order to achieve a .8 ratio or higher.  So, for example, in the

 2   Carver Police Department, it's indicating that if you had

 3   promoted .42 of a candidate, less than half of a candidate,

 4   that you would have achieved an adverse impact ratio of .8 or

 5   higher.

 6        Similarly, in the Everett Police Department it shows that

 7   just 1/20th of a minority candidate would have been sufficient

 8   to avoid an adverse impact determination; Greenfield Police

 9   Department, it would be .07; and MBTA Police, it would be 1.14

10   candidates; in Natick, it would be .22, and so forth.

11        If you see a negative number, as you do in Chelsea, it

12   means that they actually over-promoted, so that they have

13   almost one person in excess of the need to meet the .8, or

14   four-fifths rule.

15   Q.   Okay.  I'm going to draw your attention to the table

16   that's labeled "Table 3, 2006," down to the Worcester Police

17   Department where you have black and Hispanic test-takers, 11,

18   and white test-takers, 50.  Do you understand now whether that

19   data was accurate?

20   A.   From the testimony that I've read, it appears that one

21   individual that initially classified themselves as black or

22   Hispanic was incorrect, and there should have actually been ten

23   black/Hispanic test-takers and 51 white test-takers.

24   Q.   Okay.  And in this chart when you refer to "white

25   test-takers," you don't include Asians in that subset?

1    A.    No; that would be inappropriate.

2    Q.    Okay.  The next column, "Fisher's Exact Test P-value," can

3    you explain why you did that significance test and what the

4    numbers represent?

5    A.    Essentially, we're looking at the hypothesis that

6    the -- that the two groups, the minorities and non-minorities,

7    have the same promotion rate.  And to the extent that we can

8    support that, the Fisher's Exact P-value is high.  And the

9    highest value is going to be 1, because essentially that number

10   represents a probability.  So it's not exactly 1, but it rounds

11   to 1, and it's very high.

12        So essentially for Carver, where you essentially -- you

13   have almost no chance of finding any other result.  It's a very

14   likely result that we get that; that it's congruent with the

15   proposition that the -- that the proportions of the two groups

16   are equivalent or equal.

17        As we begin to see greater differences between -- in the

18   sample between minority promotions and non-minority promotions,

19   that P-value begins to drop, and it drops -- if it drops to the

20   point of only .05 or below .05, then we would say that we have

21   to reject the idea that the two proportions for the two groups

22   are the same.

23        So for example, in the Brockton Police Department, the

24   probability that that particular sample came from a population

25   where the two proportions were the same is .18; it does not

1    meet the 5 percent criteria, or the .05 criteria for

2    significance.  And many of these are very close to 1 on the

3    2006 data that's up on the screen.

4    Q.    Okay.  Just -- we don't need to go over the specifics, but

5    just the same would hold true of the tables on the second page.

6        Now, looking at the last column you did here, can you

7    explain what that test is that you conducted to come up with

8    the numbers there?

9    A.    Certainly.  The AI ratio is poorly understood, and only in

10   the last four years has any research really been done on its

11   properties.  And one of the things that's been found is that

12   it's a very unstable test with small numbers.  And by "small

13   numbers," researchers have determined that numbers as small as

14   two to four hundred will yield unstable results on the AI.  And

15   because these samples are so small, I use the same procedure to

16   determine what the false positive rate is for the AI.  And by

17   "false positive," I mean that you would say that there's AI,

18   but on the underlying populations there actually is not AI.

19       So if we had a perfect test that showed absolutely no mean

20   differences between minorities and non-minorities, what would

21   be the probability of still finding adverse impact in this kind

22   of situation?  By "this kind of situation," I mean the exact

23   situation that's facing that department; for example, in

24   Chelsea, that there are ten individuals that are black or

25   Hispanic, there are 15 individuals that are white, and they

1    have exactly three promotions.  What would be the likelihood

2    that you would still find adverse impact even though you're

3    using a test that has absolutely no difference -- so you're

4    essentially in a perfect testing situation -- would the AI

5    ratio approach or test still find AI.  And for the most part,

6    it does.  For example, in 2005, the likelihood of finding AI is

7    over 50 percent for most of the jurisdictions that we're

8    dealing with.  So it's a very unstable number.

9    Q.   So in reaching -- in conducting your calculations for this

10   particular measure, you assumed that the minorities and

11   non-minorities were performing exactly the same on the test?

12   A.   Yes.

13   Q.   Okay.  And then so let's look at Peabody, for example.

14   Okay.  Peabody Police Department.

15   A.   Uh-huh.

16   Q.   So the assumption for the purposes of the calculation in

17   the last column is that the -- there's no difference in the

18   test scores for minorities and whites but that there's only one

19   black and Hispanic test-taker, 18 white test-takers, and two

20   appointments.  And so to be clear, that number reflects the

21   chance that given those percentage -- given the number of

22   appointments, that you would find AI even with everything being

23   the same in terms of test scores?

24   A.   That's correct.

25               THE COURT:  Could you adjust the -- on our screens the

1    last column is being cut off, the right-most column.  Thank

2    you.

3         THE WITNESS:  So in this situation you have, as you

4    said, one minority, 18 non-minorities and two promotions.  I

5    basically created this situation and said, "Okay.  Let's do

6    this over and over again.  Let's create the situation when you

7    have these 19 individuals distributed as they are here and

8    we're going to make two promotions.  What's the probability?"

9         And the individuals that are being promoted are being

10   promoted based on a test that has absolutely no difference

11   between performance and average performance of the candidates.

12   And even so, you're going to find that in 89 percent of the

13   times that you pulled the sample, that you have a situation

14   exactly like this, one non-minority -- sorry -- one minority

15   and 18 non-minorities with two promotions, you're going to find

16   in 89 percent of the time you're still going to find adverse

17   impact even if we were to have a perfect test.

18   BY MS. ENGDAHL:

19   Q.   And what is Monte Carlo testing?

20   A.   Monte Carlo -- it's actually Monte Carlo simulation.  And

21   basically, it's the process by which you can create these

22   samples and do the promotions and compute the AI ratio.  And we

23   use many, many trials in order to get stability to the

24   estimates.  And in this case I used one million trials for each

25   of these estimates.

1   Q.   Again looking at Peabody, given that the assumption is

2   that minorities and non-minorities are performing the same on

3   this test, and yet you reached the conclusion that you would

4   still see adverse impact almost 90 percent of the time, what

5   could be affecting the appearance of adverse impact in this

6   case of Peabody?

7   A.   Well, it's essentially the very low selection ratios that

8   you're dealing with, along with small sample sizes and also the

9   fact that there's a very small number of minority test-takers

10  in many of these jurisdictions.  So those three -- those three

11  aspects of the data will create this type of situation, this

12  kind of false positive on the AI.

13  Q.   So is it fair to say that a very small ratio of minorities

14  and non-minorities taking the test can affect the appearance?

15  A.   When the sample sizes -- with a combination of the sample

16  sizes being so small, absolutely.

17  Q.   Okay.  As well as the selection ratio?

18  A.   Yes.

19  Q.   And we've defined it before, but if you could tell the

20  Court what you mean by "selection ratio" when you use that

21  term.

22  A.   "Selection ratio" is simply the proportion of individuals

23  that are being promoted.

24  Q.   Again focusing on your analysis that appears in the last

25  column of these tables, can you draw any conclusions from this

 1   analysis as to whether you can eliminate or reduce adverse

 2   impact where you have present, you know, a low minority

 3   test-taker participation rate compared to non-minorities and

 4   low selection ratios and low numbers?

 5   A.   Well, my conclusion is for most of the jurisdictions, even

 6   if there had been absolutely no difference in the means between

 7   minorities and non-minorities on the promotion indicator, you

 8   would have still found adverse impact in these samples for the

 9   most part.

10   Q.   In looking at your findings again, can you tell us about

11   how many jurisdictions you looked at where the chance of

12   finding adverse impact was greater than 50 percent?

13   A.   I think in all of these cases it's going to exceed 50

14   percent, and in many cases there's also quite a few that are

15   above 75 percent of the time.

16        MS. ENGDAHL:  I'd like to introduce this as Exhibit

17   197.

18        MR. CHURCHILL:  No objection.

19        THE COURT:  Next number?

20        THE CLERK:  197.

21        THE COURT:  197.

22        (Defense Exhibit No. 197 received into evidence.)

23   BY MS. ENGDAHL:

24   Q.   Okay.  Going back to the Uniform Guidelines and the

25   recommendations regarding dealing with small sample sizes, I

1    think it's found in Question 21, when a shift of one

2    significantly changes the adverse impact ratio, what other

3    options does the statistician have?

4    A.    Well, the courts also recognize the significance test,

5    such as the Fisher's Exact Test that I did.  And so that's

6    often relied on to determine whether there is a difference in

7    the groups in the underlying population.  So significance

8    testing is the other avenue when you -- when the AI ratio is so

9    unstable.

10   Q.    Okay.  Do industrial organizational psychologists ever

11   aggregate data to get a larger sample size?

12   A.    Data can be aggregated.  There's lots of ways to aggregate

13   data; for example, in metaanalysis studies we aggregate data,

14   but we don't do it at the raw data level, we do it at the

15   affect size level so each study contributes only one data

16   point, essentially, to the data, because there's so many

17   differences that can confound the data.  So affect sizes are

18   usually more prevalent when you combine data.

19   Q.    Is it fair to say that the data you're looking at looking

20   to aggregate should share some common characteristics?

21   A.    Absolutely.  You certainly don't want to combine things

22   that would lead you to -- you know, to erroneous conclusions.

23   In this data set there are certain elements that are present

24   that concern me.  One of them is the small sample sizes,

25   obviously, and the differing -- differing numbers of sample

1    sizes.  So we can have one jurisdiction that has, you know,

2    hundreds of individuals, others that have tens of individuals,

3    and others that have, you know, numbers in the single digits.

4        Another element that concerns me is the distribution of

5    the minority representation.  We can have representation here

6    from as low as about, I think, 2 to 3 percent, all the way up

7    to 50 percent in some of the small samples.

8        And then we can also -- also, the third element that

9    concerns me is the promotion rates.  And they also vary quite

10   drastically.  In some of the smaller samples they go as high as

11   50 percent, and in some of the other samples they go as low as

12   2 or 3 percent.

13       So those three elements contribute to -- you know, when

14   you combine the data you would get, perhaps, a misperception of

15   what's present there, or an exaggeration of the effect that is

16   there.

17   Q.   And is that because the test-takers do not compete across

18   employers for jobs?

19   A.   Well, that's another element that I hadn't mentioned at

20   this point, but that is the fourth element, that when you have

21   a situation and you're combining individuals together into a

22   data set and those individuals cannot all compete against each

23   other -- the Fisher's Exact T, for example, in the AI ratio,

24   each assumes that every individual can compete for every

25   position that's available.  And certainly that is not the case

```
 1   here.  Each individual can only compete for a small subset of
 2   the positions that are available.  So that will further
 3   confound the results and exaggerate P-values, for example, when
 4   you compute them.
 5   Q.   And are you familiar with the term "Simpson's Paradox"?
 6   A.   I am.
 7   Q.   And what is Simpson's Paradox?
 8   A.   It's essentially the idea that when you combine data, you
 9   get a whole different picture, or an exaggerated picture, of
10   what's truly going on compared to looking at the individual
11   data sets.
12   Q.   Okay.  And are you familiar with a gender bias in
13   admissions case from the University of California at Berkeley
14   from the 1970s?
15   A.   There are a lot of examples of the Simpson's Paradox, and
16   the Berkeley case is probably one of the most well known.  In
17   that case, in the '70s there was a lawsuit filed against the
18   University of California at Berkeley, I believe, that basically
19   said that females were being admitted to graduate school at
20   lower rates than males.
21       And they produced the data set that combined all of the
22   applicants.  And in that data set, it definitely did appear
23   that females were being admitted at a lower rate; however, upon
24   closer examination and breakout by the department, it was
25   determined that the issue was really that females were applying
```

1    to departments that had lower admission rates.  And so when you

2    combine individuals from departments that have different

3    admission rates -- in this case an analogy to our case is

4    selection ratio of the promotion rate differs by jurisdiction,

5    that you definitely get a very different picture, then.  And so

6    when they broke it out, there was actually quite close parity

7    within department for male and female admission.

8         So that's just an example of where combining data that

9    have different characteristics such as the selection ratio or

10   the admission rate can cause problems, either reverse the

11   interpretation or exaggerate the interpretation.

12   Q.   I'm going to show you a document now and ask you if you

13   recognize this document.

14   A.   I do.

15   Q.   Did you create this document?

16   A.   Yes.  This is an attempt to basically illustrate Simpson's

17   Paradox within our data.  And I created it for two

18   jurisdictions where essentially you have different levels of

19   minority representation.  In this case you have -- in one case

20   it's, you know, only about -- less than 10 percent, I think

21   about 5 percent of minority representation in Jurisdiction 1.

22   In Jurisdiction 2 you actually have closer to -- over 50

23   percent of the candidates being minorities.

24        Also, a difference in these two jurisdictions is that the

25   selection ratio, or the promotion rate, is different across the

1   two.  It's just one in seven in Jurisdiction 1 but closer to 50

2   percent, or a little bit over 50 percent in Jurisdiction 2.

3   And also, the numbers of candidates differ.  You have much more

4   candidates in Jurisdiction 2 than you do in Jurisdiction 1.

5       And if you compute the AI within each of the jurisdictions

6   so that you look at it -- just at Jurisdiction 1 and then just

7   at Jurisdiction 2, you find that the AI ratio is actually 1.0,

8   that there is no adverse impact.  Yet, when you combine those

9   two jurisdictions you do find adverse impact.

10      So clearly there's an exaggeration of the differences

11  between minorities and whites in this case, just as an example

12  of what aggregation can do to your data.

13  Q.   And the assumption is that candidates in Jurisdiction 1

14  and Jurisdiction 2 are not competing across jurisdictions for

15  those jobs?

16  A.   Yes.  That can add to the effect, yes.

17          MS. ENGDAHL:  I'd like to introduce this as Exhibit

18  198.

19          MR. CHURCHILL:  No objection.

20          THE COURT:  Okay.

21          (Defense Exhibit No. 198 received into evidence.)

22  BY MS. ENGDAHL:

23  Q.   Okay.  I'm going to put back up the table that we've

24  identified as -- that we've introduced as 197 and ask you,

25  Dr. Silva, when you analyzed the data in this particular case,

1    and you may have just testified about it but I would like you

2    to emphasize that testimony, in looking at the different

3    employers who participated in the HRD test, did you find

4    evidence of different selection ratios among the employers on

5    your tables that --

6    A.    Only in Boston.

7    Q.    Okay.  The question, I mean in terms of comparing, for

8    example, Chelsea versus Greenfield.  The selection ratios

9    within those departments, did they vary from one another or are

10   they comparable?

11   A.    Yes, they did.  As I said earlier, the selection ratios

12   varied anywhere between about 2 to 3 percent to around 50

13   percent, and the minority representation across the different

14   departments did vary from about 2 or 3 percent also to about, I

15   think, 44 or 45 percent.  So there is variation of the same

16   nature that we see in my example.  There is variation of the

17   same type present here in this data.  Similarly, the sample

18   sizes that I used can be found in this data set.

19   Q.    Okay.  When you say "different sample sizes," let's again

20   look at Chelsea versus Greenfield.  Significantly different

21   sample size there?

22   A.    Chelsea versus Greenfield?  Yes.  Essentially, you only

23   have, you know, one out of ten test -- so one out of 11

24   test-takers being a minority; whereas, in Chelsea you have, you

25   know, 40 percent, ten out of 25.  So clearly there's a huge

1    difference in the minority representation across those two data

2    sets.

3    Q.    And so is it fair to say that aggregating those data sets

4    could result in distortions in findings of AI?

5    A.    Well, as my example shows, it can.  And as the Berkeley

6    example shows, it can.  I mean, when you have differences in

7    the data sets, anything can become a problem.  And we see these

8    three elements as being the critical elements in any confound

9    that can be manifested as a result of aggregation, the minority

10   representation, the selection ratio and the sample size, along

11   with the fact that individuals can only be promoted essentially

12   for a small subset of the jobs within the data set.

13   Q.    Is there a way to account for these variables?

14   A.    I'm not aware of any.  I mean, in the Berkeley case what

15   they did is simply broke out the data by the department, or in

16   this case it would be by jurisdiction.  But that really is the

17   only way to do it, is to look at it individually and to come to

18   conclusions based on the individual data.

19   Q.    I just want to show you -- Dr. Joel Wiesen testified

20   earlier in this case regarding his decision to aggregate

21   statistics across the various employers and municipalities to

22   support AI.  And I asked him a question.  This is -- this is

23   actually page 92 of Day 5, Dr. Wiesen's testimony.

24       And I asked him, "And would you agree that comparing two

25   municipalities, or aggregating statistics where there might be

1  a selection ratio that is quite high in one and in another

2  jurisdiction the selection jurisdiction" -- it should be

3  "selection" -- "ratio is low, could that distort the aggregated

4  results?"  And his response was, "Well, it would only distort

5  the results if there was no difference between the

6  municipality -- between the minorities and non-minorities in

7  some jurisdictions or there was a difference in the other

8  or -- but in the tables in the Outtz and Silva reports" -- and

9  he's referring to the tables I believe we just introduced --

10  "the adverse impact ratios for 95 percent of the municipalities

11  listed was zero.

12      "So it wasn't like there was parity in all of those

13  municipalities and the discrepancy just magically appeared

14  because of Simpson's Paradox.  There was adverse impact in

15  almost all municipalities."

16      Do you have a response to Dr. Wiesen's claim that

17  aggregation was appropriate because there were no minorities

18  promoted in several of the jurisdictions that we analyzed?

19  A.   I would only agree with Dr. Wiesen insofar as that the

20  degree of the effect would be smaller than if there had been

21  larger numbers for minority promotions.  But the effect is

22  still going to be there, and there's still going to be a

23  contribution from those cases where there were no minority

24  promotions.

25      For example, if you take a sample of one minority and 20

1    non-minorities and there's one promotion, and that promotion is

2    for a non-minority, you would find that the Fisher's Exact Test

3    would be, probably, you know, in the .99 to 1 range, and so you

4    would find no adverse impact.  However, if you were to then

5    come up with ten samples of the same kind where you have ten

6    samples of this 120 and one promotion, you would then have 20

7    individuals that are minorities in the data set, 200

8    non-minorities and 20 promotions.

9         In that case, the Fisher's Exact Test P-value would drop

10   substantially, and a large part of that drop is going to be a

11   function of the fact that individuals within the data set are

12   being assumed to be eligible for all of the positions that are

13   available, so...  But in actuality, each of those minority

14   individuals is only eligible for one position in that data set.

15   So it's going to exacerbate the situation and magnify the

16   situation where if you use the individual data set, that would

17   not occur.

18        So the biggest problem is still going to be the fact that

19   each person is only eligible for one job and not 20.  And the

20   Fisher's Exact Test and AI all assume that every person in the

21   data set is eligible for all jobs.  So here you basically see

22   the availability of the jobs for minorities as being 20-fold

23   what it really is.  So there's still a bias, even if there are

24   no minority promotions, as Dr. Wiesen says.

25             MS. ENGDAHL:  Thank you.  I have nothing further,

1    Dr. Silva.

2              THE COURT:  Other than plaintiffs' counsel?

3              MR. CARROLL:  Yeah.

4                             CROSS-EXAMINATION

5    BY MR. CARROLL:

6    Q.   Good morning, Dr. Silva.

7    A.   Good morning.

8    Q.   I just wanted to ask a few questions to clear up some of

9    the statistical issues we've been -- well, to clear them up.

10          First of all, I think you mentioned a phrase "false

11   positive."

12   A.   I did.

13   Q.   And what is a "false positive" in statistics?  Is that a

14   term of art that statisticians use?

15   A.    It's used in a lot of fields, but statisticians certainly

16   use it as well.  It's basically saying that something is there

17   when you shouldn't have said that it's there because it really

18   isn't there.  So in the context that I used it was the AI ratio

19   tends to have a lot of false positives because it tends to say

20   that there's AI even in cases where it shouldn't say that there

21   is AI.

22          So as we -- the example we used earlier, I don't remember

23   the jurisdiction, but the 89 percent, basically it's an 89

24   percent false positive rate.  It's saying that there's adverse

25   impact when it shouldn't be saying there's adverse impact

```
 1   because we essentially created a situation that has no
 2   difference between the subgroups.
 3   Q.   Okay.  And is there such a thing as a Type 1 and a Type 2
 4   error in statistics?
 5   A.   Yes, there is.
 6   Q.   And can you explain that?
 7   A.   A Type 1 error is a -- is when you say that there is no
 8   difference but -- I'm sorry -- yeah, you say that there was --
 9   I'm sorry -- you say that there is a difference but there
10   actually is no difference, that's a Type 1 error.
11   Q.   Is that like a false positive or a --
12   A.   Actually, it's a false negative.
13   Q.   It's a false negative?  Okay.  And what is the other type,
14   a Type 2 error?
15   A.   A Type 2 error is actually the one we discussed earlier.
16   It's the false positive.
17   Q.   False positive.  And with regard to the work that you've
18   reviewed in this case from the other experts, is there a Type 1
19   or a Type 2 error embedded in their analysis?
20   A.   Well, there's -- as I said, there's a false positive rate
21   embedded in the AI ratio.  So a false positive in the AI ratio.
22   Q.   Okay.  So that would be a Type 2 error?
23   A.   Yes.
24   Q.   Okay.  And that has to do -- well, what's that
25   attributable to?
```

1    A.    In this case the Type 2 error occurs for three reasons.

2    We have a very small number of individuals in many of these

3    jurisdictions, and so that tends to lead to false positives.  A

4    second issue is the percentage of minority representation

5    within each of the jurisdictions.  And the final contributor is

6    going to be the selection ratio, or the promotion rate, within

7    the jurisdictions.  So those three elements combine to create

8    this high false positive rate.

9    Q.    And to, I believe you've indicated, get around Simpson's

10   Paradox, you used the Fisher's Exact Test because of the small

11   numbers.  Is that --

12   A.    No.  Fisher's Exact Test can be used with aggregated data

13   or disaggregated data.  In this case with the Fisher's Exact

14   Test, unaggregated data would actually be inappropriately used

15   because it does assume that each individual can take on each of

16   the jobs that are present, when in reality they are only

17   eligible for one of the positions in the data set.

18   Q.    So that -- you can't use these tests with any degree of

19   scientific reliability for aggregated data where there are

20   small sample sizes?

21   A.    It's not so much in this case the sample size, it's the

22   fact that they're only eligible for a very small subset of the

23   positions within the data set.  That's going to be what makes

24   the statistical test as well as the AI ratio inappropriate.

25   Q.    Okay.  So it's your opinion to a reasonable degree of

1    scientific certainty that it's erroneous in this case to

2    aggregate data across jurisdictions and come up with a

3    statistically reliable valuation?

4    A.    Well, when you aggregate data and you have to make some

5    decisions based on that aggregated data -- and the tools that

6    were used on this aggregated data by Dr. Wiesen and myself were

7    basically the AI ratio and the significance test.  And when we

8    aggregate data, even regardless of the base rate for minorities

9    and regardless of the selection ratio and regardless of the

10   sample size, just the fact that individuals are only eligible

11   for a small subset of the jobs within that data set makes the

12   AI ratio, as well as the Fisher's Exact Test, inappropriate in

13   that data set, it overestimates or lowers the probability value

14   to a level that's not real, because the assumption that every

15   individual is eligible for every position does not hold.

16   Q.    If the premise is untrue, then the answer is going to be

17   inaccurate.  Would that be the way --

18   A.    I'm not sure what you're asking.

19   Q.    Okay.  Well, I guess I'm trying to oversimplify something

20   I don't understand.  Let me try it another way.  On the basis

21   of all the work you've done, your education, experience and the

22   training in the field of statistics, and you have a doctorate

23   in it, your work throughout your career in researching and

24   analyzing the data, and the fact that you've looked at the data

25   and you obtained data from HRD that's being used in this case,

1   based upon all of that do you have an opinion to a reasonable

2   degree of scientific certainty as to whether there's

3   statistically significant adverse impact in the City of

4   Springfield from the 2005 police sergeant's promotional

5   examination for sergeant?

6   A.   Well, in Springfield in 2008, the significance level is

7   .07, so it does not meet the criteria for significance.  And

8   also, the probability of finding AI in this sample, even if you

9   had to use the test with no differences, would have still have

10  been 56 percent.  So there's a 56 percent false positive rate

11  associated with this particular distribution of numbers in

12  Springfield in 2005.

13      So, no, I cannot conclude that there is adverse impact in

14  Springfield from that information.

15  Q.   Your opinion is that there's not statistically significant

16  adverse opinion *[sic]*; is that correct?

17  A.   Well, it's not my opinion.  The data says it's not

18  statistically significant.

19          THE COURT:  Could you put the chart on so we could see

20  it?

21          MR. CARROLL:  I'm sorry, your Honor.  You know my

22  technical skills again, right out the window.

23          THE COURT:  Let me just -- again, I think for clarity

24  of the record, I believe when you began your answer you said

25  Springfield in 2008, and it looks like you were referring to

1    the table that refers to 2005.

2            THE WITNESS:  I'm sorry.  I meant 2005.

3            MR. CARROLL:  Thank you, your Honor.

4    BY MR. CARROLL:

5    Q.   Now, in regard to 2005, it -- the table indicates with

6    regard to Springfield 18 minority test-takers, 28 white

7    test-takers, no minority appointments, six white appointments,

8    and you have an AI of zero.  Is that using that rule of thumb

9    or how was that determined?

10   A.   That's the four-fifths rule.  So you would divide the

11   proportion of minorities that are promoted divided by the

12   number of non-minorities that are promoted -- or, I'm sorry,

13   the proportion of non-minorities that are promoted -- and

14   obviously, if the numerator is zero, the denominator is

15   anything other than zero.  You're going to have a zero as a

16   result.

17   Q.   Okay.  And in the next column you have an "AI N + 1."  And

18   I believe you said that's your shift-of-one analysis?

19   A.   Right.  That's to determine if the sample size is

20   sufficient to determine AI.  And essentially, with this shift

21   of one, you would shift one of the appointments from the white

22   column to the black/Hispanic column.  And there -- so you would

23   have a distribution of one black/Hispanic promotion and five

24   white promotions.  And that .31 reflects the AI ratio computed

25   from such data set.

1    Q.    Okay.  And is that statistically significant?

2    A.    The AI ratio has no statistical significance associated

3    with it.  It's just a number; it doesn't have statistical

4    properties as such.

5    Q.    Okay.  And the shift-of-one analysis is something that's

6    recommended by the Uniform Guidelines, I believe you said?

7    A.    It is.

8    Q.    Okay.  And then I see you have a shortfall analysis there

9    of 2.04, and then you have Fisher's Exact P-value of .07; is

10   that correct?

11   A.    That's correct.

12   Q.    And what does that mean?

13   A.    It means that even a sample that has this large a

14   difference with zero promotions for Hispanics, blacks, and six

15   appointments for non-minorities, that it can still happen 7

16   percent of the time under the assumption, and then under

17   the -- assuming that the population have equal proportions for

18   both, you know, between the minorities and non-minorities.  So

19   it basically says it could still happen.  It would happen,

20   actually, 7 percent of the time, and the criteria for

21   significance is .05.  So we would conclude that there is not

22   significance there.

23   Q.    It's not statistically significant?

24   A.    Right.  This difference is not statistically significant.

25   It could still happen within the realm of the assumption that

1    the probabilities are equal and that you just have a

2    sampling -- a variability or sampling fluctuation.

3    Q.    And is statistical significance something that

4    professional statisticians use on a regular basis?

5    A.    It's their core tool.

6    Q.    Their core tool.  And .05 is the point of significance.

7    So if it's greater than that, the statistician would say not

8    statistically significant and less than that it would indicate

9    significance?

10   A.    Technically, if it's below .05, it's significant.

11   Q.    And if it's more than .05?

12   A.    Then it's not statistically significant.  Significance is

13   an either/or proposition.

14   Q.    Okay.  It's a mathematical certainty but, yet, it's a

15   statistically reliable technique that's used, the .05.  Is that

16   something that's pretty commonly used in the field of

17   statistics?

18   A.    It's very commonly used.

19   Q.    Okay.  And, in fact, if you wanted to even be more sure,

20   then instead of .05 you would say .01, right?

21   A.    That's correct.

22   Q.    If you're going up in a rocket ship, you know, maybe 5

23   percent would be too much of an error rate, you would want to

24   cut it to one, but in this field .05 is what's looked at,

25   correct?

1   A.   That's correct.

2   Q.   And in your last column there you've got "Probability of

3   still finding AI."  What does that indicate?  In Springfield's

4   case that's .56.  What does that actually mean?

5   A.   As I described earlier, that number is estimated based on

6   the assumption that there is no difference between minorities

7   and non-minorities on the test that's used to make the

8   promotions.  So you would expect -- because there is no

9   difference you would expect that any sample would show no

10  difference in adverse impact, would have no issue with adverse

11  impact, would not show the AI ratio to be below .8, more

12  specifically.

13       But in 56 percent of the cases under the scenario that you

14  have 18 minorities, 28 non-minorities and six promotions, in 56

15  percent of those cases you would find the AI ratio to be below

16  .8 even though there's no difference at all between the groups

17  and performance on the promotion test.

18  Q.   In other words, it's likely more than half the time that

19  you're going to get a false positive?

20  A.   That's correct.

21  Q.   And is that due to the small sample size?

22  A.   It's a combination, as I said earlier, of the small sample

23  size, the small number of minorities, the selection ratio.

24  Those three things contribute to that false positive rate.

25  Q.   So the data's unstable and it's not a good way to --

1    A.    With a small sample size, the data is always unstable.

2    Q.    Now, I want to draw your attention to Table 4 on the

3    second page of 197, which is the one that was marked earlier.

4    I believe you've indicated that's a table that you prepared

5    based upon the data provided to you by HRD in this case; is

6    that correct?

7    A.    That's correct.

8    Q.    And directing your attention to the Springfield Police

9    Department, do you see that line?

10   A.    I do.

11   Q.    And it has an AI of .22?

12   A.    Yes.

13   Q.    And can you tell us, is that statistically significant?

14   A.    No, it's not statistically significant.  The P-value is

15   .2.

16   Q.    Okay.  So the P-value means the probability of a --

17   A.    Of this particular configuration promotions occurring

18   under the null hypothesis, that the promotion rates are equal

19   in the populations, it could occur 20 percent of the time.

20   Q.    Okay.  And the N + 1 analysis in the next column is a .53?

21   A.    That's correct.

22   Q.    And that's your shift of one?

23   A.    That's correct.

24   Q.    So when you shift one it -- what does that do to it?

25   A.    It raises the AI ratio from .22 to .53.

1  Q.   And is that statistically significant?

2  A.   As I said earlier, there's no statistical significance

3  ascribed to the AI ratios.

4  Q.   Oh, yeah.  Okay.  And the shortfall analysis of 1.63?

5  A.   Yes, it is.

6  Q.   What does that mean, if you took a person -- or you took

7  two people --

8  A.   In this case there were seven promotions.  If you had

9  instead made 1.63 -- I'm sorry -- 2.63 promotions to minorities

10 and the rest of the remaining promotions out of the seven to

11 whites, you would have found that the AI ratio was .8 and,

12 therefore, no adverse impact.

13 Q.   And --

14 A.   It's the number of promotions -- additional minority

15 promotions that you would have had to have made to avoid a

16 determination of adverse impact via the adverse impact ratio.

17 Q.   Which for reasons you already explained is not

18 statistically reliable given these sample sizes or these --

19 A.   It's not reliable because it has a large percentage of

20 false positive rate.

21 Q.   Okay.  And the .20 Fisher's P-value, what does that

22 indicate?

23 A.   It just indicates non-significance in that you cannot

24 reject a null hypothesis that the two proportions, or the two

25 proportion ratios, are the same for the two groups, minorities

1    and non-minorities.

2    Q.    Not statistically significant for Springfield?

3    A.    Right.    That's correct.

4    Q.    Okay.    And the probability of still finding AI less than

5    .8 percent, .34, is that -- there's a 34 percent chance of

6    getting a false positive?

7    A.    Right.    Even under optimal conditions where there are no

8    differences in the promotion tests between minorities and

9    non-minorities, 34 percent of the time you would find the

10   determination of adverse impact.    So there would be a false

11   positive rate of 34 percent even when you have a situation

12   where there is no difference between minorities and

13   non-minorities in the test.

14   Q.    Okay.    So in summary, then, it's your opinion that there's

15   no statistically significant adverse impact from these exams

16   for the City of Springfield?

17   A.    Well, it's not my opinion, it's stated right there via the

18   criteria that .05 -- below .05 is significant, these two

19   samples have significance levels or probability levels of .07

20   and .20, both above .05, so they're not significant.

21           MR. CARROLL:    Thank you, Dr. Silva.    No further

22   questions.

23                        CROSS-EXAMINATION

24   BY MR. LEAHEY:

25   Q.    Good morning, Dr. Silva.

1    A.    Good morning.

2    Q.    If I could have you look at -- ask you to look at Exhibit

3    197, Table --

4    A.    I'm not sure that I have it here.

5    Q.    If you could look at the screen, then.

6    A.    Okay.

7    Q.    The screen will work.

8    A.    Okay.

9    Q.    With respect to Lowell -- and I'd represent to you this

10   was Exhibit 197 which was based on your May 2010 report, and

11   you see for Lowell you have seven minority test-takers, 36

12   white test-takers, zero minority appointments and seven

13   appointed non-minority candidates?

14   A.    That's correct.

15   Q.    And if I'm understanding you correctly, with respect to

16   the next line, the AI line, Lowell has a zero there because no

17   minority was appointed; is that correct?

18   A.    That's correct.

19   Q.    And that would apply -- that's the -- is that the

20   four-fifths calculation, this line?

21   A.    Right, it's the AI calculation, which is sometimes

22   referred to as the four-fifths rule calculation.

23   Q.    And I see that Fall River and Fitchburg are listed as

24   having the same 0.00 that Lowell has; is that correct?

25   A.    That's correct.

1  Q.   And in each of those instances, they literally made a
2  singular appointment; is that correct?
3  A.   In the Fall River and Fitchburg?  Yes.
4  Q.   Yes.  And so the zero relates to the fact that since a
5  minority was not appointed to that singular position, it came
6  up zero, correct?
7  A.   That's correct.
8  Q.   And you'd agree with me that if there were a black, a
9  white and a Hispanic who take -- each take a promotional test
10  and there's literally one promotion available, that AI,
11  regardless of what happens, is going to be found regardless of
12  what the outcome is, correct?
13  A.   It's going to be very likely.
14  Q.   Just because when there's only one -- this goes back to
15  what you were saying about the selection rate.  When there's
16  only one position available, it's going to skew the statistics,
17  the problem with small numbers, correct?
18  A.   Well, that's correct.  And if there's 20 non-minorities,
19  for example, or in this case 16 in Chicopee, then only one of
20  those individuals is a minority and there's only one promotion
21  made, you can only -- you know, there's only a 1-in-17 chance
22  that the individual promoted is going to come from Chicopee.
23  So it's going to be very unlikely.
24  Q.   And the next line is the -- that's the shift-of-one
25  analysis that you performed?

1   A.   Yes.

2   Q.   Okay.  And with Lowell, it's .86?

3   A.   Correct.

4   Q.   And what does that number indicate?

5   A.   Well, it shifts them below .8 to above .8.  And the

6   guidelines indicate that whenever you have that kind of shift

7   from simply the shift-of-one analysis, that the sample is too

8   small to determine adverse impact.

9   Q.   And my understanding is, based on what you just testified,

10  that the shortfall for Lowell is less than a person; is that

11  correct?

12  A.   It's .94 of a person.

13  Q.   That's less than a person, correct?

14  A.   Less than a person.

15  Q.   And then the next line is the Fisher's Exact .58?

16  A.   Yes.

17  Q.   And, again, could you just explain what that number means?

18  A.   It means that under the assumption of the null hypothesis

19  that the proportions are the same, that you would observe this

20  kind of result 58 percent of the time.  And so it's very, very

21  unlikely -- I'm sorry -- it's very likely that this particular

22  result can occur simply by chance in sampling fluctuation.

23  Q.   Okay.  And then the next line, the probability of still

24  finding adverse impact, that's 26 percent of the time even when

25  there is no adverse impact; is that correct?

1    A.    Right.  Even under the condition that there is no

2    difference between the groups on the promotion criteria, you

3    would still find that adverse impact would be determined via

4    the AI ratio.

5                MR. LEAHEY:  Thank you, Doctor.

6                THE WITNESS:  Thank you.

7                        CROSS-EXAMINATION

8    BY MR. McDERMOTT:

9    Q.    Good morning, Dr. Silva.  For the record, my name is Kevin

10   McDermott.  I represent the MBTA defendants in this case.

11        Dr. Silva, I'm actually going to be using tables that were

12   introduced in this case, tables from Dr. Wiesen's reports.

13   Dr. Wiesen, *[sic]* I'm showing you Table 2c from Dr. Wiesen's

14   report in June 2010.  It's been entered as Exhibit 79.

15        Are you familiar with this table, Dr. Silva?

16   A.    I am.

17   Q.    And, Dr. Silva, this is -- this is a table that Dr. Wiesen

18   prepared that has the aggregation of data from the HRD

19   examinations from 2003 through 2008.  Is that fair to say?

20   A.    Yes.

21   Q.    In looking at the MBTA -- looking at the MBTA, the first

22   column is "AI in promotion rates," and it's .95.  Can you tell

23   me what that signifies, Dr. Silva?

24   A.    It means that the proportion of minorities promoted is 95

25   percent of the rate of non-minorities promoted.

1   Q.   And did Dr. Wiesen include Asians as non-minorities?

2   A.   I believe he said he did.

3   Q.   And in your tables, Dr. Silva, you refer to -- you compare

4   non-minorities to whites; is that fair to say?

5   A.   Yes.

6   Q.   And if I tell you the evidence in this case is that two

7   Asian police officers were promoted to sergeant of the MBTA, if

8   you were to take out the two Asians from the group of white

9   officers, would the AI promotion rates change?

10  A.   If those two candidates were the only Asians present in

11  the data set that Dr. Wiesen included, yes, absolutely they

12  would.  The AI would go up.  I don't know what the underlying

13  numbers are here so I can't say how high it would go, but it

14  could go as high as 1, perhaps higher.  I'm not sure.  But it

15  definitely would go up if those two Asians were the only Asians

16  in the data set and they were promoted.  Essentially we're

17  reducing the proportion in the denominator because the Asians

18  wouldn't have been included, that proportion of non- -- I'm

19  sorry -- yeah, that proportion of non-minorities that would

20  have been promoted would have dropped and, therefore, that

21  would have increased the division into the upper number.

22  Q.   Dr. Wiesen gave testimony where he described the -- going

23  to the number 1 as perfect equity.  Is 1 -- we described -- if

24  the AI rate is 1, what does that mean?

25  A.   That simply means that the two promotion rates for

1    minorities and non-minorities are equal.  When you divide a

2    number by the same number, you get one, and that's where that

3    comes from.

4    Q.   And looking at Table 2c, Dr. Silva, going over the last

5    three exam periods for the MBTA, which is 2003, 2005 and 2007,

6    was there any adverse impact in the promotion -- was there any

7    adverse impact in any of the statistics regarding the MBTA?

8    A.   From 2005 to 2008?

9    Q.   No.  I'm looking at the aggregated data from 2003 to 2008.

10   A.   No, there's no indication of adverse impact.

11   Q.   Dr. Silva, are you aware of the testimony of Dr. Wiesen

12   where he found that there was adverse impact within the MBTA in

13   the promotions -- in the promotional rates to sergeant?  Are

14   you aware that he found that there was adverse impact within

15   the MBTA?

16   A.   What data set are we referring to?

17   Q.   Well, let me -- I'm looking on transcript page 2-114.

18   A.   Okay.

19   Q.   And this is the questioning by Attorney Lichten to

20   Dr. Wiesen.

21   A.   Yes.

22   Q.   And he was referring to the adverse impact ratio for '05

23   and '07.  And before I get to the testimony, Doctor, maybe

24   we'll just take a look at this.  This is the chart -- this is a

25   table also from Dr. Wiesen that's been admitted into evidence,

1    I believe, as Exhibit No. 53.  The highlights are mine.

2    They're not on the original exhibit.

3        But in -- let me get the -- Table 2a is a summary of

4    updated AI analyses by police department and exam year, and for

5    the MBTA for the 2005 year there were -- AI promotion rate:

6    Zero.  Does that signify there were no promotions of minorities

7    in that year?

8    A.    That's correct.

9    Q.    And in 2007 the promotional rate was also zero.

10   A.    That's correct.

11   Q.    And in 2007 the AI in passing rates is .96.  Does

12   that -- is it fair to say that means that minorities compared

13   to non-minorities had almost an equal passing rate?

14   A.    I don't believe so.  The AI in passing rates, I don't

15   recall what that particularly is.  I think he might have been

16   talking about passing rate on the test, and I think it means

17   that in terms of whether somebody scored a passing score on the

18   test, that there was no difference in the rates for minorities

19   and non-minorities, but not with regard to promotions.

20        Did you ask me with regard to passing rate on the test?

21   Q.    I was asking you about the AI in passing rates.

22   A.    Yes.  With respect to the AI of passing the test, there is

23   no adverse impact in 2007 for minorities versus non-minorities.

24   Q.    In the statistics in 2005 and 2007, are they statistically

25   significant in determining adverse impact?

1    A.    I don't believe that they are.  Let me check my numbers.

2    No, not in 2005 and -- no, not in 2007.

3    Q.    Okay.  And I show you that, Dr. Silva, because I'm going

4    to read testimony of Dr. Wiesen with regard to the basis for

5    his opinion that there's adverse impact at the MBTA.  And

6    again, we're on day 2, page 114, and I'm going to start on line

7    3.

8         The question is, "And what was the adverse impact ratio

9    for '05?

10             "ANSWER:  Zero.

11             "QUESTION:  And how about for '07?

12             "ANSWER:  Zero.

13             "QUESTION:  Okay.  Now, are these numbers

14    statistically significant?

15             "ANSWER:  Not in themselves.

16             "QUESTION:  Okay.  Even though they're not

17    statistically significant, do you have an opinion to a

18    reasonable degree of industrial psychology certainly as to

19    whether or not there was adverse impact resulting from the 2005

20    and 2007 sergeant's exam for the MBTA?

21             "ANSWER:  Yes.

22             "QUESTION:  And what is that opinion?

23             "ANSWER:  I think that the data from MBTA in 2005 and

24    2007 that shows minorities doing less well than non-minorities

25    is reflective of what we see statewide with minorities doing

1    less well than non-minorities, and it's statistically

2    significant statewide, and I think we're seeing the same effect

3    with the MBTA.  Even though there's no statistical significance

4    for that department alone, I think they're just reflecting the

5    overall adverse impact."

6         I'm again going to show you Exhibit No. 7, Dr. Silva, and

7    I would note that the statewide statistical aggregation of data

8    that Dr. Wiesen is referring to is on the bottom of Table 2c,

9    and that's data aggregated across jurisdictions and from all

10   exams from 2003 to 2008; is that fair to say?

11   A.    Yes.

12   Q.    And is it fair to say, Doctor, that the MBTA has the same

13   pattern as -- in its aggregated data from 2003 to 2008 as the

14   statewide data from 2003 to 2008?

15   A.    No, it differs in all respects.  In all three indicators

16   the AI promotion rates is above .8 and it does not show adverse

17   impact at .95.  The AI in passing rates is also above .8, at 83

18   and is not significant, does not show adverse impact.  And

19   finally, the average difference in test-takers between

20   minorities and non-minorities is at two points.  It's lower

21   than the others and is also not statistically significant.

22   Q.    And if I understand your testimony, Dr. Silva, there is

23   no -- in the aggregated data in 2003 pertaining to the MBTA

24   there is no adverse impact, and if we were to exclude the two

25   Asian promotions from the 2003 exam, that the AI in promotion

1    rates between non-minorities and whites is close to

2    one -- close to being perfect.  In other words, the MBTA could

3    not statistically have done anything better in regards to the

4    treatment of whites and non-minorities if we exclude the two

5    Asians.  Is that fair to say?

6          MR. CHURCHILL:  Objection.

7          THE COURT:  Overruled.

8          You may answer it.

9          THE WITNESS:  I wouldn't say you can't do anything

10    better but you certainly have done a very good job.  There is

11    no indication of differences between hires.  The only way you

12    could improve upon that would be to perhaps promote minorities

13    at a higher rate than whites.  I mean, that's better.  But in

14    terms of achieving parity between minorities and

15    non-minorities, you've done a good job there.  I don't see a

16    problem.

17    BY MR. McDERMOTT:

18    Q.   And in the opinion -- the basis of the opinion from

19    Dr. Wiesen, was his opinion flawed?

20    A.   Absolutely.

21    Q.   And can you describe how it was flawed?

22    A.   Well, he concluded that the statewide aggregated results

23    reflected each of the individual jurisdictions within this

24    table.  And clearly, by his own data, it does not.  The .95 is

25    not statistically significantly different, there is no

1    indication that it's below .8; in fact, there's probably an

2    indication it's closer to 1 than it shows here.

3        The .83 is also no adverse impact; there is no statistical

4    difference between the test scorers.  So I think it goes

5    completely counter to that assertion.

6    Q.   And is Dr. Wiesen's analysis and opinion, would that be an

7    example of the Simpson's Paradox, by combining data that's not

8    similar?

9    A.   Well, it misrepresents the data by combining.  If you were

10   to say that the statewide reflects each of the individual

11   elements, they each reflect that pattern, clearly that's not

12   the case.  And so I'm not sure it's a Simpson's Paradox, per

13   se, but certainly it's grouping a jurisdiction into a group

14   that has, you know, greater degrees of adverse impact, you

15   know, in terms of within the sample -- not necessarily

16   statistically significant, but within the sample.  And it's

17   saying that that's the same pattern that they all follow.  And

18   clearly, that's not the case.

19         MR. McDERMOTT:  Thank you very much, Dr. Silva.  No

20   further questions.

21                        CROSS-EXAMINATION

22   BY MR. McQUILLAN:

23   Q.   Good morning, Dr. Silva.  My name is Peter McQuillan.  I'm

24   the attorney representing the City of Methuen.

25   A.   Good morning.

1   Q.    Doctor, I noticed on the charts that were introduced

2   through Worcester's counsel, Exhibit 197, that there was a

3   delineation of a lot of analyses of municipalities, but none of

4   those included the City of Methuen.

5   A.    That's correct.

6   Q.    Did you have an opportunity to analyze any data from the

7   City of Methuen for the purposes of determining adverse impact?

8   A.    Yes.  I was provided Methuen after my May report.  Prior

9   to the May report, my data set did not indicate any promotions

10  in Methuen.

11  Q.    Was that data based upon the data provided to you by the

12  Mass. HRD?

13  A.    That's correct.

14  Q.    Doctor, I have on the machine here a chart.  And I

15  apologize for my abstract art and cut-and-paste, but do you

16  recognize that chart?

17  A.    I do.

18  Q.    Did you prepare that chart?

19  A.    I did.

20  Q.    And is it a fair statement to say, Doctor, that as --

21  these are your findings as a result of your analysis of data as

22  it applied specifically to the City of Methuen regarding

23  adverse impact?

24  A.    Yes.

25  Q.    Could you please explain the results of those analyses to

1    the Court, please?

2    A.   Well, there were four minority test-takers and 22 whites,

3    and only one promotion was made, and it was made to a

4    non-minority.  So as a result of that, the AI ratio is going to

5    be zero.  However, if we were to shift that promotion to a

6    minority, the AI shift of one or N + 1 analysis is indicating

7    "not defined."  And essentially, "not defined" means that we

8    have a zero in the denominator.  So we're dividing 1.0 by zero

9    because all the promotions at this point in the shift-of-one

10   analysis are made to non-minorities.  So we have 1 divided by

11   zero.  So it clearly indicates you don't have any adverse

12   impact in this situation but we just can't define it

13   mathematically and represent it with an ND.

14        But clearly what's happening is that initially there is

15   AI, with a shift-of-one analysis, there's no indication of AI.

16   And therefore, the indication by Question 21 is that the sample

17   is insufficient to make a determination as to adverse impact.

18   Q.   What about the shortfall analysis.  Can you please explain

19   the results they applied to the City of Methuen, please?

20   A.   Sure.  Again, the .15 represents the number of minorities

21   that would have to have been promoted to avoid a determination

22   of adverse impact by the AI ratio .8 rule.  So in this case

23   it's saying that if you had just promoted .15 minority and .85

24   non-minority, you could have avoided a determination of AI.

25   Q.   It does not show in this chart, because unfortunately my

1  handwriting is blocked out to the right, but did you conduct a

2  probability of still finding adverse impact analysis based upon

3  this data as it applies to the City of Methuen?

4  A.   Right.  I did the same analysis that I did in the other

5  charts, which is even if there were no differences between the

6  promotion -- in a promotion test that minorities and

7  non-minorities participated in, would we have still -- how

8  likely is it that we still would have found adverse impact?

9  Q.   And do you recall the results of that determination?

10  A.   I don't recall offhand, but I would guess it would be, you

11  know, a very high probability based on this data.

12  Q.   If I suggest to you the figure of .82, would that refresh

13  your memory?

14  A.   Yes, that sounds close to it.

15  Q.   And what is the significance of that .82?

16  A.   It says that even in the absence of any differences on any

17  test that's used to make promotion decisions, 82 percent of the

18  time given this distribution of candidates and promotions you

19  would still find adverse impact.

20  Q.   Doctor, in Methuen of all the analysis that you conducted

21  and the results of those analysis, are any of those

22  statistically significant for the purposes of determining

23  adverse impact?

24  A.   No, none.

25  Q.   Would you agree with me that the P-value of those analysis

1    is probably the furthest you can be from statistical

2    significance as it applies to Methuen?

3    A.    Absolutely.  And it ranges from zero to 1, basically, and

4    this is rounded off to 1, so essentially it's very high.

5    Q.    Would you agree with me, Doctor, in your considered expert

6    opinion that there is virtually no certainty based upon the

7    results of your analysis of any adverse impact as it applied to

8    Methuen for the promotional exams for sergeant for the years

9    2006 and 2008?

10   A.    I have found no evidence whatsoever of adverse impact in

11   Methuen.

12          MR. McQUILLAN:  That's all I have, your Honor.

13          Your Honor, if I may, I would like to introduce this,

14   but I'll certainly prepare a cleaner copy for the Court and

15   provide copies to counsel.

16          THE COURT:  All right.  Why don't we reserve a

17   number --

18          MR. McQUILLAN:  199.

19          THE COURT:  -- 199, and you'll provide a clean copy to

20   the Court.

21          MR. McQUILLAN:  Thank you.

22          (Defense Exhibit No. 199 received into evidence.)

23                    CROSS-EXAMINATION

24   BY MR. D'AGOSTINO:

25   Q.    Good morning, Dr. Silva.  I'm Richard D'Agostino.  I

1    represent the City of Lawrence.

2    A.    Good morning.

3    Q.    Doctor, I've put up the chart, Table No. 3, from your

4    May 28, 2010, report.  I call your attention to Table 3 where

5    the adverse impact ratio was zero and there were three

6    promotions out of 46 test-takers.  What would happen to the

7    adverse impact ratio if just one minority had been promoted

8    instead of one of the white candidates?

9    A.    The ratio would have grown from zero to 1.8.  It would

10   have been above a parity level for minorities.  You would have

11   actually had more minorities being promoted in terms of the

12   proportion of minorities being promoted than non-minorities.

13   Q.    And what would that shift reflect?

14   A.    That the data is sufficiently unstable to make a

15   determination of adverse impact as per Question 21 in the

16   Uniform Guidelines.

17   Q.    Is the difference in the passing rates as shown here

18   significant?

19   A.    Not at all.

20   Q.    Is it even close?

21   A.    No, not at all.  It's close to 1.0.

22   Q.    Doctor, what would the probability need to be?

23   A.    It would need to be below .05.

24   Q.    Doctor, what is the shortfall?

25   A.    The shortfall is .55, and it basically reflects the fact

1    that if you do achieve a non-adverse impact conclusion based on

2    the AI ratio, you would have had to have promoted -- where's

3    the number -- 2.45 of non-minorities and .55 minorities.

4    Q.    And obviously, we can't promote half a person?

5    A.    That's correct.

6    Q.    So that would be an impossibility?

7    A.    Of course you never promote half a person, but, you know,

8    it's possible that under a certain sampling you could have

9    promoted a minority individual.  But the most likelihood here

10   is that you wouldn't have promoted that individual.

11   Q.    Thank you, Doctor.

12         I call your attention to Table No. 5 regarding the 2008

13   exam.  You prepared this table, correct?

14   A.    Yes.

15   Q.    There were three promotions, Doctor, in the 2008 exam out

16   of 27 white test-takers and 15 minority.  What would happen if

17   a minority candidate had been promoted instead of one of the

18   white candidates?

19   A.    The AI ratio would have been undefined.  And, again, as I

20   indicated earlier, "undefined" simply means that we're dividing

21   1 by zero.  But we're essentially experiencing a shift from

22   being below zero to above .8.  And so that basically, again,

23   indicates that there's insufficient data here to make a

24   determination of adverse impact.

25   Q.    And does that indicate that there's no stability to the

1    data?

2    A.    Absolutely.

3    Q.    Is there a difference in the passing rates -- I'm sorry --

4    is the difference in the passing rates statistically

5    significant?

6    A.    No, not at all.  Not even close.

7    Q.    And what is the shortfall in this sample?

8    A.    In this case it's .31, which indicates that in order to

9    avoid a determination of adverse impact versus the AI ratio .8

10   rule, you would have had to have promoted .69 non-minorities

11   and .31 minorities.

12   Q.    So, again, less than a third minorities --

13   A.    That's correct.

14   Q.    -- would have to be promoted?

15   A.    That's correct.

16   Q.    And obviously that could not be achieved?

17   A.    That could not be achieved.

18        In this case you're going to have adverse impact against

19   minorities or adverse impact against non-minorities.  There's

20   no middle ground here.  And the most likelihood, given the

21   numbers of candidates, 15 and 27, is that you're going to have

22   adverse impact against minorities even if you have a perfectly

23   fair and equal test for minorities and non-minorities.

24   Q.    What would happen, Doctor, in this instance if there were

25   no average performance differences between the whites --

1    A.   If there were no average performance differences, we had

2    this distribution with one promotion, we would have seen

3    adverse impact in 64 percent of the cases.

4    Q.   So there's a chance that adverse impact would still be

5    found?

6    A.   Almost two-thirds chance that you're going to find adverse

7    impact regardless of whether -- whatever test you use.

8    Q.   Is that a true or a false identification of adverse impact

9    in this regard?

10   A.   It's a false identification of adverse impact because the

11   underlying test distributions are the same for minorities and

12   non-minorities.

13   Q.   And, Doctor, based upon your analysis of the Lawrence

14   data, were minorities hired at a lower rate than whites?

15   A.   No, there's no indication of that at all.

16   Q.   So in your analysis, Doctor, there is no indication that

17   Lawrence -- that the results in Lawrence had any adverse impact

18   upon minorities?

19   A.   No, not at all.

20            MR. D'AGOSTINO:  Thank you very much, your Honor.

21            THE COURT:  Do you have much?

22            MS. HARRIS:  I have more than they do.

23            THE COURT:  So why don't we take the break at this

24   point.

25            THE CLERK:  All rise.  The Court will take a recess.

1           (The Court exits the courtroom and there is a recess

2    in the proceedings at 10:55 a.m.)

3           (After recess, start at 11:25 a.m.)

4                      CROSS-EXAMINATION

5    BY MS. HARRIS:

6    Q.   Good morning, Dr. Silva.

7    A.   Good morning.

8    Q.   For the record, Mary Jo Harris for the City of Boston.

9           Dr. Silva, I'm going to briefly refer you to Exhibit

10   197.

11          As I understood your testimony this morning when you

12   were questioned by Ms. Engdahl, you were explaining that you

13   ran an analysis on the data for the 2005, 2006, 2007, and 2008

14   exams.  I believe you called it the Monte Carlo analysis; is

15   that right?

16   A.   I used the Monte Carlo approach to estimate the

17   probability, yes.

18   Q.   And can you just explain for me what the Monte Carlo

19   approach is?

20   A.   Basically, let's say in Boston, since you represent

21   Boston, we have 224 candidates that are minorities and 381

22   candidates that are non-minorities, and there were nine

23   minority promotions and 57 non-minority promotions.  What I

24   would do is basically create a distribution, an infinite

25   distribution of candidates, both -- a distribution of minority

1  candidates and a distribution of non-minority candidates.  So

2  suppose you have the two distributions and you basically line

3  them up so that they're exactly the same.  So the two

4  distributions are the same for minority and non-minority.  When

5  you pull for each -- you do this a million times, but each time

6  you do it you pull 224 candidates from the minority

7  distribution that you've created, the population, essentially,

8  and you pull 381 non-minority test takers from that

9  distribution.  The distributions are exactly identical, so

10 essentially you could pull from a single distribution.  But

11 let's say you're theoretically pulling from two distributions

12 that are equal, so you pull these individuals out and then you

13 rank them in terms of their test performance and you start --

14 you know, basically top down and you go down and pick 66

15 individuals that you're going to promote, the first 66.  And

16 then you compute the AI based on that particular sample.  Is

17 there AI or not in that sample as you've pulled it through this

18 random process?  And then you basically say yes or no in that

19 case.  You do this a million times and you compute the

20 proportion out of that one million times that you would have

21 found adverse impact.  In this case it would have been

22 approximately 220,000 times out of that one million times you

23 would have found that there was adverse impact, even though you

24 had created distributions which were identical and you were

25 pulling from those, the candidates from those two

1    distributions.

2    Q.    And when you say that they that were identical, you mean

3    you're assigning them the exact same score?

4    A.    You have a distribution, so the average of that

5    distribution in the standard deviation, so the spread, the

6    shape, and the average of that distribution are the same.  That

7    distribution that I used as a standard normal distribution

8    what's often referred to as the bell curve, so you have just

9    the distribution of candidates that have centered on a mean of

10   zero and have a standard deviation of one and are standard

11   normal.

12   Q.    And when you say you checked to see if there were -- how

13   they would fall in rank order for 66 -- on 66 placements, the

14   66 that you're using is the number of vacancies; is that right?

15   A.    That's correct.

16   Q.    Okay.  And then similarly, you did the same analysis for

17   2008.

18   A.    That's correct.  There I would create samples of 213

19   minority candidates and 275 non-minority candidates, and I

20   would pull 26 promotions, the total number of promotions there

21   out of that grouping.  And then I would basically estimate the

22   probability that you would still have found adverse impact even

23   under the scenario where there are no differences between the

24   two groups.

25   Q.    And, again, in 2008 there was a 23 percent chance you that

1    would find adverse impact or chances?

2    A.    That's correct, yes.

3    Q.    Now, Dr. Silva, when you were retained in this case, the

4    HRD provided you with some data regarding the examinations that

5    are at issue here and also some prior examinations; is that

6    right?

7    A.    I know I received data from 2005 to 2008, and I also

8    received data from 2002, which included the written test, the

9    T&E scores, and an oral board exercise that was administered in

10   2002.

11   Q.    Okay.  And do you understand that the 2002 examination

12   pertained only to the Boston Police Department?

13   A.    Yes, I do.

14   Q.    And the data that HRD gave you, can you tell me, the

15   data -- specifically with regard to 2002 what that data was?

16   A.    Basically that data included scores for all candidates in

17   Boston that took the written test, the T&E exercises, and also

18   the oral board exercise.  And as I understand it, the oral

19   board exercise was a structured interview that was conducted by

20   Morris & McDaniel in that time frame, and basically includes

21   every candidate that have data on those three elements.

22   Q.    Okay.  And when you say "those three elements," did HRD

23   give you the raw data as to each component; that is to say, for

24   each candidate that took the exam you got their written test

25   score, their T&E rating, as well as their performance on the

1    oral board?

2    A.    That's correct.

3    Q.    So you didn't get one lump -- one grade at the end, you

4    got actually each component that made up the final grade?

5    A.    That's correct.  I got three scores, one for each of those

6    three elements.

7    Q.    Okay.  Now, when you reviewed the data from 2002, from the

8    2002 exam, did you do an analysis of that data?

9    A.    Yes, I did an analysis in my first report from the

10   February 2009 time frame, I believe.  And I wanted to look at

11   what if we had basically two situations, one situation where we

12   had just used the written test, because even though the oral

13   board data is available we can also do an analysis excluding

14   that data and only use the written test and the T&E scores.

15   Q.    And you could do that because you had the raw data for

16   each, correct?

17   A.    That's correct.

18   Q.    And did you also -- when you received this data, were you

19   provided with any information about the way the Morris &

20   McDaniel examination was weighted by component?

21   A.    Yes.  My understanding was that the Morris & McDaniel test

22   or the oral board exercise was weighted 40 percent and as a

23   result of including the oral board exercise, a written test was

24   reduced to only 40 percent.  So they each had equal weight.

25   Q.    And did you understand the weight that was apportioned to

1    the training and education?

2    A.    Twenty percent.

3    Q.    Okay.  And when you reviewed the Morris & McDaniel data,

4    can you tell the Court what it is that you did to test that

5    data or to review that -- examine that data?

6    A.    Well, the first thing I did is that I had -- the scores

7    were represented in weighted format already, so I had to get

8    them back to their original score form.  So essentially to get

9    it back to their original score form by dividing the number

10   provided by HR by the weight that the component was given.  In

11   addition to the three component scores, HRD had also provided

12   me with the final score based on the weights that were assigned

13   to each of the three components.  And so what I wanted to do

14   was get back to the original scores and then weight them as

15   they were weighted by HRD and see if I could get back to that

16   original total score.  So the 40/40/20, could I get back to

17   that original score that HRD provided?  That would confirm that

18   I have the original scores correct.

19          And I did that, and I achieved that same score.  So I

20   created the original scores in their unweighted form by

21   dividing it by the weight to that component and then confirmed

22   that I had the correct original scores by virtue of comparing

23   my score to the score that was also present from HRD.

24          Once I had the original scores, I can weight them any

25   way I like.  I had already at that point weighted them in

1    adherence to the actual weights that were assigned, but now I

2    have the option of assigning a different weight and excluding

3    oral board, for example, from that composite score.  So that's

4    exactly what I did.  I said --

5    Q.    Let me stop you there.  In the report that you're

6    referring to, this was in your February 2009 report --

7    A.    Yes.

8    Q.    -- that you did this work?  And did you provide a copy of

9    the Excel workbook reflecting the 2002 data that you were

10    working with?

11    A.    I did.

12    Q.    Okay.  And when you say you were able to adjust the

13    weights, you're not changing the scores themselves, you're

14    changing the weight that the scores were given to come up with

15    a final grade; is that --

16    A.    That's correct.

17    Q.    I'm sorry.  Can you tell the Court what you did then with

18    that data?

19    A.    What I did with that data is essentially create a new

20    score, a new total score for the candidate, and that total

21    score reflected only the written test and the T&E test, much

22    like the test we have today that would have an 80 percent

23    weight on the written and 20 percent weight on T&E.  And I

24    wanted to see if adding -- and the purpose of that was to see

25    if adding the oral board made any real difference with respect

1    to adverse impact.

2         So what I did was I took the written score, weighted

3    it by 80 percent, took the T&E score and weighted by 20

4    percent.  Now I have a new score for each of the candidates

5    that I can juxtapose to their original score and I can now sort

6    the data set top down by that new score of 80/20 of just

7    written test and T&E and I can see which individuals would have

8    been promoted.

9         Here, of course, I used the same selection ratio.  In

10   this case we had a total number of promotions of -- it looks

11   like 69 individuals.  So basically from this new column, this

12   new score, just 80 percent, 20 percent, I picked out the top 69

13   candidates, and I looked at their race, whether they were

14   minority status or not minority.  And I determined that when we

15   used the written test only, we had ten promotions for

16   non-minorities.  There were nine promotions for African

17   Americans and one promotion for Hispanic and 59 promotions for

18   Caucasians.

19   Q.   Okay.  And I'm putting on the monitor here table 6 from

20   your February 2009 report.  Can you see that?

21   A.   I can.

22   Q.   Okay.  And does table 6 reflect first in method 1, which

23   is titled "With Structured Interview Included," does that

24   reflect the analysis you performed on the Morris & McDaniel

25   data as it stood, in other words, with the 40/40/20 weighting

1    that you've previously described?

2    A.    Yes.

3    Q.    And method 1, the chart at method 1, these are the actual

4    promotions, as you understand, that were created from that

5    examination?

6    A.    That's correct.

7    Q.    Okay.  So I believe you previously said that it was 69

8    promotions in total; is that right?

9    A.    I believe that's true.  If you add the three together, you

10    get 69.

11    Q.    Okay.  So just to be clear about this, out of the entire

12    test that was performed in 2002, there were a total of 69

13    promotions, and you calculated the adverse impact ratio; is

14    that correct?

15    A.    I did that, yes.

16    Q.    And can you just explain for the Court what your chart

17    reflects in method 1?

18    A.    With regard to African American adverse impact ratio we

19    see .33 or .337 to be more accurate; the Hispanic, the adverse

20    impact ratio was .27; and overall, more typically as we've been

21    representing, the adverse impact ratio for minorities is .315

22    or if you round it to .32.

23          Essentially it says that, you know, we still have

24    substantial indication of adverse impact even with the

25    inclusion of the structured interview in 2002.  So the

1  inclusion of the structured interview did not really help very

2  much, we're still seeing fairly severe difference in the

3  proportion rates between minorities and non-minorities.

4  Q.    Okay.  And now underneath method 1 you have method 2

5  without structured interview included.  And is this the data

6  that reflects your reweighting of the examination, the 2002

7  examination, taking out the structured interview and allotting

8  80 percent weight to the written score and 10 percent to the

9  training and education?

10  A.    That's correct.

11  Q.    And this is still using the 2002 data?

12  A.    Exact same data set.

13  Q.    And can you just walk us through your results under method

14  2 without the structured interview?

15  A.    Again, as I created that new composite, which reflects the

16  way that things are done today, we found that as we go down

17  that list, that it really didn't take away in any substantial

18  way the number of minorities.  Instead of having two Hispanics

19  being promoted with the structured interview in place, we had

20  just one Hispanic being promoted without the structured

21  interview.  So instead of a total of 11 minorities, we found

22  that without the structured interview we had 10 minorities.  So

23  there was only -- another way to say that is as you move from a

24  written test only to a structured interview only, it really

25  didn't make much of a change and it only added one additional

1  minority as being promoted in Boston in 2002.

2  Q.   Have you had the opportunity to review the testimony of

3  Dr. Fields with regard to the weighting of the various

4  components for the 2002 examination?

5  A.   I have.

6  Q.   And I'm going to show you -- this is day six, page 83 of

7  the testimony.  And the question was placed to her -- and I'll

8  represent to you this is in regard to the 2002 examination.

9  The question was put to her, What conclusion have you drawn

10  from the fact that the City of Boston -- the oral component had

11  a mean difference of .26?  I'm paraphrasing slightly.

12        And her conclusion was:  My conclusion was that this

13  is a very encouraging result and one of the methods for

14  reducing adverse impact is assigning weights, especially higher

15  weights to things with lower adverse impact can substantially

16  reduce adverse impact for the total test score.

17        And then skipping ahead a bit.  I was thinking when I

18  had seen that .26 why didn't anyone try to improve upon

19  whatever that process was, consider explicit predictor

20  weighting and continue to improve it because it was so

21  encouraging.

22        And I'll ask you, Dr. Silva, do you understand what

23  explicit predictor weighting refers to?

24  A.   Yes.

25  Q.   And can you just tell us what your understanding of that

1  term is?

2  A.  It's basically where you choose to weight a given

3  component at a higher level for purposes of reducing adverse

4  impact.  You have to be careful there.  You know, whenever you

5  weight things, you have to have some rationale and some basis

6  in the job analysis.  If the job analysis doesn't say that the

7  characteristics that are being tested at a certain test should

8  be weighed at that level, you're basically reducing the

9  validity of the process.  But you can just for testing purposes

10  just to see if it would have had an impact certainly look at

11  that option and see if you find support for that job analysis

12  before you proceed with that approach.

13       Before you proceed with that approach you want to make

14  sure -- especially when you have data available, you want to

15  proceed by looking first to see if the data actually would

16  yield more positive results with this changed weighting.

17  Q.  Okay.  And I'm going to show you again, this is day 6 at

18  page 118, and I'll represent to you that this is -- we're still

19  talking in general terms about the 2002 examination.

20       And Dr. Fields was asked about weighting of the job

21  knowledge multiple choice component of a test, if she had an

22  opinion as to what the appropriate weighting of such a test

23  might be.

24       And she replies:  I find it generally should be in the

25  20 to 40 percent range of the total test score and my job

1   analysis would indicate specifically what it would be.

2          And then she was asked:  Do you have an opinion as to

3   whether if you reduced the weighting of the job knowledge

4   multiple choice test that would have an effect in reducing

5   adverse impact, if you utilized these other components to the

6   rest of the examination process?

7          And her answer is:  "Based on the 2002 data alone we

8   know if we increase the weight of the oral component in that

9   particular exam, we can reduce group differences."

10         And I'll ask you first if you've had a chance to

11  review the testimony of Dr. Fields?

12  A.   Yes, I've seen this before.

13  Q.   Okay.  And I'm going to show you again -- this is at day 8

14  at page 100, again, referring to this exam at the bottom of the

15  page.  I'll direct you to line 24.

16         Was there a method that could have been used in 2002

17  that would have cost hardly anything but could have had even

18  more greatly improved the adverse impact from what it was?

19         And her answer is:  "Yes."

20         And then asked:  What was that?

21         She states:  Assuming the job analysis was carefully

22  looked at, if it was justified, and the weights could be

23  altered, all that it would take to alter the weights and make

24  the oral component a higher weight than it was and the written

25  exam a lower weight than it was, and that would surely minimize

1    group differences and reduce adverse impact.

2            And I'll ask you, Dr. Silva, given the fact that you

3    have the 2002 data, did you have an opportunity to attempt to

4    prove Dr. Fields hypothesis here?

5    A.   I was curious after I read this.  Sometimes it is

6    possible, especially when you have fairly high selection

7    ratios, to make a change in weights and make some change in the

8    adverse impact ratio.  I was skeptical given that the selection

9    ratio was quite low.

10           MR. CHURCHILL:  I'm sorry to interrupt.  I'm not sure

11   where he's going to go.  It's a yes or no question.  I just

12   don't want him to elaborate.  I don't want him to get into any

13   information that was produced in terms of an expert report.

14           THE COURT:  That sounds like where it's headed.

15   BY MS. HARRIS:

16   Q.   Have you had a chance to review Dr. Fields' testimony in

17   the trial here?

18   A.   Yes.

19   Q.   About her suggestion with reweighting the examination?

20   A.   Yes.

21   Q.   Did you, in fact, using the data that you produced in your

22   February 2009 expert report review that data and reweight that

23   data to see if her hypothesis is correct?

24   A.   I followed the lead from Dr. Fields and --

25           MR. CHURCHILL:  Same objection.

1          THE COURT:  Just a minute.  Because I think the

2     objection is disclosure of the opinion.

3          MS. HARRIS:  And I'll represent that we did this

4     yesterday and I'm happy to put it up on the board to show the

5     reflection of the data.  The raw data --

6          THE COURT:  No, no --

7          MS. HARRIS:  The raw data all has been disclosed.

8          THE COURT:  You make the objection.

9          MR. CHURCHILL:  You know where I'm going, your Honor.

10    Whether it was done yesterday or six months ago, we're just

11    seeing it right now and there's been no disclosure of any

12    further analysis that's been done along these lines.  So

13    it's --

14         THE COURT:  I guess the category is supplementation of

15    expert opinions, and the objection is that it wasn't

16    supplemented to provide this opinion.

17         MS. HARRIS:  And I would suggest that it's in the

18    nature of rebuttal based on the testimony that was offered by

19    Cassie Fields in the trial here.

20         THE COURT:  Well, that explains its relevance.  I'm

21    not sure that explains the failure to alert the plaintiff to

22    the fact that you were going to elicit it.

23         MS. HARRIS:  I can make a proffer to the plaintiffs

24    now if that would be satisfactory.

25         THE COURT:  Well, I think it's probably limited in

1  scope and based on data that has been disclosed.

2         MS. HARRIS:  All of the underlying raw data has been

3  disclosed.

4         THE COURT:  I think it should have been flagged, but

5  I'll admit it.  If we need corrective action by allowing the

6  plaintiff to supplement, we can do that.

7  BY MS. HARRIS:

8  Q.   Dr. Silva I'm putting up on a board here charts that I'll

9  ask you first if you can identify the charts that are up here?

10 A.   Yes.

11 Q.   And were these created by you?

12 A.   Yes.

13 Q.   Were they created based on the data that was included in

14 your February 2009 report?

15 A.   Yes, just a simple reweighting.

16 Q.   And can you tell us on the left-hand side, method 1 with

17 assessment center AC weight 40 percent, can you explain for us

18 what that reflects?

19 A.   Well, that's basically just a copy from the May -- I'm

20 sorry, the February 2009 report where the actual weight was 40

21 percent.  The weight of the test in that scenario is 40

22 percent, the weight of the written test is 40 percent.

23        Dr. Fields in her testimony indicated that she would

24 have lowered the written test to 20 percent and increased the

25 weight on the assessment center to 60 percent and that that

1    alone would have reduced the adverse impact in a very cheap

2    and -- it would surely do it, she was convinced.  So I went and

3    checked, and actually I found that it would have absolutely no

4    impact on the adverse impact ratio.  Whereas before we would

5    have promoted nine blacks, now we would have promoted eight

6    blacks, and whereas before we would have promoted two

7    Hispanics, we would have now promoted three Hispanics.  But the

8    total number of minorities stands at 11 in both cases.

9         So Dr. Fields' statement to the fact that it would

10   have surely changed is actually incorrect.  It did not change

11   it in any fashion.

12   Q.   Now, the -- on the left-hand side of this document that

13   states method 3 with assessment center AC weight 60 percent,

14   you're showing that if the assessment center had been weighted

15   at 60 percent, the written score reduced to 20 percent, do I

16   have that correct?

17   A.   On the top number is 40 percent, the bottom number is 20

18   percent, yes.

19   Q.   Okay.  Then the promotions still using the 69 vacancies,

20   correct?

21   A.   Yes.

22   Q.   You're reflecting eight black, three Hispanic, and 58

23   whites would have been promoted?

24   A.   Yes.

25   Q.   And then can you just explain for us on the right-hand

1    side, method 3 with assessment center, what that data reflects?

2    A.   Well, the most relevant number is that the top row under

3    BHAI.  So it's the minority adverse impact ratio, and there

4    under either method you can see that the minority AI ratio

5    is .315.  So the AI ratio has not changed.  We do have a shift

6    in terms of the candidates being black or Hispanic, but in

7    terms of the overall AI ratio that we're dealing with in this

8    case, it has not changed.

9    Q.   And in running these numbers you were utilizing the test

10   scores of each of the individuals using their specific scores

11   as provided to you by HRD; is that correct?

12   A.   Yes.  Yes, absolutely.

13           MS. HARRIS:  I'd like to offer the chart as Exhibit

14   1 --

15           MR. CHURCHILL:  Your Honor, I'm going to object and

16   move to strike this entire line of testimony.  It's one thing

17   for our expert to make a theoretical proposition that one can

18   do some type of analysis.  It's entirely different to have an

19   analysis done like this that we've had no opportunity to

20   review, our expert had no opportunity to revaluate and give us

21   any feedback on.  So it puts us in an unfair position at this

22   point.  So I certainly object to this coming in as evidence,

23   and I move to strike the entire --

24           THE COURT:  The objection is overruled because I'll

25   give you the opportunity to respond to it.  If that means that

1    it happens at a later time so you have a chance, for example,

2    to consult with Dr. Fields and get her input to your rebuttal,

3    which is what it would be, I guess, then we can arrange for

4    that.  So I'll admit the evidence, but you'll have the

5    opportunity, reasonable opportunity to meet it.

6              MS. HARRIS:  Thank you, your Honor.

7              THE CLERK:  It's going to be number 200.

8              (Exhibit 200 received into evidence.)

9    BY MS. HARRIS:

10   Q.    Dr. Silva, among the other data that was provided to you

11   by the Human Resources Division, were you given -- were you

12   given test item analyses from the 2005 examination?

13   A.    I was.

14   Q.    And do you recall in your report, I believe of February

15   2009, whether you reviewed the test result data of the

16   lieutenant candidates and compared their results to the results

17   of the sergeant candidates, again, focusing on the 2005

18   examination?

19   A.    I did for a subset of the items.  I believe it was 53

20   items that were common to both tests.

21   Q.    Okay.  And so the subset that you're referring to are the

22   questions that both the lieutenant candidates and the sergeant

23   candidates were asked to answer in that examination?

24   A.    Correct.

25   Q.    And just so that we're clear, is it your understanding

1    that in the promotional examination there's a series of

2    questions in that the sergeant candidates had to answer 80

3    questions, the lieutenant candidates had 100, the captain

4    candidates had 120?

5    A.    Correct.

6    Q.    And so the numbers -- the questions that you looked at

7    were those questions that were common to both the sergeant

8    candidate and the lieutenant candidates?

9    A.    Yes.

10   Q.    And what did you find as you reviewed those questions and

11   answers?

12   A.    Well, the sergeant candidates are essentially police

13   officers, and the lieutenant candidates are essentially

14   sergeants.  And so we have two groups that we can look at in

15   terms of their knowledge of information that's relevant to the

16   sergeant position as well as the -- the sergeant position as

17   well as the lieutenant position in this case.  So we're able to

18   look at the performance of police officers on those 53 items

19   relative to the performance of sergeants on those 53 items.

20   And we would expect that sergeants having more experience and

21   having broader knowledge would be able to answer those

22   questions at a higher rate.

23          So I did an analysis that compared the passing rate of

24   individuals of sergeants and police officers in Boston

25   separately, and I also did another, similar analysis statewide.

1    I found that in Boston that 89 percent of the sergeants passed

2    those 53 items, achieved a 70 percent score on those 53 items.

3    But that only -- and I believe it was 63 percent of the police

4    officers achieved a passing score on those same 53 items.  The

5    conclusion that I derive from that is that the items are

6    relevant and that's why police officers do not perform as well

7    as the sergeant candidates, because they are not as familiar

8    with the material that sergeants have to deal with.  And so you

9    would expect there to be a difference.  The difference is in

10   line with what I would expect to see for items that are

11   relevant and more relevant to sergeants.

12         So basically it is an empirical -- because we have

13   essentially here in these kind of promotional tests content

14   validity, so what we're doing is matching content on the job

15   with content on the test and inferring that, you know, if the

16   job involves this and the test involves the same thing, then it

17   makes sense to test -- use that test for that job.  So it's a

18   content validity strategy.

19         Here's an attempt to provide a more empirical number

20   based conclusion that these items, these 53 items did indeed

21   test the sergeant's exam -- I'm sorry, tests more of a

22   sergeant's job and, as a result, you would expect that

23   sergeants would perform better on these items than would police

24   officers.  And that's exactly what we found.

25         The numbers in Boston, as I said, were 89 percent for

1    sergeants and 63 percent for police officers.  Statewide the

2    numbers were similar.  We had a 79 percent rate for sergeant at

3    the statewide level and only a 51 percent passing rate for

4    lieutenant -- I'm sorry, for police officers at the statewide

5    level.  So, again, a fairly large difference between those two

6    groups of individuals.  So, again, the conclusion is that these

7    items are relevant to the sergeant's position and that's why

8    sergeants are performing better on these items than police

9    officers are.

10   Q.    Okay.  And you're inferring from the fact that almost nine

11   out of ten of the sergeant -- incumbent sergeants were able to

12   answer those correctly, that you infer from that that that

13   information is known to them and part of their -- related to

14   their job performance as sergeants?

15   A.    That's correct.  In any occupation there are job

16   incumbents that perform at a lower level in management science.

17   Typically, just by offhand assume that about 10 percent of job

18   incumbents are not performing adequately on the job.  What we

19   have here is 11 percent in Boston and 21 percent statewide.  In

20   industrial psychology we tend to assume that one standard

21   deviation below the mean is not performing adequately, that

22   would be around 16 percent.  So between 10 and 16 percent is

23   what we would expect, and we're seeing 11 and 21 percent.  So

24   it's right in the ballpark of what we would expect.

25   Q.    Now, you yourself have been involved in the creation and

1    administration of examinations for candidates testing for

2    police sergeant; is that correct?

3    A.   Yes.

4    Q.   And can you tell the Court approximately how many times

5    you have been involved personally in the creation and

6    administration of police sergeant examinations?

7    A.   Police sergeant specifically I'd say probably five or six

8    times.

9    Q.   And is that work that you've done for the City of Miami?

10   A.   Yes.

11   Q.   And can you just briefly tell the Court what your

12   experience has been -- that's a bad question.

13        When did you begin performing services for the City of

14   Miami?

15   A.   I started in 1998.

16   Q.   And can you tell the Court what your function was with

17   regard to test development in the City of Miami?

18   A.   I was the project director, so I oversaw parts of the

19   project, designed the entire process, delivered candidate

20   preparation sessions, developed the test content.  At the time

21   Miami was under a consent decree, so I was also having to work

22   with the DOJ to develop test components that DOJ's experts

23   approved, and we went forward with those approved components by

24   DOJ experts.  So I basically performed all aspects of the

25   project, including collaboration with DOJ experts to construct

1    the best possible solution that we could.

2    Q.    And over the course of time that you have worked with the

3    City of Miami in this capacity, has the design of the

4    sergeant's promotional exam remained the same or has it

5    changed?

6    A.    During the time that I administered it, it was always the

7    same.  There was a period, I think in 2001, where the city, for

8    financial reasons, decided to do it internally and they used, I

9    think, a different format with that one.  But I'm not familiar

10   with what was done.

11   Q.    So focusing on the format you were involved in, can you

12   describe to the Court what that format entailed?

13   A.    The format for the sergeants is essentially a written job

14   knowledge test, which we call a situational judgment test.

15   It's similar to a job knowledge.  It's slightly different in

16   that it's not straight multiple choice questions out of texts.

17   Rather, what we do is we create a scenario or situation that

18   the sergeant is placed into, it might be half a page to a page

19   description of the situation, and then there's a number of

20   questions.  And it could vary between five and, say, seven

21   questions that would be relevant to that scenario.  And the

22   candidates would then be asked to respond to those questions.

23   They're basically technical knowledge questions but with

24   respect to the scenario.  There are, I believe, 75 items of

25   that type.  We call that a written test essentially.  It's a

1    technical knowledge test covering all the sources that the

2    sergeants use in preparation for the exam.

3    Q.    Can I stop you there and ask you one question about that?

4    A.    Sure.

5    Q.    So the situational judgment test that you're describing,

6    as I understand, you're saying would be a description of an

7    event that the -- the candidate is encountering?

8    A.    Yes.

9    Q.    And then a series of multiple choice questions asking what

10   he or she would do in respect to different aspects of that; is

11   that --

12   A.    That's exactly correct.

13   Q.    I'm sorry, go ahead.  In addition to the situational

14   judgment, what else?

15   A.    And we gave that particular part of the exam 40 percent

16   weight.  And then there were three other components that were

17   also part of the exam itself.  There were the three oral board

18   components.  The first component is an incident command, or it

19   might be called in other places a tactical, where the candidate

20   is given information about a situation that's developing and

21   asked to place themselves in that position and take command of

22   that situation and to tell the -- tell a panel of assessors

23   what they would do in relation to that situation to accomplish

24   some effective solution to that situation.

25            A second exercise that we used is a group meeting

1    exercise where a candidate is asked to meet with a panel of

2    three individuals and to -- and these individuals would

3    represent members of the community.  For example, they could

4    be, say, the mayor; it could be some housing development

5    president or home owners' association president; it may be a

6    resident that lives in the -- in that particular area.  And

7    they would have some particular concerns or issues about crime

8    or occurrence that happened there that they're concerned about

9    they want to discuss with the sergeant.  So they would meet

10   with this individual and have some idea ahead of time as to

11   what the issues were and who the individuals were at the

12   meeting, and they would be asked to have a discussion with this

13   group and to try to diffuse the situation and provide

14   assistance to the individuals on this panel.

15         And the third exercise is a subordinate conference

16   exercise where the candidate role plays a sergeant who is

17   meeting with a police officer, and in that role the officer may

18   have some issues.  This may be performance related issues or

19   disciplinary issues, and the officer has to meet with that

20   individual and address the issues, allow the officer to, you

21   know, state a side of the situation, and make some decisions as

22   to what actions that sergeant candidate is going to take with

23   respect to that role playing officer.

24         So those are the three exercises.  Those are weighted

25   20 percent each.  So the oral board exercise as a whole were

1  weighted 60 percent, and that has been the format throughout

2  the years that I've administered it.

3  Q.   Okay.  And in the years that you've administered it can

4  you tell me what number -- what is the number of candidates

5  that have gone through this process?

6  A.   It has varied over the years, but I think my first year

7  there might have been around 330 candidates, and in more recent

8  years I think it's closer to 220, 225.

9  Q.   And that's the total number of people who have gone

10  through all of these exercises?

11  A.   Right, within each individual year, yes, each

12  administration.

13  Q.   Have you administered the situational judgment written

14  test as a hurdle that a candidate has to pass in order to go on

15  to what I'll call the oral exercises?

16  A.   Yes.  It's always been a hurdle.  The first time we did it

17  DOJ's experts insisted that we take over 50 percent of the

18  candidates through the process, and that took nearly two weeks

19  of assessor time.  And these assessors are coming from all over

20  the United States, so it's kind of hard to do that, but we did

21  manage to do it.  We also had to cut the exercise times by 30

22  percent from what we normally have, so it takes away from the

23  exercise by running more candidates through, but we did manage

24  to do that.  And we invited 198 of the about 330 candidates to

25  come through the process.

1          More recently, based on analysis of that data, we've

2    concluded that candidates that score, say, about 80th or 90th

3    on the -- the score below 80th or 90th on the written test

4    really have no chance of getting promoted.  We can look at that

5    and come to that conclusion based on the data from 1998 where

6    we did take that many more candidates through the process and

7    any of those candidates above 90 had really any chance, I think

8    maybe 1 in a hundred chance of making it to the top of the

9    list.

10          So based on information from 1998 we've been able to

11   just take about 80, 80 candidates to the oral board exercises

12   since that time.

13   Q.    Okay.  And so, as I understand it, when you ran through

14   198 people through the oral exercises, that took about two

15   weeks to accomplish?

16   A.    About two weeks.

17   Q.    Okay.  And now when you're running about 80 candidates

18   through that process, how long does that take?

19   A.    It takes us a week.  The exercises are slightly longer for

20   each one, for each candidate, but we have half the candidates

21   or less than half the candidates so it works out to about a

22   week, sometimes six days.

23   Q.    Do you know what the cost was when you ran the oral

24   assessment press process for 198 candidates?

25          MR. CHURCHILL:  Your Honor, I'm going to object.  This

 1    whole line of questioning is not contained within the expert

 2    report, so there's a disclosure issue here.  I've been

 3    indulgent in terms of the description of the type of the exam,

 4    but it's starting to get far afield now and this is not

 5    anything that was contained in his expert report.

 6            MS. HARRIS:  If I may, your Honor.  First, I would say

 7    we had Dr. Wiesen here -- just to the earlier objection.  We

 8    had Dr. Wiesen running data on the stand.  So I would

 9    respectfully submit that having Dr. Silva reviewing data in

10    response to the assertions made by plaintiffs' experts I think

11    would be appropriate rebuttal testimony.

12            Similarly, since we had such a great deal of testimony

13    about the various abilities that the department had to use

14    different alternative exercises, I think it's entirely

15    appropriate to ask Dr. Silva about his experiences.  I would

16    also note that this was extensively covered in deposition.

17            THE COURT:  That was going to be my question.  It's

18    not recent evidence about -- his experience in Miami is not

19    opinion evidence under 702.

20            MS. HARRIS:  It's fact.

21            THE COURT:  Not the same kind of thing.  So my

22    question was going to be had it been aired in other ways in

23    discovery other than --

24            MS. HARRIS:  Quite candidly, it was extensively gone

25    through at deposition, and my thought was just to get it out

1    before cross in all candor.

2            THE COURT:  The objection is overruled.

3    BY MS. HARRIS:

4    Q.   Dr. Silva, do you know what the cost was when you ran 198

5    candidates through the two-week assessment period that you've

6    described?

7    A.   Well, it's been ten years, and I don't remember the exact

8    cost.  I can estimate it, and there's all kinds of costs

9    besides what we would charge the client.  There's costs for

10   manpower that the client has to -- you know, they have to have

11   staff on hand, typically about five to six staff on hand in

12   addition to my presence at the oral boards.  In addition, they

13   have to reserve rooms and accommodations for the assessors, pay

14   travel, and so forth.  Those are things that are beyond the

15   cost.  But they can -- I would estimate that for that

16   particular process the cost of those things I know was around

17   30 -- probably more than that because it was two weeks.  It

18   could have been around $45,000 for the assessor accommodation

19   and travel.  And then the rooms at the hotel and so forth could

20   have easily added, I'm guessing, say, another 10 to 20,000.  I

21   can't be precise here.  Then our own -- our fees for the

22   process would be in addition to that, and I'm guessing we're

23   looking at -- if we did it today, let's say, for two weeks

24   somebody on site in development and administration of

25   everything, candidate preparation sessions, and so forth, I

1   would say, you know, you're going to be running into probably

2   $125,000 to $150,000 for our services.  So in rough estimation,

3   you know, maybe around 200, 225 to run it today.

4   Q.   For the six or so exercises that you have personally been

5   involved in, can you tell us what result you had from those

6   examinations as it relates to adverse impact?

7        MR. CHURCHILL:  Same objection, your Honor.

8        THE COURT:  Overruled.

9   A.   Well, the results yielded severe adverse impact.  I don't

10  remember the exact numbers, but I could probably tell you and

11  be confident that it was below .4, certainly.  And selection

12  ratios of, say, selecting 30 individuals out of the 100 -- I'm

13  sorry, 330 candidates.  But more importantly, we always looked

14  at the results a variety of ways, and one of the things we did

15  conclude was that adding the assessment center did not enhance

16  the adverse impact in any way.  In fact, if we had used only

17  the written exercise, we would have slightly less adverse

18  impact.

19  Q.   You would have had slightly less?

20  A.   Slightly less.

21  Q.   Switching completely, Dr. Silva, were you involved in any

22  discussions at the Civil Service Commission regarding the use

23  of banding for the 2008 examination process?

24  A.   Yes.  Prior to the hearing the commission asked Dr. Jacobs

25  at our firm for an explanation of what banding was, and I

1  assisted Dr. Jacobs in preparation of that memo.  Later in

2  December, it was just later that year, I believe December 9th

3  or thereabouts of --

4  Q.    2009?

5  A.    -- 2009, I was asked to prepare a statement to read at the

6  banding hearing so that -- to explain banding, essentially what

7  the purpose of banding was and how it was done, so forth.  I

8  attended that hearing and I did present that information to the

9  group that had assembled.

10 Q.    And when you presented information about banding at the

11 Civil Service Commission in December of 2009, were there any

12 other people who presented information to the Civil Service

13 Commission about banding?

14 A.    There was no other formal presentation, but obviously

15 there was a lot of comments from individuals in the audience,

16 which was a fairly big audience.

17        MS. HARRIS:  If I could just have a moment, your

18 Honor, to confer.

19        (Discussion off the record.)

20        MS. HARRIS:  Thank you, your Honor.  I don't have any

21 further questions.

22        MR. LICHTEN:  Your Honor, can I just address this

23 question in the deposition?

24        I asked the Doctor in his deposition, because I took

25 the deposition, if he knew whether there was adverse impact or

 1    not or added adverse impact from the inclusion of these other

 2    components.  And he said in here that he did not know and did

 3    not have figures.

 4            THE COURT:  Classic impeachment.

 5            MR. LICHTEN:  Well, I think it's more serious than

 6    that, your Honor.  If they were going to then have that

 7    information, it should have been disclosed before --

 8            THE COURT:  I think it's an ordinary case.

 9                          CROSS-EXAMINATION

10    BY MR. CHURCHILL:

11    Q.    Good afternoon, Dr. Silva.

12    A.    Good afternoon.

13    Q.    I want to go back initially and talk about your experience

14    at E.B. Jacobs.

15            Now, since 2004 or so, you have focused on public

16    safety projects; is that correct?

17    A.    About 50 percent of the time.

18    Q.    And those have been public safety projects focused on fire

19    and police promotional systems?

20    A.    That's correct.

21    Q.    So you're familiar based on that work with the work of a

22    fire lieutenant?

23    A.    Yes, I am.

24    Q.    And you're familiar with the work of a police sergeant; is

25    that right?

1    A.    Yes, I am.

2    Q.    And wouldn't you agree with me that a police sergeant has

3    substantially more supervisory responsibilities than a fire

4    lieutenant?

5    A.    Direct supervision versus indirect supervision the

6    lieutenant has more direct supervision, a sergeant has less

7    direct supervision.  They tend to work more away from the

8    officers and the officers tend to work more on their own.

9    Whereas with a fire lieutenant the supervision tends to be very

10   direct and more involved.

11   Q.    Have you ever worked out on the street with police

12   sergeants?

13   A.    Have I gone on ride-arounds?

14   Q.    Yes.

15   A.    Yes.

16   Q.    In addition to the Miami test that you described, where

17   you said there was a technical knowledge test that was 40

18   percent and then three oral components that each accounted for

19   20 percent, there was also a letter writing exercise, was there

20   not?

21   A.    Not in 1998.

22   Q.    There was at some point, correct?

23   A.    I believe it was introduced in 2006, perhaps.

24   Q.    And what weight was that letter writing exercise given?

25   A.    I believe that the weights were -- I can't be positive on

1    this, but I think the weights were scaled back to 15 percent

2    apiece.

3    Q.    And now you also have had some involvement with the

4    development of -- some involvement with the sergeant

5    promotional exams for the Pennsylvania state police; is that

6    right?

7    A.    That's correct.

8    Q.    And the components there include a technical knowledge

9    test as one component; is that right?

10   A.    That's correct.

11   Q.    And there's also a component involving incident command;

12   is that right?

13   A.    Yes.

14   Q.    And there's a component involving a subordinate

15   conference?

16   A.    Yes.

17   Q.    Now, in the technical knowledge test that you've been

18   involved with at E.B. Jacobs, you've used both open-book and

19   closed-book questions; is that right?

20   A.    Yes, we have -- in the sergeant's exam we use both open

21   book and close book.

22   Q.    How do you determine what's going to be an open-book

23   question and what's going to be a closed-book question?

24   A.    Basically we talk to incumbents which become our SMEs, and

25   the SMEs, they tell us whether something needs to be known on

1    the spot or if they can take the time to look it up.

2           For example, materials dealing with union rules and

3    things of that sort tend to be materials that they can look up

4    on their own, they don't need to know in the field.  So those

5    aspects we tend to make more open book.

6           Also, sometimes DOJ prefers open-book tests in

7    general, even though we found that open-book tests tend to

8    not --

9    Q.    I think you've answered my question.

10   A.    Okay.

11   Q.    Thank you.

12          Now, you're not aware, based on your work with E.B.

13   Jacobs, of any tests that E.B. Jacobs has done -- and they do

14   work around the country; is that right?

15   A.    Yes, that's right.

16   Q.    In numerous jurisdictions around the country?

17   A.    Yes.

18   Q.    In the police promotional context?

19   A.    Yes.

20   Q.    And you're not aware of any other situation where E.B.

21   Jacobs has used a system that involves solely a technical

22   knowledge test; is that correct?

23   A.    No.  We don't use technical knowledge tests.  We don't

24   recommend them to our clients as a stand-alone product.

25   Q.    Okay.  And in fact, you yourself would definitely

1  recommend that a department use something beyond a job

2  knowledge test; is that right?

3  A.    I would.

4  Q.    And why do you do that?

5  A.    Because it adds to the validity of the process.  And if

6  you can add to the validity, bring more value to the client in

7  terms of the promotion, in addition it's become sort of state

8  of the art, and if you don't do that, then you tend to get

9  legal action against you.  So we tend to recommend to our

10  clients to stay with the state of the art, and if that gets

11  them more validity, it's good both ways.

12  Q.   So it's fair as a general proposition to say that adding

13  components to an exam increases validity; is that right?  As a

14  general proposition?

15  A.    Something -- if it's done in a judicial manner, yes, it

16  typically adds.  If you're measuring new, different abilities

17  with this new component, it should add validity.  And if the

18  new components that you're adding are related to job

19  performance it will add validity, yes.

20  Q.   All right.  I'm showing you a document that's taken from

21  the E.B. Jacobs website.  You recognize this, do you not?

22  A.    I haven't seen it in a long time, but I -- other than at

23  deposition, but I -- yeah, it looks familiar.

24  Q.   Okay.  You've anticipated my next question, that was, you

25  were shown this very document at your deposition.  You see the

1  label down there at the bottom?

2  A.    Yes, I do.

3  Q.    And this part of E.B. Jacobs' website is really focused on

4  law enforcement; is that correct?

5  A.    Yes.

6  Q.    All right.  And just to read what it says there in the top

7  under "Promotional Testing," In today's complex global

8  environment, being an effective leader requires more than

9  knowing the rules and processing the ability to do the job --

10  law enforcement professionals must also process the necessary

11  personal characteristics to succeed at the next level.

12        Did I read that correctly?

13  A.    Other than "processing," yes.

14  Q.    I stand corrected.  Possessing, not processing.

15        And that after that it says, We have provided services

16  for -- and in the bullet point there it says over 2,200

17  candidates for a single job title.  Did I read that correctly?

18  A.    Yes.

19  Q.    And then below it says, Our hallmarks include:  And the

20  first bullet point there says, "Using multiple forms of

21  assessment."  Do you see that?

22  A.    Yes.

23  Q.    And you agree that's one of the hallmarks of E.B. Jacobs?

24  A.    Yes.

25  Q.    And one of the reasons for that, as you just testified, is

1    using multiple forms of assessment tends to increase validity?

2    A.    That's correct.

3    Q.    And the final bullet point there where it says, "Our

4    Hallmarks," says, "Adopting a multi-faceted approach to

5    minimize adverse impact based on subgroup membership."  Did I

6    read that correctly?

7    A.    Yes.

8    Q.    All right.  And then if you go down further on the page,

9    there's a section entitled "Technical Knowledge Test."  Do you

10    see that?

11    A.    Yes.

12    Q.    And it says, "E.B. Jacobs tests include 100 to 150

13    multiple-choice items in closed-book (memorization) and/or

14    open-book (look-up) format to better simulate how information

15    is accessed on the job."  First of all, as a factual matter,

16    you agree that's what E.B. Jacobs does, correct?

17    A.    To some extent, but sometimes with guidance from external

18    forces.  For example, DOJ experts tend to favor everything be

19    open book, so sometimes we do make everything open book.  And

20    so I would say that that's our preference, but we don't always

21    do it that way.

22    Q.    Okay.  And you agree, do you not, with the reason or the

23    justification stated here, which is, that using a closed book

24    or an open book can better simulate how information is accessed

25    on the job?

1   A.   Yes.

2   Q.   On the next page of this exhibit there's a section

3   entitled "Written Work Samples."  Do you see that?

4   A.   I do.

5   Q.   And can you describe generally what -- what written work

6   samples are, what that means in this context?

7   A.   They tend to be not multiple-choice type instruments but

8   rather instruments that simulate how someone might actually

9   work on the job.  So for a sergeant's exam, if you were to

10  create a written work sample, you would perhaps have memos and

11  telephone messages and performance reports, incident reports,

12  and those sort of things that they would have to respond to in

13  writing.  There's no set format or preference that's set up for

14  the candidate to respond.  They have to come up with their

15  responses entirely on their own.

16  Q.   All right.  And in the section describing written work

17  samples, you see there's a box that identifies the illustrative

18  supervisory/managerial abilities assessed.  Do you see that?

19  A.   I see that.

20  Q.   And can you read those six bullet points?

21  A.   Sure.  Written expression, interpersonal relations,

22  information analysis, judgment and decision making, planning

23  and organizing, resource management.

24  Q.   Would you agree that the use of written work samples can

25  capture those abilities, can assess those abilities?

1  A.   Yes.

2  Q.   All right.  And then below that there's a section that

3  talks about oral work samples.  Do you see that?

4  A.   I do.

5  Q.   And can you describe generally what oral work samples

6  means in this context?

7  A.   I've already described that.  I'll refer back to my

8  testimony earlier that described three exercises for Miami

9  sergeant.  The incident command; the tactical, where presented

10  with a situation and asked to respond to that situation in an

11  oral fashion; also, the group meeting exercise with members of

12  the community where you're asked to deal with an incident or an

13  issue in the community; and the subordinate conference exercise

14  where you're asked to meet with a role-playing police officer

15  that has a performance or disciplinary issue.  Those would be

16  fairly typical examples of oral board exercises.

17  Q.   And you see, again, there's a box in that section that

18  identifies the illustrative supervisory/managerial abilities

19  assessed.  Do you see that?

20  A.   I see that.

21  Q.   And can you read the six bullet points the abilities that

22  are expressed?

23  A.   Certainly.  Oral expression, interpersonal relation,

24  information analysis, judgment and decision making, planning

25  and organizing, and resource management.

1  Q.   And would you agree, based on your experience, that those

2  particular abilities can be assessed through oral work samples?

3  A.   With relation to the types of exercise that I talked about

4  earlier I would not say that tactical exercise can assess

5  interpersonal relations, but other than that I would say yes.

6  Q.   All right.  The next section talks about career review

7  boards.  Do you see that?

8  A.   I do.

9  Q.   And can you describe generally what a career review board

10  is?

11  A.   It basically -- a candidate provides information to a

12  board and they compose this information themselves, they can

13  have information about their performance, about their

14  education, about training, anything, any awards, or any kind of

15  information that pertains to their career as a police officer,

16  in this case, and the panel would then assign points to the

17  individual's performance in relation to these areas.

18  Q.   All right.  And again, in this section there's a box that

19  identifies illustrative personal characteristics.  Do you see

20  that?

21  A.   I do.

22  Q.   And can you read those six bullet points?

23  A.   Motivation, initiative, attention to duty, adaptability,

24  professional development, supervisory readiness.

25  Q.   And these are the types of personal characteristics that

1    can be assessed, at least in part, using these types of review

2    boards; is that right?

3    A.    Yes.

4    Q.    Now, are you familiar with a term "the diversity of

5    validity dilemma"?

6    A.    Not familiar with that particular term, no.

7    Q.    Okay.  Are you familiar with the general concept of a

8    diversity validity dilemma?

9    A.    You mean a tradeoff?

10    Q.    That works.  Yes.

11    A.    Yes, I'm familiar --

12    Q.    What is the tradeoff?

13    A.    It's not necessarily present.  The idea is that -- what

14    the concept stands for is that when you increase validity, you

15    tend to lower adverse impact -- I'm sorry, tend to increase --

16    when you increase validity, you tend to increase adverse

17    impact -- lower adverse impact, sorry.  And that doesn't always

18    occur.  There's different schools of that.  You can actually go

19    both ways.  It can be inverse and it can be positive related.

20    Q.    Okay.  Let me stop you there for a second.

21          The reason I use that term is this is an article that

22    you co-authored; is that correct?

23    A.    Yes.

24    Q.    And this is something that came out in 2010, 2009?

25    A.    Yes, 2010, I believe.

1    Q.    And if you look at the bottom of the second paragraph

2    there, you and your co-authors use this term, "the diversity

3    validity dilemma"?

4    A.    Okay, yes.

5    Q.    And so an example of that is a job knowledge test might

6    have a high predictive value but it also is known to have high

7    levels of adverse impact against minorities; is that correct?

8    A.    That's correct.

9    Q.    Just to make sure that we're on the same page in terms of

10   validity and what that means, one meaning or understanding of

11   validity is in terms of a validity coefficient; is that right?

12   A.    That's correct.

13   Q.    But another meaning of validity is validity in terms of a

14   process, such as content validity?

15   A.    That's correct.

16   Q.    And content validity, for example, is the type of validity

17   that's discussed in the Uniform Guidelines?

18   A.    Yes.

19   Q.    And content validity generally -- I know there's been a

20   lot of testimony on this, but just to give you your chance --

21   requires a process of identifying critical KSAs; is that right?

22   A.    That's right.

23   Q.    And then weighing their importance?

24   A.    True.

25   Q.    And then linking them to a testing process that reflects

1    those weights?

2    A.   With respect to those KSAs in proportion to those weights.

3    Q.   Okay.  And that's obviously generalizing, simplifying, but

4    that's a general description of the process of content

5    validity.  Would you agree with that?

6    A.   Yes, I agree.

7    Q.   All right.  Now you have not opined in this case about the

8    validity of the exams that are at issue; is that right?

9    A.   That's correct.

10   Q.   Now, one -- one expected effect of adding components, as

11   you said a few minutes ago, is you're generally going to

12   increase validity.  So, for example, if you add components to a

13   written job knowledge test, that's going to increase the

14   validity of that test; is that right?

15   A.   Yes, typically it should.  I mean, in theory it should.

16   Q.   And that's true both with respect to both of those ideas

17   of validity, the validity coefficient and content validity.  Do

18   you agree with that?

19   A.   Yes.  Theoretically we do use content validity but it's

20   not possible to do an empirical study using numbers.  But if we

21   were to follow it up with an empirical study, we would

22   hopefully find that individuals who scored well on this content

23   valid test would also show higher performance on the job.

24   Q.   You certainly agreed that adding components increases

25   content validity?

1    A.   That's the whole logic behind content validity is if you

2    can include components that target more KSAs that are present

3    in the job analysis, that you should increase the validity of

4    the process.

5    Q.   So looking at police sergeants, for example, if

6    situational judgment, command presence, supervisory ability,

7    and things like that were important attributes for a police

8    sergeant, you would want to test for them because you'd want to

9    get as much coverage as possible of those KSAs; is that right?

10   A.   To maximize the validity I would include as many things as

11   are practically feasible, yes.

12   Q.   And you would agree that in terms of police officers,

13   there are things aside from cognitive abilities or knowledge

14   that are important for success in that profession to serve as a

15   police officer?

16   A.   Could you ask it again?  I'm sorry.

17   Q.   Sure.  You would agree that for police officers, that

18   success in that position requires more than simply job

19   knowledge?

20   A.   Absolutely.

21   Q.   And successful police officers must have the ability to

22   listen to others, to provide oral communication to a wide range

23   in audience of individuals, and to act empathetically toward

24   the public they serve.  You would agree with that?

25   A.   Yes.  That's true of many things, yes.

1    Q.   And you would agree with me that for a police sergeant

2    there's even a broader range of skills that need -- and

3    characteristics that need to be satisfied in order to perform

4    well in that position?

5    A.   As compared to?

6    Q.   To just a police officer.

7    A.   Yes, it requires some new skills.

8    Q.   All right.  You're familiar with the concept of the

9    measure of D, are you not?

10   A.   Yes.

11   Q.   And can you explain what the measure of D is in I/O

12   psychology?

13   A.    D is essentially a standardized difference between two

14   scores.  So if you, for example, find that test scores, say --

15   I think the example that I heard earlier was that the D for the

16   assessment center in Boston was .26.  So that means that

17   there's about a quarter of a standard deviation difference

18   between minorities and non-minorities on the assessment center.

19   So that minorities score about a quarter of a standard

20   deviation lower on the assessment center compared to

21   non-minorities.

22   Q.   So just so we understand the idea of D, a D of zero means

23   there's no difference between subgroups; is that right?

24   A.   That's correct.

25   Q.   And a D of 1 means there's one standard deviation

1  difference?

2  A.    That's correct.

3  Q.    And I/O psychologists typically focus on mean score

4  differences, or D, which is a standardized mean score

5  difference --

6  A.    Yes.

7  Q.    -- when addressing adverse impact?

8  A.    Yes.

9  Q.    Would you agree with that?

10  A.    Not with addressing adverse impact.  Adverse impact is

11  about promotions, not about passing a test.  So, no, I wouldn't

12  agree with that.  It's not technically correct.

13  Q.    Okay.  Well, let me show you an article that's come up in

14  this case.  This is a chapter, I believe, entitled "A Theory of

15  Adverse Impact" by James Outtz and Daniel Newman.  And you're

16  familiar with both of those individuals, are you not?

17  A.    I'm familiar with Jim, with Dr. Outtz.

18  Q.    With Dr. Outtz.

19        And directing your attention to the bottom part of

20  that paragraph, what they say here is, "Most of the I/O

21  psychology literature addressing adverse impact has focused on

22  documenting the magnitude of subgroup differences on specific

23  assessment devices."  Do you agree with that?

24  A.    Yes, I agree with that.  It doesn't state what you stated

25  earlier, though.

1    Q.   Well, I'm asking you if you agreed with this statement?

2    A.   I agree with that statement, yes.

3    Q.   And you understand that Dr. Outtz is -- has written a

4    number of articles in the field of I/O psychology?

5    A.   Yes.

6    Q.   And you have not made it a focus of your career to publish

7    widely in this field; is that fair to say?

8    A.   That's fair to say.

9    Q.   Now, one advantage of looking at mean score differences,

10   unlike with selection ratios, is you're looking at a bigger set

11   of data.  Would you agree with that?

12   A.   I'm sorry, say that again?

13   Q.   One of the advantages of looking at mean score differences

14   as opposed to a selection ratio is you're looking at bigger

15   sets of data?

16   A.   What do you mean by mean square differences?

17   Q.   Mean score differences.

18   A.   I'm sorry.  Just repeat it again because I misunderstood.

19   Q.   One of the advantages of looking at mean score differences

20   or D is that you're looking at a bigger set of data?

21   A.   Not necessarily.  D can be computed on a data set with two

22   individuals.

23   Q.   One of the problems with looking at selection ratios is

24   you're looking at a limited set of data, you agree with that?

25   A.   You're looking at the entire data set.

1    Q.    So you've never opined before that one of the problems of

2    looking at selection ratios is that you're looking at small

3    sets of data?

4    A.    No, not that I'm aware.

5    Q.    Didn't you testify earlier today that when you're looking

6    at selection ratios, which are what you term AI ratios, that

7    that is impacted by small selection rates?

8    A.    I said it was -- the finding of AI is impacted by small

9    selection -- I'm sorry, small sample size.

10   Q.    But a selection ratio doesn't look at the scores of an

11   entire population; is that correct?

12   A.    No, it does.  It includes every single individual.  The

13   proportion is computed based on the individuals.

14   Q.    But it doesn't --

15   A.    All the individuals in the data set.

16   Q.    But it doesn't look at their scores, does it?

17   A.    No, but -- it doesn't look at their scores, it looks at

18   their scores to make a decision who's at the top of the list,

19   uses their score to see who's at the top.

20   Q.    My question is a simple one, I think, which is:  When

21   you're looking at selection ratios, you're not taking into

22   account the scores that different subgroups have received?

23   A.    No -- no, I mean, with small selection ratios the average

24   scores tend to have lesser impact because it just -- who's at

25   the very top of the list is who gets promoted.  So it tends to

1    have much less impact.  A mean score difference is talking

2    about the entire distribution.  When you're looking at

3    promotion, you're really just focusing on a small subset of

4    individuals atop that distribution.  So you can have -- you can

5    have a very large difference or a small or large difference in

6    the overall comparison and still find no adverse impact at the

7    top of the list because you just have those individuals.  So

8    what's important to focus on is those individuals at the top of

9    the list, not of the entire distribution of the scores.

10   Q.   Okay.  I think in your answer you just said what I was

11   asking you about, which is, when you look at mean score

12   differences, you're looking at the entire distribution; is that

13   right?

14   A.   That's right.

15   Q.   So you're looking at all the data; is that fair to say?

16   In terms of scores?

17   A.   You're always looking at all the data.  It's just that

18   what impacts promotion rates is only those individuals at the

19   top of the list.

20   Q.   Now, isn't it fair to say that one of the things that

21   affects selection ratios are mean score differences?

22   A.   Mean score differences can have an impact on adverse

23   impact --

24   Q.   Okay.  That's my question.

25   A.   -- in large data sets.

1    Q.   And that's just consistent with common sense, isn't it?

2    Because a mean score difference -- if you have a lower -- if

3    you're in a group with a lower mean score, that means you're

4    less likely to get promoted just as a general statement.  Would

5    you agree with that?

6    A.   If you have a lower score?  Yeah, of course.

7    Q.   If you're in a group that has lower scores, you're less

8    likely to get promoted?

9    A.   In a small data set, not necessarily.

10   Q.   I'm asking about any kind of data set.

11   A.   Well, there's a distinction.

12   Q.   If you're in a group with lower mean scores, then you're

13   less likely, as a general rule, to get promoted; isn't that

14   fair to say?

15   A.   In a small data set that's not necessarily true.

16   Q.   Okay.  So let me just use a hypothetical.  If I told you

17   that you have a 90 percent chance -- you could be in one of two

18   groups, you could be in a group of two that has a 90 percent

19   chance of winning a thousand dollars or you could be in a group

20   of two that has a 95 percent chance of winning a thousand

21   dollars, which group would you want to be in?

22   A.   Well, I would want to know the conditional probability in

23   terms which I'm actually selecting from, not the entire ranges.

24   If I'm dealing with very large data sets --

25   Q.   Just answer my question.

1  A.   Again, I would say that if you have large data sets, I

2  would agree completely with you.

3  Q.   I'm not asking about large data sets.  I'm asking if you

4  could be in a group of two people, one group in a 90 percent

5  chance of winning a thousand dollars and one had a 95 percent

6  chance, which group would you be in?

7          MS. ENGDAHL:  Your Honor, I'm going to object.

8  A.   That's a simple answer, you don't need an expert --

9          THE COURT:  Dr. Silva, you have to wait.

10          MS. ENGDAHL:  I object to the form of the question.  I

11  just think the question makes no sense.  And I don't understand

12  the relevance of it, if you're in a group -- I would object as

13  to the form.

14          THE COURT:  Overruled.  Put the question.

15  BY MR. CHURCHILL:

16  Q.   Let me ask it again.

17  A.   Okay.

18  Q.   If you had the chance to be in a group of two where you

19  had a 90 percent chance of winning a thousand dollars or you

20  had a group -- the choice to be in a another group where you

21  had a 95 percent chance to win a thousand dollars, which group

22  would you want to be in?

23  A.   I'd be in the 95 percent group.

24  Q.   Why?

25  A.   Because if that's the only information I have, I want to

1    be in the group that has the higher percentage.

2    Q.   So if you were a black police officer or you're a white

3    police officer -- or if you had a choice to be in a group of

4    black police officers or a group of white police officers and

5    you knew you that black police officers had lower mean scores

6    in terms of promotion, which group would you want to be in?

7    A.   In terms of the mean average performance?

8           MS. ENGDAHL:  Objection.

9           THE COURT:  Sustained.

10   A.   I don't know that we really have enough information to

11   decide on that.

12          THE COURT:  Dr. Silva, we have a ground rule here.  If

13   there's an objection, you have to wait for the ruling.

14          THE WITNESS:  I didn't see her.  I'm sorry.

15          THE COURT:  The objection is sustained.

16   BY MR. CHURCHILL:

17   Q.   Let me ask a more general question, Dr. Silva.  How do

18   mean score differences affect a minority's chances of

19   promotion?

20   A.   I'm sorry, a mean score difference?

21          MS. HARRIS:  I'll object.

22          THE COURT:  Sustained.

23   BY MR. CHURCHILL:

24   Q.   You would agree with me, would you not, that in addition

25   to -- well, when you add components to a job knowledge test,

1    one of the effects that you achieve generally is to increase

2    validity.  You've already testified to that.

3    A.    Yes.

4    Q.    Do you agree with that?  And another effect that you will

5    achieve is to reduce mean score differences?  Do you agree with

6    that?

7    A.    Typically, yes.  You do reduce the mean score differences

8    between minorities and non-minorities.

9    Q.    When you use the term "adverse impact" -- I think you

10   testified about this earlier today -- you use that term to

11   focus solely on selection rates; is that right?

12   A.    That's the way it's used, yes.

13   Q.    And so in this case you didn't even look at mean score

14   differences; is that correct?

15   A.    No.  With these small samples, mean score differences have

16   little relevance, especially in the context of both small

17   samples and small selection ratios.  They don't really matter

18   too much.

19   Q.    My question was whether or not you looked at mean score --

20   A.    No, I did not look at them.

21   Q.    In fact, based on your use of the term "adverse impact,"

22   even if there were no mean score differences, even if there

23   were no underlying difference in scores, you would find adverse

24   impact if the selection ratio happened to end up that whites

25   were promoted at a higher rate than blacks; isn't that fair to

1   say?

2   A.   I'm not understanding your question.  I'm sorry.

3   Q.   I'm just making a distinction -- I'm trying to understand

4   how you understand and use the term "adverse impact."  So when

5   you use that term, you're focusing solely on selection ratios;

6   is that correct?

7   A.   That's correct.

8   Q.   So if there were a situation where there was no underlying

9   difference in test scores, so there was no mean score

10  difference between one subgroup and another, that wouldn't

11  concern you in terms of an adverse impact analysis, is that

12  what you're saying, that you're looking solely at the selection

13  ratios?

14  A.   Well, the purpose of -- I think you're referring to the

15  analysis in the tables that I did; is that correct?

16  Q.   No, I'm just trying to understand how you use the term and

17  understand the term "adverse impact."

18  A.   I use the term "adverse impact" as it's simply a

19  proportion of two ratios to promotion rates.

20  Q.   When you use that term, you don't concern yourself with

21  mean score differences?

22  A.   There's no need to.

23  Q.   My question is --

24  A.   I don't.  With larger data sets I would, like Boston, for

25  example.  But given that there was significance there didn't

1    seem to be any issue to concern with myself with it.  All the

2    other data sets were below a hundred, which the guidelines

3    implicitly define that as small sample.  So in small samples

4    things can go either way based on just the idiosyncratic events

5    in the data set.

6    Q.    Did I hear you correctly that you just said you would look

7    at mean score differences with larger data sets?

8    A.    If there was no significant difference in the AI ratio, I

9    would take a look at it because it is a fairly large data set

10   and I could ascribe that there would be some degree of

11   stability in those differences.

12   Q.    Okay.

13   A.    They would have an impact on the data, on the promotion

14   data in that case.

15   Q.    Okay.  Just to be clear.  You would agree that when the

16   sample size gets large enough, like it is for Boston, that it's

17   appropriate to look at mean score differences when assessing

18   adverse impact?

19   A.    Yes.

20   Q.    Now, you talked before about false positives and false

21   negatives, also known as Type 1 and Type 2 errors, and I'm not

22   going to try to figure out which one is which.  But when you

23   describe false positive, what you're saying there is an AI

24   analysis, a ratio analysis, suggests that there's some type of

25   adverse impact but that in reality there's no difference,

1   there's no group difference between two different groups?

2   A.    There's no reason to believe that the adverse impact would

3   occur, but it does occur simply because of idiosyncratic

4   behavior of small samples.

5   Q.    Right.  But when you say the falseness of the positive is

6   that there's no underlying difference, so you get an AI that

7   suggests that there's a problem, but if you look deeper in the

8   data, if you had the ability to look deeper in the data, you

9   would see there's really no difference between the subgroups;

10  is that right?

11  A.    That's correct.

12  Q.    And that a false negative is if there really is a

13  difference between the subgroups, you get a ratio that suggests

14  there's no problem; is that correct?

15  A.    Well, with small samples --

16  Q.    I'm just asking about what you mean by false --

17  A.    I can't really answer your question unless I differentiate

18  between small samples and large samples.  Do you want my

19  answer?  I can give it to you, but I have to differentiate

20  between the two because they're different answers.

21  Q.    Let me ask you this.  When you say "false negative," what

22  you mean generally is that an AI --

23  A.    You mean false positive.

24  Q.    I'm talking about false negative.  A false negative means

25  that an AI ratio indicates that there's no problem, there's no

1    adverse impact but that in reality there is some underlying

2    difference?

3    A.    Right.

4    Q.    That's what a false negative is?

5    A.    That's a false negative.

6    Q.    Okay.  And when you talk about there being in reality an

7    underlying difference, one of those real underlying differences

8    are mean score differences between different groups; is that

9    right?

10    A.    Right.

11    Q.    Now, I assume that you don't consider yourself to be an

12    expert on the law in terms of how adverse impact is defined

13    legally; is that fair to say?

14    A.    Yes.

15    Q.    And you're not familiar with the case law talking about

16    how disparate impact is or should be defined?

17    A.    No.  I haven't been involved in any of that case law, no.

18    Q.    And your understanding, if I understand correctly, of the

19    meaning of adverse impact is taken from your reading of the

20    Uniform Guidelines?

21    A.    That's correct.

22    Q.    And so you read the Uniform Guidelines to say that when

23    you talk about adverse impact, all you're talking about are

24    selection ratios?

25    A.    That's correct.

1    Q.    I'm going to show you -- this is another article by

2    Dr. Outtz, or Jim, as you call him --

3    A.    May I qualify that last thing?  The adverse impact ratio

4    is applicable only to the promotion rates.  Adverse impact can

5    be observed in means as well, but it's -- it's a different

6    concept than at that point we're not looking at a point A

7    criteria.

8    Q.    Okay.  I think you're actually getting to exactly what I

9    was about to ask you about.

10   A.    Okay.

11   Q.    So this is an article by Dr. Outtz, or chapter by

12   Dr. Outtz called "Testing Medium, Validity and Test

13   Performance."  Are you familiar with this article?

14   A.    No, I'm not.

15   Q.    You're familiar with Dr. Outtz, are you not?

16   A.    I am.

17   Q.    In this article -- I'm directing your attention to the

18   part with the Post-It note next to it.

19   A.    Right.

20   Q.    He says, "According to the Uniform Guidelines, a test or

21   selection procedure has adverse impact if test scores of

22   applicants who are members of a protected class are

23   (statistically) significantly lower than those of non-minority

24   applicants, or if the selection rate for such applicants is

25   less than 80 percent of the selection rate for non-minority

1    applicants.  If either condition exists, an employer must

2    provide validity evidence to substantiate the appropriateness

3    of the test."  Did I read that correctly?

4    A.   Yes.

5    Q.   And are you saying that you disagree with Dr. Outtz about

6    what the Uniform Guidelines mean?

7            MR. PIKULA:  Objection.  It's not whether he agrees or

8    disagrees with Dr. Outtz about it, it's irrelevant, your Honor.

9            THE COURT:  Overruled.

10           MR. PIKULA:  Dr. Outtz was here and testified.

11           THE COURT:  Overruled.  You may answer that question.

12   A.   I think we have a different -- I think it's partly

13   terminology.  Yes, there is a statistically significant

14   difference between the groups that the groups are performing at

15   a different level.  And if the groups are performing at a

16   different level, you may have to justify it, especially in very

17   large samples where there is statistical significance to those

18   differences.  So I generally would agree with that statement.

19   Q.   All right.  And the Uniform Guidelines also has a question

20   and answer section that goes along with them.

21   A.   Yes.

22   Q.   Do you agree with that?  In fact, I think you talked

23   earlier about Question 21, one of the questions in there?

24   A.   Yes.

25   Q.   So I want to focus your attention on question 26 in the

1  Uniform Guidelines in the question and answers.  And the

2  question is:  "Does the bottom line concept of section 4C apply

3  to the administrative processing of charges of discrimination

4  filed with an issuing agency, alleging that a specific

5  selection procedure is discriminatory?"

6           And the answer reads:  "No.  The bottom line concept

7  applies only to enforcement actions as defined in section 16 of

8  the guidelines.  Enforcement actions include only court

9  enforcement actions and other similar proceedings as defined in

10  section 16I.  The EEOC administrative processing of charges of

11  discrimination (investigation, finding of reasonable cause/no

12  cause, and conciliation) required by section 706(b) of Title

13  VII are specifically exempted from the bottom line concept by

14  the definition of an enforcement action.  The bottom line

15  concept is a result of a decision by the various enforcement

16  agencies that, as a matter of prosecutorial discretion, they

17  will devote their limited enforcement resources to the most

18  serious offenders of equal employment opportunity laws."

19           And did I read that correctly?

20  A.   I think so.

21  Q.   And then it goes on to say, "Since the concept is not a

22  rule of law, it does not affect the discharge by the EEOC of

23  its statutory responsibilities to investigate charges of

24  discrimination, render an administrative finding on its

25  investigation, and engage in voluntary conciliation efforts."

1          And just for completeness, I'll read the final

2    sentence.  "Similarly, with respect to the other issuing

3    agencies, the bottom line concept applies not to the processing

4    of individual charges, but to the initiation of enforcement

5    action."

6          And did I read that correctly?

7    A.   I believe so.

8    Q.   And finally -- I think you testified before that you are

9    unaware of what the law provides in terms of bottom line tests

10   and what effect they have on disparate impact cases?

11   A.   I mean, I know I'm familiar with some of the cases that

12   have been decided, but I wouldn't say I'm a lawyer and that I

13   would, you know, put my opinion over yours per se.

14   Q.   You don't have to do that.  All right.  Well, are you

15   aware that the Supreme Court -- what rulings the Supreme Court

16   has issued with respect to bottom line differences?

17   A.   I believe one of the cases is the Connecticut v. Teal.

18   Q.   You're aware of that case, the court in that case ruled

19   that bottom line outcomes are not a defense to disparate impact

20   issues.  Were you aware of that?

21   A.   Yes.

22   Q.   All right.  In terms of the effect on adverse impact --

23   and right now I'm using your concept of adverse impact, which

24   is simply the selection ratio -- it's been shown that adding

25   components can reduce adverse impact.  Do you agree with that?

1   A.   Yes, sometimes it does.

2   Q.   All right.  And it does that in addition to adding to

3   validity, correct?

4   A.   Yes.

5        MR. CHURCHILL:  Your Honor, I'm about to get into a

6   separate line, so should we break since obviously we have to

7   continue on to tomorrow?

8        THE COURT:  That's fine.  If you're about to start a

9   new area, it's five minutes to 1:00, we might as well adjourn

10  at this point and resume tomorrow morning at 9:00.  See you

11  then.

12       THE CLERK:  All rise.  Court is in recess.

13       (Court adjourned at 12:55 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          We, Marcia G. Patrisso, RMR, CRR, and Debra M. Joyce,

4    RMR, CRR, Official Reporters of the United States District

5    Court, do hereby certify that the foregoing transcript

6    constitutes, to the best of our skill and ability, a true and

7    accurate transcription of our stenotype notes taken in the

8    matter of Civil Action No. 07-11693-GAO, Pedro Lopez, et al, v.

9    City of Lawrence, et al.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13
     /s/ Debra M. Joyce
14   DEBRA M. JOYCE, RMR, CRR
     Official Court Reporter
15

16   Dated: September 16, 2010

17

18

19

20

21

22

23

24

25