UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


PEDRO LOPEZ, Individually and on )
behalf of a class of individuals )
similarly situated, )
                      )
        Plaintiffs, )
                      ) Civil Action
v. ) No. 07-11693-GAO
                      )
CITY OF LAWRENCE, et al., )
                      )
        Defendants. )
                      )


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**DAY EIGHTEEN**
**<u>NON-JURY TRIAL</u>**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Friday, September 17, 2010
9:07 a.m.


Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1    APPEARANCES:

2        LICHTEN & LISS-RIORDAN, P.C.
         By: Harold L. Lichten, Esq.
3            Stephen S. Churchill, Esq.
             Joseph L. Sulman, Esq.
4        100 Cambridge Street, 20th Floor
         Boston, Massachusetts  02114
5        On Behalf of the Plaintiffs

6        CITY OF LOWELL LAW DEPARTMENT
         By: Brian W. Leahey, Esq.
7        City Hall
         375 Merrimack Street
8        Lowell, Massachusetts  01852
         On Behalf of the Defendant City of Lowell
9
         OFFICE OF THE CITY ATTORNEY
10       By: Richard J. D'Agostino, Esq.
         200 Common Street, Suite 306
11       Lawrence, Massachusetts  01840
         On Behalf of the Defendant City of Lawrence
12
         COLLINS, LOUGHRAN & PELOQUIN
13       By: Laurie W. Engdahl, Esq.
         320 Norwood Park South
14       Norwood, Massachusetts  02062
         On Behalf of the Defendant City of Worcester
15
         MORGAN, BROWN & JOY, LLP
16       By: Mary Jo Harris, Esq.
             Robert P. Morris, Esq.
17       200 State Street, 11th Floor
         Boston, Massachusetts  02109
18       On Behalf of the Defendant City of Boston

19       MBTA LAW DEPARTMENT
         By: Kevin S. McDermott, Esq.
20       10 Park Plaza, 7th Floor
         Boston, Massachusetts  02116
21       On Behalf of the Defendant MBTA

22

23

24

25

```
1        CITY OF SPRINGFIELD LAW DEPARTMENT
         By: Harry P. Carroll, Esq.
2        36 Court Street
         Springfield, Massachusetts  01103
3        On Behalf of the Defendants City of Springfield
         and Mayor Sarno
4
         CITY OF METHUEN - OFFICE OF THE CITY SOLICITOR
5        By: Peter J. McQuillan, Esq.
         The Searles Building, Suite 311
6        41 Pleasant Street
         Methuen, Massachusetts  01844
7        On Behalf of the Defendant City of Methuen

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                              I N D E X

 2                          Direct  Cross  Redirect  Recross

 3   WITNESSES FOR THE
       DEFENSE:
 4
     JACINTO MANUEL SILVA
 5
         By Mr. Churchill (cont'd)      5              72
 6       By Ms. Engdahl                        48
         By Mr. Carroll                                 56,75
 7       By Mr. Leahey                                  58
         By Ms. Harris                                  60
 8

 9                          E X H I B I T S

10
     PLAINTIFFS'
11     EXHIBIT    DESCRIPTION              MARKED RECEIVED

12
     No. 202  Spreadsheet with Miami test data    74
13

14   DEFENDANTS'
       EXHIBIT
15
     No. 201  Spreadsheet with reweighed data for
16            Boston - 2002                             72

17   No. 204  Lowell exhibit                    82

18

19

20

21

22

23

24

25
```

```
 1                      P R O C E E D I N G S

 2              THE CLERK:  All rise.

 3              (The Court enters the courtroom at 9:07 a.m.)

 4              THE CLERK:  For a continuation of the Lopez trial.

 5   Please be seated.

 6              COUNSEL IN UNISON:  Good morning, your Honor.

 7              THE COURT:  Good morning.

 8              MR. CHURCHILL:  Good morning, your Honor.

 9                   CONTINUED CROSS-EXAMINATION

10   BY MR. CHURCHILL:

11   Q.   Good morning, Dr. Silva.

12   A.   Good morning.

13   Q.   You recall yesterday I asked you a question early on if

14   you would agree with me that a police sergeant has

15   substantially more supervisory responsibilities than a fire

16   lieutenant; do you recall that?

17   A.   Yes.

18   Q.   All right.  And I believe that you didn't agree with me?

19   At least that's how I understood the testimony.

20        I want to go to your deposition transcript.  Do you recall

21   you were deposed in June of this year by Attorney Lichten?

22   A.   Yes.

23   Q.   I just want to see if you can help me understand your

24   testimony here.  So if you'd go to page 16, starting at line

25   16, and I'll just read along there.  The question is:  "We'll
```

1    get to the police sergeant in a minute, but let's just stick

2    for a minute with the fire lieutenant."  And the answer:

3    "Police lieutenant?

4         "QUESTION:  I'm actually asking about fire lieutenant.

5         "ANSWER:  Oh, okay.

6         "QUESTION:  Would you agree with me that the closest

7    rank in a fire department to a police sergeant would be a fire

8    lieutenant because there's no fire sergeant?"

9         And then going to the next page, there's an objection,

10   then the answer.  "It's a very different type of job.  It's not

11   as much of a supervisory job.  A lieutenant's job is really a

12   firefighter who has more experience in terms of EMT activities,

13   so it's not quite the same, but -- you know, 'cause of the

14   supervisory aspect of it."

15        And then a few minutes later, here on page 21,

16   starting at line 18, the question is:  "So if I understand your

17   answer, for the fire lieutenant's exam, it's a 125-question

18   open-and-closed book exam.  Those -- the test results are then

19   scored in rank order, and that's how selections are made?

20        "ANSWER:  That's my understanding of it.

21        "QUESTION:  And the only other addition to the scoring

22   is seniority?

23        "ANSWER:  Yes, seniority is added at the end of the

24   process, and it's 20 percent.

25        "QUESTION:  And as I understand it, that was not based

1  on your recommendation, this test, it was based upon a contract

2  between the city and the union?

3           "ANSWER:  I believe so.

4           "QUESTION:  Do you recall if you made recommendations

5  to have a different format or other components of the

6  examination?

7           "ANSWER:  For lieutenant, we typically recommend for

8  validity purposes that we include additional components.  But

9  for the -- for this particular exam, which is the much more

10 technical, non-supervisory, it's not really necessary.  But if

11 it's a sergeant's exam, I would definitely recommend that for

12 validity purposes."

13          And I just wanted to clarify what you meant by this

14 testimony.  Were you saying in this testimony that, in fact,

15 police sergeants do have greater supervisory responsibilities

16 than fire lieutenants?

17 A.   Well, I think we're -- there's two types of supervisory

18 activities.  For sergeants, they're usually further removed

19 from the situation or incidents that are occurring.  So for a

20 sergeant's exam, the types of supervisory skills that we're

21 looking for are different.

22      For a lieutenant's exam, we would focus more on on-site

23 supervisory activities.  A lieutenant's exam -- what's in a

24 fire lieutenant's job when they go on a call, most of the calls

25 are EMT related, so they're usually in the rescue unit.  And so

1     they have very direct supervisory activities within that unit.

2     So if they reach an incident scene, someone is hurt, they have

3     to provide medical services.

4         The lieutenant supervises -- there's usually two

5     additional EMTs that are on-site with them, so any medical

6     procedures or any activities that are performed by the

7     lower-ranking individuals on the scene are supervised by the

8     lieutenant.  So it's a different type of supervisory activity

9     but it's more frequent in terms of the -- when it occurs and

10    how directly it occurs.

11        So in terms of -- what I said yesterday was that the fire

12    lieutenant tends to be more on-site providing supervisory

13    activity in a direct fashion all the time, whereas a police

14    sergeant is more back at the headquarters.  And they go out on

15    some incidents, but only on critical incidents, and they

16    basically supervise from their desk.  So that the type of

17    direct supervisory experience provided -- I mean, activities

18    provided by police sergeants are less.

19    BY MR. CHURCHILL:

20    Q.   Okay.  Have you studied the role of police sergeants in

21    Massachusetts?

22    A.   Not specifically, no.

23    Q.   Okay.  And are you aware that police sergeants actually go

24    out on patrol?

25    A.   Well, they do in other places as well.

1    Q.    Okay.  And you're aware that when there are critical

2    incidents a police sergeant has to be there and provide direct

3    supervision.  You understand that?

4    A.    Yes.

5    Q.    I'm putting up here a document.  And it indicates

6    "Prepared by EB Jacobs," and it indicates "For the Cleveland

7    Division of Police - Candidate Preparation Guide for the 2008

8    Promotion to Sergeant Examination."

9         Is this the kind of candidate preparation guide that EB

10   Jacobs prepares?

11   A.    Yes.

12   Q.    All right.  And this is done after a job analysis has been

13   performed?

14   A.    Usually.

15   Q.    All right.  Well, this suggests that a test is being

16   given, a promotional test; is that right?

17   A.    Yes.  It looks like that, yes.

18   Q.    And you wouldn't give a promotional test without having

19   done a job analysis, right?

20   A.    It would have been done by others prior to our

21   involvement; yes.

22   Q.    And if you direct --

23        MS. HARRIS:  Your Honor, I'm going to object to this

24   document because the prior testimony of Dr. Silva is that he

25   had no involvement whatsoever in the Cleveland Police

1    Department testing process at deposition.

2            THE COURT:  Well, what do you propose to use the

3    document for?  What's the --

4            MR. CHURCHILL:  To really compare the attributes that

5    are tested based on EB Jacobs' work for police sergeants versus

6    fire lieutenants.

7            MS. HARRIS:  I'll renew my objection.  I don't see how

8    it's relevant.

9            THE COURT:  Yeah, I guess in light of the objection,

10   we'll have to have some foundation.

11           MR. CHURCHILL:  Okay.

12   BY MR. CHURCHILL:

13   Q.   Dr. Jacobs, you testified earlier that you've done a lot

14   of work in Miami; is that right?

15   A.   Dr. Silva?  Yes.

16   Q.   I'm sorry.  And you also have been involved in -- or

17   participated in some ways with the promotional exams done in

18   other jurisdictions that EB Jacobs works in; is that right?

19   A.   More from an analytical perspective than a job analysis or

20   design or, you know, implementation of the test itself.

21   Q.   Okay.  And I think you testified yesterday that EB Jacobs

22   has, to your knowledge, never used a police sergeant

23   promotional exam that includes only a written job-knowledge

24   test; is that right?

25   A.   As far as I know, that's correct.

1   Q.   All right.  And in terms of the -- let me ask it this way:

2   When you go and provide services in connection with different

3   jurisdictions, do you rely on the work that's been done by

4   other EB Jacobs personnel?

5   A.   Yes.

6   Q.   And you're aware that EB Jacobs has -- does a promotional

7   exam for sergeants in Cleveland?

8   A.   For police?

9   Q.   Yes.

10   A.   I wasn't aware of it.  I know we do fire.  But I'm sure we

11   do police as well, since you have that up there.

12   Q.   Okay.  Do you have any reason to doubt the accuracy of

13   this document, that it's something prepared by EB Jacobs in

14   connection with the Cleveland Police Department?

15   A.   It looks like our format, yes.

16          MR. CHURCHILL:  Your Honor, I guess I'd proceed to ask

17   him questions about what's in there.

18          MS. HARRIS:  I'll press the objection, your Honor.  I

19   think it's attenuated.  I don't think it's relevant to the

20   issues that --

21          THE COURT:  I'm not sure what the relevance is, but

22   I'll permit it.

23   BY MR. CHURCHILL:

24   Q.   Directing your attention here to the section that reads

25   "Assessment Abilities."  Do you see that?

1    A.    I do.

2    Q.    Let me just zoom in.  And you see there's a list of items

3    or areas that are assessed there.  Do you see that?

4    A.    I do.

5    Q.    And can you just read the bold underlined headings there?

6    A.    Sure.

7          MR. CARROLL:  Well, your Honor, if I may, could we

8    just move that piece of paper that's covering over these words,

9    this --

10         MR. CHURCHILL:  That one?

11         MR. CARROLL:  Yes.  Thank you.

12         THE WITNESS:  "Oral expression," "Information

13   analysis," "Interpersonal relations," "Judgment and

14   decision-making," "Planning and organizing," "Resource

15   management."

16   BY MR. CHURCHILL:

17   Q.    Okay.  And I'll just go to the next page to show that it

18   ends there.

19         There's no further headings at the top of the next page;

20   is that right?

21   A.    That's correct.

22   Q.    All right.  And I'm showing you now, this is a candidate

23   preparation guide for the City of Akron Fire Department for a

24   lieutenant promotional exam.  And, again, do you recognize this

25   as the type of preparation guide that EB Jacobs prepares in

1  connection with the exams that it administers?

2  A.   I do.

3  Q.   All right.  And you were aware that EB Jacobs does work in

4  Akron?

5  A.   Yes, we've done work in Akron.

6  Q.   And let me direct your attention again to the "Assessment

7  abilities" sections here.  For Mr. Carroll's purposes, I'll

8  remove the Post-it note.

9        MR. CARROLL:  Thank you.

10 Q.   And in the section of "Assessment abilities," could you

11 read the bold underlined sections there, please?

12 A.   I could, but I could just summarize it, if you would like.

13 It's the same as the ones before except for "written

14 expression."

15 Q.   Okay.  And, again, on the next page.  I'll just make sure

16 there's no other headings at the top of the next page; is that

17 right?

18 A.   That's right.  There's no additional headings.

19 Q.   All right.  In terms of Miami, yesterday, you're aware,

20 that we received some data on the exam that was administered in

21 1998 in Miami?

22 A.   Yes.  The police sergeant's exam in 1998 in Miami.

23 Q.   And you understand that that's the only test for which we

24 received data, the 1998 test?

25 A.   That's the only data that I used for the purposes of

1    comparison.  The reason I only used that particular test is

2    that in subsequent years --

3    Q.   I just asked:  That is the only data we received?

4    A.   Yes, that is the only data.

5    Q.   And do you recall in terms of the number of candidates who

6    passed the written test hurdle, how many there were?

7    A.   There were 198 that passed.

8    Q.   Okay.  And do you recall the percent of those who passed

9    who were white?

10   A.   It was probably -- I don't know offhand.  It was probably

11   around 20 percent.

12              MR. CHURCHILL:  May I approach, your Honor?

13   BY MR. CHURCHILL:

14   Q.   All right.  I'm showing you a copy of the spreadsheet that

15   was sent over yesterday.

16   A.   Uh-huh.

17   Q.   And just so you can refresh your memory, how many of the

18   people who passed?

19   A.   There were 36 white candidates.

20   Q.   And how many minority candidates passed?

21   A.   Minority including both blacks --

22   Q.   Blacks and Hispanic.

23   A.   It would be a total of 47 plus 111, or 158.

24   Q.   Okay.  So roughly 80 percent of the candidates who passed

25   were minorities; is that right?

1  A.    That's correct.  In Miami most of the candidates are

2  Hispanic because it's a Cuban community.

3  Q.    All right.  I want to turn to the four-fifths rule.  And

4  you are critical of the four-fifths rule; is that fair to say?

5  A.    I think when it's used in conjunction with small

6  populations, it leads to misleading results the majority of the

7  time.

8  Q.    And haven't you said that the only fair approach to

9  evaluating disparate impact is to use a statistical

10  significance test?

11  A.    I've argued significance testing is an alternative

12  approach to it, and that we can control the false negative

13  rate.

14  Q.    All right.  Let me just direct your attention to your

15  second report which was prepared on May 28, 2010.  And

16  directing your attention to the section there that's

17  highlighted --

18          MS. HARRIS:  Page, please?

19          MR. CHURCHILL:  Page 10.  Sorry.

20  BY MR. CHURCHILL:

21  Q.    And it reads, "The bottom line is that there are two

22  approaches to establishing adverse impact.  The first is the

23  adverse impact ratio and the second is statistical significance

24  testing.  Given the large false positive rate associated with

25  the adverse impact ratio metric, I believe the only fair

1    approach is statistical testing which limits false positives to

2    5 percent."

3    A.   That's correct.

4    Q.   Did I read that correctly?

5    A.   Yes.

6    Q.   Okay.  Now, one thing that we see in this case is there's

7    some jurisdictions that just have small numbers; is that right?

8    A.   That's true.

9    Q.   And isn't it fair to say that for those jurisdictions

10   we'll never have statistical significance when doing the type

11   of AI analysis that you've done?

12   A.   Well, either approach will have problems.  Either the AI

13   four-fifths rule or the statistical significance testing will

14   have its own share of problems.

15   Q.   Okay.  But my question is that some jurisdictions are

16   simply too small to get a statistical significant result one

17   way or the other; is that correct?

18   A.   That's not correct.

19   Q.   All right.  Well, in the table that you produced

20   yesterday, that showed all different jurisdictions that you did

21   analyses for.  In all but Boston, really, there were too few

22   numbers to get a statistically significant result; is that

23   right?

24   A.   That's correct.

25   Q.   And in some of those jurisdictions, you're never going to

1    get a statistically significant result because the numbers are

2    simply too small; is that fair to say?

3    A.    No.

4    Q.    Okay.  So if you have a jurisdiction where you have ten

5    applicants, is there a situation where you could have a

6    statistically significant result in terms of doing the AI

7    impact analysis that you're talking about?

8    A.    If it's that small, no.  But if you're asking as a general

9    rule across all of the different jurisdictions, there are

10   jurisdictions you could get a significant result in.

11   Q.    I understand that.  And I guess the point I'm trying to

12   make is there are some jurisdictions that are just going to be

13   too small, using the example I just gave of ten, to get to a

14   statistically significant result using the analysis that you're

15   doing?

16   A.    Well, even with ten it's possible to get a statistical

17   difference.  If you have, say, for example, five promotions out

18   of that, I would say that that would be pretty close to

19   significant results.  If all of those promotions were whites,

20   that could be a significant result.

21   Q.    But the reality in Massachusetts, as in other places, is

22   that the selection rates in promotional context are low,

23   typically; is that right?

24   A.    That's correct.

25   Q.    So they're usually, in Massachusetts, around 10 or 11

1    percent?

2    A.    In Boston they were 11 percent in 2005.  In the other

3    jurisdictions, they varied as high as 50 percent.

4    Q.    Okay.  But typically, I think you've testified about this

5    before, in Massachusetts they're low.  Low selection rates?

6    A.    Yes.  But in the smaller ones, sometimes you have a much

7    higher selection ratio.

8    Q.    Okay.  When you have low selection rates, as you typically

9    do, that's going to make it more difficult to get a

10   statistically significant result; is that right?

11   A.    Not necessarily.  In large jurisdictions like Boston, no,

12   like, even though it has 11 percent.  In smaller jurisdictions,

13   yes.

14   Q.    But, Dr. Silva, didn't you testify yesterday that one of

15   the factors that makes it more difficult to get a statistically

16   significant result are low selection rates?

17   A.    I don't remember testifying --

18          MS. ENGDAHL:  Objection.  I just want to make sure

19   that we're talking about the same thing.  He's talking about

20   selection ratios, which is the ratio of how many jobs there are

21   versus the applicant pool, and counsel is using the term

22   "selection rate."  I want to make sure --

23          MR. CHURCHILL:  I appreciate the clarification, your

24   Honor.

25          THE COURT:  Go ahead.

1    BY MR. CHURCHILL:

2    Q.    So let me distinguish, so we're clear, between selection

3    rates and selection ratios.  By "selection rates," what I

4    understand that to mean -- I want to make sure we're on the

5    same page -- is -- are the percent of total applicants who are

6    promoted?

7    A.    Correct.

8    Q.    Right?  But a selection ratio refers to the AI analysis of

9    that 80 percent rule where we look at the percent --

10   A.    No.

11   Q.    The comparison of the ratio of one group selected compared

12   to the ratio of another group selected?

13   A.    That's incorrect.

14   Q.    Okay.  Well, I'm glad you clarified.  How do you

15   understand the term "selection ratio"?

16   A.    It's the same thing as promotion rate or --

17   Q.    So you understand "selection ratio" and "selection rate"

18   to be the same thing?

19   A.    You mean AI ratio?

20   Q.    I'll use the term "AI ratio."  Okay.  But you understand

21   the term "selection rate" and "selection ratio" to be the same?

22   A.    Yes.

23   Q.    So your testimony yesterday was that one of the factors

24   that makes it more difficult to get a statistically significant

25   result is when there's a low selection rate?

```
1    A.    I don't believe I testified to that.

2    Q.    Okay.  So that's not your testimony?

3    A.    I believe that I testified that what makes it more

4    difficult to -- I mean, what influences whether you get an AI

5    ratio that is below .8 is a low sample size.

6    Q.    Well, I think what you said is one factor is a low sample

7    size.

8    A.    Yes.

9    Q.    That makes it difficult --

10   A.    That's how it relates to the AI ratio and why the AI ratio

11   gets high false positives.

12   Q.    Let me try and break this down.  One factor that makes it

13   more difficult to get statistical significance are small sample

14   sizes; is that right?  One factor?

15   A.    One factor, yes.  I didn't testify to that yesterday but,

16   yes, that is correct.

17   Q.    Okay.  And that's pretty clear from statistical science,

18   right?

19   A.    Yes.  The sample size influences the ability to find

20   significant results.

21   Q.    And another factor that makes it more difficult to get a

22   statistically significant result are low selection rates, or

23   low selection ratios?

24   A.    Yes.

25   Q.    Okay.  So it's going to be the case, isn't it, that there
```

1    are some jurisdictions where the numbers and selection rates

2    are just too small to get a statistically significant result?

3    A.    Yes.

4    Q.    Okay.  You --

5    A.    I mean, it's conceivable that that's true.

6    Q.    It's conceivable that in those areas, a test is being used

7    that, in fact, is unfair to minority applicants because they do

8    worse on that type of test.  Isn't that a possibility?

9    A.    I'm sorry.  Ask the question again.

10   Q.    I'm asking that in those jurisdictions where

11   it's -- you're unable to get a statistically significant result

12   because of things like small sample size and a small selection

13   rate that, in fact, the test that's being used in those

14   jurisdictions is one that's unfair to minority applicants

15   because it has a -- you know, lower mean scores or it's been

16   shown to have a disparate impact in that regard?

17   A.    The word "unfair" I'm not sure I would include in my

18   answer but --

19   Q.    Agreed.  But it's possible that there's a test that is

20   used that minorities can be shown to do worse on?

21   A.    With only a very small sample size, it would have to be a

22   very large difference.  Like, if you only have ten people, it

23   would be -- you know, and only two of them were minorities,

24   you'd have to have, you know, a fairly large difference.  But

25   then you really have to question whether the individuals that

1   are present in that sample are even representative of the group

2   at large.  So even though you could find a difference --

3   Q.   Dr. Silva, I think you've answered my question.

4        The point I'm trying to make is there are some

5   jurisdictions where the numbers are going to be too small in

6   terms of sample size and selection rate to ever make the type

7   of adverse impact demonstration that you say is statistically

8   significant?

9   A.   I guess that's conceivably possible that that's the case.

10  Q.   Okay.  And doesn't that effectively mean that those

11  jurisdictions would be exempt from any claim of disparate

12  impact?

13  A.   I think that when you have a -- my personal opinion is

14  that when you have a very small group of individuals in a

15  jurisdiction, maybe only one or two are minorities and only one

16  promotion was made, that you really can't say much of anything

17  about it.

18  Q.   Okay.  So I think the answer to my question was "yes," is

19  that right, that there are some jurisdictions --

20           MR. CARROLL:  Objection.

21           THE COURT:  You can ask that.

22  BY MR. CHURCHILL:

23  Q.   Well, there are some jurisdictions where, because of the

24  numbers, you just -- you can't ever approve disparate impact so

25  they're effectively immune from liability under Title VII?

```
 1              MR. CARROLL:  Objection.

 2              MS. ENGDAHL:  Objection.

 3              THE COURT:  Sustained to that question.

 4              THE WITNESS:  I don't think that was my place to say.

 5              MR. CARROLL:  Objection.

 6              THE COURT:  You don't have to answer.

 7              THE WITNESS:  I'm sorry.

 8   BY MR. CHURCHILL:

 9   Q.   So there are some jurisdictions where you just -- - given

10   your definition of "disparate impact," which is making a

11   statistically significant showing, you'll never be able to do

12   that because of small numbers?

13   A.    Yes.  I mean, with any tools that you can imagine, if you

14   have a very small sample.  You can't even say that the

15   individuals that are in that group or in those subgroups are

16   even representative of the larger groups.  You can't really say

17   much of anything about a very small sample.

18   Q.   And are you aware of the history of the jurisdictions in

19   this case; for example, in Lawrence, that only one out of 17

20   sergeants are minority?

21   A.    No, I'm not aware of it.

22   Q.   Or in Lowell, for example, only two out of 30 sergeants

23   are minority?

24   A.    No, I'm not aware of it.

25   Q.   And that in Methuen and other jurisdiction, zero out of 12
```

1    sergeants are minority?

2    A.    No, I'm not aware of it.

3    Q.    Now, if some of these jurisdictions had too small numbers,

4    this type of situation could go on forever, couldn't it?

5            MR. CARROLL:  Objection.

6            THE WITNESS:  I don't understand --

7            THE COURT:  Sustained.

8    BY MR. CHURCHILL:

9    Q.    All right.  Let's turn to the question and answers again

10   in the Uniform Guidelines.  And I want to direct your attention

11   to Question 24.  And you see that appears at the bottom of the

12   screen, Question 24?

13   A.    Yes.

14   Q.    And the question is:  "Why do the guidelines rely

15   primarily upon the four-fifths rule-of-thumb rather than tests

16   of statistical significance?"  And the answer is:  "Where the

17   sample of persons selected is not large, even a large real

18   difference between groups is likely not to be confirmed by a

19   test of statistical significance (at the usual .05 level of

20   significance).  For this reason, the guidelines do not rely

21   primarily upon a test of statistical significance, but use the

22   four-fifths rule-of-thumb as a practical and easy-to-administer

23   measure of whether differences in selection rates are

24   substantial.  Many decisions in day-to-day life are made

25   without reliance upon a test of statistical significance."

1         Did I read that correctly?

2    A.    I believe so.

3    Q.    This is, in a way, an acknowledgment, is it not, that the

4    four-fifths rule is not a test of statistical significance?

5    A.    No, it's not.

6    Q.    Okay.  Well, I think it speaks for itself.

7    A.    I would like to comment, if you would like me to.

8    Q.    No, you can comment -- if one of the defense counsel has a

9    question for you, you can comment on it.

10   A.    Okay.

11   Q.    All right.  Now, you did a series of analyses, which you

12   testified about, including a shortfall analysis and an N + 1

13   analysis?

14   A.    Yes.

15   Q.    And wouldn't you agree with me that these are just various

16   ways of demonstrating the small number problem?

17   A.    No.

18   Q.    Well, the shortfall analysis, what you do there is

19   calculate how many more minorities, even if it's a fraction,

20   would have to have been promoted to meet the 80 percent

21   threshold; is that right?

22   A.    That's correct.

23   Q.    And when you're doing that, it's just another way of

24   demonstrating that the four-fifths rule, when applied, can be

25   very sensitive to small numbers?

1    A.   Well, obviously, my false positive rates are through the

2    roof.  So, you know, yes, they're very sensitive.

3    Q.   And that's the point of the shortfall analysis, isn't it?

4    A.   No.  The shortfall analysis has a different purpose.  It

5    shows that it's a fairly insignificant magnitude of shortfall

6    for minorities within those jurisdictions.

7    Q.   Right.  And that's another way of demonstrating that the

8    four-fifths rule, when applied, can be unstable because of

9    small numbers?

10   A.   Not at all.  That -- the shortfall has nothing to do with

11   instability.  That's the actual number of people that would

12   have to have been promoted from the minority group in order to

13   achieve the .8 ratio.  That's an exact number; it's not

14   unstable in any way.

15   Q.   So let me ask, then:  When you do a shortfall analysis, is

16   there some threshold that you're looking for to determine

17   whether the result you get is significant?

18   A.   No, not at all.  It has nothing to do with significance or

19   stability; it's just a quantification of the amount of -- you

20   know, if you want to call it damage or unfairness or

21   unevenness, or whatever it is, in the groups.  I mean, it says,

22   you know, if it's 1/20th of a person that would have had to

23   have been promoted, that's exactly what it is, it's 1/20th of a

24   person would have had to have been promoted in order to achieve

25   parity in the promotion rates.

1  Q.    Okay.  So I guess what I'm not understanding, is when you

2  look at those numbers, if it's 1/20th of a percent or if it's

3  10 people, is there some threshold that you're looking for that

4  tells you something about what you're -- the analysis that

5  you're doing?

6  A.    No.  The numbers just speak for themselves.

7  Q.    Okay.  Well, what does it say?

8  A.    It says, you know, basically you can get almost none of a

9  person if you have .05.  You know, there's almost no damage to

10  the minority group, you know, that .05 of a person.

11  Q.    All right.  Now, and the N + 1 analysis, you would agree,

12  is a test of the four-fifths rule, as it's applied, to see if

13  it's been influenced by small numbers?

14  A.    Right.  It's the shift-of-one analysis from Question 21 in

15  the questions and answers in the federal guidelines.  And it's

16  a way to detect whether the sample is so small as to which make

17  a determination of adverse impact possible or not.

18  Q.    Right.  So it's another way of getting at the small

19  numbers problem?

20  A.    Yes.

21  Q.    And when there are large numbers here, as there were in

22  Boston, you found clear evidence of disparate impact; is that

23  fair to say?

24  A.    In Boston?  Yes.

25  Q.    And, in fact, in your initial report, you also found that

1    even when applying the N + 1 analysis, there was disparate

2    impact in Springfield in 2005; is that right?

3    A.   Yes, I believe that's correct.  If you could put the chart

4    up, it would be helpful.

5    Q.   Sure.  I would be happy to.

6         Showing you for -- your first report, on page 8.  And in

7    Section 3 there it reads -- I'm sorry -- these are your

8    conclusions.  And in Number 3 it says, "After performing

9    standard adverse impact calculations, or AI N + 1 calculations,

10   in smaller jurisdictions, adverse impact can be demonstrated

11   only in the following jurisdictions in the years 2005 through

12   2007."  And for 2005 you identified the Springfield Police

13   Department; is that right?

14   A.   That's correct.

15   Q.   All right.  In your report you also -- and I think you

16   just referenced Question 21 of the Uniform Guidelines?

17   A.   Yes.

18   Q.   I just want to go there.  Can you read that?

19   A.   I can.

20   Q.   Don't read it.  I mean, can you see it?

21   A.   I can see it.

22   Q.   Okay.  And the question that's asked here:  "Is evidence

23   of adverse impact sufficient to warrant a validity study or an

24   enforcement action where the numbers involved are so small that

25   it is more likely than not that the difference could have

1   occurred by chance?"  That's the question, correct?

2   A.    Correct.

3   Q.    And this is where you get the justification for doing the

4   N + 1 analysis?

5   A.    Yes.

6   Q.    Now, in the first part of the answer it says, "No.  If the

7   numbers of persons and the difference in selection rates are so

8   small that it is likely that the difference could have occurred

9   by chance, the federal agencies will not assume the existence

10  of adverse impact in the absence of other evidence."

11       Do you see that?

12  A.    Yes.

13  Q.    And so even when there are small numbers, as there are in

14  jurisdictions in this case, there might be other evidence

15  that's relevant to the determination of adverse impact.  Would

16  you agree with that?

17  A.    Yes.

18  Q.    And if you go to the bottom part of the answer, it reads,

19  "On the other hand, if a lower selection rate continued over a

20  period of time so as to constitute a pattern, then the lower

21  selection rate would constitute adverse impact, warranting the

22  need for validity evidence."  Did I read that correctly?

23  A.    Right.  If you were able to overcome the small --

24  Q.    No.  My question was:  Did I read that correctly?

25  A.    Oh, yes.

1  Q.   And doesn't that suggest to you that even if you have

2  insignificance in one year, if that pattern continues year

3  after year after year after year, that it might warrant the

4  jurisdiction to establish the validity of the test they're

5  using?

6  A.   Yes.  If you have many, many years with sufficient

7  numbers, you can come to that determination.

8          THE COURT:  Well, let me just follow up on that.  By

9  aggregating over the years, is what I think you meant by that.

10         THE WITNESS:  Yes.  Aggregating --

11         THE COURT:  I think the question was whether the

12  pattern without aggregation would be evidence which would

13  warrant it.  It may be a different matter.

14         THE WITNESS:  Yes.  It is possible to aggregate over

15  the years if it's done correctly; unfortunately, Dr. Wiesen did

16  not do it correctly.

17         THE COURT:  My question is absent aggregation.

18  Without aggregating, simply looking at a pattern over years.  I

19  think that's what Mr. Churchill is asking.

20         MR. CHURCHILL:  I appreciate the clarification because

21  they're two different things.

22         THE WITNESS:  Could you clarify again?  I'm not

23  following.

24         THE COURT:  Just a pattern year by year, over years,

25  continuing in time --

1            THE WITNESS:  Oh, I se.

2            THE COURT:  -- the question suggested would that be

3     evidence that would warrant further inquiry or validity testing

4     as distinguished from aggregating the data and testing the

5     aggregated data.

6            THE WITNESS:  I think that if the numbers are large

7     enough, say, over a two-year period, in each of two-year

8     periods, and you could say, "Okay, looks like, yes, there is

9     here and there is here," the numbers aren't -- you know, maybe

10    they're only 50 or 60 in each year but you see in a pattern in

11    each of those two years, yes, you could say from year to year

12    it looks like the pattern exists in both years.

13            But with very small numbers, for example, if you had,

14    like, ten people in one year and another ten people in another

15    year, then I would say, no, that I would prefer to aggregate

16    over those two years in a correct way and to look at those

17    numbers together.

18            THE COURT:  Well, I guess the question is whether not

19    aggregating, but looking at repeated results that seem to form

20    a pattern, in your opinion would the data, the repeated results

21    themselves, have to be significant or not?  I think that's what

22    he's getting at.  And the question sort of was:  Even if not

23    significant in themselves, would the pattern, not aggregated,

24    be evidence that would warrant it?

25            THE WITNESS:  I think if you have data over three

1    years, four years, you could, even with very small numbers, you

2    know, do that.  But I think if you are looking at two years, as

3    I do here for each of these jurisdictions, and you're dealing

4    with just a very small number each year, it's still very hard

5    to do that.  But I think if you had more and more years, even

6    with very small data, you could probably come to that

7    conclusion, that there's an issue.

8                THE COURT:  Okay.

9    BY MR. CHURCHILL:

10   Q.   Now, another analysis you did, and you testified about

11   this yesterday and it was reflected in your chart, was a

12   probability analysis; is that right?

13   A.   I'm not sure what you're referring to but I think so.

14   Q.   That's fair enough.  I'll put it up so we're all on the

15   same page.

16        And this was what was marked as Exhibit 197.  And what I

17   was referring to was the analysis you did in the final column

18   there?

19   A.   Yes.

20   Q.   All right.  And what you did there was you assumed that a

21   test was being used that had no mean score difference between

22   different subgroups; is that right?

23   A.   That's correct.

24   Q.   And then you calculated what the chances are that even

25   with that underlying reality, that you would get an outcome

1  that reflected, or suggested, adverse impact when, in fact,

2  there wasn't; is that right?

3  A.   That's correct.

4  Q.   And that's -- you did that through what's called a "Monte

5  Carlo analysis"?

6  A.   "Monte Carlo simulation."

7  Q.   All right.  Here, though, we have evidence that the

8  underlying reality is that there is a mean score difference.

9  Would you agree with that?

10 A.   Yes.  The purpose of the test --

11 Q.   I think you answered my question.

12 A.   Okay.

13 Q.   Thank you.  All right.  Another analysis that you did, and

14 you testified about yesterday, was looking at the incumbent

15 sergeant performance on the 2005 exam compared to the candidate

16 performance as a measure of whether the test was evaluating the

17 functions that a sergeant performs.

18 A.   I'm sorry.  I'm not following.  Could you repeat it?

19 Q.   I'm not following it myself either.

20 A.   Okay.

21 Q.   You did an analysis looking at incumbent sergeant

22 performance; is that right?

23 A.   For the Miami exam?

24 Q.   No, no, no.  For the 2005 statewide and Boston exams, you

25 compared how incumbent sergeants did -- because they were

1  taking the lieutenant's exam --

2  A.   Yes.

3  Q.   -- with how police candidates did; is that right?

4  A.   That's right.

5  Q.   And so one of the things you -- I think you talked

6  yesterday mostly about the Boston results.  But for the

7  statewide exam, you found that 21 percent of incumbent

8  sergeants failed to even get a passing score; is that right?

9  A.   That's correct.

10  Q.   Now, isn't it fair to assume that all of the

11  sergeant -- let me back up first.

12       You understand that the -- both groups that were being

13  analyzed here, the police candidates -- I'm sorry -- the

14  sergeant candidates who are police officers, and the lieutenant

15  candidates who were current sergeants, they were all studying

16  to take an exam; is that right?

17  A.   That's correct.

18           MR. LEAHEY:  Objection, your Honor.  It assumes they

19  studied.

20           THE COURT:  Sustained.

21           MR. CHURCHILL:  Okay.  I'll take the point.

22  BY MR. CHURCHILL:

23  Q.   The context was that they were all taking a promotional

24  exam, right?

25  A.   That's correct.

1    Q.    And these are promotional exams where they had a list of

2    reading material that was supposed to cover everything they

3    needed to know to do well on these exams; is that right?

4    A.    Yes.

5    Q.    Of a technical knowledge test?

6    A.    Yes, I believe so.  That's typical.

7    Q.    Now, we know by definition that the incumbent sergeants

8    had already done well on this type of test in the past, right?

9    A.    On a test like the police officers took in the past, yes.

10   Q.    Okay.  So if the same test is being used year after year

11   after year, we know that the incumbent sergeants have already

12   done well on that type of test; is that right?

13   A.    The type of test, yes.  But it's not the same test.

14   Q.    Okay.  Well, you didn't analyze the differences between

15   the test they took earlier and the test they took in 2005, did

16   you?

17   A.    I know that they were different but I did not analyze the

18   differences.

19   Q.    Okay.  But these are all -- the incumbent sergeants are

20   ones who did well on a multiple-choice written job-knowledge

21   test; is that right?

22   A.    That's correct.

23   Q.    So I'm not sure if I'm understanding the point of the

24   analysis, because it seems that if you then test whether those

25   same sergeants -- you're taking a group of people who have

1    already done well on an exam and then you're giving them

2    basically the same exam and saying that because they did well

3    again, that establishes the validity of the test.  Doesn't that

4    seem circular to you?

5              MS. ENGDAHL:  Objection.

6              THE COURT:  Overruled.  You may answer.

7              MS. ENGDAHL:  It's asking about facts that are not in

8    evidence.

9              THE WITNESS:  It's one argument, certainly.

10   BY MR. CHURCHILL:

11   Q.   Just to use an analogy, let's say one of the -- that there

12   was a test to become a police sergeant, and the test required

13   you to be able to scale an eight-foot wall.  And so you did

14   that test, the best performers, I guess based on time, were the

15   ones who were promoted to sergeant.  So then three years later

16   you're going to give the same test and you want to ask, "Gee,

17   is this a valid test to determine whether somebody's a good

18   police sergeant?"

19        So the same incumbent sergeants who did well before take

20   it and do better than the applicant pool as a whole.  You would

21   expect that result, wouldn't you?

22              THE WITNESS:  I would.

23   BY MR. CHURCHILL:

24   Q.   And that doesn't indicate to you that that test is valid

25   in any way, does it?

1    A.    Either/or, no.

2    Q.    All right.  I want to turn to the analysis that you did of

3    the Boston 2002 exam.  You were not involved in the development

4    of that exam; is that fair to say?

5    A.    That's true.

6    Q.    And you have not studied in any detail the components of

7    that exam; is that fair to say?

8    A.    I have not.

9    Q.    Okay.  So you don't know what questions were asked or how

10   they were asked?

11   A.    I do not.

12   Q.    And you haven't undertaken any independent effort to opine

13   about the validity of that test; is that fair to say?

14   A.    No, I have not.

15   Q.    All right.  I just want to go to this part of your report

16   so we can be on the same page.  And this is your initial report

17   at pages 6 and 7.  And page 7 is what I'm going to be focusing

18   on.  I think you testified about this yesterday.

19   A.    I did.

20   Q.    All right.  And what you found when you did this analysis

21   is, in fact, that the number of minorities who were promoted

22   went up with the structured interview included; is that right?

23   A.    Yes.  They added an additional Hispanic.

24   Q.    And that the adverse impact ratio improved over the

25   situation when the structured interview was not included; is

1   that fair to say?

2   A.   Yes, it went from .8 to .32.

3   Q.   And you would agree with me that the inclusion of the

4   structured interview would have increased the validity of this

5   exam as a general rule?

6   A.   I believe so.

7   Q.   Okay.  So in this case, the use of -- or the inclusion of

8   the structured interview both improved validity and improved

9   the disparate impact ratio; is that right?

10  A.   It improved it, but I would say insubstantially.

11  Q.   I understand that.  But it improved; is that right?

12  A.   That's correct.

13  Q.   And what happened here was that there was an additional

14  minority who was promoted, right?

15  A.   That's correct.

16  Q.   And you didn't do any analysis to calculate the benefit

17  that the Boston Police Department would realize from having

18  more minorities in its sergeant ranks; is that fair to say?

19  A.   That's fair to say.

20  Q.   So you didn't calculate the benefit of having another

21  minority police sergeant out in the community that has a large

22  minority population; is that right?

23  A.   No, I did not.

24  Q.   And you didn't calculate the benefit of another minority

25  police sergeant who was then in the ranks who could be promoted

1    to higher levels; is that right?

2    A.    That's correct.

3    Q.    And you didn't -- other than the Boston 2002 exam, you

4    haven't looked at any earlier exams given in the Commonwealth

5    that had multiple components to evaluate their effectiveness,

6    did you?

7    A.    No, I did not.

8    Q.    All right.  Let me turn to the issue of aggregation.  And

9    this is from your initial report.  And this is page 1.  And

10   there's a section in your report there entitled "Correctness of

11   Examining Adverse Impact Within Jurisdiction"; is that right?

12   A.    That's correct.

13   Q.    And the first thing you note there is that both Drs.

14   Landy and Wiesen, in their expert reports, argue that

15   aggregating the examination data across jurisdictions is

16   appropriate.  Do you see that?

17   A.    I do.

18   Q.    And you were familiar with Dr. Landy before he passed

19   away; is that right?

20   A.    He was one of my professors at Penn State.

21   Q.    And, in fact, you used to work with him, didn't you?

22   A.    I've never worked with -- well, I guess for a very short

23   period of time.

24   Q.    Okay.  And you were familiar with his reputation; is that

25   right?

1  A.   Yes.

2  Q.   And how would you describe his reputation as an IO

3  psychologist?

4  A.   He was considered one of the top IO psychologists in the

5  country.

6  Q.   Okay.  And you agree that in this case he argued that

7  aggregating examination data was appropriate; is that right?

8  A.   Yes, he did.

9  Q.   Now, when you addressed aggregation of data in your

10  reports, you never addressed the issue of aggregation with

11  respect to mean scores; is that right?

12  A.   I didn't analyze mean scores.

13  Q.   Okay.  But my question was:  In your report you didn't

14  address the issue of aggregation with respect to mean scores;

15  is that right?

16  A.   That is correct.

17  Q.   Now, you talked yesterday, and you can see the table here

18  in your report, about a phenomenon that is referred to as

19  "Simpson's Paradox"?

20  A.   Yes.

21  Q.   Okay.  And the example you give here is one with two

22  jurisdictions where in both cases you can see that there's no

23  adverse impact; is that right?

24  A.   That's true.

25  Q.   But when you aggregate the data, it creates a false

1  impression, or a false positive, I guess; that there was

2  adverse impact; is that right?

3  A.   That's right.

4  Q.   But in -- you didn't in this case do an analysis where you

5  looked at every jurisdiction to see that Simpson's Paradox

6  actually applied here, did you?

7  A.   No.

8  Q.   And you would agree with me, would you not, that

9  aggregation can be a useful tool for evaluating how different

10  groups perform on different types of tests?

11  A.   If it's done correctly it can be useful at times.

12  Q.   Okay.  Let me just ask a general question.  Say the SAT or

13  the LSAT, a standardized test like that where everybody's

14  taking the same test, wouldn't you, if you were trying to

15  evaluate whether there are subgroup differences in terms of

16  taking those tests, want to look at a broad range of data,

17  aggregate data from across the country, for example?

18  A.   Yes, it can be useful.

19  Q.   And I think you've said that it is reasonable to aggregate

20  when data shares some common characteristics; is that right?

21  A.   Yes.

22  Q.   And here with the -- just focusing on the statewide exam,

23  you understand that all of the applicants sit down and take the

24  exact same test on the exact same day.  You understand that?

25  A.   I do.  But they are only eligible to be promoted within

1    one of those jurisdictions that they applied for.  And when you

2    combine the data, it assumes in the testing analysis that each

3    person is eligible for all positions available, and that simply

4    isn't true.  So the distortion begins to be present.

5    Q.    Okay.  So you're identifying -- I think you've testified

6    about this before -- that applicants don't compete with each

7    other across jurisdictions; is that right?

8    A.    That's right.

9    Q.    But the point I was making is that they all are sitting

10   down and taking the same exam on the same day; is that right?

11   A.    That's correct.  I agree to that.

12   Q.    And so it's not unreasonable to take a look at how that

13   entire applicant pool scored if you want to evaluate whether

14   there are mean score differences between black candidates, for

15   example, and white candidates?

16   A.    That would be reasonable.  If it was done correctly, and I

17   don't believe Dr. Wiesen did it correctly, because he simply

18   joined data sets where multiple individuals -- I'm sorry --

19   individuals were allowed to be present in the same data set

20   more than once.

21   Q.    Okay.  So there's two different types of aggregation here:

22   There's aggregation across jurisdictions and there's

23   aggregation over time; is that right?

24   A.    Yes.

25   Q.    Okay.  So what you just talked about was problems with

```
 1    aggregation over time?

 2    A.   No.  It can be -- yes, over time.  Yes.

 3    Q.   So for any given test, the 2005 statewide test, you're

 4    just looking at a group of -- there's no overlap; all those

 5    applicants are taking the test just once, right?

 6    A.   That's correct.

 7    Q.   So in that situation it's not unreasonable to take a look

 8    at the statewide results to see how, for example, black

 9    candidates scored and how white candidates scored?

10    A.   Right.  I stand corrected, yes.  In that situation, across

11    jurisdictions, it is appropriate to combine, and that would be

12    an appropriate use.

13    Q.   All right.  And you understand, do you not, that the

14    Uniform Guidelines specifically state that aggregation is

15    appropriate?

16              MS. ENGDAHL:  Objection.

17              THE WITNESS:  Could you be more specific?

18              THE COURT:  No, overruled.  Well, is there an

19    objection that the guidelines do not say that?

20              MR. CHURCHILL:  I'll just go to the guidelines.

21              THE COURT:  Okay.  All right.

22              MR. CHURCHILL:  I'll just go to the guidelines so I

23    can address everybody's issues.

24              MS. ENGDAHL:  Yes, he has to be more specific.

25    There's a general presumption that that's what they say and --
```

```
 1              MR. CHURCHILL:  Fair enough.
 2    BY MR. CHURCHILL:
 3    Q.   Why don't we move to the general guidelines so this is not
 4    a memorization test.
 5    A.   Okay.
 6              MR. CARROLL:  At least give him a multiple-choice
 7    answer.
 8    BY MR. CHURCHILL:
 9    Q.   I take it you don't remember which section of the Uniform
10    Guidelines, offhand?
11    A.   I'm not sure which one you're referring to.
12    Q.   That's a good point.  Okay.  This is Section 3.4D of the
13    Uniform Guidelines.  Does that help?
14    A.   No.
15    Q.   All right.  So I'm just going to put it up on the board
16    here.  It's almost looks like a Mass. statute, the way it's
17    written.  If you go to the middle here where it starts,
18    "Greater differences."  Do you see that?
19    A.   I do.
20    Q.   It says, "Greater differences in selection rate may not
21    constitute adverse impact where the differences are based on
22    small numbers and are not statistically significant, or where
23    special recruiting or other programs cause the pool of minority
24    or female candidates to be atypical of the normal pool of
25    applicants from the group.  Where the user's evidence
```

1  concerning the impact of a selection procedure indicates

2  adverse impact but is based upon numbers which are too small to

3  be reliable, evidence concerning the impact of the procedure

4  over a longer period of time and/or evidence concerning the

5  impact which the selection procedure had when used in the same

6  manner in similar circumstances elsewhere may be considered in

7  determining adverse impact."

8      Did I read that correctly?

9  A.   You did.

10 Q.   Okay.  And you agree with the Uniform Guidelines, do you

11 not?

12 A.   I do.  I think my previous testimony is compatible with

13 that statement.

14 Q.   I'm sorry?

15 A.   I think my previous testimony is compatible with that

16 statement.

17 Q.   Okay.  So you don't have any issues with that statement in

18 the Uniform Guidelines?

19 A.   No.

20      MR. CHURCHILL:  May I have a minute, your Honor?

21      (Pause.)

22      MS. HARRIS:  Are we putting in the entire guidelines

23 or just that section?  I don't have an opinion either way.

24      MR. CHURCHILL:  I was just reading from it.  I wasn't

25 purporting to introduce it.

1          MS. HARRIS:  I'm sorry.  I misunderstood.

2          MR. LICHTEN:  I said "May I have a moment?"

3          THE COURT:  Well, that's an interesting question in a

4    broader way about the entire case.  I don't know that --

5    there's been constant reference to the guidelines.

6          MR. CHURCHILL:  The guidelines are actually part of

7    the C.F.R., I believe.

8          THE COURT:  Yeah.  Well, I have to remember the

9    evidence rules.  Certainly statutes are noticed -- I guess the

10   federal regulations can be noticed.

11         MR. CHURCHILL:  I think they can be noticed.

12         MR. CARROLL:  Are the questions --

13         THE COURT:  I'm sorry?

14         MR. CARROLL:  I'm sorry, your Honor.  There's also

15   been some reference to questions and answers.  I'm not sure if

16   those are part of the --

17         MR. LICHTEN:  Judge Saris did it, your Honor.

18         MR. CARROLL:  -- regulations.  The regulations

19   themselves, I believe --

20         THE COURT:  Well, is there any controversy about it?

21   Does anybody think I shouldn't look at the Uniform Guidelines

22   questions and answers?

23         MR. LICHTEN:  No.

24         MR. CARROLL:  Not at all, your Honor.

25         (Laughter.)

1          MS. HARRIS:  We'll give you our own version later.

2          (Laughter.)

3    BY MR. CHURCHILL:

4    Q.   All right.  I just want to ask you one more quick

5    question, Dr. Silva, about the Miami results that you produced.

6    A.   Okay.

7    Q.   And I just wanted to ask -- you can look there -- first of

8    all, how many individuals were promoted based on that '98 test?

9    A.   There were 58 candidates promoted.

10   Q.   All right.  And of those 58, how many were white?

11   A.   Seventeen.

12   Q.   I'm sorry.  Seventeen?

13   A.   Seventeen.

14   Q.   All right.  And how many were black and Hispanic?

15   A.   There were nine black, and it's hard to read across there,

16   but 31.  So 40 altogether.

17   Q.   Okay.

18   A.   And this is for the -- this is the exam score and the

19   written three oral boards.

20   Q.   Okay.  My question was about who was eventually promoted.

21   Is that what you're answering?

22   A.   No, this doesn't include the seniority points.  So it does

23   not actually show how many promoted because it could have

24   swapped a little bit.

25   Q.   So that doesn't identify who was promoted?

1   A.   It only identifies who scored highest on the exam.  So it

2   only includes exam results, not seniority points.

3   Q.   Okay.  So my question, though, is that doesn't indicate

4   who actually was promoted?

5   A.   No, it does not.

6   Q.   Okay.

7   A.   They might be the same people but they might not.  I'm not

8   sure how the seniority points...

9        MR. CHURCHILL:  I have no further questions, your

10  Honor.

11       THE COURT:  Okay.  Ms. Engdahl?

12       MS. ENGDAHL:  I only have a few questions.

13                    REDIRECT EXAMINATION

14  BY MS. ENGDAHL:

15  Q.   Good morning, Dr. Silva.

16  A.   Good morning.

17  Q.   Dr. Silva, you were asked a question about Question 24 of

18  the questions and answers to the Uniform Guidelines.  What do

19  you understand Question 24 to mean?

20  A.   Let me just take a quick look at it, please.

21  Q.   Yes.

22       (Pause.)

23  BY MR. LICHTEN:

24  Q.   You requested an opportunity to elaborate on your answer.

25  A.   Oh, okay.  Basically, with the four-fifths rule, you can

1  use the four-fifths rule in the context without using

2  statistical significance.  And what this question is about is

3  whether you can rely on it, rather than tests of statistical

4  significance, when you don't have much of a chance to support

5  your conclusion of adverse impact when you have very small

6  sample sizes.  So they're saying that you don't have to rely

7  on, you know, purely significant results, but you would have to

8  see, you know, a consistent pattern of adverse impact in terms

9  of, you know, not necessarily within that year, but across

10  years you'd have to see a substantial number of individuals.

11      It's not saying that if you have adverse impact in a

12  sample where you have ten individuals that are non-minorities

13  and one minority, that if no minorities were promoted, you can

14  say that there's adverse impact; in fact, Question 21

15  specifically states that if you do a four-fifths analysis and

16  you conclude with the existing data that there is adverse

17  impact, and yet after the shift-of-one analysis you conclude

18  that there is not, the guidelines clearly say there that the

19  sample size is insufficient to determine adverse impact.

20      So it's not advocating that the four-fifths rule should be

21  used to override or to overcome issues of significance, or an

22  unlikelihood of obtaining significance, but rather, when you

23  have samples perhaps as high as 50 or 60 individuals, or you

24  still can't get significance, that you may have a pattern there

25  that you may want to rely on to base a decision as to whether

1  there is adverse impact against minorities using the

2  four-fifths rule.

3       But I don't think that it applies to the majority of the

4  jurisdictions in this case; the numbers are much smaller here.

5  Q.   Okay.  Thank you.

6  A.   Essentially, the guidelines consider even a sample of 100

7  to be small.

8  Q.   I'm going to draw your attention to Question 21 of the

9  Uniform Guidelines beginning with the first sentence, "Is

10  evidence of adverse impact sufficient to warrant a validity

11  study or enforcement action where the numbers involved are so

12  small that it is more likely than not that the difference could

13  have occurred by chance?"  And then this question and answer

14  goes on to describe what's been referred to as the shift of one

15  that you can do.

16       Doesn't Question 21 first assume that there is evidence of

17  adverse impact under the four-fifths rule before you actually

18  even do a calculation under shift of one?

19  A.   Right.  There wouldn't be any point to doing the analysis

20  because the point of the analysis is to see if you can raise

21  the AI ratio above .8.

22  Q.   And just drawing your attention to another part of the

23  Uniform Guidelines that you were shown, and I guess it's

24  60-3.4, just reading the first sentence there, "A selection

25  rate for any race, sex or ethnic group which is less than

1    four-fifths of the rate of the group with the highest rate will

2    generally be regarded by the federal enforcement agencies as

3    evidence of adverse impact," and then it goes on to talk about

4    the shift of one and other evidence.

5        Is it fair to say that if there is no evidence of adverse

6    impact based on initial four-fifths calculation, there would be

7    no need to look further under this particular guideline?

8    A.    This particular guideline, I would say yes, that's true.

9    I should also point out that for these analyses, we did use a

10   combination of black and Hispanics as a minority group.

11   Typically, that's not the case.  And this statement here

12   highlights that.  It says for each group, for each minority

13   group.

14       And so but for the purposes of trying to increase the

15   power of these statistical tests, I also followed Dr. Wiesen's

16   lead and combined blacks and Hispanics and considered them as

17   one group.  The issue with lower -- you make it even more

18   difficult if you separated out the two groups.  So I did

19   concede to that use of the combination for this purpose since

20   the sample sizes were so small.

21   Q.    I'm going to draw your attention to -- I think the

22   sentence was read to you.  It says, "Where the user's evidence

23   concerning the impact of the selection procedure indicates

24   adverse impact."  Again, the assumption there is that you

25   already found adverse impact?

1    A.    Correct.  In my analyses I always did the shift-of-one

2    analysis whether there was adverse impact or not.  You know, in

3    the data, just as a simple, you know, do it for everybody kind

4    of thing.  But in some of those jurisdictions, there really was

5    no need to do a shift-of-one analysis because there was no

6    adverse impact to start with.

7    Q.    Okay.  And then in this section of the guidelines, again,

8    "Where the user's evidence concerning the evidence of a

9    selection procedure indicates adverse impact but is based upon

10   numbers which are too small to be reliable, evidence concerning

11   the impact of the procedure over a longer period of time and/or

12   evidence about the impact which the selection procedure had

13   used, when used in the same manner in similar circumstances

14   elsewhere, may be considered in determining adverse impact."

15        If you know, do you know if that reference to "elsewhere"

16   suggests that you can use another employer's statistics or

17   numbers to find adverse impact within an employing

18   jurisdiction?

19             MR. CHURCHILL:  Objection.

20             THE COURT:  As phrased, sustained.

21   BY MS. ENGDAHL:

22   Q.    What's your understanding of the guidelines' use of the

23   term "elsewhere"?  Could that refer to another employer?

24             MR. CHURCHILL:  Objection.

25             THE COURT:  Sustained.

1    BY MS. ENGDAHL:

2    Q.   What's your understanding of, if you have one, of the

3    guidelines' use of the term "looking at similar circumstances

4    elsewhere"?

5              MR. CHURCHILL:  Objection.

6              THE COURT:  Sustained.  You can have his opinion as a

7    statistician, but not as an interpreter of the guidelines.

8    BY MS. ENGDAHL:

9    Q.   What is your opinion of that sentence, particularly

10   drawing your attention to the phrase where it says you can look

11   at the procedure using the same manner and similar

12   circumstances elsewhere?  What's your opinion of the use of the

13   word "elsewhere," if you have one?

14             MR. CHURCHILL:  Objection.

15             THE COURT:  Overruled.

16             THE WITNESS:  Typically, that refers to tests that are

17   standardized and may be sold by a publisher, and so that test

18   may be available for use across multiple organizations.  So,

19   for example, if you have the Wonderlic test and you use it in

20   Organization A to select clerks, and you find adverse impact

21   there, you could cite that information and -- you know, to make

22   a case for adverse impact in the Wonderlic in selection of

23   clerks even though it's not within your own organization or

24   within the organization that's at issue.

25   BY MS. ENGDAHL:

1  Q.   Dr. Silva, you were also asked about whether it's

2  appropriate to aggregate data over years, and your answer is,

3  "If it was done correctly."  What did you mean by "if it's done

4  correctly"?

5  A.   Well, the way Dr. Wiesen did it, is he basically took, you

6  know, one pile of data from one year and just put it on top of

7  another pile of data from another year; he didn't try to

8  identify the common individuals across the two data sets.  And

9  that's very important because essentially you may have some

10  individuals represented twice in the data set, and some

11  individuals in that data set will actually be both promoted and

12  un-promoted.  So it just confounds everything.

13      The way to do it correctly is to identify the individuals

14  that are -- the total sum of unique individuals across both

15  data sets and then follow them over time and say, for example,

16  Individual A took Test 1 and Test 2, and at the end of those

17  two processes was either promoted or not promoted.  And you

18  could do that for everybody.  Everybody's represented once and

19  it only accounts for one promotion or not a promotion across

20  that time span.  And Dr. Wiesen did not do that.

21  Q.   You were also asked about your -- about Frank Landy and

22  your opinion of his standing in the profession.  In your

23  interactions with Dr. Landy, did you agree with him 100 percent

24  of the time on issues pertinent to your profession?

25  A.   I would say we agreed about 90 percent of the time.  We

1    had frequent discussions on issues.

2    Q.    Did you have disagreements with Dr. Landy over some of his

3    positions?

4    A.    I did.  I could go back to graduate school where banding

5    was basically being introduced into the field, and I didn't

6    believe it was going to contribute much to the reduction of

7    adverse impact and Dr. Landy was certain that it would, and we

8    had lots of discussions about that.  And he later changed his

9    position to my position as I have changed my position to his

10   position a number of times.

11   Q.    You were also asked if you determined whether Simpson's

12   Paradox was present in Dr. Wiesen's aggregated analysis that he

13   did.  Is that possible to determine whether Simpson's Paradox

14   is present?

15   A.    Well, the only way to tell if it's present is to look at

16   the data aggregated and look at the data disaggregated and see

17   if it, you know, follows a similar pattern or could be

18   exaggerated in a different way.  The problem with aggregating

19   data isn't necessarily that it changes your conclusions, but

20   rather, that it can exaggerate the conclusion that you come to.

21   And I think that's the bigger issue in this case, is that the

22   combination of data can exaggerate the magnitude of the

23   difference that we have; for example, Boston that basically

24   overwhelms everything.

25        We have some jurisdictions that don't have any difference.

1    I think Worcester is one, and I think MBTA is another that

2    don't have a pattern at all.  And yet Dr. Wiesen, in some of

3    his testimony was saying -- I think we testified to some of

4    this yesterday -- that, you know, these results are -- the

5    statewide-level results apply to all of them.  And even in his

6    own chart you could see that it did not.  So aggregating data

7    can be unfair to many of the jurisdictions that are being

8    collapsed into that data.

9          MS. ENGDAHL:  Okay.  Thank you.  I have nothing

10   further.

11         THE COURT:  Mr. Carroll.

12         MR. CARROLL:  Thank you, your Honor.  Just a couple of

13   questions of Dr. Silva.

14                      RECROSS-EXAMINATION

15   BY MR. CARROLL:

16   Q.   Good morning, Dr. Silva.

17   A.   Good morning.

18   Q.   I believe earlier in your testimony, I think it was on

19   cross-examination, you were asked something about the adverse

20   impact ratio and whether there was some problems with that.

21   And I don't believe you gave a full answer.  Can you -- do you

22   recall that testimony and can you elaborate with regard to the

23   adverse impact ratio?

24   A.   Well, the adverse impact ratio, it's a very unstable

25   measure of adverse impact with very small numbers.  The counsel

1    on cross asked me if -- he basically made a statement that,

2    "Well, there are differences in these jurisdictions, aren't

3    there?"  And I said "yes," and I wanted to explain that.

4        The purpose of this test that I did in that last column of

5    my tables was to show that even if optimal circumstances were

6    present, even if we, as a result of this court case,

7    implemented different tests and did everything correctly and

8    had absolutely no differences in the testing processes for

9    sergeants, that the probability of finding adverse impact in

10   the future would be extremely likely.

11       In fact, most of those jurisdictions that I analyzed, the

12   adverse impact ratio for over 50 -- I think over more than half

13   of the jurisdictions would have had a greater than 50 percent

14   chance of, again, continuing to find adverse impact.  I think

15   some of them were over 75 percent chance of finding adverse

16   impact.

17       So the purpose of that test is just to illustrate that

18   even if we do have a perfect process to select these candidates

19   where there are absolutely no differences on the testing

20   elements used, that we're still going to find adverse impact

21   within each of these jurisdictions in the future.

22   Q.   Okay.  Now, would that be the false positive --

23   A.   Yes.  That's the false positive.

24   Q.   The Type 2 error?

25   A.   It's finding that there is adverse impact when you

1    shouldn't have found that because there was no difference in

2    the testing process whatsoever.

3    Q.   And that would be a Type 2 error in the field of

4    statistics?

5    A.   Since it's not a statistical test, it's not really

6    categorized in that fashion, but it is a false positive.

7    Q.   And you didn't find any data anywhere that indicates that

8    there was a statistically significant adverse impact in the

9    City of Springfield; is that correct?

10   A.   That's correct.

11        MR. CARROLL:   Thank you.  No further questions,

12   Dr. Silva.

13        MR. LEAHEY:   Your Honor, very briefly.

14                      RECROSS-EXAMINATION

15   BY MR. LEAHEY:

16   Q.   Dr. Silva, you were asked by Judge O'Toole regarding

17   looking at just a pattern over just test cycles and whether or

18   not there could be any type of pattern detected, and you also

19   testified with aggregation, one of the issues was counting the

20   same individual multiple times.

21        Does the concern about counting an individual multiple

22   times play any role in looking at a test-by-test analysis on a

23   year-by-year basis?

24   A.   On a test-by-test across jurisdictions or --

25   Q.   No.  If you were looking by -- well, if you were looking

```
 1   within one jurisdiction, would you still need to account for
 2   the same people taking that test year to year?
 3   A.    If you're just looking at one year in one jurisdiction --
 4   Q.    Not one -- if you're looking at multiple years --
 5   A.    Okay.
 6   Q.    -- I believe Judge O'Toole had asked you in looking at one
 7   jurisdiction over a period of time, looking at, you know, four
 8   different tests and whether or not you could detect a pattern
 9   there, my question is:  Does the fact that the same individuals
10   are taking those tests each time play a role in any type of
11   analysis that you'd have to do in that -- looking at those
12   tests over that period of time?
13   A.    Well, yes.  As I indicated earlier, you should only
14   represent each candidate once in the data set, and you should
15   track that candidate through the process and make a
16   determination over those many years that are being examined
17   whether that person was promoted or not promoted over that
18   period of time.  And then you can come to a conclusion about
19   the fairness of the process over the entire period of time
20   that's being looked at.
21   Q.    Okay.  And lastly, I just have one follow-up question just
22   to -- strike that.
23         You were asked questions regarding the 2005 statewide
24   examination where 79 percent of current sergeants passed but 21
25   percent of current sergeants failed.  Do you remember being
```

1    asked that question?

2    A.    Yes.

3    Q.    All right.  And you did a study -- or excuse me -- that

4    same analysis showed that 51 percent of the police officers who

5    were taking the police sergeant's examination failed that

6    examination?

7    A.    Just the 53 items.

8    Q.    That was the common interest between the two tests,

9    correct?

10    A.    There were 80 -- I'm sorry -- there were 80 items on each

11    of -- I'm sorry -- there were 80 items on a police officer, I

12    believe, and 100 items on a sergeant's exam, but 53 of the

13    items were in common, so I examined only the scores or the

14    performance of the two sets of candidates on the 53 items.

15    Q.    Okay.  And were you able to make -- strike that.

16                MR. LEAHEY:  I have nothing further.

17                THE WITNESS:  Okay.

18                MR. McDERMOTT:  Your Honor, the MBTA has no questions.

19                MR. McQUILLAN:  Your Honor, the City of Methuen has no

20    questions.

21                MR. D'AGOSTINO:  Your Honor, the City of Lawrence has

22    no questions.

23                THE COURT:  All right.  Ms. Harris?

24                MS. HARRIS:  The City of Boston just has a few.

25                          RECROSS-EXAMINATION

1    BY MS. HARRIS:

2    Q.   Dr. Silva, you were asked a couple of questions about the

3    Miami examination that you reviewed, and I believe that you

4    were asked about the number of people who passed that

5    examination.  Do you remember that line of questioning?

6    A.   I do.

7    Q.   And is it -- well, let me show you the document so you

8    have it in front of you.

9    A.   I think.

10   Q.   Oh, do you have it?

11   A.   I have just the exam score; I don't have the written score

12   list.

13   Q.   I'll just show you to make sure we're working off the same

14   document.  This is the document that was produced yesterday,

15   correct?

16   A.   Yes.

17   Q.   The same thing?

18   A.   Well, let me see.  There were two documents.  These two

19   consisted of both of them.  This is the written and this is the

20   exam score.  So this is the number of promoted if we used only

21   the exam score.

22   Q.   So you have the completed data?

23   A.   I have the exam.  For the exam --

24   Q.   And can you tell me, Dr. Silva, how many people were in

25   the initial pool that took the Miami exam, if you know?

1    A.    In the pool -- the total number of applicants?

2    Q.    The total number of applicants.

3    A.    330 applicants.

4    Q.    And how many people are reflected in the chart that you

5    have prepared that indicates the people who passed the

6    examination?

7    A.    195 individuals were given final scores.  There were

8    originally 198 invited to take the oral board process, but

9    three were no shows.  So we have only 195.

10   Q.    Okay.  So when we're talking about this 195, are these

11   individuals who passed the exam or are these people who were

12   invited to participate in the oral board?

13   A.    These were individuals who passed the written exam and

14   were invited to participate in the oral board.

15   Q.    Okay.  And so the original candidate group was 330, is

16   that what you said?

17   A.    That's correct.

18   Q.    And do you know of that 330, what the racial breakdown was

19   of that group?

20   A.    I don't have that information in this one.  I did have it

21   in that one.

22   Q.    Can you tell us -- of the people who were invited to take

23   the oral board, can you tell us what the racial breakdown was

24   of that subgroup?

25   A.    There were 36 whites and 158 blacks and Hispanics.

1    Q.    Okay.  And I believe that you testified when questioned by

2    Mr. Churchill that 17 whites -- at least on your

3    chart -- placed -- leaving aside the seniority issue, of this

4    group, 17 of the 36 whites placed into the group to be eligible

5    for selection, or for consideration for selection, and 40

6    blacks and Hispanics, cumulative total; is that right?

7    A.    Seventeen whites and nine blacks, 31 Hispanics.  Yes, 40

8    blacks and Hispanics.

9    Q.    So that would be 40 out of the 155; is that right?

10   A.    Out of 195.

11   Q.    I'm sorry.  I'm talking about the black and Hispanic

12   subgroup.

13   A.    Out of the 158.

14   Q.    And the exam that you put together in Miami was under

15   consent decree with assistance from the Department of Justice;

16   is that right?

17   A.    That's right.  They provided guidance in all aspects of

18   the project, and they basically selected the components that

19   went into the exam and oversaw the entire construction of the

20   exam.

21   Q.    And my math is not my strong suit, but if you have a total

22   population group of 330 and approximately 58 are getting

23   promoted, what percentage would you say that -- roughly.  We

24   don't need to be exact.  Looking at Boston being an 11 percent

25   promotion rate, can you give me a rough estimate of what the

1    promotion rate was in Miami for that exam?

2    A.    I'm sorry.  Can you just respecify the question?

3    Q.    Yes.  In Boston we have an 11 percent promotion.  That's

4    the number you've testified to previously.

5    A.    Oh, I see.

6    Q.    What's the percentage of people who were promoted in

7    Miami?

8    A.    It's probably close to 18 percent.

9    Q.    Now, you were asked yesterday about your opinion about

10   whether an open or closed book exam is preferable.  And

11   focusing on the kind of test that we're talking about here,

12   which is a sergeant's promotion exam, in your opinion or in

13   your experience in running these types of examinations, do you

14   have an opinion about whether an open- or a closed-book exam is

15   preferable?

16   A.    Actually, that's been a concern lately.  More of that has

17   been discussed.  And we did some analysis in the 1998 data and

18   I found that in the -- I'm sorry, not 1998 data -- I believe it

19   was the 2003 lieutenant data where we had both an open-book and

20   closed-book, and I found that blacks actually tend to perform

21   lower on open-book tests, Hispanics about the same.  But blacks

22   tend to have a big difference in that analysis that I did for

23   the lieutenant in Miami.

24        And part of the reason, we believe, is that you have to

25   really have studied to know the material very well for an

1    open-book test contrary to what -- it's sort of a paradoxical

2    situation.  You don't have unlimited time, so you have to be

3    able to know where the material is that you're looking for.

4    And if you don't -- haven't studied the material well, you just

5    don't have enough time to really look things up and find the

6    information that you need.  So we believe that actually

7    open-book tests may create greater adverse impact for

8    minorities.

9    Q.   And so in your experience as an industrial psychologist

10   involved in creating selection procedures for the law

11   enforcement context, would you recommend -- or do you recommend

12   the use of an open-book examination as a method of reducing

13   adverse impact?

14   A.   We really feel that it should be based on the nature of

15   the material; it should follow from the job analysis.  If the

16   material is of the type that the individuals are -- you know,

17   normally, in the normal course of work can look up the

18   material, you know, regulations, union rules, administrative

19   procedures and so forth, that those materials should be

20   open-book.  Obviously, they're going to be familiar with those

21   materials, just like they are when they study them, and they

22   can find the relevant section and answer the question.

23        But for material that tends to be of a more technical

24   nature used in the field, the job analysis typically indicates

25   that it should not be an open-book test, that they need to know

1    those things on the spur of the moment; they don't have time to

2    consult with their sergeant or consult with their lieutenant or

3    consult with other peers or consult the manuals, that they need

4    to made a decision and take action immediately.

5         So for those types of things we feel it should be

6    closed-book -- I'm sorry, open-book -- sorry -- closed-book.

7    I'm confused.  It should be closed-book.  Sorry.

8    Q.   And just so we're clear, when you're asking a candidate to

9    apply, perhaps, a department rule or regulation, you would

10   provide that rule or regulation and then ask them a series of

11   questions about how they would apply it in that circumstance?

12   A.   We wouldn't necessarily provide the rule, but it would be

13   available for them in the documents for them to peruse and find

14   the relevant information, relevant to the question.

15   Q.   Okay.  I just wanted to make sure that we were clear on

16   that.

17        Now, you had been asked some questions about your review

18   of the data that was provided to you by the HRD underlying the

19   Boston police 2002 examination, which is the examination that

20   had the oral board component.  Do you remember, generally,

21   Mr. Churchill asking you questions about that examination?

22   A.   I do.

23   Q.   And would you agree with me, Dr. Silva, that part of the

24   purpose of the adverse impact analysis is that when you have a

25   large enough group and you have differences in subgroup

1  performance, you can infer that there is something that's

2  driving that subgroup performance difference?

3  A.   Yes, there's something driving it.  If it's a substantial

4  enough sample that you can ascribe stability to the sample,

5  then you can conclude that there is some underlying reason for

6  the difference.

7  Q.   Okay.  And then when you're looking at the data to

8  determine what the underlying reason is for the difference, do

9  you look at things including the raw scores that each

10  individual obtained?

11  A.   Not really.

12  Q.   Okay.  I'm going to show you a spreadsheet which I --

13  because of its size -- this is the spreadsheet that was

14  included in your February 2009 report.  I believe it was the

15  Excel worksheet at Attachment 1.  And I'm going to show you

16  page 16 of that spreadsheet.

17      And I'll represent to you that the spreadsheet recites the

18  scores obtained, without names --

19  A.   I might have misunderstood your question.  You're asking

20  about the raw score differences?

21  Q.   I'm going to remove the question because it seemed...

22  A.   Okay.

23  Q.   We can go back to it if this helps clarify it.  I'm going

24  to show you page 16 of the raw data that was provided to you by

25  HRD -- this is page 16 -- and I'm going to draw your attention

1   to the top column.  So we have the "Exam date," the

2   "Announcement number," "Written" -- and is that the raw written

3   score obtained by each candidate?

4   A.   No, that is the weighted raw score.

5   Q.   Excuse me.  Okay.  The rated raw score.  And the E&E;

6   likewise, is that the weighted raw score?

7   A.   Yes.

8   Q.   And when you say "weighted," can you just explain what you

9   mean?

10  A.   Certainly.  In this exam, the written was weighted 40

11  percent.  So the original raw score was on a 100-point scale,

12  and it was weighted by .4.  So the highest score on the written

13  in that column can only be 40.

14  Q.   Okay.  And then likewise, the E&E, this is --

15  A.   The E&E is weighted 20 percent.  The original score was on

16  a 100-point scale, so the maximum score in that column is 20.

17  Q.   Okay.  And then when we get to column "AC/1," what does

18  that reflect?

19  A.   That column reflects their score weighted by 40 percent.

20  Q.   Okay.  And what does the "Oral" represent?

21  A.   I don't know there.  I don't know what that column

22  represents without knowing -- can you show me up a little bit?

23  Q.   Do you want to see --

24  A.   Yeah.

25  Q.   It's hard to get it all on the monitor.

1   A.   That column was really not used.  Whenever there's data in

2   it, it seems to have the same data as the AC score.  I don't

3   know why it was listed there.

4   Q.   Just to clear up any confusion, I'm going to show you the

5   first page, okay?

6   A.   Okay.

7   Q.   Again, we had "Exam date," "Announcement exam number,"

8   "Written," "E&E," "AC" -- does the AC represent the assessment

9   center score?

10   A.   Yes, that's the weighted assessment center score, a

11   maximum of 40 points.

12   Q.   Okay.  And then here we have the "Final"?

13   A.   Yes.  Those were numbers that I worked backwards from the

14   weighted scores to get the original 100-point scale scores.

15   Q.   Okay.  And then likewise, going forward we have the

16   unweighted scores --

17   A.   Yes.

18   Q.   -- is that correct?

19   A.   That's correct.

20   Q.   And then under "V," is this -- do you understand that to

21   represent the veteran's points that people were eligible to

22   receive if they met the veteran's status?

23   A.   That's right.  They either got zero points or two points.

24   The final -1 column is their total score via the original

25   process.  So it's the sum of the weighted scores.  In that row,

 1  for example, it's 34.15 plus 17.7 plus 38.29 equals 90.14.

 2  Q.    Okay.  And that doesn't take into account the addition of

 3  the statutory points, which is applied after the exam?

 4  A.    That's correct.

 5  Q.    Okay.  Now, in referring you back to the last page of this

 6  document, page 16, under the "Oral," which as we see from the

 7  first page represents the -- or the "AC" represents the score

 8  from the written exam?

 9  A.    Right.

10  Q.    We see that there's no score given for a number of people,

11  correct?

12  A.    That's correct.

13  Q.    And if you go to the preceding page, again, we see one

14  individual in that entire chart that had a score; is that

15  correct?

16  A.    That's correct.

17  Q.    And does that indicate to you, Dr. Silva, there were a

18  number of people who didn't go through the entire exam

19  component?

20  A.    That's true.  And the way HRD scored that was to simply

21  put a zero in for that part of the score.

22  Q.    And is that consistent, or at least is that similar to the

23  experience that you had in Miami where a number of people

24  didn't go through the assessment center process at all even

25  though they had been invited to participate?

1    A.    In Miami we do it a little bit differently.  We simply

2    drop the person out of the process.  The candidates are told

3    that if they do not appear for all of the exam processes, they

4    automatically are disqualified.

5    Q.    Okay.  And in the data that you received and that is

6    included in the chart that is part of your February '09 report,

7    do you understand that you have the data reflecting every

8    candidate who actually sat down and attempted to take the 2002

9    examination?

10   A.    Right.  I have all the data that HRD scored.

11   Q.    Okay.  Whether they passed it or not, whether they

12   completed each component or not?

13   A.    That's true.

14   Q.    And that's the data upon which you made your further

15   calculations that you testified to yesterday about reweighting

16   the oral board component; is that correct?

17   A.    That's correct.

18          MS. HARRIS:  Your Honor, I'd like to offer the chart

19   of the raw data of the scores.

20          MR. LICHTEN:  For Miami or for Boston?

21          MR. CHURCHILL:  It's Boston.

22          THE COURT:  Boston 2002, I assume.

23          MS. HARRIS:  Boston 2002, right.

24          MR. CHURCHILL:  So just to make sure we're on the same

25   page, Exhibit 154 is the spreadsheet.  I believe that was

1    attached to his initial report.  So this is the spreadsheet

2    that was done two days ago.

3              MS. HARRIS:  That's correct.  With the reweighting.

4              MR. LICHTEN:  The analysis.  No objection.  I just

5    wanted to make sure that's what it was.

6              THE COURT:  Okay.  201, is it?

7              MS. HARRIS:  201.

8              (Defense Exhibit No. 201 received into evidence.)

9              MS. HARRIS:  And with that, your Honor, I have no

10    further questions.

11              I'll bring it up.

12                       RECROSS-EXAMINATION

13    BY MR. CHURCHILL:

14    Q.   Dr. Silva, I think you testified earlier that with respect

15    to the 2002 Boston exam, you were unfamiliar with the

16    components or questions on that exam; is that right?

17    A.   That's correct.

18    Q.   But it's your understanding that that exam was

19    developed -- those questions were prepared by

20    Morris & McDaniel?

21    A.   Yes, I'm familiar with Morris & McDaniel.

22    Q.   Okay.  The question, though, was that you understand -- or

23    it's your understanding that those questions were developed by

24    Morris & McDaniel?

25    A.   Yes, it was developed by Morris & McDaniel.

1    Q.   But for the subsequent exams, in 2005, for example, those

2    were not developed by Morris & McDaniel.  Is that your

3    understanding?

4    A.   Say it again?

5    Q.   For the 2005 exam, your understanding is that those

6    exams -- questions were not developed by Morris & McDaniel?

7    A.   I don't know who they were developed by.

8    Q.   Okay.  In terms of the open-book and closed-book, you

9    would agree that the introduction of an open-book component

10   adds to the validity; is that right?

11   A.   No, not necessarily.

12   Q.   Okay.  What adds to the validity when you have a situation

13   where some of the job knowledge that a person might need for

14   that position is the type of information that they have an

15   opportunity to look up?

16   A.   It's not so much an issue of validity as it is an issue of

17   reflecting the job the way it's performed.

18   Q.   Okay.  Well, isn't it that the same thing as content

19   validity?

20   A.   No.  Content validity reflects to more the content aspect

21   so are you testing the same things that you do on the job.

22   This is more the manner in which you test.  But you could make

23   that argument.  I haven't seen it made before, but you could

24   certainly make that argument that you want to measure things

25   the way that they are done on a job both in terms of content

1    and manner.

2    Q.   Okay.  And you, for the exams that you continue to manage

3    in Miami, for example, still use an open-book component; is

4    that right?

5    A.   For sergeants we do.

6    Q.   Yes.

7          MR. CHURCHILL:  Your Honor, with respect to

8    the -- there's a spreadsheet of Miami data that I asked

9    Dr. Silva about, and I think Ms. Harris did as well.  We would

10   ask that this be admitted because we both were referring to it

11   and it would be easier for the record.

12         MS. HARRIS:  I have no objection.

13         MR. CARROLL:  Well, I object in terms of it being

14   offered against Springfield.  This is a Massachusetts test.

15   What relevance does, you know, some test they gave down in

16   Miami, Florida, have to do with Springfield for the raw data?

17         It just -- if they want to offer it as to Boston since

18   there's no objection, then I wouldn't object, but if they're

19   offering it as to Springfield, I think it should be excluded.

20         THE COURT:  Well, no.  I'll overrule the objection.

21   There was testimony about it.  I think it will help complete

22   the record to have it in evidence.

23         THE CLERK:  Exhibit 202.

24         (Plaintiffs' Exhibit No. 202 received into evidence.)

25   BY MR. CHURCHILL:

1  Q.   All right.  And finally, Dr. Silva, the 1998 exam in

2  Miami, the DOJ required you to test more candidates than you

3  thought was feasible; is that right?

4  A.   Yes.

5  Q.   And as a result of that, you had to shorten some of the

6  components that you had devised; is that right?

7  A.   Yes.

8  Q.   And that was over your objections?

9  A.   Yes.

10      MR. CHURCHILL:  One minute, your Honor.

11      (Pause.)

12      MR. CHURCHILL:  I have no further questions.

13      THE COURT:  All right, Dr. Silva.  Thank you.

14      MR. CARROLL:  Your Honor, if I could just ask him two

15  questions on recross as to what was just brought up about the

16  Miami data?

17      THE COURT:  Okay.  Go ahead.

18      MR. CARROLL:  Thank you.

19                    RECROSS-EXAMINATION

20  BY MR. CARROLL:

21  Q.   Dr. Silva, with regard to the questions that you were

22  asked concerning Miami, Florida, an exam apparently that the EB

23  Jacobs company administered there, first of all, there was some

24  data that was introduced as an exhibit.

25      Now, on that Miami test, that was under the direction of

1   the Department of Justice, was it?

2   A.   Yes, it was.

3   Q.   And the HRD statewide examinations in this case, 2005,

4   2006, 2007, 2008, the statewide police sergeant's promotional

5   examinations, were they under the direction of the Department

6   of Justice?

7   A.   I don't believe so but I don't know for sure.

8   Q.   And do you know if Florida law provides for the same thing

9   in its provisions as Massachusetts law with regard to Civil

10  Service examinations?

11  A.   I do not know.

12        MR. CARROLL:   Thank you.   No further questions.

13        THE COURT:   All right.   I think that does it,

14  Dr. Silva.

15        THE WITNESS:   Thank you.

16        THE COURT:   You may step down.

17        (The witness is excused.)

18        MR. LEAHEY:   Your Honor, after speaking with

19  plaintiffs' counsel this morning, we've agreed to the affidavit

20  from Sally McNeely.   I will introduce that into evidence.   I

21  don't know if you want me to correlate the exhibits that she

22  was going to do which have been premarked -- I can do it now, I

23  can do it at a break -- that we'd be submitting her affidavit

24  with the records.   However, then I would just go back, because

25  I know 141 through 145 have been premarked, and I can just add

1  the two new exhibits -- or it could be three, I'm not sure if

2  the Billerica record was in.  I'd need to check that.  But

3  there would be two new records regarding Sally McNeely.

4          And I can do that now or I could do that at the break.

5          THE COURT:  Mr. Churchill?

6          MR. CHURCHILL:  I don't care how it's marked.  But I

7  just want to make the point that we're agreeing to have this

8  exhibit come in -- I'm sorry -- this affidavit come in so that

9  we can expedite matters and finish at some point.  We're not

10 agreeing, obviously, to the relevance of the information in the

11 affidavit.

12         One of the things in the affidavit is HRD's definition

13 of "Hispanic."  And I just want to make it clear on the record

14 that we don't agree to the relevance of that, and we're not

15 agreeing generally to the relevance of what's in the affidavit.

16 We're willing to have it come in in terms of expediting

17 matters.

18         THE COURT:  Well, that's sort of a half objection, I

19 guess.  If it's in -- in the ordinary course, admitting a piece

20 of evidence admits it for whatever relevance it may have, and I

21 guess it leaves you opponents free to argue, more or less,

22 relevance.  To agree that it can come in and to say that it is

23 irrelevant is a little bit inconsistent.  I guess that's my

24 only question.

25         MR. CHURCHILL:  I appreciate that, your Honor.

1          One of the elements of the affidavit is establishing

2     the authenticity -- that these are business records of HRD.  We

3     have, obviously, no problems with that.  Some of the statements

4     in there -- what I'm saying is we're not going to, obviously,

5     appeal any issue of its admission based on relevance, but we're

6     certainly reserving the right to argue that it's relevant or

7     not.

8          THE COURT:  Fine.  So it is just a submission of

9     paper, I gather, right?  So there's an affidavit and paper

10    exhibits.  Put them in whenever.

11         MR. LEAHEY:  Right.  Except for the definition of

12    "Hispanic."  There is no document on that.  But everything else

13    is --

14         THE COURT:  Is that a statement in the affidavit?

15         MR. LEAHEY:  Yes.

16         THE COURT:  Whatever.  Just in terms of mechanics, I

17    mean, when you get the papers ready, give them to us.

18         MR. LEAHEY:  I will do that.

19         THE COURT:  Okay.

20         MR. LEAHEY:  The only other evidence that

21    Lowell -- and I will say that this -- I do have two other

22    exhibits to mark -- or one exhibit to introduce -- which was

23    originally Attorney Lichten had asked regarding I had

24    introduced a certification regarding Officer Torres.  And then

25    there was a discussion there had been one other promotion prior

1   to Officer Torres, it was a Thomas Lombard.  Counsel had asked

2   for that information, I provided it to counsel.  I would just

3   seek to introduce that.

4        And the last document I have, is you had precluded a

5   line of questioning regarding Officer Alvarez's discipline.  I

6   did want to mark just for identification one document that you

7   would not allow.  And my last thing again, just to expedite it,

8   I do have some judicial notice issues regarding the

9   Philippines, Portuguese and the City of Lowell.  I can -- if

10  you'll just allow me to put that in the brief, I can put it in

11  the brief and cite rather than try to go into historical fact

12  and address that now.

13       I would just bring the Court -- it to the Court's

14  attention that I would like to address some of those issues in

15  my brief, and I would cite judicial notice.  And I will provide

16  the references to it.  But just to expedite this rather than

17  having everyone sit here as I talk about the history of the

18  Philippines, the history of Portugal, I would rather do it

19  through -- because it goes to certain arguments that the city

20  would make as to counting Portuguese as Hispanic, and also as

21  to whether or not Alvarez is Hispanic.

22       THE COURT:  Mr. Lichten?

23       MR. LICHTEN:  First, with respect to these two

24  candidates, I'm not sure what Mr. Leahey's referring to.  I

25  don't know what document he wants me to agree or not agree to.

 1    So I just cannot comment on it.

 2            With respect to the second part, obviously either

 3    party can attempt to put in their brief that which they think

 4    is judicially noticeable, but I can't agree to it in advance.

 5    But he could try --

 6            THE COURT:  Well, you can agree that it's noticeable,

 7    is what you're saying?

 8            MR. LICHTEN:  Yeah.  But he could put it in and we

 9    could move to strike it or not.

10            THE COURT:  Again, if it's an argument -- I think

11    that's right.  It could be made that way, with whatever

12    reference is to be noticed, and then we'll decide whether

13    that's proper or not, I guess.

14            MR. LEAHEY:  That's fine.

15            THE COURT:  Okay.

16            MR. LEAHEY:  The one exhibit I have, it was just -- I

17    had e-mailed this, and this was just the one prior promotion

18    that was made off the 2000 HRD list for the promotion made in

19    2003.

20            MR. LICHTEN:  Your Honor, I'll just have to get back

21    to Mr. Leahey.  I just can't make this judgment now.  This is

22    the first I've seen this document.  It may have been sent

23    before.  I'm not saying it wasn't.  But I can't agree or

24    disagree right now.

25            THE COURT:  There are two documents here, and I don't

1    think they're the same thing, so let's talk about one, the one

2    that Mr. Lichten has.  Is that the one you're offering as an

3    exhibit?

4              MR. LEAHEY:  Yes.

5              THE COURT:  There's something else you just want to

6    mark for identification?

7              MR. LEAHEY:  Right.  I haven't -- I can give that to

8    the clerk.

9              THE COURT:  I don't want that yet.  Is what you gave

10   to the clerk the same thing that Mr. Lichten is looking at?

11             MR. LEAHEY:  Yes.

12             THE COURT:  It's a copy of the same thing?

13             MR. LEAHEY:  It was e-mailed -- the day that this

14   testimony came up when the city -- Superintendent Lavalle was

15   on the stand, the city introduced stuff regarding Officer

16   Torres, counsel asked about other promotions and said he didn't

17   have any of the documentation.  I provided -- I e-mailed that

18   documentation to everyone that day.

19             This is literally just what I e-mailed that day, for

20   completeness of the record as to there was a question as to

21   where was Torres?  Did he -- was he one of the bottom people

22   promoted?  And he was actually in the second group of

23   promotions, that this was literally the only promotion that

24   preceded those promotions on October 5th of 2003.

25             MR. LICHTEN:  I will check it.  If that's correct, I

1   won't object to it.  But I just can't do it now.

2         THE COURT:  And it will become an exhibit then, if

3   there's no objection?

4         MR. LICHTEN:  Yes.

5         THE COURT:  Okay.

6         MR. LICHTEN:  But we will look at it.

7         THE COURT:  Okay.  We don't need it yet.

8         MR. LEAHEY:  Okay.

9         THE COURT:  At some point, if there's no objection,

10   somebody will provide us the copy, and it will be marked as

11   203, I guess.

12         MR. LEAHEY:  And the last item I have is just to mark

13   for identification --

14         THE COURT:  Okay.  I don't know what we've marked for

15   identification.  Have we -- there are a lot of things that were

16   premarked that may not have been offered, and I guess in that

17   sense those are marked for identification.

18         So I suppose we just mark this as 204 not in evidence.

19         MR. LEAHEY:  That would be my two cents.

20         (Defense Exhibit No. 204 marked for identification.)

21         THE CLERK:  So we'll mark this as defendant Lowell

22   Exhibit 204 marked for ID only.

23         MR. LEAHEY:  And I don't know if you want the

24   affidavit from McNeely now --

25         THE COURT:  Whenever it's all ready, when you have

1   exhibits that --

2           MR. LEAHEY:  It will take me a little bit of time.

3           THE COURT:  That's fine.

4           MR. LEAHEY:  But other than that, that's all that

5   Lowell has, your Honor.

6           MR. McDERMOTT:  Your Honor, the plaintiffs and the

7   MBTA have entered into the substance of three factual

8   stipulations.  I believe we're just trying to work on the

9   language.

10          THE COURT:  Okay.

11          MR. McDERMOTT:  I can tell you -- they're very

12   straightforward, simply, your Honor.  If we can enter those,

13   perhaps, once we agree?  Maybe Monday enter these?

14          THE COURT:  All right.

15          MS. HARRIS:  Likewise, Boston and the plaintiffs have

16   entered into a couple of stipulations with regard to some of

17   the particular plaintiffs.  And the only other thing Boston

18   would be interested in offering, if it's necessary, is the

19   position of the superior court on the banding issue.  In fact,

20   I don't know if you can take notice of the superior court or

21   you --

22          THE COURT:  I think I probably can.

23          MR. LICHTEN:  We agree.

24          THE COURT:  There's probably a Westlaw citation to it,

25   so that I guess I don't know whether --

```
 1              MS. HARRIS:  In any event, we will provide a copy.

 2              MR. LICHTEN:  We waive any objection to your taking

 3    judicial notice of it.

 4              MS. HARRIS:  And that would be it from Boston on the

 5    face of its case, your Honor.

 6              THE COURT:  Okay.  So with all that done, when it is

 7    done, all defendants rest their presentation at this stage of

 8    the case; is that correct?

 9              MS. HARRIS:  On the liability phase.

10              MR. CARROLL:  Springfield rests on the liability

11    phase, your Honor.

12              MR. McQUILLAN:  Yes.

13              MR. McDERMOTT:  Yes, your Honor.

14              THE COURT:  Mr. Churchill?

15              MR. CHURCHILL:  We just had two items, your Honor.

16    One is the Boston Police Department recently promoted an

17    additional seven promotions of white candidates.  We have a

18    document that reflects that.

19              MS. HARRIS:  That's news to me, but -- I believe you,

20    but we'll review it and --

21              MR. CHURCHILL:  Okay.  We might make that as part of

22    our same stipulation that we're working on with them.

23              And then the final thing, your Honor, is taking up the

24    issue we had yesterday with this new analysis that was done now

25    two days ago, and you had indicated that we would have an
```

1    opportunity to consult with our experts and provide some type

2    of response, and we would like to do that.  We haven't had an

3    opportunity to vet that issue with our experts, but we do want

4    to have that opportunity.

5         THE COURT:  You haven't yet consulted to see whether

6    there's anything they could add on the point?

7         MR. CHURCHILL:  Correct.

8         THE COURT:  Well, let's see what they say.  As I

9    thought more about it, it seemed to be -- while I do think that

10   it would have been better if you had been shown the chart

11   before it was used, it did seem the chart was merely a

12   mathematical computation.

13        MR. CHURCHILL:  That's a big "merely."

14        THE COURT:  Well -- but in other words, in terms

15   of -- well, maybe -- I don't know what -- the math is the math,

16   I guess is what I was going to say.  I don't know how much

17   response can be made to math.

18        MR. CHURCHILL:  Not much by us.

19        THE COURT:  I guess there can be an alternate

20   calculation that pointed in a different direction.  So that's

21   possible, so...

22        MR. CHURCHILL:  And so that --

23        THE COURT:  So, yes, you have the opportunity, as I

24   said yesterday, to consult.  If that means you want to reopen

25   the evidence for some purpose either in person or by a proffer

1   that might be unobjected to as admitted -- as coming into

2   evidence as opposed to being agreed to in substance, then maybe

3   that would be a way of dealing with it.

4          MR. CHURCHILL:  Thank you, your Honor.

5          THE COURT:  I would like a -- well, so let's talk

6   about schedule now.  Maybe you've already thought about this.

7   Normally -- well, there are several agenda items, I guess.

8   Normally in non-jury cases like this the parties would submit

9   proposed findings and rulings, and I expect we'd do that.  And

10  I think the ordinary practice would be simultaneous submission

11  with the opportunity, perhaps, to respond to the opponents'

12  submissions on a second round, okay?

13         I think that should precede, obviously, any argument.

14  And so after we have that briefing we can establish an argument

15  date.  Does that sound generally acceptable?

16         MR. LICHTEN:  Yes.

17         THE COURT:  There are pending motions which I think

18  have been briefed, and I've looked at them but I haven't

19  studied them, because of basically we've been on trial since

20  you left us in July when those were filed.  So I haven't had

21  time to do it, really.  So I don't know what I'm going to do on

22  that.  The possibility is to resolve them on the paper or to

23  resolve them after argument on them, or as the rule permits, to

24  defer until the argument on the whole matter.  And I'm not sure

25  which of those courses we'll take yet.

```
 1              I guess that's that.

 2              MR. LICHTEN:  Do you want to set the briefing

 3     schedule?

 4              THE COURT:  Yes.  What do you propose?

 5              MR. CARROLL:  I was just going to -- before we set the

 6     briefing schedule and close out this phase, just a technical

 7     point.  And maybe I didn't review the rule on the way in this

 8     morning as I probably should have, but in the old days it used

 9     to be that we would renew our motion for a directed finding.

10     The motion for directed finding is one of those motions that I

11     believe the Court has before it, and so I would just ask on

12     behalf of all of the defendants that they be considered renewed

13     to the extent there's some procedural quirk that I'm not --

14              THE COURT:  I don't think it's necessary.  They're not

15     really being renewed because they haven't been acted on yet,

16     so...

17              They're still pending so I don't think -- but I

18     understand your point, and to the extent there's any technical

19     requirement, consider it met.

20              MR. CARROLL:  Thank you, your Honor.

21              MR. LICHTEN:  We would propose for a briefing schedule

22     something in the order of the end of October for the first set

23     of simultaneous briefs and then maybe 21 days thereafter for

24     the responsive, and then oral argument before you in early

25     December.
```

1          MS. HARRIS:  That would be ideal, your Honor.  And I

2     would just like you to know we are looking at another exam

3     cycle, so the department would appreciate whatever we can do.

4          THE COURT:  That sounds good to me, too.  So let's

5     look at the calendar.  It looks like the 29th of October is a

6     Friday, so why don't we say that.

7          MR. LICHTEN:  That's fine.

8          THE COURT:  Or if you want to work over the weekend,

9     we could say November 1st.

10          MR. CHURCHILL:  It's Halloween, your Honor.

11          MS. HARRIS:  I prefer the 29th.

12          MR. CHURCHILL:  Friday is better.

13          THE COURT:  Then the next one would be -- 21 days

14     thereafter would be November 19th, also a Friday.  That gets it

15     done before Thanksgiving.  Let me look with a little more

16     refinement at our other work for the hearing date, but early

17     December sounds good.  And we'll just try to find a -- maybe we

18     could do it now.

19          MR. CARROLL:  Your Honor, on the hearing date, would

20     that be in the afternoon or the morning?

21          THE COURT:  That's a very good question.  I think

22     we're going to need a lot of time for it, so probably morning.

23          MR. CARROLL:  I just thought I would raise it in the

24     hopes --

25          THE COURT:  That's a good point.  So we won't set that

1    now.  Let me play with the calendar and decide what that should

2    be.

3           MS. ENGDAHL:  Your Honor, I understand you're

4    considering various options with regard to the motions that are

5    currently before you, but Worcester would like to be on the

6    record as requesting an opportunity to be heard as soon as

7    possible.  I believe Worcester's case is so compelling, I would

8    like to make my case before I have to file an extensive brief

9    in this case.

10          THE COURT:  No, I understand that.

11          MS. ENGDAHL:  Thank you.

12          THE COURT:  Okay.  Thank you.

13          COUNSEL IN UNISON:  Thank you, your Honor.

14          THE COURT:  We'll be in recess.  We'll come back on

15   the other case in a few minutes.

16          MR. CARROLL:  Your Honor, will an order issue on these

17   dates?

18          THE COURT:  No; it will be in the clerk's minutes.

19          MR. CARROLL:  Thank you, your Honor.

20          THE CLERK:  All rise.  Court is in recess.

21          (The Court exited the courtroom and the proceedings

22   adjourned at 11:06 a.m.)

23

24

25

1              C E R T I F I C A T E

2

3          I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4     the United States District Court, do hereby certify that the

5     foregoing transcript constitutes, to the best of my skill and

6     ability, a true and accurate transcription of my stenotype

7     notes taken in the matter of Civil Action No. 07-11693-GAO,

8     Pedro Lopez, et al, v. City of Lawrence, et al.

9

10    /s/ Marcia G. Patrisso
      MARCIA G. PATRISSO, RMR, CRR
11    Official Court Reporter

12    Dated:  9/17/10

13

14

15

16

17

18

19

20

21

22

23

24

25