UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| PEDRO LOPEZ, ET AL | ) | |
| Plaintiffs | ) | |
| | ) | Civil Action No. 07-11693-GAO |
| v. | ) | |
| | ) | |
| CITY OF LAWRENCE, ET AL. | ) | |
| Defendants | ) | |
| | ) | |

PROPOSED FINDINGS OF FACT AND RULINGS OF LAW
BY THE DEFENDANTS
CITY OF SPRINGFIELD AND MAYOR SARNO

I. INTRODUCTION

Now come the defendants, City of Springfield and Domenic J. Sarno Jr. in his capacity as mayor for the City of Springfield, (hereinafter collectively called "Springfield"), and request that the Court adopt the following Findings of Fact and Conclusions of Law based on the evidence adduced at trial.

II. FINDINGS OF FACT

A. The Parties

1.    This is a civil action in which the plaintiffs, Hispanic and African-American police officers in the Commonwealth of Massachusetts who took the Commonwealth's promotional examination for the position of police sergeant in the years 2005, 2006, 2007, or 2008, challenged the sergeant's promotional examinations on the grounds that it had a disparate impact on minority test takers and was not shown to be job-related. (7th Am. Compl., ¶1).

2.    Only six of the plaintiffs in this case are members of the Springfield police department. They are collectively called the "Springfield Plaintiffs" and are individually

identified below.  All the other plaintiffs are members of other Police Departments: Boston Police Department, MBTA, Methuen, Lawrence, Lowell and Worcester.

3.      The plaintiff, James A. Jackson, is an African American resident of Springfield, and is a police officer for the City of Springfield, Massachusetts. (7th Am. Compl., ¶40; Ex. 125).

4.      The plaintiff, Juan Rosario, is a Hispanic resident of Springfield, and is a police officer for the City of Springfield, Massachusetts. (7th Am. Compl., ¶41; Ex. 126).

5.      The plaintiff, Louis Rosario Jr., is a Hispanic resident of Springfield, and is a police officer for the City of Springfield, Massachusetts. (7th Am. Compl., ¶42; Ex. 127).

6.      The plaintiff, Obed Almeyda, is a Hispanic resident of Springfield, and is a police officer for the City of Springfield, Massachusetts. (7th Am. Compl., ¶43; Ex. 128).

7.      The plaintiff, Devon Williams, is an African American resident of Springfield, and is a police officer for the City of Springfield, Massachusetts. (7th Am. Compl., ¶44; Ex. 129).

8.      The plaintiff, Julio M. Toledo, is a Hispanic resident of Springfield, and is a police officer for the City of Springfield, Massachusetts. (7th Am. Compl., ¶45; Ex. 130).

9.      As of April 10, 2010, Julio Toledo is a Springfield Police Sergeant.  (Ex. 172).

10.      The defendant, City of Springfield, is a duly incorporated municipality of the Commonwealth of Massachusetts which operates a police department. (7th Am. Compl., ¶65).

11.      The defendant, Domenic Sarno Jr., ("Mayor Sarno") is the Mayor of the City of Springfield.  (7th Am. Compl., ¶66).

**B. The Springfield Police Sergeant's Position and Promotional Process**

12.     In Springfield, police sergeants perform responsible, supervisory police work in

protecting life and property through the enforcement of laws and ordinances. A

Springfield police sergeant's work

> involves responsibility for supervising the performance of police duties by
> patrolmen in an assigned area, or for performing specialized and technical staff
> work of comparable difficulty and responsibility. Work is performed under
> general supervision in accordance with standard police practices and departmental
> regulations and frequently involves the performance of hazardous and strenuous
> tasks and the exercise of initiative and judgment in making work decisions in
> emergen[cy] situations endangering li[f]e and property. Supervision is exercised
> over assigned patrolmen.

(Ex. 165).

13.     A Springfield police sergeant, in performing the duties of their office, is

motivated by legislative mandates, not business or personal reasons. The nature of the

police sergeant's work, described by the illustrative examples of work, reveals that a

Springfield police sergeant is not engaged in an industry affecting commerce. (Ex. 165).

In preparing the challenged Police Sergeants Examinations, *see* discussion *infra*, the

commonwealth reviewed the primary purpose of the police sergeant's position and

determined that a:

> Sergeant is primarily a field position which is assigned to supervise the actions of
> all or some of the police officers assigned to a particular shift. The primary
> purpose of this position is to provide direction to and directly supervise police
> officers engaged in the protection of the citizens of the community and general
> law enforcement activities.

(Ex. 41, Attach. CC, #IV).

14.     The Springfield Police Sergeant's position was described by Springfield Police

Commissioner William Fitchet, who worked his way up through the ranks over the

course of his lengthy career in the Springfield Police Department:

Q. And could you briefly, in your own words, describe to us what the work of a sergeant is in the Springfield Police Department?

A. Well, as the list indicates, it's very comprehensive, but sergeant is a first-line supervisor, generally detailed to the street duty although occasionally detailed to the booking process. When the officers run into a difficult situation, they call for the sergeants. The sergeants rely on their experience and their expertise to give advice to the patrol officers regarding whatever problem's on the street.

I have a large number of sergeants that are in the detective division as investigators that have a high-level of expertise and have investigative skills that they utilize not only to present cases in court and to effect arrest, but also to teach patrol officers regarding their amount of knowledge. They respond to hazardous material spills, they respond to -- they're first responders to major crime scenes, to major disturbances, and they, by and large, direct the operations at the street level during those type of events that are happening on the street.

They are in charge of the cell block, prisoner safety, are concerned with needs for medical attention for prisoners, the welfare and well-being of the prisoners, all of the various complicated tasks of being a booking sergeant with the logs and the logging process. So it's a very comprehensive job.

(Trial Tr. 12-78, ll. 17-25; 12-79, ll. 1-16).

15.    After HRD administers a police sergeants' promotional examination the civil

service law requires that HRD:

create and maintain eligible lists of candidates for possible promotion to police sergeant, broken down by police department. While eligible lists ordinarily ranked promotion candidates in order of their written examination scores, the law also imposed a number of preferences that significantly affected candidates' rankings. Various categories of veterans, for instance, are given an absolute preference over other candidates, and candidates meeting that description are listed in order of examination performance before any other candidates, even if other candidates received higher scores. By virtue of these mandatory preferences, the top scorers on the HRD written examinations were not inevitably the candidates listed at the top of the eligibility list. By law, an eligibility list produced in a given year also usually expired after two years, and such lists were available for public inspection.

Municipalities only saw these eligibility lists if they determined that they had a vacancy for police sergeant and decided to fill it through promotion by using the results of the HRD examination.

*Lopez v. Massachusetts*, 588 F.3d 69, 78 (1st Cir. 2009) (citations omitted).

16.     When a police sergeant's position becomes vacant in order to fill the vacant

position the Springfield Police:

> department would notify HRD of the number of vacancies in the department
> through a requisition. Pursuant to § 27, HRD would then certify from the relevant
> eligible list the names of the three candidates at the top of the list who confirmed
> that they were willing to accept the job. If a candidate did not so confirm, that
> name was removed, altering the rankings.
>
> HRD, under its rulemaking authority, also promulgated PAR.09 in its
> Personnel Administration Rules, a rule to clarify the number of names to be
> certified based on the number of vacancies a local police department identified.
> Human Res. Div., Personnel Administration Rules PAR.09 (2003). PAR.09,
> commonly referred to as the "2n + 1" rule, states that to fill a certain number of
> vacancies, a municipality can choose from a number of candidates from the
> ranked list equal to twice the number of vacancies plus one. The rule extrapolates
> from the statutory requirement that HRD certify three candidates for a single
> vacancy. If there are two vacancies, the municipality must choose among the top
> five candidates, and so on.

*Lopez v. Massachusetts*, 588 F.3d 69, 78-79 (1st Cir. 2009) (citations omitted); *see also*

Exs. 161-64 (authorizing employment of Springfield police sergeants).

17.     The internal promotional process utilized by Springfield for police sergeant was

described by Springfield Police Commissioner William Fitchet as follows:

> Q. What is the promotional process for promoting sergeants in Springfield?
>
> A. There has to be a vacancy occur, which usually results as a result of a
> retirement. Then we have to petition the policy board to fill that vacancy. The
> mayor's office is represented in that policy board.
>
> Q. And is that a budgetary matter, to make sure there's funds for it?
>
> A. That's correct. If that policy board approves filling that vacancy, our personnel
> department petitions Civil Service for an eligibility list. Depending on the
> number of vacancies that you're trying to fill, they will send you a list. If it's only
> one position, it would be three people. If it's more than that, it's two times the
> number of positions plus one. That list is sent to the police department through
> the personnel department, and officers that are willing to accept that appointment
> will sign off on that list. At some point after they sign off on the list, an interview
> process is scheduled.

Q. Can I just ask you in terms of an interview process, could you describe what the structure of that interview entails?

A. The interview process is a three-member board of command staff of the Springfield Police Department, captains or deputy chiefs or the commissioner, and they interview potential candidates for the position that they're applying for by asking a series of questions and notating what their replies were and marking their replies with a numerical rating.

Q. And are these a set of questions, that everyone gets the same questions?

A. Everyone gets the same questions, yes.

Q. All right. And what are the subject matters of the questions?

A. General police operations and organization and situational questions as to what process the potential candidate might take in a given scenario, things of that nature.

Q. And then are the answers graded by the interviewers on a scale?

A. Yes, sir.

Q. A numerical scale?

A. That's correct.

Q. And other than the interview process, is there any background check that goes on?

A. Yes, there is.

Q. And what does that entail?

A. It entails review of the officers' performance, sick time, injured-on-duty time, any internal affairs investigations, any disciplinary action, and recommendations from the commanding officers of the officers that are the candidates.

(Trial Tr. 12-58, ll. 23-25; 12-59, ll. 1-25; 12-60, ll. 1-20; *see also* Ex. 69).

18.    Springfield's promotional process enhanced the content validity of the 2005 and

2007 HRD police sergeants' examinations. "Content validity is a judgmental process that

evaluates how well the content of the test corresponds to the content of the job in terms of

the requirements to do the important tasks and duties of the job." (Trial Tr. 4-77, ll. 6-9).

Dr. Wiesen explained how the actual appointment process, like the one used by Springfield, enhances the validity of the HRD police sergeants' promotional examinations:

> Q. Do you know before making an appointment to police sergeant the City of Springfield would get recommendations from the supervisors of the candidates?
>
> A. I think you might have mentioned something like that at my deposition, but I did not have any other knowledge.
>
> Q. Okay. And that would actually improve the validity of the appointment?
>
> A. That definitely has the potential of improving the validity process, yes.
>
> Q. Can you explain why that is?
>
> A. Well, the test measured a somewhat narrow slice of the candidate. First, it's only one performance on one day, and then the multiple choice test measured a fairly circumscribed area of knowledges. They might have been important, but it was circumscribed. So the supervisors of the applicants would be able to comment on many other aspects of the candidates from the mundane as in terms of attendance and promptitude to thoroughness to ability to interact with citizens. So the supervisors would have a rich source of information about the candidates that the test would not reflect.
>
> Q. And if a structured interview was used by the City of Springfield in reviewing the certified candidates for appointment, how would that impact upon the validity of the exam?
>
> A. It would improve the selections from among the people certified, but it would not improve the overall exam as much because the people who weren't certified weren't part of that structured process.
>
> Q. Okay. But you've testified the people who weren't certified essentially could not be appointed to the position because of the Civil Service law.
>
> A. Under the exam that the city signed up for, that's correct.
>
> Q. Okay. So under the promotional exam for sergeant, would it be your view that a structured interview in conjunction with the recommendations from supervisors of the candidates would enhance the validity of the appointment?

A. It would definitely make the selections from amongst the people who were certified more informed and I think probably better decisions.

(Trial Tr. 4-85, ll. 15-25; 4-86, ll. 1-25; 4-87, ll. 1-4).

### C. The Examinations and Civil Service Lists

19.     Plaintiffs are challenging four separate, police sergeant, promotional, examinations given by the commonwealth.[1]  Specifically, plaintiffs challenge the civil service police sergeant examinations given in 2005, 2006, 2007, and 2008.  (7th Am. Compl., ¶¶ 1, 63, 68).

20.     The processes which were followed in developing and administering the challenged police promotional selection procedures for the rank of sergeant are described in a "1991 Validation Report" by the Commonwealth of Massachusetts' Department of Personnel Administration ("DPA").  (Ex. 40).

21.     The 1991 Validation Report was the result of a detailed work plan.  (Ex. 41, attach. D).  The work plan was implemented by DPA and that entire effort is extensively documented by the voluminous appendices attached to the 1991 Validation Report.  (Ex. 41, attach. A-Z).  At the time the work plan was written, plaintiffs' expert, Dr. Joel P. Wiesen ("Dr. Wiesen"), was employed as DPA's Director of Test Development and Validation.  (Ex. 50A).

---

[1]     Although local policing jurisdictions subject to the civil service law "have long been able to opt out of the HRD-administered process and implement their own promotional examinations pursuant to an agreement with HRD" *Lopez v. Massachusetts*, 588 F.3d 69, 76 (1st Cir. 2009) (citations omitted), they are not required to do so and none of the defendants in this case elected to do so.

22.     The DPA is now known as the human resources division ("HRD"). *Mass. Ass'n of Minority Law Enforcement Officers v. Abban*, 434 Mass. 256, 257 (2001). HRD actually administered the four challenged examinations.[2] HRD:

> is a state agency with statutorily prescribed duties with respect to the administration of the state civil service system, including the preparation and administration of certain competitive promotions examinations. The civil service law identifies HRD as the "[a]dministrator," meaning "the personnel administrator of the human resources division," as distinct from an "appointing authority" with the "power to appoint or employ" the plaintiffs. As the administrator, HRD has statutory authority to "make and amend rules which shall regulate the recruitment, selection, training and employment of persons for civil service positions."

*Lopez v. Massachusetts*, 588 F.3d 69, 75 (1st Cir. 2009) (citations omitted).

23.     In addition HRD is legally required "to make rules pertaining to promotional appointments" and in charge of conducting promotional examinations. "HRD is also responsible for maintaining records of examinations, eligible lists resulting from those examinations, and the results of all appointment decisions in the civil service." *Id.* (citations omitted).

---

[2]     "HRD is not the only state agency responsible for the administration of the Massachusetts civil service system. HRD shares this role with another agency, the Civil Service Commission. The Commission has the power to review any rules proposed by HRD, and, if the Commission concludes that a given rule violates a merit-based approach to employment decisions, it can, upon a three-fifths vote, disapprove of the rule. The Commission can also affirmatively propose amendments to these rules if, in the Commission's view, those changes would reflect basic principles of merit and would serve the public interest.
      Finally, the Commission, not HRD, is responsible for adjudicating disputes involving various aspects of employment, including disputes concerning the content and administration of promotions examinations. Through this process, individuals who are disappointed by employment decisions can challenge actions taken by a 'local appointing authority' and those taken by HRD." *Lopez v. Massachusetts*, 588 F.3d 69, 75-76 (1st Cir. 2009) (citations omitted).

24.     Dr. Wiesen's resume states that he was DPA's Director of Test Development and

Validation from 1977 to 1993. (Ex. 50A). Dr. Wiesen repeatedly testified that he did not

have a clear recollection of being involved in the work plan or the 1991 Validation

Report (Tr. Tr. 5-31 thru 5-50). Nevertheless, Dr. Wiesen is listed as a "required

resource"[3] for the following tasks set forth in the work plan:

> I.       Develop staffing Patterns and Determine Sample;
> ....
> VIII.    Develop Methodology for determining frequent and critical tasks of the
>          job (Comprehensive Task Inventory Questionnaire, using op scannable
>          answer sheets and multilevel scales and including room for SME's to add
>          tasks if necessary);
>
> ....
> X.       Develop a critical Incident Methodology;
> ....
> XII.     Develop methodologies for determining KSAP's required at hire and
>          weighting them as to their relative importance to the tasks performed and
>          linking them to frequent and critical tasks;
>
> ....
> XVI.     Develop method for validating training and experience schedules;

(Ex. 41, Attach. D).

25.     The amount of effort which went into development of the 1991 Validation Report

was not the result of mere happenstance; it was a concentrated effort by the state to

comply with the requirements of Title VII by producing police promotional examinations

which were content valid and fair to all applicants.

> State civil service law and a consent decree to which HRD's predecessor agency
> was a party shaped the content and form of these examinations. That consent
> decree, entered in 1980, arose from civil rights litigation involving the Boston
> police department, but, in general terms, HRD's predecessor agreed to develop
> and administer promotional examinations that complied with the Equal
> Employment Opportunity Commission's (EEOC) Uniform Guidelines on
> Employee Selection Procedures (1978), 29 C.F.R. § 1607.1-18. See Boston Police

---

[3]     Dr. Wiesen's first name is Joel; during the trial he admitted that he was the only
person with that name working for DPA. (Trial Tr. 5-33 ll. 21-22).

> Superior Officers Fed'n v. City of Boston, 147 F.3d 13, 15, 17-18 (1st Cir. 1998)
> (describing the terms of the consent decree as it applied to HRD's predecessor).
> The Guidelines required, inter alia, maintaining records that show the impact that
> examinations have on applicants according to race, sex, or ethnic group, see 29
> C.F.R. § 1607.4(A), and complying with stringent standards to verify that the
> substance and form of the examinations are significantly related to job
> performance, id. § 1607.5.

*Lopez v. Massachusetts*, 588 F.3d 69, 77 (1st Cir. 2009).

26.     The police sergeant's examination administered by HRD was given in some

municipalities in 2005, others in 2006, others in 2007, and others again in 2008. (7th Am.

Compl., ¶ 75).

27.     The general legal framework under which the challenged examinations were

given has been described by the First Circuit as follows:

> By law, municipal police promotions must be made on the basis of
> competitive examinations, whether on the basis of the HRD examination or some
> other test. HRD is given statutory authority to establish the form and content of
> these examinations. However, HRD's discretion in this area is bounded. By
> statute, all examinations must 'fairly test the knowledge, skills and abilities which
> can be practically and reliably measured and which are actually required' to
> perform the job, a requirement that may significantly limit both the form and the
> substance of an examination. And HRD must consult with labor representatives
> and professionals in the field to determine what skills and abilities are relevant for
> promotion to police sergeant or any other position.
>
> For decades, HRD and its predecessor agency developed annual written
> examinations to evaluate candidates for police sergeant promotions. State civil
> service law and a consent decree to which HRD's predecessor agency was a party
> shaped the content and form of these examinations.

*Lopez v. Massachusetts*, 588 F.3d 69, 77 (1st Cir. 2009) (citations omitted).

28.     No plaintiff took more than two out of four of the challenged HRD police

sergeant's promotional examinations. (Ex. 53, p.5 - Table 1).

29.     The "police promotional examinations HRD developed in 2005, 2006, and 2007

consisted of one hundred multiple-choice questions derived from law enforcement

textbooks. The highest possible score on the test was 100, and 70 was the minimum

passing score. After developing the examinations, HRD was required by law to prepare a

notice of the examination for promotion to police sergeant. Massachusetts civil service

law also limited the possible pool of promotional candidates to only those officers who

had served on the force for at least three years in most cities." *Lopez v. Massachusetts*,

588 F.3d 69, 78 (1st Cir. 2009) (citations omitted).

30.     The Springfield Plaintiffs only took the 2005 and 2007 HRD police sergeant's

promotional examinations. (Ex. 53, p.5 - Table 1; *also compare* Ex. 74 & Ex. 76 (listing

information about Springfield police sergeant candidates) *with* Ex. 75 & Ex. 77 (omitting

information about Springfield police sergeant candidates)).

### D. The Springfield Plaintiffs' Administrative Challenges

31.     On September 24, 2008, Springfield plaintiff, James Jackson, filed an

EEOC/MCAD complaint alleging that on the "violation date: 03/04/08" he was

discriminated against. (Ex. 125).

32.     On September 24, 2008, Springfield plaintiff, Juan Rosario, filed an

EEOC/MCAD complaint alleging that on the "violation date: 03/04/08" he was

discriminated against. (Ex. 126).

33.     On September 24, 2008, Springfield plaintiff, Louis Rosario, filed an

EEOC/MCAD complaint alleging that on the "violation date: 03/01/08" he was

discriminated against. (Ex. 127).

34.     On September 24, 2008, Springfield plaintiff, Obed Almeyda, filed an

EEOC/MCAD complaint alleging that on the "violation date: 03/01/08" he was

discriminated against. (Ex. 128).

35.     On September 24, 2008, Springfield plaintiff, Devon Williams, filed an

EEOC/MCAD complaint alleging that on the "violation date: 03/01/08" he was

discriminated against. (Ex. 129).

36.     On September 24, 2008, Springfield plaintiff, Julio M. Toledo, filed an

EEOC/MCAD complaint alleging that on the "violation date: 03/01/08" he was

discriminated against.  (Ex. 130).

**E.  Content Valid Exam**

37.     The 1991 Validation Report outlines the work DPA performed and it reveals that

a conscious effort was made to develop a content valid examination to:

> comply with the requirements of the Uniform Guidelines on Employee Selection
> Procedures (UGESP) with respect to content validity, DPA conducted a
> comprehensive job analysis study of all superior officer ta[s]ks, including
> sergeant, lieutenant, captain[], deputy chief and chief.  The job content
> information gathered as a result of the job analysis study provided a foundation
> for the development of the initial selection procedures which included a written
> multiple choice examination and a training and experience (also called an
> education and experience) component.
>
> Upon receipt of the job analysis data, the public safety selection unit reviewed the
> material, mindful of the requirements stated in the UGESP, in order to determine
> several factors: content for the examination announcement; what type of
> instrument(s) would be used for the examination; and the composition of the
> recommended reading list.  The written instrument used a banded examination
> approach; i.e., questions testing common knowledges, skills and abilities for all
> three levels being tested were answered by all applicants.  In accordance with the
> UGESP, the administration of the examination was standardized across the state.

(Ex. 40 at 00247).

38.     Dr. Wiesen, who worked for DPA at the time the 1991 Validation Report was

written, admitted:

> that the project staff that put this together were experienced in job analysis, and I
> think they were particularly experienced in the task questionnaires.  They had
> some knowledge of the KSAP areas as well and they, I'm sure, tried as hard as
> they could to come up with a list of knowledge, skills, and abilities that was

appropriate for the tasks that had already been identified as important. Now, whether they did a perfect job or not, that's another matter, but I'm sure that's what they strived to do.

(Trial Tr. 4-82, ll. 11-19).

39.    One of the nations leading Industrial Psychologists[4], Dr. James Lawrence Outtz,

testified:

that the job of a police sergeant is one that has not changed very much in 20 years really, especially in terms of the knowledges, skills and abilities required to do it. So that this 1991 validation study that I looked at, I felt that the job analysis was done quite well and that I would have expected to see some update of that job analysis around eight or so -- at least eight or so years later, maybe eight or nine. And that's exactly what I found. Around the year 2000 another job analysis was done building upon that 1991 job analysis, and that simply buttressed what was done in 1991. And throughout this period of time from 1991, particularly with regard to the exams at issue in this case, they build off of both of those job analyses really.

(Trial Tr. 14-36, ll. 13-25; 14-37, l.1).

40.    After reviewing the materials in this case, Dr. Outtz "reached the conclusion that the examination process with the written test and the assessment of education and experience, that combination constituted a valid process" and it complied "with the Uniform Guidelines" (Trial Tr. 14-35, ll. 4-13).

41.    Dr. Outtz testified, to a reasonable degree of scientific certainty, that the 2005 police sergeant's promotional examination given by the Commonwealth of Massachusetts was valid[5]:

--------

[4]    (Ex. 180); (Trial Tr. 14-6 thru 14-14).

[5]    (Trial Tr. 14-15, ll. 11-25; 14-16 ll. 1-3) (explaining validity concept). The Supreme Court has noted that "scientists typically distinguish between 'validity' (does the principle support what it purports to show?) and 'reliability' (does application of the principle produce consistent results?). Although 'the difference between accuracy, validity, and reliability may be such that each is distinct from the other by no more than a hen's kick,' our reference here is to evidentiary reliability -- that is, trustworthiness. In a

By virtue of the fact that my understanding is that – and my review of documents indicates that those exams were developed in the same way as the Boston exam, the primary difference being the policies and practices of the Boston Police Department were focused on for the Boston exam, those exams have the same validity underpinning as the Boston exams, and I think they are indeed valid and meet the Uniform Guidelines.

(Trial Tr. 15-34, ll. 5-19). Dr. Outtz explained the reasons for his opinion saying:

The basis for my opinion, as I just stated, is it's my understanding that -- and the documents I reviewed indicate that those exams emanated initially from the 1991 validation study. Those exams were buttressed by the 2002 job analysis just as -- and that no data indicated substantial differences between the job of a police sergeant in other jurisdictions and a police sergeant in Boston. So there was little reason to believe that the 2002 analysis didn't apply to jobs outside of Boston, and that I was interested in was there any data indicating substantial differences between the police sergeant position in the other -- these jurisdictions – other jurisdictions and Boston, and I have seen no such data.

(Trial Tr. 15-34, ll. 22-25; 15-35, ll. 1-12).

42.    Dr. Outtz testified to the things he saw in the 1991, and then in the 2000, job analysis that assured him the necessary procedures for a content valid process had been followed (Trial Tr. 14-37, ll. 18-25, thru 14-41, l. 8) in accordance with the Uniform Guidelines. (Trial Tr. 14-41, ll. 9-25, thru 14-46, l. 20).

43.    In the context of the facts of this case, Dr. Outtz opined that the HRD police sergeant promotional examinations:

are acceptably valid with regard to the Uniform Guidelines.

THE COURT: So they meet the pass cutoff?

THE WITNESS: Yes, your Honor. Could they be made more valid? Yes. I think they are valid, and I think they meet the Uniform Guidelines in that regard.

---

case involving scientific evidence, evidentiary reliability will be based upon scientific validity." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 590 n.9 (1993) (citations omitted).

THE COURT: Now, you talked about context in terms of assessing the likelihood of affecting adverse impact.

THE WITNESS: Yes, your Honor.

THE COURT: Does context affect a judgment of validity as well?

THE WITNESS: It does. It does. It presents less of a problem in terms of validity because we can handle, you know, certain kinds of constraints and how they might precisely affect validity. We know a lot less in terms of how they might precisely affect potential adverse impact.

THE COURT: So your opinion that the tests were valid takes account of the context?

THE WITNESS: That is correct.

(Trial Tr. 15-36, ll. 1-20).

### F. Business Necessity

44.     Springfield's business necessity to use the HRD police sergeants' promotional examinations in 2005 and 2007 stems from the deplorable state of Springfield's financial condition at that time – Springfield was broke.

45.     Springfield Police Commissioner Fitchet testified about the promotional process for promoting sergeants in Springfield saying that when a vacancy occurs "we have to petition the policy board to fill that vacancy. The mayor's office is represented in that policy board"; that is a budgetary matter, to make sure there are funds for it. "If that policy board approves filling that vacancy, our personnel department petitions Civil Service for an eligibility list." (Trial Tr. 12-58, ll. 23-25; 12-59, ll. 1-6).

46.     Commissioner Fitchet also described the budget of the Springfield Police Department:

> Q. And what -- how would you describe the budget of the Springfield Police Department?

A. It's very lean. It's a lean budget.

Q. And what parameters did the mayor give you, or has the mayor given you, since you've been police commissioner in the preparation of your budget?

A. He's asked that we prepare a level-funded budget, which means that the funding has to be the same as the year before, and also to prepare budgets with a 5 percent reduction and with a 10 percent reduction.

(Trial Tr. 12-72, ll. 22-25; 12-73, ll. 1-6).

47.      The reason the Springfield police budget had to be very lean was that in 2005 and 2007 Springfield was in the midst of a severe financial crisis.  In response to Springfield's financial crisis the Governor and State Legislature enacted Chapter 169 of the Acts of 2004 which, in relevant part, provides:

> The general court finds that:-
>
> (1) The city of Springfield has a projected structural deficit for fiscal year 2005.
>
> (2) Without significant changes the city is likely to project a structural deficit in fiscal year 2006.
>
> (3) As a result of such structural deficits, the city is unable to enact a balanced budget and is in fiscal crisis.
>
> (4) The fiscal crisis poses an imminent danger to the safety of citizens of the city and their property.
>
> (5) Without an approved balanced budget, the city will be unable to collect property taxes during part or all of fiscal year 2005.
>
> (6) The city may be unable to obtain reasonable access to credit markets.
>
> (7) The city's credit has been downgraded to a sub-investment grade credit rating.
>
> (8) The city has received fiscal 2004 local aid from the commonwealth in excess of $260,000,000, representing over 60 per cent of its operating budget, a proportion in keeping with that of recent years.

17

(9) Special acts approved in 1989, 1991 and 1996 have not been
successful in achieving fiscal stability for the city.

(10) In order to assure a comprehensive long-term solution to the city's
financial problems, it is necessary to enact extraordinary remedies,
including a finance control board and, if necessary, a receiver, with the
powers necessary to achieve the intent of this act.

(11) The governor has recommended to the general court pursuant to
section 8 of Article LXXXIX of the Amendments to the Constitution that
legislation be enacted to resolve the financial emergency in the city and to
restore financial stability to the city.

(Ex. 160, § 1).

### G. No Reasonable Alternative

48.    Plaintiffs' suggest an assessment center type examination as an alternative

selection device for police sergeants.  (Trial Tr. 3-86, ll.13-25; 3-87, ll. 1-4).

49.    Plaintiffs' suggestion concerning the alternative selection device is questionable

in light of the evidence regarding assessment centers in the Springfield Police

Department.

50.    Springfield Police Commissioner Fitchet, who competed in an assessment center

selection examination for the Springfield Police Chief's position (Trial Tr. 12-73, ll. 12-

25; 12-74, ll. 1-25; 12-75, ll. 1-3), testified that he had been:

> dissatisfied with some of the components of the assessment center.  I felt that the
> role-playing components weren't necessarily testing properly for the position that
> was being applied for.  I wasn't satisfied with -- well, ultimately, with the marking
> of the assessment center.  There was no objective component; there was no
> written component to the assessment center.  I thought that was -- made the
> assessment center incomplete or made the testing process incomplete.
>
> The total promotion process relied on that, those four descriptions that I gave on
> the assessment center.  I didn't feel that that tested appropriately.

(Trial Tr. 12-75, ll. 8-19).

51.     Commissioner Fitchet testified that the Springfield Financial Control Board

required him to use an assessment center as the selection process for Deputy Police

Chief; however, the Commissioner did not feel that ranking of the candidates from the

assessment center matched what he considered to be the relative quality of each of the

candidates.

> THE WITNESS: I didn't believe that it accurately depicted the qualities of each one of the candidates.
>
> BY MR. PIKULA:
>
> Q. And why not?
>
> A. Well, in particular, there was one captain who had 40 years' experience, led the detective bureau, had a vast amount of knowledge and expertise, and he flunked the assessment center. And I found that to be incredible.
>
> Q. And so was that individual not, then, provided to you as certified for appointment?
>
> A. He was not provided to me, no.
>
> Q. All right. How about for the candidates that were provided to you for certification for your appointment, how would you describe that ranking based on your experience and knowledge of these -- of working with these officers....
>
> THE WITNESS: I found that some very -- or extremely competent captains were ranked very low. I believe that all of the captains were competent leaders and competent captains; however, I had some very experienced captains that ranked very low on the list, and it surprised me.
>
> BY MR. PIKULA:
> Q. And did you follow the ranking that was provided to you by the certification when you made your appointments?
>
> A. No, I didn't.
>
> Q. And why not?
>
> A. I had an interview process with the deputies. I knew what their work product was. I had worked with most of them for over 30 years. And I chose those candidates that I thought were best qualified for that position.

19