(Trial Tr. 12-75, ll. 21-25; 12-76, ll. 5-6; 12-77, ll. 1-25; 12-78, ll. 1-12).

52.    Dr. Wiesen's testimony under cross examination reveals a concern about the assessment center scoring process in which he has seen a 20-point swing on a 100-point scale during the rescoring of an assessment center.  (Trial Tr. 10-46, ll. 8-25; 10-47, ll. 1-22).

### III. DISCUSSION AND CONCLUSIONS OF LAW

### A. State and Federal Law Disparate Impact Standard

1.    Plaintiffs' ground their case upon two "disparate impact" theories: "violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e)" and "M.G.L. ch.151B, §4".  (7th Am. Compl., counts I and II).

2.    "Plaintiffs are African-American and Hispanic police officers employed by the cities of Boston, Lawrence, Lowell, Methuen, Springfield, and Worcester, or by the MBTA, who did not achieve the promotions to police sergeant they sought.  In 2007, they brought suit under Title VII against two classes of defendants: the state defendants, which included Massachusetts and Dietl, and the MBTA and the cities for whom the plaintiffs work.  Plaintiffs sued the state defendants on the theory that the 2005, 2006, and 2007 promotional exams for police sergeant administered by HRD, a state agency, had a disparate impact on the promotion of minorities by the MBTA and the city defendants and had no job-related purpose." *Lopez v. Massachusetts*, 588 F.3d 69, 72-73 (1st Cir. 2009).

3.    Massachusetts generally follows federal precedent in disparate impact cases and agrees "that the burden-shifting principles enunciated in *McDonnell Douglas Corp. v. Green*, are inappropriate in disparate impact cases." *Cox v. New England Tel. & Tel. Co.*,

414 Mass. 375, 385 (1993) (citations omitted); *but see Mullin v. Raytheon Co.*, 164 F.3d 696, 704 (1st Cir. 1999) (saying that the "hypothesis that the Massachusetts courts have cleared disparate impact for use in all instances arising under Chapter 151B (including age discrimination) is flawed ... it not only overlooks the structure of the statutory scheme, but also misreads the case law").

4.      "Under Massachusetts law, plaintiffs' positions as city and MBTA police officers are subject to the state civil service law." *Lopez v. Massachusetts*, 588 F.3d 69, 74 (1st Cir. 2009) (citations and footnote omitted).

5.      The purpose of the Massachusetts civil service system has been described by the First Circuit as follows:

> The state civil service law states that the purpose of its requirements is to ensure that employees in civil service positions are recruited, chosen, and promoted based on principles of merit, not on political affiliation, race, age, gender, religion, national origin, or other factors unrelated to individual ability. [T]he fundamental purposes of the civil service system [are] to guard against political considerations, favoritism, and bias in governmental employment decisions . . . and to protect efficient public employees from political control.

*Lopez v. Massachusetts*, 588 F.3d 69, 74 (1st Cir. 2009) (citations and internal quotation marks omitted).

### B. Title VII: Person and Employer

6.      Springfield, as a political subdivision of the Commonwealth of Massachusetts, is a "person" for the purposes of 42 USCS § 2000e(a).

7.      The Supreme Court has noted that "[t]here is no dispute that in enacting the 1972 Amendments to Title VII to extend coverage to the States as employers, Congress exercised its power under § 5 of the Fourteenth Amendment." *Fitzpatrick v. Bitzer*, 427 U.S. 445, 453n.9 (1976) (citations omitted); *see also Shawer v. Indiana Univ. of Pa.*, 602

F.2d 1161, 1164 (3d Cir. 1979) (stating that it is "clear beyond question that when Congress eliminated the exemption in Title VII for the employment practices of educational institutions and extended Title VII to state governments, it did so pursuant to Section 5 of the Fourteenth Amendment and thereby abrogated any existing immunity of the states from liability for discriminatory employment practices.").

8.    Not every Title VII person, however, is a Title VII employer.  A non-governmental entity cannot be considered to be a Title VII employer, unless it is engaged in an industry affecting commerce.  42 USCS § 2000e (b).

9.    Springfield, as a political subdivision of the commonwealth, engages in the performance of governmental functions and is not "engaged in an industry affecting commerce." *Boston Hous. Auth. v. Howard*, 427 Mass. 537, 538-39 (1998) ("Engaging in trade or commerce ... requires a party to act in a business context.  Whether a party is acting in a business context depends on particular circumstances such as the nature of the transaction, the character of the parties involved, and [their] activities ... and whether the transaction [was] motivated by business or personal reasons....  In the present case, we conclude that the authority was not acting in a business context.") (citations omitted).

10.    Congress is permitted to regulate activities of state and local governments, provided the necessary nexus to commerce is met.  In Massachusetts, "police occupy '[o]ffices and positions in the service of cities and towns,' and they are subject to the state civil service law." *Lopez v. Massachusetts*, 588 F.3d 69, 75 (1st Cir. 2009) (citations omitted).  In this case the plaintiffs offered no evidence to establish a sufficient link between the HRD police sergeant's examinations at issue and the flow of interstate commerce.  Springfield police sergeants perform responsible, supervisory police work in

protecting life and property through the enforcement of laws and ordinances within the City of Springfield; Springfield police are not engaged in an industry affecting commerce. Under this line of logic, Springfield could not be deemed to have "engaged in an industry affecting commerce" and, therefore, would not be considered to be a an "employer" within the meaning of 42 USCS § 2000e (b); consequently, the Springfield Plaintiffs would not be individuals employed by an employer within the meaning of 42 USCS § 2000e.

11.     Congressional action effectively foreclosed governmental exemption from the law regarding a person as an employer. Municipalities, like Springfield, are governmental entities. Even though "Congress did not analyze the effect of governmental employment practices on interstate commerce" nevertheless, the relevant language in Title VII[6] "can be used as a basis for bringing governmental entities within the reach of Title VII. Congress does have proper authority to so regulate governmental entities under section 5 of the fourteenth amendment." *EEOC v. California Teachers Asso.*, 534 F. Supp. 209, 217 (N.D. Cal. 1982).

12.     Consequently, Springfield is a person within the meaning of Title VII and the employer of the Springfield Plaintiffs.

13.     Springfield is not, however, the employer for Title VII purposes of any of the other plaintiffs in this case and cannot be held legally liable to them under any theory of law applicable in this case.

### C.  No Mayoral Liability

---

[6]     42 USCS § 2000e (h) (defining the phrase "industry affecting commerce" to include "any governmental industry, business, or activity").

14.     The Massachusetts civil service law "defines the relationship between the state agencies which administer the civil service system and cities, towns, and entities like the MBTA. The defendant cities function as 'appointing authorit[ies]' under this law: they have 'power to appoint or employ personnel in civil service positions.' Mass. Gen. Laws ch. 31, § 1. The state civil service law governs all positions in all cities, including positions on a city police force." *Lopez v. Massachusetts*, 588 F.3d 69, 74 (1st Cir. 2009) (footnote omitted).

15.     Mayor Sarno is not the Springfield "appointing authority" for members of the Springfield Police Department.

16.     Mayor Sarno is not responsible for the promotional appointments of police officers in the City of Springfield.

17.     Since July 1st of 2005, the Springfield Police Commissioner, William Fitchet (Tr. 12-52), has been the appointing authority[7] for purposes of civil service and promotions in the Springfield Police Department. (Tr. 12-53, ll. 7-17).

18.     The Springfield police commissioner has the authority to appoint, establish and organize the Springfield police department. (Ex. 159 - Revised Ordinances of the City of Springfield § 2.58.040).

19.     The Springfield police commissioner controls the government, administration, disposition and discipline of the Springfield police department, and makes all the rules and regulations for the Springfield police department and police force. (Ex. 159 - Revised Ordinances of the City of Springfield § 2.58.040).

---

[7]   M.G.L. ch. 31, § 1 (defining, for purposes of the Massachusetts civil service law, an appointing authority, as "any person, board or commission with power to appoint or employ personnel in civil service positions.").

20.    The First Circuit, in accordance with the majority of federal courts which have

considered the issue, has concluded that "there is no individual employee liability under

Title VII." *Fantini v. Salem State College*, 557 F.3d 22, 30 (1st Cir. 2009).

21.    Plaintiffs' disparate impact claims against Mayor Sarno must be dismissed

because they have no factual or legal basis.

### D.  The Limitations Bar to Springfield Plaintiffs 2005 Exam Claims

22.    A person filing a complaint about employment discrimination has 300 days from

the date of the most recent incident of discrimination to file the complaint or it will be

time barred.  The Supreme Court has observed that:

> Title VII of the Civil Rights Act of 1964 prohibits employers from using
> employment practices that cause a disparate impact on the basis of race (among
> other bases).  42 U.S.C. § 2000e-2(k)(1)(A)(i).  It also requires plaintiffs, before
> beginning a federal lawsuit, to file a timely charge of discrimination with the
> Equal Employment Opportunity Commission (EEOC). § 2000e-5(e)(1).

*Lewis v. City of Chicago*, 130 S. Ct. 2191, 2195 (2010).

23.    This filing requirement is recognized in the First Circuit.  "Title VII requires an

employee to file an administrative charge as a prerequisite to commencing a civil action

for employment discrimination." *Fantini v. Salem State College*, 557 F.3d 22, 26 (1st Cir.

2009) (citation omitted).

24.    It is also a requirement of Massachusetts law.  M.G. L. c. 151B, § 9[8]; *see also*

*Everett v. 357 Corp.*, 453 Mass. 585, 599-600 (2009) (stating that the "MCAD has been

---

[8]    M.G.L. ch. 151B, § 9 (provides, among other things, that any "person claiming to be
aggrieved by a practice made unlawful under this chapter or under chapter one hundred
and fifty-one C, or by any other unlawful practice within the jurisdiction of the
commission, may, at the expiration of ninety days *after* the filing of a complaint with the
commission ... but not later than three years after the alleged unlawful practice occurred,
bring a civil action....") (italics added for emphasis).

25

charged by the Legislature with addressing certain types of discrimination in the Commonwealth.... The predicate of administrative filing is mandatory to filing a civil suit. It may not be waived. Without the predicate filing in MCAD, the Superior Court has no jurisdiction to entertain the claim of discrimination." (citations omitted).

25.    Before beginning a Title VII suit, federal law has specific filing requirements which mandate that a plaintiff:

> first file a timely EEOC charge. In this case, petitioners' charges were due within 300 days after the alleged unlawful employment practice occurred. Determining whether a plaintiffs charge is timely thus requires identify[ing] precisely the unlawful employment practice of which he complains.

*Lewis v. City of Chicago*, 130 S. Ct. 2191, 2196-97 (2010) (citations, footnote and internal quotation marks omitted); *see also* 42 USCS § 2000e-5 (e) (1).

26.    The commonwealth has a similar and complementary filing requirement. *Luciano v. Coca-Cola Enters.*, 307 F. Supp. 2d 308, 318 (D. Mass. 2004) (stating that an "employment discrimination charge must ordinarily be filed with the EEOC or the MCAD within 180 days of an act alleged to have been discriminatory. However, where as here, a plaintiff files her initial charge with the MCAD, the EEOC deadline is enlarged to 300 days. The deadlines must be strictly observed. Under federal law, 'discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act.'") (citations omitted); *Bishop v. New Jersey*, 84 Fed. Appx. 220, 224-225 (3d Cir. 2004) (stating that the "discriminatory act that plaintiffs allege is the design and administration of the exam and the concomitant promulgation of the eligibility list. The neutral use of the list by municipal fire departments is merely the

effect of the alleged discriminatory exam.  Therefore, the statute of limitations began

running on the date that the eligibility list was promulgated.") (footnote omitted).

27.     "[D]iscrete acts ... are easy to identify.  Each incident of discrimination ...

constitutes a separate actionable unlawful employment practice.  Discrete discriminatory

acts are not actionable if time barred, even when they are related to acts alleged in timely

filed charges.... [A]cts such as ... failure to hire him for a new position -- constitute

discrete acts, for which claims must be filed within the time period." *Ruiz-Sulsona v.*

*Univ. of P.R.*, 334 F.3d 157, 160 (1st Cir. 2003) (citations omitted).

28.     In Massachusetts the identification of discrete acts of discrimination has been

simplified by an MCAD form which requires a person making a charge of discrimination

to specifically identify the "violation date."

29.     Plaintiffs produced no evidence to show that any of the six Springfield Plaintiffs

made a timely EEOC filing regarding their allegations of disparate impact resulting from

the HRD 2005 police sergeants' promotional examination.

30.     In fact the MCAD/EEOC filings of plaintiffs were made on September 24, 2008

for an alleged "violation date" in early March of 2008[9].

31.     The alleged violation dates cited by the Springfield Plaintiffs occurred well

beyond the 300 days limitation period and years after the 2005 examination was given.[10]

---

[9]   The parties stipulated to the dates the MCAD/EEOC complaints were filed.  The
portion of the stipulation pertaining to the Springfield plaintiffs is Case 1:07-cv-11693-
GAO, Doc. 273, filed 07/26/10, page 6 of 7, ## 37-42.  The Springfield plaintiffs'
MCAD/EEOC complaints are in evidence as Exhibits 125-130.  They contain "filing"
dates of "9/24/08" and a "violation" date of "3/4/08" {Officer Jackson [Ex. 125] and Sgt.
Rosario [Ex. 126]} and a "violation" date of "3/1/08" {Officers Alymeda [Ex. 128];
Rosario [Ex. 127]; Williams [Ex. 129]; and Sgt. Toledo [Ex. 130]}.

32.     Consequently, as a matter of law, plaintiffs are barred from making any claims against Springfield based upon the 2005 police promotional examination.

33.     Plaintiffs disparate impact claims against Springfield based upon the 2005 examination must be dismissed because plaintiffs' failed to file a timely charge of discrimination with the EEOC and the MCAD.

**E.  No Cause for Springfield liability regarding the 2006 or 2008 Exams**

34.     None of the Springfield Plaintiffs took the HRD police sergeant's promotional examinations in 2006 and 2008 examinations. (Ex. 53, p.5 - Table 1; *see also* Trial Tr. 4-72, ll. 11-25; 4-73, l.1).

35.     Since Springfield did not participate in either 2006 or 2008 HRD police sergeants promotional examinations (Ex. 53, p.5 - Table 1), plaintiffs did not demonstrate that Springfield used a particular employment practice with respect to the 2006 or 2008 HRD police sergeants promotional examinations that caused a disparate impact on the basis of race, color, religion, sex, or national origin or age.

36.     All the issues raised by plaintiffs regarding the 2006 and 2008 HRD police sergeants' examinations are irrelevant to Springfield and the Springfield Plaintiffs

---

[10]    For Springfield Police Officers Alymeda [Ex. 128]; Rosario [Ex. 127]; Williams [Ex. 129]; and Springfield Police Sgt. Toledo [Ex. 130] whose MCAD/EEOC complaints allege a "violation" date of "3/1/08", the time which expired from the date of the 2005 examination, October 22, 2005 (Ex. 74) to the alleged "date of violation", March 1, 2008 was 862 days or 2 years, 4 months, 9 days including the end date.  For Springfield Police Officer Jackson [Ex. 125] and Sgt. Rosario [Ex. 126] whose MCAD/EEOC complaints allege a "violation" date of "3/4/08", the time which expired from the date of the 2005 examination, October 22, 2005 (Ex. 74) to the alleged "date of violation", March 4, 2008 was 865 days from the start date to the end date, or 2 years, 4 months, 12 days.  Even if the Springfield plaintiffs counted the start period from the date the certified list was issued for the 2005 examination, March 24, 2006, (Ex. 74) rather than the date of the examination itself, the lapsed time period, 708 days and 711 days, was still substantially in excess of 300 days.

28

because Springfield did not use the 2006 and 2008 HRD police sergeants examinations
and none of the Springfield Plaintiffs took either of those examinations.

37.     Plaintiffs' "testing evidence" in so far as it pertains to the 2006 and 2008 HRD
police sergeants' examinations "is not relevant" to Springfield and, as to Springfield:

> should be excluded pursuant to Rule 402. Evidence is relevant if it has 'any
> tendency to make the existence of any fact that is of consequence to the
> determination of the action more probable or less probable than it would be
> without the evidence.' FED. R. EVID. 401. Relevant evidence is generally
> admissible. FED. R. EVID. 402. Irrelevant evidence is inadmissible. *Id.* Whether
> tests in general may disparately impact African-Americans or whether
> Defendant's supervisors and managers were aware of any such disparate impact is
> irrelevant to the issues in this case. FED. R. EVID. 401.

*Jones v. Cargill, Inc.*, 490 F. Supp. 2d 978, 982 (D. Iowa 2007).

38.     Plaintiffs' claims against Springfield with respect to the 2006 and 2008 HRD
police sergeants' examinations must be dismissed. As to Springfield those claims are
irrelevant. Springfield did not use either of those challenged promotional exams.

39.     In so far as plaintiffs' claims against Springfield are based upon the 2006 and
2008 HRD police sergeants' examinations Springfield is not liable for them because
Springfield did not use a particular employment practice that caused a disparate impact
on the basis of race, color, religion, sex, or national origin or age.

### F. No Springfield Title VII Violation for the 2007 Exam

40.     The elements of a Title VII case were described by the Supreme Court in
*Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975), in which the Court stated:

> Title VII forbids the use of employment tests that are discriminatory in effect
> unless the employer meets "the burden of showing that any given requirement
> [has]... a manifest relationship to the employment in question." This burden
> arises, of course, only after the complaining party or class has made out a prima
> facie case of discrimination, i.e., has shown that the tests in question select
> applicants for hire or promotion in a racial pattern significantly different from that
> of the pool of applicants. If an employer does then meet the burden of proving

29

that its tests are "job related," it remains open to the complaining party to show that other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate interest in "efficient and trustworthy workmanship." Such a showing would be evidence that the employer was using its tests merely as a "pretext" for discrimination.....

41.     The third circuit recently observed that there are two parts to a prima facie case of disparate impact discrimination.

> First, a plaintiff must identify the "specific employment practice that is challenged." Second, the plaintiff must show that the employment practice "causes a disparate impact on the basis of race, color, religion, sex, or national origin." To show causation, the plaintiff must present "statistical evidence of a kind and degree sufficient to show that the practice in question has caused exclusion of applicants for jobs or promotions because of their membership in a protected group."

*Stagi v. AMTRAK*, 2010 U.S. App. LEXIS 17261 (3d Cir. 2010) (citations omitted).

42.     Plaintiffs case against Springfield, hinges upon the 2007 HRD police sergeants examination. When viewed in the context of these elements of a Title VII action, plaintiffs have not made out a prima facie case of disparate impact discrimination against Springfield.

### 1. Plaintiffs Expert's Flawed Analysis.

43.     The basis for an expert's testimony is an essential component of its reliability. "In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 590 (1993).

44.     Plaintiffs' expert, Dr. Wiesen, used flawed data to formulate his opinions. Plaintiffs' expert, Dr. Cassi Lynn Fields ("Dr. Fields"), did not conduct an independent investigation to determine whether the data relied upon by Dr. Wiesen was accurate. Dr.

Fields candidly agreed that if that data was flawed, the opinions based upon such flawed data would cause one to be at least skeptical of the opinions. (Trial Tr. 7-88, ll. 3-9).

45.    Dr. Wiesen opined "that if you are trying to find out if the examination adversely affects minorities, the best approach would be to use all the data from all of the applicants that took that examination." (Trial Tr. 2-45, ll. 20-23). There are two major flaws in using such an aggregated data analysis: the data pool is: (a) too deep; and (b) too wide.

46.    The data used as the basis for an expert's opinion must be adequate to insure its reliability. Sufficiency of the basis of an expert's opinion is a question of law for the court. "Whether an expert's opinion has an adequate basis, and whether without it an evidentiary burden has been met, are matters of law for the court to decide." *Richardson v. Richardson-Merrell, Inc.*, 857 F.2d 823, 829 (D.C. Cir. 1988).

(a) Data pool too deep

47.    Dr. Wiesen's aggregated data counts candidates, who failed the civil service examinations as part of the relevant labor market. Such an aggregated data pool is too deep.

48.    Under the Massachusetts civil service law only police officers who pass a civil service examination are eligible for appointment to police sergeant. M.G.L. ch. 31, § 1 (defining "eligible list" as containing the names of "persons who have passed an examination ... from which certifications are made to appointing authorities to fill positions in the official service").

49.    Under state law, a civil servant who fails a civil service examination is not qualified for appointment and their name is not put on an eligible list.

50.    "An underpinning of the civil service structure is that original and promotional appointments will be made from a list of persons declared eligible on the basis of competitive examination. If the appointing authority elects to appoint a person other than one who stands first on the list, it must explain its reasons in writing to the State personnel administrator." *Fall River v. Teamsters Union, Local 526*, 27 Mass. App. Ct. 649, 651 (1989) (citations omitted).

51.    The Uniform Guidelines were not designed to prohibit government police forces from getting the best qualified people to be their officers. Under the state Civil Service law, the best qualified candidates, at least in theory, are determined by the highest scores on the examination. In addition, the municipalities that have Civil Service positions are required to choose among the candidates on the certified list, which is determined using the $2 N + 1$ rule. (Trial Tr. 4-64, ll. 12-25; 4-65, ll. 1-21; 4-66, ll. 17-25; 4-67, ll. 1-13, 23).

52.    Under the Civil Service Law if, as here (Exs. 161-164), "the administrator certifies from an eligible list the names of three persons who are qualified for and willing to accept appointment, the appointing authority, pursuant to the civil service law and rules, may appoint only from among such persons." M.G.L. ch. 31, § 27.

53.    "When special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value." *Hazelwood School Dist. v. United States*, 433 U.S. 299, 309 n.13 (1977).

54.    Dr. Wiesen's inclusion of police officer candidates who failed the 2007 HRD police sergeants' examination is seriously flawed because it failed to take into account

the special qualifications to be eligible for the police sergeants' position – passing of the examination.

(b)  Data pool too wide

55.     Dr. Wiesen also used a data pool which was too wide; he counted police candidates from all the jurisdictions who took the examination in his aggregated analysis, even though only employees serving on the same jurisdiction's police force are eligible for appointment on a police promotional examination.

56.     Boston Police Commissioner, Edward F. Davis, III, testified: "You can only take -- you can only test the people in your department; that's correct." (Trial Tr. 9-77, ll. 9-10; 9-78, ll. 13-25).

57.     Dr. Wiesen admitted that for promotional examinations for police sergeant in the Commonwealth of Massachusetts, those types of examinations, the competition is only within the department, stating "That's by definition.  A promotional exam is only open to people in the department." (Trial Tr. 5-69, ll. 20-24; 5-70 ll. 3-25; 5-71, l. 1; *see also* M.G.L. ch. 31, §§ 1 (defining promotional appointments under civil service); *Goncalves v. City of Boston*, 66 Mass. App. Ct. 180, 185 (2006) (stating that "promotional appointments are open to employees in the next lower title in the same force" and that where, "as here, the promotional appointment relates to a city's police force, [M.G.L. c. 31] § 7 incorporates the procedures set out in [M.G.L. c. 31] § 59.  Section 59 provides that [a]n examination for a promotional appointment to any title in a police or fire force shall be open only to permanent employees in the next lower title in such force....") (footnote and internal quotation marks omitted).

(c)  Data pool just right

58.     This case involves a civil service police sergeants' promotional examination.  The only appropriate data pool to use consists of the candidates who are eligible for promotion to police sergeant.

59.     Inclusion of candidates who fail the examination and are not eligible for appointment skews the data and results in an unreliable analysis.

60.     Furthermore, the candidates who are eligible for promotion must be evaluated in comparison with other eligible candidates from the same policing jurisdiction.

61.     This is the relevant data pool which must be used for each community because no other candidates can be appointed to the police sergeants' position based upon a promotional examination – the candidates must all be from the same policing jurisdiction.

62.     The correct data pool information is readily available and easily identifiable.  It consists of the names of candidates provided to each community on the eligible and certified lists promulgated by HRD.

63.     Springfield retained a firm, Analysis and Inference, Inc., which is composed of two principals who are leading experts in the field of statistics[11].

64.     Springfield asked Analysis and Inference, Inc. to review the proper data pool regarding appointments to sergeant[12] and the results of the sergeant exams to determine whether there is statistical evidence of discrimination in the city.  (Ex. 195).

65.     The updated expert report of Analysis and Inference, Inc. reveals:

---

[11]     Dr. William B. Fairley's qualifications are described on pages 11-20 of Ex. 195. Dr. Alan J. Salzberg's qualifications are described on pages 21-23 of Ex. 195.

[12]     The statistical analysis performed for Springfield by Dr. Fairley and Dr. Salzberg avoided a double counting error which skews the statistical analysis.  (Ex. 195, pp. 4-5). "Double counting persons therefore disfavors minorities by increasing the apparent adverse impact."  (Ex. 195, p. 5) (footnote omitted).

that Springfield appointed a total of 13 sergeants based on the 2005 and 2007 exams. All of these individuals were certified to be appointed according to their scores-based primarily on exam results. In general, appointments appear to be made according to exam performance. However, some individuals were appointed, despite the fact that other individuals had better exam results.

Our analysis explored the relation between exam ranking, certification, and appointments in order to determine if white people ("non-minorities") were more likely to be appointed than black or hispanic people ("minorities").

(Ex. 195, pp.3-8) (footnote omitted).

66.     Based upon their analysis using the relevant data pool the principals of Analysis and Inference, Inc., Dr. Fairley and Dr. Salzberg, concluded that:

among those certified to become sergeant in Springfield:

1. The percent of minorities appointed is not statistically different from the percent of whites appointed.

2. Minorities were no more or less likely to be appointed once rank on exam was taken into account.

3. Minorities were no more or less likely to be appointed once rank, experience and educational background were taken into account.

4. Springfield's appointments that were out of rank order did not negatively affect minorities.

(Ex. 195, p.3).

2. No Disparate Impact on Springfield Plaintiffs from 2007 Exam.

67.     Notwithstanding the fact that plaintiffs' own experts used data pools which were too deep and too wide, and apparently also made a double counting error in their statistical analysis, nevertheless, plaintiffs analysis shows that any adverse impact ("AI") in the 2007 Springfield police promotional exam is, more likely than not, a random data fluctuation due to chance, and not an illegal act of discrimination.

35

68.    In this case plaintiffs' experts primarily concerned themselves with three

measures of determining AI – (a) rule of thumb, (b) standard deviation and (c) statistical

significance.

69.    To establish a prima facie case of disparate impact in a Title VII case, a plaintiff

must:

> (1) identify a specific employment policy or practice of the employer and (2)
> proffer evidence, typically statistical evidence, (3) of a kind and degree sufficient
> to show that the practice in question has caused exclusion of applicants for jobs or
> promotions (4) because of their membership in a protected group.  With respect to
> meeting her burden with respect to (3), a plaintiff will typically have to
> demonstrate that the disparity in impact is sufficiently large that it is highly
> unlikely to have occurred at random, and to do so by using one of several tests of
> statistical significance.  There is no precise threshold that must be met in every
> case, but a finding of statistical significance with a probability level at or below
> 0.05, or at 2 to 3 standard deviations or greater, will typically be sufficient.

*Stagi v. AMTRAK*, 2010 U.S. App. LEXIS 17261 (3d Cir. 2010).

 (a) Rule of thumb, AI ratio, and the 4/5[th]'s rule – three names for the same thing

70.    The rule of thumb comes from the EEOC's Uniform Guidelines on Employee

Selection Procedures, 29 CFR pt. 1607 (1987).

71.    This rule of thumb is sometimes referred to as the "AI ratio" and is also known as

the four-fifths rule.  (Trial Tr. 17-13, ll. 4-6).

72.    The EEOC Guidelines adopted "an enforcement rule under which adverse impact

will not ordinarily be inferred unless the members of a particular race, sex, or ethnic

group are selected at a rate that is less than four-fifths of the rate at which the group with

the highest rate is selected.  This enforcement standard has been criticized on technical

grounds, and it has not provided more than a rule of thumb for the courts." *Watson v. Ft.*

*Worth Bank & Trust*, 487 U.S. 977, 995 n.3 (1988) (citations omitted).

36

73.    A violation of the rule of thumb has been considered in reviewing the adverse

impact of selection procedures, but it is not conclusive evidence of discrimination; it is

merely an appropriate benchmark.  The Third Circuit has described use of the rule of

thumb as follows

> some courts have ... relied upon the "80 percent rule" from the Equal Employment
> Opportunity Commission's (EEOC) Uniform Guidelines on Employee Selection
> Procedures to assess whether a plaintiff has established a prima facie disparate
> impact case.  These Guidelines are codified at 29 C.F.R. § 1607.4(D), entitled
> "Adverse impact and the 'four-fifths rule,'" and they state, in relevant part, A
> selection rate for any race, sex, or ethnic group which is less than four-fifths (4/5)
> (or eighty percent) of the rate for the group with the highest rate will generally be
> regarded by the Federal enforcement agencies as evidence of adverse impact,
> while a greater than four-fifths rate will generally not be regarded by Federal
> enforcement agencies as evidence of adverse impact.
>
> EEOC Guidelines are entitled only to Skidmore deference, under which
> EEOC Guidelines "get[] deference in accordance with the thoroughness of [their]
> research and the persuasiveness of [their] reasoning."  The "80 percent rule" or the
> "four-fifths rule" has come under substantial criticism, and has not been
> particularly persuasive, at least as a prerequisite for making out a prima facie
> disparate impact case.  The Supreme Court has noted that "[t]his enforcement
> standard has been criticized on technical grounds ... and it has not provided more
> than a rule of thumb for the courts."

*Stagi v. AMTRAK*, 2010 U.S. App. LEXIS 17261, 13-14 (3d Cir. 2010) (citations and

footnote omitted).

74.    In this case a defense expert, Dr. Jacinto M. Silva ("Dr. Silva") [13], testified that

"[a]dverse impact is when there is different rates of promotion or of hiring in different

groups of individuals such as African-Americans, Hispanics, whites, males versus

females, and so forth."  (Trial Tr. 17-10, ll. 19-22).

75.    The rule of thumb is one of the methods used to measure AI.

---

[13]    Dr. Silva's qualifications are outlined in Ex. 196.

76.     Dr. Silva testified about use of the rule of thumb to determine if adverse impact is

present, saying:

> .... The adverse impact ratio was a method that was originally developed in
> California and was later adapted by the federal guidelines in setting some criteria
> as to determine as to whether adverse impact is present in a specific
> organizational context. And as such it has, you know, no statistical properties that
> have been examined until recently. It was mainly used as a rule of thumb in
> making decisions as to whether adverse impact was present within an
> organizational selection setting.
>
> Basically, the adverse impact ratio, you simply compute the proportion of non-
> minorities -- sorry -- of minorities that are promoted and divide that by the
> proportion of non-minorities that are promoted. And that ratio, if it falls below .8,
> it is said, then, that there is adverse impact present within that data set, within that
> selection process.

(Trial Tr. 17-11, ll. 2-16).

77.     The rule of thumb becomes suspect when small sample sizes are used. Dr. Silva

testified about this stating:

> The AI ratio is poorly understood, and only in the last four years has any research
> really been done on its properties. And one of the things that's been found is that
> it's a very unstable test with small numbers. And by "small numbers," researchers
> have determined that numbers as small as two to four hundred will yield unstable
> results on the AI. And because these samples are so small, I use the same
> procedure to determine what the false positive rate is for the AI. And by "false
> positive," I mean that you would say that there's AI, but on the underlying
> populations there actually is not AI. So if we had a perfect test that showed
> absolutely no mean differences between minorities and non-minorities, what
> would be the probability of still finding adverse impact in this kind of situation?
> By "this kind of situation," I mean the exact situation that's facing that
> department; for example, in Chelsea, that there are ten individuals that are black
> or Hispanic, there are 15 individuals that are white, and they meet the 5 percent
> criteria, or the .05 criteria for significance.

(Trial Tr. 17-22, ll.9-25; 17-23, ll. 1-2).

78.     The federal guidelines recognize the problem with finding AI for small sample

sizes under the "four-fifths rule" saying:

A selection rate for any race, sex, or ethnic group which is less than four-fifths (4/5) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact. Smaller differences in selection rate may nevertheless constitute adverse impact, where they are significant in both statistical and practical terms or where a user's actions have discouraged applicants disproportionately on grounds of race, sex, or ethnic group. *Greater differences in selection rate may not constitute adverse impact where the differences are based on small numbers and are not statistically significant,* or where special recruiting or other programs cause the pool of minority or female candidates to be atypical of the normal pool of applicants from that group. Where the user's evidence concerning the impact of a selection procedure indicates adverse impact but is based upon numbers which are too small to be reliable, evidence concerning the impact of the procedure over a longer period of time and/or evidence concerning the impact which the selection procedure had when used in the same manner in similar circumstances elsewhere may be considered in determining adverse impact....

29 CFR § 1607.4 ¶D (italics added for emphasis).

79.    When looking at the Springfield data from the 2007 HRD police sergeants'

promotional examination, statisticians are faced with a relatively small data sample size.

(Ex.s. 161-164).

80.    Dr. Silva testified about the particular challenges in analyzing small samples of

data[14], such as those from Springfield, saying that with "small samples of data it's just

really very hard to know whether the observed results are due to simple chance

fluctuation or due to a real difference in the underlying populations." (Trial Tr. 17-14, ll.

13-18).

81.    Dr. Silva explained how the EEOC Guidelines recommend dealing with the small

data size issue, saying:

---

[14]    Dr. Silva testified that the EEOC Guidelines "are implicitly indicating that they consider a small sample size to be 100 or perhaps less than that. So by that definition, many of these samples are very small sample sizes." (Trial Tr. 17-19 ll. 1-4).