Well, with small sample sizes, especially when it comes to the adverse impact ratio, one of the suggestions in the Uniform Guidelines is that you use a shift-of-one analysis. And a shift-of-one analysis is where you add a minority candidate to the promoted side and take a white or non-majority [sic] candidate from the promoted side. So you're basically trading a non-minority person, if they haven't been promoted, to a non-minority, so you're just swapping two people, and then you recompute the AI ratio. And if that AI ratio at that point goes above .8, then the guidelines say that the sample is too small to make a determination about adverse impact.

Q. Okay. What's a shortfall analysis?

A. A shortfall analysis is essentially an attempt to quantify how many non-minorities should have been promoted if there was to be no adverse impact, so that the ratio would have been .8 or higher. So it's just an attempt to quantify the number of non-minorities which are affected by the lack of parity in the proportions, or the promotion rates.

THE COURT: You mean non-minorities or minorities?

THE WITNESS: I'm sorry?

THE COURT: You said "non-minorities." Do you mean that, which you might, or do you mean minorities?

THE WITNESS: I meant compare non-minorities to minorities. And it's an -- if that ratio goes above .8 -- I'm sorry -- that was a different question. It's an attempt to show how many minorities there are in the shortfall. So if that number is negative, it would mean that there's actually an excess number of minorities; if it's positive, it means that there's a small number of minorities.

Or it could actually be -- in most of these cases you'll see that it's less than a person, maybe .05 or .3, and that would be the shortfall. So if we had hired -- say, for example, that we had hired one person, and that to avoid the AI rule what we should have done is to perhaps hire .3 of a minority and .7 of a non-minority, which isn't possible. But mathematically that's what would have been required. So the shortfall in that case -- if you had hired a full minority, the shortfall would have been .3, because you really should have hired .7 of a non-minority and .3 of a minority.

(Trial Tr. 17-14, ll. 22-25; 17-15, ll. 1-25; 17-16, ll. 1-11).

Well, the guidelines in Question 21 explicitly state that if there is a change in the AI ratio from being below .8 to going above .8, then that indicates that the sample is too small to determine adverse impact. In these particular – like in 2005, for example, Carver Police Department goes from zero to three. That indicates that

40

the sample is just too small to make a determination according to the guidelines' Question 21.

Q. Does that mean that if they had hired one more minority instead of a white, the adverse impact on non-minorities would be three?

A. Yes.

Q. Okay. I'm going to draw your attention to the next column, and it's entitled "Shortfall." And this is an analysis you did of the data here on the tables. And what does that analysis show?

A. As I indicated earlier, it's just an attempt to quantify the number of non-minorities that would have been promoted in order to achieve a .8 ratio or higher. So, for example, in the Carver Police Department, it's indicating that if you had promoted .42 of a candidate, less than half of a candidate, that you would have achieved an adverse impact ratio of .8 or higher.

Similarly, in the Everett Police Department it shows that just 1/20th of a minority candidate would have been sufficient to avoid an adverse impact determination; Greenfield Police Department, it would be .07; and MBTA Police, it would be 1.14 candidates; in Natick, it would be .22, and so forth.

If you see a negative number, as you do in Chelsea, it means that they actually over-promoted, so that they have almost one person in excess of the need to meet the .8, or four-fifths rule.

(Trial Tr. 17-19, ll. 9-25; 17-20, ll. 1-14).

82.     Dr. Silva explained that a "false positive" is "basically saying that something is there when you shouldn't have said that it's there because it really isn't there. So in the context that I used it was the AI ratio tends to have a lot of false positives because it tends to say that there's AI even in cases where it shouldn't say that there is AI." (Trial Tr. 17-36, ll. 16-21).

83.     When, as in the case of Springfield, small numbers[15] are used in the rule of thumb, there is a danger of generating a type 2 statistical error because false positives

---

[15] Dr. Silva testified that "when you aggregate data and you have to make some decisions based on that aggregated data -- and the tools that were used on this aggregated

may become "embedded in the AI ratio ... a false positive in the AI ratio." (Trial Tr. 17-37, ll. 15-21).

84.    Dr. Silva testified to three reasons for the high false positive rate encountered when applying the rule of thumb in this case:

> In this case the Type 2 error occurs for three reasons. We have a very small number of individuals in many of these jurisdictions, and so that tends to lead to false positives. A second issue is the percentage of minority representation within each of the jurisdictions. And the final contributor is going to be the selection ratio, or the promotion rate, within the jurisdictions. So those three elements combine to create this high false positive rate.

(Trial Tr. 17-38, ll. 1-8).

85.    In the case of Springfield, Dr. Silva testified that the 2005 "data says it's not statistically significant" (Trial Tr. 17-40, ll. 17-18) explaining:

> the probability of finding AI in this sample, even if you had to use the test with no differences, would have still have been 56 percent. So there's a 56 percent false positive rate associated with this particular distribution of numbers in Springfield in 2005.
>
> So, no, I cannot conclude that there is adverse impact in Springfield from that information.

(Trial Tr. 17-38, ll. 1-8).

86.    Applying the rule of thumb (also known as the AI ratio and the four-fifths rule) to Springfield it's likely, more than half the time that, you're going to get a false positive. (Trial Tr. 17-44, ll. 18-20).

---

data by Dr. Wiesen and myself were basically the AI ratio and the significance test. And when we aggregate data, even regardless of the base rate for minorities and regardless of the selection ratio and regardless of the sample size, just the fact that individuals are only eligible for a small subset of the jobs within that data set makes the AI ratio, as well as the Fisher's Exact Test, inappropriate in that data set, it overestimates or lowers the probability value to a level that's not real, because the assumption that every individual is eligible for every position does not hold." (Trial Tr. 17-39, ll. 4-15).

### (b) Standard Deviation

87. "As a legal matter, the Supreme Court has stated that [a]s a general rule for ... large samples, if the difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that the [result] was random would be suspect to a social scientist." *Stagi v. AMTRAK*, 2010 U.S. App. LEXIS 17261 (3d Cir. 2010) (citation omitted).

88. Dr. Wiesen acknowledged that one measure of adverse impact is standard deviation[16] units which reflect "the probability of the results occurring based on chance" where "two or three" standard deviations is "a general rule for evaluating statistical significance. The higher the number of standard deviation units the less probable the outcome is due to chance." (Ex. 52, p. 6, n.13; *see also* p.4, n.8).

89. Dr. Fields also agreed with that use of the standard deviation unit phrase. (Trial Tr. 7-89, ll. 19-25). She also accepted as "one assessment of adverse impact" the correctness of the concept that the higher the number of standard deviations[17], the less probable the outcome is due to chance. (Trial Tr. 7-90, ll. 1-10).

---

[16] "Technically, a standard deviation is defined as 'a measure of spread, dispersion, or variability of a group of numbers equal to the square root of the variance of that group of numbers.' The 'variance' of the group of numbers is computed by subtracting the 'mean,' or average, of all the numbers, 'squaring the resulting difference, and computing the mean of these squared differences.'" *Stagi v. AMTRAK*, 2010 U.S. App. LEXIS 17261 (3d Cir. 2010) (citations omitted).

[17] "There are two related concepts associated with statistical significance: measures of probability levels and standard deviation. Probability levels (also called 'p-values') are simply the probability that the observed disparity is random—the result of chance fluctuation or distribution. For example, a 0.05 probability level means that one would expect to see the observed disparity occur by chance only one time in twenty cases—there is only a five percent chance that the disparity is random. A standard deviation is a unit of measurement that allows statisticians to measure all types of disparities in common terms. In this context, the greater the number of standard deviations from the

43

90. Dr. Wiesen indicated that an analysis of the bottom line or number of appointments is the most basic approach to evaluating AI (Ex. 52, p.6, l.1-3), and Dr. Fields agreed that "it is definitely one approach" (Trial Tr. 7-91, ll. 16-25; 7-92, ll. 1-3).

91. When he measured the 2007 police sergeants promotional examination using this metric Dr. Wiesen found that only .3 standard deviation units. (Ex. 52, p.6, Table 3 Column labeled "standard deviation units" row).

92. Dr. Fields testified that "[e]valuating the standard deviation units, that would not indicate adverse impact." (Trial Tr. 7-93, ll. 4-25; 7-94, ll. 1-3).

93. In other words, Dr. Wiesen's table and Dr. Fields testimony establish there was no AI in the 2007 HRD police sergeants promotional examination when measured using standard deviation units.

94. Dr. Wiesen prepared a corrected table "Table D2. 2007 Exam Alone: Summary of Indications of Adverse Impact" (Ex. 85a, p.2) in which he computed AI for Springfield on the 2007 examination. (Trial Tr. 11-63, ll. 20-25; Trial Tr. 11-64, ll. 1-1).

95. Table D2 shows for the row "AI ratio for promotions" 1.1 standard deviation units for Springfield on the 2007 examination and, under cross examination Dr. Wiesen testified:

> Q. And regarding the Supreme Court's general rule, the AI for promotions is 1.1, correct?
>
> A. Yes.

---

mean, the greater the likelihood that the observed result is not due to chance. To offer some sense of the relationship between these two measures, two standard deviations corresponds roughly to a probability level of 0.05; three standard deviations correspond to a probability level of 0.0027." *Stagi v. AMTRAK*, 2010 U.S. App. LEXIS 17261, 10-11 (3d Cir. 2010) (citations and footnote omitted).

44

> Q. And that's lower than the two or three standard deviation units that is kind of the general rule that the Supreme Court uses for determining statistical significance?
>
> A. Yes.
>
> Q. Not statistically significant would be the conclusion there?
>
> A. Yes.

(Trial Tr. 11-65, ll. 24-25; 11-66, ll. 1-2, 10-19).

96. Dr. Wiesen's Table D2, (Ex. 85a, p.2), for the row "AI ratio at the effective passing point" records "1.1" standard deviation units for Springfield on the 2007 examination which Dr. Wiesen, under cross examination, admitted was not statistically significant. (Trial Tr. 11-67, ll. 3-5).

97. Dr. Wiesen's Table D2, (Ex. 85a, p.2), for the row "AI ratio for official passing point of 70%" records "1.7" standard deviation units for Springfield on the 2007 examination which Dr. Wiesen, under cross examination, admitted was not statistically significant. (Trial Tr. 11-67, ll. 9-11).

98. Dr. Wiesen's Table D2, (Ex. 85a, p.2), for the row "Difference in average test scores in P.D." records "1.6" standard deviation units for Springfield on the 2007 examination which Dr. Wiesen, under cross examination, admitted was not statistically significant. (Trial Tr. 11-67, ll. 17-19).

99. The evidence in this case shows such a low level of impact that it does not rise to the level judicially established as the general rule for determining adverse impact.[18]

---

[18] "Generally, the fewer the number of standard deviations that separate an observed from a predicted result, the more likely it is that any observed disparity between predicted and actual results is not really a disparity at all but rather a random fluctuation .... A finding of two standard deviations corresponds approximately to a one in twenty, or five percent, chance that a disparity is merely a random deviation from the norm, and most

45

### (c) Statistical Significance

100. A test of statistical significance is often used in the field of inferential statistics to reduce the likelihood that an event is random. "Statistical significance is a measure of the probability that a disparity is simply due to chance, rather than any other identifiable factor. Because random deviations from the norm can always occur, statisticians do not consider slight disparities between predicted and actual results to be statistically significant. As the disparity between predicted and actual results becomes greater, however, it becomes less likely that the deviation is a random fluctuation. When the probability that a disparity is due to chance sinks to a certain threshold level, statisticians can then infer from the statistical evidence, albeit indirectly, that the deviation is attributable to some other cause unrelated to mere chance." *Ottaviani v. State Univ. of N.Y.*, 875 F.2d 365, 371 (2d Cir. 1989) (citations omitted).

101. There is not a "rigid mathematical formula" which applies:

> to determine whether plaintiffs have established a prima facie case. If statistical evidence is used, as it typically will be in disparate impact cases, it must be "sufficiently substantial" to raise "an inference of causation." The Supreme Court has not provided any definitive guidance about when statistical evidence is sufficiently substantial, but a leading treatise notes that "[t]he most widely used means of showing that an observed disparity in outcomes is sufficiently substantial to satisfy the plaintiff's burden of proving adverse impact is to show that the disparity is sufficiently large that it is highly unlikely to have occurred at random." This is typically done by the use of tests of statistical significance, which determine the probability of the observed disparity obtaining by chance.

*Stagi v. AMTRAK*, 2010 U.S. App. LEXIS 17261 (3d Cir. 2010) (citations omitted).

---

social scientists accept two standard deviations as a threshold level of statistical significance." *Ottaviani v. State Univ. of N.Y.*, 875 F.2d 365, 371 (2d Cir. 1989) (citations and footnote omitted).

### (c) Statistical Significance

100. A test of statistical significance is often used in the field of inferential statistics to reduce the likelihood that an event is random. "Statistical significance is a measure of the probability that a disparity is simply due to chance, rather than any other identifiable factor. Because random deviations from the norm can always occur, statisticians do not consider slight disparities between predicted and actual results to be statistically significant. As the disparity between predicted and actual results becomes greater, however, it becomes less likely that the deviation is a random fluctuation. When the probability that a disparity is due to chance sinks to a certain threshold level, statisticians can then infer from the statistical evidence, albeit indirectly, that the deviation is attributable to some other cause unrelated to mere chance." *Ottaviani v. State Univ. of N.Y.*, 875 F.2d 365, 371 (2d Cir. 1989) (citations omitted).

101. There is not a "rigid mathematical formula" which applies:

> to determine whether plaintiffs have established a prima facie case. If statistical evidence is used, as it typically will be in disparate impact cases, it must be "sufficiently substantial" to raise "an inference of causation." The Supreme Court has not provided any definitive guidance about when statistical evidence is sufficiently substantial, but a leading treatise notes that "[t]he most widely used means of showing that an observed disparity in outcomes is sufficiently substantial to satisfy the plaintiff's burden of proving adverse impact is to show that the disparity is sufficiently large that it is highly unlikely to have occurred at random." This is typically done by the use of tests of statistical significance, which determine the probability of the observed disparity obtaining by chance.

*Stagi v. AMTRAK*, 2010 U.S. App. LEXIS 17261 (3d Cir. 2010) (citations omitted).

---

social scientists accept two standard deviations as a threshold level of statistical significance." *Ottaviani v. State Univ. of N.Y.*, 875 F.2d 365, 371 (2d Cir. 1989) (citations and footnote omitted).

102.   Nevertheless "many courts accept a 0.05 probability level (or below) as sufficient to rule out the possibility that the disparity occurred at random." *Stagi v. AMTRAK*, 2010 U.S. App. LEXIS 17261 (3d Cir. 2010) (citations omitted).

103.   Dr. Silva testified about the statistical significance used to determine if adverse impact is present and the relationship between statistical significance and standard deviation:

> The second approach is more founded in statistics and in some ways we have a better understanding of it. It basically compares two samples and determines -- and compares them on some characteristic. In this case we're looking at the proportions between two different groups. So we have a proportion for non-minorities and a proportion for minorities, and that proportion is the proportion of people who are promoted.
>
> And we compare those two proportions and determine whether it's likely that those two samples came from an underlying population where there is no difference in the proportions that would be hired or promoted. And with any sample, it's possible that it came from a population that had no difference, but as you begin to observe larger and larger differences in the sample, it begins to show smaller and smaller probability that that sample could really have been drawn from populations where there is no difference. And as that probability drops below 5 percent, we'd say that there is statistical significance and we'd conclude that there is a difference in the underlying populations in terms of promotion rates. Failing to meet that criteria, we accept the null hypothesis that there is no difference in the underlying populations.
>
> There is also, more recently, a trend to indicate the number of standard deviations difference between subgroups. That really isn't a new method; it's just a different manifestation of significance testing. When you do significance testing, you can either quantify it as a 5 percent probability or below 5 percent probability, and there describe it as significant, or you can find, you know, two standard deviations difference between the subgroups. And if that's the case, then you can argue that that is also significant. So basically, either you find lower than 5 percent probability associated with the significance test or you find two standard deviations difference between the groups, and in both cases you can say that they're statistically significant. So they're just two sides of the same coin, but it's just a significance determination.

(Trial Tr. 17-11, ll. 17-25; 17-12, ll. 1-25; 17-13, ll. 1-3).

47

104.    Dr. Wiesen's Table D2, (Ex. 85a, p.2), for the row "AI ratio for promotions" for Springfield on the 2007 examination records a "Statistical Significance" of ".26" which Dr. Wiesen, under cross examination, admitted:

> Q. And the statistical significance, .26?
>
> A. Yes.
>
> Q. And, again, based upon the rule that's generally considered amongst statisticians for statistical significance, this would be not statistically significant?
>
> A. Correct.

(Trial Tr. 11-65, ll. 24-25; Trial Tr. 11-66, ll.1-9).

105.    Dr. Wiesen's Table D2, (Ex. 85a, p.2), for the row "AI ratio at the effective passing point" records a "Statistical Significance" of .26 which Dr. Wiesen admitted on cross-examination, would not be statistically significant. (Trial Tr. 11-66, ll. 20-25; 11-67, ll. 1-2).

106.    Dr. Wiesen's Table D2, (Ex. 85a, p.2), for the row "AI ratio for official passing point of 70%" records a "Statistical Significance" of ".09" for Springfield on the 2007 examination which Dr. Wiesen, under cross examination, admitted was not statistically significant. (Trial Tr. 11-67, ll. 9-11).

107.    Dr. Wiesen's Table D2, (Ex. 85a, p.2), for the row "Difference in average test scores in P.D." records a "Statistical Significance" of ".10" for Springfield on the 2007 examination which Dr. Wiesen, under cross examination, admitted was not statistically significant. (Trial Tr. 11-67, ll. 12-16).

108.    The 2007 HRD police promotional examination did not have a disparate impact upon the Springfield Plaintiffs.

109.    As Dr. Wiesen, under cross examination, admitted:

> Q. And so when you look at that and look at Springfield alone and the 2007 Springfield police promotional results for the sergeant's examination, essentially, in all the categories, by either the general statistical rule of thumb of the .05 or by the Supreme Court's general rule of standard deviation units, you find no statistical significance, correct?
>
> A. Correct.

(Trial Tr. 11-68, ll. 18-24).

110. Dr. Silva reached the same conclusion stating:

> Q. So in summary, then, it's your opinion that there's no statistically significant adverse impact from these exams for the City of Springfield?
>
> A. Well, it's not my opinion, it's stated right there via the criteria that .05 -- below .05 is significant, these two samples have significance levels or probability levels of .07 and .20, both above .05, so they're not significant.

(Trial Tr. 17-47, ll. 14-20).

111. Consequently, plaintiffs have not, as a matter of law, met their burden of showing "a strong basis in evidence" that the 2007 HRD police promotional examination was deficient and their claims against Springfield must be dismissed.[19]

### G. Business Necessity

112. The business necessity doctrine stems from the burden of proof provisions in Title VII; this burden shifting provision, in relevant part, states:

> (1) (A) An unlawful employment practice based on disparate impact is established under this title only if—
>
> > (i) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and *the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity*;

42 USCS § 2000e-2 (k) (italics added for emphasis).

---

[19] *Ricci v. DeStefano*, 129 S. Ct. 2658, 2676 (2009).

113. Under this burden shifting provision in Title VII once "a plaintiff makes out a prima facie case, the burden shifts to the employer to show that the employment practice at issue is job related for the position in question and is consistent with business necessity."[20]

114. Thus, Title VII has been said to proscribe "those employment practices with a disparate and adverse impact upon protected classes which cannot be justified by an employer's legitimate business needs." *IBEW v. Miss. Power & Light Co*, 442 F.3d 313, 316 (5th Cir. 2006).

115. It is not an unlawful employment practice under Title VII for an employer like Springfield "to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system". 42 USCS § 2000e-2.

116. Assuming, *arguendo*, that plaintiffs have made out a prima facie case under Title VII, nevertheless, plaintiffs' case against Springfield must be dismissed because it was a business necessity that Springfield used the HRD police sergeants' promotional examinations in 2005 and 2007. Springfield was in the midst of a financial crisis and did not have the money to spend experimenting with expensive assessment centers for police sergeants' when there was a free alternative offered by the state.

### H. No Reasonable Alternative

117. The no reasonable alternative doctrine also stems from the burden of proof provisions in Title VII; this burden shifting provision, in relevant part, states:

---

[20] *Stagi v. AMTRAK*, 2010 U.S. App. LEXIS 17261 (3d Cir. 2010) (citations and footnotes omitted).

> (1) (A) An unlawful employment practice based on disparate impact is established under this title only if—
>
> ....
>
> > (ii) the *complaining party makes the demonstration* described in subparagraph (C) *with respect to an alternative employment practice* and the respondent refuses to adopt such alternative employment practice.

42 USCS § 2000e-2 (k) (italics added for emphasis).

118. This burden shifting provision in Title VII "allows plaintiff to show that an alternative employment practice exists that has a less disparate impact and would also serve the business's legitimate interest and the employer refuses to adopt it." *Stagi v. AMTRAK*, 2010 U.S. App. LEXIS 17261 n.5 (3d Cir. 2010) (citations omitted).

119. In this case plaintiffs failed to carry their burden in that regard.

120. Plaintiffs' expert, Dr. Wiesen, testified that he did not "know much, if anything, about the financial situation in the various municipalities" so the only thing he could "say is that municipalities across the country find it practical to use alternative selection procedures, so it would be surprising none of the defendants were able to do that." (Trial Tr. 3-86, ll.13-25; 3-87, ll. 1).

121. Springfield's financial condition precluded any expenditure of funds for an assessment center for the police sergeant promotional examination so that in Springfield's situation the assessment center was not a financially feasible alternative to the free HRD police sergeants' promotional examination. (Ex. 160).

122. Moreover, Commissioner Fitchet's testimony (Trial Tr. 12-75, ll. 8-19; 12-75, ll. 21-25; 12-76, ll. 5-6; 12-77, ll. 1-25; 12-78, ll. 1-12) in this case, indicates that an assessment center examination may not be an equally valid substitute for the HRD police sergeants' promotional examination.

51

123.  In the *Carr* case, in which Dr. Wiesen testified for DPA, the Civil Service Commission found that "[m]inority candidates for promotion to the BPD Lieutenant scored better, as a group, on the examination, without the performance components than they did with the performance components included." (Ex. 41, App. C, p. 3590, ¶44). Under cross examination, Dr. Wiesen admitted that the 1987 delegated examination use of assessment centers was not successful in reducing adverse impact, at least in the use of those alternative exercises for Boston Police Lieutenant. (Trial Tr. 3-103, ll. 22-25; 3-104, ll. 1-2).

124.  Prior to the trial in this case, Dr. Wiesen stated in a deposition:

> "Do you have an opinion as to whether a straight written exam without an assessment center or any more subjective component would be an appropriate way for testing for police supervisory personnel?" And can you read your answer starting at Line 5.
>
> A. "Well, the multiple-choice test, again, can cover a wide range of topics and can be done well or less well, and the literature shows that the job knowledge tests are, if not the most valid test, very close to the most valid predictors of future job performance."
>
> So I think that the answer to your question is, yes, I think that multiple-choice examinations can be used by themselves to develop a roster of people for promotion.
>
> Q. And then I said, "I just want to make sure I understood. Is it your opinion, your opinion is that the multiple-choice test by itself is the best indicator of future performance? I just want to make sure -- I'm not sure if I misunderstood you."
>
> A. And I said, "It's either the best or one of the best predictors of future job performance."

(Trial Tr. 3-123, ll. 9-25; 3-124, l. 1).

125.  The cross examination of Dr. Fields illustrates the impractical nature of plaintiffs' suggestion that an assessment center component is a realistic option for a police sergeants' police promotional examination:

> Q. Okay. And are you aware that in Dr. Silva's adverse impact assessment of these examinations that the 2002 exam compared to the exams that we're here about today finds that one additional minority was promoted as a result of the multidimensional 2002 examination as compared to the exams that are at issue here?
>
> A. I remember that statement, yes.
>
> Q. So there's a gain of one additional minority.
>
> A. Yes.
>
> Q. And in your assessment, looking in particular at the feasibility aspect of conducting these examinations, would it -- in your experience would you find it reasonable or feasible for a community to spend $1.2 million at every two-year promotional cycle to try to achieve less adverse impact when it has achieved the results that we've described in 2002?
>
> A. We're not comparing apples to apples, though. So we achieve one more minority compared to the 2002 exam, which I thought was encouraging and could be improved potentially.
>
> Q. And when you say that the 2002 could potentially be improved, what in your estimate would it cost to improve that exam?
>
> A. I don't know.

(Trial Tr. 7-74 ll. 21-25; 7-75 ll. 1-18).

126.  In this case plaintiffs failed to demonstrate that Springfield had a feasible alternative employment practice to using the HRD police sergeants' promotional examinations in 2005 and 2007. During that period of time the Commonwealth did not offer any such free alternative and Springfield was without the resources to search for one on its own, even, assuming that one existed – a point not established by the evidence in this case.

127.  Springfield is prohibited from using test scores in a discriminatory manner in connection with the promotion of its police sergeants. It is illegal for Springfield to "adjust the scores of, use different cutoff scores for, or otherwise alter the results of,

employment related tests on the basis of race, color, religion, sex, or national origin", 42 USCS § 2000e-2 (l), or consider "race, color, religion, sex, or national origin in employment practices" or use it as "a motivating factor for any employment practice." 42 USCS § 2000e-2 (m).

## IV. CONCLUSION

Springfield only participated in the 2005 and 2007 HRD police sergeants' examinations. The Springfield Plaintiffs failed to file a timely claim with the MCAD and EEOC in regard to the 2005 HRD police sergeants' examination and their claims based upon it are time barred.

Springfield is a Title VII employer of the Springfield Plaintiffs but Springfield is not a Title VII employer of any of the other plaintiffs. Springfield is not liable for either the 2006 or the 2008 HRD police sergeants' examinations because Springfield did not participate in them.

The 2007 HRD police sergeants' examination did not have an adverse impact upon any of the Springfield Plaintiffs; moreover, it was a content valid examination for which Springfield had no other reasonable alternative given Springfield's financially strapped situation.

For the foregoing reasons Springfield respectfully requests that the Court dismiss all the claims against Springfield and enter a judgment for Springfield.

Respectfully submitted

Dated: Friday, October 29, 2010

THE DEFENDANTS: CITY OF
SPRINGFIELD AND MAYOR SARNO

By, /s/ *Edward M. Pikula, Esq.* (digitally signed)
Edward M. Pikula, Esq
BBO# 399770
City Solicitor

By, /s/ *Harry P. Carroll* (digitally signed)
Harry P. Carroll, Esq.
BBO # 076060
Senior Legal Counsel

City of Springfield Law Department
36 Court Street, Room 210
Springfield, MA 01103
(413) 787-6085
Fax: (413) 787-6173

## CERTIFICATE OF SERVICE

I hereby certify that on Friday, October 29, 2010, a copy of this document was served by electronic filing on all counsel of record.

/s/ *Harry P. Carroll* (digitally signed)
Harry P. Carroll, Esq.