**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                      )
PEDRO LOPEZ, et al.                   )
                                      )
                    Plaintiffs,       )
                                      )        Civil Action No. 07-11693-GAO
           v.                         )
                                      )
CITY OF LAWRENCE, et al.              )
                                      )
                    Defendant.        )
_____ )


**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND RULINGS OF LAW**

## TABLE OF CONTENTS

**FINDINGS OF FACT** ................................................................ 1

**1. Background** ...................................................................... 1

    A. Parties & Experts ......................................................... 1
    B. Structure of Exams ....................................................... 1
    C. Historical Background .................................................. 6
    D. Duties of Police Sergeant ............................................ 8

**2. Disparate Impact** ............................................................12

    A. Adverse Impact of Written Job Knowledge Tests ...........................12
    B. Measures of Adverse Impact: AI Ratios and
       Mean Score Differences...............................................13
    C. Statewide Evidence of Disparate Impact and
       Aggregation........................................................15
    D. Boston ..................................................................17
    E. Lawrence ...............................................................18
    F. Lowell ..................................................................19
    G. Springfield.............................................................21
    H. Methuen ................................................................23
    I. MBTA ...................................................................24
    J. Worcester ..............................................................26
    K. Silva Analyses of Disparate Impact ................................28

**3. Validity**.........................................................................29

    A. Validity Generally....................................................29
    B. 1991 Validation Report.............................................31
    C. 2000 Job Analysis....................................................34
    D. Written Job Knowledge Test ......................................35
    E. Education & Experience Component............................38
    F. Weighting of Components..........................................41
    G. Passing Scores & Use of Exam Scores As Ranking Device............................42
    H. Lack of Facial Validity ............................................43

**4. Less Discriminatory Alternatives** ...............................44

    A. Legal Availability of Alternatives ..............................44
    B. Financial Feasibility of Alternatives...........................45
    C. Types of Alternatives...............................................46
    D. Greater Validity of Alternatives................................48
    E. Lower Adverse Impact of Alternatives........................48
    F. Prevalence of Multiple Component Exams .....................50

G.  Boston's Use of Alternatives ........................................................53

**5. Plaintiff Robert Alvarez** ............................................................55

**RULINGS OF LAW** ............................................................................56

**1. Legal Framework** .......................................................................56

**2. Disparate Impact** .......................................................................57

A.  Proving Disparate Impact ............................................................57
B.  Evidence of Disparate Impact ......................................................67
    (a) Written Job Knowledge Tests ..................................................67
    (b) Mean Score Differences ..........................................................68
    (c) Other Evidence .......................................................................71

**3. Validity** ......................................................................................72

**4. Less Discriminatory Alternatives** ................................................83

**5. Plaintiff Robert Alvarez** .............................................................87

**6. Summary** ....................................................................................89

**CONCLUSION** ..................................................................................92

## FINDINGS OF FACT

**1. Background**

### A.  Parties & Experts

1.      The Plaintiffs are current or former police officers for the cities of Lawrence, Methuen, Lowell, Worcester, Springfield, Boston, or the Massachusetts Bay Transportation Authority ("MBTA").

2.      Each plaintiff is each either black or Hispanic.[1]

3.      The plaintiffs have taken the 2005, 2006, 2007 or 2008 exam[2] for the position of police sergeant but have not been promoted (or were promoted after white police officers from their jurisdiction who took the same exam).  Each exam was administered by the Commonwealth of Massachusetts Human Resources Division ("HRD").[3]

4.      Four experts testified at trial: Joel Wiesen, Ph.D. (Plaintiffs), Cassi Fields, Ph.D. (Plaintiffs), James Outtz, Ph.D. (Defendants), and Jacinto Silva, Ph.D. (Defendants).  All four are highly-qualified and experienced industrial organizational psychologists, a field that specializes in the area of testing.

### B.  Structure of Exams

5.      In Massachusetts, police and fire departments subject to civil service laws have two general options for promotional examinations: (1) use the statewide examination developed by HRD, or (2) develop their own promotional exams by entering into a delegation agreement with HRD.  (Exhs. 1, 2, 68, 151).  See also Mass. Gen. Laws ch. 31, § 5(l) (giving HRD

---

[1]      The race/ethnicity of plaintiff Robert Alvarez is disputed by the City of Lowell.  Additional facts regarding his race are set forth below.

[2]      Unless otherwise indicated, any reference to "exams" refers to these challenged exams.

[3]      The City of Boston's exams for 2005 and 2008 were administrated by HRD, but those exams had questions that differed from the statewide exam in that the Boston exams included some questions asking about Boston-specific rules.

delegation power).  All of the Defendants voluntarily elected to choose the first option, relying on HRD to create, design, and administer the exams.

6.      The exams consisted of two elements: (1) an "education and experience" rating, which nominally accounts for 20% of the exam score, and (2) a written, closed-book test consisting of 80 multiple-choice questions, which accounts for 80% of the exam score.  (Exh. 5). Pursuant to Massachusetts law, certain military veterans[4] and long-service employees receive an additional two points, which is added on to their final exam score.  (2:35).  Mass. Gen. L. ch. 31, § 59 (long service employees).

7.      Because every applicant receives at least 14 of the 20 points allotted to the "education and experience" component,[5] there are only 86 points to be determined in each case, 80 by the written test and 6 by the education and experience rating, meaning that the written test accounts for at least 93 percent (80 of 86 points) of the weighted exam grade.  (2:33-35).  In fact, as discussed in more detail below, the written test accounts for closer to 98 percent of the weighted exam grade.

8.      The written test consisted entirely of closed-book questions that either quoted or closely paraphrased texts on a pre-determined reading list.  (3:41-43).  As a result, they maximize the need for rote memorization.

9.      Candidates needed to receive a score of 70 to pass the exams.[6]  (2:53).

10.     That cut-off score was not established based on any scientific criteria.  (2:54).

---

[4]     Only some military veterans, generally those who have served during wartime, are entitled to additional points, as set forth at Mass. Gen. L. ch. 4, § 7, cl. 43, as amended by the Acts of 2005, ch. 130. (Exh. 5).  A chart of eligible veterans is posted on HRD's website, available at http://www.mass.gov/.
[5]     This component was referred to both as an "education and experience" component and a "training and experience" component.  The two terms are used interchangeably here.
[6]     For the 2008 examination, the passing score was lowered to 64.

11.     If a candidate passes the examination, he or she is then ranked by his score on the examination and placed on a list of qualified candidates.  (2:36-37).

12.     Selections for promotional positions are made by the respective jurisdiction from the top candidates on such list, typically using a rule known as "2N+1."  For example, if there are three openings in a given jurisdiction, the three candidates selected from promotion are chosen from a list of seven candidates provided by HRD to the jurisdiction's hiring authority. (2:36-37).

13.     Most jurisdictions, including Boston, select candidates in strict rank order.  (9:95; 13:21; 13:83).

**C.  Historical Background**

14.     In Massachusetts, there is a long and sad history of problems stemming from a heavy reliance on multiple-choice exams for fire and police department selections and promotions.

15.     That history reaches back almost 40 years to Boston Chapter, N.A.A.C.P., Inc. v. Beecher, 504 F.2d 1017 (1st Cir. 1974), a case in which the First Circuit affirmed a finding that a multiple-choice exam had a disparate impact on minority firefighter applicants.

16.     Several years later, the Massachusetts Association of Afro-American Police, Inc. ("MAAAP")[7] filed suit against the Boston Police Department, alleging that its promotional practices were discriminatory.  See Massachusetts Ass'n of Afro-American Police, Inc. v. Boston Police Dep't, 780 F.2d 5, 5-6 (1st Cir. 1985).  That suit resulted in a consent decree in 1978, requiring the City of Boston to, among other things, "set specific goals and timetables for

---

[7]     MAAAP is the predecessor of the Massachusetts Association of Minority Law Enforcement Officers ("MAMLEO").

promotions of black officers to sergeant." See Boston Police Superior Officers Fed'n v. City of Boston, 147 F.3d 13, 15 (1st Cir.1998) (describing history of decree).

17.    As of the mid-1980's, Boston still had not given any content-valid examinations and had failed to meet any of the consent decree's numerical goals for the promotion of black officers, resulting in further extensions to and modifications of the decree.  Id. at 15-16.

18.    Boston was not alone in having a glaring under-representation of minority police sergeants as the result of its use of discriminatory promotional exams.  For example, prior to 2001, the City of Worcester had never had a minority police sergeant.  (8:129; 13:23).  As of 2004, it had only one minority sergeant out of 55.  (Exh. 33; 8:129).  As another example, as of 1996, minorities represented 27.6% of patrol officers in the MBTA police (fifty officers out of 181), but only 7% of all sergeants (one sergeant out of fourteen).  Brackett v. Civil Service Commission, 447 Mass. 233, 245 (2006).

19.    In an attempt to increase its minority representation of police sergeants, Boston and other police departments have sought to avoid the predictably discriminatory effects of multiple-choice job-knowledge tests by seeking permission to use special lists for minority officers.  For example, in Brackett, the Supreme Judicial Court upheld the MBTA's use of a separate promotion list for black police sergeants, given that the black applicants would not otherwise have been promoted given their lower test scores.  Id. at 246 ("If the MBTA had based its promotion decisions on strict rank order...[n]o black officers would have been promoted to fill any of the seven sergeant positions.").  See also Cotter v. City of Boston, 323 F.3d 160, 164-65 (1st Cir. 2003) (describing how City of Boston bypassed white police sergeant candidates based on disparate impact of using exam scores for strict rank ordering); Boston Police Superior Officers Fed'n, 147 F.3d at 20-25 (affirming City of Boston's bypassing of white police

lieutenant candidates, even though not required by any consent decree, given the history of discrimination against black candidates).

20.     Between 1985 to the present, a period of 25 years, Boston appears to have departed from HRD's statewide exam on no more than three occasions, in 1985, 1987, and 2002. Although the evidence is limited, the record indicates that Boston gave a multi-component exam in 1985, which resulted in no adverse impact at the passing rate.  (Exh. 40 at 82).  In 1987, Boston again gave a multi-component exam, but the results were successfully challenged based on evidence that one of the components had been compromised by a police official.  (3:97-98). See Boston Police Superior Officers Federation v. Civil Service Commission, 35 Mass. App. Ct. 688 (Mass. App. Ct. 1993) (describing background of test).  In 2002, as discussed in more detail below, Boston developed a multi-component examination, but then did away with one of its new components, a so-called performance review system.  Another of the components that it added to the exam, a video exercise, had a significantly lower level of disparate impact on minority applicants, which was a move in the right direction and offered a concrete opportunity for improvement.  (3:57; 6:81-83).  Nonetheless, for the 2005 exam Boston returned to same type of exam that had resulted in predictable discrimination and litigation for the prior three decades.

21.     Today, the disparate impact of the HRD-developed exam remains so clear that Boston does not even contest that issue.  (2:76).

**D.  Duties of Police Sergeants**

22.     Police sergeants are first-level supervisors, with direct responsibility for supervising patrol officers.  Boston Police Commissioner Edward Davis testified that "[t]he sergeant's position is really where the rubber hits the road as far as supervising individuals, and it's really the most important rank."  (9:86).

23.     According to Davis, identifying effective police sergeants requires looking not only at technical knowledge but at other factors, such as the following:  "We should look at things like communication skills; I think we should look at the work ethic of the individual; whether or not they have espoused the directives that are sent from the chief's office and the command staff so that implicating [sic] things like community policing and doing outreach to the community are an integral part of what we're trying to get accomplished.  All of those things have to be measured to get the best candidate out there on the street."  (9:43).

24.     Former Boston Police Commissioner Kathleen O'Toole testified that in her experience police sergeants need to be a good role model, to have integrity, to have very strong interpersonal skills and leadership ability, and to have knowledge of the law.  (5:21).

25.     Thomas Nolan, a 27-year veteran of the Boston Police Department – with experience as a patrol officer, a sergeant, and a lieutenant – testified without contradiction about the duties of a Boston police sergeant.  Patrol sergeants work in the field, supervising 20-40 officers.  (1:70).  They are responsible for responding as needed to routine calls and are required to respond to all serious incidents (e.g., aggravated assaults, homicides, shootings, sexual assaults, community disorders involving racially-motivated incidents, armed robberies, and injured officers).  (1:70).  Sergeants have day-to-day oversight and supervisory responsibility for patrol officers.  (1:73).

26.     According to Nolan, police sergeants need abilities such as good judgment, experience, wisdom, strong communication skills, the ability to take control of a situation in the street, and decisiveness. (1:74).

27.     Springfield Police Chief William Fichet testified that, among other things, sergeants are "first responders to major crime scenes, to major disturbances, and they, by and

large, direct the operations at the street level during those type of events that are happening on the street." (12:79; Exh. 165). Most sergeants are out on the street, patrolling. (12:92).

28.     Lowell Police Superintendent Kenneth Lavallee testified that, among other things, sergeants are "basically, a first-line supervisor, who really interacts on a regular basis with the – the officers on the street." (13:44). Sergeants also must "deal with a critical situation when there is an incident in the City [of] Lowell that is of major significance, then…the sergeant's on-scene working with the officers to resolve whatever issues are taking place." (13:44). Sergeants must have good communication skills, good interpersonal skills, the ability to de-escalate situations, and the ability to deal with stressful or critical situations. (13:82). Most of Lowell's police sergeants work on the street. (13:82).

29.     Plaintiff Pedro Lopez, who works for the City of Lawrence, testified that in his experience good police sergeants are open-minded, have good communication skills, and can think "outside the box" (meaning they are "able to adapt and overcome, act fast, make quick decisions"). (1:122). Sergeants also should be capable of giving orders, leading by example, following orders, and maintaining their control, composure, and temper. (1:123).

30.     Plaintiff Robert Alvarez, who works for the City of Lowell, testified that sergeants "issue assignments to personnel, supervise them on the street, supervisor is the – supervises all sudden deaths and all use of force incidents, homicides and critical incidents." (9:108).

31.     Dr. Fields, who has designed about 300 police promotional exams, testified that the critical skills and abilities of a police sergeant include, among other things, decision-making, command presence, leadership skills, supervisory skills, oral communication skills, written

communication skills, interpersonal skills, the ability to persuade and negotiate, flexibility, and the ability to manage stress.  (6:95-96).

32.     As discussed in more detail below, Dr. Outtz's principal opinions in this case are undermined by directly contrary positions he took in a brief he and his colleagues recently submitted to the U.S. Supreme Court in Ricci v. DeStefano, ___ U.S. ___, 129 S.Ct. 2658 (2009), which involved fire lieutenant promotional exams.  See Brief of Industrial Organizational Psychologists as Amici Curiae in Support of Respondents, Ricci v. DeStefano ("Outtz Brief"), 2009 WL 796281 (2009).  At trial, Dr. Outtz attempted to reconcile that contradiction by suggesting that there was a critical distinction between the supervisory responsibilities of a police sergeant and a fire lieutenant – i.e., that police sergeant's have substantially less supervisory responsibility than a fire lieutenant.  (16:121-125).  Not only did Dr. Outtz admit that he was not familiar with the job of a police sergeant in Massachusetts (15:66-68), but his attempted distinction is inconsistent with common sense and the testimony of every other witness who testified about the duties of a police sergeant, as detailed above.  His attempted distinction is also inconsistent with his own testimony.  Dr. Outtz elsewhere admitted that the distinguishing factor of a police sergeant, as for a fire lieutenant, is the ability or responsibility for supervising and leading other officers in the line of duty.  (16:100-101).  He also acknowledged the importance of using multiple components for both police sergeant and fire lieutenant promotional exams.  (16:55-56).  As further confirmation that Dr. Outtz's distinction is without merit, Dr. Silva's firm, EB Jacobs, has developed tests that are similar for police sergeants and fire lieutenants, assessing skills such as oral expression, information analysis, interpersonal relations, judgment and decision-making, planning and organizing, and resource management.  (18:9-13).

11

33.     A 1991 validation study, upon which Defendants place great weight and which is discussed in detail below, determined that critical abilities of a police sergeant include, among other things, (a) "ability to make and carry out decisions quickly," (b) "ability to give clear, concise verbal orders," (c) "ability to communicate orally and in writing," (d) "ability to bring claim to control surroundings when in stress producing situations," and (e) "ability to establish rapport with persons from different ethnic, cultural and/or economic backgrounds."  (Exh. 41 at Att. EE).   As discussed in more detail below, the exams did not test for any of these abilities. (Id.).

34.     Similarly, a 2000 job analysis conducted by the testing firm Morris & McDaniel determined that critical abilities of a police sergeant include, among other things, (a) "skill in supervision and leadership," (b) "skill in implementing community policing procedures and techniques," (c) "interpersonal skills," (d) "presentation skills," (e) "oral communication skills," (f) "ability to remain calm in stressful situations," (g) "ability to instill confidence," and (h) "ability to think under pressure."  (Exh. 42 at 48-55).

## 2.  Disparate Impact

### A.  <u>Adverse Impact of Written Job Knowledge Tests</u>

35.     It is universally recognized among industrial organizational psychologists, including all four experts who testified at trial, that the type of written multiple-choice tests at issue in this case produce high levels of adverse impact on minority candidates.  (2:82-84; 3:43-47, 55, 60; 10:30; 16:59; 17:110).

36.     As a result, continued use of multiple-choice tests can be expected to result in ongoing patterns of disparate impact.  (2:103, 107-108, 110-11, 115, 117; 3:47).

### B. **Measures of Adverse Impact: AI Ratios and Mean Score Differences**

37.     For industrial-organizational psychologists, the usual practice for assessing

adverse impact *in terms of selection rates* is through adverse impact ratios ("AI ratio").  So, for

example, when comparing the selection rate of minorities to non-minorities, the AI ratio is the

percent of minority candidates promoted divided by the percent of non-minority candidates

promoted.

38.     The Equal Employment Opportunity Commission's Uniform Guidelines on

Employee Selection Procedures (1978) ("Uniform Guidelines") have established a rule of thumb

known as the "four-fifths rule."  Under this rule, "[a] selection rate for any race…which is less

than four-fifths (4/5) (or eighty percent) of the rate for the group with the highest rate will

generally be regarded…as evidence of disparate impact."  29 C.F.R. § 1607.4(D).

39.     When looking at small populations, adverse impact ratios, standing alone, can be

misleading.  (18:15-16, 57).  According to Dr. Silva, researchers have found that adverse impact

ratios can be an unstable test with samples as large as 200-400.  (17:22).  Other factors that can

influence the appearance of adverse impact, as measured by adverse impact ratios, are low

selection rates (the percent of applicants who are promoted) and a low percentage of minority

representation within a jurisdiction.  (17:25, 38).  In Massachusetts, selection rates for police

sergeant promotions are typically low.  (18:17).

40.     Similarly, when using a test of statistical significance, small sample sizes are one

factor that makes it more difficult to get a statistically significant result.  (18:20).  Another factor

that makes is difficult to get a statistically significant result are low selection rates.  (18:20).  As

a result, there are some jurisdictions where the numbers and selection rates are too small to get a

statistically-significant result, meaning that you could never show adverse impact if looking only at promotion rates. (18:20-23).

41.     Adverse impact can be established through evidence other than promotion rates. For example, one way that adverse impact is measured is through mean score differences between sub-groups. (17:114-15). As Dr. Outtz has written, "Most of the [industrial-organizational] psychology literature addressing adverse impact has focused on documenting the magnitude of subgroup differences on specific assessment devices." (17:114). At trial, all four experts agreed that it is appropriate to look at mean score differences when evaluating test components for adverse impact. (2:67-71; 6:43-44; 16:78-79; 17:123, 226).

42.     Mean score differences are often reflected through a number known as "d," which is a standardized difference between groups. A d of zero means there is no difference between sub-groups, and a d of 1 means there is one standard deviation of difference. (6:43-44; 17:113-14).

43.     Looking only at promotions means looking only at candidates who happen to obtain the top scores; in contrast, looking at mean score differences allows for an analysis of the entire distribution of scores. (17:116-17).

44.     As a general rule, and as logic and common sense would indicate, having a lower score results in a lower likelihood of being promoted. (17:118). Even a delayed promotion – which is another consequence of having a lower score – results in harm in the form of lost seniority. (2:77-78).

45.     The significance of mean score differences is demonstrated by the definition of a "false positive." Dr. Silva testified that a "false positive" is when an adverse impact ratio suggests the presence of adverse impact even when there are no differences between subgroups

in terms of test performance.  (17:36-37, 44, 65-66, 69).  The "reality" of an underlying

difference – that is, whether a "positive" is really true – can be determined by looking at mean

score differences.  (17:125).

46.     According to both Dr. Outtz and Dr. Silva, the Uniform Guidelines provide that

adverse impact can be measured by looking at mean score differences.  (17:126-27).  Indeed, Dr.

Silva agreed that if sub-groups are performing at a statistically-significant different level on a

test, the employer may have to justify its use of the test.  (17:127).

47.     According to the Uniform Guidelines, and as Dr. Silva confirmed, another way of

establishing adverse impact is by looking at patterns.  (18:29-32).  So, for example, even for a

jurisdiction whose numbers are too small to get a statistically-significant measure of adverse

impact, if there was a historical pattern, over three or more years, reflecting low rates of minority

promotions, then that pattern could be sufficient to require evidence of test validity.  (18:31-32).

**C.  Statewide Evidence of Disparate Impact and Aggregation**

48.     Dr. Wiesen performed statewide analyses comparing how minority and non-

minority applicants performed on the exams.  He opined that it is appropriate to conduct an

aggregated analysis in this case, because "if you are trying to find out if the examination

adversely affects minorities, the best approach would be to use all the data from all of the

applicants that took the examination."  (2:45; see also 2:48, 88; 5:85).  His opinion about the

appropriateness of aggregation is supported by accepted practice among industrial psychologists

and by the Uniform Guidelines.  (2:43-44, 121; 18:39-40).

49.     Dr. Silva agreed that aggregation is a useful tool if used correctly.  (18:41).

Aggregation is appropriate when the underlying data shares common characteristics.  (18:41).

For example, if looking at mean score differences in a standardized test like the SAT or LSAT, it

would be useful to aggregate data from across the country. (18:41; see also 18:53). In the same way, as Dr. Silva admitted at trial, it is reasonable and appropriate to look at the statewide results of each exam in this case to evaluate mean score differences. (18:42-43).

50.    In his evaluation of each of the exams, Dr. Wiesen found "highly statistically significant" differences in the mean scores for minorities (black and Hispanic) and non-minorities. (2:66-67, 70-71, 86-87; 11:48-50; Exhs. 78, 79). The probability that the differences occurred by chance was less than .001 (i.e., less than 1 out of 1,000), which is far more significant than the accepted cut-off for statistical significance, which is .05 (i.e., less than 5 out of 100). (2:40, 69; Exh. 78).

51.    Dr. Wiesen also found adverse impact when looking at pass rates and selection rates. (2:71-72, 78-80, 84-87; Exh. 78). Although some of his statewide findings were not statistically significant if considered in isolation, that fact is of no consequence given the surrounding facts that support a finding of adverse impact. (2:80-81, 84-85). The same is true with respect to analyses that were limited to particular jurisdictions. (2:102, 105, 107, 114). Testing for statistical significance is not done in a vacuum; it is done as one part of a more global analysis to determine what is happening in a given situation. (2:80-81, 102, 105, 107, 114, 121). Given the highly statistically-significant differences in the average test scores of minorities compared to non-minorities across the state, the lack of statistical significance in small communities does not preclude a finding of disparate impact, because there was a clear pattern of such impact. (2:105, 114, 121; 3:15; 11:27-30, 38).

52.    As discussed in more detail below, that pattern is shown in many ways, but one example is a chart showing a lack of minority promotions across the state. (Exh. 14). That chart lists 23 communities across the state that had made sergeant promotions from the 2006 exam.

(Id.).  As of January 17, 2008, there had been 17 promotions, all of whom were white.  (Id.).  Of the 79 minority applicants, not a single one had been promoted.  (Id.).

53.     Looking at the overall picture, Dr. Wiesen summarized his opinion by stating, "I think that the impact is clear, and that is that there will be continuing adverse impact in the promotional decisions that are based on the test scores if the system doesn't change."  (11:50).

### D. **Boston**

54.     For the 2005 and 2008 promotional exams given to Boston police officers, there are consistent and dramatic measures of disparate impact.  Indeed, Boston has stipulated that the 2005 and 2008 exam resulted in adverse impact.  (2:76).

55.     In terms of promotion rates, the adverse impact ratio (that is, the promotion rate of minority applicants divided by the promotion rate of non-minority applicants) was 0.28 for 2005 and 0.05 for 2008, far below the benchmark of 0.8.  (Exh. 79).  In terms of passing rates, the adverse impact ratio was 0.62 for 2005 and 0.73 for 2008.  (Id.).  In terms of effective passing rates,[8] the adverse impact ratio was 0.29 for 2005 and 0.08 for 2008.  (Id.).  Finally, in terms of average test score (i.e., mean score differences), non-minorities had an average score that was 6.4 point higher than minorities in 2005 and 6.6 points higher in 2008.  (Id.).  All of these measures are statistically significant.  (Exh. 79).  Indeed, the difference in average test scores between minority and non-minority applicants for the 2008 exam was so significant that the probability of the difference occurring by chance was 0.000000000000000005 (that is, 17 zeros to the right of the decimal place).  (Exh. 78).

56.     Boston's Police Commissioner Edward Davis testified that he is concerned about the lack of diversity in police supervisor positions in the Boston Police Department.  (9:45-46).

---

[8]     The effective passing rate looks at how many applicants scored above and below the lowest score at which an applicant was promoted.  (2:73).

He is disappointed, for example, that only two of 37 promotions resulting from the 2008 examination have gone to minorities. (9:46).[9] This disappointing result is consistent with a long, well-documented pattern of adverse impact, as discussed above.

### E. Lawrence

57. Of Lawrence's 17 sergeants, only one (6%) is a minority. (Exh. 38). The one minority sergeant, Jose Martinez, was promoted approximately ten years ago. (1:111). In 2008, the last year for which such data is in evidence, Lawrence had 124 patrol officers, 35 of whom (28%) were minorities. (Exh. 39). According to census data, 74% of the population in Lawrence is minority: 70.8% is Hispanic or Latino, and 3.2% is Black or African-American. See Census Data (Lawrence, MA) (available at http://factfinder.census.gov).[10]

58. Plaintiff Pedro Lopez testified that he uses his Spanish-speaking skills on a daily basis while working as a patrol officer. (1:112). None of the white sergeants in Lawrence speak Spanish. (1:112).

59. On the 2003 examination, the adverse impact ratio for promotions was 0.74*[11], the adverse impact ratio in the passing-rate was 0.46*, the adverse impact ratio for the effective passing rate was 0.46, and the difference in average test scores was 7.7 points. (Exh. 79). The 2006 and 2008 exams also reflected an adverse impact against minorities. No minorities were promoted from either examination (the eligibility list from the 2008 examination remains in

---

[9]    The situation has become even worse. As of September 13, 2010, the number of promotions has risen to 44, and all seven of the additional promotions have gone to white applicants. (Stipulation Between Plaintiffs and Defendant City of Boston, Doc. 303, Sep. 21, 2010).

[10]    The Court may take judicial notice of census data pursuant to Fed. R. Evid. 201.

[11]    When a number is designated with an asterisk, that indicates the underlying numbers were not large enough – as they were statewide and in Boston – to be statistically significant. These numbers are included because they are consistent with an overall pattern of disparate impact. (2:80-81, 102, 105, 107, 114, 121; 3:15; 11:27-30, 38). For example, as Dr. Wiesen testified at one point, "[W]hat you see in Lawrence is consistent with what you see statewide, that minority candidates score a few points lower; the minorities as a group pass at a lower rate and are appointed at a lower rate." (2:105).

effect), making the adverse impact ratio for promotions equal to 0*. (Exh. 79; 2:104-106). The adverse impact ratio for the passing rate was 0.46* for the 2006 examination, and 0.84* for the 2008 examination. (Exh. 79). The adverse impact ratio for the effective passing rate was 0* for both years. (Id.). The difference in average test scores was 6 points in 2006, which was statistically significant, and 3.3* points in 2008. (Id.).

60. The aggregated results from the three most recent exams – 2003, 2006, and 2008 – show severe adverse impact. The adverse impact ratio for promotions was 0.28*, the adverse impact ratio for the passing rate was 0.6, and the difference in average test scores was 5.3 points. (Exh. 79). The adverse impact ratio for the passing rate and the mean score difference are both statistically significant. (Id.).

61. The raw data from the exams demonstrates the real-world effects of a test that is biased against minority candidates. For the 2003 examination, out of the 15 highest-scoring candidates, only one was Hispanic. (Exh. 155). Out of the 11 candidates who failed the exam, four were Hispanic. (Id.). For the 2006 examination, no minorities were promoted out of the 10 minority test-takers, whereas 4 out of the 37 non-minority test-takers were promoted. (Exh. 81). Only three of the 10 (30%) minority test-takers passed the examination, compared to 24 of the 37 (65%) of the non-minority test-takers. (Id.). Combined, 25 minorities took the sergeant examination in 2006 and 2008, and none were promoted. (Id.). In contrast, 64 non-minorities took the examination, and five were promoted. (Id.) More telling, while only 40% of minorities passed the exams, 61% of non-minorities passed the exams. (Id.).

## F. Lowell

62. Lowell has two minority sergeants out of a total of 30, meaning only 6.6% of Lowell's sergeants are minorities. (Exh. 35; 9:108). In 2008, Lowell had 181 patrol officers, 35

of whom (19%) were minority.  (Exh. 35).  According to census data, about 22% of the

population in Lowell is minority: 15.9% are Hispanic or Latino, and 6% are Black or African-

American.  See Census Data (Lowell, MA) (available at http://factfinder.census.gov).

63.    As far back as 1999, Lowell's Superintendent of Police was aware of and shared

concerns expressed by minority police officers about a lack of minority promotions.  (9:17).

64.    Lowell has not made any minority appointments from a sergeant examination

since 2003, when the city promoted Jose Torres.  (9:109).  A second minority sergeant, Angel

Otero, was appointed in 2008 (Exh. 34), but he was not promoted as a result of the 2006

examination or any recent examination.  Otero was appointed retroactive to 1999 as a result of a

court order in a lawsuit that he filed.  See Otero v. City of Lowell, Civil Action No. 00-10777,

Slip. Op. (D. Mass. Feb. 5, 2008).

65.    On the 2003 examination, the adverse impact ratio for promotions was 0*, the

adverse impact ratio for the passing rate was 0.69*, the adverse impact ratio for the effective pass

rate was 0*, and the difference in average test scores was 8.7, which was statistically significant.

(Exh. 79).  On the 2006 examination (Lowell did not offer an examination in 2008), the adverse

impact is also evident.  No minorities were promoted, making the adverse impact ratio for

promotions equal to 0*.  (Exh. 79).  The adverse impact ratio for the passing rate was 0.78*, and

the adverse impact ratio for the effective pass rate was 0, which was statistically significant.

(Id.).  The difference in average test scores was 9.1 points, which was not only statistically

significant, but "dramatic."  (Exh. 79; 2:109).  Dr. Wiesen also opined that the  adverse impact

would continue if Lowell continues to use the same type of sergeant promotional examination in

the future.  (2:110-111).

66.     The combined results from the two exams – 2003 and 2006 – also shows
significant levels of adverse impact.  The adverse impact ratio for promotions was 0, the adverse
impact ratio for the passing rate was 0.73, and the difference in average test scores was 8.9
points.  (Exh. 79).  All of these measures were statistically significant.  (Id.).

67.     The raw data from this exam are equally telling.  For the 2003 exam, the highest-
scoring 18 candidates were non-minorities.  (Exh. 155).  Out of the remaining 22 candidates,
eight were minorities, and two of the six test-takers who failed were minorities.  (Id.).  For the
2006 exam, no minorities were promoted out of the seven minority test-takers, whereas seven out
of the 36 non-minority test-takers (28%) were promoted.  (Exh. 82; 2:109).  Five of the seven
minorities passed the examination (71%), compared to 33 out of 36 non-minorities who passed
(92%).  (Id.).  No minorities scored within the top 24, the highest scoring minority being 25th on
the list.  (Exh. 75).

**G.  Springfield**

68.     Of Springfield's 40 sergeants, only four (10%) are minorities.  (12:94-95).  In
contrast, minorities comprise approximately one-third (33%) of the patrol officers in Springfield.
(Id.).  According to census data, meanwhile, about 56% of the general population is minority
(34.8% are Hispanic or Latino, and 21.3% are Black or African-American).  See Census Data
(Springfield, MA) (available at http://factfinder.census.gov).

69.     For the 2003 examination, the adverse impact ratio for the passing-rate was 0.59,
and the difference in average test score was 10.4 points, both of which are statistically
significant.  (Exh. 79).  For the 2005 examination, no minorities were promoted out of 18
minority test-takers, while six non-minorities were promoted out of 29 non-minority test-takers,
resulting in an adverse impact ratio for promotions of 0.  (Exhs. 79A, 85A).  The adverse impact

ratio for the effective passing rate was also 0.  (Exh. 79A).  The difference in average test scores was 6.9 points.  (Exh. 79A; 2:98, 101).  All of these numbers are statistically significant.  (Exh. 79A).  For the 2007 examination, two minorities were promoted out of 16 test-takers, while six non-minorities were promoted out of 20 test-takers, resulting in an adverse impact in promotions of 0.42*.  (Exh. 79A, 85A).  The adverse impact ratio for the passing-rate was 0.54, which was statistically significant, and the adverse impact ratio for the effective passing point was 0.42*.  (Exh. 79A).  The difference in average test scores was 5.7* points.  (Exh. 79A).  When combined, the results of the 2005 and 2007 exams show an adverse impact ratio for promotions of 0.24 and an adverse impact ratio for the passing rate of 0.68, and both of these results are statistically significant.  (Exh. 85A).

70.    The raw data from these exams further demonstrates the problem.  For the 2003 examination, out of the 28 highest-scoring candidates, only one was minority.  (Exh. 155).  Of the lowest-scoring 26 candidates, 16 were minorities.  (Id.).  Out of the 12 candidates who failed, eight were minorities.  (Id.).  On the 2005 examination, the ten highest-scoring candidates were non-minorities.  (Exh. 74).  Of the 17 candidates who failed the examination, eight were minorities. (Id.).  On the 2007 examination, ten minorities failed compared to only 6 non-minorities who failed.  (Exhs. 76, 85A).  Although plaintiff Julio Toledo, a Hispanic, was promoted from the 2007 examination, his relatively lower score delayed his promotion until November 2009, one year after five higher-scoring candidates were promoted from the same examination.  (Exhs. 163, 164).

### H. __Methuen__

71.     Methuen has no minority sergeants out of a total of 12, and there is no evidence that Methuen has ever had a minority sergeant.  (Exh. 37).  This contrasts with the minority representation in Methuen's general population, which is over 21%: 20% Hispanic or Latino, and 1.3% Black or Africa-American.  See Census Data (Methuen, MA) (available at http://factfinder.census.gov).

72.     For the 2004 examination, the two minority candidates failed the examination, and therefore could not have been considered for promotion.  (Exh. 156).  The difference in average test scores was 8.5* points.  (Exh. 79).  The results from the 2006 and 2008 exams are not statistically significant.  (Id.).  The difference in average test scores was 0.2* points on the 2006 examination and 5.9* points on the 2008 examination.  (Exh. 79).  Since only one promotion, a non-minority, has been made from either examination, an adverse impact ratio for promotions cannot be determined.  (2:116).  When combined, all three exams show an adverse impact ratio for promotions of 0*, an adverse impact in the passing-rate of .91*, and a difference in average test score of 3.8* points.  (Exh. 79).

73.     Based on the 2006 examination results, Methuen would have had to make six sergeant promotions, if it promoted in rank order, to reach a minority.  (Exh. 75).  Considering that Methuen has 12 sergeants total, no minority realistically had the opportunity to be promoted from the 2006 examination.  Based on the 2008 examination results, Methuen would have to make seven promotions, if it promoted in rank order, to reach a minority.  (Exh. 77; 2:116).  Based on a consideration of all of the data he evaluated, Dr. Wiesen opined that the adverse impact will continue if Methuen uses the same type of examination in the future.  (2:115-17).

## I. **MBTA**

74.    In 1996, minorities represented 27.6% of patrol officers in the MBTA police (fifty officers out of 181), but only 7% of all sergeants (one sergeant out of fourteen).  Brackett, 447 Mass. at 245.  In recognition of this problem, the MBTA in 1996 invoked Personnel Administration Rule ("PAR") 10 to obtain a list of black sergeant candidates from an existing eligibility list.  Using this list, the MBTA promoted three black officers to sergeant on October 5, 1996, out of seven total sergeant promotions.  Id. at 237.  Notably, had the MBTA promoted from the "regular" eligibility list under the normal rule of 2N+1, no minority officers would have been promoted to sergeant, and minority sergeant representation would have decreased to 4.8% (one sergeant out of 21).  Id. at 236 n.7, 246.  These promotions resulted in a challenge by white officers, which the Supreme Judicial Court rejected, finding that the promotions were a narrowly-tailored means of remedying the "past hiring and promotion practices of the MBTA police department [that] had resulted in discriminatory treatment of minorities."  Id. at 257.

75.    In 2004, the MBTA again took proactive measures to address its lack of minority sergeants.  On July 15, 2004, based on the eligibility list established from the 2003 sergeant examination, the MBTA made 12 sergeant promotions.  The two minorities who were promoted, Miguel Sosa and Manes Cadet, ranked lower on the eligibility list than several non-minority candidates, but were promoted due to their ability to speak Spanish and Cadet's Haitian national origin.  See Maynard v. MBTA Police Dept., G2-05-12, G2-05-177, ¶¶20-21, Civil Service Commission (attached as Exhibit A to ECF Document No. 289).  The Civil Service Commission, after a challenge by one of the bypassed candidates, ruled that the MBTA improperly bypassed the non-minority candidate in favor of the minorities.  Id.  Cadet and Manes would not have been promoted on July 15, 2004 except for this improper bypass.

76.     Moreover, there is evidence that the MBTA reached these two minorities by substantially deviating from its normal rate of promotions.  The MBTA increased its total number of sergeants from 20 on December 31, 2003 to 32 on December 31, 2004.  (Exh. 149). The number of sergeants has thereafter remained around 32 (id.), demonstrating that the large number of promotions made from the 2003 examination was an exception to the MBTA's normal practice.

77.     The one minority officer appointed following the exams at issue in this case – Darren Keith – was not promoted based on his score from either the 2005 or 2007 exams. (12:133; Stipulation Between Plaintiffs and MBTA Defendants, Sep. 9,2010).  Rather, he was promoted based on a bypass appeal that resulted in him being placed at the top of the eligibility list from the 2005 examination.  (12:131-32).  In other words, Keith's score on the 2005 examination did not get him promoted.  (12:132).

78.     In 2005, 48 officers took the examination, 10 of whom were minority; seven non-minorities (18%) were promoted and none of the minorities.  (Exh. 83).  Only one of the 10 minorities (10%) passed the examination, while 12 of the 38 non-minorities (31.5%) passed. (Id.)  This resulted in adverse impact ratio for promotions of 0*, an adverse impact ratio in passing rates of .32*, and an adverse impact ratio for the effective passing rate of 0*.  (Exh. 79). The difference in average test scores was 3.3* points.  (Id.).

79.     In 2007, 31 officers took the examination, four of whom were minorities; two of the non-minorities were promoted and none of the minorities.  (Exh. 83).  Two of the four minorities passed the exam, while 14 of the 27 non-minorities passed.  (Id.).  This resulted in adverse impact in promotions of 0*, an adverse impact ratio in passing rates of 0.96*, and an

adverse impact ratio for the effective passing rate of 0*.  (Exh. 79).  The difference in average

test scores was 1.8* points.  (Id.).

### J. **Worcester**

80.     Currently, Worcester has 52 sergeants, only four of whom (7.6%) are minorities.

(Exh. 32).  This reflects a significant under-representation compared to the minority population

among police officers and in the community: 17% of all Worcester police officers are minorities

(Exh. 33), and approximately 28% of Worcester's general population are minorities.  See Census

Data (Worcester, MA) (available at http://factfinder.census.gov).

81.     Worcester has a long history of minority under-representation among its police

sergeants.  As of 2004, it had only one minority sergeant out of 55.  (Exh. 33; 8:129).  Prior to

2001, Worcester had never had a minority sergeant.  (8:129; 13:23).  Worcester's history in

terms of minority police sergeant promotions is described in findings issued by the

Massachusetts Commission Against Discrimination ("MCAD") following an administrative trial.

(Exhs. 64, 65).  Those findings arose from a complaint brought by Spencer Tatum – a plaintiff in

this case – and another minority officer in Worcester concerning the sergeant exams.  In its

findings, the MCAD provided the following data from the 1992 and 1994 exams: in 1992, the

highest minorities ranked 32, 47, and 53 based on their examination scores; in 1994, the highest

minorities ranked 29, 39, 40, 42, and 49.  (Exh. 64 at ¶ 20).  The MCAD condemned Worcester's

history of failing to promote minorities into its sergeant ranks.  Tatum v. Worcester, 2006 WL

662739, *4 (Mass. Comm'n Against Discrim. March 6, 2006).  Specifically, the MCAD noted

Worcester's "problematic record of in promoting minorities *over a significant period of time*,"

and "strongly encouraged" Worcester to take advantage of civil service rules which, at the time,

allowed for special eligibility lists for minority candidates.  Id.  (emphasis added).  The MCAD

also authorized an investigation into the City's promotional practices.  Id.

   82.   The MCAD decision was issued on March 6, 2006.  Id.  On September 21, 2006,

six months later, Worcester made its next round of sergeant promotions, in which seven officers

were promoted to sergeant, two of whom were minorities, Miguel Lopez (Hispanic) and

Anthony Maddox (Black).  (Exh. 32).  These promotions were based on the results of the 2004

sergeant examination.  As the data show, the top minorities from the 2004 examination ranked

13th (Hispanic, i.e., Miguel Lopez) and 15th (Black, i.e., Anthony Maddox) based on their

scores.  (Exh. 156).  (As reflected in this exhibit, the other seven minorities who took the

examination scored much lower, and were never considered for promotion.)  Lopez and Maddox

were barely reached for promotion, and only because Worcester made an unusually large number

of promotions.  There were a total of 14 promotions from the 2004 examination.  (Exh. 166).  In

comparison, Worcester made only seven promotions from the 2006 examination and has made

only one promotion from the 2008 examination.  (Exhs. 63, 86; 5:125).

   83.   None of the disparate impact analyses for Worcester are statistically significant.

(Exh. 79).  Based on the available evidence, Worcester has promoted one minority (Kevin

Davenport) to sergeant out of a total of eight promotions from the 2006 and 2008 exams.  (Exh.

86).  Worcester's adverse impact ratio for the 2006 examination is higher than 0 only because

Davenport happened to score high enough to be ranked fourth and therefore to be reached for

promotion.  (Exhs. 32, 63).  Only one non-minority has been promoted from the 2008

examination, preventing an adverse impact analysis.  (5:125).  Tatum, the only plaintiff from

Worcester, was ranked 13th on the 2006 eligibility list, and therefore did not place high enough

to be considered for promotion.  (Exh. 63).

**K.  Silva Analyses of Disparate Impact**

84.    The Defendants' only challenge to the Plaintiffs' evidence of disparate impact came from Dr. Silva.[12]  As a starting point, it is important to note that Dr. Silva does not recommend that jurisdictions use the type of exams being challenged in this case, because he and the firm he works for, EB Jacobs, recognize that exams with more components are more valid and less likely to lead to disparate impact.  (17:89-93, 102-105, 121, 129-30).

85.    Dr. Silva performed a number of analyses to support his opinion that there was insufficient evidence of disparate impact in all communities except Boston, where he found clear evidence of disparate impact.  (18:27).  All of his analyses were deeply flawed.

86.     As a general matter, all of his analyses looked solely at selection rates; he did not look at mean score differences.  (17:121-22).

87.    Moreover, Dr. Silva was only provided data for the 2005 to 2008 exams (17:17), which precluded him from examining any historical patterns, even though he agreed that historical patterns are relevant.  (18:29-32).

88.    One analysis Dr. Silva performed was a "shift-of-one" analysis, where it is assumed one more minority had been promoted in place of one non-minority to see if the adverse impact ratio is still under 0.8.  (17:14-15).  This analysis is simply another way of showing that an AI ratio is unstable based on small numbers (18:27), a fact that is not in dispute.  In any event, based on his analysis of Springfield, he found disparate impact for Springfield for the 2005 examination.  (18:28).

---

[12]    Dr. Outtz testified briefly about aggregation.  (15:39-44).  That testimony, however, was limited to the appropriateness of aggregation in the context of selection rates; he did not testify about the appropriateness of aggregation in the context of mean score differences.  (Id.).

89.     Another analysis he performed was a "shortfall" analysis, which is an attempt to quantify how many minorities would have to have been promoted to achieve an adverse impact ratio over 0.8.  (17:15).  Like the "shift-of-one" analysis, this analysis simply highlights the problem with small numbers.  There is no accepted benchmark for ascribing significance to the number that results from a shortfall analysis.  (18:26-27).

90.     Another analysis he performed was determining the probability of obtaining an adverse impact ratio below 0.8 even when there were no mean score differences in the underlying populations.  (17:22-24).  But Dr. Silva acknowledged that there were, in fact, mean score differences in the underlying populations here (18:33), so this analysis was performed on a faulty premise and demonstrates nothing more than the variability of statistics.

91.     Dr. Silva testified about a phenomenon known as "Simpson's Paradox," where aggregation of data suggests the presence of adverse impact even when there is no adverse impact in the individual units whose data is being aggregated.  (17:29-30).  As Dr. Silva admitted, however, whether Simpson's Paradox actually applies in a given situation can be determined by looking at the data from the individual units.  (17:33).  Dr. Silva did not analyze data from the individual municipalities to determine whether Simpson's Paradox existed in this case.  (18:41).

**3. Validity**

    **A.  <u>Validity Generally</u>**

92.     The Uniform Guidelines describe three methods of validation: criterion-related, content, and construct.    29 C.F.R. § 1607.5(A).

93.     Defendants did not attempt to justify the exams using criterion-related validation, which would have required proof of a statistically-significant correlation between scores on the exam and performance as a police sergeant.  (2:55-56).[13]

94.     Instead, Defendants contend that the HRD examination has been validated by the second of these methods: content validation.  According to the Guidelines, "[e]vidence of the validity of a test or other selection procedure by a content validity study should consist of data showing that the content of the selection procedure is representative of important aspects of performance on the job for which the candidates are to be evaluated."  29 C.F.R. § 1607.5(B).

95.     More specifically, both the Uniform Guidelines and other professional standards for industrial organizational psychologists establish that content validity requires a process of identifying critical knowledge, skills, and abilities ("KSA's"); weighing their importance; and then linking the critical KSA's to a testing process that reflects those weights.  (2:40-41, 56-60; 3:15-18, 6:70-77; 14:16-18, 96-97; 15:11-12; 17:110-111).   29 C.F.R. § 1607.14(C).  See also Outtz Brief, 2009 WL 796281 at *10, *12-*13 (discussing standards).

96.     Before examining the Defendants' attempt to establish the content validity of the exams at issue in this case, it is worth noting that none of the experts who testified in this case recommend or use police sergeant promotional exams that place such heavy reliance on a written, multiple-choice test.  (5:25-27; 6:34-36; 8:52-53, 102-103; 15:100-101, 104-106; 17:89-93, 102-103).  Dr. Outtz, in fact, has developed police and fire promotional tests that do not use any form of written, multiple-choice tests.  (15:104-105, 16:84).

_____

[13]     This type of correlation is expressed as a validity coefficient, which is a numerical indication (between 0 and 1) of the actual or predicted correlation between test performance and job performance. (17:110).  It is important not to confuse this number with content validity, which is a different concept. (17:110).

97.     Dr. Outtz testified that the written, multiple-choice test was not valid standing alone and that the exams were "minimally" valid only by virtue of the education and experience component.  (14:46; 15:128-29; 16:54).[14]  As discussed in more detail below, that component cannot carry the heavy weight Dr. Outtz puts on it.

98.     Collectively, the evidence permits only one conclusion: none of the exams were valid.

**B.  <u>1991 Validation Report</u>**

99.     In attempting to establish the validity of the exams, the Defendants rely heavily on a 1991 validation study.  (14:34; 15:35; Exh. 40).

100.     The 1991 study was too old to validate the exams.  Dr. Outtz testified that a job analysis is "useful and current for approximately five to eight years *if the job doesn't change*." (14:36) (emphasis added).  The earliest exams being challenged in this case were administered in October 2005, about 14 years after the 1991 study.  The world changed in numerous and significant ways during those 14 years, and the job of a police sergeant changed with it.  As just one example, many communities implemented community policing models during or after the 1990's.  (9:84).  Dr. Outtz acknowledged that he did not study the job of a police sergeant in the City of Boston, including any changes to that job over time, other than to look at the job analyses in these cases.  (15:66-68).

101.     Another fatal flaw with the 1991 study was the arbitrariness of the so-called "Testability Analysis" – i.e., the analysis of what critical KSA's would be tested and how.  (Exh. 41 at Att. EE; 3:23-24).  Each of the critical KSA's was put into one of three categories: (a)

---

[14]     Defendants' other expert, Dr. Silva, did not provide an opinion about the validity of the exams at issue in this case.  (17:111).

tested on the written test, (b) covered by the education and experience component, or (c) not tested. (Exh. 41 at Att. EE). There were fundamental problems with how the testability analysis assigned critical KSA's to each of these three categories, which suggests that the assignment process was largely arbitrary.

102.     The written test category was problematic because some of the critical KSA's in that category could not reasonably be tested using a multiple-choice job knowledge test, including, for example, critical KSA's such as (a) "ability to develop new policies and procedures to achieve department goals and objectives," (b) "skill in identifying problems, securing relevant information from both oral and written sources, identifying possible courses of problems and analyzing and interpreting data in complex situations involving conflicting demands, needs or priorities," (c) "the ability to confront problems, take charge, assume responsibility," and many others. (3:35-39).

103.     That the written tests did not test these areas is confirmed by a review of both the outlines used to prepare the test (see, e.g., Exh. 3) and the tests themselves (see, e.g., Exh. 48). Not surprisingly, those documents confirm what should be obvious: the written test did not assess many of the areas (e.g., the ability to take charge) that the testability analysis assigned to that test.

104.     The education and experience category was problematic because, as discussed in more detail below, the form used by HRD covered only past police experience, post-secondary degrees, some aspects of teaching experience, and some certifications. The critical KSA's put into this category were not covered by HRD's form. For example, the education and experience component allegedly tested "knowledge of external and internal factors affecting patrol operations (e.g., community influences, political influences, police organization and structure.)."

(Exh. 41 at Att. EE).  There is no evidence showing that this is so.  On the contrary, given the limited scope of the education and experience component, there is no reasonable argument that it tests for this type of knowledge.

105.    The "not tested" category is perhaps most problematic.  The Defendants offered no evidence to justify how and why it was decided to exclude a large number of critical KSA's from the assessment process.  The critical KSA's that were not tested included abilities such as (a) "ability to make and carry out decisions quickly," (b) "ability to give clear, concise verbal orders," (c) "ability to communicate orally and in writing," (d) "ability to bring claim to control surroundings when in stress producing situations," and (e) "ability to establish rapport with persons from different ethnic, cultural and/or economic backgrounds."  (Exh. 41 at Att. EE).

106.    Both Dr. Wiesen and Dr. Fields testified that the failure to test for such critical KSA's renders the exams invalid.  (3:17-18, 22; 6:96-99).

107.    Likewise, Dr. Outtz recently took the position that the omission of critical KSA's from an exam renders it invalid.  As he and his colleagues argued to the U.S. Supreme Court, the omission of such critical KSA's is fatal to the content validity of an exam:

> The omission from the testing domain of a KSAO that is an important job prerequisite - known in I/O psychology as "criterion deficiency" - vitiates the entire justification for the employment test, which is to select individuals accurately based on their capacity to perform the job in question. *A test that makes no attempt to measure one or more critical KSAOs cannot be validated under established standards*.

Outtz Brief, 2009 WL 796281 at *10 (citations omitted; emphasis added).  Similarly, according to the Defendants' other expert, Dr. Silva, his firm does not recommend that its clients use technical knowledge tests as a stand-alone product, because, for example, "being an effective leader requires more than knowing the rules and possessing the ability to do the job."  (17:102-104).

33

### C.  **2000 Job Analysis**

108.     In or around 2000, Morris & McDaniel performed a job analysis for the position of sergeant in the Boston Police Department, and that analysis was used in the development of Boston's 2002 sergeant exam.  (12:8-9; Exhs. 42, 152).

109.     The job analysis was not a validation study and did not include steps required by a validation study, including the development of a testing plan to ensure that an exam measures critical KSA's in proportion to their relative importance.  (Exh. 42).

110.     Dr. Wiesen found it highly unusual that the process allegedly followed to obtain subject matter expert ("SME") input on the importance of job duties, job tasks, and KSA's resulted in 11 SME's achieving complete unanimity in over 20,000 ratings, a result that "strains credulity," to put it modestly.  (3:75-76).  Similarly, Dr. Wiesen found many of the resulting ratings to be facially implausible.  For example, all 11 raters allegedly concluded that a police sergeant typically would perform, *on a daily basis*, tasks such as "conducts internal investigations" and "qualifies and/or engages in required practice of operation of firearms and other weapons."  (3:76-77).  These questionable aspects of the job analysis render it too unreliable to serve as a basis for validating the 2005-2008 exams.

111.     Moreover, whatever validity the job analysis added to the 2002 exam, there is no evidence that the validity carried over to later exams.  The job analysis resulted in an examination that included a written examination (40%), an assessment center (32%), a performance review system (8%), and an education and experience component (20%).  (12:12-13; Exh. 151).  Neither Morris & McDaniel nor any other expert offered an opinion to support the City of Boston's subsequent decision to abandon the assessment center and instead assign a weight of 80% to the written component of subsequent exams.  (12:13-14).

112.    More generally, there is insufficient evidence showing how or if the 2000 job analysis was used to develop any of the challenged exams.  None of the Defendants called any witnesses from Morris & McDaniel or HRD to testify about the job analysis or how, if at all, it was used to develop the challenged exams.

**D.  <u>Written Job Knowledge Test</u>**

113.    The questions on the challenged exams were not written by testing experts; they were written by a lay person at HRD.  (3:17, 42-43, 72-75, 79, 84-85; 12:15; 16:27).  The Defendants offered no evidence about the qualifications of this HRD employee.  Certainly, there is no evidence that the questions were drafted by testing experts in consultation with subject matter experts, as Dr. Outtz says should be done.  (16:26-27).

114.    The questions all asked about information taken directly from law enforcement textbooks or other specified materials.  (3:42-43; Exhs. 5, 10).

115.    All of the questions were closed-book, meaning that the applicant had to memorize everything.  This type of test is inappropriate where, as here, a police sergeant would be able to look up some types of information in the course of performing his duties.  (3:80-82; 6:73-74).  Indeed, EB Jacobs, the firm at which Dr. Silva works, uses both open- and closed-book job knowledge questions, because on the job some information needs to be memorized but other information can be looked up.  (17:101-102, 105-106).

116.    Dr. Wiesen examined and testified at length about the questions on the written tests.  (2: 31; 4:91-124; 11:24-25).

117.    For example, he identified numerous questions on the 2007 state exam that he found inappropriate for a police promotional exam, both in form and in substance.  (4:91-124; 11:24-25).  The exams were entered under seal and thus the questions will not be repeated here,

but Dr. Wiesen specifically singled out questions 26, 28, 31, 34, and 36-38, and testified that he

found at least ten additional questions that were inappropriate. (4:91-124; 11:24-25). As one

example of what was wrong with these questions, question 26 asked about the "synoptic"

approach to planning – something that Dr. Wiesen, who has a Ph.D. and years of experience in

public safety testing, had never heard of. (4:101-103). Other examples of unnecessarily difficult

words included homogeneous, adhere, unequivocal, and apportioned. (3:86). In addition to

using difficult words, the written questions were constructed in ways that were confusing. (3:83-

84). Simply put, it is impossible to conclude that these questions resulted in the selection of the

most qualified police sergeants in Massachusetts.

118. That the test items were poorly constructed is further demonstrated by what

happened after the tests were given. For example, after the 2007 exam was given and protests

were filed (see Exh. 20), HRD determined that 18 of the 80 questions were flawed. (3:85-86).

As Dr. Wiesen testified, this high level of flawed questions "wreak[ed] havoc" on the test

outline. (3:85-86).

119. Tellingly, although it was the Defendants' burden to justify the validity of the test

questions, no witness for the Defendants opined about the validity of any specific questions,

including their appropriateness, the manner in which the questions were phrased, or any other

issue concerning their validity. Therefore, there is no evidence contradicting Dr. Weisen's

testimony.

120. As one further demonstration that the written test did not cover the most

important KSA's for a police sergeant, the City of Lowell's Police Superintendent, who had

worked in the Police Department for 26 years, testified that he was not familiar with some of the

materials on the 2006 police sergeant examination reading list, including the Motor Vehicle Law

Cruiser Guide and the Juvenile Law Field Manual.  (13:69-70).  He had heard of, but had never read, another item on the list: the Police Desk Reference to Massachusetts Criminal Law. (13:70).

121.    Although he did not specifically opine on the validity of the exams, Dr. Silva testified about an analysis in which he compared the performance of incumbent sergeants on a sub-set of questions from the 2005 statewide and Boston exams to the performance of sergeant candidates (i.e., police officers) on that same sub-set of questions.  (17:85-89).  He found: (1) for Boston, that only 89 percent of Boston sergeants obtained a passing score on the sub-set of questions, compared to 63 percent of the Boston police officers taking the sergeant's promotional exam; (2) statewide, that only 79 percent of sergeants obtained a passing score, compared to 51 percent of police officers.  (17:86-88).  This analysis undercuts the validity of the exams, because a substantial number of incumbent sergeants were unable to get even a passing score on an exam designed to evaluate their ability to perform as a sergeant.  (2:50-53).

122.    It is plainly illogical to conclude that this analysis demonstrates validity.  All of the incumbent sergeants had already done well on a prior multiple-choice written job-knowledge test, so even Dr. Silva acknowledged that it is logical to expect that incumbents who had done well on one type of test would do relatively well on a later test that was similar in form.  (18:35-37).

**E.  Education & Experience Component**

123.     As noted above, Dr. Outtz agreed that the written multiple-choice test standing alone did not meet the requirements of content validity, and that only the addition of the education and experience component created "minimal" validity.

124.     Both Dr. Wiesen and Dr. Fields testified that the education and experience component was not content valid.  (3:19-20; 8:92-94).

125.     Dr. Outtz, meanwhile, was unable independently to assess the validity of the education and experience component, because he demonstrated only a limited understanding of how it was developed, how it was justified, and how it worked.  (16:42-54).

126.     Dr. Outtz testified about a journal article that addressed the validity of different testing modes.  (16:29-31; Exh. 150).  Based on this study, which examined the incremental validity (as measured by a validity coefficient) of additional testing components, Dr. Outtz agreed that the education and experience component would have added somewhere in the range of one to four percent to the validity of the written test.  (16:29-34).   This fact makes it implausible for Dr. Outtz to claim that the education and experience component made the difference in establishing "minimal" validity.

127.     Moreover, not only do education and experience components, as a rule, add almost nothing to the validity of an exam, but the education and experience component in this case had only a minimal practical effect on overall scores.  Although the education and experience component nominally accounts for 20 percent of the overall examination score, in reality it typically changes the score by a maximum of 2 points out of 100.  (16:48-53).  Stated differently, a candidate's education and experience matters as much – or, more accurately, as little – as two questions on the written exam.  The insignificant effect of the education and

experience component is a result of two factors: (1) all applicants automatically get 14 out of 20 points on the education and experience component (reducing the nominal weight of the component to 7% of the exam) (2:33-36), and (2) the point system used by HRD creates very little spread between candidates (16:48-50; Exhs. 151, 154).

128.     A close look at the education and experience point system demonstrates why it has so little impact on final scores. Candidates get points for four categories: (a) police work experience, (b) post-secondary degrees, (c) courses taught, and (d) licenses held. (Exh. 11 at 8). For **police work experience**, most police sergeant candidates will have experience in only one area: as a police officer (Category 4). (Exh. 11 at 5). Because they must have at least three years of experience to qualify for the exam, candidates will get from 4.2 points (3 year of experience) to 9.3 points (for 12 or more years of experience). (Exh. 11 at 8). When multiplied by the weight of 20%, this point range becomes 0.84 to 1.86. For **post-secondary degrees**, the range of points is 0 (for no degrees) to 12 (for a Ph.D.). When multiplied by the weight of 20%, this point range becomes 0 to 2.4. As a result of the so-called Quinn Bill, codified at Mass. Gen. L. ch. 41, § 108L, and as demonstrated by the current and former police officers who testified at trial, most police officers in Massachusetts have at least a bachelor's degree, and many have graduate degrees, so the more likely range is from 1.2 (bachelor's degree) to 2.4 (Ph.D.) in weighted points. For **courses taught**, candidates can get anywhere from 0 (no courses) to 1.5 (10 courses) points, resulting in a weighted range of 0 to 0.3. (Exh. 11 at 8). In reality, few candidates will have taught 10 courses, so the realistic range is much smaller. Finally, for **licenses held**, candidates can get anywhere from 0 (no licenses) to 2 (2 or more licenses), resulting in a weighted range of 0 to 0.4. The combined effect of these four categories is a point range of 0.84 (a police officer with three-years of experience, no degrees, no courses taught, and no licenses)

to 6.16 (a police officer with 12-plus years of experience, a Ph.D., 10-plus courses taught, and 2-plus licenses), resulting in a maximum spread of 4.96 points.  Because most candidates will fall in the middle of these two extremes, the education and experience component ends up having very little practical effect.

129.    HRD uses an identical point system for other positions, such as police lieutenants, police captains, fire chiefs, deputy fire chiefs, and district fire chiefs.  (Exhs. 11, 193).  This fact demonstrates that the education and experience component is not derived from any job analysis for police sergeants, but is an off-the-shelf system used for a wide range of jobs.  In other words, it is not content valid for the police sergeant position.

130.    As significant as what candidates get points for is what they do not get points for.  A good example of the arbitrary and invalid nature of the point system can be demonstrated through the education and experience of Plaintiff Robert Alvarez.  Alvarez served as a platoon sergeant in the U.S. Marine Corps, supervising and training 40 marines.  (9:103).  He also worked as a supervisor for American International Security Corporation, supervising anywhere from 8-100 people, depending on his assignment.  (9:105-106).  In addition, he attended a large number of police or supervision-related training courses and sessions between 1979 and 2006.  (9:106; Exh. 135).  Given the structure of the education and experience component of the challenged exams, Alvarez did not receive credit for *any* of this experience or training when applying for a police sergeant promotion.  (9:105-106).[15]

131.    Even Dr. Outtz, the Defendants' validity expert, agreed that this type of experience was relevant to serving as a police sergeant.  (16:42-47).  Likewise, Boston Police

---

[15]    Similarly, Plaintiff Pedro Lopez has attended courses relevant to his qualifications to work as a police sergeant, such as promotional patrol supervisors courses put on by the FBI.  (1:114-15).  Plaintiff Spencer Tatum served in the U.S. Army for about six years.  (8:127).

Commissioner Edward Davis testified that relevant aspects of education and experience include not only degrees but "training that's been taken in specialty police areas; things like – especially past performance; an officer's work ethic and their attendance record and their connection with the community."  (9:41-42).

132.    Although the Testability Analysis of the 1991 validation study indicates a large number of critical KSA's that would, in theory, be covered by the education and experience component (Exh. 41 at Att. EE), there is no discernable connection between those KSA's and the education and experience point system.  For example, the testability analysis indicates that the following critical KSA's, among many others, are covered by the education and experience component:  "knowledge of proper behavior in the courtroom;" "knowledge of various communities with the department's jurisdiction and the factors which make them unique;" "skill in perceiving and reacting to the need of others;" "ability to write;" "ability to be confidential;" "ability to accept responsibility;" "knowledge of the limit of one's own authority;" "skill in interviewing and interrogation;" and "knowledge of procedure/technique when major disaster occurs (i.e., hurricane, floods, earthquake, tornado, etc."  (Exh. 41 at Att. EE).  There is simply no evidence showing how these KSA's are covered by HRD's off-the-shelf education and experience point system.

**F.  Weighting of Components**

133.    It is an undisputed requirement of content validity that the components of an exam must be weighted based on the relative importance of critical KSA's.  (14:96-97; 15:11-12; 17:110-111).   29 C.F.R. § 1607.14(C).  See also Outtz Brief, 2009 WL 796281 at *12-*13 (discussing need to justify weights).

134.    The Defendants offered no evidence to support a content-valid justification for the relative weights assigned to the two components of the exams – i.e., 80 percent for the written exam and 20 percent for the education and experience component.[16]

135.    A professional testing expert assigned weights in connection with the Boston 2002 exam, when Morris & McDaniel developed an exam that had a written test with a weight of 40 percent, an assessment center with a weight of 32 percent, a performance review system with a weight of 8 percent, and the education and experience component with a weight of 20 percent. (15:11).  Those weights were abandoned for the tests being challenged here, replaced by a weight of 80 percent for the written test and a weight of 20 percent for the education and experience component.  Dr. Outtz agreed that any such change would need to be justified based on an underlying job analysis (15:12), but there is no evidence of such a justification.

### G.  Passing Scores & Use of Exam Scores As Ranking Device

136.    The Defendants offered no evidence to justify the use of 70 as a passing score or the use of the exam scores as a ranking device.

137.    There are professionally-accepted practices for setting passing scores, but none of those practices were followed here.  (3:53-54).

---

[16]    Dr. Outtz offered a creative post-hoc rationalization for the weights by counting the number of critical KSA's allocated to each exam component in Attachment EE to the 1991 validation study. (16:105-108).  That rationalization has no evidentiary significance, for at least five reasons.  First, he did not testify that such an approach was acceptable under professional standards.  Second, there is no evidence that HRD actually used such an approach to assign weights.  Third, his "analysis" resulted in a weight of 29 percent for the education and experience component, not 20 percent.  Fourth, the allocation of critical KSA's to the education and experience component was arbitrary, as discussed above.  Finally, the actual weight of the education and experience component was far less than 20 percent, because every applicant automatically received at least 14 of the 20 possible points, as also discussed above.

138.    A consultant hired by HRD recognized the inappropriateness of using the exam scores as a ranking device and recommended banding in ranges of seven points, and Dr. Outtz agreed that banding in that way would have been appropriate.  (Exh. 70; 15:59-62; 16:13-14).[17]

### H.  Lack of Facial Validity

139.    One aspect of validity is whether a test is perceived as fairly identifying the best candidates; this is known as facially validity.  (6:109-110).  The exams in this case are widely seen as inappropriate, arbitrary, and unfair.

140.    The Massachusetts Association of Major Police Chiefs passed a resolution in July 2010 advocating for the right of police chiefs to use greater assessment tools than just a written exam.  (13:75-77, 80-81).  Lowell Police Superintendent Kenneth Lavallee agrees with that position.  (13:77, 80-81).

141.    Boston Police Commissioner Edward Davis is critical of processes that rely too heavily on a written examination, because it identifies people who studied hard and can memorize by rote, and those people may not end up being the best police sergeants.  (9:41, 44-45).

142.    Former Boston Police Commissioner Kathleen O'Toole testified to her belief that written test scores alone are not a good basis for promotion because they do not test for integrity, leadership ability, interpersonal skills, or work ethic.  (5:14, 19-20, 21-22).

143.    When he worked as a sergeant, former Boston Police Lieutenant Thomas Nolan did not use any of the material he studied for the sergeant's promotional exam, with the exception of criminal law and procedure.  (1:81-82).

---

[17]    Although a court enjoined HRD's attempt to use banding, it was the after-the-fact manner in which the banding was introduced, rather than the banding concept itself, that was deemed unlawful. (9:29-32).

144.    Given his experience on the streets and his familiarity with the promotional exams, Plaintiff Pedro Lopez does not believe the exams are geared towards the realities of being a sergeant.  (1:122-23).

145.    Given his experience as a police officer and his familiarity with the promotional exams, Plaintiff Spencer Tatum has observed very little connection between the role of a police sergeant and the information tested on the exams.  (8:130-31).

**4.  Less Discriminatory Alternatives**

   **A.  <u>Legal Availability of Alternatives</u>**

146.    Hiring authorities have the right to develop their own promotional exams by entering into a delegation agreement with HRD.  (Exh. 1).  <u>See also</u> Mass. Gen. L. ch. 31, § 5(l) (giving HRD delegation power).  For example, the City of Boston entered into a delegation agreement with HRD and developed its own examination for the 2002 police sergeant exam. (Exh. 151).  The City of Lowell entered into a delegation agreement for its use of an assessment center for the job of police captain, which gave Lowell the right to develop its own test.  (9:12-13).  Other jurisdictions in Massachusetts have done likewise.  (Exh. 1).

147.    There is no limitation on the weights or content of various exam components.  For example, although appointing authorities are required to give some credit "for employment or experience in the position for which the examination is held," Mass. Gen. L. ch. 31, § 22, there are no statutory restrictions on how education and experience will be evaluated or weighed.

148.    There is no evidence that any of the Defendants were unaware of their right to develop an alternative exam.  On the contrary, the evidence showed that the Defendants were aware of that right, not only through their prior use of delegation agreements but through their direct testimony.  For example, a witness for Worcester testified that the City was aware of its

44

right to request a delegation agreement to conduct its own examination, but it has not done so. (13:25-27).

**B. Financial Feasibility of Alternatives**

149.    None of the Defendants offered evidence that they attempted to use alternative tests but were prevented from doing so by budgetary or any other constraints.

150.    At most, some of the Defendants offered evidence that budgets were tight or that unions are sometimes a factor, but these issues are faced by public agencies across the country.

151.    As one example, the Boston Police Department's operating budget for fiscal year 2006 was approximately $234 million.  (5:20).  As of the time of trial, it had grown to approximately $300 million.  (9:24).  Although the Department's budget has been under "a significant amount of pressure" (9:67), there is no evidence that it could not have paid for additional components for the 2005 or 2008 exams.  Neither Boston's Police Commissioner nor any other official in Boston requested funding for an assessment center for the 2005 or 2008 exams.  (9:91, 98; 12:11-12).

152.    The Commissioner recently recommended, however, raises for the 20 or so members of his command staff, which would cost about one million dollars per year.  (9:24-26).

153.    As another example, the Springfield Police Department's budget at the time of trial was about $39 million.  (12:71).  The City did not consider using an assessment center for the 2005 or 2007 exams, and the Police Chief testified that he did not know how much an assessment center would cost.  (12:95, 98).

154.    Similarly, the Lowell Police Department's budget for fiscal year 2007 was about $24 million.  (13:65).  The City of Lowell has made no attempt to develop an assessment center for sergeant promotions.  (13:81-82, 84).

45

155.    Because Morris & McDaniel performed a job analysis in 2000, Dr. Outtz testified that the Defendants could have used that job analysis to prepare the 2005-2008 exams (15:35), thereby saving the cost of a new analysis.

156.    Applicants can be charged a fee to offset the cost of an exam.  (9:20-21; Exh. 5).

157.    Although the use of multiple-component processes might pose some additional cost, they also result in additional benefits, including more qualified police sergeants.  Having more qualified supervisors can avoid other costs, such as lawsuits.  (13:79; 16:60-61).  There also are benefits resulting from greater minority representation in the ranks of police sergeants. For example, having more minority sergeants can result in a corps of sergeants that reflects the communities they are policing and creates a greater pool of minorities for higher level positions. (9:48).  One study discussed at trial found that the utility (i.e., benefit) of an assessment center ranged from about $500 to $3,000 per candidate.  (16:59-61, 83-84).

## C. Types of Alternatives

158.    The three general options for alternatives include the use of additional components, the use of different methods to test job knowledge, and the use of alternative scoring mechanisms.

159.    There was extensive testimony about the existence of components – often described under the general term of assessment centers – that can be used in lieu of or in conjunction with a written job-knowledge test.  Assessment centers are used widely throughout the country (3:87; 6:59-65) and throughout Massachusetts (Exh. 1).

160.    Dr. Silva testified about options used by EB Jacobs such as: (a) *written work samples*, which can evaluate abilities such as written expression, interpersonal relations, information analysis, judgment and decision making, planning and organizing, and resource

management; (b) *oral work samples*, which can evaluate abilities such as oral expression, interpersonal relations, information analysis, judgment and decision making, planning and organizing, and resource management; and (c) *career review boards*, which can evaluate abilities such as motivation, initiative, attention to duty, adaptability, professional development, and supervisory readiness.  (17:106-109).

161.    A second general option is to use a different mechanism to test for job knowledge – i.e., a mechanism other than a closed-book, multiple-choice test.  Dr. Outtz and other experts testified at length about the feasibility and advantages of using these alternative methods, which may include visual components, situational judgment tests, or assessment centers.  (3:81-82; 6:44-48, 59-69, 73-74; 16:55-56, 115-116; 17:101-102).

162.    Dr. Outtz has described the distinction between the form of a test and the quality being tested for as "construct-irrelevant variance," which means that performance on a test can be more dependent on the form of the test than on the actual job-related abilities of the test-taker. (16:72).

163.    Similarly, the Defendants could have tested for education and experience using a scoring mechanism that captured more of each applicant's relevant education and experience (such as Alvarez's supervision experience in the Marines) and that was scientifically weighted according to a job analysis instead of long-standing administratively-determined practice. Industrial organizational psychologists recognize that other forms of testing for education and experience add substantially greater validity to an exam than a simple point system.  (Exh. 150; 11:16-18; 16:29-34).

164.    A third general option is to use alternative scoring mechanisms.  For example, one option for scoring exams is banding, which takes into account the fact that test scores lack

47

perfect reliability.  (3:63-66; 15:52-62).  Dr. Outtz, like many industrial organizational

psychologists, favors banding.  (15:52-62).

165.    Another scoring option is to use a job-knowledge test as a hurdle (with a

scientifically-determined cut-off score), and then scoring and ranking candidates based on other

components designed to test other critical KSA's, such as supervisory and communication skills.

(3:62-63; 6:63-64; 17:93-94)

### D.  Greater Validity of Alternatives

166.    It is undisputed that adding components adds to the content validity of an exam.

(3:48; 6:58, 66, 68-69; 17:102-105, 111-112, 120-21).

167.    The Massachusetts Association of Major Police Chiefs recently recommended

that assessment centers be used for police promotions.  (13:81).  Lowell Police Superintendent

Kenneth Lavallee agrees with that recommendation.  (13:81).

168.    Former Boston Police Commissioner Kathleen O'Toole concluded that

assessment centers offer the potential for a more comprehensive process for promotion.  (5:16-

17).

169.    Boston Police Commissioner Ed Davis was satisfied with the City of Lowell's use

of assessment centers when he served there as Superintendent of Police.  (9:15).  More generally,

he remains a supporter of assessment centers, and would like to use an assessment center for

sergeant promotions.  (9:32-33, 42-45, 72-73).

170.    Commissioner Davis also would favor the use of banding.  (9:68-69).

### E.  Lower Adverse Impact of Alternatives

171.    Adding components to an exam – i.e., expanding the range of critical KSA's that

are tested—tends to reduce adverse impact without any sacrifice to validity.  (3:45-48; 16:67-68,

74-76). More specifically, the evidence establishes that test procedures such as assessment centers, structured interviews, and video situational judgment tests tend to result in mean score differences that range from 0 to 0.55, while the mean score differences on multiple-choice job-knowledge tests range from 0.45 to over 1.0. (3:57-60; 6:43-44; 16:80-81).

172.    Even when testing only for job knowledge, adverse impact can be reduced by using testing modes other than written, multiple-choice tests. (3:51-55; 6:45-49).

173.    Defendants' expert Dr. Silva agreed that adding components to an exam typically reduces mean score differences and therefore adverse impact. (17:105, 121, 129-30). His firm, EB Jacobs, promotes it use of multi-component tests as leading to "reduced adverse impact" while "increasing validity." (17:103-105).[18]

174.    Plaintiffs' expert  Dr. Fields, who has developed more police promotional exams than other expert in this case (6:30, 34), testified that she has used well-developed multi-component testing to increase validity and decrease adverse impact in most jurisdictions where she has worked. (6:114-15).

175.    Likewise, Dr. Outtz admitted that in the two places where he has devised police promotional exams using multiple components in the last 20 years – Detroit and Bridgeport – he has successfully reduced adverse impact. (15:104-106).

---

[18]    Dr. Silva offered testimony about tests he helped to administer in Miami, but the only data he provided was from a single examination in 1998, seven years before the first of the exams being challenged here. (18:13-14). For that examination, the group that passed the written test hurdle was 80 percent minority and 20 percent white, and most of the candidates who took the test and were promoted were Hispanic (18:14-15, 62-63), so the population was dramatically different than the population of sergeant candidates in Massachusetts. The validity of the 1998 Miami exam was comprised, meanwhile, because the components had to be shortened, over the objections of Dr. Silva's firm, to accommodate the number of test-takers mandated by the Department of Justice. (18:75). The bottom line is that the 1998 Miami exam offers no reliable or useful evidence relevant to this case.

### F.  Prevalence of Multiple Component Exams

176.     There was expert testimony about the nearly universal use of multiple component exams for police sergeant promotional exams, particularly in larger jurisdictions, and there was no evidence about any jurisdiction outside of Massachusetts that used only a written, multiple-choice job knowledge test.  (3:61-62; 6:35-36; 16:84-85; 17:102-103).[19]

177.     Dr. Silva's firm, EB Jacobs, has had clients in all but one of the 50 states.  (17:9). It aims to develop tests that are as valid as possible and that have the minimum adverse impact. (17:10).  It always administers multiple-component tests, and has done so for over 2,200 candidates for a single job title.  (17:102-104).

178.     Based on the testimony adduced at trial and reported cases, jurisdictions around the country that use multiple component tests for police sergeant promotional exams include: (1) **Bridgeport, CT** (written job knowledge test, role play exercise, in-basket exercise, and report review exercise) (15:100-101); (2) **Chicago, IL** (written qualifying exam, assessment exercise, merit selection component) (See Adams v. City of Chicago, 469 F.3d 609 (7th Cir. 2006); Allen v. City of Chicago, 351 F.3d 306, 309 (7th Cir. 2003)); (3) **Detroit, MI** (video-based situational judgment exercise, structured oral interview, seniority) (15:104-106); (4) **Hartford, CT** (written exam, oral exam, fitness exam) (See Knight v. City of Hartford, 2006 U.S. Dist. LEXIS 36331, *25-26 (D. Conn. 2006)); (5) **Jackson, MS** (written exam, assessment center, panel interview) (See Hearn v. City of Jackson, 340 F. Supp. 2d 728, 735 (S.D. Miss. 2003)); (6) **Macon, GA** (written exam, supervision exercise, oral presentation exercise, emergency incident exercise) (8:102-103); (7) **Miami, FL** (written situational judgment exercise, oral incident command exercise, oral group meeting exercise, oral subordinate conference exercise) (17:89-93); (8)

---

[19]     Dr. Wiesen testified to his belief that one Midwestern state, perhaps Kansas, might still rely on such a test.  (3:61).

**Montgomery, AL** (written exam, structured oral interview) (See U.S. v. City of Montgomery, 948 F. Supp. 1553, 1561 (M.D. Ala. 1996)); (9) **Nashville, TN** (written exam, assessment center) (See Johnson v. Metro. Gov't of Nashville & Davidson County, 2010 U.S. Dist. LEXIS 87866 (M.D. Tenn. 2010)); (10) **Roanoke, VA** (written exam, assessment center, performance review) (See Altizer v. City of Roanoke, 2003 WL 1456514 (W.D. Va. 2003)); (11) **San Antonio, TX** (video exercise) (See San Antonio Hispanic Police Off. Org. v. City of San Antonio, 188 F.R.D. 433 (W.D. Tex. 1999)); (12) **Santa Ana, CA** (written exam, oral exam, seniority) (See Sanchez v. City of Santa Ana, 928 F. Supp. 1494, 1508-1509 (C.D. Cal. 1995)); (13) **St. Louis, MO** (written exam, assessment center, review board) (8:103); (14) **Pennsylvania State Police** (technical knowledge test, incident command component, subordinate conference) (17:101); (15) **Fairfax County, Virginia** (6:26-27, 34); (16) **Louden County, Virginia** (6:29, 34); (17) **Montgomery County, Maryland** (6:29, 34); (18) **Howard County, Maryland** (6:29, 34); (19) **Prince George's County, Maryland** (6:29, 34); (20) **Falls Church, Virginia** (6:29, 34); (21) **Frederick City, Maryland** (6:29, 34); (22) **Memphis, TN** (6:29, 34); (23) **Charlotte, NC** (6:29, 34); (24) **St. Louis, MO** (6:29, 34); (25) **Alexandria, VA** (6:29, 34); (26) **Vienna, VA** (6:29, 34); (27) the **Metropolitan Washington Transit Police** (6:30, 34); (28) the **Amtrak Police** (6:30, 34); and (29) and numerous federal agencies, including the **Drug Enforcement Administration**, the **Secret Service**, the **Library of Congress Police**, the **Bureau of Engraving Police**, the **U.S. Capital Police**, and the **U.S. Park Police** (6:28, 34).

179.    In addition to the widespread use of multiple-component exams outside of Massachusetts, a number of jurisdictions in Massachusetts have used assessment devices that go beyond multiple-choice job knowledge tests.  In addition to a list of jurisdictions that have

obtained delegation agreements with HRD (Exh. 1), there was trial testimony about methods used in various Massachusetts jurisdictions.

180.    For example, the City of Chelsea used a multiple component examination in 1991 for promotions to patrol sergeant, at least for positions within the Chelsea Housing Authority. (1:108).  The components include a written examination, a role playing exercise, and oral boards. (1:108).

181.    The City of Lowell used an assessment center for its police chief selection process in 1993 or 1994.  (9:8-9).   The assessment center included a structured interview, a mock press conference, an in-basket exercise, and an essay component.  (9:9).  The City of Lowell also used assessment centers in the late 1990's for police lieutenant, captain, and deputy chief positions. (9:9-10).

182.    The City of Springfield used an assessment center for its chief of police selection in 1995 and its deputy chief selection in 2008.  (12:73).

183.    The City of Springfield uses a structured interview process and a background check for sergeant promotions, but these steps are taken only for candidates on certified promotion lists from HRD – that is, only for the 2N+1 candidates provided by HRD in response to a request for a certified promotion list.  (12:59-60).

184.    Similarly, the MBTA uses an oral board and a background review, but these steps are taken only for the 2N+1 candidates on certified promotion lists from HRD.  (12:101-105).  A former MBTA official testified that this process helped selected better sergeants and was non-discriminatory.  (12:121-22).

## G.  **Boston's Use of Alternatives**

185.    Boston has used multiple components for its police sergeant exam on at least three occasions (1985, 1987, and 2002), and in each instance the evidence demonstrates that the exams resulted in lower levels of disparate impact than the exams at issue here.  (Exh. 40 at 82; 11:22, 93-94; 12:20).

186.    More specifically, the 1991 validation study contains evidence that the 1985 and 1987 multi-component exams in Boston resulted in lower levels of adverse impact compared to the types of exams in question.  (Exh. 40 at 82).  Although the report only describes the adverse impact at the passing score, it is noteworthy that in 1985 a multi-component test resulted in an adverse impact ratio at the pass/fail rate of .85, well within the limits of the four-fifths rule. (Exh. 40 at 82).  In 1987, a multi-component process was used, but parts were thrown out by the then Department of Personnel Administration, as described in Carr v. Department of Personnel Administration, 2 Mass. Civ. Service Rep. 1045 (attached as Exhibit A).  Nevertheless, even there the adverse impact at the passing rate for the multi-component exam (with some parts thrown out) was significantly less than in the 1991 examination that used only a multiple-choice job knowledge test and education and experience component.  (Ex. 40 at 82).

187.    For the 2002 Boston exam, Boston used a video component that ultimately accounted for 40 percent of the final score, a written multiple-choice job knowledge test that accounted for 40 percent, and the education and experience rating, which accounted for the remaining 20 percent.  (17:71).

188.    The evidence shows that the video component of the examination (which counted for 32%) had significantly lower mean score differences for minority candidates (0.26) compared to the written test (0.55).  (3:57).

189.    Not surprisingly, the evidence also shows that the introduction of the video component did, in fact, reduce adverse impact and improve validity.  (11:25-26; 17:73-76; 18:37-38).

190.    Although Dr. Silva characterized the reduction in adverse impact as "insubstantial," he acknowledged that he had made no attempt to measure the benefits resulting from that reduction, including the benefit to the Boston Police Department of having greater minority representation in its sergeant ranks, the benefit to the public of having more minority sergeants in a community with a large minority population, and the benefit to the Department of increasing the possible pool of minority candidates for even higher ranks.  (18:38-39).

191.    Dr. Silva sought to test what impact the video component had on bottom-line selection rates.  When he eliminated the oral component, gave the written component a weight of 80 percent, and gave the education and experience component a weight of 20 percent, he found that only 10 minorities would have been promoted, compared to the 11 minorities who were promoted under the original test.  (17:73-76; Exh. 201).  This analysis supports the Plaintiffs' position, because it demonstrates that the inclusion of the oral component reduced adverse impact in terms of selections.

192.    He then did another analysis, giving the oral component a weight of 60 percent, instead of the original 40 percent that it had in 2002, and again found that 11 minorities would have been promoted.  (17:77-85; Exh. 200).  As detailed in testimony provided by Dr. Wiesen, this analysis proves nothing.  (Affidavit of Joel P. Wiesen, Ph.D., Sep. 27, 2010).

193.    In any event, any conclusions drawn from the 2002 exam must be tempered by the lack of evidence about that exam.  Dr. Silva admitted that he has no knowledge of the details of the 2002 exam and has no opinion as to its validity.  (18:37).  And although there was

testimony that the questions on the 2002 exam were prepared by Morris & McDaniel (12:14-15), none of the questions from the 2002 exam were introduced into evidence.

194.    More recently, the Boston Police Department used a multiple component process in 2007 for detective appointments, including a written exam and a presentation by each candidate to a review panel .  (9:33-35).

195.    This process resulted in approximately 40 appointments to detective, out of hundreds of applicants.  (9:37, 39).

196.    Boston's Police Commissioner was pleased with the number of minorities appointed as a result of this process, as well as the overall effectiveness of the process.  (9:37-39).  As he testified, "That promotional process has resulted in a much more diverse detective pool than we had prior to the examination occurring."  (9:37).

197.    The detective selection process did not result in any complaints.  (9:38, 40).

## 5.  Plaintiff Robert Alvarez

198.    Alvarez's father was Spanish and spoke both English and Spanish.  (9:109-10).

199.    Alvarez self-identifies as Hispanic.  (9:103).

200.    Alvarez identified himself as Hispanic before and after he began working for Lowell.  (9:121-22, 149-50; Exhs. 137, 147).[20]

201.    Lowell recognized him as a minority.  (9:148-49; Exh. 146).

202.    Lowell's former Police Superintendent, Edward Davis, testified that a meeting of minority police officers, at which Alvarez was present, was attended by African-American,

---

[20]    That he identified himself as "white" in fingerprint applications is of no significance, because he did so based on his knowledge that the only "race" options for the fingerprint system, as with other criminal history systems, are "black" and "white."  (9:124-25, 146-47).  Similarly, that Alvarez's birth certificate lists his father's race as white (9:126-27) is of no significance given the lack of any evidence either that "Hispanic" was a recognized option for race when the certificate was prepared or that Alvarez's father ever saw the birth certificate.

Hispanic, and Cambodian officers. (9:81). There is no evidence that anyone ever considered Alvarez to be African-American or Cambodian.

203.    Alvarez previously brought a claim of discrimination against Lowell based on his Hispanic identity, and the jury found that he was in a protected category. (9:150-51).

204.    Alvarez testified at trial, and his Hispanic features were plainly visible.[21]

## RULINGS OF LAW

**1. Legal Framework**

Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, prohibits any employment practice that has "a disparate impact on the basis of race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(k)(1)(A)(i).[22] Unlike disparate treatment claims, disparate impact claims do not require proof of intent to discriminate. Bradley v. City of Lynn, 443 F. Supp. 2d 145, 155 (D.Mass. 2006). The purpose of a disparate impact claim is to "'root[] out 'employment policies that are facially neutral in the treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.'" Id. at 155, quoting EEOC v. Steamship Clerks Union, Local 1066, 48 F.3d 594, 600-601 (1st Cir. 1995).

There are three steps in a disparate impact claim. First, the plaintiff has the initial burden of proving that a challenged employment practice has a disparate impact. Id. at 156, citing 42 U.S.C. § 2000e-2(k)(1)(A)(i). Second, once a plaintiff has demonstrated disparate impact, the

---

[21]    As Alvarez made clear at trial, he neither introduced himself nor pronounced his last name as "Ilvareck," which was a nickname. (9:119-21). Once he knew someone, he told them about the nickname, which he acquired while in the Marine Corps. (9-120).

[22]    Plaintiffs also bring, as Count II, a claim under Mass. Gen. Laws, ch. 151B. Massachusetts does not have a well-developed body of law on disparate impact. See, e.g., Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34, 38 n.10 (2005) (citing to federal law for description of disparate impact claims). As a result, the claim under chapter 151B is not separately analyzed here.

employer has the burden of proving that the challenged practice is "job-related and consistent with business necessity." Id. at 157, quoting Steamship Clerks, 48 F.3d at 601-602. See also 42 U.S.C. § 2000e-2(k)(1)(A)(i) (requiring employer " to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity"); 42 U.S.C. § 2000e(m) ("The term 'demonstrates' means meets the burdens of production and persuasion."). Third, even if the employer meets this burden, a plaintiff can still prevail by demonstrating that there is "another selection device without a similar discriminatory effect that would also serve the employer's legitimate interest." Bradley, 443 F. Supp. 2d at 156.

## 2.  Disparate Impact

### A.  Proving Disparate Impact

To prove disparate impact, a plaintiff's prima facie case consists of three elements: identification of a specific employment practice, the existence of a disparate impact, and a causal connection between the practice and the disparate impact. Id. at 156 (citation omitted). Here, the specific employment practice is the Defendants' use of promotional exams that rely almost entirely on written, multiple-choice questions. The disparate impact is that minority applicants fare worse than non-minority applicants on these exams. In this case, the causal connection is clear, because the scores from these tests are used to determine who is promoted and when.

Courts have recognized that a plaintiff's burden of proving a prima facie case of disparate impact should not be placed too high: "When widespread minority underemployment is shown to exist in a given occupation, primary selection devices should not be immunized from study by placing unrealistically high threshold burden upon those with least access to relevant data." Id. at 170, citing Beecher, 504 F.2d at 1020-21. More generally, a plaintiff need not prove to a scientific degree of certainty that a challenged employment practice caused a disparate impact;

instead, the plaintiff must proffer evidence "which reveals a disparity substantial enough to raise an inference of causation." Id. at 157 (citations and internal quotation marks omitted).

Asking whether a plaintiff has established a prima facie case of disparate impact discrimination is different than asking whether an employer will be held liable for such discrimination. The purpose of the prima facie test is merely to determine whether the employer should shoulder the burden of justifying its use of a challenged business practice. As the district court "correctly noted" in Beecher:

> Such a finding [i.e., that the plaintiffs have made a prima facie showing of disparate impact] is not determinative of the issue but merely shifts the burden to the defendant to justify the use of the exam. This is a burden a public employer should not be unwilling to assume.

Beecher, 504 F.2d at 1020 (citation and internal quotation marks omitted). The First Circuit went on to say that "[d]isproportionate impact or prima facie discrimination are simply labels that aid in singling out qualifications which it is reasonable to ask an employer to justify." Id. For the reasons discussed below, all of the Defendants in this case should assume the burden of justifying their use of the challenged exams.

The proper focus of a disparate impact analysis is on the question of equal opportunity, not simply on bottom-line promotion statistics. Connecticut v. Teal, 457 U.S. 440, 441, 450-51, 453 n.12 (1982). See also Adoption of Questions and Answers To Clarify and Provide a Common Interpretation of the Uniform Guidelines on Employee Selection Procedures ("Uniform Guidelines Q&A"), 44 Fed. Reg. 11996, 11999-12000 (1979) (Q26, noting that "bottom-line concept" is limited to exercise of prosecutorial discretion; it does not limit the enforcement of Title VII). This means that a plaintiff need not establish a bottom-line effect on promotions, and an employer cannot point to bottom-line statistics as a dispositive defense. Id. ("The suggestion that disparate impact should be measured only at the bottom line ignores the fact that Title VII

58

guarantees these individual respondents the *opportunity* to compete equally with white workers on the basis of job-related criteria.") (emphasis in original).  See also Donahue v. City of Boston, 304 F.3d 110, 119 (1st Cir. 2002) (relevant harm in adverse impact case is the "inability to compete on an equal footing"); Costa v. Markey, 706 F.2d 1, 5 (1st Cir. 1983) ("The Court's focus must be on the first step in the employment process that produces an adverse impact on a group protected by Title VII, not the end result of the employment process as a whole."); Beecher, 504 F.2d at 1019, 1021 (plaintiff must demonstrate only that challenged test "is more of a hurdle for minority members than for others;" and "question is whether the test denied applicants equal protection of the laws by creating 'built-in headwinds'").  As a result, "individual components of a hiring process may constitute separate and independent employment practices subject to Title VII *even if the overall decision-making process does not disparately impact the ultimate employment decisions*."  Bradley, 443 F. Supp. 2d at 158-59 (citations omitted; emphasis added).  To the extent the Defendants premise their arguments on a bottom-line defense, therefore, those arguments must fail.

There is no "single test" to establish disparate impact.  Langlois v. Abington Hous. Authority, 207 F.3d 43, 50 (1st Cir. 2000), citing Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 995-96 n.3 (1988) (plurality).  Instead, "courts appear generally to have judged the 'significance' or 'substantiality' of numerical disparities on a case-by-case basis."  Watson, 487 U.S. at 995 n.3.  When looking at evidence of disparate impact in a case such as this, it is important to keep the big picture in mind – as stated by the Supreme Court, the "'fine tuning of the statistics could not have obscured the glaring absence of minority'" hires.  Bradley, 443 F. Supp. 2d at 166, quoting Int'l Brotherhood of Teamsters v. United States, 431 U.S. 324, 342 n.23 (1977).

One common benchmark for measuring disparate impact is the "four-fifths rule," which comes from the Uniform Guidelines.  The First Circuit has "approved use of the four-fifths rule as a pertinent benchmark in the employment context." Langlois, 207 F.3d at 50, citing Boston Police Superior Officers, 147 F.3d at 21.  Under this rule, "[a] selection rate for any race…which is less than four-fifths (4/5) (or eighty percent) of the rate for the group with the highest rate will generally be regarded…as evidence of disparate impact."  29 C.F.R. § 1607.4(D).  That a particular employment practice meets the four-fifths test – that is, even if a test does not have an adverse impact as measured by the four-fifths rule – does not prove a lack of discrimination.  As the Uniform Guidelines state, "Smaller differences in selection rate may nonetheless constitute adverse impact, where they are significant in both statistical and practical terms or where a user's actions have discouraged applicants disproportionately on grounds of race, sex, and ethnic origin."  29 C.F.R. § 1607.4(D).  See also Isabel v. City of Memphis, 404 F.3d 404, 411-13 (6th Cir. 2005) (finding disparate impact even where test satisfied four-fifths rule).

Another method that courts have used to find disparate impact are statistical tests that examine "differences between what is expected and what is observed." Bradley, 443 F. Supp. 2d at 161.  Generally, the greater the difference between what is expected to happen (e.g., whites and minorities receiving equal scores) and what actually happens (e.g., minorities receiving lower scores), the smaller the likelihood that the difference happened by chance, leading to a stronger inference that there is some other explanation (e.g., a test with a disparate impact). Id. Under generally accepted standards, when there is less than a 5% likelihood (or, more conservatively, less than a 1% likelihood) that a particular outcome occurred by chance, one can make a "statistically significant" inference that the outcome was caused by something other than chance.  (17:13-14).

60

Proof of disparate impact is not limited to the four-fifths rule or tests of statistical significance. Courts have made clear, in fact, that disparate impact can be established though a wide range of evidence. See, e.g., Dothard v. Rawlinson, 433 U.S. 321, 329-30 (1977) (allowing use of general population data to show disparate impact of height and weight requirement on women); Phillips v. Cohen, 400 F.3d 388, 401 (6th Cir. 2005) (relying on non-statistical evidence, including information about actual hiring and employment practices, to support finding of disparate impact); Isabel, 404 F.3d at 412-13 (plaintiffs are not limited to any one form of statistical evidence); Banks v. East Baton Rouge Parish School Bd., 320 F.3d 570, 579 (5th Cir. 2003) (courts may rely on "statistical or non-statistical evidence [to establish] a prima facie case of disparate impact") (citation omitted); Rivera v. City of Wichita Falls, 665 F.2d 531, 536 (5th Cir. 1982), abrogated on other grounds Patterson v. McLean Credit Union, 491 U.S. 164 (1989) (courts can find adverse impact based on observed disparities and "decisive pattern[s] emerging from a history of experiences"); U.S. v. City of New York, 683 F. Supp. 2d 225, 240-42 (E.D.N.Y. 2010) (supporting finding of disparate impact discrimination based on history of hiring, population data, and comparisons to hiring practices of other large municipal agencies). In Beecher, for example, the First Circuit approved the district court's reliance on census figures to find disparate impact. Id. at 1020 & n.4. The First Circuit also relied on evidence that the types of exams in dispute were known to have a disparate impact on minorities. Id. at 1021.

When examining evidence of disparate impact, it is appropriate to look at broad sets of data, including data that is aggregated across jurisdictions and data over time. Aggregation is supported both by social science and by legal authority. First, Dr. Wiesen ably explained the basis for using statewide data. It is appropriate to conduct an aggregated analysis, because "if you are trying to find out if the examination adversely affects minorities, the best approach

would be to use all the data from all of the applicants that took the examination." (2:45). In this

case, "the best approach to the aggregation is statewide within any one year." (2-48). As Dr.

Wiesen explained:

> The test that was given in the various municipalities was the same test. So if we
> want to find out what the impact of that test is, the best way to do that is to get as
> much data as we can about that test, and that would be to look at the data from
> every person that took the test. And by looking at the data from every person that
> took the test, we would have the most reasonable set of data to evaluate the
> adverse impact, if any, of that statewide test. (2:88).

From a social science perspective, the reason to look at as much data as possible is that "[t]he

statistical analyses are more authoritative and more powerful if you have more data." (5:85).

His opinion about the appropriateness of aggregation is supported by accepted practice among

industrial psychologists. (2:43-44, 121). Indeed, Dr. Silva agreed that it is appropriate to

aggregate statewide statistics when looking at certain data, including mean score differences.

(18:41-43). None of the experts, in fact, disputed the use of aggregated statistics when looking at

mean score differences.

    Second, there is ample legal authority to support the use of aggregated statistics. Courts

have recognized the fundamental principle that large sample sizes are preferable: "[l]arger

sample sizes create a greater likelihood that random differences between individuals will even

out among all groups, and a lower likelihood that significant differences between the

performance of racial or ethnic groups will have resulted from chance." U.S. v. Vulcan Soc.,

Inc., 637 F. Supp. 2d 77, 95 (E.D.N.Y. 2009). One way to achieve large sample sizes, of course,

is through aggregation. The Uniform Guidelines specifically approve of this practice:

> Where the user's evidence concerning the impact of a selection procedure indicates
> adverse impact but is based upon numbers which are too small to be reliable, evidence
> concerning the impact of the procedure over a longer period of time and/or evidence
> concerning the impact which the selection procedure had when used in the same manner
> in similar circumstances elsewhere may be considered in determining adverse impact.

29 C.F.R. § 1607.4(D). See also Uniform Guidelines Q&A , 44 Fed. Reg. at 11999-12000 (Q21: "if a lower selection rate continued over a period of time, so as to constitute a pattern, then the lower selection rate would constitute adverse impact;" Q27: "[i]f the test is administered and used in the same fashion for a variety of jobs, the impact of that test can be assessed in the aggregate.").

Courts repeatedly have embraced aggregation as a reasonable way to examine disparate impact. See, e.g., Bradley, 443 F. Supp. 2d at 167 (finding aggregation reasonable), citing Vulcan Pioneers, Inc. v. N.J. Dep't of Civil Serv., 625 F. Supp. 527, 534-35, 544-45 (D.N.J. 1985) (collecting cases and finding aggregation across municipalities and across years appropriate where State administered firefighter promotion exam and exams were extremely similar across years). See also Paige v. California, 291 F.3d 1141, 1148 (9th Cir. 2002) (concluding that "it is a generally accepted principle that aggregated statistical data may be used where it is more probative than subdivided data"); Eldredge v. Carpenters 46 N. California Counties Joint Apprenticeship and Training Comm., 833 F.2d 1334, 1339 (9th Cir. 1987) ("Aggregated data presents a more complete and reliable picture."); Lilly v. Harris-Teeter Supermarket, 720 F.2d 326, 336 n.17 (4th Cir. 1983) ("[B]y significantly increasing the absolute numbers in the data, chance will more readily be excluded as a cause of any disparities found."); Capaci v. Katz & Besthoff, 711 F.2d 647, 654 (5th Cir. 1983) (permitting aggregation in order to accomplish meaningful statistical analysis); United States v. City of Yonkers, 609 F. Supp. 1281, 1289 (S.D.N.Y. 1984) (finding prima facie case under Title VII with aggregated data); NAACP v. City of Corinth, 83 F.R.D. 46, 61 (N.D. Miss. 1979) (finding that aggregated data across four years showed "a strong indication that the city's selection process operated to the detriment of black applicants"); Jones v. New York Human Resources Dep't, 391 F. Supp. 1064, 1074

(S.D.N.Y. 1975) (aggregating results of five exams to find that whites passed at a rate of three times the rate of minorities); League of United Latin American Citizens v. City of Santa Ana, 410 F. Supp. 873, 903 (C.D. Cal. 1976) (aggregating data across two exams in disparate impact case over defendant's objection that sample size was too small).

Aggregation has not been allowed where the individual tests or employment procedures at issue were too different. See, e.g., Bradley, 443 F.3d at 167, citing Fudge v. City of Providence Fire Dep't, 766 F.2d 650, 656-57 (1st Cir. 1985) (aggregation across jurisdictions was inappropriate where exams were too different). But that problem does not exist in this case. Indeed, in terms of statewide aggregation for each exam, all applicants took the exact same test, so there were no differences.

The Defendants oppose aggregation by arguing that it fails to address causation. This argument misconstrues what causation means in this case. The Plaintiffs are not arguing that any of the Defendants *caused* the test to be unfair to minority applicants. Instead, as discussed above, the Plaintiffs' argument proceeds in multiple parts: the Defendants opted to use certain tests; minorities faced a "built-in headwind" when taking those tests (i.e., they received lower scores relative to their non-minority peers); and because relative test scores affected promotional opportunities, minority applicants suffered a disadvantage as a result of the unfair tests. The causal element of the prima facie case is satisfied by the last part of this argument.

In this case, the picture of adverse impact becomes most clear when looking at the biggest groups of data. As Dr. Wiesen said, "The statistical analyses are more authoritative and more powerful if you have more data." (5:85). Looking at statewide statistics provides more data. Similarly, because Boston has the biggest numbers, it provides a picture of disparate impact that is so clear it is not even being contested. Based on the evidence in this case, it is

reasonable to conclude that as the numbers became larger in any Massachusetts jurisdiction that uses written multiple-choice tests, the picture of disparate impact would become equally clear.

As one would expect, the smaller Defendants have numbers that do not allow for a picture that is equally clear, because "[w]ith small samples of data it's just really very hard to know whether the observed results are due to simple chance fluctuation or due to a real difference in the underlying populations."  (17:14; 17:16).[23]  The Defendants seek to take advantage of that situation by arguing that the numbers are too small in their jurisdictions to permit a finding of disparate impact.  If a plaintiff never could establish disparate impact without a statistically-significant outcome at the jurisdiction level, the effect would be to insulate some employers from liability, even in the face of other evidence suggesting a disparate impact.  Some employers will never have a large enough data pool to allow for a statistically-significant test.  If there were a complete absence of any other evidence to support a showing of disparate impact, then that small-number problem may be more troublesome.  But where, as in this case, there is other evidence pointing to a test that is structurally unfair to minority applicants, that other evidence should be sufficient to put the burden on the employer to justify its use of the challenged exams.  Courts repeatedly have recognized that employers should not be able to find cover behind statistical obstacles or formalities.  See, e.g., Waisome v. Port Authority of New York and New Jersey, 948 F.2d 1370, 1379 (2d Cir. 1991) (in cases involving small or marginal samples, other indicia raising an inference of discrimination must be examined") (citations omitted); Bunch v. Bullard, 795 F.2d 384, 395 (5th Cir. 1986) (Title VII does not "permit an employer to escape liability for discriminatory tactics merely because his work force is not vast enough to provide meaningful data for a sophisticated statistical evaluation.")  The Uniform

---

[23]    Dr. Silva testified that the Uniform Guidelines consider sample sizes of less than 100 to be small. (17:18-19).

Guidelines contemplate this problem and identify a solution: aggregation.  29 C.F.R. § 1607.4(D).

The Defendants' attempt to hide behind small numbers also ignores how their long-time reliance on an unfair testing process may lead to smaller numbers.  The striking lack of minority sergeants in jurisdictions across the Commonwealth is a fact that cannot be lost on minority police officers.  Faced with a decision about whether to spend hours per day, for months on end, to study for a test that is biased against them, it is not unreasonable to expect that some minority officers would chose not to take the exam.  See Int'l Brotherhood of Teamsters, 431 U.S. at 365 (ongoing discrimination deters others in adversely impacted group from seeking employment opportunities).  Those decisions would lead to smaller sample sizes and, potentially, to an underestimate of the size of the disparate impact, because "only especially motivated and competent minority members [would take] the test."  Beecher, 504 F.2d at 1021 n.6.  The First Circuit recognized that these possibilities create another reason for not giving employers cover based on a myopic focus on small sample sizes.  Id.

The very nature of statistics is that small numbers may lead to unexpected results.  In Worcester, for example, if one were to ignore all of the evidence introduced during this trial, as well as the evidence described in court decisions stretching back decades and arising from jurisdictions around the country, demonstrating that written multiple-choice tests are biased against minorities, one might take comfort in statistics that seem to suggest there is no problem.  After all, if the nine minorities who took the exam in Worcester in 2008 achieved a higher average score than non-minorities on an exam (Exhs. 79, 86), how can that exam be biased against them?  Those statistics, however, do not provide a defense, because the totality of the evidence overwhelmingly demonstrates that the types of tests at issue here put minorities at a

significant disadvantage.  Based on all of the evidence, it is reasonable to conclude that those

nine minorities would have done even better with a fairer exam, thereby increasing the likelihood

that they would be promoted sooner.

    B.  <u>Evidence of Disparate Impact</u>

        (a)  <u>Written Job Knowledge Tests</u>

In considering whether the multiple-choice exams in this case had a disparate impact, it is

appropriate to consider evidence about the predicted effects of such exams.  <u>See</u> <u>Beecher</u>, 504

F.2d at 1021 ("What in our view conclusively tips the scale in plaintiffs' favor is the

uncontroverted testimony, from experts called by both sides, that black and Spanish surnamed

candidates typically perform more poorly on paper-and-pencil tests of this type.").  What

happened in Massachusetts, both in the years in question and in earlier years, was entirely

consistent with the well-known effects of multiple-choice tests.  (2:82-83).  Those effects – i.e.,

that minority applicants perform worse – have been recognized for decades, as demonstrated by

the First Circuit's recognition of this problem as early as 1974, close to 40 years ago.  <u>Id.</u>  The

problem continues.  As established through expert testimony at trial, the scholarly literature in

the industrial psychology field establishes that written multiple-choice tests tend to have high

levels of adverse impact on minority candidates.  (2:82-84; 3:43-46, 55, 60; 10:30).  For

example, Dr. Wiesen testified that "the summaries of the literature indicate that there are smaller

mean differences between minorities and non-minorities on most testing instruments other than a

multiple-choice job knowledge or cognitive ability test."  (10:30).  Indeed, based on a literature

summary prepared by Dr. Outtz, "the multiple-choice cognizability, or job-knowledge test, has

the highest level of adverse impact."  (3:44-46).

Consistent with the body of expert knowledge, the 1991 validation study – on which the Defendants rely to prove validity – provides further evidence that the multiple-choice tests it spawned were going to produce discriminatory tests.  The report notes that the 1991 exam had an adverse impact ratio of 0.16 at the traditional passing point of 70, which is not only far worse than the acceptable level of 0.80 but which was worse than the multiple-component exams from the 1980's against which the 1991 exam was being compared.  (Exh. 40 at 82, 101).  Dr. Outtz characterized the 0.16 ratio as "huge" adverse impact, and agreed that the adverse impact at the effective passing rate would have been even worse.  (15:116-17).

The types of multiple-choices tests at issue here, therefore, have a predictable effect on minority applicants: "in terms of the impact of [a multiple-choice] test on the grades, on the average grades for minorities and non-minorities, you definitely could predict that the test would adversely affect the minorities."  (2:84).  Indeed, as Dr. Wiesen emphasized, "[o]ne of the effects of using a written multiple-choice job-knowledge test is that you're virtually assured of adverse impact."  (3:47).  Not surprisingly, continued use of multiple-choice tests can be expected to result in ongoing patterns of disparate impact.  (2:103, 107-108, 110-11, 115, 117).  As another of the experts, Dr. Fields, stated, "[I]f you do the same thing over and over again, you can't expect a different result."  (6:80).

(b)  Mean Score Differences

As Dr. Silva acknowledged, social scientists look to mean score differences as an indicator of "actual" adverse impact.  (17:22-23, 114-15, 126).  Indeed, given that the bottom-line impact of an exam will "bounce around with the situation" (depending on how many appointments are made), industrial psychologists prefer to look at mean differences in test scores, which are a more reliable indicator of how different groups performed on the exam.

(3:53).  Dr. Silva further acknowledged that if sub-groups are performing at a statistically-significant different level on a test, the employer may have to justify its use of the test.  (17:127).

In cases involving test scores, courts have long looked to mean score differences, or comparable evidence, to find disparate impact.  See, e.g., Waisome, 948 F.2d at 1377-78 (disparate impact established based on "evidence that the scores of members of a protected group were clustered at the low end of the grading scale"); Police Officers for Equal Rights v. City of Columbus, 644 F. Supp. 393, 433 (S.D. Ohio 1985) (relying on difference in mean scores, among other evidence, to find disparate impact); Walls v. Mississippi State Dept. of Public Welfare, 542 F. Supp. 281, 293 (N.D. Miss.), aff'd in relevant part, 730 F.2d 306 (5th Cir. 1984) (same); Burney v. City of Pawtucket, 559 F. Supp. 1089, 1096, 1099-1100 (D.R.I. 1983) (same, rejecting "bottom line" defense).

There is uncontroverted evidence that minority applicants achieved lower mean scores on the exams than non-minority applicants.  Based on one large dataset – i.e., statewide data, excluding Boston, for the years 2003 to 2008 – minority applicants scored on average 4.4 points lower (on an 80 question test) than non-minority applicants.  (Exh. 79).  Indeed, for each of the exams at issue in this case, minority applicants achieved lower average scores than non-minority applicants.  (Exh. 78).  Looking at the numbers for Boston, which are smaller than the statewide numbers but still significant given their size, minority applicants had average scores that were 6.4 points lower for the 2005 exam and 6.6 points lower for the 2008 exam.  All of these outcomes are highly statistically significant, with odds of less than 1 in 1,000 that they occurred by chance.  (2:40, 69; Exh. 78).  The inescapable conclusion: minorities do worse on these tests.

The adverse consequences of lower mean scores flow from the way in which exam scores are used.  In Massachusetts, government authorities use exam scores to make appointments

under the rule of "2N+1." (2:36-37). When an authority has three openings, for example, it is given a list of the seven (2 times 3, plus 1) candidates with the highest exam scores, and it must select from among those seven candidates to fill the openings. (Id.). Even with the limited flexibility provided by the 2N+1 rule, many jurisdictions select candidates in strict rank order. (2:37). As a result, an applicant's exam score bears directly on their opportunities for promotion. An applicant whose exam score is even one point lower than another applicant may result in a lost promotion opportunity. This result is plain to see, and courts previously have recognized it. See, e.g., Bradley, 443 F. Supp. 2d at 168 ("The effect of using examination scores…for rank ordering, is to bunch minorities at the bottom of the eligible list. … Ranking by examination score thus disproportionately has precluded minority candidates from hiring consideration…."); Sanchez v. City of Santa Ana, 928 F. Supp. 1494, 1502 (C.D. Cal. 1995) (noting that while being on an eligibility list made one technically qualified for promotion, "an applicant's placement on the eligibility list clearly determined whether he had a realistic opportunity for promotion").

Even if a minority applicant ultimately receives a promotion, any delays that resulted from a lower exam score would adversely affect the applicant, because the applicant would have a lower seniority status. (2:77-78; 11:40-41). See Bradley, 443 F. Supp. 2d at 168-69 ("Even if hired in future classes, minorities as a class have been adversely and disparately impacted by loss of pay, benefits, and seniority caused by the delay."); Guinyard v. City of New York, 800 F. Supp. 1083, 1088-89 (E.D.N.Y.1992) ("illegal delay in promotion may still result in lost wages, benefits, and other types of injuries").

In addition to the Supreme Court's command to focus on equal opportunity instead of bottom-line promotions, there is another reason to look to mean score differences when evaluating disparate impact: it is the most robust number. The bottom-line effect of lower mean

scores will vary depending on how many appointments are made – i.e., as you start making

promotions, you'll have high levels of bottom-line differences; as you make more and more

appointments, the bottom-line differences will get smaller. (2:77). In other words, "[t]he

adverse impact ratio is sensitive to the number of people who are appointed." (11:34-35).

(c) Other Evidence

The Plaintiffs also introduced evidence of disparate impact when looking at statewide

pass rates and selection rates. (2:71-72, 78-80, 84-87; Exh. 78). Minorities had lower pass rates

than non-minorities for every exam at issue in this case:

| EXAM | MINORITY<br>% Pass | NON-MINORITY<br>% Pass |
|---|---|---|
| 2005 Statewide | 31.8 | 50.9 |
| 2006 Statewide | 59.7 | 74.5 |
| 2007 Statewide | 56.8 | 68.4 |
| 2008 Statewide* | 59.0 | 65.7 |
| 2005 Boston | 43.3 | 70.3 |
| 2008 Boston | 63.4 | 87.3 |

(Exh. 78). Similarly, minority applicants were selected in lower proportions than non-minority

applicants following every exam. (Exh. 78). Although the selection rate ratios were not

statistically significant for some exams, that fact is of less consequence given the surrounding

facts that support a finding of disparate impact. (2:80-81, 84-85).

In addition to the statewide evidence, which is independently sufficient to require each

Defendant to prove the validity of the exams, the Plaintiffs elicited evidence about every

Defendant jurisdiction. That evidence includes statistical evidence about differences in test

scores, differences in pass rates (both at the nominal passing score and the effective passing

score), and differences in selection rates. It includes evidence about the severe under-

representation of minorities in the ranks of police sergeants. And it includes historical evidence,

demonstrating the long-standing nature of this problem. Although some of the Defendants seek

to focus on isolated pieces of evidence, that type of myopic focus is inappropriate given the totality of the evidence. When considered together, the evidence shows a clear and dramatic pattern of a promotional process that is unfair to minority candidates. As discussed above, that pattern reaches back to <u>Beecher</u>, a 1974 case in which the First Circuit affirmed a finding that such an exam had a disparate impact on minority firefighter applicants. And, sadly, that pattern continues to this day.

### 3. Validity

Once the Plaintiffs have proven that the HRD exams had a disparate impact, the burden shifts to the Defendants to prove that those exams were job-related and consistent with business necessity. <u>Bradley</u>, 443 F. Supp. 2d at 170 (citations omitted). The Defendants must do more than ask the Court "to undertake a leap of faith." <u>Id.</u> at 171 (citations and internal quotation marks omitted). Instead, this Court should look to the Uniform Guidelines to evaluate whether the examination has been properly validated. <u>Id.</u> <u>See also</u> <u>Albermarle Paper Co. v. Halifax Local No. 425</u>, 422 U.S. 405, 431 (1975) ("The message of these Guidelines is…that discriminatory tests are impermissible unless shown, by professionally accepted methods, to be predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated.").

The Defendants' expert on validity, Dr. Outtz, has admitted that the written test, standing alone, does not meet minimal validity standards; it is only through the introduction of the education and experience component that the exams become "minimally" valid. (14:46; 15:128-29; 16:54). Not only does this opinion lay bare the limitations of the written exam, but it compels a conclusion that the exams are invalid. This is because, as discussed below, the

education and experience component is both invalid and insignificant, so it cannot save an otherwise invalid exam.

The Guidelines describe three methods of validation: criterion-related, content, and construct.    29 C.F.R. § 1607.5(A).  In this case, Defendants contend that the HRD examination has been validated by the second of these methods: content validation.  According to the Guidelines, "[e]vidence of the validity of a test or other selection procedure by a content validity study should consist of data showing that the content of the selection procedure is representative of important aspects of performance on the job for which the candidates are to be evaluated."  29 C.F.R. § 1607.5(B).

In terms of *minimal* validation procedures, the first step for content validation is a job analysis.  29 C.F.R. § 1607.14(C)(2).  A job analysis must be reasonably current – i.e., no more than five or so years old – to serve as the foundation for proper content validation.  See Bradley, 443 F. Supp. 2d at 172 ("HRD's own expert recommends, and other experts agree, that a validity study should be conducted every five years").  The next step is to ensure that there is a link between the selection procedure and the critical knowledge, skills, and abilities necessary for successful performance of the job (as identified by the job analysis).  29 C.F.R. § 1607.14(C)(4). In addition, where a selection procedure relies on prior training or experience as a selection criterion, that criterion should be justified based on the relationship between that training and experience and the content of the job. 29 C.F.R. § 1607.14(C)(6).  The use of a ranking device requires a separate demonstration that there is a relationship between higher scores and better job performance.  29 C.F.R. § 1607.14(C)(9).  Finally, test administrators are required to maintain records of adverse impact determinations and documentary evidence showing content validity.

29 C.F.R. § 1607.15(A)(2)-(3).  The exams at issue in this case failed to meet these minimal standards.[24]

  <u>First, the exams were not based on a sufficiently current validation study.</u>  The statewide exams for 2005 through 2008 were based on a validation study conducted in 1991, about 14 years before the 2005 exam.  Dr. Outtz agreed that job analyses are valid for no more than five-to-eight years, assuming there are no significant changes in the nature of the job.  (14:36).  <u>See also</u> <u>Bradley</u>, 443 F. Supp. 2d at 172 ("HRD's own expert recommends, and other experts agree, that a validity study should be conducted every five years"); <u>Vanguard Justice Soc.</u>, 592 F. Supp. at 259 (questioning vitality of job analysis that was about four years old given lack of analysis about whether work behaviors or job components changed somewhat during that time).  It is beyond dispute that the world has changed in important ways since 1991: communities have become more diverse; weapons have become more sophisticated; technology has become more advanced and prevalent.  And community policing models have been introduced in various jurisdictions.  (9:84).  As the world has changed, so has the job of a police sergeant.  Thus, even if the 1991 validation study was sufficient for exams conducted in the early to mid-1990's, it was far too stale by 2005.

  The Morris & McDaniel job analysis conducted in and around 2000 was insufficient to update the 1991 validation study.  It was, after all, only a job analysis, not a new validation study.  A job analysis is an essential component of a validation study, but a job analysis is only the first step.  After a job analysis is completed, content validation requires a process of

---

[24] Plaintiffs do not contend that Title VII requires strict compliance with the content validation requirements set out in the Guidelines.  What is required is substantial compliance, and Defendants fall far short of that standard.  <u>See</u> <u>Vanguard Justice Soc., Inc. v. Hughes</u>, 592 F. Supp. 245, 257 (D. Md. 1984) (examination should comply "in substantial measure [] with the reasonably attainable requirements set forth in the Guidelines").

developing a selection procedure that is linked to the job's critical KSA's.  There is no evidence

that the Morris & McDaniel job analysis was used in a professionally competent manner to

develop a content-valid examination.  And even if the Morris & McDaniel analysis was used to

develop a content valid examination for 2002 (a fact unsupported by any expert testimony in this

case), the multiple-component test design used in 2002 was scuttled and replaced by the same

flawed test design that had been used in earlier years.  A virtually identical situation was

examined by the district court in Vanguard Justice Soc., where the defendants had initially used

experts to develop an exam based on a job analysis, and then made major modifications to the

test (including a re-weighting of components) without expert assistance.  Id., 592 F. Supp. at

248-49.  In finding that the modified exam was not content valid, the court faulted the

defendants' failure to link the new exam to the job analysis.  Id. at 259-60.

Second, there were fundamental flaws with the link between the selection procedure and

the critical knowledge, skills, and abilities necessary for successful performance of the job.  One

critical shortcoming in the link between the job analysis and the exams was the failure of the

exams to test for a sufficiently representative sample of critical KSA's.  As a matter of common

sense, it does not require a validation study to conclude that a selection procedure that relies

primarily on a written, closed-book, multiple-choice test – essentially an assessment of

memorization skill – cannot have a strong link to a candidate's ability to perform the many

critical duties of a police sergeant.  Ironically, the 1991 validation study confirms that common

sense assessment; the study concluded that a large number of critical KSA's could not be

evaluated on a written test.  (Exh. 41 at Att. EE).  This conclusion is further supported by Boston

Police Superior Officers Fed'n v. Civil Service Comm'n, 35 Mass. App. Ct. 688 (1993).  In that

case, the Massachusetts Appeals Court affirmed a Civil Service Commission finding that a

written, multiple-choice test for police lieutenant did not meet the requirements of Mass. Gen. L.

ch. 31, § 22, because such a test could not fairly test the skills and abilities necessary to

demonstrate proficiency as a police lieutenant. Id. at 691.[25] More specifically, the Commission

ruled, after a fourteen-day hearing that included testimony from five experts, "that the multiple

choice examination component and training and experience component, without the performance

component, did not constitute a fair test for the position of a BPD lieutenant, because those

components did not adequately test for supervisory skills." Id. In upholding this ruling, the

Appeals Court noted, "The commission properly found that the multiple choice and training and

experience components alone failed to constitute a fair test of supervisory skills and ability." Id.

at 695.

One glaring example of a critical skill that cannot adequately be tested in a written,

multiple-choice format is supervision. Although Defendants contend that supervision was

covered by the written test, that contention cannot withstand even minimal scrutiny. It strains

credulity to argue that a police sergeant candidate's supervisory abilities can be fairly assessed

by asking a multiple-choice question designed to elicit his memory about a passage in

Supervision of Police Personnel (6th ed.) by Iannone and Iannone. (See Exh. 10). As another

court has recognized, "there is no good pen and paper test for evaluating supervisory skills."

Firefighters Institute for Racial Equality v. City of St. Louis, 549 F.2d 506, 513 (8th Cir. 1977).

The failure to test adequately for supervisory ability is highly significant, because "supervision is

one of the major factors separating the job of a police officer from that of a police sergeant."

Vanguard Justice Soc., 592 F. Supp. at 259. Dr. Outtz agreed that the distinguishing feature of a

police sergeant is the ability or responsibility for supervising and leading other police officers in

---

[25]    The Commission's findings and rulings are set out in detail in Carr v. Department of Personnel Administration, 2 Mass. Civ. Service Rep. 1045, a copy of which is attached as Exhibit A.

the line of duty.  (16:100-101).  In the brief he and his colleagues submitted to the Supreme

Court, Dr. Outtz staked out a firm position that failing to test for a critical KSA prevents any

showing of content validity.  See Outtz Brief, 2009 WL 796281 at *10 ("The omission from the

testing domain of a KSAO that is an important job prerequisite… - known in I/O psychology as

'criterion deficiency' - vitiates the entire justification for the employment test, which is to select

individuals accurately based on their capacity to perform the job in question.") (citation omitted).

Dr. Outtz affirmed this position at trial.  (16:98-100).

Another critical problem with the exam is the lack of any connection between the weights

of exam components and the relative importance of job duties.  As stated in the Outtz Brief,

"Scientific principles of employment-test validation require not only that tests reflect the

important KSAOs of the job, but also that the results from those tests be weighted in proportion

to their job importance."  Id. at *12-*13.  (opining that tests were "seriously flawed" given

"predetermined 60/40 weighting for the written and oral interview components of the tests with

no evidence that those weights matched the content of the jobs").  Dr. Silva agreed that exam

components should be weighted in accordance with the job analysis.  (17:110-11).  The

Defendants offered no evidence that any professionally-accepted procedure was used to establish

the 80/20 weights for the written test and the education and experience component.  The best that

Dr. Outtz could do was this: "I don't know from the data exactly precisely how they were set.   I

know the data that could be used to set it, and when you use that data, the outcome is not far

from what it is."  (16:106).  Content validity is not about speculation and coincidence; it is about

following professionally-accepted steps to ensure a fair test.  The reality is that the weights

assigned to the two exam components were the product of long-standing administrative practice,

not the result of a job analysis.  As stated in the 1991 validation study: "Standard practice is for

the Department of Personnel Administration to weight the written examination as 80% of the

final mark with the education and experience rating accounting for the other 20% of the final

mark." (Exh. 40 at 101).

Moreover, the actual weight of the education and experience component is only about

two percent. Because all candidates automatically receive 14 of 20 possible points (2:33-36),

and given the nature of the scoring system used by HRD (see Exh. 11), the bottom line is that the

education and experience component only changes a candidate's written test score by a few

points. Dr. Outtz admitted as much. (16:48-53). The difference between the nominal weighting

of 20 percent and the actual weight of about two percent is of great significance given Dr.

Outtz's position that the exams are valid only by virtue of the education and experience

component. (14:46; 15:128-29; 16:54). Given the insignificant effect of that component, it

cannot push the otherwise invalid written exam over the threshold of validity.

Another fatal problem with the linkage was the failure of the written test items to

effectively measure critical areas of knowledge. Because the questions were all closed book, and

because they all included verbatim or paraphrased language from a defined set of textbooks and

other materials, the exam was really a test of memorization skills. The witnesses who testified at

trial, from testing experts such as Dr. Outtz (15:97; 16:29) to police professionals such as Police

Commissioner Edward Davis (9:41, 44-45), agreed that such a memorization-heavy test may not

identify the best police supervisors.

In addition to the questions serving primarily as a memory test, it also is significant that

the questions on the written test were written by a lay person at HRD, not by a testing expert.

See Vanguard Justice Soc., 592 F. Supp. at 261 ("[E]mployment testing is a task of sufficient

difficulty to suggest that an employer dispenses with expert assistance at his peril….[T]he

decision to forgo such assistance should require a Court to give the resulting test careful

scrutiny."), quoting Guardians Ass'n of New York City v. Civil Service Comm'n, 630 F.2d 79,

96 (2d Cir.), cert. denied, 452 U.S. 940 (1981).  Professional testing expertise was particularly

important here, given that the written exam accounted for about 98 percent of the exam score and

was supposedly designed to test a wide range of KSA's.  When a written test seeks to measure

more complex qualifications, such as interpersonal skills or leadership, "[t]estmakers will be well

advised to obtain highly qualified assistance in constructing this portion of an exam."  Guardians,

630 F.2d at 97.

Perhaps not surprisingly, the questions on the written test read like questions written by a

lay person.  Dr. Wiesen found numerous problems with the construction of the test questions,

including the use of unnecessarily difficult words (synoptic, homogeneous, adhere, unequivocal,

and apportioned) and unnecessarily difficult question structure (using answers such as "all of the

above" or "none of the above").  (4:91-124; 11:24-25).  None of the Defendants' witnesses

offered testimony to rebut Dr. Wiesen on these points.  After the 2007 exam was administered,

HRD concluded that about 23 percent of the questions were flawed (3:85-86), which confirms

the poor quality of the test question construction.  Moreover, this high number of flawed

questions "wreak[ed] havoc" on the test outline, further undermining the exam's content validity.

(3:85-86).

Third, the education and experience component of the exams was flawed.  The education

and experience component of the examination is an off-the-shelf point system that is facially

invalid.  The only factors it takes into account are past experience in a police position, post-

secondary degrees, limited aspects of teaching experience, and limited aspects of licenses held.

And those factors are assessed using a strict point system that lacks any justification.  For

example, if a four-year veteran officer with a bachelor's degree in English goes on to get a Ph.D. in philosophy, he gets an additional 4.0 points, which becomes 0.8 points when adjusted to reflect the 20% weighting of the education and experience component. If that same officer with a bachelor's degree had, instead of a Ph.D., an additional ten years of experience as a police officer, he would get an additional 3.9 points, which becomes 0.78 points when weighted. Why should a Ph.D. in philosophy result in the same number of points as ten years of policing experience? How do those points relate to the 1991 or 2000 job analyses? There is no way to answer these questions, because the Defendants offered no justification for the point system.

As significant, the education and experience component fails to account for education and experience that is plainly relevant to successful performance as a police sergeant. For example, the component fails to take into account supervisory experience, military experience, and relevant forms of training, as demonstrated by the case of Plaintiff Robert Alvarez. Alvarez received no credit for his experience as a sergeant in the Marines, where he was responsible for supervising 40 people. (9:103-106). He received no credit for his work as a supervisor for American International Security Corporation, where he supervised up to 100 people. (Id.). He received no credit for dozens of training courses he attended between 1979 and 2006. (Id.; Exh. 135). For example, he received no credit for courses such as "State and Local Narcotic Enforcement," "Physical Evidence Techniques," and "Tactical Supervision of Critical Incidents." (Exh. 135). The Defendants offered no evidence to explain why these types of experiences and trainings were not credited as part of the exams.

Fourth, the use of the exams as a ranking device was not justified. There is a well-recognized distinction between the content validity of an examination and the use of the examination scores as a ranking device. Bradley, 443 F. Supp. 2d at 172-73, citing 29 C.F.R. §§

1607.5(g) and 1607.14(B)(6).  See also Brunet v. City of Columbus, 1 F.3d 390, 410 (6th Cir.

1993) (using exam score to rank candidates requires strong correlation between test score and job

performance); Guardians Ass'n of New York City Police Dep't, 630 F.2d at 103 ("If test scores

produce disparate racial results, an employer who wants to use rank-ordering of the scores for

hiring decisions faces a substantial task in demonstrating that rank-ordering is sufficiently

justified to be used."); Ensley Branch of NAACP v. Seibels, 616 F.2d 812, 822 (5th Cir. 1980)

(use of a test for ranking "is justified only if there is evidence showing that those with a higher

test score do better on the job than those with a lower test score").  The Defendants offered no

evidence to justify use of the exams as a ranking device.  On the contrary, Dr. Outtz testified that

candidates should have been ranked in bands, because the test scores did not have sufficient

reliability to use strict ranking.  (15:59-62; 16:13-14).  In reaching that conclusion, he agreed

with one of HRD's experts, who had recommended the use of bands in connection with the 2008

exam.  (Exh. 70).

     Fifth, there was insufficient documentation to establish the content validity of the exams.

In addition to a lack of testimonial evidence about the development of the exams, there is a

breathtaking lack of documentation about that development process.  The Defendants offered a

handful of charts and tables (see, e.g., Exhs. 183, 184), but those documents lack any foundation

as to their development, meaning, use, or significance.  Simply put, there is a wholesale lack of

evidence about the development of the exams.  That lack of evidence violates the validity

standards in the Uniform Guidelines. [26]

---

[26]     Documentary evidence of content validity should include, among other things, detailed records of
the job analysis; complete descriptions of and justifications for the selection procedure; complete
descriptions of what steps were taken to reduce adverse impact and to ensure reliability for relevant sub-
groups; a complete description of alternative selection procedures that were investigated; a description of
what selection procedures were considered (e.g., cutoff score, grouping, ranking, etc.) and why; and a

Any one of these deficiencies would be sufficient to find that the Defendants failed to prove content validity; collectively, they make such a finding inescapable. The Defendants' failure to establish the content validity of the exams in this case is similar to what has happened elsewhere. For example, in Vanguard Justice Soc., the State of Maryland used a written, multiple-choice exam for police sergeant promotions, which accounted for 40 percent of a candidate's score. Id., 592 F. Supp. at 248. Candidates who passed an initial hurdle based on the written exam and a promotional appraisal proceeded to an oral exam. Id. The plaintiffs challenged only the written exam component, given that "the severe adverse impact was based on the results of the written exam." Id. at 248 n.8 (internal quotation marks omitted). After a searching analysis, the district court found that the written exam failed to meet the requirement of content validity. Id. at 258. The problems with the test included, among other things: (a) a potentially outdated job analysis, (b) the failure to test for critical KSA's (including, for example, supervision and written communication skills), (c) the failure to weight KSA's appropriately given an unjustified re-weighting of test components, (d) the failure to allocate test questions in proportion to the relative importance of knowledge areas, (e) the poor quality of the test questions, (f) the failure to subject the test questions to reliability and readability analyses, (g) the high number of discarded questions, (h) the failure of the written test to assess a representative sample of the job, (i) the failure to justify use of the test as a rank-ordering device, and (j) the failure to justify the cut-off score. Id. at 259-69.

In Vulcan Pioneers, Inc. v. New Jersey Dep't of Civil Service, 832 F.2d 811 (3d Cir. 1987), New Jersey used a written job-knowledge test that accounted for 80 percent of a candidate's score, together with a "seniority and service" record that accounted for the remaining

---

description of steps taken to ensure accuracy and completeness of the data and results. 29 C.F.R. § 1607.15(C).

20 percent of the score, with overall scores used as a rank-order selection device.  Id. at 813.
The district court found that there were numerous shortcomings in the methodology used to
develop the test, both with respect to the job analysis and the test itself.  Id. at 815.  In terms of
the test itself, the district court found (a) "that the test rewarded test-taking ability rather than the
knowledges, abilities, and skills necessary for the position," (b) "that the test focused on a
candidate's ability to recall data from particular texts rather than his knowledge or abilities," (c)
"that test questions were ambiguously phrased," (d) "that questions tested knowledge of
terminology rather than of the underlying concepts," and (e) "that the tests in question were not
appropriate for ranking candidates."  Id.  All of these findings were upheld on appeal.  Id. at 816.

　　　　In Isabel v. City of Memphis, 404 F.3d 404 (6th Cir. 2005), the City used a written job-
knowledge test as a hurdle for police lieutenant promotions, and all who passed were assessed on
three other components: a practical exercise, a review of performance evaluations, and seniority
points.  Id. at 408.  The district court found that the use of the written test score as a hurdle was
not content valid for two reasons: (a) the cut-off score was set arbitrarily, and (b) the written test
measured only one component (job knowledge) instead of the entire job domain.  Id. at 413.  The
Sixth Circuit upheld these findings, agreeing that "the written test did not approximate a
candidate's potential job performance" and therefore was not content valid.  Id. at 414.

## 4.  Less Discriminatory Alternatives

　　　　The Plaintiffs' burden of proving that there were equally valid and less discriminatory
alternatives is subject to the standard of proof applicable to civil cases generally – i.e., they must
prove this element by a preponderance of the evidence, meaning that it is more likely than not
that there were equally or more valid tests that would have had lower levels of disparate impact.
Plaintiffs "have no obligation to provide the exact floor plan" for an alternative test.  Bradley,

443 F. Supp. 2d at 175.  As a result, the Defendants cannot argue that Plaintiffs must identify specific questions, grading mechanisms, or other details of alternative selection processes.  Id.  It is sufficient for the Plaintiffs to offer proof that "other jurisdictions have managed to devise selection procedures to have a less adverse impact."  Id.  Similarly, the Plaintiffs are not required to prove that an alternative test would have *eliminated* adverse impact.

Here, the evidence shows not simply that other jurisdictions have managed to devise selection procedures that have greater validity and less adverse impact, *it shows that nearly every other jurisdiction in the country has managed to devise such procedures*.  The Defendants' heavy reliance on a multiple-choice job-knowledge test is a practice from a bygone era.  It is akin to using sliderules when everyone else has moved on to computerized spreadsheets.  Boston's use of multiple-component tests in the 1980's – 20 years before the tests at issue in this case – demonstrates how far back the trend towards such tests reaches, and it is incomprehensible that the Defendants continue to use such outdated testing methods.  It is unsurprising that cities, towns, and states across the country have abandoned a heavy reliance on multiple-choice tests for public safety promotional exams, and it is equally unsurprising that testing experts (including all four experts in this case) have led that effort, because it is universally-recognized that those tests have an inherently low content validity and a predictably high level of disparate impact.

The defendants have argued that alternative tests were not legally available, were not financially or politically feasible, or offered an uncertain prospect of reduced adverse impact.  Based on the evidence, all of these arguments must fail.

First, it is well established that hiring authorities have the right to develop their own promotional examinations by entering into a delegation agreement with HRD.  There is evidence that both Boston and Lowell have previously entered into such delegation agreements.  (Exh.

151; 9:12-13).  There is evidence that numerous other jurisdictions have done likewise with

respect to police or fire promotional exams, including Westford, Winchester, Leominster,

Hanover, Marblehead, Salem, Pembroke, Bourne, Chelmsford, Bedford, Gloucester, Plymouth,

Reading, Salisbury, Arlington, Needham, Norton, Franklin, Weymouth, Lexington, Watertown,

Hull, Malden, and North Attleborough.  (Exh. 1).

      Second, there is no evidence that any of the Defendants actually attempted to develop an

alternative exam, so there is no credible evidence of infeasibility.  Although some of the

Defendants offered general evidence about tight budgets or concerns expressed by unions (see,

e.g., 9:67), those concerns are ones faced by every city, town, and state in the country.  In any

event, because jurisdictions may be able to charge applicants a fee for taking an exam, those fees

could be used to offset any additional costs.  Also, although it might cost additional money to

develop an alternative test, it could also cost money not to.  Failing to use a test that identifies the

best police sergeants may result in costly lawsuits, not only for the discriminatory impact of an

invalid test but for liabilities created by incompetent police supervisors.  (13:79; 16:60-61).

      Third, there was overwhelming evidence at trial that the introduction of additional

components, thereby allowing for the testing of a broader range of critical KSA's, would have

both increased content validity and decreased adverse impact.  As a starting point, it is

undisputed that adding components adds to the content validity of an exam.  (3:48; 6:58, 66, 68-

69; 17:102-105, 111-112, 120-21).  As Dr. Silva testified, "That's the whole logic behind content

validity is if you can include components that target more KSAs that are present in the job

analysis, that you should increase the validity of the process."  (17:111-112).

      It is well established that written, multiple-choice tests – in the form of those at issue here

– have the highest levels of adverse impact compared to other assessment devices.  (2:82-84;

3:43-47, 55, 60; 10:30; 16:59; 17:110).  While the mean score differences on multiple-choice

job-knowledge tests range from 0.45 to over 1.0, test procedures such as assessment centers,

structured interviews, and video situational judgment tests tend to result in significantly lower

mean score differences, ranging from 0 to 0.55.  (3:57-60; 6:43-44; 16:80-81).  As a result, it is

logical to conclude that adding additional components, which will almost always have lower

group differences, will reduce the group differences of the exam as a whole.  As Dr. Silva

acknowledged when asked if adding components to a job knowledge test reduces mean score

differences, "Typically, yes.  You do reduce the mean score differences between minorities and

non-minorities."  (17:121).  Indeed, Dr. Silva's firm, EB Jacobs, promotes its use of multi-

component tests as leading to "reduced adverse impact" while "increasing validity."  (17:103-

105).  Likewise, Dr. Outtz has taken the position that there does not need to be a tradeoff

between reducing adverse impact and increasing validity – i.e., that you can achieve both at the

same time by increasing the components and the dimensions tested for the job.  (16:67).

 The expected reduction in adverse impact that results from avoiding or adding to written

job-knowledge tests has been demonstrated time and again in jurisdictions around the country.

Dr. Fields, who has developed more police promotional exams than any other expert in this case,

testified that she has used multi-component tests to both increase validity and decrease adverse

impact in most jurisdictions where she has worked.  (6:114-15).  Dr. Outtz has accomplished

similar results in the two places where he has devised police promotional exams, Detroit and

Bridgeport.  (15:104-106).

 Boston's experience with multi-component exams also demonstrates the beneficial

effects of moving beyond the types of written tests at issue in this case.  Boston Police

Commissioner Edward Davis testified that the Department's use of an assessment center for

86

detective appointments in 2007 was effective, "resulted in a much more diverse detective pool," and did not result in any complaints. (9:33-40). Based on what limited evidence exists, the Department's use of a multi-component exam in 1985 resulted in no adverse impact at the pass/fail rate. (Exh. 40 at 82). In contrast, the return to the outdated HRD exam in 1991 resulted in "huge" adverse impact, according to Dr. Outtz. (15:116-17).

Boston's use of multiple components in the 2002 also resulted in more minority promotions than would have occurred under the traditional exam format. (18:37-38). That result is not surprising given that the additional component that was used for the final exam scores – a video component – had a significantly lower mean score difference for minority candidates compared to the written test. (3:57). Although the Defendants seek to belittle the improvement in adverse impact by arguing that only one additional minority was promoted (11 instead of 10), that critique is unfair and misguided. In the first place, focusing solely on bottom-line promotion statistics is improper, as established by <u>Connecticut v. Teal</u> and subsequent cases. In the second, even when looking at bottom-line numbers, the increase from 10 to 11 minorities represents an increase of 10 percent, and that improvement is undoubtedly of great importance not only to the additional minority who was promoted, but to the superior officers, like Commissioner Davis, who want a more diverse group of police supervisors, to the minority officers that additional minority sergeant will supervise and mentor, to the predominantly-minority communities in which he will work, and to all of the citizens who stand to gain from a more competent corps of police supervisors.

## 5. Plaintiff Robert Alvarez

Lowell has argued that the plaintiff bringing claims against them – Robert Alvarez – has failed to provide competent proof that he is Hispanic. Unlike some racial categories, the term

"'Hispanic' is unique, encompassing the concepts of both race and national origin in a way that the terms 'white,' 'black' and 'Asian' do not." Torres v. City of Chicago, 2000 WL 549588, *2 (N.D. Ill. 2000) (citation omitted). Regardless of its designation as a race or a national origin, it is "used to refer to individuals of Spanish-speaking descent, whether from Spain itself or from Spanish-speaking Latin-American countries." Salas v. Wisconsin Dept. of Corrections, 2006 WL 1049469, *6 (W.D. Wis. 2006). The plaintiffs are aware of no legal requirement – and Lowell does not point to one – that a person categorized as "Hispanic" speak Spanish.

Alvarez's father was Spanish and spoke both English and Spanish. (9:109-10). This fact is significant, if not dispositive. See Reynolds v. City of Chicago, 296 F.3d 524, 530 (7th Cir. 2002) (finding as Hispanic a plaintiff whose mother was Hispanic, regardless of whether plaintiff spoke Spanish); U.S. v. New York Bd. of Educ., 448 F. Supp. 2d 397, 422 (E.D.N.Y. 2006) (recognizing relevance of ancestral heritage and finding as "Hispanic" a plaintiff whose grandfather was born in Mexico). There is no question that Alvarez self-identifies as Hispanic, as he testified at trial. (9:103). Indeed, there is evidence demonstrating that he identified himself as Hispanic before and after he began working for Lowell. (9:121-22, 149-50; Exhs. 137, 147).[27] Lowell likewise recognized him as a minority. (9:148-49; Exh. 146). Alvarez previously brought a claim of discrimination against Lowell based on his Hispanic identity, and the jury

---

[27] That he identified himself as "white" in fingerprint applications is of no significance, because he did so based on his knowledge that the only "race" options for the fingerprint system, as with other criminal history systems, are "black" and "white." (9:124-25, 146-47). Similarly, that Alvarez's birth certificate lists his father's race as white (9:126-27) is of no significance given the lack of any evidence either that "Hispanic" was a recognized option for race when the certificate was prepared or that Alvarez's father ever saw the birth certificate.

found that he was in a protected category.  (9:150-51).  Finally, Alvarez testified at trial, and his Hispanic features were plainly visible.  As a result, there is ample proof that he is Hispanic.[28]

Lowell's expected reliance on a footnote from <u>Castro v. Beecher</u>, 334 F. Supp. 930, 934 n.2 (D. Mass. 1971) is misplaced.  In <u>Castro</u>, the court did not purport to define "Hispanic," it ventured an inference, without reference to any authority, about what the person who drafted the complaint "presumably meant" when using the term "Spanish-surnamed persons."  <u>Id.</u>

**6.  Summary**

Based on the totality of the evidence, and in light of applicable legal standards, the Defendants' use of the exams was unlawful.

First, there is overwhelming evidence that the exams had a disparate impact.  Boston concedes this point.  The only difference between Boston and the other Defendants is the size of their respective police departments.  The smaller numbers in the other Defendant jurisdictions mean that isolated statistics are not powerful enough, standing alone, to prove disparate impact.  But those isolated statistics do not stand alone.  As a matter of social science and as a matter of law, the existence of disparate impact requires consideration of a broad range of evidence, all with an eye towards this question: regardless of bottom-line promotions, does the use of a challenged test put a protected group at an unfair disadvantage?  That question can be answered in this case without looking at any statistics, because the types of exams being challenged are known to put minorities at a disadvantage.  That fact is plain to see not only from decades of social science research, but from the long history of successful challenges to these types of exams and from evidence that these tests result in a glaring under-representation of minority

---

[28]    As Alvarez made clear at trial, he neither introduced himself nor pronounced his last name as "Ilvareck," which was a nickname.  (9:119-21).  Once he knew someone, he told them about the nickname, which he acquired while in the Marine Corps.  (9-120).

police sergeants.  The disparate impact of these exams is further confirmed by the statistics in

this case.  The most powerful and robust statistics – i.e., the statewide statistics about mean score

differences – prove beyond any doubt that the exams put minority applicants at a sizeable

disadvantage in terms of test scores.  That test-score disadvantage is significant, because

applicants are promoted based on their relative test scores.  Even where minorities are promoted,

lower test scores mean that their promotions may be delayed, which causes real and significant

harm in terms of lost pay and seniority.

   Second, the evidence is equally overwhelming that the exams are not content valid.

Simply put, a written, multiple-choice job-knowledge test, combined with a narrowly-focused

and arbitrarily-scored education and experience point system, cannot test for skills and abilities

that are critical to work as a police sergeant.  They cannot, for example, test for supervisory

skills; they cannot test for oral communication skills; and they cannot test for the ability to deal

with critical incidents.  Even if one were to accept the highly-dubious proposition that such an

exam could be content valid if developed carefully, the evidence in this case proves that they

were not developed carefully.  Among other flaws, they were developed based on a long

outdated validation study; they were developed based on arbitrary determinations about what

would be tested and how; they were developed without regard to the relative importance of

police sergeant skills and abilities; they were developed in a way that tested memorization skills

more than relevant knowledge; and they included poorly-constructed test questions, drafted

without assistance from testing experts.  Not surprisingly, police professionals from patrol

officers to commissioners lamented the long-standing use of these exams.  Remarkably, the

Defendants' own expert on validity, Dr. Outtz, has a documented history of criticizing these

types of exams.  His testimony here was that the written exam was invalid standing alone, but

that the exam as a whole achieved *minimal* validity based on the addition of the education and experience component.  But he was he unable to explain how that component was developed or justified, and a careful analysis of that component demonstrates that it has little, if any, connection to any police sergeant job analysis.  It assigns points in an arbitrary fashion and fails to account for obviously-relevant types of training and experience.  It also has almost no impact on exam scores, accounting for only about *two* points on a 100-point scale.

Third, even if the Defendants had been able to establish that the exams were minimally valid, the evidence shows that there were equally valid alternatives that would have had less adverse impact.  It cannot seriously be argued that other alternatives were not available or feasible, because it appears to be the nearly-universal practice of jurisdictions outside of Massachusetts to use exams that test for a broader range of knowledge, skills, and abilities.  Even within Massachusetts, a number of jurisdictions, including some of the Defendants, have successfully used alternative mechanisms.  Testing experts have long since moved beyond multiple-choice tests like those at issue here, choosing instead to use devices like assessment centers, video components, structured interviews, review boards, hurdles, and banding.  All four experts agreed that the use of such alternative devices improves content validity, because those devices allow hiring authorities to test for a broader range of knowledge, skills, and abilities.  The evidence is equally clear that the introduction of these alternative devices almost invariably reduces adverse impact.  That evidence includes a long track record of success by testing experts who have used alternative mechanisms, including Dr. Fields and Dr. Outtz.  It includes a track record of success in Boston, when it has used multiple-component exams in the past.  And it includes numerous social science studies, including ones authored by Dr. Outtz, documenting the lower adverse impact of alternative testing strategies.  At a certain point, the Defendants must

come to recognize that there is a reason they are virtually alone in their use of exams that are outdated, predictably discriminatory, and inherently invalid.  That time is now.

## CONCLUSION

For these reasons, the Plaintiffs respectfully request that the Court issue findings of fact and rulings of law that all of the Defendants have engaged in disparate impact discrimination, in violation of Title VII and Mass. Gen. L., ch. 151B.

Respectfully Submitted,

PEDRO LOPEZ, et al., Plaintiffs,
By their attorneys,

/s/ Stephen S. Churchill
Harold L. Lichten, BBO #549689
Shannon Liss-Riordan, BBO# 640716
Stephen S. Churchill, BBO#564158
Joseph L. Sulman, BBO #663635
LICHTEN & LISS-RIORDAN, P.C.
100 Cambridge Street, 20th Floor
Boston, MA 02114
Date: October 29, 2010          (617) 994-5800

## CERTIFICATE OF SERVICE

I hereby certify that on October 29, 2010, a copy of this document was served by electronic filing on all counsel of record.

/s/ Stephen S. Churchill
Stephen S. Churchill