:TE AS 2 MCSR 1044

Massachusetts

sion

A. 02108

ent of Personnel

ne provisions of
24 of the General
of the examination

nd due
he Civil Service
1989, at its
o adopt the
of law attached

Chairman (in
or); Nicholas

ecord. Attest:

Waxman, Chairman
rvice Commission

12/21/89

CITE AS 2 MCSR 1045

COMMONWEALTH OF MASSACHUSETTS
CIVIL SERVICE COMMISSION

SUFFOLK, SS.

PAUL CARR, et al.,
Appellants

v.

DEPARTMENT OF PERSONNEL ADMINISTRATION, et al.,
Appellees

No. G-1461
G-1462
G-1463
G-1464
G-1465
B-1958

CIVIL SERVICE COMMISSION
BY: Betty E. Waxman, Chairman

CITE AS 2 MCSR 1046

COMMONWEALTH OF MASSACHUSETTS
CIVIL SERVICE COMMISSION

SUFFOLK, SS.

PAUL CARR, et al.,

Appellants

v.

DEPARTMENT OF PERSONNEL ADMINISTRATION, et al.,

Appellees

No. G-1461
G-1462
G-1463
G-1464
G-1465
B-1958

| | |
|---|---|
| Appearance for Appellants: | Harold L. Lichten, Esq.<br>44 School Street<br>Boston, MA 02108 |
| Appearance for Boston Police Department | Kevin McDermott, Esq.<br>Boston Police Department<br>154 Berkeley Street<br>Boston, MA 02116 |
| Appearance for Intervenors | Alan MacDonald, Esq.<br>One Gateway Center<br>Newton, MA 02158 |
| Appearance for Department of Personnel Administration | Margaret L. Dale, Esq.<br>One Ashburton Place<br>Boston, MA 02108 |
| Presiding Officer: | Betty E. Waxman, Chairman |

TTS
N

). G-1461
G-1462
G-1463
G-1464
G-1465
B-1958

L. Lichten, Esq.
)ol Street
, MA 02108

McDermott, Esq.
Police Department
rkeley Street
, MA 02116

acDonald, Esq.
teway Center
, MA 02158

et L. Dale, Esq.
hburton Place
, MA 02108

E. Waxman, Chairman



PROCEDURAL HISTORY

On January 12, 1988, the Department of Personnel Administration notified Paul E. Carr, William T. Morrissey, James W. Wood, William Johnston and Stephen M. Doris (Appellants) that it was denying their individual claims brought under G.L. c.31, section 22 that the Boston police lieutenant examination was not a fair test of their abilities to perform the duties of police lieutenant. The individual Appellants filed appeals against both DPA and the Boston Police Department with the Civil Service Commission (Commission). Appellants contemporaneously filed an action in Suffolk Superior Court (Doris, et al. v. City of Boston, et al., C.A. 88-0653) seeking unsuccessfully to prevent promotions to Boston police lieutenant positions pending a resolution of the merits.

The Commission consolidated the individual appeals for hearing. In the meantime, the Boston Police Superior Officers Federation intervened as an Appellee. Hearings were held on April 20 and 21, May 19, 26 and 27, June 22, July 1, 6, 8, 13 and 28, and August 3, 11 and 15, 1988, before the Commission. During the fourteen days of hearing, fifteen witnesses, including five expert witnesses, testified before the Commission.

On April 20, 1988, the first day of hearing, the Commission raised the issue that Personnel Administrator








David Haley had discussed the Boston police lieutenant examination with the Commission at Mr. Haley's regularly scheduled meetings with the Commission. Mr. Haley testified as to the nature of those conversations. On April 21, 1988, the second day of the hearing, the Appellants objected on the record to the Commission hearing the case. The Commission then requested that the parties file memoranda on the issue and indicated that Commissioner Richard Linden would file an affidavit, which he subsequently did. The DPA filed the requested memorandum. Appellants filed a statement with the Commission that they wished to preserve their right to object. The Commission ruled from the bench on May 19, 1988, that it had voted to continue with the hearing. At the conclusion of the hearing on August 15, 1988, the Commission gave the parties until September 26, 1988 to file proposed findings of fact and conclusions of law and until October 11, 1988 to file reply briefs. An extension was subsequently granted until October 3, 1988, and October 17, 1988, respectively.

FINDINGS OF FACT

1. The Department of Personnel Administration (DPA) is the state agency charged under G.L. c.31 with the administration of the Commonwealth's civil service system for state and municipal government.

2. The Boston Police Department (BPD) is a municipal public employer subject to the provisions of G.L. c.31 in the making of original and promotional appointments,

including promotions to the position of Boston police lieutenant.

3. Previous to the lieutenant examination at issue here, there had not been a promotional examination for BPD lieutenant in over ten years.

4. After a 1985 sergeant examination, the DPA and the BPD started planning for another sergeant examination and a lieutenant examination to be given in 1987. Haley assigned Dr. Joel Wiesen, Director of DPA's Bureau of Planning and Research, to act as liaison with the BPD in planning for and developing the examination on a delegated basis.

5. Delegated examinations are examinations in which DPA, at the request of an appointing authority, delegates its test development and construction functions to the appointing authority which, in turn, hires an outside consultant to develop an examination for a particular title or titles. The appointing authority normally bears the costs of examination development and administration, in this case about $300,000 for both the sergeant and lieutenant examinations. The DPA retains oversight and ultimate approval authority over the examinations.

6. In July of 1986, Haley and Boston Police Commissioner Francis M. Roache signed a delegation agreement for sergeant and lieutenant promotional examinations. Exhibit 5.



7. Dr. Wiesen worked with BPD personnel in the development of a Request for Proposal (RFP), which was issued by Roache on March 10, 1986.

8. The BPD and the DPA selected the employment test development firm of Morris and McDaniel, Inc. (MMI) to design and administer the sergeant and lieutenant examinations. 1

9. In order to administer the lieutenant's examination, MMI first developed a list of all the tasks required of a Boston police lieutenant. It then convened a group of subject matter experts (SME's), consisting of incumbents in the position of lieutenant or other high ranking officers familiar with the duties and responsibilities of the lieutenant position. The SME's analyzed approximately one hundred representative job tasks to determine whether each task required mainly technical knowledge or supervisory ability. As a result of this process, sixty per cent of the tasks were rated as primarily supervisory, and forty per cent were rated as primarily technical.

10. The Boston Police Superior Officers Federation (Federation) objected to the methodology for rating tasks because MMI had supplied the SME's with suggested answers typed along the margin of the survey forms. Exhibit 8, Appendix G. In addition, the Federation objected to the

1 Although the lieutenant's and sergeant's examinations were administered simultaneously, the Commission will focus from this point forward on the lieutenant's examination only, since that is the examination at issue in this appeal.

requirement that the SME's label each task as either supervisory or technical, rather than allocating a percentage value to the supervisory and technical components of each task.

11. As a result of complaints about the process, MMI made revisions to the original methodology and requested the SME's to reevaluate the tasks. The second set of results indicated that sixty percent of the tasks were primarily technical and forty percent of the tasks were primarily supervisory.

12. The second set of results was discarded by MMI in favor of the first set of results on the basis that the second set was intentionally slanted by the SME's toward technical knowledge. Dr. Wiesen, as well as three other test experts, concurred in the view that the second weightings were not an accurate reflection of the actual technical/supervisory composition of the lieutenant's position. Exhibit 4.

13. After MMI discarded the second set of results and reinstated the first set of results, MMI further added a training and experience component to the examination which yielded the following weights: a technical knowledge component, 32%; a supervisory component, 47%; and a training and experience component, 21%.

14. The lieutenant's examination was to be implemented in five parts: 1) a one hundred-twenty (120) question multiple choice examination (held on May 30, 1987); 2) an





in-basket exercise (held on May 30, 1987); 3) a video performance exercise (held in late July, 1987); 4) a leaderless group exercise (held in late July, 1987); and 5) a training and experience component. The in-basket, video performance and leaderless group exercises were known, collectively, as the "performance component" or "assessment center."

15. The multiple choice test consisted of items drawn from statutes, police texts, including Iannone's Principles of Supervision, and BPD rules, regulations and standard operating procedures. The items consisted of a question, a correct answer, and three distractors.

16. The in-basket exercise was designed to simulate the paperwork that might appear on the desk of a real lieutenant. It consisted of thirty (30) questions about the handling of the paperwork. It was not intended to be a graded component of the lieutenant's exam. Instead, the in-basket exercise was designed to serve two functions. First, it served as a pass/fail screening device for proceeding forward with the video and leaderless group exercises. Second, when the video exercise was graded, the in-basket answers were to be considered in reaching a final grade for the video exercise. The DPA did not issue grades on the in-basket exercise except to those candidates who failed the exercise.

17. The video exercise presented brief scenarios raising critical management/supervision issues. After

presenting each scene, the video was stopped at a critical point, and the candidates were asked to identify the critical issues raised and describe how they should be handled.

18. The leaderless group exercise consisted of a group of candidates sitting around a table discussing a particular situation. The sessions were video-taped and later reviewed by assessors. The leaderless group exercise was not intended to be used or graded independently.

19. The training and experience component consisted of assigning points for various aspects of a candidate's academic and work history.

20. Prior to May 30, 1987, Dr. David Morris, Industrial Psychologist and Vice President of MMI, conducted a number of training sessions concerning the in-basket exercise at the Boston Police Academy.

21. At the time the multiple choice and in-basket exams were administered on May 30, 1987, Albert Sweeney was a BPD Superintendent who served as head of the BPD's Anti-Corruption Unit.

22. Sweeney participated as a coach at three or four sessions of a study group organized by Sergeant Stephen Doris to prepare for the lieutenant's exam. The study group met eight or nine times prior to May 30, 1987.

23. The members of the study group took turns reading aloud from texts on the reading list and from the Department's Rules and Regulations. As the material was

being read, individuals would bring up points of interest, and there would be discussion on the points. The last study session before the May 30, 1987 examination was devoted to advice from Sweeney concerning test taking.

24. Dr. Morris first met Sweeney on May 30, 1987. Sweeney was part of an SME group selected by Edward Callahan, Personnel Director of the BPD, to review the in-basket exam. Another group of SME's were selected to review the written multiple-choice test. When the in-basket SME group finished its review, Sweeney, along with two other in-basket SME's, asked Dr. Morris if he could review the multiple choice exam and was allowed to do so. Sweeney, along with the other SME's, recommended certain changes to the answer keys for the in-basket and the multiple choice exams.

25. The recommendations of the SME's for changes in the in-basket and multiple choice exams were reviewed by Dr. Morris and by Dr. Max McDaniel, Industrial Psychologist and President of MMI. Dr. McDaniel called Dr. Wiesen to discuss the recommendations. Dr. Wiesen adopted the SME recommendations that eleven of the thirty in-basket answers should be double keyed. Dr. Wiesen also agreed with Dr. McDaniel that eight of the one-hundred twenty multiple choice questions be double keyed. Prior to agreeing to changes in the scoring of the multiple choice exam, Dr. Wiesen reviewed the appropriate reading list sources.

054
est,
study
d to
in-
review
SME
er in-
ey,
s to
ce
in
by
gist
o
E
wers



26. Dr. Morris met with Sweeney in late June or early July, 1987 and requested Sweeney to review a list of critical tasks/incidents of BPD lieutenants which Dr. Morris was going to use in preparing the video performance examination. Dr. Morris asked Sweeney to pare down the list to those most important to BPD lieutenants and to give his opinion as to the relevancy and accuracy of the tasks. Sweeney complied.

27. After the video exercise was produced but before it was administered, Sweeney reviewed it in his own office to determine if any corrections should be made. Sweeney recommended several changes, including a change in the video performers' uniforms. The changes were made.

28. Dr. Morris did not inform anyone at the BPD or the DPA that Sweeney was going to review the video performance exercise, nor did Sweeney inform anyone at the BPD or the DPA of his participation in reviewing the video performance exercise.

29. The BPD arranged to have a number of out-of-state police personnel come to Boston to serve as expert "assessors" to rate the candidates' performance on the video and leaderless group exercises. Sweeney, on behalf of the BPD, greeted and briefed the assessors.

30. On or about September 14, 1987, Haley read an article in the Boston Herald raising questions about Sweeney's involvement in the exam and his participation in the study group. Haley began an immediate investigation of

INDEX

the matter. As part of the investigation, Haley: a) corresponded with Police Commissioner Francis Roache; b) had Dr. Wiesen contact Dr. Morris; and c) met with Sweeney, Commissioner Roache, members of the BPD, members of the DPA staff, and representatives of the Attorney General's Office.

31. During the meeting between Sweeney and Haley, Sweeney did not mention that he had reviewed the multiple choice test on May 30, 1987, the day the exam was administered.

32. Haley determined that the security of the in-basket exercise and the video performance exercise had been breached.

33. On or about October 19, 1987, Haley and Police Commissioner Roache issued a joint press release announcing that the exam results from the multiple choice exam and the training and experience schedule would constitute each applicant's total score.

34. Subsequently, Commissioner Roache reversed his opinion and in a letter dated November 10, 1987, asked Haley to invalidate the entire exam based upon "the lingering and persistent perception that these examinations have been compromised and that the results are tainted."

35. Based on this request, on newspaper accounts that Sweeney had performed as an SME in the multiple choice exam, and on criticism by Dr. Morris of Haley's decision to proceed with the multiple choice and training and experience components only, Haley undertook a further investigation in

late November, 1987. He met with various members and officials of BPD unions and with an ad hoc group of police officers. He also received numerous letters and telegrams from candidates.

36. After meeting with various groups and individuals, Haley determined that the majority disagreed with Commissioner Roache's statement that there was a widespread perception that the written exam had been compromised.

37. On November 26, 1987, Drs. Morris and McDaniel wrote to Commissioner Roache contesting the determination that any part of the examination had been compromised and expressing their opinion that defending an examination comprised solely of the multiple choice and training and experience components was "problematical" and that such a test would be unfair to candidates who had been told that there would be another component.

38. In December, 1987, Haley and his staff met again with Sweeney and the other members of the May 30, 1987 SME in-basket group. Sweeney and the other in-basket SME's told Haley that, out of personal interest, they had remained at the test site after their in-basket SME work was finished in order to review the written examination.

39. In mid-December, 1987, Haley met with Dr. Morris to discuss Sweeney's involvement in the examination process. Haley asked Morris to re-administer the performance exercises (i.e., assessment center) at no cost. Dr. Morris declined, but offered instead to bring in experts to advise

Haley on the question of whether the examination had been compromised and on whether going forward with the remaining two components was valid. Haley declined.

40. Haley consulted in early January, 1988 with Dr. Thomas Tyler, an industrial psychologist from Illinois and founder of Merit Employment Assessment Services, Inc., a firm which specializes in developing primarily written (i.e., non-performance exercise) public safety examinations. Haley asked Dr. Tyler to review the examination materials and the issues surrounding the lieutenant's examination and make recommendations about how to proceed. Dr. Tyler determined that the examination could go forward based on the multiple choice and training and experience components alone.

41. On January 12, 1988, Haley wrote Commissioner Roache to announce his final decision that: a) the performance component (i.e., the assessment center) of the examination had been compromised; b) the multiple choice component had not been compromised; and c) an examination comprised of the multiple choice and training and experience components was a fair and valid examination. Haley also notified the candidates individually of his decision.

42. The eligible list for Boston Police lieutenant was established on January 12, 1988. As a result of Haley's decision, fifteen individuals whose names did not appear on a preliminary eligible list were on the January 12, 1988 eligible list. The standing of Appellant Stephen Doris

dropped from #16 on the preliminary list to #46 on the January 12, 1988 list. The standing of Appellant James Wood dropped from #50 to #51. The standing of Appellant Paul Carr dropped from #60 to #72. The standing of Appellant William Morrissey dropped from #65 to #88. The standing of Appellant William Johnston dropped from #85 to #97.

43. Thirty-three individuals were promoted to lieutenant on March 22, 1988. None of the Appellants were promoted; all appear lower on the eligible list than those who were promoted.

44. Minority candidates for promotion to BPD lieutenant scored better, as a group, on the examination without the performance components than they did with the performance components included.

45. Haley generally meets on a bimonthly basis with the Civil Service Commission to discuss matters concerning the civil service system. As part of those discussions, Haley periodically reported on the on-going events surrounding the lieutenant's examination. The sessions were informational, and he neither sought nor was given any advice or support.

## CONCLUSIONS OF LAW

I. The Bimonthly Consultations Between Personnel Administrator Haley And The Civil Service Commission Did Not Taint The Commissioners' Ability To Decide This Appeal In A Fair And Impartial Manner.

As DPA set forth in its memorandum of May 12, 1988, the Massachusetts Legislature has established a statutory scheme that envisions a close working relationship between the DPA and the Civil Service Commission. The Commission plays a role in the appointment and removal of Personnel Administrators (G.L. c.7 section 4A); the Commission is required to meet upon the request of the Personnel Administrator (G.L.c.3 section 4I); and the Commission may require any employee of the DPA to provide papers and records relating to DPA activities (G.L. c.7 section 4I). The relationship, moreover, is one that transcends the adjudicatory function, since the Commission is empowered to conduct investigations of personnel practices as well as hold hearings with respect to appeals (G.L. c.31, section 2). In order to assist the Commission in performing its dual roles, the Personnel Administrator has made it a practice to brief the Commissioners bimonthly on matters concerning the administration of the civil service system.

It was in the context of this ongoing reporting relationship that Personnel Administrator Haley briefed the Commissioners on the circumstances surrounding the administration of the BPD's exam for lieutenant. Those briefings began prior to the filing of any appeal in this matter and were allowed to continue after the appeals were filed simply because the Commissioners, prior to holding a hearing in this case, were not aware of the overlap between

the content of the briefings and the subject matter of the appeals.

The Supreme Court has made clear that a board is not automatically disqualified from hearing and deciding an appeal on the basis of evidence presented at a contested hearing simply because it has previously been exposed to evidence presented in a non-adversary, investigative context. Withrow v. Larkin, 421 U.S. 35, 55 (1975); United States v. Morgan, 313 U.S. 409, 421 (1941). In this case, the testimony, both direct and by affidavit, establishes that the Commission, during its regularly scheduled meetings with the Personnel Administrator, did nothing other than to receive information about the administration of the lieutenant's exam. No advice or support was sought by Haley, and none was offered by the Commission. Accordingly, there is no possible basis for disqualifying the Commissioners from hearing this case.

II. The Failure Of The DPA To Establish An Eligible List For BPD Lieutenant Within Six Months As Provided In G.L. c.31, Section 25, Does Not Give The Appellants A Right To Relief In This Case.

The Appellants claim a right to relief based on General Laws, chapter 31, section 25 which provides in relevant part:

> Each such [eligible] list shall be established or revised as soon as such marks are determined by the administrator, except that if such determination is made by use of a written examination, the establishment or revision of the list shall be completed no later than six months after the date of such examination.

The multiple choice component of the BPD lieutenant's exam was administered on May 30, 1987, and the eligible list was established in mid-January, 1988, some seven and one-half months later.

Several reasons militate against the granting of remedial relief on the basis of the purported delay in the establishment of the eligible list. First, the BPD lieutenant's exam must be characterized as a hybrid exam: it had a written component but also three "performance" components consisting of an in-basket exercise, a video exercise, and a leaderless group exercise. Two of the performance components were administered months after the written exam. Given this time frame and the fact that the eligible list was not established on the basis of a written exam alone, it would be unreasonable to apply the six-month deadline to the situation at hand.

Second, the Massachusetts Appeals Court recently concluded that chapter 31, section 25 does not confer a right on appellants to complain of a statutory violation of the six-month provision even though the violation directly affects their promotional opportunities. Davis v. Personnel Administrator, - Mass. App. Ct. - (March 23, 1989). See also Callanan v. Personnel Administrator, 400 Mass. 597, 511 N. E.2d 525 (1987)(persons in lower-tier positions may not complain of the Personnel Administrator's failure to establish the eligible list for a higher tier position).

Accordingly, the Commission concludes that the Appellants have no right to relief arising out of alleged delay in the establishment of the eligible list.

III. The Personnel Administrator Abused His Discretion In Determining That The Multiple Choice And Training And Experience Components Constituted A Valid Promotional Examination Pursuant to G.L. c.31, section 16.

The Legislature has entrusted to the Personnel Administrator the responsibility for conducting civil service exams. G.L. c.31, section 5. Section 16 of chapter 31 sets forth the parameters of this responsibility:

> Examinations shall be conducted under the direction of the Administrator who shall determine their form, method, and subject matter.

Judicial decisions support a broad delegation of responsibility to the Personnel Administrator in the area of test administration. <u>See</u> <u>e.g.</u> <u>McCue v. Director of Civil service</u>, 325 Mass. 605, 91 N.E. 2d 761 (1950) (acknowledging the director's primary role in the preparation of examinations). Test administration includes matters of examination security. Thus, steps taken by the Personnel Administrator to protect the integrity of the examination process are entitled to deference.

While broad, the Personnel Administrator's authority in the area of testing is not unrestricted. Section 16 establishes a standard of "fairness" with respect to the construction of civil service examinations:

> Examinations shall fairly test the knowledge,

INDEX

> skills and abilities which can be practically and reliably measured and which are actually required to perform the primary or dominant duties of the position for which the examination is held.

This fairness standard is reiterated in Ash v. Police Commissioner, 11 Mass App 650, 418 N.E. 2d 622 (1981) wherein the Appeals Court noted that the Personnel Administrator's decision regarding testing must be founded on a "reasonable" basis. Since a "reasonableness" or "fairness" requirement provides a limitation on the Personnel Administrator's exercise of discretion in the area of test construction, it provides a basis for review of the testing process by the Civil Service Commission. Procedurally, this review is made available through G.L. c.31, section 24 which provides for appeals to the Commission from decisions of the Personnel Administrator regarding examinations.[2]

The Commission's review in this case was an exhaustive one. Days of testimony and hundreds of pages of documents were submitted by the parties. The views of five expert witnesses were presented. When all the voluminous evidence is brought to bear upon the issue of examination validity, the Commission concludes that the final configuration of the lieutenant's examination -- containing only the multiple choice and training and experience components -- failed to

---

2 It is not clear whether the appellants seek review of the lieutenants' exam under G.L. c. 31, section 2(b) or section 24. The Commission arguably has jurisdiction under either or both of the sections, and none of the parties has contested the Commission's jurisdiction over the matter in dispute.

test for supervisory ability and therefore was not a fair test of the applicants' ability to perform the primary or dominant skills of the position.[3]

In order to appreciate the role of supervisory skills within the job of lieutenant, it is necessary to review the process by which MMI developed the lieutenant's exam. One of the first steps in MMI's exam-writing process was to have incumbents in the position of BPD lieutenants and other high ranking officers analyze approximately one hundred representative job tasks for the position of lieutenant. Their analysis indicated that 60% of the tasks were primarily supervisory and 40% were primarily technical in nature. Finding of Fact 9. These weights mirror the weights that have been assigned to similar tasks in other large cities. Affidavit of Dr. Joel Wiesen, Exhibit 20.

---

3 In evaluating the fairness of the multiple choice and training and experience components, the Commission declines to become enmeshed in the intricacies of discrimination law. This is not a case about racial discrimination; to the contrary, the multiple choice and training and experience components have no disparate impact. Accordingly, to the extent the Uniform Guidelines on Employee Selection, 43 Fed. Reg. 38, 291 (1978), revised 29 C.F.R. sec. 1607.1 et seq. (1986) and the American Psychological Association Standards for Educational and Psychological Testing establish criteria more rigorous than the requirement of fairness set forth in G.L. c. 31, section 16, they are not controlling. However, to the extent cases interpreting these standards flesh out a common sense notion of fairness, they are instructive. In this regard, the Commission concurs in the view expressed by the Eighth Circuit that, in order to be job-related, a promotional public safety examination must test for supervisory ability. See Firefighter Institute v. City of St. Louis, 616 F.2d 350 (8th Cir. 1980), cert. denied, 452 U.S. 930 (1981).

Notwithstanding the comparability in weights, objections were made to the methodology used by MMI to ascertain this information. MMI responded to the objections by revising the methodology and requesting the pool of promotional-level officers who served as SME's to re-analyze the tasks using the new methodology. The ensuing analysis resulted in a reversal of the percentages, yielding a 40% (supervisory) / 60% (technical) split.

After reviewing the second set of statistics, Dr. Wiesen of DPA, as well as three other test experts, concurred in the view that the second set of statistics was tainted and did not accurately reflect the actual components of the position. MMI thereupon reinstated the original ratings with the approval of DPA. Thus, the weight of the evidence indicates that the supervisory component of a lieutenant's position is 60% of the job of lieutenant; at a minimum, the supervisory component can be no less than 40%. Under either approach, it is clear that a significant portion of the position is supervisory. Exhibit 20; testimony of Dr. Joel Wiesen, Day 8 (acknowledging that supervisory skill is an essential attribute of a Boston Police lieutenant).

Once supervisory skills are recognized as an important part of the job of lieutenant, it follows that a valid promotional exam for lieutenant must test for such skills. The DPA and the intervenors claim that the multiple choice and training and experience components of the exam do, in

fact, test for such skills. This claim is not persuasive. While it is true that several of the multiple choice questions derive from the Iannone textbook, Principles of Supervision, the ability to answer these questions involves rote memory, not the application of supervisory principles. Even DPA's in-house expert, Dr. Wiesen, conceded that the questions could be successfully answered simply by memorizing textual material and did not screen for oral communication skills, writing ability, judgment, decision-making, and problem analysis. Testimony of Dr. Joel Wiesen, Day 8. See also testimony of Dr. Joel Lefkowitz, Day 4 (organizational, communication and interpersonal skills not screened once the assessment center was eliminated). As for the training and experience schedule, that portion of the exam measures the amount of prior supervisory experience rather than the quality of such experience. As such, it can not substitute for the assessment center. 4

Finally, the Commission rejects the claim that the "2 N Plus 1" selection formula allows the appointing authority to promote candidates based on supervisory ability demonstrated on the job, and therefore minimizes the impact of deleting the assessment center. The selection formula, which provides not less than three candidates for each vacant

4 Nor does the fact that the examinees may have taken and passed a supervisory exercise on a prior sergeant's exam serve as a substitute for the assessment center. The supervisory requirements of the sergeant's and lieutenant's positions are different. Passing a prior exam, moreover, does not measure comparative ability, nor does it recognize that individuals may have improved their supervisory skills while serving as sergeants.

INDEX

position, does allow an appointing authority some discretion in selecting among applicants but that discretion is limited by the fact that bypassed candidates are recertified for subsequent vacancies. The selection of most bypassed candidates can therefore be delayed but not avoided. Moreover, since there is no written evaluation system in place at the Boston Police Department, there is no meaningful way to compare candidates based on job performance. Accordingly, none of the alternate screening devices advocated by the DPA -- the multiple choice questions, the training and experience schedule, supervisory exercises on a prior sergeant's exam, or the "2N Plus 1" selection formula -- is a valid substitute for the assessment center.5

The inadequacy of substitute screening devices in this case does not mean that an assessment center is a necessary part of every police promotional examination. It is certainly possible to develop a multiple choice exam that adequately tests for supervisory ability. The use of hypothetical or situational questions, for instance, would require that examinees apply principles of supervision to real-life scenarios and, thus, exercise judgment in selecting the correct answer. Testimony of Dr. David

5 Other jurisdictions apparently agree with this position since of the five comparable police jurisdictions contacted by Dr. Wiesen in a telephone survey, all included in their promotional exams for lieutenant a heavily weighted supervisory component consisting of oral interviews, in-basket exercises, and/or assessment centers. Exhibit 20.

Morris, Day 2. The fact that the multiple choice exercise in this exam failed to screen for supervisory ability is not surprising, however, since it was intended to be used in conjunction with an assessment center, the sole purpose of which was to test for such ability. Exhibit 2, page 3 (exam poster characterizing performance exercise as the "supervisory component").

In sum, the question before the Commission is whether the particular multiple choice questions and the training and experience schedule which formed the final configuration of the lieutenant's exam can stand alone as a fair test for promotion to the position of Boston Police Lieutenant. The Commission concludes that it cannot.

IV. Since There Is No Evidence That The In-Basket Or The Leaderless Group Exercise Was Tainted, Those Portions Of The Assessment Center May Be Reinstated As A Measure Of Supervisory Ability.

Having determined that the lieutenant's exam as finally configured was not a valid test of supervisory ability, the Commission turns to the issue of remedy. In arriving at an appropriate remedy in the pending case, the Commission must take into consideration the fact that thirty-three appointments to the position of lieutenant in the Boston Police Department were made early in 1988, nearly two years ago, utilizing the eligible list based solely on the multiple-choice and training and experience components of the examination. While it is clear that some of these appointments would not, and indeed could not, have been made

INDEX

if the preliminary (i.e., pre-January 12, 1988) eligible list had been utilized, the Commission declines to take any action or issue any order which would have the effect of voiding any of the promotions to lieutenant made in 1988. Accordingly, the Commission will deal with remedial action only in the context of prospective relief.

The DPA has two alternatives in addressing this matter. First, the DPA and the BPD may administer a new assessment center, consisting of the three original components of the original assessment center. Second, the DPA and the BPD may resurrect the in-basket and leaderless group portions of the original assessment center because the Commission concludes that the security of these exercises, unlike the video exercise, was not tainted by Superintendent Sweeney's dual role as test coach and test consultant. Since DPA has stated that the cost of administering an entirely new assessment center is prohibitive, the Commission will confine its analysis to the second alternative, addressing the security issues surrounding each component of the assessment center, in turn, beginning with the video portion.

1. The Video Exercise

There is no dispute that the security of the video portion of the exam was compromised. Dr. Morris of MMI used Superintendent Sweeney's services extensively during July 1987 to construct the video exercise in direct contravention of the terms of MMI's contract, which prohibited MMI from

sending a copy of the exam to BPD personnel, and in violation of professional norms within the practice of industrial psychology. Testimony of Dr. Joel Lefkowitz, Industrial Psychologist, Day 4. In his capacity as video consultant, Sweeney received and pared down the critical incidents that were to form the basis of the video exercises and screened the proposed video scenes for technical problems. Thus, Sweeney, throughout July, was in the unique position among BPD personnel of knowing the contents of the exercise before it was administered and of being able to advise friends, study group members, and others about what to study.

It is also conceivable that in reviewing the critical incidents and final video exercise in July, 1987, Sweeney might have shaped his input, either intentionally or unintentionally, to conform to advice he had previously given the study group. This possibility is a concern even though the study group met for the express purpose of preparing for the multiple choice exam, not the video exercise. At least one of the texts reviewed by the group dealt with principles of supervision -- the focus of the video exercise which Sweeney helped to prepare.

Sweeney's testimony consists of an unequivocal denial that his role as an SME was influenced by his coaching activities or that he had divulged any information regarding the contents of the video exercise to any examinee. Such denials do not pass muster for two reasons. First, Sweeney

INDEX

could have influenced the outcome of the exam unknowingly by selecting for the video exercise those critical incidents that happened to be fresh in his mind because they were discussed in the study group. Second, the validity of an examination must be insured through institutional means rather than through the integrity of individuals with an opportunity to influence its results. Only by separating the exam writing function from the function of operating the Boston Police Department can the possibility of taint be eliminated. Testimony of Dr. Gerald Koocher, Clinical Psychologist, Day 10.

In sum, the Personnel Administrator acted within his discretion in cancelling the video portion of the assessment center.

2. The In-Basket Exercise

In his capacity as a grading consultant, Superintendent Sweeney "took" the in-basket and multiple choice exams on May 30, 1987, the same day as the examinees and provided, along with other "experts," advice that resulted in the double keying of eleven out of thirty in-basket answers and eight out of one hundred-twenty multiple choice answers. It is uncontested that May 30, 1987 was the first time Sweeney ever saw those portions of the exam. Thus, unlike the situation involving the video exercise, it would have been impossible for Sweeney to convey information relative to the contents of the in-basket and multiple choice exercises to

any of the examinees prior to the date on which the exam was administered.

The Commission also rejects the possibility that Superintendent Sweeney compromised the in-basket exam by suggesting alterations in the answer key which were tainted by his prior role as exam coach. Sweeney's participation as a grading consultant on the in-basket was essentially the same as his participation in the multiple choice exam. In both cases, his suggested revisions to the answer key were reviewed and approved by MMI and by Dr. Wiesen.

Notwithstanding the similarity in roles, the Personnel Administrator found the former activity to be a security breach and the latter activity to be permissible. The basis for the distinction -- that multiple choice answers were verified by Dr. Wiesen's review of source material -- is not convincing. There is no dispute that Dr. Wiesen, in his capacity as DPA's in-house test validation expert, served as the final arbiter of both answer keys and approved the revisions. The Civil Service Commission's independent review of the revisions to the in-basket answer key confirms their validity. Thus, the same reasoning that led the Personnel Administrator to conclude that the multiple choice component of the lieutenants' exam was not compromised by Sweeney's involvement as a grading consultant should have led the Personnel Administrator to conclude that the in-basket exercise was not compromised either. These two test components must rise or fall together. Accordingly, the

INDEX

Personnel Administrator abused his discretion in cancelling the in-basket exercise.

3. The Leaderless Group Exercise

It is noteworthy that the Personnel Administrator found no security breach involving the leaderless group exercise. It was cancelled solely on the basis that the exercise was intended to be implemented in conjunction with the other portions of the assessment center rather than as a graded, independent test component. Since the Commission has concluded that the in-basket exercise should be reinstated (as a graded component), it now follows that the leaderless group exercise should also be reinstated.

Conclusion

The lieutenant's examination must include a valid supervisory component in order to meet the statutory test of fairness. This requirement can be satisfied by resurrecting the in-basket and leaderless group exercises. While the information provided to the Commission in the course of the Commission's extended hearings on this matter failed to establish the precise manner in which the assessment center exercises were graded or otherwise evaluated, the Commission remains convinced that it is possible to arrive at individual scores for the assessment center minus the video exercise component.[6] The Commission herewith directs the

6. Drs. Morris and Wiesen both testified that new scores were computed for the leaderless group exercise although

continued to page 29

Personnel Administrator to reconstitute the lieutenant's examination with an assessment center component which includes the in-basket exercise and the leaderless group exercise, but without the video portion. The eligible list which is established as a result of the reconstituted examiantion shall continue to exist for two years from the date of this decision and shall be utilized for certifying names to the City of Boston for promotion to police lieutenant during this period.

---

6 continued from page 28
there is some confusion about their current status and location. Testimony of Dr. David Morris, Day 13; Testimony of Dr. Joel Wiesen, Day 14.