## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

| | | |
|---|---|---|
| **PEDRO LOPEZ, et al.,** | \* | |
| | \* | |
| **Plaintiffs** | \* | |
| | \* | |
| **v.** | \* | **Civil Action No, 07-11693-GAO** |
| | \* | |
| **CITY OF LAWRENCE, MASSACHUSETTS,** | \* | |
| **et al.,** | \* | |
| | \* | |
| **Defendants** | \* | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS
## OF LAW OF DEFENDANT CITY OF BOSTON

Pursuant to Fed. R. Civ. P. 52(a), and this Court's order entered September 17, 2010, Defendant City of Boston ("Boston") submits its Proposed Findings of Fact and Conclusions of Law:

**I**.     **Introduction**

The Plaintiffs to this action are police officers in the cities of Boston, Lawrence,  Lowell, Methuen, Springfield and Worcester, and at the Massachusetts Bay Transportation Authority. By a complaint and seven (7) amended complaints filed between September 11, 2007 and July 1, 2010 (Docket Nos. 1-235), Plaintiffs allege that the promotional procedures for the position of police sergeant, as administered by the Human Resources Division of the Commonwealth of Massachusetts ("HRD") in 2005, 2006, 2007 and 2008, had an unlawful disparate impact on African-American and Hispanic police officers, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq. ("Title VII"), and Massachusetts General Laws Chapter 151B ("Chapter 151B").  Boston and all other defendants deny that the promotional procedures for the years at issue violated either statute.

By order entered on June 9, 2008 (Docket No. 87), this Court (Tauro, J.) ordered that the action "be bifurcated into: (1) a declaratory relief stage regarding liability; and, if necessary, (2) a remedial stage," and that "Plaintiffs' Motion for Class Certification [be] denied as to the liability stage and denied without prejudice as to the potential remedial stage."

The Plaintiffs who are currently Boston Police Officers are: Lamont Anderson; Shumeane Benford; Rodney O. Best; Charisse Brittle-Powell; Gwendolyn Brown; James L. Brown; George Cardoza; Eddy Chrispin; Larry Ellison; Delores E. Facey; Kenneth Gaines; Murphy Gregory; William Iraola; Gloria Kinkead; Jose Lozano; David E. Melvin; Steven Morgan; Courtney A. Powell; Lynette Praileau; Molwyn A. Shaw; David Singletary; Tyrone Smith; Julian Turner; Karen Van Dyke; Lisa Venus; Angela Williams-Mitchell; and Robert C. Young. Plaintiffs Iraolo and Lozano allege that they are Hispanic; all other Boston Plaintiffs allege to be African-American. (See Seventh Amended Complaint, Docket No. 235, pars. 12-34, 36-40). By agreement, two of the Boston Plaintiffs withdrew from the case (Cothenia Cooper-Patterson and Neva Grice). (See Motion for Leave to File Amended Complaint, Docket No. 212, at 2).

When Plaintiffs originally filed this action, the Defendants included HRD and Paul Dietl, in his capacity as Personnel Administrator for the Commonwealth of Massachusetts. On January 26, 2009, the State Defendants filed a motion to dismiss and/or for summary judgment (Docket No. 142), arguing, inter alia, that they were immune from suit under Title VII pursuant to the 11th Amendment to the U.S. Constitution, on the ground that HRD did not employ Plaintiffs within the meaning of Title VII. After the District Court (Tauro, J.) denied the State Defendants' motion on April 6, 2009 (Docket No. 168), the State Defendants filed a notice of appeal from that part of the District Court's order denying their motion under the 11th Amendment (Docket

No. 174).  On May 13, 2009, Judge Tauro stayed proceedings in this Court until 30 days after the mandate issued from the State Defendants' appeal.  (See Docket No. 181).  In an opinion issued on December 3, 2009, the U.S. Court of Appeals for the First Circuit reversed the denial of the State Defendants' motion, and remanded the action for the entry of an order dismissing the State Defendants under Title VII.  See Lopez v. Commonwealth of Massachusetts, 588 F. 3d 69 (1st Cir. 2009).

In their motion to dismiss and/or for summary judgment filed in this Court, the State Defendants also sought dismissal of Plaintiffs' claim under Chapter 151B.  Plaintiffs and the State Defendants subsequently agreed to dismissal of the claim under Chapter 151B, without prejudice.  Plaintiffs re-filed their Chapter 151B claim in Suffolk County Superior Court, Civil Action No. SUCV 2009-00576, Lopez v. Massachusetts (see Plaintiffs' Reply to Defendants-Appellants' Opposition to Motion to Dismiss Appeal, filed 6/5/09 in U.S. Court of Appeals for 1st Circuit, at 4 n. 1).  The State Defendants have filed a motion to dismiss the state court complaint.  After a hearing on July 29, 2010, the motion is currently under advisement.  (Docket No. 32, Suffolk County Superior Court, Civil Action No. SUCV 2009-00576).

The trial in this action was held on July 12-16, 20-23, 26-29, and September 13-17, 2010, without a jury.  The witnesses for Plaintiffs, as to Boston, were Thomas Nolan, currently an Associate Professor of Criminal Justice at Boston University, and a former Boston Police Officer, Sergeant, and Lieutenant (fact witness); Joel Wiesen, Ph.D., an industrial organizational psychologist and HRD's Chief of Test Development and Validation between 1977 and 1993 (expert witness); Kathleen O'Toole, currently Chief Inspector of the Irish National Police Service, and Boston Police Commissioner between February 2004 and June 30, 2006 (fact witness); Cassi Fields, Ph.D., an industrial organizational psychologist (expert witness); and

Edward F. Davis, III, Boston Police Commissioner since December 2006 (fact witness).  The witnesses for Boston were Edward P. Callahan, Acting Bureau Chief for the Bureau of Administration and Technology for the Boston Police Department (fact witness); James L. Outtz, Ph.D., an industrial organizational psychologist (expert witness); and Jacinto Silva, Ph.D.,  a senior managing consultant for EB Jacobs (expert witness).

II.    **Proposed Findings Of Fact**

      A.    **Civil Service Rules Extensively Regulate The Promotion Of Police Sergeants**.

1.    Boston is a "civil service" community, meaning that it has accepted the applicability of the civil service laws and rules of the Commonwealth of Massachusetts.  (See Mass. General Laws Chapter 31, §§1, 53-55; Trial Transcript, Day 11, 7/27/10, at 89, lines 7-9).

2.    The purpose of the civil service system is "to guard against political considerations, favoritism and bias in governmental employment decisions."  (Town of Falmouth v. Civil Service Commission, 447 Mass. 814, 824, 857 N.E. 2d 1052, 1059 (2006)).

3.    Underlying the civil service system is the concept of "basic merit principles," the definition of which includes "recruiting, selecting and advancing of employees on the basis of their relative ability, knowledge and skills."  (See Mass. General Laws Chapter 31, §1).

4.    Under Chapter 31, "appointing authori[ties]" (defined in Mass. General Laws, Chapter 31, §1) must make personnel decisions free of "overtones of political control or objectives unrelated to merit standards or neutrally applied public policy."  (See Town of Falmouth v. Civil Service Commission, 61 Mass. App. Ct. 794, 800, 814 N.E. 2d 735, 739 (2004).

5.      In a civil service community, "promotional appointments in police forces shall be made only after competitive examinations," with exceptions not applicable.  (See Mass. General Laws, Chapter 31, §590.

6.      The Personnel Administrator of HRD is located within the Executive Office for Administration and Finance, and is responsible for, inter alia, "conduct[ing] examinations for purposes of establishing eligible lists."  (See Mass. General Laws, Chapter 31, §5(e)).

7.      Under Personnel Administration Rules ("PAR.") prepared by HRD's Office of Legal Counsel, "[a]ll selection procedures shall be practical in character and shall relate directly to those matters which fairly determine the relative rankings of the persons examined based on the knowledge, abilities and skills required to perform the primary duties (actual and frequent tasks) of the position, title or occupational group as determined by reliable and representative job information available to the administrator."  (PAR. 06(2)(a), available at http://www.mass.gov/Eoaf/docs/hrd/cs/publications/personneladministratorrulesforonline.doc, accessed 9/21/10).

8.      Mass. General Laws Chapter 31, Section 22 provides that "[i]n any competitive examination, an applicant shall be given credit for employment or experience in the position for which the examination is held."

9.      After marking and grading examinations, HRD prepares eligible lists of candidates.  (PAR. 07).

10.      Mass. General Laws Chapter 31, Section 25, requires HRD to prepare an eligible list of candidates "in the order of their marks on the examination based upon which the list is established."  Consistent with the statute, when an appointing authority seeks to fill a position, HRD's Personnel Administrator "shall, if a suitable eligible list exists, certify the names starting

highest on such list in order of their places on such list, except as otherwise provided by law or civil service rules."  (PAR. 08(1); see Mass. General Laws, Chapter 31, §7).

11.     "The passing mark for each examination shall be established by the administrator in accordance with generally accepted selection procedures."  (PAR. 06(3)).

12.     "When names have been certified to an appointing authority under PAR. 08 and the number of promotional appointees actually to be made is n, the appointing authority may appoint only from among the first 2n+1 persons named in the certification willing to accept appointment."  (PAR. 09(1); see Mass. General Laws, Chapter 31, §§7, 27).  "Thus, if a city needs to fill one sergeant slot it gets back from HRD a list of the three highest scoring candidates on the eligibility list."  (Pratt v. Dietl, SUCV No. 2009-01254, Memorandum of Decision and Order on the Plaintiffs' Motion for Preliminary Injunction, at 2 (Exhibit A hereto)).

13.     "If an appointing authority makes [a]…promotional appointment from a certification of any qualified person other than the qualified person whose names appear highest, and the person whose name is highest is willing to accept such appointment, the appointing authority shall immediately file with the [personnel] administrator a written statement of his reasons for appointing the person whose name was not highest."  (Mass. General Laws, Chapter 31, §27; see also PAR. 08(4), (5); PAR 09 (2)).

14.     Applicants who are bypassed, i.e., not selected despite having a higher rank than another applicant, can appeal to the Civil Service Commission, which must decide "whether the Appointing Authority has sustained its burden of proving that there was reasonable justification for the action taken by the appointing authority."   See City of Cambridge v. Civil Service Commission, 43 Mass. App. Ct. 300, 304, 682 N.E. 2d 923, 925, rev. denied, 426 Mass. 1102, 687 N.E. 2d 642 (1997).

15.      Promotional examinations administered by HRD include an education and experience component, which "shall be based on a schedule approved by the administrator which shall include credits for elements of training and experiences related to the position for which the examination is held."  (PAR 06(1)(b); Mass. General Laws Chapter 31, §22).

16.      Candidates may appeal to HRD numerous issues pertaining to an examination, including "whether an examination…was a fair test of the applicant's fitness actually to perform the primary or dominant duties of the position for which the examination was held…"  (Mass. General Laws Chapter 31, §22).

17.      Chapter 31 provides preferences for certain groups, such as military veterans and children of police officers who died in the line of duty.  (See Quinn v. City of Boston, 325 F. 3d 18, 25 (1st Cir. 2003), citing Mass. General Laws, Chapter 31, §§26, 40.  See also, http://www.mass.gov/?pageID=veteransterminal&L=3&L0=Home&L1=Returning+Veterans&L2=Welcome+Home+Guide%2C+3rd+Edition&sid=Eveterans&b=terminalcontent&f=wh_civilservice&csid=Eveterans, accessed 9/21/10, stating that in the promotional setting, a military veteran has "two points added to [his or her] score.").

18.      Municipalities may elect to use the examination prepared annually by HRD, or may conduct their own sergeant promotional examination pursuant to a delegation agreement between HRD and the municipality.  (See Mass. General Laws Chapter 31, §§9-11; Trial Exhibit Nos. 2, 151).

B.      **Validation of Selection Procedures**

19.      In the field of industrial organizational psychology, validity refers to the accuracy of inferences that an organization seeks to make on the basis of scores from a selection instrument.  If an employer administers an exam and hires individuals with the highest exam

scores, the inference is that the candidates with higher scores are more qualified than those with lower scores.  Validity assesses whether a test measures what it is supposed to measure, and allows an organization to predict future job performance at a level significantly greater than chance.  (Trial Transcript, Day 14, 9/13/10, at 15, lines 4-2, at 16, lines 1-5).

20.    Prior to analyzing a job, an industrial organizational psychologist should assess the context in which the selection device will be used.  The context includes constraints on the employer such as collective bargaining agreements and civil service rules under which the employer is operating,  the characteristics of those participating in the selection process, and the resources available to the organization.  (Trial Transcript, Day 14, 9/13/10, at 16, lines 4-9, 12-25, at 17, lines 1-8, at 20, lines 6-10; Trial Transcript, Day 15, 9/14/10, at 36, lines 11-20).

21.    In order to create a valid examination, it is necessary to conduct a job analysis, i.e., to establish what the job consists of, to identify the tasks that make up the job, and to identify the knowledges, skills and abilities ("KSAs") required to perform these tasks.  (Trial Transcript, Day 14, 9/13/10, at 16, lines 4-12, at 17, lines 9-13).   In order to conduct this analysis, any prior job analyses for the positions should be considered.  Further information may be gathered by means of interviewing individuals about the job, or by other means.  (Id. at 17, lines 14-25, at 18, lines 1-5).

22.    Once a job analysis is conducted, it is then necessary to determine the important components of a job, and the knowledges, skills and abilities required to perform those components.  Such determination can be made by submitting a questionnaire to job incumbents or their supervisors (typically subject matter experts ("SMEs")), who are asked to evaluate the job tasks in terms of their importance, how frequently the tasks are performed, and whether a

candidate must be able to perform the tasks upon entering the job.  (Trial Transcript, Day 14, 9/13/10, at 18, lines 6-20, 24-25, at 19, lines 1-21).

23.     Once the job analysis and any related analyses are complete, it is necessary to develop a test plan that describes what is intended to be measured by the selection device, and to identify the components of the selection system.  (Trial Transcript, Day 14, 9/13/10, at 18, lines 21-23, at 19, lines 22-29, at 20, lines 1-2).  While a test plan should measure as many of the pertinent knowledges, skills and abilities as are feasible (id. at 20, lines 10-12), under the Uniform Guidelines on Employee Selection Procedures, see 29 CFR §1607.14(C)(4) and 29 C.F.R. §1607.15(C)(4), a testing instrument is only required to assess a representative sample of the KSAs required for the job.  (Trial Transcript, Day 14, 9/13/10, at 40, lines 8-25, at 41, lines 1-15).

24.     Once a test plan is developed, it is necessary to develop testing exercises, and to have them reviewed by SMEs to determine their quality, and whether they measure what is intended to be measured.  (Trial Transcript, Day 14, 9/13/10, at 20, lines 13-18).

25.     When devising a selection system for sergeants, the selection system must include a job knowledge component, which typically consists of multiple-choice, written questions designed to evaluate a candidate's knowledge with regard to matters critical to performance as a sergeant, such as a jurisdiction's laws and regulations, and department regulations.  (Trial Transcript, Day 14, 9/13/10, at 24, lines 19-25, at 25, lines 1-25, at 26, lines 1-7).  The current Boston Police Commissioner and a former Boston Police lieutenant both testified at trial that a critical component of the position of police sergeant is that the individual understands the statutes and constitutional law, as well as the department's administrative rules and regulations, and the city ordinances.  When police officers need information or clarification, the first thing

they do is to call their sergeant.   (Trial Transcript Day 9, 7/23/10, at 43, lines 2-24, at 44, lines 1-2; Trial Transcript, Day 1, 7/12/10, at 90, lines 12-17).

26.    It is appropriate in industrial psychology for a test developer to rely on job analyses conducted over a period as long as ten (10) years.  While a job analysis is normally current for five (5) - eight (8) years, a job analysis can be used for a longer period, especially when a job changes very little over time, as is the case for the position of police sergeant. Moreover, test developers routinely rely upon more than one job analysis conducted over a period of time, where the later job analysis builds upon and supplements an earlier analysis. (Trial Transcript, Day 14, 9/13/10, at 35, lines 20-25, at 36, lines 1-25, at 37, lines 1-12).

27.    A written job knowledge exam is the best and most efficient method of determining what a candidate knows about critical areas identified by a job analysis.  (Trial Transcript, Day 14, 9/13/10, at 26, lines 3-7; Trial Transcript, Day 3, 7/14/10, at 123, lines 13-20, 25, at 124, line 1, at 126, lines 2-7).

C.    **The 1991 Validation Report**

28.    On October 1, 1991, the Commonwealth's Department of Personnel Administration issued a "Validation Report for the 1991 Police Promotional Selection Procedures" for the ranks of police sergeant, lieutenant and captain.  (Trial Exhibit 40, Bates Stamp page 247).

29.    The 1991 Validation Report was based on content validity, a recognized form of determining validity under the Uniform Guidelines on Employee Selection Procedures.  (Trial Exhibit 40, Bates Stamp page 247; see 29 CFR §1607.1 et seq.).

30.    In preparing the Validation Report, the Department of Personnel Administration (the predecessor to HRD) first "conducted a comprehensive job analysis of superior officer

ranks, including…sergeant…" (Trial Exhibit 40, Bates Stamp page 247). A principal feature of this analysis was "[g]athering of available job information from Massachusetts police departments, as well as job analysis reports, survey instruments and other information from jurisdictions outside the Commonwealth." (Id. at 249).

31.    In addition, DPA "[d]eveloped and administered a task inventory questionnaire designed to identify the frequent and critical tasks and duties," and "a knowledge, skills, abilities and personnel characteristics (KSAPs) inventory questionnaire designed to identify the important KSAPs required at the time of appointment." (Trial Exhibit 40, Bates Stamp page 249). DPA also developed a "[l]inkage of the important KSAPs to the frequent and critical tasks of these jobs from" SMEs, "designed and use[d]…structural group discussions to gather information from SMEs about the Education and Experience (E&E) component of DPA's selection procedures," and "gather[ed] information from SMEs about the recommended reading list from which the multiple choice written examination questions for the police promotional exams are derived." (Id. at 250).

32.    The preparation of the Validation Report also included work by a Job Analysis Team (JAT). The JAT initially gathered information by submitting a survey questionnaire to 34 jurisdictions throughout the country, seeking information on matters such as job analysis methodologies, selection procedure, reading lists and validity evidence. (Trial Exhibit 40, at Bates Stamp page 253; see Attachment E to Validation Report, Trial Exhibit 41, at Bates Stamp pages 3617-3623; Attachment F to Validation Report, Trial Exhibit 41, at Bates Stamp pages 3624-3625; Attachment G to Validation Report, Trial Exhibit 41, at Bates Stamp pages 3626-3633).

33.     In addition, the JAT considered job analysis studies, texts and articles, as well as numerous other studies and reference materials for use in developing the Task and KSAP Inventory Questionnaires.  (Trial Exhibit 40, at Bates Stamp pages 253, 254).  The DPA further requested and received job descriptions from Massachusetts police departments covered by Civil Service.  (Id. at 255).

34.     Even though the survey results showed great consistency in the sergeant position across jurisdictional lines, the JAT submitted a task inventory questionnaire for sergeant, covering 136 task or duty statements, to a sampling of 76 police departments in the Commonwealth, covering large, medium and small departments.  (Trial Exhibit 40, at Bates Stamp pages 255 and 256; see Attachment H to Validation Report, Trial Exhibit 41, at Bates Stamp pages 3634-3650).  The JAT received 824 responses, for a response rate of 78%, which led DPA to develop task profiles for sergeants and the other ranks under consideration.  (Trial Exhibit 40, Bates Stamp page at 257; Attachments J, K and L to Validation Study, Trial Exhibit 41, Bates Stamp pages at 3654-3655 (Attachment J); at 3656-3661 (Attachment K); at 3662-3695 (Attachment L)).

35.     Upon receipt and review of the above information, "the JAT developed a list of [KSAPs] that would be included in a survey to be distributed to be administered to [SMEs]," namely "superior officers currently serving on Massachusetts police departments."  (Trial Exhibit 40, at Bates Stamp page 257).  The survey sought to elicit information on the importance of each KSAP to the jobs under consideration, and whether "each KSAP was required at the time of appointment to each rank or whether it could be learned on the job after appointment."  (Id. at 257-258).  The Appendix to the Validation Study (Trial Exhibit 41) contains the survey questionnaire (Attachment M, at Bates Stamp pages 3696-3711), with 881 responses, or 74%

responding (see Attachment N, at Bates Stamp pages 3712-3713). These responses were used to identify the important KSAPs, and those required at the time of appointment. (Trial Exhibit 40, at Bates Stamp page 258; see Attachments O and P, Trial Exhibit 41, at Bates Stamp pages 3714-3878 (Attachment O), and 3879-3898 (Attachment P)).

36.     The Validation Report recognized that "[p]rofessional standards and DPA's standard operating procedures require that a linkage between essential tasks and the KSAPs required to perform those tasks be developed." (Trial Exhibit 40, at Bates Stamp page 258). "In order to provide a link between the KSAPs and the tasks of the five ranks, the JAT convened a group of 9 SMEs from Massachusetts police departments to review a master list of tasks that had been identified as important and frequent through the survey." (Id.). This effort was also undertaken to "enhance the validity of the selection procedures..." (Id.). "[B]y group consensus," the SMEs "identified which KSAPs had a direct relationship to each cluster of tasks" identified by DPA staff. (Id. at 258-259).

37.     The JAT further gathered information on the "DPA's new automated Education and Experience component of the promotional examination program," which had been developed years earlier "with SME input." (Trial Exhibit 40, at Bates Stamp page 260). Under the E&E component, "incumbents receive points that in combination with their raw score on the written civil service exam…become the score by which they are ranked and placed on civil service eligible lists of candidates for appointment. Points are awarded based on work experience, training and education. The purpose of the structured discussion group sessions…was to obtain feedback from SMEs about areas credited through this system." (Id. at 260).

38.     As set forth in Attachment W to the Validation Report, the JAT designed a structured discussion guide to identify which degrees, certificates, licenses, training and work

experience were important for the positions under consideration, including sergeant. (Trial Exhibit 40, at Bates Stamp page 260; Trial Exhibit 41, at Bates Stamp pages 4073-4085).

39.     In addition, the JAT arranged for 24 SMEs from various Massachusetts police departments to participate in three small discussion groups regarding the E&E component, with their feedback consolidated in Attachment K to the Validation Report, setting forth suggestions on areas currently credited.  (Trial Exhibit 40, at Bates Stamp page 260; Trial Exhibit 41, at Bates Stamp pages 4086-4093).

40.     In short, SMEs reviewed the information requested on the E&E instructions, and linked this information to the positions under consideration.  (Trial Transcript, Day 14, 9/13/10, at 39, lines 16-25, at 40, lines 1-7).

41.     The Public Safety Selection Unit identified 70 testable KSAPs under the written multiple choice format which sergeants must hold upon promotion.  (Trial Exhibit 40, at Bates Stamp page 265; Attachment EE, Trial Exhibit 41, at Bates Stamp pages 4272-4278).  The "testability analysis" (Attachment EE to the 1991 Validation Report, Trial Exhibit 41, at Bates Stamp pages 4272-4278) identified numerous KSAs assessed by the E&E component, by virtue of the candidate having held a patrol officer's position for at least three (3) years.  (Trial Transcript, Day 14, 9/13/10, at 57, lines 15-25, at 58, lines 1-23; Trial Exhibit 41, at Bates Stamp pages 4272-4278).

42.     The testability analysis for the 1991 Validation Report (Attachment EE, Trial Exhibit 41, at Bates Stamp pages 4272-4278) demonstrates that over 50% of the KSAs required to perform the job of sergeant were tested, which was sufficient to meet the "representative sample" requirement of the Uniform Guidelines.  (Trial Transcript, Day 14, 9/13/10, at 41, lines 16-19, at 42, lines 1-29, at 43, lines 1-23).

43.     Attachment X to the 1991 Validation Report (Trial Exhibit 41, at Bates Stamp pages 4086-4093) summarizes comments by SMEs on numerous issues pertaining to the E&E, including the usefulness of degrees in certain subject areas to the police positions under consideration.  (Trial Transcript, Day 14, 9/13/10, at 58, lines 24-25, at 59, lines 1-25, at 60, lines 1-9).

44.     Attachment W to the 1991 Validation Report demonstrates that SMEs linked the subject matters on the E&E form back to the KSAs for the position of police sergeant.  (See Trial Transcript, Day 14, 9/13/10, at 43, lines 24-25, at 44, lines 1-25, at 45, lines 1-9; Trial Exhibit 41, Attachment W, at Bates Stamp pages 4073-4085).

45.     The Validation Report further explained that under Massachusetts General Laws Chapter 31, §22, a training and experience component must be incorporated into a candidate's final mark.  Based on prior analyses, which included in part input from SMEs, a weight of 20% was assigned to this component.  (Trial Exhibit 40, at Bates Stamp page 263).

46.     In regard to reading lists, the JAT assembled a small discussion group including 24 SMEs and representatives from the academic community.  SMEs completed individual questionnaires on the reading list (Attachment Y, Trial Exhibit 41, at Bates Stamp pages 4094-4127), and SME comments and recommendations were further compiled for use by staff examiners who determined the content and structure of the reading list.  (Trial Exhibit 40, at Bates Stamp page 261, Attachment Z, Trial Exhibit 41, at Bates Stamp pages 4128-4129).

47.     The Validation Report described in detail the process used to construct the 1991 promotional exams at the BPD for the positions of sergeant, lieutenant and captain.  As set forth therein (see Trial Exhibit 40, at Bates Stamp page 263), staff examiners and experts chose to construct a multiple choice, written exam for several reasons, including the importance of

reading and writing for the positions, and because "there was no persuasive evidence that other examination modes would have no or even less adverse impact than the method chosen." (Id.).

48. After these analyses, KSAs were clustered into examination subject areas. "Depending on the number of KSAPs required for each task, the number of test questions to be developed to assess each KSAP was determined proportionately." (Trial Exhibit 40, at Bates Stamp pages 265-266; Attachment II, Trial Exhibit 41 at Bates Stamp page 4322).

49. "[A]ll questions" on the examinations "were referenced to one or more texts in the predetermined reading list," and "[e]ach reference is read with extreme care to identify principal concepts." (Trial Exhibit 40, at Bates Stamp page 266).

50. For the job analyses conducted in 1991 and in 2000, discussed infra, the exam developers identified the important parts of the sergeant position, and determined the knowledges, skills and abilities needed to perform the important tasks associated with the job. The test plan measured for the important KSAs identified. (Trial Transcript, Day 14, 9/13/10, at 37, lines 18-25, at 38, lines 1-10).

51. Defendants' expert James L. Outtz, Ph.D., summarized the remaining steps taken in completing the job analyses in 1991 and 2000:

> That test plan then was carried out by the actual writing of test items. The test items for the written exam, each time it's been administered, have been reviewed by certain experts for the appropriateness of the content of those items. If the items needed revision, they were revised. Once the items were finalized, they were administered according to a specific testing plan with items associated with each subject that had been identified as being important to the job of a police sergeant. So you can trace the items back to a reading list and that reading list back to the knowledges that have been identified as being important to certain parts of the job.
>
> The key thing that was done, that always has to be done, is to move from the knowledges, skills and abilities to a reading list. Why do

you need to do that?  Because the knowledges, skills and abilities are written somewhere.  You have to give the candidates a finite source so that you can hold them accountable for studying that source and gaining that knowledge.  If you don't do that, they don't know what to study, right?  They will study different things in different places and not be prepared in terms of the knowledge base that they need.  So this reading list becomes very, very important. The reading list is established by subject matter experts as containing the areas of knowledge that were identified in the job analysis.

And I found, in looking at the documents in this case, that the knowledges that were identified in the job analysis were then translated to the reading list which then was used to develop the test items.  The items were then revised, and to some extent honed, and put on an exam in proportions based on the importance of the various areas of knowledge.

(Trial Transcript, Day 14, 9/13/10, at 38, lines 11-25, at 39, lines 1-15).

**D**.    **The BPD Has Worked Consistently To Eradicate Discrimination In Hiring And Promotion Practices**.

**1**.    **1973-1998**

52.    Notwithstanding nearly constant litigation brought by minority and white police officers for close to 40 years, the BPD has worked diligently to increase the number of minorities in its promotional ranks, including sergeant.  In regard to entry level Police Officers, beginning in 1973, this Court (Wyzanski, J.) approved a Consent Decree seeking to increase the percentage of African-Americans on the Boston police force, in comparison to the percentage of African-Americans living in Boston at that time.  (See Deleo v. City of Boston, Massachusetts, 2004 WL 5740819 at *2 (D. Mass. 2004), discussing Castro v. Beecher, 365 F. Supp. 655 (D. Mass. 1973)).

53.    "The Castro decree applied to every Massachusetts municipality with a minority population of at least one percent," and authorized municipalities to "seek release from the terms of the decree when it 'achieves a complement of minorities commensurate with the percentage of

minorities within the community.'"  (Deleo v. City of Boston, Massachusetts, 2004 WL 5740819 at *3).

54.    Under the Castro decree, the BPD received applicants in two groups who met the "eligibility requirements,"[1] namely "one [group] that contains all black and Hispanic applicants and another that contains all other applicants."  (Deleo, 2004 WL 570819 at *2).  However, there was no specific requirement to hire candidates on a one for one basis based on race.  (Trial Transcript, Day 11, 7/27/10, at 87, lines 10-25, at 88, lines 1-9).

55.    In Deleo, this Court (Saris, J.) held that the provisions of the Castro decree had been met for Boston, based on a finding that the number of minority officers in Boston had met or nearly met the percentage of minority residents in the city.  (2004 WL 5740819 at *6-11).

56.    In regard to promotions to sergeant and other supervisory ranks in the BPD, this Court entered a consent decree in 1979 in Massachusetts Association of Afro-American Police, Inc. (MAAAP) v. The Boston Police Department.  The decree "contained various affirmative action provisions designed to increase the number of black officers promoted to sergeants."  (See Massachusetts Association of Afro-American Police, Inc. v. Boston Police Department, 780 F. 2d 5 (1st Cir. 1985), cert. denied sub nom., Burke v. Massachusetts Association of Afro-American Police, Inc., 478 U.S. 1020 (1986)).

57.    Under the MAAAP decree, the BPD was authorized to select individual African-American candidates for sergeant out of strict rank order as determined by results from an examination process, such that up to 20% of all selections could be African-American candidates.  (Trial Transcript, Day 11, 7/27/10, at 91, lines 22-25, at 92, lines 1-24).

---

[1]The eligibility requirements for being hired as a police officer included "pass[ing] a police entrance examination," and residence in Boston.  See Deleo, 2004 WL at 5740819 at *2.

58.    The <u>MAAAP</u> decree was extended in both 1985 and 1990 (<u>see</u> <u>Stuart v. Roche</u>, 951 F. 2d 446, 448 (1st Cir. 1991), <u>cert</u>. <u>denied</u>, 504 U.S. 913 (1992)), and expired in 1995.  (<u>See</u> <u>Cotter v. City of Boston</u>, 323 F. 3d 160, 165 n. 4 (1st Cir. 2003), <u>cert</u>. <u>denied</u>, 540 U.S. 825 (2003)).

59.    Under the <u>MAAAP</u> decree, as it stood in 1980, the BPD was "to use only promotional tests specifically validated as anti-discrimination and fair."  (<u>See</u> <u>Stuart v. Roche</u>, 951 F. 2d at 448).  While no "validated-fair" examinations were administered between 1980 and 1985, the decree was later extended to 1990, such that between 1985 and 1990, the BPD administered one such exam.  (<u>See</u> <u>id</u>. at 448).

60.    In 1987, the BPD, through a delegation agreement with HRD, retained a consulting firm, Morris & McDaniel, Inc. ("MMI") to prepare a sergeants and lieutenants promotional exam, consisting of a multiple choice examination; an in-basket exercise; a video performance exercise; a leaderless group exercise; and a training and experience component. The in-basket, video performance and leaderless group exercises were known collectively as the performance component, or assessment center.    (Trial Exhibit 41, Appendix C, <u>Carr v. Department of Personnel Administration</u>, at Bates Stamp pages 3580-3583; Trial Transcript, Day 11, 7/27/10, at 94, lines 2-11).

61.    The DPA designated Dr. Joel Wiesen, Ph.D., then its Director of Business Planning and Research, to act as liaison with the BPD in planning and developing the examination on a delegated basis.  (<u>See</u> Trial Exhibit 41, at Bates Stamp page 3580).

62.    After alleged misconduct of a BPD Superintendent in connection with the proposed assessment center component of the exam, the Personnel Administrator of the Department of Personnel Administration concluded that the assessment center component of the

examination had been compromised, but not the multiple choice component, and that an examination based on the multiple choice and training and experience components was a fair and valid examination. (See Trial Exhibit 41, at Bates Stamp pages 3586-3589; Trial Transcript, Day 11, 7/27/10, at 94, lines 24-25, at 95, lines 1-6).

63.    In a decision pertaining to the lieutenant's portion of the 1987 exam, the Civil Service Commission ordered that the scores from the in-basket and leaderless group exercises be used to compute candidates scores so as to ensure a valid supervisory component, but noted that its ruling did "not mean that an assessment center is a necessary part of every police promotional examination," that "[i]t is certainly possible to develop a multiple choice exam that adequately tests for supervisory ability," and that "[t]he fact that the multiple choice exercise in this exam failed to screen for supervisory ability is not surprising however, since it was intended to be used in conjunction with an assessment center, the sole purpose of which was to test for such ability." (Trial Exhibit 41, at Bates Stamp pages 3599-3600, 3605-3606).

64.    The sergeant promotional exam from 1987 resulted in a decided lack of minority promotions. (Trial Transcript, Day 11, 7/27/10, at 95, lines 7-13).

65.    After extension of the MAAAP decree, the BPD and MAAAP jointly administered a "validated-fair" exam in June 1991. (Boston Police Superior Officers Federation v. City of Boston, 147 F. 3d 13, 15 (1st Cir. 1998)).

66.    After the administration of the 1991 exam, the Massachusetts Association of Minority Law Enforcement Officers ("MAMLEO") challenged the exam's validity on the ground that it did not comport with the Equal Employment Opportunity Commission's Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. §1607.1 et seq. (See Boston Police Superior Officers Federation, 147 F. 3d at 15-16).

67.     MAMLEO's legal challenge was settled by means of an amendment to the MAAAP Consent Decree, which provided, inter alia, "that the BPD would establish the next eligibility lists for promotion to sergeant…using selection procedures 'of a significantly different type and/or scope.'"  (Boston Police Superior Officers Federation, 147 F. 3d at 15-16 (citation omitted)).

68.     In 1992, an exam was administered for the position of sergeant, which consisted of a written exam, followed by candidates making a presentation before a group of assessors, consisting of police commanders from throughout New England.  (Trial Transcript, Day 11, 7/27/10, at 95, lines 18-25, at 96, line 14).

69.     Boston's costs for the 1992 exam were in the range of $500,000.   (Trial Transcript, Day 11, 7/27/10, at 97, lines 5-7).

70.     After the administration of the 1992 sergeant promotional exam, further litigation ensued, which resulted in delay of sergeant promotions until 1996.  (Trial Transcript, Day 11, at 97, lines 8-25, at 98, lines 1-14; see Massachusetts Association of Minority Law Enforcement Officers v. Abban,  434 Mass. 256, 257, 748 N.E. 2d 455, 457 (2001)).

71.     In making promotions from the list of candidates resulting from administration of the 1992 exam, the BPD "departed from strict rank order in promoting six minority officers to sergeant…over…nonminority officers with higher civil service examine scores," in order, inter alia, to redress adverse impact resulting from the exam.  (See Massachusetts Association of Minority Law Enforcement Officers v. Abban, 434 Mass. at 257-258; 748 N.E. 2d at 457).

72.     In ensuing litigation, the Supreme Judicial Court of Massachusetts affirmed a judgment of the Superior Court that the BPD had improperly promoted to sergeant minority

police officers over white candidates with higher test scores.  (See Massachusetts Association of Minority Law Enforcement Officers v. Abban, supra).

73.    In 1998, the BPD participated in the statewide promotional exam for sergeants prepared and administered by HRD.  This exam did not include an assessment center.  (Trial Transcript, Day 11, 7/27/10, at 100, lines 3-10).

### 2.    2002 Promotional Exam

74.    After the 1998 exam, then Police Commissioner Paul Evans convened a committee in an effort to increase diversity in the promotional ranks.  Based on the committee's recommendation, the BPD decided that its next promotional process for sergeant, lieutenant and captain would include a written exam and assessment center.  (Trial Transcript, Day 11, 7/27/10, at 100, lines 11-23).

75.    The BPD was responsible for funding and administering the exam, subject to oversight by HRD.  (Trial Transcript, Day 11, 7/27/10, at 100, lines 24-25, at 101, lines 1-6).

76.    In 2000, prior to the administration of a sergeant promotional exam with an assessment center, Boston retained the services of MMI to prepare and administer the exam.  MMI's first step was to conduct a job analysis of the position of sergeant at the BPD.  (Trial Exhibit 42, at 1, Bates Stamp page 1550).

77.    A job analysis is the first step in crafting a valid promotional process, and consists of "the systemic process of collecting, processing, analyzing, and interpreting data about a job or jobs."  (Trial Exhibit 42, at 1, Bates Stamp page 1550; Trial Transcript, Day 14, 9/13/10, at 17, lines 9-25, at 18, lines 1-20).

78.    By conducting a job analysis, an employer has a basis for determining what to measure in a selection system.  (Trial Transcript, Day 14, 9/13/10, at 18, lines 21-23).

79.    The Job Analysis conducted by MMI identified principles for the validation and use of personnel selection procedures, including "[c]over[ing] important parts of the job," but which "need not be inclusive of duties of a particular job," as "determined by pooled judgments of incumbents, supervisors or personnel specialists," all in accordance with professional standards.  (Trial Exhibit 42, at 6, Bates Stamp page 1556; Trial Transcript, Day 14, 9/13/10, at 74, lines 21-25, at 75, lines 1-25, at 76, lines 1-10).

80.    As recounted in the Job Analysis for sergeant, MMI "gathered available relevant job information for the job of Boston Police Sergeant, including data from past job analyses for the rank," as well as "relevant job information for the rank of Police Sergeant in other jurisdictions, such as Denver, San Antonio and Massachusetts State Police."  (Trial Exhibit 42, at 9, Bates Stamp page 1560).

81.    "After reviewing the data relevant to the targeted position, job analysts from [MMI] assembled a comprehensive list of tasks which could be performed by persons in the Sergeant position," and also developed "a list of possible knowledges, skills and abilities." (Trial Exhibit 42, at 9, Bates Stamp page 1560).

82.    On August 14, 2000, eleven (11) SMEs holding the position of Sergeants or Detective Sergeants, participated in a task rating session for the sergeant position.  (Trial Exhibit 42, at 10-12, Bates Stamp pages 1561-1563).

83.    MMI acted in accordance with professional standards in using these eleven (11) SMEs, given MMI's experience in developing police exams, the prior 1991 validation study, and KSAs associated with that study.  (Trial Transcript, Day 14, 9/13/10, at 76, lines 17-25, at 77, lines 1-6).

23

84.     Out of a total of 218 tasks identified, nine (9) of the eleven (11) SMEs rated 163 tasks as very important or important, using an established formula for rating task importance. (Trial Exhibit 42, at 14, 39-47, 56, Bates Stamp pages 1567, 1604-1618, 1628).

85.     It is to be expected that SMEs would agree that tasks previously associated with a position were important to a job.  (Trial Transcript, Day 14, 9/13/10, at 77, lines 7-25, at 78, lines 1-25, at 79, lines 1-7; see Trial Exhibit 42, at 15-26, Bates Stamp pages 1568-1590).

86.     In assessing how regularly sergeants perform tasks, SMEs will frequently consider whether a sergeant somewhere in a department performs the task on a given day, and not whether every individual sergeant performs a task daily.  (Trial Transcript, Day 14, 9/13/10 at 79, lines 8-25, at 80, lines 1-17).

87.     The BPD and HRD entered into a Delegation Agreement pursuant to Massachusetts General Laws Chapter 31, §5(1), under which the 2002 promotional examination for sergeant was to consist of a written test (40 points), an assessment center (32 points), a performance review system (8 points), and education and experience (20 points).  (Trial Exhibit 151, at 1-2).

88.     The assessment center for sergeants consisted of a "situational exercise using multiple scenarios with oral responses."  (Trial Exhibit 151, at 3).

89.     As developed by MMI, the Performance Review System ("PRS") was to consist of quantifying the work histories of promotional candidates into a system under which the candidate would be assigned points added to their final score.  (Trial Transcript, Day 11, 7/27/10, at 102, lines 13-20).

90.     By memo dated May 29, 2002, Commissioner Paul F. Evans of the BPD withdrew the PRS from the 2002 promotional procedures for sergeants, lieutenants and captains.

As explained in the memo, the PRS was modeled on "the exam for detective, which contains a component that assesses past performance." Evans withdrew the exam because of ongoing legal challenges to the exam. Due to the withdrawal of the PRS component, the examination procedures consisted of a written test (40 points), an assessment center (40 points), and education and experience (20 points). (Trial Exhibit 194; Trial Transcript, Day 17, 9/16/10, at 71, lines 18-25, at 72, lines 1-2).

91.    The litigation referred to in Commissioner Evans's memo was brought by the Boston Police Superior Officers Federation before the Civil Service Commission. (Trial Transcript, Day 11, 7/27/10, at 102, lines 21-25, at 103, lines 1-5).

92.    MMI's expenses for developing and administering the 2002 promotional exams for sergeant, lieutenant and captain totaled $1,258,812.01. (Trial Exhibit 152).

93.    In addition to the costs associated with creating the job analysis and test exercises, the expenses associated with the 2002 examination process included transporting, housing and training the numerous police officers from throughout the county to act as assessors for the purpose of reviewing tapes of candidates from the assessment center exercise. (Trial Transcript, Day 12, 7/28/10, at 35, lines 16-25, at 36, lines 1-7, lines 15-21; see generally Trial Exhibit 152).

94.    Based on the results of the 2002 promotional exam, the BPD promoted 69 candidates to sergeant, consisting of 58 whites, 9 African-Americans, and 2 Hispanics. (Trial Transcript, Day 17, 9/16/10 at 74, lines 19-25, at 75, lines 1-10; Trial Exhibit 201).

95.    For the 2002 sergeant promotional exam, the adverse impact ratio (measured in terms of "d")[2] for African-Americans was .337, and for Hispanics .27; the combined ratio for

---

[2]As testified to by Plaintiffs' expert Cassi Fields, Ph.D., "d" refers to "standardized mean differences." The "d" "goes from negative to positive. And the more highly positive the more

African-Americans and Hispanics was .315.  (Trial Transcript, Day 17, 9/16/10, at 75, lines 11-22).  Thus, even with the inclusion of the structured interview in the 2002 exam process, there remained a highly significant difference in the promotion rates of minority and non-minority candidates.  (Id. at 75, lines 23-25, at 76, lines 1-3).

96.    HRD authorized the BPD to extend the duration of the promotional list resulting from the 2002 examination process, which allowed the BPD to promote more minority candidates than otherwise would have occurred.  (Trial Transcript, Day 12, 7/28/10 at 30, lines 24-25, at 31, lines 11-12, at 36, lines 22-25, at 37, lines 1-3).  The BPD had invested a great deal of money in the 2002 promotional process, and sought to yield as many officers as possible therefrom.  (Id. at 37, lines 17-19).

### 3.    BPD's Promotional Processes In 2005 And 2008

97.    During the period 2003-2005, the BPD operated under significant financial constraints which resulted in an unprecedented offer of early retirement in 2003, in the hopes of avoiding layoffs of younger police officers.  (Trial Transcript, Day 11, 7/27/10 at 106, lines 14-25, at 107, lines 1-3).  The retirement incentive offered in 2003 afforded the BPD the opportunity to make additional promotions off the list resulting from the 2002 exam.  (Trial Transcript, Day 12, 7/28/10, at 37, lines 14-24).

98.    By the time the BPD began preparing for the 2005 promotional exam, there were no funds budgeted to engage in a process similar to that used in 2002.  Consequently, the BPD decided to take part in the statewide promotional exam prepared and administered by HRD. (Trial Transcript, Day 11, 7/27/10, at 107, lines 4-8; Trial Transcript, Day 5, 7/16/10, at 18, lines 19-25, at 19, lines 1-7, 18-25, at 20, lines 1-4).

---

Caucasians outperform minorities, zero mean there's no difference…"  (Trial Testimony, Day 6, 7/20/10, at 43, lines 9-14).

99.    In addition to the financial cost of administering another exam such as that used in 2002, the BPD decided to use the HRD exam in 2005 based on the small number of minority candidates promoted to sergeant as a result of that costly examination.  In essence, the costs were not offset by any gains in minority promotion.  (Trial Transcript, Day 12, 7/28/10, at 17, lines 2-17, at 30, lines 8-17).

100.    Consistent with its prior practice in preparing other police promotional exams for Boston and other municipalities, the exam prepared by HRD for the position of BPD sergeant in 2005 was based on a test plan that can be traced to the 2000 job analysis prepared by MMI, which itself can be traced to the 1991 job analysis, including the KSAs identified therein as important.  (Trial Transcript, Day 15, 9/13/10, at 63, lines 20-25, at 64, lines 1-11; Trial Exhibits 4, 5).

101.    As part of its regular processes in developing a job-related and valid exam, HRD consulted with a panel of BPD captains (i.e., SMEs), some of whom were deputy superintendents, who recommended a reading list that was periodically updated over time, but was consistent with the 1991 job analysis.  (Trial Transcript, Day 14, 9/13/10, at 62, lines 17-25, at 63, lines 1-25, at 64, lines 1-2, 11-20, at 65, lines 8-25, at 66, lines 1-3; Trial Exhibits 181, 182).

102.    The 2005 BPD promotional exam included certain questions specific to the BPD, and as a result, the reading list for Boston included BPD rules, procedures and special orders. (Trial Transcript, Day 14, 9/13/10, at 63, 1-25, at 64, lines 1-2, 11-20, at 65, lines 8-25, at 66, lines 1-3; Trial Exhibits 181, 182).

103.    As part of developing the sergeant promotional exam, HRD weighted the competency areas by the relative importance of the KSAs for the position, and the number of

items to be devoted to subject areas in the exam. (Trial Transcript, Day 14, 9/13/10, at 66, lines 4-25, at 67, lines 1-8; Trial Exhibits 182, 183). In other words, "great care [was] taken not only to have the exam generally be derived appropriately from the areas of knowledge via these reading lists, but to actually apportion items in terms of numbers of items devoted to a particular subject area based upon the importance of the knowledge that these items actually measure." (Trial Transcript, Day 14, 9/13/10, at 66, lines 17-25).

104.    A further document developed prior to administration of the 2005 examination was entitled "Test Specifications," and showed the number of items devoted to particular subject areas, and competencies traced back to the KSAs associated with the sergeant position. (Trial Transcript, Day 14, 9/13/10, at 68, line 25, at 69, lines 1-6; Trial Exhibit 185). Trial Exhibit 185 represents the core of the test plan for the exam. (Trial Transcript, Day 14, 9/13/10, at 69, lines 7-8).

105.    The HRD documents further show that SMEs from the BPD reviewed test items for matters including level of difficulty prior to the exam's administration. (Trial Transcript, Day 14, 9/13/10, at 71, lines 6-25, at 72, line 1; Trial Exhibit 187). It is standard professional practice for SMEs to review exam questions prior to administration of an exam. (Trial Transcript, Day 14, 9/13/10, at 72, lines 2-6).

106.    A review of the questions from the 2005 promotional examination for sergeant reveals that the questions were linked to the underlying documents on the reading list, and in some instances were taken verbatim from those documents. (Trial Transcript, Day 14, 9/13/10, at 82, lines 1-25, at 84, lines 10-12; Trial Exhibit 49).

107.    The 2005 sergeant promotional exam for Boston was linked to KSAs identified through the 1991 and 2000 job analysis, as well as by SME review of test questions prior to the

administration of the exam.  The topics covered by exam questions included numerous BPD rules, regulations and special orders, which had been repeatedly identified as subject areas for testing.  (See Trial Exhibit 49, Question Nos. 1, 4, 7, 15, 17, 18, 28, 31, 32, 37-40, 48, 55, 68-80).

108.    The 2005 sergeant promotional exam for Boston further tested KSAs identified throughout the 1991 and 2000 job analyses, and related documents.   (See Trial Exhibit 49, Question Nos. 12, 13 (community policing); Question Nos. 2, 3, 61 (training/instruction of subordinates); Question Nos. 5, 6, 8, 10, 57-60, 62-67 (police management issues); Question Nos. 9, 11, 16 (crime-related issues); Question Nos. 14, 23, 30 (juvenile crime); Question Nos. 19, 20, 26 (crime scene); Question Nos. 21, 47, 49, 50 (interrogation); Question Nos. 22, 24, 25 (child abduction); Question No. 27 (hostage situation); Question Nos. 33, 34 (grammar); Question Nos. 35, 36 (reading charts); Question Nos. 41-46 (arrest procedures); Question Nos. 51-54, 56 (searches)).

109.    Following the administration of the 2005 sergeant promotional exam, the BPD promoted the same number of African-Americans that were promoted following the 2002 promotional exam, and one (1) additional Hispanic.  (Trial Transcript, Day 18, 9/17/10, at 37, lines 15-23; Trial Exhibits 80, 200).   In 2005, 625 patrol officers took the BPD's sergeant promotional exam, and 66 were promoted, or 10.56%.  (See Trial Exhibits 80, 200).

110.    Written exams for the sergeant and lieutenant positions at the BPD in 2005 had 53 items in common.  (Trial Transcript, Day 17, 9/16/10, at 85, lines 10-24).  For the sergeant and lieutenant candidates at the BPD, 89% of the lieutenant candidates, i.e., incumbent sergeants, achieved a passing score of 70 on these 53 items, while 63% of sergeant candidates, i.e., current police officers, achieved a passing score on these items.  (Id. at 86, lines 10-14, at 87, lines 1-4,

25, at 80, line 1).  The high passing rate for incumbent sergeants confirmed that the common

questions were related to performance as a sergeant.  (Trial Transcript, Day 15, 9/14/10, at 26,

lines 2-25, at 27, lines 1-19).

111.    For its next round of promotional procedures administered in 2008, Boston again

utilized the services of HRD to prepare a sergeant promotional exam.  In the years preceding that

exam, the BPD made substantial cuts to its budget, including cancellation of its cadet program

(involving layoffs of incumbent personnel); shutting down the mounted unit; substantially

reducing expenditures on cars; entering into negotiations with the unions on wage freezes and

wage delays; and delaying recruit classes.  (Trial Transcript, Day 9, 7/23/10, at 67, lines 14-25, at

68, lines 1-5).  This exam, like the 2005 exam, included BPD specific questions.  In preparation

for this exam, HRD prepared a test plan showing areas of knowledge to be tested, and the

number of items to be devoted to each area.  (Trial Transcript, Day 14, 9/13/10, at 85, lines 8-21;

Trial Exhibit 23).  The categories covered by the test plan included supervision and community

policing.  (Trial Transcript Day 14, 9/13/10, at 85, lines 22-25, at 86, line 8; Trial Exhibit 23).

112.    Based on the test outline (Trial Exhibit 23), a test administrator or developer

prepared the exam to match the outline.  (Trial Transcript, Day 14, 9/13/10, at 86, lines 2-10).

113.    As with the 2005 exam, SMEs updated the reading list for candidates, which is

part of the development of a professional examination.  (Trial Transcript, Day 14, 9/13/10 at 86,

lines 11-25, at 87, lines 1-17; Trial Exhibit 189).

114.    Documents from HRD show that for the 2008 sergeant promotional exam in

Boston, SMEs reviewed test items, indicated which KSA the item was linked to, assessed the

difficulty level of the item, and recommended whether or not the item should be used.  (Trial

Transcript, Day 14, 9/13/10, at 87, lines 23-25, at 88, lines 1-13; Trial Exhibit 190).

115.    The HRD documents further show that comments from SMEs were recorded, which is a common feature of SME review of test items.  (Trial Transcript, Day 14, 9/13/10, at 88, lines 14-25, at 89, lines 1-8; Trial Exhibit 190).

116.    The 2008 sergeant promotional exam for Boston contained a number of questions focusing on specific rules, regulations and special orders of the BPD.  (See Trial Exhibit 45, Question Nos. 9-20, 38-39, 44, 46, 59-69).

117.    The 2008 sergeant promotional exam for Boston further tested KSAs identified throughout the 1991 and 2000 job analyses, and related documents.  (See Trial Exhibit 45, Question Nos. 21, 36 (juvenile issues); Question Nos. 2, 3, 33, 42, 47, 50, 58 (crime-related issues); Question Nos. 4-6, 22, 40-41, 51 (searches); Question Nos. 7, 8 (firearm issues); Question Nos. 23-30, 34, 48, 49, 53, 70-73 (police management issues); Question Nos. 31, 32, 35, 37, 74, 75 (community policing); Question Nos. 43, 52 (interrogation); Question Nos. 54-57 (narcotics); Question Nos. 76-80 (reading charts)).

118.    In an effort to assist candidates who are taking promotional exams, the BPD, in both 2005 and 2008, engaged an outside consultant to provide extensive tutoring for any interested candidate.  (Trial Transcript, Day 11, 7/27/10, at 107, lines 15-22).  Prior to the 2005 promotional exam, the BPD offered tutorials and study materials for candidates, at no cost.  (Id. at 107, lines 23-25, at 108, lines 4-15, at 109, lines 14-17).  Prior to the 2008 exam, the BPD provided, at no cost to candidates, compact discs containing lectures prepared by the consultant for use by officers on their own time.  (Id. at 108, lines 16-20, at 109, lines 5-13; Trial Exhibit 153).

119.    The 2005 and 2008 HRD exams for the position of sergeant at the BPD were valid exams based on the quality of items therein, and compliance with the Uniform Guidelines

on Employee Selection Procedures.  (Trial Transcript, Day 14, 9/13/10, at 89, lines 9-16, 19-22; Trial Exhibit 45).

120.    Education and experience is routinely included in selection processes, and by expanding the number of KSAs measured to greater than 50%, the inclusion of the E&E ensured the validity of the promotional processes under consideration.  (Trial Transcript, Day 14, 9/13/10, at 45, lines 10-25, at 46, lines 1-20).

121.    The knowledges tested on the 1991 statewide exam were linked to the reading lists prepared for the sergeant promotional exams for Boston in 2005 and 2008.    (Trial Transcript, Day 15, 9/14/10, at 28, lines 24-25, at 29, lines 1-12).

122.    For both the 2005 and 2008 promotional exams for Boston, candidates for police sergeant completed an "Education and Experience Rating Sheet" in accordance with instructions thereto.  (Trial Exhibits 11, 19, 21).

123.    Section III of the E&E Rating Sheet requests candidates to provide information on their experience.  (See Trial Exhibit 14 at 3-5, Bates Stamp pages 22-24).  Police officers must have three (3) years experience to apply for sergeant.  In addition, seniority is widely recognized, even by Plaintiffs' experts, as being relevant to the ability to perform a police supervisory position.  (Trial Transcript, Day 14, 9/13/10, at 54, lines 22-25, at 55, lines 1-25, at 56, lines 1-25, at 57, line 1; Trial Transcript, Day 6, 7/20/10, at 136, lines 20-24, at 139, lines 17-25, at 140, lines 9-11, 22-24).

124.    Section IV of the E&E Rating Sheet requests candidates, inter alia, to indicate whether they have earned a degree in one of several specified subject areas.  (See Trial Exhibit 11, at 6, Bates Stamp page 25).  As part of the 1991 Validation Report, SMEs agreed that these

subject areas were related to the position of sergeant.  (Trial Transcript, Day 14, 9/13/10, at 52, lines 24-25, at 53, lines 1-25; Attachment W to Trial Exhibit 41).

125.    Section V of the E&E Rating Sheet requests candidates to indicate if they have taught a course above the high school level in the same subject areas for which credit is given if a degree is earned in that area.  (See Trial Exhibit 11, at 7, Bates Stamp page 26).  The SMEs who participated in the 1991 Validation Report concluded that the ability to teach a course evidenced oral communication skills important to the position of sergeant.  (See Trial Transcript, Day 14, 9/13/10, at 54, lines 1-11; Appendix W to Trial Exhibit 41; see also Trial Transcript, Day 14, 9/13/10, at 54, lines 11-21).

126.    Of the first 39 candidates promoted to sergeant based on the results of the 2002 promotional exam for the BPD, 36 were white, two were Hispanic, and one was African-American.  Of the first 44 candidates promoted to sergeant based on the results of the 2008 promotional exam for the BPD, 42 were white, one was Hispanic and one was African-American.  (See Trial Exhibit 201; Docket No. 303 Stipulation of Plaintiffs and Boston, filed 9/21/10).

127.    Two Plaintiffs who are members of the BPD (Jose Lozano, Kenneth Gaines) have been promoted to sergeant, effective October 2008 (Lozano) and April 2010 (Gaines).  (See Docket No. 303, Stipulation of Plaintiffs and Boston, filed 9/21/10).

128.    Three Plaintiffs who are members of the BPD (William Iraola, Gloria Kinkead, Tyrone Smith) received a failing score on the 2005 promotional exam for sergeant.  (See Docket No. 303, Stipulation of Plaintiffs and Boston, filed 9/21/10).

129.    The collective bargaining agreement between Boston and the Boston Police Patrolmen's Association for the period July 1, 2002 - June 30, 2006, provides that "[e]valuations

shall take place on an annual basis," and "[t]he Department shall neither discipline a member as the result of a subpar evaluation nor take such evaluation into account in promotions." (Trial Exhibit 133). As a result of this provision, the BPD Commissioner cannot take an officer's performance into account in determining placement on an eligibility list. (See Trial Transcript, Day 9, 7/23/10, at 55, lines 20-25).

130.    Police officers promoted to sergeant receive supervisory training at the Boston Police Academy (Trial Exhibit 158). Likewise, in Macon, Georgia, where Plaintiffs' expert witness Dr. Cassie Fields, Ph.D. worked, Dr. Fields agreed that two KSAs (ability to communicate in writing, ability to organize, plan and prioritize) could be covered in a training program after promotion. (Trial Transcript, Day 7, 7/21/10, at 36, lines 23-25, at 37, lines 1-25, at 38, lines 1-25, at 39, lines 1-10; Trial Exhibit 131, at 41).

131.    BPD Officers are covered by the Quinn Bill (Mass. General Laws Chapter 41, §108L). This statute provides for an increase in an officer's base pay at varying percentages based on whether an officer earns an associate's, bachelor's or master's degree. (Trial Transcript, Day 11, 7/27/10, at 110, lines 1-13). Approximately 50% of minority officers at the BPD have earned degrees triggering Quinn bill benefits, while about 75% of non-minority officers have done so. (Id. at 110, lines 22-25, at 111, lines 1-7).

**III**.    **Proposed Conclusions Of Law**

The Plaintiff police officers seek to hold Boston liable for disparate impact discrimination under Title VII and Chapter 151B for its use of an examination process prepared by HRD, when just a few years before the exams at issue, Boston had retained a consultant to prepare alternative selection procedures which cost the City $1.2 million, and resulted in even worse adverse impact than the HRD-created process.   For the reasons discussed below, Boston cannot be held liable because the HRD selection procedures were valid under governing law, and because Plaintiffs have not met their burden of establishing the availability of feasible, alternative selection devices with less discriminatory effects that Boston refused to use.   Accordingly, judgment must enter for Boston.

**1**.    **Legal Framework**

The legal framework for analyzing claims of disparate impact discrimination under Title VII is well-established.   Plaintiffs must initially show that the selection procedures for the position at issue caused a disparate impact on the basis of a protected characteristic (here, race). Ricci v. DeStefano, 129 S. Ct. 2658, 2672-2673 (2009), citing Griggs v. Duke Power Co., 401 U.S. 424 (1971).  The burden then shifts to defendant to demonstrate that the selection procedure is valid, i.e., the procedure is job-related and consistent with business necessity.  Ricci, 129 S. Ct. at 2672-2673, citing 42 U.S.C. §2000e-2(k)(1)(A)(i).   If the defendant meets this burden, plaintiffs may prevail only if they can show that an equally valid, less discriminatory method for selection was available, and that defendants failed to use it.  Ricci, 129 S. Ct. at 2672-2673,

citing 42 U.S.C. §2000e-2(k)(1)(A)(ii) and (C); see also Albemarle Paper Co. v. Moody, 422 U.S. 405, 425 (1975).[3]

Boston has not disputed that Plaintiffs have established a prima facie case that the HRD-created promotional exams for sergeant, as administered in 2005 and 2008,[4] had a disparate impact on African-American and Hispanic candidates.  However, the establishment of a prima facie case of disparate impact is "essentially a threshold showing of a significant statistical disparity, and nothing more…"  See Ricci, 129 S. Ct. at 2678.  Moreover,  the level of disparate impact for these exams is indistinguishable from the disparate impact created by the 2002 selection procedures (see Proposed Findings of Fact, pars. 109, 126), which procedures Plaintiffs seek to have Boston follow.

As discussed below, Boston has established the validity of the examination procedures at issue, and Plaintiffs have fallen far short of establishing the existence of less discriminatory

---

[3]Plaintiffs' disparate impact claim under Mass. General Laws Chapter 151B should be analyzed in the same manner as their Title VII claim.  See, e.g., Cox v. New England Telephone & Telegraph Co., 414 Mass. 375, 390, 607 N.E. 2d 1035, 1043-1044 (1993) (stating "the Federal law is clear, and there is no reason to construe the Commonwealth's law differently," and finding disparate impact handicap discrimination claim actionable under Chapter 151B, and following section 504 of the Rehabilitation Act of 1972; White v. University of Massachusetts at Boston, 410 Mass. 553, 557, 574 N.E. 2d 356, 358 (1991) (stating "[t]he analysis of a discrimination claim is essentially the same under the State and Federal statutes"); School Committee of Braintree v. MCAD, 377 Mass. 424, 428 n. 10, 386 N.E. 2d 1251, 1254 (1979) (stating "[w]e recognize that G.L. c. 151B, s 4, like the Federal act, 42 U.S.C. 2000e-2(a)(1) (1976) (Title VII of the Civil Rights Act of 1964) 'proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation,'" citing Griggs v. Duke Power Co., 401 U.S. at 431).

[4]It should be noted that promotions are ongoing from the list of candidates who took the 2008 sergeant promotional exam.  Consequently, any conclusions reached now about the number of minorities and whites promoted could prove to be erroneous when the last promotion from the list is made.

procedures which Boston should have followed, but refused to adopt.  Accordingly, judgment should enter for Boston on Plaintiffs' claims.[5]

    2.    **HRD's Examination Procedures Are Job-Related And Consistent With Business Necessity**.

Boston has met its burden of establishing that the HRD-created sergeant promotional exams administered in 2005 and 2008 met the governing standards for validity established by the courts, by the Uniform Guidelines on Employee Selection Procedures, see 29 CFR §1607 et seq., and by the Questions and Answers thereto.  See Adoption of Questions and Answers to Clarify and Provide a Common Interpretation of the Uniform Guidelines on Employee Selection Procedures, 44 Fed. Reg. 11,996 (1979).

    a.    **Dr. Outtz's Testimony Establishes That The 2005 And 2008 Exams Are Content Valid**.

The testimony of James L. Outtz, Ph.D., expert witness for Defendants, is highly instructive on the issue of validity.  Dr. Outtz is one of the country's leading industrial organizational psychologists.  He has published extensively on the subject of employee selection procedures.  (See Trial Exhibit 180, at 3-4; Trial Transcript, Day 14, 9/13/10, at 7, lines 17-25, at 8, lines 1-11).  Dr. Outtz has been invited to address the Equal Employment Opportunity Commission regarding employee selection procedures, and has given presentations on this

---

[5] As this is not a class action, each individual Plaintiff must prove liability.  Apart from the generally applicable issues discussed herein, in a few instances Plaintiffs cannot prevail based on factors unique to them.  First, Plaintiffs William Iraola, Gloria Kinkead and Tyrone Smith all failed the 2005 exam.  (See Proposed Findings of Fact, par. 128).  Under state law, the BPD cannot promote officers who are not on the list certified by HRD, which list does not include those with failing scores.  See Mass. General Laws, Chapter 31, §25.  Second, Plaintiffs Jose Lozano and Kenneth Gaines have been promoted to sergeant, in October 2008 and March 2010 respectively.  (See Proposed Findings of Fact, par. 127).  Given that these Plaintiffs have secured the position which the 2005 and 2008 promotional exams allegedly prevented them from obtaining (see Document No. 235, Seventh Amended Complaint, par. 1), it would be illogical to hold Boston liable to these Plaintiffs under a disparate impact theory.

subject in South Africa and in Europe.  (See Trial Exhibit 180, at 1; Trial Transcript, Day 14, 9/13/10, at 8, lines 16-29, at 9, lines 1-6).  Dr. Outtz's peers have recognized his significant contributions to the field by selecting him as a Fellow in the Society of Industrial and Organizational Psychology, and in the American Psychological Association.  (Trial Exhibit 180, at 1; Trial Transcript, Day 14, 9/13/10, at 30, lines 3-22).[6]

Dr. Outtz has been involved in creating selection systems for public sector law enforcement for approximately 30 years, and has been involved with at least one project for public sector agencies for every year during this period.  (Trial Transcript, Day 14, 9/13/10, at 10, lines 16-25, at 11, lines 1-2, 19-22).  Dr. Outtz has devised selection systems for police departments in Detroit, Chicago, New York City and New Orleans, and for law enforcement personnel at agencies including the Federal Bureau of Investigation, the Drug Enforcement Administration, and the Federal Deposit Insurance Corporation.  (Trial Transcript, Day 14, 9/13/10, at 11, lines 3-18, 24-25, at 12, lines 1-15; Trial Exhibit 180, at 9, 14, 16, 17, 20, 22-25, 27, 30).   He has also provided expert testimony for plaintiffs and defendants throughout his career.  (See Trial Exhibit 180).

The reputation of Dr. Outtz is confirmed by the testimony of Plaintiffs' expert witnesses, who frequently referred to Dr. Outtz's publications and work in glowing terms.  For example, Plaintiffs' expert Joel Wiesen, Ph.D., testified that "Dr. Outtz has spent much of his career wrestling with the problem of adverse impact and trying to find ways of reducing adverse impact.  He recently edited a highly respected text book on adverse impact."  (Trial Testimony, Day 2, 7/13/10, at 83, lines 13-16; see also Trial Testimony, Day 4, 7/14/10, at 19, lines 11-15, where Dr. Wiesen again referred to recent book of Dr. Outtz).

---

[6]There is no evidence that Dr. Wiesen or Dr. Fields is a fellow in either of these organizations.

Based on his review, Dr. Outtz opined that the 2005 and 2008 sergeant promotional exams for Boston met the validity standards set by the Uniform Guidelines in Employee Selection Procedures, 29 C.F.R. §1607 et seq. The tests at issue were validated using the "content validity" method, meaning a study "showing that the content of the selection procedure is representative of important aspects of performance on the job for which the candidates are to be evaluated." See 29 CFR §1607(5)(B). While there are three types of validation procedures recognized by the Uniform Guidelines (content, criterion and construct), no one validation procedure is preferable to another: "'Neither the case law nor the Uniform Guidelines require that an employer must demonstrate validity using more than one method.'" Hearn v. City of Jackson, 340 F. Supp. 2d 728, 736 (S.D. Miss. 2003), aff'd, 110 Fed. Appx. 424 (5th Cir. 2004), quoting Williams v. Ford Motor Co., 187 F. 3d 533, 544-545 (6th Cir. 1999), citing 29 C.F.R. §1607.5(A) ("For the purpose of satisfying these guidelines, users may rely upon criteria-related studies, content validity studies, or construct validity studies."). Indeed, the court in Hearn v. City of Jackson, supra, noted that experts agreed "that content validation alone was adequate" to validate an examinations. 340 F. Supp. 2d at 737.

Even Plaintiffs expert, Dr. Joel Wiesen, Ph.D., acknowledged that he was unaware of criterion-related validity (which he described as "the gold standard" of validity) ever being used at the police supervisory level. (Trial Transcript, Day 3, 7/13/10, at 111, lines 12-25, at 112, lines 1-18). Even though Dr. Wiesen was HRD's Chief of Test Development and Validation between 1977 and 1993, see Bradley v. City of Lynn, 443 F. Supp. 2d 145, 149-150 (D. Mass. 2006), he never attempted during that period to conduct a criterion-related study for police supervisory positions. (Trial Transcript, Day 3, 7/13/10, at 112, lines 23-25, at 113, line 1; see

also Trial Transcript, Day 2, 7/13/10, at 23, lines 13-19, at 24, lines 4-25, at 25, lines 1-7; Trial Transcript, Day 3, 7/14/10, at 88, lines 14-25, at 89, lines 3-14).

The Uniform Guidelines on Employee Selection Procedures set forth standards for content validity, see 29 CFR § 1607.14(c)(1) - (9), and based on these guidelines, the courts have explained that the following is required for content validation: "At minimum, to demonstrate content validity an employer must show that its testing procedures accurately test important skills at a level commensurate with that legitimately required by the job." Legault v. aRusso, 842 F. Supp. 1479, 1488 (D. N.H. 1994). "This type of demonstration necessarily begins with a thorough job analysis in which the employer breaks down the job into its component tasks, breaks those tasks down into a set of component skills, and then determines the relative importance of those skills and the degree of performing required in each. The employer must then demonstrate that its procedures accurately and reasonably test the skills identified in the job analysis in accordance with their relative importance." Id. (citation omitted).

The record evidence establishes that the sergeant promotional exams administered by HRD for BPD officers in 2005 and 2008 met these standards. As discussed, HRD conducted a comprehensive job analysis for the sergeant position in 1991, identifying the requisite knowledge, skills and abilities for the position. Further, HRD linked these KSAs to the two components of the exam (written test, Education & Experience), and ensured that the test plan addressed a representative sample of the KSAs identified. (See Proposed Findings of Facts, pars. 28-51).[7]  Following HRD's 1991 job analysis and validation report, Boston retained the consulting firm of MMI to conduct a further job analysis for sergeants, and to prepare a

---

[7]As discussed above at Proposed Findings of Fact, par. 23, the Uniform Guidelines require only that a selection procedure measure for a representative sample of the KSAs required to perform the position.

promotional exam, administered in 2002.  In preparation for that exam, MMI analyzed the sergeant position, and identified numerous KSAs for the position.  In preparing the sergeant promotional exam administered in Boston in 2005 and 2008, HRD utilized SMEs to ensure that the prior job analyses were up to date, and to ensure that the test plan and test questions measured a representative sample of KSAs.  (See id., pars. 76-89, 100-108, 111-117).

Likewise, the E&E component of the 2005 and 2008 selection procedures, which is required by state statute, and which predated the 1991 validation study, was validated as part of the 1991 process.  At that time, SMEs reviewed and updated the component parts of the E&E.  Moreover, specific KSAs were linked (in a "Testability Analysis") to the E&E as identified in the analysis.  (See Proposed Findings of Facts, pars. 37-40, 43-44, 123-125).

While Plaintiffs are expected to make a number of challenges to the validity of the 2005 and 2008 exams, none of these challenges withstand scrutiny.  At the outset, it must be recalled that one of Plaintiffs' experts, Dr. Joel Wiesen, has essentially vouched for the exams' validity.  Dr. Wiesen, who was employed by HRD while the study was being prepared, and conceded that he was consulted about various aspects thereof,[8] testified that the 1991 validation "study was fairly comprehensive."  (Trial Transcript, Day 3, 7/14/10, at 78, line 24; see also id. at 79, line 7, testifying in regard to the MMI study that "[a]gain, I think it covered many topics.").  Dr. Wiesen further testified, in regard to the KSAPs identified as part of the job analysis included in the 1991 Validation Study, that "[t]here was nothing just glaring on the page that could be -- just couldn't possibly be true" (Trial Transcript, 7/15/10, Day 4, at 84, lines 2-6), and that the KSAs "were all meant to be clear and be important."  (Id. at 84, lines 11-12).  Thus, whatever faults with the

---

[8]See Trial Testimony, Day 5, 7/16/10, at 32, lines 9-25, at 33, lines 1-25, at 34, lines 1-17, at 35, lines 4-8, 15-25, at 36, lines 1-8, at 38, lines 15-25, at 39, lines 1-12, 18-25, at 40, line 1, at 41, lines 23-25, at 42, lines 1-6, at 46, lines 15-25, at 47, line 1.

exams that Plaintiffs may point to, their criticisms are undermined by Dr. Wiesen's endorsement of the central portion of the exams at issue, i.e., the underlying job analysis.

**b**.      **The Validity Studies Are Not Subject To Attack Based On Their Age**.

Plaintiffs may attack the 1991 Validation Study, including its Job Analysis, as being "too old," and thus unreliable.  Plaintiffs' argument overlooks the 2000 job analysis by MMI, and the testimony of Dr. Wiesen, noted above, that the 2000 analysis was "fairly complete."  One of the experts for Defendants, Dr. Outtz, testified that it is normal practice for a job analysis to build on an earlier job analysis for the same position.  (See Proposed Findings of Fact, par. 26).

Hearn v. City of Jackson, 340 F. Supp. 2d 728 (S.D. Miss. 2003) is highly instructive on these issues.  There the court found that "there is no requirement in the industry or in the law that a new job analysis be prepared for each successive selection procedure, and an earlier developed job analysis may appropriately be used so long as it is established that the job analysis remains relevant and accurate."  Hearn, 340 F. Supp. 2d at 738.  The court accepted expert testimony that "the essential duties and responsibilities [of the police sergeant position] tend to have remained the same [over a thirty year period].  And according to [the City's expert] conventional wisdom places the shelf-life of a job analysis for the sergeant position at 'five plus years,' and up to ten years or more."  Hearn, 340 F. Supp. 2d at 738 n. 10.  Similarly, based on the record evidence discussed above, the Job Analysis for sergeant for the 1991 study, as updated by the MMI study, remained valid through the administration of the 2005 and 2008 sergeant promotional exams.

**c**.      **The Absence Of An Assessment Center Component In The 2005 and 2008 Exams Does Not Invalidate Those Exams**.

Boston anticipates that Plaintiffs will argue that the 2005 and 2008 exams are invalid because they did not include an oral or assessment center component, whereas the 2002 exam developed by MMI included such a component.  Plaintiffs' anticipated argument is undermined

by the testimony of their own expert, Dr. Wiesen, as to whether a written exam could be used as a valid selection instrument in the absence of a more subjective assessment center component. On February 17, 2006, Dr. Wiesen testified in a claim brought against the BPD before the Massachusetts Civil Service Commission by the Boston Police Superior Officers Federation, in which the Union challenged the weights assigned to the assessment center component of the 2002 Boston exam. In response to a question seeking his "opinion as to whether a straight written exam without an assessment center or any more subjective component, would be an appropriate way for testing for police supervisory personnel" (see Trial Transcript, Day 3, 7/14/10, at 123, lines 9-12), Dr. Wiesen testified as follows:

> Well, the multiple choice test again, can cover a wide range of topics and can be done well or less well, and the literature shows that job knowledge are, if not the most valid test, very close to the most valid predictors of future job performance. So, I think that the answer to your question is, yes, I think that multiple choice examinations can be used by themselves to develop a roster of people for promotion.

(Trial Transcript, Day 3, 7/14/10, at 123, lines 13-20) (emphasis added). Dr. Wiesen further testified in that proceeding that a written test is "either the best or one of the best predictors of future job performance." (Id. at 123, lines 25, at 124, line 1).

On cross-examination in this proceeding, Dr. Wiesen testified that he "still think[s] that the multiple-choice is a good predictor" of future job performance, and indeed is "one of the best" predictors, along with assessment centers. (Trial Transcript, Day 3, 7/14/10, at 126, lines 2-7). When asked to explain the striking contradiction between his trial testimony and his testimony in 2006 regarding the 2002 promotional exam in Boston, Dr. Wiesen could only offer that "my thinking with respect to sergeant promotional exams perhaps has been evolving over the years." (Id. at 128, lines 11-13). However, Dr. Wiesen offered no other explanation as to

why his testimony at trial in 2010 had evolved so drastically from his opinion in 2006, which, significantly, was offered <u>after</u> the administration of the allegedly unlawful Boston 2005 promotional exam. Thus, even if Dr. Wiesen had been advising Boston in advance of the 2005 examination, he would have told them that use of a written examination, without an assessment center component, could be valid.

      **d**.     <u>**Lack of Validation Of The Passing Point Or Rank Ordering Of Candidates Is Irrelevant On Several Grounds**</u>.

Plaintiffs may further argue that the Boston tests are not valid because neither the passing point nor the use of the results from the examinations as a rank ordering device was validated. As to the first issue, the passing point is irrelevant. As Dr. Outtz testified, Boston and other municipalities seldom, if ever, reach candidates at or about the passing score for the written exam, due to the low selection ratio, and the comparatively few number of vacancies. (Trial Testimony, Day 16, 9/15/10, at 157, lines 4-23). For Boston, the situation is particularly stark, where only about 70 out of 600 candidates are promoted, and applicants with scores below the mid-80s are not reached for promotion. (<u>See</u> Trial Exhibits 6, 80). Thus, there is no justification for invalidating the Boston exams on this ground.

As to whether the exams are valid when used as a strict ranking ordering device, this principle likewise has no application to the present situation. As Dr. Outtz testified, a critical aspect of this issue is the "reliability coefficient" for the Boston and statewide exams. "Reliability" refers to the extent to which exam scores may vary by chance (Trial Transcript, Day 16, 9/15/10, at 10, lines 21-23), or, put differently, the degree to which it can be expected that a candidate will receive the same score if tested again using a similar test. (<u>See</u> Trial Transcript, Day 3, 7/14/10, at 64, lines 9-12). The "reliability coefficient" measures, on a scale from zero to one, the extent to which a candidate would receive the same score upon retesting.

(Trial Transcript, Day 16, 9/15/10, at 12, lines 4-6; Trial Transcript, Day 3, 7/14/10, at 64, lines 14-16, at 65, lines 11-12). Dr. Outtz explained that the reliability coefficient for the exams at issue in this action (Boston and statewide) is .8 or higher. (Trial Transcript, Day 16, 9/15/10, at 9, lines 9-16). This "relatively high" value means that "there's going to be a relatively narrow range in which my score is going to vary." (Id. at 12, lines 16-18). In light of the high reliability coefficient for the exams at issue, the use of the 2005 and 2008 sergeants' promotion exam for Boston as a strict ranking ordering device should not be questioned.

In response, Plaintiffs may attempt to argue that Boston should have banded the results of the 2005 and 2008 examinations as one means to overcome disparate impact. Such argument should be summarily rejected, as it is inconsistent with existing state law (which requires strict rank order and disfavors bypassing candidates), is unavailable as an after the fact remedy for disparate impact (as the Massachusetts Superior Court held, in regard to the 2008 exam; see Pratt v. Dietl, SUCV No. 2009-01254, Memorandum of Decision and Order on the Plaintiffs' Motion for Preliminary Injunction, at 2, Exhibit A hereto), and because even if the use of banding was proposed for future exams, race based selections from a band of candidates violates Title VII and Mass. General Laws Chapter 151B.

As discussed above (see Proposed Findings of Fact, par. 10), Massachusetts law requires that candidates be certified for selection in strict rank order, as determined by the exam scores. When a municipality looks to promote, it receives a requisition from HRD of candidates under the "2n+1" formula. This, if one promotion is to be made, a list of three candidates is certified (two multiplied by one, plus one). If two candidates are to be promoted, a list of five candidates is certified, and so on. (See id., par. 12). Banding is a method by which a mathematical formula (the reliability coefficient), rather than a statutory formula, is used to group scores upon which

selection decisions are based.  (Trial Transcript, Day 3, 7/14/10, at 64, lines 18-25, at 65, lines 1-22).

In <u>Pratt v. Dietl</u>, the Superior Court squarely rejected the efforts of HRD to use banding after the administration and scoring of the 2008 statewide and Boston promotional exams for police sergeants, lieutenants and captains.   On Plaintiff-officers' motion for preliminary injunction seeking to forbid banding, the Superior Court found (1) that Plaintiffs had a reasonable likelihood of success, due to the "significant change in the manner of scoring and establishing the eligibility lists" brought about by banding, and the effect that banding would have on "the bypass and appeal procedure established by the statute and the regulations enacted pursuant thereto."  (<u>Pratt v. Dietl</u>, at 8-10).  The Court held that these significant changes to the scoring and eligibility lists should have been brought about by the rule-making procedures established in Mass. General Laws Chapter 31, §4.  (<u>See id</u> at 9-10).  For these reasons, the court enjoined HRD "from issuing eligibility lists for the promotion of police officers in score bands rather than in the manner in which it has been doing so until a final resolution of this matter on the merits."  (<u>Id</u> at 11).

Approval of a new rule, moreover, is by no means a foregone conclusion under the statute.  Chapter 31, section 4 requires that, before the eligibility rules can be amended, a public hearing must be held before a rule change, and notice of the proposed rule and hearing must be sent "to each member of the general court, to the mayor or city manager of each city and the selectmen of each town, to which such rule or change relates," in addition to newspaper notices, and notices throughout the affected cities and towns.  The proposed rule can also be rejected by a majority vote of the Civil Service Commission.  <u>See id</u>.

However the issue may be addressed in the future, state law stands in the way of implementing banding.  HRD has not issued a new rule in compliance with Chapter 31, Section 4.  Until it does so, no municipality, on its own initiative, may use banding to group scores and select candidates.

In addition to the barriers created by state law, federal anti-discrimination law also prohibits the use of banding, at least after the administration and scoring of exams, and especially if used as a race based correction.  In <u>Ricci v. DeStefano</u>, 129 S. Ct. 2658 (2009), the U.S. Supreme Court considered whether a municipality violated the prohibition against intentional discrimination in Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, <u>et</u> <u>seq</u>., by discarding the results of a firefighter's promotional exam which had a <u>prima facie</u> case of disparate impact on minorities.  In finding that the municipality lacked "a strong basis in evidence" for discarding the exam results, the U.S. Supreme Court considered whether Title VII prohibited the municipality from banding scores.  The Supreme Court held that "banding was not a valid alternative" under Title VII, because "[h]ad the City reviewed the exam results and then adopted banding, to make the minority test scores appear higher, it would have violated Title VII's prohibition of adjusting test results on the basis of race." <u>Ricci v. DeStefano</u>, 129 S. Ct. at 2680, citing 42 U.S.C. §2000e-2(1).[9]  The Supreme Court concluded: "As a matter of law, banding was not an alternative available to the City when it was considering whether to certify the examination results." <u>Ricci</u>, 129 S. Ct. at 2680.

---

[9]Section 2000(e)-2(1) of Title VII provides:

It shall be an unlawful employment practice for a respondent, in connection with the selection or referral of applicants or candidates for employment or promotion, to adjust the scores of, use different cutoff scores for, or otherwise alter the results of, employment related tests on the basis of race, color, religion, sex, or national origin.

The Supreme Court's discussion of banding in <u>Ricci</u> is controlling in this action.  HRD tried to implement banding after announcement of the 2008 exam results, but an injunction stopped the practice from going forward.  Even if Boston had the legal authority to do so, adopting banding would have made the City vulnerable to a legal challenge from non-minority officers (such as the plaintiffs in <u>Ricci</u>), on the theory that banding was a proxy for race-based decision-making.  Moreover, Plaintiffs' insistence in this action on banding makes plain its purpose, namely to increase minority promotions, in violation of Title VII. <u>See</u> <u>Chicago Firefighters Local 2 v. Chicago</u>, 249 F. 3d 649, 656 (7th Cir. 2001) ("We have no doubt that if banding were adopted in order to make lower black scores seem higher, it would indeed be ... forbidden"), cited in <u>Ricci</u>, 129 S. Ct. at 2680.

The race-based purpose of banding was confirmed by testimony in this action.  Plaintiffs' expert witness, Dr. Cassi Fields,[10] testified to a 2008 article by Ployhart and Holtz which set forth "a list of recommendations for what an organization might do to minimize adverse impact and to maintain validity."  (Trial Transcript, Day 6, 7/20/10, at 107, lines 12-25).  Dr. Fields testified that she agreed with the recommendations of Ployhart and Holtz.  (<u>Id</u>. at 108, lines 1-2).  One of the article's recommendations, as read into the record by Dr. Fields "is consider banding.  We emphasize the word 'consider' because this remains a controversial strategy among IO psychiatrists and will substantially reduce subgroup differences <u>only where there is explicit racioethnic minority or female preferences in final hiring decisions</u>."  (<u>Id</u>. at 110, line 25, at 111, lines 1-4) (emphasis added).

---

[10]It should be noted that Dr. Fields based her conclusions on an extremely limited review of the record in this action.  As Dr. Fields acknowledged on cross-examination, when she prepared her expert report, she had reviewed only the other expert reports in the case, and the attachments thereto, but none of the data and documents reviewed by other experts.  (Trial Transcript, Day 6, 7/20/10, at 137, lines 16-25, at 138, lines 1-13).

**e.    The Level Of Variance Of The E & E Has No Bearing On Validity**.

Another of Plaintiffs' expected attacks on the validity of the 2005 and 2008 promotional exams for Boston is that the E&E component has little variance, and thus makes little difference in how candidates are ranked and selected for promotion.[11]  This critique has no bearing on the validity of the exams.  Dr. Wiesen himself testified that this criticism went only to the issue of variance, i.e., the spread in scoring attributable to the E&E, and not to the validity of the component.  (See Trial Transcript, Day 2, 7/13/10, at 34, lines 13-25, at 35, lines 1-25, at 36, lines 1-8).    As Dr. Outtz explained, the level of variance attributable to a particular component of a selection device "doesn't affect the validity question of how many KSAs in the content domain" are being measured.  (See Trial Transcript, Day 14, 9/13/10, at 51, lines 5-25, at 52, lines 1-13).

**f.    No Deficiency In HRD Expertise Was Established At Trial**.

Plaintiffs may also contend, in one form or another, that HRD lacked expertise in test development and related issues.  Specifically, Dr. Wiesen was critical of alleged deposition testimony of HRD witnesses.  (See, e.g., Trial Testimony, Day 3, 7/14/10, at 42, lines 10-25, at 43, lines 1-3). While Boston does not accept the validity of this argument, there is no basis for this Court to consider it, because there is no evidence in the record to support Plaintiffs' position. No witnesses from HRD testified at trial.  In the absence of testimony from HRD witnesses, Dr. Wiesen's opinion on the quality of the work of his former employer should not be given any weight by this Court.  See Steinhilber v. McCarthy, 26 F. Supp. 2d 265, 286 (D. Mass. 1998)

---

[11]Plaintiffs' criticism has no basis.  Even if, as Plaintiffs contend, the scores on the E&E ranged from between 14 and 20, such differential can affect the ranking of a candidate.  (See Trial Transcript, Day 8, 7/22/10, at 117, lines 13-25, at 118, lines 1-25, at 119, lines 1-15, at 121, lines 4-7, at 122, lines 15-25, at 123, lines 1-25, at 124, lines 1-16).

("When the factual underpinnings of an expert's opinion is weak, it is a matter affecting the weight and credibility of the testimony -- a question to be resolved by the [fact finder].").

      **g.**    **Use Of "Difficult Words" Does Not Invalidate The Exams**.

Without distinguishing among the six (6) exams at issue in this proceeding (2005-2008 state-wide exams, 2005 and 2008 Boston exams), Dr. Wiesen testified that some of the exams contained "unnecessarily difficult words," citing as examples of difficult words, "homogenous, adhere, unequivocal and apportioned." (See Trial Testimony, Day 3, 7/14/10, at 86, lines 4-9). Dr. Wiesen's testimony did not provide any basis for distinguishing between easy and difficult words, much less those words that are difficult as opposed to "unnecessarily difficult." In any event, a review of Boston exams at issue shows only one occasion of an "unnecessarily difficult" word (adherence) on each of the 2005 and 2008 exams (See Trial Exhibits 45, 49, Question No. 30 to both exams). Moreover, there is no record evidence that African-American candidates fared disproportionately poorly on these questions as opposed to white candidates. In short, Dr. Wiesen's testimony on this score is based wholly on speculation, and should be rejected. (Cf. Trial Testimony, Day 15, 9/14/10, at 27, lines 16-18, where Dr. Outtz criticized "armchair observation of the items saying, 'well, this item sort of looks like it might create a problem…'").

      **h.**    **Failure To Use "Open Book" Examinations Does Not Invalidate The Exams**.

Plaintiffs' experts further extolled the use of open book exams as techniques that could either have reduced the adverse impact of the exams, and/or increased their validity. However, Plaintiffs' experts failed to establish that open book exams would have increased the validity of the exams at issue, or that they were a feasible testing alternative that would have reduced adverse impact. Dr. Outtz testified that he was unaware of any research suggesting that use of an open book exam for a public sector position would have a positive effect on reducing adverse

impact.  (Trial Testimony, Day 15, 9/14/10, at 27, lines 20-25, at 28, lines 1-5, 19-23), and

Plaintiffs cited to no such research.  To the contrary, Dr. Outtz testified that "[o]pen book exams

can be far more difficult than closed book exams because they require greater management" of

time.  (Id. at 28, lines 5-10).  A candidate has "to be much more test wise in terms of not wasting

time looking up answers that you ought to know already.  All those kinds of things favor

someone who is really accustomed to taking exams and is really a sharp exam taker.  And that

tends to work against individuals who are less familiar with taking exams and less familiar with

the educational settings in which exams are given."  (Id. at 28, lines 8-10, 14-18; see also Trial

Testimony, Day 18, 9/17/10, at 65, lines 7-8 (testimony of Defendants' expert Jacinto Silva,

Ph.D., that "open-book tests may create greater adverse impact for minorities.")).

Even if Plaintiffs' arguments were recast as suggesting that open book examinations

would have been easier for test takers, nothing in that argument suggests that open book

examinations would have leveled the playing field for candidates of color.  In any event, several

questions on the 2005 and 2008 exams provided candidates with the text of rules, then asked

candidates to apply the principles contained therein in answering questions.   (See Trial Exhibit

49, Question Nos. 7, 37-40 (2005 exam); Trial Exhibit 45, Question Nos. 63-68 (2008 exam)).

Thus, to the extent the Plaintiffs argue that providing "open book" exams would have any

beneficial impact on the test takers, the Boston exams did so, at least in part.

      **i**.      **Lack Of "Cultural Bias" Review Is Irrelevant**.

Another criticism expected to be offered by Plaintiffs is that HRD did not conduct a

cultural bias review prior to administering the 2005 promotional exam.  However, Dr. Outtz

characterized cultural bias reviews of test questions as being "in a word, useless," and

"show[ing] no relationship to the degree of adverse impact you're going to have, period."  (Trial

Transcript, Day 14, 9/13/10, at 130, lines 13-25, at 131, lines 1-5).  Plaintiffs offered no contrary evidence on this issue.

**3**.    **Plaintiffs Have Not Met Their Burden Of Establishing The Existence Of Alternative Selection Procedures With Lesser Adverse Impact That Boston Should Have Adopted**.

As discussed, once validity is established, plaintiffs may prevail only if they can show that an equally valid, less discriminatory method for selection was available, and that defendants failed to use it.  <u>Ricci</u>, 129 S. Ct. at 2672-2673, citing 42 U.S.C. §2000e-2(k)(1)(A)(ii).  "[T]he statutory scheme requires plaintiffs to demonstrate a viable alternative and give the employer an opportunity to adopt it."  <u>Adams v. City of Chicago</u>, 469 F. 3d 609, 613 (7th Cir. 2006), <u>cert. denied</u>, 550 U.S. 919 (2007) (citations omitted).  Plaintiffs must further "demonstrate that [the employer] 'refuse[d] to adopt such alternative employment practice.'"  <u>Id</u>. (citations omitted).  In other words, Plaintiffs "were required to specify an alternative, prove that the alternative was equally valid and prove that the alternative was less discriminatory."  <u>Allen v. City of Chicago</u>, 351 F. 3d 306, 316 (7th Cir. 2003).  In addition, plaintiffs are "required to come forward with evidence to show a correlation between their alternative procedure and job performance."  <u>Id</u>. at 314, citing 42 U.S.C. §2000e-2(k)(1)(A)(ii) and <u>Albemarle</u>, 422 U.S. at 425.  "Bare assertion" about alternatives does not suffice to meet plaintiffs' burden.  <u>Allen v. City of Chicago</u>, 351 F. 3d 306, at 316.  <u>Accord</u>, <u>Clady v. Los Angeles County</u>, 770 F. 2d 1421, 1433 (9th Cir. 1985), <u>cert</u>. <u>denied</u>, 475 U.S. 1109 (1986) (upholding District Court's finding that plaintiffs' "unspecified" alternative procedures did not meet employer's needs).  Likewise, "just suggesting an alternative practice is insufficient to meet the plaintiff's burden: the alternative practice 'must be equally effective as [the employer's chosen practice] in achieving [its] legitimate employment goals.'"  <u>Nash v. Consolidated City of Jacksonville, Duval County, Fla.</u>, 895 F. Supp. 1536, 1553

(M.D. Fla. 1995), aff'd, Nash v. Consolidated City of Jacksonville, 85 F. 3d 643 (11th Cir. 1996), quoting MacPherson v. University of Montevallo, 922 F. 2d 766, 771 (11th Cir. 1996). "Plaintiffs do not satisfy their burden merely by attacking the selection devices of the City…[T]he duty is on the Plaintiffs to identify alternatives and to show that said alternatives are equally effective in achieving the employer's legitimate business interests…If Plaintiffs fail to carry their burden, the City need not offer rebuttal evidence [to the proposed alternatives]." Sanchez v. City of Santa Ana, 928 F. Supp. 1494, 1511 & n. 20 (C.D. Cal. 1995).

In deciding which selection procedure to use, "[a]n employer is not required to choose the selection device with the least adverse impact on minority applicants." Clady v. County of Los Angeles, 770 F. 2d at 1432. "That requirement would prohibit any exam with any disparate racial impact because random selection would always be a procedure with less adverse impact." Guardians Association of the New York City Police Department, Inc. v. Civil Service Commission of the City of New York, 630 F. 2d 79, 110 (2nd Cir. 1980), cert. denied, 452 U.S. 940 (1981). Indeed, an employer is "justified in making a prudential judgment based on its prior experience" with alternate procedures. Allen v. City of Chicago, 351 F. 3d at 314. "If a user has made a reasonable effort to become aware of such alternative procedures and validity has been demonstrated in accord with these guidelines, the use of the test or other selection procedure may continue until such time as it should reasonably be reviewed for its currency." Id. at n. 10, quoting Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. §1607.3(B) (emphasis added). Finally, "factors such as cost or other burdens of proposed alternative selection devices are relevant in determining whether they would be equally as effective as the challenged practice in serving the employer's legitimate business goals." Watson v. Forth Worth Bank and Trust, 487 U.S. 977, 998 (1988) (emphasis added). Accord, Nash, 895 F. Supp. at

1552 (plaintiffs must establish existence of "an alternative selection device which has equal validity and less adverse impact <u>and does not have a burden upon the City in terms of greatly increased costs</u>" (emphasis added).

  a. <u>**Plaintiffs Have Failed To Identify An Alternative Selection Procedure Which Would Have Reduced Adverse Impact In Boston**</u>.

  Plaintiffs have fallen far short of introducing evidence which meets the governing standards described above.  While Plaintiffs' experts identified different means of conducting promotional exams, these experts stopped far short of testifying that Boston should have utilized a selection procedure used in another jurisdiction which would have resulted in reduced adverse impact.  In fact, no such procedure or jurisdiction was identified.  At best, Plaintiffs' experts testified to the potential for assessment center exercises to reduce adverse impact, and nothing more.  Thus, Dr. Fields testified that the "literature" shows that "[t]he adverse impact of assessment centers is lower than -- <u>generally lower than</u> that of job-knowledge tests."  (Trial Transcript, Day 6, 7/20/10, at 65, lines 17-23) (emphasis added).  Dr. Fields added that in her experience, "if constructed well, an assessment center can have very, very low adverse impact." (<u>Id</u>. at 65, lines 24-25, at 66, lines 1-9).  Vague references to "literature" and "well-constructed" exams are a far cry from evidence of a specific alternative with less adverse impact, and which would not have imposed additional costs.  When pressed to offer alternative selection procedures that Boston allegedly could have adopted prior to administering the 2005 and 2008 exams, Plaintiffs'  avoided discussion of specific selection procedures.  As discussed, the governing law does not allow for Plaintiffs to rest on generalities, and requires dismissal of Plaintiffs' claims of disparate impact.

  Plaintiffs also fail to take account of the context in which Boston and other defendants operate.  As. Dr. Outtz testified, the practical realities, or context, with which a public employer

must contend are an important factor in determining whether an alternative selection procedure is feasible.  (See Proposed Findings of Fact, par. 20).  As a Civil Service community, Boston must comply with the detailed Civil Service rules governing promotion practices.  (See id., par. 1). The Civil Service rules include the requirement of "competitive examinations" before promotion; the inclusion of education and experience as part of the selection criteria; certifying candidates in order on the basis of their examination results; consideration only of candidates within the "2n+1" grouping, with "n" being the number of promotions to be made; the ability of candidates who are bypassed for promotion to challenge the bypass decision before the Civil Service Commission; and preference for groups such as veterans.  (See id., pars. 2-18).

In addition to these and other Civil Service requirements, the BPD also operates under a collective bargaining agreement with the Boston Police Patrolmen's Association.  The employees covered by this agreement are those who seek promotion to sergeant.  Under this agreement, officer evaluations cannot be taken into account in promotion decisions.  (See Proposed Findings of Fact, par. 129).  This agreement was a critical factor in the litigation in 2002 that led then BPD Commissioner Evans to withdraw the Performance Review System from the 2002 selection procedures for sergeants.  (See id., par. 90).  This provision will also limit the BPD in any further selection procedures that it may employ.

In light of this contract provision, Civil Service rules, and the state court decision on banding, discussed supra, Boston is severely restricted in the types of alterative selection procedures that it could adopt.  Plaintiffs, who have the burden of identifying such a procedure that Boston refused to adopt, has completely failed to take account of the restrictions on Boston, and to explain what procedure Boston should have followed, despite these restrictions.

Nor can Plaintiffs seriously contend that Boston should have engaged in an endless search for alternative selection procedures.   The governing principles are set forth in the Uniform Employee Selection Guidelines, Interpretation and Clarification (Questions and Answers).   Plaintiffs would have Boston endlessly experimenting with alternative procedures, at virtually limitless cost, despite the absence of any evidence that alternatives would have any reduction on adverse impact.   Question and answer 49 to the Guidelines starkly poses the question:

> **49**. Q. Do the Guidelines call for a user continually to investigate suitable alternative selection procedures and suitable alternative methods of using the selection procedure which have as little adverse impact as possible?
>
> A.  No. There is no requirement for continual investigation.  A reasonable investigation of alternatives is called for by the Guidelines as a part of any validity study.   Once the study is complete and validity has been found, however, there is generally no obligation to conduct further investigations, until such time as a new study is called for.  See, Sections 3B and 5K.  If a government agency, complainant, civil rights organization or other person having a legitimate interest shows such a user an alternative procedure with less adverse impact and with substantial evidence of validity for the same job in similar circumstances, the user is obliged to investigate only the particular procedure which has been presented.  Section 3B.  (emphasis added)

Thus, under the explicit terms of the Guidelines, Boston had met its duty to investigate as part of the 1991 and 2000 validation studies.

Likewise, Question and Answer 52 make clear that "[w]ith respect to consideration of alternative selection procedures, if the user made a reasonable effort to become aware of alternative procedures, has considered them and investigated those which appear suitable as a part of the validity study, and has shown validity for a procedure, the user has complied with the Uniform Guidelines.  The burden is then on the person challenging the procedure to show that

there is another procedure with better or substantially equal validity which would accomplish the same legitimate business purposes with less adverse impact." (emphasis added).  In this action, there is no evidence that any "government agency, complainant, civil rights organization or other person having a legitimate interest" ever presented Boston with an alternative procedure with less adverse impact.  Nor have Plaintiffs shown that any available alternative that Boston could have utilized would have "less adverse impact."  Generalities and testimonials about assessment centers are no substitute for the proof required for Plaintiffs to prevail.  See discussion supra at 52-54.

       **b**.    **The Record Reflects That Boston Has Continually Searched For Alternative Selection Procedures**.

Even though Boston has met its obligations under the Uniform Guidelines with respect to searching for alternatives, the record evidence shows that the BPD has gone above and beyond its obligations in this area.  As discussed in detail (see Proposed Findings of Facts, pars. 52-96), the BPD has used alternative selection devices as far back as 1987, and as recently as 2002.  In each instance, the BPD has been met with legal challenges from officers and their representatives.  In each instance, moreover, the BPD has failed to improve upon the minority promotion levels resulting from the HRD created exams.  Most notable is the 2002 selection procedure, which cost Boston $1.2 million, and resulted in one more minority promotion that resulted from employing the 2005 HRD procedures.  There is no basis, then, for concluding that the BPD has fallen short in searching for alternative procedures.

       **c**.    **Plaintiffs' Proffered "Fix" Did Not Withstand Scrutiny**.

Despite their proclivity to generalize about alternative procedures, Plaintiffs did offer one specific alternative at trial.  Dr. Fields testified as follows in regard to the 2002 Boston exam:

Q.  Now, you were asked some questions about whether there were cost effective or cheaper ways of changing the 2002 examination that could have resulted in less adverse impact.  Was there a method that could have been used in 2002 that would have cost hardly anything that could have even more greatly improved the adverse impact from what it was?

A.  Yes

Q.  And what was that?

A.  Assuming that the job analysis was carefully looked at, if it was justified and the weights could be altered,  <u>all that it would take would be to alter the weights and make the oral component a higher weight than it was and that would surely minimize group differences and reduce adverse impact.</u>

(Trial Transcript, Day 8, 7/22/10, at 100, lines 21-25, at 101, lines 1-9) (emphasis added)).  Dr. Fields added that "[b]ased on the 2002 data alone we knew if we increase the weight of the oral component in that particular exam, we can reduce group differences."  (Trial Testimony, Day 6, 7/20/10, at 118, lines 15-17).

Despite the fact that the raw examination data was provided in the report of Defendants' expert Jacinto Silva, Ph.D[12] dated February 2009, Dr. Fields apparently testified about this method that would "cost hardly anything" and would "greatly improve[]" adverse impact, without first testing her hypothesis to see if her assertions were borne out.  Dr. Silva did test her hypothesis, and testified that he conducted the analysis recommended by Dr. Fields.  Based on his review, the re-weighting of the exam components had no effect on adverse impact.

Dr. Fields in her testimony, indicated that she would have lowered the written test to 20 percent and increased the weight on the assessment center to 60 percent and that that alone would have reduced the adverse impact in very cheap and -- it would surely do

---

[12]Dr. Silva holds a Ph.D. in Industrial Organizational Psychology (Trial Transcript, Day 17, 9/16/10, at 7, lines 21-25, at 8, lines 1-3), is a former employee of the Army Research Institute (<u>id</u>. at 6, lines 7-25, at 7, lines 1-2), and has worked for over 20 years in selection procedures, focusing on statistical and other issues.  (<u>Id</u>. at 10, lines 7-8).

> it, she was convinced. So I went and checked, and actually I found
> that it would have absolutely no impact on the adverse impact
> ratio. Whereas before we would have nine blacks, and whereas
> before we would have promoted two Hispanics, we would have
> now promoted three Hispanics. But the total number of minorities
> stands at 11 in both cases.
>
> So, Dr. Fields' statement to the fact that it would have surely
> changed is actually incorrect. It did not change it in any fashion.

(Trial Transcript, Day 17, 9/16/10, at 82, lines 23-25, at 83, lines 1-11). Dr. Silva prepared a

chart summarizing his analysis, showing a minority adverse impact ratio of .315 under both

scenarios. His testimony was that "the AI ratio has not changed. We do have a shift in terms of

the candidates being black or Hispanic, but in terms of the overall AI ratio that we're dealing

with this, it has not changed." (Id. at 84, lines 5-8; see Trial Exhibit 200).

Thus, Plaintiffs' only effort at identifying an alternative practice with less

discriminatory impact that Boston should have adopted fails utterly. When the very analysis

recommended by Plaintiffs' expert is conducted, it is undisputed that re-weighting the exam

components would have had no effect whatsoever on the adverse impact on minority

candidates. Plaintiffs have fallen far short of meeting their requisite burden of proof on this

issue.

Moreover, adopting Plaintiffs' proposal that Boston's future promotional exams imitate

the 2002 exam, but with greater weight assigned to the assessment center component, would

have the potential to invalidate any future selection procedure. As testified to by Dr. Outtz,

before reapportioning the weights for use in future exams, it would be necessary to conduct an

analysis to ensure that the re-weighted components are covering the requisite amount of KSAs

to justify the new weights. (Trial Testimony, Day 15, 9/14/10, at 11, lines 24-25, at 12, lines 1-

2, at 13, lines 1-8). Indeed, in Ricci, 129 S. Ct. at 2679, the U.S. Supreme Court held that

"[c]hanging the weighting formula, moreover, could well have violated Title VII's prohibition of altering test scores on the basis of race," citing 42 U.S.C. §2000e-2(l).

    **d.**    <u>**Plaintiffs Offered No Concrete Evidence Of Alternative Testing Mechanisms**</u>.

As noted, Dr. Fields, who provided virtually all of Plaintiffs' testimony on alternative testing regimes, never provided any specific testimony on the level of disparate impact in the many jurisdictions where she has designed police exams.   Dr. Fields's reticence is understandable, given that for the few jurisdictions for which evidence is available, there is no evidence that their selection procedures would provide Boston with an alternative that it was legally obliged to consider.

Dr. Fields testified that she has constructed a police sergeant promotional exam for St. Louis for about 200 candidates.  (Trial Testimony, Day 5, 7/16/10, at 30, lines 18-25, at 141, lines 13-14).  When asked whether she succeeded in reducing the level of adverse impact, Dr. Fields responded that "St. Louis was an example when the multi-component process was already in place and I think I might have improved it slightly or it's around the same."  (<u>Id</u>. at 115, lines 3-5).  On cross-examination she conceded that there was "moderate adverse impact, probably .6 or .7" based on the "d" calculation.  (Trial Testimony, Day 7, 7/21/10, at 97, lines 22-25, at 98, lines 1-2).[13]  While Dr. Fields thought adverse impact "was less than it had been in the past" (Trial Transcript, Day 8, 7/22/10, at 113, lines 17-10), she provided no specifics. She also acknowledged that it was not possible to transplant the validation of the weights used in the  St. Louis examination to a future Boston examination.  (<u>Id</u>. at 113, lines 5-9).

---

[13]As discussed above, "d" refers to "standardized mean differences."  The "d" "goes from negative to positive.  And the more highly positive the more Caucasians outperform minorities, zero mean there's no difference…"  (Trial Testimony, Day 6, 7/20/10, at 43, lines 9-14).

Another jurisdiction where Dr. Fields has designed a police sergeant promotional exam is Memphis, Tennessee. (Trial Transcript, Day 6, 7/20/10, at 30, lines 18-23). Prior to Dr. Fields working there, Memphis had a history of consent decrees and extensive litigation, including injunctions placed on all tests. (Id. at 113, lines 14-19). Dr. Fields testified that for the sergeant exam alone, her firm charged Memphis approximately $1.2 million. (Trial Testimony, Day 8, 7/21/10, at 9, lines 8-11).[14] While Dr. Fields had considerable difficulty recalling specifics of the examination procedure and related issues, she did acknowledge that up to ten points were added to a candidate's score based on seniority. (Id. at 51, lines 19-25, at 53, lines 1-5, at 57, lines 20-25). She further testified that the use of seniority was required by the applicable collective bargaining agreement, and was not linked to the examination in any way. (Trial Testimony, Day 6, 7/20/10, at 139, lines 17-25). Dr. Fields opined that the use of seniority increased the validity of the Memphis exam (id. at 136, lines 20-24), but inexplicably contended that the E&E component of the exams at issue in this action (which offer candidates credit for years in service, among other accomplishments) did not contribute to their validity (id. at 140, lines 22-24), and were not linked to the job. (Id. at 140, lines 9-11). It is difficult to reconcile Dr. Fields's assertion that a ten point bonus for years of service, awarded in the absence of any attempt to validate that credit, passes scrutiny under the Uniform Guidelines, with her contention that credit awarded (under the E&E component of the HRD exams) for achieving the same thing combined with other professional accomplishments lacks validity.

Another municipality in which Dr. Fields has done extensive work on police promotional exams is Macon, Georgia. "Macon had been under a very, very long-term consent

---

[14]For the three police ranks in Memphis (sergeants, lieutenants, colonel, major), comparable to the sergeant, lieutenant and captain ranks in Boston, Dr. Fields's firm has charged Memphis "in the neighborhood of $2 million," and maybe even higher. (Trial Testimony, Day 8, 7/21/10, at 34, lines 15-22).

decree" before Dr. Fields was retained.  (Trial Transcript, Day 6, 7/20/10, at 113, lines 3-8, 12-13).  Indeed, Macon had gone about eight (8) years without a police promotional exam.  (Trial Transcript, Day 7, 7/21/10, at 14, lines 15-21).  As a result, there were an unusual number of vacancies in the police promotional ranks.  (Id. at 15, lines 4-11).

For the sergeant promotional exam in Macon, consisting of a 50 item, open book job knowledge multiple choice test, with several assessment center exercises, "[t]he final standardized mean difference between African-Americans and Caucasian candidates was .74, with Caucasians outperforming African-Americans."  (Trial Exhibit 131, at 74, 97).  Even Dr. Fields's own Validation Report described this as "a moderate difference."  (Id. at 97).  The "d" factor for the various exam components were .52 for oral presentation, .49 for emergency incident, and 1.23 for the multiple choice test.  (Id. at 98).

Despite the significant disparate impact resulting from the selection procedures designed by Dr. Fields, Macon promoted a significant number of whites and minority candidates to sergeant based on the results of the procedures – in fact, almost every person who took the examination was promoted.  All 51 white candidates received a passing score, and 21 of 22 African-American candidates passed.  (Trial Transcript, Day 7, 7/21/10, at 58, lines 6-9).  Based on these results, as of January 1, 2006, Macon had promoted 25 of the 32 candidates in the selection pool, for a selection ratio of .81.  (Id. at 59, lines 1-13; Trial Transcript, Day 8, 7/22/10, at 94, lines 14-25, at 95, lines 1-3).  Selections were based on 1) "the combination of preferred qualifications and assignment points; 2) the promotion test score and 3) discipline…When there was no clear candidate with the most points, the highest test score, and the least disciplines, the Police Chief used his judgment to decide who is best qualified for the position."  (Trial Exhibit 131, at 123).

While Dr. Fields agreed that the weights of the exam process in Macon could not be transferred to Boston without a validation process (Trial Transcript, Day 8, 7/22/10, at 112, lines 18-25, at 113, lines 1-4), there are other, more fundamental reasons why the Macon results have no application to Boston.  Most obviously, the vacancy rate virtually exhausted the applicant pool in Macon.  It almost goes without saying that if every candidate can be promoted, there will be little adverse impact.  The selection ratio for Boston sergeant promotion for the 2005 and 2008 exams has been approximately 11% (see Proposed Findings of Fact, par. 109), compared to a staggering 81% in Macon.    As Dr. Wiesen testified, "adverse impact depends so much on how many people you appoint."  (Id. at 52, lines 11-12).  Dr. Outtz agreed with Dr. Wiesen, testifying that in seeking to project the level of adverse impact resulting from a selection instrument, "the selection ratio is a critical issue. How many vacancies do you have at any given time?"  (Trial Transcript, Day 14, 9/13/10, at 30, lines 17-19).

The discretion enjoyed by Macon to determine who is "best qualified" for promotion is also strikingly different from the situation in Boston, where state law and union contracts govern selection procedures.  This is yet another illustration of the importance of the context in which a public employer operates, as testified to by Dr. Outtz.

In addition, Plaintiffs are expected to argue, in one form or another, that Boston was obliged to use an examination in 2005 and 2008 modeled on the 2002 exam, i.e., an exam with significant weighting for an assessment center, and a very high level of disparate impact.  Plaintiffs' position is baseless.  This is not a situation where Boston retained a consulting firm such as MMI and decided, before implementing an exam, not to follow the consultant's recommendations.  Rather, Boston followed its consultant's recommendations, only to end up with significant adverse impact and consultant fees exceeding $1 million.  As Dr. Outtz

testified, "if the employer has tried to reduce adverse impact and it didn't work, then one would have to be very careful as to what you try the second time." (Trial Transcript, Day 15, 9/14/10, at 18, lines 24-25, at 19, line 1).

As discussed above, another factor affecting the availability of alternative selection procedures for an employer is cost. Even Dr. Fields agreed that cost is an important consideration for an employer to consider in deciding on an appropriate selection procedure. (See Trial Transcript, Day 6, 7/10/10, at 128, lines 11-21). It is undisputed that Boston incurred expenses exceeding $1 million in order to produce the same disappointing rate of minority promotions as occurred following the promotional exams created by HRD in 2005 and 2008. Moreover, Boston's finances in 2004/2005, and prior to the 2008 exam, did not allow for another expensive selection procedure, especially given the 2002 results. Plaintiffs have identified no selection procedure with a reduced adverse impact which Boston could have afforded.

Another important factor in assessing feasibility of alternative selection procedures is an employer's history in seeking to recruit minority employees through atypical selection procedures. Under section 4(D) of the UGESP, one of the factors relevant to assessing adverse impact is "where special recruiting or other programs cause the pool of minority candidates to be atypical of the normal pool of applicants from that group." In Clady v. County of Los Angeles, 770 F. 2d 1421, 1433 (9th Cir. 1985), the court found that the employer had no obligation to utilize proposed alternatives where the evidence showed that an applicant pool for a particular exam was atypical due to increased minority recruitment efforts, noting that greater variation in selection ratios is acceptable in an atypical applicant pool, citing 29 C.F.R. §1607.4(D).

As discussed above, for decades Boston operated under a consent decree which resulted in increased number of minorities being hired as patrol officers. As a result of the decree, Dr.

Outtz testified that "you have minorities coming in whose qualifications may not be the same as non-minorities coming in.

> So now you have a differential in terms of the kinds of things measured at least at the entry level in terms of certain abilities, and these people now are in the department and you're going to give them a structured evaluation to become a police sergeant. You're starting out with candidates who are unequal in the first place in terms of the kind of structured exercises that you're going to put in front of them. You're not going to make up for that by saying, well, let's shift the weight to this exercise or that exercise. As I said before, the exercises correlate with each other. There's no such thing as one exercise standing alone, and, really, if you shift everything to some other exercise, everything will be better in terms of the performance of these two -- these groups. So this inequality in terms of the capacity to deal with certain kinds of exercises and even in terms of the knowledge base or being able to process information, read and comprehend and so forth, is going to carry through no matter what you do at the next level. It will carry through for a long, long time."

(Trial Transcript, Day 16, 9/15/10, at 138, lines 16-25, at 139, lines 1-25, at 140, line 1). Dr. Outtz added that in light of evidence that 25% fewer minorities hold advanced degrees than whites (see Proposed Findings of Fact, par. 131), such disparity "would make it extremely difficult to change the testing system and reduce adverse impact. I will say it would be very, very difficult to do that." (Id. at 140, lines 2-23). Thus, regardless of the type of selection procedure utilized, differences inherent in the groups taking the test will become evident: "[T]here will be an advantage for someone who's more accustomed to dealing with problems in that structured situation than those who aren't. So that you can't propose shifting the problem to other exercises." (Trial Transcript, Day 16, 9/15/10, at 142, lines 11-14).

Thus, in light of the history of consent decrees and related court orders over hiring and promotion at the BPD, Boston cannot simply use an alternative selection exercise, and expect to have reduced adverse impact. As the UGESP recognizes, the use of special selection procedures

will have an ongoing impact which cannot be easily obviated. Plaintiffs have introduced no evidence on how Boston could use an alternative procedure that would address these issues.

**IV**.  **Conclusion**

For nearly 40 years, the BPD has faced an onslaught of litigation over its hiring and promotion procedures. The BPD has been challenged for deviating from using procedures different than those created by HRD, and for using the HRD-created exams. The use of procedures other than those utilized by HRD has cost the City millions of dollars in test administration and litigation expenses, without improving the rate of minority promotions.

Complicating matters even further for Boston is the U.S. Supreme Court's decision in Ricci. Under Ricci, a public employer cannot discard exam results after the fact based on a disproportionately low level of minority hires that are likely to result from the exam. Rather, as discussed above, an employer must have a "strong basis in evidence" before discarding such results. As Ricci demonstrates, that is an extremely high burden for an employer to meet. Thus, if an employer discards exam results based on significant statistical disparities between the performance of minorities and non-minorities, and there is found to be no strong basis in evidence for doing so, it faces a disparate treatment suit. But, if it uses the results with the likelihood of a low level of minority promotions, it still faces disparate impact liability. This is a precarious position for an employer indeed.

Boston is disappointed with the minority representation in its sergeant promotions based on all of the prior examinations in which it has participated. However, it cannot engage in race-based correction after those exams are administered when the exams themselves are valid, as the 2005 and 2008 exams have been demonstrated to be. Plaintiffs have not identified any

alternative procedures with lower adverse impact that Boston should have but refused to adopt. On this record, Plaintiffs cannot prevail.

Looking forward to the next round of promotion procedures, BPD Commissioner Edward Davis testified that the BPD has given notice to its unions that it intends to request HRD for a delegation agreement, for purpose of creating its own exam.  (See Trial Transcript, Day 9, 7/23/10, at 63, lines 18-25).  If the past is prologue, there will be litigation, for in any selection procedure, some group or other will perceive itself at a disadvantage, and seek to remedy the perceived imbalance.  As it moves forward to this next phase, the BPD should not be saddled with a finding of liability for using a valid exam created by HRD, for which Plaintiffs have shown no viable alternative that Boston refused to adopt.

Respectfully submitted,

CITY OF BOSTON,

By its attorneys,

WILLIAM F. SINNOTT
Corporation Counsel

/s/ Robert P. Morris
Mary Jo Harris (BBO #561484)
Robert P. Morris (BBO #546052)
Special Assistant Corporation Counsel
MORGAN, BROWN & JOY, LLP
200 State Street, 11th Floor
Boston, MA 02109-2605
(617) 523-6666

Date:  October 29, 2010

## <u>CERTIFICATE OF SERVICE</u>

I, Robert P. Morris, certify that on October 29, 2010, this document filed electronically through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to any persons indicated as non-registered participants.


/s/Robert P. Morris
Robert P. Morris