<u>UNITED STATES DISTRICT COURT</u>
<u>FOR THE DISTRICT OF MASSACHUSETTS</u>

| | |
|---|---|
| **PEDRO LOPEZ, ET AL.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No. 07-11693-GAO** |
| ) | |
| **CITY OF LAWRENCE,** ) | |
| **MASSACHUSETTS, ET AL.,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

<u>PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>
<u>ON BEHALF OF DEFENDANTS</u>
<u>CITY OF WORCESTER AND CITY MANAGER MICHAEL O'BRIEN</u>

Defendant City of Worcester and Defendant Michael O'Brien (hereinafter collectively referred to as "Worcester") hereby submit this Proposed Findings of Fact and Conclusions of Law pursuant to Fed. R.Civ.Pro. 52(a), in support of the entry of Judgment in favor of Worcester on all counts of the Complaint, on the following grounds:

1.    Plaintiff Spencer Tatum ("Plaintiff") failed to present evidence sufficient to support Plaintiff's prima facie case that Worcester's use of the 2006 and 2008 Sergeant promotional examinations (developed and administered by the Commonwealth of Massachusetts Human Resources Division ("HRD")) adversely impacted the rate of minority promotions to the position of Sergeant within the City of Worcester.

2.    Plaintiff's evidence based on an analysis of adverse impact aggregated across municipalities is insufficient to support Plaintiff's burden of proof to set forth a prima facie case of disparate impact.

3.    Worcester's use of the HRD developed and administered promotional

examinations in 2006 and 2008 is job related and a matter of business necessity.

     5.      Plaintiff has not identified any viable alternative.

     4.      Worcester cannot be held liable for following a state-wide testing regime that is mandated by M.G.L. c. 31 § 1 et seq. Pursuant to said statute, examinations were created and administered by the state for the very purpose of selecting candidates for promotion based upon merit.

## I.    <u>STATEMENT OF THE CASE</u>.

Plaintiff Spencer Tatum (hereinafter the "Plaintiff") claims the City of Worcester's use of the promotional examinations developed and administered by the Commonwealth of Massachusetts Human Resources Division ("HRD") in 2006 and 2008 have had a disparate impact on the rate of promotion of minorities (Blacks and Hispanics) within the City of Worcester; that this disparate impact is the result of flawed examinations; and that Worcester has alternatives other than the examinations developed and administered by HRD to reduce adverse impact.  [Seventh Amended Complaint at ¶¶ 73-79].

Plaintiff's Complaint contains two counts, alleged violations of Title VII of the Civil Right Act of 1964, as amended and G.L. c. 151B, the Massachusetts Fair Employment Practices Act.

## II.    <u>PROPOSED FINDINGS OF FACT</u>.

### A.  BACKGROUND FACTS.

     1.      The City of Worcester is a City within the Commonwealth of Massachusetts [Complaint at ¶¶ 55, 56].  Michael O'Brien is the City Manager for the City of Worcester, Massachusetts and is the appointing authority for the City.  [Complaint at ¶¶ 55, 56].

2.      Plaintiff Spencer Tatum (hereinafter "Plaintiff" or "Tatum") is employed as a Police Officer within the City of Worcester Police Department. [Complaint at ¶ 11]. Plaintiff is African-American. [Complaint at ¶ 11]. Plaintiff participated in examinations developed and conducted by HRD in 2006 and 2008. Massachusetts [Complaint at ¶ 68].   Plaintiff received a score of 83 on the 2006 examination; Plaintiff is the thirteenth (tied) candidate in rank order on the 2008 eligible list.  Trial Exhibit 175]. Plaintiff was not promoted to the position of Sergeant from the eligible lists created as a result of the 2006 and 2008 examinations.

3.      Worcester promoted seven Police Officers to the position of Sergeant from the eligible list created as result of the 2006 examination.  Six of the Police Officers promoted were White.  One of the Police Officers promoted was Black. [Trial Exhibit 174]

4.      Worcester has promoted a single Police Officer from the eligible list created as a result of the 2008 examination.  The one Police Officer promoted from this list is White. [Trial Exhibit 175]

5.      Although the Complaint does not allege that Worcester's use of a 2004 HRD Sergeants' examination resulted in disparate impact, through discovery, the Plaintiff sought and received from HRD the results of an examination administered in 2004. [Trial Exhibit 156].

6.      Worcester promoted fourteen (14) Police Officers to the position of Sergeant from the eligible list created as a result of the 2004 examination.  Twelve of the Police Officers promoted from the 2004 list were White; one of the Police Officers promoted from the 2004 list was Hispanic; one of the Police Officers promoted from the 2004 list was Black.  [Trial Exhibit 176].

7.      Plaintiff did not present evidence of examination results for any examinations prior to 2004; there is no evidence regarding the number of non-minority and non-minority

candidates participating in prior examinations; there is no evidence regarding the number of non-minority and minority candidates passing or failing the examination.

### B.    BASIC MERIT PRINCIPLES UNDER THE CIVIL SERVICE LAW AND RULES.

8.    Worcester is required to adhere to Massachusetts General Laws c. 31 (the "Civil Service Law") in making appointments and promotions (as well as a variety of other employment decisions) within its Police Department.  [Mass. General Laws, Chapter 31, §§51, 59].

9.    The purpose of the civil service system is "to guard against political considerations, favoritism and bias in governmental employment decisions."  *Town of Falmouth v. Civil Service Commission*, 447 Mass. 814, 824, 857 N.E. 2d 1052, 1059 (2006).

10.    Underlying the civil service system is the concept of "basic merit principles," the definition of which includes "recruiting, selecting and advancing of employees on the basis of their relative ability, knowledge and skills."  [Mass. General Laws, Chapter 31, §1].

11.    Under Chapter 31, "appointing authori[ties]" (defined in Mass. General Laws, Chapter 31, §1) must make personnel decisions free of "overtones of political control or objectives unrelated to merit standards or neutrally applied public policy."  *See Town of Falmouth v. Civil Service Commission*, 61 Mass. App. Ct. 794, 800, 814 N.E. 2d 735, 739 (2004).

12.    In cities and other civil service communities, "promotional appointments in police forces shall be made only after competitive examinations," with exceptions not applicable.  See Mass. General Laws, Chapter 31, §59.

13.     The Personnel Administrator of HRD is located within the Executive Office for Administration and Finance, and is responsible for, <u>inter alia</u>, "conduct[ing] examinations for purposes of establishing eligible lists."  *See* Mass. General Laws, Chapter 31, §5(e).

14.     HRD is required to determine the form, method and subject matter of examinations, which must fairly test the knowledge, skills and abilities which can be practically and reliably measured and which are actually required to perform the primary or dominant duties.  [G.L. c. 31,§ 16].

15.     Massachusetts General Laws Chapter 31, Section 22 provides that HRD shall determine the passing requirements of an examination.  Additionally, "[i]n any competitive examination, an applicant shall be given credit for employment or experience in the position for which the examination is held."  [Mass. General Laws, Chapter. 31, § 22].

16.     After marking and grading examinations, HRD prepares eligible lists of candidates.  (Personnel Administration Rules ("PAR.") PAR. 07).

17.     Mass. General Laws Chapter 31, Section 25, requires HRD to prepare an eligible list of candidates "in the order of their marks on the examination based upon which the list is established."  Consistent with the statute, when an appointing authority seeks to fill a position, HRD's Personnel Administrator "shall, if a suitable eligible list exists, certify the names starting highest on such list in order of their places on such list, except as otherwise provided by law or civil service rules."  (PAR. 08(1); *see* Mass. General Laws, Chapter 31, §7).

18.     "The passing mark for each examination shall be established by the administrator in accordance with generally accepted selection procedures."  (PAR. 06(3)).

19.     Mass. General Laws Chapter 31, Section 27, requires an appointing authority to appoint from among the top three candidates appearing on an eligible list who are willing to accept appointment or promotion.

20.     "When names have been certified to an appointing authority under PAR. 08 and the number of promotional appointees actually to be made is n, the appointing authority may appoint only from among the first 2n+1 persons named in the certification willing to accept appointment."  (PAR. 09(1); *see* Mass. General Laws, Chapter 31, §§7, 27).  "Thus, if a city needs to fill one sergeant slot it gets back from HRD a list of the three highest scoring candidates on the eligibility list."  *Pratt v. Dietl*, SUCV No. 2009-01254, Memorandum of Decision and Order on the Plaintiffs' Motion for Preliminary Injunction, at 2 (Exhibit A hereto).

21.     "If an appointing authority makes [a]…promotional appointment from a certification of any qualified person other than the qualified person whose names appear highest, and the person whose name is highest is willing to accept such appointment, the appointing authority shall immediately file with the [personnel] administrator a written statement of his reasons for appointing the person whose name was not highest."  (Mass. General Laws, Chapter 31, §27; *see also* PAR. 08(4), (5); PAR 09 (2)).

22.     Applicants who are bypassed, i.e., not selected despite having a higher rank than another applicant, can appeal to the Civil Service Commission, which must decide "whether the Appointing Authority has sustained its burden of proving that there was reasonable justification for the action taken by the appointing authority."  *See City of Cambridge v. Civil Service Commission*, 43 Mass. App. Ct. 300, 304, 682 N.E. 2d 923, 925, *rev. denied*, 426 Mass. 1102, (1997).

23.     With respect to promotions, an applicant is only eligible for promotion within a department in which he or she has served in the next lower title.  [M.G.L. c. 31 §§ 7-11].  Consequently, applicants for promotion to the position of Police Sergeant compete only for positions within their Departments, and do not compete for promotion across employing units.

24.     Promotional examinations administered by HRD include an education and experience component, which "shall be based on a schedule approved by the administrator which shall include credits for elements of training and experiences related to the position for which the examination is held."  (PAR 06(1)(b); Mass. General Laws Chapter 31, §22).

25.     Candidates may appeal to HRD numerous issues pertaining to an examination, including "whether an examination…was a fair test of the applicant's fitness actually to perform the primary or dominant duties of the position for which the examination was held…"  (Mass. General Laws Chapter 31, §22).

26.     Municipalities may elect to use the examination prepared annually by HRD, or may conduct their own sergeant promotional examination pursuant to a delegation agreement between HRD and the municipality.  (*See* Mass. General Laws, Chapter 31, §§9-11; Trial Exhibit Nos. 2, 151).

27.     Even in municipalities that have entered into a delegation agreement with HRD, HRD retains the right to approve the actions of the appointing authority.  [Trial Exhibits 2 and 151 (Leominster and Boston Delegation Agreements).

28.     HRD does not provide municipalities with any information regarding the development of the examination process, nor are municipalities entitled to copies of the examinations themselves.  [Testimony of Kenneth Lavallee, Trial Transcript at __].  HRD provides to the participating appointing authorities only the written scores of test-takers who are

eligible for promotion within the jurisdiction. [*Affidavit of Sally McNeely*, Trial Exhibit 205, Paragraph 12]

29.    HRD provides the participating appointing authorities only the written scores of test-takers who pass the examination. HRD does not provide an appointing authority with a list of participants or nor does it provide the appointing authority with names of persons who took but did not pass the examination. [*Affidavit of Sally McNeely*, Trial Exhibit 205, Paragraph 12]

## C.    THE FOUR-FIFTHS RULE

30.    The Four-Fifths Rule is a rule of thumb adopted by the Equal Employment Opportunity Commission for assessing adverse impact based on statistical analysis. [Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607.4(D); *Bradley v. City of Lynn*, 443 F.Supp.2d 145. 160 (D. Mass. 2006). This calculation compares the rates of hiring of minority and non-minority candidates for promotion or hire; if the resulting ratio is less than .80 (meaning the rate of hiring for minorities is less than 80% of the rate of hiring for non-minorities), such a result may indicate that the challenged employment practice has an adverse impact on minority employment and promotion opportunities. *Bradley*, supra. The rule, however, "has not provided more than a rule of thumb for the courts." *Bradley*, 443 F.Supp at 161 (citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 995 n. 3 (1988)) .

31.    Small sample sizes present challenges in determining whether observed results are due to simple chance fluctuation or real differences in the underlying population. [Testimony of Jacinto Silva, Trial Transcript at 17:14; *International Brotherhood of Teamsters v. U.S.,* 431 U.S. 324, 340, n. 20 (1977)(considerations such as small sample size may, of course, detract from the value of such evidence).

32.     In determining whether a sample size is too small to provide relevant evidence under the Four-Fifths Rule, the EEOC employs a test known as the "shift of one." [Testimony of Jacinto Silva, Trial Transcript 17:14-15; See *Questions and Answers on the Federal Executive Agency Guidelines On Employee Selection Procedures,* 44 Fed. Reg. 11,996 (1979), Question 21].

33.     When a data set is small, the *Questions and Answers on the Federal Executive Agency Guidelines On Employee Selection Procedures,* 44 Fed. Reg. 11,996 (1979), provides that use of the 4/5ths rule is inappropriate where the number of persons and the difference in selection rates are so small that the selection of one different person for one job would shift the result from adverse impact against one group to a situation in which that group has a higher selection rate than the other group:

> "If the numbers of persons and the difference in selection rates are so small that it is likely that the difference could have occurred by chance, the federal agencies will not assume the existence of adverse impact,  in the absence of other information . . . Generally, it is inappropriate to require validity evidence or to take enforcement action where the number of persons and the difference in selection rates are so small that the selection of one different person for one job would shift the result from adverse impact against one group to a situation in which that group has a higher selection rate than the other group."

34.     This "shift of one" rule has also been adopted by the First Circuit and in many other federal jurisdictions. *See Boston Police Superiors Officer Federation v. City of Boston*, 147 F.3d. 13, 22 (1st Cir. 1998); *Fudge v. City of Providence*, 766 F.2d. 650 (1st Cir. 1985); *Cotter v. City of Boston*, 193 F.Supp.2d 323, 348, n.11 (1st Cir. 2002) (there are instances, particularly where the sample size is small, where use of the four-fifths rule is inappropriate). *See also, Mems v. City of St. Paul*, 224 F.3d 735 (8th Cir. 2000); *Stewart v. City of Saint Louis*, 2007 WL 6211634 (E.D. Mo 2007) (aff.d *Stewart v. City of Saint Louis*, 532 F.3d 939 (8th Cir. 2008); *NAACP v. City of Mansfield*, 866 F.2d 162, 168 (6th Cir. 1989) (this court has been

cautious about giving too much weight to 'four-fifths' computations where the sample base is of less than significant proportions); *Frasier v. Consolidated Rail Corp.*, 851 F.2d 1447, 1451 (D.C. Cir. 1988) (approving the district court's rejection of the 80% rule where the sample size was small).

35.    In small numbers, the Four-Fifths rule is an unstable test, and there exists a high rate of false positive results; a false positive is a finding of adverse impact under the four-fifths rule when there is no actual adverse impact in the underlying populations being compared. [Testimony of Jay Silva; Trial Transcript, Day 17, at page 22.

36.    Dr. Jacinto M. Silva tested the reliability of the four-fifths ratio on the data from the results of the examinations between 2005 and 2008.  In Trial Exhibit 197, the last column reflects these findings.  With regard to how Dr. Silva arrived at the numbers in the last column entitled "Probability of still finding AI," Dr. Silva assumed for each municipality that there was absolutely no mean differences in the scores achieved by minorities and non-minorities.  Dr. Silva tested the probability that adverse impact would appear, even though the test itself had absolutely no difference, using a Monte Carlo simulation. This calculation involves creating many trial samples in order to get stability to the estimates.  Dr. Silva ran the data for each municipality one million times. [Testimony of Jacinto Silva, Trial Transcript 17:22-24; Trial Exhibit 197].

37.    In *Fudge v. City of Providence*, 766 F.2d. 650, 659 - 660 (1st Cir. 1985), Justice Breyer, in a concurring opinion, pointed out that "[a] perfectly fair. . . test (that is, a test having no systematic disparate impact on blacks) would, if repeatedly applied to racially similar pools, yield one (or no) successful black applicant(s) out of thirty 18 percent of the time (82 percent of the time it will yield two or more.)."

38.     The appearance of adverse impact is the result of the fact that the selection rates are low, in that there are many applicants compared to the number of applicants actually promoted.  Additionally, the fact that minorities generally represent just a fraction of the total test-takers means that, even where scores are equal, there exists a high probability of finding adverse impact in promotion rates even where none exists in mean test scores. [Testimony of Jacinto Silva, Trial Transcript 17:22-24; Trial Exhibit 197].  For example, if only one in ten test-takers is a minority, it is not difficult to see that if you are selecting from the first three candidates, that you have a greater chance of selecting a non-minority than a minority based on the lack of minority participation alone.

39.     The appointment of one (1) Sergeant is too small a number to be statistically significant.  See *Questions and Answers on the Federal Executive Agency Guidelines On Employee Selection Procedures,* 44 Fed. Reg. 11,996 (1979), Question 21.

40.     Under the *Questions and Answers on the Federal Executive Agency Guidelines On Employee Selection Procedures,* 44 Fed. Reg. 11,996 (1979), Question 21, when a data set is small, validity evidence is warranted only where the lower selection rate continues over time.

**D.     OVERVIEW OF STATISTICAL ANALYSES IN DISPARATE IMPACT CASES.**

41.     The four-fifths rule is only one method of analysis for examining whether adverse impact exists based on numbers alone. [Testimony of Jacinto M. Silva, Trial Transcript at 17:10-12; *Isabel v. City of Memphis*, 404 F.3d 404 (6th Cir. 2005)]

42.     Another method of statistical measure is significance testing.  Significance testing can be performed based on probabilities or "standard deviations."  [Testimony of Silva, Trial Transcript at 17:10-13].

43.     Significance testing utilizing probabilities compares data based on some identified characteristics, such that if there is a difference in the two groups (e.g., differences in rates of hiring for minorities and non-minorities), one can determine the probability that the characteristic are the same, or conversely whether there are differences too large to have occurred by chance.  If there are observed differences in the two groups, for example, and the probability drops below 5% (.05) that the observed differences could have occurred by chance, such a result is deemed to be statistically significant, and it is reasonable to conclude that there is a difference in the characteristic being measured in the two data sets.  [Testimony of Jacinto Silva, Trial Transcript at 17:11-12].

44.     There are two calculations that can be performed to reach values based on probabilities:  Fischer's Exact Test and the Chi Square Test.  [Testimony of Jacinto Silva, Trial Transcript at 17:13].  Fischer's Exact Test is more appropriate when using small sample sizes. [Testimony of Jacinto Silva, Trial Transcript at 17:13].

45.     In addition to the method of significance testing which seeks to reach conclusions based on probabilities, another method of significance testing examines "standard deviation differences" between the groups.  This method of statistical significance testing uses a calculation that measures differences in groups based on standard deviations.  Under this measure, if there exists a standard deviation of two or more units between the groups being compared, such differences are said to be statistically significant.  [Testimony of Jacinto Silva, Trial Transcript at 17:12-13].

46.     Separately, a "shortfall analysis is an attempt to quantify how many non-minorities would have been promoted if there was to be no adverse impact (i.e., to meet the .80 ratio or higher).  [Testimony of Jacinto Silva, Trial Transcript at 17:15-16].

47.     Data can be aggregated across different data sets, however, one does not want to combine data that would lead to erroneous conclusions. Combining data sets that have differing characteristics can lead to erroneous conclusions.

48.     The various municipalities participating in the 2005 through 2008 examinations have elements and characteristics that could lead to erroneous conclusions when these data sets are combined.  For examples, the size of the jurisdictions vary, resulting in large differences in sample sizes (i.e., the results from a large data sample would overwhelm the results from the smaller sample).  Additionally, the distribution of minority participation rates can vary from 1 to 2 percent up to 50% of the applicant pool.  [Trial Transcript 17:27-29]

49.     Fischer's Exact Test assumes that every individual is competing for every position that is available, and when in reality each individual is competing for only a small subset of available positions, this further confounds the results and exaggerates p-values.

50.     Simpson's Paradox refers to a situation where aggregation of data using subgroups with different characteristics can result in distortions.

51.     Dr. Silva demonstrated Simpson's Paradox in an example using data similar to the data examined in the 2005 through 2008 examinations.  [Trial Exhibit 198].  Dr. Silva aggregated the hiring data of two hypothetical jurisdictions.  The two 'jurisdictions' have different characteristics:  the percentage of minorities participating is substantially higher in one jurisdiction; the rate of promotion, or selection ratio (i.e., the number of actual appointments as a fraction of the number of applicants) is different across the two; and the total number of candidates differ between the two.  [Trial Transcript 17:30-31; Trial Exhibit 198].

52.     Individually, or within each jurisdiction, minorities and non-minorities are promoted at the same rate (e.g., adverse impact is 1.0).  When the two jurisdictions having

13

different characteristics are combined or aggregated, however, there is a finding of adverse impact in hiring.  [Trial Transcript 17:30-31; Trial Exhibit 198]..

**E.      SUMMARY AND IMPLICATIONS OF 2006 AND 2008 POLICE SERGEANT EXAMINATION RESULTS – A STATEWIDE ANALYSIS.**

53.     Dr. Jacinto Silva testified that he was provided data for police sergeant promotional examinations for examinations given between 2005 and 2008.   [Testimony of Jacinto Silva, Trial Transcript 17:17].

54.     Dr. Silva's examination of the data shows that for nearly all of the municipalities participating in the HRD examinations between 2005 and 2008, the sample size (e.g., the number of police officers promoted to Sergeant in a particular jurisdiction) was so small that a "shift of one" resulted in no adverse impact, or more frequently adverse impact on non-minorities. [Trial Exhibit 197; Testimony of Jacinto Silva at 17:15.]   The sole exception is the City of Brockton.[1]

55.     The conclusion to be drawn from the 'shift of one' analysis is that these samples are generally (with the exception of the City of Brockton) too small to make a determination according to the Uniform Guidelines Questions and Answers.

56.     Dr. Silva's shortfall analysis also demonstrates that, for nearly all of the municipalities participating in the HRD examinations between 2005 and 2008, the shortfall of minority officers promoted is generally less than one person.  For example, in the Andover Police Department the shortfall is identified as .18; this means that if Andover had appointed 18/100 (18%) of a person, there would have been no adverse impact.  [Trial Exhibit 197].

---

[1] Dr. Silva did not perform the shift of one analysis in jurisdictions which made a total of one appointment, because the obvious result would have been to an AI of "0" in favor of minorities, which would have been an irrelevant statistic.  [Testimony of Jacinto Silva at 17:__; Trial Exhibit 197].

Additionally, Trial Exhibit 197, which was based upon data supplied to Dr. Silva from HRD, contains an error in connection with the Worcester data:  the parties do not dispute that the number of Black/Hispanic test-takers was 10 and the number of White test-takers was 51 for the 2006 examination, which resulted in an adverse impact ratio of greater than .80

57.     Dr. Silva also conducted significance testing using Fisher's Exact P-value test to measure whether there existed statistical significance to differences in rates of promotion among the two groups (i.e., minorities and non-minorities).  In nearly all of the municipalities, there was no statistical significance to any differences between the two groups (i.e., statistical significance is found when the 'p' value is less than .05.  [Trial Exhibit 197; Testimony of Jacinto Silva, Trial Transcript 17:21-22].

58.     Statewide, the adverse impact in pass/fail rates of minorities compared to non-minorities taking the 2006 Sergeants' promotional examination was .80, which does not fail the 4/5ths rule.  [Trial Exhibit 78]

59.     Statewide, the adverse impact in pass/fail rates of minorities compared to non-minorities taking the 2008 Sergeants' promotional examination was .90, which does not fail the 4/5ths rule.  [Trial Exhibit 78].

60.     Police officers compete for promotion only within the municipality that employs them.  Police officers in different municipalities and jurisdictions do not compete for promotion with each other.

61.     Dr. Joel Wiesen conducted an aggregated analysis of promotional rates state-wide, which did not account for the fact that police officers do not compete across employers or jurisdictions. [Wiesen Testimony, Trial Transcript, Day 5, at 5-88:21, 5-94:7 through 5-94:17, July 16, 2010].

62.     Dr. Wiesen's aggregated analysis of promotional rates state-wide did not consider or account for different selection ratios (selection ratio is defined as the number of appointments relative to the number of applicants competing for those appointments) among the various

municipalities. [Wiesen Testimony, Trial Transcript, Day 5 at 5-92:6 through 5-93:10, 5-94:7 through 5-94:17]

63.    Dr. Wiesen's aggregated analysis of promotional rates state-wide did not consider or account for the different sized pools of candidates among the various municipalities.  [Wiesen Testimony, Trial Transcript, Day 5 at 5-93:23 through 5-94:6, 5-94:7 through 5-94:17].

64.    Dr. Wiesen's aggregated analysis of promotional rates state-wide did not consider or account for the different proportions of minorities to non-minorities competing for promotion that may exist among the various municipalities.  [Wiesen Testimony, Trial Transcript, Day 5 at 5-91:14 through 5-92:5, 5-94:7 through 5-94:17].

65.    Dr. Wiesen's aggregated analysis of promotional rates across time (e.g., across multiple examinations 2003-2008) did not account for the fact that test-takers who took these examinations multiple times will be counted more than once.   Dr. Wiesen admits such aggregation could distort the data. [Wiesen Testimony, Trial Transcript, Day 5 at 5-106:1, 5-107:13, 5-94:7 through 5-94:17]

66.    Several of Dr. Wiesen's calculations were based on inaccurate data, including his calculation of adverse impact in promotions from Worcester's use of the 2004 examination as set forth in Trial Exhibit 79, which also was incorporated into his state-wide aggregated analyses. [Trial Exhibit 79]

## F.    SUMMARY AND IMPLICATIONS OF 2006 AND 2008 EXAMINATION RESULTS  FOR CITY OF WORCESTER POLICE OFFICERS.

A.    <u>Pass – Fail Rates for Minorities and Non-Minorities from Worcester</u>.

67.    In Worcester, minority test-takers passed the 2004 Sergeants' examination at higher rates (i.e., in a higher proportion) than non-minorities passed the examination (adverse impact ratio of 1.27) [Trial Exhibit 79, at page 2].

68.    In Worcester, the rate at which minority test-takers passed the 2006 Sergeants' examination compared to non-minority test-takers was nearly the same. [Wiesen Testimony, Trial Transcript 2-117:20 through 2-117:22; Plaintiffs' Exhibit 86]. [2]

69.    In Worcester, minority test-takers passed the 2008 Sergeants' examination at higher rates than non-minorities passed the examination (adverse impact ratio of 1.28) [Plaintiffs' Exhibit 86; Wiesen Testimony, Trial Transcript 2-117:20 through 2-117:22].

70.    Dr. Wiesen's finding that one Worcester minority failed the 2008 examination is wrong, and is not reflected in the data that he relied on, which reveals that no Worcester minorities failed the 2008 examination.  [Plaintiffs' Exhibit 86].

B.    Average Scores for Minorities and Non-Minorities from Worcester.

71.    In Worcester, non-minority and minority test-takers of the 2006 Sergeants' examination had approximately equal test-scores; that is, minority test takers scored less than a point (.97th of a point) lower than non-minorities on the 2006 examination.  [Plaintiffs' Exhibit 86; Wiesen Testimony, 2-117:16 through 2-117:18].

72.    In Worcester, minority test-takers of the 2008 examination outscored non-minority test-takers by 4.3 points (adverse impact ratio of 1.36).  [Plaintiffs' Exhibit 86; Wiesen Testimony, Trial Transcript at 2-117:16 through 2-117:18].

C.    Selection Rates for Minorities and Non-Minorities By Worcester.

73.    The adverse impact on the rate of promotions of minority test-takers to the position of Sergeant resulting from Worcester's use of the 2004 Sergeants' promotional examination was .82, above the 4/5ths "rule of thumb" set forth in the Uniform Guidelines on

---

[2]  While Dr. Wiesen's testimony and the Plaintiffs' table show that minorities passed at 97% of the rate that whites passed the 2006 examination, the parties stipulated that the number of minority test-takers was 10 and not 11.  The resulting ratio of passing rates is actually closer to 93% (7 of 10 minorities passing divided by 39 of 52 whites passing).

Employee Selection Procedures (2 of 10 minority test-takers were promoted; 12 of 51 non-minority test-takers were promoted). [Exhibit 156, 2004 Test Results Data for all candidates who sat for the 2004 sergeant promotional examination, from Commonwealth production at Bate-stamped pages 1854-1877, showing number of Worcester test-takers; Trial Transcript at 5-122)[3]].

74.    The adverse impact in the rate of promotions of minority test-takers to the position of Sergeant resulting from Worcester's use of the 2006 Sergeants' promotional examination was .88, above the 4/5ths "rule of thumb" set forth in the Uniform Guidelines on Employee Selection Procedures. [Wiesen Testimony, Trial Transcript 2-118:14 through 2-118:15]

75.    Worcester has appointed one (1) Sergeant from the list generated from the 2008 Sergeants' promotional examination. The Sergeant promoted was a non-minority. [Plaintiffs' Exhibit 32].

76.    In aggregating selection data from the 2008 examination with selection data from the prior two examinations (2004 and 2006), there is no evidence of adverse impact in selection rates among the three examinations together.

77.    Dr. Wiesen's testimony that the highest scoring minority on the 2008 examination is ranked 15th on the certified list is wrong, as the data supplied from the Commonwealth (Plaintiffs' Exhibit 77), which was available to Dr. Wiesen, reveals that there is a Hispanic candidate in 12th place and a Black candidate (the Plaintiff) tied for 13th place.

---

[3]   Although in this portion of the trial transcript, Dr. Wiesen is asked to assume that 2 minorities and 12 non-minorities were promoted from the 2004 list, Plaintiffs are not anticipated to dispute this fact. [Trial Transcript 11-40:4 through 11-40:9].

D.    Summary of Indicators of Adverse Impact between 2006 and 2008 examinations
Based on Worcester Statistics.

78.    Dr. Wiesen found the adverse impact ratio for promotions in Worcester when aggregating the 2006 and 2008 examinations to be .82, above the 4/5[th]s "rule of thumb." [Plaintiffs' Exhibit 86].

79.    In aggregating the 2006 and 2008 examinations, Dr. Wiesen found that the difference in points earned by minorities and non-minorities at the effective passing point was 2.1 points (out of 100 points).  [Plaintiffs' Exhibit 86].

80.    In aggregating the 2006 and 2008 examinations, Dr. Wiesen found that the difference in points earned by minorities and non minorities at the actual official passing point was 1.1 points (out of 100 points).  [Plaintiffs' Exhibit 86].

G.    JOB-RELATEDNESS AND VALIDITY OF THE 2006 AND 2008 POLICE SERGEANT EXAMINATIONS.

81.  Mass. General Laws, Chapter 31, requires examinations to test the knowledge, skills and abilities that can be practically measured and which are required to perform the primary job duties.

82.    The job knowledge component of an examination for the selection of police sergeant typically consists of multiple-choice, written questions designed to evaluate a candidate's knowledge with regard to matters critical to performance as a sergeant, such as a jurisdiction's laws and regulations, and department regulations.  [Trial Transcript, Day 14, page 24, lines 19-25; Day 14, page 25, lines 1-25; Day 14, page 26, lines 1-7]

83.    It is appropriate in industrial psychology for a test developer to rely on job analyses conducted over a period as long as ten (10) years.  While a job analysis is normally current for five (5) - eight (8) years, a job analysis can be used for a longer period, especially

when a job changes very little over time, as is the case for the position of police sergeant. Moreover, test developers routinely rely upon more than job analysis conducted over a period of time, where the later job analysis builds upon and supplements the earlier analysis.  [Trial Transcript, Day 14,  page 35, lines 20-25; Day 14, page 36, lines 1-25; Day 14, page 37, lines 1-12].

84.    A written job knowledge exam is the best and most efficient method of determining what a candidate knows about critical areas identified by a job analysis.  (Trial Transcript, Day 14, page 26, lines 3-7; Trial Transcript, Day 3, page 123, lines 13-20, 25; Day 3, page 124, line 1; Day 3, page 126, lines 2-7).

85.    On October 1, 1991, the Commonwealth's Department of Personnel Administration issued a "Validation Report for the 1991 Police Promotional Selection Procedures" for the ranks of police sergeant, lieutenant and captain.  [Trial Exhibit 40, Bates Stamp page 247].

86.    The 1991 Validation Report was based on content validity, a recognized form of determining validity under the Uniform Guidelines on Employee Selection Procedures.  [Trial Exhibit 40, Bates Stamp page 247; see 29 CFR §1607.1 et seq.].

87.    In preparing the Validation Report, the Department of Personnel Administration ("DPA," the predecessor to HRD) first "conducted a comprehensive job analysis of superior officer ranks, including…sergeant…"  [Trial Exhibit 40, Bates Stamp page 247].

88.    In addition, DPA "[d]eveloped and administered a task inventory questionnaire designed to identify the frequent and critical tasks and duties," and "a knowledge, skills, abilities and personnel characteristics (KSAPs) inventory questionnaire designed to identify the important KSAPs required at the time of appointment."  [Trial Exhibit 40, Bates Stamp page 249].  DPA

also developed a "[l]inkage of the important KSAPs to the frequent and critical tasks of these jobs from" SMEs, "designed and use[d]…structural group discussions to gather information from SMEs about the Education and Experience (E&E) component of DPA's selection procedures," and "gather[ed] information from SMEs about the recommended reading list from which the multiple choice written examination questions for the police promotional exams are derived."  [Id. at 250].

89.     The 1991 Validation Report recognized that "[p]rofessional standards and DPA's standard operating procedures require that a linkage between essential tasks and the KSAPs required to perform those tasks be developed."  [Trial Exhibit 40, at Bates Stamp page 258].  In order to provide a link between the KSAPs and the tasks of the five ranks, a group of 9 subject matter experts ("SMEs") from Massachusetts police departments were convened to review a master list of tasks that had been identified as important and frequent through the survey."  [Id].

90.     The testability analysis for the 1991 Validation Report (Attachment EE, Trial Exhibit 41, at Bates Stamp pages 4272-4278) demonstrates that over 50% of the KSAs required to perform the job of sergeant were tested, which was sufficient to meet the "representative sample" requirement of the Uniform Guidelines.  [Trial Transcript, Day 14, page 41, lines 16-19; page 42, lines 1-29; page 43, lines 1-23].

91.     Attachment X to the 1991 Validation Report (Trial Exhibit 41, at Bates Stamp pages 4086-4093) summarizes comments by SMEs on numerous issues pertaining to the E&E, including the usefulness of degrees in certain subject areas to the police positions under consideration.  [Trial Transcript, Day 14, page 58, lines 24-25; Day 14, page 59, lines 1-25; Day 14 page 60, lines 1-9].

92. Attachment W to the 1991 Validation Report demonstrates that SMEs linked the subject matters on the E&E form back to the KSAs for the position of police sergeant. [See Trial Transcript, Day 14, page 43, lines 24-25; Day 14, page 44, lines 1-25; Day 14, page 45, lines 1-9; Trial Exhibit 41, Attachment W, at Bates Stamp pages 4073-4085].

93. The Validation Report further explained that under Massachusetts General Laws Chapter 31, §22, a training and experience component must be incorporated into a candidate's final mark.

94. The Validation Report described in detail the process used to construct the 1991 promotional exams at the BPD for the positions of sergeant, lieutenant and captain. As set forth therein (see Trial Exhibit 40, at Bates Stamp page 263), staff examiners and experts chose to construct a multiple choice, written exam for several reasons, including the importance of reading and writing for the positions, and because "there was no persuasive evidence that other examination modes would have no or even less adverse impact than the method chosen." (Id.).

95. After these analyses, KSAs were clustered into examination subject areas. "Depending on the number of KSAPs required for each task, the number of test questions to be developed to assess each KSAP was determined proportionately." [Trial Exhibit 40, at Bates Stamp pages 265-266; Attachment II, Trial Exhibit 41 at Bates Stamp page 4322].

96. "[A]ll questions" on the examinations "were referenced to one or more texts in the predetermined reading list," and "[e]ach reference is read with extreme care to identify principal concepts." [Trial Exhibit 40, at Bates Stamp page 266].

III.     **PROPOSED CONCLUSIONS OF LAW**.

    A. **THE PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CASE OF DISPARATE IMPACT DISCRIMINATION AGAINST WORCESTER BECAUSE WORCESTER'S ADMINISTRATION OF THE          HRD PROMOTIONAL EXAM DID NOT HAVE AN ADVERSE IMPACT ON WORCESTER MINORITIES.**

The framework for proving unlawful discrimination based on disparate impact is set forth in 42 U.S.C. § 2000e-(k)(1)(A).  A disparate impact claim arises when an employer's otherwise neutral policy has a "significantly disproportionate impact on a protected class".  42 U.S.C. § 2000e-(k)(1)(A)(i); Albermarle Paper Company v. Moody, 422 U.S. 405 (1975).

In order to establish a prima facie case of discrimination, a plaintiff must (1) identify the challenged employment practice or policy; (2) demonstrate a disparate impact on a group that falls within the protective ambit of Title VII; and (3) demonstrate a causal relationship between the identified practice and the disparate impact.  42 U.S.C. § 2000e-(k)(1)(A)(i).

Plaintiff has failed to offer any statistical evidence or expert opinion that supports a finding that Worcester's promotional exams had an adverse impact on minorities.    In fact, Plaintiff's expert testified that there was no evidence of adverse impact in Worcester, whether the applicable measure is the passing rate, average test scores or selection rates.

    1.     **Plaintiff's Prima Facie Case Requires Proof That Worcester's Use of HRD's Examination Has An Adverse Impact On Minority Rates of Hire Within The Employing Unit.**

Plaintiff cannot prove disparate impact without first proving that the challenged practices, the use of promotional exams in 2006 and 2008, actually has an adverse impact on the protected class, Blacks and Hispanics.  Bradley v. City of Lynn, 443 F.Supp.2d 145, 160 (D. Mass. 2006) (holding that as part of the prima facie case the plaintiffs must demonstrate that the exams had both

an adverse and disparate impact, specifically that the adverse effects of the practice fall more heavily on members of the protected class than they fall on nonmembers who are similarly situated).

Plaintiffs frequently will seek to prove disparate impact using a calculation known as the "4/5[th] Rule" which comes from the Equal Employment Opportunity Commission's (EEOC's) Uniform Guidelines on Employee Selection Procedures. 29 C.F.R. § 1607.4(D); *Bradley v. City of Lynn*, 443 F.Supp.2d 145. 160 (D. Mass. 2006).   This calculation compares the rates of hiring of minority and non-minority candidates for promotion or hire; if the resulting ratio is less than .80 (meaning the rate of hiring for minorities is less than 80% of the rate of hiring for non-minorities), such a result may indicate that the challenged employment practice has an adverse impact on minority employment and promotion opportunities.  *Bradley*, supra.  The rule, however, "has not provided more than a rule of thumb for the courts."  *Bradley*, 443 F.Supp at 161 (citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 995 n. 3 (1988)) .

Under any measure, as set forth in Section II, Proposed Findings of Fact, Worcester's use of the 2006 and 2008 promotional examinations did not adversely affect actual minority rates of promotion or their opportunity to compete for promotion.  There is no measure of the Worcester data which fails the 4/5ths rule, regardless of whether one examines pass/fail rates, average test scores, selection rates, data applicable to individual exam years (2004, 2006 or 2008), or data aggregated across examination years.

**2.     The Standard of Proof in Disparate Impact Discrimination Cases Precludes The Plaintiff From Supporting His Claims Based On Promotional Data Aggregated Across Jurisdictions.**

Here, the challenged employment practices against Worcester are its use of an examination (or examinations) developed and administered by HRD.  [Complaint at ¶¶ 73-79]. The burden on Plaintiff thus is to demonstrate that the challenged employment practices have a

disparate impact on the rates of minority hiring within the employing unit.  More particularly, as part of its prima facie case, Plaintiffs must show that the challenged employment practices caused the discriminatory impact that they seek to prove.

Plaintiff's proof based on state-wide adverse impact statistics lacks any connection to the challenged employment practices, because it can hardly be argued that Worcester's use of these examinations could have caused a state-wide problem.  In this sense, it cannot be said that any appearance of adverse impact on a state-wide basis was the result of Worcester's use of the examination.  Such an argument is obviously illogical and not reasonable - - the City of Worcester's two challenged employment practices of utilizing HRD's 2006 and the 2008 examination affect only the promotions of its own officers within its jurisdiction.

In *Bradley v. City of Lynn*, supra, plaintiffs brought a class action under Title VII against the Commonwealth of Massachusetts and the City of Lynn, alleging that the civil service examination for entry level firefighters had a disparate impact on minorities.  In that case, in determining whether disparate impact existed for the purpose of liability against the individual municipalities, Judge Saris examined the data on a disaggregated city-by-city basis:

> ". . . the Court finds that the statewide aggregated approach advocated by the plaintiffs and the disaggregated municipality approach advocated by the HRD are both useful in this case . . . The decision process in hiring firefighters in Massachusetts, however, contains multiple steps that span both the state and municipal levels. . . The HRD argues that statistical evidence aggregated on a statewide basis is flawed because hiring decisions are made individually in each municipality at the local level and because a large municipality can distort the whole adverse impact analysis.  Dr. Jacobs asserts that aggregation 'allows one single jurisdiction to have a major influence on the entire system leading to a conclusion of adverse impact for the entire Commonwealth when a single community is responsible for the outcome.'  . . . Because this seems reasonable, the Court examines the disaggregated hiring data of Boston. The Court also examines the disaggregated hiring data of Lynn, the municipality of the four named plaintiffs.  The data shows that the examination has a disparate impact on the hiring of minorities in both of these municipalities."

*Id* at 165.

Here, the evidence supporting disaggregation of the data is even more compelling than in *Bradley v. Lynn*. As noted, unlike the entry level firefighter positions at issue in *Bradley v. Lynn*, police officers in different police departments do not compete against each other for promotion. Candidates eligible to compete for entry level firefighter are eligible for appointment across jurisdictions. This distinction is not minor. When applicants who are not competing with each other for the same positions are added up and divided as though they do, such aggregation of promotion rates can significantly distort the conclusions that may appear as a result of the aggregation. Further, unlike in *Bradley v. Lynn*, the entity responsible for the state-wide examination, the Commonwealth of Massachusetts, is no longer a party to this case. Thus, while aggregation of minority selection rates may be "useful" against a state-wide actor, such data has no relevance to the individual municipalities.

Not only does *Bradley* require disaggregation of data for the purpose of determining liability among the individual Defendants, common sense also dictates this result. If the Court were to hold individual municipalities liable based on what may be happening on a state-wide level, there would be no difference between the municipality that promotes all of its minority candidates and the municipality that may be promoting many candidates but where minority promotions fail the 4/5ths rule to a statistically significant degree. Such a conclusion would be fundamentally unfair and would be inconsistent with the prima facie case which requires the Plaintiff to prove causation. Moreover, because Plaintiff made no effort to determine, through discovery or otherwise, what contributes to the appearance of adverse impact from municipality-to-municipality, it may be the case that a particular municipality has made efforts in conjunction with its use of the examination (such as concentrated effort to recruit at the entry level increasing

minority pool size and candidate quality) that accounts for no adverse impact within its borders despite the appearance of adverse impact that may appear in other jurisdictions.

Plaintiff is expected to rely on *Vulcan Pioneers v. New Jersey Department of Civil Service*, 625 F.Supp. 527 (D. N.J. 1985), to support its claim that data aggregated across different employers can be used to prove a prima facie case of disparate impact. Worcester first notes that this case is District Court decision from another Circuit and is 25 years old, and so has little precedential value in any event. More significantly, however, that case did not decide the proof required in a prima facie case under Title VII. In that case, defendants were the State of New Jersey and approximately twelve municipalities. Although the court relied on some data aggregated across municipalities (and some disaggregated data) in reaching its conclusions, the posture of that case is entirely different from the claims under Title VII in this instant case. In *Vulcan Pioneers*, the parties had previously entered into a consent decree, which required, among other things, the State of New Jersey to develop a valid, job-related promotional examination with the goal of eliminating adverse impact. *Vulcan Pioneers*, 625 F.Supp. at 531-532. The court was looking at whether the State of New Jersey had met its obligations under the consent decree, and was not considering whether plaintiffs in that case had established a prima facie case under Title VII, or whether there existed causation between the aggregated statistics and the disparate impact within each defendant municipality. *Vulcan Pioneers*, 625 F.Supp. at 531. Interestingly, it appears that, while the examination was given state-wide, only the municipalities which were parties to the consent decree were affected by the decision (which found that the examination was not valid).

Simply put, Plaintiff cannot support a prima facie case based on disparate impact statistics which are not Worcester's and which lack any connection to Worcester's use of the 2006 and 2008 examinations.

> **3.     The State-Wide Aggregated Analysis Of Dr. Joel Wiesen Must Not Be Given Any Weight As It Is Irrelevant And Simply Does Not Meet The Standard Of Admissibility For Expert Evidence.**

Even if one could support a disparate impact claim using hiring statistics from other employers, the methods used by Plaintiffs' Expert Dr. Joel Wiesen in reaching his conclusions about the import of these results are flawed and significantly distort the data.  The overly simplistic calculation of Dr. Wiesen in reaching his state-wide conclusions is of limited value, because it cannot be determined whether the failure of Dr. Wiesen to consider and account for varying characteristics of the municipal subgroups distorted his conclusions.   Dr. Wiesen acknowledged in his testimony that he did not consider or account for the numerous characteristics of each subgroup (i.e., the different employers) and that it is possible that simply aggregating these groups could "possibly" yield a distorted result.

The method used by Dr. Wiesen was to group the candidates for promotion within each jurisdiction into a single large group, as though the candidates compete with each other on a single combined eligible list across the state.  Such an analysis has the result of giving the same weight to candidates in various jurisdictions, regardless of whether in one jurisdiction there may be three candidates for promotion and in another jurisdiction, 40 or more candidates for promotion.  Dr. Silva explains that this may result in a phenomenon known as "Simpson's Paradox." [ Testimony of Dr. Silva, Trial Transcript, Day 17 at pages 29-31].

In an example which is as simple as it is compelling, Dr. Silva explained how - -  if you aggregate the hiring data of two jurisdictions, each of which has at least one minority eligible for

promotion, where there exists no adverse impact on hiring within each jurisdiction - - aggregating the two could yield a distorted adverse impact ratio. [Trial Exhibit 198]. In his example, in Jurisdiction 1, there are 16 test-takers; two minority and fourteen white candidates. If Jurisdiction 1 promotes one minority and seven white minority candidates, then the rate of hiring of minorities compared to non-minorities is the same (adverse impact ratio of 1). Similarly, in Jurisdiction 2, there are 77 candidates for promotion; twenty-eight (28) minorities and forty-nine (49) whites. If Jurisdiction 2 promotes four (4) minority and seven (7) non-minority candidates, then the rate of hiring is the same (adverse impact ratio of 1). If, however, the candidates for promotion are combined across jurisdictions, and given equal weight as though they compete together for positions within a single employer, the adverse impact ratio becomes .75 (below the 4/5$^{\text{th}}$s "rule of thumb"). [Trial Exhibit 198]. Thus, aggregating the data makes it appear that there is an adverse impact in both jurisdictions when in actuality there is no adverse impact in either jurisdiction.

Additionally, Dr. Wiesen's overly simplistic equation fails to consider other possible factors (other than an allegedly flawed test) that may contribute to the appearance of adverse impact, such as the contribution of statutory requirements (i.e., the requirement that candidates must be within the '2N + 1' highest scoring candidates to even be considered by the appointing authority).

Further, Dr. Wiesen combined statistics across time, again as though the candidates are all competing on a single list. In this scenario, because test-takers often repeat taking the same test, the result is that many test-takers will be counted two or more times. Test-takers who have been promoted may be included more than once as non-promoted and promoted candidates in

such a scenario. Such an analysis, combining lists and repeating the same candidates across time, distorts the numerical data from which the experts make their calculations.

Accordingly, the Dr. Wiesen's substandard calculation of state-wide data is not really an 'expert' analysis at all, but constitutes a simple calculation that is not based on reliable principles and clearly distorts the evidence against the Defendants.

Plaintiffs are expected to argue that, because the sample sizes in each of the jurisdictions are small, aggregation across jurisdictions is appropriate and the only way to prove their case. A plaintiff, however, cannot rely on irrelevant and distorted evidence merely because it is convenient or because it has no other evidence to prove its case. Certainly, Plaintiff's expert could have sought more extensive information across time for each of the municipal defendants; Plaintiff's expert could have run an analysis so as not to count participants more than once. The fact that Plaintiff chose not to analyze the data most relevant to proving discrimination and instead conducted an inferior analysis based on irrelevant data does not mean that this Court has to accept such analyses. In fact, the Plaintiff's expert himself all but admitted that, at least in the case of Worcester, where he did have data for promotions across three examination dates (2004, 2006, and 2008), he chose not to include the results of such an aggregated analysis in his report, *precisely because the results were not helpful to Plaintiff's case*. [Trial Transcript 5-114:20 through 5-115:16].

In any event, in many cases, courts have found that reliance on small sample sizes is just too speculative to make out a claim of discrimination based on disparate impact, resulting in dismissal of a plaintiff's claims. *See e.g., Fudge v. City of Providence,* 766 F.2d. 650 (1st Cir. 1985).

**B.    WORCESTER'S USE OF THE 2006 AND 2008 HRD EXAMINATIONS ARE JOB-RELATED AND CONSISTENT WITH BUSINESS NECESSSITY.**

The challenged employment practices of the City of Worcester are its use of the 2006 and 2008 examinations for police sergeant promotions developed and administered by HRD.  It cannot be over-emphasized that, in a case of discrimination based upon disparate impact, if an employment practice has no disparate impact on a protected class of candidates, a court or enforcement agency must not look any further to require a showing of business necessity or job-relatedness.  It is not a violation of law to utilize a selection method that is not job-related if it cannot first be shown that such a practice has an adverse impact on a protected class of applicants.  For example, selection by random lottery would not be a valid or job-related selection method, but if it does not result in adverse impact, it will not violate Title VII or Chapter 151B.

Notwithstanding that the Plaintiff has failed to demonstrate adverse impact within the City of Worcester using any statistical measure, Worcester also submits that its use of HRD's examinations is a matter of business necessity and that the examinations are valid and job related.

**1.    The Recent Decision Of The Supreme Court In *Ricci V. DeStefano* Now Requires Employers To Show That There Is A Substantial Basis In Evidence To Believe That Use Of A Job-Related Examination Will Result In Liability Before Such A Test May Be Discarded.**

The recent landmark ruling of the Supreme Court in *Ricci v. DeStefano*, 129 S.Ct. 2658, __ U.S. __ (2009) requires disposition of the instant case in favor of the City of Worcester.  *Ricci* makes it clear that Worcester was required to use the examination results certified to it based on business necessity, or it would incur liability for intentional discrimination.

In that case, the City of New Haven developed, administered and scored its own promotional examination, after which it was determined that the "racial adverse impact" was "significant." *Id.* at 2677. The City of New Haven decided, after considering the adverse impact of the test results, that it would not utilize the examination for promotional purposes. The Supreme Court ruled that such a decision was a "race based" decision, which was unsustainable absent a substantial basis in evidence that the employer would be liable for disparate impact discrimination. *Id.* at 2673.

Worcester here stands in the same decision-making position as the City of New Haven; that is, the Plaintiff argues that by not rejecting the examinations either developed by HRD or developed with HRD assistance based on evidence of disparate impact, Worcester must be held liable under Title VII and G.L. c. 151B. As noted, however, any decision by Worcester to reject the results of the subject examinations because of concern over whether the results disparately impact minorities, constitutes a race-based decision that can only be justified if there is a substantial basis in evidence of disparate impact discrimination. *Id.* at 2677. The Plaintiff utterly failed to present any evidence at trial that there exists a strong basis in evidence (or any evidence) of disparate impact.

Plaintiff is expected to argue that the *Ricci* analysis does not apply here because Worcester knew or should have known that use of the HRD examinations would result in adverse impact, and should have taken steps prior to certification of the 2006 results to utilize another examination instrument. The first problem with such an argument is related to the lack of a prima facie case - - since Worcester's use of the 2006 and 2008 examinations did not result in adverse impact, such an argument is entirely illogical. Moreover, the examination utilized by

Worcester immediately preceding the 2006 examination (i.e., the 2004 examination) likewise did not result in adverse impact in promotions.

Alternatively, the Plaintiff may argue that the difference between the percentage of minorities in entry level police officer positions compared to the percentage of minority officers at the sergeant level should have put Worcester on notice of adverse impact in promotions. Such information does not, however, advance the Plaintiff's position, as such information is incomplete at best. Such data does not inform the fact-finder as to how many of the minority officers at the entry level actually competed for promotion; nor does the data inform as to whether the numbers at the entry level are higher based on recent hiring and whether more time is needed to see minority representation increase at the supervisory level. In any event, there is nothing in Title VII which requires an employer's workforce to be racially balanced, or which requires an employer to utilize affirmative action to reach racial balance. Such statistics may be probative of purposeful discrimination, but it is ordinarily to be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population; however figures for the population might not accurately reflect the pool of qualified applicants. *See International Brotherhood of Teamsters v. U.S.*, 431 U.S. 324, 340 n. 20 (1977).

Accordingly, Worcester was required by business necessity based on the landmark decision *Ricci v. DeStefano*, to utilize the results of the examination once those results were certified to it, and there is no evidence in the record to support any finding that there existed a strong basis in evidence to support Worcester's throwing out the examination results. Worcester's use of the HRD examinations has not resulted in any adverse impact in the rates of promotion in recent years. As a matter of common sense, Worcester's use of an examination

instrument that has resulted in similar examination mean scores, passing rates and promotions would under the law established by the Supreme Court in *Ricci v. DeStefano*, constitute ample business necessity for its use. Indeed, given Worcester's results, one might argue that it would be irresponsible for the City of Worcester to try different testing methods. There is no guarantee that there exists any other testing method that would have the results that Worcester has achieved in recent years.

> **2.    The Use of the HRD Examinations By Worcester Is Based on Business Necessity Because of the Responsibilities and Constraints Under General Laws Chapter 31.**

The Plaintiff alleges that the "examinations have, over the last 20 years, been shown to have a significant adverse impact upon minority (Black and Hispanic) test takers while not having been shown to be valid predictors of job performance for a police sergeant." [Seventh Amended Complaint at ¶ 73]. While Worcester, as set forth above, does not believe that the Plaintiff can make out a prima facie case based on any statistical measure, Worcester also submits that business necessity requires use of HRD's expertise and that public policy in Massachusetts compels use of the merit system. The examination process - - whether pursuant to examination developed and conducted by HRD or under the authority of HRD pursuant to a delegation agreement, satisfies the standard of job relatedness and business necessity. In connection with its burden to show job relatedness or business necessity, an employer may show that its legitimate employment needs are significantly served by the employment practice; however, it does not need to show that those needs require the employment practice. *United States of America v. City of Garland*, 2004 WL 741295 (N.D. Texas 2004) (Citing *New York City Transit Authority v. Beazer*, 440 U.S. 568, 587 n. 31, 99 S.Ct. 1355 (1979).

To this end, Massachusetts law and public policy require public safety departments in all of the cities of the Commonwealth and the MBTA to adhere to the utilization of examinations

and eligible lists when making appointments and promotions to public safety positions, among others.    Worcester must comply with the statutory mandate of adhering to "basic merit principles" when making appointments and promotions in order to assure the "fair treatment of all applicants and employees in all aspects of personnel administration without regard to political affiliation, race, color, age, national origin, sex, marital status, handicap or religion..." G.L. c. 31, § 1 (e). The fundamental purpose of the process and procedures of the Civil Service Laws is to guard against political considerations, favoritism and bias in governmental hiring. *Massachusetts Association of Minority Law Enforcement Officers v. Abban*, 434 Mass. 256, 259 (2001) , citing, Cambridge v. Civil Serv. Comm'n., 43 Mass. App. Ct. 300, 304 (1997). Thus Worcester is, by necessity, required to comply with civil service law, rules and procedures.

In particular, once a list is certified to an appointing authority, Mass. General Laws Chapter 31 requires appointments to be made from that list.  The appointing authority does not have the option of using any alternative to the use of the civil service eligible list that has been certified to it.  When there exists a valid civil service eligible list, an appointing authority violates the law if it makes an appointment other than from off the list.  Mass. General Laws, Chapter. 31, § 12, 15.  Under law, HRD may approve the promotion of a civil service employee only "if there is no suitable eligible list or if the list contains the names of less than three persons eligible for and willing to accept appointment." [M.G.L. c. 31, § 7].   By definition, a provisional appointment is only permissible until a suitable eligible list is established and until an appointment can be made from an established list. [Personnel Administration Rules, PAR.02].

Further, even if adherence to state law were not required, it is consistent with business necessity that Worcester utilize the examinations developed by HRD.    Under Mass. General Laws, Chapter 31, HRD is charged with the responsibility and authority to develop examinations

that "fairly test the knowledge, skills and abilities which can be practically and reliably measured." *Boston Police Superior Officers Federation v. Civil Service Commission*, 35 Mass. App. Ct. 688, 692 (1993). Mass. General Laws Chapter 31, § 16 delegates the determination of the 'form, method and subject matter' of promotional examinations to the Administrator of the Human Resources Division. *Id.* The Administrator is the skilled professional who is authorized to decide technical matters such as scoring an interpretation of examinations. *Id.*

### 3. The 2006 and 2008 Examinations Were Valid And Job-Related.

Worcester also submits that the Plaintiff failed to show that the examinations were not job-related or did not otherwise comply with the mandates Title VII and Mass. General Laws Chapter 31 requiring examinations to fairly test the knowledge, skills and abilities of applicants. In this regard, because the facts relating to job-relatedness and test validity are substantial, but are also common to the defendants utilizing the HRD examination, Worcester herein acknowledges the City of Boston's proposed findings of fact relating to the validity of the HRD developed and administered examinations and does not intend to re-publish herein said proposed findings and conclusions of law with respect to the validity of the examinations. In sum, there is ample evidence based on the 1991 Validity Report and on the expert testimony of James Outtz to support a finding that these examinations were valid.

Although Boston's experience is unique to it, it is important to recognize also that Boston's efforts and history of working with HRD, along with its engagement of outside experts and consultants at great cost, is particularly instructive when looking at Worcester's experience. In view of the substantial resources that the City of Boston has expended in an effort to eliminate adverse impact, without much to show for it, such facts should be considered in determining whether the law would require other municipalities to make such efforts.

**C.    PLAINTIFF FAILED TO IDENTIFY A VIABLE ALTERNATIVE TO THE HRD EXAMINATION.**

The extent of the "alternative practice" alleged by the Plaintiff that was available to Worcester is the right, pursuant to G.L. c. 31 § 5(l) to seek and obtain a delegation agreement from HRD.  As noted above, Boston did just that, with the result that its examination is still subject to challenge.

As noted above, in 2002, the City of Boston conducted its own examination pursuant to a delegation agreement with HRD.  The City of Boston, at great expense, retained a professional consulting firm, Morris & McDaniel to construct, validate and score a 2002 police sergeant promotional examination.  The City of Boston paid to Morris & McDaniel the sum of $1,258,812 for its work on those examinations  The results of the 2002 examination were that the examination did not materially reduce adverse impact.

Consequently, the Plaintiffs' argument regarding an alternative simply is not reasonable under the circumstances - - the resources, costs and effort to produce an examination in small municipalities could not be justified where the number of promotions in any given year is likely less than a handful, and particularly where the experience of the City of Boston demonstrates that such efforts may not further minority promotional opportunities.

**D.    WORCESTER CANNOT BE HELD LIABLE FOR FOLLOWING A STATE-WIDE TESTING REGIME THAT IS MANDATED BY M.G.L. C. 31 § 1 ET SEQ. PURSUANT TO SAID STATUTE, EXAMINATIONS WERE CREATED AND ADMINISTERED BY THE STATE FOR THE VERY PURPOSE OF SELECTING CANDIDATES FOR PROMOTION BASED UPON MERIT.**

On or about July 9, 2010, the Defendants (including Worcester) filed a Motion To Dismiss All Defendants Pursuant to FRCP 12(b)(6) and a Memorandum in support thereof.  In order to avoid lengthy duplication of the facts and arguments set forth in that Motion, Worcester

hereby incorporates the points and authorities set forth therein and renews its argument, as if fully set forth herein.

That Motion, in sum, acknowledges Worcester is an employer and therefore subject to Title VII's prohibitions. Title VII does not, however, make it unlawful for Worcester to comply with the Commonwealth's state wide testing requirements at issue.   In the present case, the HRD promotional examinations were conducted *outside of an employment context* and do not give rise to a cause of action under Title VII as that statute prohibits an "employer" from engaging in specified "unlawful employment practice[s]." 42 U.S.C. 2000e-2(a).   As other courts have recognized, Title VII does not restrict a sovereign's exercise of its traditional police powers, including the promulgating and enforcement of testing requirements, in a non-employment capacity. *See*, *e.g., Camacho v. Puerto Rico Ports Auth.,* 369 F.3d 570, 578 (1st Cir. 2004) (noting "long line of cases" holding that testing authorities are not subject to Title VII).   Because nothing in Title VII manifests a clear intent to impose further restrictions on the states' exercise of their sovereign police power to test or license professionals including police officers, Title VII should not be read to intrude on such matters of core state authority. See *Bass,* 404 U.S. at 349; cf. *Gregory v. Ashcroft,* 501 U.S. 452, 460-461 (1991) (holding that Congress's intent "to alter the usual constitutional balance between the States and the Federal Government" must be "unmistakably clear in the language of the statute") (citation omitted).

Worcester is aware that a recent Second Circuit decision, *Gulino v. Board of Education of the City School District of the City of New York*, 460 F.3d 361 (2d Cir. 2006), requires the City of New York to defend under Title VII its use of a state-mandated licensing system in hiring and retaining its teachers.   The Second Circuit held that, because federal law preempts state law, adherence to state law was not a defense to disparate impact discrimination under Title VII.

Worcester submits that *Gulino* was wrongly decided. The implications of holding municipal employers liable for adherence to state law governing the merit system cannot be overstated. Municipalities would be subject to a flood of litigation and conflicting judicial decisions, resulting in enormous costs and abuse of resources, not to mention the devastating effect such decisions necessarily would have on the operations of public safety departments across the Commonwealth, the frustrated promotional expectations of hard-working police and fire personnel and morale. Congress certainly did not intend this result when it passed Title VII and its amendments.

## V.     CONCLUSION

Accordingly, because Plaintiff's prima facie case against Worcester requires him to demonstrate a causal relationship between an identified practice of Worcester and a disparate impact in Worcester's hiring, the Plaintiff can only do so by disaggregating the promotional data, and analyzing the data applicable to Worcester.

To this end, there simply is no dispute that Plaintiff has not met his burden of proof that there exists any evidence of adverse impact based on the selection rates of minorities compared to non-minorities, or based on any other adverse impact measure, including pass/fail rates and average test scores. In fact, the Plaintiff's own lead expert, Dr. Joel Wiesen, admitted during trial that while he believed statewide data showed a clear mean difference in test for minorities and non-minorities in one direction (adverse impact), in Worcester the impact appears to be the opposite direction (adverse impact on non-minorities).

Alternatively, Worcester submits that its use of the HRD developed and administered examinations constitute business necessity and there do not exist any viable alternatives that would improve adverse impact.

WHEREFORE, Defendants City of Worcester and Michael O'Brien request that the Court enter a finding in Worcester's favor on Plaintiff's claims under both Title VII of the Civil Rights Act of 1964 and M.G.L. c. 151B, and further that the Court award Worcester its attorneys fees and costs.[4]

Respectfully submitted,

CITY OF WORCESTER,

By its attorneys,

/s/Laurie W. Engdahl
Laurie W. Engdahl
B.B.O. #554635
Collins, Loughran & Peloquin, P.C.
320 Norwood Park South
Norwood, MA 02062
(781) 762-2229

Date:   October 29, 2010

---

[4]   Following the entry of Judgment in favor of Worcester, Worcester intends to file a separate Motion under FRCP Rule 54 for such attorneys' fees and costs.

## <u>CERTIFICATE OF SERVICE</u>

      I, Laurie W. Engdahl, certify that on October 29, 2010, this document filed electronically through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to any persons indicated as non-registered participants.


                              /s/Laurie W. Engdahl
                              Laurie W. Engdahl