UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PEDRO LOPEZ, et al.,

    Plaintiffs

v.

CITY OF LAWRENCE, et al.

    Defendants

Civil Action No. 07-11693-GAO

DEFENDANT, CITY OF LOWELL'S PROPOSED
FINDINGS OF FACT AND RULINGS OF LAW

PROPOSED FINDINGS OF FACT

Pursuant to the Court's order of September 17, 2010, the City of Lowell ("Lowell") respectfully submits Defendant, City of Lowell's Proposed Findings of Fact and Rulings of Law.

The following persons testified on matters pertaining to Plaintiff Robert Alvarez's claims against the City of Lowell: facts witnesses - Robert Alvarez, Edward F. Davis III in his capacity as former Superintendent of the Lowell Police Department, and Kenneth Lavallee, the current Superintendent of the Lowell Police Department; expert witnesses - Dr. Joel P. Wiesen, Dr. Cassi L. Fields, Dr. James L. Outtz, and Dr. Jacinto Silva.

I.    **ROBERT ALVAREZ**

1.    In March 1986, Plaintiff Robert Alvarez took the HRD Open Competitive examination for the position of entry level police officer ("HRD Open Exam") where he received a score of 91. See Exhibit 141.

2.    Since 1987, Alvarez has been continually employed as a civil service police officer in Massachusetts. He was originally hired by the Groton Police Department, transferred to the Waltham Police Department in 1991, and transferred to the Lowell Police Department in 1994. Testimony of Robert Alvarez ("Alvarez Testimony").

3.      Alvarez does not speak Spanish and was not raised in a home where Spanish was the primary language. Alvarez Testimony.

4.      Alvarez claims his race is Hispanic and though he never met or spoke to his father, Alvarez testified that his father came from a wealthy Spanish Filipino family in the Philippines, comparable to the whites of South Africa and that his father spoke Spanish and English. Alvarez Testimony.

5.      Despite claiming to be Hispanic, the evidence shows on numerous occasions, the race of Alvarez fluctuates and literally changes between Hispanic and white on numerous documents. See Exhibits 136, 137, 138, 139, 141, 142, 143, 144.

6.      Alvarez's father was born in Manila, Philippines. See Exhibit 136.

7.      The Philippines is an archipelago located in and around the South China, Philippine, Sulu and Celebes Seas in Southeastern Asia in the Eastern Hemisphere. Judicial Notice of Geographical Fact.

8.      From 1580 to 1898, the Philippines were conquered, colonized, and ruled by Spain. In 1898, as a result of the Spanish-American war, it became a commonwealth of the United States. During World War II, the Philippines was occupied and controlled by Japan. In 1946, the independent nation of the Republic of the Philippines was founded. Judicial Notice of Historical Facts.

9.      On November 21, 1849 Spanish Governor General to the Philippines D. Narciso Claveria y Zalsua issued a decree, Catalogo Alfabetico Apellidos ("Claveria's Decree") where the Spanish government assigned Spanish surnames to all Filipinos.    Judicial Notice of Historical Fact.

10.     Alvarez attended Chelmsford High School and graduated after four years. He earned an associates degree in liberal arts from Middlesex Community College. He earned a bachelor's degree in sociology from the University of Lowell. He earned a master's degree in criminal justice from Anna Maria College in 1993. TT, Alvarez Testimony.

11.     The master's degree in criminal justice earns Alvarez an additional 25% increase in his salary under the "Quinn Bill". Alvarez Testimony.

12.     The Quinn Bill, M.G.L.c.41, §108L, Career Incentive Pay Program was enacted in 1970. It allows police officers to earn compensation above their regular salary based on attaining certain post-high school educational degrees where a 25% increase is the maximum amount. Judicial Notice.

13.     On March 5, 1988, though employed as a police officer by the Town of Groton, Alvarez took the HRD Open Exam for the second time where he received a score of 97. See Exhibit 142.

14.    On October 27, 1990, though still employed as a police officer by the Town of Groton, Alvarez took the HRD Open Exam for the third time and for the second time received a scored of 97. See Exhibit 143.

15.    On October 17, 1998, Alvarez took the HRD state-wide police sergeant examination ("HRD Sgt. Exam") and received a score of 85. See Exhibit 144.

16.    Alvarez studied hard for the 1998 HRD Sgt Exam, he created flash cards, took a preparatory class, took seminars, and bought study aids. Alvarez Testimony.

17.    On November 21, 2000, Alvarez took the 2000 HRD Sgt. Exam, where he received a score of 76, a 9 point drop from his 1998 result. Alvarez did not study or otherwise prepare for the test due in part to a disciplinary issue. Alvarez Testimony, Exhibit 145.

18.    In 2003, Alvarez did not begin to study for the October 2003 HRD Sgt exam until sometime in September 2003 but did not put any effort to study or prepare for the exam. Alvarez Testimony.

19.    In 2006, though notice of the HRD reading list came out on April 21, 2006. Alvarez did not begin to study for the October 2006 HRD examination until an unknown date in July 2006. He studied approximately two hours a day. At this time, in addition to his regular duties, Alvarez also worked 8-12 hours a month on training for Northeastern Massachusetts Law Enforcement Council ("NEMLEC") Alvarez Testimony.

20.    The format for the HRD Open Exams that Alvarez took in 1986, 1988 and 1990 was the same as the HRD Sgt. Exams that he took in 1998, 2000, 2003 and 2006. Both involved a multiple choice job knowledge tests and an education and experience worksheet. Alvarez Testimony.

21.    Based on the evidence, I find that Alvarez has the ability to score very well on HRD examinations that include a job knowledge multiple choice test and points for education and experience with previous test scores of 91, 97, 97 and 85. Exhibits 141-144.

22.    Despite Alvarez's military experience, he did meet the statutory requirements to obtain any of the military veteran's preferences under G.L.c.31. Alvarez Testimony and Judicial Notice.

23.    Since 2000, Alvarez has had notice that Lowell objected to his claim of being Hispanic. Alvarez Testimony.

## II.    G.L.c.31 - CIVIL SERVICE

24.    "The civil service law, G. L. c. 31, establishes a comprehensive plan for the appointment of individuals to civil service positions, whether on an original or a promotional basis, and whether permanent or temporary." Somerville v. Somerville Municipal Employees Asso., 20 Mass. App. Ct. 594, 597 (1985). Illustrative cases include Lopez v. Commonwealth of Massachusetts, 588 F.3d 69 (1st Cir. 2009); Cambridge v. Civil Service Comm'n, 43 Mass. App. Ct. 300 (1997). and Pratt v. Dietl, SUCV2009-1254, a copy of which is attached as "A".

25.    The normative underpinnings of civil service are to recruit, hire, and promote the best candidate for the position based upon the "basis merit principles" as defined in M.G.L.c.31, §1. The "basic merit principles" required appointments to be fair and without regard to political affiliation, race, color, age, national origin, sex, marital status, handicap or religion. Id.

26.    The civil service laws create rights, duties, and responsibilities for the Personnel Administrator and Human Resource Division (collectively "HRD"); the Civil Service Commission ("CSC"); civil service municipalities through their "appointing authorities" and the civil service applicants. Judicial Notice.

27.    For the entry level position of police officer, the educational requirement is either a high school diploma or GED. Castro v. Beecher, 459 F.2d 725 (1st Cir. 1972).

28.    "[A]ppointing authority" is defined as "any person, board or commission with power to appoint or employ personnel in civil service positions." M.G.L.c.31, §1. It is the part of the municipality that is responsible for civil service appointments, it is not a separate legal entity.[1]

### A.  HRD

29.    The duties of HRD involve the administration of the civil service system, and include the preparation and administration of certain competitive promotional examinations. It has rulemaking authority regulating the recruitment, selection, training, employment and promotion of persons for civil service promotions. Lopez, at 75 citing M.G.L.c.31 §§1, 3.

30.    In the course and administration of its duties, HRD promulgated its Personnel Administration Rules ("PAR") in order to carry out its statutory mandate, a copy of relevant PARs, as of May 2010, is attached as "B". HRD is required to follow M.G.L.c.31, §4 when it seeks to change a PAR. See also Pratt v. Dietl, attached as "A".

---

[1] For the purpose of these Findings of Fact and Rulings of Law, "appointing authority" is interchangeably used with "municipality".

31.    HRD is also responsible for maintaining records of examinations, eligibility lists resulting from those examinations, and the results of all appointment decisions in the civil service. Id., citing M.G.L.c.31 §5(h).

32.    HRD is required to establish the form and content of these examinations which must 'fairly test the knowledge, skills and abilities which can be practically and reliably measured and which are actually required' to perform the job, a requirement that may significantly limit the form and substance of an examination. Lopez, at 77 citing M.G.L.c.31 §16.

33.    HRD is also responsible for determining the passing requirements of examinations. M.G.L.c.31, §22.

34.    HRD is required to give an applicant "credit for employment or experience in the position for which the examination is held." M.G.L.c.31, §22.

35.    As a result of litigation, in 1980, HRD "agreed to develop and administer promotional examinations that complied with the Equal Employment Opportunity Commission's (EEOC) Uniform Guidelines on Employment Selection Procedures." Lopez, at 77.

36.    For decades, HRD developed, within the constraints of applicable law, written annual examinations to evaluate candidates for the police sergeant promotions. Id. at 77-78.

37.    After developing an examination, HRD is required to give notice of the examination. M.G.L.c.31 §19.

38.    After administering an examination, HRD is required to create and maintain 'eligibility lists' of candidates for possible promotion to police sergeant in strict rank order for for each municipality ("in order of their marks on the examination") subject to any statutory preferences. Lopez, at 78 citing M.G.L.c.31 §25.

39.    In promotional examinations, an individual who is a 'military veteran' or an individual who has 25 years of credible police service receives 2 additional points added to his or her overall score. M.G.L.c.31 §§26, 59 and PAR.14(2).

40.    When a municipality seeks to fill a position, HRD provides it with a certified list of names listed in strict rank order pursuant to the "2n+1" rule. The "2n+1" rule requires 2 names + 1 more name for each available appointment. However, all persons tied are included within the "2n+1" formula. For example, in Exhibit 178, six names are listed for 1 position as 2 candidates were tied at 86 and 4 candidates were tied at 85. See PAR.09.

41.    HRD also has the authority to approve or disapproval any bypass of a candidate by a municipality in the selection process. M.G.L.c.31, 27.

42.     From the evidence, it appears the HRD Sgt. Examination is administered by HRD at no cost to the municipalities that utilize such an examination.

### 1.  **Definition of Hispanic**

43.     HRD uses several racial/ethnic classifications in the performance of its duties regarding the administration and first-level enforcement of Massachusetts civil service law and associated rules and regulations such as eligibility lists for entry level and promotional positions for police officers. See Exhibit 205.

44.     The racial/ethnic classifications used by HRD are: W – White; B – Black; H – Hispanic; A – Asian; and I – Native American. HRD uses the terms "race" and ethnicity" interchangeably. See Exhibit 205.

45.     When an individual applies for an HRD examination, he or she self-identifies their racial/ethnic classification such as whether he or she is "Hispanic." Exhibit 205.

46.     Since the Castro and NAACP consent decrees in the 1970's, HRD has defined "Hispanic", though originally termed "Spanish-surnamed", as an individual who (or whose family) originates from a Spanish speaking country in the Western Hemisphere and who either speaks Spanish or was raised in a household where Spanish was the primary language." Exhibit 205.

47.     Under the Castro and NAACP consent decrees, blacks and Hispanics as defined by HRD receive an appointment preference for entry level police and fire civil service positions. Judicial Notice. This consent decrees was to remedy past discrimination against blacks and Hispanics.[2]

### B. **Civil Service Commission**

48.     The CSC "has the power to review any rules proposed by HRD, and, if the Commission concludes that a given rule violates a merit-based approach to employment decisions, it can, upon, a three-fifths vote, disapprove of the rule. Lopez at 75 citing M.G.L.c.31 §3.

49.     Other duties of the CSC include adjudicating disputes concerning the content and administration of promotions examinations, any HRD decision or action that affects an applicant, and any employment action taken by an appointing authority. Lopez at 75-76 citing s.2(b)-(c), and Pratt v. Dietl, attached as "A".

### C. **Appointing Authorities**

50.     As of February 2005, there were 170 police departments covered by the requirements of civil service. See Exhibit 192.

---

[2] Previously, Lowell submitted a copy of the Castro consent decree in Defendant City of Lowell's Motion for Judgment on Partial Findings of Fact, docket number 281.

51.    All civil service examinations must be made on the basis of competitive examinations, whether on the basis of an HRD exam or some other test. M.G.L.c.31, §59.

52.    An appointing authority may use the HRD examination or may receive a delegated agreement from HRD. In either scenario, the municipality is "still bound by the state civil service law and regulations and the 'basic merit principles.' Lopez at 76, M.G.L.c.31, §59

53.    In any promotional exam, a municipality is required to appoint the top ranked candidate unless the individual is "bypassed". A municipality is required to notify HRD in writing explaining the reasons for all bypasses. See M.G.L.c.31, §27.

54.    A municipality can only consider for promotion, names on the certified HRD eligibility list under the "2n+1" formula. M.G.L.c.31, §7, PAR.08(1)

55.    A municipality only sees an HRD eligibility list when it requests permission to fill a vacation. Lopez, supra at 78. M.G.L.c.31, §7

56.    HRD does not provide a municipality with any information concern the design, administration, scoring of its examination or even furnish copies of any examination. Trial Testimony of Dr. Joel P. Wiesen ("Wiesen Testimony"), Dr. James L. Outtz ("Outtz Testimony"), Superintendent Kenneth Lavallee ("Lavallee Testimony"); see also protective orders, docket entry 24, 79; the Joint Order between HRD and Plaintiffs; various motions requesting HRD produce documents, and numerous on the record discussions.

57.    HRD does not provide the municipalities with any information concerning how candidates perform on either of the HRD test components, the multiple job knowledge test and the training and experience portion. It does not provide any information on persons who fail the examination. Lavallee Testimony and Exhibit 208.

## D.  Civil Service Applicants and Members

58.    In terms of educational requirements for the position of police officer, a candidate must have a high school diploma, a GED or 3 years of "military service' as defined by HRD. Judicial Notice, Castro v. Beecher, 459 F.2d 725, 735 (1st Cir. 1972).

59.    For cities or towns that have a population of 50,000, an applicant must have served as police officer with that specific department before he or she is eligible to apply for a promotion. M.G.L.c.31, §59.

60.    An individual has the right to challenge the validity of an HRD rule before the CSC. Lopez at 76. See also Pratt v. Dietl, attached as "A".

61.    An applicant has the right to file with HRD documentation regarding his or her training and experience and to receive credit for such training and experience. M.G.L.c.31,§22 and Exhibit 11.

62.    An applicant has the right to file an appeal regarding the grade received on either the written test or the training and experience components. M.G.L.c.31, §22.

63.    An applicant also has the right to appeal whether the examination process itself was a "fair test of the applicant's fitness" for the position. M.G.L.c.31, §22.

64.    An applicant has the right to appeal to CSC an HRD decision determination of whether the examination was a "fair test of the applicant's fitness" for the position. M.G.L.c.31, §24.

## III.    2006 HRD POLICE SGT EXAM

65.    On April 21, 2006, HRD provided notice for the 2006 HRD Sgt. Exam and provided a reading list on which the exam would be based. See Exhibit 10.

66.    The 2006 HRD Sgt. Exam consisted of two components: a job knowledge multiple choice written test consisting of 80 questions which constituted 80% of an individual's grade and an education and experience component, where the applicant followed the instructions and filled out a work sheeting indicating his or her levels of training and experience ("E&E"), which constituted 20% of an individual's grade.

67.    There is no evidence that shows Alvarez filed any protest challenging any portion of the 2006 HRD examination: the rating assigned to his training and experience, either his written examination grade or his E&E, or whether it was a "fair test."

68.    HRD certified the 2006 HRD Sgt. Exam in March 2007. See Exhibit 75.

69.    Based on the evidence, I find that Alvarez did not challenge any portion of the 2006 HRD Sgt. Exam in an appeal to either HRD or the CSC.

### A.  Disaggregation of Data

70.    Based on the evidence, the appropriate measure to view data concerning the adverse impact in the selection rates of minorities for the position of sergeant is to look at each individual defendant by jurisdiction as promotions are made jurisdiction by jurisdiction and not on a state wide basis. Lopez at 78, M.G.L.c31, §§25 and 59.

71.    Disaggregation of data is further warranted due to the fact that the score needed for promotion varies by jurisdiction. For example, in Lowell, the person promoted with the lowest written grade was "08500" but in numerous other jurisdictions significantly

lower scores resulted in promotion including but not limited to Arlington PD "07625", Ashland PD "07500", and Athol PD "07375" See Exhibit 75.

72.     Further, disaggregation of data prevents Simpson's Paradox from occurring where the cumulative results create a false representation based on unreliable data as opposed to what the data actually shows for each jurisdiction. Testimony of Dr. Jacinto Silva ("Silva Testimony") and Exhibit 198.

73.     In the field of statistics, it is not acceptable to aggregate raw data and then use it to compare across employers or jurisdictions as there are many differences that confound the data such as the different sample sizes, minority size and selection ratios. Silva Testimony.

74.     In the field of industrial psychology, it is not acceptable to aggregate raw data from two different employers such as Alcoa and Boeing and apply it to either or to use Alcoa data with respect to Boeing, each employer must be compared on its own data. Outzz Testimony.

75.     If a Lowell officer had the ability to be promoted in another jurisdiction, a Lowell minority officer who score an 82 using the "2n+1" formula would have been certified and eligible to be promoted in numerous municipalities including but not limited to: Arlington, Ashland, Athol, Braintree, Brockton, Brookline, Cohasset, Dedham, Fairhaven, Fitchburg, Framingham, Haverhill, Hingham, Hudson, Hull and Kingston. See Exhibit 75.

## B. Lowell Data[3]

76.     In 2006, 43 Lowell officers, consisting of 7 minorities and 36 non-minorities took the HRD Sgt. Exam. 7 white officers were promoted, 2 of whom received an additional 2 points for statutory credit under M.G.L.c31, §59. See Exhibit 75.

77.     Plaintiff first presented evidence alleging an adverse impact regarding Lowell in June 2010, prior to that date Plaintiffs presented no data on Lowell. Wiesen Testimony.

78.     When "adverse impact' involves small numbers, it is problematic because the numbers are very unstable. Silva Testimony.

79.     Statistical significance is defined as a difference in outcome that is due to something other than chance. Only when probably drops below 0.05 can one conclude there is statistical significance. Otherwise, there is no statistical significance and the null hypothesis that any difference is due to chance remains in effect. Silva Testimony.

80.     Another way to measure whether a difference in outcome is due to something other chance is "standard deviation." "Standard deviation analysis seeks to determine the

---

[3] The data assumes Alvarez is, in fact, Hispanic. Also, only blacks and Hispanics are counted as "minorities" in all data sets. All other racial and ethnic groups are considered to be "non-minorities."

probability that the disparately between a group's....population and the group's percentage in the....pool is attributable to random chance. <u>Berghuis v. Smith</u>, 130 S. Ct. 1382, 1390 (2010) (analysis used to determine disparity in general population and qualified jury pool).

81.    "As a general rule for such large samples, if the difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that the [selection ratio] was random would be suspect to a social scientist." <u>Castaneda v. Partida</u>, 430 U.S. 482, 496, n.17 (1977). In <u>Partida</u>, the "large samples" were based on grand jury pool numbers of "860" and "339" where Hispanics comprised 79% of the population.

82.    By Plaintiff's own admission, the data that purports to show an adverse impact ratio in the selection rate for promotions, the effective passing point, and the passing rate in Lowell for the 2006 HRD Sgt. Exam is statistically insignificant. The statistical significance for each is above .05 statistical threshold and all are less than two or three standard deviations. Wiesen Testimony and Exhibit 82.

83.    The only statistic that Dr. Wiesen opined was statistically significant ("highly significant" was the "9.1 mean score difference" on the written exam between 7 minorities and 36 non-minorities. However, the standard deviation unit for this mean difference was three. Wiesen Testimony and Exhibit 82.

84.    Any purported statistical significant in the mean score difference is irrelevant with respect to any analysis for 'adverse impact'. Outtz Testimony.

85.    Adverse impact is determined by the actual selection numbers and not an average mean score. Outtz Testimony and the testimony of Dr. Cassi L. Fields ("Fields Testimony").

86.    In the field of statistics, mean score differences have little relevance in the context of small samples due to the instability of small numbers. Silva Testimony.

87.    Based on the evidence, I find that the "greater than two to three standard deviations" rule is only appropriate when dealing with large numbers, it is not appropriate for small numbers. The standard deviation unit for the 'average mean difference' in Lowell was "three" and three is not "greater than two to three standard deviations."

88.    As "100" is considered a small number, the 7 minority scores in Lowell used to create the minority mean score is a miniscule small number and of no significance to allow any inference that defeats the null hypothesis of randomness. The difference between the 'highly statistical significance" and with the "standard deviation" shows nothing more than the instability and unreliability of small numbers.

89.    The setting of the passing grade at 70 by HRD for the job knowledge test is irrelevant to Lowell. Alvarez scored a "07625" on the written portion on the test and the lowest score of a Lowell officer promoted off the 2006 HRD examination scored an "WR 08500".Outtz Testimony, See Exhibit 75. Lowell has not promoted anyone who score lower than 85 in years, if ever. See Exhibit 75, 178, 179, 203,

## C. Adverse Impact

90.    Under the Equal Employment Opportunity Commission's Uniform Guide on Selection Procedures ("EEOC Guidelines") 29 CFR §1607 et seq., the term 'adverse impact' relates to subgroup differences in the selection rates for applicants in a testing instrument. Outtz and Fields Testimony.

91.    There is no scientific explanation for why adverse impact exists in test instruments but it may include outside factors such as differences in education, background, geography, and test preparation. It is a complex concept that is very hard to predict. As such, it is hard to create a test instrument that will actually lower 'adverse impact'. At best, one hopes that a test instrument may tend to have less adverse impact. And even this is questionable because if multiple components are used where component A has high 'adverse impact" and component B has low "adverse impact", it is possible to get a combined "adverse level" that is the highest when combing the two components. Wiesen Testimony.

92.    Generally speaking, when considering the concept 'adverse impact" three factors are to be considered as they will affect the analysis and ability to remedy any 'adverse impact." The first is actual differences between the groups such as educational background. If for example, all police officers were required to have college degrees, it would "level the playing field" for all candidates. Otherwise, there will be a difference regardless of 'adverse impact." It is not feasible to adjust a test instrument for such inequalities. The second is the selection ratio. If there are only a few positions and a large number of applicants, it will be difficult to limit the adverse impact. The third factor is the test instrument itself. These three factors are always considered regardless of the type of testing instrument. Outtz Testimony.

93.    It is possible to have a valid examination process with 'adverse impact' but is compliant with the EEOC Uniform Guidelines. This occurs when it is not feasible to create a test with similar validity and less discrimination. Outtz Testimony.

94.    In the field of industrial psychology, the literature generally shows that the more valid a testing instrument has, the more 'adverse impact" will be present. A job knowledge test is one, if not the most, valid type of testing instrument. Wiesen Testimony.

95.    In trying to remedy adverse impact, one must be careful not to create an unreliable testing instrument. For example, if one were to create a test with a too low of a

cutoff rate, the utility of the instrument is compromised. Decreased utility in a test instrument leads to a greater number of incorrect decisions. Outtz Testimony.

96.    In the field of industrial psychology, one should not make a test too easy as it precludes one from distinguishing between the high and low performers. Fields Testimony.

97.    In looking at the difference in the selection rates, the EEOC Guidelines uses a "Four-Fifths" measurement as a rule of thumb. If a selection rate differs by less than 80% there will be an inference of adverse impact, which may require additional analysis such as a validation study. Outtz Testimony.

98.    The "Four-Fifths" rule of thumb was adopted as an administrative tool. There is no science or analysis that validates the appropriateness of this rule. It is has no scientific basis. Wiesen, Fields and Silva Testimony.

99.    While the EEOC Guidelines state each subgroup is allowed to stand on its own analysis, combining subgroups such as blacks and Hispanics increases the power of the statistical analysis. Silva Testimony.

100.    The EEOC Guidelines Q&A take into account the problem of small numbers when applying the "Four-Fifths" rule by allowing for a "shift of one" analysis where you add one minority selection and remove one non-minority selection. This is because with small numbers, the difference in selection rates may be the result of chance. The "Four-Fifths" rule is very unstable with small numbers. Wiesen and Silva Testimony.

101.    The EEOC Guidelines Questions and Answers ("EEOC Guidelines Q&A") assume that "small numbers" is a number not less than 100 but "small numbers" may be as high as 200 to 400. Outtz and Silva Testimony.

102.    In addition, when dealing with "small numbers" the probably of false positives of adverse impact are increased due to the instability of the numbers. Using the Monte Carlo simulation, a statistical device, shows that even if there were no actual differences in the selection rates, based on Lowell's numbers, there would be a false positive 26% of the time. Silva Testimony and Exhibit 197.

103.    A shortfall analysis shows the actual number of persons that are required to be promoted from a minority group in order to comply with the "Four-Fifths" rule. For Lowell, the number was less than 1 person. Silva Testimony and Exhibit 197.

104.    Using a "shift of one" analysis, Lowell's promotional rate complies with the "Four-Fifths" rule. Silva Testimony and Exhibit 197.

105.    Based on the evidence, I find that there was no adverse impact with respect to Lowell and the 2006 HRD Sgt, Exam.

### D. Validity

106.    Validity is the accuracy of inferences that one seeks to make on the basis of scores from a selection instrument. Validity assesses whether a test instrument measures what it is supposed to measure. It allows one to predict at a level greater than chance as to how someone will perform. Outtz Testimony.

107.    Content validity is whether a test is an accurate measure of a representative sample of the content for the job, i.e., does it test the information needed to be a good sergeant. The closer the test reflects the actual job requirements, the more content validity the test has. Wiesen Testimony.

108.    A testing instrument is created within the constraints that exist, such as the employer's mission, its financial resources, applicable civil service laws, and collective bargaining agreements. A valid testing instrument for a position requires a job analysis, an identification of the required knowledge, skills and abilities ("KSAs"), the creation of a test map, development of the test instrument, a review of the test instrument by subject matter experts ("SMEs") to ensure the instrument is measuring what supposed to measure, determining the selection process including the logistics of administration, administration of the test, the scoring, and providing the results to the employer. The weights for an examination are derived from and linked to the job analysis. Outtz and Fields Testimony.

109.    In Ricci, the constraints included the New Haven City Charter and collective bargaining agreements. Judicial Notice.

110.    In Memphis, Tennessee, Dr. Fields was constrained by the Memphis City Charter, collective bargaining agreements and had to get the approval of the police union prior to implementing her test instrument. Fields Testimony.

111.    The weights for an examination are derived from and linked to the job analysis. Examination weights are set before a testing instrument is utilized. In the field of industrial psychology, weights cannot be altered or changed after the fact. It is inappropriate and unethical to do so. Outtz Testimony.

112.    The 2006 HRD Sgt. Exam that consisted of the written job knowledge multiple choice test and E&E constituted a minimally valid examination and complied with the Uniformed Guidelines. Outtz Testimony.

113.    The 2006 HRD Sgt. Exam was based on a 1991 validation study (Exhibits 40 & 41) and a subsequent 2002 validation study (Exhibit 42). It is appropriate to build a testing instrument on such prior validity studies. This is especially true when the basic KSAs of the position of sergeant have not dramatically changed over the years. Outtz Testimony.

114,    The 1991 validation study was an extensive and thorough report which exceeded any previous study conducted by HRD. Wiesen Testimony.

115.    The job knowledge test questions and the E&E component of the 2006 HRD Sgt. Exam were linked to the position through the validation studies of 1991 and 2002. The examination consisted of a representative sample of the KSA's for the position of sergeant. The test instrument is not required to test every possible KSA. Outtz Testimony, See Exhibits 9, 40, 41 and 191.

116.    The E&E was an appropriate means of measuring certain KSAs that were not tested for in the written job knowledge exam. It informs the employer of what one is capable of doing based on what one has done in the past. In the field of industrial psychology, one can make reasonable inferences such as it is reasonable to assume that a police officer who has been on the job for a minimum of three years can read, write and speak English fluently. Similarly, if a police officer has taught a course or class, it is reasonable to conclude he or she has oral skills. Outtz Testimony.

117.    The test outline for the 2006 HRD Sgt. Exam was the instrument used to create a representative sample of the KSAs required for the sergeant position. Outtz Testimony, Exhibit 9.

118.    The 2006 HRD Sgt. Exam consisted of questions of law, police supervision, community policing, and police functions. See Exhibit 9.

119.    The exam questions were reviewed by the SMEs prior to finalization of the exam and the weights for the test and E&E  were properly derived from a job analysis. Outzz Testimony.

120.    The more knowledge, skills and abilities that a police officer acquires over the course of his or her employment will aid the officer in preparing for a sergeant's testing instrument that has valid content. One can expect the longer an officer is on the force, he or she will become more familiar with federal, state and local laws, be involved in situations to learn the KSAs of a sergeant's position. Outtz, Field, and Wiesen Testimony.

121.    A police officer learns knowledge, skills and abilities by doing his or her job. Outtz Testimony.

122.    The positions of police officer and sergeant contain many of the same knowledge, skills and abilities. Both make arrests, direct traffic, investigate crimes, write reports, assist citizens, serve warrants, conduct searches, preserve crime scenes, and respond to emergencies. Both positions require interpersonal skills, the ability to work under pressure, good judgment, a quick real time knowledge of law, and the ability to apply that knowledge in real time, Fields Testimony.

123.    If an exam has content validity and is testing what is needs to test, with additional years of training and experience, assuming applicants are properly studying and preparing for the examination, one should expect the individual's scores to rise over time. Wiesen and Fields Testimony.

124.    But if individual remained minimally competent in the current position of police officer, one should expect the individual's scores would not rise. Fields Testimony.

### E. Readability

125.    The requirement of a high school diploma or a GED coupled with the Quinn Bill shows that the "Massachusetts Legislature has made a deliberate value judgment that the professionalization of the police is a major goal in our increasing complex society." Castro v. Beecher, 459 F.2d 725, 735 (1st Cir, 1972) and Quinn Bill. This requires all police officers to be able to read and written at a 12th grade level at a minimum and provides significant additional financial compensation for obtaining post-high school degrees. Judicial Notice

126.    The appropriate reading level for any test instrument should be determined by the job analysis. Police sergeants are required to read and understand complex documents regarding various laws. Outtz Testimony.

127.    The 1991 validation study stated a "high reading level is due to its correlation to the reading materials, difficult textual material appearing on the examination was equally difficult for all candidates, regardless of ethnic or racial background for valid job related reasons." See Exhibit 40, 41.

128.    To ensure HRD was using appropriate job related reading materials, HRD would conduct regular reading surveys. The survey broke down the texts by rank, i.e., sergeant, lieutenant and captain. The surveys were sent to all 170 civil service police communities. Most recently, HRD conducted a reading survey in February 2005 as part of its process to establish appropriate texts for the examination and reading list for the 2006-2008 HRD police promotional exams. Outzz Testimony and Exhibit 192.

129.    Superintendent Lavallee testified that the textbooks Community Policing: A Contemporary Perspective, Criminal Investigations, Police Administration, and Supervision of Police Personnel are appropriate reading material for the position of sergeant. Lavallee Testimony.

130.    Dr, Wiesen testified that the textbooks used as part of the 2005 HRD Sgt. Exam they were respected authoritative textbooks used in colleges and police departments across the country. Wiesen Testimony.

131.    The readability level of the exams was appropriate for the position of sergeant. Many of the questions were taken verbatim from documents that directly related to the

sergeant's work such as in the case of Boston, its policies and procedures or were based on actual case or statutory law. Outzz Testimony.

132.    Police officers and sergeants must know and be familiar with constitutional law as determined by the courts as well as applicable statutes such as the laws on domestic violence, motor vehicles and drug offenses, Wiesen Testimony.

133.    The complexity and readability of constitutional case law speak for itself. Judicial Notice.

134.    The complexity and readability of statutory laws such as M.G.L.c.209A - Abuse Prevention, M.G.L.c.90 – Motor Vehicle and Aircraft, and M.G.L.c.94C – Controlled Substances Act speak for themselves. Judicial Notice.

135.    With respect to 6 words cited by Dr. Wiesen as being "hard" or difficult words; 3 ("unequivocal", "intrusiveness", "inherent") are legal terms of art and were used in that context in Questions 13, 15 and 25 of the 2007 HRD Sgt. Exam; "adhere" was used in the context of compliance with a department policy against sexual harassment in Question 35; and the remaining two "homogenous" and "apportioned" were properly used in context of Question 34, which appears to be taken from an identified and specific text used for supervising police personnel. See Exhibit 46.

136.    Based on the evidence, I find that all police officers regardless of rank have to be able to read at a high level, understand, know and apply numerous difficult and terms of art as necessary job related activities regardless of any allegation of cultural bias. A sixth or eighth grade reading level is not an acceptable reading level for any individual who has the tremendous duties, responsibilities, and obligations conferred unto that individual through the powers of law enforcement in Massachusetts.

## IV.    LOWELL POLICE DEPARTMENT

137.    From 1994 through December 2006, now Commissioner Davis was the Superintendent of the Lowell Police Department ("Lowell PD"). Since December 2006, Superintendent has been the department head for Lowell PD. Lowell is civil service community where the City Manager is the appointing authority.

138.    Lowell PD has officers who patrol the streets, it also has several specialty positions such as drug enforcement, criminal investigations, and family services. Lavallee Testimony.

139.    Lowell PD runs a police academy where its officers provide training scenarios for recruits as well as in service training for police officers for approximately 27 communities. In order to teach at the academy, an officer must have a proficiency in the area for which he or she instructs. Lavallee Testimony.

140.    Superintendent Lavallee expects all Lowell officers to have: the ability to communicate with people; good interpersonal skills; the ability to handle emotional situations; the ability to deescalate situations; knowledge of the law; and the ability to handle stressful situations. A sergeant should have an enhancement of those abilities as that position is the first-line supervisor, a coach, who can answer questions and provide advice. Lavallee Testimony.

141.    It is critically important that sergeants have post high school degrees given the sophisticated situations sergeants face on a regular basis. All but one of Lowell's sergeants receive Quinn Bill compensation. Lavallee Testimony.

142.    In 1994, Angel Otero, Jose Torres and Robert Alvarez filed FBI fingerprint applications with Lowell PD; Otero and Torres listed their race as Hispanic, Alvarez listed his race as White. Alvarez Testimony.

143.    Or or about January 1999, Angel Otero, a Hispanic Lowell officer would have been promoted to sergeant based on his rank on the pre-1998 HRD Sgt. Exam administered between 1995 and 1997 but for an October 1998 off-duty incident. Lavallee Testimony, Exhibit 134.

144.    As a result of issues relating to the October 1998 off duty incident, in September 1999, Davis addresses concerns of black, Hispanic and Asian Lowell officers that included promotions. There was a discussion of whether to look into the possibility of seeking a list of minority promotional candidates from HRD. However, the minority officers rejected the idea of any special treatment based on race. There was also a discussion on assessment centers but the minority officers wanted to keep the HRD Sgt. Exam and not use an assessment center. Testimony of Edward F. Davis III ("Davis Testimony").

145.    In October 1998, Lowell utilized the HRD Sgt Exam, where 31 individuals passed the test. Alvarez ranked sixth and higher than twenty five (25) other Lowell PD Officers including: Thomas Lombard (eleventh), James Hodgdon VI (fourteenth), Jonathon Noone (fifteenth), Scott Fuller (sixteenth), Stephen Morrill (twentieth), Thomas Daly Jr. (twenty-first), David Quirbach (twenty-seventh), and John Sheehan (thirty-first). See Exhibit 208.

146.    Based on scores on subsequent HRD Sgt. Exams, Lombard, Hodgdon, Noone, Fuller, Morrill, Daly, Quirbach and Sheehan, all ranked lower than Alvarez on the 1998 HRD Sgt. Exam, were eventually promoted to the rank of sergeant.[4] Most recently, Noone and Quirbach were promoted as a result of the 2006 HRD Sgt. Exam See Exhibits 34, 35, 75, 178 and 208.

---

[4] Like Otero, Fuller was bypassed for promotion in October 2003 as a result of the off-duty October 1998 incident. See Exhibit 177.

147.    In September 2000, based on his score of 85 on the 1998 HRD Sgt. Exam, Alvarez was certified as eligible for a sergeant's promotion. See Exhibit 178.[5]

148.    In October 2003, after scoring a 91 on the 2000 HRD State Sgt. Exam, fifth highest in Lowell, Jose Torres a Hispanic officer was promoted to sergeant. See Exhibits 178, 203.

149.    In 1999, Lowell utilized the delegated assessment center process for promotions for the positions of Deputy Superintendent, Captain and Lieutenant, all supervisory positions other than Sergeant. Lowell had also previously used an assessment for the position of Superintendent. Davis and Lavallee Testimony.

150.    In 2001, and as a result of 'at the table collective bargaining' pursuant to M.G.L.c.150E, §6 which allows for the negotiation of any term or condition of employee, the 2000-2003 Memorandum of Agreement eliminated the assessment center process and reinstituted the HRD exam for promotions. Davis Testimony and Exhibit 134.

151.    Every time Lowell has used an Assessment Center, it was result of a signed collective bargain agreement. Recently Lowell and union agreed to an assessment center for the position of Captain. Lavallee Testimony and Exhibit 43..

152.    When Lowell has utilized an assessment center, it was result of a lengthy and expensive process that involved planning and budgeting with the City Manager, negotiations with the unions, obtaining an HRD delegation agreement, preparing a Request for Proposal, putting the proposal out to bid,  selecting the best proposal, and having the contractor develop the assessment center. Davis and Lavallee Testimony.

153.    Any contract by a municipality for an assessment center is required to comply with M.G.L.c.30B, the Uniform Procurement Act. Judicial Notice.

154.    In the 1990's, the assessment center for the positions of Lieutenant, Captain and Deputy Superintendent cost approximately $300,000.00. There were approximately 50 persons eligible for these promotion based on the number of sergeants, lieutenants and captains, for a cost of approximately $6,000.00 per candidate. Davis Testimony.

155.    For the position of sergeant, Lowell has always used the HRD Sgt. Exam. This is due for a variety of reasons. The police officers prefer the HRD Sgt Exam. The unions prefer the HRD exam. An assessment center would mean a larger number of participants. An assessment center would be costly. At any given time, there are approximately 125-150 police officers who are eligible to take the police sergeants' examination. Davis Testimony and Exhibit 35.

---

[5] Had the military experience of Alvarez qualified him for the additional two statutory awarded points, assuming there were no disciplinary issues, he would have been the top ranked candidate. Though not admitted into evidence, Alvarez had disciplinary issues.

156.    Unlike the other supervisory positions, the Sergeant position is more focused on job knowledge skills. Both Davis and Superintend Lavallee believe a job knowledge multiple choice can test the skills necessary for the position of sergeant. Davis and Lavallee Testimony.

157.    From FY07 to FY10, the bottom line funding for Lowell PD has decreased from approximately $24 million to $21 million, a decrease approximately 14%. Due to budget constraints, while Lowell PD is authorized to have 260 sworn officers, currently it has 226 sworn officers, approximately 85% of it's authorized number. A further yearly funding loss began in FY09 when due to the state budget constraints, the Commonwealth reduced its Quinn Bill reimbursement payments to Lowell from approximately $1 million to somewhere between $200,000-250,000 leaving Lowell responsible for the difference due to CBA obligations, a decrease of 75-80%. Lavallee Testimony.

158.    Plaintiffs' lawsuit that alleges a theory of adverse impact against Lowell for using the HRD Sgt. Exam is the first time Lowell has been sued under such a theory of liability concerning the method of promotional examination. Lavallee Testimony.

159.    Lowell officers take the HRD examination process seriously. They take preparatory class, study long hours, make sacrifices, and are very competitive with each other. This is best illustrated by the study habits of Superintendent Lavallee who would prepare a written strategy months in advance, set deadlines in his preparation, purchase the study guides for every exam textbook, attend preparatory courses, and make sacrifices professionally by forgoing all extra work and personally, once even deferring his honeymoon. Lavallee Testimony.

160.    As of 2008, Lowell had 35 minority officers, 2 of whom were sergeants. These statistics are not statistically significant. Wiesen Testimony.

161.    As of January 1, 2006, Lowell had promoted a minority off of the pre-1998 HRD Sgt. exam, had a minority eligibility for promotion off the 1998 HRD Sgt. Exam, and promoted a minority off the 2000 HRD Sgt. exam.[6]

## V.    LOPEZ LAWSUIT

162.    On October 22, 2005, HRD administered the 2005 HRD Sgt. Exam and on February 13, 2006 HRD certified the results. See Exhibit 74.

163.    On October 27, 2006, HRD administered the 2006 HRD Sgt. Exam and on March 30, 2007, HRD certified the results. See Exhibit 75.

164.    On May 13, 2007, Lowell made a permanent sergeant promotional appointment based on the 2006 HRD Sgt. exam. See Exhibit 15

---

[6] The 1998 HRD Sgt exam assumes Alvarez meets the HRD definition of Hispanic.

165.    On June 24, 2007, Lowell made a second permanent sergeant promotional appointment based on the 2006 HRD Sgt. exam. See Exhibit 15.

166.    On September 11, 2007, Plaintiffs filed their original complaint which did not name Lowell as a defendant and Alvarez was not a named plaintiff. Court Docket.

167.    On October 28, 2007, Lowell made three (3) temporary sergeants promotional appointments based on the 2006 HRD exam. See Exhibit 15.

168.    In November 2007, Alvarez filed his complaint with the Massachusetts Commission Against Discrimination making the allegations that form the basis for this lawsuit. Judicial Notice.

169,    On or about January 4, 2008, Plaintiffs filed their Second Amended Complaint naming Lowell as a defendant where Alvarez was a plaintiff.[7] Court Docket.

170.    On or June 2010, Plaintiff disclosed data for the first time which purports to show Lowell's use of the 2006 HRD Sgt. Exam resulted in 'adverse impact' involving blacks and Hispanics. Wiesen Testimony.

## VI.    ASSESSMENT CENTERS

171.    The field of industrial psychology is continuingly evolving as to what the capabilities are of any assessment center. Outtz and Wiesen.

172.    In 2006, the field of industrial psychology was struggling with assessment centers, In 2010, the field is still struggling with them. There is no universal set of core criteria on what they should consist of or how they should be weighted or graded. Assessment centers vary greatly. There are no uniform criteria for evaluations and selections. Evaluators grade independently, blindly and subjectively. Assessment centers have not eliminate personal biases. Wiesen Testimony.

173.    As of 2010, there is still disagreement as to what one can expect from an assessment center for a primarily job knowledge position like police sergeant in terms of actually reducing "adverse impact" or even its potential. Regardless of effort, resources, and money, one cannot guarantee that 'adverse impact' will be eliminated or even lowered. Outtz and Wiesen Testimony.

174.    What is not disputed is the fact that assessment centers are costly propositions with minimum costs anywhere from $1,000.00 to $6,000.00 per candidate. In the 1990's, Lowell spent approximately $300,000.00 to test no more than 50 candidates. In 2009, it cost approximately $1.2 million to test somewhere between 900 and 1200 individuals on

---

[7] Alvarez is the single plaintiff whose allegations pertain to Lowell, a second plaintiff Marisol Nobrega dismissed her case against Lowell on December 4, 2008.

a video multiple choice test in Memphis. In 2002, Boston spent $1,2 million on an assessment center.

175.   I do not find credible Dr. Wiesen's testimony on the cost to construct and administer a 1990's assessment center test for 1500 applicants that consisted of a written examination, an oral board and a physical abilities test for "something under $30,000," which amounts to less than $20 per candidate.

176.   Further complicating a potential to reduce adverse impact is the nature of the sergeant position, which is primarily job knowledge and where written documents and knowing the correct answer, i.e., the law, is critically important as opposed to a fire position which is more sensory driven. Outtz Testimony.

177.   When job knowledge skills are to be tested, a written multiple choice test such as the written portion of an HRD Sgt. Exam is more efficient, valid and objective than an assessment center. Outzz and Wiesen Testimony.

178.   No assessment center or any testing instrument can measure every possible attribute that an employer desires its employees to have. For example, there is no test instrument that has the ability to measure a person's work ethic. Outtz Testimony.

179.   Based upon the evidence, I find it would take at a minimum of one year for a municipality to have an assessment center online as the process requires an approved budget, negotiations with unions, a delegated agreement with HRD, a prepared Request for Proposal, putting it out to bid and complying with M.G.L.c.30B, selecting the vendor, have the contractor develop a valid assessment center and provide applicants enough notice to prepare for the examination.

180.   Based on the evidence, had any defendant consulted with Dr. Wiesen regarding the best way to conduct a sergeant's promotional examination, he would have recommended using the HRD Sgt. Exam as is as of February 1, 2006. Dr. Wiesen was of the opinion that not only was this type of test one if not the most valid type of test and best predictor for future job performance but that no other testing component was necessary. His advocacy of assessment center as a better test model evolved sometime after that date. Wiesen Testimony.

## VII.   BANDING

181.   Eligibility requirements for a promotion under civil service is limited to the "2n+1" formula where scores are listed in strict ranked order. M.G.L.c.31, §7, and PAR09. Scores on the eligibility list are presented in whole numbers. PAR.07(4).

182.   After the 2008 HRD Sgt. Exam, HRD announced that it was going to "band" scores. See Exhibit 70, 73 and <u>Pratt v. Dietl</u>, attached as "A".

183.    On March 27, 2009, individuals and the Boston Police Patrolmen's Association, Inc. ("BPPA") filed a complaint seeking injunctive relief in Suffolk Superior Court, Pratt v. Dietl, SUCV2009-1254, to enjoin HRD from using banded scores as HRD did not promulgate the rule in accordance with M.G.L.c.31, §4. Pratt v. Dietl, attached as "A".

184.    M.G.L.c.31, §4 requires a public hearing with at least 30 days notice of the proposed change after which the CSC must review and approve the proposed change. Judicial Notice.

185.    On April 16, 2009, Justice Bruce R. Henry issued an injunction precluding HRD from issuing eligibility promotion lists in bands and required HRD to utilize eligibility lists in strict rank order based on a numerical grade of a whole number as required by PAR.07(4). Pratt v. Dietl, attached as "A".

186.    On December 9, 2009 at a hearing before the CSC, Dr. Silva spoke in favor HRD's proposed rule change where PAR.07(04) would be revised to allow for eligibility lists to uses banding. Silva Testimony.

187.    As of May 2010, PAR.07(4) remains unchanged. It still requires that all grades be presented on HRD eligibility lists in whole numbers. Judicial Notice, see PAR.07(4). attached as "B".

## PROPOSED RULINGS OF LAW

Under a Title VII claim of disparate impact, a plaintiff establishes a prima facie case violation by showing that an employer "uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex or national origin." 42 U.S.C. §2000e-2(k)(1)(A)(i). An employer may defend against liability by demonstrating that the practice is "job related for the position in question and consistent with business necessity." Id. If an employer meets that burden, a plaintiff may still succeed by showing that the employer refuses to adopt an available alternative employment practice that has less disparate impact and serves the employer's legitimate needs. §§2000e-2(k)(1)(A)(ii) and (C).

**RICCI V. DESTEFANO**

The purpose of <u>Ricci</u> was to provide guidance to employers and courts with respect to balancing the prohibitions between unintentional disparate impact liability and intentional disparate treatment liability. <u>Ricci v. Destefano</u>, 129 S.Ct. 2658 (200), Under <u>Ricci</u>, Lowell could avoid using the results of the 2006 HRD Sgt. Exam only if it "can demonstrate a strong basis in evidence that had it not taken the action, it would have been liable under the disparate-impact statute." <u>Id</u>. at 2664. But simply using statistical evidence to invalidate the results of a lawful and beneficial promotional exam amounts to "a *de facto* quota system, in which 'focus on statistics....could put undue pressure on employers to adopt inappropriate prophylactic measures." <u>Id</u>. at 2675 citing <u>Watson v. Fort Worth Bank & Trust</u>, 487 U.S. 977, 992 (1988) (plurality opinion). A test cannot be invalidated for racial based statistics, it requires "strong evidence that the test was deficient and that discarding the results is necessary to avoid violating the disparate-impact provision." <u>Id</u>. at 2676. "The problem for the respondents is that a prima facie case of disparate-impact liability – essentially, a threshold showing of a significant statistical disparity, <u>Connecticut v. Teal</u>, 457 U.S. 440, 446 (1982), and nothing more – is far from a strong basis in evidence that the City would have been liable under Title VII had the City certified the results." <u>Id.</u> at 2678. <u>Ricci</u> "clarifies how Title VII applies to resolve competing expectations under the disparate-treatment and disparate-impact provisions. If, after it certifies the test results, [an employer] faces a disparate-impact suit...[it] would avoid disparate-impact liability based on the strong basis in evidence that, had it not certified the results, it would have been subject to the disparate-treatment liability." <u>Id.</u> at 2681.

23

Lowell had no basis in fact, let alone "a strong basis in evidence" when it first started promoting off of the 2006 HRD Sgt, Exam, certified by HRD in March 2007, in May 2007 of any allegation of adverse impact. By the time, Lowell was informed of the allegations of adverse impact via this lawsuit in January 2008, it had already made 5 promotions, 2 permanent and 3 temporary off of eligibility lists certified by HRD. It was not until June 2010, approximately 1 month before trial when Plaintiffs alleged a theory of adverse impact against Lowell that claimed to show a statistical disparity albeit with statistically insignificant data.

**STANDING**

Since Alvarez does not meet any of the criteria set forth by HRD in its definition of Hispanic, his family originates from the Philippines, which is not located in the Western Hemisphere, he does not speak Spanish, and was not raised in a household where Spanish was the primary language, he lacks standing to bring this claim as he is not an aggrieved person.[8]  According to HRD definitions, Alvarez is "Asian" which in terms of this lawsuit is considered to be "white."

In <u>Castro v. Beecher</u>, the Court defined Hispanic in the context of G.L.c.31 under the then used term "Spanish surnamed persons" as:

> 'Spanish-surnamed persons' is a term which would apply to a native American with a Spanish surname whose ancestors had for generations lived in the United States, to a person with a Spanish surname born in Madrid and educated at its famous university, and to many others **who obviously are not in the same class** as any of the named plaintiffs. What

---

[8] Based on the evidence, even under a broader definition of Hispanic, Alvarez could not meet any such definition. The only evidence he presented was his own testimony. Since 2000, he has known the City has formally contested his claim of being Hispanic, yet he offered no supporting evidence. No siblings testified, no photographic or family records were introduced. He relies on his Spanish surname which is equally explained by Claveria's Decree. On numerous self-reported documents, unlike anyone else, his race fluctuated between Hispanic and white and best illustrated by his FBI Fingerprint application submitted at the time of his transfer to Lowell in 1994. Unlike Sgts. Torres and Otero, who identified themselves as Hispanic, Alvarez identified himself as white.

the pleader presumably meant was **persons who were born or whose parents were born in Puerto Rico, Cuba, or other Caribbean countries, whose primary language is Spanish, and who have not had education and training comparable to that received by most mainstream white Americans**. Castro v. Beecher, 334 F. Supp. 930, 934 n.2 (D. Mass 1971). (emphasis added)

The Castro consent decree further requires that the above described 'Spanish-surnamed' individual must be "born in a Spanish-speaking country" or "raised in a home where the primary language was Spanish." Castro v. Beecher, Consent Decree, ¶16, Civil Action Nos. 70-1220-W and 74-2982-C.

As a result of Castro and NAACP court cases and consent decrees, HRD developed its definition of Hispanic in order to comply with the consent decrees and remedy the past discrimination against blacks and Hispanics. There is no evidence that shows that any discrimination against English speaking "Spanish Filipinos" who come from wealthy families in the Philippines and are the equivalent to the whites of South Africa, in Lowell or anywhere else in Massachusetts. Such persons are not within the class of persons who were born or whose parents were born in Puerto Rico, Cuba, or other Caribbean countries, whose primary language is Spanish, and who have not had education and training comparable to that received by most mainstream white Americans.

Racial classifications are to be narrowly construed and survive strict scrutiny only if they are narrowly tailored measures that further compelling governmental interests as was the case in Castro and NAACP. See Adarand Contractors, Inc. v. Pena, 515 US 200, 227 (1995). A remedial program is only narrowly tailored if its application is limited to those minority groups that have actually suffered discrimination. Western States Paving Co., Inc. v. USA, 407 F.3d. 983 (9th Cir. 2005). Cotter v. City of Boston, 323 F.3d 160 (1st Cir. 2003) (narrowly tailored remedy for past discrimination). See also Jana-Rock

Construction, Inc. v. New State Department of Economic Development, 438 F.3d 195 (2nd Cir. 2006) (remedial effort limited to minority groups most in need of remedial efforts) and generally, Richmond v. J.A. Croson Co., 488 U.S. 469 (1989). The Castro and NAACP consent decrees have survived strict scrutiny challenges because they are narrowly tailored, If the HRD definition of Hispanic and consent decrees were expanded to include persons like Alvarez, neither would survive constitutionally scrutiny.

### ADVERSE IMPACT

For the factual reasons set forth in Section III(A), the data concerning the municipalities is properly disaggregated by each defendant employer. This approach is consistent with Bradley v. City of Lynn, 443 F. Supp. 145 (D. Mass. 2006) where only disaggregated City of Lynn ("Lynn") data was used to determine whether or not there was adverse impact in Lynn's own selection rates. The court did not allow state aggregated data to be used in the analysis of Lynn. While state-wide allegedly "aggregated" data was allowed in the analysis of HRD's selection rates, this was because HRD was the "de facto" employer. Technically, the data was not aggregated across jurisdictions because HRD's "jurisdiction" was state-wide. To analogize, HRD was acting as a large company with 170 offices and all data from those 170 offices was used in determining HRD's selection ratios; it was all the company's own employment data. Lynn was a sole proprietorship with a single office. Bradley does NOT stand for the proposition that its appropriate to aggregate data across employers where the employment data of Alcoa is used to prove 'adverse impact' at Boeing.

There is no evidence to support the claim of Alvarez that Lowell's use of the 2006 HRD Sgt. Exam resulted in any adverse impact in Lowell's selection rates for sergeant.

Fed.R.Evid.702 allows an expert witness based on his or her knowledge, skill, experience, training or education to provide knowledge but that knowledge must "assist the trier of fact to understand the evidence or to determine a fact in issue." First Marblehead Corp. v House, 541 F.3d 36, 41 (1st Cir. 2008). It is required that an expert's testimony be "based upon sufficient facts or data" that result from the application of "reliable principles and methods." Fed. R. Evid. 702. This requirement is to "ensure, as a condition of admissibility, that proffered expert testimony rests on a sufficiently trustworthy foundation." Crowe v. Marchand, 506 F.3d 13, 17 (1st Cir. 2007) citing Daubert v., Merrell Down Pharms., Inc., 509 U.S. (1993). By Dr. Wiesen's own admission, the data pertaining to Lowell is "not statistically significant." It is not reliable knowledge. It is not sufficiently trustworthy and has no evidentiary value.

Any claim that by simply failing to promote a single minority candidate which may technically violates the :"Four-Fifths" rule of thumb is misplace as in such a position is not only inconsistent with the EEOC Uniform Guidelines Q&A, which allow for a "shift of one" analysis for small numbers. More importantly, such a proposition would constitute an unconstitutional de facto quota system. Ricci, 129 S.Ct. at 2675 citing Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 992 (1988) (plurality opinion).

### JOB RELATED AND BUSINESS NECESSITY

Based on the evidence presented, Lowell has met its burden of proving that the 2006 HRD Sgt. Exam was a bona fide promotional examination that was job related and consistent with job necessity. An employer may give and act upon the results of a professionally developed abilities test provide so long as the test is not designed, intended or used to discriminate because of race. 42 U.S.C. §2000e-2(h). The 2006 HRD Sgt.

Exam was created as a result of two validation studies, a job analysis, the identification of KSAs, a test plan linking the KSAs to the test instrument, a job knowledge multiple choice test and an E&E component, the weights of which were also linked. The questions on the examinations came from textbooks that police departments use rely and upon. The examination material consisted of constitutional and statutory laws, police supervision, community policing and police functions. The reading level was appropriate for the examinations as it tests knowledge on complex legal theories that requires successful applicants to know the meaning and context of words such as "unequivocal."

The examination met the government standards for content validity consistent with the EEOC Uniform Guidelines. See 29 CFR §1607.14(c). A test will have content validity if there is a direct relationship between the test contents and the job contents. Williams v. Ford Motor Co., 187 F.3d 533, 538-43 (6th Cir. 1999). To establish whether the contents of an employment test are job-related, the employer must show that they are "predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated." Id. at 539.

Doctors Outtz, Wiesen and Fields all opined that if an exam had good content validity and the candidate acquired additional knowledge, skills and abilities, assuming that person studied for the examination, you would expect that the scores of the better candidates would increase over time. Dr. Fields also opined however, that you would not have the same expectation for someone who was only minimally competent. She testified that one would expect that the grades to increase for someone who was only minimally qualified. After attaining more years of service, experience and knowledge, 8 Lowell

28

candidates, who ranked between 11th and 31st (last) on the 1998 HRD Sgt. Exam, eventually scored high enough on subsequent tests to be promoted. Conversely, Alvarez who ranked 6th in 1998, did not see any increase in his score, instead, his scores decreased. The most likely reason for the decrease in the scores Alvarez received is the fact that he generally chooses not to study for the examinations.

Finally, the 2006 HRD Sgt. Exam was also administered and scored in within the constraints of the laws of civil service regarding eligibility lists, the "2n+1" rule and statutory points for military veterans and police officers with 25 years of experience. While not ruling on the constitutionality of municipal law, Ricci noted that the New Haven exams had to comply with its city charter which precluded banding, required a"rule of 3" and had to use a scoring system that was the result of collective bargaining.[9]

## ALTERNATIVE SELECTION METHODS

Based on the evidence presented, Plaintiffs have not met their burden of showing that Lowell refused to adopt an available alternative employment practice that has less disparate impact and served the employer's legitimate needs. Ricci requires an alternative to be both "available" and "produce less adverse impact." Ricci, 129 S.Ct. at 2680. Plaintiffs claim that an assessment center, banding, or a combination of both would reduce adverse impact and serve the needs of the defendants.

The law requires any such alternative to be feasible. There is no evidence that shows there is an available alternative employment practice that has less disparate impact for the position of police sergeant. Though Plaintiffs allege that an assessment center will

---

[9] Presumably the civil service laws promulgated by a state in the name of public safety would have an Eleventh Amendment argument, not available for a municipal ordinance, where the state would claim the intent of Congress in enacting Title VII was not to interfere with a duel sovereign's police powers to protect public safety. See generally, Lopez v. Commonwealth of Massachusetts, 588 F.3d 69 (2009).

29

reduce adverse impact, there is no evidence that shows this to be true for such a job knowledge position. The field of industrial psychology has struggled with concept of assessments centers for years. There is no consensus as to what one can expect from such a testing instrument. If an assessment center is used, they are costly, averaging anywhere from a $1,000-$6,000 per candidate. In the current fiscal crisis where municipal budgets are being cut, municipalities are required to spend tax dollars wisely and to best utilize resources available to it. It is unreasonable for them to spend precious resources on experiments where they try to find a testing instrument that "may possibly tend but may not decrease 'adverse impact' because it is so complex." The EEOC Uniform Guidelines only require feasible alternatives that will reduce adverse impact. The statutory constraints placed on the municipalities eliminate most discretion for municipalities to adopt alternatives. They are precluded by the 'basic merit principles' to use subjected criteria. They are precluded from expanding eligibility lists as they are constricted by the "2n+1" and strict rank order. An additional constraint is G.L.c.150E, which requires municipalities to negotiate with unions in good faith regarding changes in working conditions such as the promotional process. Coupling those constraints is the fact that unlike most positions that are more conducive to an assessment center, a police sergeant's position requires critical job knowledge skills as it is the sergeant, generally speaking, who is on the street coaching and ensuring that his or her officers are properly functioning as police officers.

Based on all of the evidence, Plaintiff cannot prove that as of October 2005, a best case scenario amount of time, a municipality would need to create an assessment center that an assessment center would have less disparate impact and served the employments

30

needs of Lowell which comply within the constraints of G.L.c.31. Had Lowell retained the services of Dr. Wiesen at this time, he would have opinioned that a job knowledge multiple choice test was the most efficient and valid instrument that was the best predictor for future performance to identify the best candidates for promotion to sergeant and that an assessment center would not have less adverse impact.

Plaintiffs also claim that banding was another feasible option that Lowell should have utilized as part of its 2006 HRD Sgt. Exam. Banding is not a feasible alternative for any civil service community to utilize. It was not a legally viable option in 2009 as illustrated by Pratt v. Dietl. And as of May 2010, it remains legally untenable as PAR.07(4) has not changed. Like the City Charter of New Haven, the laws of civil service in the Commonwealth of Massachusetts do not allow banding. Further, Ricci specifically bans an employer from re-weighing an exam after the fact to create an acceptable racial balance. Ricci, 129 S.Ct. at 2680.

Lastly, there is no evidence to support a claim that Lowell has "refused to adopt" any alternative employment practice that is less discriminatory. The evidence shows that Lowell has a history of using assessments centers. It even broached the subject with minority officers in September 1999 about exploring the feasibility of an assessment center process for sergeant but the minority officers rejected that exploratory offer; they preferred the HRD Sgt. Exam. Approximately, 18 months later, in March 2001, Lowell abandoned the assessment center process as the union had the same opinion of assessment centers as did the minority officers. The use or elimination of assessment centers have always been as a result of "at the table" collective bargaining where the agreement was included in a collective bargaining agreement. The evidence shows Lowell

31

is willing to utilize assessment centers in the promotional process but will only do so after reaching an agreement with the appropriate union. Prior to this lawsuit, Lowell has never been sued over the type of examination it has utilized for promotion be it the HRD exam or an assessment center.

Until and unless the laws of civil service are revised, a municipality is required to make all appointments pursuant to the 'basic merit principles', the "2n+1" formula for eligibility, promoting in strict rank order unless there is a basis for bypassing a candidate where banding is prohibited.

### CONCLUSION

Based on the testimony and exhibits introduced at trial along with the facts for which this court make take judicial notice, the Defendant, City of Lowell, respectfully requests this Court adopt its findings of fact and rulings of law.

October 29, 2010                          Respectfully submitted,
                                          CITY OF LOWELL,
                                          By its attorneys,


                                          /s/Brian W. Leahey
                                          Brian W. Leahey, Assistant City Solicitor
                                          BBO #567403
                                          R. Eric Slagle, Assistant City Solicitor
                                          BBO #658813
                                          City of Lowell - Law Department
                                          375 Merrimack Street, 3rd Floor
                                          Lowell, MA 01852-5909
                                          Tel: 978-970-4050
                                          Fax: 978-453-1510
                                          Dated: October 29, 2010

## **CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the foregoing document, filed through the Electronic Case Filing System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on October 29, 2010.

/s Brian W. Leahey
Brian W. Leahey, Assistant City Solicitor