### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS

_____
)
PEDRO LOPEZ, ET AL                       )
Plaintiffs                               )
                                         )        Civil Action No. 07-11693-GAO
v.                                       )
                                         )
CITY OF LAWRENCE, ET AL.                 )
Defendants                               )
_____      )

### SPRINGFIELD'S RESPONSE TO PLAINTIFFS'
### PROPOSED FINDINGS OF FACT AND RULINGS OF LAW

### I. INTRODUCTION

Now come the defendants, City of Springfield and Domenic J. Sarno Jr. in his
capacity as mayor for the City of Springfield, (hereinafter collectively called
"Springfield"), and respond to those portions of "Plaintiffs' Proposed Findings of Fact
and Rulings of Law" ("Pls.' Proposed FOF") in Case 1:07-cv-11693-GAO Doc. 313 filed
10/29/10 which Springfield opposes.

### 1. Background

### A. Parties & Experts

Pls.' Proposed FOF 1.

>    The Plaintiffs are current or former police officers for the cities of Lawrence,
>    Methuen, Lowell, Worcester, Springfield, Boston, or the Massachusetts Bay
>    Transportation Authority ("MBTA").

>    *Springfield's Response to Pls.' Proposed FOF 1.*

Only six of the Plaintiffs are current or former police officers for the city of
Springfield (hereinafter collectively called the "Springfield Plaintiffs"). The six
Springfield Plaintiffs are: (i) James A. Jackson (7th Am. Compl., ¶40; Ex. 125); (ii) Juan

Rosario (7th Am. Compl., ¶41; Ex. 126); (iii) Louis Rosario Jr. (7th Am. Compl., ¶42; Ex. 127); (iv) Obed Almeyda, (7th Am. Compl., ¶43; Ex. 128); (v) Devon Williams (7th Am. Compl., ¶44; Ex. 129); and (vi) Julio M. Toledo, (7th Am. Compl., ¶45; Ex. 130). Moreover, as of April 10, 2010, Julio Toledo is a Springfield Police Sergeant.  (Ex. 172). None of the other plaintiffs are current or former police officers for the City of Springfield.  None of the other plaintiffs are employees of the City of Springfield.  This is significant because Title VII is directed against unlawful employment practices[1] by an "employer" against an "employee".  42 USCS § 2000e-2 (a) (setting forth unlawful practices).  For purposes of Title VII both the word "employer" and "employee" are defined terms.  *See* 42 USCS § 2000e (b) (defining employer); (f) (defining employee). Since Springfield is not the employer of the other plaintiffs, and the other plaintiffs are not employees of Springfield, Springfield has no legal liability for any of the other plaintiffs' claims in this case.


Pls.' Proposed FOF 3.

> The plaintiffs have taken the 2005, 2006, 2007 or 2008 exam for the position of police sergeant but have not been promoted (or were promoted after white police officers from their jurisdiction who took the same exam). Each exam was administered by the Commonwealth of Massachusetts Human Resources Division ("HRD").

*Springfield's Response to Pls.' Proposed FOF 3.*

The Springfield Plaintiffs took the 2005 and 2007 HRD police sergeant's

examinations.  None of the Springfield Plaintiffs took the 2006 or the 2008 HRD police

---

[1]    "Title VII does not define employment practice."  *Lewis v. City of Chicago*, 130 S. Ct. 2191, 2198 (2010) (internal quotation marks omitted).

sergeant's examinations.  Springfield did not participate in the 2006 or 2008 HRD police

sergeant's examinations.  (Ex. 53, p.5 - Table 1; *also compare* Ex. 74 & Ex. 76 (listing

information about Springfield police sergeant candidates) *with* Ex. 75 & Ex. 77 (omitting

information about Springfield police sergeant candidates).  Springfield has no legal

liability for any claims in this case which are based upon the 2006 or the 2008 HRD

police sergeant's examinations because Springfield was not the employer of any

candidate which took those examination and none of the plaintiffs who did take those

examinations were Springfield employees.


Pls.' Proposed FOF 4.

> Four experts testified at trial: Joel Wiesen, Ph.D. (plaintiffs), Cassi Fields, Ph.D.
> (Plaintiffs), James Outtz, Ph.D. (Defendants), and Jacinto Silva, Ph.D.
> (Defendants). All four are highly-qualified and experienced industrial
> organizational psychologists, a field that specializes in the area of testing.

*Springfield's Response to Pls.' Proposed FOF 4.*

Springfield did not contest the truth of this allegation at trial; however, it is not a

complete recitation of the entire expert evidence in this case.  Springfield offered into

evidence the expert report by Analysis and Inference, Inc.  After moving to exclude the

Analysis and Inference, Inc. report plaintiffs agreed to its admission (Trial Tr. 12-64, ll.

5-8 & 18-19).  Consequently, the "Updated Report: Analysis of Appointments to

Sergeant in Springfield, MA based on 2005 and 2007 Exams, May 27, 2010" dated July

28, 2010 by Dr. William B. Fairley and Dr. Alan J. Salzberg was admitted into evidence

in this case.  (Ex. 195).  The resumes of Dr. Fairley and Dr. Salzberg are included within

the Analysis and Inference, Inc. report; they document that both Dr. Fairley and Dr.

Salzberg are highly-qualified and experienced statisticians who are prominent in their

field.  (Ex. 195, pp. 11-23).

## B. Structure of Exams

Pls.' Proposed FOF 5.

> In Massachusetts, police and fire departments subject to civil service laws have
> two general options for promotional examinations: (l) use the statewide
> examination developed by HRD, or (2) develop their own promotional exams by
> entering into a delegation agreement with HRD.  (Exhs. 1, 2, 68, 151).  See also
> Mass. Gen. Laws ch. 31, § 5(1) (giving HRD delegation power).  All of the
> Defendants voluntarily elected to choose the first option, relying on HRD to
> create, design, and administer the exams.

*Springfield's Response to Pls.' Proposed FOF 5.*

Springfield did not contest the truth of these allegations at trial; however, to the

extent that plaintiffs are suggesting that the delegation "option" is equal to the HRD

"option" from the perspective of Springfield that is just not true.  HRD has the legal

responsibility to develop and administer non-discriminatory civil service examinations in

the commonwealth.  *Lopez v. Massachusetts*, 588 F.3d 69, 75 (1st Cir. 2009) (stating that

HRD "is a state agency with statutorily prescribed duties with respect to the

administration of the state civil service system, including the preparation and

administration of certain competitive promotion[al] examinations....  As the

administrator, HRD has statutory authority to make and amend rules which shall regulate

the recruitment, selection, training and employment of persons for civil service

positions.") (citations and internal quotation marks omitted).

When HRD performs its legal duties with respect to the administration of the state

civil service system, by designing, preparing and administering competitive promotional

civil service examinations, the commonwealth does not impose any charge upon a local

community or police department.  The evidence shows that when a local government seeks delegated authority from HRD to prepare its own civil service examination the local government must bear the costs in connection with exercising that delegated authority.[2]  These delegated costs are expensive.  (Ex. 152 – detailing Boston's payments to Morris & McDaniel. Inc. totaling $1,258,812.01).  One professional article projects that the cost of developing and administering an assessment center can be approximately ten or more times as expensive as a pencil and paper test which is consistent with the experience of Dr. Outtz in developing assessment centers.  (Trial Tr. 14-111, ll. 8-13).  Moreover Dr. Outtz testified that although assessment centers were generally expected to reduce adverse impact the reality is that "[s]ometimes they do, sometimes they don't."  (Trial Tr. , ll. 11-21).

Due to the financial crisis in Springfield and the "very lean" Springfield Police Department budget, the "option" of obtaining a delegation agreement to hire a consultant to develop, construct, validate, administer, and score an assessment center component for the Springfield Police Sergeant's position and to pay all attendant costs associated with

---

[2]     (Ex. 2, p. LOP000205, ¶ 4 requiring the Leominster Police Department "to hire a consultant to develop, construct, validate, administer, and score the assessment center component, and to pay all attendant costs associated with same."; Ex. 2, p. LOP000207, ¶ 4 requiring the Beverly Police Department "to hire a consultant to develop, construct, validate, administer, and score the assessment center component, and to pay all attendant costs associated with same."; Ex. 2, p. LOP000209, ¶ 2 requiring the Town of Great Barrington "to hire a consultant to develop, construct, validate, administer, and score a Police Sergeant assessment center and to pay all attendant costs associated with same."; Ex. 151, p. 1, ¶ 2 stating that the Boston Police Department "has retained the professional services of Morris & McDaniel. Inc, to develop, construct, validate, administer and score a promotional process, as described in detail below, and to pay all attendant costs associated with same.").

same was really not an option at all – it was not financially feasible.  (Ex. 160; Trial Tr. 12-72, ll. 22-25; Trial Tr. 12-73, ll. 1-6).

In fact, plaintiffs' own evidence shows that the 2005 HRD Police Sergeant's examination did not have a statistically significant adverse impact upon the Springfield Plaintiffs in the AI ratio for promotions.  (Ex.85A; Trial Tr. 11-63, ll. 20-25; Trial Tr. 11-64, ll. 1-25; Trial Tr. 11-65, ll. 1-23).  Similarly, the 2007 HRD Police Sergeant's examination did not have a statistically significant adverse impact upon the Springfield Plaintiffs.  (Ex.85A; Trial Tr. 11-65, ll. 24-25; Trial Tr. 11-66, ll. 1-25; Trial Tr. 11-67, ll. 1-19).


Pls.' Proposed FOF 8.

> The written test consisted entirely of closed-book questions that either quoted or closely paraphrased texts on a pre-determined reading list. (3:41-43).  As a result, they maximize the need for rote memorization.

*Springfield's Response to Pls.' Proposed FOF 8.*

Springfield agrees that the written HRD police sergeant's examinations consisted entirely of closed-book questions that either quoted or closely paraphrased texts on a pre-determined reading list.  There is nothing wrong with such a closed-book test.  In fact, Dr. Outtz testified he knows:

> of no data showing that open book exams have less adverse impact than closed book exams.  It certainly hasn't been my experience.  Open book exams can be far more difficult than closed book exams because they require greater management -- within a certain time frame -- you have a time limit for the exam.  You have to manage your time; you have to be much more test wise in terms of not wasting time looking up answers that you ought to know already; you have to make the decision as to whether you should look up the answer or trust that you know the answer ahead of time.  That's a critical decision in terms of your time management.  All those kinds of things favor someone who's really accustomed to taking exams and is a really sharp exam-taker.  And that tends to work against

individuals who are less familiar with taking exams and less familiar with the educational settings in which exams are given.

(Trial Tr. 15-28, ll. 3-18).

Springfield contests plaintiffs' unsupported conclusion that "they maximize the need for rote memorization."  Plaintiffs supply no citation to any evidence which supports plaintiffs' conclusory assertion.  During the trial plaintiffs' counsel asked Dr. Wiesen some questions about a portion of a "Group Discussion Leader Debriefing" document contained in the Appendix to the 1991 Validation Report.  The "rote memory" language in plaintiffs' conclusory assertion apparently comes from plaintiffs' counsel, who read an excerpt from the Group Leader's debriefing memo, saying that the SMEs "felt that much of the current test examines for rote memory and not for the application of concepts."  (Trial Tr. 3-34, ll. 15-25; Trial Tr. 3-35, ll. 1-18; Ex. 41, attach. AA, p. 4131).[3]  Moreover, that attachment is quite enlightening about what the SMEs actually thought about the multiple choice examination.

I. Current Written Exam Program

The SME's were nearly unanimously supportive of the written exam program. Though they had some suggestions for changes, they felt strongly that the written exam program was the only fair way of selecting candidates.

The Next written Exam

The SME's from Boston wanted their next exam to be the same as the state—wide exam, -no customized components and no assessment center.  They were quite vocal and emphatic on this point.

---

[3]    A lay witness, Boston Police Commissioner, Edward F. Davis, III, testified he believes "that people who studied hard for it and can memorize by rote do get a high score, but I believe that there are other things that should be taken into consideration." (Trial Tr. 9-41, ll. 12-18; 9-88, ll. 2-5).  Thereafter, plaintiffs' counsel got Dr. Outtz to agree with that statement by Commissioner Davis.  (Trial Tr. 15-96, ll. 20-25; 15-97, ll. 1-6).

(Ex. 41, attach. AA, p. 4130). The SME preference for multiple choice examinations is not surprising since these types of tests validly predict future job success. Dr. Wiesen testified at both his deposition and at trial that:

> "Well, the multiple-choice test, again, can cover a wide range of topics and can be well done or less well. And the literature shows that the job-knowledge tests are, if not the most valid test, very close to the most valid predictors of future job performance. So I think the answer to your question is yes. I think that multiple-choice examinations can be used by themselves to develop a roster of people for promotion."

(Trial Tr. 11-57, ll. 20-25; Trial Tr. 11-58, l. 1).

### C. Historical Background

<u>Pls.' Proposed FOFs 14-21</u>.

> In Massachusetts, there is a long and sad history of problems stemming from a heavy reliance on multiple-choice exams for fire and police department selections and promotions.[4]

> *Springfield's Response to Pls.' Proposed FOFs 14-21.*

Springfield's problems with civil service appointments to its Police Department were effectively addressed under the auspices of a revised federal consent decree which provided for original appointments to the Springfield Police Department to be made by

> the continued use of minority and non-minority groups, at a ratio of one to one in Boston and Springfield and three to one in other municipalities, until the percentage of minorities in the police force was commensurate with the percentage of minorities in the community.

---

[4]  Plaintiffs' Proposed Findings of Fact in ¶¶15-21 purport to provide historical background to their basic premise in ¶14. Springfield is not specifically named in 14-21 which primarily consist of a number of court decisions in which Springfield was not involved. Under these circumstances it was deemed appropriate for Springfield to address its specific history in a unified response to Plaintiffs' Proposed Findings of Fact in ¶¶14-21.

*Sullivan v. City of Springfield*, 555 F. Supp. 2d 246, 250 (D. Mass. 2008); *see also*

*Sullivan v. City of Springfield*, 561 F.3d 7, 17 (1st Cir. 2009) (observing that the

"language of the consent decree requires the creation of two separate lists: one of

minority applicants "who pass a ... police entrance examination and are otherwise

qualified for appointment on the basis of existing requirements"; and another of non-

minority candidates "who pass a ... police entrance examination and are otherwise

qualified for appointment on the basis of existing requirements."  It then specifies that

"candidates shall be certified on the basis of one candidate from [the minority list] for

every candidate certified from [the non-minority list]."  The language of the decree,

evidence concerning past practices under the decree, and common sense regarding the

intended operation of the decree are relevant considerations in interpreting the scope of

the *Castro* consent decree.  All these considerations support the conclusion that the City's

actions were well within the scope of the *Castro* decree.") (citation omitted).  Springfield,

for more than thirty years, has made an effort as authorized under the *Castro* consent

decree

> to increase the number of minorities hired by ensuring that minority applicants
> made up a certain proportion of the applicants considered for positions.  In the
> case of Springfield, the decree required that one minority be considered for every
> non-minority.

*Sullivan v. City of Springfield*, 555 F. Supp. 2d 246, 255 (D. Mass. 2008).  The consent

decree involved entry level positions in the police department.  The civil service law

differentiates between an entry level examination and a promotional examination.  *See*

M.G.L. ch. 31, § 1 (defining a 'civil service appointment' as either "an original

appointment or a promotional appointment made pursuant to the provisions of the civil

service law and rules"; *see also* the definitions of 'original appointment' and 'promotional appointment').

This case involves promotional examinations, not entry level examinations. Plaintiffs produced no evidence and did not cite any legal authority to establish a history of discriminatory promotional practices in the Springfield Police Department. When Springfield bypassed the top two scoring white candidates to appoint a Hispanic candidate to a vacant police sergeant's position the Civil Service Commission upheld the white candidates bypass appeal saying:

> Although building a diverse police force, reflective of the community, is an important goal, it does not constitute reasonable justification in the present case for promoting two (2) officers whose names appeared lower on the certification list than both the Appellants.

A copy of that Civil Service Commission Decision is attached hereto and incorporated herein as Exhibit A, pp. 8-9. The Civil Service Commission ordered HRD to place the two white candidates "names at the ·top of the next and subsequent certification lists for promotion to the position of Sergeant until such time as they are again are considered for said promotion." (Exhibit A, p. 9). This apparently led to a mistake in Dr. Wiesen's data analysis. (Trial Tr. 4-67, ll. 6-25; Trial Tr. 4-68, ll. 1-25; Trial Tr. 4-69, ll. 1-18; Ex. 31 – Ex. 1 attached thereto). That administrative decision comports with state law. *Mass. Ass'n of Minority Law Enforcement Officers v. Abban*, 434 Mass. 256, 264 (2001) (ruling that the civil service "commission, and the Superior Court judge on review, correctly concluded that without the consent decree's mandate, race, a consideration specifically identified by the Legislature in G. L. c. 31, § 1 (e), as inconsistent with basic merit principles, cannot be used to justify a bypass. While civil service law allows consideration of race in promotion decisions as part of an approved affirmative action

plan ... there was no such plan here and therefore the police department improperly based these promotions on race.").  Dr. Wiesen testified that he was originally hired by DPA, HRD's predecessor, because they needed to be more professional in how they tested their -- and prepared their examinations.  (Trial Tr. 10-6, ll. 1-9).

Plaintiffs have not produced any evidence to establish that a race-conscious action is necessary to ameliorate vestiges of past discrimination in the Springfield Police Department's promotional process for the police sergeant's position.  Plaintiffs failed to produce any evidence or provide any case authority to prove that the Springfield Police Department's promotional process for police sergeant is sufficiently discriminatory to necessitate remedial action.  Plaintiffs' failure to produce any evidence on that fact specific inquiry is fatal to the Springfield Plaintiffs' claims in this case.  Springfield cannot simply discard the 2005 and 2007 HRD police sergeant's promotional examinations to achieve a more desirable ethnic and racial distribution among Springfield police sergeants.  State civil service law prohibits promotion of ineligible and unqualified candidates to the Springfield police sergeant's position regardless of their race or ethnicity.  In this case there is no evidence of a strong basis in evidence that the 2005 and 2007 HRD police sergeants' examination were deficient and that discarding those examinations is necessary to avoid disparate impact in the Springfield Police Department. Plaintiffs failed to make a threshold showing of statistical disparity in the 2005 and 2007 HRD police sergeants' promotional examinations to provide a strong evidentiary basis from which one could reasonably conclude that those tests had an unlawful disparate impact against the Springfield Plaintiffs.  Moreover, there is ample evidence in this case to show that the 2005 and 2007 HRD police sergeants' promotional examinations were

both job-related and consistent with business necessity, and plaintiffs failed to present any strong basis in evidence of an equally valid, less-discriminatory testing alterative. Springfield does not have a strong basis in evidence to replace HRD's cost free, merit selection process with a race-based police sergeant promotional process. "[U]nder Title VII, before an employer can engage in intentional discrimination for the asserted purpose of avoiding or remedying an unintentional disparate impact, the employer must have a strong basis in evidence to believe it will be subject to disparate-impact liability if it fails to take the race-conscious, discriminatory action." *Ricci v. DeStefano*, 129 S. Ct. 2658, 2677 (2009); *see also* 42 USCS § 2000e-2 (l) (making it "an unlawful employment practice for a respondent, in connection with the selection ... candidates for ... promotion, to adjust the scores of, use different cutoff scores for, or otherwise alter the results of, employment related tests on the basis of race, color, religion, sex, or national origin."). In this case there is no evidence that Springfield had a strong basis in evidence to believe it would be subject to disparate-impact liability if it did not take the race-conscious, discriminatory action of promoting the Springfield Plaintiffs due to their race or ethnicity over other candidates who scored higher on the HRD police sergeants promotional examinations in 2005 and 2007; moreover, Title VII prohibits such a discriminatory use of test scores.

### D. Duties of Police Sergeants

Pls.' Proposed FOFs 22-34.

Plaintiffs proposed findings ##22-34 reference some of the evidence pertaining to a few police sergeant duties.

*Springfield's Response to Pls.' Proposed FOFs 14-21.*

There is a lot of evidence, not referenced by plaintiffs, regarding a Springfield police sergeant's duties (Ex. 165 and Trial Tr. 12-78, ll. 17-25; Trial Tr. 12-79, ll. 1-16) and the knowledges, skills, abilities and personal characteristics ("KSAP") required to be a police sergeant elsewhere in the commonwealth.  (Ex. 41, Attach. CC at p. 4264 #IV; Ex. 41, Attach. EE at pp. 4272-78; Ex. 41, Attach. FF at pp. 4279-82; Ex. 41, Attach. GG at pp. 4295- 4303; Ex. 41, Attach. HH at pp. 4316-17; Ex. 41, Attach. L at pp. 3662-66 & 3684-87; Ex. 41, Attach. P at pp. 3879-88; Ex. 41, Attach. Q at pp. 3901-12; Ex. 41, Attach. R, at pp. 3937-47 thru #82 & 3949; Ex. 41, Attach. T at pp. 3954-78; Ex. 42, at pp. 1592-1603).  In amassing its information regarding a police sergeant's duties in the commonwealth HRD carefully gathered "current and accurate job content information" so that it "would be the basis for the development of valid and reliable selection procedures."  (Ex. 40, p. 00249).  HRD gathered its information from "Massachusetts police departments, as well as job analysis reports, survey instruments and other information from jurisdictions outside the Commonwealth."  (Ex. 40, p. 00249).  From that police generated information about the police sergeants position, HRD developed and administered "a task inventory questionnaire designed to identify the frequent and critical tasks and duties" or important KSAPs required at the time of appointment to the police sergeant's position.  (Ex. 40, p. 00249).  Those important KSAPs were linked "to the frequent and critical tasks of these jobs by subject matter experts (SMEs), .i. e. ·superior officers from Massachusetts police departments."  (Ex. 40, p. 00250).  Over the years that information was updated.  (Ex. 42; Trial Tr. 15-35, ll. 1-12).

Plaintiffs cherry pick a few of the KSAPs and assert that "the exams did not test for any of these abilities" (Pls.' Proposed FOF #33, last sentence) but plaintiffs' assertion is undermined by the expert testimony of Dr. Wiesen:

> Q. So let's talk about the testability analysis for just a moment. Is it your position that every knowledge, skill and ability that's listed on the testability analysis should be tested for in the exam itself?
>
> A. Well, ideally it would be, but I think there are practicalities that preclude that.
>
> Q. And when we talk about "ideally," there's a difference, isn't there, between the ideal, or the perfect exam, and an exam that's reasonable, reliable, fair and valid?
>
> A. Right. And even the Uniform Guidelines talk about a representative sample as opposed to an exhaustive coverage.
>
> Q. So even under the Uniform Guidelines, if you don't test every single knowledge, skill and ability, it will still even pass their demanding standards?
>
> A. As I say, the Uniform Guidelines talk about a representative sample and do not require comprehensive coverage.

(Trial Tr. 4-34, ll. 15-25; Trial Tr. 4-35, ll. 1-6). *See* 29 CFR 1607.14 C. (1) (stating that "a selection procedure can be supported by a content validity strategy to the extent that it is a representative sample of the content of the job.").

## 2. Disparate Impact Issues

### A. Written Job Knowledge Tests

Pls.' Proposed FOF 35.

> It is universally recognized among industrial organizational psychologists, including all four experts who testified at trial, that the type of written multiple-choice tests at issue in this case produce high levels of adverse impact on minority candidates. (2:82-84; 3:43-47, 55, 60; 10:30; 16:59; 17:110).

*Springfield's Response to Pls.' Proposed FOF 35.*

According to Dr. Wiesen the phrase, adverse impact, "looms large in the field of industrial psychology." (Trial Tr. 2-37, ll. 23-24). Although industrial organizational

psychologists sometimes use the phrases, adverse impact and disparate impact,

interchangeably (Trial Tr. 2-38, ll. 17-19) only statistically significant adverse impact

legally rises to the level of a Title VII disparate impact.  When the data is statistically

insignificant "the data isn't reliable enough for you to say that there's a real difference."

(Trial Tr. 5-75, ll. 20-21).  Dr. Wiesen testified:

> There are criteria -- mathematical criteria for statistical significance.

(Trial Tr. 4-58, ll. 1-2).

> The way the statistical significance works, it's all or none, at least as it was
> designed.

(Trial Tr. 4-58, ll. 24-25).

> Q. It's a fact that a probability of .05 or less is typically considered statistically
> significant, correct?
>
> A. Yes.
>
> Q. So if it's greater than .05 -- if it's .05 or more, then that will typically be
> considered not statistically significant, is that correct?
>
> A. If it's greater than .05, yes.

(Trial Tr. 11-64, ll. 10-16).

The Uniform Guidelines define adverse impact as a "*substantially* different rate of

selection in hiring, promotion, or other employment decision which works to the

disadvantage of members of a race, sex, or ethnic group. See section 4 of these

guidelines."  29 CFR 1607.16 (italics added for emphasis).  Under the Uniform

Guidelines adverse impact is quantified as a "selection rate for any race, sex, or ethnic

group which is less than four-fifths ( 4/5 ) (or eighty percent) of the rate for the group

with the highest rate will generally be regarded by the Federal enforcement agencies as

evidence of adverse impact, while a greater than four-fifths rate will generally not be

regarded by Federal enforcement agencies as evidence of adverse impact."  29 CFR 1607.4 D.

Title VII does not use the phrase "adverse impact"; instead it "prohibits employers from using employment practices that cause a disparate impact on the basis of race (among other bases). 42 U.S.C. § 2000e-2(k)(1)(A)(i)."  *Lewis v. City of Chicago*, 130 S. Ct. 2191, 2195 (2010).  To legally establish a disparate impact violation under Title VII justifying judicial imposition of a race based remedy the complaining a party must provide the court with "a strong basis in evidence that the test was deficient and that discarding the results is necessary to avoid violating the disparate-impact provision." *Ricci v. DeStefano*, 129 S. Ct. 2658, 2676 (U.S. 2009).  Here the evidence shows a statistically insignificant impact upon the Springfield Plaintiffs from the 2005 and 2007 HRD police sergeant's examinations.  Thus plaintiffs failed to provide a strong basis in evidence of a disparate impact upon the Springfield Plaintiffs from the challenged HRD police sergeants' promotional examinations.

There was no evidence of universal recognition among industrial organizational psychologists that the written multiple-choice tests in this case produce statistically significant levels of adverse impact on minority candidates.  Although Dr. Wiesen testified that one effect "of using a written multiple-choice job-knowledge test is that you're virtually assured of adverse impact" (Trial Tr. 3-47, ll. 17-19), when he was asked:

> As an industrial psychologist in this field, prior to even the administration of the 2005 exam, would you have been able to predict with a reasonable degree of scientific certainty whether there was going to be adverse impact if a sergeant's exam was given that had only a multiplechoice job knowledge test?
>
> ....

A.  I would not have been able to make a numeric prediction because adverse impact is very complex.  For example, it depends on the number of people you appoint, just as we went over with that frequency distribution.  In the extreme, if a department were to appoint all the people that took the test, then a hundred percent of the minorities would be selected, a hundred percent of the non-minorities.  That would be 1 over 1.  It would be perfect equity.  So the same test can have different adverse impact ratios depending on the appointment process.  But in terms of the impact of the test on the grades, on the average grades for minorities and non-minorities, you definitely could predict that the test would adversely affect the minorities; and given some reasonable assumptions about what proportion of people might be promoted, you could make a reasonable guess as to the actual adverse impact.

(Trial Tr. 2-83, l. 25; Trial Tr. 2-84, 1-22).  Dr. Wiesen admitted under cross examination that other testing methods "tend to have less adverse impact"; but that is not evidence of universal recognition among industrial organizational psychologists that the "written multiple-choice tests at issue in this case produce high levels of adverse impact on minority candidates."  (Trial Tr. 10-30, ll. 1-25; Trial Tr. 10-31, ll. 1).  Plaintiffs speculate that if, an industrial organizational psychologist had reviewed all the scientific literature in 2004 such a person may have been able to predict that a multiple-choice job-knowledge test, using convergent thinking, was highly likely to have significant adverse impact on minorities (Trial Tr. 16-58, ll. 21-25; Trial Tr. 16-59, ll. 1-8) but it is also possible that due to the "the diversity validity dilemma" it may also have "a high predictive value."  (Trial Tr. 17-110, ll. 1-18).  Although this type of theoretical musing holds some interest to the inquisitive mind, the reality is that, in this case, there is no evidence that any of the experts actually undertook such a review in 2004.  Dr. Outtz pointed out that "[n]o one's published an assessment center where you had a component that had no adverse impact, so they all have some."  (Trial Tr. 15-7, ll. 8-10).  In responding to a question about an article published in 2010 in the Handbook of Workplace Assessment containing a critique that adverse impact in assessment centers

tends to be similar to the amounts found in job-knowledge tests, Dr. Outtz indicated that he has found some instances where the amount of adverse impact in an assessment center is similar to that which is produced in the job-knowledge test. (Trial Tr. 15-5, ll. 18-25; Trial Tr. 15-6, ll. 1-3).

In Dr. Outtz experience "in dealing with adverse impact the ball game is played, for the most part, in terms of selection ratio." (Trial Tr. 15-16, ll. 20-22). Dr. Outtz testified that the "adverse impact itself is determined by the actual selections." (Trial Tr. 16-71, ll. 24-25). The evidence shows that the 2005 HRD police sergeants' promotional examination did not have a statistically significant adverse impact upon the Springfield Plaintiffs. (Ex. 85a, Table D1, row one, columns 2 &3; Trial Tr. 11-64, ll. 1-25; Trial Tr. 11-65, ll. 1-23; Ex. 195; Trial Tr. 17-40, ll. 1-18; Trial Tr. 17-47, ll. 14-20). In fact Dr. Outtz testified, to a reasonable degree of scientific certainty, that the HRD police sergeant's promotional examinations at issue in this case "are indeed valid and meet the Uniform Guidelines." (Trial Tr. 15-34, ll. 4-23).

Pls.' Proposed FOF 36.

> As a result, continued use of multiple-choice tests can be expected to result in ongoing patterns of disparate impact. (2:103, 107-108, 110-11, 115, 117; 3:47).

*Springfield's Response to Pls.' Proposed FOF 36.*

In so far as this allegation pertains to Springfield the plaintiffs rely upon the testimony by Dr. Wiesen; that testimony apparently was based upon information (Trial Tr. 2-97, ll. 24-25; Trial Tr. 2-98 thru 2-103) contained in Dr. Wiesen's third supplemental report (Ex. 53). At the time Dr. Wiesen filed his third supplemental report, June 25, 2010, and provided his initial testimony pertaining to Springfield, Tuesday, July

13, 2010, the information pertaining to Springfield was still[5] wrong.  The next day the

parties took steps to correct it:

> MR. CHURCHILL: And then, in addition, your Honor, we wanted to move into evidence the tables from Dr. Wiesen's reports that he was referring to, none of the text that precedes or follows it, but just the numbers on there for everyone's benefit so we can all be on the same page in terms of what he was looking at and describing.
>
> MR. PIKULA: I just have one issue with one of them which I had discussed with counsel. I'm not sure if it's one you intend to introduce or whether it's just the chalk that Mr. Wiesen had utilized.  There was an error as to one of the Springfield numbers, which I have conferred -- and I think we've located the source of the error and we're trying to work that out.  I believe Mr. Lichten was actually going to make a phone call to confirm that.
>
> MR. LICHTEN: I'm trying to work that out, your Honor.
>
> MR. CHURCHILL: So for the Springfield-specific data, we've agreed to hold off on that one for now.

(Trial Tr. 3-6, ll. 7-23; Trial Tr. 3-9, ll. 23-24).  On Tuesday, July 27, 2010, the following

discussion took place in connection with that corrected Springfield data:

> Q. Doctor Wiesen, let me show you a chart that you prepared which was given to me yesterday. And can you identify this chart for me, please, sir?
>
> A. Yes. It's a –
>
> Q. What is this chart?
>
> A. It's a summary of the -- some of the adverse impact analyses that I've done for the City of Springfield.

(Trial Tr. 11-63, ll. 6-25; Trial Tr. 11-64, l. 1).  The next day, following further

discussion, the corrected information was admitted into evidence as Exhibit 85a.  (Trial

Tr. 12-40, ll. 16-25; Trial Tr. 12-41, ll. 1-25; Trial Tr. 12-42, ll. 1-25).

---

[5]    Dr. Wiesen admitted that the aggregated information pertaining to Springfield and Worcester which he had used in his earlier reports was wrong.  (Trial Tr. 5-117, ll. 5-9).

Once the erroneous data about Springfield was corrected Dr. Wiesen's analysis of it shows that the 2005 HRD police sergeants' promotional examination did not have a statistically significant adverse impact upon the Springfield Plaintiffs.  (Ex. 85a, Table D1, row one, columns 2 &3; Trial Tr. 11-63, ll. 20-25; Trial Tr. 11-64, ll. 1-25; Trial Tr. 11-65, ll. 1-23; Ex. 195; Trial Tr. 17-40, ll. 1-18; Trial Tr. 17-47, ll. 14-20).  The evidence also shows that the 2007 HRD police sergeants' promotional examination did not have a statistically significant adverse impact upon the Springfield Plaintiffs.  (Ex. 85a, Table D2, rows one thru four, columns 2 &3; Trial Tr. 11-65, ll. 24-25; Trial Tr. 11-66, ll. 1-25; Trial Tr. 11-67, ll. 1-19; Trial Tr. 11-68, ll. 18-24; Ex. 195).  Since neither the 2005 nor 2007 HRD police sergeants' promotional examinations had a statistically significant adverse impact upon the Springfield Plaintiffs, plaintiffs speculation about the future impact of HRD police sergeants' promotional examinations in Springfield gives an aura of respectability to testimony that does not deserve it.  Calling speculation science tends more to conceal rather than reveal the truth.

### B.  AI Ratios and Mean Score Differences

Pls.' Proposed FOF ##41-46.

Plaintiffs proposed findings of fact ##41-46 concern mean score differences between sub-groups.  Dr. Wiesen testified that he:

> performed an analysis to compare the written test scores for minority applicants, black and Hispanic applicants, and everyone else on each of the four statewide exams and the two Boston exams; and what I found was, there were discrepancies, there were differences in the means for minorities and non-minorities, and those differences were highly statistically significant. They were not likely to have occurred by chance.

(Trial Tr. 2-67 ll. 17-23).

*Springfield's Response to Pls.' Proposed FOFs 41-46.*

Title VII specifies the burden of proof in disparate impact cases but it does not specify the evidence necessary to establish the existence of disparate impact.  The Supreme Court has observed:

> Under the disparate-impact statute, a plaintiff establishes a prima facie violation by showing that *an employer uses "a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin."* An employer may defend against liability by demonstrating that the practice is "job related for the position in question and consistent with business necessity." Even if the employer meets that burden, however, a plaintiff may still succeed by showing that the employer refuses to adopt an available alternative employment practice that has less disparate impact and serves the employer's legitimate needs.

*Ricci v. DeStefano*, 129 S. Ct. 2658, 2673 (2009) (citations omitted) (italics added for emphasis).

To ascertain the "particular employment practice" which plaintiffs claim caused "a disparate impact on the basis of race, color, religion, sex, or national origin" requires an examination of the Seventh Amended Complaint.  In this case plaintiffs did not expressly assert a claim against Springfield based on the mean score differences between sub-groups.[6]  Apart from plaintiffs, not inconsequential, failure to plead a mean score differences claim the evidence in this case establishes that the challenged HRD police

---

[6]    Plaintiffs vaguely challenge "the the sergeant's promotional examination on the grounds that it has a disparate impact on minority test takers." (7th Am. Compl. ¶ 1).  Plaintiffs complain that if "a candidate passes such examination, he or she is then ranked by their score on the examination and selections for promotional positions are made by the respective city and town from the top candidates on such list."  (7th Am. Compl. ¶ 71). Plaintiffs complain that even though "a majority of the ... plaintiffs passed the sergeant's examination" they did not receive "scores high enough that they will likely be reached for promotion" and, additionally, some of the plaintiffs "did not receive a passing score on the police sergeant's examination."  (7th Am. Compl. ¶ 77).  Finally plaintiffs assert that there are "significant number of qualified minority police officers who are otherwise qualified for such promotion, were it not for the resulting scores on the police sergeant's promotional examination administered by HRD."  (7th Am. Compl. ¶ 79).

sergeants' promotional examinations for 2005 and 2007 were created, administered and

scored by HRD.  The carefully structured professional process by which the challenged

HRD police sergeants promotional examinations were created and content validated is

described in the *Commonwealth of Massachusetts, Department of Personnel*

*Administration, Validation Report, for the 1991 Police Promotional Selection*

*Procedures, October 1, 1991* (Ex. 40) and the voluminous appendix thereto (Ex. 41).  Dr.

Outtz testified:

> that the job of a police sergeant is one that has not changed very much in 20 years
> really, especially in terms of the knowledges, skills and abilities required to do it.
> So that this 1991 validation study that I looked at, I felt that the job analysis was
> done quite well and that I would have expected to see some update of that job
> analysis around eight or so -- at least eight or so years later, maybe eight or nine.
> And that's exactly what I found. Around the year 2000 another job analysis was
> done building upon that 1991 job analysis, and that simply buttressed what was
> done in 1991.  And throughout this period of time from 1991, particularly with
> regard to the exams at issue in this case, they build off of both of those job
> analyses really.

(Trial Tr. 14-36, ll. 13-25; 14-37, l.1).  After reviewing the materials in this case, Dr.

Outtz "reached the conclusion that the examination process with the written test and the

assessment of education and experience, that combination constituted a valid process"

and it complied "with the Uniform Guidelines"  (Trial Tr. 14-35, ll. 4-13).  Consequently,

even assuming, *arguendo*, that there were statistically significant differences in the mean

scores for minorities and non-minorities they were not caused by Springfield.  The First

Circuit has described the responsibilities for creating and scoring the challenged police

sergeant promotional examinations in this case:

> HRD ... is a state agency with statutorily prescribed duties with respect to the
> administration of the state civil service system, including the preparation and
> administration of certain competitive promotions examinations.  The civil service
> law identifies HRD as the "[a]dministrator," meaning "the personnel administrator
> of the human resources division," as distinct from an "appointing authority" with

the "power to appoint or employ" the plaintiffs.  As the administrator, HRD has statutory authority to "make and amend rules which shall regulate the recruitment, selection, training and employment of persons for civil service positions."  HRD here is not being sued by its own HRD employees, but in its capacity as the administrator of the civil service system.

The law also directs HRD to make rules pertaining to promotional appointments, and for conducting appointment and promotion examinations....

*Lopez v. Massachusetts*, 588 F.3d 69, 75 (1st Cir. 2009) (citations omitted).


<u>Pls.' Proposed FOF #47</u>.

47. According to the Uniform Guidelines, and as Dr. Silva confirmed, another way of establishing adverse impact is by looking at patterns. (18:29-32)  So, for example, even for a jurisdiction whose numbers are too small to get a statistically-significant measure of adverse impact, if there was a historical pattern, over three or more years, reflecting low rates of minority promotions, then that pattern could be sufficient to require evidence of test validity. (18 :31-32).

*Springfield's Response to Pls.' Proposed FOF 47.*

The evidence in this case shows the 2005 and the 2007 HRD police sergeants promotional examinations did not have a statistically significant adverse impact on the Springfield Plaintiffs.  (Ex. 85a, Table D1, row one, columns 2 &3; Trial Tr. 11-63, ll. 20-25; Trial Tr. 11-64, ll. 1-25; Trial Tr. 11-65, ll. 1-23; Ex. 195; Trial Tr. 17-40, ll. 1-18; Trial Tr. 17-47, ll. 14-20; Ex. 85a, Table D2, rows one thru four, columns 2 &3; Trial Tr. 11-65, ll. 24-25; Trial Tr. 11-66, ll. 1-25; Trial Tr. 11-67, ll. 1-19; Trial Tr. 11-68, ll. 18-24; Ex. 195).  Consequently, no pattern of discriminatory police sergeant promotions exists in Springfield.

Q. Doctor Wiesen, is it fair to say that if analysis of a particular exam result is not statistically significant it shows no clear pattern?

A. Taken alone, yes.

Q. It's then insignificant, is that correct?

A. Taken alone, if it's not statistically significant, then it's not statistically significant.

(Trial Tr. 10-115, ll. 18-24).


### C. Aggregation Issues

Pls.' Proposed FOFs ##48-53.

Plaintiffs propose that statewide data should be used to measure disparate impact. (Pls.' Proposed FOF ##48-53). Dr. Wiesen opined that "to find out if the examination adversely affects minorities, the best approach would be to use the data from all of the applicants that took the examination." (Pls.' Proposed FOF #48).

*Springfield's Response to Pls.' Proposed FOFs 48-53.*

Aggregation of data, when correctly done statistically, can be a useful way to summarize information but it may not answer the question which counts. For instance former United States Secretary of Labor Robert Reich has been said to have quipped that he (at 5 feet tall) and Shaquille O'Neal (at 7 feet tall) have an average height of 6 feet. Their combined average height does not provide very useful information to a basketball coach recruiting a center for the team. Disaggregating the data does provide useful information; it makes the coach's decision less demanding.

The question which counts in this case is whether Springfield discriminated against the Springfield Plaintiffs in its use of the 2005 and 2007 HRD police sergeants' promotional examinations. Aggregating data from all the statewide police sergeant candidates to draw a conclusion of disparate impact with regard to the Springfield Plaintiffs is erroneous. A statewide aggregated data pool does not correspond to the

reality of the merit based departmental promotional process in this case.  Liability under

Title VII hinges upon an employer-employee relationship between the plaintiff and the

defendant.  42 USCS § 2000e-2 (a) (establishing unlawful employment practices for

employers).  Springfield is only the employer of the Springfield Plaintiffs.  (7th Am.

Compl. ¶¶43-48; 61-62).  Springfield is not an employer of any of the other plaintiffs in

this case.  (7th Am. Compl. ¶¶3-42 & 49-60).  Only Springfield police candidates were

legally qualified to take the HRD police sergeants' promotional examination.  The

examination for a promotional appointment to Springfield Police Sergeant was only open

to permanent Springfield police officers who had served "for at least three years" in that

position.  M.G.L. ch. 31, § 59.  Dr. Outtz testified about the inappropriateness of

plaintiffs' data aggregation:

> A. I disagree with the appropriateness of aggregating data across jurisdictions.
> The Uniform Guidelines indicate that if the numbers are too small you can look at
> the data over time for a given employer.  In this instance, my understanding of the
> promotion process is -- at the different jurisdictions is that you compete in a
> jurisdiction against individuals in your jurisdiction; you do not compete against
> candidates throughout the state in all other jurisdictions.  That, then, in my
> opinion, precludes the appropriateness of aggregating data across jurisdictions
> simply because they have a similar selection system.
>
> To me, that would be tantamount to having Boeing and Alcoa having similar
> selection systems.  You don't apply for jobs at Alcoa and Boeing at the same time,
> nor are you allowed to, let's assume, but we're going to aggregate the data from
> Boeing and Alcoa and determine whether each or both of them have a situation
> that has adverse impact.  That would be, to me, wholly inappropriate, and it's
> wholly inappropriate in this case, in my opinion.

(Trial Tr. 15-40, ll. 23-35; Trial Tr. 15-41, ll. 1-18).  According to Dr. Outtz "the

candidates in each jurisdiction should be compared within that jurisdiction because that is

where they compete.  That is the selection situation."  (Trial Tr. 15-42, ll. 15-17).

Springfield did not participate in either the 2006 or the 2008 HRD police sergeant's promotional examinations; no Springfield employee took either examination. Assuming, *arguendo,* the statewide or aggregated data shows that the HRD police sergeants' promotional examinations adversely affected minorities statewide such evidence does not prove that Springfield discriminated against the Springfield Plaintiffs. The statewide or aggregated data deals only with a proposition that is no longer an issue in this case - whether the commonwealth itself committed a Title VII violation.  The First Circuit eliminated that issue from this case ruling that:

> the Eleventh Amendment clearly bars such a claim in federal court against the state defendants.  "[A] claim that state officials violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment....  [T]his principle applies as well to state law claims brought into federal court under pendent jurisdiction."

*Lopez v. Massachusetts*, 588 F.3d 69, 73 n.1 (1st Cir. 2009) (citation omitted).  In this case Dr. Silva, under cross examination, testified:

> Q. And here with the -- just focusing on the statewide exam, you understand that all of the applicants sit down and take the exact same test on the exact same day. You understand that?
>
> A. I do. But they are only eligible to be promoted within one of those jurisdictions that they applied for.  And when you combine the data, it assumes in the testing analysis that each person is eligible for all positions available, and that simply isn't true.  So the distortion begins to be present.

(Trial Tr. 18-41, ll. 22-25; Trial Tr. 18-42, ll. 1-4).

Dr. Wiesen's use of the aggregated data pool was flawed because such a data pool is too wide and too deep to produce reliable results.  *See* Springfield's Proposed Findings of Fact and Conclusion of Law, which is incorporated herein by reference, at pp. 30-33, ¶¶ 43-57.  To select an appropriate pool of candidates on which to base a statistical inference of discrimination it is necessary to consider the qualifications of the potential

candidates, especially where, as here, the qualifications are specified by law.  Plaintiffs'

case against Springfield based upon aggregated data is an example of, a common but

misleading statistical phenomenon rooted in the differing sizes of subgroups known as,

Simpson's Paradox.

> Q. And what is Simpson's Paradox?
>
> A. It's essentially the idea that when you combine data, you get a whole different picture, or an exaggerated picture, of what's truly going on compared to looking at the individual data sets.

(Trial Tr. 17-29, ll. 7-11).  Dr. Wiesen testified that Simpson's Paradox is "something

that could be described as, say, incorrect conclusion based on aggregating data."  (Trial

Tr. 5-89, ll. 19-21).

> The problem with aggregating data isn't necessarily that it changes your conclusions, but rather, that it can exaggerate the conclusion that you come to. And I think that's the bigger issue in this case, is that the combination of data can exaggerate the magnitude of the difference that we have; for example, Boston that basically overwhelms everything.

(Trial Tr. 18-55, ll. 18-24).

> Aggregating data over time if not done correctly can lead to double counting

errors.  Dr. Outtz testified:

> One concern with aggregating over time is that you lose independence of your assessment.  You're looking at the same people over and over, to some extent; in other words, the people who seek a promotion in Year 1, the next year you look at the data, a lot of those same people are still in the data.  So your analysis the second time, to some extent, is not independent of your analysis the first time.  So that's a statistical problem that you would have when you aggregate data over time even within the same jurisdiction, or within the same jurisdiction.

(Trial Tr. 15-42, ll. 2-11).  Dr. Wiesen apparently committed double counting errors in

his data analysis.  He admitted "there might be some people who are counted twice in the

first exam, the '05, and then again in the '07". (Trial Tr. 2-103, ll. 8-10). Dr. Silva

described Dr. Wiesen's double counting errors:

> Q. Dr. Silva, you were also asked about whether it's appropriate to aggregate data over years, and your answer is, "If it was done correctly." What did you mean by "if it's done correctly"?

> A. Well, the way Dr. Wiesen did it, is he basically took, you know, one pile of data from one year and just put it on top of another pile of data from another year; he didn't try to identify the common individuals across the two data sets. And that's very important because essentially you may have some individuals represented twice in the data set, and some individuals in that data set will actually be both promoted and un-promoted. So it just confounds everything. The way to do it correctly is to identify the individuals that are -- the total sum of unique individuals across both data sets and then follow them over time and say, for example, Individual A took Test 1 and Test 2, and at the end of those two processes was either promoted or not promoted. And you could do that for everybody. Everybody's represented once and it only accounts for one promotion or not a promotion across that time span. And Dr. Wiesen did not do that.

(Trial Tr. 18-54, ll. 1-20). Dr. Wiesen's double counting error exacerbated his unsound

statistical analysis. Springfield's statistical experts explained:

> It is important to note that the individuals counted in Table 1 [in the Analysis and Inferences Report] are all unique, different people who are certified, because counting a person each time they take an exam disfavors minorities. In Table 1 [in the Analysis and Inferences Report] there is no double counting of a certified person taking both exams. "Certified" means "ever Certified from either or both of 2005 or 2007". A person appointed from 2005 will necessarily be counted only once because in the normal course you can only be appointed once. A person who took the 2005 and failed to be appointed from 2005, then-- assuming they were certified from 2007 alone or from both of the exams--will be counted as "Appointed" or "Not Appointed" exactly once--depending on the decision made on them from the 2007 exam. Thus, each ever-certified person appears only once in the total of 21 persons."

> It is important to count the unique person rather than count a person each time they take an exam, because minorities take the exams more often on average before they are appointed than do non-minorities. Thus, the percent of their exams ("person exams") for which they are appointed will be less than the percent of their numbers-- as unique people--who are appointed. Double counting persons therefore disfavors minorities by increasing the apparent adverse impact.

(Ex. 195, pp. 4-5) (footnotes omitted).  When the double counting errors are eliminated as a factor in the statistical analysis, even if the Springfield data from both the 2005 and 2007 HRD police sergeants' promotional examinations is aggregated,

> the difference between minority and non-minority is not statistically significant at the typical 5% level, meaning that the differences shown in the table above [Table 1: Certified Individuals Appointed based on 2005 and 2007 Exams in the Analysis and Inferences Report at p. 5] could be due to chance alone.
>
> Because rank on the exam was a primary factor in appointments, we next considered whether minorities were less likely to be appointed, when rank on the exam was taken into account.  In this case, we again found that minority appointments were not statistically different than non-minority appointments.
>
> We also considered whether a statistically significant difference existed between minorities and non-minorities after adding experience and education as factors.  Once again, the statistical tests for standard models showed no statistically significant difference between minority and non-minority appointments.
>
> Finally, we considered instances where Springfield appointed someone sergeant despite there being an individual with better rank who was not appointed. In 2005, an individual with a rank of 8 was appointed, although someone with a rank of 5 and two other people with a rank of 8 were not appointed. All four individuals were non- minority. In other words, no minority was bypassed. In 2007, a minority with rank was appointed, although a non-minority with a rank of 5 and a minority with a rank of 7 was not appointed.  In this case, although a minority was bypassed, another minority was appointed and thus the number of minorities appointed was not negatively impacted.... [H]ad appointments taken place in strict rank order, one minority would have been appointed, and in fact two minorities were appointed.

(Ex.195, pp. 5-7) (footnotes omitted).  When only the corrected data pertaining to Springfield is analyzed it reveals no disparate impact upon the Springfield Plaintiffs.  *See* discussion and evidence cited *supra,* Springfield's Response to Pls.' Proposed FOF 36.

When Dr. Wiesen's double counting errors are eliminated from the data analysis, the statistical evidence shows no discrimination by Springfield, even if the Springfield data from both the 2005 and 2007 HRD police sergeants' promotional examinations is aggregated.  Plaintiffs' focus on underlying components of the testing process, like mean

scores or pass rates, is also misdirected. The adverse impact ratio is not measured by

differences in mean scores or differences in pass rates between sub-groups. Dr. Silva

testified:

> Q. And I/O psychologists typically focus on mean score differences, or D, which is a standardized mean score difference –
>
> A. Yes.
>
> Q. -- when addressing adverse impact?
>
> A. Yes.
>
> Q. Would you agree with that?
>
> A. Not with addressing adverse impact. Adverse impact is about promotions, not about passing a test. So, no, I wouldn't agree with that. It's not technically correct.

(Trial Tr. 17-114, ll. 3-12).

> Q. When you use the term "adverse impact" -- I think you testified about this earlier today -- you use that term to focus solely on selection rates; is that right?
>
> A. That's the way it's used, yes.
>
> Q. And so in this case you didn't even look at mean score differences; is that correct?
>
> A. No. With these small samples, mean score differences have little relevance, especially in the context of both small samples and small selection ratios. They don't really matter too much.

(Trial Tr. 17-121, ll. 9-18).

> Q. No, I'm just trying to understand how you use the term and understand the term "adverse impact."
>
> A. I use the term "adverse impact" as it's simply a proportion of two ratios to promotion rates.
>
> Q. When you use that term, you don't concern yourself with mean score differences?

A. There's no need to.

(Trial Tr. 17-122, ll. 16-22).

Q. And so you read the Uniform Guidelines to say that when you talk about adverse impact, all you're talking about are selection ratios?

A. That's correct.

(Trial Tr. 17-125, ll. 23-25).

A. May I qualify that last thing? The adverse impact ratio is applicable only to the promotion rates.  Adverse impact can be observed in means as well, but it's -- it's a different concept than at that point we're not looking at a point A criteria.

(Trial Tr. 17-126, ll. 3-7).

Assuming, *arguendo*, that the aggregated mean score differences and pass rates found by Dr. Wiesen were statistically significant; they do not rise to the level of a Title VII infraction under the circumstances of this case.  Plaintiffs' proposals to use the aggregated mean score differences or pass rates found by Dr. Wiesen to measure disparate impact should be rejected.  Rather than target the mean scores and pass rates on the HRD police sergeant promotional examinations it is more appropriate to focus on the merit based selection system for police sergeant.  Numerical comparisons of the aggregated mean score differences and pass rates found by Dr. Wiesen do not help identify a possibly unfair, discriminatory hurdle interposed between the eligible minority applicant and success.  Title VII guarantees individuals[7] the opportunity to compete equally on the basis of job-related criteria; it does not create racial or ethnic preferences in professional promotional opportunities or guarantee promotions based upon

---

[7]    "The principal focus of the statute is the protection of the individual employee, rather than the protection of the minority group as a whole.  Indeed, the entire statute and its legislative history are replete with references to protection for the individual employee." *Connecticut v. Teal*, 457 U.S. 440, 453-54 (1982) (citations omitted).

government quotas for favored racial or ethnic groups. (Trial Tr. 7-84, ll. 8-25; Trial Tr. 7-85, l. 1). Title VII does not prohibit municipalities from using merit based selection systems to make promotions unless those merit based selection systems are intentionally discriminatory.[8] In this case plaintiffs have not alleged, much less proven, such a discriminatory intent. In Massachusetts police promotions under the civil service law must be made in accordance with the "2N +1" rule. The number of candidates certified by HRD is determined by the rule of "2n + 1", where "n" equals the number of vacancies for promotion. *See* MASS. GEN. LAWS ch. 31, §§ 25, 27; Doc. 318-2, filed 11/01/10, pp. 10-11 of 15, *Personnel Administration Rules*, ¶09 (1). Dr. Weisen testified that "the 2 N + 1 does not drive ... adverse impact at all" because a minority "will appear in the top three names in a frequency that reflects the proportion of minorities among the applicant group." (Trial Tr. 5-103, ll. 8-12). The relationship between the 2 N +1 rule and the certified list was described by Dr. Wiesen as follows:

> Q. Okay. So the Uniform Guidelines aren't designed, then, to prohibit government entities, say, police forces, from getting the best qualified people to be their officers. Would that be correct?
>
> A. Correct.
>
> Q. And under the state Civil Service law, that, at least in theory, is determined by highest scorers on examinations?
>
> A. Correct.

---

[8] 42 USCS § 2000e-2 (h) (stating that "it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide ... merit system ... provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin); *see also Connecticut v. Teal*, 457 U.S. 440, 452 (1982) (stating that "Congress, in adding § 703(h), intended only to make clear that tests that were job related would be permissible despite their disparate impact.").

Q. And under the state Civil Service laws, the municipalities that have Civil Service positions are required, really by state law, to choose among the candidates on the certified list?

A. Correct.

Q. And that's related to the 2 N + 1 rule?

A. Yes.

Q. And that relationship is 2 N + 1 is the certified list, correct?

A. Correct.

(Trial Tr. 4-64, ll. 12-25; Trial Tr. 4-65, ll. 1-2).  Dr. Fields testified:

Q. Now, my question is in a merit-based system, such as the one we have here where there's a top-down selection, would you agree that regardless of the placement of the cut score the individuals who are -- that the system is designed to identify for promotion are those who can demonstrate that they are the most qualified using the selection instrument that's in play?

A. What I would say is that candidates have to get into a consideration band, which is your 2 N + 1, which is depending on the number of vacancies, that's what they have to achieve.

(Trial Tr. 6-145, ll. 2-10).  Dr. Outtz explained why the mean scores are irrelevant to the

disparate impact analysis:

Q. Earlier today you were asked questions from Attorney Lichten with respect to a passing grade with respect to the exams at issue in this case.  The passing grade in this case is 70.  As part of your review in this matter, did you investigate how the passing score of 70 relates to the selection ratio for candidates for promotion?

A. It's my understanding from looking at the data in this case it's not really relevant.  You don't reach that point in the selection process, that most of the selections are already made; that is, because there's such a low selection ratio and few vacancies, you seldom go down far enough on the list to even get close to that 70. So the issue becomes the 2 N + 1 rule; that is, the lowest level at which there is a vacancy.

And that's typically well above the 70 percent.

Q. When you're talking about the 70 percent, you're talking about promotions that are made with individuals scoring in the 90s or the 80s?

A. That's correct.

Q. And so there's no need to go to 70, or below 70 to 65?

A. It typically is not done.

(Trial Tr. 16-157, ll. 4-23).

Local governments who use the HRD police sergeants' promotional examinations to make an appointment do not receive any information about the aggregated mean score differences and pass rates examined by Dr. Wiesen. Dr. Fields acknowledged that an appointing authority would not necessarily know the average test scores assuming that all the appointing authority gets is a certification list that it requisitioned pursuant to openings for promotions. (Trial Tr. 8-80, ll. 11-17). This was explained by Lowell Police Department Superintendent Kenneth Lavallee:

Q. And what does 2 N + 1 mean? What's your understanding of 2 N + 1?

A. Well, when we would call for a list, let's say if we were going to promote one candidate, they would send us two names, the two top names, plus one other name, so there would be three names on that list for promotion for one position in the Lowell Police Department. So we would be getting three names for one promotion. And we would have to promote amongst that top three.

(Trial Tr. 13-49, ll. 9-17).

Q. Does HRD give you any information as to how individuals did on the individual written test component?

A. No.

Q. Does HRD give you any information as to how individuals do on the training and experience component?

A. No, they don't.

(Trial Tr. 13-51, ll. 11-16). Springfield Police Commissioner Fitchet testified that he does not "see the list of people that failed the exam." (Trial Tr. 12-93, l. 9) and that "the

only list I see is the one that they send me for promotions with the 2 N + 1 rule." (Trial Tr. 12-93, l. 13-14; *see also* Exs. 161-64). Former MBTA, Deputy Police Chief, Delores Ford-Murphy, testified that unless a candidate was within the 2 N + 1 band, the candidate could not sit for an interview. (Trial Tr. 12-122, ll. 7-15). It is not surprising that local officials did not see the HRD information because HRD does not provide that information to local officials. *See* McNeely Affidavit, p. 3 ¶12; Doc. 307 Filed 10/04/10.


### D. Springfield

Pls.' Proposed FOF #68.

> 68. Of Springfield's 40 sergeants, only four (10%) are minorities. (12:94-95). In contrast, minorities comprise approximately one-third (33%) of the patrol officers in Springfield. (Id.). According to census data, meanwhile, about 56% of the general population is minority. (34.8% are Hispanic or Latino, and 21.3% are Black or African-American). See Census Data (Springfield, MA) (available at http://factfinder.census.gov).

> *Springfield's Response to Pls.' Proposed FOF 68.*

The exact number of Springfield police sergeants and patrol officers fluctuates from year to year but approximately one third of the Springfield police force consists of individuals who are members of a minority group. (Exs. 166-169; Trial Tr. 12-94, ll. 21-22). This information and the census information pertaining to percentages of subgroups within the population is supportive of plaintiffs' implicit suggestion that the number of Springfield police sergeants should be racially and ethnically balanced based upon the percentages of minorities on the Springfield police force or in the Springfield community; however, that is not what the law requires. The Fourth Circuit has explained that:

> Title VII does not require a racially balanced work force, for such a conclusion is, in the words of the Supreme Court, an "erroneous theory." Moreover, the problem is explicitly dealt with by the statute.

Section 703(j) of the Act, 42 USC § 2000e-2(j), makes clear that employer liability may not be based solely on the existence of a racial imbalance among employees, when the district court has found the absence of purposeful discrimination.  As explained by Senator Humphrey, the purpose of this provision is to indicate the absence from the statute of any required racial balance:

> "A new subsection 703(j) is added to deal with the problem of racial balance among employees.  The proponents of this bill have carefully stated on numerous occasions that Title VII does not require an employer to achieve any sort of racial balance in his work force by giving preferential treatment to any individual or group."

Thus, § 703(j) forbids court ordered preferential treatment designed solely to achieve a racial balance, as well as the formulation of liability based merely on the lack of racial balance.

*Lewis v. Tobacco Workers' Int'l Union*, 577 F.2d 1135, 1141-42 (4th Cir. 1978) (citations

and footnotes omitted).

Pls.' Proposed FOF #69.

69.  For the 2003 examination, the adverse impact ratio for the passing-rate was 0.59, and the difference in average test score was 10.4 points, both of which are statistically significant. (Exh. 79).  For the 2005 examination, no minorities were promoted out of 18 minority test-takers, while six non-minorities were promoted out of 29 non-minority test-takers, resulting in an adverse impact ratio for promotions of O. (Exhs. 79A, 85A).  The adverse impact ratio for the effective passing rate was also O. (Exh. 79A).  The difference in average test scores was 6.9 points. (Exh. 79A; 2:98, 101).  All of these numbers are statistically significant. (Exh. 79A).  For the 2007 examination, two minorities were promoted out of 16 test-takers, while six non-minorities were promoted out of 20 test-takers, resulting in an adverse impact in promotions of 0.42* . (Exh. 79A, 85A).  The adverse impact ratio for the passing-rate was 0.54, which was statistically significant, and the adverse impact ratio for the effective passing point was 0.42*. (Exh.79A).  The difference in average test scores was 5.7* points. (Exh.79A).  When combined, the results of the 2005 and 2007 exams show an adverse impact ratio for promotions of 0.24 and an adverse impact ratio for the passing rate of 0.68, and both of these results are statistically significant. (Exh. 85A).

*Springfield's Response to Pls.' Proposed FOF 69.*

Plaintiffs' citation of unverified information pertaining to the 2003 examination does not have any tendency to establish a proposition or fact that is material to this lawsuit. Plaintiffs challenged the 2005 thru 2008 HRD police sergeant's examinations in this case (7th Am. Compl. ¶¶ 1, 63, 68, 75, 76). Plaintiffs did not challenge the 2003 HRD police sergeant's examination; consequently, plaintiffs' evidence regarding 2003 examination has no probative value with respect to the HRD police sergeants' promotional examinations challenged in this case, the 2005 thru 2008 tests. Moreover, to the extent that Dr. Wiesen's 2003 chart (Ex. 79) pertains to Springfield it is based on erroneous information – it incorrectly says Springfield had "no promotions" in 2003. Under cross examination Dr. Wiesen admitted:

> Q. Okay. When you conducted your statewide aggregated data in your earlier reports, was that based on that information that we now know was not correct, that Worcester and Springfield hadn't had any appointments when they had?
>
> A. Yes.

(Trial Tr. 5-117, ll. 5-9).

Plaintiff's references to "statistical significance" for the adverse impact ratio further confuse the inaccuracy of their proposed findings. The AI ratio, which is sometimes called the 80 percent rule (the figure at which or below the EEOC will presume the existence of disparate impact) or the 4/5ths rule, is simply a rule of thumb. *See* discussion and citations in Springfield's Proposed Findings of Fact and Rulings of Law, ¶¶ 70-86). Dr. Silva testified that the "AI ratio has no statistical significance associated with it. It's just a number; it doesn't have statistical properties as such." (Trial Tr. 17-42, ll. 2-4). The concept of statistical significance is scientifically meaningful:

> Q. And is statistical significance something that professional statisticians use on a regular basis?

A. It's their core tool.

Q. Their core tool.  And .05 is the point of significance.  So if it's greater than that, the statistician would say not statistically significant and less than that it would indicate significance?

A. Technically, if it's below .05, it's significant.

Q. And if it's more than .05?

A. Then it's not statistically significant.  Significance is an either/or proposition.

(Trial Tr. 17-43, ll. 3-13).

For the 2005 and 2007 examination plaintiffs expert double counted some data and used flawed data by including candidates who failed the examinations and candidates who did not qualify under the 2 N + 1 rule for making civil service appointments.  As previously pointed out, when the corrected data is analyzed and Dr. Wiesen's double counting errors are eliminated from the data analysis, the statistical evidence shows no discrimination by Springfield, even if the Springfield data from both the 2005 and 2007 HRD police sergeants' promotional examinations is aggregated.  *See*, discussion and citations, *supra* in Springfield's Response to Pls.' Proposed FOFs 48-53.  Moreover, plaintiffs' assertions lack probative value because state law mandates that police sergeant promotions be made on the basis of merit principles:

> An underpinning of the civil service structure is that ... promotional appointments will be made from a list of persons declared eligible on the basis of competitive examination.  If the appointing authority elects to appoint a person other than one who stands first on the list, it must explain its reasons in writing to the State personnel administrator.

*Fall River v. Teamsters Union, Local 526*, 27 Mass. App. Ct. 649, 651 (1989) (citations omitted); *see also Lopez v. Massachusetts*, 588 F.3d 69, 77 (1st Cir. 2009) (stating that by "law, municipal police promotions must be made on the basis of competitive

examinations, whether on the basis of the HRD examination or some other test.  HRD is

given statutory authority to establish the form and content of these examinations.

However, HRD's discretion in this area is bounded.  By statute, all examinations must

'fairly test the knowledge, skills and abilities which can be practically and reliably

measured and which are actually required' to perform the job, a requirement that may

significantly limit both the form and the substance of an examination.") (citations

omitted).

Only qualified candidates are eligible for promotion to the police sergeant's

position in Springfield so that randomly pulling names out of a hat is not a viable option

for Springfield to use when selecting police sergeants under the commonwealth's civil

service system.

> Q. And the point of having these examinations in the first place is to distinguish between the qualifications of people who are competing for a position, correct?

> A. Yes.

(Trial Tr. 11-62, ll. 5-8).

> Q. Well, let me shift, then, to a different issue.  With regard to candidates who take the examination, as I understood your testimony earlier, you indicated that the idea of Civil Service, at least in theory, is to predict the best qualified candidates, which theoretically would be the top scorers on an exam.  Would that be accurate?

> A. That is definitely a goal, yes.

(Trial Tr. 4-63, ll. 8-14).

> Q. Okay.  So the Uniform Guidelines aren't designed, then, to prohibit government entities, say, police forces, from getting the best qualified people to be their officers.  Would that be correct?

> A. Correct.

Q. And under the state Civil Service law, that, at least in theory, is determined by highest scorers on examinations?

A. Correct.

(Trial Tr. 4-64, ll. 12-19).

HRD provides Springfield with the list of certified candidates who are eligible for appointment and under the civil service law, the selection of a police sergeant must be made from among the candidates on the certified list.

Q. And under the state Civil Service laws, the municipalities that have Civil Service positions are required, really by state law, to choose among the candidates on the certified list?

A. Correct.

Q. And that's related to the 2 N + 1 rule?

A. Yes.

Q. And that relationship is 2 N + 1 is the certified list, correct?

A. Correct.

(Trial Tr. 4-64, ll. 20-25; Trial Tr. 4-65, ll. 1-3).

Q. And that's the only group of people, though, that a municipality such as Springfield can appoint under state law; is that correct?
....
THE WITNESS: Yes, when the examination gets to that point, that would be the only group of people.
....
Q. Okay. And before it gets to that point no appointments can be made, correct?

A. No Civil Service appointments, right.

Q. Right. And so the only time a municipality gets involved in making an appointment is after they get the certified list from the state, correct?

A. I think that's the way it worked back then, yes.

Q. Okay. And even then when they get the certified list, their hands are tied by the certified list; that is, they can only appoint off the certified list?

A. Correct.

Q. And under the state Civil Service law, if you bypass a candidate on that certified list who scores higher, then that candidate has a right to appeal to the Civil Service Commission, correct?

A. I believe that's correct.

Q. And the community has to have valid reasons for bypassing a higher-scoring candidate in order for the Civil Service Commission to uphold the bypass on appeal, correct?
....
THE WITNESS: Yes.

(Trial Tr. 4-65, ll. 19-21; Trial Tr. 4-66, ll. 16-25; Trial Tr. 4-67, ll. 1-13 & 23).

Finally, it should be observed that when Dr. Wiesen used the correct data his analysis shows no statistically significant impact on the Springfield Plaintiffs from either the 2005 examination, (Ex.85A; Trial Tr. 11-63, ll. 20-25; Trial Tr. 11-64, ll. 1-25; Trial Tr. 11-65, ll. 1-23; Trial Tr. 17-40, ll. 1-25; *see also* Trial Tr. 17-41, ll. 1-3), or the 2007 examination.  (Ex.85A; Trial Tr. 11-65, ll. 24-25; Trial Tr. 11-66, ll. 1-25; Trial Tr. 11-67, ll. 1-19; *see also* Trial Tr. 7-92, ll. 7-25; Trial Tr. 7-93, ll. 1-3).  Dr. Silva summed up the statistical evidence relating to Springfield saying:

Q. Okay. So in summary, then, it's your opinion that there's no statistically significant adverse impact from these exams for the City of Springfield?

A. Well, it's not my opinion, it's stated right there via the criteria that .05 -- below .05 is significant, these two samples have significance levels or probability levels of .07 and .20, both above .05, so they're not significant.

(Trial Tr. 17-47, ll. 14-20).


Pls.' Proposed FOF #70.

70. The raw data from these exams further demonstrates the problem.  For the 2003 examination, out of the 28 highest-scoring candidates, only one was

minority. (Exh. ISS).  Of the lowest-scoring 26 candidates, 16 were minorities.
(Id.). Out of the 12 candidates who failed, eight were minorities. (Id.).  On the
2005 examination, the ten highest-scoring candidates were non-minorities.
(Exh.74).  Of the 17 candidates who failed the examination, eight were minorities.
(Id.).  On the 2007 examination, ten minorities failed compared to only 6
nonminorities who failed. (Exhs. 76, 85A).  Although plaintiff Julio Toledo, a
Hispanic, was promoted from the 2007 examination, his relatively lower score
delayed his promotion until November 2009, one year after five higher-scoring
candidates were promoted from the same examination. (Exhs. 163, 164).

*Springfield's Response to Pls.' Proposed FOF 70.*

For the reasons set forth *supra*, in Springfield's Response to Pls.' Proposed FOF

69, plaintiffs' reliance upon the erroneous 2003 data is not material evidence on whether

Springfield's use of the 2005 and 2007 HRD police sergeants' promotional examinations

violated Title VII.  Under Massachusetts civil service system promotional appointments

are made on "the basis of merit as determined by examination" and other "factors which

fairly test the applicant's ability to perform the duties of the position as determined by the

administrator."  M.G.L. ch. 31, § 3 (e); *see also* M.G.L. ch. 31, § 1 (defining basic merit

principles to mean, among other things the "(a) recruiting, selecting and advancing of

employees on the basis of their relative ability, knowledge and skills including open

consideration of qualified applicants for initial appointment; .... (e) assuring fair treatment

of all applicants and employees in all aspects of personnel administration without regard

to political affiliation, race, color, age, national origin, sex, marital status, handicap, or

religion and with proper regard for privacy, basic rights outlined in this chapter and

constitutional rights as citizens, and; (f) assuring that all employees are protected against

coercion for political purposes, and are protected from arbitrary and capricious actions.").

Under this merit based civil service system used when selecting candidates for

Springfield police sergeant the lowest-scoring candidates and those who fail the HRD

police sergeants' promotional examinations do not merit promotion; they are not certified

for appointment by HRD and Springfield can only promote candidates off of the certified

list.  (*See* MASS. GEN. LAWS ch. 31, §§ 25, 27; Doc. 318-2, filed 11/01/10, pp. 10-11 of

15, *Personnel Administration Rules*, ¶09 (1).


## E. Dr. Silva

<u>Pls.' Proposed FOF #84.</u>

> 84. The Defendants' only challenge to the Plaintiffs' evidence of disparate impact
> came from Dr. Silva.  As a starting point, it is important to note that Dr. Silva
> does not recommend that jurisdictions use the type of exams being challenged in
> this case, because he and the firm he works for, EB Jacobs, recognize that exams
> with more components are more valid and less likely to lead to disparate impact.
> (17:89-93,102-105,121,129-30).

> *Springfield's Response to Pls.' Proposed FOF 84.*

Plaintiffs failed to present any credible evidence of adverse impact on the

Springfield Plaintiffs from either the 2005 or 2007 HRD police sergeants' examinations.

As previously pointed out, Dr. Wiesen's analysis was based upon data about Springfield

which was wrong; consequently, it is intrinsically unpersuasive because erroneous data is

not reasonably relied upon by experts in the field in forming opinions or inferences upon

the subject.  *See* discussion, *supra* in Springfield's Response to Pls.' Proposed FOFs 14-

21, & 36.  Dr. Fields testified:

> Q. I guess my question is kind of more fundamental than that.  You didn't do any
> investigation, independent investigation to determine how accurate that data was,
> did you?

> A. No.

> Q. So if the data itself was flawed and opinions were based upon that data, then
> that would cause one to be at least skeptical of the opinions; is that correct?

A. If the data was flawed, yes.

(Trial Tr. 7-88, ll. 2-9).

Another reason to be skeptical of Dr. Wiesen's statistical analysis is that Dr. Wiesen is not a statistician. Springfield's expert statisticians, Analysis & Inferences, Inc., reviewed the Springfield data regarding appointments to sergeant and the results of the HRD police sergeant promotional exams to determine whether there is statistical evidence of discrimination. (Ex. 195). Dr. Fairly and Dr. Salzberg are the only statistical experts who provided evidence in this case. (Ex. 195). Dr. Fairly earned his PhD in 1968 from the Department of Statistics at Harvard University where he held Woodrow Wilson and National Science Foundation Fellowships. (Ex. 195, p.12). Dr. Salzberg earned his Ph.D. in Statistics, at the Wharton School of the University of Pennsylvania in 1995. (Ex. 195, p.23). Dr. Wiesen earned his Ph.D. in "Psychology" from Lehigh University in 1975. Dr. Wiesen's lack of statistical expertise is revealed by his use of erroneous data, data pools which were too wide and too deep, double counting of candidates, and stumbling over Simpson's Paradox. *See* discussion and evidence cited, *supra* in Springfield's Response to Pls.' Proposed FOFs 48-53. The only expert statistical analysis in this case found that among those certified to become police sergeant in Springfield:

> 1. The percent of minorities appointed is not statistically different from the percent of whites appointed.
>
> 2. Minorities were no more or less likely to be appointed once rank on exam was taken into account.
>
> 3. Minorities were no more or less likely to be appointed once rank, experience and educational background were taken into account.

4. Springfield's appointments that were out of rank order did not negatively affect minorities.

(Ex. 195, p.3).

*Springfield's Response to Pls.' Proposed FOFs ##85-91.*

Plaintiffs also criticize Dr. Silva because he did not look at mean score differences; however, any such differences are irrelevant.  (Trial Tr. 16-157, ll. 4-23); *see* discussion and evidence cited, *supra* in Springfield's Response to Pls.' Proposed FOFs 41-46 & 48-53.  Dr. Silva's' analysis revealed that one problem with the AI ratio is that it is a very unstable measure with very small numbers such as those in Springfield.  Using it in such a situation leads to false positives a "finding that there is adverse impact when you shouldn't have found that because there was no difference in the testing process whatsoever."  (Trial Tr. 18-57, l. 25; Trial Tr. 18-58, ll. 1-2).  Dr. Silva testified that in order to establish a pattern when very small numbers were involved, as they are for Springfield, he would need data for three, four or more years; but here "you are looking at two years, as I do here for each of these jurisdictions, and you're dealing with just a very small number each year, it's still very hard to do that."  (Trial Tr. 18-31, ll. 18-25; Trial Tr. 18-32, ll. 1-7).  Dr. Silva did initially find adverse impact in Springfield from the 2005 exam (Trial Tr. 18-27, l. 25; Trial Tr. 18-28, ll. 1-14) but all the experts submitted revised reports; in fact, Dr. Wiesen submitted three reports and even then did not provide the corrected Springfield data, until midway thru the trial.  (Trial Tr. 11-63, ll. 6-25).  In any event Dr. Silva testified at trial that he did not find any data anywhere that indicates that there was a statistically significant adverse impact in the City of Springfield.  (Trial Tr. 18-58, ll. 7-10).  Similarly when Dr. Wiesen analyzed the corrected Springfield data (Ex. 85A) he found no statistically significant adverse impact

in Springfield for either the 2005 or 2007 examinations.  (Trial Tr. 11-64 thru Trial Tr.

11-67, ll. 1-19).  When the Springfield data pools for 2005 and 2007 are combined in a

proper statistical manner, i.e., without double counting the candidates, there is no

discrimination.  (Ex. 195).


### 3.  Validity of Examinations

<u>Pls.' Proposed FOFs ##92-98; 99-138.</u>

> Plaintiffs, cherry pick isolated aspects of the evidence and use it to conclude that
> collectively "the evidence permits only one conclusion: none of the exams were
> valid.

> *Springfield's Response to Pls.' Proposed FOFs ##92-98; 99-138.*

In this case there is ample evidence of the validity of the challenged HRD police

sergeants' promotional examinations.  The documentary evidence includes, but is not

limited to, the 1991 Validation Report (Ex. 40); the voluminous appendices thereto (Ex.

41) and the Job Analysis by Morris and McDaniel (Ex. 42).  Dr. Outtz, perhaps the

preeminent industrial organizational psychologist in the field, explained the concept of

validity as it is understood in the field of industrial psychology:

> A. In my field, from a scientific standpoint, validity refers to the accuracy of
> inferences that you wish to make on the basis of scores from a selection
> instrument: Are those inferences accurate? For example, if you give an exam and
> you hire people at the -- who score the highest on that exam, the inference is that
> those people are more qualified than people who scored lower. If you give an
> exam for people to get admitted into college, and you admit students whose scores
> are up at the upper distribution, you are making the inference they are more
> qualified than students who have lower scores.  Validity refers to evidence that is
> garnered to establish the accuracy of those inferences. In a more simplistic way,
> it's whether a test measures what it's supposed to measure.

> Q. And would it be fair to say that part of validity is the predictive value of the
> instrument; in other words, that the candidate -- that the examination will predict

whether or not the person who is scoring on the test will do well, less well, or better than somebody that they score higher than on the test?

A. That is the essence of validity, to allow one to predict at a level great than -- significantly greater than chance as to how well someone will perform.

(Trial Tr. 14-15, ll. 4-25; Trial Tr. 14-16, ll. 1-3).  In regard to the challenged

examinations in this case Dr. Outtz testified:

Q. Now, in this case you were asked to review the examinations that the HRD put together for selection to police sergeant. And there were a number of examinations that were provided to you; is that right?

A. Yes.

Q. And did you also have access to other information that underlie -- strike the question.  Can you tell me what else the HRD provided to you as part of your ability to review the examinations that are at issue in this litigation?

A. I was provided, and I requested, any validation studies that had been done with regard to these examinations; I requested the actual examinations which I reviewed, and reviewed the items in those examinations; I reviewed the document explaining the procedure that was used to develop each one of those examinations; and documents that describe those procedures in detail.

Q. And after reviewing those documents, did you ultimately come to an opinion as to whether the examinations administered by the HRD were valid?

A. Yes.

Q. And what is that opinion?

A. I reached the conclusion that the examination process with the written test and the assessment of education and experience, that combination constituted a valid process.

Q. And did you -- upon reaching that conclusion did you consider whether or not the exams at issue complied with the requirements of the Uniform Guidelines?

A. I did.

Q. And what did you determine?

A. I determined that they did, and in my opinion do, comply with the Uniform Guidelines.

Q. Now, in looking at the validity of the examinations here, I believe that you referred to looking at validity reports. And did you look at more than one validity report?

A. I looked at a validity report that was dated 1991, and a subsequent validity report in 2001-2002, around that time frame.

Q. And first, can you tell the Court is it appropriate or is it -- is it acceptable practice for an industrial psychologist -- or for a test developer to use two different job analyses, analyses from two different points in time?

A. Not only is it appropriate, it's required typically that once you conduct a job analysis, how useful is it? When does it become obsolete? That's an interesting question in IO psychology, and we've discussed that at many conferences.

The general consensus, in my opinion, with regard to a job analysis and its obsolescence is that the job analysis can -- is useful and current for approximately five to eight years if the job doesn't change. If the job changes, then you do another job analysis.

Now, you have some jobs that can change rather rapidly. Jobs in the information technology field change rapidly all the time. Like 18 months in information technology is a lifetime. In developing selection systems for police sergeant, over such a long period of time, typically in the same jurisdiction, looking at the same job over and over and over, I came to the conclusion that the job of a police sergeant is one that has not changed very much in 20 years really, especially in terms of the knowledges, skills and abilities required to do it.

So that this 1991 validation study that I looked at, I felt that the job analysis was done quite well and that I would have expected to see some update of that job analysis around eight or so -- at least eight or so years later, maybe eight or nine. And that's exactly what I found. Around the year 2000 another job analysis was done building upon that 1991 job analysis, and that simply buttressed what was done in 1991.

And throughout this period of time from 1991, particularly with regard to the exams at issue in this case, they build off of both of those job analyses really.

Q. Now, when you said that in your opinion that the job of police sergeant hadn't changed dramatically over a period of time, are you referring to the job analyses here or are you referring to your experience with other jurisdictions focusing on the police sergeant's position?

A. My experience generally that the job really has not changed. As I've said, I've done police sergeant exams in jurisdictions other than Bridgeport. And

48

collectively, looking at all of that data, the job really hasn't changed and the knowledges, skills and abilities required to do it haven't changed.

Q. Now, in the job analyses that you were provided by the HRD, did you find that the analyses complied with the steps that you described earlier that industrial psychologists would go through in creating a job analysis?

A. Yes.

Q. And can you just explain for the Court what those things were that you saw in the 1991, and then in the 2000, job analysis that assured you that they had followed those procedures?

A. In each of theses job analyses the researchers, those who developed the examination process, isolated and identified the important parts of the police sergeant job. They also determined the knowledges, skills and abilities needed to perform those important tasks associated with the job. There were rating scales that they used that are typically used to evaluate tasks and knowledges, skills and abilities, that identify how important they are and so forth.

They used that information. Once they identified the important tasks, the important knowledges, skills and abilities, they developed a test plan to measure those things.  That test plan consisted of the subject areas in the written exam and also the education and experience rating that's used in the system.

That test plan then was carried out by the actual writing of test items. The test items for the written exam, each time it's been administered, have been reviewed by certain experts for the appropriateness of the content of those items. If the items needed revision, they were revised. Once the items were finalized, they were administered according to a specific testing plan with items associated with each subject that had been identified as being important to the job of a police sergeant. So you can trace the items back to a reading list and that reading list back to the knowledges that have been identified as being important to certain parts of the job.

The key thing that was done, that always has to be done, is to move from the knowledges, skills and abilities to a reading list. Why do you need to do that? Because the knowledges, skills and abilities are written somewhere. You have to give the candidates a finite source so that you can hold them accountable for studying that source and gaining that knowledge. If you don't do that, they don't know what to study, right? They will study different things in different places and not be prepared in terms of the knowledge base that they need. So this reading list becomes very, very important. The reading list is established by subject matter experts as containing the areas of knowledge that were identified in the job analysis.

And I found, in looking at the documents in this case, that the knowledges that were identified in the job analysis were then translated to the reading list which then was used to develop the test items. The items were then revised, and to some extent honed, and put on an exam in proportions based on the importance of the various areas of knowledge.  The education and experience rating process emanated -- not emanated from the 1991 study but was buttressed, in large measure, by the 1991 study in that subject matter experts were asked -- for each of the areas that you find on this education and experience rating, they were asked: Is this something that's important to the job of – law enforcement job in -- that you are aware of? And they would say yes or no.

So that at the end of the day, when you look at the education and experience ratings in terms of what's being asked, that information was screened and looked at by subject matter experts and asked whether that relates to the job. So they were linking it to the job. And in my opinion, this education and experience rating, combined with the written test, constituted a sufficient assessment of a representative sample of the knowledges, skills and abilities to meet the requirement of validity.

Q. Now, when you talk about a representative sample, what are you referring to?

A. You asked me earlier about the Uniform Guidelines. The Uniform Guidelines basically tell an employer what is required to demonstrate validity. The Uniform Guidelines, in Section 14C(4), lay out what an employer has to demonstrate in terms of something called "content validity," which was the validity strategy, has been the validity strategy used by the organizations involved in this case in order to meet the guidelines. And the processes that were used in developing the exams over the years have, in fact, met 14C(4) of the Uniform Guidelines.

I should note that the guidelines tell an employer what to require. I testified earlier that most of the time I may – I typically use something more than a written exam. That's because employers don't hire me to do simply what's required. I don't accept that as a standard; I accept trying to get them to do the very best thing possible. That's not what they're legally required to do. If it doesn't have adverse impact, they're not required to do anything. Even if it has adverse impact, the employer's required to do what is feasible in terms of demonstrating validity and minimizing adverse impact. So there's a line that has to be drawn there in terms of what an employer is required to do to meet the Uniform Guidelines, and what I, for example, as a professional might urge that organization to do, guidelines or no guidelines.

Q. Do the Uniform Guidelines require that every knowledge, skill and ability that pertains to a particular position be tested in a selection instrument?

> A. They do not. The guidelines require that the knowledges, skills and abilities that you measure should be a representative sample of the knowledges, skills and abilities required for that job.

(Trial Tr. 14-34, ll. 7-25 thru Trial Tr. 14-41, ll. 1-15).  Dr. Outtz went on to explain that the evidence in this case (Ex. 41, Attach EE) demonstrates that a representative sampling of the KSAPs which were tested were sufficient stating that by his calculations they "represent over 50 percent of all the knowledges, skills and abilities that were isolated or identified as being important and required for sergeant. And that is more than enough to indicate a representative sample of the knowledges, skills and abilities." (Trial Tr. 14-43 ll. 4-9).  In Dr. Outtz's expert opinion a sufficient number of KSAPs were tested to "meet the Uniform Guidelines of the representative sample, yes."  (Trial Tr. 14-43 ll. 18-24).

Plaintiffs also level criticism at the written job knowledge test.  Springfield had ample reason to believe that the HRD Police Sergeant's Promotional examinations would fairly and validly test the primary duties of the position in accordance with the Uniform Guidelines.  The First Circuit has observed that:

> For decades, HRD and its predecessor agency developed annual written examinations to evaluate candidates for police sergeant promotions.  State civil service law and a consent decree to which HRD's predecessor agency was a party shaped the content and form of these examinations.  That consent decree, entered in 1980, arose from civil rights litigation involving the Boston police department, but, in general terms, HRD's predecessor agreed to develop and administer promotional examinations that complied with the Equal Employment Opportunity Commission's (EEOC) Uniform Guidelines on Employee Selection Procedures (1978), 29 C.F.R. § 1607.1-18.  The Guidelines required, inter alia, maintaining records that show the impact that examinations have on applicants according to race, sex, or ethnic group, and complying with stringent standards to verify that the substance and form of the examinations are significantly related to job performance.

*Lopez v. Massachusetts*, 588 F.3d 69, 77 (1st Cir. 2009) (citations omitted).

During the trial various experts testified about the written multi-choice

examination including Dr. Wiesen who stated:

> A. "Well, the multiple-choice test, again, can cover a wide range of topics and can
> be well done or less well.  And the literature shows that the job-knowledge tests
> are, if not the most valid test, very close to the most valid predictors of future job
> performance.  So I think the answer to your question is yes.  I think that multiple-
> choice examinations can be used by themselves to develop a roster of people for
> promotion."

(Trial Tr. 11-57, ll. 20-25; Trial Tr. 11-58, l. 1).  *See* discussion and citations *supra* in

Springfield's Response to Pls.' Proposed FOF 8.

Plaintiffs were critical of the education and experience component of the

challenged examinations.  Dr. Outtz testified about this component of the process,

stating:

> A. My understanding is that this education and experience component is basically
> required by either -- I believe it's the Civil Service rule that this component be
> there, which is fine.  The question is: What's in it? Requiring it may be considered
> administrative. You can still, though, make it valid by making sure what's in it is
> related to the job itself. And that's been done in this case, in my opinion.
>
> Q. When you say that that's been done in this case, what is it that you're referring
> to that satisfies you that that has been done in this case?
>
> A. I'm referring to the work that was documented in the 1991 validation study
> showing that subject matter experts were asked to link the subject areas from that
> E&E, education and experience rating, to the law enforcement job, or the job of a
> police sergeant. And they were asked about each of the areas that are on that form
> working in law enforcement, having taught courses in law enforcement. The
> things that you see on that form were actually linked back to the job itself, and
> that's what's required in terms of the Uniform Guidelines.
>
> Q. Now, I'm going to show you a document that is, again, one of the appendices
> from the 1991 job analysis. And it's at [Ex. 41] Attachment W. And I want to
> make this a little more legible.  And this document, the title of this document, is
> "Education and Experience," and it has a checklist of 1 to 5, from "extremely
> useful" to "not applicable." Do you see where I'm referring you?
>
> A. Yes.

Q. And is this the document that you're referring to that indicates to you that the subject matter experts reviewed the knowledge, skills and abilities that were covered by the education and experience component?

A. That's correct.

Q. Now, in talking -- in your experience, have you seen testing processes or exam selection procedures that have included, as components to it, an education and experience piece?

A. Yes.

Q. And is it unusual in your field that education and experience would be factored in as a component of a testing exam?

A. Not at all. Education and experience is used routinely in making selection decisions. I mean, if you applied to work at a supermarket, you're going to be asked what's your education and what's your experience and have you ever worked at a supermarket before? If you're applying as an intern to become a law clerk, you're going to be asked what you've done in the past, or if you're applying to become an attorney at a firm you're going to be asked what's your experience and what have you done in addition to your education, the inference being that telling me what you've done gives me an idea of what you're capable of doing. That's done in employment all the time.

Q. In your opinion does the education and experience piece or component of this examination add to the validity of the exams that you reviewed?

A. It does. The education and experience rating, in my opinion, is what makes this package, in my opinion, meet the Uniform Guidelines. It expands the number of KSAs being measured to over 50 percent of the KSAs that were identified as being important to the job.

So that in this education and experience component, in terms of the validity issue, to me is very important in that it does, in fact, expand -- which is what content validity is about. It expands the proportion of KSAs being measured by this selection system, and it is the proportion of KSAs that are being measured that goes to the heart of the requirement of the Uniform Guidelines in terms of content validity, which is the form of validation that was used in this case.

(Trial Tr. 14-44, ll. 3-25; thru Trial Tr. 14-46, ll. 1-20).

Q. And then, in general, if one has experience, and as we know from the record in this case in order to be eligible to test for the position of sergeant, one has to have been an incumbent police officer for a minimum of three years. Is there any

information that you can infer from one's seniority as to one's ability to perform the position?

A. Yes. In my own experience in analyzing jobs, not just in the police service but in the fire service and in jobs outside the public sector -- but let's go back to the police service -- you need a certain number of years on the job in the police service to be seasoned enough to go to the next level for any number of reasons: One, if you're a police officer and you have, say, less than one year of experience, you have not been involved in enough situations to then be able to supervise someone as a police officer and give them guidance as to what to do.

Now, that number is bantered about, whether you need two years, three years, eight years, five years, but you need some number of years of experience before you can function in that job, "experience" meaning having gone through the daily routine of the kinds of situations that a police officer is going to have to go through so that as a sergeant you can advise a police officer.

A good example of this, in my own history, is that I can remember working in a New York City Fire Department and developing a promotional exam for fire lieutenant. This is where firefighters would take an exam for the first level of supervisory job. Many of the applicants in that jurisdiction wouldn't take the lieutenant's job until they had been in the firefighter job for a certain number of years because they didn't want the responsibility; they felt that they were not qualified to tell other firefighters, especially senior firefighters, what to do if they hadn't had the experience of doing it themselves. That often occurs in public sector jobs.

Police sergeants are going to have to advise police officers. Sometimes they're going to have to advise -- can you imagine advising a police officer, who's been an officer for 20 years, and you've been in the department three years, and you're going to tell that officer what to do? Do you think that officer is going to respect you that you know what you're talking about if you've only, for example, been a police officer for a year?

So these requirements that you be in a job for a certain amount of years really resonate with individuals in the public sector.

Q. And the number of years that are required in Massachusetts to take the test for a sergeant's exam are established not by the individual putting together the examination but by state law; is that correct?

A. That's my understanding.

(Trial Tr. 14-54, ll. 22-25 thru Trial Tr. 14-56, ll. 17-21).  Dr. Outtz also provided expert

testimony explaining how the education and experience component of the challenged

examinations tested for KSAPs which were not tested on the written examinations.

> Q. Okay. Now, in talking about the E&E component, I'm going to refer you back
> again, if I may, to [Ex. 41] Attachment EE. And this is -- it's page number 3 at the
> top. And I'll refer you to Item No. 56, "Knowledge of the limits of one of
> authority," and the Xs in the box indicating that the education and the experience
> component is going to be testing for that attribute.  Do you see where I'm
> referring to?

> A. I do.

> Q. And your opinion is that validly measured by the E&E?

> A. I think it is. I think if you have been a police officer for three years, you are
> going to get an understanding of the limits of your authority and you're going to --
> you know, you will certainly get an understanding of the limits of your authority,
> what you can and can't do, because your authority will be tested every day.
> Somebody's going to second guess you every day. Can you lawfully arrest this
> person in this situation? Do you have the authority to arrest this person in this
> situation? You're going to face that every single day.

> Q. And then I'll refer you to Item 58, "Knowledge of administrative rules,
> regulations and procedures affecting the operations of the police department," and
> it indicates that that's going to be tested by the education and experience.

> A. Yes.

> Q. And when we're talking -- I think you mentioned this earlier, your description
> of -- for the purpose of these selection procedures, is to provide a basis of
> information from which you can infer certain things about the candidates; is that
> right?

> A. That's right.

> Q. So is it fair to say that by indicating that these items are tested by the E&E,
> these test developers, at least, are inferring that you can assume certain factors by
> virtue of one's education and experience?

> A. That's correct.

(Trial Tr. 14-57, ll. 15-25; Trial Tr. 14-58, ll. 1-23). Dr. Outtz also testified about the

importance of the educational component, stating:

> Q. Now, when you reviewed the 1991 job analysis report and the attachments, did
> you note at any point within that document whether or not the subject matter
> experts expressed opinions or recommendations with regard to the usefulness of
> the degrees for which were tested by the E&E component?
>
> A. There is some language in the document describing that whole process in
> which subject matter experts expressed various opinions about the utility of
> certain kinds of degrees.
> ....
> Q. Did you find in reviewing the E&E rating sheet instructions that the rating
> instructions credited degrees and experiences consistently with the
> recommendations in this portion of the appendix?
>
> A. I did. And I looked at that very carefully. That is, the things that the subject
> matter experts rated as being relevant to the different ranks you find in the E&E,
> the subjects that they basically said were not relevant, such as civil engineers you
> don't find in the E&E. So that, to me, was an indication that these SME ratings
> were, in fact, translated and implemented in terms of the E&E.
>
> Q. Now, when you're putting together a job analysis and determining the
> knowledge, skills and abilities that are important to the job and the components by
> which you're going to test them do you, as the test developer, rely on the
> experience of the subject matter experts?
>
> A. I rely -- well, an industrial organizational psychologist will rely heavily on
> subject matter experts. As you gain more experience, you can juxtapose their
> experience with what you also have learned, and then in that combination I think
> you get the best outcome. But you can't do very much, if anything, without the
> subject matter experts.
>
> Q. And are you aware -- well, as you have testified, the 1991 job analysis includes
> summaries of the opinions that are offered by the subject matter experts?
>
> A. Yes.
>
> Q. And you also reviewed the job analysis that was conducted in 2000 for the City
> of Boston by Morris McDaniel, correct?
>
> A. That's true.
>
> Q. Now, in reviewing the Morris McDaniel job analysis, did you also find that
> that analysis relied on subject matter experts to provide information?

A. Yes, it did.

(Trial Tr. 14-58, ll. 24-25; Trial Tr. 14-59, ll. 1-6; Trial Tr. 14-60, ll. 24-25; Trial Tr. 14-

60, ll. 1-25; Trial Tr. 14-61, ll. 1-6).  In addition, Dr. Outtz explained how the work plan

was used in developing the examinations (Ex. 41, Attach. HH; Trial Tr. 14-61, ll. 16-25;

Trial Tr. 14-62, ll. 1-16); how the reading lists - the source documents that are used to

develop the information that relates back to this test plan have been assessed by subject

matter experts and were tied back into the examination (Trial Tr. 14-62, ll. 17-25; thru

Trial Tr. 14-64, ll. 1-2) and the updating of the information including the weighting of

weighting of competency areas and reading lists:

> Q. And have you reviewed these documents as part of your review of the validity of the 2005 examination?
>
> A. I've reviewed documents such as these for each of the examinations, and found that for each of the examinations, before it's administered there is a test plan that's developed that can be traced back to the 2002 job analysis, which can be traced back to the 1991 job analysis, which is designed to link the KSAs that were identified as important with specific documents. The documents may change over time. You may have a 3rd edition of some book today and three years from now you'll have the 4th edition of that book, or you might have a group of captains recommend a similar book with a different title by a different author but devoted to the same subject. So, you know, that's normal.
>
> But the process of having these knowledges, skills and abilities fitted into documents that you can hold these candidates accountable for from which you can write items is the normal process for developing a job-related and valid exam.
> ....
> A. Yes, for this exam and for all of the exams that are looked at, there is a consistency there that lets me know that this was done properly. It's so consistent that you can see a pattern of these documents that trace all the way back to 1991 indicating to me that the processes that were used to originally identify the KSAs and come up with the reading list have carried over from year to year; the job, as I testified earlier, really hasn't changed; the KSAs required hasn't changed, so there's no need -- I would have expected to see these reading lists be consistent over the years, and they are.

Q. I'm going to show you another document which is titled "The weights of competency areas to be measured according to BPDs SMEs, and this is Bates No. 2158. Do you see this?

A. Yes.

Q. As can you tell the Court, was this a document that was provided to you by the HRD as part of your work reviewing the examinations at issue in the case?

A. Yes.

Q. And can you describe for us what this document is?

A. It's the weighting of competency areas by the relative importance of the competency area based upon the KSAs that underlie it, and the number of items that will eventually be devoted to a subject area on an exam.

Q. And can you tell me how this document fits into the development of the examination itself? What does the test screener do with this?

A. Each time these exams were administered, a certain number of items were devoted to a particular subject area. The question is: Why is that? Why didn't you devote all the items to arrest, Because there are different knowledges, skills and abilities that you could put under the area of laws of arrest; and, therefore, it dictates only a certain number of items be devoted to that area. There are some relatively esoteric areas that would warrant fewer items.

So there was great care taken not only to have the exam generally be derived appropriately from the areas of knowledge via these reading lists, but to actually apportion items in terms of number of items devoted to a particular subject area based upon the importance of the knowledges that those items actually measure.

(Trial Tr. 14-64, ll. 1-20; Trial Tr. 14-65, ll. 19-25; Trial Tr. 14-66, ll. 1-25; Trial Tr. 14-67, ll. 1-8). There doesn't have to be an annual validation report to satisfy Industrial Psychologists concerning the validity of an examination. Where, as in this case, "the documents are there, they're there. You could put them in a report or not put them in a report. As long as the documents exist and as long as those documents establish the kind of information required by the Uniform Guidelines, it's professionally acceptable." (Trial

Tr. 14-68, ll. 15-19). Dr. Outtz testified that the Uniform Guidelines contain the

requirements of what a job analysis should contain, stating:

> A. The job analysis requirements of the Uniform Guidelines are basically laid out in section 14C(4) and 15C(4). And basically they -- the guidelines require that your job analysis identify the important parts of the job, what tasks are important, and show how you did that; show what knowledge, skills, and abilities are important and how you identified those; show the connection between the knowledge, skills, and abilities that are important and the tasks that you say are important; and then show a connection between your selection device and those knowledge, skills, and abilities that they say are important that you've identified as important which in turn have been identified as links attached. Tasks that's, in essence, what the guidelines require.

> Q. And the review of the materials that you did in this case, are you satisfied that the documents that were produced by the HRD, report of the examinations that were administered met the requirements of the Uniform Guidelines?

> A. I am.

> Q. And can you tell us with regard to the examinations that we've looked at today, the 2005 examination first off, the documents that you reviewed indicated that the HRD had consulted with subject matter experts, prepared a test plan, relied on the 1991 and 2000 job analyses, and created an examination that was linked back through those various documents?

> A. That is my understanding.

> Q. And in reviewing the materials that were produced by HRD, you were given the opportunity to review the examination questions themselves; is that correct?

> A. Yes.

> Q. And in your review of those examination questions were you satisfied that those questions were sufficiently linked to those documents?
> ....
> A. I was very much satisfied that those questions were linked to those documents. In some instances those questions were taken verbatim from those documents.

(Trial Tr. 14-81, ll. 2-3, 8-25; Trial Tr. 14-82, ll. 1-15; Trial Tr. 14-84, ll. 10-12).

Pls.' Proposed FOFs ##139-145.

Plaintiffs question, on the basis of the testimony of a number of lay witnesses, the "facial validity" of the HRD police sergeants' promotional examinations.

*Springfield's Response to Pls.' Proposed FOFs ##139-145.*

Plaintiffs' reliance upon the testimony of a variety of lay witnesses who have no training, education or experience as professional statisticians or industrial organization psychologists as support for plaintiffs' speculation about "facial validity" is lacking in probative value.  It also ignores the testimony of another lay witness, Springfield Police Commission Fitchet, whose experiences with police assessment centers exams left him unsatisfied with that selection device. (Trial Tr. 12-75, ll. 17-19; Trial Tr. 12-77, ll. 7-8). Most of the lay witnesses had no personal knowledge of the challenged examinations. Although the individual plaintiffs who testified did have personal knowledge of the challenged examinations they could not be fairly categorized as objective or impartial observers of the examination process.  Professor Nolan admitted that during his career on the Boston Police Department he took several HRD promotional examinations including two for police sergeant and that in his experience the only people who were appointed to the positions were those whose names appeared on the certified list.  (Trial Tr. 1-96, ll. 4-23).  The police officials who worked their way up through the ranks by taking, passing, and achieving sufficiently high scores on the multiple choice HRD police promotional examinations to qualify them for appointment to a higher rank (*i.e.*, Boston Police Commissioner Davis: Trial Tr. 9-8, ll. 11-23; Springfield Police Commissioner Fitchet: Trial Tr. 12-56, ll. 14-25 & Trial Tr. 12-57, ll. 1-11; Former MBTA Transit Police Deputy Chief Ford-Murphy: Trial Tr. 12-99, ll. 1-18; Lowell Police Superintendent Lavallee: Trial Tr. 13-36, ll. 9-25 & Trial Tr. 13-37, ll. 1-24; Garda Síochána Chief Inspector O'Toole: Trial Tr. 5-6, ll. 8-14, Trial Tr. 5-7, ll. 5-25 & Trial Tr. 5-8, ll. 1-24; )

demonstrate the general job relatedness of the HRD police promotional examinations and the facial validity of those exams to select meritorious individuals for promotion in the police service.  In other words the outstanding professional careers of the police officials who worked their way up through the ranks in the police service by achieving sufficiently high scores on one or more of the HRD police promotional examinations to earn promotion are evidence that those tests are valid selection devices because they measure what they are supposed to measure – the most qualified individuals on the basis of their relative ability, knowledge and skills who earned promotion in the police service.

### 4.  No Viable Alternative

<u>Pls.' Proposed FOFs ##146-184.</u>

> Plaintiffs suggest various alternatives to use of the challenged HRD police sergeants' promotional examinations.

> *Springfield's Response to Pls.' Proposed FOFs ##146-184.*

Springfield acknowledges it was theoretically possible in a legal sense to pursue an alternative promotional selection process for police sergeant, however, the reality of Springfield's financial situation made it practically impossible to do so.  *See* discussion and citations *supra* in Springfield's Response to Pls.' Proposed FOF 5; *see also* discussion and citations, *supra* in Springfield's Response to Pls.' Proposed FOFs 44-47. In addition to the lack of funds required to implement any suggested alternative selection process there is expert evidence in this case that plaintiffs' suggested alternatives would not be efficacious.  Dr. Outtz testified:

> Q. Dr. Outtz, as you're aware, part of the issue in the case here is whether or not the examination that was administered by the HRD was valid, which I think we've discussed, but also whether there were available alternative examinations that

would have had less adverse impact on the populations, the candidate populations. You're aware of that –

A. Yes.

Q. Can you tell us what is your understanding of the obligation of the employer in determining whether there are less adverse instruments available for its use?

A. The Uniform Guidelines require that an employer that uses an exam that has adverse impact has at least two options: One, to -- well, has two requirements. Demonstrate that that exam is valid. Even if the employer demonstrates that it's valid, plaintiffs can come forward with an alternate examination process that if plaintiffs can show is just as valid and has less adverse impact, the employer has an obligation to use that procedure if the employer is shown that procedure. But those are two requirements: One, that the alternative be just as valid, and that it has been demonstrated to have less adverse impact.

Now, having worked in this area for 25 years and developing alternatives, the issue of what constitutes an alternative is really something that, you know, hits home with me. What is an alternative? And when have you been shown -- when has the employer been shown an alternative that, in fact, has less adverse impact? As opposed to someone suggesting, implying, intimating that there is some alternative out there somewhere.

So the requirement of the guidelines is that there be an alternative and that that alternative be shown to be both, both valid and have less adverse impact.

Q. Now, to be fair, the Uniform Guidelines require the employer to investigate whether there are alternatives?

A. That's correct.

Q. And as an expert in this field, what does it mean to you for the employer to investigate alternatives?

A. It means that the employer will seek out in whatever sources might be available, whether it's the literature, whether it's some work that they know someone is doing, or whether it be at a conference or whatever, seek out information about alternatives and then weigh that information to determine whether it meets the standards of the Uniform Guidelines.

The Uniform Guidelines, as I understand them, do not require an employer to experiment with alternatives; that is, let's sort of see what will work. That's not a requirement of the guidelines. I might encourage an employer to do that and I have and do it all the time. But I don't profess to the employer that you are required to experiment with these alternatives.

If you hire me, I would like the opportunity to try to develop the alternatives and push the profession in terms of developing alternatives. That's the only way you're going to get them developed, is for an employer to let you do that. But it's one thing for an employer to allow you to do that, it's another thing to tell an employer you're required to allow me to experiment. So that for me drew my interest in this case.

What exactly is an alternative? And that came out my Ricci experience, where we were asked to show there was an alternative. In Ricci I knew for a fact there was an alternative because in the very adjacent jurisdiction I had developed an alternative with similar Civil Service rules and it didn't have adverse impact. So I was very confident and said things in that brief about that particular job and that situation because I had intimate knowledge of an alternative with data that showed that it worked.

Q. Now, in this case you're aware from having seen the Morris & McDaniel 2000 job analysis that in 2002 the Boston Police Department administered an examination that had as components to it a multiple choice job knowledge examination, an assessment center number of exercises, and the T&E or the education and experience component, correct?

A. I'm aware of that.

Q. And are you aware of the results that the BPD obtained from that examination as it relates to adverse impact?

A. My understanding is that there was very little improvement in adverse impact in using that process, that the overall reaction to that process from candidates generally was negative, that the employer had expended a considerable amount of resources to develop that process.

What that showed me was that this particular employer did, in fact, seek alternatives, did, in fact, try alternatives. They didn't work. So that's now a new situation. What's that employer to do? Should that employer -- is that employer required by the Uniform Guidelines to do that over and over again? Is the employer -- does an employer who has a fiduciary responsibility to be frugal with taxpayers' money simply say, well, no, we'll just do this until it works regardless of how much it costs? Even if the employer wants to do that, the question is: Is the employer required to do that under the Uniform Guidelines? So that to me was the issue that fascinated me in this case.

I don't -- my understanding of the posture of this employer was that the employer did, in fact, try an alternative. And having been in the situation where you try an alternative and it doesn't work, you have some hard decisions to make.

Q. Now, in exploring whether or not there's an alternative testing mechanism that is as valid and has less adverse impact, does the employer or you as the consultant, would you be looking at the other contexts within which that employer is working?

A. Absolutely.

Q. What would you do?

A. In other words, in the Ricci case I would not have come forward to lead a team talking about an alternative in the Ricci case had I not been able to convince myself that the situation in which I developed the alternative that I was talking about was almost identical to the situation in which they gave the test in the Ricci situation.

Those contextual variables that I talked about had to be the same, and the Uniform Guidelines require that the situations be similar. To not have that would mean that an employer A would have a selection system over here and a context, employer B has a totally different process, and you find some alternative in the situation for alternative B and say -- and simply infer that you can apply it to situation A, although the situations may be totally different. And the Uniform Guidelines, as I understand them, don't require an employer to transfer some process if it's not done in a situation similar to this employer situation such that you can transfer the probability of adverse impact.

Q. Now, as we're talking about the predictive nature of this, of this kind of test development, would it be fair to say that any employer using a job knowledge test for the position of sergeant can reasonably predict that that examination process will have adverse impact, some degree of adverse impact?

A. Yes.
....
Q. I'll try. Are you aware as an expert in the field of industrial psychology as to whether there is a testing mechanism for the position of sergeant where you could reasonably predict that you would not have adverse impact?

A. No. You can estimate whether you're going to have adverse impact. You can try to estimate based upon the kind of variables that I've talked about, but -- and you can talk about the potential for adverse impact. But we don't have -- we're not good enough yet to say if you do so and so, you won't have adverse impact. Or if you do so and so as an employer, you will have this degree of reduction in adverse impact in any given situation. We're not that good.

(Trial Tr. 14-90, ll. 5-25; thru Trial Tr. 14-95, ll. 1-7, 15-25; Trial Tr. 14-96, l. 1).  The

civil service laws in Massachusetts impose restraints upon public employers which make

theoretical alternatives like those suggested by plaintiffs, even assuming *arguendo* they

would both reduce adverse impact and be financially feasible, practically impossible.  As

Dr. Outtz put it:

> Q. In the context of the examinations that are at issue here, as you just alluded to,
> we're talking about examinations that are administered within a Civil Service
> system?
>
> A. Correct.
>
> Q. And in the role of an industrial psychologist in designing or recommending
> testing components for a commonwealth doing statewide exams or for an
> independent employer, would you look at the requirements of that Civil Service
> system in making your recommendations?
>
> A. Yes.
>
> Q. So, for example, here, the record has established that under Massachusetts
> Civil Service law the examination must be merit based, promotions must be made
> under a 2 N + 1 formula, and there is an education and -- the T&E component is a
> requirement of state law. So under those -- under those constraints how would an
> industrial psychologist make a recommendation to the commonwealth or to an
> individual employer about designing a selection system that would minimize
> adverse impact?
>
> A. You would be driven by data from similar situations, either derived by you or
> derived such that you know of them and can document them. So that you would
> look for situations where there was a merit system, there was some Civil Service
> rules such as a 2 N + 1 rule, and you have bargaining agreements or whatever.
> You look for a situation in which there was a process developed that had less
> adverse impact than yours, and that would be the applicable potential alternative
> for you.
>
> If you have situations where there is no Civil Service rule or you have a situation
> where you don't have the constraints of a merit system, for whatever reason, you
> can't then transfer that situation and say this employer really ought to do what we
> did over here. You didn't have the same restrictions as this employer over here.
>
> So the issue is either get rid of the restrictions or you don't have an alternative. So
> you could go to the employer and say if I can't find a similar situation, I would
> have to try to find a way to work within those restrictions to try to get that job
> done, and that would be very, very difficult. I would have to do that within the
> context of advising an employer that I know is going to spend quite a bit of

money in terms of developing this alternative with the assumption that it's going to have less adverse impact and it may or may not and most likelihood it won't.

(Trial Tr. 14-97, ll. 12-25 thru Trial Tr. 14-99, ll. 1-4). Jurisdictions operating under consent decrees requiring race based or ethnic based appointments have more leeway in utilizing experimental alternatives than do the policing jurisdictions in this case which are not operating under a consent decree pertaining to police sergeant promotions. Dr. Outtz touched on this fact stating:

> Q. My question is: Is there a difference in the restrictions under which you operate when you're dealing with a municipality that's under consent decree versus one that is bound by its collective bargaining agreements or state laws?
>
> A. There is a difference and it can be a substantial difference. I've worked under -- in situations where there was a consent decree. When there is a consent decree and you have the oversight of a court, the amount of resources that can be devoted to the selection system increases quite a bit because the employer is under pressure to get this done. You've agreed in a settlement to do the following. And therefore, it's easier to go to the city council and say we've been ordered by the court by virtue of this settlement agreement to do so and so. So larger expenditures. You can do more creative things. It's absolutely amazing when you're in that environment as an industrial psychologist you have leeway to do a lot of things you otherwise would not be able to do.
>
> When the consent decree is over, however -- and I've been through this -- now the consent decree is over, we'd like you, Dr. Outtz, to go ahead and develop the next system. By the way, your budget has been cut by 70 percent because we're not under consent decree anymore. Different ball game.
>
> Q. Are you aware in this case, at least as it pertains to Boston, that we have the 2 N + 1 requirement, you have the Civil Service selection system, the merit-based selection system that includes the E&E, and there is also a collective bargaining agreement which prohibits the use of personnel evaluations as a measurement for promotion?
>
> A. I'm aware of that.
>
> Q. And can you tell me, in your experience are you aware of any other jurisdiction with similar restrictions that has been able to institute a promotional system that does not have adverse impact?
> ....

A. I am -- I am not aware of a jurisdiction that has the restrictions that exist in this case with the selection ratio that exists in this case. As I said, that's a key variable in whether you can reduce adverse impact, the number of vacancies you have in relation to the number of candidates. And in this case it's usually very, very low. So you don't have a lot of options in terms of trying to reduce adverse impact. I'm not aware of jurisdictions that typically have systems that don't have adverse impact with those kind of restraints.

Q. When you're dealing with communities that administer promotional exams on a two- or three-year cycle, what is the -- what is your expectation about what kind of vacancy rate or selection ratio that you're going to be experiencing?

A. The selection ratio is going to be very low so that you -- if you now are proposing to that employer that I have -- I, Dr. Outtz, have a system that will have less adverse impact, you'd have to meet a pretty rigorous standard which I would have to meet. Show me a situation similar to this situation and show me the data indicating that under these restrictions your system had less adverse impact. I have seen no such data in this case.

(Trial Tr. 14-99, ll. 20-25; Trial Tr. 14-100, ll. 1-25; Trial Tr. 14-101, ll. 1-2 & 8-25;

Trial Tr. 14-102, ll. 1-3).

CONCLUSION

Title VII of the Civil Rights Act of 1964 does not prohibit employers from using

employment practices that do not cause a disparate impact on the basis of race or

ethnicity.  Title VII of the Civil Rights Act of 1964 does not prohibit employers from

promoting employees on the basis of their relative merit as determined by a valid job

related examination.  The 2005 and 2007 HRD police sergeants' promotional

examinations used by Springfield did not have a disparate impact upon the Springfield

Plaintiffs.  The evidence in this case shows that those examinations were content valid.

Springfield consistent with business necessity followed state civil service law and

selected the most qualified candidates for police sergeant.  Those candidates were

promoted based upon their relative ability, knowledge and skills as demonstrated in the

job-related, content valid examinations administered by the commonwealth. For all of the foregoing reasons, the Plaintiffs' Proposed Findings of Fact are unavailing and should be rejected. Judgment should enter in favor of the City of Springfield and Mayor Sarno on both Counts.

Respectfully submitted

Dated: Thursday, November 18, 2010

THE DEFENDANTS: CITY OF SPRINGFIELD AND MAYOR SARNO

Edward M. Pikula, Esq.
Digitally signed by Edward M. Pikula, Esq.
DN: cn=Edward M. Pikula, Esq., c=US, o=Law Department, ou=City of Springfield,
email=epikula@springfieldcityhall.com
Date: 2010.11.19 09:16:08 -05'00'

By, /s/_____
Edward M. Pikula, Esq
BBO# 399770
City Solicitor

Harry P. Carroll
Digitally signed by Harry P. Carroll
DN: cn=Harry P. Carroll, o=City of Springfield, ou=Springfield Law Department,
email=hcarroll@springfieldcityhall.com, c=US
Date: 2010.11.18 15:38:12 -05'00'

By, /s/_____
Harry P. Carroll, Esq.
BBO # 076060
Senior Legal Counsel

City of Springfield Law Department
36 Court Street, Room 210
Springfield, MA 01103
(413) 787-6085
Fax: (413) 787-6173

### CERTIFICATE OF SERVICE

I hereby certify that on Friday, November 19, 2010, a copy of this document was served by electronic filing on all counsel of record.


Harry P. Carroll
Digitally signed by Harry P. Carroll
DN: cn=Harry P. Carroll, o=City of Springfield, ou=Springfield Law Department,
email=hcarroll@springfieldcityhall.com, c=US
Date: 2010.11.18 15:38:38 -05'00'

/s/_____
Harry P. Carroll, Esq.