**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                              )
PEDRO LOPEZ, et al.                           )
                                              )
                    Plaintiffs,               )
                                              )     Civil Action No. 07-11693-GAO
          v.                                  )
                                              )
CITY OF LAWRENCE, et al.                      )
                                              )
                    Defendant.                )
_____ )

**PLAINTIFFS' RESPONSE TO DEFENDANTS'**
**PROPOSED FINDINGS OF FACT AND RULINGS OF LAW**

## <u>TABLE OF CONTENTS</u>

**1. Disparate Impact** ................................................................................................ 3

**2. Validity** ............................................................................................................ 6

    A. Meaning of Validity ................................................................................. 6
    B. Burden of Proving Validity ..................................................................... 7
    C. 1991 Validation Study ............................................................................ 8
    D. 2000 Job Analysis .................................................................................11
    E. Education & Experience Component ......................................................12

**3. Less Discriminatory Alternatives** ..................................................................15

    A. Burden of Proof ....................................................................................15
    B. Prior Boston Exams ..............................................................................18
    C. Springfield/MBTA Selection Process ...................................................21
    D. Banding .................................................................................................22

**4. Other Issues** ...................................................................................................23

    A. Statute of Limitations ...........................................................................23
    B. Defendants' Knowledge ........................................................................24
    C. Effect of *Ricci v. DeStefano* ...............................................................25
    D. Reliance on HRD .................................................................................26

**CONCLUSION** ....................................................................................................27

Taken as a whole, the Defendants' proposed findings not only fail to meet the Plaintiffs' evidence, they actually lend further support to the Plaintiffs' case. First, in terms of disparate impact, the Defendants' attempts to have this Court focus solely on isolated statistics ignores the testimony of their own experts and the overwhelming weight of legal authority. Second, in terms of validity, the Defendants' heavy reliance on the 1991 validity study undercuts their argument that the exams were valid, both because that study was far too old and because the study's own findings help to show that the exams were not valid. Third, in terms of less discriminatory alternatives, the Defendants' have failed to rebut the Plaintiffs' exhaustive evidence that such alternatives were in use throughout the country and in many communities in Massachusetts. Indeed, Boston's prior use of alternatives demonstrates that alternatives were politically, financially, and legally feasible, and that they resulted in better outcomes. None of the Defendants' collateral arguments, meanwhile, are sufficient to overcome the inevitable conclusion in this case: the exams had a disparate impact and were not valid, so all of the Defendants must be found liable.

**1. Disparate Impact**

Remarkably, none of the Defendants addressed the facts or law relevant to mean score differences, even though that issue lies at the heart this case. Plaintiffs focused on that issue in their trial brief, during their examinations of expert witnesses, and in their opposition to the Defendants' motions for judgment, so the Defendants can hardly claim surprise. The Defendants' silence is not surprising given that their own experts acknowledge both the relevance of mean score differences and the appropriateness of looking at aggregated data when

considering those differences. (Plaintiffs' Proposed Findings at 14-15, 61-62, 68-69). For example, Dr. Outtz wrote the following:

> According to the Uniform Guidelines, a test or selection procedure has adverse impact *if test scores of applicants who are members of a protected class are (statistically) significantly lower than those of non-minority applicants*, or if the selection rate for such applicants is less than 80 percent of the selection rate for non-minority applicants. If *either* condition exists, an employer must provide validity evidence to substantiate the appropriateness of the test.

(17:126-27) (emphasis added). The Defendants go to great lengths to emphasize Dr. Outtz' eminence in the field of industrial organizational psychology (Boston's Proposed Findings at 37-38), so they have no basis to question the authority of this statement. In fact, this statement was not disputed. When asked whether he agreed with it, Dr. Silva said he did, adding, "And if the groups are performing at a different level, you may have to justify it, especially in very large samples where there is statistical significance to those differences." (17:127).

Dr. Silva also agreed that it is appropriate to aggregate across the state when looking at mean score differences in this case, because all applicants take the same test:

> Q: So for any given test, the 2005 statewide test, you're just looking at a group of – there's no overlap; all those applicants are taking the test just once, right?
>
> A: That's correct.
>
> Q: So in that situation it's not unreasonable to take a look at the statewide results to see how, for example, black candidates scored and how white candidates scored?
>
> A: Right. I stand corrected, yes. In that situation, across jurisdictions, it is appropriate to combine, and that would be an appropriate use.

(18:43). His acceptance of aggregation is supported by the Uniform Guidelines. (18:44-45).

See 29 C.F.R. § 1607.4(D) (supporting use of aggregation); Uniform Guidelines Q&A , 44 Fed. Reg. at 11999-12000 (Q21) (same).

Given the undisputed relevance of aggregated mean score statistics, the Defendants' limited focus on adverse impact ratios and their exclusive focus on numbers within their own jurisdictions is unwarranted.[1]  As Dr. Wiesen testified at trial, what is significant about those ratios is not what they mean in isolation, but how they fit within an overwhelming pattern of consistency across all different measures (mean score differences and adverse impact ratios, aggregated and disaggregated, statistically-significant or not, below the four-fifths rule or above): the overall pattern of these measures indicates that minority applicants fared worse on the exams.  In other words, the exams had a disparate impact on minority applicants.

Dr. Wiesen's reliance on the overall collection of statistical analyses – including those resulting in statistically-significant outcomes and those not – is in keeping with First Circuit precedent.  In EEOC v. Steamship Clerks Union, Local 1066, 48 F.3d 594 (1st Cir. 1995), a disparate impact case, the court observed that any piece of statistical evidence does not stand alone, but instead "depends on all of the surrounding facts and circumstances."  Id. at 604-605(citation and internal quotation marks omitted).  It specifically rejected an argument that the plaintiffs' statistics were not sufficiently robust, reaching a conclusion that is equally apt here: given "the logical force of the conclusion that the numbers suggest, it would blink reality to conclude that a serious 'sample size' problem lurks here."  Id. at 605.  In that case, as in this case, there was an "unvarnished reality" of minority under-representation that put everything into context.  Id.

---

[1]      Likewise, the Defendants' argument that it is inappropriate to consider applicants who failed the tests (Boston's Proposed Findings at 37 n.5; Springfield's Proposed Findings at 31-33) defies logic.  The Plaintiffs allege that the tests were unfair to minorities, *because minorities do worse*.  It is plainly reasonable to look at the scores of all test takers to evaluate whether minorities do worse.  This is undeniably true with respect to mean score differences.  It is equally true with respect to an analysis of pass/fail rates and selection rates.  Given that the Defendants' argument lacks common sense, it is not surprising that they offer no expert testimony or legal authority to support it.

## 2.  Validity

### A.  <u>Meaning of Validity</u>

Defendants confuse two different concepts of validity.  One concept of validity is expressed through a validity coefficient, which is a measure of the relationship between a test score and job performance (ranging from a low of 0, meaning there is no correlation, to a high of 1, meaning perfect correlation).  (6:55-56, 65; 14:47-48; 17:110).  Validity coefficients result from criterion-validation studies (6:55-56), none of which were conducted for the exams at issue in this case.  At trial, there was testimony about validity coefficients that have been calculated for other tests, some of which were job knowledge tests.  One article that was discussed, and partially admitted into evidence (Exh. 150), included a meta-analysis of various criterion-validation studies.  According to that article, which looked at a wide range of test types, work sample tests were found to have an average validity coefficient of 0.54; structured interviews, 0.51; peer ratings, 0.49; job knowledge tests, 0.48; and T&E point methods, 0.11.  (Exh. 150).  Plainly, even when looking at one form of test, the actual validity coefficient for a specific exam will vary, depending on the quality of the test and the nature of the job.  As Dr. Fields testified, for example, validity coefficients for job knowledge tests have been found to be as low as 0.1. (6:56).

This evidence about validity coefficients provides relevant background information about different forms of tests, but it does not satisfy the Defendants' burden of proving validity.  It is undisputed that the Defendants do not seek to validate the exams using *criterion validation*; instead, they seek to validate the exams using *content validation*.  Content validity focuses not on a measure of correlation, but on the process used to ensure a relationship between the critical

knowledge, skills, and abilities ("KSA") of a specific job and test design. (6:70-71; 14:47; 17:110-111).

One way the Defendants confuse these two different concepts of validity is through their unwarranted attacks on Dr. Wiesen. Dr. Wiesen previously testified about multiple choice tests, saying, "[T]he literature shows that job knowledge are, if not the most valid test, very close to the most valid predictors of future job performance." (Boston Proposed Findings at 43). He reaffirmed that testimony at trial. (3:126). But that testimony plainly concerns validity in the context of criterion validity, not content validity. Dr. Wiesen's testimony is entirely consistent with his opinion, and the opinion of Dr. Fields, that the Defendants have failed to establish that the exams have satisfied the requirements of content validity. That is, even if written tests can have high criterion validity, that fact says nothing about whether the exams in this case were content valid.

### B. Burden of Proving Validity

At times, the Defendants forget that they have the burden of proving validity. For example, Boston alleges that "there is no evidence in the record to support Plaintiffs' position" that HRD's test developer lacked sufficient testing expertise, noting that "[n]o witnesses from HRD testified at trial." (Boston's Proposed Findings at 49). If anything, this shows that the Defendants failed to meet their burden of proof, because they did not show that the exams were developed by staff with sufficient training or expertise. In any event, there was ample evidence that HRD's test developer lacked sufficient training or expertise, including evidence about the poor quality of the test questions, an issue about which there was extensive testimony. (Plaintiffs' Proposed Findings at 35-36).

C. <u>1991 Validation Report</u>

The 1991 validation study has a superficial facade of comprehensiveness, with many pages, various tables and charts, a series of forms, references to subject matter experts ("SMEs"), and a long list of exhibits.  The Defendants seek to take the fullest possible advantage of that facade.  (Boston's Proposed Findings at 10-16).  But there are at least two major reasons to conclude that, for all of its pages, the 1991 study is insufficient to establish the content validity of the 2005-2008 exams.

First, regardless of whether it was sufficient at the time, the 1991 study was too outdated to validate exams given 14 or more years later.  Although the Defendants baldly declare that "[i]t is appropriate in industrial psychology for a test developer to rely on job analyses conducted over a period as long as ten (10) years" (Boston's Proposed Findings at 10), their expert begs to differ.  Dr. Outtz testified that a job analysis "is useful and current for approximately five to eight years *if the job doesn't change*."  (14:34) (emphasis added).  That testimony is supported by case law, which indicates that a validation study should be conducted at least every five years.  <u>See</u>, <u>e.g.</u>, <u>Bradley v. City of Lynn</u>, 443 F. Supp. 2d 145, 172 (D. Mass. 2006) ("HRD's own expert recommends, and other experts agree, that a validity study should be conducted every five years").

Among the many reasons to require current validation studies, one reason that is evident from the 1991 study itself is the need to evaluate alternative testing mechanisms.  As the Defendants note (Boston's Proposed Findings at 15-16), the 1991 study concluded that a multiple choice test was acceptable *at that time* because "there was no persuasive evidence that other examination modes would have no or even less adverse impact than the method chosen."  (Exh. 40 at 15).  Although it is debatable whether that statement was true even in 1991, no

reasonable person would argue that the practices and techniques in the testing field remained static from 1991 through 2005. On the contrary, there is overwhelming evidence that the types of multiple-choice job-knowledge tests at issue here are known to have the highest levels of adverse impact. And in the context of police promotional exams those tests rarely, if ever, are relied on as heavily as they were in this case.

Second, one of the most critical parts of the 1991 study is the testability analysis, which purports to show what would be covered on the written exam, what would be covered by the education and experience component, and what would not be tested. (Exh. 41 at Att. EE). Not only were some critical KSAs that were supposedly covered by the written exam not actually tested (Plaintiffs' Proposed Findings at 32), but the process of deciding which KSAs would be tested was deeply flawed. One factor used to exclude critical KSAs from testing was the impossibility of using a statewide exam to test for tasks specific to a local department. (Exh. 40 at 17). That factor hurts the Defendants, because it demonstrates how their reliance on a statewide exam precluded them from testing for critical KSAs relevant to their own jurisdictions. Another factor was the inability to test for tasks not covered in the reading list texts and materials, including "knowledge of the characteristics of gangs and gang violence." (Id.). Thus, it was a predefined reading list, rather than critical KSAs identified in a job analysis, that was driving the test design. Another factor was the inability to test for some KSAs in a written test, such as "ability to establish rapport with persons from different ethnic, cultural, and/or economic backgrounds." (Id.). In short, this was the reverse of content validation. Instead of developing a test to cover critical KSAs, HRD started with a test method (i.e., a statewide written test using a predefined reading list) and then excluded all critical KSAs that could not be covered by that method, without regard to how critical they were. This process flunks Dr. Outtz's own standards

for content validity: "The omission from the testing domain of a KSAO that is an important job prerequisite… - known in I/O psychology as 'criterion deficiency' - vitiates the entire justification for the employment test, which is to select individuals accurately based on their capacity to perform the job in question." (16:98-100).

In its proposed findings, Boston suggests that the 1991 exam was "validated fair," citing as support <u>Boston Police Superior Officers Federation v. City of Boston</u>, 147 F.3d 13, 15 (1998). (Boston's Proposed Findings at 20). This finding is not supported by that case or any other evidence. In that case, the First Circuit stated as follows:

> However, by 1990, the BPD had given only one 'validated-fair' exam, and the number of blacks promoted still fell short of the decree's goals. As a result, the BPD and MAAAP jointly requested that the court extend the decree until the BPD could give one more 'validated-fair' exam in June, 1991.
>
> Following the 1991 exam's administration, *MAMLEO challenged its validity on the ground that it did not comport with the Guidelines*. The parties settled this challenge by jointly proposing an amendment to the consent decree, which specifically reaffirmed that selection procedures for the promotion to the position of sergeant be validated in accordance with the Guidelines. In addition, the amendment stated generally that the BPD would establish the next eligible lists for promotion to sergeant, lieutenant, and captain using selection procedures 'of a significantly different type and/or scope.'

<u>Id.</u> at 15-16 (emphasis added). In other words, the 1991 exam was never found to be a "validated fair" exam. On the contrary, the validity of the 1991 exam was challenged, and the parties settled that challenge by agreeing to use a "significantly different" procedure that was validated by the Guidelines. If anything, this information suggests that all parties viewed the 1991 exam as invalid, with the need for a "significantly different" exam. Because the exams at issue in this case were developed using the same study that was used to justify the 1991 exam, the flaws in the 1991 exam carried over to the exams in this case.

D. <u>2000 Job Analysis</u>

The Defendants attempt to rely on the 2000 job analysis as a means to revive the outdated 1991 study.  The evidence does not support that attempt.  The 2000 job analysis was part of an effort by Morris & McDaniel to develop a new test for Boston's 2002 exam.  Following the administration of that exam, Boston scuttled the exam and Morris & McDaniel.  For its 2005 exam, Boston returned to HRD, which continued its longstanding practice of administering exams in the familiar format: a written multiple-choice job knowledge test and the education and experience point system.  As discussed in Plaintiffs' proposed findings, there is no reliable evidence demonstrating a connection between the 2000 job analysis and the exams at issue in this case (Plaintiff's Proposed Findings at 35), and none of the Defendants point to any such evidence.

Although Boston relies on the testimony of Dr. Outtz to make a connection between the 2000 job analysis and Boston's 2005 exam (Boston's Proposed Findings at 27), Dr. Outtz identified no documents to support his testimony, and the exhibits introduced at trial contradict him.  The test outline for Boston's 2005 exam is just that – an outline.  It provides nothing more than a list of six "competency areas," each with two to five sub-parts, and a designation of how many questions would relate to those sub-parts.  (Exh. 4).  The 2000 job analysis, meanwhile, says nothing about any such "competency areas," nothing about test outlines, and nothing about testing weights.  (Exh. 42).  What it does say is that exclusive reliance on a written exam is inappropriate:

> The method of evaluation of a candidate for promotion on a KSA may include, but is not limited to, a written examination, an assessment center, a training program, a probationary period, and/or a medical/physical examination.  The method of evaluation is dependent on the appropriateness of measurement for the particular KSA.  For example, knowledge of search and seizure laws can be evaluated most effectively in a written examination, whereas ability to

> communicate orally is more appropriately evaluated through a performance based
> assessment technique such as an oral board or an assessment center.

(Exh. 42 at 1). Given this expert perspective, it is not surprising that the 2002 exam developed

by Morris & McDaniel had components beyond a written test and an education and experience

component, including a "Situational Exercise using multiple scenarios with oral responses" and a

"Performance Review System." (Exh. 151).

Ultimately, the 2000 job analysis identified 160 "KSAs Meeting Test Criteria." (Id. at

48-55). Once Boston abandoned the use of a multi-component exam and turned, once again, to

HRD, there is no clear indication whether or how those 160 KSAs were used to develop a

content-valid exam. There is, for example, no reliable way to link the list of 160 KSAs to the

outline for Boston's 2005 exam. (Compare Exh. 42 at 48-55 with Exh. 4). In short, any claim

that the 2000 job analysis was used to develop the exams at issue in this case is wholly

unsupported by the evidence.

E. Education and Experience Component

None of the Defendants offered any evidence to show that the education and experience

component was validated as part of the 2000 job analysis. Instead, in attempting to validate that

component, the Defendants look solely to the 1991 validation study. For example, they claim

that as part of the 1991 study SMEs reviewed that component and "linked this information to the

position under consideration." (Boston's Proposed Findings at 14). Even if a 1991 validation of

the education and experience component was sufficiently timely to support the use of that

component as part of the 2005-2008 exams – and it plainly would not be sufficiently timely – the

claim that the 1991 study validated the education and experience component is simply wrong.

A close examination of the 1991 report demonstrates that it was not intended to establish

the validity of the education and experience component, which already was in existence. The

report indicates that after receiving the results of the job analysis, staff and experts "began their work relative to the development and construction of a content-valid, multiple choice written examination."  (Exh. 40 at 15).  There is no indication that those staff and experts attempted to develop a similarly "content-valid" education and experience component.  Instead, the report notes that a "training and experience" component is required under Massachusetts law, and that "the decision was made to weight the…component at 20% of the final mark."  (Id.).

SMEs did *review*, as opposed to *validate*, the existing education and experience component, but their review found flaws with that component, and those flaws were not fixed. (Exh. 41 at Att. X).  With respect to educational background, SMEs rated the importance of various fields differently depending on what rank an applicant was seeking (i.e., sergeant, lieutenant, or captain).  (Id. at 4089).  This led to a recommendation "that in [HRD's] re-examination of these fields, [it] approach each rank individually rather than collectively."  (Id. at 4090).  That did not happen, as demonstrated by the education and experience forms admitted into evidence, which are the same for all three ranks.   (Exh. 11).  The education and experience component was a one-size-fits-all assessment tool, which is contrary to the whole notion of job-specific content validity.  Similarly, with respect to experience, SMEs made the common sense suggestion that other areas be credited, such as management and general military experience. (Exh. 41 at Att. X at 4090).  This recommendation also was not implemented, as demonstrated by the education and experience forms and by testimony at trial.  (Exh. 11; 9:103-106).  Given that the SME review of the education and experience component found flaws that were left unaddressed, the Defendants cannot reasonably argue that this review contributed to the content validity of the exam.  On the contrary, the 1991 study proves that the education and experience component was not valid.

Even if the Defendants had offered evidence to support the 20 percent weighting of the education and experience component, that evidence would only hurt the Defendants in this case. Because every applicant automatically received 14 of 20 possible points, the maximum possible weight was no more than 7 percent (6/86, given 6 possible points for education and experience component, and 80 possible points for written exam).  (2:33-36).  As discussed in more detail in the Plaintiffs' proposed findings, the real weight was even lower.  (Plaintiffs' Proposed Findings at 38-40).  As a result, even making the generous assumption that the exams were validated with the education and experience component having a weight of 20 percent (in fact, there is no evidence that the component was validated at all), that validity was fatally compromised given that the component actually had a weight of just a few percentage points.

Boston confuses the issue when arguing that the "level of variance of the E&E has no bearing on validity."  (Boston's Proposed Findings at 49).  Its claim that Dr. Wiesen stated as much is not supported by the testimony it cites; Dr. Wiesen never said any such thing.  (Id., citing 2:34-35).  He would not have offered such testimony because it was obviously not true.  If a validation process assigns a component a weight of 20 percent, but it actually has a weight of no more than a few percentage points, then the component's actual weight is invalid.  Dr. Outtz's testimony is not the contrary.  (Id., citing 14:51-52).  Dr. Outtz noted that all applicants might perform equally well on a valid test component, which could result in a small spread between the applicants' scores, but the point here is different.  In this case, the point is not that all applicants happened to perform equally well; the point is that it was *structurally impossible* for candidates to have a spread of more than five points.  (Plaintiffs' Proposed Findings at 40).  At bottom, the claim that the education and experience component had a weight of 20 percent is pure fiction.

### 3. Less Discriminatory Alternatives

A. Burden of Proof

As described in their proposed findings, the Plaintiffs are not required to provide "the exact floor plan" for an alternative test. (Plaintiffs' Proposed Findings at 84). See Bradley, 443 F. Supp. 2d at 175. It is sufficient for them to offer proof that "other jurisdictions have managed to devise selection procedures to have a less adverse impact." Id. The Defendants cite to various cases to advance a principle that is undisputed – i.e., that a plaintiff must do more than offer bare allegations about unspecified alternatives. (Boston's Proposed Findings at 52-53). As discussed at length in their proposed findings, the Plaintiffs offered substantial evidence about alternatives that have been shown to be feasible, to have greater validity, and to reduce adverse impact. (Plaintiff's Proposed Findings at 44-55, 83-87).

Relying on two cases from the Seventh Circuit – Adams v. City of Chicago, 469 F.3d 609 (7th Cir. 2006) and Allen v. City of Chicago, 351 F.3d 316 (7th Cir. 2003) – the Defendants argue that the Plaintiffs have a far greater burden, including the need to prove that they gave the employer an opportunity to adopt a specific alternative and that there is a correlation between that specific alternative procedure and job performance. (Boston's Proposed Findings at 52).

As a starting point, these cases are not controlling. There is no authority from the Supreme Court or the First Circuit that imposes, or even hints at, a requirement that plaintiffs lay out the exact floor plan of an alternative or that plaintiffs show that they offered up such a floor plan to a defendant. Moreover, a close examination of these cases demonstrates that they do not stand for the extreme positions for which they are cited. Both cases were resolved at summary judgment, meaning that neither the district courts nor the Seventh Circuit had the benefit of

weeks of testimony, from four experts and various police professionals, about alternative testing methods.  And the underlying facts of those cases did not resemble the facts of this case.

Adams involved a 1994 police sergeant promotional exam, which consisted of three equally-weighted parts: (1) a job knowledge test covering the law, regulations, and departmental procedures, (2) a test of administrative functions, including reviewing reports and determining crime patterns, and for candidates who did sufficiently well on the first two parts, (3) an oral examination based on a written briefing.  Id. at 610-11.  (It is worth noting that 4,700 officers took this exam, id. at 615, far more than the total applicants for any of the exams at issue in this case.)  The exam was used for promotions in August 1994, in March 1996, and on February 22, 1997.  Id. at 611.  On January 16, 1997, about one month before to the last set of promotions, a task force recommended that 30 percent of all future promotions be based on a merit component (i.e., evaluations of prior job performance).  Id.  The plaintiffs argued that the City's failure to follow that recommendation when making the promotions in February 1997 violated Title VII, because the City had been presented with an equally valid and less discriminatory alternative. Id.  In rejecting that argument, the Seventh Circuit concluded there was no evidence that the City could have adopted a valid mechanism for introducing the merit component in the one-month window between the task force's recommendation and the final set of promotions.  Id. at 614-16. The court noted that the process of developing a valid merit component ended up requiring about 19 months of analysis and training by experts.  Id. at 614.  Given the narrow argument made by the plaintiffs, the Seventh Circuit's conclusion was unremarkable.

Allen involved the City's next promotional exam, which was first administered in 1998. The new exam included a written job-knowledge test as a hurdle, with a qualifying score that was set by subject matter experts and test consultants.  351 F.3d at 309.  Individuals who passed

the written qualifying test were eligible for promotion based on an assessment exercise (70% of promotions) or on a merit selection system (30% of promotions).  Id.  The parties did not dispute that this selection process was content valid.  Id. at 312-313, 316.  Two classes brought suit, one (Subclass A) comprised of minority applicants who failed the written hurdle, and one (Subclass B) comprised of minority applicants who argued that the City should have promoted more candidates using the merit selection system.  Id. at 310.  Subclass A proposed that the merit selection system be used without requiring a passing score on the written qualifying test.  Id. at 316.  Subclass B's claim was premised on the fact that African-American and Hispanic applicants performed better on the merit selection component than on the assessment exercise component.  Id. at 310.  Under the merit selection component, in fact, African-American candidates were promoted at rates *higher* than white candidates.  Id.  As a result, the plaintiffs argued that the City could have used the merit selection system for more than 30 percent of the promotions.  Id. at 311.  Again, the court's conclusion that neither class offered sufficient evidence of less discriminatory alternatives was unremarkable, because the plaintiffs proposed specific alternatives that were plainly flawed.  In effect, what each class sought to do was to take what was *indisputably* a content-valid exam and make alterations that would have undermined that validity.

The circumstances of the Chicago cases and this case could not be more different.  The Chicago cases started with multi-component exams (for huge applicant pools) that were newly-developed and that had elements with no adverse impact.  Here, the Defendants relied on exams that were developed 14 or more years earlier and that relied almost entirely on poorly-constructed multiple-choice tests that posed 80 job-knowledge questions, a form of testing known to have the highest levels of adverse impact.  Even if the exams were minimally valid – a

finding that seems wholly insupportable based on the evidence – there is undisputed evidence that there were alternative methods that were available (and evidently in use in virtually every other jurisdiction around the country, *including Chicago*), that would have increased content validity, and that would have reduced adverse impact.

    B. <u>Prior Boston Exams</u>

Boston's reliance on its prior exams fails to support its position.[2]  First, Boston points to its 1992 exam, which allegedly included a component requiring candidates to make a presentation before a group of assessors, comprising police commanders from throughout New England.  (Boston's Proposed Findings at 21).  Although Boston offered no evidence regarding the development, validity, or level of disparate impact from this exam, it implies that there was a significant level of impact, relying on <u>Massachusetts Association of Minority Law Enforcement Officers v. Abban</u>, 434 Mass. 256 (2001).  (Id.).  If anything, <u>Abban</u> indicates that the level of adverse impact resulting from this multi-component exam was lower than the extreme levels resulting from earlier exams.  As noted in the case, the minorities who were promoted had scores that were within two points of the white candidates who were bypassed, and banding would have put all of those candidates in the same ranking, thereby eliminating or reducing adverse impact. <u>Id.</u> at 258, 259 n.4, 262, 265.  <u>See also id.</u> at 268-71 (Ireland, J., dissenting).  That the minority officers who were promoted had scores that were within two points of the white candidates who

---

[2]    With respect to Boston's 1987 exam, the Defendants suggest that minorities taking the lieutenant's exam did better on the exam when performance components were not included.  (Springfield Proposed Findings at 52).  The problem with that suggestion, of course, is that the performance component was compromised.  A police superintendent had been involved in the development of a video exercise, and he was then able "to advise friends, study group members, and others about what to study." (Exh. 41 at Att. C at 25).  As a result, it is inappropriate to draw any conclusions from the results of that component.

were bypassed indicates that there was greater parity as a result of this multi-component exam than there was under the exams at issue in this case.

Second, Boston points to its 2002 exam as evidence that alternatives are expensive and do not work. (Boston's Proposed Findings at 24-26, 57).[3]  In terms of expense, there are at least three responses.  One, by its own admission, Boston was able to develop and pay for an alternative test, which undercuts its claim that alternatives were politically, legally, or financially infeasible.  Two, Boston could have realized a greater return on its investment by administering the same test in future years, with expert-assisted modifications, if necessary.  Three, better tests result in benefits beyond reduced adverse impact, so the return on an investment for a better test cannot be measured solely by bottom-line promotion statistics.  When Defendants complain about the cost of an alternative, the proper focus should not be on the gross cost (i.e., how much money is paid to a testing consultant), but on the net cost (i.e., comparing the money paid to a testing consultant with the benefits of using a better selection system, including the value of promoting more qualified candidates, the avoidance of litigation, etc.).  For example, one study discussed at trial found that the utility (i.e., benefit) of assessment centers ranged from $500 to $3,000 per candidate.  (16:59-61, 83-84).  As a result, in the long run, the use of alternative selection systems may actually help a jurisdiction's bottom line.

In terms of effectiveness, Boston suggests that the results of the 2002 exam were comparable to the results of the 2005 exam in terms of minority promotions.  (Boston's Proposed Findings at 29).  The absolute number of promotions, however, cannot be taken out of context; it

---

[3]      In response to evidence about the implausible unanimity of SME ratings in Morris & McDaniel's 2000 job analysis (see Plaintiffs' Proposed Findings, at 34), the Defendants seek to shore up the validity of that analysis by speculating that "[i]t is to be expected that SMEs would agree" and that "SMEs will frequently consider whether a sergeant somewhere in the department performs the task on a given day." (Boston's Proposed Findings at 24).  These speculative musings are insufficient to explain an otherwise unheard of level of unanimity.

is necessary to look at how the number of promotions for each group compared to the overall number of applicants for each group. Boston's multi-component 2002 exam had an adverse impact ratio of 0.315 (Exh. 200), while the 2005 traditional exam had an adverse impact ratio of 0.280 (Exh 80), which is about 11 percent worse.[4]

There is undisputed evidence that the component added to the 2002 exam resulted in a level of adverse impact that was substantially lower than the adverse impact of the written exam. The 2002 video component had a mean score difference $(d = 0.26)$ that was half the size of the mean score difference of the written exam $(d = 0.55)$. Although the effects of these differences on bottom-line promotions will depend on statistical vagaries, minority applicants who take tests with lower mean score differences will be competing on a more level playing field. As a simple example, if a white person uses a weighted coin that gives him a 55% chance of getting a "heads," it's possible that after 100 coin tosses he could end up with 45, 50, 55, or some different number of "heads." If a minority used a different weighted coin, giving him only a 45% chance of getting a "heads," it's also possible that after 100 coin tosses he could end up with 45, 50, 55, or some different number. The actual number of "heads" that each gets will depend on chance, but nobody would argue that there was a level playing field. A mean score difference between groups is akin to each group using different coins: the bottom line may or may not vary, but the playing field is not equal. Regardless of bottom line numbers, therefore, the introduction of a component with lower mean score differences in 2002 resulted in an exam that was substantially more fair to minority applicants.

_____

[4]    Boston confuses adverse impact ratios with the measure known as "d." (Boston's Proposed Findings at 25-26). An adverse impact ratio is a simple comparison of promotion rates between two different groups. (Plaintiffs' Proposed Findings at 13). Typically, the lower the ratio, the worse the adverse impact, with any ratio below 0.8 running afoul of the 4/5's rule. By contrast, "d" is a measure of standardized mean score differences. (Plaintiffs' Proposed Findings at 14). A lower "d" reflects a lower level of group difference, with 0 meaning there is no difference between groups.

C.  Springfield/MBTA Selection Process

Springfield and the MBTA both use selection processes that incorporate structured panel interviews, together with other supplemental components, such as performance reviews or background checks.  (Springfield's Proposed Findings at 5-6; MBTA Proposed Findings at 5-6).  As Springfield notes, these additional processes enhance content validity.  (Springfield's Proposed Findings at 6-8).  The problem with both defendants' processes, however, is that they come too late.  They are *post-exam* processes.  Those processes do not begin until after Springfield or the MBTA have openings and request a certified list of 2N+1 promotable candidates from the top of the exam list.  It is only those candidates at the top of the exam list who get the benefit of these additional selection components.  If, as Plaintiffs allege, the statewide exam has a disparate impact (meaning that minority candidates are less likely to make it onto these lists of promotable candidates), then the Defendants' supplemental efforts to evaluate candidates who make it onto those lists is plainly insufficient to establish validity.

These supplemental components, while insufficient to establish the validity of the exams, provide further evidence that additional components are feasible and, if introduced earlier, would enhance content validity.  Both jurisdictions have been able to develop selection components that test for a broader range of critical KSAs than the exam alone.  Based on the evidence, there is no reason why the Defendants would be unable to develop a delegated exam that used the results of a written exam, together with supplemental components, to generate exam scores.  In other words, the Defendants could incorporate structured panel interviews into the exam, rather than using them as a post-exam process.  The final rankings of a jurisdiction's candidates, therefore, would take into account the assessment of a broader range of critical KSAs.

D. <u>Banding</u>

The Defendants attack a straw man when addressing banding.  Boston, for example, states that "Plaintiffs may attempt to argue that Boston should have banded the results of the 2005 and 2008 examinations as one means to overcome disparate impact." (Boston's Proposed Findings at 45).  Plaintiffs never have proposed such a post-hoc remedy.  Instead, Plaintiffs offered evidence that banding can be incorporated into test design to ensure that rank ordering, which is required under Massachusetts law, takes into account the variance of any test component.  Based on that evidence, this Court could find, as Judge Saris did in <u>Bradley</u>, that "HRD could have banded the written cognitive examination scores," because "[a]s all experts agree, there is no rational, statistically valid basis for distinguishing between candidates within a band of eight points because of the examination's reliability."  <u>Bradley</u>, 443 F. Supp. 2d at 174. In addressing the contention that banding is inconsistent with Massachusetts civil service statutes, Judge Saris concluded that "banding based on scores that have no statistical difference to diminish the adverse impact of a rank-order system seems consistent with the statutory scheme and applicable caselaw under Title VII."  <u>Id.</u>  Indeed, no authority holds that banding is prohibited under Massachusetts law.  The Defendants' reliance on <u>Pratt v. Dietl</u>, Civil Action No. 2009-01254, Memorandum of Decision and Order on the Plaintiffs' Motion for Preliminary Injunction (Mass. Super.  Ct. Apr. 15, 2009), is misplaced.  <u>Pratt</u> held only that HRD's attempt to implement banding *after* an exam had been administered ran afoul of the "requisite review process."  <u>Id.</u> at 10.  In reaching this result, the court explicitly recognized the potential value of banding:

> The proposed banding may well prove to be a better and fairer approach to assessing candidates for promotion within the civil service framework and Massachusetts may well join the numbers of other jurisdictions which have adopted the banding approach.

Id.  This is a far cry from a ruling that banding is illegal under Massachusetts law.

**4.  Other Issues**

    A.  Statute of Limitations

    Springfield and the MBTA argue that their Plaintiffs' claims with respect to the 2005 exam are not timely.  (Springfield's Proposed Findings at 25-28; MBTA's Proposed Findings at 16-17).  This argument is without merit for two principal reasons.  First, because the 2005 examination results, which were not posted until the spring of 2006, were in effect until the spring of 2008, the Plaintiffs' filings were timely.  A plaintiff in Massachusetts is generally required to file an administrative complaint of discrimination within 300 days of the alleged discrimination.  Thomas v. Eastman Kodak Co., 183 F.3d 38, 47 (1st Cir. 1999).  This requirement "is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling."  Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982).  Accord Christo v. Edward G. Boyle Ins. Agency, Inc., 402 Mass. 815, 816-817 (1988) (applying Massachusetts law).

    The 300-day filing requirement "cannot be mechanically applied, because it is not possible to pinpoint when the limitations period begins – i.e., when the plaintiff's claim 'accrues' – without first determining the date, or the temporal boundary, of the 'alleged unlawful employment practice.'"  Thomas, 183 F.3d at 48.  In Lewis v. City of Chicago, ___ U.S. ___, 130 S.Ct. 2191 (2010), the Supreme Court specifically addressed when the limitations period begins in the context of a disparate impact claim involving civil service examinations.  The Court held that the limitations period does not begin to run when an employer decides to use a particular examination or when the scores of the examination are announced, but every time the scores have an impact on the selection of candidates.  Id. at 2198.

The Springfield and MBTA plaintiffs filed administrative complaints of discrimination on September 24, 2008.  (Amended Stipulation at 5-6).  Any claim arising within the 300 days preceding that filing – i.e., on or after November 29, 2007 – would be timely.  The 2005 examination was held on October 22, 2005.  (Exh. 74).  The eligibility list from that examination was established on March 24, 2006.  (Id.).  Eligibility lists are valid for two years, so this eligibility list was valid through March 24, 2008.  During the entire time this list was in effect, from March 24, 2006 through March 24, 2008, the Springfield and MBTA plaintiffs suffered an adverse impact, because their potential for promotion was adversely affected by the ongoing use of the examination.

Second, at this stage, it is of little practical consequence whether the Springfield and MBTA plaintiffs' complaints were timely with respect to the 2005 examination, because there is no question that the complaints were timely with respect to the 2007 examination.  To support their claim of disparate impact, the Plaintiffs may look to the results of the 2005 examination (or earlier examinations), regardless of whether they are entitled to any relief in connection with those examinations.  As described in more detail in the Plaintiffs' proposed findings, courts may consider a broad range of evidence when evaluating disparate impact, including historical patterns.  (Plaintiffs' Proposed Findings at 57-67).  As a result, the timeliness of the Plaintiffs' claims as to the 2005 examination relates, if anything, to possible remedies, not to the question of liability for using an employment practice that had a disparate impact.

B.  Defendants' Knowledge

Although the Defendants repeatedly argue that they had no reason to know that HRD's exams resulted in adverse impact, that fact is of no consequence.  It is well established that an employer's knowledge and intent is irrelevant in a disparate impact case.  Boston Chapter,

24

N.A.A.C.P., Inc. v. Beecher, 504 F.2d 1017, 1021 (1st Cir. 1974). The question is whether a challenged test denied applicants equal opportunities "by creating 'built-in headwinds'" for minority applicants. Id. "If it did, the inequality may be remedied without regard to office malice, specific intent, or actionable neglect." Id. As a result, all of the Defendants arguments about what they knew or intended are misplaced.

      C. Effect of *Ricci v. DeStefano*

      Two of the Defendants argue that they cannot be held liable based on the Supreme Court's decision in Ricci v. DeStefano, ___ U.S. ___, 129 S.Ct. 2658 (2009). (Worcester's Proposed Findings at 31-34; Lowell's Proposed Findings at 23-24). Specifically, they argue that they could not lawfully have discarded the results of the challenged examinations. (Id.). This argument disregards the holding of Ricci and the point of this case.

      Ricci considered whether a government employer that engaged in race-conscious hiring could defend against a claim of disparate treatment discrimination by establishing that its actions were necessary to overcome a discriminatory testing process. The Court held that this defense is available, but only when "the employer can demonstrate a strong basis in evidence that, had it not taken the action, it would have been liable under the disparate-impact statute." Id. at 2664. Here, the Plaintiffs are seeking to establish that the Defendants *are* liable under a disparate impact theory. If the Plaintiffs succeed, then Ricci provides no defense. If they do not succeed, then Ricci is of no consequence. As a result, Ricci does not help the Defendants. See U.S. v. Vulcan Society, Inc., 637 F. Supp. 2d 77, 83 (E.D.N.Y. 2009) (in disparate impact case, noting that Ricci does not provide a defense).

D. <u>Reliance on HRD</u>

The Defendants persist in arguing that their reliance on HRD provides a defense. (Methuen's Proposed Findings at 15-17; MBTA's Proposed Findings at 15; Worcester's Proposed Findings at 37-39; Lawrence Proposed Findings at 17-19). That argument goes nowhere.

At trial, there was ample evidence demonstrating that Massachusetts jurisdictions are not required to use HRD's statewide exam. (Plaintiffs' Proposed Findings at 44). The First Circuit already has recognized that this is so. In <u>Lopez v. City of Lynn</u>, 588 F.3d 69 (1st Cir. 2009), the court ruled that the Commonwealth and HRD could not be liable for discrimination because, among other reasons, they did not dictate how or whether the municipal defendants would use HRD's examination. <u>Id.</u> at 77-78. In reaching this result, the First Circuit noted that "[n]othing in the civil service law…mandated that municipalities had to use the results of HRD's written examinations as the only criterion to evaluate merit." As a result, there is no basis for the Defendants to argue that they were required to use HRD's exam.

The Defendants fare no better if arguing that their *choice* to rely on HRD's exam provides a defense. The Defendants offer no authority for such an argument, and the Plaintiffs are unaware of any authority. The law offers only one substantive defense in a case where plaintiffs have established that a test has a disparate impact: the defendant must show that the test was valid. <u>Bradley</u>, 443 F.3d at 157, 171. An otherwise invalid test does not become valid simply because it is most expedient or because it was developed by a government authority. If a defendant were able to defend against a disparate impact claim by arguing that it simply used the selection device that was most readily available, then disparate impact claims would rarely, if ever, succeed.

Reduced to its core, the Defendants are doing nothing more than appealing to the Court's sympathy. They state, in effect, "We used a statewide exam that was free, that we assumed was fair, and that we could not independently evaluate, so what's wrong with that?" What's wrong with that is it violates state and federal law, provided the exam has a disparate impact and is not valid. By relying on the state's exam, the Defendants' took a calculated risk that the benefits of that decision outweighed the costs. Numerous other jurisdictions across the country, and in Massachusetts, have made a different decision, recognizing that the best way to comply with discrimination law is to take control of their selection process. In short, the Defendants cannot be permitted to escape the consequences of their decision to take the easy way out.

## CONCLUSION

For these reasons, together with the reasons set forth in Plaintiffs' Proposed Findings of Fact and Rulings of Law, the Plaintiffs respectfully request that the Court issue findings of fact and rulings of law that all of the Defendants have engaged in disparate impact discrimination, in violation of Title VII and Mass. Gen. L., ch. 151B.

Respectfully Submitted,

PEDRO LOPEZ, et al., Plaintiffs,
By their attorneys,


/s/ Stephen S. Churchill
Harold L. Lichten, BBO #549689
Shannon Liss-Riordan, BBO# 640716
Stephen S. Churchill, BBO#564158
Joseph L. Sulman, BBO #663635
LICHTEN & LISS-RIORDAN, P.C.
100 Cambridge Street, 20th Floor
Boston, MA 02114
Date: November 19, 2010                        (617) 994-5800

## CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2010, a copy of this document was served by electronic filing on all counsel of record.

 /s/ Stephen S. Churchill
Stephen S. Churchill