UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
PEDRO LOPEZ, et al.,                     *
                                         *
            Plaintiffs                   *
                                         *
v.                                       *   Civil Action No. 07-11693-GAO
                                         *
CITY OF LAWRENCE,                        *
MASSACHUSETTS, et al.,                   *
                                         *
            Defendants                   *
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

REPLY MEMORANDUM OF DEFENDANT
CITY OF BOSTON TO PLAINTIFFS' PROPOSED
FINDINGS OF FACTS AND CONCLUSIONS OF LAW

In their Proposed Findings of Facts and Conclusions of Law ("Pl. Proposed Findings"), Plaintiffs argue that the 2005 and 2008 sergeant promotional exams for the Boston Police Department ("BPD") were not properly validated, and that there were feasible alternatives available to the BPD, which it refused to implement.   As discussed below, Plaintiffs' arguments on both issues are replete with errors, and must be rejected. Accordingly, judgment should enter for Defendant City of Boston ("Boston") on Plaintiffs' claims of disparate impact discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq. ("Title VII"), and Mass. General Laws Chapter 151B.

A.    **Plaintiffs Acknowledge That The Establishment Of A Prima Facie Case Is Not Equivalent To Establishing Liability**.

While Boston does not dispute that Plaintiffs can establish a prima facie case of disparate impact discrimination under federal and state law, it should be emphasized that nothing more is being conceded than the existence of a prima facie case.  As Plaintiffs

themselves acknowledge (Pl. Proposed Findings at 58), "[a]sking whether a plaintiff has established a prima facie case of disparate impact discrimination is different than asking whether an employer will be held liable for such discrimination.  The purpose of the prima facie test is merely to determine whether the employer should shoulder the burden of justifying its use of a challenged business practice."  (Compare Boston's Proposed Findings of Fact and Conclusions of Law ("Boston's Proposed Findings"), at 36) (same).  Thus, nothing more should be read into Plaintiffs' establishment of a prima facie case than the law permits.

**B**.  **Boston Has Met The Elements Identified By Plaintiffs For Validating The Exams At Issue**.

Plaintiffs identify (Pl. Proposed Findings at 73-74) five steps they deem essential for validating the promotional exams at issue.  Assuming arguendo that Plaintiffs' recitation is correct, the record evidence conclusively shows that the tests at issue met the steps identified by Plaintiffs.

The first step necessary for validation, as identified by Plaintiffs, "is a job analysis" that "must be reasonably current."  (See Pl. Proposed Findings at 73).  Plaintiffs find fault (id. at 73-75) with the age of the job analyses pertinent to the BPD's sergeant position, without justification.  As discussed in Boston's Proposed Findings (at 42), courts have found that for a police sergeant position, a job analysis can remain current for up to ten years.[1]  Plaintiffs further argue, without record support, that the 1991 Job Analysis accompanying the Validation Report from that year cannot be deemed current

---

[1] In a case cited by Boston in its Proposed Findings (at 42), Hearn v. City of Jackson, 340 F. Supp. 2d 728 (S.D. Miss. 2003), the expert who opined that a job analysis for sergeant could remain current for up to ten years was the late Dr. Frank Landy, Ph.D., whose expert report Plaintiffs unsuccessfully sought to have admitted into the record in this action.

because "[i]t is beyond dispute that the world has changed in important ways since 1991…"  While there may be no doubt that the world in some respects is always changing, the pertinent question for this action is whether the police sergeant position had so changed that the two job analyses prepared in 1991 and 2000 were no longer "reasonably current."  (See Pl. Proposed Findings at 74).  Through 18 days of testimony, and the introduction of over 200 exhibits, no such evidence has been presented. (Compare id. at par. 100, reiterating unsupported conclusion about world changing).

Second, the records show "a link between the selection procedure and the critical knowledge, skills, and abilities necessary for successful performance on the job (as identified by the job analysis)."  (See Pl. Proposed Findings at 73).  Boston has already established (see Boston's Proposed Findings, pars. 100-108, 111-115, 117) the strong linkage between the critical knowledges, skills and abilities ("KSAs") identified in the 1991 Validation Study and 2000 Job Analysis, and the 2005 and 2008 exams   While correctly acknowledging (id. at 75) that only a "representative sample" of KSAs for a position need be covered by a selection procedure, Plaintiffs resort to "common sense" to support their position that a written, multiple choice exam "cannot have a strong link" to the sergeant's position.  (Id.).  It is perhaps understandable that Plaintiffs would have this Court rely on "common sense" for this proposition, because they cannot rely on their own expert witnesses.  As discussed in Boston's Proposed Findings (at 43-44), Plaintiffs' expert Dr. Joel Wiesen, Ph.D. testified in a 2006 deposition, in response to a question about promotions at the BPD, that a "multiple choice test…can cover a wide range of topics, and the literature shows that job knowledge are, if not the most valid test, very close to the most valid predictors of future job performance."  Based on the record

evidence, Plaintiffs are in no position to argue that a written, multiple choice exam cannot be a valid selection instrument for the position of sergeant.

Plaintiffs' citation (Pl. Proposed Findings at 74-75) to Boston Superior Officers Federation v. Civil Service Commission, 35 Mass. App. Ct. 688, 624 N.E. 2d 617 (1993), is undermined by the decision of the Civil Service Commission which the Appeals Court affirmed in this opinion. As discussed in Boston's Proposed Findings (par. 63), the decision of the Civil Service Commission rejected the conclusion "that an assessment center is a necessary part of every police promotional examination," and that "[i]t is certainly possible to develop a multiple choice exam that adequately tests for supervisory abilities." Dr. Wiesen, of course, reached the same conclusion in February 2006, after the administration of the 2005 promotional exam for Boston.

Plaintiffs make the additional argument (Pl. Proposed Findings at 76-77) that Defendants' expert, Dr. James Outtz, Ph.D., took the position in an amicus curiae brief to the U.S. Supreme Court that the failure to test for a critical KSA can invalidate an entire selection procedure. Plaintiffs' argument is highly misleading. As Dr. Outtz testified, the brief to which his name was attached, in Ricci v. DeStefano, 129 S.Ct. 2658 (2009), concerned the position of fire lieutenant in New Haven, Connecticut, and none other. (Trial Transcript, Day 16, 9/15/10, at 125, lines 11-15). As explained by Dr. Outtz, the positions of fire lieutenant and police sergeant are not at all comparable. A fire lieutenant must have command presence to take charge of 15-25 firefighters at the scene of a fire, all of whom report to the lieutenant. Subject matter experts ("SMEs") have told Dr. Outtz over the years that commanding a fire scene is the essence of a fire lieutenant's job, and that if a fire lieutenant cannot do this, then "we don't care what else you can do." (Id.

at 121, lines 7-25, at 122, lines 1-25, at 123, lines 1-25, at 124, lines 1-11; Trial Transcript, Day 14, 9/13/10, at 120, lines 4-15). By contrast, police sergeants do not arrive at a crime scene en masse, with the sergeant directing each member of a squad. Rather, a sergeant will typically arrive at a scene where one or two officers are present. (Trial Transcript, Day 14, 9/13/10, at 120, lines 17-21; Trial Transcript, Day 16, 9/15/10, at 122, lines 3-8). There is no task for a police sergeant that is comparable to a fire lieutenant taking charge of a scene. (Trial Transcript, Day 16, 9/15/10, at 124, lines 12-14).

Plaintiffs also attack (Pl. Proposed Findings at 77-78) the weights assigned to the written and the Education and Experience ("E&E") components of the promotional exams. Plaintiffs' argument overlooks the analysis of Dr. Outtz that Attachment EE to the 1991 Job Analysis shows that about 28% - 29% of the KSAs for the police sergeant position were allotted to the E&E. While this weighting does not correspond exactly to the 20% weight assigned to the E&E (and 80% to the written test), the weighting is close enough to meet professional standards. (Trial Transcript, Day 16, at 151, lines 6-21).[2]

Plaintiffs' further criticism (Pl. Proposed Findings at 78-79) of HRD personnel who drafted the test questions is curious, given that Plaintiffs did not call any witnesses from HRD, or provide any evidence regarding their level of expertise. In any event, HRD is charged by statute with preparing written exams annually for a variety of

---

[2]Plaintiffs' criticism of Dr. Outtz's testimony on this issue (see Pl. Proposed Findings at 42, n. 16) is baseless. First, as discussed, Dr. Outtz did testify that the allocation of weights to the E&E met professional standards, and that it was of no import that the KSAs assigned to the E&E did not exactly correlate with the 20% rating for the E&E on the exam. Moreover, as discussed within, the KSAs for the E&E were carefully linked to the underlying job analysis, and the level of variance on the E&E score is irrelevant to the question of validity.

positions in the Commonwealth, and is presumed to have expertise in this area.  See Mass. General Laws Chapter 31, §16 ("Examinations shall be conducted under the direction of the administrator, who shall determine their form, method and subject matter.").  Under Chapter 31, §16, HRD "'is the skilled professional' who is authorized, among other things, 'to decide technical matters such as the scoring and interpretation of examinations.'"  Boston Superior Officers Federation v. Civil Service Commission, 35 Mass. App. Ct. 688, 692, 624 N.E. 2d 617, 620 (1993), quoting Ash v. Police Commissioner of Boston, 11 Mass. App. Ct. 650, 652, 418 N.E. 2d 622, 624 (1981), in which court noted that "[t]he Administrator's decision need not be based on conclusive testing principles; it need only be founded on a reasonable basis.").  In addition, the opinions of Plaintiffs' expert, Dr. Joel Wiesen, Ph.D., that certain words used in exam questions were "unnecessarily difficult," and that one of the six exams at issue (2007 statewide exam) was of low quality (see Pl. Proposed Findings at 79), is a far cry from expert opinion that the six exams at issue, including the two Boston exams, were so poorly designed that their validity should be questioned.[3]

Third, the E&E is amply justified by the relationship between the E&E and the job content.  While Plaintiffs argue (Pl. Proposed Findings at 79-80) that the E&E component of the exams at issue "is facially invalid," Plaintiffs' position is meritless.

---

[3]Plaintiffs further assert (see Pl. Proposed Findings, par. 116) that Boston's witnesses should have vouched for the validity of every question on every exam at issue, potentially adding several days to an already lengthy trial.  Plaintiffs are mistaken.  As discussed, the expertise of the administrative agency charge with creating the exams (HRD) is to be presumed.  See discussion supra.  Plaintiffs' only "evidence" on this score concerns the 2007 statewide exam, but not the two Boston exams at issue.  Assuming arguendo that the evidence on the statewide exams is probative, there remains no evidence in this record undermining the presumed expertise of HRD in drafting questions for the Boston exams.

Initially, Plaintiffs do not argue that a selection device is invalid by reason of incorporating a training and experience component, or some similar component. Indeed, Plaintiffs' expert, Cassi Fields, Ph.D., testified to a selection procedure that she developed for a police sergeant position in Memphis, Tennessee, in which ten (10) points were assigned to a candidate's score based on seniority, without any effort to link seniority to the exam. (See Boston's Proposed Findings, at 61).

Plaintiffs also overlook the 1991 Validation Study, and attachments thereto. As discussed in Boston's Proposed Findings (at pars. 37-41), the E&E was painstakingly reviewed and updated as part of the 1991 study. This review included a structured discussion guide, review by 24 SMEs, and link to the job analysis by means of a testability analysis. (See Attachment EE, Trial Exhibit 41, at Bates Stamp pages 4272-4278). As testified to by Dr. Outtz, these procedures fulfill the terms of the Uniform Guidelines. (Trial Transcript, Day 14, 9/13/10, at 44, lines 10-21). Based on the extensive review and analysis prior to the E&E's revision, to call the E&E "facially invalid" (see Pl. Proposed Findings at 79) is absurd.

Plaintiffs further question (Pl. Proposed Findings at 80) why the E&E assigns points for certain matters, but not for others. Plaintiffs' criticism misses the mark. Plaintiffs assume that one of the named Plaintiffs would receive no credit for military service, overlooking the two points added to the scores of eligible military veterans. (See Boston's Proposed Findings, par. 17). Plaintiffs further believe that course work, as opposed to degrees, should be credited. Plaintiffs' argument disregards the testimony of Dr. Outtz that assigning credit for courses taken is an onerous task, requiring a high degree of judgment ("if somebody took 25 courses in different subject matters, how

would you really assess whether that's tapping the kinds of knowledge that come from the job;" see Trial Transcript, Day 16, at 153, lines 9-22).  The decision not to provide credit for courses taken, moreover, is consistent with training and experience components for exams in other jurisdictions.  (See id. at 153, lines 4-8).

Plaintiffs further find fault with the E&E based on the "minimal practical effect on overall scores."  (See, e.g., Pl. Proposed Findings, pars. 127, 128).  While Dr. Outtz agreed that the E&E could only move individual scores by about two points (see Trial Transcript, Day 16, 9/15/10, at 48, lines 18-25, at 49, lines 1-3), there is no doubt that even a small adjustment to scores can have a significant impact on ranking of candidates (see Boston's Proposed Findings at 49, n. 16).  Moreover, as also discussed (id. at 49), the level of variance, i.e., how much a selection criterion affects candidate ranking, is a separate and distinct question from the questions of validity.

Contrary to Plaintiffs' position, nothing in Dr. Outtz's testimony that the E&E adds approximately 4% to the validity provided by the job knowledge test (see Trial Transcript, Day 16, 9/15/10, at 32, lines 3-8), provides any reason for finding that the 2005 and 2008 Boston exams are invalid.  Dr. Outtz testified, based on a chart prepared by respected industrial organizational psychologists Schmidt and Hunter (see Trial Exhibit 156) that job knowledge tests such as those at issue have a very high level of validity.  (Trial Transcript, Day 15, 9/14/10, at 48, lines 9-25, at 49, lines 1-4).  The additional level of validity provided by the E&E should not be so lightly discounted. Plaintiffs have not cited to any established formula for establishing validity, and Boston is aware of none.  Plaintiffs' skepticism is not evidence upon which this Court can rely to invalidate the exams at issue.

Fourth, use of the selection procedure as a ranking device was justified. In arguing to the contrary (see Pl. Proposed Findings at 80-81), Plaintiffs overlook the argument already advanced in Boston's Proposed Findings (at 44-45) that there is a high reliability coefficient for the written exam.  As expected, Plaintiffs argue for the banding of score results, but overlook that banding is not currently feasible in Massachusetts. (See id at 45-46).  And while Plaintiffs may argue that they are not seeking an adjustment of scores on the basis of race (which violates Title VII), such argument flatly contradicts their suit, which both seeks additional promotions for minority officers, and the banding of test scores in Massachusetts.

Fifth, Plaintiffs point (Pl. Proposed Findings at 81) to "a wholesale lack of evidence about the development of the exams," and then cite to a provision of the Uniform Guidelines on Employee Selection Procedures on record keeping for purposes of content validity.  (See id. at 81 n. 20).  Plaintiffs' argument is confused at best.  At trial, Boston offered far more than "a handful of charts and tables" (see id. at 81), but instead provided numerous exhibits detailing the procedures followed in developing the 2005 and 2008 promotional exams.  (See Trial Exhibits 4, 5, 23, 40, 41, 42, 153, 157, 158, 181, 182, 183, 184, 185, 187, 188, 189, 190, 192).  While Plaintiffs complain (Pl. Proposed Findings at 81) about a lack of foundation for the documents, such argument has been waived by virtue of not objecting to their admission into evidence.  Plaintiffs' further complaint about insufficient record keeping smacks of the type of "strict compliance with the content violation requirements" which Plaintiffs specifically state they are not advocating.  (See Pl. Proposed Findings at 74, n. 24).  In any event, the 1991

Validation Study, and attachments thereto, provide virtually all the documentation identified by Plaintiffs.

In sum, Plaintiffs' efforts at undermining the validity of the BPD's exams are unpersuasive. Boston has met all five of the "necessary" criteria identified by Plaintiffs for establishing validity of selection procedures. Accordingly, there is no basis for finding against Boston on this issue.

In their submission, Plaintiffs identify further alleged reasons for invalidating the BPD exams, none of them persuasive. Plaintiffs suggest (see e.g., Pl. Proposed Findings at 5), that every question on the exam at issue was simply an exercise in memorization, but such is not the case. As discussed in Boston's Proposed Findings (at 51), at least some questions on both the 2005 and 2008 exams required candidates to apply the text of rules and orders as printed in the test booklet, rather than requiring memorization thereof.

Plaintiffs lavish attention on the testimony of current BPD Commissioner Davis, former Commissioner O'Toole and former BPD Lieutenant Nolan, that selection instruments should test for factors such as "the work ethic of the individual" (Pl. Proposed Findings, par. 23), "whether or not they have espoused the directives that are sent from the Chief's office" (id.), being "a good role model" (id. at par 24), "hav[ing] integrity" (id.), and possessing "good judgment, experience and wisdom." (Id. at par. 26; see also id. at par. 142). Whether or not the assessment of these witnesses is correct, and leaving aside the issue of how one measures and compares such qualities (notably, Plaintiffs do not offer a testing mechanism to capture these qualities), it is not possible for the BPD to select candidates for promotion based on these factors. As noted at par. 129 of Boston's Proposed Findings, and as the Boston Police Patrolmen's Association and its

legal counsel would undoubtedly argue to the present day, and beyond, the collective bargaining agreement between the BPD and the Patrolmen's Association provides that the BPD cannot take an officer's performance into account in making promotion decisions. All the factors cited by Plaintiffs -- work ethic, espousing the department's directives, serving as a role model, good judgment, experience, wisdom, integrity -- pertain to an officer's performance, and cannot be considered in a promotion decision.

While criticizing the BPD for not using the 2002 promotional exam as a model for future exams, paradoxically, Plaintiff also finds fault with the development of that exam. (See Pl. Proposed Findings, pars. 109, 110). That the job analysis prepared in 2000 is not a validation study (see par. 109) is self-evident, but is also irrelevant. Plaintiffs have criticized the BPD for not having a sufficiently current job analysis. As discussed, the 2000 job analysis updated the analysis prepared for the 1991 Validation Report, and was sufficiently current for use in preparing the 2005 and 2008 exams.[4]

Plaintiffs also argue (Pl. Proposed Findings, pars. 121-122) that the performance of patrol officers and incumbents on common sections of the 2005 promotional exam does not support the exam's validity. Plaintiffs are mistaken. As discussed in Boston's Proposed Findings (at par. 110), the 2005 promotional exams for sergeant and lieutenant positions had 53 questions in common. The performance of incumbent sergeants on these common questions (89% achieved a passing score) far exceeded that of patrol officers (63% passing). As testified to by Defendants' expert, Jacinto Silva, Ph.D., if in fact these common items were relevant to the sergeant's position, then "you would expect

_____

[4]Plaintiffs also criticize the job analysis on multiple grounds (Pl. Proposed Findings, par. 110), grounds which were anticipated and addressed in Boston's Proposed Findings (see pars. 84-86). Boston's Proposed Findings (at 50-51) also anticipated and addressed Plaintiffs' argument on open book exams. (See Plaintiffs' Proposed Findings, par. 115).

that sergeants would perform better on these items than would patrol officers. And that's exactly what we found." (Trial Transcript, Day 17, 9/16/10, at 85, lines 10-25, at 86, lines 1-25, at 87, lines 1-24). As to Plaintiffs' argument that the failure of a small number of incumbent sergeants on these questions undermined the validity of the exam, Dr. Silva testified that "[i]n any occupation there are job incumbents that perform at a lower level…" (Id. at 88, lines 10-16). Based on standard methodology, it would be expected that 16% of incumbents were not performing adequately. The failure rates of sergeants in Boston (11%) and statewide (21%) on the common sections was "right in the ballpark of what we would expect." (Id. at 88, lines 10-24).

Another of Plaintiffs' arguments (see, e.g., Plaintiffs' Proposed Findings, par. 135) is that Boston's use of the 2005 and 2008 statewide exams was somehow invalid, because no expert blessed Boston's decision not to re-administer the 2002 exam in subsequent years. Plaintiffs' argument is baseless. Initially, Plaintiffs appear to assume that it was Boston's decision to assign an 80% weight to the written exam in comparison to the 40% assigned to the written exam by Morris & McDaniel, Inc. for the selection procedures used in 2002. As Plaintiffs are well aware, HRD established the weighs for the components of the selection procedures. Plaintiffs have cited to no authority that reliance on HRD's expertise was unlawful.

Moreover, Plaintiffs have cited to no authority under which the BPD was required to expend funds on an expert industrial organizational psychologist before deciding not to implement again a selection procedure as unsuccessful as that used in 2002. Not only did the fees associated with development of the procedures exceed $1.2m, but the number of Hispanic and African-American promotions to sergeant differed by only one the number

of promotions resulting from the HRD process utilized in 2005.  Facing these results, Boston would have been foolish indeed to retain an expert before scuttling this selection device.

**C**.     **Plaintiffs Have Not Met Their Burden Of Establishing A Viable Alternative Selection Procedure That Boston Failed To Employ**.

In arguing that they met their burden of establishing a less discriminatory alternative selection procedure that Boston refused to follow, Plaintiffs fail (at 51) to state the correct standard on an issue for which they bear the burden of proof.  See Bradley v. City of Lynn, 443 F. Supp. 2d 145, 156 (D. Mass. 2006) ("The plaintiff bears the burden of demonstrating the existence of alternative business practices.").  While Plaintiffs brush past the case law on alternative practices (see Boston's Proposed Findings, at 52-54), under this case law, Plaintiffs must "specify an alternative, prove that the alternative was equally valid and prove that the alternative was less discriminatory."  See Allen v. City of Chicago, 351 F. 3d 306, 316 (7th Cir. 2003) (emphasis added).  Neither "[b]are assertion," see Allen v. City of Chicago, 351 F. 3d at 316, nor "suggest[ion]" of an alternative practice, suffices.  See Nash v. Consolidated City of Jacksonville, Duval County, Fla., 895 F. Supp. 1536, 1553 (M.D. Fla. 1995), aff'd, 85 F. 3d 643 (11th Cir. 1996) (citation omitted).  In addition, Plaintiffs must demonstrate that the employer had "an opportunity to adopt" the alternative practice, Adams v. City of Chicago, 469 F. 3d 609, 613 (7th Cir. 2006), cert. denied, 550 U.S. 919 (2007), and that the employer "'refuse[d] to adopt such'" practice.  Id. (citations omitted).

Plaintiffs have fallen far short of identifying an alternative selection procedure which Boston should have adopted, and which would have had less adverse impact.  Plaintiffs cite (Pl. Proposed Findings at 83-84) to Bradley v. City of Lynn, 443 F. Supp.

13

2d at 175, for the proposition that they "have no obligation to provide the exact floor plan" for an alternative selection procedure.  In Bradley, however, the Plaintiffs had at least provided a blueprint for testing entry-level firefighter candidates -- "incorporating physical, personality and/or biodata" to the use of a written cognitive ability examination. See id.  The failure to "prepare precise personality or biodata questions, grading mechanisms for a physical abilities test or weights of the different tests," see id., was a far cry from the sweeping generalizations offered by Plaintiffs in this action, such as that "nearly every other jurisdiction has managed to devise" different "selection procedures and [achieve] less adverse impact."  (See Pl. Proposed Findings, at 84).  The voluminous record in this action does not identify any such jurisdiction, at least any comparable to Boston, a racially diverse city of over 600,000.

Plaintiffs refer to "adding additional components" (Pl. Proposed Findings at 86) to selection procedures, as if the addition of more components will automatically reduce adverse impact levels.  The expert testimony, however, does not support this conclusion. As testified to by Dr. Outtz, "the viewpoint as to the adverse impact of assessment center[s] is not a foregone conclusion.  The data presented in this case, the studies presented in this case, all show that there can be differences of opinion within my field as to how much you can expect to reduce adverse impact from an assessment center."  (Trial Transcript, Day 16, 9/15/10, at 147, lines 1-6).

The absence of evidence on alternative selection procedures is particularly notable in light of the context in which the BPD must operate.  In devising and choosing selection

14

procedure, the BPD faces a low selection ratio for promoting sergeants,[5] HRD's "2n+1" rule in making promotions, other Civil Service regulations, a collective bargaining agreement prohibiting the use of personnel evaluations in promotion decisions, and a state court order prohibiting banding. (See Trial Transcript, Day 14, 9/13/10, at 101, lines 7-25, at 102, lines 1-2, 8-25, at 103, lines 1-3; see also Boston's Proposed Findings, at 54-55). For Plaintiffs to assert (Pl. Proposed Findings at 86) that the use of assessment centers can reduce adverse impact, without paying heed to the context in which the BPD operates (which context also includes a history of consent decrees and minority preferences in hiring) is simply insufficient to meet their burden of proof.

It is, of course, not possible for Plaintiffs to identify an alternative selection procedure that would be guaranteed to reduce adverse impact. However, it would be possible for Plaintiffs to identify one or more jurisdictions not only comparable in size to Boston, but also operating under similar constraints in which different selection procedures were utilized that resulted in lower adverse impact than Boston experienced in the 2005 and 2008 promotional exams. Given the professed expertise of Drs. Wiesen and Fields, this should have been a light burden indeed. Plaintiffs' failure to offer any evidence on this score makes plain the complete absence of evidence to support Plaintiffs' position.

Plaintiffs do not dispute that expense is a legitimate factor for public employers to consider in deciding on the selection procedures for use in sergeant promotions. Still, Plaintiffs ignore their burden of proof on this issue, arguing that "there is no evidence that

---

[5] Plaintiffs acknowledge, as they must, that "low selection rates (the percent of applicants who are promoted)" influence the level of adverse impact. (See Pl. Proposed Findings, par. 39).

the BPD could not have paid for the additional components for the 2005 or 2008 exams." (See Pl. Proposed Findings, par. 151). Plaintiffs' use of a double negative does not meet their burden of proof. Even though the BPD introduced evidence on the financial constraints it faced prior to the 2005 and 2008 exams (see Boston's Proposed Findings, pars. 97, 98, 111), it is up to Plaintiffs to establish that Boston could have afforded a repeat of the 2002 exam process. This Plaintiffs have failed to do.[6] In any event, as Commissioner Davis testified, 90% of the BPD budget is devoted to salaries and wages, with very little available for discretionary expenses. (Trial Testimony, Day 9, 7/23/10, at 67, lines 2-13).

As expected, Plaintiffs contend that the 2002 exam was highly successful, and that Boston should have continued to use that exam going forward, regardless of the expense incurred. Plaintiffs are wrong. Initially, Plaintiffs assume (see Pl. Proposed Findings, pars. 157, 190) that, by virtue of one more minority officer being promoted after the 2002 exam than after the 2005 exam, the 2002 exam had results superior to those from the 2005 exam. But this is not the case. As confirmed by the testimony of Dr. Outtz, 3.5% of minority candidates were promoted following the 2002 exam, as opposed to 4% of minority candidates after the 2005 exam. (See Trial Transcript, Day 16, 9/15/10 at 133, lines 23-25, at 134, lines 1-25, at 135, lines 1-8). Thus, Plaintiffs' efforts to trumpet the 2002 exam as some kind of success story rings hollow.

---

[6]While Plaintiffs criticize BPD Commissioner Davis (see Pl. Proposed Findings, par. 152) for granting raises to his command staff, Plaintiffs overlook the fact that in the absence of raise, the command staff would be earning less than those they supervised, due to leaving their union upon promotion. For operational reasons it is important to increase the command staff's compensation to the level they would have earned had they not been promoted. (See Trial Transcript, Day 9, 7/23/10, at 65, lines 2-25, at 66, lines 1-7).

As expected, Plaintiffs further argue, based on the "mean score differences" between the written and video components of the 2002 exam (see Pl. Proposed Findings, par. 188), that Boston had a strong basis for using a similar exam in 2005 and 2008, albeit with greater weight assigned to the video component.  However, as discussed in Boston's Proposed Findings (at 57-60), Defendants' expert Dr. Silva conducted the exact analysis recommended by Plaintiffs, only to find that Plaintiffs' proposal had no effect on the adverse impact on minority candidates.

After trial, Plaintiffs filed an affidavit from their expert Dr. Wiesen on this issue, but his affidavit does not undermine Dr. Silva's analysis in any way. As discussed in "Defendant City of Boston's Motion to Strike Plaintiffs' Motion to Supplement the Record or Alternatively, Opposition to Plaintiffs' Motion" (Document 309, Filed 10/5/10), Dr. Wiesen's affidavit does not even purport to rebut Dr. Silva's analysis and thus, his further testimony should be stricken from the record, or in the alternative, disregarded.

Dr. Wiesen's new analyses (discussed at Pl. Proposed Findings, par. 192) are based on assumptions that are not supported by the record evidence.  In his first proposed analysis, Dr. Wiesen suggests that adverse impact could be minimized or eliminated by "Hiring based on the Oral Component Alone" (Wiesen Affidavit, par. 5).  The oral component of the 2002 examination was one component of a multiple component examination, and to use it as the sole examination device without consideration of the knowledge, skills and abilities it was designed to test is contrary to Dr. Wiesen's own testimony about the propriety of test development.  As Dr. Wiesen testified, relying on a single measurement instrument is "often unwise" (Trial Transcript, Day 4, 7/15/10, line

24), and the Uniform Guidelines require the selection procedures to be a representative sample of the knowledge, skills and abilities necessary to do the job.  (Id. at 55, lines 1-6).

The record is replete with testimony asserting that job knowledge is an essential component of the police sergeant job, and as Dr. Wiesen testified, job knowledge examinations are among the most valid testing instruments.  (See Boston's Proposed Findings, at 43).  The oral component to the 2002 examination, as originally designed, was to include a performance review and situational exercises.  (Trial Exhibit 151).  After a legal challenge to the performance review component, that piece of the examination was withdrawn, and the points allotted to the situational exercise component alone. (Trial Exhibit 194).  Dr. Wiesen does not explain how a component that was designed to represent 40% of the total sergeant examination could be used as the exclusive device to test for the representative knowledge, skills and abilities of the position.

Dr. Wiesen also misrepresents the magnitude of increase in minorities that would be realized if an oral examination were used as the only selection device.  Although Dr. Wiesen avers that an increase of five candidates would be promoted using the oral examination exclusively to identify new sergeants, Dr. Silva's review of the data demonstrates that 14 minority candidates are tied at ranks 65 to 69 (not tied at rank 69 alone, as Dr. Wiesen implies).  (See Dr. Silva's Affidavit, attached as Exhibit A to Document 309).

Dr. Wiesen's conclusion -- that five new minority candidates would be promoted using the oral examination as the exclusive ranking device -- assumes that the five minority officers in the tie groups would be the candidates selected for promotion.  Since

race cannot be used as the tie breaker, some other mechanism must be used to identify the candidates for promotion from the tied groups. As Dr. Silva sets forth in his affidavit, if a fair, race-neutral tie breaker were used to select among the tie groups for promotion, only 1.79 (or 5 multiplied by 5/14) minorities would be promoted, a net gain of 2, not 5, and the adverse impact ratio would remain high, at 0.39. (See Silva Affidavit).

Dr. Wiesen also fails to acknowledge that using the oral component, to the exclusion of an education and experience component, and the award of veterans' points, is inconsistent with Massachusetts law and thus, not a feasible alternative examination device for Boston. Even assuming that the use of an oral examination by itself (to the exclusion of the E&E component) to test for police sergeants was a reliable and valid test for the position; it would not be available under existing state law. See Mass. General Laws ch. 31, §22 ("In any examination the applicant shall be allowed…to file with the administrator a training and experience sheet and to receive credit for such training and experience as of the time designated by the administrator."). Similarly, ranking candidates without factoring in points for those who have veteran status would also run afoul of state law. (See Personnel Administration Rules, PAR 14(2), attached as Exhibit B to Document 309, "In competitive examinations for promotion to any position in the classified official service, the administrator shall add two points to the general average mark obtained by any veteran, as defined in M.G.L. c. 31, § 1, providing such veteran has first obtained a passing mark in said examination.").

**D**.    **Conclusion**

For all the above reasons, and the reasons set forth in Boston's Proposed Findings, this Court should enter judgment for Boston on Plaintiffs' disparate impact claims under Title VII and Chapter 151B.

<div style="margin-left: 50%;">

Respectfully submitted,

CITY OF BOSTON,

By its attorneys,

WILLIAM F. SINNOTT
Corporation Counsel

/s/ Robert P. Morris
Mary Jo Harris (BBO #561484)
Robert P. Morris (BBO #546052)
Special    Assistant    Corporation
Counsel
MORGAN, BROWN & JOY, LLP
200 State Street, 11th Floor
Boston, MA 02109-2605
(617) 523-6666

</div>

Date:  November 19, 2010

## CERTIFICATE OF SERVICE

I, Robert P. Morris, certify that on November 19, 2010, this document filed electronically through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to any persons indicated as non-registered participants.

<div style="margin-left: 50%;">

/s/Robert P. Morris
Robert P. Morris

</div>