UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PEDRO LOPEZ, et al.,
    Plaintiffs

v.

CITY OF LAWRENCE, et al.
    Defendants

Civil Action No. 07-11693-GAO

### DEFENDANT, CITY OF LOWELL'S RESPONSE TO PLAINTIFFS' PROPOSED FINDINGS OF FACT AND RULINGS OF LAW

In response to Plaintiffs' Proposed Findings of Fact and Rulings of Law, the City of Lowell ("Lowell") respectfully submits its Defendant, City of Lowell's Response to Plaintiffs' Proposed Findings of Fact and Rulings of Law and supplements its Defendant, City of Lowell's Proposed Findings of Fact and Rulings of Law in the following respects:

### ADDITIONAL FACTS PERTAINING TO ROBERT ALVAREZ

188. Spain and Portugal are located in Europe where they share the Iberian Peninsula. Judicial Notice of Geographical Fact.

189. In 1521, the Portuguese explorer Ferdinand Magellan "discovered" the Philippines on behalf of Spain. From 1580 to 1640, Portugal was ruled by Spain. Judicial Notice of Historical Fact.

190. Under HRD definitions, a person of Filipino descent is classified as Asian and not as Hispanic. Exhibit 205.

191. The Court takes judicial notice of the Motion of Defendant City of Lowell Request for a Court Order for Personnel Records of Plaintiff Robert Alvarez and the Memorandum in Support of Motion of Defendant City of Lowell Request for a Court Order for Personnel Records where at a prior trial, in addition to the evidence of Asian (Filipino) ancestry other evidence showed that over the years Alvarez represented himself to be Hispanic, White (Greek) and Native American (Inuit). Court docket numbers 123 and 124.

192. In the early 1980's Superintendent Lavallee worked as the Director of Security for St. John's Hospital where he supervised Alvarez. During this time, Alvarez pronounced

his surname as "Ilvarek" and not "Alvarez." He did not tell Lavallee that "Ilvarek" was a nickname. Lavallee Testimony.

193. On November 10, 1984 Alvarez took the HRD entry level state police exam. Although HRD does not have a record of Alvarez's score or his race, it is clear from the evidence that Alvarez was not hired by the Massachusetts State Police. Exhibits 205 and 206.

194. As of January 15, 1987, when Alvarez was listed on an HRD eligibility list for the position of entry level police officer for the Town of Groton ("Groton"), he self-reported as Hispanic. See Exhibits 137 and 205.

195. On February 15, 1987, when Alvarez filed out his FBI fingerprint card for the Groton Police Department, he did not indicate his race but rather left that information blank. Exhibit 140.

196. On or about June 2, 1987, HRD records show the "ETHIC ID" of Alvarez was changed. See Exhibit 141 and 205.

197. On August 29, 1987, while employed by Groton as a police officer, Alvarez took the HRD entry level state police exam for the second time. Although HRD does not have a record of his score or his race, it is clear from the evidence that Alvarez was not hired by the Massachusetts Sate Police. Exhibits 205 and 206.

198. On or about January 7, 1988, HRD records show the "RACE CHANGED" and "ADDR CHG" of Alvarez changed. See Exhibits 205 and 206.

199. As of March 5, 1988, HRD records show that Alvarez was listed as "White". See Exhibit 142.

200. Based on the evidence, I find that at the time Alvarez was hired by Groton in January 1987, he self-identified his race as Hispanic yet he did not indicate this on his FBI fingerprint card in February 1987 as Otero and Torres had in February 1994 and before Alvarez would have known about any FBI classification system. At some point after Groton hired Alvarez, his race/ethnicity was changed in HRD records. By March 5, 1988, HRD records list his race as "white". I further find that despite his selective self-identification as Hispanic, Alvarez does not meet the HRD definition of Hispanic.

201. At the time Alvarez transferred to Lowell from Waltham in 1994, he identified himself as white as indicated in his Lowell FBI fingerprint card. However, at some point prior to September 1999, Alvarez had resumed his claim to be a minority, presumably Hispanic and received notice of the minority officer meeting which was sent to Hispanic, black and Asian officers. See Exhibit 146.

202. On December 10, 2002 and after Lowell challenged his claim that he was in-fact Hispanic in 2000 in other legal proceedings, Alvarez self-identified as "Hispanic" for the first time in a Lowell document. Alvarez Testimony and Exhibit 147.

203. Based on the evidence, I find Superintendent Lavallee's testimony credible regarding Alvarez and his surname and I do not find credible Alvarez's claim that "Ilvarek" was a nickname. For a period of time, Alvarez pronounced his surname as "Ilvarek" and not "Alvarez."

204. Exhibit 135 is a Lowell PD document that lists the certifications that Alvarez received. Of the 41 certificates, only 1 involves supervision, Tactical Supervision of Critical Incidents from April 1989. 7 certificates are police instructor certificates for weapons/equipment or motorcycle training. While Dr. Outtz testified it was possible that instruction certificates "could be" taken into consideration in an E&E component presumably as evidence of oral skills, there is no evidence that the certification and authorization of a police officer to use a specific weapon/equipment or ride a motorcycle was a KSA for the position of sergeant. The remaining 33 certificates involve police officer training.

205. In Plaintiffs' proposed findings Paragraph 203, Alvarez claims he was found to be a member of a "protective class" in a prior lawsuit.

206. Persons of any race are protected classes of persons. Judicial Notice of M.G.L.c.151B, §4(1).

207. Alvarez's prior lawsuit involved allegations of disparate treatment of intentional discrimination and retaliation by Lowell against Alvarez. His lawsuit did not involve a challenge to HRD's promotional examination alleging the test discriminated against blacks and Hispanics. Further, at trial, Alvarez abandoned his claims that he was in-fact Hispanic and argued the issue was that Lowell reasonably believed he was Hispanic. Judicial Notice of 2002MICV-4841 L2. Relevant trial transcripts concerning the proposed questions the jury, Alvarez's closing argument and the court's jury instruction on the issue are attached as "A."[1]

---

[1] In January 2006, counsel for Lowell represents that Lowell was not aware of HRD's definition of Hispanic and as evidenced by the judge's instructions to the jury. See Attachment A. However, given the issues in that case, the HRD definition may have been irrelevant or immaterial. Alvarez pursued a theory that Lowell intentionally discriminated against him concerning discipline, removal from NEMLEC, assignments and not bestowing appropriate awards and citations to him because it believed him to be Hispanic. The question of whether he was in-fact Hispanic regardless of any definition was not addressed. The City introduced the exhibits listed in Exhibit 205 as evidence that Alvarez was not in-fact Hispanic but rather merely claimed to Hispanic when convenient for him to do so. Alvarez objected to Lowell's request for a specific jury question as to whether he was in-fact Hispanic and the judge did not ask the jury to answer that question. For this reason alone Alvarez cannot argue Lowell is precluded from seeking a ruling that Alvarez is not in-fact Hispanic under the HRD definition (or even under a broader definition) when he prevented Lowell from doing so in the previous trial.

208. The State Office of Minority and Women Business Assistance ("SOMWBA") of the Commonwealth of Massachusetts establishes a preference for minority and women owed organizations in awarding state contracts. Judicial Notice of 425 CMR 2.00. The definition of Minority under SOMWBA includes: Hispanic - "All persons having origins in any of the Spanish-speaking peoples of Mexico, Puerto Rico, Cuba, Central or South America, or the Caribbean Islands"; Asian - "All persons having origins in any of the original peoples of the Far East, Southeast Asia, the Indian sub-continent or the Pacific Islands, including but not limited to China, Japan, Korea, Samoa, India and the Philippine Islands"; and Portuguese – "All persons of Portuguese origin." Judicial Notice of 425 CMR 2.02(1). It should be noted that "Portuguese" is only defined as a Minority "in programs funded by state transportation bond statutes which include such persons as eligible participants." Id.

209. The Department of Public Health ("DPH") of the Commonwealth of Massachusetts specifically excludes Filipinos from its definition of Hispanic. The Massachusetts Cancer Registry ("MCR") is required to collect information relating to cancer and persons' race and/or ethnicity. Judicial Notice of 105 CMR 301. "If the patient has a Spanish surname/maiden name, but the medical record contains information that he or she is not of Spanish origin, enter 0 ('non-Spanish, NOS'). (American Indians and Filipinos may have Spanish surnames but are *not* to be considered Spanish/Hispanic under this coding scheme.)" (italic in original). Judicial Notice of DPH, MCR - Abstracting and Coding Manual for Hospitals, 3rd Edition, 1999 page 63. "Native Americans, Filipinos, and Portuguese/Cape Verdeans/Azoreans often have Hispanic names but they are not Hispanic." Judicial Notice of DPH, MCR - Data Collection Manual, Abstracting and Coding Manual for Hospitals, 5th Edition, 2003, page 68. Filipinos are classified as "non-Spanish, non-Hispanic". Judicial Notice of Cancer in Massachusetts by Race and Ethnicity, 2000-2004, MCR, DPH, Appendix B, page 33.

## OTHER ADDITIONAL FACTS

210. Lowell objects to Plaintiffs' claim that the information listed and cited in Paragraph 62 is purported to be U.S. Census data where 22% of Lowell's population is black or Hispanic. It appears that Plaintiffs are relying not on actual census data but rather surveys conducted from 2006-2008 that have significant "margin of error" issues. For example, the "+/-" numbers on the margin of errors are as follows: Hispanics – 1,709 (10.89%), blacks – 1,322 (22.19%), whites – 2,316 (03.75%) and Asian – 1,847 (10.46%). Judicial Notice of 2006-2008 American Community Survey 3-Year Estimates Data Profile Highlights, factfinder.census.gov.

211. As an individual must have been employed a police officer in Lowell for three years to be eligible for the 2006 HRD Sgt. Exam, information relating to U.S. Census demographics in Lowell from 2006 to 2008 regardless of accuracy is irrelevant. Judicial Notice, M.G.L.c.31, §.59.

212. In 2004, there were 191 police officers in Lowell, 36 (18.85%) were black or Hispanic. See Exhibit 35.

213. According to 2000 US Census data, Hispanics (14%) and blacks (04.2%) comprised 18.2% of the population of Lowell. Filipinos, who are classified as Asian, comprise 00.10% of the population. 05.8% of the population of Lowell is of Portuguese ancestry. See 2000 Census data attached as "B".[2]

214. If Portuguese is included in the definition of Hispanic, while the numbers are still statistically insignificant, it shows that in 2008, LPD had 4 Hispanic sergeants out of 30 sergeants (13.33%). Further, the evidence would show that in approximately the last 26 years (during Lavallee's employment), Lowell has promoted at a minimum 6 Hispanic officers to the rank of sergeant: Robert DeMoura, Charles Duarte, Angel Otero, Charles Santos, Sean Santos and Jose Torres. Lavallee Testimony.

215. In Plaintiffs' proposed rulings of law, they allege that the reason for the small numbers in Lowell is because some minority officers choose not to take the HRD Sgt. Exam yet Plaintiffs produced no evidence to support this claim. Based on available Lowell data, any such argument is unfounded. In 2006, 7 out of 29 eligible minority officers (24.14%) and 36 out of 143 eligible nonminority officers (25.17%) in Lowell took the 2006 HRD Sgt. Exam. See Exhibits 35 and 75.[3] Based on the evidence, approximately 25% of eligible Lowell officers took the 2006 HRD Sgt. Exam regardless of race.

216. While Superintendent Lavallee may not be familiar with three texts used in the 2006 HRD Sgt. Exam, I do not credit any characterization that his unfamiliarity with the Motor Vehicle Law Cruiser Guide, Juvenile Law Field Manual and Police Desk Reference to Massachusetts Criminal Law correlates to a finding that those texts were inappropriate as alleged in Plaintiff's Paragraph 120. While no evidence was presented as what these materials are, it is reasonable to infer they are compendiums of specific laws

---

[2] It should be noted the U.S. Census information is merely an indication of demographics. It is not controlling. These statistics includes persons who are not eligible for the civil service job of police officer for a variety of reasons such as those do not speak, read or write English proficiently, are not legal residents as census data includes all persons regardless of legal status, or have not attained the required educational requirements. In Lowell, 17,879 of 97,516 (18.33%) persons 5 and older speak English "less than 'very well'"; 23,267 of 105,167 (22.7%) persons are foreign born; 16,245 of 105,167 (15.4%) are not citizens and 18,541 of 64,421 (28.7%) persons 25 or older do not have a high school diploma or GED. Judicial Notice, Attachment B. This information is similarly not controlling but merely illustrative that more substantive and detailed evidence is required if one is attempting to correlate census data to civil service employment statistics. Further, any such substantive and detailed evidence would also need to take into account the fact that most police officers once hired remain on the job until they retire 25 to 35 years later and that census data changes every 10 years. Judicial Notice. Further compounding any correlation is that promotional opportunities are less frequent than entry level positions and require candidates to have a minimum of 3 years before being eligible for promotion where most candidates have more experience than 3 years. Outtz and Fields Testimony and Judicial Notice.

[3] Lowell assumed all officers listed on the 2004 Lowell PD roster were eligible to take the 2006 HRD Sgt. Exam. If all 2004 officers were eligible for the 2003 HRD Sgt. Exam, the numbers would be 8 minority officers out of 36 (22.22%) and 32 nonminority officers out of 155 (20.65%) took that exam. See Exhibits 35 and 155.

that pertain to motor vehicles, juveniles and criminal law. All of which are appropriate areas of knowledge for a sergeant. Further, the reading materials were vetted by police chiefs in February 2006. See Exhibit 192.

217. Any evidence concerning a position statement that the Massachusetts Association of Major Police Chiefs passed on July 20, 2010, 9 days after this trial started, is irrelevant to the 2005-2008 examinations at issue. Further, the position statement was a "wish list" of how police chiefs aspired their departments could operated in a "perfect world" where a prerequisite to be a police officer is a bachelor's degree with a concentration in police issues; money is not an object; and the laws of civil service are not impediments in a police chief's ability to make personnel decisions. Lavallee Testimony.

218. Dr. Fields testified she knows "many, many police chiefs who do not have bachelor's degrees." It is her professional opinion that she does not agree with the proposition that it should be the ultimate aim of all police departments to employ only police officers who have attained bachelors' degrees. Fields Testimony.

219. With respect to the Memphis examinations created by Dr. Fields admitted at her deposition that the following questions may have been included the Memphis police sergeant process as part of a practice examination that she created and administered: "A search warrant is a document that gives permission to conduct a search"; "Select the word to complete the following sentence: Citizens should always lock [blank] vehicles and secure valuables in the trunk"; "A search warrant must be issued by either an impartial citizen, the court, a lawyer of a senior police official": and "A complete sentence must include: a) a subject; b) a verb; c) a pronoun; d) both A and B." At trial, she testified these questions were not part of that process. The only reason she knew these questions were not included was because after her deposition, she literally reviewed her records for these exact questions. It was not because such questions were unequivocally too simplistic for any police position. I find such rudimentary questions are inappropriate for any police sergeant examination process in Massachusetts.

220. The job of a police officer and police sergeant do not involve mechanical aptitude KSA's. However, mechanical aptitude KSA's are part of a firefighter job functions and mechanical aptitude tests are widely used in the selection of firefighters. Wiesen Testimony.

221. According to Dr. Fields, all police officers are required to know basic grammar, how to write police reports that contain the requisite information such as elements of a criminal offense in an arrest report. Further, it is equally important for a sergeant in reviewing an arrest report to ensure that the elements of the criminal offense are included but that the report is grammatically correct. Fields Testimony.

## ADDITIONAL RULINGS OF LAW

**Alvarez and Race**

For the purposes of this lawsuit, it does not matter whether Lowell recognized or believed Alvarez's self-identification claim of Hispanic. Nor does it matter if Alvarez did or did not self identify as Hispanic. In this case the question is whether Alvarez is in-fact Hispanic as defined by HRD. See Malone v. Civil Service Commission, 38 Mass. App. Ct. 147 (1995). See also Jana-Rock Construction, Inc. v. New State Department of Economic Development, 438 F.3d 195 (2nd Cir. 2006) (an individual is "Hispanic" under one definition but not "Hispanic" under another definition). In Malone, a set of twin brothers were hired under the NAACP consent decree as "black" by the Boston Fire Department in 1978. In 1988, they were determined to be "white" and were terminated. While Hispanic is defined by HRD, the term "black" in Malone was not. As there was no definition of "black", the court approved the hearing officer's visual observation of physical features, documentary evidence and their claim that they were black. Id. at 148. The brothers' birth certificates established they were white. Their claim of a black ancestor along with a photograph was rejected. Id. at footnote 5. I find as a matter of law that Alvarez is not Hispanic under the laws of civil service in Massachusetts as defined by HRD. Therefore, he is not a person aggrieved and he lacks standing to maintain this lawsuit against Lowell and the claims against Lowell are hereby dismissed.

**Portuguese Inclusion in the HRD Definition of Hispanic**

If the HRD definition of Hispanic can be expanded to include an English-only non-Spanish speaking American who pronounces his surname "Ilvarek" but spells it "Alvarez" whose father is Filipino, there is no reason to exclude persons of Portuguese

descent in any broadened HRD definition. Persons of Portuguese origin have been classified as "Hispanic" for the purpose of determining the composition of a grand jury in Massachusetts. See USA v. Fafael Vicente De La Rosa Sanchez, 1981 U.S. Dist. LEXIS 10431 (D. Mass. 1981) This inclusion was consistent with Social Security Administration form SS-5 and the "definition of 'Hispanic' as 'relating to or derived from the people, speech, or culture of Spain or Spain and Portugal' and derived from the Latin word "Hispania," meaning Spain or the Iberian Peninsula." Id. at footnote 3.

Similarly, Congress and the United States Department of Transportation ("DOT") recognize persons from Spain and Portugal as "Hispanic" in the Transportation Equity Act for the 21st Century Act ("Transportation Equity Act"), enacted in 1998 which provides race and gender preferences in awarding federal transportation contracts due to social and economic disadvantage. See 49 CFR 26.00 et al. DOT defines "Hispanic Americans" to include "persons of Mexican, Puerto Rican, Cuban, Dominican, Central or South American, or other Spanish or Portuguese culture or origin, regardless of race" for individuals who are "Socially and economically disadvantaged." 49 C.F.R. 26.5(ii). Filipinos are also classified as socially or economically disadvantaged persons under DOT but are "Asian-Pacific Americans." 49 C.F.R. 26.5(iv). DOT's preferences and definitions have been upheld in Western States Paving Co., Inc. v. USA, 407 F.3d 983 (9th Cir. 2005); Adarand Constructors, Inc. v. Slater, 228 F.3d. 1147 (10th Cir. 2000); and Sherbrooke Turf, Inc. v. Minnesota Department of Transportation, 345 F.3d 964 (8th Cir. 2003).

While those courts have upheld the Transportation Equity Act and DOT's definition where persons from Spain and Portugal are "Hispanic", it does not mean a state

is required to use the same definition as any preferential classification must be narrowly tailored. In New York, persons from Spain and Portugal are not "Hispanic" for awarding state public contracts. <u>Jana-Rock Construction, Inc. v. New State Department of Economic Development</u>, 438 F.3d 195 (2nd Cir. 2006) The State of New York defines Hispanic only to include Spanish and Portuguese persons who originate from Latin America. <u>Id</u>. at 200. Compare, <u>Builders Ass'n of Greater Chi. County of Cook</u>, 256 F.3d 642, 647 (7th Cir. 2001) (county ordinance that included preferences for persons who ancestors came from Spain and Portugal was over inclusive and unconstitutional).

In Massachusetts, putting aside HRD's definition for civil service employment for police and fire, SOMWBA defines "Hispanics" as those persons who originate from the Western Hemisphere – "Mexico, Puerto Rico, Cuba, Central or South America or the Caribbean Islands." 425 CMR 2.02(1). That definition excludes persons from Spain from being "Hispanic." SOMWBA also classifies Portuguese persons as minorities in certain circumstances, presumably, this is done to be consistent with DOT and the Transportation Equality Act where Portuguese is "Hispanic" as the Portuguese classification only applies in a transportation context. See 425 CMR 2.02(1) and 49 C.F.R. 26.5(ii).

Though I find that the HRD definition of "Hispanic" is narrowly tailored and should be not be expanded, any revised definition should treat Spain and Portugal similarly: either they both are included or they are not. If an expanded definition were used, I find that over the past 25 years, at least six (6) Hispanic individuals achieved scores high enough on the HRD Sgt, Exam to be promoted under the 2n+1 civil service formula in Lowell where in 2008, 13.33% of sergeants and 15.47% of police officers are "Hispanic." While these small numbers are still statistically insignificant and unstable,

9

they show that Alvarez cannot sustain his allegation against Lowell that 2006 HRD Sgt. Exam had an adverse impact against Hispanics.

**Alvarez and Protected Class**

However, the question of whether someone whose family originates from Spain is a separate and distinct question from whether someone whose family originates from the Philippines is included under any definition of Hispanic. All sources of information – HRD, US Census, DOT, SOMBWA, and DPH classify persons from the Philippines as Asian. Alvarez offered no evidence or support for his claim that a person of Filipino descent, means he is "Hispanic" under any definition. Further, as Alvarez purports that his Spanish Filipino ancestors are the equivalent of whites in South Africa, any claim that he is entitled to HRD's preferential classification which must be based on specific past discrimination or social and/or economic disadvantage on Spanish ancestry by way of the Philippines is both disingenuous and offensive as Spain conquered the indigenous peoples of the Philippines, ruled over them for centuries, and imposed Claveria's Decree upon them.[4]

All races including white and/or Caucasian and Asian are 'protected classes' as defined by M.G.L.c 151B. Illustrative cases include <u>Lopilato v. Boston Public Schools</u>, 25 MDLR 46 (2004) (white), <u>Pierson v. Stembridge</u>, 27 Mass. L. Rep. 274 (2010) (white), <u>Pacheco v. Bentley College</u>, 2004 Mass. Super. LEXIS 668 (2004) (white); <u>Nguyen v. William Joiner Ctr. for the Study of War and Social Consequences</u>, 450 Mass. 291 (2007) (Asian); <u>Poon v. Mass. Inst. of Tech.</u>, 74 Mass. App. Ct. 185 (2009) (Asian).

---

[4] This does not even take into consideration Spain's role in slavery, the slave trade, and the genocide of indigenous peoples throughout the world by its Conquistadors from the 15th through the 19th centuries.

The fact that Alvarez was found to be a member of a 'protect class" as part of a disparate treatment lawsuit where he argued the issue was not whether he was Hispanic but rather whether Lowell reasonably believed he was Hispanic is irrelevant in this disparate impact lawsuit that is predicated on decades of litigation where "Hispanic" has long been defined by HRD for the purpose of employment selection in the civil service laws of Massachusetts.

### Fire Fighters and Police Officers

In support of their argument against written job knowledge tests, Plaintiffs allege that the KSA's of fire fighting and the supervision of fire fighters are essentially the same as those of a police officer and the supervision of police officers and quote from Boston Chapter NAACP, Inc. v. Beecher, 504 F.2d 1017 (1st Cir. 1974). See Plaintiffs' Rulings of Law, page 67. That case involved a written test for entry level firefighter positions and resulted in the NAACP consent decree. In NAACP, the court found that the first 25 questions, on the written examination were "general knowledge" questions consisting of current events, spelling, vocabulary, and arithmetic, had "nothing to do with fire fighting" and were not "job related" questions. Id. at 1022-1023. The other 75 questions depended too heavily on verbal memory versus what was needed to be a good fire fighter. "The test does not examine traits seemingly more relevant to a fire fighter's performance such as agility, stamina, quick thinking under pressure, poise, mechanical aptitude and the ability to work with others." Id. at 1023. Persons applying for firefighter positions were not required to have a high school diploma or GED under the civil service laws. NAACP, supra at footnote 9. Nevertheless, the First Circuit still though objective written tests were important for the firefighter position noting, "[l]ittle will be gained by minorities if courts

so discourage the use of tests that the doors to political selection are reopened." Id. at 1022. The Court wanted the firefighter's test to measure the physical demands of the position, mechanical aptitude, and ability to work as a team, skills critical for any firefighter's position.

The position of police officer, on the other hand, requires extensive memory and job knowledge skills. A police officer's job entails "particular types of observation, memory, statement and judgment which are useful in connection with the exercise of authority of all kinds, and which are necessary for policeman as guardians, administrators, witnesses, community counselors, social welfare aids, and representatives of a regime of law and order." Castro, 334 F.Supp. 930, 942 (D. Mass. 1971).

Any police position also requires a high level of reading comprehension. The First Circuit in Castro opines on how critical it is for police officers to be professional trained and have a "high level of education" where a "high school diploma is viewed as a bare minimum for successful performance of the policeman's responsibilities." Castro, 459 F.2d at 735. It is recommended that every department "insist immediately that all recruits, except community service officers, have both a high school diploma and a demonstrated ability, measured by appropriate tests, to do college work." Id., footnote 11, quoting page 110 of a 1967 report entitled, "The Challenges of Crime in a Free Society" from the President's Commission on Law Enforcement and Administration of Justice. The problem with the tests in Castro was that the written examinations in dispute were 1968 -1970 general intelligence tests; they were not job knowledge tests. See Castro v. Beecher, 334 F. Supp. 930, 950-954 (D. Mass. 1971). Also, from the Castro cases, it does not appear that there was any training/education and experience component.

It is clear from the Castro (police) and NAACP (fire) decisions, Massachusetts courts have long understood the inherent differences between police and fire personnel and their functions and supervision. These differences are consistent with Dr. Outtz's testimony. Presumably, these distinctions explain why the Quinn Bill applies to police officers only and not fire fighters.

I find that a written job knowledge test is critical for the position of police sergeant and that there is no reasonable alternative to replace this examination. I further find that the written examination must test appropriate material for a supervisory position where a testing instrument cannot include rudimentary legal or grammatical questions. This is true even if the written examination results in less minority appointments. A means of selection may disqualify proportionally more minority candidates and have a disparate impact yet not be discriminatory where no alternative exists. NAACP, supra at 1019 citing Castro, supra at 735. "[A] court would go astray in this technical field to strike down an otherwise properly justified means of selection in favor of a purely speculative alternative." Castro, 459 F.2d at 733. It is clear from the evidence that officers who possess only the bare minimum educational qualifications of either a high school diploma or a GED face a major hurdle regardless of race or ethnicity in any job knowledge test that requires a high reading and comprehension level.

While a municipality may offer tutorials or other assistance, they are not required to do so as "[a] public employer may constitutionally take its applicants as it finds them." Castro, 459 F.2d at 733.

**EEOC Guidelines**

Congress, in enacting Title VII, did not confer upon the EEOC authority to promulgate rules or regulations pursuant to that Title. Albemarie Paper Co. v. Moody, 422 U.S. 405, 431 (1975). The EEOC Guidelines "'while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance,'" Meritor Savings Bank v. Vinson, 477 U.S. 57, 65 (1986) quoting General Electric Co. v. Gilbert, 429 U.S. 125, 141-142 (1976). "The Uniform Guidelines are not legally binding. They have not been promulgated as regulations and do not have the force of law." Association of Mexican-American Educators v. California, 195 F.3d. 465, 487 (9th Cir. 1999)(citations omitted). See also Anderson v. Douglas & Lomason Co., 26 F.3d 1277, 1287 (5th Cir. 1994). The EEOC Guidelines are "a set of principles….designed to assist… [users] to comply with requirements of Federal Law…." 29 CFR 1607.1(B). While the EEOC Guidelines are codified in the CFR, they are not mandatory regulations. I find that the EEOC Guidelines are what they say they are: guidelines that provide a set of principles for assistance with respect to complying with federal law. Similarly, I find the EEOC Guidelines Questions and Answers to be further guidance for said compliance.

**CONCLUSION**

Based on the testimony and exhibits introduced at trial along with the facts for which this court make take judicial notice, the Defendant, City of Lowell, respectfully requests this Court adopt its additional findings of fact and rulings of law in response to Plaintiffs' Proposed Findings of Fact and Rulings of Law.

I find that the 2006 HRD Sgt. Exam did not result in adverse impact with respect to Lowell. I further find that the 2006 HRD Sgt. Exam was a valid examination and that at the time Lowell utilized the examination there was no alternative. Lastly, I find that when Alvarez first brought this issue to the attention to Lowell, it has already promoted several persons off of eligibility lists to the position of Sergeant.

November 19, 2010

Respectfully submitted,
CITY OF LOWELL,
By its attorneys,

/s/Brian W. Leahey
Brian W. Leahey, Assistant City Solicitor
BBO #567403
R. Eric Slagle, Assistant City Solicitor
BBO #658813
City of Lowell - Law Department
375 Merrimack Street, 3rd Floor
Lowell, MA 01852-5909
Tel: 978-970-4050
Fax: 978-453-1510
Dated: November 19, 2010

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document, filed through the Electronic Case Filing System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on November 19, 2010.

/s Brian W. Leahey
Brian W. Leahey, Assistant City Solicitor